# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## BRIEF IN SUPPORT OF THE FORMER DIRECTORS' AND OFFICERS' MOTION TO DISMISS AMENDED COMPLAINT OR IN THE ALTERNATIVE TRANSFER VENUE

Mark Minuti (DE Bar No. 2659)
Lucian B. Murley (DE Bar No. 4892)
SAUL EWING ARNSTEIN & LEHR LLP
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mark.minuti@saul.com
luke.murley@saul.com

Craig C. Martin (Admitted *Pro Hac Vice*)
David Jimenez-Ekman (Admitted *Pro Hac Vice*)
Melissa M. Root (Admitted *Pro Hac Vice*)
Michael T. Graham (Admitted *Pro Hac Vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2776
Facsimile: (312) 527-0484
cmartin@jenner.com
djimenez-ekman@jenner.com
mroot@jenner.com
mgraham@jenner.com

*Counsel for Former Directors and Officers*

Dated: March 19, 2019

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ..................................................................................................................1

RELEVANT BACKGROUND ...........................................................................................3

    A.    Summary Of The Allegations Against The Former Directors And Officers........3

    B.    The First-Filed Wisconsin Action Over The Same Subject Matter.....................4

    C.    The Pre-Adversary Transfer Of The Debtors' Claims To The Trustees
        In The Confirmed Plan..............................................................................................5

ARGUMENT .........................................................................................................................5

    A.    The Court Should Dismiss The State Law Counts (I Through IV, VII and
        VIII) For Lack Of Subject Matter Jurisdiction ....................................................5

    B.    The Court Should Dismiss The State Law Counts (I Through IV, VII and
        VIII) Because They Are Preempted By ERISA And Thus Fail To State A
        Claim............................................................................................................................10

    C.    Alternatively, The Court Should Transfer This Case To The Eastern
        District of Wisconsin ..............................................................................................12

    D.    The Court Should Dismiss The Preference Claim (Count IX, XIV-XVIII)
        Because They Are Not Pled With The Requisite Particularity...........................16

CONCLUSION....................................................................................................................19

i

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004).................................................................................10

*Arrow Oil & Gas, Inc. v. J. Aron & Co. (In re Semcrude, L.P.)*,
    442 B.R. 258 (Bankr. D. Del. 2010) ............................................... 13-14

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*,
    372 F.3d 154 (3d Cir. 2004)....................................................... *passim*

*Breland v. Liberty Life Assur. Co. of Boston*,
    Case No. 14-cv-352, 2014 WL 5795681 (W.D. Pa. Nov. 6, 2014)..................10, 11

*Buck v. Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)........................................................4

*Chavez v. Dole Food Co.*,
    836 F.3d 205 (3d Cir. 2016).......................................................13

*Durango-Ga. Paper Co. v. H.G. Estate, LLC*,
    739 F.3d 1263 (11th Cir. 2014) ...................................................12

*Gavin Solmonese, LLC v. Shyamsundar (In re AmCad Holdings, LLC)*,
    No. 14-12168 (MFW), 2016 WL 3412289 (Bankr. D. Del. June 14, 2016) ...................17, 18

*Geruchat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*,
    505 F.3d 237 (3d Cir. 2007)......................................................8, 10

*Glunk v. Noone*,
    689 F. App'x 137 (3d Cir. 2017) ..................................................13

*Grimes v. Graue (In re Haws)*,
    158 B.R. 965 (Bankr. S.D. Tex. 1993) .............................................9

*Halper v. Halper*,
    164 F.3d 830 (3d Cir. 1999)......................................................6, 7

*Harris v. Wooden*,
    808 F. Supp. 2d 736 (D. Del. 2011)...............................................6

*I.R.S. v. CM Holdings, Inc.*,
    No. CIV. A. 97-695 MMS, 1999 WL 459754 (D. Del. June 10, 1999) ................13

ii

*Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union No. 42 v.*
*S. Jersey Insulation Servs., Inc.,*
   No. 05-3143 RMB, 2007 WL 276137 (D.N.J. Jan. 26, 2007)................................12

*Jumara v. State Farm Ins. Co.,*
   55 F.3d 873 (3d Cir. 1995)..........................................................................13

*Menkes v. Prudential Ins. Co. of Am.,*
   762 F.3d 285 (3d Cir. 2014).....................................................................10, 11

*Miller v. Welke (In re United Tax Grp., LLC),*
   No. 14-10486 (LSS), 2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016)............16

*MoneyCat Ltd v. PayPal Inc.,*
   No. CV 1:13-1358, 2014 WL 2042699 (D. Del. May 15, 2014)...........................14

*In re New Century TRS Holdings, Inc.,*
   505 B.R. 431 (Bankr. D. Del. 2014) .............................................................7

*Pacor Inc. v. Higgins,*
   743 F.2d 984 (3d Cir. 1984)........................................................................7

*Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.),*
   274 B.R. 634 (Bankr. D. Del. 2001) ............................................................16

*Pursuit Athletic Footwear, Inc. v. Save Power Ltd.,*
   No. CIV. A. 96-40-MMS, 1996 WL 328596 (D. Del. June 7, 1996) ...................15

*In re Qualteq, Inc.,*
   No. 11-12572 KJC, 2012 WL 527669 (Bankr. D. Del. Feb. 16, 2012)................13

*Ross v. Inst. Longevity Assets LLC,*
   No. CV 12-102-LPS-CJB, 2013 WL 5299171 (D. Del. Sept. 20, 2013)................14

*Seagate Tech. (US) Holdings, Inc. v. Global Kato HG, LLC (In re Solyndra, LLC),*
   Adv. Proc. No. 15-50268 (MFW), 2015 WL 6125246
   (Bankr. D. Del. Oct. 16, 2015)....................................................................7

*Shandler v. DLJ Merchant Banking, Inc. (In re Insilco Techs., Inc.),*
   330 B.R. 512 (Bankr. D. Del. 2005) ...................................................2, 5, 6, 8, 9

*Shaw v. Delta Air Lines, Inc.,*
   463 U.S. 85 (1983)...................................................................................10

*Southmark Prime Plus, L.P. v. Falzone,*
   776 F. Supp. 888 (D. Del. 1991)..................................................................4

iii

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................................6

*Trosio v. Erickson (In re IMMC Corp.),*
    No. 08-11178 KJC, 2011 WL 6832900 (Bankr. D. Del. Dec. 29, 2011) ..................5, 6, 9, 10

*Universal Secure Registry, LLC v. Apple Inc.,*
    No. CV 17-585-CFC-SRF, 2018 WL 4502062 (D. Del. Sept. 19, 2018)..............................15

*Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.),*
    288 B.R. 189 (Bankr. D. Del. 2003) ....................................................................3, 17

*Wash. Mut., Inc. v. XL Specialty Ins. Co. (In re Wash. Mut., Inc.),*
    Adv. No. 12-50422 (MFW), 2012 WL 4755209
    (Bankr. D. Del. Oct. 4, 2012).............................................................................7

*Zazzali v. Swenson,*
    852 F. Supp. 2d 438 (D. Del. 2012)...............................................................13, 15

## Statutes

11 U.S.C. § 544 .............................................................................................16

11 U.S.C. § 547 .............................................................................................16

11 U.S.C. § 550 .............................................................................................16

28 U.S.C. § 157 ............................................................................................2, 6

28 U.S.C. § 1334 .......................................................................................2, 6, 10

28 U.S.C. § 1404 .....................................................................................2, 12, 13

28 U.S.C. § 1412 ............................................................................................13

29 U.S.C. § 1132 ............................................................................................12

29 U.S.C. § 1144 .........................................................................................2, 10

6 Del. C. § 1301 et seq. .................................................................................16, 17

Wisconsin Statutes, Ch. 242, et seq. ...................................................................16, 17

## Other Authorities

Fed. R. Bankr. P. 7012.......................................................................................5

Fed. R. Civ. P. 12 ........................................................................................5, 10

iv

## INTRODUCTION

Appvion Inc.'s former directors and officers (the "D&Os") moved to dismiss Plaintiffs' original Complaint because the Court has no post-confirmation subject matter jurisdiction over the state law claims and those claims are preempted by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Alternatively, the D&Os requested that the Court transfer the action to the Eastern District of Wisconsin – a vastly more appropriate and convenient forum where a similar first-filed complaint is pending. Rather than respond to the D&Os' motion to dismiss, Plaintiffs filed an Amended Complaint. However, the Amended Complaint does not cure – but instead *strengthens* – the D&Os' arguments to dismiss this action or have it transferred to Wisconsin.

As the Court may recall, the Debtors were owned by the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP").[1]  In this Amended Complaint, Plaintiffs – the Liquidating Trust Trustees (the "Trustees") in Appvion's bankruptcy – assert six ESOP-related state law claims (Counts I to IV, VII and VIII) and six avoidable preference claims (Counts IX and XIV to XVIII) against the D&Os. The Trustees allege that the D&Os breached state law fiduciary duties and violated state dividend laws by purportedly artificially inflating the ESOP's appraised stock price for their own benefit, and by mishandling intercompany loans and relationships. The Trustees allege this ESOP-related conduct caused injuries for which they seek money damages. While the Trustees added several pages of new allegations and several new preference claims, they did not address any of the D&Os' arguments raised in their first motion

---

[1]    Technically, the Debtors created a "KSOP," which is a combination of the Debtors'' prior 401(k) retirement plan and the new employee stock ownership plan.  Since the ESOP portion of the KSOP is at issue in the case, the D&Os will reference the ESOP when discussing the retirement plan at issue.

1

to dismiss.  As discussed in that motion, the Court should not hear these claims for three discrete reasons.

*First*, the Court has no subject matter jurisdiction over the Trustees' state law claims. These post-confirmation state law tort claims brought by a litigation trust plainly are not "core proceedings" that arise under or in a chapter 11 case pursuant to 28 U.S.C. §§ 1334(b) or 157. They also are not covered by 28 U.S.C. § 1334(b)'s "related to" jurisdictional grant because there is no "close nexus" to the chapter 11 proceeding.  That nexus is lacking because the resolution of the Trustees' claims does not turn on or affect the Liquidation Plan's "interpretation, implementation, consummation, execution, or administration."  *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004); *Shandler v. DLJ Merchant Banking, Inc. (In re Insilco Techs., Inc.)*, 330 B.R. 512, 525 (Bankr. D. Del. 2005).

*Second*, the Trustees' Counts I-IV, VII and VIII should be dismissed with prejudice because ERISA preempts them.  ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  ERISA preempts all of the Trustees' state law claims because they each relate to or have a substantial connection with the ESOP's alleged mismanagement.  Moreover, the Trustees failed to allege any ERISA claims because they cannot – they lack statutory standing to bring an ERISA claim.

*Third*, alternatively, the Trustees' state law claims should be transferred under 28 U.S.C. § 1404 and the Third Circuit's "first-filed" rule to the United States District Court for the Eastern District of Wisconsin, where an earlier-filed case by the ESOP's current named fiduciary (the "Wisconsin action") is pending.  The Wisconsin action is against many of the same defendants, makes many nearly identical factual allegations, and asserts similar state law claims.  If the

2

Trustees' state law claims are not dismissed, the Court should exercise its discretion to send them to be heard with the first-filed case in the Eastern District of Wisconsin.

 ***Finally***, the Trustees' preference claim (Count IX) against defendant Ferree still fails to adequately plead an avoidable preference, *see Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003), and the Trustees' new preference claims (Counts XIV to XVIII) are equally flawed.

## RELEVANT BACKGROUND

**A.** **Summary Of The Allegations Against The Former Directors And Officers.**

 The Trustees' Amended Complaint alleges claims against sixteen named defendants, including the D&Os, as well as Argent Trust Company, as the ESOP's Trustee, and Stout Risius Ross, an ESOP service provider.  All of the D&Os were either directors or officers (or employees who reported to officers) of the Debtors (Appvion, Inc. and Paperweight Development Corporation ("PDC")) during the past decade.  (Am. Compl. ¶¶ 24-39.)

 The Trustees allege the D&Os breached their fiduciary duties by misrepresenting Appvion's stock value in order to enrich themselves as the Debtors' business collapsed, thereby injuring the ESOP and its participants.  (*Id.* ¶¶ 1-10.)  The Trustees allege the D&Os overvalued Appvion's stock for the ESOP's purposes because doing so increased their incentive-based compensation and permitted them to cash out their personal stock holdings at inflated prices. (*Id.* ¶¶ 3, 6-8.)  The Trustees further allege the D&Os breached their fiduciary duties by mismanaging the relationship between PDC and Appvion, and improperly forgiving intercompany debt.  (*Id.* ¶¶ 17-18.)  In the Amended Complaint, the Trustees added a series of allegations related to the ESOP Committee's alleged ratification of the ESOP's stock value determinations.  (*Id.* ¶¶ 348-358).  The Trustees plead against the D&Os six state law causes of action for fiduciary breach (Counts I-IV) and illegal dividends (Counts VII-VIII).  They also

3

expanded the number of their avoidable preference claims against certain D&Os (Counts IX and

XIV-XVIII). The Trustees, acting as the Debtors' assignees, filed their Amended Complaint on

February 19, 2019.

**B.    The First-Filed Wisconsin Action Over The Same Subject Matter.**

Four days before the original Adversary Complaint was filed, on November 26, 2018, the

ESOP's named fiduciary filed a complaint in Wisconsin. *Appvion Inc. Ret. Sav. and Emp. Stock

Ownership Plan v. Buth et al*., No. 1:18-cv-01861-WCG (E.D. Wis. filed Nov. 26, 2018).[2] The

ESOP's now-amended complaint (the "Wisconsin FAC," Ex. A.) names as defendants (among

others) twelve of the sixteen defendants named in the Amended Complaint here, and makes

many of the same allegations the Trustees make here. (*Compare* Wisconsin FAC, at 1-2 *with*

Am. Compl., at 1.) Among other things, like the Trustees here, the ESOP alleges in the

Wisconsin action amended complaint that:

- Appvion's stock value was improperly inflated from the ESOP's adoption in 2001 through Appvion's bankruptcy filing in 2017. (*Compare* Wisconsin FAC ¶¶ 1, 4, 31, 38-39, 41 *with* Am. Compl. ¶¶ 3-7.)

- Appvion's stock valuations repeatedly failed to take into account certain executive compensation and other corporate debt. (*Compare* Wisconsin FAC ¶¶ 27, 44 *with* Am. Compl. ¶¶ 14-19.)

- Appvion's valuations were not independent, despite the ESOP Trustee's and management's representations that they were. (*Compare* Wisconsin FAC ¶¶ 6-12 *with* Am. Compl. ¶¶ 7, 156, 182, 258.)

- Appvion's executive compensation structure drove the ESOP's Trustee to mis-value Appvion's stock. (*Compare* Wisconsin FAC ¶¶ 34-36, 42, 54 *with* Am. Compl. ¶¶ 150-56.)

---

[2]    This Court may take judicial notice of the Liquidation Plan's and the Liquidation Trust Agreement's provisions, as well as the ESOP's Wisconsin FAC filed in the Eastern District of Wisconsin, attached as **Exhibit A**. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991).

4

- There were improprieties in intercompany loans between Appvion and PDC, which wholly owned Appvion, Inc. as a subsidiary. (*Compare* Wisconsin FAC ¶¶ 168, 335-37 *with* Am. Compl. ¶¶ 18, 116, 133-39.)

In the Wisconsin action, as here, the ESOP asserts state law fiduciary breach causes of action; it also adds ERISA claims based on the same facts. (*Compare* Wisconsin FAC ¶¶ 516-636, 754-92, 809-14 *with* Am. Compl. ¶¶ 391-418.)

**C.    The Pre-Adversary Transfer Of The Debtors' Claims To The Trustees In The Confirmed Plan.**

On August 14, 2018, this Court entered an order confirming the Debtors' Liquidation Plan (the "Liquidation Plan" or "Plan"). (Dkt. 970-1.) The Plan's effective date is August 25, 2018. (Dkt. 999.) The Liquidation Plan transferred the claims asserted in the Amended Complaint – as "Litigation Claims and Litigation Proceeds" – from the Debtors to a post-confirmation Liquidation Trust. (Ex. B, Liquidation Plan, Art. II.A.111; Art. VIII.D.) After the transfer, on November 30, 2018, the Trustees filed this Adversary Complaint, not on the Debtors' behalf, but on the Litigation Trust's behalf.

**ARGUMENT**

**A.    The Court Should Dismiss The State Law Counts (I Through IV, VII and VIII) For Lack Of Subject Matter Jurisdiction.**

The Court should dismiss Counts I through IV, VII and VIII because it has no subject matter jurisdiction over the Trustees' state law claims asserted after the Plan's confirmation – they do not "arise under or in" the bankruptcy nor do they "relate to" the bankruptcy. *In re Resorts Int'l, Inc.*, 372 F.3d at 163, 169; *Trosio v. Erickson (In re IMMC Corp.)*, No. 08-11178 KJC, 2011 WL 6832900, at *4 (Bankr. D. Del. Dec. 29, 2011) *aff'd* 909 F.3d 489 (3d Cir. 2018); *In re Insilco Techs., Inc.*, 330 B.R. 512, 525-26 (Bankr. D. Del. 2005), *aff'd,* 394 B.R. 747 (D. Del. 2008). Under Rules 12(b)(1) and (h)(3) of the Federal Rules of Civil Procedure, and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, the Court must dismiss claims over

5

which it lacks subject matter jurisdiction unless the proponent proves jurisdiction exists. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Harris v. Wooden*, 808 F. Supp. 2d 736, 739 (D. Del. 2011). As this Court well knows, by statute (28 U.S.C. §§ 1334 and 157), bankruptcy courts' jurisdiction is strictly limited to "four types of title 11 matters, pending referral from the district court: (1) cases under title 11, (2) proceeding[s] arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11." *Resorts Int'l*, 372 F.3d at 162 (citation and internal quotations omitted). As this Court recognized in *Insilco*, 330 B.R. at 525-26, and *Trosio*, 2011 WL 6832900, at *4, standard state law monetary relief claims asserted by litigation trustees after a plan has been confirmed do not fall into any of these categories, and cannot be prosecuted in bankruptcy court.

The Court therefore lacks jurisdiction over the Trustees' claims here for two reasons. *First*, Counts I through IV, VII and VIII do not fall into any of the first three "core proceeding" jurisdictional categories because they do not invoke a substantive right under title 11, and they can arise outside of the bankruptcy context. In *Halper v. Halper*, the Third Circuit explained that:

> To determine whether a proceeding is a "core" proceeding, courts of this Circuit must consult two sources. First, a court must consult [28 U.S.C.] § 157(b). Although § 157(b) does not precisely define "core" proceedings, it nonetheless provides an illustrative list of proceedings that may be considered "core." Second, the court must apply this court's test for a "core" proceeding. Under that test, a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.

164 F.3d 830, 836 (3d Cir. 1999) (citations and internal quotations omitted).

Counts I through IV, VII and VIII, which assert garden-variety state law breaches of fiduciary duty and illegal dividends, flunk this test. These causes of action are not included in the claims enumerated as "core" in the illustrative list set forth in § 157(b)(2)(A)-(O). They also

6

are not created by or based on a Bankruptcy Code provision, and therefore do not "invoke[] a substantive right provided by title 11." *Halper*, 164 F. 3d at 836; *see also Seagate Tech. (US) Holdings, Inc. v. Global Kato HG, LLC (In re Solyndra, LLC)*, Adv. Proc. No. 15-50268 (MFW), 2015 WL 6125246 at * 4 (Bankr. D. Del. Oct. 16, 2015); *In re New Century TRS Holdings, Inc.*, 505 B.R. 431, 440-41 (Bankr. D. Del. 2014). Nor do the Trustees' claims exist only in title 11's context. Instead, they are "ordinary state law causes of action" that are routinely brought in litigation "with no connection to the Bankruptcy Code or a bankruptcy case." *Wash. Mut., Inc. v. XL Specialty Ins. Co. (In re Wash. Mut., Inc.)*, Adv. No. 12-50422 (MFW), 2012 WL 4755209 at *2 (Bankr. D. Del. Oct. 4, 2012); *see also New Century TRS Holdings*, 505 B.R. at 441 (no "arising under" jurisdiction over claims that "[were] not claims that arise only in the context of a bankruptcy case").

**Second**, the state law claims pleaded in Counts I through IV, VII and VIII are not "related to" the bankruptcy case because the Plan has already been confirmed, and the relief the Amended Complaint seeks does not turn on, and will not affect, the confirmed Plan. In *Pacor Inc. v. Higgins*, the Third Circuit set forth the general test for "related to" jurisdiction, explaining that it turns on whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." 743 F.2d 984, 994 (3d Cir. 1984), *overruled in part by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 116 (1995). However, once a plan has been confirmed, as the court explained in *Resorts International*, "it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred." 372 F.3d at 165. Under those circumstances, a post-confirmation dispute can only enjoy "related to" jurisdiction if there is a "close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation,

7

consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement . . . ." *Id.* at 168-69; *see also Geruchat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*, 505 F.3d 237, 265 (3d Cir. 2007). Notably, the fact that success on a post-confirmation claim could increase a litigation trust's overall assets does *not* create otherwise lacking "related to" jurisdiction. *Resorts Int'l*, 372 F.3d at 170 ("[I]f the mere possibility of a gain or loss of trust assets sufficed to confer bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the 'related to' grant.").

There is no "related to" jurisdiction over the Trustees' claims here because those claims have no nexus to the now-confirmed Plan *other than* the potential to increase the amount the Litigation Trust will ultimately distribute. At confirmation, the Plan here transferred to the Liquidating Trust all "claims and Causes of Action related to or arising out of the ESOP" and the "Preserved D&O Claims," the latter of which includes causes of action that could be asserted against certain of the Debtors' former directors and officers. (**Exhibit B**, Liquidation Plan, Art. II.A.114.) The Trustees now assert these claims on the Liquidating Trust's behalf – not the Debtors' – and they have no potential to affect the Plan other than to increase the Liquidation Trust's overall distribution. As this Court has held following *Resorts International*, 372 F.3d at 170, these kinds of claims brought post-confirmation by a liquidating trustee against the debtors' former directors lack the "close nexus" to the Plan required to confer "related to" jurisdiction. *Trosio*, 2011 WL 6832900 at *4; *accord Insilco,* 330 B.R. at 524.

In *Insilco*, after the plan's confirmation, the liquidating trustee sued the debtor's board of directors for fiduciary breach claims that had been assigned to the trust. 330 B.R. at 517. This Court held that there was no "related to" jurisdiction over the trustee's claims because "their resolution [did] not require interpretation of the Plan and [would] not affect the bankruptcy estate

8

or the Debtor." *Id.* at 524.   The Court acknowledged that "the outcome of this adversary proceeding could result in additional assets to distribute to creditors" but held that fact could not confer "related to" jurisdiction even though the plan specifically authorized the trust's creation and the trust's pursuit of causes of action.   *Id.*   Affirming on appeal, the district court explained that "the [bankruptcy] court correctly noted that jurisdiction cannot be created simply by preservation of a claim in a plan." *In re Insilco Techs., Inc.*, 394 B.R. 747, 750 (D. Del. 2008). Likewise, in *Trosio*, this Court held that it did not have "related to" jurisdiction over the liquidating trustee's claims against the former debtor's directors and officers because it "d[id] not perceive any 'unique bankruptcy-related issues.'"   2011 WL 6832900 at *4; *accord Resorts Int'l*, 372 F.3d at 168 (citing with approval *Falise v. Am. Tobacco Co.*, 241 B.R. 48 (E.D.N.Y. 1999), where the court found no "related to" jurisdiction in asbestos producer's bankruptcy over suit by litigation trust against tobacco companies for contribution to asbestos-related illnesses because "the resolution of the dispute would have had no impact on any integral aspect of the bankruptcy plan or proceeding"); *Grimes v. Graue (In re Haws)*, 158 B.R. 965, 971 (Bankr. S.D. Tex. 1993) (no "related to" jurisdiction over litigation trust's claim for fiduciary duty breach against debtor's partner because the bankruptcy court was not asked to "construe or interpret the confirmed plan or to see that federal bankruptcy laws are complied with").

Here, nothing in the Plan suggests, let alone shows, that its implementation, execution, consummation, or administration is dependent on the Trustees' prosecution of this adversary proceeding.   There is no need for the fact finder to even refer to the Plan to determine the D&Os' potential liability for the Trustees' state law claims.   As in *Resorts International*, the Trustees' lawsuit here is wholly collateral to the Plan.   372 F.3d at 168-170.   While the Trustees point to the Plan's purported reservation of the Court's jurisdiction, as the Third Circuit emphasized in

9

*Resorts International*, "[w]here a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization." *Id.* at 161. Parties cannot "write their own jurisdictional ticket." *Id.*[3]; *see also Seven Fields Development Corp.*, 505 F.3d at 256 (citation omitted) ("courts will give effect to retention-of-jurisdiction provisions that reorganization plans sometimes include only if there is bankruptcy court jurisdiction under 28 U.S.C. §§ 1334 and 157."). The Court should dismiss Counts I through IV, VII and VIII under Fed. R. Civ. P. 12(b)(1) and 12(h)(3).

**B.      The Court Should Dismiss The State Law Counts (I Through IV, VII and VIII) Because They Are Preempted By ERISA And Thus Fail To State A Claim.**

ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). A law "relates to" an employee benefit plan if it expressly refers to or has a connection to an ERISA-governed plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). State law claims are preempted if (1) an individual, at some point in time, could have brought his claim under ERISA's expansive civil enforcement mechanism; and (2) where no other independent legal duty is implicated by a defendant's actions. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004). For example, claims that "are premised on the existence of the plan and require interpreting the plan's terms" or that "require reference to the plan and what it covers" are preempted. *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 295-96 (3d Cir. 2014). Courts regularly hold that ERISA preempts state law fiduciary breach claims relating to employee benefit plans. *See, e.g.*, *Menkes*, 762 F.3d at 296; *Breland v. Liberty Life Assur. Co. of Boston*, Case No. 14-cv-352, 2014 WL 5795681, at *2 (W.D. Pa. Nov. 6, 2014). Rule 12(b)(6) authorizes the Court to dismiss claims on

---

[3]      Because no subject matter jurisdiction exists under 28 U.S.C. § 1334, the D&Os have not moved the district court to withdraw the reference to this Court to determine the Trustees' non-core claims. *See Trosio*, 909 F.3d at 596. However, the D&Os reserve their right to seek a withdrawal of the reference in the event that the Court denies the Motion.

10

preemption grounds.  *See Menkes*, 762 F.3d at 289-90, 297 (dismissing claims pursuant to Rule 12(b)(6) because they were preempted).

The Trustees' claims against the D&Os are founded on the allegations that Appvion's former directors, officers, and consultants did not administer the ESOP appropriately because they inflated Appvion's stock valuation.  (*See* Am. Compl. ¶¶ 1, 3-5, 393-95, 401, 404, 409, 422-25, 431-33.)  The Trustees specifically allege that the ESOP was the "ultimate owner of the Debtors" at all relevant times.  (*Id.* ¶ 1.)  They allege that the "Debtor's capital structure, with ESOP ownership," required "systemic unconditional financial support" that the Defendants failed to provide or account for in their valuations.  (*Id.* ¶¶ 2-3.)  They allege that the Defendants "artificially and materially inflated the value of the stock held by the ESOP."  (*Id.* ¶ 3.)  They allege that the Defendants' allegedly faulty financial projections "were critical to the determinations by the ESOP trustee's determination [sic] . . . of the fair market value of PDC common equity."  (*Id.* ¶ 7.)  They further allege that payments to the ESOP during the time when the company's stock was overvalued were essentially "a Ponzi scheme."  (*Id.* ¶ 16.)  In the Amended Complaint, the Trustees added a series of allegations related to the ESOP Committee's alleged ratification of the ESOP's stock value determinations.  (*Id.* ¶¶ 348-58).  These claims necessarily depend on the ESOP's existence and administration, and therefore relate to and have a substantial connection with an ERISA-governed plan, and must be dismissed with prejudice.  *Menkes*, 762 F.3d at 294-96; *Breland*, 2014 WL 5795681, at *2.

The dismissal should be with prejudice because this is not a technical pleading defect that the Trustees can cure by pleading proper ERISA claims.  The Trustees do not have standing to pursue ERISA claims because Section 502(a) limits standing to the Secretary of Labor, plan participants, beneficiaries, and fiduciaries; neither the Trustees nor their predecessor – the

Debtors – are or were any of those things.  29 U.S.C. §§ 1132(a); *Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union No. 42 v. S. Jersey Insulation Servs., Inc.*, No. 05-3143 RMB, 2007 WL 276137, at *2 (D.N.J. Jan. 26, 2007).  Moreover, a liquidation trustee recovers money only on the debtor estate's behalf, not on behalf of a particular creditor or class of creditors, such as the people who may have been injured as a result of the ESOP's collapse. *See, e.g., Durango-Ga. Paper Co. v. H.G. Estate, LLC*, 739 F.3d 1263, 1272 (11th Cir. 2014).  While its claims have other fatal defects, it is the ESOP (by its named fiduciary) in the Wisconsin action that is the proper party to assert claims based on any alleged injury to the ESOP and its participants.

## C.   Alternatively, The Court Should Transfer This Case To The Eastern District Of Wisconsin.

Even if the Court finds that it has subject matter jurisdiction over non-preempted claims, the Court should send this action to the United States District Court for the Eastern District of Wisconsin under 28 U.S.C. § 1404 and the Third Circuit's "first filed" rule.  This forum has no connection to the Amended Complaint other than the Trustees chose it.  However, the ESOP is already litigating a largely duplicative first-filed case, against many of the same defendants, in the Eastern District of Wisconsin.  That is also where many of the defendants reside; where the transactions and occurrences at issue occurred; and where the preponderance of the witnesses and documents can be found.  If not dismissed, the Court should send this action there.

12

Third Circuit courts have broad discretion to determine whether convenience and fairness necessitate a venue transfer under Section 1404.[4] *Zazzali v. Swenson*, 852 F. Supp. 2d 438, 447 (D. Del. 2012). When determining if transfer is appropriate, courts consider both public and private interests. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The private interests include: (1) the plaintiff's forum preference as manifested in the original choice, (2) the defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the witnesses' convenience – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and (6) the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum). *Id.* (quotations omitted). Courts also consider public interest factors including: (1) the enforceability of the judgment, (2) practical considerations that could make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, (5) the public policies of the fora, and (6) the trial judge's familiarity with the applicable state law in diversity cases. *Id.* at 879-80 (quotations omitted). The Third Circuit also observes the "first-filed case" rule: "when duplicative lawsuits are filed successively in two different federal courts, the court where the action was filed first has priority." *Chavez v. Dole Food Co.*, 836 F.3d 205, 210 (3d Cir. 2016); *see also Glunk v. Noone*, 689 F. App'x 137, 139 (3d Cir. 2017) (court may dismiss or transfer the later-filed proceeding where there is substantial overlap with the subject matter of the first-filed proceeding); *Arrow Oil & Gas, Inc. v. J. Aron &*

---

[4]     This Court has the authority to transfer this action pursuant to 28 U.S.C. § 1404 or 28 U.S.C. § 1412. *See In re Qualteq, Inc.*, No. 11-12572 KJC, 2012 WL 527669, at *1 (Bankr. D. Del. Feb. 16, 2012). While Section 1412 is expressly limited to a "case or proceeding under title 11," courts in the Third Circuit have determined that the "decision to transfer venue under either section . . . turn[s] on the same issues." *I.R.S. v. CM Holdings, Inc.*, No. CIV. A. 97-695 MMS, 1999 WL 459754, at *2 (D. Del. Jun. 10, 1999).

*Co. (In re Semcrude, L.P.)*, 442 B.R. 258, 271 (Bankr. D. Del. 2010) (applied in bankruptcy court).

Here, only two factors – the plaintiffs' choice and the potential applicability of Delaware law – weakly support venue in this Court; the balance overwhelmingly favor transfer to Wisconsin. While the Trustees, as plaintiffs, have chosen this forum, the weight given to the Trustees' choice is "reduced when the chosen venue is not the plaintiff's home forum." *MoneyCat Ltd v. PayPal Inc.*, No. CV 1:13-1358, 2014 WL 2042699, at *4 (D. Del. May 15, 2014). Here, the Trustees are New York and New Jersey residents, making their forum selection of little moment. (Am. Compl. at ¶¶ 21-22.) Similarly, while the Trustees seek to invoke Delaware law, those claims may be adequately handled by a Wisconsin judge already charged with resolving similar claims. *See Ross v. Inst. Longevity Assets LLC*, No. CV 12-102-LPS-CJB, 2013 WL 5299171, at *15 (D. Del. Sept. 20, 2013) (recommending transfer, including Delaware state law claims), *report and recommendation adopted,* No. CV 12-102-LPS-CJB, 2013 WL 5613998 (D. Del. Oct. 11, 2013).[5]

All of the other relevant factors also counsel for transfer. Starting with the private interest factors, the Trustees' claims arise out of Appvion's management and operation, which took place at its Appleton, Wisconsin headquarters. The parties' convenience also points to Wisconsin because a similar first-filed action alleging similar claims is already pending there. Twelve of this case's sixteen defendants are named in the Wisconsin action, four live in Wisconsin, three live in states bordering Wisconsin, and two reside closer to Wisconsin than Delaware. (**Exhibit C**, Declaration of Michael T. Graham). While four defendants live closer to Delaware, they are named in the Wisconsin complaint and will already be required to travel

---

[5]    The Trustees' reliance on Wisconsin law with respect to Counts IX, XIV-XVIII support transfer to Wisconsin.

there.  The remaining factors weigh in Wisconsin's favor, as witnesses and records are largely located at or near Appvion's Appleton headquarters.

Turning to the public interest factors, for many of the same reasons, the "practical considerations" factor weighs heavily in Wisconsin's favor: the majority of the percipient events, documents, defendants, witnesses, and existing related litigation are all closer to Wisconsin than Delaware.  The "local interest in deciding local controversies at home and public policies of the fora" factors also favor Wisconsin because Wisconsin has an interest in monitoring and rectifying alleged wrongful conduct by its citizens (or non-citizens) that operated a business there.  *See Zazzali*, 852 F. Supp. 2d at 452.  The remaining factor, relative levels of court congestion, does not appear to favor one venue or the other, so this factor is neutral.  *See Universal Secure Registry, LLC v. Apple Inc.*, No. CV 17-585-CFC-SRF, 2018 WL 4502062, at *5 (D. Del. Sept. 19, 2018).

At bottom, it makes no practical sense, post-confirmation, for a case about a Wisconsin-based company, over Wisconsin-based conduct, implicating primarily Wisconsin-based defendants and evidence to proceed in Delaware bankruptcy court.  *Zazzali*, 852 F. Supp. 2d at 452 (transferring action against officers and directors to Idaho when it involved Idaho-based conduct concerning a company located in Idaho); *see also Pursuit Athletic Footwear, Inc. v. Save Power Ltd.*, No. CIV. A. 96-40-MMS, 1996 WL 328596, at *1, *6 (D. Del. June 7, 1996) (transferring adversary proceeding over Texas company to Texas where evidence was located). That is doubly so here, where there is a first-filed action in Wisconsin that implicates much of the same conduct and many of the same defendants that will proceed in parallel there.  The Court should transfer this action against the D&Os to the Eastern District of Wisconsin.

**D.     The Court Should Dismiss The Preference Claims (Counts IX, XIV-XVIII) Because They Are Not Pled With The Requisite Particularity.**

Counts IX and XIV-XVIII (the "Preference Counts") seek to avoid allegedly preferential transfers under 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq. and Wisconsin Statutes, Ch. 242, et seq.

Each of Counts IX and XIV-XVIII, the Preference Counts, should be dismissed to the extent they assert claims under Wisconsin or Delaware law because the Trustees fail to adequately put the relevant D&O's on notice of the actual claims and legal theories supporting those claims. *See Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 639–40 (Bankr. D. Del. 2001) ("Although liberal, the pleading requirements of the Federal Rules are not intended to reduce a defendant to guesswork and conjecture."). Each of Counts IX and XIV-XVIII is pled as an "Avoidable Preference," yet the Trustees cite generically to Wisconsin and Delaware law (6 Del. C. § 1301 et seq. and Wisconsin Statutes, Ch. 242, et seq.) relating to fraudulent transfers, not preferences. (See Counts IX and XIV-XVIII.) And unlike other Counts in the Amended Complaint in which the Trustees cite to these same state laws to support allegations that certain transfers were fraudulent (see Count XI, ¶ 466; Count XII ¶ 485; and the corresponding prayers for relief), neither Counts IX and XIV-XVIII nor the Trustees' prayer for relief alleges a fraudulent transfer claim against the D&Os. Even if the Preference Counts properly asserted fraudulent transfer claims (they do not), the Preference Counts, at most, assert "merely conclusory statements parroting" the elements of Wisconsin and Delaware laws and should be dismissed. *Miller v. Welke (In re United Tax Grp., LLC)*, No. 14-10486 (LSS), 2016 WL 7235622, at *5 (Bankr. D. Del. Dec. 13, 2016) (granting motion to dismiss). Accordingly, the state law claims in Counts IX and XIV-XVII should be dismissed for failure to state a claim.

16

Each of Counts IX and XIV-XVIII, the Preference Counts, should be dismissed to the extent they assert claims under Wisconsin or Delaware law because the Trustees fail to adequately put the relevant D&Os on notice of the actual claims and legal theories supporting those claims. Each of Counts IX and XIV-XVIII is pled as an "Avoidable Preference," yet the Trustees cite generically to Wisconsin and Delaware law (6 Del. C. § 1301 et seq. and Wisconsin Statutes, Ch. 242, et seq.) relating to fraudulent transfers, not preferences.  (*See* Counts IX and XIV-XVIII.) And, unlike the Amended Complaint's counts in which the Trustees cite to these same state laws to support allegations that certain transfers were fraudulent (*see* Count XI, ¶ 466; Count XII ¶ 485; and the corresponding prayers for relief), neither Counts IX and XIV-XVIII nor the Trustees' prayer for relief alleges a fraudulent transfer claim against the D&Os. Accordingly, the state law claims in Counts IX and XIV-XVII should be dismissed for failure to state a claim.

Count IX, which seeks to avoid and recover an allegedly preferential transfer to Ferree, should also be dismissed because it fails to state a claim for the avoidance of a preference. "Alleged preferential transfers must be identified with particularity to ensure that the defendant receives sufficient notice of what transfer is sought to be avoided." *Gavin Solmonese, LLC v. Shyamsundar (In re AmCad Holdings, LLC)*, No. 14-12168 (MFW), 2016 WL 3412289, at *3 (Bankr. D. Del. June 14, 2016).  To survive a motion to dismiss, a preference count must include the following information: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee, and (iv) the amount of the transfer." *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) (dismissing the preference count for failure to state a claim).

17

Count IX does not contain this required information – specifically, it fails to identify the transferor of each of the eight alleged transfers to Mr. Ferree the Trustees seek to avoid. (*See* Am. Compl. ¶¶ 436-46; 293-95.)  Instead, the Trustees aggregate the transfers and summarily allege, "PDC *and/or* Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree." (*Id.* at ¶ 441 (emphasis supplied).) The specific factual allegations that purportedly support the Trustee's preference claim also do not identify the transferor of each of the eight transfers.[6] (*Id.* at ¶¶ 293-95.) Thus, Count IX fails to identify the allegedly preferential transfers with particularly and should be dismissed for failure to state a claim.  *AmCad Holdings, LLC*, 2016 WL 3412289 at *3.

---

[6]     The Complaint cites to Appvion's Statement of Financial Affairs for some, but not all of the transfers, but the Trustees do not allege which debtor entity – Appvion or PDC – made the eight identified alleged transfers. (Am. Compl. ¶¶ 293-95.)

18

# CONCLUSION

For the foregoing reasons, the D&Os respectfully request that the Court dismiss the Adversary Proceeding with prejudice, or in the alternative, transfer the Adversary Proceeding to the Eastern District of Wisconsin where a first-filed action is pending.

Dated: March 19, 2019

Respectfully submitted,

*/s/ Lucian Murley*
Mark Minuti (DE Bar No. 2659)
Lucian B. Murley (DE Bar No. 4892)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mark.minuti@saul.com
luke.murley@saul.com

-and-

Craig C. Martin (Admitted *Pro Hac Vice*)
David Jimenez-Ekman (Admitted *Pro Hac Vice*)
Melissa M. Root (Admitted *Pro Hac Vice*)
Michael T. Graham (Admitted *Pro Hac Vice*)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2776
Facsimile: (312) 527-0484
cmartin@jenner.com
djimenez-ekman@jenner.com
mroot@jenner.com
mgraham@jenner.com

*Counsel for Former Directors and Officers*

# **EXHIBIT A**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | | |
|---|---|---|
| Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, by and through Grant Lyon in his capacity as the ESOP Administrative Committee of Appvion, Inc., | ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 1:18-cv-01861-WCG |
| v. | ) | |
| | ) | Demand For A Jury Trial |
| Douglas P. Buth and Gayle Buth, husband and wife; Paul J. Karch and Anne Karch, husband and wife; Mark Richards and Jeanne Richards, husband and wife; Tom Ferree and Carol J. Ferree, husband and wife; Rick Fantini and Debra L. Fantini, husband and wife; Dale E. Parker and Debrah Parker, husband and wife; Angela Tyczkowski and Mark Tyczkowski, husband and wife; Kerry Arent and Timothy Arent, husband and wife; Kent Willetts and Andrea Willetts, husband and wife; Susan Scherbel and Thomas Scherbel, husband and wife; Ronald Pace and Teresa Pace, husband and wife; Stephen Carter and Lisa L. Carter, husband and wife; Kathi Seifert, an individual; Andrew Reardon and Michele Reardon, husband and wife; Terry Murphy and Mary E. Murphy, husband and wife; Mark Suwyn and Patricia Suwyn, husband and wife; Kevin Gilligan and Angela Gilligan, husband and wife; Louis A. Paone and Jane Doe Paone, husband and wife; Houlihan Lokey Capital, Inc. (f/k/a Houlihan Lokey Howard & Zukin Capital), a California corporation; Houlihan Lokey Financial Advisors, Inc. (f/k/a Houlihan Lokey Howard & Zukin Financial Advisors, Inc.), a California corporation; State Street Bank and Trust Company, N.A., a nationally chartered trust company; Kelly Driscoll and David Driscoll, husband and wife; Sydney Marzeotti and Stephen Marzeotti, husband and wife; Argent Trust Company, N.A., a Tennessee | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

corporation; Reliance Trust Company, a )
Georgia corporation; Howard Kaplan and )
Wendy Kaplan, husband and wife; Stephen )
Martin and Jane Doe Martin, husband and )
wife; David Williams and Jane Doe Williams, )
husband and wife; Willamette Management )
Associates, Inc., an Oregon corporation; )
Scott D. Levine and Debora Levine, husband )
and wife; Aziz El-Tahch and Ayelish M. )
McGarvey, husband and wife; Robert Socol )
and Lynn Socol, husband and wife; Stout )
Risius Ross, Inc., a Michigan limited liability )
company; Stout Risius Ross, LLC, an )
Michigan limited liability company, DOES 1 )
through 50, ABC Corporations 1-5, DEF )
Partnerships 1-5, GHI Limited Partnerships 1- )
5, and JKL Limited Liability Companies 1-5, )
                                            )
                          Defendants.       )

# FIRST AMENDED COMPLAINT

Plaintiff, the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan"), by and through the ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee"), and for its First Amended Complaint ("FAC") against the Defendants alleges as follows:

## I.  INTRODUCTION

### A.  The Defendants Participated in "Fraud or Concealment" Regarding the True Value of the PDC Stock.

1.      This FAC seeks to recover damages suffered by the ESOP Plan and ultimately by its employee participants ("Employee Participants"), most of whom were union members.  When the operating paper company, Appvion, Inc. ("Appvion") filed bankruptcy in October 2017, the stock in its parent company, Paperweight Development Corp. ("PDC"), which was 100% owned by the ESOP Plan, became worthless.  As a result, the ESOP Plan and its Employee Participants

suffered hundreds of millions in damages, including those resulting from the loss of all of the retirement funds invested in the ESOP Plan.

2.    As described in this FAC, these and other damages were caused by, among others, the Defendants' breaches of fiduciary duties and fraudulent misrepresentations and omissions to the ESOP Plan.  These breaches of fiduciary duty and misrepresentations included:

- Inducing Employee Participants to take money saved in their 401(k) plans and use it to provide the $106 million down payment needed to fund the ESOP Plan's purchase of 100% of PDC's stock in November 2001.  Included in these fraudulent misrepresentations was that Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") had acted independently in connection with its expansive role in the ESOP Plan; and

- Inflating the appraised value of the PDC stock in each semi-annual appraisal from 2001 through the 2017 Appvion bankruptcy by, among other issues, failing to make deductions for as much as $175.5 million in unfunded pension/post-retirement related liabilities.

3.    Because the Defendants engaged in fraud or concealment that prevented the ESOP Plan and its Employee Participants from learning of the Defendants' breaches of fiduciary duties, the ESOP Plan and its Employee Participants were unable to discover the fiduciary breaches until at least August 2017, after an independent party was appointed to the ESOP Committee and he was able to begin investigating the ESOP's finances.  For example, the ESOP appraisal reports were not provided to the Employee Participants, and Appvion management selectively disclosed factors that supposedly accounted for and supported the high stock valuations, while hiding key factors that would have lowered the stock valuations.  Without the

ability to review the appraisals, the ESOP Plan and the Employee Participants could not discover that the stock price was substantially inflated and therefore could not discover Defendants' fraud or omissions and breaches of fiduciary duties.

### B. Appvion Management and Professional Advisors Fraudulently Persuaded Appvion's Employees to Buy PDC Stock.

4.      In early 2001, Appvion management, spearheaded by then-CEO Douglas Buth and General Counsel Paul Karch, proposed an employee buyout of the company for $810 million using money from Appvion employees' individual 401(k) retirement funds.  Appvion employees had accumulated the funds over time by directing portions of their paychecks into their retirement accounts.  According to Appvion management, the buyout required employees to cumulatively agree to invest at least $100 million of their 401(k) savings into the ESOP Plan, or the deal would not go through.  However, Buth and Karch both stood to gain incentive payments that were linked to the final purchase price, but only if the purchase price was at least $700 million.

5.      Appvion management (including Buth, Karch, and other executives) and professional advisors, including Houlihan Lokey (financial advisor), Willamette (valuation firm), State Street (the ESOP Plan's trustee) and Principal (the plan administrator) proposed the ESOP Plan to the Appvion employees.  They engaged in various road shows to sell the scheme to the employees.

6.      A video of a road show on 2 August 2001 shows Buth, Karch and Kerry Arent (Appvion's Director of Benefits and Compensation) side-by-side with purportedly "independent" ESOP professionals, Louis Paone (Houlihan), Kelly Driscoll (State Street), and Rick Braun (Willamette) making repeated misrepresentations/omissions to Appvion's employees in order to convince them that they should seize upon this "unique one-time opportunity" to transfer money

out of their 401(k) plans to buy PDC stock. They explained that if the employees came up with at least $100 million, the company could borrow the rest (about $650 million) to buy 100% of PDC's stock.

7.      Referring to the employees' opportunity to invest in PDC's stock, Buth explained: "[I]t just does not happen more than once in a lifetime and we're very fortunate to be employees here at this time." Describing the financial return, he represented: "For every dollar that we pay down in debt, it turns into our equity. So the $100 million that we put down on this deal will grow by $500 million in less than five years if we achieve our Base Case plan . . . . The upside you guys can figure out because my management team is only focused on one thing, beating that Base Case. That's what we are paid to do." And the professional advisors agreed.

8.      Houlihan played a central role in the ESOP buyout. The retainer agreement, signed by Paone himself, documents that Houlihan would orchestrate virtually all elements of the ESOP Plan including the negotiations of the stock purchase price and the selection of the "ESOP Team," one member of which was the ESOP Trustee, State Street Global Advisors.

9.      Houlihan was also retained to provide a "fairness opinion" in support of the transaction. However, under Houlihan's retainer agreements (which were not disclosed), Houlihan stood to gain a contingent fee, calculated as a percentage of the final purchase price, but only if the deal closed.

10.     However, Buth failed to disclose this conflict of interest. Instead, he fraudulently represented that Houlihan was independent. In a 25 July 2001 letter to Appvion employees, Buth fraudulently represented that Houlihan's Paone would present an "independent validation" of the ESOP transaction. An agenda distributed to employees describing the August 2001 road show similarly said Paone would give "Independent Validation of Deal Terms."

11.     At the 2 August 2001 road show, Karch again fraudulently introduced Paone as being independent and instrumental in negotiating the price at which the ESOP Plan would buy the company from the seller:  "The first person who is going to provide an independent view and validation of our deal here is Lou Paone, our investment banker from Houlihan Lokey Howard and Zukin. . . . He helped us negotiate with AWA [the seller] and arrange financing."

12.     Under the fraudulent pretext of being an independent professional, Paone then pushed the deal:  "Paul had mentioned that one of the things that I'm going to do this evening is help validate the purchase price of the transaction and the financial aspects as to why they are so attractive and why you're getting such a good deal."

13.     Paone explained that while recent transactions of paper related companies had sold at an average of 9.1 times EBITDA—a measure of the company's operating cash flow, the Appvion ESOP Plan was buying Appvion for the "attractive price" of "a little over four times your company's year 2000 operating cash flow."

14.     Paone concluded:  "I think in the coming slides and the discussion that you are going to hear, you're going to feel just like me that this is an extraordinary opportunity and one that could generate significant value for all of you."

15.     No one disclosed to employees that Houlihan and Paone had a conflict of interest in advising that the buyout transaction was fair.  Ultimately, Houlihan stood to gain as much as $8.1 million in fees (1% of the final buyout price of $810 million) when the transaction closed. Like Buth and Karch, Houlihan stood to gain more, the higher the purchase price.

16.     Karch then introduced Kelly Driscoll from State Street which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."

17.     As the ESOP Trustee, Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . . [W]e are very comfortable with the valuation. . . . So, we are very pleased, quite frankly, on the price we were able to get with the seller.  We think we got a very good price."

18.     State Street was supported in its opinion of value by the appraisal firm Willamette.  Driscoll explained: "[Rick Braun from Willamette] had a whole team who was really looking at the financial aspects and the valuation aspects of this transaction … ."  She then represented:  "So, we had a lot of people, a lot of experts looking out for the interests of the ESOP."

19.     Similarly, Buth told employees that they were paying the right price for the transaction and that they were getting a good deal.  For example, Buth stated that the deal they were offering was "lucrative" and a "wonderful opportunity."  Buth also stated that Driscoll from State Street would not overpay for stock and that Driscoll would tell the employees that they underpaid for the transaction.

20.     Braun, of Willamette, then represented that Willamette would determine the value of the stock: "[W]e will come in twice a year in order to … provide a full report to the trustee and will also provide management and the board of directors with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward."

21.     In their road show presentation, Buth, Karch and Paone downplayed the risks and appropriateness of transferring funds from an existing employment retirement plan to a new, highly-leveraged, undiversified ESOP.

22.     The ESOP Plan was analogized to a mortgage on a home even though the risks of a home mortgage are not at all comparable to a highly leveraged buyout transaction.  They even compared the opportunity of owning Appvion stock to the benefits of owning shares of Microsoft.

23.     BCI's Prodoehl told employees, among other things, that the buyout opportunity was a once in a lifetime opportunity to get rich by concentrating your investment in one stock.

24.     No one disclosed to any of the employees considering the buyout that Houlihan would receive a fee contingent on the success of the deal amounting to as much as $8.1 million dollars if the employees agreed to the buyout.

25.     Employees ultimately approved the transaction, contributing approximately $107 million from their 401(k) accounts in order to complete the buyout.

26.     The Transaction closed on 9 November 2001.

27.     The    Appvion    employees    were    convinced    by    the    fraudulent representations/omissions.  They cashed out over $106 million from their individual 401(k) plans to invest in the ESOP Plan, investing their life savings, earned paycheck by paycheck, in a very risky transaction in which every dollar the employees invested was encumbered with approximately $6.60 in debt.

28.     The average size of ESOP investment made from each employee's 401(k) account was $50,000 of hard-earned dollars earned over substantial time periods.  The money went from diversified, liquid, marketable 401(k) investments to an ESOP Plan from which they would be

unable to access their money prior to retirement, termination, death, or disability, except under limited circumstances.  And then, only if the stock retained some value.

C.   **PDC's Stock Valuation Rises from $10 to $33.62 And Management Sells its Stock.**

29.   Following the 2001 buyout, Appvion employees continued to defer a portion of their paychecks to the ESOP to buy PDC stock, instead of investing in more reliable, diversified, marketable and liquid 401(k) accounts.  Appvion also made ongoing matching contributions of PDC stock to the ESOP instead of paying cash to the employees' 401(k) accounts for some period of time.  These ongoing employee contributions to the ESOP were used to meet share repurchase obligations under the ESOP, and any excess would be used to provide cash to Appvion.

30.   Appvion management, including Buth, Karch and others, urged continued employee investment in the ESOP Plan.  For example, Buth represented to the ESOP Plan and the Employee Participants that it was achievable for the PDC stock price to reach $100 from its initial price of $10.  As an ERISA fiduciary due to his role on both the ESOP Committee and the Appvion/PDC Board of Directors, it was inappropriate for Buth to make these kinds of representations.

31.   For the next six years, Appvion reported strongly increasing semi-annual stock valuations that seemed to support the road show recommendation to participate; however, these stock valuations were fraudulent and did not accurately represent the true value of PDC stock.

32.   For example, from when the transaction closed on 9 November 2001 until the first valuation on 31 December 2001, the stock value rose by 28% from $10.00 to $12.83, based upon fraudulent valuations, even though the company's fundamental health did not change.

33.   From December 2001 through June 2004, Plaintiff believes, although Plaintiff has no access to the valuation reports, that Willamette generated fraudulent semi-annual appraisals. That is because in 2004, Willamette employees joined SRR, and SRR took over the appraisals beginning in December 2004.   Therefore, Plaintiff believes that the Willamette appraisals were conducted in the same manner.   The ESOP Trustee was at all times responsible for approving the appraisals and releasing the semi-annual stock price.

34.   The appraised stock price rose from $10 at the ESOP formation in November 2001, to $33.62 in December 2006.   At the same time, management also implemented, and Appvion Board of Directors approved, various incentive programs that awarded themselves phantom stock and deferred compensation tied to the increase in the value of PDC's stock.

35.   For example, on 8 August 2006, Appvion fraudulently reported that the Company stock had risen 9.5% for the period, for a 213% increase since the ESOP formation; however, this number was inflated and not a correct valuation:



8/8/2006

Company Stock Value Increases Over 9 Percent for First Half 2006

State Street Global Advisors (SSGA) has completed its valuation of Paperweight Development Corp. stock for the first half of 2006 and determined the per share value to be $31.27. That means the share value increased 9.5% for the period January 1, 2006 through June 30, 2006. The previous value of PDC stock was $28.56 per share

> As a result of the latest valuation, a $50,000 investment in PDC stock on the day we purchased the company is now worth $156,500, an increase of 213% since the November 2001 buyout.

36.     During this period (2005 – 2007) when Appvion's fraudulently appraised value was at or near its highest, virtually all of Appvion's top management, including Buth and Karch, armed with inside information about Appvion's true financial condition, left the company and began the process of cashing out of their personal investment in PDC stock, as well as phantom stock and deferred compensation rights.

37.     For example, Buth left on 1 July 2005, retiring at the age of 49.  He was able to capture a gain of more than $852,000 for his stock.  Karch left in March 2007, his gain was $304,000.  These departures, timed to coincide with the fraudulently highest stock valuations, caused the ESOP Plan and Appvion to drastically overpay these executives and drained Appvion's critical cash reserves.  The Defendants' inside information regarding the true value of the PDC stock was withheld from the ESOP Plan and its Employee Participants.

**D.     <u>Appvion Ultimately Files for Bankruptcy</u>**

38.     From December 2007 until June 2010, PDC's stock values declined from $33.41 to $12.03.  The decline was blamed on the impact of the Great Recession and other factors.  In December 2010, the fraudulently appraised stock values began to climb again, reaching $17.85 as of June 2013.  In an effort to convince employees to continue investing in the ESOP, when management announced the PDC stock values to the ESOP Plan and the Employee Participants, they highlighted selected financial data that supposedly justified the increasing valuations. Unaware of undisclosed material deficiencies that caused every one of the stock appraisals to be fraudulently overstated, Employee Participants continued to contribute a portion of their salaries to the ESOP Plan as retirement savings.

39.     Knowing Appvion's true (but concealed) financial condition, management shifted the manner in which they were compensated.  They changed the method of how their stock was valued from one which rewarded the increase in PDC stock price to one that guaranteed their results independent of an increase in stock value.  For example, CEO Mark Richards lost money from his ESOP account when Appvion went bankrupt; however, his salary and bonus compensation was so high that he made millions per year in the years leading up to his retirement, regardless of Appvion's income or stock value:

| Year | Salary/Bonus | Synthetic Equity | Non-Equity Incentive Plan Compensation | Pension Value and Deferred Compensation | Other Compensation | Total |
|------|-------------|------------------|----------------------------------------|-----------------------------------------|--------------------|-------|
| 2012 | $1,176,000 | $1,409,200 | $1,224,000 | $255,610 | $148,516 | $4,213,326 |
| 2013 | $800,000 | $1,294,020 | $102,400 | $126,139 | $497,210 | $2,819,769 |
| 2014 | $815,385 | $1,366,385 | $492,800 | $420,646 | $86,709 | $3,181,925 |
| 2015 | $800,000 | $1,388,772 | -0- | $124,408 | $2,995,387 | $5,308,567 |

40.     The Employee Participants had no similar way to protect themselves from declines in the PDC stock values.

41.     The stock price declined to $6.85 as of June 2017.  In October 2017, shortly after the fraudulent June 2017 valuation, Appvion filed for bankruptcy protection, completely wiping out the PDC stock equity value held by the ESOP Plan for the benefit of the Employee Participants.  With the filing of the Appvion bankruptcy, the game of hiding Appvion's true value was over.

42.     The primary ESOP beneficiaries were Buth, Karch and other senior management or directors who rewarded themselves by either cashing out at periods of fraudulently high stock prices or who received excessive compensation packages pre-bankruptcy, all at the ESOP Plan and the individual Employee Participant's expense.  The other beneficiaries included Houlihan, the ESOP Trustees and the ESOP appraisers.

### E.    Grant Lyon Discovers that Each of PDC's Stock Valuations Are Fraudulently Overvalued.

43.    In August 2017, Grant Lyon was appointed to replace the entire Appvion ESOP Committee.  Having a forensic accounting background and training, he began an analysis of Appvion's financial statements and PDC's stock valuations.  He learned, for the first time, that each of the appraisals to which he had access (beginning with the 30 June 2005 appraisal) fraudulently overvalued PDC's stock value and concealed Appvion's true financial condition.  And as explained earlier, he had no reason to believe that the earlier appraisals were any different.

44.    Mr. Lyon has now learned that the Appvion appraisals were materially and fraudulently overstated for at least the following reasons:

- Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities.  For example, unfunded pension/post-retirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012.  Each year, these liabilities were prominently displayed in Appvion's PricewaterhouseCoopers ("PWC")-audited financial statements.  For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows.  The SRR valuation reports from 31 December 2004 through 2017 do not consider the pension/post-retirement liabilities.  On information and belief, the Willamette appraisals prior to December 2004 likewise make no deduction for these pension/post-retirement liabilities:

| **"LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME** | | |
| **(dollars in thousands)** | | |
| | December 29, 2012 | December 31, 2011 |
| --- | --- | --- |
| * * * | | |
| Long-term debt | 511,624 | 510,533 |
| Post-retirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

Had the PDC appraised values deducted just these pension/post-retirement liabilities, the PDC stock would have had a negative value as early as 2009 and every year thereafter.

• The appraisals relied heavily on projections of future earnings created by Appvion's management, even though the appraisers, the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants knew, but did not disclose, that Appvion consistently missed these projections.

• The appraisals inflated Appvion's terminal value by purporting to capitalize a declining income stream into perpetuity. Although it may be appropriate to capitalize (reduce to present value) an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue. Therefore, recognized appraisal theory does not allow its capitalization in this manner. By capitalizing a declining income stream into perpetuity, the appraisals repeatedly overstated the value of PDC stock.

- The 30 June 2015 appraisal changed valuation methods, which offset both a dramatic decline in EBITDA for Appvion's thermal paper division and the sale of Appvion's valuable Encapsys division.

- The 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

- The appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- The appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- The appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- The appraisals improperly applied a 10% or 15% control premium in their valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion under the terms of the ESOP Plan or the Security Holder's Agreement.  Further, when the PDC Stock was sold upon a triggering event, only small units of stock were sold, thus not commanding a control premium.

- The appraisals failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- The appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- The appraisals failed to stress test Appvion's projections.

45.    In order to understand the appraisal deficiencies, it was necessary to have both the financial statements and the appraisal reports.  While all members of the ESOP Committee, the ESOP Trustees and the Appvion Board of Directors had access to the appraisal reports, the Employee Participants did not have that access.

46.    Even though union members specifically asked to see the appraisal report, they were denied access.  Thus, the ESOP Plan and the Employee Participants had no basis to conclude that the appraised stock values did not properly analyze the factors affecting Appvion's value.  The most glaring and obvious deficiency was the appraisals' failure to make a deduction for unfunded pension/post-retirement liabilities and also for the "other liabilities" recorded on each balance sheet.

47.    Lyon reported his preliminary findings to Appvion's Board of Directors on or about 1 September 2017.  As a result of the deficiencies Lyon identified, each of the fraudulent appraisals, from 2001 through 2017, masked and concealed the fundamental weaknesses in Appvion's true financial condition and prevented the ESOP Plan and its Employee Participants from being able to understand PDC stock's true value.  Therefore, the ESOP Plan (on behalf of the Employee Participants) overpaid for PDC stock from the beginning of the ESOP Plan through bankruptcy.  Based on his findings, Lyon recommended that all ESOP purchases of PDC stock be suspended.

48.     In the fall of 2018, Lyon for the first time discovered that Houlihan was not "independent" as had been fraudulently represented by Buth, Karch and Paone, but in fact stood to gain a contingent fee of as much as 1% of the $810 million purchase price (over $8 million), but only if the ESOP transaction closed.  Here is the relevant contingent fee paragraph from the engagement contract signed by Buth on behalf of PDC and Paone, as the Managing Director of Houlihan:

> 2.     In consideration of the foregoing financial advisory services, the Company agrees to pay Houlihan Lokey a non-refundable retainer fee of $100,000 upon the execution of this letter agreement. The Company also agrees to pay Houlihan Lokey a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of the Company with respect to an ESOP Acquisition.  Aggregate Consideration shall mean the sum of the fair market values of any consideration

Engagement Ltr. to Douglas Buth from Louis Paone (Houlihan) 14 Feb 01, pp. 1–2.

49.     This lack of independence is particularly disturbing because Buth, who together with Paone, negotiated the ESOP stock purchase price from the seller, also had a conflict of interest.  As disclosed in the 23 July 2001 Prospectus, for example, those employees who "assisted in the acquisition" received a total "sale incentive" of $2.46 million—"40% to Mr. Buth and the balance will be distributed by Mr. Buth in his discretion among other employees who assisted with the acquisition."

50.     Therefore, Buth and Houlihan, two parties who negotiated the ESOP stock purchase price, were both conflicted because they each stood to gain millions of dollars, but only if the transaction closed.  And, the higher the purchase price they negotiated, the greater their contingent payment would be.

51.     Because the Prospectus disclosed Buth's conflict of interest, it was critical that Buth and Karch presented Houlihan (Paone) at the ESOP road show as being "independent." And even though the Prospectus reported that Houlihan rendered its preliminary opinion to

Paperweight Development's Board of Directors that the purchase price that Paperweight Development was paying for the acquisition was fair, it likewise fraudulently concealed Houlihan's conflict and that the price, by any reasonable standard, was not fair.

52.     In other words, the Prospectus fails to disclose that if Houlihan were to determine the purchase price was *not* fair, it stood to lose as much as $8.1 million.

53.     This may explain why Buth and Paone were willing to negotiate an $810 million purchase price even though the Prospectus indicates that the seller was willing to pay Buth and other Appvion management a sale incentive for anything over $700 million.

54.     Rather than being a unique, once-in-a-lifetime opportunity for Appvion's employees, the fraudulently concealed conflict of interest and the fraudulent PDC stock overvaluations allowed Buth, Karch and others, the time and resources to benefit themselves, by receiving large employment compensation packages that they used to enrich themselves before Appvion's collapse into bankruptcy.   And, in the process, they convinced the employees to transfer (and continue to transfer) their investment dollars out of a traditional, diversified, liquid, marketable, unleveraged retirement fund into this fund which lacked all of those characteristics.

55.     This FAC seeks to recover damages suffered by the ESOP Plan (and indirectly by the Employee Participants), including those resulting from the fraudulently inflated appraisals and stock price and the undisclosed conflict of interest.

56.     It also seeks to recover the amounts paid to the management insiders and ESOP Plan fiduciaries who sold their stock at inflated values and who took other inflated compensation facilitated by the overvaluation.   It seeks to recover from management and directors for the losses to Appvion and PDC from the purchase of overvalued stock; this has amounted to at least $57 million in damages from just 2009.  It also seeks to recover all fees paid to Houlihan.

57.     The Defendants include (1) Williamette and SRR, who performed the false appraisals, (2) the Appvion ESOP trustees who had a fiduciary duty to the ESOP Plan to, among other things, put processes in place to make sure the stock was properly valued and to conduct an independent and objective analysis of the appraisals, (3) members of the Appvion ESOP Committee and Board of Directors who owed a fiduciary duty to the ESOP Plan and who had access to the full appraisal reports, to the company projections and to Appvion audited and unaudited financial information; and (4) Houlihan for its role in fraudulently misrepresenting its independence, thus facilitating and orchestrating the entire ESOP transaction.

## II.   NATURE OF THE ACTION

58.     This action arises in part under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* and is brought by the ESOP Plan to restore losses to the ESOP Plan, obtain equitable relief to remedy violations of ERISA and/or breaches of fiduciary duty, and to obtain damages.

59.     This action seeks relief against the fiduciary Defendants for violations of ERISA's statutory and fiduciary provisions, including recovery to the ESOP Plan of any losses resulting from the breaches, disgorgement of profits of any fiduciary which have been made through the use of assets of the ESOP Plan, and other appropriate equitable and remedial relief pursuant to ERISA § 502(a)(2) (29 U.S.C. § 1143(a)(2)), ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), ERISA § 404 (20 U.S.C. § 1104), ERISA § 405 (20 U.S.C. § 1105), ERISA § 406 (20 U.S.C. § 1106), and ERISA § 410 (29 U.S.C. § 1110).

60.     This action also seeks relief against certain Defendants for fraud, negligent misrepresentation, Wisconsin securities fraud, federal securities fraud, and breach of fiduciary duty under Wisconsin law.

## III.     **PARTIES, JURISDICTION, AND VENUE**

61.    Non-Party Appvion, Inc. (f/k/a Appleton Papers, Inc., and Appleton, Inc.[1]) ("Appvion") is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Appvion established and maintained the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan (the "ESOP Plan") to provide retirement benefits for its eligible employees. The ESOP Plan consists of an employee stock ownership component (the "ESOP Component") which holds shares of Paperweight Development Corp ("PDC"), the direct parent of Appvion, Inc., and a 401(k) component (the "Non-ESOP Component"). The ESOP Plan is an employee benefit plan within the meaning of ERISA § 3(3) (29 U.S.C. § 1002(3)) and the ESOP Component is intended to meet the requirements of ERISA § 407(d)(6) 29 U.S.C. § 1107(d)(6)).

62.    The ESOP Administrative Committee of Appvion, Inc. (the "ESOP Committee") is a fiduciary of the ESOP Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)). The members of the ESOP Committee are appointed by the Board of Directors of Appvion. Grant Lyon is the sole member of the ESOP Committee by appointment of Appvion's Board of Directors, effective 9 August 2017, in conjunction with an ESOP Plan amendment allowing the Committee to consist of one member.

63.    The ESOP Committee has standing to bring this action on behalf of the ESOP Plan under ERISA § 502(a) (29 U.S.C. § 1132(a)). Additionally, the 14 August 2018 Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation (the "Liquidation Plan") states that nothing in the Liquidation Plan impairs any claim held by the ESOP Committee. The Liquidation Plan also states that "Grant Lyon, in his

---

[1] Appleton Papers, Inc. changed its name to Appvion in May 2013. For simplicity, it is referred to throughout this Complaint as Appvion.

capacity as an ESOP Committee member, shall have standing to prosecute the ESOP Claims and other ESOP Preserved Claims. . ."  ESOP Preserved Claims are defined as "(i) any Claim held by the ESOP, the ESOP Committee or its members, or ESOP participants. . ., arising from or relating to the ESOP or any Interest in any Debtor, against any Person other than the Debtors."

64.     Defendant Douglas P. Buth ("Buth") and Gayle Buth are husband and wife and United States citizens who currently reside in Appleton, Wisconsin.  Buth was a CPA and formerly worked for Pricewaterhouse, Saks Fifth Avenue, and BATUS prior to working for Appvion.  During his tenure at Appvion, from 9 November 2001 through July 2005, Buth served as Chairman of the Board of Directors of Appvion and PDC, CEO, and President.  Buth was also a member of the ESOP Committee from 2001 until approximately May 2005 when he retired from Appvion.  Buth retained Houlihan and knew about the approximately $8 million Houlihan stood to gain if the ESOP buyout was approved.  Buth was instrumental in persuading employees into voting in favor of the buyout.  Buth made affirmative misrepresentations and omissions to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.  As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan.  Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his ESOP Investment (not including any payments under various compensation plans related to the value of the stock) upon his departure.  Buth also received excessive compensation under the various Appvion incentive plans.

65.     Defendant Paul Karch ("Karch") and Anne Karch are husband and wife and United States citizens who currently reside in Madison, Wisconsin.  Karch is a lawyer who graduated from Harvard Law School in 1982.  During his tenure at Appvion, from 2001 through

2007, Karch served as Vice President of Human Services and Law, Secretary, General Counsel and Vice President of Administration. Karch was a member of the ESOP Committee from 2001 through late 2006. Karch also served on the Board of Directors of Appvion and PDC from 2001 to 2006. Karch left Appvion in March 2007. Karch made affirmative misrepresentations and omissions to employees in order to induce them to approve the buyout and place their money into the ESOP Plan at the employees' expense. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. Karch left the company on 2 March 2007 with a gain of over $300,000. Karch also received excessive compensation under various Appvion incentive plans.

66.    Defendant Mark Richards ("Richards") and Jeanne Richards are husband and wife and United States citizens who currently reside in Appleton, Wisconsin. Richards earned an MBA from Northwestern University's Kellogg Graduate School of Management. During Richards' tenure at Appvion, Richards served as Chairman of the Board of Directors of Appvion and PDC, CEO, and President. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. Richards also received excessive compensation under various Appvion incentive plans.

67.    Defendant Tom Ferree ("Ferree") and Carol J. Ferree are husband and wife and United States citizens who, upon information and belief, currently reside in Solon, Iowa. Ferree has a master's degree in finance from the University of Iowa. During his tenure at Appvion, Ferree served as Treasurer and Vice President of Finance. Ferree was a member of the ESOP

Committee from late 2006 until April 2017. Ferree received excessive compensation under Appvion's various incentive plans. Ferree not only had access to the Appvion financial statements, but because of his position, was intimately familiar with them. He also had access to the PDC stock appraisals and participated in the generation of the financial projections used in the appraisals. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet he used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan.

68.    Defendant Rick Fantini ("Fantini") and Debra L. Fantini are husband and wife and United States citizens who, upon information and belief, currently reside in Denver, Colorado. Fantini has a master's degree in labor and industrial relations from Michigan State University and an MBA from Northwestern University's Kellogg Graduate School of Management. During his tenure at Appvion, Fantini served as Vice President of Operations. Fantini was the Chair of the ESOP Committee from 2001 to 2005. Fantini was present when the ESOP Committee recommended the retention of Willamette. As a member of the ESOP Committee, he knew the true financial health of Appvion, yet used fraudulent appraisals to set PDC share prices above fair market value to the detriment of the ESOP Plan. When Fantini left Appvion in 2005, he had a gain of over $577,000 from his ESOP investments. Fantini also received excessive compensation under Appvion's various incentive plans.

69.    Defendant Dale E. Parker ("Parker") and Debrah Parker are husband and wife who currently reside in Rocky Mount, North Carolina. Parker has an MBA from Xavier University and is a CPA. Prior to joining Appvion, Parker served as the Vice President of Finance of Black Clawson Companies. During his tenure at Appvion, Parker served as Vice President of Finance and CFO from 2001 to June 2006. Parker was a member of the ESOP

Committee from 2001 to June 2006.  Parker also served on Appvion and PDC's Board of Directors from 2001 to 2006.  As a member of the ESOP Committee and Board of Directors, Parker knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.  Parker also received excessive compensation under Appvion's various incentive plans.

70.     Defendant Angela Tyczkowski ("Tyczkowski") and Mark Tyczkowski are husband and wife who currently reside in Appleton, Wisconsin.  Tyczkowski went to law school at Marquette University.  During her tenure at Appvion, Tyczkowski served as Secretary, General Counsel and Chief Compliance Officer.  Tyczkowski sat on the ESOP Committee from September 2006 to June 2008.  As a member of the ESOP Committee, Tyczkowski knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.  Tyczkowski also received excessive compensation under Appvion's various incentive plans.

71.     Kerry Arent ("Arent") and Timothy J. Arent are husband and wife who currently reside in Grand Chute, Wisconsin.  Arent received her bachelor's degree from the University of Wisconsin-Oshkosh and holds a Senior Professional Human resources certification since 2005. During her tenure at Appvion, Arent served as Vice President, Executive Director and Senior VP Human Resources.  Arent sat on the ESOP Committee from July 2008 through 2015.  As a member of the ESOP Committee, Arent knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.  Arent also received excessive compensation under Appvion's various incentive plans.

72.     Kent Willetts ("Willetts") and Andrea Willetts are husband and wife who currently reside in Appleton, Wisconsin.  Willetts has an MBA from Northwestern University's

Kellogg Graduate School of Management.  During his tenure at Appvion, Willetts served as Senior Vice President.  Willetts sat on the ESOP Committee from July 2008 through June 2013. As a member of the ESOP Committee, Willetts knew the true financial health of Appvion, yet used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.  Willets also received excessive compensation under Appvion's various incentive plans.

73.      Buth, Karch, Richards, Ferree, Fantini, Parker, Tyczkowski, Arent, and Willetts are collectively referred to herein as the "Prior Committee Defendants."

74.      Susan Scherbel ("Scherbel") and Thomas Scherbel are husband and wife who currently reside in Hancock, Maine.  Scherbel has a bachelor's degree from Harvard and Juris Doctor and a Master of Law degrees from Georgetown University.  She previously held an advisory position at the U.S. Department of Treasury relating to ESOP legislation and regulation. Scherbel was an Outside Independent Director of Appvion and PDC from 2002 through July 2011.  Scherbel served on the Board of Directors' Audit Committee from 2002 through July 2011 and the Board of Directors' Compensation Committee from 2002 through 2006. Scherbel was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Scherbel, as a member of the Board of Directors, knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

75.     Ronald Pace ("Pace") and Teresa Pace are husband and wife who currently reside in Cedarburg, Wisconsin.  Pace has an MBA from the University of Connecticut and held a management position with Kohler Company from 1995 through 2015.  Pace was an Outside Independent Director of Appvion and PDC from 2003 through July 2011.  Pace served on the Board of Directors' Audit Committee from 2003 through 2008 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Pace knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition..

76.     Stephen Carter ("Carter") and Lisa L. Carter are husband and wife who currently reside in Rockford, Illinois.  Carter has a bachelor's degree from Brigham Young University and is a CPA.  Carter was an Outside Independent Director of Appvion and PDC from 2004 through 2015.  Carter served on the Board of Directors' Audit Committee from July 2004 through 2012 and again from 2014 through 2016 and served as Chairman of the Audit Committee from 2006 through 2011 and in 2016.  He was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Carter was also considered an audit committee financial expert by the Board of Directors.  As a member of the Board of Directors, Carter knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants;

and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

77.     Kathi Seifert ("Seifert") currently resides in Appleton, Wisconsin.  Seifert was an executive with Kimberly-Clark Corporation and has served as a director of several other large companies, including Eli Lilly and Company and Revlon Consumer Products.  Seifert was an Outside Independent Director of Appvion and PDC from July 2004 through 2016.  Seifert served on the Board of Directors' Audit Committee from 2004 through 2006 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Seifert knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

78.     Andrew Reardon ("Reardon") and Michele Reardon are husband and wife who currently reside in Marco Island, Florida.  Reardon has a law degree from the University of Cincinnati and an LLM in taxation from the Washington University Law School.  Reardon was an Outside Independent Director of Appvion and PDC from June 2007 through 2014.  Reardon served on the Board of Directors' Audit Committee from 2009 through 2011 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Reardon knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2)

failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

79.     Terry Murphy ("Murphy") and Mary E. Murphy are husband and wife who currently reside in Naples, Florida.  Murphy has a master's degree in business administration from Marquette, a Juris Doctor degree from Seton Hall University School of Law, and is a CPA. Murphy was an Outside Independent Director of Appvion and PDC from June 2007 through 2017.  Murphy served on the Board of Directors' Audit Committee from 2012 through 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting and reporting practices and the quality and integrity of the PDC financial reports.  Murphy also served as Chairman of the Audit Committee in 2012-2015 and Audit Committee Financial Expert by Board of Directors.  As a member of the Board of Directors, Murphy knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

80.     Mark Suwyn ("Suwyn") and Patricia Suwyn are husband and wife who currently reside in Bonita Springs, Florida.  Suwyn has a doctorate degree in inorganic chemistry and has a background working in the coated paper industry.  Suwyn was an Outside Independent Director of Appvion and PDC from July 2011 through 2017.  Suwyn served on the Board of Directors' Audit Committee in 2016 and 2017 and was responsible for providing assistance to the Board of Directors in fulfilling its responsibility to the ESOP Participants relating to financial accounting

and reporting practices and the quality and integrity of the PDC financial reports.  As a member of the Board of Directors, Suwyn knew the true financial condition of Appvion but 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

81.    Kevin Gilligan ("Gilligan") and Angela Gilligan are husband and wife who currently reside in Appleton, Wisconsin.  Gilligan has an MBA from Indiana University and previously worked as an executive with H.B. Fuller Company.  Gilligan was a Director of Appvion and PDC from 2015 through 2017.  Gilligan also served as President and CEO beginning in January 2016 and was a member of the ESOP Committee in 2016 and 2017. Gilligan attended ESOP Committee meetings where Appvion's financial performance and the ESOP Plan's ERISA compliance was discussed.  As a member of the ESOP Committee, Gilligan knew the true financial health of the Appvion, but used fraudulent appraisals to set share prices above fair market value to the detriment of the ESOP Plan.  As a member of the Board of Directors, Gilligan 1) failed to exercise proper oversight of the company; 2) failed to properly monitor the ESOP Committee and the Trustee Defendants; and 3) allowed Appvion management to repeatedly release statements to employees in support of the stock price that failed to fully disclose Appvion's true financial condition.

82.    Buth, Parker, Richards, Scherbel, Pace, Carter, Seifert, Reardon, Murphy, Suwyn, Karch, and Gilligan are collectively referred to herein as the Director Defendants.  Of these, Buth, Parker, Richards, Karch, and Gilligan were also officers of the company and are included as Prior Committee Defendants.

83.     Defendant Houlihan Lokey Capital, Inc., formerly known as Houlihan Lokey Howard & Zukin Capital, Inc. (together with Houlihan Lokey Howard & Zukin Financial Advisors, Inc., "Houlihan") is a California corporation with its principal place of business in Los Angeles, California.

84.     Defendant Houlihan Lokey Howard & Zukin Financial Advisors, Inc. is a California corporation with its principal place of business in Los Angeles, California.

85.     Defendant Louis A. Paone ("Paone") and Jane Doe Paone are husband and wife who currently reside in or near Charlotte, North Carolina.  Paone was Managing Director of Houlihan in 2001.  Paone attended the road shows with Appvion Management and, among other things, represented, through his acquiescence, that Houlihan was providing an "independent review and validation" of the proposed buyout transaction.  However, Houlihan was not independent.  It would receive as much as $8.1 million if the ESOP transaction closed.

86.     Defendant State Street Bank and Trust Company, N.A. ("State Street") is a nationally chartered trust company with its principal place of business in Boston, Massachusetts. State Street Bank and Trust Company NA was the trustee of the ESOP Component of the ESOP Plan from 2001 through approximately April 1, 2013.  In its dealings with Appvion, State Street sometimes went by the name State Street Global Advisors, which is a division of State Street.

87.     Defendant Kelly Driscoll ("Driscoll") and Dave Driscoll are husband and wife who currently reside in or near Boston, Massachusetts.  Driscoll served as Senior Managing Director of State Street 1997 to 2008 and is currently a Senior Vice President for State Street. Driscoll made affirmative representations and omissions to induce the employees to approve the buyout and place their money into the ESOP Plan at the employees' expense.  According to the 26 March 2001 Appvion Newsletter, "The Ownership Update," "[t]he Appleton Papers board of

directors has hired Kelly Q. Driscoll of State Street Global Advisors to serve as our ESOP trustee." As ESOP trustee, she had responsibilities to review the annual appraisal work for the purpose of arriving at the appropriate PDC stock price. In fact, Driscoll reported in September 2003: "I typically call Doug Buth to inform him and Appleton of the new value of PDC stock."

88.    Defendant Sydney Marzeotti ("Marzeotti") and Stephen Marzeotti are husband and wife who currently reside in Lynnfield, Massachusetts. Marzeotti served as Vice President of State Street from 2002 to present. Upon information and belief, Marzeotti, along with Driscoll, was responsible for overseeing the independent appraiser selected by State Street and arriving at the appropriate PDC stock price.

89.    State Street, Driscoll and Marzeotti are collectively referred to as the "State Street Defendants."

90.    Defendant Argent Trust Company, N.A. ("Argent") is a Tennessee corporation with its principal place of business in Ruston, Louisiana. Argent became the trustee of the ESOP Component of the Plan beginning in 2014.

91.    Defendant Reliance Trust Company ("Reliance") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Reliance ESOP Group was the trustee of the ESOP Component of the Plan from approximately April 1, 2013 to June 30, 2014. Reliance was purchased by Argent in 2014.

92.    Defendant Howard Kaplan ("Kaplan") and Wendy Kaplan are husband and wife currently living in Jasper, Georgia. Kaplan served as Senior Vice President of Reliance from 2000 to 2014. Upon information and belief, Kaplan was responsible for overseeing the independent appraiser approved by Reliance. Kaplan was present when Scott Levine of Stout

31

Risius Ross presented on the valuations to the ESOP committee and appears to have done nothing to address the flaws Lyon later identified.

93.     Stephen Martin ("Martin") and Jane Doe Martin are husband and wife who currently reside in or near Atlanta, Georgia.  Martin served as Senior Vice President of Reliance and later for Argent. Upon information and belief, Martin was responsible for overseeing the independent appraiser approved by Reliance.  Martin was present when Scott Levine of Stout Risius Ross presented on the valuations to the ESOP committee and appears to have done nothing to address the flaws Lyon later identified.

94.     David Williams ("Williams") and Jane Doe Williams are husband and wife currently living in or near Atlanta, Georgia.  Williams served as Senior Vice President of Reliance and later for Argent.  Upon information and belief, Williams was responsible for overseeing the independent appraiser approved by Reliance and appears to have done nothing to address the flaws Lyon later identified.

95.     Reliance, Kaplan, Martin, and Williams are collectively referred to as the "Reliance Defendants," depending on the time period Martin and Williams are also collectively referred to herein as the "Argent Defendants."

96.     The Argent Defendants, the Reliance Defendants, and the State Street Defendants are collectively referred to herein as the "Trustee Defendants."

97.     Defendant Willamette Management Associates, Inc. ("Willamette") is an Oregon corporation with its principal place of business in Chicago, Illinois.  Willamette served as financial advisor to State Street as ESOP trustee and valued the share price of PDC stock from 2001 through 30 June 2004.

98.     Defendant Stout Risius Ross, Inc. is or was a Michigan corporation with offices around the United States.  SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock from 31 December 2004 through 2017.

99.     Defendant Stout Risius Ross, LLC is a Michigan limited liability company with offices around the United States.  SRR served as financial advisor to the ESOP trustees and valued the share price of PDC stock in 2017.

100.    Defendant Stout Risius Ross, Inc. and Defendant Stout Risius Ross, LLC are collectively referred to as SRR.

101.    Scott D. Levine ("Levine") and Debora Levine are husband and wife currently living in Oakton, Virginia.  Levine served as a Principal of Willamette from 2000 through 2004. Levine also served as a Managing Director of SRR from 2004 through present.  Levine was the primary individual, at both Willamette and SRR, responsible for valuing Appvion.  In 2004, when Levine moved from Willamette to SRR, Appvion's account moved as well. Under Levine's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed appraisals from 2001 through 2017.  Additionally, Levine attended ESOP Committee meetings to explain the valuations.  Appvion's financial performance was also discussed at those meetings.

102.    Aziz El-Tahch ("El-Tahch") and Ayelish M. McGarvey are husband and wife currently living in New York, New York.  El-Tahch served as an Associate of Willamette from at least 2002 through 2004.  El-Tahch also served as a Manager of SRR from 2004 through June 2007 and returned to SRR in 2008 as Managing Director.  In 2004, when El-Tahch moved from Willamette to SRR, Appvion's account moved as well. Under El-Tahch's direction and supervision, Willamette, on information and belief, and SRR produced fundamentally flawed

valuations from 2001 through 2007 and from 2008 through 2017.    Additionally, El-Tahch attended ESOP Committee meetings to explain valuations.    The financial performance of Appvion was also discussed at those meetings.

103.    Robert Socol ("Socol") and Lynn Socol are husband and wife currently living in Glencoe, Illinois.    Socol was a Managing Director of Willamette from 1992 to 2004 while Willamette was conducting Appvion's early stock valuations.    Socol moved to SRR in 2004 at or around the same time that Levine and El-Tahch moved to SRR.    Upon information and belief, Socol was responsible for the valuation of Appvion with Levine and El-Tahch.

104.    Plaintiff is uncertain of the true names and capacities of certain individuals or entities that may be liable for the damages alleged herein and therefore sues them by fictitious names of Does 1-50, ABC Corporations 1-5, DEF Partnerships 1-5, GHI Limited Partnerships 1-5, and JKL Limited Liability Companies 1-5.    Plaintiff will amend its FAC by asserting their true names, capacities, and appropriate charging allegations when they are ascertained.

105.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for jurisdiction of actions brought under Title I of ERISA.

106.    This Court has supplemental jurisdiction over the state law claims in this action subject to 28 U.S.C. § 1367.

107.    This Court also has diversity jurisdiction over the state law claims against the out-of-state Defendants because they did or are doing business in the State of Wisconsin, the acts complained of herein occurred in the State of Wisconsin, Plaintiff represents a Wisconsin-based employee stock ownership plan and the Employee Participants, and the amount in controversy herein exceeds $75,000.

**IV.**    <u>**NON-PARTIES IN INTEREST**</u>

108.    Non-Party Appvion, Inc. is a Delaware corporation with its principal place of business in Appleton, Wisconsin.

109.    Non-Party Paperweight Development Corp. ("PDC") is a Wisconsin corporation with its principal place of business in Appleton, Wisconsin.  PDC is Appvion's parent company, and the ESOP Plan was the sole shareholder of PDC.

110.    Non-Party Benefits Consultants, Inc. ("BCI") is a Florida corporation with its principal place of business in Tampa, Florida.  BCI was purchased by Principal Financial Group ("Principal") in 2003.  BCI, and later Principal, acted as the administrator for the ESOP Plan.

111.    Non-Party Principal Financial Group ("Principal") is an Iowa corporation with its principle place of business in Des Moines, Iowa.

**V.**    <u>**DEFINED TERMS**</u>

112.    "AWA" is defined as Arjo Wiggins Appleton.

113.    "ESOP Committee" is defined as employee stock ownership plan administrative committee of Appvion, Inc.

114.    "Houlihan Defendants" is defined as Houlihan Lokey and Louis Paone.

115.    "LTIP" is defined as Appvion's Long Term Incentive Plan which became effective on or about December 1, 2001.

116.    "PDC" is defined as Paperweight Development Corporation.

117.    "ESOP Plan" is defined as Appleton Papers Retirement Savings and Employee Stock Ownership Plan as amended in 2001 and from time to time thereafter.

118.    "Employee Participants" is defined as employees of Appvion who chose to transfer funds from their 401(k) accounts into the ESOP Plan proposed in 2001 and those that invested in the ESOP Plan various times thereafter.

119.    "RSU" is defined as the long-term restricted stock unit plan adopted by Appvion effective January 3, 2010.

120.    "SERP" is defined as Supplemental Executive Retirement Plan.

121.    "SRR Defendants" is defined as SRR, Levine, El-Tahch, and Socol.

122.    "State Street Defendants" is defined as State Street, Driscoll and Marzeotti.

123.    "Willamette Defendants" is defined as Willamette, Levine, El-Tahch. and Socol

## VI.    FACTUAL BACKGROUND

124.    Appvion was formed in 1907 in Appleton, Wisconsin as The Appleton Coated Paper Company.

125.    It operated as an independent company until 1970, when it merged with the NCR Corporation ("NCR").

126.    In 1971, NCR merged Appleton Coated with Combined Paper Mills into Appleton Papers, Inc., with headquarters in Appleton.

127.    In 1978, NCR sold Appleton Papers to B.A.T. Industries P.L.C.  In 1990, B.A.T. spun off Appleton Papers and another subsidiary, Wiggins Teape into an independent company called Wiggins Teape Appleton.

128.    In December 1990, Wiggins Teape Appleton merged with French paper company Arjomari-Prioux, and the new entity became AWA.

129.    Appvion has historically had two primary business lines—carbonless paper and thermal paper.

130.    Carbonless paper was invented by Appleton Papers in 1954, and is a type of coated paper designed to transfer information written on the top sheet onto sheets beneath it.

131.    While Appvion had approximately 60% of the carbonless paper market in the late 1990s, the market was declining by eight to 9% per year due to the advent of computers.

132.    Appvion invented thermal paper in 1969; thermal paper is used for receipts, lottery tickets, and other similar applications.

**A.    AWA and Buth Agreed To An Employee Buyout That Created a Conflict of Interest for Appvion Management.**

133.    In 1998, Buth was named as CEO of Appleton Papers.

134.    In approximately November 2000, Buth presented the idea of an employee buyout to AWA.

135.    AWA agreed to the employee buyout.

136.    Effective 26 November 2000, AWA spun off the assets and operations of two of Appleton Papers' business lines into new entities, Appleton Coated LLC and Appleton Leasing LLC.

137.    On 12 February 2001, AWA signed a letter of intent to sell Appleton Papers to Paperweight Development Corporation ("PDC") for $843,000,000. PDC would be owned entirely by employees as an S corporation, which meant it was tax exempt. In July 2001, the purchase price was adjusted to $810,000,000.

138.    Also on 12 February 2001, AWA signed a letter agreeing to pay Buth and other executives of Appleton Papers bonuses if they were able to complete a sale of Appleton Papers; the bonuses would only be available if the sale was completed in 2001. The bonuses consisted of two main components:

- A "Value Related Completion Bonus" (sales incentive) which created a bonus pool of up to $10 million depending on the sale price.  Based on the $843 million sale price in the letter of intent, the pool would be $2.9062 million.  If the ultimate sale price was $700 million or less, there would be no bonus pool.  According to the prospectus, the sales incentive was ultimately $2.46 million, with 40% of it allocated to Buth and the rest to be distributed to other employees at Buth's discretion.

- "Loyalty Payments" totaling $4.403 million, payable only if the sale price was greater than $759.403 million.  Each individual who would receive a Loyalty Payment agreed to defer 30% of the payment for between 5 and 10 years.  Under the Deferred Compensation Plan, the value of the deferred portion of this payment was tied to the increase in the value of stock.  According to the prospectus, the loyalty payments ultimately totaled $4.1 million, with $1.2 million of it deferred.

139.    These incentive payments were to be recorded as obligations of Appleton Papers prior to closing of the Transaction.

140.    Buth retained Houlihan to develop a plan for the employee buyout.

141.    According to Houlihan's 14 February 2001 engagement letter, signed by Paone, Houlihan was to act as PDC's "exclusive financial advisor with respect to the possible acquisition . . . by a to-be-formed Employee Stock Ownership Plan ('ESOP') . . . ."

142.    Also according to that letter, Houlihan was to receive a transaction fee at "Transaction closing equal to 1.0% of the 'Aggregate Consideration' paid for the stock of the Company with respect to an ESOP Acquisition."

143.    An addendum to that later indicates that Houlihan was to complete two phases of work which included, among other things:

- Corporate due diligence;

- Transaction value parameters;

- ESOP transaction model construction;

- Financing assessment and capital tranche sources and terms;

- Management deferred compensation and option/stock roll overs;

- Use of pension plans over-funded balances;

- Management bonus participation as ongoing investment tool;

- Assist Management in negotiations regarding a purchase of PDC;

- Advise management on the selection of the "ESOP Team" including independent trustee, ESOP Counsel, ESOP Financial Advisor and negotiate engagement terms;

- Advise on the structure of management performance warrants as part of bonus/incentive plans;

- Prepare materials to be presented to employees; and

- Assist in the documentation of transaction terms.

144.    The letters between Houlihan and Buth were not disseminated to the ESOP Plan or the Employee Participants so they did not know about Houlihan's contingent transaction fee.

145.    The plan developed by Houlihan was to use at least $100 million from the employees' 401(k) retirement plans to fund a portion of the buyout, with the rest of the sale price coming from bank debt, bonds and seller financing.

146.    After agreeing to the employee buyout in February 2001, Buth then announced the plan to the employees.

147.    On July 20, 2001, James Waldo, Director of Houlihan and Buth executed another retainer agreement, which engaged Houlihan to "render an opinion as to the fairness to the Shareholder of the Company, from a financial point of view of the consideration to be paid by the Company . . . in connection with the Transaction and that such consideration is not more than the fair market value of Appleton." Houlihan charged $100,000 for this fairness opinion, which would be credited toward the 1% transaction contingent fee Houlihan was entitled to under the February 2001 retainer agreement.

148.    This engagement was signed just four months after Appvion's 26 March 2001 newsletter warned that those performing fairness opinions must have no conflicts that might "impair independence":

### Who is Qualified To Issue ESOP Fairness Opinions?

* * *

1.      **No conflicts of interest** and/or **fee arrangements based on contingencies**, both of which would **impair the independence of the financial advisor**.

Appleton Papers, "The Ownership Update," Issue 4, 26 Mar 01, p. 2.

### B.    **Appvion Management Pitched the Buy Out to Appvion Employees.**

149.    The Appleton Papers Retirement Savings Plan was established effective 1 January 1985. This plan consisted primarily of a 401(k) component. As of July 2001, Appvion employees had approximately $155 million in their 401(k) accounts through the original Plan.

150.    In order to implement the deal as structured by Houlihan, at least $100 million out of the approximately $155 million in Appvion employee 401(k) accounts would need to be contributed to carry out the buyout.

151.    Without the employee's $100 million, the deal could not go forward as structured.

152.    Appvion management and the ESOP professionals therefore had to pitch the transaction to employees and convince them to transfer a substantial portion of their 401(k) funds to the ESOP.

153.    Appvion management circulated a prospectus dated 23 July 2001 to employees. The prospectus included the following statements:

- Paperweight Development's financial advisor, Houlihan, and the CEO team believe that the purchase price as negotiated is fair to the buyers.

- Houlihan has rendered its preliminary opinion to Paperweight Development's board of directors that the purchase price that Paperweight Development is paying for us in the acquisition is fair, from a financial point of view, to the ESOP, as the sole shareholder of Paperweight Development. Houlihan's preliminary fairness opinion was based on a number of facts and assumptions, including financial information through the end of April 1, 2001. Its preliminary opinion was rendered to the board of directors of Paperweight Development and may not be relied upon by any other person. Houlihan has been asked to render a fairness opinion to the Board of Directors of Paperweight Development effective as of the closing of the transaction to the effect described above.

154.    The Prospectus did not disclose that Houlihan's fees were contingent on the deal closing or that they were structured as a percentage of the purchase price.  In other words, Houlihan did not disclose it stood to gain millions but only if its fairness opinion supported the stock purchase and only if Houlihan could convince the ESOP Plan and Appvion's employees to support the ESOP purchase.

155.    In a 25 July 2001 letter to employees, Buth represented that the ESOP buyout "offers all employees not only a unique ownership opportunity, but also the potential for extraordinary rewards for initial investors and greater control of our company's future." He also stated that "[d]uring the past few months we have made every effort to educate you about employee stock ownership. This package of materials includes more detailed information about our KSOP plan as well as a complete prospectus."

156.    Buth stressed that Houlihan and State Street would provide "independent validation of the deal": "I also encourage you to attend a KSOP Road Show meeting where I will discuss our KSOP opportunity. You will also receive independent validation of the deal from Lou Paone, our investment banker, and Kelly Driscoll, the ESOP trustee."

157.    In order to convince employees to contribute to the ESOP, Appvion executives Buth, Karch, and Arent, along with State Street's Driscoll, Houlihan's Paone, Principal's Pete Prodoehl, and Willamette's Braun, held a series of meetings they referred to as road shows to present the buyout to Appvion's employees.

158.    The road shows included at least two visits to each of Appvion's major facilities.

159.    As part of the pitch to convince employees to transfer their 401(k) funds to the ESOP, employees were told that the buyout was necessary or the company would be sold to an equity firm and be sold off for scrap, or that an equity firm would bleed the company dry and run it into the ground.

160.    As discussed above, Buth, Karch, and Arent presented the buyout transaction at a road show on 2 August 2001, along with purportedly "independent" ESOP professionals, Paone (Houlihan), Driscoll (State Street), and Braun (Willamette). During this presentation, they urged employees to invest in the ESOP, emphasizing the benefits of an once-in-a-lifetime investment

opportunity. However, they failed to disclose Houlihan's conflict of interest and glossed over the risks of moving retirement funds from a 401(k) fund to a highly leveraged ESOP and the specific business risks that Appvion faced.

161.    As described herein, Appvion management along with Houlihan Defendants, State Street Defendants, the Willamette Defendants, and others, used fraudulent representations and omissions to convince Appvion employees to agree to the ESOP Plan.

162.    The Transaction closed on 9 November 2001.

**C.    Appvion Amended the Existing Employee Retirement Savings Plan Into the Appleton Papers Retirement Savings and Employee Stock Ownership Plan.**

163.    In anticipation of the buyout transaction, the Appleton Papers Retirement Savings Plan was amended and restated as of 1 January 2001 and renamed the Appleton Papers Retirement Savings and Employee Stock Ownership Plan. The amended and restated plan added the ESOP Component while retaining the traditional Non-ESOP Component.

164.    Under the terms of the ESOP Plan, as amended, Employee Participants would be eligible to make a one-time irrevocable election in 2001 to transfer a portion of their non-ESOP accounts to an ESOP account. The ESOP account funds would then be invested in the stock of PDC Acquisition Corporation which would become PDC stock after the Transaction closed.

165.    After the initial election in connection with the 2001 Transaction, participants in the ESOP Plan could elect to contribute a portion of their wages on an ongoing basis to either the Non-ESOP Component or the ESOP Component. Initially participants could contribute up to 15% of their salary to the ESOP Component, but in January 2002 the ESOP Committee voted to allow deferrals of up to 50% of their salary.

166.    Deferrals or contributions to the ESOP Component would be invested in the stock of PDC, and the ESOP was the sole shareholder of PDC. PDC, in turn, owned all of Appvion's

stock.  Shares owned by the ESOP would be allocated to the ESOP accounts of participants, who were the beneficial owners of PDC/Appvion.

167.    In theory, the share repurchase obligations would be funded from employee contributions to the ESOP Plan.  Under the terms of the ESOP Plan, Appvion would also make matching contributions on behalf of employees; according to the terms of the ESOP Plan, the Board of Directors had the sole discretion to determine whether matching contributions would be in the form of company stock or cash.

168.    If net repurchases exceeded contributions to the ESOP, repurchases were funded through a loan from Appvion to PDC, which PDC loaned to the ESOP.

169.    Share repurchases would reduce the total number of shares in circulation.  For example, if there were 10,000,000 shares issued and the ESOP repurchased 1,000,000, the total share count would be reduced to 9,000,000.  After the initial buyout transaction, 10,684,373 shares of PDC stock were issued.  By the time of the Bankruptcy in October 2017, only 5,932,120 shares remained outstanding. Stated differently, Appvion had to purchase over 4,000,000 of shares at inflated prices, drastically reducing its liquidity.

170.    Withdrawals from a participant's ESOP account were limited to statutory diversification, additional diversification, participant loans, retirement, disability, death, termination or employment and hardship distributions.  As Appvion's liquidity eroded and the stock price declined, the majority of ESOP investors were unable to diversify their ESOP investment into other investments.

171.    Any sales or purchases of PDC stock were required to be for fair market value.

1.      **Fiduciaries of the ESOP**

  a.      **The ESOP Committee**

172. The ESOP Plan authorized the creation of the ESOP Committee, which was to consist of at least three members.

173. Under the terms of the ESOP Plan, Appvion's Board of Directors had the sole authority to appoint members of the ESOP Committee.

174. Pursuant to the ESOP Plan, the ESOP Committee was "the named fiduciary with respect to the financial management of the ESOP Plan and the control or management of the assets of the Plan[.]"

175. Also pursuant to the ESOP Plan, the ESOP Committee had the following powers and responsibilities:

- to establish and carry out, or cause to be established and carried out by those persons (including without limitation, any investment manager or trustee) to whom responsibility or authority therefore has been allocated or delegated in accordance with this ESOP Plan or the Trust Agreement, funding and investment policies and methods consistent with the objectives of the ESOP Plan and the requirements of ERISA. For such purposes, such Committee shall, at a meeting duly called for the purpose, establish funding and investment policies and methods that satisfy the requirements of ERISA, and shall meet at least annually to review such policies and methods. All actions taken with respect to such policies and methods and the reasons therefore shall be recorded in the minutes of the meetings of such Committee;

- to appoint a trustee or trustees to hold the assets of the ESOP Plan, and who, upon acceptance of being appointed, shall have authority and discretion to manage and control the assets of the ESOP Plan, except to the extent that the authority to manage, acquire or dispose of assets of the ESOP Plan is delegated to one or more investment managers pursuant to paragraph (3) below; and

- to appoint an investment manager or managers, as defined in Section 3(38) of ERISA, to manage (including the power to acquire, invest and dispose of) any assets of the ESOP Plan.

176.    The ESOP Committee also had the right to delegate its responsibilities under the ESOP Plan to third parties and had authority to establish nondiscriminatory rules relating to the Additional Diversification right.

177.    A 2006 KSOP Guide distributed to employees titled "Take Ownership of your Future" confirmed the ESOP Committee's fiduciary status, stating "Because the committee exercises discretionary authority with respect to the management of the ESOP and provides direction to the ESOP trustee, its members also have a fiduciary obligation to act in the best interest of the ESOP."

178.    In January 2008, the ESOP Committee adopted a Charter.    According to the Charter, the ESOP Committee's primary responsibilities were, among other things:

- To oversee the administration and enforcement of the Appleton Employee Stock Ownership Plan;

- To direct the activities of the Trustee of the ESOP Plan;

- Appoint Trustee or Trustees to hold the assets of the ESOP Plan;

- Review stock price calculations as soon as practical after the Trustee establishes the stock price;

- Review current/forecasted company financial performance and covenant compliance;

- Review status of the ESOP Plan in relation to ERISA to ensure compliance;

- Review performance of the record keeper for the ESOP;

179.    A 13 May 2015 presentation to Appvion's Board of Directors described the ESOP Committee's responsibilities, including the "**Semi-annual review and approval of stock price calculations** with Trustee and Stout Risius Ross."

### b.    The Trustee

180.    Appvion appointed State Street as the trustee for the ESOP Component of the ESOP Plan effective as of 1 June 2001.

181.    State Street was empowered to retain an Independent Appraiser to value the shares of PDC's stock.

182.    In March 2013, State Street stepped down as ESOP Trustee, purportedly as part of a decision to no longer serve as trustee for private ESOPs.  Appvion retained Reliance Trust to serve as the trustee effective 1 April 2013.

183.    In 2014, Reliance Trust sold its ESOP business unit to Argent, and Argent took over as trustee pursuant to a trust agreement effective 1 July 2014.  The ESOP Committee voted to choose Argent as the trustee in May 2015.

184.    Pursuant to a May 2015 engagement letter and an Amended and Restated Trust Agreement effective 3 August 2015, Appvion designated Argent as a discretionary trustee.

185.    The trust agreements and the May 2015 engagement letter are collectively referred to herein as the "Trust Documents."

186.    Under the Trust Documents, the Trustee Defendants were required to retain an "Independent Appraiser," as described by Section 401(a)(28)(C) of the Internal Revenue Code, to value PDC stock.  However, the Trustee Defendants were responsible for reviewing and finalizing the valuation in accordance with Section 3(18)(B) of ERISA, which requires the fair market value to be determined in good faith by the trustee.

187.    In addition, the Trust Documents required the Trustee Defendants "to report to the Company as of the last day of each Plan Year . . . the then "Net Worth" of the Trust Fund, that is, the fair market value of all property held in the Trust Fund, reduced by any liabilities other than liabilities to Participants in the Plan and their Beneficiaries, as determined by the Trustee."

188.    The May 2015 engagement letter with Argent also required Argent to provide the ESOP Committee and the Board of Directors with a report on the activities of the ESOP and Argent's actions as trustee within thirty days after the completion of the valuations.

189.    The August 2015 trust agreement also gave Appvion the right to inspect the books and records of the trust and report on the examination to the Board of Directors.

190.    On information and belief, the Trustee also met with Appvion and PDC's Board of Directors to report on the ESOP Plan.

<div align="center">

c.    **The Board of Directors**

</div>

191.    The Board of Directors for Appvion and PDC were identical, and the Director Defendants were members of both Boards of Directors.

192.    Appvion and PDC's Board of Directors was also a fiduciary of the ESOP Plan under ERISA § 3(21)(A) (29 U.S.C. § 1001(21)(A)) because it exercised discretionary authority or control regarding the management of the ESOP Plan.

193.    Specifically, the Board of Directors was responsible for appointing the members of the ESOP Committee under the ESOP Plan Document, as well as selecting a chairman and secretary for the ESOP Committee.  Accordingly, the Board of Directors had a duty to monitor the ESOP Committee.

194.    The Board of Directors also had the following responsibilities under the ESOP Plan Document:

- Discretion for determining the percentage of matching contributions to the ESOP as well as whether matching contributions to the non-ESOP Component or the ESOP Component would be in the form of cash or company stock.

- The power to amend the ESOP Plan Document.  Starting in approximately 2008, the Board delegated the authority to make non-material amendments to the ESOP Plan to the ESOP Committee.

195.    In addition, while the ESOP Plan Document gave the ESOP Committee the authority to appoint the trustee, in practice the Appvion/PDC Board of Directors appointed the trustee.  In a 26 March 2001 newsletter, Karch stated that he, Buth, and Parker, the sole members of the Board of Directors at the time, had selected Driscoll and State Street to serve as the trustee.

196.    This was confirmed in the 2006 KSOP Guide, which included the following graphic:



197.    Similarly, a November 2002 presentation explained that the Board of Directors appoints the Trustee.

198.    A 19 March 2001 employee newsletter emphasized the Board of Directors' fiduciary role in managing the company, which included reviewing the company's projections against its actual performance:

- "Shareholders have the right to elect a board of directors, a governing body that has the authority to manage the business and affairs of a corporation and has a 'fiduciary obligation,' or legal responsibility, to represent the interests of the shareholders."

- "A board of directors is charged with 'high level' oversight of the company, its officers and employees, as well as the company's financial performance. The

board of directors appoints company officers and the company officers hire the management team who are responsible for the company's day-to-day operations."

- "The board of directors and company officers make many significant decisions, such as establishing the company's financial objectives, reviewing its performance against its objectives, and determining appropriate business strategies.

- "The trustee is selected and retained by the board of directors, who evaluate the qualifications of the trustee on the basis of a number of factors."

199.    In response to the question "How do we know the board of directors will make good decisions for us?" the newsletter stated:

- "The board of directors has a fiduciary obligation to the company's shareholders. That is, they have a legal responsibility to ensure that the shareholder interests are served."

- "In an ESOP company, the board has a legal obligation to the ESOP trustee as the shareholder."

- "The ESOP trustee has a fiduciary obligation to act in the best interests of plan participants."

- "The plan participants are the company's beneficial shareholders. Thus, in ESOP companies, there are two entities charged with acting in the best interests of the participant shareholders, the trustee and the board of directors."

200.    A 2006 KSOP Guide distributed to employees contained nearly identical language.  That document also reiterated that "The Appleton board of directors hired State Street Trust Company to serve as our ESOP trustee."

201.    According to a September 2003 newsletter, State Street representatives also attended at least one meeting of the Board of Directors per year and met with the outside directors that served on Appvion's Board of Directors.

202.    A January 2006 employee newsletter stressed that the board of directors has a legal obligation to prevent fraud relating to the ESOP: "Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole shareholder) to prevent the kind of fraud that occurred at Enron."

203.    On information and belief, the Director Defendants also participated in road shows to discuss the valuations and the ESOP Plan with employees.  For example, in November 2007, the ESOP Committee discussed holding a road show "including representatives of State Street Global Advisors, Stout Risius Ross, the ESOP Committee, and a representative from the Appleton Board of Directors and the Audit Committee."  Emails from Richards to employees on 9 November and 6 December 2007 indicated that Carter would be the director at the road shows.

204.    As a specific example, a 15 August 2008 email from Richards to Appvion employees reported on a meeting of the Appvion and PDC Board of Directors, stating that

- "The audit committee reviewed and approved our quarterly SEC filing (10Q) and earnings release and discussed the oversight and control measures we have in place for the company."

- "Tom Ferree, chief financial officer, and Syd Marzeotti from State Street joined us for the board meeting on August 7.  Tom presented an operations updated and projections for the third quarter and full-year financials.  The second half of the year will be challenging because we anticipate continued weakness in the economy.  Our estimates assume some improvements to international and

domestic sheet volume, but continued inflationary pressure on our operations. The board praised Appleton employees for our determined efforts to reduce costs and eliminate waste through Lean Sigma and spending controls."

205.    As the party responsible for appointing the ESOP Committee members and the Trustee Defendants, the Director Defendants had a duty to monitor their performance, including a duty to review the valuations.  Director Defendants at all times had the authority to oversee the actions of the Trustee and the ESOP Committee.

206.    Under the 2015 trust agreement with Argent, the Director Defendants had the right to request a full report from Argent on its actions as trustee at any time, and Argent was required to provide a report on its actions and the activities of the ESOP within thirty days of each completed valuation.

## 2.    The ESOP Plan Did Not Have Control That Would Justify the Control Premium.

207.    Under ¶ 14.1(a)(1) of the ESOP Plan and the 2006 KSOP and Me document, Employee Participants were only entitled to vote on corporate matters that involved extraordinary transactions.  For example, "the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business, or such other transactions that may be prescribed by regulation . . . ."  However, the ESOP Committee had "the sole responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this provision."

208.    However, the ESOP Plan provided that "In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee."

209.    On 9 November 2001, the Appleton Papers Inc. Employee Stock Ownership Trust, through State Street as Trustee, entered into a Security Holders Agreement with PDC.

210.    Under § 1.2(a) of that agreement, State Street and PDC agreed that they were to nominate the seven members of Appvion's Board of Directors as follows:

- Prior to January 1, 2003, the Trustee and Appvion's CEO would each nominate three individuals to the Board and the Trustee and CEO would jointly nominate one individual;

- In 2003, the Trustee would nominate two individuals to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate two individuals;

- In 2004, the Trustee would nominate one individual to the Board, the CEO would nominate three individuals to the Board, and the Trustee and CEO would jointly nominate three individuals;

- After January 1, 2005, the CEO would nominate four individuals to the Board and the Trustee and CEO would jointly nominate three individuals.

211.    Under § 1.2(b) of the Security Holders Agreement, votes to remove any director were subject to § 1.2(a), and jointly nominated directors could only be removed by mutual agreement of the Trustee and the CEO.

212.    Therefore, after 1 January 2005, no director could be elected without CEO approval and no director could be removed without CEO approval.

213.    Under § 2.2 of the Security Holders Agreement, PDC and Appvion were authorized to engage in acquisitions of other companies for less than $100 million without permission of the Trustee.

214.    The terms of Security Holder's Agreement were not disclosed in the Prospectus. The terms first appeared in a Prospectus Update dated 19 November 2001.  The terms of the ESOP Plan and the Security Holders Agreement severely limited the ESOP Plan's ability to control the affairs of PDC or Appvion.

**D.      The Trustee Defendants Retain an Independent Appraiser.**

215.    Under the Trust Documents, the Trustee Defendants were responsible for retaining an independent appraiser and for reviewing and approving the valuations.  However, the Trustee was ultimately responsible for setting the share price which would be used for all ESOP transactions.

**1.      Willamette and SRR Valued PDC Stock At Least Two Times Per Year.**

216.    To determine the value of PDC stock, SRR and Willamette employed two appraisal methods—the Guideline Company Method and the Discounted Cash Flow Method.

217.    These methods did not value Appvion as a company, but rather broke it into segments and then added the values for those segments together.  The primary segments used for the valuations were the Carbonless and Thermal segments, but at times SRR and Willamette also valued the Performance Packaging segment (included through the 31 December 2009 valuation), BemroseBooth (included through the 31 December 2007 valuation), and Encapsys (valued from mid-2009 through the end of 2014).

218.    SRR's 30 June 2005 valuation report described the Discounted Cash Flow ("DCF") Method as follows:

- "The Discounted Cash Flow ('DCF') Method estimates the value of a company based on the present value of its expected future economic benefits (i.e., distributable cash flow). Distributable cash flow is a preferred measure of a

company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to the owners of a business without impairing its operations."

- "To perform a DCF Method analysis, the future available cash flow that a business can generate is projected by estimating each year's revenue, expenses, and other items such as capital expenditures and additional working capital requirements. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk. Each element of this computed rate is expressed in terms of current market yields as of the Valuation Date."

- "The application of the DCF Method is meaningful with respect to the valuation of Appleton. Appleton is an operating entity that is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value. Our application of the Discounted Cash Flow Method—which is used to value each business unit separately—is presented in Section VII of this report."

219.    SRR's 30 June 2005 valuation report described the Guideline Company Method as follows:

- "The Guideline Company Method estimates the value of a company by comparing it to publicly traded companies that are similar from an investment risk

and return perspective. Criteria for comparability in the selection of publicly traded companies include industry and operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics."

- "Once a guideline company is selected, pricing multiples are developed by dividing the enterprise value of the guideline companies by appropriate measures of operating results, such as sales, operating income, or operating cash flow. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate multiples are applied to the operating results of the subject company to estimate value."

220.    SRR would perform each of these valuation methods and weighted them equally. For example, if the DCF Method valued the Thermal business at $210 million and the Guideline Company Method valued it at $200 million, SRR would add those two numbers and divide by two, reaching a valuation of $205 million.

221.    SRR's goal was to determine the fair market value of PDC stock.  SRR defined "fair market value" "In accordance with Title I of ERISA and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18(b)(2)(i))" as:

> "[T]he price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, with both parties being able, as well as willing, to trade, and with both parties being well-informed about the asset and the market for the asset."

222.    In its early valuation reports, SRR further defined "asset" in its definition of fair market value as "the combined tangible and intangible assets of a company as components of a going concern business enterprise, and also gives consideration to all known liabilities."

However, as discussed below, SRR's valuation reports failed to give consideration to all known liabilities.

### 2.    After the 2001 Transaction, the Share Price Increased Dramatically.

223.    State Street retained Willamette to issue a valuation opinion at the time of the 2001 Transaction.  Willamette opined that the purchase price was for not more than fair market value.  The initial share price was set at $10 per share.  This "per share purchase price and the number of shares to be sold were arbitrarily determined based on the need to raise a minimum of $100 million."

224.    This share price was used in the initial allocations and was also used to grant phantom stock to executives under the Long-Term Incentive Plan (discussed below) in December 2001.

225.    Starting 31 December 2001, the Trustee was required to begin conducting semi-annual valuations of PDC stock.

226.    At an 8 January 2002 meeting, the ESOP Committee recommended that that the Trustee retain Willamette as the valuation firm for the 31 December 2001 and 30 June 2002 valuations.

227.    Accordingly, State Street retained Willamette to conduct the valuations for the years 2001 through mid-2004.

228.    Scott Levine was the primary Willamette employee responsible for Appvion's valuations.

229.    Willamette reached the following determinations of share value:

| Valuation Date | Share Price |
| --- | --- |
| 11/9/2001 | $ 10.00 |
| 12/31/2001 | $ 12.81 |
| 06/30/2002 | $ 18.58 |

Case 1:18-cv-01861-WCG    Filed 01/08/19    Page 83 of 1527    Document 14-2

| Valuation Date | Share Price |
|---|---|
| 12/31/2002 | $ 21.92 |
| 06/30/2003 | $ 22.42 |
| 12/31/2003 | $ 23.36 |
| 06/30/2004 | $ 26.09 |

230.    The 31 December 2001 valuation represented a 28% increase over the 9 November valuation, even though it was only conducted a mere seven weeks after the initial buyout transaction closed and the company's fundamental health had not changed.  The 30 June 2002 valuation just six months later was a 45% increase over the 31 December 2001 valuation and an 86% increase over the 9 November 2001 valuation.

231.    In 2004, Levine, the principal individual handling the Appvion account, left Willamette and went to work for SRR.

232.    At the 14 January 2005 meeting of the ESOP Committee, the Committee recommended that the Trustee retain SRR for the December 2004 valuation and subsequent valuations.

233.    SRR conducted the valuations from late 2004 through 2017.  Levine continued to be the primary SRR employee responsible for the valuations and responsible for meeting with the ESOP Committee. Indeed, Levine presented valuations at ESOP Committee meetings, often in the presence of El-Tahch, Marzeotti, Martin and Kaplan.

234.    Indeed, Marzeotti attended at least nine ESOP Committee Meetings where SRR's valuations were discussed.  At several of these meetings, Marzeotti even answered questions posed by the ESOP Committee.

235.    SRR reached the following determinations of share value as financial advisor to State Street:

| Valuation Date | Share Price |
|----------------|-------------|
| 12/31/2004 | $ 26.36 |
| 06/30/2005 | $ 27.77 |
| 12/31/2005 | $ 28.56 |
| 06/30/2006 | $ 31.27 |
| 12/31/2006 | $ 33.62 |
| 06/30/2007 | $ 32.89 |
| 12/31/2007 | $ 33.41 |
| 06/30/2008 | $ 26.64 |
| 12/31/2008 | $ 21.43 |
| 06/30/2009 | $ 18.87 |
| 12/31/2009 | $ 13.26 |
| 06/30/2010 | $ 12.03 |
| 12/31/2010 | $ 12.84 |
| 06/30/2011 | $ 14.10 |
| 12/31/2011 | $ 15.01 |
| 06/30/2012 | $ 16.45 |
| 12/31/2012 | $ 17.55 |

236.    In March 2013, State Street stepped down as ESOP Trustee and the ESOP Plan retained Reliance Trust to serve as the trustee.  Reliance Trust agreed to retain SRR to determine the value of PDC stock.

237.    SRR reached the following determinations of share value as the financial advisor for Reliance:

| Valuation Date | Share Price |
|----------------|-------------|
| 06/30/2013 | $ 17.85 |
| 12/31/2013 | $ 16.25 |

238.    When Argent took over Reliance's ESOP business unit in 2014, Argent continued to employ SRR to conduct the valuations.

239.    SRR reached the following determinations of share value as financial advisor to Argent:

| Valuation Date | Share Price |
|----------------|-------------|
| 06/30/2014 | $ 16.30 |
| 12/31/2014 | $ 11.00 |
| 06/30/2015 | $ 12.90 |

| 12/31/2015 | $ 12.30 |
| 06/30/2016 | $ 13.70 |
| 12/31/2016 | $ 10.35 |
| 06/30/2017 | $  6.85 |

240.    In connection with the appraisals, Appvion released the resulting share price to the ESOP Plan and its participants with a brief explanation.

**E.    The Share Price As Determined By Willamette/SRR and Approved By The Trustees Was Inflated.**

241.    After becoming the sole member of the ESOP Committee in 2017, Mr. Lyon began conducting an investigation into the valuations.    Mr. Lyon determined that SRR's valuations overstated the fair market value of PDC stock because of, among others, the following deficiencies:

- They failed to account for certain known liabilities, including unfunded pension and post-retirement liabilities.

- They relied heavily on projections of future cash flow created by Appvion's management, even though the appraisers, the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants knew that Appvion consistently missed these projections.

- They changed the methodology of their valuations to compensate for periods of low earnings.

- They used the perpetuity model to capitalize a declining income stream, overstating the value of PDC stock.

- They improperly included a control premium that inflated the valuations.

- They failed to include all overhead costs in the projections by breaking Appvion out into business segments, thus failing to account for overhead costs not allocated to individual business segments.

- They failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- They failed to appropriately consider the impact on the discounted cash flow of the need to repurchase PDC stock.

- They failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

- They failed to account for market indicia of value by, for example, failing to consider the market discount to the value of Appvion's debt.

- The appraisals failed to stress test Appvion's projections.

242.    Willamette's valuation reports have not been made available to Plaintiffs. However, on information and belief, those valuation reports had the same flaws as the SRR valuations.  As discussed earlier, Levine was primarily responsible for both the Willamette and the SRR appraisals.

243.    These flaws, which are discussed in more detail below, caused each valuation of PDC stock to be materially and fraudulently overstated, which in turn caused Appvion and the ESOP Plan (largely funded from Appvion's cash) to consistently overpay for the purchase of PDC stock.  Because the ESOP Plan was consistently overpaying for PDC stock, it was taking a

loss with each purchase; in addition, spending the cash on overpriced PDC stock took liquidity away from Appvion.

244.    Appvion had to increase its borrowings in order to fund the repurchase of its shares.  As debt increased, thus reducing equity, Appvion fell deeper into a hole from which it could not recover.  SRR's appraisals helped conceal the extent of Appvion's deteriorating financial condition by indicating there was still equity value in the company; however, ultimately, this only made the problem worse since Appvion and the ESOP continued to overpay for the shares.  Ultimately the deficit reached a point where it could not be concealed anymore and Appvion was forced to file for bankruptcy.

245.    For example, if only the pension/post-retirement liabilities are included, PDC stock would have had a negative value by at least 2009.  Since 2009, the ESOP has therefore overpaid for Appvion stock by at least $57 million.

### 1.    The Valuations Failed to Account for Certain Liabilities.

246.    Each of the semi-annual appraisals from 2001 through 2017 failed to account for material liabilities, even though SRR's own definition of fair market value required it to consider all known liabilities.

### a.    The Valuations Did Not Include Substantial Pension/Post-retirement Liabilities.

247.    For example, unfunded pension/post-retirement liabilities alone exceeded $73 million in 2001 and reached as high as $175.5 million in 2012.  These constituted amounts due under defined benefit plans as well as post-retirement benefits such as retiree healthcare and life insurance.  These retirement-related obligations should be viewed as loans provided by employees to Appvion, to be repaid upon retirement, and are company obligations that are senior to the shareholder's equity.

248.    Each year, these liabilities were prominently displayed in Appvion's PWC-audited financial statements.  For example, the relevant portion of the 2012 balance sheet (which is just like every other year) looks as follows:

| "LIABILITIES, REDEEMABLE COMMON STOCK, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME **(dollars in thousands)** | | |
| --- | --- | --- |
| | December 29, 2012 | December 31, 2011 |
| * * * | | |
| Long-term debt | 511,624 | 510,533 |
| Post-retirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,379 |
| Commitments and contingencies (Note 19) | - | -" |

249.    From 2001 to 2017, Appvion's unfunded pension and post-retirement benefits other than pension liabilities totaled:

| Year | Pension/Post-retirement Liabilities (in thousands) |
| --- | --- |
| 2001 | $73,132 |
| 2002 | $69,221 |
| 2003 | $99,165 |
| 2004 | $108,505 |
| 2005 | $114,139 |
| 2006 | $101,638 |
| 2007 | $64,293 |
| 2008 | $154,896 |
| 2009 | $151,921 |
| 2010 | $133,716 |
| 2011 | $166,856 |
| 2012 | $175,521 |
| 2013 | $96,748 |
| 2014 | $124,656 |
| 2015 | $128,331 |
| 2016 | $132,805 |

| Year | Pension/Post-retirement Liabilities (in thousands) |
|------|---------------------------------------------------|
|      |                                                   |

250.    However, other evidence demonstrates that SRR, the Prior Committee Defendants, and the Director Defendants knew that pension liabilities, in particular, were material to a valuation.  For example, in December 2003, the Board approved Appvion's acquisition of BemroseBooth, a printing business based in the United Kingdom, for $61.7 million.  However, BemroseBooth did not perform as expected and in 2008, Appvion began making efforts to sell BemroseBooth.  Although Appvion received expressions of interest and offers, SRR noted in its 30 June 2008 valuation of Appvion that the bids Appvion received "effectively value BemroseBooth at an equity of zero after considering the assumptions of debt and [BemroseBooth's] **unfunded pension liability** which exceeds… $36 million, based on current estimates."

251.    As a further example, at a 26 May 2016 ESOP Committee meeting, the ESOP Committee discussed its unfunded pension liability and whether SRR should be including the pension funding in its valuations.  The minutes indicated that Ferree would discuss the pension funding issue with SRR on 6 June 2016.  However, SRR never adjusted the valuation to add in unfunded pension/post-retirement liabilities.

252.    On information and belief, the Willamette appraisals prior to 30 June 2005 likewise make no deduction for these unfunded pension/post-retirement liabilities.

**b.    Many of the Valuations Failed to Include All Interest-Bearing Debt.**

253.    SRR's valuations purported to calculate the enterprise value of the company, using the Guideline Company Method and the Discounted Cash Flow Method to reach a value of the full company.  SRR then subtracted certain liabilities to reach a fair market value of the

equity in the company; that fair market value was divided by the number of shares to determine the share price in that valuation.  An example from the 31 December 2008 valuation is below:

| Conclusion of Value | | |
|---|---|---|
| *In Thousands of U.S. Dollars* | | **Indicated Value as of 12/31/2008** |
| Carbonless | $ | 409,000 |
| Thermal | | 233,000 |
| Performance Packaging | | 103,000 |
| **Concluded Enterprise Value** | $ | 745,000 |
| Add:  Cash and Cash Equivalents [a] | | 5,500 |
| Add:  Note Receivable for Bemrose Booth | | 3,000 |
| Add:  Chemical Division Value [b] | | 15,000 |
| **Adjusted Enterprise Value** | $ | 769,000 |
| Less:  Interest-Bearing Debt [c] | | (534,300) |
| **Marketable, Controlling-Interest Value of Equity** | $ | 235,000 |
| Less:  Discount for Limited Marketability | 5.0% | (12,000) |
| **Fair Market Value of Equity (Rounded)** | $ | 223,000 |
| Less:  Synthetic Equity Adjustment | | (109) |
| **Fair Market Value of Equity (Rounded)** | $ | 223,000 |
| Divided by:  Shares Outstanding | | 10,406.611 |
| **Fair Market Value of Equity per Share** | $ | 21.43 |
| Fair Market Value of Equity per Share as of 06/30/2008 | $ | 26.64 |
| Percentage Change | | -19.6% |
| [a] Based on the Company's expected cash and debt balance as of December 31, 2008. | | |
| [b] Calculated by multiplying the Chemical Division's LTM EBITDA of $2.1 million by a multiple of 7 times. | | |
| [c] Assumes the bulk sale of receivables of $20.0 million that is expected to be completed prior to the  Valuation Date.  The Company's cash balance includes the expenses related to the bulk sale of receivables. | | |

254.    The largest liability that impacted value was the amount of interest-bearing debt that the company had.

255.    Appvion's interest-bearing debt load ranged from over $600 million in 2001 to a little over $400 million in 2015.  However, in some of its valuation reports, SRR improperly disregarded or discounted some of that debt, which directly impacted the share price calculation.

256.    In its 31 December 2008 valuation, SRR specifically acknowledged that Appvion had forecast a total interest-bearing debt balance of $602.1 million as of 31 December 2008. However, SRR discounted this value to $534.3 million and used that figure in its "conclusion of value" based on the following factors:

- Debt with a face value of over $250 million was "trading at a discount to par value as of the Valuation Date."  Accordingly, SRR discounted the value of that debt by over $40 million.

- Appvion "intends to repurchase approximately $30 million of its publicly traded" debt for approximately $21 million.

- "[T]he Company expects to consummate a bulk receivables sale for $20 million, which will be used to reduce the outstanding revolver balance[.]"

257.    SRR should not have reduced the debt to its trading value because: 1) Appvion was legally obligated to pay the face value of the debt; 2) Appvion did not have the cash to buy back this debt at a reduced face value; and 3) there was no indication Appvion had any present ability to refinance the full debt.  In addition, as discussed below, the report acknowledged that the debt was trading at a discount at least in part due to "Company-specific performance factors" which indicates the market for the debt was reflecting a high risk of not being repaid.

258.    There is no indication there was any kind of buyout in 2008, since the Company's interest-bearing debt as of December 31, 2008 (as reported in its 2008 10-K filing) was $604.1 million—almost exactly the $602.1 million amount SRR's report identified as the forecast debt. It was improper to exclude liabilities based on potential future transactions that Appvion was not legally obligated to consummate.  If the debt is corrected back to $602.1 million, the stock valuation would have been materially reduced.

259.    SRR's 30 June 2009 valuation report similarly reduces the debt based on the market's trading value of Appvion's debt, again subtracting approximately $60 million from Appvion's actual outstanding debt.  However, Appvion did not actually refinance its debt until 30 September 2009.  SRR's decision to reduce the interest-bearing debt it used in its valuation analysis in the 31 December 2008 and 30 June 2009 valuations overstated the value of equity in the company.

260.    In certain of its reports, SRR failed to include all or part of the revolving line of credit as part of Appvion's "interest-bearing debt" in its valuation.  SRR claimed it was excluding the debt because it was part of Appvion's working capital, which was inconsistent with SRR's own initial standards of valuation and its own admission that "all liabilities" must be considered.  Excluding this debt was inconsistent with SRR's methodology in all other appraisals and overstated the value of Appvion's equity in the affected valuations.  This had a material impact on the share price valuation as shown below:

| Valuation Date | Revolving Line of Credit - total Debt (in thousands) | Amount of Revolver Excluded from Valuation (in thousands) | Share Price per SRR Valuation | Share Price If Revolver Included | Share Price Impact |
|---|---|---|---|---|---|
| 06/30/2012 | $32,150 | $32,150 | $16.45 | $12.84 | $3.61 |
| 06/30/2013 | $34,600 | $24,600 | $17.85 | $14.88 | $2.97 |
| 12/31/2015 | $9,600 | $9,600 | $12.30 | $11.79 | $0.51 |
| 06/30/2016 | $27,000 | $27,000 | $13.70 | $9.47 | $4.23 |
| 12/31/2016 | $31,920 | $16,898 | $10.35 | $7.65 | $2.70 |
| 06/30/2017 | $19,500 | $8,484 | $6.85 | $5.39 | $1.45 |

261.    In addition, beginning with its valuation as of 31 December 2013, SRR improperly reduced the "interest-bearing debt" it used in its report by certain "unamortized

discounts" that Appvion applied.   For example, as of 3 January 2015 Appvion's financial statements showed the following for its publicly traded loans:

| | Amount as of 3 Jan 15 (in thousands) | Unamortized Discount (in thousands) | Discounted Value (in thousands) |
|---|---|---|---|
| First lien term loan at 5.75%, due June 2019 | $330,813 | $2,588 | $328,225 |
| Second lien senior secured notes payable at 9.0% due June 2020 | $250,000 | $3,255 | $246,745 |

262.    This misstated and undercounted the interest-bearing debt and further caused SRR's valuations to be inflated.

<p align="center">c.    <b><u>The Valuation Reports Omitted Other Significant Liabilities.</u></b></p>

263.    The SRR valuations failed to include additional long-term liabilities that were listed on Appvion's balance sheet, including compensation obligations, workers compensation obligations, accrued insurance obligations, accrued tax obligations, amounts due on accounts receivable securitization, and other obligations.   These liabilities, which were reported in Appvion's audited financial statements, reached as high as $30-40 million in some years and would have had a material impact on the valuations.

<p align="center">d.    <b><u>The Failure to Include All Liabilities Caused the Valuation Reports to Overstate Appvion's Value.</u></b></p>

264.    Had SRR's valuations included just these other liabilities and the pension/post-retirement liabilities, as discussed above, Appvion's fair market value of equity would have been negative or zero every year since 2009:

|  | 12/31/2009 Report (in thousands) | 12/31/2010 Report (in thousands) | 12/31/2011 Report (in thousands) | 12/31/2012 Report (in thousands) |
|---|---|---|---|---|
| SRR Fair Market Value of Equity | $130,000 | $124,000 | $139,000 | $153,000 |
| Pension/Post-retirement Liabilities | $151,921 | $133,716 | $166,856 | $175,521 |
| Other Liabilities | $9,294 | $5,716 | $7,389 | $32,165 |
| Total Excluded Liabilities | $161,215 | $139,432 | $174,245 | $207,686 |
| Revised Value of Equity | $(31,215) | $(15,432) | $(35,245) | $(54,686) |

|  | 12/31/2013 Report | 12/31/2014 Report | 12/31/2015 Report | 12/31/2016 Report |
|---|---|---|---|---|
| SRR Fair Market Value of Equity | $129,600 | $80,700 | $83,000 | $64,900 |
| Pension/Post-retirement Liabilities | $96,748 | $124,656 | $128,331 | $132,805 |
| Other Liabilities | $36,243 | $43,753 | $35,354 | $30,536 |
| Total Excluded Liabilities | $132,991 | $168,409 | $163,685 | $163,341 |
| Revised Value of Equity | $ (3,391) | $ (87,709) | $(80,685) | $(98,441) |

265.    Because the Trustee, Appraiser and Director Defendants reviewed Appvion's PWC-audited financial statements, they were aware of these material liabilities and knew they had been excluded from the valuation analysis.

266.    The Trustee, Appraiser, and Director Defendants also had access to the valuation reports and knew that SRR was not consistently including all of Appvion's interest-bearing debt.

### 2.    SRR's Discounted Cash Flow Analysis Was Flawed.

267.    As part of its DCF method analysis, SRR relied on projections of future earnings over a five-year period, which were prepared by Appvion management.    SRR used these projections to determine two values: 1) the Present Value of Distributable Cash Flows, which

took the projected EBITDA figures over a five years and discounted the expected cash to present value; and 2) a "Terminal Enterprise Value" which took the EBITDA for the Year 5 projection, multiplying it by a "Terminal EBITDA Multiple", and then discounting it to present value. These two values were then added together to reach the enterprise value of that segment (prior to subtracting any liabilities).

268.    For example, below is the 30 June 2012 DCF Method valuation for the Thermal segment:

## IV.   DISCOUNTED CASH FLOW METHOD

### Discounted Cash Flow Method - Thermal

| In Thousands of U.S. Dollars | | Year 1 12/31/2012 | Year 2 12/31/2013 | Year 3 12/31/2014 | Year 4 12/31/2015 | Year 5 12/31/2016 | Residual |
|---|---|---|---|---|---|---|---|
| | | | For the Fiscal Year Ending | | | | |
| **Distributable Cash Flows** | | | | | | | |
| EBITDA | $ | 52,708 | $   59,470 | $   64,699 | $   71,080 | $   80,866 | |
| Depreciation and Amortization | | (15,987) | (15,636) | (15,167) | (14,381) | (14,381) | |
| Income Taxes | | (14,138) | (16,876) | (19,070) | (21,829) | (25,597) | |
| Debt-Free Net Income | | 22,583 | 26,958 | 30,462 | 34,870 | 40,888 | |
| | | | | | | | |
| Depreciation and Amortization | | 15,987 | 15,636 | 15,167 | 14,381 | 14,381 | |
| Capital Expenditures | | (11,900) | (8,400) | (13,300) | (15,400) | (15,400) | |
| Additional Working Capital | | 4,200 | 4,400 | (2,400) | (2,500) | (2,600) | |
| Distributable Cash Flows | | 30,870 | 38,594 | 29,929 | 31,351 | 37,269 | |
| | | | | | | | |
| Partial Period Adjustment [a] | | 0.46 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Distributable Cash Flows Allocated to Projection Period | | 14,149 | 38,594 | 29,929 | 31,351 | 37,269 | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | | |
| Weighted Average Cost of Capital | | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | |
| Discount Period [a] | | 0.23 | 0.96 | 1.96 | 2.96 | 3.96 | |
| Present Value Factor | | 0.9704 | 0.8820 | 0.7737 | 0.6787 | 0.5953 | |
| Present Value of Distributable Cash Flows | | 13,730 | 34,040 | 23,156 | 21,277 | 22,187 | |

| **Enterprise Value** | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2016) | 114,000 | 2016 EBITDA | $   80,866 |
| Present Value of Terminal Enterprise Value | 180,000 | Terminal EBITDA Multiple | 4.0x |
| | | | |
| | | Terminal Enterprise Value | 323,462 |
| **Enterprise Value, Controlling Interest Basis (Rounded)    $   294,000** | | Present Value Factor | 0.5576 |
| | | Present Value of Terminal Enterprise Value | $   180,000 |

[a] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

### a.    The DCF Analysis Was Based on Grossly Inflated Projections of Future Earnings.

269.    Because the projections prepared by Appvion management were unrealistically inflated, Appvion rarely met its targets.  SRR, the Trustee Defendants, the Prior Committee

71

Defendants, and the Director Defendants knew that Appvion consistently missed these projections, sometimes by very wide margins, but there is no evidence that SRR or Willamette challenged or stress tested management's projections.  SRR and the Trustee Defendants should not have relied on the projections prepared by Appvion management knowing that they were consistently inaccurate.

270.    For example, below are the projections used in the valuations as of 31 December 2011 and 30 June 2012, compared to the actual (adjusted) EBITDA for those years as reported in later valuations:

| Thermal Segment | | | | | |
|---|---|---|---|---|---|
| | Year Ending 12/31/2012 | Year Ending 12/31/2013 | Year Ending 12/31/2014 | Year Ending 12/31/2015 | Year Ending 12/31/2016 |
| Projected EBITDA - 12/31/2011 Report | $ 40,400 | $ 41,600 | $ 47,400 | $ 52,800 | $ 58,200 |
| Projected EBITDA - 06/30/2012 Report | $ 52,708 | $ 59,470 | $ 64,699 | $ 71,080 | $ 80,866 |
| Actual (Adjusted) EBITDA | $ 48,968 | $ 41,929 | $ 26,826 | $  8,139 | $ 28,769 |
| Carbonless Segment | | | | | |
| Projected EBITDA - 12/31/2011 Report | $ 50,400 | $ 48,000 | $ 46,000 | $ 44,000 | $ 42,000 |
| Projected EBITDA - 06/30/2012 Report | $ 57,847 | $ 58,600 | $ 57,605 | $ 53,245 | $ 50,837 |
| Actual (Adjusted) EBITDA | $ 51,102 | $ 50,828 | 41,171 | $ 47,191 | $ 32,739[2] |

271.    The projections 1) increased (by an average of 37% for Thermal and 21% for Carbonless) in the 30 June 2012 valuation from the projections used in the 31 December 2011 report; and 2) overestimated EBITDA, especially with the Thermal division missing the mark for

---

[2] Source: The actual EBITDA numbers are from Valuation Report dated 30 June 2017, Exhibits B and C.

2015 EBITDA by more than $63 million as compared to the 30 June 2012 projection.   In addition, the 30 June 2012 projections were made halfway through 2012, but, the projections still materially overestimated EBITDA in 2012.

272.    In particular, since the Year 5 number was the basis for the Terminal Enterprise Value, a high Year 5 value would drastically inflate the Terminal Enterprise Value and therefore the enterprise value as determined by the DCF Method valuation.  The "Year 5" projections used in the DCF analysis were consistently and unrealistically inflated, causing the Terminal EBITDA Value to be consistently inflated.  Below is a chart with the projected Year 5 EBITDA numbers compared to the actual EBITDA for that year, which shows how inflated the Year 5 projection was:

| Thermal | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2010 | $ 26,092 | $ 20,032 |
| | $ 29,191 | |
| 2011 | $ 61,101 | $ 33,306 |
| 2012 | $ 55,479 | $ 48,968 |
| 2013 | $ 52,000 | $ 41,929 |
| | $ 52,600 | |
| 2014 | $ 41,200 | $ 26,826 |
| | $ 50,500 | |
| 2015 | $ 52,483 | $ 7,985 |
| | $ 51,941 | |
| 2016 | $ 58,200 | $ 28,800 |
| | $ 80,866 | |

| Carbonless | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2010 | $ 52,431 | $ 59,387 |
| | $ 66,410 | |
| 2011 | $ 81,784 | $ 49,731 |
| 2012 | $ 83,964 | $ 51,102 |

73

| Carbonless | | |
|---|---|---|
| | Year 5 Projection(s) | Actual EBITDA |
| 2013 | $ 62,000 | $ 50,828 |
| | $ 60,500 | |
| 2014 | $ 54,800 | $ 42,171 |
| | $ 53,200 | |
| 2015 | $ 51,042 | $ 47,191 |
| 2016 | $ 42,000 | $ 32,739 |
| | $ 50,837 | |

273.    The Trustee Defendants, as the parties ultimately responsible for approving the valuations, had a duty to 1) investigate and document the processes that Appvion management used to create these projections; 2) investigate any large, unexplained changes in the projections like the large increase for the 30 June 2012 projections; and 3) critically assess the reasonableness of the projections, especially in light of Appvion's consistent failure to meet its projections.    On information and belief, the Trustee Defendants failed to investigate the projections.

274.    Willamette, SRR, and the Trustee Defendants also should have recognized that the individuals at Appvion who were creating the projections had significant conflicts of interest. Specifically, as discussed below, they would benefit from higher stock prices under numerous incentive compensation plans that were tied to the stock price.    There is no indication they appropriately considered these conflicts of interest.

### b.    The Terminal EBITDA Value Capped A Declining Income Stream into Perpetuity.

275.    A DCF analysis is intended to represent the present value of the future cash flows from the business.    SRR's calculation of the terminal EBITDA enterprise value assumed cash flow would continue growing into perpetuity, or at least continue at the Year 5 level.

276.   However, for all time periods relevant to this Complaint, Appvion was recognized as a declining business; in particular, the Carbonless division was declining as consumers switched to electronic means of communication.  As early as 23 April 2001, Appvion referred to itself as "a company with steady but declining earnings."

277.   However, SRR's calculation of terminal values disregarded any declining EBITDA trends, instead choosing to capitalize (reduce to present value) Appvion's future income streams into perpetuity.  Although it may be appropriate to capitalize an income stream that is assumed to continue into perpetuity, a declining income stream, by definition, cannot continue.

278.   The effect of SRR's capitalization of a declining income stream and the use of unrealistic projections was that the terminal EBITDA value represented a disproportionately high percentage of Appvion's total enterprise value, as shown in the chart below:

|  | Terminal Value Percent of DCF Value - Carbonless | Terminal Value Percent of DCF Value - Thermal |
| --- | --- | --- |
| 06/30/2005 Report | 66% | 81% |
| 12/31/2005 Report | 59% | 78% |
| 06/30/2006 Report | 63% | 79% |
| 12/31/2006 Report | 63% | 93% |
| 06/30/2007 Report | 66% | 94% |
| 12/31/2007 Report | 63% | 93% |
| 06/30/2008 Report | 67% | 83% |
| 12/31/2008 Report | 60% | 71% |
| 06/30/2009 Report | 65% | 70% |
| 12/31/2009 Report | 58% | 79% |
| 06/30/2010 Report | 61% | 73% |
| 12/31/2010 Report | 56% | 65% |
| 06/30/2011 Report | 60% | 68% |
| 12/31/2011 Report | 51% | 66% |
| 06/30/2012 Report | 46% | 61% |
| 12/31/2012 Report | 46% | 66% |
| 06/30/2013 Report | 53% | 68% |

| | Terminal Value Percent of DCF Value - Carbonless | Terminal Value Percent of DCF Value - Thermal |
|---|---|---|
| 12/31/2013 Report | 53% | 70% |
| 06/30/2014 Report | 62% | 77% |
| 12/31/2014 Report | 60% | 71% |
| 06/30/2015 Report | 56% | 63% |
| 12/31/2015 Report | 60% | 65% |
| 06/30/2016 Report | 64% | 66% |
| 12/31/2016 Report | 65% | 64% |
| 06/30/2017 Report | 70% | 67% |

279.    For a business with a declining income stream, it was inappropriate for the terminal values to constitute such a large portion of the overall enterprise value.

280.    SRR's methods were not consistent with recognized appraisal standards. At a minimum, Willamette, SRR, and the Trustee Defendants should have documented in writing why they considered this treatment to be reasonable for Appvion, but they failed to do so.

281.    SRR's willingness to rely upon highly inflated fifth year projections and failure to properly account for Appvion's declining income stream (as reflected by EBITDA), created a disproportionately large terminal value calculation that overstated the value of PDC stock.

282.    This issue was compounded by the fact that Appvion needed to use its cash to meet stock repurchase obligations, which consistently exceeded the amount of cash received from stock purchases. SRR failed to adequately consider this ongoing drain on Appvion's cash flow.

c.    **SRR's DCF Method Analysis Was Not Reliable.**

283.    The DCF method as applied by SRR was also subject to manipulation. The DCF method required SRR to calculate the "Weighted Average Cost of Capital," which was used to generate the discount rate used to determine the present value of the projected cash flows. This calculation purported to represent "an overall rate based upon the individual rates of return for

invested capital (equity and interest-bearing debt)" which is "calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure." Given the same projections, a lower discount rate would lead to a higher valuation, while a higher discount rate would lead to a lower valuation.

284.  In practice, SRR changed the discount rate substantially from valuation to valuation without sufficient explanation. The chart below contains the weighted average cost of capital for Thermal for each of SRR's valuations:

| Valuation Date | Weighted Average Cost of Capital |
|---|---|
| 06/30/2005 | 12.5% |
| 12/31/2005 | 8.5% |
| 06/30/2006 | 9.5% |
| 12/31/2006 | 14.5% |
| 06/30/2007 | 15.5% |
| 12/31/2007 | 12.5% |
| 06/30/2008 | 12.5% |
| 12/31/2008 | 12.5% |
| 06/30/2009 | 12.5% |
| 12/31/2009 | 9.5% |
| 06/30/2010 | 9.5% |
| 12/31/2010 | 10.0% |
| 06/30/2011 | 10.0% |
| 12/31/2011 | 10.5% |
| 06/30/2012 | 14.0% |
| 12/31/2012 | 14.0% |
| 06/30/2013 | 13.5% |
| 12/31/2013 | 12.0% |
| 06/30/2014 | 12.0% |
| 12/31/2014 | 12.5% |
| 06/30/2015 | 12.5% |
| 12/31/2015 | 12.0% |
| 06/30/2016 | 12.5% |
| 12/31/2016 | 13.0% |
| 06/30/2017 | 13.0% |

285.   SRR purported to illustrate how it determined the weighted average cost of capital, but it did not explain critical aspects of the calculation like its selection of a "company-specific risk premium," which varied between 0% for some years and segments and was as high as 8% for some years and segments.

286.   SRR's calculation of the weighted average cost of capital, which was key to its discounted cash flow analysis discussed above, appears to rely on industry rates of return instead of Appvion's actual cost of debt.  Had Appvion's actual bond risk (as shown by the fact that its bonds were trading for below par value, Appvion's Standard and Poor's rating, discussed below) and Appvion's high amount of leverage been considered, the weighted average cost of capital would have been much higher, resulting in a much lower equity valuation.

287.   For example, SRR's valuation as of 30 June 2016, includes a "cost of debt" of 4.4% in the Carbonless calculation of the weighted average cost of capital, referencing that it was "[b]ased on estimated senior lending rates as of the Valuation Date."

288.   However, the same document has an exhibit listing all of Appvion's interest-bearing debt, which shows an actual cost of Appvion debt of 7.55%.  And because Appvion's Second Lien Notes were trading in the 55% of par value ($0.55 on the dollar) range at the time, the actual cost of Appvion debt was even higher.

289.   To compound the problem, the weighted average cost of capital also miscalculates (or assumes) the percentage of debt in Appvion's capital structure was 40%.  In fact, the actual debt percentage was 78.9% as calculated using the interest-bearing debt ($409.4 million) and equity ($87.6 million) figures shown in the appraisal.

290.   As a result, SRR badly underestimates Appvion's actual cost of capital in its calculation of Appvion's weighted average cost of capital.

291.    The other key variable was the Terminal EBITDA Multiple, which was used to multiply the inflated Year 5 EBITDA projection and therefore accounted for a significant portion of the DCF valuation.  This multiple also varied widely with no or insufficient explanation or justification; below is the multiple used for Carbonless in each of SRR's reports:

| Valuation Date | Terminal EBITDA Multiple |
|---|---|
| 06/30/2005 | 6.0x |
| 12/31/2005 | 7.0x |
| 06/30/2006 | 7.0x |
| 12/31/2006 | 7.0x |
| 06/30/2007 | 6.0x |
| 12/31/2007 | 6.0x |
| 06/30/2008 | 6.0x |
| 12/31/2008 | 6.0x |
| 06/30/2009 | 6.0x |
| 12/31/2009 | 5.5x |
| 06/30/2010 | 5.5x |
| 12/31/2010 | 5.5x |
| 06/30/2011 | 5.5x |
| 12/31/2011 | 5.0x |
| 06/30/2012 | 4.0x |
| 12/31/2012 | 5.0x |
| 06/30/2013 | 5.5x |
| 12/31/2013 | 6.0x |
| 06/30/2014 | 5.0x |
| 12/31/2014 | 5.0x |
| 06/30/2015 | 5.5x |
| 12/31/2015 | 5.5x |
| 06/30/2016 | 5.5x |
| 12/31/2016 | 6.5x |
| 06/30/2017 | 7.0x |

292.    For example, SRR gave no justification for why the multiple increased in 2016 and 2017, even though Carbonless was in a declining industry and its EBITDA had decreased substantially.

293.    On information and belief, SRR would sometimes manipulate the discount rate and the EBITDA multiples to prevent large swings in the valuation.    For example, the projections for the Thermal and Carbonless segments discussed above included in the 30 June 2012 valuation report marked a significant increase over the projections included in the 31 December 2011 valuation report.    However, in the 30 June 2012 valuation report, SRR drastically increased the weighted average cost of capital and lowered the terminal EBITDA multiple so that the valuations of Thermal and Carbonless were nearly identical to the prior valuation report:

|  | Valuation as of 12/31/2011 | Valuation as of 6/30/2012 |
|---|---|---|
| **Carbonless** | | |
| Present Value of Distributable Cash Flows (Years 1-5) | $ 133,000 | $ 143,000 |
| WACC | **9.0%** | **12.0%** |
| Terminal EBITDA Value | $ 136,000 | $ 123,000 |
| Terminal EBITDA Multiple | **5.0x** | **4.0x** |
| **Enterprise Value** | **$ 269,000** | **$ 266,000** |
| **Thermal** | | |
| Present Value of Distributable Cash Flows (Years 1-5) | $ 98,000 | $ 114,000 |
| WACC | **10.5%** | **14.0%** |
| Terminal EBITDA Value | $ 194,000 | $ 180,000 |
| Terminal EBITDA Multiple | **5.5x** | **4.0x** |
| **Enterprise Value** | **$ 292,000** | **$ 294,000** |

### d.    SRR Changed Its DCF Methodology in Its 30 June 2015 Report.

294.    The 30 June 2015 DCF analysis also contains an additional material flaw.  SRR typically relied on five years of projected EBITDA in their DCF analysis.  However, the 30 June 2015 valuation used six years of data, which artificially increased the valuation even though the projections used for that year actually decreased.  In addition, the Year 6 projections used in the analysis substantially increased the terminal value of the analysis without explanation or justification.

295.    SRR's valuation report did not explain why it used six years of data instead of five.  While it may be permissible to use more than five years of projections for a DCF analysis (and may have even been preferable considering Appvion's declining revenues), adding an extra year of data for this one report inflated the value of Appvion's stock by approximately $2.00 a share.  It further reflected SRR's willingness to use inconsistent methods from one appraisal period to another.

296.    This valuation report coincided with 1) the sale of Encapsys, which materially lowered the overall value of the company; and 2) a terrible year for the Thermal segment, in which it's EBITDA was only $8 million.  However, using six years of data instead of five allowed SRR to increase the stock price valuation from $11.00 a share in the 31 December 2014 valuation to $12.90 a share in the 30 June 2015 valuation, even though the sale of Encapsys was devastating to Appvion's future ability to grow its cash flow.

### 3.    SRR's Guideline Company Method Analysis was Flawed.

297.    The Guideline Company Method purported to analyze the values of comparable public companies.  This was supposed to be based on SRR's independent research and determination of what companies were similar to Appvion from an investment risk and return

perspective.  However, the ESOP Committee was improperly involved in selecting the guideline companies that SRR used in its analysis.  In its 30 June 2016 valuation reports, SRR specifically acknowledged this guidance—"We searched several sources and held discussions with management to identify guideline public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application in our analysis."

298.    In addition, while the Guideline Company Method relied heavily on analysis of other companies, the basis for the valuation was still projections prepared by management. Specifically, the method involved analysis of the guideline companies in order to determine a range of pricing multiples; SRR would then choose a pricing multiple from that range, and apply it to 1) actual revenue and EBITDA for the twelve months prior to the valuation; and 2) Appvion management's projected EBITDA and revenue for the next fiscal year.  The results of this would then be averaged and a control premium of either 10% or 15% would be added to reach an enterprise value.  For example, below is the valuation for Carbonless from the 31 December 2010 valuation report:

## V.    GUIDELINE COMPANY METHOD

**Indication of Value - Carbonless**

*In Thousands of U.S. Dollars*

| | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $    64,100 | 4.1x | 7.8x | 6.1x | 6.1x | 4.5x | $    288,000 |
| Revenue | 472,000 | 0.53x | 0.95x | 0.76x | 0.79x | 0.65x | 307,000 |
| | | | | | Indicated Enterprise Value (Rounded) | | 298,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 62,931 | 3.3x | 9.0x | 5.8x | 6.3x | 5.0x | 315,000 |
| Revenue | 472,030 | 0.55x | 0.99x | 0.81x | 0.83x | 0.65x | 307,000 |
| | | | | | Indicated Enterprise Value (Rounded) | | 311,000 |
| | | | | | Indicated Enterprise Value, Minority Interest | | 305,000 |
| | | | | | Plus: Control Premium @ 15.0% | | 46,000 |
| | | | | | **Enterprise Value, Controlling Interest Basis (Rounded)** | | **$    351,000** |

299.    Since SRR's application of the Guideline Company method continued to rely on the inflated projections, the resulting calculation of value was likewise inflated.  In addition, SRR relied on the management projections in choosing EBITDA and revenue multiples, so higher projections caused SRR to choose higher multiples.

300.    SRR also applied the Guideline Company analysis inconsistently.  In its valuation reports between 30 June 2009 and 30 June 2012, SRR chose to disregard Thermal's "last twelve months" EBITDA value; this meant that the enterprise value was skewed toward the inflated projections.  In the 30 June 2012 valuation report, SRR took it a step farther and chose to disregard the last twelve months of revenue, so that the valuation was based only on projected data.

301.    In addition, in the 31 December 2012, 31 December 2013, and 31 December 2014 valuation reports, the enterprise value SRR identifies for Thermal through its Guideline Company Method analysis does not match the numbers in the report, overstating the value by

between two and three million dollars.  The Carbonless analysis for 30 June 2014 has a similar defect.

302.    In 2015, Appvion's Thermal segment had a disastrous year and only achieved an EBITDA of $8 million.  To compensate, SRR again changed its methodology in the 30 June 2015 valuation report:

- Ignored the last twelve months EBITDA value;

- Instead of using the projected EBITDA for fiscal year 2015, it used projected EBITDA for fiscal year 2016, which was inconsistent with all of SRR's other valuations;

- For the first time, SRR added a third component to its Guideline Company Method analysis for Thermal only, a three-year historical average of EBITDA and revenue.

303.    Starting with the 31 December 2015 valuation report, SRR disregarded both the three year historical average, last twelve months, and projected EBITDA numbers and relied solely on revenue multipliers in its valuation of the Thermal segment.

304.    As with the Discounted Cash Flow method, SRR's use of multipliers in its Guideline Company Method analyses also varied widely with little explanation.

### 4.    SRR Ignored Market Indications That Appvion Was Insolvent.

305.    In its early valuation reports, part of SRR's valuation process included looking at the Bloomberg valuation for Appvion's publicly-traded debt.  The Bloomberg valuation provides the market price of publicly-traded debt, and therefore the market's opinion of a company's risk of default on its debt.

306.     In its 30 June 2005 and 31 December 2005 valuation reports, SRR noted that Appvion's debt was trading for slightly below par value, citing to the Bloomberg valuation. However, SRR used the book value of the stock for purposes of its valuation, stating that "Because the pricing of the Company's publicly-traded debt can fluctuate materially over a short period of time, we used the book value of the Company's debt to calculate the Company's equity value in our analysis."

307.     SRR continued using the book value of debt until its 31 December 2008 and 30 June 2009 valuations, when it improperly disregarded the book value and used the market value in its valuations as discussed above.

308.     After its 30 June 2009 valuation report, SRR stopped commenting on the Bloomberg value of Appvion's publicly-traded debt entirely.  However, the Bloomberg value increasingly showed that the market considered Appvion to be troubled, when Appvion's Second Lien Notes were priced at a discount to par.  In February 2016, bond prices were trading as low as 30¢ on the dollar, indicating a yield to maturity in excess of 30%.  The Bloomberg value continued to trade Appvion's bonds and notes for below par through the date that Appvion filed for bankruptcy in November 2017.

309.     In addition, based Appvion's had a Standard & Poor's rating of B as early as 2009; in August 2016, the rating reduced to B-.  Standard & Poor's defines a B rating as follows:

> An obligor rated "BB" is less vulnerable in the near term than other lower-rated obligors. However, **it faces major ongoing uncertainties and exposure to adverse business, financial, or economic conditions** that could lead to the obligor's inadequate capacity to meet its financial commitments.
>
> An obligation rated "B" is **more vulnerable to nonpayment than obligations rated "BB"**, but the obligor currently has the capacity to meet its financial commitments on the obligation. **Adverse business, financial, or economic conditions will likely impair**

**the obligor's capacity or willingness to meet its financial commitments** on the obligation.

310.    SRR knew the Bloomberg value and Appvion's Standard & Poor rating was relevant to its valuations, as evidenced by its citation to the Bloomberg value in its earlier reports.  However, Stout chose to ignore this market-based evidence that was inconsistent with its valuations, without explanation or justification.  Likewise, the ESOP Committee, Trustee and Director Defendants failed to require that these market indicators of value be appropriately considered.

### 5.    The Valuations Improperly Applied a Control Premium.

311.    The appraisals improperly applied a control premium in many of their valuations.  According to SRR's valuation reports, the control premium is intended to represent the difference between what a third party would pay for a marketable, minority ownership interest in a company as compared to a controlling interest where the shareholder is able to exert control over the management or operation of the company.

312.    SRR applied this control premium to its appraisals of Appvion in two ways.  First, for the Guideline Company Method, the enterprise value is multiplied by a control premium, which is then added to reach the enterprise value on a controlling-interest basis.  For example, if the enterprise value was $300 million and the control premium was 15%, the final value would be $345 million ($300 million plus 15% of $300 million).  SRR applied a control premium of 15% to its valuations from 2005 through 2011.  Beginning with its 30 June 2012 through its 31 December 2014 valuation, SRR reduced the premium to 10%, without explanation for the reduction.

313.    Starting with its 30 June 2015 valuation, SRR appears to have removed the control premium from its report entirely, though it continued to list the enterprise value as being

on a "controlling-interest basis."  SRR did not explain why it was removing the control premium from its Guideline Company Method analysis, if in fact it did so.

314.    Second, for the discounted cash flow analysis, the control premium is incorporated in the EBITDA multiples SRR applied: "the selected exit EBITDA multiple applied in the DCF method incorporates a control premium.  Therefore, the indication of value from the DCF Method in our analysis represents a controlling ownership interest value."  SRR does not explain how much the control premium influenced the multiplies; in addition, since the multiples varied so much as discussed above, it's unclear if SRR ever stopped applying a control premium to its DCF analysis.

315.    On information and belief, Willamette also applied a control premium of at least 15% to its valuations.

316.    As discussed above, application of a control premium here was not appropriate since the shareholder of the Company (the ESOP, through the Trustee Defendants) did not have any practical ability to control the resources and affairs of PDC or Appvion under the terms of the ESOP Plan or the Security Holder's Agreement.  Further, since only relatively small amounts of Appvion stock were sold at a time, valuing the stock on a control basis was inappropriate.

### 6.    The Valuations Were Flawed in Additional Ways.

317.    In addition to the issues with the valuations discussed above, the valuations contained the following material flaws:

- In order to justify their numbers, the 2012 SRR appraisal failed to subtract losses from the closure of Appvion's West Carrollton Mill and the associated severance costs.

- The appraisals failed to include all overhead costs in the projections by breaking Appvion out into business segments. By not reporting on the value of Appvion as a whole, SRR was able to avoid accounting for general overhead and losses on plant closures and pick and choose which expenses to include in EBITDA, thus over-valuing the Appvion stock. For example, SRR's reports list the historical adjusted EBITDA for Thermal at $33.3 million, Carbonless at $49.3 million, and Encapsys at $11.9 million, which adds up to $94.5 million. However, SRR's reports state the EBITDA for Appvion as a whole was only $82.7 million.

- The appraisals failed to apply a large enough discount for the company's repurchase obligation and the discount for limited marketability of the shares. SRR's valuation reports combined the repurchase obligation and the discount for limited marketability as a 5% discount to equity, after subtracting interest-bearing debt. This calculation ignores the actual data about the age of ESOP participants and Appvion's actual ability to meet its repurchase obligations, especially in light of Appvion's diminishing cash flow.

- The appraisals failed to consider any kind of asset approach to valuing Appvion. This was especially problematic starting in at least 2013, when the financial statements showed that Appvion's interest-bearing debt exceeded its assets.

- SRR did not conduct any kind of stress testing to consider what would happen if the company failed to meet its projections. Stress testing allows a valuation firm to test the quality of the projections and look in depth at the assumptions behind the projections. This helps answer the question of whether the company is in

danger of default on its debts; if it is in danger of default, the premise of the projections has to change.

318.    These flaws, along with the other issues discussed above, meant the SRR valuation reports were unreliable and that they consistently overstated PDC's stock value.

**F.    The Director Defendants and the Prior Committee Defendants Reviewed the Valuations.**

**1.    The ESOP Committee Took an Active Role in The Valuations.**

319.    The ESOP Committee was always aware of and involved in the valuations.

320.    Beginning in January 2008, minutes of the ESOP Committee show that SRR and the Trustee Defendants specifically presented the valuations to the ESOP Committee after each valuation had been completed.

321.    For example, at the 10 January 2008 ESOP Committee meeting, SRR's Levine participated in the meeting telephonically and explained the valuation "as prepared by Stout Risius Ross and approved by State Street Global Advisors."

322.    The ESOP Committee requested edits to SRR's valuation presentation to State Street, including removing a reference to insurance settlement litigation and adding additional carbonless competitors to the presentation.

323.    Similarly, the 7 July 2008 minutes of the ESOP Committee show that the ESOP Committee "accepted the valuation" after discussion with SRR and State Street.

324.    In a 7 July 2009 ESOP Committee Meeting, the ESOP Committee reviewed the 30 June 2009 stock valuation prepared by SRR and approved by State Street Defendants, and requested adjustments to the share price.

325.    According to the minutes of the meeting:

The Committee reviewed the June 30, 2009 stock valuation prepared by Stout Risius Ross and approved by state Street Global Advisors.  Mr. Levine described the process used to arrive at the June 30, 2009 valuation.  **Following a detailed discussion, it was determined that the stock price needed to be adjusted.  The ESOP Committee accepted the adjusted valuation**.  A revised valuation report will be forwarded to the ESOP Committee.

326.    Thereafter, representatives from SRR and the trustees participated in ESOP Committee meetings to review each of their valuations with the ESOP Committee.

> **2.    The Director Defendants Either Reviewed the Valuation Reports or Should Have Been Reviewing Them As Part of its Duties to the ESOP Plan.**

327.    As part of its duties to oversee PDC and Appvion's operations, the Board of Directors had an Audit Committee and a Compensation Committee.  According to numerous 10-K filings, the Audit Committee was tasked with "provid[ing] assistance to the Board of Directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports."  The Audit Committee was responsible for, among other things, reviewing the audited financial statements; as discussed below, those audited financial statements included numerous liabilities that the valuations failed to account for, or even consider, including hundreds of millions of dollars in unfunded pension/post-retirement liabilities.  The director defendants that were on the Audit Committee include the following:  **Carter, Pace, Scherbel, Reardon, and Murphy.**

328.    PDC/Appleton's Board of Directors also reviewed both the financial projections prepared by management and the stock valuations.  This included review of the financial projections that formed the basis for Willamette and SRR's valuations.

329. Specifically, Willamette's Braun said part of the valuation process would be providing the "the board of directors with enough information so they understand what it is we did, why it makes sense, at least why we think it made sense and how we feel that is a supportable value for purposes of determining what your value is going forward."

330. In addition, the trust agreements required the Trustee "to report to the Company as of the last day of each Plan Year of the Plan . . . the then "Net Worth" of the Trust Fund, that is, the fair market value of all property held in the Trust Fund, reduced by any liabilities other than liabilities to Participants in the Plan and their Beneficiaries, as determined by the Trustee[.]"

331. Further, various ESOP publications including a 2001 newsletter and the 2006 KSOP guide discussed above, represented that the Directors Defendants reviewed the company's performance against its objectives.

332. Under the 2015 discretionary trust engagement letter with Argent, Argent agreed to present a report of its actions as Trustee within thirty days of each valuation.

G. **The Inflated Share Price Caused the ESOP Plan to Repurchase Shares for More Than Fair Market Value.**

333. SRR conducted these valuations knowing that the Trustee Defendants and the ESOP Committee would use the valuation to set the share price to be used for ESOP Plan transactions, including deferrals to the ESOP Plan and repurchases of shares.

334. As a result of the fraudulently inflated valuations, the ESOP Plan repeatedly purchased shares from the Employee Participants at a price above the share's fair market value and repeatedly bought shares on behalf of Employee Participants at a price above the share's fair market value.

335. Since PDC had no assets other than its ownership of Appvion, Appvion loaned cash to PDC to fund the ESOP's repurchase obligations.

91

336.    Because of the inflated stock valuations, Appvion was required to loan significantly more cash to PDC than it should have.  This reduced the cash Appvion had available to repay its debt and make capital improvements, which further damaged its value and ability to operate as a going concern.  The fair market value as determined by the Trustee Defendants and SRR was also used in connection with the intercompany loans from PDC to the ESOP Plan—the ESOP Plan would sell shares to PDC at fair market value in order to repay the loan.

337.    Yet, Appvion management and others (with the directors' acquiescence or approval) continued to make affirmative representations to reassure employees that the valuations were correct.  For example, in 2001, Defendant Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.  In September 2003, Driscoll authored a newsletter sent to the Employee Participants that stated that "[w]ith the help of our financial advisors, our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance. To that end, Willamette and State Street perform due diligence meetings with Appleton management during the year."  In a 2007 publication titled "Appleton: Applying Technology for Performance," Driscoll is quoted as stating that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP.  And it was.  Employees would not be paying more than the fair market value to buy Appleton Papers."

338.    In reliance upon accurate share valuations, employees continued to divert portions of their paychecks to fund the ESOP and the ESOP Plan continued to purchase PDC stock at inflated values.

339.    As an added inducement, Appvion made matching contributions of PDC stock to employees' contributions.

340.    Unbeknownst to the employees, to the extent the matching contributions to the ESOP Component of the Plan were in the form of PDC stock, they were effectively worthless by at least 2009.

**H.    The Executives Responsible For the 2001 Transaction Left Appvion While the Share Price Was High.**

341.    As part of the 2001 Transaction, Appvion management represented that its fourteen-member executive team was putting 100% of their 401(k) plans into the ESOP.

342.    However, certain Appvion management had inside financial information about the status of the Company and its true value; therefore, they knew when to pull their money out of stock or out of management incentive plans.

343.    Immediately after the 2001 Transaction, the named executive officers reported holding 4.2% of the shares in the ESOP.

344.    However, as the share price rapidly increased, members of the executive team at the time of the 2001 Transaction began leaving the company and receiving distributions of their ESOP accounts for a combined gain of over $7.2 million.

345.    In 2004, Doug Buth, Appvion's CEO, announced that he would be retiring in early 2005 at age 49.

346.    Buth was paid for his shares on an installment basis, and he had a gain of over $850,000 on his investments in the ESOP Component of the Plan (not including any payments under various compensation plans tied to the value of the stock).

347.    Rick Fantini, the Vice President of Operations, left the company in 2005 and had a gain of over $577,000 from his investments in the ESOP Component of the Plan.

348.    By November 2006, Paul Karch was the only remaining member of the executive team from the 2001 Transaction who was still with Appvion.  However, Karch left the company on 2 March 2007 with a gain of over $300,000 from his investments in the ESOP Component of the Plan.

349.    These departures, timed while the share price was artificially high, added to the liquidity strain on the Company and therefore further reduced the true value of PDC stock.

350.    Also after the departures, senior management reported owning decreasing amounts of company stock through the ESOP.  By 31 December 2006, the top executives held only 1.59% of the ESOP shares, and by 31 December 2010, they held only 0.93% of the ESOP shares.  Instead, management became increasingly dependent on incentive plans (discussed below), which were not limited to the distribution and diversification options available under the ESOP Plan Documents and which were not calculated solely by the increase in PDC's stock value.

I.    **Management Compensation Was Excessive And Drained Cash From Appvion.**

351.    In conjunction with the 2001 Transaction, Appvion Director Defendants implemented additional incentive plans for management employees and senior executives.

352.    Following the 2001 Transaction, Appvion Director Defendants continued to add additional incentive programs as described below to reward executives and directors.  Since a number of these incentives were tied to stock value, they gave the Prior Committee Defendants and the Director Defendants a reason to inflate the price of PDC stock.  At the same time, these incentives meant the Prior Committee Defendants were not as heavily reliant on the funds they had invested in the ESOP.

1.    **Long Term Incentive Plan ("LTIP") Allowed the Board of Directors to Award Phantom Stock Units.**

353.    Appvion's Long Term Incentive Plan ("LTIP") was effective on or about December 1, 2001.

354.    Under the LTIP, the Compensation Committee of Appvion's Board of Directors had the authority to award employees with phantom stock units.

355.    Under the terms of the LTIP:

- The Compensation Committee could award up a number of units equal to 3% of total stockholders' equity in the Company each year;

- Phantom stock units were to be awarded the first day of the Plan Year (defined as the Company's fiscal year);

- Phantom stock units vested over 3 years and expired after 10 years, or upon leaving the company;

- On exercise of the phantom units granted under the LTIP, participants would receive a cash bonus equal to the increase in the value of the stock from the date of issue until the exercise date.

356.    In 2016, the LTIP was renamed the Long Term Stock Appreciation Rights Plan.

357.    On information and belief, when Buth left the company in July 2005, he received significant payments under the LTIP.

2.    **The Deferred Compensation Plan Allowed Employees to Defer Their Salary and Bonuses.**

358.    In addition to the LTIP, Appvion established a Deferred Compensation Plan (the "New Deferred Compensation Plan") effective 1 July 2000, which allowed eligible employees to defer all or a portion of their salary and/or bonus.

359.   In addition, the deferred portions of the loyalty payment made to executives as part of the 2001 Transaction were included in this plan.  However, the deferred loyalty payments were tied to increases in the value of PDC common stock.

360.   The New Deferred Compensation Plan was terminated in the first quarter of 2005 based on the recommendation of the independent directors of the Compensation Committee "because they viewed the crediting of the loyalty payment portions of the Plan based on increases in PDC common stock as an expensive form of company capital."   On termination, beneficiaries were paid $2.7 million.

### 3.   The Executive Nonqualified "Excess" Plan Allowed Executives to Defer Compensation on a Pre-Tax Basis.

361.   Effective 1 February 2006, Appvion created the Executive Nonqualified "Excess" Plan (the "Excess Plan") for executives and non-employee directors, which allows them to defer compensation on a pre-tax basis, with the value of the deferrals linked to the performance of selected mutual funds.  Like the Deferred Compensation Plan, the Excess Plan provided for matching contributions.

362.   Appvion did not actually set aside any funds to pay for this deferred compensation obligation.

363.   As of 2 January 2016, this plan included $5.4 million of deferred compensation.

### 4.   The Non-Employee Director Deferred Compensation Plan Awarded Phantom Stock to Non-Employee Directors.

364.   Also in 2006, Appvion established the Non-Employee Director Deferred Compensation Plan, which awarded non-employee members of the Board of Directors with phantom stock units.  The value of the stock awarded under this plan was to be paid in five equal

annual cash installments following a director's conclusion of service on the board of directors, based on the stock valuation as of the payment date.

365.    By 31 December 2015, there were nearly 122,000 phantom units outstanding under this plan, valued at $1.5 million.

366.    This plan gave the non-employee directors an incentive to agree to the inflated stock valuations as appraised by Willamette and SRR and approved by the Trustee Defendants.

### 5.    The Long-Term Performance Cash Plan Provided Bonuses to Management.

367.    Effective 1 January 2008, Appvion created the Long-Term Performance Cash Plan which provided for bonuses if Appvion met certain financial goals over three-year cycles. Mark Richards, Thomas Ferree, and Kent Willetts received payments under this plan for the 2009-2011 cycle.

### 6.    The Long-Term Restricted Stock Unit Replaced LTIP in Order to Ensure Management Received Additional Compensation.

368.    When the share price went down in 2009, it rendered the LTIP phantom stock units worthless until the share price went back up.  In order to continue providing incentive payments to senior executives, the Company adopted a long-term restricted stock unit ("RSU") plan effective 3 January 2010.

369.    The RSU plan awarded key management employees with future cash payments based on the full fair market value of Appvion common stock.  All units vest three years after the award date and the cash value of the stock was paid to the employee on the vesting date, based on the valuation as of the vesting date (as determined by SRR and the Trustee Defendants).

370.    After implementing the RSU Plan, the Compensation Committee of Appvion/PDC's Board of Directors decided whether to award units under the LTIP or the RSU Plan.

371.    This plan gave Appvion management an incentive to inflate the value of PDC stock.

### 7.    The Annual Incentive Plan Provided Another Method to Give Management Bonus Compensation.

372.    Appvion also had a separate Annual Incentive Plan which paid out based on company and business segment performance and other factors as determined by the CEO and the Compensation Committee of the Board of Directors.  In addition, Appvion paid discretionary bonuses under the Annual Incentive Plan.

### 8.    The Supplemental Executive Retirement Plan Also Provided Benefits to Management.

373.    In addition to these compensation plans, executives and certain other management employees also received additional benefits including pension benefits under the Supplemental SERP.  The SERP provided retirement benefits for management and other highly compensated employees whose benefits are reduced by the tax-qualified plan limitations of the pension plan for eligible salaried employees.  Effective as of 1 December 2014, the SERP was amended to provide for payment of the supplemental benefit in the form of a single life annuity.

### 9.    The Termination Protection Agreements Provided Management Additional Compensation Upon Termination.

374.    In addition, Appvion management had Termination Protection Agreements or Enhanced Severance Agreements in place which gave them substantial benefits on termination. These agreements only provided for payments if Appvion terminated the employee other than for misconduct or disability or the employee terminated employment other than for "Good Reason."

Good Reason is defined in the agreement as 1) prior to a change of control, a reduction in salary of more than 25%; or 2) after a change of control, a decrease in the executive's responsibilities, a material reduction in the executive's pay, relocation of the executive without consent, or refusal to agree to comply with requirements for assignment of the termination protection agreement.

375.    The various incentive plans and termination protection agreements also included change in control provisions allowing for significant payments on a change in control.

### 10.    The Various Incentive and Compensation Plans Resulted in Excessive Compensation for Management.

376.    The LTIP, Non-Employee Director Deferred Compensation phantom stock units, and Restricted Stock Units all served to create synthetic equity owned by executives and directors.  By the end of 2014, SRR calculated that this synthetic equity accounted for 25.3% of the equity ownership of Appvion.  SRR's valuation analysis estimated a valuation for this synthetic equity and subtracted it from the equity value of the company.

377.    These incentive and retirement plans were amended several times to increase benefits due to beneficiaries under these Plans, even while Appvion was losing money, while its stock price was grossly overstated and while it was unable to meet its repurchase obligations under the ESOP.  On information or belief, these amendments substantially increased the amounts paid to executives under the plans.  For example, in August 2015 the Company filed an Amendment to the Appvion, Inc. Long Term Incentive Plan with the SEC; the amendment provided that "Retirements on December 31 of any given Plan Year would be treated as a full year of employment for vesting purposes."  When Richards retired from Appvion effective December 31, 2015, this provision allowed him to receive partial payment for LTIP units that were granted in 2015; the units were treated as 33.3% vested.

378.   Under the numerous incentive and compensation plans described above, management compensation was at all times excessive, especially compared to company performance and true stock price.  For example, in 2012, Appvion had a net loss of over $148 million.  However, Richards received total compensation of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

379.   Excessive compensation paid to Richards and other executives (including but not limited to Thomas Ferree and Kerry Arent) caused significant harm to the corporation and was a breach of fiduciary duty toward the ESOP Plan and the Employee Participants and was not justified by the true stock price.

**J.   Appvion's Finances Became Increasingly Dire.**

**1.   Appvion Refinanced its Substantial Debt.**

380.   In June 2013, Appvion refinanced its debt through a $435 million senior secured credit facility, which included a $335 million first lien term loan facility and a $100 million revolving credit facility.  This was used to pay off $305 million in fixed-rate debt, an existing revolving credit facility, and pay related fees and expenses.

381.   In November 2013, Appvion raised $250 million through the sale of second lien senior secured notes; Appvion used the proceeds to pay off existing debt, including related fees and expenses.

382.   This refinancing increased Appvion's overall debt.

## 2.    **Appvion Sold its Most Profitable Unit.**

383.    Appvion's    Encapsys    segment    encompassed    Appvion's    chemical microencapsulation activities; microencapsulation is the process of putting a microscopic wall around a core substance.

384.    This process was developed in the 1950's and was part of Appvion's carbonless paper process, but Appvion had worked to develop other applications for the process over the years.

385.    In 2007, Appvion signed a multiyear supply agreement with Proctor & Gamble and expanded its microencapsulation business significantly.

386.    By 2010, Encapsys was a driving factor in SRR's valuations.  According to a January 2011 employee communication, "The rapid and consistent growth of the Encapsys business was the single biggest contributor to share price growth in H2 2010.  The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

387.    Similarly, an 18 July 2011 employee communication about Encapsys stated that "The continued growth of the Encapsys business was the single biggest contributor to share price growth in H1 2011, as it was for the H2 2010 valuation."

388.    By 2012, Appvion was divided into two primary operating units—the Technical Papers unit (which included the Carbonless and Thermal divisions) and Encapsys.

389.    In the years 2010 through 2013, the Encapsys unit accounted for approximately 6% of Appvion's net sales but in 2014 it accounted for approximately 8% of Appvion's net sales.

390.    Additionally, Encapsys had room for significant growth going forward and was Appvion's most profitable division.

391.    In April 2015, SCH submitted a proposal to acquire the Encapsys unit and related assets for $205 million, which was later revised to $208 million.  Appvion agreed to sell the Encapsys unit to SCH, and the sale was completed in August 2015.

392.    On 8 May 2015, Appvion amended its Executive Nonqualified Excess Plan to allow deferral of compensation received under The Encapsys Long Term Performance Cash Plan.  This Encapsys Long Term Performance Cash Plan is not described in any of the 10-K filings and it was not filed with the SEC.  On information and belief, Appvion management may have received compensation from this plan as part of the sale of Encapsys.

393.    In May 2015, Appvion made Argent a discretionary trustee with the authority to vote on the Encapsys sale.

394.    Employees were not told about the sale of Encapsys ahead of time—the sale was approved by Argent as the Trustee and the Board of Directors of Appvion without a vote by employees.

395.    In an October 2015 publication to employees, Appvion management stated that it was selling Encapsys as a way to "1) support and expand its thermal and carbonless/specialty papers business segments; 2) fund the continued growth of Encapsys; and 3) continue to reduce the company's debt. The sale of Encapsys helps the company achieve all three objectives."

396.    The Board considered the impact of the sale on the ESOP and asked the ESOP trustee (at the time, Argent) to review and approve the transaction.  According to a Q&A released by Appvion management:

> The sale of Encapsys required approval from the Appvion board of directors. **The board must consider the value of the transaction to the Appvion shareholders who are, ultimately, the ESOP plan participants**. The board must also consider the impacts of the transaction to the Appvion business.  To assist the board in analyzing the transaction, **the board sought a fairness opinion**

**about the transaction from an independent valuation firm** as well as advice from outside legal counsel as the basis for its decision.

**The board also asked our independent ESOP trustee (Argent** Trust Company) **to review and approve the transaction,** even though approval from the ESOP trustee was not required for this transaction.    To assist the ESOP trustee in analyzing the transaction, **the trustee sought a separate fairness opinion about the transaction from an independent valuation firm as well as advice from separate outside legal counsel**. Based on the analyses, fairness opinions and advice from legal counsel, **the Appvion board and Argent Trust Company concluded the transaction is fair to and in the best interest of Appvion**.

397.    The sale of Encapsys closed in August 2015.

398.    While the sale of Encapsys allowed Appvion to pay off some debt, the loss of its most profitable unit impaired Appvion's ability to function as a going concern.  .

### 3. Richards and Other Executives Left in 2015 and Received Large Bonuses.

399.    Richards retired from his role as President and CEO of Appvion and PDC on 4 August 2015.  He stayed on as Chairman and Director of Appvion until on 31 December 2015, when he fully retired.

400.    Even though Richards retired and did not leave Appvion for "Good Reason" as defined in his Termination Protection Agreement, he received a payment of $1.2 million as if he had left for Good Reason.

401.    Richards also received a payment of $30,000 in outplacement services and over $900,000 in SERP payments, as well as payments of LTIP and Restricted Stock Units.

402.    Richards received total compensation in 2015 of over $5 million.

403.     Kerry Arent, Appvion's Senior Vice President of Human Resources, also retired in 2015 and received payments under her Termination Protection Agreement as if she had left for "Good Reason" or in connection with a change in control.

404.     Arent received $427,500 in Termination Protection Payments and $5,000 in outplacement services payments.

**K.     At the Summer 2017 Road Show, Appvion Said It Would Be Able to Turn The Company Around.**

405.     At the summer 2017 road show, the company reported it was going to be able to turn around, it was doing great, that it had hired an outside consultant to find refinancing, and they would be back on their feet.  There was no indication that the company had trouble finding financing.

406.     Similarly, in a communication to employees about the 30 June 2017 valuation, Gilligan told employees that Appvion was "making good progress on several fronts that set the stage for better results in the second half of the year."

**L.     Appvion Filed for Bankruptcy Protection In 2017.**

407.     On 1 October 2017, Appvion and certain of its subsidiaries filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

408.     On 14 August 2018, the Bankruptcy Court for the District of Delaware issued a Conformation Order that included a reservation of rights stating that the order did not "operate as a waiver or release or otherwise impair in any respect (i) any claim held by the ESOP, the ESOP Committee or its members, or ESOP participants . . . ."  It also confirmed that Grant Lyon, in his capacity as an ESOP Committee Member, has standing to prosecute claims on behalf of the ESOP Plan and the Employee Participants.

**M.    Fraud or Concealment Extends the Statue of Limitations for Plaintiff's Claims.**

409.    Defendants committed fraud or concealed nearly two decades of wrong doing from the ESOP Plan and Employee Participants.  As a result of Defendants' actions, the ESOP Plan and Employee Participants could not and did not discover the wrongdoing until after August 2017, when Grant Lyon was appointed to the ESOP Committee and began conducting an investigation into the valuations.

**1.    The Defendants Committed Fraud or Concealment In Connection With the 2001 Transaction.**

410.    During the 2 August 2001 road show, Buth represented that the employees "know more about this opportunity about this investment than any other investment [they'll] ever make."  In a March 2001 employee newsletter, Buth similarly stated that under the law, "All investors . . . . Must have access to certain basic facts about an investment prior to buying it."

411.    However, the Defendants failed to disclose key facts about the 2001 transaction.

**a.    Buth, Karch, Arent, Driscoll, Paone, and Braun Represented to the Potential Employee Participants that the Houlihan Defendants Provided Independent Validation of the 2001 Buyout.**

412.    In a 25 July 2001 letter to Appvion employees, Buth fraudulently represented that Houlihan's Paone would present an "independent validation" of the ESOP transaction.  An agenda distributed to employees describing the August 2001 road show similarly said Paone would give "Independent Validation of Deal Terms."

413.    During the 2 August 2001 road show Buth, Karch and Arent, side by side with purportedly "independent" ESOP professionals, went to work convincing Appvion's employees (most of whom were union members) that they should seize upon this "unique one-time opportunity" to transfer money out of their 401(k) plans to buy PDC stock.

414.    During the 2 August 2001 road show, Karch stated that Houlihan's Paone was "going to provide an **independent view** and **validation**" of the buyout transaction.  Karch also stated that Paone was "**our** investment banker" from Houlihan, insinuating that Paone represented the interest of the employees—the people to which he ultimately gave advice—in a fair, impartial and unbiased manner.

415.    Also during the 2 August 2001 road show Paone stated, among other things:

> This is, in my opinion, an extraordinary opportunity and over the next few slides I hope to make clear why I feel so strongly about this.  Paul had mentioned that one of the things that I'm going to do this evening is **help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why you're getting such a good deal**.

> **b.**    **Defendants Did Not Disclose Houlihan Lokey Defendants' Contingent Compensation Interest in Ensuring the Buyout Closed.**

416.    As described above, the Houlihan Lokey Defendants committed fraud or concealment by:

- Representing to the ESOP Plan and employees that it provided an "independent review and validation" of the buyout transaction

- Failing to disclose to the ESOP Plan and employees that on 14 February 2001 it entered into an engagement with PDC which stated that Houlihan would receive "a transaction fee at a Transaction closing equal to 1.0% of the "Aggregate Consideration" paid for the stock of [Appvion] with respect to an ESOP Acquisition.

- Failing to disclose that the transaction fee that Houlihan anticipated receiving was as much as $8.1 million.

- Allowing Prior ESOP Committee Defendants and Director Defendants to represent to the ESOP Plan and the Employee Participants that Houlihan was providing independent validation of the Appvion buyout during the 2 August 2001 road show.

- Failing to provide fair, impartial and unbiased assessment of the ESOP buyout while at the same time representing to be independent.

### 2. The Defendants Committed Fraud or Concealment In Connection with the Valuations.

#### a. Willamette Defendants and SRR Defendants Produced Fraudulent Valuations that Were Fundamentally Flawed.

417.    From December 2001 through June 2004, Willamette performed semi-annual appraisals establishing stock value.

418.    On 9 November 2001, Willamette Defendants validated the initial stock value on the 2001 buyout transaction at $10 per share.

419.    During the 2 August 2001 road show, Braun stated:

> We were trying to keep the value as low as possible we spent a lot of time over the last few months telling everybody how little this company was worth because we were trying to help you folks buy it at the cheapest possible price, or have the ESOP buy it at the cheapest possible price.

420.    On 31 December 2001, Willamette Defendants valued the stock at $12.81 per share. The share price continued to rise as described above.

421.    While the share price was disclosed to the ESOP Plan and the Employee Participants, the content of the appraisals was not, thus impeding anyone's ability to ascertain the true valuation of Appvion's stock. By refusing to make the valuation reports available to the

owners of Appvion (i.e., the ESOP Plan and Employee Participants), the various defendants were able to continue to conceal the fraud until the bankruptcy filing.

422.    Upon information and belief, Willamette produced seven valuations between 9 November 2001 and 30 June 2004 that failed to account for fundamental flaws.  For example, they failed to account for the unfunded pension/post-retirement liabilities.

423.    Each share price calculation misrepresented the value and the health of Appvion to the detriment of the ESOP Plan and Employee Participants.

424.    In 2004, Willamette employees, including Levine, El-Tahch, and Socol, joined SRR, and SRR took over the appraisals beginning in December 2004.

425.    Consistent with Willamette Defendants' actions, SRR conducted semi-annual valuations of PDC stock through mid-2017, producing 26 valuations as described above.

426.    SRR Defendants' valuations failed to account for fundamental flaws as described above.

427.    In particular, the unfunded liability was a substantial, material liability. Appvion's unfunded liabilities consisted of at least three components: 1) pension liability under several defined benefit and defined contribution pension plans; 2) the Supplemental Executive Retirement Plan, which provided retirement benefits for management and other highly compensated employees; and 3) post-retirement benefits other than pensions, which included medical, dental, and life insurance for certain retirees and eligible dependents.

428.    These liabilities were included in each of Appvion's audited financial statements. However, they were inexplicably not included in any of the valuations.

429.    None of the Defendants disclosed to the ESOP Plan or to Employee Participants that SRR was failing to consider material liabilities in its analysis.

430.    Each stock value was disclosed to employees in communications from the Prior Committee Defendants.  In addition, the values were disclosed in account statements issued to employees which showed the value of their ESOP accounts.

431.    These values and the related communications constituted affirmative misrepresentations that concealed the overvaluation of PDC's stock.

> **b.    The Prior Committee Defendants' and The Director Defendants' Communications Did Not Disclose the Valuation Process.**

432.    The Prior ESOP Committee Members, Director Defendants and the Trustee Defendants never released the valuation reports by Willamette and SRR to the ESOP Participants.  Indeed, Union representatives for the Employee Participants specifically requested to view the valuation reports and were denied access.  On 23 April 2001, Appvion told its employees they would not have access to the valuation report:

> **I understand that an ESOP appraiser values the stock at least twice a year.  Will I have access to this valuation report?**
>
> No.  **The trustee, as the legal shareholder, is the only one with the right to this document**.
>
> **A summary of the results of this appraisal** will be provided to plan participants when the current value is disclosed.

Appleton Papers, "The Ownership Update," 23 Apr 01, p. 4.

433.    Accordingly, there was no way for the ESOP Plan or the Employee Participants to look at the processes that Willamette and SRR employed and verify that key financial information was not being omitted despite the representations that all relevant information was being considered.  They were led to believe all relevant factors had been appropriately considered.

109

434.    For example, Appvion told the ESOP Plan and the Employee Participants that the independent appraiser would consider, among other things, the following in determining Appvion's fair market value:

> In determining a company's fair market value, the appraiser must consider all facts considered relevant.
>
> * * *
>
> The appraiser looks at a variety of factors to determine the business risk facing the company being valued compared to risks facing the guideline companies.
>
> If the company being valued is determined to be more or less risky than the public companies, that risk would generally have an impact on value.
>
> The discounted future cash flow approach utilizes the company's outlook for the future in order to determine fair market value.
>
> * * *
>
> First, the appraiser determines the amount of cash the company should generate in the future to pay its bills, invest in equipment and facilities, conduct research and development, and pay its debts as they become due.
>
> Cash that is left after the company meets its obligations, known as free cash flow, generally would be available for distribution to the owners of the company, even though the company may determine to retain this cash flow for reinvestment in the future.
>
> * * *
>
> In summary, a company's fair market value is determined by a wide variety of both internal and external factors.  Decreasing profits or revenues or increased expenses generally have a negative impact on a company's fair market value. . . .
>
> All other things being equal, factors that result in improved profitability for a company, such as increased revenues or decreased expenses, typically have a favorable impact on a company's fair market value.

"Employee Ownership at Appleton," Appleton KSOP & Me, Section 6.

435.   Similarly, a November 2002 Appvion presentation titled "Ownership Advisory Committee" described how the valuations would be conducted:

- "Value is determined by the appraiser doing several things:

    o   Benchmarking the Company's financial performance against other companies of similar size in similar industries, using merger and acquisition data that is available

    o   Benchmarking its financial performance against publicly traded firms in same industry

    o   Evaluating value of assets if business were liquidated

    o   Reviewing the Company's future financial forecast (profit and growth of revenues) & valuing future cash flows

    o   Applying a weighting to respective values, blending to determine final value"

436.   However, by at least 2005, Willamette and SRR were not applying an asset approach to valuing Appvion; according to SRR this was "since the Company derives much of its value from its intangible property."  In addition, they also did not typically include merger and acquisition data in their analysis.

437.   The November 2002 presentation also indicated that the independent appraiser would determine a range in value and the Trustee would select the specific share value. However, at least by mid-2005 (and perhaps earlier), SRR and Willamette were only selecting a single stock value.

438.   An October 2006 publication titled "Take Ownership of Your Future KSOP Guide" again explained the methods the valuation firm used to determine fair market value:

> When an ESOP owns stock in a private company, **an independent appraiser approved by the ESOP trustee must determine the fair market value of the company stock** at least once per year. Appleton has made the decision to value stock twice a year, June 30 and December 31.

The term fair market value means **the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company** and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, **the appraiser must consider all facts considered relevant.** While a lot of "number crunching" goes into an appraisal, fair market value is ultimately the result of an appraiser's informed judgment. That makes it especially important to have an appraiser who is independent, knowledgeable, and experienced in such matters.

The complete list of factors that may impact a company's value is too long to be included here. However, **factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks** relating to its business. The company's customers, suppliers, management, workforce, and facilities relative to their competitors may also be considered. Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach…

439.   Even the November 2015 KSOP Guide states:

When an ESOP owns stock in a private company the ESOP trustee **must determine the fair market value of the company stock** at least once per year.  To do this, **the trustee hires an independent appraiser.**

\* \* \*

In determining a company's fair market value, the appraiser must consider all fact considered relevant.

\* \* \*

To determine a company's fair market value, an appraiser may consider several approaches. **Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach** . . . .

440.    Numerous press releases and other communications between 13 August 2002 and 14 July 2009 to Employee Participants reassured employees that Willamette and SRR were properly valuing PDC's stock by stating they were using "an income approach and a market approach to value stock."

441.    However, the ESOP Plan and its Employee Participants were never told that the Defendant appraisers were not fully considering the factors that were described in Appvion's publications.    The communications describing Willamette and SRR's methods also did not disclose that the valuations improperly applied a control premium or that the valuations did not account for unfunded pension liability or post-retirement benefits other than pension liability. The failure to disclose all factors considered (or not considered) allowed the continued fraud and concealment to continue until the bankruptcy filing.    Nor did they report that in arriving at fair market value, not "all liabilities" were being considered as was required by SRR's own valuation language.

        **c.**    **Management, Driscoll and State Street Urged the ESOP Plan and Employee Participants to Trust the Willamette Defendants and the SRR Defendants at the Road Show and Beyond.**

442.    At the 2 August 2001 road show, Kelly Driscoll of State Street stated that:

> [A]n ESOP can't pay a parent company more than the fair price of the asset and that is really critical to us and that's why we, in the end have **to make sure that we're not paying more than the fair market valu**e.    And [Rick Braun from Willamette] does a lot of work helping us with that to determine what that fair market value is and **make sure he can give us an opinion that we aren't paying more than fair market** value and that the transaction, as a whole, is in the **best interest of the plan** from a financial perspective.

443.    In a 14 January 2002 email to employees, Paul Karch addressed the recent Enron collapse and stressed that the valuation of stock by an independent appraiser would protect employees:

> The value of our company stock **will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor**. This valuation process **provides another level of scrutiny of the company's accounting practices**. Enron stock is publicly traded and its value, including its overvalue, was and is determined by speculators in the stock market.

444.    Similarly, in an August 2002 email about the 30 June stock valuation, Appvion's Bill Van Den Brandt stressed reliance on Willamette's professional judgment:

> Some employees have wondered how the June 30 stock value was calculated.
>
> Remember that our trustee, State Street Global Advisors, conducts the valuation. SSGA relies upon Willamette Management Associates to perform an appraisal of Appleton Papers and PDC to assist in determining the value of PDC stock. **Willamette considers both income and market factors to determine stock value**. The stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete….

445.    In a September 2003 "Ownership Update" newsletter distributed to employees, Driscoll described State Street's goal of providing "the highest quality fiduciary services" by being a "knowledgeable and proactive fiduciary acting on behalf of the ESOP." Driscoll also described the valuation process, including meetings with members of the Board of Directors:

> We hired Willamette Management Associates, a well-known and respected firm, as our financial advisor **to assist us with our responsibilities for overseeing the plan's investment in PDC stock** and for determining the appropriate value for the stock.
>
> With the help of our financial advisors, **our oversight of PDC stock includes frequent monitoring of Appleton's financial condition and the stock's performance**. To that end, Willamette and State Street perform due diligence meetings with Appleton

114

management during the year. **A State Street representative attends at least one Appleton board meeting each year and conducts meetings with the outside directors that serve on Appleton's board**.

Throughout this oversight process, **State Street and Willamette build a greater understanding of Appleton's business operations, the basis for your company's financial projections, and the risks and likelihood of meeting those projections**.

Twice per year, as of June 30 and December 31, State Street determines the value of PDC stock. In its role as financial advisor, **Willamette performs an extensive analysis that calculates Appleton's value based on approaches they believe are appropriate** for Appleton's business… .

446.    31 March 2004, the KSOP Guide and Summary Plan Description stated:

In order to comply with the Department of Labor requirements that **all stock purchases be made at no more than current fair market value**, the trustee must wait until the next valuation date before investing your deferrals in company stock.

447.    In a 3 May 2004 email about Doug Buth's planned departure from Appvion, Paul Karch reminded employees that "no one at Appleton determines our stock price; Willamette and our trustee State Street Global Advisors do."

448.    After SRR took over for Willamette on the 31 December 2004 valuation, a 24 February 2005 internal communication from Bill Van Den Brandt assured employees that SRR could be trusted, stating:

The latest valuation of Paperweight Development Corporation was conducted by Stout Risius Ross (SSR [sic]), not Willamette Management Associates as I reported below.  Many key members of the Willamette Management ESOP valuation team including Bob Socol and Scott Levine have joined SRR.

Our trustee, **State Street Global Advisors (SSGA), selects the firm to conduct the appraisal** that helps SSGA determine the value of PDC stock.  **SSGA chose Stout Risius Ross because of the qualifications and experience of Socol, Levine and their colleagues as well as their knowledge of our company**.  The

Willamette team had conducted all of our company's prior valuations.

**SRR is a full-service financial advisory firm with over 125 professionals** and offices in Chicago, Detroit, Cleveland and Washington DC.  With the addition of Socol, Levine and others, **SRR has strong expertise in ESOP and ERISA advisory services**.

449.    With nearly every communication about stock value, Appvion management (with the acquiescence or approval of the Director Defendants) assured employees that that the appraisals were conducted by Willamette or SRR using their professional expertise and judgment to apply the market approach and an income approach.  However, SRR's actual analysis was never disclosed to the Employee Participants, and nor did they disclose that SRR failed to properly take into account the standards outlined in these publications.

> **d.    Buth, Karch, Parker, and the Trustee Defendants Encouraged the ESOP Plan and Employee Participants to Rely on and Have Confidence in the Trustee Defendants and the Director Defendants.**

450.    In a 25 July 2001 letter to employees, Buth stressed that employees would receive "independent validation of the deal from . . . Kelly Driscoll, the ESOP trustee."

451.    At the August 2001 road show, Karch then introduced Driscoll from State Street which he described as "a very large and successful financial institution which manages money for lots of people in different ways, but specifically acts as trustee for many ESOP's."

452.    Driscoll from State Street stated that she and State Street were appointed to make sure that the employees would not be paying more than fair market value during the buyout.

453.    Driscoll then represented that it was her team's job to "represent the ESOP from an investment perspective. . . . [W]e want to make sure we analyze this investment, we really understand the business of Appleton Papers. . . .  [W]e are very comfortable with the valuation. .

. .  So, we are very pleased, quite frankly, on the price we were able to get with the seller.  We think we got a very good price."

454.    Also at the August 2001 road show, Buth stated that Driscoll from State Street would not overpay for stock and that Driscoll would tell the employees that the employees underpaid for the transaction.

455.    A January 2006 newsletter also stressed that the company's board of directors and the trustee would protect employees from the kind of fraud that occurred at Enron:

> Enron executives were able to sell their stock and pay themselves large bonuses even though the company was failing and the employees were not able to sell their stock. **Can that happen to us**?
>
> * * *
>
> **Our company's board of directors has a legal obligation to company shareholders** (in our case, the ESOP is the sole shareholder) **to prevent the kind of fraud that occurred at Enron**. In the event the board of directors does not act, **our trustee, State Street Global Advisers, in its capacity as the sole shareholder, could vote to replace the entire board with directors who would act to prevent fraud**. At Enron, the ESOP was a minority shareholder and did not control the board.

456.    However, since the Trustee had no ability to remove or replace members of the Board of Directors without approval of the CEO after 2005, this assurance was meaningless.

457.    A May 2006 newsletter to employees reiterated that stock purchases must be at fair market value and that SRR applied a market and income approach to valuation.  The newsletter further explained:

> To determine the value to be recommended to State Street, Stout Risius Ross weighs the values from all the factors they believe are appropriate and arrives at a final value. **Stout Risius Ross makes a presentation of its analysis to State Street's fiduciary committee, which is comprised of senior investment and other professionals** at State Street. **The committee reviews findings from Stout Risius Ross and then determines the current price**

117

**of PDC stock**. Stout Risius Ross then issues an opinion to State Street confirming the fair market value of PDC stock.

458.    On 27 March 2013, in an internal communication to Employee Participants, Ferree stated:

> [We] are pleased to welcome Reliance Trust Company as the new trustee. Reliance Trust is one of the largest independent trust companies in the country with more than $109 billion in assets under management and administration, and over 24,000 retirement plans administered. **The company is a highly-qualified, independent fiduciary** accustomed to serving ESOPs of all sizes.

459.    On 27 March 2013, Reliance Defendants sent a letter to the Employee Participants stating "[w]e are confident that you will soon recognize Reliance Trust as a highly regarded ESOP professional, a prudent fiduciary with a diligent process, and a qualified partner."

460.    On 30 June 2014, after Argent agreed to stay on as the ESOP Plan's trustee, Ferree touted Argent's experience.  Specifically he stated that Argent has "grown a successful business over its existence" and that Argent "currently has responsibility for more than $6 billion in client assets."

461.    Also on 30 June 2014, Steve Martin of Argent sent a letter to Employee Participants stating that they could be "confident that [they] will continue to be serviced by the same professional team that is familiar with your company and your ESOP, and also by Argent, a company focused on providing the highest quality fiduciary services."

462.    The letter continues:  "We understand the importance of safeguarding our clients' assets. For us, the responsibility and the approach are personal."

e.    **The Prior Committee Defendants, Director Defendants and Trustee Defendants Reassured Employees That the Valuations Were Correct.**

463.    In addition to reassuring employees that the valuations had been conducted by trusted professionals, the Prior Committee Defendants sometimes released statements that selectively discussed Willamette and SRR's valuation analysis in order to justify the share price. These discussions failed to provide a full disclosure of the valuation analysis and affirmatively concealed the fact that the valuations were inflated.

464.    For example, in the 31 December 2001 valuation, less than 2 months after the 2001 Transaction closed, Willamette valued the shares at $12.81 (a 28.1% increase over a two month period).

465.    However, Appvion management assured employees that the valuation was correct and to trust Willamette's valuation.

466.    On 14 February 2002, Karch emailed Employee Participants and stated that "The value of our company stock will be determined twice per year by an independent, third party appraiser according to the methodology established by the Department of Labor.  This valuation process provides another level of scrutiny of the company's accounting practices."

467.    In a 12 March 2002 internal communication, Appvion's Bill Van Den Brandt announced the share price and stated that "Willamette's valuation considers such factors as the purchase price we paid, company performance in November and December 2001 and comparable market factors to determine our company's fair market value and, in turn, the stock value."

468.    The 12 March 2002 communication also included a quote from Buth indicating that the increase in share value was because of better than expected financing—"We got a good

deal, we arranged a strong financing package and we were able to keep the cash at closing so we borrowed less than we expected,' said Buth, "Those were the foundations of the appraiser's valuation."

469.    In addition, "Buth emphasized that future valuations primarily will reflect our repayment of debt, which depends on our earnings and cash flow, and any changes in valuation as we grow and transform our company."

470.    To explain the 31 December 2001 valuation to employees, Buth went on an employee road show in March 2002 with Levine and Pete Prodoehl from Principal.  The purpose of the road show was to "explain the valuation process, how it differs from the fairness opinion issued at the deal closing, and how it determines stock value."

471.    For the 30 June 2002 valuation, Willamette valued the shares at $18.58.  In an 13 August 2002 email to employees Appvion's Bill Van Den Brandt issued a communication stating that "the stock value is the product of a rigorous and complicated process that ultimately requires professional judgment to complete."  The email also attempted to explain key financial data underlying the valuation.  Buth again went on a road show in September 2002 to explain the valuation.

472.    The Company continued to hold road shows approximately twice a year to present the share price to employees and discuss company performance.

473.    Additional employee communications in support of the fraudulent stock valuations include the following:

- For the 30 June 2003 valuation, Willamette valued the shares at $22.42.  Bill Van Den Brandt informed employees that "the new stock price reflects the performance of our core businesses offset by our debt repayment in the first half

of the year and the improved valuations of comparable publicly traded companies."

- The 31 December 2003 valuation increased further to $23.36. A 19 February 2004 email from Doug Buth to employees highlighted double digit growth in the inkjet product line and the thermal, security and performance packaging businesses. The 24 February 2004 email to employees communicating the share price also again stressed SSGA's reliance upon Willamette.

- For the 30 June 2005 communication, Van Den Brandt informed employees, via email on 23 August 2005, that SRR "uses both an income approach and a market approach and to value stock. The income approach considers our past and projected earnings, cash flow and debt repayment. The market approach considers performance data from publicly traded companies and recent mergers and acquisitions."

- A May 2006 newsletter to employees explained the valuation process and also identified "Value drivers for the December 31, 2005 share price," including "the better than expected financial performance of our carbonless business and continued signs that future declines might be less than expected." The newsletter also discussed repayment of debt and showed how debt repayment increased the value of the company according to SRR's methodology; however, it again did not disclose SRR's full valuation analysis or the flaws with the valuation process discussed above:

## What Causes the Price of PDC Stock to Move? (continued)

**Value drivers for the December 31, 2005, share price**
The December 31, 2005, share price of PDC stock was $28.56, a $.79 per share increase from the June 30, 2005, share price of $27.77. The most significant value driver during 2005 was the better than expected financial performance of our carbonless business and continued signs that future declines might be less than expected. International carbonless shipment volumes actually showed growth of more than 5% compared to the previous year.

**Carbonless**
Carbonless net sales for fiscal 2005 declined $12 million or 2% on volume decline of 4% compared to fiscal 2004. Overall, stronger net selling prices helped to offset a portion of the impact of decreased shipment volumes.

**Thermal**
Fiscal 2005 net sales for thermal increased 5% on a 3% shipment volume increase compared to fiscal 2004. Earnings from our thermal business decreased slightly compared to fiscal 2004 and were below forecasted levels for fiscal 2005.

**Performance packaging**
Net sales for our performance packaging segment were up nearly 112% over fiscal 2004 sales levels. The addition of the results of New England Extrusion accounted for virtually all of the increase, although sales by American Plastics and C&H Packaging increased a combined 2.8% from 2004.

**BemroseBooth**
Net sales in fiscal 2005 for our secure and specialized print services segment, represented by BemroseBooth, increased 2.0%, over fiscal 2004. Gross profit increased nearly $1 million in fiscal 2005 compared to fiscal 2004.

**Enterprise value down slightly**
Total enterprise value for all of Appleton remained essentially the same with a decline of about $2 million, less than 1% of total enterprise value.

Enterprise value is a figure that, in theory, represents the entire value of a company, including both equity and debt. The lack of change in Appleton's enterprise value reflects the fact that our businesses overall have not achieved long-term sustainable growth in sales and profits. Our mission, our four platforms and our five-year plan are all designed to create sustainable growth for Appleton. But we won't get credit for that sustainable growth in our share price until we actually achieve it in our top and bottom lines.

**Debt reduction adds value**
We reduced the book value of our net debt by $15 million during the valuation period. The $15 million reduction in debt results in a $15 million increase in equity value due to positive cash flow, which was used to repay debt.

**Equity value up $13 million**
The appraiser took our enterprise value (-$2 million) plus or minus other factors (+$15 million net debt reduction) to determine that the equity value for Appleton increased $13 million to $341 million during this valuation period. Equity value is a market-based measure of the value of a firm. It accounts for all the ownership interests in a company. The appraiser then divided the equity value of the company by the 11,938,060 shares outstanding to establish the current stock price of $28.56.

**How employees can affect share price**
The primary goal of our five-year and annual business plans and our incentive programs is to improve our business and financial performance to maximize long-term, sustainable value for our shareholders. As a result, the objectives and scorecards we set for our company, our divisions, locations, departments and teams are designed to improve company performance and increase stock value. The extent to which every employee understands and achieves the objectives for his or her location, department, function or machine will directly affect our share price. That's the power of employee ownership.

- The valuation of PDC stock peaked at $33.62 with the 31 December 2006 valuation. Richards released a communication touting the share price and stating that "by all market measures we are exceeding expectations."

- In a 2007 publication titled "Appleton: Applying Technology for Performance," Appvion Management represents that Karch said "we had our legal and financial advisors there to make sure everything we disclosed was appropriate and in compliance." According to the document, Prodoehl stated that employees "essentially had all the information they needed to make an informed decision whether or not to invest in the company." That document also represented that Driscoll stated that State Street was "appointed the fiduciary to make sure the transaction was fair from a financial perspective to the ESOP. And it was.

Employees would not be paying more than the fair market value to buy Appleton Papers."

- In a 10 July 2007 email, Appvion management reported that SRR had valued PDC stock at $32.89, which was a slight decrease since December 2006 and the first decrease in share price since the 2001 buyout transaction. The communication reassured employees that the decrease in share price was based on "a general softening in market conditions" and SRR "see[s] no major changes in the fundamentals of our company."

- For the 31 December 2007 valuation, SRR valued the shares at $33.41. An internal communication on 11 January 2008 explained the valuation, stating that the carbonless segment exceeded expectations. The communication also stated that "the year was even tougher for BemroseBooth and its results in the second half of 2007 along with increased pension liabilities for the company produced a significant decrease in share value." The communication continues: "Three factors that helped to offset those reductions in value. For the first time SRR recognized value in our developing microencapsulation business. Second, we reduced the company's debt including repurchasing some of our most expensive bonds. Third, SRR recognized value in our pending insurance claims and expected judgment for certain litigation expenses. In general, those three factors along with the performance of our paper business accounted for the $.52 increase in the PDC stock value." Additionally, Mark Richards held road shows in January 2008 along with representatives from State Street and Scott Levine of SRR to explain the valuations.

- For the 30 June 2008 valuation, an internal communication dated 7 July 2008 stated that "BemroseBooth has struggled with difficult economic conditions and tough markets for its products. [BemroseBooth] has a big pension liability with future funding requirements. Those two factors have hampered Appleton's efforts to sell BemroseBooth and have resulted in a dramatic write down of its value."

- For the 31 December 2010 valuation, SSR valued the shares at $12.84, an increase from $12.03 per share on 30 June 2010. Appvion pointed to "increased demand for its products and market share gains driven by strong sales of its carbonless sheet product and its BPA-free thermal receipt paper. Results were also positively affected by numerous price increases the company implemented during the year to offset the impact of rising pulp prices. The increase in the value of the thermal business essentially offset the value of the carbonless business. The rapid and consistent growth of the Encapsys business was the single business contributor to share price growth in H2 2010. The Encapsys division continues to increase its contribution to shareholder value with each recent valuation."

- In 2012, Appvion explored a merger with a third party which would have resulted in the ESOP being a minority shareholder. The employees voted to approve the merger; however, ultimately it fell apart and the proposed merger was terminated. Appvion management said the deal fell apart due to volatile market conditions. According to Mark Richards and Tom Ferree, Appvion had received positive feedback from potential investors about the fundamental strength of Appvion.

- For the 31 December 2012 valuation, an internal communication dated 5 February 2013 stated "Key contributors to the increase in share price were strong sales and earnings growth from our thermal papers segment, savings delivered by the strategic supply agreement with Domtar, a significant reduction in working capital, and strong improvement in adjusted operating income."

- For the 30 June 2013 valuation, SRR valued the shares at $17.85, an increase from $17.55 on 31 December 2012.  Appvion management indicated that SRR was actually being conservative, noting that the market analysis would produce a significant increase in stock value but that "Historically SRR has been cautious about immediately applying those changes in value (up or down) to PDC stock. SRR chose to discount the H1 2013 performances of comparable companies until the associated stock values prove to be sustainable."

- In 2015, SRR's valuation increased from $11 a share on 31 December 2014 to $12.90 a share on 30 June 2015 and $12.30 a share on 31 December 2015.  This increase was in spite of the fact that Appvion announced to employees that its 2015 earnings were not enough to cover the fixed expenses for interest, pension, ESOP distributions, maintenance, and environmental liability obligations. However, Prior Committee Defendants and Director Defendants reiterated that the same approaches were being used.  In reporting the 30 June 2015 valuation, an employee communication noted that "The sale of Encapsys and our receipt of net proceeds of approximately $200 million (minus the transaction fees) had a significant positive impact on the share price of almost $5.  However poor performance by our thermal business decreased per share value by approximately

$4." The communication also pointed out additional factors that influenced share price; they noted that revenues were down in the first half of 2015 but a reduction in selling, general and administrative expenses offset the decline and payment of Fox River liabilities had also improved share price. The communication did not disclose the problems with the 30 June 2015 valuation discussed above, including the facts that SRR used 6 instead of 5 years of data in its discounted cash flow analysis and that SRR had changed its guideline company methodology for that valuation. Instead, Appvion management just reiterated that Argent was relying on SRR:

> **Valuation process**
>
> Argent relies upon Stout Risius Ross (SRR), an independent valuation firm, to conduct appraisals of Appvion and PDC to assist in determining the value of PDC stock. SRR uses an income approach and a market approach to value stock.

- For the 31 December 2015 valuation, Appvion management released a communication acknowledging that the share price had decreased from $12.90 a share to $12.30 a share. However, the communication blamed the decrease on "volatile market conditions," stating: "Appvion's business performance during the second half did not significantly alter the value of the company. Most of the decline in share value was the result of volatile market conditions and the negative performances of comparable companies and general market indices."

474. Each of the Prior Committee Defendants, the Director Defendants, and the Trustee Defendants had a duty and responsibility to ensure the information provided to the ESOP Plan and its Employee Participants was accurate.

475.    The Trustee Defendants set the value of PDC stock based on Willamette and SRR's valuations.  As discussed above, these values were inflated and misrepresented the true value of PDC stock.

476.    The Prior Committee Defendants communicated the (inflated) share values as set by the Trustee and approved by the Prior Committee Defendants to the Employee Participants. In doing so, the Prior Committee Defendants knew the share values were inflated and did not represent the true value of PDC stock.

477.    The Trustee Defendants and the Director Defendants either approved these communications or knew that the Prior Committee Defendants were communicating the stock value to the Employee Participants and acquiesced in those communications.

478.    On information and belief, the employee stock communications were reviewed during meetings of the ESOP Committee and approved for release by the Prior Committee Defendants who were on the ESOP Committee at the time of the communication.

479.    Selectively disclosing factors that supposedly impacted the valuations while failing to fully disclose Willamette and SRR's valuation process constitutes fraud or concealment.

480.    These communications also did not disclose that the valuations omitted key liabilities or the other flaws in the valuations discussed above.  For example, the unfunded pension/post-retirement liabilities were reported on Appvion's balance sheet in each of the PWC audited financial statements.  This means that the liabilities were both probable and estimable. Because of the sheer magnitude of these liabilities, and, therefore, their high level of materiality to Appvion's financial condition, each ESOP fiduciary (the Director Defendants, the Prior Committee Defendants, and the Trustee Defendants) who had access to the semi-annual

appraisals, participated in fraud or concealment by not requiring that the liabilities be explicitly addressed.

481.   The communications also did not disclose that SRR was ignoring market-based evidence of Appvion's financial condition.  The Bloomberg values and Standard & Poor's rating discussed above are not available without access to those services and would not have been known to the Employee Participants.

### 3. The Director Defendants Did Not Disclose That They Were Failing to Monitor the Trustee Defendants and the Prior Committee Defendants.

482.   The Director Defendants received reports on the semi-annual valuations of PDC stock.

483.   Braun from Willamette represented that Willamette will come to Appvion twice a year and provide a "full report" to the management and the board of directors so that they would have "enough information so they understand what it is [Willamette] did, why it makes since, at least why [Willamette] think[s] it made sense and how [Willamette] feel[s] that it is a supportable value for the purpose of determining what [the employees'] value is going forward."

484.   Driscoll also reported to employees in September 2003 and May 2006 newsletters that a representative of State Street met with the Board each year.

485.   The Director Defendants also had an Audit Committee that was responsible for helping the Board "fulfill its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of Paperweight Development financial reports."  The Audit Committee reviewed Appvion's audited financial statements.

486.    The October 2006 KSOP Guide establishes that the Director Defendants "establish[ed] the company's financial objectives, review[ed] its performance against those objectives, and determin[ed] appropriate business strategies."

487.    The Director Defendants also had the authority to request additional information from the Trustee, especially under the 2015 trust agreements with Argent.

488.    The Director Defendants were also responsible for setting the compensation of Appvion's executives, including the excessive compensation plans tied to the value of PDC stock.  The Director Defendants therefore knew Appvion management had a conflict of interest by being financially motivated creating inflated projections that increased the valuations of PDC stock.

489.    However, the Director Defendants failed, among other things, to oversee the projections and failed to verify that key, material liabilities were included in the valuation reports.

490.    The Director Defendants did not disclose to employees that they were not monitoring the Prior Committee Defendants and the Trustee Defendants.  Instead, publications repeatedly misrepresented to employees that the Director Defendants were complying with their fiduciary duty to watch out for the Employee Participants' interests as shareholders.

491.    To the extent the Director Defendants claim that they did not know that the semi-annual PDC stock valuations were materially overstated, it is because they failed to monitor the ESOP Committee or the ESOP trustees or otherwise failed to comply with their fiduciary duty to protect the interests of the ESOP Plan and the Employee Participants.

492.    The Director Defendants also either approved or acquiesced in the release of the communications to employees that selectively justified the value of PDC stock and that misrepresented the PDC stock's value.

### 4.    The Argent Defendants Acknowledged Critical Issues with SRR's Valuations but Admitted That They Had Rubberstamped Them Anyway.

493.    Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017.

494.    Less than a month after Lyon's appointment, he had identified specific deficiencies with the PDC stock appraisals.

495.    He then met with Argent's Steve Martin about the issues he had uncovered. Following that discussion, he prepared a report to Appvion's board dated 1 September 2017 (the "Lyon Report").

496.    Lyon gave Martin an opportunity to review the Lyon Report before Lyon gave it to the Appvion Board.

497.    Argent admitted that it had never run a review process for SRR and that it used SRR because the predecessor trustee, State Street, used them.  Argent said it had used SRR in other engagements.

498.    Argent acknowledged that Appvion had consistently missed their financial projections during Argent's time as trustee.

499.    Argent acknowledged that it had questioned SRR's low (5%) discount for lack of marketability, but SRR had not changed the discount percentage.

500.    Argent acknowledged that it has not been involved in explaining SRR's valuations or Appvion's financial condition to the Employee Participants.  Rather, Argent

Defendants allowed Appvion management and board to take the lead in communicating the stock price and financial information to Employee Participants.

501.   Argent acknowledged that unfunded pension and post-retirement benefits other than pension liabilities were never included in the SRR valuation, even though those liabilities and post-retirement benefits other than pension were included in the audited financial statements.

502.   Argent never disclosed these problems with the valuations to Employee Participants, but instead provided stock prices as described earlier.

> **5.**   **The Prior Committee Defendants and The Director Defendants Led the ESOP Plan and the Employee Participants to Believe that the Executive Team had the Same Level of Risk as the Potential Employee Participants.**

503.   In the 2001 KSOP and the Prospectus, Appvion management represented that the money they would receive under the defined compensation plans was "subject to the same important risk and return profile as the ESOP equity investment."

504.   At the 2 August 2001 road show, Buth told the employees that he and his "management team have already committed 100% of [their] funds.  Of the 14 of [them] that [was] $5 million dollars…"

505.   In a 14 January 2002 email to employees, Paul Karch distinguished Appvion's ESOP from Enron's, in order to reassure employees that the Appvion ESOP was safer than Enron's plan:

> Control
>
> Our ESOP holds 100 percent of the company's stock.  **Our ESOP trustee, as the legal shareholder, is the sole shareholder, and thus has control of the company**.  In Enron's case, their qualified plan held less than 10 percent of the company's total outstanding stock, so the trustee was a minority shareholder who could not influence or affect the governance structure and protect participants' holdings.

Diversification

**Our plan design prevents company executives or other employee group from selling their stock sooner than any other employee since all our stock is in the ESOP**.  In Enron's situation, company executives owned stock that was not held in their qualified plans.  That stock was not subject to the same restrictions on sales as the stock in the qualified plans.

506.    Similarly, a January 2006 newsletter also stressed that the company's board of directors and the trustee would protect employees from the kind of fraud that occurred at Enron:

**Enron executives were able to sell their stock and pay themselves large bonuses** even though the company was failing and the employees were not able to sell their stock. **Can that happen to us**?

**No. Our executives are able to own company stock only through the ESOP**, so they are not able to sell it any sooner or at a different price than any other participant.

507.    However, the ESOP Plan design only prevented executives or employees from selling their stock while remaining with Appvion; instead, all of the Appvion executives in place at the time of the 2001 transaction left the company by March 2007, and they all withdrew their funds either on a lump sum basis or over the five years after leaving Appvion.  Further, executives received significant incentive compensation that was not part of the ESOP and therefore they were not dependent on the ESOP in the same way that other employees were.

508.    When Buth left Appvion in 2004, Karch sent an internal communication dated 3 May 2004 that stated:

Since Doug's leaving the company is voluntary, he **will not receive any severance payments nor are there any special deals that apply**.  Doug has the same options as any other employee who terminates his or her employment.  He may choose to leave his investment in company stock or request a distribution.  **My understanding is that Doug intends to leave his money invested in company stock.**

509.    Buth received significant funds on his departure.  Specifically, Buth received compensation under the various incentive and bonus plans discussed above.

510.    However, Prior Committee Defendants and Director Defendants knew the true financial condition of Appvion and knew when to pull their money out of stock and/or management incentive plans.  Indeed, at least Buth, Karch, Fantini, and Parker timed their exit to ensure they received gains from the sale of their shares.  Specifically, Buth, Karch, Fantini, and Parker gained:

| Individual | Gains |
|------------|-----------|
| Buth | $851,972 |
| Karch | $303,566 |
| Fantini | $577,365 |
| Parker | $156,493 |

**6.    Employees Were Unable To Get Additional Information About the Valuations.**

511.    After the 2001 Transaction, there was a committee of hourly and salaried personnel that met with the Company and the Board of Directors on behalf of the Employee Participants.  However, when committee members retired or left the committee, the Company did not replace them.  The committee was eventually disbanded in around 2006.

512.    Also around 2006, the Company stopped meeting with Union members quarterly to discuss the ESOP by negotiating it out of the bargaining agreement.

513.    During the road show presentations, employees would ask questions about the SEC filings, the Company's debt, and the valuations.  When faced with these questions, CFO Tom Ferree would typically respond that he could not answer because it would be considered insider trading.

514.    Employees who requested more information about the stock valuation and the company's finances were shut down.

515.    Employees were prohibited from talking directly to the ESOP Trustee to get more information about the valuations.

## COUNT I
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE TRUSTEE DEFENDANTS

516.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

517.    ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

518.    The Trustee Defendants are plan fiduciaries.

### The Trustee Defendants Have a Duty to Act in the Best Interest of Plan Participants and a Duty to Act Prudently

519.    The duty of loyalty under ERISA § 404(a)(1)(A) and duty of prudence under ERISA § 404(a)(1)(B) requires a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receive adequate consideration for the assets of the plan and the participants' accounts in the plan.

## The Trustee Defendants Have a Duty to Thoroughly Investigate

520.    The Trustee Defendants were responsible for hiring the independent appraisers who conducted the semi-annual valuations of PDC's stock price.

521.    ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

522.    In order to comply with their fiduciary obligations, the Trustee Defendants must investigate the independent appraisers' qualifications, provide the independent appraisers with complete and accurate information, and make certain that reliance on the independent appraisers' advice was reasonably justified.

523.    The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently.  Specifically, the Trustee Defendants cannot rely on other persons in order to make a good faith determination that the sale or purchase of Appvion stock was for fair market value and that the appraisals received actually reflect the health of the company for the purpose of valuing the stock.

## The Trustee Defendants Have a Duty to Ensure Plan Participants Receive Adequate Consideration and to Ensure that the ESOP Plan Does Not Pay More Than Fair Market Value For Stock

524.    The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine

135

that the plan and its participants receive adequate consideration for the assets of the plan and the participants' accounts in the plan.

525.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

526.    In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

<div align="center">**The Trustee Defendants Have a Duty to Disclose and Inform**</div>

527.    An ERISA fiduciary's duty of loyalty and its duty of prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

**The Trustee Defendants Have a Duty to Act in Accordance with the ESOP Plan Documents**

528.    In order to comply with their fiduciary obligations, the Trustee Defendants were required to have complied with the ESOP Plan Documents.

529.    Pursuant to the Trust Documents, the Trustee Defendants were required to hire an independent advisor (as described in Section 401(a)(28)(c) of the Internal Revenue Code) to appraise the value of PDC stock on a semi-annual basis.   The Trustee Defendants were responsible for reviewing finalizing, and adopting the valuations.

530.    IRC § 401(a)(28)(C) requires that "all valuations of employer securities which are not readily tradeable on an established securities market with respect to activities carried on by the plan are by an independent appraiser," which means an appraiser meeting the requirements of the regulations prescribed under section 107(a)(1).   In the context of an ESOP that holds, acquires or sells securities that is not readily tradeable on an established securities market, an ESOP fiduciary needs to hire an independent appraiser, but the fiduciary remains responsible for ensuring that the valuation and the information on which it is based is complete, accurate, and up-to-date.

531.    Section 1.33 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Fair Market Value as the "fair market value of Company Stock, at a certain date, as determined by the Trustee based the appraisal of an Independent Appraiser."

532.    Section 1.38 of the 2001 Appleton Papers Retirement Savings and Employee Stock Ownership Plan, and various plans thereafter, define Independent Appraiser to mean "an Independent Appraiser as defined in Section 401(a)(28) of the Code, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA."

533.    The Trustee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with the ESOP Plan documents.   Specifically, the Trustee Defendants cannot rely on other persons in order to make a

good faith determination that the sale of Appvion stock was for fair market value and the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

### The Trustee Defendants have a Duty to Monitor the Board of Directors

534.    As the representative of the sole shareholder of PDC, the Trustee Defendants also have a duty to monitor the performance of PDC and Appvion's board of directors.  While the Trustee Defendants did not have authority to unilateral removal of members of any members of the board of directors after 2005, they could request that Appvion's CEO agree to remove jointly appointed members of the board of directors.

535.    The Trustee Defendants have a duty to monitor Appvion's Board of Directors by reviewing board minutes, financial statements, and monitoring the performance of the company.

### The Trustee Defendants Breached Their Duties to (1) Act in the Best Interest of the ESOP Plan (i.e. loyalty), (2) Act Prudently, (3) Act in Accordance with the ESOP Plan Documents, and (4) Monitor the Board of Directors

536.    The Trustee Defendants breached their fiduciary duties as described above by, among other things, the following:

- Failing to properly investigate the fair market value of PDC stock.

- Failing to properly investigate Willamette and SRR's methods for valuing PDC stock and adopting the valuations despite substantial flaws in the valuations that resulted in significant overvaluations of PDC stock.

- Failing to properly scrutinize the financial projections provided by Appvion management, which Willamette and SRR relied on in valuating PDC stock, even though Appvion had consistently failed to meet its projections.

- Failing to take reasonable steps to determine that Willamette and SRR receive complete, accurate and current information necessary to value PDC stock, including failure to identify conflicts of interest with the individuals at Appvion who were creating the projections.

- Failing to prudently determine that its reliance on the valuation reports and appraiser's advice was reasonable.

- Failing to document, in writing, their oversight of the appraisers, the appraisal process, and their analysis and review of the final valuation reports, including, among other things, failure to ensure that either the appraiser or the trustee conducted and documented the following:

  - The identification of the individuals responsible for providing projections reflected in the valuation report and a reasonable inquiry as to whether those individuals have conflicts of interest;

  - An opinion as to the reasonableness of any projections considered and explanation why and to what extent the projections are or are not reasonable, including, at a minimum, an analysis of how the projections compare to and whether they are reasonable in light of the company's five-year historical averages.

  - The reasonableness of disregarding certain projections, including adjustments made.

  - The support of the reasonableness of projections and why those assumptions are reasonable if the company is projected to meet or exceed its historical performance.

  - The explanation why a greater weight is assigned to some valuation methods over others, including the removal of an entire valuation method.

  - The Trustee's analysis of the final valuation reports, including consideration of the topics, such as, but not limited to, the following:

    - Marketability discounts;

139

- Minority interests and control premiums;

- Projections of the company's future economic performance and the reasonableness or unreasonableness of such projections, including, if applicable, the bases for assuming that the company's future financial performance will meet or exceed historical performance or the expected performance of the relevant industry generally;

- Reliability and timeliness of the historical financial data considered, including a discussion of whether the financial statements used by the valuation advisor were the subject of unqualified audit opinions, and if not, why it would nevertheless be prudent to rely on them;

- The comparability of the companies chosen as part of any analysis based on comparable companies; and

- Whether the methodologies employed were standard and accepted methodologies and the bases for any departures from standard and accepted methodologies.

- Failing to disclose material facts, including but not limited to the following facts:

  (i)  That the valuations significantly overstated the value of PDC stock;

  (ii)  That the valuations did not include significant liabilities, including unfunded pension and other post-retirement liabilities, certain types of interest-bearing debt, and other liabilities that were included on Appvion's audited financial statements;

  (iii)  That the valuations did not comply with the standard of care for appraisals of this type;

  (iv)  That the valuations were based on unrealistic projections prepared by Appvion management; and

(v)     That the valuations improperly applied a control premium that increased the valuation even though the ESOP had no practical ability to control Appvion or PDC.

(vi)    That the valuations contained other deficiencies including those described in this complaint.

- Failing to monitor Appvion's Board of Directors.

- Allowing Appvion management to communicate the share price to Appvion employees, even though Appvion management selectively disclosed factors that influenced the share price while omitting material information about the valuations, such as the fact that the valuations improperly applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded pension and other post-retirement liabilities), that Willamette, on information and belief, and SRR capped the declining income stream into perpetuity, that Willamette, on information and belief, and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette, on information and belief, and SRR failed to apply the proper discount for the lack of marketability of the shares, and that Willamette, on information and belief, and SRR improperly applied a control premium in its valuation, among other things.

- Failing to participate in Appvion's management's explanation of the stock price and investment advice to employees.

- Failing to follow up with Willamette and SRR on what it believed to be a low discount rate based on lack of marketability.

- Failing to establish processes to adequately monitor Appvion's board of directors, especially in the operation of the ESOP Committee and the Compensation Committee.

- Agreeing to the sale of Encapsys.

- Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from setting and benefiting from artificially high stock prices at the expense of the ESOP Plan.

537.  These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A), the duty of prudence under ERISA § 404(a)(1)(B), the duty to act in accordance with the plan under ERISA § 404(a)(1)(D) and the duty to monitor the board of directors.

538.  The Trustee Defendants' breaches of their fiduciary duties damaged the ESOP Plan by causing it to consistently and repeatedly overpay for PDC stock.

539.  The Trustee Defendants also knew that the share price that it adopted was used by PDC/Appvion in the payment of bonuses and other incentives to directors and offices of PDC/Appvion.  The Trustee Defendants' breaches of their fiduciary duties therefore further damaged the ESOP Plan by causing Appvion to overpay directors and officers, thereby reducing cash available to pay Employee Participants for the value of their shares.

**COUNT II**
**BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AND BREACH OF THE DUTY TO MONITOR AGAINST THE PRIOR COMMITTEE DEFENDANTS**

540.  Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

541.  As former members of the ESOP Committee, the Prior Committee Defendants were Named Fiduciaries under Section 8.2(a)(2) of the ESOP Plan Documents.

142

542.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

### Prior Committee Defendants Have a Duty to Act in the Best Interest of the ESOP Plan and a Duty to Act Prudently

543.    The duty of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the ESOP Plan and its participants receive adequate consideration for the assets of the ESOP Plan and the participants' accounts in the ESOP Plan.

### The Prior Committee Defendants Have a Duty to Monitor the Trustee Defendants and the Valuations

544.    ERISA § 404 requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  This requires a fiduciary to not only analyze the merits of a proposed transaction or valuation but also to thoroughly investigate a proposed transaction or valuation.

545.    As members of the ESOP Committee, the Prior Committee Defendants were responsible for interpreting the ESOP Plan and establishing policies and procedures to implement the ESOP Plan.

143

546.    In order to comply with their fiduciary obligations, the Prior Committee Defendants had a duty to monitor the actions of the Trustee Defendants and ensure they were complying with their fiduciary duties adequately protecting the interest of the ESOP Plan.

547.    The Prior Committee Defendants also had a duty to investigate the independent appraisals, including verifying that the independent appraisers were qualified, that they reviewed complete and accurate information, and that reliance on the independent appraisers' advice was reasonably justified.

548.    The Prior Committee Defendants cannot rely on the actions or activities of other persons (even other fiduciaries) to comply with the requirement to act in accordance with their duties to act in the best interest of the plan and to act prudently.  Specifically, the Prior Committee Defendants cannot rely on other persons in order to make a good faith determination that the sale of Appvion stock was for fair market value and that the appraisals received actually reflected the health of the company for the purpose of valuing the stock.

549.    In addition, beginning in at least 2008, the ESOP Committee began reviewing and approving the valuations prepared by the Trustee Defendants and SRR.

### The Prior Committee Defendants Have a Duty to Ensure  that the ESOP Plan Receives Adequate Consideration and to Ensure that the ESOP Plan Does Not Pay More than Fair Market Value For Stock

550.    The duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the ESOP Plan receives adequate consideration for the assets of the ESOP Plan and the Employee Participants' accounts in the ESOP Plan.

551.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith

by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

552.    In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under ERISA § 404(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances.

**The Prior Committee Defendants Have a Duty to Disclose and Inform**

553.    Additionally, an ERISA fiduciary's duties of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) include a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

**The Prior Committee Defendants Had A Duty To Monitor the Repurchase Obligation**

554.    Under the ESOP Plan Documents, when an employee was eligible for distributions, the Company was required to repurchase the shares of stock allocated to that employee.

555.    The Prior Committee Defendants had a duty to monitor the repurchase obligation and make sure there were sufficient funds available to meet the repurchase obligation.

**Prior Committee Defendant Breached Their Duties to (1) Act in the Best Interest of the ESOP Plan (i.e. loyalty), (2) Act Prudently, and (3) Monitor the Trustee Defendants**

556.   The Prior Committee Defendants breached their fiduciary duties in, among others, the following ways:

- Buth and Karch presented Houlihan as an independent advisor who would provide an independent opinion on the value of PDC as of the time of the 2001 Transaction.  However, Buth and Karch failed to disclose that Houlihan's fee was contingent on the deal closing and that their opinion was therefore not truly independent and should not be relied upon.

- In convincing employees to invest in the ESOP, Buth, Karch, Fantini, and Parker also represented that their investment in the ESOP was at equal or greater risk than the average employees.  They had access to inside financial information and knew when to sell their shares or leave the company in order to maximize their gains.

- The Prior Committee Defendants had access to inside financial information and knew that the stock prices set by the Trustee Defendants were artificially inflated. For example, having access to both the financial statements and the appraisals was sufficient for them to understand that the unfunded pension/post-retirement benefits were not included in any of the appraisals.  They therefore knew when to sell their shares or leave the company in order to maximize their gains.

- Karch represented to employees that the third party appraiser was valuing the company consistent with the methodology established by the Department of Labor.

- Karch also represented to employees that the independent appraisal would protect the employees from artificially high stock prices.

- The Prior Committee Defendants were involved in preparing the financial projections that the appraisers relied on in valuing PDC stock. They created overly optimistic financial projections even though they consistently failed to meet the projections, and they knew that the appraisers were incorporating those financial projections into the stock price and inflating the stock price.

- When Appvion's stock reached its artificial peak, Richards falsely represented to employees that Appvion was exceeding market expectations.

- Timing their exits from Appvion while the stock prices were artificially high for their own personal benefit but at the detriment of Appvion and all of the remaining employees.

- Selectively disseminating information to employees in order to prevent them from discovering Appvion's true financial health.

- Selectively disclosing factors that influenced the share price while omitting material information about the valuations, such as those described in this complaint, including the fact that the valuations applied a control premium, that the valuations did not account for some material liabilities (including significant unfunded pension, post-retirement liabilities), that Willamette and SRR capped the declining income stream into perpetuity, that Willamette and SRR broke Appvion into business segments and failed to include all overhead costs in the projections, that Willamette and SRR failed to apply the proper discount for the

lack of marketability of the shares, and that Willamette and SRR improperly applied a control premium in its valuation, among other things.

- Failing to implement systemic processes to review the Trustee Defendants' processes and strategies for reviewing and adopting the appraisals.

- Accepting the stock values adopted by the Trustee Defendants even though the Prior Committee Defendants knew or should have known that they were fundamentally flawed.

- Failing to take steps to prevent the Prior Committee Defendants and the Board of Directors from benefiting from artificially high stock prices at the expense of the ESOP Plan.

557.    Prior Committee Defendants' breaches damaged the ESOP Plan by causing or allowing it to consistently and repeatedly overpay for PDC stock.

## COUNT III
## BREACH OF FIDUCIARY AGAINST THE DIRECTOR DEFENDANTS

558.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

559.    According to the Department of Labor "the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such a manner as may reasonably be expected to ensure that their performance has be in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."

560.    The Director Defendants had the authority to both appoint and remove the trustee, and they did in fact appoint State Street, Reliance, and Argent as the ESOP Trustees.

561.    The Director Defendants were also responsible for appointing members of the ESOP Committee, including the Prior Committee Defendants.

562.    The Director Defendants therefore had discretionary authority and control over the management and administration of the ESOP Plan and its assets and were fiduciaries of the ESOP Plan.

563.    The Trustee Defendants appointed directors to Appvion's Board of Directors as described above, however, after January 1, 2005, the Trustee only had the ability to jointly nominate (with the CEO) three of seven possible individuals to the Board of Directors and it could not unilaterally remove those directors.

564.    Given the Director Defendants' ability to remove the Trustee Defendants and the relationship between the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants, the Director Defendants had a duty to monitor the Trustee Defendants and Prior Committee Defendants by implementing systematic processes to review their courses of action and strategies.

565.    The Director Defendants' knew or in the exercise of reasonable diligence should have known that the Trustee Defendants had retained Willamette and SRR to perform semi-annual valuations of PDC stock and that those valuations were fundamentally flawed as described above.

566.    The Director Defendants breached their duty to monitor by, among other things, the following:

- Allowing the Prior Committee Defendants to selectively disclose information about the valuations to employees;

- Failing to take steps to prevent the Trustee Defendants and the Prior Committee Defendants from setting and benefiting from artificially high stock prices at the expense of the ESOP Plan;

- Failing scrutinize the projections prepared by Appvion management and used as the basis for the valuations, even though the projections were inconsistent with Appvion's actual performance and with Appvion's audited financial statements;

- Allowing the Prior Committee Defendants to be paid amounts over and above the fair market value of their shares; and

- Allowing Appvion management employees to receive incentive and bonus payments based on the artificially inflated value of PDC stock.

567.    Because the Director Defendants had access to both the financial statements and the semi-annual appraisals, they knew that the appraisals failed to include a deduction for the unfunded pension, post-retirement liabilities and; therefore, misrepresented the true value of the PDC stock.

568.    The Director Defendants held themselves out as fiduciaries and stated that they were taking care of the interests of the shareholders, which includes the ESOP Plan, as the ESOP Plan held all shares allocated to the Employee Participants.

569.    For example, in a 19 March 2001 employee newsletter, the Board of Directors stated that "[s]hareholders have the right to elect a board of directors" that 'has a fiduciary obligation,' or legal responsibility, to represent the interests of the shareholders."

570.    A 2006 KSOP Guide contained nearly identical language, as did a January 2006 newsletter in which the Board of Directors said: "Our company's board of directors has a legal obligation to company shareholders (in our case, the ESOP is the sole shareholder) to prevent the kind of fraud that occurred at Enron."

571.    The Director Defendants failed in their fiduciary responsibility for the reasons described in this FAC, including, among other things:

- Failing to ensure the PDC stock appraised value was at fair market value for the reasons described in this FAC and failing to disclose those;

- Acquiescing or approving communications to the ESOP Plan and Employee Participants that misrepresented the fair market value of the PDC stock;

- Failing to consider and adjust for management and directors' conflict of interest as a result of being compensated with PDC stock;

- Directors Buth, Parker, and Richards disclosed that they were getting a fairness opinion from Houlihan in the prospectus, but omitted that the fairness opinion was coming from an entity that had a conflict of interest as described in this FAC.

572.    Plaintiff has been injured as a result of Director Defendants' conduct by, among other things, overpaying for PDC stock and entering into the ESOP transaction that it either would not have agreed to or would only have agreed to upon different terms.

**COUNT IV**
**ENGAGING IN PROHIBITED TRANSACTIONS AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS AND THE TRUSTEE DEFENDANTS**

573.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

574.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

575.    ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

576.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

577.    ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) defines a "party in interest" to include "any fiduciary… of such employee benefit plan" as well as "an employer any of whose employees are covered by such plan."

578.    ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H) defines a "party in interest" to include "any employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) of a person described in subparagraph" (C), among other subparagraphs.  Subparagraph (c) refers to ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C), which defines a party in interest to include "an employer any of whose employees are covered by such plan."

579.    Appvion was a party in interest to the ESOP because it was the employer whose employees were covered by the ESOP.  As directors of Appvion, the Director Defendants were parties in interest pursuant to the ESOP.

580.    The Prior Committee Defendants were parties in interest to the ESOP because they were employees, officers, and directors of Appvion.

581.    The Prior Committee Defendants and the Director Defendants were Plan fiduciaries as members of the ESOP Committee and/or the Board of Directors.

582.    The Trustee Defendants were fiduciaries to the ESOP in their roles as trustees who were responsible for, among other things, determining the fair market value of PDC stock.

583.    The actions of the Trustee Defendants, the Prior Committee Defendants, and the Director Defendants in adopting inflated stock valuations and additional compensation plans tied to or influenced by the stock valuations repeatedly caused the ESOP Plan to overpay for PDC stock beginning as early as December 2001.

584.    The Prior Committee Defendants sold their PDC stock at artificially high prices and thereby received consideration for their own personal accounts to the detriment of the ESOP Plan.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

585.    All of the Prior Committee Defendants received consideration from the incentive plans described above that were influenced by the artificially high valuations of PDC stock. These payments constitute prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

586.    The non-employee Director Defendants were awarded phantom stock units beginning in 2006, which counted as synthetic equity and were based on the value of PDC stock. Under this plan, the non-employee Director Defendants received consideration for their own personal accounts to the detriment of the ESOP Plan when they sold their phantom stock at artificially high stock prices.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

587.    In addition, the Company and the ESOP Plan purchased shares from other senior management who served in fiduciary capacities at inflated prices.  These transactions constituted prohibited transactions pursuant to ERISA § 406(a), 29 U.S.C. § 1106(a).

588.    Since PDC had no assets other than Appvion, the Director Defendants arranged for Appvion to loan cash to PDC to fund the ESOP's repurchase obligations, further damaging the value of the Company.  These transactions constituted prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

589.    The Trustee Defendants knew or should have known that the Prior Committee Defendants, the Director Defendants met the definitions of parties-in-interest with respect to the ESOP Plan.

590.    The Trustee Defendants were fiduciaries who caused the ESOP Plan to purchase the Prior Committee Defendants' and the Director Defendants' stock at artificially high stock prices.  As such, the Trustee Defendants caused the ESOP Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

591.    As parties in interest, the Prior Committee Defendants and the Director Defendants violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) and ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

592.    The exemption of ERISA § 408, 29.U.S.C. § 1108 does not apply to these transactions because the ESOP Plan paid more than adequate consideration for the shares.

593.    The prohibited transactions described above caused significant losses to the ESOP Plan.

## COUNT V
## KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST HOULIHAN LOKEY

594.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

595.    As alleged in the paragraphs above, the State Street Defendants, Buth, Karch, Fantini, and Parker, and others breached their fiduciary duties to the ESOP Plan in connection with the 2001 Transaction.

596.    Houlihan knew that the conduct described in the above paragraphs constituted a breach of the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' fiduciary duties.

597.    In addition, Buth, Karch, Fantini, and Parker received incentive payments in connection with the 2001 Transaction.  These payments were prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.

598.    Despite this knowledge, Houlihan knowingly participated in the breaches by:

- Issuing a fairness opinion that resulted in Houlihan receiving up to $8.1 million;

- Representing to Appvion employees that it was preparing an independent validation of the buyout proposed in 2001, while failing to disclose that its fees were contingent on both the deal closing and were structured as a percentage of the purchase price; and

- Representing to Appvion employees that the proposed buyout was a great deal for them.

599.    Houlihan's knowing participation assisted the State Street Defendants, Buth, Karch, Fantini, and Parker, and others' breaches of fiduciary duty in convincing Appvion's employees to agree to the buyout.  This allowed the Prior Committee Defendants, the State Street Defendants, and the Director Defendants to perpetrate their breaches of fiduciary duties and frauds over the next 16 years.

600.    Houlihan received up to $8.1 million in fees in connection with the 2001 Transaction.  This fee constituted an asset of the ESOP Plan.

601.    Plaintiff was harmed as a result of Houlihan's conduct.

602.    Houlihan, Buth, and Karch presented Houlihan as an independent advisor in connection with the 2001 Transaction.  At no point did they disclose that Houlihan's fees was contingent and that Houlihan therefore had a conflict of interest.

603.    Plaintiff is entitled to equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT VI
### VIOLATION OF ERISA § 410 AND BREACH OF FIDUCIARY DUTY UNDER ERISA §§ 404(a)(1)(A) AND (B), 29 U.S.C. § 1110 AND §§ 1104 (a)(1)(A) AND (B) AGAINST THE TRUSTEE DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE HOULIHAN LOKEY DEFENDANTS

604.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

605.    ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy."

606.    As Part IV of ERISA includes ERISA §§ 404, 405, and 406, 29 U.S.C. §§ 1104, 1105, and 1106, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a), unless there is an exception or exemption.  No such exception or exemption is applicable here.

607.    The DOL Regulations promulgated under ERISA § 410, 29 C.F.R. § 2509.75-4, renders "void any arrangement for indemnification of a fiduciary of an employee benefit plan by

the plan" because it would have "the same results as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations."

608.    For a 100% ESOP-owned company, a provision requiring indemnity by the ESOP-owned company is treated as an indemnity provision by the ESOP Plan because it effectively requires Plan participants to pay for the costs of the breaching fiduciaries' liability.

609.    Section 8.11 of the 31 July 2002 Plan Document and subsequent plan purport to have the Company, which is defined as Appleton Papers Inc. or its subsidiaries or affiliates "indemnify and save each person who is a member of the Committee and each employee or director of the Company or a Related Company, harmless against any and all loss, liability, claim, damage, cost and expense that may arise by reason of, or be based upon, any matter connected with or related to the Plan or the administration of the Plan…"

610.    To the extent that Section 8.11 of the 31 July 2002 Plan Document and the subsequent plan documents attempt to relieve the Prior Committee Defendants from their responsibility or liability for their breaches of fiduciary duties under ERISA and have the ESOP Plan be responsible for their liability or breaches, Section 8.11 is void as against public policy.

611.    The Trustee engagement letters and trust agreements purport to have Appvion indemnify and hold Trustee Defendants harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever.

612.    Plaintiff is entitled to declaratory judgment that any such indemnification clauses or agreements are void as against public policy and under ERISA § 410.

613.    To the extent that any fiduciaries of the ESOP Plan agreed to such an indemnity provision that is against public policy under ERISA § 410 (i.e. by accepting the benefits of the

indemnity provision), that fiduciary breached his or her fiduciary duties under ERISA by failing to discharge their duties with respect to the ESOP Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

## COUNT VII
## CO-FIDUCIARY LIABILITY PURSUANT TO ERISA § 405, 29 U.S.C. § 1105 AGAINST THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE TRUSTEE DEFENDANTS

614.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

615.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

### The Prior Committee Defendants and the Director Defendants

616.    The Prior Committee Defendants violated ERISA § 405(a)(1)-(3) when they knowingly participated in each other's violations when they acted as a Committee because (1) they each participated knowingly in the actions taken as a Committee and knew or were reckless

in not knowing the actions taken were a breach, (2) failed to fulfill their duties as members of the Committee set forth in the ESOP Plan Document, and (3) had knowledge of breaches by other Prior Committee Defendants and made no efforts to remedy the breaches.  As such, the Prior Committee Defendants are liable for the breaches of the other Prior Committee Defendants pursuant to ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3).

617.    The Prior Committee Defendants and Director Defendants violated ERISA §405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3) because they knew of the underlying facts, had an obligation to review the following breaches and either failed to fulfill those duties or had knowledge of the breaches and failed to make any efforts to remedy the breaches as follows:

- The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants breached their fiduciary responsibilities as set forth in Counts 1 and 6, including because each of them had access to the valuations performed by Willamette and SRR and had access to the financial information necessary to know that the stock price reflected in the valuations did not accurately reflect the fair market value of Appvion's stock.

- The Prior Committee Defendants and Director Defendants knew or should have known, consistent with their responsibilities, that Trustee Defendants failed to make proper disclosures as set forth in Counts 1, 6, because each of the Prior Committee Defendants either knew of or through a proper review would have discovered Trustee Defendants failure to make proper disclosures.

159

**Trustee Defendants**

618.    Trustee Defendants violated ERISA § 405(a)(1)-(3) when they participated in the prohibited transactions as set forth in Count 4 because Trustee Defendants failed to fulfill their duties as Trustee by failing to properly monitor Willamette and SRR to ensure the share prices it calculated were reasonably accurate and that Willamette and SRR's processes and information were reasonably reliable.

619.    Trustee Defendants knew of the breaches set forth in Counts 2, 3, 6 and made no effort to remedy the breaches or violations.  As such, Trustee Defendants are liable for the breaches and violations of the Prior Committee Defendants and the Director Defendants.

## COUNT VIII
### KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY PURSUANT TO ERISA § 502(a)(3), 28 U.S.C. §1132(a)(2) AGAINST THE WILLAMETTE DEFENDANTS AND THE SRR DEFENDANTS

620.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

**The Willamette Defendants and the SRR Defendants Knowingly Participated in the Trustee Defendants' Breaches of Fiduciary Duty.**

621.    The Trustee Defendants were fiduciaries to the ESOP Plan.

622.    The Trustee Defendants were responsible for determining the fair market value of PDC stock and they retained the Willamette Defendants and the SRR Defendants to advise them on the fair market value of PDC stock.

623.    The Trustee Defendants breached their fiduciary duties to the ESOP Plan as described above in Count I.

624.    The Willamette Defendants and the SRR Defendants knew that the Trustee Defendants were relying on their opinion in setting the fair market value of PDC stock, and knew

that the Trustee Defendants were failing to conduct appropriate diligence and breaching their fiduciary duties to the ESOP Plan as described above in Count I.

625.    The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the breaches by issuing valuations that were fundamentally flawed for the reasons described in this complaint, including:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They failed to include some liabilities, including lease liability, restructuring reserves, and pension/post-retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton mill.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

- SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

- They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

626.    The Willamette Defendants and the SRR Defendants' conduct damaged the ESOP Plan.

627.    Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Trustee Defendants' breaches of fiduciary duty.

**The Willamette Defendants and the SRR Defendants Knowingly Participated in the Prior Committee Defendants' Breaches of Fiduciary Duty.**

628.    The Prior Committee Defendants were fiduciaries to the ESOP Plan.  The Prior Committee Defendants breached their fiduciary duties to the ESOP Plan by the conduct described above in Count II.

629.    The Willamette Defendants and the SRR Defendants knew that the Prior Committee Defendants were breaching their fiduciary duties to the ESOP Plan by the conduct described above in Count II.  Specifically, the Willamette Defendants, on information and belief, and the SRR Defendants knew, among others, the following:

- The Prior Committee Defendants were providing inflated financial projections, even though Appvion had historically failed to meet the financial projections prepared by management.

- Appvion's audited financial statements showed significant unfunded pension/post-retirement and other liabilities which the Prior Committee Defendants were aware of, but which were not being included as liabilities in the valuations.

- The Prior Committee Defendants were participants in the ESOP Plan, and when they terminated employment with the company they would receive distributions based on the inflated stock values.

- The Prior Committee Defendants had synthetic equity from various incentive plans, which was tied to the stock valuations prepared by the Willamette Defendants and the SRR Defendants.

630.    The Willamette Defendants, on information and belief, and the SRR Defendants knowingly participated in the Prior Committee Defendants' breaches of fiduciary duty by issuing valuations that were fundamentally flawed because:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They failed to include some liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities, that would have resulted in negative valuations from at least 2009 through 2016.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton Mill.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments.

- SRR ignored evidence of Appvion's enterprise value from the sale of its Encapsys unit and concluded that Appvion's enterprise value was $53 million in excess of what the real world data available.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation.

- They improperly applied a control premium in its valuation, which was inappropriate since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

631. The Willamette Defendants and the SRR Defendants' conduct damaged The ESOP Plan. As such, Plaintiff is entitled to appropriate equitable relief against the Willamette Defendants and the SRR Defendants for their knowing participation in the Prior Committee Defendants' breaches of fiduciary duty.

### The Willamette Defendants and the SRR Defendants Knowingly Participated in the Director Defendants' Breaches of Fiduciary Duty

632. The Director Defendants were fiduciaries of the ESOP Plan.

633. The Director Defendants breached their fiduciary duties to the ESOP Plan as described above in Count III.

634. The Willamette and SRR Defendants knew that the Director Defendants were breaching their fiduciary duties to the ESOP Plan by as described above in Count III.

635. Willamette and SRR's conduct damaged the ESOP Plan.

636. By knowingly participating in the Trustee Defendants', the Prior Committee Defendants', and Director Defendants' breaches and violations, Willamette and SRR are subject to appropriate equitable relief.

### COUNT IX
### FRAUD AGAINST WILLAMETTE

637. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

638.    Willamette was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

639.    Willamette served as State Street's independent appraiser from 2001 to mid-2004.

640.    Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

641.    Willamette knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for Plan transactions.

642.    Willamette knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants.  Willamette also knew that the Employee Participants would rely on Willamette's opinion of the stock's value in making decisions to, among other things, make deferrals to the ESOP Plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

643.    Indeed, Willamette intended the ESOP Plan and the Employee Participants to rely on their valuation of the Company's stock in purchasing stock back from employees.

644.    During its tenure are the ESOP Plan's independent appraiser, Willamette determined the value of PDC's stock as described above.  Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including that it did not account for millions of dollars in pension/post-retirement benefits.

645.    Because of these flaws, the stock prices as determined by Willamette, on information and belief, overstated the fair market value of PDC stock by a significant degree.

646.    Willamette, on information and belief, knew that the stock prices it provided for the ESOP Plan's use were not accurate and that they overstated the fair market value of the stock.

647.    The ESOP Plan and the Employee Participants believed Willamette's appraisal of fair market value.

648.    The ESOP Plan and the Employee Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them.   In addition, Willamette's wrongdoing was concealed as described above.

649.    In reliance on Willamette's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time.   The fair market value determinations also played a key role in Appvion's eventual insolvency, which caused the remaining investments in the ESOP Plan to be worthless.

650.    The ESOP Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

651.    As a result of Willamette's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan has been damaged.

## COUNT X
### FRAUD AGAINST THE SRR DEFENDANTS

652.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

653.    SRR was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

654.    SRR was hired by Reliance, in its capacity as trustee of the ESOP Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

655.    SRR was hired by Argent, in its capacity as trustee of the ESOP Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

656.    SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

657.    SRR knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for ESOP Plan transactions.

658.    SRR knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants.  SRR also knew that the Employee Participants would rely on SRR's opinion of the stock's value in making decisions to, among other things, make deferrals to the plan, request statutory or additional diversification, request distributions from the ESOP after terminating employment, and/or retire or otherwise terminate employment at Appvion.

659.    During its tenure are the ESOP Plan's independent appraiser, SRR determined the value of PDC's stock as described above.   SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- Even though SRR's own valuation reports admitted that its appraisal needed to consider all known liabilities, SRR's appraisals omitted know liability, they failed to include material liabilities, including lease liability, restructuring reserves, pension/post-retirement liabilities, and some types of interest-bearing debt. Inclusion of these liabilities should have resulted in negative valuations from at least 2009 through 2017.

- They capped a declining income stream into perpetuity.

- SRR changed valuation methods and relied only on revenue multiples, instead of EBITDA, in response to poor performance by Appvion's Thermal Division in order to continue to justify its appraised values.

- SRR failed to subtract losses from the closure of Appvion's West Carrollton mill and the associated severance costs.

- SRR failed to include all overhead costs in the projections by breaking Appvion out into business segments thus overstating earnings and value.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

168

Case 18-50955-KJC    Doc 66-1    Filed 03/19/19    Page 169 of 207
Case 1:18-cv-01861-WCG    Filed 11/08/19    Page 193 of 527    Document 74-2

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

660.  Because of these flaws, the stock prices as determined by SRR overstated the fair market value of PDC stock by a significant degree.

661.  SRR knew that the stock prices it provided for the ESOP Plan's use were not accurate and that they overstated the fair market value of the stock because, for example, SRR's own valuation reports admitted that in calculating fair market value, all liabilities must be considered.

662.  SRR also specifically knew that they should have included Appvion's unfunded pension liabilities and other liabilities in its valuations.  Indeed, on 31 December 2013 SRR and Reliance discussed the ESOP's pension liability at an investment policy subcommittee meeting held by them.  In addition, on information and belief, Ferree discussed the pension funding issue with SRR in June 2016, but SRR still did not include the pension liability in its valuation.

663.  SRR also knew that the value of the stock was material because it would be used to set the share price to be used for ESOP Plan transactions, including deferrals to the ESOP Plan and repurchases of shares.

664.  Indeed, SRR intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

665.  The ESOP Plan and the Employee Participants believed SRR's appraisal of fair market value.

666.    The ESOP Plan and the Employee Participants had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them.  In addition, SRR's wrongdoing was as described above.

667.    In reliance on SRR's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses over time.  The fair market value determinations also played a key role in Appvion's eventual insolvency, which caused the remaining investments in the ESOP Plan to be worthless.

668.    The ESOP Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

669.    As a result of SRR's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

## COUNT XI
## NEGLIGENT MISREPRESENTATION AGAINST WILLAMETTE

670.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

671.    Willamette was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock.

672.    Willamette served as State Street's independent appraiser from 2001 to mid-2004.

673.    Willamette knew that its appraisal would be used by State Street to set the fair market value of PDC stock.

674.    Willamette knew that the value of the stock was material to the ESOP Plan and the Employee Participants because it would be used to set the share price to be used for Plan transactions.

675.    Willamette knew that its opinion of the stock's value would be shared with the ESOP Plan and Employee Participants.

676.    Indeed, Willamette intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

677.    During its tenure are the ESOP Plan's independent appraiser, Willamette determined the value of PDC's stock as described above.   Willamette reached these determinations even though Willamette, on information and belief, knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

678.    Because of these flaws, the stock prices as determined by Willamette overstated the value of PDC stock by a significant degree.

679.     Because of these flaws, Willamette, on information and belief, had no reasonable grounds for believing that the stock prices it provided for the ESOP Plan's use were accurate and that they correctly stated the fair market value of the stock. Willamette was therefore negligent in determining the fair market value of the stock.

680.     The ESOP Plan and the Employee Participants believed Willamette's appraisal of fair market value.

681.     The ESOP Plan and the Employee Participants had no way to know that Willamette had overstated the value of the stock because Willamette's full valuation reports were never shared with them.   In addition, Willamette's wrongdoing was concealed as described above.

682.     In reliance on Willamette's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time.

683.     The ESOP Plan justifiably relied on Willamette's opinions of the fair market value of PDC stock.

684.     As a result of Willamette's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

## COUNT XII
## NEGLIGENT MISREPRESENTATION AGAINST SRR

685.     Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

686.     SRR was hired by State Street, in its capacity as trustee of the ESOP Plan, to serve as State Street's independent appraiser in determining the fair market value of PDC stock from late 2004 through the end of 2012.

687.    SRR was hired by Reliance, in its capacity as trustee of the ESOP Plan, to serve as Reliance's independent appraiser in determining the fair market value of PDC stock for the semi-annual valuations of PDC stock in 2013.

688.    SRR was hired by Argent, in its capacity as trustee of the ESOP Plan, to serve as Argent's independent appraiser in determining the fair market value of PDC stock from 2014 through mid-2017.

689.    SRR knew that its appraisal would be used by State Street, Reliance, and Argent to set the fair market value of PDC stock.

690.    SRR knew that the value of the stock was material to the ESOP Plan because it would be used to set the share price to be used for ESOP Plan transactions.

691.    SRR knew that its opinion of the stock's value would be shared with the ESOP Plan and Plan Participants.

692.    Indeed, SRR intended the ESOP Plan to rely on their valuation of the Company's stock in purchasing stock back from employees.

693.    During its tenure are the ESOP Plan's independent appraiser, SRR determined the value of PDC's stock as described above.  SRR reached these determinations even though SRR knew that its valuation analyses contained significant flaws, including the following:

- They relied heavily on projections of future cash flow created by Appvion's management, even though Appvion consistently missed these projections.

- They never stress-tested the projections to understand the consequences of constrained liquidity and a highly-leveraged balance sheet on equity valuations.

- They failed to include material liabilities, including lease liability, restructuring reserves, and pension/retirement liabilities.

- They failed to apply a large enough discount for the lack of marketability of the shares and failed to fully account for the repurchase obligation of the pension liabilities.

- They improperly applied a control premium in its valuation since the ESOP had no practical ability to control the affairs of PDC or Appvion under the ESOP Plan Document or the Security Holder's Agreement.

694.    Because of these flaws, the stock prices as determined by SRR overstated the value of PDC stock by a significant degree.

695.    Because of these flaws, SRR had no reasonable grounds for believing that the stock prices it provided for the ESOP Plan's use were accurate and that they correctly stated the fair market value of the stock. SRR was therefore negligent in determining the fair market value of the stock.

696.    The ESOP Plan believed SRR's appraisal of fair market value.

697.    The ESOP Plan had no way to know that SRR had overstated the value of the stock because SRR's full valuation reports were never shared with them.  In addition, SRR's wrongdoing was concealed as described above.

698.    In reliance on SRR's valuations, the ESOP Plan repeatedly purchased shares from PDC and sold shares to PDC for more than fair market value, causing large losses to the ESOP Plan over time.

699.    The ESOP Plan justifiably relied on SRR's opinions of the fair market value of PDC stock.

700.    As a result of SRR's determination of the Company's stock price and the ESOP Plan's justifiable reliance there on, the ESOP Plan was damaged.

## COUNT XIII
## WISCONSIN SECURITIES FRAUD AGAINST THE RELIANCE DEFENDANTS, THE ARGENT DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE SRR DEFENDANTS

701.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

702.    The item offered/sold was a security as defined by Wisconsin law.

703.    PDC's stock is a security under Wisconsin Uniform Securities Law Section 551.102(28).

704.    The Defendants misrepresented the true value of PDC stock in connection with the ESOP's purchases and sales of PDC stock.

705.    The Defendants also knew or were reckless in failing to ascertain that certain material facts were omitted from its representations relating to the value of PDC stock, that were necessary to render not misleading the remainder of their representations.

### The Trustee Defendants Committed Wisconsin Securities Fraud

706.    While it was acting as Trustee to the ESOP Plan in 2013 and 2014, the Reliance Defendants falsely represented that value of PDC's stock was properly valued at $16.25 per share in connection as of the 31 December 2013 valuation date.

707.    The Reliance Defendants communicated these stock values to the ESOP Plan and the Employee Participants directly or through the issuance of statements to employees that purported to represent the value of their stock.  Alternatively, the Reliance Defendants were aware that the Prior Committee Defendants and Appvion management were communicating these stock values to the ESOP Plan and the Employee Participants and providing limited information that purported to justify the stock values.

708.    In connection with the release of the stock valuations, the Reliance Defendants omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That they were not taking steps to ensure that SRR reviewed accurate, reliable financial projections.

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

709.    While it was acting as Trustee to the ESOP Plan in 2014 through 2017, the Argent Defendants falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

710.    The Argent Defendants communicated these stock values to the ESOP Plan and the Employee Participants directly or through the issuance of statements to employees that purported to represent the value of their stock.  Alternatively, the Argent Defendants were aware that the Prior Committee Defendants and Appvion management were communicating these stock values to the ESOP Plan and the Employee Participants and providing limited information that purported to justify the stock values.

711.    In connection with the release of the stock valuations, the Reliance Defendants omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That they were not taking steps to ensure that SRR reviewed accurate, reliable financial projections.

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion. They also did not disclose that SRR may have stopped applying this control premium after its 31 December 2014 valuation.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

712.    The Reliance and Argent Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

713.    The Reliance and Argent Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the ESOP Plan and the Employee Participants in connection with the sale of securities.

714.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

**The Prior Committee Defendants Committed Wisconsin Securities Fraud**

715.    Certain of the Prior Committee Defendants (Richards, Ferree, Arent, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of material fact and/or failed to state material facts necessary to make their statements made not misleading.

716.    In connection with the 31 December 2013 through the 30 June 2015 valuation dates, Richards, Arent, and Ferree falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2013 | $16.25 |
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |

717.    Richards, Arent, and Ferree also released or approved the release of communications that discussed and justified these stock prices, including but not limited to the following:

- A 23 January 2014 communication to employees announcing that Reliance had valued PDC stock at $16.25 per share and purporting to describe SRR's income and market analysis.

- A 16 July 2014 communication to employees announcing that Argent had valued PDC stock at $16.30 per share and purporting to describe SRR's income and market analysis as follows.

- A 13 January 2015 communication to employees announcing that Argent had valued PDC stock at $11.00 per share and purporting to describe SRR's income and market analysis.  Specifically, this email identified the following support for the share price:

  o "The income analysis was affected by our company missing its 2014 earnings targets due primarily to poor operating results from the paper business. Encapsys had the best performance of our business segments and exceeded its 2014 performance targets…. The performance of carbonless and specialty papers segment [sic] effectively offset the share value gain produced by Encapsys' performance."

  o "The performance of our thermal business reduced share value by approximately $4."

     o   "The funding agreement that the company entered into for the Fox River clean-up …served to reduce the value of the company by $19 million and the share price by approximately $2.60."

- An undated communication relating to the 30 June 2015 valuation announcing that Argent had valued PDC stock at $12.90 per share and purporting to describe SRR's income and market analysis to justify the increase since the prior valuation. This email is discussed above in Section M(2)(e).

718. In connection with the release of the stock prices, Richards, Arent, and Ferree omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR was improperly applying a 10% percent control premium to its valuations, even though the ESOP Plan as the sole shareholder had no practical ability to control the affairs of PDC or Appvion. They also did not disclose that SRR may have stopped applying this control premium after its 31 December 2014 valuation.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

719.    In connection with the 31 December 2015 through 30 June 2017 valuation dates, Ferree and Gilligan falsely represented the value of PDC stock as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

720.    Ferree and Gilligan also released or approved the release of communications that discussed and justified these stock prices, including the following:

- A 16 January 2016 communication announcing that Argent had valued PDC stock at $12.30 per share and purporting to describe SRR's income and market analysis.

The communication blamed the decrease in share value on "volatile market conditions," stating:

    o  "Appvion's business performance during the second half did not significantly alter the value of the company. Most of the decline in share value was the result of volatile market conditions and the negative performances of comparable companies and general market indices."

- An undated communication relating to the 30 June 2016 valuation which announced the increase in share value to $13.70 per share and purporting to describe SRR's income and market analysis. The email attributed the share price increase to "Appvion's business performance, specifically the improved results from the thermal segment" and the reduced number of shares as a result of share repurchases."

- An undated communication from Gilligan relating to the 30 June 2017 valuation which stated that SRR's income and market analysis "did not materially change the enterprise valuation of Appvion from the last valuation." Rather, Gilligan pointed to an "increase in debt" as the reason that Appvion's stock price decreased. A 25 July 2017 communication to employees similarly identified the increased debt as the "principal impact[]" on share price.

721.    In connection with the release of the stock prices, Ferree and Gilligan omitted material facts that were necessary to render not misleading their representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

722.    These Prior Committee Defendants made these untrue statements and material omissions in connection with the offer, sale, or purchase of a security in this state.

723.    These Prior Committee Defendants acted willfully because they knew that they were making an untrue statement of material fact and were failing to state material facts necessary to make their statements made not misleading to the ESOP Plan and the Employee Participants in connection with the sale of securities.

724.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

### The Director Defendants Committed Wisconsin Securities Fraud

725.    As discussed above in Sections C(1)(c) and M(3), the Director Defendants were monitoring Appvion's financial performance (including the audited financial statements), its projected financial performance, and the stock valuations.   They therefore knew or in the exercise of reasonable care could have known of the misrepresentations and omissions discussed above.

726.    The Director Defendants were also responsible for appointing both the Trustee Defendants and the Prior Committee Defendants, and accordingly had control over them.

727.    In connection with the 31 December 2013 through 30 June 2017 valuation dates, certain of the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan), are jointly and severally liable to the same extent as the Trustee Defendants and the Prior Committee Defendants for the conduct described above.

### The SRR Defendants Committed Wisconsin Securities Fraud

728.    In connection with its appraisals for the 31 December 2013 through 30 June 2017 valuation dates, SRR and its employees involved in those valuations (Levine and El-Tahch) falsely represented that the fair market value of PDC stock was as follows:

| Valuation Date | PDC Stock Price |
|---|---|
| 31 December 2013 | $16.25 |
| 30 June 2014 | $16.30 |
| 31 December 2014 | $11.00 |
| 30 June 2015 | $12.90 |
| 31 December 2015 | $12.30 |
| 30 June 2016 | $13.70 |
| 31 December 2016 | $10.35 |
| 30 June 2017 | $6.85 |

729.    In representing that the above prices represented the fair market value of PDC stock, SRR omitted material facts that were necessary to render not misleading its representations relating to the value of PDC stock, including but not limited to the following:

- That SRR was relying on consistently inflated projections of future earnings, and that SRR failed to stress test Appvion's projections.

- That SRR was capitalizing a declining income stream into perpetuity, and that capitalized income stream constituted a very high proportion of SRR's valuations.

- That SRR was omitting certain liabilities from its valuations, including but not limited to pension/postretirement liabilities.

- That SRR was not including all interest-bearing debt in its calculation of value for the valuation reports starting by at least its 31 December 2013 valuation.

- That the appraisals broke Appvion out into business segments, thus failing to account for all overhead costs not allocated to individual business segments.

- That the appraisals failed to appropriately consider the impact on the discounted cash flow of Appvion's need to repurchase PDC stock.

- That the appraisals failed to apply a large enough discount for the lack of liquidity and marketability of the shares.

- That SRR changed its valuation methods in connection with its 30 June 2015 appraisal, and that SRR began ignoring EBITDA in its Guideline Company Method analysis beginning with its 31 December 2015 appraisal.

- That the appraisals failed to account for market indicia of value by, for example, failing to appropriately consider the market discount to the value of Appvion's debt.

- That SRR failed to correctly apply the Guideline Company Method by manipulating the choice of publicly traded companies to compare with Appvion and by failing to make appropriate and consistent adjustments to compensate for differences in the companies.

730.    SRR made these untrue statements and material omissions knowing that its representations of the fair market value of PDC stock would be communicated to the ESOP Plan and the Employee Participants.   SRR also knew that these stock prices would be used in connection with the offer, sale, or purchase of a security in this state.

731.    SRR acted willfully because it knew or with the exercise of reasonable care could have known that its opinions of fair market value overstated the value of PDC stock.  SRR also knew or with the exercise of reasonable care could have known that the omissions described above were material and that they were necessary to make their representations of stock value not misleading to the ESOP Plan and the Employee Participants.

732.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

187
Case 1:18-cv-01861-WCG Filed 11/08/19 Page 213 of 527   Document 74-2
Case 19-8-c-01861-WCG Filed 11/08/19 Page 213 of 527   Document 74-2

733.    The ESOP Plan has been damaged as the result of the above-listed Trustee Defendants', the above-listed Prior Committee Defendants', the above-listed Director Defendants', and the above-listed SRR Defendants' conduct.

## COUNT XIV
## FEDERAL SECURITIES FRAUD AGAINST THE RELIANCE DEFENDANTS, THE ARGENT DEFENDANTS, THE PRIOR COMMITTEE DEFENDANTS, THE DIRECTOR DEFENDANTS, AND THE SRR DEFENDANTS

734.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

### The Trustee Defendants Committed Securities Fraud

735.    While it was acting as Trustee to the ESOP Plan in 2013 and 2014, the Reliance Defendants directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Reliance's statements misleading as described above in Count XIII.

736.    While it was acting as Trustee to the ESOP Plan in 2014 through 2017, the Argent Defendants directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered Argent's statements misleading as described above in Count XIII.

737.    The Trustee Defendants untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

738.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

739.    The ESOP Plan has been damaged as a result of the Trustee Defendants' conduct.

## Prior Committee Defendants Committed Securities Fraud

740.    From 2012 through 2017, certain of the Prior Committee Defendants (Richards, Ferree, Arent, and Gilligan) directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered the Prior Committee Defendants' statements misleading as described above in Count XIII.

741.    These Prior Committee Defendants' untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

742.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

743.    The ESOP Plan has been damaged as a result of these Prior Committee Defendants' conduct.

## Director Defendants Committed Securities Fraud

744.    As discussed above in Sections C(1)(c) and M(3), the Director Defendants were monitoring Appvion's financial performance (including the audited financial statements), its projected financial performance, and the stock valuations.  They therefore knew or in the exercise of reasonable care could have known of the misrepresentations and omissions discussed above.

745.    The Director Defendants were also responsible for appointing both the Trustee Defendants and the Prior Committee Defendants, and accordingly had control over them.

746.    In connection with the 31 December 2013 through 30 June 2017 valuation dates, certain of the Director Defendants (Carter, Murphy, Reardon, Suwyn, Seifert, Richards, and Gilligan), are jointly and severally liable to the same extent as the Trustee Defendants and the Prior Committee Defendants for the conduct described above.

747.    These Director Defendants did not act in good faith in connection with their supervision or monitoring of the Trustee Defendants and the Prior Committee Defendants.

748.    The ESOP Plan has been damaged as a result of these Director Defendants' conduct.

## SRR Committed Securities Fraud

749.    From 2013 through 2017, SRR directly or indirectly, intentionally and willfully made untrue statements of a material fact and failed to disclose a material fact that rendered their statements misleading as described above in Count XIII.

750.    SRR's untrue statements were made and material omissions were done in connection with the purchase and sale of stock.

751.    The ESOP Plan relied on these misrepresentations and omissions in connection with the purchase and sale of PDC stock.

752.    The ESOP Plan has been damaged as a result of the SRR Defendants' conduct in an amount to be determined at trial.

753.    The ESOP Plan has been damaged as the result of the above-listed Trustee Defendants', the above-listed Prior Committee Defendants', the above-listed Director Defendants', and the above-listed SRR Defendants' conduct.

## COUNT XV
## BREACH OF FIDUCIARY DUTY UNDER ERISA § 404(A)(1)(A), (B) & (D), 29 U.S.C. § 1104(A)(1) AGAINST HOULIHAN AND LOUIS PAONE

754.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

755.    ERISA §1002(21), 29 U.S.C. § 1002(21) defines a fiduciary as a person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so…"

756.    Houlihan and Louis Paone are ERISA plan fiduciaries because they rendered investment advice directly to the Employee Participants during the 2001 Road Show by making a presentation and answering questions raised by the Employee Participants.

757.    ERISA § 404(A)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

758.    Houlihan breached its fiduciary duties by, among other things:

- By performing all its work in connection with the ESOP transaction with a conflict of interest that caused it to be biased, partial and compromised;

- Allowing Buth to insinuate that Houlihan was the Employee Participants' investment advisor during the 2001 Roadshow;

- By representing that it was providing an independent validation of the ESOP transaction;

- By issuing a fairness opinion to the board of directors while being compensated on the basis of a contingent fee that impaired their independence and impartiality;

- By representing and advising that the highly leveraged buyout was an "extraordinary" deal for the Employee Participants;

- By failing to inform the ESOP Plan and the Employee Participants that it was would receive up to an $8.1 million contingent fee only if the ESOP transaction closed; and

- By failing to present the proposed ESOP transaction in a fair, balanced, and impartial manner, unaffected by a conflict of interest.

759. These breaches constitute breaches of duties of loyalty under ERISA § 404(a)(1)(A) and the duty of prudence under ERISA § 404(a)(1)(B).

760. Houlihan's and Paone's breaches damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion. As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## COUNT XVI
### BREACH OF FIDUCIARY DUTY UNDER WISCONSIN LAW
### AGAINST THE DIRECTOR DEFENDANTS AND THE PRIOR COMMITTEE
### DEFENDANTS

761. Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

762.    Corporate officers and directors owe a fiduciary duty to act in good faith and to deal fairly in the conduct of all corporate business.  This duty extends to the corporation and to its shareholders.

763.    In particular, directors of a corporation may not use their position of trust to further their private interests.

764.    The ESOP Plan was PDC's sole shareholder.  Accordingly, the officers and directors owed a fiduciary duty to the ESOP as PDC's sole shareholder.

765.    The ESOP Plan seeks recovery for damages to it in its capacity as sole shareholder of PDC.  Accordingly, Plaintiff, on behalf of the ESOP Plan, has standing to bring this claim directly.

### Appvion Management and Directors Received Excessive Compensation

766.    Appvion management received excessive base salaries, combined with substantial incentive payments from not only an annual bonus plan, but additional incentive plans including, but not limited to, the Long-Term Incentive Plan discussed above, the Restricted Stock Unit Plan discussed above, the Executive Nonqualified "Excess" Plan discussed above.

767.    Examples of the effects of these compensation plans include:

- In 2012, Appvion had a net loss of over $148 million.  However, Richards received total compensation in 2012 of over $4.2 million, including his $800,000 salary, a discretionary bonus of $376,000, incentive plan compensation of $1.2 million, as well as awards under the LTIP program, Restricted Stock Units, and various other compensation.

- When Mark Richards retired in 2015, he received a $1.2 million payment under his Termination Protection Agreement, in addition to $30,000 in outplacement

services.  However, the terms of the Termination Protection Agreement should not have been triggered by Richards' retirement.

- On information and belief, certain officers received compensation in connection with the 2015 Encapsys sale.

- As of the December 2015 valuation, the synthetic equity created by the LTIP, the RSU Plan, and the Non-Employee Director Deferred Compensation Plan (discussed above) constituted approximately 27.4% ownership of PDC, even though it was allegedly owned entirely by the ESOP.

768.    Salaries for Appvion management employees were set by the Compensation Committee of the Board of Directors.  However, at all times after 2007, two out of the three members of the Compensation Committee were appointed to the Board of Directors unilaterally by the CEO.  The third member of the Board of Directors was appointed jointly by the CEO and the ESOP Trustee, but the ESOP Trustee did not have authority to remove that director without agreement from the CEO.  Accordingly, the Compensation Committee was not independent.

769.    The incentive plans were amended repeatedly over the years to increase benefits due to directors and officers.

770.    Compensation to directors and officers was in excess of market rates and was not warranted based on Appvion's declining revenues, excessive leverage, and negative income for most years.

771.    The Director Defendants willfully compensated Appvion management employees and themselves excessively for the services they provided to Appvion and PDC.

772.    The excessive compensation to directors and officers used up Appvion's available cash, which should have been used instead to 1) make capital investments in Appvion to improve

revenues; 2) meet repurchase obligations for the ESOP; and 3) pay down Appvion's debt, thereby increasing the fair market value of shareholder equity.  Instead, Appvion was forced to take on additional debt in order to meet its obligations, which directly reduced shareholder value both under the valuations and because after Appvion declared bankruptcy, there was no equity left for shareholders.

773.    The excessive compensation to directors and officers also directly reduced the fair market value of shareholder equity for employees, since SRR subtracted synthetic equity (phantom stock under the LTIP and Non-Employee Director Deferred Compensation Plan and RSUs) as a from Appvion's fair market value before determining shareholder equity.

774.    The ESOP Plan, as Appvion's sole shareholder, was directly damaged by the Director Defendants' breaches of fiduciary duty in approving excess compensation.

## The Sale of Encapsys

775.    As discussed above Appvion's Encapsys unit was Appvion's most profitable division by approximately 2014, and it was a growing segment while Appvion's other divisions were struggling.

776.    In 2015, Appvion's directors and officers, including the Prior Committee Defendants at the time of the sale (Richards, Ferree, and Arent) agreed to sell the Encapsys unit to a third party.  The sale was completed in August 2015.

777.    While Appvion was able to use the proceeds from the sale of Encapsys to pay down some of its debt, the sale of its most profitable division crippled Appvion.

778.    Even though Appvion had net income of over $150 million in 2015, that income came largely from the sale of Encapsys and Appvion ended the year with less than $2 million in cash.

779.    Selling the Encapsys unit also significantly reduced Appvion's assets.

780.    Without the Encapsys unit, Appvion was not able to continue operating as a going concern for very long, and Appvion filed for bankruptcy two years later.

781.    The Director Defendants should not have agreed to the sale of Encapsys knowing that it would cripple Appvion or in the alternative, should have recognized the impact on PDC's value.

782.    The sale of Encapsys significantly reduced the real value of the ESOP Plan's shares of PDC stock.

## The Inflated Stock Valuations Caused the Company To Waste its Cash

783.    The Director Defendants allowed the ESOP Plan to repeatedly purchase shares from the ESOP Plan and Employee Participants at a price above fair market value and repeatedly bought shares on behalf of the Employee Participants at a price above the shares fair market value.

784.    As a result, Director Defendants caused Appvion to loan cash to PDC in order to fund the ESOP Plan's repurchase obligations.

785.    Because Appvion was loaning more to PDC than it should have, based on the inflated share price, Appvion no longer had the cash available to repay its own debt and make capital improvements.

786.    No reasonable director would have been willing to allow the ESOP Plan to pay more than the fair market value when repurchasing shares nor would it have been willing to loan funds in excess of what was necessary to cover the cost of the fair market value of the shares.

787.    These repeated purchases for more than the fair market value of shares reduced the value of the ESOP Plan's shares of PDC stock.

**Derivative Claims**

788.    If the Plaintiff does not have standing to bring the above claim directly, Plaintiff pleads in the alternative that it has standing to bring the above claim derivatively on behalf of the corporation.

789.    Plaintiff did not make efforts to secure from Appvion this cause of action because the Board of Directors reviewing a derivative demand for this claim would not be able to consider the demand impartially because of the years of fraudulent and deceiving conduct the Board of Directors either directly took part in, assisted in covering up, or benefited from as more fully described above.

790.    Additionally, these same Director Defendants were appointed by either CEOs that are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 3, 4, 6, 13, 14, 16 or Trustee Defendants who are being sued for their negligent, intentional, and/or fraudulent conduct as described in Counts 1, 4, 6, 7.

791.    Moreover, Grant Lyon was appointed as the sole member of the ESOP Committee in August 2017.  After a preliminary investigation, Lyon presented the following information to Appvion's Board of Directors on September 1, 2017:

- Argent had not run a process for selecting a valuation firm;

- Appvion consistently failed to achieve its financial projections but neither Argent nor SRR adjusted the projections;

- There was no deduction given for unfunded pension/post-retirement liability;

- Appvion was still allowing employees to invest new funds into ESOP; and

- There was no real forum for explaining financial condition or SRR per share valuations.

792.    Lyon presented to the Board of Directors, yet none of the Director Defendants have taken any steps to seek redress for the corporate waste that occurred from 2001 through 2017.

## COUNT XVII
## FRAUD AGAINST HOULIHAN AND PAONE

793.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

794.    PDC hired Houlihan in 2001 to issue a fairness opinion in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.

795.    Houlihan and Paone directly advised the ESOP Plan and the Employee Participants whether to approve the proposed ESOP transaction.  Paone attended one or more road shows, including the road show on 2 August 2001, where he gave presentations to potential Employee Participants.

796.    Indeed, Houlihan and Paone intended the potential Employee Participants to rely on its assessment that the proposed buy-out was fair, a "good deal" and an "extraordinary opportunity."

797.    At the road shows held in August 2001, Karch in the presence of Paone, represented that Paone was "our investment banker" leading employees to falsely believe that they could rely on Paone's statements.

798.    Additionally Karch, again in Paone's presence, stated that Paone was going to provide an "independent view and validation" of the ESOP Plan.

799.    Paone then went on to show Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the

purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

800.    Paone also answered questions in relation to the ESOP Plan.  For example, Karch states "the question is to our advisors who have worked on lots of difference ESOPs how does this Appleton Papers plan compare to other ESOPs?"

801.    In response, Paone explains "very significant feature[s]" that make the ESOP Plan different from other ESOPs.  Paone also states that "[f]or us to structure this transaction for the employees to have … 35-40% rate of return opportunity, it's pretty extraordinary to offer employees of a company."

802.    Additionally, in response to the question "Why do you have a different levels of bank debt wouldn't it have been better just to get it all on the lowest interest rate for the bank?", Paone states "[t]hat $380 million dollars is pretty much as far any bank senior lenders are willing to go today in terms of how much they are willing to lend against assets and how much they are willing to lend against the company's cash flow.  If we could of put more into those, believe me when we were out in the market we tried to get as much of the capital from that source because of the low cost.  At a certain point, the banks say this is beyond our appetite.  We can't, our lending rule preclude us from giving you even more money.  That's when you have to go to the next market for those investors who are willing to invest without security of assets and are willing to lend out for a longer term.  And for that you will have to pay them a premium in terms of the interest rate."

803.    Paone and Houlihan allowed Appvion to misrepresent to the ESOP Plan and the Employee Participants that they were independent.

804.    Houlihan and Paone failed to inform the ESOP Plan and the Employee Participants that if the employees approved the ESOP transaction, Houlihan stood to gain approximately $8.1 million and if the employees did not approve the ESOP transaction, Houlihan would only receive approximately $100,000.00.

805.    The ESOP Plan and the Employee Participants had no way to know that Houlihan stood to gain $8.1 million only if they approved the ESOP transaction.

806.    This misrepresentation or omission was material because it concealed a material conflict of interest that everything Houlihan did, including the negotiation of the purchase price of the PDC stock, the contents of its fairness opinion and its advice that the purchase price was fair and that employees should invest in the ESOP.

807.    The ESOP Plan and the Employee Participants relied upon Houlihan's misrepresentation and omission in electing to participate in the ESOP transaction.

808.    Houlihan's and Paone's fraudulent misrepresentations and omissions damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion.  As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## COUNT XVIII
## BREACH OF FIDUCIARY DUTY UNDER WISCONSIN LAW AGAINST HOULIHAN AND PAONE

809.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

810.    Houlihan and Paone owed the ESOP Plan fiduciary duties because they allowed Karch to introduce them to the employees who would be voting on the existence of the plan as "our investment banker".  Additionally, Houlihan and Paone provided financial advice directly to the individuals responsible for approving or declining to approve the ESOP transaction.

811.    With their representations as discussed throughout this FAC, Houlihan and Paone directly made representations as to the advisability of investing in the ESOP Plan.

812.    Houlihan breached its fiduciary duties by, among other things:

- By performing all its work in connection with the ESOP transaction with a conflict of interest that caused it to be biased, partial and compromised;

- Allowing Buth to insinuate that Houlihan was the Employee Participants' investment advisor during the 2001 Roadshow;

- By representing that it was providing an independent validation of the ESOP transaction;

- By issuing a fairness opinion to the board of directors while being compensated on the basis of a contingent fee that impaired their independence and impartiality;

- By representing and advising that the highly leveraged buyout was an "extraordinary" deal for the Employee Participants;

- By failing to inform the ESOP Plan and the Employee Participants that it was would receive up to an $8.1 million contingent fee only if the ESOP transaction closed; and

- By failing to present the proposed ESOP transaction in a fair, balanced, and impartial manner, unaffected by a conflict of interest.

813.    Houlihan's and Paone's breaches damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion.  As a result, Houlihan caused the ESOP Plan and the Appvion employees to enter into a transaction that they otherwise would not have , or in the alternative, on terms that were less favorable than they should have been.

814.    As a result of these breaches, the ESOP Plan was damaged.

## COUNT XIX
## NEGLIGENT MISREPRESENTATION AGAINST HOULIHAN AND PAONE

815.    Plaintiff incorporates and re-alleges by reference each of the foregoing paragraphs as if fully set forth herein.

816.    PDC hired Houlihan in 2001 to, among other things, issue a fairness opinion to Appvion and PDC's Board of Directors in connection with the formation of the ESOP Plan, Buth, Karch and others were trying to convince Appvion employees to approve.  Houlihan also helped negotiate the purchase price of the PDC stock and largely orchestrated the ESOP transaction through its completion.

817.   Paone from Houlihan attended road shows in August 2001 in order to advise and convince Appvion employees to approve the establishment of an ESOP Plan.

818.   At the road shows, Paone showed Appvion employees a slide titled "fairness of purchase price" while representing to Appvion employees that he was going to "help validate the purchase price of the transaction and financial aspects as to why they are so attractive and why [the employees are] getting such a good deal."

819.   Paone also stated that he believed that the potential Employee Participants would determine that the creation of the ESOP Plan was an "extraordinary opportunity."

820.   Paone and Houlihan allowed Appvion to misrepresent to the ESOP Plan and the Employee Participants that they were independent.

821.   Houlihan and Paone failed to inform the ESOP Plan and the Employee Participants that if the employees approved the ESOP transaction, Houlihan stood to gain approximately $8.1 million and if the employees did *not* approve the ESOP transaction, Houlihan would only receive approximately $100,000.00.

822.   The ESOP Plan and the Employee Participants had no way to know that Houlihan stood to gain $8.1 million only if they approved the ESOP transaction.

823.   This misrepresentation or omission was material because it concealed a material conflict of interest that everything Houlihan did, including the negotiation of the purchase price of the PDC stock, the contents of its fairness opinion and its advice that the purchase price was fair and that employees should invest in the ESOP.

824.   The ESOP Plan and the Employee Participants relied upon Houlihan's misrepresentation and omission in electing to participate in the ESOP transaction.

825.    Houlihan's and Paone's negligent misrepresentations and omissions damaged the ESOP Plan, by among other things, preventing the ESOP Plan from benefitting from a truly independent financial advisor who would have presented the proposed ESOP buyout in a fair, balanced, and impartial manner, who would have negotiated the terms of the PDC stock acquisition free of conflict, and who would have provided the board of directors with an unbiased fairness opinion.    As a result, Houlihan caused the ESOP Plan and the Employee Participants to enter into a transaction that they otherwise would not have, or in the alternative, on terms that were less favorable than they should have been.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgement to be entered against Defendants on all claims, and request that the Court order the following relief:

A.    With respect to Plaintiffs' ERISA claims:

1.    Declare that each of the above fiduciary Defendants breached his, her or its fiduciary duties under ERISA, and/or knowingly participated in a fiduciary's breach.

2.    Require each fiduciary found to have breached his/her/its fiduciary duties to the ESOP Plan to jointly and severally pay such amount to the ESOP Plan as is necessary to make the ESOP Plan whole for any losses which resulted from said breaches of fiduciary duties, or by virtue of liability pursuant to ERISA § 405.

3.    An order requiring the forfeiture of any interest in the ESOP Plan of any fiduciary found to have breached his or her fiduciary duty to the ESOP

Plan to the extent necessary after any recovery for the ESOP Plan to make whole the innocent participants of the ESOP Plan.

4.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

5.      Award pre-judgment and post-judgment interest.

6.      Declare that any indemnification agreement between the Defendants and the ESOP Plan, Appvion, or PDC violates ERISA § 410, 29 U.S.C. § 1110 and is therefore null and void.

7.      Award any such other relief that the Court determines that Plaintiff is entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.

B.      With respect to the non-ERISA claims, an award of damages in an amount to be proven at trial, along with punitive damages and such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all claims to which it is entitled a jury.

DATED this 8th day of January 2019.

**PREVIANT LAW FIRM, S.C.**


By: s/Sara J. Geenen_____
    Frederick Perillo
    Sara J. Geenen
    310 West Wisconsin Avenue, Suite 100 NW
    Milwaukee, WI  53203

    -and-

    Leo R. Beus (Admitted *Pro Hac Vice*)
    L. Richard Williams (Admitted *Pro Hac Vice*)
    Abigail Terhune (Admitted *Pro Hac Vice*)
    Ashley Williams Hale (Admitted *Pro Hac Vice*)

    **BEUS GILBERT PLLC**
    701 North 44th Street
    Phoenix, AZ  85008-6504
    480-429-3001
    Fax:  480-429-3100
    docket@beusgilbert.com
    Attorneys for Plaintiff
    BGD-#234144-v3-FAC

# **EXHIBIT B**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
                              :

In re:                          : Chapter 11
                              :

      APPVION, INC., *et al.*,[1]        : Case No. 17-12082 (KJC)
                              :

           Debtors.           : (Jointly Administered)
                              :

------------------------------------------------------------ x

## SECOND AMENDED JOINT COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLANS OF LIQUIDATION

Dated: June 20, 2018
        Wilmington, Delaware

**DLA PIPER LLP (US)**
Stuart M. Brown (DE 4050)
Kaitlin Mackenzie Edelman (DE 5924)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
         kaitlin.edelman@dlapiper.com

Richard A. Chesley (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com

Jamila Justine Willis (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: jamila.willis@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq. (admitted *pro hac vice*)
Wojciech F. Jung, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: krosen@lowenstein.com
         wjung@lowenstein.com

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Michael W. Yurkewicz (DE 4165)
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 552-5519
Facsimile: (302) 426-9193
Email: myurkewicz@klehr.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Appvion, Inc. (6469), Paperweight Development Corp. (4992), PDC Capital Corporation (1197), Appvion Receivables Funding I LLC (9218) and APVN Holdings LLC (8543). The corporate headquarters and the mailing address for the Debtors listed above is 825 East Wisconsin Avenue, P.O. Box 359, Appleton, Wisconsin 54912.

I.    INTRODUCTION ........................................................................................... 1

II.    DEFINITIONS AND CONSTRUCTION OF TERMS................................... 1

    A.    Definitions ......................................................................................... 1

    B.    Interpretation; Application of Definitions and Rules of Construction................. 19

III.    BACKGROUND ............................................................................................ 19

    A.    Overview of the Debtors' Business ................................................. 19

    B.    The Debtors' Prepetition Capital Structure.................................... 24

    C.    Events Precipitating the Chapter 11 Filing ................................... 28

    D.    The Chapter 11 Cases .................................................................... 30

IV.    CONFIRMATION AND VOTING ................................................................ 38

    A.    Confirmation Procedures ................................................................ 38

V.    TREATMENT OF UNCLASSIFIED CLAIMS ............................................ 44

    A.    General Administrative Expense Claims ........................................ 44

    B.    Priority Tax Claims......................................................................... 46

    C.    Statutory Fees.................................................................................. 46

    D.    ESOP .............................................................................................. 46

VI.    CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED
    RECOVERIES ............................................................................................... 46

VII.    TREATMENT OF CLAIMS AND INTERESTS ......................................... 47

    A.    Treatment of Claims and Interests ................................................. 47

    B.    Modification of Treatment of Claims and Interests........................ 52

VIII.    PROVISIONS REGARDING THE LIQUIDATING TRUST........................ 52

    A.    Appointment of the Liquidating Trustee........................................ 52

    B.    Creation of Liquidating Trust ........................................................ 52

    C.    Beneficiaries of Liquidating Trust ................................................. 53

    D.    Vesting and Transfer of Assets to the Liquidating Trust................ 53

    E.    Funding of the Liquidating Trust.................................................... 53

EAST\152399891.23

| | | |
|---|---|---|
| F. | Distributions from the Liquidating Trust | 54 |
| G. | Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee | 54 |
| H. | Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets | 56 |
| I. | Term of Liquidating Trust | 56 |
| J. | Limitation of Liability of the Liquidating Trustee | 57 |

**IX. ADDITIONAL MEANS FOR IMPLEMENTATION** ... 57

| | | |
|---|---|---|
| A. | Substantive Consolidation | 57 |
| B. | Preservation of Right to Conduct Investigations | 60 |
| C. | Prosecution and Resolution of Litigation Claims | 60 |
| D. | Effectuating Documents and Further Transactions | 61 |
| E. | Authority to Act | 61 |
| F. | Real Property | 61 |
| G. | Cancellation of Documents | 62 |
| H. | Termination of Debtors' Plans | 62 |
| I. | Corporate Action; Effectuating Documents; Further Transactions | 62 |
| J. | Release of Liens | 63 |
| K. | Exemption from Securities Laws | 63 |
| L. | Exemption from Certain Taxes and Fees | 63 |
| M. | Privileges as to Certain Causes of Action | 64 |
| N. | Preservation of Causes of Action | 64 |
| O. | Insurance Policies | 65 |
| P. | Filing of Monthly and Quarterly Reports and Payment of Statutory Fees | 65 |
| Q. | Closing of the Chapter 11 Cases | 65 |

**X. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED PLAN AND DISCLOSURE STATEMENT** ... 65

| | | |
|---|---|---|
| A. | Distribution Record Date; Transferability | 65 |
| B. | Method of Payment | 66 |
| C. | Claims Objection Deadline | 66 |
| D. | No Distribution Pending Allowance | 66 |
| E. | Reserve of Cash Distributions | 66 |

- ii -

| | F. | Distribution After Allowance | 66 |
| | G. | Delivery of Distributions | 67 |
| | H. | Unclaimed Distributions | 67 |
| | I. | Set-Off | 67 |
| | J. | Postpetition Interest | 68 |
| | K. | Distributions After Effective Date | 68 |
| | L. | Distributions Free and Clear | 68 |
| | M. | Allocation of Distributions Between Principal and Interest | 68 |
| | N. | De-Minimis Distribution and Donation | 68 |
| | O. | Prepayment | 68 |
| XI. | | EXECUTORY CONTRACTS | 68 |
| | A. | Rejection of Executory Contracts | 68 |
| | B. | Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement | 69 |
| XII. | | INJUNCTION, EXCULPATION AND RELEASES | 69 |
| | A. | Injunction to Protect Estate Assets | 69 |
| | B. | Term of Injunctions or Stays | 70 |
| | C. | Injunction Against Interference with Plan | 70 |
| | D. | Exculpation | 70 |
| | E. | Releases | 71 |
| | F. | Necessity and Approval of Releases and Injunctions | 73 |
| | G. | Releases, Exculpations, Waivers and Injunctions under Plan and Related Documents Shall Not Affect Fifth Third Bank and KeyBank Suits for Damages under DIP Credit Agreement | 74 |
| XIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 74 |
| | A. | General | 74 |
| | B. | Consequences to the Debtors | 75 |
| | C. | Consequences to Holders of Claims and Equity Interests | 76 |
| | D. | Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests | 77 |
| | E. | Tax Treatments of Holders of Warrants | 79 |
| | F. | Withholding on Distributions, and Information Reporting | 80 |

EAST\152399891.23

XIV. CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE ...... 81

    A.    Conditions Precedent to Confirmation ...... 81

    B.    Conditions Precedent to the Effective Date ...... 81

    C.    Establishing the Effective Date ...... 82

    D.    Effect of Failure of Conditions ...... 82

    E.    Waiver of Conditions to Confirmation and Effective Date ...... 82

XV. RETENTION OF JURISDICTION ...... 83

XVI. MISCELLANEOUS PROVISIONS ...... 85

    A.    Amendment or Modification of this Combined Plan and Disclosure Statement ...... 85

    B.    Severability ...... 85

    C.    Revocation or Withdrawal of this Combined Plan and Disclosure Statement ...... 85

    D.    Binding Effect ...... 86

    E.    Notices ...... 86

    F.    Governing Law ...... 87

    G.    Withholding and Reporting Requirements ...... 87

    H.    Headings ...... 87

    I.    Exhibits/Schedules ...... 87

    J.    Filing of Additional Documents ...... 88

    K.    No Admissions ...... 88

    L.    Successors and Assigns ...... 88

    M.    Reservation of Rights ...... 88

    N.    Inconsistency ...... 88

    O.    Dissolution of the Debtors ...... 88

    P.    Dissolution of the Creditors' Committee ...... 89

XVII. RISKS AND OTHER CONSIDERATIONS ...... 89

    A.    Bankruptcy Considerations ...... 89

    B.    No Duty to Update Disclosures ...... 90

    C.    Alternatives to Confirmation and Consummation of the Plan ...... 90

    D.    Certain Federal Tax Consequences ...... 90

XVIII. RECOMMENDATION AND CONCLUSION ............................................................. 96

EAST\152399891.23

Each Holder of a Claim against the Debtors entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Combined Plan and Disclosure Statement may be made except under the terms hereof and section 1125 of the Bankruptcy Code. If you are entitled to vote to approve the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Debtors and the Creditors' Committee urge you to vote to accept the Plan.

This Combined Plan and Disclosure Statement has been prepared in accordance with sections 1125 and 1129 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3017, and Local Rule 3017-2, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against, or Interests in, the Debtors should evaluate this Combined Plan and Disclosure Statement in light of the purpose for which it was prepared. This Combined Plan and Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of this Combined Plan and Disclosure Statement as to Holders of Claims against or Interests in the Debtors.

There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Debtors' knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell, or the solicitation of an offer to buy, securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.

Any projected recoveries to Creditors set forth in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtors and their advisors. Although the Debtors and their advisors have made every effort to verify the accuracy of the information presented herein, the Debtors and their advisors cannot make any representations or warranties regarding the accuracy of the information.

Nothing herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party. The statements contained herein are made as of the date hereof, unless another time is specified. The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the opinion of the Debtors and the Creditors' Committee that the treatment of Creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the Debtors. Accordingly, the Debtors and the Creditors' Committee believe that confirmation of the Plan is in the best interests of Creditors, and the Debtors and the Creditors' Committee recommend that Creditors support and vote to accept the Plan.

# I. INTRODUCTION

Appvion, Inc. ("Appvion"), together with its affiliated debtors and debtors in possession (collectively, the "Debtors"), and the Creditors' Committee propose this Combined Plan and Disclosure Statement under sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2. While the Debtors and the Creditors' Committee are the proponents of this Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code, this Combined Plan and Disclosure Statement, as may be amended from time to time, is the culmination of extensive negotiations between the Debtors, certain of its lenders, the Creditors' Committee, and other key constituents of the Debtors' Estates, resulting in these consensual liquidating chapter 11 plans for the Debtors and the remaining Assets of the Estates. The Debtors and the Creditors' Committee support this Combined Plan and Disclosure Statement and encourage the Holders of impaired Claims entitled to vote hereunder to vote to accept this Combined Plan and Disclosure Statement.

This Combined Plan and Disclosure Statement contemplates the creation of a Liquidating Trust from which, under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, Distributions shall be made for the benefit of Holders of various Allowed Claims.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in Section XVI.A of this Combined Plan and Disclosure Statement, the Debtors expressly reserve the right, in accordance with Section XVI.A, to alter, amend, or modify this Combined Plan and Disclosure Statement, including the Plan Supplements, one or more times before substantial Consummation thereof.

# II. DEFINITIONS AND CONSTRUCTION OF TERMS

## A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**2L/Committee Settlement**" means that certain Settlement Agreement effective as of May 9, 2018 entered into by and among the Majority DIP Lender, the Debtors, the Second Lien Noteholders, the Creditors' Committee and the Purchaser, approved by the *Order Approving Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 753] granting the *Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 734].

2.    "**363 Sale**" means the sale of substantially all of the Debtors' Assets as set forth in, and in accordance with, the 363 Sale Documents, which was consummated on the 363 Sale Effective Date.

3.    "**363 Sale Agreement**" means that certain Asset Purchase Agreement, dated as of March 13, 2018, by and among Appvion Holding Corp., as Purchaser, and Debtors Appvion, PDC, PDC Capital, Appvion Receivables, and APVN, as sellers, approved by the Bankruptcy Court on May 14, 2018, as amended, modified or supplemented from time to time.

4.    "**363 Sale Documents**" means the 363 Sale Agreement, the 363 Sale Order, and all documents, instruments, and agreements executed and delivered in connection with the consummation of the transactions contemplated by the 363 Sale Agreement.

5.    "**363 Sale Effective Date**" or "**Closing Date**" means June 13, 2018, the effective date of the 363 Sale.

6.    "**363 Sale Motion**" means *the Motion of the Debtors For Entry of Orders (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets; (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases;(D) Approving the Form and Manner of Notice Thereof, and (II)(A) Approving and Authorizing the Sale of Substantially All Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 425].

7.    "**363 Sale Order**" means the *Order (A) Approving and Authorizing the Sale of Substantially All of the Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 751].

8.    "**401(k) Fund**" means the 401(k) retirement savings feature of the KSOP.

9.    "**Acquired Assets**" means all Assets transferred, conveyed, sold, and assigned to the Purchaser under and in connection with the consummation of the 363 Sale under the 363 Sale Documents, which are set forth in more detail in the 363 Sale Agreement.

10.    "**Accounts Receivable Securitization Facility**" means the accounts receivable securitization program whereby transactions under the accounts receivable facility were accounted for as sales of trade receivables, pursuant to that certain Receivables Purchase Agreement dated as of June 4, 2014 among Appvion Receivables, as seller, Appvion, as servicer, various purchasers from time to time party thereto, and Fifth Third Bank, as purchaser and administrative agent and that certain Purchase and Sale Agreement dated as of June 4, 2014 between Appvion and Appvion Canada Ltd., as originators, and Appvion Receivables.

11.    "**Ad Hoc Group of Second Lien Noteholders**" means that group of certain beneficial holders, or investment advisors or managers of beneficial holders, of the Second Lien Notes issued under the Second Lien Indenture identified in the *Second Supplemental Verified Statement of Stroock & Stroock & Lavan LLP and Young Conaway Stargatt & Taylor LLP Pursuant to Bankruptcy Rule 2019* [D.I. 763], as may be amended or updated from time to time.

- 2 -

12.    "**Administrative Expense Claim**" means any Claim constituting an actual, necessary cost or expense of administering the Chapter 11 Cases under sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, and (c) all Claims arising under section 503(b)(9) of the Bankruptcy Code.

13.    "**Administrative Expense Claim Bar Date**" means the deadline, which is thirty (30) days from the Effective Date, for Holders of Administrative Expense Claims accruing for the period from the Petition Date through the Effective Date to file a request with the Bankruptcy Court for payment of such Administrative Expense Claim in the manner indicated in Section V herein.

14.    "**Allowed**" means, with respect to Claims:  (a) any Claim, proof of which was timely Filed (or for which Claim, under this Combined Plan and Disclosure Statement, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a proof of Claim is not or shall not be required to be Filed); (b) any Claim which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent and for which no proof of Claim has been Filed; or (c) any Claim expressly allowed under this Combined Plan and Disclosure Statement or a Final Order of the Bankruptcy Court; *provided* that any Claim described in clauses (a) and (b) shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period fixed by this Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such objection is interposed and the Claim or any portion thereof is subsequently Allowed by a Final Order; *provided, further*, that Claims Allowed solely for purposes of voting on this Combined Plan and Disclosure Statement under an Order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.  An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim under the provisions of the Bankruptcy Code and applicable law.  Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim.  Unless otherwise specified in this Combined Plan and Disclosure Statement, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Combined Plan and Disclosure Statement, include interest on such Claim accruing from and after the Petition Date.

15.    "**Appvion**" means Appvion, Inc.

16.    "**Appvion Canada**" means Appvion Canada, Ltd.

17.    "**Appvion Netherlands**" means Appvion Global Netherlands Cooperatief UA.

18.    "**Appvion Receivables**" means Appvion Receivables Funding I LLC.

19.    "**APVN**" means APVN Holdings, LLC.

20.    "**Arjo Wiggins**" means Arjo Wiggins Appleton p.l.c.

- 3 -

21.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and the Estates within the meaning of section 541 of the Bankruptcy Code.

22.    "**Avoidance Actions**" means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estates under chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code sections 502(d), 510, 541, 542, 544, 545, 547, 548, 550, 551, and 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date.

23.    "**Ballot**" means the ballot on which each Holder of a Claim entitled to vote on the acceptance or rejection of this Combined Plan and Disclosure Statement casts such vote.

24.    "**Balloting Agent**" means Prime Clerk.

25.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

26.    "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

27.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

28.    "**Beneficiary**" means any Holder of an Allowed Second Lien Secured Note Claim in Class 3 and any Holder of an Allowed General Unsecured Claim in Class 5 that may, or that is entitled to, receive a Distribution from the Liquidating Trust under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

29.    "**Bid Procedures Motion**" means the *Motion of Debtors for Entry of Orders (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to Assumption of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II)(A) Approving and Authorizing Sale of Substantially All Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 425].

30.    "**Bid Procedures Order**" means the *Order (I)(A) Approving and Authorizing Bidding Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Expense Reimbursement, (C) Approving Procedures Related to the Assumption and Assignment*

- 4 -

*of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof,* entered by the Bankruptcy Court on March 12, 2018 [D.I. 565].

31.    "**Board**" means the boards of directors of Appvion and PDC.

32.    "**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

33.    "**Cash**" means legal tender of the United States of America and equivalents thereof.

34.    "**Causes of Action**" means all claims, actions (including the Avoidance Actions), causes of action, choses in action, suits, refunds, turnovers, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any of the Estates against any Person, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, and any and all commercial tort claims against any Person, arising from or relating to any act or omission or other event occurring at any time prior to (and including) the Effective Date; and *subject, however, to* any releases provided in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, 2L/Committee Settlement, or any other Final Order of the Bankruptcy Court. For the avoidance of doubt, the Causes of Action shall not include any Causes of Action against the Released Parties.

35.    "**CBAs**" means the collective bargaining agreements entered into by and among Appvion and USW.

36.    "**Chapter 11 Cases**" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  17-12082 (KJC), 17-12083 (KJC), 17-12084 (KJC), 17-12085 (KJC) and 17-12086 (KJC), which Chapter 11 Cases are jointly administered under case number 17-12082 (KJC).

37.    "**Chief Restructuring Officer**" means Alan D. Holtz of AP Services LLC.

38.    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

39.    "**Claims Agent**" means Prime Clerk.

40.    "**Claims Objection Deadline**" means the date that is one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

41.    "**Class**" means any group of substantially similar Claims or Interests classified by this Combined Plan and Disclosure Statement under sections 1122 and 1123(a)(1) of the Bankruptcy Code.

42.    "**Combined Plan and Disclosure Statement**" or "**Plan**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time through and including the Effective Date; *provided that* any such modifications are reasonably acceptable to the Majority DIP Lender, the Creditors' Committee, and the Ad Hoc Group of Second Lien Noteholders.

43.    "**Company**" means Appvion and its subsidiaries and affiliates.

44.    "**Consummation**" or "**Consummate**" means the occurrence of or to achieve the Effective Date.

45.    "**Creditor**" means any Person that is the Holder of a Claim against any of the Debtors.

46.    "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on October 11, 2017 [D.I. 97], as may be amended from time to time.

47.    "**Cure Notices**" means all notices to counterparties to Executory Contracts, including the *Notice to Counterparties to Executory Contracts and Unexpired Leases that May be Assumed and Assigned* filed by the Debtors on March 13, 2018 [D.I. 576] and including all amendments and supplements thereto and any additional such notices that may be Filed and served from time to time.

48.    "**D&O Insurance**" means all primary and excess Insurance Policies that provide coverage for liability related to the Litigation Claims and the Released D&O Claims, and, if applicable, "tail" or "runoff" coverage for such policies.

49.    "**Debtors**" means Appvion, PDC, PDC Capital, Appvion Receivables, and APVN.

50.    "**Debtors in Possession**" means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases under sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

51.    "**DIP Agent**" means Wilmington Trust, National Association, in its capacity as administrative and collateral agent in connection with the DIP Financing.

52.    "**DIP Credit Agreement**" means that certain Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of October 2, 2017, as amended from time to time, or that certain Senior Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of March 16, 2018, as amended from time to time, as applicable.

- 6 -

53.     "**DIP Facility Claims**" means Claims arising under the DIP Financing.

54.     "**DIP Financing**" means the initial postpetition, senior superpriority debtor-in-possession financing; the Senior DIP Facility; and the letter of credit facility provided to the Debtors by the DIP Lenders and the L/C Issuer, respectively, pursuant to and under the respective DIP Credit Agreement and DIP Order.

55.     "**DIP Lenders**" means the lenders party to the DIP Financing.

56.     "**DIP Motion**" means, collectively, the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 17]; and the Senior DIP Motion.

57.     "**DIP Order**" means any of, or collectively, (i) the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 75]; (ii) the *Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (III) Modifying Final Existing DIP Financing Order; (IV) Scheduling A Final Hearing; and (V) Granting Related Relief* [D.I. 564]; and (iii) the Final DIP Orders, each as modified, amended and/or supplemented from time to time.

58.     "**Direct ESOP Claims**" means solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

59.     "**Directors and Officers**" means the current and former directors and officers of the Debtors.

60.     "**Disputed**" means, with respect to any Claim or any portion thereof, (A) any Claim that (i) is, or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated; (ii) is evidenced by a proof of Claim that, on its face, is contingent or unliquidated; (iii) is evidenced by a proof of Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated or disputed; or (iv) is objected to in whole or in part or subject to a request for estimation prior to the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or resolved; and (B) any Claim that is not an Allowed Claim or a disallowed Claim in whole or in part by settlement or Final Order.

61.     "**Distribution**" means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, or Beneficiaries, as

- 7 -

applicable, under this Combined Plan and Disclosure Statement and/or the Liquidating Trust Agreement.

62.     "**Distribution Date**" means the date or dates determined by the Liquidating Trustee in accordance with the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement upon which the Liquidating Trustee shall make Distributions to holders of Allowed Claims entitled to receive Distributions under the Plan.

63.     "**Distribution Record Date**" means the record date for purposes of making Distributions under the Plan and the Liquidating Trust Agreement on account of Allowed Claims, which date or dates shall be set forth in the Liquidating Trust Agreement.

64.     "**Domtar**" means Domtar Paper Company, LLC, Domtar A.W., LLC and its affiliates.

65.     "**Domtar Motion**" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Performing Under the Consignment Agreement Nunc Pro Tunc to the Petition Date (II) Authorizing the Debtors to Obtain Postpetition Credit Under the Domtar Facility; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Domtar; (V) Approving Setoff; (VI) Modifying the Automatic Stay; and (VII) Waiving Bankruptcy Rule 6004(h)* [D.I. 98].

66.     "**Domtar Supply Agreement**" means that certain Supply Agreement entered into by and between Domtar Paper Company, LLC, Domtar A.W., LLC and Appvion, together with all related ancillary agreements, undertakings, understandings, terms and condition.

67.     "**Effective Date**" means the date on which the conditions specified in Section XIV.B of this Combined Plan and Disclosure Statement have been satisfied or waived and the transactions contemplated hereunder have been substantially consummated.

68.     "**Employee Benefit Programs**" means, collectively, (a) medical and dental, and prescription drug insurance plans and health savings plans; (b) life, disability, and AD&D insurance; (c) retiree medical, dental, and life insurance and related benefits; (d) holidays and other paid time off; (e) reimbursement and allowance programs; (f) an onsite clinic; (g) a health facility; (h) an employee assistance program; (i) a scholarship program; and (j) miscellaneous other benefit plans and policies of Appvion.

69.     "**Employee Benefit Plans**" means the Appvion, Inc. Retirement Plan, amended and restated effective January 1, 2015; Pace Industry Union-Management Pension Plan; the Appleton Papers Inc. Supplemental Executive Retirement Plan, as amended through March 28, 2001, the Amendment to the Appleton Papers Inc. Supplemental Executive Retirement Plan, effective January 1, 2009, and the Amendment to the Appvion, Inc. Supplemental Executive Retirement Plan, dated August 27, 2014; the Nonqualified Excess Plan; the Appvion, Inc. Flexible Benefits Plan for Bargaining Unit Employees, amended and restated effective January 1, 2017; Appvion, Inc. Flexible Benefits Plan for Non-Bargaining Unit Employees, amended and restated effective January 1, 2017; Appvion, Inc. Long Term Restricted Stock Unit Plan, as amended and restated effective January 1, 2017; the Appvion, Inc. Long Term Stock Appreciation Rights Plan, as amended and restated effective January 1, 2017; the Appvion, Inc.

- 8 -

Group Medical Plan, restated effective January 1, 2016; the Employee Referral Award Policy, effective January 1, 2008 and revised on January 1, 2014; the Appvion, Inc. Short Term Disability for Non-Union Employees, effective July 1, 2011 and revised on June 1, 2016; the Appvion, Inc. Disability Plan For Non-Bargaining Unit Employees, effective July 1, 2015; the Appvion, Inc. Cafeteria Plan; the Appvion, Inc. Group Life Insurance Plan, including AD&D; the Appvion, Inc. Dental Plan; the Appvion, Inc. Severance Plan For Salaried Employees; the HCC Life Insurance Company Stop Loss Policy, effective July 1, 2017; the Travel Insurance Policy; the Code Section 105(h) Plan Reserve Fund; the Charles Boyd Scholarship Program; the Work Disruption Pay Policy, effective July 14, 2008 and revised on January 1, 2015; the Appvion, Inc. Accident & Sickness for Bargaining Unit Hourly Employees, effective January 1, 1993 and revised on March 1, 2014; the 2017 Annual Incentive Plan for Union Hourly Employees, effective January 2017; the Overtime and Miscellaneous Pay – Non-Union Employees Policy, effective July 14, 2018 and revised on January 1, 2017; and all other benefit plans made available to the employees of Appvion.

70. "**Encapsys Business**" means the business of developing and manufacturing microencapsulation solutions formerly owned by Appvion and sold to an affiliate of Sherman Capital Holdings LLC on August 4, 2015.

71. "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

72. "**Equity Interest**" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests.

73. "**Equity Security**" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

74. "**ESOP**" means the Paperweight Development Corporation employee stock ownership plan component of the KSOP, invested in the stock of PDC.

75. "**ESOP Committee**" means the members of the ESOP administrative committee established to perform all administrative functions with respect to the operation of the ESOP and to direct the ESOP Trustee.

76. "**ESOP Trustee**" means Argent Trust Company.

77. "**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases, including all of the Debtors' Assets.

78. "**Exculpated Parties**" means, as of the Petition Date through the date of Consummation of the Plan, the Debtors, the Creditors' Committee and members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), Alan D. Holtz (current Chief Restructuring Officer), AP Services, LLC, the Debtors' Professionals, the Foreign Subsidiaries, the Senior DIP Lenders and DIP Lenders, the Senior DIP Agent and DIP Agent and each of their respective Related Persons, in their capacity as such, to the extent such Related Persons serve as fiduciaries of the Estates, as well as the Debtors' current directors and officers as of the Petition Date through the date of the Consummation of the Plan.

79. "**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between any Debtor and any other Person or Persons.

80. "**File**", "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases or any other related proceedings.

81. "**Final DIP Order**" means any of, or collectively, (i) the *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Postpetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Granting Related Relief* [D.I. 234]; (ii) the *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Modifying Final Existing DIP Financing Order; and (III) Granting Related Relief* [D.I. 625]; and (iii) the Senior DIP Order, each as modified, amended and/or supplemented from time to time.

82. "**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; *provided, however*, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order shall not cause such order not to be a Final Order.

83. "**First Day Motions**" has the meaning set forth in Section III.D.1 of this Combined Plan and Disclosure Statement.

84. "**Foreign Subsidiaries**" means Appvion Canada, Ltd., Arjo Wiggins and Appvion Netherlands.

85. "**General Administrative Expense Claim**" means any Administrative Expense Claim and any Professional Fee Administrative Claim.

86. "**General Bar Date**" means February 14, 2018, as established in the General Bar Date Order.

87. "**General Bar Date Order**" means that certain order of the Bankruptcy Court dated as of December 19, 2017 [D.I. 337], establishing, among other things, (a) February 14, 2018 as the general bar date for filing proofs of Claim in the Chapter 11 Cases, and (b) March 30, 2018 as the deadline for all Governmental Units (as such term is defined in section 101(27) of the Bankruptcy Code) for filing proofs of Claim in the Chapter 11 Cases, subject in each case to only those exceptions permitted thereby.

88. "**General Unsecured Claim**" means any Claim against the Debtors that arose or is deemed or determined by the Bankruptcy Code or Bankruptcy Court, as the case may be, to

have arisen before the Petition Date and that is not: (i) a Secured Claim, (ii) an Administrative Expense Claim, (iii) a Professional Fee Administrative Claim, (iv) a Statutory Fee Claim, (v) a Priority Tax Claim, (vi) an Other Priority Claim or any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, or (vii) any Claim that constitutes an Interest. For the avoidance of doubt, General Unsecured Claims (a) shall include Rejection Damages Claims and (b) shall not include any deficiency claims, including any deficiency claim related to the Second Lien Notes.

89. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

90. "**Governmental Unit Bar Date**" means March 30, 2018 at 4:00 p.m. (prevailing Eastern Time), the deadline for Governmental Units to file a proof of Claim against any of the Debtors for a Claim that arose prior to the Petition Date.

91. "**GUC Cash Pool**" means Cash in the amount of $600,000 paid by the Purchaser into an escrow account held by Debtors' counsel for Distribution to Holders of Allowed General Unsecured Claims against the Debtors, other than Second Lien Noteholders in their capacity as Second Lien Noteholders, in accordance with the terms of the 2L/Committee Settlement.

92. "**Guggenheim Securities**" means Guggenheim Securities, LLC.

93. "**Holder**" means the legal or beneficial holder of any Claim or Interest.

94. "**Indenture Trustee**" means U.S. Bank National Association, as indenture trustee and collateral agent for the Second Lien Notes pursuant to the Second Lien Indenture.

95. "**Industrial Development Bonds**" means the Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 Company issued in the aggregate principal amount $6 million pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027.

96. "**Insurance Policies**" means all insurance policies of the Debtors, including any D&O Insurance.

97. "**Intercompany Claims**" means (i) any account reflecting intercompany book entries by one Debtor with respect to another Debtor or any Foreign Subsidiary, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against another Debtor or any Foreign Subsidiary, in each case accruing before or after the Petition Date through the Effective Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that was allocable between the Debtors.

98. "**Interest**" means any equity or membership interest in any Debtor.

99. "**IRC**" means the Internal Revenue Code of 1986, as amended.

100. "**IRS**" means the Internal Revenue Service.

- 11 -

101.    "**Jefferies**" means Jefferies Finance LLC.

102.    "**Key Employee Retention Plan**" means the key employee retention plan authorized by the *Order Approving Debtors' Key Employee Retention Plan* [D.I. 261].

103.    "**KSOP**" means the Appvion Retirement Savings and Employee Stock Ownership Plan.

104.    "**L/C**" means letter of credit.

105.    "**L/C Issuer**" means Citizens Bank, N.A.

106.    "**Letter of Credit Agreement**" means that certain Letter of Credit Agreement, dated as of February 2, 2018, by and between the Debtors and Citizens Bank, N.A.

107.    "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

108.    "**Liquidating Trust**" means the trust established on the Effective Date as described in Section VIII of this Combined Plan and Disclosure Statement and in accordance with the Liquidating Trust Agreement and the 2L/Committee Settlement.

109.    "**Liquidating Trust Advisors**" means any firm(s) or individual(s) retained by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement to serve as legal counsel for the Liquidating Trust or to provide other professional services for the Liquidating Trust in connection with the performance of the Liquidating Trustee's duties and responsibilities under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

110.    "**Liquidating Trust Agreement**" means the trust agreement, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Group of Second Lien Noteholders, the Creditors' Committee and the Liquidating Trustee as of the Effective Date, establishing the Liquidating Trust described in Section VIII of this Combined Plan and Disclosure Statement, and which shall be filed in draft form as part of the Plan Supplement.

111.    "**Liquidating Trust Assets**" means (i) any and all Litigation Claims and Litigation Proceeds; (ii) the Plan Contribution Payment; (iii) the GUC Cash Pool; (iv) the benefits, rights, interests and proceeds of any Insurance Policies (including the D&O Insurance); and (v) any and all other Assets belonging to the Debtors' Estates, including any Cash and other Assets that are not Acquired Assets remaining in the Debtors' Estates on the Effective Date.

112.    "**Liquidating Trustee**" means the Person or Persons selected by the Debtors, the Creditors' Committee and the Second Lien Noteholders in accordance with the 2L/Committee Settlement and appointed to administer the Liquidating Trust, which shall be disclosed in the Plan Supplement, with such rights, duties, and obligations as set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement.

EAST\152399891.23

113.  "**Liquidating Trust Operating Expenses**" means the overhead and other operational expenses of the Liquidating Trust including, but not limited to, (i) reasonable compensation for the Liquidating Trustee and members of the Trust Oversight Committee (which expenses shall not include professional fees of such members) in accordance with the Liquidating Trust Agreement, (ii) costs and expenses incurred by the Liquidating Trustee in administering the Liquidating Trust, (iii) Statutory Fees incurred after the Effective Date to the U.S. Trustee, and (iv) any fees and expenses payable to the Liquidating Trust Advisors.

114.  "**Litigation Claims**" means any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

115.  "**Litigation Proceeds**" means the net proceeds of the Litigation Claims.

116.  "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as amended from time to time.

117.  "**Majority DIP Lender**" means Franklin Advisors, Inc., as investment manager on behalf of certain funds and accounts.

118.  "**MSCI**" means Marubeni Specialty Chemicals, Inc.

119.  "**NM Term Loan Obligations**" shall have the meaning set forth in the DIP Credit Agreement.

120.  "**Nonqualified Excess Plan**" means the Executive Nonqualified Excess Plan, dated March 14, 2013.

121.  "**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the docket.

122.  "**Other Priority Claim**" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), that is not otherwise a Priority Tax Claim, a Statutory Fee Claim, an Administrative Expense Claim, or a Professional Fee Administrative Claim.

123.  "**Owned Real Property**" means all real property and all of the Debtors' right, title and interest in real property owned, in whole or in part, directly or indirectly by the Debtors, together with all buildings, fixtures and improvements located thereon, and all easements, rights of way, servitudes, tenements, appurtenances, privileges and other rights with respect thereto.

124.  "**PDC**" means Paperweight Development Corporation.

125.  "**PDC Capital**" means PDC Capital Corporation.

- 13 -

EAST\152399891.23

126.  "**Person**" means an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a governmental unit or any agency or subdivision thereof or any other entity.

127.  "**Petition Date**" means October 1, 2017, the date on which the Debtors commenced these Chapter 11 Cases.

128.  "**PIUMPF**" means the Pace Industry Union-Management Pension Plan.

129.  "**Plan Confirmation Date**" means the date on which the Bankruptcy Court enters the Plan Confirmation Order.

130.  "**Plan Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider approval and confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

131.  "**Plan Confirmation Order**" means an Order entered by the Bankruptcy Court approving and confirming this Combined Plan and Disclosure Statement on a final basis under sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.

132.  "**Plan Contribution Payment**" means the forgivable loan in the amount of $350,000 paid by the Purchaser into an escrow account held by the Debtors' counsel to be transferred to the Liquidating Trust on the Effective Date in accordance with the terms of the 2L/Committee Settlement, which forgivable loan shall be repaid only from the Litigation Proceeds, if any, net of Liquidating Trust Operating Expenses, prior to Distribution of any such Litigation Proceeds to the Liquidating Trust Beneficiaries.

133.  "**Plan Documents**" means this Combined Plan and Disclosure Statement, the Plan Supplements, and all of the exhibits and schedules attached to any of the foregoing.

134.  "**Plan Proponents**" means the Debtors and the Creditors' Committee as the proponents of the Combined Plan and Disclosure Statement.

135.  "**Plan Supplement**" means the appendix of schedules and exhibits to be Filed at least seven (7) days before the Plan Confirmation Hearing containing, among other things, the Liquidating Trust Agreement and the Warrant Agreement, as may be amended, modified, and/or supplemented; each of which shall be in form and substance reasonably acceptable to the Majority DIP Lender, the Creditors' Committee, and the Ad Hoc Group of Second Lien Noteholders and otherwise in accordance with the terms of the 2L/Committee Settlement.

136.  "**Preserved D&O Claims**" means any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; *provided, however*, that the Preserved D&O Claims shall not include the Released D&O Claims.

- 14 -

137.    "**Prime Clerk**" means Prime Clerk LLC.

138.    "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

139.    "**Privilege**" means the attorney client privilege, work product protections or other immunities (including without limitation those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtors or their Estates.

140.    "**Professional**" means any professional Person employed by the Debtors or the Creditors' Committee in the Chapter 11 Cases under section 327, 363, or 1103 of the Bankruptcy Code or otherwise under an Order of the Bankruptcy Court.

141.    "**Professional Fee Administrative Claim**" means a Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, including Claims of any Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

142.    "**Professional Fee Escrow**" means one or more accounts to be funded by the Debtors on or prior to the Effective Date in an amount equal to the aggregate amount of unpaid fees for all Professionals earned as of the Sale Effective Date and through the Plan Effective Date, as estimated in the Debtors' reasonable discretion.

143.    "**Pro Rata**" means the proportion that (i) an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class (for the avoidance of doubt, with respect to any Distributions of the GUC Cash Pool, "Pro Rata" means the proportion that an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 5); (ii) with respect to any Distributions of the Litigation Proceeds, an Allowed Second Lien Secured Note Claim in Class 3 or an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 3 and Class 5; (iii) with respect to any Distributions of the Liquidating Trust Assets (excluding the GUC Cash Pool, Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), an Allowed Second Lien Secured Note Claim in Class 3 or an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 3 and Class 5.

144.    "**Purchaser**" means Appvion Holding Corp., in its capacity as purchaser under the 363 Sale Agreement.

145.    "**QIP Motion**" means *Motion of the Debtors for Entry of an Order Approving the Debtors' Quarterly Incentive Plan* [D.I. 361].

- 15 -

146.    "**Qualified Bid**" means an offer, solicitation or proposal submitted in connection with the 363 Sale satisfying the conditions set forth in the Bid Procedures Order, as determined by the Debtors, in consultation with the Creditors' Committee.

147.    "**Rejection Damages Claim**" means a Claim for damages arising out of the rejection of an Executory Contract.

148.    "**Related Persons**" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former shareholders, affiliates (whether by operation of law or otherwise), subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, and any Person claiming by or through them, each in their capacities as such.

149.    "**Released D&O**" means any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

150.    "**Released D&O Claims**" means any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O.

151.    "**Released Parties**" means the Debtors, the Purchaser, the Ad Hoc Group of Second Lien Noteholders and the members of the Ad Hoc Group of Second Lien Noteholders (solely in their capacity as members of the Ad Hoc Group of Second Lien Noteholders), the Creditors' Committee, the Senior DIP Agent, the DIP Agent, and the DIP Lenders, in each case in their capacities as such, and each of their respective Related Persons; provided, however, that the Released Parties shall not include any of the Debtors' Directors and Officers other than the Released D&O.

152.    "**Releasing Parties**" means (i) the Released Parties, (ii) each Holder of a Claim who votes to accept the Plan, (iii) each Holder of a Claim who votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release, (iv) each Holder of a Claim who abstains from voting on the Plan (except for those Holders of Claims whose solicitation packages were returned to the Debtors or the Balloting Agent as undeliverable, which Holders of Claims shall be identified in the Debtors' voting certification or a notice to be filed by the Debtors or the Balloting Agent) and does not mark its ballot to indicate its refusal to grant the Third-Party Release, and (v) with respect to the foregoing clauses (i) though (iv), each of such Person's Related Persons, in each case in their capacity as such.

153.    "**Schedules**" mean the schedules of assets and liabilities, schedules of executory contracts, schedules of co-debtors and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

154.    "**Second Lien Indenture**" means that certain Indenture, dated as of November 19, 2013, by and among Appvion, the guarantors identified therein and U.S. Bank National

- 16 -

Association, as trustee and collateral agent, pursuant to which the Second Lien Notes were issued.

155. "**Second Lien Notes**" means the 9.000% Second Lien Senior Secured Notes due June 1, 2020 issued in the aggregate principal amount of $250 million pursuant to the Second Lien Indenture.

156. "**Second Lien Noteholders**" means Holders of the Second Lien Notes.

157. "**Second Lien Secured Note Claims**" means the Claims held by Second Lien Noteholders.

158. "**Secured Claim**" means a Claim that is secured (a) by a Lien that is valid, perfected, and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of an Order, or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value determined in accordance with section 506(a) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in such property (unless an election has been made under section 1111(b) of the Bankruptcy Code on or prior to the Plan Confirmation Date) or to the extent of an amount subject to such setoff, as applicable.

159. "**Senior DIP Agent**" means Wilmington Trust, National Association, in its capacity as administrative and collateral agent in connection with the Senior DIP Facility.

160. "**Senior DIP Credit Agreement**" means that certain Senior Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of March 16, 2018, as amended from time to time.

161. "**Senior DIP Facility**" means the postpetition, senior superpriority senior debtor-in-possession financing provided to the Debtors by the Senior DIP Lenders pursuant to and under the Senior DIP Order.

162. "**Senior DIP Lenders**" means the lenders party to the Senior DIP Facility.

163. "**Senior DIP Motion**" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (III) Modifying Final Existing DIP Financing Order; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 520].

164. "**Senior DIP Order**" means the *Amended Final Order (i) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (ii) Modifying Final Existing DIP Financing Order; and (iii) Granting Related Relief* [D.I. 639].

165. "**Statutory Fees**" means any and all fees payable to the U.S. Trustee under section 1930 of title 28 of the United States Code and any interest thereupon.

- 17 -

166.    "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

167.    "**Third-Party Release**" means the releases set forth in Section XII of this Plan.

168.    "**Transition Services Agreement**" means that certain Transition Services Agreement effective as of June 13, 2018 by and between the Purchaser and the Debtors.

169.    "**Trust Oversight Committee**" means the committee formed on the Effective Date to be selected by the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders and reasonably acceptable to the Debtors and the Majority DIP Lender and identified in the Plan Supplement for the purposes set forth in the Liquidating Trust Agreement.

170.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

171.    "**Unclaimed Distribution Deadline**" means, in each instance, the date that is one hundred and twenty (120) days from the date the Liquidating Trustee makes a Distribution.

172.    "**USW**" means the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial Union.

173.    "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

174.    "**Voting Deadline**" means August 6, 2018 at 5:00 p.m. (prevailing Eastern Time) as described in Section IV.A.9 of this Combined Plan and Disclosure Statement.

175.    "**Warrant Agent**" means, collectively, Computershare Inc., a Delaware corporation, and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, together with their respective successors and assigns.

176.    "**Warrant Agreement**" means the warrant agreement executed by and between the Purchaser and the Warrant Agent, pursuant to which (i) the Warrants were issued by the Purchaser to the Warrant Agent and delivered to the Debtors upon the 363 Sale Effective Date to be held in trust for benefit of the Holders of Allowed Second Lien Secured Note Claims, and (ii) the Warrants are to be distributed under this Plan to Holders of Allowed Second Lien Secured Note Claims on the Effective Date in exchange for the Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code.

177.    "**Warrants**" means the warrants issued by the Purchaser and delivered to the Debtors upon the 363 Sale Effective Date for the benefit of the Holders of Allowed Second Lien Secured Note Claims, as set forth in the 2L/Committee Settlement, for 5.0% of the common stock of the Purchaser on a fully diluted basis after giving effect to exercise in full of all of the Warrants in two tranches: (x) 5-year warrants for 2.5% of the common stock of the Purchaser, struck at the "make-whole" equity value as of the 363 Sale Effective Date resulting in a 100% recovery to Roll-Up DIP Lenders (as defined in the DIP Credit Agreement), including a 1.5% exit fee (the "Tranche A Warrants"), and (y) 5-year warrants for 2.5% of the common stock of

the Purchaser, with a strike price of 15% above the Tranche A Warrants (the "Tranche B Warrants"). The Warrants shall contain reasonable and customary anti-dilution, exemption, transferability and information rights, and in the event of a change of control (to be defined in the Warrant Agreement), the Purchaser shall be required to pay the holders of the Warrants an amount of Cash equal to the value of the Warrants based on the Black-Scholes pricing model using a volatility of 37%.

## B.     Interpretation; Application of Definitions and Rules of Construction

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in this Combined Plan and Disclosure Statement are to the respective section in, article of, Schedule to, or Exhibit to this Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Plan and Disclosure Statement. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Plan and Disclosure Statement. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in this Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Plan and Disclosure Statement. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

## III. BACKGROUND

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code initiating these Chapter 11 Cases. Following the Petition Date, the Debtors remained in possession of their Assets and management of their businesses as Debtors in Possession under sections 1107 and 1108 of the Bankruptcy Code.

## A.     Overview of the Debtors' Business

### 1.     Description of the Debtors' Operations and History

Appvion and its subsidiaries and affiliates (the "Company"), headquartered in Appleton, Wisconsin, is a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. The Company was founded by Charles Boyd on May 13, 1907 as "The Appleton Coated Paper Company." Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013. Today, the Company creates

EAST\152399891.23

product solutions for customers and end users through its development and use of coating formulations and applications as well as security technologies. Appvion has a dedicated heritage of growing new markets and well-regarded technical assets.

On November 9, 2001, the Company's employees purchased Appvion from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan. In late 2001, approximately 90% of Appvion's employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the employee stock ownership plan component of the Appvion Retirement Savings and Employee Stock Ownership Plan purchased all of the common stock of PDC. PDC simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available Cash, to finance the purchase of Appvion from Arjo Wiggins.

2.    **The Debtors' Workforce, Compensation and Benefits**

As of the Petition Date, the Debtors employed approximately 1,350 employees across their headquarters in Appleton, Wisconsin, their fully-integrated pulp and paper mill located in Roaring Spring, Pennsylvania, which produces carbonless, security and specialty papers, and their thermal paper-producing plant located in West Carrollton, Ohio. Appvion was party to three CBAs with the USW, which expired on August 31, 2017, February 1, 2018 and March 31, 2018, respectively. The USW represents approximately 915 employees (collectively, the "Union Employees") at the Debtors' manufacturing facilities. Throughout these Chapter 11 Cases, the Debtors negotiated with the USW regarding revised CBAs, which negotiations the Purchaser continued following entry of the Bid Procedures Order.

As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees. The Debtors supplement their workforce from time to time with co-ops, interns and other temporary employees, to whom they pay wages but do not provide benefits. The Debtors also have an international sales team of sales contractors, who are critical to the Debtors' sales and marketing operations and play an important role in the Debtors' business operations.

As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans"). The purpose of the Long-Term Incentive Plans was to attract and retain key management employees, who were in a position to make a significant contribution to the growth and profitability of the Debtors' business. The compensation committee of the Board established the number of units granted each year under the Long-Term Incentive Plans. The Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Recipients were required to enter into a non-compete and non-solicitation agreement in order to receive units under the Long-Term Incentive Plans which, if violated following the receipt of units, resulted in forfeiture of any and all rights to receive payment relating to the units. Units received prior to January 1, 2017 were generally vested

- 20 -

three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

Further, in the ordinary course of business, the Debtors offered various bonus and incentive programs to recognize and reward certain key employees' superior achievements and contributions to the Debtors' business. Prior to the Petition Date, the Debtors maintained incentive plans for salaried employees, sales employees, and certain night-shift employees (the "Incentive Plans"). Each Incentive Plan was designed to compensate eligible employees for attaining various financial, sales, and performance metrics.

In the ordinary course of business, the Debtors maintained various Employment Benefit Programs and policies, including, without limitation: (a) medical and dental, and prescription drug insurance plans and health savings plans; (b) life, disability, and AD&D insurance; (c) retiree medical, dental, and life insurance and related benefits; (d) holidays and other paid time off; (e) reimbursement and allowance programs; (f) an onsite clinic; (g) a health facility; (h) an employee assistance program; (i) a scholarship program; and (j) miscellaneous other benefit plans and policies. The Employee Benefit Programs were, in each case, available to eligible full-time, part-time, terminated, and retired former employees under each respective plan or policy. The Debtors also provided certain retired former employees and their eligible dependents with medical, dental, and life insurance and maintained a retiree call center and open enrollment processing center (collectively, the "Retiree Benefit Obligations").

The KSOP is a tax-qualified retirement plan that contains (i) the 401(k) Fund, which provides participants with the ability to make pre-tax contributions to the KSOP by electing to defer a percentage of their compensation, and (ii) a separate tax-qualified ESOP designed to invest primarily in the common stock of PDC. Employees could defer, on a pre-tax basis, a percentage of their pay in an amount, subject to certain IRS limitations, to the 401(k) Fund, the ESOP, or a combination of both. Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next valuation date, June 30 or December 31. At that time, these deferrals and the interest earned on these amounts were used to purchase shares based upon the price of a share of PDC common stock on the valuation date preceding or following the date on which the participant made the deferrals, whichever is lower.

The Appvion, Inc. Retirement Plan (the "Pension Plan") is a single-employer defined benefit pension plan with approximately 3,200 participants. Under the Pension Plan, benefits were vested upon retirement at age 65 with 5 years of service and paid as annuities or a single lump sum following termination of employment. Pension Plan benefits for salaried employees were based on years of service and employee pay, and benefits for union employees are based on years of service. The Pension Plan was closed for all new salaried employees on and after January 1, 2008 and frozen for all salaried employees as of March 1, 2011. For all new USW employees, the Pension Plan was closed effective as of 2014 or 2015 depending on the applicable CBA. Salaried employees who no longer receive pension benefits received a contribution for future retirement benefits into the 401(k) Fund of the KSOP and new USW

- 21 -

employees and USW employees who elected to freeze their pension also receive a contribution for future retirement benefits into the 401(k) Fund of the KSOP.

Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017.

The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan. The SERP benefit, when added to the Pension Plan benefit, provided a combined benefit equal to the benefit under the Pension Plan as if certain tax-qualified plan limitations did not apply. Benefits under the SERP were paid as annuities only, except for benefits with a present value of less than $20,000, which were paid in lump sums.

The Debtors also maintained the Nonqualified Excess Plan for highly-compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. Participants in the Nonqualified Excess Plan chose to have deferrals deemed invested in selected mutual funds, and the Debtors invested funds equal to participants' deferred amounts in the mutual funds selected by participants. The Debtors pay administrative expenses of the Nonqualified Excess Plan and annually add funds to the Nonqualified Excess Plan to make up for any difference between the participants' deemed investments and the actual performance of the investments. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP. This benefit provided the same 1% to 5% contribution calculated on excluded pay. There is an additional "KSOP match" of 6% of excluded pay, which is calculated regardless of whether the employee participates in the KSOP.

3.      **The Debtors' Organizational Structure**

The Debtors in these Chapter 11 Cases are PDC, Appvion, and certain of their wholly-owned direct and indirect subsidiaries. A brief overview of each of the Debtors and non-debtors, including their business operations, follows:

EAST\152399891.23

- PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and is owned in its entirety by the ESOP. PDC does not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP and actions required to be taken under ancillary acquisition agreements.

- PDC Capital, a Wisconsin corporation is a wholly owned subsidiary of PDC and a parent company to Arjo Wiggins. PDC Capital does not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

- Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor, has no assets and no operations.

- Appvion, a Delaware corporation, is a wholly owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Appvion is the major operating company and manufacturer of the Company's products. Appvion also employs the majority of the Company's employees.

- Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and an operating entity based in Toronto, Ontario. Appvion Canada is not a Debtor.

- Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and has no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Company under its Account Receivable Securitization (as defined below).

- APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and 1% owner of the stock of Appvion Netherlands, which has no operations.

On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Despite the prior intentions of the Company to expand its business to the Netherlands and Germany, Appvion Netherlands never conducted any operations. In 2015, Appvion transferred approximately $25,000 to Appvion Netherlands as a capital contribution. The Debtors and Appvion Netherlands began efforts to wind down Appvion Netherlands. Shortly after the Petition Date, the Debtors determined that equitable distribution of Appvion Netherlands' limited assets would be better achieved through liquidation under Dutch law rather than through the administrative expenses incurred under chapter 11 or chapter 7 of the Bankruptcy Code. On October 27, 2017, Appvion Netherlands filed the *Motion of the Debtor to Dismiss the Chapter 11 Case of Appvion Global Netherlands Cooperatief U.A.* [D.I. 194] seeking entry of an order dismissing its Chapter 11 Case. On November 15, 2017, the Bankruptcy Court entered the *Order Dismissing the Chapter 11 Case of Appvion Global Netherlands Cooperatief U.A.* [D.I. 262]. As of April 26, 2018, the liquidation of Appvion Netherlands was complete and Appvion Netherlands was struck from the corporate rolls of the Netherlands.

EAST\152399891.23

B.     **The Debtors' Prepetition Capital Structure**

       The Company reports its financial information on a consolidated basis.  As of August 31, 2017, the last reporting period prior to the Petition Date, the Company's books and records reflected total assets of approximately $381 million and current liabilities totaled approximately $75 million.  The Company's long-term liabilities, as of August 31, 2017, totaled $640.9 million, consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

       Prior to the Petition Date, the Company's primary sources of liquidity and capital resources included Cash provided by operations and credit available under its $75 million revolving credit facility and $24 million Accounts Receivable Securitization Facility, both described in additional detail herein.  As of the Petition Date, a total of approximately $490 million was owed to the Company's pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

1.     **Senior Secured Credit Facility**

       On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, Jefferies, as joint lead arranger, joint book runner and administrative agent, Fifth Third Bank, as joint lead arranger, joint book runner, revolver agent and swing line lender and L/C lender, KeyBank National Association, as joint lead arranger, joint book runner and documentation agent, and the other lenders party thereto (the "Prepetition Credit Agreement").  The Term Loan had an original term of six years, maturing on September 15, 2015, and the Revolving Credit Facility had an original term of five years, maturing on June 30, 2015.  The Revolving Credit Facility included a $25 million subfacility for standby letters of credit and a $5 million subfacility for swing line loans.

       Appvion's obligations under the Prepetition Credit Agreement were guaranteed by PDC, Appvion Canada and, through a joinder agreement after its formation, APVN, each of which granted to Jefferies, for the benefit of the secured parties under the Prepetition Credit Agreement, a senior first priority security interest in substantially all of its assets in order to secure the prompt and complete payment and performance when due of its obligations under the Prepetition Credit Agreement and the related loan documents.

       The Senior Secured Credit Facility was senior in right of payment to all existing and future subordinated indebtedness of Appvion and secured by security interests in substantially all property and assets of Appvion, PDC, Appvion Canada, and APVN.

       On June 28, 2013, Appvion applied substantially all of the Term Loan proceeds to fund the purchase price, including principal, premium, consent fee, and accrued and unpaid interest, of $300.71 million aggregate principal amount of its 10.50% Senior Secured Notes due 2015 pursuant to its Cash tender offer and consent solicitation, and to pay related fees and expenses.

- 24 -

On November 11, 2013, Appvion, PDC, Jefferies, as administrative agent, and certain lenders entered into the first amendment to the Prepetition Credit Agreement (the "First Amendment"). The First Amendment, among other things, permitted the Company to issue $250 million aggregate principal amount of the Second Lien Notes to refinance its outstanding 9.750% Senior Subordinated Notes due 2014 and 11.25% Second Lien Notes due 2015 and allowed the Company to enter into an intercreditor agreement governing the relative priorities of the respective security interests in its assets securing the newly issued notes and the borrowings under its Senior Secured Credit Facility governed by the Prepetition Credit Agreement.

On August 3, 2015, Appvion, PDC and Jefferies, as administrative agent, and certain lenders under the Prepetition Credit Agreement entered into the third amendment to the Prepetition Credit Agreement (the "Third Amendment"). The Third Amendment became effective simultaneously with the closing of the sale of the Encapsys Business. Upon its effectiveness, the Third Amendment, among other things, (i) permitted the Company to consummate the sale of the Encapsys Business and provided for the corresponding release of liens on the Encapsys Business, (ii) required that not less than $165 million of the net proceeds be applied to prepay the revolving credit loans and the term loans under the Prepetition Credit Agreement and provided that the remainder of the net proceeds be reinvested or otherwise applied to further prepay indebtedness in accordance with the Prepetition Credit Agreement, (iii) provided for a permanent reduction of the revolving credit facility commitments from $100 million to $75 million, (iv) required the payment of a consent fee equal to 0.175% of the aggregate principal amount of loans and commitments, and (v) further conformed certain terms and covenants under the Prepetition Credit Agreement to account for the sale of the Encapsys Business and the transactions contemplated thereby.

On January 16, 2017, Appvion, PDC, Jefferies, as administrative agent, Fifth Third Bank, as revolver agent, swing line lender and L/C issuer, and the lenders party to the Prepetition Credit Agreement entered into a fifth amendment (the "Fifth Amendment") to the Prepetition Credit Agreement. The Fifth Amendment, among other things, (i) fixed the applicable interest rate on the Company's term and revolving loans at 5.5% per annum for base rate loans and 6.5% per annum for eurodollar loans, regardless of the Company's then current consolidated leverage ratio, (ii) increased the maximum consolidated first lien leverage ratios applicable to the Company pursuant to the maximum consolidated leverage covenant to require maintenance of a consolidated first lien leverage ratio, during the first fiscal quarter of 2017, of not more than 3.60 to 1.00, during the second fiscal quarter of 2017, of not more than 3.50 to 1.00, during the period beginning on the third fiscal quarter of 2017 though the second fiscal quarter of 2018, of not more than 3.25 to 1.00 and from and after July 1, 2018, of not more than 3.00 to 1.00, and (iii) required the payment of a 1.5% premium on any prepayments, payments in connection with a change in control or a refinancing, or payments at maturity of either term or revolving loans.

On February 16, 2017, Appvion, PDC, Jefferies, as administrative agent, Fifth Third Bank, as revolver agent, swing line lender and L/C issuer, and the lenders party to the Prepetition Credit Agreement entered into a sixth amendment (the "Sixth Amendment") to the Prepetition Credit Agreement. The Sixth Amendment amended the Prepetition Credit Agreement to provide for the availability of additional term loans in an aggregate principal amount not to exceed $20.0 million, on the same terms and subject to the same conditions as the

- 25 -

term loans already existing under the Prepetition Credit Agreement. Proceeds from the issuance of these term loans were reduced by $0.8 million for original issue discount, and the net proceeds were used to pay down the revolving line of credit. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

2.      **Second Lien Notes**

On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes accrue interest from the issue date at a rate of 9.000% per year, payable in Cash semi-annually in arrears on each June 1 and December 1, maturing on June 1, 2020. The Second Lien Notes were issued pursuant to that certain Indenture, dated as of November 19, 2013, by and among Appvion, the guarantors identified therein, and U.S. Bank National Association, as trustee and collateral agent. The obligations under the Second Lien Notes were guaranteed by PDC, Appvion Canada, APVN, and any existing or future domestic or foreign subsidiaries that become guarantors or borrowers under the Senior Secured Credit Facility. The Second Lien Notes rank equal in right of payment to the Senior Secured Credit Facility and are secured by a second priority security interest in substantially all of the property and assets of Appvion, PDC, Appvion Canada and APVN, junior in priority to the liens on the same collateral securing the outstanding debt obligations under the Senior Secured Credit Facility. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes. On November 19, 2013, the Debtors, the collateral agent for the Senior Secured Credit Facility, and the Indenture Trustee entered into that certain Intercreditor Agreement, thereby documenting their rights, responsibilities and remedies vis-à-vis the collateral and each other.

3.      **Accounts Receivable Securitization**

On June 4, 2014, the Company entered into the Accounts Receivable Securitization Facility, with a commitment size of $30.0 million, whereby transactions under the program were accounted for as sales of trade receivables, pursuant to that certain Receivables Purchase Agreement dated as of June 4, 2014 among Appvion Receivables, as seller, Appvion, as servicer, various purchasers from time to time party thereto, and Fifth Third Bank, as purchaser and administrative agent and that certain Purchase and Sale Agreement dated as of June 4, 2014 between Appvion and Appvion Canada, as originators, and Appvion Receivables. Trade receivables sold to third-party financial institutions, serviced by Appvion, totaled $46 million as of August 31, 2017. As of the Petition Date, approximately $24 million was owed under the securitization. The Accounts Receivable Securitization Facility was scheduled to mature on September 29, 2017. Appvion Receivables, Appvion, and Fifth Third Bank negotiated, but did not execute, a fifth amendment to the Accounts Receivable Securitization Facility to extend the maturity date to October 16, 2017. Appvion, however, paid a facility fee in the amount of $100,000, a condition for effectiveness of the fifth amendment to the Accounts Receivable Securitization Facility. As of the Petition Date, the trade receivables were reflected on Appvion's books and records. The Debtors paid off the Accounts Receivable Securitization Facility with the proceeds of the DIP Facility on October 5, 2017.

- 26 -

4.      **Other Indebtedness and Obligations**

Additionally, on August 8, 1997 the Company issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"), which had a 0.9% average interest rate as of July 2, 2017. As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Further, the Company is the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan.

There are also a number of workers' compensation claims pending against the Company. Many of these claims are proceeding through the litigation process, and the final outcome will not be known until the claim is adjudicated or a settlement is reached with the claimant. The ultimate cost of individual workers' compensation claims can vary based upon, among other factors, the nature of the injury, the duration of the disability period, if any, the length of the claim period, the jurisdiction of the claim and the nature of the final outcome. The Company has approximately $2.2 million in pending workers' compensation claims. These Claims for pending workers' compensation will continue as obligations of the Purchaser following Consummation of the Plan.

Each of the Debtors is a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1301-1461 (2012 & Supp. IV 2016). The Pension Benefit Guaranty Corporation (the "PGBC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. As of December 31, 2016, the total projected benefit obligation of the Company's defined benefit pension plans exceeded the fair value of the plan assets by $112.6 million. The Company was not required to make, nor did it make, any contributions to the Pension Plan in 2015 or 2016. The Company made a payment of $2.5 million on September 25, 2017. Following the Petition Date, the Company made no contributions to the Pension Plan.

On January 17, 2018, PBGC filed three proofs of claim, claim nos. 280-282, against each of the Debtors, asserting unfunded benefit liabilities under 29 U.S.C. § 1362(b), missed minimum funding contributions due to the Pension Plan under 26 U.S.C. §§ 412, 430; 29 U.S.C. §§ 1082, 1342(d), and pension termination premiums due under 29 U.S.C. § 1306. As of October 31, 2017, PBGC asserted that the Pension Plan's unfunded benefit liabilities were an estimated $148.9 million. *See* 29 U.S.C. § 1362(b). The PBGC is currently updating the amount of the Pension Plan's underfunding based on updated actuarial information.

On May 10, 2018, PBGC filed a motion for allowance of administrative expenses in the amount of $3,276,329 for asserted missed minimum funding contributions due to the Pension Plan during the post-petition period. PBGC also asserts a priority claim in the amount of $936,573 for missed contributions due to the Pension Plan arising from services rendered within 180 days before the Petition Date. While the Debtors dispute the PBGC's asserted

Claims, they and the PBGC are engaged in settlement negotiations and if a settlement is reached, it will be presented to the Court at or before the Confirmation Hearing and will become included into the Plan.

5.     **Trade Vendor Obligations**

The Debtors' business is dependent upon their ability to timely fulfill orders from and provide prompt shipment of products to their customers which, in turn, makes them dependent upon continuous access to the raw materials, including base stock and other chemicals, goods and services that are essential to the production of the Debtors' products from a number of trade vendors.

On February 22, 2012, Appvion, formerly Appleton Papers, Inc., entered into a long-term supply agreement with Domtar for the purchase of carbonless and thermal base stock for coating at the Debtors' converting facilities, and from time to time during the parties' performance under the Domtar Supply Agreement the parties entered formal and informal agreements, undertakings, understandings, terms and conditions that modify, amend, or supplement the Domtar Supply Agreement. The Domtar Supply Agreement provides that Domtar will be the exclusive supplier of certain thermal and carbonless base stock used by the Debtors. The term of the Domtar Supply Agreement is 15 years.

In 2016, the Debtors purchased approximately $226 million of base stock from various external suppliers. Nearly 100% of the base stock purchased to produce carbonless paper and approximately 92% of the base stock purchased to produce thermal papers was purchased from Domtar. As of the Petition Date, the Debtors ordered approximately $500,000 of base stock per day, 7 days per week, under the Domtar Supply Agreement.

On October 6, 2017, the Debtors paid Domtar a $4.1 million adequate assurance deposit, which deposit Domtar applied to amounts due from the Debtors for postpetition shipments. Upon Domtar's demand for additional adequate protection of its interest in the purchased inventory as of the Petition Date and thereafter respecting postpetition sale of inventory to the Debtors, the Debtors filed the Domtar Motion seeking (i) authority to continue performing under the consignment agreement *nunc pro tunc* to the Petition Date; (ii) authority to obtain postpetition credit from Domtar under the Domtar Supply Agreement; (iii) authority to provide adequate protection to Domtar; and (iv) modification of the automatic stay and approval of setoff of the rebates owed to Domtar. The Bankruptcy Court entered orders approving the Domtar Motion on an interim and final basis on October 16, 2017 and October 30, 2017, respectively [D.I. 124 and 219].

C.     **Events Precipitating the Chapter 11 Filing**

The need to file for chapter 11 was a result of the confluence of a number of factors including persistent negative industry trends, an unsustainable degree of balance sheet leverage, inability to adequately address near-term maturities, and rapidly deteriorating liquidity. The North American paper industry began to contract in the mid-2000s, resulting in closure of paper mills throughout the industry. In particular, the coated paper industry faces a long-term, structural decline as dependency on digital technology has increased and demand has decreased.

- 28 -

As a result, over the last several years, the Company began to sell business lines and implement transformational savings projects to maintain or improve financial performance.

The Company experienced further challenges in 2015, driven primarily by a soft pricing environment in thermal paper point of sale products, such as merchandise receipts, ATM receipts, coupons and gas receipts. In the following year, the Company successfully executed its business plan, resulting in a 20% adjusted EBITDA improvement. The key drivers of this performance improvement were execution of cost and performance initiatives in manufacturing operations, targeted selling, general and administrative expense savings, and continued growth in the thermal tag, label and entertainment paper products, which include event tickets, retail tags and labels, baggage tags, package labeling, and lottery tickets.

The Company's revenues from sales to customers in the United States began to drop, from $568.6 million in 2014 to $526.0 million in 2015, and then rose slightly, to $529.7 million in 2016. Revenues from sales to customers in foreign countries also dropped, from $196.1 million in 2014 to $174.0 million in 2015, and then to $160.7 million in 2016. Sales revenues continued to decline during the 2017 year. Through this period of declining sales, the Company's debt load grew, and its liquidity became strained.

1.      **Attempted Refinancing**

Beginning in the spring of 2017, the Company began to explore a refinancing of its senior debt, with a focus on extending the maturity of its existing debt obligations and raising additional liquidity. On April 5, 2017, the Company engaged Guggenheim Securities as investment banker, to initially assist in the Company's exploration of ways to address its impending debt maturities, and subsequently the Company's exploration of an out-of-court refinancing transaction designed to extend its maturities and improve its liquidity. As part of this process, the Company, with the assistance of Guggenheim Securities, pursued a multi-track approach focusing on both the Company's existing senior lenders and almost twenty third-parties that had signed non-disclosure agreements. In the end, while the Company did receive four new-money proposals, it became apparent to the Company that a refinancing transaction on appropriate terms was not commercially feasible due to the nature of the Company's debt agreements, financial condition and near-term liquidity demands.

Accordingly, beginning in August 2017, the Board directed the Company's advisors to begin to explore a deleveraging transaction that could be accomplished through either an out-of-court process, or a chapter 11 proceeding. In order to further these discussions, both the participants to the Senior Secured Credit Facility and the Ad Hoc Group of Second Lien Noteholders retained legal and financial advisors and became restricted, thereby allowing open and arms-length negotiations toward a solution to both the Company's short-term liquidity needs and long-term leverage issues. During this same period, the Board retained AlixPartners as an advisor to evaluate near term liquidity and cash flow and to support the efforts of the Company's other advisors.

Due to the inability to consummate a refinancing transaction, and with near-term maturity of certain of the credit facilities, on August 16, 2017, the Company issued its Form 10-

Q for the quarter ending July 2, 2017, which stated, "there is substantial doubt about its ability to continue as a going concern."

Shortly thereafter, Standard & Poor's issued a credit rating downgrade on the Company. The combination of these two announcements led a number of the Company's vendors to begin to request disadvantageous trade terms, further restricting the Company's liquidity. Further, the Accounts Receivable Securitization Facility was scheduled to expire on September 29, 2017, which would have had a negative impact on liquidity that the Company could not have withstood. In light of these significant factors negatively impacting liquidity, it was determined that it would be necessary for the Company to effectuate the restructuring through an in-court process.

## D.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

### 1.    First Day Orders

On the Petition Date, in addition to the voluntary petitions for relief Filed by the Debtors, the Debtors Filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief. A summary of the relief sought and obtained under the First Day Motions is set forth below:

- **Joint Administration Motion.** Following consideration of the *Motion of the Debtors for an Order Directing the Joint Administration of Their Chapter 11 Cases* [D.I. 2], the Bankruptcy Court entered an Order [D.I. 52] authorizing the joint administration of the Chapter 11 Cases for procedural purposes only.

- **Consolidated Creditor List Motion.** Following consideration of the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor* [D.I. 3], the Bankruptcy Court entered an Order [D.I. 54], among other things, authorizing the Debtors to submit a consolidated list of creditors and File a consolidated list of the Debtors' twenty largest unsecured creditors.

- **Application to Retain Prime Clerk.** Following consideration of the *Application of the Debtors For Appointment of Prime Clerk LLC as Claims and Noticing Agent* [D.I. 5], the Bankruptcy Court entered an Order [D.I. 56] authorizing the Debtors to retain Prime Clerk as Claims Agent in the Chapter 11 Cases.

- **Cash Management Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Continued Use of the Debtors' Cash Management System, (B),Authorizing*

- 30 -

*Continued Transfers Among Debtors and Non-Debtor Affiliates and (C) Scheduling a Final Hearing on the Motion* [D.I. 8], the Bankruptcy Court entered interim and final Orders [D.I. 53 and 224] that, among other things, (i) authorized the Debtors to continue to use their current cash management system, existing bank accounts, and business forms, including authorizing the Debtors to open and close certain bank accounts; (ii) continue intercompany transfers and, to the extent applicable, grant administrative expense priority status to postpetition Intercompany Claims held by a Debtor against one or more of the other Debtors.

- **Employee Wages/Benefits Motion.** Following consideration of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefits and Programs in the Ordinary Course; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations; and (III) Granting Related Relief* [D.I. 11], the Bankruptcy Court entered interim and final Orders [D.I. 61 and 218] authorizing the Debtors to, among other things, pay and honor certain prepetition employee obligations, including prepetition payroll obligations, reimbursable expenses, and benefit plan obligations.

- **Utilities Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* [D.I. 7], the Bankruptcy Court entered interim and final Orders [D.I. 58 and 206] authorizing and approving the provision of adequate assurance of payment to the Debtors' utility service providers under section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of their utility services from those utility companies.

- **Insurance Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue Their Insurance Policies and Pay Prepetition and Postpetition Obligations in Respect Thereof* [D.I. 9], the Bankruptcy Court entered interim and final Orders [D.I. 59 and 207] authorizing the Debtors to, among other things, pay any outstanding obligations under the Debtors' existing Insurance Policies and renew, revise, extend, supplement, change, or enter into new Insurance Policies.

- **Customer Programs Motion.** Following consideration of the *Motion of the Debtors for Interim and Final Orders Authorizing Debtors to (I) Honor Prepetition Obligations to Customers and (II) Continue Customer Programs in the Ordinary Course of Business* [D.I. 10], the Bankruptcy

- 31 -

Court entered an interim and final Orders [D.I. 60 and 208] authorizing the Debtors to continue to honor prepetition obligations owed to customers arising under customer-related programs, practices and maintain, renew, replace, implement, modify or terminate any such customer programs, as the Debtors deem appropriate in their business judgment and in the ordinary course of business.

- **Tax Motion.** Following consideration of the Motion of the *Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes* [D.I. 6], the Bankruptcy Court entered interim and final Orders [D.I. 57 and 205] authorizing the Debtors to, among other things, pay prepetition taxes in the ordinary course of their business.

- **Critical Vendors Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendor Obligations* [D.I. 14], the Bankruptcy Court entered interim and final Orders [D.I. 64 and 210] authorizing the Debtors to, among other things, pay prepetition claims of certain critical domestic vendors in the ordinary course of their business.

- **Foreign Vendors Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Foreign Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Foreign Vendors Obligations* [D.I. 15], the Bankruptcy court entered interim and final Orders [D.I. 65 and 225] authorizing the Debtors, to among other things, pay prepetition claims of certain critical foreign vendors in the ordinary course of their business.

- **Shippers and Warehousemen Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Prepetition Claims of Shippers and Warehousemen and (B) Satisfy Customs Duties Imposed on Shipments and Foreign Suppliers* [D.I. 12], the Bankruptcy Court entered interim and final Orders [D.I. 62 and 209] authorizing the Debtors to, among other things, (a) pay prepetition claims of shippers and warehousemen, possessory lien claimants in the ordinary course of their business and (b) satisfy prepetition custom duties imposed on shipments of goods from foreign suppliers.

2. **Appointment of Creditors' Committee**

The Office of the United States Trustee formed the Creditors' Committee on October 11, 2017 [D.I. 97]. On November 14, 2017 the Bankruptcy Court authorized the

retention of the following advisors to the Creditors' Committee: Lowenstein Sandler LLP [D.I. 255] and Klehr Harrison Harvey Branzburg LLP [D.I. 256] as co-counsel and FTI Consulting, Inc. as financial advisor [D.I. 276]. The members of the Creditors' Committee are: (i) Pension Benefit Guaranty Corporation; (ii) Pace Industry Union-Management Pension Fund; (iii) Yupo Corporation America; (iv) Marubeni America Specialty Chemicals, Inc.; (v) BASF Corporation; (vi) USW, and (vii) Granwell Products, Inc.

On February 8, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order Approving Settlement Agreement with Marubeni Specialty Chemicals Inc.* [D.I. 424] (the "Marubeni Settlement Motion"). The Marubeni Settlement Motion sought approval of a settlement agreement (the "Marubeni Settlement Agreement") among the Debtors and MSCI, by which the Debtors paid MSCI the full amount of its prepetition claim in exchange for favorable terms and trade credit. The Marubeni Settlement Agreement contemplates payment by the Debtors to MSCI in full and complete satisfaction of the Released Claims. On February 26, 2018, the Bankruptcy Court entered an order approving the Marubeni Settlement Motion and the Marubeni Settlement Agreement [D.I. 486]. Subsequently, MSCI resigned from the Creditors' Committee and became an *ex officio* member of the Creditors' Committee.

### 3. Employment of Professionals and Advisors

On October 30, 2017 the Bankruptcy Court authorized the Debtors to (a) retain DLA Piper LLP (US) as their attorneys pursuant to sections 327(a) and 329(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 213], (b) retain and appoint Prime Clerk as claims and noticing agent for the Debtors pursuant to 28 U.S.C. § 156(c), *nunc pro tunc* to the Petition Date [D.I. 215], and (c) retain AP Services, LLC to provide the Debtors with a Chief Restructuring Officer (and certain additional personnel), and designate Alan D. Holtz of AP Services, LLC as the Chief Restructuring Officer [D.I. 216]. Moreover, on November 1, 2017, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Bankruptcy Court authorized the Debtors to retain Guggenheim Securities as investment banker [D.I. 235].

### 4. Schedules, Section 341(a) Meeting of Creditors, and Bar Dates

On November 15 and 16, 2017, the Debtors Filed their Schedules. On December 20, 2018, the U.S. Trustee conducted the meeting of creditors in these Chapter 11 Cases under section 341(a) of the Bankruptcy Code.

On December 19, 2017, the Bankruptcy Court entered the General Bar Date Order [D.I. 337] establishing (a) February 14, 2018 at 4:00 p.m. (prevailing Eastern Time) as the General Bar Date, and (b) March 30, 2018 at 4:00 p.m. (prevailing Eastern Time) as the Governmental Unit Bar Date.

### 5. Postpetition Financing

In order to have sufficient Cash to operate their businesses while in bankruptcy, the Debtors sought approval to obtain postpetition financing initially through the DIP Motion. The DIP Motion sought authorization to enter into a postpetition, superpriority debtor-in-possession financing facility between the Debtors and certain lenders party thereto. On October

- 33 -

3, 2017, the Bankruptcy Court entered an order authorizing entry into the DIP Facility on an interim basis.

On October 31, 2017, the Bankruptcy Court entered the Final DIP Order, authorizing and approving on a final basis, *inter alia*, the Debtors' entry into and performance under the DIP Facility and the granting of certain liens and adequate protection in connection therewith, all as more fully set forth in such Final DIP Order. Under the Final DIP Order, the Debtors were authorized to obtain $325.3 million of postpetition financing, and to secure this financing, the DIP Lenders were granted superpriority liens on substantially all of the Debtors' Assets. In connection with the final approval of the DIP Facility, the Debtors and the DIP Lenders agreed to amend the DIP Facility, which, among other things, extended certain of the milestones under which the Debtors must file a chapter 11 plan.

As of the Petition Date, the Debtors had caused an aggregate amount of approximately $13.1 million in letters of credit to be issued by Fifth Third Bank, which letters of credit were held by Domtar, Zurich American Insurance Company, the Ohio Bureau of Workers' Compensation, the Pennsylvania Department of Environmental Protection, amongst others. Postpetition, following entry of the final order approving the Domtar Motion, Domtar drew on a letter of credit in the amount of approximately $2.2 million and the Bank of New York Mellon Trust Company, N.A. drew on a letter of credit in the amount of approximately $6 million. A replacement letter of credit was not issued to either party.

Shortly after the commencement of these Chapter 11 Cases, Fifth Third Bank informed the Debtors that it did not intend to renew the then outstanding letters of credit upon expiration, despite being fully cash collateralized.

Aware that Fifth Third Bank would not renew the outstanding letters of credit after expiration, the Debtors sought approval of, and the Final DIP Order provided for, the issuance of new standby letters of credit in an amount not to exceed $8.1 million, in order to provide for the replacement of letters of credit and to provide for the capacity to issue additional letters of credit, pursuant to documentation to be entered into after the date of the entry of the Final DIP Order. *See* Final DIP Order [D.I. 234], at ¶ (ii)(c). The Final DIP Order further contemplated the cash collateralization of any such new letters of credit, and provided that such cash collateral could be funded with cash collateral released by Fifth Third Bank upon expiration of the letters of credit and, if necessary, no more than an additional $3 million from the proceeds of the DIP Financing. *See id.*

The Debtors approached a number of institutions with the intent of seeking replacement letters of credit, after which Citizens Bank, N.A. agreed to provide a letter of credit facility which the Debtors would use for replacement letters of credit and additional letters of credit in an aggregate amount not to exceed at any time outstanding $5 million on terms acceptable to the Debtors and Citizens Bank, N.A. On February 2, 2018, the Debtors filed the *Motion of the Debtors for Entry of a Supplemental Order Authorizing the Debtors to Incur Additional Post-Petition Secured Debt in Connection with Letter of Credit Facility* [D.I. 411], as of which date, the aggregate outstanding amount of the letters of credit was $4.6 million. On February 16, 2018, the Court entered an Order [D.I. 461] authorizing, *inter alia*, the Debtors to

- 34 -

enter that certain Letter of Credit Agreement and a corresponding amendment to the DIP Facility to authorize entry into the Letter of Credit Agreement.

On March 5, 2018, the Debtors filed a motion seeking authority to enter into a new Senior DIP Facility to address constraints on liquidity due to headwinds faced by the Debtors, and the need to manage developments in these Chapter 11 Cases, and authority to enter into a corresponding amendment to the DIP Facility authorizing entry into the Senior DIP Facility. On March 12, 2018, the Bankruptcy Court entered the *Interim Order (i) Authorizing the Debtors to (a) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (b) Grant Senior Liens and Superpriority Administrative Expense Status; (ii) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (iii) Modifying Final Existing DIP Financing Order; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [D.I. 564], authorizing the Debtors to enter into the Senior DIP Facility on an interim basis. The Senior DIP Order approving the Senior DIP Facility was entered on March 29, 2018 [D.I. 625]. Through the approval of the Senior DIP Facility, the Debtors were authorized to obtain a total of $100 million of postpetition financing, through which the NM Term Loan Obligations under the initial DIP Financing were refinanced.

Prior to the Petition Date, Fifth Third Bank and KeyBank National Association were the prepetition first lien revolver agent and the first lien documentation agent under the Prepetition Credit Agreement, respectively. Upon approval of the DIP Facility, both Fifth Third Bank and KeyBank National Association became DIP Lenders under the DIP Credit Agreement as Roll-Up Lenders, and did not participate in the New Money Term Loans under the DIP Credit Agreement. Fifth Third Bank and KeyBank National Association filed objections to the Bid Procedures Motion, alleging disparate treatment among DIP Lenders. Fifth Third Bank and KeyBank National Association further objected to the Senior DIP Facility, alleging that the necessary approvals to refinance the DIP Facility were not obtained and the Senior DIP Facility sought to revise the Final DIP Order to correct flaws in the sale structure. Both the Bid Procedures Order and the Senior DIP Order were entered over the objections of Fifth Third Bank and KeyBank National Association. Subsequently, Fifth Third Bank and KeyBank National Association filed complaints against the Majority DIP Lender and others in the Supreme Court of the State of New York, County of New York (the "State Court Lender Dispute") alleging breach of contract claims relating to the Bankruptcy Court's approval of the Senior DIP Facility. On April 27, 2018, the defendants removed the State Court Lender Dispute to the United States District Court for the Southern District of New York. On May 14, 2018, the defendants moved to transfer venue of the State Court Lender Dispute to the United States District Court for the District of Delaware for referral to the Bankruptcy Court.

6.    **Key Employee Retention Plan and Quarterly Incentive Plan**

On November 15, 2017, the Bankruptcy Court approved the Debtors' Key Employee Retention Plan [D.I. 261], authorizing the Debtors to make retention payments, in the maximum aggregate amount of $1 million to certain non-executive employees of the Debtors, as follows: (a) one-third of the payments were payable (and paid) by the Debtors on December 31, 2017 and (b) two-thirds of the payments shall be payable on the later of the consummation of a Restructuring Transaction or June 1, 2018.

- 35 -

On December 27, 2017, the Debtors filed the QIP Motion seeking authority to pay certain bonus amounts in accordance with the Debtors' quarterly incentive plan. The Bankruptcy Court entered orders approving the QIP Motion for all non-executive employees on and for all executive employees on February 16, 2018 [D.I. 460].

7.     **Sale of Substantially All of the Debtors' Assets**

a.     Marketing Process and Bid Procedures Order

On February 8, 2018 the Debtors filed the Bid Procedures Motion, which set forth both a proposed schedule and process, including bidding procedures, for the marketing and sale of all or substantially all of the Debtors' Assets to the highest bidder at auction. Under the Bid Procedures Motion, the Purchaser was named as the "Stalking Horse Purchaser" of the Debtors' Assets. The procedural relief requested in the Bid Procedures Motion was granted by entry of the *Order (i)(a) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all Assets, (b) Approving the Expense Reimbursement, (c) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (d) Approving the Form and Manner of Notice Thereof* [D.I. 565] on March 12, 2018.

The Debtors with the assistance of their investment banking professionals conducted an extensive marketing process for the sale of substantially all of the Debtors' Assets prior to filing the Chapter 11 Cases. This marketing continued after the filing of the Chapter 11 Cases and included establishing and maintaining a "data room" for prospective purchasers to conduct due diligence. In total, more than sixty (60) strategic and financial prospective purchasers of Appvion were contacted, NDA and teasers were provided to fifty-eight (58) parties, providing confidential information memoranda and data room access to twenty-two (22) parties, and management presentations were made to three (3) parties all over approximately three (3) months' time. The Debtors' professionals received five (5) expressions of interest, two (2) of which were from potential purchasers to the thermal side of the business. In the end, a total of three (3) bids were submitted to the Debtors and their advisors to purchase all or substantially all of the Debtors' Assets. Of the three (3) bids, the Debtors, in consultation with the Creditors' Committee, determined that none of the bids were Qualified Bids. No Qualified Bid, other than the bid of the Purchaser, was submitted to the Debtors. Accordingly, on April 30, 2018, the Debtors canceled the Auction and filed a notice that the Purchaser was the Successful Bidder. Consequently, the Purchaser agreed to acquire substantially all of the Debtors' Assets on terms negotiated between them and the Debtors pursuant to the 363 Sale Agreement.

b.     363 Sale Order and Sale of Assets to the Purchaser

On May 14, 2018, the Bankruptcy Court held a hearing on the approval of the 363 Sale Agreement and authorization to close the 363 Sale. The 363 Sale Agreement provided for, among other things, the assumption of certain trade payables including, among other things, payment of cure amounts associated with the assumption and assignment of several of the Debtors' executory contracts. The Purchaser credit bid the full amount of the Term Loan Claims, including the assumption of the DIP Financing. The order approving the 363 Sale and 363 Sale Agreement was entered on May 14, 2018 [D.I. 751].

- 36 -

The Debtors and the Purchaser entered into an amendment to the 363 Sale Agreement extending the date by which the 363 Sale must be consummated to June 18, 2018. The Debtors and the Purchaser consummated the Sale on the 363 Sale Effective Date. Having sold substantially all of their Assets, the Debtors seek to wind-down their remaining operations and liquidate their remaining Assets as set forth in this Plan.

8.      **Disputes and Settlements**

At the outset of the Chapter 11 Cases, the Creditors' Committee played an active role. When the Debtors began to engage in earnest to effect a sale of substantially all Assets with the Purchaser, the Creditors' Committee objected to the Debtors' sale-related motions, including the Bid Procedures Motion, and filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting the Committee Standing to Commence and Prosecute an Action on Behalf of the Debtors' Estates Against Administrative Agent for Prepetition First Lien Lenders, Trustee and Collateral Agent for the Prepetition Second Lien Noteholders, Administrative Agent for DIP Lenders, the Prepetition Lenders and the DIP Lenders* [D.I. 377] (the "Standing Motion"), seeking standing to sue the prepetition lenders, the DIP Lenders and the Second Lien Noteholders and challenge the DIP Lenders' and Second Lien Noteholders' liens on Assets. At a hearing on the Bid Procedures Motion, the Creditors' Committee agreed to adjourn the Standing Motion to the hearing to approve the 363 Sale, and withdrew its objection to the Bid Procedures Motion after commitments from the DIP Lenders, the Purchaser, and the Debtors to engage in good faith negotiations towards a consensual resolution of the Chapter 11 Cases. Following such negotiations, the Purchaser, the Majority DIP Lender, the Debtors, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders agreed to the 2L/Committee Settlement, pursuant to which the parties agreed, among other things, that (i) the Debtors would file a plan of liquidation and disclosure statement that is consistent with the 2L/Committee Settlement and otherwise reasonably acceptable to the Purchaser, the Majority DIP Lender, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders; (ii) the Purchaser will have no greater than $175 million of drawn debt as of the 363 Sale Effective Date, in a manner consistent with the terms agreed to between the Purchaser and the USW; (iii) the Purchaser will pay into an escrow account to be held by the Debtors' counsel the Plan Contribution Payment and the GUC Cash Pool, each of which will be transferred to the Liquidating Trust upon the Effective Date; (iv) any and all Litigation Claims will be transferred to the Liquidating Trust on the Effective Date; (v) the Liquidating Trust shall make Distributions of (a) the GUC Cash Pool on a Pro Rata basis to Holders of Allowed General Unsecured Claims in Class 5, and (b) the Litigation Proceeds, if any, net of Liquidating Trust Operating Expenses and repayments of the Plan Contribution Payment, on a Pro Rata basis to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5; (vi) the Purchaser will issue and deliver the Warrants to the Debtors upon the 363 Sale Effective Date for the benefit of the Holders of Allowed Second Lien Secured Note Claims, and the Debtors will distribute the Warrants under this Plan to Holders of Allowed Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code; (vii) the parties will fully support the Debtors' Plan, provided that the Plan is consistent with the 2L/Committee Settlement and otherwise reasonably acceptable to the Purchaser, the Majority DIP Lender, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders; (viii) on or before the 363 Sale Effective Date, the Creditors' Committee will withdraw the Standing Motion with prejudice and the Debtors and the Creditors' Committee will

- 37 -

release all claims related thereto; and (ix) certain of the professional advisors of the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee will be subject to fee limitations. The Debtors sought approval of the 2L/Committee Settlement through the *Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 734]. The Bankruptcy Court approved the 2L/Committee Settlement on May 14, 2018 [D.I. 753].

# IV. CONFIRMATION AND VOTING

**A.    Confirmation Procedures**

1.    **Plan Confirmation Hearing**

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of this Combined Plan and Disclosure Statement. On June 20, 2018, the Bankruptcy Court entered an order scheduling the Plan Confirmation Hearing for August 14, 2018 at 11:00 a.m. (prevailing Eastern Time), to consider, among other things, final approval of this Combined Plan and Disclosure Statement under section 1125 of the Bankruptcy Code and confirmation of this Combined Plan and Disclosure Statement under section 1129 of the Bankruptcy Code. Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Equity Interests, and other parties in interest.

Any objection to confirmation of this Combined Plan and Disclosure Statement must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors, the basis for the objection and the specific grounds of the objection, and must be Filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than August 2, 2018 at 4:00 p.m. (prevailing Eastern Time): (i) counsel to the Debtors, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, Illinois 60606 (Attn: Richard A. Chesley, Esq.), DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown, Esq. and Kaitlin Mackenzie Edelman, Esq.), and DLA Piper LLP (US) 1251 Avenue of the Americas, 27th Floor New York, New York 10020 (Attn: Jamila Justine Willis, Esq.); (ii) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Mark S. Kenney, Esq.); (iii) counsel to the Majority DIP Lender and Purchaser, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Daniel S. Shamah, Esq. (dshamah@omm.com)) and Richards, Layton & Finger, P.A., One Rodney Square, Wilmington, Delaware 19801 (Attn: Michael J. Merchant, Esq. (merchant@rlf.com)); (iv) counsel to the DIP Agent, Covington & Burling LLP, 620 Eighth Avenue, New York, New York 10018 (Attn: Ronald Hewitt, Esq. (rhewitt@cov.com)) and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, Wilmington, Delaware 19899 (Attn: David Fournier, Esq. (fournierd@pepperlaw.com)); (v) counsel to the Committee, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801 (Attn: Michael Yurkewicz, Esq. (myurkewicz@klehr.com)) and Lowenstein Sandler LLP, 1251 Avenue of the Americas,

- 38 -

New York, New York 10020 (Attn: Kenneth Rosen, Esq. (krosen@lowenstein.com) and Wojciech Jung, Esq. (wjung@lowenstein.com)); (vi) counsel to the Ad Hoc Group of Second Lien Noteholders: Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq. (jgoldstein@stroock.com)); (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (viii) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to Confirmation of this Combined Plan and Disclosure Statement. **UNLESS AN OBJECTION TO CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

2. **Requirements for Confirmation**

The Bankruptcy Court will confirm this Plan only if the Plan meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in these Chapter 11 Cases is that this Plan (i) is accepted by one impaired Classes of Claims and Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) is feasible. The Bankruptcy Court must also find, among other things, that:

   a.     this Plan has classified Claims and Interests in a permissible manner;

   b.     this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

   c.     this Plan has been proposed in good faith.

3. **Cram Down**

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both. The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

EAST\152399891.23

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non-accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the plan.

These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the Holders of each type of Claim or Equity Interest and by treating each Holder of a Claim or Equity Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims or unsecured claims. In general, section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule. This rule requires that the dissenting class be paid in full before a junior class may receive anything under the plan. The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

- Secured Creditors. Either: (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- Unsecured Creditors. Either: (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- 40 -

- Equity Interests.  Either: (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims.  If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims have failed to accept the Plan under section 1129(a)(8) of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors believe that this Combined Plan and Disclosure Statement satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that this Combined Plan and Disclosure Statement meets the requirements of section 1129(b) of the Bankruptcy Code or that at least one impaired class of Claims will vote to accept the Plan, as required for confirmation of a Plan under the "cram down" procedures.

4.     **Best Interests of Creditors Test**

The Bankruptcy Code requires that, with respect to an impaired Class of Claims or Interests, each Holder of an impaired Claim or Interest in such Class either (i) accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such Holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The costs of a chapter 7 liquidation would necessarily include fees payable to a chapter 7 trustee, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code.  Other costs of liquidating the Debtors' Estates would include the expenses incurred during the bankruptcy cases and allowed by the Bankruptcy Court in the chapter 7 cases.  The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims.  Without the benefit of settlements and resolutions reached in these Chapter 11 Cases, any recoveries for Holders of Allowed General Unsecured Claims in a chapter 7 liquidation would be significantly diluted.

Accordingly, the Debtors believe that in a chapter 7 liquidation, Holders of Claims and Interests would receive less than such Holders would receive under this Combined Plan and Disclosure Statement.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

- 41 -

5.      **Feasibility**

Under section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan. Under this Combined Plan and Disclosure Statement, the Litigation Claims are being transferred to the Liquidating Trust for prosecution, liquidation and distribution in accordance with the Liquidating Trust Agreement. Therefore, as this is a liquidating Plan, the Bankruptcy Court's confirmation of this Combined Plan and Disclosure Statement will not be followed by unanticipated liquidation or the need for any further reorganization.

6.      **Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires the proponent of this Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that this Combined Plan and Disclosure Statement's classification scheme places substantially similar Claims or Interests in the same Class and, thus, meets the requirements of section 1122 of the Bankruptcy Code.

7.      **Impaired Claims or Interests**

Under section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "impaired" by this Combined Plan and Disclosure Statement and receiving a Distribution under this Combined Plan and Disclosure Statement may vote to accept or reject this Combined Plan and Disclosure Statement. Under section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if this Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not impaired by this Combined Plan and Disclosure Statement are deemed to accept this Combined Plan and Disclosure Statement and do not have the right to vote on this Combined Plan and Disclosure Statement. The Holders of Claims or Interests in any Class that will not receive any Distribution or retain any property under this Combined Plan and Disclosure Statement are deemed to reject this Combined Plan and Disclosure Statement and do not have the right to vote.

8.      **Eligibility to Vote on this Combined Plan and Disclosure Statement**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 3 and 5 may vote on this Combined Plan and Disclosure Statement. In order to vote on this Combined Plan and Disclosure Statement, you must hold an Allowed Claim in a voting class or be the Holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

9.      **Procedure/Voting Deadlines**

In order for your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at the following address:

- 42 -

Appvion, Inc. Balloting, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

The Balloting Agent must RECEIVE original ballots on or before **August 6, 2018 at 5:00 p.m.** (prevailing Eastern Time), the Voting Deadline.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant, and that is cast as an acceptance or rejection of this Combined Plan and Disclosure Statement will be counted and cast as an acceptance or rejection, as the case may be, of this Combined Plan and Disclosure Statement.

Absent the prior agreement of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders, the following Ballots will not be counted or considered for any purpose in determining whether this Combined Plan and Disclosure Statement has been accepted or rejected by the class in which such Holder holds a Claim or Interest:

> a. any Ballot submitted that is received after the Voting Deadline, unless the Debtors or the Bankruptcy Court grant an extension of the Voting Deadline with respect to such Ballot;
>
> b. any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;
>
> c. any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject this Combined Plan and Disclosure Statement;
>
> d. any Ballot cast for a Claim designated or determined as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no Bankruptcy Rule 3018(a) motion has been Filed by the Bankruptcy Rule 3018(a) motion deadline;
>
> e. any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of this Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of this Combined Plan and Disclosure Statement;
>
> f. any Ballot not bearing an original signature; or
>
> g. any Ballot that is submitted by facsimile or electronic mail.

### 10. Releases

**All Holders of Claims are urged to carefully read the release provisions set forth in Section XII.E of the Plan. The Plan provides that each Holder of a Claim or an Interest that (i) is a Released Party, (ii) votes to accept the Plan, (iii) votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release**

EAST\152399891.23

contained in Section XII.E of the Plan, (iv) abstains from voting on the Plan (except for those Holders of Claims or Interests whose solicitation packages were returned to the Debtors or the Balloting Agent as undeliverable, which Holders of Claims or Interests shall be identified in the Debtors' voting certification or a notice to be filed by the Debtors or the Balloting Agent) and does not mark its ballot to indicate its refusal to grant the Third-Party Release contained in Section XII.E of the Plan, and (v) is a Related Person with respect to each of the foregoing clauses (i) through (iv), will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged the Released Parties and their Related Persons from any and all Claims and causes of action against the Debtors and the Released Persons. Holders of Class 6 Intercompany Claims and Class 7 Equity Interests, all of whom are deemed to reject this Plan, will be granted an opportunity to opt-out of the release provisions set forth in Section XII.E of the Plan.

The releases provided are critical parts of this Combined Plan and Disclosure Statement and are appropriate under the Third Circuit standard. Such releases are: **(i)** in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; **(ii)** in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; **(iii)** fair, equitable, and reasonable; and **(iv)** a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement from asserting any Claims or causes of action released under the Plan in favor of the Released Parties.

11.    **Acceptance of this Combined Plan and Disclosure Statement**

As a Creditor, your acceptance of this Combined Plan and Disclosure Statement is important. In order for this Combined Plan and Disclosure Statement to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept this Combined Plan and Disclosure Statement. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Combined Plan and Disclosure Statement. The Debtors and the Creditors' Committee urge that you vote to accept this Combined Plan and Disclosure Statement. **YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## V. TREATMENT OF UNCLASSIFIED CLAIMS

A.    **General Administrative Expense Claims**

General Administrative Expense Claims comprise Administrative Expense Claims and Professional Fee Administrative Claims. The 363 Sale Agreement provides for the payment of General Administrative Expense Claims in accordance with the Wind-Down Budget, as amended by the 2L/Committee Settlement, including but not limited to all Allowed Claims arising under section 503(b)(9) of the Bankruptcy Code, all unpaid post-petition obligations, and Allowed Professional Fee Administrative Claims.

- 44 -

With respect to Allowed Administrative Expense Claims, in full and complete satisfaction of such Claims, payment on the later of (i) the 363 Sale Effective Date, (ii) the date such Administrative Expense Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, and (iii) the date such Administrative Expense Claim comes due in the ordinary course of business, with such Administrative Expense Claims being paid in the full amount Allowed in Cash (as determined by agreement, settlement, or Final Order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Administrative Expense Claim, the Debtors, the Majority DIP Lender, and the Creditors' Committee (prior to the Effective Date) and the Liquidating Trustee (after the Effective Date). To be eligible to receive Distributions under this Combined Plan and Disclosure Statement on account of an Administrative Expense Claim that is not otherwise expressly Allowed by this Combined Plan and Disclosure Statement, a request for payment of an Administrative Expense Claim must have been or be Filed on or before the Administrative Expense Claim Bar Date; *provided, however*, that Claims arising under section 503(b)(9) of the Bankruptcy Code shall be and remain subject to the General Bar Date. Any Administrative Expense Claim that is not timely asserted by the Administrative Expense Claim Bar Date or the General Bar Date, as applicable, in accordance herewith and the General Bar Date Order, as applicable, shall be deemed disallowed under this Combined Plan and Disclosure Statement and shall be forever barred against the Debtors, the Estates, the Liquidating Trust, or any of their Assets or property, and the Purchaser, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

With respect to Professional Fee Administrative Claims, in full and complete satisfaction of their Claims, payment on the later of (i) the 363 Sale Effective Date, (ii) the Effective Date, and (iii) the date such Professional Fee Administrative Claim becomes an Allowed Claim by a Final Order of the Bankruptcy Court, to be paid in the full Allowed amount in Cash (as determined by agreement, settlement, or order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Professional Fee Administrative Claim, the Debtors, and the Purchaser.

The deadline for submission by **all** Professionals (including any applications of members of the Creditors' Committee for expense reimbursement) for Bankruptcy Court approval of Professional Fee Administrative Claims shall be thirty (30) days after the Effective Date. Any Professional or other Person or Entity that is required to File and serve a request for approval of a Professional Fee Administrative Claim that fails to File and serve a timely request will be forever barred, estopped, and enjoined from asserting any request for payment of a Professional Fee Administrative Claim or participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtors or the Creditors' Committee shall provide to the Debtors an estimate of their accrued professional fees and expenses through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) within five (5) Business Days prior to the 363 Sale Effective Date. The aggregate amount of the Professional Fee Administrative Claims shall be held in the Professional Fee Escrow. The Professional Fee Escrow shall be funded on or before the 363 Sale Effective Date. Upon approval of professional fees consistent with the procedures established by the Bankruptcy Court, the Debtors or the

- 45 -

Liquidating Trustee, as applicable, shall release the appropriate amount to the Professionals from the Professional Fee Escrow.

**B.    Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim, shall receive in full satisfaction of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, payment in Cash equal to the Allowed amount of such Priority Tax Claim, on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, or such other treatment as may be agreed upon by any such Holder of a Priority Tax Claim, the Debtors, and the Creditors' Committee (prior to the Effective Date) and the Liquidating Trustee (after the Effective Date). The Liquidating Trustee reserves the right to prepay such Allowed Priority Tax Claim at any time. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.

**C.    Statutory Fees**

Statutory Fees from the Petition Date through the Effective Date shall be paid by the Debtors on the Effective Date. Statutory Fees relating to any period of time after the Effective Date shall be paid by the Liquidating Trust.

**D.    ESOP**

Any Holder of a beneficial interest in the ESOP wishing to vote on the Plan must hold a Claim against the Debtors in Class 3 or Class 5 that is separate and apart from a Direct ESOP Claim. Any Direct ESOP Claims held by the Holders of beneficial interests in the ESOP on account of their beneficial interest in the ESOP will be asserted by the ESOP Committee, in its discretion, on behalf of all Holders of beneficial interests in the ESOP. Notwithstanding the foregoing, any other party which holds a Direct ESOP Claim may assert such Direct ESOP Claim under applicable law. Notwithstanding anything to the contrary in this Plan, the ESOP Committee shall retain responsibility, standing, and authority to commence, prosecute and settle lawsuits or actions on behalf of the Holders of beneficial interests in the ESOP.

## VI. CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

For purposes of voting, confirmation and making Distributions under the Plan, the Plan provides for and is premised upon the substantive consolidation of the Debtors and their Estates. Claims for each of the Debtors – other than Administrative Expense Claims, Professional Fee Administrative Claims, Priority Tax Claims, and Statutory Fees Claims – are classified for all purposes, including voting, confirmation, and Distribution under this Combined Plan and Disclosure Statement, as follows:

**Appvion, Inc.**

- 46 -

| Class | Type | Status Under Plan | Voting Status | Anticipated Recovery |
|---|---|---|---|---|
| 1 | DIP Facility Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Second Lien Secured Note Claims | Impaired | Entitled to Vote | Warrants, Pro Rata share of the Litigation Proceeds, plus Pro Rata share of the remaining Liquidating Trust Assets, as set forth below |
| 4 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | Pro Rata share of the Litigation Proceeds, plus Pro Rata share of the GUC Cash Pool, plus Pro Rata share of the remaining Liquidating Trust Assets, as set forth below |
| 6 | Intercompany Claims | Impaired | Deemed to Reject | No Distribution |
| 7 | Equity Interests | Impaired | Deemed to Reject | No Distribution |

## VII.      TREATMENT OF CLAIMS AND INTERESTS

A.      <u>Treatment of Claims and Interests</u>

    1.      **DIP Facility Claims (Class 1)**

        a.      <u>Classification</u>

Class 1 consists of all DIP Facility Claims against Appvion, PDC, Appvion Receivables, and APVN.

        b.      <u>Impairment and Voting</u>

Class 1 is unimpaired. Holders of Allowed Class 1 DIP Facility Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

        c.      <u>Treatment</u>

All DIP Facility Claims shall be deemed fully and finally satisfied as against the Debtors and their Estates by the credit bid and treatment of such claims upon the 363 Sale Effective Date.

2.      **Other Secured Claims (Class 2)**

        a.      <u>Classification</u>

Class 2 consists of all Other Secured Claims, if any, against any Debtor, secured by such Debtor's assets.

        b.      <u>Impairment and Voting</u>

Class 2 is unimpaired. Holders of Allowed Class 2 Other Secured Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

        c.      <u>Treatment</u>

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in settlement, and release of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, one of the following treatments, as determined by the Debtors or the Liquidating Trustee, as soon as reasonably practicable after the Effective Date or such later date on which such Other Secured Claim becomes an Allowed Secured Other Claim: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; and/or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered unimpaired.

3.      **Second Lien Secured Note Claims (Class 3)**

        a.      <u>Classification</u>

Class 3 consists of Second Lien Secured Note Claims against the Debtors.

        b.      <u>Impairment and Voting</u>

EAST\152399891.23

Class 3 is impaired. Holders of Allowed Class 3 Second Lien Secured Note Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

       c.     <u>Treatment</u>

Except to the extent that a Holder of an Allowed Second Lien Secured Note Claim agrees to less favorable treatment, in settlement and release of each Allowed Second Lien Secured Note Claim, each Holder of an Allowed Second Lien Secured Note Claim shall receive on account of its Allowed Second Lien Secured Note Claim, consistent with the terms and conditions of the 2L/Committee Settlement, on or as soon as practicable after the Effective Date:

       (i) its Pro Rata share of the Warrants, which shall be distributed by the Debtors only to the Holders of Allowed Second Lien Secured Note Claims, and

       (ii) a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed Second Lien Secured Note Claim to the following on each applicable Distribution Date:

       (a) its Pro Rata share of the Litigation Proceeds (net of Liquidating Trust Operating Expenses, repayments of the Plan Contribution Payment, and any other Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed Second Lien Secured Note Claims in Class 3 are paid in full or the Litigation Proceeds are exhausted, and

       (b) its Pro Rata share of the remaining Liquidating Trust Assets (excluding the GUC Cash Pool, the Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed Second Lien Secured Note Claims in Class 3 are paid in full or the remaining Liquidating Trust Assets are exhausted.

    4.    **Other Priority Claims (Class 4)**

       a.     <u>Classification</u>

Class 4 consists of all Other Priority Claims, if any, against the Debtors.

EAST\152399891.23

b.    Impairment and Voting

Class 4 is unimpaired.  Holders of Allowed Class 4 Other Priority Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    Treatment

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in settlement and release of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, on account of its Allowed Other Priority Claim, payment in full in Cash as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

5.    **General Unsecured Claims (Class 5)**

a.    Classification

Class 5 consists of all General Unsecured Claims against the Debtors.

b.    Impairment and Voting

Class 5 is impaired, and Holders of Allowed General Unsecured Claims are entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    Treatment

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, and after satisfaction in full of all senior Claims (except the Second Lien Secured Note Claims as provided for in the 2L/Committee Settlement), in settlement and release of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on account of such Allowed General Unsecured Claim, consistent with the terms and conditions of the 2L/Committee Settlement, on or as soon as practicable after the Effective Date:

(i) such Holder's Pro Rata share of the GUC Cash Pool in Cash, which shall be distributed only to the Holders of Allowed General Unsecured Claims, and

(ii) a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed General Unsecured Claim to the following on each applicable Distribution Date:

(a) its Pro Rata share of the Litigation Proceeds (net of Liquidating Trust Operating Expenses, repayments of the Plan Contribution Payment, and any other Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax

- 50 -

Claims, Allowed Other Secured Claims and Allowed Other Priority Claims), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed General Unsecured Claims in Class 5 are paid in full or the Litigation Proceeds are exhausted; and

(b) its Pro Rata share of the remaining Liquidating Trust Assets (excluding the GUC Cash Pool, the Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed General Unsecured Claims in Class 5 are paid in full or the remaining Liquidating Trust Assets are exhausted.

6.   **Intercompany Claims (Class 6)**

a.   Classification

Class 6 consists of all Intercompany Claims.

b.   Impairment and Voting

Class 6 is impaired, and Holders of Allowed Intercompany Claims against the Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.   Treatment

Holders of Intercompany Claims in Class 6 will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Intercompany Claim will be canceled as of the Effective Date.

7.   **Equity Interests (Class 7)**

a.   Classification

Class 7 consists of all Equity Interests in the Debtors.

b.   Impairment and Voting

Class 7 is impaired, and Holders of Allowed Equity Interests in the Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

- 51 -

c. <u>Treatment</u>

Holders of Equity Interests in Class 7 will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Equity Interests will be canceled as of the Effective Date.

**B.  Modification of Treatment of Claims and Interests**

The Plan Proponents, with the consent of the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee, reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the Holder of such Claim or Equity Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Equity Interest whose Allowed Claim or Equity Interest, as the case be, is being adversely affected.

**VIII.  PROVISIONS REGARDING THE LIQUIDATING TRUST**

**A.  Appointment of the Liquidating Trustee**

The Liquidating Trustee shall be selected by the Creditors' Committee and Second Lien Noteholders in consultation with the Debtors, and shall be identified by the Debtors in the Plan Supplement. At the Plan Confirmation Hearing, the Bankruptcy Court shall consider and, if appropriate, ratify the selection of the Liquidating Trustee. All compensation for the Liquidating Trustee shall be paid from the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement. The approved Persons shall serve as the Liquidating Trustee upon execution of the Liquidating Trust Agreement on the Effective Date. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The Liquidating Trust Agreement shall be provided in the Plan Supplement. On the Effective Date, all Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidating Trustee, then successors shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, and the Liquidating Trust Agreement.

Following the Effective Date, the Liquidating Trustee shall also be, and shall enjoy the powers of, the Debtors' authorized representative for all purposes, including, without limitation, section 1123 of the Bankruptcy Code. No further proof of such power shall be necessary or required.

**B.  Creation of Liquidating Trust**

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in its capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, as well as the obligation to repay the Plan Contribution Payment in accordance with the terms of this Plan and the 2L/Committee Settlement, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Liquidating

- 52 -

Trust Assets not in its possession or control and to prosecute the Litigation Claims. The Liquidating Trust will then be created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the primary purpose of prosecuting the Litigation Claims, liquidating the Liquidating Trust Assets and making Distributions in accordance with this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

## C.    Beneficiaries of Liquidating Trust

The Holders of Allowed Second Lien Secured Note Claims and Allowed General Unsecured Claims entitled to Distributions hereunder shall be the Beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and transferable in accordance with the terms set forth in this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

## D.    Vesting and Transfer of Assets to the Liquidating Trust

Under section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall be assigned, transferred, and vest in the Liquidating Trust upon the Effective Date free and clear of all Claims and Liens; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any Assets that the Liquidating Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Any Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. As of the Effective Date, all Liquidating Trust Assets vest in the Liquidating Trust and all Assets dealt with in this Combined Plan and Disclosure Statement shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Combined Plan and Disclosure Statement or in the Plan Confirmation Order; *provided, further*, that nothing herein shall relieve the Liquidating Trust of its obligation to repay the Plan Contribution Payment in accordance with the terms of this Plan and the 2L/Committee Settlement.

## E.    Funding of the Liquidating Trust

In accordance with the terms of the 2L/Committee Settlement, the Liquidating Trust shall be funded from (i) the Plan Contribution Payment, (ii) the GUC Cash Pool, (iii) net recoveries resulting from the prosecution of any and all Litigation Claims, (iv) the proceeds of any Insurance Policies, and (v) any and all other Assets belonging to the Debtors' Estates.

To the extent not paid in full in Cash on the Effective Date, reserves for payment of Disputed Claims and Professional Fee Administrative Claims shall be set aside and held by Liquidating Trustee until such Claims are approved, Allowed and authorized to be paid, by the Bankruptcy Court.

On the Effective Date, the Debtors and the Debtors' Estates shall transfer and be deemed to have transferred the Liquidating Trust Assets to the Liquidating Trust and such

- 53 -

Liquidating Trust Assets shall vest in the Liquidating Trust to be utilized, administered, and distributed by the Liquidating Trustee in accordance with the terms and conditions of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, and the 2L/Committee Settlement.

## F.   Distributions from the Liquidating Trust

Distributions from the Liquidating Trust shall be made in accordance with the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.  For the avoidance of doubt, the Litigation Proceeds shall be used to pay any Liquidating Trust Operating Expenses and repayments of the Plan Contribution Payment prior to making any Distributions to Beneficiaries of the Liquidating Trust.

## G.   Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee

### 1.   General Powers of the Liquidating Trustee

The Liquidating Trustee shall have, and enjoy the powers of, the Debtors' authorized representative for all purposes and shall have the power and authority to perform the acts described in the Liquidating Trust Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of this Combined Plan and Disclosure Statement, including without limitation any set forth herein, *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein, to conserve and protect the Liquidating Trust and the Liquidating Trust Assets, or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Combined Plan and Disclosure Statement.  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority, power, and responsibility to: (a) receive, manage, invest, supervise, and protect Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and Distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, the Litigation Claims vested in the Liquidating Trust, as set forth in the Liquidating Trust Agreement; (f) resolve issues involving Claims and Equity Interests in accordance with this Combined Plan and Disclosure Statement, including the power to object to Claims, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of Statutory Fees incurred post-Effective Date and the ultimate closing of the Chapter 11 Cases and dissolution of the Debtor entities; (h) dissolve the Debtors' Employee Benefit Plans

- 54 -

other than the ESOP and KSOP not sold and transferred to the Purchaser in connection with the 363 Sale; and (i) take such other action as may be vested in or assumed by the Liquidating Trustee consistent with this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and any applicable Orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Combined Plan and Disclosure Statement.

Except as expressly set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion to pursue or not to pursue any Litigation Claims as he/she/it determines is in the best interests of the Liquidating Trust's Beneficiaries and consistent with the purposes of the Liquidating Trust, and shall be indemnified to the fullest extent permitted under applicable law by the Liquidating Trust for the outcome of his, her, or its decisions, other than those decisions constituting fraud, gross negligence, willful misconduct, bad faith or self-dealing. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash. Other than as provided for in the 363 Sale Documents, the Liquidating Trust is the successor to the Debtors, their Estates, their books and records, and their Privileges and protections (it being understood that to the extent the Liquidating Trustee is a successor with respect to documents subject to a common interest privilege with any third party, nothing herein shall relieve the Liquidating Trustee of any formal or informal obligations with respect to such common interest agreements). The Liquidating Trustee shall have standing, authority, power, and right to assert, prosecute, and/or settle the Litigation Claims, including, with respect to the Liquidating Trust, making a claim under Insurance Policies based upon its powers as a bankruptcy-appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials. The Litigation Claims will vest in the Liquidating Trust as set forth in the Liquidating Trust Agreement; *however*, there can be no assurance as to the outcome of such Litigation Claims or the dollar amount of any recovery that will be obtained by the Liquidating Trust. With respect to the provisions of the Transition Services Agreement, which survive the Effective Date and Consummation of this Plan, the Liquidating Trustee shall be deemed a permitted assignee of the Debtors under the Transition Services Agreement and shall receive the benefit thereunder.

2.     **Books and Records**

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with the 363 Sale; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or beneficial.

3.     **Investments of Cash**

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided*, *however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

- 55 -

4.     **Costs and Expenses of Administration of the Liquidating Trust**

All Liquidating Trust Operating Expenses shall be the responsibility of and paid by the Liquidating Trust in accordance with the Liquidating Trust Agreement from the Liquidating Trust Assets.

5.     **Reporting**

In no event later than thirty (30) Business Days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been released or paid out in accordance with this Combined Plan and Disclosure Statement, the Liquidating Trustee shall File reports setting forth the amounts, recipients, and dates of all Distributions through each applicable reporting period.

**H.     Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that the trust be owned by its Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

The Liquidating Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust and for the Debtors. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from a Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder under this Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidating Trustee, as the case may be, until such time as Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

**I.     Term of Liquidating Trust**

EAST\152399891.23

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Litigation Claims have been prosecuted to completion and the Liquidating Trust Assets have been collected and liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement have been made, and (v) the Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, unless the Liquidating Trust has procured a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

J.      **Limitation of Liability of the Liquidating Trustee**

The Liquidating Trust shall indemnify its Liquidating Trustee and its professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee or its professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals of the Liquidating Trust for performing any functions incidental to such service; *provided, however,* the foregoing shall not relieve the Liquidating Trustee or its professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and, as required under Rule 1.8(h)(1) of the Delaware Layers' Rules of Professional Conduct, malpractice.

## IX. ADDITIONAL MEANS FOR IMPLEMENTATION

A.      **Substantive Consolidation**

1.      **The Basis for Substantive Consolidation**

Substantive consolidation of the Debtors and their Estates is an important element of the Debtors' successful implementation of the Plan. The Debtors' proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations, and available information regarding the Debtors' prepetition financial affairs.

Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the cases of affiliated debtors, among other instances. When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single debtor. The United States Court of Appeals for the Third Circuit (the "Third Circuit Court of Appeals"), the circuit in which the Chapter 11 Cases are pending, articulated a test in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), for determining whether substantive consolidation is warranted. In setting forth the test, the Third Circuit Court of Appeals looked to five principles behind substantive consolidation: (i) limiting the cross-creep of

- 57 -

liability by respecting entity separateness is a fundamental ground rule; (ii) the harms substantive consolidation addresses are nearly always those caused by debtors; (iii) mere benefit of administration of the case is hardly a harm calling for substantive consolidation into play; (iv) substantive consolidation should be a rare remedy and one of last resort after considering and rejecting other remedies; and (v) while substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively. *Id.* at 211. Based on these principles, the Third Circuit Court of Appeals held that, in the Third Circuit, the party calling for substantive consolidation must prove: (i) that prepetition, the entities to be consolidated disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) that postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* Substantive consolidation is appropriate if either factor is justified. *Id.*

The Debtors believe that the substantive consolidation provided for under the Plan is appropriate under the standards set forth by the Third Circuit Court of Appeals in the *Owens Corning* case, for several reasons. First, the Debtors believe that, prepetition, many of their creditors effectively treated the Debtors as a single entity. Second, the Debtors believe that while they did observe appropriate corporate formalities and separateness during the prepetition period, as a practical matter the Debtors' business was operated as an integrated enterprise. Third, the Plan provides substantial benefits to creditors, available only to the extent that substantive consolidation provided for in the Plan occurs. Fourth, to the extent that individual Debtors have little or no assets, and the recovery to the creditors of such Debtors is comprised largely of the monetary contributions provided for by the Purchaser, individual restructurings of these Debtors would not be a viable option. Accordingly, the Debtors believe that the Plan's partial substantive consolidation structure is beneficial to creditors.

2.     **Impracticality of Separate Entity Plans**

Substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm individual plans of liquidation for each of the Debtors, which separate plans of liquidation will be prone to inaccuracies that may prejudice certain creditors. Separate plans for each entity will inevitably rest on certain assumptions; for instance, as the Debtors were not managed operationally on an individual entity basis, it is difficult to allocate value and operational costs and benefits on a legal entity basis. In addition, many financial obligations of the Debtors are based on the Debtors as a whole or other combinations of entities that make allocation to legal entities difficult, fact-intensive and subject to challenge. Seeking to overcome the inherent limitations of separate plans of liquidation for each of the Debtors would entail the Debtors' dedication of enormous resources and significant time to the project – and it cannot be assured, even after such an endeavor, that such plan of liquidation would be free of such assumptions, or free of potential prejudice to certain creditors resulting from such assumptions.

The assumptions that the Debtors would necessarily adopt to confirm separate plans of liquidation would likely be the focus of protracted and lengthy litigation. The attendant delay from such litigation could threaten the Debtors' consummation of the plans of liquidation in a timely manner. Even if the Estates were exposed to such a risk and cost, there would still be no assurances that the information contained therein would be accurate on an entity-by-entity

- 58 -

basis (if even available at such time). The Debtors believe that substantive consolidation is warranted in these Chapter 11 Cases because of the connection of assets and liabilities of the Debtors.

3. **Basis for Substantive Consolidation**

Given the significant roadblocks to the proposal of separate, confirmable plans of liquidation, the Debtors reviewed their organizational, operational, and financial history in order to determine the substantive consolidation structure that best meets the application of the existing case law governing substantive consolidation. This Plan is a result of that lengthy and wide-ranging analysis, which revealed that significant creditors conducted business (including extending credit) to the Debtors as consolidated entities, while other creditors extended credit to a single entity.

The factors supporting substantive consolidation are satisfied. The *Owens Corning* court specifically found that entanglement among affiliated debtors provides a basis for substantive consolidation, where, as here, creditors disregarded entity separateness and separating debtor entities would harm creditors.

4. **The Effect of Substantive Consolidation**

Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes. The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors without duplication for purposes of voting on the reorganization plan.

On and after the Effective Date, each of the Debtors will be deemed consolidated for the following purposes under the Plan:

- all assets and liabilities of each of the Debtors will be treated as though they were merged with the assets and liabilities of each other Debtor,

- no Distributions will be made under the Plan on account of any Claim held by a Debtor against any other Debtor,

- except as otherwise set forth in the Plan, no Distributions will be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor,

- all guaranties of any Debtor of the obligations of any other Debtor will be eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors, and

- each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors will be deemed filed against all of the Debtors, and will be one Claim against, and obligation of, the Debtors.

- 59 -

The Plan shall serve as a motion of the Debtors seeking entry of a Bankruptcy Court order approving the substantive consolidation of the Debtors' Estates provided for in the Plan as well as any additional consolidation that may be proposed by the Debtors in connection with confirmation and consummation of the Plan. The Debtors reserve the right to file appropriate alternative pleadings in support of the proposed substantive consolidation in connection with the Plan Confirmation Hearing. Unless an objection to consolidation is made in writing by any creditor affected by the Plan on or before 4:00 p.m. (prevailing Eastern Time), on the date fixed by the Bankruptcy Court for objections to confirmation of the Plan, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Plan Confirmation Hearing.

Upon the Effective Date, without the need for further order of the Bankruptcy Court or motion of, or notice from, the Debtors or the Liquidating Trustee, the Chapter 11 Cases of each of the Debtors shall be deemed closed as of the Effective Date without prejudice to the rights of any party in interest to seek to reopen any of the Chapter 11 Cases under section 350(b) of the Bankruptcy Code; *provided, however*, that the case of Appvion shall remain open until the Liquidating Trustee for Appvion files a motion seeking entry of a final decree closing its case. In accordance with Local Rule 3017-2, the Debtors shall seek entry of separate Orders closing each other case. Furthermore, (i) all motions, contested matters, adversary proceedings and other matters with respect to those closed cases and those Debtors shall be administered in the open case of Appvion, without prejudice to the rights of any party in interest and (ii) the case caption shall be amended to reflect that it is the only remaining open case for each of the Debtors.

## B.  Preservation of Right to Conduct Investigations

The preservation for the Liquidating Trust of any and all rights to conduct investigations under Bankruptcy Rule 2004 is necessary and relevant to the Liquidating Trust and with respect to the prosecution of Litigation Claims and the administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations under Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

## C.  Prosecution and Resolution of Litigation Claims

From and after the Effective Date, the Liquidating Trust shall have the sole responsibility, standing (including derivative standing), and authority to prosecute and settle all Litigation Claims under this Combined Plan and Disclosure Statement and the Plan Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Estates, subject to the provisions of the Plan Documents and the 363 Sale Documents, to pursue, settle, or abandon such Litigation Claims as the sole representatives of the Estates under section 1123(b)(3) of the Bankruptcy Code. Any and all Litigation Claims that are not expressly released or waived under this Combined Plan and Disclosure Statement are reserved and preserved and vest in the Liquidating Trust in accordance with this Combined Plan and Disclosure Statement. No Person may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement or the Plan Supplements to any Litigation Claim against it as any indication that the Debtors or Liquidating Trustee will not investigate or pursue any and all available Litigation Claims against such Person. Such Litigation Claims may

- 60 -

include, but are not limited to, claims for breach of fiduciary duties by certain officers and directors, claims grounded in tort, claims for negligence, claims based upon breach of contract, claims for professional malpractice, and/or claims for or relating to the ESOP (other than Direct ESOP Claims), to the fullest extent permitted by law.  The Liquidating Trustee expressly reserves all Litigation Claims, except for Litigation Claims against any Person that are expressly released or waived under this Combined Plan and Disclosure Statement or have otherwise been released under any agreement or Final Order, including, but not limited to, the 2L/Committee Settlement and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or substantial consummation of this Combined Plan and Disclosure Statement.

Unless otherwise provided in this Plan, for the avoidance of doubt, the Debtors and the Liquidating Trustee expressly reserve the right to pursue all claims and Causes of Action other than the Released D&O Claims.

## D.      **Effectuating Documents and Further Transactions**

Upon entry of the Plan Confirmation Order, the Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, notices, resolutions, programs, and other agreements, instruments, and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, substantially consummate, and/or further evidence the terms and conditions of this Combined Plan and Disclosure Statement and any transactions described in or contemplated by this Combined Plan and Disclosure Statement.  The Debtors or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Allowed Equity Interests receiving Distributions under this Combined Plan and Disclosure Statement or as Beneficiaries of the Liquidating Trust, at the request or direction of the Debtors or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Combined Plan and Disclosure Statement.

## E.      **Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the members, managers, or other owners, direct or indirect, of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) under applicable law, without any further vote, consent, approval, authorization, or other action by such members, managers, or other owners of the Debtors or notice to, order of, or hearing before, the Bankruptcy Court.

## F.      **Real Property**

On the Effective Date, except to the extent otherwise provided in this Combined Plan and Disclosure Statement, all real property rights, title and interests of any and all of the

- 61 -

Debtors, including, without limitation the Owned Real Property, shall transfer to the Purchaser, free and clear of all taxes as provided by section 1146(a) of the Bankruptcy Code.

**G.    Cancellation of Documents**

On the Effective Date, except to the extent otherwise provided in this Combined Plan and Disclosure Statement, any and all notes, instruments, debentures, certificates and other documents evidencing Claims against and Equity Interests in the Debtors shall be deemed automatically extinguished, canceled, and of no further effect with the Debtors having no continuing obligations thereunder, and shall be deemed rejected and terminated; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, the Second Lien Indenture shall continue in effect solely for purposes of (i) enabling Second Lien Noteholders to receive Distributions under the Plan on account of the Allowed Second Lien Secured Note Claims as provided herein, (ii) allowing the Indenture Trustee to make Distributions on account of the Allowed Second Lien Secured Note Claims, as applicable, (iii) preserving the Indenture Trustee's rights to compensation and indemnification under the Second Lien Indenture, (iv) permitting the Indenture Trustee to enforce any obligation owed to it under the Plan, (v) preserving all rights, including rights of enforcement, of the Indenture Trustee against any Person other than a Released Party, and (vi) permitting the Indenture Trustee to appear in the Chapter 11 Cases or in any related proceeding in the Bankruptcy Court or any other court; *provided, further*, that the preceding proviso shall not affect the discharge of Allowed Second Lien Secured Note Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Debtors or to the Liquidating Trust, except to the extent set forth in or provided for under this Combined Plan and Disclosure Statement; *provided, further*, that nothing in this section shall effect a cancellation of any Warrants.

**H.    Termination of Debtors' Plans**

With the exception of the Pension Plan and the PIUMPF, upon the entry of an order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement, the ESOP and all Employee Benefit Plans not assumed by the Purchaser under the 363 Sale Order shall automatically terminate. Title IV of ERISA provides the exclusive means for terminating the Pension Plan. 29 U.S.C. § 1341(a)(1). Shortly after the hearing approving the 363 Sale, the Debtors and the PBGC began discussing various issues with respect to the Pension Plan, including termination thereof. Because the Purchaser is not assuming the Pension Plan, which will be left with the liquidating debtors, the Debtors anticipate that the PBGC will terminate the Pension Plan under 29 U.S.C. § 1342 during the pendency of the Chapter 11 Cases. Appvion withdrew from the PIUMPF and upon the entry of an order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement, the withdrawal liability payments will terminate.

**I.    Corporate Action; Effectuating Documents; Further Transactions**

On the Effective Date, all matters and actions provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the directors, officers, members, or managers of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors, officers, members, and managers of the Debtors. The Debtors and the Liquidating

- 62 -

Trustee are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement.

**J.**   **Release of Liens**

Except as otherwise provided in this Combined Plan and Disclosure Statement, or in any contract, instrument, release, or other agreement or document created under this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other interests in or against any property of the Estates shall be deemed fully released without any further action of any party, including, but not limited to, further Order of the Bankruptcy Court or filing updated schedules or statements typically filed under the Uniform Commercial Code or other applicable law.

**K.**   **Exemption from Securities Laws**

The Purchaser shall be deemed the legal successor of the Debtors within the meaning of section 1145 of the Bankruptcy Code and the offering, issuance and distribution of (a) beneficial interests in the Liquidating Trust under this Combined Plan and Disclosure Statement, (b) the Warrants under this Combined Plan and Disclosure Statement, and (c) all shares of common stock of the Purchaser or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, shall be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable.

In addition, any and all (x) beneficial interests in the Liquidating Trust issued or distributed under this Combined Plan and Disclosure Statement, (y) Warrants issued or distributed under this Combined Plan and Disclosure Statement, and (z) shares of common stock of the Purchaser or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, will be freely tradable by the recipients thereof, subject to: (A) the provisions of Bankruptcy Code section 1145(b)(1) relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, as amended, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (B) in the case of the beneficial interests in the Liquidating Trust, the provisions of the Liquidating Trust Agreement; and (C) in the case of the Warrants, the provisions of the Warrant Agreement.

**L.**   **Exemption from Certain Taxes and Fees**

Under section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer from a Debtor to the Liquidating Trust, or to any other Person under this Combined Plan and Disclosure Statement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Plan

- 63 -

Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the forgoing instruments or other documents without the payment of any such tax or governmental assessment.

## M.  Privileges as to Certain Causes of Action

Effective as of the Effective Date, all Privileges of the Debtors relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust.  The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and is entitled to assert such Privileges.  No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors.  The Debtors' Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement.  Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtors.

## N.  Preservation of Causes of Action

Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, the Plan Confirmation Order or the 2L/Committee Settlement, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and the Liquidating Trustee shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No entity may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement, the Plan Supplement, or the Plan Confirmation Order to any Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Causes of Action against them.  The Debtors and the Liquidating Trustee expressly reserve all rights to prosecute any and all Causes of Action against any entity, except as otherwise expressly provided herein.**  Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, the Debtors and the Liquidating Trustee expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of this Combined Plan and Disclosure Statement.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to this Section IX.N that any of the Debtors may hold against any entity shall be transferred to the Liquidating Trust upon the Effective Date.  The Liquidating Trustee, through its authorized agents or representatives, shall retain and may exclusively

EAST\152399891.23

enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in this Combined Plan and Disclosure Statement.

## O.    Insurance Policies

Nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies, including any replacement or tail policies or coverages following the 363 Sale Effective Date. All of the Debtors' Estates' benefits, rights, interests and proceeds under any Insurance Policy to which the Debtors and/or the Debtors' Estates may be insureds or beneficiaries shall vest with the Liquidating Trust for the benefit of the Beneficiaries of the Liquidating Trust and all of the beneficiaries of such policies.

## P.    Filing of Monthly and Quarterly Reports and Payment of Statutory Fees

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly Liquidating Trust reports shall be the responsibility of the Liquidating Trustee. All Statutory Fees shall be payable as set forth in Section V.C hereof and such obligation shall continue until such time as the Chapter 11 Case of Appvion is closed, dismissed, or converted. All monthly operating reports covering pre-Effective Date periods shall be prepared and filed by the Debtors.

## Q.    Closing of the Chapter 11 Cases

When all Liquidating Trust Assets have been collected, liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Appvion Chapter 11 Case in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

## X. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED PLAN AND DISCLOSURE STATEMENT

## A.    Distribution Record Date; Transferability

The Liquidating Trustee shall set such Distribution Record Dates as may be necessary in accordance with the terms of the Liquidating Trust Agreement. To the fullest extent permitted by applicable law, the beneficial interests in the Liquidating Trust may be assigned or otherwise transferred by any Beneficiary to any Person, subject to the terms of the Liquidating Trust Agreement.

- 65 -

EAST\152399891.23

## B.    Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made under this Combined Plan and Disclosure Statement shall be made by check drawn on a domestic bank or an electronic wire transfer.

## C.    Claims Objection Deadline

The Liquidating Trustee, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall File and serve any objection to any Claim no later than the Claims Objection Deadline; *provided, however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Liquidating Trustee.    The filing of such a motion shall automatically extend the Claims Objection Deadline until entry of an order on account of such motion, in accord with Local Rule 9006-2.

## D.    No Distribution Pending Allowance

Notwithstanding any other provision of this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement.    For the avoidance of doubt, the Second Lien Secured Notes Claims are not Disputed Claims.    The procedures with respect to resolution of Disputed Claims shall be set forth in the Liquidating Trust Agreement.

## E.    Reserve of Cash Distributions

On any date that Distributions are to be made under the terms of this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, the Liquidating Trustee shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.    Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

## F.    Distribution After Allowance

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Liquidating Trustee shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder of an Allowed Claim is then entitled; *provided*, that to the extent any Liquidating Trust Assets have not yet been collected or liquidated by the Liquidating Trustee, including any Litigation Proceeds, such Liquidating Trust Assets shall be distributed to Holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof.

- 66 -

## G.    Delivery of Distributions

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim last Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules if no proof of Claim is Filed and the Liquidating Trustee has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Liquidating Trustee as undeliverable, no further Distribution shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Liquidating Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution under Section X.H of this Combined Plan and Disclosure Statement.

Until such time as an undeliverable Distribution becomes an Unclaimed Distribution, within thirty (30) days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Liquidating Trustee shall make Distributions of all Cash and property that has become deliverable during the preceding quarter. Each such Distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such Distribution would have been due had it then been deliverable to the date that such Distribution becomes deliverable.

The Liquidating Trustee shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions, *provided, however*, nothing contained in this Combined Plan and Disclosure Statement shall require the Liquidating Trustee to locate any Holder of an Allowed Claim.

## H.    Unclaimed Distributions

Any Cash or other property to be distributed under this Combined Plan and Disclosure Statement shall revert to the Liquidating Trustee if it is not claimed by the Holder within one hundred and twenty (120) days after the date of such Distribution. If such Cash or other property is not claimed on or before such date, the Distribution made to such Holder shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.

## I.    Set-Off

Except as otherwise provided herein, the Debtors and Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records. Rights of a setoff against any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action of the Debtors, their Estates, or the Liquidating Trustee and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

- 67 -

**J.**     **Postpetition Interest**

Interest shall not accrue on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Allowed secured claims under section 506(b) of the Bankruptcy Code.

**K.**     **Distributions After Effective Date**

For Disputed Claims as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

**L.**     **Distributions Free and Clear**

Except as may be otherwise provided in this Combined Plan and Disclosure Statement, all Distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

**M.**     **Allocation of Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under this Combined Plan and Disclosure Statement comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**N.**     **De-Minimis Distribution and Donation**

There shall be no Distribution on account of Allowed General Unsecured Claims to the extent such Distribution will result in a payment of less than $50.00 to the Holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the Liquidating Trust. Unless otherwise set forth in this Plan, the Liquidating Trustee may donate remaining Assets of the Liquidating Trust to a charitable institution if the Distribution of such Assets is too costly, too burdensome, or impracticable.

**O.**     **Prepayment**

Except as otherwise provided herein or the Plan Confirmation Order, the Debtors and the Liquidating Trustee, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XI. EXECUTORY CONTRACTS

**A.**     **Rejection of Executory Contracts**

On the Effective Date, all Executory Contracts not previously assumed and/or assigned (including in connection with the 363 Sale and under the 363 Sale Order), not subject to

- 68 -

a pending motion to assume and/or assign as of the Effective Date, not administered under the Transition Services Agreement, or not rejected before the Effective Date, will be deemed rejected. The Plan Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

Unless otherwise specified, each Executory Contract assumed or rejected by the Debtors shall be assumed or rejected *cum onere,* to include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly to any agreement, instrument, or other document that in any manner affects such Executory Contract.

**B.    Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement**

If the rejection by the Debtors, under this Combined Plan and Disclosure Statement or otherwise, of an Executory Contract gives rise to a Claim for rejection damages in accordance with section 502(g) of the Bankruptcy Code, a proof of Claim must be filed with the Claims Agent at the following address:  Prime Clerk LLC, 830 3rd Avenue, 3rd Floor New York, NY 10022, by no later than thirty (30) days after the earlier of (i) the Effective Date or (ii) the date provided in any other applicable Order of the Bankruptcy Court.  Any proofs of Claim with respect to a Rejection Damages Claim not filed within such time shall be forever barred from assertion against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trust Assets, and their property and such Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Rejection Damages Claims, absent further order of the Bankruptcy Court.  All Rejection Damages Claims will be treated as General Unsecured Claims under this Combined Plan and Disclosure Statement and, to the extent they are deemed Allowed General Unsecured Claims, will receive the treatment afforded Allowed General Unsecured Claims.

## XII.    INJUNCTION, EXCULPATION AND RELEASES

**A.    Injunction to Protect Estate Assets**

**From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims or rights giving rise to any equitable relief against the Assets or any Equity Interests in the Debtors arising prior to the Effective Date are permanently enjoined from taking any of the following actions against the Estates, the Released Parties, any member of the Creditors' Committee in its capacity as such, the Liquidating Trust, the Liquidating Trustee, or any of their respective property or Assets (collectively, the "Estate Assets") on account of any such Claims or Equity Interests:  (a) commencing or continuing, in any manner or in any place, any action or proceeding seeking to collect or to recover in any manner against, or assert control or dominion over, the Estate Assets; (b) enforcing, attaching, collecting, or recovering in any manner against the Estate Assets, any judgment, award, decree or order; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Estate Assets; (d) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Plan Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right**

- 69 -

of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan; *provided, however*, that such Persons and Entities shall not be precluded from exercising their rights under and consistent with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement.

## B.     Term of Injunctions or Stays

Unless otherwise provided in this Combined Plan and Disclosure Statement or Plan Confirmation Order, all injunctions or stays in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court) and existing on the Plan Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of the Effective Date and the date indicated in the Order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, as applicable.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## C.     Injunction Against Interference with Plan

Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the Debtors', the Liquidating Trust's, the Liquidating Trustee's, and their respective Related Persons' implementation or substantial Consummation of this Combined Plan and Disclosure Statement.   Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

## D.     Exculpation

**The Exculpated Parties shall not have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, action, proceeding, Cause of Action, Avoidance Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, setoff, or right to payment arising or accruing on or after the Petition Date, or the decision to initiate these Chapter 11 Cases, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, admitted, secured, or unsecured, with or without priority, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claim Holder or Holder of an Equity Interest, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation, solicitation, Filing, and confirmation of this Combined Plan and Disclosure Statement, the pursuit of confirmation of this Combined Plan and Disclosure Statement, the substantial Consummation or Consummation of this Combined Plan and Disclosure Statement, the**

- 70 -

administration of this Combined Plan and Disclosure Statement, or the property to be liquidated and/or distributed under this Combined Plan and Disclosure Statement, except for their fraud, willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Combined Plan and Disclosure Statement. With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be as provided for by Bankruptcy Code section 1125(e). Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

E.    **Releases**

1.    **Debtor Releases**

Except as may otherwise be expressly provided in this Combined Plan and Disclosure Statement, as of the Effective Date, for good and valuable consideration provided by each of the Released Parties and each member of the Creditors' Committee (solely in its capacity as such), the adequacy of which is hereby confirmed, on the Plan Confirmation Date and effective as of the Effective Date, to the fullest extent permitted under applicable law, the Released Parties are deemed released and discharged by the Debtors and the Estates of and from any and all Claims, interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, setoffs and liabilities (other than the rights of the Debtors to enforce this Combined Plan and Disclosure Statement, and the contracts, instruments, releases, and other agreement or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act or omission, transaction, event, or other occurrences, whether direct or derivative, taking place on or prior to the Effective Date in connection with, or related to, (i) the Debtors or their operations; (ii) the Chapter 11 Cases; (iii) any investment by any Releasing Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest in the Debtors; (iv) any action or omission with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases; (vi) the negotiation, formulation, preparation, entry into, or dissemination of the (a) the Prepetition Credit Agreement; (b) 363 Sale Documents; (c) the DIP Credit Agreements; (d) the Second Lien Indenture and related documents; (e) the Combined Plan and Disclosure Statement; and (f) any other action or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; (vii) any Challenge Proceeding (as defined in the DIP Credit Agreements) including the transactions referenced or described in the Standing Motion; and (viii) any action taken in furtherance of the formation of the Purchaser, other than with respect to Claims, causes of action or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or gross negligence.

EAST\152399891.23

Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Liquidating Trustee's, or the Debtors' Estates asserting any claim, Cause of Action or other assertion of liability released pursuant to the Debtor Release.

Notwithstanding anything to the contrary contained in the Combined Plan and Disclosure Statement, and notwithstanding anything to the contrary contained in the Confirmation Order, the PBGC does not release, discharge, or exculpate any claim or cause of action relating to any liability under Title I or Title IV of ERISA against any persons or entities other than the Debtors in these Chapter 11 Cases. For the avoidance of doubt, nothing in this Plan or the Confirmation Order shall enjoin, impair, or prevent the PBGC from pursuing or collecting any such liability from any liable party.

Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any claims of or obligations owed to Domtar, or the first priority liens and security interests of Domtar, arising under the Supply Agreement and the Consignment Agreement (the "Domtar Agreements"), the Domtar DIP Order and applicable law, and provided for in the order of the Bankruptcy Court dated May 14, 2018 [D.I. 751] approving the sale of substantially all of the Debtors' assets to the Purchaser (the "Sale Order"), including but not limited to the cure obligation set forth in the Sale Order and any unpaid post-petition obligations and any obligations owed to Domtar under the Domtar Agreements, which have been assumed by the Purchaser.

2.       Releases by Holders of Claims

To the fullest extent permitted under applicable law, all of the Releasing Parties shall be deemed fully, completely, unconditionally, irrevocably, and forever to release the Released Parties of and from any and all Claims and causes of action and any other debts, obligations, rights, suits, damages, actions, setoffs, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to (i) the Debtors or their operations; (ii) the Chapter 11 Cases; (iii) any investment by any Releasing Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of

EAST\152399891.23

any security, asset, right, or interest in the Debtors; (iv) any action or omission of any Releasing Party with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases; (vi) the negotiation, formulation, preparation, entry into, or dissemination of the (a) the Prepetition Credit Agreement; (b) the 363 Sale Documents; (c) the DIP Credit Agreements; (d) the Second Lien Indenture and related documents; (e) the Combined Plan and Disclosure Statement; and (f) any other action or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, related thereto; (vii) any Challenge Proceeding (as defined in the DIP Credit Agreements) including the transactions referenced or described in the Standing Motion; and (viii) any action taken in furtherance of the formation of the Purchaser. Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

3.   Waiver of Statutory Limitations on Releases

Each of the parties providing the releases contained in Sections XII.E.I and XII.E.II above expressly acknowledges that although ordinarily a general release may not extend to Claims or causes of action that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Combined Plan and Disclosure Statement are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

F.   **Necessity and Approval of Releases and Injunctions**

The releases, exculpations, and injunctions set forth in Section XII of this Combined Plan and Disclosure Statement are not severable and are appropriately tailored and constitute integral consideration and critical parts of this Combined Plan and Disclosure Statement, and the Released Parties have relied on the efficacy and conclusive effects of such

- 73 -

releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions and exchanging consideration in connection with the Chapter 11 Cases and under this Combined Plan and Disclosure Statement. Under Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases, exculpations, and injunctions set forth in Section XII of this Combined Plan and Disclosure Statement and shall constitute the Bankruptcy Court's finding that such releases, exculpations, and injunctions are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement asserting any Claims or causes of action released under the Plan in favor of the Released Parties.

**G.** **Releases, Exculpations, Waivers and Injunctions under Plan and Related Documents Shall Not Affect Fifth Third Bank and KeyBank Suits for Damages under DIP Credit Agreement**

Notwithstanding anything in the Combined Plan and Disclosure Statement, any other Plan Documents, and/or the Plan Confirmation Order to the contrary, the releases, exculpations, waivers and injunctions provided under such Combined Plan and Disclosure Statement, any other Plan Document, and/or the Plan Confirmation Order, including, without limitation, Section XII of such Combined Plan and Disclosure Statement, shall not affect in any way, and shall not provide any releases, exculpations, waiver and/or injunctions or otherwise affect in any way, the claims and causes of action asserted or that may be asserted (including claims that may be asserted against additional parties) against any of the current defendants (and/or the agents and/or other parties to the DIP Credit Agreement) in the Supreme Court of New York for the County of New York in civil actions captioned (a) KeyBank National Association vs. Franklin Advisors Inc., et al., Index No. 651517/2018 and (b) Fifth Third Bank vs. Franklin Advisors, Inc., et al., Index No. 651518/2018, along with (c) any successor or related action(s) and or as such litigation(s) may have been or may be in the future be transferred, removed or remanded (as and if applicable) under applicable law (collectively, the "Litigations"), and any related claims, rights, defenses or counterclaims thereto; provided, however, that the plaintiffs in the Litigations agree that no claim or cause of action in the Litigations shall constitute a collateral attack on any order of this Court (including, but not limited to, this Sale Order, the Initial DIP Order, the Senior DIP Order), the DIP Facility Documents (as defined in the Initial DIP Credit Agreement), or the Senior DIP Facility Documents (as defined in the Senior DIP Credit Agreement).

**XIII.** **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.** **General**

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Allowed Claims. This summary does not address the federal income tax consequences to Holders of

- 74 -

Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, or Holders whose Claims are entitled to payment in full in Cash.

This summary is based on the Internal Revenue Code ("IRC"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.      Consequences to the Debtors**

1.      Asset Disposition

The sale of the Debtors' Assets during the pendency of the Plan may produce taxable income, but the Debtors are not expected to be taxed on such taxable income as they do not pay income tax.

2.      Cancellation of Debt

The Debtors may realize cancellation of debt ("COD") income by reason of the discharge of the Debtors' indebtedness. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of Cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). Consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not expect to incur COD as a result of the implementation of the Plan prior to the distribution of all or substantially all of its Assets (other than to the extent any Allowed Claim's Distribution is subject to a maximum or has been or is separately settled for less than its carrying value).  The Debtors are not expected to be taxed on any COD incurred as the Debtors do not pay income tax.

- 75 -

3.      Transfer of Assets to Liquidating Trust

        The Debtors' transfer of Assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtors, depending in part on the value of such Assets on the date of such transfer to the Liquidating Trust relative to the Debtors' tax basis in such Assets. As indicated above, the Debtors are not expected to be taxed on any gain as they do not pay income tax.

C.      **Consequences to Holders of Claims and Equity Interests**

1.      Realization and Recognition of Gain or Loss, In General

        The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the Holder's Claim, when the Holder receives payment in respect of such Claim or Equity Interest, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim at a discount, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes. A Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

        Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust Interests and Pro Rata share of the Warrants), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, including, as discussed below, any beneficial interests in a Liquidating Trust or Pro Rata share of the Warrants (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

        When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

        As discussed below, each Holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trustee will in good faith value the Assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims and Equity Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

- 76 -

A Holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the Assets of the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying Assets of the Liquidating Trust.

A Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the establishment of a Liquidating Trust. A Holder's tax basis in the Warrants should equal the fair market value of the Holder's Pro Rata share of the Warrants and the holding period of the Warrants received on the Effective Date would begin on the date following the Effective Date.

2.      Allocation of Consideration to Interest

Pursuant to the Section X.M of the Plan, all Distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received (whether stock, Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

**D.      Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests**

1.      Classification of the Liquidating Trust

A Liquidating Trust, if created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the Liquidating Trust Beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any Liquidating Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that any Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may

- 77 -

not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

> 2.      General Tax Reporting by the Liquidating Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those Assets, directly to the Holders of the respective Claims or Equity Interests receiving Liquidating Trust Interests (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the Holders of such Assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its Assets (valued at their tax book value, and other than Assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

- 78 -

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a Holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent Distribution to the Holder. In general, a Distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the Beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a granter trust pursuant to Treasury Regulation section 1.671-4(a). The Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

## E.    Tax Treatments of Holders of Warrants

As described above, certain Holders of Allowed Claims that receive a Pro Rata share of the Warrants and other consideration should be treated as exchanging such Allowed Claim for the Warrants and other consideration in fully taxable exchange.

Holders of Warrants generally will not realize gain or loss upon the exercise of the Warrants into common stock of the Purchaser. A Holder's basis in the stock of the Purchaser received upon the exercise of such Holder's Warrants will equal the sum of (i) the exercised portion of the fair market value of such Holder's Pro Rata share of the Warrants on the Effective Date and (ii) the aggregate exercise price of the exercised Warrants. A Holder's holding period

EAST\152399891.23

in the stock of the Purchaser acquired through exercise of Warrants will begin on the date of exercise of the Warrants.

Sales or other taxable dispositions (including lapse of unexercised Warrants) by Holders of Warrants generally will give rise to gain or loss equal to the difference between the amount realized on the disposition, if any, and the Holder's tax basis in such Warrants. In general, gain or loss recognized on the sale or exchange of Warrants may be long-term capital gain or loss if the Warrants disposed of are capital assets in the hands of the Holder and have been held for more than one year. Each Holder should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

## F.    <u>Withholding on Distributions, and Information Reporting</u>

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. *A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trustee.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated

- 80 -

by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## XIV.    CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE

### A.    Conditions Precedent to Confirmation

Confirmation of this Combined Plan and Disclosure Statement shall not occur, and the Plan Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived in accordance with Section XIV.E of the Plan:

1.    The proposed Plan Confirmation Order shall be reasonably acceptable in form and substance to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

2.    The Plan Supplements and any other exhibits or schedules incorporated as part of this Combined Plan and Disclosure Statement are in form and substance reasonably acceptable to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

### B.    Conditions Precedent to the Effective Date

This Combined Plan and Disclosure Statement shall not become effective unless and until the following conditions shall have been satisfied or waived in accordance with Section XIV.E of the Plan:

1.    The Plan Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance reasonably acceptable to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

2.    The Plan Confirmation Date shall have occurred and no request for revocation of the Plan Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

3.    All actions, documents, and agreements necessary to implement this Combined Plan and Disclosure Statement, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Plan and Disclosure Statement, including the Liquidating Trust Agreement, shall have been effectuated or executed.

4.    The absence of any pending or threatened government action or any law that has the effect of or actually does prevent Consummation of any transaction contemplated under this Combined Plan and Disclosure Statement.

5.    All Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose.

- 81 -

6. The 363 Sale Effective Date shall have occurred.

7. The Liquidating Trust Agreement shall have been executed by the Liquidating Trustee in form and substance reasonably acceptable to the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

8. The Warrant Agreement shall have been executed by the Purchaser in form and substance acceptable to the Ad Hoc Group of Second Lien Noteholders, and the Warrants shall have been issued by the Purchaser to the Debtors for the benefit of the Second Lien Noteholders.

9. All terms and conditions of the 2L/Committee Settlement have been satisfied.

## C. Establishing the Effective Date

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions the Effective Date, which date will be selected by the Debtors in consultation with the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

## D. Effect of Failure of Conditions

If each condition to the Effective Date has not been satisfied or duly waived within one hundred and twenty (120) days after the Plan Confirmation Date, then upon motion by any party in interest if applicable, and upon notice to such parties in interest as the Bankruptcy Court may direct, the Plan Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that notwithstanding the Filing of such motion, the Plan Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtors, if applicable, before any Order granting such relief becomes a Final Order. If the Plan Confirmation Order is vacated, this Combined Plan and Disclosure Statement shall be deemed null and void in all respects and nothing contained herein shall (i) constitute an admission or a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtors; *provided, however*, that if the Plan Confirmation Order is vacated, neither the 2L/Committee Settlement nor the 363 Sale Order shall be vacated and both shall remain in full force and effect.

## E. Waiver of Conditions to Confirmation and Effective Date

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, the Majority DIP Lender and the Ad Hoc Group of Second Lien Noteholders, and, in the case of the conditions set forth in Sections XIV.A.1, XIV.A.2, XIV.B.1, XIV.B.2, and XIV.B.3, without notice or an Order of the Bankruptcy Court.

- 82 -

## XV.     **RETENTION OF JURISDICTION**

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent provided by law, including, without limitation over all matters arising in, arising under, and related to the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement are carried out. The Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases, this Combined Plan and Disclosure Statement, and the Liquidating Trust Agreement for, among other things, the following purposes:

1.     To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

2.     To enter and implement such Orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, or vacated;

3.     To issue such Orders in aid of execution and Consummation of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

4.     To consider any amendments to or modifications of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Plan Confirmation Order;

5.     To hear and determine all requests for compensation and reimbursement of expenses under section 330 or 503 of the Bankruptcy Code;

6.     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Combined Plan and Disclosure Statement, the DIP Credit Agreements, the 363 Sale Documents, and the Liquidating Trust Agreement, including the releases, exculpations, and injunctions provided hereunder;

7.     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

8.     To hear any other matter not inconsistent with the Bankruptcy Code;

9.     To enter a final decree closing the Chapter 11 Cases;

10.     To ensure that Distributions to Holders of Allowed Claims are accomplished under the provisions of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

11.     To decide or resolve any motions, adversary proceedings, contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, the DIP Credit

- 83 -

Agreements, the 363 Sale Documents, including those brought by the Liquidating Trustee on behalf of the Liquidating Trust;

12.    To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

13.    To approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidating Trust;

14.    To resolve any dispute or matter arising under or in connection with the Liquidating Trust, including any request for an extension of the term of the Liquidating Trust;

15.    To determine any other matters that may arise in connection with or related to this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, the DIP Credit Agreements, the 363 Sale Documents, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement;

16.    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed), including, without limitation, the 363 Sale Order;

17.    To resolve disputes concerning the 363 Sale Agreement, the 363 Sale Order, and any related documents or matters;

18.    To resolve disputes concerning the 2L/Committee Settlement, and any related documents or matters;

19.    To resolve disputes concerning the Prepetition Credit Agreement, including the State Court Lender Dispute, or DIP Credit Agreements and any related documents or matters.

20.    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

21.    To hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance; and

22.    To resolve any other matter or for any purpose specified in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, or any other document entered into in connection with any of the foregoing.

- 84 -

# XVI.   MISCELLANEOUS PROVISIONS

## A.   Amendment or Modification of this Combined Plan and Disclosure Statement

This Combined Plan and Disclosure Statement or any exhibits hereto, including, without limitation, the Plan Supplement, may be amended, modified, or supplemented by the Plan Proponents with the consent of the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders and consistent with the terms of the 2L/Committee Settlement in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure under section 1125 of the Bankruptcy Code. In addition, after the Plan Confirmation Date, the Debtors or Liquidating Trustee, as applicable, with the consent of the Ad Hoc Group of Second Lien Noteholders and the Creditors Committee and consistent with the terms of the 2L/Committee Settlement, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Combined Plan and Disclosure Statement or the Plan Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Combined Plan and Disclosure Statement. The Debtors may make appropriate technical adjustments and modifications to this Combined Plan and Disclosure Statement prior to the Effective Date without further order or approval of the Bankruptcy Court. Notwithstanding the foregoing, any amendment, modification, supplement or adjustment to this Combined Plan and Disclosure Statement, any exhibits thereto, or the Plan Confirmation Order that adversely affect a Released Party, shall require the prior written consent of such Released Party.

## B.   Severability

This Combined Plan and Disclosure Statement is not severable; all of the terms and conditions are fully integrated. Nevertheless, if, prior to the entry of the Plan Confirmation Order, any term or provision of this Combined Plan and Disclosure Statement is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Combined Plan and Disclosure Statement will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable under its terms.

## C.   Revocation or Withdrawal of this Combined Plan and Disclosure Statement

The Plan Proponents reserve the right to revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date. If the Plan Proponents revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date, then this Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or

EAST\152399891.23

against the Debtors or the Liquidating Trustee or to prejudice in any manner the rights of the Debtors or the Liquidating Trustee in any further proceedings involving the Debtors.

**D.    Binding Effect**

   This Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Interests, and the Released Parties and their respective successors and assigns.

**E.    Notices**

   All notices to or requests of the Plan Proponents or Liquidating Trustee by parties in interest in connection with this Combined Plan and Disclosure Statement shall be in writing and delivered either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery, all charges prepaid, and shall be deemed to have been given when received by:

   If to the Debtors (prior to the Effective Date):

     Appvion, Inc.
     825 East Wisconsin Avenue, P.O. Box 359
     Appleton, Wisconsin 54912.
     Attn:  Alan Holtz

     -with a copy to-

     DLA Piper LLP (US)
     444 W. Lake Street, Suite 900
     Chicago, Illinois, 60601
     Attn:  Richard A. Chesley, Esq.

     DLA Piper LLP (US)
     1201 North Market Street, Suite 2100
     Wilmington, Delaware 19801
     Attn:   Stuart M. Brown, Esq.
       Kaitlin Mackenzie Edelman, Esq.

     DLA Piper LLP (US)
     1251 Avenue of the Americas, 27th Floor
     New York, New York 10020
     Attn:   Jamila Justine Willis, Esq.

   If to the Liquidating Trustee and the Debtors (after the Effective Date):

     Liquidating Trustee
     c/o Alan D. Halperin
     Halperin Battaglia Benzija, LLP

EAST\152399891.23

40 Wall Street, 37th Floor
New York, New York 10005
Email: ahalperin@halperinlaw.net

and

Eugene I. Davis
PIRINATE Consulting Group, LLC
5 Canoe Brook Drive
Livingston, New Jersey 07039
Email: genedavis@pirinateconsulting.com

If to the Majority DIP Lender or the Purchaser:

Franklin Advisors, Inc.
c/o O'Melveny & Myers LLP
Seven Times Square
New York, New York
Attn: Daniel Shamah, Esq.

**F.    Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to this Combined Plan and Disclosure Statement provides otherwise, the rights and obligations arising under this Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**G.    Withholding and Reporting Requirements**

In connection with the Consummation of this Combined Plan and Disclosure Statement, the Debtors and the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. All Beneficiaries, as a condition to receiving any Distribution, shall provide the Liquidating Trustee with a completed and executed Form W-9. Failure to timely provide the Liquidating Trustee with a completed and executed Form W-9 may result, at the option of the Liquidating Trustee, in the forfeiture by a Holder of Claim of its Distribution under the Plan and Liquidating Trust Agreement.

**H.    Headings**

Headings are used in this Combined Plan and Disclosure Statement for convenience and reference only, and shall not constitute a part of this Combined Plan and Disclosure Statement for any other purpose.

**I.    Exhibits/Schedules**

- 87 -

The Plan Documents are an integral part of this Combined Plan and Disclosure Statement, and are hereby incorporated by reference and made a part thereof.

**J.      Filing of Additional Documents**

On or before substantial Consummation of this Combined Plan and Disclosure Statement, the Debtors or Liquidating Trustee, as applicable, shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement; *provided that* the Plan Supplement shall be Filed on or before August 7, 2018.

**K.      No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in this Combined Plan and Disclosure Statement shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**L.      Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assignee of such Person or Entity.

**M.      Reservation of Rights**

Except as expressly set forth herein, this Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Plan Confirmation Order. None of the Filing of this Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights or Causes of Action of the Debtors, Holders of Claims, or Equity Interest before the Effective Date.

**N.      Inconsistency**

In the event of any inconsistency among this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, or any other instrument or document created or executed under this Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall govern; *provided that* in the event of any inconsistency among this Combined Plan and Disclosure Statement and the Plan Confirmation Order, the provisions of the Plan Confirmation Order shall govern.

**O.      Dissolution of the Debtors**

Immediately following the Distribution of all of the Debtors' and the Estates' property under the terms of this Combined Plan and Disclosure Statement, on the Effective Date, the Debtors' members, directors, managers, and officers and any remaining employees shall be deemed to have resigned, the entity dissolved for all purposes and of no further legal existence

EAST\152399891.23

under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and, as to Appvion, upon termination of the Liquidating Trustee or the wind down of the Liquidating Trust, Appvion shall be deemed dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the Delaware or any other authority.

P.      **Dissolution of the Creditors' Committee**

Upon the occurrence of the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of this Combined Plan and Disclosure Statement, and (iv) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

## XVII.     RISKS AND OTHER CONSIDERATIONS

A.      **Bankruptcy Considerations**

Although the Plan Proponents believe that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm this Combined Plan and Disclosure Statement as proposed. Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived. In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within one hundred and twenty (120) days after the Plan Confirmation Date, which period may be extended by the Plan Proponents, then the Plan Confirmation Order may be vacated, no Distributions will be made under this Combined Plan and Disclosure Statement, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests,

- 89 -

as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponents believe that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operating Expenses or make Distributions to the Liquidating Trust Beneficiaries.

**B.      No Duty to Update Disclosures**

The Plan Proponents have no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so under an Order of the Bankruptcy Court.  Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.      Alternatives to Confirmation and Consummation of the Plan**

**1.      Alternate Plan**

If this Combined Plan and Disclosure Statement is not confirmed, the Debtors or any other party in interest (if, under section 1121 of the Bankruptcy Code, the Debtors have not Filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan.  Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance).  The Plan Proponents believe that this Combined Plan and Disclosure Statement, which is the result of extensive negotiations provides for an orderly and efficient liquidation of the Debtors' remaining Assets and enables creditors to realize the best return under the circumstances.

**2.      Chapter 7 Liquidation**

If a plan under chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, under applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtors for Distribution in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponents believe that such a liquidation would result in smaller Distributions being made to the Debtors' creditors than those provided for in this Combined Plan and Disclosure Statement because (a) the likelihood that other Assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation. *See* Liquidation Analysis, attached to this Plan as **Exhibit B**.

**D.      Certain Federal Tax Consequences**

- 90 -

1.    **General**

The following discussion summarizes certain material U.S. federal income tax consequences to Holders of Claims entitled to vote on this Combined Plan and Disclosure Statement. This discussion is based on current provisions of the IRC, applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the IRS. There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the Holders of Claims, the Liquidating Trust, or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in this Combined Plan and Disclosure Statement. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on this Combined Plan and Disclosure Statement or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount, and timing of income, gain, or loss recognized as a consequence of this Combined Plan and Disclosure Statement and the Distributions provided for hereby may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions hereunder in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal

- 91 -

income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by this Combined Plan and Disclosure Statement.

**The following discussion is intended only as a summary of certain U.S. federal tax consequences of this Combined Plan and Disclosure Statement and is not a substitute for careful tax planning with a tax professional. The following discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances. Accordingly, each Holder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of this Combined Plan and Disclosure Statement.**

2. **U.S. Federal Income Tax Consequences to the Debtors**

If there is a discharge of a debt obligation by a debtor (or, in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt income, which must be included in the debtor's income (or, in the case of a debtor that is treated as a disregarded entity for U.S. federal income tax purposes, in the income of its owner). However, the Debtors should be able to utilize a special tax provision that excludes from income debts discharged in a chapter 11 case. Notably, the Debtors may not recognize income as a result of the discharge of debt under this Combined Plan and Disclosure Statement because section 108 of the IRC provides that taxpayers in bankruptcy cases do not recognize income from discharge of indebtedness. A taxpayer is, however, required to reduce its "tax attributes" by the amount of the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses for the taxable year of the discharge, and any net operating loss carryover to such taxable year; (ii) general business credits; (iii) minimum tax credits; (iv) capital loss carryovers; (v) the basis of the property of the taxpayer; (vi) passive activity loss and credit carryovers; and (vii) foreign tax credit carryovers.

3. **U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust**

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtors are not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement will require all relevant parties to treat, for federal income tax purposes, the transfer of the Debtors' Assets to the Liquidating Trust as (i) a transfer of such Assets to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such Assets by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the Beneficiaries of the Liquidating Trust being

EAST\152399891.23

treated as the grantors and owners of the Liquidating Trust. Each Beneficiary of the applicable Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of Cash and the fair market value of any other Assets received or deemed received for U.S. federal income tax purposes under this Combined Plan and Disclosure Statement in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-Cash asset under this Combined Plan and Disclosure Statement in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

Beneficiaries of the Liquidating Trust should value the Assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the Assets transferred to the Liquidating Trust.

Consistent with the treatment of the Liquidating Trust as a grantor trust, each Holder should report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any Distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a Distribution of underlying Assets from the Liquidating Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such Assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of Distributions from the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust as a grantor trust under Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

- 93 -

4.      **U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust**

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Liquidating Trust should be treated as receiving from the Debtors their respective shares of the applicable Assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such Assets to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the Assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the Assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of Cash and fair market value of the Assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a Beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the IRS may assert that any loss should not be recognizable until the Liquidating Trustee makes their final Distributions of the Assets of the Liquidating Trust Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final Distribution of the Assets of the Liquidating Trust.

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Assets of the Debtors are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust's Assets, as an

- 94 -

amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) under this Combined Plan and Disclosure Statement is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash or other property should be attributable to accrued but unpaid interest is unclear. The Debtors and the Liquidating Trust intend to take the position that such Cash or property distributed under this Combined Plan and Disclosure Statement will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under this Combined Plan and Disclosure Statement that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

EAST\152399891.23

# XVIII. RECOMMENDATION AND CONCLUSION

The Plan Proponents and the Creditors' Committee believe that this Combined Plan and Disclosure Statement is in the best interests of the Estates and the Creditors and urge the Holders of impaired Claims entitled to vote to vote to accept this Combined Plan and Disclosure Statement and to evidence such acceptance by properly voting and timely returning their Ballots.

**OLDAPCO, INC. (f/k/a APPVION, INC.)**

By: /s/ *Alan D. Holtz*
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO PDC CORP. (f/k/a PAPERWEIGHT DEVELOPMENT CORP.)**

By: /s/ *Alan D. Holtz*
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO PDC CAP CORP. (f/k/a PDC CAPITAL CORPORATION)**

By: /s/ *Alan D. Holtz*
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO ARFI LLC (f/k/a APPVION RECEIVABLES FUNDING I LLC)**

By: /s/ *Alan D. Holtz*
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

- 96 -

**OLDAPCO APVN LLC (f/k/a APVN HOLDINGS LLC)**

By: /s/ Alan D. Holtz
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

EAST\152399891.23

**EXHIBIT A**

**PLAN SUPPLEMENT**

EAST\158243192.2

## SCHEDULE 1:

**Form of Liquidating Trust Agreement**

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "Agreement"), dated and effective as of _____, 2018 by and among Oldapco, Inc. (f/k/a Appvion, Inc.); Oldapco PDC Corp. (f/k/a Paperweight Development Corp.); Oldapco PDC Cap Corp. (f/k/a PDC Capital Corporation); Oldapco ARFI LLC (f/k/a Appvion Receivables Funding I LLC); and Oldapco APVN LLC (f/k/a APVN Holdings, LLC) (collectively, the "Debtors"), Alan D. Halperin, as co-trustee ("Halperin Trustee") and Eugene I. Davis, as co-trustee ("Davis Trustee", and collectively with Halperin Trustee, the "Trustees"), provides for the establishment of a liquidating trust (the "Liquidating Trust") under the terms of the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation, dated _____, 2018 [Dkt No. ___] (as may be amended, modified or supplemented, the "Plan") confirmed by the United States Bankruptcy Court for the District of Delaware (the "Court") by order dated _____, 2018 [Dkt No. ___] (the "Confirmation Order") in the Debtors' Chapter 11 cases jointly administered under Case Number _____ (the "Cases").

## WITNESSETH

WHEREAS, on October 1, 2017, each of the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Court;

WHEREAS, the Plan became effective on _____, 2018 (the "Effective Date"), and copies of the Plan and the Confirmation Order are attached hereto as Exhibits "A" and "B" respectively, and are incorporated herein by reference;

WHEREAS, this Agreement is executed to establish the Liquidating Trust and to facilitate implementation of the Plan;

WHEREAS, the Plan provides for the Liquidating Trust to be established in order to, among other things, receive and liquidate the Liquidating Trust Assets, prosecute, settle or resolve the Disputed Claims, investigate, assert, prosecute or settle the Litigation Claims, make Distributions in accordance with the provisions of the Plan, and take any and all other actions not inconsistent with the terms of the Plan and this Agreement that are necessary or appropriate to effectuate the wind-up and liquidation of the Debtors and their Estates;

WHEREAS, the primary purposes of the Liquidating Trust are: (a) investigating, asserting, prosecuting and/or settling the Litigation Claims, and (b) liquidating the Liquidating Trust Assets, including (without limitation) the Litigation Claims, for the benefit of Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims in accordance with Treasury Regulation Section 301.7701-4(d) and distributing such assets to the Beneficiaries as provided for in the Plan;

WHEREAS, the Liquidating Trust shall not be operated with the objective of continuing or engaging in the conduct of a trade or business, except to the extent reasonably necessary to

**DRAFT**

preserve or enhance the liquidation value of the Liquidating Trust Assets, and consistent with the liquidating purpose of the Liquidating Trust;

WHEREAS, this Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes, and the Trustees shall operate and maintain the Liquidating Trust in compliance with the guidelines for liquidating trusts as set forth in the applicable provisions of Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation Sections 1.671-4(a) and 301.7701-4(d) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service, U.S. Treasury Department and other applicable legislative, administrative, regulatory and judicial agencies and departments; and

WHEREAS, pursuant to the Plan, the Debtors, the Trustees and the Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust as a transfer of the Liquidating Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Second Lien Secured Note Claims and their Allowed General Unsecured Claims, followed by a transfer of the Liquidating Trust Assets by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interest therein, and to treat the Beneficiaries as the grantors and owners of the Liquidating Trust in accordance with Treasury Regulation § 301.7701-4.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein and in the Plan, the Debtors and the Trustees agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATIONS

1.1   Definitions.  The following definitions apply to the capitalized terms wherever those terms appear throughout this Agreement.  Any capitalized term defined in the prefatory paragraph, the recitals, this Section or any Section below shall have the meaning ascribed to such term therein.  Any capitalized term not otherwise defined in this Agreement shall have the meaning set forth in the Plan.

1.1.1   "Available Cash" shall mean the aggregate cash proceeds of the Liquidating Trust Assets available for Distribution to the Beneficiaries after (a) satisfaction of Allowed Other Claims in accordance with the terms of the Plan, (b) repayments of the Plan Contribution Payment, and (c) payment of the PBGC Priority Payment, and subject to reserves for Liquidating Trust Operating Expenses, Disputed Claims and any other reserves determined in the Trustees' reasonable discretion.

1.1.2   "Beneficiaries" and each, a "Beneficiary", shall mean Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims.  For the avoidance of doubt, Holders of Allowed Other Claims are not Beneficiaries.

1.1.3   "DTC" shall mean the Depository Trust Company.

EAST\158265739.3 -2-

NY 77263700

**DRAFT**

1.1.4   "DTC Account" shall mean account # [_____] at the DTC.

1.1.5   "Indemnified Parties" shall have the meaning ascribed to such term in Section 7.6 of this Agreement.

1.1.6   "Member" and "Members" shall have the meanings ascribed to such terms in Section 11.1 of the Agreement.

1.1.7   "Other Claims" shall mean General Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims.

1.1.8   "PBGC Priority Payment" shall mean the $350,000 payable to the Pension Benefit Guaranty Corporation on account of its Allowed Other Priority Claim in accordance with the settlement approved by the Bankruptcy Court [Docket _____].

1.1.9   "Permitted Investments" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Court may approve from time to time, or (d) demand deposits or certificates of deposit at any bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000.  The Trustees may take action reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust; provided, however, that the scope of any Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. Permitted Investments shall not include listed stocks or securities.

1.2   Interpretation.  The headings in this Agreement are for convenience only and shall not affect the meaning or understanding of this Agreement or any provision hereof.  Words defined, denoted or stated in the singular form also include the plural form and vice versa, and words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to."  The word "or" is not exclusive.

1.3   Particular Words.  Reference in this Agreement to any Section or Article is, unless otherwise specified, to such Section or Article under this Agreement.  The words "hereof," "herein," "hereto" and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

ARTICLE II

DECLARATION OF TRUST

EAST\158265739.3 -3-

NY 77263700

**DRAFT**

      2.1   <u>Creation and Name</u>.  The Debtors, on behalf of themselves and the Beneficiaries, and the Trustees hereby create the Liquidating Trust, which shall be known as the "Appvion Liquidating Trust", which is the trust referred to as the "Liquidating Trust" in the Plan.  The Trustees may conduct the affairs of the Liquidating Trust under the name of the "Appvion Liquidating Trust."

      2.2   <u>Purpose of Liquidating Trust</u>.  Pursuant to the Plan, the Liquidating Trust is created for the purpose of collecting, liquidating and distributing the Liquidating Trust Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement, the Plan and Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  The activities of the Liquidating Trust shall be limited to those activities set forth in this Agreement and as otherwise contemplated by the Plan.  The Trustees shall make continuing efforts to collect and liquidate the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust.

      2.3   <u>Transfer of Liquidating Trust Assets</u>.  As of the Effective Date, the Debtors irrevocably grant, release, assign, convey, transfer and deliver, on behalf of the Beneficiaries, all of the Debtors' right, title and interest in the Liquidating Trust Assets to the Liquidating Trust in trust for the benefit of the Beneficiaries, pursuant to sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code and in accordance with the Plan and Confirmation Order and notwithstanding any prohibition on assignment under nonbankruptcy law, and the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of any and all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible under section 1141(c) of the Bankruptcy Code for the uses and purposes as specified in this Agreement and the Plan, but subject only to (i) the Allowed General Unsecured Claims and the Allowed Second Lien Secured Note Claims of the Beneficiaries, (ii) the Liquidating Trust Operating Expenses, including the obligation of the Liquidating Trust to repay the Plan Contribution Payment in accordance with the terms of the Plan and the 2L/Committee Settlement, and (iii) the Allowed Claims of Holders of Other Claims; provided, however, that the Trustees may abandon or otherwise not accept any Assets that the Trustees believe, in good faith, will have no value to, or will be unduly burdensome to, the Liquidating Trust.

      2.4   <u>Title to Liquidating Trust Assets</u>.  From and after the Effective Date, legal title to the Liquidating Trust Assets shall be vested at all times in the Liquidating Trust as a separate legal entity, except where applicable law in any jurisdiction in which the Liquidating Trust property may be located requires title to any part of the Liquidating Trust Assets to be vested in a trustee, in which case title shall be deemed vested in the Trustees.  No Beneficiary shall have legal title to any part of the Liquidating Trust Assets.

      2.5   <u>Tax Treatment</u>.  The Liquidating Trust shall be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.  In furtherance of this objective, the Trustees shall, in their business judgment, endeavor in good faith not to unduly prolong the duration of the Liquidating Trust.  For all federal income tax

purposes, all parties (including the Debtors, the Trustees, and the Beneficiaries) shall treat the transfer of the Liquidating Trust Assets allocable to the Beneficiaries as a transfer to such Beneficiaries of their proportionate interests in the Liquidating Trust Assets followed by a transfer by such Beneficiaries of such interests in the Liquidating Trust Assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust. The Beneficiaries under the Liquidating Trust will be treated as the deemed owners of the Liquidating Trust.

2.6   <u>Securities Law</u>. It is intended that the interests of the Beneficiaries in the Liquidating Trust and the entitlements hereunder, if any, of such Beneficiaries, shall not constitute "securities." Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust to the Beneficiaries under the Plan shall be exempt from registration under the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder (the "<u>Securities Act</u>"), and all applicable state and local laws requiring registration of securities. If the Trustees determine, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder (the "<u>Exchange Act</u>"), the Trust Indenture Act of 1939, as amended (the "<u>Trust Indenture Act</u>") or the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), then the Trustees shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission. Nothing herein shall be deemed to preclude the Trustees from amending this Agreement to make such changes as are deemed necessary or appropriate by the Trustees, with the advice of counsel, to ensure that the Liquidating Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act or the Investment Company Act.

2.7   <u>Appointment and Acceptance of Trustees</u>. Solely with respect to the Liquidating Trust, the Trustees shall be deemed to be appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Trustees accept the Liquidating Trust created by this Agreement and the grant, assignment, transfer, conveyance and delivery to the Liquidating Trust, on behalf, and for the benefit, of the Beneficiaries, by the Debtors of all of their right, title and interest in the Liquidating Trust Assets, upon and subject to the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order.

2.8   <u>Status of Trustees</u>. The Trustees shall each be a "representative of the estate" as that phrase is used in section 1123(b)(3)(B) of the Bankruptcy Code with respect to the rights and powers granted in this Agreement, the Plan and the Confirmation Order. Except as otherwise set forth in the Plan, the Trustees shall each be the successor-in-interest to the Debtors solely with respect to: (a) the Liquidating Trust Assets, including all Litigation Claims that were or could have been commenced by the Debtors prior to the Effective Date and shall be deemed substituted for the same as the party in such action; and (b) any objections, setoffs, defenses or counterclaims that have been or could have been raised by the Debtors with respect to any Claim. All actions, claims, rights or interests constituting Liquidating Trust Assets are preserved and retained and may be enforced by the Trustees as the representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Trustees shall each have the authority to bind the Liquidating Trust, and for all purposes of this Agreement, shall each be acting as a Trustee, and not in their individual capacity. Subject to the provisions of this Agreement, as of

**DRAFT**

the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, the Trustees on behalf of the Liquidating Trust may control and exercise authority over the Liquidating Trust Assets, over the acquisition, management and disposition thereof, and over the management and conduct of the affairs of the Liquidating Trust.

2.9    <u>No Reversion to Debtors</u>.  The Debtors shall have no claim to, right, or interest in, whether direct, residual, contingent or otherwise, the Liquidating Trust Assets once such assets have been transferred to the Liquidating Trust.  In no event shall any part of the Liquidating Trust Assets be distributed to any of the Debtors, except as otherwise set forth herein.

2.10    <u>Capacity of Liquidating Trust</u>.  Notwithstanding any state or federal law to the contrary or anything herein, the Liquidating Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Liquidating Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.  Subject to the terms of the Plan, Confirmation Order, and this Agreement, the Liquidating Trust shall also be entitled to assert all of the Estates' rights under section 558 of the Bankruptcy Code.

ARTICLE III

ADMINISTRATION OF THE LIQUIDATING TRUST

3.1    <u>Rights, Powers and Privileges</u>.  The Trustees shall have only the rights, powers and privileges expressly provided in this Agreement, the Plan and the Confirmation Order.  For the avoidance of doubt, the inclusion of a right, power or privilege of the Trustees shall not be deemed an obligation of the Trustees to exercise such right, power or privilege, if in the judgment of the Trustees such action is not in the best interest of the Liquidating Trust and the Beneficiaries.  Subject to the terms of this Agreement, including <u>Sections 3.4, 11.4 and 11.5</u> of this Agreement, the Trustees shall each have the power to take the actions granted in this <u>Section 3.1</u> and any powers reasonably incidental thereto that the Trustees reasonably determine to be necessary or appropriate to fulfill the purpose of the Liquidating Trust, without any further Bankruptcy Court approval, including but not limited to:

A.    Acting as the liquidating trustees for the Liquidating Trust and administering the Liquidating Trust;

B.    Acting for the Liquidating Trust in accordance with the provisions of the Plan and this Agreement;

C.    Exercising all power and authority that may be or could have been exercised and taking all actions that may be or could have been taken solely with respect to the Liquidating Trust Assets by any officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, shareholders or other party;

Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 345 of 1527   Document 14-2

D.      Representing the Debtors' Estates before the Court and other courts of competent jurisdiction solely with respect to matters concerning the Liquidating Trust and the Liquidating Trust Assets;

E.      Taking any action necessary to collect and transfer the Liquidating Trust Assets to the Liquidating Trust;

F.      Receiving, managing, investing, supervising, and protecting the Liquidating Trust Assets;

G.      Paying taxes or other obligations incurred by the Liquidating Trust and issuing to employees or other Persons, and/or filing with the appropriate Governmental Units, applicable tax and wage returns and forms;

H.      Retaining and compensating, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Trustees in carrying out their powers and duties under this Agreement, including the investigation, commencement, prosecution and/or settlement of the Litigation Claims, and paying, in accordance with <u>Section 8.8</u> hereof and without Court approval, all reasonable fees and expenses of such employees, professionals, advisors and consultants retained by the Liquidating Trust, accruing from and after the Effective Date;

I.      Calculating and implementing Distributions of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries and Holders of Allowed Other Claims;

J.      Investigating (including causing the Liquidating Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004), commencing, prosecuting, settling, assigning or otherwise compromising, releasing, dismissing or abandoning for the benefit of the Liquidating Trust any and all Litigation Claims, including, without limitation, taking any action with respect to appeals, counterclaims and defenses of or with respect to such claims and causes of action, including retaining counsel to pursue the Litigation Claims, and to confer with the Oversight Committee with respect to all such Litigation Claims;

K.      Entering into, or cause to be entered into, litigation finance arrangements, including for the funding of counsel fees, expert fees, and court costs, in connection with the commencement, prosecution, appeal, settling or otherwise compromising any and all Litigation Claims;

L.      Undertaking all administrative functions of the Cases, including the payment of Statutory Fees incurred post-Effective Date and the ultimate closing of the Cases and dissolution of the Debtor entities;

**DRAFT**

M.      Reviewing and resolving any Claims in the Cases without Bankruptcy Court approval, filing or litigating objections to the allowance of any such Claims, seeking to estimate, subordinate and/or recharacterize Claims by objection, motion, or adversary proceeding or otherwise, and conferring with the Oversight Committee with respect to all such objections to Claims, and addressing any issues with respect to Equity Interests to the extent necessary or desirable;

N.      Executing any documents and taking any other actions related to, or in connection with, the liquidation of the Liquidating Trust Assets and the exercise of the Trustees' powers granted in this Agreement, the Plan and Confirmation Order;

O.      Holding legal title to any and all rights of the Beneficiaries in, to or arising from the Liquidating Trust Assets;

P.      Establishing reserves as may be necessary and appropriate for the proper operation of matters incident to the Liquidating Trust;

Q.      Protecting and enforcing the rights to the Liquidating Trust Assets vested in the Trustees by this Agreement by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

R.      Preparing and filing any and all tax returns with respect to the Debtors and on behalf of the Liquidating Trust, paying taxes properly payable by the Liquidating Trust, if any, and causing the Liquidating Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, and make tax elections by and on behalf of the Liquidating Trust;

S.      Making all necessary filings on behalf of the Liquidating Trust in accordance with any applicable law, statute or regulation;

T.      Determining and satisfying from the Liquidating Trust Assets any and all taxes and ordinary course liabilities incurred by or on behalf of the Liquidating Trust;

U.      Investing the Liquidating Trust Assets received by the Liquidating Trust or the Trustees or otherwise held by the Liquidating Trust or Trustees in accordance with Section 3.6 of this Agreement;

V.      In the event that the Trustees determine that the Beneficiaries or the Liquidating Trust may, will or have become subject to different tax consequences than those described in this Agreement, taking such actions that will, or are intended to, address such different tax consequences;

W.      Creating sub-trusts of which the Liquidating Trust or the Beneficiaries hold the beneficial or ownership interests, as may be necessary and in each case pursuant to and in accordance with the Plan and the treatment of Trust Beneficiaries as set forth therein;

Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 347 of 1527   Document 14-2

DRAFT

X.      Enforcing, waiving, assigning or releasing rights, privileges or immunities of any kind;

Y.      Sending annually to each Beneficiary a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit and instructing all such Beneficiaries to report such items on their federal tax returns;

Z.      Filing reports with the Court on a quarterly basis setting forth the amounts, recipients, and dates of all Distributions through each applicable reporting period, beginning no later than thirty (30) Business Days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Liquidating Trust Assets have been liquidated to Cash and all Cash in the Liquating Trust has been released or paid out in accordance with the Plan.

AA.     Opening and maintaining bank accounts on behalf of or in the name of the Liquidating Trust, determining and satisfying any and all liabilities created, incurred, or assumed by the Liquidating Trust and paying all expenses, debts, and other liabilities of the Liquidating Trust;

BB.     Purchasing customary insurance coverage in accordance with <u>Section 3.11</u> of this Agreement on behalf of the Liquidating Trust or the Trustees (including but not limited to errors and omissions policies) to the extent the Trustees deem reasonably necessary or advisable, paying all insurance premiums and costs as the Trustees deem reasonably necessary or advisable, and requesting and receiving reports from any insurer under the Insurance Policies regarding the payment of any proceeds of such policies;

CC.     In reliance upon the official claims register maintained in the Cases and any applicable court order, maintaining on the Trustees' books and records a register evidencing the beneficial interest in the Liquidating Trust held by each Beneficiary;

DD.     Maintaining the books and records of the Liquidating Trust;

EE.     Implementing, enforcing or discharging all of the terms, conditions and all other provisions of, and all duties and obligations under, the Plan, the Confirmation Order and this Agreement;

3.2     <u>Litigation Claims</u>.   The Liquidating Trust shall have the sole responsibility, standing (including derivative standing), and authority to commence, prosecute and settle all Litigation Claims. Any and all Litigation Claims that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan. No person may rely on the absence of a specific reference in the Plan or this Agreement or any other Plan Supplements to any Litigation Claim against it as any indication that the Trustees will not investigate and/or pursue any and all available Litigation Claims against such Person. Litigation Claims may include, but are not limited to, claims against certain officers and directors for breach of fiduciary duty, breach of the duty of loyalty, failure to monitor fiduciaries of the

**DRAFT**

Estates; claims for professional malpractice or mismanagement; claims grounded in tort; claims for breach of contract; and/or claims based upon the malfeasance or omissions of parties in connection with the valuation and administration of the ESOP (other than Direct ESOP Claims), to the fullest extent permitted by law.

3.3     <u>Agents and Professionals</u>.  The Trustees may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants or other professionals and employees as the Trustees deem appropriate in the reasonable exercise of their discretion, and who the Trustees reasonably determine to have qualifications necessary to assist the Trustees in the proper administration of the Liquidating Trust.  Subject to <u>Section 8.8</u> of this Agreement, the Trustees may pay the reasonable fees, costs and expenses of such persons (including the Trustees) out of the Liquidating Trust Assets in the ordinary course of business pursuant to the Plan and Confirmation Order.  Subject to this <u>Section 3.3</u> and the other terms and conditions of this Agreement, the Plan and Confirmation Order, the Trustees may retain professionals who previously were employed by the Creditors' Committee, the Ad Hoc Group of Second Lien Noteholders and/or the Debtors.  For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Trustees from engaging each Trustee's respective firm or its affiliates to do work for the Liquidating Trust.

3.4     <u>Safekeeping of Liquidating Trust Assets</u>.  All Liquidating Trust Assets shall, until distributed or paid over as provided herein or in the Plan, be held in trust for the benefit of the Beneficiaries in accordance with the Plan and this Agreement.  The Trustees shall be under no liability for interest or producing income on any moneys received by them under this Agreement and held for Distribution or payment to the Beneficiaries, except as such interest or income shall actually be received by the Trustees.

3.5     <u>Limitations on Trustees</u>.  The Trustees shall have no authority to take any action in contravention of this Agreement, the Plan, the Confirmation Order or applicable law, or any action that would make it impossible to carry on the activities of the Liquidating Trust.  Neither of the Trustees shall at any time, on behalf of the Liquidating Trust or Beneficiaries, enter into or engage in any trade or business, and no part of the Liquidating Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Liquidating Trust in furtherance of any trade or business.

3.6     <u>Investment</u>.   The Trustees may, but shall not be required to, invest Cash (including any earnings thereon or proceeds therefrom) in the Liquidating Trust only in (i) Permitted Investments, in a manner consistent with the requirements of section 345 the Bankruptcy Code or any order of the Court modifying such requirements, or (ii) to the extent authorized by the Oversight Committee, in Permitted Investments other than those described in section 345 of the Bankruptcy Code.  To the extent the Trustees invest the Liquidating Trust Assets in accordance with the terms of this <u>Section 3.6</u>, the Trustees and the Oversight Committee shall have no liability in the event of insolvency of any institution in which the Trustees have invested any of the Liquidating Trust Assets or reserves or any proceeds, revenue or income therefrom.

**DRAFT**

3.7   <u>Trustees Action</u>.   The Trustees shall hold, collect, conserve, protect and administer the Liquidating Trust in accordance with the provisions of this Agreement, the Plan and the Confirmation Order, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement, the Plan and the Confirmation Order.  Any good faith determination by the Trustees, and the Oversight Committee to the extent applicable by <u>Sections 11.4 and 11.5</u>, as to what actions are in the best interests of the Liquidating Trust shall be determinative.

3.8   <u>Court Approval of Trustees Actions</u>.   Except as provided in the Plan or otherwise specified in this Agreement, the Trustees need not obtain an order or approval of the Court in the exercise of any power, rights or discretion conferred hereunder, or account to the Court, including with respect to the sale of assets or the settlement of controversies.  The Trustees shall exercise their business judgment for the benefit of the Beneficiaries in order to maximize the value of the Liquidating Trust Assets and Distributions, giving due regard to the cost, risk and delay of any course of action.  Notwithstanding the foregoing in this <u>Section 3.8</u>, but subject to <u>Section 3.5</u> of this Agreement, the Trustees may submit to the Court any question or questions regarding which the Trustees may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Trustees with respect to the Liquidating Trust Assets, the Liquidating Trust, the Agreement, the Plan or the Debtors, including the administration and Distribution of the Liquidating Trust Assets.  The Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon motion.  In addition, subject to <u>Section 3.4</u> of this Agreement, the Trustees shall have the authority, but not the obligation, to seek Court approval to sell any Asset free and clear of any and all Liens, Claims and encumbrances.

3.9   <u>No Personal Gain</u>.   The Trustees shall, during the period that each serves as a Trustee under this Agreement and following the termination of this Agreement or their removal or resignation hereunder, not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Liquidating Trust Assets or Reserves relate or which he has become aware of in his capacity as a Trustee.

3.10   <u>United States Trustee Fees and Reports</u>.   After the Effective Date, the Trustees shall pay as an expense of the Liquidating Trust all fees incurred under 28 U.S.C. § 1930 by reason of the Trust's disbursements as required under the Plan and Confirmation Order until the Cases are closed.  After the Confirmation Date, the Liquidating Trust shall prepare and serve on the Office of the U.S. Trustee such quarterly disbursement reports for the Liquidating Trust as required by the U.S. Trustee for as long as the Cases remain open.

3.11   <u>Insurance</u>.   The Trustees may, in their discretion, use Liquidating Trust Assets in the Trustees' reasonable business judgment to maintain customary insurance coverage, if available, for the protection of the Liquidating Trust Assets, the Trustees and the Oversight Committee.

3.12   <u>Abandonment; Donation</u>.   If, in the Trustees' reasonable judgment, any Liquidating Trust Assets cannot be sold or distributed in a commercially reasonable manner or the Trustees believe in good faith that such property has inconsequential value to the Liquidating Trust or its Beneficiaries or is insufficient to render a further Distribution practicable, or exceed

**DRAFT**

the amounts required to be paid under the Plan, the Trustees shall have the right, for Liquidating Trust Assets with an aggregate value of up to $10,000 (and for Liquidating Trust Assets in excess of $10,000, with the approval of the Oversight Committee), to cause the Liquidating Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustees.

    3.13   <u>Incentive Fund</u>.  One percent (1%) of all Litigation Proceeds in excess of $20 million (after the payment of, or reserves for, Liquidating Trust Operating Expenses, repayment of the Plan Contribution Payment, and payment of the PBGC Priority Payment) shall be allocated to an incentive fund that shall be used to provide additional compensation for the Trustees and compensation for the Oversight Committee Members, which compensation shall be subject to Court approval.

<div align="center">ARTICLE IV</div>

<div align="center">DISTRIBUTIONS TO TRUST BENEFICIARIES</div>

    4.1   <u>Distribution Record Dates</u>.  Prior to each Distribution Date with respect to Distributions to Beneficiaries, the Trustees shall set a Distribution Record Date for determining the Beneficiaries entitled to participate in the Distribution on such Distribution Date.  The Distribution Record Date shall not apply to the Second Lien Secured Note Claims, the Holders of which shall receive Distributions in accordance with the customary procedures of DTC on or as soon as practicable after the Distribution Date.

    4.2   <u>Timing and Amount of Distributions from the GUC Cash Pool</u>.  The Trustees shall in their reasonable discretion make Distributions of Available Cash from the GUC Cash Pool on a Pro Rata basis to the Holders of Allowed General Unsecured Claims, consistent with the Plan, on each Distribution Date; provided, however, that on any date that Distributions are to be made under the terms of the Plan or this Agreement, the Trustees shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed General Unsecured Claims as if each such Disputed General Unsecured Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.  Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed General Unsecured Claims pending determination of their entitlement thereto.

    4.3   <u>Timing and Amount of Distributions of Litigation Proceeds and Liquidating Trust Assets (Other Than the GUC Cash Pool)</u>.  The Trustees shall in their reasonable discretion, subject to approval by the Oversight Committee, make Distributions of Available Cash (other than the GUC Cash Pool) on a Pro Rata basis to the Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims, consistent with the Plan, on each Distribution Date; provided, that the Trustees shall make Distributions to Holders of Allowed Second Lien Secured Note Claims solely via transfer to the DTC Account; provided, further, that the Trustees shall distribute at least annually to the Beneficiaries the net income (i.e., taxable income as determined for U.S. federal income tax purposes) of the Liquidating Trust, other than the amount of net income reasonably necessary to pay current expenses and liabilities

(including but not limited to satisfying Allowed Other Claims in accordance with the terms of the Plan, repaying the Plan Contribution Payment, and paying the PBGC Priority Payment) and preserve the value of the Liquidating Trust Assets or meet the Liquidating Trust's claims and contingent liabilities (including but not limited to reserves for Liquidating Trust Operating Expenses, Disputed Claims and any other reserves determined in the Trustees' reasonable discretion); provided, however, that on any date that Distributions are to be made under the terms of the Plan or this Agreement, the Trustees shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed General Unsecured Claims as if each such Disputed General Unsecured Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed General Unsecured Claims pending determination of their entitlement thereto. For the avoidance of doubt, Available Cash from the Liquidating Trust Assets (including the Litigation Proceeds but excluding the GUC Cash Pool) shall be used to satisfy first, any Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed Other Claims in accordance with the terms of the Plan, provided, that Available Cash shall only be used to satisfy Allowed Other Claims to the extent that such Allowed Other Claims are the subject of an established reserve and/or have otherwise been included in the Debtors' wind-down budget and such funds have been transferred to the Trust, and shall not be satisfied from any other Liquidation Trust Assets (including the Plan Contribution Payment), without the written consent of the Trustees, second, the Liquidating Trust Operating Expenses, third, repayments of the Plan Contribution Payment, and fourth, payment of the PBGC Priority Payment, prior to making any Distributions to Beneficiaries of the Liquidating Trust on a Pro Rata basis. For the avoidance of doubt, the Debtors shall provide the Trustees with a copy of the wind-down budget indicating which claimants have not yet been paid and for which the Debtors have turned over funds to cover such payments, and the Trustees shall be entitled to rely on such information following the Effective Date as current and wholly accurate.

    4.4    <u>Location for Distributions; Notice of Change of Address</u>. Distributions to the Beneficiaries shall be made by the Trustees to the Beneficiaries at the last address: (a) set forth on the respective proofs of Claim last Filed by such Beneficiaries; (b) set forth in any written notices of address changes delivered to the Trustees by such Beneficiaries after the date of any related proof of Claim; or (c) reflected in the Schedules if no proofs of Claim were filed by such Beneficiaries and the Trustees have not received a written notice of a change of address. The Trustees may, in their sole discretion, attempt to determine a Beneficiary's current address or otherwise locate a Beneficiary, but nothing in this Agreement or the Plan shall require the Trustees to do so. For the avoidance of doubt, the Trustees shall be entitled to rely on the claims register provided to them by the Debtors or the claims agent, as the case may be, following the Effective Date as current and wholly accurate (including, without limitation, with respect to the most current address, among other things), and shall have not any obligation to conduct diligence with respect to any change of address notices provided to the Debtors or to the claims agent prior to the effectiveness of this Agreement.

    4.5    <u>Tax Information</u>. The Trustees shall require the Beneficiaries to furnish to the Trustees in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and completed IRS Form W-9 or, if applicable, IRS Form W-8, within thirty

**DRAFT**

(30) days of a written request, and the Trustees shall make two (2) such requests to the extent necessary. Failure of a Beneficiary to respond to the Trustees' second request for such tax information within 45 days of the second request shall result in the Beneficiary forfeiting its Liquidating Trust interest and rights to any Distribution, and such forfeited amounts shall revest in the Liquidating Trust and be distributed to the remaining Beneficiaries on the next Distribution Date.

    4.6    <u>Distributions After Allowance or Disallowance of a Disputed Claim</u>. Upon a Disputed Claim becoming an Allowed Claim, the Trustees shall distribute to the Holder thereof no later than the next Distribution Date, such amount as would have been distributed to such Holder if its Claim had been an Allowed Claim on the Effective Date.

    4.7    <u>Payments Limited to Liquidating Trust Assets</u>. All payments to be made by the Trustees to or for the benefit of any Beneficiary on behalf of the Liquidating Trust shall be made only from the Liquidating Trust Assets.

    4.8    <u>Undeliverable Distributions and Unclaimed Property</u>. If any Distribution to a Beneficiary is returned to the Trustees as undeliverable, no further Distributions shall be made to such Beneficiary unless and until the Trustees are notified in writing of such Beneficiary's then current address. Undeliverable Distributions shall remain in the possession of the Trustees until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution. Such Unclaimed Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and all title to and beneficial interest in the Liquidating Trust Assets represented by any such undeliverable Distribution shall be cancelled and revert to and/or remain in the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary). In the event any check sent to a Beneficiary respecting a Distribution to such Beneficiary has not been cashed within one hundred and twenty (120) days after the date of the respective Distribution, such check shall be cancelled, no replacement Distribution shall be made to such Beneficiary, and the Claims of such Beneficiary that may have been entitled to such Distribution shall be discharged and forever barred from receiving Distributions under this Agreement, the Plan and Confirmation Order. The uncashed Distributions shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and shall become Liquidating Trust property and revert to the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

<center>ARTICLE V</center>

<center>DISTRIBUTIONS TO<br>HOLDERS OF OTHER CLAIMS</center>

    5.1    <u>Distribution Record Dates</u>. Prior to each Distribution Date with respect to Distributions to Holders of Allowed Other Claims, the Trustees shall set a Distribution Record

**DRAFT**

Date for determining the Holders of Allowed Other Claims entitled to participate in the Distribution on such Distribution Date.

5.2     Timing of Distributions to Holders of Other Claims.  On or as soon as reasonably practicable after the date any Other Claim that is not otherwise to be paid by the Purchaser becomes an Allowed Claim, the Trustees shall make the Distributions required to be made under the Plan to Holders thereof.

5.3     Distributions After Allowance or Disallowance of a Disputed Other Claim.  On or as soon as reasonably practicable after a Disputed Other Claim becomes an Allowed Claim, the Trustees shall distribute to the Holder thereof such amount as would have been distributed to such Holder if its Other Claim had been an Allowed Claim on the Effective Date, in accordance the Plan.

5.4     Location for Distributions; Notice of Change of Address. Distributions shall be made by the Trustees to the Holders of Allowed Other Claims at the last address: (a) set forth on the respective proofs of Claim or notices of General Administrative Expense Claims last Filed by such Holders of Allowed Other Claims; (b) set forth in any written notices of address changes delivered to the Trustees by such Holders of Allowed Other Claims after the date of any related proof of Claim or notice of General Administrative Expense Claim; or (c) reflected in the Schedules if no proofs of Claim or notices of General Administrative Expense Claims were filed by such Holders of Allowed Other Claims and the Trustees have not received a written notice of a change of address.  The Trustees may, in their sole discretion, attempt to determine a Holder's current address or otherwise locate a Holder, but nothing in this Agreement or the Plan shall require the Trustees to do so.

5.5     Tax Information.  The Trustees may, in their discretion, require the Holders of Other Claims to (i) furnish to the Trustees in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and completed IRS Form W-9 or, if applicable, IRS Form W-8, or (ii) establish to the satisfaction of the Trustees an applicable exemption from the requirement to provide such forms, within thirty (30) days of a written request, and the Trustees shall make two (2) such requests to the extent necessary.  Failure of any Holder of the Other Claims to respond to the Trustees' second request for such tax information within 30 days of the second request shall result in their forfeiting their rights to any Distribution, and such forfeited amounts shall revest in the Liquidating Trust and be distributed to the remaining Beneficiaries on the next Distribution Date.

5.6     Undeliverable Distributions and Unclaimed Property.  If the Distribution to the Holder of any Allowed Other Claim is returned to the Trustees as undeliverable, no further Distribution shall be made to such Holder unless and until the Trustees are notified in writing of such Holder's then current address.  Undeliverable Distributions shall remain in the possession of the Trustees until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.  Such Unclaimed Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and all title to and beneficial interest in the Liquidating Trust Assets represented by any such undeliverable Distribution shall be cancelled and revert to and/or remain in the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any

**DRAFT**

applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary). In the event any check sent to a Holder of any Allowed Other Claim respecting a Distribution to such Holder has not been cashed within one hundred and twenty (120) days after the date of the respective Distribution, such check shall be cancelled, no replacement Distribution shall be made to such Holder, and the Claims of such Holder that may have been entitled to such Distribution shall be discharged and forever barred from receiving Distributions under this Agreement, the Plan and Confirmation Order. The uncashed Distributions shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and shall become Liquidating Trust property and revert to the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

ARTICLE VI

BENEFICIARIES

6.1     <u>Incidents of Ownership</u>.  The Beneficiaries shall be the sole beneficiaries of the Liquidating Trust, and the Trustees shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this Agreement, the Plan and the Confirmation Order.

6.2     <u>Interest Beneficial Only</u>.  Each Beneficiary shall take and hold its beneficial interest in the Liquidating Trust subject to all of the terms and provisions of this Agreement and the Plan.  The ownership of a beneficial interest in the Liquidating Trust shall not entitle any Beneficiary or the Debtors to any title in or to the Liquidating Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein or in the Plan.  A Beneficiary shall have no title or right to, or possession, management, or control of, the Liquidating Trust Assets and the interest of a Beneficiary in the Liquidating Trust is in all respects personal property, and the death, insolvency, or incapacity of an individual Beneficiary shall not terminate or affect the validity of this Agreement.  No surviving spouse, heir, or devisee of any deceased Beneficiary shall have any right of dower, homestead, inheritance, partition, or any other right, statutory or otherwise, in the Liquidating Trust Assets, and their sole interest shall be the rights and benefits given to the Beneficiaries under this Agreement.

6.3     <u>Evidence of Beneficial Interest</u>.  Ownership of a beneficial interest in the Liquidating Trust shall not be evidenced by any certificate, security or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Trustees and, with respect to the Allowed Second Lien Secured Note Claims, on the records held by DTC.

6.4     <u>Identification of Beneficiaries</u>.  On or immediately prior to the Effective Date, the Debtors shall provide the Trustees with a true and correct copy of the claims register maintained in the Cases or other document setting forth the names, addresses, any tax identification numbers and Claim amounts, and noting whether any Claims are Disputed or Allowed as of such date, and if Allowed, the Allowed amount.  For the avoidance of doubt, the Second Lien Secured Note Claims are Allowed.  The Trustees shall use this register to create a register of Beneficiaries (the

EAST\158265739.3 -16-

NY 77263700

**DRAFT**

"Beneficiary Register"), which shall be maintained by the Trustees and updated periodically, including as Disputed General Unsecured Claims become Allowed General Unsecured Claims. The beneficial interests in the Liquidating Trust held by the Holders of Allowed Second Lien Secured Note Claims shall be identified in the aggregate on the Beneficiary Register as the "Holders of Allowed Second Lien Secured Note Claims" and represented by an "escrow" CUSIP held at DTC. Any Distributions made by the Trustees on account of Second Lien Secured Note Claims shall be made solely to the DTC Account and shall not be made to individual holders of Second Lien Secured Note Claims. None of the Debtors, the Liquidating Trust, the Trustees and Members of the Oversight Committee shall incur any liability in connection with the determination of the interests of the Beneficiaries in the Liquidating Trust and the size of any Disputed Claims reserve, nor shall they incur any liability for any charging lien asserted by the Indenture Trustee. The Liquidating Trust and the Trustees shall have the absolute and unconditional right to rely on the information provided by the Debtors for purposes of notices and distributions under this Agreement and the Plan and neither the Liquidating Trust, the Trustees nor the Members of the Oversight Committee shall incur any liability by relying on the information it receives under this Section 6.4.

6.5    Transferability. The beneficial interests in the Liquidating Trust held by the Holders of Allowed Second Lien Secured Note Claims, which are represented by an "escrow" CUSIP held at DTC, shall be freely tradeable and transferable and any such trade and transfer shall be reflected on the DTC's books and records. The beneficial interests in the Liquidating Trust held by the Holders of Allowed General Unsecured Claims shall not be transferable, except upon prior written consent of the Trustees.

6.6    Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to a Claim of a Beneficiary, the Trustees shall be entitled, in their sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustees shall: (a) make no payment or Distribution with respect to the Claim represented by the claims or demands involved, or any part thereof, and (b) refer such conflicting claims and demands to the Court, which shall have exclusive jurisdiction over the resolution of such conflicting claims or demands. In so doing, the Trustees shall not be liable to any party for their refusal to comply with any such conflicting claims or demand. The Trustees shall be entitled to refuse to comply with conflicting claims and demands until either (a) the rights of the adverse claimants have become adjudicated by a Final Order of the Court or (b) the conflict has been resolved by a written agreement among such parties and the Trustees, which agreement shall include a complete release of the Liquidating Trust, the Trustees and the Oversight Committee with respect to the subject matter of the dispute.

ARTICLE VII

THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

7.1    Parties Dealing With the Trustees. In the absence of actual knowledge to the contrary, any person dealing with the Liquidating Trust or the Trustees shall be entitled to rely on the authority of the Trustees or any of the Trustees' agents to act in connection with the Liquidating Trust Assets. There is no obligation on any Person dealing with the Trustees to

**DRAFT**

inquire into the validity, expediency or propriety of any transaction by the Trustees or any agent of the Trustees.

    7.2    <u>Limited Recourse</u>.  All Persons (including any professionals retained by the Trustees in accordance with this Agreement) engaged in transactions with the Liquidating Trust or the Trustees shall look only to the Liquidating Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with carrying out the terms of this Agreement, the Plan or the Confirmation Order.

    7.3    <u>Limitation of Liability</u>.  The Indemnified Parties (defined below) shall enjoy immunity from suit and shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Liquidating Trust Assets, the Reserves, the acts associated with carrying out the terms of this Agreement, the Plan or the Confirmation Order or the affairs of the Liquidating Trust, except for their own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty.  Without limiting the generality of the foregoing, the Trustees and/or Oversight Committee Members shall have no liability to any Beneficiary or Holder of an Other Claim on account of the Trustees' investment or non-investment of any Litigation Trust Assets or any losses with respect to any such investments of Litigation Trust Assets, provided such investments are made, or the Trustees' decision not to invest any Litigation Trust Assets in any case is made, in accordance with the terms of this Litigation Trust Agreement.

    7.4    <u>Non-Liability for Acts of Others</u>.   Except as expressly provided in this Agreement, the Plan or the Confirmation Order, neither the Liquidating Trust nor the Trustees shall assume any of the liabilities, obligations or duties of the Debtors or the Beneficiaries.  The Trustees may accept and rely upon any accounting made by or on behalf of the Debtors and any statement or representation made by the Debtors or their agents and professionals as to the assets comprising the Liquidating Trust Assets or the Reserves or as to any other fact bearing upon the creation of the Liquidating Trust, so long as the Trustees have a good faith basis to do so.  Any successor Trustees may accept and rely upon any accounting made by or on behalf of any predecessor Trustees hereunder, and any statement or representation made by a predecessor Trustees or their agents as to the assets comprising the Liquidating Trust Assets, the Reserves or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as the successor Trustees have a good faith basis to do so.  The Trustees shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  The Trustees or successor Trustees shall not be liable for any act or omission of any predecessor Trustees, nor have a duty to enforce any claims against any predecessor Trustees on account of any such act or omission.  The Trustees or the Members of the Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance upon the advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Trustees nor the Members of the Oversight Committee shall be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Trustees or the

**DRAFT**

Members and/or their designees, unless such determination is based on its own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty. For the avoidance of doubt, the Trustees have no obligation, and shall not be deemed to have any obligation, to administer, operate, wind-down, or otherwise exercise any control over or responsibilities for, any Employee Benefit Programs or Employee Benefit Plans. Nor shall any Trustee or the Liquidating Trust be, or be deemed to be, a fiduciary, sponsor or successor of any such Employee Benefit Programs or Employee Benefit Plans.

7.5    <u>Indemnification, Exculpation and Reimbursement</u>. The Trustees, the Oversight Committee and its Members, and each of their current equity holders, including shareholders, partnership interest holders and limited liability company unit holders, Affiliates, partners, firms, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective predecessors, successors and assigns (in each case, solely in their capacity as such) (collectively, the "<u>Indemnified Parties</u>") shall be indemnified and held harmless by the Liquidating Trust, to the fullest extent permitted by law, solely from the Liquidating Trust Assets and/or any applicable insurance coverage and the proceeds thereof, for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of an Indemnified Party solely in its capacity as such; provided, however, that the Liquidating Trust shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty by such Indemnified Party. Notwithstanding any provision in this Agreement to the contrary, the Indemnified Parties shall be entitled to request advances from the Liquidating Trust to cover reasonable fees and necessary expenses incurred in connection with defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such; provided, however, that the Trustees shall not be required to make any such advances; provided further, however, that any Indemnified Parties receiving such advances shall repay the amounts so advanced to the Liquidating Trust upon the entry of a Final Order of a court of competent jurisdiction finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this <u>Section 7.5</u>. This indemnification shall survive the death, dissolution, resignation or removal, as may be applicable, of the Indemnified Parties, or the termination of the Liquidating Trust, and shall inure to the benefit of the Indemnified Parties' heirs and assigns.

7.6    <u>Reliance by the Trustees</u>. The Trustees may absolutely and unconditionally rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustees in good faith to be genuine and to have been signed or presented by an authorized party or parties. The Trustees may consult with legal counsel, financial or accounting advisors, and other professionals to be selected by the Trustees and may rely, in good-faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in accordance with the advice thereof.

**DRAFT**

7.7    <u>Confirmation of Survival of Provisions.</u>  Without limitation in any way of any provision of this Agreement, the provisions of this <u>Article VII</u> shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustees or Members of the Oversight Committee, or the termination of the Liquidating Trust or this Agreement, and shall inure to the benefit of the Trustees' and the Members' respective heirs, successors, and assigns.

ARTICLE VIII

SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

8.1    <u>Initial Trustees.</u>  The initial Trustees shall be the : (i) Halperin Trustee; and (ii) Davis Trustee, who shall serve as co-Trustees of the Liquidating Trust with equal power and authority concerning the administration and oversight of the Liquidating Trust and all powers set forth in the Plan and this Agreement.

8.2    <u>Term of Service.</u>  The Trustees shall serve as of the Effective Date until: (a) the completion of all of the Trustees' duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Liquidating Trust in accordance with this Agreement, or (c) the respective Trustee's death or dissolution, incapacitation, resignation or removal.

8.3    <u>Removal of a Trustee.</u>  Either or both Trustees may be removed with or without cause, at any time by the Oversight Committee in accordance with <u>Sections 8.5 and 11.4</u> hereof, (i) upon not less than sixty (60) days' prior written notice to the affected Trustee if removed without cause, or (ii) immediately or as determined by the Oversight Committee if removed with cause.  If one of the Trustees is removed pursuant to this <u>Section 8.3</u>, the remaining Trustee shall continue to serve as the sole Trustee.  If the sole Trustee is removed pursuant to this <u>Section 8.3</u>, (a) the Oversight Committee shall appoint a successor Trustee to replace the last removed Trustee as soon as reasonably practicable, or (b) and if a successor Trustee is not appointed or does not accept his or her appointment pursuant to this <u>Section 8.3</u> within thirty (30) days from the date of the removal notice served upon such last removed Trustee, any Beneficiary may petition the Court for the appointment of a successor Trustee to replace such last removed Trustee.  For notice purposes only and not for approval, the Oversight Committee shall file with the Court a notice appointing such successor Trustee.  In the event of a removal, the Trustee(s) shall render to the Oversight Committee prior to the date of such Trustee's removal or as soon as reasonably practicable thereafter a full and complete accounting of monies and assets received, disbursed and held during the term of office of the removed Trustee. In the event of the removal of a Trustee, such Trustee shall be entitled to payment of all compensation earned by such Trustee through and including the effective date of such removal.

8.4    <u>Resignation of a Trustee.</u>  Either or both Trustees may resign by giving not less than sixty (60) days' prior written notice thereof to the Oversight Committee.  If one of the Trustees resigns pursuant to this <u>Section 8.4</u>, the remaining Trustee shall continue to serve as the sole Trustee.  If the sole Trustee resigns pursuant to this <u>Section 8.4</u>, the Oversight Committee shall appoint a successor Trustee to replace the last resigned Trustee as soon as reasonably

EAST\158265739.3 -20-

NY 77263700

**DRAFT**

practicable.  Resignation shall become effective on the later to occur of: (a) the day specified in such notice, (b) the appointment of a successor Trustee by the Oversight Committee and the acceptance by such successor of such appointment, or (c) the date the accounting described in the last sentence of this section is delivered.   If the sole Trustee resigns pursuant to this Section 8.4 (a) the Oversight Committee shall appoint a successor Trustee to replace the last resigned Trustee as soon as reasonably practicable, or (b) and if a successor Trustee is not appointed or does not accept his or her appointment within thirty (30) days following delivery of notice of resignation, any Beneficiary may petition the Court for the appointment of a successor Trustee to replace such last resigned Trustee.  For notice purposes only and not for approval, the Oversight Committee shall file with the Court a notice appointing such successor Trustee.  In the event of a resignation, the Trustee(s) shall render to the Oversight Committee prior to the date of such Trustee's resignation or as soon as reasonably practicable thereafter a full and complete accounting of monies and assets received, disbursed and held during the term of office of that resigned Trustee. In the event of a resignation of the Trustee, the resigning Trustee shall be entitled to payment of all compensation earned by such Trustee through and including the effective date of such resignation.

8.5     Appointment of a Successor Trustee.  Upon the resignation, death, incapacity or removal of a Trustee, the Oversight Committee shall promptly appoint a successor Trustee in accordance with Section 11.4 to fill the vacancy so created.  Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agree that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee. Notwithstanding anything in this Agreement to the contrary, in the event that a successor Trustee is not appointed within thirty (30) days of the occurrence or effectiveness, as applicable, of the prior Trustee's resignation, death, incapacity or removal, any Beneficiary shall be authorized to move the Court for the appointment of a successor Trustee.

8.6     Powers and Duties of a Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers and duties of the predecessor Trustee being replaced under this Agreement and the Plan.

8.7     Liquidating Trust Continuance.  The death, incapacity, resignation or removal of a Trustee shall not terminate the Liquidating Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by a Trustee.

8.8     Compensation and Costs of Administration.  The terms of the compensation of the Trustees are set forth on Exhibit C hereto.   Payment of the Trustees' non-deferred compensation and documented reasonable out of pocket expenses shall be payable automatically at the beginning of each month from the Liquidating Trust Assets.  Solely with respect to the Trustees' deferred compensation, the Trustees shall deliver their invoices to the Oversight Committee before payment from the Liquidating Trust Assets shall be allowed. The Trustees may retain and compensate professionals (including such Trustees' respective firms or affiliates) as provided for in Section 3.3 of this Agreement.   The reasonable and documented fees and actual, necessary and documented expenses of such professionals shall be paid by the Trustees upon each monthly submission of a fee statement to the Trustees in accordance with the procedures described in this Section.  Any professionals retained by the Trustees pursuant to this

Agreement shall deliver their invoices or fee statements to the Trustees for approval before payment from the Liquidating Trust Assets shall be allowed.  Any Members of the Oversight Committee shall deliver their invoices for any fees and expenses, in each case solely to the extent permitted by Section 11.7 hereof, to the Trustees for approval before payment from the Liquidating Trust Assets shall be allowed.[1]   In each instance, the Trustees and Oversight Committee, as applicable, shall have ten (10) days from the delivery of any invoice or fee statement to submit an objection thereto.  In the event no objections are timely raised, the Trustees may pay the fees and expenses, or that portion of the fees and expenses that are not subject to an objection. For an objection to be valid, it shall (i) be in writing, (ii) set forth in detail the specific fees objected to and the basis for the objection, and (iii) be delivered within the ten (10) day period to the party whose invoice is subject to the objection, along with a copy to the Trustees and the Oversight Committee Members. Any objection that remains unresolved fifteen (15) days after it is made may be submitted to the Court for resolution.  The Trustees may pay their respective compensation and the Liquidating Trust Operating Expenses before approving or making any Distributions to Beneficiaries.

8.9    No Bond. The Trustees shall not be required to post any bond or surety or other security for the performance of their duties unless otherwise ordered by the Court and, in the event the Trustees are so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be borne by the Liquidating Trust and paid for from the Liquidating Trust Assets.

8.10    Reporting and Filing Requirements.  On an annual basis, within sixty (60) days of the close of each calendar year, the Trustees shall deliver to the Oversight Committee a report of the Liquidating Trust's activity, including: (i) all Liquidating Trust Assets transferred to and accepted by the Liquidating Trust during the preceding calendar year, including whether such assets continue to be held and the date of any disposal thereof, (ii) a summary of all Distributions made to the Beneficiaries during the preceding calendar year, (iii) a summary of all pending Litigation Claims, and (iv) financial statements, including all fees, income and expenses related to the Liquidating Trust during the preceding calendar year.  The Trustees shall also timely prepare, file and distribute such additional statements, reports and submissions as may be necessary to cause the Liquidating Trust and the Trustees to be in compliance with applicable law.

8.11    Allocation of Trustee Responsibilities.  Notwithstanding Section 8.1, the Halperin Trustee shall have primary decision making authority regarding all matters concerning the receipt, maintenance, investment and Distributions concerning the GUC Cash Pool, as well as the general administration of the Liquidating Trust, subject to the review and approval of the Oversight Committee.  For all decisions concerning the planning, strategy, commencement, settlement, or otherwise affecting any litigation that the Liquidating Trust may commence or defend against (including but not limited to Litigation Claims) the Trustee Halperin and the Trustee Davis shall have co-decision making authority, subject to the review and approval of the Oversight Committee.

---

[1] For the avoidance of doubt, a Member of the Oversight Committee shall not be entitled to reimbursement of fees or expenses incurred by professionals retained by such Member.

EAST\158265739.3 -22-

NY 77263700

**DRAFT**

## ARTICLE IX

## LIQUIDATING TRUST TAX OBLIGATIONS

9.1    The Trustees shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and any other applicable laws or regulations.

9.2    On an annual basis, the Trustees shall send to each Beneficiary a statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct all such Holders to report such items on their federal income tax returns.  Such a statement also shall be sent to each Beneficiary after the dissolution of the Liquidating Trust.  The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated (subject to provisions of the Plan and Confirmation Order relating to Disputed Claims) to the Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust, as determined pursuant to this Agreement.  For purposes of allocation of the Liquidating Trust's net taxable income, the Pension Benefit Guaranty Corporation shall be allocated the first $350,000 of any such net taxable income as a priority allocation.

9.3    As soon as practicable after the Effective Date, the Trustees (to the extent that they deem it necessary or appropriate in the reasonable exercise of their discretion) shall, in good faith, value the Liquidating Trust Assets, and shall apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Debtors, the Trustees and the Beneficiaries) for all federal income tax purposes.  The Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

## ARTICLE X

## MAINTENANCE OF RECORDS

10.1    <u>Books and Records</u>.  The Trustees shall maintain books and records relating to the Claims of the Beneficiaries, the Liquidating Trust Assets, the income of the Liquidating Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Said books and records shall be open to reasonable inspection by any Beneficiary upon written request to the Trustees.  The Trustees shall furnish to any Beneficiary upon written request an annual statement of receipts and disbursements, including a summary of all income and expenses of the Liquidating Trust.

10.2    <u>Notice of Intent to Destroy</u>.  Should the Trustees determine that the retention of certain of the Debtors' books and records is no longer necessary or beneficial to the Liquidating Trust, the Trustees shall File no less than 30 days' written notice of its intent to destroy or abandon such books and records in the Cases.  To the extent a final decree has been entered in the Chapter 11 Cases and the Chapter 11 Cases are closed, the Trustees may alternatively provide 30 days' written notice of such intent to [____].

**DRAFT**

10.3 <u>Confidentiality</u>. The Trustees shall hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any of the Liquidating Trust Assets or of which the Trustees become aware in their capacity as such; provided, however, that this Section 10.2 shall not apply to information provided in compliance with an Order of the Bankruptcy Court.

## ARTICLE XI

## LIQUIDATING TRUST OVERSIGHT COMMITTEE

11.1 <u>Oversight Committee</u>. As of the Effective Date, the initial members of the Oversight Committee (each, a "<u>Member</u>" and, together, the "<u>Members</u>") shall be comprised of: (i) up to two members of the Creditors' Committee that shall agree to serve on the Oversight Committee (the "<u>UCC Members</u>"); and (ii) up to three representatives selected by the Ad Hoc Group of Second Lien Noteholders that shall agree to serve on the Oversight Committee (the "<u>2L Members</u>"). The UCC Members shall hold two (2) votes in the aggregate, and the 2L Members shall hold three (3) votes in the aggregate. The initial Members and votes of the Members shall be as set forth in the table below:

| Member Type | Member Name | Number of Votes |
|---|---|---|
| UCC Member | Pace Industry Union-Management Pension Fund | 1 |
| UCC Member | Pension Benefit Guaranty Corporation, | 1 |
| 2L Member | Barings LLC | 1 |
| 2L Member | Cross Sound Management LLC | 2 |

The 2L Members may reallocate their votes among the 2L Members at any time or from time to time, provided, that the 2L Members shall notify the Trustees and the Oversight Committee of any such reallocation by email as soon as reasonably practicable. Should any of the Members resign from or otherwise cease to serve on the Oversight Committee, replacements, if any, may be selected in accordance with <u>Section 11.8</u>. In all circumstances, the Oversight Committee and its Members shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Liquidating Trust. The Oversight Committee shall not take any action which will cause the Liquidating Trust to fail to qualify as a "liquidating trust" for U.S. federal income tax purposes.

11.2 <u>Oversight Committee Approval</u>. Except as otherwise expressly provided herein, the following shall constitute an act or decision of the Oversight Committee:

        A. <u>Meeting Vote</u>: A majority affirmative vote of the Members present at a meeting at which a quorum is present shall be the act of the Oversight Committee (a "<u>Meeting Vote</u>"). Members holding a majority of the voting power of all Members then sitting on the Oversight Committee shall constitute a quorum for the transaction of

EAST\158265739.3 -24-

**DRAFT**

business at any meeting of the Oversight Committee. Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangement (rather than or in addition to the place) for holding thereof. Any Member participating by this means is deemed to be present in person at the meeting.

        B.    <u>Unanimous Written Consent</u>: Any actions required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent (a "<u>UWC</u>", and together with the Meeting Vote, "<u>Affirmative Consent</u>"), as evidenced by one or more written consents describing the action taken and signed by the Members.

        C.    <u>Email Consent</u>: Solely to the extent permitted in <u>Section 11.5</u>, the Trustees may make recommendations for the action or inaction of the Oversight Committee via email on four (4) business days' notice (the "<u>Voting Period</u>"), and in the absence of Members who hold a majority of the voting power of all Members rejecting the recommendation within the Voting Period, the recommendation shall be deemed to have been approved by a majority vote of the Members ("<u>Email Consent</u>"). For the avoidance of doubt, Email Consent is not Affirmative Consent.

11.3    <u>Reports to the Oversight Committee</u>. Notwithstanding any other provision of this Agreement, the Trustees shall report to the Oversight Committee as may be requested by the Oversight Committee, but not less than quarterly, and such reports shall include any material updates and any such other matters and information as reasonably requested by the Oversight Committee. The Oversight Committee shall keep all such information strictly confidential, except to the extent the Oversight Committee deems it reasonably necessary to disclose such information to the Court [(in which case, a good faith effort shall be made to file such information under seal)].

11.4    <u>Actions Requiring Approval by Affirmative Vote of the Oversight Committee</u>. Notwithstanding anything to the contrary herein, the Trustees shall obtain the approval of the Oversight Committee prior to taking any of the following actions, which approval must be by Affirmative Consent:

        A.    The commencement or settlement of any Litigation Claims against any third parties, other than Claim objections;

        B.    The selection of Liquidating Trust professionals with respect to the prosecution of Litigation Claims and the terms of the engagement thereof;

        C.    The timing for payment of any deferred compensation to the Trustees;

        D.    The removal of any Trustee, the appointment of any successor Trustee, and the appointment of any successor Member of the Oversight Committee;

**DRAFT**

E.     The modification or amendment of this Liquidating Trust Agreement in accordance with <u>Section 13.8</u>; and

F.     The decision to cause the Liquidating Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, in accordance with <u>Section 3.12</u>.

11.5    <u>Actions Subject to Approval by Affirmative Vote or Email Consent of the Oversight Committee</u>. Notwithstanding anything to the contrary herein, the Trustees shall obtain the approval of the Oversight Committee prior to taking any of the following actions, which approval may be made by Affirmative Consent or Email Consent:

A.     The settlement, compromise, withdrawal, dismissal or other resolution of any Claims or Objections to Claims where the settlement, compromise, withdrawal, dismissal or other resolution amount exceeds $250,000;

B.     The sale, transfer, abandonment, assignment or other disposition of any Liquidating Trust Assets having a valuation in excess of $50,000;

C.     The borrowing of any funds by the Liquidating Trust or pledge of any portion of the Liquidating Trust Assets and the terms of any such arrangements;

D.     The amount and timing of Distributions to Beneficiaries from Liquidating Trust Assets or the proceeds of Liquidating Trust Assets (other than Distributions to Holders of Allowed General Unsecured Claims from the GUC Cash Pool); and

E.     The investment of the Liquidating Trust Assets in Permitted Investments other than those described in section 345 of the Bankruptcy Code.

11.6    <u>Conflicts</u>. To the extent one of the Trustees cannot take any action, including, without limitation, the prosecution of any Litigation Claims or the objection to any Claim, by reason of an actual or potential conflict of interest, the remaining Trustee, if any, shall be authorized to take any such action(s) in his place and stead.  To the extent both of the Trustees (or the sole Trustee, if applicable) cannot take any action, including, without limitation, the prosecution of any Litigation Claims or the objection to any Claim, by reason of an actual or potential conflict of interest, the Oversight Committee acting by a majority of voting power shall be authorized to take any such action(s) in his place and stead, including without limitation, the retention of professionals (which may include professionals retained by the Trustees) for such purpose of taking such actions.

11.7    <u>Compensation of the Oversight Committee</u>. The Members shall be entitled to (i) compensation as set forth in <u>Section 3.13</u> of this Agreement to the extent such compensation is approved by the Court; and (ii) reimbursement of all reasonable out-of-pocket expenses incurred in such Members' duty on behalf of the Oversight Committee, in each case payable in accordance with <u>Section 8.8</u> of this Agreement; provided, that such Members shall not be reimbursed for the fees, costs or expenses of separate counsel, but such Members may consult with the Liquidating Trustees' counsel and any other of the Liquidating Trustees' professionals at no cost to the individual Members.

EAST\158265739.3 -26-

NY 77263700

**DRAFT**

11.8    <u>Tenure and Replacement of the Members</u>.  The authority of the Members will be effective as of the Effective Date and will remain and continue in full force and effect until the Liquidating Trust is dissolved in accordance with the terms of this Agreement.  The service of the Members will be subject to the following terms and conditions:

        A.    The Members will serve until death, incapacitation or resignation.

        B.    A Member may resign at any time by providing a written notice of resignation to the Trustees and remaining members of the Oversight Committee.  Such resignation will be effective on the earlier of: (a) when a successor is appointed as provided herein; (b) at a time mutually agreed to by the Trustees and the Oversight Committee; and (c) thirty (30) days after the date of the notice of resignation, and as such time, the resigning member shall have no further liability or responsibility with respect thereto.

        C.    Upon the resignation, death, or incapacity of a Member, the successor UCC Member shall be appointed by the remaining UCC Member, and the successor 2L Member shall be appointed by the remaining 2L Members.

        D.    Immediately upon appointment of a successor Member, all rights, powers, duties, authority, and privileges of the predecessor Member hereunder shall be vested in, and be undertaken by, the successor Member without any further act, and the successor Member shall not be liable for any act or omission of the predecessor Member.

11.9    <u>Recusal</u>.    A Member shall be recused from the Oversight Committee's deliberations and votes on any matters as to which such Member has a conflicting interest.  If a Member does not voluntarily recuse itself from any such matter, that Member may be recused from such matter by the unanimous vote of the remaining Members that are not recused from the matter.  In such event, (a) a unanimous affirmative vote of the non-recused Members shall be required to constitute an act of the Oversight Committee, and (b) the recused Member may challenge such vote, and the vote which resulted in the involuntary recusal of the Member, and the Court shall have jurisdiction to adjudicate such matter.

11.10    <u>Proxies</u>.    With respect to any act or decision taken by Meeting Vote, UWC, or Email Consent, any Member of the Oversight Committee may vote for itself or by proxy.  Any Member of the Oversight Committee may appoint a proxy in writing and such appointment shall be transmitted to the proxyholder and the Trustees by email at any time.  The appointment of a proxy shall be effective for the period expressly specified in the appointment form.

11.11    <u>Limitation of Liability</u>.  Neither the Oversight Committee nor any of its Members shall be liable for the act, omission, default or misconduct of any other Member of the Oversight Committee, nor shall any Member be liable for anything other than such Member's own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty. The Oversight Committee may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with the Liquidating Trustee's counsel and any other of the Liquidating Trustee's professionals, and the Oversight Committee shall not be liable for anything done or omitted in accordance with the advice or opinions of such professionals. If the Oversight Committee determines not to consult with counsel, accountants or other professionals, such

**DRAFT**

failure to consult shall not be deemed to impose any liability on the Oversight Committee or its Members.

## ARTICLE XII

## DURATION OF LIQUIDATING TRUST

12.1    <u>Duration</u>.  The Liquidating Trust shall become effective upon the Effective Date of the Plan, and the Liquidating Trust and its provisions herein shall remain and continue in full force and effect until the Liquidating Trust is terminated.

12.2    <u>Termination</u>.  The Trustees and the Oversight Committee shall be discharged and the Liquidating Trust shall be terminated, at such time as: (i) all Disputed Claims have been resolved; (ii) all of the Litigation Claims have been prosecuted to completion and the Liquidating Trust Assets have been collected and liquidated; (iii) all duties and obligations of the Trustees under this Agreement have been fulfilled; (iv) all Distributions required to be made by the Liquidating Trust under the Plan and this Agreement have been made; and (v) the Cases have been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, unless the Liquidating Trust has procured a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  After the termination of the Liquidating Trust, the Trustees shall retain for a period of twelve (12) months the books, records, Beneficiary lists and certificates and other documents and files which shall have been delivered to or created by the Trustees.  At the Trustees' discretion, all of such records and documents may, but need not, be destroyed at any time after twelve (12) months from the termination of the Liquidating Trust.  Except as otherwise set forth in this Section 12.2, upon termination of the Liquidating Trust, the Trustees shall have no further duties or obligations hereunder.

## ARTICLE XIII

## MISCELLANEOUS

13.1    <u>Jurisdiction</u>.  The Court shall have exclusive jurisdiction over (a) the Liquidating Trust and the Trustees, with respect to the administration of and activities relating to the Liquidating Trust, and (b) any issues or disputes arising out of this Agreement or the administration of and activities relating to the Liquidating Trust; provided, however, that notwithstanding the foregoing, the Trustees shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute the Litigation Claims.

13.2    <u>Notices</u>.  All notices to be given to the Holders of Claims and the Beneficiaries may be given by ordinary mail at the addresses appearing on the books kept by Trustees.  Any

**DRAFT**

notice or other communication which may be or is required to be given, served or sent to the Trustees shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

If to the Trust/Trustees:

      Alan D. Halperin.
      Halperin Battaglia Benzija, LLP
      40 Wall Street, 37th Floor
      New York, New York 10005
      Email: ahalperin@halperinlaw.net

      and

      Eugene I. Davis
      PIRINATE Consulting Group, LLC
      5 Canoe Brook Drive
      Livingston, New Jersey 07039
      Email: genedavis@pirinateconsulting.com

If to the Oversight Committee:

      Charles Knight
      Pace Industry Union-Management Pension Fund
      Tel:  615.315.0292
      Email:  CKnight@uswbenefitfunds.com

      Thomas Taylor
      Pension Benefit Guaranty Corporation
      Tel: 202.326.4020 Ext. 3303
      Email:  taylor.thomas@pbgc.gov

      Barings LLC
      Attn: Bryan High
      Email: Bryan.High@barings.com

      Cross Sound Management LLC
      Attn: David Dunn
      Email: Dunn@cross-sound.com

or to such other address as may from time to time be provided in written notice by the Trustees or the Oversight Committee.

    13.3    <u>Governing Law</u>.  This Agreement is made in the State of Delaware, and the Liquidating Trust and this Agreement, and the rights and obligations of the Trustees and the

EAST\158265739.3 -29-

NY 77263700

**DRAFT**

Oversight Committee are to be governed by and construed and administered according to the laws of the State of Delaware without regard to such state's principles of conflicts of law, provided, however, that, except as expressly provided in this Agreement, there shall not be applicable to the Liquidating Trust, the Trustees, the Oversight Committee or its Members, or this Agreement (a) the provisions of Section 3540 of Title 12 of the Delaware Code, or (b) any provisions of the laws (statutory or common) of the State of Delaware pertaining to trusts which relate to or regulate: (i) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (ii) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (iii) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (iv) fees or other sums payable to trustees, officers, agents or employees of a trust, (v) the allocation of receipts and expenditures to income or principal, (vi) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, or (vii) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees, which are inconsistent with the limitations or liabilities or authorities and powers of the Trustees set forth or referenced in this Agreement.

13.4    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

13.5    <u>No Execution</u>.  All funds in the Liquidating Trust and the Reserves shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary or a Holder of the Other Claims, or as otherwise permitted by this Agreement, as applicable, and no Beneficiary or any other Person can bind, pledge, encumber, execute upon, garnish or attach the Liquidating Trust Assets or the Reserves in any manner or compel payment from the Liquidating Trust or the Trustees except by Final Order of the Court. All payments and Distributions will be governed solely by the Plan and this Agreement.

13.6    <u>Plan and Confirmation Order</u>.  To the extent that the terms of this Agreement are inconsistent with the terms set forth in the Plan, then the terms of the Plan shall govern and control.  To the extent that the terms of this Agreement are inconsistent with the terms set forth in the Confirmation Order, then the terms of the Confirmation Order shall govern and control.

13.7    <u>Intention of Parties to Establish Grantor Trust</u>.  This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust, and any ambiguity herein shall be construed consistent herewith, and if necessary, this Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

13.8    <u>Amendment</u>.  The Trustees may, with the approval of Members who hold a majority of the voting power of all Members of the Oversight Committee, modify, supplement or amend this Agreement, but only to clarify any ambiguity or inconsistency, or render the Agreement in compliance with its stated tax purposes, and only if such amendment (a) does not materially and adversely affect the interests, rights, treatment or Distributions of any Beneficiaries, and (b) is not inconsistent with the Plan or the Confirmation Order.  In the event

**DRAFT**

that the Oversight Committee is unable to reach a majority vote regarding a proposed modification, supplement or amendment, the Trustees may seek Court approval of any such modification, supplement or amendment.

13.9    Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

13.10    Integration.  This Agreement, the Plan and the Confirmation Order constitute the entire agreement with, by and among the parties thereto, and there are no representations, warranties, covenants or obligations except as set forth herein, in the Plan and in the Confirmation Order.  This Agreement, together with the Plan and the Confirmation Order, supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.

13.11    Third Party Beneficiary.  This Liquidating Trust Agreement shall be binding upon and inure to the benefit of each of the parties hereto and, additionally, shall inure to the benefit of the Oversight Committee and its successors and assigns and the Beneficiaries and each of their respective successors and assigns and, except as provided hereunder, nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Liquidating Trust Agreement, the Liquidating Trust Assets or the Liquidating Trust or any part thereof.

13.12    Counterparts.   This Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

13.13    Actions Taken on Other Than Business Day.  In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

[Remainder of page intentionally blank]

08/13/2018 DRAFT

IN WITNESS WHEREOF, the parties have executed this Agreement (or are deemed to have so executed this Agreement) as of the day and year first written above.

**Debtors:**

**OLDAPCO, INC.**

By: /s/ *DRAFT*_____
     Name:  Alan D. Holtz
     Title:  Chief Restructuring Officer

**OLDAPCO PDC CORP.**

By: /s/ *DRAFT*_____
     Name:  Alan D. Holtz
     Title:  Chief Restructuring Officer

**OLDAPCO PDC CAP CORP.**

By: /s/ *DRAFT*_____
     Name:  Alan D. Holtz
     Title:  Chief Restructuring Officer

**OLDAPCO ARFI LLC**

By: /s/ *DRAFT*_____
     Name:  Alan D. Holtz
     Title:  Chief Restructuring Officer

*Signature Page of the Liquidating Trust Agreement*

**DRAFT**

**OLDAPCO APVN LLC**

By: /s/ DRAFT
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

**Co-Trustees:**

By: /s/ DRAFT
    Name:  Alan D. Halperin
    Title:  Co-Trustee to the Liquidating Trust

By: /s/ DRAFT
    Name:  Eugene I. Davis
    Title:  Co-Trustee to the Liquidating Trust

**08/13/2018 DRAFT**

EXHIBIT A


Plan

**DRAFT**

## EXHIBIT B

### Confirmation Order

EAST\158265739.3 -35-

NY 77263700

**DRAFT**

EXHIBIT C

Trustees' Compensation

The Trustees shall be compensated at an aggregate monthly rate of $20,000 for the duration of the Liquidating Trust, with $10,000 per month in compensation to Trustee Halperin and $10,000 per month in compensation to Trustee Davis.

Of the $20,000 per month in compensation, only $10,000 per month shall be immediately payable on a monthly basis to the Trustees from the Liquidating Trust Assets (each Trustee receiving $5,000 per month). The balance of the monthly compensation owed to each Trustee shall accrue on a monthly basis and shall be payable only to the extent that there are sufficient funds available from Litigation Proceeds to pay the accrued compensation.

The Trustees shall be entitled to additional compensation as set forth in <u>Section 3.13</u> to the extent such additional compensation is approved by the Court.

# SCHEDULE 2:

## Identity of the Liquidating Trustee

### Identification of the Liquidating Trustee

The Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders, in consultation with the Debtors, have selected and appointed Eugene Davis and Alan Halperin as co-trustees to serve as the Liquidating Trustee.

EAST\158243192.2

**SCHEDULE 3:**

**Warrant Agreement**

EAST\158243192.2

Execution Version

# WARRANT AGREEMENT

THIS WARRANT AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "<u>Agreement</u>"), dated as of June 13, 2018, is by and among Appvion Holding Corp., a Delaware corporation (the "<u>Company</u>"), and Computershare Inc., a Delaware corporation ("<u>Computershare</u>"), and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "<u>Warrant Agent</u>").

## RECITALS

**WHEREAS,** Appvion, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") and commenced reorganization cases thereunder (the "<u>Chapter 11 Cases</u>") on October 1, 2017 in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") under Case No. 17-12082 (KJC);

**WHEREAS,** on March 12, 2018, the Bankruptcy Court entered an order approving bidding procedures for a sale of substantially all of the Debtors' assets, including among other things, a process for submitting qualified bids and scheduling an auction and a hearing to approve the sale of the Debtors' assets to the successful bidder [Docket No. 565];

**WHEREAS,** on April 30, 2018, the Debtors filed the *Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Successful Bidder* [Docket No. 709];

**WHEREAS,** on May 14, 2018, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to the Company [Docket No. 751];

**WHEREAS,** on May 9, 2018, the Company, the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of Second Lien Noteholders (as defined below) and Franklin Advisers, Inc. as investment manager on behalf of certain funds and accounts entered into a Settlement Agreement (the "<u>Settlement Agreement</u>") to resolve any and all disputes and issues existing among the parties thereto with respect to the Chapter 11 Cases, including without limitation, all disputes and issues regarding the proposed sale of substantially all of the Debtors' assets to the Company, the ultimate distribution of the proceeds of the proposed sale, and the distribution of proceeds of any other property of the Debtors' estates, which Settlement Agreement was approved by the Bankruptcy Court on May 14, 2018 [Docket No. 753];

**WHEREAS,** certain of the terms and conditions of the Settlement Agreement have been incorporated into the *Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation*, dated as of May 23, 2018 (as may be amended, supplemented or otherwise modified from time to time, the "<u>Plan</u>") [Docket No. 792];

**WHEREAS,** pursuant to the terms of the Settlement Agreement, on the date hereof, the Company will issue and deliver warrants to purchase shares of common stock, par value $0.01 per share, of the Company ("<u>Common Stock</u>") representing an aggregate total of 5.0% of the issued and outstanding shares of Common Stock as of the date hereof on a fully-diluted basis after giving

effect to the exercise in full of all of the Warrants (as defined below) ("Diluted Outstanding Common Stock") to the Debtors to hold in trust for the benefit of the Second Lien Noteholders (as defined below);

**WHEREAS,** on the effective date of the Plan (the "Effective Date") the Debtors will distribute the Warrants under the Plan to the Second Lien Noteholders in exchange for the Allowed Second Lien Secured Note Claims (as defined below) pursuant to section 1145 of the Bankruptcy Code;

**WHEREAS,** the Warrants will be issued in two tranches: (a) Tranche A warrants to purchase shares of Common Stock representing, in the aggregate, 2.5% of the Diluted Outstanding Common Stock (the "Tranche A Warrants") at an exercise price of $27.17 per share (subject to adjustment from time to time as provided in Article V) (the "Tranche A Exercise Price"), and (b) Tranche B warrants to purchase shares of Common Stock representing, in the aggregate, 2.5% of the Diluted Outstanding Common Stock (the "Tranche B Warrants" and together with the Tranche A Warrants, the "Warrants") at an exercise price of $31.25 per share (subject to adjustment from time to time as provided in Article V) (the "Tranche B Exercise Price");

**WHEREAS,** the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

**WHEREAS,** the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, exercise and cancellation of the Warrants; and

**WHEREAS,** all acts and things have been done and performed which are necessary to make the Warrants, when issued, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.

As used in this Agreement, the following capitalized terms shall have the following respective meanings:

(a)    "Ad Hoc Group of Second Lien Noteholders" has the meaning set forth in the Plan.

(b)    "Additional Shares of Common Stock" has the meaning set forth in Section 5.5(b) hereof.

2

(c) "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(d) "Agreement" has the meaning set forth in the preamble.

(e) "Allowed Second Lien Secured Note Claims" has the meaning set forth in the Plan.

(f) "Appropriate Officer" means the Chief Executive Officer, President, Chief Financial Officer, Treasurer, Assistant Treasurer, Secretary, Assistant Secretary or any Vice President (or higher or equivalent officer) of the Company.

(g) "Bankruptcy Code" has the meaning set forth in the Recitals.

(h) "Bankruptcy Court" has the meaning set forth in the Recitals.

(i) "Beneficial Holders" means, with respect to any Warrants represented by a Global Warrant Certificate, any Person that "beneficially owns" (as such term is defined and determined pursuant to Rule 13d-3 promulgated under the Exchange Act) such Warrants.

(j) "Black Scholes Value" means the value of the unexercised portion of any Warrants remaining on the date of the consummation of the Change of Control, which value is calculated using the Black Scholes Option Pricing Model for a "call" option, as obtained from the "OV" function on Bloomberg, L.P. utilizing (i) an underlying price per share equal to the greater of (1) the Current Sale Price of the Common Stock on the Business Day immediately preceding the consummation of the Change of Control and (2) the sum of the price per share being offered in cash in the Change of Control (if any) plus the value of the non-cash consideration being offered in the Change of Control (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the consummation of the Change of Control, (iii) a risk-free interest rate corresponding to the stated rate on the United States Treasury security with a maturity closest to the remaining term of the Warrant as of the date of consummation of the Change of Control, (iv) a zero cost of borrow, (v) the term of the Warrants shall be the amount of time remaining in the Exercise Period as of the date of consummation of the Change of Control and (vi) an expected volatility equal to thirty-seven percent (37%).

(k) "Blackout Period" has the meaning set forth in Section 9.18(f) hereof.

(l) "Board of Directors" means the Board of Directors of the Company.

(m) "Book-Entry Warrants" has the meaning set forth in Section 3.1(d) hereof.

(n) "Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

(o) "Certificated Warrant" has the meaning set forth in Section 3.1(d) hereof.

(p) "Change of Control" means the consummation, in one transaction or a series of related transactions, of any of the following:  (i) any consolidation, merger, share exchange

3

or other business combination of the Company with or into any other Person, other than any such transaction in which the holders of the Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the continuing, resulting or surviving entity of such transaction, or the parent thereof, outstanding immediately after such transaction and in substantially the same proportions relative to each other (provided, however, that such holders of Common Stock shall be deemed to hold substantially the same proportions relative to each other even if they change their percentage holdings relative to each other so long as the holders of Common Stock that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction (determined based on the fewest number of holders that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction) own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the continuing, resulting or surviving entity of such transaction, or the parent thereof, outstanding immediately after such transaction), (ii) any sale or other disposition of Common Stock (other than any sale of Common Stock to any Affiliate of the holder of Common Stock being sold or disposed) representing more than fifty percent (50%) of all of the issued and outstanding shares of Common Stock, or (iii) any sale, lease or other Transfer of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any other Person (other than a direct or indirect Subsidiary of the Company), other than any such transaction in which the holders of Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the acquiring or transferee entity, or the parent thereof, outstanding immediately after such transaction and in substantially the same proportions relative to each other (provided, however, that such holders of Common Stock shall be deemed to hold substantially the same proportions relative to each other even if they change their percentage holdings relative to each other so long as the holders of Common Stock that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction (determined based on the fewest number of holders that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction) own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the acquiring or transferee entity, or the parent thereof, outstanding immediately after such transaction).  For purposes of determining the holders of Common Stock as of immediately prior to any transaction that is described in clause (i), (ii) or (iii) above, if any such transaction is consummated through a series of related transactions (including a combination of different types or forms of transactions described in any of clause (i), (ii) or (iii) above), then such determination shall be made as of immediately prior to the first transaction in such series of related transactions.

(q)   "Chapter 11 Cases" has the meaning set forth in the Recitals.

(r)   "Common Stock" has the meaning set forth in the Recitals, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(s)   "Company" has the meaning set forth in the preamble.

4

(t)   "Computershare" has the meaning set forth in the preamble.

(u)   "Convertible Securities" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

(v)   "Current Sale Price" of the Common Stock on any date of determination is reasonably determined in good faith by the Board of Directors; provided, however, that where a public market exists for the Common Stock at the date of determination, the Current Sale Price shall be the average of the closing sale prices quoted on the national securities exchange on which the Common Stock is quoted or listed for the ten (10) trading day period ending immediately prior to the date of determination (or, if no closing sale price is reported on any day in such ten (10) trading day period, the average of the closing bid and asked prices of the Common Stock on such day), or, if the Common Stock is not listed or quoted on a national securities exchange, the average of the closing bid and asked prices of the Common Stock in the over-the-counter market as reported by the OTC Markets or other similar organization for the ten (10) trading day period ending immediately prior to the date of determination.  If any Warrants are exercised in connection with or conditioned upon a Change of Control, then the Current Sale Price of the Common Stock on the applicable Exercise Date for purposes of Section 4.3(b) shall be deemed to be equal to the greater of (i) the Current Sale Price of the Common Stock on the Business Day immediately preceding the consummation of the Change of Control, as determined pursuant to the immediately preceding sentence, and (ii) the sum of the price per share being offered in cash in the Change of Control (if any) plus the value of the non-cash consideration being offered in the Change of Control (if any).

(w)   "Date of Issuance" has the meaning set forth in Section 3.1(b) hereof.

(x)   "Debtors" has the meaning set forth in the Recitals.

(y)   "Depositary" has the meaning set forth in Section 3.1(d) hereof.

(z)   "Diluted Outstanding Common Stock" has the meaning set forth in the Recitals.

(aa)   "Direct Registration Warrants" has the meaning set forth in Section 3.1(d) hereof.

(bb)   "e-mail" has the meaning set forth in Section 9.3 hereof.

(cc)   "Effective Date" has the meaning set forth in the Recitals.

(dd)   "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(ee)   "Exercise Date" means, in connection with any exercise of Warrants by a Holder, any date on or prior to the expiration of the Exercise Period on which such Holder exercises the Warrant once all conditions to such exercise specified in Section 4.3(d) hereof have been satisfied; provided, however, that if any Warrants are exercised conditioned upon the occurrence of a Change of Control, then the Exercise Date shall be on the date of the consummation of such Change of Control.

5

(ff) "Exercise Form" has the meaning set forth in Section 4.3(d) hereof.

(gg) "Exercise Period" has the meaning set forth in Section 4.2 hereof.

(hh) "Exercise Price" means (i) with respect to the Tranche A Warrants, the Tranche A Exercise Price, and (ii) with respect to the Tranche B Warrants, the Tranche B Exercise Price.

(ii) "Funds" has the meaning set forth in Section 9.15 hereof.

(jj) "GAAP" means generally accepted accounting principles in the United States, as in effect from time to time, consistently applied.

(kk) "Global Warrant Certificates" has the meaning set forth in Section 3.1(d) hereof.

(ll) "Governmental Authority" means any (i) government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(mm) "Holder" has the meaning set forth in Section 4.1 hereof.

(nn) "issuance", for purposes of Section 5.5 hereof, has the meaning set forth in Section 5.5 hereof.

(oo) "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(pp) "nonelecting share" has the meaning set forth in Section 5.6 hereof.

(qq) "Options" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

(rr) "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's equity securities or assets or other similar transaction, in each case, which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which is a Change of Control or which triggers an adjustment pursuant to any provision of Article V, as applicable, other than Section 5.6.

(ss) "OTC Markets" means either the OTCQX or the OTCQB.

6

(tt) "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Authority or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(uu) "Plan" has the meaning set forth in the Recitals.

(vv) "Pro Rata" has the meaning set forth in the Plan.

(ww) "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock (subject to satisfaction of any conditions to participation therein such as those relating to minimum holding percentages or accredited status) to purchase or exchange their shares of Common Stock, in the case of both clauses (i) and (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person, or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary of the Company), or any combination thereof, effected while the Warrants are outstanding. The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(xx) "Registered Holder" has the meaning set forth in Section 3.3(d) hereof.

(yy) "Requisite Holders" means, as of any date of determination, Holders of Warrants exercisable for a majority of the Common Stock issuable upon exercise of all Warrants then outstanding; provided, however, that any Warrants held by (i) the Company, (ii) any Affiliate of the Company or (iii) any officer or director of the Company or any Affiliate of the Company shall be disregarded and not outstanding for purposes of determining Requisite Holders.

(zz) "SEC" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(aaa) "Second Lien Noteholders" has the meaning set forth in the Plan.

(bbb) "Securities Act" means the Securities Act of 1933, as amended.

(ccc) "Settlement Agreement" has the meaning set forth in the Recitals.

(ddd) "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of the Voting Securities of such corporation is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability

7

company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(eee)   "Tranche A Exercise Price" has the meaning set forth in the Recitals.

(fff) "Tranche A Warrants" has the meaning set forth in the Recitals.

(ggg)   "Tranche B Exercise Price" has the meaning set forth in the Recitals.

(hhh)   "Tranche B Warrants" has the meaning set forth in the Recitals.

(iii) "Transfer" means any transfer, sale, assignment or other disposition.

(jjj) "Voting Securities" means, with respect to any Person, the securities of such Person, the holders of which are ordinarily entitled to vote for the election of directors (or Persons performing similar functions) of such Person (other than securities entitled to vote only by reason of the happening of a contingency).

(kkk)   "Warrant Agent" has the meaning set forth in the preamble and shall include any successor to the Warrant Agent pursuant to Section 8.1 hereof.

(lll) "Warrant Certificate" has the meaning set forth in Section 3.1(d) hereof.

(mmm)"Warrant Exercise Shares" means the shares of Common Stock issuable upon the exercise of a Warrant.

(nnn)   "Warrant Register" has the meaning set forth in Section 3.3(c) hereof.

(ooo)   "Warrant Restrictions" has the meaning set forth in Section 3.1(d).

(ppp)   "Warrant Statements" has the meaning set forth in Section 3.1(d) hereof.

(qqq)   "Warrants" has the meaning set forth in the Recitals.

Section 1.2     Rules of Construction.

(a)   The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa. The use herein of a word of any gender shall include correlative words of all genders.

(b)   Unless otherwise specified, references to Articles, Sections, Exhibits and other subdivisions of this Agreement are to the designated Articles, Sections, Exhibits and other

8

subdivisions of this Agreement.  The words "hereof", "herein", "hereunder", "hereby" and words of similar import refer to this Agreement as a whole.  The words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation".

(c)  References to "$" are to dollars in lawful currency of the United States of America.

(d)  The Exhibits attached hereto are an integral part of this Agreement.

(e)  This Warrant Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II

## APPOINTMENT OF WARRANT AGENT

Section 2.1     Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement (and no implied terms or conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

## ARTICLE III

## WARRANTS

Section 3.1     Issuance of Warrants.

(a)  On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Settlement Agreement, on the date of this Agreement, the Company will issue the Warrants to the Debtors to hold in trust for the benefit of the Second Lien Noteholders.

(b)  On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Settlement Agreement, on the Effective Date (such date, the "Date of Issuance") the Debtors will distribute the Warrants under the Plan to the Second Lien Noteholders in exchange for the Allowed Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code, as set forth in the Plan, and the Company and Warrant Agent will take all commercially reasonable action to effect such distribution.

(c)  [Intentionally Deleted.]

(d)  Unless otherwise provided in this Agreement, the Warrants (such Warrants being referred to as "Book-Entry Warrants") shall be issued through the book-entry facilities of The Depository Trust Company, as depositary (the "Depositary"), in the form of global warrant certificates ("Global Warrant Certificates"), duly executed on behalf of the Company and

9

countersigned, either by manual, facsimile or other electronically submitted signature, by the Warrant Agent, in the manner set forth in Section 3.2(b) below, which the Company shall deliver, or cause to be delivered to the Depositary, on or as soon as reasonably practicable after the Date of Issuance. Notwithstanding the foregoing, any Warrants which are not issuable through the book-entry facilities of the Depositary shall either be (x) represented by certificates (together with the Global Warrant Certificates, "Warrant Certificates"; and any Warrant represented by a Warrant Certificate, other than a Global Warrant Certificate, being referred to as a "Certificated Warrant") or (y) issued by electronic entry registration on the books of the Warrant Agent ("Direct Registration Warrants") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "Warrant Statements"); provided, that any Certificated Warrants or Direct Registration Warrants that are not subject to any restriction on Transfer or exercise, or are not subject to any vesting requirements (such restrictions or requirements, but excluding any restrictions included in this Agreement or any restrictions imposed under applicable federal or state securities Laws, "Warrant Restrictions"), may be exchanged at any time for a corresponding number of Book-Entry Warrants, in accordance with Section 6.1(d) and the applicable procedures of the Depositary and the Warrant Agent (it being understood that none of the Warrants issued to the Debtors as of the date of this Agreement and none of the Warrants that will be distributed by the Debtors under the Plan to the Second Lien Noteholders will be subject to any Warrant Restrictions).

Section 3.2    Form of Warrant; Execution of Warrant Certificates.

(a)    Subject to Section 6.1 of this Agreement, the Global Warrant Certificate for the Tranche A Warrants shall be in substantially the form set forth in Exhibit A-1 attached hereto and the Global Warrant Certificate for the Tranche B Warrants shall be in substantially the form set forth in Exhibit A-2 attached hereto. The certificates for Certificated Warrants for the Tranche A Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-3 attached hereto and the certificates for Certificated Warrants for the Tranche B Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-4 attached hereto. The Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, may have such letters, numbers or other marks of identification or designation and such legends or endorsements placed thereon as may be required by the Depositary and as are consistent with the provisions of this Agreement, or as may be required to comply with any Law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange on which the Warrants may be listed or as may be reasonably determined (in a manner consistent with the provisions of this Agreement) by the Appropriate Officer of the Company executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates. Such signatures may be manual, facsimile or other electronically transmitted signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.

(b)    In case any Appropriate Officer of the Company who shall have signed any of the Warrant Certificates (either manually or by facsimile or other electronically transmitted signature) shall cease to be such Appropriate Officer before the Warrant Certificates so signed shall have been countersigned (either manually or by facsimile or other electronically

10

transmitted signature) by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by any Person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Warrant Certificate, although at the date of the execution of this Agreement any such Person was not such Appropriate Officer.

(c)   The Global Warrant Certificates shall be deposited on or after the Date of Issuance with the Warrant Agent and registered in the name of Cede & Co., as the nominee of the Depositary. Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(d)   A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been cancelled in accordance with the terms hereof.

Section 3.3    Registration and Countersignature.

(a)   Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent (i) shall upon receipt of Warrant Certificates, including the Global Warrant Certificates, duly executed on behalf of the Company, countersign, either by manual, facsimile or other electronically transmitted signature, such Warrant Certificates evidencing Warrants, and record such Warrant Certificates, including the Registered Holders thereof, in the Warrant Register, and (ii) shall register in the Warrant Register any Direct Registration Warrants in the names of the initial Registered Holders thereof. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Certificated Warrants or Direct Registration Warrants and the name of the Registered Holders thereof, and the number of Warrants that are to be issued as Book-Entry Warrants, and the Warrant Agent may rely conclusively on such written order.

(b)   No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the manual, facsimile or other electronically transmitted signature of the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder.

(c)   The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Certificated Warrants or Direct Registration Warrants, and the Warrants represented by Global Warrant Certificates, and exercises, exchanges, cancellations and Transfers of outstanding Warrants in accordance with the

11

procedures set forth in <u>Section 6.1</u> of this Agreement, all in a form reasonably satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Holder in connection with any such exchange or registration of Transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d)  Prior to due presentment for registration of Transfer or exchange of any Warrants in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the Person in whose name such Warrants are registered upon the Warrant Register (the "<u>Registered Holder</u>" of such Warrants) as the absolute owner of such Warrants, for all purposes including, without limitation, for the purpose of any exercise thereof (subject to <u>Section 4.3(d)(z)</u>), any distribution to the Holder thereof and for all other purposes (subject to <u>Section 4.1(ii)</u>), and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.  Neither the Company nor the Warrant Agent will be liable or responsible for any registration or Transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

**ARTICLE IV**

**TERMS AND EXERCISE OF WARRANTS**

Section 4.1    <u>Exercise Price</u>.  Each Tranche A Warrant and each Tranche B Warrant shall entitle (i) in the case of the Certificated Warrants or Direct Registration Warrants, the Registered Holder thereof and (ii) in the case of Book-Entry Warrants, the Beneficial Holder thereof ((i) and (ii) collectively, the "<u>Holder</u>"), subject to the provisions of this Agreement, the right to purchase from the Company one share of Common Stock (subject to adjustment from time to time as provided in <u>Article V</u> hereof), at the Tranche A Exercise Price and Tranche B Exercise Price, respectively.  Notwithstanding any provision to the contrary in this Agreement, from the date of this Agreement until the Date of Issuance, the Debtors will hold the Warrants in trust solely for the benefit of the Second Lien Noteholders and are not considered a "Holder" of the Warrants entitled to exercise the Warrants.

Section 4.2    <u>Exercise Period</u>.  Warrants may be exercised by the Holder thereof, in whole or in part, at any time and from time to time after the Date of Issuance and prior to 5:00 P.M., New York time on June 13, 2023 (the "<u>Exercise Period</u>").  Any fractional shares of Common Stock that would otherwise be issued upon the exercise of any Warrants are subject to the terms of <u>Section 4.6</u>.  To the extent that a Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 4.3    <u>Method of Exercise</u>.

(a)  In connection with the exercise of any Warrant, (i) in the case of Certificated Warrants, the Holder shall surrender the Warrant Certificate that represents such Certificated Warrants (or any affidavit of loss if the Holder does not have possession of such Warrant

12

Certificate at the time of exercise) to the Warrant Agent for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which such Certificated Warrants are exercisable and (ii) the Exercise Price shall be paid, at the option of the Holder, (x) in United States dollars by personal, certified or official bank check payable to the Company (if by certified or official bank check the Holder's Computershare account number and name and address must be typeset on the check), or by wire transfer to an account specified in writing by the Company or the Warrant Agent to such Holder, in either case in immediately available funds in an amount equal to the aggregate Exercise Price for the Warrant Exercise Shares for which the Warrants are being exercised as specified in the Exercise Form or (y) by cashless exercise as set forth in Section 4.3(b).

(b)  In lieu of paying the Exercise Price by personal, certified or official bank check or by wire transfer, any Holder may elect to exercise Warrants by authorizing the Company to withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares for which the Warrants are being exercised, and (y) the Exercise Price, divided by (ii) the Current Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under such Warrants, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares).

(c)  Upon exercise of any Warrants, the Warrant Agent will as promptly as practicable, within a reasonable time period to enable the Company to meet its obligations under Section 4.4(a), deliver written notice to the Company to confirm the number of Warrant Exercise Shares issuable in connection with such exercise. The Company shall calculate and transmit to the Warrant Agent in a written notice, and the Warrant Agent shall have no duty, responsibility or obligation to calculate, the number of Warrant Exercise Shares issuable in connection with any exercise. The Warrant Agent shall be entitled to rely conclusively on any such written notice provided by the Company, and the Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with such written instructions or pursuant to this Agreement. Such written notice from the Company shall also set forth the cost basis for such shares of Common Stock issued pursuant to such exercise.

(d)  Subject to the terms and conditions of this Agreement, in order to validly exercise, in whole or in part, any of the Warrants, the Holder of such Warrants must exercise such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrants by: (x) in the case of Certificated Warrants, providing an exercise form for the election to exercise such Warrants (including the exercise forms referred to in clauses (y) and (z) below, an "Exercise Form") substantially in the form of Exhibit B-1, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, (y) in the case of Direct Registration Warrants, providing an Exercise Form substantially in the form of Exhibit B-2 hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, and (z) in the case of Book-Entry Warrants, providing an Exercise Form in compliance with the practices and procedures of the Depositary and its direct and indirect participants, as applicable.

(e)  Any exercise of Warrants pursuant to the terms of this Agreement shall be irrevocable as of the date of delivery of the Exercise Form and shall constitute a binding

13

agreement between the Holder and the Company, enforceable in accordance with the terms of this Agreement; provided, however, an exercise of Warrants may be conditioned upon the occurrence of any Change of Control that is specified in the Exercise Form and such conditional exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the range of dates (which date of occurrence or range of dates shall occur or end, as applicable, no later than a date that is the later of (i) 30 days from the date of delivery of the Exercise Form, and (ii) the proposed effective date of the Change of Control specified in the notice of the Change of Control delivered by the Company pursuant to Section 7.2 ), specified in such Exercise Form.

(f)    In the case of Certificated Warrants, upon receipt of the Warrant Certificate with the properly completed and duly executed Exercise Form, or in the case of Direct Registration Warrants, upon receipt of the properly completed and duly executed Exercise Form, in each case pursuant to Section 4.3(d), the Warrant Agent shall:

(i)    examine the Exercise Form and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the information provided on any Exercise Form received and the information on the Warrant Register;

(iv)    advise the Company as promptly as practicable, within a reasonable time period to enable the Company to meet its obligations under Section 4.4(a), after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of Warrant Exercise Shares in respect of which the Warrants are requested to be exercised in accordance with the terms and conditions of this Agreement, (B) the instructions with respect to delivery of the Common Stock deliverable upon such exercise, subject to timely receipt of such information by the Warrant Agent, and (C) such other information as the Company shall reasonably request; and

(v)    subject to Common Stock being made available to the Warrant Agent by or on behalf of the Company, and written instructions from the Company, liaise with the transfer agent for the Common Stock for the issuance and registration of the number of shares of Common Stock issuable upon exercise of the Warrants in accordance with the Exercise Form.

The Company reserves the right reasonably to reject any and all Exercise Forms that it determines are not in proper form or for which any corresponding agreement by the Company to exchange

14

would, in the opinion of the Company, be unlawful. Any such determination by the Company shall be final and binding on the Holders of the Warrants, absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrants or any defects in the Exercise Form(s) with regard to any particular exercise of Warrants. The Company shall provide prompt written notice to the Warrant Agent of any such rejection or waiver.

(g)   In the case of Book-Entry Warrants, the Company and the Warrant Agent shall cooperate with the Depositary and its direct and indirect participants in order to effectuate the exercise of such Warrants, in accordance with the applicable practices and procedures of the Depositary and such participants, including the manner of delivery of notice of exercise by the Beneficial Holders thereof, in such form as shall be prescribed by such participants, as applicable.

(h)   The Warrant Agent shall forward funds received for warrant exercises in a given month by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company.

Section 4.4     Issuance of Common Stock.

(a)   Upon the effectiveness of any exercise of any Warrants pursuant to Section 4.3, the Company shall, subject to Section 4.6, promptly at its expense, and in no event later than five (5) Business Days after the Exercise Date, (i) cause to be issued as directed by the Holder of such Warrants the total number of whole shares of Common Stock for which such Warrants are being exercised (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder by electronic entry on the books of the Company's transfer agent or, if the Common Stock is then held through the book-entry facilities of the Depositary, through the book-entry facilities of the Depositary, and (ii) in the case of Certificated Warrants where less than the full number of Certificated Warrants evidenced by the Warrant Certificate are being exercised, deliver or cause to be delivered to the Holder thereof a new Warrant Certificate, of like tenor, for the number of Certificated Warrants evidenced by such Warrant Certificate, less the number of Warrants then being exercised.

(b)   The Warrant Exercise Shares shall be deemed to have been issued at the time at which all of the conditions to such exercise have been fulfilled, and the Holder, or other Person to whom the Holder shall direct the issuance thereof, shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

Section 4.5     Reservation of Shares.

(a)   During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of all outstanding Warrants. The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents, any agreements to which the Company is a party, any

15

requirements of any national securities exchange upon which shares of Common Stock may be listed or any applicable Laws.  The Company shall not at any time permit the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of all outstanding Warrants.

(b)  The Company covenants that it will take such actions as may be necessary or appropriate in order that all Warrant Exercise Shares issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be validly issued, fully paid and non-assessable, and free from any and all (i) security interests and liens (other than security interests and liens created by a Holder) and (ii) taxes and charges with respect to the issuance thereof, other than income taxes incurred in connection with the exercise of the Warrants or taxes in respect of any Transfer occurring contemporaneously therewith.  If at any time prior to the expiration of the Exercise Period the number and kind of authorized but unissued shares of the Company's capital stock shall not be sufficient to permit exercise in full of all outstanding Warrants, the Company will promptly take such corporate action as may, in the opinion of its counsel, be reasonably necessary (including seeking stockholder approval, if required) to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes.  The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Exercise Shares to issue Warrant Exercise Shares upon the exercise of Warrants. Without limiting the generality of the foregoing, the Company will not increase the stated or par value per share, if any, of the Common Stock above the Exercise Price per share in effect immediately prior to such increase in stated or par value.  If shares of Common Stock are listed for trading on a securities exchange, the Company covenants that all Warrant Exercise Shares will, at all times that Warrants are exercisable, be duly approved for listing on such exchange.

Section 4.6    Fractional Shares.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Holder of Warrants would, except for the provisions of this Section 4.6, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall (a) round up to the nearest whole number of Warrant Exercise Shares for fractions of half or greater or (b) round down to the nearest whole number of Warrant Exercise Shares for fractions of less than half; provided, that the number of whole Warrant Exercise Shares which shall be issuable upon the contemporaneous exercise of any Warrants by a Holder shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 4.7    Close of Books; Par Value.  The Company shall not close its books against the Transfer of any Warrants or any Warrant Exercise Shares in a manner which interferes with the timely exercise of such Warrants.  Without limiting Section 4.5(b), the Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of the Warrants is at all times equal to or less than the Tranche A Exercise Price then in effect.

Section 4.8    Payment of Taxes.  In connection with the exercise of any Warrants, the Company shall not be required to pay any tax or other charge imposed in respect of any Transfer

16

involved in the Company's issuance and delivery of shares of Common Stock (including certificates therefor) (or any payment of cash or other property in lieu of such shares) to any recipient other than the Holder of the Warrants being exercised, and in case of any such tax or other charge, the Warrant Agent and the Company shall not be required to issue or deliver any such shares (or cash or other property in lieu of such shares) until (x) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (y) it has been established to the Company's and the Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid. For the avoidance of doubt, the Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes or charges, unless and until the Warrant Agent is satisfied that all such taxes and/or charges have been paid.

<div align="center">**ARTICLE V**</div>

<div align="center">**ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF
WARRANT EXERCISE SHARES**</div>

In order to prevent dilution of the rights granted under the Warrants, the Exercise Price shall be subject to adjustment from time to time as provided in this Article V, and the number of shares of Common Stock issuable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article V.

Section 5.1    Subdivision or Combination of Common Stock.

In the event that, at any time after the date of this Agreement but prior to the expiration of the Exercise Period, the amount of outstanding shares of Common Stock is increased or decreased by combination (by reverse stock split or reclassification) or subdivision (by any stock split or reclassification) of the Common Stock, then, on the effective date of such combination or subdivision, the number of Warrant Exercise Shares issuable on exercise of the Warrants shall be increased or decreased, as applicable, in proportion to such increase or decrease, as applicable, in the outstanding Common Stock.  Whenever the number of Warrant Exercise Shares issuable upon the exercise of the Warrants is adjusted pursuant to this Section 5.1, then, on the effective date of the applicable combination or subdivision, the Exercise Price shall be adjusted (to the nearest cent ($0.01)) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (a) the numerator of which shall be the number of Warrant Exercise Shares issuable upon the exercise of a Warrant immediately prior to such adjustment and (b) the denominator of which shall be the number of Warrant Exercise Shares so issuable immediately thereafter.

Section 5.2    Common Stock Dividends.  If the Company at any time after the date of this Agreement but prior to the expiration of the Exercise Period declares or otherwise authorizes a dividend or any other distribution on the Common Stock in shares of Common Stock, then the number of Warrant Exercise Shares issuable upon exercise of each outstanding Warrant shall be increased to equal the product of (a) the number of Warrant Exercise Shares issuable upon exercise of a Warrant in effect immediately prior to the record date for such dividend or other distribution and (b) a fraction, (i) the numerator of which is the sum of (x) the total number of shares of Common Stock issued and outstanding immediately prior to the record date for such dividend or other distribution and (y) the total number of shares of Common Stock to be issued pursuant to

<div align="center">17</div>

such dividend or other distribution, and (ii) the denominator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the record date for such dividend or other distribution.  The Exercise Price for each outstanding Warrant shall be correspondingly decreased by dividing the Exercise Price for each outstanding Warrant in effect immediately prior to the record date for such dividend or other distribution by the fraction referred to in clause (b) of the immediately preceding sentence.  An adjustment made pursuant to this Section 5.2 shall be made effective immediately prior to the open of business on the first Business Day immediately following the record date for such dividend or other distribution; provided, that any exercise of a Warrant following the record date but prior to the dividend or distribution being made is subject to Section 5.11.  In the event that such dividend or other distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to make such dividend or distribution, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such dividend or other distribution had not been so declared or authorized.

Section 5.3    Other Distributions.  If the Company at any time after the date of this Agreement but prior to the expiration of the Exercise Period declares or otherwise authorizes a dividend or other distribution to all holders of shares of Common Stock (other than a dividend or other distribution of shares of Common Stock referred to in Section 5.2, any dividend or distribution made in connection with the consummation of an Organic Change referred to in Section 5.6, any issuance or deemed issuance of Additional Shares of Common Stock referred to in Section 5.5, or any distribution pursuant to Section 5.4 or Section 5.7) of securities, evidences of indebtedness, assets, cash, rights or warrants, then, in each such case, the Exercise Price for each outstanding Warrant in effect immediately prior to the record date for such dividend or other distribution shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ ((CP_0 - FV)/CP_0)$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 5.3;

$EP_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this Section 5.3;

$CP_0$    =    the Current Sale Price of the Common Stock on the last Business Day preceding the first date on which the Common Stock is without the right to receive such dividend or distribution; and

18

FV    =    the amount of cash and/or the fair market value of the
           securities, evidences of indebtedness, assets, rights or warrants
           to be so distributed in respect of one share of Common Stock,
           as reasonably determined in good faith by the Board of
           Directors.

Any adjustment made pursuant to this <u>Section 5.3</u> shall be made effective immediately prior to the open of business on the first Business Day immediately following the record date for the dividend or other distribution; <u>provided</u>, that any exercise of a Warrant following the record date but prior to the dividend or distribution being made is subject to <u>Section 5.11</u>. In such event, the number of Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by <u>dividing</u> (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment <u>by</u> (y) the new Exercise Price immediately following such adjustment.

In the event that such dividend or distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such dividend or distribution was not so declared or authorized.

Section 5.4    <u>Pro Rata Repurchase Offer of Common Stock</u>.

If at any time after the date of this Agreement but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \, x \frac{(OS_0 \, x \, CP_0) - AP}{(OS_0 - SP) \, x \, CP_0}$$

where

$EP_1$    =    the Exercise Price in effect immediately following the
              application of the adjustments in this <u>Section 5.4</u> (but in no
              event greater than $EP_0$);

$EP_0$    =    the Exercise Price in effect immediately prior to the application
              of the adjustments in this <u>Section 5.4</u>;

$OS_0$    =    the number of shares of Common Stock outstanding
              immediately before consummation of such Pro Rata
              Repurchase Offer;

$CP_0$    =    the Current Sale Price of a share of Common Stock on the

19

Business Day immediately preceding the first public announcement of the intent to effect such Pro Rata Repurchase Offer;

AP = the aggregate purchase price (including the fair market value, as reasonably determined in good faith by the Board of Directors, of any non-cash consideration included therein) paid for the shares of Common Stock in the Pro Rata Repurchase Offer; and

SP = the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.  For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrants shall be made pursuant to this Section 5.4.

Section 5.5   Dilutive Issuances.

(a)  In the event the Company at any time or from time to time after the date of this Agreement but prior to the expiration of the Exercise Period shall issue, sell, grant or otherwise distribute Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section 5.5(c)) (each, an "issuance") without consideration or for consideration per share less than the Current Sale Price on the Business Day immediately prior to the date of such issuance (or the earlier announcement thereof), then the Exercise Price for each outstanding Warrant in effect on the date of such issuance shall be reduced to an amount equal to the product of (A) such Exercise Price and (B) a fraction, (i) the numerator of which is the sum of (x) the number of shares of Common Stock outstanding immediately prior to such issuance and (y) the number of shares of Common Stock which the aggregate consideration received by or payable to the Company for the total number of Additional Shares of Common Stock so issued would purchase at the Current Sale Price on the Business Day immediately prior to the date of such issuance (or the earlier announcement thereof), and (ii) the denominator of which shall be the sum of (x) the number of shares of Common Stock outstanding immediately prior to such issuance and (y) the number of Additional Shares of Common Stock so issued.  If the Exercise Price of a Warrant is reduced as hereinabove provided, the number of Warrant Exercise Shares issuable upon exercise of such Warrant shall be correspondingly increased by dividing it by the same fraction referred to in the immediately preceding sentence.  An adjustment made pursuant to this Section 5.5 shall be made effective concurrently with the consummation of the applicable issuance.

(b)  For purposes of this Section 5.5, the term "Additional Shares of Common Stock" shall mean all shares of Common Stock issued (or, pursuant to Section 5.5(c), deemed to be issued) by the Company after the date of this Agreement, other than:

20

(i)     shares of Common Stock issued or issuable upon exercise of Warrants;

(ii)     shares of Common Stock issued or issuable in a subdivision to which Section 5.1 applies, in a dividend or distribution to which Section 5.2 or Section 5.3 applies, or in an Organic Change to which Section 5.6 applies;

(iii)     shares of Common Stock issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants of the Company pursuant to any employee benefit plan or program, incentive compensation plan or program, executive compensation agreement or directors' compensation program, in each case approved by the Board of Directors; and

(iv)     shares of Common Stock issued as bona fide "equity kickers" following the date of this Agreement in connection with one or more debt financings of the Company provided by any Person other than any Affiliate of the Company and only so long as such shares of Common Stock are only issued to the Persons that are providing such debt financings.

Notwithstanding anything to the contrary herein, issuances referenced in clauses (i) - (iv) of this Section 5.5(b) include any deemed issuances pursuant to Section 5.5(c) and there shall be no adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon the exercise of the Warrants pursuant to this Section 5.5 with respect to any issuances referenced in clauses (i) - (iv) above.

(c)   Subject to Section 5.5(b) above, in the event the Company at any time or from time to time after the date of this Agreement but prior to the expiration of the Exercise Period shall issue any Options or Convertible Securities, then the maximum number of shares of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issuance; provided, that in any such case in which Additional Shares of Common Stock are deemed to be issued:

(i)     no further adjustments in the Exercise Price of a Warrant or the number of Warrant Exercise Shares issuable upon exercise of such Warrant shall be made upon the subsequent issuance of shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities (or, in the case of Options for the purchase of Convertible Securities, the subsequent issue of the Convertible Securities or the shares of Common Stock issuable upon conversion or exchange thereof); and

(ii)     if such Options or Convertible Securities by their terms (other than terms designed to protect against dilution) provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Company, or increase or decrease in the number of shares of Common Stock issuable, upon the exercise, conversion

21

or exchange thereof, the Exercise Price of each Warrant and the number of Warrant Exercise Shares issuable upon exercise of each Warrant computed upon the original issuance thereof, and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities; provided, however, that no readjustment pursuant to this clause (ii) shall have the effect of increasing the Exercise Price to an amount that exceeds the Exercise Price of a Warrant in effect immediately prior to the issuance of the applicable Options or Convertible Securities or decreasing the number of shares of Common Stock issuable upon exercise of a Warrant to a number that is less than the number of shares of Common Stock issuable upon exercise of a Warrant in effect immediately prior to the issuance of the applicable Options or Convertible Securities.

(d)    For purposes of this Section 5.5, the consideration received by or payable to the Company in connection with the issuance of any Additional Shares of Common Stock shall be computed as follows:

(i)    Such consideration shall:

(A)    insofar as it consists of cash, be computed at the aggregate amount of cash received by or payable to the Company therefor prior to deducting therefrom any discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof;

(B)    insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issuance, as reasonably determined in good faith by the Board of Directors, except where a public market exists for such securities, in which case the fair value of such securities shall be the average of the closing sale prices quoted on the national securities exchange on which such securities are quoted or listed for the ten (10) trading day period ending immediately prior to the date of determination (or, if no closing sale price is reported on any day in such ten (10) trading day period, the average of the closing bid and asked prices for such securities on such day), or, if such securities are not listed or quoted on a national securities exchange, the average of the closing bid and asked prices of such securities in the over-the-counter market as reported by the OTC Markets or other similar organization for the ten (10) trading day period ending immediately prior to the date of determination; and

(C)    in the event Additional Shares of Common Stock are issued together with other securities or property of the Company for consideration which covers both the Additional Shares of Common Stock and such other securities or property, be the proportion of such consideration so received in respect of the Additional Shares of Common Stock, computed as provided in clauses (A) and (B) above, as reasonably determined in good faith by the Board of Directors.

22

(ii)    The consideration per share received by or payable to the Company for Additional Shares of Common Stock deemed to have been issued pursuant to Section 5.5(c) relating to Options and Convertible Securities shall be determined by dividing:

(A)    the total amount, if any, received by or payable to the Company as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) received by or payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(B)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

Section 5.6    Organic Changes.  If there occurs any Organic Change after the date of this Agreement but prior to the expiration of the Exercise Period, then each Holder of a Warrant shall have the right to acquire and receive, upon valid exercise of such Warrant pursuant to Article IV at any time after the consummation of such Organic Change, in lieu of Warrant Exercise Shares that would have been issuable upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change with respect to or in exchange for, as applicable, the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant if such Warrant had been exercised immediately prior to the consummation of such Organic Change assuming no rights of election, if any, as to the kind or amount of cash, stock, securities or other assets or property receivable upon such Organic Change were exercised (provided that, if the kind or amount of cash, stock, securities or other assets or property receivable upon such Organic Change is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("nonelecting share"), then for the purposes of this Section 5.6, the kind and amount of cash, stock, securities or other assets or property receivable upon such Organic Change shall be deemed to be the kind and amount so receivable per share by a plurality of the nonelecting shares).  The Company shall not affect any Organic Change unless, prior to the consummation thereof, the continuing, resulting, acquiring or surviving Person (if other than the Company) from or in such Organic Change shall assume, by written instrument substantially similar in form and substance to this Agreement in all material respects (including with respect to the provisions of this Article V), the obligation to deliver to the Holders such cash, stock, securities or other assets or property which, in accordance with the foregoing provision, the Holders shall be entitled to receive upon exercise of the Warrants.  The provisions of this Section 5.6 shall apply to successive Organic Changes.

23

Section 5.7    Change of Control.

In the event of a Change of Control after the date of this Agreement but prior to the expiration of the Exercise Period, the Company shall be required to redeem all outstanding Warrants simultaneously with the consummation of such Change of Control without any further action on behalf of the Holder. Such redemption shall be made by the Company irrevocably paying to each Holder the Black Scholes Value of the Warrants owned or held by such Holder in full in cash simultaneously with the consummation of such Change of Control; provided, however, that if a Change of Control shall be consummated prior to the distribution by the Debtors of the Warrants under the Plan to the Second Lien Noteholders, then the Company shall pay, simultaneously with the consummation of such Change of Control, an aggregate amount of cash equal to the Black Scholes Value of all outstanding Warrants (for the avoidance of doubt, all Warrants held by the Debtors in trust for the Second Lien Noteholders shall be deemed outstanding and the Debtors shall not have any rights to be paid the Black Scholes Value of the Warrants upon a Change of Control) to the holders of Second Lien Secured Note Claims (such amount to be shared Pro Rata among such holders). The payments described in the immediately preceding sentence shall be in full and complete satisfaction of all of the Company's obligations under the Warrants and, upon any such payment being made, the Warrants shall automatically terminate. Nothing in this Section 5.7 shall have any effect on the exercise of any Warrants made prior to, or in connection with, any Change in Control.

Section 5.8    Notice of Adjustments.

Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a written statement setting forth the adjusted number and/or kind of shares issuable upon the exercise of Warrants and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which such adjustment was made, and (ii) cause the Warrant Agent to give written notice to each Holder in the manner provided in Section 9.3 below, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. The Warrant Agent shall be fully protected in relying upon any such written notice delivered in accordance with this Section 5.8, and on any adjustment therein contained, and shall not be deemed to have knowledge of any such adjustment unless and until it shall have received such written notice. Notwithstanding anything to the contrary contained herein, the Warrant Agent shall have no duty or obligation to investigate or confirm whether the information contained in any such written notice complies with the terms of this Agreement or any other document. The Warrant Agent shall have no duty to determine when an adjustment under this Article V should be made, how any such adjustment should be calculated, or the amount of any such adjustment.

Section 5.9    Deferral or Exclusion of Certain Adjustments.

No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 5.9 are not required to be made shall be carried

24

forward and taken into account in any subsequent adjustment. Subject to Section 4.5(b), no adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section 5.9 shall be made to the nearest one one-thousandth (1/1,000) of one cent ($0.01) or to the nearest one one-thousandth (1/1,000) of a share, as the case may be.

Section 5.10    Form of Warrant After Adjustments.

The form of Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number and/or kind of shares issuable upon exercise of the Warrants, and Warrant Certificates theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated therein, as initially issued; provided, that such adjustments in the Exercise Price or the number and/or kind of shares issuable upon exercise of the Warrants pursuant to the terms of this Agreement shall nonetheless have effect upon exercise of the Warrants. The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate or this Agreement (including the rights, duties, liabilities or obligations of the Warrant Agent), and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 5.11    Temporary Suspension of Certain Adjustments.

In any case in which Section 5.2 or Section 5.3 shall result in an adjustment to the number of Warrant Exercise Shares issuable upon exercise of any Warrants and the Exercise Price becoming effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment becomes effective but prior to the occurrence of such specified event, the Company may elect in its sole discretion to defer until the occurrence of such specified event (a) the issuance to the Holder of such Warrant (or other Person entitled thereto) of, and the registration of such Holder (or other Person) as the record holder of, the Warrant Exercise Shares over and above the Warrant Exercise Shares issuable upon such exercise on the basis of the number of Warrant Exercise Shares obtainable upon exercise of such Warrant immediately prior to such adjustment and to require payment in respect of such number of Warrant Exercise Shares the issuance of which is not deferred on the basis of the Exercise Price in effect immediately prior to such adjustment and (b) the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to such Holder or other Person such additional Warrant Exercise Shares upon the occurrence of such specified event requiring such adjustment (without payment of any additional Exercise Price in respect of such additional Warrant Exercise Shares).

## ARTICLE VI

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 6.1    Registration of Transfers and Exchanges.

(a) *Transfer and Exchange of Book-Entry Warrants.* The Transfer and exchange of Book-Entry Warrants shall be effected through the Depositary and its direct and

indirect participants, in accordance with the practices and procedures therefor of the Depositary and such participants.

(b) *Exchange of Book-Entry Warrants for Certificated Warrants or Direct Registration Warrants.* If at any time the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice, then upon written instructions signed by an Appropriate Officer of the Company, the Warrant Agent shall register and issue Certificated Warrants, or shall register Direct Registration Warrants, in an aggregate number equal to the number of Book-Entry Warrants represented by the Global Warrant Certificates, in accordance with such written instructions. Such written instructions provided by the Company shall state that the Certificated Warrants or Direct Registration Warrants issued in exchange for Book-Entry Warrants pursuant to this Section 6.1(b) shall be registered in such names and in such amounts as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c) *Transfer and Exchange of Certificated Warrants or Direct Registration Warrants.* When Certificated Warrants or Direct Registration Warrants are presented to the Warrant Agent with a written request:

(i) to register the Transfer of such Certificated Warrants or Direct Registration Warrants; or

(ii) to exchange such Certificated Warrants or Direct Registration Warrants for an equal number of Certificated Warrants or Direct Registration Warrants, respectively, of other authorized denominations, the Warrant Agent shall register the Transfer or make the exchange, and in the case of Certificated Warrants shall issue such new Warrant Certificates, as requested if its customary requirements for such transactions are met, provided, that the Warrant Agent shall have received (x) a written instruction of Transfer in form reasonably satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing along with evidence of authority that may be required by the Warrant Agent, including but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, (y) a written order of the Company signed by an Appropriate Officer authorizing such exchange and (z) in the case of Certificated Warrants, surrender of the Warrant Certificate or Certificate(s) representing same duly endorsed for Transfer or exchange.

(d) *Exchange of Certificated Warrants or Direct Registration Warrants for Book-Entry Warrants.* Certificated Warrants or Direct Registration Warrants that are not subject to any Warrant Restrictions may be exchanged for Book-Entry Warrants upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate written instruments of transfer with respect to such Certificated Warrants or Direct Registration Warrants, in form reasonably satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, and in the case of Certificated Warrants, surrender of the Warrant Certificate(s) representing the same duly endorsed for Transfer or

26

exchange (or any affidavit of loss if the Holder does not have possession of such Warrant Certificate), together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Certificated Warrants or Direct Registration Warrants, then the Warrant Agent shall cancel such Certificated Warrants or Direct Registration Warrants on the Warrant Register and cause or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Book-Entry Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificates are then outstanding, or if the Global Warrant Certificates then outstanding cannot be used for such purposes, the Company shall issue and the Warrant Agent shall countersign (by either manual, facsimile or other electronically transmitted signature), a new Global Warrant Certificate representing the appropriate number of Book-Entry Warrants.

(e) *Restrictions on Transfer and Exchange of Global Warrant Certificates.* Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 6.1(f)), unless and until it is exchanged in whole for Certificated Warrants or Direct Registration Warrants, a Global Warrant Certificate may not be Transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f) *Restrictions on Transfer.* No Warrants or Warrant Exercise Shares shall be sold, exchanged or otherwise Transferred in violation of the Securities Act or state securities Laws or the Company's articles of incorporation. Notwithstanding anything in this Agreement to the contrary, until the Company separately becomes subject to the reporting requirements of the Exchange Act and the rules and regulations thereunder, no Transfer of Warrants is permitted if, after giving effect to such Transfer, and after giving effect to the conversion, exercise or exchange of all such Warrants, such Transfer would result in the Company becoming subject to the reporting requirements of the Exchange Act. If any Holder purports to Transfer Warrants to any Person in a transaction that would violate the provisions of this Section 6.1(f), such Transfer shall be void ab initio and of no effect.

(g) *Exchange of Global Warrant Certificate.* A Global Warrant Certificate may be exchanged for another Global Warrant Certificate of like or similar tenor for purposes of complying with the practices and procedures of the Depositary.

(h) *Cancellation of Global Warrant Certificate.* At such time as all beneficial interests in a Global Warrant Certificate have either been exchanged for Certificated Warrants or Direct Registration Warrants, exercised, redeemed, repurchased or cancelled, the Global Warrant Certificate shall be returned to, or retained and cancelled pursuant to applicable Law by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

27

Section 6.2    Obligations with Respect to Transfers and Exchanges of Warrants.

(a)    All Certificated Warrants or Direct Registration Warrants issued upon any registration of Transfer or exchange of Certificated Warrants or Direct Registration Warrants, respectively, shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Direct Registration Warrants surrendered upon such registration of Transfer or exchange. No service charge shall be made to a Registered Holder for any registration, Transfer or exchange of any Certificated Warrants or Direct Registration Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such Persons as the Company shall specify by written notice. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)    So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, shall be considered by the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent as the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Agreement (subject to Sections 4.1(ii) and 4.3(d)(z)). Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy, or other authorization furnished by the Depositary or impair the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(c)    Subject to Section 6.1(c), and this Section 6.2, the Warrant Agent shall:

(i)    in the case of Certificated Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Certificated Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of the Warrant Certificate representing such Certificated Warrants, properly endorsed for transfer, by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney; and upon any such registration of Transfer, a new Warrant Certificate shall be issued to the transferee; and

(ii)    in the case of Direct Registration Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Direct Registration Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of Exhibit C hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal

28

representative thereof or by a duly authorized attorney; and upon any such registration of Transfer, a new Direct Registration Warrant shall be issued to the transferee.

Section 6.3     Fractional Warrants.

The Warrant Agent shall not effect any registration of Transfer or exchange which will result in the issuance of a fraction of a Warrant.

## ARTICLE VII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 7.1     No Rights or Liability as Stockholder.

Nothing contained herein shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  The vote or consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrants held by such Holder. No Holder, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant. No provision thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such Holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 7.2     Notice to Registered Holders.

The Company shall give notice to Registered Holders by regular mail or electronic mail, and prompt written notice thereof to the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)  the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)  the issuance to all holders of Common Stock of any additional shares of Common Stock or other securities, or of rights, options or warrants to subscribe for or purchase Common Stock, other securities or of any other subscription rights, options or warrants;

(c)  a Pro Rata Repurchase Offer;

(d)  an Organic Change;

(e)  a Change of Control;

29

(f)    a dissolution, liquidation or winding up of the Company; or

(g)    the occurrence of any other event that would result in an adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon exercise of the Warrants under Article V.

Such giving of notice shall be made at least ten (10) days prior to the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, additional shares of Common Stock, other securities, rights, options or warrants, or of the stockholders entitled to vote on such Organic Change, Change of Control, dissolution, liquidation or winding up (or, if there is no record date, the proposed effective date of such Organic Change, Change of Control, dissolution, liquidation or winding up), or the proposed commencement date or effective date of a Pro Rata Repurchase Offer or any other event that would result in an adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon exercise of the Warrants under Article V. Such notice shall specify such record date or the date of closing the stock transfer books or proposed commencement date or effective date, as the case may be. Failure to provide such notice shall not affect the validity of any action taken. For the avoidance of doubt, no such notice (or the failure to provide it to any Holder) shall supersede or limit any adjustment called for by Article V by reason of any event as to which notice is required by this Section 7.2.

Section 7.3    Lost, Stolen, Mutilated or Destroyed Warrant Certificates.

If any Warrant Certificate is lost, stolen, mutilated or destroyed, the Company may issue, and upon written request by the Company, the Warrant Agent shall countersign (either by manual, facsimile or other electronically transmitted signature), and deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor in accordance with written instructions from the Company, subject to (at the Company's or the Warrant Agent's request) reimbursement to the Company and the Warrant Agent of all reasonable expenses incidental thereto. In the case of Warrant Certificates other than Global Warrant Certificates, the Warrant Agent shall require evidence reasonably satisfactory to it of the loss, theft or destruction of such Warrant Certificate, and an open penalty surety bond satisfactory to it and holding the Company and the Warrant Agent harmless, absent notice to Warrant Agent that such certificates have been acquired by a bona fide purchaser.

Section 7.4    Cancellation of Warrants.

If the Company shall purchase or otherwise acquire Warrants (including the redemption of any unexercised portion of the Warrants in the event of a Change of Control in accordance with Section 5.7), such Warrants shall be cancelled and retired and shall cease to be outstanding for all purposes of this Agreement, in the case of Certificated Warrants or Direct Registration Warrants, by appropriate notation on the Warrant Register, and, in the case of Book-Entry Warrants, in accordance with the practices and procedures of the Depositary, including if required by such practices and procedures by appropriate notation on the applicable Global Warrant Certificate. Further, after the date of this Agreement, if the Plan is not confirmed by the Bankruptcy Court, the Company shall cause the cancellation of the Warrants and terminate this Agreement in accordance

30

with Section 9.12.

## ARTICLE VIII

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 8.1 Resignation, Removal, Consolidation or Merger of Warrant Agent.

(a) *Appointment of Successor Warrant Agent.* The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving thirty (30) days' notice in writing to the Company. In the event the transfer agency relationship in effect between the Company and the Warrant Agent terminates, the Warrant Agent will be deemed to have resigned automatically and be discharged from its duties under this Agreement as of the effective date of such termination. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of thirty (30) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Holder of a Warrant, then the Holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost. The Company may, at any time and for any reason at no cost to the Holders, remove the Warrant Agent and appoint a successor Warrant Agent by written instrument signed by the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent. Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a Person organized and existing under the Laws of the United States of America, or any state thereunder, in good standing. After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company and without assumption of any liability or any other obligation by the predecessor Warrant Agent, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b) *Notice of Successor Warrant Agent.* In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) in the case of Certificated Warrants or Direct Registration Warrants, cause written notice thereof to be delivered to each Registered Holder at such Registered Holder's address appearing on the Warrant Register and, in the case of Book-Entry Warrants, cause written notice thereof to be delivered to the Depositary, or its nominee. Failure to give any notice provided for in this Section 8.1(b) or any defect therein shall not affect the legality or

31

validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(c)  *Merger, Consolidation or Name Change of Warrant Agent.*

(i)  Any Person into which the Warrant Agent may be merged or with which it may be consolidated or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement, without any further act or deed, if such Person would be eligible for appointment as a successor Warrant Agent under the provisions of <u>Section 8.1(a)</u>. If any of the Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Agreement, any such successor to the Warrant Agent may adopt the countersignature of any previous Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

(ii)  If at any time the name of the Warrant Agent is changed and at such time any of the Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

Section 8.2   <u>Fees and Expenses of Warrant Agent</u>.

(a)  *Remuneration.*  The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent hereunder as set forth in the fee schedule agreed upon by the Company and the Warrant Agent dated as of the date hereof and will reimburse the Warrant Agent upon demand for all reasonable and documented out-of-pocket expenses (including reasonable counsel fees and expenses), taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in connection with the negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of this Agreement and the exercise and performance of its duties hereunder.

(b)  *Further Assurances.*  The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be requested or required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

32

Section 8.3   Duties of Warrant Agent.

(a)   *Covered Persons*. References to the Warrant Agent in this Section 8.3 shall include the Warrant Agent and its Affiliates, principles, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(b)   *Liability*.

(i)   The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement, the Warrant Statements or in the Warrant Certificates (except, in each case, its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only. The Warrant Agent shall not be under any responsibility in respect of the validity or sufficiency of this Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificate (except, in each case, its countersignature therefor); nor shall the Warrant Agent be responsible for any breach by the Company of any covenant or condition contained in this Agreement; nor shall the Warrant Agent be responsible for the making of any adjustment in the Exercise Price or the number and/or kind of shares issuable upon the exercise of Warrants required under the provisions of Article V or be responsible for the manner, method or amount of any such change or the ascertaining of the existence of facts that would require any such change; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Exercise Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Warrant Exercise Shares will, when issued, be validly issued and fully paid and non-assessable.  The Warrant Agent shall not be accountable or under any duty or responsibility for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(ii)   The Warrant Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement, instrument or document other than this Agreement.

(iii)   The Warrant Agent may rely on and shall incur no liability or responsibility to the Company, any Holder, or any other Person for any action taken, suffered or omitted to be taken by it upon any notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument furnished to the Warrant Agent hereunder and believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument.  The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(iv)   The Warrant Agent shall act hereunder solely as agent for the Company and in a ministerial capacity and does not assume any obligation or relationship of agency or trust with any of the Holders, and its duties shall be determined solely by the express provisions hereof. The Warrant Agent shall not be liable for any action taken,

33

suffered or omitted to be taken in connection with this Agreement except to the extent that its own gross negligence, willful misconduct or bad faith (as each is determined by a final, non-appealable judgment of a court of competent jurisdiction) was the primary cause of any loss.

(v)      Anything in this Agreement to the contrary notwithstanding, in no event shall the Warrant Agent be liable for any special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage.  Notwithstanding anything contained in this Agreement to the contrary, any liability of the Warrant Agent under this Agreement, whether in contract, or in tort, or otherwise, shall be limited in the aggregate to, and shall not exceed, an amount equal to the fees and charges, but not including reimbursable expenses, paid by the Company to the Warrant Agent hereunder during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.

(vi)      All rights and obligations contained in Section 8.2 and this Section 8.3 shall survive the termination of this Agreement and the resignation, replacement, incapacity or removal of the Warrant Agent. Without limiting the generality of the foregoing, all fees and expenses incurred by the Warrant Agent prior to or in connection with the resignation, replacement, incapacity or removal of the Warrant Agent shall be paid by the Company in accordance with this Section 8.3 notwithstanding such resignation, replacement, incapacity or removal of the Warrant Agent.

(vii)      The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to the provisions of this Agreement.

(viii)      In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(ix)      In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(c)      *Reliance on Company Statement.*  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically

34

prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon such statement and shall not be liable for any action taken or suffered by it pursuant to the provisions of this Agreement.

(d) *Indemnity*. The Company agrees to indemnify, defend and protect the Warrant Agent and hold it harmless from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, that may be imposed on, incurred by, or asserted against the Warrant Agent, at any time, and in any way relating to or arising out of or in connection with, directly or indirectly, the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Warrant Agent; provided, however, that the Warrant Agent shall not be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such loss was caused by its own gross negligence, bad faith or willful misconduct (each as determined in a final non-appealable judgment of a court of competent jurisdiction). Further, the Warrant Agent shall provide prompt notice to the Company of any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, with respect to which it is requesting indemnification; provided, however, that any delay or failure of the Warrant Agent to give notice to the Company shall not relieve the Company of its indemnification obligations unless the Company is materially prejudiced by reason of such delay or failure. Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent, which written consent shall not be unreasonably conditioned, withheld or delayed.

(e) *Exclusions*. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except, in each case, its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any Common Stock will, when issued, be valid and fully paid and non-assessable. The Warrant Agent will not be under any duty or responsibility to ensure compliance with any applicable federal or state securities Laws in connection with the issuance, Transfer or exchange of Warrants.

(f) The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company or any Person resulting from such neglect or misconduct, provided, that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined in a

final, non-appealable decision of a court of competent jurisdiction) in connection with the selection of such attorneys, agents or employees.

(g)   The Warrant Agent may consult at any time with legal counsel satisfactory to it (who may be legal counsel for the Company) and the advice or opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by such parties in accordance with such advice or opinion.

(h)   The Warrant Agent may buy, sell, or deal in any of the Warrants or other securities of the Company freely as though it was not Warrant Agent under this Agreement. Nothing contained herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.

(i)   The Warrant Agent shall not be required to use or risk its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Warrant Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity satisfactory to it.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1     Binding Effects; Benefits.  This Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.2     Compliance with the Securities Act.

(a)   The Company shall be deemed the legal successor of the Debtors within the meaning of section 1145 of the Bankruptcy Code.  The Warrants are issued, and any shares of underlying Common Stock shall be issued, in reliance upon the exemption from the registration requirements of Section 5 of the Securities Act provided by section 1145 of the Bankruptcy Code.  Neither the Warrants nor any shares of underlying Common Stock will be registered under the Securities Act or any state or local Law requiring registration for offer or sale of a security.  To the extent a Holder is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, the Warrants and shares of underlying Common Stock may not be sold or Transferred in the absence of an effective registration statement under the Securities Act or an available exemption from registration thereunder.

(b)   The Company may stop any Transfer of Warrants or underlying Common Stock if (i) such Warrants or underlying Common Stock are not registered under the Securities Act and (ii) the Company has reasonable grounds to believe such Transfer may not be exempt from registration under the Securities Act.  The Company may require any Holder to provide evidence that a Transfer of Warrants or underlying Common Stock is exempt from registration

36

under the Securities Act if the Company has reasonable grounds to believe such Transfer may not be exempt.

(c)   To the extent the Company reasonably determines that the exemption from registration provided under section 1145 of the Bankruptcy Code is not available with respect to any issuance or Transfer of Warrants or shares of underlying Common Stock, the Warrant Certificates representing such Warrants or certificate representing such shares of underlying Common Stock may be stamped or otherwise imprinted with a legend, and the Warrant Register may include a restrictive notation with respect to such Warrants, in substantially the following form:

"THE WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF. "

In the event that such shares of underlying Common Stock are uncertificated, such shares shall be subject to a restrictive notation substantially similar to such legend in the stock ledger or other appropriate records maintained by the Company or its transfer agent.

(d)   Any legend or restrictive notation referenced in Section 9.2(c) shall be removed from the Warrant Register, Warrant Certificates or certificates for the shares of underlying Common Stock (or, in the case of uncertificated shares, from the appropriate

37

records) at any time after the restrictions described in such legend or restrictive notation cease to be applicable, <u>provided</u>, that the Company may request from any Holder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

Section 9.3    <u>Notices</u>.

Any notice, request, demand, document delivery or other communication required or which may be given or made hereunder shall be in writing and shall be sent by first-class mail, postage prepaid, certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery, by facsimile transmission or electronic mail ("<u>e-mail</u>")(except with respect to notices to the Warrant Agent).  Such notice, request, demand, document delivery or other communication shall be deemed given, provided, made or received (i) if mailed, two (2) days after the date of mailing, (ii) if sent by national courier service, one (1) Business Day after being sent, (iii) if delivered personally, when so delivered or (iv) if sent by e-mail or facsimile transmission, one (1) Business Day after such e-mail or facsimile is transmitted, in each case as follows:

if to the Warrant Agent, to:

Computershare Inc.
Voluntary Corporate Actions
250 Royall Street
Suite V
Canton, MA 02021
Facsimile: (781) 575-2901
Email: ed.eismont@computershare.com (as a courtesy copy, but which shall not constitute notice)

if to the Company, to:

Appvion Holding Corp.
825 E, Wisconsin Avenue
Appleton, Wisconsin 549121
Attention: George Wurtz
E-mail: george.wurtz@yahoo.com

with copies (which shall not constitute notice) to:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Facsimile: (212) 326-2000
Attention: Daniel Shamah and Jeeho Lee
Email: dshamah@omm.com and jeeholee@omm.com

if to Holders, in the case of Certificated Warrants and Direct Registration Warrants, at the

38

addresses, facsimile numbers or e-mail addresses of the Registered Holders as they appear in the Warrant Register and, if different, at the addresses, facsimile numbers or e-mail addresses appearing in the records of the transfer agent or registrar for the Common Stock, and in the case of Book-Entry Warrants, notice shall be delivered to the Depositary or its nominee.

Section 9.4    Persons Having Rights under this Agreement.

Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person other than the parties hereto and the Holders, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof; provided, however, that the Second Lien Noteholders are intended third party beneficiaries of, and shall be entitled to enforce, the provisions of the proviso set forth in Section 5.7 and the Ad Hoc Group of Second Lien Noteholders are intended third party beneficiaries of, and shall be entitled to enforce, the provisions of the last two sentences of Section 9.12(a). All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto, the Holders, the Second Lien Noteholders (with respect to the provisions of the proviso set forth in Section 5.7), the Ad Hoc Group of Second Lien Noteholders (with respect to the provisions set forth in the last two sentences of Section 9.12(a)) and each of their respective successors and assigns. Notwithstanding any provision to the contrary in this Agreement, from the date of this Agreement until the Date of Issuance, the Debtors will hold the Warrants in trust solely for the benefit of the Second Lien Noteholders and are not entitled to any rights conferred upon a Holder of Warrants or any other rights under this Agreement.

Section 9.5    Examination of this Agreement.

A copy of this Agreement, and of the entries in the Warrant Register relating to each Registered Holder's Warrants, shall be made available by the Warrant Agent at all reasonable times at an office designated for such purpose by the Warrant Agent, for examination by any Holder; provided, however, such Holder provides reasonable evidence of its Warrant holdings if reasonably requested by the Company.

Section 9.6    Counterparts.

This Agreement may be executed and transmitted in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 9.7    Effect of Headings.

The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation hereof.

Section 9.8    Amendments.

(a)    Subject to Section 9.8(b) below, this Agreement may not be amended, supplemented, amended and restated, modified or waived except in writing signed by the Company and the Warrant Agent.

39

(b) The Company and the Warrant Agent may from time to time amend, supplement, amend and restate, modify or waive this Agreement or the Warrants, solely as follows:

(i) without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement or the Warrants, or to correct or supplement any provision contained herein or in the Warrants that may be defective or inconsistent with any other provision herein or in the Warrants, or

(ii) with the prior written consent of Requisite Holders; provided, however, that the consent of each Holder adversely affected thereby shall be required for any amendment, supplement, amendment and restatement, modification or waiver that (i) reduces the term of the Warrants (or otherwise modifies any provisions pursuant to which the Warrants may be terminated or cancelled), or (ii) increases the Exercise Price and/or decreases the number of Warrant Exercise Shares (or, as applicable, the amount of such other securities and/or assets) deliverable upon exercise of the Warrants, other than such increases and/or decreases that are made pursuant to Article V.

(c) Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed amendment, supplement, amendment and restatement, modification or waiver is in compliance with the terms of this Section 9.8, the Warrant Agent shall execute such amendment, supplement, amendment and restatement, modification or waiver; provided that the Warrant Agent may, but shall not be obligated to, execute any amendment, supplement, amendment and restatement, modification or waiver that affects the Warrant Agent's rights, duties, immunities, liabilities or obligations hereunder. No supplement or amendment to this Agreement shall be effective unless duly executed by the Warrant Agent. Any amendment, supplement, amendment and restatement, modification or waiver effected pursuant to and in accordance with the provisions of this Section 9.8 shall be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, supplement, amendment and restatement, modification or waiver, the Company shall give prompt notice thereof to all Registered Holders in the case of Certificated Warrants and Direct Registration Warrants, and to the Depositary or its nominee in the case of Book-Entry Warrants. Any failure of the Company to give such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment, supplement, amendment and restatement, modification or waiver.

(d) Anything herein to the contrary notwithstanding, the Company and the Warrant Agent shall not amend, supplement, amend and restate, modify or waive this Agreement or any term, condition or provision hereof prior to the Date of Issuance and the distribution of the Warrants under the Plan to the Second Lien Noteholders pursuant to section 1145 of the Bankruptcy Code.

(e) Nothing in this Section 9.8 shall change, affect, restrict or otherwise alter the provisions of Section 9.12 or any of the provisions of the Settlement Agreement relating to the subject matter of Section 9.12.

40

Section 9.9     No Inconsistent Agreements.

The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in this Agreement or the obligations of the Company in this Agreement. The Company represents and warrants to the Holders that the rights granted to the Holders hereunder and the obligations of the Company hereunder do not in any way conflict with any other agreement, document, instrument or contract to which the Company is a party or to which it is otherwise subject or bound as of the date hereof, including any of the rights granted to holders of the Company's securities under any other agreements.

Section 9.10     Integration/Entire Agreement.

As between the Warrant Agent, on the one hand, and the Company and the Holders, on the other hand, this Agreement and the Warrants are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein. As between the Company and the Holders, this Agreement, together with the Settlement Agreement, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Holders in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein with respect to the Warrants (and in the Settlement Agreement, as between the Company and the Holders). This Agreement supersedes all prior agreements and understandings between the parties with respect to the Warrants (except for the Settlement Agreement, as between the Company and the Holders, but not the Warrant Agent).

Section 9.11     Governing Law, Etc.

This Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the exclusive jurisdiction of the courts of the State of New York located in New York County and of the U.S. federal courts located in the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Agreement or the transactions contemplated hereby. In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 9.3 hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 9.12     Termination.

(a) This Agreement will terminate on the earliest of (i) such date when all Warrants have been exercised with respect to all shares subject thereto, (ii) the expiration of the

41

Exercise Period, (iii) upon written notice by the Company to the Warrant Agent in accordance with the last sentence of this Section 9.12(a); and (iv) the consummation of a Change of Control and the irrevocable payment by the Company of the applicable cash payments in accordance with the terms of Section 5.7. Pursuant to the terms of the Settlement Agreement, if the Effective Date does not occur or upon the happening or existence of any event that shall render the Effective Date incapable of occurring, the Ad Hoc Group of Second Lien Noteholders may, at its election, require the Company to (x) cancel the Warrants and (y) enter into a new warrant agreement (on the same terms as this Agreement) and issue new warrants for the purchase of shares of Common Stock (on the same terms as the Warrants) directly to the Second Lien Noteholders; provided, that, such issuance is exempt from the registration requirements of the Securities Act and any other applicable federal or state securities laws; provided, however, that the Company shall use its best efforts to ensure that such issuance is exempt. If the Company shall receive any such election by the Ad Hoc Group of Second Lien Noteholders referred to in the immediately preceding sentence, then the Company shall immediately deliver to the Warrant Agent a written notice electing to terminate this Agreement and shall immediately enter into a new warrant agreement and issue new warrants to the Second Lien Noteholders, as described in the immediately preceding sentence and contemplated by the Settlement Agreement.

(b)    The provisions of Section 8.2, Section 8.3 and this Article IX shall survive such termination and the resignation, replacement or removal of the Warrant Agent.

Section 9.13    Waiver of Trial by Jury.

Each party hereto, including each Holder by its receipt of a Warrant, hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Agreement and the transactions contemplated hereby.

Section 9.14    Remedies.

The Company hereby agrees that, in the event that the Company violates any provisions of the Warrants (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at Law available to the Holder of such Warrant may be inadequate. In such event, the Requisite Holders and, other than in the event the Company fails to deliver Warrant Exercise Shares upon a Holder's exercise of its Warrants (which shall not require the consent of the Requisite Holders), with the prior written consent of the Requisite Holders, the Holder of such Warrants, shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief with respect to the Company to enforce the provisions of this Agreement and the Warrants.

Section 9.15    Bank Accounts.

All funds received by Computershare under this Agreement that are to be distributed or applied by Computershare in the performance of its services hereunder (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company. Until paid pursuant to the

42

terms of this Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by Standard & Poor's Financial Services LLC (Long-Term Local Issuer Credit Rating), Moody's Investors Service (Long Term Rating) and Fitch Ratings, Inc. (Long-Term Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). Computershare shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by Computershare in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. Computershare may from time to time receive interest, dividends or other earnings in connection with such deposits. Computershare shall not be obligated to pay such interest, dividends or earnings to the Company, any holder or any other party.

Section 9.16    Severability.

In the event that any one or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein shall not be affected or impaired thereby; provided, however, that if any such excluded provision shall adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to immediately resign.

Section 9.17    Confidentiality.    The Warrant Agent and the Company agree that the Warrant Register and personal, non-public Holder information, which are exchanged or received pursuant to the negotiation or carrying out of this Agreement, shall remain confidential and shall not be voluntarily disclosed to any other Person, except as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions), or pursuant to the requirements of the SEC.

Section 9.18    Information Rights.

(a)    The Company shall make available to each Holder, within ninety (90) days after the end of each fiscal year of the Company, an annual report with respect to the Company and its Subsidiaries containing:

(i)    audited year-end consolidated financial statements of the Company and its consolidated Subsidiaries (including balance sheets, statements of operations and statements of cash flows that would be required from an SEC registrant in an Annual Report on Form 10-K (or any successor or comparable form) prepared in accordance with GAAP, including a report on the annual financial statements by certified independent accountants; and

(ii)    the information described in Items 101 and 303 of Regulation S-K under the Securities Act ("*Description of Business*" and "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," respectively) with respect to such period, to the extent such information would otherwise be required to be filed in an Annual Report on Form 10-K if the Company were required to file such report with the SEC.

43

(b)   The Company shall make available to each Holder, within forty-five (45) days after the end of each fiscal quarter, a quarterly report with respect to the Company and its Subsidiaries containing:

(i)      unaudited quarterly consolidated financial statements of the Company and its consolidated Subsidiaries (including balance sheets, statements of operations and statements of cash flows) that would be required from an SEC registrant in a Quarterly Report on Form 10-Q, (or any successor or comparable form) prepared in accordance with GAAP, subject to normal year-end adjustments; and

(ii)     the information described in Item 303 of Regulation S-K under the Securities Act with respect to such period, to the extent such information would otherwise be required to be filed by an SEC registrant in a Quarterly Report on Form 10-Q if the Company were required to file such report with the SEC.

(c)   The Company shall make available to each Holder, within five (5) Business Days after the occurrence of each event that would have been required to be reported in a Current Report on Form 8-K if the Company had been a reporting company under the Exchange Act, current reports containing substantially all of the information that would have been required to be contained in a Current Report on Form 8-K under the Exchange Act under such items if the Company had been a reporting company under the Exchange Act; provided, however, that (i) no such current report will be required to be furnished if the Company determines in its good faith judgment that such event is not material to stockholders or the business, assets, operations, financial positions or prospects of the Company and its Subsidiaries, taken as a whole, and (ii) the Company shall not be required to provide information required by Items 3.02 (Unregistered Sales of Equity Securities), 5.02(e) (Executive Compensation) or 5.07 (Submission of Matters to a Vote of Security Holders).

(d)   Notwithstanding the foregoing and for the avoidance of doubt, (i) the Company shall not be required to furnish any information, certificates or reports required by Section 302, Section 404 or Section 906 of the Sarbanes-Oxley Act of 2002, or related Items 307, 308, 402 or 407 of Regulation S-K, (ii) the information and reports referred to in Sections 9.18(a), (b) and (c) will not be required to contain the separate financial statements or other information contemplated by Rule 3-05, Rule 3-09, Rule 3-10 or Rule 3-16 of Regulation S-X, (iii) the information and reports referred to in Sections 9.18(a), (b) and (c) shall not be required to present compensation or beneficial ownership information and (iv) the information and reports referred to in Sections 9.18(a), (b) and (c) shall not be required to include any exhibits required by Item 5 or 15 of Form 10-K or Item 6 of Form 10-Q.

(e)   The Company shall:

(i)      within ten (10) Business Days after causing the annual report required by Section 9.18(a)(i) or the quarterly report required by Section 9.18(b)(i) to be furnished to the Holders, use commercially reasonable efforts to hold a conference call to discuss such report and the results of operations for the applicable reporting period with the Holders;

44

(ii)    issue a notice to the Holders no fewer than three (3) Business Days prior to the date of the conference call required to be held in accordance with this Section 9.18(e), announcing the time and date of such conference call and either including all information necessary to access the call or directing the Holders to contact the appropriate person at the Company to obtain such information; and

(iii)    maintain a website (which shall be non-public and password protected) to which the Holders, holders of Common Stock, prospective investors of Common Stock or Warrants that certify that they are accredited investors and that they are not involved in the design or manufacturing of specialty and high value-added coated paper products or otherwise competitors of the Company, bona fide purchasers of the Common Stock or Warrants that certify that they are not involved in the design or manufacturing of specialty and high value-added coated paper products or otherwise competitors of the Company, and broker dealers or market makers are given access and to which all of the information required by this Section 9.18 is posted.

(f)    The Company may cease providing the information set forth in Section 9.18 (i) upon the date when no Warrants remain outstanding, (ii) during any period starting with the date ninety (90) days before the Company's good-faith estimate of the date of filing of a registration statement with the SEC if the Company reasonably concludes that it must do so during such period to comply with the SEC's rules and regulations applicable to such registration statement and related offering; provided, that the Company's obligations under this Section 9.18 will be reinstated (including with respect to any information that the Company had ceased providing during such period) at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective, and (iii) during any period during which the Company is a reporting company under the Exchange Act. Further, the Company may elect not to provide (x) any information that would otherwise be included in an annual report delivered pursuant to Section 9.18(a) or a quarterly report delivered pursuant to Section 9.18(b), in either case to the extent that such information addresses the Company's future prospects or events that may occur in the future that would reasonably likely have a material effect on the Company, or (y) any information that would otherwise be included in a Current Report on Form 8-K delivered pursuant to Section 9.18(c), in each case, if the Company reasonably determines, in good faith, that the disclosure of such information would interfere with any financing, acquisition, corporate reorganization, strategic or other similar transaction involving the Company or its Subsidiaries (each, a "Blackout Period"), provided, however, that the Company may not institute a Blackout Period for more than two (2) consecutive quarters.

[*Signature Page Follows*]

45

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned parties hereto as of the date first above written.

APPVION HOLDING CORP.

By: _____
Name:  George W. Wurtz III
Title:  Chairman, President and Chief
Executive Order

COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST COMPANY, N.A.
collectively, as Warrant Agent

By: _____
Name:
Title:

[*Signature Page to Warrant Agreement*]

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned parties hereto as of the date first above written.

APPVION HOLDING CORP.

By: _____

Name: George W. Wurtz III
Title:  Chairman, President and Chief
Executive Order

COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST COMPANY, N.A.
collectively, as Warrant Agent

By: *Collinekeogu*

Name:
Title:   Collin Ekeogu

Manager, Corporate Actions

[*Signature Page to Warrant Agreement*]

**EXHIBIT A-1**

**THE TRANCHE A WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE A WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE A WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE A WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.**

**FACE OF GLOBAL WARRANT CERTIFICATE FOR TRANCHE A WARRANTS**

**VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON June 13, 2023**

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred pursuant to Section 6.1(e) of the Warrant Agreement and as set forth below.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee or as otherwise set forth in Section 6.1(e) of the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

THE SECURITIES REPRESENTED BY THIS TRANCHE A GLOBAL WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS TRANCHE A GLOBAL WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS TRANCHE A WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

**TRANCHE A WARRANT TO PURCHASE**

**244,167 SHARES OF COMMON STOCK OF**

**APPVION HOLDING CORP.\***

CUSIP # 03835B 118
ISSUE DATE:  [●]

No. [W-1A]

   This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after [●][1] until a period ending at 5:00 p.m., New York time, on June 13, 2023, the number of fully paid and non-assessable shares of Common Stock, par value $0.01 per share ("Common Stock") of the Company set forth above at the Tranche A Exercise Price (as defined in the Warrant Agreement).  The Tranche A Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche A Exercise Price shall be $27.17.

   This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

---

\*  Exercisable for 244,167 shares of Common Stock for all Tranche A Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

[1]  This date is the Effective Date.

IN WITNESS WHEREOF, this Tranche A Warrant Global Certificate has been duly executed by the Company as of the [●] day of [●].

APPVION HOLDING CORP.

By: _____

Print Name: _____

Title: _____

Attest: _____

Computershare Inc., and Computershare Trust Company, N.A. collectively, as Warrant Agent

By: _____

Name:

Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

FORM OF REVERSE OF TRANCHE A GLOBAL WARRANT CERTIFICATE

The Tranche A Warrants evidenced by this Global Warrant Certificate are a part of a duly authorized issue of Tranche A Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used but not defined in this Global Warrant Certificate that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof (subject to Section 4.3(d)(z) of the Warrant Agreement) and for all other purposes (subject to Section 4.1(ii) of the Warrant Agreement), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

EXHIBIT A-2

**THE TRANCHE B WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE B WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE B WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE B WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.**

FACE OF GLOBAL WARRANT CERTIFICATE FOR TRANCHE B WARRANTS

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred pursuant to Section 6.1(e) of the Warrant Agreement and as set forth below.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee or as otherwise set forth in Section 6.1(e) of the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

THE SECURITIES REPRESENTED BY THIS TRANCHE B GLOBAL WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS TRANCHE B GLOBAL WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS TRANCHE B WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

### TRANCHE B WARRANT TO PURCHASE

### 244,167 SHARES OF COMMON STOCK OF

### APPVION HOLDING CORP.*

CUSIP # 03835B 126
ISSUE DATE:  [●]

No. [W-1B]

      This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after [●]$^2$ until a period ending at 5:00 p.m., New York time, on June 13, 2023, the number of fully paid and non-assessable shares of Common Stock, par value $0.01 per share ("Common Stock") of the Company set forth above at the Tranche B Exercise Price (as defined in the Warrant Agreement).  The Tranche B Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche B Exercise Price shall be $31.25.

      This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

---

*  Exercisable for 244,167 shares of Common Stock for all Tranche B Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.
[2]  This date is the Effective Date.

IN WITNESS WHEREOF, this Tranche B Warrant Global Certificate has been duly executed by the Company as of the [●] day of [●].

APPVION HOLDING CORP.

By:  _____

Print Name:  _____

Title:  _____

Attest:  _____

Computershare Inc., and Computershare Trust
Company, N.A. collectively, as Warrant
Agent

By:  _____
      Name:
      Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

FORM OF REVERSE OF TRANCHE B GLOBAL WARRANT CERTIFICATE

     The Tranche B Warrants evidenced by this Global Warrant Certificate are a part of a duly authorized issue of Tranche B Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used but not defined in this Global Warrant Certificate that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

     The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

     No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

     This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

     The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof (subject to Section 4.3(d)(z) of the Warrant Agreement) and for all other purposes (subject to Section 4.1(ii) of the Warrant Agreement), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

EXHIBIT A-3

THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE A WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE A WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE A WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

Certificate Number _____          Warrants _____
                                              CUSIP  03835B 118

This certifies that

is the holder of

TRANCHE A WARRANTS TO PURCHASE COMMON STOCK OF
APPVION HOLDING CORP.

transferable on the books of the Company by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed. Each Tranche A Warrant entitles the holder and its registered assigns (collectively, the "Registered Holder") to purchase by exercise from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after "[●]³ until a period ending at 5:00 p.m., New York time, on June 13, 2023, one fully paid and non-assessable share of Common Stock, par value $0.01 per share ("Common Stock") of the Company at the Tranche A Exercise Price (as defined in the Warrant Agreement). The Tranche A Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche A Exercise Price shall be $27.17.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

---

³     This date is the Effective Date.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the facsimile signatures of the Company's duly authorized officers.

DATED

_____
Authorized Officer

Attest:

COUNTERSIGNED AND
REGISTERED
**COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST
COMPANY, N.A.**
COLLECTIVELY, AS WARRANT
AGENT

_____
Secretary

By _____
        AUTHORIZED SIGNATURE

FORM OF REVERSE OF TRANCHE A WARRANT

APPVION HOLDING CORP.

The Tranche A Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Tranche A Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, dated as of June 13, 2018, between Appvion Holding Corp. (the "Company") and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent" and the agreement, the "Warrant Agreement"), a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Warrants represented by this Warrant Certificate do not entitle the Registered Holder to any of the rights of a stockholder of the Company. The Company and the Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

<div align="right"><b>EXHIBIT A-4</b></div>

**THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "<u>BANKRUPTCY CODE</u>") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, <u>PROVIDED</u> THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE B WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE B WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE B WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.**

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "<u>WARRANT AGREEMENT</u>").

Certificate Number _____          Warrants _____
                                                    CUSIP 03835B 126

This certifies that

is the holder of

<div align="center">TRANCHE B WARRANTS TO PURCHASE COMMON STOCK OF<br>APPVION HOLDING CORP.</div>

transferable on the books of the Company by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed. Each Tranche B Warrant entitles the holder and its registered assigns (collectively, the "<u>Registered Holder</u>") to purchase by exercise from Appvion Holding Corp., a Delaware corporation (the "<u>Company</u>"), subject to the terms and conditions hereof, at any time after [●][4] until a period ending at 5:00 p.m., New York time, on June 13, 2023, one fully paid and non-assessable share of Common Stock, par value $0.01 per share ("<u>Common Stock</u>") of the Company at the Tranche B Exercise Price (as defined in the Warrant Agreement). The Tranche B Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement. The initial Tranche B Exercise Price shall be $31.25.

---

[4] This date is the Effective Date.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the facsimile signatures of the Company's duly authorized officers.

DATED

_____
Authorized Officer

Attest:

COUNTERSIGNED AND
REGISTERED
**COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST
COMPANY, N.A.**
COLLECTIVELY, AS WARRANT
AGENT

_____
Secretary

By _____
AUTHORIZED SIGNATURE

FORM OF REVERSE OF TRANCHE B WARRANT

APPVION HOLDING CORP.

The Tranche B Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Tranche B Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, dated as of June 13, 2018, between Appvion Holding Corp. (the "Company") and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent" and the agreement, the "Warrant Agreement"), a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Warrants represented by this Warrant Certificate do not entitle the Registered Holder to any of the rights of a stockholder of the Company. The Company and the Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT B-1**

EXERCISE FORM FOR REGISTERED HOLDERS HOLDING CERTIFICATED WARRANTS
(To be executed upon exercise of Warrants)

The undersigned Registered Holder of this Warrant Certificate, being the holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[5] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent") hereby irrevocably elects [(subject to the immediately succeeding paragraph of this Exercise Form)] to exercise [Tranche A] [Tranche B] Warrants, for the purchase of [_____] shares of Common Stock, par value $0.01 per share ("Common Stock") and (check one):

☐       herewith tenders payment for _____ of the Warrant Exercise Shares to the order of Appvion Holding Corp. in the amount of $_____ in accordance with the terms of the Warrant Agreement; or

☐       agrees that it is electing to use the cashless exercise provisions set forth in Section 4.3(b) of the Warrant Agreement by authorizing the Company to withhold and not issue to the undersigned Registered Holder, in payment of the Exercise Price for the Warrant Exercise Shares set forth above, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares set forth above, and (y) the Exercise Price, and divided by (ii) the Current Sale Price on the Exercise Date. This exercise and election shall be immediately effective [(subject to the immediately succeeding paragraph of this Exercise Form)].

[The undersigned is exercising [Tranche A] [Tranche B] Warrants pursuant to this Exercise Form in connection with, or in contemplation of, the occurrence of: [Describe Change of Control (including the date on which, or range of dates during which, such Change of Control is expected to occur)]. The undersigned hereby elects to condition such exercise upon the occurrence of such Change of Control and such exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the dates, specified in this paragraph.]

The undersigned requests that the Warrant Exercise Shares, or the net number of shares of Common Stock issuable upon exercise of the [Tranche A] [Tranche B] Warrants pursuant to the cashless exercise provisions of Section 4.3(b) of the Warrant Agreement, be issued in the name of the undersigned Holder or as otherwise indicated below:

Name      _____
Address   _____

Email      _____

If said number of [Tranche A] [Tranche B] Warrants shall not be all the [Tranche A] [Tranche B] Warrants represented by the applicable Warrant Certificate, the undersigned requests that a new Warrant Certificate representing the balance of such [Tranche A] [Tranche B] Warrants shall be issued in the name of the undersigned Holder or as otherwise indicated below and be delivered to the address indicated below:

Name      _____
Address   _____

Email      _____

---

[5] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

Delivery Address (if different)

_____

_____

Dated: _____, 20___

HOLDER

[_____]

By _____

Name:

Title:

**EXHIBIT B-2**

EXERCISE FORM FOR REGISTERED HOLDERS HOLDING DIRECT REGISTERED WARRANTS
(To be executed upon exercise of Warrants)

The undersigned Holder, being the holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[6] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent"), hereby irrevocably elects [(subject to the immediately succeeding paragraph of this Exercise Form)] to exercise [Tranche A] [Tranche B] Warrants, for the purchase of [_____] shares of Common Stock, par value $0.01 per share ("Common Stock") and (check one):

☐   herewith tenders payment for _____ of the Warrant Exercise Shares to the order of Appvion Holding Corp. in the amount of $_____ in accordance with the terms of the Warrant Agreement; or

☐   agrees that it is electing to use the cashless exercise provisions set forth in Section 4.3(b) of the Warrant Agreement by authorizing the Company to withhold and not issue to the undersigned Registered Holder, in payment of the Exercise Price for the Warrant Exercise Shares set forth above, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares set forth above, and (y) the Exercise Price, and divided by (ii) the Current Sale Price on the Exercise Date. This exercise and election shall be immediately effective [(subject to the immediately succeeding paragraph of this Exercise Form)].

[The undersigned is exercising [Tranche A] [Tranche B] Warrants pursuant to this Exercise Form in connection with, or in contemplation of, the occurrence of: [Describe Change of Control (including the date on which, or range of dates during which, such Change of Control is expected to occur)]. The undersigned hereby elects to condition such exercise upon the occurrence of such Change of Control and such exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the dates, specified in this paragraph.]

The undersigned requests that the Warrant Exercise Shares, or the net number of shares of Common Stock issuable upon exercise of the [Tranche A] [Tranche B] Warrants pursuant to the cashless exercise provisions of Section 4.3(b) of the Warrant Agreement, be issued in the name of the undersigned Holder or as otherwise indicated below:

Name      _____
Address   _____
          _____
Email     _____

---

[6] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

**EXHIBIT C**

FORM OF ASSIGNMENT
FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrants)

For value received, the undersigned Holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[7] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively]as warrant agent (together with their respective successors and assigns, the "Warrant Agent"), hereby sells, assigns and transfers unto the assignee(s) named below the number of [Tranche A] [Tranche B] Warrants listed opposite the respective name(s) of the assignee(s) named below, and all other rights of the Holder under said [Tranche A] [Tranche B] Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said [Tranche A] [Tranche B] Warrants, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address of Assignee(s) | Number of [Tranche A] [Tranche B] Warrants |
|---|---|---|
| _____ | _____ | _____ |

Dated: _____, 20__          Signature: _____

Name: _____

Note: The above signature and name should correspond exactly with the name of the Holder of the [Tranche A] [Tranche B] Warrants as it appears on the Warrant Register.

---

[7] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

## SCHEDULE 4:

### Identity of the Trust Oversight Committee

EAST\158243192.2

**Identification of the Trust Oversight Committee**

The Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders have selected and

appointed the following entities to serve on the Trust Oversight Committee:

| Member Type | Member Name | Number of Votes |
|---|---|---|
| UCC Member | Pace Industry Union-Management Pension Fund | 1 |
| UCC Member | Pension Benefit Guaranty Corporation, | 1 |
| 2L Member | Barings LLC | 1 |
| 2L Member | Cross Sound Management LLC | 2 |

**SCHEDULE 5:**

**ESOP Committee Professionals**

EAST\158243192.2

100250 - 00001

LEGAL REPRESENTATION AGREEMENT
(Commercial Contingent Fee Arrangement)
(☐ With/☒ Without Advance Costs Deposit)

THIS AGREEMENT is entered into as of this _____ day of _____, 2018, in Phoenix, Arizona, by and between _____, whose principal address is  (hereinafter referred to as "Client") and BEUS GILBERT PLLC, 701 North 44th Street, Phoenix, Arizona 85008-6504 (hereinafter referred to as "Counsel").

**1.    SCOPE OF ENGAGEMENT.**

1.1.    Matter Involved.  Client has engaged Counsel to undertake the legal representation of Client in a matter (hereinafter referred to as the "Matter") involving work on claims or evaluation of claims on behalf of the ESOP, the ESOP Committee, or Grant Lyon in his capacity as an ESOP Committee member, or any other tasks requested by Grant Lyon.

This Legal Representation Agreement shall be presented to _____ for their prior approval.

1.2.    Counsel Functions.  Counsel agrees to provide its legal services in return for the covenants and promises made by Client herein.  Counsel will perform such legal services as it shall deem appropriate to the Matter.  It is specifically understood and agreed by Client that Counsel does not, by this Agreement, promise to perform any specific act of legal representation, nor does Counsel promise to obtain any particular result.  Client acknowledges that Client has relied upon no oral representations to the contrary in entering into this Agreement.

1.3.    Client Functions.  Client agrees to perform the following functions:

(a)    Payment.  To pay Counsel for the performance of such legal services, and to pay for all fees, costs, charges and expenses incurred in connection therewith, as specified in Section 2 below.

(b)    Cooperation.  To cooperate fully with Counsel in representing Client in the Matter.

(c)    Multiple Clients.  If Counsel is representing multiple Clients jointly in the Matter, it is each Client's responsibility to advise Counsel if any information concerning the Matter is confidential and is to be withheld from the other Clients.  Otherwise, all relevant communications received from any Client in the Matter will be fully disclosed to the others.  If such a situation arises, Counsel will advise the other Clients that a confidence exists (without divulging it) and will determine if any of the other Clients has any objection to Counsel receiving, retaining, and withholding from them such information.  Counsel retains the right to withdraw from representing any one or more of Clients involved, if in the sole discretion of Counsel, a conflict of interest arises by reason of such confidences which mandates such a withdrawal.

(d)    Other.  Such other functions as may be reasonably requested by Counsel from time to time.

(e)    Authorization and Decision-Making.  Client authorizes and directs Counsel to take all actions which Counsel deems advisable on Client's behalf in the Matter.  Counsel agrees to notify Client of all significant developments and to consult with Client in advance as to any significant decisions attendant to those developments.

**2.    LEGAL FEES AND EXPENSES.**

2.1.    Method of Determining Fees.  Client and Counsel agree that the following method is to be used for determining the amount of legal fees:

(a)     Client agrees to pay Counsel a fee contingent upon the outcome of the Matter. If any recovery is made in the Matter on Client's behalf, Client agrees to pay to Counsel, for legal services rendered, a sum equal to:

| | |
|---|---|
| 25% | of any and all sums recovered by way of settlement of the Matter or any portion thereof prior to instituting a lawsuit; or |
| 33 1/3% | of any and all sums recovered either as a result of trial or by way of settlement of the Matter or any portion thereof after a lawsuit has been instituted; or |
| 40% | of any and all sums recovered if any judgment is appealed, either on behalf of Client or by any adverse party, or if garnishment or any proceeding after judgment is brought to collect the judgment or any portion thereof; or |
| 50% | of any and all sums recovered if the Matter is the subject of a retrial as ordered by a trial or appellate court. |

If there is no recovery, except as provided in Section 3 hereof, there shall be no fees owed by Client to Counsel for representation in the Matter. Further, it is agreed that if there is no recovery, Client shall not be responsible for fees, costs, charges and expenses as described in Section 2.2 herein. To the extent there is a partial recovery, Client shall be responsible for fees, costs, charges and expenses to the extent of that recovery, but no more. In the event there are partial recoveries during the course of the representation, Counsel shall be entitled to costs and expenses and interest thereon as described in Section 2.2 herein, along with interest as described in Section 2.3(d) herein to the extent of recoveries.

(b)     Client agrees that Counsel may deduct from the proceeds of any recovery the applicable fee as agreed upon above, along with all other fees, costs, charges and expenses, with interest, as described in Section 2.2 herein for which Client is responsible and which remain unpaid at the time the recovery proceeds are received.

(c)     Such fee shall be computed on the basis of the gross recovery. The gross recovery will be total amounts recovered, including cancellation or forgiveness of debt owed by Client, punitive damages, attorneys' fees, interest, and the fair market value of any property, real or personal, tangible or intangible, recovered whether by settlement or judgment, without reduction for the fees, costs, charges and expenses paid by Client or advanced by Counsel in connection with providing legal representation to Client in the Matter. The fair market value of any property shall be agreed upon by Client and Counsel, and, if they are unable to agree, shall be determined by an appraiser mutually agreeable to Counsel and Client, or if Counsel or Client cannot agree upon an appraiser, an appraiser selected by a Judge of the Superior Court of Maricopa County, Arizona.

(d)     Counsel agrees to make no compromise or settlement in the Matter without the approval of Client as to the specific settlement or compromise. Counsel agrees to notify Client whenever an offer of settlement or compromise is received by Counsel, and to inform Client of the amount of that offer, and the recommendation of Counsel as to the acceptability thereof. Likewise, Client agrees to make no compromise or settlement in the Matter without the approval of Counsel. Client agrees to notify Counsel whenever an offer of settlement or compromise is received by Client, and to inform Counsel of the amount and terms of any such offer.

(e)     Client hereby grants Counsel a lien upon, and security interest in, the claims or causes of action and on any sum recovered by way of settlement and on any judgment that may be recovered in an amount equal to Counsel's fees and other fees, costs, charges and expenses incurred by Counsel pursuant to this Agreement. Counsel may, in its discretion, execute on Client's behalf and cause to be filed with appropriate agencies, UCC Financing Statements evidencing the foregoing security interest. Counsel shall have all general, possessory, or retaining liens, and all special or charging liens known to the common law or available under law.

(f)     Client hereby authorizes Counsel to fully investigate the facts and the law relative to the Matter. Upon the conclusion of such investigation Counsel shall have the discretionary right to determine that it is

2

not feasible to pursue the Matter, and upon notification to Client of such determination Counsel shall be entitled to withdraw from any further representation of Client pursuant to this Agreement. In such event no legal fees shall be payable to Counsel, but Client agrees to promptly pay Counsel for all fees, costs, charges and expenses incurred pursuant to Section 2.2 hereof prior to the date of such withdrawal in the event there are recoveries or partial recoveries.

(g)     In the event a settlement proposal is made to Client with the affirmative recommendation of Counsel, Counsel shall have the right, if such settlement proposal is rejected by Client, to withdraw from any further representation of Client pursuant to this Agreement upon written notice thereof by Counsel to Client. In such event Client agrees to promptly pay Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of withdrawal, and for all other fees, costs, charges and expenses incurred pursuant to Section 2.2 hereof prior to the date of such withdrawal.

2.2.     <u>Other Fees, Costs, Charges and Expenses</u>.

(a)     <u>Retention of Third Parties</u>. Client authorizes Counsel to retain and agrees to pay the fees and charges of every other person or entity hired by Counsel to perform necessary services related to the Matter. Such other persons and entities may include, but are not limited to, court reporters, appraisers, real estate agents, escrow agents, accountants, investigators, expert witnesses, trust officers, stock brokers, title examiners, surveyors, land planners, engineers, expert consultants, and other attorneys hired for ancillary matters in other localities. Client authorizes Counsel, in its discretion, to direct such other persons and entities to render invoices for services rendered and expenses advanced either directly to Client or to Counsel, in which event Client agrees to promptly pay the full amount of such invoices upon Client's receipt thereof.

(b)     <u>Expenses</u>. Client acknowledges that Counsel may incur various costs, charges and expenses in providing services to Client. Client agrees to reimburse Counsel for all costs, charges and expenses paid or incurred by Counsel. Such costs, charges and expenses include, but are not limited to, charges for serving and filing papers, courier and messenger services, recording and certifying documents, depositions, transcripts, investigations, witnesses, long-distance telephone calls, title insurance premiums, photocopies, printing, facsimiles, overtime clerical assistance, travel expenses, and postage. In addition, Client agrees to reimburse Counsel for all costs, charges and expenses, paid or incurred by Counsel, for Electronic Data Management such as, but not limited to, OCR and ESI processing, document conversion, image branding, video deposition synchronizing and data hosting performed by outside vendors at the actual invoice amount and, if performed in-house, at rates comparable to those charged by outside vendors. Counsel's current charges for photocopies are $0.25 per page and for facsimile transmissions, $1.00 per page. All other internal charges, such as long distance telephone and computerized legal research will be billed at an amount which approximates Counsel's total cost for the items, including an allowance for direct labor and administration.

2.3.     <u>Schedule of Billing and Payments</u>. Client and Counsel agree to the following schedule of billing and payments for fees and expenses:

(a)     <u>Legal Fees</u>. Legal fees determined by the method described in this Agreement will be billed to the Client at the above address.

(b)     <u>Other Fees, Costs, Charges and Expenses</u>. Other fees, costs, charges and expenses incurred by Counsel for Client in the Matter will be billed to Client as they are incurred by Counsel, or may, in Counsel's discretion, be accumulated or billed monthly to Client.

(c)     <u>Payment in Full</u>. Client agrees to pay in full the amount of each separate invoice rendered under Subsection 2.3(c) for other fees, costs, charges and expenses immediately upon receipt except fees, costs, charges and expenses shall be paid solely out of recoveries.

(d)     <u>Interest</u>. Any other fees, costs, charges and expenses incurred by Counsel on behalf of Client not paid by Client to Counsel shall accrue interest at a rate of one and one-fourth percent (1-1/4%) per month from the date the fee, cost, charge or expense is incurred until paid.

3

(e)   Execution of Promissory Note.  Client agrees that in the event any sums are not fully paid on or before the due date thereof, Client, upon the request of Counsel, shall execute in favor of Counsel a promissory note affirming the obligation of Client to pay such sums together with any interest referenced to above. Such promissory note shall contain terms that are fair and reasonable to Client.  Prior to signing the promissory note, Counsel shall forward such promissory note to Client and shall advise Client, in writing, that, prior to its signing, Client should seek advice of and consult with independent counsel of Client's choice in regards to the terms of the promissory note.  Counsel cannot advise Client as to the fairness and reasonableness of the terms of such promissory note.  No note shall require payment in excess of the amount of recovery.

2.4.   Information Provided in Invoices.  Counsel agrees to include in the invoices sent to Client a general identification of the services of Counsel for which Client is being charged and a specific identification of all other fees, costs, charges and expenses for which Counsel seeks reimbursement.

2.5.   Payments Directly to Counsel.  The parties agree that any amounts recovered, whether by settlement, judgment, or otherwise, shall be payable directly to Counsel, to be held in trust until such time as Counsel shall become entitled to payment for fees, costs, charges and expenses, as provided for in this Agreement, at which time Counsel shall be entitled to pay itself those fees, costs, charges and expenses from such amounts being held in trust, and to remit all remaining amounts to Client.

## 3.   GENERAL MATTERS.

3.1.   Assigned Claims.  Client and Counsel recognize that some or all of the claims asserted by Counsel on behalf of Client may include claims which are assigned by Client to others, including a liquidating trustee.  Client acknowledges that Counsel has no obligation to any party other than Client and no obligation to pursue any claim other than those claims which may lawfully be brought by Client under applicable law.  The attorney/client relationship is solely between Counsel and Client.

3.2.   Information to Be Made Available to Client.  Counsel agrees to make reasonable efforts to keep Client informed at all times as to the status of the Matter and as to the courses of action which are being followed, or are being recommended, by Counsel.  Counsel agrees to make reasonably available to Client for reading in Counsel's office all written materials sent or received by Counsel pertaining to the Matter.  Copies of all such materials will be provided at Client's request and Client's expense.  All of Counsel's work product will be owned by Counsel.

3.3.   Confidentiality.

(a)   Client's communications with Counsel are generally protected by the attorney-client privilege and ethical rules prohibiting the disclosure of information relating to Counsel's representation of Client. Counsel will undertake reasonable efforts to maintain the confidentiality of such communications and information; however, Client authorizes Counsel to disclose such communications and information to the extent Counsel deems necessary in order to carry out Counsel's representation of Client in the Matter.  Client further authorizes Counsel to disclose that Counsel represents Client in the Matter and/or that Counsel has represented Client in other matters. Client may revoke this consent by informing Counsel in writing that Client no longer consents to such disclosure.

(b)   Counsel may from time to time communicate about the Matter with Client or third parties via facsimile, mobile telephone, instant message, text message, email or other form of electronic communication. Counsel may also store Client's documents and other documents relating to Counsel's representation of Client in electronic format, and these documents may be stored on servers maintained by third parties.  Counsel may preserve these documents in electronic format only and may destroy any paper copies.  Data may be transmitted and stored in unencrypted format.  No form of communication or data storage is completely secure, and these forms of communication and data storage have some risk of unauthorized interception, unauthorized access, corruption or loss even though Counsel employs reasonable measures to maintain the security, integrity and confidentiality of Client's information.  Client hereby acknowledges these risks and consents to Counsel's use of these technologies in connection with Counsel's representation of Client.  Client agrees to provide Counsel with an email address that Counsel may use for correspondence relating to Counsel's representation of Client.  Client agrees to check this email address regularly.  Client is responsible for ensuring that third parties do not have access to his/her/its email

4

address, so that Client can receive confidential correspondence from Counsel at this email address. Client is further responsible for ensuring that Client's "spam" filters do not block emails from Counsel and that emails with attachments can be received at this email address. Client agrees to notify Counsel promptly if Client becomes unable to receive emails at this email address, the security of Client's emails has been compromised or any other issue arises that would affect Counsel's communication with Client by email. Client agrees to inform Counsel if any document or information provided by Client requires enhanced security measures for any reason.

3.4.    Conflicting Engagement.  Counsel agrees not to accept, without prior approval from Client, any engagement known by Counsel to be in direct conflict with the interests of Client in the Matter. If, in the course of representing multiple Clients, Counsel determines in its sole discretion that a conflict of interest exists, Counsel will notify all affected Clients of such conflict and may withdraw from representing any one or more of the Clients to the extent such a withdrawal would be permitted or required by applicable provisions of the Arizona Rules of Professional Conduct or the rules of courts of the State of Arizona or of the state in which the Matter is pending.

3.5.    No Guarantees.

(a)    It is impossible for Counsel to predict the total amount of fees, costs, charges and expenses that will be incurred in regard to Counsel's representation of Client. No guarantees have been made, nor can they be made, to Client with respect to the fees, costs, charges and expenses relating to such representation. Any estimate of fees, costs, charges and expenses that Counsel may have discussed represents only an estimate of such fees, costs, charges and expenses.

(b)    Litigation necessarily involves many risks beyond Counsel's control. During the course of Counsel's representation, Counsel may express opinions or beliefs concerning the litigation or various courses of action and the results that might be anticipated. Any such statement made by anyone on behalf of Counsel is intended to be an expression of opinion only, based on information available to Counsel at the time, and it should not be construed by Client as a promise or guarantee of the outcome. Counsel cannot and does not guarantee that the outcome of the Matter will be acceptable to Client or that any particular result will be achieved.

3.6.    Awards of Fees and Costs.

(a)    There may be a statutory or contractual basis for the award of attorneys' fees and costs in the Matter. In Counsel's experience, however, the court rarely orders one party to pay all of the fees of attorneys and other professionals incurred by the other party, and the court may order each party to pay all of such party's own attorneys' and other professional fees and costs. The court's determination of the attorneys' fees and other professional fees and costs that Client may recover from, or be obligated to pay, the opposing party shall not constitute a determination concerning the reasonableness of the fees and costs charged by Counsel or payable by Client. If the court orders the opposing party to pay Client's fees, costs, charges or expenses, Client is still responsible for the payment of all fees, costs, charges and expenses due hereunder, whether or not the other party actually pays the court-ordered fees, costs, charges and expenses.

(b)    Client should realize that, in the event that Client does not prevail in the Matter, the opponent may have the right to recover its attorneys' fees, costs, charges and expenses from Client. Payment of any such award of fees, costs, charges and expenses is exclusively Client's responsibility. For this reason, it is essential that Client always consider the reasonableness of Client's position before Counsel is directed to proceed with a claim or defense or to reject an offer of settlement.

3.7.    Termination of Representation.  The relationship established by this Agreement is subject to termination only as follows:

(a)    Withdrawal by Counsel.  Counsel reserves the right to withdraw from any representation if Client fails to honor this Agreement, or if Counsel concludes at any time that the Matter does not merit further representation or for any other condition that exists which would permit or require withdrawal under the Arizona Rules of Professional Conduct or by the rules of courts of the State of Arizona or of the state in which the Matter is pending. Notification of withdrawal shall be made in writing to Client. In the event of such withdrawal, Client

5

agrees to promptly pay Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of withdrawal, and all other fees, costs, charges and expenses incurred pursuant to Section 2.2 of this Agreement prior to the date of such withdrawal.

        (b)     Termination for Cause.  Client reserves the right to terminate the representation for cause if Counsel fails to honor this Agreement. Notification of the termination shall be made in writing to Counsel. In the event of any such termination by Client, Counsel waives any further rights to compensation relative to the representation; provided, however, that Client shall promptly pay Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of termination, and for all other fees, charges, and expenses incurred pursuant to Section 2.2 of this Agreement through the date of such termination.

        (c)     Termination Without Cause.  Client further reserves the right to terminate the representation without cause, and shall notify Counsel in writing of any such termination.  In the event of any such termination, Counsel's compensation due hereunder shall be whichever of the following Counsel elects: (a) prompt payment to Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of termination, and all other fees, charges, and expenses incurred prior to the date of such termination, as provided in Section 2.2 of this Agreement; or (b) a continuing contingent fee as provided in this Agreement, to be shared with successor counsel on the basis of relative time spent by Counsel and successor counsel through the conclusion of the Matter.

        (d)     Transition.  Upon termination of this representation for any reason, by either Client or Counsel, Counsel agrees to cooperate with any successor counsel to accommodate a smooth transition of the representation, and upon payment of all amounts owed to Counsel hereunder, to transfer Client files to such successor counsel.

## 4.    ARBITRATION.

    4.1.    Arbitration.  As a material term to Counsel's engagement, both Client and Counsel agree to settle any claim, controversy, dispute or any other disagreement of any nature, type or description regardless of the facts or legal theories which may be involved ("Dispute") **arising out of or relating to the professional services rendered to Client by Counsel including, without limitation, issues as to legal fees and costs and claims for professional malpractice, breach of fiduciary duty, breach of contract or any other claim based upon any alleged misconduct or any other alleged breach of duty, by binding arbitration in the City of Phoenix, Arizona**, in accordance with the following:

        (a)     The party seeking to initiate arbitration ("Disputing Party") shall notify the other party ("Answering Party") in writing that the Disputing Party demands arbitration as provided hereinbelow, setting forth in specific terms the Disputing Party's proposed statement of the matters in Dispute to be submitted to arbitration and the name and address of the arbitrator selected by the Disputing Party.  Within seven (7) business days following receipt of the Disputing Party's written arbitration demand complying with the requirements of this Subsection 4.1(a), the Answering Party shall notify the Disputing Party in writing, setting forth in specific terms the Answering Party's proposed statement of the matters in Dispute and identifying the name and address of the arbitrator selected by the Answering Party.

        (b)     The two (2) arbitrators so selected shall meet and confer within twenty (20) days after receipt by the Disputing Party of the Answering Party's written notice as called for under Subsection 4.1(a) above, and if they are unable within said twenty (20) day period to reach a decision on the matters in Dispute, they shall, at the expiration of said twenty (20) day period, jointly select a third arbitrator.  If said arbitrators are unable to choose the third arbitrator, Client and Counsel shall choose the third arbitrator; provided, however, that all arbitrators shall be disinterested individuals knowledgeable in disputes between legal counsel and clients and shall have had not less than fifteen (15) years' experience in litigating, arbitrating or adjudicating disputes between legal counsel and clients in metropolitan Phoenix, Arizona.  Subject to the foregoing, the arbitrators, including the third arbitrator, may be selected from any area in the United States.  Upon selection of the third arbitrator, the three (3) arbitrators shall, within ten (10) days thereafter, schedule an arbitration hearing at a date, time and place (in metropolitan Phoenix,

6

Arizona) designated by said arbitrators by a majority vote, written notice of which shall be given to the parties not later than thirty (30) days prior to said hearing date. The commencement of the arbitration hearing shall occur not more than one hundred and twenty (120) days from the initial demand for arbitration. At the hearing, each party may be represented by counsel and present testimony and evidence. If at the commencement of the hearing the parties cannot agree on a joint statement of the matters in Dispute to be submitted to the arbitrators, the arbitrators shall be empowered to frame the issue(s). A Certified Court Reporter's transcript may be demanded by any party or by the arbitrators and said official transcript shall be prepared, completed, and delivered to the arbitrators with copies to each party within ten (10) days following the conclusion of the hearing. The original transcript shall be paid for by the party requesting the transcription or the costs of transcription shall be shared equally by the parties if the transcript is requested by the arbitrators. Arbitration sessions following the initial session, if necessary, shall be scheduled by the arbitrators so that the arbitration proceedings (i.e., presentation of evidence and closing arguments, if permitted) are completed within twenty (20) days of the initial session. Each party shall be given the opportunity to file with the arbitrators simultaneous written briefs seven (7) days following receipt by the arbitrators of the official transcript but, if no transcript is demanded as provided in this Agreement, said briefs shall be filed simultaneously seven (7) business days following conclusion of the hearing. Copies of any such briefs shall be provided to the other party concurrently upon filing with the arbitrators.

(c)     Within ten (10) days following the receipt by the arbitrators of the brief(s) (or within ten (10) days following conclusion of the hearing if all parties waive briefs), the arbitrators shall make and deliver to the parties their decision and award in writing. The arbitrators shall have the authority to enter any award or to grant any relief which could be obtained in an Arizona court applying Arizona substantive law and giving full effect to the terms of this Agreement. Reasonable attorneys', expert witnesses', paralegals', arbitrators' and experts' fees, expenses, costs and necessary disbursements of arbitration may be awarded as the arbitrators see fit, consistent with the provisions of this Agreement. A reasoned award shall not be required. The arbitrators, and not any court, shall have the power and authority to decide whether the matter(s) in dispute is/are subject to arbitration; i.e., the arbitrators shall decide arbitrability. The arbitrators shall have no authority to modify, amend or alter the provisions of this Agreement and shall base their decision and award on the language contained in this Agreement and the facts giving rise to the Dispute as presented on the record at the hearing. The parties may mutually stipulate in writing to extend or to shorten the prescribed time periods (including a stipulation to expedite the referral and submission to arbitration) in this Section 4. All provisions of this Agreement not in dispute shall be observed and performed by the parties without interruption during the pendency of any proceeding called for under this Section 4. **Any arbitration award shall be final, binding and conclusive upon Client and Counsel, shall be non-appealable, and shall be enforceable in all courts of competent jurisdiction. Client and Counsel agree that to the extent permitted by law, binding arbitration, as provided in this Section 4, is the sole and exclusive remedy of such parties and Client and Counsel each waive and forego any and all rights to pursue any action in any court or other legal forum to resolve any Dispute.**

(d)     If a third arbitrator is required pursuant to Subsection 4.1(b) above, each party shall pay its pro rata share of any required retainer or other payments required by such arbitrator upon such arbitrator's demand, with the ultimate responsibility for the arbitrators' fees to be determined by the arbitrators in the final arbitration award pursuant to Subsection 4.1(c) above; otherwise, each party shall bear its own costs, charges and expenses in connection with any proceedings under this Section and, in any event, each party shall pay the fees of the arbitrator it selects.

4.2.    <u>Advantages of Arbitration</u>. The advantages of arbitration include:

(a)     The decisions of the arbitrators are final and are subject only to very limited review by the courts.

(b)     Costs are usually lower as compared to cost of court proceedings.

(c)     Generally, a final resolution can be reached more quickly through arbitration.

(d)     Normally, parties in arbitration have greater control over procedural matters and can set a timetable for hearings.

7

(e)     Arbitration can offer more confidentiality and privacy than a court hearing.

(f)     Procedures are relatively informal; rules of evidence are not strictly adhered to.

(g)     Arbitration usually provides a friendlier forum than litigation.

(h)     Arbitration possibly allows for more creative solutions than a court may offer.

(i)     Arbitrators are generally selected because of their knowledge of the subject matter, and the parties have the benefit of the arbitrators' experience.

4.3.    <u>Disadvantages of Arbitration</u>.  **The disadvantages of arbitration include:**

(a)     **In arbitration, the parties are waiving their right to litigate in court, including their right to a jury trial.**

(b)     **Arbitration is final and binding on the parties.  The right to appeal or seek modification of arbitrators' rulings is extremely limited.**

(c)     **Discovery in arbitration is generally more limited than discovery in court.**

(d)     **Arbitrators are not required to include factual findings or legal reasoning in their awards.**

(e)     **Costs of an arbitrator or arbitrators can be significant because of the number of arbitrators that may be required to participate, depending on the complexity of the arbitration.**

4.4.    <u>Review By Independent Counsel</u>.  If Client has any questions regarding the effect of Arbitration on the Client's rights in the event of a Dispute arising under this Agreement and the waiver of such rights, prior to signing this Agreement, Client should seek advice of and consult with independent counsel of Client's choice in regard to the terms of these arbitration provisions.

**5.    ADDITIONAL MATTERS.**

5.1.    <u>Commencement of Representation</u>.  Counsel shall not be required to commence representation of Client in the Matter until Counsel receives a copy of this Agreement signed by Client.

5.2.    <u>Retention of Files</u>.  Counsel agrees to assert reasonable efforts, subject to Subsection 3.7(d) hereof and causes beyond the control of Counsel, to retain and maintain the files relative to the Matter for a period of five (5) years following the conclusion of the Matter.  Thereafter, prior to destruction of such files, Counsel agrees to use reasonable efforts to notify Client at the Client's principal address stated above or such other address as Client provides to Counsel hereafter in writing, or to the e-mail address of Client hereafter provided.  In the alternative, Counsel may deliver the entire file to Client, in which case Counsel shall have no further responsibility in regards to Counsel's retention of the files.  Counsel shall not be required to maintain a copy of the files upon such delivery to Client, and Client shall take adequate measures to protect such files.

5.3.    <u>Original Documents</u>.  Upon termination of the representation, Counsel agrees to deliver to Client all original documents received by Counsel during the course of Counsel's engagement relative to the Matter.

5.4.    <u>Complete Integration; Binding Upon All Parties; Severability</u>.  This Agreement contains the entire agreement between Client and Counsel regarding Counsel's handling of the Matter and the fees, costs, charges and expenses to be paid relative thereto.  This Agreement shall not be modified, nor shall Counsel's contractual obligations with respect to the Matter be enlarged, except by written agreement signed by Client and by a member of Counsel.  This Agreement shall be binding upon Client and Counsel and their respective heirs, executors, legal

8

representatives, and successors.  If any portion of this Agreement is determined to be invalid or unenforceable, the remaining portions shall continue to be binding and enforceable in accordance with their terms.  The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement.

5.5.    <u>Multiple Parties</u>.  If more than one individual signs this Agreement on behalf of Client, the liability of all such persons shall be joint and several.

5.6.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

CLIENT HAS READ THE FOREGOING LEGAL REPRESENTATION AGREEMENT AND CLIENT'S SIGNATURE BELOW INDICATES THAT CLIENT FULLY UNDERSTANDS AND AGREES TO ALL OF THE TERMS OF THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, ITS ARBITRATION PROVISIONS.  THE TERMS OF THE ENGAGEMENT OF COUNSEL, AS STATED ABOVE, ARE HEREBY ACCEPTED AND APPROVED BY CLIENT.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

CLIENT:    _____
           Grant Lyon

           *IN SOLE CAPACITY AS TRUSTEE*
           Title of signer (if applicable)  *In my capacity*

E-Mail Address:  glyon@caissacap.com

COUNSEL:    BEUS GILBERT PLLC

By: _____
    Leo R. Beus, Founding Member

*SIGNED DURING MEETING IN NEW YORK ON JUNE 5*

BGD-#225213-v1-Appvion_Fee_Agreement.DOCX

BEUS GILBERT PLLC

SCHEDULE OF RATES

June 2016

### HOURLY RATES[1]

Members .................................................................................................... $335 - $730

Associates ................................................................................................ $185 - $275

Planning Consultants ....................................................................................$245

Assistant Planning Consultants...................................................................$110

Paralegals .......................................................................................... $175 - $205

Project Assistants................................................................................. $55 - $100

Support Staff Overtime.......................................................................... $18 - $53

---

[1] These rates are subject to change from time to time.

BGD-#225213-v1-Appvion_Fee_Agreement.DOCX

10

# EXHIBIT B

# LIQUIDATION ANALYSIS

EAST\158243192.2

## Liquidation Analysis

The Debtors believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code. This liquidation analysis and the conclusions set forth herein represent management's best judgment regarding the results of such a liquidation. This liquidation analysis was prepared for the sole purpose of assisting the Bankruptcy Court and Holders of Impaired Claims or Interests in making this determination and should not be used for any other purpose. Nothing contained in this liquidation analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical Chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Combined Plan and Disclosure Statement.

The liquidation analysis is shown on a consolidated basis and reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors liquidated under chapter 7 of the Bankruptcy Code commencing immediately. Also reflected is an analysis of estimated cash proceeds available under the Debtors' chapter 11 Plan of Liquidation, for purposes of comparison. Management of the Debtors prepared the liquidation analysis with the assistance of AP Services, LLP. A number of estimates and assumptions underlie the analysis that, while considered reasonable, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, management and their advisors. Independent accountants have not examined or reviewed the liquidation analysis. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO LIQUIDATE UNDER CHAPTER 7.

The liquidation analysis assumes that the Debtors' liquidation would commence under the direction of a Chapter 7 trustee and would continue for a period of two months. During this time, all of the Debtors' assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priorities established under the Bankruptcy Code.

The liquidation itself would likely trigger certain priority payments that otherwise would not be due in the ordinary course of business. These priority payments would be made in full before any distribution of proceeds to pay Holders of general unsecured claims or to make distributions in respect of Interests. The liquidation may also create a larger number of unsecured creditors that would subject the chapter 7 estates to additional claims.

The liquidation analysis contains an estimate of the value of Claims that ultimately will become Allowed Claims based on the Debtors' books and records as of July 31, 2018. The Debtors have not evaluated, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this liquidation analysis. Upon information and belief, the Debtors

1

do not believe that any variance between the estimates contained herein and the final Allowed Claims would have a material effect on the liquidation analysis for purposes of section 1129(a)(7) of the Bankruptcy Code.

The liquidation analysis further assumes that there are no recoveries from the pursuit of any potential preferential payments or fraudulent conveyances, or from any other causes of action, which would be expected to be the same under both a chapter 7 and a chapter 11 scenario.

**Appvion, Inc.**
**Liquidation Analysis**
**As of June 13, 2018\***

| $000s | | Note | Chapter 7 Liquidation Low Recovery | Chapter 7 Liquidation High Recovery | Chapter 11 Liquidation |
|---|---|---|---|---|---|
| **A.** | **Estimated Proceeds** | | | | |
| | Cash | 1 | $ 11,284 | $ 11,284 | 11,284 |
| | Restricted Cash - Escrow | 2 | 5,228 | 5,228 | 5,228 |
| | Other Receivable | 3 | 1,568 | 1,568 | 1,568 |
| | D & O Insurance Refund Receivable | 4 | 15 | 15 | 15 |
| | Settlement Proceeds | 5 | 950 | 950 | 950 |
| | Total Estimated Proceeds | | 19,045 | 19,045 | 19,045 |
| | | | | | |
| **B.** | **Estimated Wind-Down Expenses** | | | | |
| | Corporate Wind-Down Expenses | 6 | (183) | (183) | (183) |
| | Ch 11 and Wind-Down Professional Fees | 7 | (12,113) | (12,113) | (12,113) |
| | Ch. 7 Trustee Fees | 8 | (571) | (571) | - |
| | Ch. 7 Professional Fees | 9 | (1,050) | (700) | - |
| | Chapter 11 Trustee fees | | - | - | (350) |
| | Total Estimated Wind-Down Expenses | | (13,918) | (13,568) | (12,646) |
| | | | | | |
| | **Estimated Proceeds Available for Claim Distributions** | | $ 5,127 | $ 5,477 | $ 6,399 |
| | | | | | |
| **C.** | **Estimated Administrative Claims** | | | | |
| | 503(b)(9) Claims | 10 | $ (2,215) | $ (2,215) | $ (2,215) |
| | Post-Petition Taxes | 11 | (292) | (292) | (292) |
| | PBGC Administrative Claim | 12 | (2,800) | (2,800) | (2,800) |
| | Total Estimated Administrative Claims | | (5,307) | (5,307) | (5,307) |
| | *% Recovery to Administrative Expenses* | | *100.0%* | *100.0%* | *100%* |
| | | | | | |
| | **Estimated Proceeds Available for Priority Claims, Second Lien Secured Note Claims, and General Unsecured Claims** | | $ (179) | $ 171 | $ 1,092 |
| | | | | | |
| **D.** | **Estimated Priority Claims** | | | | |
| | Priority Taxes | 13 | $ (232) | $ (232) | $ (232) |
| | PBGC Priority Claim | 12 | (610) | (610) | (260) |
| | Total Estimated Priority Claims | | (842) | (842) | (492) |
| | *% Recovery to Priority Claims* | | *-21.3%* | *20.3%* | *100%* |
| | | | | | |
| | **Estimated Proceeds Available for Second Lien Secured Note Claims, and General Unsecured Claims** | 14 | $ (1,022) | $ (672) | $ 600 |

2

### Notes to Liquidation Analysis

\*  **Amounts included for proceeds, expenses and claims reflect best estimates at the time the analysis was prepared (early August 2018). All amounts in the analysis are reflected *as of* June 13, 2018, when substantially all of the Debtors' assets were sold under a Section 363 sale transaction (the "Closing"). Cash assets have been (and continue to be) used to satisfy certain expenses and claims in the normal course since the Closing, and thus, amounts are not necessarily reflective of current balances, although estimated net proceeds available to creditors remains the same.**

1.  Represents cash proceeds from Purchaser's funding of Wind-down Budget, including $10.8 million funded at Closing and $0.4 million funded subsequently, net of amounts escrowed (see Note 2).
2.  Represents cash placed into separate escrow accounts at Closing for the payment of certain pre-sale professional fees and transaction fees.
3.  Represents estimated amounts receivable from the investment advisor for benefit plans not assumed by Purchaser and being terminated. Amount has subsequently been collected.
4.  Represents anticipated refund of unearned premium related to a D&O insurance policy not assumed by Purchaser.
5.  Represents amounts funded by the Purchaser for the General Unsecured Creditors' Cash Pool ($0.6 million) and Liquidating Trust ($0.35 million), under terms of Settlement Agreement.
6.  Represents estimate for expenses (other than professional fees) during the wind-down period.
7.  Represents accrued and unpaid professional fees at Closing and professional fees required to wind down the Debtors' estates through the time of a Chapter 7 Trustee appointment.
8.  Represents fees for the appointed Chapter 7 Trustee, estimated at 3% of distributable proceeds.
9.  Represent fees for legal and financial advisors of Chapter 7 Trustee, estimated to range between 2x ($0.7 million) and 3x ($1.05 million) the fees allocated to the Chapter 11 Liquidating Trust under the Settlement Agreement ($0.35 million). Such amounts in either scenario would be used to fund investigation and litigation related costs to pursue causes of action, and such costs are expected to be greater in the Chapter 7 scenario due to greater availability of funds.
10. Represents amounts owed to creditors for goods delivered within the 20 days prior to the bankruptcy filing and adjustments required to resolve objections to cure notices sent to creditors.
11. Represents estimate of income taxes, sales and use taxes, franchise taxes and UK-VAT taxes owed by the Debtor as of Closing.
12. Represents post-Closing settlement with PBGC for priority and administrative claims. A $0.35 million portion of the priority claim in the Chapter 11 scenario is contingent upon receiving litigation proceeds, and thus not reflected.

3

13. Represents prepetition sales and use taxes owed by the Debtors, based upon audits conducted by the respective taxing authorities.

14. Second Lien Secured Note Claims would share in any Chapter 11 recoveries in excess of $0.6 million, as this amount has been earmarked for General Unsecured Creditor Claims under the terms of the Settlement.

4

# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**DECLARATION OF MICHAEL T. GRAHAM IN SUPPORT**
**OF THE FORMER DIRECTORS AND OFFICERS' MOTION TO DISMISS**
**AMENDED COMPLAINT OR IN THE ALTERNATIVE TRANSFER VENUE**

I, Michael T. Graham, declare as follows:

      1.      I am a member in good standing of the State Bar of Illinois.  I am Special Counsel with the law firm of Jenner & Block LLP and one of the attorneys representing Appvion Inc.'s former directors and officers (the "D&Os") in the above-captioned matter.  I make this Declaration in support of the Former Directors' and Officers' Motion to Dismiss the Amended Complaint Or in the Alternative Transfer Venue.

1

2.     This Declaration is based on my own personal knowledge, information, and belief. If called upon, I would testify competently as to the matters set forth in this Declaration.

3.     On November 30, 2018, plaintiff, the Liquidating Trust Trustees filed their complaint in this matter.  (Dkt. 1).

4.     Following that filing, I and Jenner & Block LLP were retained to represent the D&Os in this matter.

5.     Since being retained, I and Jenner & Block LLP have requested in writing that each of the D&Os provide me their address to their current place of residence and any other non-permanent residences.

6.     The D&Os responded to my request in writing and have each confirmed their place of residence.

7.     Mark R. Richards confirmed that he currently lives in Fort Lauderdale, Florida. (*See also* Dkt. 9.)

8.     Thomas J. Ferree confirmed that he currently lives in Solon, Iowa.

9.     Tami L. Van Straten confirmed that she currently lives in Appleton, Wisconsin. (*See also* Dkt. 15.)

10.     Jeffrey J. Fletcher confirmed that he currently lives in Cumming, Iowa and has a non-permanent residence in Appleton, Wisconsin.  (*See also* Dkt. 12.)

11.     Kerry S. Arent confirmed that she currently lives in Appleton, Wisconsin and has a non-permanent residence in Phoenix, Arizona.  (*See also* Dkt. 14.)

12.     Stephen P. Carter confirmed that he currently lives in Rockford, Illinois.  (*See also* Dkt. 18.)

2

13.     Terry M. Murphy confirmed that he currently lives in Naples, Florida and has a non-permanent residence in Port Washington, Wisconsin.  (*See also* Dkt. 16.)

14.     Andrew F. Reardon confirmed that he currently lives in Marco Island, Florida.  (*See also* Dkt. 10.)

15.     Kathi P. Seifert confirmed that she currently lives in Appleton, Wisconsin and has a non-permanent residence in Neenah, Wisconsin.  (*See also* Dkt. 17.)

16.     Mark S. Suwyn confirmed that he currently lives in Bonita Springs, Florida.  (*See also* Dkt. 11.)

17.     Carl J. Laurino confirmed that he currently lives in Union, Kentucky and has a non-permanent residence in Wilder, Kentucky.  (*See also* Dkt. 21.)

18.     David A. Roberts confirmed that he currently lives in Carmel, Indiana.  (*See also* Dkt. 22.)

19.     Kevin Gilligan confirmed that he currently lives in Appleton, Wisconsin. (*See also* Dkt. 13.)

I declare under the penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Chicago, Illinois on March 19, 2019.

*/s/ Michael T. Graham*
Michael T. Graham

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Lucian Murley, hereby certify that on March 19, 2019, I caused a copy of the foregoing **Brief in Support of the Former Directors' and Officers' Motion to Dismiss Amended Complaint Or in the Alternative Transfer Venue** was served via First Class Mail on the parties on the attached service list.

/s/ Lucian Murley
Lucian B. Murley (DE Bar No. 4892)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
(302) 421-6898

**Service List**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Gordon Z. Novod, Esquire
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017

Mark L. Desgrosseilliers, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

Lars Golumbic, Esquire
Groom Law Group
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5811

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.,* | Case No.: 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 18-50955-KJC |
| MARK R. RICHARDS *et al.*, | |
| Defendants. | |

**DEFENDANT ARGENT TRUST COMPANY'S MOTION TO DISMISS**

Defendant, Argent Trust Company ("Argent"), files this Motion to Dismiss the Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012. Plaintiffs assert three claims against Argent: a state tort law aiding and abetting claim (Count V); a preference claim (Count XII); and a constructive fraudulent transfer claim (Count XIII). As explained in Argent's *Opening Brief in Support of Defendant's Motion to Dismiss the First Amended Complaint*, filed concurrently with this Motion, Plaintiffs' claims against Argent fail as a matter of law for the following reasons:

1.     The aiding and abetting claim (Count V) is preempted by ERISA. ERISA preempts state law as it relates to an employee benefit plan like the Appvion ESOP. The purpose of ERISA is to have a single body of law govern employee benefit plans and the conduct of ERISA fiduciaries like Argent, and not a hodgepodge of 50 states' trust and tort laws. Here the Plaintiffs use state common law as the benchmark for determining whether Argent properly valued the stock held in the Appvion ESOP. This valuation was required by the Appvion ESOP (as the Plaintiffs

acknowledge) and applicable law, and is a core fiduciary function, the performance of which is central to proper ESOP administration. The Plaintiffs' challenge to Argent's work for the Appvion ESOP seeks to judge Argent's fiduciary conduct under state law in just the way that ERISA preempts.

2.      If not preempted by ERISA, the aiding and abetting claim was not properly preserved in the Plan of Liquidation and is therefore barred by *res judicata*.

3.      The Plaintiffs' aiding and abetting claim should also be dismissed because it fails to allege sufficient facts to state a claim for two other reasons. First, the Plaintiffs have not and cannot allege the requisite "knowing participation" by Argent. Second, the Plaintiffs did not and cannot allege that the trustee and valuation services Argent provided to the Appvion ESOP constitute sufficient assistance to the underlying alleged tortfeasors to state an aiding and abetting claim.

4.      The two avoidance claims should also be dismissed (Count XII and Count XIII). Plaintiffs have effectively plead that the Debtors received reasonably equivalent value for the targeted transfers in Count XIII. As detailed below, Plaintiffs allege that Argent received the allegedly voidable transfers pursuant to two pre-petition Trustee Letter Agreements between Argent and Appvion, one of the Debtors. As such, Plaintiffs' allegations, taken as true, concede that Appvion received reasonably equivalent value from Argent as a matter of law – and have therefore failed to plead a basic element of a fraudulent transfer claim in Count XIII. As for the preference claim in Count XII, Plaintiffs have failed to plead sufficient facts to state a preference claim against Argent under the Supreme Court's *Iqbal* and *Twombly* cases.

Because Plaintiffs have failed to state any claims against Argent, the Court should dismiss Counts V, XII, and XIII pursuant to Federal Rule 12(b)(6).

Pursuant to Federal Rule of Bankruptcy Procedure 7012(b), Argent does not consent to entry of a final order or judgment by the bankruptcy court on any claims in Counts V, XII, and XIII.

*/s/ Tara L. Lattomus*

Tara L. Lattomus (Bar I.D. No. 3515)
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
222 Delaware Street, 7th Floor
Wilmington, DE  19801
Telephone: (302) 574-7400
Facsimile:  (302) 574-7401
tlattomus@eckertseamans.com

Michael L. Scheier (Ohio 0055512)
Brian P. Muething (Ohio 0076315)
Jacob Rhode (Ohio 0089636)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202
Email: mscheier@kmklaw.com
        bmuething@kmklaw.com
        jrhode@kmklaw.com
Tel:  (513) 579-6400
Fax:  (513) 579-6457

*Counsel for Argent Trust Company*

Dated:  March 19, 2019

3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.,* | Case No.: 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 18-50955-KJC |
| MARK R. RICHARDS *et al.*, | |
| Defendants. | |

**[*PROPOSED*] ORDER GRANTING
DEFENDANT ARGENT TRUST COMPANY'S MOTION TO DISMISS**

Upon the Motion to Dismiss of Argent Trust Company, pursuant to Rule 12 of the Federal Rules of Civil Procedure and Rule 7012 of the Federal Rules of Bankruptcy Procedure; and the Court having reviewed the First Amended Complaint, the Motion, the Opening Brief in Support of Defendant's Motion to Dismiss and all responses, if any, to the Motion; and this Court finding that the Motion is meritorious and should be granted, and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1. The Motion is Granted.

2. The Court recommends to the district court that it enter a final order dismissing the claims asserted against Argent Trust Company in Counts V, XII, and XIII, and enter judgment in Argent Trust Company's favor.

Dated: _____, 2019          _____
                                                      UNITED STATES BANKRUPTCY JUDGE

## CERTIFICATE OF SERVICE

I, Tara L. Lattomus, hereby certify that on this 19th day of March, 2019, I caused a true and correct copy of the foregoing ***Defendant Argent Trust Company's Motion to Dismiss*** to be served via Court's CM/ECF System and Hand Delivery on the below counsel:

Mark Minuti, Esquire
Saul Ewing Arnstein & Lehr LLP
1201 N. Market Street, Suite 230
P.O. Box 1266
Wilmington, DE  19899

Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Mark L. Desgrosseilliers, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

        */s/ Tara L. Lattomus*
Tara L. Lattomus (Bar I.D. No. 3515)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.,* | Case No.: 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 18-50955-KJC |
| MARK R. RICHARDS *et al.,* | |
| Defendants. | |

## <u>OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

Tara L. Lattomus (Bar I.D. No. 3515)
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
222 Delaware Street, 7th Floor
Wilmington, DE  19801
Telephone: (302) 574-7400
Facsimile:  (302) 574-7401
tlattomus@eckertseamans.com

Michael L. Scheier (Ohio 0055512)
Brian P. Muething (Ohio 0076315)
Jacob Rhode (Ohio 0089636)
**KEATING MUETHING & KLEKAMP, PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202
Email:  mscheier@kmklaw.com
         bmuething@kmklaw.com
         jrhode@kmklaw.com
Tel:  (513) 579-6400
Fax:  (513) 579-6457

*Counsel for Argent Trust Company*

# TABLE OF AUTHORITIES

## Cases

*Aetna Health, Inc. v. Davila*,
542 U.S. 200 (2004) ................................................................ 6

*Antioch Co. Litig. Trust v. Morgan*,
456 B.R. 791 (Bankr. S.D. Ohio 2011) ............................. 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................. 16, 17, 20

*AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*,
335 B.R. 309 (Bankr. D. Del. 2005) ................................... 17

*AT&T v. Empire Blue Cross & Blue Shield*,
No. 93-cv-1224, 1994 U.S. Dist. LEXIS 21091 (D.N.J. July 19, 1994) .................................. 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................. 16, 17, 20

*Binder v. Price Waterhouse Co., LLP (In re Resorts Int'l)*,
372 F.3d 154 (3d Cir. 2004) ............................................... 21

*Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*,
466 B.R. 626 (Bankr. D. Del. 2012) ............................. 17, 18

*Carter v. San Pasqual Fiduciary Tr. Co.*,
No. 15-cv-01507, 2016 U.S. Dist. LEXIS 163017 (C.D. Cal. Apr. 18, 2016) ........................ 9

*Continental Ins. Co. v. Dawson*,
273 F. Supp. 3d 688 (N.D. Tex. Mar. 31, 2017) ................ 9

*Cumming v. Edens.*,
2018 Del. Ch. LEXIS 54 (Del. Ch. Feb. 20, 2018) ............. 13

*Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*,
Nos. 09-11582, 11-53884, 2012 Bankr. LEXIS 5102 (Bankr. D. Del., Oct. 31, 2012) ......... 19

*Gobeille v. Liberty Mut. Ins. Co.*,
136 S. Ct. 936 (2016) ..................................................... 7, 8

*Goldstein v. BRT, Inc. (In re Universal Mktg.)*,
460 B.R. 828 (Bankr. E.D. Pa. 2011) ............................. 18, 19

*Horizon Blue Cross Blue Shield of N.J. v. E. Brunswick Surgery Ctr.*,
623 F. Supp. 2d 568 (D.N.J. 2009) ..................................... 9

*In re Dole Food Co., Stockholder Litig.*,
No. 9079-*VCL*, 2015 Del. Ch. LEXIS 223 (Del. Ch. Aug. 27, 2015) .................................... 12

i

*In re Image Masters, Inc.*,
    421 B.R. 164 (Bankr. E.D. Pa. 2009) ................................................................. 17

*In re Mortg. Elec. Registration Sys., Inc.*,
    754 F.3d 772 (9th Cir. 2014) ............................................................................... 21

*In re Rural Metro Corp. Stockholders Litig.*,
    88 A.3d 54 (Del. Ch. 2014) ........................................................................... 13, 14

*In re Santa Fe Pac. Corp. Shareholder Litig.*,
    669 A.2d 59 (Del. 1995) ..................................................................................... 14

*In re Worldwide Direct, Inc.*,
    280 B.R. 819 (Bankr. D. Del. 2002) .................................................................. 11

*In re Xura, Inc. Stockholder Litig.*,
    2018 Del. Ch. LEXIS 563 (Del. Ch. Dec. 10, 2018) .......................................... 13

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990) ........................................................................................ 6, 7

*Lawrence v. Bank of Am., N.A.*,
    455 F.App'x 904 (11th Cir. 2012) ...................................................................... 16

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ........................................................................... 12, 13

*Matthew v. Laudamiel*,
    2015 Del. Ch. LEXIS 247 (Sept. 28, 2015) ....................................................... 12

*McFall v. Stacy & Witbeck, Inc.*,
    No. 14-cv-04150, 2016 U.S. Dist. LEXIS 148399 (N.D. Cal., Oct. 26, 2016) ............... 15, 16

*McLemore v. Regions Bank*,
    Nos. 08-cv-0021, 08-cv-1003, 2010 U.S. Dist. LEXIS 25785, 2010 WL 1010092 (M.D. Tenn. Mar. 18, 2010) ..................................................................................... 9

*Menkes v. Prudential Ins. Co. of Amer.*,
    762 F.3d 285 (3d Cir. 2014) ................................................................................ 6

*Miller v. Mitsubishi Digital Electronics Amer., Inc. (In re Tweeter Opco)*,
    452 B.R. 150 (Bankr. D. Del. 2011) .................................................................. 20

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ............................................................................................ 7

*Nymex S'holder Litig. v. New York Mercantile Exch., Inc.*,
    2009 Del. Ch. LEXIS 176 (Del. Ch. Sept. 30, 2009) .................................... 14-15

*Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*,
    274 B.R. 634 (Bankr. D. Del. 2004) .................................................................. 20

ii

*Pardo v. Gonzaba (In re APF Co.)*,
   308 B.R. 183 (Bankr. D. Del. 2004) ........................................................ 19

*Pilot Life Ins. Co.*,
   481 U.S. 41 (1987) ...................................................................................... 7

*Pryor v. National Collegiate Athletic Assoc.*,
   288 F.3d 548 (3d Cir. 2002) ................................................................... 3, 5

*RBC Capital Mkts. LLC v. Jervis*,
   129 A.3d 816 (Del. 2015) .......................................................................... 13

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*,
   768 F.3d 284 (3d Cir. 2014) ....................................................................... 3

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983) ...................................................................................... 6

*Singh v. Attenborough*,
   137 A.3d 151 (Del. 2016) .......................................................................... 13

*Stewart v. Wilmington Trust SP Servs.*,
   112 A.3d 271 (Del. Ch. 2015) ................................................................... 16

*Zayed v. Associated Bank, N.A.*,
   779 F.3d 727, 735 (8th Cir. 2015) ............................................................ 16

## Statutes

11 U.S.C. § 544 ............................................................................... 16, 17, 18

11 U.S.C. § 548 ............................................................................... 16, 17, 18

26 U.S.C. § 409 ............................................................................................ 5

26 U.S.C. § 4975 .......................................................................................... 5

29 U.S.C. § 1002 .......................................................................................... 5

29 U.S.C. § 1104 .......................................................................................... 5

29 U.S.C. § 1132 .......................................................................................... 6

29 U.S.C. § 1144 .................................................................................. 6, 7, 12

6 Del. C. Section 1301, *et seq.* ............................................................. 16, 17

Wis. Stat. Section 242.01, et seq. ......................................................... 16, 17

iii

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY ......................................... 3

   A.  Factual Allegations in the First Amended Complaint............................................. 3

   B.  Procedural History ................................................................................................ 4

III. ARGUMENT ......................................................................................................... 5

   A.  The Aiding and Abetting Claim Against Argent Is Preempted by ERISA....................... 5

      1.  ERISA Preemption Background ...................................................................... 5

      2.  The Aiding and Abetting Claim is Preempted by ERISA ............................................ 7

   B.  If ERISA Preemption Does Not Apply, the Aiding and Abetting Claim Must be Dismissed
       on the Basis of Res Judicata Because It Was Not Preserved in the Plan of Liquidation.. 11

   C.  The Aiding and Abetting Claim Should Alternatively be Dismissed For Failure to State a
       Claim.................................................................................................................. 12

   D.  The Avoidance Claims Should Be Dismissed ............................................................ 16

      1.  Plaintiffs Failed to Plead a Constructive Fraudulent Transfer as a Matter of Law....... 16

      2.  The Preference Claim Should be Dismissed............................................................. 20

   E.  Joinder to Arguments of Co-Defendants ........................................................... 21

IV.  CONCLUSION...................................................................................................... 21

iv

On February 19, 2019, Plaintiffs filed their First Amended Complaint. The First Amended Complaint restated the state law tort claim of aiding and abetting against Argent Trust Company ("Argent") in Count V. The First Amended Complaint also alleges two new avoidance claims against Argent. In Count XII, Plaintiffs assert a preference claim, and in Count XIII, Plaintiffs assert a constructive fraudulent transfer claim. These two avoidance claims are purportedly brought under both the Bankruptcy Code and state law. Pursuant to Federal Rule 12(b)(6), the Court should dismiss all of Plaintiffs' claims asserted against Argent for failure to state a claim.[1]

## I.    **PRELIMINARY STATEMENT**

Argent Trust Company provides trustee services to pension and retirement plans, including ESOPs. In 2014 Appvion, Inc. ("Appvion") appointed Argent the trustee of the Appvion Retirement Savings and Employee Stock Ownership Plan ("Appvion ESOP"). In Count V, the Plaintiffs allege that Argent aided and abetted management in harming the Debtors by overvaluing the stock of Paperweight Development Corporation (Appvion's parent company) held in the Appvion ESOP. Argent was required to value the Paperweight Development Corporation stock twice a year under the Appvion ESOP and Argent's engagement and trust agreements with Appvion. The Plaintiffs make these allegations even though Argent valued the Paperweight Development Corporation stock materially lower than the Appvion ESOP's predecessor trustees had, had nothing to gain by virtue of this alleged wrongdoing, and as a matter of law owed no duties to anyone other than the Appvion ESOP.

---

[1] As noted in the Motion, pursuant to Federal Rule of Bankruptcy Procedure 7012(b), Argent does not consent to entry of a final order or judgment by the bankruptcy court on any of the Plaintiff's claims addressed in the Motion and this Opening Brief.  Rather, the relief sought from this Court is to dismiss Plaintiff's claims against Argent and to submit proposed findings and conclusions to the district court consistent with 28 U.S.C. section 157(c)(1).

That aside, Plaintiffs' claims against Argent fail as a matter of law for the following reasons:

1.     The aiding and abetting claim is preempted by ERISA. ERISA preempts state law as it relates to an employee benefit plan like the Appvion ESOP. The purpose of ERISA is to have a single body of law govern employee benefit plans and the conduct of ERISA fiduciaries like Argent, and not a hodgepodge of 50 states' trust and tort laws. Here the Plaintiffs use state common law as the benchmark for determining whether Argent properly valued the stock held in the Appvion ESOP. This valuation was required by the Appvion ESOP (as the Plaintiffs acknowledge) and applicable law, and is a core fiduciary function, the performance of which is central to proper ESOP administration. The Plaintiffs' challenge to Argent's work for the Appvion ESOP seeks to judge Argent's fiduciary conduct under state law in just the way that ERISA preempts.

2.     If not preempted by ERISA, the aiding and abetting claim was not properly preserved in the Plan of Liquidation and is therefore barred by *res judicata*.

3.     The Plaintiffs' aiding and abetting claim should also be dismissed because it fails to allege sufficient facts to state a claim for two other reasons. First, the Plaintiffs have not and cannot allege the requisite "knowing participation" by Argent. Second, the Plaintiffs did not and cannot allege that the trustee and valuation services Argent provided to the Appvion ESOP constitute sufficient assistance to the underlying alleged tortfeasors to state an aiding and abetting claim.

4.     The two avoidance claims should also be dismissed. Plaintiffs have effectively plead that the Debtors received reasonably equivalent value for the targeted transfers in Count XIII. As detailed below, Plaintiffs allege that Argent received the allegedly voidable transfers pursuant to two pre-petition Trustee Letter Agreements between Argent and Appvion, one of the

2

Debtors. As such, Plaintiffs' allegations, taken as true, concede that Appvion received reasonably equivalent value from Argent as a matter of law – and have therefore failed to plead a basic element of a fraudulent transfer claim in Count XIII. As for the preference claim in Count XII, Plaintiffs have failed to plead sufficient facts to state a preference claim against Argent under the Supreme Court's *Iqbal* and *Twombly* cases.

In conclusion, Plaintiffs have failed to state any claims against Argent. The Court should therefore dismiss Counts V, XII, and XIII pursuant to Federal Rule 12(b)(6) and submit proposed findings and conclusions to the district court. 28 U.S.C. section 157(c)(1).[2]

## II.    FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

### A.    Factual Allegations in the First Amended Complaint

As it must, Argent accepts as true the allegations in the First Amended Complaint solely for the purposes of the Motion.

In late 2001, more than 90% of the Debtors' employees invested certain funds to allow Appvion's ESOP to purchase 100% of the equity of Paperweight Development Corporation ("PDC"), the holding company that owned Appvion. (First Amended Complaint ("FAC") ¶¶ 66-69.) In the years following the 100% ESOP transaction, PDC's share price rose significantly, from approximately $10 per share to a high of $33.41 per share in 2008. (FAC Figure 10, p. 53.)

Under ERISA and the terms of the Appvion ESOP, the ESOP trustee is required to value PDC stock twice a year. (FAC ¶¶ 89, 100.)[3] Argent was the successor to the successor trustee of

---

[2] *See* Fed. R. Bank. P. 7012(b) (incorporating Federal Rule 12(b)(6) into adversary proceedings).

[3] *See* **Ex. 1** (Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, effective January 1, 2014, at § 1.80); **Ex. 2** (Amended and restated trust agreement for the Appleton Papers Inc. Employee Stock Ownership Trust, eff. as of Apr. 1, 2013) *and* **Ex. 3** (Appvion, Inc. Employee Ownership Trust, as amended and restated eff. Aug. 3, 2015). The Court may consider these documents on this Rule 12(b)(6) Motion because they are referenced in, and central to, the First Amended Complaint (*e.g.* FAC ¶¶ 89, 92-95). *Pryor v. National Collegiate*

the Appvion ESOP: Argent was retained in 2014 (FAC ¶ 92) to replace Reliance Trust Company

which had replaced the original trustee, State Street Global Advisors. (FAC ¶ 94.)[4] Reliance had

used the leading professional valuation firm of Stout to assist Reliance in valuation of the PDC

stock in the Appvion ESOP (FAC ¶ 102.) Argent continued to use Stout when Argent became

trustee in 2014. (FAC ¶ 108.)

　　　The first value determination of PDC stock for which Argent was responsible was the June

2014 valuation. That valuation was a nickel per share higher than the one Reliance reached six

months prior, about 10% lower than the valuation a year earlier, and half of the all-time high. The

second valuation Argent performed was the December 2014 valuation, which dropped the PDC

share price nearly a third, to $11 per share.

### B.    Procedural History

　　　On October 1, 2017, the Debtors filed their bankruptcy petitions. Pursuant to a certain

settlement and the Plan of Liquidation, the Appvion Liquidating Trust was created. The

Liquidating Trust is generally permitted to pursue certain Litigation Claims of the Debtors. The

Liquidating Trust is not permitted under the plan or governing law to pursue claims arising under

ERISA.

　　　The Plaintiffs filed this lawsuit on November 30, 2018, and amended their complaint on

February 19, 2019. The Plaintiffs challenge the methodologies that Stout, as Argent's financial

---

*Athletic Assoc.*, 288 F.3d 548, 560 (3d Cir. 2002) (citing Miller, 27A Fed. Proc. § 62.508);
*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284,
291 (3d Cir. 2014) (considering "Plan contracts and supporting documents" in appeal of Rule
12(b)(6) dismissal of ERISA suit).

[4] **Ex. 4** (Apr. 1, 2013 Trustee engagement letter between Reliance Trust Company and
Appleton Papers, Inc.) and **Ex. 5** (Trustee engagement letter between Argent and Appvion as
of May 26, 2015). The Trustee engagement letter effective as of April 1, 2013 was initially
applicable to Argent based on the 2014 sale of Reliance to Argent. Exhibits 4 and 5 will be
collectively referred to as the "Trustee Letter Agreements".

advisor, used in connection with the fair market value determinations that Argent was required to make and deliver bi-annually to the Appvion ESOP. Indeed, the bulk of the First Amended Complaint consists of valuation methodology challenges. (e.g. FAC ¶¶ 200-347.) The Plaintiffs further contend that the Debtors' former officers and directors used allegedly inflated valuations of PDC stock to direct excessive compensation to themselves.

Just days prior to the filing of this lawsuit, the ESOP Administrative Committee for the Appvion ESOP filed suit in the United States District Court for the Eastern District of Wisconsin, Case 1:18-cv-01861-WCG (the "Wisconsin Litigation") against all of the defendants to this adversary proceeding and about 30 additional individuals or entities. The Wisconsin Litigation contains 19 causes of action, including six against Argent. Among the claims against Argent are claims for violations of ERISA. An important aspect of the claims in the Wisconsin Litigation is the allegation that the ESOP trustees overvalued the PDC stock. Like here, the Appvion ESOP seeks to hold Argent, as ESOP trustee, liable for some of these alleged overvaluations.[5]

## III.  ARGUMENT

### A.  The Aiding and Abetting Claim Against Argent Is Preempted by ERISA

#### 1.  ERISA Preemption Background

An Employee Stock Ownership Plan ("ESOP") is a defined contribution plan under 26 U.S.C. § 4975(e)(7) that allows participants to make investments in employer securities. 26 U.S.C. § 409(l)(1). As such, an ESOP is an individual account plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA § 3(34) (29 U.S.C. § 1002(34)). "Argent served as the ESOP Trustee" (FAC ¶ 412) of the Appvion ESOP and was an ERISA fiduciary as defined

---

[5] The Court may take judicial notice of the pleadings in the Wisconsin Litigation on a Rule 12(b)(6) motion to dismiss.  *See Pryor*, 288 F.3d at 560.

by ERISA section 3(21) (29 U.S.C. § 1002(21)). Argent's duties were therefore governed exclusively by ERISA and to be exercised "solely in the interest of the [ESOP] participants and beneficiaries." ERISA § 404(a) (29 U.S.C. § 1104(a)). Argent accordingly owed a duty only to the Appvion ESOP and not to the Debtors, their boards of directors, or company management.

ERISA is a "comprehensive legislative scheme," which includes an "integrated enforcement mechanism." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004). Civil enforcement of the duties of an ERISA fiduciary like Argent is available only pursuant to ERISA section 502(a) (29 U.S.C. § 1132(a)). That section permits only participants, beneficiaries, and other ERISA fiduciaries to challenge fiduciary conduct, seek equitable relief, or assert claims for breach of fiduciary duty, but the Plaintiffs are none of these.

Through ERISA, Congress sought "to provide a uniform regulatory regime over employee benefit plans." *Id*. "To this end, ERISA includes expansive" preemption provisions, "which are intended to ensure that employee benefit plan regulation" is an "exclusively federal concern." *Id*. (citing *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). A principal way of enforcing this Congressional intent is ERISA's express preemption clause (section 514(a)) which provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Preempted claims should be dismissed in response to a Rule 12(b)(6) motion. *Menkes v. Prudential Ins. Co. of Amer.*, 762 F.3d 285, 295-96 (3d Cir. 2014).

The Supreme Court has noted that section 514(a) "is conspicuous for its breadth" and employs "deliberately expansive language." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990) (internal quotations and citations omitted). When analyzing express preemption under section 514(a), the "key . . . is found in the words 'relate to.'" *Id*. A "law 'relates to' an employee

6

benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). "Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans or the effect is only indirect." *Ingersoll-Rand Co.*, 498 U.S. at 139 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)).

"[T]o underscore its intent that section 514(a) be expansively applied, Congress used equally broad language in defining the 'State law' that would be pre-empted." *Id*. Pursuant to section 514(c)(1), the "term 'State law' includes all laws, decisions, rules, regulations or other State action having the effect of law." 29 U.S.C. § 1144(c)(1); *see also Pilot Life Ins. Co.*, 481 U.S. at 47-48 (noting that common-law causes of action like the Plaintiffs' aiding and abetting claim that "relate to" an employee benefit plan fall under ERISA's express preemption clause).

As relevant here, ERISA preempts "a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that 'governs . . . a central matter of plan administration' or 'interferes with nationally uniform plan administration.'" *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (quoting *Egelhoff v. Egelhoff*, 532 U. S. 141, 148 (2001)). Because ERISA establishes the requirements for employee benefit plans, the standards of conduct for maintaining and administering employee benefit plans, and the remedies and sanctions for violations of those requirements and standards, "state laws providing alternative enforcement mechanisms" have an impermissible connection with ERISA and are therefore preempted. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995).

### 2.    The Aiding and Abetting Claim is Preempted by ERISA

The aiding and abetting claim against Argent in Count V is preempted under the foregoing principles. The Plaintiffs' allegations "relate to" a benefit plan because they challenge Argent's conduct in discharge of duties as trustee which are governed by ERISA. The only act of alleged

wrongdoing that the Plaintiffs have asserted against Argent—alleged flaws in valuation of PDC's common stock—occurred in Argent's "role as the ESOP Trustee." (FAC ¶ 413.) Indeed the Plaintiffs acknowledge that "the ESOP required the ESOP Trustee" to make a determination of fair market value of the shares twice a year (FAC ¶ 89) and therefore the valuation work directly impacts and is required by the Appvion ESOP.[6]

Accordingly, the Plaintiffs' claims here impermissibly seek to use state law to challenge Argent's work in connection with valuation, a "central matter of plan administration." *Gobeille*, 136 S. Ct. at 943 (2016). Again, Plaintiffs acknowledge as much, alleging that "the biannual [Fair Market Value] Determination served several crucial functions related to the administration of the ESOP…[.]" (FAC ¶ 112.) Indeed these fair market value determinations were used for the most basic and central parts of plan administration, including in connection with "contributions to the ESOP," "distributions to ESOP participants," and management and "estimate [of] the upcoming repurchase obligations under the ESOP." (FAC ¶ 113.) It is hard to imagine matters more central to plan administration.

That Plaintiffs are attempting to use state law improperly as an alternative enforcement mechanism is not a hypothetical concern. As noted above, a few days before this action was filed, Argent was sued in the Eastern District of Wisconsin with allegations that directly overlap—indeed are word-for-word in some instances—with the allegations in this matter. The plaintiff in the Wisconsin Litigation is the ESOP Administrative Committee for the Appvion ESOP and has asserted claims for violations of four different sections of ERISA. (*See Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan v. Buth et al*, Case 1:18-cv-01861-WCG, (E.D.

---

[6] Where stock in an ESOP is not publicly traded, an independent valuation expert must perform a valuation of the stock at least once a year. *E.g.*, 26 U.S.C. § 401(28)(C). Argent hired Stout for this purpose.

Wis.).) Congress's fear of exposing ERISA fiduciaries to a non-uniform set of fiduciary principles is realized here unless Plaintiffs' claims against Argent are dismissed.

The analysis does not change because Plaintiffs have asserted an aiding and abetting theory of liability. Courts do not focus on the packaging of a plaintiff's complaint but whether, in substance, the claims in the complaint impermissibly seek to regulate ERISA fiduciary conduct. "Obviously, a plaintiff may not evade ERISA's enforcement provisions by characterizing its claims as arising under common law, as such a practice would 'elevate form over substance.'" *Horizon Blue Cross Blue Shield of N.J. v. E. Brunswick Surgery Ctr.*, 623 F. Supp. 2d 568, 578 (D.N.J. 2009) (quoting *Davila*, 542 U.S. at 214).

As a result, courts routinely have held that aiding and abetting claims are preempted under ERISA. *See, e.g.*, *AT&T v. Empire Blue Cross & Blue Shield*, No. 93-cv-1224, 1994 U.S. Dist. LEXIS 21091, *80, 1994 WL 16057794 (D.N.J. July 19, 1994) (holding aiding and abetting claim was preempted under section 514(a) where plaintiffs asserted fiduciary claims against defendants "based on their alleged status as ERISA plan fiduciaries."); *see also Continental Ins. Co. v. Dawson*, 273 F. Supp. 3d 688 (N.D. Tex. Mar. 31, 2017) (finding aiding and abetting breach of fiduciary duty claim fell within the scope of section 502(a) and was therefore preempted); *Carter v. San Pasqual Fiduciary Tr. Co.*, No. 15-cv-01507, 2016 U.S. Dist. LEXIS 163017 (C.D. Cal. Apr. 18, 2016) (holding aiding and abetting claim had an impermissible "connection with" an ERISA plan and was preempted under section 514(a)); *McLemore v. Regions Bank*, Nos. 08-cv-0021, 08-cv-1003, 2010 U.S. Dist. LEXIS 25785, 2010 WL 1010092 (M.D. Tenn. Mar. 18, 2010) (holding that aiding and abetting state law cause of action was "derivative of, and inseparable from" ERISA claims because the aiding-and-abetting claims "implicate[d] the relationships among

9

traditional ERISA plan entities" and because the claims "constitute[d] an alternate means for the [Bankruptcy] Trustee to pursue a remedy for what is, at its core an ERISA claim.").

A directly analogous case where a Bankruptcy Court dismissed claims for aiding and abetting on preemption grounds is *Antioch Co. Litig. Trust v. Morgan*, 456 B.R. 791 (Bankr. S.D. Ohio 2011). In *Antioch*, like here, a post-confirmation trustee sued three different entities that served as trustees of an ESOP on an aiding and abetting theory. On preemption grounds, the court dismissed the ERISA trustees. Noting that an "ESOP trustee holds a single fiduciary duty which runs to the ESOP, not to the company," the Bankruptcy Court found that an "ESOP trustee—when acting within its defined role—has no duty to a company, but has a single unwavering fiduciary duty to the ESOP's beneficiaries." *Id*. at 836. Because the complaint did "not contain a single allegation that" suggested that the ESOP trustee "made any decision, good, bad, or otherwise, outside of its fiduciary role as the ESOP trustee" and because the complaint did not indicate that the ESOP trustee "held any position, fiduciary or otherwise, with the Company," the court concluded that the "Complaint fail[ed] because it [sought] to change the role of the ESOP trustee in a way ERISA does not contemplate." *Id*. Accordingly, the Bankruptcy Court found that the "Complaint's allegations necessarily interfere[d] with the comprehensive ERISA enforcement scheme" and that the claims against the ESOP trustee were preempted. *Id*.

The Court should reach the same result here as in *Antioch*. Argent, as ESOP trustee, had *no* independent duty to the Debtors, not by contract or imposed by statute or common law. Indeed ERISA makes clear that Argent's duties ran solely to participants and beneficiaries. ERISA § 404. Therefore the Debtors (and the Plaintiffs asserting the Debtors' claims) have no standing to assert claims under ERISA against Argent and ERISA preempts attempts to regulate the conduct of an

10

ERISA fiduciary by use of state law, as Plaintiffs attempt to do here. The Court should dismiss the aiding and abetting claim against Argent in Count V as preempted by ERISA.

**B.    If ERISA Preemption Does Not Apply, the Aiding and Abetting Claim Must be Dismissed on the Basis of Res Judicata Because It Was Not Preserved in the Plan of Liquidation**

If the Court does not hold that the aiding and abetting claim against Argent is preempted, then the Court should dismiss the claim on the basis of *res judicata*.

It is well-settled that litigation claims may only be asserted post-confirmation if they are expressly reserved in a confirmed plan; otherwise, *res judicata* principles operate to bar the cause of action. *In re Worldwide Direct, Inc.*, 280 B.R. 819, 822 (Bankr. D. Del. 2002) ("Because a confirmation order must be accorded *res judicata* effect, courts have held that unless a plan expressly reserves the right to litigate a specific cause of action, confirmation of the plan will bar its assertion thereafter.") (citing *D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257 (7th Cir. 1997); *In re Kelley*, 199 B.R. 698 (9th Cir. B.A.P. 1996)).

Consider the reservation language in the Plan of Liquidation on which Plaintiffs rely. (FAC ¶ 366.) The Plan of Liquidation purports to reserve the following Litigation Claims:

> (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

There is no reasonable argument that the aiding and abetting claim against Argent is one of the claims identified in (b), (c), or (d). So the only possible theory for Plaintiffs would be in category (a), the claims related to the ESOP that are not Direct ESOP Claims.

Plaintiffs are thus in a bind from which they cannot escape. Their only way to argue that the claim against Argent is preserved by the Plan of Liquidation—and avoid the *res judicata* bar—

11

is to contend that it is "related to or aris[es] out of the ESOP." But arguing that Plaintiffs' claim against Argent is "related to or aris[es] out of the ESOP" means that the claim is unquestionably preempted by ERISA. 29 U.S.C. § 1144(a) (ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate* to any employee benefit plan." ) (emphasis added). Whether preemption or *res judicata*, behind either door must be an order of dismissal.

### C.    The Aiding and Abetting Claim Should Alternatively be Dismissed For Failure to State a Claim

Were the Court to find the aiding and abetting claim against Argent not subject to preemption or *res judicata*, Argent should nevertheless be dismissed because the Plaintiffs fail to plead sufficient facts to state an aiding and abetting claim against Argent under the Supreme Court's *Twombly-Iqbal* line of cases.

Under Delaware law, to prevail on a claim for aiding and abetting, a plaintiff must establish that the defendant "knowingly participated in [the] breach" of the underlying tortfeasor. *Matthew v. Laudamiel*, 2015 Del. Ch. LEXIS 247, at *46 (Sept. 28, 2015); *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).[7] The element of "knowing participation" requires that the alleged aider/abettor provide "substantial assistance" to the primary tortious actor. *E.g., In re Dole Food Co., Stockholder Litig.*, No 9079-VCL, 2015 Del. Ch. LEXIS 223, at *138-39 (Del. Ch. Aug. 27, 2015). Delaware courts apply the standard in Section 876(b) of the Restatement (Second) of Torts, stating that an alleged aider/abettor is liable "[f]or harm resulting to a third party from the tortious conduct of another" if that actor "knows that the other's conduct constitutes a breach of duty and

---

[7] Plaintiffs' allegations are insufficient to engage in an exhaustive choice of law analysis. Argent will cite Delaware law for its discussion of the aiding and abetting tort but reserves the right to argue that a different substantive law might apply. For the arguments advanced here, there is not a significant difference in the substantive law that might be applied.

gives substantial assistance or encouragement to the other so to conduct himself." *Id.* (citing Restatement (Second) of Torts § 876(b) (1979)).

Courts recognize that the knowledge standard "is a stringent one." *In re Xura, Inc. Stockholder Litig.*, 2018 Del. Ch. LEXIS 563, at *38 (Del. Ch. Dec. 10, 2018). Indeed, "[a]n adequate pleading of 'knowing participation' requires a pleading of scienter." *E.g., Cumming v. Edens.*, 2018 Del. Ch. LEXIS 54, at *58 (Del. Ch. Feb. 20, 2018). "To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind." *Id* (internal quotations and citation omitted). Put differently, the knowledge element "requires that the third party act[ed] with knowledge that the conduct advocated or assisted constitute[d] such a breach." *E.g., Malpiede*, 780 A.2d at 1097. This scienter standard "'makes an aiding and abetting claim among the most difficult to prove.'" *Cumming*, 2018 De. Ch. LEXIS 54 at *58-59 (quoting *RBC Capital Mkts. LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)).

The Delaware Supreme Court has also explained that service providers and advisors are provided "a high degree of insulation from liability" for claims of aiding and abetting a tortfeasor's breach of fiduciary duty. *Singh v. Attenborough,* 137 A.3d 151, 152 (Del. 2016). "In essence, the aider and abettor standard affords the advisor a form of protection by insulating it from liability unless it acts with *scienter*." *RBC Capital Mkts.,* 129 A.3d at 875. However, one way in which a plaintiff may show that an advisor acted with scienter is through "evidence of a conflict of interest diverting the advisor's loyalties from its client, such that the advisor . . . is being paid in some fashion something he would not otherwise get in order to assist in the breach of duty." *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 100 (Del. Ch. 2014) (internal quotations and citation omitted).

The Plaintiffs offer *no* allegation that Argent acted with scienter or with an "illicit state of mind." *Cumming*, 2018 De. Ch. LEXIS 54 at *58. Nor is there any allegation or fair inference that Argent acted with scienter. Indeed it strains all credulity to think that a professional trustee company—and individuals dedicating their professional careers to service of ESOPs—would purposefully overvalue a stock for no identifiable reason, particularly when they had nothing to gain from the alleged wrongful conduct. *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d at 100. That three different professional, independent trustees with no incentive to do so—along with the leading valuation firm they hired that similarly had no incentive to do so—conspired with a board of directors and management team that changed in composition, and all this occurred over a 15-year period is extraordinarily implausible. In fact, the only plausible and logical inference from the facts alleged is that a professional trustee with no stake in the outcome and no reason for doing so would *not* knowingly engage in wrongful conduct.

With no factual support, the Plaintiffs are left to generalized conclusory statements. An example is in the claim for relief against Argent, paragraph 413, where the Plaintiffs allege, "Rather than urge [] against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew [other defendants] were [] breaching their fiduciary duties of care and loyalty by purposeful overvaluing PDC's common stock…[.]" Such conclusory statements are insufficient to overcome a motion to dismiss. *In re Santa Fe Pac. Corp. Shareholder Litig.*, 669 A.2d 59, 72 (Del. 1995) (affirming dismissal of aiding and abetting claim under Rule 12(b)(6) because plaintiff "fail[ed] to allege any facts" and "merely include[d] a conclusory statement" that defendant had knowledge of the other defendants' tortious conduct); *Nymex S'holder Litig. v. New York Mercantile Exch., Inc.*, 2009 Del. Ch. LEXIS 176, at *48 (Del. Ch. Sept. 30, 2009) ("With regard to the third

14

element—knowing participation—conclusory allegations such as 'aiding and abetting defendant had knowledge of the fiduciary defendants' fiduciary duties and knowingly and substantially participated and assisted in the fiduciary defendants' breaches of fiduciary duty . . .' are insufficient as a matter of law.") (internal brackets omitted).

Past that, it takes a gigantic leap—one much too far—to infer that Appvion's financial projection history provided knowledge to Argent that officers and directors had breached their fiduciary duty. Past is not necessarily prologue; that Appvion missed a financial target one year does not mean it will miss the target the following year. But that aside, the First Amended Complaint alleges that Argent and Stout did in fact consider the projection history and did "adjust for assessed riskiness" related to Appvion's projections. (FAC ¶ 413.) So even Plaintiffs acknowledge that Argent considered and addressed in a way that would have *lowered* the stock price. That this allegation comes in the Plaintiffs' complaint alleging that Argent aided other defendants by inflating the share price shows the implausible nature of the First Amended Complaint.[8]

In addition to failing to allege scienter and knowledge, the Plaintiffs also fail to allege that Argent provided substantial assistance to the alleged torfeasors by providing trustee services, including stock valuation, to the Appvion ESOP. Courts routinely hold that a professional services firm—like a valuation company, an accountant, or a trust company—does not provide needed assistance to the underlying tortfeasor where, as here, the service provider "'had no authority to

---

[8] Moreover, "'that a company is [misstating its financial status] does not necessarily mean that the company's principals are looting it . . . *[S]uspicion and surmise do not constitute actual knowledge.*'" *McFall v. Stacy & Witbeck, Inc.*, No. 14-cv-04150-JSC, 2016 U.S. Dist. LEXIS 148399, *20 (N.D. Cal., Oct. 26, 2016) (emphasis in original) (quoting *In re Sharp Int'l Corp.*, 281 B.R. 506, 515 (Bankr. E.D.N.Y. 2002)) (dismissing aiding and abetting claims against valuation advisor).

influence the affairs of the primary tortfeasor and had the [service provider] quit upon learning the primary tortfeasor's irregular financial practices, [the primary tortfeasor] could simply have hired a less astute accountant or bookkeeper.'" *McFall*, 2016 U.S. Dist. LEXIS 148399 at *22 (quoting *Mendelsohn v. Capital Underwriters, Inc.*, 490 F. Supp. 1069, 1084 (N.D. Cal. 1979); *see also, e.g.*, *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 735 (8th Cir. 2015) ("In addressing aiding and abetting liability in cases involving professionals, most courts have recognized that 'substantial assistance' means something more than the provision of routine professional services.") (citations omitted); *Lawrence v. Bank of Am., N.A.*, 455 F.App'x 904, 907 (11th Cir. 2012) (same); *Stewart v. Wilmington Trust SP Servs.*, 112 A.3d 271, 323 (Del. Ch. 2015) (same).

The well-known pleading standards of *Twombly* and *Iqbal* require more than the threadbare "aiding and abetting" facts in the First Amended Complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). It should therefore be dismissed as against Argent on this alternative ground.

### D. The Avoidance Claims Should Be Dismissed

#### 1. Plaintiffs Failed to Plead a Constructive Fraudulent Transfer as a Matter of Law

In Count XIII, Plaintiffs assert a constructive fraudulent transfer claim against Argent pursuant to Bankruptcy Code sections 544(b), 548(a)(1)(B) and 550. Under Code section 548(a)(1)(B) a transfer is avoidable only if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B). Section 544(b) provides to the bankruptcy trustee the right to avoid a transfer to the same extent that a present unsecured creditor could avoid such transfer under state law. 11 U.S.C. § 544(b)(1). Plaintiffs base their Code section 544(b) claim upon the Uniform Fraudulent Transfer Act (UFTA) as enacted under both Delaware law (6 Del. C. Section 1301, *et seq.*) and Wisconsin law (Wis. Stat. Section

16

242.01, *et seq.*). Like Code section 548(a)(1)(B), the UFTA provides that a transfer is avoidable only when a debtor made such transfer "without receiving a reasonably equivalent value in exchange for the transfer." 6 Del. C. § 1304(a)(2); Wis. Stat. § 242.04(1)(b).

Accordingly, to assert a claim for constructive fraudulent transfer, whether brought under Code section 548(a)(1)(B) or section 544(b), Plaintiffs "must allege facts supporting [ ] that the debtor did not receive reasonably equivalent value." *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 660 (Bankr. D. Del. 2012). "Value," for the purposes of both Code section 548(a)(1)(B) and the UFTA under section 544(b), includes any transfer made for the satisfaction of an antecedent debt. 11 U.S.C. § 548(d)(2)(A); 6 Del. C. § 1303(a); Wis. Stat. § 242.03(1).

Here, Plaintiffs assert, without any facts, the bald legal conclusion that "Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers." (FAC ¶ 481.) Such "threadbare, formulaic recitation of the elements of a cause of action for avoidance of a transfer based on constructive fraud" compels dismissal of Count XIII. *In re Image Masters, Inc.*, 421 B.R. 164, 179-80 (Bankr. E.D. Pa. 2009) (holding that allegation that debtor "received no value whatsoever in exchange for the Transfers alleged in this case – let alone reasonable equivalent value" was insufficient to survive a Rule 12(b)(6) motion to dismiss) *aff'd in part, vacated in part, remanded sub nom. Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375 (E.D. Pa. 2013); *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Plaintiffs simply do not allege any facts that demonstrate Appvion received less than reasonably equivalent value in exchange for the Argent Transfers. [9]

---

[9] It is notable that Plaintiffs fail to even allege with specificity the amount and the date of each alleged transfer from Appvion to Argent that they seek to avoid. *See AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 333-34 (Bankr.

To the contrary, Plaintiffs *admit* that "Argent received the Argent Transfers in return for services rendered as trustee of the ESOP." (FAC ¶ 469.) Pursuant to the terms of the Trustee Letter Agreements, Appvion was contractually obligated to pay Argent for those services. In other words, the Argent Transfers were payments on its contractual liability to Argent, *i.e.* an "antecedent debt." Not only does that satisfy the definition of "value" under the applicable fraudulent transfer laws, but courts have held that facts similar to those in the First Amended Complaint constitute reasonably equivalent value as a matter of law, requiring dismissal under Rule 12(b)(6).

For example, in *Burtch*, the debtor was a co-borrower under a loan made by the alleged constructively fraudulent transferee. 466 B.R. at 660. Like the alleged payments Argent received, each payment the transferee received in *Burtch* was applied to reduce the debtor's contractual obligations to the transferee. *Id*. "The Debtor was contractually obligated . . . to make payments to [transferee] and the Debtor received value that was actually equivalent in the reduction of the Debtor's outstanding debt owed to [transferee]." *Id*. Accordingly, the Chapter 7 trustee in *Burtch* could not allege facts supporting his claim that the debtor did not receive reasonably equivalent value and the Bankruptcy Court dismissed the trustee's constructive fraudulent transfer claims under Code sections 548(a)(1)(B) and 544(b) (Delaware UFTA). *Id*.

Likewise, in *Goldstein v. BRT, Inc. (In re Universal Mktg.)*, the Chapter 7 trustee sought to avoid certain alleged constructive fraudulent transfers pursuant to Code sections 548 and 544(b) (Pennsylvania UFTA) the debtors made in exchange for goods and/or services the defendant provided to the debtors. 460 B.R. 828, 836-37 (Bankr. E.D. Pa. 2011). The Bankruptcy Court found "nothing alleged in the Complaint that even hints that the Debtors received no consideration

---

D. Del. 2005) (valid claim for avoidable transfer pled when allegations specify, among other things, the date of the transfer, the amount of the consideration received, and the debtor's alleged financial condition at the time it made the transfer).

(or purposefully received less than reasonably equivalent value) in return for the transfers at issue." *Id*. at 837-38. Rather, the complaint created "the opposite inference . . . on the question of reasonably equivalent value," as the complaint demonstrated that the purchased goods and services were real and "that the transfers at issue were payments for the goods and services received." *Id*. at 838. "Indeed, based on the factual allegations, the more plausible inference is that the transactions were bona fide commercial transactions in which the Debtors received reasonably equivalent value." *Id*. Accordingly, given the absence of any factual basis to infer that the transfers at issue were made without receiving "reasonably equivalent value," the trustee's fraudulent transfer claims in *Goldstein* were dismissed. *Id. See also Pardo v. Gonzaba, (In re APF Co.)*, 308 B.R. 183 (Bankr. D. Del. 2004) (constructive fraudulent transfer claim related to certain note payments failed because payments were contractually required and thus made for value); *Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*, Nos. 09-11582 (MFW), 11-53884 (MFW), 2012 Bankr. LEXIS 5102, at *21-22 (Bankr. D. Del., Oct. 31, 2012) (same).

The same result the Bankruptcy Court reached in each of the foregoing decisions should be reached here. Plaintiffs concede that each payment Argent received was applied to satisfy Appvion's obligations due and owing under the Trustee Letter Agreements with Argent, which payments were the contract price that Appvion was contractually obligated to pay to Argent. (FAC ¶¶ 93, 98, 469.) The only plausible inference drawn from Plaintiffs' allegations is that the Argent Transfers were made in satisfaction of antecedent debt created by the bona fide Trustee Letter Agreements between Appvion and Argent whereby Argent served as the ESOP trustee (*see* **Exs. 4** and **5** and n.4, *supra*). Plaintiffs' constructive fraudulent transfer claims in Count XIII should therefore be dismissed.

19

## 2.    The Preference Claim Should be Dismissed

Plaintiffs have failed to plead sufficient facts in support of their preference claim to survive a motion to dismiss.

As described in detail above, to survive a motion to dismiss, factual allegations "must be enough to raise a right to relief above the speculative level," or "contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (internal ellipsis omitted). A complaint is insufficient when "it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotations and brackets omitted).

These pleading standards apply to Bankruptcy Code preference claims like the one asserted against Argent in Count XII. For example, in *Miller v. Mitsubishi Digital Electronics Amer., Inc. (In re Tweeter Opco),* 452 B.R. 150 (Bankr. D. Del. 2011), the court dismissed a preference claim because the complaint lacked sufficient factual detail under *Iqbal* and *Twombly* even though the trustee did recite the statutory elements of a preference and some additional facts such as "exact check dates, check numbers, and exact dollar amounts." *Id.* at 154. The court held that despite some factual detail in addition to the statutory elements, the Complaint failed to "meet the pleading standards of *Twombly* and *Iqbal*." *Id.* The court also held that under current pleading requirements, "preferential transfers must be identified with particularity to ensure that the defendant receives sufficient notice of what transfer is sought to be avoided." This means that a preference claim, like Count XII in the First Amended Complaint, "must identify each transfer by date, amount, name of transferor, and name of transferee." *Id.* And particularly relevant to this case, the court held that where, as here, there are multiple debtors, "the trustee must identify the transferor precisely by name." *Id.* at 155. *See also Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*, 274 B.R. 634, 640 (Bank. D. Del. 2001) (dismissing preference claim because plaintiff failed "to provide even

20

rudimentary facts surrounding the preferences, e.g., the date, time and amount of the allegedly preferential payments. . . .").

The First Amended Complaint suffers the precise pleading defects that lead the *Miller* and *Pardo* courts to dismiss the bankruptcy trustee's preference claim. The Court should therefore dismiss the preference claim asserted against Argent in Count XII.

### E.    Joinder to Arguments of Co-Defendants

Argent has reviewed the challenge of the Director Defendants to this Court's subject matter jurisdiction to adjudicate the state law claims in this litigation. Argent joins this argument and incorporates the Director Defendants' position by reference. *Binder v. Price Waterhouse Co., LLP (In re Resorts Int'l)*, 372 F.3d 154, 161 (3d Cir. 2004).

Moreover, to the extent the Director Defendants prevail on a motion to dismiss the claims against them, then the aiding and abetting claims must also be dismissed. Aiding and abetting claims are derivative, depending on the establishment of an underlying tort. *See, e.g., In re Mortg. Elec. Registration Sys., Inc*., 754 F.3d 772, 786 (9th Cir. 2014) (collecting cases). The dismissal of the tort claims against the Director Defendants also results in the dismissal of the aiding and abetting claim against Argent.

## IV.    CONCLUSION

For the foregoing reasons, the claims against Argent Trust Company should be dismissed.


Dated: March 19, 2019                     By:      */s/ Tara L. Lattomus*
                                                    Tara L. Lattomus (Bar I.D. No. 3515)
                                                    **ECKERT SEAMANS CHERIN & MELLOTT, LLC**
                                                    222 Delaware Street, 7th Floor
                                                    Wilmington, DE  19801
                                                    Telephone: (302) 574-7400
                                                    Facsimile:  (302) 574-7401
                                                    tlattomus@eckertseamans.com

Michael L. Scheier (0055512)
Brian P. Muething (0076315)
Jacob Rhode (0089636)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202
Email:  mscheier@kmklaw.com
       bmuething@kmklaw.com
      jrhode@kmklaw.com
Tel:  (513) 579-6400
Fax:  (513) 579-6457

*Counsel for Argent Trust Company*

# Exhibit 1

**APPVION, INC.**
**RETIREMENT SAVINGS AND**
**EMPLOYEE STOCK OWNERSHIP PLAN**
(Amended and Restated Generally Effective as of January 1, 2014)

**APPVION, INC.**
**RETIREMENT SAVINGS AND**
**EMPLOYEE STOCK OWNERSHIP PLAN**
(Amended and Restated Generally Effective as of January 1, 2014)

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARTICLE 1:    DEFINITIONS ................................................................................................... 3

    1.1    ACP ............................................................................................................... 3
    1.2    Actual Contribution Ratio ............................................................................ 3
    1.3    Actual Deferral Ratio ................................................................................... 3
    1.4    ADP ............................................................................................................... 4
    1.5    Affiliate ......................................................................................................... 4
    1.6    Annual Additions .......................................................................................... 4
    1.7    Bargaining Unit Employee ........................................................................... 5
    1.8    Beneficiary .................................................................................................... 5
    1.9    Closing Date .................................................................................................. 6
    1.10   Code ............................................................................................................... 6
    1.11   Combined Account ........................................................................................ 6
    1.12   Committee ...................................................................................................... 6
    1.13   Company ........................................................................................................ 6
    1.14   Company Stock .............................................................................................. 6
    1.15   Compensation ................................................................................................ 7
    1.16   Corporation ................................................................................................... 9
    1.17   Covered Compensation ................................................................................. 9
    1.18   Date of Employment .................................................................................... 11
    1.19   Date of Severance ........................................................................................ 11
    1.20   Deemed-Owned Shares ................................................................................ 11
    1.21   Disability ...................................................................................................... 11
    1.22   Discretionary Profit Sharing Contribution ................................................. 11
    1.23   Elective Account .......................................................................................... 11
    1.24   Elective Contributions ................................................................................ 12
    1.25   Elective Deferrals ........................................................................................ 12
    1.26   Eligible Employee ........................................................................................ 12
    1.27   Employee ...................................................................................................... 12
    1.28   Entry Date .................................................................................................... 13
    1.29   ERISA .......................................................................................................... 13
    1.30   ESOP Accounts ............................................................................................ 13
    1.31   ESOP Cash Account .................................................................................... 13
    1.32   ESOP Component ......................................................................................... 13
    1.33   ESOP Elective Account ............................................................................... 13
    1.34   ESOP Loan Account .................................................................................... 13
    1.35   ESOP Matching Account ............................................................................. 14
    1.36   ESOP Profit Sharing Account ..................................................................... 14

| | | |
|---|---|---|
| 1.37 | ESOP Rollover Account | 14 |
| 1.38 | ESOP Stock Account | 14 |
| 1.39 | ESOP Transfer Account | 14 |
| 1.40 | Exempt Loan | 14 |
| 1.41 | FMV of Company Stock | 15 |
| 1.42 | Former Participant | 15 |
| 1.43 | Fund | 15 |
| 1.44 | HCE | 15 |
| 1.45 | Hour of Service | 15 |
| 1.46 | Independent Appraiser | 16 |
| 1.47 | Investment Fund | 16 |
| 1.48 | Limitation Year | 16 |
| 1.49 | Mandatory Profit Sharing Contribution | 16 |
| 1.50 | Matching Account | 17 |
| 1.51 | Matching Contributions | 17 |
| 1.52 | MSP | 17 |
| 1.53 | Nonallocation Year | 17 |
| 1.54 | Non-ESOP Accounts | 18 |
| 1.55 | Non-ESOP Component | 18 |
| 1.56 | Non-ESOP Loan Account | 18 |
| 1.57 | NHCE | 18 |
| 1.57.1 | Normal Retirement Age | 18 |
| 1.58 | Participant | 18 |
| 1.59 | Participant Loan | 18 |
| 1.60 | Pay Period; Pay Date | 18 |
| 1.61 | Period of Service | 19 |
| 1.62 | Period of Severance | 19 |
| 1.63 | Plan | 19 |
| 1.64 | Plan Administrator | 19 |
| 1.65 | Plan Year | 19 |
| 1.66 | Profit Sharing Account | 20 |
| 1.67 | Profit Sharing Contribution | 20 |
| 1.68 | Related Company | 20 |
| 1.69 | Retirement | 20 |
| 1.70 | Rollover Account | 20 |
| 1.71 | Rollover Contribution | 20 |
| 1.72 | S Corporation Disqualified Person | 21 |
| 1.73 | Savings Percentage | 21 |
| 1.74 | Service | 21 |
| 1.75 | Suspense Account | 21 |
| 1.76 | Synthetic Equity | 22 |
| 1.77 | Reserved | 22 |
| 1.78 | Trust Agreement | 22 |
| 1.79 | Trustee | 22 |
| 1.80 | Valuation Date | 23 |
| 1.81 | Valuation Period | 23 |

**ARTICLE 2:    PARTICIPATION** ................................................................ **24**

    2.1    Eligibility ....................................................................................... 24
    2.2    Terms of Participation .................................................................... 24
    2.3    Transferred Employees .................................................................. 27
    2.4    Reemployment ............................................................................... 28
    2.5    Bargaining Unit Employees ........................................................... 28
    2.6    Leased Employees ......................................................................... 28
    2.7    Adoption by Affiliate .................................................................... 28

**ARTICLE 3:    COMPANY CONTRIBUTIONS** ...................................... **29**

    3.1    Matching Contributions ................................................................. 29
    3.2    Profit Sharing Contribution ........................................................... 31
    3.3    Time and Medium of Payment of Contributions; Allocation Rules ................. 31
    3.4    Reinstatements .............................................................................. 34
    3.5    Contributions Conditioned on Deductibility .................................. 34
    3.6    Rollover Contributions .................................................................. 35
    3.7    Prohibited Allocations of Stock in an S Corporation (effective for Plan
          Years ending after March 14, 2001) ............................................. 36

**ARTICLE 4:    VESTING** ........................................................................... **38**

    4.1    Fully Vested Accounts ................................................................... 38
    4.2    Accounts Subject to Vesting Schedule .......................................... 39
    4.3    Special Vesting Rules .................................................................... 39

**ARTICLE 5:    LIMITATIONS ON CONTRIBUTIONS** ......................... **40**

    5.1    Limitation on Elective Deferrals .................................................... 40
    5.2    ADP Limitation ............................................................................. 41
    5.3    ACP Limitation ............................................................................. 42
    5.4    Maximum Limitations on Annual Additions .................................. 43
    5.5    Deduction Limitation .................................................................... 44

**ARTICLE 6:    THE FUND, INVESTMENTS, AND ACCOUNTING** ........ **45**

    6.1    Trust Fund ..................................................................................... 45
    6.2    Investment Funds in the Non-ESOP Component and the ESOP
          Component ..................................................................................... 45
    6.3    Participants' Designation of Investment Funds under the Non-ESOP
          Component ..................................................................................... 46
    6.4    Participants' Designation of Investment in Company Stock .............. 47
    6.5    Diversification of ESOP Accounts ................................................ 48
    6.6    Reserved ........................................................................................ 49
    6.7    Allocation and Crediting of Employer Contributions ..................... 49
    6.8    Valuation of Investment Funds and Adjustment of Non-ESOP Accounts ........... 50
    6.9    Adjustment of ESOP Accounts ..................................................... 50
    6.10   Former Participants and Beneficiaries ........................................... 51
    6.11   Participant Loans ........................................................................... 51

6.12   Exempt Loans .................................................................................. 55
6.13   Right of First Refusal ..................................................................... 57
6.14   Put Option ...................................................................................... 58
6.15   Share Legend; Other Restrictions ................................................. 58

**ARTICLE 7:    DISTRIBUTION** ...................................................... **59**

7.1   Distribution Options for Participants who Retire or Incur a Disability ............... 59
7.2   Distribution Options Upon Death ................................................. 60
7.3   Distribution Options Upon Termination of Employment/Permanent Layoff ...... 60
7.4   Form of Distributions .................................................................... 61
7.5   Forfeitures ...................................................................................... 61
7.6   Amount of Distribution ................................................................. 62
7.7   Participant's Right to Consent to Distributions ............................ 62
7.8   Time When Distributions Must Commence; Length of Distribution Period ....... 62
7.9   Hardship ......................................................................................... 66
7.10   Inability to Locate Distributee ...................................................... 68
7.11   Withdrawals After Age 59½ .......................................................... 69
7.12   Direct Rollovers ............................................................................. 69
7.13   Qualified Domestic Relations Orders ........................................... 70

**ARTICLE 8:    ADMINISTRATION OF THE PLAN** ................................. **71**

8.1   Appointment of ESOP Administrative Committee ....................... 71
8.2   Named Fiduciaries ......................................................................... 71
8.3   Allocation of Fiduciary and Other Responsibilities ..................... 72
8.4   Quorum and Voting; Procedures .................................................. 72
8.5   Service in Multiple Capacities ...................................................... 72
8.6   Powers and Authority .................................................................... 72
8.7   Powers of Plan Administrator ....................................................... 72
8.8   Powers of Committee ..................................................................... 73
8.9   Advisors ......................................................................................... 73
8.10   Powers Not Exclusive ................................................................... 74
8.11   Limitation of Liability; Indemnity ................................................ 74

**ARTICLE 9:    AMENDMENT OF THE PLAN** ......................................... **75**

9.1   Amendment ..................................................................................... 75

**ARTICLE 10:    TERMINATION OF THE PLAN; MERGER** ..................... **76**

10.1   Termination .................................................................................... 76
10.2   Plan Merger .................................................................................... 76

**ARTICLE 11:    LIMITATION OF RIGHTS OF PARTICIPANTS, FORMER
PARTICIPANT AND BENEFICIARIES** .......................... **77**

11.1   No Employment Rights .................................................................. 77
11.2   Spendthrift Clause ......................................................................... 77
11.3   Incompetents .................................................................................. 77

DB1/ 74982740.12

iv

| | | |
|---|---|---|
| 11.4 | Minors | 77 |
| 11.5 | Doubt as to Identity | 77 |
| 11.6 | Discharge of Liability | 78 |

**ARTICLE 12:    TOP-HEAVY PROVISIONS** ........................................... 79

| | | |
|---|---|---|
| 12.1 | Application of Article 12 | 79 |
| 12.2 | Top-Heavy Determination | 79 |
| 12.3 | Reserved | 79 |
| 12.4 | Minimum Contributions | 79 |
| 12.5 | Reserved | 80 |
| 12.6 | Definitions | 80 |

**ARTICLE 13:    RIGHTS, RESTRICTIONS, AND OPTIONS ON COMPANY STOCK** ................................................................. 82

**THE PROVISIONS OF ARTICLE 13 HAVE BEEN INCORPORATED INTO SECTIONS 6.13 THROUGH 6.16** ................................... 82

**ARTICLE 14:    VOTING AND TENDERING OF STOCK** ........................ 83

| | | |
|---|---|---|
| 14.1 | Voting of Company Stock | 83 |
| 14.2 | Tendering of Company Stock | 83 |

**ARTICLE 15:    MISCELLANEOUS** ...................................................... 85

| | | |
|---|---|---|
| 15.1 | Severability | 85 |
| 15.2 | Captions | 85 |
| 15.3 | Construction | 85 |

APPVION, INC.
RETIREMENT SAVINGS AND
EMPLOYEE STOCK OWNERSHIP PLAN
AMENDED AND RESTATED GENERALLY EFFECTIVE AS OF JANUARY 1, 2014

## INTRODUCTION

**Background**.    Appvion, Inc. (formerly Appleton Papers Inc.) (the "Company") established the Appleton Papers Retirement Savings Plan (the "Original Plan") effective January 1, 1985 to provide retirement benefits for its Eligible Employees through a tax-qualified retirement benefit plan.

The Original Plan, as amended from time to time thereafter, was amended and restated in its entirety effective as of January 1, 2001 (the "2001 Restated Plan") to enable Eligible Employees of the Company and its affiliates to: (1) accumulate funds for their future security by electing to make cash or deferral contributions and by sharing in employer contributions to the Plan; and (2) acquire stock ownership interests in the Company.  Accordingly, as restated (and renamed the "Appleton Papers Retirement and Employee Stock Ownership Plan"), the Restated Plan contained the following two separate components:

- A Non-ESOP Component intended to meet the applicable requirements of Section 401(a) of the Internal Revenue Code of 1986 (the "Code"), including a cash or deferred arrangement intended to qualify under Section 401(k) of the Code.

- An ESOP Component designed to invest primarily in stock of the Company and intended to meet the applicable requirements of Sections 401(a), 409, and 4975(e)(7) of the Code and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974 ("ERISA"), including a cash or deferred arrangement intended to qualify under Section 401(k) of the Code.

The 2001 Restated Plan was subsequently amended to (i) comply with the provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001; (ii) comply with new mandatory distribution rules under Code Section 401(a)(31); (iii) amend the definition of Compensation to conform it with the requirements of new Code Section 415 regulations issued by the Internal Revenue Service on April 5, 2007; and (iv) comply with certain requirements of the Heroes Earnings Assistance and Relief Tax Act of 2008 and the Worker, Retiree and Employer Recovery Act of 2008. The 2001 Restated Plan was also amended to add a new Mandatory Profit Sharing Contribution feature and make certain other desired changes and clarifying amendments

Effective May 13, 2013, the Company changed its name to Appvion, Inc. Accordingly, the Plan has been renamed the Appvion, Inc. Retirement and Employee Stock Ownership Plan.  The 2001 Restated Plan, as amended from time to time thereafter, is hereby amended and restated in its entirety generally effective as of January 1, 2014, except as otherwise required by law, or otherwise indicated herein (the "Plan").  The benefits of

Participants who terminated employment prior to the effective date of this restatement shall be determined under the terms of the plan in effect at their termination of employment.

## ARTICLE 1:  DEFINITIONS

In construing the following definitions and the balance of the Plan, the masculine pronoun wherever used includes the feminine, and the singular includes the plural.

### 1.1    ACP

The term "ACP" (an acronym for Actual Contribution Percentage) means, for a specified group of Eligible Employees for any Plan Year (i.e., HCEs or NHCEs), the average of the Actual Contribution Ratios (calculated separately for each Employee in the group).

### 1.2    Actual Contribution Ratio

(a)    The term "Actual Contribution Ratio" means, for each Employee for any Plan Year, the ratio of:

    (1)    the sum of the amount of Matching Contributions actually paid into the Fund on behalf of such Employee for such Plan Year, to

    (2)    the Employee's compensation (within the meaning of Section 414(s) of the Code) for such Plan Year.

(b)    The Actual Contribution Ratio shall be calculated separately based upon the Matching Contributions made on behalf of such Employee for such Plan Year and separately on behalf of Bargaining Unit Employees.

(c)    The Actual Contribution Ratio for any HCE who is a participant under two or more arrangements described in Section 401(k) of the Code sponsored by the Company or a Related Company shall be determined as if all such arrangements (except plans that may not be aggregated under applicable regulations) were one such arrangement.

### 1.3    Actual Deferral Ratio

(a)    The term "Actual Deferral Ratio" means, for each Employee for any Plan Year, the ratio of:

    (1)    the sum of the amount of Elective Contributions actually paid into the Fund on behalf of such Employee for such Plan Year, to

    (2)    the Employee's compensation (within the meaning of Section 414(s) of the Code) for such Plan Year.

(b)    The Actual Deferral Ratio shall be calculated separately based upon the Elective Contributions made on behalf of such Employee for such Plan Year to the ESOP Component and to the Non-ESOP Component, and separately for Bargaining Unit Employees.

(c)     The Actual Deferral Ratio for any HCE who is a participant under two or more arrangements described in Section 401(k) of the Code sponsored by the Company or a Related Company shall be determined as if all such arrangements (except plans that may not be aggregated under applicable regulations) were one such arrangement.

## 1.4    ADP

The term "ADP" (an acronym for Actual Deferral Percentage) means, for a specified group of Eligible Employees for any Plan Year (i.e., HCEs or NHCEs), the average of the Actual Deferral Ratios (calculated separately for each Employee in the group).

## 1.5    Affiliate

The term "Affiliate" means any Related Company and any corporation or unincorporated trade or business that would be a Related Company if "more than 50%" were substituted for "80%" where "80%" appears in Section 1563(a) of the Code or in the regulations promulgated under Section 414(c) of the Code.

## 1.6    Annual Additions

(a)     The term "Annual Additions" means the sum credited to a Participant for any Limitation Year of:

(1)     employer contributions,

(2)     Employee contributions,

(3)     forfeitures,

(4)     amounts allocated to an individual medical account (as defined in Section 415(l)(2) of the Code) that is part of a pension or annuity plan maintained by the Company or an Affiliate, and

(5)     amounts derived from contributions paid or accrued after December 31, 1985 in taxable years ending after such date, that are attributable to post-retirement medical benefits allocated to the separate account of a key employee (as defined in Section 419A(d)(3) of the Code) under a welfare benefit fund (as defined in Section 419(e) of the Code) maintained by the Company or an Affiliate.

Annual Additions for purposes of Section 415 of the Code shall not include: (1) The direct transfer of a benefit or employee contributions from a qualified plan to this Plan; (2) Rollover contributions (as described in Sections 401(a)(31), 402(c)(1), 403(a)(4), 403(b)(8), 408(d)(3), and 457(e)(16)) of the Code; (3) Repayments of loans made to a Participant from the Plan; and (4) Repayments of amounts described in Section 411(a)(7)(B) of the Code (in accordance with Sections 411(a)(7)(C)) and 411(a)(3)(D) of the Code or repayment of contributions to a governmental plan (as defined in Section 414(d) of the Code) as described in Section 415(k)(3) of the Code, as well as Company restorations of benefits that are required pursuant to such repayments.

Annual Additions for purposes of Section 415 of the Code shall not include restorative payments. A restorative payment is a payment made to restore losses to a Plan resulting from actions by a fiduciary for which there is reasonable risk of liability for breach of a fiduciary duty under ERISA or under other applicable federal or state law, where Participants who are similarly situated are treated similarly with respect to the payments. Generally, payments are restorative payments only if the payments are made in order to restore some or all of the Plan's losses due to an action (or a failure to act) that creates a reasonable risk of liability for such a breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan). This includes payments to the Plan made pursuant to a Department of Labor order, the Department of Labor's Voluntary Fiduciary Correction Program, or a court-approved settlement, to restore losses to the Plan on account of the breach of fiduciary duty (other than a breach of fiduciary duty arising from failure to remit contributions to the Plan). Payments made to the Plan to make up for losses due merely to market fluctuations and other payments that are not made on account of a reasonable risk of liability for breach of a fiduciary duty under ERISA are not restorative payments and generally constitute contributions that are considered Annual Additions.

(b)    In all instances, the determination of a Participant's Annual Additions for any Limitation Year shall be made in accordance with Section 415 of the Code and the regulations thereunder, as amended, the provisions of which are hereby incorporated by reference.

**1.7    Bargaining Unit Employee**

The term "Bargaining Unit Employee" means an Employee employed primarily to render services within the jurisdiction of a union, where his compensation, hours of work, or conditions of employment are determined by collective bargaining with such union.

**1.8    Beneficiary**

(a)    The term "Beneficiary" means any person designated in writing by a Participant in accordance with prescribed rules, to receive any distribution in the event of the death of the Participant, or, if no such designation is in effect, then the surviving spouse, or children, or the estate of the Participant in such order of priority.

(b)    Notwithstanding subsection (a) above, a Participant's sole Beneficiary shall be his surviving spouse (if he has a surviving spouse) unless he has designated another Beneficiary with the written consent of such spouse (which consent shall not be effective unless it acknowledges the effect of such designation and is witnessed by a notary public). Any change in a Beneficiary designation by a Participant that has the effect of naming a person other than the surviving spouse as sole Beneficiary is subject to the above consent requirement. Notwithstanding the foregoing, if a Participant establishes to the satisfaction of the Plan Administrator or his delegate that written consent cannot be obtained because the spouse cannot be located, or because of such other circumstances as permitted under applicable law, the spouse whose written consent was unobtainable will be deemed to have consented to any designation or change of Beneficiary. Any such

consent shall be effective only with respect to the spouse who gave or was deemed to have given the consent and shall be irrevocable.

**1.9    Closing Date**

The term "Closing Date" means the date upon which Buyer (as defined below) purchased from Seller (as defined below) all of the partnership interests in Arjo Wiggins Delaware General Partnership, a Delaware partnership, with all of its subsidiaries including the Company. "Buyer" collectively means Paperweight Development Corporation ("PDC"), a Wisconsin corporation and New Appleton LLC, a Wisconsin limited liability company owned by PDC. "Seller" collectively means Arjo Wiggins North America Investments, Ltd., a United Kingdom corporation, and Arjo Wiggins U.S. Holdings, Ltd., a United Kingdom corporation.

**1.10    Code**

The term "Code" means the Internal Revenue Code of 1986, as amended, or any successor statute. Reference to a specific section of the Code shall include a reference to any successor provision.

**1.11    Combined Account**

The term "Combined Account" means the sum of a Participant's ESOP Accounts and Non-ESOP Accounts.

**1.12    Committee**

The term "Committee" means the ESOP Administrative Committee appointed pursuant to Article 8 of the Plan.

**1.13    Company**

(a)    The term "Company" means Appvion, Inc. (formerly, Appleton Papers Inc.), a Delaware corporation, and its predecessors and successors in interest, as appropriate.

(b)    The term "Company" also means any subsidiary or other Affiliate of Appvion, Inc. that adopts the Plan with the approval of the Board of Directors of Appvion, Inc., subject to the provisions of Section 2.7.

**1.14    Company Stock**

For purposes of the Plan, the term "Company Stock" shall mean common stock issued by the Corporation that is readily tradable on an established securities market; provided, however, if the Corporation's common stock is not readily tradable on an established securities market, the term "Company Stock" shall mean common stock issued by the Corporation having a combination of voting power and dividend rates equal to or in excess of: (a) that class of common stock of the Corporation having the greatest voting power and (b) that class of common stock of the Corporation having the greatest dividend rights. Non-callable preferred stock shall be treated as Company Stock for purposes of the Plan if such stock is convertible at any time into stock that is

readily tradable on an established securities market (or, if applicable, that meets the requirements of (a) and (b) next above) and if such conversion is at a conversion price that, as of the date of the acquisition by the Plan, is reasonable. For purposes of the immediately preceding sentence, preferred stock shall be treated as non-callable if, after the call, there will be a reasonable opportunity for a conversion that meets the requirements of the immediately preceding sentence. Company Stock shall be held under the Trust only if such stock satisfies the requirements of Section 407(d)(5) of ERISA.

**1.15    Compensation**

(a)    For purposes of determining highly compensated employees pursuant to Section 1.41, determining any minimum top-heavy benefits pursuant to Section 12.4, and applying the limitations under Section 415 of the Code, as set out in Section 5.4, "Compensation" means the Participant's wages, salaries, fees for professional services and other amounts received (without regard to whether or not an amount is paid in cash) for personal services actually rendered in the course of employment with the Company maintaining the Plan to the extent that the amounts are includible in gross income (or to the extent amounts would have been received and includible in gross income but for an election under a cafeteria plan pursuant to Code Section 125(a), a qualified transportation fringe plan pursuant to Code Section 132(f)(4), a 401(k) or 403(b) plan pursuant to Code Section 402(e)(3), a simplified employee pension pursuant to Code Section 402(h)(1)(B), a simple retirement account pursuant to Code Section 402(k) or an eligible deferred compensation plan pursuant to Code Section 457(b). These amounts include, but are not limited to, commissions paid to salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits and reimbursements or other expense allowances under a nonaccountable plan (as described in Section 1.62-2(c) of the Treasury Regulations). Compensation also includes: (1) in the case of an Employee who is an employee within the meaning of Section 401(c)(1) of the Code and the regulations promulgated thereunder, the Employee's earned income (as described in Section 401(c)(2) of the Code and the regulations promulgated thereunder) plus amounts deferred at the election of the Employee that would be includible in gross income but for the rules governing contributions to 401(k) and 403(b) plans (Code Section 402(e)(3)), simplified employee pensions (Code Section 402(h)(1)(B)), simple retirement accounts (Code Section 402(k)) or eligible deferred compensation plans under Code Section 457(b); (2) amounts received through or employer contributions for accident or health insurance, as described in Sections 104(a)(3) or 105(a) or amounts paid to highly compensated employees under a self-insured medical reimbursement plan under Code Section 105(h), but only to the extent that these amounts are includible in the gross income of the Employee; (3) amounts paid or reimbursed by the Company for moving expenses incurred by an Employee, but only to the extent that at the time of the payment it is reasonable to believe that these amounts are not deductible by the Employee under Section 217 of the Code; (4) the value of a nonstatutory option (which is an option other than a statutory option as defined in Section 1.421-1(b) of the Treasury Regulations) granted to an Employee by the Company, but only to the extent that the value of the option is includible in the gross income of the Employee for the taxable year in which granted; (5) the amount includible in the gross income of an Employee upon making the election described in Section 83(b) of the Code;

and (6) amounts that are includible in the gross income of an Employee under the rules of Sections 409A or 457(f)(1)(A) of the Code or because the amounts are constructively received by the Employee.

(b) The definition of Compensation does not include:

    (1) Employer contributions (other than elective contributions described in Sections 402(e)(3), 408(k)(6), 408(p)(2)(A)(i) or 457(b) of the Code) made by the Company to a plan of deferred compensation (including a simplified employee pension described in Section 408(k) of the Code or a simple retirement account described in Section 408(p) of the Code, and whether or not qualified) to the extent the contributions are not included in the gross income of the Employee for the taxable year in which contributed. In addition, any distributions from a plan of deferred compensation (whether or not qualified) are not considered as compensation for Section 415 of the Code purposes, regardless of whether such amounts are includible in the gross income of the Employee when distributed;

    (2) Amounts realized from the exercise of a nonstatutory option (which is an option other than a statutory option as defined in Section 1.421-1(b) of the Treasury Regulations), or when restricted stock or other property held by an Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture;

    (3) Amounts realized from the sale, exchange or other disposition of stock acquired under a statutory stock option (as defined in Section 1.421-1(b) of the Treasury Regulations);

    (4) Other amounts that receive special tax benefits, such as premiums for group term life insurance (but only to the extent that the premiums are not includible in the gross income of the Employee) and are not salary reduction amounts described in Section 125 of the Code); and

    (5) Other items of remuneration similar to the items listed in Section 1.15(b)(1)-(4) above.

(c) Amounts under Section 125 of the Code include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that he or she has other health coverage. An amount will be treated as an amount under Section 125 of the Code only if the Company does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan.

(d) Compensation shall also include "Post-Severance Compensation." For this purpose, Post-Severance Compensation means the following amounts paid after a Participant's date of severance from employment.

    (1) To the extent that such amounts are paid to the Participant by the later of 2½ months after the Participant's date of severance from employment and the end of

the Limitation Year that includes the Participant's date of severance from employment, Post-Severance Compensation includes the following:

    (A)    The payment of regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments, provided that the payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Company.

    (B)    Payments for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued and such amounts would have been included in the definition of Compensation if they had been paid prior to the Participant's date of severance from employment.

    (2)    Post-Severance Compensation shall include payments to an individual who does not currently perform services for the Company by reason of qualified military service (as that term is used in Section 414(u)(1) of the Code) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Company rather than entering qualified military service.

(e)    In addition to other applicable limitations set forth in the Plan, and notwithstanding any other provision of the Plan to the contrary, the annual Compensation of each Participant taken into account for any Plan Year shall not exceed $245,000, as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code. If the limitation year is not the calendar year, then the Section 401(a)(17) compensation limit that applies to such limitation year is the Section 401(a)(17) compensation limit in effect for the respective calendar year in which such limitation year begins.

## 1.16    Corporation

The term "Corporation" shall mean Paperweight Development Corp., a Wisconsin corporation, and its predecessor and successors in interest, as appropriate. The Corporation elected to be treated as an S Corporation effective September 5, 2001. The Company is a QSUB of the Corporation for tax purposes.

## 1.17    Covered Compensation

(a)    The term "Covered Compensation" means, for any Plan Year, the regular wages or salary paid by the Company to a Participant for services during such period, including overtime, bonus, sales bonus, accrued vacation pay and similar pay, and the wages or salary paid by the Company to a Participant on a military leave of absence, but excluding all other special payments, such as deferred compensation (including, without limitation, amounts realized from the exercise of a non-qualified stock option, or a right under a phantom stock plan), severance payments, and determined before any Savings Percentage election

made pursuant to Section 2.2 or salary reduction elections under a cafeteria plan under Section 125 of the Code or a qualified transportation fringe program under Section 132(f) of the Code.

(b)    In addition to other applicable limitations set forth in the Plan, and notwithstanding any other provision of the Plan to the contrary, the annual Covered Compensation of each Participant taken into account in determining allocations for any Plan Year shall not exceed $245,000, as adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code. Annual Covered Compensation means compensation during the Plan Year or such other consecutive 12-month period over which compensation is otherwise determined under the Plan (the determination period). The cost-of-living adjustment in effect for a calendar year applies to annual compensation for the determination period that begins with or within such calendar year.

(c)    Covered Compensation shall also include "Post-Severance Compensation." For this purpose, Post-Severance Compensation means the following amounts paid after a Participant's date of severance from employment.

   (1)    To the extent that such amounts are paid to the Participant by the later of 2½ months after the Participant's date of severance from employment and the end of the Limitation Year that includes the Participant's date of severance from employment, Post-Severance Compensation includes the following:

      (A)    The payment of regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments, provided that the payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Company.

      (B)    Payments for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued and such amounts would have been included in the definition of Compensation if they had been paid prior to the Participant's date of severance from employment.

   (2)    Post-Severance Compensation shall include payments to an individual who does not currently perform services for the Company by reason of qualified military service (as that term is used in Section 414(u)(1) of the Code) to the extent those payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Company rather than entering qualified military service.

(d)    Notwithstanding any provision of the Plan to the contrary, effective on and after January 1, 2009, a Participant's Covered Compensation shall include the amount of any differential wage payments made by the Employer to a Participant in accordance with

sections 3401(h) and 414(u)(12) of the Code for any period of active military service in the uniformed services in the United States for more than thirty (30) days.

**1.18    Date of Employment**

The term "Date of Employment" means the first date on which an Employee performs an Hour of Service.

**1.19    Date of Severance**

The term "Date of Severance" means the earlier of:

(1)    the date on which an Employee quits, retires, is discharged or dies, or

(2)    the first anniversary of the first date on which an Employee remains absent from employment with the Company or a Related Company for any reason other than those described in paragraph (1) above.

**1.20    Deemed-Owned Shares**

"Deemed-Owned Shares" means, with respect to any Participant:

(a)    stock in an S Corporation constituting Company Stock held by this Plan which is held in the Participant's ESOP Account under this Plan;

(b)    such Participant's share of Company Stock in an S Corporation which is held in the unallocated ESOP Account under this Plan but which has not been allocated under this Plan to Participants; and

(c)    Synthetic Equity.

**1.21    Disability**

The term "Disability" means the total and permanent physical or mental incapacity of a Participant to perform the usual duties of his employment with the Company and shall be deemed to have occurred only upon (1) the receipt by the Participant of payments under the Company's long-term disability program, or (2) the receipt by the Plan Administrator of medical proof of such incapacity that is satisfactory to the Plan Administrator.

**1.22    Discretionary Profit Sharing Contribution**

The term "Discretionary Profit Sharing Contribution" means any amounts contributed by the Company on behalf of a Participant pursuant to Sections 3.2(a) or (b) and 3.3(c)(4).

**1.23    Elective Account**

The term "Elective Account" means the separate bookkeeping account established for each Participant to which the Elective Contributions made on his behalf and invested under the Non-ESOP Component of the Plan are credited.

### 1.24    Elective Contributions

The term "Elective Contributions" means amounts contributed by the Company on behalf of a Participant up to 100% of the Participant's Savings Percentage. A Participant may designate (in accordance with Sections 6.3 and 6.4) whether his Elective Contributions shall be invested in the ESOP or Non-ESOP Component.

### 1.25    Elective Deferrals

The term "Elective Deferrals" means Elective Contributions and any other elective deferrals as defined in Section 402(g)(3) of the Code and the regulations thereunder.

### 1.26    Eligible Employee

(a)    The term "Eligible Employee" means any Employee employed by the Company with the exception of leased employees within the meaning of Section 414(n) of the Code, Summer Students, Intern/Co-Op Students and Project Employees.

(b)    For purposes of determining the employment status of an Employee, the following definitions shall apply:

    (1)    Summer Student. The term "Summer Student" means a full-time student employed by the Company solely during school vacation and holiday periods, and who is so classified in the Company's human resource or payroll systems.

    (2)    Intern/Co-op Student. The term "Intern/Co-op Student" means a full-time student employed by the Company in furtherance of the student's course of academic study, and who is so classified in the Company's human resource or payroll systems.

    (3)    Project Employee. The term "Project Employee" means an individual employed by the Company, for a limited period of time, for the purpose of providing services with respect to discrete, identifiable Company-related projects, and who is so classified in the Company's human resource or payroll systems.

### 1.27    Employee

(a)    For all purposes of the Plan, an individual shall be an Employee of or be "employed" by the Company for any Plan Year only if such individual is treated by the Company as an Employee for purposes of employment taxes and wage withholding for federal income taxes. If an individual is not considered to be an Employee of the Company for a Plan Year in accordance with the preceding sentence, a subsequent determination by the Company, any governmental agency or court that the individual is a common law employee of the Company, even if such determination is applicable to prior years, will not have a retroactive effect for purposes of eligibility to participate in the Plan.

(b)    Notwithstanding the foregoing, with respect to Mandatory Profit Sharing Contributions, the term "Employee" shall not include any Bargaining Unit Employee or any non-union hourly employees working in a Company distribution center.

## 1.28    Entry Date

The term "Entry Date" means the first day on which an Employee satisfies the Eligibility requirements set forth in Section 2.1.

## 1.29    ERISA

The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute.  Reference to a specific section of ERISA shall include a reference to any successor provision.

## 1.30    ESOP Accounts

The term "ESOP Accounts" means all of a Participant's ESOP Elective Account, ESOP Matching Account, ESOP Rollover Account, ESOP Transfer Account and ESOP Profit Sharing Account.  The Plan Administrator may establish an "ESOP Stock Account," an "ESOP Cash Account" and an "ESOP Loan Account" as subaccounts.

## 1.31    ESOP Cash Account

The term "ESOP Cash Account" means the separate bookkeeping account established for each Participant to which the portion of the Participant's Elective Contribution which is designated for investment in the Company Stock under the ESOP Component of the Plan is credited.

## 1.32    ESOP Component

The term "ESOP Component" means the portion of the Plan that is intended to constitute an employee stock ownership plan designed to invest primarily in Company Stock and that is intended to meet the applicable requirements of Sections 401(a), 409, and 4975(e)(7) of the Code and Section 407(d)(6) of the ERISA, with a cash or deferred feature designed to satisfy the applicable requirements of Section 401(k) of the Code.

## 1.33    ESOP Elective Account

The term "ESOP Elective Account" means the separate bookkeeping account established for each Participant to which the Elective Contributions made on his behalf and invested under the ESOP Component of the Plan are credited.

## 1.34    ESOP Loan Account

The term "ESOP Loan Account" means the separate bookkeeping account established for each Participant to which Participant Loans from the Borrower's ESOP Accounts are noted.

### 1.35    ESOP Matching Account

The term "ESOP Matching Account" means the separate bookkeeping account established for each Participant to which the Matching Contributions made on his behalf and invested under the ESOP Component of the Plan are credited.

### 1.36    ESOP Profit Sharing Account

The term "ESOP Profit Sharing Account" means the separate bookkeeping account established for each Participant to which the Profit Sharing Contributions made on his behalf and invested under the ESOP Component of the Plan are credited.

### 1.37    ESOP Rollover Account

The term "ESOP Rollover Account" means the separate bookkeeping account established for each Participant to which Rollover Contributions made by the Participant under the ESOP Component of the Plan are credited.

### 1.38    ESOP Stock Account

The term "ESOP Stock Account" means the separate bookkeeping account established for each Participant to which shares of Company Stock purchased with funds from the Participant's ESOP Cash Account under the ESOP Component of the Plan are credited.

### 1.39    ESOP Transfer Account

The term "ESOP Transfer Account" means the separate bookkeeping account established for each Participant to which amounts are transferred from either the Non-ESOP Component of the Plan or the MSP, pursuant to Section 6.4(b).  The Plan Administrator may direct the Trustee to establish different subaccounts in the ESOP Transfer Account to recognize the different types of monies transferred to the ESOP Transfer Account (e.g., 401(k) or Matching Contributions from the Plan, or profit sharing contributions from the MSP).

### 1.40    Exempt Loan

The term "Exempt Loan" means any loan to the Trustee, including without limitation a loan which is made or guaranteed by a disqualified person (within the meaning of Section 4975(e)(2) of the Code), a direct loan of cash, a purchase money transaction, an assumption of an obligation of the Trustee, or an unsecured guarantee or the use of assets of a disqualified person (within the meaning of Section 4975(e)(2) of the Code) as collateral for a loan, and which satisfies the provisions of Treas. Reg. § 54.4975-7(b).

### 1.41    FMV of Company Stock

The term "FMV of Company Stock" means the fair market value of Company Stock, at a certain date, as determined by the Trustee based on the appraisal of an Independent Appraiser who meets the requirements similar to the requirements of regulations prescribed under Section 170(a)(1) of the Code.

### 1.42    Former Participant

The term "Former Participant" means any former Employee whose interest in the Fund has not been completely distributed pursuant to Article 7.

### 1.43    Fund

The term "Fund" means the trust fund established by the Trust Agreement as described in Article 6.

### 1.44    HCE

(a)    The term "HCE" means any Employee who is a highly compensated employee as defined in Section 414(q) of the Code, which includes any Employee who:

   (1)    was at any time a 5% owner (as defined in Section 416(i)(1) of the Code) of the Company or a Related Company during the Plan Year or the preceding Plan Year;

   (2)    for the preceding Plan Year:

      (A)    received Compensation from the employer in excess of $110,000 (as adjusted from time to time by the Commissioner for increases in the cost of living in accordance with Section 414(q)(1) of the Code); and

      (B)    was in the top paid group of Employees for such preceding year.

(b)    Reserved.

(c)    With respect to a Plan Year being tested, the determination of who is an HCE, including but not limited to the determinations of the number and identity of the Employees in the top-paid group and the compensation that is considered, will be made in accordance with Section 414(q) of the Code and the regulations thereunder.

### 1.45    Hour of Service

(a)    The term "Hour of Service" means:

   (1)    each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Company or a Related Company. These hours shall be credited to the Employee for the computation period or periods in which the duties are performed;

(2)     each hour for which an Employee is paid, or entitled to payment, by the Company or a Related Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including Disability), layoff, jury duty, military duty or leave of absence; and

(3)     each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Company or a Related Company. The same Hours of Service shall not be credited both under paragraph (1) or paragraph (2), as the case may be, and under this paragraph (3). These hours shall be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made.

(b)     Hours of service shall be calculated and credited under this Section 1.42 pursuant to Section 2530.200b-2 of the Department of Labor Regulations, incorporated herein by reference, and in accordance with the Family and Medical Leave Act of 1992 and regulations promulgated thereunder

(c)     Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.

## 1.46    Independent Appraiser

The term "Independent Appraiser" shall mean an Independent Appraiser as defined in Section 401(a)(28) of the Code, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA.

## 1.47    Investment Fund

The term "Investment Fund" means a portion of the Fund that is separately invested, as more specifically provided in Article 6.

## 1.48    Limitation Year

The term "Limitation Year" means the calendar year, unless another consecutive twelve-month period is adopted by written resolution of the Company.

## 1.49    Mandatory Profit Sharing Contribution

The term "Mandatory Profit Sharing Contribution" means any amounts contributed by the Company on behalf of a Participant pursuant to Sections 3.2(c) and 3.3(c)(5).

**1.50    Matching Account**

The term "Matching Account" means the separate bookkeeping account established for each Participant to which Matching Contributions made on his behalf and invested under the Non-ESOP Component are credited.

**1.51    Matching Contributions**

The term "Matching Contributions" means amounts contributed by the Company on behalf of a Participant under Section 3.1.

**1.52    MSP**

The term "MSP" means The Appleton Papers Inc. Retirement Medical Savings Plan.

**1.53    Nonallocation Year.**

The term "Nonallocation Year" means any Plan Year of this Plan if, at any time during such Plan Year:

(a)    this Plan holds Company Stock consisting of shares of stock in an S Corporation, and

(b)    S Corporation Disqualified Persons cumulatively own at least fifty percent (50%) of the number of shares of stock in the S Corporation.  For purposes of this subparagraph (b), stock includes, but is not limited to, Company Stock owned directly by the S Corporation Disqualified Person, Deemed-Owned Shares of the S Corporation Disqualified Person, and Synthetic Equity of the S Corporation Disqualified Person.

(c)    For purposes of this Section, the following attribution rules shall apply:

(1)    The rules of Code Section 318(a) shall apply for purposes of determining ownership except that:

(A)    in applying paragraph (1) thereof, the members of an individual's family shall include members of the family described in Code Section 409(p)(4)(D), and

(B)    paragraph (4) thereof shall not apply.

(2)    Notwithstanding the Employee trust exception in Code Section 318(a)(2)(B)(i), an individual shall be treated as owning Deemed-Owned Shares of the individual.

### 1.54    Non-ESOP Accounts

The term "Non-ESOP Accounts" means the sum of a Participant's Elective Account, Matching Account, Rollover Account, and Profit Sharing Account. The Plan Administrator may establish a Non-ESOP Loan Account as a subaccount.

### 1.55    Non-ESOP Component

The term "Non-ESOP Component" means the portion of the Plan that is intended to constitute a profit sharing plan with a cash or deferred feature designed to satisfy the applicable requirements of Sections 401(a) and 401(k) of the Code.

### 1.56    Non-ESOP Loan Account

The term "Non-ESOP Loan Account" means the separate bookkeeping account established for each Participant to which loan balances which existed immediately prior to the Closing Date are noted under the Non-ESOP Component of the Plan.

### 1.57    NHCE

The term "NHCE" (an acronym for Non-Highly Compensated Employee) means any Employee who is not a HCE.

### 1.57.1    Normal Retirement Age

Effective January 1, 2012, the term "Normal Retirement Age" means the earlier of (i) the time that the Participant has attained the age of 65, and (ii) the time that the Participant has attained the age of 55 and has completed at least ten years of Service.

### 1.58    Participant

The term "Participant" means any Employee who has enrolled in the Plan pursuant to Section 2.2 or on whose behalf the Company makes a Profit Sharing Contribution. "Participant" also means an individual who is a Former Participant.

### 1.59    Participant Loan

The term "Participant Loan" means any loan made to an Employee pursuant to Section 6.11.

### 1.60    Pay Period; Pay Date

The term "Pay Period" means the applicable period for which Covered Compensation is paid. The term "Pay Date" means the date upon which Covered Compensation applicable to a Pay Period is actually paid.

### 1.61    Period of Service

The term "Period of Service" means the period commencing on an Employee's most recent Date of Employment and ending on his next Date of Severance, including any Period of Severance of less than 12 consecutive months.  Service prior to the effective date of this amendment and restatement of the Plan shall be included in an Employee's Period of Service.

### 1.62    Period of Severance

(a)    The term "Period of Severance" means the period of time commencing on a Date of Severance and ending on the date on which an Employee again performs an Hour of Service; provided, however, the first twelve (12)-consecutive months of absence from work after a Date of Severance shall not be included within a Period of Severance if such absence is for maternity or paternity reasons (as defined below).

(b)    For purposes of this Section 1.58, an absence from work for maternity or paternity reasons means a cessation of active employment (and continuous absence from such employment)

      (1)    by reason of the pregnancy of the individual,

      (2)    by reason of the birth of a child of the individual,

      (3)    by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or

      (4)    for purposes of caring for such child for a period beginning immediately following such birth or placement.

### 1.63    Plan

The term "Plan" means the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, as amended and restated generally effective as of January 1, 2009, except as otherwise required by law, which is an amendment and restatement of the Appleton Papers Retirement Savings Plan (effective as of January 1, 2001).

### 1.64    Plan Administrator

The term "Plan Administrator" means the individuals designated to act as such by the Committee.  The Committee may appoint different administrators for the ESOP Component and the Non-ESOP Components of the Plan.

### 1.65    Plan Year

The term "Plan Year" means the calendar year.

### 1.66    Profit Sharing Account

The term "Profit Sharing Account" means the separate bookkeeping account established for each Participant to which the Profit Sharing Contributions made on his behalf and invested under the Non-ESOP Component of the Plan are credited.

### 1.67    Profit Sharing Contribution

The term "Profit Sharing Contribution" means any amounts contributed by the Company on behalf of a Participant under Section 3.3(c).

### 1.68    Related Company

(a)    The term "Related Company" means, for an applicable period:

      (1)    any corporation that is a member of a controlled group of corporations (within the meaning of Section 414(b) of the Code and the regulations thereunder) that includes the Company, or

      (2)    any trade or business (whether or not incorporated) that is under common control with the Company, as determined in accordance with Section 414(c) of the Code and the regulations thereunder, or

      (3)    any organization that is a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code and the regulations thereunder) that includes the Company, or

      (4)    any other entity required to be aggregated with the Company pursuant to regulations promulgated under Section 414(o) of the Code, or

      (5)    for purposes of Section 2.3, any group of individuals approved by the Board of Directors of the Company.

### 1.69    Retirement

Effective January 1, 2012, the term "Retirement" means the termination of employment of a Participant after such Participant has attained Normal Retirement Age.

### 1.70    Rollover Account

The term "Rollover Account" means the separate bookkeeping account established for each Employee to which Rollover Contributions made by the Participant under the Non-ESOP Component of the Plan are credited.

### 1.71    Rollover Contribution

The term "Rollover Contribution" means all of the amounts contributed by an Eligible Employee in accordance with Section 3.6 of the Plan; provided that such amount is an eligible rollover distribution as such term is defined in the Code and applicable regulations.

## 1.72    S Corporation Disqualified Person

The term "S Corporation Disqualified Person" means any person if:

(a)    the aggregate number of Deemed-Owned Shares of such person and the members of such person's family is at least twenty percent (20%) of the number of Deemed-Owned Shares of stock in the S Corporation, or

(b)    in the case of a person not described in (a) above, the number of Deemed-Owned Shares of such person is at least ten percent (10%) of the number of Deemed-Owned Shares of stock in such S Corporation.

In the case of an S Corporation Disqualified Person described in (a) above, any member of such person's family with Deemed-Owned Shares shall be treated as an S Corporation Disqualified Person if not otherwise treated as an S Corporation Disqualified Person under (a) or (b) above.

For the purposes of this Section, the term "member of the family" means, with respect to any individual:

(1)    the spouse of the individual,

(2)    an ancestor or lineal descendant of the individual or the individual's spouse,

(3)    a brother or sister of the individual or the individual's spouse and any lineal descendant of the brother or sister; and

(4)    the spouse of any individual described in (i) or (ii) above.

For purposes of this Section, a spouse of an individual who is legally separated from such individual under a decree of divorce or separate maintenance shall not be treated as such individual's spouse for purposes of this Section.

## 1.73    Savings Percentage

The term "Savings Percentage" means for any Pay Period the percentage elected by a Participant pursuant to Section 2.2 and in effect for such Pay Period.

## 1.74    Service

The term "Service" means the aggregate of an Employee's Periods of Service.

## 1.75    Suspense Account

The term "Suspense Account" means the account or accounts comprised of unallocated shares of Company Stock prior to the allocation of such shares to a Participant's ESOP Accounts.

## 1.76    Synthetic Equity

The term "Synthetic Equity" means any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the S Corporation in the future.  Except to the extent provided in regulations, Synthetic Equity also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value.  Synthetic Equity also includes the following forms of deferred compensation: (i) any remuneration for services rendered to the Company, or a Related Company, to which Code Section 404(a)(5) applies; (ii) any right to receive property in a future year to which Code Section 83 applies for the performance of services rendered to the Employer or a Related Employer; (iii) any transfer of property to which Code Section 83 applies in connection with the performance of services for the Company or a Related Company, to the extent such property is not substantially vested within the meaning of Code Section 1.83-3(i) by the end of the Plan Year in which the property was transferred; and (iv) any other remuneration for services rendered to the Company or a Related Company under a plan, method, or arrangement deferring receipt of the remuneration to a date that is after the 15th day of the 3rd calendar month after the end of the calendar year in which the services were performed.

In the case of a person who owns Synthetic Equity in the S Corporation, except to the extent provided in regulations, the shares of stock in the S Corporation on which such Synthetic Equity is based shall be treated as outstanding stock in such corporation and Deemed-Owned Shares of such person if such treatment of Synthetic Equity of one (1) or more persons results in:

(a) the treatment of any person as an S Corporation Disqualified Person, or

(b) the treatment of any Plan Year as a Nonallocation Year.

For purposes of this Section, Synthetic Equity shall be treated as owned by a person in the same manner as stock is treated as owned by a person under the rules of paragraphs (2) and (3) of Code Section 318(a).  If, without regard to this paragraph, a person is treated as an S Corporation Disqualified Person or a Plan Year is treated as a Nonallocation Year, this paragraph shall not be construed to result in the person or year not being so treated.

## 1.77    Reserved.

## 1.78    Trust Agreement

The term "Trust Agreement" means the written agreement or agreements between the Company and the Trustee with respect to the Fund.

## 1.79    Trustee

The term "Trustee" means the trustee or trustees of the Fund at any time acting under one or more Trust Agreements, as described in Article 6.

**1.80    Valuation Date**

Other than for Company Stock, the term "Valuation Date" means each day the New York Stock Exchange is open for business or such other times as may be agreed to in writing between the Company and the Trustee.  For Company Stock, the term "Valuation Date" means December 31 and June 30. Notwithstanding the foregoing, in the case of a transaction between the Plan and a disqualified person (within the meaning of Section 4975(e)(2) of the Code), the Valuation Date shall be the date of such transaction.

**1.81    Valuation Period**

The Valuation Period means the period of time between Valuation Dates.

## ARTICLE 2:  PARTICIPATION

### 2.1    Eligibility

(a)    Each Eligible Employee who was previously participating in the Plan shall continue to participate in the Plan, as amended and restated, subject to the terms of the Plan;

(b)    Each Eligible Employee (other than a Bargaining Unit Employee) shall be eligible to become a Participant as of his or her Date of Employment; and

(c)    An Eligible Employee who is a Bargaining Unit Employee shall be eligible to become a Participant on the first day he or she becomes eligible for welfare benefits as determined under the collective bargaining agreement covering such Bargaining Unit Employee, the terms of which are set forth in Appendix A hereto.

(d)    Any Eligible Employee not described in subsections (a), (b) or (c) above shall be eligible to become a Participant on the first day of the calendar year quarter following the first anniversary of his Date of Employment, if he has completed 1,000 Hours of Service within the 12-month period beginning on such Date of Employment.  An Eligible Employee subject to this subsection who does not complete 1,000 Hours of Service in that initial 12-month period shall be eligible to become a Participant on the first day of the calendar year quarter next following the close of the first Plan Year in which he completes 1,000 Hours of Service within the Plan Year.

### 2.2    Terms of Participation

(a)    Subject to the limitations set forth herein, an Eligible Employee may become a Participant in the Plan by electing a Savings Percentage of any whole percentage of the Participant's Covered Compensation in an amount not less than two percent (2%) nor more than fifteen percent (15%) of such Covered Compensation; provided that the Company may, in its sole discretion, increase the maximum percentage on a year-by-year basis to the extent permitted by law.  A Savings Percentage election shall be made in writing on a form prescribed and provided by the Plan Administrator, and shall include an agreement by the Eligible Employee to reduce his cash remuneration by an amount equal to such Savings Percentage.  Effective October 1, 2011, a non-Bargaining Unit Employee who is an Eligible Employee shall be automatically enrolled in the Plan in accordance with Section 2.2(g) and a Bargaining Unit Employee who is an Eligible Employee shall be automatically enrolled in the Plan in accordance with Section 2.2(g) if such automatic enrollment is specifically authorized under the terms of the applicable collective bargaining agreement. In addition, all Employees who are eligible to make Elective Contributions under this Plan and who have attained age 50 before the close of the Plan Year shall be eligible to make catch-up contributions in accordance with, and subject to the limitations of, Section 414(v) of the Code.  Such catch-up contributions shall not be taken into account for purposes of the provisions of the Plan implementing the required limitations of Sections 402(g) and 415 of the Code.  The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of

Section 401(k)(3), 401(k)(11), 401(k)(12), 410(b), or 416 of the Code, as applicable, by reason of the making of such catch-up contributions.

(b)     An Employee's Savings Percentage election under subsection (a) above shall be effective upon the first Pay Date occurring on or after the Entry Date following the date he files an election form; provided the required form is completed, signed and received by the Company in such form and at such time the Plan Administrator may require.

(c)     A Participant may change the percentage designation of his election as of any Pay Date, and may terminate his election at any time, provided that such Participant notifies the Plan Administrator in such form and at such time as the Plan Administrator may require, but in all events prior to the proposed effective date of such change or termination. A termination shall take effect as soon as administratively practical after notification is received by the Company. A Participant who so terminates his election may make a new election as provided in this Section 2.2.

(d)     Reserved.

(e)     The Company shall contribute, on behalf of each Participant who elects to credit to this Plan the payment of certain elective benefit credits under an applicable flexible benefits plan of the Company, if any, 100% of the value of such credits to such Participant's Elective Account under the Non-ESOP Component to the extent allowed under applicable guidance.

(f)     Notwithstanding any provision of the Plan to the contrary, effective January 1, 2009, any Participant performing military service (as described in Section 3401(h)(2)(A) of the Code) for more than thirty (30) days will be treated as incurring a separation from employment notwithstanding the fact that such Participant may be receiving military differential payments. As a result, the limitations on in-service distributions from a Participant's Elective Account pursuant to Code Section 401(k)(2)(B)(i)(I) will not apply, to the extent allowed under the Code. In the event that a Participant receives a distribution from such Participant's Elective Account pursuant to this paragraph, such Participant will be prohibited from making Elective Deferrals or employee contributions, including but not limited to Elective Contributions, for a period of six (6) months after receipt of such distribution.

(g)     Automatic Enrollment. Effective October 1, 2011:

(1)     A non-Bargaining Unit Employee who is an Eligible Employee and whose Date of Employment occurs on or after October 1, 2011, must make an affirmative Savings Percentage election no later than thirty (30) days following the Date of Employment. In the absence of making an affirmative election within the specified period, and provided that such Eligible Employee has received an appropriate notice regarding such election, the Eligible Employee shall be automatically enrolled in the Plan with a Savings Percentage election equal to three percent (3%) of his Covered Compensation. An Eligible Employee who is automatically enrolled in the Plan pursuant to this subsection (g)(i) shall have his

Savings Percentage election increased on the anniversary of his Date of Employment as follows:

| Years After the Date of Employment | Savings Percentage election |
|---|---|
| Year 1 | 4% |
| Year 2 | 5% |
| Year 3 | 6% |

(2)  A non-Bargaining Unit Employee who is an Eligible Employee, whose Date of Employment occurs prior to October 1, 2011, and who has not previously made a Savings Percentage election or has made a Savings Percentage election of 0%, must make an affirmative Savings Percentage election no later than thirty (30) days following the date the Plan Administrator provides an appropriate notice regarding such election. In the absence of making an affirmative election within the specified period, such Eligible Employee shall be automatically enrolled in the Plan with a Savings Percentage election equal to three percent (3%) of his Covered Compensation. An Eligible Employee who is automatically enrolled in the Plan pursuant to this subsection (g)(ii) shall have his Savings Percentage election increased annually on October 1 as follows:

| Date | Savings Percentage election |
|---|---|
| October 1, 2012 | 4% |
| October 1, 2013 | 5% |
| October 1, 2014 | 6% |

(3)  A Bargaining Unit Employee who is an Eligible Employee, and who is covered by a collective bargaining agreement providing for automatic enrollment, must make an affirmative Saving Percentage election no later than thirty (30) days after such first becoming subject to this Section 2.2(g). In the absence of making an affirmative election within the specified period, and provided that such Eligible Employee has received an appropriate notice regarding such election, the Eligible Employee shall be automatically enrolled in the Plan with a Savings Percentage election equal to three percent (3%) of his Covered Compensation. An Eligible Employee who is automatically enrolled in the Plan pursuant to this subsection (g)(3) shall have his Savings Percentage election increased on the anniversary of his automatic enrollment in the Plan, as follows:

| Years After the Date of Automatic Enrollment | Savings Percentage election |
|---|---|
| Year 1 ................................................ | 4% |
| Year 2 ................................................ | 5% |
| Year 3 ................................................ | 6% |

(4)     Notwithstanding the foregoing, an Eligible Employee may, at any time, change his Savings Percentage election or terminate his election in accordance with the provisions of Section 2.2(c).

(5)     Effective January 1, 2012, if an Employee, after terminating employment, shall be rehired by the Company and again become an Eligible Employee, then, solely for the purpose of this Section 2.2(g), the date as of which such Employee is rehired by the Company shall be treated as his Date of Employment.

## 2.3    Transferred Employees

(a)     Except as provided below in this Section 2.3, each person who is transferred to the Company from a Related Company shall become eligible to enroll as a Participant upon his compliance with the eligibility requirements of Section 2.1 above.

(b)     Periods of employment with a Related Company or a series of Related Companies shall be included in determining an Eligible Employee's compliance with the eligibility requirements for participation in the Plan and for purposes of vesting under Article 4 and for purposes of determining whether the termination of employment of an Employee is a Retirement as the term is defined in Article 1.

(c)     If a Participant is transferred to employment with a Related Company or a series of Related Companies, he shall not be deemed to have retired or terminated his Service or employment for purposes of this Plan until such time as he is employed neither by the Company nor by any Related Company.  Upon Retirement, Disability, death, layoff or termination from service of such a Participant while in the employ of a Related Company, distribution shall be made in accordance with this Plan as if such Participant had been retired, become Disabled, died, been laid off, or terminated his service in the employ of the Company.

(d)     Nothing in this Section 2.3 shall be construed to authorize a Participant to share in contributions under this Plan with respect to remuneration paid to him by a Related Company.

## 2.4    Reemployment

If an Employee, after terminating employment, shall be rehired by the Company, he shall be eligible to resume participation in this Plan on the first Entry Date after rehire if he had previously become a Participant under the Plan. Otherwise he shall become a Participant when he complies with the foregoing provisions of this Article 2, by taking into account both his Service prior to termination and his Period of Service after rehire.

## 2.5    Bargaining Unit Employees

Notwithstanding any other provision of the Plan, Bargaining Unit Employees shall be eligible to participate in this Plan only if the applicable collective bargaining agreement expressly so provides, in which case participation by a Bargaining Unit Employee shall be only to the extent and on the terms and conditions specified in the collective bargaining agreement covering such individual, the relevant terms of which are described in Appendix A hereto.

## 2.6    Leased Employees

(a)    If any person who is not an Employee of the Company provides services to the Company (or a Related Company) on a substantially full-time basis for a period of at least one year, such periods shall be counted as if such person had been an Employee in calculating Hours of Service for purposes of determining eligibility to participate under Section 2.1, and in calculating Service for purposes of vesting under Article 4, but only if:

(1)    such services are provided pursuant to an agreement between the Company and any other person; and

(2)    such services are performed under the primary direction and control of the Company.

(b)    Reserved.

## 2.7    Adoption by Affiliate

Any subsidiary or other Affiliate of Appvion, Inc. that has become a "Company" as provided in Section 1.13(b) is deemed to have designated Appvion, Inc. as its agent with respect to amending or terminating the Plan. Any such action shall be binding on such subsidiary or Affiliate at the time taken.

## ARTICLE 3:  COMPANY CONTRIBUTIONS

**3.1    Matching Contributions**

(a)    **Amount of Contribution**

Effective October 1, 2011, subject to the limitations set forth herein, the Company shall contribute on behalf of each Participant, including Participants who are automatically enrolled under Section 2.2(g), the following amounts:

(1)    Non-Bargaining Unit Employees – A contribution to the Participant's ESOP Matching Account equal to the sum of:

(A)    100% of the Participant's Savings Percentage invested under the ESOP Component of the Plan; and

(B)    50% of the Participant's Savings Percentage invested under the Non-ESOP Component of the Plan.

provided, however, that a Matching Contribution shall only be made on that portion of the Savings Percentage not in excess of 6% of Covered Compensation.

(2)    Bargaining Unit Employees (Appleton):

(A)    100% of the Participant's Saving Percentage invested under the ESOP Component of the Plan; and

(B)    50% of the Participant's Savings Percentage invested under the Non-ESOP Component of the Plan,

provided, however, that a Matching Contribution shall only be made on that portion of the Savings Percentage not in excess of 6% of Covered Compensation. Such Matching Contribution shall be invested in either the ESOP Component or the Non-ESOP Component of the Plan in the same manner as the Participant's Savings Percentage to which the Matching Contribution relates.

(3)    Bargaining Unit Employees (West Carrollton and Roaring Spring):    A contribution to the Participant's ESOP Matching Account equal to 100% of the portion of the Participant's Savings Percentage invested under the ESOP Component of the Plan not in excess of 6% of Covered Compensation.

(4)    Bargaining Unit Employees (employed at Roaring Spring and not receiving a contribution toward retiree medical) will receive a Matching Contribution, in addition to the contribution specified in Section 3.1(a)(2) above, of 50% of the portion of the Participant's Savings Percentage not in excess of 6% of Covered Compensation.  Such Matching Contribution shall be invested in either the ESOP

Component or the Non-ESOP Component of the Plan in the same manner as the Participant's Savings Percentage to which the Matching Contribution relates.

(5)    Bargaining Unit Employees (Harrisburg):

    (A)    100% of the Participant's Savings Percentage invested under the ESOP Component of the Plan; and

    (B)    75% of the Participant's Savings Percentage invested under the Non-ESOP Component of the Plan.

provided, however, that a Matching Contribution shall only be made on that portion of the Savings Percentage not in excess of 6% of Covered Compensation. Such Matching Contribution shall be invested in either the ESOP Component or the Non-ESOP Component of the Plan in the same manner as the Participant's Savings Percentage to which the Matching Contribution relates.

(6)    Bargaining Unit Employees (Kansas City):

    (A)    100% of the Participant's Savings Percentage invested under the ESOP Component of the Plan; and

    (B)    80% of the Participant's Savings Percentage invested under the Non-ESOP Component of the Plan.

provided, however, that a Matching Contribution shall only be made on that portion of the Savings Percentage not in excess of 6% of Covered Compensation. Such Matching Contribution shall be invested in either the ESOP Component or the Non-ESOP Component of the Plan in the same manner as the Participant's Savings Percentage to which the Matching Contribution relates.

(b)    The Company may, by resolution of its Board of Directors and in its sole and absolute discretion, increase or decrease the percentage factors set forth above based on profitability or such other reasons that it deems appropriate.

(c)    In addition, at or as of the end of each Plan Year, the Company shall contribute on behalf of each Participant who has not received the maximum available Matching Contribution on Elective Deferrals made pursuant to a Savings Percentage election for such Plan Year, an additional Matching Contribution equal to the difference (if any) between (1) the amount of Matching Contribution the Participant would have received under the formulas above if his or her Savings Percentage had been made on a level basis throughout that Plan Year, and (2) the amount previously contributed as a Matching Contribution by the Company for such Plan Year. Such additional Matching Contribution shall in all events be made in the form of Company Stock.

**3.2     Profit Sharing Contribution**

(a)     Subject to the limitations set forth herein, the Company, in its discretion, may determine whether a Discretionary Profit Sharing Contribution shall be made to the Non-ESOP Component of the Plan for a Plan Year, and if so, the amount to be contributed. Such amounts shall be credited to each eligible Participant's Profit Sharing Account and shall be subject to the Participant's investment direction under Section 6.3.

(b)     Subject to the limitations set forth herein, the Company, in its discretion, may determine whether a Discretionary Profit Sharing Contribution shall be made to the ESOP Component of the Plan for a Plan Year, and if so, the amount to be contributed. Such allocated amounts shall be credited to each eligible Participant's ESOP Profit Sharing Account subject to the limitations and rules governing the ESOP Component of the Plan.

(c)     Subject to the limitations set forth herein, the Company shall make a Mandatory Profit Sharing Contribution to the Non-ESOP Component of the Plan for each Plan Year, with the amount of such contribution to be determined pursuant to Section 3.3(c)(5) below. Such amounts shall be credited to each eligible Participant's Profit Sharing Account and shall be subject to the Participant's investment directions under Section 6.3.

**3.3     Time and Medium of Payment of Contributions; Allocation Rules**

(a)     **Elective Contributions**

**Medium.**  The Company shall pay Participants' Elective Contributions over to the Trustee in cash.

(b)     **Matching Contributions**

(1)     **Timing**

(A)     Contributions to the Non-ESOP Component of the Plan shall be made within 60 days following the Pay Date during which the Elective Contributions to which such Matching Contributions relate would have been paid.

(B)     Contributions to the ESOP Component of the Plan shall be made as of the Valuation Date following the Pay Date during which the Elective Contributions to which such Matching Contributions relate would have been paid, and shall be based on the FMV of Company Stock as of the Valuation Date preceding or following the relevant Pay Date (whichever is lower).

(2)     **Form of Contribution.**  The Company shall make Matching Contributions required under the Non-ESOP Component in the form of Company Stock or cash as determined by the Board of Directors of the Company in its sole discretion. The Company shall make Matching Contributions required under the ESOP

Component in the form of Company Stock or cash, as determined by the Board of Directors of the Company in its sole discretion.

(c)    **Profit Sharing Contributions**

(1)    **Timing.**  Profit Sharing Contributions to either the Non-ESOP Component or the ESOP Component of the Plan shall be made by the due date of the Company's tax return (including extensions) for the year to which such contributions relate.

(2)    **Form of Contribution.**  The Company shall make any Profit Sharing Contributions under the Non-ESOP Component in the form of cash.  The Company shall make any Profit Sharing Contributions under the ESOP Component in the form of Company Stock or cash to be invested in Company Stock, as determined by the Board of Directors of the Company in its sole discretion.

(3)    **Eligibility to Receive an Allocation of Discretionary Profit Sharing Contribution.**  In general, an individual must be (A) eligible to participate in the Plan and (B) employed on the last day of a Plan Year to which a Discretionary Profit Sharing Contribution relates in order to share in such Discretionary Profit Sharing Contribution.  However, Participants who cease to be Employees during the Plan Year by reason of death, Disability or Retirement shall be eligible to share in such Discretionary Profit Sharing Contribution.

(4)    **Allocation of Discretionary Profit Sharing Contributions.**  Participants eligible to receive an allocation of such Discretionary Profit Sharing Contribution shall share in such Contribution in proportion to their relative amounts of Covered Compensation for that portion of the Plan Year during which they were eligible to participate in the Plan.

(5)    **Allocation of Mandatory Profit Sharing Contributions.**  A Mandatory Profit Sharing Contribution, based upon the schedule set forth below, shall be allocated to the Non-ESOP Profit Sharing Account of each Participant who: (A) effective beginning April 1, 2008, has made an affirmative election to cease accruing benefits under the Appleton Papers Inc. Retirement Plan; (B) was ineligible to commence participation in the Appleton Papers Inc. Retirement Plan because of the freezing of the participation provisions of such plan; (C) was ineligible to commence participation in the Appleton Papers Inc. Retirement Plan because such Participant did not qualify as an "Eligible Employee" under such plan; or (D) ceased to accrue benefits under the Appleton Papers Inc. Retirement Plan upon such Participant's transfer from a Bargaining Unit Employee to a salaried employee or to a non-union hourly employee.  Notwithstanding the foregoing, Participants who do not make the affirmative election referenced in (A) immediately above and who otherwise meet the eligibility criteria set forth herein, shall be eligible for this Mandatory Profit Sharing Contribution beginning March 1, 2011.  Mandatory Profit Sharing Contributions shall be made on each Pay Date to eligible Participants who are employed on the Pay Date, based upon

their Covered Compensation for the applicable Pay Period, based upon their age in years on their birthday that occurs during the Plan Year and based upon their Service in whole years on their Service anniversary date that occurs during the Plan Year in accordance with the following schedule:

| Age + Service | Mandatory Profit Sharing Contribution |
|---|---|
| < 35 | 1% of Covered Compensation |
| 35-49 | 2% of Covered Compensation |
| 50-64 | 3% of Covered Compensation |
| 65-79 | 4% of Covered Compensation |
| 80 or more | 5% of Covered Compensation |

Effective January 1, 2010, Mandatory Profit Sharing Contributions shall be made on each Pay Date to eligible Participants based upon their Covered Compensation for the applicable Pay Period, based upon their age in years on their birthday that occurs during the Plan Year and based upon their Service in whole years on their Service anniversary date that occurs during the Plan Year, in accordance with the preceding schedule, regardless of whether such Participant is employed on the relevant Pay Date.

Further effective January 1, 2010, in determining a Participant's Service for purposes of this Section 3.3(c)(5), that portion of any Participant's Period of Service during which the Participant was classified as a "temporary employee" on the Company's payroll system shall be disregarded.

Notwithstanding the foregoing, a Mandatory Profit Sharing Contribution shall not be made with respect to a Participant who (a) incurs a Disability and/or (b) is an HCE, unless the Committee determines, in its complete discretion, that such application will not cause the Plan in operation to discriminate in favor of HCEs and thereby fail to comply with Section 401(a)(4) of the Code.

(6)     **Special Profit Sharing Contributions.**

(A)     Bargaining Unit Employees (Appleton)

(i)     A special Profit Sharing Contribution of $1,000 shall be allocated to the Non-ESOP Profit Sharing Account of each Bargaining Unit Employee when his work area completes the work system redesign conducted during 2005 and 2006 or, if his work area does not participate in a redesign, when all redesigns are complete;

(ii)    A special Profit Sharing Contribution of $2,500 shall be allocated to the Non-ESOP Profit Sharing Account of each Bargaining Unit Employee

whose original hire date with the Company is prior to January 1, 2012 and whose retirement date with the Company is after August 31, 2014, such contribution to be made as soon as reasonably practicable following the later to occur of the following dates: (A) September 1, 2014 provided that the Employee has then attained at least age 55 and completed 17 years of Service, and (B) the date that the Employee has attained age 55 and completed 17 years of Service.

(B)    Bargaining Unit Employees (West Carrollton)

(i)    A special Profit Sharing Contribution of $2,500 shall be allocated to the Non-ESOP Profit Sharing Account of each Bargaining Unit Employee who was hired by the Company prior to July 1, 2012 (including terminated Employees with original hire dates prior to July 1, 2012 who are rehired prior to April 1, 2015) and whose retirement date with the Company is after March 31, 2014, such contribution to be made as soon as reasonably practicable following the later to occur of the following dates: (A) April 1, 2014, provided that the Employee has then attained at least age 55 and completed 17 years of Service, and (B) the date that the Employee has attained age 55 and completed 17 years of Service;

(ii)    A special Profit Sharing Contribution of $2,000 shall be allocated as soon as reasonably practicable to the Non-ESOP Profit Sharing Account of each Bargaining Unit Employee who was actively employed with the Company as of September 6, 2012, and an additional special Profit Sharing Contribution of $1,000 shall be allocated as soon as reasonably practicable following April 1, 2013 to each Employee who remains actively employed with the Company as of that date; provided, however, that if a Bargaining Unit Employee was laid off as a result of the 2012 Domtar Basestock Purchase Agreement, and was recalled by the Company after September 6, 2012 and within his one-year recall period, such Employee shall, in lieu of the $2,000 and $1,000 special Profit Sharing Contributions referred to above, receive a $3,000 special Profit Sharing Contribution as of the one-year anniversary of the date of his recall, provide that on such date he remains actively employed with the Company

**3.4    Reinstatements**

In addition to the contributions otherwise provided for in Sections 3.1, 3.2 and 3.3 above, the Company shall contribute such additional amounts as are required for reinstatement of any accounts in accordance with Sections 7.5 and 7.10.

**3.5    Contributions Conditioned on Deductibility**

Notwithstanding any other provision of the Plan, each contribution by the Company under this Article 3 is expressly conditioned on the deductibility of such contribution under Section 404 of the Code.

**3.6    Rollover Contributions**

(a)    The Committee may, under uniform rules applied on a consistent and non-discriminatory basis, permit the Trustee to accept Participant Rollover Contributions and/or direct rollovers of distributions from the types of plans specified below; provided, however, that in the opinion of the Committee or its legal counsel, the Rollover Contribution and/or direct rollover of an eligible rollover distribution will not jeopardize the tax-exempt status of the Plan or the Trust or create adverse tax consequences for the Company:

    (1)    Direct rollovers from:

        (A)    a qualified plan described in Section 401(a) or 403(a) of the Code, excluding after-tax employee contributions;

        (B)    an annuity contract described in Section 403(b) of the Code, excluding after-tax employee contributions; and

        (C)    an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

    (2)    Indirect rollovers from:

        (A)    a qualified plan described in Section 401(a) or 403(a) of the Code, excluding after-tax employee contributions;

        (B)    an annuity contract described in Section 403(b) of the Code, excluding after-tax employee contributions; and

        (C)    an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

    (3)    The portion of a distribution from an individual retirement account or annuity described in Section 408(a) or 408(b) of the Code that is eligible to be rolled over and would otherwise be included in gross income.

    (4)    The Committee may require such evidence as they deem appropriate to ensure that any such Rollover Contribution to the Plan shall not adversely affect its tax-qualified status.

(b)    In no event shall a Rollover Contribution be made to the Plan in the form of a direct transfer from any tax-qualified plan that is required to provide benefits in the form of a qualified joint and survivor annuity or a qualified pre-retirement survivor annuity, as defined in subsections (b) and (c) of Section 417 of the Code. The Committee may, under uniform rules applied on a consistent and nondiscriminatory basis, permit Participants to direct that a portion of such Rollover Contribution be invested in Company Stock under the ESOP Component of this Plan.

3.7    **Prohibited Allocations of Stock in an S Corporation (effective for Plan Years ending after March 14, 2001)**

(a)    Notwithstanding any Plan provision to the contrary, during any Plan Year in which the Company is an S Corporation and Company Stock held under this Plan consists of stock in an S Corporation, no portion of the assets held by the Trust shall, during a Nonallocation Year (as defined below), accrue or be allocated (either directly or indirectly) under this Plan or any plan qualified under Section 401(a) of the Code that is maintained by the Company for the benefit of an S Corporation Disqualified Person (as defined below), to the extent that such accrual or allocation would cause an Impermissible Accrual or Impermissible Allocation.

In the event any allocation under this Plan would cause the ESOP Component of the Plan to have a Nonallocation Year, amounts held by an S Corporation Disqualified Person (or person reasonably expected to become an S Corporation Disqualified Person absent a transfer described in this Section), necessary to avoid a Nonallocation Year, shall be transferred to the Non-ESOP Component of the Plan.

(b)    Assets held under the Plan in accordance with the above are held in the Non-ESOP Component of the Plan and not under the ESOP Component which is intended to qualify as an employee stock ownership plan, within the meaning of Section 4975(e)(7) of the Code.  Amounts held in the Non-ESOP Component of the Plan shall be held in accounts that are separate from the accounts for the amounts held in the ESOP Component.  The statements provided to Participants and Beneficiaries to show their interest in the Plan shall separately identify the amounts held in each such portion.  Except as specifically set forth in this Section, all of the terms of the Plan apply to any amount held under the Non-ESOP Component of the Plan in the same manner and to the same extent as to any other amount held under the Plan.

(c)    In the case of any event that the Plan Administrator determines would cause a Nonallocation Year to occur (referred herein as a "Non-allocation Event"), shares of Company Stock held under the Plan before the date of the Non-allocation Event, shall be transferred from the ESOP Component of the Plan to the Non-ESOP Component of the Plan as provided in this Section 3.7(c).  Actions that may cause a Non-allocation Event, include, but are not limited to, a contribution to the Plan in the form of shares of Company Stock, a distribution from the Plan in the form of shares of Company Stock, a change of investment within the ESOP Accounts of an S Corporation Disqualified Person that alters the number of shares of Company Stock held in the ESOP Accounts of the S Corporation Disqualified Person, or the issuance by the Company of Synthetic Equity (as defined below).  A Non-allocation Event occurs only if (i) the total number of shares of Company Stock held in the ESOP Accounts of those Participants who are or who would be S Corporation Disqualified Persons after taking into account the Participant's Synthetic Equity and the Non-allocation Event, exceeds (ii) 49.9% of the total number of shares of Company Stock outstanding after taking the Non-allocation Event into account (causing a Nonallocation Year to occur).  No transfer under this Section 3.7 shall be greater than the excess, if any, of (i) over (ii). Before the Non-allocation Event occurs, the Plan Administrator shall determine the extent to which a transfer is required to be

made and shall take steps to ensure that all action necessary to implement the transfer are taken before the Non-allocation Event occurs.

(d)     Except as provided for in this Section 3.7(d), at the date of the transfer, the total number of shares transferred as provided for in Section 3.7(c), shall be charged against the ESOP Accounts of Participants who are S Corporation Disqualified Persons (i) by first reducing the ESOP Accounts of the Participant who is an S Corporation Disqualified Person whose ESOP Accounts have the largest number of shares (with the addition of Synthetic Equity shares) and (ii) thereafter by reducing the ESOP Accounts of each succeeding Participant who is an S Corporation Disqualified Person who has the largest number of shares in his or her ESOP Accounts (with the addition of Synthetic Equity shares). Immediately following the transfer, the number of transferred shares charged against any Participant's ESOP Accounts in the ESOP Component of the Plan shall be credited to an account established for that Participant in the Non-ESOP Component of the Plan.

(e)     Notwithstanding Section 3.7(d), the number of shares transferred shall be charged against the ESOP Accounts of Participants who are S Corporation Disqualified Persons by first reducing the ESOP Accounts of the Participant with the fewest shares (including Synthetic Equity) who is an S Corporation Disqualified Person and who is a HCE to cause the Participant not to be an S Corporation Disqualified Person, and thereafter reducing the ESOP Accounts of each other Participant who is an S Corporation Disqualified Person and a HCE, in order of who has the fewest Company Stock shares (including Synthetic Equity). A transfer under this Section 3.7(e) only applies to the extent that the transfer results in fewer shares being transferred than in a transfer under Section 3.7(d).

(f)     If two or more Participants described in Section 3.7(d) or Section 3.7(e) have the same number of shares, the ESOP Accounts of the Participant with the longest service shall be reduced first.

(g)     Beneficiaries of the Plan are treated as Participants for purposes of this Section.

(h)     Income Taxes. If the Trust owes income taxes as a result of unrelated business taxable income under Section 512(e) of the Code with respect to shares of Company Stock held in the Non-ESOP Component of the Plan, the income tax payments made by the Trustee shall be charged against the Non-ESOP Accounts of each Participant or Beneficiary in proportion to the ratio of the shares of Company Stock in such Participant's or Beneficiary's Non-ESOP Accounts to the total shares of Company Stock in the Non-ESOP Component of the Plan. The Company shall purchase shares of Company Stock from the Trustee with cash (based on the FMV of Company Stock of the shares so purchased) from each such Non-ESOP Account to the extent necessary for the Trustee to make the income tax payments.

(i)     For purposes of this Section, there is an "Impermissible Accrual" to the extent that Company Stock consisting of stock in an S Corporation owned by the Plan and any assets attributable thereto are held under the Plan for the benefit of an S Corporation Disqualified Person during a Nonallocation Year. For this purpose, assets attributable to

stock in an S Corporation owned by the Plan include any S Corporation distributions, within the meaning of Section 1368 of the Code, made on S Corporation Stock held in an S Corporation Disqualified Person's account in the Plan (including earnings thereon), plus any proceeds from the sale of S Corporation Company Stock held for an S Corporation Disqualified Person's account in the Plan (including earnings thereon). Thus, in the event of a Nonallocation Year, all S Corporation Company Stock and all other Plan assets attributable to S Corporation Company Stock, including distributions, sales proceeds, and earnings on either distributions or proceeds, held for the account of such S Corporation Disqualified Person in the Plan during that year are an Impermissible Accrual for the benefit of that person, whether attributable to contributions in the current Plan Year or in prior Plan Years.

(j)      For purposes of this Section, an "Impermissible Allocation" occurs during a Nonallocation Year to the extent that a contribution or other Annual Addition is made with respect to the Account of an S Corporation Disqualified Person, or the S Corporation Disqualified Person otherwise accrues additional benefits, directly or indirectly under the Plan or any other plan of the employer qualified under Section 401(a) of the Code (including a release and allocation of assets from a suspense account, as described at Sections 54.4975-11(c) and (d) of the Treasury Regulations) that, for the Nonallocation Year, would have been added to the account of the S Corporation Disqualified Person under the Plan and invested in Company Stock consisting of stock in an S Corporation owned by the Plan but for a provision in the Plan that precludes such addition to the account of the S Corporation Disqualified Person, and investment in Company Stock during a Nonallocation Year.

(k)      Reserved.

(l)      Reserved.

(m)      For purposes of this Section 3.7, for any Plan Year in which it is determined that the principal purposes of the ownership structure of the Company, as an S Corporation, constitute an avoidance or evasion of Section 409(p) of the Code, this Plan shall have a Nonallocation Year and/or treat any person required to be designated as an S Corporation Disqualified Person, as required by the Commissioner, pursuant to Section 1.409(p)-1(b)(3) of the Treasury Regulations or Section 409(p)(7)(B) of the Code.

## ARTICLE 4: VESTING

### 4.1    Fully Vested Accounts

A Participant's Elective Account, ESOP Elective Account, Rollover Account, ESOP Rollover Account, and ESOP Transfer Account shall at all times be fully vested and nonforfeitable.

## 4.2    Accounts Subject to Vesting Schedule

A Participant's Matching Account and ESOP Matching Account, Profit Sharing Account and ESOP Profit Sharing Account shall be vested in accordance with the following schedule, based on the Employee's Service:

| Service (In Years): | Vesting Percentage |
|---|---|
| Less than one | 0% |
| One but less than two | 20% |
| Two but less than three | 40% |
| Three but less than Four | 60% |
| Four but less than five | 80% |
| Five or more | 100% |

## 4.3    Special Vesting Rules

A Participant's Matching Account, ESOP Matching Account, Profit Sharing Account and ESOP Profit Sharing Account shall in all events be or become fully vested and nonforfeitable upon the first to occur of the following events:

(a)    Effective January 1, 2013, attainment of Normal Retirement Age while employed by the Company, a Related Company or an affiliate;

(b)    Disability while employed by the Company, a Related Company or an Affiliate;

(c)    Death while employed by the Company, a Related Company or an Affiliate;

(d)    Upon the complete discontinuance of employer contributions to the Plan;

(e)    Upon the complete termination of the Plan; or

(f)    Upon the partial termination of the Plan, if the Participant is affected by such partial termination.

Notwithstanding any provision of the Plan to the contrary, effective on and after January 1, 2007, if a Participant dies while performing qualified military service for a period longer than thirty (30) days, such Participant's Beneficiary shall be eligible for any additional benefits (other than benefits accruals relating to the period of qualified military service) that would have been provided under the Plan if the Participant had resumed employment on the day prior to his death and then terminated employment due to death.

## ARTICLE 5:  LIMITATIONS ON CONTRIBUTIONS

**5.1    Limitation on Elective Deferrals**

(a)    Notwithstanding any other provision of the Plan to the contrary, Elective Deferrals made on behalf of a Participant in any calendar year under the Plan and all plans, contracts or arrangements maintained by the Company or any Related Company shall not exceed $16,500, as such amount may be adjusted in accordance with Section 402(g) of the Code and the regulations thereunder, the provisions of which are hereby incorporated by reference.  In the event that the limitation set forth in the preceding sentence is exceeded under the Plan with respect to any Participant in any calendar year, the Participant shall be deemed to have notified the Committee of such excess amount (hereinafter referred to as "Excess Elective Deferrals"), and such Excess Elective Deferrals, increased by any income and decreased by any losses attributable thereto shall be distributed to the Participant no later than April 15 of the following calendar year.

(b)    If a Participant also participates in any other plans, contracts or arrangements subject to the limitation set forth in Section 5.1(a) above and has made Excess Elective Deferrals for any calendar year under this Plan when combined with all other such plans, contracts or arrangements, the Participant may notify the Committee in writing no later than March 1 of the following calendar year of the amount of Elective Deferrals made under the Plan that constitute Excess Elective Deferrals.  Upon such timely notification by a Participant, the Plan shall distribute such Excess Elective Deferrals, increased by any income and decreased by any losses attributable thereto no later than the April 15 of such following calendar year; provided, however, that in no event may a Participant receive from the Plan a distribution of Excess Elective Deferrals for a calendar year in an amount exceeding the Participant's total Elective Deferrals under the Plan for such calendar year.

(c)    The determination of the income and loss allocable to Excess Elective Deferrals shall be made in accordance with Section 402(g) of the Code and the regulations thereunder, as may be amended from time to time.

(d)    The amount of Excess Elective Deferrals that may be distributed to a Participant for a calendar year pursuant to this Section 5.1 shall be reduced by any Excess Contributions (as defined in Section 5.2(b)) previously distributed with respect to the Participant for the Plan Year beginning with or within such calendar year.  In the event of a reduction under this Section 5.1(d), the amount of Excess Contributions included in the gross income of the Participant and reported as a distribution of Excess Contributions shall be reduced by the amount of the reduction under this Section 5.1(d).

(e)    Notwithstanding any other provision of the Plan, to the extent that Excess Elective Deferrals are distributed to a Participant under this Section 5.1, all corresponding Matching Contributions (increased by any income and decreased by any losses attributable thereto), if any, shall be forfeited at the time of such distribution and shall be applied to reduce the Company's future contributions to the Plan.

(f)     Excess Elective Deferrals and income allocable thereto that are distributed to a Participant in accordance with this Section 5.1 shall not be treated as an Annual Addition to the Participant's Combined Accounts for purposes of the limitations set forth in Section 5.4.

**5.2     ADP Limitation**

(a)     Notwithstanding any other provision of the Plan, in each Plan Year, the ADP for the group of eligible HCEs shall satisfy one of the following tests:

(1)     The ADP for the group of eligible HCEs for that Plan Year shall not exceed the ADP for the group of eligible NHCEs for that same Plan Year multiplied by 1.25, or

(2)     The ADP for the group of eligible HCEs for that Plan Year shall not exceed the ADP for the group of eligible NHCEs for that same Plan Year multiplied by 2.0, but not more than 2 percentage points in excess of the ADP for the group of eligible NHCEs.

The determination of whether the Plan satisfies the requirements of this Section 5.2(a) shall be made in accordance with Section 401(k)(3) of the Code and the regulations thereunder (including Section 1.401(k)-1(b) of such regulations), as may be amended from time to time, the provisions of which are hereby incorporated by reference and shall override the provisions of the Plan to the extent inconsistent therewith.  Collectively bargained employees shall be disaggregated for testing purposes as required by Treasury Regulations.

(b)     If, during a Plan Year, it is determined that a HCE's Actual Deferral Ratio would cause the Plan to exceed the maximum permissible ADP specified in Section 5.2(a) above for the Plan Year, then the Plan Administrator may, to the extent necessary to prevent such excess Elective Contributions ("Excess Contributions") from being contributed to the Plan, reduce the Elective Deferral elections of such eligible HCEs in increments of one-tenth of one percent (.10%), commencing with the elections by those HCEs with the highest dollar amount of deferrals.

(c)     In the event that the Plan fails to satisfy the requirements set forth in Section 5.2(a) above for any Plan Year, then the Excess Contributions and any income or loss allocable thereto shall be distributed to the HCEs on whose behalf such Excess Contributions were made, to the extent practicable, within two and one-half months following the Plan Year for which such Excess Contributions were made, but in no event later than the close of the Plan Year following the Plan Year in which such Excess Contributions were made.  The determination of the income and loss allocable to Excess Contributions shall be made in accordance with Section 401(k) of the Code and the regulations thereunder.

(d)     The amount of Excess Contributions attributable to an individual HCE for a Plan Year shall be calculated and distributed according to the following procedures:

(1)    Step 1:  the total dollar amount of Excess Contributions is determined by reducing the Elective Contributions made on behalf of HCEs in the order of their ADPs, beginning with the highest of such percentages and continuing until one of the tests described in Section 5.2(a) is satisfied.

(2)    Step 2:  the amount determined in Step (1) above shall be distributed beginning with the HCE with the highest dollar amount of Elective Contributions to equal the dollar amount of the HCE with the next highest dollar amount of Elective Contributions and continuing in succeeding order of the HCEs until all Excess Contributions are accounted for as determined in Step (1) above.

(e)    The amount of Excess Contributions to be distributed under this Section 5.2 with respect to HCEs for a Plan Year shall be reduced by the amount of Excess Elective Deferrals previously distributed to the HCE for the calendar year ending with or within the Plan Year.

(f)    Notwithstanding any other provision of the Plan, to the extent that Excess Contributions are distributed to a Participant under this Section 5.2, all corresponding Matching Contributions (increased by any income and decreased by any losses attributable thereto), if any, shall be forfeited at the time of such distribution and applied to reduce the Company's future contributions to the Plan.

## 5.3    ACP Limitation

(a)    Notwithstanding any other provision of the Plan, in each Plan Year, the ACP for the group of eligible HCEs shall satisfy one of the following tests:

(1)    The ACP for the group of eligible HCEs shall not exceed the ACP for the group of eligible NHCEs for the Plan Year multiplied by 1.25, or

(2)    The ACP for the group of eligible HCEs shall not exceed the ACP for the group of eligible NHCEs for the Plan Year multiplied by 2.0, but not more than 2 percentage points in excess of the ACP for the group of eligible NHCEs.

The determination of whether the Plan satisfies the requirements of this Section 5.3(a) shall be made in accordance with Section 401(m) of the Code and the regulations thereunder (including, without limitation, Section 1.401(m)-1(b) of such regulations, as may be amended from time to time, the provisions of which are hereby incorporated by reference and shall override the provisions of the Plan to the extent inconsistent therewith. Collectively bargained employees shall be disaggregated for testing purposes as required by Treasury Regulations.

(b)    In the event that the Plan exceeds the limitations set forth in Section 5.3(a) above for any Plan Year, then the excess Matching Contributions ("Excess Aggregate Contributions") and any income or loss allocable thereto shall, to the extent vested (as determined in accordance with Section 4.2 above), be distributed to the HCEs on whose behalf such Excess Aggregate Contributions were made, to the extent practicable, within two and one-half months following the Plan Year for which such Excess Aggregate Contributions

were made, but in no event later than the close of the Plan Year following the Plan Year in which such Excess Aggregate Contributions were made.  To the extent that Excess Aggregate Contributions are not vested, such Excess Aggregate Contributions and any income or loss allocable thereto shall be forfeited and applied to reduce the Company's future contributions to the Plan.  The determination of the income and loss allocable to Excess Aggregate Contributions and the application of forfeited Excess Aggregate Contributions and the income and loss allocable thereto shall be made in accordance with Section 401(m) of the Code and the regulations thereunder.

(c)     The amount of Excess Aggregate Contributions attributable to an individual HCE for a Plan Year shall be calculated and distributed according to the following procedures:

    (1)     Step 1:  the total dollar amount of Excess Aggregate Contributions is determined by reducing the contributions made on behalf of HCEs in the order of their ACPs, beginning with the highest of such percentages and continuing until one of the tests described in Section 5.3(a) is satisfied.

    (2)     Step 2:  the amount determined in Step (1) above shall be distributed, or if such amount is not vested, shall be forfeited, beginning with the HCE with the highest dollar amount of Matching Contributions to equal the dollar amount of the HCE with the next highest dollar amount of Matching Contributions and continuing in succeeding order of the HCEs until all Excess Aggregate Contributions are accounted for as determined in Step (1) above.

**5.4     Maximum Limitations on Annual Additions**

(a)     Notwithstanding any other provision of the Plan to the contrary, Annual Additions credited under the Plan and all other defined contribution plans maintained by the Company or an Affiliate (as aggregated in accordance with the regulations promulgated under Section 415 of the Code) with respect to each Participant for any Limitation Year shall not exceed the lesser of:

    (1)     $49,000, as adjusted from time to time by the Commissioner for increases in the cost of living in accordance with Section 415 of the Code, or

    (2)     100% of the Participant's Compensation for such Limitation Year.

(b)     If the Annual Additions credited under the Plan with respect to a Participant for any Limitation Year exceed the limitations of Section 5.4(a), the correction of any excess Annual Additions shall be in accordance with applicable guidance, including the Employee Plans Compliance Resolution System ("EPCRS") that is issued by the Internal Revenue Service.

(c)     If a Participant also participates in any other defined contribution plan or plans maintained by the Company or an Affiliate which are subject to the limitation set forth in Section 5.4(a) above and, as a result, such limitation would be exceeded with respect to the Participant in any Limitation Year, any reduction or other permissible method necessary to ensure compliance with such limitation first shall be made under such other

plan or plans in accordance with the terms thereof. If, after such correction, a further reduction is necessary to ensure that the limitation set forth in Section 5.4(a) above is not exceeded, Annual Additions credited under the Plan with respect to the Participant shall be reduced in accordance with the provisions of this Section 5.4.

(d)     Reserved.

(e)     The determination of whether the Plan satisfies the requirements of this Section 5.4 with respect to a Participant shall be made in accordance with Section 415 of the Code and the regulations thereunder, the provisions of which are hereby incorporated by reference and shall override the provisions of the Plan to the extent inconsistent therewith.

**5.5     Deduction Limitation**

(a)     In no event shall the contributions for any Plan Year, either separately or when combined with the contributions of the Company under all other qualified retirement plans of the Company, exceed the amount allowable as a deduction for Federal income tax purposes.

(b)     If any contribution required to be made pursuant to Article 3 would cause the limitation of subsection (a) above to be exceeded in any Plan Year, then such contribution shall not be made and, to the extent not made, any Participant's agreement to reduce his cash remuneration in consideration thereof shall be deemed null and void.

## ARTICLE 6:  THE FUND, INVESTMENTS, AND ACCOUNTING

**6.1    Trust Fund**

(a)    The Fund shall be held in trust by one or more Trustees appointed by the Committee under one or more Trust Agreements and shall consist of the contributions of the Company, all investments made therewith and proceeds thereof and all earnings thereon and profits therefrom, less the distributions which at the time of reference have been made by the Trustee.

(b)    No person shall have any right to or interest in the Fund except as provided in the Plan and the Trust Agreements.

(c)    The Fund shall in no event be used for or diverted to purposes other than for the exclusive benefit of Participants and their Beneficiaries (including the payment of the expenses of the administration of the Plan and of the Fund) prior to the satisfaction of all liabilities, except at the Company's request:

(1)    A contribution that is made by the Company by a mistake of fact may be returned to the Company within one year after the payment of the contribution; or

(2)    A contribution that is conditioned upon its deductibility under Section 404 of the Code pursuant to Section 3.5 may be returned to the Company, to the extent that the contribution is disallowed as a deduction, within one year after such disallowance.

**6.2    Investment Funds in the Non-ESOP Component and the ESOP Component**

(a)    Upon direction of the Committee, the portion of the Fund constituting the Non-ESOP Component shall be subdivided into Investment Funds that shall be separately invested. Not less than three of such Investment Funds shall constitute a broad range of investment alternatives, and shall provide a Participant a reasonable opportunity to materially affect the potential return on amounts in such Participant's Combined Accounts and the degree of risk to which such amounts are subject.  One such investment alternative shall be designated as the "Fixed Income Fund" and shall constitute an income producing, low risk, liquid fund, sub-fund or account, as determined by the Committee (or its delegate). Such broad range of investment alternatives shall satisfy the following requirements:

(1)    each shall be diversified,

(2)    each shall have materially different risk and return characteristics,

(3)    all of which, in the aggregate, enable the Participant, by choosing among them, to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the Participant, and

    (4)    each of which, when combined with investments in the other alternatives, tends to minimize through diversification the overall risk to a Participant's portfolio.

(b)    The portion of the Fund constituting the ESOP Component shall be invested primarily in Company Stock.

(c)    Notwithstanding the foregoing, any Investment Fund or the ESOP Component may retain such investments of another nature or cash balances as may be needed in order to effect distributions or to meet other administrative requirements of the Plan.

(d)    Contributions received by the Trustee may be invested in short-term investments pending transfer to an Investment Fund.

(e)    Participants shall designate the portion of their Savings Percentage to be invested in the ESOP Component or the Non-ESOP Component. Effective October 1, 2011, to the extent that a Participant fails to make such a designation, he shall be deemed to have invested his Savings Percentage, including a Savings Percentage established under Section 2.2(g), in the non-ESOP component. Further, if a Participant's Savings Percentage (i) exceeds 6% of Covered Compensation and (ii) is invested partially under the ESOP Component of the Plan and partially under the Non-ESOP Component of the Plan, for purposes of determining the Matching Contribution to which the Participant is entitled under Section 3.1, contributions to the ESOP Component shall be counted first in determining the amount of the Participant's contributions eligible to receive a Matching Contribution.

## 6.3    Participants' Designation of Investment Funds under the Non-ESOP Component

(a)    Each Participant shall be entitled to designate the percentage of his Elective Contributions invested in the Non-ESOP Component that shall be allocated to each Investment Fund in the Non-ESOP Component.

(b)    Each Participant shall be entitled to designate the percentage of any Company contribution under Section 3 to his Non-ESOP Account that shall be allocated to each Investment Fund in the Non-ESOP Component.

(c)    Effective October 1, 2011, a Participant who has no designation in effect under this Section 6.3, including a Participant whose Savings Percentage has been established under Section 2.2(g), shall be deemed to have allocated his entire Non-ESOP Account to the Investment Fund designated by the Committee for this purpose, which Investment Fund shall satisfy the requirements of Section 404(c)(5) of ERISA and the regulations issued thereunder..

(d)    The designation of the allocation of contributions and transfer to the Investment Funds is subject to the procedural rules established by the Plan Administrator from time to time, including the following:

    (1)    Designations and transfers shall be made or changed upon such advance notice, and in such form and manner, as the Plan Administrator shall prescribe by written

rule established and applied on a uniform and nondiscriminatory basis to all Participants similarly situated.

(2)     Designations made under this Section 6.3 shall continue in effect until changed by filing a new designation in accordance with this Section 6.3.

(3)     Any withdrawals or distributions from a Participant's Non-ESOP Accounts in the Fund shall be made among the Investment Funds in proportion to the balance of his interest in each separate Investment Fund as of the Valuation Date coinciding with or immediately following the date of that authorized withdrawal or distribution directions are received by the Trustee from the Plan Administrator.

**6.4     Participants' Designation of Investment in Company Stock**

(a)     Effective as soon as practicable following the Closing Date, each Participant shall be entitled to designate the percentage of his Elective Contributions that shall be invested in Company Stock under the ESOP Component.

(1)     If no Exempt Loan as described in Section 6.12 is outstanding, to the extent a Participant directs his Elective Contributions to be invested under the ESOP Component of the Plan, such contributions shall be accumulated in a short term interest fund in the ESOP Component of the Plan and shall be converted to Company Stock on a semi-annual basis using the Company Stock value as of the Valuation Date preceding or following the conversion (whichever is lower), and shall be allocated to the Participant's ESOP Elective Account. To the extent that the FMV of Company Stock as of the preceding Valuation Date is less than the FMV of Company Stock on the date of purchase, the shares will be treated as though they were purchased as of the preceding Valuation Date and the excess will be considered appreciation on the shares for all purposes of the Plan.

(2)     To the extent necessary to repay interest and principal on an Exempt Loan described in Section 6.12, the Trustee may use Elective Contributions to repay such Exempt Loan, in which case stock from the Suspense Account would be released and allocated to the account of each such Participant making Elective Contributions in an amount not to exceed the amount of such Participant's Elective Contribution. If the amount of stock released from the Suspense Account is less than the amount of stock that would have been acquired under Section 6.4(a)(1) with such Participant's Elective Contribution if no Exempt Loan were outstanding, an amount equal to such difference shall be allocated from other amounts contributed by the Company. If the amount of stock released from the Suspense Account is greater than the amount of stock that would have been acquired under Section 6.4(a)(1) with such Participant's Elective Contribution if no Exempt Loan were outstanding, an amount equal to such difference shall be allocated to an interim account and shall be allocated in the same fashion as other Company contributions, provided that all amounts held in such interim account shall be fully allocated on or before the last day of the Play Year during which the interim account was created.

(b)    Special One-Time Election:

(1)    Prior to the Closing Date, each Participant in the Plan shall have the right to make a one-time irrevocable election to transfer, effective as of the Closing Date, all or a portion of his Non-ESOP Accounts under the Plan (other than his Non-ESOP Loan Account, if any) and/or account balance under the MSP to his ESOP Transfer Account. Such transferred amounts will be invested in stock of PDC Acquisition Corporation, which will become Company Stock immediately after the Closing Date. Any such investment direction shall be made exclusively in accordance with: (A) the terms, conditions, limitations, and restrictions established by the Plan Administrator (which may include nondiscriminatory provisions for allocating the right to purchase Company Stock in the event that the offers to buy such stock exceeds the amount of such stock available), and (B) the provision of this Plan and the MSP, as applicable. An election (or failure to elect) as provided above shall be irrevocable. For the purposes of this investment election, the Participants shall be considered named fiduciaries, as described in Sections 402 and 403 of ERISA.

(2)    Following the effective date of the irrevocable election made by a Participant pursuant to this Section 6.4(b) and the Closing Date, the Participants shall not be able to elect to transfer any portion of their investment in Company Stock held in their ESOP Transfer Accounts, except as provided in Section 6.5.

**6.5    Diversification of ESOP Accounts**

(a)    Each Participant who has attained age 55 years and has at least ten years of participation in the Plan (measured from the date any account was first established for the Participant under the Plan) or the MSP (if the Participant made a transfer from the MSP as described in Section 6.4(b)) (a "Qualified Participant") may elect during each of the Participant's Qualified Election Periods (as defined below) to diversify a portion of the Qualified Participant's ESOP Accounts balance eligible for diversification (as described below), by transferring the applicable amount to one or more Investment Funds under the Non-ESOP Component.

(1)    The portion of a Qualified Participant's ESOP Accounts balance subject to diversification shall equal twenty-five percent (fifty percent in the case of the Qualified Participant's last year of the Qualified Election Period) of the total number of shares of Company Stock allocated to the Participant's ESOP Accounts (including shares that the Participant previously elected to diversify pursuant to this subsection), less the number of such shares previously diversified pursuant to the Qualified Participant's election under this subsection. In any one election, a Qualified Participant may diversify the entire remaining portion of his ESOP Accounts balance eligible for diversification or a part of such diversifiable portion equal to any whole percentage of five percent or more of his ESOP Accounts balance.

(2)    For purposes of this subsection, a "Qualified Election Period" means:  (A) the ninety-day period immediately following the last day of the first Plan Year in which the Participant becomes a Qualified Participant, and (B) the ninety-day period immediately following the last day of each of the five Plan Years immediately following the first Plan Year in which the Participant becomes a Qualified Participant.  Any election made in accordance with subparagraph (A) next above with respect to any Qualified Election Period shall be implemented no later than ninety days after the end of such Qualified Election Period, or as soon as administratively feasible thereafter, and shall be based on the price of the Company Stock as of the most recent Valuation Date.

(3)    The provisions of this subsection shall not apply to any Participant if the value of the Participant's ESOP Accounts (determined as of the regular Valuation Date immediately preceding the first day on which the Participant would otherwise be entitled to make an election under this subsection) is $500 or less.

(4)    Any amounts distributed in cash or transferred from the Company Stock Fund to one or more of the Investment Funds under this subsection shall not be available for distribution in the form of Company Stock (as otherwise allowed under Article 7).

(b)    **Additional Diversification Right**

In each Plan Year a Participant shall have the right to elect to transfer up to 10% of the current value of the Participant's ESOP Account to his Non-ESOP Account ("Additional Diversification Election"), subject to the restrictions contained the Company's then outstanding third party loan agreements, including, without limitation, credit agreements and bond indentures (the "Loan Agreements"). To the extent permitted under the Company's Loan Agreements, Additional Diversification Elections will be implemented in an aggregate amount not to exceed the lesser of (a) twenty-five percent (25%) of the Company's net income from the prior completed four quarters or (b) ten million dollars ($10,000,000) (the "Additional Diversification Limit"). In the event that the Loan Agreements restrict the amount of funds otherwise required to satisfy all Additional Diversification Elections, or the amount of the aggregate Additional Diversification Elections exceeds the Additional Diversification Limit, the Committee shall reduce the amount of amount of each Participant's Additional Diversification Election on a pro rata basis. The amount available for Additional Diversification Elections in any four quarter period will be reduced by any prior Additional Diversification Election payments made during the previous four quarters. For purposes of this Section 6.5(b), "net income" means U.S. GAAP as required for Security Exchange Commission reporting.

**6.6    Reserved**

**6.7    Allocation and Crediting of Employer Contributions**

Subject to the provisions of Article 5, Matching Contributions and Profit Sharing Contributions, made under Article 3, in the form of Company Stock or cash, shall be allocated and credited to the ESOP Accounts or Non-ESOP Accounts, as applicable, of each eligible Participant in

accordance with the provisions of Article 3. Upon the purchase of Company Stock with cash held in a Participant's ESOP Cash Account, an appropriate number of shares of Company Stock shall be credited to the Participant's ESOP Stock Account and the Participant's ESOP Cash Account shall be charged by the amount of the cash used to purchase the Company Stock for the Participant's ESOP Stock Account.

**6.8    Valuation of Investment Funds and Adjustment of Non-ESOP Accounts**

(a)    A Participant's interest in his Non-ESOP Accounts as of any Valuation Date shall consist of the sum of the fair market values of his then interest in each Investment Fund. The Plan Administrator shall maintain a record of the amount to the credit of the Non-ESOP Accounts of each Participant in the Fund and in each Investment Fund.

(b)    The Committee may, for administrative purposes, establish unit values for one or more Investment Funds (or any portion thereof) and maintain the Non-ESOP Accounts setting forth each Participant's interest in such Investment Fund (or any portion thereof) in terms of such units, all in accordance with such rules and procedures as the Committee shall deem to be fair, equitable and administratively practicable. In the event that unit accounting is thus established for any Investment Fund, the value of a Participant's interest in that Investment Fund (or any portion thereof) at any time shall be an amount equal to the then value of a unit in such Investment Fund (or any portion thereof) multiplied by the number of units then credited to the Participant.

(c)    Each Participant's interest in each Investment Fund shall be adjusted as of each Valuation Date to reflect his proportionate share of the total net fair market value of such Investment Fund, based upon his Non-ESOP Account balance in such Investment Fund as of the immediately preceding Valuation Date, as adjusted for subsequent additions thereto and distributions or withdrawals therefrom (including transfers from or to any other Investment Fund), in such manner as the Plan Administrator shall determine in its sole discretion to be fair, equitable, and administratively practicable.

**6.9    Adjustment of ESOP Accounts**

(a)    Participants' ESOP Cash Accounts and ESOP Stock Accounts shall be adjusted as follows:

(1)    The Plan Administrator shall credit to the ESOP Cash Account of each Participant any cash dividends paid to the Trustee on shares of Company Stock held in that Participant's ESOP Stock Account as of a record date. Such cash dividends shall be used to purchase shares of Company Stock. The Plan Administrator shall credit an appropriate number of shares of Company Stock to the ESOP Stock Account of such Participant, and the Participant's ESOP Cash Account shall then be charged by the amount of cash used to purchase such Company Stock for the Participant's ESOP Stock Account. For the purposes of this Plan, the term "dividends" shall include both dividends as described in Section 316 of the Code and all distributions made with respect to the shares of stock of an S corporation.

(2)    As of each Valuation Date, before the allocation of any Elective Contributions, Matching Contributions or Profit Sharing Contributions under Article 3 made in cash to be invested in Company Stock as of such date, any appreciation, depreciation, income, gains or losses in the fair market value of the Participants' ESOP Cash Accounts shall be allocated among and credited to the ESOP Cash Accounts of Participants, pro rata, according to the amount of such contributions.

As of each Valuation Date, before the allocation of any Elective Contributions, Matching Contributions or Profit Sharing contributions under Article 3 made in Company Stock as of such date, any appreciation, depreciation, income, gains, or losses in the fair market value of the Participants' ESOP Stock Accounts shall be allocated among and credited to the ESOP Stock Accounts of Participants, pro rata, according to the number of shares of Company Stock allocated to each Participant's ESOP Stock Account.

(3)    For purposes of the Plan and Trust, the FMV of Company Stock shall be determined by an Independent Appraiser, as of each Valuation Date, in accordance with the terms of the Trust and the provisions of Section 3(18) of ERISA.

(b)    Shares of Company Stock received by the Trustee that are attributable to stock dividends, stock splits or to any reorganization or recapitalization of the Company shall be credited to the Participants' ESOP Stock Accounts so that the interests of Participants immediately after any such stock dividend, split, reorganization or recapitalization are the same as such interests immediately before such event.

(c)    ESOP Share Records. The Plan Administrator shall maintain or cause to be maintained records as to the number and cost of shares of Company Stock acquired or transferred by or within the Trust in accordance with the applicable provisions of this Section 6.

## 6.10    Former Participants and Beneficiaries

(a)    A Former Participant or Beneficiary who is entitled to installment or other deferred distribution of any interest in the Fund shall be entitled to designate the portion of the Non-ESOP Accounts to be allocated to each Investment Fund in the same manner as prescribed above, as if he were a Participant.

(b)    Such interest in the Fund shall continue to be adjusted in accordance with the provisions of this Article 6 as if the Former Participant or Beneficiary were still a Participant until distribution thereof is completed.

## 6.11    Participant Loans

(a)    A Participant who is an Employee ("Borrower") may apply to the Plan Administrator to borrow from the vested portion of the Borrower's ESOP and Non-ESOP Accounts (other than the portion of such Accounts attributable to Mandatory Profit Sharing Contributions) in the Fund, and the Plan Administrator may direct the Trustee to permit such a Participant Loan distribution. Any such application must be accompanied by a reasonable

origination fee established by the Plan Administrator and charged to all Borrowers on a uniform basis. Participant Loans shall be made in accordance with the terms, conditions, limitations, and restrictions established by the Committee and the rules of this Plan and shall be available to all eligible Participants on a reasonably equivalent basis. Participant Loans shall not be made available to HCEs, officers or shareholders in an amount greater than is made available to other Borrowers.

(b)     The following terms and conditions shall apply to Participant Loans:

| For Participant Loan Amounts of: | The Maximum Participant Loan Value Available Is: | Participant Loans are Permitted Solely For: |
|---|---|---|
| $1,000 - $10,000 | 50% of the balance in the Plan Component (ESOP or Non-ESOP) (other than the portion of such Accounts attributable to Mandatory Profit Sharing Contributions) from which the Participant Loan is requested. | No restrictions. |
| $10,001 - $25,000 | 50% of the balance in the Plan Component (ESOP or Non-ESOP) (other than the portion of such Accounts attributable to Mandatory Profit Sharing Contributions) from which the Participant Loan is requested. | Payment of expenses described in Section 7.9(b). |

(c)     All such Participant Loans also shall be subject to the following terms and conditions:

(1)     A Participant Loan may be made in an amount (not less than $1,000) which, when added to the total outstanding balance of all prior Participant Loans to the Borrower under the Plan and loans from other plans of the Company and its Related Companies, does not exceed the lesser of:

(A)     $50,000 reduced by the excess, if any, of:

(i)     the highest total outstanding balance of Participant Loans and other loans from such plans during the one-year period ending on the day before the date such Participant Loan was made, over;

(ii)    the total outstanding balance of Participant Loans and other loans from such plans on the date on which such Participating Loan was made; or

(B)     one-half of the present value of the Borrower's non-forfeitable accrued benefit under the Plan.

(2)     Each Participant Loan shall be evidenced by a promissory note. All Participant Loans, other than Principal Residence Loans (as defined below), shall be amortized in substantially level payments, made not less frequently than quarterly,

for a period of not less than one (1) year and not more than five (5) years. Principal Residence Loans shall be amortized in substantially level payments, made not less frequently than quarterly, for a period of not less than one (1) year and not more than fifteen (15) years. For this purpose, a Principal Residence Loan is a loan that is made to a Participant to acquire any dwelling unit that, within a reasonable time, is to be used (determined at the time the Principal Residence Loan is made) as the principal residence of the Participant. A Borrower requesting a Principal Residence Loan for a term extending beyond five (5) years shall provide copies of any documents relating to the purchase of such principal residence that the Plan Administrator may deem necessary to verify that the proceeds of such Principal Residence Loan will be used as specified above.

(3)     A Participant Loan shall be adequately secured by the Borrower's vested ESOP or Non-ESOP Account balances (as applicable) in the Plan.

(4)     A Participant Loan shall bear a reasonable rate of interest, as established by the Plan Administrator, which provides a return commensurate with the interest rates charged by persons in the business of lending money for loans that would be made under similar circumstances.

(5)     Repayment will be made by means of payroll deductions from the Borrower's salary. A Borrower may repay an outstanding Participant Loan in full at any time without penalty.

(6)     A Participant Loan may be taken out no more than once in any twelve-month period from each Component of the Plan and a Borrower may have no more than one Participant Loan outstanding from each Component (ESOP and Non-ESOP) of the Plan at any one time; provided, however, that the foregoing restrictions of no more than one Participant Loan shall not apply to Participant Loans originated prior to the Closing Date. Notwithstanding the foregoing, in no event shall a Borrower who has prepaid a Participant Loan be permitted to receive another Participant Loan from the Plan for three (3) months from the date of such prepayment.

(7)     A Participant must take a Participant Loan from the Non-ESOP Component of the Plan before taking a Participant Loan from the ESOP Component of the Plan. Requests for Participant Loans from the ESOP Component may be submitted at any time; provided, however that such requests will be processed twice a year, as soon as administratively feasible after the Company Stock has been valued.

(8)     A reasonable annual administrative fee may be charged each year that a Participant Loan is outstanding.

(9)     A Participant Loan shall become immediately due and payable in full upon a Borrower's Retirement, death, separation from service due to Disability or termination of employment. If the Participant Loan is not paid in full within 30 days of the occurrence of any one of the foregoing events, the Plan Administrator

shall foreclose on the Participant Loan in order to collect the full remaining outstanding Participant Loan balance or shall make such other arrangements with the Borrower as the Plan Administrator deems appropriate. Upon default, an actual reduction of the Borrower's Elective Account or ESOP Elective Account under the Plan shall not be effected until occurrence of a distributable event under Section 401(k)(2)(B) of the Code, and no rights against the Borrower or the security for such Participant Loan shall be deemed waived by the Plan as a result of such delay.

(10)    Interest on and repayments of the principal of a Participant Loan shall be allocated to the Component (ESOP or Non-ESOP) from which the Participant Loan was made and, within such Component, shall be invested in the same manner as Elective Contributions. Loan repayments made to the ESOP Component will be deposited into a cash fund and, following the semi-annual Valuation Date, cash is used to purchase Company Stock, which is then reallocated to the Borrower's account. The dollar amount repaid, plus accrued interest, is applied to purchase Company Stock at the price in effect on the Valuation Date preceding or following the date the repayment is received (whichever is lower).

(d)    Proceeds for a Participant Loan under the Non-ESOP Component of the Plan shall be made in proportion to the balance of his interest in each separate Investment Fund as of the Valuation Date coinciding with or immediately following the date that authorized Participant Loan processing directions are received by the Trustee from the Plan Administrator.

(e)    All requests for Participant Loans from the ESOP Component submitted during a Valuation Period will be held until after the Committee calculates the aggregate requests and determines the amount available for distributions, diversifications and Participant Loans. Participant Loan requests from the ESOP Component will be processed in aggregate amounts not to exceed five hundred thousand dollars ($500,000) during a Valuation Period. The Participant's Company Stock Account shall be liquidated to the extent required to fund the approved loan amount. The Company shall purchase the Company Stock used to fund Participant Loans based on the FMV of Company Stock as of the purchase date. In the event that the Loan Agreements restrict the amount of funds otherwise required to satisfy all Participant Loan requests, or the amount of the aggregate Participant Loan requests exceeds the five hundred thousand dollar ($500,000) limit, the Committee shall reduce the amount of amount of each Participant Loan request on a pro rata basis.

(f)    The Plan Administrator may adopt administrative procedures with respect to Participant Loans made pursuant to this Section 6.11, provided that such procedures do not conflict with the terms of the Plan or applicable law.

**6.12    Exempt Loans**

(a)    The Committee may direct the Trustee to obtain an Exempt Loan and use the proceeds of such Exempt Loan either to purchase Company Stock or to repay interest and/or principal on a prior Exempt Loan. Any such Exempt Loan shall meet all requirements necessary to constitute an "exempt loan" within the meaning of Section 54.4975-7(b)(1)(iii) of the Treasury Regulations and shall be used primarily for the benefit of the Participants (and their Beneficiaries). The number of years to maturity under the Exempt Loan must be definitely ascertainable at all times. The Exempt Loan may not be payable at the demand of any person, except in the case of default. In the event of default upon the Exempt Loan, the value of Plan assets transferred in satisfaction of the Exempt Loan must not exceed the amount of the default, and if the lender is a Disqualified Person, the Exempt Loan must provide for transfer of Plan assets upon default only upon and to the extent of the failure of this Plan to meet the payment schedule of the Exempt Loan. The proceeds of any such Exempt Loan shall be used, within a reasonable time after the Exempt Loan is obtained, only to purchase Company Stock, repay the Exempt Loan, or repay any prior Exempt Loan. Any such Exempt Loan shall provide for no more than a reasonable rate of interest, as determined under Section 54.4975-7(b)(7) of the Treasury Regulations and must be without recourse against the Plan except as hereinafter provided. The payment made with respect to an Exempt Loan by this Plan during a Plan Year must not exceed an amount equal to the sum of such contributions and earnings received during or prior to the year less such payments in prior years. The contributions and earnings shall be accounted for separately on the books of the ESOP until the Exempt Loan is repaid.

At the time that an Exempt Loan is made, the interest rate for such Exempt loan and the price of the Company Stock acquired by such Exempt Loan should not be such that Plan assets might be drained off. The only assets of the Plan that may be given as collateral for an Exempt Loan are shares of Company Stock acquired with the proceeds of the Exempt Loan and shares of Company Stock that were used as collateral on a prior Exempt Loan repaid with the proceeds of the current Exempt Loan. All such Company Stock acquired with the proceeds of an Exempt Loan, whether or not pledged, shall be placed in the Suspense Account. No person entitled to payment under an Exempt Loan shall have recourse against assets of the Plan other than such shares in the Suspense Account pledged as collateral, Company contributions and Elective Contributions that are available under the Plan to meet obligations under the Exempt Loan, and earnings attributable to such collateral and such Company contributions and Elective Contributions. Any pledge of Company Stock must provide for the release of shares so pledged, as provided below, upon the payment of any portion of the Exempt Loan.

For each Plan Year during the duration of the Exempt Loan, the number of shares of Company Stock released from the Suspense Account shall be determined by multiplying the number of encumbered securities held immediately before release for the current Plan Year by a fraction, the numerator of which shall be the amount of principal and interest paid for the year and the denominator of which is the sum of the numerator plus the principal and interest to be paid on the Exempt Loan for all future years, or by any other method permitted by the Code or regulations promulgated thereunder. Such years will be determined without taking into account any possible extension or renewal periods. In the

event such interest is variable, the interest to be paid in future years must be computed by using the interest rate applicable as of the end of the Plan Year.

The Committee may, in its discretion, elect at the time an Exempt Loan is entered into, in lieu of the provision in the preceding paragraph providing for the release of Company Stock from the Suspense Account on the basis of principal and interest paid during the Plan Year, to release Company Stock from the Suspense Account solely with reference to principal payments only, subject to the requirements imposed by Section 54.4975-7, of the Treasury Regulations specifically including the following three rules as provided in Section 54.4975-7(b)(8)(ii) of the Treasury Regulations:

    (1)    The Exempt Loan must provide for annual payments of principal and interest at a cumulative rate that is not less rapid at any time than level annual payment of such amount for 10 years;

    (2)    Interest included in any payment is disregarded only to the extent it would be determined to be interest under standard loan amortization tables; and

    (3)    These special rules are not applicable from the time that, by reason of a renewal, extension or refinancing of an Exempt Loan, the sum of the expired duration of the Exempt Loan, the renewal period, the extension period and the duration of the new Exempt Loan exceeds ten 10 years.

The Committee reserves the right to extend or reduce the maturity of any Exempt Loan, whether by amendment or refinancing, or to otherwise alter the amortization and level of debt service of an Exempt Loan. The amortization schedule of each Exempt Loan shall not establish any right on the part of any Participant to the timing of the release of shares of Company Stock from the Suspense Account or the allocation of such shares to any Participant's ESOP Account.

    (b)    All Company contributions and Elective Contributions paid in cash during the Plan Year in which an Exempt Loan is incurred (whether before or after the date the proceeds of the Exempt Loan are received), all Company contributions and Elective Contributions paid thereafter in cash, all earnings attributable to such Company contributions and Elective Contributions, all proceeds of the sale of any Company Stock held in the Suspense Account, and all cash distributions paid to the Plan with respect to Company Stock held in the Plan, or other permissible earnings on such Company Stock, may be available to meet obligations under the Exempt Loan, until the Exempt Loan has been repaid in full. Payments of principal and interest on any such Exempt Loan during a Plan Year shall be made by the Trustee (as directed by the Committee) only from (1) Company contributions paid in cash, and earnings from such Company contributions made to the Plan to meet the Plan's obligation under an Exempt Loan and from any earnings attributable to Company Stock held in the Suspense Account during the Plan Year; (2) the proceeds of a subsequent Exempt Loan made to repay a prior Exempt Loan; (3) cash distributions paid to the Plan with respect to Company Stock held in the Plan; and (4) Elective Contributions.

(c)    In the event that Company contributions and Elective Contributions, by reason of the limitations in Section 5.4, are insufficient to enable the Trust to pay principal and interest on such Exempt Loan as it is due, the Company shall make an Exempt Loan to the Trust, as described in Section 54.4975-7(b)(4)(iii) of the Treasury Regulations, in sufficient amounts to meet such principal and interest payments. Such new Exempt Loan shall also meet all requirements of an "exempt loan" within the meaning of Section 54.4975-7(b)(1)(iii) of the Treasury Regulations. Company Stock released from the pledge of the prior Exempt Loan shall be pledged as collateral to secure the new Exempt Loan. Such Company Stock shall be released from this new pledge and allocated to the ESOP Accounts of the Participants in accordance with the applicable provisions of the Plan.

To the extent permitted by law, if cash dividends on allocated Company Stock held in a Participant's Company Stock Account are to be used to repay an Exempt Loan, Company Stock at least equal in value to the cash dividends used to make Exempt Loan payments shall be allocated to such Participant's Company Stock Account. If cash Dividends on Company Stock held in a Participant's Company Stock Accounts and cash Dividends on Company Stock held in the Suspense Account are not used to repay an Exempt Loan, such Dividends will be allocated to the Participant's ESOP Cash Account pursuant to Section 3.2.

## 6.13   Right of First Refusal

Shares of Company Stock distributed by the Trustee to a Participant may be subject to a "right of first refusal." Such shares must not be publicly traded at the time the right is exercised. Such a "right" shall provide that prior to any subsequent transfer, the shares shall first be offered in writing to the Plan and then, if refused by the Plan, to the Company at a price equal to the greater of (1) the then fair market value of such shares of Company Stock as determined in good faith by the Committee from time to time, or (2) the purchase price offered by a buyer, other than the Company or Trustee, making a good faith arms-length (as determined by the Committee) offer to purchase such shares of Company Stock. The Plan or the Company, as the case may be, may accept the Participant's offer as to part or all of the Company Stock at any time during a period not exceeding fourteen (14) days after receipt of such offer by the Trust, or the offer will lapse. The terms and conditions of the offer must be no less favorable to the Participant than those offered by the independent third party buyer. A Participant (or the Participant's Beneficiary) entitled to a distribution of Company Stock may be required to execute an appropriate stock transfer agreement (evidencing the right of first refusal) prior to receiving a certificate for Company Stock. No right of first refusal shall be exercisable by reason of any of the following transfers:

(a)    The transfer upon disposition of any such shares by any legal representative, heir or legatee, but the shares shall remains subject to the right of first refusal; or

(b)    The transfer while Company Stock is listed on a national securities exchange registered under Section 6 of the Securities Exchange Act of 1934 or quoted on a system sponsored by a national securities association registered under Section 15A(b) of the Securities Exchange Act of 1934.

**6.14    Put Option**

If shares of Company Stock acquired with the proceeds of an Exempt Loan by the Trust are not publicly traded within the meaning of Section 54.4975-7(b)(1)(iv) of the Treasury Regulations or, if publicly traded, are subject to a trading limitation (a "trading limitation" on a security is a restriction under any federal or state securities law, any regulation thereunder, or an agreement affecting the security which would make the security not as freely tradable as one not subject to such restriction), they shall be subject to a "put" option at the time of distribution.  The "put" option shall be exercisable by the Participant or Beneficiary, by the donees of either, or by a person (including an estate or its distributee) to whom the Company Stock passes by reason of the Participant's or Beneficiary's death.  The "put" option shall provide that for a period of at least 60 days immediately following the date the shares are distributed to the holder of the option, the holder of the option shall have the right to cause the Company, by notifying it in writing, to purchase such shares at their fair market value, as determined by the Committee.  If the "put" option is not exercised within such 60-day period, the holder of the option shall have the right to sell such shares at their fair market value for an additional period of at least 60 days in the following year, beginning as soon as practicable following the December 31 Valuation Date. The period during which the "put" option is exercisable shall not include any period during which the holder is unable to exercise such "put" option because the Company is prohibited from honoring it by federal or state law.  The terms of payment for the purchase of such shares of Company Stock shall be set forth in the "put" option.  Such "put" option may provide that if a Participant or Beneficiary exercises the option, the Company, or the Plan if the Plan so elects, will repurchase the Company Stock in five (5) substantially equal annual payments, with the first such installment paid no later than thirty (30) days after exercise of the "put" option.  The Company or the Trust, as the case may be, shall pay a reasonable rate of interest and provide adequate security on amounts not paid after thirty (30) days.  The protections afforded Participants by this Section 6.14 are non-terminable.

**6.15    Share Legend; Other Restrictions**

Shares of Company Stock held or distributed by the Trustee may include such legend restrictions on transferability as the Company may reasonably require in order to assure compliance with applicable Federal and state securities laws.

The provisions of Sections 6.13, 6.14 and 6.15 herein are nonterminable and shall continue to be applicable to shares of Company Stock even if the Plan ceases to be an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code.

## ARTICLE 7:  DISTRIBUTION

**7.1    Distribution Options for Participants who Retire or Incur a Disability**

Upon the Retirement or Disability of a Participant, the entire amount to the credit of his Combined Accounts in the Fund shall be eligible to be distributed to him in accordance with his written election made pursuant to the following:

(a)    **Non-ESOP Accounts**

A Participant who Retires or becomes Disabled may elect, on a form prescribed by the Plan Administrator, to receive distribution of the portion of his Non-ESOP Accounts in a form that provides for:

(1)    payment in an immediate lump sum;

(2)    payment in a deferred lump sum after Retirement or Disability;

(3)    payment in immediate or deferred monthly, quarterly or annual installments over a fixed period or based upon a fixed payment schedule; or

(4)    payment in intermittent installments.

(b)    **ESOP Accounts**

Unless the Participant elects a longer period, distributions of ESOP Accounts following a Participant's Disability or Retirement will be made, as determined by the Plan Administrator in a uniform and non-discriminatory manner, in a single lump sum or in a series of monthly, quarterly, semiannual, or annual installments to be paid no less rapidly than substantially equal annual installments over a period of not longer than five (5) years.  In the case of a Participant with ESOP Accounts attributable to Company Stock in excess of $1,035,000, the five (5) year period shall be extended one (1) additional year (but not more than five (5) additional years) for each $205,000 or fraction thereof by which such balance exceeds $1,035,000.  These dollar limits shall be adjusted at the same time and in the same manner as provided in Code Section 415(d).

(c)    **Additional Rules**

(1)    Any payments made under Section 7.1 shall commence as soon as practicable after the date such form is received by the Plan Administrator.

(2)    Upon the death of a Former Participant, any remaining balances in his Combined Accounts, including unpaid installments, shall be distributed as provided in Section 7.2.

(3)    An election to receive installment distributions as described in subsection (a)(3) above may be commuted into a single sum payment at any time by the Participant or Beneficiary, as applicable, upon written notice to the Plan Administrator.

## 7.2    Distribution Options Upon Death

Upon the death of a Participant prior to his Retirement or other termination of employment with the Company or a Related Company, or upon the death of a Former Participant prior to the complete distribution of his Combined Accounts, the Participant's Beneficiary may elect to have the Participant's Combined Account distributed as soon as practicable in accordance with Section 7.1(a) as relates the Participant's Non-ESOP Account, and in accordance with Section 7.2(b) as relates to the Participant's ESOP Account.  Notwithstanding any provision of the Plan to the contrary, effective on and after January 1, 2007, if a Participant dies while performing qualified military service for a period longer than thirty (30) days, such Participant shall be treated as if he had resumed employment on the day prior to his death and then terminated employment due to death for purposes of determining the method pursuant to which such Participant's Combined Account balance shall be distributed to his Beneficiary.

## 7.3    Distribution Options Upon Termination of Employment/Permanent Layoff

(a)    Upon the termination of employment of a Participant for any reason other than Retirement, Disability or death:

(1)    **Non-ESOP Accounts**

The Participant may elect, on a form prescribed by the Plan Administrator, to receive distribution of the portion of his Non-ESOP Accounts in a form that provides for: (a) payment in an immediate lump sum; (b) payment in an immediate or deferred monthly, quarterly or annual installments over a fixed period or based upon a fixed payment schedule; or (c) payment in intermittent installments.

(2)    **ESOP Accounts**

(A)    The entire amount to the credit of the Participant's ESOP Transfer Account shall be eligible to be distributed to him, in accordance with Section 7.1(b), as soon as practicable after his termination of employment.

(B)    The vested amount to the credit of the Participant's ESOP Accounts (other than his ESOP Transfer Account), shall be eligible to be distributed, in accordance with Section 7.1(b), within a reasonable time following the close of the Plan Year which is the fifth Plan Year following the Plan Year in which the Participant terminated employment.

(b)    For purposes of Section 7.3(a), a termination of employment of a Participant shall include a sale of all or substantially all of the assets used by the Company or an Affiliate in a trade or business or the sale of the Company's or an Affiliate's interest in a subsidiary

that results in the Participant's termination of employment with the Company or an entity that constitutes an Affiliate.

## 7.4    Form of Distributions

Distributions from the Participants' Non-ESOP Accounts shall be made in cash.  Distributions from the Participants' ESOP Accounts shall be made in shares of Company Stock; provided, however, if the Company's charter or bylaws restrict ownership of substantially all of the outstanding Company Stock to Employees and the Trust or if the Company has elected to be taxed as an S corporation under Section 1361 of the Code, the Participants' ESOP Accounts will be distributed in cash or in Company Stock as determined by the Plan Administrator in a uniform and non-discriminatory manner, subject to a requirement that any shares of Company Stock so distributed must be sold to the Company immediately upon distribution.

## 7.5    Forfeitures

(a)    Any unvested portion of a Participant's Combined Account shall be forfeited as of the last day of the Plan Year in which the Participant first incurs five (5) consecutive one-year Periods of Severance or the date the Participant receives a cash-out distribution under Section 411(a)(7)(B) of the Code.

(b)    If a Participant who is less than 100% vested in his Combined Account ceases to be an Employee and, as a result, receives a distribution from the Plan in an amount that is less than the present value of the Participant's accrued benefit under the Plan, the portion of the Participant's Combined Account that was forfeited pursuant to paragraph 7.5(a) above shall be restored to the Participant's ESOP Accounts or Non-ESOP Accounts, as applicable, if the Participant is re-employed by the Company or a Related Company prior to incurring five consecutive Periods of Severance and repays to the Plan the full amount of such distribution prior to the occurrence of the earlier of 5 years after the first date on which the Participant is subsequently re-employed; or the date the Participant incurs 5 consecutive one-year Periods of Severance.  Such reinstatement shall be provided by an additional contribution by the Company for the Plan Year in which such reinstatement occurs.

(c)    If a Participant incurs five consecutive one-year Periods of Severance, the vested portion of the Participant's Combined Account attributable to service prior to such Periods of Severance shall not be increased as a result of any service after such Periods of Severance.

(d)    Notwithstanding the other provisions of this Section, Company Stock shall be forfeited only after other assets in a Participant's Combined Accounts have been forfeited. If more than one class of Company Stock subject to the Exempt Loan provisions of the Plan has been allocated to a Participant's Combined Account, the Plan must forfeit the same proportion of each class.

### 7.6    Amount of Distribution

After a Participant's Date of Severance has occurred, and pending complete distribution of the Participant's Combined Account balances, the Participant's Combined Accounts will be held under the Plan and will be subject to adjustment under Article 6.

The amount of any distribution to be made based on the value of an entire Participant's Combined Account, or a portion thereof, shall be determined with reference to the value of such Combined Account (or portion thereof) as of the Valuation Date coinciding with or immediately preceding the date that authorized distribution directions are received by the Trustee from the Plan Administrator.

### 7.7    Participant's Right to Consent to Distributions

(a)    For the period commencing on the Date of Severance and ending on the date a Participant attains normal retirement age (determined in the same manner as the determination of whether a Participant has retired), if a Participant's vested Combined Account balance exceeds $5,000 at all times during such period, no portion of his Combined Accounts may be distributed to him without his written consent before he attains normal retirement age (determined in the same manner as the determination of whether a Participant has retired). Failure to provide consent within thirty (30) days following solicitation of such consent by the Plan Administrator shall be deemed to be an election to defer such distribution to as soon as practicable following the earliest to occur of the Participant's attainment of normal retirement age, the date on which the Committee receives notice of the Participant's death, or the date on which the Participant gives such consent.

(b)    For the period commencing on the Date of Severance and ending on the date a Participant attains normal retirement age (determined in the same manner as the determination of whether a Participant has retired), if a Participant's vested Combined Account balance is $5,000 or less, the Participant will receive a distribution of the value of the entire vested portion of such Combined Account balance and the non-vested portion will be treated as a forfeiture. For this purpose, if the value of a Participant's vested Combined Account balance is zero, the Participant shall be deemed to have received a distribution of such vested Combined Account balance immediately upon his Date of Severance.

(c)    In the event of a mandatory distribution greater than $1,000 payable in accordance with the provisions of Section 7.7(b), if the Participant does not elect to have such distribution paid directly to an eligible retirement plan specified by the Participant in a direct rollover or to receive the distribution directly, then the distribution will be paid in a direct rollover to an individual retirement plan designated by the Plan Administrator.

### 7.8    Time When Distributions Must Commence; Length of Distribution Period

(a)    Unless a Participant elects otherwise, distributions shall commence not later than the 60th day following the close of the Plan Year in which the latest of the following occurs: (1) the Participant attains normal retirement age (as described in Section 401(a)(14) of the Code); (2) the tenth anniversary of the date on which the Participant commenced

participation under this Plan; or (3) the Participant terminates employment with the Company, Related Company and all Affiliates.

(b)    The requirements of this Section 7.8(b) shall take precedence over any inconsistent provisions of the Plan. All distributions required under this Section 7.8(b) shall be determined and made in accordance with Section 401(a)(9) of the Code and the regulations thereunder. Notwithstanding the other provisions of this Section, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act ("TEFRA") and the provisions of the Plan that relate (or did relate) to Section 242(b)(2) of TEFRA.

(1)    The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's required beginning date, as set forth in Section 7.8(b)(6)(E). A Participant's distribution under this Section 7.8(b) shall come from the Non-ESOP Component first and then only to the extent necessary from the ESOP Component. To the extent made from the Non-ESOP Component, such distributions shall be taken from the Investment Funds in which the Participant's Elective Account is invested on a pro rata basis.

(2)    If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(A)    If the Participant's surviving spouse is the Participant's sole Designated Beneficiary, then distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70½, if later.

(B)    If the Participant's surviving spouse is not the Participant's sole Designated Beneficiary, then distributions to the Designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(C)    If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(D)    If the Participant's surviving spouse is the Participant's sole Designated Beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this Section 7.8(b)(2), other than Section 7.8(b)(2)(A), will apply as if the surviving spouse were the Participant.

(E)    For purposes of this Section 7.8(b)(2) and Section 7.8(b)(5), unless Section 7.8(b)(2)(D) applies, distributions are considered to begin on the Participant's required beginning date. If Section 7.8(b)(2)(D) applies,

distributions are considered to begin on the date distributions are required to begin to the surviving spouse under Section 7.8(c)(2)(A).

(3)     Unless the Participant's interest is distributed in a single sum on or before the required beginning date, as of the first Distribution Calendar Year distributions will be made in accordance with Section 7.8(b)(4) and 7.8(b)(5) of this Section 7.8(b).

(4)     Required minimum distributions during a Participant's lifetime shall be determined according to the following:

   (A)     During the Participant's lifetime, the minimum amount that will be distributed for each Distribution Calendar Year is the lesser of:

      (i)     the quotient obtained by dividing the Participant's Combined Account Balance by the distribution period in the "uniform lifetime table" set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

      (ii)     if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's spouse, the quotient obtained by dividing the Participant's Combined Account Balance by the number in the "joint and last survivor table" set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the Distribution Calendar Year.

   (B)     Required minimum distributions will be determined under this Section 7.8(b)(4) beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

(5)     Required minimum distributions after the Participant's death shall be determined in accordance with the following:

   (A)     If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Combined Account Balance by the longer of the remaining Life Expectancy of the Participant or the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as follows:

      (i)     The Participant's remaining Life Expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

    (ii)    If the Participant's surviving spouse is the Participant's sole Designated Beneficiary, the remaining Life Expectancy of the surviving spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For Distribution Calendar Years after the year of the surviving spouse's death, the remaining Life Expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

    (iii)    If the Participant's surviving spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining Life Expectancy is calculated using the age of the Designated Beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(B)    If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Combined Account Balance by the Participant's remaining Life Expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(C)    If the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's Combined Account Balance by the remaining Life Expectancy of the Participant's Designated Beneficiary, determined as provided in Section 7.8(b)(5)(A).

(D)    If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(E)    If the Participant dies before the date distributions begin, the Participant's spouse is the Participant's sole Designated Beneficiary, and the surviving spouse dies before distributions are required to begin to the surviving spouse under Section 7.8(b)(2)(A), this Section 7.8(b)(5)(E) shall apply as if the surviving spouse were the Participant.

(6)    For purposes of this Section 7.8(b), the terms listed below shall be defined as follows:

(A)     Designated Beneficiary.    The individual who is designated as the Beneficiary in accordance with Section 1.8 and is the designated Beneficiary under Section 401(a)(9) of the Code and Section 1.401(a)(9)-4 of the Treasury Regulations.

(B)     Distribution Calendar Year.    A calendar year for which a minimum distribution is required.  For distribution calendar years beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's required beginning date.  For distributions beginning after the Participant's death, the first distribution calendar year is the calendar in which distributions are required to begin under Section 7.8(b)(2).  The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's required beginning date.  The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's required beginning date occurs, will be made on or before December 31 of the distribution calendar year.

(C)     Life Expectancy.    Life expectancy as computed by use of the "single life table" in Section 1.401(a)(9)-9 of the Treasury Regulations.

(D)     Participant's Combined Account Balance.    The Combined Account balance as of the last valuation date in the calendar year immediately preceding the Distribution Calendar Year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the Combined Account balance as of the dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The Combined Account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan in the valuation calendar year or in the Distribution Calendar Year if distributed or transferred in the valuation calendar.

(E)     Required Beginning Date.  April 1 of the calendar year next following the later of: (i) the calendar year in which the Participant attains age 70½ or (ii) the calendar year in which the Participant's Date of Severance occurs ("Required Commencement Date"); provided, however, that the Required Commencement Date of a Participant who is a five-percent owner (as defined in Section 416 of the Code) of the Company or a Related Company is the calendar year in which the Participant attains age 70½.

## 7.9    Hardship

(a)     A Participant may apply in writing to the Plan Administrator for a distribution, due to financial hardship, of all or a part of the Participant's Elective Account and ESOP

Elective Account, excluding earnings thereon, and all or a part of the Participant's Rollover Account (a "Hardship Distribution"). A Hardship Distribution shall be made only if such distribution is necessary to alleviate an immediate and heavy financial need of the Participant as determined in accordance with Section 7.9(b) below, and is necessary to satisfy such financial need as determined in accordance with Section 7.9(c) below. The determination by the Plan Administrator of the existence of an immediate and heavy financial need and of the amount necessary to meet such need shall be made in a nondiscriminatory and uniform manner. The Plan Administrator shall not allow a Hardship Distribution to be made to a Participant unless the requirements of this Section 7.9 are satisfied.

(b)     The determination by the Plan Administrator of whether a Participant has an immediate and heavy financial need is to be made on the basis of all the relevant facts and circumstances, and must be for one of the reasons specified in subsections (1) – (6) below (and may include any amounts necessary to pay any federal, state or local income taxes or penalties reasonably anticipated to result from the distribution). A financial need shall not fail to qualify as immediate and heavy merely because such need was reasonably foreseeable or voluntarily incurred by the Participant. To receive a Hardship Distribution, a Participant must submit a completed application form provided by the Plan Administrator, any additional written documentation necessary to establish to the satisfaction of the Plan Administrator that such distribution is for:

(1)     Expenses for (or necessary to obtain) medical care that would be deductible under Section 213(d) of the Code (determined without regard to whether the expenses exceed 7.5% of adjusted gross income);

(2)     Costs directly related to the purchase of a principal residence for the Employee (excluding mortgage payments);

(3)     Payment of tuition, related educational fees, and room and board expenses, for up to the next 12 months of post-secondary education for the Employee, or the Employee's spouse, children, or dependents (as defined in Section 152 of the Code, without regard to Sections 152(b)(1), (b)(2) and (d)(1)(B) of the Code); or

(4)     Payments necessary to prevent the eviction of the Employee from the Employee's principal residence or foreclosure on the mortgage on that residence;

(5)     Payments for burial or funeral expenses for the Employee's deceased parent, spouse, children or dependents (as defined in Section 152 of the Code, without regard to Section 152(d)(1)(B) of the Code); or

(6)     Expenses for the repair of damage to the Employee's principal residence that would qualify for the casualty deduction under Section 165 of the Code (determined without regard to whether the loss exceeds 10% of adjusted gross income).

(c)     A Hardship Distribution made pursuant to this Section 7.9 will be deemed to be necessary to satisfy an immediate and heavy financial need of a Participant only if:

(1)     the distribution is not in excess of the amount of the Participant's immediate and heavy financial need (including any amounts necessary to pay any federal, state or local income taxes or penalties reasonably anticipated to result from such distribution); and

(2)     the Participant has obtained all distributions (other than Hardship Distributions) and all nontaxable loans currently available under all plans maintained by the Company and any Related Company.

(d)     Notwithstanding any provision of the Plan or any other plan maintained by the Company or a Related Company to the contrary, a Participant who receives a Hardship Distribution shall not be eligible to make any Elective Contributions or after-tax employee contributions to the Plan and all other plans maintained by the Company or a Related Company for a period of six months following the date of receipt of the Hardship Distribution, and shall enter into a legally enforceable, written agreement acknowledging same.  For this purpose, the term "all other plans" means all qualified and nonqualified plans of deferred compensation including, without limitation, stock option, stock purchase or similar plans and a cash or deferred arrangement that is part of a cafeteria plan (within the meaning of Section 125 of the Code), but excluding the mandatory employee contribution portion of a defined benefit plan and a health and welfare benefit plan, including such a plan that is part of a cafeteria plan described in Section 125 of the Code.

(e)     A Participant's Hardship Distribution shall come from the Non-ESOP Component first and then only to the extent necessary from the ESOP Component.  To the extent made from the Non-ESOP Component, a Hardship Distribution shall be taken from the Investment Funds in which the Participant's Elective Account is invested on a pro rata basis. The availability of Hardship Distributions from the ESOP Component is subject to restrictions contained the Company's Loan Agreements.

## 7.10    Inability to Locate Distributee

(a)     Notwithstanding any other provision of the Plan, in the event that the Company cannot locate any person to whom a payment or distribution is due under the Plan, and no other distributee has become entitled thereto pursuant to any provision of the Plan, the unvested portion of a Participant's Combined Account in respect of which such payment or distribution is to be made shall be forfeited at the close of the Plan Year following five (5) consecutive one-year Periods of Severance (but in all events prior to the time such Combined Account would otherwise escheat under any applicable State law); provided, that any Combined Account so forfeited shall be reinstated if such person subsequently makes a valid claim for such benefit.

(b)     Such reinstatement shall be provided by an additional contribution for the Plan Year in which such reinstatement is made.

(c)     Any amount forfeited under this Section 7.10 shall be applied to reduce the next succeeding Company contribution under Article 3.

**7.11    Withdrawals After Age 59½**

Upon reaching age 59 ½, a Participant who is fully vested in his Non-ESOP Accounts may apply for the withdrawal of all or a portion of his Non-ESOP Accounts in one of the forms of distribution provided under Section 7.1(a), such payment to commence as soon as practicable after proper application is received by the Plan Administrator.

**7.12    Direct Rollovers**

(a)    Notwithstanding any other provision of the Plan to the contrary that would otherwise limit a Distributee's election under this Article 7, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an Eligible Rollover Distribution paid directly to one or more Eligible Retirement Plans specified by the Distributee in a Direct Rollover.

(b)    The following terms shall have the following meanings when used in this Section 7.12:

(1)    Eligible Rollover Distribution. An "Eligible Rollover Distribution" is any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or life expectancies) of the Distributee and the Distributee's designated Beneficiary or for a specified period of ten years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and Hardship Distributions.   Notwithstanding the foregoing, effective January 1, 2007, a distribution to a Distributee who is a non-spouse Beneficiary shall only be treated as an Eligible Rollover Distribution to the extent that the distribution is made in the form of a direct rollover to an individual retirement plan described in Section 402(c)(8)(B)(i) or (ii) of the Code established for the purpose of receiving the distribution on behalf of such eligible Distributee.

A portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income.  However, such portion may be transferred only to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified trust or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(2)    Eligible Retirement Plan.  An "Eligible Retirement Plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code (other than an endowment contract), a qualified trust described in Section 401(a) of the Code, an annuity plan described in Section 403(a) of the Code, an annuity contract described in Section 403(b) of the Code, an eligible plan under Section 457(b) of

the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, and effective for distributions made after December 31, 2007, a Roth IRA described in Section 408A of the Code. The definition of Eligible Retirement Plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Section 414(p) of the Code. However, in the case of a Distributee who is a non-spouse Beneficiary, an Eligible Retirement Plan means an individual retirement account described in Section 408(a) of the Code and an individual retirement annuity described in Section 408(b) of the Code (other than an endowment contract) which is established for the purpose of receiving the distribution on behalf of such individual as a Beneficiary of the Participant.

(3)     Distributee. A "Distributee" includes a Participant or a Former Participant. In addition, the Participant's or Former Participant's surviving spouse and the Participant's or Former Participant's former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are Distributees with regard to the interest of the spouse or former spouse. In addition, effective January 1, 2007, a deceased Participant's non-spouse Beneficiary is a Distributee with regard to the interest of the Participant.

(4)     Direct Rollover. A "Direct Rollover" is a payment by this Plan in the form of a trustee-to-trustee transfer that meets the requirements of an Eligible Rollover Distribution.

## 7.13    Qualified Domestic Relations Orders

Distributions may not be made to an alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, from the ESOP Component before the earliest of the Participant's (i) attainment of age fifty (50) or (ii) termination of employment. Distributions will be made in a manner consistent with the provisions of this Article 7. If the Plan Administrator receives a domestic relations order that otherwise qualifies as a qualified domestic relations order under Section 414(p) of the Code, and such order provides for a distribution or series of distributions from the Non-ESOP Component that may commence to an alternate payee before the Participant attains the earliest retirement age under the Plan, or for an immediate lump-sum distribution, the Plan Administrator shall recognize the domestic relations order as a qualified domestic relations order and authorize payment of said distribution or distributions from the Non-ESOP Component.

## ARTICLE 8:  ADMINISTRATION OF THE PLAN

**8.1    Appointment of ESOP Administrative Committee**

(a)    There is hereby authorized an ESOP Administrative Committee, which shall consist of not less than three members.  The Board of Directors of the Company shall appoint the members of the Committee.  Each member of the Committee may resign, or may be removed at any time by the Board of Directors of the Company (with or without cause), and, in the event of the removal, death or resignation of any member, his successor shall be appointed by the Board of Directors of the Company.  In the event that a vacancy or vacancies shall occur on the Committee, the remaining member or members shall act as the Committee until the Board of Directors of the Company fills such vacancy or vacancies.  The members of the Committee shall serve without compensation for their services as such members.

(b)    No person shall be ineligible to be a member of the Committee because he is, was or may become entitled to benefits under the Plan or because he is a director and/or officer of the Company or any Related Company; provided, that no member of the Committee shall participate in any determination by the Committee relating specifically to his own benefits under the Plan.

(c)    The members of the Committee shall serve without bond except to the extent required by applicable law.

**8.2    Named Fiduciaries**

(a)    Named Fiduciaries under the Plan shall be:

(1)    the Plan Administrator, who shall have authority to control and manage the operation and administration of the Plan, except with respect to those matters that under the Plan or the Trust Agreement are the responsibility, or subject to the authority, of the Committee or the Trustee, and

(2)    the Committee, which shall be the named fiduciary with respect to the financial management of the Plan and the control or management of the assets of the Plan, except with respect to those matters that under the Plan or the Trust Agreement are the responsibility, or subject to the authority, of the Plan Administrator or the Trustee.  Consistent with ERISA, the Committee may further delegate these duties, including without limitation, establishing separate subcommittees responsible for the financial management of the ESOP Component and the Non-ESOP Component.

(3)    Participants, with respect to the voting of Company Stock in their ESOP Accounts, as described in Section 14.1(a)(1), and with respect to the one-time election in Company Stock, as described in Section 6.4.

(b)    Reserved.

**8.3    Allocation of Fiduciary and Other Responsibilities**

(a)    Each Named Fiduciary (with the exception of Participants) shall have the right:

    (1)    to allocate responsibilities (fiduciary or otherwise) among it and the other Named Fiduciary,

    (2)    to designate individual members of the Committee to carry out responsibilities (fiduciary or otherwise) under the Plan, and

    (3)    to designate persons other than such Named Fiduciaries to carry out responsibilities (fiduciary or otherwise) under the Plan.

(b)    Reserved.

**8.4    Quorum and Voting; Procedures**

(a)    A majority of the members of the Committee at the time in office shall constitute a quorum for the transaction of business.  The Board of Directors of the Company shall select from among the Committee members a Chairman, and shall appoint (from its members or otherwise) a Secretary.

(b)    The Committee may act by vote or written consent of the majority of its members then in office and may establish its own procedures.  The Committee may authorize any one or more of its members or the Secretary or any designee of the Committee to sign and deliver any instrument, certificate or other paper or document on its behalf.

**8.5    Service in Multiple Capacities**

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

**8.6    Powers and Authority**

Each Named Fiduciary shall have all powers necessary or helpful for the carrying out of its responsibilities, and the decisions or actions of such Named Fiduciary in good faith in respect of any matter hereunder shall be conclusive and binding upon all parties concerned.

**8.7    Powers of Plan Administrator**

(a)    Without limiting the generality of the foregoing, the Plan Administrator shall have the power:

    (1)    to make rules and regulations for the administration of the Plan that are not inconsistent with the terms and provisions of the Plan;

    (2)    to construe all terms, provisions, conditions and limitations of the Plan;

(3)     to determine all questions arising out of or in connection with the provisions of the Plan or its administration in any and all cases in which he deems such a determination advisable; and

(4)     to establish a claims procedure in accordance with applicable law, which shall afford a reasonable opportunity to any Participant whose claim for benefits has been denied for a full and fair review of the decision denying such claim.

(b)     In all instances, the Plan Administrator shall have complete discretionary authority to find facts, determine eligibility for participation and benefits under the Plan, and to construe and interpret all provisions of the Plan and all documents relating thereto including, without limitation, all disputed and uncertain terms. All deference permitted by law shall be given to such findings, constructions, interpretations and determinations.

## 8.8     Powers of Committee

(a)     Without limiting the generality of the foregoing, the Committee shall have the power:

(1)     to establish and carry out, or cause to be established and carried out by those persons (including without limitation, any investment manager or trustee) to whom responsibility or authority therefore has been allocated or delegated in accordance with this Plan or the Trust Agreement, funding and investment policies and methods consistent with the objectives of the Plan and the requirements of ERISA. For such purposes, such Committee shall, at a meeting duly called for the purpose, establish funding and investment policies and methods that satisfy the requirements of ERISA, and shall meet at least annually to review such policies and methods. All actions taken with respect to such policies and methods and the reasons therefore shall be recorded in the minutes of the meetings of such Committee;

(2)     to appoint a trustee or trustees to hold the assets of the Plan, and who, upon acceptance of being appointed, shall have authority and discretion to manage and control the assets of the Plan, except to the extent that the authority to manage, acquire or dispose of assets of the Plan is delegated to one or more investment managers pursuant to paragraph (3) below; and

(3)     to appoint an investment manager or managers, as defined in Section 3(38) of ERISA, to manage (including the power to acquire, invest and dispose of) any assets of the Plan.

(b)     Reserved.

## 8.9     Advisors

Each Named Fiduciary (with the exception of the Participants), and any fiduciary designated by them pursuant to Section 8.3 above to whom such power is granted, may employ one or more persons to render advice with regard to any responsibility such fiduciary has under the Plan.

## 8.10    Powers Not Exclusive

The foregoing list of powers is not intended to be either complete or exclusive, and each Named Fiduciary shall, in addition, have such powers as it may determine to be necessary for the performance of its duties under the Plan and the Trust Agreement.

## 8.11    Limitation of Liability; Indemnity

Except to the extent otherwise provided by law, if any duty or responsibility of a Named Fiduciary has been allocated or delegated to any other person in accordance with any provision of this Plan or of the Trust Agreement, then such Named Fiduciary shall not be liable for any act or omission of such person in carrying out such duty or responsibility.  The Company shall indemnify and save each person who is a member of the Committee and each Employee or director of the Company or a Related Company, harmless against any and all loss, liability, claim, damage, cost and expense that may arise by reason of, or be based upon, any matter connected with or related to the Plan or the administration of the Plan (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation, commenced or threatened, or in settlement of any such claim whatsoever) to the fullest extent permitted under applicable law, except when same is judicially determined to be due to the gross negligence or willful misconduct of such person.

## ARTICLE 9:  AMENDMENT OF THE PLAN

**9.1     Amendment**

(a)     Subject to the provisions hereinafter set forth, the Company reserves the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of the Plan, provided however, that:

     (1)     no modification or amendment may be made which by reason thereof will deprive any Participant or Former Participant or Beneficiary without his consent of any amounts theretofore credited to his Combined Account under the Plan; and

     (2)     no such modification or amendment shall make it possible for any part of any funds contributed under the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of Participants or Former Participants or Beneficiaries under the Plan, subject to subsection (b) below, or as otherwise may be required or permitted under applicable law.

(b)     Notwithstanding subsection (a) above, any modification or amendment of the Plan may be made, retroactively if necessary, that the Company deems necessary or appropriate to bring the Plan or Trust into conformity with governmental regulations or other applicable guidance in order to qualify (or maintain the qualification of) the Plan, the Trust and contributions for tax exemption or deduction, or to comply with other applicable guidance, in accordance with the Employee Plan Compliance Resolution System of the Internal Revenue Service ("EPCRS").

## ARTICLE 10:  TERMINATION OF THE PLAN; MERGER

**10.1    Termination**

(a)    The Company assumes no obligation to continue this Plan and specifically reserves the right at any time and for any reason deemed sufficient by it to discontinue this Plan and contributions under it.

(b)    Upon complete or partial termination of, or complete discontinuance of contributions under the Plan, the rights of all affected Participants to the amounts credited to their Combined Accounts shall be nonforfeitable, except to the extent required to preclude discrimination between Participants and classes of Participants.  In the case of a sale of all or a significant portion of the assets used by the Company or an Affiliate in a trade or business or of the sale of all or a significant portion of the Company's or an Affiliate's interest in a subsidiary, the Company, in its sole discretion, may elect to treat any similarly situated employees of such trade or business or such subsidiary as fully vested hereunder.

(c)    In the event of such termination, subject to the limitations set forth in Article 9, the Trustee(s) shall dispose of any and all funds held under the Plan by any Trustee in accordance with the written order of the Committee.  The Committee shall determine the amounts that are payable under the Plan to Participants or Former Participants or for administrative expenses of the Plan, and shall direct the Trustee to pay over any and all funds either directly to the persons certified by it to be entitled to receive such amounts, to an insurance company or companies for the purchase of annuity contracts or to the Company for distribution, or to hold such amounts for distribution at the time and in the manner provided for in Article 7.

**10.2    Plan Merger**

In the case of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant in this Plan shall be entitled to a benefit immediately after the merger, consolidation, or transfer (if the Plan then terminated) that is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the Plan had then been terminated).

## ARTICLE 11:  LIMITATION OF RIGHTS OF PARTICIPANTS, FORMER PARTICIPANT AND BENEFICIARIES

**11.1    No Employment Rights**

Nothing contained in the Plan shall be deemed to give any Participant the right to be retained in the service of the Company.

**11.2    Spendthrift Clause**

(a)    Except as otherwise required or permitted by law, no interest, right or claim in or to any part of the Fund or any payment there from shall be assignable, transferable or subject to sale, mortgage, pledge, hypothecation, commutation, anticipation, garnishment, attachment, execution or levy of any kind, and the Company shall not recognize any attempt to assign, transfer, sell, mortgage, pledge, hypothecate, commute or anticipate the same.

(b)    Section 11.2(a) above shall apply to the creation, assignment or recognition of a right to any benefit payable pursuant to a domestic relations order, unless such order is determined by the Plan Administrator to be a "qualified domestic relations order" as defined in Section 414(p) of the Code.

(c)    Section 11.2(a) above shall not apply to the offset of a Participant's benefit under the Plan of an amount the Participant is required to pay to the Plan pursuant to a criminal conviction, civil judgment or settlement agreement described in Section 401(a)(13)(C) of the Code.

**11.3    Incompetents**

If a Participant, Former Participant or Beneficiary to whom distributions shall be due under the Plan shall be or become incompetent, either physically or mentally, in the judgment of the Plan Administrator, the Plan Administrator shall have the right to determine to whom such distributions shall be made for the benefit of such Participant, Former Participant or Beneficiary.

**11.4    Minors**

If at any time a person entitled to receive any payment hereunder is a minor, such payment may be made for the benefit of such minor to his parent, guardian, or the person with whom he resides, or to the minor himself, and the release of any such parent, guardian, person or minor shall be valid and complete discharge for such payment.

**11.5    Doubt as to Identity**

In case at any time any doubt exists as to the identity of any person entitled to any payment hereunder or the amount or time of such payment, the Plan Administrator shall be entitled to direct the Trustee to hold such sum in trust until such identity or amount or time is determined or

until order of a court of competent jurisdiction, or to pay such sum into court in accordance with appropriate rules of law in such case then provided.

## 11.6    Discharge of Liability

If the Plan Administrator or his delegate reasonably believes (taking into account any document purporting to be a valid consent of the Participant's spouse, or any representation by the Participant that he is not married or any designation of beneficiary) that a distribution in respect of a Participant's Combined Account is made to a person who properly qualifies as the Participant's Beneficiary, the Plan shall have no further liability with respect to such Combined Account to the extent of the distribution.

## ARTICLE 12: TOP-HEAVY PROVISIONS

### 12.1    Application of Article 12

The following provisions of this Article 12 shall apply automatically in any Plan Year in which the Plan is determined to be Top-Heavy, and shall override any inconsistent provisions herein. The determination of whether the Plan is a Top-Heavy Plan in any Plan Year, and the application of these provisions, shall be interpreted in accordance with the definitions set forth in Section 12.6 and Section 416 of the Code and the regulations thereunder.

### 12.2    Top-Heavy Determination

(a)    For purposes of this Article 12, the Plan is a Top-Heavy Plan with respect to a Plan Year if, as of the Determination Date for the Plan Year, (1) the Plan has a Top-Heavy Ratio greater than 60% and is not a member of a Required Aggregation Group, or (2) the Plan is a member of a Required Aggregation Group that has a Top-Heavy Ratio greater than 60%.

(b)    Notwithstanding subsection (a) above, if the Plan is a member of a Permissive Aggregation Group with a Top-Heavy Ratio less than or equal to 60%, it shall not be considered to be a Top-Heavy Plan.

(c)    The present values of accrued benefits and the amounts of account balances of an Employee as of the determination date shall be increased by the distributions made with respect to the Employee under the Plan and any plan aggregated with the Plan under Section 416(g)(2) of the Code during the 1-year period ending on the determination date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code.  In the case of a distribution made for a reason other than separation from service, death, or disability, this provision shall be applied by substituting "5-year period" for "1-year period."

(d)    The accrued benefits and accounts of any individual who has not performed services for the Company during the 1-year period ending on the determination date shall not be taken into account.

### 12.3    Reserved

### 12.4    Minimum Contributions

(a)    If the Plan is determined to be a Top-Heavy Plan for a Plan Year, minimum employer contributions (including forfeitures) shall be made, on behalf of each Participant who has not separated from service as of the end of the Plan Year and who is not a Key Employee, of not less than the lesser of the following percentage of annual Compensation for that Plan Year:

(1)    3%, or

(2)     the highest percentage at which employer contributions (including forfeitures and amounts contributed pursuant to a salary reduction agreement) are made under the Plan for the Plan Year on behalf of a Key Employee.

Matching Contributions may be counted toward any minimum contribution requirement under this Section 12.4

(b)     A Top-Heavy Plan shall not be treated as meeting the requirements of this Section 12.4 unless the Plan meets such requirements without taking into account any Social Security contributions or benefits.

(c)     Notwithstanding subsections (a) and (b) above, this Section 12.4 shall not apply to any Participant to the extent that such Participant is covered under any other qualified plan of the Company or a Related Company and such other plan provides the minimum allocation or benefit requirement applicable to Top-Heavy plans.

## 12.5    Reserved

## 12.6    Definitions

(a)     For purposes of this Article 12, the following terms shall have the following meanings:

(1)     "Determination Date" means, with respect to a Plan Year, the last day of the preceding Plan Year or, in the case of the first Plan Year, the last day of the Plan Year.

(2)     "Key Employee" means any Employee or former employee (including any deceased employee) who at any time during the Plan Year that includes the determination date was an officer of the Company having annual compensation greater than $160,000, as adjusted under Section 416(i)(1) of the Code, a 5-percent owner of the Company, or a 1-percent owner of the Company having annual compensation of more than $150,000.   For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code.   The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable regulations and other guidance of general applicability issued thereunder.

(3)     "Permissive Aggregation Group" means each plan in the Required Aggregation Group and any other qualified plan or plans maintained by the Company or a Related Company if such group of plans, when considered together, would meet the requirements of Sections 401(a)(4) and 410 of the Code.   A terminated plan of the Company is treated like any other plan of the Company for this purpose if it was maintained within the last five years ending on the Determination Date for the Plan Year in question and would, but for the fact that it terminated, be part of a Required Aggregation Group for such Plan Year.

(4)     "Required Aggregation Group" means, with respect to a Plan Year for which a determination is being made, (1) this Plan, (2) each other qualified plan of the

Company and any Related Company in which at least one Key Employee is a participant and (3) any other qualified plan of the Company or any Related Company that enables any plan described in items (1) and (2) above to meet the requirements of Section 401(a)(4) or 410 of the Code. A terminated plan of the Company is treated like any other plan of the Company for this purpose if it was maintained within the last five years ending on the Determination Date for the Plan Year in question and would, but for the fact that it terminated, be part of a Required Aggregation Group for such Plan Year.

(5)     "Top-Heavy Ratio" means, with respect to the plans taken into consideration, a fraction, the numerator of which is the sum of the Key Employees' account balances under the applicable defined contribution plans and the present value of the Key Employees' accrued benefits under the applicable defined benefit plans, and the denominator of which is the sum of all participants' account balances under the applicable defined contribution plans and the present value of all participants' benefits under the applicable defined benefit plans. Both the numerator and the denominator of this fraction are adjusted so as to include in-service distributions made in the plan year containing the Determination Date or in the four preceding plan years and in the case of defined contribution plans, any contributions due but unpaid as of the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan that if it had not been terminated would have been included in the Required Aggregation Group. The value of account balances and the present value of accrued benefits will be determined as of the most recent valuation date that falls within or ends with the 12-month period ending on the Determination Date. The account balances and accrued benefits of an individual who is not a Key Employee but who was a Key Employee in a prior year will be disregarded. When more than one plan is being considered, the value of account balances and accrued benefits will be calculated with reference to the Determination Dates that fall within the same calendar year. Present values shall be based on reasonable actuarial assumptions as to interest and mortality. Solely for the purpose of determining if the Plan, or any other plan included in an aggregation group of which this Plan is a part, is top-heavy, the accrued benefit of a Participant other than a Key Employee shall be determined under (1) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Company or a Related Company or (2) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code. In all instances, the calculation of the Top-Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account, will be made in accordance with Section 416 of the Code and the regulations thereunder, as may be amended.

(b)     Reserved.

## ARTICLE 13:  RIGHTS, RESTRICTIONS, AND OPTIONS ON COMPANY STOCK

The provisions of Article 13 have been incorporated into Sections 6.13 through 6.16.

## ARTICLE 14:  VOTING AND TENDERING OF STOCK

**14.1**   **Voting of Company Stock**

(a)   The voting of Company Stock held in the Trust shall be subject to the provisions of ERISA and the following provisions, to the extent such provisions are not inconsistent with ERISA:

(1)   With respect to any corporate matter that involves the voting of Company Stock with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business, or such other transactions that may be prescribed by regulation (and, if the Company has a registration-type class of securities, all other shareholder voting issues), each Participant may be entitled to direct the Trustee as to the exercise of any shareholder voting rights attributable to shares of Company Stock then allocated to his ESOP Accounts, but only to the extent required by Sections 401(a)(22) and 409(e)(3) of the Code and the regulations thereunder. For purposes of the foregoing sentence, each Participant shall be a Named Fiduciary of the Plan as described in Section 402(a)(2) of ERISA.  The Committee shall have the sole responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this provision.   If a Participant is entitled to so direct the Trustee, all allocated Company Stock as to which such instructions have been received (which may include an instruction to abstain) shall be voted by the Trustee in accordance with such instructions, provided that the Trustee may vote the shares as it determines is necessary to fulfill his fiduciary duties under ERISA.  The Trustee shall vote any shares as to which no voting instructions have been received at the direction of the Committee, subject to his fiduciary duties under ERISA.

(2)   In all other circumstances, the Trustee shall vote all shares of Company Stock as directed by the Committee.

**14.2**   **Tendering of Company Stock**

(a)   The tendering of Company Stock held in the Trust shall be subject to the provisions of ERISA and the following provisions, to the extent such provisions are not inconsistent with ERISA:

(1)   In the event of a tender offer or other offer to purchase shares of Company Stock held by the Trust, the Trustee shall tender or sell the shares as directed by each Participant (or, if applicable, designated Beneficiary or alternate payee) with respect to shares of Company Stock then allocated to his ESOP Accounts, subject to the fiduciary duties under ERISA.  In all other circumstances, the Trustee shall tender or exchange shares of Company Stock as directed by the ESOP Administrative Committee.  In carrying out its responsibilities under this Section, the Trustee may rely on information furnished to it by the Plan Administrator,

including the names and current addresses of Participants, the number of shares of Company Stock allocated to their ESOP Accounts, and the number of shares of Company Stock held by the Trustee (if any) that have not yet been allocated.

## ARTICLE 15: MISCELLANEOUS

**15.1    Severability**

If any provision of the Plan is held invalid or unenforceable, its validity or unenforceability shall not affect any other provisions of the Plan and the Plan shall be construed and enforced as if such provisions had not been included therein.

**15.2    Captions**

The captions contained herein and the table of contents, if any, prefixed hereto are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or interest of the Plan nor in any way shall affect the Plan or the construction of any provision thereof.

**15.3    Construction**

The Plan shall be construed and enforced in accordance with the laws of the State of Wisconsin (without regard to its conflict of laws provisions), except to the extent that such laws are preempted by Federal law.

IN WITNESS WHEREOF, the Company has executed this Plan on the _____16th_____ day of ___April___, 2014, to be effective as of January 1, 2014, or as otherwise required by applicable law or indicated herein.

APPVION, INC.

*[signature]*

Name: *Tami L. Van Straten*
Title: *ESOP Administrative Committee Member*

<u>**Appendix A**</u>

**to the**
**APPVION, INC.**
**RETIREMENT SAVINGS AND**
**EMPLOYEE STOCK OWNERSHIP PLAN**
**(Amended and Restated Generally Effective as of January 1, 2009)**

Notwithstanding any provision of the Plan to the contrary, the following Bargaining Unit Employees shall become eligible to participate in the Plan as follows:

<u>Appleton Plant – AFL-CIO-CLC Local 2-0469</u>

> A Bargaining Unit Employee of the Appleton Plant shall be eligible to become a Participant following 80 calendar days of probationary employment.

<u>West Carrollton Plant – AFL-CIO-CLC Local 266</u>

> A Bargaining Unit Employee of the West Carrollton Plant shall be eligible to become a Participant following 90 calendar days of probationary employment.

<u>Spring Mill – AFL-CIO-CLC Local 10-422</u>

> A Bargaining Unit Employee of the Spring Mill shall be eligible to become a Participant following 90 calendar days of probationary employment.

<u>Harrisburg Plant – AFL-CIO-CLC Local 10-1098</u>

> A Bargaining Unit Employee of the Harrisburg Plant shall be eligible to become a Participant following 60 calendar days of probationary employment.

<u>Kansas City Distribution Center – United Steelworkers International Union Local 348</u>

> A Bargaining Unit Employee of the Kansas City Distribution Center shall be eligible to become a Participant following 60 calendar days of probationary employment.

# Exhibit 2

# AMENDED AND RESTATED TRUST AGREEMENT FOR THE
# APPLETON PAPERS INC. EMPLOYEE STOCK OWNERSHIP TRUST

### (Effective as of April 1, 2013)

DB1/ 73701652.3

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ............................................................................. 2

   1.1   Code ............................................................................................ 2
   1.2   Committee ................................................................................... 2
   1.3   Company Stock .......................................................................... 2
   1.4   Company ..................................................................................... 2
   1.5   ERISA ......................................................................................... 2
   1.6   Independent Trustee ................................................................. 2
   1.7   Net Worth ................................................................................. 2
   1.8   Non-Indemnity Loss ................................................................ 2
   1.9   Participant ................................................................................. 2
   1.10  Participating Company ............................................................ 2
   1.11  Plan ............................................................................................ 2
   1.12  Recordkeeper ........................................................................... 3
   1.13  Trust .......................................................................................... 3
   1.14  Trust Fund ................................................................................ 3
   1.15  Trustee ...................................................................................... 3
   1.16  Valuation Date ......................................................................... 3

ARTICLE II ESTABLISHMENT OF THE TRUST ................................... 3

   2.1   Trust Established ...................................................................... 3
   2.2   Independent Trustee ................................................................ 3
   2.3   Limit of Participating Companies' Interests ......................... 3
   2.4   Trustee Compensation ............................................................ 3

ARTICLE III MANAGEMENT AND CONTROL OF TRUST FUND ASSETS ...................... 4

   3.1   Trust Fund ................................................................................ 4
   3.2   Responsibility of Trustee ........................................................ 4
   3.3   Named Fiduciary ..................................................................... 5
   3.4   General Powers ........................................................................ 5
   3.5   Exercise of Trustee's Duties ................................................... 8
   3.6   Plan Administration ................................................................. 8
   3.7   Continuation of Powers on Trust Termination .................... 8

ARTICLE IV INVESTMENT OF TRUST FUND ...................................... 9

   4.1   Investment of Cash .................................................................. 9
   4.2   Stock Dividends, Splits and Other Capital Reorganizations ............ 9
   4.3   Voting of Company Stock ....................................................... 9
   4.4   Tender or Exchange Offers ..................................................... 10
   4.5   Put Option ................................................................................ 10

ARTICLE V EXPENSES ...................................................................................................10

ARTICLE VI REMOVAL AND RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE .................................................................................................................11

ARTICLE VII AMENDMENT OF TRUST AND TERMINATION OF PLAN 11

7.1   Amendment of Trust ............................................................................................11
7.2   Termination of Plan .............................................................................................11

ARTICLE VIII MISCELLANEOUS ...............................................................................11

8.1   Nonalienation of Benefits ....................................................................................11
8.2   Exclusive Benefit .................................................................................................11
8.3   Effect of Plan .......................................................................................................11
8.4   Entire Agreement .................................................................................................12
8.5   Notices .................................................................................................................12
8.6   Liability for Predecessor or Successor .................................................................12
8.7   Liability for Acts of Others ..................................................................................12
8.8   Indemnification ....................................................................................................12
8.9   Controlling Law ...................................................................................................14
8.10  Effective Date ......................................................................................................14
8.11  Execution in Counterpart .....................................................................................14

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 596 of 1527    Document 14-2

AMENDED AND RESTATED TRUST AGREEMENT FOR THE
APPLETON PAPERS INC. EMPLOYEE STOCK OWNERSHIP TRUST

THIS TRUST AGREEMENT (this "Agreement") is entered into on April 1, 2013 by and between Appleton Papers Inc. (the "Company") and Reliance Trust Company (the "Trustee").

WITNESSETH THAT:

WHEREAS, the Company maintains the Plan, which is intended to qualify under Code § 401(a) and is intended to qualify as an employee stock ownership plan within the meaning of Code § 4975(e)(7), for the benefit of its eligible employees and those of a Participating Company;

WHEREAS, the Company has established two trusts for the purpose of funding benefits under the Plan: the Principal Trust Company Directed Trust (the "Principal Directed Trust") and this Trust, both of which are for the exclusive benefit of participants in the Plan and their beneficiaries;

WHEREAS, the Principal Directed Trust holds the assets invested in various mutual funds selected by the Benefit Finance Committee of the Company;

WHEREAS, the Company has appointed Delaware Charter Guarantee & Trust Company, d/b/a Principal Trust Company to serve as trustee for the Principal Directed Trust;

WHEREAS, a portion of the Plan's assets are held by State Street Bank and Trust Company (the "Original Trustee") pursuant to the Appleton Papers Inc. Employee Stock Ownership Trust Agreement, dated June 1, 2001, as amended (the "Original Trust Agreement");

WHEREAS, the Company has amended and restated the Original Trust Agreement into this Agreement and appointed the Trustee as the Plan's trustee to hold and administer the portion of the Plan's assets originally held under the Original Trust Agreement pursuant to this Agreement;

WHEREAS, simultaneous with this Agreement, the Original Trustee will resign as the Plan's trustee;

WHEREAS, the Company desires to appoint the Trustee as a trustee to hold and administer a portion of the Plan's assets in accordance with this Agreement; and

WHEREAS, the Trustee has agreed to serve as trustee of the trust established under this Agreement.

NOW, THEREFORE, the Company and the Trustee mutually covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

The following words and phrases, when used in this Agreement with an initial capital letter, will have the meanings set forth below unless a different meaning plainly is required by the context. Any reference to a section number will refer to a section of this Agreement unless otherwise specified.

1.1     Code means the Internal Revenue Code of 1986, as amended.

1.2     Committee means the Committee as defined in Section 1.12 of the Plan.

1.3     Company Stock means the common stock of Paperweight Development Corp., the Company's parent, or any other qualifying employer security within the meaning of ERISA § 407(d)(5).

1.4     Company means Appleton Papers Inc. and its successors that adopt the Plan.

1.5     ERISA means the Employee Retirement Income Security Act of 1974, as amended.

1.6     Independent Trustee means an independent trustee appointed by the Company for certain assets of the Plan held separate from the Trust.

1.7     Net Worth means the fair market value of all property held in the Trust Fund reduced by any liabilities other than liabilities to participants in the Plan and their beneficiaries.

1.8     Non-Indemnity Loss means any claim, damage, expense, liability or loss that is found by a court of competent jurisdiction, in a final judgment from which no appeal can be taken, to have resulted either from a breach by the Trustee of its fiduciary duties under Title I of ERISA or, in non-fiduciary matters, from the bad faith, gross negligence, willful misconduct or material breach of the terms of this Agreement by the Trustee.

1.9     Participant means a participant in the Plan and his or her beneficiary or alternate payee under the Plan.

1.10     Participating Company means the Company and any of its affiliates that have adopted or hereafter may adopt the Plan for the benefit of its employees and that continue to participate in the Plan.

1.11     Plan means the Appleton Papers Inc. Savings and Employee Stock Ownership Plan, as amended from time to time.

1.12    <u>Recordkeeper</u> means the Plan's duly appointed recordkeeper and any of its respective agents or assigns, including processing agents.    The Committee will notify the Trustee of the Recordkeeper's identity and will promptly notify the Trustee of any change in the Recordkeeper's identity.

1.13    <u>Trust</u> means the trust established by this Agreement.

1.14    <u>Trust Fund</u> means the total amount of cash and other property held from time to time under this Agreement.

1.15    <u>Trustee</u> means Reliance Trust Company.

1.16    <u>Valuation Date</u> means the valuation date as defined in Section 1.74 of the Plan.

<div align="center">

ARTICLE II
ESTABLISHMENT OF THE TRUST

</div>

2.1    <u>Trust Established</u> By this Agreement the Company establishes with the Trustee, as a funding medium for the Plan, the Trust consisting of the Trust Fund and such earnings, profits, increments, additions and appreciation thereto and thereon as may accrue from time to time.

2.2    <u>Independent Trustee</u> The Trust created under this Agreement is a separate trust from any trusts that may be held by an Independent Trustee and the Trustee will not be responsible for any assets of the Plan that are held in any such separate trusts by an Independent Trustee.    The Trustee is expressly relieved of any responsibility or liability, whether as co-fiduciary or otherwise, in accordance with ERISA § 405(b)(3)(A), for any losses resulting to the Plan arising from any acts or omissions on the part of an Independent Trustee.

2.3    <u>Limit of Participating Companies' Interests</u> Except as provided in the succeeding paragraph and ERISA, the Participating Companies will not have any right, title, interest, claim or demand whatsoever in or to the funds held by the Trustee, other than the right to a proper application and accounting therefor by the Trustee as provided in this Agreement, nor will any funds revert to any Participating Company except as permitted by ERISA or required by the Code for qualification of the Plan.

Any other provisions of this Agreement or the Plan notwithstanding, if and to the extent permitted by the Code, ERISA and other applicable laws and regulations thereunder, on the Company's request, a contribution made by a mistake in fact or conditioned on the deductibility of the contribution under Code § 404 will be returned to the specified Participating Company within one year after the mistaken payment of the contribution or the disallowance of the deduction (to the extent disallowed), whichever is applicable.

2.4    <u>Trustee Compensation.</u>    The Trustee will be entitled to compensation for its services under this Agreement at such rates as from time to time the Trustee and the Company agree in writing.  The Trustee will retain for its own account, as additional compensation under this Agreement, earnings (i.e., float) on amounts received in the Trust Fund before such amounts are invested pursuant to this Agreement and on amounts held pending distribution.

(a)    <u>Contributions and Purchases</u>.   The timing of cash investment by the Trustee is dependent on the Recordkeeper and its reconciliation of funds received in the Trust. If funds are sent to the Trustee via wire, or Automated Clearing House ("ACH") debt to the Company's bank account, the investment of these funds will generally occur within one business day of receipt. The Company may review the service contract with the Recordkeeper to identify specific standards concerning the timing of investment purchases. The Trustee will earn income approximating the rates of return on a two (2) year Treasury note on money received from the date of deposit with the Trustee until the later of the date the monies are wired in payment of investment purchases or the settlement date. The Company may monitor and compute the amount of income earned by the Trustee by reviewing the date of deposit (as reported on the account statements) versus the settlement date of the purchases.

(b)    <u>Distributions and Sales</u>.   Generally, in connection with any distributions, the Trustee will wire funds to the Recordkeeper within one business day of the funds becoming available as a result of sale settlements. If the Trustee issues Participant distribution checks or other trust checks, the Trustee earns income from the date cash is made available in a Trust account until the date a check is cashed. The amount of income the Trustee earns shall be calculated in the same manner described in §2.4(a). The Trustee will generally issue distribution checks within two business days of receipt of both cash and complete payment instructions.

## ARTICLE III
## MANAGEMENT AND CONTROL OF TRUST FUND ASSETS

3.1    <u>Trust Fund</u>. The Trustee may manage, invest and account for all contributions made by the Company and any Participating Company under the Plan as one Trust Fund without identification of any part of the Trust assets as being attributable to the Company, a Participating Company or any other person. If, for any reason, it becomes necessary to determine the portion of the Trust Fund allocable to the Participants related to the Company or any Participating Company as of any date, the Committee will specify such date as a Valuation Date and, after all adjustments required under the Plan as of that Valuation Date have been made, the portion of the Trust Fund attributable to each of such Participants will be determined by the Committee and will consist of an amount equal to the aggregate of the account balances of each of such Participants plus an amount equal to any contributions allocable to such Participants since the close of the immediately preceding Plan Year. The Trustee need not inquire into the source of any money or property transferred to it nor the authority or right of the transferor to transfer such money or property to the Trustee.

3.2    <u>Responsibility of Trustee</u>. The Trustee will not be responsible in any way for the adequacy of the Trust Fund to discharge any or all liabilities under the Plan or for the proper application of distributions made or other action taken on the Committee's written direction. The Trustee's powers, rights and duties will be limited to those set forth in this Agreement, and nothing contained in the Plan, either expressly or by implication, will be deemed to impose any additional duties on the Trustee.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 600 of 1527    Document 14-2

3.3    <u>Named Fiduciary.</u> The Committee will be a named fiduciary of the Plan and Trust as described in ERISA § 402(a)(2). Each Participant will also be a named fiduciary with respect to the exercise of investment directions relating to the acquisition or disposition of Company Stock, as applicable under the terms of this Agreement, including the exercise of voting and tender or exchange offer rights for Company Stock credited to such Participant's account.

3.4    <u>General Powers.</u> Subject to the provisions of §§ 3.5 and 3.6 and Article IV, with respect to the Trust Fund, the Trustee will have the following powers, rights and duties in addition to those provided elsewhere in this Agreement or by law:

(a)    The Trustee will receive and hold all contributions paid to it under the Plan, provided that the Trustee will have no duty to require any contributions to be made to it, to determine that the contributions received by it comply with the provisions of the Plan or with any resolution of the Company's board of directors providing therefore.

(b)    As directed by the Committee, the Trustee will retain in cash (pending investment, reinvestment or distribution including distribution of dividends) such reasonable amount as may be required for the proper administration of the Trust and to invest such cash as provided in § 4.1. Pending receipt of directions from the Committee, the Trustee may retain reasonable amounts of cash, in its discretion, without any liability for interest.

(c)    As directed by the Committee, the Trustee will make distributions from the Trust Fund to such persons, in such manner, at such times and in such forms (Company Stock, cash or a combination of both) as directed, without inquiring as to whether a payee is entitled to the payment, or as to whether a payment is proper, and without liability for a payment made in good faith without actual notice or knowledge of the changed condition or status of the payee or the Company. If any payment of benefits directed to be made from the Trust Fund by the Trustee is not claimed, the Trustee will notify the Committee of that fact promptly. The Committee will make a diligent effort to ascertain the whereabouts of the payee. The Trustee will dispose of such payments as the Committee directs. The Trustee will have no obligation to ascertain the whereabouts of any payee of benefits from the Trust Fund.

(d)    The Trustee shall vote any Company Stock as provided in § 4.3 and, as directed by the Committee, shall vote other stocks, bonds or other securities held in the Trust, and as directed by the Committee, otherwise consent to or request any action on the part of the issuer in person, by proxy or power of attorney.

(e)    As directed by the Committee, the Trustee may contract or otherwise enter into transactions with the Company or any Company shareholder for the purpose of acquiring or selling Company Stock and, subject to § 3.5, may retain such Company Stock.

(f)    As directed by the Committee, the Trustee may compromise, contest, arbitrate, settle or abandon claims and demands by or against the Trust Fund.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 601 of 1527    Document 14-2

(g)    As directed by the Committee, the Trustee may begin, maintain and defend any litigation necessary in connection with the investment, reinvestment and administration of the Trust.  To the extent not paid from the Trust Fund, the Company will indemnify the Trustee against all expenses and liabilities reasonably sustained or anticipated by the Trustee by reason thereof (including reasonable attorneys' fees) as and when the Trustee incurs such expenses and liabilities.

(h)    The Trustee may retain any funds or property subject to any dispute without liability for the payment of interest or decline to make payment or delivery thereof until final adjudication is made by a court of competent jurisdiction.

(i)    The Trustee will report to the Company as of the last day of each Plan Year of the Plan (which shall be the same as the Trust's fiscal year), as of any Valuation Date, or at such other times as may be required under the Plan, as to the Trust Fund's Net Worth, as determined by the Trustee.

(j)    The Trustee will furnish to the Company and the Committee an annual written account, as well as accounts for such other periods as may be required under the Plan, showing the Net Worth of the Trust Fund at the end of the period(s), all investments, receipts, disbursements and other transactions made by the Trustee during the period(s) and such other information as the Trustee may possess that the Company requires to comply with ERISA § 103. The Trustee will keep accurate accounts of all investments and earnings thereon, and all accounts, books and records related to such investments will be open to inspection by any person designated by the Company or the Committee.  All accounts of the Trustee will be kept on an accrual basis.  If, during the term of this Agreement, the Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports required by ERISA, the Trustee will use such valuation methods for purposes of the accounts described by this § 3.4(j).  If shares of Company Stock are not traded with sufficient volume or frequency, as determined by the Committee, to be considered readily tradable on a national securities market or exchange, all valuations of shares of Company Stock will originally be made by an independent appraiser (as described in Code § 401(a)(28)(C)) retained by the Trustee and reviewed and finalized by the Trustee in accordance with ERISA § 3(18)(B).  The Company may approve such accounts by written notice of approval delivered to the Trustee or by failure to express objection to such accounts in writing delivered to the Trustee within 30 days from the date on which the accounts were delivered to the Company.  On the receipt of a written approval of the accounts or on the passage of the period of time within which objection may be filed without written objections having been delivered to the Trustee, such accounts will be deemed to be approved and the Trustee will be released and discharged as to all items, matters and things set forth in such accounts, as fully as if such accounts had been settled and allowed by decree of a court of competent jurisdiction in an action or proceeding in which the Trustee, the Company and all persons having or claiming to have any interest in the Trust Fund or under the Plan were parties.  Notwithstanding the foregoing, the statute of limitations set forth in ERISA §413 shall apply with respect to any alleged violations of ERISA.

(k)     As directed by the Committee, the Trustee will pay any estate, inheritance, income or other tax, charge or assessment attributable to any benefit that it will or may be required to pay out of such benefit. Before making any payment, the Trustee may require such release or other document from any taxing authority and such indemnity from the intended payee as it deems necessary for its protection.

(l)     The Trustee may employ and reasonably rely on information and advice furnished by agents, attorneys, independent appraisers, accountants or other persons of its choice for such purposes as it considers desirable.

(m)     The Trustee may assume, until advised to the contrary, that the Trust evidenced by this Agreement is entitled to tax exemption under Code § 501(a).

(n)     The Trustee will have the authority to invest and reinvest the assets of the Trust Fund, on direction from the Committee, in personal property of any kind, including, but not limited to, bonds, notes, debentures, mortgages, equipment, trust certificates, investment trust certificates, guaranteed investment contracts, preferred or common stock and registered investment companies. The Trustee will follow the Committee's directions and will have no duty to review the assets from time to time so acquired nor to make any recommendations with respect to the investment, reinvestment or retention thereof. However, all investments in Company Stock will be undertaken pursuant to the provisions of § 4.1.

(o)     As directed by the Committee, the Trustee may exercise any options, subscription rights and other privileges with respect to Trust assets, subject to Article IV.

(p)     The Trustee may register ownership of any securities or other property held by it in its own name or in the name of a nominee, with or without the addition of words indicating that such securities or other property are held in a fiduciary capacity, and may hold any securities in bearer form. The Trustee's books and records will at all times reflect that all such investments are part of the Trust.

(q)     As directed by the Committee, the Trustee may borrow such sums from time to time as the Committee considers necessary or desirable and in the best interest of the Trust Fund, including to purchase Company Stock, and to enter into such agreements as directed by the Committee as the Committee determines necessary or appropriate to accomplish such actions, and for that purpose may mortgage or pledge any part of the Trust Fund subject to the provisions of Code § 4795(c) and the regulations issued thereunder.

(r)     The Trustee may deposit securities with a clearing corporation as permitted by applicable law. The certificates representing securities, including those in bearer form, may be held in bulk form with, and may be merged into, certificates of the same class of the same issuer that constitute assets of other accounts or owners, without certification as to the ownership attached. Utilization of a book-entry system may be made for the transfer or pledge of securities held by the Trustee or by a clearing corporation. The Trustee will at all times maintain a separate and distinct record of the securities owned by the Trust.

DB1/ 73701652.3

7

(s)    The Trustee may participate in and use the Federal Book-Entry Account System, a service provided by the Federal Reserve Bank for its member banks for deposit of Treasury securities.

(t)    As directed by the Committee, the Trustee will perform any and all other acts that are necessary or appropriate for the proper management, investment and distribution of the Trust Fund.

(u)    Except as provided in § 4.4, the Trustee will not sell, exchange, transfer or otherwise dispose of Company Stock unless directed to do so by the Committee.

3.5    Exercise of Trustee's Duties□ The Trustee will discharge its duties under this Agreement solely in the interest of the Participants and other persons entitled to benefits under the Plan and (a) for the exclusive purpose of providing benefits to Participants and other persons entitled to benefits under the Plan and defraying reasonable expenses of administering the Plan, (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims and (c) in accordance with the documents and instruments governing the Plan unless, in the Trustee's good faith judgment, the documents and instruments are not consistent with ERISA or this Agreement.  Notwithstanding any other provision of this Agreement, the Trustee will not be required to comply with any provision of this Agreement that is not consistent with the requirements of ERISA.  Moreover, if a court of competent jurisdiction issues an opinion or order to the Plan, the Company or the Trustee that, in the opinion of counsel to the Company or the Trustee, invalidate any provision of this Agreement under ERISA in all circumstances or in any particular circumstances, on notice thereof to the Company or to the Trustee, as the case may be, such invalid or conflicting provision of this Agreement will be given no further force or effect.

3.6    Plan Administration□ The Plan will be administered by the Committee.  Except as provided in §§ 3.4(a),  3.4(h), 3.4(i), 3.4(j), 3.4(l), 3.4(n) dealing with Company Stock, 3.4(p), 3.4(r) and 3.4(s), the Trustee will have no authority to act unless directed by the Committee.  The Committee may authorize one or more individuals to sign all communications between the Committee and the Trustee and will at all times keep the Trustee advised of the names of the members of the Committee and individuals authorized to sign on the Committee's behalf and provide specimen signatures thereof.  The Committee may authorize the Trustee to act without directions or instructions from the Committee on any matter or class of matters with respect to which directions or instructions from the Committee are called for under this Agreement.  The Trustee will be fully protected in relying on any communication sent by any authorized person and will not be required to verify the accuracy or validity of any signature unless the Trustee has reasonable grounds to doubt the authenticity of any signature.  If the Trustee requests any directions under this Agreement and does not receive them, the Trustee will act or refrain from acting, as it may determine with no liability for such action or inaction.

3.7    Continuation of Powers on Trust Termination□ Notwithstanding anything to the contrary in this Agreement, on termination of the Trust, the Trustee's powers, rights and duties under this Agreement will continue until all Trust Fund assets have been liquidated.

DB1/ 73701652.3

8

## ARTICLE IV
## INVESTMENT OF TRUST FUND

4.1    Investment of Cash. The primary purpose of the Plan is to acquire an ownership interest in the Company either from the Company or its shareholders and to provide benefits to Participants in the form of shares of Company Stock. Accordingly, the portion of the Plan that is intended to be an employee stock ownership plan has been established to provide for investment primarily in shares of Company Stock. The Trustee will purchase Company Stock with the assets contained in the Participants' accounts under the Plan on the Committee's direction, unless the Trustee determines that such purchase is prohibited by ERISA. The Trustee will purchase Company Stock from the Company or from any shareholder, if the Trustee is directed by the Committee to do so, and such Company Stock may be outstanding, newly issued or treasury stock. All such purchases must be at a price not in excess of fair market value, as determined by an independent appraiser and as approved by the Trustee, if such Company Stock is not publicly traded. Pending investment of cash in Company Stock, the Trustee may invest such cash in savings accounts, certificates of deposit, high-grade, short-term debt securities or other high-grade, short-term bonds, mutual funds that invest in the foregoing or other investments or may hold it as cash. Such investments may include any common or collective funds (including a common debt, or collective fund for which the Trustee or one of its affiliates serves as investment advisor or trustee) maintained as a short-term investment fund. Such investments may also include any others approved by the Committee for these purposes. To the extent that the Trust Fund is invested in such common or collective funds, the terms of the instrument establishing such funds are made a part of this Agreement as fully as if set forth at length in this Agreement. Any cash dividends received by the Trustee on Company Stock held in the Trust Fund will be applied, after the receipt of such cash dividend, as provided by Article 6 of the Plan.

4.2    Stock Dividends, Splits and Other Capital Reorganizations. Any Company Stock received by the Trustee as a stock split or dividend or as a result of a reorganization or other recapitalization of the Company will be allocated as of each Valuation Date under the Plan in proportion to the Company Stock to which it is attributable.

4.3    Voting of Company Stock. Subject to ERISA, with respect to any corporate matter that involves the voting of Company Stock with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation (and, if the Company has a registration-type class of securities, all other shareholder voting issues), each Participant will be entitled to direct the Trustee as to the exercise of any shareholder voting rights attributable to shares of Company Stock allocated to his accounts under the Plan, but only to the extent required by Code § 401(a)(21) and 409(e)(3) and the regulations thereunder. For purposes of the foregoing sentence, each Participant will be a named fiduciary of the Plan as described in ERISA § 402(a)(2). The Committee will have the sole responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this § 4.3. If a Participant is entitled to direct the Trustee under this § 4.3, all allocated Company Stock as to which instructions have been received (which may include an instruction to abstain) will be voted by the Trustee in accordance with such instructions, provided that the Trustee may vote the shares as it determines is necessary to fulfill its fiduciary duties under ERISA. The Trustee will vote any shares as to which no voting instructions have

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 605 of 1527    Document 14-2

been received as directed by the Committee as a named fiduciary of the Plan, as described in ERISA § 402. In all other circumstances, the Trustee will vote all shares of Company Stock as directed by the Committee as a named fiduciary of the Plan as described in ERISA § 402.

4.4    Tender or Exchange Offers. Subject to ERISA, in the event of a tender or exchange offer or other offer to purchase shares of Company Stock held by the Trust, the Trustee will tender or sell the shares as directed by each Participant with respect to shares of Company Stock allocated to his account under the Plan, subject to the fiduciary duties of the Trustee under ERISA. For purposes of the foregoing sentence, each Participant will be a named fiduciary of the Plan as described in ERISA § 402(a)(2). In all other circumstances, the Trustee will tender or exchange shares of Company Stock as directed by the Committee as a named fiduciary of the Plan, as described in ERISA § 402. In carrying out its responsibilities under this § 4.4, the Trustee may rely on information furnished to it by the Committee, including the names and current addresses of Participants and the number of shares of Company Stock allocated to their accounts under the Plan.

4.5    Put Option. If the distribution of a Participant's account is to be made in cash, a Participant exercises his rights under Section 6.5 of the Plan or the Trustee expects to incur substantial Trust expenses that will not be paid directly by the Company or a Participating Company and the Trustee determines that the Trust Fund has insufficient cash to make anticipated distributions or pay Trust expenses, the Trust will have a put option to the Company on Company Stock it holds for the purpose of acquiring the cash to make such anticipated distributions and paying such expenses. The purchase price for the sale of stock by the Trustee to the Company will be the fair market value of the stock as of the date of the sale.

ARTICLE V
EXPENSES

The Trustee will pay from the Trust Fund the expenses it incurs in the performance of its duties under this Agreement, including fees for legal services rendered to it, its compensation and all other proper charges and disbursements, including all personal property taxes, income taxes and other taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws on or in respect of the Trust or any money, property or security forming a part of the Trust Fund. Such expenses will constitute a charge on the Trust Fund unless the Company pays the same or any part thereof. To the extent the Company or a Participating Company pays any expenses that are properly payable from the Trust Fund, the Trustee will reimburse the Company or Participating Company from the Trust Fund if requested to do so by the Company or the Participating Company. The Company will promptly pay for any services required of the Trustee that may arise after the Trustee's resignation or removal based on the Trustee's then prevailing fee schedule. This provision will survive the termination of this Agreement.

DB1/ 73701652.3

10

## ARTICLE VI
## REMOVAL AND RESIGNATION OF TRUSTEE AND SUCCESSOR TRUSTEE

The Company may remove the Trustee at any time on 60 days' written notice delivered to the Trustee. The Trustee may resign at any time on 60 days' written notice delivered to the Company. If the Trustee is removed or resigns in accordance with this Article VI, the Company will notify the Trustee of the appointment of a successor trustee and the Trustee will convey and deliver to such successor trustee all of the Trust assets. Within 90 days after the Trustee's removal or resignation, the Trustee will make a final accounting to the Company and the Committee as of the effective date of such removal or resignation pursuant to the terms of § 3.4(j).

## ARTICLE VII
## AMENDMENT OF TRUST AND TERMINATION OF PLAN

7.1    Amendment of Trust☐ The Company and the Trustee may amend this Agreement by written agreement at any time or from time to time, and any such amendment by its terms may be retroactive. Notwithstanding the foregoing, no amendment will be made that would authorize or permit any Trust assets, other than such assets as are required to pay taxes and administration expenses, to be used for or diverted to purposes other than the exclusive benefit of Participants, except that this Agreement may be amended retroactively and to affect the benefits of Participants if necessary to cause the Plan and Trust to be or remain qualified and exempt from income taxes under the Code.

7.2    Termination of Plan. In the event of the Plan's termination, the Trustee will continue to hold the Trust, to be applied and distributed in accordance with the Plan's terms.

## ARTICLE VIII
## MISCELLANEOUS

8.1    Nonalienation of Benefits☐ Except as provided under the provisions of the Plan relating to loans to Participants and to qualified domestic relations orders and to the extent permitted by law, neither the benefits payable from the Trust nor any interest in the Trust will be subject in any manner to the claim of any creditor of a Participant or to any legal process by any creditor of such Participant. A Participant will not have any right to alienate, commute, anticipate or assign any right to benefits payable from or any interest in the Trust, except as provided in the Plan.

8.2    Exclusive Benefit☐ Except as otherwise provided in the Plan and this Agreement, no part of the Trust will be used for or diverted to any purpose other than for the exclusive benefit of Participants or the payment of expenses as provided in this Agreement.

8.3    Effect of Plan. The Trustee is not a party to the Plan, and in no event will the Plan's terms, either expressly or by implication, be deemed to impose on the Trustee any responsibility other than as set forth in this Agreement. In the event of any conflict between the Plan's provisions and this Agreement, this Agreement will be deemed to be incorporated into and be a part of the Plan, and the terms of this Agreement will control over any inconsistent terms of the Plan. The Trustee will not be a named fiduciary under the Plan and will not have the authority to interpret the Plan.

DB1/ 73701652.3

11

8.4    Entire Agreement. This Agreement constitutes the entire agreement between the parties with regard to its subject matter. There are no other agreements or understandings between the parties relating to this Agreement's subject matter other than those set forth or provided for in this Agreement.

8.5    Notices. Notices, directions and other communications provided in writing will be mailed to the parties at the following addresses:

If to the Company:    ESOP Administrative Committee
Appleton Papers Inc.
P.O. Box 359
Appleton, WI 54912-0359
Attn: Tom Ferree

If to the Trustee:    Reliance Trust Company
P.O. Box 28166
Atlanta, Georgia 30358
Attn: Steve Martin

8.6    Liability for Predecessor or Successor. Except as required under ERISA, no successor trustee under this Agreement in any way will be liable or responsible for any prior trustee's actions or omissions in the administration of the Trust or the assets comprising the Trust prior to the date such successor trustee assumes its obligations under this Agreement. No prior trustee will in any way be liable or responsible for any successor trustee's actions or omissions.

8.7    Liability for Acts of Others. The Trustee will not be liable for the acts or omissions of the Company, the Committee or any Independent Trustee except with respect to any acts or omissions of any such party in which the Trustee participates knowingly or that it knowingly undertakes to conceal and that it knows constitutes a breach of fiduciary responsibility of such party.

8.8    Indemnification. Recognizing that engagements of the type contemplated in this Agreement can result in government investigations, litigation or other proceedings, the Company agrees to indemnify the Trustee and its directors, employees and officers against and from any and all claims, damages, expenses, liabilities and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing for, defending or responding to discovery requests or other requests for information relating to any investigations, litigation, arbitration or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to the Trustee's duties as a trustee (including all events that occurred prior to the Trustee becoming a trustee or after the Trustee's service as a trustee has terminated). However, the Trustee's indemnification will not apply to any Non-Indemnity Loss.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 608 of 1527    Document 14-2

If the Trustee receives notice of a proceeding, the Trustee will notify the Company of the proceeding in writing within 30 days of its receipt of notice of the proceeding. However, the Trustee's failure to so notify the Company will not relieve the Company from any liability for indemnification under this § 8.8 except to the extent that the failure to notify the Company actually prejudiced the Company's defense of any proceeding. The Company will be entitled to assume the defense of the proceeding with legal counsel reasonably satisfactory to the Trustee or to otherwise participate in the proceeding. If the Company elects to assume the defense of the proceeding, it will pay all costs of defense.

The Trustee will have the right to employ its own legal counsel in any proceeding if (a) the Company authorizes the Trustee's employment of its own legal counsel, (b) the Trustee's legal counsel advises it that there may be one or more legal defenses available to the Trustee that are in addition to or different from defenses available to the Company and the Company's legal counsel declines to assert such defenses (in which case the Company will not have the right to assume the defense of the proceeding on the Trustee's behalf) or (c) the Trustee's legal counsel informs the Trustee that a potential conflict of interest exists between the Company and the Trustee. The Trustee will not be required to disclose or otherwise share its counsel's advice to satisfy either clause (b) or (c).

The rights of indemnification provided to the Trustee in this § 8.8 will also be available to all directors, officers and employees of the Trustee against whom any such claim is asserted, without regard to whether such claim is also asserted against the Trustee, and to any insurance carrier that is obligated to pay any losses or defense costs associated with any claim pursuant to an insurance policy under which the Trustee is an insured or otherwise provided coverage.

The Company, regardless of the type or nature of any claims asserted against the Trustee as part of a proceeding and without regard to whether any such claims, if established, would constitute a Non-Indemnity Loss, will reimburse the Trustee for all reasonably incurred expenses and fees as and when the Trustee incurs them in connection with any proceeding, including without limitation the expenses and fees of investigating, responding to discovery proceedings, testifying in any hearing and consulting with the Company or its advisors and attorneys, the Trustee's share of fees and expenses of mediators or arbitrators, and for the reasonable expenses and fees of the experts and legal counsel whom the Trustee engages for any proceeding. Any such reasonably incurred expenses and fees advanced to the Trustee as part of a proceeding will be returned to the Company only if a claim with respect to which such advancement has been made is finally determined to be Non-Indemnity Loss.

If the Trustee seeks payment from the Company or seeks to enforce the indemnification or agreement to hold harmless pursuant to this § 8.8, the Trustee will provide the Company all applicable invoices for legal fees and other expenses it incurs in investigating or defending such claims and any supporting documentation as the Company reasonably requires. However, the Trustee may redact the invoices and documentation or take other measures to preserve the attorney-client privilege, work product doctrine or other applicable privilege.

Case 1:19-cv-01561-WCG     Filed 11/19/19     Page 609 of 1527     Document 14-2

8.9    <u>Controlling Law</u> This Agreement will be construed according to the laws of the State of Georgia, except to the extent superseded by ERISA or any other federal law.

8.10    <u>Effective Date.</u> This Agreement will be effective on and after April 1, 2013.

8.11    <u>Execution in Counterpart.</u> This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original and all of which together will constitute one and the same instrument.

*[Remainder of page intentionally left blank; signature page to follow]*

DB1/ 73701652.3

14

IN WITNESS WHEREOF, the Company, by its duly authorized officer, and the Trustee have caused this Agreement to be signed on the 1st day of April, 2013.

**COMPANY**

Appleton Papers Inc.

By: _____
     Thomas J. Ferree
     Senior Vice President, Chief Financial Officer

**TRUSTEE**

Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee of the Appleton Papers Inc. Employee Stock Ownership Trust:

By: _____
     Stephen A. Martin
     Senior Vice President

DB1/ 73701652.3

15

# Exhibit 3

# APPVION, INC.
## EMPLOYEE STOCK OWNERSHIP TRUST
### (As Amended and Restated Effective August 3, 2015)

DB1/ 83724705.6

# TABLE OF CONTENTS

PAGE

ARTICLE I    NAME .................................................................................................... 2

ARTICLE II   MANAGEMENT AND CONTROL OF TRUST FUND ASSETS ..................... 3

    2.1. Acceptance ................................................................................................. 3

    2.2. Trust Fund Administration......................................................................... 3

    2.3. Investment of Trust Fund ........................................................................... 3

    2.4. Purchase and Sale Transactions ................................................................ 3

    2.5. Voting Company Stock ............................................................................... 3

    2.6. Trust Fund Powers .................................................................................... 4

    2.7. Borrowing to Purchase Company Stock ..................................................... 7

    2.8. Exercise of Duties ..................................................................................... 8

    2.9. Trustee Directions Authorized by ESOP Committee ................................... 9

ARTICLE III  NO REVERSION TO COMPANY ......................................................... 9

    3.1. No Reversion to Company........................................................................... 9

    3.2. Denial of Tax Qualification ........................................................................ 9

    3.3. Nondeductible Contributions ..................................................................... 10

    3.4. Mistake of Fact ......................................................................................... 10

    3.5. Residual Assets ......................................................................................... 10

ARTICLE IV  CHANGE OF TRUSTEE ....................................................................... 10

    4.1. Resignation ............................................................................................... 10

    4.2. Removal of Trustee..................................................................................... 10

    4.3. Duties of Resigning or Removed Trustee and of Successor Trustee................ 10

    4.4. Changes in Organization of Trustee............................................................ 11

ARTICLE V   GENERAL ............................................................................................ 11

    5.1. Disagreement as to Acts............................................................................. 11

    5.2. Persons Dealing With Trustee .................................................................... 11

    5.3. Benefits May Not Be Assigned or Alienated ................................................ 11

    5.5. Evidence.................................................................................................... 11

    5.6. Waiver of Notice ....................................................................................... 12

    5.7. Counterparts............................................................................................. 12

    5.8. Governing Laws; Venue ............................................................................. 12

-i-

**TABLE OF CONTENTS**
(continued)

<div align="right">Page</div>

5.9. Successors .................................................................................................... 12

5.10. Successor Company ..................................................................................... 12

5.11. Compensation and Expenses........................................................................ 12

5.12. Limit of Responsibility ................................................................................ 12

5.13. Severability ................................................................................................. 12

5.14. Gender and Number..................................................................................... 12

5.15. Text to Control............................................................................................. 12

5.16. Construction of Powers................................................................................ 13

5.17. Right of the Company to Inspect Trust Fund Records................................... 13

5.18. Application of Rules ..................................................................................... 13

5.19. Conflict Between or Among other Agreements.............................................. 13

ARTICLE VI  AMENDMENT AND TERMINATION .............................................. 13

6.1. Entire Agreement; Amendment ...................................................................... 13

6.2. Termination................................................................................................... 13

ARTICLE VII DEFINITIONS .................................................................................. 14

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 615 of 1527    Document 14-2

APPVION, INC.
EMPLOYEE STOCK OWNERSHIP TRUST
(As Amended and Restated Effective August 3, 2015)


This Trust Agreement is the amended and restated trust agreement of the Former ESOT on the date hereof to be effective as of the Effective Date, by and between Appvion, Inc. (formerly, Appleton Papers Inc.), a Delaware corporation (the "Company"), and Argent Trust Company ("Argent"), not in its corporate capacity but solely in its capacity as trustee of the Appvion, Inc. Employee Stock Ownership Trust (As Amended and Restated Effective August 3, 2015). The Company and Argent have entered into this Trust Agreement to continue the trust under the laws of the State of Delaware, and to authorize Argent to serve as the discretionary trustee of the Appvion, Inc. Employee Stock Ownership Trust (As Amended and Restated Effective August 3, 2015). The Parent Corporation hereby joins into this Trust Agreement effective as of the date hereof. All definitions used herein are set forth in Article VII hereof.


<u>RECITALS</u>


**WHEREAS,** the Company originally established the Appleton Papers Retirement Savings Plan ("Original Plan"), effective January 1, 1985, and amended and restated the Original Plan in its entirety, effective January 1, 2001, to add an employee stock ownership plan feature and to rename the Original Plan the Appleton Papers, Inc. Retirement Savings and Employee Stock Ownership Plan ("2001 Plan") ;

**WHEREAS,** the 2001 Plan was amended on several occasions, and was most recently amended and restated in its entirety to be known as the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, effective as of January 1, 2014 ("Plan");

**WHEREAS,** the Plan is designed to invest primarily in Company Stock and is intended to meet the requirements of Sections 401(a) and 4975(e)(7) of the Code and Section 407(d)(6) of ERISA;

**WHEREAS,** the Company and Reliance Trust Company ("Reliance") entered into the Former ESOT;

**WHEREAS,** Argent, as successor trustee of the Former ESOT, has assumed all of the responsibilities and obligations from Reliance in connection with the Former ESOT;

**WHEREAS,** the Company and Argent desire to amend and restate the Former ESOT into the Trust to be effective August 3, 2015;

DB1/ 83724705.6

**WHEREAS,** the Company and Argent have entered into an Engagement Agreement setting forth the terms and conditions of the agreement between Argent and the Company, with the Parent Corporation joining into the Engagement Agreement;

**WHEREAS,** Argent will serve as the discretionary Trustee of the Trust pursuant to the Engagement Agreement;

**WHEREAS,** Argent, in its capacity as the Trustee of the Trust, shall continue to hold the assets of the Trust for the benefit of the participants and beneficiaries of the Plan;

**WHEREAS,** the Company desires to amend and restate the Former ESOT to reflect that Argent is the discretionary Trustee of the Trust pursuant to the Engagement Agreement, and Argent desires to amend and restate the Former ESOP to reflect that Argent is the discretionary trustee of the Trust pursuant to the Engagement Agreement;

**WHEREAS,** Argent will serve as the discretionary Trustee of the Trust pursuant to this Trust Agreement and consistent with the terms and conditions set forth in the Engagement Agreement;

**WHEREAS,** the Company and Argent have agreed to the fees that Argent will charge for serving as the discretionary Trustee of the Trust, as set forth in the Engagement Agreement;

**WHEREAS,** the Company desires the Trust to continue to be exempt from tax under Section 501(a) of the Code;

**WHEREAS,** Argent accepts the terms of the Trust, and Argent agrees to perform the obligations set forth in this Trust Agreement; and

**WHEREAS,** the Trustee intends to interpret the Trust Agreement, whenever possible, to comply with the terms of the Code, ERISA, and all formal regulations and rulings thereunder, and intends to follow the terms of the Engagement Agreement in the event that a conflict arises between or among the Trust Agreement, the Engagement Agreement, and/or the Plan unless such provision violates ERISA, then the Trust Agreement first, then the Plan second, shall control and be binding on such parties.

## ARTICLE I
## NAME

The Trust is evidenced by this Trust Agreement, and the Trust shall be known as the "Appvion, Inc. Employee Stock Ownership Trust (As Amended and Restated Effective August 3, 2015)."

-2-

## ARTICLE II
## MANAGEMENT AND CONTROL OF TRUST FUND ASSETS

2.1.    Acceptance.  Argent agrees to be the discretionary Trustee of the Trust and agrees to the terms of the Trust set forth in this Trust Agreement.  In addition, Argent agrees to hold the Trust Fund in trust hereunder, and shall receive and hold all sums heretofore held in the Trust Fund.  The Trustee shall (a) receive and accept for the purposes hereof all sums of money and other property acceptable to the Trustee for receipt which is paid to the Trust, contributed to the Trust through Contributions, and Dividends paid to the Trust; and (b) hold, invest, reinvest, manage, administer, and distribute such monies and other property and the increments, proceeds, earnings and income thereof pursuant to the terms of the Trust Agreement and for the exclusive benefit of the Plan's participants and their beneficiaries.

2.2.    Trust Fund Administration.  All Contributions and Dividends made to the Trust will be managed and controlled by the Trustee acting under this Trust Agreement.  The Trustee shall manage, administer, and invest all Contributions and Dividends made to the Trust by the Company along with the other assets of the Trust Fund.  If, for any reason, it becomes necessary to determine the portion of the Trust Fund allocable to Employees and former Employees or a particular Employer as of any date, the Recordkeeper shall specify such date as an Accounting Date, and after all adjustments required under the Plan as of that Accounting Date have been made, the portion of the Trust Fund attributable to such Employees and former Employees shall be determined and shall consist of an amount equal to the aggregate of the account balances of Employees and former Employees or that Employer plus an amount equal to an allocable Contribution made by the Company or Employer since the close of the immediately preceding Plan Year.

2.3.    Investment of Trust Fund.  Assets held by the Trustee in the Trust Fund shall be invested by the Trustee primarily in Company Stock, to the extent consistent with ERISA.  To the extent permitted by the Code and ERISA, Contributions and Dividends made by the Company to the Trust (pursuant to the terms of the Plan) in cash, and other assets of the Trust Fund, may be used to purchase shares of Company Stock from the Company or from any shareholder of the Company, or to repay an Exempt Loan.  Company Stock shall be purchased by the Trustee only at prices which do not exceed the fair market value of the shares purchased, as determined by the Trustee, in its sole discretion, based upon an appropriate valuation performed by an independent appraiser to support the Trustee's decision on establishing the fair market value of such Company Stock on the Valuation Date.

2.4.    Purchase and Sale Transactions.  The Trustee, in its sole discretion, may enter into purchase and sale transactions of any form or structure from time to time, but shall not enter into a non-exempt "prohibited transaction," as that term is defined in Section 4975(c) of the Code and Section 406 of ERISA.

2.5.    Voting Company Stock.  The Trustee shall vote the shares of Company Stock held in the Trust Fund with respect to all matters, in its discretion, pursuant to the Voting Requirements.

-3-

2.6.    <u>Trust Fund Powers</u>.  The Trustee shall be a discretionary trustee with respect to all the assets of the Trust Fund, including, but not limited to, purchases, holding, and sales of Company Stock, as well as voting shares of Company Stock.  Subject to the provisions of Sections 2.8 2.9, and 2.10, the Trustee shall have the following powers, rights, and duties with respect to the Trust Fund, in addition to, and not limited to, those provided elsewhere in this Trust Agreement or by Applicable Law:

(a)    To receive and hold all Contributions and Dividends paid to the Trust under the Plan.

(b)    To retain in cash any portion of the Trust Fund (pending investment, reinvestment, or payment of benefits) and, subject to Section 2.3, to deposit cash in any depositary (including the banking department of the bank, if any, acting as Trustee or an affiliate of that bank), without liability for interest, or to deposit cash in savings accounts or time certificates of deposit bearing a reasonable rate of interest in the banking department of the bank acting as Trustee (or an affiliate of that bank) or in money market funds or money market mutual funds established, maintained, or managed by the Trustee (or an affiliate of the Trustee), including any money market mutual fund for which the Trustee or an affiliate of the Trustee serves as investment adviser.

(c)    To make payments from the Trust Fund to the Persons, in the manner, at the times as directed by the ESOP Committee pursuant to Section 2.9, and in the amounts as calculated by the Recordkeeper.

(d)    To begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the Trust Fund, and the administration of the Trust.

(e)    To have all rights conveyed under Section 2.5 and all rights of an individual owner, including the power to give proxies to vote stocks, to join in or oppose (alone or jointly with others) voting trusts, mergers, consolidations, foreclosures, reorganizations, recapitalizations, or liquidations, and to exercise or sell stock subscription or conversion rights.

(f)    To retain any assets, funds or property subject to any dispute, without liability for the payment of interest, or to decline to make payment or delivery of the funds or property, until final adjudication is made by a court of competent jurisdiction.

(g)    To maintain financial records of the Trust and to provide a report to the ESOP Committee, with a courtesy copy to the Company upon request, on the last day of each Plan Year and on any Valuation Date, with the records, including such information but not limited to, the number of shares of Company Stock held by the Trust and the net worth of the Trust Fund (that is, the fair market value of all property held in the Trust Fund, reduced by any liabilities other than liabilities to participants in the Plan and their

– 4 –

beneficiaries, as determined by the Trustee), the amount of cash and types of investments made by the Trust, and the expenses charged and/or paid to or by the Trust;

(h)  To furnish to the ESOP Committee, with a courtesy copy to the Company upon request, an annual written account, and accounts for any other periods as may be reasonably requested by the ESOP Committee, showing the net worth of the Trust Fund at the end of the period, all investments, receipts, disbursements, and other transactions made or entered into by the Trustee during the Accounting Period, and any other information that the Trustee may possess which the ESOP Committee requires in order to comply with Section 103 of ERISA. All accounts of the Trustee shall be kept on an accrual basis. If during the term of this Trust Agreement, the Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports required by ERISA, the Trustee shall use those valuation methods for purposes of the accounts described by this subsection.

(i)  To pay any income, withholding, or other taxes, charges, or assessments attributable to any benefit which, in the Trustee's opinion, it shall or may be required to pay out of the benefit; and to require, before making any payment, a release or other document from any taxing authority, and indemnity from the intended payee, as the Trustee shall deem necessary for its protection.

(j)  To employ agents, attorneys, third party administrators, Recordkeeper, actuaries, accountants, investment managers, appraiser, valuation firm, or independent financial advisors for any purposes that the Trustee considers desirable;

(k)  To invest in Company Stock (as set forth in Section 2.3) and to select an independent appraiser to assist the Trustee to determine the fair market value of the Company Stock and the Valuation Date. In addition, the Trustee shall determine the fair market value of the Company Stock and the other assets of the Trust Fund as of each Valuation Date, or, in the absence of readily ascertainable market values, at such values as the Trustee shall, in its sole discretion, determine with consideration being given to methods consistently followed and uniformly applied. The Trustee, in its sole discretion, may rely for all purposes of this Trust Agreement on the latest valuation and transaction information submitted to it by the Person responsible for the investment of such assets that are not invested in Company Stock even if such information predates the Valuation Date.

(l)  To assume, until advised to the contrary, that the Trust evidenced by this Trust Agreement is qualified under Section 401(a) of the Code and is entitled to tax exemption under Section 501(a) of the Code.

-5-

(m)     To borrow money in accordance with Section 2.7, to purchase and sell Company Stock in accordance with Sections 2.3 and 2.4, and to vote the Company Stock in accordance with Section 2.5 herein.

(n)     To invest and reinvest the Trust Fund from time-to-time in any property, real, personal, or mixed, including without limitation, securities of domestic and foreign corporations and investment trusts or companies, bonds, debentures, real estate, agriculture real estate, preferred stocks, common stocks, Company Stock, mutual funds, common trust funds (as described in Code Section 584), collective investment funds (which conform to the rules of the Comptroller of the Currency), mortgages, and mortgage participations, all with complete discretion to change the character of the Trust Fund, even though such investment causes a great proportion of the total Trust Fund to be invested in investments of one type or of another type;

(o)     To lease for oil, gas and other mineral purposes and to create mineral severances by grant or reservation; to pool or unitize interests in oil, gas and other minerals; and to enter into operating agreements and to execute division and transfer orders;

(p)     To provide information to the Company, or to the firm engaged by the Company to perform such services as the case may  be, that is available to the Trustee to enable the Company to file all required tax returns and to complete its financial statements audit of the Company;

(q)     To compromise, contest, arbitrate, settle or abandon claims and demands by or against the Trust and Trust Fund;

(r)     To exercise any options, subscription rights and other privileges with respect to the Trust Fund with respect to assets other than Company Stock, to manage, sell, contract to sell, grant options to purchase, convey, exchange, transfer, abandon, improve, repair, insure, lease for any term even though commencing in the future or extending beyond the term of the Trust, and otherwise deal with all property, real or personal, in such manner, for such considerations and on such terms and conditions as the Trustee decides;

(s)     To register ownership of any securities or other property held by it in its own name or in the name of a nominee, with or without the addition of words indicating that such securities are held in a fiduciary capacity, and may hold any securities in bearer form, but the books and records of the Trustee shall at all times reflect that all such investments are part of the Trust;

(t)     To Put the Company Stock, in whole or in part, and if: (i) the distribution of a Company Stock Account of a participant or beneficiary of the Plan is to be made in cash; (ii) the Trustee is required to diversify a Company Stock Account of a

-6-

participant or beneficiary of the Plan under the Plan; or (iii) the Trustee expects to incur substantial Trust expenses which will not be paid directly by the Company, and the Trustee determines that the Trust Fund has insufficient cash to make anticipated distributions or pay Trust expenses;

(v)    To attend all shareholder meetings of the Company and act as the shareholder of record for the benefit of the Trust; and

(w)    To perform any and all other acts in its judgment necessary or appropriate: (i) for the proper and advantageous management, investment, and distribution of the Trust Fund, and (ii) for carrying out its obligations under the Engagement Agreement.

The Trustee shall have full discretionary authority to interpret the terms of this Trust Agreement. All decisions, determinations, interpretations, and applications of the Trust Agreement shall be final and binding upon all persons, including Plan participants and beneficiaries.

2.7.    <u>Borrowing to Purchase Company Stock</u>. Subject to the provisions of Section 2.8, the Trustee shall have the power to borrow funds for the purpose of purchasing Company Stock or for the purpose of repaying all or any portion of any outstanding indebtedness incurred by the Trustee to purchase Company Stock, subject to the following conditions:

(a)    The loan must be for a specific term and constitute an Exempt Loan.

(b)    The rate of interest payable on the loan may be fixed or variable, but the rate must not exceed a reasonable rate of interest taking into account all relevant factors, including the amount and duration of the loan, the security for and any guarantee of the loan, and the creditworthiness of the Trust and of any guarantor of the loan.

(c)    Within a reasonable time after receipt of the loan proceeds, the Trustee shall use the proceeds to purchase Company Stock or to repay all or any portion of the loan or of any prior outstanding loan that has been used to acquire Company Stock.

(d)    The only assets of the Plan which may be pledged as collateral for the loan are shares of Company Stock that were acquired either with the loan proceeds or with the proceeds of any prior loan, to the extent that the prior loan is repaid with the loan proceeds. Any shares of Company Stock which are pledged as collateral for a loan shall be released from the pledge and allocated to the accounts of the participants in the manner provided for in the Plan.

(e)    The loan agreement shall provide that no person entitled to payment under the agreement shall have any right to assets of the Trust other than: (i) collateral given for the loan, in accordance with subparagraph (d) above; (ii) Contributions made by the Company to the Trust to enable the Trustee to meet its obligations under the loan

–7–

agreement (other than Contributions of Company Stock); and (iii) earnings (which includes Dividends) attributable to the shares of Company Stock pledged as collateral to secure the loan and earnings attributable to the contributions made by the Company to the Plan to enable the Trustee to meet its obligations under the loan agreement (other than contributions of Company Stock).

(f)    Except as provided in subparagraph (e) above, the loan must be without recourse against the Plan.

(g)    The payments made by the Trustee during any Plan Year on all outstanding indebtedness incurred by the Trustee for the purpose of acquiring shares of Company Stock shall not exceed an amount equal to the sum of: (i) all Contributions (other than Contributions of Company Stock) made by the Company to the Plan for the purpose of enabling the Trustee to meet its obligations under the loan agreement during or prior to the applicable Plan Year; plus (ii) all earnings on those Contributions (other than Contributions of Company Stock) and all Dividends paid solely on the shares of Company Stock pledged as collateral to secure the loans in accordance with subparagraph (d) above during or prior to the applicable Plan Year, less (iii) all prior payments made on the loans.  Such Contributions and earnings shall be accounted for separately on the Plan's books until the loan is paid off.

(h)    The loan agreement must provide that the value of the Trust Fund  assets to be transferred in satisfaction of the loan in the case of a default shall not exceed the amount of the default.  If the lender is a "disqualified person" (as that term is defined in Section 4975(e) of the Code) or is a "party in interest" to the Plan (as that term is defined in Section 3(14) of ERISA), the loan agreement must provide for a transfer of Trust Fund assets upon a default only upon and to the extent of the failure of the Trust to meet the payment schedule set forth in the loan agreement.

(i)    Except as provided in the Trust Agreement, Company Stock acquired with the proceeds of a loan shall not be subject to a Put, call, or other option and shall not be subject to a buy-sell or similar arrangement, either while the Company Stock is held in the Trust Fund or after it is distributed to or on account of any participants.

(j)    The loan may not be payable upon demand, except in the case of default.

2.8.    Exercise of Duties.  Subject to the provisions of Article III, the Trustee shall discharge its duties under this Trust Agreement solely in the interest of the Plan participants and their beneficiaries and:

(a)    For the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries of the Plan; and

– 8 –

(ii)    defraying reasonable expenses of administering the Trust;

(b)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; and

(c)    In accordance with the documents and instruments governing the Trust and the Plan insofar as those documents and instruments are consistent with the provisions of ERISA;

The Trustee shall not cause the Trust to engage in any transaction prohibited by either this Trust Agreement, ERISA or the Code.

2.9.    <u>Trustee Directions Authorized by ESOP Committee</u>.  Subject to the Trustee's right to override the direction received by the Trustee from the ESOP Committee pursuant to Section 2.8, the ESOP Committee shall direct the Trustee with respect to the following:

(a)    To make distributions and diversification distributions (as required under the Plan) at certain times to participants and beneficiaries of the Plan in the amounts as calculated by the Recordkeeper;

(b)    To assist the Trustee in obtaining information necessary for the firm, engaged by the Trustee, performing the valuation of the Company Stock held by the Trust; and

(c)    To address the administrative aspects of the Plan (such as, but not limited to, eligibility of Employees becoming participants in the Plan).

<div align="center">ARTICLE III<br>NO REVERSION TO COMPANY</div>

3.1.    <u>No Reversion to Company</u>.  Except as provided below in this Article III, no part of the corpus or income of the Trust Fund shall revert to the Company or the Parent Corporation (as the case may be) or be used for, or diverted to, purposes other than for the exclusive benefit of participants and their beneficiaries of the Plan.

3.2.    <u>Denial of Tax Qualification</u>.  If any Contribution under the Plan is conditioned on receiving an initial or subsequent qualification of the Plan under Sections 401(a) and 4975(e)(7) of the Code and if the Plan does not so qualify, then the Trustee shall return to the Company, or the Parent Corporation (as the case may be),  the amount of the Contribution and any earnings attributable to the Contribution within one calendar year after the date initial qualification of the Plan is denied.

<div align="center">–9–</div>

3.3.    Nondeductible Contributions. If a Contribution is conditioned upon the deductibility of the Contribution under Section 404 of the Code and if the deduction is disallowed, then the Trustee shall return to the Company, or the Parent Corporation (as the case may be), within one year after the date the deduction is disallowed the excess of: (i) the amount contributed over (ii) the amount that would have been contributed had there not occurred a mistake in determining the deduction, reduced by losses attributable to the excess (and limited so as not to reduce the balance of the individual account of any participant or beneficiary from what it would have been if the excess had not been contributed).

3.4.    Mistake of Fact. If a Contribution or any portion thereof is made by the Company, or the Parent Corporation (as the case may be),  by reason of a mistake of fact, then the Trustee shall return to the Company, or the Parent Corporation (as the case may be),  within one year after the date of the Contribution the excess of (i) the amount contributed over (ii) the amount that would have been contributed had there not occurred a mistake of fact, reduced by losses attributable to the excess (and limited so as not to reduce the balance of the individual account of any participant or beneficiary from what it would have been if the excess had not been contributed).

3.5.    Residual Assets.   If, after all liabilities of the Trust created under the Plan to participants and their beneficiaries have been satisfied, any residual assets remain in the Trust, those assets shall be used for the benefit of the participants and beneficiaries of the Plan.

<div align="center">

ARTICLE IV
CHANGE OF TRUSTEE

</div>

4.1.    Resignation.  The Trustee may resign at any time by giving at least 30 days' advance written notice to the Company.

4.2.    Removal of Trustee.  By action of the Board or of a person designated by resolution of its Board of Directors, the Company may remove the Trustee by giving at least 30 days' advance written notice to the Trustee.

4.3.    Duties of Resigning or Removed Trustee and of Successor Trustee.  If the Board fails to appoint a successor trustee as provided herein, or the successor trustee appointed by the Board declines to serve as the successor trustee for any reason, the chairperson of the ESOP Committee shall assume the responsibility and position as the sole successor trustee at the end of the thirty (30) day notice period described in Section 4.1 and Section 4.2 above.  If a Trustee resigns or is removed, it shall promptly, but not longer than 30 days from the date of the written notice described in Sections 4.1 and 4.2, as the case may be, transfer and deliver the assets of the Trust Fund to the successor Trustee, after reserving a reasonable amount to provide for its fees and expenses and any sums chargeable against the Trust Fund for which it may be liable.  The resigning or removed Trustee shall provide an accounting to the Company and to the successor Trustee within 60 days of the date of its removal or resignation.  The Company and the successor Trustee shall have 60 days from the date of

-10-

the delivery of the accounting within which to file written objections to the accounting. If neither the Company nor the successor Trustee files a written objection to the accounting within 60 days, then, to the extent permitted under ERISA, the successor Trustee shall be deemed to have approved the accounting, and the removed or resigning Trustee shall be released and discharged with respect to any matters set forth or otherwise described in the accounting. Each successor Trustee shall succeed to the title to the Trust Fund vested in its predecessor without the signing or filing of any further instrument, but any resigning or removed Trustee shall sign all documents and perform all acts necessary to vest title of record in any successor Trustee. Each successor Trustee shall have all the powers, rights, and duties conferred by this Trust Agreement as if originally named Trustee.

4.4.    Changes in Organization of Trustee. If any Trustee shall be converted into, merged or consolidated with, or shall sell or transfer substantially all of its assets and business to a corporation formed under the laws of the United States of America or any of its political subdivisions, that corporation shall become the Trustee of the Trust with the same effect as though specifically so named.

**ARTICLE V**
**GENERAL**

5.1.    Disagreement as to Acts. If there is a disagreement between the Trustee and anyone as to any act or transaction reported in any accounting, the Trustee shall have the right to have accounts settled by a court of competent jurisdiction.

5.2.    Persons Dealing With Trustee. No person dealing with the Trustee shall be required to see to the application of any money paid or property delivered to the Trustee or to determine whether or not the Trustee is acting pursuant to any authority granted under this Trust Agreement.

5.3.    Benefits May Not Be Assigned or Alienated. The interests of Plan participants and of their beneficiaries under this Trust Agreement may not be voluntarily or involuntarily assigned or alienated. However, the provisions of this Section 5.3 shall not apply: (a) to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant or beneficiary pursuant to a "qualified domestic relations order," as that term is defined in Section 414(p) of the Code; or (b) to offsets against a participant's or beneficiary's benefits authorized under Section 401(a)(13)(C) of the Code.

5.4.    Indemnification.    The Company and the Trustee agree to the indemnification provisions set forth in the Engagement Agreement.

5.5.    Evidence. Evidence required of anyone under this Trust Agreement may be by certificate, affidavit, document, or other instrument which the person acting in reliance thereon considers pertinent and reliable and which is signed, made, or presented by the proper party.

-11-

5.6.    Waiver of Notice.  Any notice required under this Trust Agreement may be waived by the person entitled to the notice.

5.7.    Counterparts.  This Trust Agreement may be signed in any number of counterparts, each of which shall be deemed an original, and no other counterpart need be produced.

5.8.    Governing Laws; Venue.  This Trust Agreement shall be construed and administered according to the laws of the State of Wisconsin to the extent that those laws are not preempted by the laws of the United States of America; and the venue shall be in the city closest in miles to Appleton, Wisconsin that has a residing federal district court.

5.9.    Successors.  The provisions of this Trust Agreement shall be binding upon the Company, the Trustee, ESOP Committee, and their successors, and on all persons entitled to benefits under the Plan and their respective heirs and legal representatives.

5.10.    Successor Company.  If a successor to the Company or a purchaser of all or substantially all of the Company's assets elects to continue the Plan, the successor or purchaser shall be substituted for the Company under this Trust Agreement.

5.11.    Compensation and Expenses.  The Trustee may pay from the Trust Fund all of the Trust expenses, taxes, and charges incurred in connection with the collection, administration, management, investment, protection, and distribution of the Trust Fund and of the Plan to the extent that they are not paid directly by the Company, including fees of persons employed by the Trustee in accordance with Sections 2.6(j) and (k), and including the Trustee's fees set forth in the Engagement Agreement.

5.12.    Limit of Responsibility.  The Company shall deliver to the Trustee a signed copy of the Plan and signed copies of any amendments to the Plan.  The terms of this Trust Agreement shall be controlling, and the rights, powers, and duties of the Trustee shall be governed solely by the terms of this Trust Agreement.

5.13.    Severability.  If any provision of this Trust Agreement is held illegal or invalid, the illegality or invalidity shall not affect the remaining provisions of the Trust Agreement, but shall be severable, and the Trust Agreement shall be construed and enforced as if the illegal or invalid provision had never been inserted herein.

5.14.    Gender and Number.  In this Trust Agreement, where the context admits, words in the masculine gender include the feminine and neuter genders, words in the singular include the plural, and words in the plural include the singular.

5.15.    Text to Control.  The article and section headings and numbers in this Trust Agreement are included solely for convenience of reference.  If there shall be any conflict between the headings and numbers and the text of this Trust Agreement, the text shall control.

-12-

5.16.    Construction of Powers.  No enumeration of special powers of the Trustee by any of the provisions of this Trust Agreement shall be construed to limit any grant of general powers to the Trustee contained in, conferred by, or reasonably to be implied from any other provisions of this Trust Agreement. All the powers and authority conferred upon the Trustee by this Trust Agreement may be exercised in the manner provided for in this Trust Agreement without application to any court for leave or confirmation.

5.17.    Right of the Company to Inspect Trust Fund Records.  The Company may at its own expense, and at any time or from time to time, cause an examination of the books and records of the Trust Fund to be made by attorneys, accountants, auditors, or other agents of the Company that the Company shall select for that purpose, and it may cause a report of the examination to be made to the Board of Directors of the Company.

5.18.    Application of Rules.  In operating and administering the Trust Fund, the Trustee shall apply all rules of procedure and regulations adopted by it in a uniform and nondiscriminatory manner.

5.19.    Conflict Between or Among other Agreements.   In the event a conflict should arise between or among the Trust Agreement, the Plan, Engagement Agreement, or any other agreement or policy, the Trustee and the Company agree that the terms of the Engagement Agreement shall control, override, and prevail over such provision or provisions of the Plan, Trust and/or to such other agreement(s), and the provisions of the Engagement Agreement shall be binding on the Trustee and the Company, unless such provision in the Engagement Agreement violates ERISA, then the Trust Agreement first, then the Plan second, shall control and be binding on the parties.

## **ARTICLE VI**
## **AMENDMENT AND TERMINATION**

6.1.    Entire Agreement; Amendment.   The Company and Trustee may, by mutual consent, amend or modify and supplement this Trust Agreement in such manner as may be agreed in writing. This Agreement constitutes the entire agreement between the Company and Trustee with respect to the subject matter hereof and shall supersede all previous commitments and writings (including, but not limited to, the Former ESOT), provided, however, that the terms of the Engagement Agreement and the Paperweight Development Corp. Security Holders Agreement shall continue to be given full force and effect.

6.2.    Termination.  If the Plan is terminated, all of the provisions of the Trust evidenced by this Trust Agreement nevertheless shall continue in effect until the Trust Fund has been distributed by the Trustee.  If after all liabilities of the Plan to participants in the Plan and their beneficiaries have been satisfied, any residual assets remain, those assets shall be used for the benefit of the participants and beneficiaries of the Plan.

-13-

## ARTICLE VII
## DEFINITIONS

"Accounting Date" shall mean the last day of the Plan Year, or any more frequent date for reporting and/or investment purposes established, determined, or agreed to by the Trustee.

"Accounting Period" shall mean the twelve (12) consecutive month period coincident with the calendar year, or the shorter period in any year in which the Trustee accepts appointment as Trustee hereunder, or ceases to serve as Trustee hereunder for any reason.

"Applicable Law" shall mean any federal, state, or local law and all related regulations thereunder.

"Argent" shall mean Argent Trust Company or its successor.

"Board" shall mean the board of directors of the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any lawful regulations thereunder.

"Company" shall mean Appvion, Inc., a Delaware corporation, or any successor thereto.

"Company Stock" shall mean shares of common stock of the Parent Corporation, provided that such shares constitute "employer securities," as such term is defined in Section 409(l) of the Code.

"Company Stock Account" shall mean the participant's or beneficiary's account in the Plan (as calculated by the Recordkeeper) consisting of Company Stock.

"Contributions" shall mean contributions made in the form of cash, other property, or in any combination thereof by the Company, or the Parent Corporation, and declared by the Board as contributions subject to the certain limitations set forth in the Code.

"Dividends" shall mean cash and/or property distributions attributed to the Company Stock declared by the Board, and paid by the Parent Corporation to the Trust.

"Effective Date" shall mean August 3, 2015.

"Employee" shall mean any individual employed by an Employer and who is a participant in the Plan.

"Employer" shall mean a member of: (i) a "controlled group of corporations," as defined in Section 414(b) of the Code, which includes the Company; (ii) a trade or business under common control (whether or not incorporated and as determined pursuant to Section 414(c) of the Code) with the Parent Corporation; or (iii) a member of an "affiliated service group" as defined in Section 414(m)

–14–

of the Code with respect to the Parent Corporation, which has adopted this Trust Agreement with the consent of the Company.

"Engagement Agreement" shall mean a separate written agreement entered into between the Company and Argent executed on August 3, 2015 to be effective as of August 3, 2015.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time-to-time.

"ESOP Committee" shall mean the Person or committee member appointed by the Board to serve on the ESOP Committee until such time such Person or member resigns, dies, or his or her replacement is appointed by the Board, and the ESOP Committee shall be responsible for benefit administration, including any representative (designated in writing as such) or designee thereof authorized to act on behalf of such ESOP Committee.

"Exempt Loan" shall mean a loan between: (i) the Company and the Trust; (ii) the Trust and a selling shareholder; or (iii) any combination thereof, that constitutes an "exempt loan" for purposes of Section 4975(d)(3) of the Code and Section 408(b)(3) of ERISA.

"Former ESOT" shall mean the Amended and Restated Trust Agreement for the Appleton Papers, Inc. Employee Stock Ownership Trust (executed on April 2, 2013 to be effective on April 2, 2013) and which was a part of the Plan in effect until the Effective Date.

"Named Fiduciary" shall mean Argent. The Company, acting through its Board, is not a Named Fiduciary with respect to carrying out certain duties and responsibilities necessary to maintain the Plan and Trust, such as, but not limited to, appointment of the Trustee and members of the ESOP Committee, removal of the Trustee and members of the ESOP Committee, appointing the replacement of the Trustee and members of the ESOP Committee, adoption of amendments to the Plan and Trust, selection and engagement of the auditing firm auditing the Plan and Trust Fund, and selection and engagement of a Recordkeeper to prepare participant reports, and filing certain income tax forms with the Internal Revenue Service.

"Parent Corporation" shall mean Paperweight Development Corp., a Wisconsin corporation, or its successor.

"Person" shall mean a natural person, trust, estate, corporation of any kind or purpose, mutual company, joint-stock company, unincorporated organization, association, partnership, joint venture, employee organization, committee, board, participant, beneficiary, trustee, partner, or venture acting in an individual, fiduciary or representative capacity, as the context may require.

"Plan" shall mean the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan executed on April 16, 2014 to be effective January 1, 2014, as amended from time-to-time.

–15–

"Plan Administrator" shall mean the ESOP Committee.

"Plan Year" shall mean January 1st through December 31st.

"Put" shall mean the Trustee's right to put Company Stock to the Parent Corporation in exchange for the payment in cash from the Company.

"Recordkeeper" shall mean the Person or Persons engaged by the Trustee to keep and maintain the records of the Plan and perform other administration services in connection with the Plan.

"Trust" shall mean the Appvion, Inc. Employee Stock Ownership Trust (As Amended and Restated Effective August 3, 2015).

"Trust Agreement" shall mean this agreement entered into between the Company and Argent.

"Trust Fund" shall mean all property of every kind held by the Trustee, including the corpus and income collectively comprising the fund held in the Trust pursuant to this Trust Agreement by the Trustee.

"Trustee" shall mean Argent or its successor.

"Valuation Date" shall mean the last day of the Accounting Period, date of termination, or partial termination of the Plan, or any more frequent date for reporting and/or investment purposes agreed to by the Trustee.

"Voting Requirements" shall mean the following:

(a)    *Unregistered Company Stock.*  With respect to Company Stock held in a Company Stock Account which is not part of a registration-type class of securities (as defined in Code Section 409(e)(4)), (i) the participants (or their beneficiaries) of the Plan shall be entitled to direct the Trustee regarding the voting of Company Stock that is allocated to his or her Company Stock Account with respect to any corporate matter which involves the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as the Department of Treasury may prescribe in Treasury Regulations, and (ii) the Trustee, in its discretion, shall have the right to vote: (1) the shares of Company Stock that are not allocated to the participant's Company Stock Account; and (2) the shares of Company Stock allocated to a participant's Company Stock Account for which a participant (or beneficiary) failed to provide direction to the Trustee on how to vote, or untimely provided direction to the Trustee regarding the voting of such Company Stock on matters described in (a) (i) above. On all other corporate matters requiring a vote of the shareholders, the Trustee, in its discretion, shall have the right to vote any shares of Company Stock that are  not allocated to the participant's Company Stock Account and any

-16-

shares of Company Stock allocated to a participant's Company Stock Account. If all Company Stock is held as unallocated Company Stock on the record date when a matter is submitted to a vote of the Company's shareholders, the Trustee shall properly vote such Company Stock for or against any proposal, in its sole discretion.

(b)    *Registered Company Stock.* With respect to Company Stock allocated to a participant's Company Stock Account which is part of a registration-type class of securities: (i) the participants (or their beneficiaries) of the Plan shall be entitled to direct the Trustee with respect to the voting of such Company Stock allocated to the participant's Company Stock Account on all corporate matters requiring a vote of stockholders; and (ii) the Trustee, in its discretion, shall have the right to vote the shares of Company Stock that are not allocated to the participant's Company Stock Account and the shares of Company Stock allocated to a participant's Company Stock Account for which a participant (or beneficiary) failed to provide direction to the Trustee on how to vote, or untimely provided direction to the Trustee on the matters described in (b)(i) above. If all Company Stock is held as unallocated Company Stock on the record date when a matter is submitted to a vote of the Company's shareholders, the Trustee shall properly vote such Company Stock for or against any proposal, in its sole discretion.

(c)    *Participant Voting Direction Procedures.* If the participants (or beneficiaries) of the Plan are entitled to direct the Trustee under (a)(i) or (b)(i) above on how to vote Company Stock allocated to such participant's Company Stock Account, the Trustee shall establish reasonable procedures and implement such procedures to carry out its responsibilities under (a)(i) and (b)(i) above. In addition, the Company shall provide to the Trustee proxy solicitation materials or other notices or information statements describing the matter to be voted upon by the shareholders, and the Trustee may distribute such documentation to each participant (or beneficiary) of the Plan along with materials that the Trustee prepares. The Trustee shall provide each participant (or beneficiary) with a written direction form requesting directions as to the manner in which the participant (or beneficiary) wants the Company Stock which is allocated to such participant's Company Stock Account to be voted by the Trustee. Each participant (or beneficiary) shall, as a named fiduciary described in ERISA Section 403(a)(1), direct the Trustee with respect to the voting of such Company Stock which is allocated to the Company Stock Account of the participant (or beneficiary). The Trustee shall establish reasonable procedures and employ such procedures to reasonably maintain the confidentiality of the direction received by the Trustee from such participant (or beneficiary), it being the intent of the Company to ensure that the Company (and its directors, officers, Employees and agents) cannot determine how a participant (or beneficiary) directed the Trustee to vote on such matter. The Trustee may establish any conditions as to the delivery form (*i.e.,* mail, fax, PDF, or Federal Express), manner or time for a participant (or beneficiary) to provide the direction to vote Company Stock allocated to such participant's Company Stock Account. Each participant (or beneficiary) of the Plan shall have one vote per whole share of Company Stock allocated to his or her Company Stock Account (unless the by-laws of the Company require the Trustee

-17-

to vote on an issue in a manner that reflects a one-man, one-vote philosophy, in which case each participant or beneficiary of the Plan shall be entitled to direct the Trustee based on the one vote on an issue philosophy, and the Trustee shall base its direction to vote on all shares of Company Stock held by the Trust in proportion to the results of the directions cast on the issue by the participants (and beneficiaries) of the Plan.

      (d)    *ERISA Direction Override Requirements.*

          (i)    Notwithstanding any other provision contained in this Trust Agreement (including the Voting Requirements), compliance with Plan participant (or beneficiary) directions which are or would result in a violation of ERISA or would not be in the best interest of the participant (or beneficiary) of the Plan, shall not be necessary or required, and if the participant (or beneficiary) directions to vote are or would result in a violation of ERISA or would not be in the best interest of the participant (or beneficiary) of the Plan, the Trustee, in its discretion, shall properly vote such Company Stock in a manner which is in the best interest of the participants (or beneficiaries).

          (ii)    If any provision contained in, or action required herein, violates any provision under ERISA, the provisions under ERISA shall control.

IN WITNESS WHEREOF, the Company has caused this Trust Agreement to be signed by its duly authorized officer, and the Trustee has caused this Trust Agreement to be signed by its duly authorized representative, on this _12th_ day of August 2015, to be effective as of the Effective Date.

APPVION, INC.

By: _____
Kevin M. Gilligan, CEO

ARGENT TRUST COMPANY

By: _____
Stephen Martin, Senior Vice President

Paperweight Development Corp., a Wisconsin corporation, hereby joins into this Trust Agreement on this _12th_ day of August 2015, to be effective as of the Effective Date.

PAPERWEIGHT DEVELOPMENT CORP.

By: _____
Kevin M. Gilligan, CEO

-19-

# Exhibit 4



March 22, 2014

Mr. Mark B Richards
Chief Executive Officer
Appleton Papers Inc.
825 E. Wisconsin Avenue
Appleton, WI 54912-0359

Re:    Appleton Papers Inc. Employee Stock Ownership Plan

Dear Mr. Richards:

This letter will confirm the conditions and terms under which Reliance Trust Company ("Reliance") has agreed to serve as directed trustee under the Appleton Papers Inc. ("Company") Employee Stock Ownership Plan and Trust as amended (collectively the "ESOP")

        1)    In connection with the appointment of Reliance directed as trustee, Reliance hereby agrees to serve as trustee under the ESOP, with respect to fiduciary or other duties allocated to the trustee, under the terms of the current ESOP documents and this letter agreement, provided that a new Trust Agreement is prepared that is acceptable to both Reliance and Company.

        In the management and control of the ESOP, Reliance shall be subject to the direction of the Company, provided, however, that Reliance shall only be subject to proper directions which are made in accordance with the terms of the ESOP and not contrary to ERISA. Reliance shall be under no obligation to determine if such directions are made in accordance with the terms of the ESOP and may rely on the Company to make such determinations. Reliance shall have no responsibility to review or make recommendations regarding investments for the ESOP made at the direction of the Company or any other party assigned the responsibility under the ESOP to determine the investments for the ESOP. The Company shall not issue any directions to Reliance that are in violation of the terms of the ESOP or prohibited by ERISA

        2)    For its services as a directed trustee, the Company will pay Reliance pursuant to the schedule attached as Addendum A.

        3)    To advise Reliance in connection with its duties hereunder, Reliance will engage Stout Risius Ross, Inc. as an independent appraiser and financial advisor as well as K&L Gates, LLP as its legal counsel. The Company will pay the reasonable expenses and fees of such independent appraiser and financial advisor as they relate to Reliance's services, promptly upon presentation of their invoices and such supporting documentation as the Company shall reasonably require. The expenses and fees of the independent



Mr. Richards
3/22/2013
Page 2

appraiser and financial advisor may also be subject to separate letter agreements among the Company, the independent appraiser and financial advisor, and Reliance.

    4)    Recognizing that appointments of the type contemplated in this letter agreement can result in investigations, litigation, or other proceedings, the Company agrees, to the fullest extent federal law permits, to indemnify and hold Reliance and its directors, employees, and officers harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing, or defending any investigations, litigation, or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to Reliance's duties hereunder (including all events that occurred prior to Reliance's appointment). However, any such indemnification or agreement to hold Reliance harmless shall not apply to any claim, damage, expense, liability, or loss that is attributable to its/their bad faith, breach of fiduciary duty under ERISA, gross negligence, willful misconduct, or a material breach of the terms of this letter or any subsequent agreement.

    If Reliance receives notice of any action or legal proceeding with respect to which indemnification may be sought from the Company pursuant to this paragraph 4 (a "Proceeding"), Reliance shall notify the Company of the Proceeding in writing within 30 days of its receipt of notice of the commencement of the Proceeding. However, the failure by Reliance to so notify the Company shall not relieve the Company from any liability, except to the extent that the failure to notify the Company shall actually have prejudiced the Company's defense of any Proceeding. The Company will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to Reliance or to otherwise participate in the Proceeding. If the Company elects to assume the defense of the Proceeding, it then shall pay all costs of defense.

    Reliance shall have the right to employ their own counsel in any Proceeding, if any one or more of the following conditions are satisfied:

    a.   the Company shall authorize the employment by Reliance of their own legal counsel;

    b.   legal counsel to Reliance advises Reliance that that there may be one or more legal defenses available to them that are in addition to or different from defenses available to the Company and legal counsel for the Company declines to assert such defenses (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of Reliance); or

    c.   in the reasonable opinion of legal counsel to Reliance a conflict of interest exists between the Company and Reliance that would make such separate representation advisable.



Mr. Richards
3/22/2013
Page 3

The Company shall reimburse Reliance for all reasonable documented expenses and fees immediately when Reliance incurs them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable documented expenses and fees of the experts and legal counsel (unless the Company has elected to assume the defense of the Proceeding) whom Reliance engages for any Proceeding.

If Reliance seeks payment from the Company to enforce the indemnification or agreement to hold harmless pursuant to this paragraph 4, Reliance shall provide the Company all applicable invoices for such claims and any supporting documentation as the Company reasonably shall require. Reliance shall return to the Company the amount of such reimbursements that Reliance receives if a court, from which no appeal can be or is taken, determines that Reliance is not entitled to indemnification pursuant to the last sentence of paragraph 4 above.

5)    Regardless of the cancellation or termination of this letter agreement, the covenants of the Company contained in this letter agreement shall remain in full force and effect before, during, and after any period during which Reliance serves as trustee. The covenants of the Company shall be binding upon any successors and assigns of the Company.

6)    The purpose of this letter agreement is to outline in general terms the duties Reliance is to perform and its remuneration therefor. Reliance's actual duties may be governed by additional written agreements, including those that the parties may execute from time to time, and by applicable law and regulations. However, no verbal or other agreements of the parties shall be legally binding unless and until such agreements are reduced to writing and the party against whom enforcement thereof is sought signs them.



Mr. Richards
3/22/2013
Page 4

    If the foregoing accurately sets forth the agreement between Reliance and the
Company, please have the Company indicate its acceptance and approval by executing a
copy of this letter agreement at the place provided below and returning it to Reliance,
whereupon it will become a binding agreement.

                    Very truly yours,

                    RELIANCE TRUST COMPANY
                    By:_____

                    ACCEPTED AND AGREED TO effective
                    as of the __15t__ day of __April__,
                    2013.

                    APPLETON PAPERS INC.
                    By:_____

                    Name: _THOMAS FEROE_____
                    Title: _SVP-CFO_____



Mr. Richards
3/22/2013
Page 5

<div align="center">

**ADDENDUM A**
**DIRECTED TRUSTEE SERVICES**

</div>

Annual Fee of $170,000

**ANCILLARY FEES**

**Fiduciary Fees**

| | |
|---|---|
| Professional Services rates | $250 per hour |
| Annual Valuation Review | $1,500.00 |

**Administrative Fees \***

| | |
|---|---|
| Wires - Incoming or Outgoing to/from Reliance | $30 per wire |
| Stop Payments | $25 each |
| Rollover Distributions | $20.50 per check |
| In-Kind Distributions | $125 per distribution |
| Lump Sum Distributions, Loans, Hardships & Trust Checks | $50.00 per check |
| Recurring Payments | $3.50 per check/ACH |
| Replacement Tax Reporting | $30 per 1099-R |
| Purchases/Sales of Investments | $25 per transaction |
| Sub-accounts | $250 per account |
| Additional Statement Copies | $25 electronic/$50 hardcopy |
| Express Mail Delivery Fees and Postage | Billed at actual cost |
| Special Services Fee | $250 per hour |
| Termination Fee | $500 fee plus transactions |

**PROVISIONS:**

1. Reliance retains the right to re-price fees upon receipt of additional information acquired in the due diligence process prior to formally accepting the appointment.

2. Most standard expenses associated with establishing the plan and trust with Reliance are covered by the first year annual fees; however, Reliance may assess additional fees when excessive consultation and negotiations are required.

3. This agreement will remain in place for at least one year unless Reliance is removed in accordance with the Trust Agreement.

4. Fees are billed monthly. Additional charges will be billed for travel, express delivery, fed wires, special reporting, overdrafts, and other extraordinary services requested or required.

5. Additional charges are assessed for custody of investment assets such as insurance policies, GICs, CDs, limited partnerships, or other unique assets.

6. Necessary services provided by other professionals for accounting, advisory, legal, proxy tabulation services shall be charged to the trust or plan sponsor, as defined in the trust agreement.



Mr. Richards
3/22/2013
Page 6

7.  In the event of a corporate action involving a tender offer, sale of the company stock,
    acquisition of another company, recapitalization, and redemption will be subject to a
    separate engagement fee as well as potential expenses associated with the services of a
    financial advisor and legal counsel.

# Exhibit 5



phone: 855.504.1376
fax: 678.325.3132
1100 Abernathy Road
500 NorthPark, Suite 550
Atlanta, GA 30328
ArgentFinancial.com

May 26, 2015

Appvion, Inc.
825 E. Wisconsin Avenue
Appleton, WI 54912-0359
Attention: Mr. Mark Richards, CEO

       *Re: Appvion, Inc. Employee Stock Ownership Trust*

Dear Mr. Richards:

       This letter constitutes an agreement (the "Agreement") between Argent Trust Company, N.A. ("Argent") and Appvion, Inc., a Delaware corporation (the "Company"), under which Argent will: (i) serve as the independent, discretionary trustee (the "Trustee") of the Appvion, Inc. Employee Stock Ownership Trust (the "Trust") (which is part of the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan, as amended from time to time (the "Plan," together with the Trust referred to as the "ESOP")); (ii) carry out the duties and responsibilities of the Trust as set forth in the agreement governing the Trust; and (iii) provide professional services as are appropriate and consistent with its fiduciary responsibilities under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as the independent, discretionary Trustee of the Trust. Paperweight Development Corp., a Wisconsin corporation ("Parent Corporation," together with the Company referred to as "The Paperweight Companies") hereby joins into this Agreement as of the date hereof.

***Engagement***

       Effective as of the date hereof ("Effective Date"), the Company and Argent agree that Argent shall serve as the discretionary Trustee of the Trust pursuant to this Agreement and the terms of the Trust, and the terms of the engagement agreement between Reliance Trust Company (the predecessor of Argent) and Appleton Papers, Inc. (now known as Appvion) dated March 22, 2014 shall be amended and restated in its entirety by this Agreement.

       By way of this Agreement, Argent, in its capacity as discretionary Trustee, agrees to represent: (i) the participants and beneficiaries of the Plan; and (ii) the Trust as a separate legal entity that is holding assets (including, but not limited to, the shares of common stock of Parent Corporation) for the benefit of the participants and beneficiaries of the Plan. As part of this engagement, Argent agrees to: (i) review the terms and conditions of the proposed transaction involving the sale of assets associated with the Encapsys business of the Company to Sherman Capital Holdings LLC ("Proposed Transaction"); (ii) determine whether to consent to such Proposed Transaction; and (iii) determine whether to pass through the vote on the shares of common stock of the Parent Corporation to the participants pursuant to the ESOP. This engagement does not include representation or protection of the interests of: (i) The Paperweight Companies; or (ii) the Parent Corporation, and affiliates, subsidiaries (which includes Appvion),

advisors, agents or other constituents of the Parent Corporation. In addition, the ESOP Administrative Committee will continue to be responsible for directing Argent with respect to certain administrative aspects of the ESOP (such as, eligibility and distributions which will be set forth in the amendment to the Trust or amended and restated Trust). In all such instances, Argent's fiduciary duties under ERISA are solely owed to the interests of participants and beneficiaries of the Plan. Argent and the Company agree that Argent is engaged to serve as the independent discretionary Trustee of the Trust and to carry out all the duties and responsibilities required by ERISA and the Trust.

Argent acknowledges that all of its duties and responsibilities are owed <u>solely</u> to the participants and beneficiaries of the Plan, even though the Company has agreed to pay Argent's fees and expenses (including the fees and expenses of Argent's professional advisors). Argent intends to take all action necessary to maintain its independence as long as Argent serves as the Trustee of the Trust.

### *Trustee's Authority*

Argent agrees, in Argent's sole and complete discretion, to manage, acquire, hold, dispose of, and vote the shares of common stock of the Parent Corporation held by the Trust (or act by written consent of the sole shareholder of the Parent Corporation), and control the assets and investments of the Trust, and will exercise its duties and obligations with respect thereto in accordance with: (i) the fiduciary requirements of ERISA; and (ii) the terms and conditions set forth in this Agreement and the Trust. Argent agrees to take such actions, or cause others to act on its behalf, to carry out its fiduciary duties and responsibilities as discretionary Trustee of the Trust.

Argent agrees to keep and maintain all financial records of the Trust. Either: (i) upon ten (10) days request by the ESOP Administrative Committee, the Board of the Company, or the Board of the Parent Corporation; or (ii) thirty days following the completion by the Trustee of the annual valuation of the shares of common stock of the Parent Corporation held by the Trust, Argent shall provide the ESOP Administrative Committee and the Boards of The Paperweight Companies with: (i) a report on the activities of the ESOP; and (ii) a report on the actions performed or taken by the Trustee.

Argent shall: (i) engage an independent financial advisor of its choosing to perform valuations as required under the ESOP and to assist Argent in determining the fair market value of the shares of common stock of the Parent Corporation held by the Trust and/or evaluating any proposed transaction(s) involving the assets of the Trust which may include among other types of work, performing financial analysis for the Trustee and issuing a fairness opinion on a particular transaction or decision; (ii) engage and retain independent legal counsel of its choosing in connection with matters involving the Trust; and (iii) reimburse from available Trust assets reasonable fees of such consultants, advisors, and attorneys. As part of the process of selecting the independent financial advisor, Argent agrees to conduct a well documented interview process and document the reasons for the selection of the financial advisor (including confirmation of the financial advisor's independence and qualifications).

DBI/ 83258445.7

The independent financial advisor engaged by Argent will report directly to Argent, not to the Company.  Argent shall permit: (i) the Company to rely on any work and opinions rendered by its financial advisor, unless such grant of permission or reliance would result in a violation of ERISA, or Argent, in its sole discretion, determines that such grant of permission or reliance would not be appropriate under the circumstances and in the best interests of the Plan; and (ii) upon request by Company or the Parent Corporation, the auditing firm engaged by the Company that performs the audit/review of the financial statements of the Company to receive a copy of the valuation of the shares of the common stock of the Parent Corporation held by the Trust after the auditing firm (engaged by the Company) signs a non-reliance/non-disclosure letter that Argent provides to such auditing firm.

To enable Argent to perform its duties properly, the Company shall deliver to Argent all information regarding the finances and operations of The Paperweight Companies (and its subsidiaries) that Argent shall reasonably request.  In addition, The Paperweight Companies shall grant to Argent (and its advisors) reasonable access to the facilities, officers, directors and employees of the Company (and its subsidiaries).  The Company represents that the information that it provides to Argent (and its advisors) will be accurate and complete in all material respects.  The Company acknowledges that Argent will rely on the accuracy of such information to carry out its responsibilities pursuant to this Agreement.

### *Compensation and Expenses*

For its services as a discretionary Trustee of the Trust in connection with the Proposed Transaction, the Company shall pay Argent the Transaction Fee of $200,000 of which $115,000 is due at the execution of this letter.  The balance of the Transaction Fee of $85,000 will be due upon the earlier of (i) the closing of the Proposed Transaction and (ii) August 31, 2015.  All fees and expenses are payable regardless of whether the Proposed Transaction is consummated and regardless of whether Argent consents to the Proposed Transaction.

From and after the earlier of (i) closing of the Proposed Transaction and (ii) August 31, 2015, for its services as an ongoing discretionary Trustee, the Company shall also pay an annual fee in accordance with the attached "Fee Schedule".  Such annual fee shall be pro rated on a monthly basis for any partial calendar year.

Argent shall also be reimbursed for any and all reasonable direct out-of-pocket expenses incurred in connection with the performance of its duties and responsibilities under the Trust, pursuant to this Agreement.  Such expenses may include, but not be limited to, legal, accounting, independent financial advisor, and other professional fees as may be required in the event Argent considers it necessary to obtain such services to perform its duties and responsibilities adequately under the Trust and this Agreement.   Such out-of-pocket expenses shall be paid within a reasonable period of time after detailed bills from such professionals are reviewed and accepted by the Trustee and forwarded to the Company for payment.  If the Company disputes any such bill, Argent and the Company agree to work in good faith to resolve the matter within 30 days after such expense is disputed by the Company.

DB1/ 83258445.7

In the event: (i) Argent (or any officer, director or employee of Argent) is called to answer interrogatories, be deposed, or give testimony in an administrative or judicial proceeding regarding investigation or inquiry of the ESOP; or (ii) Argent is asked to perform duties beyond the scope of this engagement, Argent shall be entitled to reasonable compensation and out-of-pocket expenses incurred in connection therewith.

### *Termination of Trustee's Engagement*

The engagement of Argent under this Agreement may be terminated by either party pursuant to the provisions and procedures set forth in the Trust. If there is no such provision in the Trust, the terminating party shall give the other party thirty (30) days written notice.

### *Indemnification*

Recognizing that appointments of the type contemplated in this Agreement can result in investigations, litigation, or other proceedings, the Company agrees, to the fullest extent federal law permits, to indemnify and hold Argent and its directors, employees, and officers harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing, or defending any investigations, arbitrations, litigation, or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may become subject under any applicable federal or state law or otherwise relating to Argent's duties hereunder (including all claims that should arise against Argent prior to Argent's appointment and engagement as the Trustee) and under the Trust. However, any such indemnification or agreement to hold Argent harmless shall not apply to any claim, damage, expense, liability, or loss that is held by a court of competent jurisdiction, on a final judgment from which no appeal can be taken (or the parties have agreed to not appeal such decision), to the extent it results from Argent's bad faith, breach of fiduciary duty under ERISA, gross negligence, willful misconduct, or a material breach of the terms of this Agreement. The Company further agrees that Argent shall have no liability to the Company, or any other person for any losses relating to this engagement, except as provided in the last paragraph of this "Indemnification" section of the Agreement.

If Argent receives notice of any action or legal proceeding with respect to which indemnification may be sought from the Company pursuant under this paragraph (a "Proceeding"), Argent shall notify the Company of the Proceeding in writing within thirty (30) days of its receipt of notice of the commencement of the Proceeding. However, the failure by Argent to so notify the Company shall not relieve the Company from any liability, except to the extent that the failure to notify the Company shall actually have prejudiced the Company's defense of any Proceeding. The Company will be entitled to assume the defense of the Proceeding with counsel reasonably satisfactory to Argent (which consent shall not be unreasonably withheld) or to otherwise participate in the Proceeding. If the Company elects to assume the defense of the Proceeding, it then shall pay all costs of defense.

Argent shall have the right to employ its own counsel in any Proceeding, if any one or more of the following conditions are satisfied:

      a.  the Company shall authorize the employment by Argent of its own legal counsel;

DB1/ 83258445.7

    b.  legal counsel to Argent advises Argent that that there may be one or more legal defenses available to it that is in addition to or different from defenses available to the Company and legal counsel for the Company declines to assert such defenses (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of Argent); or

    c.  in the reasonable opinion of legal counsel to Argent a conflict of interest exists between the Company and Argent that would make such separate representation advisable.

The Company shall reimburse Argent for all reasonable, documented expenses and fees promptly when Argent incurs them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable, documented expenses and fees of its experts and legal counsel (unless the Company has elected to assume the defense of the Proceeding) whom Argent engages for any Proceeding.

If Argent seeks payment from the Company to enforce the indemnification or agreement to hold harmless and reimburse pursuant to this paragraph, Argent shall provide the Company all applicable invoices and any supporting documentation as the Company reasonably shall require. Argent shall return to the Company the amount of such indemnification and hold harmless payments and reimbursements that Argent receives if a court of competent jurisdiction, in a final order from which no appeal can be taken (or the parties have agreed to not appeal such decision), determines that Argent is not entitled to indemnification pursuant to the first paragraph of this "Indemnification" section.

### *Miscellaneous*

The Company and Argent agree to enter into and execute either an amendment to the Trust or an amended and restated Trust within ten (10) days following the execution of this Agreement.

This Agreement supersedes all prior written and oral agreements between the parties with respect to its subject matter (including prior engagement letters) and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

This Agreement may not be amended, except by an instrument in writing signed on behalf of each party hereto. This Agreement constitutes the entire agreement among the parties. No party shall be bound by any communications between them on the subject matter hereto unless such communications are in writing and bear a date contemporaneous with, or subsequent to, the date hereof.

If this Agreement is terminated, the covenants of the Company contained in this letter agreement shall remain in full force and effect before, during, and after any period during which Argent served as trustee for a period of six (6) years following the date of the termination of this

DB1/ 83258445.7

Agreement. Unless otherwise agreed to by the parties, the covenants of the Company shall be binding upon any successors and assigns of the Company.

The purpose of the Agreement is to set forth the general terms the duties and responsibilities of Argent and its remuneration therefore. Argent's actual duties may be governed by additional written agreements, including those that the parties may execute from time to time, and by applicable law and regulations.  However, no oral or other agreements of the parties shall be legally binding unless and until such agreements are reduced to writing and the party against whom enforcement thereof is sought executes them and is a party thereto.

In the event a court of competent jurisdiction holds that any part of this Agreement is invalid or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect as if the provisions held invalid or unenforceable were never a part hereof.  If a conflict arises between (or among) this Agreement, the Plan and/or the Trust,  the parties agree that this Agreement shall control and be binding on Argent and the Company unless such provision violates ERISA, then the Trust first, then the Plan second,  shall control and be binding on the parties.

This Agreement shall be governed by the laws of Wisconsin, and venue shall be in a city closest to Appleton, Wisconsin that has a residing federal district court.

If this Agreement meets with your approval, please so indicate by signing and returning one original of this Agreement.

Dated this ___26___ day of May 2015.

                                        *ARGENT TRUST COMPANY, N.A.*

                        By: _____
                                        Stephen Martin, Sr. Vice President


*ACCEPTED AND AGREED TO:*

*APPVION, INC.*

By: _____
        Mark Richards, CEO

DB1/ 83258445.7

Paperweight Development Corporation hereby joins into this Agreement on the date hereof:

*PAPERWEIGHT DEVELOPMENT CORPORATION*

By: _____
     Mark Richards, CEO

DB1/ 83258445.7



## Discretionary Trustee Fee Schedule
### *FOR EMPLOYEE STOCK OWNERSHIP PLAN*

### APPVION, INC. RETIREMENT SAVINGS AND EMPLOYEE STOCK OWNERSHIP TRUST
**May 19, 2015**

#### Services

- **Trustee** – carry out or cause to carry out the directions and perform the duties in accordance with the terms of the trust agreement.
- **Reporting** – provide certified annual trust accounting reports on plan investments (including transaction and distribution detail) and work with plan auditors.
- **Safeguard Assets** – safeguard plan assets as registered owner of investments.
- **Sponsor Assistance** – provide general trust administrative assistance and guidance to the plan sponsor and plan administrator for matters concerning the trust.
- **Paying Agent** – prepare and disburse benefit payments as needed and perform related tax withholding, remittance and reporting services.

| Annual Asset Charge | |
|---|---|
| Annual Fee – Guaranteed through June 5, 2016. | $200,000 |
| **Other Service Fees** | |
| Participant Distributions via check | $50 each |
| Participant Distributions via wire | $100 each |
| Participant Distributions via ACH | $50 each |
| Trust Distributions via check | $20 each |
| Trust Distributions via wire | $70 each |
| Trust Distributions via ACH | $20 each |
| In-Kind Distributions | $125 per distribution |
| Stop Payments/Void Payments | $50 each |
| Replacement Tax Reporting | $30 per tax form |
| Tax Reporting Corrections | $60 per correction |
| Wires/ACHs – Incoming or Outgoing to/from Argent Trust Company | $50 each |
| Check Deposits | $50 each |
| Sub-accounts | $500 per account |
| Additional Statement Copies | $25 electronic/$50 hard copy |
| Express Mail Delivery Fees and Postage | May be billed at actual cost |
| Special Services Fee | Negotiable |
| On-Site Client Meetings | Travel & Lodging at Cost |
| Termination Fee | $500 flat fee plus transactions |

**IF THE PARTIES HAVE AGREED THAT ARGENT TRUST COMPANY WILL NOT PROVIDE CERTAIN OF THE OTHER SERVICES, THEN NO FEES WILL BE CHARGED FOR THOSE SERVICES.**

#### Special Services and Provisions

1. Most standard expenses associated with operating the plan and trust with Argent Trust Company are covered by this fee schedule. Additional fees may be billed at our Special Services Fee rates (see above) if account transactions, excessive consultations or negotiations are required. In that event, related legal fees and out of pocket expenses may also be billed. IRS penalties associated with participant tax form changes, if applicable, will be billed at cost.



## Discretionary Trustee Fee Schedule
### FOR EMPLOYEE STOCK OWNERSHIP PLAN

2.  Argent Trust Company will provide custodial services, except to the extent any party other than the Argent Trust Company holds any trust assets. In that case, such other party shall also be considered a Custodian for the trust and its duties shall be described in a separate custodial agreement. Custody of assets such as CDs, GICs, foreign assets, investments not publicly traded (other than employer securities in the ESOP), employer stock (other than employer securities in the ESOP), limited partnerships or other unique assets must be approved in advance and will be priced separately.

3.  Fees for services associated with extraordinary corporate events, such as bankruptcies, change of control transactions, litigation, purchases and sales of employer securities and redemptions will be billed at our Special Services Fee rate; related legal fees and out of pocket expenses may also be billed. If not covered by this fee schedule, additional expenses and fees may be billed for special reporting and other extraordinary services the employer, the plan or any agent of the plan requests or requires.

4.  All fees will normally be billed monthly.

5.  Argent Trust Company may receive as additional compensation earnings (i.e. "float") on amounts the trust receives before such amounts are invested and on amounts held pending distribution from the trust.

6.  If Argent Trust Company receives contributions by itself performing an ACH (Automated Clearing House) debit to the employer's bank account, the investment of these contributions will generally occur within 24 hours of the debit. If the employer on its own initiative sends contributions to Argent Trust Company via wire, ACH or check, the investment of these contributions will generally occur within 36 hours of receipt by Argent Trust Company. Argent Trust Company may earn float on contributions received from the date of deposit until the date funds are wired in payment of investment purchases or the settlement date of such purchases if later.

    Generally, Argent Trust Company will wire funds by the close of business on the business day following the availability of such funds as a result of settlements from the sale of investments. Argent Trust Company may also earn float on amounts it holds prior to wiring such funds.

    In the case of participant distribution checks or other trust checks, Argent Trust Company may earn float from the date a check is written until the check is cleared by the bank on which the check is drawn (or in the case of an uncashed check, when such check is returned to Argent Trust Company and the funds are otherwise distributed.) Argent Trust Company will generally write checks by the close of business on the second business day following receipt of both available funds and complete payment instructions. Typically such a check is mailed the same day it is written.

    Argent Trust Company will generally earn float at the rates paid by the depository institutions in which the funds referred to in paragraph 6 are deposited.

    The potential receipt of float income was a consideration in setting the fee schedule.

7.  Argent Trust Company may modify this schedule. Such modifications will become effective 30 days subsequent to the mailing date of written notification to the client's last address of record on file.

**If you are in agreement with the terms listed above, please sign below.**

**APPROVED:**

_____          5 June 2015
Client Signature                                              Date

## CERTIFICATE OF SERVICE

I, Tara L. Lattomus, hereby certify that on this 19th day of March, 2019, I caused a true and

correct copy of the foregoing ***Opening Brief in Support of Defendant Argent Trust Company's***

***Motion to Dismiss*** to be served via Court's CM/ECF System and Hand Delivery on the below

counsel:

Mark Minuti, Esquire
Saul Ewing Arnstein & Lehr LLP
1201 N. Market Street, Suite 230
P.O. Box 1266
Wilmington, DE  19899

Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Mark L. Desgrosseilliers, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

<div align="right">

*/s/ Tara L. Lattomus*
Tara L. Lattomus (Bar I.D. No. 3515)

</div>

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## MOTION OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC TO DISMISS COMPLAINT

Pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC (together, "**Stout**") by and through

their undersigned counsel, respectfully move the Court to dismiss Counts VI (Aiding and Abetting

Breaches of the Fiduciary Duties of Care and Loyalty Against Stout), X (Avoidable Preference in

Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin

Statutes, Ch. 242, et. seq. Against Stout), XI (Avoidable Transfer in Violation of 11 U.S.C. §§

544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch.

242.01-242.11 Against Stout), and XIII (Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout) of Plaintiff's First Amended Complaint (D.I. 59, 60) (the "**FAC**") in its entirety.  The grounds for dismissal, which are set forth more fully in the accompanying *Opening Brief in Support of Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss the First Amended Complaint*, are:

1.      Count VI is preempted by the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") sections 514, 29 U.S.C. § 1144, and 502(a), 29 U.S.C. § 1132.

2.      Count VI was not preserved in the Debtors' Plan of Liquidation and cannot be asserted now pursuant to principles of *res judicata*.

3.      The Court lacks subject matter jurisdiction to decide Count VI.

4.      To the extent it is not preempted, Count VI, whether pleaded under ERISA or Delaware law, fails to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

5.      Count VI is partially time-barred by ERISA's three-year limitations period, 29 U.S.C. § 1113.  To the extent Plaintiff's claim sounds in state law, it is partially time-barred by 10 Del. C. § 8106.

6.      Counts X, XI, and XIII fail to state claims upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

7.      The FAC should be dismissed with prejudice because any further amendment would be futile.

8.      The Court lacks personal jurisdiction over Stout pursuant to Bankruptcy Rule 7004(f).

9.      The Court should therefore dismiss Plaintiff's claims against Stout with prejudice.

- 2 -

10.    Stout incorporates by reference its brief in support, which it is filing with this motion.

**WHEREFORE**, for these reasons and those set forth in Stout's contemporaneously filed brief in support, Stout respectfully requests that the Court issue an Order dismissing all claims and causes of action asserted herein against Stout with prejudice and that the Court provide such other and further relief as the Court deems just and proper.

Dated:  March 19, 2019
         Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**


*/s/ Mark L. Desgrosseilliers*

Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    desgross@chipmanbrown.com

—and—

Lars C. Golumbic, admitted *pro hac vice*
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Telephone:    (202) 861-6615
Email:    lgolumbic@groom.com

*Attorneys for Stout Risius Ross, Inc. and Stout Risius Ross, LLC*

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 655 of 1527    Document 14-2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, <br> Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, <br> Defendants. | **Related Docket No. ___** |

## ORDER GRANTING MOTION OF STOUT RISIUS ROSS, INC. AND
## STOUT RISIUS ROSS, LLC TO DISMISS FIRST AMENDED COMPLAINT

After careful consideration of the arguments, briefs, and pleadings on file, the Court hereby

**GRANTS** the *Motion to Dismiss Plaintiff's First Amended Complaint by Defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC* (together, "**Stout**"). Plaintiff's First Amended Complaint (D.I. 59, 60), is hereby **DISMISSED WITH PREJUDICE** as to Stout.

**IT IS SO ORDERED:**

Dated: _____, 2019
        Wilmington, Delaware

                                                    _____
                                                    Honorable Kevin J. Carey
                                                    United States Bankruptcy Judge

## CERTIFICATE OF SERVICE

I, Mark L. Desgrosseilliers, hereby certify that, on the 19th day of March 2019, the following pleadings were filed were filed *via* the Court's CM/ECF electronic filing system ("**CM/ECF**"), which sent notice to all parties receiving notification through CM/ECF:

(1)    Stout Risius Ross, Inc. and Stout Risius Ross, LLC's Motion to Dismiss the First Amended Complaint; and

(2)    Opening Brief in Support of Stout Risius Ross, Inc. and Stout Risius Ross, LLC's Motion to Dismiss the First Amended Complaint (together, the "**Stout Pleadings**")

I further certify that, in addition, on the 19th day of March 2019, I caused the Stout Pleadings to be served on the following parties *in the manner indicated below*:

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
*Grant & Eisenhofer P.A.*
123 Justison Street
Wilmington, Delaware 19801
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust)

**By Hand-Delivery**

Craig Martin, Esquire
David Jimenez-Ekman, Esquire
Michael Graham, Esquire
*Jenner & Block LLP*
353 North Clark Street
Chicago, Illinois 60654-3456
(Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, and Kevin Gilligan)

**By Overnight Courier**

Gordon Z. Novod, Esquire
*Grant & Eisenhofer P.A.*
485 Lexington Avenue, 29th Floor
New York, New York 10017
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust)

**By Overnight Courier**

Tara L. Lattomus, Esquire
*Eckert Seamans Cherin & Mellot, LLC*
222 Delaware Avenue, 7th Floor
Wilmington, Delaware 19801
(Counsel for Argent Trust Company)

**By Hand-Delivery**

Brian P. Muething, Esquire
Jacob D. Rhode, Esquire
*Keating Muething & Klekamp PLL*
One East 4th Street, Suite 1400
Cincinnati, Ohio 45202
(Counsel for Argent Trust Company)

**By Overnight Courier**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | **OPENING BRIEF IN SUPPORT OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** Related Adv. Docket Nos. 59, 60 |
| Defendants. | |

Mark L. Desgrosseilliers (Delaware Bar No. 4083)
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Tel: (302) 295-0191
E-mail: desgross@chipmanbrown.com

Lars C. Golumbic, admitted *pro hac vice*
Groom Law Group, Chartered
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Tel: (202) 861-6615
E-mail: lgolumbic@groom.com

March 19, 2019

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ................................................................................................. 5

ARGUMENT ...................................................................................................................... 6

I.    Count VI is Preempted by ERISA. ......................................................................... 6

    A.    Count VI is Preempted by ERISA Section 514.............................................. 8

    B.    Count VI is Preempted by ERISA Section 502(a)........................................ 10

II.   Count VI Was Not Reserved in the Plan of Liquidation. ..................................... 15

III.  The Court Lacks Subject Matter Jurisdiction to Decide Count VI....................... 17

IV.   The FAC Fails to Allege Facts Sufficient to Show that Stout Knowingly Participated in
    Unlawful Conduct. ................................................................................................ 19

    A.    The FAC Fails to State a Knowing Participation Claim Under ERISA. ........................ 19

        1. The FAC Pleads No Facts to Support an Inference that Stout "Knowingly Participated"
        in Unlawful Conduct.................................................................................... 20

        2. It is Implausible that Stout "Knowingly Participated" in Unlawful Conduct............... 23

    B.    The FAC Fails to Plead a State Law Aiding and Abetting Claim. ................................... 26

V.    Count VI is Partially Time-Barred........................................................................ 30

VI.   Counts X, XI and XIII Fail to State Claims for Relief.......................................... 32

    A.    Count X Fails to State a Claim Against Stout. .............................................. 32

    B.    Count XI Fails to State a Claim Against Stout............................................... 35

    C.    Count XIII Fails to State a Claim for Relief Against Stout............................. 37

VII.  The Claims Asserted Against Stout Should be Dismissed With Prejudice............. 37

VIII. The Court Lacks Personal Jurisdiction Over Stout................................................ 38

CONCLUSION.................................................................................................................. 40

i

**TABLE OF AUTHORITIES**

Cases

*Aetna Health Inc. v. Davila,*
  542 U.S. 200 (2004) ................................................................................. 7, 8, 13
*Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson,*
  No. 5:03-cv-1060, 2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006) ......................... 13
*ALA, Inc. v. CCAIR, Inc.,*
  29 F.3d 855 (3d Cir. 1994) ................................................................................ 25
*Alston v. Parker,*
  363 F.3d 229 (3d Cir. 2004) .............................................................................. 38
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................... passim
*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .......................................................................... 4, 5, 19, 20
*Bliss Techs., Inc. v. HMI Indus. (In re Bliss Techs., Inc.),*
  307 B.R. 598 (Bankr. E.D. Mich. 2004) ............................................................ 18
*Breeden v. Sphere Drake Ins. P.L.C. (In re Bennett Funding Group, Inc.),*
  258 B.R. 67 (Bankr. N.D.N.Y. 2000) ................................................................. 18
*Browning v. Levy,*
  283 F.3d 761 (6th Cir. 2002) ............................................................................ 16
*Buena Vista Television v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),*
  307 B.R. 404 (Bankr. S.D.N.Y. 2004) ............................................................... 18
*Burtch v. Milberg Factors, Inc.,*
  662 F.3d 212 (3d Cir. 2011) ............................................................................... 6
*Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.),*
  463 B.R. 302 (Bankr. D. Del. 2012) ................................................................. 32
*Byrnes v. DeBolt Transfer, Inc.,*
  741 F.2d 620 (3d Cir. 1984) .............................................................................. 31
*Car Care Center of Crystal Lake Ltd. v. Miller (In re Miller),*
  336 B.R. 408 (Bankr. E.D. Wis. 2005) .............................................................. 39
*Carlson v. Principal Life Ins. Co.,*
  No. 01-cv-0581, 2006 WL 2806543 (E.D.N.Y. Sept. 28, 2006),
  *aff'd,* 259 F. App'x 365 (2nd Cir. 2008). ........................................................... 13
*Consol. Beef Indus., Inc. v. New York Life Ins. Co.,*
  949 F.2d 960 (8th Cir. 1991), *cert. denied,* 503 U.S. 985 (1992) ........................ 14
*Custer v. Pan Am. Life Ins. Co.,*
  12 F.3d 410 (4th Cir. 1993) .......................................................................... 14, 15
*D&K Prop. Crystal Lake v Mut. Life Ins. Co. of N.Y.,*
  112 F.3d 257 (7th Cir. 1997) ............................................................................ 16
*DiLeo v. Ernst & Young,*
  901 F.2d 624 (7th Cir. 1990), *cert. denied,* 498 U.S. 941 (1990) ........................ 25
*Duphily v. Del. Elec. Coop., Inc.,*
  662 A.2d 821 (Del. 1995) ................................................................................. 28

ii

*End of the Rd. Tr. v. Terex Corp.* (*In re Fruehauf Trailer Corp.*),
250 B.R. 168 (D. Del. 2000) ............................................................ 19, 32, 40

*Enzo Life Scis., Inc. v. Adipogen Corp.*,
82 F. Supp. 3d 568 (D. Del. 2015) ................................................................. 26

*Eslava v. Gulf Tel. Co., Inc.*,
No. 04-0297, 2007 WL 9717348 (S.D. Ala. June 13, 2007).......................... 23

*Gellert v. Coltec Indus., Inc.* (*In re Crucible Materials Corp.*), No. 11-53884,
2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012)........................................ 33

*Gerosa v. Savasta & Co.*,
329 F.3d 317 (2d Cir. 2003), *cert. denied,* 540 U.S. 967 (2003) ................. 11

*Gibson v. Prudential Ins. Co. of Am.*,
915 F.2d 414 (9th Cir. 1990)........................................................................ 14

*Global Link Liquidating Tr. v. Avantel* (*In re Global Link Telecom Corp.*),
327 B.R. 711 (Bankr. D. Del. 2005) ............................................................. 37

*Gluck v. Unisys Corp.*,
960 F.2d 1168 (3d Cir. 1992)........................................................................ 32

*Gobeille v. Liberty Mut. Ins. Co.*,
136 S. Ct. 936 (2016) ..................................................................................... 7

*Great-West Life & Annuity Ins. Co. v. Knudson*
534 U.S. 204 (2002) ..................................................................................... 12

*Grove Holding Corp. v. First Wisconsin Nat'l Bank of Sheyboygan*,
803 F. Supp. 1486 (E.D. Wis. 1992) ....................................................... 25, 26

*Harris Tr. & Sav. Bank, v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) ..................................................................... 10, 11, 12, 14

*Hatzel & Buehler, Inc. v. Orange & Rockland Utils.*,
107 B.R. 34 (D. Del. 1989) ........................................................................... 18

*In re Broadstripe, LLC*,
444 B.R. 51 (Bankr. D. Del. 2010) ............................................................... 26

*In re Fruehauf Trailer Corp.*,
444 F.3d 203 (3d Cir. 2006).................................................................... 37, 38

*In re Kelley v. South Bay Bank*,
199 B.R. 698 (B.A.P. 9th Cir. 1996)............................................................. 15

*In re ML/EQ Real Estate P'ship Litig.*,
No. 15741, 1999 WL 1271885 (Del. Ch. Dec. 21, 1999) ............................. 31

*In re Mort. Elec. Resignation Sys., Inc.*,
754 F.3d 772 (9th Cir. 2014)........................................................................... 5

*In re Pfizer Inc. ERISA Litig.*,
No. 04-cv-10071, 2009 WL 749545 (S.D.N.Y. Mar. 20, 2009) ................... 13

*In re PMTS Liquidating Corp.*,
452 B.R. 498 (Bankr. D. Del. 2011) ............................................................. 26

*In re Santa Fe Pac. Corp. S'holder Litig.*,
669 A.2d 59 (Del. 1995)................................................................................ 26

*In re Telecomms., Inc. S'holders Litig.*,
No. A-16470, 2003 WL 21543427 (Del. Ch. July 7, 2003)........................... 27

*Jepsco, Ltd. v. B.F. Rich Co.*,
No. 7343, 2013 WL 593664 (Del. Ch. Feb. 14, 2013).............................. 31, 32

iii

*JNA-1 Corp. v. Uni-Marts, LLC (In re UniMarts, LLC)*,
    404 B.R. 767 (Bankr. D. Del. 2009) ............................................................... 39
*Johnson v. Radian Grp., Inc.*,
    No. 08-2007, 2009 WL 2137241 (E.D. Pa. July 16, 2009) ................................ 19
*Klingher v. Salci (In re Tandycrafts, Inc.)*,
    317 B.R. 287 (Bankr. D. Del. 2004) ............................................................... 39
*Kloth v. S. Christian Univ.*,
    320 Fed. App'x 113 (3d Cir. 2008) ................................................................. 40
*Kool v. Coffey*,
    300 F.3d 340 (3d Cir. 2002) .......................................................................... 22
*Lee v. Pincus*,
    No. CV 8458-CB, 2014 WL 6066108 (Del. Ch. Nov. 14, 2014) .................... 26, 28
*MAS Litig. Trust v. Plastech Engineered Prods. (In re Meridian Auto Sys. Composite
    Operations, Inc.)*,
    No. 05-11168, 2007 WL 4322527 (Bankr. D. Del. Dec. 5, 2007) ...................... 39
*Max Daetwyler Corp. v. R. Meyer*,
    762 F.2d 290 (3d Cir. 1985), *cert. denied,* 474 U.S. 980 (1985) ................. 39, 40
*Menkes v. Prudential Insurance Company of America*,
    762 F.3d 285 (3d Cir. 2014) ....................................................................... 8, 10
*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) .......................................................................... 10, 11, 12
*Morgan v. Cash*,
    No. 5053, 2010 WL 2803746 (Del. Ch. July 16, 2010) ................................... 27
*Nat'l Sec. Sys., Inc. v. Iola*,
    700 F.3d 65 (3d Cir. 2012) ........................................................................... 7, 8
*Official Comm. Of Unsecured Creditors of Allied Sys. Holding v, Yucaipa Am. Alliance Fund I,
    L.P. (In re Allied Sys. Holdin*gs, Inc.),
    524 B.R. 598 (Bankr. D. Del. 2015) ............................................................... 18
*Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc. (In re
    Midway Games, Inc.)*,
    428 B.R. 303 (Bankr. D. Del. 2010) ............................................................... 35
*Official Comm. of Unsecured Creditors of Wickes, Inc. v. Wilson (In re Wickes, Inc.)*,
    No. 06-C-0869, 2006 WL 1457786 (N.D. Ill. May 23, 2006) ........................... 18
*Old Elec., Inc. v. RCP, Inc. (In re Old Elec. Inc.)*,
    142 B.R. 189 (Bankr. N.D. Ohio 1992) .......................................................... 39
*PCT v. Authentic Specialty Foods, Inc. (In re Fleming Companies, Inc.)*,
    347 B.R. 163 (Bankr. D. Del. 2006) ............................................................... 38
*Peltz v. Worldnet Corp. (In re USN Comm'cn., Inc.)*,
    280 B.R. 573 (Bankr. D. Del. 2002) ............................................................... 16
*Pietrangelo v. NUI Corp.*,
    No. 04–3223, 2005 WL 1703200 (D.N.J. July 20, 2005) ................................. 19
*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) ..................................................................................... 7, 13
*RBC Capital Mkts., LLC v. Jervis*,
    129 A.3d 816 (Del. 2015) .............................................................................. 27

iv

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ............................................................................ 11
*Russell v. K-Mart Corp.*,
  761 A.2d 1 (Del. 2000) .......................................................................... 28, 29, 30
*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014) .......................................................................... 2, 3
*Scroggins v. BP Exploration & Oil, Inc. (In re Brown Transp. Truckload, Inc.)*,
  161 B.R. 735 (Bankr. N.D. Ga. 1993) ................................................................ 39
*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
  742 F.2d 786 (3d Cir. 1984) ................................................................................ 23
*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) .................................................................................... 7, 10
*Spear v. Fenkell*,
  No. 13-02391, 2015 WL 3643571 (E.D. Pa. June 12, 2015) ........................... 11, 20
*Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*,
  285 B.R. 822 (S.D.N.Y. 2002) ............................................................................ 18
*Sysco Food Servs. of Metro New York, LLC v. Tramontana*,
  No. 06-2864, 2007 WL 4165349 (D.N.J. Nov. 20, 2007) ..................................... 19
*Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*,
  425 B.R. 78, (Bankr. S.D.N.Y. 2010) ................................................................. 18
*Tri-State Telecomms., Inc. v. First Fed. Sav. & Loan Ass'n*,
  No. 12-0377, 2012 WL 4904537 (Bankr. E.D. Pa. Oct. 15, 2012) ......................... 34
*Tribune Media Servs. Inc. v. Beatty (In re Tribune Co.)*,
  418 B.R. 116 (Bankr. D. Del. 2009) .................................................................... 39
*Union Bank v. Wolas*,
  502 U.S. 151 (1991) .......................................................................................... 33
*VFB LLC v. Campbell Soup Co.*,
  482 F.3d 624 (3d Cir. 2007) .............................................................................. 37
*Vigeant v. Meek*,
  352 F. Supp. 3d 890 (D. Minn. 2018) ................................................................. 19
*Wilmington Shipping Co. v. New England Life Ins. Co.*,
  496 F.3d 326 (4th Cir. 2007) ............................................................................. 13
*Zazzali v. Hirschler Fleischer, P.C.*,
  482 B.R. 495 (D. Del. 2012) ........................................................................ 27, 28

Federal Statutes

11 U.S.C. § 108(a) ................................................................................................. 32
11 U.S.C. § 547(c) ........................................................................................... 33, 34
11 U.S.C. § 548(a) ................................................................................................. 37
26 U.S.C. § 401(a) ............................................................................................... 1, 9
28 U.S.C. § 157(b) ................................................................................................. 18
28 U.S.C. § 157(c) ................................................................................................. 18
28 U.S.C. §§ 2071-2077 ......................................................................................... 39
29 U.S.C. § 404 ...................................................................................................... 2
29 U.S.C. § 1002 ................................................................................................... 11
29 U.S.C. § 1102 ................................................................................................... 15

v

29 U.S.C. § 1113 .............................................................................................................. 31
29 U.S.C. § 1132(a)(3) ..................................................................................................... 11
29 U.S.C. § 1144 ................................................................................................... 7, 8, 17

State Statutes

6 Del. C. §§ 1301-1311 .................................................................................................... 32
6 Del. C. § 1304(a) ........................................................................................................... 36
10 Del. C. § 3104(c) .......................................................................................................... 40
10 Del. C. § 8106 .............................................................................................................. 31
Wis. Stat. §§ 242.01-242.11 ............................................................................................ 32
Wis. Stat. § 242.02(1) ....................................................................................................... 36

Rules

Fed. R. Bankr. P. 7004 ................................................................................................ 38, 39
Fed. R. Civ. P. 8(a) .................................................................................................. 5, 19, 20
Fed. R. Civ. P. 9(b) .................................................................................................... 19, 23

Other Authorities

Restatement (Second) Of Torts § 448 (1965) ............................................................... 30

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 665 of 1527    Document 14-2

# INTRODUCTION

Appvion, Inc. ("Appvion" or the "Company") sponsored for its employees the Appvion Retirement Savings and Employee Stock Ownership Plan (the "Plan" or the "ESOP"), a pension benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Appvion ESOP Administrative Committee (the "ESOP Committee") was a named fiduciary of the Plan, which was intended to operate as a tax-qualified retirement plan investing primarily in the stock of Appvion's parent company, Paperweight Development Corporation ("PDC"). In 2014, the Company retained Argent Trust Company, N.A. ("Argent")[1] and delegated to it certain ERISA fiduciary duties with respect to the Plan. Those duties included ensuring that the value of the Company stock held in the Plan was determined each year by an independent appraiser, as required by statute. *See* 26 U.S.C. § 401(a)(28)(C). Argent contracted with Stout Risius Ross, Inc. and Stout Risius Ross, LLC (together, "Stout")[2] for this purpose.

Stout is a leading independent advisory firm. *See* https://www.stout.com/en/services/valuation-advisory. Stout's specialized ESOP and ERISA advisory services practice has provided ESOP services to every major institutional ESOP trustee in the United States. *See* https://www.stout.com/en/services/esop-erisa. In 2018, Stout reported $135 million in revenue. *See* https://www.2018.stout.com/what-we-did.

Here, Argent contracted with Stout for a singular and discrete purpose: to provide the statutorily-required independent valuation of the PDC stock held by the ESOP. *See* Ex. 1, Stout

---

[1]  State Street was named Trustee of the ESOP when it was created. *See* First Am. Compl. (Adversary Docket Nos. 59, 60) ("FAC") ¶ 94. Reliance Trust Company ("Reliance") became Trustee on April 1, 2013, *see id.*, and Argent became Trustee on May 28, 2014. *See id.* ¶ 92.

[2]  Argent contracted with Stout Risius Ross, Inc. to prepare valuations from 2012 through 2016. Stout Risius Ross, Inc. reorganized as Stout Risius Ross, LLC in 2017. Accordingly, Argent contracted with Stout Risius Ross, LLC for the June 2017 valuation. *See* Ex. 1, Stout Engagement Agreements; *see also infra* n.3.

1

Engagement Agreements.[3]  In that role, Stout provided services (and owed contractual duties) only to the Trustee—not to the Plan and not to the Company.  *See, e.g., id.*, Stout Engagement Agreement (6/20/2013), at A.2.[4]  Although the Trustee owed fiduciary duties to the Plan as set forth in ERISA, *see generally* 29 U.S.C. § 404, Stout was not a fiduciary to the Plan (and the FAC does not suggest that it was) and, thus, owed no duty to the Plan.

Similarly, Stout owed no duty to the Company.  Stout prepared the independent valuation for the Trustee, and it ultimately was the Trustee's obligation to determine the fair market value of PDC stock.  *See* FAC ¶ 413.  The engagement agreements clearly defined the limited nature of Stout's role.  Each agreement provided that Stout would "report ***solely to the Trustee***, notwithstanding that the Company w[ould] pay all fees for [Stout's] work."  *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), at A.2 (emphasis added).  Further, the agreements provided that Stout's valuation analysis would "be used ***for annual reporting and plan administration purposes by the Trustee***."  *See, e.g., id.* (emphasis added).  By signing the agreements, Appvion acknowledged that Stout could not successfully perform its services if it did not receive "accura[te] and complete[]" information from the Company.  *See, e.g., id.* at A.5.

Stout received a fixed fee of $50,000 for each semi-annual valuation, or $100,000 annually.  *See, e.g., id.* at A.3.  The amount of this fixed fee remained the same from 2013 through 2017, except for a single valuation for which Stout received an hourly fee.  *See* Ex. 1.[5]  Stout's

---

[3]  The FAC "explicitly relie[s]" on and quotes from Stout's engagement letters, *see* FAC ¶¶ 102-08, and accordingly the Court may consider them when determining the instant motion to dismiss.  *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[4]  The Trustee did not delegate any fiduciary duties to Stout.  *See generally* Ex. 1.

[5]  The May 18, 2015 engagement agreement provided that the June 30, 2015 valuation would be billed at standard hourly rates, plus out-of-pocket expenses, and that the December 31, 2015 valuation would be prepared for $50,000.  *See* Ex. 1, Stout Engagement Agreement (5/18/2015) at A.16.

2

compensation did not depend on the value it placed on the Company.  *See, e.g., id.*, Stout Engagement Agreement (6/20/2013), at A.7, Professional Terms, ¶ 12.

In short, Stout was a service provider to the Trustee of an ERISA plan sponsored by the Company.  It owed no duty to the Company or to the Plan.  Its obligation was solely to the Trustee.

Now, despite Stout's clearly delimited role, Plaintiff[6] makes the validity of Stout's valuation work the centerpiece of its FAC and seeks to pin the downfall of the Company on a vast conspiracy to manipulate those valuations.  That conspiracy is implausible for a number of reasons, however, not the least of which is that it was supposedly carried out by a changing cast of directors and officers of the Company over a period of many years.  Further, the FAC analyzes Stout's valuations[7] in a vacuum, and implies that Stout relied solely on the data "manipulated" by the Company's management when preparing its valuations, which is demonstrably inaccurate.  The FAC fails to mention that multiple third parties made offers to buy the Company or its business units at prices that ***exceeded*** Stout's valuations.[8]  These offers were real-world indicators of the Company's value, which Stout considered when preparing its valuations.  Stout also considered information from the Company's auditors, who consistently issued unqualified audit opinions.

---

[6] "Plaintiff" refers to the plaintiffs herein, Alan D. Halperin and Eugene I. Davis, Co-Trustees of the Appvion Liquidating Trust.

[7] The FAC puts at issue and incorporates Stout's valuation reports into the FAC.  The Court thus may consider the reports when determining the instant motion.  *See Schmidt*, 770 F.3d at 249.

[8] In 2012, the Company considered a combination with another entity that would have resulted in the Company going public.  *See* Ex. 2, 6/30/2013 FMV, at A.51; *see also* Ex. 3, 2012 10-K, at A.157.  Were this case to proceed, the evidence would show that the consideration to be paid for shares of PDC was $21.00 per share—a substantial premium over the $15.01 per share value estimated by Stout as of December 31, 2011.  *See* FAC Fig. 10.  Later that year, Hicks Equity Partners, LLC submitted a letter of intent to purchase the stock of PDC at $22.00 per share—which also reflected a significant premium over Stout's most recent valuation of the stock at $16.45 per share.  *See* Ex. 2, 6/30/2013 FMV, at A.52; FAC Fig. 10.  Further, in 2015, Sherman Capital Holdings, LLC purchased the Encapsys business unit for $208 million—which likewise reflected a significant premium over Stout's most recent valuation of that component of the business at $166 million.  *See* Ex. 4, 12/31/2015 FMV at A.304; Ex. 5, 12/31/2014 FMV at A.456-57.

3

*See, e.g.*, Ex. 3, 2012 10-K at A.179.  It is patently implausible that these third parties also were manipulating data concerning the Company's value and joined in the purported scheme to defraud.

Although Plaintiff has specifically described the manner in which it believes Stout's professional services were inadequate (a claim it does not and cannot bring), Plaintiff has utterly failed to articulate any facts supporting the aiding and abetting claim it does bring.  Plaintiff does not plead any ***facts*** that could support a reasonable inference that Stout had knowledge of any unlawful conduct by others, or that Stout participated in such conduct.

The FAC likewise fails to offer any reason why Stout would be motivated to further unlawful activity by others.  Stout is not alleged to have profited from the supposed misconduct.  Stout was paid a fixed fee for its work, and the FAC does not allege its fees were unreasonable.  The FAC's allegations depict, ***at most***, that Plaintiff—with the benefit of hindsight—believes Stout did not perform its job well; the absence of facts or motive supporting claims beyond that confirms that Plaintiff has failed to "nudge[] [its aiding and abetting] claim[] across the line from conceivable to plausible[.]"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

Even if Plaintiff had articulated some plausible theory that Stout, in exchange for a modest flat fee (that amounted to less than one-half of one percent Stout's overall revenue), discarded its professional integrity to benefit the directors and officers of an entity that was not even its client, the aiding and abetting claim still fails.  ERISA's broad preemptive effect mandates that claims relating to ERISA plans be brought under ERISA.  Plaintiff seeks to dodge ERISA preemption by artful pleading, because ERISA does not provide the cause of action or remedy Plaintiff seeks.  This is not permitted.  Moreover, even if the aiding and abetting claim against Stout were not preempted by ERISA, it would still fail.  The claim is barred by *res judicata* and the Court lacks subject matter jurisdiction over this claim.  Additionally, regardless of whether Count VI has been

4

asserted under ERISA or state law, it fails to allege that Stout "knowingly participated" in any unlawful conduct and is partially time-barred.[9]

The counts added in the FAC, which attempt to plead causes of action under the Bankruptcy Code and the Uniform Fraudulent Transfer Act ("UFTA"), as adopted by Delaware and Wisconsin, fare no better. The face of the FAC makes clear that the payments received by Stout in the 90 days preceding the filing of the Petition were made in the ordinary course of business, and, therefore, Plaintiff does not have an avoidable preference claim. Further, the FAC fails to allege an adequate constructive fraudulent conveyance claim against Stout. Finally, the Court lacks personal jurisdiction over Stout, which warrants the dismissal of all of the claims asserted against Stout.

Plaintiff should not be granted leave to amend its allegations again. Plaintiff has had full knowledge of its claims against Stout for *years*, and already has had one chance to remedy its inadequate claims. While voluminous, the FAC fails to cure the pleading deficiencies of the original Complaint and insufficiently pleads new claims against Stout. For all of these reasons, the claims against Stout should be dismissed with prejudice.

## STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While a complaint "does not need detailed factual allegations," a plaintiff must plead "more than labels and conclusions." *Twombly*, 550 U.S. at 545 ("[A] formulaic recitation of a cause of action's elements will not do."). "Mere restatements of the elements of a claim are not

---

[9] If the Court dismisses the breach of fiduciary duty claims asserted against the former directors and officers, Count VI should also be dismissed because aiding and abetting claims are derivative and depend on the establishment of an underlying tort. *See, e.g., In re Mort. Elec. Resignation Sys., Inc.*, 754 F.3d 772, 786 (9th Cir. 2014) (collecting cases).

5

entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 244 (3d Cir. 2011) (citations and alterations omitted).   Rather, a complaint must allege "factual pleadings [that] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

### I.    Count VI is Preempted by ERISA.

The FAC asserts a claim for "Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty," against Stout, *see* FAC, Count VI, and demands the entry of judgment against Stout in an amount to be determined at trial.  *See id.* ¶ 418, Prayer for Relief, ¶ (f).  The FAC does not specify whether this claim is brought under ERISA or state law.  Even though the case centers around the alleged failure to value accurately the stock held in an ERISA plan as statutorily required, the FAC deliberately avoids invoking that governing statute.  Notably, the FAC states unequivocally that Counts I, II, and III (which have been asserted against the directors and officers) are brought under state law.  *See* FAC ¶¶ 392 (alleging violation of "applicable state corporate law"), 399 (same), 403 (same).  Yet when it comes to stating causes of action against the ERISA fiduciaries (the ESOP Committee and the Trustee) and the Trustee's service provider (Stout), the FAC, like the original Complaint, falls silent as to the legal basis for the claims.  *See id.* Counts IV-VI.   The FAC's amendments do not clarify the source of law that purportedly governs these claims.  *Compare* Compl., Counts IV-VI *with* FAC, Counts IV-VI.

This silence speaks loud and clear:  Plaintiff is attempting to avoid any suggestion of an ERISA claim—even against the Plan's ERISA fiduciaries for their alleged failures in overseeing the required valuation of the ERISA Plan's holdings—because ERISA does not provide Plaintiff with a cause action on these facts, as explained below.  ERISA's broad preemptive power mandates

6

that ERISA is the sole enforcement vehicle for such alleged breaches.  To the extent Plaintiff is pleading a state law claim, then, that claim is preempted.

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans.  To this end, ERISA includes expansive pre-emption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern."  *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004) (internal quotation omitted); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (describing ERISA's preemption provision as "deliberately expansive"); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 83 (3d Cir. 2012) ("[ERISA's] broad preemptive scope reflects Congress's intent to lodge regulation of employee benefit plans firmly in the federal domain.").  "Section 1144 [of 29 U.S.C.] contains what may be the most expansive express pre-emption provision in any federal statute." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 947 (2016) (Thomas, J., concurring).

The Third Circuit has recognized two forms of preemption under ERISA, explaining, "[w]hat emerged from Congress's deliberations on ERISA was a statute that both preempts state law expressly and contains a comprehensive civil enforcement scheme that preempts any conflicting state remedy." *Iola*, 700 F.3d at 83.  As for express preemption, ERISA section 514(a) preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  The Supreme Court has held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983).  The Third Circuit has held that state law claims "have 'a connection with' the ERISA plans [when] they are premised on the existence of the plans." *Iola*, 700 F.3d at 84.  As for the second type of preemption, ERISA section 502(a) sets forth ERISA's exclusive enforcement scheme that preempts conflicting state

remedies.  The Third Circuit described this subsection's preemptive effect in *Menkes v. Prudential Insurance Company of America*, 762 F.3d 285 (3d Cir. 2014).  There the court held that claims for punitive damages, which are not available under ERISA, are preempted by section 502(a).  The court explained that "*Aetna Health* confirms that conflict preemption applies to any state cause of action that provides an alternative remedy to those provided by the ERISA civil enforcement mechanism because such a cause of action conflicts with Congress' clear intent to make the ERISA mechanism exclusive."  *Id.* at 296 (internal quotations omitted).  Count VI is preempted under both of ERISA's preemption provisions.

### A.  Count VI is Preempted by ERISA Section 514.

Plaintiff's claim against Stout is preempted by ERISA section 514 because the claim relates to an employee benefit plan—namely, the ESOP—as made clear on the face of the FAC.  In filing the FAC, Plaintiff specifically invokes its authority to bring "Causes of Action ***related to or arising out of [the] ESOP*** that are not Direct ESOP Claims (as defined in the Plan [of Liquidation])." FAC ¶ 364 (emphasis added).  Indeed, despite Plaintiff's assiduous avoidance of any reliance on ERISA, the ERISA Plan and the duties surrounding it form the entire basis for the FAC.

Specifically, the FAC is built upon allegations of unlawful conduct related to the valuation of the stock held by the Plan—what the FAC describes as a "core" function of plan administration. *See id.* ¶ 1 ("This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to ***oversee and administer the core functions of [the Plan]*.") (emphasis added); *see also id.* ¶ 112 ("The biannual FMV Determination served several crucial functions, related both to ***the administration of the ESOP*** and the operation of the Debtors' businesses.") (emphasis added). Stout's engagement letters expressly provided that the valuations were prepared for the ERISA

8

Trustee's work related to "plan administration."  *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), at A.2 ("We understand that our valuation analysis will be used for ***annual reporting and plan administration purposes by the Trustee***.") (emphasis added).

Stout's entire involvement with this matter arose out of the ERISA Trustee's fiduciary obligation to have the ERISA Plan's stock holdings valued by an independent appraiser.  Here, the ESOP Committee was delegated the fiduciary function of overseeing the Trustee.  *See* FAC ¶ 97 ("Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee.  The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP.").  The ESOP Committee, in turn, engaged Argent, *id.* ¶ 93, to serve as the Plan's Trustee to carry out plan fiduciary functions, including "determining the fair market value of PDC's common stock."  *Id.* ¶ 413; *see also id.* ¶¶ 99-100.  The Plan (and the Internal Revenue Code, *see* 26 U.S.C. § 401(a)(28)(C)), required the Trustee to retain an independent outside appraiser to assist it with this determination.  *Id.* ¶ 89.  Argent, accordingly, retained Stout to provide an independent valuation of PDC stock "[i]n accordance with . . . []ERISA[]."  *See, e.g.*, Ex. 1, 6/20/2013 Stout Engagement Agreement, at A.2.  Argent, as the Trustee, reviewed Stout's valuations and "determin[ed] the fair market value of PDC's common stock."  FAC ¶ 413.  Thus, the ESOP Committee was responsible for overseeing the Trustee's work in determining the fair market value of the stock held by the Plan, and the Trustee in turn retained Stout to provide independent valuations.  The ESOP Committee's oversight responsibility with respect to the valuations related to a "core" plan administrative function.  *See id.* ¶ 1.

In sum, Stout, which was hired by the ERISA Trustee to carry out an ERISA plan-required function, is alleged to have aided and abetted breaches by the ERISA plan fiduciaries who were

responsible for monitoring the ERISA Trustee's performance.  This claim plainly has a connection with or reference to an ERISA plan, *see Shaw*, 463 U.S. at 96-97, and is therefore preempted.

## B.  Count VI is Preempted by ERISA Section 502(a).

Similarly, Count VI is preempted because ERISA section 502(a) provides the exclusive enforcement scheme for the breaches alleged here.  In enacting ERISA, Congress chose ***not*** to provide a remedy for the type of claims Plaintiff tries to bring against Stout.  The Third Circuit has made clear that plaintiffs may not invoke state law in order to evade ERISA's carefully crafted enforcement provisions: "The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."  *Menkes*, 762 F.3d at 296 (internal quotations omitted).

### 1.  *ERISA Does Not Recognize A Cause of Action Against Stout.*

The availability and scope of relief against Stout under ERISA as a non-fiduciary is exceedingly narrow.[10]  Under section 502(a)(3), a "participant, beneficiary, or fiduciary" may only obtain "appropriate ***equitable*** relief" from a non-fiduciary, and only where the non-fiduciary is a knowing participant[11] in a ***prohibited transaction***.  *See Harris Tr. & Sav. Bank, v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248 (2000) ("*Harris Trust*") (emphasis added).[12]

---

[10] Stout was not a fiduciary to the Plan and the FAC does not allege that it was.  Instead, as the FAC alleges, Stout provided "financial advisory services" to the Trustee in order that the Trustee might fulfill its own duties.  *See* FAC ¶ 102.

[11] The FAC fails to allege that Stout knowingly participated in any ERISA violations for the reasons set forth in Part IV.A, *infra*.

[12] ERISA defines the term "fiduciary" to encompass any person "to the extent" that he or she, *inter alia*, "exercises any discretionary authority or discretionary control respecting management" of a plan or "has any discretionary authority or discretionary responsibility in the administration" of a plan.  *See* 29 U.S.C. § 1002(21)(A).  When drafting ERISA, Congress expanded the definition of "fiduciary" found in traditional trust law and thus expanded "the universe of persons subject to fiduciary duties—and to damages."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).  At the

The facts alleged in the FAC do not make out a section 502(a)(3) claim against Stout.  First, the FAC purports to plead a claim against Stout for knowing participation in a ***fiduciary breach*** (as opposed to knowing participation in a prohibited transaction).  However, knowing participation in a fiduciary breach does not give rise to a section 502(a)(3) claim.  In *Harris Trust*, the Supreme Court sanctioned liability against a non-fiduciary under section 502(a)(3) only where the non-fiduciary knowingly participated in a ***prohibited transaction***.  *See* 530 U.S. at 251.  Following *Harris Trust*, lower courts, including the Third Circuit, have held that a non-fiduciary's knowing participation in a breach of fiduciary duty is not actionable under section 502(a)(3).  *See Renfro v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011) ("29 U.S.C. § 1132(a)(3) does not authorize suit against 'nonfiduciaries charged solely with participating in a fiduciary breach.'"); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 322 (2d Cir. 2003) *cert. denied,* 540 U.S. 967 (2003) (recognizing that a cause of action against a non-fiduciary for knowing participation in a breach of fiduciary duty is no longer available under recent Supreme Court precedent); *Spear v. Fenkell*, No. 13-02391, 2015 WL 3643571, at *9 (E.D. Pa. June 12, 2015) ("[A] 'knowing participation' claim involving a non-fiduciary must involve a 'prohibited transaction.'").  Thus, although ERISA provides relief against a non-fiduciary for certain violations, it does not do so here.

Not only is Plaintiff's cause of action unavailable under ERISA, but the remedy it seeks is unavailable as well.  The Supreme Court has emphasized that the type of relief available against a non-fiduciary under section 502(a)(3) is limited to "appropriate equitable relief."  *See Harris Tr.*, 530 U.S. at 250; *Mertens*, 508 U.S. at 257-58.  In *Mertens*, the Court held that the plaintiffs could

---

same time, Congress deliberately limited the relief available against other parties considered non-fiduciaries under the statute.  *See id.* (Congress "eliminated . . . the common law's joint and several liability for *all* direct and consequential damages suffered by the plan, on the part of persons who had no real power to control what the plan did.").

11

not obtain monetary relief from the plan's actuaries under section 502(a)(3) for losses the plan sustained as a result of an underlying breach of fiduciary duty. *See* 508 U.S. at 255. The Supreme Court then reiterated the narrow nature of the relief available against a non-fiduciary under section 502(a)(3) in two subsequent cases. In *Harris Trust*, the Court held that "appropriate equitable relief" includes "restitution of the [trust] property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." 530 U.S. at 250. In *Great-West Life & Annuity Ins. Co. v. Knudson*, the Court held that equitable restitution was limited to the imposition of a "constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." 534 U.S. 204, 213 (2002).

The FAC demands relief for "***damage*** to Debtors and their businesses and prospects," FAC ¶ 418 (emphasis added), and seeks the entry of a "judgment" against Stout "in an amount to be determined at trial, including punitive damages." *Id.* Prayer for Relief, ¶(f). This is a demand for an award of money damages, which are not available against a non-fiduciary. *See Mertens*, 508 U.S. at 255 ("Money damages are, of course, the classic form of *legal* relief.").

Moreover, there is no "other appropriate equitable relief" that could be awarded against Stout. The only types of relief that the Supreme Court has sanctioned under section 502(a)(3) are restitution of trust property, disgorgement of proceeds or profits, and the imposition of a constructive trust or an equitable lien. *See Harris Tr.*, 530 U.S. at 250; *Great-West*, 534 U.S. at 213. These forms of relief are not available against Stout. Stout was paid a fixed fee for services rendered to the Trustee. *See generally* Ex. 1. The FAC makes no allegation that Stout profited from or was unjustly enriched by any unlawful conduct or that it is otherwise in possession of money or property that in good conscience belongs to the ESOP. Accordingly, Plaintiff has no

12

ERISA claim against Stout.[13]

### 2. *Plaintiff May Not Avoid ERISA By Bringing State Law Claims.*

Although the scope of liability and relief available against a non-fiduciary under ERISA is narrow, that does not mean that Plaintiff can bring a state law claim to avoid those limitations. A claim is preempted by ERISA where the "state cause of action attempts to authorize remedies beyond those authorized by ERISA § 502(a)." *Aetna Health*, 542 U.S. at 214-15; *see also id.* at 215 ("The limited remedies available under ERISA are an inherent part of the 'careful balancing' between ensuring fair and promoted enforcement of rights under a plan and the encouragement of the creation of such plans.") (quoting *Pilot Life*, 481 U.S. at 55). Where a "state law duplicate[s] the elements of a claim available under ERISA," it must be preempted if it attempts to "convert an equitable remedy into a legal remedy." *Aetna*, 542 U.S. at 215-16.

The fact that this leaves Plaintiff without a cause of action is not troubling. "ERISA's preemptive scope is not diminished simply because a finding of preemption will leave a gap in the relief available to a plaintiff." *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007). Courts of appeals have specifically held that this is true with regard to claims against non-fiduciaries. *See id.* at 342-43 ("ERISA preempts state-law claims against nonfiduciaries if those claims relate to a plan. The central question is not whether a particular defendant is a fiduciary, or whether the preemption decision would create a gap in the law with

---

[13] *See In re Pfizer Inc. ERISA Litig.*, No. 04-cv-10071, 2009 WL 749545, at *15-16 (S.D.N.Y. Mar. 20, 2009) (dismissing section 502(a)(3) claim against non-fiduciaries where the underlying nature of the relief sought was money damages); *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, No. 5:03-cv-1060, 2006 WL 2934391, at *25 (N.D.N.Y. Oct. 12, 2006) (dismissing section 502(a)(3) claim against non-fiduciary auditor where it had not "profited from fiduciary breaches of others, as distinct from its role as an auditor, nor ha[d] it been unjustly enriched"); *Carlson v. Principal Life Ins. Co.*, No. 01-cv-0581, 2006 WL 2806543, at *4 (E.D.N.Y. Sept. 28, 2006) (holding that non-fiduciary who was not the transferee of ill-gotten trust assets was not a proper defendant under section 502(a)(3)), *aff'd*, 259 F. App'x 365 (2nd Cir. 2008).

13

respect to suits against nonfiduciaries, but rather whether the action *relates* to any employee benefit plan.") (citation and internal quotations omitted); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 419 (4th Cir. 1993) ("[T]he generalized contention that there should be some form of action available against nonfiduciaries is insufficient to overcome the specific language of the statute which provides for preemption of any claim that relates to an employee benefit plan."); *Consol. Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 964 (8th Cir. 1991) *cert. denied,* 503 U.S. 985 (1992) ("[B]ecause ERISA allows equitable relief against both fiduciaries and non-fiduciaries, Congress intended pre-emption to apply even where no ERISA fiduciary remedy existed."); *Gibson v. Prudential Ins. Co. of Am.*, 915 F.2d 414, 417-18 (9th Cir. 1990) (holding that state law claims that were "directly connected with the Plan" were preempted, even though money damages are not available against a non-fiduciary under ERISA).[14]

It is not surprising that Plaintiff has been left without an ERISA cause of action.  ERISA's enforcement scheme provides statutory standing to bring a claim to, among other enumerated persons and entities,[15] the fiduciaries of Plan.  In fact, the Plan's current fiduciary, the ESOP Committee, has initiated a lawsuit in the Eastern District of Wisconsin (the district where the Plan is administered), which asserts substantially similar allegations against many of the defendants named in this case.  *See* First Am. Compl. (ECF 77), *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, No. 1:18-cv-01861 (E.D. Wis.).  Although the allegations are similarly unmeritorious and Stout expects to defeat them, the plaintiff therein, as an ERISA fiduciary, has

---

[14] *Custer*, *Consolidated Beef Industries*, and *Gibson* were decided before the Supreme Court's decision in *Harris Trust, supra*, which settled the open question of whether ERISA provides a cause of action against a non-fiduciary.  *Harris Trust* held that non-fiduciaries may be subject to "appropriate equitable relief" in limited circumstances.  *See supra* at Part I.B.1.

[15] *See generally* 29 U.S.C. § 1102 (providing that a civil action may be brought by, as relevant here, a participant, beneficiary, fiduciary, or the Secretary of Labor).

14

standing to seek an ERISA remedy (against at least some of the named defendants), in contrast to the contorted manner in which Plaintiff has attempted to bring state law breach of fiduciary duty claims in the midst of this bankruptcy proceeding.[16]  To the extent the conduct alleged in the breach of fiduciary duty claims was unlawful, ERISA provides a remedy (against at least some of the defendants) for the Plan, not the Liquidating Trust of the Company that sponsored the Plan.

Thus, Plaintiff cannot evade ERISA by arguing that it lacks a cause of action under ERISA or is unable to obtain the type of relief it seeks under the statute.  *See Custer,* 12 F.3d at 418-19 ("The Act's preemption clause does not place the analysis on whether remedies are provided by the Act, but rather on whether the action *relates* to any employee benefit plan.").  Count VI "relates to" an employee benefit plan and, accordingly, is preempted by ERISA.

## II.    Count VI Was Not Reserved in the Plan of Liquidation.

To the extent that Count VI is not preempted by ERISA, the Debtors (and accordingly Plaintiff), waived that claim by failing to preserve it in the Second Amended Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation ("Plan of Liquidation"), D.I. 970-1, or the Confirmation Order, D.I., 944-1.  Accordingly, Count VI cannot be asserted against Stout now.

The Plan of Liquidation and Confirmation Order are *res judicata* with respect to claims that are not expressly reserved therein.[17]  For *res judicata* to apply to a dispute, the dispute must (i) be subsequent to a final judgment on the merits rendered by a court of competent jurisdiction

---

[16] As explained in the portion of the Brief in Support of the Former Directors' and Officers' Motion to Dismiss the First Amended Complaint or in the Alternative to Transfer Venue ("Directors' and Officers' Motion to Dismiss the FAC") that addresses preemption, which Stout incorporates herein by reference, Plaintiff lacks standing to pursue a claim under section 502(a)(3).

[17] *See D&K Prop. Crystal Lake v Mut. Life Ins. Co. of N.Y.*, 112 F.3d 257, 261-62 (7th Cir. 1997) ("A blanket reservation that seeks to reserves all causes of action reserves nothing."); *In re Kelley v. South Bay Bank*, 199 B.R. 698 (B.A.P. 9th Cir. 1996) ("If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply. On the other hand, if the debtor fails to mention the cause of action . . . then he will be precluded from asserting it post[-]confirmation.").

15

in a prior action; (ii) involve the same parties or those in privity with them; and (iii) be based on the same cause of action. *See Peltz v. Worldnet Corp. (In re USN Comm'cn., Inc.)*, 280 B.R. 573, 586 (Bankr. D. Del. 2002). These factors are met with respect to Count VI.

First, the Court's Confirmation Order is a final judgment on the merits with respect to the issues addressed in the Plan of Liquidation. *See Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002) ("[C]onfirmation of a plan of reorganization constitutes a final judgment.").

Second, assuming that Plaintiff's allegation that Stout received notice of the Plan of Liquidation and the Confirmation Order/Effective Date is true, the Debtors (and their successor, Plaintiff) and Stout had the opportunity to participate in the plan confirmation process.

Third, the aiding and abetting claim could have been raised in the confirmation proceeding. *See Browning*, 283 F.3d at 772 ("[C]onfirmation by a bankruptcy court 'has the [same] effect of a judgment by the district court and *res judicata* principles bar relitigation of any issues raised *or that could have been raised* in the confirmation proceedings.") (emphasis added). The Debtors had actual knowledge of potential claims against Stout for years, *see infra* at Part V, but the Plan of Liquidation failed to identify (i) Stout as an entity against which any such causes of action were being reserved and (ii) the type of claim that Plaintiff is asserting against Stout in Count VI.

The Plan reserved claims against two categories of defendants, neither of which include Stout: the directors and officers and the insiders of the Debtors. *See* FAC ¶ 366. The Plan of Liquidation also reserved two specific types of claims against unnamed defendants: "claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code" and "claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims." *Id.* Count VI plainly is not a bankruptcy claim. That means that the claim only could have been reserved by the Plan of Liquidation if it (i) is "related to or arising out of the ESOP" and (ii) is not a Direct ESOP

16

Claim.  Count VI meets the second prong of this test:  it is not a "Direct ESOP Claim[]" because it is a claim asserted by Plaintiff, as the successor to the Debtors,  and it is not a claim asserted by the ESOP Committee or Trustee.  *See* FAC ¶ 370 (Direct ESOP Claims are "direct cause[s] of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, *excludes any Causes of Action related to the ESOP held by the Debtors and their Estates*.") (emphasis added).  Thus, if Count VI is "related to or arising out of the ESOP," that means that the claim is reserved under the Plan of Liquidation.  However, that also means that the claim is preempted by ERISA, *see* 29 U.S.C. § 1144(a) (ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate* to any employee benefit plan.") (emphasis added), and Plaintiff has no cause of action against Stout.  *See supra* at Part I.B.[18]  On the other hand, if Count VI is a state law claim that is not preempted by ERISA, *i.e.*, it is not "relate[d] to" the ESOP, that necessarily means that the claim was not reserved by the Plan of Liquidation.  Either result demands that Count VI be dismissed.

## III.    The Court Lacks Subject Matter Jurisdiction to Decide Count VI.

Count VI should also be dismissed because the Court lack subject matter jurisdiction over this claim:  it not a "core" claims that "arises under" or "arises in" this bankruptcy matter and it also is not a non-core claim that "relates to" the bankruptcy.  *See* 28 U.S.C. § 157(b)(1), (c).[19]

Count VI is not a "core" claim.  It is not included in the illustrative list of "core" claims set forth in Section 157(b)(2).  The claim will not affect the bankruptcy estate other than that the potential proceeds resulting from a judgment will provide additional funds for creditors, which is

---

[18] Plaintiff attempts to avoid this result by alleging that the Plan of Liquidation "was drafted with the purpose of preserving . . . all clams [*sic*]. . . *connected with* the Debtors' *ESOP Structure*." FAC ¶ 362 (emphases added).  Plaintiff cannot revise the language of the Plan of Liquidation, which clearly reserves claims "related to or arising out of the ESOP," *i.e.*, ERISA claims.

[19] Stout joins and incorporates by reference the portion of the Directors' and Officers' Motion to Dismiss the FAC that addresses this Court's subject matter jurisdiction.

insufficient to transform a non-core state law claim into a core claim.  *See Hatzel & Buehler, Inc. v. Orange & Rockland Utils.*, 107 B.R. 34, 39-40 (D. Del. 1989).  Indeed, courts have found that claims for breach of fiduciary duty are non-core claims.  *See Official Comm. of Unsecured Creditors of Wickes, Inc. v. Wilson (In re Wickes, Inc.)*, No. 06-C-0869, 2006 WL 1457786, *16 (N.D. Ill. May 23, 2006); *Bliss Techs., Inc. v. HMI Indus. (In re Bliss Techs., Inc.)*, 307 B.R. 598, 608 (Bankr. E.D. Mich. 2004) (finding "persuasive the cases holding that a state-law breach of fiduciary duty cause of action, which is based on pre-petition conduct, does not, and constitutionally cannot, fit within [28 U.S.C. §§ 157(b)(2)(A) or (O)]").  Similarly, courts have found that claims for aiding and abetting breaches of fiduciary duty are non-core claims.  *See, e.g., Official Comm. Of Unsecured Creditors of Allied Sys. Holding v, Yucaipa Am. Alliance Fund I, L.P. (In re Allied Sys. Holdings, Inc.)*, 524 B.R. 598, 605-606 (Bankr. D. Del. 2015) (finding claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty to be non-core).[20]

Further, for the reasons stated in the Directors and Officers' Motion to Dismiss the FAC, Count VI is not a non-core claim that is "related to" the bankruptcy.  Accordingly, the Court lacks

---

[20] *See also Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78, (Bankr. S.D.N.Y. 2010) (finding claim for aiding and abetting breach of fiduciary duty to be non-core); *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 285 B.R. 822, 827 (S.D.N.Y. 2002) (holding that claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are traditionally non-core); *Buena Vista Television v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 307 B.R. 404, 419 (Bankr. S.D.N.Y. 2004) (holding that state law claims of breach of fiduciary duty and aiding and abetting breaches of fiduciary duty are normally non-core claims); *Breeden v. Sphere Drake Ins. P.L.C. (In re Bennett Funding Group, Inc.)*, 258 B.R. 67, 76 (Bankr. N.D.N.Y. 2000) (finding action for aiding and abetting breach of fiduciary duties to be non-core).

18

subject matter jurisdiction over Count VI,[21] and this claim should be dismissed pursuant to Rule

12(b)(1).[22]

## IV.    The FAC Fails to Allege Facts Sufficient to Show that Stout Knowingly Participated in Unlawful Conduct.

Whether preempted or not, Count VI should be dismissed because the FAC fails to plead

any facts that could support a reasonable inference that Stout knew or should have known that the

directors and officers were breaching their fiduciary duties and that it participated in this conduct.

*See Twombly,* 550 U.S. at 556.  This failure persists under both ERISA and state law.

### A.    The FAC Fails to State a Knowing Participation Claim Under ERISA.

The FAC's allegations are not sufficient to meet the standard of Rule 8, let alone the

heightened pleading requirements of Rule 9(b) that apply where, as here, an ERISA claim is

grounded in fraud.[23]  Specifically, the FAC fails to allege sufficient facts to show that Stout knew

of the directors' and officers' breaches or actively participated in them.

---

[21] To the extent that this Court determines that Count VI is non-core, and does not otherwise dismiss this claim, Stout expressly does not consent to the entry of a final order by this Court.

[22] To the extent that the Court finds that it has subject matter jurisdiction over this case, the Court should transfer this case to the United States District Court for the Eastern District of Wisconsin for the reasons stated in the portion of the Directors' and Officers' Motion to Dismiss the FAC that addresses transfer, which Stout incorporates herein by reference.

[23] Allegations that a fiduciary concealed material information and engaged in a scheme designed to inflate the price of stock sound in fraud and are subject to Rule 9(b).  *End of the Rd. Tr. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 206 (D. Del. 2000); *see also Johnson v. Radian Grp., Inc.*, No. 08-2007, 2009 WL 2137241, at *12 (E.D. Pa. July 16, 2009); *Sysco Food Servs. of Metro New York, LLC v. Tramontana*, No. 06-2864, 2007 WL 4165349, at *3 (D.N.J. Nov. 20, 2007); *Pietrangelo v. NUI Corp.,* No. 04–3223, 2005 WL 1703200, at *9 (D.N.J. July 20, 2005). Further, courts have specifically held that allegations of fraudulent data manipulation, such as providing inaccurate and misleading information to an independent appraiser, sound in fraud.  *See Vigeant v. Meek*, 352 F. Supp. 3d 890, 896 (D. Minn. 2018).  Although the FAC does not use the word "fraud," that is what the FAC alleges:  that Appvion's management provided inaccurate information to Stout in order to purposefully manipulate the price of PDC stock and enrich themselves, and that Stout knowingly assisted them in this unlawful conduct.  Accordingly, Rule 9(b)'s heightened pleading standard applies to Plaintiff's claims against Stout.

19

Instead, the FAC relies on inferences and bald allegations of a purported scheme by Defendants to inflate the price of PDC's stock to assert Stout's "knowing participation" in a fiduciary breach, which is insufficient even under Rule 8. *See Spear*, 2015 WL 3643571, at *9 (holding conclusory allegations regarding non-fiduciary's knowing participation in prohibited transaction to be insufficient under *Twombly*). Moreover, the FAC's allegations regarding Stout's knowledge and participation in any unlawful conduct are not plausible. *See Iqbal*, 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face.") (internal quotation omitted).

1. *The FAC Pleads No Facts to Support an Inference that Stout "Knowingly Participated" in Unlawful Conduct.*

Stout performed semi-annual valuations for the Trustee pursuant to the terms of its engagement agreements. The engagement agreements expressly contemplated that Stout, at the request of the Trustee, would meet with Appvion's management and rely on the "assumptions and information" provided by the Company to prepare the valuations. *See, e.g.,* Ex. 1, Stout Engagement Agreement (6/20/2013), at A.3. While the FAC faults Stout for not seeking "more reliable projections" from management, *see, e.g.*, FAC ¶¶ 183, 203, the engagement agreements stated that Stout's services were dependent on the "accuracy" and "completeness" of the data provided to it. *See, e.g.,* Ex. 1, Stout Engagement Agreement (6/20/2013), at A.3 ("[T]he Company acknowledges that the successful delivery of our services . . . [is] dependent on . . . the accuracy and completeness of the assumptions and information provided to us . . . ."). Thus, while the FAC implies that Stout's meetings with Appvion's management team and its reliance on the data they provided support Plaintiff's assertion that Stout was aiding the directors and officers in unlawful conduct, *see, e.g.*, FAC ¶¶ 10, 13, 181-85, 203, those meetings and exchanges of information were necessary for Stout to perform the valuations and contemplated by the terms of its engagement

20

agreements.    These allegations do not support a reasonable inference that Stout knowingly participated in unlawful conduct.

Similarly, the FAC faults Stout for relying on projections that purportedly were "unrealistic" and "unreliable."  *See, e.g., id.* ¶¶ 12-13, 203, 416.  Even if the projections were "unrealistic" and "unreliable" though, that does not necessarily mean that they were purposefully manipulated by Appvion's management to enrich themselves (and, in turn, that Stout knew or should have known about the purported manipulation).  Indeed, the FAC acknowledges that the projections may not have been "purposefully inflated" by Appvion's management.  *See, e.g.*, *id.* ¶ 11 ("Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, *or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited*, the EBITDA projections played a crucial role in Stout's FMV Determinations.") (emphasis added).  If Company's management did not deliberately manipulate the projections, then there was no scheme to inflate the price of the PDC stock in which Stout could have "knowingly participated."

Likewise, the FAC alleges that Stout's valuations were "manipulated," but the only ***facts*** pleaded in support of that contention are Plaintiff's perceived errors in the valuations.  The FAC claims that the valuations were "flawed" because they valuations excluded material indebtedness and certain liabilities, *id.* ¶¶ 206, 209; included comparisons to companies that were "not suitable," *id.* ¶ 228; relied on "improper exclusions and adjustments," *id.* ¶ 260; and contained other purported "errors" and "faults."  *See id.* ¶¶ 243-49, 259, 267, 269-80.[24]

---

[24] The FAC makes these assertions based on data that has been cherry-picked to support Plaintiff's narrative.  As previously noted, third parties made offers to buy the Company or its components for prices that exceeded Stout's valuations.  *See supra* n.8.  Moreover, Plaintiff overlooks the fact that Stout's valuations reflected that PDC stock experienced a significant decline in value from 2008 to 2010, from which it did not recover.  *See* FAC Fig. 10.

21

The FAC claims these "errors" were "not the result of mere academic disagreement." *Id.* ¶ 203. Accordingly to Plaintiff, Stout was "fully aware" that the projections were inflated, *id.* ¶¶ 183, 203, and the "errors" in the valuations were "knowingly made to compensate for the unreliable financial projections." *Id.* ¶ 203. The FAC, however, pleads no ***facts*** to support these conclusions. The FAC implies that Stout worked in concert with Appvion's management to produce the "inflated" valuations, but does not actually allege as much. The FAC alleges that Stout relied on the financial projections at the officers' "behest," *see id.* ¶ 217, but this allegation only supports the inference that Appvion's management provided Stout with the "assumptions and information" contemplated in Stout's engagement agreements, *see* Ex. 1, Stout Engagement Agreement (6/20/2013), at A.3, not that Stout colluded with Appvion's management to inflate the price of PDC stock in its valuations. Further, the FAC alleges "[u]pon information and belief" that one or more of the officers "assisted Stout to selectively exclude" certain EBITDA ratios, FAC ¶ 265, and that Stout's decision regarding whether to apply a Company-Specific Risk Premium may have been made "with possible input from Management." *Id.* ¶ 269. The FAC does not plead a single fact in support of these allegations. Indeed, the FAC adds multiple paragraphs concerning the knowledge that the members of the boards of Appvion and PDC allegedly had regarding the reliability of the Company's projections. *See* FAC ¶¶ 173-80. Those paragraphs do not include any allegations concerning ***Stout's*** knowledge. *See id.*

At most, Plaintiff—with the benefit of hindsight—has alleged that Stout did a poor job in valuing the Company. As the Third Circuit has acknowledged, however, the valuation of privately-held ESOP stock is a task that requires a significant degree of professional judgment. *See Kool v. Coffey*, 300 F.3d 340, 362-63 (3d Cir. 2002) (acknowledging the "extremely difficult task of valuing the stock of a company which is privately owned"). Thus, merely alleging that a

<center>22</center>

valuation was "incorrect" or that the valuation could have been performed differently, as Plaintiff has done here, is insufficient to plead a violation of section 502(a)(3). *See Eslava v. Gulf Tel. Co., Inc.*, No. 04-0297, 2007 WL 9717348, at *4 (S.D. Ala. June 13, 2007) (on summary judgment, holding that "Plaintiffs' assertion that the fairness evaluation was incorrect is insufficient to support [the] claim that [the defendant valuation firm] knowingly participated in a fiduciary breach").

### 2.    It is Implausible that Stout "Knowingly Participated" in Unlawful Conduct.

The purported scheme to defraud—coordinated among multiple classes of defendants over a period of years—is implausible. *See Iqbal*, 556 U.S. at 678.  Conspicuously, the FAC does not allege when the fraud began (*i.e.*, when the ESOP was formed or at some later point in time), who started it, or when each of the defendants (including Stout) joined it.  The failure to allege key details sufficient to put Defendants on notice of their allegedly fraudulent actions is insufficient under Rule 9(b). *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (To satisfy Rule 9(b), a plaintiff must plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the price misconduct with which they are charged[.]") (quotation omitted).

Such a coordinated effort is particularly implausible given the significant turnover among the alleged wrongdoers.  The ESOP was formed in 2001, *see* FAC ¶ 67, and the composition of Appvion's management changed over time.[25]  The turnover in personnel was not limited to the

---

[25] From the time the ESOP was created in 2001 until the Company filed for bankruptcy in 2017, there were multiple changes in the management of Appvion.  The Company's CEO changed two times.  *See* FAC ¶¶ 24, 36.  The other officers of the Company changed over time, *see id.* ¶¶ 25 (Ferree – served in various management roles from 2006 - 2017), 26 (Van Straten – became Vice President, General Counsel and Secretary of PDC and Appvion in 2012), 27 (Fletcher – became Vice President and Controller of Appvion in 2010 and retired in 2017), 28 (Arent – became Senior Vice President of Human Resources in 2013 and retired in 2015), as did its directors. *See, id.* ¶¶

23

Company.  The Trustee of the ESOP also changed multiple times.  *See supra* n. 1.  It is patently implausible that the 13 individual officers and directors who have been named as defendants in the FAC (and potentially the officers and directors who preceded these individuals), multiple trustees, and an independent valuation firm all worked in concert to inflate the value of the PDC stock, seamlessly handing the baton of fraud off from one to another over an indefinite time period that at a minimum lasted several years.

The fraud is even more implausible given that Stout relied on multiple sources of data—which included data from the Company ***as well as real-world indications of market value from independent third parties***—when preparing its valuations.  The FAC claims that the "inflated projections" are "primarily responsible" for the "disconnect" between Stout's valuations and the Company's "financial reality."  FAC ¶ 203.  The projections (and the other data provided to Stout by the Company), however, were one of multiple data points considered by Stout.  As is reflected in its valuation reports, Stout also considered data from third parties, including the Company's auditors, the investment bankers engaged by the Company to assist with its multiple attempts to sell its assets, and the prospective purchasers who made offers to buy the Company in whole or in part.[26]  It is implausible that the alleged fraud was also joined by these third parties.

---

29 (Carter, 2004-2016), 30 (Murphy, 2007-2016), 31 (Reardon, 2007-2015), 32 (Seifert, from 2004), 33 (Suwyn, from 2011), 34 (Laurino, from 2017), 35 (Roberts, from May 2016).

[26]  The Company engaged in several attempts to sell its assets.  In the related due diligence processes, the Company's financial data was reviewed by multiple third parties, including investment bankers and prospective purchasers.  *See, e.g.,* Ex. 4, 12/31/2015 FMV at A.302-04.  Yet Defendants' purported scheme to "manipulate" the stock price supposedly continued even as the processes necessary for such potential sales took place and the Company received purchase offers that *exceeded* the valuations prepared by Stout.  *See supra* n.8.  This is patently implausible.  Further, it underscores why Stout could not have had even constructive knowledge of any allegedly unlawful conduct by the officers and directors: even the third parties reviewing the Company's financial records who submitted offers to purchase the Company did not detect the supposed fraud.

24

Stout's purported knowledge of and participation in this fraudulent scheme is rendered further implausible by the limited scope of Stout's engagements and the nature of its compensation. Stout was engaged to determine the fair market value of the stock "for annual reporting and plan administration purposes by the Trustee" and reported "solely to the Trustee." *See, e.g.,* Ex. 1, Stout Engagement Agreement (6/20/2013), at A.2.[27]  It was the ***Trustee's*** responsibility to review and ultimately adopt the valuations. *See, e.g.*, FAC ¶¶ 100, 412-13.  Stout could not plausibly have known nor should it have known that its valuations—which were expressly for use by the Trustee—were being manipulated by Appvion's management for their own financial benefit.  The FAC does not make such an allegation.  Moreover, in contrast to the directors and officers, Stout had no incentive to inflate the valuations.  Stout's receipt of a fixed fee for its work—that was less than one-half of one percent of its annual revenue, *see* Ex. 1—negates any inference that Stout would have benefitted from the fraud in any way.  While Stout's engagements were renewed each year (at the same rate), its continued receipt of a reasonable, fixed fee for services rendered does not amount to a motive to engage in unlawful conduct. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) *cert. denied,* 498 U.S. 941 (1990) (An accounting firm's "greatest asset is its reputation for honesty, followed closely by its reputation for careful work.  Fees . . . could not approach the losses [a firm] would suffer from a perception that it would muffle a client's fraud."); *see also Grove Holding Corp. v. First Wisconsin Nat'l Bank of Sheyboygan*, 803 F. Supp. 1486, 1504 (E.D. Wis. 1992) (holding accountant's fee for services insufficient to support an

---

[27] The FAC alleges that, contrary to the terms of Stout's engagement agreements, "Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations." FAC ¶ 113; *cf. ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading thereon, the written instrument will control.").  The FAC, however, does not allege that *Stout* knew or should have known that the Trustee (or anyone else) was using its valuations for purposes other than those set forth in its engagement agreements.

inference of scienter for securities fraud and common law fraud claims).  Where, as here, the FAC

pleads facts that are "'merely consistent with' a defendant's liability," the allegations fall "short

of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678.

Accordingly, Count VI fails to state a section 502(a)(3) claim against Stout.

**B.    The FAC Fails to Plead a State Law Aiding and Abetting Claim.**

Similarly, the FAC fails to state an aiding and abetting claim under Delaware law.[28]  "There

are four elements to a claim of aiding and abetting a breach of fiduciary duty: "(i) the existence of

a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that

breach by the defendant; and (iv) damages proximately caused by the breach."  *In re Broadstripe,*

*LLC*, 444 B.R. 51, 107 (Bankr. D. Del. 2010).  At minimum, the FAC fails to plausibly allege the

third and fourth elements of this cause of action.[29]

"Knowing participation has been described as a 'stringent' standard that turn[s] on proof

of scienter."  *Lee v. Pincus*, No. CV 8458-CB, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014)

(internal quotations omitted) (alteration in original); *see also In re Santa Fe Pac. Corp. S'holder*

*Litig.,* 669 A.2d 59 (Del. 1995) (holding that conclusory allegations of knowledge and participation

in breaches of fiduciary duty to be insufficient under Rule 12(b)(6)).  An aider and abettor must

act "knowingly, intentionally, or with reckless indifference; that is, with an illicit state of mind."

---

[28] To the extent Plaintiff brings Count VI under state law, Delaware law applies.  "[A] federal court applies the choice of law principles of the state in which it sits."  *In re PMTS Liquidating Corp.*, 452 B.R. 498, 507 (Bankr. D. Del. 2011).  "In deciding disputes between and among corporate actors, Delaware subscribes to the internal affairs doctrine, a conflict of laws principle under which the internal affairs of a corporate entity are governed by the laws of the state of incorporation."  *Enzo Life Scis., Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 597 (D. Del. 2015) (quotation omitted).  "Claims implicating an entity's internal affairs include . . . aiding and abetting [a breach of fiduciary duty]."  *Id.* (internal quotations omitted).

[29] Stout does not concede that Plaintiff has plausibly alleged that there was a breach of any fiduciary duties by the directors and officers or Argent.

26

*RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (internal quotations omitted). Allegations that a professional engaged in "routine" services without pleading facts "suggesting how and why" it used its position to aid the alleged breaches of fiduciary duty do not support an inference of "knowing participation." *See Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. 2012) (citing *Morgan v. Cash*, No. 5053, 2010 WL 2803746, at *4-8 (Del. Ch. July 16, 2010)). A plaintiff may plead knowing participation by alleging facts that support the inference that the defendant would profit from the breach or through direct factual allegations that the defendant sought to induce the breach. *In re Telecomms., Inc. S'holders Litig.*, No. A-16470, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003).

The FAC fails plausibly to plead "knowing participation" in support of a state law aiding and abetting claim for the same reasons it fails to plead "knowing participation" under ERISA. *See supra* at Part IV.A. The FAC pleads no facts that lead to an inference that Stout did anything other than perform valuations for the Trustee pursuant to the terms of its engagement agreements. *Cf. Zazzali*, 482 B.R. at 519; *Morgan*, 2010 WL 2803746, at *4-8. Stout met with management and relied on the assumptions and information they provided to it, which Appvion's management agreed, by signing the engagement agreements, would be "accura[te] and complete[]." *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), at A.3. The FAC does not plausibly plead any facts from which it could reasonably be inferred that Stout knew that this information was "purposefully inflated" or "manifest[ly] implausibl[e]." *See* FAC ¶ 11; *Zazzali*, 482 B.R. at 519 (finding allegation that defendant law firm must have known that corporate insiders were committing fraud and breaching their fiduciary duties based on "numerous and glaring misstatements in the PPMs [(private placement memorandums)] . . . [wa]s unsupported," because the plaintiff "failed to plead any fact giving rise to a reasonable inference that Defendant was aware

27

that the PPMs did not contain factually accurate financial information"). The FAC points out "errors" in Stout's work, but it pleads no facts that could lead to the inference that "errors" were purposeful or that Stout was colluding with Appvion's management. *See supra* at Part IV.A.

Moreover, the FAC does not allege *why* Stout would have engaged in such conduct. Stout had no motive or incentive to engage in unlawful conduct. Stout was paid a fixed fee for services rendered—which has not been alleged to be excessive or unreasonable—that did not change during the relevant time period. *See id.* This does not support a reasonable inference of knowing participation. *See Lee*, 2014 WL 6066108, at \*14 ("It is not reasonable to infer here that, simply by receiving fees (that are not alleged to be unreasonable) for acting as underwriters in the secondary offering, that Underwriter Defendants 'participated in the [Zynga] board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue.") (alterations in original).

Further, the FAC fails to allege facts that plausibly plead proximate cause. A proximate cause is one "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the results would not have occurred." *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000). "In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor." *Duphily v. Del. Elec. Coop., Inc.*, 662 A.2d 821, 829 (Del. 1995). A court may decide proximate causation as a matter of law if there can be "no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinarily negligent . . . ." *Id.* at 831.

28

The FAC alleges a lengthy chain of events that ultimately led to Plaintiff's purported injury. Stout prepared the valuations using information provided by Appvion's management that may or may not have been "purposefully inflated," FAC ¶ 11, even though Appvion's management agreed to provide Stout with "accura[te]" "assumptions and information." *See, e.g.,* Ex. 1, Stout Engagement Agreement (6/20/2013), at A.3.  The Trustee then reviewed and adopted those valuations (with the ESOP Committee overseeing the Trustee's work), *see* FAC ¶¶ 89, and the "inflated" valuations were then used to set prices for the purchases and sales of PDC stock.  *Id.* ¶ 16.  Because the ESOP "frequently" did not have enough cash to fund the cost of ESOP distributions at the "inflated" stock prices, the ESOP borrowed money from PDC.  *Id.* ¶ 115. Appvion's management breached their fiduciary duties to the Company by extending credit from Appvion to PDC in the form of intercompany loans, so that PDC could in turn lend money to the ESOP.  *Id.*, Count III.  In at least one instance, Appvion's management breached their fiduciary duties to the Company by forgiving an intercompany note from Appvion to PDC for no consideration.  *Id.* ¶ 18, Count II.  Appvion borrowed money from its lenders to fund its loans to PDC.  *Id.* ¶ 116.  The "outflow" of money from Appvion "had a ripple effect" on the business, "***playing a role*** in the Debtors' decision to sell" the Encapsys business unit.  *Id.* ¶ 16 (emphasis added).  This, in turn, "saddl[ed] the Debtors" with an "unsustainable capital structure."  *Id.*  All of this supposedly somehow led to Appvion's bankruptcy and Plaintiff's injury.

This chain of events includes multiple superseding causes, and there could be no "reasonable difference of opinion" as to their foreseeability.  *Cf. Russell*, 761 A.2d at 5.  It certainly was not foreseeable to Stout that Appvion's management would supply it with information that was not accurate and complete, contrary to the terms of its engagement agreements.  It also was not foreseeable that they would do so to enrich themselves.  Further, it was not foreseeable to Stout

29

that Appvion's management would commit breaches of fiduciary duty when deciding that Appvion should loan money to PDC to fund ESOP distributions and, in at least one instance, forgive a loan from Appvion to PDC for no consideration.  *Cf.* Restatement (Second) Of Torts § 448 (1965) ("The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, . . . unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created.").  It was not foreseeable to Stout that Appvion's management would decide to sell a key business unit and revenue driver as a result of the Company's debt obligations, which included ***but were not limited*** *to* its loans to PDC to fund ESOP distributions.  Indeed, the FAC acknowledges that the ESOP obligations *"**play[ed] a role**"* in the decision to sell the Encapsys business unit but were not the primary reason for that decision.[30]  *See* FAC ¶ 16.  This is far from a "natural and continuous sequence."  *Cf. Russell*, 761 A.2d at 5.  No reasonable person could come to the conclusion that Stout's conduct was the "but for" cause of Plaintiff's purported injury, when, on the face of the FAC, there were multiple acts and events by other actors that were unforeseeable to Stout.  Accordingly, to the extent Plaintiff's claim sounds in state law, it should be dismissed.

## V.    Count VI is Partially Time-Barred.

Regardless of whether Count VI is an ERISA claim or sounds in state law, it is partially time-barred.  The statute of limitations for a fiduciary breach under ERISA is the earlier of (i) six years from the last action constituting part of the breach or, in the case of an omission, the latest

---

[30] Should this case proceed, the evidence will show that Appvion's management considered the sale of the Company in whole or in part for years due to ongoing liquidity issues. *See, e.g.*, Ex. 5, 12/31/2014 FMV at A.409. Multiple factors contributed to the Company's accumulation of debt, including its sale of several investments at significant losses and the recession of 2008-09. *See id.* at A.410.  The strain on the Company's liquidity was reflected in Stout's declining valuations of the Company, *see* FAC Fig. 10, and was described in Stout's reports. *See, e.g.*, Ex. 5, 12/31/2014 FMV at A.409.

30

date on which the fiduciary could have cured the breach or (ii) three years after the earliest date on which the plaintiff had actual knowledge of the breach. 29 U.S.C. § 1113. In the event of "fraud or concealment," the period is six years after the date of discovery of the breach. *Id.*

The statute of limitations for an aiding and abetting a breach of fiduciary duty claim under Delaware law is three years. *See* 10 Del. C. § 8106. The statute of limitations begins to run when the plaintiff is on inquiry notice of the facts giving rise to the cause of action. *See Jepsco, Ltd. v. B.F. Rich Co.*, No. 7343, 2013 WL 593664, at *8 (Del. Ch. Feb. 14, 2013) (holding that the limitations period begins to run when "the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* [when the plaintiff is] on inquiry notice") (alteration in original).

Plaintiff does not allege that Stout engaged in fraudulent concealment, and, thus, neither statute of limitations should be tolled on this basis. *See Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984) ("[F]raudulent concealment, must be pleaded with particularity."); *In re ML/EQ Real Estate P'ship Litig.*, No. 15741, 1999 WL 1271885, at *1 (Del. Ch. Dec. 21, 1999) ("It is, of course, the plaintiffs' burden to plead facts to 'demonstrate that the statute of limitations was, in fact, tolled.'"), *reargument denied,* No. 15741, 2000 WL 364188 (Del. Ch. Mar. 22, 2000). The only questions remaining are (i) to the extent the claim is an ERISA claim, when Plaintiff had "actual knowledge" of the breach; and (ii) to the extent the claim sounds in state law, when Plaintiff had inquiry notice of the facts giving rise to the cause of action.

The FAC extensively cites to the Plan, the Appvion ESOP Guide, and other publicly available information, *see, e.g.*, FAC ¶¶ 71, 90, 170, 335, 339—all of which the Company had access to at all times. Further, the FAC cites to Stout's valuation reports and its engagement letters, *see, e.g.*, FAC ¶¶ 101-08, 190-99, 206-11, 213-14, to which the Company, through the ESOP Committee, also had full access at all times. The ESOP Committee reviewed Stout's valuation

31

reports and the bases for its valuations as part of its oversight of the Trustee.  *See id.* ¶¶ 97, 212, 348-51, 353, 355, 357.  All of this amounts to the Company's "actual knowledge" of the "material facts" necessary to understand that the Company had a claim against Stout under ERISA.  *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) ("[A]ctual knowledge of a breach or violation" requires that a "plaintiff have actual knowledge of all material facts necessary to understand that some claim exists.").  It certainly establishes inquiry notice under Delaware law.  *See Jepsco*, 2013 WL 593664, at *8.  Accordingly, a three-year statute of limitations applies to Plaintiff's claim, regardless of whether the claim sounds under ERISA or Delaware law.

Under Section 108(a) of the Bankruptcy Code, the Trustee may assert claims that were timely as of the date the petition was filed.  11 U.S.C. § 108(a); *see also In re Fruehauf Trailer Corp.*, 250 B.R. at 185.  Here, the Petition was filed on October 1, 2017.  Thus, the claim against Stout is barred to the extent it alleges violations that pre-date October 1, 2014.

## VI.    Counts X, XI and XIII Fail to State Claims for Relief.

### A.    Count X Fails to State a Claim Against Stout.

Count X seeks to avoid payments that Appvion made to Stout in July and August 2017.  *See* FAC ¶¶ 448-49.  Plaintiff purports to assert this "[a]voidable [p]reference" claim under the Bankruptcy Code and Wisconsin and Delaware law.  *See id.*, Count X.

Bankruptcy Code Section 547(b) is a "bright line rule allowing a debtor to recover from its creditors payments it made to those creditors in the 90 days prior to the filing of bankruptcy."  *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 304 (Bankr. D. Del. 2012).  There is no analogue to Section 547(b) under Delaware or Wisconsin law.  While Delaware and Wisconsin law allow a debtor to bring a cause of action to avoid fraudulent conveyances, *see* 6 Del. C. §§ 1301-1311; Wis. Stat. §§ 242.01-242.11, neither state has enacted an avoidable transfer provision analogous to 11 U.S.C. § 547(b).  Plaintiff cites the respective

32

chapters of the Delaware Code and Wisconsin Statutes that have adopted the UFTA, but fails to cite any specific provisions of those chapters.  *See id.*, Count X (citing "6 Del. C. § 1301 et seq." and "Wisconsin Statutes, Ch. 242, et seq.").   Plaintiff has thus offered no legal basis for its state law causes of action, and there is none.   Accordingly, Count X should be dismissed to the extent it purports to assert an avoidable preference claim under Delaware and Wisconsin state law.

Moreover, the FAC fails to state a claim against Stout under Section 547(b).  Transfers may not be avoided under Section 547(b) "to the extent that the transfer was made in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee."  11 U.S.C. § 547(c)(2).  This defense was "intended to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."  *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (internal quotation omitted).

Count X should be dismissed because the allegations in the FAC and Stout's engagement letters make clear that the July and August 2017 payments were made in the ordinary course of business.  Although affirmative defenses, such as the ordinary course defense, are generally inappropriate for resolution on a motion to dismiss, a court may dismiss a claim "[w]hen an affirmative defense appears on the face of the complaint and presents an insuperable barrier to recovery by the plaintiff[.]"  *See Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, No. 11-53884, 2012 WL 5360945, at *4 (Bankr. D. Del. Oct. 31, 2012) (internal quotation omitted).  To create an "insuperable barrier to recovery," a complaint must satisfy all of the elements of the affirmative defense.  *See id.*  Here, that means that Stout must demonstrate the elements of the "ordinary course" exception: (i) the debtor incurred the debt in the ordinary course of business of the debtor and the transferee and (ii) the debtor either (a) made the transfer in the

<center>33</center>

ordinary course of business or financial affairs of the debtor and the transferee or (b) made the payment according to ordinary business terms.  *See* 11 U.S.C. § 547(c)(2).

The FAC's allegations demonstrate each of these elements.  As to the first element, Appvion incurred the debt in the ordinary course of its business and Stout's business.  As to the second element, Appvion made the July and August 2017 transfers in the ordinary course of such business.  Argent, as the Trustee of the ESOP, engaged Stout to perform semi-annual valuations of the Company pursuant to the requirements of the Plan.  *See* FAC ¶¶ 89, 100.  Stout had provided such "valuation services to Reliance, as ESOP Trustee," for years—"*since before 2013*."  FAC ¶ 100 (emphasis added).  Additionally, the payments were made by Appvion to Stout according to ordinary business terms.  As Stout's engagement letters indicate,[31] the Company paid Stout $50,000 for each semi-annual valuation, or $100,000 annually, *see* Ex. 1 at A.2-A.3, and the amount of this fixed fee remained the same from 2013 to 2017, except for a single valuation in 2015 for which Stout received an hourly fee.  *See id.* at A.16.  The July and August 2017 payments were no exception.  Those payments were made pursuant to the May 3, 2017 engagement letter, which provided that Stout would perform valuations of the Company as of June 30, 2017 and December 31, 2017 for a fixed fee of $100,000, plus expenses.  *See* Ex. 1 at A.28-A.29; *see also* FAC ¶ 108 (citing May 3, 2017 engagement letter).  The FAC alleges that Stout prepared the June 30, 2017 valuation (and indeed cites to it).  *See, e.g.*, FAC ¶ 198.

These facts are directly analogous to those in *In re Crucible*, where the court found that the allegations of the complaint were sufficient to demonstrate that the payments at issue were made

---

[31] In determining whether an affirmative defense is "clear from the complaint itself, a court may consider documents incorporated by the complaint[.]" *Tri-State Telecomms., Inc. v. First Federal Savings & Loan Association.* (*In re Tri-State Telecomms., Inc.*), No. 12-0377, 2012 WL 4904537, at *6 (Bankr. E.D. Pa. Oct. 15, 2012), such as Stout's engagement letters.

34

in the ordinary course of business and dismissed the trustee's avoidable transfer claim. *See* 2012 WL 5360945, at *5. There, the complaint alleged that the debtor made interest payments pursuant to a financing lease's amortization schedule over the course of multiple years. *Id.* The court held these allegations were sufficient to establish that a payment made approximately a month before the bankruptcy petition was filed was made in the ordinary course of business. *Id.* Here, the FAC alleges that the Trustee had engaged Stout perform semi-annual valuations for multiple years before the petition was filed, FAC ¶ 100; the engagement letters make clear that Stout consistently charged a flat fee of $50,000 per valuation or $100,000 annually, plus expenses during that time period, *see generally* Ex. 1, and Stout's May 3, 2017 contained the same terms, *see id.* at A.28-A.29; Stout performed the June 30, 2017 valuation, *see, e.g.,* FAC ¶ 198, and Appvion made payments to Stout shortly thereafter in amount just over $50,000. *Id.* ¶ 109 & Fig. 2. These facts demonstrate that the July and August 2017 payments were made in the ordinary course. Plaintiff's avoidable preference claim thus fails as a matter of law. *See In re Crucible*, 2012 WL 5360945, at *5; *see also Official Comm. of Unsecured Creditors of Midway Games, Inc. v. Nat'l Amusements, Inc. (In re Midway Games, Inc.)*, 428 B.R. 303, 324 (Bankr. D. Del. 2010) (granting motion to dismiss avoidable preference claim predicated on fees paid by debtor to independent directors because the complaint did "did not contain sufficient facts to show that the fees were anything other than in the realm of 'normal financial relations'"). Accordingly, Count X should be dismissed.

**B.    Count XI Fails to State a Claim Against Stout.**

Count XI purports to assert a constructive fraudulent conveyance claim for transfers totaling approximately $522,000 (the "Stout Transfers"), and again invokes the Bankruptcy Code and Delaware and Wisconsin law. *See* FAC ¶¶ 459-67. Bankruptcy Code section 548(a)(1)(B)

35

authorizes avoidance of transfers of interests in the debtor's property if, *inter alia*, the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]"  11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I).  The elements of a constructive fraudulent conveyance under the UFTA, as adopted by Delaware and Wisconsin, do not substantially vary from the elements set forth in Section 548(a)(1)(B) of the Bankruptcy Code.  *See* 6 Del. C. § 1304(a)(2); Wis. Stat. § 242.02(1)(b).

While the FAC arguably alleges the second element of a fraudulent conveyance claim, *i.e.*, that the Company was insolvent at the time of the transfers (Stout maintains that the evidence will show that these allegations are patently incorrect), the FAC fails to plead any facts in support of the first element, *i.e.*, that the debtor received reasonably equivalent value for the transfers.

"[A] party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave."  *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal quotation omitted).  To determine whether a debtor received reasonably equivalent value, a court considers the "totality of the circumstances" of the transfer, including "(i) the 'fair market value' of the benefit received as a result of the transfer, (ii) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (iii) the transferee's good faith."  *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006).

Here, the FAC rests on the conclusory allegation that "Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers," FAC ¶ 462, and a chart titled "[S]chedule of Payments by Appvion to Stout."  *Id.*, Fig. 2.  The chart of payments, however, does not support Plaintiff's assertion that Appvion did not receive reasonably equivalent value, and the FAC offers no other facts in support of that conclusion.  Indeed, the FAC's allegations demonstrate that

36

Company received reasonably equivalent value for the Stout Transfers. The FAC acknowledges that Stout sent Appvion invoices for actual services that it rendered to the Company, *i.e.*, "its preparation of FMV reports from 2013 through 2017." *Id.* ¶ 109. These are the very reports that the FAC incorporates by reference and cites repeatedly. *See, e.g.*, *id.* ¶¶ 181-346. While the FAC alleges that Stout should have performed its valuations differently, it does not plead any ***facts*** supporting the assertion that Appvion did not receive reasonably equivalent value for monies that Stout received in exchange for preparing them. Nothing in the FAC suggests that Stout's relationship with the Company was anything but an arm's-length relationship conducted under a mutually negotiated contract that Stout carried out in good faith: Stout was paid a reasonable, fixed fee for its work and the FAC does not allege that Stout profited from the supposed breaches of fiduciary duty. Thus, Plaintiff's bare-bones allegation that Appvion "did not receive reasonably equivalent value" is insufficient to survive a motion to dismiss. *See Global Link Liquidating Tr. v. Avantel* (*In re Global Link Telecom Corp.*), 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing fraudulent conveyance claim where the "only facts" pleaded were "two lists of transfer[]" and the complaint "present[ed] no information on . . . the value of what was received in exchange").

### C.    Count XIII Fails to State a Claim for Relief Against Stout.

Count XIII appears to have been asserted against Stout in error. It is styled as an avoidable transfer claim "[a]gainst Stout," but seeks to avoid transfers made by Appvion to Argent. *See* FAC ¶¶ 479-86. Moreover, Plaintiff has not demanded any relief under Count XIII from Stout. *See id.*, Prayer for Relief ¶ (m) (demanding relief against Argent for Count XIII). Therefore, Count XIII should be dismissed as to Stout.

### VII.    The Claims Asserted Against Stout Should be Dismissed With Prejudice.

The Court should dismiss all of the claims asserted against Stout with prejudice and should not afford Plaintiff a ***third*** chance to amend its allegations. A court need not grant leave to amend

37

where the amendment would be futile.  *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

Futility of amendment exists when "the claim or defense is not accompanied by a showing of

plausibility sufficient to present a triable issue."  *PCT v. Authentic Specialty Foods, Inc. (In re*

*Fleming Companies, Inc.)*, 347 B.R. 163, 167 (Bankr. D. Del. 2006).  Plaintiff has had more than

ample time and opportunity to prepare its complaint.   As previously explained, Plaintiff has had

full and complete knowledge of its claims against Stout for years.  *See supra* at Part V.  Plaintiff

already has had two bites at the apple, and still has not stated any viable claim for relief against

Stout.  Accordingly, the claims against Stout should be dismissed with prejudice.

## VIII.    The Court Lacks Personal Jurisdiction Over Stout.

Finally, all of the claims against Stout should be dismissed because the Court lacks personal

jurisdiction over Stout.  There are three requirements for a bankruptcy court to have personal

jurisdiction over a party:  (i) service of process has been made in accordance with Bankruptcy Rule

7004 or Federal Rule of Civil Procedure 4; (ii) the court has subject matter jurisdiction under

Bankruptcy Code section 1334; and (iii) exercise of jurisdiction is consistent with the Constitution

and laws of the United States.  *See* Fed. R. Bankr. P. 7004(f).

The final requirement of Rule 7004(f) is not mere here:  the exercise of jurisdiction in this

case is not consistent with the Constitution.  "[I]n the absence of a governing federal statute

providing for nationwide service of process, in personam jurisdiction may not rest upon an alien

defendant's aggregated contacts with the United States."  *Max Daetwyler Corp. v. R. Meyer*, 762

F.2d 290, 300 (3d Cir. 1985) *cert. denied,* 474 U.S. 980 (1985).

There is no federal statute applicable here that provides for nationwide service of process.

Certain courts have held that Bankruptcy Rule 7004(d), which authorizes service anywhere in the

United States, constitutes "a governing federal statute providing for nationwide service of

38

process."[32]  These cases, respectfully, discount the plain language of 28 U.S.C. §§ 2071-2077 (the

"Rules Enabling Act").  The Rules Enabling Act provides, in pertinent part, that "[t]he Supreme

Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings,

and motions, and the practice and procedure in cases under title 11 . . . ."  *Id.* § 2075.  Because the

Supreme Court, not Congress, drafted and approved the Bankruptcy Rules, the Rules are not

statutes.  *See Old Elec., Inc. v. RCP, Inc. (In re Old Elec. Inc.)*, 142 B.R. 189, 192 (Bankr. N.D.

Ohio 1992) ("[I]t would seriously distort the text of Bankruptcy Rule 7004(e) to hold that

Bankruptcy Rule 7004(d) is either a statute or an order.").[33]  Accordingly, this Court cannot rely

on Bankruptcy Rule 7004 for asserting personal jurisdiction over Stout.

Due process thus requires that Plaintiff establish that Stout has minimum contacts with the

State of Delaware.  *See Max Daetwyler*, 762 F.2d at 300 (analyzing contacts with the forum

state).[34]  Plaintiff, however, has not alleged that Stout has ***any*** contacts with the State of Delaware.

Nor could it.  Stout has not filed a claim or otherwise appeared in the Bankruptcy Cases.  Stout

Risius Ross, Inc. is a Michigan corporation.  *See* FAC ¶ 41.  Stout Risius Ross, LLC is a Michigan

limited liability corporation.  *See id.* ¶ 42.  This lack of contact means that Plaintiff has failed to

---

[32] *See, e.g., Tribune Media Servs. Inc. v. Beatty (In re Tribune Co.)*, 418 B.R. 116, 123 (Bankr. D. Del. 2009); *Klingher v. Salci (In re Tandycrafts, Inc.)*, 317 B.R. 287, 289 (Bankr. D. Del. 2004); *JNA-1 Corp. v. Uni-Marts, LLC (In re UniMarts, LLC)*, 404 B.R. 767, 775-76 (Bankr. D. Del. 2009); *MAS Litig. Trust v. Plastech Engineered Prods. (In re Meridian Auto Sys. Composite Operations, Inc.)*, No. 05-11168, 2007 WL 4322527, at *2-3 (Bankr. D. Del. Dec. 5, 2007).

[33] *See also Car Care Center of Crystal Lake Ltd. v. Miller (In re Miller)*, 336 B.R. 408, 412 (Bankr. E.D. Wis. 2005) (distinguishing bankruptcy statutes, which are enacted by Congress, from bankruptcy rules, which are promulgated by the U.S. Supreme Court); *Scroggins v. BP Exploration & Oil, Inc. (In re Brown Transp. Truckload, Inc.)*, 161 B.R. 735, 738 (Bankr. N.D. Ga. 1993) ("The Bankruptcy Code is a federal statute, while the [Bankruptcy Rules] are only rules established by the Bankruptcy Rules Committee.").

[34] *But see In re Fruehauf Trailer Corp.*, 250 B.R. at 200 ("While not free from doubt, the Third Circuit Court of Appeals is likely to apply a national contacts test where the statute provides for nationwide service of process.").

39

establish "minimum contacts" with Delaware or otherwise satisfy the Delaware long-arm statute.

*See Max Daetwyler*, 762 F.2d at 293; *see also Kloth v. S. Christian Univ.*, 320 Fed. App'x 113, 115 n.1 (3d Cir. 2008) ("The Delaware long-arm statute, 10 Del. C. § 3104(c), confers jurisdiction to the maximum extent possible under the due process clause.").  For this reason, the FAC should be dismissed with respect to Stout.

## **CONCLUSION**

For all of the reasons stated above, the FAC should be dismissed with prejudice as to Stout.

By: *Mark L. Desgrosseilliers*

Mark L. Desgrosseilliers (Delaware Bar No. 4083)
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Email:  desgross@chipmanbrown.com

-and-

Lars C. Golumbic, admitted *pro hac vice*
Groom Law Group, Chartered
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Phone: (202) 861-6615
Email:  lgolumbic@groom.com

*Attorneys for Stout Risius Ross, Inc. and Stout Risius Ross, LLC*

40

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, Defendants. | **APPENDIX FOR OPENING BRIEF IN SUPPORT OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC'S MOTION TO DISMISS** |

Mark L. Desgrosseilliers (Delaware Bar No. 4083)
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Tel: (302) 295-0191
E-mail: desgross@chipmanbrown.com

Lars C. Golumbic, admitted *pro hac vice*
Groom Law Group, Chartered
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, DC 20006
Tel: (202) 861-6615
E-mail: lgolumbic@groom.com

March 19, 2019

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION | Appendix Page |
|---------|-------------|---------------|
| 1 | Stout Engagement Agreements (June 20, 2013; January 17, 2014; May 18, 2015; January 28, 2016; May 3, 2017) | A.1 |
| 2 | PDC Valuation of Common Stock as of June 30, 2013 ("6/30/2013 FMV") | A.34 |
| 3 | PDC Form 10-K for the year ended December 29, 2012 ("2012 10-K") | A.134 |
| 4 | PDC Valuation of Common Stock as of December 31, 2015 ("12/31/2015 FMV") | A.282 |
| 5 | PDC Valuation of Common Stock as of December 31, 2014 ("12/31/2014 FMV") | A.386 |

# EXHIBIT 1



June 20, 2013

Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
1100 Abernathy Road
Northpark Building 500
Suite 400
Atlanta, GA 30328

Dear Trustee:

On behalf of Stout Risius Ross, Inc. ("SRR"), I am pleased to confirm the arrangement under which we will provide certain financial advisory services to Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee (the "Trustee") of the Appleton Papers, Inc. Employee Stock Ownership Trust ("ESOT").

## Objectives and Scope

We understand the engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 (collectively, the "Valuation Dates"). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the Trustee of the Company's ESOT. We will report solely to the Trustee, notwithstanding that the Company will pay all fees for our work.

In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

## Approach

Given our preliminary understanding of the Company, we will consider forms of the two traditional approaches to valuation, including the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use the approach or approaches that in our experience and judgment will provide the most supportable valuation. After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

At the conclusion of our analysis, following your review and comment, we will submit a report to the Trustee containing a determination of the value of the equity of the Company owned by the ESOT for the Valuation Dates, a description of the methodologies used in arriving at our conclusion of value, and supporting schedules showing details of major calculations and analyses.

8180 Greensboro Drive, Suite 600
McLean, VA 22102
ph. +1.703.637.3700
fax +1.866.808.7621
www.srr.com



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
June 20, 2013
Page 2

We are prepared to begin our work immediately, subject to receipt of all requested information. We anticipate presenting our analysis and providing you with our conclusions within four weeks after we meet with key personnel and receive all of the requested information. This timeframe requires extensive cooperation from the Company and its representatives, as described under Your Responsibilities.

### Your Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

### Fees and Expenses

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

Reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, research charges, copying, etc.) will be billed at the actual amounts incurred. There will be a flat $350 research charge for the necessary use of fee-based databases and subscription services. In addition, there will be a flat $350 administrative charge for administrative personnel support. Our invoices are due upon presentation. Amounts remaining overdue for more than 30 days will be subject to a late charge of 1.5% per month from the date of invoice. We reserve the right to suspend services if invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss, damage or expense connected with such suspension.

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

### Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of $25,000 before commencing work. The retainer may be applied to any invoice at our discretion or to our final invoice at the conclusion of the engagement. Any unused portion of the retainer will be promptly refunded to you at the end of our engagement. This retainer is not intended to be an estimate for the total cost of work to be performed. An invoice for the retainer is enclosed.



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
June 20, 2013
Page 3

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer. Below are our fund transfer instructions:

Stout Risius Ross, Inc.
Fifth Third Bank
Wire ABA Number 042000314
ACH ABA Number 072405455
Account Number 7911786619

## Professional Terms

The attached Professional Terms apply to this engagement. Please sign below and return the enclosed copy of this letter to us. By signing as Trustee, you are indicating your agreement to all of these terms **except** Sections 3 (Fees and Expenses), 8 (Liability and Indemnification), 9 (Response to Subpoena), and 11(c) (Payment in the Event of Termination). By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, **including** Sections 3, 8, 9 and 11(c).

\* \* \* \* \* \*



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
June 20, 2013
Page 4

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, INC.**

By: *Scott D Levine*
Scott D. Levine, CPA/ABV, CFA, ASA
Managing Director

Attachments:   Professional Terms

Acknowledged and Accepted:

**RELIANCE TRUST COMPANY,** ~~not in its~~ corporate capacity, but solely in its capacity as Trustee of the
  APPLETON PAPERS, INC. ESOT:

Signed:

Name: *Howard L. Kaplan*

Title: *Senior Vice President*

Date: *6/25/2013*

Acknowledged and Accepted:

**APPVION, INC.:**

Signed:

Name: *Thomas J. Ferree*

Title: *Chief Financial Officer*

Date: *6-20-13*



# STOUT RISIUS ROSS, INC.
# PROFESSIONAL TERMS

**1.  Our Services**  We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

**2.   Independent Contractor**  We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services.   We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

**3.  Fees and Expenses**  Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include taxes.  The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services, excluding taxes on our income generally.

**4.  Confidentiality**  With respect to any information supplied in connection with this engagement and designated by any party as confidential, or which the other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, the other party(s) agree to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose.  This will not apply to information which is: (i) publicly known other than by reason of breach of this agreement, (ii) already known to the recipient without any obligation of confidentiality, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order.  We will not mention the name of the Company and/or use the company logo or provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others without the Company's prior written consent.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement.  (Any such disclosure document is defined herein as a "Filing".)  Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

**5.  Use of Financial & Other Information / GAAS**  In the course of our engagement, we will use financial and other information, including prospective financial information, obtained from the Company, and/or its representatives, and other public and private sources.  The scope of our work will not enable us to accept responsibility for the accuracy and completeness of such information, and it is understood that we will have no duty of independent investigation or

verification of such information.  While our work may involve analysis of various records, our engagement does not include an examination in accordance with generally accepted auditing standards known as "GAAS." Furthermore, we will take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company, whether relied upon by us or not. We will in our report to the Trustee state that during the course of our engagement nothing has come to our attention that has caused us to believe that it was unreasonable for us to utilize or rely upon the financial projections or other financial information provided to us by the Company,

**6.   Our Work Product and Your License**  Upon full payment of all amounts due us in connection with this engagement, the work product prepared by us for you in connection with our services will become your property, except as set forth below.  Our work papers will not constitute work product and will remain our sole and exclusive property.  We will retain sole and exclusive ownership of all right, title and interest in our proprietary information which will not constitute work product, including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services for you.  To the extent our deliverables to you contain our proprietary information, we grant you a non-exclusive, non-assignable, royalty-free license to use the proprietary information provided by us in the work product and the subject of the engagement and for no other or further use without our express, prior written consent.

**7.  Our Warranty**  We warrant that our services will be performed with reasonable care in a diligent and competent manner.  Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 60 days after the services are performed or, if applicable, deliverables are delivered. The notice will specify and detail the non-conformance and, if you and we agree that a non-conformance exists, we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services.  Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS   WARRANTY   IS   OUR   ONLY   WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

**8.  Liability and Indemnification**  (a) The Company will indemnify us, our owners, employees, contractors and agents against all costs, fees, expenses, damages and liabilities (including reasonable attorneys' fees and costs) associated with any third party claim, relating to or arising as



a result of the services or our engagement except to the extent caused by negligence, willful acts or omissions of our employees, contractors or agents in performing the services.

(b)     No party will be liable for any delays or failures in performance due to circumstances beyond such party's reasonable control.

(c)     For purposes of this agreement, "negligence" means a material departure from the standard of ordinary care applicable to an experienced ESOP valuation firm taking into consideration customary and reasonable assumptions used to determine the valuation of the stock.

**9. Response to Subpoena** In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice the Company at our standard hourly rates applicable at the time such services are rendered. We will also invoice the Company for our related reasonable out-of-pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees.

**10.  Non-Solicitation**  During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**11. Termination** (a) The Trustee or SRR may terminate our engagement at any time upon 30 days written notice.

(b)     Stout Risius Ross, Inc. may suspend or terminate this engagement immediately in the event of non-payment of amounts due us provided that 3 business days notice has been given.

(c)     The Company will pay us for all services rendered, reasonable expenses incurred or commitments made by us to the effective date of termination.

**12.  Our Financial Interest / Compensation** None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach. We do not warrant or predict results or final developments in this matter.

**13.  Staffing** While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14.  General** (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire understanding and agreement between us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by all parties. If there is a conflict between these Professional

Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)     No term of this agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)     The terms of this agreement which by their nature are to survive this agreement will survive its expiration or termination.

(d)     We will retain files related to this engagement in accordance with our document retention policy.

(e)     We each acknowledge that we may correspond or convey documentation via internet e-mail and that none of the parties has control over the performance, reliability, availability, or security of internet e-mail. Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any internet e-mail due to any reason beyond our reasonable control.

(f)     All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of the Commonwealth of Virginia.

\*   \*   \*   \*   \*   \*



January 17, 2014

Reliance Trust Company, as Trustee
   of the Appleton Papers, Inc.
   Employee Stock Ownership Trust
1100 Abernathy Road
Northpark Building 500
Suite 400
Atlanta, GA  30328

Dear Trustee:

On behalf of Stout Risius Ross, Inc. ("SRR"), I am pleased to confirm the arrangement under which we will provide certain financial advisory services to Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee (the "Trustee") of the Appleton Papers, Inc. Employee Stock Ownership Trust ("ESOT").

## Objectives and Scope

We understand the engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2014 and December 31, 2014 (collectively, the "Valuation Dates"). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the Trustee of the Company's ESOT. We will report solely to the Trustee, notwithstanding that the Company will pay all fees for our work.

In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

## Approach

Given our preliminary understanding of the Company, we will consider forms of the two traditional approaches to valuation, including the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use the approach or approaches that in our experience and judgment will provide the most supportable valuation. After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

At the conclusion of our analysis, following your review and comment, we will submit a report to the Trustee containing a determination of the value of the equity of the Company owned by the ESOT for the Valuation Dates, a description of the methodologies used in arriving at our conclusion of value, and supporting schedules showing details of major calculations and analyses.

8270 Greensboro Drive, Suite 900
McLean, VA 22102
ph. +1.703.637.3700
fax +1.866.808.7621
www.srr.com



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
January 17, 2014
Page 2

We are prepared to begin our work immediately, subject to receipt of all requested information. We anticipate presenting our analysis and providing you with our conclusions within four weeks after we meet with key personnel and receive all of the requested information. This timeframe requires extensive cooperation from the Company and its representatives, as described under Your Responsibilities.

## Your Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

## Fees and Expenses

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

Reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, research charges, copying, etc.) will be billed at the actual amounts incurred. There will be a flat $350 research charge for the necessary use of fee-based databases and subscription services. In addition, there will be a flat $350 administrative charge for administrative personnel support. Our invoices are due upon presentation. Amounts remaining overdue for more than 30 days will be subject to a late charge of 1.5% per month from the date of invoice. We reserve the right to suspend services if invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss, damage or expense connected with such suspension.

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

## Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of $25,000 before commencing work. The retainer may be applied to any invoice at our discretion or to our final invoice at the conclusion of the engagement. Any unused portion of the retainer will be promptly refunded to you at the end of our engagement. This retainer is not intended to be an estimate for the total cost of work to be performed. An invoice for the retainer is enclosed.



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
January 17, 2014
Page 3

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer. Below are our fund transfer instructions:

    Stout Risius Ross, Inc.
    Fifth Third Bank
    Wire ABA Number 042000314
    ACH ABA Number 072405455
    Account Number 7911786619

## Professional Terms

The attached Professional Terms apply to this engagement. Please sign below and return the enclosed copy of this letter to us. By signing as Trustee, you are indicating your agreement to all of these terms **except** Sections 3 (Fees and Expenses), 8 (Liability and Indemnification), 9 (Response to Subpoena), and 11(c) (Payment in the Event of Termination). By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, **including** Sections 3, 8, 9 and 11(c).

* * * * * *



Reliance Trust Company, as Trustee
  of the Appleton Papers, Inc.
  Employee Stock Ownership Trust
January 17, 2014
Page 4

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, INC.**

By:    Scott D Levine
         Scott D. Levine, CPA/ABV, CFA, ASA
         Managing Director

Attachments:    Professional Terms

Acknowledged and Accepted:

**RELIANCE TRUST COMPANY**, not in its corporate capacity, but solely in its capacity as Trustee of the APPLETON PAPERS, INC. ESOT:

Signed:
Name:    Stephen A. Martin
Title:    Senior Vice President
Date:    1/21/2014

Acknowledged and Accepted:

**APPVION, INC.:**
Signed:
Name:    Thomas Ferree
Title:    SVP-CFO
Date:    1/20/14



# STOUT RISIUS ROSS, INC. PROFESSIONAL TERMS

**1.  Our Services**  We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

**2.   Independent Contractor**  We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services.   We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

**3.  Fees and Expenses**  Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include taxes.  The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services, excluding taxes on our income generally.

**4.  Confidentiality**  With respect to any information supplied in connection with this engagement and designated by any party as confidential, or which the other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, the other party(s) agree to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose.  This will not apply to information which is: (i) publicly known other than by reason of breach of this agreement, (ii) already known to the recipient without any obligation of confidentiality, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order.  We will not mention the name of the Company and/or use the company logo or provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others without the Company's prior written consent.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement.  (Any such disclosure document is defined herein as a "Filing".)  Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

**5.  Use of Financial & Other Information / GAAS**  In the course of our engagement, we will use financial and other information, including prospective financial information, obtained from the Company, and/or its representatives, and other public and private sources.  The scope of our work will not enable us to accept responsibility for the accuracy and completeness of such information, and it is understood that we will have no duty of independent investigation or

verification of such information.  While our work may involve analysis of various records, our engagement does not include an examination in accordance with generally accepted auditing standards known as "GAAS." Furthermore, we will take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company, whether relied upon by us or not. We will in our report to the Trustee state that during the course of our engagement nothing has come to our attention that has caused us to believe that it was unreasonable for us to utilize or rely upon the financial projections or other financial information provided to us by the Company,

**6.   Our Work Product and Your License**  Upon full payment of all amounts due us in connection with this engagement, the work product prepared by us for you in connection with our services will become your property, except as set forth below.  Our work papers will not constitute work product and will remain our sole and exclusive property.  We will retain sole and exclusive ownership of all right, title and interest in our proprietary information which will not constitute work product, including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services for you.  To the extent our deliverables to you contain our proprietary information, we grant you a non-exclusive, non-assignable, royalty-free license to use the proprietary information provided by us in the work product and the subject of the engagement and for no other or further use without our express, prior written consent.

**7.   Our Warranty**  We warrant that our services will be performed with reasonable care in a diligent and competent manner.  Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 60 days after the services are performed or, if applicable, deliverables are delivered.  The notice will specify and detail the non-conformance and, if you and we agree that a non-conformance exists, we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services.  Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

**8.   Liability and Indemnification**    (a) The Company will indemnify us, our owners, employees, contractors and agents against all costs, fees, expenses, damages and liabilities (including reasonable attorneys' fees and costs) associated with any third party claim, relating to or arising as



a result of the services or our engagement except to the extent caused by negligence, willful acts or omissions of our employees, contractors or agents in performing the services.

(b)      No party will be liable for any delays or failures in performance due to circumstances beyond such party's reasonable control.

(c)      For purposes of this agreement, "negligence" means a material departure from the standard of ordinary care applicable to an experienced ESOP valuation firm taking into consideration customary and reasonable assumptions used to determine the valuation of the stock.

**9. Response to Subpoena**  In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice the Company at our standard hourly rates applicable at the time such services are rendered.  We will also invoice the Company for our related reasonable out-of-pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees.

**10.  Non-Solicitation**  During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**11.  Termination**  (a) The Trustee or SRR may terminate our engagement at any time upon 30 days written notice.

(b)      Stout Risius Ross, Inc. may suspend or terminate this engagement immediately in the event of non-payment of amounts due us provided that 3 business days notice has been given.

(c)      The Company will pay us for all services rendered, reasonable expenses incurred or commitments made by us to the effective date of termination.

**12.  Our Financial Interest / Compensation**  None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach.  We do not warrant or predict results or final developments in this matter.

**13.  Staffing**  While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14.  General**  (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire understanding and agreement between us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by all parties.  If there is a conflict between these Professional

Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)      No term of this agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)      The terms of this agreement which by their nature are to survive this agreement will survive its expiration or termination.

(d)      We will retain files related to this engagement in accordance with our document retention policy.

(e)      We each acknowledge that we may correspond or convey documentation via Internet e-mail and that none of the parties has control over the performance, reliability, availability, or security of Internet e-mail.  Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(f)      All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of the Commonwealth of Virginia.

*      *      *      *      *      *



January 17, 2014

Mr. Thomas J. Ferree
Vice President - Finance, CFO
Appvion, Inc.
825 East Wisconsin Avenue
P.O. Box 359
Appleton, WI  54912

### Statement of Retainer

For Services Related to the Update Valuations of Appvion, Inc. as of
June 30, 2014 and December 31, 2014                                    $25,000.00

If you have any comments or questions, please do not hesitate to contact Scott Levine at (703) 848-4944.
Please note that receipt of this retainer amount and a signed engagement letter is required prior to the
commencement of our work, and that the retainer will be applied against the final invoice issued in this
matter.

Please remit to:

|  |  |  |
|---|---|---|
| Stout Risius Ross, Inc.<br>4000 Town Center<br>20th Floor<br>Southfield, MI 48075 | - or - | Stout Risius Ross, Inc.<br>Fifth Third Bank<br>Wire ABA Number 042000314<br>ACH ABA Number 072405455<br>Account Number 7911786619 |

Sincerely,

**STOUT RISIUS ROSS, INC.**

### Payable Upon Receipt

FED ID 38-3003685

8270 Greensboro Drive, Suite 900
McLean, VA 22102
| ph. +1.703.637.3700
| fax +1.866.808.7621



May 18, 2015

Argent Trust Company, as Trustee
 of the Appvion, Inc. Employee Stock Ownership Plan
1100 Abernathy Road
Building 500, Suite 550
Atlanta, GA 30328

Dear Trustee:

On behalf of Stout Risius Ross, Inc. ("SRR"), I am pleased to confirm the arrangement under which we will provide certain financial advisory services to Reliance Trust Company, not in its corporate capacity but solely in its capacity as trustee (the "Trustee") of the Appvion, Inc. Employee Stock Ownership Plan ("ESOP").

## Objectives and Scope

We understand the engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2015 and December 31, 2015 (collectively, the "Valuation Dates"). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the Trustee of the Company's ESOP. We will report solely to the Trustee, notwithstanding that the Company will pay all fees for our work.

In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

## Approach

Given our preliminary understanding of the Company, we will consider forms of the two traditional approaches to valuation, including the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use the approach or approaches that in our experience and judgment will provide the most supportable valuation. After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

At the conclusion of our analysis, following your review and comment, we will submit a report to the Trustee containing a determination of the value of the equity of the Company owned by the ESOP for the Valuation Dates, a description of the methodologies used in arriving at our conclusion of value, and supporting schedules showing details of major calculations and analyses.

8270 Greensboro Drive, Suite 900
McLean, VA 22102
ph +1 703 637.3700
fax +1 866 808 7621



Reliance Trust Company, as Trustee
Argent Trust Company, as Trustee
  of the Appvion, Inc. Employee Stock Ownership Plan
May 18, 2015
Page 2

We are prepared to begin our work immediately, subject to receipt of all requested information. We anticipate presenting our analysis and providing you with our conclusions within four weeks after we meet with key personnel and receive all of the requested information. This timeframe requires extensive cooperation from the Company and its representatives, as described under Your Responsibilities.

## Your Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

## Fees and Expenses

Our fees for the services described in this letter related to the June 30, 2015 analysis will be billed at our standard hourly rates, which currently range from $210 per hour to $650 per hour, plus out-of-pocket expenses, and will be paid by the Company.  Our fess for the services described in this letter related to the December 31, 2015 analysis will be a fixed fee of $50,000, plus out-of-pocket expenses, and will be paid by the Company.  This fee estimate includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

Reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, research charges, copying, etc.) will be billed at the actual amounts incurred. There will be a flat $350 research charge for the necessary use of fee-based databases and subscription services. In addition, there will be a flat $350 administrative charge for administrative personnel support.  Our invoices are due upon presentation.  Amounts remaining overdue for more than 30 days will be subject to a late charge of 1.5% per month from the date of invoice.  We reserve the right to suspend services if invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss, damage or expense connected with such suspension.

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

## Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of $25,000 before commencing work. The retainer may be applied to any invoice at our discretion or to our final invoice at the conclusion of the engagement. Any unused portion of the retainer will be promptly refunded to you at the end of our engagement. This retainer is not intended to be an estimate for the total cost of work to be performed. An invoice for the retainer is enclosed.



Reliance Trust Company, as Trustee
Argent Trust Company, as Trustee
 of the Appvion, Inc. Employee Stock Ownership Plan
May 18, 2015
Page 3

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer. Below are our fund transfer instructions:

>      Stout Risius Ross, Inc.
>      Fifth Third Bank
>      Wire ABA Number 042000314
>      ACH ABA Number 072405455
>      Account Number 7911786619

## Professional Terms

The attached Professional Terms apply to this engagement. Please sign below and return the enclosed copy of this letter to us. By signing as Trustee, you are indicating your agreement to all of these terms **except** Sections 3 (Fees and Expenses), 8 (Liability and Indemnification), 9 (Response to Subpoena), and 11(c) (Payment in the Event of Termination). By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, **including** Sections 3, 8, 9 and 11(c).

\*   \*   \*   \*   \*   \*



Reliance Trust Company, as Trustee
Argent Trust Company, as Trustee
  of the Appvion, Inc. Employee Stock Ownership Plan
May 18, 2015
Page 4

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, INC.**

By: _Scott D. Levine_
    Scott D. Levine, CPA/ABV, CFA
    Managing Director

Attachments:    Professional Terms

Acknowledged and Accepted:

**ARGENT TRUST COMPANY**, not in its corporate capacity, but solely in its capacity as Trustee of the Appvion, Inc. ESOP:

Signed: _____

Name: ___Marc L. Hartburger___

Title: ___Senior Vice President___

Date: ___5/18/2015___

Acknowledged and Accepted:

**APPVION, INC.:**

Signed: _____

Name: ___Thomas J. Ferree___

Title: ___Senior Vice President + Chief Financial Officer___

Date: ___5-19-15___



# STOUT RISIUS ROSS, INC. PROFESSIONAL TERMS

**1. Our Services**  We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

**2. Independent Contractor**  We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services.  We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

**3. Fees and Expenses**  Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include taxes.  The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services, excluding taxes on our income generally.

**4. Confidentiality**  With respect to any information supplied in connection with this engagement and designated by any party as confidential, or which the other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, the other party(s) agree to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose.  This will not apply to information which is: (i) publicly known other than by reason of breach of this agreement, (ii) already known to the recipient without any obligation of confidentiality, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order.  We will not mention the name of the Company and/or use the company logo or provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others without the Company's prior written consent.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement.  (Any such disclosure document is defined herein as a "Filing".)  Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

**5. Use of Financial & Other Information / GAAS**  In the course of our engagement, we will use financial and other information, including prospective financial information, obtained from the Company, and/or its representatives, and other public and private sources.  The scope of our work will not enable us to accept responsibility for the accuracy and completeness of such information, and it is understood that we will have no duty of independent investigation or verification of such information.  While our work may involve analysis of various records, our engagement does not include an examination in accordance with generally accepted auditing standards known as "GAAS." Furthermore, we will take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company, whether relied upon by us or not. We will in our report to the Trustee state that during the course of our engagement nothing has come to our attention that has caused us to believe that it was unreasonable for us to utilize or rely upon the financial projections or other financial information provided to us by the Company,

**6. Our Work Product and Your License**  Upon full payment of all amounts due us in connection with this engagement, the work product prepared by us for you in connection with our services will become your property, except as set forth below.  Our work papers will not constitute work product and will remain our sole and exclusive property.  We will retain sole and exclusive ownership of all right, title and interest in our proprietary information which will not constitute work product, including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services for you.  To the extent our deliverables to you contain our proprietary information, we grant you a non-exclusive, non-assignable, royalty-free license to use the proprietary information provided by us in the work product and the subject of the engagement and for no other or further use without our express, prior written consent.

**7. Our Warranty**  We warrant that our services will be performed with reasonable care in a diligent and competent manner.  Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 60 days after the services are performed or, if applicable, deliverables are delivered.  The notice will specify and detail the non-conformance and, if you and we agree that a non-conformance exists, we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services.  Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

**8. Liability and Indemnification**  (a) The Company will indemnify us, our owners, employees, contractors and agents against all costs, fees, expenses, damages and liabilities (including reasonable attorneys' fees and costs) associated with any third party claim, relating to or arising as



a result of the services or our engagement except to the extent caused by negligence, willful acts or omissions of our employees, contractors or agents in performing the services.

(b)    No party will be liable for any delays or failures in performance due to circumstances beyond such party's reasonable control.

(c)    For purposes of this agreement, "negligence" means a material departure from the standard of ordinary care applicable to an experienced ESOP valuation firm taking into consideration customary and reasonable assumptions used to determine the valuation of the stock.

**9. Response to Subpoena**  In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice the Company at our standard hourly rates applicable at the time such services are rendered. We will also invoice the Company for our related reasonable out-of-pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees.

**10. Non-Solicitation**  During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**11. Termination**  (a) The Trustee or SRR may terminate our engagement at any time upon 30 days written notice.

(b)    Stout Risius Ross, Inc. may suspend or terminate this engagement immediately in the event of non-payment of amounts due us provided that 3 business days notice has been given.

(c)    The Company will pay us for all services rendered, reasonable expenses incurred or commitments made by us to the effective date of termination.

**12. Our Financial Interest / Compensation**  None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach. We do not warrant or predict results or final developments in this matter.

**13. Staffing**  While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14. General**  (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire understanding and agreement between us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by all parties. If there is a conflict between these Professional

Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)    No term of this agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)    The terms of this agreement which by their nature are to survive this agreement will survive its expiration or termination.

(d)    We will retain files related to this engagement in accordance with our document retention policy.

(e)    We each acknowledge that we may correspond or convey documentation via Internet e-mail and that none of the parties has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(f)    All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of the Commonwealth of Virginia.

\*    \*    \*    \*    \*    \*



January 28, 2016

Argent Trust Company, as Trustee
 of the Appvion, Inc. Employee Stock Ownership Plan
1100 Abernathy Road
Building 500, Suite 550
Atlanta, GA 30328

Dear Trustee:

On behalf of Stout Risius Ross, Inc. ("SRR"), I am pleased to confirm the arrangement under which we will provide certain financial advisory services to Argent Trust Company, not in its corporate or individual capacity but solely in its capacity as trustee (the "Trustee") of the Appvion, Inc. Employee Stock Ownership Plan ("ESOP").

## Objectives and Scope

We understand the engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2016 and December 31, 2016 (collectively, the "Valuation Dates"). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the Trustee of the Company's ESOP. We will report solely to the Trustee, notwithstanding that the Company will pay all fees for our work.

In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

## Approach

Given our preliminary understanding of the Company, we will consider forms of the two traditional approaches to valuation, including the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use the approach or approaches that in our experience and judgment will provide the most supportable valuation. After applying the appropriate valuation methodology or methodologies, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

At the conclusion of our analysis, following your review and comment, we will submit a report to the Trustee containing a determination of the value of the equity of the Company owned by the ESOP for the Valuation Dates, a description of the methodologies used in arriving at our conclusion of value, and supporting schedules showing details of major calculations and analyses.

*8270 Greensboro Drive, Suite 900*
*McLean, VA 22102*
*ph. +1 703.637.3700*
*fax +1.866.808.7621*



Argent Trust Company, as Trustee
  of the Appvion, Inc. Employee Stock Ownership Plan
January 28, 2016
Page 2

We are prepared to begin our work immediately, subject to receipt of all requested information. We anticipate presenting our analysis and providing you with our conclusions within four weeks after we meet with key personnel and receive all of the requested information. This timeframe requires extensive cooperation from the Company and its representatives, as described under Your Responsibilities.

## Your Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

## Fees and Expenses

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

Reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, research charges, copying, etc.) will be billed at the actual amounts incurred. There will be a flat $350 research charge for the necessary use of fee-based databases and subscription services. In addition, there will be a flat $350 administrative charge for administrative personnel support. Our invoices are due upon presentation. Amounts remaining overdue for more than 30 days will be subject to a late charge of 1.5% per month from the date of invoice. We reserve the right to suspend services if invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss, damage or expense connected with such suspension.

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

## Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of $25,000 before commencing work. The retainer may be applied to any invoice at our discretion or to our final invoice at the conclusion of the engagement. Any unused portion of the retainer will be promptly refunded to you at the end of our engagement. This retainer is not intended to be an estimate for the total cost of work to be performed. An invoice for the retainer is enclosed.



Argent Trust Company, as Trustee
  of the Appvion, Inc. Employee Stock Ownership Plan
January 28, 2016
Page 3

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer. Below are our fund transfer instructions:

Stout Risius Ross, Inc.
BMO Harris Bank

ACH & Wire ABA Number: 071000288
Account Number: 3998895

## Professional Terms

The attached Professional Terms apply to this engagement. Please sign below and return the enclosed copy of this letter to us. By signing as Trustee, you are indicating your agreement to all of these terms **except** Sections 3 (Fees and Expenses), 8 (Liability and Indemnification), 9 (Response to Subpoena), and 11(c) (Payment in the Event of Termination). By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, **including** Sections 3, 8, 9 and 11(c).

\*   \*   \*   \*   \*   \*



Argent Trust Company, as Trustee
 of the Appvion, Inc. Employee Stock Ownership Plan
January 28, 2016
Page 4

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, INC.**

By:    Scott D. Levine
       Scott D. Levine, CPA/ABV, CFA
       Managing Director

Attachments:    Professional Terms

Acknowledged and Accepted:

**ARGENT TRUST COMPANY**, not in its corporate or individual capacity, but solely in its capacity as Trustee of the Appvion, Inc. ESOP:

Signed: _____

Name: _____Stephen A Martin_____

Title: _____SVP_____

Date: _____6/6/16_____

Acknowledged and Accepted:

**APPVION, INC.:**

Signed: _____

Name: _____THOMAS FERREE_____

Title: _____SVP-CFO_____

Date: _____2/8/2016_____



# STOUT RISIUS ROSS, INC.
# PROFESSIONAL TERMS

**1. Our Services**  We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

**2.  Independent Contractor**  We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services.  We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

**3.  Fees and Expenses**  Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include taxes.  The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services, excluding taxes on our income generally.

**4.  Confidentiality**  With respect to any information supplied in connection with this engagement and designated by any party as confidential, or which the other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, the other party(s) agree to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose.  This will not apply to information which is: (i) publicly known other than by reason of breach of this agreement, (ii) already known to the recipient without any obligation of confidentiality, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order.  We will not mention the name of the Company and/or use the company logo or provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others without the Company's prior written consent.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement.  (Any such disclosure document is defined herein as a "Filing".)  Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

**5.  Use of Financial & Other Information / GAAS**  In the course of our engagement, we will use financial and other information, including prospective financial information, obtained from the Company, and/or its representatives, and other public and private sources.  The scope of our work will not enable us to accept responsibility for the accuracy and completeness of such information, and it is understood that we will have no duty of independent investigation or verification of such information.  While our work may involve analysis of various records, our engagement does not include an examination in accordance with generally accepted auditing standards known as "GAAS." Furthermore, we will take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company, whether relied upon by us or not. We will in our report to the Trustee state that during the course of our engagement nothing has come to our attention that has caused us to believe that it was unreasonable for us to utilize or rely upon the financial projections or other financial information provided to us by the Company,

**6.  Our Work Product and Your License**  Upon full payment of all amounts due us in connection with this engagement, the work product prepared by us for you in connection with our services will become your property, except as set forth below.  Our work papers will not constitute work product and will remain our sole and exclusive property.  We will retain sole and exclusive ownership of all right, title and interest in our proprietary information which will not constitute work product, including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services for you.  To the extent our deliverables to you contain our proprietary information, we grant you a non-exclusive, non-assignable, royalty-free license to use the proprietary information provided by us in the work product and the subject of the engagement and for no other or further use without our express, prior written consent.

**7.  Our Warranty**  We warrant that our services will be performed with reasonable care in a diligent and competent manner.  Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 60 days after the services are performed or, if applicable, deliverables are delivered.  The notice will specify and detail the non-conformance and, if you and we agree that a non-conformance exists, we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services.  Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.



**8. Liability and Indemnification**   (a) The Company will indemnify us, our owners, employees, contractors and agents against all costs, fees, expenses, damages and liabilities (including reasonable attorneys' fees and costs) associated with any third party claim, relating to or arising as a result of the services or our engagement except to the extent caused by negligence, willful acts or omissions of our employees, contractors or agents in performing the services.

(b)       No party will be liable for any delays or failures in performance due to circumstances beyond such party's reasonable control.

(c)       For purposes of this agreement, "negligence" means a material departure from the standard of ordinary care applicable to an experienced ESOP valuation firm taking into consideration customary and reasonable assumptions used to determine the valuation of the stock.

**9. Response to Subpoena**   In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice the Company at our standard hourly rates applicable at the time such services are rendered. We will also invoice the Company for our related reasonable out-of-pocket expenses, including, but not limited to, copying charges, courier fees, travel expenses and attorney fees.

**10. Non-Solicitation**   During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**11. Termination** (a) The Trustee or SRR may terminate our engagement at any time upon 30 days written notice.

(b)       Stout Risius Ross, Inc. may suspend or terminate this engagement immediately in the event of non-payment of amounts due us provided that 3 business days notice has been given.

(c)       The Company will pay us for all services rendered, reasonable expenses incurred or commitments made by us to the effective date of termination.

**12. Our Financial Interest / Compensation** None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach. We do not warrant or predict results or final developments in this matter.

**13. Staffing**   While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**14. General**  (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire understanding and agreement between us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by all parties. If there is a conflict between these Professional Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)       No term of this agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c)       The terms of this agreement which by their nature are to survive this agreement will survive its expiration or termination.

(d)       We will retain files related to this engagement in accordance with our document retention policy.

(e)       We each acknowledge that we may correspond or convey documentation via Internet e-mail and that none of the parties has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(f)       All of our respective rights and duties and all controversies and claims in connection with this engagement will be determined in accordance with the laws of the Commonwealth of Virginia.

<div align="center">*   *   *   *   *   *</div>



January 28, 2016

Mr. Thomas J. Ferree
Vice President - Finance, CFO
Appvion, Inc.
825 East Wisconsin Avenue
P.O. Box 359
Appleton, WI 54912

**Statement of Retainer**

For Services Related to the Update Valuations of Appvion, Inc. as of
June 30, 2016 and December 31, 2016                     <u>$25,000.00</u>

If you have any comments or questions, please do not hesitate to contact Scott Levine at (703) 848-4944. Please note that receipt of this retainer amount and a signed engagement letter is required prior to the commencement of our work, and that the retainer will be applied against the final invoice issued in this matter.

Please remit to:

Stout Risius Ross, Inc.          Stout Risius Ross, Inc.
4000 Town Center                  BMO Harris Bank
20th Floor           - or -
Southfield, MI 48075              ACH & Wire ABA Number: 071000288
                                  Account Number: 3998895

Sincerely,

**STOUT RISIUS ROSS, INC.**

**Payable Upon Receipt**

FED ID 38-3003685

8270 Greensboro Drive, Suite 900
McLean, VA 22102
ph. +1.703.637.3700
fax +1.866.808.7621



May 3, 2017

Argent Trust Company, as Trustee
  of The Appvion, Inc. Employee Stock Ownership Plan
1100 Abernathy Road
Building 500, Suite 550
Atlanta, GA  30328

Dear Trustees:

On behalf of Stout Risius Ross, LLC ("Stout"), I am pleased to confirm the arrangement under which we will provide certain services to Argent Trust Company not in its corporate capacity, but solely in its capacity as trustee (the "Trustee") of the Appvion, Inc. ("Appvion" or the "Company") Employee Stock Ownership Plan ("ESOP").

## Objectives and Scope

We understand the engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. as of June 30, 2017 and December 31, 2017 (collectively, the "Valuation Dates"). We understand that the Trustee will use our valuation analysis for annual reporting and administration purposes. We will report solely to the Trustee, notwithstanding that the Company will pay all fees for our work. Neither Stout's verbal conclusions nor our work product are in any way intended for, nor may they be relied upon by, any other person or used for any other purpose without our express, prior written consent.

In accordance with Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to the Department of Labor ("DOL") Proposed Regulation Section 2510.3-18(b)(2)(i)), for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset (DOL Proposed Regulation Section 2510.3-18(b)(2)(i)).

## Approach

Given our preliminary understanding of the Company, we will consider using two forms of the traditional approaches to valuation, the Income Approach and the Market Approach. These valuation approaches have long been recognized as acceptable in the appropriate circumstances. Accordingly, we will use such approaches in such combinations that in our experience and judgment will provide the most supportable valuation. After applying the appropriate approaches, discounts for lack of control and for limited marketability will be applied, if, in our judgment, they are appropriate.

## Method and Timing of Reporting

At the conclusion of our analysis, and following your review and comment, we will submit a report to the Trustee containing a determination of the value of the common stock of the Company owned by the ESOP for the Valuation Dates, a description of the methodologies we used in arriving at our conclusion of value, and supporting schedules showing details of our calculations and analyses.

We are prepared to begin our work immediately, subject to receipt of all requested information. We anticipate presenting our analysis and providing you with our conclusions within a mutually agreed to

Investment Banking  |  Valuation Advisory  |  Dispute Consulting  |  Management Consulting



Argent Trust Company, as Trustee
  of The Appvion, Inc.
  Employee Stock Ownership Plan
May 3, 2017
Page 2

schedule.  This timeframe requires extensive cooperation from the Company and its representatives, as
described under Company Responsibilities.

## Company Responsibilities

In order for us to maximize the value of our work and to keep the project on schedule, it is important for us
to receive the information we request from the Company promptly.  Additionally, if the Company is or
becomes aware of other relevant information necessary to the proper completion of our work, the Company
agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged,
are dependent on (i) the Company's timely and effective completion of its responsibilities, (ii) the accuracy
and completeness of the assumptions and information provided to us, and (iii) timely decisions and required
approvals.

## Fees and Expenses

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus
reasonable out-of-pocket expenses.  The Company will pay the fees and expenses.  This fee includes the
time required to issue the written report and analysis, as well as making a presentation to the Trustee.  Any
other work, including but not limited to, consultations with the Company or Trustee advisors, testimony or
preparation for testimony, etc., will be billed at our standard hourly rates.

Reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies,
research charges, copying, etc.) will be billed at the actual amounts incurred.  There will be a flat $350
research charge for the necessary use of fee-based databases and subscription services.  In addition, there
will be a flat $350 administrative charge for administrative personnel support.

Our invoices are due upon presentation.  Amounts remaining overdue for more than 30 days will be subject
to a late charge of 1.5% per month from the date of invoice.  We reserve the right to suspend services if
invoices are not promptly paid, in which event we will not be responsible or liable for any resulting loss,
damage or expense connected with such suspension.

We understand that the Company will pay our fees for work on this matter and, therefore, we request that
an officer of the Company sign the enclosed copy of this letter and return it to us.

## Retainer

As is standard practice for an engagement of this type, we require a retainer in the amount of $25,000
before commencing work.  We may at our discretion apply the retainer to any invoice or to our final invoice
at the conclusion of the engagement.  This retainer is not intended to be an estimate for the total cost of
work to be performed.  An invoice for the retainer is enclosed.

Argent Trust Company, as Trustee
  of The Appvion, Inc.
  Employee Stock Ownership Plan
May 3, 2017
Page 3

## Wire Transfer

Any payments required hereunder may be paid by check or wire transfer.  Below are our fund transfer instructions:

Stout Risius Ross, LLC
BMO Harris Bank

ACH & Wire ABA Number: 071000288
Account Number:  3998895

## Professional Terms

The attached Professional Terms apply to this engagement.  Please sign below and return the enclosed copy of this letter to us.  By signing as Trustee, you are indicating your agreement to all of these terms except Sections 4 (Fees and Expenses), 9 (Liability and Indemnification), 10 (Response to Subpoena), and 12(c) (Payment in the Event of Termination).  By signing as the Company, you are indicating your agreement to all of these attached Professional Terms, including Sections 4, 9, 10 and 12(c).

*   *   *   *   *   *

Argent Trust Company, as Trustee
   of The Appvion, Inc.
   Employee Stock Ownership Plan
May 3, 2017
Page 4

We appreciate the opportunity to be of service to you and look forward to working with you on this important project.

Very truly yours,

**STOUT RISIUS ROSS, LLC**

By:    *Scott Levine*

   _____
   Scott D. Levine, CPA/ABV, CFA
   Managing Director

Attachments:    Professional Terms

Acknowledged and Accepted:

**ARGENT TRUST COMPANY**, not in its corporate capacity, but solely in its capacity as Trustee of the **APPVION, INC. ESOP:**

Signed: _____

Name: _____Stephan A. Marrin_____

Title: _____Senior Vice President_____

Date: _____5/4/2017_____

Acknowledged and Accepted by:

**APPVION, INC.:**

Signed: _____

Name: _____Thomas J. Ferree_____

Title: _____Senior Vice President & CFO___

Date: _____5-10-2017_____

# STOUT RISIUS ROSS, LLC PROFESSIONAL TERMS

**1.   Use of Terminology**  The terms "you" or "your" refers to the ESOP Trustee.

**2. Our Services**  We will provide the services as described in our engagement letter, as may be modified from time to time by mutual consent.

**3.    Independent Contractor**  We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the details and the means and methods of performing our services.   We assume sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, disability insurance and other applicable employee withholdings.

**4. Fees and Expenses**  Our fees, out-of-pocket expenses, and payment terms are set out in our engagement letter. Those fees do not include the following taxes. The Company will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of our services, excluding taxes on our income generally.

**5.  Confidentiality**  With respect to any information supplied in connection with this engagement that any party(s) to our engagement letter designates as confidential, or that any other party(s) should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure, such other party(s) agree to protect the confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) disclosed by a third party without restriction, (iv) independently developed, or (v) disclosed pursuant to legal requirement or order.  Following the completion of our engagement, but not before such time and with your consent and the consent of the Company, we may mention the name of the Company and/or use the Company logo and provide a general description of the engagement in our printed or electronic materials, or in our marketing presentations to others.

We are not to be characterized as an "expert" for purposes of securities law and we are not to be referred to, either by name or inference, in any public (e.g., S-1) or nonpublic security filing or private placement. (Any such disclosure document is defined herein as a "Filing".)  Moreover, we are not obligated to provide, nor will we provide, any consent to be named in any such Filing either during the performance of our services or after the conclusion of our engagement.

**6.  Use of Financial & Other Information / GAAS**  In performing our analysis, we shall use various financial and other information provided to us by management or obtained from other private and public sources, and shall rely on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with generally accepted auditing standards known as GAAS. Accordingly, we will not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, hypothetical or projected results that the management of the Company or others anticipate. However, we shall exercise our independent judgment in evaluating the information that we receive from the Company and/or its representatives, and we shall not rely on information that we know to be inadequate, incomplete or obviously incorrect

**7. Our Work Product and Your License**  Upon full payment of all amounts due us in connection with this engagement, the work product we prepare for you in connection with our services will become your property, except as set forth below. Our work papers will not constitute work product and will remain our property.  We will retain sole ownership of all right, title and interest in our proprietary information, which will not constitute work product, such as such information we possessed prior to the delivery of our services and, to the extent such information is of general application, anything we discover, create or develop during our provision of services for you.   To the extent our deliverables to you contain our proprietary information, we grant you a non-assignable, non-exclusive, royalty-free license to use the proprietary information in connection with the valuation analysis (as defined in our engagement letter) but for no other use, without our express, prior written consent.

**8.   Our Warranty**  We warrant that our services will be performed with reasonable care in a diligent and competent manner.  We also warrant that we meet the requirements of being an "independent appraiser" for purposes of Internal Revenue Code Section 401(a)(28)(C).

We do not warrant and are not responsible for any third party products or services.  Your only remedies and rights with respect to any third party products or services are against the third party and not against us.

**9.  Liability and Indemnification**  (a) The Company will, to the fullest extent allowable by law,  indemnify us, our owners, employees, contractors and agents against all costs and fees, (including reasonable attorneys' costs and fees) damages and expenses, and other liabilities (all of the foregoing referred to as "Damages") associated with any third party claim arising out of our services, except to the extent the Damages are a result of the negligence or willful acts or omissions of our employees, contractors or agents in performing the services.

**(b)**        Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

**(c)**        Our total liability relating to this engagement will in no event exceed an amount equal to five times the fees we receive for the portion of the engagement giving rise to liability and will not include any special, consequential, incidental or

exemplary damages or loss (nor any lost profits, saving or business opportunity).

(d)     For purposes of this agreement, "negligence" means a departure from the standard of ordinary care applicable to an experienced ESOP trustee financial advisor, taking into consideration the customary and reasonable assumptions we are using to determine a range of fair market value of the stock.

**10.  Response to Subpoena**  In the event we are required to respond to a subpoena (e.g., producing documents in our possession, providing testimony, cooperating with your legal counsel, etc.) related to this engagement (regardless of whether such subpoena is served during or subsequent to the completion of our work), we will invoice the Company at our standard hourly rates applicable at the time we respond to the subpoena.  We will also invoice the Company for our related out-of-pocket expenses, including, but not limited to attorney fees, copying charges, courier fees, and travel expenses.

**11.  Non-Solicitation**  During the term of this engagement, and for a period of one year following its expiration or termination, you will not actively solicit for employment, employ or otherwise engage any of our employees (including former employees) who were involved directly in the engagement.

**12.  Termination**  (a) Any party to our engagement letter may terminate our engagement at any time upon 10 days written notice.

(b)     We may suspend or terminate this engagement immediately and without notice in the event of non-payment of amounts due us. We will inform you and the Company of the effective date of suspension or termination.

(c)     In the event of any such suspension of termination, and pursuant to the terms of our engagement letter, the Company will pay us for all services rendered, expenses incurred or financial commitments we make and for all reasonable costs associated with any termination.

**13.  Our Financial Interest / Compensation**  None of our employees who will work on this engagement have any known financial interest in the Company or the outcome of our analysis, and our compensation is neither based upon nor contingent upon the conclusions we reach.  We do not warrant or predict results of our analysis in this matter.

**14.  Staffing**  While we will attempt to comply with your requests for specific individuals, we retain the right to assign and reassign our personnel, as appropriate, to perform the services.

**15.  General**  (a) These Professional Terms, together with the engagement letter, including all its attachments, constitute the entire agreement and understanding among the Company, you and us with respect to the services and deliverables described in the engagement letter, supersede all prior oral and written communications among us, and may be changed only in writing when all of us sign.  If there is a conflict between

these Professional Terms and the terms of the engagement letter, these Professional Terms will govern.

(b)     No term of our engagement letter or this Professional Terms agreement will be deemed waived, and no breach excused, unless the waiver or excuse is in writing signed by the party granting such waiver or excuse.

(c)     The terms of this Professional Services agreement that by their nature are to survive this agreement will survive its expiration or termination.

(d)     We will retain files related to our engagement in accordance with our document retention policy, which shall include any computer documents or files that have been created as a result of our automatic archiving and backup procedures.

(e)     We each acknowledge that we may correspond or convey documentation via Internet e-mail and that none of the parties to our engagement letter has control over the performance, reliability, availability or security of Internet e-mail.  Therefore, none of the parties will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(f)     All of our respective duties and rights and all claims and controversies in connection with this engagement will be determined in accordance with the laws of the Commonwealth of Virginia.

\*    \*    \*    \*    \*    \*    \*

**Investment Banking | Valuation Advisory | Dispute Consulting | Management Consulting**

# EXHIBIT 2



# PAPERWEIGHT DEVELOPMENT CORP.

## Valuation of Common Stock
## as of June 30, 2013

**Issued: July 15, 2013**



Investment Banking

Valuation & Financial Opinions

Dispute Advisory & Forensic Services

**[This page is intentionally left blank.]**

*For more information, please contact one of the following members of the engagement team:*

---

Scott D. Levine, CPA / ABV,
CFA, ASA
Managing Director
(703) 848-4944
slevine@srr.com

Aziz J. El-Tahch, CFA
Managing Director
(646) 807-4224
aeltahch@srr.com

Isaiah Aguilar, CFA
Vice President
(703) 848-4942
iaguilar@srr.com

---



**Atlanta | Chicago | Cleveland | Dallas | Detroit | Houston | Los Angeles | New York | Washington, D.C.**

---

**www.srr.com**

# APPENDICES

| | | |
|---|---|---|
| **I.** | Introduction ................................................................................................................ | 1 |
| **II.** | Summary of Operations Since December 31, 2012 ..................................................... | 4 |
| **III.** | Economic and Industry Outlook ................................................................................... | 17 |
| **IV.** | Guideline Company Method.......................................................................................... | 25 |
| **V.** | Discounted Cash Flow Method .................................................................................... | 35 |
| **VI.** | Valuation Reconciliation and Conclusion .................................................................... | 44 |
| **VII.** | Opinion......................................................................................................................... | 52 |





# APPENDICES

**Appendix A**.................................................................................................................................Exhibits

**Appendix B**............................................................................................... Guideline Company Descriptions

**Appendix C**.............................................................................................................. Control Premium

**Appendix D**..........................................................................................Assumptions and Limiting Conditions

**Appendix E**.........................................................................................................Statement of Qualifications



Valuation & Financial Opinions

# Section I

## **Introduction**



Valuation & Financial Opinions 

# I.  INTRODUCTION

## Description of Analysis

■ Stout Risius Ross, Inc. ("SRR") has been retained by Reliance Trust Company ("State Street") solely in its capacity as the trustee (the "Trustee") of the Appleton Papers Inc. Employee Stock Ownership Plan (the "ESOP") to estimate the Fair Market Value of the common stock of Paperweight Development Corp. ("Paperweight") on a controlling-ownership interest basis, taking into consideration the appropriate discount for limited marketability, as of June 30, 2013 (the "Valuation Date").

■ We understand the ESOP owns 100% of the outstanding common stock of Paperweight which in turn owns 100% of Appvion, Inc. ("Appvion") (Paperweight and Appvion are collectively referred to herein as the "Company").

■ The purpose of our analysis is to provide an independent opinion of the Fair Market Value of the common stock of Paperweight held by the ESOP as of the Valuation Date for ESOP administration purposes.  No other purpose is intended or should be inferred.

## Standard of Value

■ In accordance with Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i)) (the "Proposed Regulation"), the term "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset.

## Factors Considered

We considered the following factors in performing our analysis:

■ The nature of the business and the history of the Company from its inception;

■ The economic outlook in general and the condition and outlook of the industry in which the Company operates;

■ The book value of the stock and the financial condition of the Company;

■ The earning capacity of the Company;

■ The dividend-paying capacity of the Company;

■ Whether goodwill or other intangible value exists within the Company;

■ Previous sales of the Company's stock and the size of the block of stock to be valued; and

■ The market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.





Valuation & Financial Opinions

# I. INTRODUCTION

## Sources of Information

In connection with this analysis, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. Among other things we:

- reviewed Paperweight's audited financial statements and Form 10-K filings with the U.S. Securities and Exchange Commission ("SEC") for the fiscal years ended December 31, 2008 through December 31, 2012;

- reviewed Paperweight's Form 10-Q filing with the U.S. SEC for the fiscal quarter ended March 31, 2013;

- reviewed Paperweight's internally-prepared financial statements for the four-month periods ended April 30, 2012 and April 30, 2013;

- reviewed select items from Paperweight's internally-prepared balance sheet prepared by Company management as of June 30, 2013;

- reviewed the financial projections prepared by Company management for the fiscal years ending December 31, 2013 through December 31, 2017;

- reviewed the Confidential Information Memorandum prepared by Jefferies Finance, LLC, dated June 2013;

- reviewed the Credit Agreement between Paperweight, Jefferies Finance, LLC, Fifth Third Bank, and Key Bank National Association, dated June 28, 2013;

- held discussions with certain members of the senior management of Appvion regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;

- reviewed publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- reviewed other information and conducted other studies, analyses, and investigations as we deemed appropriate.

## Assumptions and Limiting Conditions

- This report and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and should not be referred to or distributed, in whole or in part, without our prior written consent. Reference should be made to Appendix D, as well as our engagement letter dated June 20, 2013, for certain assumptions and limiting conditions that are applicable to our analysis and report.



- 3 -



Valuation & Financial Opinions

Section II

**Summary of Operations Since December 31, 2012**

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 750 of 1527    Document 27-2

APPVION

Valuation & Financial Opinions



# II. SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

## Company Overview

- Founded in 1907, Appvion is the world's largest manufacturer of carbonless paper and the leading North American manufacturer of thermal paper. Appvion, a privately held company, is headquartered in Appleton, Wisconsin, with manufacturing facilities located in Appleton and Portage, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania.

- Appvion is organized into two primary operating units: (1) Technical Papers and (2) Encapsys, which encompasses the Company's chemical microencapsulation activities. Technical Papers, the Company's largest operating unit, includes the Carbonless and Thermal divisions.

- On May 13, 2013, the Company changed its name from Appleton Papers, Inc. to Appvion, Inc.

- The Company has one class of stock: common stock. The ESOP owns 100% of Appvion's unrestricted common stock. There were 8,294,806 shares outstanding as of the Valuation Date.

- Effective January 3, 2010, the Company adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on the value of Appvion common stock. All units vest three years after the award date and the cash value of the stock is paid to the employee on the vesting date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated. As of the Valuation Date, there were 207,925 RSUs outstanding.

- In 2006, the Company established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors. As of the Valuation Date, there were 73,638 phantom units outstanding.

- The Company's Long-Term Incentive Plan ("LTIP") awards synthetic equity units to employees, which are awarded at the most recent Appvion stock price as determined by the semi-annual ESOP valuation. As of the Valuation Date, there were 2,080,900 LTIP units outstanding with a weighted average exercise price of $20.98. In addition, there were 650 Canadian Stock Appreciation Right ("SAR") units outstanding with a weighted average exercise price of $26.68.





Valuation & Financial Opinions

## II.   SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

| Paperweight Equity Ownership Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Total | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 8,294,806 | 0 | 0 | 0 | 0 | 8,294,806 | 77.8% |
| Management | 0 | 207,925 | 73,638 | 2,080,900 | 650 | 2,363,113 | 22.2% |
| **Total** | **8,294,806** | **207,925** | **73,638** | **2,080,900** | **650** | **10,657,919** | **100.0%** |

■ During the latest 12 month period ended April 30, 2013 (the "LTM period"), Appvion generated revenue of $836.1 million, of which approximately 45.2% was generated from Carbonless (including sales of security paper products), 50.9% from Thermal, and 3.9% from Encapsys.





## II.   SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

**Carbonless**

- Carbonless paper is used in the production of multi-part business forms.  Two-part carbonless forms work as follows: the top sheet is coated on the back with encapsulated dye and the bottom sheet is coated on the front with a reactive chemical.

- Carbonless revenue decreased 7.0% from $406.8 million in fiscal year 2012 to $378.2 million in the LTM period. Carbonless' revenue declined due to lower shipment volumes, consistent with the contracting nature of the market as well as the Company's decision to discontinue sales of carbonless products in certain non-strategic international markets.  This decline was somewhat offset by price increases implemented in 2012 and the first half of 2013.

- Carbonless' EBITDA increased, despite the decrease in sales, from $51.1 million, or 12.6% of net sales, in fiscal year 2012 to $54.3 million, or 14.4% of net sales, in the LTM period due to the benefits of a supply agreement with Domtar (discussed herein) as well as increased prices and improved product mix (i.e., lower sales volume of lower-margin Carbonless roll products). In addition, the Company discontinued sales to certain non-U.S. customers, which typically generated lower profit margins.

- The Company is projecting Carbonless sales to decrease from $378.2 million in the LTM period to $366.3 million in fiscal 2013. Thereafter, net sales are projected to decline to $300.7 million by fiscal year 2017 as the carbonless paper market continues to decline.

- Carbonless' adjusted EBITDA is projected to increase from $54.3 million, or 14.4% of net sales, in the LTM period to $58.9 million, or 16.1% of net sales, in fiscal 2013 primarily due to the continued benefits of the supply agreement with Domtar as well as the elimination of less profitable non-U.S. business. Thereafter, EBITDA is expected to decline to $41.4 million, or 13.8% of net sales, in fiscal year 2017, consistent with the decline in revenue.

**Thermal**

- Thermal paper is a heat sensitive paper that is coated with colorless dye, co-reactants, and binders.  When thermal paper is fed through a printer, heat from the thermal print head causes dyes and co-reactants to activate and form an image.  Accordingly, unlike inkjet and laser printers, thermal printers do not require ribbons or toner. Some of the fastest growing markets for thermal paper include point-of-sale applications (e.g., receipts received from ATM or retail sale transactions), label applications (e.g., weigh scale labels and shipping and delivery labels), and tag/ticket applications (e.g., entertainment and travel tickets and retail and industrial tags).

- Thermal's revenue increased 3.3% from $411.7 million in fiscal year 2012 to $425.4 million in the LTM period primarily due to (1) higher prices and (2) higher shipment volumes resulting from an increase in capacity as well as market share capture. Thermal's shipment volumes benefitted from increased sales of tag, ticket, and label products as well as receipt paper.

- Thermal's adjusted EBITDA remained stable at $49.0 million between fiscal year 2012 and the LTM period. Adjusted EBITDA margins decreased slightly from 11.9% of net sales in fiscal year 2012 to 11.5% of net sales in the LTM period attributable to a





Valuation & Financial Opinions

## II.  SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

decline in gross margins due to product mix. Over time, however, EBITDA margins have been increasing primarily due to (1) increasing revenue, (2) an improved product mix toward higher margin tag, ticket, and label products, (3) the benefits of the supply agreement with Domtar, and (4) other efforts to control costs.

- The Company expects Thermal's net sales to increase from $425.4 million in the LTM period to $481.5 million in fiscal 2013 as a result of (1) increasing shipment volumes and (2) price increases implemented in fiscal year 2012 and 2013.  Thereafter, net sales are expected to increase to $564.9 million in fiscal 2017, which represents a compound annual growth rate of 4.1%.

- Thermal's adjusted EBITDA is projected to increase from $49.2 million, or 12.3% of net sales, in the LTM period to $59.7 million, or 12.4% of net sales, in fiscal 2013 due to the full impact of price increases, a focus on sales of high value-added products, and the benefits of the supply agreement with Domtar.  Thereafter, adjusted EBITDA is projected to increase to $95.6 million, or 16.9% of net sales, in fiscal 2017 due to the continued benefits described above as well as economies of scale.

### Encapsys

- On November 7, 2007, Appvion signed a multiyear supply agreement with Procter & Gamble ("P&G") to provide microencapsulated specialty chemicals.  Appvion's initial project with P&G involves microencapsulating the fragrance for Downy liquid fabric softener, and future projects will involve hair care products and dryer sheets.  P&G and Appvion filed a joint patent related to this product in fiscal 2007. In addition, P&G and Appvion entered into an exclusive five-year contract for microencapsulation in laundry products. Furthermore, P&G requested that Appvion open a microencapsulation plant in Germany to provide microencapsulation services to a nearby P&G facility.

- Encapsys' net sales increased from $31.2 million in fiscal 2012 to $32.5 million in the LTM period primarily due to an increase in sales to P&G relative to the first four months of 2012.

- Encapsys' EBITDA increased from $10.8 million, or 34.5% of net sales, in fiscal 2012 to $11.7 million, or 36.0% of net sales, in the LTM period due to the increase in sales as well as operating efficiencies.

- Encapsys' net sales are expected to increase from $32.5 million in the LTM period to $34.2 million in fiscal 2013.  Thereafter, net sales are expected to increase to $163.3 million in fiscal 2017, which represents a compound annual growth rate of 47.8%. In the short-term, most of Encapsys' sales will be generated from the Company's relationship with P&G as well as increased encapsulation of phase change materials, which absorb and release thermal energy in order to maintain a regulated temperature in a product. By 2017, however, a greater percentage of sales are expected to be derived from non-P&G customers.

- P&G is currently in the process of building a manufacturing plant in Western Europe that will provide P&G with better access to emerging markets in the region. Company management believes this will provide Encapsys the opportunity to provide P&G with increased encapsulation services, which lower the cost of P&G's products, and access lower income markets.

- As of the Valuation Date, the Company was continuing to pursue other initiatives in its Encapsys division with non-P&G partners such as the Troy Corporation and Sherwin-Williams, which operate in the paint industry; Buckman Laboratories, an international




## II.    SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

specialty chemical company; Entropy Solutions, a bio-based specialty company; and AMCOL International, a specialty minerals company.

- The Company recently hired Mary Goggans ("Ms. Goggans") as Executive Director and General Manager of Encapsys. Company management stated that Ms. Goggans will focus on corporate development for Encapsys as well as potential acquisitions.

- Encapsys' adjusted EBITDA is projected to increase from $11.7 million, or 36.0% of net sales, in the LTM period to $11.8 million, or 34.4% of net sales, in fiscal 2013. Thereafter, adjusted EBITDA is projected to increase to $56.6 million, or 34.7% of net sales, in fiscal 2017.

**Litigation/Off-Balance Sheet Issues**

- In 2008, Appvion paid $25 million for costs related to the Fox River environmental clean up, representing its unindemnified obligation in the matter. The balance of Appvion's ultimate liability is indemnified by Arjo Wiggins ("AWA"). AWA supported its indemnification through the purchase of a $250 million insurance policy from Commerce & Industry Insurance Company, a unit of AIG. While the face value of that policy has diminished with the payment of expenses over time, AWA has successfully claimed significant reimbursements from former insurers of Appvion, replenishing its resources and capability for future indemnification costs. Accordingly, Company management believes that AWA should still be able to satisfy its obligations associated with the indemnification agreement.

  - The Company's responsibility for the $25 million of Fox River liabilities has been completely satisfied and as a result, AWA has resumed responsibility for any remaining For River liabilities. In July 2011, Appvion filed a motion for summary judgment with the goal of having Appvion removed as a potentially responsible party.

  - On April 10, 2012, the U.S. District Court for the Eastern District of Wisconsin (the "U.S. District Court") granted Appvion's motion for summary judgment and dismissed all claims against Appvion in the enforcement action. The decision establishes that Appvion is no longer a potentially responsible party, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA"), no longer considered a legal successor to NCR Corporation's ("NCR") liabilities, and no longer required to comply with the order commanding remediation of the Fox River. In addition, on July 3, 2012, the U.S. District Court determined that Appvion and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

  - The rulings do not affect Appvion's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appvion's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appvion and BAT have joint and several liability under the Arbitration. As of April 30, 2013, the carrying amount of Appvion's liability under the Arbitration was $62.4 million. On June 8, 2012, BAT served AWA with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by AWA from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served





Valuation & Financial Opinions

## II.   SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

Appvion with the same claim, seeking a declaration that BAT is indemnified by Appvion. Appvion intends to defend against this claim.

➢ Appvion cannot reasonably estimate possible losses in excess of amounts accrued due to uncertainties regarding the scope and cost of implementing the final remediation plan, the scope of restoration and final valuation of natural resource damage assessments, the evolving nature of remediation and restoration technologies and governmental policies, NCR's share of liability relative to other potentially responsible parties, and the extent of BAT's performance under the Arbitration. Appvion believes NCR has paid more than its estimated share of the liability. Interim legal determinations may periodically obligate NCR (and BAT and Appvion pursuant to the Arbitration) to fund portions of the cleanup costs to extents greater than NCR's share as finally determined, and in such instances, Appvion may reserve additional amounts (including appropriate reimbursement under its indemnification agreements).

➢ The indemnification agreements negotiated with AWA are designed to ensure that Appvion will not be required to fund any of the indemnified costs and expenses in relation to the Fox River liabilities. Company management expects this arrangement to continue to protect Appvion with respect to the indemnified costs and expenses, based on Appvion's review of the financial condition of AWA and estimates of Appvion's liability. However, Appvion's ultimate liability pursuant to the Arbitration could prove to be larger than the current carrying amount and potentially could exceed the financial capability of AWA. In the event Appvion is unable to secure payment from AWA or its former parent companies, Appvion may be liable for amounts pursuant to the Arbitration.

### Pension Accounting Adjustment

■ During the fourth quarter of 2012, the Company adopted mark-to-market accounting for its pension and other postretirement benefit plans. Under mark-to-market accounting, all actuarial gains and losses are immediately recognized in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year. Under the Company's previous accounting method, a portion of the actuarial gains and losses was deferred in accumulated other comprehensive loss on the Company's balance sheet and amortized into future periods. In addition, the previous method smoothed the investment gains and losses of the plan assets over a period of five years. In connection with this change in accounting policy, the Company also elected to change its method of accounting for certain costs included in inventory. The Company elected to exclude the amount of its pension and other postretirement benefit costs applicable to former employees from inventoriable costs. While the Company's historical policy of including all pension and other postretirement benefits costs as a component of inventoriable costs was acceptable, it believes the new policy is preferable as inventoriable costs will only include costs that are directly attributable to current employees involved in the production of inventory. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting principles. The mark-to-market adjustment resulted in an additional pension expense of $45.5 million in fiscal 2011 and $25.5 million in fiscal 2012, while a reduction of expense of $410,000 was recorded in fiscal 2010.





Valuation & Financial Opinions

## II.   SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

**Labor Issues**

■ The Company's manufacturing employees at its facilities in Appleton, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.  As of the Valuation Date, the Company's labor agreements with all union employees were current.

**Domtar Supply Agreement**

■ On February 22, 2012, Appvion entered into a long-term supply agreement with Domtar Corporation ("Domtar") to purchase carbonless and thermal stock supply.  Pursuant to the terms of the supply agreement, Domtar became Appvion's exclusive supplier of carbonless and thermal base stock for a period of 15 years, with successive five-year renewals.  The supply agreement allows Appvion to eliminate unprofitable business lines and reduce working capital, fixed assets, and overhead costs.  The supply agreement also allows Appvion to dispose of certain assets at its West Carrollton, Ohio facility and move certain operations to its Appleton, Wisconsin facility.  Company management believes that the supply agreement will result in many benefits for Appvion, including improvements to cash flow and EBITDA.

➢ In fiscal 2012, the Company recorded $106.0 million of restructuring costs related to the supply agreement, of which approximately $25.2 million are related to employee termination costs (including related pension and benefit costs) and approximately $64.7 million relate to impairment and accelerated depreciation on certain equipment.  As of the Valuation Date, according to the Company's most recent 10-Q filing with the SEC, the Company expects to incur additional cash expenditures of approximately $31 million as a result of ceasing papermaking operations at West Carrollton, of which approximately $1 million is projected to be paid in 2013, approximately $12 million over the next five years, and the remaining $18 million may be paid over the next five to 20 years.

➢ Prior to the supply agreement with Domtar, a certain number of the Company's employees participated in the Pace Industry Union-Management Pension Fund ("PIUMPF"), a multi-employer defined benefit plan.  As a result of the restructuring of the West Carrollton facility and as agreed upon in labor contract negotiations, the Company withdrew from PIUMPF and recorded a $7.0 million settlement charge in fiscal 2012.  The Company also recorded an $18.0 million liability related to additional withdrawal costs, which are expected to be paid over several years and is included in the projected additional cash expenditures discussed above.

➢ We did not explicitly account for future cash expenditures related to the restructuring in our analysis because they are expected to be offset by improvements in working capital resulting from the Domtar supply agreement and cash realization from the sale of scrap.



**Valuation & Financial Opinions**



## II.  SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

**Description of Terminated Transaction**

- In the first half of fiscal 2012, the Company was contemplating a business combination with Hicks Acquisition Company II, Inc. ("HAC II") that would have comprised the following steps:

  - Appvion was going to convert from a qualified subchapter S subsidiary into a limited liability company ("Appleton LLC"), which was expected to be treated as a partnership for U.S. federal income tax purposes.  Appleton LLC was going to be capitalized with Class A Voting Units and Class B Exchangeable Units (which were to be exchangeable into publicly traded common stock of HAC II on a one-for-one basis, subject to certain anti-dilution adjustments).  Appleton LLC was going to issue to Paperweight 9,632,024 Class B Exchangeable Units and a certain number of Class B Exchangeable Units to be determined prior to closing.

  - In addition, Paperweight was going to be entitled to receive up to an aggregate of 3.0 million shares of HAC II common stock (the "Earnout Shares").  The Earnout Shares were to be payable upon the achievement of certain stock price targets based upon the future trading price of the HAC II common stock.

  - The Company was also bringing a tax basis step-up and related tax benefits to the business combination.  As a result, HAC II and Paperweight were going to execute a Tax Receivables Agreement ("TRA") pursuant to which HAC II was expected to make a cash payment to Paperweight equal to 85% of the future tax benefits resulting from these tax benefits.  The remaining 15% was to be retained by HAC II.

  - The business combination was expected to follow an "Up-C" structure, whereby cash that would otherwise be paid out as federal income taxes was instead going to be paid into a continuing tax deferred subchapter S corporation owned by the ESOP.  The benefits of the Up-C tax distributions were expected to accrue to ESOP participants as long as they remained in the ESOP.

- It was anticipated that the combined entity would be publicly-traded on the NASDAQ stock exchange under a mutually agreed upon ticker symbol.

- On July 13, 2012, the Company and HAC II formally announced their mutual agreement to terminate the proposed business combination.  In doing so, Company management indicated that volatile market conditions prevented a transaction size from being reached that was acceptable to both Appvion and HAC II.  Given the ultimate transaction size proposed, which would have provided lower near-term liquidity than originally anticipated and may not have allowed the combined Company to be traded on the NASDAQ stock exchange, Company management team was unsure whether or not the business combination would enable the Company to achieve its stated objectives.  However, Mark Richards, Chief Executive Officer, and Tom Ferree, Chief Financial Officer, both stated that the feedback received from potential investors regarding the fundamental strength of the Company was positive, notwithstanding their reluctance to participate in the business combination under prevailing market conditions.

- On October 22, 2012, Hicks Equity Partners, LLC ("HEP") provided Company management with a letter of intent to acquire 100% of the common stock of Paperweight (the "Transaction").



## II.    SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

- ➢ According to the letter of intent, the Transaction implied an Enterprise Value of $732.5 million, representing a 5.6x multiple of the Company's pro forma 2012 EBITDA of $131 million as provided to HEP at the time.  HEP estimated cash proceeds to the ESOP would be approximately $22.00 per share.

- ➢ As part of the Transaction, HEP expected to refinance the Company's Senior Secured Bonds and leave the Company's other debt instruments outstanding.

- ➢ HEP expected to partner with another firm or firms (the "Investment Partners") that would underwrite the full equity amount of the Transaction and ultimately hold approximately 50% of the Company's equity post-Transaction. The remaining 50% equity ownership would be held by an affiliate of HEP.

- ➢ Following the Transaction, Tom Hicks, the Chairman and Chief Executive Officer of HEP, would have been named Chairman of the Company's Board of Directors and Mark Richards would have remained Chief Executive Officer and a member of the Board.  It was expected that HEP and the Investment Partner would each have had representation on the Board.

- ➢ According to the letter of intent, HEP expected to form a management incentive plan that would encourage senior management to roll-over a meaningful portion of their LTIP and RSU payments on a pari passu basis with HEP.  HEP expected the management incentive plan would have comprised options representing 10% of the Company's equity on a fully-diluted basis.

- ■ Appvion provided HEP with a period of exclusivity through January 18, 2013. However, HEP and Appvion decided to not pursue the Transaction due to a disagreement among the potential Investment Partners on certain economic terms of the Transaction, as well as uncertainty created by the Company's debt refinancing efforts.





Valuation & Financial Opinions

## II.  SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

**Refinancing**

- On June 28, 2013, to take advantage of the low interest rate environment to refinance debt, Appvion entered into a $435 million senior secured credit facility, which includes a $335 million first lien term loan facility (the "First Lien Notes") and a $100 million revolving credit facility (the "Revolving Credit Facility").

- Key terms and conditions of the First Lien Notes and Revolving Credit Facilty include:

  - The First Lien Notes and Revolving Credit Facility accrue interest at an annual rate equal to, at the Company's option, (1) LIBOR (with 1.25% floor) plus 4.5% per annum or (2) Prime plus 3.5%.

  - The First Lien Notes have a term of six years while the Revolving Credit Facility has a term of five years.

- Substantially all of the First Lien Notes proceeds were used to finance the purchase price, including principal, premium, consent fee, and accrued and unpaid interest, of $300.7 million (aggregate principal amount) of the Company's 10.50% fixed-rate Senior Secured Notes and to pay related fees and expenses. The total principal balance of the Senior Secured Notes was $305.0 million. Appvion issued a redemption notice to redeem on July 31, 2013 all of the remaining $4.3 million of Senior Secured Notes outstanding at a redemption price equal to $1,052.50 per $1,000 principal amount of Senior Secured Notes, plus accrued and unpaid interest.

- The issuance of $335.0 million of First Lien Notes and repurchase of $300.7 million of Senior Secured Notes is referred to herein as the "Refinancing."

- The proceeds of the Revolving Credit Facility will be used to provide ongoing working capital and for general corporate purposes of Appvion and its subsidiaries.

- Based on the lower interest rates, Appvion expects to reduce its annual interest expense by approximately $12 million and reduce the Company's borrowing costs by approximately 300 basis points.  In addition, since the First Lien Term Loan will mature in 2019, the duration of the Company's senior debt will be extended by four years. This extended maturity of the Company's senior debt is expected to improve the Company's financial flexibility.

- Although the Company will have approximately $30 million of additional debt due to the Refinancing, this increased debt is somewhat mitigated by the significantly lower cash interest expense the Company expects to incur as well as the improved financial flexibility and marketability of the Company.



- 14 -



Valuation & Financial Opinions

## II.   SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

| Sources and Uses of Funds | | | | | |
|---|---|---|---|---|---|

*U.S. Dollars in Thousands*

| Sources of Cash | | | Uses of Cash | | |
|---|---|---|---|---|---|
| First Lien Term Notes | $ | 335,000 | Senior Secured Notes | $ | 319,797 |
| Revolver | | 34,600 | Existing Revolver | | 40,949 |
| | | | Estimated Fees, Expenses, & OID | | 8,842 |
| | | | Cash to Balance Sheet | | 12 |
| **Total Sources of Cash** | **$** | **369,600** | **Total Uses of Cash** | **$** | **369,600** |





Valuation & Financial Opinions

## II.    SUMMARY OF OPERATIONS SINCE DECEMBER 31, 2012

**Management Team and Board of Directors**

| Executive Management Team | |
| --- | --- |
| **Individual** | **Position** |
| Mark Richards | Chairman, President, and Chief Executive Officer |
| Thomas J. Ferree | Senior Vice President of Finance and Chief Financial Officer |
| Kerry S. Arent | Senior Vice President of Human Resources |
| Jeffrey J. Fletcher | Vice President and Controller |
| James R. Hillend | Vice President of Thermal and Carbonless |
| Tami L. Van Straten | Vice President, General Counsel, and Secretary |
| Ted E. Goodwin | Vice President of Business Development |

| Board of Directors | |
| --- | --- |
| **Individual** | **Position** |
| Mark Richards | Chairman, President, and Chief Executive Officer |
| Stephen P. Carter | Director |
| Terry M. Murphy | Director |
| Andrew F. Reardon | Director |
| Kathi P. Seifert | Director |
| Mark A. Suwyn | Director |
| George W. Wurtz | Director |



Valuation & Financial Opinions



Section III

**Economic and Industry Outlook**



**Valuation & Financial Opinions**



# III.   ECONOMIC AND INDUSTRY OUTLOOK

## Gross Domestic Product

- Real (i.e., inflation adjusted) GDP growth of 2.0% to 2.5% is generally considered optimal when the economy is operating at full employment (5.5% to 6.0% unemployment).

- GDP increased at an annual rate of 2.4% in the first quarter of 2013, increasing from the 0.4% growth in the fourth quarter of 2012. Compared with the fourth quarter of 2012, the increased growth rate was primarily the result of an increase in consumption and inventories.

- GDP is forecasted to increase at an annual rate of 2.0% in 2013.

## Consumer Price Index

- The CPI has increased at an average rate of 2.5% over the past 20 years.

- The CPI increased 0.1% in May 2013 and has increased 1.4% over the past 12 months.

- The core index, excluding food and energy prices, increased 0.2% in May 2013 and has increased 1.7% over the past 12 months.

- The CPI is expected to increase 1.7% in 2013 and 2.2% in 2014.







Valuation & Financial Opinions



# III. ECONOMIC AND INDUSTRY OUTLOOK

## Employment Situation

- Typically, economists consider the economy to be operating at full employment when the unemployment rate is between 5.5% and 6.0%.

- In May 2013, 175,000 jobs were added, and the unemployment rate increased to 7.6% from 7.5% in May 2013 due to an increase in the size of the labor force.

- The unemployment rate is forecasted to be 7.2% in the second quarter of 2014.

## Consumer Sentiment

- The Index of Consumer Sentiment, normalized at a value of 100 in the first quarter of 1966, is constructed by the Survey Research Center at the University of Michigan based on a survey of consumers regarding personal finances, business conditions, and anticipated spending. This metric is an important barometer of the strength of the economy since consumer spending represents approximately two-thirds of GDP.

- Consumer sentiment increased from 76.4 in April 2013 to 84.5 in May 2013, its highest level since July 2007. The increase in consumer sentiment was driven by improvements in the stock, housing, and job markets, combined with stable gas prices.



Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia



Source: Dismal Scientist



Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Purchasing Managers' Index

■ Index values above 50 indicate an expanding manufacturing sector, while values below 50 indicate a contracting manufacturing sector.

■ The PMI decreased to 49.0 points in May 2013 from 50.7 points in April 2013.  The decrease in May is due primarily to decreases in production, new orders, and supplier deliveries.

## Equity Markets

■ Over the past 20 years, the S&P 500 and Russell 2000 have increased 6.1% and 7.0% per annum, respectively.

■ For the month ended June 28, 2013, the S&P 500 decreased 2.6% and the Russell 2000 decreased 1.0%.

■ For the year ended June 28, 2013, the S&P 500 increased 20.9% and the Russell 2000 increased 26.0%.







Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Industry Synopsis

- In the United States, approximately 3,200 companies with combined annual revenues of $175 billion manufacture paper products.  Overall industry concentration is low, but is highly concentrated within specific product segments. Major companies include International Paper, Kimberly-Clark, Georgia Pacific, Neenah Paper, and MeadWestvaco. Major product categories are paperboard containers, paper bags, coated papers, tissue product, and stationary.

- As finished paper products tend to be inexpensive and bulky, transportation costs make up a significant portion of total costs. Smaller manufacturers can compete effectively with larger producers by focusing on their local market.

## Industry Growth

- According to IBIS World, between 2008 and 2013 industry average revenue declined 2.7% on an annual basis. Along with declining revenues, profitability has been constrained by an increase in the price of pulp, paper, and paper board, as well as significant price competition from foreign competitors.

- U.S. shipments of paper products declined 1.7% in 2012 compared to 2011, suggesting ongoing downward pressure on demand as more communications shift to digital media. Shipments by pulp, paper, and paperboard mills decreased 1.8%, while those for paperboard containers decreased 2.2%. While paper product and mill operations inventories decreased as demand and shipments declined, paperboard container inventories increased 3.2%. Reduced 2012 shipments of paperboard containers combined with rising inventories may indicate a further reduction in capacity utilization and production in 2013.

## Paper Production

- Production of paper products declined more than 25% between 2000 and 2010 as digital communications have become more popular.  According to IBIS World, the output of U.S. paper mills is forecast to contract at an annual compounded rate of 0.4% between 2013 and 2018.  Over the five years through 2018, the industry is expected to face two primary challenges: (1) the increasing substitution of electronic recordkeeping systems for the industry's paper products and (2) increased competition from paper-producing countries in global markets as the U.S. dollar strengthens.  In addition, Chinese production volumes are expected to increase substantially as the industry transitions into newer technologies.

- U.S. nondurable goods manufacturers' shipments of paper products, an indicator of paper product production, decreased 2.6% in the first five months of 2013 compared to the same period in 2012.

## Capacity

- According to an American Forest and Paper Association ("AFPA") survey released in March 2013, U.S. paper and paperboard capacity decreased 1.6% in 2012 but is expected to remain stable from 2013 through 2015.  Paper and paperboard capacity is expected to decrease 0.4% in 2013 but increase 0.6% and 0.2% in 2014 and 2015, respectively.



- 21 -

Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

**International Issues**

- Between 2010 and 2015, the specialty paper market will experience most of its growth in emerging markets, according to a study by Pira International. India is expected to experience the most rapid growth with a compound annual growth rate of more than 5%. Other countries that should experience significant growth in demand for specialty papers are China, Brazil, Turkey, Russia, and Poland. Specialty paper demand is expected to remain flat in the mature markets of Western Europe, Japan, and the United States.

- The economic expansion in China has created an emerging export market and also a new source for potential investment funding for U.S. paper product manufacturing companies. China lacks the necessary natural resources to satisfy its existing paper product needs and demand for timber, wood pulp, and recycled paper and cardboard is continuing to increase. Some industry experts believe Chinese firms will soon begin to invest in or acquire U.S. paper production companies that need additional capital to modernize production facilities.

- In recent years, China has invested significantly in new, advanced paper mills, supported by government subsidies.  To compensate for the lack of sufficient domestic timber supplies, Chinese paper companies have also developed industrial scale plantations and bioengineered hardwood trees that need just four to six years to reach full height, approximately ten times faster than the normal rate of growth.

- According to the *Twelfth Five-Year Plan for the Development of the Paper Making Industry*, a joint publication by the Chinese National Development and Reform Commission and several other Chinese government agencies, the total production capacity of China's paper and paperboard producers is expected to reach 130 million tons by 2015, with a volume of 116 million tons produced. Paper and paperboard consumption in China is expected to reach 114.7 million tons by 2015, which represents an annualized growth rate for both production and consumption of 4.6% from 2011 to 2015.  This indicates that China's production capacity will soon rise to meet its demand for paper products, though capacity is expanding at a much slower rate than in previous years.

- The U.S. Department of Commerce imposed antidumping and countervailing duties on imports of coated free sheet paper from China and Indonesia as a result of a U.S. International Trade Commission ("USITC") ruling. The USITC ruled in October 2010 that imports of coated paper from Chinese and Indonesian companies are causing material injury to U.S. paper companies and their employees. The USITC decision follows an earlier Department of Commerce finding that the two countries engaged in "dumping" subsidized coated paper on the U.S. market. U.S. paper suppliers claim the unfair trade practices of some paper exporters are suppressing prices and causing paper mill closures domestically.  In August 2012, the USITC announced that it would maintain these existing duties.

- In September 2012, the WTO announced that it would evaluate whether the United States' anti-subsidy duties on Chinese goods including solar panels, thermal paper, wind towers, and steel wire violate global commerce rules.

- In December 2012, the U.S. Department of Commerce issued a preliminary determination that Papierfabrik August Koehler AG and Koehler America, Inc. (collectively "Koehler") deliberately coordinated with multiple parties to structure its sales, pricing, and



- 22 -



**Valuation & Financial Opinions**

# III.  ECONOMIC AND INDUSTRY OUTLOOK

shipping procedures in a manner that would enable it to manipulate its sales prices of lightweight thermal paper ("LWTP") reported to the U.S. Commerce Department.  The U.S. Department of Commerce also found Koehler's actions consistent with a pattern of price manipulation to evade antidumping duties.  As a result, the U.S. Department of Commerce proposed to impose a 75.36% duty on LTWP sold by Koehler in the United States.  In April 2013, the U.S. Department of Commerce issues its final determination that upheld the originally proposed duty.

- ■ Antidumping duties for German manufacturers other than Koehler are 6.5%.  Antidumping duties on imports from China range from 20% to 115%, and countervailing duties range from 13% to 123%.  These duties cover imports of lightweight thermal paper products sold into the United States by manufacturers and converters based in China and Germany.

## Raw Material Pricing

- ■ Prices for wood pulp can fluctuate sharply from year to year, depending partly on energy costs; changes of 10% within a year are not unusual. Paper manufacturers are often unable to pass all cost increases to customers.  Prices for Northern bleached softwood kraft, an industry benchmark grade of wood pulp, increased 70% in the first half of 2013.

- ■ Oil prices (i.e. West Texas Intermediate Crude spot rate) increased approximately 4.9% year-to-date, from $91.83 per barrel as of December 31, 2012 to $96.36 per barrel as of June 28, 2013.

- ■ According to the Bureau of Labor Statistics, the producer price index for the average industry product is expected to have increased an average of 1.3% per year over the five years to 2013.  Prices were particularly strong in 2011, when peak commodity prices and strong demand from developing countries led prices to increase.

- ■ Global market prices for pulp started to decline in the second half of 2008 and continued to decline through the first half of fiscal 2009.  However, due to increased global demand and a tightening supply, wood pulp prices started to increase in the third quarter of fiscal 2009 and continued to increase in 2010.  According to *Pulp & Paper Week*, pulp producers attributed the increase in demand to paper producers replenishing their inventories.  In addition, prices increased due to concerns about supply due to the February 2010 earthquake in Chile and temporary dock work strikes in March 2010 in Finland.  Pulp prices reached a cyclical peak in August 2010 and decreased gradually in the fourth quarter of 2010.  Despite weak paper demand in the first half of 2011, pulp prices reached a record high in June 2011 due to high wood fiber costs and increased demand for pulp.  Pulp prices decreased in the second half of 2011, partially due to increased economic uncertainty in Europe and efforts by the Chinese government to control inflation by reducing the credit supply.  In the first half of 2012, pulp prices stabilized and then increased in response to an April price increase by suppliers, before declining through the third quarter due to uncertain demand and ample supply.  In October 2012, suppliers announced another price increase, which was effective, leading to an increase in prices through the end of the year.  Pulp prices continued to increase in 2013 due to low inventory levels and industry demand.





# III.  ECONOMIC AND INDUSTRY OUTLOOK

### Industry Reorganization

- Large national companies have historically been vertically integrated, owning everything from the forests and logging operations to the plants where finished products are made.  Smaller companies will purchase the paper or paperboard raw material from large producers to convert into finished goods.

- In the past, paper companies offered a wide variety of products based on the perception that diversified product offerings would lead to increased profitability and decreased risk.  In recent years, however, several large companies, including International Paper, MeadWestvaco, and Boise Cascade, have divested non-core assets and focused on becoming leading, low-cost producers of a small number of products.

- According to IBISWorld, the number of companies in the industry is expected to decline from 151 enterprises in 2013 to 145 in 2018, an average annual decline of 0.9%.  Restructuring, including facility and machine closures, is expected to continue over the next five years as industry operators compete with imports from emerging economies.   Competition for market share is expected to increase during this period with larger companies buying the assets of smaller ones and consolidating operations.

## Applicability to the Company

- The financial condition and growth prospects of the Company are dependent on the overall performance of the global economy since the industries in which Appvion operates are cyclical. As a result, the economic contraction negatively affected the Company's financial results in fiscal years 2008 and 2009, while a gradual recovery was reflected in higher shipment volumes in fiscal 2010.  In fiscal 2011, 2012, and the first half of fiscal 2013, Carbonless shipment volumes were negatively impacted by the gradual decline in the market segment. However, the decline in Carbonless was somewhat offset by the positive performance of Thermal, whose performance was more positively impacted by the improvement in economic conditions and increase in market share.



Valuation & Financial Opinions



Section IV

**Guideline Company Method**

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 771 of 1527    Document 17-2

APPVION

Valuation & Financial Opinions



# IV.  GUIDELINE COMPANY METHOD

## Selection of Guideline Companies

- SRR performed an extensive review of publicly available information and held discussions with management in order to identify comparable public companies.  Based on our search, seven companies were identified as comparable to Carbonless and Thermal from an investment risk and return perspective. A brief business description of each of these companies is presented in Appendix B.

- The following is a list of the companies we identified as comparable to Carbonless and Thermal for purposes of our analysis:

  - Neenah Paper Inc.
  - International Paper Company
  - MeadWestvaco Corporation
  - Wausau Paper Company
  - Domtar Corporation
  - PH Glatfelter Co.
  - Verso Paper Corp.

## Analysis

### Methods of Comparison

The market multiples considered in our analysis include:

- EV / Revenue, and
- EV / EBITDA.

We considered these market multiples over two distinct time periods:

- Projected next fiscal year ("NFY"), and
- Latest 12 months ("LTM").



- 26 -



Valuation & Financial Opinions

# IV.  GUIDELINE COMPANY METHOD

**Calculation of Multiples – Carbonless and Thermal**

### Implied Pricing Multiples - Thermal & Carbonless

|  | EV / NFY EBITDA | EV / LTM EBITDA | EV / NFY Revenue | EV / LTM Revenue |
|---|---|---|---|---|
| Neenah Paper, Inc. | 6.0x | 6.3x | 0.77x | 0.84x |
| International Paper Company | 7.1x | 8.9x | 1.06x | 1.11x |
| MeadWestvaco Corporation | 8.8x | 9.8x | 1.37x | 1.42x |
| Wausau Paper Corp. | n/m | n/m | 1.19x | 0.98x |
| Domtar Corporation | 3.9x | 4.0x | 0.52x | 0.53x |
| PH Glatfelter Co. | 6.8x | 8.2x | 0.72x | 0.79x |
| Verso Paper Corp. | n/m | 10.0x | n/m | 0.91x |
| | | | | |
| Low | 3.9x | 4.0x | 0.52x | 0.53x |
| High | 8.8x | 10.0x | 1.37x | 1.42x |
| | | | | |
| Mean | 6.5x | 7.9x | 0.94x | 0.94x |
| Median | 6.8x | 8.6x | 0.92x | 0.91x |

Source:  Exhibit F



Valuation & Financial Opinions



# IV. GUIDELINE COMPANY METHOD

## Selection of Multiples – Appvion

### Selected Financial Information - Paperweight Development Corp.

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $28,268.0 | International Paper Company | $3,522.0 | Neenah Paper, Inc. | 12.1% | Neenah Paper, Inc. | 16.2% |
| MeadWestvaco Corporation | 5,490.0 | MeadWestvaco Corporation | 796.0 | PH Glatfelter Co. | 9.8% | International Paper Company | 6.9% |
| Domtar Corporation | 5,429.0 | Domtar Corporation | 725.0 | International Paper Company | 6.0% | MeadWestvaco Corporation | 2.7% |
| PH Glatfelter Co. | 1,591.9 | PH Glatfelter Co. | 152.4 | Verso Paper Corp. | 2.7% | Wausau Paper Corp. | -0.1% |
| Verso Paper Corp. | 1,432.5 | Verso Paper Corp. | 131.0 | MeadWestvaco Corporation | 0.3% | Paperweight Development Corp. | -0.9% |
| Paperweight Development Corp. | 836.1 | Paperweight Development Corp. | 115.4 | Domtar Corporation | 0.1% | PH Glatfelter Co. | -1.7% |
| Neenah Paper, Inc. | 823.8 | Neenah Paper, Inc. | 109.9 | Paperweight Development Corp. | -0.5% | Domtar Corporation | -2.3% |
| Wausau Paper Corp. | 794.0 | Wausau Paper Corp. | 43.6 | Wausau Paper Corp. | -7.3% | Verso Paper Corp. | -14.4% |
| **Guideline Company Median** | **$1,591.9** | **Guideline Company Median** | **$152.4** | **Guideline Company Median** | **2.7%** | **Guideline Company Median** | **-0.1%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Profitability (LTM Gross Profit Margin) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 17.5% | Neenah Paper, Inc. | 23.4% | International Paper Company | 26.3% | MeadWestvaco Corporation | 14.5% |
| International Paper Company | 6.0% | Paperweight Development Corp. | 15.9% | Domtar Corporation | 20.5% | Paperweight Development Corp. | 13.8% |
| MeadWestvaco Corporation | 3.0% | PH Glatfelter Co. | 7.0% | MeadWestvaco Corporation | 20.2% | Domtar Corporation | 13.4% |
| Paperweight Development Corp. | 1.4% | MeadWestvaco Corporation | -0.6% | Neenah Paper, Inc. | 19.5% | Neenah Paper, Inc. | 13.3% |
| Verso Paper Corp. | -1.6% | International Paper Company | -4.7% | Verso Paper Corp. | 14.3% | International Paper Company | 12.5% |
| PH Glatfelter Co. | -9.9% | Domtar Corporation | -27.0% | PH Glatfelter Co. | 13.2% | PH Glatfelter Co. | 9.6% |
| Domtar Corporation | -12.5% | Verso Paper Corp. | -30.7% | Paperweight Development Corp. | 11.2% | Verso Paper Corp. | 9.1% |
| Wausau Paper Corp. | -27.5% | Wausau Paper Corp. | -50.7% | Wausau Paper Corp. | 10.8% | Wausau Paper Corp. | 5.5% |
| **Guideline Company Median** | **-1.6%** | **Guideline Company Median** | **-4.7%** | **Guideline Company Median** | **19.5%** | **Guideline Company Median** | **12.5%** |

Source: Capital IQ, Inc. and Paperweight Development Corp. financials.



Valuation & Financial Opinions



# IV.  GUIDELINE COMPANY METHOD

**Selected Financial Information - Paperweight Development Corp.**

*U.S. Dollars in Millions*

| Profitability<br>( LTM EBIT Margin) | | Profitability<br>( LTM Return on Assets) | | Profitability<br>( LTM Return on Equity) | | Liquidity<br>( LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp.** | **10.1%** | Neenah Paper, Inc. | 6.7% | Verso Paper Corp. | 20.0% | Neenah Paper, Inc. | 3.0 |
| Neenah Paper, Inc. | 9.9% | PH Glatfelter Co. | 3.3% | Neenah Paper, Inc. | 19.5% | Domtar Corporation | 2.8 |
| MeadWestvaco Corporation | 7.6% | **Paperweight Development Corp.** | **2.7%** | International Paper Company | 11.6% | PH Glatfelter Co. | 2.2 |
| International Paper Company | 7.2% | Domtar Corporation | 2.6% | PH Glatfelter Co. | 7.4% | MeadWestvaco Corporation | 1.9 |
| Domtar Corporation | 6.3% | International Paper Company | 2.5% | Domtar Corporation | 5.4% | Wausau Paper Corp. | 1.8 |
| PH Glatfelter Co. | 5.3% | MeadWestvaco Corporation | 1.9% | MeadWestvaco Corporation | 4.9% | International Paper Company | 1.7 |
| Verso Paper Corp. | 1.3% | Wausau Paper Corp. | -1.0% | Wausau Paper Corp. | -3.9% | Verso Paper Corp. | 1.6 |
| Wausau Paper Corp. | -0.8% | Verso Paper Corp. | -6.3% | **Paperweight Development Corp.** | **n/m** | **Paperweight Development Corp.** | **1.5** |
| **Guideline Company Median** | **6.3%** | **Guideline Company Median** | **2.5%** | **Guideline Company Median** | **7.4%** | **Guideline Company Median** | **1.9** |

| Activity<br>( LTM Asset Turnover) | | Activity<br>( LTM Inventory Turnover) | | Leverage<br>( LTM Total Debt to EBITDA) | | Leverage<br>( LTM EBIT / Interest Expense) | |
|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp.** | **1.5** | Wausau Paper Corp. | 7.7 | Verso Paper Corp. | 9.6 | Neenah Paper, Inc. | 6.5 |
| Neenah Paper, Inc. | 1.3 | Verso Paper Corp. | 7.7 | Wausau Paper Corp. | 5.1 | PH Glatfelter Co. | 4.6 |
| PH Glatfelter Co. | 1.3 | International Paper Company | 7.5 | **Paperweight Development Corp.** | **4.5** | Domtar Corporation | 4.0 |
| Verso Paper Corp. | 1.3 | **Paperweight Development Corp.** | **7.3** | International Paper Company | 3.5 | International Paper Company | 2.8 |
| Wausau Paper Corp. | 1.1 | Domtar Corporation | 6.4 | MeadWestvaco Corporation | 2.7 | MeadWestvaco Corporation | 2.7 |
| Domtar Corporation | 0.9 | Neenah Paper, Inc. | 6.4 | Neenah Paper, Inc. | 1.7 | **Paperweight Development Corp.** | **1.4** |
| International Paper Company | 0.9 | MeadWestvaco Corporation | 6.4 | PH Glatfelter Co. | 1.6 | Verso Paper Corp. | 0.1 |
| MeadWestvaco Corporation | 0.6 | PH Glatfelter Co. | 6.2 | Domtar Corporation | 1.6 | Wausau Paper Corp. | (1.4) |
| **Guideline Company Median** | **1.1** | **Guideline Company Median** | **6.4** | **Guideline Company Median** | **2.7** | **Guideline Company Median** | **2.8** |

Source:  Capital IQ, Inc. and Paperweight Development Corp. financials.





# IV.  GUIDELINE COMPANY METHOD

## Selection of Multiples – Carbonless & Thermal

### Selected Financial Information - Carbonless & Thermal

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth ( 3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $28,268.0 | International Paper Company | $3,522.0 | Thermal | 13.5% | Neenah Paper, Inc. | 16.2% |
| MeadWestvaco Corporation | 5,490.0 | MeadWestvaco Corporation | 796.0 | Neenah Paper, Inc. | 12.1% | Thermal | 11.0% |
| Domtar Corporation | 5,429.0 | Domtar Corporation | 725.0 | PH Glatfelter Co. | 9.8% | International Paper Company | 6.9% |
| PH Glatfelter Co. | 1,591.9 | PH Glatfelter Co. | 152.4 | International Paper Company | 6.0% | MeadWestvaco Corporation | 2.7% |
| Verso Paper Corp. | 1,432.5 | Verso Paper Corp. | 131.0 | Verso Paper Corp. | 2.7% | Wausau Paper Corp. | -0.1% |
| Neenah Paper, Inc. | 823.8 | Neenah Paper, Inc. | 109.9 | MeadWestvaco Corporation | 0.3% | PH Glatfelter Co. | -1.7% |
| Wausau Paper Corp. | 794.0 | Carbonless | 54.3 | Domtar Corporation | 0.1% | Domtar Corporation | -2.3% |
| Thermal | 425.4 | Thermal | 49.0 | Carbonless | -4.3% | Carbonless | -10.2% |
| Carbonless | 378.2 | Wausau Paper Corp. | 43.6 | Wausau Paper Corp. | -7.3% | Verso Paper Corp. | -14.4% |
| **Guideline Company Median** | **$1,512.2** | **Guideline Company Median** | **$141.7** | **Guideline Company Median** | **4.4%** | **Guideline Company Median** | **1.3%** |

| Growth ( 3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (Projected EBITDA Growth) | | Profitability ( LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Thermal | 32.5% | Thermal | 47.0% | Wausau Paper Corp. | 77.9% | MeadWestvaco Corporation | 14.5% |
| Neenah Paper, Inc. | 17.5% | Neenah Paper, Inc. | 23.4% | International Paper Company | 34.6% | Carbonless | 14.4% |
| International Paper Company | 6.0% | PH Glatfelter Co. | 7.0% | PH Glatfelter Co. | 28.6% | Domtar Corporation | 13.4% |
| MeadWestvaco Corporation | 3.0% | Carbonless | 2.8% | Thermal | 21.9% | Neenah Paper, Inc. | 13.3% |
| Verso Paper Corp. | -1.6% | MeadWestvaco Corporation | -0.6% | Carbonless | 15.2% | International Paper Company | 12.5% |
| PH Glatfelter Co. | -9.9% | International Paper Company | -4.7% | MeadWestvaco Corporation | 13.7% | Thermal | 11.5% |
| Carbonless | -10.6% | Domtar Corporation | -27.0% | Neenah Paper, Inc. | 6.9% | PH Glatfelter Co. | 9.6% |
| Domtar Corporation | -12.5% | Verso Paper Corp. | -30.7% | Domtar Corporation | 2.4% | Verso Paper Corp. | 9.1% |
| Wausau Paper Corp. | -27.5% | Wausau Paper Corp. | -50.7% | Verso Paper Corp. | n/m | Wausau Paper Corp. | 5.5% |
| **Guideline Company Median** | **0.7%** | **Guideline Company Median** | **-2.7%** | **Guideline Company Median** | **21.9%** | **Guideline Company Median** | **12.0%** |

Source: Capital IQ, Inc. and Carbonless financials.





Valuation & Financial Opinions

# IV.  GUIDELINE COMPANY METHOD

**Conclusion - Carbonless**

- ■ We selected pricing multiples to apply to Carbonless based on the following:

    - ➢ Carbonless is smaller than all of the guideline companies in terms of revenue and EBITDA;

    - ➢ Carbonless operates in a declining market;

    - ➢ Historical and long-term projected EBITDA growth is negative for Carbonless;

    - ➢ Carbonless' projections were not materially different from the projections used as of the December 31, 2012 analysis; and

    - ➢ Carbonless' profitability is expected to increase between the LTM period and fiscal year 2013; there is some positive correlation between profitability and revenue pricing multiples.

- ■ Based on these and other factors, we selected both revenue and EBITDA multiples for Carbonless below the median of the range of the guideline companies for the LTM and NFY periods.





Valuation & Financial Opinions

# IV.  GUIDELINE COMPANY METHOD

**Guideline Company Method - Carbonless**

*In Thousands of U.S. Dollars*

| | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 58,885 | 3.9x | 8.8x | 6.5x | 6.8x | 4.0x | $ 236,000 |
| Revenue | 366,280 | 0.52x | 1.37x | 0.94x | 0.92x | 0.65x | 238,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 54,293 | 4.0x | 10.0x | 7.9x | 8.6x | 4.5x | $ 244,000 |
| Revenue | 378,224 | 0.53x | 1.42x | 0.94x | 0.91x | 0.60x | 227,000 |

| | |
| --- | --- |
| Indicated Enterprise Value, Minority Interest | 237,000 |
| Plus: Control Premium @ 10.0% | 24,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$  261,000** |




Valuation & Financial Opinions

# IV. GUIDELINE COMPANY METHOD

**Conclusion - Thermal**

- ■ We selected pricing multiples to apply to Thermal based on the following:

  - ➤ Thermal is smaller than all the guideline companies in terms of revenue and EBITDA, which suggests lower pricing multiples;

  - ➤ The Company's $125 million investment in the West Carrollton plant has benefitted the Company with regard to additional capacity and is expected to facilitate higher revenue growth and profitability in future years;

  - ➤ Thermal profitability as a percentage of revenue is below the median of the guideline companies;

  - ➤ Thermal's historical revenue and EBITDA growth rates are above the medians of the guideline companies; and

  - ➤ Thermal's future profitability and growth are expected to benefit from the supply agreement with Domtar, which is already reflected in Thermal's improved financial performance in fiscal 2012 as well as higher projections for Thermal relative to the December 31, 2012 analysis.

- ■ Based on these and other factors, we selected both revenue and EBITDA multiples for Thermal below the median of the range of the guideline companies for the LTM and NFY periods.



**Valuation & Financial Opinions**



# IV.  GUIDELINE COMPANY METHOD

**Guideline Company Method - Thermal**

*In Thousands of U.S. Dollars*

| | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| Next Fiscal Year: | | | | | | | |
| EBITDA | $ 59,689 | 3.9x | 8.8x | 6.5x | 6.8x | 5.0x | $ 298,000 |
| Revenue | 481,474 | 0.52x | 1.37x | 0.94x | 0.92x | 0.65x | 313,000 |
| Latest Twelve Months: | | | | | | | |
| EBITDA | 49,017 | 4.0x | 10.0x | 7.9x | 8.6x | 6.0x | 294,000 |
| Revenue | 425,361 | 0.53x | 1.42x | 0.94x | 0.91x | 0.70x | 298,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 302,000 |
| Plus: Control Premium @ 10.0% | 30,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$  332,000** |





Valuation & Financial Opinions

# Section V

## Discounted Cash Flow Method

APPVION

**Valuation & Financial Opinions**



# V.    DISCOUNTED CASH FLOW METHOD

The Discounted Cash Flow Method derives an estimate of value through the use of a market-derived discount rate to capitalize anticipated financial performance.

- The cash flows expected to be generated by the Company are discounted to their present value equivalent using a rate of return that reflects the relative risk of an investment in Carbonless, Thermal, and Encapsys as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt). The return for Carbonless and Thermal, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure.

- The following charts illustrate our concluded WACCs for Carbonless and Thermal:





Valuation & Financial Opinions

# V.  DISCOUNTED CASH FLOW METHOD

### Weighted Average Cost of Capital - Carbonless

**Required Return on Equity**

Capital Asset Pricing Model

| | | |
|---|---|---|
| Risk-Free Rate of Return [a] | | 3.2% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 0.0% |
| **Required Return on Equity - CAPM** | | **17.0%** |

**Cost of Debt**

Cost of Debt

| | | |
|---|---|---|
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |

**Weighted Average Cost of Capital**

| | | |
|---|---|---|
| Equity Allocation of Capital Structure | 60.0% | 10.2% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.5%** |

[a]  20-year U.S. Treasury bond yield as of the Valuation Date.

[b]  Morningstar, Inc., *Stocks, Bonds, Bills and Inflation: 2013 Yearbook,* (Chicago: Morningstar, Inc., 2013).

[c]  Based on estimated senior lending rates as of the Valuation Date.



- 37 -



Valuation & Financial Opinions

# V.    DISCOUNTED CASH FLOW METHOD

**Weighted Average Cost of Capital - Thermal**

| | | |
|---|---|---|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 3.2% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 3.0% |
| **Required Return on Equity - CAPM** | | **20.0%** |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 12.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **13.5%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.

[b] Morningstar, Inc., *Stocks, Bonds, Bills and Inflation: 2013 Yearbook,* (Chicago: Morningstar, Inc., 2013).

[c] Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# V.   DISCOUNTED CASH FLOW METHOD

## Conclusion – Carbonless and Thermal

### Discounted Cash Flow Method - Carbonless

| In Thousands of U.S. Dollars | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | Year 1 12/31/2013 | Year 2 12/31/2014 | Year 3 12/31/2015 | Year 4 12/31/2016 | Year 5 12/31/2017 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $      58,885 | $      52,611 | $      47,618 | $      44,502 | $      41,374 | |
| Depreciation and Amortization | (14,738) | (14,738) | (14,738) | (14,738) | (14,738) | |
| Income Taxes | (16,997) | (14,581) | (12,659) | (11,459) | (10,255) | |
| **Debt-Free Net Income** | **27,151** | **23,292** | **20,221** | **18,305** | **16,381** | |
| | | | | | | |
| Depreciation and Amortization | 14,738 | 14,738 | 14,738 | 14,738 | 14,738 | |
| Capital Expenditures | (3,800) | (4,800) | (5,000) | (5,000) | (5,000) | |
| Additional Working Capital | 3,700 | 3,600 | 3,400 | 3,200 | 3,000 | |
| **Distributable Cash Flows** | **41,789** | **36,830** | **33,359** | **31,243** | **29,119** | |
| | | | | | | |
| Partial Period Adjustment [a] | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | **20,894** | **36,830** | **33,359** | **31,243** | **29,119** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | |
| Discount Period [b] | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | **0.9732** | **0.8969** | **0.8044** | **0.7214** | **0.6470** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **20,333** | **33,031** | **26,833** | **22,538** | **18,840** | |

| **Enterprise Value** | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 122,000 | 2017 EBITDA | $      41,374 |
| Present Value of Terminal Enterprise Value | 139,000 | Terminal EBITDA Multiple | 5.5x |
| | | | |
| | | Terminal Enterprise Value | 227,556 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$      261,000** | Present Value Factor | 0.6127 |
| | | **Present Value of Terminal Enterprise Value** | **$      139,000** |

[a]  The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.
[b]  Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



# V. DISCOUNTED CASH FLOW METHOD

**Discounted Cash Flow Method - Thermal**

| *In Thousands of U.S. Dollars* | | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|---|
| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| | | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | Residual |
| **Distributable Cash Flows** | | | | | | | |
| EBITDA | $ | 59,689 | $ 71,909 | $ 77,090 | $ 85,201 | $ 95,555 | |
| Depreciation and Amortization | | (13,418) | (13,595) | (13,595) | (13,595) | (13,595) | |
| Income Taxes | | (17,814) | (22,451) | (24,445) | (27,568) | (31,555) | |
| **Debt-Free Net Income** | | **28,457** | **35,863** | **39,049** | **44,038** | **50,405** | |
| | | | | | | | |
| Depreciation and Amortization | | 13,418 | 13,595 | 13,595 | 13,595 | 13,595 | |
| Capital Expenditures | | (15,200) | (19,200) | (20,000) | (20,000) | (20,000) | |
| Additional Working Capital | | 4,800 | (2,500) | (2,600) | (2,700) | (2,800) | |
| **Distributable Cash Flows** | | **31,475** | **27,758** | **30,044** | **34,933** | **41,200** | |
| | | | | | | | |
| Partial Period Adjustment [a] | | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | | **15,737** | **27,758** | **30,044** | **34,933** | **41,200** | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | | |
| Weighted Average Cost of Capital | | 13.5% | 13.5% | 13.5% | 13.5% | 13.5% | |
| Discount Period [b] | | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | | **0.9688** | **0.8811** | **0.7763** | **0.6839** | **0.6026** | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | | **15,247** | **24,457** | **23,322** | **23,892** | **24,827** | |

| **Enterprise Value** | | | **Terminal Value** | |
|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 112,000 ◄ | | 2017 EBITDA | $ 95,555 |
| Present Value of Terminal Enterprise Value | 243,000 ◄ | | Terminal EBITDA Multiple | 4.5x |
| | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 355,000** | | **Terminal Enterprise Value** | **429,998** |
| | | | Present Value Factor | 0.5656 |
| | | | **Present Value of Terminal Enterprise Value** | **$ 243,000** |

[a] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# V.  DISCOUNTED CASH FLOW METHOD

- During fiscal years 2010 and 2011, the Company's Encapsys division generated increasing revenue and profitability.  However, Encapsys' revenue and profitability decreased in fiscal year 2012 due to delayed projects with P&G.  Encapsys' revenue and profitability improved in the first four months of fiscal 2013 relative to the prior year due to the increase in sales to P&G as well as operating efficiencies. Since Encapsys is still in the early stages of development, Company management expects the division to grow significantly in the future.  Accordingly, we estimated a value for Encapsys using the DCF Method.  However, the division has not yet established the level of financial performance that is contemplated in the financial projections and all of its revenue to date has been generated from one customer relationship.  Accordingly, an investor evaluating an ownership position in Encapsys would require a high rate of return as compensation for the incremental risk related to this investment.  Specifically, an investor would require a rate of return similar to those required by venture capital firms.  Due to the inherent risk in venture capital investments, venture capital investors require much higher rates of return than investors in companies that have an expected stable level of financial performance.  The following chart presents the approximate range of required rates of return for venture capital investments.  We selected a discount rate of 30.0% for Encapsys which is at the low end of the range of required rates of return for late-stage venture capital companies.  We increased the discount rate from 27.5% as of the December 31, 2012 analysis to 30.0% as of the current analysis to account for the increased risk of Encapsys' projections, consistent with the divisions' performance in the first six months of fiscal 2013, which included lower than expected revenue and profitability.

| Venture Capital Rates of Return | |
|---|---|
| Stage | Range of Required Rates of Return |
| Start-up | 50% to 75% |
| First-Stage | 40% to 60% |
| Second-Stage | 35% to 50% |
| Third-Stage | 30% to 50% |
| Fourth-Stage | 30% to 40% |





Valuation & Financial Opinions

# V. DISCOUNTED CASH FLOW METHOD

- The concluded Enterprise Value of $125.0 million for Encapsys results in an implied pricing multiple of 10.6x NFY EBITDA, which compares to an implied pricing multiple of 14.2x NFY EBITDA for Balchem Corp. ("Balchem"), a publicly traded company that provides microencapsulation products similar to Encapsys.

  - ➢ Balchem is a specialty chemical company that provides ingredients and products for the food, nutritional, feed, pharmaceutical, and medical sterilization industries. Balchem's Food, Pharma & Nutrition segment provides microencapsulation, granulation, and agglomeration solutions to a range of applications in food, pharmaceutical, and nutritional ingredients.



Valuation & Financial Opinions



# V.    DISCOUNTED CASH FLOW METHOD

### Discounted Cash Flow Method - Encapsys

| In Thousands of U.S. Dollars | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | Year 1 12/31/2013 | Year 2 12/31/2014 | Year 3 12/31/2015 | Year 4 12/31/2016 | Year 5 12/31/2017 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $    11,775 | $    24,208 | $    37,031 | $    49,399 | $    56,602 | |
| Depreciation and Amortization | (2,044) | (6,159) | (6,359) | (6,800) | (6,800) | |
| Income Taxes | (3,746) | (6,949) | (11,809) | (16,401) | (19,174) | |
| **Debt-Free Net Income** | **5,985** | **11,100** | **18,863** | **26,198** | **30,628** | |
| | | | | | | |
| Depreciation and Amortization | 2,044 | 6,159 | 6,359 | 6,800 | 6,800 | |
| Capital Expenditures | (8,000) | (13,000) | (17,000) | (17,000) | (17,000) | |
| Additional Working Capital | (200) | (400) | (600) | (700) | (800) | |
| **Distributable Cash Flows** | **(171)** | **3,859** | **7,622** | **15,298** | **19,628** | |
| | | | | | | |
| Partial Period Adjustment [a] | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | **(86)** | **3,859** | **7,622** | **15,298** | **19,628** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Discount Rate | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | |
| Discount Period [b] | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | **0.9365** | **0.7692** | **0.5917** | **0.4552** | **0.3501** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **(80)** | **2,969** | **4,510** | **6,963** | **6,872** | |

| Enterprise Value | | | Terminal Value | | |
|---|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 21,000 ← | | 2017 EBITDA | $ | 56,602 |
| Present Value of Terminal Enterprise Value | 104,000 | | Terminal EBITDA Multiple | | 6.0x |
| | | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$    125,000** | | **Terminal Enterprise Value** | | 339,612 |
| | | | Present Value Factor | | 0.3071 |
| | | | **Present Value of Terminal Enterprise Value** | **$** | **104,000** |

[a]  The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.
[b]  Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.





Valuation & Financial Opinions

Section VI

# Valuation Reconciliation and Conclusion

APPVION

Valuation & Financial Opinions



# VI.  VALUATION RECONCILIATION AND CONCLUSION

## Conclusion of Enterprise Value

- In our valuation analysis of the Company, we analyzed Carbonless and Thermal using the DCF Method and the Guideline Company Method.  We analyzed Encapsys using the DCF Method.

- Based upon our analysis, we believe that these methods provide an accurate indication of the Company's Enterprise Value. The values indicated by each method are presented in the following table:

### Conclusion of Value

| *In Thousands of U.S. Dollars* | | Indicated Value as of 6/30/2013 |
|---|---|---|
| **Carbonless** | | |
| Guideline Company Method | $ | 261,000 |
| Discounted Cash Flow Method | | 261,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **261,000** |
| **Thermal** | | |
| Guideline Company Method | $ | 332,000 |
| Discounted Cash Flow Method | | 355,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **344,000** |
| **Encapsys** | | |
| Discounted Cash Flow Method | $ | 125,000 |
| **Concluded Enterprise Value for Appleton (Rounded)** | **$** | **730,000** |





# VI.   VALUATION RECONCILIATION AND CONCLUSION

## Adjustments to Enterprise Value

- Enterprise Value incorporates the value of total invested capital, including the value of both debt and equity.  Several adjustments are necessary in order to derive the Fair Market Value of equity.

### Cash and Cash Equivalents

- Our valuation analysis was performed on a "net-of-cash" basis.  Therefore, in addition to the value associated with the cash flows generated by the Company, the value of its existing cash balance must be considered.  The Company's cash balance as of June 30, 2013 was $6.9 million.

### Interest-Bearing Debt

- The Company had $579.6 million of interest-bearing debt as of the Valuation Date, including $34.6 million drawn on the Company's revolver. Based on discussions with Company management and our review of the Company's cash flow statements, a portion of this revolver was used to support seasonal changes in working capital.  Company management expects to have minimal borrowings on its revolver in the second half of fiscal 2013.  For purposes of our analysis, and based on discussions with Company management, we adjusted the balance of the Company's revolver to equal $10.6 million as of the Valuation Date, which is consistent with the costs to finance share repurchases.

- The Company's interest-bearing debt includes $162.1 million of Second Lien Notes due in December 2015.  Pursuant to the Second Lien Notes Indenture,  in the event that (1) the ESOP ceases to beneficially own 100% of the common stock of Paperweight or Paperweight ceases to beneficially own 100% of the common stock of Appvion; (2) the ESOP ceases to have all voting power in respect of Paperweight or Paperweight ceases to have all voting power in respect of Appvion; (3) the ESOP transfers any of its economic interest in Paperweight or Paperweight transfers any of its economic interest in the Company; or (4) the ESOP is terminated; then, the Company will make a one-time payment in respect of the Second Lien Notes to the holders thereof in the form of an additional payment of Second Lien Notes in an amount equal to 11.25% of the principal amount of the Second Lien Notes then outstanding (the "Payment In Kind") or $18.45 million in aggregate.

- In addition, pursuant to the Second Lien Notes Indenture, in the event the Company redeems all of the Second Lien Notes outstanding, the Company must pay the holders of the Second Lien Notes an amount equal to the present value of the remaining scheduled payments of interest on the Second Lien Notes (the "Make-Whole Payment"), in addition to the principal amount outstanding, which could equal up $36 million of additional debt as of the Valuation Date. However, since the Company recently completed the refinancing of the Senior Secured Notes, Company management does not expect to refinance the Second Lien Notes in the near-term period, and believes that such refinancing would not occur until late fiscal year 2014 or early 2015, resulting in a Make-Whole Payment that is more similar to the Payment In Kind due to fewer interest payments remaining on the Second Lien Notes as the maturity date approaches.



Valuation & Financial Opinions



# VI.  VALUATION RECONCILIATION AND CONCLUSION

- Accordingly, in order to account for the possibility that the Company will have to pay the Payment In Kind or Make Whole Payment related to the Second Lien Notes, we included $18.45 million of Payment In Kind in the Company's interest-bearing debt as of the Valuation Date.

- Since Enterprise Value incorporates the value of total invested capital (i.e., both debt and equity), we subtracted the adjusted face value of the Company's debt of $574.1 million as of the Valuation Date to estimate the value of the equity.

## Adjustments to Equity Value

### Impact of Synthetic Equity Units, Restricted Stock Units, and Phantom Stock

- As of the Valuation Date, there were 2,080,900 LTIP units outstanding with a weighted average exercise price of $20.98 per share.  We subtracted the dilutive impact of the Company's outstanding in-the-money LTIP units.

- In addition, there were 207,925 RSUs and 73,638 shares of phantom stock as of the Valuation Date.  We subtracted the dilutive impact of the Company's RSUs and phantom stock.

### Discount for Limited Marketability

- In calculating the Company's equity value, it is appropriate to consider a discount for limited marketability.  All else being equal, an investment in which the owner is able to achieve liquidity (i.e., convert into cash) quickly is worth more than an investment that is not as liquid.  Thus, publicly traded companies, which are readily marketable, are worth more than privately held companies.  The diminution in value associated with this factor is referred to as a discount for limited marketability.

- Appvion is closely monitoring its repurchase obligation, and Company management believes that the Company may be obligated to repurchase 30.0% or more of the Company's common stock from ESOP participants over the next five years.  By itself, the impact of the repurchase obligation on the Company's current and future share price is immaterial since the dilution caused by the decrease in Company cash or increase in debt will be offset by the corresponding reduction in shares outstanding, and the Company is projected to have adequate cash flow to satisfy the share repurchases.  However, the repurchase obligation has contributed to the Company's decision to monetize certain assets and explore the possible sale of a part of or all of the Company's equity.  Based on our analysis and all of the information regarding the Company's business operations and strategic initiatives as of the Valuation Date, the impact of the Company's future repurchase obligation on the marketability of the common shares owned by the ESOP should not exceed 5.0% of the Company's equity value, or approximately $7.3 million in aggregate.



Valuation & Financial Opinions



# VI.  VALUATION RECONCILIATION AND CONCLUSION

## Indicated Market Value

### Conclusion of Value

| In Thousands of U.S. Dollars | | Indicated Value as of 6/30/2013 |
|---|---|---|
| Carbonless | $ | 261,000 |
| Thermal | | 344,000 |
| Encapsys | | 125,000 |
| **Concluded Enterprise Value** | $ | **730,000** |
| Add:  Cash and Cash Equivalents | | 6,863 |
| **Adjusted Enterprise Value** | $ | **737,000** |
| Less:  Interest-Bearing Debt | | (574,086) |
| **Marketable, Controlling-Interest Value of Equity** | $ | **163,000** |
| Less:  Discount for Limited Marketability | 5.0% | (8,200) |
| **Fair Market Value of Equity (Rounded)** | $ | **155,000** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (7,342) |
| **Fair Market Value of Equity (Rounded)** | $ | **148,000** |
| Divided by: Shares Outstanding | | 8,294.806 |
| **Fair Market Value of Equity per Share** | $ | **17.85** |

 APPVION

Valuation & Financial Opinions

 SRR
STOUT | RISIUS | ROSS

# VI.  VALUATION RECONCILIATION AND CONCLUSION

## Comparison to Prior Valuation

### Reconciliation of Value

*In Thousands of U.S. Dollars*

|  | | 12/31/2012 Valuation | | 6/30/2013 Valuation | Amount of Change | Percentage Change | | Per Share Change |
|---|---|---|---|---|---|---|---|---|
| Carbonless | $ | 259,000 | $ | 261,000 | 2,000 | **0.8%** | | |
| Thermal | | 324,000 | | 344,000 | 20,000 | **6.2%** | | |
| Encapsys | | 121,000 | | 125,000 | 4,000 | **3.3%** | | |
| **Concluded Enterprise Value** | $ | **704,000** | $ | **730,000** | $   **26,000** | 3.7% | $ | **2.98** |
| Add:  Cash and Cash Equivalents | | 1,851 | | 6,863 | 5,012 | | | |
| **Total Adjustments to Enterprise Value** | | **1,851** | | **6,863** | **5,012** | | | 0.57 |
| **Adjusted Enterprise Value** | $ | **706,000** | $ | **737,000** | $   **31,000** | 4.4% | $ | **3.55** |
| Less:  Interest-Bearing Debt | | (537,273) | | (574,086) | (36,813) | 6.9% | | (4.22) |
| **Marketable, Controlling-Interest Value of Equity** | $ | **169,000** | $ | **163,000** | $   **(6,000)** | -3.6% | $ | **(0.69)** |
| Less:  Discount for Limited Marketability | 5.0% | (8,500) | 5.0% | (8,000) | 500 | | | 0.06 |
| **Fair Market Value of Equity (Rounded)** | $ | **161,000** | $ | **155,000** | $   **(6,000)** | -3.7% | $ | **(0.69)** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (8,064) | | (7,342) | 722 | | | 0.08 |
| **Fair Market Value of Equity (Rounded)** | $ | **153,000** | $ | **148,000** | $   **(5,000)** | -3.3% | $ | **(0.57)** |
| Divided by:  Shares Outstanding | | 8,730.143 | | 8,294.806 | | | | 0.87 |
| **Indicated Market Value of Equity per Share** | $ | **17.55** | $ | **17.85** | | 1.7% | $ | **0.30** |



Valuation & Financial Opinions



# VI. VALUATION RECONCILIATION AND CONCLUSION



**Appvion Historical Stock Price: November 2001 - June 2013**



Valuation & Financial Opinions



# VI.  VALUATION RECONCILIATION AND CONCLUSION

## Summary of Change of Value

### Enterprise Value

- ■ The Enterprise Value for Carbonless increased slightly by 0.8% from $259 million as of December 31, 2012 to $261.0 million as of the Valuation Date. The relatively flat Enterprise Value for Carbonless is primarily due to consistent financial projections relative to the December 31, 2012 analysis as well as the increase in the Carbonless' earnings despite the decline in revenue.

- ■ The Enterprise Value for Thermal increased by 6.2% from $344.0 million as of December 31, 2012 to $344.0 million as of the Valuation Date. The increase in Thermal's Enterprise Value is primarily due to the increase in Thermal's financial projections, which reflect market share capture and the benefits of the Domtar supply agreement.

- ■ The Enterprise Value for Encapsys increased by 3.3% to $125.0 million as of June 30, 2013 from $121.0 million as of December 31, 2012.

### Debt

- ■ The Company's interest-bearing debt balance used for purposes of our analysis increased from $537.3 million as of December 31, 2012 to $574.1 as of the Valuation Date primarily due to the Refinancing.

### Shares Outstanding

- ■ The number of the Company's fully-diluted shares outstanding declined from 8,730,143 as of the December 31, 2012 analysis to 8,294,806 as of the current analysis as a result of employee redemptions due to terminations and retirement and diversification elections.



Valuation & Financial Opinions



# Section VII
## Opinion



Valuation & Financial Opinions



# VII. OPINION

## Opinion

- In accordance with the foregoing, it is our Opinion that the Fair Market Value of the common stock of Appvion held by the ESOP on a controlling interest, per share basis (8,294,806 common shares outstanding), taking into consideration the appropriate discount for limited marketability, as of June 30, 2013, is reasonably stated in the amount of:

<p align="center"><strong><em>$17.85</em></strong></p>

<p align="center">*    *    *    *    *    *    *</p>

## Assumptions and Limiting Conditions

- This Opinion is solely for the use and benefit of the Trustee, and any summary of or reference to the Opinion or any other reference to SRR by the Company will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

- Reference should be made to Appendix D, as well as our engagement letter dated June 20, 2013, for assumptions and limiting conditions that are applicable to our conclusions and our financial advisory role.



Valuation & Financial Opinions



# Appendix A

## Exhibits



**Valuation & Financial Opinions**



## A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| *In Thousands of U.S. Dollars* | | Indicated Value as of 6/30/2013 |
|---|---|---|
| Carbonless | $ | 261,000 |
| Thermal | | 344,000 |
| Encapsys | | 125,000 |
| **Concluded Enterprise Value** | $ | **730,000** |
| Add:  Cash and Cash Equivalents | | 6,863 |
| **Adjusted Enterprise Value** | $ | **737,000** |
| Less:  Interest-Bearing Debt | | (574,086) |
| **Marketable, Controlling-Interest Value of Equity** | $ | **163,000** |
| Less:  Discount for Limited Marketability        5.0% | | (8,200) |
| **Fair Market Value of Equity (Rounded)** | $ | **155,000** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (7,342) |
| **Fair Market Value of Equity (Rounded)** | $ | **148,000** |
| Divided by: Shares Outstanding | | 8,294.806 |
| **Fair Market Value of Equity per Share** | $ | **17.85** |



## A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| *In Thousands of U.S. Dollars* | Indicated Value as of 6/30/2013 | |
|---|---|---|
| **Carbonless** | | |
| Guideline Company Method | $ | 261,000 |
| Discounted Cash Flow Method | | 261,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **261,000** |
| **Thermal** | | |
| Guideline Company Method | $ | 332,000 |
| Discounted Cash Flow Method | | 355,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **344,000** |
| **Encapsys** | | |
| Discounted Cash Flow Method | $ | 125,000 |
| **Concluded Enterprise Value for Appleton (Rounded)** | **$** | **730,000** |




## A.  EXHIBITS

---

**Exhibit B - Guideline Company Method - Carbonless**

---

*In Thousands of U.S. Dollars*

| | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $    58,885 | 3.9x | 8.8x | 6.5x | 6.8x | 4.0x | $   236,000 |
| Revenue | 366,280 | 0.52x | 1.37x | 0.94x | 0.92x | 0.65x | 238,000 |
| | | | | | | | |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 54,293 | 4.0x | 10.0x | 7.9x | 8.6x | 4.5x | $   244,000 |
| Revenue | 378,224 | 0.53x | 1.42x | 0.94x | 0.91x | 0.60x | 227,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 237,000 |
| Plus: Control Premium @ 10.0% | 24,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$   261,000** |

---



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit B - Discounted Cash Flow Method - Carbonless**

*In Thousands of U.S. Dollars*

|  | Year 1 12/31/2013 | Year 2 12/31/2014 | Year 3 12/31/2015 | Year 4 12/31/2016 | Year 5 12/31/2017 | Residual |
|---|---|---|---|---|---|---|
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 58,885 | $ 52,611 | $ 47,618 | $ 44,502 | $ 41,374 | |
| Depreciation and Amortization | (14,738) | (14,738) | (14,738) | (14,738) | (14,738) | |
| Income Taxes | (16,997) | (14,581) | (12,659) | (11,459) | (10,255) | |
| **Debt-Free Net Income** | **27,151** | **23,292** | **20,221** | **18,305** | **16,381** | |
| Depreciation and Amortization | 14,738 | 14,738 | 14,738 | 14,738 | 14,738 | |
| Capital Expenditures | (3,800) | (4,800) | (5,000) | (5,000) | (5,000) | |
| Additional Working Capital | 3,700 | 3,600 | 3,400 | 3,200 | 3,000 | |
| **Distributable Cash Flows** | **41,789** | **36,830** | **33,359** | **31,243** | **29,119** | |
| Partial Period Adjustment [a] | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | **20,894** | **36,830** | **33,359** | **31,243** | **29,119** | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | |
| Discount Period [b] | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | **0.9732** | **0.8969** | **0.8044** | **0.7214** | **0.6470** | |
| **Present Value of Distributable Cash Flows** | **20,333** | **33,031** | **26,833** | **22,538** | **18,840** | |

**Enterprise Value**

| | | |
|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 122,000 | |
| Present Value of Terminal Enterprise Value | 139,000 | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 261,000** | |

**Terminal Value**

| | |
|---|---|
| 2017 EBITDA | $ 41,374 |
| Terminal EBITDA Multiple | 5.5x |
| Terminal Enterprise Value | 227,556 |
| Present Value Factor | 0.6127 |
| **Present Value of Terminal Enterprise Value** | **$ 139,000** |

[a] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



# A. EXHIBITS

**Exhibit B - Reported Income Statements - Carbonless**

| *In Thousands of U.S. Dollars* | | | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | For the Fiscal Year Ended | | | | | | | | | | | |
| | 12/31/2008 | % | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 4/30/2013 | % |
| **Net Sales** | $ 567,053 | 100.0% | $ 464,808 | 100.0% | $ 479,058 | 100.0% | $ 453,007 | 100.0% | $ 406,845 | 100.0% | $ 378,224 | 100.0% |
| *Growth Rate* | *n/a* | | *-18.0%* | | *3.1%* | | *-5.4%* | | *-10.2%* | | *-7.0%* | |
| Cost of Sales | 432,530 | 76.3% | 334,579 | 72.0% | 366,114 | 76.4% | 352,603 | 77.8% | 318,368 | 78.3% | 289,145 | 76.4% |
| Gross Profit | 134,523 | 23.7% | 130,229 | 28.0% | 112,944 | 23.6% | 100,404 | 22.2% | 88,477 | 21.7% | 89,079 | 23.6% |
| Operating Expenses | 65,742 | | 45,608 | | 54,244 | | 49,136 | | 53,589 | | 51,068 | |
| Depreciation | 37,352 | | 33,379 | | 27,579 | | 26,261 | | 21,550 | | 19,374 | |
| S,G&A Expenses | 103,094 | 18.2% | 78,987 | 17.0% | 81,823 | 17.1% | 75,397 | 16.6% | 75,139 | 18.5% | 70,442 | 18.6% |
| **Operating Income** | **31,429** | 5.5% | **51,242** | 11.0% | **31,121** | 6.5% | **25,007** | 5.5% | **13,338** | 3.3% | **18,637** | 4.9% |
| Additional Adjustments [a] | 1,972 | 0.3% | (13,052) | -2.8% | 687 | 0.1% | (1,537) | -0.3% | 16,214 | 4.0% | 16,282 | 4.3% |
| **Total Adjustments** | **1,972** | 0.3% | **(13,052)** | -2.8% | **687** | 0.1% | **(1,537)** | -0.3% | **16,214** | 4.0% | **16,282** | 4.3% |
| **EBIT** | $ 33,401 | 5.9% | $ 38,190 | 8.2% | $ 31,808 | 6.6% | $ 23,470 | 5.2% | $ 29,552 | 7.3% | $ 34,919 | 9.2% |
| **EBITDA** | $ 70,753 | 12.5% | $ 71,569 | 15.4% | $ 59,387 | 12.4% | $ 49,731 | 11.0% | $ 51,102 | 12.6% | $ 54,293 | 14.4% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with Company management.  Also includes unallocated overhead expense in fiscal years 2008 through the LTM period.

Source:  Management prepared schedules and discussions with Company management.

*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# A. EXHIBITS

## Exhibit B - Projected Income Statements - Carbonless

| *In Thousands of U.S. Dollars* | For the Fiscal Year Ending | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2013 | % | 12/31/2014 | % | 12/31/2015 | % | 12/31/2016 | % | 12/31/2017 | % |
| **Net Sales [a]** | **$ 366,280** | 100.0% | **$ 363,057** | 100.0% | **$ 340,237** | 100.0% | **$ 319,482** | 100.0% | **$ 300,736** | 100.0% |
| *Growth Rate* | *677.4%* | | *-0.9%* | | *-6.3%* | | *-6.1%* | | *-5.9%* | |
| Cost of Sales and Operating Costs [b] | 307,395 | | 310,446 | | 292,619 | | 274,980 | | 259,362 | |
| Depreciation and Amortization | 14,738 | | 14,738 | | 14,738 | | 14,738 | | 14,738 | |
| Total S,G&A Expenses | 322,133 | 87.9% | 325,184 | 89.6% | 307,357 | 90.3% | 289,718 | 90.7% | 274,100 | 91.1% |
| **Operating Income** | **44,147** | 12.1% | **37,873** | 10.4% | **32,880** | 9.7% | **29,764** | 9.3% | **26,636** | 8.9% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | **$ 44,147** | 12.1% | **$ 37,873** | 10.4% | **$ 32,880** | 9.7% | **$ 29,764** | 9.3% | **$ 26,636** | 8.9% |
| **EBITDA** | **$ 58,885** | 16.1% | **$ 52,611** | 14.5% | **$ 47,618** | 14.0% | **$ 44,502** | 13.9% | **$ 41,374** | 13.8% |

[a] Includes the Company's Security and Carbonless divisions.
[b] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.

Source: Management prepared projections




## A.  EXHIBITS

### Exhibit B - Weighted Average Cost of Capital - Carbonless

#### Required Return on Equity

Capital Asset Pricing Model

| | | |
|---|---|---|
| Risk-Free Rate of Return [a] | | 3.2% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 0.0% |
| **Required Return on Equity - CAPM** | | **17.0%** |

#### Cost of Debt

Cost of Debt

| | | |
|---|---|---|
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |

#### Weighted Average Cost of Capital

| | | |
|---|---|---|
| Equity Allocation of Capital Structure | 60.0% | 10.2% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.5%** |

[a]  20-year U.S. Treasury bond yield as of the Valuation Date.

[b]  Morningstar, Inc., *Stocks, Bonds, Bills and Inflation: 2013 Yearbook,* (Chicago: Morningstar, Inc., 2013).

[c]  Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit C - Guideline Company Method - Thermal**

*In Thousands of U.S. Dollars*

|  | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
|  |  | Low | High | Mean | Median |  |  |
| **Next Fiscal Year:** |  |  |  |  |  |  |  |
| EBITDA | $ 59,689 | 3.9x | 8.8x | 6.5x | 6.8x | 5.0x | $ 298,000 |
| Revenue | 481,474 | 0.52x | 1.37x | 0.94x | 0.92x | 0.65x | 313,000 |
| **Latest Twelve Months:** |  |  |  |  |  |  |  |
| EBITDA | 49,017 | 4.0x | 10.0x | 7.9x | 8.6x | 6.0x | 294,000 |
| Revenue | 425,361 | 0.53x | 1.42x | 0.94x | 0.91x | 0.70x | 298,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 302,000 |
| Plus: Control Premium @ 10.0% | 30,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 332,000** |



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit C - Discounted Cash Flow Method - Thermal**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | Year 1 12/31/2013 | Year 2 12/31/2014 | Year 3 12/31/2015 | Year 4 12/31/2016 | Year 5 12/31/2017 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 59,689 | $ 71,909 | $ 77,090 | $ 85,201 | $ 95,555 | |
| Depreciation and Amortization | (13,418) | (13,595) | (13,595) | (13,595) | (13,595) | |
| Income Taxes | (17,814) | (22,451) | (24,445) | (27,568) | (31,555) | |
| **Debt-Free Net Income** | **28,457** | **35,863** | **39,049** | **44,038** | **50,405** | |
| | | | | | | |
| Depreciation and Amortization | 13,418 | 13,595 | 13,595 | 13,595 | 13,595 | |
| Capital Expenditures | (15,200) | (19,200) | (20,000) | (20,000) | (20,000) | |
| Additional Working Capital | 4,800 | (2,500) | (2,600) | (2,700) | (2,800) | |
| **Distributable Cash Flows** | **31,475** | **27,758** | **30,044** | **34,933** | **41,200** | |
| | | | | | | |
| Partial Period Adjustment [a] | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | **15,737** | **27,758** | **30,044** | **34,933** | **41,200** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 13.5% | 13.5% | 13.5% | 13.5% | 13.5% | |
| Discount Period [b] | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | **0.9688** | **0.8811** | **0.7763** | **0.6839** | **0.6026** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **15,247** | **24,457** | **23,322** | **23,892** | **24,827** | |

| **Enterprise Value** | | | **Terminal Value** | |
|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 112,000 | | 2017 EBITDA | $ 95,555 |
| Present Value of Terminal Enterprise Value | 243,000 | | Terminal EBITDA Multiple | 4.5x |
| | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 355,000** | | **Terminal Enterprise Value** | **429,998** |
| | | | Present Value Factor | 0.5656 |
| | | | **Present Value of Terminal Enterprise Value** | **$ 243,000** |

[a] The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.
[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit C - Reported Income Statements - Thermal**

| *In Thousands of U.S. Dollars* | For the Fiscal Year Ended | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2008 | % | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 4/30/2013 | % |
| **Net Sales** | $ 280,297 | 100.0% | $ 281,229 | 100.0% | $ 341,776 | 100.0% | $ 370,832 | 100.0% | $ 411,699 | 100.0% | $ 425,361 | 100.0% |
| *Growth Rate* | *n/a* | | *0.3%* | | *21.5%* | | *8.5%* | | *11.0%* | | *3.3%* | |
| Cost of Sales | 254,120 | 90.7% | 261,632 | 93.0% | 307,211 | 89.9% | 320,037 | 86.3% | 356,943 | 86.7% | 369,509 | 86.9% |
| Gross Profit | 26,177 | 9.3% | 19,597 | 7.0% | 34,565 | 10.1% | 50,795 | 13.7% | 54,756 | 13.3% | 55,852 | 13.1% |
| Operating Expenses | 24,013 | | 10,096 | | 16,742 | | 16,844 | | 27,014 | | 28,811 | |
| Depreciation | 14,146 | | 20,042 | | 19,702 | | 18,454 | | 16,405 | | 15,082 | |
| S,G&A Expenses | 38,159 | 13.6% | 30,138 | 10.7% | 36,444 | 10.7% | 35,298 | 9.5% | 43,419 | 10.5% | 43,893 | 10.3% |
| **Operating Income** | (11,982) | -4.3% | (10,541) | -3.7% | (1,879) | -0.5% | 15,497 | 4.2% | 11,337 | 2.8% | 11,959 | 2.8% |
| Additional Adjustments [a] | 18,891 | 6.7% | 11,535 | 4.1% | 2,209 | 0.6% | (645) | -0.2% | 21,226 | 5.2% | 21,976 | 5.2% |
| **Total Adjustments** | 18,891 | 6.7% | 11,535 | 4.1% | 2,209 | 0.6% | (645) | -0.2% | 21,226 | 5.2% | 21,976 | 5.2% |
| **EBIT** | $ 6,909 | 2.5% | $ 994 | 0.4% | $ 330 | 0.1% | $ 14,852 | 4.0% | $ 32,563 | 7.9% | $ 33,935 | 8.0% |
| **EBITDA** | $ 21,055 | 7.5% | $ 21,036 | 7.5% | $ 20,032 | 5.9% | $ 33,306 | 9.0% | $ 48,968 | 11.9% | $ 49,017 | 11.5% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with
    Company management.  Includes estimated unallocated overhead expense for fiscal year 2011 through the LTM period.

Source:  Management prepared schedules and discussions with Company management.

*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit C - Projected Income Statements - Thermal**

| In Thousands of U.S. Dollars | | | | | For the Fiscal Year Ending | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2013 | % | 12/31/2014 | % | 12/31/2015 | % | 12/31/2016 | % | 12/31/2017 | % |
| **Net Sales** | $ 481,474 | 100.0% | $ 500,616 | 100.0% | $ 521,063 | 100.0% | $ 540,015 | 100.0% | $ 564,910 | 100.0% |
| *Growth Rate* | *677.4%* | | *4.0%* | | *4.1%* | | *3.6%* | | *4.6%* | |
| Cost of Sales and Operating Costs [a] | 421,785 | | 428,707 | | 443,973 | | 454,814 | | 469,355 | |
| Depreciation and Amortization | 13,418 | | 13,595 | | 13,595 | | 13,595 | | 13,595 | |
| Total S,G&A Expenses | 435,203 | 90.4% | 442,302 | 88.4% | 457,568 | 87.8% | 468,409 | 86.7% | 482,950 | 85.5% |
| **Operating Income** | **46,271** | 9.6% | **58,314** | 11.6% | **63,495** | 12.2% | **71,606** | 13.3% | **81,960** | 14.5% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ **46,271** | 9.6% | $ **58,314** | 11.6% | $ **63,495** | 12.2% | $ **71,606** | 13.3% | $ **81,960** | 14.5% |
| **EBITDA** | $ **59,689** | 12.4% | $ **71,909** | 14.4% | $ **77,090** | 14.8% | $ **85,201** | 15.8% | $ **95,555** | 16.9% |

[a] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.

Source: Management prepared projections



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit C - Weighted Average Cost of Capital - Thermal**

| **Required Return on Equity** | | |
|---|---|---|
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 3.2% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 3.0% |
| **Required Return on Equity - CAPM** | | **20.0%** |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [c] | | 6.0% |
| Less: Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 12.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **13.5%** |

[a]  20-year U.S. Treasury bond yield as of the Valuation Date.

[b]  Morningstar, Inc., *Stocks, Bonds, Bills and Inflation: 2013 Yearbook,* (Chicago: Morningstar, Inc., 2013).

[c]  Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



## A.  EXHIBITS

### Exhibit D - Discounted Cash Flow Method - Encapsys

In Thousands of U.S. Dollars

| | Year 1 12/31/2013 | Year 2 12/31/2014 | Year 3 12/31/2015 | Year 4 12/31/2016 | Year 5 12/31/2017 | Residual |
|---|---|---|---|---|---|---|
| | For the Fiscal Year Ending | | | | | |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $  11,775 | $  24,208 | $  37,031 | $  49,399 | $  56,602 | |
| Depreciation and Amortization | (2,044) | (6,159) | (6,359) | (6,800) | (6,800) | |
| Income Taxes | (3,746) | (6,949) | (11,809) | (16,401) | (19,174) | |
| **Debt-Free Net Income** | **5,985** | **11,100** | **18,863** | **26,198** | **30,628** | |
| | | | | | | |
| Depreciation and Amortization | 2,044 | 6,159 | 6,359 | 6,800 | 6,800 | |
| Capital Expenditures | (8,000) | (13,000) | (17,000) | (17,000) | (17,000) | |
| Additional Working Capital | (200) | (400) | (600) | (700) | (800) | |
| **Distributable Cash Flows** | **(171)** | **3,859** | **7,622** | **15,298** | **19,628** | |
| | | | | | | |
| Partial Period Adjustment [a] | 0.50 | 1.00 | 1.00 | 1.00 | 1.00 | |
| **Distributable Cash Flows Allocated to Projection Period** | **(86)** | **3,859** | **7,622** | **15,298** | **19,628** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Discount Rate | 30.0% | 30.0% | 30.0% | 30.0% | 30.0% | |
| Discount Period [b | 0.25 | 1.00 | 2.00 | 3.00 | 4.00 | |
| **Present Value Factor** | **0.9365** | **0.7692** | **0.5917** | **0.4552** | **0.3501** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **(80)** | **2,969** | **4,510** | **6,963** | **6,872** | |

| **Enterprise Value** | | | **Terminal Value** | |
|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2017) | 21,000 | | 2017 EBITDA | $  56,602 |
| Present Value of Terminal Enterprise Value | 104,000 | | Terminal EBITDA Multiple | 6.0x |
| | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$  125,000** | | **Terminal Enterprise Value** | 339,612 |
| | | | Present Value Factor | 0.3071 |
| | | | **Present Value of Terminal Enterprise Value** | **$  104,000** |

[a]  The partial period adjustment represents the percentage of distributable cash flows for the full year that is expected to be received between the Valuation Date and the end of the first projection year.
 [b  Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit D - Historical Income Statements - Encapsys**

| *In Thousands of U.S. Dollars* | For the Fiscal Year Ended | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 4/30/2013 | % |
| **Net Sales** | $ **29,050** | 100.0% | $ **33,490** | 100.0% | $ **31,212** | 100.0% | $ **32,493** | 100.0% |
| Cost of Sales and Operating Costs | 20,270 | | 21,572 | | 20,447 | | 20,795 | |
| Depreciation and Amortization | 2,254 | | 3,751 | | 2,816 | | 2,067 | |
| Total Expenses | 22,524 | 77.5% | 25,323 | 75.6% | 23,263 | 74.5% | 22,862 | 70.4% |
| **Operating Income** | $ **6,526** | 22.5% | $ **8,167** | 24.4% | $ **7,949** | 25.5% | $ **9,631** | 29.6% |
| Adjustments | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ **6,526** | 22.5% | $ **8,167** | 24.4% | $ **7,949** | 25.5% | $ **9,631** | 29.6% |
| **EBITDA** | $ **8,781** | 30.2% | $ **11,918** | 35.6% | $ **10,765** | 34.5% | $ **11,698** | 36.0% |

- 68 -

APPVION    Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 814 of 1527    Document 27-2    Valuation & Financial Opinions    SRR  STOUT | RISIUS | ROSS

## A.  EXHIBITS

**Exhibit D - Projected Income Statements - Encapsys**

| *In Thousands of U.S. Dollars* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | *For the Fiscal Year Ending* | | | | | |
| | 12/31/2013 | % | | 12/31/2014 | % | | 12/31/2015 | % | | 12/31/2016 | % | | 12/31/2017 | % |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales** | $ 34,208 | 100.0% | $ 70,861 | 100.0% | $ 110,840 | 100.0% | $ 146,100 | 100.0% | $ 163,276 | 100.0% |
| *Growth Rate* | *677.4%* | | *107.1%* | | *56.4%* | | *31.8%* | | *11.8%* | |
| | | | | | | | | | | |
| Cost of Sales and Operating Costs | 22,433 | | 46,653 | | 73,809 | | 96,701 | | 106,674 | |
| Depreciation and Amortization | 2,044 | | 6,159 | | 6,359 | | 6,800 | | 6,800 | |
| Total Expenses | 24,477 | 71.6% | 52,812 | 74.5% | 80,168 | 72.3% | 103,501 | 70.8% | 113,474 | 69.5% |
| | | | | | | | | | | |
| **Operating Income** | $ 9,731 | 28.4% | $ 18,049 | 25.5% | $ 30,672 | 27.7% | $ 42,599 | 29.2% | $ 49,802 | 30.5% |
| | | | | | | | | | | |
| Adjustments | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| | | | | | | | | | | |
| **EBIT** | $ 9,731 | 28.4% | $ 18,049 | 25.5% | $ 30,672 | 27.7% | $ 42,599 | 29.2% | $ 49,802 | 30.5% |
| **EBITDA** | $ 11,775 | 34.4% | $ 24,208 | 34.2% | $ 37,031 | 33.4% | $ 49,399 | 33.8% | $ 56,602 | 34.7% |

Source:  Management prepared projections



## A.  EXHIBITS

### Exhibit E - Reported Balance Sheets

| In Thousands of U.S. Dollars | As of | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 4/30/2013 |
| Cash and Cash Equivalents | $ 4,180 | $ 9,963 | $ 3,772 | $ 7,241 | $ 1,851 | $ 2,280 |
| Accounts Receivable | 92,029 | 90,584 | 93,374 | 90,339 | 92,680 | 93,201 |
| Environmental Indemnification Receivable | 37,700 | 47,100 | 20,580 | 46,000 | 65,000 | 62,401 |
| Inventories | 130,053 | 120,942 | 110,032 | 103,877 | 94,349 | 101,505 |
| Other Current Assets | 8,539 | 8,659 | 21,412 | 8,724 | 5,620 | 4,609 |
| **Total Current Assets** | **272,501** | **277,248** | **249,170** | **256,181** | **259,500** | **263,996** |
| **Net Property and Equipment** | **445,671** | **405,598** | **354,601** | **324,665** | **243,265** | **240,132** |
| Goodwill and Other Intangible Assets | 83,540 | 70,640 | 48,449 | 46,125 | 43,839 | 43,092 |
| Environmental Indemnification Receivable | 114,300 | 28,600 | 0 | 0 | 0 | 0 |
| Other Assets | 13,909 | 15,894 | 24,779 | 16,297 | 14,486 | 14,347 |
| **Total Other Assets** | **211,749** | **115,134** | **73,228** | **62,422** | **58,325** | **57,439** |
| **Total Assets** | **$ 929,921** | **$ 797,980** | **$ 676,999** | **$ 643,268** | **$ 561,090** | **$ 561,567** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.  April 30, 2013 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Reported Balance Sheets**

*In Thousands of U.S. Dollars*

| | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 4/30/2013 |
|---|---|---|---|---|---|---|
| | | | As of | | | |
| Current Portion of Long-Term Debt | $      5,455 | $      5,955 | $    18,694 | $      1,256 | $      3,975 | n/a |
| Accounts Payable | 62,538 | 60,020 | 48,651 | 51,766 | 68,600 | 66,822 |
| Restructuring Reserve | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Accrued Liabilities | 87,770 | 97,471 | 66,082 | 94,055 | 122,102 | 112,261 |
| **Total Current Liabilities** | **155,763** | **163,446** | **133,427** | **147,077** | **194,677** | **179,083** |
| | | | | | | |
| Long-Term Debt | 598,598 | 544,113 | 540,131 | 510,533 | 511,624 | 522,676 |
| Capital Lease Obligation | 0 | 0 | 0 | 0 | 0 | 0 |
| Fox River (AWA) Liability | 114,300 | 28,600 | 0 | 0 | 0 | 0 |
| Other Long-Term Liabilities | 168,205 | 161,215 | 139,432 | 174,245 | 207,686 | 207,261 |
| **Total Long-Term Liabilities** | **881,103** | **733,928** | **679,563** | **684,778** | **719,310** | **729,937** |
| | | | | | | |
| **Total Liabilities** | **1,036,866** | **897,374** | **812,990** | **831,855** | **913,987** | **909,020** |
| | | | | | | |
| Common Stock & Paid-In Capital | 147,874 | 122,087 | 110,045 | 97,615 | 81,704 | 80,458 |
| Retained Earnings | (159,650) | (121,764) | (153,765) | (299,226) | (439,923) | (433,762) |
| Accumulated Other Comprehensive Loss | (95,169) | (99,717) | (92,271) | 13,024 | 5,322 | 5,851 |
| **Total Stockholders' Equity** | **(106,945)** | **(99,394)** | **(135,991)** | **(188,587)** | **(352,897)** | **(347,453)** |
| | | | | | | |
| **Total Liabilities & Stockholders' Equity** | **$    929,921** | **$    797,980** | **$    676,999** | **$    643,268** | **$    561,090** | **$    561,567** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.  April 30, 2013 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.    EXHIBITS

**Exhibit E - Reported Income Statements [a]**

| In Thousands of U.S. Dollars | | | | | | | | | | | | | | 12 Months Ended 4/30/2013 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/31/2008 | % | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | | | | |
| **Net Sales** | $ | 964,577 | 100.0% | $ | 862,140 | 100.0% | $ | 849,884 | 100.0% | $ | 857,329 | 100.0% | $ | 849,756 | 100.0% |
| *Growth Rate* | | *n/a* | | *-10.6%* | | *-1.4%* | | *0.9%* | | *-0.9%* | | | | | |
| Cost of Sales | | 780,440 | 80.9% | 684,261 | 79.4% | 682,228 | 80.3% | 718,710 | 83.8% | 758,875 | 89.3% | | | | |
| Gross Profit | | 184,137 | 19.1% | 177,879 | 20.6% | 167,656 | 19.7% | 138,619 | 16.2% | 90,881 | 10.7% | | | | |
| S,G&A Expenses | | 209,253 | 21.7% | 145,904 | 16.9% | 130,207 | 15.3% | 148,050 | 17.3% | 179,362 | 21.1% | | | | |
| **Operating Income** | | **(25,116)** | -2.6% | **31,975** | 3.7% | **37,449** | 4.4% | **(9,431)** | -1.1% | **(88,481)** | -10.4% | | | | |
| Other Income (Expense) | | 30,420 | 3.2% | 44,782 | 5.2% | (6,254) | -0.7% | 23,686 | 2.8% | 271 | 0.0% | | | | |
| **EBIT** | | **5,304** | 0.5% | **76,757** | 8.9% | **31,195** | 3.7% | **14,255** | 1.7% | **(88,210)** | -10.4% | | | | |
| Interest Expense | | (54,267) | -5.6% | (51,291) | -5.9% | (65,772) | -7.7% | (61,330) | -7.2% | (59,654) | -7.0% | | | | |
| **Earnings Before Taxes** | | **(48,963)** | -5.1% | **25,466** | 3.0% | **(34,577)** | -4.1% | **(47,075)** | -5.5% | **(147,864)** | -17.4% | | | | |
| Income Taxes | | 268 | 0.0% | (334) | 0.0% | (176) | 0.0% | (577) | -0.1% | (587) | -0.1% | | | | |
| **Net Income from Continuing Operations** | | **(48,695)** | | **25,132** | | **(34,753)** | -4.1% | **(47,652)** | -5.6% | **(148,451)** | -17.5% | | | | |
| (Loss) Income from Discontinued Operations | | (48,687) | | 0 | | 3,499 | 0.4% | 0 | 0.0% | 0 | 0.0% | | | | |
| **Net (Loss) Income** | $ | **(97,382)** | -10.1% | $ | **25,132** | 2.9% | $ | **(31,254)** | -3.7% | $ | **(47,652)** | -5.6% | $ | **(148,451)** | -17.5% |

For the row "12 Months Ended 4/30/2013" values:

| 4/30/2013 | % |
|---|---|
| $ 836,078 | 100.0% |
| *-1.6%* | |
| 742,222 | 88.8% |
| 93,856 | 11.2% |
| 95,638 | 11.4% |
| (1,782) | -0.2% |
| (362) | 0.0% |
| (2,144) | -0.3% |
| (59,531) | -7.1% |
| (61,675) | -7.4% |
| (589) | -0.1% |
| (62,264) | -7.4% |
| 0 | 0.0% |
| $ (62,264) | -7.4% |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.  April 30, 2013 financial results based on information provided by Company management.
[a] Fiscal years 2008 and 2009 include Performance Packaging.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



## A.  EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

| *In Thousands of U.S. Dollars* | For the Fiscal Year Ended | | | | | Four Months Ended 4/30/2013 |
|---|---|---|---|---|---|---|
| | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | |
| Net Income | $ (97,382) | $ 25,132 | $ (31,254) | $ (47,652) | $ (148,451) | $ 4,919 |
| Depreciation and Amortization | 54,995 | 58,279 | 48,578 | 46,292 | 98,010 | 9,060 |
| Amortization of Intangible Assets | 4,401 | 3,755 | 2,908 | 2,324 | 2,286 | 747 |
| Impaired Inventory Valuation | 0 | 0 | 0 | 0 | 11,061 | 0 |
| Impairment of Continuing Operations Goodwill | 39,645 | 6,341 | 0 | 0 | 0 | 0 |
| Impairment of Discontinued Operations Goodwill and Long Lived Assets | 43,745 | 0 | 0 | 0 | 0 | 0 |
| Amortization of Financing Fees | 2,199 | 3,115 | 4,080 | 3,373 | 2,645 | 954 |
| Amortization of Bond Discount | 0 | 0 | 745 | 958 | 1,066 | 378 |
| Employer 401(k) Noncash Matching Contributions | 5,807 | 4,006 | 3,209 | 2,738 | 3,038 | 985 |
| Foreign Exchange (Gain) Loss | 4,922 | (958) | 559 | 1,143 | (227) | 475 |
| Net Loss (Gain) from Involuntary Conversion / Disposal of Equipment | 0 | 0 | (638) | (1,374) | (2,382) | 0 |
| Loss on Disposals of Equipment | 1,450 | 574 | 419 | 209 | 1,448 | 16 |
| Gain on Sale of Business | 0 | 0 | (2,560) | 0 | 0 | 0 |
| Accretion of Deferred Payment and Capital Lease Obligations | 111 | (687) | 33 | 7 | 10 | 3 |
| Recognition of Noncash Expense Associated with Interest Rate Swaps | 9,446 | 0 | 0 | 0 | 0 | 0 |
| Accretion of Environmental Liability | 0 | 0 | 0 | 0 | 0 | 0 |
| Debt Extinguishment Expenses | (11,598) | (42,602) | 7,010 | 0 | 0 | 0 |
| Fox River Insurance Recovery | 0 | 0 | (9,053) | (145) | 0 | 0 |
| Discount on Repayment of Deferred Payment Obligation | 0 | 0 | 0 | 0 | 0 | 0 |
| (Increase) Decrease in Accounts Receivable | 30,493 | (735) | (14,540) | 2,004 | (2,857) | (784) |
| (Increase) Decrease in Inventories | (10,792) | 3,767 | (5,872) | 6,107 | (962) | (7,186) |
| (Increase) Decrease in Other Current Assets | 1,046 | 376 | (6,739) | 14,484 | 3,105 | 1,010 |
| Increase (Decrease) in Accounts Payable and Other Accrued Liabilities | (44,965) | 14,488 | (9,273) | (569) | 27,159 | (117) |
| Increase (Decrease) in Restructuring Reserve | 1,740 | (2,138) | 0 | 0 | 0 | 0 |
| Increase (Decrease) in Accrued Pension | (5,524) | (5,484) | (11,862) | 37,149 | 12,322 | 1,755 |
| Increase (Decrease) in Fox River Liabilities | (25,000) | 0 | 0 | 0 | 0 | 0 |
| Increase (Decrease) in Other, net | (2,975) | (6,001) | (5,735) | 1,663 | 16,034 | (8,766) |
| **Net Cash Provided by (Used in) Operating Activities** | **1,764** | **61,228** | **(29,985)** | **68,711** | **23,305** | **3,449** |
| Proceeds from Sale of Equipment | 159 | 27 | 208 | 6 | 22 | 0 |
| Net Change in Cash Due to Sale of Bemrose Group Limited / C&H Packaging, Inc. | (999) | 16,875 | 0 | 0 | 0 | 0 |
| Net Change in Cash Due to Sale of Performance Packaging | 0 | 0 | 56,000 | 2,000 | 0 | 0 |
| Insurance Proceeds from Involuntary Conversion | 0 | 0 | 1,029 | 1,374 | 0 | 0 |
| Restricted Cash for Mill Expansion | 0 | 0 | 0 | 0 | 0 | 0 |
| Purchases of Property, Plant, and Equipment | (99,534) | (24,556) | (17,839) | (15,847) | (17,143) | (5,943) |
| **Net Cash Provided by (Used in) Investing Activities** | **(100,374)** | **(7,654)** | **39,398** | **(12,467)** | **(17,121)** | **(5,943)** |

Source: Fiscal year end financial results from historical form 10-K filings with the SEC. April 30, 2013 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | Four Months Ended 4/30/2013 |
|---|---|---|---|---|---|---|
| | 12/31/2008 | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | |
| **Net Cash Provided by (Used in) Operating Activities** | $ 1,764 | $ 61,228 | $ (29,985) | $ 68,711 | $ 23,305 | $ 3,449 |
| Proceeds from Sale of Equipment | 159 | 27 | 208 | 6 | 22 | 0 |
| Net Change in Cash Due to Sale of Bemrose Group Limited / C&H Packaging, Inc. | (999) | 16,875 | 0 | 0 | 0 | 0 |
| Net Change in Cash Due to Sale of Performance Packaging | 0 | 0 | 56,000 | 2,000 | 0 | 0 |
| Acquisitions of Businesses, net of cash acquired | 0 | 0 | 1,029 | 1,374 | 0 | 0 |
| Restricted Cash for Mill Expansion | 0 | 0 | 0 | 0 | 0 | 0 |
| Purchases of Property, Plant, and Equipment | (99,534) | (24,556) | (17,839) | (15,847) | (17,143) | (5,943) |
| **Net Cash Provided by (Used in) Investing Activities** | **(100,374)** | **(7,654)** | **39,398** | **(12,467)** | **(17,121)** | **(5,943)** |
| Payments of Senior Secured Notes Payable | (2,813) | (10,400) | (211,225) | 0 | 0 | 0 |
| Proceeds from Senior Secured Notes Payable | 0 | 0 | 299,007 | 0 | 0 | 0 |
| Payments of Senior Notes Payable | (27,990) | 0 | 0 | 0 | 0 | 0 |
| Proceeds from Senior Notes Payable | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments of Senior Subordinated Notes Payable | 0 | (1,687) | 0 | (17,491) | 0 | 0 |
| Proceeds from Senior Subordinated Notes Payable | 0 | 0 | 0 | 0 | 0 | 0 |
| Payment of Deferred Payment Obligation | 0 | 0 | 0 | 0 | 0 | 0 |
| Proceeds from Ohio Financing | 0 | 3,000 | 0 | 0 | 0 | 0 |
| Payments of State of Ohio Loan | (325) | (958) | (1,151) | (1,203) | (1,256) | (351) |
| Debt Acquisition Costs | (279) | (8,642) | (10,847) | 0 | 0 | 0 |
| Proceeds from Forgivable Debt | 0 | 0 | 0 | 0 | 300 | 0 |
| Payments Relating to Capital Lease Obligation | (731) | (731) | (721) | (47) | (68) | (24) |
| Proceeds from Revolving Lines of Credit | 396,707 | 254,201 | 338,343 | 202,800 | 253,400 | 83,100 |
| Payments of Revolving Lines of Credit | (312,973) | (249,710) | (397,268) | (232,100) | (249,700) | (76,050) |
| Proceeds from Secured Financing | 22,000 | 0 | 0 | 0 | 0 | 0 |
| Payments of Secured Financing | (186) | (2,120) | (20,905) | 0 | 0 | 0 |
| Proceeds from Issuance of Redeemable Common Stock | 6,426 | 4,135 | 3,561 | 2,875 | 2,884 | 0 |
| Payments to Redeem Common Stock | (27,930) | (21,162) | (11,811) | (12,351) | (14,070) | (10) |
| Increase in Cash Overdraft | 5,729 | (13,717) | (2,628) | 4,749 | (3,078) | (3,736) |
| **Net Cash Provided by (Used in) Financing Activities** | **57,635** | **(47,791)** | **(15,645)** | **(52,768)** | **(11,588)** | **2,929** |
| **Effect of Foreign Exchange Rate Changes on Cash and Cash Equivalents** | 317 | 0 | 41 | (7) | 14 | (6) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | **(40,658)** | **5,783** | **(6,191)** | **3,469** | **(5,390)** | **429** |
| Cash and Cash Equivalents at Beginning of Year | 44,838 | 4,180 | 9,963 | 3,772 | 7,241 | 1,851 |
| **Cash and Cash Equivalents at End of Year** | $ 4,180 | $ 9,963 | $ 3,772 | $ 7,241 | $ 1,851 | $ 2,280 |

Source: Fiscal year end financial results from historical form 10-K filings with the SEC. April 30, 2013 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions

# A. EXHIBITS

**Exhibit E - Adjusted Income Statements [a]**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | | 12 Months Ended 4/30/2013 | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2008 | % | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | | |
| **Net Sales** | $ 964,577 | 100.0% | $ 862,140 | 100.0% | $ 849,884 | 100.0% | $ 857,329 | 100.0% | $ 849,756 | 100.0% | $ 836,078 | 100.0% |
| **Earnings Before Taxes** | (48,963) | -5.1% | 25,466 | 3.0% | (34,577) | -4.1% | (47,075) | -5.5% | (147,864) | -17.4% | (61,675) | -7.4% |
| Debt Extinguishment Expense (Gain) | (11,598) | | (42,602) | | 7,010 | | 0 | | 0 | | 0 | |
| Mark to Market Retirement Accounting Change | 0 | | 0 | | (410) | | 45,540 | | 25,512 | | 25,512 | |
| Foreign Exchange Loss (Gain) | 4,523 | | (958) | | 600 | | 1,136 | | (213) | | 524 | |
| Restructuring and Other Charges | 2,578 | | 0 | | 0 | | 0 | | 105,950 | | 26,800 | |
| Synthetic Equity Expense | (3,116) | | 287 | | 1,076 | | 1,906 | | 3,610 | | 5,419 | |
| Domtar Transition Costs | 0 | | 0 | | 0 | | 0 | | 11,458 | | 12,302 | |
| Special Investigation Fee | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Bank and Legal Fees (Consent Solicitation Process) | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Insurance Recovery | (22,274) | | 0 | | (8,947) | | 0 | | (2,188) | | (2,188) | |
| West Carrollton Silo Expense (Gain) | 0 | | 0 | | 391 | | 0 | | 0 | | 0 | |
| Non-Cash KSOP Stock Match | 5,807 | | 4,006 | | 3,209 | | 2,738 | | 3,038 | | 3,075 | |
| Taxes and Tax Refunds | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Litigation Settlement | 0 | | 0 | | 0 | | 3,122 | | 0 | | 0 | |
| Litigation Recovery | 0 | | 0 | | 0 | | (23,229) | | 0 | | 0 | |
| Customer Bankruptcy Write-Offs | 0 | | 1,866 | | 0 | | 0 | | 0 | | 0 | |
| Fuel-Tax Credit | 0 | | (17,655) | | 0 | | 0 | | 0 | | 0 | |
| Bonus Payments | 0 | | 3,387 | | 0 | | 0 | | 0 | | 0 | |
| Pension Withdrawal Expense | 0 | | 0 | | 0 | | 0 | | 7,000 | | 7,000 | |
| Thermal Anti-Dumping Legal Expenses | 2,498 | | 288 | | 483 | | 613 | | 738 | | 749 | |
| West Carrollton Start Up Expenses | 14,200 | | 8,553 | | 0 | | 0 | | 0 | | 0 | |
| Performance Packaging Goodwill Impairment | 39,645 | | 6,341 | | 0 | | 0 | | 0 | | 0 | |
| Andritz Litigation Fees | 786 | | 213 | | 0 | | 0 | | 0 | | 0 | |
| One-Time Lower of Cost or Market Adjustment | 997 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Debt Exchange Expenses | 0 | | 4,182 | | 0 | | 0 | | 0 | | 0 | |
| Bemrose Booth Payment | 0 | | (820) | | 0 | | 0 | | 0 | | 0 | |
| HAC II Transaction Expenses | 0 | | 0 | | 0 | | 0 | | 7,494 | | 7,054 | |
| Gain on Sale of Business | 0 | | (755) | | (2,560) | | 0 | | 0 | | 0 | |
| **Total Adjustments** | **34,046** | 3.5% | **(33,667)** | -3.9% | **852** | 0.1% | **31,826** | 3.7% | **162,399** | 19.1% | **86,245** | 10.3% |
| Adjusted Earnings Before Taxes | (14,917) | -1.5% | (8,201) | -1.0% | (33,725) | -4.0% | (15,249) | -1.8% | 14,535 | 1.7% | 24,570 | 2.9% |
| Interest Expense | 54,267 | 5.6% | 51,291 | 5.9% | 65,772 | 7.7% | 61,330 | 7.2% | 59,654 | 7.0% | 59,531 | 7.1% |
| Depreciation and Amortization | 59,396 | 6.2% | 62,034 | 7.2% | 49,780 | 5.9% | 48,616 | 5.7% | 35,554 | 4.2% | 31,309 | 3.7% |
| **Adjusted EBIT** | $ 39,350 | 4.1% | $ 43,090 | 5.0% | $ 32,047 | 3.8% | $ 46,081 | 5.4% | $ 74,189 | 8.7% | $ 84,101 | 10.1% |
| **Adjusted EBITDA** | $ 98,746 | 10.2% | $ 105,124 | 12.2% | $ 81,827 | 9.6% | $ 94,697 | 11.0% | $ 109,743 | 12.9% | $ 115,410 | 13.8% |

[a] Fiscal years 2008 and 2009 include Performance Packaging.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit E - Ratio Analysis**

| | For the Fiscal Year Ended | | | 12 Months Ended |
| --- | --- | --- | --- | --- |
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 4/30/2013 |
| **Activity Ratios (End of Year Balances)** | | | | |
| Inventory Turnover | 6.2 | 6.9 | 8.0 | 7.3 |
| Asset Turnover | 1.3 | 1.3 | 1.5 | 1.5 |
| **Liquidity and Working Capital Ratios (End of Year Balances)** | | | | |
| Current Ratio | 1.9 | 1.7 | 1.3 | 1.5 |
| Net Working Capital / Net Sales | 13.0% | 6.7% | 0.2% | 2.4% |
| Days in Accounts Receivable | 40.1 | 38.5 | 39.8 | 40.7 |
| + Days in Inventories | 58.9 | 52.8 | 45.4 | 49.9 |
| - Days in Accounts Payable | (26.0) | (26.3) | (33.0) | (32.9) |
| **Net Trade Cycle** | **72.9** | **64.9** | **52.2** | **57.7** |
| **Leverage and Coverage** | | | | |
| Liabilities / Equity | n/m | n/m | n/m | n/m |
| Debt / (Debt + Equity) | n/m | n/m | n/m | n/m |
| Assets / Equity | n/m | n/m | n/m | (1.6) |
| EBIT / Interest Expense | 0.5 | 0.8 | 1.2 | 1.4 |
| Total Debt / EBITDA | 6.8 | 5.4 | 4.7 | 4.5 |
| Debt / EV | n/a | n/a | n/a | n/a |
| **Profitability** | | | | |
| Gross Profit Margin | 19.7% | 16.2% | 10.7% | 11.2% |
| EBITDA Margin | 9.6% | 11.0% | 12.9% | 13.8% |
| EBIT Margin | 3.8% | 5.4% | 8.7% | 10.1% |
| Net Profit Margin | -2.4% | -1.1% | 1.1% | 1.8% |
| Return on Assets | -3.1% | -1.5% | 1.6% | 2.7% |
| Return on Equity | n/m | n/m | n/m | n/m |
| **Other Ratios** | | | | |
| Deprec. and Amort. / Sales | 5.9% | 5.7% | 4.2% | 3.7% |



## A.  EXHIBITS

**Exhibit F - Implied Pricing Multiples - Thermal & Carbonless**

|  | EV / NFY EBITDA | EV / LTM EBITDA | EV / NFY Revenue | EV / LTM Revenue |
|---|---|---|---|---|
| Neenah Paper, Inc. | 6.0x | 6.3x | 0.77x | 0.84x |
| International Paper Company | 7.1x | 8.9x | 1.06x | 1.11x |
| MeadWestvaco Corporation | 8.8x | 9.8x | 1.37x | 1.42x |
| Wausau Paper Corp. | n/m | n/m | 1.19x | 0.98x |
| Domtar Corporation | 3.9x | 4.0x | 0.52x | 0.53x |
| PH Glatfelter Co. | 6.8x | 8.2x | 0.72x | 0.79x |
| Verso Paper Corp. | n/m | 10.0x | n/m | 0.91x |
| Low | 3.9x | 4.0x | 0.52x | 0.53x |
| High | 8.8x | 10.0x | 1.37x | 1.42x |
| Mean | 6.5x | 7.9x | 0.94x | 0.94x |
| Median | 6.8x | 8.6x | 0.92x | 0.91x |

Source:  Exhibit F



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit F - Calculation of Enterprise Value - Thermal & Carbonless**

*In Millions of Shares and U.S. Dollars, Except Stock Price*

| General Market Information | Neenah Paper, Inc. | International Paper Company | MeadWestvaco Corporation | Wausau Paper Corp. | Domtar Corporation | PH Glatfelter Co. | Verso Paper Corp. |
|---|---|---|---|---|---|---|---|
| Ticker Symbol | NP | IP | MWV | WPP | UFS | GLT | VRS |
| Stock Exchange | NYSE | NYSE | NYSE | NYSE | NYSE | NYSE | NYSE |
| | | | | | | | |
| Closing Common Stock Price (06/28/2013) | $ 31.77 | $ 44.31 | $ 34.11 | $ 11.40 | $ 66.50 | $ 25.10 | $ 1.15 |
| Closing Common Stock Price (12/31/2012) | 28.47 | 39.84 | 31.87 | 8.66 | 83.52 | 17.48 | 1.07 |
| Percent Change | 11.6% | 11.2% | 7.0% | 31.6% | -20.4% | 43.6% | 7.5% |
| **Calculation of Enterprise Value** | | | | | | | |
| Closing Common Stock Price (06/28/2013) | $ 31.77 | $ 44.31 | $ 34.11 | $ 11.40 | $ 66.50 | $ 25.10 | $ 1.15 |
| Multiplied by: Shares Outstanding | 16.0 | 444.0 | 176.9 | 49.4 | 34.3 | 42.9 | 53.2 |
| **Market Value of Equity ("MVE")** | **$ 507.4** | **$ 19,673.2** | **$ 6,033.3** | **$ 563.2** | **$ 2,277.9** | **$ 1,077.2** | **$ 61.1** |
| | | | | | | | |
| Add: Total Debt | 186.5 | 12,260.0 | 2,160.0 | 220.5 | 1,125.0 | 250.0 | 1,259.4 |
| Add: Preferred Stock | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Add: Minority Interest in Subsidiaries | 0.0 | 356.0 | 18.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Less: Cash and Short-Term Investments | (3.8) | (934.0) | (417.0) | (3.3) | (513.0) | (76.4) | (12.7) |
| **Enterprise Value ("EV")** | **$ 690.1** | **$ 31,355.2** | **$ 7,794.3** | **$ 780.4** | **$ 2,889.9** | **$ 1,250.8** | **$ 1,307.8** |

Source: Capital IQ, Inc.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit F - Selected Financial Information - Paperweight Development Corp.**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | |
|---|---|---|---|
| International Paper Company | $28,268.0 | International Paper Company | $3,522.0 |
| MeadWestvaco Corporation | 5,490.0 | MeadWestvaco Corporation | 796.0 |
| Domtar Corporation | 5,429.0 | Domtar Corporation | 725.0 |
| PH Glatfelter Co. | 1,591.9 | PH Glatfelter Co. | 152.4 |
| Verso Paper Corp. | 1,432.5 | Verso Paper Corp. | 131.0 |
| **Paperweight Development Corp.** | **836.1** | **Paperweight Development Corp.** | **115.4** |
| Neenah Paper, Inc. | 823.8 | Neenah Paper, Inc. | 109.9 |
| Wausau Paper Corp. | 794.0 | Wausau Paper Corp. | 43.6 |
| **Guideline Company Median** | **$1,591.9** | **Guideline Company Median** | **$152.4** |

| Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|
| Neenah Paper, Inc. | 12.1% | Neenah Paper, Inc. | 16.2% |
| PH Glatfelter Co. | 9.8% | PH Glatfelter Co. | 6.9% |
| International Paper Company | 6.0% | MeadWestvaco Corporation | 2.7% |
| Verso Paper Corp. | 2.7% | Wausau Paper Corp. | -0.1% |
| MeadWestvaco Corporation | 0.3% | **Paperweight Development Corp.** | **-0.9%** |
| Domtar Corporation | 0.1% | PH Glatfelter Co. | -1.7% |
| **Paperweight Development Corp.** | **-0.5%** | Domtar Corporation | -2.3% |
| Wausau Paper Corp. | -7.3% | Verso Paper Corp. | -14.4% |
| **Guideline Company Median** | **2.7%** | **Guideline Company Median** | **-0.1%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | |
|---|---|---|---|
| Neenah Paper, Inc. | 17.5% | Neenah Paper, Inc. | 23.4% |
| International Paper Company | 6.0% | **Paperweight Development Corp.** | **15.9%** |
| MeadWestvaco Corporation | 3.0% | PH Glatfelter Co. | 7.0% |
| **Paperweight Development Corp.** | **1.4%** | MeadWestvaco Corporation | -0.6% |
| Verso Paper Corp. | -1.6% | International Paper Company | -4.7% |
| PH Glatfelter Co. | -9.9% | Domtar Corporation | -27.0% |
| Domtar Corporation | -12.5% | Verso Paper Corp. | -30.7% |
| Wausau Paper Corp. | -27.5% | Wausau Paper Corp. | -50.7% |
| **Guideline Company Median** | **-1.6%** | **Guideline Company Median** | **-4.7%** |

| Profitability (LTM Gross Profit Margin) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|
| International Paper Company | 26.3% | MeadWestvaco Corporation | 14.5% |
| Domtar Corporation | 20.5% | **Paperweight Development Corp.** | **13.8%** |
| MeadWestvaco Corporation | 20.2% | Domtar Corporation | 13.4% |
| Neenah Paper, Inc. | 19.5% | Neenah Paper, Inc. | 13.3% |
| Verso Paper Corp. | 14.3% | International Paper Company | 12.5% |
| PH Glatfelter Co. | 13.2% | PH Glatfelter Co. | 9.6% |
| **Paperweight Development Corp.** | **11.2%** | Verso Paper Corp. | 9.1% |
| Wausau Paper Corp. | 10.8% | Wausau Paper Corp. | 5.5% |
| **Guideline Company Median** | **19.5%** | **Guideline Company Median** | **12.5%** |

| Profitability (LTM EBIT Margin) | | Profitability (LTM Return on Assets) | |
|---|---|---|---|
| **Paperweight Development Corp.** | **10.1%** | Neenah Paper, Inc. | 6.7% |
| Neenah Paper, Inc. | 9.9% | PH Glatfelter Co. | 3.3% |
| MeadWestvaco Corporation | 7.6% | **Paperweight Development Corp.** | **2.7%** |
| International Paper Company | 7.2% | Domtar Corporation | 2.6% |
| Domtar Corporation | 6.3% | International Paper Company | 2.5% |
| PH Glatfelter Co. | 5.3% | MeadWestvaco Corporation | 1.9% |
| Verso Paper Corp. | 1.3% | Wausau Paper Corp. | -1.0% |
| Wausau Paper Corp. | -0.8% | Verso Paper Corp. | -6.3% |
| **Guideline Company Median** | **6.3%** | **Guideline Company Median** | **2.5%** |

| Profitability (LTM Return on Equity) | | Liquidity (LTM Current Ratio) | |
|---|---|---|---|
| Verso Paper Corp. | 20.0% | Neenah Paper, Inc. | 3.0 |
| Neenah Paper, Inc. | 19.5% | Domtar Corporation | 2.8 |
| International Paper Company | 11.6% | PH Glatfelter Co. | 2.2 |
| PH Glatfelter Co. | 7.4% | MeadWestvaco Corporation | 1.9 |
| Domtar Corporation | 5.4% | Wausau Paper Corp. | 1.8 |
| MeadWestvaco Corporation | 4.9% | International Paper Company | 1.7 |
| Wausau Paper Corp. | -3.9% | Verso Paper Corp. | 1.6 |
| **Paperweight Development Corp.** | **n/m** | **Paperweight Development Corp.** | **1.5** |
| **Guideline Company Median** | **7.4%** | **Guideline Company Median** | **1.9** |

| Activity (LTM Asset Turnover) | | Activity (LTM Inventory Turnover) | |
|---|---|---|---|
| **Paperweight Development Corp.** | **1.5** | Wausau Paper Corp. | 7.7 |
| Neenah Paper, Inc. | 1.3 | Verso Paper Corp. | 7.7 |
| PH Glatfelter Co. | 1.3 | International Paper Company | 7.5 |
| Verso Paper Corp. | 1.3 | **Paperweight Development Corp.** | **7.3** |
| Wausau Paper Corp. | 1.1 | Domtar Corporation | 6.4 |
| Domtar Corporation | 0.9 | Neenah Paper, Inc. | 6.4 |
| International Paper Company | 0.9 | MeadWestvaco Corporation | 6.4 |
| MeadWestvaco Corporation | 0.6 | PH Glatfelter Co. | 6.2 |
| **Guideline Company Median** | **1.1** | **Guideline Company Median** | **6.4** |

| Leverage (LTM Total Debt to EBITDA) | | Leverage (LTM EBIT / Interest Expense) | |
|---|---|---|---|
| Verso Paper Corp. | 9.6 | Neenah Paper, Inc. | 6.5 |
| Wausau Paper Corp. | 5.1 | PH Glatfelter Co. | 4.6 |
| **Paperweight Development Corp.** | **4.5** | Domtar Corporation | 4.0 |
| International Paper Company | 3.5 | International Paper Company | 2.8 |
| MeadWestvaco Corporation | 2.7 | MeadWestvaco Corporation | 2.7 |
| Neenah Paper, Inc. | 1.7 | **Paperweight Development Corp.** | **1.4** |
| PH Glatfelter Co. | 1.6 | Verso Paper Corp. | 0.1 |
| Domtar Corporation | 1.6 | Wausau Paper Corp. | (1.4) |
| **Guideline Company Median** | **2.7** | **Guideline Company Median** | **2.8** |

Source:  Capital IQ, Inc. and Paperweight Development Corp. financials.





Valuation & Financial Opinions

# A. EXHIBITS

**Exhibit F - Selected Financial Information - Carbonless & Thermal**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | |
|---|---|
| International Paper Company | $28,268.0 |
| MeadWestvaco Corporation | 5,490.0 |
| Domtar Corporation | 5,429.0 |
| PH Glatfelter Co. | 1,591.9 |
| Verso Paper Corp. | 1,432.5 |
| Neenah Paper, Inc. | 823.8 |
| Wausau Paper Corp. | 794.0 |
| **Thermal** | **425.4** |
| **Carbonless** | **378.2** |
| **Guideline Company Median** | **$1,512.2** |

| Size (LTM EBITDA) | |
|---|---|
| International Paper Company | $3,522.0 |
| MeadWestvaco Corporation | 796.0 |
| Domtar Corporation | 725.0 |
| PH Glatfelter Co. | 152.4 |
| Verso Paper Corp. | 131.0 |
| Neenah Paper, Inc. | 109.9 |
| **Carbonless** | **54.3** |
| **Thermal** | **49.0** |
| Wausau Paper Corp. | 43.6 |
| **Guideline Company Median** | **$141.7** |

| Growth (3-Year Revenue CAGR) | |
|---|---|
| **Thermal** | **13.5%** |
| Neenah Paper, Inc. | 12.1% |
| PH Glatfelter Co. | 9.8% |
| International Paper Company | 6.0% |
| Verso Paper Corp. | 2.7% |
| MeadWestvaco Corporation | 0.3% |
| Domtar Corporation | 0.1% |
| **Carbonless** | **-4.3%** |
| Wausau Paper Corp. | -7.3% |
| **Guideline Company Median** | **4.4%** |

| Growth (1-Year Revenue) | |
|---|---|
| Neenah Paper, Inc. | 16.2% |
| **Thermal** | **11.0%** |
| International Paper Company | 6.9% |
| MeadWestvaco Corporation | 2.7% |
| Wausau Paper Corp. | -0.1% |
| PH Glatfelter Co. | -1.7% |
| Domtar Corporation | -2.3% |
| **Carbonless** | **-10.2%** |
| Verso Paper Corp. | -14.4% |
| **Guideline Company Median** | **1.3%** |

| Growth (3-Year EBITDA CAGR) | |
|---|---|
| **Thermal** | **32.5%** |
| Neenah Paper, Inc. | 17.5% |
| International Paper Company | 6.0% |
| MeadWestvaco Corporation | 3.0% |
| Verso Paper Corp. | -1.6% |
| PH Glatfelter Co. | -9.9% |
| **Carbonless** | **-10.6%** |
| Domtar Corporation | -12.5% |
| Wausau Paper Corp. | -27.5% |
| **Guideline Company Median** | **0.7%** |

| Growth (1-Year EBITDA) | |
|---|---|
| **Thermal** | **47.0%** |
| Neenah Paper, Inc. | 23.4% |
| PH Glatfelter Co. | 7.0% |
| **Carbonless** | **2.8%** |
| MeadWestvaco Corporation | -0.6% |
| International Paper Company | -4.7% |
| Domtar Corporation | -27.0% |
| Verso Paper Corp. | -30.7% |
| Wausau Paper Corp. | -50.7% |
| **Guideline Company Median** | **-2.7%** |

| Growth (Projected EBITDA Growth) | |
|---|---|
| Wausau Paper Corp. | 77.9% |
| International Paper Company | 34.6% |
| PH Glatfelter Co. | 28.6% |
| **Thermal** | **21.9%** |
| **Carbonless** | **15.2%** |
| MeadWestvaco Corporation | 13.7% |
| Neenah Paper, Inc. | 6.9% |
| Domtar Corporation | 2.4% |
| Verso Paper Corp. | n/m |
| **Guideline Company Median** | **21.9%** |

| Profitability (LTM EBITDA Margin) | |
|---|---|
| MeadWestvaco Corporation | 14.5% |
| **Carbonless** | **14.4%** |
| Domtar Corporation | 13.4% |
| Neenah Paper, Inc. | 13.3% |
| International Paper Company | 12.5% |
| **Thermal** | **11.5%** |
| PH Glatfelter Co. | 9.6% |
| Verso Paper Corp. | 9.1% |
| Wausau Paper Corp. | 5.5% |
| **Guideline Company Median** | **12.0%** |

Source: Capital IQ, Inc. and Carbonless financials.



Valuation & Financial Opinions    SRR STOUT|RISIUS|ROSS

## A. EXHIBITS

**Exhibit F - Selected Financial Information - Thermal & Carbonless**

*U.S. Dollars in Millions*

| | Neenah Paper, Inc. | International Paper Company | MeadWestvaco Corporation | Wausau Paper Corp. | Domtar Corporation | PH Glatfelter Co. | Verso Paper Corp. | Median | Paperweight Development Corp. |
|---|---|---|---|---|---|---|---|---|---|
| **Size ($ Millions)** | | | | | | | | | |
| Sales | $ 823.8 | $ 28,268.0 | $ 5,490.0 | $ 794.0 | $ 5,429.0 | $ 1,591.9 | $ 1,432.5 | $ 1,591.9 | $ 836.1 |
| Assets | 614.4 | 32,698.0 | 8,805.0 | 697.9 | 5,960.0 | 1,224.6 | 1,131.7 | 1,224.6 | 561.6 |
| EBITDA | 109.9 | 3,522.0 | 796.0 | 43.6 | 725.0 | 152.4 | 131.0 | 152.4 | 115.4 |
| Enterprise Value | 690.1 | 31,355.2 | 7,794.3 | 780.4 | 2,889.9 | 1,250.8 | 1,307.8 | 1,307.8 | n/a |
| **Growth** | | | | | | | | | |
| Sales 3-year CAGR | 12.1% | 6.0% | 0.3% | -7.3% | 0.1% | 9.8% | 2.7% | 2.7% | -0.5% |
| Sales LFY Growth Rate | 16.2% | 6.9% | 2.7% | -0.1% | -2.3% | -1.7% | -14.4% | -0.1% | -0.9% |
| EBITDA 3-year CAGR | 17.5% | 6.0% | 3.0% | -27.5% | -12.5% | -9.9% | -1.6% | -1.6% | 1.4% |
| EBITDA LFY Growth Rate | 23.4% | -4.7% | -0.6% | -50.7% | -27.0% | 7.0% | -30.7% | -4.7% | 15.9% |
| Projected EBITDA Growth | 6.9% | 34.6% | 13.7% | 77.9% | 2.4% | 28.6% | n/m | 21.2% | 29.4% |
| **Activity** | | | | | | | | | |
| Inventory Turnover | 6.4 | 7.5 | 6.4 | 7.7 | 6.4 | 6.2 | 7.7 | 6.4 | 7.3 |
| Asset Turnover | 1.3 | 0.9 | 0.6 | 1.1 | 0.9 | 1.3 | 1.3 | 1.1 | 1.5 |
| **Liquidity and Working Capital** | | | | | | | | | |
| Current Ratio | 3.0 | 1.7 | 1.9 | 1.8 | 2.8 | 2.2 | 1.6 | 1.9 | 1.5 |
| Net Working Capital / Sales | 20.3% | 12.4% | 10.5% | 10.1% | 14.0% | 12.3% | 6.7% | 12.3% | 2.4% |
| Days in Accounts Receivable | 45.5 | 46.2 | 44.8 | 33.5 | 41.1 | 36.0 | 25.1 | 41.1 | 40.7 |
| + Days in Inventories | 56.8 | 49.0 | 57.4 | 47.2 | 56.8 | 58.4 | 47.7 | 56.8 | 49.9 |
| - Days in Accounts Payable | 20.5 | 50.9 | 48.1 | 28.0 | 53.7 | 33.2 | 27.8 | 33.2 | (32.9) |
| Net Trade Cycle | 81.8 | 44.3 | 54.1 | 52.6 | 44.2 | 61.2 | 45.0 | 52.6 | 57.7 |
| **Leverage and Coverage** | | | | | | | | | |
| Liabilities / Equity | 1.9 | 3.6 | 1.6 | 2.9 | 1.1 | 1.2 | n/m | 1.8 | n/m |
| Debt / (Debt + Equity) | 46.8% | 63.2% | 39.1% | 55.4% | 28.4% | 31.5% | 139.9% | 46.8% | n/m |
| Assets / Equity | 2.9 | 4.6 | 2.6 | 3.9 | 2.1 | 2.2 | n/m | 2.8 | (1.6) |
| EBIT / Interest Expense | 6.5 | 2.8 | 2.7 | (1.4) | 4.0 | 4.6 | 0.1 | 2.8 | 1.4 |
| Total Debt / EBITDA | 1.7 | 3.5 | 2.7 | 5.1 | 1.6 | 1.6 | 9.6 | 2.7 | 4.5 |
| Debt / EV | 27.0% | 39.1% | 27.7% | 28.3% | 38.9% | 20.0% | 96.3% | 28.3% | n/a |
| **Profitability** | | | | | | | | | |
| Gross Profit Margin | 19.5% | 26.3% | 20.2% | 10.8% | 20.5% | 13.2% | 14.3% | 19.5% | 11.2% |
| EBITDA Margin | 13.3% | 12.5% | 14.5% | 5.5% | 13.4% | 9.6% | 9.1% | 12.5% | 13.8% |
| EBIT Margin | 9.9% | 7.2% | 7.6% | -0.8% | 6.3% | 5.3% | 1.3% | 6.3% | 10.1% |
| Net Profit Margin | 5.0% | 2.9% | 3.0% | -0.9% | 2.8% | 2.5% | -5.0% | 2.8% | 1.8% |
| Return on Assets | 6.7% | 2.5% | 1.9% | -1.0% | 2.6% | 3.3% | -6.3% | 2.5% | 2.7% |
| Return on Equity | 19.5% | 11.6% | 4.9% | -3.9% | 5.4% | 7.4% | 20.0% | 7.4% | n/m |
| **Other** | | | | | | | | | |
| Depreciation / Sales | 3.5% | 5.2% | 6.9% | 6.3% | 7.1% | 4.3% | 7.9% | 6.3% | 3.7% |

Source: Capital IQ, Inc.



Valuation & Financial Opinions

SRR STOUT | RISIUS | ROSS

## A.   EXHIBITS

**Exhibit G - Interest-Bearing Debt**

*As of June 30, 2013*

|  | Face Value | Interest Rate |
|---|---|---|
| First Lien Notes | $    335,000 | 5.50% |
| Revolver-Appleton | 10,600 | 4.00% |
| State of Ohio Loan | 6,787 | 6.00% |
| Second Lien Notes | 162,104 | 11.25% |
| Payment-in-kind on Second Lien Notes [a] | 18,450 | 11.25% |
| Senior Subordinated Notes | 32,195 | 9.75% |
| Industrial Revenue Bonds - Part 1 | 2,650 | 0.31% |
| Industrial Revenue Bonds - Part 2 | 6,000 | 0.36% |
| Columbia County, Wisconsin Forgivable Note | 300 | 2.00% |
| **Total ($) / Weighted Average (%)** | $    574,086 | 7.45% |

[a] Payment-in-kind payment would be triggered by a minority investment or change of control transaction consummated
    by the Company.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit H - Synthetic Equity Dilution**

*In Thousands of U.S. Dollars, except Per Share Values*

Long-Term Incentive Plan

| Grant Date | Number of Instruments (Thousands) | Fair Market Value Per Share | Exercise Price | Dilution Per Unit | Pre-Tax Dilution | After-Tax Dilution @ 38.5% |
|---|---|---|---|---|---|---|
| 1/1/2004 | 29.200 | $ 17.85 | $ 23.36 | $ 0 | $ 0 | $ 0 |
| 7/1/2005 | 140.000 | 17.85 | 27.77 | 0 | 0 | 0 |
| 1/1/2006 | 145.600 | 17.85 | 28.56 | 0 | 0 | 0 |
| 1/1/2007 | 174.000 | 17.85 | 33.62 | 0 | 0 | 0 |
| 1/1/2008 | 208.500 | 17.85 | 33.41 | 0 | 0 | 0 |
| 1/1/2009 | 328.000 | 17.85 | 21.43 | 0 | 0 | 0 |
| 1/1/2009 | 14.000 | 17.85 | 18.87 | 0 | 0 | 0 |
| 1/2/2011 | 590.500 | 17.85 | 12.84 | 5.01 | 2,958 | 1,819 |
| 7/1/2011 | 10.000 | 17.85 | 14.10 | 3.75 | 38 | 23 |
| 1/1/2012 | 250.000 | 17.85 | 15.01 | 3 | 710 | 437 |
| 8/13/2012 | 2.000 | 17.85 | 16.45 | 1 | 3 | 2 |
| 1/1/2013 | 189.100 | 17.85 | 17.55 | 0 | 57 | 35 |
| Total | 2,080.900 | | | | $ 3,765 | $ 2,316 |

Canadian SARs Plan

| Grant Date | Number of Instruments (Thousands) | Fair Market Value Per Share | Exercise Price | Dilution Per Unit | Pre-Tax Dilution | After-Tax Dilution @ 38.5% |
|---|---|---|---|---|---|---|
| 1/1/2004 | 0.150 | $ 17.85 | $ 23.36 | $ 0 | $ 0 | $ 0 |
| 1/1/2005 | 0.200 | 17.85 | 26.36 | 0 | 0 | 0 |
| 1/1/2006 | 0.300 | 17.85 | 28.56 | 0 | 0 | 0 |
| Total | 0.650 | | | | $ 0 | $ 0 |

|  |  |
|---|---|
| Total (Rounded) | $ 2,316 |





Valuation & Financial Opinions

# Appendix B

## Guideline Company Descriptions

APPVION

Valuation & Financial Opinions



# B.  GUIDELINE COMPANY DESCRIPTIONS

## International Paper Company

International Paper Company ("IP") is a global forest products, paper and packaging company that is complemented by an extensive distribution system. IP operates 26 pulp, paper and packaging mills, 88 converting and packaging plants, 25 wood products facilities, and seven specialty chemical plants.

## MeadWestvaco Corporation

MeadWestvaco Corporation ("MWV") was formed as a result of the merger of the Mead Corporation and Westvaco Corporation in January 2002. As a combined entity, MWV's principal business segments include: (1) packaging products; (2) coated and specialty papers; (3) consumer and office products; and (4) specialty chemicals. MWV has operations in 29 countries and serves customers in approximately 100 nations.

## Neenah Paper, Inc.

Neenah Paper, Inc. ("NP") engages in the manufacture and distribution of premium and specialty paper grades, as well as bleached kraft pulp in North America and Europe. The company has three primary operations: (1) the fine paper business; (2) the technical paper business; and (3) the pulp business.  Neenah Paper was incorporated in 2004 and is headquartered in Alpharetta, Georgia.

## Wausau Paper Company

Wausau Paper Company ("WPP") manufacturers, converts, and sells paper and paper products. WPP's principal office is located in Mosinee, Wisconsin, with an additional ten facilities in six states. The company is organized into three operating groups: the specialty paper group; the printing and writing group; and the towel and tissue group.

## Domtar Inc.

Domtar, Inc. ("UFS") manufactures and markets uncoated freesheet paper in North America. It operates through four segments: (1) Paper; (2) Paper Merchants; (3) Wood; and (4) Packaging. The Paper segment manufactures and distributes business commercial printing and publication, and technical and specialty papers, as well as pulp. The Paper Merchants segment engages in the purchase, warehousing, sale, and distribution of various products manufactured by the company and other manufacturers.  The Wood segment involves in the manufacture and marketing of lumber and wood-based value-added products, as well as in the management of forest resources. The Packaging segment produces corrugated boxes and containers and specialty products.





Valuation & Financial Opinions

# B.    GUIDELINE COMPANY DESCRIPTIONS

## P.H. Glatfelter Company

P.H. Glatfelter Company ("P.H. Glatfelter"), together with its subsidiaries, manufactures specialty papers and engineered products. P.H. Glatfelter provides papers for trade book publishing, carbonless products, tea bags and coffee filters, specialized envelopes, playing cards, pressure-sensitive postage stamps, metallized papers for labels and packaging, and digital imaging applications. P.H. Glatfelter's products include wet laid non-woven products, such as double-sided adhesive tape substrates and battery grid pasting tissue. P.H. Glatfelter serves customers in various markets, including book publishing, carbonless and forms, envelope and converting, engineered products, food and beverage, composite laminates, and other technical niche markets.

## Verso Paper Corporation

Verso Paper Corp. ("Verso") manufactures and supplies coated papers to catalog and magazine publishers. Verso was founded in 2006 and is based in Memphis, Tennessee.



# Appendix C

## Control Premium



Valuation & Financial Opinions



# C.   CONTROL PREMIUM

## Control Premium

The value of a fractional interest in a company may be equal to, more than, or less than a pro rata share of the value of the entire company. That is, certain valuation approaches provide indications of value on a controlling ownership basis, and other approaches provide indications of value on a minority ownership interest basis. The analyst must reconcile these differing value indications to arrive at an indication of value consistent with the purpose and objective of the assignment. The adjustment from a minority ownership interest basis to a controlling ownership interest basis is typically made by applying a premium for control.

In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

With respect to the DCF Method, the indication of value can reflect a minority or a controlling ownership interest, depending on a number of factors. In our analysis, we used a capital structure based on industry averages and Appvion's long-term capital structure in estimating the WACC. In addition, based on our discussions with Appvion's management and our review of Appvion's financial projections, the forecasted results reflect optimal financial performance that a hypothetical financial buyer could not affect materially. Furthermore, the selected exit EBITDA multiple applied in the DCF method incorporates a control premium. Therefore, the indication of value from the DCF Method in our analysis represents a controlling ownership interest value.

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

The most objective and established evidence of control premiums is the study of cash tender offers. By looking at premiums offered during a tender for control of a company with publicly held shares, we can approximate the difference between a controlling and minority ownership interest value.



Valuation & Financial Opinions



# C.   CONTROL PREMIUM

A control premium can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2013* tracks publicly announced formal transfers of ownership of at least 10% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 23.1% to 41.1% over the past 20 years, with a median premium of 33.7%. The results of these studies are summarized in the table below.

| **Percent Premium Paid Over Market Price** | | | | | |
|------|-------------------------|-------------------------|------|-------------------------|-------------------------|
| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
| 1993 | 173 | 33.0% | 2003 | 371 | 31.6% |
| 1994 | 260 | 35.0% | 2004 | 322 | 23.4% |
| 1995 | 324 | 29.2% | 2005 | 392 | 24.1% |
| 1996 | 381 | 27.3% | 2006 | 454 | 23.1% |
| 1997 | 487 | 27.5% | 2007 | 491 | 24.7% |
| 1998 | 512 | 30.1% | 2008 | 294 | 36.5% |
| 1999 | 723 | 34.6% | 2009 | 239 | 39.8% |
| 2000 | 574 | 41.1% | 2010 | 348 | 34.6% |
| 2001 | 439 | 40.5% | 2011 | 321 | 37.8% |
| 2002 | 326 | 34.4% | 2012 | 323 | 37.1% |
| | | | **20-Year Median Control Premium** | | **33.7%** |

Source: Factset Mergerstat LLC, *Mergerstat Review 2013*.

In addition, we searched for control premiums paid in transactions within Appvion's industry. According to Mergerstat Review 2013, there were two transactions in the paper industry with a control premium of 9.4% in 2007, zero transactions in 2008, one transaction with a control premium of 341.0% in 2009, one transaction with a control premium of 7.9% in 2010, four transactions with a control premium of 80.6% in 2011, and zero transactions in 2012.

**Applicability to the Subject Company**

There is one important factor to consider when applying the data above to the Company. The transactions of the interests in the companies discussed above represent both financial and strategic acquisitions. Often, strategic acquisitions include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer. Accordingly, the control premium that would apply to an interest in Appvion would be lower than that indicated by the study.

Based on the facts and circumstances related specifically to our valuation of the Appvion equity, we applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of Appvion.



Valuation & Financial Opinions



Appendix D

**Assumptions and Limiting Conditions**

APPVION                                    Valuation & Financial Opinions



# D.  ASSUMPTIONS AND LIMITING CONDITIONS

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company. However, we have exercised our independent judgment in evaluating the information that we received from the Company and/or its representatives, and we have not relied on information that we know to be inadequate or incomplete.

- For the purpose of this engagement and report, we have made no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's April 30, 2013 balance sheet was intact as of that date and that the projected June 30, 2013 balance sheet will not be materially different than on the Valuation Date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- Our conclusion of value is applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report, and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- Stout Risius Ross, Inc. is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.




# Appendix E

## Statement of Qualifications

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 838 of 1527    Document 27-2

Valuation & Financial Opinions



# E.    STATEMENT OF QUALIFICATIONS

## Scott D. Levine, CPA / ABV, CFA, ASA

Scott D. Levine is a Managing Director in the **Valuation & Financial Opinions Group** at **Stout Risius Ross, Inc.**  His concentration is in ESOP and ERISA Advisory Services.  Over the last ten years, he has had extensive experience in the valuation of business interests in both private and public corporations. Mr. Levine has performed valuation analyses in a broad range of industries and for numerous purposes including fairness and solvency opinions, estate and gift taxation, shareholder disputes, purchase price allocation, mergers and acquisitions, marital dissolutions and liability and damages analysis. He has a particular expertise in the valuation of business ownership interests in employee stock ownership plan (ESOP) related analyses, including ESOP security formation, transaction analysis, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. Levine has served are biotechnology, computer services, construction, engineering, entertainment, financial services, government contracting, health care, manufacturing, medical practices, telecommunications and wholesale distribution.

Mr. Levine has presented on many different topics in the field of business valuation to the following organizations: the American Society of Appraisers; the National Center for Employee Ownership; the ESOP Association; and the Association for Corporate Growth. He has also authored many articles related to the valuation of closely held companies. In addition, Mr. Levine has testified as an expert witness in state courts, arbitration and deposition.

Prior to joining **Stout Risius Ross, Inc.,** Mr. Levine was a principal with a national valuation firm specializing in the valuation of closely held companies. During his tenure, he was responsible for business development and management of business valuation assignments as well as hiring and supervising staff. Prior to that, Mr. Levine was a CPA with Price Waterhouse in their audit group and was responsible for conducting audits for both privately held and publicly traded companies.

Mr. Levine earned an MBA with a concentration in Finance from George Washington University. He also graduated cum laude from Boston University's School of Management with a concentration in Accounting. Mr. Levine is a certified public accountant licensed in the state of Maryland, and a member of the American Institute of Certified Public Accountants holding the ABV designation (accredited in business valuation). He has also earned the right to use the Chartered Financial Analyst designation.  Mr. Levine is an Accredited Senior Appraiser of the American Society of Appraisers, certified in business valuation. Mr. Levine is a member of the CFA Institute, the American Institute of Certified Public Accountants and the ESOP Association. He is also a member of the Finance Committee of the ESOP Association.



Valuation & Financial Opinions



# E.  STATEMENT OF QUALIFICATIONS

## Aziz El-Tahch, CFA

Aziz El-Tahch is a Managing Director in the **Valuation & Financial Opinions Group** at **Stout Risius Ross, Inc.** His concentration is in ESOP and ERISA Advisory Services. He has experience in the valuation of securities, intangible assets, and business interests for numerous purposes, including fairness and solvency opinions, mergers and acquisitions, corporate strategic planning, stock options and warrants, purchase price allocation, goodwill impairment testing, estate and gift taxation, shareholder disputes, and liability and damages analysis. He has extensive experience in the valuation of business ownership interests in Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security formation and transactions, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. El-Tahch has served are advertising, agriculture, cable television, commercial printers, construction, engineering, financial services, furniture, government and defense contracting, healthcare, insurance, internet retailing, paper, packaging, pharmaceuticals, oil and gas services, paint, petroleum refining, restaurant, specialty chemicals, technology, telecommunications and wholesale distribution, among others. Mr. El-Tahch has presented at numerous conferences and seminars on the subjects of valuation and transaction advisory services. He has also published articles on the use of ESOPs  to facilitate business transitions and the valuation of intangible property in the context of transfer pricing analyses.

Prior to joining **Stout Risius Ross, Inc.**, Mr. El-Tahch was a Senior Investment Analyst at a New York-based alternative assets investment fund with approximately $500 million under management. At the fund, Mr. El-Tahch focused on credit card debt securitizations, collateralized debt obligation (CDO) and collateralized loan obligation (CLO) securities, and second-lien and mezzanine loans to middle-market companies. Among the industries that Mr. El-Tahch served are the regional banking and healthcare industries.

Mr. El-Tahch graduated magna cum laude, Phi Beta Kappa from Georgetown University's Edmund A. Walsh School of Foreign Service with a concentration in Economics. Mr. El-Tahch is a member of the CFA Institute, the New York Society of Security Analysts, the Association for Corporate Growth, the National Center for Employee Ownership, and the ESOP Association, where he serves as an Officer on the Executive Committee of the New York / New Jersey Chapter.  Mr. El-Tahch is also a member of SRR's philanthropy board.





Valuation & Financial Opinions

# EXHIBIT 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
        For the fiscal year ended: December 29, 2012

                                                        **OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**
        For The Transition Period From        To        .

Commission file numbers: 333-82084-01
333-82084

| PAPERWEIGHT DEVELOPMENT CORP. | APPLETON PAPERS INC. |
|---|---|
| (Exact Name of Registrant as Specified in Its Charter) | (Exact Name of Registrant as Specified in Its Charter) |
| Wisconsin | Delaware |
| (State or Other Jurisdiction of | (State or Other Jurisdiction of |
| Incorporation or Organization) | Incorporation or Organization) |
| 39-2014992 | 36-2556469 |
| (I.R.S. Employer | (I.R.S. Employer |
| Identification No.) | Identification No.) |

825 East Wisconsin Avenue, P.O. Box 359,
Appleton, Wisconsin                                                54912-0359
(Address of Principal Executive Offices)                    (Zip Code)

Registrant's telephone number, including area code: (920) 734-9841
Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if either of the registrants is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if either of the registrants is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.
Yes ☒   No ☐

Indicate by check mark whether each registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether either of the registrants has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).     Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrants' knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether either of the registrants is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check one).
        Large Accelerated filer ☐     Accelerated filer ☐     Non-accelerated filer ☒     Smaller reporting company ☐
                                        (Do not check if a smaller reporting company)

Indicate by check mark whether either of the registrants is a shell company (as defined in Rule 12b-2 of the Exchange Act):   Yes ☐   No ☒

As of March 1, 2013, 8,729,555 shares of Paperweight Development Corp. common stock, $.01 par value, were outstanding. There is no trading market for the common stock of Paperweight Development Corp. As of March 1, 2013, 100 shares of Appleton Papers Inc.'s common stock, $100.00 par value, were outstanding. There is no trading market for the common stock of Appleton Papers Inc. No shares of Paperweight Development Corp. or Appleton Papers Inc. were held by non-affiliates.

Documents incorporated by reference: None.

Paperweight Development Corp. and Appleton Papers Inc. meet the conditions set forth in General Instruction I(1)(a) and (b) and are therefore filing this form with the reduced disclosure format.

1

## TABLE OF CONTENTS

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 11 |
| Item 1B | Unresolved Staff Comments | 18 |
| Item 2 | Properties | 19 |
| Item 3 | Legal Proceedings | 19 |
| Item 4 | Mine Safety Disclosures | 19 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6 | Selected Financial Data | 21 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 42 |
| Item 8 | Financial Statements and Supplementary Data | 43 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 102 |
| Item 9A | Controls and Procedures | 102 |
| Item 9B | Other Information | 103 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 104 |
| Item 11 | Executive Compensation | 109 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 129 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 129 |
| Item 14 | Principal Accountant Fees and Services | 130 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 131 |
| **SIGNATURES** | | |
| **EXHIBITS** | | |

2

## PART I

*Unless stated to the contrary or the context requires otherwise, all references in this report to the Company refer to Paperweight Development Corp. ("PDC" or "Paperweight") and its 100%-owned subsidiaries. It includes Appleton Papers Inc. and its 100%-owned subsidiaries (collectively "Appleton").*

**Item 1.**              **Business**

### Overview

The Company is a leading manufacturer of specialty, high value-added coated paper products, including carbonless, thermal and security papers. The Company creates product solutions for customers and end users through its development and use of coating formulations and applications as well as microencapsulation and security technologies. Under U.S. generally accepted accounting principles ("GAAP"), it has three reportable segments: carbonless papers, thermal papers and Encapsys®. The performance of these three segments is described in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8. Financial Statements and Supplementary Data."

**Carbonless Papers**

The carbonless papers segment includes carbonless and security paper products. The Company produces and sells the Appleton and NCR PAPER* brands of carbonless paper. The Company believes it is the world's largest producer of carbonless paper. Carbonless paper is used to make multipart business forms such as invoices and purchase orders. The Company produces coated products for point-of-sale displays and other design and print applications and offers custom coating solutions. The Company also produces security papers with features that resist forgery, tampering and counterfeiting. The Company's portfolio of products incorporates security technologies, including watermarks, taggants, reactive chemicals, embedded threads and fibers and machine-readable technologies, to serve global markets. The Company produces financial and identity documents for business and government such as checks, visas, automobile titles and birth certificates.

* NCR PAPER is a registered trademark licensed to the Company.

**Thermal Papers**

The thermal papers segment develops and produces substrates for transaction and item identification markets. The Company believes it is the largest manufacturer of direct thermal papers in North America. Thermal paper is used in four principal end markets: (1) point-of-sale products for retail receipts and coupons; (2) label products for shipping, warehousing, medical and clean-room applications; (3) tags and tickets for airline and baggage applications, event and transportation tickets and lottery and gaming applications; and (4) printer, calculator and chart paper for engineering, industrial and medical diagnostic charts.

**Encapsys**

The Encapsys segment discovers, develops and manufactures microencapsulation solutions for external partner companies and for the Company's carbonless papers segment. Microencapsulation is the process of putting a microscopic wall around a core substance. The Company helped NCR Corporation ("NCR") produce the first commercial application for microencapsulation in 1954 with the introduction of carbonless paper. Since then, the Company researchers have developed the art and science of microencapsulation and are working with potential partners in industries as diverse as agriculture, paints and coatings, food, building and construction, paper, textiles, personal and household care, adhesives, and oil and gas. The Encapsys segment leverages the Company's extensive technical knowledge and experience with microencapsulation and uses an open innovation process with partner companies to develop successful technical solutions for those companies.

### Company Background

PDC was incorporated in Wisconsin on December 28, 2000. Appleton was incorporated in Delaware in July 1965 and is the primary operating subsidiary of PDC.

**Company History**

Appleton Coated Paper Company, or ACPC, began operations in 1907 in Appleton, Wisconsin. In 1953, ACPC began working with NCR on the development and production of carbonless paper. In 1954, NCR began marketing its NCR PAPER* brand of carbonless paper, which ACPC manufactured.

3

In 1969, NCR acquired Combined Paper Mills, Inc., which then consisted of pulp and paper mills in Combined Locks, Wisconsin, and Roaring Spring, Pennsylvania. In 1970, NCR acquired ACPC. In 1971, NCR formed the Appleton Papers division by merging ACPC with Combined Paper Mills, Inc.

In 1978, Appleton, then a subsidiary of B.A.T Industries Limited, acquired the assets of the Appleton Papers division from NCR. In 1990, Appleton, together with The Wiggins Teape Group Ltd., was separated from B.A.T Industries to form Wiggins Teape Appleton p.l.c., a public company listed on the London Stock Exchange. Later that year, Wiggins Teape Appleton merged with Arjomari Prioux SA, a public French paper manufacturer and merchant. Shortly after the merger, the group changed its name to Arjo Wiggins Appleton p.l.c. Appleton operated as an indirect, 100%-owned subsidiary of Arjo Wiggins Appleton p.l.c. until 2001.

On November 9, 2001, Appleton employees purchased Appleton from Arjo Wiggins Appleton p.l.c. through the use of an employee stock ownership plan.

**The KSOP and the ESOP**

The Appleton Papers Retirement Savings and Employee Stock Ownership Plan (the "KSOP" or the "plan") includes a separate employee stock ownership plan component (the "ESOP" or the "Company Stock Fund"). The KSOP is a tax-qualified retirement plan that is available to U.S. employees. The ESOP component of the KSOP is a tax-qualified employee stock ownership plan that invests in PDC common stock.

In late 2001, approximately 90% of Appleton's employees invested approximately $107 million in the ESOP. On November 9, 2001, the ESOP purchased 100% of the common stock of PDC. PDC simultaneously used all the proceeds from the sale of those shares of common stock, along with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and its available cash, to finance the purchase of the acquisition described below.

**Acquisition from Arjo Wiggins**

On November 9, 2001, PDC and a 100%-owned subsidiary acquired Appleton from Arjo Wiggins Appleton p.l.c., now known as Windward Prospects Ltd ("AWA"), and two of its subsidiary holding companies, (the "sellers" or "affiliates of AWA"). Appleton is now a 100%-owned subsidiary of PDC and the ESOP owns 100% of the shares of common stock of PDC. PDC does not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

**Dispositions**

During second quarter 2009, the Company committed to a formal plan to sell C&H Packaging Company, Inc. ("C&H") which was acquired in April 2003. On December 18, 2009, the Company completed the sale of C&H to The Interflex Group, Inc. During second quarter 2010, the Company committed to a formal plan to sell American Plastics Company, Inc. ("APC") and New England Extrusion, Inc. ("NEX"). These companies were acquired in April 2003 and January 2005, respectively. On July 22, 2010, the Company completed the sale of APC and NEX to Mason Wells Buyout Fund II, Limited Partnership. Since C&H, APC and NEX engaged in the manufacture, printing, converting, marketing and sale of high-quality single and multilayer polyethylene films for packaging applications, their operations did not align with the Company's strategic, long-term focus on its core competencies in specialty papers and microencapsulation. The operating results of APC and NEX are reported as discontinued operations for the year ended January 1, 2011.

*For financial information regarding the Company's business segments, refer to Note 24 of Notes to Consolidated Financial Statements contained below in "Item 8. Financial Statements and Supplementary Data."*

**Carbonless Papers**

The carbonless papers segment produces carbonless paper and security paper and accounted for approximately 48% of total company net sales in 2012. The Company sells carbonless roll and sheet products under the Appleton and NCR PAPER* brands. The Company believes it has the broadest carbonless product line in the industry and offers its customers a single source solution for their carbonless paper needs.

4

Carbonless products are sold to converters, business forms printers and merchant distributors who stock and sell carbonless paper to printers. Carbonless paper is used to make multipart business forms such as invoices and purchase orders. Carbonless paper is used in a variety of end markets, including government, retail, financial, insurance and manufacturing, with no one predominant end market. Demand for carbonless products in many of these markets is tied to economic growth, which impacts the number of transactions completed in a given year. Historically, sales of carbonless products have not been significantly impacted by seasonality.

Since 1994, the North American carbonless market has been in decline as a result of greater use of competing technologies such as digital laser, inkjet and thermal printers, and electronic communications that do not use impact printing to create images. The Company believes the North American carbonless paper market declined by approximately 7% to 9% annually from 2007 through 2012, except during the recession period when the decline was estimated at an annual rate of 12% to 16%. The decline is expected to continue at historical rates over the next several years. The Company believes the worldwide carbonless market is also in decline, with demand declining at approximately 2% to 4% per year.

In addition to the Company, other significant carbonless paper producers include P.H. Glatfelter Company, Mitsubishi Paper Mills Company Ltd., IdemPapers S.A., Asia Pulp and Paper Co. Ltd., Koehler AG, Nippon Industries Co. Ltd. and Oji Paper Co. Ltd. In the carbonless market, the Company competes primarily on the basis of product quality, service, breadth of product offering and price.

The Company produces security papers with features that resist forgery, tampering and counterfeiting. The Company's portfolio of products incorporates security technologies, including watermarks, taggants, reactive chemicals, embedded threads and fibers and machine-readable technologies, to serve global markets. The Company produces financial and identity documents for business and government such as checks, visas, automobile titles and birth certificates. Sales of the Company's security products have not been significantly impacted by seasonality.

Security paper competitors include P.H. Glatfelter Company, Cascades Resources, Papierfabrik Louisenthal GmbH, Arjowiggins Security and De La Rue International. The Company competes primarily on the basis of product quality, service, breadth of product offering and price.

**Thermal Papers**

The thermal papers segment develops and produces substrates for the transaction and item identification markets and accounted for approximately 48% of total company net sales in 2012. Thermal paper is used in four principal end markets: (1) point-of-sale products for retail receipts and coupons; (2) label products for shipping, warehousing, medical and clean-room applications; (3) tags and tickets for airline and baggage applications, event and transportation tickets and lottery and gaming applications; and (4) printer, calculator and chart paper for engineering, industrial and medical diagnostic charts. The point-of-sale and label market segments, combined, accounted for the majority of thermal paper volume of the North American thermal market in 2012.

Point-of-sale products are sold to printers and converters who in turn sell to end-user customers or to resellers such as office supply stores, office superstores, warehouse clubs, mail order catalogs, equipment dealers, merchants and original equipment manufacturers. Label products are sold to companies who apply pressure sensitive adhesive coatings and release liners and then sell these products to label printers. Tag, ticket and chart grades are sold to specialty printing companies who convert them to finished products such as entertainment, lottery and gaming tickets, tags, coupons and medical charts.

The thermal papers market is growing with new applications being developed to use thermal technology. Based on its assessment of the period 2007 through 2012, the Company believes North American thermal markets expanded at a 3% compound average growth rate, with annual rates ranging from a decline of 2% to increases of 5%. The Company believes demand for thermal paper will continue to grow in North America and around the world. In 2007, an expansion program of approximately $125 million commenced at the West Carrollton, Ohio facility, involving the installation of a state-of-the-art coater to produce thermal papers. The project was completed in third quarter 2008. Sales of thermal papers have not been significantly impacted by seasonality. In addition to the Company, other significant thermal paper producers include Koehler AG, Kanzaki Specialty Papers, Ricoh Company, Ltd., Mitsubishi Paper Mills Company Ltd. and Hansol Paper Company, Ltd. The Company competes primarily on the basis of product quality, service, breadth of product offering and price.

5

## Encapsys

The Encapsys segment develops and delivers custom microencapsulation solutions for its partners. The Company uses an open innovation process that typically includes development agreements with partner companies that seek to protect existing and potential intellectual property. Encapsys is exploring opportunities with potential partners in industries as diverse as agriculture, paints and coatings, food, building and construction, paper, textiles, personal and household care, adhesives, and oil and gas. During 2012, Encapsys accounted for approximately 6% of total company net sales.

Microencapsulation competitors include Ronald T. Dodge Company, Aveka, Inc., GAT Microencapsulation AG, Microtek Laboratories, Inc., Lipo Technologies, Inc., Balchem Corporation, Reed Pacific and others. Large chemical producers such as BASF, Firmenich, Henkel AG & Co., International Flavors and Fragrances Inc., Dow Chemical Company and Monsanto may also be competitors in some market situations.

### Geographical Financial Information

Revenues from sales in the U.S. were $577.3 million in 2012, $576.7 million in 2011 and $579.5 million in 2010. Revenues from sales to customers in foreign countries were $272.5 million in 2012, $280.6 million in 2011 and $270.4 million in 2010. Substantially all long-lived assets were located in the U.S. as of December 29, 2012, December 31, 2011 and January 1, 2011. See Note 24, Segment Information, of Notes to Consolidated Financial Statements.

### Research and Development

Ongoing investment in research and development has enabled the Company to develop core competencies in the microencapsulation process, specialty coating chemistry, coating application systems and security technologies. Research and development efforts are focused on cost reduction, product line extensions, new product development and technology transfer and development. Research and development costs related to the development of new products and significant improvements to existing products were $11.2 million in 2012, $11.4 million in 2011 and $12.5 million in 2010.

### Sales, Marketing and Distribution

The Company promotes and sells products through its sales and marketing organization. Sales personnel operate from field locations. Marketing employees endeavor to acquire market, end-user and competitor insight to uncover and deliver market-focused solutions. Technical service representatives assist customers with product applications and improvements and complaint resolution by telephone and in person at customer locations. Customer service representatives receive customer orders, establish delivery dates and answer inquiries about stock availability and order status.

The Company uses 11 distribution centers to store and distribute products to customers. Distribution centers are located in Appleton, Wisconsin; Camp Hill, Pennsylvania; Monroe, Ohio; Kansas City, Kansas; Ontario, California; McDonough, Georgia; and Peterborough, Ontario, Canada. Third-party logistics services are contracted through distribution facilities at Portland, Oregon, Birmingham, England, Scarborough, England, and Utrecht, Netherlands.

### Distributors and Customers

The Company currently sells through merchant distributors that stock and redistribute carbonless sheet products globally from over 315 locations. Carbonless rolls are sold through a variety of channels including merchants, agents and directly to printer and converter customers worldwide. In North America, some carbonless rolls are sold to forms printers through merchant distributors on a drop-shipment basis. In those cases, the Company ships products from distribution centers and provides customer support while the merchant bears the credit risk of nonpayment.

The Company sells thermal papers to converters who cut and rewind large rolls into smaller rolls, print and otherwise further process the paper based on end-user needs. The Company sells security products through merchants and to other security printers who print checks, titles, certificates and other secure documents.

The five largest customers in the carbonless papers segment accounted for approximately 33% of carbonless papers net sales in 2012 and 32% of carbonless papers net sales in 2011 and 2010. The five largest customers in the thermal papers segment accounted for approximately 40% of thermal papers net sales in 2012, 47% of thermal papers net sales in 2011 and 43% of thermal papers net sales in 2010. The largest external customer in the Encapsys segment accounted for approximately 58% of Encapsys net sales (which include internal sales to the Company's carbonless papers segment) in 2012, 59% in 2011 and 52% in 2010. Sales to the Company's largest customer accounted for approximately 8% of 2012 total company net sales, 7% of 2011 total company net sales and 8% of 2010 total company net sales.

6

## Working Capital Practices

The Company maintains finished goods inventories sufficient to provide a high level of available stock items and next day delivery to most carbonless and thermal papers customers. Raw material inventories are maintained at levels consistent with demand for both stock and custom orders. Custom order lead times are typically less than 30 days. Accounts receivable management practices, including terms of sale, are designed to accommodate the competitive differences of each business segment and market channel.

During fourth quarter 2012, the Company adopted mark-to-market accounting for its pension and other postretirement benefit plans. Under mark-to-market accounting, all actuarial gains and losses are immediately recognized in net periodic cost annually in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year and, the market-related value of plan assets used in the cost calculations is equal to fair value. Under the Company's previous accounting method, a portion of the actuarial gains and losses was deferred in accumulated other comprehensive loss on the Consolidated Balance Sheet and amortized into future periods. In addition, the previous method smoothed the investment gains and losses of the plan assets over a period of five years. In connection with this change in accounting policy for pension and other postretirement benefit plans, the Company also elected to change its method of accounting for certain costs included in inventory. The Company has elected to exclude the amount of its pension and other postretirement benefit costs applicable to former employees from inventoriable costs. While the Company's historical policy of including all pension and other postretirement benefits costs, excluding those charged directly to selling, general and administrative ("SG&A") expense, as a component of inventoriable costs was acceptable, it believes the new policy is preferable as inventoriable costs will only include costs that are directly attributable to current employees involved in the production of inventory. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting principles. See Note 2, Summary of Significant Accounting Policies, of Notes to Consolidated Financial Statements for further details relating to these accounting policy changes.

## Order Backlogs

In the carbonless papers business, customers typically order from stock grades and most orders are delivered the next day. Thermal papers customers also order primarily stock grades. As of year-end 2012, the total of carbonless papers and thermal papers products ordered but not shipped was approximately 6% of annual sales volume. At both 2011 and 2010 year-ends, products ordered but not shipped totaled approximately 4% of total annual shipments of carbonless papers and thermal papers.

In the Encapsys business, customers typically place orders as needed and product is manufactured after orders are placed. Encapsys tends to carry very little finished goods inventory and no product backlogs.

## Manufacturing

The Appleton plant, located in Appleton, Wisconsin, produces carbonless and thermal papers. The Roaring Spring, Pennsylvania mill is a nearly fully-integrated pulp and paper mill with three paper machines and produces carbonless and security products. The West Carrollton, Ohio plant produces thermal paper products. In 2007, an expansion program of approximately $125 million commenced at the plant, involving the installation of a state-of-the-art coater to produce thermal papers. The project was completed in third quarter 2008. In 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock to be coated at the Company's converting facilities. As a result, the Company ceased papermaking and recycling operations at the West Carrollton facility but maintained the thermal paper coating operations there.

The Encapsys business operates a state-of-the art manufacturing plant in Portage, Wisconsin. This facility produces thousands of metric tons of microencapsulated material annually. Microcapsules are used in the manufacture of carbonless papers at the Appleton and Roaring Spring facilities. The Company also supplies microcapsules for other commercial applications. Encapsys research and development laboratories, marketing and administrative staff are located in Appleton.

On February 22, 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock to be coated at the Company's converting facilities. Under the terms of this agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years. The agreement includes successive five-year renewal terms unless either party gives notice of non-renewal at least two years prior to the expiration of the then current term.

In connection with its approval of this supply agreement, the Company's Board of Directors authorized a plan for the Company to dispose of papermaking assets at its West Carrollton, Ohio facility and move its carbonless coating to the Company's converting plant in Appleton, Wisconsin. As a result, 314 jobs were eliminated at West Carrollton and 68 jobs added at the Appleton facility. The Company maintains its thermal coating operations at the West Carrollton facility and was staffed by 111 employees as of year-end 2012. For further information see the disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 3, Restructuring and Other Related Costs, of Notes to Consolidated Financial Statements.

7

**Raw Materials**

Raw materials purchases primarily consist of base stock and chemicals. In 2012, those materials made up approximately 47% of the cost of goods sold. The largest raw material component, base stock - rolls of uncoated paper used in the production of coated paper products, comprised 25% of cost of goods sold in 2012. Base stock is acquired from multiple sources pursuant to purchase agreements which establish pricing and volume targets. These agreements mitigate exposure to significant pricing cycles common for pulp and commodity paper products. The next largest raw material component is chemicals.

The Company was party to a significant base stock supply agreement with a supplier which was signed in June 2010 and set to expire on December 31, 2012. On February 22, 2012, the Company entered into a new long-term supply agreement with this supplier for the purchase of carbonless and thermal base stock for coating at the Company's converting facilities. Under the terms of this agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years. The agreement includes successive five-year renewal terms unless either party gives notice of non-renewal at least two years prior to the expiration of the then current term. Prices to be paid by the Company are subject to certain rebates and certain adjustments during the term of the agreement based on volume, changes to raw material pricing, freight prices and productivity gains. The supplier has agreed to be competitive in terms of price, delivery, quality and services. Purchases made from this supplier were approximately 66% of total 2012 base stock purchases. For further information see the disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 3 of Notes to Consolidated Financial Statements.

The Company uses many specialty raw materials which are designed and manufactured to work best with its products and manufacturing processes. The Company makes purchasing decisions based upon quality, service, value and long-term strategic importance. There are long-term agreements with key suppliers designed to ensure stable and consistent supply, to promote joint development and engineering of new raw materials and products, to enhance total value to customers and to protect mutual strategic interests.

**Employees**

As of February 24, 2013, the Company employed 1,644 persons, of whom, 1,062 were covered by union contracts. Manufacturing employees at the Company's major manufacturing facilities in Appleton, Roaring Spring and West Carrollton are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"). In June 2012, represented employees at the Roaring Spring facility ratified a labor agreement effective to November 17, 2014. In September 2012, represented employees at the West Carrollton plant ratified a labor agreement effective to April 1, 2015.

USW also represents employees at the Appleton, Camp Hill and Kansas City distribution centers. Employees at the Peterborough, Ontario, Canada facility are represented by Independent Paperworkers of Canada. Employees at the Portage, Wisconsin plant and other distribution centers in Georgia, Ohio and California are not represented.

The Company has enjoyed good labor-management relations over an extended period of time. There have been no work stoppages over the last 30 years. This long-term relationship has been critical in developing efficient manufacturing sites and a workforce that is highly committed to the Company's success.

**Intellectual Property**

As part of the acquisition of the business from NCR in 1978, the Company obtained a 100-year license to use forms of the NCR PAPER* trademark in branding for carbonless products. The Company also licenses technology from other companies covering non-critical articles of manufacture, manufacturing processes or materials used in such processes. The Company does not believe that any single patent or patent application is material to the Company's business or operations. The Company believes that the duration of the existing patents is consistent with its business needs.

8

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                    8/147

## Environmental

**General**

The Company's operations are subject to comprehensive and frequently changing federal, state and local environmental laws and regulations. These include laws and regulations governing emissions of air pollutants, discharges of wastewater and storm water, storage, treatment and disposal of materials and waste, remediation of soil, surface water and groundwater contamination and liability for damages to natural resources. In addition, the Company is also governed by laws and regulations relating to workplace safety and worker health which, among other things, regulate employee exposure to hazardous chemicals in the workplace.

Compliance with environmental laws and regulations is an important facet of the business. The Company expects to incur capital expenditures of approximately $1.0 million in 2013 and a total of approximately $4.5 million from 2014 through 2018 to maintain compliance with applicable federal, state, local and foreign environmental laws and regulations and to meet new regulatory requirements. The Company expects to continue to incur expenditures after 2018 to maintain compliance with applicable federal, state, local and foreign environmental laws and regulations and to meet new regulatory requirements.

The Company is subject to strict and, under some circumstances, joint and several liability for the investigation and remediation of environmental contamination, including contamination caused by other parties, at properties that it owns or operates and at properties where the Company or its predecessors have arranged for the disposal of regulated materials. As a result, the Company is involved from time to time in administrative and judicial proceedings and inquiries relating to environmental matters. The Company could be involved in additional proceedings in the future and the total amount of these future costs and other environmental liabilities may be material.

Other than the polychlorinated biphenyls ("PCBs") contamination in the area of the wastewater impoundments at the West Carrollton Mill, and the Fox River matter, both of which are disclosed below, there are no known material liabilities with respect to environmental compliance issues.

**West Carrollton Mill**

The West Carrollton, Ohio mill operates pursuant to various state and federal permits for discharges and emissions to air and water. As a result of the de-inking of carbonless paper containing PCBs through the early 1970s, there may have been releases of PCBs and volatile organic compounds into the soil in the area of the wastewater impoundments at the West Carrollton facility and low levels of PCBs have been detected in the groundwater immediately under this area. In addition, PCB contamination is present in sediment in the adjacent Great Miami River, but it is believed that this contamination is from a source other than the West Carrollton mill.

Based on investigation and delineation of PCB contamination in soil and groundwater in the area of the wastewater impoundments, the Company believes that it may be necessary to undertake remedial action in the future, although the Company is currently under no obligation to do so. The Company has not had any discussions or communications with any federal, state or local agencies or authorities regarding remedial action to address PCB contamination at the West Carrollton mill. The cost for remedial action, which could include installation of a cap, long-term pumping, treating and/or monitoring of groundwater and removal of sediment in the Great Miami River, was estimated in 2001 to range up to approximately $10.5 million, with approximately $3 million in short-term capital costs and the remainder to be incurred over a period of 30 years. However, costs could exceed this amount if additional contamination is discovered, if additional remedial action is necessary or if the remedial action costs are more than expected.

Because of the uncertainty surrounding the ultimate course of action for the West Carrollton mill property, the Great Miami River remediation and the Company's share of these remediation costs, if any, and since the Company is currently under no obligation to undertake remedial action in the future, no provision has been recorded in its financial statements for estimated remediation costs. In conjunction with the acquisition of PDC by the ESOP in 2001, and as limited by the terms of the purchase agreement, AWA agreed to indemnify the Company for 50% of all environmental liabilities at the West Carrollton mill up to $5.0 million and 100% of all such environmental costs exceeding $5.0 million. In addition, the former owners and operators of the West Carrollton mill may be liable for all or part of the cost of remediation of historic PCB contamination.

**Lower Fox River**

*Appleton Removed as a Potentially Responsible Party ("PRP").* On April 10, 2012, the United States District Court for the Eastern District of Wisconsin granted Appleton's motion for summary judgment and dismissed all claims against Appleton in the enforcement action. The decision establishes that Appleton is no longer a PRP, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA" or "Superfund"), no longer considered a legal successor to NCR's liabilities, and no longer required to comply with the 106 Order commanding remediation of the Lower Fox River. In addition, on July 3, 2012, the United States District Court for the Eastern District of Wisconsin determined that Appleton Coated Paper Company and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

The rulings do not affect Appleton's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appleton's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appleton and BAT have joint and several liability under the Arbitration. Appleton has initiated the dispute resolution procedures outlined in the 1998 agreement. Issues in dispute include the scope of Appleton's liability under the agreement as well as funding requests and supporting documentation from NCR (the "Dispute Resolution"). The current carrying amount of Appleton's liability under the Arbitration is $65.0 million, which represents Appleton's best estimate of amounts to be paid for 2012 and 2013. On June 8, 2012, BAT served AWA with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by AWA from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appleton with the same claim, seeking a declaration that BAT is indemnified by Appleton. Appleton intends to vigorously defend against this claim and has filed an application challenging the jurisdiction of the United Kingdom court.

9

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                                                9/147

Prior to the ruling in the above enforcement action, the United States Environmental Protection Agency ("EPA") and Wisconsin Department of Natural Resources ("DNR") claimed Appleton was a PRP with respect to historic discharges of polychlorinated biphenyls ("PCBs") into the Lower Fox River in Wisconsin. Carbonless paper containing PCBs was manufactured at what is currently the Appleton plant from 1954 until 1971. During this period, wastewater containing PCBs was discharged into the Lower Fox River from a publicly-owned treatment works, from the Appleton plant, from the Combined Locks, Wisconsin paper mill and from other local industrial facilities. Wastewater from the Appleton plant was processed through the publicly-owned treatment works. Appleton purchased the Appleton plant and the Combined Locks, Wisconsin paper mill from NCR in 1978, long after the use of PCBs in the manufacturing process was discontinued. The EPA issued an administrative order in November 2007, directing the PRPs to implement the remedial action of the Fox River pursuant to which certain of the PRPs commenced remediation in 2008. The various PRPs, including NCR, the EPA and the DNR continue to contest the scope, extent and costs of the remediation as well as the appropriate bases for determining the parties' relative shares of the remediation cost.

The rulings also do not affect either of the two indemnification agreements entered in 2001 wherein AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims (including certain claims under the Arbitration), which are defined in the agreements as the Fox River Liabilities. Appleton has recorded a $65.0 million environmental indemnification receivable as of December 29, 2012.

***Estimates of Liability.*** The accrued Arbitration liability is derived from available information, including consideration of uncertainties regarding the scope and cost of implementing the final remediation plan, the scope of restoration and final valuation of natural resource damage ("NRD") assessments, the evolving nature of remediation and restoration technologies and governmental policies, NCR's share of liability relative to other PRPs and the extent of BAT's performance under the Arbitration. Appleton believes NCR has paid more than its estimated share of the liability based on the assumptions below. Based on the analysis of available information, it is reasonably possible that the Company's costs to satisfy its Arbitration liability, when ultimately settled, could range from $10 million to $310 million, with a payment period extending beyond ten years. The Company has recorded a liability of $65 million at December 29, 2012, which is its best estimate of the probable loss within this range. The Company believes the likelihood of an outcome in the upper end of the range is significantly less than other possible outcomes within the range. Interim legal determinations may periodically obligate NCR (and BAT and Appleton pursuant to the Arbitration) to fund portions of the cleanup costs to extents greater than NCR's share as finally determined, and in such instances, Appleton may reserve additional amounts (including appropriate reimbursement under its indemnification agreements as discussed below).

The following assumptions were used in evaluating Appleton's Arbitration liability:

- As of December 31, 2012, NCR has recorded an estimated liability of $115 million representing its portion of defense and liability costs with respect to the Lower Fox River;

- Technical analyses contending that discharges from NCR's former assets represent 8% to 10% of the total PCBs discharged by the PRPs;

- Appleton's and BAT's joint and several responsibility for over half of the claims asserted against NCR and Appleton, based on the Arbitration and the Dispute Resolution;

- Based on legal analyses and ongoing reviews of publicly-available financial information, Appleton believes that other PRPs will be required, and have adequate financial resources, to pay their respective shares of the remediation and NRD claims for the Lower Fox River; and

- legal fees and other expenses.

Appleton believes its recorded liability reflects its best estimate of expected payments during 2013 under the Arbitration Agreement. Appleton believes NCR has paid more than its estimated share of the liability, as described above, and therefore payments beyond 2013 under the Arbitration are not deemed probable at December 29, 2012.

10

*AWA Indemnification.* Pursuant to two indemnification agreements entered in 2001, AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims, which are defined in the agreements as the Fox River Liabilities.

Under the indemnification agreements, Appleton is indemnified for the first $75 million of Fox River Liabilities and for amounts in excess of $100 million. During 2008, Appleton paid $25 million to satisfy its portion of the Fox River Liabilities not covered by the indemnification agreement with AWA. As of December 29, 2012, AWA has paid $273.5 million in connection with Fox River Liabilities. At December 29, 2012, PDC's total indemnification receivable from AWA was $65.0 million, all of which is recorded in other current assets. At December 29, 2012, the total Appleton indemnification receivable from PDC was $65.0 million, all of which is recorded in other current assets.

In March 2008, Appleton received favorable jury verdicts in a state court declaratory judgment relating to insurance coverage of its environmental claims involving the Fox River. A final judgment and order was entered in January 2009. The insurers appealed the final judgment. In June 2010, the Wisconsin Court of Appeals upheld the final judgment. Settlements have been negotiated between the insurers and Appleton. Under the terms of the indemnification agreement, recoveries from insurance are reimbursed to AWA to the extent of its indemnification obligation. During 2010, Appleton recorded an $8.9 million receivable, representing settlements to be received in excess of amounts reimbursable to AWA, in the Consolidated Balance Sheet as of January 1, 2011. During 2011, Appleton received $6.2 million of these funds. During 2012, an additional environmental expense insurance recovery of $2.2 million was recorded as a separate line item within operating income on the Consolidated Statement of Comprehensive Loss and all remaining funds were received by Appleton in 2012.

The indemnification agreements negotiated with AWA are designed to ensure that Appleton will not be required to fund any of the indemnified costs and expenses in relation to the Fox River Liabilities. This arrangement is working as designed and is expected to continue to protect Appleton with respect to the indemnified costs and expenses, based on Appleton's review of the financial condition of AWA and estimates of Appleton's liability. As earlier noted, Appleton's ultimate liability pursuant to the Arbitration could prove to be significantly larger than the current carrying amount and potentially could exceed the financial capability of AWA. In the event Appleton is unable to secure payment from AWA or its former parent companies, Appleton may be liable for amounts pursuant to the Arbitration and these amounts may be material to Appleton.

**Item 1A.**       **Risk Factors**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This report contains forward-looking statements. The words "will," "may," "should," "believes," "anticipates," "intends," "estimates," "expects," "projects," "plans," "seeks" or similar expressions are intended to identify forward-looking statements. All statements in this report other than statements of historical fact, including statements which address the Company's strategy, future operations, future financial position, estimated revenues, projected costs, prospects, plans and objectives of management and events or developments that it expects or anticipates will occur, are forward-looking statements. All forward-looking statements speak only as of the date on which they are made. They rely on a number of assumptions concerning future events and are subject to a number of risks and uncertainties, many of which are outside the Company's control, which could cause actual results to differ materially from such statements. These risks and uncertainties include, but are not limited to, the factors listed below. Many of these factors are beyond the Company's ability to control or predict. Given these uncertainties, undue reliance should not be placed on the forward-looking statements. The Company disclaims any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

***The Company is subject to substantial costs and potential liabilities relating to environmental regulation and litigation.***

The Company is subject to comprehensive and frequently changing laws and regulations enacted by various federal, state and local authorities concerning the impact of the environment on human health, the limitation and control of emissions and discharges into the air, ground and waters, the quality of ambient air and bodies of water and the handling, use and disposal of specified substances. Financial responsibility for the cleanup or other remediation of contaminated property or for natural resource damages can extend to previously-owned or used properties, waterways and properties owned by unrelated companies or individuals, as well as properties currently owned and used by the Company, regardless of whether the contamination is attributable entirely to prior owners. In addition, the Company makes capital expenditures and incurs operating expenses for environmental obligations and matters arising from its daily operations.

The Company may be named as a potentially responsible party, or PRP, in the future and the associated costs may be material. The Company expects environmental laws and regulations and the interpretation and enforcement of those laws and regulations to become increasingly stringent and to further limit emission and discharge levels and to increase the likelihood and cost of environmental cleanups and related activities. All of these factors are likely to increase the Company's operating expenses, require continuing capital expenditures and adversely affect the operating flexibility of its manufacturing operations and may require indeterminable and significant additional expenditures in connection with such compliance.

11

*Appleton is obligated to share defense and liability costs with NCR as determined by a 1998 agreement and a 2005 arbitration determination ("the Arbitration").*

On April 10, 2012, the United States District Court for the Eastern District of Wisconsin granted Appleton's motion for summary judgment and dismissed all claims against Appleton in the enforcement action. The decision establishes that Appleton is no longer a PRP, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA" or "Superfund"), no longer considered a legal successor to NCR's liabilities, and no longer required to comply with the 106 Order commanding remediation of the Lower Fox River. In addition, on July 3, 2012, the United States District Court for the Eastern District of Wisconsin determined that Appleton Coated Paper Company and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

The rulings do not affect Appleton's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appleton's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appleton and BAT have joint and several liability under the Arbitration. Appleton has initiated the dispute resolution procedures outlined in the 1998 agreement. Issues in dispute include the scope of Appleton's liability under the agreement as well as funding requests and supporting documentation from NCR (the "Dispute Resolution"). The current carrying amount of Appleton's liability under the Arbitration is $65.0 million, which represents Appleton's best estimate of amounts to be paid for 2012 and 2013. On June 8, 2012, BAT served AWA with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by AWA from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appleton with the same claim, seeking a declaration that BAT is indemnified by Appleton. Appleton intends to vigorously defend against this claim and has filed an application challenging the jurisdiction of the United Kingdom court.

Prior to the ruling in the above enforcement action, the United States Environmental Protection Agency ("EPA") and Wisconsin Department of Natural Resources ("DNR") claimed Appleton was a PRP with respect to historic discharges of polychlorinated biphenyls ("PCBs") into the Lower Fox River in Wisconsin. Carbonless paper containing PCBs was manufactured at what is currently the Appleton plant from 1954 until 1971. During this period, wastewater containing PCBs was discharged into the Lower Fox River from a publicly-owned treatment works, from the Appleton plant, from the Combined Locks, Wisconsin paper mill and from other local industrial facilities. Wastewater from the Appleton plant was processed through the publicly-owned treatment works. Appleton purchased the Appleton plant and the Combined Locks, Wisconsin paper mill from NCR in 1978, long after the use of PCBs in the manufacturing process was discontinued. The EPA issued an administrative order in November 2007, directing the PRPs to implement the remedial action of the Fox River pursuant to which certain of the PRPs commenced remediation in 2008. The various PRPs, including NCR, the EPA and the DNR continue to contest the scope, extent and costs of the remediation as well as the appropriate bases for determining the parties' relative shares of the remediation cost.

The rulings also do not affect either of the two indemnification agreements entered in 2001 wherein AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims (including certain claims under the Arbitration), which are defined in the agreements as the Fox River Liabilities. Appleton has recorded a $65.0 million environmental indemnification receivable as of December 29, 2012.

Appleton cannot predict the final outcomes of the various proceedings that will determine the portion of NCR's remediation costs that it may be obligated to share under the Arbitration, nor can it anticipate that AWA will have sufficient resources to support the indemnification agreements. If the Arbitration obligation exceeds AWA's financial capability, and BAT fails to meet its obligation under Arbitration, Appleton could be required to pay such excess, which could materially adversely affect its business, financial condition and results of operations.

*Appleton's former parent, AWA, may fail to comply with its indemnification obligations related to the acquisition of Appleton.*

As amended in, and as limited by the terms of the purchase agreement relating to the acquisition of Appleton, AWA and two of its affiliates have agreed to indemnify PDC and Appleton for certain losses resulting from (1) inaccuracies in the environmental representations and warranties made by AWA and its affiliates, (2) certain known environmental matters that existed at the closing of the acquisition, (3) environmental matters related to the businesses of Newton Falls, Inc., Appleton Coated LLC and several other of the Company's former affiliates and subsidiaries and (4) environmental matters relating to the real property on which the Company's former Camp Hill, Pennsylvania plant and the Company's current distribution center are located that existed prior to its sale of the Camp Hill plant to a third-party.

AWA has also agreed, subject to certain limitations, to indemnify Appleton and PDC for specified environmental liabilities relating to the contamination of the Lower Fox River. If the indemnified matters result in significant liabilities for the Company, and AWA and/or its affiliates are unable or unwilling to honor these indemnification obligations, the Company could be required to pay for these liabilities, which could materially adversely affect its business, financial condition and results of operations.

12

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

***Future greenhouse gas/carbon regulations or legislation and future Boiler Maximum Achievable Control Technology ("MACT") regulations could adversely affect the Company's costs of compliance with environmental laws.***

In 2009, the EPA finalized its finding that greenhouse gas ("GHG") emissions endanger the public health and welfare. Since then, the EPA has finalized rules to regulate GHG emissions under the federal Clean Air Act. Also in 2009, several bills were introduced in the U.S. Congress concerning climate change and the emission into the environment of carbon dioxide and other GHGs. If there is legislation, it may take the form of a cap and trade program and the Company may then be required, among other things, to purchase allowances or offsets to emit GHGs or other regulated pollutants or to pay taxes on such emissions. In April 2010, the EPA proposed three related air rules commonly known as the Industrial Boiler MACT under the Clean Air Act. These air rules were finalized by the EPA in December 2012. The Company is currently analyzing the new rules and their impact on the Company and the cost the Company will incur to comply with these new air rules.

***The Company has a substantial amount of indebtedness outstanding and, as a result, it is operating as a highly leveraged company.***

The Company's total debt at December 29, 2012, was approximately $515.6 million. For a description of the components of the Company's debt see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" and Note 11 of the Notes to Consolidated Financial Statements. This large amount of indebtedness could:

- make it more difficult for the Company to satisfy its financial obligations with respect to the asset-backed revolving credit facility, as amended, the senior secured first lien notes, the second lien notes and senior subordinated notes, as amended;

- require the Company to dedicate a substantial portion of cash flow from operations to payments on indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures, acquisitions, research and development or general corporate activities;

- limit the Company's ability to obtain additional financing for working capital, capital expenditures, acquisitions, research and development or general corporate purposes and

- limit the Company's flexibility in planning for, or reacting to, changes in its businesses and the industries in which it operates.

Furthermore, although the Company's ability to borrow money is restricted by the terms of its various debt agreements, it may be possible for the Company to incur even more debt and, if it does so, these risks could intensify.

***The Company's ability to service its debt is dependent on its future operating results and the Company cannot be sure that it will be able to meet its debt obligations as they come due.***

The Company's ability to meet its payment obligations, relating to its indebtedness, is subject to a variety of factors, including, for example, changes in:

- demand for and selling prices of the Company's products;

- competition;

- costs of raw materials and operating costs;

- the rate of decline in sales of carbonless paper products;

- environmental regulations and

- general economic conditions.

The Company expects to use cash flow from operations to pay its expenses and scheduled interest and principal payments due under its outstanding indebtedness. Its ability to make these payments depends on its future performance, which is affected by financial, business, economic and other factors, many of which the Company cannot control. The recent recession and credit crisis and related turmoil in the global financial system has had and may continue to have an adverse effect on the Company's business, financial condition, results of operations and cash flows. Consequently, its business may not generate sufficient cash flow from operations in the future and its anticipated growth in revenue and cash flow may not be realized, either or both of which could result in the Company being unable to repay or pay interest on its indebtedness or to fund other liquidity needs. If the Company does not have enough money, it may be required to refinance all or part of its then-existing debt, sell assets or borrow more money. The Company cannot make any assurances that it will be able to accomplish any of these alternatives on terms acceptable to it, or at all. In addition, the terms of existing or future debt agreements, including the indenture governing the notes and the revolving credit facility, as amended, may restrict the Company from adopting any of these alternatives. The failure to generate sufficient cash flow or to achieve any of these alternatives could significantly adversely affect the value of its indebtedness and its ability to pay the amounts due. In addition, if the Company defaults in the payment of amounts due, it would give rise to an event of default under the note indentures and possible acceleration of amounts due under its outstanding indebtedness. In the event of any acceleration, there can be no assurance that the Company will have enough cash to repay its outstanding indebtedness.

*Compliance with the covenants relating to the Company's indebtedness may limit its operating flexibility.*

Certain of the Company's debt agreements contain provisions that require the Company to maintain specified financial ratios as such items are defined in the debt agreements. The Company's ability to comply with the financial covenants in the future depends on achieving forecasted operating results. However, with the volatility being experienced in the current economic environment, it can be difficult to predict the ultimate impact of current economic trends on the Company's future operating results. Given the uncertain global economies and other market uncertainties, there are various scenarios, including a reduction from forecasted operating results, under which the Company could violate its financial covenants. The Company's failure to comply with such covenants or an assessment that it is likely to fail to comply with such covenants, could also lead the Company to seek amendments to or waivers of the financial covenants. No assurances can be provided that the Company would be able to obtain any amendments to or waivers of the covenants. In the event of non-compliance with debt covenants, if the lenders will not amend or waive the covenants, the debt would be due and the Company would need to seek alternative financing. The Company cannot provide assurance that it would be able to obtain alternative financing. If the Company were not able to secure alternative financing, this would have a material adverse impact on the Company.

*The market for the primary product in the Company's carbonless papers segment, carbonless paper, may decline more rapidly than anticipated.*

The Company's carbonless papers segment, of which the primary product is carbonless paper, accounted for 56% of net sales in 2010, 53% of net sales in 2011 and 48% of net sales in 2012. Total sales volume of carbonless paper products decreased approximately 13% from 2011 to 2012 largely due to the Company's decision to discontinue selling carbonless papers into certain non-strategic international markets. Total sales volume of carbonless paper products decreased approximately 11% from 2010 to 2011, while a volume increase of approximately 4% occurred from 2009 to 2010 due to increased market share. The Company believes the worldwide carbonless market is declining as users switch to alternative modes of communication and technologies that do not use impact printing to create images. The Company expects that its total sales volume of carbonless paper products will continue to decline at rates that are consistent with the decline rate of the overall market. If the decline in the Company's sales of carbonless paper products accelerates, or if it is unable to maintain the prices of its carbonless paper products or if it is unable to offset reductions in carbonless papers sales with increased sales of thermal papers or other products, then the Company's business, financial condition and results of operations may be materially adversely affected.

*The Company may be unable to develop and introduce new and enhanced products.*

The Company's success in developing new products will depend in large part on its ability to use its existing technical and manufacturing capabilities and knowledge in the development and introduction of new, value-added products targeted at new markets and customers. If the Company is unable to utilize its capabilities or, properly identify and address the evolving needs of targeted customers and markets, the Company's ability to capture and develop new business opportunities will be limited. In addition, if the revenue and profits generated by new products are not sufficient to replace the anticipated decline in revenue and profits generated by carbonless products, then the Company's business, financial condition and results of operations may be materially adversely affected.

14

***The Company's ability to compete effectively in the marketplace depends, in part, on its ability to continually improve productivity and reduce operating costs.***

The Company must continually strive to improve the productivity and cost structure of its manufacturing operations and the efficiency of its support services in order to offer products that are priced competitively and deliver an attractive value proposition to its customers. The Company sets specific productivity and cost reduction goals each year for each of its production facilities and key staff functions. Accomplishing these goals is essential to its near-term competitiveness and long-term financial viability. If the Company fails to reach these goals, it may experience an erosion of its profit margins, a decline in net sales or both, which could negatively affect its ability to service its debt and invest in the future growth of its business segments.

***The Company currently relies on a relatively small number of customers to generate a significant amount of its net sales from each of its various businesses.***

The five largest customers in the carbonless papers segment accounted for approximately 33% of carbonless papers net sales in 2012 and 32% of carbonless papers net sales in 2011 and 2010. The five largest customers in the thermal papers segment accounted for approximately 40% of thermal papers net sales in 2012, 47% of thermal papers net sales in 2011 and 43% of thermal papers net sales in 2010. The largest external customer in the Encapsys segment accounted for approximately 58% of Encapsys net sales (which include internal sales to the Company's carbonless papers segment) in 2012, 59% in 2011 and 52% in 2010.

Many of the Company's customers are under no obligation to purchase its products in the future. Furthermore, some of the Company's customers have become insolvent or financially distressed in recent years. If the Company loses one or more of its significant customers (e.g., to a competitor or as a result of their being acquired by a customer of a competitor) or any of the Company's significant customers experience financial difficulty, then its business, financial condition and results of operations may be materially adversely affected.

***The Company currently relies on a small number of third parties to supply several of the key raw materials used to produce its products.***

The Company's business depends upon the availability of key raw materials, including base stock and certain chemicals. In 2012, the Company purchased approximately $195 million of base stock from external suppliers. The Company relied on a single external supplier for approximately 89% of the base stock it purchased in 2012 to produce carbonless paper products, and a single external supplier for approximately 61% of the base stock the Company purchased in 2012 to produce thermal papers. For some of the key chemicals the Company uses in its products, it relies on one or two suppliers. If there is a disruption in the supply of raw materials, including the chemicals that the Company needs to produce its carbonless papers and thermal papers, then the Company may be required to purchase these raw materials from alternative sources, which may result in a significant increase in its operating costs. Included in these increased costs would be development costs associated with qualifying new raw materials and suppliers. The Company may not be able to procure carbonless base stock, thermal base stock, key chemicals or other raw materials from alternative suppliers in the future in amounts sufficient to meet its needs or at prices consistent with historical prices.

On February 22, 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock for coating at the Company's converting facilities. Under the terms of this agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years. Related to this supply agreement, the Company's Board of Directors approved a plan to dispose of the papermaking assets at the Company's West Carrollton, Ohio facility, thereby eliminating the Company's capacity to manufacture base stock in West Carrollton. For further information see the disclosures in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and Note 3 of Notes to Consolidated Financial Statements. This agreement will have the effect of reducing the number of raw material suppliers to the Company and increasing the Company's dependence on key suppliers. Should this supplier of base stock fail to supply quantities ordered by the Company, the Company may not be able to procure alternate sources of carbonless and thermal base stock in quantities sufficient to meet customer requirements or at prices comparable to the terms under this supply agreement.

The lack of available alternative suppliers could subject the Company to significant cost increases and manufacturing delays and its business, financial condition and results of operations may be materially adversely affected.

***The global credit market crisis and economic weakness may adversely affect the Company's customers and suppliers.***

Global financial and credit markets recently have been extremely unstable and unpredictable. Worldwide economic conditions have been weak and may deteriorate further. The instability of the markets and weakness of the global economy could affect the demand for the Company's customers' products, the amount, timing and stability of their orders from the Company, the financial strength of its customers and suppliers, and/or the Company's suppliers' and customers' ability to fulfill their obligations to the Company. These factors could materially adversely affect its business, financial condition and results of operations.

15

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

***The Company has competitors in its various markets and it may not be able to maintain prices and margins for its products.***

      The Company faces strong competition in all of its business segments. Its competitors vary in size and the breadth of their product offerings and some of its competitors have significantly greater financial, technical and marketing resources than the Company does. Regardless of the continuing quality of the Company's primary products, the Company may be unable to maintain its prices or margins due to:

•      declining overall carbonless market size;

•      accelerating decline in carbonless sheet sales;

•      variations in demand for, or pricing of, carbonless products;

•      increasing manufacturing and raw material costs;

•      increasing competition in international markets or from domestic or foreign producers or

•      declining general economic conditions.

      The Company's inability to compete effectively or to maintain its prices and margins could have a material adverse effect on its earnings and cash flow.

      The Company competes based on a number of factors, including price, product availability, quality and customer service. Additionally, the Company competes with domestic production and imports from Europe and Asia. In 2007, the Company filed antidumping petitions against imports of certain lightweight thermal paper ("LWTP") from China, Germany and Korea and a countervailing duty petition against such imports from China. In 2008, the U.S Department of Commerce ("Department") issued its final determination, affirming that certain Chinese producers and exporters of LWTP sold the product in the U.S. at prices below fair value, imposing final duties of 19.77% to 115.29%, and that German producers and exporters sold the product in the U.S. at prices below fair value and imposed final duties on those imports of 6.5%. In addition, for all but one Chinese producer, the Department imposed countervailing duties of between 13.17% and 137.25%. In 2008, the U.S. International Trade Commission ("ITC") determined the U.S. industry producing LWTP is threatened with material injury due to unfairly traded imports from China and Germany, and final duties went into effect in 2008. These duties do not have a direct impact on the Company's net income.

      A German manufacturer filed an appeal of the ITC determination to the U.S. Court of International Trade ("CIT"). The appeal was decided in favor of the Company in 2009, and the German manufacturer filed a further appeal to the U.S. Court of Appeals for the Federal Circuit ("CAFC"). In 2011, the CAFC remanded the matter for further consideration by the ITC, and the ITC upheld its original determination. In January 2012, the CIT upheld the ITC's decision on remand, and the German manufacturer filed another appeal of the matter to the CAFC. In January 2013, the CAFC affirmed the decision of the CIT in favor of the Company.

      In addition, for each of the four 12-month periods following implementation of the final duties, the Company and the German manufacturer have filed requests for administrative review with the Department, seeking to modify the amount of the duties based on the market practices during each respective 12-month period. In 2011, the Department issued a final determination in the first 12-month review period, resulting in a dumping margin of 3.77 percent for imports from the German manufacturer for the period from November 2008 to October 2009. In 2012, the Department issued a final determination in the second 12-month review period, resulting in a dumping margin of 4.33% for imports from the German manufacturer for the period from November 2009 to October 2010. The German manufacturer has appealed the first and second review determinations. In December 2012, the Department issued a preliminary determination in the third 12-month review period, reflecting a dumping margin of 75.36% based on the Department's finding that the German manufacturer knowingly and intentionally submitted fraudulent responses to the Department. The Company anticipates the Department will confirm the 75.36% duty in its final determination for the third 12-month review period, which is expected to be issued in early April 2013. Upon final resolution of the appeals, the third administrative review and the fourth administrative review, certain of the duties could be reduced, increased or eliminated.

***Continued volatility of raw materials costs may adversely impact the Company's margins for its products.***

      In recent years, the Company has experienced greater volatility in raw materials costs, which comprise a significant portion of the Company's operating costs. The Company endeavors to recover cost increases through continuous improvements in its business operations and product formulations and through selected price increases. However, the effects of rising raw materials costs on margins are difficult to match in precise amount or timing with offsetting price increases or cost reduction activities. To the extent the Company is unable to offset raw materials cost inflation, margins for products may be adversely impacted.

<div align="center">16</div>

***PDC and its eligible subsidiaries may fail to remain qualified to be taxed as subchapter S corporations and the ESOP may not continue to be exempt from U.S. federal or certain state and local income taxes.***

PDC has made an election to be treated as a subchapter S corporation for U.S. federal and, where recognized, state and local income tax purposes and an election to treat its eligible subsidiaries as qualified subchapter S subsidiaries for U.S. federal and, where recognized, state and local income tax purposes. PDC believes that it qualifies as a subchapter S corporation and that Appleton and other eligible subsidiaries are qualified subchapter S subsidiaries. Appleton's Canadian subsidiary is subject to Canadian tax law and is not eligible for this treatment.

Section 1362 of the Internal Revenue Code of 1986, as amended, or the Code, provides that a corporation that meets certain requirements may elect to be taxed as a subchapter S corporation. Section 1361 of the Code provides that a corporation that, among other requirements, has all of its stock owned by a subchapter S corporation or a qualified subchapter S subsidiary may elect to be classified as a qualified subchapter S subsidiary. A qualified subchapter S subsidiary is disregarded as a separate entity for federal and most state and local income tax purposes. With limited exceptions, a subchapter S corporation does not pay any income tax. Rather, the income of an S corporation is allocated to its shareholders. An ESOP is exempt from income tax pursuant to Section 501 of the Code and is not taxed on its allocable share of a subchapter S corporation's income. However, a plan is not treated as an ESOP unless it meets the requirements of Section 4975(e)(7) of the Code.

PDC's continuing status as a subchapter S corporation and its eligible subsidiaries as qualified subchapter S subsidiaries for U.S. federal and state income tax purposes will depend upon its, and their, ability to continue to meet the eligibility requirements.

It is possible that the Internal Revenue Service, or IRS, could take the position on audit that PDC is not eligible to be taxed as a subchapter S corporation and, as a consequence, terminate its subchapter S election. Additionally, the applicable law and regulations may change in a way that results in PDC being taxed as a corporation other than as a subchapter S corporation. Furthermore, the current law that exempts the ESOP trust from taxation on its allocable share of a subchapter S corporation's income may change.

PDC could realize significant tax savings during profitable years due to the subchapter S corporation status. However, if, for any reason, it lost its subchapter S corporation status, or any of its qualified subchapter S subsidiaries loses its qualified subchapter S subsidiary status, it would be required to pay U.S. federal and certain state and local income taxes, thereby reducing the amount of cash available to repay debt or reinvest in the Company's operations, which could have a material adverse effect on its earnings and cash flow. Similarly, if the plan does not qualify as an ESOP and becomes subject to tax on its share of the subchapter S corporation's income, the Company would have to distribute cash to the ESOP trust to enable it to pay the resulting taxes, again reducing the amount of cash available to repay debt or to be reinvested in its operations.

***The Company's underfunded pension plans require future pension contributions which could limit flexibility in managing the Company.***

The total projected benefit obligation of the Company's defined benefit pension plans exceeded the fair value of the plan assets by $137.6 million at December 29, 2012. The Company contributed $25.0 million to the pension plan in 2012 and $18.0 million to the pension plan in 2011. The Company is forecasting a contribution of $12.5 million in 2013. Among the key assumptions inherent in the actuarially calculated pension plan obligation and pension plan expense are the discount rate and the expected rate of return on plan assets. If interest rates and actual rates of return on invested plan assets were to decrease significantly, the pension plan obligation could increase materially. The size of future required pension contributions could result in the Company dedicating a substantial portion of its cash flow from operations to making the contributions which could materially adversely affect its business, financial condition and results of operations.

Effective January 1, 2008, the Company amended the Appleton Papers Inc. Retirement Plan (the "Plan") to provide that no non-union individuals hired or re-hired on or after January 1, 2008, shall be eligible to participate in the Plan. Also, plan benefits accrued under the Plan were frozen as of April 1, 2008, with respect to Plan participants who elected to participate, effective April 1, 2008, in a "Mandatory Profit Sharing Contribution" known as the Retirement Contribution benefit under the Appleton Papers Inc. Retirement Savings and Employee Stock Ownership Plan (the "KSOP"), or January 1, 2015, in the case of any other Plan participants. In December 2010, it was announced that the effective date of the freeze would be changed from January 1, 2015 to March 1, 2011.

17

*Future legislation or regulations intended to reform pension and other employee benefit plans could adversely affect the Company's ability to repay its debt, reinvest in its operations or grow its business through new product development or through acquisitions.*

From time to time in recent years, legislators and agencies of the executive branch have formulated or suggested various legislative proposals that would affect employee benefit plans. If legislation is adopted that requires the Company to lift restrictions on sales of PDC common stock held in participants' KSOP accounts, or that limits the amount of PDC common stock that may be held by the KSOP, then the Company may be required to fund the repurchase of substantial amounts of PDC common stock or take some other action restrictive to its finances. These repurchases or other restrictive actions could reduce the amount of cash available to repay debt, reinvest in its operations or grow its business through new product development or through acquisitions. In addition, these repurchases could violate covenants under the Company's outstanding debt agreements, which could lead to a default under those agreements.

*PDC's legal obligations to repurchase common stock from employees and former employees may lead to a default under the agreements governing the Company's indebtedness or may constrain the Company's ability to make necessary reinvestments in its operations or invest in new business opportunities.*

It may be necessary for Appleton to make significant distributions to PDC in order for PDC to satisfy its share repurchase obligations, under the Employee Retirement Income Savings Act of 1974, or ERISA, and the terms of the KSOP, to current and former employees who are participants in the ESOP. PDC incurs obligations to ESOP participants, when they retire or otherwise terminate employment, to repurchase shares of PDC. The ESOP allows PDC to satisfy its share repurchase obligations by installment payments and PDC currently satisfies its share repurchase obligations to former participants by making five equal annual installment payments. The ESOP also has obligations to permit certain participants to diversify the investment of a portion of their ESOP account, which would otherwise be invested in shares of PDC stock. However, the agreements governing the Company's indebtedness contain limitations on its ability to satisfy the repurchase obligations. The amount of PDC's repurchase obligations may at any time exceed these limitations and Appleton may elect, or be forced, to help PDC meet its obligations. Further, PDC, as a guarantor of the Company's indebtedness, may also be limited to some extent from making payments to the ESOP or its beneficiaries by the terms of its and the Company's indebtedness.

As a result of PDC's legally imposed repurchase obligations, Appleton and/or PDC may be forced to violate the distribution and/or payment limitations contained in the agreements relating to its and the Company's indebtedness, which may ultimately result in defaults under the agreements and the notes. Defaults on any of its indebtedness could result in acceleration of its indebtedness and cause the Company to dispose of its assets or declare bankruptcy and, as a result, it may not have sufficient funds to satisfy its obligations under the notes.

Moreover, PDC's legally imposed repurchase obligations are expected to consume a significant portion of the Company's cash flows from operations. After satisfying repurchase obligations and required debt repayments, the Company's remaining cash flow may be insufficient to make required reinvestments in its existing business or to invest in potentially desirable new business opportunities.

**Item 1B.**      **Unresolved Staff Comments**

None.

18

## Item 2.       Properties

The Company owns or leases the facilities reflected in the table below. The Company believes that its plants and facilities have been well maintained, are in good condition, are suitable for their respective operations and provide sufficient capacity to meet production requirements.

| Location | Description | Approximate Square Footage | Status |
|---|---|---|---|
| Appleton, Wisconsin (Wisconsin Ave.) | Headquarters Offices and Manufacturing Plant | 1,151,000 | Owned |
| Portage, Wisconsin | Capsule Manufacturing Plant | 73,000 | Owned |
| Roaring Spring, Pennsylvania | Pulp and Paper Mill | 636,000 | Owned |
| West Carrollton, Ohio | Manufacturing Plant | 758,000 | Owned |
| Appleton, Wisconsin (East Warehouse Road) | Warehouse | 290,000 | Lease expires 12/31/14 |
| Appleton, Wisconsin (Kensington Drive) | Distribution Center | 357,000 | Lease expires 12/31/15 |
| Monroe, Ohio | Distribution Center | 220,000 | Lease expires 4/30/16 |
| Camp Hill, Pennsylvania | Distribution Center | 212,000 | Lease expires 12/31/13 |
| Ontario, California | Distribution Center | 102,000 | Lease expires 7/31/13 |
| Kansas City, Kansas | Distribution Center | 103,000 | Lease expires 1/31/15 |
| McDonough, Georgia | Distribution Center | 106,000 | Lease expires 10/31/14 |
| Peterborough, Ontario, Canada | Distribution Center | 44,000 | Lease expires 3/31/15 |
| Roaring Spring, Pennsylvania | Warehouse | 89,000 | Month to Month |

The Company's business is primarily operated in Appleton and Portage, Wisconsin, West Carrollton, Ohio and Roaring Spring, Pennsylvania.

During the years 2008 through 2012, the Company invested approximately $168 million in capital improvements, of which, approximately $156 million was spent at its manufacturing facilities. The primary goal of this capital spending was to improve manufacturing efficiencies, product quality and cycle time. Of the $156 million spent on manufacturing facilities, approximately $2 million was spent to comply with applicable environmental regulations.

The Company also maintains one field sales office in the U.S. which is in a leased premises under a short-term lease.

## Item 3.       Legal Proceedings

The Company is involved from time to time in certain administrative and judicial proceedings and inquiries related to environmental matters. For a discussion of these environmental matters, see "Item 1. Business – Environmental" and Note 19 of the Notes to the Consolidated Financial Statements. Furthermore, from time to time the Company may be subject to various demands, claims, suits or other legal proceedings arising in the ordinary course of business. The Company maintains a comprehensive insurance program to protect against such matters, though not all such exposures are, or can be, addressed by insurance. Estimated costs are recorded for such demands, claims, suits or proceedings of this nature when reasonably determinable. The Company has successfully defended such claims, settling some for amounts which are not material to the business and obtaining dismissals in others. While the Company will vigorously defend itself and expects to prevail in any similar cases that may be brought against it in the future, there can be no assurance that it will be successful.

Other than the Lower Fox River matter described in "Item 1. Business – Environmental," and assuming the Company's expectations regarding defending such demands, claims, suits or other legal or regulatory proceedings prove accurate, the Company does not believe that any pending or threatened demands, claims, suits or other legal or regulatory proceedings will have, individually or in the aggregate, a materially adverse effect on its business, financial condition and results of operations or cash flows.

## Item 4.       Mine Safety Disclosures

Not applicable

19

**PART II**

Item 5.          **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

There is no established trading market for the common stock of PDC or Appleton. All of the outstanding shares of PDC are owned of record by the KSOP, in which there are 2,222 active participants who were invested in the Company's Stock Fund as of December 29, 2012. All of the outstanding shares of Appleton are owned of record by PDC.

No dividends have been declared on the common stock of PDC or Appleton in the last two years and neither of these entities currently anticipates paying dividends in the foreseeable future. Each of these entities is and has been restricted from declaring dividends and repurchasing common stock pursuant to provisions contained in the Company's indebtedness agreements. For further information, see "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Description of Outstanding Indebtedness" and Notes 11 and 25 of Notes to Consolidated Financial Statements.

During the year ended December 29, 2012, PDC sold approximately 184,444 shares of its common stock to the ESOP. The ESOP acquired the shares with pre-tax payroll deferrals, rollovers and employee loan payments made to the ESOP during the period from January 1, 2012, to December 29, 2012, by employees of the Company who are participants in the KSOP as well as interest received by the trust. The aggregate sales price was $2.9 million. There were no underwriters used and no underwriting discounts or commissions paid. The offer and sale of the shares was made pursuant to Rule 701 under the Securities Act of 1933, as amended. The Company's matching contributions over this same period resulted in an additional 194,122 shares of PDC redeemable common stock being issued. As a result of hardship withdrawals, diversification elections, employee terminations and employee loan requests, 861,256 shares of PDC redeemable common stock were repurchased during 2012 at an aggregate price of $14.1 million.

20

**Item 6.**        **Selected Financial Data**

The following tables set forth selected historical consolidated financial data for Paperweight Development Corp. and Subsidiaries and Appleton Papers Inc. and Subsidiaries as of and for each of the five years in the five-year period ended December 29, 2012. The consolidated financial information shown below reflects Bemrose (through its sale in 2008), C&H (through its sale in 2009), NEX and APC (through their sale in July 2010) as discontinued operations for all years presented. The historical consolidated financial data for the years ended December 29, 2012, December 31, 2011 and January 1, 2011, were derived from the consolidated financial statements included elsewhere in this report, which have been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as indicated in its report included in "Item 8. Financial Statements and Supplementary Data." The remaining historical financial data presented below were derived from previously-reported consolidated financial statements, not included in this report, retrospectively adjusted to reflect the Company's accounting policy changes related to mark-to-market accounting for its pension and other postretirement benefit plans and the accounting for certain costs included in inventory. See Note 2, Summary of Significant Accounting Policies, of Notes to Consolidated Financial Statements for further information.

The historical consolidated financial data presented in this report are not necessarily indicative of the financial position or results of operations for any future period. The financial and other operating data set forth below should be read in conjunction with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and the historical consolidated financial statements and related notes included elsewhere in this report.

| | PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES AND APPLETON PAPERS INC. AND SUBSIDIARIES | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2012** | **2011** | **2010** | **2009** | **2008** |
| | (in thousands) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net sales | $ 849,756 | $ 857,329 | $ 849,884 | $ 761,807 | $ 854,923 |
| Cost of sales | 758,875 | 718,710 | 682,228 | 609,734 | 743,490 |
| Gross profit | 90,881 | 138,619 | 167,656 | 152,073 | 111,433 |
| Selling, general and administrative expenses | 152,961 | 144,928 | 139,154 | 129,147 | 184,703 |
| Restructuring and other charges (1) | 28,589 | - | - | - | 2,578 |
| Environmental expense insurance recovery | (2,188) | - | (8,947) | - | - |
| Litigation settlement, net | - | 3,122 | - | - | - |
| Operating (loss) income | (88,481) | (9,431) | 37,449 | 22,925 | (75,848) |
| Interest expense | 59,654 | 61,330 | 65,772 | 51,291 | 54,267 |
| Debt extinguishment expense (income), net | - | - | 7,010 | (42,602) | (11,598) |
| Interest income | (224) | (355) | (327) | (402) | (1,071) |
| Litigation settlement, net | - | (23,229) | - | - | (22,274) |
| Other (income) expense | (47) | (102) | (429) | (2,326) | 6,061 |
| (Loss) income from continuing operations before income taxes | (147,864) | (47,075) | (34,577) | 16,964 | (101,233) |
| Provision (benefit) for income taxes | 587 | 577 | 176 | 333 | (317) |
| (Loss) income from continuing operations | (148,451) | (47,652) | (34,753) | 16,631 | (100,916) |
| Discontinued operations | | | | | |
| Income (loss) from discontinued operations, net of income taxes | - | - | 3,499 | (606) | (80,965) |
| Net (loss) income | $ (148,451) | $ (47,652) | $ (31,254) | $ 16,025 | $ (181,881) |

21

Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 862 of 1527   Document 14-2

| | | 2012 | | 2011 | | 2010 | | 2009 | | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp. and Subsidiaries** | | | | | | | | | | |
| **Other Financial Data:** | | | | | | | | | | |
| Depreciation and amortization (2) | $ | 100,296 | $ | 48,616 | $ | 49,780 | $ | 56,460 | $ | 53,310 |
| Capital expenditures (2) | | 17,143 | | 15,847 | | 17,250 | | 22,851 | | 95,193 |
| **Balance Sheet Data (at end of period):** | | | | | | | | | | |
| Working capital (3) | $ | 64,823 | $ | 109,104 | $ | 115,738 | $ | 105,490 | $ | 115,436 |
| Total assets (3) | | 561,090 | | 643,268 | | 676,994 | | 790,799 | | 928,619 |
| Total debt | | 515,765 | | 511,874 | | 558,950 | | 550,716 | | 605,364 |
| Redeemable common stock | | 81,704 | | 97,615 | | 110,045 | | 122,087 | | 147,874 |
| Accumulated deficit (3) | | (439,923) | | (299,226) | | (257,258) | | (232,996) | | (261,776) |
| | | | | | | | | | | |
| **Appleton Papers Inc. and Subsidiaries** | | | | | | | | | | |
| **Other Financial Data** | | | | | | | | | | |
| Depreciation and amortization (2) | $ | 100,296 | $ | 48,616 | $ | 49,780 | $ | 56,460 | $ | 53,310 |
| Capital expenditures (2) | | 17,143 | | 15,847 | | 17,250 | | 22,851 | | 95,193 |
| **Balance Sheet Data (at end of period):** | | | | | | | | | | |
| Working capital (3) | $ | 64,823 | $ | 109,104 | $ | 115,738 | $ | 105,490 | $ | 115,436 |
| Total assets (3) | | 561,078 | | 643,256 | | 676,982 | | 790,787 | | 928,607 |
| Total debt | | 515,765 | | 511,874 | | 558,950 | | 550,716 | | 605,364 |
| Common stock | | 10,500 | | 10,500 | | 10,500 | | 10,500 | | 10,500 |
| Paid-in capital | | 623,305 | | 623,305 | | 623,305 | | 623,305 | | 623,305 |
| Due from parent | | (237,257) | | (229,104) | | (222,354) | | (217,305) | | (204,272) |
| Accumulated deficit (3) | | (754,779) | | (606,328) | | (558,676) | | (527,422) | | (543,448) |

(1) The Company continually assesses its staffing requirements for its headquarters and manufacturing operations. Staffing reductions occurred in 2008 and due to the continued decline in the Company's carbonless business, as well as the global economic downturn, additional nonrestructuring headcount reductions were taken during 2009 - 2011. During 2012, the Company ceased papermaking operations at its West Carrollton, Ohio facility and moved its carbonless coating to the Company's converting plant in Appleton, Wisconsin, resulting in the reduction of 314 jobs at the West Carrollton facility and the addition of 68 jobs at the Appleton facility. Related employee termination benefits and equipment decommissioning and other expenses are included in the 2012 restructuring charge. See Note 3, Restructuring and Other Related Costs, of Notes to Consolidated Financial Statements for further discussion.

(2) Amounts exclude information related to discontinued operations. See Note 4, Discontinued Operations, of Notes to Consolidated Financial Statements for further discussion.

(3) See Note 2, Summary of Significant Accounting Policies, of Notes to Consolidated Financial Statements, for the impacts of the 2012 accounting policy changes on the financial information presented for the three years ended December 29, 2012. For fiscal years 2010, 2009 and 2008, the accounting policy changes had the following impacts.

For fiscal year 2010 ended January 1, 2011, accumulated deficit increased $103.5 million and accumulated other comprehensive loss was reduced by $103.5 million. For fiscal year 2009 ended January 2, 2010, the Statement of Operations Data above includes an increase to cost of sales of $6.5 million and an increase to selling, general and administrative expenses ("SG&A") of $0.7 million. This resulted in reduced net income of $7.2 million. In addition, inventories increased $0.1 million while the accumulated deficit increased $103.9 million and accumulated other comprehensive loss was reduced by $104.0 million. For fiscal year 2008 ended January 3, 2009, there was an increase to cost of sales of $60.1 million and an increase to SG&A of $28.6 million. This resulted in an increased net loss of $88.7 million. In addition, inventories increased $4.1 million while the accumulated deficit increased $96.7 million and accumulated other comprehensive loss was reduced by $100.8 million.

**Item 7.        Management's Discussion and Analysis of Financial Condition and Results of Operations**

    *Unless stated to the contrary or the context requires otherwise, all references in this report to the Company refer to Paperweight Development Corp. ("PDC" or "Paperweight") and its 100%-owned subsidiaries. It includes Appleton Papers Inc. and its 100%-owned subsidiaries (collectively "Appleton").*

**Overview**

    This discussion summarizes significant factors affecting the consolidated operating results, financial position and liquidity of PDC and Appleton for the three-year period ended December 29, 2012. This discussion should be read in conjunction with the accompanying Consolidated Financial Statements and related Notes.

    During fourth quarter 2012, the Company adopted mark-to-market accounting for its pension and other postretirement benefit plans. Under mark-to-market accounting, all actuarial gains and losses are immediately recognized in net periodic cost annually in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year and, the market-related value of plan assets used in the cost calculations is equal to fair value. Under the Company's previous accounting method, a portion of the actuarial gains and losses was deferred in accumulated other comprehensive loss on the Consolidated Balance Sheet and amortized into future periods. In addition, the previous method smoothed the investment gains and losses of the plan assets over a period of five years. While the Company's historical policy of recognizing pension and other postretirement benefits expense was considered acceptable under accounting principles generally accepted in the United States, the Company believes this new policy to be preferable as it eliminates the delay in recognizing actuarial gains and losses within operating results. This change will also improve the transparency within the Company's operating results by immediately recognizing the effects of economic and interest rate trends on plan investments and assumptions in the year these actuarial gains and losses are actually incurred. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting policy. See Note 2, Summary of Significant Accounting Policies, of Notes to Consolidated Financial Statements for further details relating to this accounting policy change.

    In connection with this change in accounting policy for pension and other postretirement benefit plans, the Company also elected to change its method of accounting for certain costs included in inventory. The Company has elected to exclude the amount of its pension and other postretirement benefit costs applicable to former employees from inventoriable costs. While the Company's historical policy of including all pension and other postretirement benefits costs, excluding those charged directly to selling, general and administrative ("SG&A") expense, as a component of inventoriable costs was acceptable, it believes the new policy is preferable as inventoriable costs will only include costs that are directly attributable to current employees involved in the production of inventory. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting policy. See Note 2, Summary of Significant Accounting Policies, of Notes to Consolidated Financial Statements for further details relating to this accounting policy change.

    On May 16, 2012, the Company announced a definitive agreement under which Appleton was to engage in a business combination, valued at $675 million, excluding debt, with Hicks Acquisition Company II, Inc. ("HACII"), a special purpose acquisition company with approximately $149.3 million of cash in trust. The combined company was to be listed on the Nasdaq exchange and would do business as Appvion. Appvion combines the words "applied" and "innovation," reflecting Appleton's transformation from a paper company to a business focused on coating formulations and applications and specialty chemicals. Under the terms of the proposed business combination, HACII was to invest the cash held in trust, less expenses and amounts paid for certain repurchases and redemptions of its stockholders, to acquire an equity interest in Appleton. On July 13, 2012, Appleton and HACII announced their agreement to discontinue the proposed business combination. Volatile market conditions prevented a deal from being reached that was acceptable to Appleton and HACII. Costs incurred during 2012 as a result of this proposed transaction totaled $7.5 million and were recorded as SG&A expense.

<div align="center">23</div>

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                           23/147

On April 10, 2012, the United States District Court for the Eastern District of Wisconsin granted Appleton's motion for summary judgment and dismissed all claims against Appleton in the enforcement action. The decision establishes that Appleton is no longer a PRP, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA" or "Superfund"), no longer considered a legal successor to NCR's liabilities, and no longer required to comply with the 106 Order commanding remediation of the Lower Fox River. In addition, on July 3, 2012, the United States District Court for the Eastern District of Wisconsin determined that Appleton Coated Paper Company and NCR did not arrange for the disposal of hazardous waste with the meaning of CERCLA. The rulings do not affect Appleton's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appleton's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appleton and BAT have joint and several liability under the Arbitration. Appleton has initiated the dispute resolution procedures outlined in the 1998 agreement. Issues in dispute include the scope of Appleton's liability under the agreement as well as funding requests and supporting documentation from NCR (the "Dispute Resolution"). The current carrying amount of Appleton's liability under the Arbitration is $65.0 million, which represents Appleton's best estimate of amounts to be paid for 2012 and 2013. The rulings also do not affect either of the two indemnification agreements entered in 2001 wherein AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims (including certain claims under the Arbitration), which are defined in the agreements as the Fox River Liabilities. Appleton has recorded a $65.0 million environmental indemnification receivable as of December 29, 2012. On June 8, 2012, BAT served AWA with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by AWA from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appleton with the same claim, seeking a declaration that BAT is indemnified by Appleton. Appleton intends to vigorously defend against this claim and has filed an application challenging the jurisdiction of the United Kingdom court.

On February 22, 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock for coating at the Company's converting facilities. Under the terms of the agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years. It includes successive five-year renewal terms unless either party gives notice of non-renewal at least two years prior to the expiration of the then current term. Prices to be paid by the Company are subject to certain rebates and certain adjustments during the term of the agreement based on volume, changes to raw material pricing, freight prices and productivity gains. The supplier has agreed to be competitive in terms of price, delivery, quality and services. The supply agreement includes certain penalties if either the supplier or the Company fails to fulfill its obligations under the agreement. The supply agreement may be terminated by either party in the event (i) the other party defaults in the performance of any of its material duties or obligations under the agreement and fails to cure such default within 20 days after notice or (ii) the other party is in material default in the performance of the supply agreement after certain specified bankruptcy and reorganization events.

In connection with its approval of this supply agreement, the Company's Board of Directors authorized a plan for the Company to dispose of papermaking assets at its West Carrollton, Ohio facility and move its carbonless coating to the Company's converting plant in Appleton, Wisconsin. Decommissioning of the three paper machines took place in May and June and carbonless coating activity, previously performed at the mill, was moved to Appleton, Wisconsin. As a result, headcount at West Carrollton has been reduced by 314 and 68 jobs were added at the Appleton facility. The Company continues to operate its thermal coating facilities in West Carrollton and was staffed by 111 employees as of year-end 2012. The actions taken to cease papermaking operations in West Carrollton resulted in pre-tax charges associated with this manufacturing capacity rationalization and include employee termination costs (including related pension and benefit costs), accelerated depreciation on certain equipment and other associated costs. During 2012, a $28.6 million restructuring charge and a $77.4 million charge for impairment and accelerated depreciation of certain West Carrollton equipment were recorded in SG&A expense and cost of sales, respectively, in the Company's Consolidated Statement of Comprehensive Loss for the year ended December 29, 2012.

During third quarter 2011, the Company received payment of $23.2 million in damages, including interest and net of related fees and litigation expenses. This was the result of a favorable jury trial verdict, received in 2009, related to litigation commenced by the Company against Andritz BMB AG and Andritz, Inc. In March 2011, the Wisconsin Court of Appeals issued a decision unanimously affirming the final judgment. On September 1, 2011, the Wisconsin Supreme Court denied the defendants' petition seeking further review of the matter. This income was recorded in the other expense (income) section of the Consolidated Statement of Comprehensive Loss for the year ended December 31, 2011.

In June 2011, in accordance with the terms of its 8.125% senior notes payable, the Company repaid in full the remaining note balance of $17.5 million.

At the end of March 2011, the Company resolved litigation initiated by a supplier over contract terms and recorded a charge to income of $3.1 million, including legal fees.

24

Manufacturing operations at the Company's West Carrollton, Ohio paper mill were temporarily interrupted in July 2010 by the collapse of one of its coal silos. The incident caused no injuries. One boiler was extensively damaged as was the supporting infrastructure for two other boilers. While most of the West Carrollton facility was undamaged, the collapse of the coal silo reduced the mill's ability to produce the power and steam required to operate its manufacturing equipment. The thermal coater resumed production within a few days of the incident and the remainder of the mill resumed production in early August. The Company managed customer orders and shifted paper production to other company-owned manufacturing facilities to minimize impact to its customers. The boiler that was extensively damaged resumed operation prior to the end of first quarter 2011.

Losses associated with property damage and business interruption were covered by insurance subject to a deductible of $1.0 million. During second quarter 2011, the corresponding insurance claim was agreed and settled in full with all proceeds received from the insurer. The Company incurred approximately $24.1 million in property damage, cost to repair and business interruption. After netting the $1.0 million deductible, and $1.7 million of capital and $1.1 million of expense for safety and efficiency upgrades to the replacement property and other expenses not covered under the policy, the Company recovered $20.3 million from its insurer.

Expenses associated with property damage and business interruption, totaling $17.1 million, were reported in cost of sales within the Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011. According to the terms of the insurance policy, the Company recorded a $17.1 million recovery, less a $0.9 million valuation reserve, as a reduction to cost of sales for the year ended January 1, 2011, and a $0.5 million recovery as a reduction to cost of sales for the year ended December 31, 2011. Business interruption coverage also included recovery from lost margins related to the accident and therefore, the Company recorded a gain of $0.6 million in cost of sales within the Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011 and an additional $0.2 million gain in cost of sales for the year ended December 31, 2011. The Company also recorded a $0.4 million involuntary conversion loss on fixed assets associated with the property loss in its Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011.

Total capital spending of approximately $5.5 million was incurred for work associated with bringing the damaged boiler back online. At year-end 2010, $1.0 million, net of the $1.0 million deductible, was recorded as a gain on the other income line within the Consolidated Statement of Comprehensive Loss. For the year ended December 31, 2011, the Company recorded an additional $1.4 million of gain on the other expense (income) line within the Consolidated Statement of Comprehensive Loss, which was recorded during the second quarter.

On July 2, 2010, the Company entered into a stock purchase agreement with NEX Performance Films Inc. ("Films"), an entity affiliated with Mason Wells Buyout Fund II, Limited Partnership whereby the Company agreed to sell all of the outstanding capital stock of American Plastics Company, Inc. ("APC") and New England Extrusion Inc. ("NEX") for a cash purchase price of $58 million. This transaction closed on July 22, 2010, with the Company receiving $56 million at the time of closing and $2 million held in escrow, on behalf of the Company, for 12 months to satisfy potential claims under the stock purchase agreement with Films. No claims were made against the escrow and the $2 million was paid to the Company on July 25, 2011. The cash proceeds of the sale were used to reduce debt. A $0.4 million net gain on sale was recorded in income from discontinued operations for the year ended January 1, 2011. APC was acquired in 2003 and is located in Rhinelander, Wisconsin. NEX was acquired in 2005 and has manufacturing operations in Turners Falls, Massachusetts, and Milton, Wisconsin.

**Financial Highlights**

Results for 2012 include the following:

- Net sales totaled $849.8 million, a $7.5 million, or 0.9%, decrease from 2011 net sales. Net sales within the paper business decreased $5.3 million, or 0.6%. Shipment volumes were approximately 4% lower than 2011 largely due to the Company's decision to discontinue selling carbonless papers into certain non-strategic international markets. Encapsys net sales decreased $3.8 million, or 6.9%. Volumes were approximately 12% lower than 2011 as a result of the non-strategic sales decline of carbonless paper as well as a weak global economy reducing the short-term demand for customer products using Encapsys microencapsulation.

- As a result of the cessation of papermaking operations at West Carrollton, the Company recorded $77.4 million of other related costs in cost of sales. These costs include $64.7 million of noncash expense for accelerated depreciation related to the decommissioning of papermaking assets. It also includes an $11.1 million noncash writedown of papermaking stores and spare parts inventories to lower of cost or market, a $1.2 million noncash writedown of construction in progress and $0.4 million of retention incentives and other costs. In addition, as a result of working through the transition to the 15-year base stock supply agreement, costs of $11.4 million were incurred during the year. Restructuring expense of $28.6 million was also recorded and included employee termination benefits and exit costs related to the decommissioning of papermaking assets.

- Cost of sales includes pension and other postretirement benefit plan expense of $21.0 million which is $17.6 million lower than in 2011.

25

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                  25/147

- SG&A spending of $153.0 million was $8.1 million, or 5.6%, higher than 2011 spending largely due to $7.5 million of costs incurred as a result of the discontinued business combination transaction discussed above. In addition, 2012 incentive compensation, including bonuses and stock-based incentive compensation, was $6.2 million higher. Pension and other postretirement benefit plan expense of $10.6 million was $4.9 million lower than in 2011.

- An environmental expense insurance recovery of $2.2 million was recorded as a separate line item within operating loss on the Consolidated Statement of Comprehensive Loss representing additional insurance recovery due Appleton. In March 2008, Appleton received favorable jury verdicts in a state court declaratory judgment relating to insurance coverage of its environmental claims involving the Fox River. A final judgment and order was entered in January 2009. The insurers appealed the final judgment. In June 2010, the Wisconsin Court of Appeals upheld the final judgment. Settlements have been negotiated between the insurers and Appleton. Under the terms of the indemnification agreement, recoveries from insurance are reimbursed to AWA to the extent of its indemnification obligation. During 2010, Appleton recorded an $8.9 million receivable, representing settlements to be received in excess of amounts reimbursable to AWA, in the Consolidated Balance Sheet as of January 1, 2011. During 2011, Appleton received $6.2 million of these funds. This additional $2.2 million was received during October 2012.

- Net loss was $148.5 million compared to last year's loss of $47.7 million. As discussed above, 2012 results include a restructuring charge of $28.6 million, other related costs associated with the ceasing of papermaking in West Carrollton, Ohio of $77.4 million and $7.5 million of costs related to the discontinued business combination transaction. In comparison, the 2011 results included a $3.1 million litigation settlement and a $23.2 million litigation recovery.

- Net debt as of December 29, 2012 was $513.7 million compared to $504.5 million at the end of 2011, an increase of $9.2 million.

- During 2012, the Company generated $23.3 million of cash from operations which included a decrease in working capital of $26.4 million.

The Company creates product solutions for customers and end users through its development and use of coating formulations and applications as well as microencapsulation and security technologies. The Company has three reportable segments: carbonless papers, thermal papers and Encapsys.

## Carbonless Papers

The carbonless papers segment includes carbonless and security paper products. The Company believes the North American market for carbonless paper products has been in decline as a result of greater use of competing technologies such as digital laser, inkjet and thermal printers, and electronic communications that do not use impact printing to create images. The Company believes the North American carbonless paper market declined by approximately 7% to 9% annually from 2007 through 2012, except during the recession period when the decline was estimated at an annual rate of 12% to 16%. The decline is expected to continue at historical rates over the next several years. The Company believes the worldwide carbonless market is also in decline, with demand declining at approximately 2% to 4% per year. The carbonless papers segment accounted for approximately 48% of total company net sales in 2012.

The carbonless papers market is highly competitive. The Company competes based on a number of factors, including price, product availability, quality and customer service. In addition to declining North American and foreign carbonless markets, the carbonless business continues to experience competitive pricing from foreign and domestic producers. Other domestic carbonless producers have continued their competitive pricing strategies in efforts to maintain or gain share. In addition, foreign competitors continue to sell into the North American carbonless market with low-price strategies. As a result of this increased pricing competition, the Company has continued to experience pressure on selling prices for carbonless products. Nevertheless, market conditions permit the Company to implement price increases from time to time to offset the increasing costs of raw materials. Also during 2012, the Company discontinued selling carbonless papers into certain non-strategic international markets.

## Thermal Papers

The thermal papers market is growing with new applications being developed to use thermal technology. Based on its assessment of the period 2007 through 2012, the Company believes North American thermal markets expanded at a 3% compound average growth rate, with annual rates ranging from a decline of 2% to increases of 5%. The Company believes demand for thermal paper will continue to grow in North America and around the world. In 2007, an expansion program of approximately $125 million commenced at the West Carrollton, Ohio facility involving the installation of a state-of-the-art coater to produce thermal papers. The project was completed in third quarter 2008. Sales of thermal papers accounted for approximately 48% of total company net sales in 2012.

26

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm    26/147

In 2007, the Company filed antidumping petitions against imports of certain lightweight thermal paper ("LWTP") from China, Germany and Korea and a countervailing duty petition against such imports from China. In 2008, the U.S Department of Commerce ("Department") issued its final determination, affirming that certain Chinese producers and exporters of LWTP sold the product in the U.S. at prices below fair value, imposing final duties of 19.77% to 115.29% and that German producers and exporters sold the product in the U.S. at prices below fair value and imposed final duties on those imports of 6.5%. In addition, for all but one Chinese producer, the Department imposed counterveiling duties of between 13.17% and 137.25%. In 2008, the U.S. International Trade Commission ("ITC") determined the U.S. industry producing LWTP is threatened with material injury due to unfairly traded imports from China and Germany and final duties went into effect in 2008. These duties do not have a direct impact on the Company's net income. A German manufacturer filed an appeal of the ITC determination to the U.S. Court of International Trade ("CIT"). The appeal was decided in favor of the Company in 2009 and the German manufacturer filed a further appeal to the U.S. Court of Appeals for the Federal Circuit ("CAFC"). In 2011, the CAFC remanded the matter for further consideration by the ITC and the ITC upheld its original determination. In January 2012, the CIT upheld the ITC's decision on remand and the German manufacturer filed another appeal of the matter to the CAFC. In January 2013, the CAFC affirmed the decision of the CIT in favor of the Company. In addition, for each of the four 12-month periods following implementation of the final duties, the Company and the German manufacturer have filed requests for administrative review with the Department, seeking to modify the amount of the duties based on the market practices during each respective 12-month period. In 2011, the Department issued a final determination in the first 12-month review period, resulting in a dumping margin of 3.77 percent for imports from the German manufacturer for the period from November 2008 to October 2009. In 2012, the Department issued a final determination in the second 12-month review period, resulting in a dumping margin of 4.33% for imports from the German manufacturer for the period from November 2009 to October 2010. The German manufacturer has appealed the first and second review determinations. In December 2012, the Department issued a preliminary determination in the third 12-month review period, reflecting a dumping margin of 75.36% based on the Department's finding that the German manufacturer knowingly and intentionally submitted fraudulent responses to the Department. The Company anticipates the Department will confirm the 75.36% duty in its final determination for the third 12-month review period, which is expected to be issued in early April 2013. Upon final resolution of the appeals, the third administrative review and the fourth administrative review, certain of the duties could be reduced, increased or eliminated.

Encapsys

The Encapsys segment develops and delivers custom microencapsulation solutions for its partners. The Company uses an open innovation process that typically includes development agreements with partner companies that seek to protect existing and potential intellectual property. Encapsys is exploring opportunities with potential partners in industries as diverse as agriculture, paints and coatings, food, building and construction, paper, textiles, personal and household care, adhesives, and oil and gas. During 2012, Encapsys accounted for approximately 6% of total company net sales.

27

**Comparison 2012 and 2011**

<div align="center">

**Paperweight Development Corp. and Subsidiaries and
Appleton Papers Inc. and Subsidiaries**

</div>

| | For the Year Ended | | Increase |
| --- | --- | --- | --- |
| | December 29, 2012 | December 31, 2011 | (Decrease) |
| | (dollars in millions) | | |
| Net sales | $ 849.8 | $ 857.3 | -0.9% |
| Cost of sales | 758.9 | 718.7 | 5.6% |
| Gross profit | 90.9 | 138.6 | -34.4% |
| | | | |
| Selling, general and administrative expenses | 153.0 | 144.9 | 5.6% |
| Environmental expense insurance recovery | (2.2) | - | nm |
| Restructuring | 28.6 | - | nm |
| Litigation settlement, net | - | 3.1 | -100.0% |
| | | | |
| Operating loss | (88.5) | (9.4) | nm |
| | | | |
| Interest expense, net | 59.4 | 61.0 | -2.6% |
| Recovery from litigation settlement, net | - | (23.2) | -100.0% |
| Other non-operating income, net | - | (0.1) | -100.0% |
| | | | |
| Loss before income taxes | (147.9) | (47.1) | -214.0% |
| Provision for income taxes | 0.6 | 0.6 | - |
| | | | |
| Net loss | $ (148.5) | $ (47.7) | -211.3% |
| | | | |
| Comparisons as a % of net sales | | | |
| Cost of sales | 89.3% | 83.8% | 5.5% |
| Gross margin | 10.7% | 16.2% | -5.5% |
| Selling, general and administrative expenses | 18.0% | 16.9% | 1.1% |
| Operating margin | -10.4% | -1.1% | -9.3% |
| Loss before income taxes | -17.4% | -5.5% | -11.9% |
| Net loss | -17.5% | -5.6% | -11.9% |

Net sales for 2012 were $849.8 million, decreasing $7.5 million, or 0.9%, compared to $857.3 million of net sales in 2011. Net sales within the paper business decreased $5.3 million, or 0.6%, during 2012 and included the impact of the Company's decision to discontinue selling carbonless papers into certain non-strategic international markets. Shipment volumes were approximately 4% lower than in 2011, of which, thermal volumes were almost 9% higher and carbonless volumes were nearly 13% lower. The Encapsys business experienced a net sales decline of $3.8 million, or 6.9%, on a volume decrease of nearly 12%.

An operating loss of $88.5 million was recorded in 2012. This compared to an operating loss of $9.4 million in 2011. Current year financial results were positively impacted by improved price and mix of $17.9 million. Gross profit was also positively impacted by efficiency gains and cost reduction. This was partially offset by a $6.2 million reduction in operating income due to lower shipment volumes. Included in current year cost of sales was a $6.8 million settlement charge relating to the withdrawal from the multi-employer pension plan as negotiated by the West Carrollton bargaining workforce during recent labor contract negotiations. The 2012 operating loss also included noncash expense of $64.7 million for accelerated depreciation related to the decommissioning of papermaking assets at the West Carrollton, Ohio facility as well as an $11.1 million noncash writedown of papermaking stores and spare parts inventories to lower of cost or market. Both are included in cost of sales. A $1.2 million noncash write-off of construction in progress was also included in current year cost of sales. As a result of working through the transition to the base paper supply agreement, additional costs of $11.1 million were reported year-to-date in cost of sales and $0.3 million in SG&A expenses.

SG&A spending of $153.0 million was $8.1 million, or 5.6%, higher than 2011 spending largely due to $7.5 million of costs incurred as a result of the discontinued business combination transaction. In addition, 2012 incentive compensation, including bonuses and stock-based incentive compensation, was $6.2 million higher. Pension and other postretirement benefit plan expense of $10.6 million was $4.9 million lower than in 2011. Current year restructuring expense of $28.6 million includes $25.2 million of employee termination benefits, including severance, related benefits and pension costs, and $3.4 million of decommissioning and other costs.

The Company recorded a 2012 net loss of $148.5 million compared to a $47.7 million loss recorded in 2011. In addition to the items noted above, the 2011 results included the receipt of a $23.2 million litigation settlement recovery.

**Business Segment Discussion – 2012**

During 2012, the paper business, which includes carbonless papers and thermal papers, recorded net sales of $818.5 million, which were $5.3 million lower than 2011 net sales. During this same period, the paper business recorded an operating loss of $76.4 million compared to an operating loss of $3.7 million in 2011. The year-on-year operating loss variance was the result of the following (dollars in millions):

| | |
|---|---:|
| Favorable price and mix | $ 17.9 |
| Favorable manufacturing operations | 19.0 |
| Selling, general and administrative expense and other | 11.3 |
| Favorable raw materials and utilities pricing | 1.4 |
| Restructuring and other related costs | (106.0) |
| Long-term supply agreement transition costs | (11.4) |
| Lower shipment volumes | (4.9) |
| | $ (72.7) |

Carbonless Papers

- Carbonless papers segment 2012 net sales totaled $406.8 million, a decrease of $46.2 million, or 10.2%, from the prior year. Current year shipment volumes were nearly 13% lower than 2011 shipments. In addition to the expected carbonless market decline, during 2012 the Company discontinued selling carbonless papers into certain non-strategic international markets. This contributed to approximately 85% of the reduced volumes and 74% of the sales decline. The carbonless papers segment recorded a 2012 operating loss of $42.2 million compared to a 2011 operating loss of $4.2 million. The current year operating loss includes restructuring and other related costs of $58.3 million and $4.1 million of one-time transition costs related to the 15-year base stock supply agreement. This was partially offset by a $13.1 million reduction in retiree benefits expense.

Thermal Papers

- Thermal papers segment 2012 net sales of $411.7 million were $40.9 million, or 11.0%, higher than 2011 net sales of $370.8 million. During 2012, shipments of thermal papers increased approximately 9% over the prior year. Continued strong demand for tag, label and entertainment ("TLE") products, in all markets, accounted for an increase in shipment volumes of nearly 19%. Current year shipments of receipt paper were flat year on year. Current year net sales were also positively impacted by favorable price and mix of $4.8 million and $2.2 million, respectively. The thermal papers segment recorded a 2012 operating loss of $34.2 million compared to 2011 operating income of $0.6 million. The current year operating loss includes restructuring and other related costs of $47.7 million and $7.3 million of one-time transition costs related to the 15-year base stock supply agreement. Also during 2012, this business segment recorded a $6.8 million settlement charge relating to withdrawal from the multi-employer pension plan as negotiated by the West Carrollton bargaining workforce during current year labor contract negotiations. These were partially offset by a $5.2 million reduction in retiree benefits expense.

Encapsys

- Encapsys segment net sales for 2012 totaled $51.0 million, which was a decrease of $3.8 million, or 6.9%, from 2011 net sales. Current year operating income was $10.5 million compared to 2011 operating income of $10.8 million. Compared to last year, shipment volumes declined nearly 12%. Lower Encapsys sales volume was the result of decreased carbonless papers production as well as a weak global economy reducing the short-term demand for customer products using Encapsys microencapsulation.

29

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm    29/147

<u>Unallocated Corporate Charges</u>

- As of year-end 2012, unallocated corporate charges totaled $19.6 million and include $7.5 million of discontinued business combination transaction costs, $4.2 million higher incentive compensation expense and a $2.2 million environmental expense insurance recovery. As of year-end 2011, unallocated corporate charges totaled $13.3 million and included a $3.1 million litigation settlement.

***Effects of Inflation.*** Prices for certain raw materials, including base stock, chemicals and pulp, as well as costs for natural gas, oil and electricity have been subject to price changes and can have material effects on the business, financial condition and results of operations. Prices for certain raw materials increased during 2012 and could continue to increase, or decrease, in response to changes in demand. The Company historically has been able to use price increases to recoup a portion of raw material price increases, but relies on cost-cutting measures and productivity and efficiency gains to offset the remaining portion of raw material price increases. While the Company expects that any significant increase in raw materials or energy costs will be offset by price increases and/or by cost containment and productivity and efficiency initiatives, profitability could be adversely affected if the Company is unable to pass on or mitigate any future cost increases.

**Comparison 2011 and 2010**

<div align="center">

**Paperweight Development Corp. and Subsidiaries and**
**Appleton Papers Inc. and Subsidiaries**
</div>

| | For the Year Ended | | Increase |
|---|---|---|---|
| | **December 31, 2011** | **January 1, 2011** | **(Decrease)** |
| | (dollars in millions) | | |
| Net sales | $ 857.3 | $ 849.9 | 0.9% |
| Cost of sales | 718.7 | 682.2 | 5.4% |
| Gross profit | 138.6 | 167.7 | -17.4% |
| | | | |
| Selling, general and administrative expenses | 144.9 | 139.2 | 4.1% |
| Environmental expense insurance recovery | - | (8.9) | -100.0% |
| Litigation settlement, net | 3.1 | - | nm |
| | | | |
| Operating (loss) income | (9.4) | 37.4 | -125.1% |
| | | | |
| Interest expense, net | 61.0 | 65.4 | -6.7% |
| Debt extinguishment expense, net | - | 7.0 | -100.0% |
| Recovery from litigation settlement, net | (23.2) | - | nm |
| Other non-operating income, net | (0.1) | (0.4) | -75.0% |
| | | | |
| Loss from continuing operations before income taxes | (47.1) | (34.6) | -36.1 % |
| Provision for income taxes | 0.6 | 0.2 | 200.0% |
| | | | |
| Loss from continuing operations | (47.7) | (34.8) | -37.1% |
| | | | |
| Income from discontinued operations, net of income taxes | - | 3.5 | -100.0% |
| | | | |
| Net loss | $ (47.7) | $ (31.3) | -52.4% |
| | | | |
| Comparisons as a % of net sales | | | |
| Cost of sales | 83.8% | 80.3% | 3.5% |
| Gross margin | 16.2% | 19.7% | -3.5% |
| Selling, general and administrative expenses | 16.9% | 16.4% | 0.5% |
| Operating margin | -1.1% | 4.4% | -5.5% |
| Loss from continuing operations before income taxes | -5.5% | -4.1% | -1.4% |
| Loss from continuing operations | -5.6% | -4.1% | -1.5% |
| Income from discontinued operations, net of income taxes | - | 0.4% | -0.4% |
| Net loss | -5.6% | -3.7% | -1.9% |

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 871 of 1527    Document 14-2
https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm      30/147

Net sales for 2011 were $857.3 million, increasing $7.4 million, or 0.9%, compared to $849.9 million of net sales in 2010. The positive impact of price increases initiated in response to escalating raw material costs, as well as Encapsys growth, offset the impact of lower shipment volumes. Net sales within the paper business increased $3.0 million, or 0.4% during 2011 while the Encapsys business continued to grow with net sales surpassing prior year net sales by $2.5 million, or 4.8%, on a volume increase of over 7%.

An operating loss of $9.4 million was recorded for the year ended December 31, 2011. This compared to operating income of $37.4 million recorded in 2010. During 2011, pension and other retirement benefits expense was $46.0 million higher than in 2010. Raw material and utilities inflation accounted for a $29.9 million increase in cost of sales when compared to the prior year. Lower shipment volumes accounted for decreased operating income of $6.3 million and mill curtailments to match customer demand added $6.2 million of expense. Also during 2011, a $3.1 million litigation settlement was recorded while 2010 results included an $8.9 million environmental expense recovery. These were partially offset by favorable price and mix of $45.0 million.

SG&A increased $5.7 million, or 4.1%, during 2011. Included in this increase was additional pension and other postretirement benefit plan expense of $10.7 million. This was partially offset by a $2.2 million reduction in compensation expense due to lower headcount as well as decreased severance expense. Other employee benefit costs were also lower during 2011, largely due to favorable group health claims experience.

The Company recorded a 2011 net loss from continuing operations of $47.7 million compared to a $34.8 million loss from continuing operations recorded in 2010. Net interest expense was $4.4 million lower in 2011 due to the November 2010 repayment of the secured term note payable, the June 2011 repayment of the 8.125% senior notes payable and lower levels of borrowing on the revolving credit facility, as amended, during 2011. The Company also received a $23.2 million litigation settlement recovery during third quarter 2011. During 2010, the Company recorded $7.0 million of debt extinguishment expense associated with the voluntary refinancing completed in February 2010.

Income from discontinued operations of $3.5 million was recorded in 2010 representing income from the Films operations until its sale in July 2010. It also includes a $0.4 million gain on the sale of the business.

For 2011, the Company recorded a net loss of $47.7 million compared to a net loss of $31.3 million recorded in 2010.

**Business Segment Discussion – 2011**

During 2011, the paper business, which includes carbonless papers and thermal papers, recorded net sales of $823.8 million, which were $3.0 million higher than 2010 net sales. During this same period, the paper business reported an operating loss of $3.7 compared to 2010 operating income of $28.7 million. The year-on-year operating income variance was the result of the following (dollars in millions):

| | |
|---|---:|
| Favorable price and mix | $  44.8 |
| Net inflation of raw material and utilities pricing | (29.9) |
| Increased manufacturing costs, including retiree benefits expense | (33.5) |
| Mill curtailments to match customer demand | (6.3) |
| Lower shipment volumes | (7.5) |
| | $  (32.4) |

Carbonless Papers

- Carbonless papers segment 2011 net sales totaled $453.0 million, a decrease of $26.1 million, or 5.4%, from the prior year. Current year shipment volumes were nearly 10% lower than 2010 shipments. The impact of lower shipment volumes was partially offset by favorable pricing resulting from various price increases initiated since 2010 in response to rapidly rising raw material costs. Carbonless papers operating income decreased $34.7 million during 2011 to a reported operating loss of $4.2 million. Margins continued to be negatively impacted by continued inflation in raw material and utilities pricing. While pulp prices came down during the second half of 2011, the cost of chemicals continued to climb. Overall, average pulp prices paid in 2011 were higher than those paid in 2010. As noted above, increased pension and other retirement benefits expense negatively impacted current year earnings, of which, $27.9 million was included in the carbonless papers segment.

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                    32/147

Thermal Papers

- Thermal papers segment 2011 net sales of $370.8 million were $29.0 million higher than 2010 net sales of $341.8 million. During 2011, shipments of thermal papers increased approximately 1% over the prior year. In order to improve profitability, the Company has been managing volumes and price of the point of sale receipt paper ("POS") portion of the thermal business. Shipment volumes of POS were approximately 7% lower than 2010 shipment volumes. Demonstrating the strength of the Company's thermal products portfolio, shipment volumes of TLE were approximately 12% higher than the prior year. The thermal papers segment also benefited from favorable pricing realized in response to escalating raw material costs. During 2011, the thermal papers segment recorded operating income of $0.6 million compared to a 2010 operating loss of $1.8 million. Improved pricing and mix, as well as volume growth, more than offset increases in raw material costs and pension and other retirement benefits expense. As noted above, increased pension and other retirement benefits expense negatively impacted current year earnings, of which, $14.9 million was included in the thermal papers segment.

Encapsys

- Encapsys segment net sales for 2011 totaled $54.7 million, which was an increase of $2.5 million, or 4.8%, over 2010 net sales. Current year operating income was $10.8 million compared to 2010 operating income of $10.3 million. These increases were the result of increased shipment volumes of approximately 7%.

Unallocated Corporate Charges

- As of year-end 2011, unallocated corporate charges totaled $13.3 million. These charges include increased pension and other retirement benefits costs as well as a $3.1 million litigation settlement. In 2010, income of $1.9 million was reported in unallocated corporate charges and included an environmental expense insurance recovery of $8.9 million.

*Effects of Inflation.* Prices for certain raw materials, including base stock, chemicals and pulp, as well as costs for natural gas, oil and electricity have been subject to price changes and can have material effects on the business, financial condition and results of operations. Prices for certain raw materials increased during 2011 and could continue to increase, or decrease, in response to changes in demand. The Company historically has been able to use price increases to recoup a portion of raw material price increases, but relies on cost-cutting measures and productivity and efficiency gains to offset the remaining portion of raw material price increases. While the Company expects that any significant increase in raw materials or energy costs will be offset by price increases and/or by cost containment and productivity and efficiency initiatives, profitability could be adversely affected if the Company is unable to pass on or mitigate any future cost increases.

**Liquidity and Capital Resources**

*Overview.* The Company's primary sources of liquidity and capital resources are cash provided by operations and available borrowings under its revolving credit facility, as amended. The Company expects that cash on hand, internally-generated cash flow and available credit from its revolving credit facility, as amended, will provide the necessary funds for the reasonably foreseeable operating and recurring cash needs (e.g., working capital, debt service, other contractual obligations and capital expenditures). At December 29, 2012, the Company had $1.9 million of cash and approximately $65.2 million of unused borrowing capacity under its revolving credit facility, as amended. The revolving credit facility, as amended, had an outstanding balance of $3.7 million and net debt (total debt less cash) increased to $513.7 million compared to $504.5 million at year-end 2011.

The Company was in compliance with all debt covenants at December 29, 2012, and is forecasted to remain compliant for the next twelve months. The Company's ability to comply with the financial covenants in the future depends on achieving forecasted operating results and operating cash flows. The Company's failure to comply with its covenants, or an assessment that it is likely to fail to comply with its covenants, could lead the Company to seek amendments to, or waivers of, the financial covenants. The Company cannot provide assurance that it would be able to obtain any amendments to or waivers of the covenants. In the event of non-compliance with debt covenants, if the lenders will not amend or waive the covenants, the debt would be due and the Company would need to seek alternative financing. The Company cannot provide assurance that it would be able to obtain alternative financing. If the Company were not able to secure alternative financing, this would have a material adverse impact on the Company.

32

On February 22, 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock for coating at the Company's converting facilities. Under the terms of the agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years. Prices to be paid by the Company are subject to certain rebates and certain adjustments during the term of the agreement based on volume, changes to raw material pricing, freight prices and productivity gains. The supplier has agreed to be competitive in terms of price, delivery, quality and services.

In connection with its approval of this supply agreement, the Company's Board of Directors authorized a plan for the Company to dispose of papermaking assets at its West Carrollton, Ohio facility and move its carbonless coating to the Company's converting plant in Appleton, Wisconsin. Decommissioning of the three paper machines took place in May and June and carbonless coating activity, previously performed at the mill, was moved to Appleton, Wisconsin. As a result, headcount at West Carrollton has been reduced by 314 and 68 jobs were added at the Appleton facility. The Company continues to operate its thermal coating facilities in West Carrollton and was staffed by 111 employees as of year-end 2012. The actions taken to cease papermaking operations in West Carrollton resulted in pre-tax charges associated with this manufacturing capacity rationalization and include employee termination costs (including related pension and benefit costs), accelerated depreciation on certain equipment and other associated costs. During 2012, a $28.6 million restructuring charge and a $77.4 million charge for impairment and accelerated depreciation of certain West Carrollton equipment were recorded in SG&A expense and cost of sales, respectively, in the Company's Consolidated Statement of Comprehensive Loss for the year ended December 29, 2012.

During third quarter 2011, the Company received a $23.2 million net recovery from litigation initiated in September 2007 against Andritz BMB AG and Andritz, Inc. and used the proceeds to pay down debt on the Company's revolving credit facility, as amended.

In June 2011, in accordance with the terms of its 8.125% senior notes payable, the Company repaid in full the remaining note balance of $17.5 million. A payment of $18.2 million represented full and complete payment of all unpaid principal and accrued and unpaid interest. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the notes were terminated and the Company was released from all obligations under the notes.

**_Cash Flows from Operating Activities-Paperweight Development Corp. and Subsidiaries._** Net cash provided by operating activities during 2012 was $23.3 million compared to $68.7 million net cash provided by operating activities in 2011. The net loss, adjusted for non-cash charges, used $31.5 million in operating cash for the period. Non-cash charges included $100.3 million in depreciation and amortization, $11.1 million inventory revaluation charge, $3.0 million of non-cash employer matching contributions to the KSOP and $2.6 million of other net non-cash charges. During 2012, working capital decreased by $26.4 million, of which, the primary component was a $27.2 million increase in accounts payable and other accrued liabilities. This included a $20.1 million increase in accounts payable due to improved payment terms. Accrued compensation, including both current and deferred, is higher by $7.5 million and includes a higher reserve for annual incentive compensation and a newly-vested portion of deferred incentive compensation paid to participants in February 2013. Though a $25.0 million contribution was made to the pension plan during 2012, accrued pension increased by $12.3 million. Other, net provided cash of $16.0 million including a $25.0 million reserve for full withdrawal from the multi-employer pension plan.

Net cash provided by operating activities during 2011 was $68.7 million compared to $30.0 million net cash used by operating activities in 2010. The net loss, adjusted for non-cash charges, provided $7.9 million in operating cash for the period. Non-cash charges included $48.6 million in depreciation and amortization, $2.7 million of non-cash employer matching contributions to the KSOP, $1.1 million of foreign exchange loss and $4.6 million of other non-cash charges. These non-cash charges were decreased by a $1.4 million net gain from involuntary conversion of equipment. A decrease in working capital provided $22.0 million of cash. This included a $14.5 million reduction in other current assets due to the receipt of an $8.2 million insurance recovery receivable for the West Carrollton coal silo collapse. Cash of $1.7 million was also provided by a decrease in other assets which included receiving $2.6 million in December from the sale of foreign exchange contracts originally set to mature at various points in 2012. Accrued pension increased by $37.1 million, though an $18.0 million pension contribution was made in 2011.

<div align="center">33</div>

Net cash used by operating activities during 2010 was $30.0 million. The net loss, adjusted for non-cash charges, provided $24.0 million in operating cash for the period. Non-cash charges included $51.5 million in depreciation and amortization, $7.0 million of debt extinguishment expense associated with current year debt refinancing and debt repayment, $3.2 million of non-cash employer matching contributions to the KSOP, $0.6 million of foreign exchange loss, and $5.3 million of other non-cash charges. These non-cash charges were decreased by the $9.1 million Fox River insurance recovery, proceeds of which are expected to be received during 2011 and 2012, a $2.6 million gain on the sale of Films and a $0.6 million net gain from involuntary conversion of equipment. Uses of cash included a $36.4 million increase in working capital, an $11.9 million change in pension which included a $15.0 million pension payment for the 2009 plan year and a net $5.7 million of other uses. A major component of the $36.4 million increase in working capital was a $14.5 million increase in accounts receivable. This increase was the result of higher year-on-year net sales and increased international sales which carry longer payment terms. Other components of the increase in working capital were a $9.3 million decrease in accounts payable and accrued liabilities, a $6.7 million increase in other current assets and a $5.9 million increase in inventories. The increase in other current assets is largely the result of an $8.2 million insurance recovery receivable recorded for the West Carrollton coal silo collapse.

***Cash Flows from Operating Activities-Appleton Papers Inc. and Subsidiaries.*** Net cash provided by operating activities was $39.3 million in 2012 and $91.4 million in 2011. In 2010, cash used by operating activities was $88.3 million. As Appleton is the primary operating subsidiary of the Company, a majority of the components of cash flows from operating activities are the same as those discussed above for Paperweight Development Corp. and Subsidiaries. Under an arbitration award with NCR, related to remediation of the Lower Fox River, Appleton agreed to share defense and liability costs with NCR and therefore the funding under this agreement is included in operating activities. This is the main driver of the additional changes in cash flows from operating activities.

***Cash Flows from Investing Activities-Paperweight Development Corp. and Subsidiaries and Appleton Papers Inc. and Subsidiaries.*** Current year net cash used by investing activities was $17.1 million and was used entirely for investment in capital projects.

Net cash used by investing activities in 2011 totaled $12.5 million. During 2011, the Company invested $15.9 million in capital projects. In July 2011, the Company received the remaining $2.0 million of cash proceeds from the July 2010 sale of APC and NEX which had been in escrow pending any potential buyer claims resulting from the sale. Insurance proceeds of $1.4 million were received to compensate the Company's loss of property, plant and equipment as the result of the July 2010 coal silo collapse at the West Carrollton, Ohio paper mill.

As a result of the $56.0 million of cash proceeds from the July 2010 sale of APC and NEX, cash provided by investing activities totaled $39.4 million in 2010. During 2010, the Company invested $17.8 million in capital projects. Current year cash flows from investing also included $1.0 million of insurance recovery, related to fixed assets, as a result of the West Carrollton coal silo collapse.

***Cash Flows from Financing Activities-Paperweight Development Corp. and Subsidiaries.*** During 2012, net cash used by financing activities was $11.6 million. During the year, the Company made mandatory debt repayments of $1.3 million, plus interest, on its State of Ohio loans. During 2012, the Company borrowed a net $3.7 million on its revolving credit facility, as amended. During March 2012, the Company received the proceeds of a $0.3 million note issued to Appleton Papers Inc. by Columbia County, Wisconsin.

Current year proceeds from the issuance of PDC redeemable common stock totaled $2.9 million. The ESOP trustee purchased this stock using pre-tax deferrals, rollovers and loan payments made by employees during 2012. Current year payments to redeem PDC common stock were $14.1 million.

Cash overdrafts decreased $3.1 million during 2012. Cash overdrafts represent short-term obligations, in excess of deposits on hand, which have not yet cleared through the banking system. Fluctuations in the balance are a function of quarter-end payment patterns and the speed with which the payees deposit the checks.

During 2011, net cash used by financing activities was $52.8 million. In June 2011, in accordance with the terms of its 8.125% senior notes payable, the Company repaid in full the remaining note balance of $17.5 million. A payment of $18.2 million represented full and complete payment of all unpaid principal and accrued and unpaid interest. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the notes were terminated and the Company was released from all obligations under the notes. The Company also made mandatory debt repayments of $1.2 million, plus interest, on its State of Ohio loans. During the current year, the Company repaid a net $29.3 million on its revolving credit facility, as amended, and as of December 31, 2011, did not have an unpaid revolver balance. Approximately $18.8 million of the revolving credit facility, as amended, was used to support outstanding letters of credit.

34

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                        35/147

Proceeds from the issuance of PDC redeemable common stock totaled $2.9 million. The ESOP trustee purchased this stock using pre-tax deferrals, rollovers and loan payments made by employees during 2011. Payments to redeem PDC common stock were $12.4 million. Cash overdrafts increased $4.7 million during 2011.

During 2010, net cash used by financing activities was $15.6 million. The Company made mandatory debt repayments of $3.6 million, plus interest, on its secured term note payable, as amended, and the State of Ohio loans. As discussed below, in February 2010, the Company completed a voluntary refinancing of its debt which included a new five-year, asset-backed $100 million revolving credit facility. As of year-end 2010, there was an outstanding balance on this revolving credit facility of $29.3 million. In addition, approximately $16.8 million of the revolving credit facility was used to support outstanding letters of credit.

On November 1, 2010, the Company voluntarily repaid the remaining $17.5 million balance of the secured term note payable, as amended, due December 2013. A payment of $18.9 million represented full and complete payment of all unpaid principal, accrued and unpaid interest and a prepayment fee. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the note was terminated and the Company was released from all obligations under the note. Debt extinguishment expense of $1.5 million was recorded as a result of the termination of this note. The Company entered into this five-year, $22 million secured term note payable in November 2008. In February 2010, the Company and the noteholder of this debt, further amended the terms of this note to eliminate a financial covenant and adjust the levels of the remaining financial covenants.

Proceeds from the issuance of PDC redeemable common stock totaled $3.6 million in 2010. The ESOP trustee purchased this stock using pre-tax payroll deferrals, rollovers and loan payments made by employees during 2010. Payments to redeem PDC common stock were $11.8 million. The net cash decrease realized from these proceeds and redemptions was $8.9 million less than in 2009. Cash overdrafts decreased $2.6 million during 2010.

On February 8, 2010, the Company completed a voluntary refinancing of its debt to extend debt maturities, increase liquidity, eliminate certain financial covenants and increase financial flexibility. The refinancing included the sale of $305.0 million of 10.5% senior secured first lien notes due June 2015 and a five-year, asset-backed $100 million revolving credit facility. Proceeds from the sale of the senior secured notes, less expenses and discounts, were $292.2 million. The new revolving credit facility, as amended,  provides for up to $100 million of revolving loans including a letter of credit sub-facility of up to $25 million and a swing line sub-facility of up to $5 million. Initial borrowing totaled $20.6 million. A majority of the proceeds from this refinancing transaction were used to repay and terminate the senior secured credit facilities which included senior secured variable rate notes payable of $211.2 million, plus interest, and the revolving credit facility of $97.1 million, plus interest. Remaining proceeds were used to pay related transaction fees and expenses totaling $10.8 million. Debt extinguishment expenses of $5.5 million were also recorded as a result of this voluntary refinancing. For further information see Note 11 of Notes to Consolidated Financial Statements.

***Cash Flows from Financing Activities-Appleton Papers Inc. and Subsidiaries.*** Net cash used by financing activities was $27.6 million in 2012 and $75.5 million in 2011. In 2010, cash provided by financing activities was $42.7 million. As Appleton is the primary operating subsidiary of the Company, a majority of the components of cash flows from financing activities are the same as those discussed above for Paperweight Development Corp. and Subsidiaries. As Appleton is indemnified by PDC for payments made under the arbitration award with NCR, related to the remediation of the Lower Fox River, funds due from PDC are recorded as a financing activity. The main driver of the additional changes in cash flows from financing activities is this change in due from PDC.

35

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm　　　　　　　　　　　36/147

**_Description of Outstanding Indebtedness._** Long-term obligations, excluding capital lease obligations, consist of the following (dollars in millions):

| | 2012 | 2011 |
|---|---|---|
| Revolving credit facility at approximately 4.25% | $ 3.7 | $ - |
| Secured variable rate industrial development bonds, 0.4% average interest rate at December 29, 2012, $2.7 million due in 2013 and $6.0 million due in 2027 | 8.7 | 8.7 |
| State of Ohio assistance loan at 6%, approximately $0.1 million due monthly and final payment due May 2017 | 5.2 | 6.2 |
| State of Ohio loan at 1% until July 2011, then 3% until May 2019, approximately $30,000 due monthly and final payment due May 2019 | 2.0 | 2.2 |
| Columbia County, Wisconsin municipal debt due December 2019 | 0.3 | - |
| Senior subordinated notes payable at 9.75%, due June 2014 | 32.2 | 32.2 |
| Senior secured first lien notes payable at 10.5%, due June 2015 | 305.0 | 305.0 |
| Unamortized discount on 10.5% senior secured first lien notes payable, due June 2015 | (3.3) | (4.3) |
| Second lien notes payable at 11.25%, due December 2015 | 161.8 | 161.8 |
| | 515.6 | 511.8 |
| Less obligations due within one year | (4.0) | (1.3) |
| | $ 511.6 | $ 510.5 |

<u>2012</u>

As of May 1, 2012, the revolving credit facility was amended to reduce all applicable interest rate spreads by 1.25%. The interest rate assessed on Eurodollar loans is now the Eurodollar rate plus an interest rate spread ranging from 2.0% to 2.5%, depending on defined levels of average excess availability of the credit facility. The interest rate assessed on base rate loans is now the base rate plus an interest rate spread ranging from 1.0% to 1.5%, also depending on defined levels of average excess availability. During March 2012, the Company received the proceeds of a $0.3 million note issued to Appleton Papers Inc. by Columbia County, Wisconsin.

<u>2011</u>

As of July 1, 2011, the revolving credit facility was amended to reduce all applicable interest rate spreads by 0.25%. The interest rate assessed on Eurodollar rate loans was the Eurodollar rate plus an interest rate spread ranging from 3.25% to 3.75%, depending on defined levels of average excess availability of the credit facility. The interest rate assessed on base rate loans was the base rate plus an interest rate spread ranging from 2.25% to 2.75%, also depending on defined levels of average excess availability.

During June 2011, in accordance with the terms of its 8.125% senior notes payable, the Company repaid in full the remaining note balance of $17.5 million. A payment of $18.2 million represented full and complete payment of all unpaid principal and accrued and unpaid interest. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the notes were terminated and the Company was released from all obligations under the notes.

<u>2010</u>

On November 1, 2010, the Company voluntarily repaid the remaining $17.5 million balance of the secured term note payable, as amended, due December 2013. A payment of $18.9 million represented full and complete payment of all unpaid principal, accrued and unpaid interest and a prepayment fee. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the note was terminated and the Company was released from all obligations under the note. Debt extinguishment expense of $1.5 million was recorded as a result of the termination of this note. The Company entered into this five-year, $22 million secured term note payable in November 2008. In February 2010, the Company and the noteholder of this debt, further amended the terms of this note to eliminate a financial covenant and adjust the levels of the remaining financial covenants.

36

On February 8, 2010, the Company completed a voluntary refinancing of its debt to extend debt maturities, increase liquidity, eliminate certain financial covenants and increase financial flexibility. The refinancing included the sale of $305.0 million of 10.5% senior secured first lien notes due June 2015 and a five-year, asset-backed $100 million revolving credit facility. Proceeds from the sale of the senior secured notes, less expenses and discounts, were $292.2 million. The revolving credit facility, as amended, provides for up to $100 million of revolving loans including a letter of credit sub-facility of up to $25 million and a swing line sub-facility of up to $5 million. It also contains an uncommitted accordion feature that allows the Company to increase the size of the revolving credit facility, as amended, by up to $25 million if the Company can obtain commitments for the incremental amount. Borrowings under the revolving credit facility, as amended, are limited to the sum of (a) 85% of the net amount of eligible accounts receivable and (b) the lesser of (i) 70% of the net amount of eligible raw materials and finished goods inventory or (ii) 85% of the net orderly liquidation value of such inventory. This asset-backed revolving credit facility, as amended, contains a debt covenant whereby if the Company's average availability ratio should fall below 20%, the Company is subject to a fixed charge coverage ratio of not less than 1.10:1.00. The average availability ratio is calculated monthly and is a function of the Company's average outstanding revolver borrowing as compared to the borrowing base of eligible inventory and accounts receivable as discussed above. Initial borrowing totaled $20.6 million. A majority of the proceeds from this refinancing transaction were used to repay and terminate the senior secured credit facilities which included senior secured variable rate notes payable of $211.2 million, plus interest, and the revolving credit facility of $97.1 million, plus interest. Remaining proceeds were used to pay related transaction fees and expenses totaling $10.8 million. Debt extinguishment expenses of $5.5 million were also recorded as a result of this voluntary refinancing. For further information, see Note 11 of Notes to Consolidated Financial Statements.

The 10.5% senior secured first lien notes due June 2015 rank senior in right of payment to all existing and future subordinated indebtedness of the Company and equally in right of payment with all existing and future senior indebtedness of the Company. The notes are secured by security interests in substantially all of the property and assets of the Company and are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by all of the Company's restricted subsidiaries (other than excluded restricted subsidiaries) and the parent entity. Initially, in addition to Appleton, this included PDC and Appleton Papers Canada Ltd.

The revolving credit facility, as amended, is guaranteed by PDC, each of PDC's existing and future 100%-owned domestic and Canadian subsidiaries and each other subsidiary of PDC that guarantees the 10.5% senior secured first lien notes due June 2015. Lenders hold a senior first-priority interest in (i) substantially all of the accounts, inventory, general intangibles, cash deposit accounts, business interruption insurance, investment property (including, without limitation, all issued and outstanding capital stock of Appleton and each revolver guarantor (other than PDC) and all interests in any domestic or Canadian partnership, joint venture or similar arrangement), instruments (including all collateral security thereof), documents, chattel paper and records of Appleton and each revolver guarantor now owned or hereafter acquired (except for certain general intangibles, instruments, documents, chattel paper and records of Appleton or any revolver guarantor, to the extent arising directly in connection with or otherwise directly relating to equipment, fixtures or owned real property), (ii) all other assets and properties of Appleton and each revolver guarantor now owned or hereafter acquired, and (iii) all proceeds of the foregoing. Lenders also hold a junior first-priority security interest in (i) substantially all equipment, fixtures and owned real property of Appleton and each revolver guarantor now owned or hereafter acquired, (ii) in each case solely to the extent arising directly in connection with or otherwise directly related to any of the foregoing, certain general intangibles, instruments, documents, chattel paper and records of Appleton and each revolver guarantor now owned or hereafter acquired, and (iii) all proceeds of the foregoing. The revolving credit facility, as amended, contains affirmative and negative covenants customary for similar credit facilities, which among other things, restrict the Company's ability and the ability of the Company's subsidiaries, subject to certain exceptions, to incur liens, incur or guarantee additional indebtedness, make restricted payments, engage in transactions with affiliates and make investments.

***Off-Balance Sheet Arrangements.*** The Company had no arrangements or other relationships with unconsolidated entities or other persons that are reasonably likely to materially affect liquidity or the availability of, or requirements for, capital resources at December 29, 2012.

***Disclosures about Contractual Obligations, Commercial Commitments and Contingencies.*** A summary of significant contractual obligations, commercial commitments and contingencies as of December 29, 2012, for both Paperweight Development Corp. and Subsidiaries and Appleton Papers Inc. and Subsidiaries, is as follows:

| | | | Payment Due by Period | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less Than 1 Year** | **1-3 Years** | **4-5 Years** | **After 5 Years** |
| | | | (dollars in millions) | | |
| Long-term debt (1) | $ 518.8 | $ 4.0 | $ 505.5 | $ 2.5 | $ 6.8 |
| Operating leases | 8.7 | 4.1 | 4.4 | 0.2 | - |
| Other long-term obligations (2) | 355.1 | 74.3 | 143.5 | 49.7 | 87.6 |
| Total contractual cash obligations | $ 882.6 | $ 82.4 | $ 653.4 | $ 52.4 | $ 94.4 |

(1)    The senior secured first lien notes payable at 10.5%, due June 2015, are included at face of $305.0 million.

(2)    Represents obligations for interest, pension funding, postretirement health benefits and deferred compensation payments.

In addition to the contractual obligations listed above, it will also be necessary for the Company to use cash to satisfy its repurchase obligations related to the ESOP. The following table outlines the potential repurchase liability for the next five years based on management's assumptions, developed in conjunction with the ESOP administrator, related to participant death, retirement, diversification requests, employment termination and changes in share valuation.

| | | Estimate of Potential Commitment per Period | | |
|---|---|---|---|---|
| **Other Commitments** | **Total** | **Less Than 1 Year** | **1-3 Years** | **4-5 Years** |
| | | | (dollars in millions) | |
| Estimated share repurchase liability | $ 108.0 | $ 19.3 | $ 41.5 | $ 47.2 |

The Company expects that a portion of this share repurchase liability will be funded from new deferrals from employees into the Company Stock Fund. Employees may defer, on a pre-tax basis, a percentage of their pay in an amount, subject to certain IRS limitations, equal to between 2% and 50% of their annual compensation. Participants have the option of directing their deferrals to the 401(k) Fund, the Company Stock Fund or a combination of both. The Company believes that new deferrals from employees into the Company Stock Fund for the five-year period presented above will aggregate approximately $14 million and could be used to fund a portion of the repurchase liability set forth in the table above.

Deferrals directed to the Company Stock Fund accumulate in a short-term interest-bearing account within the ESOP trust until the next valuation date, June 30 or December 31. At that time, these deferrals and the interest earned on these amounts, are used to purchase shares based upon the price of a share of PDC common stock on the valuation date preceding or following the date on which the participant made the deferrals, whichever is lower.

## Collective Bargaining Agreements

Manufacturing employees at the Company's major manufacturing facilities in Appleton, Wisconsin, Roaring Spring, Pennsylvania and West Carrollton, Ohio are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"). In June 2012, represented employees at the Roaring Spring facility ratified a labor agreement effective to November 17, 2014. In September 2012, represented employees at the West Carrollton plant ratified a labor agreement effective to April 1, 2015. In December 2011, represented employees at the Appleton facility ratified a labor agreement effective to August 31, 2014.

USW also represents employees at the Appleton, Wisconsin, Camp Hill, Pennsylvania and Kansas City, Kansas distribution centers. Employees at the Peterborough, Ontario, Canada facility are represented by Independent Paperworkers of Canada. Employees at the Portage, Wisconsin plant and other distribution centers in Georgia, Ohio and California are not represented.

***Disclosures About Certain Trading Activities that Include Non-Exchange Traded Contracts Accounted for at Fair Value.*** The Company does not engage in any trading activities that include non-exchange traded contracts accounted for at fair value.

***Disclosures About Effects of Transactions with Related and Certain Other Parties.*** There were no significant transactions with related and certain other parties.

38

**Disclosures About Critical Accounting Policies**

PDC and Appleton prepare their consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP").

This requires management to make estimates and assumptions that affect reported amounts and related disclosures. Actual results could differ from those estimates. Accounting policies are disclosed in the Notes to Consolidated Financial Statements in Item 8. Financial Statements and Supplementary Data. The following policies are considered by management to be the most critical in understanding the judgments that are involved in the preparation of the consolidated financial statements and the uncertainties that could impact the results of operations, financial position and cash flows. Management has discussed the development, selection and disclosure of these estimates and assumptions with the Audit Committee of the Board of Directors.

*Environmental.* Accruals for losses associated with environmental obligations are recorded when it is probable that a liability has been incurred and the amount of the liability can be reasonably estimated based on existing legislation, regulatory action and remediation technologies. Accruals are discounted to reflect the time value of money if the aggregate amount of the liability and the amount and timing of cash payments are fixed or reliably determinable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remedy and technology will be required, the outcome of discussions with regulatory agencies and, at multi-party sites, other potentially responsible parties ("PRPs"). In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remedy or remedies being used could significantly change those estimates. Accordingly, the Company cannot give any assurances that its eventual environmental cleanup costs and liabilities will not exceed the amount of the current reserve.

*Redeemable Common Stock.* Redeemable equity securities are required to be accreted so the amount on the balance sheet reflects the estimated amount redeemable at the earliest redemption date based upon the redemption value at each period end. Due to reductions in the share price on June 30, 2010 and earlier, partially offset by increases in the share price thereafter, the Company reduced the redeemable common stock accretion by $7.8 million for the year ended December 29, 2012. Redeemable common stock is being accreted up to the earliest redemption date, mandated by federal law, based upon the estimated fair market value of the redeemable common stock as of December 29, 2012. The earliest redemption date, as mandated by federal law, occurs when the holder reaches 55 years of age and has 10 years of participation in the KSOP. At that point, the holder has the right to make diversification elections for a period of six years. The fair value of redeemable common stock is determined by an independent, third-party appraiser selected by State Street Global Advisors, the ESOP Trustee, as required by law and the ESOP. Based upon the estimated fair value of the redeemable common stock, an ultimate redemption liability of approximately $153 million has been determined. The accretion is being charged to retained earnings as redeemable common stock is the only class of shares outstanding.

*Income Taxes.* In conjunction with the acquisition of Appleton, PDC elected to be treated as a subchapter S corporation and elected that its eligible subsidiaries be treated as qualified subchapter S subsidiaries for U.S. federal and, where recognized, state and local income tax purposes, and therefore, the Company anticipates that it will not incur any future U.S. federal income tax liability and minimal state and local income tax liabilities. Appleton's Canadian subsidiary, Appleton Papers Canada Ltd., is not eligible for treatment as a qualified subchapter S subsidiary. As a result, the Company will incur a foreign tax liability. The Company's income tax reserve at December 29, 2012, covers various audit issues and provisions for certain non-U.S. entities. All U.S. federal C corporation tax years are closed. Various Canadian and state tax years remain open.

*Intangible Assets.* The Company reviews the carrying value of intangible assets with indefinite lives for impairment annually or more frequently if events or changes in circumstances indicate that an asset might be impaired. A considerable amount of management judgment and assumptions are required in performing the impairment test, principally in determining the fair value of the respective indefinite-lived intangible assets.

Other intangible assets with definite lives continue to be amortized over their estimated useful lives and are tested for impairment when events or changes in circumstances indicate that the asset might be impaired. Indefinite-lived intangible assets are not amortized.

*Revenue Recognition.* Revenue is recognized by the Company when all of the following criteria are met: persuasive evidence of a selling arrangement exists; the Company's price to the customer is fixed; collectability is reasonably assured; and title has transferred to the customer. These criteria are met at the time of shipment. Estimated costs for sales incentives, discounts and sales returns and allowances are recorded as sales reductions in the period in which the related revenue is recognized. The Company typically does not invoice its customers for shipping and handling fees, which are classified as selling, general and administrative expenses.

*Sales Returns and Allowances.* A reserve is established for expected sales returns and allowances. The amount of the reserve is based on historic sales and returns and allowances data, which is analyzed by product line and market channel to determine average returns and allowances as a percent of gross sales. This percentage is applied to recent sales activity and is adjusted, as necessary, for any significant known claims or trends.

***Employee Benefit Plans.*** The Company provides a range of benefits to its employees and retired employees, including pensions and postretirement healthcare. The Company recognizes all actuarial gains and losses immediately in net periodic cost annually in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year and, the market-related value of plan assets used in the cost calculations is equal to fair value.

The determination of the Company's obligation and expense for pension and other postretirement benefits, such as retiree healthcare and life insurance, is dependent on the selection of certain assumptions in calculating such amounts. Those assumptions include, among others and where applicable, the discount rate and rates of increase in healthcare costs. The Company reviews its actuarial assumptions on an annual basis and makes modifications to the assumptions based on current rates and trends, when appropriate.

The discount rate is developed by selecting a portfolio of high-quality corporate bonds appropriate to provide for the projected benefit payments of the plan. This portfolio is selected from a universe of over 500 Aa-graded noncallable bonds available in the market as of December 29, 2012, further limited to those bonds with average yields between the 10th and 90th percentiles. After the bond portfolio is selected, a single rate is determined that equates the market value of the bonds selected to the discounted value of the plan's benefit payments. Based on the methodology described above, and a selected portfolio of 19 bonds, the Company has selected a discount rate of 4.15% for the pension plans to value year-end liabilities. The discount rate used at year-end 2011 was 5.00%.

The expected long-term rate of return on assets assumption is developed considering the relative weighting of plan assets, the historical performance of total plan assets and individual asset classes and economic and other indicators of future performance. Expected returns for each asset class are developed using estimates of expected real returns plus expected inflation. Long-term expected real returns are derived from future expectations for the U.S. Treasury real yield curve. Based on the assumptions and methodology described above, the Company selected 7.75% at year-end 2012 and 8.00% at year-end 2011 as its long-term rate of return on assets assumption.

Significant differences in actual experience or significant changes in assumptions may materially affect its pension and other postretirement obligations and future expense.

## Environmental and Legal Matters

The Company's operations are subject to comprehensive and frequently changing federal, state and local environmental laws and regulations. These include laws and regulations governing emissions of air pollutants, discharges of wastewater and storm water, storage, treatment and disposal of materials and waste, remediation of soil, surface water and groundwater contamination and liability for damages to natural resources. In addition, the Company is also governed by laws and regulations relating to workplace safety and worker health which, among other things, regulate employee exposure to hazardous chemicals in the workplace.

Compliance with environmental laws and regulations is an important facet of the business. The Company expects to incur capital expenditures of approximately $1.0 million in 2013 and a total of approximately $4.5 million from 2014 through 2018 to maintain compliance with applicable federal, state, local and foreign environmental laws and regulations and to meet new regulatory requirements. The Company expects to continue to incur expenditures after 2018 to maintain compliance with applicable federal, state, local and foreign environmental laws and regulations and to meet new regulatory requirements.

The Company is subject to strict and, under some circumstances, joint and several liability for the investigation and remediation of environmental contamination, including contamination caused by other parties, at properties that it owns or operates and at properties where the Company or its predecessors have arranged for the disposal of regulated materials. As a result, the Company is involved from time to time in administrative and judicial proceedings and inquiries relating to environmental matters. The Company could be involved in additional proceedings in the future and the total amount of these future costs and other environmental liabilities may be material.

The Company is involved from time to time in certain administrative and judicial proceedings and inquiries related to environmental matters. For a discussion of these environmental matters, see "Item 1. Business – Environmental" and Note 19 of the Notes to the Consolidated Financial Statements. Furthermore, from time to time the Company may be subject to various demands, claims, suits or other legal proceedings arising in the ordinary course of business. A comprehensive insurance program is maintained to provide a measure of financial protection against such matters, though not all such exposures are, or can be, addressed by insurance. Estimated costs are recorded for such demands, claims, suits or proceedings of this nature when reasonably determinable. The Company has successfully defended such claims, settling some for amounts which are not material to its business and obtaining dismissals in others. While the Company will vigorously defend itself in any similar cases that may be brought against it in the future, there can be no assurance that it will be successful.

In September 2007, the Company commenced litigation against Andritz BMB AG and Andritz, Inc. The claims asserted included breach of obligations under a February 2007 agreement to perform certain engineering services which also granted the Company an option to purchase certain equipment and services relating to an off-machine paper coating line. On May 14, 2009, the Company received a favorable jury verdict, and on August 11, 2009, an Outagamie County, Wisconsin judge granted the Company's motion to enter judgment in favor of the Company in the amount of $29.1 million plus 12% interest annually beginning as of January 9, 2009. The defendant appealed the final judgment and in March 2011 the Wisconsin Court of Appeals issued a decision unanimously affirming the final judgment. On September 1, 2011, the Wisconsin Supreme Court denied the defendants' petition seeking further review of the matter. During the third quarter 2011, the Company received payment of $23.2 million in damages, including interest and net of related fees and litigation expenses.

Other than the Lower Fox River matter described in "Item 1. Business – Environmental," and assuming the Company's expectations regarding defending such demands, claims, suits or other legal or regulatory proceedings prove accurate, the Company does not believe that any pending or threatened demands, claims, suits or other legal or regulatory proceedings will have, individually or in the aggregate, a materially adverse effect on its business, financial condition and results of operations or cash flows.

## New Accounting Pronouncements

In February 2013, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2013-02, "Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income." This update adds new disclosure requirements for items reclassified out of accumulated other comprehensive income. The updated standard is effective prospectively for the Company's annual and interim periods beginning after December 15, 2012. The adoption of this new ASU is not expected to have a significant impact the Company's consolidated financial statements.

In July 2012, the FASB issued ASU No. 2012-02, "Testing Indefinite-Lived Intangible Assets for Impairment." It provides the option to perform a qualitative, rather than quantitative, assessment to determine whether it is more likely than not an indefinite-lived intangible asset is impaired. ASU 2012-02 is effective for annual and interim impairment tests performed for fiscal years beginning after September 15, 2012, though early adoption is permitted. The Company expects that adoption will not have a significant impact on its consolidated financial statements.

In June 2011, the FASB issued ASU No. 2011-05, "Presentation of Comprehensive Income." It provides updated guidance related to the presentation of other comprehensive income, offering two alternatives for presentation, including (a) a single continuous statement of comprehensive income or (b) two separate but consecutive statements. ASU 2011-05 was effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. As required, the Company adopted this guidance during first quarter 2012 and the necessary presentation is included in its consolidated financial statements.

In May 2011, the FASB issued ASU No. 2011-04, "Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs," which amends ASC 820. This updated guidance relates to fair value measurements and disclosures, including (a) the application of the highest and best use valuation premise concepts, (b) measuring the fair value of an instrument classified in a reporting entity's stockholders' equity and (c) quantitative information required for fair value measurements categorized within Level 3. Additionally, disclosure requirements have been expanded to include additional disclosure for Level 3 measurements regarding the sensitivity of fair value to changes in unobservable inputs and any interrelationships between those inputs. ASU 2011-04 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. As required, the Company adopted this guidance during first quarter 2012. Any required disclosures are included in Note 14, Derivative Instruments and Hedging Activities and Note 16, Fair Value Measurements.

**Item 7A.          Quantitative and Qualitative Disclosures About Market Risk**

The Company is exposed to market risk from changes in interest rates, foreign currency exchange rate fluctuations and commodity prices. To reduce these risks, it selectively uses financial instruments and other proactive risk management techniques. For additional information, see Note 2 to Consolidated Financial Statements, Derivative Financial Instruments and Hedging Activities, and Note 14 to Consolidated Financial Statements, Derivative Instruments and Hedging Activities.

*Interest Rate Risk.* As of year ended December 29, 2012, the Company had variable rate debt of $8.7 million. As such, a change of 1% to current interest rates would not have a material impact on interest expense.

*Currency Risk.* The Company maintains a sales organization and distribution facility in Canada and makes investments and enters into transactions denominated in foreign currencies. Although the majority of international sales are denominated in U.S. dollars, a portion of international sales are denominated in foreign currencies with the effect that the Company is increasingly exposed to translational foreign exchange risk in coming years.

The Company has entered into limited foreign exchange contracts to reduce the variability of the earnings and cash flow impacts of nonfunctional currency denominated activities between its Canadian distribution center and customers located outside the United States. Gains and losses resulting from hedging instruments offset the foreign exchange gains or losses on the underlying items being hedged. Maturities of forward exchange contracts coincide with settlement dates of related transactions. Forward exchange contracts are designated as cash flow hedges in accordance with ASC 815, "Derivatives and Hedging." A 10% appreciation or depreciation in the Canadian dollar at December 29, 2012 would not have a significant impact on the Company's consolidated balance sheet, consolidated statement of operations or consolidated statement of cash flows.

*Commodity Prices.* The Company is subject to the effects of changing raw material costs caused by movements in underlying commodity prices. The Company is exposed to fluctuating market prices for commodities, including pulp, chemicals and base stock, and has established programs to manage exposure to commodity prices through effective negotiations with suppliers. As listed within its contractual obligations, the Company enters into contracts with vendors to lock in commodity prices at various times and for various periods to limit near-term exposure to fluctuations in raw material prices.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using swap and collar contracts to manage risks associated with market fluctuations in energy prices. These contracts are recorded in the Consolidated Balance Sheet at fair value using inputs based on the New York Mercantile Exchange as measured on the last trading day of the accounting period and compared to the strike price. The contracts' gains or losses due to changes in fair value are recorded in current period earnings. At December 29, 2012, the hedged volumes of these contracts was approximately 1.3 million MMBTU (Million British Thermal Units) of natural gas. The contracts have settlement dates extending through December 2013.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using swap contracts to manage risks associated with market fluctuations in pulp prices. These contracts are recorded in the Consolidated Balance Sheet at fair value using market inputs based on pricing published by RISI, Inc. ("RISI") as measured on the last trading day of the accounting period and compared to the swap's fixed price. Currently, there are no pulp swap contracts in place.

42

**Item 8.**        **Financial Statements and Supplementary Data**

**Report of Independent Registered Public Accounting Firm**

To the Shareholder and Board of Directors of Paperweight Development Corp. and Subsidiaries:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of comprehensive loss, of cash flows and of redeemable common stock, accumulated deficit and accumulated other comprehensive income present fairly, in all material aspects, the financial position of Paperweight Development Corp. and its subsidiaries at December 29, 2012 and December 31, 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 29, 2012, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for pension and other postretirement benefit plans and inventory costing in 2012.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Milwaukee, Wisconsin
March 13, 2013

To the Shareholder and Board of Directors of Appleton Papers Inc. and Subsidiaries:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of comprehensive loss, of cash flows and of equity present fairly, in all material aspects, the financial position of Appleton Papers Inc. and its subsidiaries at December 29, 2012 and December 31, 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 29, 2012, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As described in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for pension and other postretirement benefit plans and inventory costing in 2012.


/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Milwaukee, Wisconsin
March 13, 2013

44

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**(dollars in thousands, except share data)**

|  | December 29, 2012 | December 31, 2011 |
|---|---|---|
| Current assets | | |
|   Cash and cash equivalents | $ 1,851 | $ 7,241 |
|   Accounts receivable, less allowance for doubtful accounts of | | |
|   $1,077 and $1,186, respectively | 92,680 | 90,339 |
|   Inventories | 94,349 | 103,877 |
|   Other current assets | 70,620 | 54,724 |
|     Total current assets | 259,500 | 256,181 |
| Property, plant and equipment, net of accumulated depreciation | | |
|   of $607,006 and $513,985, respectively | 243,265 | 324,665 |
| Intangible assets, net | 43,839 | 46,125 |
| Other assets | 14,486 | 16,297 |
|     Total assets | $ 561,090 | $ 643,268 |

**LIABILITIES, REDEEMABLE COMMON STOCK,**
**ACCUMULATED DEFICIT AND**
**ACCUMULATED OTHER COMPREHENSIVE INCOME**

|  | December 29, 2012 | December 31, 2011 |
|---|---|---|
| Current liabilities | | |
|   Current portion of long-term debt | $ 3,975 | $ 1,256 |
|   Accounts payable | 68,600 | 51,766 |
|   Accrued interest | 2,467 | 2,628 |
|   Other accrued liabilities | 119,635 | 91,427 |
|     Total current liabilities | 194,677 | 147,077 |
| | | |
| Long-term debt | 511,624 | 510,533 |
| Postretirement benefits other than pension | 38,440 | 41,611 |
| Accrued pension | 137,081 | 125,245 |
| Other long-term liabilities | 32,165 | 7,389 |
| Commitments and contingencies (Note 19) | - | - |
| Redeemable common stock, $0.01 par value, | | |
| shares authorized: 30,000,000, shares issued and | | |
| outstanding: 8,730,118 and 9,212,808, respectively | 81,704 | 97,615 |
| Accumulated deficit | (439,923) | (299,226) |
| Accumulated other comprehensive income | 5,322 | 13,024 |
| | | |
|     Total liabilities, redeemable common stock, | | |
|     accumulated deficit and accumulated other comprehensive | | |
|     income | $ 561,090 | $ 643,268 |

The accompanying notes are an integral part of these consolidated financial statements.

## APPLETON PAPERS INC. AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS
#### (dollars in thousands, except share data)

| | | December 29, 2012 | | December 31, 2011 |
|---|---|---|---|---|
| Current assets | | | | |
| Cash and cash equivalents | $ | 1,851 | $ | 7,241 |
| Accounts receivable, less allowance for doubtful accounts of | | | | |
| $1,077 and $1,186, respectively | | 92,680 | | 90,339 |
| Inventories | | 94,349 | | 103,877 |
| Other current assets | | 70,620 | | 54,724 |
|     Total current assets | | 259,500 | | 256,181 |
| Property, plant and equipment, net of accumulated depreciation | | | | |
| of $607,006 and $513,985, respectively | | 243,265 | | 324,665 |
| Intangible assets, net | | 43,839 | | 46,125 |
| Other assets | | 14,474 | | 16,285 |
|     Total assets | $ | 561,078 | $ | 643,256 |
| **LIABILITIES AND TOTAL EQUITY** | | | | |
| Current liabilities | | | | |
| Current portion of long-term debt | $ | 3,975 | $ | 1,256 |
| Accounts payable | | 68,600 | | 51,766 |
| Accrued interest | | 2,467 | | 2,628 |
| Other accrued liabilities | | 119,635 | | 91,427 |
|     Total current liabilities | | 194,677 | | 147,077 |
| Long-term debt | | 511,624 | | 510,533 |
| Postretirement benefits other than pension | | 38,440 | | 41,611 |
| Accrued pension | | 137,081 | | 125,245 |
| Other long-term liabilities | | 32,165 | | 7,389 |
|     Total liabilities | | 913,987 | | 831,855 |
| Commitments and contingencies (Note 19) | | - | | - |
| Common stock, $100.00 par value, | | | | |
| 130,000 shares authorized, | | | | |
| 100 shares issued and outstanding | | 10,500 | | 10,500 |
| Paid-in capital | | 623,305 | | 623,305 |
| Due from parent | | (237,257) | | (229,100) |
| Accumulated deficit | | (754,779) | | (606,328) |
| Accumulated other comprehensive income | | 5,322 | | 13,024 |
|     Total equity | | (352,909) | | (188,599) |
| Total liabilities and equity | $ | 561,078 | $ | 643,256 |

The accompanying notes are an integral part of these consolidated financial statements.

46

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(dollars in thousands)**

| | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| Net sales | $ 849,756 | $ 857,329 | $ 849,884 |
| Cost of sales | 758,875 | 718,710 | 682,228 |
| Gross profit | 90,881 | 138,619 | 167,656 |
| Selling, general and administrative expenses | 152,961 | 144,928 | 139,154 |
| Environmental expense insurance recovery | (2,188) | - | (8,947) |
| Restructuring | 28,589 | - | - |
| Litigation settlement, net | - | 3,122 | - |
| Operating (loss) income | (88,481) | (9,431) | 37,449 |
| Other expense (income) | | | |
| Interest expense | 59,654 | 61,330 | 65,772 |
| Debt extinguishment expense, net | - | - | 7,010 |
| Interest income | (224) | (355) | (327) |
| Recovery from litigation settlement, net | - | (23,229) | - |
| Foreign exchange (gain) loss | (213) | 1,136 | 600 |
| Other expense (income) | 166 | (1,238) | (1,029) |
| Loss from continuing operations before income taxes | (147,864) | (47,075) | (34,577) |
| Provision for income taxes | 587 | 577 | 176 |
| Loss from continuing operations | (148,451) | (47,652) | (34,753) |
| Discontinued operations | | | |
| Income from discontinued operations, net of income taxes | - | - | 3,499 |
| Net loss | (148,451) | (47,652) | (31,254) |
| Other comprehensive (loss) income | | | |
| Changes in retiree plans | (4,812) | 433 | 6,743 |
| Realized and unrealized (losses) gains on derivatives | (2,890) | 1,373 | 140 |
| Total other comprehensive (loss) income | (7,702) | 1,806 | 6,883 |
| Comprehensive loss | $ (156,153) | $ (45,846) | $ (24,371) |

The accompanying notes are an integral part of these consolidated financial statements.

47

**APPLETON PAPERS INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(dollars in thousands)**

| | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| Net sales | $ 849,756 | $ 857,329 | $ 849,884 |
| Cost of sales | 758,875 | 718,710 | 682,228 |
| Gross profit | 90,881 | 138,619 | 167,656 |
| Selling, general and administrative expenses | 152,961 | 144,928 | 139,154 |
| Environmental expense insurance recovery | (2,188) | - | (8,947) |
| Restructuring | 28,589 | - | - |
| Litigation settlement, net | - | 3,122 | - |
| Operating (loss) income | (88,481) | (9,431) | 37,449 |
| Other expense (income) | | | |
| Interest expense | 59,654 | 61,330 | 65,772 |
| Debt extinguishment expense, net | - | - | 7,010 |
| Interest income | (224) | (355) | (327) |
| Recovery from litigation settlement, net | - | (23,229) | - |
| Foreign exchange (gain) loss | (213) | 1,136 | 600 |
| Other expense (income) | 166 | (1,238) | (1,029) |
| Loss from continuing operations before income taxes | (147,864) | (47,075) | (34,577) |
| Provision for income taxes | 587 | 577 | 176 |
| Loss from continuing operations | (148,451) | (47,652) | (34,753) |
| Discontinued operations | | | |
| Income from discontinued operations, net of income taxes | - | - | 3,499 |
| Net loss | (148,451) | (47,652) | (31,254) |
| Other comprehensive (loss) income | | | |
| Changes in retiree plans | (4,812) | 433 | 6,743 |
| Realized and unrealized (losses) gains on derivatives | (2,890) | 1,373 | 140 |
| Total other comprehensive (loss) income | (7,702) | 1,806 | 6,883 |
| Comprehensive loss | $ (156,153) | $ (45,846) | $ (24,371) |

The accompanying notes are an integral part of these consolidated financial statements.

48

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE TWELVE MONTHS ENDED**
**(dollars in thousands)**

|  | December 29, 2012 | December 31, 2011 | January 1, 2011 |
|---|---|---|---|
| Cash flows from operating activities: |  |  |  |
| Net loss | $ (148,451) | $ (47,652) | $ (31,254) |
| Adjustments to reconcile net loss to net cash provided |  |  |  |
| (used) by operating activities: |  |  |  |
| Depreciation | 98,010 | 46,292 | 48,578 |
| Amortization of intangible assets | 2,286 | 2,324 | 2,908 |
| Impaired inventory revaluation | 11,061 | - | - |
| Amortization of financing fees | 2,645 | 3,373 | 4,080 |
| Amortization of bond discount | 1,066 | 958 | 745 |
| Employer 401(k) noncash matching contributions | 3,038 | 2,738 | 3,209 |
| Foreign exchange (gain) loss | (227) | 1,143 | 559 |
| Net gain from involuntary conversion of equipment | - | (1,374) | (638) |
| Noncash gain on foreign currency hedging | (2,382) | - | - |
| Loss on disposals of equipment | 1,448 | 209 | 419 |
| Gain on sale of business | - | - | (2,560) |
| Accretion of capital lease obligations | 10 | 7 | 33 |
| Loss on debt extinguishment | - | - | 7,010 |
| Fox River insurance recovery | - | (145) | (9,053) |
|  |  |  |  |
| (Increase)/decrease in assets and increase/(decrease) in liabilities: |  |  |  |
| Accounts receivable | (2,857) | 2,004 | (14,540) |
| Inventories | (962) | 6,107 | (5,872) |
| Other current assets | 3,105 | 14,484 | (6,739) |
| Accounts payable and other accrued liabilities | 27,159 | (569) | (9,273) |
| Accrued pension | 12,322 | 37,149 | (11,862) |
| Other, net | 16,034 | 1,663 | (5,735) |
| Net cash provided (used) by operating activities | 23,305 | 68,711 | (29,985) |
|  |  |  |  |
| Cash flows from investing activities: |  |  |  |
| Proceeds from sale of equipment | 22 | 6 | 208 |
| Net change in cash due to sale of Films | - | 2,000 | 56,000 |
| Insurance proceeds from involuntary conversion of equipment | - | 1,374 | 1,029 |
| Additions to property, plant and equipment | (17,143) | (15,847) | (17,839) |
| Net cash (used) provided by investing activities | (17,121) | (12,467) | 39,398 |
|  |  |  |  |
| Cash flows from financing activities: |  |  |  |
| Payments of senior secured notes payable | - | - | (211,225) |
| Payments of senior notes payable | - | (17,491) | - |
| Proceeds from senior secured first lien notes payable | - | - | 299,007 |
| Debt acquisition costs | - | - | (10,847) |
| Payments relating to capital lease obligations | (68) | (47) | (721) |
| Proceeds from old revolving line of credit | - | - | 21,350 |
| Payments of old revolving line of credit | - | - | (109,575) |
| Proceeds from revolving line of credit | 253,400 | 202,800 | 316,993 |
| Payments of revolving line of credit | (249,700) | (232,100) | (287,693) |
| Payments of State of Ohio loans | (1,256) | (1,203) | (1,151) |
| Payments of secured financing | - | - | (20,905) |
| Proceeds from municipal debt | 300 | | |
| Proceeds from issuance of redeemable common stock | 2,884 | 2,875 | 3,561 |
| Payments to redeem common stock | (14,070) | (12,351) | (11,811) |
| (Decrease) increase in cash overdraft | (3,078) | 4,749 | (2,628) |
| Net cash used by financing activities | (11,588) | (52,768) | (15,645) |
|  |  |  |  |
| Effect of foreign exchange rate changes on cash and cash equivalents | 14 | (7) | 41 |
| Change in cash and cash equivalents | (5,390) | 3,469 | (6,191) |
| Cash and cash equivalents at beginning of period | 7,241 | 3,772 | 9,963 |
|  |  |  |  |
| Cash and cash equivalents at end of period | $ 1,851 | $ 7,241 | $ 3,772 |

The accompanying notes are an integral part of these consolidated financial statements.

49

**APPLETON PAPERS INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE TWELVE MONTHS ENDED**
**(dollars in thousands)**

|  | December 29, 2012 | December 31, 2011 | January 1, 2011 |
|---|---|---|---|
| Cash flows from operating activities: |  |  |  |
| Net loss | $ (148,451) | $ (47,652) | $ (31,254) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities: |  |  |  |
| Depreciation | 98,010 | 46,292 | 48,578 |
| Amortization of intangible assets | 2,286 | 2,324 | 2,908 |
| Impaired inventory revaluation | 11,061 | - | - |
| Amortization of financing fees | 2,645 | 3,373 | 4,080 |
| Amortization of bond discount | 1,066 | 958 | 745 |
| Employer 401(k) noncash matching contributions | 3,038 | 2,738 | 3,209 |
| Foreign exchange (gain) loss | (227) | 1,143 | 559 |
| Net gain from involuntary conversion of equipment | - | (1,374) | (638) |
| Noncash gain on foreign currency hedging | (2,382) | - | - |
| Loss on disposals of equipment | 1,448 | 209 | 419 |
| Gain on sale of business | - | - | (2,560) |
| Accretion of capital lease obligations | 10 | 7 | 33 |
| Loss on debt extinguishment | - | - | 7,010 |
| Fox River insurance recovery | - | (145) | (9,053) |
| (Increase)/decrease in assets and increase/(decrease) in liabilities: |  |  |  |
| Accounts receivable | (2,857) | 2,004 | (14,540) |
| Inventories | (962) | 6,107 | (5,872) |
| Other current assets | 3,105 | 14,484 | (6,739) |
| Accounts payable and other accrued liabilities | 46,159 | 24,851 | (35,793) |
| Accrued pension | 12,322 | 37,149 | (11,862) |
| Other, net | 13,005 | (1,067) | (37,535) |
| Net cash provided (used) by operating activities | 39,276 | 91,401 | (88,305) |
| Cash flows from investing activities: |  |  |  |
| Proceeds from sale of equipment | 22 | 6 | 208 |
| Net change in cash due to sale of Films | - | 2,000 | 56,000 |
| Insurance proceeds from involuntary conversion of equipment | - | 1,374 | 1,029 |
| Additions to property, plant and equipment | (17,143) | (15,847) | (17,839) |
| Net cash (used) provided by investing activities | (17,121) | (12,467) | 39,398 |
| Cash flows from financing activities: |  |  |  |
| Payments of senior secured notes payable | - | - | (211,225) |
| Payments of senior notes payable | - | (17,491) | - |
| Proceeds from senior secured first lien notes payable | - | - | 299,007 |
| Debt acquisition costs | - | - | (10,847) |
| Payments relating to capital lease obligations | (68) | (47) | (721) |
| Proceeds from old revolving line of credit | - | - | 21,350 |
| Payments of old revolving line of credit | - | - | (109,575) |
| Proceeds from revolving line of credit | 253,400 | 202,800 | 316,993 |
| Payments of revolving line of credit | (249,700) | (232,100) | (287,693) |
| Payments of State of Ohio loans | (1,256) | (1,203) | (1,151) |
| Payments of secured financing | - | - | (20,905) |
| Proceeds from municipal debt | 300 | - | - |
| Due from parent | (27,157) | (32,166) | 50,070 |
| (Decrease) increase in cash overdraft | (3,078) | 4,749 | (2,628) |
| Net cash (used) provided by financing activities | (27,559) | (75,458) | 42,675 |
| Effect of foreign exchange rate changes on cash and cash equivalents | 14 | (7) | 41 |
| Change in cash and cash equivalents | (5,390) | 3,469 | (6,191) |
| Cash and cash equivalents at beginning of period | 7,241 | 3,772 | 9,963 |
| Cash and cash equivalents at end of period | $ 1,851 | $ 7,241 | $ 3,772 |

The accompanying notes are an integral part of these consolidated financial statements.

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF REDEEMABLE COMMON STOCK,
ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME
FOR THE YEARS ENDED**
(dollars in thousands, except share data)

| | Redeemable Common Stock | | Accumulated Deficit | Accumulated Other Comprehensive Income |
|---|---|---|---|---|
| | Shares Outstanding | Amount | | |
| Balance, January 2, 2010 | 10,097,099 | $ 122,087 | $ (232,996) | $ 4,335 |
| Comprehensive loss: | | | | |
| Net loss | - | - | (31,254) | - |
| Other comprehensive income | - | - | - | 6,883 |
| Issuance of redeemable common stock | 562,003 | 6,761 | - | - |
| Redemption of redeemable common stock | (945,890) | (11,811) | - | - |
| Accretion of redeemable common stock | - | (6,992) | 6,992 | - |
| Balance, January 1, 2011 | 9,713,212 | 110,045 | (257,258) | 11,218 |
| Comprehensive loss: | | | | |
| Net loss | - | - | (47,652) | - |
| Other comprehensive income | - | - | - | 1,806 |
| Issuance of redeemable common stock | 416,217 | 5,605 | - | - |
| Redemption of redeemable common stock | (916,621) | (12,351) | - | - |
| Accretion of redeemable common stock | - | (5,684) | 5,684 | - |
| Balance, December 31, 2011 | 9,212,808 | 97,615 | (299,226) | 13,024 |
| Comprehensive loss: | | | | |
| Net loss | - | - | (148,451) | - |
| Other comprehensive loss | - | - | - | (7,702) |
| Issuance of redeemable common stock | 378,566 | 5,913 | - | - |
| Redemption of redeemable common stock | (861,256) | (14,070) | - | - |
| Accretion of redeemable common stock | - | (7,754) | 7,754 | - |
| Balance, December 29, 2012 | 8,730,118 | $ 81,704 | $ (439,923) | $ 5,322 |

The accompanying notes are an integral part of these consolidated financial statements.

51

**APPLETON PAPERS INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF EQUITY**
**FOR THE YEARS ENDED**
(dollars in thousands, except share data)

| | Common Stock | | | | | |
| | Shares Outstanding | Amount | Paid-in Capital | Due from Parent | Accumulated Deficit | Accumulated Other Comprehensive Income |
|---|---|---|---|---|---|---|
| Balance, January 2, 2010 | 100 | $ 10,500 | $ 623,305 | $ (217,305) | $ (527,422) | $ 4,335 |
| Comprehensive loss: | | | | | | |
| Net loss | - | - | - | - | (31,254) | - |
| Other comprehensive income | - | - | - | - | - | 6,883 |
| Change in due from parent | - | - | - | (5,049) | - | - |
| Balance, January 1, 2011 | 100 | 10,500 | 623,305 | (222,354) | (558,676) | 11,218 |
| Comprehensive loss: | | | | | | |
| Net loss | - | - | - | - | (47,652) | - |
| Other comprehensive income | - | - | - | - | - | 1,806 |
| Change in due from parent | - | - | - | (6,746) | - | - |
| Balance, December 31, 2011 | 100 | 10,500 | 623,305 | (229,100) | (606,328) | 13,024 |
| Comprehensive loss: | | | | | | |
| Net loss | - | - | - | - | (148,451) | - |
| Other comprehensive loss | - | - | - | - | - | (7,702) |
| Change in due from parent | - | - | - | (8,157) | - | - |
| Balance, December 29, 2012 | 100 | $ 10,500 | $ 623,305 | $ (237,257) | $ (754,779) | $ 5,322 |

The accompanying notes are an integral part of these consolidated financial statements.

52

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### 1. BASIS OF PRESENTATION AND NATURE OF OPERATIONS

The accompanying consolidated financial statements, after the elimination of intercompany accounts and transactions, include the accounts of Paperweight Development Corp. ("PDC") and its 100%-owned subsidiaries (collectively the "Company"), which includes the consolidated financial statements of Appleton Papers Inc. and its 100%-owned subsidiaries (collectively "Appleton"), for the years ended December 29, 2012, December 31, 2011, and January 1, 2011. PDC conducts substantially all of its business through Appleton. In late October 2011, the SEC Regulations Committee September minutes published a clarification of S-X Rule 3-10 as it relates to the definition of what is a "full and unconditional" guarantee. As a result, separate financial statements are presented for PDC, the Parent, and Appleton, the Issuer of the debt.

<u>NATURE OF OPERATIONS</u>

Appleton is the primary operating subsidiary of PDC. The Company creates product solutions for customers and end users through its development and use of coating formulations and applications as well as microencapsulation and security technologies. It has three reportable segments: carbonless papers, thermal papers and Encapsys (see Note 24, Segment Information).

The carbonless papers segment includes carbonless and security paper products. Carbonless paper is used to make multipart business forms such as invoices and purchase orders. The Company produces coated products for point-of-sale displays and other design and print applications and offers custom coating solutions. Carbonless products are sold to converters, business forms printers and merchant distributors who stock and sell carbonless paper to printers. The Company produces security papers with features that resist forgery, tampering and counterfeiting. The Company's portfolio of products incorporates security technologies, including watermarks, taggants, reactive chemicals, embedded threads and fibers and machine-readable technologies, to serve global markets. The Company produces financial and identity documents for business and government such as checks, visas, automobile titles and birth certificates. Sales within the carbonless papers segment accounted for approximately 48% of consolidated net sales in 2012, 53% of consolidated net sales in 2011 and 56% of consolidated net sales in 2010.

The thermal papers segment develops and produces substrates for the transaction and item identification markets. Thermal paper is used in four principal end markets: (1) point-of-sale products for retail receipts and coupons; (2) labels for shipping, warehousing, medical and clean-room applications; (3) tags and tickets for airline and baggage applications, event and transportation tickets and lottery and gaming applications; and (4) printer, calculator and chart products for engineering, industrial and medical diagnostic charts. Point-of-sale products are sold to printers and converters who in turn sell to end-user customers or to resellers such as office supply stores, office superstores, warehouse clubs, mail order catalogs, equipment dealers, merchants and original equipment manufacturers. Label products are sold to companies who apply pressure sensitive adhesive coatings and release liners and then sell these products to label printers. Tag, ticket and chart grades are sold to specialty printing companies who convert them to finished products such as entertainment, lottery and gaming tickets, tags, coupons and medical charts. Sales within the thermal papers segment accounted for approximately 48% of consolidated net sales in 2012, 43% of consolidated net sales in 2011 and 40% of consolidated net sales in 2010.

The Encapsys segment discovers, develops and manufactures microencapsulation solutions for external partner companies and for the Company's carbonless papers segment. Microencapsulation is the process of putting a microscopic wall around a core substance. The Company helped NCR Corporation ("NCR") produce the first commercial application for microencapsulation in 1954 with the introduction of carbonless paper. Since then, the Company researchers have developed the art and science of microencapsulation and are working with potential partners in industries as diverse as agriculture, paints and coatings, food, building and construction, paper, textiles, personal and household care, adhesives, and oil and gas. The Encapsys segment leverages the Company's extensive technical knowledge and experience with microencapsulation and uses an open innovation process with partner companies to develop successful technical solutions for those companies. Sales within the Encapsys segment accounted for approximately 6% of consolidated net sales in 2012, 2011 and 2010.

53

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                          56/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

RELATIONSHIPS WITH FORMER PARENT

At the close of business on November 9, 2001, PDC and New Appleton LLC completed the purchase of all the partnership interests of Arjo Wiggins Delaware General Partnership ("AWDGP") and its 100%-owned subsidiary, Appleton Papers Inc.

In conjunction with the acquisition, the Company entered into two indemnification agreements under which Arjo Wiggins Appleton Limited, now known as Windward Prospects Ltd ("AWA"), the former parent of Appleton, agreed to indemnify PDC and PDC agreed to indemnify Appleton for the costs, expenses and liabilities related to certain governmental and third-party environmental claims, referred to as the Fox River Liabilities.

Under the indemnification agreements, Appleton is indemnified for the first $75 million of Fox River Liabilities and for amounts in excess of $100 million (see Note 19, Commitments and Contingencies). During 2008, Appleton paid $25 million to satisfy its portion of the Fox River Liabilities not covered by the indemnification agreement with AWA.

In connection with the indemnification agreements, AWA purchased and fully paid for indemnity claim insurance from Commerce & Industry Insurance Company, an affiliate of American International Group, Inc. The insurance policy provided up to $250 million of coverage for Fox River Liabilities, subject to certain limitations defined in the policy. As of December 31, 2011, there was no remaining coverage on the policy.

As amended in, and as limited by the terms of the purchase agreement relating to the acquisition of Appleton, AWA and two of its affiliates have agreed to indemnify PDC and Appleton for certain losses resulting from (1) inaccuracies in the environmental representations and warranties made by AWA and its affiliates, (2) certain known environmental matters that existed at the closing of the acquisition, (3) environmental matters related to the businesses of Newton Falls, Inc., Appleton Coated LLC and several other of the Company's former affiliates and subsidiaries and (4) environmental matters relating to the real property on which the Company's former Camp Hill, Pennsylvania plant and the Company's current distribution center are located that existed prior to its sale of the Camp Hill plant to a third-party.

RELATIONSHIP OF APPLETON PAPERS INC. WITH PARENT

As a result of PDC's November 2001 acquisition of Appleton Papers Inc., Appleton entered into borrowings with a third-party and transferred the acquired cash through a subordinated demand note receivable with PDC to fund the acquisition from AWA. The note principal of $167.1 million and accrued interest at 6% is due on demand. Though the principal and accrued interest is due on demand, PDC does not have the ability or intent to repay the amounts due. As such, the loan has been classified as a reduction in equity.

As described in Note 22, the ESOP purchased 100% of PDC shares in 2001. All ESOP shares activities, including issuance, deferrals, redemptions, and accretion, are recorded by PDC. Cash is transacted through intercompany loans from Appleton to PDC in order to fund ESOP redemption activities and, ESOP deferrals are in turn paid back to Appleton. Redemption activities are significantly larger than employee deferrals. The Company has classified the intercompany loans on Appleton's ledger as a reduction to equity as PDC does not have the ability or intent to repay the amounts due.

As discussed above, in conjunction with the acquisition of Appleton, PDC entered into two indemnification agreements under which AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for the costs, expenses and liabilities related to the Fox River Liabilities. The balance sheet of PDC includes an indemnification receivable from AWA in current assets and a corresponding indemnification payable to Appleton in current liabilities. The balance sheet of Appleton includes an indemnification receivable from PDC in current assets and a corresponding reserve for Fox River Liabilities in current liabilities.

2.     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

FISCAL YEAR

The Company's fiscal year is the 52-week or 53-week period ending the Saturday nearest December 31. Fiscal year 2012 was a 52-week period ending December 29, 2012. Fiscal year 2011 was a 52-week period ending December 31, 2011. Fiscal year 2010 was a 52-week period ending on January 1, 2011.

54

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm      57/147

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

USE OF ESTIMATES

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The more critical estimates made by management relate to environmental contingencies, pension and postretirement assumptions, accrued discounts, intangible and tangible asset impairment analyses, fair market value of redeemable common stock and receivable reserves. Actual results could differ from those estimates.

RECLASSIFICATIONS

See Note 4, Discontinued Operations, which discusses reclassifications made to the financial statements to present divested subsidiaries as discontinued operations.

CHANGE IN ACCOUNTING POLICIES

During fourth quarter 2012, the Company adopted mark-to-market accounting for its pension and other postretirement benefit plans. Under mark-to-market accounting, all actuarial gains and losses are immediately recognized in net periodic cost annually in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year and, the market-related value of plan assets used in the cost calculations is equal to fair value. Under the Company's previous accounting method, a portion of the actuarial gains and losses was deferred in accumulated other comprehensive loss on the Consolidated Balance Sheet and amortized into future periods. In addition, the previous method smoothed the investment gains and losses of the plan assets over a period of five years. While the Company's historical policy of recognizing pension and other postretirement benefits expense was considered acceptable under accounting priniciples generally accepted in the United States, the Company believes this new policy to be preferable as it eliminates the delay in recognizing actuarial gains and losses within operating results. This change will also improve the transparency within the Company's operating results by immediately recognizing the effects of economic and interest rate trends on plan investments and assumptions in the year these actuarial gains and losses are actually incurred. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting policy.

In connection with this change in accounting policy for pension and other postretirement benefit plans, the Company also elected to change its method of accounting for certain costs included in inventory. The Company has elected to exclude the amount of its pension and other postretirement benefit costs applicable to former employees from inventoriable costs. While the Company's historical policy of including all pension and other postretirement benefits costs, excluding those charged directly to SG&A, as a component of inventoriable costs was acceptable, it believes the new policy is preferable as inventoriable costs will only include costs that are directly attributable to current employees involved in the production of inventory. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting policy.

55

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The impact of these accounting policy changes on the Company's consolidated financial statements are summarized below.

**Consolidated Statements of Comprehensive Loss (PDC and Appleton)**

|  | For the Year Ended December 29, 2012 | | |
|---|---|---|---|
|  | Previous Method | Effect of Change | As Reported |
| Net sales | $ 849,756 | $ - | $ 849,756 |
| Cost of sales | 741,408 | 17,467 | 758,875 |
| Gross profit | 108,348 | (17,467) | 90,881 |
| | | | |
| Selling general and administrative expenses | 144,916 | 8,045 | 152,961 |
| Environmental expense insurance recovery | (2,188) | - | (2,188) |
| Restructuring | 28,589 | - | 28,589 |
| Operating loss | (62,969) | (25,512) | (88,481) |
| | | | |
| Other expense (income) | | | |
| Interest expense | 59,654 | - | 59,654 |
| Interest income | (224) | - | (224) |
| Other income | (47) | - | (47) |
| Loss before income taxes | (122,352) | (25,512) | (147,864) |
| Provision for income taxes | 587 | - | 587 |
| Net loss | (122,939) | (25,512) | (148,451) |
| | | | |
| Other comprehensive loss: | | | |
| Changes in retiree plans | (29,350) | 24,538 | (4,812) |
| Realized and unrealized losses on derivatives | (2,890) | - | (2,890) |
| Total other comprehensive loss | (32,240) | 24,538 | (7,702) |
| Comprehensive loss | $ (155,179) | $ (974) | $ (156,153) |

|  | For the Year Ended December 31, 2011 | | |
|---|---|---|---|
|  | Previously Reported | Effect of Change | Revised |
| Net sales | $ 857,329 | $ - | $ 857,329 |
| Cost of sales | 687,524 | 31,186 | 718,710 |
| Gross profit | 169,805 | (31,186) | 138,619 |
| | | | |
| Selling general and administrative expenses | 130,574 | 14,354 | 144,928 |
| Litigation settlement, net | 3,122 | - | 3,122 |
| Operating income (loss) | 36,109 | (45,540) | (9,431) |
| | | | |
| Other expense (income) | | | |
| Interest expense | 61,330 | - | 61,330 |
| Interest income | (355) | - | (355) |
| Recovery from litigation settlement, net | (23,229) | - | (23,229) |
| Other income | (102) | - | (102) |
| Loss before income taxes | (1,535) | (45,540) | (47,075) |
| Provision for income taxes | 577 | - | 577 |
| Net loss | (2,112) | (45,540) | (47,652) |
| | | | |
| Other comprehensive (loss) income: | | | |
| Changes in retiree plans | (46,461) | 46,894 | 433 |
| Realized and unrealized gains on derivatives | 1,373 | - | 1,373 |
| Total other comprehensive (loss) income | (45,088) | 46,894 | 1,806 |
| Comprehensive loss | $ (47,200) | $ 1,354 | $ (45,846) |

56

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

| | For the Year Ended January 1, 2011 | | |
| --- | --- | --- | --- |
| | Previously Reported | Effect of Change | Revised |
| Net sales | $ 849,884 | $ - | $ 849,884 |
| Cost of sales | 684,488 | (2,260) | 682,228 |
| Gross profit | 165,396 | 2,260 | 167,656 |
| | | | |
| Selling general and administrative expenses | 137,304 | 1,850 | 139,154 |
| Environmental expense insurance recovery | (8,947) | - | (8,947) |
| Operating income | 37,039 | 410 | 37,449 |
| | | | |
| Other expense (income) | | | |
| Interest expense | 65,772 | - | 65,772 |
| Debt extinguishment expense, net | 7,010 | - | 7,010 |
| Interest income | (327) | - | (327) |
| Other income | (429) | - | (429) |
| Loss from continuing operations before income taxes | (34,987) | 410 | (34,577) |
| Provision for income taxes | 176 | - | 176 |
| Loss from continuing operations | (35,163) | 410 | (34,753) |
| Discontinued operations | | | |
| Income from discontinued operations, net of income taxes | 3,499 | - | 3,499 |
| Net loss | (31,664) | 410 | (31,254) |
| | | | |
| Other comprehensive income: | | | |
| Changes in retiree plans | 7,306 | (563) | 6,743 |
| Realized and unrealized gains on derivatives | 140 | - | 140 |
| Total other comprehensive income | 7,446 | (563) | 6,883 |
| Comprehensive loss | $ (24,218) | $ (153) | $ (24,371) |

**Consolidated Balance Sheets (PDC and Appleton, unless otherwise noted)**

| | December 29, 2012 | | |
| --- | --- | --- | --- |
| | Previous Method | Effect of Change | As Reported |
| Inventories | $ 93,973 | $ 376 | $ 94,349 |
| | | | |
| Accumulated deficit (PDC) | (265,378) | (174,545) | (439,923) |
| Accumulated deficit (Appleton) | (580,234) | (174,545) | (754,779) |
| | | | |
| Accumulated other comprehensive (loss) income | (169,599) | 174,921 | 5,322 |

| | December 31, 2011 | | |
| --- | --- | --- | --- |
| | Previously Reported | Effect of Change | Revised |
| Inventories | $ 102,527 | $ 1,350 | $ 103,877 |
| | | | |
| Accumulated deficit (PDC) | (150,193) | (149,033) | (299,226) |
| Accumulated deficit (Appleton) | (457,295) | (149,033) | (606,328) |
| | | | |
| Accumulated other comprehensive (loss) income | (137,359) | 150,383 | 13,024 |

57

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

<u>Consolidated Statements of Cash Flows (PDC and Appleton, unless otherwise noted)</u>

| | For the Year Ended December 29, 2012 | | |
|---|---|---|---|
| | Previous Method | Effect of Change | As Reported |
| Cash flows from operating activities: | | | |
| Net loss | $ (122,939) | $ (25,512) | $ (148,451) |
| (Increase)/decrease in assets and increase/(decrease) in liabilities: | | | |
| Inventories | (1,936) | 974 | (962) |
| Accrued pension | (14,788) | 27,110 | 12,322 |
| Other, net (PDC) | 18,606 | (2,572) | 16,034 |
| Other, net (Appleton) | 15,577 | (2,572) | 13,005 |

| | For the Year Ended December 31, 2011 | | |
|---|---|---|---|
| | Previously Reported | Effect of Change | Revised |
| Cash flows from operating activities: | | | |
| Net loss | $ (2,112) | $ (45,540) | $ (47,652) |
| (Increase)/decrease in assets and increase/(decrease) in liabilities: | | | |
| Inventories | 7,463 | (1,356) | 6,107 |
| Accrued pension | (12,004) | 49,153 | 37,149 |
| Other, net (PDC) | 3,920 | (2,257) | 1,663 |
| Other, net (Appleton) | 1,190 | (2,257) | (1,067) |

| | For the Year Ended January 1, 2011 | | |
|---|---|---|---|
| | Previously Reported | Effect of Change | Revised |
| Cash flows from operating activities: | | | |
| Net loss | $ (31,664) | $ 410 | $ (31,254) |
| (Increase)/decrease in assets and increase/(decrease) in liabilities: | | | |
| Inventories | (6,026) | 154 | (5,872) |
| Accrued pension | (7,279) | (4,583) | (11,862) |
| Other, net (PDC) | (9,754) | 4,019 | (5,735) |
| Other, net (Appleton) | (41,554) | 4,019 | (37,535) |

58

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**Consolidated Statements of Redeemable Common Stock, Accumulated Deficit,**
**Accumulated Other Comprehensive Income and Equity (PDC and Appleton, unless**
**Otherwise noted)**

| | For the Year Ended December 29, 2012 | | |
| --- | --- | --- | --- |
| | Previous Method | Effect of Change | As Reported |
| Accumulated deficit | | | |
| Net loss | $ (122,939) | $ (25,512) | $ (148,451) |
| Total accumulated deficit (PDC) | (265,378) | (174,545) | (439,923) |
| Total accumulated deficit (Appleton) | (580,234) | (174,545) | (754,779) |
| | | | |
| Accumulated other comprehensive (loss) income | | | |
| Other comprehensive loss | (32,240) | 24,538 | (7,702) |
| Total accumulated other comprehensive (loss) income | (169,599) | 174,921 | 5,322 |

| | For the Year Ended December 31, 2011 | | |
| --- | --- | --- | --- |
| | Previously Reported | Effect of Change | Revised |
| Accumulated deficit | | | |
| Net loss | $ (2,112) | $ (45,540) | $ (47,652) |
| Total accumulated deficit (PDC) | (150,193) | (149,033) | (299,226) |
| Total accumulated deficit (Appleton) | (457,295) | (149,033) | (606,328) |
| | | | |
| Accumulated other comprehensive (loss) income | | | |
| Other comprehensive (loss) income | (45,088) | 46,894 | 1,806 |
| Total accumulated other comprehensive (loss) income | (137,359) | 150,383 | 13,024 |

| | For the Year Ended January 1, 2011 | | |
| --- | --- | --- | --- |
| | Previously Reported | Effect of Change | Revised |
| Accumulated deficit | | | |
| Balance at January 2, 2010 (PDC) | $ (129,093) | $ (103,903) | $ (232,996) |
| Balance at January 2, 2010 (Appleton) | (423,519) | (103,903) | (527,422) |
| Net loss | (31,664) | 410 | (31,254) |
| Total accumulated deficit (PDC) | (153,765) | (103,493) | (257,258) |
| Total accumulated deficit (Appleton) | (455,183) | (103,493) | (558,676) |
| | | | |
| Accumulated other comprehensive (loss) income | | | |
| Balance at January 2, 2010 | (99,717) | 104,052 | 4,335 |
| Other comprehensive income | 7,446 | (563) | 6,883 |
| Total accumulated other comprehensive (loss) income | (92,271) | 103,489 | 11,218 |

REVENUE RECOGNITION

      Revenue is recognized by the Company when all of the following criteria are met: persuasive evidence of a selling arrangement exists; the Company's price to the customer is fixed; collectability is reasonably assured; and title has transferred to the customer. These criteria are met at the time of shipment. Estimated costs for sales incentives, discounts and sales returns and allowances are recorded as sales reductions in the period in which the related revenue is recognized. The Company typically does not invoice its customers for shipping and handling fees, which are classified as selling, general and administrative expenses and totaled approximately $46 million for 2012 and $48 million for both 2011 and 2010.

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGING ACTIVITIES

The Company selectively uses financial instruments to manage some market risks from changes in interest rates, foreign currency exchange rates or commodity prices and follows the guidance of ASC 815, "Derivatives and Hedging." The fair values of all derivatives are recorded in the Consolidated Balance Sheet. The change in a derivative's fair value is recorded each period in current earnings or accumulated other comprehensive income, depending on whether the derivative is designated and qualifies as part of a hedge transaction and, if so, the type of hedge transaction.

The Company selectively hedges forecasted transactions that are subject to foreign currency exchange exposure by using forward exchange contracts. These instruments are designated as cash flow hedges in accordance with ASC 815 and are recorded in the Consolidated Balance Sheet at fair value. The effective portion of the contracts' gains or losses due to changes in fair value is initially recorded as a component of accumulated other comprehensive income and is subsequently reclassified into earnings when the underlying transactions occur and affect earnings or if it becomes probable the forecasted transaction will not occur. These contracts are highly effective in hedging the variability in future cash flows attributable to changes in currency exchange rates.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using swap contracts to manage risks associated with market fluctuations in energy prices. These contracts are recorded in the Consolidated Balance Sheet at fair value. The contracts' gains or losses due to changes in fair value are recorded in current period earnings.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using swap contracts to manage risks associated with market fluctuations in pulp prices. As of December 29, 2012, no contracts were in place. At year-end 2011, there were two pulp swap contracts in place and each was recorded in the Consolidated Balance Sheet at fair value. One contract was not designated as a hedge and its gains or losses due to changes in fair value were recorded in current period earnings. The second contract was designated as a cash flow hedge of forecasted pulp purchases and the change in the effective portion of the fair value of this hedge was deferred in accumulated other comprehensive income until the inventory containing the pulp was sold.

In February 2008, the Company fixed the interest rate, at 5.45%, on $75.0 million of its variable rate notes with a five-year interest rate swap contract. As a result of the February 2010 voluntary refinancing, the Company paid $5.0 million, including interest, to settle this derivative. See Note 11, Long-Term Obligations.

For the year ended December 29, 2012, the amount recognized in earnings due to ineffectiveness of hedge transactions was a loss of $0.2 million. For the two years ended December 31, 2011, the amount recognized in earnings due to ineffectiveness of hedge transactions was immaterial. The amount reported as realized and unrealized losses on derivatives of $2.9 million in 2012, in accumulated other comprehensive income, represents the net loss on derivatives designated as cash flow hedges. The amount reported as realized and unrealized gains of $1.4 million in 2011 and $0.1 million in 2010, in accumulated other comprehensive income, represents the net gain on derivatives designated as cash flow hedges.

CASH EQUIVALENTS

Cash equivalents consist of funds invested in institutional money market funds with daily liquidity. At December 29, 2012 and December 31, 2011, there were cash overdrafts of approximately $10.7 million and $13.7 million, respectively, which are included in accounts payable within the accompanying consolidated balance sheets.

INVENTORIES

Inventories are stated at the lower of cost or market. Cost is determined using the first-in, first-out ("FIFO") method for raw materials, work in process and finished goods inventories. Stores and spare parts inventories are valued at average cost. Finished goods and work in process inventories include the cost of materials, labor and manufacturing overhead.

60

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment are stated at cost, including interest incurred during construction and depreciated over their estimated useful lives using the straight-line method for financial reporting purposes and accelerated methods for income tax purposes. The general range of useful lives for financial reporting is 10 to 40 years for buildings and improvements and 3 to 20 years for machinery and equipment. Maintenance and repair costs that do not significantly improve the related asset or extend its useful life are charged to expense as incurred. When assets are sold or retired, their cost and related accumulated depreciation are removed from the accounts with resulting gains or losses reflected in operating income.

INTERNAL USE SOFTWARE

Costs incurred related to the development of internal use software are accounted for in accordance with ASC 350, "Intangibles – Goodwill and Other" which requires the capitalization of certain costs incurred in connection with developing or obtaining software for internal use once certain criteria are met. Capitalized software costs are amortized over the lesser of 8 years or the useful life of the software using the straight-line method.

INTANGIBLE ASSETS

Certain intangible assets (including a portion of registered trademarks) have been determined to have indefinite useful lives and will not be amortized until their useful lives are determined to no longer be indefinite. Other intangible assets (customer relationships and the remaining registered trademarks) are amortized over their estimated useful lives of 20 to 25 years.

IMPAIRMENT OF INTANGIBLES AND LONG-LIVED ASSETS

The Company reviews the carrying value of intangible assets with indefinite lives for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired. This impairment analysis consists of a comparison of the fair value of the intangible asset with its carrying amount. If the carrying amount of the asset exceeds its fair value, an impairment loss would be recognized in an amount equal to that excess.

The Company reviews the carrying value of intangible assets with definite lives and other long-lived assets whenever events or changes in circumstances indicate that the assets may be impaired. The fair value of the assets is based on an analysis of the undiscounted future cash flows. If the carrying amount of the asset exceeds the determined fair value, an impairment loss would be recognized based upon anticipated discounted cash flows from the asset.

INCOME TAXES

In conjunction with the acquisition of Appleton, PDC elected to be treated as a subchapter S corporation and elected that its eligible subsidiaries be treated as qualified subchapter S subsidiaries for U.S. federal and, where recognized, state and local income tax purposes, and therefore, the Company anticipates that it will not incur any future U.S. federal income tax liability and minimal state and local income tax liabilities.

Ineligible subsidiaries account for income taxes in accordance with ASC 740, "Income Taxes," which requires recognition of deferred tax liabilities and assets for the expected future tax consequences of events that have been included in the financial statements or tax returns. Under this method, deferred tax liabilities and assets are determined based on the difference between the financial statement basis and tax basis of assets and liabilities using enacted tax rates in effect for the years in which the differences are expected to reverse. A valuation allowance is provided against deferred tax assets in those circumstances where it is more likely than not that some or all of the deferred tax asset may not be realized.

61

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

FAIR VALUE OF FINANCIAL INSTRUMENTS

ASC 820 establishes a framework for measuring fair value and expands disclosure about fair value measurements. This statement enables the reader of the financial statements to assess the inputs used to develop those measurements by establishing a hierarchy for ranking the quality and reliability of the information used to determine fair values. The statement requires that assets and liabilities carried at fair value will be classified and disclosed in one of the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.
Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.
Level 3: Unobservable inputs that are not corroborated by market data.

When available, quoted market prices were used to determine fair value and such measurements are classified within Level 1. In some cases where market prices are not available, observable market-based inputs were used to calculate fair value, in which case the measurements are classified within Level 2. If quoted or observable market prices are not available, fair value is based upon internally developed models that use, where possible, current market-based parameters such as interest rates, yield curves and currency rates. These measurements are classified within Level 3.

Fair value measurements are classified according to the lowest level input or value-driver that is significant to the valuation. A measurement may therefore be classified within Level 3 even though there may be significant inputs that are readily observable.

ASC 820 expanded the definition of fair value to include the consideration of nonperformance risk. Nonperformance risk refers to the risk that an obligation (either by a counterparty or by the Company) will not be fulfilled. For financial assets traded in an active market (Level 1 and certain Level 2), the nonperformance risk is included in the market price. For certain other financial assets and liabilities (Level 2 and 3), fair value calculations have been adjusted accordingly.

The fair value of interest rate swap derivatives is primarily based on models that utilize the appropriate market-based forward swap curves and zero-coupon interest rates to determine the discounted cash flows that result in a measurement that is classified as Level 2. The fair value of foreign currency forward contracts is based on a valuation model that discounts cash flows resulting from the differential between the contract price and the market-based forward rate, also deemed to be categorized as Level 2.

In addition to the methods and assumptions used to record the fair value of financial instruments as discussed above, the following methods and assumptions are used to estimate the fair value of financial instruments as required by ASC 825, "Financial Instruments." Cash and cash equivalents, accounts receivable and accounts payable recorded in the balance sheets approximate fair value based on the short maturity of these instruments. Fair values of long-term debt are estimated based on market conditions and interest rates available to the Company for similar financial instruments.

ACCUMULATED OTHER COMPREHENSIVE INCOME

The components of the non-owner changes in equity, or accumulated other comprehensive income, are as follows (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Changes in retiree plans | $ 6,453 | $ 11,265 |
| Realized and unrealized (losses) gains on derivatives | (1,131) | 1,759 |
|  | $ 5,322 | $ 13,024 |

RESEARCH AND DEVELOPMENT

Research and development costs are charged to expense as incurred. Such costs incurred in the development of new products or significant improvements to existing products totaled $11.2 million in 2012, $11.4 million in 2011 and $12.5 million in 2010.

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

<u>ACCOUNTING PRONOUNCEMENTS</u>

In February 2013, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2013-02, "Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income." This update adds new disclosure requirements for items reclassified out of accumulated other comprehensive income. The updated standard is effective prospectively for the Company's annual and interim periods beginning after December 15, 2012. The adoption of this new ASU is not expected to have a significant impact the Company's consolidated financial statements.

In July 2012, the FASB issued ASU No. 2012-02, "Testing Indefinite-Lived Intangible Assets for Impairment." It provides the option to perform a qualitative, rather than quantitative, assessment to determine whether it is more likely than not an indefinite-lived intangible asset is impaired. ASU 2012-02 is effective for annual and interim impairment tests performed for fiscal years beginning after September 15, 2012, though early adoption is permitted. The Company expects that adoption will not have a significant impact on its consolidated financial statements.

In June 2011, the FASB issued ASU No. 2011-05, "Presentation of Comprehensive Income." It provides updated guidance related to the presentation of other comprehensive income, offering two alternatives for presentation, including (a) a single continuous statement of comprehensive income or (b) two separate but consecutive statements. ASU 2011-05 was effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. As required, the Company adopted this guidance during first quarter 2012 and the necessary presentation is included in its consolidated financial statements.

In May 2011, the FASB issued ASU No. 2011-04, "Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs," which amends ASC 820. This updated guidance relates to fair value measurements and disclosures, including (a) the application of the highest and best use valuation premise concepts, (b) measuring the fair value of an instrument classified in a reporting entity's stockholders' equity and (c) quantitative information required for fair value measurements categorized within Level 3. Additionally, disclosure requirements have been expanded to include additional disclosure for Level 3 measurements regarding the sensitivity of fair value to changes in unobservable inputs and any interrelationships between those inputs. ASU 2011-04 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. As required, the Company adopted this guidance during first quarter 2012. Any required disclosures are included in Note 14, Derivative Instruments and Hedging Activities and Note 16, Fair Value Measurements.

**3.  RESTRUCTURING AND OTHER RELATED COSTS**

On February 22, 2012, the Company entered into a long-term supply agreement for the purchase of carbonless and thermal base stock for coating at the Company's converting facilities. Under the terms of this agreement, the supplier will be the exclusive supplier of certain thermal and carbonless base stock used by the Company. The term of the agreement is 15 years and includes successive five-year renewal terms unless either party gives notice of non-renewal.

In connection with its approval of this supply agreement, the Company's Board of Directors authorized a plan for the Company to dispose of papermaking assets at its West Carrollton, Ohio facility and move its carbonless coating to the Company's converting plant in Appleton, Wisconsin. As a result, 314 jobs were eliminated at West Carrollton and 68 jobs added at the Appleton facility. The Company maintains its thermal coating operations at the West Carrollton facility and was staffed by 111 employees as of year-end 2012. During 2012, the Company recorded restructuring expense and other related costs totaling $106.0 million. These include the following (dollars in thousands):

|  | For the Year Ended December 29, 2012 | Location on Statement of Comprehensive Loss |
|---|---|---|
| Employee termination benefits | $ 25,166 | Restructuring |
| Decommissioning and other expenses | 3,423 | Restructuring |
| Retention incentives and other costs | 320 | Cost of sales |
| Accelerated depreciation | 64,742 | Cost of sales |
| Revaluation of inventory | 11,061 | Cost of sales |
| Loss on disposal of fixed assets | 1,238 | Cost of sales |
|  | $ 105,950 |  |

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

Of the costs recorded during 2012, $58.3 million were allocated to the carbonless papers segment and $47.7 million were allocated to the thermal papers segment.

The table below summarizes the components of the restructuring reserve included in the Condensed Consolidated Balance Sheet as of December 29, 2012.

| | December 31, 2011 Reserve | 2012 Additions to Reserve | 2012 Utilization | December 29, 2012 Reserve |
|---|---|---|---|---|
| Exit costs - equipment decommissioning | $ - | $ 3,423 | $ (2,658) | $ 765 |
| Employee termination benefits - short-term | - | 7,166 | (6,712) | 454 |
| Employee termination benefits - long-term | - | 18,000 | - | 18,000 |
| | $ - | $ 28,589 | $ (9,370) | $ 19,219 |

Employee termination benefits include severance as well as related benefits and pension costs. At December 29, 2012, $1.2 million is included in current liabilities and $18.0 million is included in other long-term liabilities. The Company expects any remaining charges for employee termination costs and other exit costs to be immaterial. It is estimated that cash of approximately $31 million remains to be paid as a result of ceasing papermaking operations at West Carrollton. Of this amount, it is expected that approximately $1 million will be paid during 2013. In addition, approximately $12 million will be disbursed over the next five years as a result of distributions from the Company's stock fund to former West Carrollton employees terminated as a result of the restructuring. The remaining $18 million may be paid over the next five to 20 years.

During second quarter 2012, papermaking equipment was decommissioned and, by year-end 2012, certain real property used in the papermaking operations was abandoned. As a result, accelerated depreciation of $64.7 million was recorded during 2012. Related to the decommissioning of papermaking assets, stores and spare parts inventories were revalued to lower of cost or market and resulted in a write-down of $11.1 million. Construction in progress of $1.2 million was also written off during the year ended December 29, 2012. These were all noncash charges.

**4.    DISCONTINUED OPERATIONS**

On July 2, 2010, the Company entered into a stock purchase agreement with NEX Performance Films Inc. ("Films"), an entity affiliated with Mason Wells Buyout Fund II, Limited Partnership whereby the Company agreed to sell all of the outstanding capital stock of APC and NEX for a cash purchase price of $58 million. This transaction closed on July 22, 2010, with the Company receiving $56 million at the time of closing and $2 million held in escrow, on behalf of the Company, for 12 months to satisfy potential claims under the stock purchase agreement with Films. No claims were made against the escrow and the $2 million was paid to the Company on July 25, 2011. The cash proceeds of the sale were used to reduce debt and a $0.4 million net gain was recorded in income from discontinued operations for the year ended January 1, 2011. APC was acquired in 2003 and is located in Rhinelander, Wisconsin. NEX was acquired in 2005 and has manufacturing operations in Turners Falls, Massachusetts, and Milton, Wisconsin.

APC and NEX were included in the Company's former performance packaging business segment. Since APC and NEX engaged in the manufacture, marketing and sale of high-quality single and multilayer polyethylene films for packaging applications, their operations did not align with the Company's strategic, long-term focus on its core competencies of specialty papers and microencapsulation. The operating results of APC and NEX were reclassified and reported as discontinued operations. As of the end of second quarter 2010, depreciation and amortization expense was suspended, resulting in a $0.2 million reduction in expense.

64

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The following table presents the net sales and income from discontinued operations for APC and NEX (dollars in thousands):

|  | For the Year Ended January 1, 2011 |
|---|---|
| Net sales | $ 51,581 |
| Operating income | $ 3,513 |
| Income before income taxes | $ 3,513 |
| Provision for income taxes | 14 |
| Income from discontinued operations | $ 3,499 |

**5.    BUSINESS INTERRUPTION AND PROPERTY LOSS**

Manufacturing operations at the Company's West Carrollton, Ohio paper mill were temporarily interrupted in July 2010 by the collapse of one of its coal silos. The incident caused no injuries. One boiler was extensively damaged as well as the supporting infrastructure for two other boilers. While most of the West Carrollton facility was undamaged, the collapse of the coal silo reduced the mill's ability to produce the power and steam required to operate its manufacturing equipment. The thermal coater resumed production a few days later and the remainder of the mill resumed production in early August. The Company managed customer orders and shifted paper production to other company-owned manufacturing facilities in order to minimize any impact to its customers. The boiler that was extensively damaged resumed operation just prior to the end of first quarter 2011.

Losses associated with property damage and business interruption were covered by insurance subject to a deductible of $1.0 million. During second quarter 2011, the corresponding insurance claim was agreed and settled in full with all proceeds received from the insurer. The Company incurred approximately $24.1 million in property damage, cost to repair and business interruption. After netting the $1.0 million deductible, and $1.7 million of capital and $1.1 million of expense for safety and efficiency upgrades to the replacement property and other expenses not covered under the policy, the Company recovered $20.3 million from its insurer.

Expenses associated with property damage and business interruption, totaling $17.1 million, were reported in cost of sales within the Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011. Expenses associated with property damage and business interruption, totaling $0.7 million, were reported in cost of sales within the Consolidated Statement of Comprehensive Loss for the year ended December 31, 2011. According to the terms of the insurance policy, the Company recorded a $17.1 million recovery, less a $0.9 million valuation reserve, as a reduction to cost of sales for the year ended January 1, 2011, and a $0.5 million recovery as a reduction to cost of sales for the year ended December 31, 2011. Business interruption coverage also included recovery from lost margins related to the accident and therefore, the Company recorded a gain of $0.6 million in cost of sales within the Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011, as this amount was agreed with the insurer. During 2011, the Company recorded an additional $0.2 million gain in cost of sales related to lost margins. The Company also recorded a $0.4 million involuntary conversion loss on fixed assets associated with the property loss in its Consolidated Statement of Comprehensive Loss for the year ended January 1, 2011.

Total capital spending of approximately $5.5 million was incurred for work associated with bringing the damaged boiler back online. At year-end 2010, $1.0 million, net of the $1.0 million deductible, was recorded as a gain on the other income line within the Consolidated Statement of Comprehensive Loss. For the year ended December 31, 2011, the Company recorded an additional $1.4 million of gain on the other expense (income) line within the Consolidated Statement of Comprehensive Loss, all of which was recorded during the second quarter.

**6.    INTANGIBLE ASSETS**

The Company reviews the carrying value of intangible assets with indefinite lives for impairment annually or more frequently if events or changes in circumstances indicate that an asset might be impaired.

65

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The Company's intangible assets consist of the following (dollars in thousands):

| | As of December 29, 2012 | | As of December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Amortizable intangible assets: | | | | |
| Trademarks | $ 44,665 | $ 26,275 | $ 44,665 | $ 24,177 |
| Patents | 7,808 | 7,808 | 10,071 | 10,071 |
| Customer relationships | 5,365 | 2,781 | 5,365 | 2,593 |
| Subtotal | 57,838 | $ 36,864 | 60,101 | $ 36,841 |
| Unamortizable intangible assets: | | | | |
| Trademarks | 22,865 | | 22,865 | |
| Total | $ 80,703 | | $ 82,966 | |

Of the $80.7 million of acquired intangible assets, $67.5 million was assigned to registered trademarks. Trademarks of $44.6 million related to carbonless paper are being amortized over their useful life of 20 years, while the remaining $22.9 million are considered to have an indefinite life and are not subject to amortization. Customer relationships are being amortized over their estimated useful lives of 25 years.

Amortization expense for the year ended December 29, 2012 approximated $2.3 million. Amortization expense for each of the years ended December 31, 2011, and January 1, 2011, also approximated $2.3 million. Excluding the impact of any future acquisitions, the Company anticipates annual amortization of intangible assets will approximate $2.3 million for each of the years 2013 through 2017.

## 7. INVENTORIES

Inventories consist of the following (dollars in thousands):

| | 2012 | 2011 |
| --- | --- | --- |
| Finished goods | $ 43,243 | $ 43,888 |
| Raw materials, work in process and supplies | 51,106 | 59,989 |
| | $ 94,349 | $ 103,877 |

Stores and spare parts inventory balances of $15.9 million in 2012 and $25.5 million in 2011 are valued at average cost and are included in raw materials, work in process and supplies. All other inventories are valued using the first-in, first-out ("FIFO") method.

## 8. PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment balances consist of the following (dollars in thousands):

| | 2012 | 2011 |
| --- | --- | --- |
| Land and improvements | $ 9,634 | $ 9,279 |
| Buildings and improvements | 134,144 | 133,042 |
| Machinery and equipment | 663,915 | 657,310 |
| Software | 33,643 | 33,349 |
| Capital leases | 304 | 165 |
| Construction in progress | 8,631 | 5,505 |
| | 850,271 | 838,650 |
| Accumulated depreciation | (607,006) | (513,985) |
| | $ 243,265 | $ 324,665 |

66

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**9. OTHER CURRENT AND NONCURRENT ASSETS**

Other current assets consist of the following (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Environmental indemnification receivable | $ 65,000 | $ 46,000 |
| Environmental expense insurance recovery | - | 2,960 |
| Other | 5,620 | 5,764 |
|  | $ 70,620 | $ 54,724 |

The environmental indemnification receivables of $65.0 million and $46.0 million, noted above, for the years ended December 29, 2012 and December 31, 2011, respectively, represent an indemnification receivable from AWA as recorded on the Consolidated Balance Sheet of Paperweight Development Corp. and subsidiaries and an indemnification receivable from PDC as recorded on the Consolidated Balance Sheet of Appleton Papers Inc. and subsidiaries.

Other noncurrent assets for Paperweight Development Corp. and Subsidiaries consist of the following (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Deferred debt issuance costs | $ 7,736 | $ 10,381 |
| Other | 6,750 | 5,916 |
|  | $ 14,486 | $ 16,297 |

Other noncurrent assets for Appleton Papers Inc. and Subsidiaries consist of the following (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Deferred debt issuance costs | $ 7,736 | $ 10,381 |
| Other | 6,738 | 5,904 |
|  | $ 14,474 | $ 16,285 |

**10. OTHER ACCRUED LIABILITIES**

Other accrued liabilities, as presented in the current liabilities section of the balance sheet, consist of the following (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Compensation | $ 14,800 | $ 9,966 |
| Trade discounts | 16,796 | 15,277 |
| Workers' compensation | 4,875 | 5,090 |
| Accrued insurance | 1,896 | 2,153 |
| Other accrued taxes | 1,494 | 1,181 |
| Postretirement benefits other than pension | 3,248 | 3,218 |
| Fox River Liabilities | 65,000 | 46,000 |
| Litigation settlement | - | 750 |
| Restructuring reserve | 1,219 | - |
| Other | 10,307 | 7,792 |
|  | $ 119,635 | $ 91,427 |

67

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

**11.　LONG-TERM OBLIGATIONS**

Long-term obligations, excluding capital lease obligations, consist of the following (dollars in thousands):

|  | December 29, 2012 | December 31, 2011 |
|---|---|---|
| Revolving credit facility at approximately 4.25% | $　　3,700 | $　　- |
| Secured variable rate industrial development bonds, 0.4% average interest rate at December 29, 2012, $2,650 due in 2013 and $6,000 due in 2027 | 8,650 | 8,650 |
| State of Ohio assistance loan at 6%, approximately $100 due monthly and final payment due May 2017 | 5,210 | 6,185 |
| State of Ohio loan at 1% until July 2011, then 3% until May 2019, approximately $30 due monthly and final payment due May 2019 | 2,002 | 2,283 |
| Columbia County, Wisconsin municipal debt due December 2019 | 300 | - |
| Senior subordinated notes payable at 9.75%, due June 2014 | 32,195 | 32,195 |
| Senior secured first lien notes payable at 10.5%, due June 2015 | 305,000 | 305,000 |
| Unamortized discount on 10.5% senior secured first lien notes payable, due June 2015 | (3,224) | (4,290) |
| Second lien notes payable at 11.25%, due December 2015 | 161,766 | 161,766 |
|  | 515,599 | 511,789 |
| Less obligations due within one year | (3,975) | (1,256) |
|  | $　511,624 | $　510,533 |

During 2012, the Company made mandatory debt repayments of $1.3 million, plus interest, on its State of Ohio loans. Also, during 2012, the Company borrowed $253.4 million and repaid $249.7 million on its revolving credit facility, as amended, leaving a $3.7 million outstanding balance at year-end. Approximately $15.8 million of the revolving credit facility, as amended, is used to support outstanding letters of credit. As of May 1, 2012, the revolving credit facility was amended to reduce all applicable interest rate spreads by 1.25%. The interest rate assessed on Eurodollar loans is now the Eurodollar rate plus an interest rate spread ranging from 2.0% to 2.5%, depending on defined levels of average excess availability of the credit facility. The interest rate assessed on base rate loans is now the base rate plus an interest rate spread ranging from 1.0% to 1.5%, also depending on defined levels of average excess availability. During March 2012, the Company received the proceeds of a $0.3 million note issued to Appleton Papers Inc. by Columbia County, Wisconsin.

During June 2011, in accordance with the terms of its 8.125% senior notes payable, the Company repaid in full the remaining note balance of $17.5 million. These funds were sourced from a combination of cash from operations and borrowing on the revolving credit facility, as amended. Upon payment, the notes were terminated and the Company was released from all obligations under the notes.

On February 8, 2010, the Company completed a voluntary refinancing of its debt to extend debt maturities, increase liquidity, eliminate certain financial covenants and increase financial flexibility. The refinancing included the sale of $305.0 million of 10.5% senior secured first lien notes due June 2015 and a five-year, asset-backed $100 million revolving credit facility. Proceeds from the sale of the senior secured notes, less expenses and discounts, were $292.2 million. The revolving credit facility, as amended, provides for up to $100 million of revolving loans including a letter of credit sub-facility of up to $25 million and a swing line sub-facility of up to $5 million. It also contains an uncommitted accordion feature that allows the Company to increase the size of the revolving credit facility, as amended, by up to $25 million if the Company can obtain commitments for the incremental amount. Borrowings under the revolving credit facility, as amended, are limited to the sum of (a) 85% of the net amount of eligible accounts receivable and (b) the lesser of (i) 70% of the net amount of eligible raw materials and finished goods inventory or (ii) 85% of the net orderly liquidation value of such inventory. This asset-backed revolving credit facility, as amended, contains a debt covenant whereby if the Company's average availability ratio should fall below 20%, the Company is subject to a fixed charge coverage ratio of not less than 1.10:1.00. The average availability ratio is calculated monthly and is a function of the Company's average outstanding revolver borrowing as compared to the borrowing base of eligible inventory and accounts receivable as discussed above. Initial borrowing totaled $20.6 million. A majority of the proceeds from this refinancing transaction were used to repay and terminate the senior secured credit facilities which included senior secured variable rate notes payable of $211.2 million, plus interest, and the revolving credit facility of $97.1 million, plus interest. Remaining proceeds were used to pay related transaction fees and expenses totaling $10.8 million. Debt extinguishment expenses of $5.5 million were also recorded as a result of this voluntary refinancing.

68

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

The revolving credit facility, as amended, is guaranteed by PDC, each of PDC's existing and future 100%-owned domestic and Canadian subsidiaries and each other subsidiary of PDC that guarantees the 10.5% senior secured first lien notes due June 2015. Lenders hold a senior first-priority interest in (i) substantially all of the accounts, inventory, general intangibles, cash deposit accounts, business interruption insurance, investment property (including, without limitation, all issued and outstanding capital stock of Appleton and each revolver guarantor (other than PDC) and all interests in any domestic or Canadian partnership, joint venture or similar arrangement), instruments (including all collateral security thereof), documents, chattel paper and records of Appleton and each revolver guarantor now owned or hereafter acquired (except for certain general intangibles, instruments, documents, chattel paper and records of Appleton or any revolver guarantor, to the extent arising directly in connection with or otherwise directly relating to equipment, fixtures or owned real property), (ii) all other assets and properties of Appleton and each revolver guarantor now owned or hereafter acquired, and (iii) all proceeds of the foregoing. Lenders also hold a junior first-priority security interest in (i) substantially all equipment, fixtures and owned real property of Appleton and each revolver guarantor now owned or hereafter acquired, (ii) in each case solely to the extent arising directly in connection with or otherwise directly related to any of the foregoing, certain general intangibles, instruments, documents, chattel paper and records of Appleton and each revolver guarantor now owned or hereafter acquired, and (iii) all proceeds of the foregoing. The revolving credit facility, as amended, contains affirmative and negative covenants customary for similar credit facilities, which among other things, restrict the Company's ability and the ability of the Company's subsidiaries, subject to certain exceptions, to incur liens, incur or guarantee additional indebtedness, make restricted payments, engage in transactions with affiliates and make investments.

The 10.5% senior secured first lien notes due June 2015 rank senior in right of payment to all existing and future subordinated indebtedness of the Company and equally in right of payment with all existing and future senior indebtedness of the Company. The notes are secured by security interests in substantially all of the property and assets of the Company and are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by all of the Company's restricted subsidiaries (other than excluded restricted subsidiaries) and the parent entity. Initially, in addition to Appleton, this included PDC and Appleton Papers Canada Ltd.

On February 8, 2010, the Company settled an interest rate swap contract for $5.0 million as part of its voluntary refinancing activity.

The 11.25% second lien notes due 2015, as amended, will accrue interest from the issue date at a rate of 11.25% per year and interest will be payable semi-annually in arrears on each June 15 and December 15, commencing on December 15, 2009. These notes are guaranteed by PDC and certain of present and future domestic and foreign subsidiaries. Guarantors include PDC and, American Plastics Company, Inc. and New England Extrusion Inc. until their July 22, 2010 divestiture. The guarantees of these notes are second-priority senior secured obligations of the guarantors. They rank equally in right of payment with all of the guarantors' existing and future senior debt and rank senior in right of payment to all of the guarantors' existing and future subordinated debt. The guarantees of these notes are effectively subordinated to all of the first-priority senior secured debt of the guarantors, to the extent of the collateral securing such debt.

The first lien notes and the second lien notes, as amended, contain covenants that restrict Appleton's ability and the ability of Appleton's other guarantors to sell assets or merge or consolidate with or into other companies; borrow money; incur liens; pay dividends or make other distributions; make other restricted payments and investments; place restrictions on the ability of certain subsidiaries to pay dividends or other payments to Appleton; enter into sale and leaseback transactions; amend particular agreements relating to the transaction with former parent Arjo Wiggins Appleton Limited and the ESOP; and enter into transactions with certain affiliates. These covenants are subject to important exceptions and qualifications set forth in the indenture governing the 11.25% second lien notes due 2015, as amended. On January 29, 2010, the Company received the requisite consents from the beneficial owners of the second lien notes to certain amendments to the indenture governing these notes in order to (i) permit a transaction pursuant to which the ESOP will cease to own at least 50% of PDC, without triggering a requirement on the part of the Company to make an offer to repurchase the second lien notes and (ii) permit a capital contribution or operating lease of the black liquor assets located at the Company's Roaring Spring, Pennsylvania facilities to a newly formed joint venture with a third-party in exchange for a minority equity interest in such joint venture.

The senior subordinated notes, as amended, are unconditionally guaranteed by PDC, subject to certain limitations.

The Company was in compliance with all debt covenants at December 29, 2012, and is forecasted to remain compliant for the next twelve months. The Company's ability to comply with the financial covenants in the future depends on achieving forecasted operating results and operating cash flows. The Company's failure to comply with its covenants, or an assessment that it is likely to fail to comply with its covenants, could lead the Company to seek amendments to, or waivers of, the financial covenants. The Company cannot provide assurance that it would be able to obtain any amendments to or waivers of the covenants. In the event of non-compliance with debt covenants, if the lenders will not amend or waive the covenants, the debt would be due and the Company would need to seek alternative financing. The Company cannot provide assurance that it would be able to obtain alternative financing. If the Company were not able to secure alternative financing, this would have a material adverse impact on the Company.

69

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Scheduled repayment of principal on long-term obligations outstanding at December 29, 2012, is as follows (dollars in thousands):

|  | Obligations Outstanding at December 29, 2012 |
|---|---|
| 2013 | $        3,975 |
| 2014 | 33,594 |
| 2015 | 471,944 |
| 2016 | 1,567 |
| 2017 | 982 |
| Thereafter | 6,761 |
|  | $      518,823 |

The senior secured first lien notes payable at 10.5%, due June 2015, are included in the above schedule at face of $305.0 million.

**12.    INCOME TAXES**

In conjunction with the acquisition of Appleton, PDC elected to be treated as a subchapter S corporation and elected that its eligible subsidiaries be treated as qualified subchapter S subsidiaries for U.S. federal and, where recognized, state and local income tax purposes. As a result, its tax provision includes only foreign and minimal state and local income taxes. For 2012 the Company recorded a net tax provision of $0.6 million primarily for Canadian income taxes. For 2011 the Company recorded a net tax provision of $0.6 million primarily for U.S. state and local income taxes. For 2010 the Company recorded a net tax provision of $0.2 million primarily for Canadian income taxes.

All U.S. federal C corporation tax years are closed. Various Canadian and state tax years remain open. Reserves for uncertain tax positions, as they relate to these matters, are insignificant.

**13.    LEASES**

The Company leases buildings, machinery and equipment and other facilities. Many of these leases obligate the Company to pay real estate taxes, insurance and maintenance costs. Total rent expense was $6.0 million for 2012, $5.4 million for 2011 and $5.7 million for 2010.

Future minimum lease payments as of December 29, 2012, under leases that have initial or remaining non-cancelable terms in excess of one year are as follows (dollars in thousands):

|  | Operating Leases |
|---|---|
| 2013 | $        4,077 |
| 2014 | 2,935 |
| 2015 | 1,491 |
| 2016 | 202 |
| 2017 | - |
| Thereafter | 3 |
|  |  |
| Total minimum lease payments | $        8,708 |

**14.    DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES**

The Company selectively uses financial instruments to manage some market risks from changes in interest rates, foreign currency exchange rates or commodity prices. The fair values of all derivatives are recorded in the Consolidated Balance Sheet. The change in a derivative's fair value is recorded each period in current earnings or accumulated other comprehensive income, depending on whether the derivative is designated and qualifies as part of a hedge transaction and, if so, the type of hedge transaction.

70

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Company selectively hedges forecasted transactions that are subject to foreign currency exchange exposure by using forward exchange contracts. These instruments are designated as cash flow hedges and are recorded in the Consolidated Balance Sheet at fair value using Level 2 observable market inputs. The fair value of foreign currency forward contracts is based on a valuation model that discounts cash flows resulting from the differential between the contract price and the market-based forward note, also deemed to be categorized as Level 2. The effective portion of the contracts' gains or losses due to changes in fair value is initially recorded as a component of accumulated other comprehensive income and is subsequently reclassified into earnings when the underlying transactions occur and affect earnings or if it becomes probable the forecasted transaction will not occur. These contracts are highly effective in hedging the variability in future cash flows attributable to changes in currency exchange rates. The notional amount of foreign exchange contracts used to hedge foreign currency transactions is $30.8 million as of December 29, 2012. These contracts have settlement dates extending through December 2013.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using collar contracts to manage risks associated with market fluctuations in energy prices. These contracts are recorded in the Consolidated Balance Sheet at fair value using Level 2 observable market inputs based on the New York Mercantile Exchange as measured on the last trading day of the accounting period and compared to the collar price. The contracts' gains or losses due to changes in fair value are recorded in current period earnings. At December 29, 2012, the hedged volumes of these contracts totaled 1,341,054 MMBTU (Million British Thermal Units) of natural gas. The contracts have settlement dates extending through December 2013.

The Company selectively hedges forecasted commodity transactions that are subject to pricing fluctuations by using swap contracts to manage risks associated with market fluctuations in pulp prices. These contracts were recorded in the Consolidated Balance Sheet at fair value using Level 2 observable market inputs based on pricing published by RISI, Inc. ("RISI") as measured on the last trading day of the accounting period and compared to the swap's fixed price. During first quarter 2012, there were two pulp swap contracts in place. The first swap had a hedge volume of 2,000 tons of pulp and was settled in February 2012. It was not designated as a hedge, and therefore, gains or losses due to changes in fair value were recorded in current period earnings. The second pulp hedge was designated as a cash flow hedge of forecasted pulp purchases, and therefore, the change in the effective portion of the fair value of the hedge was deferred in accumulated other comprehensive income until the inventory containing the pulp is sold. This pulp hedge was settled as of September 30, 2012. As of December 29, 2012 there were no other swap contracts in place.

In February 2008, the Company fixed the interest rate, at 5.45%, on $75.0 million of its variable rate notes with a five-year interest rate swap contract. As a result of the February 2010 voluntary refinancing, the Company paid $5.0 million, including interest, to settle this derivative.

The following table presents the location and fair values of derivative instruments included in the Company's Consolidated Balance Sheets at year-end 2012 and 2011, respectively (dollars in thousands):

| Designated as a Hedge | Balance Sheet Location | December 29, 2012 | | December 31, 2011 | |
|---|---|---|---|---|---|
| Foreign currency exchange derivatives | Other current liabilities | $ | 1,014 | $ | - |
| Pulp fixed swap | Other current liabilities | | - | | 760 |
| Not Designated as a Hedge | | | | | |
| Natural gas fixed swap | Other current liabilities | | 43 | | 599 |
| Pulp fixed swap | Other current liabilities | | - | | 200 |

71

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm    75/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following table presents the location and amount of gains (losses) on derivative instruments and related hedge items included in the Company's Consolidated Statement of Comprehensive Loss for the years ended December 29, 2012, December 31, 2011, and January 1, 2011 and (losses) gains initially recognized in accumulated other comprehensive income in the Consolidated Balance Sheet at the period-ends presented (dollars in thousands):

| Designated as a Hedge | Statement of Comprehensive Loss Location | December 29, 2012 | December 31, 2011 | January 1, 2011 |
|---|---|---|---|---|
| Foreign currency exchange derivatives | Net sales | $ 3,056 | $ (437) | $ 918 |
| (Losses) gains recognized in accumulated other comprehensive income | | (934) | 2,382 | 386 |
| Pulp fixed swap | Cost of sales | (1,181) | - | - |
| Pulp fixed swap | Other expense | (166) | (137) | - |
| Losses recognized in accumulated other comprehensive income | | (197) | (623) | - |
| Not Designated as a Hedge | | | | |
| Natural gas fixed swap | Cost of sales | (271) | (986) | (88) |
| Pulp fixed swap | Cost of sales | (10) | (145) | - |
| Interest rate swap contract | Interest expense | - | - | 961 |

For a discussion of the fair value of financial instruments, see Note 15, Fair Value of Financial Instruments.

**15.    FAIR VALUE OF FINANCIAL INSTRUMENTS**

The carrying amount (including current portions) and estimated fair value of certain of the Company's recorded financial instruments are as follows (dollars in thousands):

| Financial Instruments | December 29, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Senior subordinated notes payable | $ 32,195 | $ 32,356 | $ 32,195 | $ 23,341 |
| Senior secured first lien notes payable | 301,776 | 319,883 | 300,710 | 303,717 |
| Second lien notes payable | 161,766 | 175,516 | 161,766 | 147,207 |
| Revolving credit facility | 3,700 | 3,700 | - | - |
| State of Ohio loans | 7,212 | 7,212 | 8,468 | 8,530 |
| Columbia County, Wisconsin municipal debt | 300 | 300 | - | - |
| Industrial development bonds | 8,650 | 8,650 | 8,650 | 8,650 |
| | $ 515,599 | $ 547,617 | $ 511,789 | $ 491,445 |

The senior secured first lien notes payable and the second lien notes payable are traded regularly in public markets and therefore, the fair value was determined using Level 1 inputs based on quoted market prices. The senior subordinated notes payable are not regularly traded in public markets so fair value was determined using Level 2 observable market inputs including pricing for similar debt. The fair value of the State of Ohio loans was determined using Level 2 observable market inputs including current rates for financial instruments of the same remaining maturity and similar terms. The industrial development bonds have a variable interest rate that reflects current market terms and conditions.

Due to their short-term nature, the carrying values of cash and cash equivalents, accounts receivable and accounts payable are reasonable estimates of fair value as of December 29, 2012 and December 31, 2011.

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**16. EMPLOYEE BENEFITS**

The Company has various defined benefit pension plans and defined contribution pension plans. This includes a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for management and other highly compensated employees whose benefits are reduced by the tax-qualified plan limitations of the pension plan for eligible salaried employees.

The status of these plans, including a reconciliation of benefit obligations, a reconciliation of plan assets and the funded status of the plans, as well as the key assumptions used in accounting for the plans, is shown below (dollars in thousands):

| Pension Benefits | | 2012 | | 2011 |
|---|---|---|---|---|
| Change in benefit obligation | | | | |
| Benefit obligation at beginning of period | $ | 391,091 | $ | 349,692 |
| Service cost | | 3,907 | | 3,995 |
| Interest cost | | 19,468 | | 19,874 |
| Actuarial loss | | 56,008 | | 36,271 |
| Benefits and expenses paid | | (20,052) | | (18,741) |
| Benefit obligation at end of period | $ | 450,422 | $ | 391,091 |
| | | | | |
| Change in plan assets | | | | |
| Fair value at beginning of period | $ | 265,341 | $ | 260,606 |
| Actual return on plan assets | | 42,082 | | 5,007 |
| Employer contributions | | 25,452 | | 18,469 |
| Benefits and expenses paid | | (20,052) | | (18,741) |
| Fair value at end of period | $ | 312,823 | $ | 265,341 |
| | | | | |
| Funded status of plans | | | | |
| Funded status at end of period | $ | (137,599) | $ | (125,750) |
| | | | | |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Accrued benefit liability-current | $ | (518) | $ | (505) |
| Accrued benefit liability-noncurrent | | (137,081) | | (125,245) |
| Net amount recognized | $ | (137,599) | $ | (125,750) |
| | | | | |
| Key assumptions at end of period (%) | | | | |
| Discount rate | | 4.15 | | 5.00 |

The amounts in accumulated other comprehensive income on the Consolidated Balance Sheet, net, that have not been recognized as components of net periodic benefit cost at December 29, 2012 and December 31, 2011, are as follows (dollars in thousands):

| | | 2012 | | 2011 |
|---|---|---|---|---|
| Prior service cost | $ | 2,142 | $ | 2,628 |

73

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The amount in accumulated other comprehensive income that is expected to be recognized as components of net periodic benefit cost over the next year is as follows (dollars in thousands):

|  |  |
|---|---|
| Prior service cost | $ 486 |

The components of net periodic pension cost include the following (dollars in thousands):

| Pension Benefits | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| Net periodic benefit cost |  |  |  |
| Service cost | $       3,907 | $       3,995 | $       5,769 |
| Interest cost | 19,468 | 19,874 | 19,728 |
| Expected return on plan assets | (21,770) | (21,687) | (18,413) |
| Amortization of |  |  |  |
| Prior service cost | 486 | 486 | 550 |
| Mark-to-market adjustment | 35,696 | 52,950 | 684 |
| Curtailment gain | - | - | (4,502) |
| Net periodic benefit cost | $      37,787 | $      55,618 | $       3,816 |
| Key assumptions (%) |  |  |  |
| Discount rate | 5.00 | 5.75 | 6.00 |
| Expected return on plan assets | 8.00 | 8.25 | 8.25 |
| Rate of compensation increase | NA | NA | 4.00 |

Expected future benefit payments are as follows (dollars in thousands):

|  |  |
|---|---|
| 2013 | $      19,379 |
| 2014 | 20,521 |
| 2015 | 21,670 |
| 2016 | 22,756 |
| 2017 | 23,788 |
| 2018 thru 2022 | 133,083 |
|  | $     241,197 |

As of the 2012 and 2011 measurement dates, the approximate asset allocations by asset category for the Company's pension plan were as follows:

|  | December 29, 2012 | December 31, 2011 |
|---|---|---|
| U.S. Equity | 38% | 38% |
| International Equity | 15 | 16 |
| Private Equity | 2 | 2 |
| Emerging Market Equity | 10 | 10 |
| Fixed Income | 30 | 29 |
| Real Estate | 5 | 5 |
| Total | 100% | 100% |

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Company's Benefits Finance Committee (the "Committee") is, among other things, charged with monitoring investment performance. The Committee periodically reviews fund performance and asset allocations. The plan trustee makes changes as necessary to realign the asset mix with the target allocations. The Committee has an investment policy for the pension plan assets that establishes long-term target asset allocations by asset class, as follows:

| | |
|---|---|
| Total U.S. Equity (including private equity) | 40% |
| Total International Equity | 25% |
| Real Estate | 6% |
| Bonds | 29% |

The investment policy objectives adopted by the Committee are designed to (a) provide benefit security to plan participants, (b) support accounting policy and funding goals, (c) maintain a target funded ratio to avoid adverse outcomes, and (d) promote stability and growth in funded status. The Committee is assisted by an investment advisor in managing the fund investments and establishing asset allocations and long-term return expectations. The investment advisor develops and maintains long-term return, risk and correlation expectations for a broad array of capital markets which the Committee uses in its monitoring activity.

The expected long-term rate of return on assets assumption is developed considering the relative weighting of plan assets, the historical performance of total plan assets and individual asset classes and economic and other indicators of future performance. Expected returns for each asset class are developed using estimates of expected real returns plus expected inflation. Long-term expected real returns are derived from future expectations for the U.S. Treasury real yield curve. Based on the assumptions and methodology described above, the Company selected 7.75% at year-end 2012 and 8.00% at year-end 2011 as its long-term rate of return on assets assumptions.

The discount rate is developed by selecting a portfolio of high-quality corporate bonds appropriate to provide for the projected benefit payments of the plan. This portfolio is selected from a universe of over 500 Aa-graded noncallable bonds available in the market as of December 29, 2012, further limited to those bonds with average yields between the 10th and 90th percentiles. After the bond portfolio is selected, a single rate is determined that equates the market value of the bonds selected to the discounted value of the plan's benefit payments. Based on the methodology described above, and a selected portfolio of 19 bonds, the Company selected a discount rate of 4.15% for 2012 and 5.00% for 2011 to value year-end liabilities for the pension plans.

75

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

In accordance with ASC 820, "Fair Value Measurements and Disclosures," the fair value of the assets within the pension plan as of December 29, 2012 and December 31, 2011 are as follows (dollars in thousands):

| | | Fair Value Measurements at December 29, 2012 | | | |
| Asset Category | | Quoted Prices in Active Markets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|---|
| Cash and cash equivalents | | $ 1,597 | | | $ 1,597 |
| Public equity | | | | | |
| U.S. | (a) | | 119,414 | | 119,414 |
| International | (a) | | 48,090 | | 48,090 |
| Emerging markets | (b) | | 32,883 | | 32,883 |
| Private equity | (c) | | | 6,072 | 6,072 |
| Fixed income | | | | | |
| Corporate bonds | (d) | | 91,529 | | 91,529 |
| Real estate | (e) | | | 13,238 | 13,238 |
| | | $ 1,597 | $ 291,916 | $ 19,310 | $ 312,823 |

| | | Fair Value Measurements at December 31, 2011 | | | |
| Asset Category | | Quoted Prices in Active Markets (Level 1) | Significant Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|---|
| Cash and cash equivalents | | $ 683 | | | $ 683 |
| Public equity | | | | | |
| U.S. | (a) | | 101,468 | | 101,468 |
| International | (a) | | 41,231 | | 41,231 |
| Emerging markets | (b) | | 27,561 | | 27,561 |
| Private equity | (c) | | | 6,475 | 6,475 |
| Fixed income | | | | | |
| Government | (d) | | 474 | | 474 |
| Corporate bonds | (d) | | 75,138 | | 75,138 |
| Real estate | (e) | | | 12,311 | 12,311 |
| | | $ 683 | $ 245,872 | $ 18,786 | $ 265,341 |

76

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm    80/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

(a) U.S. and international equity investments include investments in commingled funds that invest primarily in publicly-traded equities. Equity investments are diversified across U.S. and non-U.S. stocks and are divided by investment style and market capitalization.

(b) Emerging markets equity investments include investments in commingled funds that invest primarily in publicly-traded equities. Equity investments are diversified across non-U.S. stocks and are divided by country, investment style and market capitalization.

(c) Private equity assets consist primarily of investments in limited partnerships that invest in individual companies in the form of non-public equity or non-public debt positions. The plan's private equity investments are limited to 5% of the total limited partnership and the maximum allowable loss cannot exceed the commitment amount.

(d) Fixed income securities include investments in commingled funds that invest in a diversified blend of investment grade fixed income securities.

(e) Investment in real estate is designed to provide stable income returns and added diversification based upon the historical low correlation between real estate and equity or fixed income investments. The plan's real estate assets consist of a commingled fund that invests in a diversified portfolio of direct real estate investments.

<u>Description of Fair Value Measurements</u>

Level 1 – Quoted, active market prices for identical assets or liabilities. Foreign and domestic common stocks are exchange-traded and are valued at the closing price reported by the respective exchanges on the day of valuation. Share prices of the funds, referred to as a fund's Net Asset Value ("NAV"), are calculated daily based on the closing market prices and accruals of securities in the fund's total portfolio (total value of the fund) divided by the number of fund shares currently issued and outstanding. Redemptions of the mutual funds, collective trust funds and funds for employee benefit trust shares occur by contract at the respective fund's redemption date NAV.

Level 2 – Observable inputs other than Level 1 prices, such as quoted active market prices for similar assets or liabilities, quoted prices for identical or similar assets in inactive markets and model-derived valuations in which all significant inputs are observable in active markets. The pension plan's Level 2 investments include foreign and domestic common stocks, mutual funds, collective trust funds and funds for employee benefit trust. The NAVs of the funds are calculated monthly based on the closing market prices and accruals of securities in the fund's total portfolio (total value of the fund) divided by the number of fund shares currently issued and outstanding. Redemptions of the mutual funds, collective trust fund and funds for employee benefit trust shares occur by contract at the respective fund's redemption date NAV.

Level 3 – Valuation techniques in which one or more significant inputs are unobservable in the marketplace. The pension plan's Level 3 assets are primarily investment funds which invest in underlying groups of investment funds or other pooled investment vehicles that are selected by the respective funds' investment managers. The investment funds and the underlying investments held by these investment funds are valued at fair value. In determining the fair value of these assets, management takes into account the estimated NAV of the underlying funds, as well as any other considerations that may increase or decrease such estimated value.

While the Company believes its valuation methods for plan assets are appropriate and consistent with other market participants, the use of different methodologies or assumptions, particularly as applied to Level 3 assets described below, could have a material effect on the computation of their estimated fair values.

77

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                                                          81/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The fair value measurement of plan assets using significant unobservable inputs (Level 3) changed during 2012 and 2011 due to the following (dollars in thousands):

| | Changes in Fair Value Using Significant Unobservable Inputs (Level 3) | | |
| --- | --- | --- | --- |
| | Private Equities | Real Estate | Total |
| Balance, January 1, 2011 | $      7,062 | $      13,748 | $      20,810 |
| Realized gains/(losses) | 799 | (919) | (120) |
| Unrealized gains | 14 | 1,560 | 1,574 |
| Return of capital | (1,464) | (2,905) | (4,369) |
| Income | 64 | 827 | 891 |
| Balance, December 31, 2011 | 6,475 | 12,311 | 18,786 |
| Realized gains/(losses) | 499 | (137) | 362 |
| Unrealized (losses) gains | (85) | 716 | 631 |
| Return of capital | (913) | (404) | (1,317) |
| Income | 96 | 752 | 848 |
| Balance, December 29, 2012 | $      6,072 | $      13,238 | $      19,310 |

Effective January 1, 2008, the Company amended the Appleton Papers Inc. Retirement Plan (the "Plan") to provide that any non-union individuals hired or re-hired on or after January 1, 2008, would not be eligible to participate in the Plan. Also, plan benefits accrued under the Plan were frozen as of April 1, 2008, with respect to Plan participants who elected to participate, effective April 1, 2008, in a "Mandatory Profit Sharing Contribution" known as the Retirement Contribution benefit under the Appleton Papers Inc. Retirement Savings and Employee Stock Ownership Plan (the "KSOP"), or January 1, 2015, in the case of any other Plan participants. In December 2010, it was announced that the effective date of the freeze would change from January 1, 2015 to March 1, 2011. This change resulted in a curtailment charge of $0.4 million in 2010 and a reduction in the pension benefit obligation of $4.9 million.

The Company expects to contribute approximately $12.5 million to its pension plan in 2013. The defined benefit plan provides that hourly employees receive payments of stated amounts for each year of service. Payments under the defined benefit plan covering salaried employees are based on years of service and the employees' compensation during employment. At December 29, 2012, the accumulated benefit obligation for the defined benefit plans was approximately $450.4 million. At December 31, 2011, the accumulated benefit obligation for the deferred benefit plans was approximately $391.1 million.

Certain of the Company's hourly employees participated in a multi-employer defined benefit plan, the Pace Industry Union-Management Pension Plan (EIN #11-6166763). Participants in this plan included the West Carrollton represented manufacturing employees, where the collective bargaining agreement expired April 1, 2012. Participants also included the represented employees at the Kansas City, Kansas distribution center, where the collective bargaining agreement expired December 31, 2011. The Company's contributions to this plan were $1.3 million in 2012, $1.8 million in 2011 and $1.7 million in 2010. The 2011 employer contribution to this plan was less than 5% of total contributions to the plan. For the 2011 plan year, this multi-employer plan was 72.85% funded. Though the plan was between 65% and 80% funded, it was subject to a funding improvement plan for the plan year beginning January 1, 2010, and again for the plan years beginning January 1, 2011 and January 1, 2012, as it is projected there will be an accumulated funding deficiency in the next four years. In an effort to improve the plan's funding situation, the Trustees adopted a Rehabilitation Plan in July 2010, designed to assist the plan in meeting the applicable benchmarks established by law. Law requires that all contributing employers pay to the fund a surcharge to help correct the fund's financial situation. The amount of the surcharge is equal to a percentage of the amount an employer is otherwise required to contribute to the fund under the applicable collective bargaining agreement. Beginning in July 2010, and extending through the term of the collective bargaining agreement, a 10% surcharge applies for each plan year in which the fund is in critical status.

78

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

As a result of labor contracts ratified in June 2012 and September 2012, by the bargaining employees at the Kansas City, Kansas distribution center and West Carrollton, Ohio plant, respectively, both groups elected to end their participation in this multi-employer plan and instead participate in the defined benefit pension plan sponsored by the Company. This resulted in a full withdrawal from the multi-employer plan, for which, the Company recorded a $7.0 million expense in third quarter 2012 representing its estimated cost to satisfy its complete withdrawal liability under the terms of the plan's trust agreement. This is in addition to the $18.0 million partial withdrawal liability recorded during first quarter 2012 due to the workforce reduction at the West Carrollton, Ohio plant resulting from the cessation of papermaking activities. The estimated obligation for the complete withdrawal liability is derived from available information, including but not limited to collective bargaining agreements, plan trust agreements, participation agreements, ERISA statutes, regulations and rulings, discussions with the plan trustee, and discussions with legal counsel. Based on the analysis of available information, it is reasonably possible that the Company's costs to satisfy its withdrawal liability, when ultimately settled with the plan, could range from $16 million up to $54 million, with a payment period extending up to 20 years. The likelihood of an outcome in excess of the $25 million accrued amount is significantly less than other possible outcomes within the range primarily due to plan provisions that implement statutory limits on the amount of annual payments and the maximum number of payment periods.

A deferred compensation plan, named the Executive Nonqualified "Excess" Plan of Appleton Papers Inc., effective on February 1, 2006, was established for highly-compensated employees, including all directors and executive officers. Salaried employees, with base salaries of $100,000 and over, are eligible to participate in the plan. This plan was established for the purpose of allowing a tax-favored option for saving for retirement when the IRS limits the ability of highly-compensated employees to participate under tax-qualified plans. This plan allows for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings. Participants in the plan may choose to have deferrals increased or decreased based on the performance of a selection of mutual funds. No assets are actually set aside to fund the Company's obligation under this plan. The non-employee directors are also allowed to participate in this plan. For the years ended December 29, 2012 and December 31, 2011, $2.2 million and $1.7 million was recorded in other long-term assets, respectively. In addition, for the years ended December 29, 2012 and December 31, 2011, $2.2 million and $1.7 million was recorded in other long-term liabilities, respectively.

**17.  POSTRETIREMENT BENEFIT PLANS OTHER THAN PENSIONS**

The Company has defined postretirement benefit plans that provide medical, dental and life insurance for certain retirees and eligible dependents.

The status of these plans, including a reconciliation of benefit obligations and the funded status of the plans, as well as the key assumptions used in accounting for the plans, is as follows (dollars in thousands):

| Other Postretirement Benefits | | 2012 | | 2011 |
|---|---|---|---|---|
| Change in benefit obligation | | | | |
| Benefit obligation at beginning of period | $ | 44,829 | $ | 48,891 |
| Service cost | | 374 | | 498 |
| Interest cost | | 1,879 | | 2,511 |
| Plan amendments | | (1,026) | | (2,616) |
| Actuarial gain | | (2,130) | | (1,867) |
| Benefits and expenses paid | | (2,238) | | (2,588) |
| Benefit obligation at end of period | $ | 41,688 | $ | 44,829 |
| | | | | |
| Funded status of plans | | | | |
| Funded status at end of period | $ | (41,688) | $ | (44,829) |
| | | | | |
| Amounts recognized in the consolidated balance sheet consist of: | | | | |
| Accrued benefit liability-current | $ | (3,248) | $ | (3,218) |
| Accrued benefit liability-noncurrent | | (38,440) | | (41,611) |
| Net amount recognized | $ | (41,688) | $ | (44,829) |
| | | | | |
| Key assumptions at end of period | | | | |
| Discount rate | | 3.71% | | 4.64% |
| Valuation year medical trend | | 7.00% | | 7.50% |
| Ultimate medical trend | | 5.00% | | 5.00% |
| Year ultimate medical trend reached | | 2016 | | 2016 |

79

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                     83/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The discount rate is developed by selecting a portfolio of high-quality corporate bonds appropriate to provide for the projected benefit payments of the plan. This portfolio is selected from a universe of over 500 Aa-graded noncallable bonds available in the market as of December 29, 2012, further limited to those bonds with average yields between the 10th and 90th percentiles. After the bond portfolio is selected, a single rate is determined that equates the market value of the bonds selected to the discounted value of the plan's benefit payments. Based on the methodology described above, and a selected portfolio of 22 bonds, the Company selected a discount rate of 3.71% for the postretirement benefit plan.

The December 29, 2012, accumulated postretirement benefit obligation ("APBO") was determined using assumed medical care cost trend rates of 7.0%, decreasing one half percent each year to an ultimate rate of 5% in 2016. The December 31, 2011, APBO was determined using assumed medical care cost trend rates of 7.5%, decreasing one half percent each year to an ultimate rate of 5% in 2016.

The amount in accumulated other comprehensive income in the Consolidated Balance Sheet, that has not been recognized as a component of net periodic benefit cost at December 29, 2012 and December 31, 2011, is as follows (dollars in thousands):

|  | 2012 | 2011 |
|---|---|---|
| Prior service credit | $ 8,595 | $ 13,894 |

The amount in accumulated other comprehensive income expected to be recognized as a component of net periodic benefit cost over the next year is shown below (dollars in thousands):

| | |
|---|---|
| Amortization of prior service credit | $ 2,075 |

As the result of a new labor agreement ratified in September 2012, represented manufacturing employees in West Carrollton, Ohio, will not be eligible for post-Medicare retiree health plan coverage if they retire after March 31, 2014. This change resulted in an estimated reduction to the year-end 2012 benefit obligation of $1.1 million.

Due to a significant reduction in the represented manufacturing workforce, resulting from the ceasing of papermaking operations at the West Carrollton, Ohio facility, the Company recorded a curtailment gain of $3.7 million in second quarter 2012. This curtailment also called for the plan to be remeasured as of the date of the event triggering the curtailment, using assumptions appropriate to that date. The plan's cost was remeasured as of May 31, 2012, using a discount rate of 4.21%.

As the result of a new labor agreement ratified in December 2011, represented manufacturing and distribution center employees in Appleton, Wisconsin, will not be eligible for post-Medicare retiree health plan coverage if they retire after August 31, 2014. This change resulted in an estimated reduction to the year-end 2011 benefit obligation of $3.5 million.

As of January 1, 2008, the Company implemented a change to the plan options offered to pre-Medicare salaried retirees, spouses and surviving spouses by removing HMO designs and offering a qualified high-deductible health plan. In December 2010, certain other changes to the postretirement benefit plan were announced. Upon retirement and after COBRA benefits expire, the Company will continue to provide a subsidy toward the premium paid for pre-Medicare retiree medical coverage for those full-time salaried employees hired prior to April 1, 2003, and who retired before July 1, 2011. Beginning in 2012, the Company's contribution will be capped at $200 per person per month until December 31, 2020, or until Medicare eligible, whichever comes first. In addition, those Medicare-eligible salaried retirees, spouses and surviving spouses who currently receive benefits from the Company, beginning in 2012, will receive $100 per month to be used toward individual insurance coverage or other medical-related expenses. This change resulted in a curtailment gain of $1.5 million in 2010 and a reduction in the year-end 2010 benefit obligation of $9.5 million.

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

The components of other postretirement benefit (gain) cost include the following (dollars in thousands):

| Other Postretirement Benefits | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| Net periodic benefit (gain) cost | | | |
| Service cost | $ 374 | $ 498 | $ 741 |
| Interest cost | 1,879 | 2,511 | 2,970 |
| Amortization of prior service credit | (2,599) | (2,668) | (2,151) |
| Mark-to-market adjustment | (2,130) | (1,867) | 4,132 |
| Curtailment gain | (3,726) | - | (1,450) |
| Net periodic benefit (gain) cost | $ (6,202) | $ (1,526) | $ 4,242 |

The key assumptions used in the measurement of the Company's net periodic benefit (gain) cost are shown in the following table:

| | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| Discount rate | 4.64% | 5.47% | 5.70% |
| Valuation year medical trend | 7.50% | 8.00% | 8.50% |
| Ultimate medical trend | 5.00% | 5.00% | 5.00% |
| Year ultimate medical trend reached | 2017 | 2017 | 2017 |

Impact of a one percent change in medical trend rate (dollars in thousands):

| | 1% Increase | 1% Decrease |
|---|---|---|
| Aggregate impact on service and interest cost | $ 37 | $ (35) |
| Effect on accumulated plan benefit obligation | 831 | (769) |

Expected postretirement benefit payments for each of the next five years, and the aggregate from 2018 through 2022, are as follows (dollars in thousands):

| | |
|---|---|
| 2013 | $ 3,248 |
| 2014 | 3,200 |
| 2015 | 3,226 |
| 2016 | 3,256 |
| 2017 | 3,264 |
| 2018 thru 2022 | 15,645 |
| | $ 31,839 |

81

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**18.**    **LONG-TERM INCENTIVE COMPENSATION**

In December 2001, the Company adopted the Appleton Papers Inc. Long-Term Incentive Plan ("LTIP"). Effective January 3, 2010, the Company adopted a long-term restricted stock unit plan ("RSU"). These plans, in accordance with the specific terms of each plan, provide key management employees, who are in a position to make a significant contribution to the growth and profitability of the Company, the opportunity to be rewarded for performance that aligns with long-term shareholder interests. Both plans utilize phantom units. The value of a unit in the LTIP is based on the change in the fair market value of PDC's common stock under the terms of the employee stock ownership plan (the "ESOP") between the grant date and the exercise date. All units granted under the LTIP may be exercised after three full years. Units expire ten years after the grant date. The value of a unit in the RSU is based on the value of PDC common stock, as determined by the ESOP trustee. All RSUs vest three years after the award date and are paid at vesting. The cash payment upon vesting is equal to the value of one share of PDC common stock at the most recent valuation date times the number of units granted. RSU units can be deferred to the Non-Qualified Excess Plan if the recipient so elects shortly after the units have been granted. All units under both the LTIP and RSU plans will vest immediately, and cash payment will be made, upon a change in control as defined in the plans. Beginning in 2009, recipients were required to enter into a non-compete and non-solicitation agreement in order to receive units which, if violated following the receipt of units, results in forfeiture of any and all rights to receive payment relating to the units.

The Compensation Committee of the board establishes the number of units granted each year under these plans in accordance with the Compensation Committee's stated goals and policies. The Compensation Committee has the discretion to use either, or both, plan(s) as appropriate to attract, motivate and retain key management employees while managing the expense to the Company. During 2012, 283,000 additional units were granted under the LTIP plan and 116,500 additional units were granted under the RSU plan. During 2011, all units, totaling 770,500 units, were granted under the LTIP. In 2010, all units were granted under the RSU. Units are valued at the most recent PDC stock price as determined by the semi-annual ESOP valuation as of June 30 and December 31. As of the end of December 2012, the fair market value of one share of PDC common stock was $17.55.

82

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

During 2012, the Company recorded $1.6 million of expense for the LTIP within selling, general and administrative expenses. During 2011, the Company recorded $0.5 million of expense for the LTIP within selling, general and administrative expenses. During 2010, the Company recorded $0.1 million of LTIP expense within selling, general and administrative expenses. Based on the Company's common stock price as of the end of December 2012, the Company had $1.4 million of unrecognized compensation expense related to nonvested phantom units granted under the plans. Since the inception of the Plan, 3,657,170 phantom units have been granted, 1,213,310 phantom units have been forfeited and 421,410 phantom units have been exercised, leaving an outstanding balance of 2,022,450 phantom units at December 29, 2012. A summary of 2010 - 2012 activity within the LTIP plan is as follows:

| | Weighted Average Grant Unit Price | Grant Units | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value (dollars in thousands) |
|---|---|---|---|---|
| Outstanding, January 2, 2010 | $ 27.72 | 1,545,340 | | |
| Exercised | 10.00 | (2,100) | | |
| Forfeited or expired | 27.91 | (144,467) | | |
| Outstanding, January 1, 2011 | $ 27.73 | 1,398,773 | 6.3 | $ 16 |
| Exercisable, January 1, 2011 | $ 30.49 | 976,440 | 5.5 | $ 16 |
| | | | | |
| Outstanding, January 1, 2011 | $ 27.73 | 1,398,773 | | |
| Granted | 12.87 | 770,500 | | |
| Exercised | 10.00 | (5,540) | | |
| Forfeited or expired | 24.14 | (172,666) | | |
| Outstanding, December 31, 2011 | $ 22.34 | 1,991,067 | 6.6 | $ - |
| Exercisable, December 31, 2011 | $ 27.87 | 1,251,067 | 5.3 | $ - |
| | | | | |
| Outstanding, December 31, 2011 | $ 22.34 | 1,991,067 | | |
| Granted | 15.02 | 283,000 | | |
| Forfeited or expired | 20.12 | (251,617) | | |
| Outstanding, December 29, 2012 | $ 21.59 | 2,022,450 | 6.1 | $ - |
| Exercisable, December 29,2012 | $ 27.77 | 1,145,950 | 4.4 | $ - |

During 2010, 2,100 phantom units were exercised with a minimal appreciation value. During 2011, 5,540 phantom units were exercised with a minimal appreciation value. During 2012, no phantom units were exercised. As of December 29, 2012, a liability of approximately $2.1 million is included in the Consolidated Balance Sheet, all of which is classified as long-term and represents 876,500 unvested units. As a result of the decline in share price, there is currently no liability for fully vested units as of December 29, 2012 since the current value is below the grant price.

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Compensation Committee approved an aggregate total for the 2010 year of up to 219,000 units to be granted, of which 213,000 units were granted under the RSU. The Compensation Committee approved an aggregate total for the 2012 year of up to 124,000 units to be granted, of which, 116,500 units were granted under the RSU. Due to terminations of employment, 42,500, 10,500 and 7,500 unvested units were forfeited during 2012, 2011 and 2010, respectively. A balance of 269,000 RSU units remains as of December 29, 2012. Approximately $1.5 million, $1.1 million and $0.8 million of expense, related to this plan, was recorded during 2012, 2011 and 2010, respectively. In 2011, the Compensation Committee elected to grant awards under the LTIP rather than under the RSU plan. As noted in the table below, 160,000 units became fully vested and exercisable on January 2, 2013. In accordance with the plan, payment for these RSUs was made on February 22, 2013. A summary of 2010 – 2012 activity within the RSU plan is as follows:

| | Weighted Average Grant Unit Price | Grant Units | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value (dollars in thousands) |
|---|---|---|---|---|
| Outstanding, January 2, 2010 | $ - | - | | |
| Granted | 13.25 | 213,000 | | |
| Forfeited or expired | 13.09 | (7,500) | | |
| Outstanding, January 1, 2011 | $ 13.26 | 205,500 | 2.0 | $ (86) |
| | | | | |
| Outstanding, January 1, 2011 | $ 13.26 | 205,500 | | |
| Forfeited or expired | 13.32 | (10,500) | | |
| Outstanding, December 31, 2011 | $ 13.25 | 195,000 | 1.0 | $ 343 |
| | | | | |
| Outstanding, December 31, 2011 | $ 13.25 | 195,000 | | |
| Granted | 15.02 | 116,500 | | |
| Forfeited or expired | 13.63 | (42,500) | | |
| Outstanding, December 29, 2012 | $ 13.96 | 269,000 | 0.8 | $ 2,834 |
| Exercisable, January 2, 2013 | $ 13.26 | 160,000 | - | $ 2,834 |

Beginning in 2006, the Company established a nonqualified deferred compensation agreement with each of its non-employee directors. Deferred compensation is in the form of phantom units and is earned over the course of six-month calendar periods of service beginning January 1 and July 1. The number of units to be earned is calculated using the established dollar value of the compensation divided by the fair market value of one share of PDC common stock as determined by the semi-annual ESOP valuation. This deferred compensation vests coincidental with the board member's continued service on the board. Upon cessation of service as a director, the deferred compensation will be paid in five equal annual cash installments. During 2012, expense for this plan was approximately $0.3 million. During 2011, expense for this plan was approximately $0.3 million. During 2010, expense for this plan was approximately $0.2 million.

On February 22, 2012, the Company's board of directors adopted a special retention incentive program designed to retain certain executives and other employees who are in a position to make a significant contribution in identifying, negotiating and closing one or more of the following transactions or series of transactions: the issuance of equity securities in connection with an acquisition, a merger or business combination with an unrelated entity, the sale of equity in a private placement or public offering, a sale of all or substantially all of the assets of Appleton or PDC, an exchange of debt securities for equity, or any combination of the foregoing transactions. In exchange for continued employment through such transactions, the named executives would receive payments in the event a change of control occurs, as defined in the Long-Term Incentive Plan, as a result of any of the transactions listed above. Amounts payable would be as approved by the board of directors. On February 1, 2013, the Company's board of directors terminated this plan.

84

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**19. COMMITMENTS AND CONTINGENCIES**

<u>CONTINGENCIES</u>

**Lower Fox River**

*Appleton Removed as a Potentially Responsible Party ("PRP").* On April 10, 2012, the United States District Court for the Eastern District of Wisconsin granted Appleton's motion for summary judgment and dismissed all claims against Appleton in the enforcement action. The decision establishes that Appleton is no longer a PRP, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA" or "Superfund"), no longer considered a legal successor to NCR's liabilities, and no longer required to comply with the 106 Order commanding remediation of the Lower Fox River. In addition, on July 3, 2012, the United States District Court for the Eastern District of Wisconsin determined that Appleton Coated Paper Company and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

The rulings do not affect Appleton's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appleton's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appleton and BAT have joint and several liability under the Arbitration. Appleton has initiated the dispute resolution procedures outlined in the 1998 agreement. Issues in dispute include the scope of Appleton's liability under the agreement as well as funding requests and supporting documentation from NCR (the "Dispute Resolution"). The current carrying amount of Appleton's liability under the Arbitration is $65.0 million, which represents Appleton's best estimate of amounts to be paid for 2012 and 2013. On June 8, 2012, BAT served AWA with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by AWA from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appleton with the same claim, seeking a declaration that BAT is indemnified by Appleton. Appleton intends to vigorously defend against this claim and has filed an application challenging the jurisdiction of the United Kingdom court.

Prior to the ruling in the above enforcement action, the United States Environmental Protection Agency ("EPA") and Wisconsin Department of Natural Resources ("DNR") claimed Appleton was a PRP with respect to historic discharges of polychlorinated biphenyls ("PCBs") into the Lower Fox River in Wisconsin. Carbonless paper containing PCBs was manufactured at what is currently the Appleton plant from 1954 until 1971. During this period, wastewater containing PCBs was discharged into the Lower Fox River from a publicly-owned treatment works, from the Appleton plant, from the Combined Locks, Wisconsin paper mill and from other local industrial facilities. Wastewater from the Appleton plant was processed through the publicly-owned treatment works. Appleton purchased the Appleton plant and the Combined Locks, Wisconsin paper mill from NCR in 1978, long after the use of PCBs in the manufacturing process was discontinued. The EPA issued an administrative order in November 2007, directing the PRPs to implement the remedial action of the Fox River pursuant to which certain of the PRPs commenced remediation in 2008. The various PRPs, including NCR, the EPA and the DNR continue to contest the scope, extent and costs of the remediation as well as the appropriate bases for determining the parties' relative shares of the remediation cost.

The rulings also do not affect either of the two indemnification agreements entered in 2001 wherein AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims (including certain claims under the Arbitration), which are defined in the agreements as the Fox River Liabilities. Appleton has recorded a $65.0 million environmental indemnification receivable as of December 29, 2012.

*Estimates of Liability.* The accrued Arbitration liability is derived from available information, including consideration of uncertainties regarding the scope and cost of implementing the final remediation plan, the scope of restoration and final valuation of natural resource damage ("NRD") assessments, the evolving nature of remediation and restoration technologies and governmental policies, NCR's share of liability relative to other PRPs and the extent of BAT's performance under the Arbitration. Appleton believes NCR has paid more than its estimated share of the liability based on the assumptions below. Based on the analysis of available information, it is reasonably possible that the Company's costs to satisfy its Arbitration liability, when ultimately settled, could range from $10 million to $310 million, with a payment period extending beyond ten years. The Company has recorded a liability of $65 million at December 29, 2012, which is its best estimate of the probable loss within this range. The Company believes the likelihood of an outcome in the upper end of the range is significantly less than other possible outcomes within the range. Interim legal determinations may periodically obligate NCR (and BAT and Appleton pursuant to the Arbitration) to fund portions of the cleanup costs to extents greater than NCR's share as finally determined, and in such instances, Appleton may reserve additional amounts (including appropriate reimbursement under its indemnification agreements as discussed below).

85

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The following assumptions were used in evaluating Appleton's Arbitration liability:

- As of December 31, 2012, NCR has recorded an estimated liability of $115 million representing its portion of defense and liability costs with respect to the Lower Fox River;

- Technical analyses contending that discharges from NCR's former assets represent 8% to 10% of the total PCBs discharged by the PRPs;

- Appleton's and BAT's joint and several responsibility for over half of the claims asserted against NCR and Appleton, based on the Arbitration and the Dispute Resolution;

- Based on legal analyses and ongoing reviews of publicly-available financial information, Appleton believes that other PRPs will be required, and have adequate financial resources, to pay their respective shares of the remediation and NRD claims for the Lower Fox River; and

- legal fees and other expenses.

Appleton believes its recorded liability reflects its best estimate of expected payments during 2013 under the Arbitration Agreement. Appleton believes NCR has paid more than its estimated share of the liability, as described above, and therefore payments beyond 2013 under the Arbitration are not deemed probable at December 29, 2012.

***AWA Indemnification.*** Pursuant to two indemnification agreements entered in 2001, AWA agreed to indemnify PDC and PDC agreed to indemnify Appleton for costs, expenses and liabilities related to certain governmental and third-party environmental claims, which are defined in the agreements as the Fox River Liabilities.

Under the indemnification agreements, Appleton is indemnified for the first $75 million of Fox River Liabilities and for amounts in excess of $100 million. During 2008, Appleton paid $25 million to satisfy its portion of the Fox River Liabilities not covered by the indemnification agreement with AWA. As of December 29, 2012, AWA has paid $273.5 million in connection with Fox River Liabilities. At December 29, 2012, PDC's total indemnification receivable from AWA was $65.0 million, all of which is recorded in other current assets. At December 29, 2012, the total Appleton indemnification receivable from PDC was $65.0 million, all of which is recorded in other current assets.

In March 2008, Appleton received favorable jury verdicts in a state court declaratory judgment relating to insurance coverage of its environmental claims involving the Fox River. A final judgment and order was entered in January 2009. The insurers appealed the final judgment. In June 2010, the Wisconsin Court of Appeals upheld the final judgment. Settlements have been negotiated between the insurers and Appleton. Under the terms of the indemnification agreement, recoveries from insurance are reimbursed to AWA to the extent of its indemnification obligation. During 2010, Appleton recorded an $8.9 million receivable, representing settlements to be received in excess of amounts reimbursable to AWA, in the Consolidated Balance Sheet as of January 1, 2011. During 2011, Appleton received $6.2 million of these funds. During 2012, an additional environmental expense insurance recovery of $2.2 million was recorded as a separate line item within operating income on the Consolidated Statement of Comprehensive Loss and all remaining funds were received by Appleton in 2012.

The indemnification agreements negotiated with AWA are designed to ensure that Appleton will not be required to fund any of the indemnified costs and expenses in relation to the Fox River Liabilities. This arrangement is working as designed and is expected to continue to protect Appleton with respect to the indemnified costs and expenses, based on Appleton's review of the financial condition of AWA and estimates of Appleton's liability. As earlier noted, Appleton's ultimate liability pursuant to the Arbitration could prove to be significantly larger than the current carrying amount and potentially could exceed the financial capability of AWA. In the event Appleton is unable to secure payment from AWA or its former parent companies, Appleton may be liable for amounts pursuant to the Arbitration and these amounts may be material to Appleton.

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

### West Carrollton Mill

The West Carrollton, Ohio mill operates pursuant to various state and federal permits for discharges and emissions to air and water. As a result of the de-inking of carbonless paper containing PCBs through the early 1970s, there may have been releases of PCBs and volatile organic compounds into the soil in the area of the wastewater impoundments at the West Carrollton facility and low levels of PCBs have been detected in the groundwater immediately under this area. In addition, PCB contamination is present in sediment in the adjacent Great Miami River, but it is believed that this contamination is from a source other than the West Carrollton mill.

Based on investigation and delineation of PCB contamination in soil and groundwater in the area of the wastewater impoundments, the Company believes that it may be necessary to undertake remedial action in the future, although the Company is currently under no obligation to do so. The Company has not had any discussions or communications with any federal, state or local agencies or authorities regarding remedial action to address PCB contamination at the West Carrollton mill. The cost for remedial action, which could include installation of a cap, long-term pumping, treating and/or monitoring of groundwater and removal of sediment in the Great Miami River, was estimated in 2001 to range up to approximately $10.5 million, with approximately $3 million in short-term capital costs and the remainder to be incurred over a period of 30 years. However, costs could exceed this amount if additional contamination is discovered, if additional remedial action is necessary or if the remedial action costs are more than expected.

Because of the uncertainty surrounding the ultimate course of action for the West Carrollton mill property, the Great Miami River remediation and the Company's share of these remediation costs, if any, and since the Company is currently under no obligation to undertake remedial action in the future, no provision has been recorded in its financial statements for estimated remediation costs. In conjunction with the acquisition of PDC by the ESOP in 2001, and as limited by the terms of the purchase agreement, AWA agreed to indemnify the Company for 50% of all environmental liabilities at the West Carrollton mill up to $5.0 million and 100% of all such environmental costs exceeding $5.0 million. In addition, the former owners and operators of the West Carrollton mill may be liable for all or part of the cost of remediation of historic PCB contamination.

### Litigation Settlements

During first quarter 2011, the Company resolved litigation initiated by a supplier over contract terms and recorded a charge to income of $3.1 million, including legal fees. Prior to resolution, the Company had assessed the potential for liability as less than reasonably possible. However, during a court-ordered pre-trial mediation, the parties were able to resolve the litigation to the satisfaction of both parties.

During third quarter 2011, the Company received payment of $23.2 million of damages, including interest and net of related fees and litigation expenses. This was the result of a favorable jury trial verdict, received in 2009, related to litigation commenced by the Company against Andritz BMB AG and Andritz, Inc. During the time that followed, the defendants' attempts to overturn the verdict were unsuccessful. In March 2011, the Wisconsin Court of Appeals issued a decision unanimously affirming the final judgment. On September 1, 2011, the Wisconsin Supreme Court denied the defendants' petition seeking further review of the matter. This income was recorded in the other expense (income) section of the Consolidated Statements of Comprehensive Loss for the year ended December 31, 2011.

### Other

From time to time, the Company may be subject to various demands, claims, suits or other legal proceedings arising in the ordinary course of business. A comprehensive insurance program is maintained to provide a measure of financial protection against such matters, though not all such exposures are, or can be, addressed by insurance. Estimated costs are recorded for such demands, claims, suits or proceedings of this nature when reasonably determinable. The Company has successfully defended such claims, settling some for amounts which are not material to the business and obtaining dismissals in others. While the Company will vigorously defend itself and expects to prevail in any similar cases that may be brought against it in the future, there can be no assurance that it will be successful.

87

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Except as described above, and assuming the Company's expectations regarding defending such demands, claims, suits or other legal or regulatory proceedings prove accurate, the Company does not believe that any pending or threatened demands, claims, suits or other legal proceedings will have, individually or in the aggregate, a materially adverse effect on its business, financial condition and results of operations or cash flows.

### 20.  CONSOLIDATED STATEMENTS OF CASH FLOWS

Supplemental cash flow disclosures (dollars in thousands):

|  | For the Year Ended December 29, 2012 | | For the Year Ended December 31, 2011 | | For the Year Ended January 1, 2011 | |
|---|---|---|---|---|---|---|
| Cash paid during the period for: | | | | | | |
| Interest | $ | 55,904 | $ | 57,377 | $ | 63,143 |
| Income taxes | | 377 | | 442 | | 387 |
| | | | | | | |
| Cash received during the period for: | | | | | | |
| Income tax refunds | $ | 644 | $ | 19 | $ | 1 |

### 21.  CONCENTRATIONS OF CREDIT AND OTHER RISKS

Financial instruments that potentially subject the Company to a concentration of credit risk consist primarily of temporary cash investments that exceed the maximum federally insured limits and trade receivables. The Company places its temporary cash investments with high quality financial funds that, by policy, limit their exposure to any one financial security.

Concentrations of credit risk with respect to trade receivables are limited due to the large number of customers comprising the Company's customer base. The Company does not believe it is dependent upon any single customer. Sales to the Company's two largest customers each represented approximately 8% and 7% of net sales in 2012, 7% and 6% of net sales in 2011 and 8% and 6% of net sales in 2010.

The five largest customers in the carbonless papers segment accounted for approximately 33% of carbonless papers net sales in 2012 and 32% of carbonless papers net sales in 2011 and 2010. The five largest customers in the thermal papers segment accounted for approximately 40% of thermal papers net sales in 2012, 47% of thermal papers net sales in 2011 and 43% of thermal papers net sales in 2010. The largest external customer in the Encapsys segment accounted for approximately 58% of Encapsys net sales (which include internal sales to the Company's carbonless papers segment) in 2012, 59% in 2011 and 52% in 2010.

Base stock is a key raw material in the Company's business. In 2012, the Company purchased approximately $195 million of base stock from external suppliers. Approximately $39 million of this base stock was purchased for the production of carbonless products with approximately 89% purchased from one external supplier. The Company purchased approximately $156 million of base stock for the production of thermal products with approximately 61% purchased from a single external supplier. In 2011, the Company purchased approximately $114 million of base stock from external suppliers. Approximately $17 million of this base stock was purchased for the production of carbonless products with approximately 86% purchased from one external supplier. The Company purchased approximately $95 million of base stock for the production of thermal products with approximately 50% purchased from a single external supplier. During 2010, the Company purchased approximately $138 million of base stock from external suppliers. Approximately $33 million of this base stock was purchased for the production of carbonless products with approximately 42% purchased from one external supplier. The Company purchased approximately $103 million of base stock for the production of thermal products with approximately 42% purchased from a single external supplier.

### 22.  EMPLOYEE STOCK OWNERSHIP PLAN

The KSOP includes a separate ESOP component. The KSOP is a tax-qualified retirement plan that also contains a 401(k) feature, which provides participants with the ability to make pre-tax contributions to the KSOP by electing to defer a percentage of their compensation. The ESOP is a tax-qualified employee stock ownership plan that is designed to invest primarily in the common stock of PDC.

88

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Eligible participants, as "named fiduciaries" under ERISA, were offered a one-time irrevocable election in 2001 to acquire a beneficial interest in the common stock of PDC by electing to direct the transfer of all or a portion of their existing account balances in the KSOP and the 401(a) plan (Appleton Papers Inc. Retirement Medical Savings Plan) to the Company Stock Fund. The total proceeds transferred by eligible participants to the Company Stock Fund were approximately $106.8 million. All proceeds of the offering were used by the ESOP trustee to purchase 10,684,373 shares of PDC common stock. As a result of this purchase, the ESOP owns 100% of the common stock of PDC. The ESOP trustee is expected to purchase common stock from PDC with future pre-tax payroll deferrals made by employees. The Company also intends to fund a significant part of its matching contribution commitment with common stock of PDC. Matching contributions charged to expense amounted to $3.0 million in 2012, $2.7 million in 2011 and $3.2 million in 2010. Approximately $0.1 million was recorded in discontinued operations in 2010.

The value of each participant's account balance will be paid to that participant, or that participant's beneficiary, in the case of the participant's death, upon the participant's retirement, death, disability, resignation, dismissal or permanent layoff. Requests for lump sum distributions from the Company Stock Fund will be granted in accordance with a uniform, nondiscriminatory policy established by the ESOP committee. Covenants in the agreements providing for the senior credit facility (prior to the February 2010 voluntary refinancing) and indentures governing the second lien notes and senior subordinated notes (prior to the September 2009 amendment) restrict Appleton's ability to pay dividends to PDC, which could limit PDC's ability to repurchase shares distributed to ESOP participants who have terminated employment or who are entitled to diversification rights. PDC has obligations to make distributions to former participants in the ESOP under ERISA and these obligations may conflict with the terms of the senior credit and note agreements. During 2012, 2011 and 2010, the Company exercised its right to satisfy requests for distributions to former participants using five equal annual installments.

In 2012, the ESOP trustee purchased 184,444 shares of PDC redeemable common stock for an aggregate price of $2.9 million from pre-tax payroll deferrals, rollovers and loan payments made by employees, as well as interest received by the trust. Matching contributions over this same period resulted in an additional 194,122 shares of redeemable common stock being issued. As a result of hardship withdrawals, required diversifications, employee terminations and employee loan requests, 861,256 shares of PDC redeemable common stock were repurchased during 2012 at an aggregate price of $14.1 million.

In 2011, the ESOP trustee purchased 213,502 shares of PDC redeemable common stock for an aggregate price of $2.9 million from pre-tax payroll deferrals, rollovers and loan payments made by employees, as well as interest received by the trust. Matching contributions over this same period resulted in an additional 202,715 shares of redeemable common stock being issued. As a result of hardship withdrawals, required diversifications, employee terminations and employee loan requests, 916,621 shares of PDC redeemable common stock were repurchased during 2011 at an aggregate price of $12.4 million.

In 2010, the ESOP trustee purchased 295,990 shares of PDC redeemable common stock for an aggregate price of $3.6 million from pre-tax payroll deferrals, rollovers and loan payments made by employees, as well as interest received by the trust. Matching contributions over this same period resulted in an additional 266,013 shares of redeemable common stock being issued. As a result of hardship withdrawals, required diversifications, employee terminations and employee loan requests, 945,890 shares of PDC redeemable common stock were repurchased during 2010 at an aggregate price of $11.8 million.

89

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

In accordance with the ASC 480, "Distinguishing Liabilities from Equity," redeemable equity securities are required to be accreted so the amount in the balance sheet reflects the estimated amount redeemable at the earliest redemption date based upon the redemption value at each period end. Redeemable common stock is being accreted up to the earliest redemption date, mandated by federal law, based upon the estimated fair market value of the redeemable common stock as of December 29, 2012. The earliest redemption date, as mandated by federal law, occurs when the holder reaches 55 years of age and has 10 years of participation in the KSOP. At that point, the holder has the right to make diversification elections for a period of six years. For several semi-annual periods prior to year-end 2010, stock valuations resulted in decreases to the stock price. The impact of these reductions caused the Company to reduce redeemable common stock accretion by $7.8 million for the year ended December 29, 2012. Based upon the estimated fair value of the redeemable common stock, an ultimate redemption liability of approximately $153 million has been determined. The redeemable common stock recorded book value as of December 29, 2012, was $82 million. Since the inception of the ESOP, approximately $34 million of accretion has been recorded. The fair value of the redeemable common stock is determined by an independent, third-party appraiser selected by State Street Global Advisors, the ESOP Trustee, as required by law and the ESOP. Such valuations are made as of June 30 and December 31. Until the independent valuation is received, the fair value of the stock is estimated by management. The interim estimates as of the first and third quarter of each year may differ from the values determined by the appraiser as of June 30 and December 31. Adjustments, if any, as of the first quarter and third quarter of each year, will be recorded when the independent valuation is received. The accretion is being charged to retained earnings as redeemable common stock is the only class of shares outstanding.

**23.　　UNAUDITED QUARTERLY FINANCIAL DATA**

Unaudited quarterly financial data for 2012 includes the following (dollars in thousands):

| | For the Three Months Ended April 1, 2012 | For the Three Months Ended July 1, 2012 | For the Three Months Ended September 30, 2012 | For the Three Months Ended December 29, 2012 | For the Year Ended December 29, 2012 |
|---|---|---|---|---|---|
| Net sales | $　　219,630 | $　　213,901 | $　　210,744 | $　　205,481 | $　　849,756 |
| Gross profit | 9,455 | 12,644 | 44,788 | 23,994 | 90,881 |
| Operating (loss) income | (49,981) | (30,526) | 14,542 | (22,474) | (88,481) |
| Net (loss) income | $　　(64,886) | $　　(46,950) | $　　516 | $　　(37,131) | $　　(148,451) |

During the year ended December 29, 2012, the Company recorded $106.0 million in restructuring expense and other costs related to the ceasing of papermaking operations in West Carrollton, Ohio. See Note 3, Restructuring and Other Related Costs. Of this amount, $35.9 million, $38.0 million, $0.9 million and $2.6 million was included in cost of sales in first quarter, second quarter, third quarter and fourth quarter, respectively. Restructuring expense of $25.4 million, $1.1 million, $0.7 million and $1.4 million was also included in operating (loss) income for each of the consecutive four quarters, respectively. Also during each of the 2012 consecutive quarters, $0.4 million, $6.5 million, $0.3 million and $0.3 million of expense was recorded related to the discontinued business combination transaction.

Third quarter gross profit was reduced by a $6.8 million settlement charge relating to the full withdrawal from a multi-employer pension plan. Third quarter 2012 operating income includes $2.2 million of environmental expense insurance recovery. During fourth quarter 2012, the Company recorded a mark-to-market adjustment for pension and other postretirement benefit plans of $33.6 million.

Unaudited quarterly financial data for 2011 includes the following (dollars in thousands):

| | For the Three Months Ended April 3, 2011 | For the Three Months Ended July 3, 2011 | For the Three Months Ended October 2, 2011 | For the Three Months Ended December 31, 2011 | For the Year Ended December 31, 2011 |
|---|---|---|---|---|---|
| Net sales | $　　218,015 | $　　216,586 | $　　217,104 | $　　205,624 | $　　857,329 |
| Gross profit | 47,323 | 43,508 | 44,756 | 3,032 | 138,619 |
| Operating income (loss) | 10,680 | 11,728 | 12,045 | (43,884) | (9,431) |
| Net (loss) income | $　　(4,815) | $　　(2,289) | $　　18,872 | $　　(59,420) | $　　(47,652) |

90

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

At the end of first quarter 2011, the Company resolved litigation initiated by a supplier over contract terms and recorded a charge to income of $3.1 million, including legal fees. During third quarter 2011, the Company received payment of $23.2 million of damages, including interest and net of related fees and litigation expenses from a litigation settlement. During fourth quarter 2011, the Company recorded a mark-to-market adjustment for pension and other postretirement benefit plans of $51.1 million.

As a result of the changes in accounting policies related to the accounting for pension and other postretirement benefit plans, and the inventory capitalization of these costs, as elected by the Company in fourth quarter 2012 (See Note 2, Summary of Significant Accounting Policies.), the Company revised previously-issued financial statements. The impact of these revisions on the quarterly results is as follows.

Gross profit was impacted as follows, increase/(decrease)

2012: Q1 - $(0.6) million; Q2 - $1.5 million; Q3 - $2.0 million

2011: Q1 - $0.5 million; Q2 - $1.1 million; Q3 - $0.8 million; Q4 - $(33.6) million

Operating (loss) income was impacted as follows, increase/(decrease)

2012: Q1 - $(0.2) million; Q2 - $1.9 million; Q3 - $2.6 million

2011: Q1 - $0.4 million; Q2 - $1.0 million; Q3 - $0.8 million; Q4 - $(47.8) million

Net (loss) income was impacted as follows, increase/(decrease)

2012: Q1 - $(0.2) million; Q2 - $1.9 million; Q3 - $2.6 million

2011: Q1 - $0.4 million; Q2 - $1.0 million; Q3 - $0.8 million; Q4 - $(47.8) million

## 24.     SEGMENT INFORMATION

The Company's reportable segments are as follows: carbonless papers, thermal papers and Encapsys. The accounting policies applicable to these reportable segments are the same as those described in the summary of significant accounting policies. Management evaluates the performance of the segments based primarily on operating income. Items excluded from the determination of segment operating income are unallocated corporate charges, interest income, interest expense, debt extinguishment expense, foreign exchange (gain) loss, recovery from litigation settlement and other expense (income).

The carbonless papers segment includes carbonless and security paper products. Carbonless paper is used to make multipart business forms such as invoices and purchase orders. The Company produces coated products for point-of-sale displays and other design and print applications and offer custom coating solutions. Carbonless products are sold to converters, business forms printers and merchant distributors who stock and sell carbonless paper to printers. The Company produces security papers with features that resist forgery, tampering and counterfeiting. The Company's portfolio of products incorporates security technologies, including watermarks, taggants, reactive chemicals, embedded threads and fibers and machine-readable technologies, to serve global markets. The Company produces financial and identity documents for business and government such as checks, visas, automobile titles and birth certificates.

The thermal papers segment develops and produces substrates for the transaction and item identification markets. Thermal paper is used in four principal end markets: (1) point-of-sale products for retail receipts and coupons; (2) labels for shipping, warehousing, medical and clean-room applications; (3) tag and tickets for airline and baggage applications, event and transportation tickets and lottery and gaming applications; and (4) printer, calculator and chart products for engineering, industrial and medical diagnostic charts. Point-of-sale products are sold to printers and converters who in turn sell to end-user customers or to resellers such as office supply stores, office superstores, warehouse clubs, mail order catalogs, equipment dealers, merchants and original equipment manufacturers. Label products are sold to companies who apply pressure sensitive adhesive coatings and release liners and then sell these products to label printers. Tag, ticket and chart grades are sold to specialty printing companies who convert them to finished products such as entertainment, lottery and gaming tickets, tags, coupons and medical charts.

91

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm                                                                      95/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

The Encapsys segment discovers, develops and manufactures microencapsulation solutions for external partner companies and for the Company's carbonless papers segment. Microencapsulation is the process of putting a microscopic wall around a core substance. The Company helped NCR produce the first commercial application for microencapsulation in 1954 with the introduction of carbonless paper. Since then, the Company researchers have developed the art and science of microencapsulation and are working with potential partners in industries as diverse as agriculture, paints and coatings, food, building and construction, paper, textiles, personal and household care, adhesives, and oil and gas. The Encapsys segment leverages the Company's extensive technical knowledge and experience with microencapsulation and uses an open innovation process with partner customers to develop successful technical solutions for those companies.

The Company does not allocate total assets internally in assessing operating performance and does not track capital expenditures by segment. Net sales, operating (loss) income and depreciation and amortization, as determined by the Company for its reportable segments, are as follows (dollars in thousands):

| | For the Year Ended December 29, 2012 | For the Year Ended December 31, 2011 | For the Year Ended January 1, 2011 |
|---|---|---|---|
| **Net sales** | | | |
| Carbonless papers | $ 406,845 | $ 453,007 | $ 479,058 |
| Thermal papers | 411,699 | 370,832 | 341,776 |
| | 818,544 | 823,839 | 820,834 |
| Encapsys | 50,969 | 54,733 | 52,250 |
| Intersegment (A) | (19,757) | (21,243) | (23,200) |
| Total | $ 849,756 | $ 857,329 | $ 849,884 |
| **Operating (loss) income** | | | |
| Carbonless papers | $ (42,172) | $ (4,215) | $ 30,492 |
| Thermal papers | (34,229) | 555 | (1,787) |
| | (76,401) | (3,660) | 28,705 |
| Encapsys | 10,491 | 10,805 | 10,345 |
| Unallocated corporate charges | (19,632) | (13,296) | 1,944 |
| Intersegment (A) | (2,939) | (3,280) | (3,545) |
| Total | $ (88,481) | $ (9,431) | $ 37,449 |
| **Depreciation and amortization** | | | |
| Carbonless papers | $ 54,473 | $ 26,114 | $ 27,377 |
| Thermal papers | 42,946 | 18,454 | 19,702 |
| | 97,419 | 44,568 | 47,079 |
| Encapsys | 2,816 | 3,898 | 2,455 |
| Unallocated corporate charges | 61 | 150 | 246 |
| Total | $ 100,296 | $ 48,616 | $ 49,780 |

(A)   Intersegment represents the portion of the Encapsys segment financial results relating to encapsulated products provided internally for the production of carbonless papers.

During the year ended December 29, 2012, the Company recorded $106.0 million in restructuring expense and other costs related to the ceasing of papermaking operations at the West Carrollton, Ohio facility (see Note 3, Restructuring and Other Related Costs). The operating (loss) income of the carbonless papers and thermal papers segments for the year included $58.3 million and $47.7 million, respectively. A $6.8 million settlement charge relating to the full withdrawal from a multi-employer pension plan was also recorded in the thermal papers segment during the year. Unallocated corporate charges for the year include $7.5 million of transaction costs for a discontinued business combination that was to take place during third quarter 2012. Also during 2012, a charge of $2.2 million of environmental expense insurance recovery was recorded.

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm   96/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

Of the $106.0 million of restructuring and other related charges recorded during 2012, $64.7 million was accelerated depreciation of the decommissioned papermaking assets. The carbonless papers segment was charged with $35.6 million of this accelerated depreciation and the thermal papers segment was charged with $29.1 million.

During the year ended December 31, 2011, the Company recorded a $3.1 million litigation settlement within unallocated corporate charges.

During the year ended January 1, 2011, the Company recorded an $8.9 million environmental expense insurance recovery within unallocated corporate charges.

Revenues from sales in the U.S. were $577.3 million in 2012, $576.7 million in 2011 and $579.5 million in 2010. Revenues from sales to customers in foreign countries were $272.5 million in 2012, $280.6 million in 2011 and $270.4 million in 2010. Substantially all long-lived assets were located in the U.S. as of December 29, 2012, December 31, 2011, and January 1, 2011.

**25.    GUARANTOR FINANCIAL INFORMATION**

Appleton (the "Issuer") has issued senior subordinated notes, as amended, which have been guaranteed by PDC (the "Parent Guarantor"), as well as by C&H (prior to its December 18, 2009 sale), APC (prior to its July 22, 2010 sale), Rose Holdings Limited and NEX (prior to its July 22, 2010 sale), each of which was/is a 100%-owned subsidiary of Appleton (the "Subsidiary Guarantors").

Presented below is condensed consolidating financial information for the Parent Guarantor, the Issuer, the Subsidiary Guarantors and a 100%-owned non-guarantor subsidiary (the "Non-Guarantor Subsidiary") as of December 29, 2012 and December 31, 2011, and for the years ended December 29, 2012, December 31, 2011, and January 1, 2011. This financial information should be read in conjunction with the consolidated financial statements and other notes related thereto.

The first lien notes and the second lien notes, as amended, place restrictions on the subsidiaries of the Issuer that would limit dividend distributions by these subsidiaries.

93

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEET**

**DECEMBER 29, 2012**

**(dollars in thousands)**

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $ - | $ 1,593 | $ - | $ 258 | $ - | $ 1,851 |
| Accounts receivable, net | - | 88,111 | - | 4,569 | - | 92,680 |
| Inventories | - | 92,939 | - | 1,410 | - | 94,349 |
| Due from parent | - | 65,000 | - | - | (65,000) | - |
| Other current assets | 65,000 | 5,570 | - | 50 | - | 70,620 |
| Total current assets | 65,000 | 253,213 | - | 6,287 | (65,000) | 259,500 |
| Property, plant and equipment, net | - | 243,254 | - | 11 | - | 243,265 |
| Investment in subsidiaries | (352,909) | 14,216 | - | - | 338,693 | - |
| Other assets | 12 | 58,298 | - | 15 | - | 58,325 |
| Total assets | $ (287,897) | $ 568,981 | $ - | $ 6,313 | $ 273,693 | $ 561,090 |
| **LIABILITIES, REDEEMABLE COMMON STOCK, COMMON STOCK, PAID-IN CAPITAL, DUE FROM PARENT, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME** | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | $ - | $ 3,975 | $ - | $ - | $ - | $ 3,975 |
| Accounts payable | - | 68,574 | - | 26 | - | 68,600 |
| Due to (from) parent and affiliated companies | 65,000 | 10,799 | - | (10,799) | (65,000 ) | - |
| Other accrued liabilities | - | 119,690 | - | 2,412 | - | 122,102 |
| Total current liabilities | 65,000 | 203,038 | - | (8,361) | (65,000) | 194,677 |
| Long-term debt | - | 511,624 | - | - | - | 511,624 |
| Other long-term liabilities | - | 207,228 | - | 458 | - | 207,686 |
| Redeemable common stock, common stock, paid-in capital, due from parent, accumulated deficit and accumulated other comprehensive income | (352,897) | (352,909) | - | 14,216 | 338,693 | (352,897) |
| Total liabilities, redeemable common stock, common stock, paid-in capital, due from parent, accumulated deficit and accumulated other comprehensive income | $ (287,897) | $ 568,981 | $ - | $ 6,313 | $ 273,693 | $ 561,090 |

94

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm    98/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEET**

**DECEMBER 31, 2011**

**(dollars in thousands)**

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $ - | $ 6,688 | $ - | $ 553 | $ - | $ 7,241 |
| Accounts receivable, net | - | 85,795 | - | 4,544 | - | 90,339 |
| Inventories | - | 102,504 | - | 1,373 | - | 103,877 |
| Due from parent | - | 46,000 | - | - | (46,000) | - |
| Other current assets | 46,000 | 8,675 | - | 49 | - | 54,724 |
| Total current assets | 46,000 | 249,662 | - | 6,519 | (46,000) | 256,181 |
| Property, plant and equipment, net | - | 324,651 | - | 14 | - | 324,665 |
| Investment in subsidiaries | (188,599) | 13,713 | - | - | 174,886 | - |
| Other assets | 12 | 62,315 | - | 95 | - | 62,422 |
| Total assets | $ (142,587) | $ 650,341 | $ - | $ 6,628 | $ 128,886 | $ 643,268 |
| **LIABILITIES, REDEEMABLE COMMON STOCK, COMMON STOCK, PAID-IN CAPITAL, DUE FROM PARENT, ACCUMULATED DEFICIT AND ACCUMULATED OTHER COMPREHENSIVE INCOME** | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | $ - | $ 1,256 | $ - | $ - | $ - | $ 1,256 |
| Accounts payable | - | 51,694 | - | 72 | - | 51,766 |
| Due to (from) parent and affiliated companies | 46,000 | 9,714 | - | (9,714) | (46,000 ) | - |
| Other accrued liabilities | - | 91,599 | - | 2,456 | - | 94,055 |
| Total current liabilities | 46,000 | 154,263 | - | (7,186) | (46,000) | 147,077 |
| Long-term debt | - | 510,533 | - | - | - | 510,533 |
| Other long-term liabilities | - | 174,144 | - | 101 | - | 174,245 |
| Redeemable common stock, common stock, paid-in capital, due from parent, accumulated deficit and accumulated other comprehensive income | (188,587) | (188,599) | - | 13,713 | 174,886 | (188,587) |
| Total liabilities, redeemable common stock, common stock, paid-in capital, due from parent, accumulated deficit and accumulated other comprehensive income | $ (142,587) | $ 650,341 | $ - | $ 6,628 | $ 128,886 | $ 643,268 |

Case 1:19-cv-01561-WCG Filed 11/12/19 Page 940 of 1527 Document 14-2
https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm 99/147

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**CONSOLIDATED STATEMENT OF COMPREHENSIVE (LOSS) INCOME**

**FOR THE YEAR ENDED DECEMBER 29, 2012**

**(dollars in thousands)**

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Net sales | $ - | $ 846,934 | $ - | $ 50,947 | $ (48,125) | $ 849,756 |
| Cost of sales | - | 758,252 | - | 48,079 | (47,456) | 758,875 |
| Gross profit | - | 88,682 | - | 2,868 | (669) | 90,881 |
| Selling, general and administrative expenses | - | 150,855 | - | 2,106 | - | 152,961 |
| Environmental expense insurance recovery | - | (2,188) | - | - | - | (2,188) |
| Restructuring | - | 28,589 | - | - | - | 28,589 |
| Operating (loss) income | - | (88,574) | - | 762 | (669) | (88,481) |
| Interest expense | - | 59,654 | - | - | - | 59,654 |
| Interest income | - | (224) | - | - | - | (224) |
| Loss (income) in equity investments | 148,451 | (372) | - | - | (148,079) | - |
| Other expense (income) | - | 787 | - | (297) | (537) | (47) |
| (Loss) income before income taxes | (148,451) | (148,419) | - | 1,059 | 147,947 | (147,864) |
| Provision for income taxes | - | 32 | - | 555 | - | 587 |
| Net (loss) income | $ (148,451) | $ (148,451) | $ - | $ 504 | $ 147,947 | $ (148,451) |
| Other comprehensive loss | | | | | | |
|   Changes in retirement plans | (4,812) | (4,812) | - | - | 4,812 | (4,812) |
|   Realized and unrealized losses on derivatives | (2,890) | (2,890) | - | - | 2,890 | (2,890) |
| Total other comprehensive loss | (7,702) | (7,702) | - | - | 7,702 | (7,702) |
| Comprehensive loss (income) | $ (156,153) | $ (156,153) | $ - | $ 504 | 155,649 | (156,153) |

96

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**CONSOLIDATED STATEMENT OF COMPREHENSIVE (LOSS) INCOME**

**FOR THE YEAR DECEMBER 31, 2011**

**(dollars in thousands)**

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Net sales | $ - | $ 854,000 | $ - | $ 51,119 | $ (47,790) | $ 857,329 |
| Cost of sales | | 718,262 | | 48,560 | (48,112) | 718,710 |
| Gross profit | - | 135,738 | - | 2,559 | 322 | 138,619 |
| Selling, general and administrative expenses | - | 142,758 | - | 2,170 | - | 144,928 |
| Litigation settlement, net | - | 3,122 | - | - | - | 3,122 |
| Operating (loss) income | - | (10,142) | - | 389 | 322 | (9,431) |
| Interest expense | - | 61,677 | - | - | (347) | 61,330 |
| Interest income | - | (355) | - | (347) | 347 | (355) |
| Loss (income) in equity investments | 47,652 | (571) | - | - | (47,081) | - |
| Other (income) expense | - | (23,607) | - | 275 | 1 | (23,331) |
| (Loss) income before income taxes | (47,652) | (47,286) | - | 461 | 47,402 | (47,075) |
| Provision for income taxes | - | 366 | - | 211 | - | 577 |
| Net (loss) income | $ (47,652) | $ (47,652) | $ - | $ 250 | $ 47,402 | $ (47,652) |
| Other comprehensive income | | | | | | |
|   Changes in retiree plans | 433 | 433 | - | - | (433) | 433 |
|   Realized and unrealized gains on derivatives | 1,373 | 1,373 | - | - | (1,373) | 1,373 |
| Total other comprehensive income | 1,806 | 1,806 | - | - | (1,806) | 1,806 |
| Comprehensive (loss) income | $ (45,846) | $ (45,846) | $ - | $ 250 | $ 45,596 | $ (45,846) |

97

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**

**CONSOLIDATED STATEMENT OF COMPREHENSIVE (LOSS) INCOME**

**FOR THE YEAR JANUARY 1, 2011**

**(dollars in thousands)**

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Net sales | $ - | $ 847,623 | $ - | $ 47,867 | $ (45,606) | $ 849,884 |
| Cost of sales | | 682,121 | | 45,771 | (45,664) | 682,228 |
| Gross profit | - | 165,502 | - | 2,096 | 58 | 167,656 |
| Selling, general and administrative expenses | - | 137,284 | - | 1,870 | - | 139,154 |
| Environmental expense insurance recovery | - | (8,947) | - | - | - | (8,947) |
| Operating income | - | 37,165 | - | 226 | 58 | 37,449 |
| Interest expense | - | 66,190 | - | - | (418) | 65,772 |
| Debt extinguishment expense, net | - | 7,010 | - | - | - | 7,010 |
| Interest income | - | (326) | - | (419) | 418 | (327) |
| Loss in equity investments | 31,254 | 24,591 | - | - | (55,845) | - |
| Other expense (income) | - | 230 | - | (664) | 5 | (429) |
| (Loss) income from continuing operations before income taxes | (31,254) | (60,530) | - | 1,309 | 55,898 | (34,577) |
| Provision for income taxes | - | 20 | - | 156 | - | 176 |
| (Loss) income from continuing operations | (31,254) | (60,550) | - | 1,153 | 55,898 | (34,753) |
| Income (loss) from discontinued operations, net of income taxes | - | 29,296 | (25,797) | - | - | 3,499 |
| Net (loss) income | $ (31,254) | $ (31,254) | $ (25,797) | $ 1,153 | $ 55,898 | $ (31,254) |
| Other comprehensive income | | | | | | |
| Change in retiree plans | 6,743 | 6,743 | - | - | (6,743) | 6,743 |
| Realized and unrealized gains on derivatives | 140 | 140 | - | - | (140) | 140 |
| Total other comprehensive income | 6,883 | 6,883 | - | - | (6,883) | 6,883 |
| Comprehensive (loss) income | $ (24,371) | $ (24,371) | $ (25,797) | $ 1,153 | $ 49,015 | $ (24,371) |

98

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

FOR THE YEAR ENDED DECEMBER 29, 2012

(dollars in thousands)

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | | |
| Net (loss) income | $ (148,451) | $ (148,451) | $ - | $ 504 | $ 147,947 | $ (148,451) |
| Adjustments to reconcile net (loss) income to net cash (used) provided by operating activities: | | | | | | |
| Depreciation and amortization | - | 100,292 | - | 4 | | 100,296 |
| Other | - | 16,956 | - | (297) | - | 16,659 |
| Change in assets and liabilities, net | 132,480 | 69,689 | - | 579 | (147,947) | 54,801 |
| Net cash (used) provided by operating activities | (15,971) | 38,486 | - | 790 | | 23,305 |
| Cash flows from investing activities: | | | - | | | |
| Proceeds from sale of equipment | - | 22 | - | - | - | 22 |
| Additions to property, plant and equipment | - | (17,143) | - | - | - | (17,143) |
| | | | | | - | |
| Net cash used by investing activities | - | (17,121) | - | - | - | (17,121) |
| Cash flows from financing activities: | | | - | | | |
| Payments relating to capital lease obligations | - | (68) | - | - | - | (68) |
| Proceeds from revolving line of credit | - | 253,400 | - | - | - | 253,400 |
| Payments of revolving line of credit | - | (249,700) | - | - | - | (249,700) |
| Payments of State of Ohio loan | - | (1,256) | - | - | - | (1,256) |
| Proceeds from forgivable debt | - | 300 | - | - | - | 300 |
| Due to (from) parent and affiliated companies, net | 27,157 | (26,072) | - | (1,085) | | - |
| Proceeds from issuance of redeemable common stock | 2,884 | - | - | - | - | 2,884 |
| Payments to redeem common stock | (14,070) | - | - | - | - | (14,070) |
| Decrease in cash overdraft | - | (3,078) | - | - | - | (3,078) |
| Net cash provided (used) by financing activities | 15,971 | (26,474) | - | (1,085) | | (11,588) |
| Effect of foreign exchange rate changes on cash and cash equivalents | - | 14 | - | - | - | 14 |
| Change in cash and cash equivalents | - | (5,095) | - | (295) | - | (5,390) |
| Cash and cash equivalents at beginning of period | - | 6,688 | - | 553 | - | 7,241 |
| Cash and cash equivalents at end of period | $ - | $ 1,593 | $ - | $ 258 | $ - | $ 1,851 |

99

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

FOR THE YEAR ENDED DECEMBER 31, 2011

(dollars in thousands)

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | | |
| Net (loss) income | $ (47,652) | $ (47,652) | $ - | $ 250 | $ 47,402 | $ (47,652) |
| Adjustments to reconcile net (loss) income to net cash (used) provided by operating activities: | | | | | | |
| Depreciation and amortization | - | 48,612 | - | 4 | - | 48,616 |
| Other | - | 6,634 | - | 275 | - | 6,909 |
| Change in assets and liabilities, net | 24,962 | 80,001 | 101 | 3,176 | (47,402) | 60,838 |
| Net cash (used) provided by operating activities | (22,690) | 87,595 | 101 | 3,705 | - | 68,711 |
| Cash flows from investing activities: | | | | | | |
| Proceeds from sale of equipment | - | 6 | - | - | - | 6 |
| Proceeds from sale of Films | - | 2,000 | - | - | - | 2,000 |
| Insurance proceeds from involuntary conversion of equipment | - | 1,374 | - | - | - | 1,374 |
| Additions to property, plant and equipment | - | (15,833) | - | (14) | - | (15,847) |
| Net cash used by investing activities | - | (12,453) | - | (14) | - | (12,467) |
| Cash flows from financing activities: | | | - | | | |
| Payments of senior subordinated notes payable | - | (17,491) | - | - | - | (17,491) |
| Payments relating to capital lease obligation | - | (47) | - | - | - | (47) |
| Proceeds from revolving line of credit | - | 202,800 | - | - | - | 202,800 |
| Payments of revolving line of credit | - | (232,100) | - | - | - | (232,100) |
| Payments of State of Ohio loan | - | (1,203) | - | - | - | (1,203) |
| Due to (from) parent and affiliated companies, net | 32,166 | (28,554) | (101) | (3,511) | - | - |
| Proceeds from issuance of redeemable common stock | 2,875 | - | - | - | - | 2,875 |
| Payments to redeem common stock | (12,351) | - | - | - | - | (12,351) |
| Increase in cash overdraft | - | 4,749 | - | - | - | 4,749 |
| Net cash provided (used) by financing activities | 22,690 | (71,846) | (101) | (3,511) | - | (52,768) |
| Effect of foreign exchange rate changes on cash and cash equivalents | - | (7) | - | - | - | (7) |
| Change in cash and cash equivalents | - | 3,289 | - | 180 | - | 3,469 |
| Cash and cash equivalents at beginning of period | - | 3,399 | - | 373 | - | 3,772 |
| Cash and cash equivalents at end of period | $ - | $ 6,688 | $ - | $ 553 | $ - | $ 7,241 |

100

PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES
AND APPLETON PAPERS INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS - (Continued)

CONDENSED CONSOLIDATING STATEMENT OF CASH FLOWS

FOR THE YEAR ENDED JANUARY 1, 2011

(dollars in thousands)

| | Parent Guarantor | Issuer | Subsidiary Guarantors | Non-Guarantor Subsidiary | Eliminations | Consolidated |
|---|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | | |
| Net (loss) income | $ (31,254) | $ (31,254) | $ (25,797) | $ 1,153 | $ 55,898 | $ (31,254) |
| Adjustments to reconcile net (loss) income to net cash provided (used) by operating activities: | | | | | | |
| Depreciation and amortization | - | 49,755 | 1,726 | 5 | - | 51,486 |
| Other | - | 4,468 | - | (664) | - | 3,804 |
| Change in assets and liabilities, net | 89,574 | (79,618) | (7,264) | (815) | (55,898) | (54,021) |
| Net cash provided (used) by operating activities | 58,320 | (56,649) | (31,335) | (321) | - | (29,985) |
| Cash flows from investing activities: | | | | | | |
| Proceeds from sale of equipment | - | 208 | - | - | - | 208 |
| Proceeds from sale of Films | - | 56,000 | - | - | - | 56,000 |
| Insurance proceeds from involuntary conversion of equipment | - | 1,029 | - | - | - | 1,029 |
| Additions to property, plant and equipment | - | (17,249) | (590) | - | - | (17,839) |
| Net cash provided (used) by investing activities | - | 39,988 | (590) | - | - | 39,398 |
| Cash flows from financing activities: | | | | | | |
| Payments of senior subordinated notes payable | - | (211,225) | - | - | - | (211,225) |
| Proceeds from senior secured first lien notes payable | - | 299,007 | - | - | - | 299,007 |
| Debt acquisitions costs | - | (10,847) | - | - | - | (10,847) |
| Payments relating to capital lease obligation | - | (721) | - | - | - | (721) |
| Proceeds from old revolving line of credit | - | 21,350 | - | - | - | 21,350 |
| Payments of old revolving line of credit | - | (109,575) | - | - | - | (109,575) |
| Proceeds from new revolving line of credit | - | 316,993 | - | - | - | 316,993 |
| Payments of new revolving line of credit | - | (287,693) | - | - | - | (287,693) |
| Payments of State of Ohio loan | - | (1,151) | - | - | - | (1,151) |
| Payments of secured financing | - | (20,905) | - | - | - | (20,905) |
| Due (from) to parent and affiliated companies, net | (50,070) | 18,253 | 31,924 | (107) | - | - |
| Proceeds from issuance of redeemable common stock | 3,561 | - | - | - | - | 3,561 |
| Payments to redeem common stock | (11,811) | - | - | - | - | (11,811) |
| Decrease in cash overdraft | - | (2,628) | - | - | - | (2,628) |
| Net cash (used) provided by financing activities | (58,320) | 10,858 | 31,924 | (107) | - | (15,645) |
| Effect of foreign exchange rate changes on cash and cash equivalents | - | 41 | - | - | - | 41 |
| Change in cash and cash equivalents | - | (5,762) | (1) | (428) | - | (6,191) |
| Cash and cash equivalents at beginning of period | - | 9,161 | 1 | 801 | - | 9,963 |
| Cash and cash equivalents at end of period | $ - | $ 3,399 | $ - | $ 373 | $ - | $ 3,772 |

**Item 9.     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.     Controls and Procedures**

Paperweight Development Corp. and Subsidiaries

**Disclosure Controls and Procedures**

PDC maintains a set of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports filed or submitted under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely discussions regarding required disclosure. PDC carried out an evaluation, under the supervision and with the participation of management, including the CEO and CFO, of the effectiveness, design and operation of PDC's disclosure controls and procedures. Based on that evaluation, the CEO and CFO of PDC concluded that its disclosure controls and procedures are effective as of the end of the period covered by this report.

**Management's Report on Internal Control Over Financial Reporting**

PDC's management is responsible for establishing and maintaining adequate internal control over financial reporting. The registrant's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the registrant's financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate.

Under the supervision and with the participation of its management, including the CEO and CFO, PDC conducted an assessment of the effectiveness of its internal control over financial reporting as of December 29, 2012. The assessment was based on criteria established in the framework *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management concluded that PDC's internal control over financial reporting was effective as of December 29, 2012.

This annual report does not include an attestation report of PDC's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by PDC's independent registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit PDC to provide only management's report in this annual report.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in PDC's internal control over financial reporting during PDC's fourth quarter that have materially affected, or are reasonably likely to materially affect, PDC's internal control over financial reporting.

Appleton Papers Inc. and Subsidiaries

**Disclosure Controls and Procedures**

Appleton maintains a set of disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports filed or submitted under the Securities Exchange Act of 1934, as amended, or the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the CEO and CFO, as appropriate, to allow timely discussions regarding required disclosure. Appleton registrants carried out an evaluation, under the supervision and with the participation of management, including the CEO and CFO, of the effectiveness, design and operation of Appleton's disclosure controls and procedures. Based on that evaluation, the CEO and CFO of Appleton concluded that its disclosure controls and procedures are effective as of the end of the period covered by this report.

102

**Management's Report on Internal Control Over Financial Reporting**

Appleton's management is responsible for establishing and maintaining adequate internal control over financial reporting. The registrant's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the registrant's financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or because the degree of compliance with policies or procedures may deteriorate.

Under the supervision and with the participation of its management, including the CEO and CFO, Appleton conducted an assessment of the effectiveness of its internal control over financial reporting as of December 29, 2012. The assessment was based on criteria established in the framework *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management concluded that Appleton's internal control over financial reporting was effective as of December 29, 2012.

This annual report does not include an attestation report of Appleton's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by Appleton's independent registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit Appleton to provide only management's report in this annual report.

**Changes in Internal Control Over Financial Reporting**

There have been no changes in Appleton's internal control over financial reporting during Appleton's fourth quarter that have materially affected, or are reasonably likely to materially affect, Appleton's internal control over financial reporting.

**Item 9B.　　Other Information**

None.

## PART III

Item 10.      **Directors, Executive Officers and Corporate Governance**

The following table presents information as of March 8, 2013, regarding the executive officers and directors of Appleton and PDC.

| Name | Age | Position |
|---|---|---|
| Mark R. Richards | 53 | Chairman, President, Chief Executive Officer and a Director of Appleton, and Chairman, President, Chief Executive Officer and a Director of PDC |
| Stephen P. Carter | 61 | Director of Appleton and PDC |
| Terry M. Murphy | 64 | Director of Appleton and PDC |
| Andrew F. Reardon | 67 | Director of Appleton and PDC |
| Mark A. Suwyn | 70 | Director of Appleton and PDC |
| Kathi P. Seifert | 63 | Director of Appleton and PDC |
| George W. Wurtz | 56 | Director of Appleton and PDC |
| Kerry S. Arent | 52 | Senior Vice President Human Resources of Appleton |
| Thomas J. Ferree | 55 | Senior Vice President Finance, Chief Financial Officer and Treasurer of Appleton, and Senior Vice President Finance, Chief Financial Officer and Treasurer of PDC |
| Jeffrey J. Fletcher | 60 | Vice President, Controller and Assistant Treasurer of Appleton, and Vice President, Controller and Assistant Treasurer of PDC |
| James R. Hillend | 54 | Vice President Carbonless and Thermal Value Streams of Appleton |
| Tami L. Van Straten | 41 | Vice President, General Counsel & Secretary of Appleton, and Vice President, General Counsel & Secretary of PDC |

*Mark R. Richards*. Mr. Richards has been Chief Executive Officer and President of Appleton since April 2005 and a Director and Chairman of Appleton since June 2005 and Chief Executive Officer, Chairman, Director and President of PDC since April 2005. Mr. Richards has also served as a director for Neenah Foundry Company since August 2010. Prior to joining the Company, Mr. Richards served as President of the Engineered Support Structures division of Valmont Industries, Inc. since 1999. Mr. Richards is a graduate of Northwestern University's Kellogg Graduate School of Management where he earned a master's degree in business administration with concentrations in marketing and finance in 1989. He earned a bachelor's degree in packaging from Michigan State University in 1983. Mr. Richards' extensive business and management experience as division President of a global producer of engineered products and services, as well as his leadership experience in this position and as a director of a large North American supplier of municipal castings, and his graduate degree in business, led to the conclusion that he should serve as a director of Appleton and PDC.

*Stephen P. Carter*. Mr. Carter joined Appleton and PDC as a Director in July 2004. Mr. Carter is currently a principal in Ingenium Aerospace LLC, a consultant and director of Blackhawk Bancorp., Inc., a publicly held bank holding company and a director of Hollister, Incorporated, a privately held medical device company. Mr. Carter has been a principal in Ingenium Aerospace LLC since March 2010, a director of Blackhawk Bancorp, Inc. since 2003, and a director of Hollister, Incorporated since 2009. Mr. Carter retired as the Executive Vice President, Chief Financial Officer and Treasurer for Woodward, Inc. in August 2005, a position he held since January 2003. Mr. Carter graduated with a bachelor's degree from Brigham Young University in 1973 and is a CPA in Illinois. Mr. Carter's financial background as a certified public accountant, a consultant and director of a bank holding company and as the former Executive Vice President, Chief Financial Officer and Treasurer for a large industrial company, as well as his leadership experience in these positions and as a director of a medical device company, led to the conclusion that he should serve as a director of Appleton and PDC.

104

*Terry M. Murphy.* Mr. Murphy joined Appleton and PDC as a Director in June 2007. Mr. Murphy is currently a director of Hagerty, LLC, a specialty insurance company, and has held this position since July 2010. Mr. Murphy is a member of the Board of Trustees of Carroll University located in Waukesha, Wisconsin, and has held this position since May 2007. Mr. Murphy was Executive Vice President and Chief Financial Officer of A.O. Smith from the time he joined the company in 2006 until his retirement on May 1, 2011. From 1999 to 2005, Mr. Murphy held various executive management positions at Quanex Corporation and in his last position at Quanex Corporation served as its Senior Vice President and Chief Financial Officer. Mr. Murphy earned a bachelor's degree from the University of Wisconsin-LaCrosse in 1970 and a master's degree in business administration from Marquette University in 1974. He also earned a Juris Doctor degree from Seton Hall University School of Law in 1980 and is a certified public accountant. Mr. Murphy's financial background as a certified public accountant, former Senior Vice President and Chief Financial Officer for a large building products manufacturing company, and former Executive Vice President and Chief Financial Officer for a large diversified manufacturing company, as well as his leadership experience as an executive and director, and his graduate degree in business and degree in law, led to the conclusion that he should serve as a director of Appleton and PDC.

*Andrew F. Reardon.* Mr. Reardon joined Appleton and PDC as a Director in June 2007. Mr. Reardon retired in November 2008 as the Chairman and Chief Executive Officer of TTX Company, positions he held since June 1, 2008. Prior to June 1, 2008, he was the President and Chief Executive Officer of TTX Company, positions he held since 2001. He currently serves as a consultant to the law firm of Reardon & Chasar, L.P.A., located in Cincinnati, Ohio, which he co-founded in 2009. He joined TTX in 1992 as Vice President of Human Resources and Labor Relations. He later served as Vice President of Law and Human Resources and was named President of the company in 2000. TTX is a large supplier of leased railcars in North America. Mr. Reardon earned a bachelor's degree from the University of Notre Dame (English) in 1967 and a Juris Doctor degree from the University of Cincinnati in 1974. He also earned a L.L.M. degree in taxation from Washington University Law School in 1975. Mr. Reardon's business and legal experience as a principal in a law firm, consultant and former Chairman and Chief Executive Officer and Vice President of Law and Human Resources for a major North American railcar supply company, as well as his leadership experience in these positions and his graduate degree in law, led to the conclusion that he should serve as a director of Appleton and PDC.

*Kathi P. Seifert.* Ms. Seifert joined Appleton and PDC as a Director in July 2004. Ms. Seifert retired as Executive Vice President and Group President of Global Personal Care Products for Kimberly-Clark Corporation in June 2004, a position she held since 1999. Ms. Seifert is also currently a director of Eli Lilly and Company, Revlon Consumer Products Corporation, Supervalu, Inc. and Lexmark, Inc. She has served as a director of Eli Lilly and Company since 1995 and as a director of Revlon Consumer Products Corporation, Supervalu, Inc. and Lexmark, Inc. since 2006. Ms. Seifert served as a director of Albertson's, Inc. in 2005. Ms. Seifert also serves on the Board of Directors for the Fox Cities Performing Arts Center, the Fox Cities Community Foundation, and New North. Ms. Seifert graduated with a bachelor's degree from Valparaiso University in 1971. Ms. Seifert's business experience as the former Executive Vice President and division Group President of a global manufacturer of family and personal care products, and as a director of a global pharmaceutical company, cosmetics and personal care products company, grocery retailing company, and printing and imaging products manufacturing company, as well as her leadership experience in these positions, led to the conclusion that she should serve as a director of Appleton and PDC.

*Mark A. Suwyn.* Mr. Suwyn joined Appleton and PDC as a Director in July 2011. Mr. Suwyn is currently the President of Marsuw, LLC, a private investment and consulting company, and has held this position since March 2000. Mr. Suwyn is currently serving as Executive Chairman of Gourmet Express, a privately owned frozen food business, a position he has held since January 2012. Mr. Suwyn retired as Chairman of NewPage Corporation, a large coated paper producer in North America, in June 2010. He had previously served as Chairman and Chief Executive Officer of NewPage Corporation since May 2005. He served as a director of Ballard Power Systems, Inc. from 2003 to 2012, and as a director of Contech Construction Products Inc. from 2011 through 2012. Mr. Suwyn also served as Chairman and Chief Executive Officer of Louisiana-Pacific Corporation from January 1996 until November 2004. Prior to that, Mr. Suwyn held executive management positions with International Paper Company and spent 25 years with E.I. Du Pont where he directed marketing, acquisition and joint venture efforts. Mr. Suwyn earned a doctorate degree (Inorganic Chemistry) from Washington State University and bachelor's degree (Chemistry) from Hope College, Holland, Michigan. Mr. Suwyn's extensive business experience in the paper industry, experience as former Chairman and Chief Executive Officer for both a large coated paper producer and a leading manufacturer of building materials, as well as his leadership experience as an executive and director and his doctorate degree in chemistry, led to the conclusion that he should serve as a director of Appleton and PDC.

105

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm      110/147

_George W. Wurtz_. Mr. Wurtz joined Appleton and PDC as a Director in July 2011. Mr. Wurtz is currently the President and Chief Executive Officer of Soundview Paper Company LLC, Elmwood Park, New Jersey, a position he has held since April 2012. Soundview is a privately-held manufacturer of virgin and recycled tissue consumer products. From November 2006 until November 2011, Mr. Wurtz served as President and Chief Executive Officer of New WinCup Holdings, Stone Mountain, Georgia, a privately-held manufacturer and distributor of single-use cups, food service containers, lids and straws. Mr. Wurtz is currently a director of the State University of New York at Oswego ("SUNY Oswego") Engineering Advisory Board and Mohawk Fine Papers, Inc. He has served as a director of the SUNY Oswego Engineering Advisory Board since 2009 and as a director of Mohawk Fine Papers, Inc. since January 2012. Mr. Wurtz retired as Executive Vice President of Georgia-Pacific Corporation in February 2006 after serving in several executive management positions including President of Paper, Bleached Board and Kraft Operations. Prior to joining Georgia-Pacific Corporation in October 2000, Mr. Wurtz was employed by James River Corporation/Fort James Corporation for 14 years and held executive management positions in operations, logistics, procurement and manufacturing planning. Mr. Wurtz received his bachelor's degree (Industrial Arts and Technology) from SUNY Oswego in 1978. Mr. Wurtz's extensive business experience in the paper industry, experience as former President and Chief Executive Officer of a food-service products manufacturer and distributor, as well as his leadership experience as an executive and director of several paper companies, led to the conclusion that he should serve as a director of Appleton and PDC.

_Kerry S. Arent_. Ms. Arent has been Senior Vice President Human Resources of Appleton since January 2013. Ms. Arent previously served as Vice President Human Resources of Appleton from July 2009 through 2012, as Executive Director Human Resources of Appleton from February 2008 to 2009, and as Human Resources Director of Appleton since 1997. Ms. Arent joined the Company in 1982 and served in a number of human resources roles from 1982 to 1997. Ms. Arent received her bachelor's degree (Business Administration, Human Resources) from the University of Wisconsin-Oshkosh in 1982. Ms. Arent holds a Senior Professional Human Resources certification since 2005.

_Thomas J. Ferree_. Mr. Ferree has been the Senior Vice President Finance and Chief Financial Officer of Appleton since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appleton October 2006 through January 2010 and Treasurer of Appleton and Chief Financial Officer and Treasurer of PDC since November 2006. Prior to joining the Company, Mr. Ferree served as Senior Vice President of Finance and Chief Financial Officer of Wells' Dairy, Inc. since 2003. Mr. Ferree received his bachelor's degree (Business Administration, Accounting) from the University of Iowa in 1979 and he received his master's degree in finance from the University of Iowa in 1980.

_Jeffrey J. Fletcher_. Mr. Fletcher has been Vice President and Controller of Appleton since December 2010, and Assistant Treasurer of Appleton since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appleton since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. Prior to joining the Company in February 2007, Mr. Fletcher was Corporate Controller for Wells' Dairy, Inc. since 2005. From 2003 to 2005, Mr. Fletcher worked for IP Innovations, Inc. as President and Chief Financial Officer. Mr. Fletcher earned a bachelor's degree in accounting from the University of Iowa in 1978 and a master's degree in business administration from Northwestern University's Kellogg Graduate School of Management in 1992.

_James R. Hillend_. Mr. Hillend has been Appleton's Vice President of Thermal and Carbonless Value Streams since January 2013. Mr. Hillend previously served as Appleton's Vice President of Thermal Operations from April through December 2012, as Executive Director and General Manager of Appleton's Thermal Tag, Label and Entertainment business from January 2011 to April 2012, Executive Director of the Thermal Point-of-Sale business from June 2009 to January 2011, and Executive Director of Market Development from January 2008 to June 2009. Mr. Hillend joined the Company in 1993 and prior to 2008 served in a number of management positions related to purchasing, new business development, technical research, and the Company's value streams. Prior to joining Appleton, Mr. Hillend held management positions with Mitsubishi Pulp Sales, ITT Rayonier and Southwest Forest Industries. Mr. Hillend earned a bachelor's degree in pulp and paper engineering from the University of Washington in 1981.

_Tami L. Van Straten_. Ms. Van Straten has been Vice President, General Counsel and Secretary of Appleton since January 2012 and Vice President, General Counsel and Secretary of PDC since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appleton and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined the Company in 2001 and served in a number of legal counsel roles from 2001 to August 2006. Prior to joining the Company, Ms. Van Straten served as law clerk to the Hon. N. Patrick Crooks of the Supreme Court of Wisconsin and was in private legal practice. Ms. Van Straten earned a bachelor's degree in criminal justice and political science from the University of Wisconsin-Oshkosh in 1994 and earned her Juris Doctor degree from Marquette University in 1997.

106

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

The boards of directors of both PDC and Appleton currently consist of seven members. PDC has entered into a security holders agreement with the ESOP Trust which sets forth the manner in which the ESOP Trust will vote its shares of PDC common stock in connection with the election of directors of PDC's board of directors. Under the agreement, the ESOP Trust has agreed to vote all of its shares of PDC common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's chief executive officer and three individuals jointly nominated by the ESOP Trust and the chief executive officer.

The ESOP Trust has agreed that any vote taken to remove a director or to fill vacancies on the boards of directors is subject to the provisions described above. The agreement also provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's chief executive officer. In addition to the election of directors, the agreement prohibits PDC from issuing capital stock to any person other than the ESOP Trust or making, or permitting any of its subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of the ESOP Trust.

PDC has entered into a security holders agreement with Appleton on terms substantially similar to those described above to provide for the manner in which PDC will vote its shares of Appleton's common stock in connection with the election of directors of Appleton's board of directors. In addition to the election of directors, the agreement prohibits Appleton from issuing capital stock to any person other than PDC or making, or permitting any of Appleton's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC. Pursuant to the terms contained in the Company's indebtedness agreements, the security holders agreement may not be amended except under limited circumstances.

Pursuant to the agreements above, Mr. Murphy, Mr. Reardon, Mr. Richards and Ms. Seifert were nominated by Mr. Richards, Appleton's chief executive officer, and elected to the boards of directors of PDC and Appleton. Mr. Carter, Mr. Suwyn and Mr. Wurtz were jointly nominated by Mr. Richards and the ESOP Trust and elected to the boards of directors of PDC and Appleton.

The board of directors of PDC has an Audit Committee responsible for, among other things, providing assistance to the board of directors in fulfilling its responsibility to the ESOP participants relating to financial accounting and reporting practices and the quality and integrity of PDC financial reports. Effective March 7, 2013, members of the committee include: Mr. Carter, Mr. Murphy and Mr. Wurtz. Mr. Murphy serves as the Audit Committee Chair. The boards of directors of PDC and Appleton have determined that Mr. Murphy is an "audit committee financial expert" as defined under the applicable rules of the SEC. Mr. Murphy is an "independent director" as that term is defined under the listing standards of the Nasdaq Stock Market, Inc. The charter for the Audit Committee can be found on the Company's website at www.appletonideas.com (investor information section).

The board of directors of Appleton has a Compensation Committee responsible for authorizing the compensation of the Chief Executive Officer subject to ratification by the board of directors, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The Compensation Committee also has authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective March 7, 2013, members of the committee include: Mr. Reardon, Ms. Seifert and Mr. Suwyn. Ms. Seifert serves as the Compensation Committee Chair. See "Item 11. Executive Compensation—Compensation Discussion and Analysis," below. The charter for the Compensation Committee is available at www.appletonideas.com (investor information section).

The board of directors of Appleton has a Corporate Governance Committee for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Company, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective March 7, 2013, members of the committee include: Mr. Reardon, Mr. Richards, Ms. Seifert and Mr. Suwyn. Mr. Reardon serves as the Corporate Governance Committee Chair. The charter for the Corporate Governance Committee can be found on the Company's website at www.appletonideas.com (investor information section).

The Company has adopted a Code of Business Conduct and Ethics that applies to the directors, officers and employees of PDC and Appleton, including the principal executive officer, principal financial officer and controller of PDC and Appleton. This Code of Business Conduct and Ethics is posted on the Company's Internet web site at www.appletonideas.com (investor information section). The Company intends to timely disclose, on the website, any amendments to, or waivers from, certain provisions of the Code of Business Conduct and Ethics that apply to the principal executive officer, principal financial officer and controller of PDC and Appleton.

The boards of Appleton and PDC recognize that Related Person Transactions (as defined below) can present potential or actual conflicts of interest and create the appearance that Company decisions are based on considerations other than the best interests of the Company and its shareholders. The Corporate Governance Committee and the Audit Committee have the authority to review and approve Related Person Transactions. The Company has adopted written procedures for the review of Related Person Transactions, which provide for review of all the relevant facts and circumstances for all Related Person Transactions that require approval. In determining whether to approve or disapprove a Related Person Transaction, the Corporate Governance Committee and the Audit Committee will take into account, among other factors deemed appropriate, whether the Related Person Transaction is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances and the extent of the Related Person's interest in the transaction. A Related Person Transaction is any transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness), or any series of similar transactions, arrangements or relationships, in which (a) the aggregate amount involved will or may be expected to exceed $120,000 in any fiscal year; (b) the Company is or was a participant; and (c) any Related Person has or will have a direct or indirect interest (other than solely as a result of being a director or trustee (or any similar position) or a less than 10 percent beneficial owner of another entity). A "Related Person" is any (a) person who is an executive officer, director or nominee for election as a director of the Company; (b) person who owns greater than 5 percent beneficial ownership of the Company's outstanding common stock; or (c) Immediate Family Member of any of the foregoing. An "Immediate Family Member" includes spouse, parent, grandparents, children, grandchildren, siblings, mothers and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law and any person (other than a tenant or employee) sharing the household of a person.

The Company has also adopted other best practices including the following:

- The boards of Appleton and PDC regularly approve Appleton's CEO succession plan.

- The independent directors meet regularly without the CEO present.

The Company maintains an Enterprise Risk Management ("ERM") function. The purpose of ERM is to maximize the Company's ability to achieve its business objectives. The ERM function creates a comprehensive approach to anticipate, identify, prioritize and manage material risks to the Company's business objectives. The Audit Committee of the Board receives periodic reports from the ERM Committee regarding the ERM Committee's activities, findings, conclusions and recommendations. The charter for the ERM function can be found at the Company's website at www.appletonideas.com (investor information section).

108

**Item 11.**                    **Executive Compensation**

**Compensation Discussion and Analysis**

    *Goals and Policies.* The Executive Compensation Goals and Policies, adopted by the Compensation Committee of the board of directors of Appleton, establish the objectives of the Company's compensation program as follows:

-    enable the Company to attract, motivate and retain highly qualified people;

-    provide compensation opportunities that are competitive for similar positions within similar companies when company performance meets pre-established goals;

-    include a performance-based variable pay component that supports the Company's strategic business goals; and

-    act in the best interests of the Company's beneficial owners, the participants in the ESOP.

    *Compensation Elements.* The Company's executive compensation includes base salary, annual performance-based incentive pay, long-term performance-based incentive pay and benefits, including general benefits available to all employees and specific executive benefits. The Compensation Committee believes these elements of executive compensation provide the proper incentives and rewards for increasing shareholder value. Base salary provides market competitive compensation for executive management and leadership at a level that will attract highly qualified professionals. Annual performance-based incentive pay, in amounts based on market competitive values within the Company's labor market for executive talent, provides an incentive for executives to achieve the Company's annual performance goals. Long-term performance-based incentive pay provides executives with direct rewards for multi-year business performance that contributes to shareholder value over several years. Employee benefits provide health, welfare and retirement income benefits that enable employees, including executives, to maintain good health and provide financial security for employees and families in order to remain focused on the Company's success. The mix of elements of compensation is based on the proportion of those elements of executive compensation paid in the market.

    *Performance-Based Compensation.* When Company performance exceeds pre-established target goals for the year, performance-based pay elements (annual and long-term incentive) allow for compensation that exceeds the median market compensation. Conversely, when performance falls short of targeted goals, performance-based pay elements allow for compensation below median market compensation levels.

    The Compensation Committee believes that this combination of cash and equity-based compensation supports the objectives of the executive compensation program described above. First, these vehicles allow the Company to provide a competitive compensation package based on prevailing market practices. At the same time, a significant portion of target compensation is variable "at-risk" pay tied to both short-term performance and long-term performance. Variable pay for short-term performance is capped to protect the business from annual "windfall" results. The Compensation Committee believes these awards support the Company's pay-for-performance philosophy by linking pay amounts to the Company's level of performance and the achievement of the Company's strategic goals. The Compensation Committee believes that the Company's executive compensation program is not structured to encourage management to take unreasonable or excessive risks relating to the Company's business. Instead, the Compensation Committee believes that the compensation programs encourage management to take a balanced approach that focuses on delivering annual results and contributing to shareholder value. The pay that is fixed and at risk varies by position. As shown in the table below, the Company's emphasis on pay-for-performance resulted in performance-based compensation representing a significant portion of the total target compensation of the named executive officers in fiscal year 2012. Executive compensation includes more pay at risk than that of other employees in the organization.

**2012 Total Direct Compensation Mix at Target Company Performance**

|  | Fixed (Salary) | Pay at Risk (Annual and Long-Term Incentives)[1] |
|---|---|---|
| Mark R. Richards<br>Chairman, President, Chief Executive Officer and a Director of Appleton, and Chairman, President, Chief Executive Officer and a Director of PDC | 30% | 70% |
| Thomas J. Ferree<br>Senior Vice President Finance, Chief Financial Officer and Treasurer of Appleton, and Chief Financial Officer and Treasurer of PDC | 37% | 63% |
| Kerry S. Arent<br>Senior Vice President, Human Resources of Appleton | 48% | 52% |
| Tami Van Straten<br>Vice President, General Counsel & Secretary of Appleton | 59% | 41% |
| Jeffrey J. Fletcher<br>Vice President and Controller of Appleton, and Assistant Treasurer and Controller of PDC | 62% | 38% |
| Kent E. Willetts<br>Former Senior Vice President of Appleton | 46% | 54% |

(1)    Calculated using annual incentive paid at target plus restricted stock units and long-term incentive. Long- term incentive expected value based on Black-Scholes valuation methodology. The assumptions used for a January 1, 2012 valuation are: Expected life: 6.5 years (mid-point of 3 and 10 years vesting period); Dividend yield: 0% (plan does not pay dividends); Risk Free Interest Rate (based on Treasury Constant Maturities yield curve): 1.29% ; Volatility (based on peer group volatility for previous 6.5 years): 44%. The LTIP grant as of January 1, 2012 is valued at $6.74 per share with a $15.01 per share grant price. The Restricted Stock Unit grant as of January 1, 2012  is valued at $15.01 per share grant price.

*Market Survey Process*. The Compensation Committee determines competitive market pay by means of market surveys and analyses conducted every other year by nationally recognized, non-employee executive compensation consultants who report to the Compensation Committee. In the years in which the consultant does not conduct a full market survey and analysis, a general rate of market increase is established for executive compensation and the rate of increase is applied to the market pay determined in the prior year's analysis.

The Company's consultants use a broad-based survey of general industry companies with a median revenue of approximately $2 billion (243 participating companies), regressed to the Company's revenue size. The specific identity of these companies was not provided to the Compensation Committee. A second source of proxy data from forty (40) publicly traded companies, including paper and general manufacturers with revenues between $450 million and $7.8 billion (median is $2.3 billion), regressed to the Company's revenue size is also used. These companies, which were identified to the Compensation Committee, consisted of AEP Industries Inc; AptarGroup Inc.; Arctic Cat Inc.; Avery Dennison Corp; Ball Corp; Bemis Co Inc; Briggs&Stratton Corp.; Cenveo Inc.; Crane Co.; Crown Holdings Inc; Donaldson Co Inc.; Ecolab Inc.; H.B. Fuller Co.; Graco Inc.; Graphic Packaging Corp; Kennametal Inc.; Lennox International Inc.; MeadWestvaco Corp; Herman Miller Inc; Modine Manufacturing Co; Myers Industries Inc.; NACCO Industries Inc.; Owens-Illinois Inc.; Packaging Corp Of America; Pactiv Corp; Pentair Inc.; Polaris Industries Inc.; Rock-Tenn Co; Sealed Air Corp; Silgan Holdings Inc; Snap-On Inc; Sonoco Products Co; Teleflex Inc; Temple-Inland Inc.; Toro Co (The); Valmont Industries Inc; Valspar Corp (The); West Pharmaceutical Services Inc.; Winnebago Industries Inc.; and Worthington Industries Inc. This sample was chosen by the compensation consultants because it best represents the Company's labor market for executive talent, which is broader than the paper industry, and provides a reasonable sample size that allows the Company to track changes in the labor market for executive talent. The two sources produced similar data.

Appleton's senior vice president of human resources provides the consultant with descriptions of the Company's executives' responsibilities but does not participate in the market surveys or analyses provided by the consultant. The senior vice president of human resources also provides organizational and technical support to the Compensation Committee by coordinating the work of the compensation consultant and providing relevant information about company policies and practices. On occasion, Appleton's senior vice president of human resources may provide additional analyses under the direction of the Compensation Committee for their use and review. The Chief Executive Officer (the "CEO") provides a description of the Company's business but does not participate in the market surveys or analyses.

A full market survey was conducted in November 2010. In November 2011, a general rate of market increase (2.9%) was established for executive compensation and applied to the November 2010 market pay. The results were used in 2012 compensation planning. The updated market analysis shows that the Company is competitive with the market across all elements of compensation – base salary, target annual incentive and total compensation (sum of base salary, target annual incentive and target long-term incentive). Competitive is defined as above the 25th percentile and below the 75th percentile of the survey data. The total target compensation for each executive in 2012 is between 101% and 121% of the median (50th percentile) of the survey data, excluding Mr. Fletcher and Ms. VanStraten, whose positions were not covered in the 2010 full market survey. Although the Compensation Committee considers executive compensation paid at companies included in the market survey, the Committee does not attempt to maintain a specified target percentile within the market to determine executive compensation.

In 2012, Towers Watson was paid $41,445 in fees for executive compensation consulting, and $443,543 in fees for all other retirement consulting, administrative fees and actuarial services for the Company's plans.

***Compensation Decisions.*** The Compensation Committee reviews and approves individual executive salaries based on the market pay for the executive's position and the executive's general level of performance in the position. At times, prior salary may influence a decision on current salary. An executive fully performing the duties of a position will be paid market pay for that position. An executive not yet fully performing in a position may receive less than market pay. An executive new to the role will typically be paid at market within three years. An executive making contributions significantly in excess of those expected for the position may receive above market pay. The Compensation Committee uses quantitative and qualitative metrics and exercises some judgment in determining achievement of the overall company and division performance goals and assessing the named executive's individual performance for the prior year. The Compensation Committee uses an evaluation of individual performance in determining increases to base salary and awarding annual performance-based incentive compensation and long-term compensation.

The Compensation Committee is responsible for authorizing the compensation of the CEO, subject to ratification by the board of directors, approving the compensation of the named executive officers who report directly to the CEO based on the recommendations of the CEO, and reviewing the compensation plans applicable to the other executive officers. The CEO is responsible for approving all other pay. The Compensation Committee considers market analysis and data from Towers Watson in authorizing and approving compensation arrangements for executive officers. Decisions to increase or decrease executive compensation materially, if any, are based on: (1) significant changes in individual performance; (2) significant changes in job duties and responsibilities; and/or (3) review of market pay levels to ensure compensation is competitive.

***Annual Performance-Based Incentive Plan.*** In 2012, the Appleton Annual Incentive Plan's annual performance-based incentive is measured by Earnings Before Interest, Taxes, Depreciation, Amortization, and Inventory reduction (EBITDAI) (80% weighting) and Cash Conversion Days (CCD) (20% weighting). The Annual Incentive Plan allows for adjustments, as recommended by the Chief Financial Officer (the "CFO") and approved by the Compensation Committee, to the calculation of EBITDAI. These adjustments are restricted to special circumstances such as restructuring, refinancing, acquisitions, divestitures, mark-to-market pension adjustments or other items the committee determines should be adjusted and is then referred to as Adjusted EBITDAI. Incentive payouts will reflect performance levels relating to Adjusted EBITDAI and CCD performance measures for the Company or Division level. EBITDAI is an indicator of the Company's profitability and financial performance and is calculated as follows: EBITDAI equals Net Income (including incentive accrual expense) plus Interest, Taxes, Depreciation, Amortization, Inventory reduction and Gains and Losses from Foreign currency exchange.

CCD is a measure of the Company's effective cash management by monitoring days outstanding (DO). CCD is calculated as Accounts Receivable DO plus Inventory DO minus Accounts Payable DO. The cash conversion cycle measures the time between outlay of cash and the cash recovery. Cash conversion cycles are based on four primary factors: (1) the number of days it takes customers to pay what they owe; (2) the number of days it takes the Company to make its product; (3) the number of days the product sits in inventory before it is sold; and (4) the length of time the Company has to pay its vendors.

Performance below Adjusted EBITDAI threshold will result in no annual performance-based incentive compensation. Targets were set at a level of improvement from the prior year performance as listed below.

### 2012 All Appleton Performance Goals ($ millions)

|  | All Appleton Adjusted EBITDAI | CCD |
|---|---|---|
| Outstanding | $103 | 55 days |
| Target | $95 | 58 days |
| Threshold | $87 | 63 days |

111

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

The annual performance-based incentive when performance results are at target is 85% of base salary for the CEO, 60% of base salary for the CFO, 50% of base salary for the senior vice president human resources and 40% for the vice president and controller and 40% for the vice president, secretary and general counsel. For 2013, the Compensation Committee increased the annual performance-based incentive at target to 100% of base salary for the CEO, 55% of base salary for the senior vice president of human resources and 50% of the base salary for the vice president, secretary and general counsel.

In 2012, EBITDAI for "All Appleton" calculated per the plan document resulted in a total EBITDAI of $45.2 million. Adjustments were recommended by the CFO and approved by the Compensation Committee for business restructuring, the supplier strategic alliance conversion expenses including pension withdrawal expense, retiree plans mark-to-market, corporate development expenses, and environmental expense insurance recovery. These adjustments resulted in Adjusted EBITDAI of $104.1 million (outstanding level). Actual CCD performance, adjusted for transition to the supplier, was 55 days (outstanding level). The combined incentive payout resulted in Outstanding performance equal to 200% of target.

For each executive other than the CEO, the CEO has discretion to increase or decrease the executive's annual performance-based incentive bonus by as much as 20% of the earned incentive without Compensation Committee approval based on the executive's achievement of strategic business objectives established by the CEO at the beginning of the fiscal year. These objectives may relate to business segment margin improvement, manufacturing operations performance, new business growth, or leadership competency. Some of these objectives may be measurable while others may require more judgment and discretion to evaluate. The Compensation Committee approved discretionary bonuses for 2012 that exceeded 20%. Further, at the recommendation of the Compensation Committee, the Board approved a discretionary bonus for the CEO. Thus, as a result of the executives' unique achievement on the supplier strategic alliance, flawless execution of the transition to the supplier strategic alliance and special corporate development work, the following discretionary bonus amounts were awarded: Mr. Richards 31%, Mr. Ferree 44%, Ms. Arent 39%, Mr. Fletcher 94%, and Ms. Van Straten 99%. The percentages are calculated as a percent of earned incentive. These one-time discretionary awards reflect the unique strategic achievements in 2012 and were made in accordance with the terms of the annual incentive plan.

**Long-Term Compensation**. Prior to 2010, the Company had two forms of long-term compensation, the Appleton Papers Inc. Long-Term Incentive Plan (or the LTIP) and the Appleton Papers Inc. Long-Term Performance Cash Plan (or the Performance Cash Plan). In 2010, the Compensation Committee elected to discontinue awards under the LTIP and Performance Cash Plan and introduced a new long-term compensation plan, the Long-Term Restricted Stock Unit Plan (RSU). The Compensation Committee determined that it would be advisable in appropriate cases to consider the award of units under the RSU, which provide for future cash payments based on the value of PDC common stock, in lieu of or in combination with units under the LTIP, which produce value only if the PDC common stock price increases over the grant price. This determination reflected the desire to maintain a strong long-term equity component in executive compensation, to reduce the number of equity-based units required to provide such component and to adjust compensation practices appropriately in light of accounting standards requiring companies to recognize compensation cost related to share-based payment transactions. In 2010, the Committee determined to make all of its equity-based grants under the RSU. In 2011, the Committee determined to make all of its equity-based grants under the LTIP. The Compensation Committee determined that equity-based grants in 2012 were to be a combination of approximately 50% RSU and 50% LTIP grants for all named executive officers. All grants under the RSU and the LTIP are subject to vesting and forfeiture provisions, thereby creating incentives for executives and employees to remain with the Company. The Compensation Committee believes that long-term incentive plans are necessary to encourage retention of executive talent and provide appropriate incentives to increase shareholder value. Individual grant levels for named executive officers are determined so that total targeted compensation, including base salary, target bonus and most recent grant of long term compensation awards, is competitive with the external market for total compensation.

*Long-Term Incentive Plan*. The purpose of the LTIP is to attract and retain key management employees who are in a position to make a significant contribution to the growth and profitability of the Company by providing a reward for increase in stock performance to align with long-term shareholder interests. The LTIP provides for future cash payments based on increases in the value of PDC common stock, as determined by the semi-annual valuation provided by the ESOP trustee. The Compensation Committee of the board will establish the number of units granted each year in accordance with the Compensation Committee's stated goals and policies. The units are valued, as of the date of the grant, at the most recent PDC stock price as determined by the semi-annual ESOP valuation. The cash payment upon the exercise of a unit is equal to the increase in the value of PDC common stock from the date of grant until the exercise date. Recipients are required to enter into a non-compete and non-solicitation agreement in order to receive units under the LTIP which, if violated following the receipt of units, results in forfeiture of any and all rights to receive payment relating to LTIP units. As of December 31, 2012, 90 current or former executive and management employees participate in the LTIP. Some of these employees also participate in the RSU.

112

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm        117/147

Employees are generally entitled to exercise any LTIP units only after holding the units for at least three years and for up to ten years from the date of grant. There were no units exercised by a named executive officer under the LTIP during 2012. All named executive officers have LTIP units that have been held for more than three years. In the event of a change of control, described below, the LTIP units become immediately exercisable. A "change of control" is defined in the LTIP, and was further clarified in 2010, as:

- the termination of the ESOP or amendment of the ESOP so that it ceases to be an employee stock ownership plan;

- an event whereby the ESOP ceases to own a majority interest in the Company;

- the sale, lease, exchange or other transfer of all or substantially all of the Company assets to another entity;

- termination of the Company's business, liquidation, dissolving or selling substantially all stock;

- the Company's merger or consolidation with another company and the Company is not the surviving company and the Company is not controlled by the persons or entities who controlled the Company immediately prior to such merger or consolidation; or

- any other event whereby ownership and control is effectively transferred.

Upon termination of a participant's employment due to death, disability or retirement, the award of LTIP units shall be one-third vested and exercisable for each completed year of employment after the grant of such LTIP units. Upon termination of employment for any other reason, any LTIP units held for at least three years are then exercisable, and any units held for fewer than three years are forfeited. Mr. Willetts forfeited LTIP units upon his departure from the Company.

The first grant of LTIP units occurred on November 9, 2001, with additional awards made effective as of January 1, 2003, January 1, 2004, July 1, 2005, each January 1 from 2006 through 2009, January 2, 2011 and January 1, 2012. The actual awards of LTIP units have not been and will likely not be made on the effective date. The actual awards will be made on a date following the effective date as long as the share price has not changed since the effective date. This delay is a result of the administrative time needed by the trustee to determine and communicate the most recent PDC stock price through the semi-annual ESOP valuation process. The Compensation Committee determines awards for the CEO and reviews the recommendations made by the CEO for other named executive officers. Management decides which employees are in a position to make a significant contribution to the Company's growth and profitability, and of the employees who receive LTIP awards, most receive such awards based on the Company's succession planning and leadership management process.

*Long-Term Performance Cash Plan.* Appleton's board of directors adopted the Performance Cash Plan for the purpose of attracting and retaining senior executive employees who are in a position to make a significant contribution to the Company's long-term strategic objectives of revenue growth and profitability. The plan provided annual grants of long-term cash-based performance awards, which were earned by participants based on the Company's achievement of pre-established performance measures and the participant's continued employment. Performance measures included increases in average revenue growth and average return on invested capital over a three-year performance period. Targets were set above historical industry medians. The plan was an unfunded bonus program of the Company and did not permit participants to elect to defer their compensation. No awards were made since 2009. The Long-Term Performance Cash Plan was terminated by the Board effective February 1, 2013.

At, or shortly after, the start of the three-year performance cycle, a target award was established for each participant. Target awards, based on market competitive values, are expressed as a fixed dollar amount. The target award for the 2009 – 2011 cycle was equal to $373,000 for Mr. Richards, $116,000 for Mr. Ferree and $69,000 for Mr. Willetts. At the end of the performance cycle, the award was determined based upon the Compensation Committee's evaluation of the Company's performance against the pre-established performance measures. For the 2009-2011 performance cycle, the resulting award value could range from 50% to 150% of the target award. Performance below the minimum results in zero compensation and overall payments are capped at 150% of target. At the end of 2011, performance for the 2009-2011 cycle was 52.76% of target bonus. Incentives were paid to Mr. Richards ($196,795), Mr. Ferree ($61,202), and Mr. Willetts ($36,404).

The 2009-2011 performance cycle was calculated against equally weighted target metrics of average revenue growth and average return on invested capital (ROIC) over the same period of time. The 2009–2011 performance cycle metrics were as follows:

### 2009 – 2011 Performance Cycle Metrics

|  | Minimum | Target | Maximum |
| --- | --- | --- | --- |
| 3-Year Average Revenue Growth | 0.5% | 2.5% | 5.0%+ |
| 3-Year Average ROIC | 6.0% | 8.5% | 11.0%+ |

113

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

The first performance cycle was from January 1, 2008, through December 31, 2010. At the end of 2010, actual performance was below threshold, thus no incentive was paid. The second performance cycle was from January 1, 2009, through December 31, 2011.

*Long-Term Restricted Stock Unit Plan (RSU).* Appleton's board of directors adopted the RSU plan effective January 3, 2010, for the purpose of attracting and retaining key management employees who are in a position to make a significant contribution to the growth and profitability of the Company by providing a reward for stock performance to align with long-term shareholder interests. Additional awards were made effective as of January 1, 2012. The RSU provides for future cash payments based on the value of PDC common stock, as determined by the semi-annual valuation provided by the ESOP trustee. The Compensation Committee of the board will establish the number of units granted each year in accordance with the Compensation Committee's stated goals and policies. The units are valued, as of the date of the grant, at the most recent PDC stock price as determined by the semi-annual ESOP valuation. Units are generally vested three years after the award date and paid in 2012. There were no RSU grants that vested and paid in 2012. The cash payment upon vesting of a unit is equal to the value of PDC common stock at the most recent valuation date times the number of units vested. Other current executive and key management employees also participate in the RSU. Recipients are required to enter into a non-compete and non-solicitation agreement in order to receive units under the RSU which, if violated following the receipt of units, results in forfeiture of any and all rights to receive payment relating to RSU units. As of December 31, 2012, 75 executive and management employees participate in the RSU. Some of these employees also participate in the LTIP.

Termination provisions, including defined change of control events, are the same as those described above in the LTIP. Mr. Willetts forfeited RSUs upon his termination from the company.

*Equity Ownership.* The Company's executives are eligible to participate in the ESOP in the same manner and with the same rights as all other U.S. employees. Because the ESOP is a tax-qualified plan subject to ERISA, the Company may not require executive participation in the ESOP at a specified level nor may the Company take any adverse employment action against an executive for the exercise of his or her right to participate or not participate in the ESOP. The Company believes, however, that it is in the best interests of the employees, as beneficial owners of the ESOP, to have executives acquire and maintain equity interests in the Company.

*Termination or Change of Control.* The Company has entered into Termination Protection Agreements (or TPAs) with Mr. Richards, Mr. Ferree, Ms. Arent and Mr. Willetts. The Company has entered into an Enhanced Severance Agreement with Mr. Fletcher and Ms. Van Straten. These agreements provide for payments to the executive officers in the event of termination whether before or within two years after a "change of control," as defined in the TPA, the executive officer's employment is terminated other than for misconduct or "permanent disability," as defined in the TPA, or if the executive officer terminates employment for "good reason," as defined in the TPA. "Change of Control" is defined to include various events whereby ownership and control of the Company is effectively transferred. These events were chosen by the Company as appropriate events to trigger payment based on competitive market analysis of such agreements for executive officers. Mr. Willetts received payments under his TPA as a result of his departure in December 2012. These payments are described in detail under "Accrued Post-Employment Payments" below. The TPAs and Enhanced Severance Agreements are discussed in detail under "Potential Payments upon Termination or Change of Control" below.

On February 22, 2012, Appleton's board of directors adopted a special retention incentive program designed to retain certain executives and other employees who are in a position to make a significant contribution in identifying, negotiating and closing a Potential Transaction. A Potential Transaction was defined to include one or more of the following transactions or series of transactions:  the issuance of equity securities in connection with an acquisition, a merger or business combination with an unrelated entity, the sale of equity in a private placement or public offering, a sale of all or substantially all of the assets of Appleton or PDC, an exchange of debt securities for equity, or any combination of the foregoing transactions. In exchange for continued employment through a Potential Transaction, the named executives would receive payments in the event a Change of Control occurs as defined in the Long-Term Incentive Plan as a result of a Potential Transaction. Amounts payable would be as approved by the board of directors in consideration of any given Potential Transaction. This retention incentive was not considered eligible compensation for retirement income or severance benefit calculations. The Board terminated this plan effective February 1, 2013.

*Executive Benefits.* In 2012, the Company provided a cash allowance in lieu of perquisites to all named executive officers. The Company believes the amounts provided to the CEO ($25,000), senior vice presidents ($15,000), and corporate controller and general counsel ($10,000) are competitive to the value provided by other companies for a car allowance, club memberships, etc. The Company also provides the opportunity for the CEO and senior vice presidents to enroll in an individual life insurance policy. The cash allowances in lieu of perquisites were eliminated effective December 31, 2012 for all executive officers. An equivalent amount was added to the base salary effective January 1, 2013 for all executive officers except the CEO.

114

**Compensation Committee Report**

The 2012 Compensation Committee consisted of three independent directors including Ms. Seifert, who serves as the Compensation Committee Chair, Mr. Suwyn and. Mr. Reardon.

The Compensation Committee is appointed annually by Appleton's board of directors and operates pursuant to a Charter, which is available at www.appletonideas.com (investor information section). The Compensation Committee is responsible for authorizing the compensation of the CEO subject to ratification by the board of directors, approving the compensation of the named executive officers who report directly to the CEO based on the recommendations of the CEO and reviewing the compensation plans for other executive officers. It is also responsible for adopting and amending the Company's general compensation policies and benefit plans, including the ESOP. The Compensation Committee may not delegate, and has not delegated, any of these duties to others.

The Compensation Committee has reviewed and discussed the above section titled "Compensation Discussion and Analysis" with management and, based on this review and discussion, recommended the inclusion of the "Compensation Discussion and Analysis" section in this annual report.

Members of the 2012 Compensation Committee
Kathi P. Seifert, Chairperson
Andrew F. Reardon
Mark A. Suwyn

<center>115</center>

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | LTIP Awards ($)[1] | RSU Awards ($)[2] | Non-Equity Incentive Plan Compensation ($)[3] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)[4] | All Other Compensation ($)[5] | Total ($)[6] |
|---|---|---|---|---|---|---|---|---|---|
| Mark R. Richards Chairman, President, Chief Executive Officer and a Director of Appleton, and Chairman, President, Chief Executive Officer and a Director of PDC | 2012 | 800,000 | 376,000[7] | 808,800 | 600,400 | 1,224,000 | 255,610 | 148,516 | 4,213,326 |
| | 2011 | 800,000 | 0 | 1,567,500 | 0 | 546,179[8] | 133,043 | 99,937 | 3,146,659 |
| | 2010 | 792,308 | 0 | 0 | 861,900 | 185,202 | 150,475 | 39,785 | 2,029,670 |
| Thomas J. Ferree Senior Vice President Finance, Chief Financial Officer and Treasurer of Appleton, and Chief Financial Officer and Treasurer of PDC | 2012 | 402,462 | 200,000[7] | 293,190 | 217,645 | 458,807 | 49,828 | 75,029 | 1,696,961 |
| | 2011 | 388,500 | 16,468[9] | 513,000 | 0 | 170,988[8] | 44,151 | 53,944 | 1,187,051 |
| | 2010 | 385,654 | 0 | 0 | 278,460 | 58,330 | 66,117 | 35,785 | 824,346 |
| Kerry S. Arent Senior Vice President, Human Resources of Appleton | 2012 | 256,846 | 100,000[7] | 101,100 | 75,050 | 256,846 | 140,987 | 44,878 | 975,707 |
| | 2011[10] | 238,423 | 9,184[9] | 208,050 | 0 | 61,228[8] | 107,593 | 35,448 | 659,926 |
| Tami L. Van Straten Vice President, General Counsel & Secretary | 2012[11] | 199,231 | 150,000[7] | 37,070 | 30,020 | 151,416 | 35,231 | 29,075 | 632,043 |
| Jeffrey J. Fletcher Vice President and Controller of Appleton, and Assistant Treasurer and Controller of PDC | 2012 | 209,179 | 150,000[7] | 30,330 | 22,515 | 158,976 | 23,235 | 29,655 | 623,890 |
| | 2011[10] | 204,000 | 8,058[9] | 68,400 | 0 | 41,942[8] | 23,486 | 16,554 | 362,440 |
| Kent E. Willetts Former Senior Vice President of Appleton | 2012[12] | 277,519 | 0 | 121,320[13] | 90,060[13] | 0 | 13,944 | 493,860 | 996,703 |
| | 2011 | 272,000 | 10,290[9] | 213,750 | 0 | 105,002[8] | 37,906 | 34,291 | 673,239 |
| | 2010 | 270,769 | 7,446[14] | 0 | 185,640 | 37,231 | 47,388 | 28,639 | 577,113 |

116

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

(1)    In 2011, the LTIP grant date fair value is calculated based on a Black-Scholes valuation methodology. The assumptions used for January 2, 2011 grant are: Expected life: 6.5 years (mid-point of 3 and 10 years vesting period); Dividend yield: 0% (plan does not pay dividends); Risk Free Interest Rate (based on Treasury Constant Maturities yield curve): 2.71%; Volatility (based on peer group volatility for previous 6.5 years): 40%. The LTIP grant as of January 2, 2011 is valued at $5.70 per share with a $12.84 per share grant price. In 2012, the assumptions used for January 1, 2012 grant are: Expected life: 6.5 years (mid-point of 3 and 10 years vesting period); Dividend yield: 0% (plan does not pay dividends); Risk Free Interest Rate (based on Treasury Constant Maturities yield curve): 1.29%; Volatility (based on peer group volatility for previous 6.5 years): 44%. The LTIP grant as of January 1, 2012 is valued at $6.74 per share with a $15.01 per share grant price.

(2)    Units awarded for January 3, 2010 under the RSU plan are valued at the grant price ($13.26 per share) multiplied by the number of units granted. Units awarded for January 1, 2012 under the RSU plan are valued at the grant price ($15.01 per share) multiplied by the number of units granted.

(3)    Non-equity performance-based incentive plan compensation consists of payments under Appleton's Annual Incentive Plan and the Performance Cash Plan. Amounts paid under the Annual Incentive Plan are determined based on company and business segment performance and other extraordinary factors, positive or negative, determined by the CEO and the Compensation Committee. Amounts paid under the Annual Incentive Plan are earned in 2012 and paid in 2013. The Performance Cash Plan reflects the compensation costs recognized by the Company for financial reporting purposes and ASC 718 for long-term non-equity performance-based incentives. There were no awards paid in 2012 under the Performance Cash Plan.

(4)    The valuation methods and material assumptions used in determining the change in pension value are discussed in detail in Note 16 of the Consolidated Financial Statements in Item 8, above.

(5)    The aggregate incremental costs of all perquisites are stated as actual costs to the Company.

All other compensation for 2012 consists of the following for each named executive officer:

Mr. Richards: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $121,156, allowance in lieu of perquisites $25,000, and executive life insurance $2,360.

Mr. Ferree: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $53,093, allowance in lieu of perquisites $15,000, tax gross up on travel and entertainment for spouse to company events $1,652, travel and entertainment for spouse to company events $3,179, and executive life insurance $2,104.

Ms. Arent: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $28,498, allowance in lieu of perquisites $15,000, and executive life insurance $1,380.

Ms. Van Straten: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $14,354, allowance in lieu of perquisites $9,616, tax gross up on travel and entertainment for spouse to company events $1,746, and travel and entertainment for spouse to company events $3,359.

Mr. Fletcher: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $19,655, and allowance in lieu of perquisites $10,000.

Mr. Willetts: Company match and company retirement contribution to KSOP defined contribution plan and related Excess Plan $15,000, allowance in lieu of perquisites $14,711, and FICA on estimated SERP $744. Employment terminated December 14, 2012. As a result of his departure, Mr. Willetts will receive $550,472 in accrued post-employment/severance payments including $87,067 in SERP benefits, $19,906 in COBRA health benefits, $9,800 in outplacement services, and $427,500 in accordance with Termination Protection Agreement.

(6)    In 2010, the following executives deferred the following indicated amounts into the Nonqualified Excess Plan: Mr. Richards ($65,280). In 2011, the following executives deferred the following indicated amounts into the Nonqualified Excess Plan: Mr. Richards ($40,000). In 2012, the following executives deferred the following indicated amounts into the Nonqualified Excess plan: Mr. Richards ($117,877) and Ms. Arent ($35,206). These deferrals are also described in the Nonqualified Deferred Compensation table.

(7)    In 2012, the following executives received a discretionary bonus amount: Mr. Richards 31%, Mr. Ferree 44%, Ms. Arent 39%, Ms. Van Straten 99% and Mr. Fletcher 94%. The discretionary bonus amount is represented as a percent of the earned incentive. The discretionary awards were made in accordance with the terms of the annual incentive plan.

(8)   In 2011, the value of Non-Equity Incentive Payments for each of the named executives is as follows:
      Mr. Richards: Performance Cash Plan ($196,795); Annual ($349,384)
      Mr. Ferree: Performance Cash Plan ($61,202); Annual ($109,786)
      Ms. Arent: Annual ($61,228)
      Mr. Fletcher: Annual ($41,942)
      Mr. Willetts:  Performance Cash Plan ($36,404; Annual ($68,598)
(9)   In 2011, the following executives received a discretionary bonus in the amount of 15% of the earned incentive: Mr. Ferree,
      Ms. Arent and Mr. Willetts. Mr. Fletcher received a discretionary bonus of 19% of the earned incentive.
(10)  Ms. Arent and Mr. Fletcher became named officers in 2011.
(11)  Ms. Van Straten became a named officer in 2012.
(12)  Mr. Willetts departed on December 14, 2012.
(13)  Awards that were granted were forfeited at departure.
(14)  Mr. Willetts received a discretionary bonus amount in 2010 of 20% of the earned incentive.

<div align="center">118</div>

**Grants of Plan-Based Awards**

| Name | Plan | Grant Date[(1)] | Approval Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards[(2)] | | | All Other Stock Awards: Number of Securities Underlying Units (#)[(3)] | Grant Date Fair Value of Stock Awards ($)[(4)] |
|---|---|---|---|---|---|---|---|---|
| | | | | Threshold ($) | Target ($) | Maximum ($) | | |
| Mark R. Richards | Annual Performance-Based Incentive Plan | | | 68,000 | 680,000 | 1,360,000 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 2/22/2012 | | | | 120,000 | 808,800 |
| | Restricted Stock Unit Plan | 1/1/2012 | 2/22/2012 | | | | 40,000 | 600,400 |
| Thomas J. Ferree | Annual Performance-Based Incentive Plan | | | 24,148 | 241,477 | 482,954 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 1/12/2012 | | | | 43,500 | 293,190 |
| | Restricted Stock Unit Plan | 1/1/2012 | 1/12/2012 | | | | 14,500 | 217,645 |
| Kerry S. Arent | Annual Performance-Based Incentive Plan | | | 12,842 | 128,423 | 256,846 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 1/12/2012 | | | | 15.000 | 101,100 |
| | Restricted Stock Unit Plan | 1/1/2012 | 1/12/2012 | | | | 5,000 | 75,050 |
| Tami L. Van Straten | Annual Performance-Based Incentive Plan | | | 7,969 | 79,692 | 159,385 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 1/12/2012 | | | | 5,500 | 37,070 |
| | Restricted Stock Unit Plan | 1/1/2012 | 1/12/2012 | | | | 2,000 | 30,020 |
| Jeffrey J. Fletcher | Annual Performance-Based Incentive Plan | | | 8,367 | 83,671 | 167,343 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 1/12/2012 | | | | 4,500 | 30,330 |
| | Restricted Stock Unit Plan | 1/1/2012 | 1/12/2012 | | | | 1,500 | 22,515 |
| Kent E. Willetts | Annual Performance-Based Incentive Plan[(5)] | | | 15,675 | 156,750 | 313,500 | | |
| | Long-Term Incentive Plan | 1/1/2012 | 1/12/2012 | | | | 18,000[(5)] | 121,320 |
| | Restricted Stock Unit Plan | 1/1/2012 | 1/12/2012 | | | | 6,000[(5)] | 90,060 |

119

(1) The Grant Date for units under the Company's Long-Term Incentive Plan reflects the date upon which the units were awarded to the named executive officer.

(2) All Non-Equity Incentive Plan awards are made under the Company's Annual Incentive Plan. Projected payouts are based, or will be based, on Company financial performance. The Threshold, Target and Maximum payouts stated are based on 2012 salaries for the Annual Incentive Plan. Actual amounts earned in 2012 and paid in 2013 are stated in the Non-Equity Incentive Plan Compensation column of the Summary Compensation Table.

(3) Represents grants of units under the Company's Long-Term Incentive Plan or Restricted Stock Unit Plan.

(4) The units granted under the Company's LTIPs are valued, as of the date of the grant, at the most recent PDC stock price as determined by the semi-annual ESOP valuation. Value is calculated using a Black-Scholes valuation methodology. The assumptions used for valuation are: Expected life: 6.5 years (mid-point of 3 and 10 years vested period); Dividend yield: 0% (plan does not pay dividends); Risk Free Interest Rate (based on Treasury Constant maturities yield curve): 1.29%; Volatility (based on peer group volatility for previous 6.5 years): 44%. The LTIP grant as of January 1, 2012 is valued at $6.74 per share with a $15.01 per share grant price. The RSU units are valued, as of the Grant Date, at the most recent PDC stock price as determined by the semi-annual ESOP valuation. The RSU grant as of January 1, 2012 is valued at $15.01 per share.

(5) Units granted were forfeited at departure on December 14, 2012 and no annual incentive will be paid for 2012.

<center>120</center>

---

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm      125/147

*Cash Compensation*. The amounts included in the Summary Compensation Table generally describe the total accrued cost to the Company of executive compensation, but in some cases describe the SEC prescribed fair value at time of grant. However, in either case much of that compensation was not paid to the Company's executives in cash in the year reported. The following table sets out the total compensation, the elements which were accrued but not paid in each year, and the resulting net cash compensation to each of the executives. Some executives elected to defer some of that net cash compensation.

### Cash Compensation Table

| Name | Year | Total Compensation ($)[1] | Less Non-Cash Compensation | | | Net Cash Compensation ($) |
| | | | Long-Term Awards ($)[2] | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | Other ($)[3] | |
|---|---|---|---|---|---|---|
| Mark R. Richards | 2012 | 4,213,326 | 1,409,200 | 255,610 | 2,360 | 2,546,156 |
| | 2011 | 3,146,659 | 1,567,500 | 133,043 | 3,136 | 1,442,980 |
| | 2010 | 2,029,670 | 861,900 | 150,475 | | 1,017,295 |
| Thomas J. Ferree | 2012 | 1,696,961 | 510,835 | 49,828 | 3,756 | 1,132,542 |
| | 2011 | 1,187,051 | 513,000 | 44,151 | 2,770 | 627,130 |
| | 2010 | 824,346 | 278,460 | 66,117 | | 479,769 |
| Kerry S. Arent | 2012 | 975,707 | 176,150 | 140,987 | 1,380 | 657,190 |
| | 2011 | 659,926 | 208,050 | 107,593 | 1,380 | 342,903 |
| Tami L. Van Straten | 2012 | 632,043 | 67,090 | 35,231 | 1,746 | 527,976 |
| Jeffrey J. Fletcher | 2012 | 623,890 | 52,845 | 23,235 | 0 | 547,810 |
| | 2011 | 362,440 | 68,400 | 23,486 | 0 | 270,554 |
| Kent E. Willetts | 2012 | 996,703 | 211,380 | 13,944 | 452,443[4] | 318,936 |
| | 2011 | 673,239 | 213,750 | 37,906 | 1,907 | 419,676 |
| | 2010 | 577,113 | 185,640 | 47,388 | | 344,085 |

(1) Total Compensation includes the Annual Incentive Pay Plan. Amounts paid under the Annual Incentive Pay Plan are earned in year reported and paid in following year.

(2) LTIP Option Awards (2011 and 2012) and RSU Option Awards (2010 and 2012). Performance Cash Plan (2011) is cash compensation.

(3) Tax gross-ups and life insurance.

(4) Also includes accrued severance.

121

**Outstanding Equity Awards at Fiscal Year-End**

    Awards in the table describe units issued under the Company's Long-Term Incentive Plan (LTIP) in 2012 and prior years. Awards in the table describe units issued under the Company's Restricted Stock Unit Plan (RSU) in 2012 and prior years. All prior awards granted to Mr. Willetts were forfeited on his departure date or as of December 31, 2012.

### LTIP Awards

| Name | Grant Date | Number of Securities Underlying Unexercised Units Exercisable(#) | Number of Securities Underlying Unexercised Units Unexercisable(#) | Grant Price ($) | Date Fully Vested[1] | Expiration Date[1] |
|---|---|---|---|---|---|---|
| Mark R. Richards | 01/01/12 | 0 | 120,000 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11 | 0 | 275,000 | 12.84 | 01/02/14 | 01/02/21 |
| | 01/01/09 | 155,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 100,000 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 01/01/07 | 90,000 | 0 | 33.62 | 01/01/10 | 01/01/17 |
| | 01/01/06 | 85,000 | 0 | 28.56 | 01/01/09 | 01/01/16 |
| | 07/01/05 | 85,000 | 0 | 27.77 | 07/01/08 | 07/01/15 |
| Thomas J. Ferree | 01/01/12 | 0 | 43,500 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11 | 0 | 90,000 | 12.84 | 01/02/14 | 01/02/21 |
| | 01/01/09 | 45,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 31,000 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 01/01/07 | 25,000 | 0 | 33.62 | 01/01/10 | 01/01/17 |
| Kerry S. Arent | 01/01/12 | 0 | 15,000 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11 | 0 | 36,500 | 12.84 | 01/02/14 | 01/02/21 |
| | 07/01/09 | 14,000 | | 18.87 | 07/01/12 | 07/01/19 |
| | 01/01/09 | 10,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 5,000 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 01/01/06 | 3,000 | 0 | 28.56 | 01/01/09 | 01/01/16 |
| | 07/01/05 | 2,000 | 0 | 27.77 | 07/01/08 | 07/01/15 |
| | 01/01/04 | 1,600 | 0 | 23.36 | 01/01/07 | 01/01/14 |
| | 01/01/03 | 1,600 | 0 | 21.92 | 01/01/06 | 01/01/13 |
| Tami L. Van Straten | 01/01/12 | 0 | 5,500 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11 | 0 | 10,000 | 12.84 | 01/02/14 | 01/02/21 |
| | 01/01/09 | 4,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 3,000 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 01/01/07 | 3,000 | 0 | 33.62 | 01/01/10 | 01/01/17 |
| | 01/01/06 | 3,000 | 0 | 28.56 | 01/01/09 | 01/01/16 |
| | 01/01/04 | 3,000 | 0 | 23.36 | 01/01/07 | 01/01/14 |
| | 01/01/03 | 1,000 | 0 | 21.92 | 01/01/06 | 01/01/13 |
| Jeffrey J. Fletcher | 01/01/12 | 0 | 4,500 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11 | 0 | 12,000 | 12.84 | 01/02/14 | 01/02/21 |
| | 01/01/09 | 10,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 6,000 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 02/05/07 | 6,000 | 0 | 33.62 | 02/05/10 | 02/05/17 |
| Kent E. Willetts | 01/01/12[2] | 0 | 18,000 | 15.01 | 01/01/15 | 01/01/22 |
| | 01/02/11[2] | 0 | 37,500 | 12.84 | 01/02/14 | 01/02/21 |
| | 01/01/09 | 27,000 | 0 | 21.43 | 01/01/12 | 01/01/19 |
| | 01/01/08 | 18,500 | 0 | 33.41 | 01/01/11 | 01/01/18 |
| | 01/01/07 | 18,500 | 0 | 33.62 | 01/01/10 | 01/01/17 |
| | 01/01/06 | 18,500 | 0 | 28.56 | 01/01/09 | 01/01/16 |
| | 11/14/05 | 18,500 | 0 | 27.77 | 11/14/08 | 11/14/15 |

122

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm　　　　127/147

**RSU Awards**

| Name | Grant Date | Number of Underlying Securities That Have Not Vested (#)[3] | Market Value of Underlying Securities That Have Not Vested ($)[4] | Date Fully Vested |
|---|---|---|---|---|
| Mark R. Richards | 01/01/12 | 40,000 | 702,000 | 01/01/15 |
| | 01/03/10 | 65,000 | 1,140,750 | 01/03/13 |
| Thomas J. Ferree | 01/01/12 | 14,500 | 254,475 | 01/01/15 |
| | 01/03/10 | 21,000 | 368,550 | 01/03/13 |
| Kerry S. Arent | 01/01/12 | 5,000 | 87,750 | 01/01/15 |
| | 01/03/10 | 9,000 | 157,950 | 01/03/13 |
| Tami L. Van Straten | 01/01/12 | 2,000 | 35,100 | 01/01/15 |
| | 01/03/10 | 2,500 | 43,875 | 01/03/13 |
| Jeffrey J. Fletcher | 01/01/12 | 1,500 | 26,325 | 01/01/15 |
| | 01/03/10 | 5,000 | 87,750 | 01/03/13 |
| Kent E. Willetts | 01/01/12 | 6,000[2] | 0 | |
| | 01/03/10 | 14,000[2] | 0 | |

(1) Employees are generally entitled to exercise any LTIP units only after holding the units for at least three years and for up to ten years from the date of grant.

(2) Forfeited upon departure.

(3) RSU units are vested three years after the award date and paid at vesting.

(4) The market value of RSU units that have not vested was calculated by multiplying the number of units by the PDC stock price of $17.55 as of December 31, 2012 as determined by the semi-annual ESOP valuation.

123

**Pension Benefits**

| Name | Plan Name | Number of Years of Credited Service (#) | Present Value of Accumulated Benefit ($)[1] | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| Mark R. Richards | Pension | 6.0 | 165,371 | 0 |
| | SERP | 6.0 | 682,446 | 0 |
| Thomas J. Ferree | Pension | 4.4 | 139,736 | 0 |
| | SERP | 4.4 | 138,992 | 0 |
| Kerry S. Arent | Pension | 28.8 | 655,381 | 0 |
| | SERP | 28.8 | 50,695 | 0 |
| Tami Van Straten | Pension | 10.1 | 135,503 | 0 |
| | SERP | 10.1 | 0 | 0 |
| Jeffrey J. Fletcher | Pension | 4.1 | 146,547 | 0 |
| | SERP | 4.1 | 9,831 | 0 |
| Kent E. Willetts | Pension | 5.3 | 129,930 | 0 |
| | SERP | 5.3 | 87,067 | 0 |

(1)     The valuation methods and material assumptions used in determining the present value of accumulated pension benefits are discussed in detail in Note 16 of the Consolidated Financial Statements in Item 8, above.

*Pension Plan and Supplemental Executive Retirement Plan ("SERP").* The Company maintains a broad-based tax-qualified, noncontributory defined benefit pension plan for eligible salaried employees, referred to as the Pension Plan. Benefits under the Pension Plan vest after five years of service. Benefits are based on years of service and employee pay. The Company has also established the SERP to provide retirement benefits for management and other highly compensated employees whose benefits are reduced by the tax-qualified plan limitations in the Pension Plan. Benefits under the Pension Plan and the SERP are paid as annuities (except for small benefits defined as less than $20,000). The SERP benefit, when added to the Pension Plan benefit, provides a combined benefit equal to the benefit under the Pension Plan as if certain tax-qualified plan limitations did not apply. The total combined benefit under the plans is equal to 1.0% of final average compensation up to Social Security covered compensation, plus 1.4% of final average compensation above Social Security covered compensation, multiplied by years of benefit service (limited to 35 years). Under the Pension Plan and the SERP, a pension is payable upon retirement at age 65 with 5 years of service. Benefit payments may begin as early as age 55. The benefit is actuarially reduced when payments begin earlier than age 62. In accordance with the terms of the plan, the Company provides an enhancement to the benefit for all eligible salaried employees when age plus service equals 65 or more at the time of termination. The pension benefits are based on years of credited service and the average annual compensation received during the highest five full consecutive calendar years of the last ten years prior to termination or March 1, 2011, whichever occurs first. Compensation covered by the plans includes base salary, bonus and deferred compensation.

In December 2007, it was announced that the Pension Plan covering eligible salaried employees, of which certain named executives officers are participants, will be frozen effective January 1, 2015 and replaced with a broad-based tax-qualified, noncontributory defined contribution benefit which is referred to as the Retirement Contribution benefit described below. New hires were not permitted in the plan on or after January 1, 2008. All eligible participants in the Pension Plan, including named executive officers, were given a one-time opportunity to accelerate participation in the Retirement Contribution benefit by electing to freeze their benefit in the Pension Plan and begin receiving the Retirement Contribution benefit effective April 1, 2008. In December 2010, it was announced that the effective date of the freeze would be changed from January 1, 2015 to March 1, 2011.

124

**Nonqualified Deferred Compensation**

| Name | Executive Contributions in Last Fiscal Year ($) (1) | Company Contributions in Last Fiscal Year ($)(2) | Aggregate Earnings in Last Fiscal Year ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at December 31, 2012 ($) |
|---|---|---|---|---|---|
| Mark R. Richards | 117,877 | 98,656 | 87,959 | 0 | 1,225,949 |
| Thomas J. Ferree | 0 | 30,593 | 544 | 0 | 43,922 |
| Kerry S. Arent | 35,206 | 8,498 | 1,557 | 0 | 45,261 |
| Jeffrey J. Fletcher | 0 | 918 | 0 | 0 | 918 |
| Tami Van Straten | 0 | 0 | 0 | 0 | 0 |
| Kent E. Willetts | 0 | 0 | 13,721 | (86,379) | 0 |

(1)     Employee Contributions to the Nonqualified Excess Plan may include base salary and/or annual performance-based incentive pay. Amounts reported as deferred under the Nonqualified Excess Plan are included as part of Total Compensation in the Summary Compensation Table.

(2)     Excess Plan contribution related to Retirement Contribution Benefit (see below).

**Nonqualified Excess Plan.** On February 1, 2006, the Company established a Nonqualified Excess Plan for approximately 100 highly compensated employees including directors and executive officers. This plan was established for the purpose of allowing a tax-favored option for saving for retirement when the Code limits the ability of highly compensated employees to participate under tax-qualified plans. This plan allows for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and/or up to 75% of a participant's annual performance-based incentive pay. Participants in the plan choose to have deferrals deemed invested in selected mutual funds. The Company invests funds equal to the amounts deferred by participants in the mutual funds which the participants select for their deemed investments. These funds are the Company's assets to which the participants have no claim other than as general creditors of the Company. The Company pays administrative expenses of the plan and annually adds funds to the plan to make up for any difference between the participants' deemed investments and the actual performance of the investments.

**Retirement Contribution Benefit and Excess Plan.** As a replacement to the pension plan, any management employee hired on or after January 1, 2008, or those electing to freeze their accrued benefit under the pension plan on April 1, 2008 or March 1, 2011, will begin receiving a contribution for future retirement benefits into the 401(k) fund of the Appleton Papers Retirement Savings and Employee Stock Ownership Plan (KSOP). The contribution is a points-based formula ranging from 1% to 5% of total compensation based on the employee's age and service and is the same benefit provided to other eligible employees.

The Company has also established a benefit within the above referenced Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP Plan. This benefit provides the same 1% to 5% contribution calculated on excluded pay. There is an additional "KSOP match" of 6% of excluded pay which is calculated regardless of whether the employee participates in the KSOP plan.

**Accrued Post-Employment Payments**

Upon termination of employment, Mr. Willetts became entitled to the post-employment payments set forth below under the terms of a Termination Protection Agreement which may be paid out over a period of eighteen (18) months. The total accrued payments are included in the All Other Compensation in the Summary Compensation Table.

**Accrued Post-Employment Payments**

| Name | Unused Vacation Paid at Termination ($) | COBRA Health Benefits ($) | Outplacement Services ($) | Termination Protection Payments ($) | Company FICA To Be Paid ($) | Total ($) |
|---|---|---|---|---|---|---|
| Kent E. Willetts | $0 | $19,906 | $9,800 | $427,500 | $6,199 | $463,405 |

125

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

130/147

The table below reflects the amount of compensation that would be paid to each of the named executive officers in the event of termination of such executive's employment under various scenarios. The amounts shown assume that such termination would be effective December 31, 2012. Mr. Willetts is no longer employed by the Company. These amounts are estimates; the actual amounts to be paid can only be determined at the time of a termination or a change of control.

### Potential Payments upon Termination or Change of Control

| Name | Termination Other Than for Misconduct or With Good Reason | COBRA Health Benefits ($)[1] | Outplacement Services ($) | Termination Protection Payments ($)[2] | Long-Term Incentive Plans ($)[3] | Company FICA To Be Paid ($)[4] | Tax Gross-Up Payments ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Mark R. Richards | Without Change of Control | 19,906 | 9,800 | 2,424,000 | 1,140,750 | 51,689 | 0 | 3,646,145 |
| | Within two years of Change of Control | 39,811 | 9,800 | 5,649,200 | 3,503,870 | 132,720 | 0 | 9,335,401 |
| Thomas J. Ferree | Without Change of Control | 19,906 | 9,800 | 1,066,307 | 368,550 | 20,805 | 0 | 1,485,368 |
| | Within two years of Change of Control | 26,541 | 9,800 | 1,754,807 | 1,157,415 | 42,227 | 0 | 2,990,790 |
| Kerry S. Arent | Without Change of Control | 19,906 | 9,800 | 646,846 | 157,950 | 11,671 | 0 | 846,173 |
| | Within two years of Change of Control | 26,541 | 9,800 | 1,036,846 | 446,715 | 21,513 | 0 | 1,541,415 |
| Tami L. Van Straten | Without Change of Control | 13,270 | 9,800 | 311,416 | 43,875 | 5,152 | 0 | 383,513 |
| | Within one year of Change of Control | 13,270 | 9,800 | 311,416 | 140,045 | 6,547 | 0 | 481,078 |
| Jeffrey J. Fletcher | Without Change of Control | 13,270 | 9,800 | 327,072 | 87,750 | 6,015 | 0 | 443,907 |
| | Within one year of Change of Control | 13,270 | 9,800 | 327,072 | 182,025 | 7,382 | 0 | 539,549 |
| Kent E. Willetts | Without Change of Control | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Within two years of Change of Control | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(1) COBRA Health Benefits amounts stated in this table are based on cost of high deductible medical and comprehensive dental plan options.

(2) Includes Termination Protection Payments (or Enhanced Severance Payment for Mr. Fletcher and Ms. Van Straten) and Prorated Annual Incentive.

(3) In the event of a change of control as defined in the Termination Protection Agreements, the LTIP and RSU become immediately exercisable. The amount reflects the value of all outstanding awards on December 31, 2012, including the value of January 3, 2010 grants that were paid out on February 22, 2013. The value of outstanding RSU units is determined by multiplying the number of units outstanding for each grant date by the PDC unit value on December 31, 2012. The value of outstanding LTIP units is determined by multiplying the number of units outstanding for each grant date by the change in unit value from the date of the grant to December 31, 2012.

(4) Assumes company Medicare rate at 1.45%.

126

*Termination Protection Agreements.* The Company has entered into Termination Protection Agreements with Mr. Richards, Mr. Ferree, Mr. Willetts and Ms. Arent that comply with Section 409A of the Internal Revenue Code. The agreements provide that if, at any time other than within two years after a "change of control," as defined below, the Company terminates the executive officer's employment other than for misconduct, or "permanent disability," as defined below, or the executive officer terminates employment for "good reason," as defined below, then the executive officer will continue to receive payments in accordance with the Company's normal payroll practices for 18 months  following termination of employment at a rate equal to the executive officer's base salary in effect on the date on which his or her employment terminates. The payments to the executive officer would be reduced after twelve months from the date of termination by amounts he or she earns through other employment during the remaining portion of the 18-month salary continuation period. The payments would cease completely if the executive officer, at any time, directly or indirectly (whether a shareholder, owner, partner, consultant, employee or otherwise) engaged in a competing business, referred to in the Termination Protection Agreements as a "major business," as defined below.

If, within two years of a change of control, the Company terminates the executive officer's employment other than for misconduct, or permanent disability, or he or she terminates for good reason, then he or she is entitled to a lump-sum cash payment. This payment will be equal to two times his or her annual base salary (2.99 times for the CEO), plus a multiple of two times his or her targeted bonus (2.99 times for the CEO) for the fiscal year in which his or her employment terminates, or if no such bonus has been established for the fiscal year of termination, then the bonus for the fiscal year prior to termination is used. The executive officer will also be entitled to a lump-sum cash payment representing a partial bonus for the year of termination, based on the number of days the executive officer worked for the Company in the year of termination.

The Company has entered into enhanced severance agreements with Mr. Fletcher and Ms. Van Straten. The agreements provide that if the Company terminates Mr. Fletcher's or Ms. Van Straten's employment other than for misconduct or "permanent disability," or if Mr. Fletcher or Ms. Van Straten terminate employment for "good reason," as defined below, Mr. Fletcher or Ms. Van Straten will continue to receive payments in accordance with the Company's normal payroll practices for 52 weeks. The first 26 weeks will be paid at a rate of 100% of base salary and the next 26 weeks will be paid at a rate of 60% of base salary. Mr. Fletcher and Ms. Van Straten are also entitled to a lump-sum cash payment representing a partial bonus for the year of termination, based on the number of full months Mr. Fletcher and Ms. Van Straten worked for the Company in the year of termination. These agreements remain in effect for 12 months following a change of control unless the Company gives 12 months advance notice prior to a change of control.

Whether or not an executive officer's employment terminates within two years of a change of control, the executive officer would also receive his or her salary through the date of termination and all other amounts owed to the executive officer at the date of termination under the Company's benefit plans. In addition, if the executive officer's employment terminates as described in either of the preceding paragraphs, he or she would be entitled to reimbursement for outplacement services and continued health and dental coverage for the executive officer and the executive officer's family for the length of severance.

A "change of control" is defined in these agreements as a change in ownership or effective control of the Company or a change in the ownership of a substantial portion of the assets of the Company, as defined by the occurrence of any one of the following events;

- the date upon which a third party acquires ownership of Company stock constituting more than 50% of the total fair market value of total voting power of the stock of the Company;

- the date upon which any third party acquires (during a 12-month period ending on the date of the most recent acquisition) ownership of the Company stock constituting more than 35% of the total voting power of the stock of the Company;

- the date upon which a majority of the Company's Board of Directors are replaced during a 12-month period, and the new appointments are not endorsed by a majority of the Board prior to the date of appointment; or

- the date upon which any third party acquires (during a 12-month period ending on the date of the most recent acquisition) assets of the Company having a gross fair market value of at least 40% of the total gross fair market value of all assets of the Company immediately prior to such acquisition.

"Permanent disability" is defined in these agreements as any time an executive officer is entitled to receive benefits under Title II of the Social Security Act.

127

"Good reason" is defined in these agreements as, prior to a change of control, without the executive officer's consent, a reduction of 25% or more of the executive officer's base salary, and after a change of control:

- a decrease in the executive officer's position or responsibilities without his or her consent;

- failure to pay the executive officer's salary or bonus in effect immediately prior to a change of control;

- the relocation of the executive officer's principal place of employment without his or her consent; or

- failure by any successor entity to expressly assume and agree to the terms of the Termination Protection Agreement.

"Major business" is defined in these agreements as any business segment of the Company (e.g., carbonless paper, thermal paper or other business segments) that: (a) produced more than 5% of the revenues of the Company in the last full fiscal year prior to the executive's termination; or (b) is projected to produce more than 5% of the revenues of the Company in the fiscal year of the executive's termination or in either of the two succeeding fiscal years following the executive's termination. Executive officers shall be deemed not a shareholder of a company that would otherwise be a competing entity if the executive officer's record and beneficial ownership of the capital stock of such company amount to not more than 1% of the outstanding capital stock of any such company subject to the periodic and other reporting requirements of Section 13 or Section 15(d) of the Exchange Act.

### 2012 Director Compensation

| Name | Fees Earned or Paid in Cash ($)[1] | Stock Awards ($)[2] | Total ($) |
|---|---|---|---|
| Stephen P. Carter | 57,500 | 35,000 | 92,500 |
| Terry M. Murphy | 62,500 | 35,000 | 97,500 |
| Andrew F. Reardon | 60,000 | 35,000 | 95,000 |
| Kathi P. Seifert | 60,000 | 35,000 | 95,000 |
| Mark A. Suwyn | 55,000 | 35,000 | 90,000 |
| George W. Wurtz | 55,000 | 35,000 | 90,000 |

(1) Non-employee directors are entitled to participate in the Company's Nonqualified Excess Plan and may defer 100% of their fees. Mr. Murphy deferred $62,500 of his cash compensation into that plan.

(2) On January 2, 2012, each of the then non-employee directors were issued 1165.9 deferred compensation units valued at the December 31, 2011 share price of $15.01 per share ($17,500). On July 2, 2012, each of the then non-employee directors were issued 930.9 deferred compensation units valued at the June 30, 2012 share price of $18.80 per share ($17,500). The amounts reflect the aggregate grant date fair value computed in accordance with Financial Accounting Standards Codification Topic.

**Non-Employee Director Compensation.** Cash compensation to directors of Appleton and PDC, who are not employees of Appleton, PDC or any of their subsidiaries, consists of $55,000 in annual retainer fees and $10,000 annually for serving as the chairman of the Audit Committee, $5,000 annually for serving as the chairman of the Compensation Committee or Corporate Governance Committee. These compensation levels have been in effect since 2009. For 2013, at the recommendation of management, the board approved an increase in the committee chair compensation to $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee, thus maintaining competitive market pay. Committee chair responsibilities are described in Item 10. Director fees are paid quarterly in advance of the services being provided. If a director ceases to be a director during a quarter, the cash compensation for the quarter is not prorated. There are no separate fees paid for participation in committee or board meetings.

Directors also receive deferred compensation of $35,000 awarded in units which track PDC common stock. This award level has been in effect since 2006. To maintain competitive market pay, the value of awarded units will increase to $55,000 in 2013. Deferred compensation will be calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. If a director ceases to be a director during the six-month period, the deferred compensation will be prorated for the time served as a director. The deferred compensation will be paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. The value of the installment payment will be determined by the PDC common stock price in effect at the time of payment. In the event of death, disability or change in control, the deferred compensation will fully vest and be paid in a single sum using the PDC common stock price most recently determined by the ESOP trustee. No non-employee director has a compensation arrangement which differs from these standard compensation arrangements. On March 7, 2013, the board adopted The Appleton Papers Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan.

128

https://www.sec.gov/Archives/edgar/data/1144326/000114432613000002/form10-k.htm

**Item 12.**      **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The Appleton Papers Employee Stock Ownership Trust, whose address is c/o State Street Global Advisors, One Lincoln Street, Boston, Massachusetts 02111, owns beneficially and of record 100% of the issued and outstanding shares of PDC. PDC owns beneficially and of record 100% of the issued and outstanding shares of Appleton.

The following table sets forth as of December 31, 2012, the number of shares, if any, allocated to the accounts of the directors, the named executive officers and the directors and executive officers as a group in Appleton Stock Fund of the KSOP.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership [1] | Percent |
|---|---|---|
| Mark R. Richards | 18,767 | * |
| Thomas J. Ferree | 23,171 | * |
| Kerry S. Arent | 31,629 | * |
| Tami L. Van Straten | 9,417 | * |
| Jeffrey J. Fletcher | 2,407 | * |
| James R. Hillend | 20,072 | * |
| Kent E. Willetts | 15,216 | * |
| Stephen P. Carter | — [2] | * |
| Terry M. Murphy | — [2] | * |
| Andrew F. Reardon | — [2] | * |
| Kathi P. Seifert | — [2] | * |
| Mark A. Suwyn | — [2] | * |
| George W. Wurtz | — [2] | * |
| All directors and executive officers as a group (13 persons) | 120,679 | 1.38% |

*Less than 1%.

(1) Participants in the KSOP have the right to direct the ESOP trustee to vote shares of common stock which have been allocated to that participant's ESOP account either for or against specified corporate events relating to PDC. For all other shareholder votes, the ESOP trustee will vote all shares of common stock held by the ESOP as directed by the ESOP committee, subject to the security holders agreements described above under "Item 10. Directors, Executive Officers and Corporate Governance." Participants have statutory diversification rights beginning at age 55, conditional diversification rights, and the right to receive distributions from the participant's KSOP account upon retirement, death, disability, resignation, dismissal or permanent layoff. Participants may not sell, pledge or otherwise transfer the shares of common stock allocated to their KSOP accounts.

(2) Non-employee directors are not eligible to participate in the KSOP.

**Item 13.**      **Certain Relationships and Related Transactions and Director Independence**

None.

129

**Item 14.**      **Principal Accountant Fees and Services**

Audit Fees. The aggregate fees billed for professional services rendered by PricewaterhouseCoopers LLP for both the audit of financial statements as of and for the years ended December 29, 2012 and December 31, 2011, and the review of the financial statements included in the Quarterly Reports on Form 10-Q and assistance with and review of documents filed with the SEC, including those related to the discontinued business combination transaction, during those periods were $2,226,667 in 2012 and $504,907 in 2011. During 2012, PricewaterhouseCoopers LLP did not bill any aggregate fees for audit-related services. The aggregate fees billed in 2011 for audit-related services were $77,709 and related to certain accounting consultations.

Tax Fees. The aggregate fees billed by PricewaterhouseCoopers LLP for tax services were $210,313 in 2012 and $5,590 in 2011. The 2012 fees relate to the discontinued business combination transaction as well as tax compliance for Rose Holdings Limited in the United Kingdom. The 2011 fees relate to tax compliance for Rose Holdings Limited.

All Other Fees. There were other fees of $1,800 in both 2012 and 2011 billed by PricewaterhouseCoopers LLP.

<p align="center">130</p>

**PART IV**

**Item 15.**          **Exhibits and Financial Statement Schedules**

(a)(1)    Financial Statements.
          Report of Independent Registered Public Accounting Firm
                  Paperweight Development Corp. and Subsidiaries                                                    43
                  Appleton Papers Inc. and Subsidiaries                                                            44

          Consolidated Balance Sheets as of December 29, 2012 and December 31, 2011
                  Paperweight Development Corp. and Subsidiaries                                                    45
                  Appleton Papers Inc. and Subsidiaries                                                            46

          Consolidated Statements of Comprehensive Loss for the years ended December 29, 2012,
            December 31, 2011 and January 1, 2011
                  Paperweight Development Corp. and Subsidiaries                                                    47
                  Appleton Papers Inc. and Subsidiaries                                                            48

          Consolidated Statements of Cash Flows for the years ended December 29, 2012, December 31,
            2011 and January 1, 2011
                  Paperweight Development Corp. and Subsidiaries                                                    49
                  Appleton Papers Inc. and Subsidiaries                                                            50

          Consolidated Statements of Redeemable Common Stock, Accumulated Deficit and Accumulated              51
          Other Comprehensive
          Income for the years ended December 29, 2012, December 31, 2011 and January 1, 2011 for
          Paperweight Development
          Corp. and Subsidiaries

          Consolidated Statements of Equity for the years ended December 29, 2012, December 31, 2011          52
          and January 1, 2011 for Appleton Papers Inc. and Subsidiaries

          Notes to Consolidated Financial Statements                                                          53

          Report of Independent Registered Public Accounting Firm on Financial Statement Schedule
                  Paperweight Development Corp. and Subsidiaries                                              138
                  Appleton Papers Inc. and Subsidiaries                                                      139

(a)(2)    SCHEDULE II - Valuation and Qualifying Accounts                                                    140

(a)(3)    Exhibits.

3.1      Second Amended and Restated Certificate of Incorporation of Appleton Papers Inc. Incorporated by reference to Exhibit 3.1 to the Registrants'
         Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

3.2      Amended and Restated By-laws of Appleton Papers Inc. Incorporated by reference to Exhibit 3.2 to the Registrants' Registration Statement on Form S-
         4 (Registration No. 333-82084) filed on February 4, 2002.

3.2.1    Amendment to Amended and Restated By-laws of Appleton Papers Inc. Incorporated by reference to Exhibit 3.2.1 to Amendment No. 2 to the
         Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on May 15, 2002.

3.2.2    Amendment to Amended and Restated By-laws of Appleton Papers Inc. Incorporated by reference to Exhibit 3.2.2 to the Registrants' Annual Report
         on Form 10-K for the year ended December 28, 2002.

3.3      Amended and Restated Articles of Incorporation of Paperweight Development Corp. Incorporated by reference to Exhibit 3.3 to the Registrants'
         Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

3.4      Amended and Restated By-laws of Paperweight Development Corp. Incorporated by reference to Exhibit 3.4 to the Registrants' Registration Statement
         on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

| 4.1 | Indenture, dated as of June 11, 2004, between Appleton Papers Inc. and each of the guarantors named therein and U.S. Bank National Association, as trustee governing the 9 3/4 Senior Subordinated Notes due 2014 (the "Senior Subordinated Notes Indenture"). Incorporated by reference to Exhibit 4.2 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 4, 2004. |
|---|---|
| 4.2 | Form of registered Senior Subordinated Note (included as Exhibit A1 to the Senior Subordinated Notes Indenture). Incorporated by reference to Exhibit 4.4 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 2, 2010. |
| 4.3 | First Supplemental Indenture, dated as of January 11, 2005, among Appleton Papers Inc., each of the guarantors named therein and U.S. Bank National Association, as trustee, governing the 9 3/4% Senior Subordinated Notes due 2014. Incorporated by reference to Exhibit 4.6 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 29, 2007. |
| 4.4 | Second Supplemental Indenture, dated as of June 13, 2006, among Appleton Papers Inc., each of the guarantors named therein and U.S. Bank National Association, as trustee, governing the 9 3/4% Senior Subordinated Notes due 2014. Incorporated by reference to Exhibit 4.2 to the Registrant's current report on Form 8-K filed June 16, 2006. |
| 4.5 | Form of 9 3/4% Senior Subordinated Notes due 2014. Incorporated by reference to Exhibit 4.4 to the Registrant's current report on Form 8-K filed on June 16, 2006. |
| 4.6 | Third Supplemental Indenture, dated as of September 9, 2009, among Appleton Papers Inc., as issuer, each of the guarantors named therein and U.S. Bank National Association, a trustee, governing the 9 3/4% Senior Subordinated Notes due 2014. Incorporated by reference to Exhibit 4.3 to the Registrant's current report on Form 8-K filed October 6, 2009. |
| 4.7 | Indenture, dated as of September 30, 2009, among Appleton Papers Inc., as issuer, each of the guarantors named therein and U.S. Bank National Association, as trustee and collateral agent, governing the 11.25% Second Lien Notes due 2015 (the "Second Lien Notes Indenture"). Incorporated by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed October 6, 2009. |
| 4.8 | Form of Second Lien Notes due 2015 (included as Exhibits A1 and A2 to the Second Lien Notes Indenture). Incorporated by reference to Exhibit 4.14 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 2, 2010. |
| 4.9 | Second Lien Collateral Agreement, dated as of September 30, 2009, among Appleton Papers Inc., Paperweight Development Corp. and each other Grantor identified therein in favor of U.S. Bank National Association, as Collateral Agent. Incorporated by reference to Exhibit 4.14 to Registrants' Quarterly Report on Form 10-Q filed for the quarter ended July 3, 2011. |
| 4.10 | First Supplemental Indenture, dated as of January 29, 2010, among Appleton Papers Inc., as issuer, each of the guarantors identified therein and U.S. Bank National Association, as trustee and collateral agent, governing the 11.25% Second Lien Notes Due 2015. Incorporated by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed February 3, 2010. |
| 4.11 | Indenture, dated as of February 8, 2010, among Appleton Papers Inc., as issuer, each of the guarantors named therein and U.S. Bank National Association, as trustee and collateral agent, governing the 10.50% Senior Secured Notes due 2015 (the "Senior Secured Notes Indenture"). Incorporated by reference to Exhibit 4.1 to the Registrant's current report on Form 8-K filed February 12, 2010. |
| 4.12 | Form of 10 1/2% Senior Secured Notes due 2015 (included as Exhibit A to the Senior Secured Notes Indenture). Incorporated by reference to Exhibit 4.18 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 2, 2010. |
| 10.1 | Purchase Agreement by and among Arjo Wiggins Appleton p.l.c., Arjo Wiggins US Holdings Ltd., Arjo Wiggins North America Investments Ltd., Paperweight Development Corp. and New Appleton LLC, dated as of July 5, 2001. Incorporated by reference to Exhibit 10.4 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002. |
| 10.1.1 | Amendment to Purchase Agreement by and among Arjo Wiggins US Holdings Ltd., Arjo Wiggins North America Investments Ltd., Arjo Wiggins Appleton Ltd., Paperweight Development Corp. and New Appleton LLC, dated as of June 11, 2004. Incorporated by reference to Exhibit 10.2 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 4, 2004. |
| 10.2 | Fox River AWA Environmental Indemnity Agreement by and among Arjo Wiggins Appleton p.l.c., Appleton Papers Inc., Paperweight Development Corp. and New Appleton LLC, dated as of November 9, 2001. Incorporated by reference to Exhibit 10.1 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended October 2, 2011. |
| 10.2.1 | Amendment to Fox River AWA Environmental Indemnity Agreement by and among Paperweight Development Corp., New Appleton LLC, Appleton Papers Inc. and Arjo Wiggins Appleton Ltd., dated as of June 11, 2004. Incorporated by reference to Exhibit 10.3 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 4, 2004. |
| 10.3 | Fox River PDC Environmental Indemnity Agreement by and among Appleton Papers Inc. and Paperweight Development Corp., dated as of November 9, 2001. Incorporated by reference to Exhibit 10.7 to Amendment No. 1 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on April 17, 2002. |
| 10.3.1 | Amendment to Fox River PDC Environmental Indemnity Agreement by and among Appleton Papers Inc., Paperweight Development Corp. and New Appleton LLC, dated as of June 11, 2004. Incorporated by reference to Exhibit 10.4 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 4, 2004. |

10.4    Security Agreement by and among Appleton Papers Inc., Paperweight Development Corp., New Appleton LLC and Arjo Wiggins Appleton p.l.c., dated as November 9, 2001. Incorporated by reference to Exhibit 10.8 to Amendment No. 1 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on April 17, 2002.

10.5    Amended and Restated Relationship Agreement by and among Arjo Wiggins Appleton Ltd. (f/k/a Arjo Wiggins Appleton p.l.c.), Arjo Wiggins (Bermuda) Holdings Limited, Paperweight Development Corp., PDC Capital Corporation and Arjo Wiggins Appleton (Bermuda) Limited, dated as of June 11, 2004. Incorporated by reference to Exhibit 10.5 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 3, 2011.

10.6    Assignment and Assumption Deed, dated as of November 9, 2001, between Arjo Wiggins Appleton p.l.c. and Arjo Wiggins Appleton (Bermuda) Limited. Incorporated by reference to Exhibit 10.10 to Amendment No. 1 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on April 17, 2002.

10.7    Collateral Assignment, dated as of November 9, 2001, between Arjo Wiggins Appleton (Bermuda) Limited Paperweight Development Corp., New Appleton LLC and Appleton Papers Inc. Incorporated by reference to Exhibit 10.11 to Amendment No. 1 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on April 17, 2002.

10.8    Appleton Papers Inc. Employee Stock Ownership Trust, created September 6, 2001, effective June 1, 2001. Incorporated by reference to Exhibit 10.13 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

10.8.1    Amendment to Appleton Papers Inc. Employee Stock Ownership Trust, dated effective May 3, 2012.

10.9    Collateral Agreement made by Paperweight Development Corp., Appleton Papers Inc., and certain of its subsidiaries in favor of U.S. Bank National Association, as collateral agent, dated as of February 8, 2010. Incorporated by reference to Exhibit 4.2 to the Registrants' current report on Form 8-K filed February 12, 2010.

10.10    Collateral Agreement made by Appleton Papers Canada Ltd. in favor of U.S. Bank National Association, as collateral agent, dated as of February 8, 2010. Incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 3, 2011.

10.11    Credit Agreement, dated as of February 8, 2010, among Appleton Papers Inc., as borrower, Paperweight Development Corp., as holdings, Fifth Third Bank, as administrative agent, swing line lender and an L/C issuer, the other lenders party thereto and Fifth Third Bank, as sole lead arranger and sole book manager. Incorporated by reference to Exhibit 10.2 to the Registrants' Quarterly report on Form 10-Q for the quarter ended October 2, 2011.

10.11.1    First Amendment to Credit Agreement, dated as of August 27, 2010, among Appleton Papers Inc., as borrower, Paperweight Development Corp., as holdings, Fifth Third Bank, as administrative agent, swing line lender and an L/C issuer, and the other lenders party thereto. Incorporated by reference to Exhibit 10.12.1 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011.

10.11.2    Second Amendment to Credit Agreement, dated as of July 1, 2011, among Appleton Papers Inc., as borrower, Paperweight Development Corp., as holdings, Fifth Third Bank, as administrative agent, swing line lender and an L/C issuer, and the other lenders party thereto. Incorporated by reference to Exhibit 10.2.1 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended October 2, 2011.

10.11.3    Third Amendment to Credit Agreement, dated as of May 1, 2012, among Appleton Papers Inc., as borrower, Paperweight Development Corp., as holdings, Fifth Third Bank, as administrative agent, swing line lender and an L/C issuer, and the other lenders party thereto. Incorporated by reference to Exhibit 10.1 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 1, 2012.

10.12    Guarantee and Collateral Agreement made by Paperweight Development Corp., Appleton Papers Inc. and certain of its subsidiaries, in favor of Fifth Third Bank, as administrative agent, dated as of February 8, 2010. Incorporated by reference to Exhibit 10.6 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended July 3, 2011.

10.13    Guarantee and Collateral Agreement made by Appleton Papers Canada Ltd. in favor of Fifth Third Bank, as administrative agent, dated as of February 8, 2010.  Incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended July 3, 2011.

10.14    Appleton Papers Inc. New Deferred Compensation Plan, as amended on October 31, 2002, and restated effective as of November 9, 2001. Incorporated by reference to Exhibit 10.12 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2005.(1)

10.15    The Executive Nonqualified Excess Plan of Appleton Papers Inc., as amended and restated on January 1, 2013. (1)

10.15.1    Adoption Agreement, effective March 1, 2011, by Appleton Papers Inc. and Principal Life Insurance Company, as the provider. Incorporated by reference to Exhibit 10.2 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended April 3, 2011. (1)

10.16    Appleton Papers Inc. Supplemental Executive Retirement Plan, as amended through March 28, 2001. Incorporated by reference to Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2005. (1)

10.16.1    Amendment to the Appleton Papers Inc. Supplemental Executive Retirement Plan, effective January 1, 2009. Incorporated by reference to Exhibit 10.16.1 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 2, 2010. (1)

10.17    Form of Termination Protection Agreement. Incorporated by reference to Exhibit 10.13 to the Registrant's Annual Report on Form 10-K for the fiscal year ended January 3, 2009. (1)

10.17.1    Clarifying Amendment to Form of Termination Protection Agreement, effective November 11, 2010. Incorporated by reference to Exhibit 10.17.1 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 1, 2011. (1)

10.18      Form of Enhanced Severance Agreement. (1)

10.19      Termination Protection Agreement Amended and Restated for Mark R. Richards dated effective December 17, 2008. Incorporated by reference to Exhibit 10.14 to the Registrant's Annual Report on Form 10-K for the fiscal year ended January 3, 2009. (1)

10.19.1    Clarifying Amendment to Termination Protection Agreement Amended and Restated for Mark R. Richards, effective November 11, 2010. Incorporated by reference to Exhibit 10.19.1 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 1, 2011. (1)

10.20      Amended and Restated Intellectual Property Agreement among Appleton Papers Inc., WTA Inc., Appleton Coated Papers Holdings Inc. and Appleton Coated LLC, dated as of November 9, 2001. Incorporated by reference to Exhibit 10.20 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

10.21      Trademark License Agreement between Appleton Papers Inc., f/k/a Lentheric, Inc., and NCR Corporation, dated as of June 30, 1978. Incorporated by reference to Exhibit 10.21 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

10.22      Security Holders Agreement by and between Paperweight Development Corp. and the Appleton Papers Inc. Employee Stock Ownership Trust, dated as of November 9, 2001. Incorporated by reference to Exhibit 10.26 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

10.23      Security Holders Agreement by and among Paperweight Development Corp., Appleton Investment Inc. and Appleton Papers Inc., dated as of November 9, 2001. Incorporated by reference to Exhibit 10.25 to the Registrants' Registration Statement on Form S-4 (Registration No. 333-82084) filed on February 4, 2002.

10.24      Appleton Papers Retirement Savings and Employee Stock Ownership Plan, amended and restated generally effective January 1, 2009. Incorporated by reference to Exhibit 10.23 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 2, 2010. (1)

10.24.1    Resolution by Appleton's Board of Directors dated December 8, 2010, amending the Appleton Papers Inc. Retirement Savings and Employee Stock Ownership Plan, generally effective March 1, 2011. Incorporated by reference to Exhibit 10.24.2 to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 1, 2011. (1)

10.24.2    Resolution by Appleton's ESOP Administrative Committee and the Benefit Finance Committee of Appleton Papers Inc. effective October 1, 2011, amending Appleton Papers Retirement Savings and Employee Stock Ownership Plan, generally effective January 1, 2009. Incorporated by reference to Exhibit 10.26.2 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011. (1)

10.24.3    Resolution by Appleton's ESOP Administrative Committee effective January 1, 2012, amending Appleton Papers Retirement Savings and Employee Stock Ownership Plan, generally effective January 1, 2009. (1)

10.24.4    Resolution by Appleton's ESOP Administrative Committee effective October 8, 2012, amending Appleton Papers Retirement Savings and Employee Stock Ownership Plan, generally effective January 1, 2009. (1)

10.25      Amended and restated Appleton Papers Inc. Retirement Plan as amended through March 9, 2011. Incorporated by reference to Exhibit 10.1 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended April 3, 2011. (1)

10.25.1    Resolutions by the Benefit Finance Committee of Appleton Papers Inc. dated April 4, 2011 further amending the Appleton Papers Inc. Retirement Plan as amended through March 9, 2011. Incorporated by reference to Exhibit 10.1.1 to the Registrants' Quarterly Report on Form 10-Q for the quarter ended April 3, 2011. (1)

10.25.2    Resolutions by the Benefit Finance Committee of Appleton Papers Inc. effective July 1, 2012 further amending the Appleton Papers Inc. Retirement Plan as amended through March 9, 2011. (1)

10.25.3    Resolutions by the Benefit Finance Committee of Appleton Papers Inc. effective September 24, 2012, further amending the Appleton Papers Inc. Retirement Plan as amended through March 9, 2011. (1)

10.26      Form of Non-Employee Director Deferred Compensation Agreement. Incorporated by reference to Exhibit 10.4 of the Registrant's Quarterly Report on Form 10-Q for the quarter ended October 1, 2006. (1)

10.27      Appleton Papers Inc. Long-Term Incentive Plan, as amended and restated, effective as of January 1, 2011. Incorporated by reference to Exhibit 10.29 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011. (1)

10.28      Appleton Papers Inc. Long-Term Performance Cash Plan, amended and restated, effective November 11, 2010. Incorporated by reference to Exhibit 10.30 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011. (1)

10.29      Appleton Papers Inc. Long Term Restricted Stock Unit Plan, revised and restated effective November 11, 2010. Incorporated by reference to Exhibit 10.31 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011. (1)

134

| 10.30 | Stock Purchase Agreement between Appleton Papers Inc. and NEX Performance Films Inc. dated as of July 2, 2010. Incorporated by reference to Exhibit 2.1 to the Registrant's current report on Form 8-K/A filed August 9, 2010 (exhibits and schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K, but a copy will be furnished supplementally to the Securities and Exchange Commission upon request). |
|---|---|
| 10.31 | Supply Agreement dated as of February 22, 2012 between Domtar Paper Company, LLC, Domtar A.W. LLC and Appleton Papers Inc. (with certain confidential information deleted therefrom). Incorporated by reference to Exhibit 10.33 to the Registrants' Annual Report on Form 10-K for the fiscal year ended December 31, 2011. |
| 18.1 | Letter of Concurring Opinion from PricewaterhouseCoopers, dated March 11, 2011, to the Board or Directors of Paperweight Development Corp. and Subsidiaries regarding the preferability of change in accounting principle from the LIFO to the FIFO method. Incorporated by reference to the Registrants' Annual Report on Form 10-K for the fiscal year ended January 1, 2011. |
| 18.2 | Letter of Concurring Opinion from PricewaterhouseCoopers, dated March 13, 2013, to the Board of Directors of Appleton Papers Inc. and Subsidiaries regarding the preferability of changes in accounting principles to mark-to-market accounting for pension and other postretirement benefit plans, and to certain costs included in inventory. |
| 18.3 | Letter of Concurring Opinion from PricewaterhouseCoopers, dated March 13, 2013, to the Board of Directors of Paperweight Development Corp. and Subsidiaries regarding the preferability of changes in accounting principles to mark-to-market accounting for pension and other postretirement benefit plans, and to certain costs included in inventory. |
| 21.1 | Subsidiaries of Paperweight Development Corp. |
| 31.1 | Certification of Mark R. Richards, Chairman, President and Chief Executive Officer of Appleton Papers Inc., pursuant to Rule 15d-14(a) of the Securities Exchange Act of 1934 as amended. |
| 31.2 | Certification of Thomas J. Ferree, Senior Vice President Finance, Chief Financial Officer and Treasurer of Appleton Papers Inc., pursuant to Rule 15d-14(a) of the Securities Exchange Act of 1934 as amended. |
| 31.3 | Certification of Mark R. Richards, Chairman, President and Chief Executive Officer of Paperweight Development Corp., pursuant to Rule 15d-14(a) of the Securities Exchange Act of 1934 as amended. |
| 31.4 | Certification of Thomas J. Ferree, Senior Vice President Finance, Chief Financial Officer and Treasurer of Paperweight Development Corp., pursuant to Rule 15d-14(a) of the Securities Exchange Act of 1934 as amended. |
| 32.1 | Certification of Mark R. Richards, Chairman, President and Chief Executive Officer of Appleton Papers Inc., pursuant to 18 U.S.C. Section 1350. |
| 32.2 | Certification of Thomas J. Ferree, Senior Vice President Finance, Chief Financial Officer and Treasurer of Appleton Papers Inc., pursuant to 18 U.S.C. Section 1350. |
| 32.3 | Certification of Mark R. Richards, Chairman, President and Chief Executive Officer of Paperweight Development Corp., pursuant to 18 U.S.C. Section 1350. |
| 32.4 | Certification of Thomas J. Ferree, Senior Vice President Finance, Chief Financial Officer and Treasurer of Paperweight Development Corp., pursuant to 18 U.S.C. Section 1350. |
| 101.ins | XBRL Instance Document |
| 101.sch | XBRL Taxonomy Extension Schema |
| 101.cal | XBRL Taxonomy Extension Calculation Linkbase |
| 101.def | XBRL Taxonomy Extension Definition Linkbase |
| 101.lab | Taxonomy Extension Label Linkbase |
| 101.pre | Taxonomy Extension Presentation Linkbase |

(1)    Management contract or compensatory plan or arrangement.

Certain exhibits and schedules to the agreements filed herewith have been omitted. Such exhibits and schedules are described in the agreements and are not material. The Registrants hereby agree to furnish to the Securities and Exchange Commission, upon its request, any or all of such omitted exhibits or schedule.

## SIGNATURES

  Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="center">

APPLETON PAPERS INC.

</div>

By: /s/ Mark R. Richards
    Mark R. Richards
    President and Chief Executive Officer
Date: March 13, 2013

  Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ MARK R. RICHARDS<br>Mark R. Richards | Chairman, President, Chief Executive Officer and a Director (Principal Executive Officer) | March 7, 2013 |
| /s/ THOMAS J. FERREE<br>Thomas J. Ferree | Senior Vice President Finance, Chief Financial Officer and Treasurer (Principal Financial Officer) | March 7, 2013 |
| /s/ JEFFREY J. FLETCHER<br>Jeffrey J. Fletcher | Vice President, Controller and Assistant Treasurer | March 7, 2013 |
| /s/ STEPHEN P. CARTER<br>Stephen P. Carter | Director | March 7, 2013 |
| /s/ TERRY M. MURPHY<br>Terry M. Murphy | Director | March 7, 2013 |
| /s/ ANDREW F. REARDON<br>Andrew F. Reardon | Director | March 7, 2013 |
| /s/ KATHI P. SEIFERT<br>Kathi P. Seifert | Director | March 7, 2013 |
| /s/ MARK A. SUWYN<br>Mark A. Suwyn | Director | March 7, 2013 |
| /s/ GEORGE W. WURTZ<br>George W. Wurtz | Director | March 7, 2013 |

  **Supplemental Information to be furnished with reports filed pursuant to Section 15(d) of the Act by Registrants which have not registered securities pursuant to Section 12 of the Act.**

No annual report or proxy material has been provided to security holders covering the registrant's fiscal year 2012.

<div align="center">

136

</div>

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="right">

PAPERWEIGHT DEVELOPMENT CORP.

</div>

By:   /s/ Mark R. Richards

         Mark R. Richards
         President and Chief Executive Officer

Date:   March 13, 2013

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
| --- | --- | --- |
| /s/ MARK R. RICHARDS<br>Mark R. Richards | Chairman, President, Chief Executive Officer and a Director (Principal Executive Officer) | March 7, 2013 |
| /s/ THOMAS J. FERREE<br>Thomas J. Ferree | Senior Vice President Finance, Chief Financial Officer and Treasurer (Principal Financial Officer) | March 7, 2013 |
| /s/ JEFFREY J. FLETCHER<br>Jeffrey J. Fletcher | Vice President, Controller and Assistant Treasurer | March 7, 2013 |
| /s/ STEPHEN P. CARTER<br>Stephen P. Carter | Director | March 7, 2013 |
| /s/ TERRY M. MURPHY<br>Terry M. Murphy | Director | March 7, 2013 |
| /s/ ANDREW F. REARDON<br>Andrew F. Reardon | Director | March 7, 2013 |
| /s/ KATHI P. SEIFERT<br>Kathi P. Seifert | Director | March 7, 2013 |
| /s/ MARK A. SUWYN<br>Mark A. Suwyn | Director | March 7, 2013 |
| /s/ GEORGE W. WURTZ<br>George W. Wurtz | Director | March 7, 2013 |

**Supplemental Information to be furnished with reports filed pursuant to Section 15(d) of the Act by Registrants which have not registered securities pursuant to Section 12 of the Act.**

No annual report or proxy material has been provided to security holders covering the registrant's fiscal year 2012.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
**ON**
**FINANCIAL STATEMENT SCHEDULE**

To the Shareholder and Board of Directors of Paperweight Development Corp. and Subsidiaries:

Our audits of the consolidated financial statements referred to in our report dated March 13, 2013 appearing in this Annual Report on Form 10-K also included an audit of the financial statement schedule listed in Item 15(a)(2) of this Form 10-K. In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Milwaukee, Wisconsin
March 13, 2013

<div align="center">138</div>

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
**ON**
**FINANCIAL STATEMENT SCHEDULE**

To the Shareholder and Board of Directors of Appleton Papers Inc. and Subsidiaries:

Our audits of the consolidated financial statements referred to in our report dated March 13, 2013 appearing in this Annual Report on Form 10-K also included an audit of the financial statement schedule listed in Item 15(a)(2) of this Form 10-K. In our opinion, this financial statement schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Milwaukee, Wisconsin
March 13, 2013

**PAPERWEIGHT DEVELOPMENT CORP. AND SUBSIDIARIES**
**AND APPLETON PAPERS INC. AND SUBSIDIARIES**

**SCHEDULE II—Valuation and Qualifying Accounts**
**(dollars in thousands)**

| Allowances for Losses on Accounts Receivable | Balance at Beginning of Period | Charged To Costs and Expenses | Amounts Written Off Less Recoveries | Balance at End of Period |
|---|---|---|---|---|
| January 1, 2011 | 1,356 | 734 | (655) | 1,435 |
| December 31, 2011 | 1,435 | 679 | (928) | 1,186 |
| December 29, 2012 | 1,186 | 193 | (302) | 1,077 |

    All other schedules are omitted because the required information is not present or is not present in amounts sufficient to require submission of a schedule or because the information required is included in the consolidated financial statements of PDC and Appleton or the notes thereto or the schedules are not required or are inapplicable under the related instructions.

140

# EXHIBIT 4



# PAPERWEIGHT DEVELOPMENT CORP.

**Valuation of Common Stock
as of December 31, 2015**

**Issued: January 15, 2016**



**[This page is intentionally left blank.]**

*For more information, please contact one of the following members of the engagement team:*

---

| Scott D. Levine, CPA / ABV, CFA | Isaiah Aguilar, CFA | Cara M. Davis |
|---|---|---|
| Managing Director | Director | Analyst |
| (703) 848-4944 | (703) 848-4942 | (703) 891-4313 |
| slevine@srr.com | iaguilar@srr.com | cdavis@srr.com |

---



**Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit | Houston | Los Angeles | New York | Tysons Corner | Washington, D.C.**

---

**www.srr.com**

# APPENDICES

| | | |
|---|---|---|
| **I.** | Introduction .................................................................................................................. | 1 |
| **II.** | Summary of Operations Since June 30, 2015 ............................................................. | 5 |
| **III.** | Economic and Industry Outlook ................................................................................... | 19 |
| **IV.** | Valuation Methodology ................................................................................................. | 28 |
| **V.** | Guideline Company Method ......................................................................................... | 32 |
| **VI.** | Discounted Cash Flow Method .................................................................................... | 42 |
| **VII.** | Valuation Reconciliation and Conclusion .................................................................... | 48 |
| **VIII.** | Opinion ........................................................................................................................ | 56 |

APPVION

Valuation & Financial Opinions

SRR STOUT | RISIUS | ROSS

# APPENDICES

**Appendix A**................................................................................................................................Exhibits

**Appendix B**......................................................................................... Guideline Company Descriptions

**Appendix C**................................................................................................................. Control Premium

**Appendix D**.............................................................................Assumptions and Limiting Conditions

**Appendix E**......................................................................................... Statement of Qualifications





Valuation & Financial Opinions

# Section I

## Introduction



Case 1:19-cv-01561-WCG    Filed 11/19/20    Page 995 of 1527    Document 27-2

Valuation & Financial Opinions



# I.  INTRODUCTION

## Description of Analysis

- ■ Stout Risius Ross, Inc. ("SRR") was retained by Argent Trust Company solely in its capacity as the trustee (the "Trustee") of the Appvion, Inc. Employee Stock Ownership Trust, which forms a part of the Appvion, Inc. Employee Stock Ownership Plan (collectively the "ESOP"), to estimate the Fair Market Value of the common stock of Paperweight Development Corp. ("Paperweight") on a controlling-ownership interest basis, taking into consideration an appropriate discount for limited marketability, as of December 31, 2015 (the "Valuation Date").

- ■ We understand the ESOP owns 100% of the outstanding common stock of Paperweight which in turn owns 100% of Appvion, Inc. ("Appvion") (Paperweight and Appvion are collectively referred to herein as the "Company.")

- ■ The purpose of our analysis is to provide an independent opinion of the Fair Market Value of the common stock of Paperweight held by the ESOP as of the Valuation Date for ESOP administration purposes. No other purpose is intended or should be inferred.

## Standard of Value

- ■ In accordance with Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i)) (the "Proposed Regulation"), the term "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset.

## Factors Considered

We considered the following factors in performing our analysis:

- ■ The nature of the business and the history of the Company from its inception;
- ■ The economic outlook in general and the condition and outlook of the industry in which the Company operates;
- ■ The book value of the stock and the financial condition of the Company;
- ■ The earning capacity of the Company;
- ■ The dividend-paying capacity of the Company;
- ■ Whether goodwill or other intangible value exists within the Company;
- ■ Previous sales of the Company's stock and the size of the block of stock to be valued; and





Valuation & Financial Opinions

# I. INTRODUCTION

- The market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Sources of Information

In connection with this analysis, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- Paperweight's audited financial statements and Form 10-K filings with the U.S. Securities and Exchange Commission ("SEC") for the fiscal years ended December 31, 2010 through December 31, 2014;

- Paperweight's Form 10-Q filing with the SEC for the fiscal quarter ended October 4, 2015;

- Paperweight's internally-prepared financial statements for fiscal years ended December 31, 2010 through December 31, 2014, including internally-prepared financial statements for the Company's Carbonless, Thermal, and Encapsys divisions;

- Paperweight's internally-prepared financial statements for the ten-month periods ended October 31, 2014 and October 31, 2015, including internally-prepared financial statements for the Company's Carbonless, Thermal, and Encapsys divisions;

- select items from Paperweight's internally-prepared balance sheet prepared by Company management as of December 31, 2015;

- the financial projections prepared by Company management for the fiscal years ending December 31, 2016 through December 31, 2020, including financial projections for the Company's Carbonless and Thermal divisions;

- the Asset Purchase Agreement by and among the Company and Sherman Capital Holdings LLC ("SCH" or the "Buyer") dated August 3, 2015 (the "Asset Purchase Agreement");

- a site visit at the Company's headquarters located in Appleton, Wisconsin and discussions with certain members of the senior management of Appvion regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;

- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- other information, studies, and investigations that we deemed appropriate.



Valuation & Financial Opinions



# I. INTRODUCTION

**Assumptions and Limiting Conditions**

- This report and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and should not be referred to or distributed, in whole or in part, without our prior written consent. Reference should be made to Appendix D, as well as our engagement letter dated May 18, 2015, for certain assumptions and limiting conditions that are applicable to our analysis and report.

APPVION

Valuation & Financial Opinions



Section II

## Summary of Operations Since June 30, 2015

Valuation & Financial Opinions



# II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

## Company Overview

- Founded in 1907, Appvion is the world's largest manufacturer of carbonless paper and the leading North American manufacturer of thermal paper. Appvion, a privately held company, is headquartered in Appleton, Wisconsin, with manufacturing facilities located in Appleton, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania.

- Appvion is organized into two operating divisions: (1) Carbonless and (2) Thermal. The Company previously comprised two primary operating units: (1) Technical Papers, which included the Carbonless and Thermal operating divisions, and (2) Encapsys, which developed microencapsulation products and technology. On August 3, 2015, the Company sold all of the assets primarily used in the development, manufacture, and sale of microencapsulation materials by the Encapsys division to Rise Acquisition LLC, an affiliate of SCH, for an aggregate purchase price of $208.0 million in cash.

- The Company has one class of stock: common stock. The ESOP owns 100% of the Company's unrestricted common stock. There were 6,751,614 shares outstanding as of the Valuation Date, which includes 6,621,614 shares and 130,000 shares expected to be issued. The number of the Company's fully-diluted shares outstanding declined from 6,934,029 as of the June 30, 2015 analysis as a result of redemptions due to employee terminations and diversifications.

- Effective January 3, 2010, the Company adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on the value of Appvion common stock. All units vest three years after the award date and the cash value of the stock is paid to the employee on the vesting date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated. As of the Valuation Date, there were 359,975 RSUs outstanding.

- In 2006, the Company established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors. As of the Valuation Date, there were 121,987.493 phantom units outstanding.

- The Company's Long-Term Incentive Plan ("LTIP") awards synthetic equity units to employees, which are awarded at the most recent Appvion stock price as determined by the semi-annual ESOP valuation. As of the Valuation Date, there were 2,063,134 LTIP units outstanding with a weighted average exercise price of $18.19.




## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

■ During the latest 12-month period ended October 31, 2015 (the "LTM period"), Appvion generated revenue of $749.2 million, of which approximately 45.0% was generated from Carbonless (including sales of security paper products), 50.0% from Thermal, and 5.0% from Encapsys.



Revenue by Divison

Carbonless (incl. Security) 45.0%

Encapsys 5.0%

Thermal 50.0%

Source: Appleton records for LTM period ended October 31, 2015.

APPVION

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

**Carbonless**

■ Carbonless paper is used in the production of multi-part business forms. Two-part carbonless forms work as follows: the top sheet is coated on the back with encapsulated dye and the bottom sheet is coated on the front with a reactive chemical.

■ Carbonless revenue decreased 3.4% from $349.4 million in fiscal year 2014 to $337.3 million in the LTM period. Carbonless' revenue was negatively impacted by a decrease in shipment volumes, weaker international sales due to the strength of the U.S. dollar, and the long-term decline in demand for carbonless paper, somewhat offset by the sale of new specialty paper products, including colored bond and high-speed inkjet product lines.

■ Carbonless' EBITDA increased from $43.2 million, or 12.4% of net sales, in fiscal year 2014 to $43.8 million, or 13.0% of net sales, in the LTM period due to ongoing manufacturing operations improvements, continued efforts to reduce operating expenses, improved product pricing and mix, and increased sales of new specialty paper products, such as colored bond and high-speed inkjet papers which generate higher profit margins.

■ Due to the continued decline in the carbonless paper market, the Company is projecting Carbonless sales to decrease from $337.3 million in the LTM period to $322.0 million in fiscal 2016. Thereafter, net sales are projected to decrease to $286.4 million by fiscal year 2020. Company management expects increased sales of specialty paper and increased contract manufacturing services will somewhat offset the decline in carbonless paper sales.

■ Carbonless' adjusted EBITDA is projected to increase slightly from $43.8 million, or 13.0% of net sales, in the LTM period to $44.1 million, or 13.7% of net sales, in fiscal 2016. Thereafter, adjusted EBITDA is expected to increase to $45.6 million, or 15.9% of net sales, in fiscal year 2020. Carbonless' improving profit margins are expected to result from (1) improved product mix; (2) cost reductions; (3) ongoing improvements to manufacturing operations; and (4) the shift of carbonless paper production to more variable-cost facilities.

**Thermal**

■ Thermal paper is a heat sensitive paper that is coated with colorless dye, co-reactants, and binders. When thermal paper is fed through a printer, heat from the thermal print head causes dyes and co-reactants to activate and form an image. Accordingly, unlike inkjet and laser printers, thermal printers do not require ribbons or toner. Some of the fastest growing markets for thermal paper include point-of-sale applications (e.g., receipts received from retail sale transactions), label applications (e.g., weigh scale labels and shipping labels), and tag/ticket applications (e.g., entertainment and travel tickets and retail and industrial tags).

■ Thermal's net sales decreased 9.8% from $415.3 million in fiscal year 2014 to $374.8 million in the LTM period primarily due to lower shipments and point-of-sale product pricing as a result of increased competition from foreign competitors and the impact of the strong U.S. dollar. The decline in Thermal's net sales was partially offset by price increases for thermal receipt paper that became effective September 1, 2015.



Valuation & Financial Opinions



## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

- Thermal's adjusted EBITDA decreased from $28.1 million, or 6.8% of net sales, in fiscal year 2014 to $6.3 million, or 1.7% of net sales, in the LTM period. The decline in adjusted EBITDA is primarily due to decreased revenue and pricing pressure resulting from increased foreign competition.

- The Company expects Thermal's net sales to increase from $374.8 million in the LTM period to $405.8 million in fiscal 2016. Thereafter, net sales are expected to increase to $459.1 million in fiscal 2020. Thermal's net sales are expected to increase due to the expected recovery of point-of-sale paper pricing, which is consistent with price increases implemented in September 2015 and an additional price increase scheduled for January 2016. In addition, Company management stated that certain key competitors decided to exit the North American point-of-sale paper market in 2015, which increases the Company's ability to increase market share. The Company's projections are consistent with record shipment levels of Thermal paper in the third quarter of 2015.

- Thermal's adjusted EBITDA is projected to increase from $6.3 million, or 1.7% of net sales, in the LTM period to $28.6 million, or 7.0% of net sales, in fiscal 2016. Thereafter, adjusted EBITDA is projected to increase to $56.1 million, or 12.2% of net sales, in fiscal 2020 due primarily to improved point-of-sale product pricing, as well as an increased focus on tag, ticket, and label product sales, which typically generate higher profit margins. Thermal's current run rate is consistent with Thermal's fiscal 2016 projections as the Company experienced record shipment levels in the third quarter of fiscal 2015 and established 5% to 7% price increases beginning in September 2015. Thermal product pricing is also expected to improve due to additional scheduled price increases in early fiscal 2016 and similar price increases by industry competitors.

- Generally, the global thermal paper industry is forecasted to experience growth in the near-term, benefitting from increasing consumer disposable income, the growing popularity of advertising on thermal paper receipts, and increases in market pricing due to increased input costs and strong demand. However, over the longer term the thermal paper industry is forecasted to experience slight declines in demand due to the growing popularity of electronic receipts and tickets.

**Litigation/Off-Balance Sheet Issues**

- In 2008, Appvion paid $25 million for costs related to the Fox River environmental cleanup, representing its unindemnified obligation in the matter. The balance of Appvion's ultimate liability is indemnified by Windward Prospects Ltd. (formerly Arjo Wiggins, "Windward"). Windward supported its indemnification through the purchase of a $250 million insurance policy from Commerce & Industry Insurance Company, a unit of AIG. While the face value of that policy has diminished with the payment of expenses over time, Windward has successfully claimed significant reimbursements from former insurers of Appvion, replenishing its resources and capability for future indemnification costs.

  - The Company's responsibility for the $25 million of Fox River liabilities has been completely satisfied and as a result, Windward resumed responsibility for any remaining For River liabilities. In July 2011, Appvion filed a motion for summary judgment with the goal of having Appvion removed as a potentially responsible party.

  - On April 10, 2012, the U.S. District Court for the Eastern District of Wisconsin (the "U.S. District Court") granted Appvion's motion for summary judgment and dismissed all claims against Appvion in the enforcement action. The decision established





Valuation & Financial Opinions

## II. SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

that Appvion was no longer a potentially responsible party, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA"), no longer considered a legal successor to NCR Corporation's ("NCR") liabilities, and no longer required to comply with the order commanding remediation of the Fox River. In addition, on July 3, 2012, the U.S. District Court determined that Appvion and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

➤ The rulings did not affect Appvion's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appvion's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appvion and BAT have joint and several liability under the Arbitration. Appvion initiated the dispute resolution procedures outlined in the 1998 agreement and arbitration commenced in March 2014. Issues in dispute include the scope of Appvion's liability under the agreement, if any, as well as funding requests and supporting documentation from NCR (the "Dispute Resolution").

➤ On June 8, 2012, BAT served Windward with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by Windward from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appvion with the same claim, seeking a declaration that BAT is indemnified by Appvion. On February 10, 2014, Appvion filed a defense and counterclaim against BAT seeking declaration that BAT is required to reimburse Appvion for damages in excess of $100 million representing BAT's share of past liability costs paid by Appvion and that BAT should be ordered to pay its share of future liability costs.

➤ On September 30, 2014, Appvion entered into a funding agreement (the "Funding Agreement") with NCR, BAT, and Windward related to cleanup costs for the Lower Fox River and certain potential future sites (the "Future Sites"). In addition to the agreed payments to be made by the other parties, the Company agreed to and made a $6.0 million payment on September 30, 2014 toward historical Fox River costs incurred by NCR through September 1, 2014. The Company also agreed to pay $4.0 million on February 1, 2014, up to $7.5 million on September 1, 2015, and up to $7.5 million on September 1, 2016. As a result of the Funding Agreement, $24.0 million of expense was recorded as selling, general, and administrative expense, reflecting the total of the four payments discounted to the end of the third quarter of 2014. A liability of $24.0 million was also recorded on the Company's balance sheet as of September 28, 2014 related to the Funding Agreement. The previously recorded and remaining indemnification receivable and Fox River liabilities reserve, both of which had a balance of $59.3 million as of December 31, 2013, were also written off and are no longer included in the Company's balance sheet. Appvion made its required payment of $7.5 million in September 2015, and the remaining liability related to Fox River is limited to $7.5 million as of the Valuation Date.

➤ Additionally, as the 1998 agreement with NCR is not limited to Fox River, the Company's liability related to costs incurred for the clean-up of other sites by NCR and BAT where environmental contamination may have occurred resulting from carbonless copy paper manufactured in Appleton, Wisconsin or Combined Locks, Wisconsin is limited to $25.0 million in aggregate. The Company agreed to pay up to $7.5 million annually related to clean-up costs and potential liabilities related to such Future Sites, provided that the Company's aggregate liability related to Future Sites not exceed $25.0 million.





Valuation & Financial Opinions

## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

➢ Appvion bears sole responsibility for its funding obligations under the Funding Agreement. The Funding Agreement does not, however, modify, alter or amend the two indemnification agreements entered into in 2001 wherein Windward agreed to indemnify the Company for certain costs, expenses and liabilities relating to Fox River and Future Sites. However, there are currently no outstanding matters for which costs are being incurred and thereby eligible for indemnification under the noted indemnification agreements and therefore no corresponding environmental indemnification receivable or Fox River liabilities reserve is recorded on the Company's balance sheet.

➢ The parties to the Funding Agreement agree that they have no recourse against Appvion for any further liability relating to the Fox River or Future Sites beyond the funding obligations set forth in the Funding Agreement.

➢ As a result of the Funding Agreement, (1) NCR and Appvion instructed the American Arbitration Association not to release the pending decision in the arbitration between NCR and Appvion and (2) BAT, Appvion, and Windward discontinued the pending litigation in the United Kingdom court.

### Labor Issues

■ The Company's manufacturing employees at its facilities in Appleton, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union. As of the Valuation Date, the Company's labor agreements with all union employees were current.

### Domtar Supply Agreement

■ On February 22, 2012, Appvion entered into a long-term supply agreement with Domtar Corporation ("Domtar") to purchase carbonless and thermal stock supply. Pursuant to the terms of the supply agreement, Domtar became Appvion's exclusive supplier of carbonless and thermal base stock for a period of 15 years, with successive five-year renewals. The supply agreement allows Appvion to eliminate unprofitable business lines and reduce working capital, fixed assets, and overhead costs. The supply agreement also allows Appvion to dispose of certain assets at its West Carrollton, Ohio facility and move certain operations to its Appleton, Wisconsin facility. Company management believes that the supply agreement will result in many benefits for Appvion, including improvements to cash flow and EBITDA.

➢ In fiscal 2012, the Company recorded $106.0 million of restructuring costs related to the supply agreement, of which approximately $25.2 million are related to employee termination costs (including related pension and benefit costs) and approximately $64.7 million relate to impairment and accelerated depreciation on certain equipment. As of December 28, 2013, the Company expected to incur additional cash expenditures of approximately $35 million as a result of ceasing papermaking operations at West Carrollton, of which approximately $5 million is projected to be paid during fiscal 2014. In addition, approximately $4 million is projected to be disbursed through 2016 as a result of distributions from the Company's stock fund for former West Carrollton employees. The remaining $26 million may be paid over a period through 2033.



Valuation & Financial Opinions



# II. SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

➢ Prior to the supply agreement with Domtar, a certain number of the Company's employees participated in the Pace Industry Union-Management Pension Fund ("PIUMPF"), a multi-employer defined benefit plan. As a result of the restructuring of the West Carrollton facility and as agreed upon in labor contract negotiations, the Company withdrew from PIUMPF and recorded a $7.0 million settlement charge in fiscal 2012. The Company also recorded an $18.0 million liability related to additional withdrawal costs, which are expected to be paid over several years and is included in the projected additional cash expenditures discussed above.

➢ We did not explicitly account for future cash expenditures related to the restructuring in our analysis because they are expected to be offset by improvements in working capital resulting from the Domtar supply agreement and cash realization from the sale of scrap.

## Receivables Financing Program

■ The Company entered a receivables financing program through Fifth Third Bank in June 2014. The program has helped Appvion lower its cost of capital as well as improve the Company's cash flow, which continues to be used to repay debt and support working capital. The cost of the program is LIBOR plus 1.95%, which compares to the Company's revolver of LIBOR plus 4.5%.

## 2013 Refinancings

■ On June 28, 2013, to take advantage of the low interest rate environment to refinance debt, Appvion entered into a $435 million senior secured credit facility, which includes a $335 million first lien term loan facility (the "First Lien Notes") and a $100 million revolving credit facility (the "Revolving Credit Facility").

■ Key terms and conditions of the First Lien Notes and Revolving Credit Facility include:

➢ The First Lien Notes and Revolving Credit Facility accrue interest at an annual rate equal to, at the Company's option, (1) LIBOR (with 1.25% floor) plus 4.5% per annum or (2) Prime plus 3.5%.

➢ The First Lien Notes have a term of six years while the Revolving Credit Facility has a term of five years.

■ Substantially all of the First Lien Notes proceeds were used to finance the purchase price, including principal, premium, consent fee, and accrued and unpaid interest, of $300.7 million (aggregate principal amount) of the Company's 10.50% fixed-rate Senior Secured Notes and to pay related fees and expenses. The total principal balance of the Senior Secured Notes was $305.0 million. On July 31, 2013, Appvion redeemed all of the remaining $4.3 million of Senior Secured Notes outstanding at a redemption price equal to $1,052.50 per $1,000 principal amount of Senior Secured Notes, plus accrued and unpaid interest.

■ The issuance of $335.0 million of First Lien Notes and repurchase of $300.7 million of Senior Secured Notes is referred to herein as the "Senior Refinancing."



Valuation & Financial Opinions



## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

| Senior Refinancing - Sources and Uses of Cash | | | | |
|---|---|---|---|---|
| *U.S. Dollars in Thousands* | | | | |
| Sources of Cash | | Uses of Cash | | |
| First Lien Term Notes | $     335,000 | Senior Secured Notes | $     319,797 |
| Revolver | 34,600 | Existing Revolver | 40,949 |
| | | Estimated Fees, Expenses, & OID | 8,842 |
| | | Cash to Balance Sheet | 12 |
| **Total Sources of Cash** | **$     369,600** | **Total Uses of Cash** | **$     369,600** |

- On November 19, 2013, the Company raised $250 million through the sale of second lien senior secured notes (the "New Second Lien Notes"). The Company used the proceeds of the New Second Lien Notes to redeem $161.8 million of the existing Second Lien Notes, including $9.3 million of accrued interest and $33.3 million of make-whole payments, and $32.2 million of Senior Subordinated Notes, including $1.6 million of accrued interest. Key terms and conditions of the New Second Lien Notes include:

  - The New Second Lien Notes accrue interest at an annual rate of 9.0%.

  - The New Second Lien Notes mature on June 1, 2020.

  - The New Second Lien Notes rank equally in right of payment with all of the Company's senior debt and are senior in right of payments to all existing subordinated indebtedness of the Company.

  - The New Second Lien Notes have second-priority security interest on the collateral.

  - On or after December 1, 2016, the Company, at its option, may redeem the New Second Lien Notes at (1) 104.5% of the principal amount in the 12-month period commencing December 1, 2016, (2) 102.25% in the 12-month period commencing December 1, 2017, and (3) 100% thereafter.

  - Prior to December 1, 2016, the Company may redeem the New Second Lien Notes only upon payment of an amount equal to the present value of the remaining scheduled interest payments on the Second Lien Notes (the "Make-Whole Price").

  - At any time prior to December 1, 2016, the Company may on any one or more occasions redeem up to 35% of the aggregate principal amount of the New Second Lien Notes at a redemption price of 109.0% of the principal amount, plus accrued and unpaid interest through the redemption date, with the net cash proceeds of one or more equity offerings; provided that:





Valuation & Financial Opinions

# II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

- ◆ at least 65% of the aggregate principal amount of the New Second Lien Notes originally issued remains outstanding immediately after the occurrence of such redemption; and

- ◆ each such redemption occurs within 120 days of the date of the closing of such equity offerings.

➢ If the Company experiences certain change of control events, the Company must offer to repurchase the New Second Lien Notes at 101% of the principal amount, plus accrued and unpaid interest.

■ The issuance of $250.0 million of New Second Lien Notes and repurchase of Senior Subordinate Notes and existing Second Lien Notes is referred to herein as the "Junior Refinancing."

■ The Senior Refinancing and Junior Refinancing are collectively referred to herein as the "2013 Refinancings."

| Junior Refinancing - Sources and Uses of Cash | | | | | |
|---|---|---|---|---|---|
| *U.S. Dollars in Thousands* | | | | | |
| Sources of Cash | | | Uses of Cash | | |
| New Second Lien Notes | $ | 250,000 | Existing Second Lien Notes | $ | 171,068 |
| | | | Make-Whole Payment | | 33,299 |
| | | | Senior Subordinated Notes | | 33,799 |
| | | | Estimated Fees, Expenses, & OID | | 7,748 |
| | | | Cash to Balance Sheet | | 4,087 |
| **Total Sources of Cash** | **$** | **250,000** | **Total Uses of Cash** | **$** | **250,000** |

■ Due to the 2013 Refinancings, the Company was able to replace debt with higher interest rates with new debt with lower interest rates.

➢ The annual interest rate of the Senior Secured Notes was 10.5%, which was replaced by the First Lien Notes with an interest rate of LIBOR (1.25% floor) plus 4.5% (5.75% as of the Valuation Date).

➢ The annual interest rate on the Senior Subordinated Notes and Second Lien Notes were 9.75% and 11.25%, respectively, which were replaced by the New Second Lien Notes with an interest rate of 9.0%.

■ By completing the 2013 Refinancings, the Company was also able to extend the maturities of its existing debt to improve the Company's financial flexibility:



Valuation & Financial Opinions



# II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

> ➤ The Senior Secured Notes were due in June 2015, which were replaced by the First Lien Term Loan that matures in June 2019.

> ➤ The Senior Subordinated Notes and existing Second Lien Notes were due in June 2014 and December 2015, respectively. The Company was able to replace these notes with the New Second Lien Notes that mature in June 2020.

- Although the Company incurred additional debt due to the 2013 Refinancings, Company management believes this increased debt was mitigated by the significantly lower cash interest expense the Company expected to incur as well as the improved financial flexibility and marketability of the Company.

**Strategic Initiatives**

- Despite the 2013 Refinancings, which provided the Company with increased financial flexibility, the Company continued to explore strategic alternatives to facilitate the achievement of its business objectives. In that regard, the Company engaged Jefferies LLC, an investment bank, to help Appvion explore such strategic alternatives, including the sale of the Company.

- Beginning in May 2014, Jefferies contacted both strategic and financial prospective buyers about the potential sale of the Company as a whole or the individual sale of the Company's Technical Papers or Encapsys division. Of the 97 prospective buyers, 53 executed a non-disclosure agreement ("NDA") and reviewed a confidential information memorandum. All 42 prospective financial buyers and four prospective strategic buyers that executed an NDA were interested in the purchase of the entire Company, while seven prospective strategic buyers were interested in the purchase of Encapsys. Of the 53 prospective buyers that executed an NDA, 12 parties submitted initial indications of interest. Of the twelve prospective buyers, six submitted revised indications of interest. Of the six, two prospective financial buyers were interested in the purchase of the entire Company, one prospective financial buyer was interested in the purchase of the Technical Papers division, and three strategic buyers were interested in the purchase of Encapsys.

- Based on the indications of interest, the Company decided to continue discussions with five prospective buyers, who received access to a data room, site tours and access to numerous calls and meetings with management to discuss strategy, financial forecasts, customer relationships, human resources, intellectual property, and other issues. Lubrizol, one of the potential strategic buyers of Encapsys, did not submit a final offer due to their concerns regarding Encapsys' customer concentration with P&G. Atlas Holdings, a private equity firm with a portfolio interest in Finch Paper, did not submit a final offer but indicated a willingness to acquire Appvion's paper operations through a structured transaction involving Finch Paper.

- On December 11, 2014, SCH submitted a final bid for the entire Company with an implied enterprise value ranging from $680 million to $710 million, or 7.6x to 7.9x LTM adjusted EBITDA. In addition, on the same day, Croda International Plc ("Croda"), submitted a final bid for Encapsys with an implied enterprise value for Encapsys of $175 million. Additionally, it is important to note that Croda revised its bid downwards from an implied enterprise value of $250 million due to concerns over limitations imposed by the contractual relationship between Encapsys and P&G. Company management decided to continue discussions with SCH about a potential transaction and to not accept the offer from Croda for Encapsys.



Valuation & Financial Opinions



## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

---

- On January 7, 2015, SCH submitted a revised proposal with an implied enterprise value ranging from $683 million to $713 million, plus dividends and potential additional upside from a convertible preferred security. In addition, HEP submitted a proposal to purchase the Company at an implied enterprise value ranging from $652 million to $693 million. However, following further due diligence and reviewing Appvion's fiscal 2014 financial results that were lower than expected, both SCH and HEP rescinded their offers at the implied valuations.

- On February 24, 2015, SCH submitted a revised proposal to invest a total of $65 million to acquire (1) a controlling ownership interest in Encapsys as a standalone entity and (2) a minority ownership interest in the remaining operations in Appvion. SCH's proposal implied a total enterprise value for the Company of $660 million. Company management stated that the transaction structure proposed by SCH was too complex and did not provide sufficient capital to delever the Company's balance sheet.

- On April 13, 2015, SCH submitted a proposal to acquire all of the assets primarily used in the Encapsys business for $205 million in cash, which was later revised to $208 million. On May 2, 2015, the Company signed the revised letter of intent from SCH to pursue the sale of Encapsys.

APPVION

Valuation & Financial Opinions



## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

**Encapsys Transaction**

- On August 3, 2015, SCH, through its affiliate, Rise Acquisition LLC,  acquired all of the assets (the "Acquired Assets") primarily used in the development, manufacture, and sale of microencapsulation materials by the Company's Encapsys division for $208.0 million (the "Purchase Price") on a cash-free, debt-free basis (the "Encapsys Purchase").

- The Acquired Assets included (1) certain facilities in which Encapsys operates as well as certain fixed assets (e.g., machinery, equipment, and fixtures) used in Encapsys' operations; (2) all inventories of supplies and materials associated with Encapsys; (3) all accounts or notes receivable with respect to Encapsys; and (3) all rights to the Encapsys name and trademarks and all other intellectual property used by Encapsys, among other assets. Appvion also assigned to SCH all contracts related primarily to Encapsys (the "Assumed Contracts"). The Buyer assumed those liabilities that related to Encapsys that (1) were included in the Net Working Capital adjustment described below, (2) arose under the Assumed Contracts after the Closing Date, or (3) were specifically identified in the Asset Purchase Agreement (the "Assumed Liabilities).

- The Encapsys Purchase, together with any related transactions, are collectively referred to herein as the "Encapsys Transaction."

- Pursuant to the Encapsys Transaction, Appvion and SCH entered into a Supply Agreement for the sale of Encapsys' microencapsulation products by Encapsys to Appvion for a 10 year period. In addition, SCH and Appvion entered into a Transition Services Agreement for the provision of transition services, such as information technology and administrative support, by Appvion to Encapsys. Company management expects Appvion to spend approximately $4.0 million per year for services to satisfy the Transition Services Agreement, which are expected to be more than offset by approximately $8.0 million of projected cost reductions, including administrative, benefits, and overhead costs, following the sale of Encapsys.

- The cash consideration received by the Company, net of transaction expenses and working capital adjustments, totaled approximately $200.5 million. Of the $200.5 million of net proceeds, approximately $165 million was used immediately to repay a portion of long-term debt. Proceeds of $35 million were set aside as restricted cash to be used within one year of the Encapsys Transaction closing for the specific purpose of capital investment and/or debt reduction. In the third quarter of 2015, the Company used this restricted cash to repay $25 million of long-term debt and used $5.7 million for capital investments.





Valuation & Financial Opinions

## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2015

**Management Team and Board of Directors**

- In August 2015, Kevin M. Gilligan ("Mr. Gilligan") replaced Mark Richards as President and Chief Executive Officer of Appvion. Mr. Gilligan previously served as president of the Company's paper division since joining Appvion in June 2014. Prior to joining Appvion, Mr. Gilligan served 20 years at H.B. Fuller, a specialty chemical company, including as vice president of global operations since 2012. Mr. Richards will stay on as Chairman of the Board until the Company identifies a replacement in fiscal 2016.

- At the end of fiscal 2015, Andrew F. Reardon resigned from the Board of Directors. The Company expects to name a new director to the Board in fiscal 2016.

| Executive Management Team | |
|---|---|
| **Individual** | **Position** |
| Kevin M. Gilligan | Chief Executive Officer |
| Thomas J. Ferree | Senior Vice President of Finance and Chief Financial Officer |
| Tami L. Van Straten | Senior Vice President of Administration and General Counsel |
| Ethan Haas | Vice President and General Manager of Carbonless and Specialty Papers |
| Jason A. Schulist | Vice President of Continuous Improvement |
| Justin C. Merrit | Vice President and General Manager of Thermal |

| Board of Directors | |
|---|---|
| **Individual** | **Position** |
| Mark Richards | Chairman |
| Stephen P. Carter | Director |
| Terry M. Murphy | Director |
| Andrew F. Reardon | Director |
| Kathi P. Seifert | Director |
| Mark A. Suwyn | Director |
| George W. Wurtz | Director |





Valuation & Financial Opinions

Section III

**Economic and Industry Outlook**

APPVION

**Valuation & Financial Opinions**



# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Gross Domestic Product

- Real (i.e., inflation adjusted) GDP growth of 2.0% to 2.5% is generally considered optimal when the economy is operating at full employment (5.5% to 6.0% unemployment).

- GDP increased at an annual rate of 2.1% in the third quarter of 2015, following an increase of 3.9% in the second quarter of 2015. The main driver of growth in the third quarter was increased consumer spending, which was partially offset by slower inventory accumulation.

- GDP is forecasted to increase at an annual rate of 2.6% in 2016.

## Consumer Price Index

- The CPI has increased at an average rate of 2.2% over the past 20 years.

- The CPI remained unchanged in November 2015 and increased 0.4% relative to November 2014.

- The core index, excluding food and energy prices, increased 0.2% in November 2015, and has increased 2.0% over the past 12 months.

- The CPI is forecast to average 2.0% in 2016.








# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Employment Situation

- Typically, economists consider the economy to be operating at full employment when the unemployment rate is between 5.5% and 6.0%.

- In November 2015, 211,000 jobs were added, and the unemployment rate remained unchanged from the prior month at 5.0%. Labor force participation increased to 62.5% in November 2015 from 62.4% in October 2015.

- The unemployment rate is forecasted to average 4.8% in 2016.

## Consumer Sentiment

- The Index of Consumer Sentiment, normalized at a value of 100 in the first quarter of 1966, is constructed by the Survey Research Center at the University of Michigan based on a survey of consumers regarding personal finances, business conditions, and anticipated spending. This metric is an important barometer of the strength of the economy since consumer spending represents approximately two-thirds of GDP.

- Consumer sentiment increased from 91.3 in November 2015 to 91.8 in December 2015. The increase in December is in part attributable to decreasing gasoline prices and the improving labor market.





Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia

Source: Dismal Scientist

 APPVION



Valuation & Financial Opinions

# III. ECONOMIC AND INDUSTRY OUTLOOK

## Purchasing Managers' Index

- Index values above 50 indicate an expanding manufacturing sector, while values below 50 indicate a contracting manufacturing sector.

- The PMI decreased from 50.1 points in October 2015 to 48.6 points in November 2015 as new orders, production, and inventories declined. This marks the first time the index has decreased below its neutral threshold of 50 since November 2012.

## Equity Markets

- Over the past 20 years, the S&P 500 and Russell 2000 have increased 6.2% and 6.6% per annum, respectively.

- For the month ended December 31, 2015, the S&P 500 decreased 1.8% and the Russell 2000 decreased 5.2%.

- For the year ended December 31, 2015, the S&P 500 decreased 0.7% and the Russell 2000 decreased 5.7%.









Valuation & Financial Opinions

# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Industry Synopsis

- In the United States, approximately 3,100 companies with combined annual revenues of $180 billion manufacture paper products. Overall industry concentration is low, but is highly concentrated within specific product segments. Major companies include International Paper, Kimberly-Clark, Georgia Pacific, Neenah Paper, and WestRock Company. Major product categories are paperboard containers, paper bags, coated papers, tissue product, and stationary.

- As finished paper products tend to be inexpensive and bulky, transportation costs make up a significant portion of total costs. Smaller manufacturers can compete effectively with larger producers by focusing on their local market.

## Industry Growth

- According to IBIS World, between 2009 and 2014 paper product manufacturing industry revenue declined 1.2% on an annual basis. Along with declining revenues, profitability has been constrained by an increase in the price of pulp, paper, and paper board, as well as significant price competition from foreign competitors. To offset this, companies have reduced headcount and restructured and consolidated facilities.

- According to First Research, the output of U.S. pulp, paper, and paperboard products manufacturing is forecast to grow at an annual compounded rate of 2% between 2015 and 2019.

## Paper Production

- Domestic production of paper products has declined in recent years due to competition from foreign manufacturers as well as the increasing popularity of digital communications, leading to declining revenue and industry-wide consolidation through mergers and acquisitions as well as restructuring and bankruptcies. According to IBIS World, the revenue of U.S. paper mills is forecast to contract at an annual rate of 0.7% between 2015 and 2020. Over the five years through 2020, the domestic paper industry is expected to face two primary challenges: (1) the increasing substitution of electronic recordkeeping systems for the industry's paper products and (2) increased competition from paper-producing countries in global markets if the U.S. dollar continues to strengthen. In addition, production volumes in China, Indonesia, and Mexico are expected to increase substantially as the industry transitions into newer technologies. Paper mills in the United States will be forced to emphasize higher-quality gloss paper products rather than bulk paper reams, which historically have generated the majority of industry revenue.

- U.S. manufacturers' shipments of paper products decreased approximately 0.7% in the 10 months ended October 2015 compared to the same period in 2014. Sales of manufactured paper products decreased 0.3% in the third quarter of 2015 relative to the third quarter of 2014.





Valuation & Financial Opinions

# III.  ECONOMIC AND INDUSTRY OUTLOOK

**Capacity**

- According to an American Forest and Paper Association ("AFPA") survey released in May 2015 (latest data available), U.S. paper and paperboard capacity decreased 1.7% in 2014, but is expected to remain stable in 2015. Containerboard and tissue remain growth sectors for the paper industry. Tissue paper capacity reached an all-time high in 2014, and is expected to continue to increase in 2015. However, capacity to produce newsprint and printing-writing papers continued to decline.

**International Issues**

- The economic expansion in China has created an emerging export market and also a new source for potential investment funding for U.S. paper product manufacturing companies. China lacks the necessary natural resources to satisfy its existing paper product needs and demand for timber, wood pulp, recycled paper, and cardboard is continuing to increase. Some industry experts believe Chinese firms will soon begin to invest in or acquire U.S. paper production companies that need additional capital to modernize production facilities.

- While technology has reduced the demand for printing, writing, and newsprint paper, demand for cardboard packaging, tissue paper, and paper towels is rising in emerging markets including China, according to HSBC. China's paper consumption over the past ten years has increased from 15% of global demand to 25% of global demand, making it the largest consumer of paper in the world. HSBC expects worldwide paper consumption to increase 2.4% through 2019, driven by emerging markets and increased urbanization in Asia.

- In recent years, China has invested significantly in new, advanced paper mills, supported by government subsidies. As a result, China has become the largest paper manufacturing producer in the world, overtaking the United States. To compensate for the lack of sufficient domestic timber supplies, Chinese paper companies have also developed industrial scale plantations and bioengineered hardwood trees that need just four to six years to reach full height, approximately ten times faster than the normal rate of growth. Additionally, pulp production is increasing in Latin America, as the favorable climate enables some trees to reach maturity in six to seven years, relative to 25 years in North America.

- The U.S. Department of Commerce imposed antidumping and countervailing duties on imports of coated free sheet paper from China and Indonesia as a result of a U.S. International Trade Commission ("USITC") ruling. The USITC ruled in October 2010 that imports of coated paper from Chinese and Indonesian companies are causing material injury to U.S. paper companies and their employees. The USITC decision follows an earlier Department of Commerce finding that the two countries engaged in "dumping" subsidized coated paper on the U.S. market. U.S. paper suppliers claim the unfair trade practices of some paper exporters are suppressing prices and causing paper mill closures domestically. In December 2014, the USITC announced that it would maintain these existing duties against imports from China for another five years.

- In September 2012, the WTO announced that it would evaluate whether the United States' anti-subsidy duties on Chinese goods including solar panels, thermal paper, wind towers, and steel wire violate global commerce rules.



Valuation & Financial Opinions



# III. ECONOMIC AND INDUSTRY OUTLOOK

■ In December 2012, the U.S. Department of Commerce issued a preliminary determination that Papierfabrik August Koehler AG and Koehler America, Inc. (collectively "Koehler") deliberately coordinated with multiple parties to structure its sales, pricing, and shipping procedures in a manner that would enable it to manipulate its sales prices of lightweight thermal paper ("LWTP") reported to the U.S. Commerce Department. The U.S. Department of Commerce also found Koehler's actions consistent with a pattern of price manipulation to evade antidumping duties. As a result, the U.S. Department of Commerce proposed to impose a 75.36% duty on LTWP sold by Koehler in the United States for the period from November 2010 to October 2011. In April 2013, the U.S. Department of Commerce issued its final third review determination that upheld the originally proposed duty.

■ On December 26, 2013, the U.S. Department of Commerce issued a preliminary determination in the fourth 12-month review period proposing to not apply a dumping margin for imports from Koehler for the period from November 2011 to October 2012, which was upheld in the final determination issued in June 2014. As a result of the ruling, Koehler re-entered the U.S. market, which resulted in increased price competition and lower market share for U.S. manufacturers.

## Raw Material Pricing

■ Prices for wood pulp can fluctuate sharply from year to year, depending partly on energy costs; changes of 10% within a year are not unusual. Paper manufacturers are often unable to pass all cost increases to customers. The price of Northern bleached softwood kraft, an industry benchmark grade of wood pulp, was $940 per metric ton in November 2015, below the trailing 12-month average of $980 per ton and a decrease from $980 per metric ton in May 2015.

■ Oil prices (i.e. West Texas Intermediate ("WTI") Crude spot rate) decreased approximately 30.5% from $53.45 per barrel as of December 31, 2014 to $37.13 per barrel as of December 31, 2015. The price of WTI Crude decreased 37.6% between June 30, 2015 and December 31, 2015.

■ According to the Bureau of Labor Statistics, the producer price index for the paper manufacturing industry remained stable in November 2015. The index has decreased by 0.7% from November 2014 to November 2015. According to economists surveyed by the Wall Street Journal, producer prices across industries are generally declining as a result of the appreciation of the U.S. dollar, declining oil prices, and declines in China's producer prices.

■ Global market prices for pulp started to decline in the second half of 2008 and continued to decline through the first half of fiscal 2009. However, due to increased global demand and a tightening supply, wood pulp prices started to increase in the third quarter of fiscal 2009 and continued to increase in 2010. According to *Pulp & Paper Week*, pulp producers attributed the increase in demand to paper producers replenishing their inventories. In addition, prices increased due to concerns about supply due to the February 2010 earthquake in Chile and temporary dock work strikes in March 2010 in Finland. Pulp prices reached a cyclical peak in August 2010 and decreased gradually in the fourth quarter of 2010. Despite weak paper demand in the first half of 2011, pulp prices reached a record high in June 2011 due to high wood fiber costs and increased demand for pulp. Pulp prices decreased in the second half of 2011, partially due to increased economic uncertainty in Europe and efforts by the Chinese government to control inflation by reducing the credit supply. In the first half of 2012, pulp prices stabilized and then increased in response to an April price increase by suppliers, before declining through the third quarter due to uncertain demand and ample supply. In October 2012, suppliers announced another price increase, which was effective, leading to an




# III.  ECONOMIC AND INDUSTRY OUTLOOK

increase in prices through the end of the year. Pulp prices continued to increase in 2013 and 2014 due to low inventory levels and industry demand. According to paper industry consultants Brian McClay & Associés Inc., China accounted for 90% of the growth in world pulp demand in 2014. Pulp prices declined in the first half of 2015, due in part to the appreciation of the U.S. dollar, before stabilizing in the latter half of the year.

**Industry Reorganization**

- Large national companies have historically been vertically integrated, owning everything from the forests and logging operations to the plants where finished products are made. Smaller companies will purchase the paper or paperboard raw material from large producers to convert into finished goods.

- In the past, paper companies offered a wide variety of products based on the perception that diversified product offerings would lead to increased profitability and decreased risk. In recent years, however, several large companies, including International Paper, WestRock, and Boise Cascade, have divested non-core assets and focused on becoming leading, low-cost producers of a small number of products.

- On January 7, 2015, Verso Paper ("Verso"), a producer of coated papers, acquired NewPage Holdings Inc. ("NewPage"), a producer of printing and specialty papers, at an implied enterprise value of $1.4 billion, or 6.5x LTM EBITDA and 0.5x LTM revenue. The combined company is expected to have annual sales of approximately $3.5 billion and eight manufacturing facilities located in six states.

- On January 7, 2015, Catalyst Paper Holdings, an owner and operator of paper mills, acquired two subsidiaries of NewPage, Rumford Paper Company and Biron Mill, a paper mill and manufacturer of paper for the printing and publishing industries, at an implied enterprise value of $62.4 million, or 0.1x LTM revenue.

- On July 1, 2015, MeadWestvaco Corporation, a provider of packaging solutions to a variety of industries, merged with Rock-Tenn Company, a manufacturer of containerboard and paperboard products, at an implied enterprise value of $11.0 billion, or 11.9x LTM EBITDA. The merger created WestRock Company, the second largest U.S. packaging company behind International Paper, with combined revenue of approximately $15.0 billion.

- On July 31, 2015, Neenah Paper, Inc., a producer of technical products and fine papers, acquired ASP Fibermark LLC, a manufacturer of coated, textured, and colored paper products, at an implied enterprise value of $120.0 million, or 0.8x LTM revenue.

- According to IBIS World, the number of companies in the paper mill industry is expected to decline from 132 enterprises in 2015 to 112 in 2020, an average annual decline of 3.2%. Restructuring, including facility and machine closures, is expected to continue over the next five years as industry operators are negatively affected by declining demand as well as competition from emerging economies, which could potentially benefit if the U.S. dollar continues to appreciate as the economy improves. Competition for market share is expected to increase during this period with larger companies buying the assets of smaller ones and consolidating operations.



Valuation & Financial Opinions



# III. ECONOMIC AND INDUSTRY OUTLOOK

## Applicability to the Company

■ The financial condition and growth prospects of the Company are dependent on the overall performance of the global economy since the industries in which Appvion operates are cyclical. As a result, the economic downturn negatively affected the Company's financial results in fiscal years 2008 and 2009, while a gradual recovery was reflected in higher shipment volumes in fiscal 2010. In fiscal 2011 through 2015, Carbonless shipment volumes were negatively impacted by the gradual decline in the market segment and a strong U.S. dollar in 2015, which have been somewhat offset by the sale of specialty paper products, including colored bond paper and high-speed inkjet product lines. Over the same period, Thermal's financial performance benefitted from improvements in economic conditions, increases in market share, and trade duties imposed against Chinese competitors. However, Thermal's performance was also negatively impacted by increasing raw materials prices through fiscal 2014 as well as manufacturing quality issues in 2013 and 2014, in addition to continued pricing pressure as the result of a foreign competitor, Koehler, returning to the U.S. market. Going forward, the Company expects product pricing for Thermal to increase towards historical averages following price increases by both Koehler and Appvion in the second half of fiscal 2015 and additional price increases scheduled for fiscal 2016. In addition to improved pricing, Thermal's performance is also expected to benefit from volume increases consistent with forecasted near-term growth in the thermal paper industry and the Company's record shipment levels in the third quarter of fiscal 2015. The Company intends to increase efficiency in order to maintain or increase market share despite declining demand for paper products and increased foreign competition.



Valuation & Financial Opinions



Section IV

**Valuation Methodology**

APPVION

Valuation & Financial Opinions



# IV. VALUATION METHODOLOGY

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our estimation of value. A description of each approach is discussed below.

## Market Approach

### Guideline Company Method

■ The Guideline Company Method is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

■ Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

### Applicability to the Company

■ In our application of the Guideline Company Method, we were able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value. A description of each company is presented in Appendix B and the assumptions behind our analysis are presented in Section V of this report.

### Transaction Method

■ The primary focus of the Transaction Method is to examine the terms, prices, and conditions found in either actual sales of the subject company's stock or sales of companies in the industry. After the relevant transactions are identified, transaction multiples (e.g., total capital to earnings before interest and taxes) are derived and applied to the corresponding operating results of the subject company to estimate its implied value.

### Applicability to the Company

■ A search for transactions involving companies in related industries did not indicate a significant number of transactions with sufficient disclosure of financial terms to draw meaningful conclusions to rely on the Transaction Method. As a result, although we considered this form of the Transaction Method, we did not apply it in our estimation of value.





Valuation & Financial Opinions

# IV.  VALUATION METHODOLOGY

## Income Approach

■ The Income Approach is a valuation technique in which the value of a company is estimated based on the earning capacity of that company.

### Discounted Cash Flow Method

■ The Discounted Cash Flow Method is a valuation technique in which the value of a company is estimated based on the present value of its expected future economic benefits. The level of benefit we chose to utilize is distributable cash flow. Distributable cash flow is a preferred measure of a company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to owners of a business without impairing its operations.

■ To perform a Discounted Cash Flow analysis, the available cash flow that a business can generate is projected into the future. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk, and would value the investment accordingly. Each element of this computed rate is expressed in terms of current market yields as of the valuation date.

### Applicability to the Company

■ The application of the Discounted Cash Flow Method is meaningful with respect to the valuation of Appvion. Appvion is an operating entity which is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value.

## Asset Approach

■ The Asset Approach provides an indication of Enterprise Value by developing a Fair Market Value balance sheet. All of the business' assets are identified and listed on the Fair Market Value balance sheet, with intangible assets being determined either collectively or discretely. Restating all liabilities to Fair Market Value and subtracting this amount from the Fair Market Value of assets yields the Fair Market Value of equity.



Valuation & Financial Opinions



# IV. VALUATION METHODOLOGY

**Applicability to the Subject Company**

- Appvion is an operating entity that is producing a return on its assets that indicates value exists over-and-above the value of its tangible underlying assets; that is, it possesses intangible asset value. A significant portion of this intangible asset value does not readily lend itself to discrete valuation and is therefore more appropriately valued collectively as a part of the Company's "goodwill."  Since the calculation of the Company's goodwill would largely require using a valuation method that shares numerous underlying assumptions with the Discounted Cash Flow Method, its use would render a duplicative, and not independent, indication of value. Accordingly, we considered but did not employ the Asset Approach in our determination of the Company's value.

APPVION

Valuation & Financial Opinions



# Section V

## **Guideline Company Method**

APPVION

**Valuation & Financial Opinions**



# V.   GUIDELINE COMPANY METHOD

## Selection of Guideline Companies

■ We searched several sources and held discussions with management to identify guideline public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application in our analysis. Specifically, we started with a broad group of publicly traded companies that operate in the paper products manufacturing industry. After removing companies that (1) do not have common stock actively traded on a major U.S-based exchange and (2) are financially insolvent, we further narrowed our guideline company group.

■ Although there are few public companies directly comparable to Carbonless and Thermal in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors, we were able to identify a group of public companies we deem similar from a risk and return perspective. While these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served, exact comparability is not required under this valuation method. Furthermore, the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general. A summary description of each of the guideline public companies considered relevant for purposes of our analysis is presented in Appendix B. The following is a list of the companies we identified as similar to Carbonless and Thermal for purposes of our analysis:

➢ Neenah Paper Inc.

➢ International Paper Company

➢ Wausau Paper Company

➢ Domtar Corporation

➢ PH Glatfelter Co.





Valuation & Financial Opinions

# V.    GUIDELINE COMPANY METHOD

## Analysis

### Methods of Comparison

The market multiples considered in our analysis include:

- EV / Revenue, and
- EV / EBITDA.

We considered these market multiples over three distinct time periods:

- Projected next fiscal year ("NFY");
- Latest 12 months; and
- Three-Year Average.





Valuation & Financial Opinions

# V. GUIDELINE COMPANY METHOD

**Calculation of Multiples – Carbonless and Thermal**

**Implied Pricing Multiples - Thermal & Carbonless [a]**

*Multiples as of December 31, 2015*

| | EV / NFY EBITDA | EV / LTM EBITDA | EV / 3-Year Average EBITDA | EV / NFY Revenue | EV / LTM Revenue | EV / 3-Year Average Revenue |
|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 8.5x | 9.9x | 11.0x | 1.38x | 1.50x | 1.56x |
| International Paper Company | 6.8x | 7.2x | 7.3x | 1.23x | 1.19x | 1.17x |
| Wausau Paper Corp. | 9.4x | 13.6x | 12.6x | 1.94x | 2.03x | n/m |
| Domtar Corporation | 5.1x | 5.3x | 5.3x | 0.68x | 0.70x | 0.68x |
| PH Glatfelter Co. | 6.6x | 8.7x | 7.7x | 0.72x | 0.71x | 0.69x |
| | | | | | | |
| Low | 5.1x | 5.3x | 5.3x | 0.68x | 0.70x | 0.68x |
| High | 9.4x | 13.6x | 12.6x | 1.94x | 2.03x | 1.56x |
| | | | | | | |
| Mean | 7.3x | 8.9x | 8.8x | 1.19x | 1.23x | 1.03x |
| Median | 6.8x | 8.7x | 7.7x | 1.23x | 1.19x | 0.93x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.

Source:  Exhibit H



**Valuation & Financial Opinions**



# V.  GUIDELINE COMPANY METHOD

## Selection of Multiples – Appvion

**Selected Financial Information - Paperweight Development Corp.**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $22,865.0 | International Paper Company | $3,808.0 | Neenah Paper, Inc. | 5.0% | Wausau Paper Corp. | 3.2% |
| Domtar Corporation | 5,329.0 | Domtar Corporation | 703.0 | PH Glatfelter Co. | 2.4% | Neenah Paper, Inc. | 3.1% |
| PH Glatfelter Co. | 1,689.4 | Neenah Paper, Inc. | 140.4 | Wausau Paper Corp. | 1.7% | International Paper Company | -4.2% |
| Neenah Paper, Inc. | 923.9 | PH Glatfelter Co. | 138.1 | International Paper Company | 1.7% | Domtar Corporation | -5.6% |
| **Paperweight Development Corp.** | **712.1** | Wausau Paper Corp. | 53.8 | Domtar Corporation | -1.0% | **Paperweight Development Corp.** | **-8.2%** |
| Wausau Paper Corp. | 360.4 | **Paperweight Development Corp.** | **47.7** | **Paperweight Development Corp.** | **-4.8%** | PH Glatfelter Co. | -8.8% |
| **Guideline Company Median** | **$1,689.4** | **Guideline Company Median** | **$140.4** | **Guideline Company Median** | **1.7%** | **Guideline Company Median** | **-4.2%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Profitability (LTM Gross Profit Margin) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 9.4% | Wausau Paper Corp. | 33.3% | International Paper Company | 30.9% | International Paper Company | 16.7% |
| International Paper Company | 3.4% | Neenah Paper, Inc. | 17.8% | Neenah Paper, Inc. | 21.1% | Neenah Paper, Inc. | 15.2% |
| Domtar Corporation | -4.1% | International Paper Company | 1.5% | Domtar Corporation | 20.8% | Wausau Paper Corp. | 14.9% |
| Wausau Paper Corp. | -5.4% | Domtar Corporation | -11.6% | Wausau Paper Corp. | 18.1% | Domtar Corporation | 13.2% |
| PH Glatfelter Co. | -5.5% | PH Glatfelter Co. | -27.0% | **Paperweight Development Corp.** | **13.8%** | PH Glatfelter Co. | 8.2% |
| **Paperweight Development Corp.** | **-22.7%** | **Paperweight Development Corp.** | **-34.6%** | PH Glatfelter Co. | 12.0% | **Paperweight Development Corp.** | **6.7%** |
| **Guideline Company Median** | **-4.1%** | **Guideline Company Median** | **1.5%** | **Guideline Company Median** | **20.8%** | **Guideline Company Median** | **14.9%** |

| Profitability (LTM EBIT Margin) | | Profitability (LTM Return on Assets) | | Profitability (LTM Return on Equity) | | Liquidity (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 11.9% | Neenah Paper, Inc. | 7.4% | International Paper Company | 25.7% | Neenah Paper, Inc. | 2.3 |
| International Paper Company | 10.8% | International Paper Company | 3.6% | Neenah Paper, Inc. | 19.2% | Domtar Corporation | 2.1 |
| Domtar Corporation | 6.4% | Domtar Corporation | 2.5% | Domtar Corporation | 5.6% | PH Glatfelter Co. | 1.9 |
| PH Glatfelter Co. | 4.4% | PH Glatfelter Co. | 2.2% | PH Glatfelter Co. | 5.2% | **Paperweight Development Corp.** | **1.5** |
| Wausau Paper Corp. | 3.4% | Wausau Paper Corp. | -0.1% | Wausau Paper Corp. | -0.4% | International Paper Company | 1.3 |
| **Paperweight Development Corp.** | **2.6%** | **Paperweight Development Corp.** | **-4.6%** | **Paperweight Development Corp.** | **n/m** | Wausau Paper Corp. | 1.2 |
| **Guideline Company Median** | **6.4%** | **Guideline Company Median** | **2.5%** | **Guideline Company Median** | **5.6%** | **Guideline Company Median** | **1.9** |

| Activity (LTM Asset Turnover) | | Activity (LTM Inventory Turnover) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (LTM EBIT / Interest Expense) | |
|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp.** | **1.7** | **Paperweight Development Corp.** | **8.1** | **Paperweight Development Corp.** | **9.1** | Neenah Paper, Inc. | 9.4 |
| Neenah Paper, Inc. | 1.2 | Wausau Paper Corp. | 7.5 | International Paper Company | 4.2 | PH Glatfelter Co. | 4.1 |
| PH Glatfelter Co. | 1.1 | Neenah Paper, Inc. | 6.8 | Wausau Paper Corp. | 3.2 | International Paper Company | 3.8 |
| Domtar Corporation | 0.9 | Neenah Paper, Inc. | 6.1 | PH Glatfelter Co. | 2.8 | Domtar Corporation | 3.6 |
| Wausau Paper Corp. | 0.8 | PH Glatfelter Co. | 6.0 | Domtar Corporation | 1.8 | Wausau Paper Corp. | 0.9 |
| International Paper Company | 0.7 | Domtar Corporation | 5.6 | Neenah Paper, Inc. | 1.8 | **Paperweight Development Corp.** | **0.4** |
| **Guideline Company Median** | **0.9** | **Guideline Company Median** | **6.1** | **Guideline Company Median** | **2.8** | **Guideline Company Median** | **3.8** |

Source:  Capital IQ, Inc. and Paperweight Development Corp. financials.



Valuation & Financial Opinions

SRR
STOUT│RISIUS│ROSS

# V. GUIDELINE COMPANY METHOD

## Selection of Multiples – Carbonless & Thermal

**Selected Financial Information - Carbonless & Thermal**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $22,865.0 | International Paper Company | $3,808.0 | Neenah Paper, Inc. | 5.0% | Wausau Paper Corp. | 3.2% |
| Domtar Corporation | 5,329.0 | Domtar Corporation | 703.0 | PH Glatfelter Co. | 2.4% | Neenah Paper, Inc. | 3.1% |
| PH Glatfelter Co. | 1,689.4 | Neenah Paper, Inc. | 140.4 | Wausau Paper Corp. | 1.7% | Carbonless | -3.4% |
| Neenah Paper, Inc. | 923.9 | PH Glatfelter Co. | 138.1 | International Paper Company | 1.7% | International Paper Company | -4.2% |
| Thermal | 374.8 | Wausau Paper Corp. | 53.8 | Domtar Corporation | -1.0% | Domtar Corporation | -5.6% |
| Wausau Paper Corp. | 360.4 | Carbonless | 43.8 | Thermal | -3.3% | PH Glatfelter Co. | -8.8% |
| Carbonless | 337.3 | Thermal | 6.3 | Carbonless | -6.4% | Thermal | -9.8% |
| **Guideline Company Median** | **$1,306.7** | **Guideline Company Median** | **$139.2** | **Guideline Company Median** | **1.7%** | **Guideline Company Median** | **-4.9%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (Projected EBITDA Growth) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 9.4% | Wausau Paper Corp. | 33.3% | Wausau Paper Corp. | 35.9% | International Paper Company | 16.7% |
| International Paper Company | 3.4% | Neenah Paper, Inc. | 17.8% | PH Glatfelter Co. | 24.1% | Neenah Paper, Inc. | 15.2% |
| Domtar Corporation | -4.1% | International Paper Company | 1.5% | Neenah Paper, Inc. | 14.7% | Wausau Paper Corp. | 14.9% |
| Carbonless | -5.3% | Carbonless | 1.4% | International Paper Company | 6.5% | Domtar Corporation | 13.2% |
| Wausau Paper Corp. | -5.4% | Domtar Corporation | -11.6% | Domtar Corporation | 3.3% | Carbonless | 13.0% |
| PH Glatfelter Co. | -5.5% | PH Glatfelter Co. | -27.0% | Carbonless | 0.5% | PH Glatfelter Co. | 8.2% |
| Thermal | -51.5% | Thermal | -77.6% | Thermal | n/m | Thermal | 1.7% |
| **Guideline Company Median** | **-4.7%** | **Guideline Company Median** | **-5.1%** | **Guideline Company Median** | **14.7%** | **Guideline Company Median** | **14.1%** |

Source: Capital IQ, Inc. and Carbonless financials.



**Valuation & Financial Opinions**

SRR STOUT | RISIUS | ROSS

# V.  GUIDELINE COMPANY METHOD

## Conclusion - Carbonless

- We selected pricing multiples to apply to Carbonless based on the following:
  - ➢ Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA;
  - ➢ Revenue is expected to decline through the projection period due to the declining market;
  - ➢ Projected EBITDA margins are expected to improve during the projection period as a result of increased efficiency resulting from (1) improved product mix; (2) cost reductions; (3) the resolution of internal manufacturing issues; and (4) the shift of carbonless paper production to more variable-cost facilities;
  - ➢ Carbonless' net sales and adjusted EBITDA projections were 5.2% lower and 1.9% higher, on average, than the projections used as of the June 30, 2015 analysis for the applicable years; and
  - ➢ there is some positive correlation between profitability and revenue pricing multiples.
- Based on these and other factors, we selected both revenue and EBITDA multiples for Carbonless near the low end of the range of the guideline companies for the LTM and NFY periods.



Valuation & Financial Opinions



# V.  GUIDELINE COMPANY METHOD

**Guideline Company Method - Carbonless**

*In Thousands of U.S. Dollars*

| | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $    44,107 | 5.1x | 9.4x | 7.3x | 6.8x | 5.5x | $    243,000 |
| Revenue | 321,962 | 0.68x | 1.94x | 1.19x | 1.23x | 0.75x | 241,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 43,826 | 5.3x | 13.6x | 8.9x | 8.7x | 6.0x | 263,000 |
| Revenue | 337,331 | 0.70x | 2.03x | 1.23x | 1.19x | 0.75x | 253,000 |

| Enterprise Value, Controlling Interest Basis (Rounded) | $  250,000 |
|---|---|



Valuation & Financial Opinions



# V.  GUIDELINE COMPANY METHOD

## Conclusion - Thermal

- We selected pricing multiples to apply to Thermal based on the following:
  - ➤ Thermal is smaller than all of the guideline companies in terms of EBITDA and all but one of the guideline companies in terms of revenue, which suggests lower pricing multiples;
  - ➤ Thermal profitability as a percentage of revenue is below all of the guideline companies;
  - ➤ Thermal's historical one-year and three-year revenue and EBITDA growth rates are below all of the guideline companies;
  - ➤ Thermal's future profitability and growth are expected to benefit from the supply agreement with Domtar;
  - ➤ Thermal's revenue and profitability has been negatively impacted by pricing competition from Koehler, a specialty paper company based in Germany, resulting in lower point-of-sale product pricing;
  - ➤ Company management expects point-of-sale product pricing to increase towards the historical mean throughout the projection period, consistent with recent price increases by the Company in September 2015 and an expected price increase in January 2016;
  - ➤ Thermal's earnings run rate as of the Valuation Date is consistent with the Company's fiscal 2016 forecast as well as Thermal achieving record shipment levels in the third quarter of fiscal 2015 and improving market conditions;
  - ➤ Thermal's net sales and adjusted EBITDA projections were 2.1% higher and 2.9% lower, on average, than the projections used as of the June 30, 2015 analysis for the applicable years; and
  - ➤ Thermal's LTM and NFY financial results are below historical levels but are expected to improve in the future, with the division expected to return to a normal level of operating performance in fiscal years 2016 and 2017, consistent with normal industry business cycles.
- Based on these and other factors, we selected revenue multiples near the low end of the range of the guideline companies. We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis.



Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1034 of 1527    Document 212

Valuation & Financial Opinions



# V.   GUIDELINE COMPANY METHOD

**Guideline Company Method - Thermal**

*In Thousands of U.S. Dollars*

| | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 28,593 | 5.1x | 9.4x | 7.3x | 6.8x | n/m | n/m |
| Revenue | 405,831 | 0.68x | 1.94x | 1.19x | 1.23x | 0.65x | 264,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 6,296 | 5.3x | 13.6x | 8.9x | 8.7x | n/m | n/m |
| Revenue | 374,752 | 0.70x | 2.03x | 1.23x | 1.19x | 0.70x | 262,000 |
| **Three-Year Average:** | | | | | | | |
| EBITDA | 25,439 | 5.3x | 12.6x | 8.8x | 7.7x | n/m | n/m |
| Revenue | 403,722 | 0.68x | 1.56x | 1.03x | 0.93x | 0.65x | 262,000 |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ 263,000 |
|---|---|





Valuation & Financial Opinions

Section VI

**Discounted Cash Flow Method**

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1036 of 1527    Document 1-2

APPVION

Valuation & Financial Opinions



# VI. DISCOUNTED CASH FLOW METHOD

The Discounted Cash Flow Method derives an estimate of value through the use of a market-derived discount rate to capitalize anticipated financial performance.

- The cash flows expected to be generated by the Company are discounted to their present value equivalent using a rate of return that reflects the relative risk of an investment in Carbonless and Thermal, as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt). The return for Carbonless and Thermal, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure.

- The following charts illustrate our concluded WACCs for Carbonless and Thermal:





# VI.  DISCOUNTED CASH FLOW METHOD

### Weighted Average Cost of Capital - Carbonless

#### Required Return on Equity

Capital Asset Pricing Model

| | | |
|---|---|---|
| Risk-Free Rate of Return [a] | | 2.7% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.20 | 7.2% |
| Small Stock Risk Premium [b] | | 5.8% |
| Company-Specific Risk Premium | | 1.0% |
| **Required Return on Equity - CAPM** | | **16.7%** |

#### Cost of Debt

Cost of Debt

| | | |
|---|---|---|
| Cost of Debt [c] | | 5.5% |
| Less:  Income Tax Factor | 38.5% | -2.1% |
| **After-tax Cost of Debt** | | **3.4%** |

#### Weighted Average Cost of Capital

| | | |
|---|---|---|
| Equity Allocation of Capital Structure | 60.0% | 10.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.4% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.5%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on Duff & Phelps LLC, 2015 Valuation Handbook – Guide to Cost of Capital.
[c] Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# VI.   DISCOUNTED CASH FLOW METHOD

**Weighted Average Cost of Capital - Thermal**

| | | |
|---|---:|---:|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.7% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.20 | 7.2% |
| Small Stock Risk Premium [b] | | 5.8% |
| Company-Specific Risk Premium | | 2.0% |
| **Required Return on Equity - CAPM** | | **17.7%** |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [c] | | 5.5% |
| Less:  Income Tax Factor | 38.5% | -2.1% |
| **After-tax Cost of Debt** | | **3.4%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 10.6% |
| Debt Allocation of Capital Structure | 40.0% | 1.4% |
| **Weighted Average Cost of Capital (Rounded)** | | **12.0%** |

[a]  20-year U.S. Treasury bond yield as of the Valuation Date.

[b]  Based on Duff & Phelps LLC, 2015 Valuation Handbook – Guide to Cost of Capital.

[c]  Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

## Conclusion – Carbonless and Thermal

**Discounted Cash Flow Method - Carbonless**

| *In Thousands of U.S. Dollars* | | For the Fiscal Year Ending | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year 1 12/31/2016 | Year 2 12/31/2017 | Year 3 12/31/2018 | Year 4 12/31/2019 | Year 5 12/31/2020 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | |
| Depreciation and Amortization | (13,838) | (13,838) | (13,838) | (13,838) | (13,838) | |
| Income Taxes | (11,654) | (12,910) | (12,869) | (12,320) | (12,236) | |
| **Debt-Free Net Income** | **18,615** | **20,623** | **20,558** | **19,680** | **19,545** | |
| | | | | | | |
| Depreciation and Amortization | 13,838 | 13,838 | 13,838 | 13,838 | 13,838 | |
| Capital Expenditures | (12,000) | (9,000) | (9,000) | (9,000) | (9,000) | |
| Additional Working Capital [a] | 900 | 1,300 | 1,300 | 1,600 | 0 | |
| **Distributable Cash Flows** | **21,353** | **26,761** | **26,696** | **26,118** | **24,383** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9470** | **0.8494** | **0.7618** | **0.6832** | **0.6127** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **20,222** | **22,729** | **20,335** | **17,844** | **14,940** | |

| **Enterprise Value** | | **Terminal Value** | |
| --- | --- | --- | --- |
| Total Present Value of Distributable Cash Flows (Through 2020) | 96,000 | 2020 EBITDA | $ 45,619 |
| Present Value of Terminal Enterprise Value | 146,000 | Terminal EBITDA Multiple | 5.5x |
| | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 242,000** | **Terminal Enterprise Value** | **250,906** |
| | | Present Value Factor | 0.5803 |
| | | **Present Value of Terminal Enterprise Value** | **$ 146,000** |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

**Discounted Cash Flow Method - Thermal**

*In Thousands of U.S. Dollars*

| | Year 1 12/31/2016 | Year 2 12/31/2017 | Year 3 12/31/2018 | Year 4 12/31/2019 | Year 5 12/31/2020 | Residual |
|---|---|---|---|---|---|---|
| | | | For the Fiscal Year Ending | | | |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $  28,593 | $  41,089 | $  46,604 | $  52,609 | $  56,092 | |
| Depreciation and Amortization | (13,148) | (13,148) | (13,148) | (13,148) | (13,148) | |
| Income Taxes | (5,946) | (10,757) | (12,881) | (15,192) | (16,533) | |
| **Debt-Free Net Income** | **9,499** | **17,184** | **20,575** | **24,268** | **26,410** | |
| | | | | | | |
| Depreciation and Amortization | 13,148 | 13,148 | 13,148 | 13,148 | 13,148 | |
| Capital Expenditures | (6,000) | (5,000) | (5,000) | (5,000) | (5,000) | |
| Additional Working Capital [a] | (1,500) | (2,600) | (2,200) | (1,700) | 0 | |
| **Distributable Cash Flows** | **15,147** | **22,732** | **26,523** | **30,716** | **34,558** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9449** | **0.8437** | **0.7533** | **0.6726** | **0.6005** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **14,312** | **19,178** | **19,979** | **20,659** | **20,753** | |

| **Enterprise Value** | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2020) | 95,000 | 2020 EBITDA | $  56,092 |
| Present Value of Terminal Enterprise Value | 175,000 | Terminal EBITDA Multiple | 5.5x |
| | | | |
| | | Terminal Enterprise Value | 308,505 |
| **Enterprise Value, Controlling Interest Basis (Rounded)    $  270,000** | | Present Value Factor | 0.5674 |
| | | **Present Value of Terminal Enterprise Value   $  175,000** | |

[a] Assumes working capital is equal to 12.0% of revenue.
[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 1041 of 1527   Document 1-2

Valuation & Financial Opinions



Section VII

**Valuation Reconciliation and Conclusion**

APPVION

Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

## Conclusion of Enterprise Value

- We considered the appropriateness, accuracy, and quantity of evidence as primary criteria in reconciling the aforementioned valuation approaches. To determine the Enterprise Value of Carbonless and Thermal, we considered the strengths and weaknesses of each of the valuation methods applied in terms of the above three criteria.

- In our valuation analysis of the Company, we analyzed Carbonless and Thermal using the DCF Method and the Guideline Company Method. These estimates of value implicitly incorporate equal weighting of each valuation methodology utilized.

- Based upon our analysis, we believe that these methods provide an accurate indication of the Company's Enterprise Value. The values indicated by each method are presented in the following table:

### Conclusion of Value

| In Thousands of U.S. Dollars | | Indicated Value |
|---|---|---|
| **Carbonless** | | |
| Guideline Company Method | $ | 250,000 |
| Discounted Cash Flow Method | | 242,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **246,000** |
| **Thermal** | | |
| Guideline Company Method | $ | 263,000 |
| Discounted Cash Flow Method | | 270,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **267,000** |
| **Concluded Enterprise Value for Appvion (Rounded)** | **$** | **513,000** |





Valuation & Financial Opinions

# VII. VALUATION RECONCILIATION AND CONCLUSION

## Adjustments to Enterprise Value

■ Enterprise Value incorporates the value of total invested capital, including the value of both debt and equity. Several adjustments are necessary in order to derive the Fair Market Value of equity.

### Interest-Bearing Debt, Net of Cash

■ The Company had $413.5 million of interest-bearing debt as of the Valuation Date, excluding the Company's revolving credit facility which is used to finance working capital needs.

■ Our valuation analysis was performed on a "net-of-cash" basis. Therefore, in addition to the value associated with the cash flows generated by the Company, the value of its existing cash balance must be considered. The Company's estimated cash balance as of December 31, 2015 was $1.9 million.

■ Since Enterprise Value incorporates the value of total invested capital (i.e., both debt and equity), we subtracted the face value of the Company's debt, net of the Company's existing cash balance, of $411.7 million as of the Valuation Date to estimate the value of the equity.

### Fox River Liability

■ Pursuant to the Funding Agreement, the Company will pay a maximum of $7.5 million through fiscal 2016 related to the Fox River environmental clean-up. Accordingly, we subtracted this amount from the Company's Enterprise Value.

## Adjustments to Equity Value

### Impact of Synthetic Equity Units, Restricted Stock Units, and Phantom Stock

■ As of the Valuation Date, there were 2,063,134 LTIP units outstanding with a weighted average exercise price of $18.19 per share. We subtracted the dilutive impact of the Company's outstanding in-the-money LTIP units.

■ In addition, there were 359,975 RSUs and 121,987.493 shares of phantom stock as of the Valuation Date. We subtracted the dilutive impact of the Company's RSUs and phantom stock.



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

**Discount for Limited Marketability**

- In calculating the Company's equity value, it is appropriate to consider a discount for limited marketability. All else being equal, an investment in which the owner is able to achieve liquidity (i.e., convert into cash) quickly is worth more than an investment that is not as liquid. Thus, publicly traded companies, which are readily marketable, are worth more than privately held companies. The diminution in value associated with this factor is referred to as a discount for limited marketability.

- Appvion is closely monitoring its repurchase obligation, and Company management believes that the Company may be obligated to repurchase 30.0% or more of the Company's common stock from ESOP participants over the next five years. By itself, the impact of the repurchase obligation on the Company's current and future share price is immaterial since the dilution caused by the decrease in Company cash or increase in debt will be offset by the corresponding reduction in shares outstanding, and the Company is projected to have adequate cash flow to satisfy the share repurchases. Based on our analysis and all of the information regarding the Company's business operations and strategic initiatives as of the Valuation Date, the impact of the Company's future repurchase obligation on the marketability of the common shares owned by the ESOP should not exceed 5.0% of the Company's equity value, or approximately $4.7 million in aggregate.





Valuation & Financial Opinions

# VII. VALUATION RECONCILIATION AND CONCLUSION

## Conclusion of Value

**Conclusion of Value**

| *In Thousands of U.S. Dollars* | | **Indicated Value** |
|---|---|---|
| Carbonless | $ | 246,000 |
| Thermal | | 267,000 |
| **Concluded Enterprise Value** | $ | **513,000** |
| Less:  Interest-Bearing Debt, Net of Cash [a] | | (411,648) |
| Less:  Fox River Liability | | (7,500) |
| **Marketable, Controlling-Interest Value of Equity** | $ | **93,900** |
| Less:  Discount for Limited Marketability     5.0% | | (4,700) |
| **Fair Market Value of Equity (Rounded)** | $ | **89,200** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (6,201) |
| **Fair Market Value of Equity (Rounded)** | $ | **83,000** |
| Divided by: Shares Outstanding [b] | | 6,751.614 |
| **Fair Market Value of Equity per Share** | $ | **12.30** |

[a] Based on the Company's balance sheet as of December 31, 2015. Excludes the Company's revolving credit facility which is used to finance working capital needs.

[b] Includes 6,621,614 shares as of December 31, 2015 and 130,000 to-be-issued shares.



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

## Comparison to Prior Valuation

<div align="center">

**Reconciliation of Value**

</div>

*In Thousands of U.S. Dollars*

| | | 6/30/2015 Valuation | | 12/31/2015 Valuation | Amount of Change | Percentage Change | | Per Share Change |
|---|---|---|---|---|---|---|---|---|
| Carbonless | | $ 246,000 | | $ 246,000 | 0 | **0.0%** | | |
| Thermal | | 263,000 | | 267,000 | 4,000 | **1.5%** | | |
| **Concluded Enterprise Value** | | **$ 509,000** | | **$ 513,000** | **$ 4,000** | **0.8%** | **$** | **0.58** |
| Less: Interest-Bearing Debt, Net of Cash | | (393,218) | | (411,648) | (18,430) | **4.7%** | | **(2.66)** |
| Less: Fox River Liability | | (15,000) | | (7,500) | 7,500 | | | **1.08** |
| **Marketable, Controlling-Interest Value of Equity** | | **$ 100,800** | | **$ 93,900** | **$ (6,900)** | **-6.8%** | **$** | **(1.00)** |
| Less: Discount for Limited Marketability | 5.0% | (5,000) | 5.0% | (4,700) | 300 | | | 0.04 |
| **Fair Market Value of Equity (Rounded)** | | **$ 95,800** | | **$ 89,200** | **$ (6,600)** | **-6.9%** | **$** | **(0.95)** |
| Less: Synthetic Equity, RSU, and Phantom Stock Adjustment | | (6,411) | | (6,201) | 210 | | | 0.03 |
| **Fair Market Value of Equity (Rounded)** | | **$ 89,400** | | **$ 83,000** | **$ (6,400)** | **-7.2%** | **$** | **(0.92)** |
| Divided by: Shares Outstanding | | 6,934.029 | | 6,751.614 | | | | 0.32 |
| **Indicated Market Value of Equity per Share** | | **$ 12.90** | | **$ 12.30** | | **-4.7%** | **$** | **(0.60)** |



**Valuation & Financial Opinions**



# VII. VALUATION RECONCILIATION AND CONCLUSION



**Appvion Historical Stock Price: November 2001 - December 2015**



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

## Summary of Change of Value

### Enterprise Value

■ The Enterprise Value for Carbonless as of December 31, 2015 remained unchanged from the prior valuation as of June 30, 2015 at $246.0 million.

■ The Enterprise Value for Thermal increased by 1.5% from $263.0 million as of June 30, 2015 to $267.0 million as of the Valuation Date. The increase in Thermal's Enterprise Value is primarily due to (1) the Company's ability to implement price increases in September 2015 and expected price increases in January 2016; (2) increased shipments of Thermal paper in the second half of fiscal 2015 including record shipments in the third quarter of 2015; and (3) increased opportunities to gain market share in the thermal paper market as certain competitors exited the North American market.

### Fox River Liability

■ On September 30, 2014, the Company entered into the Funding Agreement in which it agreed to pay up to $25 million of costs related to the cleanup of the Lower Fox River. As of the Valuation Date, the Company recorded a liability of $7.5 million for remaining costs resulting from the Funding Agreement, relative to a liability of $15.0 million as of June 30, 2015, consistent with the terms of the Funding Agreement.

### Shares Outstanding

■ The number of the Company's fully-diluted shares outstanding decreased from 6,934,029 as of the June 30, 2015 analysis to 6,751,614 as of the current analysis as a result of redemptions due to distributions and diversifications.





Valuation & Financial Opinions

Section VIII

**Opinion**



Valuation & Financial Opinions



# VIII. OPINION

## Opinion

- In accordance with the foregoing, it is our opinion that the Fair Market Value of the common stock of Appvion held by the ESOP on a controlling interest, per share basis (6,751,614 common shares outstanding), taking into consideration the appropriate discount for limited marketability, as of December 31, 2015, is reasonably stated in the amount of:

### *$12.30*

\*    \*    \*    \*    \*    \*    \*

## Assumptions and Limiting Conditions

- This opinion is solely for the use and benefit of the Trustee, and any summary of or reference to the opinion or any other reference to SRR by the Company will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld. The opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

- Reference should be made to Appendix D, as well as our engagement letter dated May 18, 2015, for assumptions and limiting conditions that are applicable to our conclusions and our financial advisory role.



Valuation & Financial Opinions



# Appendix A

## Exhibits




## A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| In Thousands of U.S. Dollars | | Indicated Value |
|---|---|---|
| Carbonless | $ | 246,000 |
| Thermal | | 267,000 |
| **Concluded Enterprise Value** | $ | **513,000** |
| Less:  Interest-Bearing Debt, Net of Cash [a] | | (411,648) |
| Less:  Fox River Liability | | (7,500) |
| **Marketable, Controlling-Interest Value of Equity** | $ | **93,900** |
| Less:  Discount for Limited Marketability 5.0% | | (4,700) |
| **Fair Market Value of Equity (Rounded)** | $ | **89,200** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (6,201) |
| **Fair Market Value of Equity (Rounded)** | $ | **83,000** |
| Divided by: Shares Outstanding [b] | | 6,751.614 |
| **Fair Market Value of Equity per Share** | $ | **12.30** |

[a] Based on the Company's balance sheet as of December 31, 2015. Excludes the Company's revolving credit facility which is used to finance working capital needs.

[b] Includes 6,621,614 shares as of December 31, 2015 and 130,000 to-be-issued shares.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| In Thousands of U.S. Dollars | | Indicated Value |
|---|---|---|
| **Carbonless** | | |
| Guideline Company Method | $ | 250,000 |
| Discounted Cash Flow Method | | 242,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **246,000** |
| **Thermal** | | |
| Guideline Company Method | $ | 263,000 |
| Discounted Cash Flow Method | | 270,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **267,000** |
| **Concluded Enterprise Value for Appvion (Rounded)** | **$** | **513,000** |

APPVION

**Valuation & Financial Opinions**



## A.  EXHIBITS

**Exhibit B - Guideline Company Method - Carbonless**

*In Thousands of U.S. Dollars*

| | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 44,107 | 5.1x | 9.4x | 7.3x | 6.8x | 5.5x | $ 243,000 |
| Revenue | 321,962 | 0.68x | 1.94x | 1.19x | 1.23x | 0.75x | 241,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 43,826 | 5.3x | 13.6x | 8.9x | 8.7x | 6.0x | 263,000 |
| Revenue | 337,331 | 0.70x | 2.03x | 1.23x | 1.19x | 0.75x | 253,000 |

| Enterprise Value, Controlling Interest Basis (Rounded) | $ 250,000 |
|---|---|



Valuation & Financial Opinions



# A. EXHIBITS

## Exhibit B - Discounted Cash Flow Method - Carbonless

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ending | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year 1 12/31/2016 | Year 2 12/31/2017 | Year 3 12/31/2018 | Year 4 12/31/2019 | Year 5 12/31/2020 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | |
| Depreciation and Amortization | (13,838) | (13,838) | (13,838) | (13,838) | (13,838) | |
| Income Taxes | (11,654) | (12,910) | (12,869) | (12,320) | (12,236) | |
| **Debt-Free Net Income** | **18,615** | **20,623** | **20,558** | **19,680** | **19,545** | |
| | | | | | | |
| Depreciation and Amortization | 13,838 | 13,838 | 13,838 | 13,838 | 13,838 | |
| Capital Expenditures | (12,000) | (9,000) | (9,000) | (9,000) | (9,000) | |
| Additional Working Capital [a] | 900 | 1,300 | 1,300 | 1,600 | 0 | |
| **Distributable Cash Flows** | **21,353** | **26,761** | **26,696** | **26,118** | **24,383** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.5% | 11.5% | 11.5% | 11.5% | 11.5% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9470** | **0.8494** | **0.7618** | **0.6832** | **0.6127** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | 20,222 | 22,729 | 20,335 | 17,844 | 14,940 | |

| **Enterprise Value** | | **Terminal Value** | |
| --- | --- | --- | --- |
| Total Present Value of Distributable Cash Flows (Through 2020) | 96,000 | 2020 EBITDA | $ 45,619 |
| Present Value of Terminal Enterprise Value | 146,000 | Terminal EBITDA Multiple | 5.5x |
| | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 242,000** | **Terminal Enterprise Value** | **250,906** |
| | | Present Value Factor | 0.5803 |
| | | **Present Value of Terminal Enterprise Value** | **$ 146,000** |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Case 1:19-cv-01561-WCG  Filed 11/19/19  Page 1056 of 1527  Document 1-2

Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit B - Reported Income Statements - Carbonless**

| In Thousands of U.S. Dollars | | | | | For the Fiscal Year Ended | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 10/31/2015 | % |
| **Net Sales** | $    479,058 | 100.0% | $    453,007 | 100.0% | $    406,845 | 100.0% | $    351,468 | 100.0% | $    349,376 | 100.0% | $    337,331 | 100.0% |
| *Growth Rate* | *n/a* | | *-5.4%* | | *-10.2%* | | *-13.6%* | | *-0.6%* | | *-3.4%* | |
| Cost of Sales | 348,829 | 72.8% | 340,063 | 75.1% | 306,441 | 75.3% | 285,175 | 81.1% | 289,156 | 82.8% | 279,177 | 82.8% |
| Gross Profit | 130,229 | 27.2% | 112,944 | 24.9% | 100,404 | 24.7% | 66,293 | 18.9% | 60,220 | 17.2% | 58,154 | 17.2% |
| Operating Expenses | 71,529 | | 61,676 | | 65,516 | | 12,798 | | 15,535 | | 13,073 | |
| Depreciation | 27,579 | | 26,261 | | 21,550 | | 15,093 | | 13,967 | | 14,603 | |
| S,G&A Expenses | 99,108 | 20.7% | 87,937 | 19.4% | 87,066 | 21.4% | 27,891 | 7.9% | 29,502 | 8.4% | 27,676 | 8.2% |
| **Operating Income** | **31,121** | 6.5% | **25,007** | 5.5% | **13,338** | 3.3% | **38,402** | 10.9% | **30,718** | 8.8% | **30,478** | 9.0% |
| Additional Adjustments [a] | 687 | 0.1% | (1,537) | -0.3% | 16,214 | 4.0% | (2,667) | -0.8% | (1,449) | -0.4% | (1,255) | -0.4% |
| **Total Adjustments** | **687** | 0.1% | **(1,537)** | -0.3% | **16,214** | 4.0% | **(2,667)** | -0.8% | **(1,449)** | -0.4% | **(1,255)** | -0.4% |
| **EBIT** | $    31,808 | 6.6% | $    23,470 | 5.2% | $    29,552 | 7.3% | $    35,735 | 10.2% | $    29,269 | 8.4% | $    29,223 | 8.7% |
| **EBITDA** | $    59,387 | 12.4% | $    49,731 | 11.0% | $    51,102 | 12.6% | $    50,828 | 14.5% | $    43,236 | 12.4% | $    43,826 | 13.0% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with
    Company management.  Also includes unallocated overhead expense in fiscal years 2010 through the LTM period.
Source:  Management prepared schedules and discussions with Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit B - Projected Income Statements - Carbonless**

| *In Thousands of U.S. Dollars* | | | | | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2016 | % | 12/31/2017 | % | 12/31/2018 | % | 12/31/2019 | % | 12/31/2020 | % |
| **Net Sales [a]** | $ 321,962 | 100.0% | $ 311,050 | 100.0% | $ 299,807 | 100.0% | $ 286,406 | 100.0% | $ 286,406 | 100.0% |
| *Growth Rate* | *-4.6%* | | *-3.4%* | | *-3.6%* | | *-4.5%* | | *0.0%* | |
| Cost of Sales and Operating Costs [b] | 277,855 | | 263,679 | | 252,542 | | 240,568 | | 240,787 | |
| Depreciation and Amortization | 13,838 | | 13,838 | | 13,838 | | 13,838 | | 13,838 | |
| Total S,G&A Expenses | 291,693 | 90.6% | 277,517 | 89.2% | 266,380 | 88.9% | 254,406 | 88.8% | 254,625 | 88.9% |
| **Operating Income** | **30,269** | 9.4% | **33,533** | 10.8% | **33,427** | 11.1% | **32,000** | 11.2% | **31,781** | 11.1% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ **30,269** | 9.4% | $ **33,533** | 10.8% | $ **33,427** | 11.1% | $ **32,000** | 11.2% | $ **31,781** | 11.1% |
| **EBITDA** | $ **44,107** | 13.7% | $ **47,371** | 15.2% | $ **47,265** | 15.8% | $ **45,838** | 16.0% | $ **45,619** | 15.9% |

[a] Includes the Company's Security and Carbonless divisions.
[b] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.
Source:  Management prepared projections



# A.  EXHIBITS

### Exhibit B - Weighted Average Cost of Capital - Carbonless

#### Required Return on Equity

##### Capital Asset Pricing Model

| | | |
|---|---:|---:|
| Risk-Free Rate of Return [a] | | 2.7% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.20 | 7.2% |
| Small Stock Risk Premium [b] | | 5.8% |
| Company-Specific Risk Premium | | 1.0% |
| **Required Return on Equity - CAPM** | | **16.7%** |

#### Cost of Debt

##### Cost of Debt

| | | |
|---|---:|---:|
| Cost of Debt [c] | | 5.5% |
| Less:  Income Tax Factor | 38.5% | -2.1% |
| **After-tax Cost of Debt** | | **3.4%** |

#### Weighted Average Cost of Capital

| | | |
|---|---:|---:|
| Equity Allocation of Capital Structure | 60.0% | 10.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.4% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.5%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on Duff & Phelps LLC, 2015 Valuation Handbook – Guide to Cost of Capital.
[c] Based on estimated senior lending rates as of the Valuation Date.




Valuation & Financial Opinions

## A.  EXHIBITS

### Exhibit C - Guideline Company Method - Thermal

*In Thousands of U.S. Dollars*

| | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $  28,593 | 5.1x | 9.4x | 7.3x | 6.8x | n/m | n/m |
| Revenue | 405,831 | 0.68x | 1.94x | 1.19x | 1.23x | 0.65x | 264,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 6,296 | 5.3x | 13.6x | 8.9x | 8.7x | n/m | n/m |
| Revenue | 374,752 | 0.70x | 2.03x | 1.23x | 1.19x | 0.70x | 262,000 |
| **Three-Year Average:** | | | | | | | |
| EBITDA | 25,439 | 5.3x | 12.6x | 8.8x | 7.7x | n/m | n/m |
| Revenue | 403,722 | 0.68x | 1.56x | 1.03x | 0.93x | 0.65x | 262,000 |

| Enterprise Value, Controlling Interest Basis (Rounded) | $   263,000 |
|---|---|



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit C - Discounted Cash Flow Method - Thermal**

| In Thousands of U.S. Dollars | | For the Fiscal Year Ending | | | | |
|---|---|---|---|---|---|---|
| | Year 1 12/31/2016 | Year 2 12/31/2017 | Year 3 12/31/2018 | Year 4 12/31/2019 | Year 5 12/31/2020 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $  28,593 | $  41,089 | $  46,604 | $  52,609 | $  56,092 | |
| Depreciation and Amortization | (13,148) | (13,148) | (13,148) | (13,148) | (13,148) | |
| Income Taxes | (5,946) | (10,757) | (12,881) | (15,192) | (16,533) | |
| **Debt-Free Net Income** | **9,499** | **17,184** | **20,575** | **24,268** | **26,410** | |
| | | | | | | |
| Depreciation and Amortization | 13,148 | 13,148 | 13,148 | 13,148 | 13,148 | |
| Capital Expenditures | (6,000) | (5,000) | (5,000) | (5,000) | (5,000) | |
| Additional Working Capital [a] | (1,500) | (2,600) | (2,200) | (1,700) | 0 | |
| **Distributable Cash Flows** | **15,147** | **22,732** | **26,523** | **30,716** | **34,558** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9449** | **0.8437** | **0.7533** | **0.6726** | **0.6005** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **14,312** | **19,178** | **19,979** | **20,659** | **20,753** | |

| **Enterprise Value** | | | **Terminal Value** | |
|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2020) | 95,000 | | 2020 EBITDA | $  56,092 |
| Present Value of Terminal Enterprise Value | 175,000 | | Terminal EBITDA Multiple | 5.5x |
| | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$  270,000** | | **Terminal Enterprise Value** | **308,505** |
| | | | Present Value Factor | 0.5674 |
| | | | **Present Value of Terminal Enterprise Value** | **$  175,000** |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit C - Reported Income Statements - Thermal**

| In Thousands of U.S. Dollars | | | For the Fiscal Year Ended | | | | | | | | | 12 Months Ended 10/31/2015 | % | Three-Year Average | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | | | | |
| **Net Sales** | $ 341,776 | 100.0% | $ 370,832 | 100.0% | $ 411,699 | 100.0% | $ 421,089 | 100.0% | $ 415,325 | 100.0% | $ 374,752 | 100.0% | $ 403,722 | 100.0% |
| *Growth Rate* | *n/a* | | *8.5%* | | *11.0%* | | *2.3%* | | *-1.4%* | | *-9.8%* | | | |
| Cost of Sales | 307,211 | 89.9% | 320,037 | 86.3% | 356,943 | 86.7% | 369,241 | 87.7% | 377,097 | 90.8% | 359,560 | 95.9% | 368,633 | 91.3% |
| Gross Profit | 34,565 | 10.1% | 50,795 | 13.7% | 54,756 | 13.3% | 51,848 | 12.3% | 38,228 | 9.2% | 15,192 | 4.1% | 35,089 | 8.7% |
| Operating Expenses | 16,742 | | 16,844 | | 27,014 | | 8,069 | | 10,715 | | 8,285 | | 9,023 | |
| Depreciation | 19,702 | | 18,454 | | 16,405 | | 12,983 | | 13,499 | | 13,194 | | 13,225 | |
| S,G&A Expenses | 36,444 | 10.7% | 35,298 | 9.5% | 43,419 | 10.5% | 21,052 | 5.0% | 24,214 | 5.8% | 21,479 | 5.7% | 22,248 | 5.5% |
| **Operating Income** | **(1,879)** | -0.5% | **15,497** | 4.2% | **11,337** | 2.8% | **30,796** | 7.3% | **14,014** | 3.4% | **(6,287)** | -1.7% | **12,841** | 3.2% |
| Additional Adjustments [a] | 2,209 | 0.6% | (645) | -0.2% | 21,226 | 5.2% | (1,850) | -0.4% | 578 | 0.1% | (611) | -0.2% | (627) | -0.2% |
| **Total Adjustments** | **2,209** | 0.6% | **(645)** | -0.2% | **21,226** | 5.2% | **(1,850)** | -0.4% | **578** | 0.1% | **(611)** | -0.2% | **(627)** | -0.2% |
| **EBIT** | $ 330 | 0.1% | $ 14,852 | 4.0% | $ 32,563 | 7.9% | $ 28,946 | 6.9% | $ 14,592 | 3.5% | $ (6,898) | -1.8% | $ 12,214 | 3.0% |
| **EBITDA** | $ 20,032 | 5.9% | $ 33,306 | 9.0% | $ 48,968 | 11.9% | $ 41,929 | 10.0% | $ 28,091 | 6.8% | $ 6,296 | 1.7% | $ 25,439 | 6.3% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with Company management.  Includes
   estimated unallocated overhead expense for fiscal year 2011 through the LTM period.

Source:  Management prepared schedules and discussions with Company management.

*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

### Exhibit C - Projected Income Statements - Thermal

| In Thousands of U.S. Dollars | | | | For the Fiscal Year Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2016 | % | 12/31/2017 | % | 12/31/2018 | % | 12/31/2019 | % | 12/31/2020 | % |
| **Net Sales** | $ 405,831 | 100.0% | $ 427,341 | 100.0% | $ 445,289 | 100.0% | $ 459,093 | 100.0% | $ 459,093 | 100.0% |
| *Growth Rate* | *8.3%* | | *5.3%* | | *4.2%* | | *3.1%* | | *0.0%* | |
| Cost of Sales and Operating Costs [a] | 377,238 | | 386,252 | | 398,685 | | 406,484 | | 403,001 | |
| Depreciation and Amortization | 13,148 | | 13,148 | | 13,148 | | 13,148 | | 13,148 | |
| Total S,G&A Expenses | 390,386 | 96.2% | 399,400 | 93.5% | 411,833 | 92.5% | 419,632 | 91.4% | 416,149 | 90.6% |
| **Operating Income** | **15,445** | 3.8% | **27,941** | 6.5% | **33,456** | 7.5% | **39,461** | 8.6% | **42,944** | 9.4% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ 15,445 | 3.8% | $ 27,941 | 6.5% | $ 33,456 | 7.5% | $ 39,461 | 8.6% | $ 42,944 | 9.4% |
| **EBITDA** | $ 28,593 | 7.0% | $ 41,089 | 9.6% | $ 46,604 | 10.5% | $ 52,609 | 11.5% | $ 56,092 | 12.2% |

[a] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.
Source:  Management prepared projections



Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1063 of 1527   Document 27-2

Valuation & Financial Opinions



## A.   EXHIBITS

**Exhibit C - Weighted Average Cost of Capital - Thermal**

| | | |
|---|---|---|
| **Required Return on Equity** | | |
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.7% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.20 | 7.2% |
| Small Stock Risk Premium [b] | | 5.8% |
| Company-Specific Risk Premium | | 2.0% |
| **Required Return on Equity - CAPM** | | **17.7%** |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [c] | | 5.5% |
| Less:  Income Tax Factor | 38.5% | -2.1% |
| **After-tax Cost of Debt** | | **3.4%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 10.6% |
| Debt Allocation of Capital Structure | 40.0% | 1.4% |
| **Weighted Average Cost of Capital (Rounded)** | | **12.0%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.

[b] Based on Duff & Phelps LLC, 2015 Valuation Handbook – Guide to Cost of Capital.

[c] Based on estimated senior lending rates as of the Valuation Date.

 APPVION

Valuation & Financial Opinions

 SRR
STOUT | RISIUS | ROSS

## A.  EXHIBITS

### Exhibit D - Historical Income Statements - Encapsys

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 10/31/2015 | % |
| **Net Sales** | $ 29,050 | 100.0% | $ 33,490 | 100.0% | $ 31,212 | 100.0% | $ 34,793 | 100.0% | $ 45,118 | 100.0% | $ 37,151 | 100.0% |
| *Growth Rate* | *n/a* | | *15.3%* | | *-6.8%* | | *11.5%* | | *29.7%* | | *-17.7%* | |
| Cost of Sales and Operating Costs | 20,270 | | 21,572 | | 20,447 | | 22,631 | | 28,954 | | 23,015 | |
| Depreciation and Amortization | 2,254 | | 3,751 | | 2,816 | | 2,020 | | 2,394 | | 1,203 | |
| Total Expenses | 22,524 | 77.5% | 25,323 | 75.6% | 23,263 | 74.5% | 24,651 | 70.9% | 31,348 | 69.5% | 24,218 | 65.2% |
| **Operating Income** | $ 6,526 | 22.5% | $ 8,167 | 24.4% | $ 7,949 | 25.5% | $ 10,142 | 29.1% | $ 13,770 | 30.5% | $ 12,933 | 34.8% |
| Adjustments | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ 6,526 | 22.5% | $ 8,167 | 24.4% | $ 7,949 | 25.5% | $ 10,142 | 29.1% | $ 13,770 | 30.5% | $ 12,933 | 34.8% |
| **EBITDA** | $ 8,781 | 30.2% | $ 11,918 | 35.6% | $ 10,765 | 34.5% | $ 12,162 | 35.0% | $ 16,164 | 35.8% | $ 14,136 | 38.1% |

APPVION

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# A.  EXHIBITS

**Exhibit E - Reported Balance Sheets**

| In Thousands of U.S. Dollars | | As of | | | | | |
|---|---|---|---|---|---|---|---|
| | | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 10/31/2015 |
| Cash and Cash Equivalents | $ | 3,772 | $ 7,241 | $ 1,851 | $ 1,800 | $ 2,720 | $ 9,742 |
| Accounts Receivable | | 93,374 | 90,339 | 92,680 | 75,928 | 49,783 | 49,518 |
| Environmental Indemnification Receivable | | 20,580 | 46,000 | 65,000 | 59,253 | 0 | 0 |
| Inventories | | 110,032 | 102,527 | 94,349 | 92,313 | 94,290 | 80,034 |
| Other Current Assets | | 21,412 | 8,724 | 5,620 | 6,078 | 6,809 | 2,907 |
| **Total Current Assets** | | **249,170** | **254,831** | **259,500** | **235,372** | **153,602** | **142,201** |
| | | | | | | | |
| **Net Property and Equipment** | | **354,601** | **324,665** | **243,265** | **245,233** | **236,437** | **221,379** |
| | | | | | | | |
| Goodwill and Other Intangible Assets | | 48,449 | 46,125 | 43,839 | 41,554 | 39,268 | 37,378 |
| Other Assets | | 24,779 | 16,297 | 14,486 | 25,369 | 19,961 | 20,824 |
| **Total Other Assets** | | **73,228** | **62,422** | **58,325** | **66,923** | **59,229** | **58,202** |
| | | | | | | | |
| **Total Assets** | $ | **676,999** | $ **641,918** | $ **561,090** | $ **547,528** | $ **449,268** | $ **421,782** |

Source: Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2015 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Reported Balance Sheets**

| In Thousands of U.S. Dollars | As of | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 10/31/2015 |
| Current Portion of Long-Term Debt | $ 18,694 | $ 1,256 | $ 3,975 | $ 4,734 | $ 4,825 | $ 1,478 |
| Accounts Payable | 48,651 | 51,766 | 68,600 | 61,454 | 57,719 | 41,892 |
| Other Accrued Liabilities | 66,082 | 94,055 | 122,102 | 103,975 | 61,865 | 51,242 |
| **Total Current Liabilities** | **133,427** | **147,077** | **194,677** | **170,163** | **124,409** | **94,612** |
| | | | | | | |
| Long-Term Debt | 540,131 | 510,533 | 511,624 | 592,412 | 587,383 | 434,442 |
| Other Long-Term Liabilities | 139,432 | 174,245 | 207,686 | 132,991 | 168,409 | 159,022 |
| **Total Long-Term Liabilities** | **679,563** | **684,778** | **719,310** | **725,403** | **755,792** | **593,464** |
| | | | | | | |
| **Total Liabilities** | **812,990** | **831,855** | **913,987** | **895,566** | **880,201** | **688,076** |
| | | | | | | |
| Common Stock & Paid-In Capital | 110,045 | 97,615 | 81,704 | 63,322 | 121,017 | 121,017 |
| Retained Earnings | (153,765) | (150,193) | (439,923) | (415,173) | (579,136) | (410,230) |
| Accumulated Other Comprehensive Loss | (92,271) | (137,359) | 5,322 | 3,813 | 27,186 | 22,919 |
| **Total Stockholders' Equity** | **(135,991)** | **(189,937)** | **(352,897)** | **(348,038)** | **(430,933)** | **(266,294)** |
| | | | | | | |
| **Total Liabilities & Stockholders' Equity** | **$ 676,999** | **$ 641,918** | **$ 561,090** | **$ 547,528** | **$ 449,268** | **$ 421,782** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2015 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.





Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit E - Reported Income Statements**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | 12 Months Ended | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 10/31/2015 | % |
| **Net Sales** | $ 849,884 | 100.0% | $ 857,329 | 100.0% | $ 849,756 | 100.0% | $ 807,486 | 100.0% | $ 809,816 | 100.0% | $ 749,231 | 100.0% |
| *Growth Rate* | *n/a* | | *0.9%* | | *-0.9%* | | *-5.0%* | | *0.3%* | | *-7.5%* | |
| Cost of Sales | 682,228 | 80.3% | 718,710 | 83.8% | 758,875 | 89.3% | 567,786 | 70.3% | 677,383 | 83.6% | 645,523 | 86.2% |
| Gross Profit | 167,656 | 19.7% | 138,619 | 16.2% | 90,881 | 10.7% | 239,700 | 29.7% | 132,433 | 16.4% | 103,708 | 13.8% |
| S,G&A Expenses | 130,207 | 15.3% | 148,050 | 17.3% | 179,362 | 21.1% | 106,928 | 13.2% | 173,119 | 21.4% | 140,456 | 18.7% |
| **Operating Income** | **37,449** | 4.4% | **(9,431)** | -1.1% | **(88,481)** | -10.4% | **132,772** | 16.4% | **(40,686)** | -5.0% | **(36,748)** | -4.9% |
| Other Income (Expense) | (6,254) | -0.7% | 23,686 | 2.8% | 271 | 0.0% | (59,394) | -7.4% | (2,354) | -0.3% | 190,589 | 25.4% |
| **EBIT** | **31,195** | 3.7% | **14,255** | 1.7% | **(88,210)** | -10.4% | **73,378** | 9.1% | **(43,040)** | -5.3% | **153,841** | 20.5% |
| Interest Expense | (65,772) | -7.7% | (61,330) | -7.2% | (59,654) | -7.0% | (55,910) | -6.9% | (49,463) | -6.1% | (50,289) | -6.7% |
| **Earnings Before Taxes** | **(34,577)** | -4.1% | **(47,075)** | -5.5% | **(147,864)** | -17.4% | **17,468** | 2.2% | **(92,503)** | -11.4% | **103,552** | 13.8% |
| Income Taxes | (176) | 0.0% | (577) | -0.1% | (587) | -0.1% | (193) | 0.0% | (269) | 0.0% | (355) | 0.0% |
| **Net Income from Continuing Operations** | **(34,753)** | -4.1% | **(47,652)** | -5.6% | **(148,451)** | -17.5% | **17,275** | 2.1% | **(92,772)** | -11.5% | **103,197** | 13.8% |
| (Loss) Income from Discontinued Operations | 3,499 | 0.4% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **Net (Loss) Income** | $ (31,254) | -3.7% | $ (47,652) | -5.6% | $ (148,451) | -17.5% | $ 17,275 | 2.1% | $ (92,772) | -11.5% | $ 103,197 | 13.8% |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2015 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | For the 10 Months Ended 10/31/2015 |
|---|---|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | |
| Net Income | $ (31,254) | $ (47,652) | $ (148,451) | $ 17,275 | $ (92,772) | $ 176,962 |
| Depreciation and Amortization | 48,578 | 46,292 | 98,010 | 27,776 | 27,729 | 22,403 |
| Amortization of Intangible Assets | 2,908 | 2,324 | 2,286 | 2,285 | 2,286 | 1,892 |
| Impaired Inventory Valuation | 0 | 0 | 11,061 | 0 | 0 | 0 |
| Impairment of Continuing Operations Goodwill | 0 | 0 | 0 | 0 | 0 | 0 |
| Impairment of Discontinued Operations Goodwill and Long Lived Assets | 0 | 0 | 0 | 0 | 0 | 0 |
| Amortization of Financing Fees | 4,080 | 3,373 | 2,645 | 2,411 | 2,084 | 1,691 |
| Amortization of Bond Discount | 745 | 958 | 1,066 | 864 | 961 | 778 |
| Employer 401(k) Noncash Matching Contributions | 3,209 | 2,738 | 3,038 | 2,637 | 2,319 | 1,618 |
| Foreign Exchange (Gain) Loss | 559 | 1,143 | (227) | 99 | 2,108 | 0 |
| Net Loss (Gain) from Involuntary Conversion / Disposal of Equipment | (638) | (1,374) | (2,382) | 197 | (163) | 0 |
| Loss on Disposals of Equipment | 419 | 209 | 1,448 | 265 | 453 | 3,043 |
| Gain on Sale of Business | (2,560) | 0 | 0 | 0 | 0 | 0 |
| Accretion of Deferred Payment and Capital Lease Obligations | 33 | 7 | 10 | 0 | 0 | 0 |
| Debt Extinguishment/Refinancing Expenses | 7,010 | 0 | 0 | 8,101 | 0 | 0 |
| Fox River Insurance Recovery | (9,053) | (145) | 0 | 0 | 0 | 0 |
| (Increase) Decrease in Accounts Receivable | (14,540) | 2,004 | (2,857) | 17,343 | 23,784 | 265 |
| (Increase) Decrease in Inventories | (5,872) | 6,107 | (962) | 1,832 | (1,748) | 14,256 |
| (Increase) Decrease in Other Current Assets | (6,739) | 14,484 | 3,105 | (461) | (14) | 3,902 |
| Increase (Decrease) in Accounts Payable and Other Accrued Liabilities | (9,273) | (569) | 27,159 | (21,357) | 19,384 | (24,024) |
| Increase (Decrease) in CIP Contained in Accounts Payable | 0 | 0 | 0 | 0 | 0 | (4,765) |
| Increase (Decrease) in Accrued Pension | (11,862) | 37,149 | 12,322 | (70,052) | 53,234 | (186) |
| Increase (Decrease) in Other, net | (5,735) | 1,663 | 16,034 | (11,533) | 7,585 | (19,888) |
| **Net Cash Provided by (Used in) Operating Activities** | **(29,985)** | **68,711** | **23,305** | **(22,718)** | **47,230** | **177,947** |
| Proceeds from Sale of Equipment | 208 | 6 | 22 | 17 | 2,272 | 5 |
| Net Change in Cash Due to Sale of Performance Packaging | 56,000 | 2,000 | 0 | 0 | 0 | 0 |
| Insurance Proceeds from Involuntary Conversion | 1,029 | 1,374 | 0 | 0 | 0 | 0 |
| Increase (Decrease) in CIP Contained in Accounts Payable | 0 | 0 | 0 | 0 | 0 | 4,765 |
| Purchases of Property, Plant, and Equipment | (17,839) | (15,847) | (17,143) | (28,290) | (19,737) | (12,267) |
| **Net Cash Provided by (Used in) Investing Activities** | **39,398** | **(12,467)** | **(17,121)** | **(28,273)** | **(17,465)** | **(7,497)** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ended | | | | | For the 10 Months Ended |
|---|---|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 10/31/2015 |
| **Net Cash Provided by (Used in) Operating Activities** | $ (29,985) | $ 68,711 | $ 23,305 | $ (22,718) | $ 47,230 | $ 177,947 |
| | | | | | | |
| Proceeds from Sale of Equipment | 208 | 6 | 22 | 17 | 2,272 | 5 |
| Net Change in Cash Due to Sale of Performance Packaging | 56,000 | 2,000 | 0 | 0 | 0 | 0 |
| Acquisitions of Businesses, net of cash acquired | 1,029 | 1,374 | 0 | 0 | 0 | 0 |
| Increase (Decrease) in CIP Contained in Accounts Payable | 0 | 0 | 0 | 0 | 0 | 4,765 |
| Purchases of Property, Plant, and Equipment | (17,839) | (15,847) | (17,143) | (28,290) | (19,737) | (12,267) |
| **Net Cash Provided by (Used in) Investing Activities** | 39,398 | (12,467) | (17,121) | (28,273) | (17,465) | (7,497) |
| | | | | | | |
| Payments of Senior Secured Notes Payable | (211,225) | 0 | 0 | (305,837) | (3,350) | (171,170) |
| Proceeds from Senior Secured Notes Payable | 299,007 | 0 | 0 | 331,650 | 0 | 19 |
| Payments of Second Lien Notes Payable | 0 | 0 | 0 | (161,766) | 0 | 0 |
| Proceeds from Second Lien Notes Payable | 0 | 0 | 0 | 246,252 | 0 | 161 |
| Payment of Industrial Development Bonds | 0 | 0 | 0 | (2,650) | 0 | 0 |
| Payments of Senior Subordinated Notes Payable | 0 | (17,491) | 0 | (32,195) | 0 | 0 |
| Payments of State of Ohio Loan | (1,151) | (1,203) | (1,256) | (1,325) | (1,399) | (1,126) |
| Debt Acquisition Costs | (10,847) | 0 | 0 | (13,706) | (185) | (1,312) |
| Proceeds from Forgivable Debt | 0 | 0 | 300 | 0 | 0 | 0 |
| Payments Relating to Capital Lease Obligation | (721) | (47) | (68) | (86) | (114) | 0 |
| Proceeds from Revolving Lines of Credit | 338,343 | 202,800 | 253,400 | 368,100 | 291,650 | 62,000 |
| Payments of Revolving Lines of Credit | (397,268) | (232,100) | (249,700) | (364,200) | (292,800) | (46,600) |
| Payments of Secured Financing | (20,905) | 0 | 0 | 0 | 0 | 0 |
| Proceeds from Issuance of Redeemable Common Stock | 3,561 | 2,875 | 2,884 | 2,910 | 2,372 | 2,153 |
| Payments to Redeem Common Stock | (11,811) | (12,351) | (14,070) | (16,441) | (18,164) | (6,168) |
| Increase in Cash Overdraft | (2,628) | 4,749 | (3,078) | 251 | (6,817) | 0 |
| Unearned Income | 0 | 0 | 0 | 0 | 0 | (1,374) |
| **Net Cash Provided by (Used in) Financing Activities** | (15,645) | (52,768) | (11,588) | 50,957 | (28,807) | (163,417) |
| | | | | | | |
| **Effect of Foreign Exchange Rate Changes on Cash and Cash Equivalents** | 41 | (7) | 14 | (17) | (38) | 0 |
| | | | | | | |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | (6,191) | 3,469 | (5,390) | (51) | 920 | 7,033 |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.

*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit F - Adjusted Income Statements**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 12/31/2014 | % | 10/31/2015 | % |
| **Net Sales** | $ 849,884 | 103.5% | $ 857,329 | 104.1% | $ 849,756 | 103.8% | $ 807,486 | 104.5% | $ 809,816 | 105.9% | $ 749,231 | 105.2% |
| Encapsys Net Sales | (29,050) | | (33,490) | | (31,212) | | (34,793) | | (45,118) | | (37,151) | |
| **Adjusted Net Sales** | $ 820,834 | 100.0% | $ 823,839 | 100.0% | $ 818,544 | 100.0% | $ 772,693 | 100.0% | $ 764,698 | 100.0% | $ 712,080 | 100.0% |
| **Earnings Before Taxes** | (34,577) | -4.2% | (47,075) | -5.7% | (147,864) | -18.1% | 17,468 | 2.3% | (92,503) | -12.1% | 103,552 | 14.5% |
| | | | | | | | | | | | | |
| Debt Extinguishment Expense (Gain) | 7,010 | | 0 | | 0 | | 59,681 | | 0 | | 3,605 | |
| Mark to Market Retirement Accounting Change | (410) | | 45,540 | | 25,512 | | (61,900) | | 63,616 | | 63,784 | |
| Foreign Exchange Loss (Gain) | 600 | | 1,136 | | (213) | | 82 | | 2,070 | | 2,518 | |
| Restructuring and Other Charges | 0 | | 0 | | 105,950 | | 0 | | 0 | | 0 | |
| Synthetic Equity Expense | 1,076 | | 1,906 | | 3,610 | | 1,349 | | 1,165 | | 871 | |
| Domtar Transition Costs | 0 | | 0 | | 11,458 | | 2,382 | | 0 | | 0 | |
| Fox River Settlement Expense | 0 | | 0 | | 0 | | 0 | | 25,030 | | 0 | |
| Insurance Recovery | (8,947) | | 0 | | (2,188) | | 0 | | 0 | | 0 | |
| West Carrollton Silo Expense (Gain) | 391 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Non-Cash KSOP Stock Match | 3,209 | | 2,738 | | 3,038 | | 2,637 | | 2,319 | | 1,979 | |
| Litigation Settlement | 0 | | 3,122 | | 0 | | 0 | | 0 | | 0 | |
| Litigation Recovery | 0 | | (23,229) | | 0 | | 0 | | 0 | | 0 | |
| Pension Withdrawal Expense | 0 | | 0 | | 7,000 | | 0 | | 0 | | 0 | |
| Thermal Anti-Dumping Legal Expenses | 483 | | 613 | | 738 | | 1,347 | | 2,301 | | 783 | |
| HAC II Transaction Expenses | 0 | | 0 | | 7,494 | | 0 | | 0 | | 0 | |
| Gain on Sale of Business | (2,560) | | 0 | | 0 | | 0 | | 0 | | (197,518) | |
| Severance | 0 | | 0 | | 0 | | 0 | | 0 | | 2,822 | |
| Accounts Receivable Securitization Legal Fees | 0 | | 0 | | 0 | | 0 | | 684 | | 0 | |
| Encapsys EBITDA | (8,781) | | (11,918) | | (10,765) | | (12,162) | | (16,164) | | (14,136) | |
| **Total Adjustments** | (7,929) | -1.0% | 19,908 | 2.4% | 151,634 | 18.5% | (6,584) | -0.9% | 81,021 | 10.6% | (135,292) | -19.0% |
| | | | | | | | | | | | | |
| Adjusted Earnings Before Taxes | (42,506) | -5.2% | (27,167) | -3.3% | 3,770 | 0.5% | 10,884 | 1.4% | (11,482) | -1.5% | (31,740) | -4.5% |
| | | | | | | | | | | | | |
| Interest Expense | 65,772 | 8.0% | 61,330 | 7.4% | 59,654 | 7.3% | 55,910 | 7.2% | 49,463 | 6.5% | 50,289 | 7.1% |
| Depreciation and Amortization | 49,780 | 6.1% | 48,616 | 5.9% | 35,554 | 4.3% | 30,061 | 3.9% | 30,015 | 3.9% | 29,154 | 4.1% |
| | | | | | | | | | | | | |
| **Adjusted EBIT** | $ 23,266 | 2.8% | $ 34,163 | 4.1% | $ 63,424 | 7.7% | $ 66,794 | 8.6% | $ 37,981 | 5.0% | $ 18,549 | 2.6% |
| **Adjusted EBITDA** | $ 73,046 | 8.9% | $ 82,779 | 10.0% | $ 98,978 | 12.1% | $ 96,855 | 12.5% | $ 67,996 | 8.9% | $ 47,703 | 6.7% |

*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



- 77 -

Valuation & Financial Opinions

SRR | STOUT | RISIUS | ROSS

## A.  EXHIBITS

**Exhibit G - Ratio Analysis**

|  | For the Fiscal Year Ended | | | 12 Months Ended |
|---|---|---|---|---|
|  | 12/31/2012 | 12/31/2013 | 12/31/2014 | 10/31/2015 |
| **Activity Ratios (End of Year Balances)** | | | | |
| Inventory Turnover | 8.0 | 6.2 | 7.2 | 8.1 |
| Asset Turnover | 1.5 | 1.4 | 1.7 | 1.7 |
| | | | | |
| **Liquidity and Working Capital Ratios (End of Year Balances)** | | | | |
| Current Ratio | 1.3 | 1.4 | 1.2 | 1.5 |
| Net Working Capital / Adjusted Net Sales | 7.9% | 8.4% | 5.3% | 6.2% |
| | | | | |
| Days in Accounts Receivable | 41.3 | 35.9 | 23.8 | 25.4 |
| + Days in Inventories | 45.4 | 59.3 | 50.8 | 45.3 |
| - Days in Accounts Payable | (33.0) | (39.5) | (31.1) | (23.7) |
| **Net Trade Cycle** | **53.7** | **55.7** | **43.5** | **46.9** |
| | | | | |
| **Leverage and Coverage** | | | | |
| Liabilities / Equity | n/m | n/m | n/m | n/m |
| Debt / (Debt + Equity) | n/m | n/m | n/m | n/m |
| Assets / Equity | n/m | n/m | n/m | n/m |
| EBIT / Interest Expense | 1.1 | 1.2 | 0.8 | 0.4 |
| Total Debt / EBITDA | 5.2 | 6.2 | 8.7 | 9.1 |
| Debt / EV | n/a | n/a | n/a | n/a |
| | | | | |
| **Profitability** | | | | |
| Gross Profit Margin | 10.7% | 29.7% | 16.4% | 13.8% |
| EBITDA Margin | 12.1% | 12.5% | 8.9% | 6.7% |
| EBIT Margin | 7.7% | 8.6% | 5.0% | 2.6% |
| Net Profit Margin | 0.3% | 0.9% | -0.9% | -2.7% |
| Return on Assets | 0.4% | 1.2% | -1.6% | -4.6% |
| Return on Equity | n/m | n/m | n/m | n/m |
| | | | | |
| **Other Ratios** | | | | |
| Deprec. and Amort. / Sales | 4.3% | 3.9% | 3.9% | 4.1% |
| Net Capital Expenditures / Sales | 2.1% | 3.7% | 2.3% | n/m |
| Unlevered Free Cash Flow / Sales | 13.7% | -5.4% | 18.1% | n/m |

APPVION

Valuation & Financial Opinions



## A. EXHIBITS

### Exhibit H - Implied Pricing Multiples - Thermal & Carbonless [a]

Multiples as of December 31, 2015

| | EV / NFY EBITDA | EV / LTM EBITDA | EV / 3-Year Average EBITDA | EV / NFY Revenue | EV / LTM Revenue | EV / 3-Year Average Revenue |
|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 8.5x | 9.9x | 11.0x | 1.38x | 1.50x | 1.56x |
| International Paper Company | 6.8x | 7.2x | 7.3x | 1.23x | 1.19x | 1.17x |
| Wausau Paper Corp. | 9.4x | 13.6x | 12.6x | 1.94x | 2.03x | n/m |
| Domtar Corporation | 5.1x | 5.3x | 5.3x | 0.68x | 0.70x | 0.68x |
| PH Glatfelter Co. | 6.6x | 8.7x | 7.7x | 0.72x | 0.71x | 0.69x |
| | | | | | | |
| Low | 5.1x | 5.3x | 5.3x | 0.68x | 0.70x | 0.68x |
| High | 9.4x | 13.6x | 12.6x | 1.94x | 2.03x | 1.56x |
| | | | | | | |
| Mean | 7.3x | 8.9x | 8.8x | 1.19x | 1.23x | 1.03x |
| Median | 6.8x | 8.7x | 7.7x | 1.23x | 1.19x | 0.93x |

[a] The stock prices utilized to calculate the multiples of the guideline companies incorporate a control premium of 10.0%.

Source:  Exhibit H



# A. EXHIBITS

**Exhibit H - Calculation of Enterprise Value - Thermal & Carbonless**

*In Millions of Shares and U.S. Dollars, Except Stock Price*

| **General Market Information** | Neenah Paper, Inc. | International Paper Company | Wausau Paper Corp. | Domtar Corporation | PH Glatfelter Co. |
|---|---|---|---|---|---|
| Ticker Symbol | NP | IP | WPP | UFS | GLT |
| Stock Exchange | NYSE | NYSE | NYSE | NYSE | NYSE |
| | | | | | |
| Closing Common Stock Price (12/31/2015) [a] | $ 68.67 | $ 41.47 | $ 11.25 | $ 40.65 | $ 20.28 |
| Closing Common Stock Price (06/30/2015) [a] | 64.86 | 52.35 | 10.10 | 45.54 | 24.19 |
| Percent Change | 5.9% | -20.8% | 11.4% | -10.7% | -16.1% |
| **Calculation of Enterprise Value** | | | | | |
| | | | | | |
| Closing Common Stock Price (12/31/2015) [a] | $ 68.67 | $ 41.47 | $ 11.25 | $ 40.65 | $ 20.28 |
| Multiplied by: Shares Outstanding | 16.7 | 414.6 | 50.1 | 62.8 | 43.4 |
| **Market Value of Equity ("MVE")** | $ 1,148.9 | $ 17,191.5 | $ 563.6 | $ 2,552.5 | $ 880.5 |
| | | | | | |
| Add: Total Debt | 246.2 | 15,916.0 | 169.6 | 1,288.0 | 389.1 |
| Add: Preferred Stock | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Add: Minority Interest in Subsidiaries | 0.0 | 121.0 | 0.0 | 0.0 | 0.0 |
| Less: Cash and Short-Term Investments | (5.5) | (5,949.0) | (2.8) | (128.0) | (73.7) |
| **Enterprise Value ("EV")** | $ 1,389.6 | $ 27,279.5 | $ 730.3 | $ 3,712.5 | $ 1,195.9 |

Source: Capital IQ, Inc.

[a] The share prices of the guideline companies incorporate a control premium of 10.0%.





Valuation & Financial Opinions

# A. EXHIBITS

## Exhibit H - Selected Financial Information - Paperweight Development Corp.

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | |
|---|---|
| International Paper Company | $22,865.0 |
| Domtar Corporation | 5,329.0 |
| PH Glatfelter Co. | 1,689.4 |
| Neenah Paper, Inc. | 923.9 |
| **Paperweight Development Corp.** | **712.1** |
| Wausau Paper Corp. | 360.4 |
| | |
| **Guideline Company Median** | **$1,689.4** |

| Size (LTM EBITDA) | |
|---|---|
| International Paper Company | $3,808.0 |
| Domtar Corporation | 703.0 |
| Neenah Paper, Inc. | 140.4 |
| PH Glatfelter Co. | 138.1 |
| Wausau Paper Corp. | 53.8 |
| **Paperweight Development Corp.** | **47.7** |
| | |
| **Guideline Company Median** | **$140.4** |

| Growth (3-Year Revenue CAGR) | |
|---|---|
| Neenah Paper, Inc. | 5.0% |
| PH Glatfelter Co. | 2.4% |
| Wausau Paper Corp. | 1.7% |
| International Paper Company | 1.7% |
| Domtar Corporation | -1.0% |
| **Paperweight Development Corp.** | **-4.8%** |
| | |
| **Guideline Company Median** | **1.7%** |

| Growth (1-Year Revenue) | |
|---|---|
| Wausau Paper Corp. | 3.2% |
| Neenah Paper, Inc. | 3.1% |
| International Paper Company | -4.2% |
| Domtar Corporation | -5.6% |
| **Paperweight Development Corp.** | **-8.2%** |
| PH Glatfelter Co. | -8.8% |
| | |
| **Guideline Company Median** | **-4.2%** |

| Growth (3-Year EBITDA CAGR) | |
|---|---|
| Neenah Paper, Inc. | 9.4% |
| International Paper Company | 3.4% |
| Domtar Corporation | -4.1% |
| Wausau Paper Corp. | -5.4% |
| PH Glatfelter Co. | -5.5% |
| **Paperweight Development Corp.** | **-22.7%** |
| | |
| **Guideline Company Median** | **-4.1%** |

| Growth (1-Year EBITDA) | |
|---|---|
| Wausau Paper Corp. | 33.3% |
| Neenah Paper, Inc. | 17.8% |
| International Paper Company | 1.5% |
| Domtar Corporation | -11.6% |
| PH Glatfelter Co. | -27.0% |
| **Paperweight Development Corp.** | **-34.6%** |
| | |
| **Guideline Company Median** | **1.5%** |

| Profitability (LTM Gross Profit Margin) | |
|---|---|
| International Paper Company | 30.9% |
| Neenah Paper, Inc. | 21.1% |
| Domtar Corporation | 20.8% |
| **Paperweight Development Corp.** | **13.8%** |
| PH Glatfelter Co. | 12.0% |
| | |
| **Guideline Company Median** | **20.8%** |

| Profitability (LTM EBITDA Margin) | |
|---|---|
| International Paper Company | 16.7% |
| Neenah Paper, Inc. | 15.2% |
| Wausau Paper Corp. | 14.9% |
| Domtar Corporation | 13.2% |
| PH Glatfelter Co. | 8.2% |
| **Paperweight Development Corp.** | **6.7%** |
| | |
| **Guideline Company Median** | **14.9%** |

| Profitability (LTM EBIT Margin) | |
|---|---|
| Neenah Paper, Inc. | 11.9% |
| International Paper Company | 10.8% |
| Domtar Corporation | 6.4% |
| PH Glatfelter Co. | 4.4% |
| Wausau Paper Corp. | 3.4% |
| **Paperweight Development Corp.** | **2.6%** |
| | |
| **Guideline Company Median** | **6.4%** |

| Profitability (LTM Return on Assets) | |
|---|---|
| Neenah Paper, Inc. | 7.4% |
| International Paper Company | 3.6% |
| Domtar Corporation | 2.5% |
| PH Glatfelter Co. | 2.2% |
| Wausau Paper Corp. | -0.1% |
| **Paperweight Development Corp.** | **-4.6%** |
| | |
| **Guideline Company Median** | **2.5%** |

| Profitability (LTM Return on Equity) | |
|---|---|
| International Paper Company | 25.7% |
| Neenah Paper, Inc. | 19.2% |
| Domtar Corporation | 5.6% |
| PH Glatfelter Co. | 5.2% |
| Wausau Paper Corp. | -0.4% |
| **Paperweight Development Corp.** | **n/m** |
| | |
| **Guideline Company Median** | **5.6%** |

| Liquidity (LTM Current Ratio) | |
|---|---|
| Neenah Paper, Inc. | 2.3 |
| Domtar Corporation | 2.1 |
| PH Glatfelter Co. | 1.9 |
| **Paperweight Development Corp.** | **1.5** |
| International Paper Company | 1.3 |
| Wausau Paper Corp. | 1.2 |
| | |
| **Guideline Company Median** | **1.9** |

| Activity (LTM Asset Turnover) | |
|---|---|
| **Paperweight Development Corp.** | **1.7** |
| Neenah Paper, Inc. | 1.2 |
| PH Glatfelter Co. | 1.1 |
| Domtar Corporation | 0.9 |
| Wausau Paper Corp. | 0.8 |
| International Paper Company | 0.7 |
| | |
| **Guideline Company Median** | **0.9** |

| Activity (LTM Inventory Turnover) | |
|---|---|
| **Paperweight Development Corp.** | **8.1** |
| Wausau Paper Corp. | 7.5 |
| International Paper Company | 6.8 |
| Neenah Paper, Inc. | 6.1 |
| PH Glatfelter Co. | 6.0 |
| Domtar Corporation | 5.6 |
| | |
| **Guideline Company Median** | **6.1** |

| Leverage (LTM Total Debt to EBITDA) | |
|---|---|
| **Paperweight Development Corp.** | **9.1** |
| International Paper Company | 4.2 |
| Wausau Paper Corp. | 3.2 |
| PH Glatfelter Co. | 2.8 |
| Domtar Corporation | 1.8 |
| Neenah Paper, Inc. | 1.8 |
| | |
| **Guideline Company Median** | **2.8** |

| Leverage (LTM EBIT / Interest Expense) | |
|---|---|
| Neenah Paper, Inc. | 9.4 |
| PH Glatfelter Co. | 4.1 |
| International Paper Company | 3.8 |
| Domtar Corporation | 3.6 |
| Wausau Paper Corp. | 0.9 |
| **Paperweight Development Corp.** | **0.4** |
| | |
| **Guideline Company Median** | **3.8** |

Source: Capital IQ, Inc. and Paperweight Development Corp. financials.





# A.  EXHIBITS

**Exhibit H - Selected Financial Information - Carbonless & Thermal**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $22,865.0 | International Paper Company | $3,808.0 | Neenah Paper, Inc. | 5.0% | Wausau Paper Corp. | 3.2% |
| Domtar Corporation | 5,329.0 | Domtar Corporation | 703.0 | PH Glatfelter Co. | 2.4% | Neenah Paper, Inc. | 3.1% |
| PH Glatfelter Co. | 1,689.4 | Neenah Paper, Inc. | 140.4 | Wausau Paper Corp. | 1.7% | Carbonless | -3.4% |
| Neenah Paper, Inc. | 923.9 | PH Glatfelter Co. | 138.1 | International Paper Company | 1.7% | International Paper Company | -4.2% |
| Thermal | 374.8 | Wausau Paper Corp. | 53.8 | Domtar Corporation | -1.0% | Domtar Corporation | -5.6% |
| Wausau Paper Corp. | 360.4 | Carbonless | 43.8 | Thermal | -3.3% | PH Glatfelter Co. | -8.8% |
| Carbonless | 337.3 | Thermal | 6.3 | Carbonless | -6.4% | Thermal | -9.8% |
| **Guideline Company Median** | **$1,306.7** | **Guideline Company Median** | **$139.2** | **Guideline Company Median** | **1.7%** | **Guideline Company Median** | **-4.9%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (Projected EBITDA Growth) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 9.4% | Wausau Paper Corp. | 33.3% | Wausau Paper Corp. | 35.9% | International Paper Company | 16.7% |
| International Paper Company | 3.4% | Neenah Paper, Inc. | 17.8% | PH Glatfelter Co. | 24.1% | Neenah Paper, Inc. | 15.2% |
| Domtar Corporation | -4.1% | International Paper Company | 1.5% | Neenah Paper, Inc. | 14.7% | Wausau Paper Corp. | 14.9% |
| Carbonless | -5.3% | Carbonless | 1.4% | International Paper Company | 6.5% | Domtar Corporation | 13.2% |
| Wausau Paper Corp. | -5.4% | Domtar Corporation | -11.6% | Domtar Corporation | 3.3% | Carbonless | 13.0% |
| PH Glatfelter Co. | -5.5% | PH Glatfelter Co. | -27.0% | Carbonless | 0.5% | PH Glatfelter Co. | 8.2% |
| Thermal | -51.5% | Thermal | -77.6% | Thermal | n/m | Thermal | 1.7% |
| **Guideline Company Median** | **-4.7%** | **Guideline Company Median** | **-5.1%** | **Guideline Company Median** | **14.7%** | **Guideline Company Median** | **14.1%** |

Source: Capital IQ, Inc. and Carbonless financials.



Valuation & Financial Opinions



# A. EXHIBITS

**Exhibit I - Interest-Bearing Debt**

*As of December 31, 2015*

| | Face Value | Interest Rate |
|---|---|---|
| First Lien Notes | $ 157,308 | 5.75% |
| Revolving Credit Facility | 9,600 | 6.75% |
| State of Ohio Loans | 3,010 | 5.00% |
| Second Lien Notes | 247,230 | 9.00% |
| Industrial Revenue Bonds | 6,000 | 0.20% |
| **Total ($) / Weighted Average (%)** | **$ 423,148** | **7.59%** |



## A. EXHIBITS

**Exhibit I - Synthetic Equity Dilution**

*In Thousands of U.S. Dollars, except Per Share Values*

Long-Term Incentive Plan

| Grant Date | Number of Instruments (Thousands) | Fair Market Value Per Share | Exercise Price | Dilution Per Unit | Pre-Tax Dilution | After-Tax Dilution @ 38.5% |
|---|---|---|---|---|---|---|
| 1/1/2007 | 154.000 | $ 12.30 | $ 33.62 | $ 0 | $ 0 | $ 0 |
| 1/1/2008 | 184.500 | 12.30 | 33.41 | 0 | 0 | 0 |
| 1/1/2009 | 298.000 | 12.30 | 21.43 | 0 | 0 | 0 |
| 7/1/2009 | 14.000 | 12.30 | 18.87 | 0 | 0 | 0 |
| 1/2/2011 | 409.000 | 12.30 | 12.84 | 0 | 0 | 0 |
| 1/1/2012 | 234.000 | 12.30 | 15.01 | 0 | 0 | 0 |
| 8/13/2012 | 2.000 | 12.30 | 16.45 | 0 | 0 | 0 |
| 1/1/2013 | 158.867 | 12.30 | 17.55 | 0 | 0 | 0 |
| 9/24/2013 | 5.000 | 12.30 | 17.85 | 0 | 0 | 0 |
| 1/1/2014 | 186.467 | 12.30 | 16.25 | 0 | 0 | 0 |
| 7/1/2014 | 28.000 | 12.30 | 16.30 | 0 | 0 | 0 |
| 1/4/2015 | 324.300 | 12.30 | 11.00 | 1 | 422 | 259 |
| 4/6/2015 | 15.000 | 12.30 | 11.00 | 1 | 20 | 12 |
| 4/20/2015 | 2.500 | 12.30 | 11.00 | 1 | 3 | 2 |
| 7/1/2015 | 47.500 | 12.30 | 12.90 | 0 | 0 | 0 |
| Total | 2,063.134 | | | | $ 444 | $ 273 |



Valuation & Financial Opinions



## A.  EXHIBITS

### Exhibit I - Analysis of Historical Working Capital

| In Thousands of U.S. Dollars | As of | | | | |
|---|---|---|---|---|---|
| | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 10/31/2015 |
| Accounts Receivable | $  90,339 | $  92,680 | $  75,928 | $  49,783 | $  49,518 |
| Inventories | 102,527 | 94,349 | 92,313 | 94,290 | 80,034 |
| Other Current Assets | 8,724 | 5,620 | 6,078 | 6,809 | 2,907 |
| **Total Cash-Free Current Assets** | **201,590** | **192,649** | **174,319** | **150,882** | **132,459** |
| Accounts Payable | 51,766 | 68,600 | 61,454 | 57,719 | 41,892 |
| Accrued Expenses [a] | 48,055 | 57,102 | 44,722 | 50,606 | 44,028 |
| **Total Debt-Free Current Liabilities** | **99,821** | **125,702** | **106,176** | **108,325** | **85,920** |
| **Net Working Capital** | **$  101,769** | **$  66,947** | **$  68,143** | **$  42,557** | **$  46,539** |
| Net Sales | 823,839 | 818,544 | 772,693 | 764,698 | 712,080 |
| **Net Working Capital / Sales** | **12.4%** | **8.2%** | **8.8%** | **5.6%** | **6.5%** |

[a]  Excludes Environmental Liability



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

## A. EXHIBITS

| Select Historical and Projected Metrics | | | | | | |
|---|---|---|---|---|---|---|
| | **Paperweight Development Corp. Select Ratios** | | | | **Guideline Public Company Historical** | |
| | 5-Year Historical Average | 5-Year Historical Median | 5-Year Projected Average | 5-Year Projected Median | 5-Year Average Low | 5-Year Average High |
| Return on Assets | -1.4% | -1.6% | n/a | n/a | -6.3% | 6.4% |
| Return on Equity | n/a | n/a | n/a | n/a | 3.9% | 19.0% |
| EBIT Margin | 5.6% | 5.0% | 8.6% | 9.0% | 0.8% | 10.1% |
| EBITDA Margin | 10.1% | 10.0% | 12.3% | 12.6% | 8.3% | 19.7% |
| Net Capital Expenditures to Sales | 2.4% | 2.1% | 2.0% | 1.9% | 3.4% | 17.0% |
| Unlevered Free Cash Flow to Sales | 7.9% | 13.7% | n/a | n/a | 2.0% | 7.9% |
| | | | 5-Year Historical CAGR | 5-Year Projected CAGR | 5-Year Historical Low CAGR | 5-Year Historical High CAGR |
| Revenue Growth Rate | | | -2.9% | 0.9% | -15.7% | 11.5% |
| Adjusted EBITDA Growth Rate | | | -8.4% | 15.8% | -11.1% | 12.7% |

■ We were not provided with projected balance sheets and cash flow statements. Accordingly, we could not calculate the Company's projected return on assets, return on equity, or unlevered free cash flow to sales ratios. These ratios have historically been within the range of the guideline companies.

■ The Company's historical EBIT and EBITDA margins are within the range of the guideline companies. Carbonless' profit margins are projected to increase as a result of increased efficiency resulting from (1) improved product mix; (2) cost reductions; (3) ongoing manufacturing operations improvements; and (4) the shift of carbonless paper production to more variable-cost facilities, while Thermal's margins are projected to improve primarily due to pricing increases.

■ The Company's historical ratios of net capital expenditures to sales are below the low end of the range of the guideline companies.

■ The Company's historical revenue and adjusted EBITDA growth rates are within the ranges of the guideline companies. The Company's revenue and adjusted EBITDA growth rates are projected to increase as point-of-sale pricing improves and the Company realizes the improvements in efficiency described above.



- 86 -

Valuation & Financial Opinions



# Appendix B

## Guideline Company Descriptions

Case 1:19-cv-01561-WCG    Filed 11/19/24    Page 1081 of 1527    Document 142

APPVION                    Valuation & Financial Opinions    

# B.   GUIDELINE COMPANY DESCRIPTIONS

## International Paper Company

International Paper Company operates as a paper and packaging company in North America, Europe, Latin America, Russia, Asia, Africa, and the Middle East. The company operates through three segments: Industrial Packaging, Printing Papers, and Consumer Packaging. The Industrial Packaging segment manufactures containerboards, including linerboard, medium, whitetop, recycled linerboard, recycled medium, and saturating kraft. The Printing Papers segment produces printing and writing papers, such as uncoated papers for end use applications, including brochures, pamphlets, greeting cards, books, annual reports, and direct mail, as well as envelopes, tablets, business forms, and file folders. This segment sells uncoated papers under the Hammermill, Springhill, Williamsburg, Postmark, Accent, Great White, Chamex, Ballet, Rey, Pol, and Svetocopy brand names. It also produces pulp for manufacturing printing, writing, and specialty papers, as well as towels and tissues, filtration products, diapers, and sanitary napkins. The Consumer Packaging segment offers coated paperboard for various packaging and commercial printing end uses, such as food, cosmetics, pharmaceuticals, computer software, and tobacco products under the Everest, Fortress, and Starcote brand name. This segment also produces cups, lids, food containers, and plates. The company sells its packaging products, paper products, and other products directly to end users and

converters, as well as through agents, resellers, and paper distributors. International Paper Company was founded in 1898 and is based in Memphis, Tennessee.

## Neenah Paper, Inc.

Neenah Paper, Inc. produces and sells technical products and fine papers worldwide. The company's Technical Products segment provides filtration media for automotive transportation; saturated and unsaturated crepe and flat paper tapes to manufacturers; lightweight abrasive paper for waterproof and dry sanding; label and tag products to pressure sensitive coaters; latex saturated and coated papers; premask, medical packaging, image transfer, and decorative components papers; clean room papers, durable printing papers, release papers, and furniture backers; and wall covering substrates for commercial and consumer-do-it-yourself markets. Its Fine Paper and Packaging segment manufactures and sells writing papers for business and personal stationery, corporate identity packages, and related end-use applications; text and cover papers, and envelopes used in corporate brochures, pocket folders, corporate annual reports, advertising inserts, direct mail, business cards, hang tags, scrapbooks, and other uses; custom colors, paper finishes, and duplex/laminated papers; and bright papers used in direct mail, advertising inserts, scrapbooks, and marketing collateral applications. This segment also offers packaging and label papers for retail, cosmetics, spirits, and electronics end-use markets; and





Valuation & Financial Opinions

# B.  GUIDELINE COMPANY DESCRIPTIONS

specialty paper products for enhanced image, such as translucent and art papers, papers for optical scanning, and other specialized applications. The company sells its products through authorized paper distributors, converters, retailers, specialty businesses, and direct sales. Neenah Paper, Inc. was founded in 2004 and is headquartered in Alpharetta, Georgia.

## Wausau Paper Corp.

Wausau Paper Corp. manufactures, converts, and sells towel and tissue products primarily in the United States and Canada. The company offers paper towel and tissue products for the commercial and industrial away-from-home market, including washroom roll and folded towels; towel, tissue, and soap dispensers; industrial wipers; dairy towels; household roll towels; and other towel and tissue products. It offers its products under the Alliance, Artisan, DublSoft, DublNature, EcoSoft, OptiCore, Wausau Paper, Bay West, OptiServ, Wave 'N Dry, Revolution, and other brands. The company sells its products to paper and sanitary supply distributors that serve factories and other commercial and industrial locations, health service facilities, office buildings, restaurants, theme parks, airports, and hotels. Wausau Paper Corp. was founded in 1899 and is based in Mosinee, Wisconsin.

## Domtar Corporation

Domtar Corporation designs, manufactures, markets, and distributes communications papers, specialty and packaging papers, and absorbent hygiene products in the United States, Canada, Europe, Asia, and internationally. It operates in two segments, Pulp and Paper, and Personal Care. The company provides business papers, including copy and electronic imaging papers that are used with ink jet and laser printers, photocopiers, and plain-paper fax machines, as well as computer papers, preprinted forms, and digital papers for office and home use. It also offers commercial printing and publishing papers comprising offset papers and opaques used in sheet and roll fed offset presses; publishing papers, such as tradebook and lightweight uncoated papers for publishing textbooks, dictionaries, catalogs, magazines, hard cover novels, and financial documents; design papers for brochures and annual reports; and base papers that are converted into envelopes, tablets, business forms, and data processing/computer forms. In addition, the company provides papers for thermal printing, flexible packaging, food packaging, medical gowns and drapes, sandpapers backing, carbonless printing, labels, and other coating and laminating applications; and papers for industrial and specialty applications, such as carrier papers, treated papers, security papers, and specialized printing and converting applications. Further, it designs, manufactures,




# B.   Guideline Company Descriptions

markets, and distributes adult incontinence products and absorbent hygiene products under the brand name of Attends, IncoPack, and Indasec. It provides branded and private label briefs, protective underwear, underpads, pads, and washcloths, as well as baby diapers and infant training pants for acute care, long-term care, homecare, and retail channels. The company serves merchants, retail outlets, stationers, printers, publishers, converters, and end-users. Domtar Corporation is headquartered in Montreal, Canada.

## P.H. Glatfelter Company

P. H. Glatfelter Company, together with its subsidiaries, manufactures and sells specialty papers and fiber-based engineered materials worldwide. Its Composite Fibers business unit provides food and beverage papers for single-serve coffee and tea products; non-woven wall covering base materials for wallpaper manufacturers; metallized products that are used in the labeling of bottles, packaging innerliners, gift wrap, self-adhesive labels, and other consumer product applications; composite laminates for use in the production of decorative laminates, furniture, and flooring applications; and special paper products, which are used in batteries, capacitors, adhesive tapes, and other highly-engineered applications. The company's Advanced Airlaid Materials business unit supplies absorbent cellulose-based airlaid non-woven materials that are used to manufacture consumer and industrial products comprising feminine hygiene and adult incontinence products, specialty wipes, home care products, table tops, and food pads, as well as for use in napkins, cleaning pads, tablecloths, and baby wipes. Its Specialty Papers business unit offers carbonless and non-carbonless forms papers for credit card receipts, multi-part forms, security papers, and other end-user applications; book publishing papers for the production of hardbound books and other book publishing needs; envelope and converting papers for transactional and direct mail envelopes; and engineered products for digital imaging, packaging, casting, release, transfer, playing card, postal, FDA-compliant food and beverage, and other specialty applications. The company markets its products directly, as well as through wholesale paper merchants, brokers, and agents. P. H. Glatfelter Company was founded in 1864 and is headquartered in York, Pennsylvania.



Valuation & Financial Opinions



# Appendix C

## Control Premium

APPVION

Valuation & Financial Opinions



# C. CONTROL PREMIUM

## Control Premium

The value of a fractional interest in a company may be equal to, more than, or less than a pro rata share of the value of the entire company. That is, certain valuation approaches provide indications of value on a controlling ownership basis, and other approaches provide indications of value on a minority ownership interest basis. The analyst must reconcile these differing value indications to arrive at an indication of value consistent with the purpose and objective of the assignment. The adjustment from a minority ownership interest basis to a controlling ownership interest basis is typically made by applying a premium for control.

In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

With respect to the DCF Method, the indication of value can reflect a minority or a controlling ownership interest, depending on a number of factors. In our analysis, we used a capital structure based on industry averages and Appvion's long-term capital structure in estimating the WACC. In addition, based on our discussions with Appvion's management and our review of Appvion's financial projections, the forecasted results reflect optimal financial performance that a hypothetical financial buyer could not affect materially. Furthermore, the selected exit EBITDA multiple applied in the DCF method incorporates a control premium. Therefore, the indication of value from the DCF Method in our analysis represents a controlling ownership interest value.

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

The most objective and established evidence of control premiums is the study of cash tender offers. By looking at premiums offered during a tender for control of a company with publicly held shares, we can approximate the difference between a controlling and minority ownership interest value.



Valuation & Financial Opinions



# C.  CONTROL PREMIUM

A control premium can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2015* tracks publicly announced formal transfers of ownership of at least 10% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 23.1% to 41.1% over the past 20 years, with a median premium of 30.9%. The results of these studies are summarized in the table below.

| Percent Premium Paid Over Market Price | | | | | |
|---|---|---|---|---|---|
| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
| 1995 | 324 | 29.2% | 2005 | 392 | 24.1% |
| 1996 | 381 | 27.3% | 2006 | 454 | 23.1% |
| 1997 | 487 | 27.5% | 2007 | 491 | 24.7% |
| 1998 | 512 | 30.1% | 2008 | 294 | 36.5% |
| 1999 | 723 | 34.6% | 2009 | 239 | 39.8% |
| 2000 | 574 | 41.1% | 2010 | 348 | 34.6% |
| 2001 | 439 | 40.5% | 2011 | 321 | 37.8% |
| 2002 | 326 | 34.4% | 2012 | 323 | 37.1% |
| 2003 | 371 | 31.6% | 2013 | 257 | 29.7% |
| 2004 | 322 | 23.4% | 2014 | 328 | 28.7% |
| | | | **20-Year Median Control Premium** | | **30.9%** |

Source: Factset Mergerstat LLC, *Mergerstat Review 2015*.

In addition, we searched for control premiums paid in transactions within Appvion's industry. According to *Mergerstat Review 2015*, there was one transaction in the paper industry with a control premium of 7.9% in 2010, four transactions with an average control premium of 80.6% in 2011, zero transactions in 2012, three transactions with an average control premium of 29.4% in 2013, and two transactions with an average control premium of 20.3% in 2014.

**Applicability to the Subject Company**

There is one important factor to consider when applying the data above to the Company. The transactions of the interests in the companies discussed above represent both financial and strategic acquisitions. Often, strategic acquisitions include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer. Accordingly, the control premium that would apply to an interest in Appvion would be lower than that indicated by the study.

Based on the facts and circumstances related specifically to our valuation of the Appvion equity, we applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of Appvion.



- 93 -

Valuation & Financial Opinions

# Appendix D

**Assumptions and Limiting Conditions**



APPVION    Valuation & Financial Opinions

# D.  ASSUMPTIONS AND LIMITING CONDITIONS

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company.

- For the purpose of this engagement and report, we have made no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's October 31, 2015 balance sheet were intact as of that date and that the estimated December 31, 2015 balance sheet will not be materially different than on the Valuation Date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- Our conclusion of value is applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report, and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- Stout Risius Ross, Inc. is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.



Valuation & Financial Opinions



# Appendix E

## Statement of Qualifications



Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1090 of 1527

Valuation & Financial Opinions



# E.   STATEMENT OF QUALIFICATIONS

## Scott D. Levine, CPA / ABV, CFA

Scott D. Levine is a Managing Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. Over the last twenty years, he has had extensive experience in the valuation of business interests in both private and public corporations. Mr. Levine has performed valuation analyses in a broad range of industries and for numerous purposes including fairness and solvency opinions, estate and gift taxation, shareholder disputes, purchase price allocation, mergers and acquisitions, marital dissolutions and liability and damages analysis. He has a particular expertise in the valuation of business ownership interests in employee stock ownership plan (ESOP) related analyses, including ESOP security formation, transaction analysis, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. Levine has served are biotechnology, computer services, construction, engineering, entertainment, financial services, government contracting, healthcare, manufacturing, medical practices, telecommunications and wholesale distribution.

Mr. Levine has presented on many different topics in the field of business valuation to the following organizations: the American Society of Appraisers; the National Center for Employee Ownership; the ESOP Association; and the Association for Corporate Growth. He has also authored many articles related to the valuation of closely held companies. In addition, Mr. Levine has testified as an expert witness in state courts, arbitration and deposition.

Prior to joining SRR, Mr. Levine was a principal with a national valuation firm specializing in the valuation of closely held companies. During his tenure, he was responsible for business development and management of business valuation assignments as well as hiring and supervising staff. Prior to that, Mr. Levine was a CPA with Price Waterhouse in their audit group and was responsible for conducting audits for both privately held and publicly traded companies.

Mr. Levine is a member of the CFA Institute, the American Institute of Certified Public Accountants and the ESOP Association.



Valuation & Financial Opinions



# E.   STATEMENT OF QUALIFICATIONS

## Isaiah Aguilar, CFA

Isaiah Aguilar is a Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. He has had experience in the valuation of business interests in both private and public corporations. Mr. Aguilar has performed valuation analyses in a broad range of industries and for numerous purposes, including fairness and solvency opinions, estate and gift taxation, shareholder disputes, and liability and damages analysis. He has had particularly strong experience in the valuation of business ownership interests in Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security formation and transactions, determination of transaction fairness and adequate consideration, and annual employer security valuation updates.

Among the many industries that Mr. Aguilar has served are agriculture, commercial printers, construction, engineering, financial services, forest and paper products, government contracting, healthcare, information technology, paint, petroleum refining and specialty chemicals, among others.

Mr. Aguilar earned an MA in Applied Economics and a BA in International Studies from The Johns Hopkins University in Baltimore, Maryland. Mr. Aguilar is a member of the CFA Institute and the ESOP Association. Mr. Aguilar has earned the right to use the Chartered Financial Analyst designation.



Valuation & Financial Opinions



# EXHIBIT 5



# PAPERWEIGHT DEVELOPMENT CORP.

**Valuation of Common Stock**
**as of December 31, 2014**

**Issued: January 14, 2015**



**[This page is intentionally left blank.]**

*For more information, please contact one of the following members of the engagement team:*

---

Scott D. Levine, CPA / ABV, CFA
Managing Director
(703) 848-4944
slevine@srr.com

Aziz J. El-Tahch, CFA
Managing Director
(646) 807-4224
aeltahch@srr.com

Isaiah Aguilar, CFA
Senior Vice President
(703) 848-4942
iaguilar@srr.com

---



**Atlanta | Baltimore | Chicago | Cleveland | Dallas | Denver | Detroit | Houston | Los Angeles | New York | Washington, D.C.**

---

**www.srr.com**

# APPENDICES

| | | |
|---|---|---|
| **I.** | Introduction | 1 |
| **II.** | Summary of Operations Since June 30, 2014 | 5 |
| **III.** | Economic and Industry Outlook | 21 |
| **IV.** | Valuation Methodology | 30 |
| **V.** | Guideline Company Method | 34 |
| **VI.** | Discounted Cash Flow Method | 43 |
| **VII.** | Valuation Reconciliation and Conclusion | 53 |
| **VIII.** | Opinion | 62 |

# APPENDICES

**Appendix A**................................................................................................................................................Exhibits

**Appendix B**................................................................................................... Guideline Company Descriptions

**Appendix C**.................................................................................................................................. Control Premium

**Appendix D**.................................................................................................Assumptions and Limiting Conditions

**Appendix E**................................................................................................................. Statement of Qualifications





# Section I

## Introduction



Valuation & Financial Opinions



# I. INTRODUCTION

## Description of Analysis

- Stout Risius Ross, Inc. ("SRR") was retained by Reliance Trust Company solely in its capacity as the trustee (the "Trustee") of the Appvion, Inc. Employee Stock Ownership Trust, which forms a part of the Appvion, Inc. Employee Stock Ownership Plan (collectively the "ESOP"), to estimate the Fair Market Value of the common stock of Paperweight Development Corp. ("Paperweight") on a controlling-ownership interest basis, taking into consideration the appropriate discount for limited marketability, as of December 31, 2014 (the "Valuation Date"). On June 30, 2014, Reliance Trust Company sold its ESOP business to Argent Trust Company ("Argent"). The Company (defined below) appointed Argent as successor Trustee. It is to Argent, as successor Trustee, that SRR presents this analysis and opinion.

- We understand the ESOP owns 100% of the outstanding common stock of Paperweight which in turn owns 100% of Appvion, Inc. ("Appvion") (Paperweight and Appvion are collectively referred to herein as the "Company.")

- The purpose of our analysis is to provide an independent opinion of the Fair Market Value of the common stock of Paperweight held by the ESOP as of the Valuation Date for ESOP administration purposes. No other purpose is intended or should be inferred.

## Standard of Value

- In accordance with Title I of the Employee Retirement Income Security Act ("ERISA") and the Proposed Regulation Relating to the Definition of Adequate Consideration (Prop. Reg. Section 2510.3-18 (b)(2)(i)) (the "Proposed Regulation"), the term "Fair Market Value" is defined as the price at which an asset would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties being able, as well as willing, to trade and being well-informed about the asset and the market for the asset.

## Factors Considered

We considered the following factors in performing our analysis:

- The nature of the business and the history of the Company from its inception;

- The economic outlook in general and the condition and outlook of the industry in which the Company operates;

- The book value of the stock and the financial condition of the Company;

- The earning capacity of the Company;

- The dividend-paying capacity of the Company;

- Whether goodwill or other intangible value exists within the Company;





Valuation & Financial Opinions

# I.  INTRODUCTION

- Previous sales of the Company's stock and the size of the block of stock to be valued; and

- The market prices of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

## Sources of Information

In connection with this analysis, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. The principal sources of information used in performing our analysis included, but were not limited to:

- Paperweight's audited financial statements and Form 10-K filings with the U.S. Securities and Exchange Commission ("SEC") for the fiscal years ended December 31, 2009 through December 31, 2013;

- Paperweight's Form 10-Q filing with the SEC for the fiscal quarter ended September 28, 2014;

- Paperweight's internally-prepared financial statements for the ten-month periods ended October 31, 2013 and October 31, 2014;

- select items from Paperweight's internally-prepared balance sheet prepared by Company management as of December 31, 2014;

- the financial projections prepared by Company management for the fiscal years ending December 31, 2015 through December 31, 2019;

- Paperweight's Form 8-K filing with the SEC, dated September 30, 2014;

- the Funding Agreement by and among the Company and NCR Corporation, B.A.T Industries, p.l.c, and Windward Prospects Ltd., dated September 30, 2014;

- the Confidential Information Memorandum prepared by the Company's financial advisor, Jefferies LLC, dated July 2014;

- a presentation prepared by the Company's financial advisor, Jefferies LLC ("Jefferies"), titled "Project Rise", dated December 2014;

- the letter of intent to purchase the Company provided to Jefferies by Sherman Capital Holdings, LLC, dated December 11, 2014;

- the letter of intent to purchase the Company's Encapsys business provided to Jefferies by Croda International Plc, dated December 11, 2014;

- discussions with certain members of the senior management of Appvion regarding the operations, financial condition, future prospects, and projected operations and performance of the Company;



Valuation & Financial Opinions



# I.  INTRODUCTION

- publicly available information and financial data on publicly traded companies considered similar to the Company from an investment risk/return perspective; and

- other information and conducted other studies, analyses, and investigations as we deemed appropriate.

## Assumptions and Limiting Conditions

- This report and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and should not be referred to or distributed, in whole or in part, without our prior written consent. Reference should be made to Appendix D, as well as our engagement letter dated January 17, 2014, for certain assumptions and limiting conditions that are applicable to our analysis and report.



Valuation & Financial Opinions



Section II

**Summary of Operations Since June 30, 2014**

APPVION

Valuation & Financial Opinions



# II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

## Company Overview

- Founded in 1907, Appvion is the world's largest manufacturer of carbonless paper and the leading North American manufacturer of thermal paper. Appvion, a privately held company, is headquartered in Appleton, Wisconsin, with manufacturing facilities located in Appleton and Portage, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania.

- Appvion is organized into two primary operating units: (1) Technical Papers and (2) Encapsys, which encompasses the Company's chemical microencapsulation activities. Technical Papers, the Company's largest operating unit, includes the Carbonless and Thermal divisions.

- The Company has one class of stock: common stock. The ESOP owns 100% of the Company's unrestricted common stock. There were 7,340,838 shares outstanding as of the Valuation Date.

- Effective January 3, 2010, the Company adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on the value of Appvion common stock. All units vest three years after the award date and the cash value of the stock is paid to the employee on the vesting date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated. As of the Valuation Date, there were 332,625 RSUs outstanding.

- In 2006, the Company established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors. As of the Valuation Date, there were 97,816.744 phantom units outstanding.

- The Company's Long-Term Incentive Plan ("LTIP") awards synthetic equity units to employees, which are awarded at the most recent Appvion stock price as determined by the semi-annual ESOP valuation. As of the Valuation Date, there were 2,050,950 LTIP units outstanding with a weighted average exercise price of $21.01. In addition, there were 500 Canadian Stock Appreciation Right ("SAR") units outstanding with a weighted average exercise price of $27.68.

| Paperweight Equity Ownership Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Total | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| **Total** | **7,340,838** | **332,625** | **97,817** | **2,050,950** | **500** | **9,822,730** | **100.0%** |





Valuation & Financial Opinions

## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

- During the latest 12 month period ended October 31, 2014 (the "LTM period"), Appvion generated revenue of $802.9 million, of which approximately 43.1% was generated from Carbonless (including sales of security paper products), 51.5% from Thermal, and 5.4% from Encapsys.



**Revenue by Divison**

Carbonless
(incl. Security)
43.1%

Encapsys
5.4%

Thermal
51.5%

Source:  Appleton records for LTM period ended October 31, 2014.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1105 of 1527

APPVION                    Valuation & Financial Opinions    

## II. SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

### Carbonless

- Carbonless paper is used in the production of multi-part business forms. Two-part carbonless forms work as follows: the top sheet is coated on the back with encapsulated dye and the bottom sheet is coated on the front with a reactive chemical.

- Carbonless revenue decreased 1.6% from $351.4 million in fiscal year 2013 to $345.9 million in the LTM period. Carbonless' revenue declined primarily due to internal manufacturing issues and an unfavorable product mix, somewhat offset by a slight increase in shipment volume and the introduction and sale of new specialty paper products, including colored bond and high-speed inkjet product lines.

- Carbonless' EBITDA decreased from $51.4 million, or 14.6% of net sales, in fiscal year 2013 to $43.2 million, or 12.5% of net sales, in the LTM period due to internal manufacturing issues resulting in increased costs, including overtime, unfavorable changes in product mix, and lower sales. The decline in earnings was somewhat offset by the benefits of a supply agreement with Domtar (discussed herein) and lower raw materials costs.

- Due to the continued decline in the carbonless paper market, the Company is projecting Carbonless sales to decrease from $345.9 million in the LTM period to $332.5 million in fiscal 2015. Thereafter, net sales are projected to decrease to $286.4 million by fiscal year 2019. Company management expects increased sales of specialty paper to somewhat offset the decline in carbonless paper.

- Carbonless' adjusted EBITDA is projected to remain stable at $43.2 million from the LTM period to fiscal 2015. Thereafter, EBITDA is expected to increase to $47.7 million, or 16.6% of net sales, in fiscal year 2019. Carbonless' improving profit margins are expected to result from (1) improved product mix; (2) cost reductions, including lower headcount; (3) the resolution of internal manufacturing issues; and (4) the shift of carbonless paper production to more variable-cost facilities.

### Thermal

- Thermal paper is a heat sensitive paper that is coated with colorless dye, co-reactants, and binders. When thermal paper is fed through a printer, heat from the thermal print head causes dyes and co-reactants to activate and form an image. Accordingly, unlike inkjet and laser printers, thermal printers do not require ribbons or toner. Some of the fastest growing markets for thermal paper include point-of-sale applications (e.g., receipts received from ATM or retail sale transactions), label applications (e.g., weigh scale labels and shipping and delivery labels), and tag/ticket applications (e.g., entertainment and travel tickets and retail and industrial tags).

- Thermal's revenue decreased 1.8% from $421.3 million in fiscal year 2013 to $413.9 million in the LTM period primarily due to lower point-of-sale product pricing as a result of increased competition from foreign competitors and quality issues with a supplier. It is important to note that shipment volumes in the first half of 2013 were above historical levels due to the market reaction to the temporary exit of a foreign competitor from the U.S. market. During the second half of fiscal 2013, demand for thermal paper decreased to levels more consistent with historical trends.



Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1106 of 1527

Valuation & Financial Opinions



## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

- Thermal's adjusted EBITDA decreased from $42.5 million, or 10.1% of net sales, in fiscal year 2013 to $33.8 million, or 8.2% of net sales, in the LTM period. The decline in adjusted EBITDA is primarily due to lower revenue, pricing pressure as a result of increased competition, and temporary manufacturing quality issues related to the Company's thermal products, which resulted in the loss of some customers, increased labor costs, and discounts given to customers. Company management estimates the quality issues cost the Company between $10 million to $12 million of earnings in 2013 and approximately $7 million of earnings in fiscal 2014. However, Company management stated that it has resolved the manufacturing quality issues by transitioning its supply demands to Domtar.

- The Company expects Thermal's net sales to increase from $413.9 million in the LTM period to $434.8 million in fiscal 2015. Thereafter, net sales are expected to increase to $507.2 million in fiscal 2019, which represents a compound annual growth rate of 3.9%. Thermal sales growth is expected to result from increased sales of tag, ticket, and label products driven by product innovation, growth with international customers, and expansion into adjacent markets, somewhat offset by a gradual decline in point-of-sale product sales. It is important to note that Thermal's current forecast is more aligned with general market conditions in comparison to forecasts prepared in fiscal years 2012 and 2013.

- Thermal's adjusted EBITDA is projected to decrease from $33.8 million, or 8.2% of net sales, in the LTM period to $33.0 million, or 7.6% of net sales, in fiscal 2015 due to continued declines in point-of-sale product pricing. Thereafter, adjusted EBITDA is projected to increase to $49.9 million, or 9.8% of net sales, in fiscal 2019 due to an increased focus on tag, ticket, and label product sales, which typically generate higher profit margins.

- Thermal's net sales and adjusted EBITDA projections are lower (3.9% and 18.3%, on average, respectively) than the projections used as of the June 30, 204 analysis for fiscal years 2015 through 2018. The Company's financial projections for Thermal are more conservative due to the return of a foreign competitor to the U.S. market, as well as accounting for actual results over the last few years.

**Encapsys**

- On November 7, 2007, Appvion signed a multiyear supply agreement with Procter & Gamble ("P&G") to provide microencapsulated specialty chemicals. Appvion's initial project with P&G involves microencapsulating the fragrance for Downy liquid fabric softener, and future projects will involve hair care products and dryer sheets. P&G and Appvion filed a joint patent related to this product in fiscal 2007. In addition, P&G and Appvion entered into an exclusive five-year contract for microencapsulation in laundry products. Furthermore, P&G requested that Appvion open a microencapsulation plant in Germany to provide microencapsulation services to a nearby P&G facility.

- Encapsys' net sales increased 24.0% from $34.8 million in fiscal 2013 to $43.1 million in the LTM period primarily due to an increase in sales to P&G.

- Encapsys' EBITDA increased from $12.3 million, or 35.2% of net sales, in fiscal 2013 to $15.9 million, or 36.9% of net sales, in the LTM period due to the increase in sales.



- 9 -



Valuation & Financial Opinions

# II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

- P&G is currently in the process of building a manufacturing plant in Western Europe that will provide P&G with better access to emerging markets in the region. Company management believes this will provide Encapsys the opportunity to provide P&G with increased encapsulation services, which lower the cost of P&G's products, and access lower income markets. Encapsys capital expenditures are projected to total $8.0 million in fiscal 2014 and $22.1 million in fiscal 2015, of which $1.5 million per year is related to maintenance, with the remaining capital expenditures related to growth.

- As of the Valuation Date, the Company was continuing to pursue other initiatives in its Encapsys division with non-P&G partners such as the Troy Corporation and Sherwin-Williams, which operate in the paint industry; Buckman Laboratories, an international specialty chemical company; Entropy Solutions, a bio-based specialty company; AMCOL International, a specialty minerals company; Sealy-Posturepedic, a mattress manufacturer; and Outlast, a textile company.

- Encapsys' net sales are expected to increase from $43.1 million in the LTM period to $59.3 million in fiscal 2015. Thereafter, net sales are expected to increase to $194.3 million in fiscal 2019, which represents a compound annual growth rate of 34.5%. In fiscal 2015, 83.4% of Encapsys' sales are projected to be generated from the Company's relationship with P&G, including sales related to the new Germany plant. By 2019, however, approximately half of sales are expected to be derived from non-P&G customers and from different applications, such as the encapsulation of phase change materials, which absorb and release thermal energy in order to maintain a regulated temperature in a product. Encapsys' adjusted EBITDA is projected to increase from $15.9 million, or 36.9% of net sales, in the LTM period to $23.0 million, or 38.8% of net sales, in fiscal 2015. Thereafter, adjusted EBITDA is projected to increase to $92.4 million, or 47.6% of net sales, in fiscal 2019.

- The portion of Encapsys' net sales derived from P&G is expected to decline from 83.4% in fiscal 2015 to 49.8% in fiscal 2019 as the Company expects to develop relationships with new partners.

**Litigation/Off-Balance Sheet Issues**

- In 2008, Appvion paid $25 million for costs related to the Fox River environmental clean up, representing its unindemnified obligation in the matter. The balance of Appvion's ultimate liability is indemnified by Windward Prospects Ltd. (formerly Arjo Wiggins, "Windward"). Windward supported its indemnification through the purchase of a $250 million insurance policy from Commerce & Industry Insurance Company, a unit of AIG. While the face value of that policy has diminished with the payment of expenses over time, Windward has successfully claimed significant reimbursements from former insurers of Appvion, replenishing its resources and capability for future indemnification costs.

  - The Company's responsibility for the $25 million of Fox River liabilities has been completely satisfied and as a result, Windward resumed responsibility for any remaining For River liabilities. In July 2011, Appvion filed a motion for summary judgment with the goal of having Appvion removed as a potentially responsible party.

  - On April 10, 2012, the U.S. District Court for the Eastern District of Wisconsin (the "U.S. District Court") granted Appvion's motion for summary judgment and dismissed all claims against Appvion in the enforcement action. The decision established that Appvion was no longer a potentially responsible party, no longer liable under the federal Comprehensive Environmental Response, Compensation, and Liability Act, ("CERCLA"), no longer considered a legal successor to NCR Corporation's





Valuation & Financial Opinions

## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

("NCR") liabilities, and no longer required to comply with the order commanding remediation of the Fox River. In addition, on July 3, 2012, the U.S. District Court determined that Appvion and NCR did not arrange for the disposal of hazardous waste within the meaning of CERCLA.

➤ The rulings did not affect Appvion's rights or obligations to share defense and liability costs with NCR in accordance with the terms of a 1998 agreement and a 2005 arbitration determination ("the Arbitration") arising out of Appvion's acquisition of assets from NCR in 1978 while it was a subsidiary of B.A.T Industries Limited ("BAT"). Appvion and BAT have joint and several liability under the Arbitration. Appvion initiated the dispute resolution procedures outlined in the 1998 agreement and arbitration commenced in March 2014. Issues in dispute include the scope of Appvion's liability under the agreement, if any, as well as funding requests and supporting documentation from NCR (the "Dispute Resolution").

➤ On June 8, 2012, BAT served Windward with a claim filed in a United Kingdom court, seeking a declaration that BAT is indemnified by Windward from and against any losses relating to the Lower Fox River. On June 26, 2012, BAT served Appvion with the same claim, seeking a declaration that BAT is indemnified by Appvion. On February 10, 2014, Appvion filed a defense and counterclaim against BAT seeking declaration that BAT is required to reimburse Appvion for damages in excess of $100 million representing BAT's share of past liability costs paid by Appvion and that BAT should be ordered to pay its share of future liability costs.

➤ On September 30, 2014, Appvion entered into a funding agreement (the "Funding Agreement") with NCR, BAT, and Windward related to cleanup costs for the Lower Fox River and certain potential future sites (the "Future Sites"). In addition to the agreed payments to be made by the other parties, the Company agreed to and made a $6.0 million payment on September 30, 2014 toward historical Fox River costs incurred by NCR through September 1, 2014. The Company also agreed to pay $4.0 million on February 1, 2014, up to $7.5 million on September 1, 2015, and up to $7.5 million on September 1, 2016. As a result of the Funding Agreement, $24.0 million of expense was recorded as selling, general, and administrative expense, reflecting the total of the four payments discounted to the end of the third quarter of 2014. A liability of $24.0 million was also recorded on the Company's balance sheet as of September 28, 2014 related to the Funding Agreement. The previously recorded and remaining indemnification receivable and Fox River liabilities reserve, both of which had a balance of $59.3 million as of December 31, 2013, were also written off and are no longer included in the Company's balance sheet. Appvion's liability related to Fox River is limited to $19.0 million as of the Valuation Date.

➤ Additionally, as the 1998 agreement with NCR is not limited to Fox River, the Company's liability related to costs incurred for the clean-up of other sites by NCR and BAT where environmental contamination may have occurred resulting from carbonless copy paper manufactured in Appleton, Wisconsin or Combined Locks, Wisconsin is limited to $25.0 million in aggregate. The Company agreed to pay up to $7.5 million annually related to clean-up costs and potential liabilities related to such Future Sites, provided that the Company's aggregate liability to Future Sites not exceed $25.0 million.

➤ Appvion bears sole responsibility for its funding obligations under the Funding Agreement. The Funding Agreement does not, however, modify, alter or amend the two indemnification agreements entered into in 2001 wherein Windward agreed to indemnify the Company for certain costs, expenses and liabilities relating to Fox River and Future Sites. However, there are currently no outstanding matters for which costs are being incurred and thereby eligible for indemnification under the noted



Valuation & Financial Opinions



## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

indemnification agreements and therefore no corresponding environmental indemnification receivable or Fox River liabilities reserve is recorded on the Company's balance sheet.

➤ The parties to the Funding Agreement agree that they have no recourse against Appvion for any further liability relating to the Fox River or Future Sites beyond the funding obligations set forth in the Funding Agreement.

➤ As a result of the Funding Agreement, (1) NCR and Appvion instructed the American Arbitration Association not to release the pending decision in the arbitration between NCR and Appvion and (2) BAT, Appvion, and Windward discontinued the pending litigation in the United Kingdom court.

### Pension Accounting Adjustment

■ During the fourth quarter of 2012, the Company adopted mark-to-market accounting for its pension and other postretirement benefit plans. Under mark-to-market accounting, all actuarial gains and losses are immediately recognized in the fourth quarter of each year and whenever a plan is determined to qualify for a remeasurement during a fiscal year. Under the Company's previous accounting method, a portion of the actuarial gains and losses was deferred in accumulated other comprehensive loss on the Company's balance sheet and amortized into future periods. In addition, the previous method smoothed the investment gains and losses of the plan assets over a period of five years. In connection with this change in accounting policy, the Company also elected to change its method of accounting for certain costs included in inventory. The Company elected to exclude the amount of its pension and other postretirement benefit costs applicable to former employees from inventoriable costs. While the Company's historical policy of including all pension and other postretirement benefits costs as a component of inventoriable costs was acceptable, it believes the new policy is preferable as inventoriable costs will only include costs that are directly attributable to current employees involved in the production of inventory. All prior periods presented were retrospectively adjusted to reflect the period-specific effects of applying the new accounting principles. The mark-to-market adjustment resulted in an additional pension expense of $45.5 million in fiscal 2011 and $25.5 million in fiscal 2012, while a reduction of expense of $410,000 was recorded in fiscal 2010. During the fourth quarter of 2013, the Company recorded a $61.9 million mark-to-market gain on its pension and other post-retirement benefit plans.

### Labor Issues

■ The Company's manufacturing employees at its facilities in Appleton, Wisconsin; West Carrollton, Ohio; and Roaring Spring, Pennsylvania are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union. As of the Valuation Date, the Company's labor agreements with all union employees were current.

### Domtar Supply Agreement

■ On February 22, 2012, Appvion entered into a long-term supply agreement with Domtar Corporation ("Domtar") to purchase carbonless and thermal stock supply. Pursuant to the terms of the supply agreement, Domtar became Appvion's exclusive



Valuation & Financial Opinions



# II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

supplier of carbonless and thermal base stock for a period of 15 years, with successive five-year renewals. The supply agreement allows Appvion to eliminate unprofitable business lines and reduce working capital, fixed assets, and overhead costs. The supply agreement also allows Appvion to dispose of certain assets at its West Carrollton, Ohio facility and move certain operations to its Appleton, Wisconsin facility. Company management believes that the supply agreement will result in many benefits for Appvion, including improvements to cash flow and EBITDA.

➢   In fiscal 2012, the Company recorded $106.0 million of restructuring costs related to the supply agreement, of which approximately $25.2 million are related to employee termination costs (including related pension and benefit costs) and approximately $64.7 million relate to impairment and accelerated depreciation on certain equipment. As of December 28, 2013, the Company expected to incur additional cash expenditures of approximately $35 million as a result of ceasing papermaking operations at West Carrollton, of which approximately $5 million is projected to be paid during fiscal 2014. In addition, approximately $4 million is projected to be disbursed through 2016 as a result of distributions from the Company's stock fund for former West Carrollton employees. The remaining $26 million may be paid over a period through 2033.

➢   Prior to the supply agreement with Domtar, a certain number of the Company's employees participated in the Pace Industry Union-Management Pension Fund ("PIUMPF"), a multi-employer defined benefit plan. As a result of the restructuring of the West Carrollton facility and as agreed upon in labor contract negotiations, the Company withdrew from PIUMPF and recorded a $7.0 million settlement charge in fiscal 2012. The Company also recorded an $18.0 million liability related to additional withdrawal costs, which are expected to be paid over several years and is included in the projected additional cash expenditures discussed above.

➢   We did not explicitly account for future cash expenditures related to the restructuring in our analysis because they are expected to be offset by improvements in working capital resulting from the Domtar supply agreement and cash realization from the sale of scrap.

**Receivables Financing Program**

■   The Company entered a receivables financing program through Fifth Third Bank in June 2014. Company management expects the program will help Appvion lower its cost of capital as well as improve the Company's cash flow, which will be used to repay debt and support working capital. Company management stated the cost of the program to be LIBOR plus 1.95%, which compares to the Company's revolver of LIBOR plus 4.5%.

**Description of Terminated Transaction**

■   In the first half of fiscal 2012, the Company was contemplating a business combination with Hicks Acquisition Company II, Inc. ("HAC II") that would have comprised the following steps:

➢   Appvion was going to convert from a qualified subchapter S subsidiary into a limited liability company ("Appleton LLC"), which was expected to be treated as a partnership for U.S. federal income tax purposes. Appleton LLC was going to be capitalized with Class A Voting Units and Class B Exchangeable Units (which were to be exchangeable into publicly traded


**Valuation & Financial Opinions**


## II.  SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

common stock of HAC II on a one-for-one basis, subject to certain anti-dilution adjustments). Appleton LLC was going to issue to Paperweight 9,632,024 Class B Exchangeable Units and a certain number of Class B Exchangeable Units to be determined prior to closing.

➢ In addition, Paperweight was going to be entitled to receive up to an aggregate of 3.0 million shares of HAC II common stock (the "Earnout Shares"). The Earnout Shares were to be payable upon the achievement of certain stock price targets based upon the future trading price of the HAC II common stock.

➢ The Company was also bringing a tax basis step-up and related tax benefits to the business combination. As a result, HAC II and Paperweight were going to execute a Tax Receivables Agreement ("TRA") pursuant to which HAC II was expected to make a cash payment to Paperweight equal to 85% of the future tax benefits resulting from these tax benefits. The remaining 15% was to be retained by HAC II.

➢ The business combination was expected to follow an "Up-C" structure, whereby cash that would otherwise be paid out as federal income taxes was instead going to be paid into a continuing tax deferred subchapter S corporation owned by the ESOP. The benefits of the Up-C tax distributions were expected to accrue to ESOP participants as long as they remained in the ESOP.

■ It was anticipated that the combined entity would be publicly-traded on the NASDAQ stock exchange under a mutually agreed upon ticker symbol.

■ On July 13, 2012, the Company and HAC II formally announced their mutual agreement to terminate the proposed business combination. In doing so, Company management indicated that volatile market conditions prevented a transaction size from being reached that was acceptable to both Appvion and HAC II. Given the ultimate transaction size proposed, which would have provided lower near-term liquidity than originally anticipated and may not have allowed the combined Company to be traded on the NASDAQ stock exchange, Company management team was unsure whether or not the business combination would enable the Company to achieve its stated objectives. However, Mark Richards, Chief Executive Officer, and Tom Ferree, Chief Financial Officer, both stated that the feedback received from potential investors regarding the fundamental strength of the Company was positive, notwithstanding their reluctance to participate in the business combination under prevailing market conditions.

■ On October 22, 2012, Hicks Equity Partners, LLC ("HEP") provided Company management with a letter of intent to acquire 100% of the common stock of Paperweight (the "HEP Transaction").

➢ According to the letter of intent, the HEP Transaction implied an Enterprise Value of $732.5 million, representing a 5.6x multiple of the Company's pro forma 2012 EBITDA of $131 million as provided to HEP at the time. HEP estimated cash proceeds to the ESOP would be approximately $22.00 per share.

➢ As part of the HEP Transaction, HEP expected to refinance the Company's Senior Secured Bonds and leave the Company's other debt instruments outstanding.




## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

➢ HEP expected to partner with another firm or firms (the "Investment Partners") that would underwrite the full equity amount of the HEP Transaction and ultimately hold approximately 50% of the Company's equity post-Transaction. The remaining 50% equity ownership would be held by an affiliate of HEP.

➢ Following the HEP Transaction, Tom Hicks, the Chairman and Chief Executive Officer of HEP, would have been named Chairman of the Company's Board of Directors and Mark Richards would have remained Chief Executive Officer and a member of the Board. It was expected that HEP and the Investment Partner would each have had representation on the Board.

➢ According to the letter of intent, HEP expected to form a management incentive plan that would encourage senior management to roll-over a meaningful portion of their LTIP and RSU payments on a pari passu basis with HEP. HEP expected the management incentive plan would have comprised options representing 10% of the Company's equity on a fully-diluted basis.

■ Appvion provided HEP with a period of exclusivity through January 18, 2013. However, HEP and Appvion decided to not pursue the HEP Transaction due to a disagreement among the potential Investment Partners on certain economic terms of the HEP Transaction, as well as uncertainty created by the Company's debt refinancing efforts.

**2013 Refinancings**

■ On June 28, 2013, to take advantage of the low interest rate environment to refinance debt, Appvion entered into a $435 million senior secured credit facility, which includes a $335 million first lien term loan facility (the "First Lien Notes") and a $100 million revolving credit facility (the "Revolving Credit Facility").

■ Key terms and conditions of the First Lien Notes and Revolving Credit Facility include:

➢ The First Lien Notes and Revolving Credit Facility accrue interest at an annual rate equal to, at the Company's option, (1) LIBOR (with 1.25% floor) plus 4.5% per annum or (2) Prime plus 3.5%.

➢ The First Lien Notes have a term of six years while the Revolving Credit Facility has a term of five years.

■ Substantially all of the First Lien Notes proceeds were used to finance the purchase price, including principal, premium, consent fee, and accrued and unpaid interest, of $300.7 million (aggregate principal amount) of the Company's 10.50% fixed-rate Senior Secured Notes and to pay related fees and expenses. The total principal balance of the Senior Secured Notes was $305.0 million. On July 31, 2013, Appvion redeemed all of the remaining $4.3 million of Senior Secured Notes outstanding at a redemption price equal to $1,052.50 per $1,000 principal amount of Senior Secured Notes, plus accrued and unpaid interest.

■ The issuance of $335.0 million of First Lien Notes and repurchase of $300.7 million of Senior Secured Notes is referred to herein as the "Senior Refinancing."



Valuation & Financial Opinions



## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

| Senior Refinancing - Sources and Uses of Cash | | | | | |
|---|---|---|---|---|---|
| *U.S. Dollars in Thousands* | | | | | |
| Sources of Cash | | | Uses of Cash | | |
| First Lien Term Notes | $ | 335,000 | Senior Secured Notes | $ | 319,797 |
| Revolver | | 34,600 | Existing Revolver | | 40,949 |
| | | | Estimated Fees, Expenses, & OID | | 8,842 |
| | | | Cash to Balance Sheet | | 12 |
| **Total Sources of Cash** | **$** | **369,600** | **Total Uses of Cash** | **$** | **369,600** |

- On November 19, 2013, the Company raised $250 million through the sale of second lien senior secured notes (the "New Second Lien Notes"). The Company used the proceeds of the New Second Lien Notes to redeem $161.8 million of the existing Second Lien Notes, including $9.3 million of accrued interest and $33.3 million of make-whole payments, and $32.2 million of Senior Subordinated Notes, including $1.6 million of accrued interest. Key terms and conditions of the New Second Lien Notes include:

  - The New Second Lien Notes accrue interest at an annual rate of 9.0%.

  - The New Second Lien Notes mature on June 1, 2020.

  - The New Second Lien Notes rank equally in right of payment with all of the Company's senior debt and will be senior in right of payments to all existing subordinated indebtedness of the Company.

  - The New Second Lien Notes will have second-priority security interest on the collateral.

  - On or after December 1, 2016, the Company, at its option, may redeem the New Second Lien Notes at (1) 104.5% of the principal amount in the 12-month period commencing December 1, 2016, (2) 102.25% in the 12-month period commencing December 1, 2017, and (3) 100% thereafter.

  - Prior to December 1, 2016, the Company may redeem the New Second Lien Notes only upon payment of an amount equal to the present value of the remaining scheduled interest payments on the Second Lien Notes (the "Make-Whole Price").

  - At any time prior to December 1, 2016, the Company may on any one or more occasions redeem up to 35% of the aggregate principal amount of the New Second Lien Notes at a redemption price of 109.0% of the principal amount, plus accrued and unpaid interest through the redemption date, with the net cash proceeds of one or more equity offerings; provided that:



**Valuation & Financial Opinions**

## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

- ◆ at least 65% of the aggregate principal amount of the New Second Lien Notes originally issued remains outstanding immediately after the occurrence of such redemption; and

- ◆ each such redemption occurs within 120 days of the date of the closing of such equity offerings.

➢ If the Company experiences certain change of control events, the Company must offer to repurchase the New Second Lien Notes at 101% of the principal amount, plus accrued and unpaid interest.

■ The issuance of $250.0 million of New Second Lien Notes and repurchase of Senior Subordinate Notes and existing Second Lien Notes is referred to herein as the "Junior Refinancing."

■ The Senior Refinancing and Junior Refinancing are collectively referred to herein as the "2013 Refinancings."

| Junior Refinancing - Sources and Uses of Cash | | | | | |
|---|---|---|---|---|---|
| *U.S. Dollars in Thousands* | | | | | |
| Sources of Cash | | | Uses of Cash | | |
| New Second Lien Notes | $ | 250,000 | Existing Second Lien Notes | $ | 171,068 |
| | | | Make-Whole Payment | | 33,299 |
| | | | Senior Subordinated Notes | | 33,799 |
| | | | Estimated Fees, Expenses, & OID | | 7,748 |
| | | | Cash to Balance Sheet | | 4,087 |
| **Total Sources of Cash** | **$** | **250,000** | **Total Uses of Cash** | **$** | **250,000** |

■ Due to the 2013 Refinancings, the Company was able to replace debt with higher interest rates with new debt with lower interest rates.

➢ The annual interest rate of the Senior Secured Notes was 10.5%, which was replaced by the First Lien Notes with an interest rate of LIBOR (1.25% floor) plus 4.5% (5.75% as of the Valuation Date).

➢ The annual interest rate on the Senior Subordinated Notes and Second Lien Notes were 9.75% and 11.25%, respectively, which were replaced by the New Second Lien Notes with an interest rate of 9.0%.

■ By completing the 2013 Refinancings, the Company was also able to extend the maturities of its existing debt to improve the Company's financial flexibility:



Valuation & Financial Opinions



## II.    SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

- ➤ The Senior Secured Notes were due in June 2015, which was replaced by the First Lien Term Loan that matures in June 2019.

- ➤ The Senior Subordinated Notes and existing Second Lien Notes were due in June 2014 and December 2015, respectively. The Company was able to replace these notes with the New Second Lien Notes that mature in June 2020.

- ■ Although the Company incurred additional debt due to the 2013 Refinancings, this increased debt is mitigated by the significantly lower cash interest expense the Company expects to incur as well as the improved financial flexibility and marketability of the Company.

### Strategic Initiatives

- ■ Despite the 2013 Refinancings, which provided the Company with increased financial flexibility, the Company is continuing to explore strategic alternatives that would facilitate the achievement of its business objectives. The Company engaged Jefferies LLC, an investment bank, to help Appvion explore such strategic alternatives, including the sale of the Company.

- ■ Jefferies contacted both strategic and financial prospective buyers about the potential sale of the Company as a whole or the individual sale of the Company's Technical Papers or Encapsys division. Of the 97 prospective buyers, 53 executed a non-disclosure agreement ("NDA") and reviewed a confidential information memorandum. All 42 prospective financial buyers and four prospective strategic buyers that executed an NDA were interested in the purchase of the entire Company, while seven prospective strategic buyers were interested in the purchase of Encapsys. Of the 53 prospective buyers that executed an NDA, 12 parties submitted initial indications of interest. Of the twelve prospective buyers, six submitted revised indications of interest. Of the six, two prospective financial buyers were interested in the purchase of the entire Company, one prospective financial buyer was interested in the purchase of the Technical Papers division, and three strategic buyers were interested in the purchase of Encapsys.

- ■ Based on the indications of interest, the Company decided to continue discussions with five prospective buyers, who received access to a data room, site tours and access to numerous calls and meetings with management to discuss strategy, financial forecasts, customer relationships, human resources, intellectual property, and other issues. Based thereon, one financial buyer, Sheman Capital Holdings, LLC ("Sherman"), submitted a final bid for the entire Company with an implied enterprise value ranging from $680 million to $710 million, or 7.6x to 7.9x LTM adjusted EBITDA. In addition, one strategic buyer, Croda International Plc ("Croda"), submitted a final bid for Encapsys with an implied enterprise value for Encapsys of $175 million, or 11.0x LTM adjusted Encapsys EBITDA. Additionally, it is important to note that Croda revised its bid downwards from an implied enterprise value of $250 million, or 15.7x LTM adjusted EBITDA, due to concerns over limitations imposed by the contractual relationship between Encapsys and Proctor & Gamble.

- ■ There is no imminent transaction pending as of the Valuation Date. Any transaction would be structured based on negotiations between Appvion and the potential buyer or strategic partner. The structure of a transaction could impact the purchase price of the Company and ultimately the implied value. Consistent with the standard of Fair Market Value, we have not taken into



Valuation & Financial Opinions



## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

account explicitly a specific transaction structure or purchase price in performing our analysis. However, the preliminary offers were considered for purposes of comparison to our valuation conclusion.

**Management Team and Board of Directors**

- In June 2014, the Company hired Kevin Gilligan ("Mr. Gilligan") as President of the Paper Division. Prior to joining Appvion, Mr. Gilligan served in a variety of positions while working over 20 years at H.B. Fuller, a global specialty chemical company, most recently serving as Vice President of Global Operations.

- In July 2014, the Company hired Ethan Haas ("Mr. Haas") as Senior Vice President and General Manager of Carbonless and Specialty Papers. Mr. Haas has served in a variety of positions over the course of 18 years in the paper industry. Prior to joining Appvion, Mr. Haas served as Vice President of Broker, International, Pulp and Auxiliary Markets for NewPage Corporation. Mr. Haas has also worked for MeadWestvaco Corporation.

| Executive Management Team | |
|---|---|
| **Individual** | **Position** |
| Mark Richards | Chairman, President, and Chief Executive Officer |
| Thomas J. Ferree | Senior Vice President of Finance and Chief Financial Officer |
| Kerry S. Arent | Senior Vice President of Human Resources |
| Kevin M. Gilligan | President of Paper |
| Ethan Haas | Senior Vice President of Carbonless and Specialty Papers |
| Jeffrey J. Fletcher | Vice President and Controller |
| James R. Hillend | Vice President of Thermal |
| Tami L. Van Straten | Vice President, General Counsel, and Secretary |
| Ted E. Goodwin | Vice President of Business Development |
| Jason A. Schulist | Vice President of Continuous Improvement |



Case 1:19-cv-01561-WCG     Filed 11/19/19     Page 1117 of 1527     Document 1-2

**Valuation & Financial Opinions**



## II.   SUMMARY OF OPERATIONS SINCE JUNE 30, 2014

| Board of Directors | |
|---|---|
| **Individual** | **Position** |
| Mark Richards | Chairman, President, and Chief Executive Officer |
| Stephen P. Carter | Director |
| Terry M. Murphy | Director |
| Andrew F. Reardon | Director |
| Kathi P. Seifert | Director |
| Mark A. Suwyn | Director |
| George W. Wurtz | Director |

APPVION

Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# Section III

## Economic and Industry Outlook

Valuation & Financial Opinions



# III. ECONOMIC AND INDUSTRY OUTLOOK

## Gross Domestic Product

- Real (i.e., inflation adjusted) GDP growth of 2.0% to 2.5% is generally considered optimal when the economy is operating at full employment (5.5% to 6.0% unemployment).

- GDP increased at an annual rate of 3.6% in the third quarter of 2014, following an increase of 4.6% in the second quarter of 2014. Compared with the second quarter of 2014, the lower growth rate is primarily the result of decreased consumption, fixed investment, and inventory investment, partially offset by increased exports and government spending.

- GDP is forecasted to increase at an annual rate of 3.1% in 2015.

## Consumer Price Index

- The CPI has increased at an average rate of 2.5% over the past 20 years.

- The CPI decreased 0.3% in November 2014 and has increased 1.3% over the past 12 months.

- The core index, excluding food and energy prices, increased 0.1% in November 2014 and has increased 1.7% over the past 12 months.

- The CPI is expected to increase 1.9% in 2015 and 2.1% in 2016.



Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia



Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia





Valuation & Financial Opinions

- 22 -

# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Employment Situation

- Typically, economists consider the economy to be operating at full employment when the unemployment rate is between 5.5% and 6.0%.

- In November 2014, 321,000 jobs were added, and the unemployment rate remained stable at 5.8% from October 2014 to November 2014.

- The unemployment rate is forecasted to average 5.6% in 2015.

## Consumer Sentiment

- The Index of Consumer Sentiment, normalized at a value of 100 in the first quarter of 1966, is constructed by the Survey Research Center at the University of Michigan based on a survey of consumers regarding personal finances, business conditions, and anticipated spending. This metric is an important barometer of the strength of the economy since consumer spending represents approximately two-thirds of GDP.

- Consumer sentiment increased from 88.8 in November 2014 to 93.6 in December 2014. The increase in consumer sentiment was driven by strengthening household finances, lower gasoline prices, and a declining unemployment rate.



Sources: Dismal Scientist and Federal Reserve Bank of Philadelphia



Source: Dismal Scientist



Case 1:19-cv-01561-WCG   Filed 11/19/404   Page 1121 of 1527   Document 1-2

Valuation & Financial Opinions



# III. ECONOMIC AND INDUSTRY OUTLOOK

## Purchasing Managers' Index

- Index values above 50 indicate an expanding manufacturing sector, while values below 50 indicate a contracting manufacturing sector.
- The PMI decreased to 58.7 points in November 2014 from 59.0 points in October 2014. The slight decrease in November is due primarily to decreases in inventories and production.

## Equity Markets

- Over the past 20 years, the S&P 500 and Russell 2000 have increased 7.8% and 8.2% per annum, respectively.
- For the month ended December 31, 2014, the S&P 500 decreased 0.4% and the Russell 2000 increased 2.7%.
- For the year ended December 31, 2014, the S&P 500 increased 11.4% and the Russell 2000 increased 3.5%.







# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Industry Synopsis

■ In the United States, approximately 3,100 companies with combined annual revenues of $180 billion manufacture paper products. Overall industry concentration is low, but is highly concentrated within specific product segments. Major companies include International Paper, Kimberly-Clark, Georgia Pacific, Neenah Paper, and MeadWestvaco. Major product categories are paperboard containers, paper bags, coated papers, tissue product, and stationary.

■ As finished paper products tend to be inexpensive and bulky, transportation costs make up a significant portion of total costs. Smaller manufacturers can compete effectively with larger producers by focusing on their local market.

## Industry Growth

■ According to IBIS World, between 2009 and 2014 paper product manufacturing industry revenue declined 1.1% on an annual basis. Along with declining revenues, profitability has been constrained by an increase in the price of pulp, paper, and paper board, as well as significant price competition from foreign competitors. To offset this, companies have reduced headcount and restructured and consolidated facilities.

■ Annualized U.S. industrial production of paper products declined approximately 2.3% in October 2014 compared to October 2013. Sales of manufactured paper products decreased 0.3% in the third quarter of 2014 relative to the third quarter of 2013, while operating profits declined 10.6% during the same period.

■ According to First Research, the output of U.S. pulp, paper, and paperboard products manufacturing is forecast to grow at an annual compounded rate of 3% between 2014 and 2018.

## Paper Production

■ Production of paper products declined more than 30% between 2002 and 2012 as digital communications have become more popular. According to IBIS World, the output of U.S. paper mills is forecast to contract at an annual compounded rate of 1.1% between 2014 and 2019. Over the five years through 2019, the industry is expected to face two primary challenges: (1) the increasing substitution of electronic recordkeeping systems for the industry's paper products and (2) increased competition from paper-producing countries in global markets if the U.S. dollar continues to strengthen. In addition, production volumes in China, Indonesia, and Mexico are expected to increase substantially as the industry transitions into newer technologies. Paper mills in the United States will be forced to emphasize higher-quality gloss paper products rather than bulk paper reams, which historically have generated the majority of industry revenue.

■ U.S. nondurable goods manufacturers' shipments of paper products, an indicator of paper product production, increased 1.1% in the first nine months of 2014 compared to the same period in 2013.



Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

**Capacity**

■ According to an American Forest and Paper Association ("AFPA") survey released in May 2014, U.S. paper and paperboard capacity decreased 1.1% in 2013. Tissue paper capacity reached an all-time high in 2013 due in part to population growth in the United States, while containerboard capacity rebounded from lows reached during the recession. However, capacity to produce newsprint and printing-writing papers continued to decline.

**International Issues**

■ The economic expansion in China has created an emerging export market and also a new source for potential investment funding for U.S. paper product manufacturing companies. China lacks the necessary natural resources to satisfy its existing paper product needs and demand for timber, wood pulp, and recycled paper and cardboard is continuing to increase. Some industry experts believe Chinese firms will soon begin to invest in or acquire U.S. paper production companies that need additional capital to modernize production facilities.

■ While technology has reduced the demand for printing, writing, and newsprint paper, demand for cardboard packaging, tissue paper, and paper towels is rising in emerging markets including China, according to HSBC. China's paper consumption over the past ten years has increased from 15% of global demand to 25% of global demand, making it the largest consumer of paper in the world. HSBC expects worldwide paper consumption to increase 2.4% over the next five years, driven by emerging markets and increased urbanization in Asia.

■ In recent years, China has invested significantly in new, advanced paper mills, supported by government subsidies. To compensate for the lack of sufficient domestic timber supplies, Chinese paper companies have also developed industrial scale plantations and bioengineered hardwood trees that need just four to six years to reach full height, approximately ten times faster than the normal rate of growth. Additionally, pulp production is increasing in Latin America, as the favorable climate enables some trees to reach maturity in six to seven years, relative to 25 years in North America.

■ According to the *Twelfth Five-Year Plan for the Development of the Paper Making Industry*, a joint publication by the Chinese National Development and Reform Commission and several other Chinese government agencies, the total production capacity of China's paper and paperboard producers is expected to reach 130 million tons by 2015, with a volume of 116 million tons produced. Paper and paperboard consumption in China is expected to reach 114.7 million tons by 2015, which represents an annualized growth rate for both production and consumption of 4.6% from 2011 to 2015. This indicates that China's production capacity will soon rise to meet its demand for paper products, though capacity is expanding at a much slower rate than in previous years.

■ The U.S. Department of Commerce imposed antidumping and countervailing duties on imports of coated free sheet paper from China and Indonesia as a result of a U.S. International Trade Commission ("USITC") ruling. The USITC ruled in October 2010 that imports of coated paper from Chinese and Indonesian companies are causing material injury to U.S. paper companies and their employees. The USITC decision follows an earlier Department of Commerce finding that the two countries engaged in



Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

"dumping" subsidized coated paper on the U.S. market. U.S. paper suppliers claim the unfair trade practices of some paper exporters are suppressing prices and causing paper mill closures domestically. In August 2012, the USITC announced that it would maintain these existing prices.

- In September 2012, the WTO announced that it would evaluate whether the United States' anti-subsidy duties on Chinese goods including solar panels, thermal paper, wind towers, and steel wire violate global commerce rules.

- In December 2012, the U.S. Department of Commerce issued a preliminary determination that Papierfabrik August Koehler AG and Koehler America, Inc. (collectively "Koehler") deliberately coordinated with multiple parties to structure its sales, pricing, and shipping procedures in a manner that would enable it to manipulate its sales prices of lightweight thermal paper ("LWTP") reported to the U.S. Commerce Department. The U.S. Department of Commerce also found Koehler's actions consistent with a pattern of price manipulation to evade antidumping duties. As a result, the U.S. Department of Commerce proposed to impose a 75.36% duty on LTWP sold by Koehler in the United States for the period from November 2010 to October 2011. In April 2013, the U.S. Department of Commerce issued its final third review determination that upheld the originally proposed duty.

- On December 26, 2013, the U.S. Department of Commerce issued a preliminary determination in the fourth 12-month review period proposing to not apply a dumping margin for imports from Koehler for the period from November 2011 to October 2012, which was upheld in the final determination issued in June 2014. As a result of the ruling, Koehler announced that it plans to return to the U.S. market.

**Raw Material Pricing**

- Prices for wood pulp can fluctuate sharply from year to year, depending partly on energy costs; changes of 10% within a year are not unusual. Paper manufacturers are often unable to pass all cost increases to customers. The price of Northern bleached softwood kraft, an industry benchmark grade of wood pulp, was $1,025 per metric ton in October 2014, similar to the trailing 12-month average of $1,020 per ton, an increase from $990 per metric ton on December 31, 2013, and near the record high of $1,035 reached in June 2011.

- Oil prices (i.e. West Texas Intermediate ("WTI") Crude spot rate) decreased approximately 22.8% from $98.17 per barrel as of December 31, 2013 to $75.74 per barrel as of November 24, 2014. The price of WTI Crude decreased 28.6% between June 30, 2014 and November 24, 2014.

- According to the Bureau of Labor Statistics, the producer price index for the paper manufacturing industry decreased 0.1% in October 2014, after increasing 0.1% in September 2014. The index decreased 0.2% from October 2013 to October 2014. According to Moody's Analytics, producer prices across industries are generally declining as a result of the decrease in oil prices, which are expected to remain low in the near term based on market fundamentals.

- Global market prices for pulp started to decline in the second half of 2008 and continued to decline through the first half of fiscal 2009. However, due to increased global demand and a tightening supply, wood pulp prices started to increase in the third quarter of fiscal 2009 and continued to increase in 2010. According to *Pulp & Paper Week*, pulp producers attributed the increase in demand to paper producers replenishing their inventories. In addition, prices increased due to concerns about



Valuation & Financial Opinions



# III.  ECONOMIC AND INDUSTRY OUTLOOK

supply due to the February 2010 earthquake in Chile and temporary dock work strikes in March 2010 in Finland. Pulp prices reached a cyclical peak in August 2010 and decreased gradually in the fourth quarter of 2010. Despite weak paper demand in the first half of 2011, pulp prices reached a record high in June 2011 due to high wood fiber costs and increased demand for pulp. Pulp prices decreased in the second half of 2011, partially due to increased economic uncertainty in Europe and efforts by the Chinese government to control inflation by reducing the credit supply. In the first half of 2012, pulp prices stabilized and then increased in response to an April price increase by suppliers, before declining through the third quarter due to uncertain demand and ample supply. In October 2012, suppliers announced another price increase, which was effective, leading to an increase in prices through the end of the year. Pulp prices continued to increase in 2013 and 2014 due to low inventory levels and industry demand.

## Industry Reorganization

- Large national companies have historically been vertically integrated, owning everything from the forests and logging operations to the plants where finished products are made. Smaller companies will purchase the paper or paperboard raw material from large producers to convert into finished goods.

- In the past, paper companies offered a wide variety of products based on the perception that diversified product offerings would lead to increased profitability and decreased risk. In recent years, however, several large companies, including International Paper, MeadWestvaco, and Boise Cascade, have divested non-core assets and focused on becoming leading, low-cost producers of a small number of products.

- On January 6, 2014, Verso Paper ("Verso"), a producer of coated papers, and NewPage Holdings Inc. ("NewPage"), a producer of printing and specialty papers, announced that they have entered into a definitive agreement under which Verso will acquire NewPage in a transaction valued at $1.4 billion. Upon closing of the transaction, the combined company will have sales of approximately $4.5 billion and 11 manufacturing facilities located in six states. On December 31, 2014, Verso reached a settlement with the U.S. Justice Department related to antitrust concerns over the purchase of NewPage, and as a result the transaction is expected to close in January 2015.

- On October 30, 2014, Catalyst Paper Holdings ("Catalyst"), an owner and operator of paper mills, entered into a definitive agreement to acquire two subsidiaries of NewPage, Rumford Paper Company and Biron Mill, a paper mill and manufacturer of paper for the printing and publishing industries, at an implied enterprise value of $74.0 million, or 0.1x latest 12 months revenue. The sale is intended to reduce antitrust concerns related to the acquisition of NewPage by Verso.

- According to IBISWorld, the number of companies in the paper mill industry is expected to decline from 147 enterprises in 2014 to 138 in 2019, an average annual decline of 1.3%. Restructuring, including facility and machine closures, is expected to continue over the next five years as industry operators compete with imports from emerging economies, which could potentially benefit if the U.S. dollar continues to appreciate as the economy improves. Competition for market share is expected to increase during this period with larger companies buying the assets of smaller ones and consolidating operations.





Valuation & Financial Opinions

# III.  ECONOMIC AND INDUSTRY OUTLOOK

## Applicability to the Company

- The financial condition and growth prospects of the Company are dependent on the overall performance of the global economy since the industries in which Appvion operates are cyclical. As a result, the economic downturn negatively affected the Company's financial results in fiscal years 2008 and 2009, while a gradual recovery was reflected in higher shipment volumes in fiscal 2010. In fiscal 2011 through the first half of 2014, Carbonless shipment volumes were negatively impacted by the gradual decline in the market segment, which has been somewhat offset by the sale of specialty paper products, including colored bond paper and high-speed inkjet product lines. Over the same period, Thermal's financial performance benefitted from improvements in economic conditions and increases in market share. However, Thermal's performance was also negatively impacted by manufacturing quality issues in 2013 and 2014, as well as pricing pressure as the result of a foreign competitor, Koehler, returning to the U.S. market. Finally, Appvion expects Encapsys to benefit from its relationship with P&G as well as other applications, but will be required to make significant capital expenditures in order to achieve its projected results.



Valuation & Financial Opinions



# Section IV

## Valuation Methodology

APPVION

Valuation & Financial Opinions



# IV.  VALUATION METHODOLOGY

Current valuation theory includes consideration of several valuation approaches, including an Income Approach, a Market Approach, and an Asset Approach. We considered each of these valuation approaches in our estimation of value. A description of each approach is discussed below.

## Market Approach

### Guideline Company Method

- The Guideline Company Method is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

- Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

#### Applicability to the Company

- In our application of the Guideline Company Method, we were able to find public companies that are comparable enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value. A description of each company is presented in Appendix B and the assumptions behind our analysis are presented in Section V of this report.

### Transaction Method

- The primary focus of the Transaction Method is to examine the terms, prices, and conditions found in either actual sales of the subject company's stock or sales of companies in the industry. After the relevant transactions are identified, transaction multiples (e.g., total capital to earnings before interest and taxes) are derived and applied to the corresponding operating results of the subject company to estimate its implied value.

#### Transaction Method

- A search for transactions involving companies in related industries did not indicate a significant number of transactions with sufficient disclosure of financial terms to draw meaningful conclusions to rely on the Transaction Method. As a result, although we considered this form of the Transaction Method, we did not apply it in our estimation of value.



Valuation & Financial Opinions



# IV.  VALUATION METHODOLOGY

## Income Approach

- The Income Approach is a valuation technique in which the value of a company is estimated based on the earning capacity of that company.

### Discounted Cash Flow Method

- The Discounted Cash Flow Method is a valuation technique in which the value of a company is estimated based on the present value of its expected future economic benefits. The level of benefit we chose to utilize is distributable cash flow. Distributable cash flow is a preferred measure of a company's earning and dividend-paying capacity because it represents the earnings available for distribution to investors after considering the reinvestment required for a company's future growth. Distributable cash flow is the amount that could be paid to owners of a business without impairing its operations.

- To perform a Discounted Cash Flow analysis, the available cash flow that a business can generate is projected into the future. Each year's cash flow is then discounted to the valuation date at a rate of return commensurate with the risk involved in realizing those cash flows. An investor would accept a rate of return no lower than that available from other investments with equivalent risk, and would value the investment accordingly. Each element of this computed rate is expressed in terms of current market yields as of the valuation date.

### Applicability to the Company

- The application of the Discounted Cash Flow Method is meaningful with respect to the valuation of Appvion. Appvion is an operating entity which is expected to produce positive cash flows in the future. Moreover, a potential buyer of the Company would likely place a great deal of weight upon the future cash flows generated by the Company in determining its value.

## Asset Approach

- The Asset Approach provides an indication of Enterprise Value by developing a Fair Market Value balance sheet. All of the business' assets are identified and listed on the Fair Market Value balance sheet, with intangible assets being determined either collectively or discretely. Restating all liabilities to Fair Market Value and subtracting this amount from the Fair Market Value of assets yields the Fair Market Value of equity.

### Applicability to the Subject Company

- Appvion is an operating entity that is producing a return on its assets that indicates value exists over-and-above the value of its tangible underlying assets; that is, it possesses intangible asset value. A significant portion of this intangible asset value does not readily lend itself to discrete valuation and is therefore more appropriately valued collectively as a part of the Company's "goodwill."    Since the calculation of the Company's goodwill would largely require using a valuation method that shares



Valuation & Financial Opinions



# IV.  VALUATION METHODOLOGY

numerous underlying assumptions with the Discounted Cash Flow Method, its use would render a duplicative, and not independent, indication of value. Accordingly, we considered but did not employ the Asset Approach in our determination of the Company's value.



Valuation & Financial Opinions



Section V

**Guideline Company Method**

APPVION                                                Valuation & Financial Opinions    

# V.  GUIDELINE COMPANY METHOD

## Selection of Guideline Companies

- We searched several sources and held discussions with management to identify guideline public companies that are sufficiently comparable to Carbonless and Thermal to render the Guideline Company Method relevant for application in our analysis. Specifically, we started with a broad group of publicly traded companies that operate in the paper products manufacturing industry. After removing companies that (1) do not have common stock actively traded on a major U.S-based exchange and (2) are financially insolvent, we further narrowed our guideline company group.

- Although there are few public companies directly comparable to Carbonless and Thermal in terms underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors, we were able to identify a group we deem comparable from a risk and return perspective. Ultimately, while these companies differ from Carbonless and Thermal in terms of specific product offering and markets served, the exact comparability is not required under this method of valuation and the guideline public company group, as a whole, does reflect economic conditions and business risks for the Carbonless and Thermal's industry in general. A summary description of each of the guideline public companies considered relevant for our analysis is presented in Appendix B. Consistent with our previous valuation, the following is a list of the companies we identified as comparable to Carbonless and Thermal for purposes of our analysis:

➢ Neenah Paper Inc.
➢ International Paper Company
➢ MeadWestvaco Corporation
➢ Wausau Paper Company

➢ Domtar Corporation
➢ PH Glatfelter Co.
➢ Verso Paper Corp.

## Analysis

### Methods of Comparison

The market multiples considered in our analysis include:

- EV / Revenue, and
- EV / EBITDA.

We considered these market multiples over two distinct time periods:

- Projected next fiscal year ("NFY"), and
- Latest 12 months ("LTM").



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# V.    GUIDELINE COMPANY METHOD

**Calculation of Multiples – Carbonless and Thermal**

### Implied Pricing Multiples - Thermal & Carbonless

|  | EV / NFY EBITDA | EV / LTM EBITDA | EV / NFY Revenue | EV / LTM Revenue |
|---|---|---|---|---|
| Neenah Paper, Inc. | 8.5x | 9.3x | 1.21x | 1.31x |
| International Paper Company | 7.5x | 8.6x | 1.38x | 1.13x |
| MeadWestvaco Corporation | 9.6x | 10.8x | 1.75x | 1.83x |
| Wausau Paper Corp. | 10.8x | n/m | 1.99x | 2.08x |
| Domtar Corporation | 4.8x | 5.1x | 0.68x | 0.69x |
| PH Glatfelter Co. | 6.6x | 8.4x | 0.78x | 0.80x |
| Verso Paper Corp. | n/m | n/m | n/m | 1.15x |
|  |  |  |  |  |
| Low | 4.8x | 5.1x | 0.68x | 0.69x |
| High | 10.8x | 10.8x | 1.99x | 2.08x |
|  |  |  |  |  |
| Mean | 8.0x | 8.4x | 1.30x | 1.28x |
| Median | 8.0x | 8.6x | 1.30x | 1.15x |

Source: Exhibit F





# V. GUIDELINE COMPANY METHOD

## Selection of Multiples – Appvion

### Selected Financial Information - Paperweight Development Corp.

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $29,119.0 | International Paper Company | $3,844.0 | Neenah Paper, Inc. | 9.4% | Neenah Paper, Inc. | 7.4% |
| MeadWestvaco Corporation | 5,567.0 | MeadWestvaco Corporation | 943.0 | PH Glatfelter Co. | 4.3% | PH Glatfelter Co. | 6.4% |
| Domtar Corporation | 5,543.0 | Domtar Corporation | 753.0 | International Paper Company | 4.2% | MeadWestvaco Corporation | 4.4% |
| PH Glatfelter Co. | 1,808.3 | PH Glatfelter Co. | 173.5 | MeadWestvaco Corporation | 2.7% | Domtar Corporation | 3.8% |
| Verso Paper Corp. | 1,320.7 | Verso Paper Corp. | 125.0 | Wausau Paper Corp. | 1.9% | Wausau Paper Corp. | 1.8% |
| Neenah Paper, Inc. | 891.0 | Neenah Paper, Inc. | 97.4 | Domtar Corporation | -0.4% | International Paper Company | 0.2% |
| **Paperweight Development Corp.** | **802.9** | **Paperweight Development Corp.** | **89.5** | **Paperweight Development Corp.** | **-2.3%** | **Paperweight Development Corp.** | **-0.7%** |
| Wausau Paper Corp. | 353.2 | Wausau Paper Corp. | 41.0 | Verso Paper Corp. | -9.2% | Verso Paper Corp. | -6.5% |
| **Guideline Company Median** | **$1,808.3** | **Guideline Company Median** | **$173.5** | **Guideline Company Median** | **2.7%** | **Guideline Company Median** | **3.8%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Profitability (LTM Gross Profit Margin) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 13.1% | Domtar Corporation | 32.4% | **Paperweight Development Corp.** | **28.8%** | MeadWestvaco Corporation | 16.9% |
| MeadWestvaco Corporation | 7.8% | MeadWestvaco Corporation | 31.3% | International Paper Company | 27.4% | Neenah Paper, Inc. | 14.0% |
| PH Glatfelter Co. | 5.2% | PH Glatfelter Co. | 16.0% | MeadWestvaco Corporation | 21.0% | Domtar Corporation | 13.6% |
| International Paper Company | 1.0% | Neenah Paper, Inc. | 13.2% | Domtar Corporation | 20.7% | International Paper Company | 13.2% |
| **Paperweight Development Corp.** | **-2.0%** | **Paperweight Development Corp.** | **-21.1%** | Neenah Paper, Inc. | 19.7% | Wausau Paper Corp. | 11.6% |
| Domtar Corporation | -12.4% | Verso Paper Corp. | -36.9% | Wausau Paper Corp. | 14.2% | **Paperweight Development Corp.** | **11.1%** |
| Verso Paper Corp. | -20.7% | Wausau Paper Corp. | -58.9% | PH Glatfelter Co. | 12.9% | PH Glatfelter Co. | 9.6% |
| Wausau Paper Corp. | -28.8% | | | Verso Paper Corp. | 12.7% | Verso Paper Corp. | 7.4% |
| **Guideline Company Median** | **1.0%** | **Guideline Company Median** | **13.2%** | **Guideline Company Median** | **19.7%** | **Guideline Company Median** | **13.2%** |

| Profitability (LTM EBIT Margin) | | Profitability (LTM Return on Assets) | | Profitability (LTM Return on Equity) | | Liquidity (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 10.7% | Neenah Paper, Inc. | 7.5% | Neenah Paper, Inc. | 17.2% | Neenah Paper, Inc. | 2.5 |
| MeadWestvaco Corporation | 10.1% | International Paper Company | 3.7% | International Paper Company | 15.7% | PH Glatfelter Co. | 2.2 |
| International Paper Company | 8.3% | PH Glatfelter Co. | 3.1% | Verso Paper Corp. | 14.8% | MeadWestvaco Corporation | 1.9 |
| **Paperweight Development Corp.** | **7.5%** | Domtar Corporation | 2.5% | PH Glatfelter Co. | 7.2% | Domtar Corporation | 1.8 |
| Domtar Corporation | 6.5% | MeadWestvaco Corporation | 2.5% | MeadWestvaco Corporation | 7.2% | International Paper Company | 1.7 |
| PH Glatfelter Co. | 5.6% | **Paperweight Development Corp.** | **1.3%** | Domtar Corporation | 5.3% | **Paperweight Development Corp.** | **1.3** |
| Wausau Paper Corp. | 0.0% | Wausau Paper Corp. | -1.2% | Wausau Paper Corp. | -3.8% | Verso Paper Corp. | 1.0 |
| Verso Paper Corp. | -0.2% | Verso Paper Corp. | -8.5% | **Paperweight Development Corp.** | **n/m** | Wausau Paper Corp. | 1.0 |
| **Guideline Company Median** | **6.5%** | **Guideline Company Median** | **2.5%** | **Guideline Company Median** | **7.2%** | **Guideline Company Median** | **1.8** |

| Activity (LTM Asset Turnover) | | Activity (LTM Inventory Turnover) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (LTM EBIT / Interest Expense) | |
|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp.** | **1.7** | Verso Paper Corp. | 8.9 | Verso Paper Corp. | 13.8 | Neenah Paper, Inc. | 8.4 |
| Neenah Paper, Inc. | 1.3 | International Paper Company | 8.5 | **Paperweight Development Corp.** | **6.5** | PH Glatfelter Co. | 5.3 |
| Verso Paper Corp. | 1.3 | Wausau Paper Corp. | 7.1 | Wausau Paper Corp. | 4.2 | Domtar Corporation | 3.7 |
| PH Glatfelter Co. | 1.1 | Neenah Paper, Inc. | 6.6 | MeadWestvaco Corporation | 3.2 | International Paper Company | 3.7 |
| International Paper Company | 1.0 | PH Glatfelter Co. | 6.4 | International Paper Company | 3.1 | MeadWestvaco Corporation | 2.8 |
| Domtar Corporation | 0.9 | **Paperweight Development Corp.** | **6.2** | PH Glatfelter Co. | 2.4 | **Paperweight Development Corp.** | **1.2** |
| Wausau Paper Corp. | 0.8 | Domtar Corporation | 6.1 | Domtar Corporation | 1.8 | Wausau Paper Corp. | 1.0 |
| MeadWestvaco Corporation | 0.6 | MeadWestvaco Corporation | 6.1 | Neenah Paper, Inc. | 1.5 | Verso Paper Corp. | (0.0) |
| **Guideline Company Median** | **1.0** | **Guideline Company Median** | **6.6** | **Guideline Company Median** | **3.1** | **Guideline Company Median** | **3.7** |

Source: Capital IQ, Inc. and Paperweight Development Corp. financials.



Valuation & Financial Opinions



# V.   GUIDELINE COMPANY METHOD

## Selection of Multiples – Carbonless & Thermal

**Selected Financial Information - Carbonless & Thermal**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $29,119.0 | International Paper Company | $3,844.0 | Neenah Paper, Inc. | 9.4% | Neenah Paper, Inc. | 7.4% |
| MeadWestvaco Corporation | 5,567.0 | MeadWestvaco Corporation | 943.0 | PH Glatfelter Co. | 4.3% | PH Glatfelter Co. | 6.4% |
| Domtar Corporation | 5,543.0 | Domtar Corporation | 753.0 | International Paper Company | 4.2% | MeadWestvaco Corporation | 4.4% |
| PH Glatfelter Co. | 1,808.3 | PH Glatfelter Co. | 173.5 | Thermal | 4.0% | Domtar Corporation | 3.8% |
| Verso Paper Corp. | 1,320.7 | Neenah Paper, Inc. | 125.0 | MeadWestvaco Corporation | 2.7% | Wausau Paper Corp. | 1.8% |
| Neenah Paper, Inc. | 891.0 | Verso Paper Corp. | 97.4 | Wausau Paper Corp. | 1.9% | International Paper Company | 0.2% |
| Thermal | 413.9 | Carbonless | 43.2 | Domtar Corporation | -0.4% | Carbonless | -1.6% |
| Wausau Paper Corp. | 353.2 | Wausau Paper Corp. | 41.0 | Carbonless | -9.1% | Thermal | -1.8% |
| Carbonless | 345.9 | Thermal | 33.8 | Verso Paper Corp. | -9.2% | Verso Paper Corp. | -6.5% |
| **Guideline Company Median** | **$1,564.5** | **Guideline Company Median** | **$149.2** | **Guideline Company Median** | **3.3%** | **Guideline Company Median** | **2.8%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Growth (Projected EBITDA Growth) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 13.1% | Domtar Corporation | 32.4% | Wausau Paper Corp. | 52.2% | MeadWestvaco Corporation | 16.9% |
| MeadWestvaco Corporation | 7.8% | MeadWestvaco Corporation | 31.3% | PH Glatfelter Co. | 20.4% | Neenah Paper, Inc. | 14.0% |
| PH Glatfelter Co. | 5.2% | PH Glatfelter Co. | 16.0% | International Paper Company | 10.6% | Domtar Corporation | 13.6% |
| International Paper Company | 1.0% | Neenah Paper, Inc. | 13.2% | MeadWestvaco Corporation | 9.7% | International Paper Company | 13.2% |
| Thermal | 0.5% | International Paper Company | 5.8% | Neenah Paper, Inc. | 7.1% | Carbonless | 12.5% |
| Carbonless | -4.8% | Carbonless | -15.9% | Domtar Corporation | 3.4% | Wausau Paper Corp. | 11.6% |
| Domtar Corporation | -12.4% | Thermal | -20.5% | Carbonless | -0.1% | PH Glatfelter Co. | 9.6% |
| Verso Paper Corp. | -20.7% | Verso Paper Corp. | -36.9% | Thermal | -2.3% | Thermal | 8.2% |
| Wausau Paper Corp. | -28.8% | Wausau Paper Corp. | -58.9% | Verso Paper Corp. | n/m | Verso Paper Corp. | 7.4% |
| **Guideline Company Median** | **0.8%** | **Guideline Company Median** | **9.5%** | **Guideline Company Median** | **9.7%** | **Guideline Company Median** | **12.4%** |

Source: Capital IQ, Inc. and Carbonless financials.




Valuation & Financial Opinions

# V.   GUIDELINE COMPANY METHOD

## Conclusion - Carbonless

- We selected pricing multiples to apply to Carbonless based on the following:

  - Carbonless is smaller than all of the guideline companies in terms of revenue and all but one guideline company in terms of EBITDA;

  - Revenue is expected to decline through the projection period due to the declining market;

  - Projected EBITDA growth is expected to be positive during the projection period as a result of increased efficiency resulting from headcount reductions and the resolution of internal manufacturing issues;

  - Carbonless' net sales and adjusted EBITDA projections were 11.8% and 8.4% lower, on average, than the projections used as of the June 30, 2014 analysis for the applicable years; and

  - Carbonless' profitability is expected to increase throughout the projection period; there is some positive correlation between profitability and revenue pricing multiples.

- Based on these and other factors, we selected both revenue and EBITDA multiples for Carbonless near the low end of the range of the guideline companies for the LTM and NFY periods. The selected revenue and EBITDA multiples are consistent with the June 30, 2014 analysis.



Valuation & Financial Opinions



# V.  GUIDELINE COMPANY METHOD

**Guideline Company Method - Carbonless**

*In Thousands of U.S. Dollars*

|  | Carbonless Results | Low | High | Mean | Median | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 43,152 | 4.8x | 10.8x | 8.0x | 8.0x | 5.0x | $ 216,000 |
| Revenue | 332,543 | 0.68x | 1.99x | 1.30x | 1.30x | 0.70x | 233,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 43,211 | 5.1x | 10.8x | 8.4x | 8.6x | 5.0x | $ 216,000 |
| Revenue | 345,932 | 0.69x | 2.08x | 1.28x | 1.15x | 0.70x | 242,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 227,000 |
| Plus: Control Premium @ 10.0% | 23,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 250,000** |



Valuation & Financial Opinions



# V.   GUIDELINE COMPANY METHOD

## Conclusion - Thermal

- We selected pricing multiples to apply to Thermal based on the following:

  - Thermal is smaller than all but one of the guideline companies in terms of revenue and all of the guideline companies in terms of EBITDA, which suggests lower pricing multiples;

  - The Company's $125 million investment in the West Carrollton plant has benefitted the Company with regard to additional capacity and is expected to facilitate higher revenue growth and profitability in future years;

  - Thermal profitability as a percentage of revenue is below the median of the guideline companies;

  - Thermal's historical three-year revenue and EBITDA growth rates are around the medians of the guideline companies, while Thermal's one-year revenue and EBITDA growth rates are below the medians of the guideline companies;

  - Thermal's future profitability and growth are expected to benefit from the supply agreement with Domtar;

  - In fiscal 2013 and the LTM period, Thermal experienced temporary manufacturing quality issues, which the Company is in the process of resolving by transitioning its supply demands to Domtar;

  - Thermal's revenue and profitability has been negatively impacted by pricing competition from Koehler, resulting in lower point-of-sale product pricing;

  - Thermal's net sales and adjusted EBITDA projections are lower (3.9% and 18.3%, on average, respectively) than the projections used as of the June 30, 2014 analysis for the applicable years; and

  - Thermal's LTM and NFY financial results are abnormally low but have been improving, with the division expected to return to a normal level of operating performance in fiscal years 2016 and 2017.

- Based on these and other factors, we selected EBITDA multiples for Thermal below the median of the range of the guideline companies for the LTM and NFY periods. The selected EBITDA multiples are consistent with our June 30, 2014 valuation. We selected LTM and NFY revenue multiples near the low end of the range of the guideline companies. The selected revenue multiples are 0.05x lower than the selected multiples in the June 30, 2014 valuation to account for Thermal's lower profitability and projections.





Valuation & Financial Opinions

# V.    GUIDELINE COMPANY METHOD

**Guideline Company Method - Thermal**

*In Thousands of U.S. Dollars*

*Indicated Values as of December 31, 2014*

| | Thermal Results | Low | High | Mean | Median | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
| **Next Fiscal Year:** | | | | | | | |
| EBITDA | $ 33,034 | 4.8x | 10.8x | 8.0x | 8.0x | 7.5x | $ 248,000 |
| Revenue | 434,763 | 0.68x | 1.99x | 1.30x | 1.30x | 0.60x | 261,000 |
| **Latest Twelve Months:** | | | | | | | |
| EBITDA | 33,805 | 5.1x | 10.8x | 8.4x | 8.6x | 7.5x | 254,000 |
| Revenue | 413,873 | 0.69x | 2.08x | 1.28x | 1.15x | 0.65x | 269,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 262,000 |
| Plus: Control Premium @ 10.0% | 26,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 288,000** |



Valuation & Financial Opinions



Section VI

**Discounted Cash Flow Method**

APPVION

Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

The Discounted Cash Flow Method derives an estimate of value through the use of a market-derived discount rate to capitalize anticipated financial performance.

- ■ The cash flows expected to be generated by the Company are discounted to their present value equivalent using a rate of return that reflects the relative risk of an investment in Carbonless, Thermal, and Encapsys as well as the time value of money. This return is an overall rate based upon the individual rates of return for invested capital (equity and interest-bearing debt). The return for Carbonless and Thermal, known as the weighted average cost of capital ("WACC"), is calculated by weighting the required returns on interest-bearing debt and common stock in proportion to their estimated percentages in an expected capital structure.

- ■ The following charts illustrate our concluded WACCs for Carbonless and Thermal:



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

**Weighted Average Cost of Capital - Carbonless**

**Required Return on Equity**

Capital Asset Pricing Model

| | | |
|---|---|---|
| Risk-Free Rate of Return [a] | | 2.5% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 0.0% |
| **Required Return on Equity - CAPM** | | **16.3%** |

**Cost of Debt**

Cost of Debt

| | | |
|---|---|---|
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |

**Weighted Average Cost of Capital**

| | | |
|---|---|---|
| Equity Allocation of Capital Structure | 60.0% | 9.8% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.0%** |

[a] 20-year U.S. Treasury bond yield as of the Valuation Date.
[b] Based on Duff & Phelps LLC, 2014 Valuation Handbook – Guide to Cost of Capital
[c] Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

**Weighted Average Cost of Capital - Thermal**

| Required Return on Equity | | |
|---|---|---|
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.5% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 2.0% |
| **Required Return on Equity - CAPM** | | **18.3%** |

| Cost of Debt | | |
|---|---|---|
| Cost of Debt | | |
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |

| Weighted Average Cost of Capital | | |
|---|---|---|
| Equity Allocation of Capital Structure | 60.0% | 11.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **12.5%** |

a] 20-year U.S. Treasury bond yield as of the Valuation Date.
b] Based on Duff & Phelps LLC, 2014 Valuation Handbook – Guide to Cost of Capital
c] Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

## Conclusion – Carbonless and Thermal

### Discounted Cash Flow Method - Carbonless

| In Thousands of U.S. Dollars | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|
| | Year 1<br>12/31/2015 | Year 2<br>12/31/2016 | Year 3<br>12/31/2017 | Year 4<br>12/31/2018 | Year 5<br>12/31/2019 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $    43,152 | $    44,356 | $    46,455 | $    47,618 | $    47,663 | |
| Depreciation and Amortization | (13,854) | (13,838) | (13,838) | (13,838) | (13,838) | |
| Income Taxes | (11,280) | (11,750) | (12,558) | (13,005) | (13,023) | |
| **Debt-Free Net Income** | **18,019** | **18,769** | **20,060** | **20,775** | **20,802** | |
| | | | | | | |
| Depreciation and Amortization | 13,854 | 13,838 | 13,838 | 13,838 | 13,838 | |
| Capital Expenditures | (12,750) | (12,000) | (9,000) | (9,000) | (9,000) | |
| Additional Working Capital [a] | 1,800 | 1,300 | 1,300 | 1,300 | 1,600 | |
| **Distributable Cash Flows** | **20,923** | **21,907** | **26,198** | **26,913** | **27,240** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.0% | 11.0% | 11.0% | 11.0% | 11.0% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9492** | **0.8551** | **0.7704** | **0.6940** | **0.6252** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **19,859** | **18,732** | **20,182** | **18,678** | **17,032** | |

| **Enterprise Value** | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 94,000 | 2019 EBITDA | $    47,663 |
| Present Value of Terminal Enterprise Value | 141,000 | Terminal EBITDA Multiple | 5.0x |
| | | | |
| | | Terminal Enterprise Value | 238,315 |
| **Enterprise Value, Controlling Interest Basis (Rounded)**   **$    235,000** | | Present Value Factor | 0.5935 |
| | | **Present Value of Terminal Enterprise Value** | **$    141,000** |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

**Discounted Cash Flow Method - Thermal**

| *In Thousands of U.S. Dollars* | | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|---|
| | Year 1 12/31/2015 | Year 2 12/31/2016 | Year 3 12/31/2017 | Year 4 12/31/2018 | Year 5 12/31/2019 | Residual | |
| **Distributable Cash Flows** | | | | | | | |
| EBITDA | $        33,034 | $        37,932 | $        42,626 | $        47,371 | $        49,908 | | |
| Depreciation and Amortization | (13,159) | (13,148) | (13,148) | (13,148) | (13,418) | | |
| Income Taxes | (7,652) | (9,542) | (11,349) | (13,176) | (14,049) | | |
| **Debt-Free Net Income** | **12,223** | **15,242** | **18,129** | **21,047** | **22,441** | | |
| | | | | | | | |
| Depreciation and Amortization | 13,159 | 13,148 | 13,148 | 13,148 | 13,418 | | |
| Capital Expenditures | (6,750) | (6,000) | (5,000) | (5,000) | (5,000) | | |
| Additional Working Capital [a] | (2,300) | (1,600) | (2,800) | (2,400) | (1,800) | | |
| **Distributable Cash Flows** | **16,332** | **20,790** | **23,477** | **26,795** | **29,059** | | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | | |
| Weighted Average Cost of Capital | 12.5% | 12.5% | 12.5% | 12.5% | 12.5% | | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | | |
| **Present Value Factor** | **0.9428** | **0.8381** | **0.7449** | **0.6622** | **0.5886** | | |
| | | | | | | | |
| **Present Value of Distributable Cash Flows** | **15,398** | **17,423** | **17,489** | **17,743** | **17,104** | | |

| **Enterprise Value** | | | **Terminal Value** | | |
|---|---|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 85,000 | ← | 2019 EBITDA | $        49,908 | |
| Present Value of Terminal Enterprise Value | 208,000 | ← | Terminal EBITDA Multiple | 7.5x | |
| | | | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$        293,000** | | Terminal Enterprise Value | **374,310** | |
| | | | Present Value Factor | 0.5549 | |
| | | | **Present Value of Terminal Enterprise Value** | **$        208,000** | |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.





# VI. DISCOUNTED CASH FLOW METHOD

- During fiscal years 2010 and 2011, the Company's Encapsys division generated increasing revenue and profitability. However, Encapsys' revenue and profitability decreased in fiscal year 2012 due to delayed projects with P&G. Encapsys' revenue and profitability improved in fiscal 2013 and the first ten months of fiscal 2014 due to the increase in sales to P&G. Since Encapsys is still in the early stages of development, Company management expects the division to grow significantly in the future. Accordingly, we estimated a value for Encapsys using the DCF Method. However, the division has not yet established the level of financial performance that is contemplated in the financial projections and all of its revenue to date has been generated from one customer relationship. Accordingly, an investor evaluating an ownership position in Encapsys would require a high rate of return as compensation for the incremental risk related to this investment. Specifically, an investor would require a rate of return similar to those required by venture capital firms. Due to the inherent risk in venture capital investments, venture capital investors require much higher rates of return than investors in companies that have an expected stable level of financial performance. The following chart presents the approximate range of required rates of return for venture capital investments. In our June 30, 2014 analysis, we selected a discount rate of 30.0% for Encapsys which is at the low end of the range of required rates of return for late-stage venture capital companies. However, due to the continued growth of Encapsys as well as acquisition offers from potential strategic buyers, further indicating the growth potential and commercial applications of Encapsys, we lowered the discount rate from 30.0% in our June 30, 2014 analysis to 27.5% in our current analysis.




# VI.  DISCOUNTED CASH FLOW METHOD

**Venture Capital Rates of Return**

| Plummer Studies [a] | | Sahlman Studies [b] | |
|---|---|---|---|
| **Development Stage** | Required Rate of Return | **Development Stage** | Required Rate of Return |
| **Seed Capital / Startup**<br>▪ Usually less than one year old<br>▪ Involved in early product development and testing | **50% to 70%** | **Start-Up**<br>▪ Organization is prepared to commence operations<br>▪ Has product in prototype form embodying proprietary technology | **50% to 70%** |
| **1st Stage**<br>▪ Performing market studies and testing prototypes<br>▪ Manufacturing limited amounts of product | **40% to 60%** | **Early Development (1st Stage)**<br>▪ Not profitable, but has an established organization, working product, and some revenues<br>▪ Capital used to establish marketing efforts and hire sales and support personnel | **40% to 60%** |
| **2nd Stage**<br>▪ Financing for initial expansion is provided<br>▪ Viable product exists and a market has been established | **35% to 50%** | | |
| **3rd Stage**<br>▪ Experiencing a ramp-up in sales<br>▪ Profit margins exist, but internally-generated cash insufficient to meet expansion requirements | **30% to 50%** | **Expansion (2nd Stage)**<br>▪ Company has established a market for its products and is rapidly expanding<br>▪ Financing provided to support working capital requirements and fixed asset purchases | **30% to 50%** |
| **4th Stage**<br>▪ Company is profitable and growing rapidly<br>▪ Capital may still be needed to fuel growth | **30% to 40%** | **Bridge / IPO**<br>▪ IPO is not yet appropriate due to size and performance of the company, but is expected within one year of bridge financing<br>▪ Funds used to satisfy ongoing capital needs | **20% to 35%** |
| **Bridge / Mezzanine / IPO**<br>▪ Bridge financing is intended to satisfy ongoing capital needs until initial public offering (IPO) | **25% to 35%** | | |

[a] Source:  Plummer, James L., "QED Report on Venture Capital Financial Analysis," *QED Research, Inc.*, 1987.
[b] Source:  Sahlman, William A., Harvard Business School, *A Method for Valuing High-Risk, Long-Term Investments - The "Venture Capital Method"*.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

---

■ The concluded Enterprise Value of $166.0 million for Encapsys results in an implied pricing multiple of 7.2x NFY EBITDA, which compares to implied NFY EBITDA pricing multiples of 14.1x for Balchem Corp. ("Balchem"), 17.7x for Sigma-Aldrich Corporation ("Sigma-Aldrich"), and 12.3x for International Flavors and Fragrances, Inc., publicly traded companies that provide similar products and services as Encapsys.

➢ Balchem is a specialty chemical company that provides ingredients and products for the food, nutritional, feed, pharmaceutical, and medical sterilization industries. Balchem's Food, Pharma & Nutrition segment provides microencapsulation, granulation, and agglomeration solutions to a range of applications in food, pharmaceutical, and nutritional ingredients.

➢ Sigma-Aldrich is a life science and high technology company that develops, manufactures, purchases, and distributes various chemicals, biochemicals, and equipment worldwide.

➢ International Flavors & Fragrances creates, manufactures, and supplies flavors and fragrances for the food, beverage, personal care, and household products industries. The company's flavors and fragrances are individual ingredients or compounds of various ingredients that are blended, mixed, or reacted together to produce proprietary formulas created by its perfumers and flavorists.



Valuation & Financial Opinions



# VI.  DISCOUNTED CASH FLOW METHOD

---

**Discounted Cash Flow Method - Encapsys**

---

*In Thousands of U.S. Dollars*

| | | For the Fiscal Year Ending | | | | |
|---|---|---|---|---|---|---|
| | Year 1 12/31/2015 | Year 2 12/31/2016 | Year 3 12/31/2017 | Year 4 12/31/2018 | Year 5 12/31/2019 | Residual |
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 23,000 | $ 34,234 | $ 51,228 | $ 69,336 | $ 92,428 | |
| Depreciation and Amortization | (2,831) | (3,215) | (4,715) | (6,422) | (8,523) | |
| Income Taxes | (7,765) | (11,942) | (17,908) | (24,222) | (32,303) | |
| **Debt-Free Net Income** | **12,404** | **19,077** | **28,605** | **38,692** | **51,602** | |
| | | | | | | |
| Depreciation and Amortization | 2,831 | 3,215 | 4,715 | 6,422 | 8,523 | |
| Capital Expenditures | (22,100) | (11,800) | (21,900) | (14,000) | (24,300) | |
| Additional Working Capital [a] | (700) | (1,000) | (1,600) | (1,800) | (2,200) | |
| **Distributable Cash Flows** | **(7,565)** | **9,492** | **9,820** | **29,314** | **33,625** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Discount Rate | 27.5% | 27.5% | 27.5% | 27.5% | 27.5% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.8856** | **0.6946** | **0.5448** | **0.4273** | **0.3351** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **(6,700)** | **6,593** | **5,350** | **12,525** | **11,268** | |

**Enterprise Value**

| | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 29,000 | 2019 EBITDA | $ 92,428 |
| Present Value of Terminal Enterprise Value | 137,000 | Terminal EBITDA Multiple | 5.0x |
| | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)   $ 166,000** | | Terminal Enterprise Value | 462,140 |
| | | Present Value Factor | 0.2968 |
| | | **Present Value of Terminal Enterprise Value** | **$ 137,000** |

---

[a] Assumes working capital is equal to 5.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.

---



Valuation & Financial Opinions



# Section VII

## Valuation Reconciliation and Conclusion

Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

## Conclusion of Enterprise Value

- In our valuation analysis of the Company, we analyzed Carbonless and Thermal using the DCF Method and the Guideline Company Method. We analyzed Encapsys using the DCF Method.

- Based upon our analysis, we believe that these methods provide an accurate indication of the Company's Enterprise Value. The values indicated by each method are presented in the following table:

### Conclusion of Value

| *In Thousands of U.S. Dollars* | Indicated Value as of 12/31/2014 |
|---|---|
| **Carbonless** | |
| Guideline Company Method | $    250,000 |
| Discounted Cash Flow Method | 235,000 |
| **Concluded Enterprise Value (Rounded)** | **$    243,000** |
| **Thermal** | |
| Guideline Company Method | $    288,000 |
| Discounted Cash Flow Method | 293,000 |
| **Concluded Enterprise Value (Rounded)** | **$    291,000** |
| **Encapsys** | |
| Discounted Cash Flow Method | $    166,000 |
| **Concluded Enterprise Value for Appleton (Rounded)** | **$    700,000** |



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

## Adjustments to Enterprise Value

- Enterprise Value incorporates the value of total invested capital, including the value of both debt and equity. Several adjustments are necessary in order to derive the Fair Market Value of equity.

### Cash and Cash Equivalents

- Our valuation analysis was performed on a "net-of-cash" basis. Therefore, in addition to the value associated with the cash flows generated by the Company, the value of its existing cash balance must be considered. The Company's cash balance as of December 31, 2014 was $1.1 million.

### Interest-Bearing Debt

- The Company had $592.1 million of interest-bearing debt as of the Valuation Date. Since Enterprise Value incorporates the value of total invested capital (i.e., both debt and equity), we subtracted the face value of the Company's debt of $592.1 million as of the Valuation Date to estimate the value of the equity.

### Fox River Liability

- Pursuant to the Funding Agreement, the Company will pay a maximum of $19.0 million through fiscal 2016 related to the Fox River environmental clean-up. Accordingly, we subtracted this amount from the Company's Enterprise Value.

## Adjustments to Equity Value

### Impact of Synthetic Equity Units, Restricted Stock Units, and Phantom Stock

- As of the Valuation Date, there were 2,050,950 LTIP units outstanding with a weighted average exercise price of $21.01 per share, and 500 Canadian SARs outstanding with a weighted average exercise price of $27.68 per share. We subtracted the dilutive impact of the Company's outstanding in-the-money LTIP units and SARs.

- In addition, there were 332,625 RSUs and 97,817 shares of phantom stock as of the Valuation Date. We subtracted the dilutive impact of the Company's RSUs and phantom stock.



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

**Discount for Limited Marketability**

- In calculating the Company's equity value, it is appropriate to consider a discount for limited marketability. All else being equal, an investment in which the owner is able to achieve liquidity (i.e., convert into cash) quickly is worth more than an investment that is not as liquid. Thus, publicly traded companies, which are readily marketable, are worth more than privately held companies. The diminution in value associated with this factor is referred to as a discount for limited marketability.

- Appvion is closely monitoring its repurchase obligation, and Company management believes that the Company may be obligated to repurchase 30.0% or more of the Company's common stock from ESOP participants over the next five years. By itself, the impact of the repurchase obligation on the Company's current and future share price is immaterial since the dilution caused by the decrease in Company cash or increase in debt will be offset by the corresponding reduction in shares outstanding, and the Company is projected to have adequate cash flow to satisfy the share repurchases. However, the repurchase obligation has contributed to the Company's decision to monetize certain assets and explore the possible sale of a part of or all of the Company's equity. Based on our analysis and all of the information regarding the Company's business operations and strategic initiatives as of the Valuation Date, the impact of the Company's future repurchase obligation on the marketability of the common shares owned by the ESOP should not exceed 5.0% of the Company's equity value, or approximately $4.5 million in aggregate.




# VII.  VALUATION RECONCILIATION AND CONCLUSION

## Indicated Market Value

### Conclusion of Value

| In Thousands of U.S. Dollars | | Indicated Value as of 12/31/2014 |
|---|---|---|
| Carbonless | $ | 243,000 |
| Thermal | | 291,000 |
| Encapsys | | 166,000 |
| **Concluded Enterprise Value** | **$** | **700,000** |
| Add:  Cash and Cash Equivalents  [a] | | 1,149 |
| **Adjusted Enterprise Value** | **$** | **701,000** |
| Less:  Interest-Bearing Debt | | (592,096) |
| Less:  Fox River Liability | | (19,000) |
| **Marketable, Controlling-Interest Value of Equity** | **$** | **89,900** |
| Less:  Discount for Limited Marketability          5.0% | | (4,500) |
| **Fair Market Value of Equity (Rounded)** | **$** | **85,400** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (4,735) |
| **Fair Market Value of Equity (Rounded)** | **$** | **80,700** |
| Divided by: Shares Outstanding | | 7,340.838 |
| **Fair Market Value of Equity per Share** | **$** | **11.00** |

[a] Based on the Company's cash balance as of December 31, 2014.



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

# VII.  VALUATION RECONCILIATION AND CONCLUSION

## Comparison to Prior Valuation

### Reconciliation of Value

*In Thousands of U.S. Dollars*

| | | 6/30/2014 Valuation | | 12/31/2014 Valuation | Amount of Change | Percentage Change | | Per Share Change |
|---|---|---|---|---|---|---|---|---|
| Carbonless | $ | 251,000 | $ | 243,000 | (8,000) | -3.2% | | |
| Thermal | | 319,000 | | 291,000 | (28,000) | -8.8% | | |
| Encapsys | | 161,000 | | 166,000 | 5,000 | 3.1% | | |
| **Concluded Enterprise Value** | $ | **731,000** | $ | **700,000** | $  **(31,000)** | **-4.2%** | $ | **(3.97)** |
| Add:  Cash and Cash Equivalents | | 3,982 | | 1,149 | (2,833) | | | |
| **Total Adjustments to Enterprise Value** | | **3,982** | | **1,149** | **(2,833)** | | | **(0.36)** |
| **Adjusted Enterprise Value** | $ | **735,000** | $ | **701,000** | $  **(34,000)** | **-4.6%** | $ | **(4.36)** |
| Less:  Interest-Bearing Debt | | (592,947) | | (592,096) | 851 | -0.1% | | 0.11 |
| Less:  Fox River Liability | | 0 | | (19,000) | (19,000) | | | |
| **Marketable, Controlling-Interest Value of Equity** | $ | **142,100** | $ | **89,900** | $  **(52,200)** | **-36.7%** | $ | **(6.69)** |
| Less:  Discount for Limited Marketability      5.0% | | (7,100) | 5.0% | (4,500) | 2,600 | | | 0.33 |
| **Fair Market Value of Equity (Rounded)** | $ | **135,000** | $ | **85,400** | $  **(49,600)** | **-36.7%** | $ | **(6.36)** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (7,872) | | (4,735) | 3,137 | | | 0.40 |
| **Fair Market Value of Equity (Rounded)** | $ | **127,100** | $ | **80,700** | $  **(46,400)** | **-36.5%** | $ | **(5.95)** |
| Divided by:  Shares Outstanding | | 7,803.579 | | 7,340.838 | | | | 0.65 |
| **Indicated Market Value of Equity per Share** | $ | **16.30** | $ | **11.00** | | **-32.5%** | $ | **(5.30)** |




# VII. VALUATION RECONCILIATION AND CONCLUSION



**Appvion Historical Stock Price: November 2001 - December 2014**



Valuation & Financial Opinions



# VII.  VALUATION RECONCILIATION AND CONCLUSION

## Summary of Change of Value

### Enterprise Value

- The Enterprise Value for Carbonless decreased by 3.2% from $251.0 million as of June 30, 2014 to $243.0 million as of the Valuation Date. The decrease in Carbonless' Enterprise Value is primarily due to lower LTM and projected NFY financial results relative to the June 30, 2014 analysis, as well as higher projected capital expenditure requirements.

  - In the Guideline Company Method, we applied pricing multiples to Carbonless's NFY and LTM adjusted EBITDA consistent with the June 30, 2014 analysis despite generally higher pricing multiples for the guideline companies due to a lower projected growth rate for Carbonless.

  - In the Discounted Cash Flow Method, we did not change the terminal EBITDA multiple in the current analysis relative to the June 30, 2014 analysis and decreased the specific risk premium from 2% to 0% in the discount rate calculation to account for the decreased risk of Carbonless' lower projections.

- The Enterprise Value for Thermal decreased by 8.8% from $319.0 million as of June 30, 2014 to $291.0 million as of the Valuation Date. The decrease in Thermal's Enterprise Value is primarily due to the decrease in Thermal's financial projections consistent with LTM financial results that were below plan, somewhat offset by lower projected capital expenditure requirements.

  - In the Guideline Company Method, relative to the June 30, 2014 analysis, we did not change the pricing multiples applied to the Company's adjusted NFY and LTM EBITDA despite generally higher pricing multiples to account for Thermal's lower LTM and projected results. We decreased LTM and NFY revenue pricing multiples by 0.05x due to Thermal's lower projected profitability relative to the prior analysis.

  - In the Discounted Cash Flow Method, the terminal EBITDA multiple remained at 7.5x relative to the June 30, 2014 analysis, in line with the EBITDA pricing multiples applied in the Guideline Company Method.

- The Enterprise Value for Encapsys increased by 3.1% to $166.0 million as of December 31, 2014 from $161.0 million as of June 30, 2014 due to a lower discount rate as a result of management's increased optimism regarding Appvion's relationship with new potential customers and discussions with potential strategic buyers indicating the growth potential for the Company's encapsulation technology.

### Fox River Liability

- On September 30, 2014, the Company entered into the Funding Agreement in which it agreed to pay up to $25 million of costs related to the cleanup of the Lower Fox River. As of the Valuation Date, the Company has recorded a liability of $19 million for remaining costs resulting from the Funding Agreement.



Valuation & Financial Opinions



# VII. VALUATION RECONCILIATION AND CONCLUSION

**Shares Outstanding**

- The number of the Company's fully-diluted shares outstanding declined from 7,803,579 as of the June 30, 2014 analysis to 7,340,838 as of the current analysis as a result of employee redemptions due to terminations and retirement and diversification elections.



- 61 -

**Valuation & Financial Opinions**



# Section VIII

## **Opinion**



Valuation & Financial Opinions



# VIII. OPINION

## Opinion

■ In accordance with the foregoing, it is our Opinion that the Fair Market Value of the common stock of Appvion held by the ESOP on a controlling interest, per share basis (7,340,838 common shares outstanding), taking into consideration the appropriate discount for limited marketability, as of December 31, 2014, is reasonably stated in the amount of:

### *$11.00*

\*        \*        \*        \*        \*        \*        \*

## Assumptions and Limiting Conditions

■ This Opinion is solely for the use and benefit of the Trustee, and any summary of or reference to the Opinion or any other reference to SRR by the Company will be subject to SRR's prior review and written approval, which shall not be unreasonably withheld. The Opinion will not be included in, summarized, or referenced to in any manner in materials distributed to the public or potential investors of the Company without SRR's prior written consent, which shall not be unreasonably withheld.

■ Reference should be made to Appendix D, as well as our engagement letter dated January 17, 2014, for assumptions and limiting conditions that are applicable to our conclusions and our financial advisory role.




Appendix A

**Exhibits**



Valuation & Financial Opinions 

# A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| In Thousands of U.S. Dollars | | Indicated Value as of 12/31/2014 |
|---|---|---|
| Carbonless | $ | 243,000 |
| Thermal | | 291,000 |
| Encapsys | | 166,000 |
| **Concluded Enterprise Value** | **$** | **700,000** |
| Add:  Cash and Cash Equivalents  [a] | | 1,149 |
| **Adjusted Enterprise Value** | **$** | **701,000** |
| Less:  Interest-Bearing Debt | | (592,096) |
| Less:  Fox River Liability | | (19,000) |
| **Marketable, Controlling-Interest Value of Equity** | **$** | **89,900** |
| Less:  Discount for Limited Marketability          5.0% | | (4,500) |
| **Fair Market Value of Equity (Rounded)** | **$** | **85,400** |
| Less:  Synthetic Equity, RSU, and Phantom Stock Adjustment | | (4,735) |
| **Fair Market Value of Equity (Rounded)** | **$** | **80,700** |
| Divided by: Shares Outstanding | | 7,340.838 |
| **Fair Market Value of Equity per Share** | **$** | **11.00** |

[a] Based on the Company's cash balance as of December 31, 2014.



**Valuation & Financial Opinions**



# A.  EXHIBITS

**Exhibit A - Conclusion of Value**

| *In Thousands of U.S. Dollars* | | Indicated Value as of 12/31/2014 |
|---|---|---|
| **Carbonless** | | |
| Guideline Company Method | $ | 250,000 |
| Discounted Cash Flow Method | | 235,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **243,000** |
| **Thermal** | | |
| Guideline Company Method | $ | 288,000 |
| Discounted Cash Flow Method | | 293,000 |
| **Concluded Enterprise Value (Rounded)** | **$** | **291,000** |
| **Encapsys** | | |
| Discounted Cash Flow Method | $ | 166,000 |
| **Concluded Enterprise Value for Appleton (Rounded)** | **$** | **700,000** |



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit B - Guideline Company Method - Carbonless**

*In Thousands of U.S. Dollars*

|  | Carbonless Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
|---|---|---|---|---|---|---|---|
|  |  | Low | High | Mean | Median |  |  |
| Next Fiscal Year: |  |  |  |  |  |  |  |
| EBITDA | $ 43,152 | 4.8x | 10.8x | 8.0x | 8.0x | 5.0x | $ 216,000 |
| Revenue | 332,543 | 0.68x | 1.99x | 1.30x | 1.30x | 0.70x | 233,000 |
| Latest Twelve Months: |  |  |  |  |  |  |  |
| EBITDA | 43,211 | 5.1x | 10.8x | 8.4x | 8.6x | 5.0x | $ 216,000 |
| Revenue | 345,932 | 0.69x | 2.08x | 1.28x | 1.15x | 0.70x | 242,000 |

| | |
|---|---|
| Indicated Enterprise Value, Minority Interest | 227,000 |
| Plus: Control Premium @ 10.0% | 23,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 250,000** |





Valuation & Financial Opinions

# A.   EXHIBITS

**Exhibit B - Discounted Cash Flow Method - Carbonless**

*In Thousands of U.S. Dollars*

| | Year 1 12/31/2015 | Year 2 12/31/2016 | Year 3 12/31/2017 | Year 4 12/31/2018 | Year 5 12/31/2019 | Residual |
|---|---|---|---|---|---|---|
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 43,152 | $ 44,356 | $ 46,455 | $ 47,618 | $ 47,663 | |
| Depreciation and Amortization | (13,854) | (13,838) | (13,838) | (13,838) | (13,838) | |
| Income Taxes | (11,280) | (11,750) | (12,558) | (13,005) | (13,023) | |
| **Debt-Free Net Income** | **18,019** | **18,769** | **20,060** | **20,775** | **20,802** | |
| | | | | | | |
| Depreciation and Amortization | 13,854 | 13,838 | 13,838 | 13,838 | 13,838 | |
| Capital Expenditures | (12,750) | (12,000) | (9,000) | (9,000) | (9,000) | |
| Additional Working Capital [a] | 1,800 | 1,300 | 1,300 | 1,300 | 1,600 | |
| **Distributable Cash Flows** | **20,923** | **21,907** | **26,198** | **26,913** | **27,240** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 11.0% | 11.0% | 11.0% | 11.0% | 11.0% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9492** | **0.8551** | **0.7704** | **0.6940** | **0.6252** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **19,859** | **18,732** | **20,182** | **18,678** | **17,032** | |

**Enterprise Value**

| | | |
|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 94,000 | |
| Present Value of Terminal Enterprise Value | 141,000 | |

**Enterprise Value, Controlling Interest Basis (Rounded)**    **$   235,000**

**Terminal Value**

| | |
|---|---|
| 2019 EBITDA | $ 47,663 |
| Terminal EBITDA Multiple | 5.0x |
| | |
| **Terminal Enterprise Value** | 238,315 |
| Present Value Factor | 0.5935 |
| **Present Value of Terminal Enterprise Value** | **$   141,000** |

[a] Assumes working capital is equal to 12.0% of revenue.
[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit B - Reported Income Statements - Carbonless**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | | | 10/31/2014 | % |
| **Net Sales** | $ 464,808 | 100.0% | $ 479,058 | 100.0% | $ 453,007 | 100.0% | $ 406,845 | 100.0% | $ 351,417 | 100.0% | | | $ 345,932 | 100.0% |
| *Growth Rate* | *n/a* | | *3.1%* | | *-5.4%* | | *-10.2%* | | *-13.6%* | | | | *-1.6%* | |
| Cost of Sales | 330,285 | 71.1% | 348,829 | 72.8% | 340,063 | 75.1% | 306,441 | 75.3% | 252,364 | 71.8% | | | 252,976 | 73.1% |
| Gross Profit | 134,523 | 28.9% | 130,229 | 27.2% | 112,944 | 24.9% | 100,404 | 24.7% | 99,053 | 28.2% | | | 92,956 | 26.9% |
| Operating Expenses | 49,902 | | 71,529 | | 61,676 | | 65,516 | | 44,984 | | | | 47,519 | |
| Depreciation | 33,379 | | 27,579 | | 26,261 | | 21,550 | | 15,092 | | | | 13,950 | |
| S,G&A Expenses | 83,281 | 17.9% | 99,108 | 20.7% | 87,937 | 19.4% | 87,066 | 21.4% | 60,076 | 17.1% | | | 61,469 | 17.8% |
| **Operating Income** | 51,242 | 11.0% | 31,121 | 6.5% | 25,007 | 5.5% | 13,338 | 3.3% | 38,977 | 11.1% | | | 31,487 | 9.1% |
| Additional Adjustments [a] | (13,052) | -2.8% | 687 | 0.1% | (1,537) | -0.3% | 16,214 | 4.0% | (2,667) | -0.8% | | | (2,226) | -0.6% |
| **Total Adjustments** | (13,052) | -2.8% | 687 | 0.1% | (1,537) | -0.3% | 16,214 | 4.0% | (2,667) | -0.8% | | | (2,226) | -0.6% |
| **EBIT** | $ 38,190 | 8.2% | $ 31,808 | 6.6% | $ 23,470 | 5.2% | $ 29,552 | 7.3% | $ 36,310 | 10.3% | | | $ 29,261 | 8.5% |
| **EBITDA** | $ 71,569 | 15.4% | $ 59,387 | 12.4% | $ 49,731 | 11.0% | $ 51,102 | 12.6% | $ 51,402 | 14.6% | | | $ 43,211 | 12.5% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with
    Company management.  Also includes unallocated overhead expense in fiscal years 2009 through the LTM period.
Source:  Management prepared schedules and discussions with Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



# A. EXHIBITS

**Exhibit B - Projected Income Statements - Carbonless**

| *In Thousands of U.S. Dollars* | | | | | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2015 | % | 12/31/2016 | % | 12/31/2017 | % | 12/31/2018 | % | 12/31/2019 | % |
| **Net Sales [a]** | $ 332,543 | 100.0% | $ 321,962 | 100.0% | $ 311,050 | 100.0% | $ 299,807 | 100.0% | $ 286,406 | 100.0% |
| *Growth Rate* | *-3.9%* | | *-3.2%* | | *-3.4%* | | *-3.6%* | | *-4.5%* | |
| Cost of Sales and Operating Costs [b] | 289,391 | | 277,606 | | 264,595 | | 252,189 | | 238,743 | |
| Depreciation and Amortization | 13,854 | | 13,838 | | 13,838 | | 13,838 | | 13,838 | |
| Total S,G&A Expenses | 303,245 | 91.2% | 291,444 | 90.5% | 278,433 | 89.5% | 266,027 | 88.7% | 252,581 | 88.2% |
| **Operating Income** | **29,298** | 8.8% | **30,518** | 9.5% | **32,617** | 10.5% | **33,780** | 11.3% | **33,825** | 11.8% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ 29,298 | 8.8% | $ 30,518 | 9.5% | $ 32,617 | 10.5% | $ 33,780 | 11.3% | $ 33,825 | 11.8% |
| **EBITDA** | $ 43,152 | 13.0% | $ 44,356 | 13.8% | $ 46,455 | 14.9% | $ 47,618 | 15.9% | $ 47,663 | 16.6% |

[a] Includes the Company's Security and Carbonless divisions.
[b] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.
Source:  Management prepared projections



Valuation & Financial Opinions



## A.   EXHIBITS

### Exhibit B - Weighted Average Cost of Capital - Carbonless

| Required Return on Equity | | |
|---|---|---|
| **Capital Asset Pricing Model** | | |
| Risk-Free Rate of Return [a] | | 2.5% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 0.0% |
| **Required Return on Equity - CAPM** | | **16.3%** |
| **Cost of Debt** | | |
| **Cost of Debt** | | |
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 9.8% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **11.0%** |

[a]  20-year U.S. Treasury bond yield as of the Valuation Date.
[b]  Based on Duff & Phelps LLC, 2014 Valuation Handbook – Guide to Cost of Capital
[c]  Based on estimated senior lending rates as of the Valuation Date.



Valuation & Financial Opinions



# A. EXHIBITS

**Exhibit C - Guideline Company Method - Thermal**

*In Thousands of U.S. Dollars*

*Indicated Values as of December 31, 2014*

| | Thermal Results | Indicated Pricing Multiples | | | | Selected Multiples | Indicated Values |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low | High | Mean | Median | | |
| Next Fiscal Year: | | | | | | | |
| EBITDA | $ 33,034 | 4.8x | 10.8x | 8.0x | 8.0x | 7.5x | $ 248,000 |
| Revenue | 434,763 | 0.68x | 1.99x | 1.30x | 1.30x | 0.60x | 261,000 |
| Latest Twelve Months: | | | | | | | |
| EBITDA | 33,805 | 5.1x | 10.8x | 8.4x | 8.6x | 7.5x | 254,000 |
| Revenue | 413,873 | 0.69x | 2.08x | 1.28x | 1.15x | 0.65x | 269,000 |

| | |
| --- | --- |
| Indicated Enterprise Value, Minority Interest | 262,000 |
| Plus: Control Premium @ 10.0% | 26,000 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 288,000** |




# A. EXHIBITS

**Exhibit C - Discounted Cash Flow Method - Thermal**

*In Thousands of U.S. Dollars*

| | Year 1 12/31/2015 | Year 2 12/31/2016 | Year 3 12/31/2017 | Year 4 12/31/2018 | Year 5 12/31/2019 | Residual |
|---|---|---|---|---|---|---|
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $ 33,034 | $ 37,932 | $ 42,626 | $ 47,371 | $ 49,908 | |
| Depreciation and Amortization | (13,159) | (13,148) | (13,148) | (13,148) | (13,418) | |
| Income Taxes | (7,652) | (9,542) | (11,349) | (13,176) | (14,049) | |
| **Debt-Free Net Income** | **12,223** | **15,242** | **18,129** | **21,047** | **22,441** | |
| | | | | | | |
| Depreciation and Amortization | 13,159 | 13,148 | 13,148 | 13,148 | 13,418 | |
| Capital Expenditures | (6,750) | (6,000) | (5,000) | (5,000) | (5,000) | |
| Additional Working Capital [a] | (2,300) | (1,600) | (2,800) | (2,400) | (1,800) | |
| **Distributable Cash Flows** | **16,332** | **20,790** | **23,477** | **26,795** | **29,059** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Weighted Average Cost of Capital | 12.5% | 12.5% | 12.5% | 12.5% | 12.5% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | **0.9428** | **0.8381** | **0.7449** | **0.6622** | **0.5886** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **15,398** | **17,423** | **17,489** | **17,743** | **17,104** | |

| Enterprise Value | | Terminal Value | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 85,000 | 2019 EBITDA | $ 49,908 |
| Present Value of Terminal Enterprise Value | 208,000 | Terminal EBITDA Multiple | 7.5x |
| | | | |
| | | Terminal Enterprise Value | 374,310 |
| **Enterprise Value, Controlling Interest Basis (Rounded)** | **$ 293,000** | Present Value Factor | 0.5549 |
| | | **Present Value of Terminal Enterprise Value** | **$ 208,000** |

[a] Assumes working capital is equal to 12.0% of revenue.

[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions



## A.   EXHIBITS

**Exhibit C - Reported Income Statements - Thermal**

| In Thousands of U.S. Dollars | | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | For the Fiscal Year Ended | | | | | | | | | |
| | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 10/31/2014 | % |
| **Net Sales** | $ 281,229 | 100.0% | $ 341,776 | 100.0% | $ 370,832 | 100.0% | $ 411,699 | 100.0% | $ 421,276 | 100.0% | $ 413,873 | 100.0% |
| *Growth Rate* | *n/a* | | *21.5%* | | *8.5%* | | *11.0%* | | *2.3%* | | *-1.8%* | |
| Cost of Sales | 261,632 | 93.0% | 307,211 | 89.9% | 320,037 | 86.3% | 356,943 | 86.7% | 347,852 | 82.6% | 347,721 | 84.0% |
| Gross Profit | 19,597 | 7.0% | 34,565 | 10.1% | 50,795 | 13.7% | 54,756 | 13.3% | 73,424 | 17.4% | 66,152 | 16.0% |
| Operating Expenses | 10,096 | | 16,742 | | 16,844 | | 27,014 | | 29,049 | | 32,071 | |
| Depreciation | 20,042 | | 19,702 | | 18,454 | | 16,405 | | 12,983 | | 12,767 | |
| S,G&A Expenses | 30,138 | 10.7% | 36,444 | 10.7% | 35,298 | 9.5% | 43,419 | 10.5% | 42,032 | 10.0% | 44,838 | 10.8% |
| **Operating Income** | **(10,541)** | -3.7% | **(1,879)** | -0.5% | **15,497** | 4.2% | **11,337** | 2.8% | **31,392** | 7.5% | **21,314** | 5.1% |
| Additional Adjustments [a] | 11,535 | 4.1% | 2,209 | 0.6% | (645) | -0.2% | 21,226 | 5.2% | (1,850) | -0.4% | (276) | -0.1% |
| **Total Adjustments** | **11,535** | 4.1% | **2,209** | 0.6% | **(645)** | -0.2% | **21,226** | 5.2% | **(1,850)** | -0.4% | **(276)** | -0.1% |
| **EBIT** | $ 994 | 0.4% | $ 330 | 0.1% | $ 14,852 | 4.0% | $ 32,563 | 7.9% | $ 29,542 | 7.0% | $ 21,038 | 5.1% |
| **EBITDA** | $ 21,036 | 7.5% | $ 20,032 | 5.9% | $ 33,306 | 9.0% | $ 48,968 | 11.9% | $ 42,525 | 10.1% | $ 33,805 | 8.2% |

[a] Includes those adjustments made to the overall Appleton fundamentals that were not adjusted for on a business unit basis.  The adjustments were allocated to each business unit based on discussions with
    Company management.  Includes estimated unallocated overhead expense for fiscal year 2011 through the LTM period.
Source:  Management prepared schedules and discussions with Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.





Valuation & Financial Opinions

## A. EXHIBITS

### Exhibit C - Projected Income Statements - Thermal

| In Thousands of U.S. Dollars | For the Fiscal Year Ending | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2015 | % | 12/31/2016 | % | 12/31/2017 | % | 12/31/2018 | % | 12/31/2019 | % |
| **Net Sales** | $ 434,763 | 100.0% | $ 448,350 | 100.0% | $ 472,070 | 100.0% | $ 491,807 | 100.0% | $ 507,220 | 100.0% |
| *Growth Rate* | *5.0%* | | *3.1%* | | *5.3%* | | *4.2%* | | *3.1%* | |
| Cost of Sales and Operating Costs [a] | 401,729 | | 410,418 | | 429,444 | | 444,436 | | 457,312 | |
| Depreciation and Amortization | 13,159 | | 13,148 | | 13,148 | | 13,148 | | 13,418 | |
| Total S,G&A Expenses | 414,888 | 95.4% | 423,566 | 94.5% | 442,592 | 93.8% | 457,584 | 93.0% | 470,730 | 92.8% |
| **Operating Income** | **19,875** | 4.6% | **24,784** | 5.5% | **29,478** | 6.2% | **34,223** | 7.0% | **36,490** | 7.2% |
| Adjustment | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ **19,875** | 4.6% | $ **24,784** | 5.5% | $ **29,478** | 6.2% | $ **34,223** | 7.0% | $ **36,490** | 7.2% |
| **EBITDA** | $ **33,034** | 7.6% | $ **37,932** | 8.5% | $ **42,626** | 9.0% | $ **47,371** | 9.6% | $ **49,908** | 9.8% |

[a] Includes corporate overhead expenses, including salaries for the senior management team, that are necessary to support the revenue reflected in the financial projections.
Source:  Management prepared projections





Valuation & Financial Opinions

## A.   EXHIBITS

### Exhibit C - Weighted Average Cost of Capital - Thermal

| Required Return on Equity | | |
|---|---|---|
| Capital Asset Pricing Model | | |
| Risk-Free Rate of Return [a] | | 2.5% |
| Market Equity Risk Premium [b] | 6.0% | |
| Selected Equity Beta | 1.30 | 7.8% |
| Small Stock Risk Premium [b] | | 6.0% |
| Company-Specific Risk Premium | | 2.0% |
| **Required Return on Equity - CAPM** | | **18.3%** |
| **Cost of Debt** | | |
| Cost of Debt | | |
| Cost of Debt [c] | | 6.0% |
| Less:  Income Tax Factor | 38.5% | -2.3% |
| **After-tax Cost of Debt** | | **3.7%** |
| **Weighted Average Cost of Capital** | | |
| Equity Allocation of Capital Structure | 60.0% | 11.0% |
| Debt Allocation of Capital Structure | 40.0% | 1.5% |
| **Weighted Average Cost of Capital (Rounded)** | | **12.5%** |

a] 20-year U.S. Treasury bond yield as of the Valuation Date.
b] Based on Duff & Phelps LLC, 2014 Valuation Handbook – Guide to Cost of Capital
c] Based on estimated senior lending rates as of the Valuation Date.



Case 1:19-cv-01561-WCG   Filed 11/19/40   Page 1174 of 1527   Document 1-2



Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit D - Discounted Cash Flow Method - Encapsys**

*In Thousands of U.S. Dollars*

| | Year 1 12/31/2015 | Year 2 12/31/2016 | Year 3 12/31/2017 | Year 4 12/31/2018 | Year 5 12/31/2019 | Residual |
|---|---|---|---|---|---|---|
| **Distributable Cash Flows** | | | | | | |
| EBITDA | $  23,000 | $  34,234 | $  51,228 | $  69,336 | $  92,428 | |
| Depreciation and Amortization | (2,831) | (3,215) | (4,715) | (6,422) | (8,523) | |
| Income Taxes | (7,765) | (11,942) | (17,908) | (24,222) | (32,303) | |
| **Debt-Free Net Income** | 12,404 | 19,077 | 28,605 | 38,692 | 51,602 | |
| | | | | | | |
| Depreciation and Amortization | 2,831 | 3,215 | 4,715 | 6,422 | 8,523 | |
| Capital Expenditures | (22,100) | (11,800) | (21,900) | (14,000) | (24,300) | |
| Additional Working Capital [a] | (700) | (1,000) | (1,600) | (1,800) | (2,200) | |
| **Distributable Cash Flows** | **(7,565)** | **9,492** | **9,820** | **29,314** | **33,625** | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | | | | | | |
| Discount Rate | 27.5% | 27.5% | 27.5% | 27.5% | 27.5% | |
| Discount Period [b] | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | |
| **Present Value Factor** | 0.8856 | 0.6946 | 0.5448 | 0.4273 | 0.3351 | |
| | | | | | | |
| **Present Value of Distributable Cash Flows** | **(6,700)** | **6,593** | **5,350** | **12,525** | **11,268** | |

| **Enterprise Value** | | **Terminal Value** | |
|---|---|---|---|
| Total Present Value of Distributable Cash Flows (Through 2019) | 29,000 | 2019 EBITDA | $  92,428 |
| Present Value of Terminal Enterprise Value | 137,000 | Terminal EBITDA Multiple | 5.0x |
| | | | |
| **Enterprise Value, Controlling Interest Basis (Rounded)  $  166,000** | | **Terminal Enterprise Value** | **462,140** |
| | | Present Value Factor | 0.2968 |
| | | **Present Value of Terminal Enterprise Value** | **$  137,000** |

[a] Assumes working capital is equal to 5.0% of revenue.
[b] Calculated utilizing the "mid-year convention," which assumes that cash flows will be received evenly throughout the projection period rather than at the end of the period.



Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit D - Historical Income Statements - Encapsys**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | 12 Months Ended 10/31/2014 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | | 10/31/2014 | % |
| **Net Sales** | $ 29,050 | 100.0% | $ 33,490 | 100.0% | $ 31,212 | 100.0% | $ 34,793 | 100.0% | $ 43,135 | 100.0% |
| *Growth Rate* | *n/a* | | *15.3%* | | *-6.8%* | | *11.5%* | | *24.0%* | |
| Cost of Sales and Operating Costs | 20,270 | | 21,572 | | 20,447 | | 22,539 | | 27,222 | |
| Depreciation and Amortization | 2,254 | | 3,751 | | 2,816 | | 1,879 | | 2,622 | |
| Total Expenses | 22,524 | 77.5% | 25,323 | 75.6% | 23,263 | 74.5% | 24,418 | 70.2% | 29,844 | 69.2% |
| **Operating Income** | $ 6,526 | 22.5% | $ 8,167 | 24.4% | $ 7,949 | 25.5% | $ 10,375 | 29.8% | $ 13,291 | 30.8% |
| Adjustments | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ 6,526 | 22.5% | $ 8,167 | 24.4% | $ 7,949 | 25.5% | $ 10,375 | 29.8% | $ 13,291 | 30.8% |
| **EBITDA** | $ 8,781 | 30.2% | $ 11,918 | 35.6% | $ 10,765 | 34.5% | $ 12,254 | 35.2% | $ 15,913 | 36.9% |





Valuation & Financial Opinions

## A.  EXHIBITS

### Exhibit D - Projected Income Statements - Encapsys

| In Thousands of U.S. Dollars | | | | | | For the Fiscal Year Ending | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2015 | % | 12/31/2016 | % | 12/31/2017 | % | 12/31/2018 | % | 12/31/2019 | % |
| **Net Sales** | $ 59,322 | 100.0% | $ 80,139 | 100.0% | $ 112,624 | 100.0% | $ 149,419 | 100.0% | $ 194,345 | 100.0% |
| *Growth Rate* | *37.5%* | | *35.1%* | | *40.5%* | | *32.7%* | | *30.1%* | |
| Cost of Sales and Operating Costs | 36,322 | | 45,905 | | 61,396 | | 80,083 | | 101,917 | |
| Depreciation and Amortization | 2,831 | | 3,215 | | 4,715 | | 6,422 | | 8,523 | |
| Total Expenses | 39,153 | 66.0% | 49,120 | 61.3% | 66,111 | 58.7% | 86,505 | 57.9% | 110,440 | 56.8% |
| **Operating Income** | $ 20,169 | 34.0% | $ 31,019 | 38.7% | $ 46,513 | 41.3% | $ 62,914 | 42.1% | $ 83,905 | 43.2% |
| Adjustments | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **EBIT** | $ 20,169 | 34.0% | $ 31,019 | 38.7% | $ 46,513 | 41.3% | $ 62,914 | 42.1% | $ 83,905 | 43.2% |
| **EBITDA** | $ 23,000 | 38.8% | $ 34,234 | 42.7% | $ 51,228 | 45.5% | $ 69,336 | 46.4% | $ 92,428 | 47.6% |

Source:  Management prepared projections




## A.  EXHIBITS

### Exhibit E - Reported Balance Sheets

| *In Thousands of U.S. Dollars* | | | As of | | | |
|---|---|---|---|---|---|---|
| | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 10/31/2014 |
| Cash and Cash Equivalents | $    9,963 | $    3,772 | $    7,241 | $    1,851 | $    1,800 | $    8,364 |
| Accounts Receivable | 90,584 | 93,374 | 90,339 | 92,680 | 75,928 | 58,534 |
| Environmental Indemnification Receivable | 47,100 | 20,580 | 46,000 | 65,000 | 59,253 | 0 |
| Inventories | 120,942 | 110,032 | 102,527 | 94,349 | 92,313 | 91,975 |
| Other Current Assets | 8,659 | 21,412 | 8,724 | 5,620 | 6,078 | 3,629 |
| **Total Current Assets** | **277,248** | **249,170** | **254,831** | **259,500** | **235,372** | **162,502** |
| **Net Property and Equipment** | **405,598** | **354,601** | **324,665** | **243,265** | **245,233** | **237,203** |
| Goodwill and Other Intangible Assets | 70,640 | 48,449 | 46,125 | 43,839 | 41,554 | 39,664 |
| Environmental Indemnification Receivable | 28,600 | 0 | 0 | 0 | 0 | 0 |
| Other Assets | 15,894 | 24,779 | 16,297 | 14,486 | 25,369 | 22,150 |
| **Total Other Assets** | **115,134** | **73,228** | **62,422** | **58,325** | **66,923** | **61,814** |
| **Total Assets** | **$    797,980** | **$    676,999** | **$    641,918** | **$    561,090** | **$    547,528** | **$    461,519** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2014 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.





Valuation & Financial Opinions

## A. EXHIBITS

**Exhibit E - Reported Balance Sheets**

*In Thousands of U.S. Dollars*

|  | As of | | | | | |
|---|---|---|---|---|---|---|
|  | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 10/31/2014 |
| Current Portion of Long-Term Debt | $ 5,955 | $ 18,694 | $ 1,256 | $ 3,975 | $ 4,734 | n/a |
| Accounts Payable | 60,020 | 48,651 | 51,766 | 68,600 | 61,454 | 66,451 |
| Other Accrued Liabilities | 97,471 | 66,082 | 94,055 | 122,102 | 103,975 | 61,591 |
| **Total Current Liabilities** | **163,446** | **133,427** | **147,077** | **194,677** | **170,163** | **128,042** |
| Long-Term Debt | 544,113 | 540,131 | 510,533 | 511,624 | 592,412 | 585,916 |
| Capital Lease Obligation | 0 | 0 | 0 | 0 | 0 | 0 |
| Fox River (AWA) Liability | 28,600 | 0 | 0 | 0 | 0 | 6,856 |
| Other Long-Term Liabilities | 161,215 | 139,432 | 174,245 | 207,686 | 132,991 | 118,911 |
| **Total Long-Term Liabilities** | **733,928** | **679,563** | **684,778** | **719,310** | **725,403** | **711,683** |
| **Total Liabilities** | **897,374** | **812,990** | **831,855** | **913,987** | **895,566** | **839,725** |
| Common Stock & Paid-In Capital | 122,087 | 110,045 | 97,615 | 81,704 | 63,322 | 54,302 |
| Retained Earnings | (121,764) | (153,765) | (150,193) | (439,923) | (415,173) | (434,965) |
| Accumulated Other Comprehensive Loss | (99,717) | (92,271) | (137,359) | 5,322 | 3,813 | 2,458 |
| **Total Stockholders' Equity** | **(99,394)** | **(135,991)** | **(189,937)** | **(352,897)** | **(348,038)** | **(378,206)** |
| **Total Liabilities & Stockholders' Equity** | **$ 797,980** | **$ 676,999** | **$ 641,918** | **$ 561,090** | **$ 547,528** | **$ 461,519** |

Source: Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2014 financial results based on information provided by Company management.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A. EXHIBITS

**Exhibit E - Reported Income Statements [a]**

| In Thousands of U.S. Dollars | | | | | | For the Fiscal Year Ended | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | | 10/31/2014 | % |
| Net Sales | $ 862,140 | 100.0% | $ 849,884 | 100.0% | $ 857,329 | 100.0% | $ 849,756 | 100.0% | $ 807,486 | 100.0% | $ 802,940 | 100.0% |
| Growth Rate | n/a | | -1.4% | | 0.9% | | -0.9% | | -5.0% | | -0.6% | |
| Cost of Sales | 684,261 | 79.4% | 682,228 | 80.3% | 718,710 | 83.8% | 758,875 | 89.3% | 567,786 | 70.3% | 571,846 | 71.2% |
| Gross Profit | 177,879 | 20.6% | 167,656 | 19.7% | 138,619 | 16.2% | 90,881 | 10.7% | 239,700 | 29.7% | 231,094 | 28.8% |
| S,G&A Expenses | 145,904 | 16.9% | 130,207 | 15.3% | 148,050 | 17.3% | 179,362 | 21.1% | 106,928 | 13.2% | 138,515 | 17.3% |
| Operating Income | 31,975 | 3.7% | 37,449 | 4.4% | (9,431) | -1.1% | (88,481) | -10.4% | 132,772 | 16.4% | 92,579 | 11.5% |
| Other Income (Expense) | 44,782 | 5.2% | (6,254) | -0.7% | 23,686 | 2.8% | 271 | 0.0% | (59,394) | -7.4% | (39,659) | -4.9% |
| EBIT | 76,757 | 8.9% | 31,195 | 3.7% | 14,255 | 1.7% | (88,210) | -10.4% | 73,378 | 9.1% | 52,920 | 6.6% |
| Interest Expense | (51,291) | -5.9% | (65,772) | -7.7% | (61,330) | -7.2% | (59,654) | -7.0% | (55,910) | -6.9% | (50,090) | -6.2% |
| Earnings Before Taxes | 25,466 | 3.0% | (34,577) | -4.1% | (47,075) | -5.5% | (147,864) | -17.4% | 17,468 | 2.2% | 2,830 | 0.4% |
| Income Taxes | (334) | 0.0% | (176) | 0.0% | (577) | -0.1% | (587) | -0.1% | (193) | 0.0% | (219) | 0.0% |
| Net Income from Continuing Operations | 25,132 | | (34,753) | | (47,652) | -5.6% | (148,451) | -17.5% | 17,275 | 2.1% | 2,611 | 0.3% |
| (Loss) Income from Discontinued Operations | 0 | | 3,499 | | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Net (Loss) Income | $ 25,132 | 2.9% | $ (31,254) | -3.7% | $ (47,652) | -5.6% | $ (148,451) | -17.5% | $ 17,275 | 2.1% | $ 2,611 | 0.3% |

Source: Fiscal year end financial results from historical form 10-K filings with the SEC. October 31, 2014 financial results based on information provided by Company management.
[a] Fiscal year 2009 includes Performance Packaging.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

*In Thousands of U.S. Dollars*

| | For the Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 |
| Net Income | $ 25,132 | $ (31,254) | $ (47,652) | $ (148,451) | $ 17,275 |
| Depreciation and Amortization | 58,279 | 48,578 | 46,292 | 98,010 | 27,776 |
| Amortization of Intangible Assets | 3,755 | 2,908 | 2,324 | 2,286 | 2,285 |
| Impaired Inventory Valuation | 0 | 0 | 0 | 11,061 | 0 |
| Impairment of Continuing Operations Goodwill | 6,341 | 0 | 0 | 0 | 0 |
| Amortization of Financing Fees | 3,115 | 4,080 | 3,373 | 2,645 | 2,411 |
| Amortization of Bond Discount | 0 | 745 | 958 | 1,066 | 864 |
| Employer 401(k) Noncash Matching Contributions | 4,006 | 3,209 | 2,738 | 3,038 | 2,637 |
| Foreign Exchange (Gain) Loss | (958) | 559 | 1,143 | (227) | 99 |
| Net Loss (Gain) from Involuntary Conversion / Disposal of Equipment | 0 | (638) | (1,374) | (2,382) | 197 |
| Loss on Disposals of Equipment | 574 | 419 | 209 | 1,448 | 265 |
| Gain on Sale of Business | 0 | (2,560) | 0 | 0 | 0 |
| Accretion of Deferred Payment and Capital Lease Obligations | (687) | 33 | 7 | 10 | 0 |
| Debt Extinguishment/Refinancing Expenses | (42,602) | 7,010 | 0 | 0 | 8,101 |
| Fox River Insurance Recovery | 0 | (9,053) | (145) | 0 | 0 |
| (Increase) Decrease in Accounts Receivable | (735) | (14,540) | 2,004 | (2,857) | 17,343 |
| (Increase) Decrease in Inventories | 3,767 | (5,872) | 6,107 | (962) | 1,832 |
| (Increase) Decrease in Other Current Assets | 376 | (6,739) | 14,484 | 3,105 | (461) |
| Increase (Decrease) in Accounts Payable and Other Accrued Liabilities | 14,488 | (9,273) | (569) | 27,159 | (21,357) |
| Increase (Decrease) in Restructuring Reserve | (2,138) | 0 | 0 | 0 | 0 |
| Increase (Decrease) in Accrued Pension | (5,484) | (11,862) | 37,149 | 12,322 | (70,452) |
| Increase (Decrease) in Other, net | (6,001) | (5,735) | 1,663 | 16,034 | (11,533) |
| **Net Cash Provided by (Used in) Operating Activities** | **61,228** | **(29,985)** | **68,711** | **23,305** | **(22,718)** |
| Proceeds from Sale of Equipment | 27 | 208 | 6 | 22 | 17 |
| Net Change in Cash Due to Sale of Bemrose Group Limited / C&H Packaging, Inc. | 16,875 | 0 | 0 | 0 | 0 |
| Net Change in Cash Due to Sale of Performance Packaging | 0 | 56,000 | 2,000 | 0 | 0 |
| Insurance Proceeds from Involuntary Conversion | 0 | 1,029 | 1,374 | 0 | 0 |
| Purchases of Property, Plant, and Equipment | (24,556) | (17,839) | (15,847) | (17,143) | (28,290) |
| **Net Cash Provided by (Used in) Investing Activities** | **(7,654)** | **39,398** | **(12,467)** | **(17,121)** | **(28,273)** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Reported Statements of Cash Flows**

| *In Thousands of U.S. Dollars* | For the Fiscal Year Ended | | | | |
|---|---|---|---|---|---|
| | 12/31/2009 | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 |
| **Net Cash Provided by (Used in) Operating Activities** | $ 61,228 | $ (29,985) | $ 68,711 | $ 23,305 | $ (22,718) |
| Proceeds from Sale of Equipment | 27 | 208 | 6 | 22 | 17 |
| Net Change in Cash Due to Sale of Bemrose Group Limited / C&H Packaging, Inc. | 16,875 | 0 | 0 | 0 | 0 |
| Net Change in Cash Due to Sale of Performance Packaging | 0 | 56,000 | 2,000 | 0 | 0 |
| Acquisitions of Businesses, net of cash acquired | 0 | 1,029 | 1,374 | 0 | 0 |
| Purchases of Property, Plant, and Equipment | (24,556) | (17,839) | (15,847) | (17,143) | (28,290) |
| **Net Cash Provided by (Used in) Investing Activities** | **(7,654)** | **39,398** | **(12,467)** | **(17,121)** | **(28,273)** |
| Payments of Senior Secured Notes Payable | (10,400) | (211,225) | 0 | 0 | (305,837) |
| Proceeds from Senior Secured Notes Payable | 0 | 299,007 | 0 | 0 | 331,650 |
| Payments of Second Lien Notes Payable | 0 | 0 | 0 | 0 | (161,766) |
| Proceeds from Second Lien Notes Payable | 0 | 0 | 0 | 0 | 246,252 |
| Payment of Industrial Development Bonds | 0 | 0 | 0 | 0 | (2,650) |
| Payments of Senior Subordinated Notes Payable | (1,687) | 0 | (17,491) | 0 | (32,195) |
| Proceeds from Ohio Financing | 3,000 | 0 | 0 | 0 | 0 |
| Payments of State of Ohio Loan | (958) | (1,151) | (1,203) | (1,256) | (1,325) |
| Debt Acquisition Costs | (8,642) | (10,847) | 0 | 0 | (13,706) |
| Proceeds from Forgivable Debt | 0 | 0 | 0 | 300 | 0 |
| Payments Relating to Capital Lease Obligation | (731) | (721) | (47) | (68) | (86) |
| Proceeds from Revolving Lines of Credit | 254,201 | 338,343 | 202,800 | 253,400 | 368,100 |
| Payments of Revolving Lines of Credit | (249,710) | (397,268) | (232,100) | (249,700) | (364,200) |
| Payments of Secured Financing | (2,120) | (20,905) | 0 | 0 | 0 |
| Proceeds from Issuance of Redeemable Common Stock | 4,135 | 3,561 | 2,875 | 2,884 | 2,910 |
| Payments to Redeem Common Stock | (21,162) | (11,811) | (12,351) | (14,070) | (16,441) |
| Increase in Cash Overdraft | (13,717) | (2,628) | 4,749 | (3,078) | 251 |
| **Net Cash Provided by (Used in) Financing Activities** | **(47,791)** | **(15,645)** | **(52,768)** | **(11,588)** | **50,957** |
| **Effect of Foreign Exchange Rate Changes on Cash and Cash Equivalents** | 0 | 41 | (7) | 14 | (17) |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | **5,783** | **(6,191)** | **3,469** | **(5,390)** | **(51)** |
| Cash and Cash Equivalents at Beginning of Year | 4,180 | 9,963 | 3,772 | 7,241 | 1,851 |
| **Cash and Cash Equivalents at End of Year** | **$ 9,963** | **$ 3,772** | **$ 7,241** | **$ 1,851** | **$ 1,800** |

Source:  Fiscal year end financial results from historical form 10-K filings with the SEC.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.



Valuation & Financial Opinions



## A.  EXHIBITS

**Exhibit E - Adjusted Income Statements [a]**

| In Thousands of U.S. Dollars | For the Fiscal Year Ended | | | | | | | | | | | 12 Months Ended | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2009 | % | 12/31/2010 | % | 12/31/2011 | % | 12/31/2012 | % | 12/31/2013 | % | 10/31/2014 | % |
| **Net Sales** | $ 862,140 | 100.0% | $ 849,884 | 100.0% | $ 857,329 | 100.0% | $ 849,756 | 100.0% | $ 807,486 | 100.0% | $ 802,940 | 100.0% |
| **Earnings Before Taxes** | 25,466 | 3.0% | (34,577) | -4.1% | (47,075) | -5.5% | (147,864) | -17.4% | 17,468 | 2.2% | 2,830 | 0.4% |
| | | | | | | | | | | | | |
| Debt Extinguishment Expense (Gain) | (42,602) | | 7,010 | | 0 | | 0 | | 59,681 | | 34,580 | |
| Mark to Market Retirement Accounting Change | 0 | | (410) | | 45,540 | | 25,512 | | (61,900) | | (60,761) | |
| Foreign Exchange Loss (Gain) | (958) | | 600 | | 1,136 | | (213) | | 82 | | 1,551 | |
| Restructuring and Other Charges | 0 | | 0 | | 0 | | 105,950 | | 0 | | 0 | |
| Synthetic Equity Expense | 287 | | 1,076 | | 1,906 | | 3,610 | | 1,349 | | 2,889 | |
| Domtar Transition Costs | 0 | | 0 | | 0 | | 11,458 | | 2,382 | | 0 | |
| Fox River Settlement Expense | 0 | | 0 | | 0 | | 0 | | 0 | | 23,975 | |
| Insurance Recovery | 0 | | (8,947) | | 0 | | (2,188) | | 0 | | 0 | |
| West Carrollton Silo Expense (Gain) | 0 | | 391 | | 0 | | 0 | | 0 | | 0 | |
| Non-Cash KSOP Stock Match | 4,006 | | 3,209 | | 2,738 | | 3,038 | | 2,637 | | 2,396 | |
| Litigation Settlement | 0 | | 0 | | 3,122 | | 0 | | 0 | | 0 | |
| Litigation Recovery | 0 | | 0 | | (23,229) | | 0 | | 0 | | 0 | |
| Customer Bankruptcy Write-Offs | 1,866 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Fuel-Tax Credit | (17,655) | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Bonus Payments | 3,387 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Pension Withdrawal Expense | 0 | | 0 | | 0 | | 7,000 | | 0 | | 0 | |
| Thermal Anti-Dumping Legal Expenses | 288 | | 483 | | 613 | | 738 | | 1,347 | | 2,387 | |
| West Carrollton Start Up Expenses | 8,553 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Performance Packaging Goodwill Impairment | 6,341 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Andritz Litigation Fees | 213 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Debt Exchange Expenses | 4,182 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| Bemrose Booth Payment | (820) | | 0 | | 0 | | 0 | | 0 | | 0 | |
| HAC II Transaction Expenses | 0 | | 0 | | 0 | | 7,494 | | 0 | | 0 | |
| Gain on Sale of Business | (755) | | (2,560) | | 0 | | 0 | | 0 | | 0 | |
| **Total Adjustments** | (33,667) | -3.9% | 852 | 0.1% | 31,826 | 3.7% | 162,399 | 19.1% | 5,578 | 0.7% | 7,017 | 0.9% |
| | | | | | | | | | | | | |
| Adjusted Earnings Before Taxes | (8,201) | -1.0% | (33,725) | -4.0% | (15,249) | -1.8% | 14,535 | 1.7% | 23,046 | 2.9% | 9,847 | 1.2% |
| | | | | | | | | | | | | |
| Interest Expense | 51,291 | 5.9% | 65,772 | 7.7% | 61,330 | 7.2% | 59,654 | 7.0% | 55,910 | 6.9% | 50,090 | 6.2% |
| Depreciation and Amortization | 62,034 | 7.2% | 49,780 | 5.9% | 48,616 | 5.7% | 35,554 | 4.2% | 30,061 | 3.7% | 29,546 | 3.7% |
| | | | | | | | | | | | | |
| **Adjusted EBIT** | $ 43,090 | 5.0% | $ 32,047 | 3.8% | $ 46,081 | 5.4% | $ 74,189 | 8.7% | $ 78,956 | 9.8% | $ 59,937 | 7.5% |
| **Adjusted EBITDA** | $ 105,124 | 12.2% | $ 81,827 | 9.6% | $ 94,697 | 11.0% | $ 109,743 | 12.9% | $ 109,017 | 13.5% | $ 89,483 | 11.1% |

[a]  Fiscal year 2009 includes Performance Packaging.
*Effective January 1, 2011 the Company changed its method of inventory accounting from the LIFO method to the FIFO method.





Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit E - Ratio Analysis**

| | 12/31/2009 | 12/31/2010 | For the Fiscal Year Ended | | | 12 Months Ended 10/31/2014 |
| --- | --- | --- | --- | --- | --- | --- |
| | | | 12/31/2011 | 12/31/2012 | 12/31/2013 | |
| **Activity Ratios (End of Year Balances)** | | | | | | |
| Inventory Turnover | 5.7 | 6.2 | 7.0 | 8.0 | 6.2 | 6.2 |
| Asset Turnover | 1.1 | 1.3 | 1.3 | 1.5 | 1.5 | 1.7 |
| | | | | | | |
| **Liquidity and Working Capital Ratios (End of Year Balances)** | | | | | | |
| Current Ratio | 1.7 | 1.9 | 1.7 | 1.3 | 1.4 | 1.3 |
| Net Working Capital / Net Sales | % Rev. | 15.4% | 11.9% | 7.9% | 8.4% | 4.6% |
| | | | | | | |
| Days in Accounts Receivable | 58.3 | 48.9 | 38.5 | 39.8 | 34.3 | 26.6 |
| +  Days in Inventories | 64.5 | 58.9 | 52.1 | 45.4 | 59.3 | 58.7 |
| -  Days in Accounts Payable | (32.0) | (26.0) | (26.3) | (33.0) | (39.5) | (42.4) |
| **Net Trade Cycle** | **90.8** | **81.8** | **64.2** | **52.2** | **54.2** | **42.9** |
| | | | | | | |
| **Leverage and Coverage** | | | | | | |
| Liabilities / Equity | (9.0) | (6.0) | n/m | n/m | n/m | n/m |
| Debt / (Debt + Equity) | 122.1% | 132.2% | n/m | n/m | n/m | n/m |
| Assets / Equity | (8.0) | (5.0) | n/m | n/m | n/m | (1.2) |
| EBIT / Interest Expense | 0.8 | 0.5 | 0.8 | 1.2 | 1.4 | 1.2 |
| Total Debt / EBITDA | 5.2 | 6.8 | 5.4 | 4.7 | 5.5 | 6.5 |
| Debt / EV | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | | | | |
| **Profitability** | | | | | | |
| Gross Profit Margin | 20.6% | 19.7% | 16.2% | 10.7% | 29.7% | 28.8% |
| EBITDA Margin | 12.2% | 9.6% | 11.0% | 12.9% | 13.5% | 11.1% |
| EBIT Margin | 5.0% | 3.8% | 5.4% | 8.7% | 9.8% | 7.5% |
| Net Profit Margin | -0.6% | -2.4% | -1.1% | 1.1% | 1.8% | 0.8% |
| Return on Assets | -0.6% | -3.1% | -1.5% | 1.6% | 2.6% | 1.3% |
| Return on Equity | 5.1% | 15.3% | n/m | n/m | n/m | n/m |
| | | | | | | |
| **Other Ratios** | | | | | | |
| Deprec. and Amort. / Sales | 7.2% | 5.9% | 5.7% | 4.2% | 3.7% | 3.7% |
| Net Capital Expenditures / Sales | 2.8% | 2.1% | 1.8% | 2.0% | 3.5% | n/m |
| Unlevered Free Cash Flow / Sales | 7.9% | -0.3% | 14.2% | 14.0% | -4.2% | n/m |



## A.   EXHIBITS

**Exhibit F - Implied Pricing Multiples - Thermal & Carbonless**

|  | EV / NFY EBITDA | EV / LTM EBITDA | EV / NFY Revenue | EV / LTM Revenue |
|---|---|---|---|---|
| Neenah Paper, Inc. | 8.5x | 9.3x | 1.21x | 1.31x |
| International Paper Company | 7.5x | 8.6x | 1.38x | 1.13x |
| MeadWestvaco Corporation | 9.6x | 10.8x | 1.75x | 1.83x |
| Wausau Paper Corp. | 10.8x | n/m | 1.99x | 2.08x |
| Domtar Corporation | 4.8x | 5.1x | 0.68x | 0.69x |
| PH Glatfelter Co. | 6.6x | 8.4x | 0.78x | 0.80x |
| Verso Paper Corp. | n/m | n/m | n/m | 1.15x |
|  |  |  |  |  |
| Low | 4.8x | 5.1x | 0.68x | 0.69x |
| High | 10.8x | 10.8x | 1.99x | 2.08x |
|  |  |  |  |  |
| Mean | 8.0x | 8.4x | 1.30x | 1.28x |
| Median | 8.0x | 8.6x | 1.30x | 1.15x |

Source:  Exhibit F



Valuation & Financial Opinions

SRR
STOUT | RISIUS | ROSS

## A.  EXHIBITS

**Exhibit F - Calculation of Enterprise Value - Thermal & Carbonless**

*In Millions of Shares and U.S. Dollars, Except Stock Price*

| General Market Information | Neenah Paper, Inc. | International Paper Company | MeadWestvaco Corporation | Wausau Paper Corp. | Domtar Corporation | PH Glatfelter Co. | Verso Paper Corp. |
|---|---|---|---|---|---|---|---|
| Ticker Symbol | NP | IP | MWV | WPP | UFS | GLT | VRS |
| Stock Exchange | NYSE | NYSE | NYSE | NYSE | NYSE | NYSE | NYSE |
| | | | | | | | |
| Closing Common Stock Price (12/31/2014) | $ 60.27 | $ 53.58 | $ 44.39 | $ 11.37 | $ 40.22 | $ 25.57 | $ 3.43 |
| Closing Common Stock Price (06/30/2014) | 53.15 | 50.47 | 44.26 | 10.82 | 42.85 | 26.53 | 2.10 |
| Percent Change | 13.4% | 6.2% | 0.3% | 5.1% | -6.1% | -3.6% | 63.3% |
| **Calculation of Enterprise Value** | | | | | | | |
| Closing Common Stock Price (12/31/2014) | $ 60.27 | $ 53.58 | $ 44.39 | $ 11.37 | $ 40.22 | $ 25.57 | $ 3.43 |
| Multiplied by:  Shares Outstanding | 16.6 | 423.5 | 167.7 | 50.0 | 64.5 | 42.9 | 53.3 |
| **Market Value of Equity ("MVE")** | **$ 1,002.9** | **$ 22,691.0** | **$ 7,443.4** | **$ 568.5** | **$ 2,593.0** | **$ 1,098.0** | **$ 182.9** |
| Add:  Total Debt | 186.4 | 11,762.0 | 2,998.0 | 171.2 | 1,375.0 | 410.2 | 1,347.0 |
| Add:  Preferred Stock | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Add:  Minority Interest in Subsidiaries | 0.0 | 161.0 | 159.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Less:  Cash and Short-Term Investments | (24.0) | (1,718.0) | (400.0) | (4.4) | (134.0) | (53.7) | (11.8) |
| **Enterprise Value ("EV")** | **$ 1,165.3** | **$ 32,896.0** | **$ 10,200.4** | **$ 735.3** | **$ 3,834.0** | **$ 1,454.6** | **$ 1,518.0** |

Source:  Capital IQ, Inc.



Valuation & Financial Opinions



# A.  EXHIBITS

**Exhibit F - Selected Financial Information - Paperweight Development Corp.**

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | | Size (LTM EBITDA) | | Growth (3-Year Revenue CAGR) | | Growth (1-Year Revenue) | |
|---|---|---|---|---|---|---|---|
| International Paper Company | $29,119.0 | International Paper Company | $3,844.0 | Neenah Paper, Inc. | 9.4% | Neenah Paper, Inc. | 7.4% |
| MeadWestvaco Corporation | 5,567.0 | MeadWestvaco Corporation | 943.0 | PH Glatfelter Co. | 4.3% | PH Glatfelter Co. | 6.4% |
| Domtar Corporation | 5,543.0 | Domtar Corporation | 753.0 | Domtar Corporation | 3.8% | MeadWestvaco Corporation | 4.4% |
| PH Glatfelter Co. | 1,808.3 | PH Glatfelter Co. | 173.5 | International Paper Company | 4.2% | Domtar Corporation | 3.8% |
| Verso Paper Corp. | 1,320.7 | Neenah Paper, Inc. | 125.0 | MeadWestvaco Corporation | 2.7% | Wausau Paper Corp. | 1.8% |
| Neenah Paper, Inc. | 891.0 | Verso Paper Corp. | 97.4 | Wausau Paper Corp. | 1.9% | International Paper Company | 0.2% |
| **Paperweight Development Corp.** | **802.9** | **Paperweight Development Corp.** | **89.5** | Domtar Corporation | -0.4% | **Paperweight Development Corp.** | **-0.7%** |
| Wausau Paper Corp. | 353.2 | Wausau Paper Corp. | 41.0 | **Paperweight Development Corp.** | **-2.3%** | Verso Paper Corp. | -6.5% |
| | | | | Verso Paper Corp. | -9.2% | | |
| **Guideline Company Median** | **$1,808.3** | **Guideline Company Median** | **$173.5** | **Guideline Company Median** | **2.7%** | **Guideline Company Median** | **3.8%** |

| Growth (3-Year EBITDA CAGR) | | Growth (1-Year EBITDA) | | Profitability (LTM Gross Profit Margin) | | Profitability (LTM EBITDA Margin) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 13.1% | Domtar Corporation | 32.4% | **Paperweight Development Corp.** | **28.8%** | MeadWestvaco Corporation | 16.9% |
| MeadWestvaco Corporation | 7.8% | MeadWestvaco Corporation | 31.3% | International Paper Company | 27.4% | Neenah Paper, Inc. | 14.0% |
| PH Glatfelter Co. | 5.2% | PH Glatfelter Co. | 16.0% | MeadWestvaco Corporation | 21.0% | Domtar Corporation | 13.6% |
| International Paper Company | 1.0% | Neenah Paper, Inc. | 13.2% | Domtar Corporation | 20.7% | International Paper Company | 13.2% |
| **Paperweight Development Corp.** | **-2.0%** | International Paper Company | 5.8% | Neenah Paper, Inc. | 19.7% | Wausau Paper Corp. | 11.6% |
| Domtar Corporation | -12.4% | **Paperweight Development Corp.** | **-21.1%** | Wausau Paper Corp. | 14.2% | **Paperweight Development Corp.** | **11.1%** |
| Verso Paper Corp. | -20.7% | Verso Paper Corp. | -36.9% | PH Glatfelter Co. | 12.9% | PH Glatfelter Co. | 9.6% |
| Wausau Paper Corp. | -28.8% | Wausau Paper Corp. | -58.9% | Verso Paper Corp. | 12.7% | Verso Paper Corp. | 7.4% |
| **Guideline Company Median** | **1.0%** | **Guideline Company Median** | **13.2%** | **Guideline Company Median** | **19.7%** | **Guideline Company Median** | **13.2%** |

| Profitability (LTM EBIT Margin) | | Profitability (LTM Return on Assets) | | Profitability (LTM Return on Equity) | | Liquidity (LTM Current Ratio) | |
|---|---|---|---|---|---|---|---|
| Neenah Paper, Inc. | 10.7% | Neenah Paper, Inc. | 7.5% | Neenah Paper, Inc. | 17.2% | Neenah Paper, Inc. | 2.7 |
| MeadWestvaco Corporation | 10.1% | International Paper Company | 3.7% | International Paper Company | 15.7% | PH Glatfelter Co. | 2.2 |
| International Paper Company | 8.3% | PH Glatfelter Co. | 3.1% | Verso Paper Corp. | 14.8% | MeadWestvaco Corporation | 1.9 |
| **Paperweight Development Corp.** | **7.5%** | Domtar Corporation | 2.5% | PH Glatfelter Co. | 7.2% | Domtar Corporation | 1.8 |
| Domtar Corporation | 6.5% | MeadWestvaco Corporation | 2.5% | MeadWestvaco Corporation | 6.7% | International Paper Company | 1.7 |
| PH Glatfelter Co. | 5.6% | **Paperweight Development Corp.** | **1.3%** | Domtar Corporation | 5.3% | **Paperweight Development Corp.** | **1.3** |
| Wausau Paper Corp. | 0.0% | Wausau Paper Corp. | -1.2% | Wausau Paper Corp. | -3.8% | Verso Paper Corp. | 1.0 |
| Verso Paper Corp. | -0.2% | Verso Paper Corp. | -8.5% | **Paperweight Development Corp.** | **n/m** | Wausau Paper Corp. | 1.0 |
| **Guideline Company Median** | **6.5%** | **Guideline Company Median** | **2.5%** | **Guideline Company Median** | **7.2%** | **Guideline Company Median** | **1.8** |

| Activity (LTM Asset Turnover) | | Activity (LTM Inventory Turnover) | | Leverage (LTM Total Debt to EBITDA) | | Leverage (LTM EBIT / Interest Expense) | |
|---|---|---|---|---|---|---|---|
| **Paperweight Development Corp.** | **1.7** | Verso Paper Corp. | 8.9 | Verso Paper Corp. | 13.8 | Neenah Paper, Inc. | 8.4 |
| Neenah Paper, Inc. | 1.3 | International Paper Company | 8.5 | **Paperweight Development Corp.** | **6.5** | PH Glatfelter Co. | 5.3 |
| Verso Paper Corp. | 1.3 | Wausau Paper Corp. | 7.1 | Wausau Paper Corp. | 4.2 | Domtar Corporation | 3.7 |
| PH Glatfelter Co. | 1.1 | Neenah Paper, Inc. | 6.6 | MeadWestvaco Corporation | 3.2 | International Paper Company | 3.7 |
| International Paper Company | 1.0 | PH Glatfelter Co. | 6.4 | International Paper Company | 3.1 | MeadWestvaco Corporation | 2.8 |
| Domtar Corporation | 0.9 | **Paperweight Development Corp.** | **6.2** | PH Glatfelter Co. | 2.4 | **Paperweight Development Corp.** | **1.2** |
| Wausau Paper Corp. | 0.8 | Domtar Corporation | 6.1 | Domtar Corporation | 1.8 | Wausau Paper Corp. | 0.0 |
| MeadWestvaco Corporation | 0.6 | MeadWestvaco Corporation | 6.1 | Neenah Paper, Inc. | 1.5 | Verso Paper Corp. | (0.0) |
| **Guideline Company Median** | **1.0** | **Guideline Company Median** | **6.6** | **Guideline Company Median** | **3.1** | **Guideline Company Median** | **3.7** |

Source: Capital IQ, Inc. and Paperweight Development Corp. financials.



Valuation & Financial Opinions



# A. EXHIBITS

## Exhibit F - Selected Financial Information - Carbonless & Thermal

*U.S. Dollars in Millions*

| Size (LTM Net Sales) | |
| --- | --- |
| International Paper Company | $29,119.0 |
| MeadWestvaco Corporation | 5,567.0 |
| Domtar Corporation | 5,543.0 |
| PH Glatfelter Co. | 1,808.3 |
| Verso Paper Corp. | 1,320.7 |
| Neenah Paper, Inc. | 891.0 |
| Thermal | 413.9 |
| Wausau Paper Corp. | 353.2 |
| Carbonless | 345.9 |
| **Guideline Company Median** | **$1,564.5** |

| Size (LTM EBITDA) | |
| --- | --- |
| International Paper Company | $3,844.0 |
| MeadWestvaco Corporation | 943.0 |
| Domtar Corporation | 753.0 |
| PH Glatfelter Co. | 173.5 |
| Neenah Paper, Inc. | 125.0 |
| Verso Paper Corp. | 97.4 |
| Carbonless | 43.2 |
| Wausau Paper Corp. | 41.0 |
| Thermal | 33.8 |
| **Guideline Company Median** | **$149.2** |

| Growth (3-Year Revenue CAGR) | |
| --- | --- |
| Neenah Paper, Inc. | 9.4% |
| PH Glatfelter Co. | 4.3% |
| International Paper Company | 4.2% |
| Thermal | 4.0% |
| MeadWestvaco Corporation | 2.7% |
| Wausau Paper Corp. | 1.9% |
| Domtar Corporation | -0.4% |
| Carbonless | -9.1% |
| Verso Paper Corp. | -9.2% |
| **Guideline Company Median** | **3.3%** |

| Growth (1-Year Revenue) | |
| --- | --- |
| Neenah Paper, Inc. | 7.4% |
| PH Glatfelter Co. | 6.4% |
| MeadWestvaco Corporation | 4.4% |
| Domtar Corporation | 3.8% |
| Wausau Paper Corp. | 1.8% |
| International Paper Company | 0.2% |
| Carbonless | -1.6% |
| Thermal | -1.8% |
| Verso Paper Corp. | -6.5% |
| **Guideline Company Median** | **2.8%** |

| Growth (3-Year EBITDA CAGR) | |
| --- | --- |
| Neenah Paper, Inc. | 13.1% |
| MeadWestvaco Corporation | 7.8% |
| PH Glatfelter Co. | 5.2% |
| International Paper Company | 1.0% |
| Thermal | 0.5% |
| Carbonless | -4.8% |
| Domtar Corporation | -12.4% |
| Verso Paper Corp. | -20.7% |
| Wausau Paper Corp. | -28.8% |
| **Guideline Company Median** | **0.8%** |

| Growth (1-Year EBITDA) | |
| --- | --- |
| Domtar Corporation | 32.4% |
| MeadWestvaco Corporation | 31.3% |
| PH Glatfelter Co. | 16.0% |
| Neenah Paper, Inc. | 13.2% |
| International Paper Company | 5.8% |
| Carbonless | -15.9% |
| Thermal | -20.5% |
| Verso Paper Corp. | -36.9% |
| Wausau Paper Corp. | -58.9% |
| **Guideline Company Median** | **9.5%** |

| Growth (Projected EBITDA Growth) | |
| --- | --- |
| Wausau Paper Corp. | 52.2% |
| PH Glatfelter Co. | 20.4% |
| International Paper Company | 10.6% |
| MeadWestvaco Corporation | 9.7% |
| Neenah Paper, Inc. | 7.1% |
| Domtar Corporation | 3.4% |
| Carbonless | -0.1% |
| Thermal | -2.3% |
| Verso Paper Corp. | n/m |
| **Guideline Company Median** | **9.7%** |

| Profitability (LTM EBITDA Margin) | |
| --- | --- |
| MeadWestvaco Corporation | 16.9% |
| Neenah Paper, Inc. | 14.0% |
| Domtar Corporation | 13.6% |
| International Paper Company | 13.2% |
| Carbonless | 12.5% |
| Wausau Paper Corp. | 11.6% |
| PH Glatfelter Co. | 9.6% |
| Thermal | 8.2% |
| Verso Paper Corp. | 7.4% |
| **Guideline Company Median** | **12.4%** |

Source: Capital IQ, Inc. and Carbonless financials.



Valuation & Financial Opinions



## A.   EXHIBITS

**Exhibit F - Selected Financial Information - Thermal & Carbonless**

*U.S. Dollars in Millions*

| | Neenah Paper, Inc. | International Paper Company | MeadWestvaco Corporation | Wausau Paper Corp. | Domtar Corporation | PH Glatfelter Co. | Verso Paper Corp. | Median | Paperweight Development Corp. |
|---|---|---|---|---|---|---|---|---|---|
| **Size ($ Millions)** | | | | | | | | | |
| Sales | $ 891.0 | $ 29,119.0 | $ 5,567.0 | $ 353.2 | $ 5,543.0 | $ 1,808.3 | $ 1,320.7 | $ 1,808.3 | $ 802.9 |
| Assets | 674.2 | 29,403.0 | 9,704.0 | 463.2 | 6,192.0 | 1,596.7 | 1,019.7 | 1,596.7 | 461.5 |
| EBITDA | 125.0 | 3,844.0 | 943.0 | 41.0 | 753.0 | 173.5 | 97.4 | 173.5 | 89.5 |
| Enterprise Value | 1,165.3 | 32,896.0 | 10,200.4 | 735.3 | 3,834.0 | 1,454.6 | 1,518.0 | 1,518.0 | n/a |
| **Growth** | | | | | | | | | |
| Sales 3-year CAGR | 9.4% | 4.2% | 2.7% | 1.9% | -0.4% | 4.3% | -9.2% | 2.7% | -2.3% |
| Sales LFY Growth Rate | 7.4% | 0.2% | 4.4% | 1.8% | 3.8% | 6.4% | -6.5% | 3.8% | -0.7% |
| EBITDA 3-year CAGR | 13.1% | 1.0% | 7.8% | -28.8% | -12.4% | 5.2% | -20.7% | 1.0% | -2.0% |
| EBITDA LFY Growth Rate | 13.2% | 5.8% | 31.3% | -58.9% | 32.4% | 16.0% | -36.9% | 13.2% | -21.1% |
| Projected EBITDA Growth | 7.1% | 10.6% | 9.7% | 52.2% | 3.4% | 20.4% | n/m | 10.2% | -7.8% |
| **Activity** | | | | | | | | | |
| Inventory Turnover | 6.6 | 8.5 | 6.1 | 7.1 | 6.1 | 6.4 | 8.9 | 6.6 | 6.2 |
| Asset Turnover | 1.3 | 1.0 | 0.6 | 0.8 | 0.9 | 1.1 | 1.3 | 1.0 | 1.7 |
| **Liquidity and Working Capital** | | | | | | | | | |
| Current Ratio | 2.7 | 1.7 | 1.9 | 1.0 | 1.8 | 2.2 | 1.0 | 1.8 | 1.3 |
| Net Working Capital / Sales | 16.8% | 7.8% | 11.7% | -1.0% | 14.0% | 13.9% | 2.8% | 11.7% | 4.6% |
| Days in Accounts Receivable | 44.1 | 38.3 | 51.4 | 28.2 | 43.7 | 39.4 | 26.6 | 39.4 | 26.6 |
| + Days in Inventories | 55.6 | 43.1 | 60.0 | 51.7 | 59.7 | 57.5 | 40.9 | 55.6 | 58.7 |
| - Days in Accounts Payable | 25.2 | 45.2 | 45.6 | 34.0 | 58.8 | 29.8 | 28.0 | 34.0 | (42.4) |
| Net Trade Cycle | 74.5 | 36.1 | 65.8 | 46.0 | 44.6 | 67.1 | 39.5 | 46.0 | 42.9 |
| **Leverage and Coverage** | | | | | | | | | |
| Liabilities / Equity | 1.3 | 3.2 | 1.6 | 2.1 | 1.1 | 1.3 | n/m | 1.5 | n/m |
| Debt / (Debt + Equity) | 38.9% | 62.8% | 45.0% | 53.6% | 31.9% | 37.3% | 176.6% | 45.0% | n/m |
| Assets / Equity | 2.3 | 4.2 | 2.6 | 3.1 | 2.1 | 2.3 | n/m | 2.5 | (1.2) |
| EBIT / Interest Expense | 8.4 | 3.7 | 2.8 | 0.0 | 3.7 | 5.3 | (0.0) | 3.7 | 1.2 |
| Total Debt / EBITDA | 1.5 | 3.1 | 3.2 | 4.2 | 1.8 | 2.4 | 13.8 | 3.1 | 6.5 |
| Debt / EV | 16.0% | 35.8% | 29.4% | 23.3% | 35.9% | 28.2% | 88.7% | 29.4% | n/a |
| **Profitability** | | | | | | | | | |
| Gross Profit Margin | 19.7% | 27.4% | 21.0% | 14.2% | 20.7% | 12.9% | 12.7% | 19.7% | 28.8% |
| EBITDA Margin | 14.0% | 13.2% | 16.9% | 11.6% | 13.6% | 9.6% | 7.4% | 13.2% | 11.1% |
| EBIT Margin | 10.7% | 8.3% | 10.1% | 0.0% | 6.5% | 5.6% | -0.2% | 6.5% | 7.5% |
| Net Profit Margin | 5.6% | 3.8% | 4.4% | -1.6% | 2.8% | 2.8% | -6.5% | 2.8% | 0.8% |
| Return on Assets | 7.5% | 3.7% | 2.5% | -1.2% | 2.5% | 3.1% | -8.5% | 2.5% | 1.3% |
| Return on Equity | 17.2% | 15.7% | 6.7% | -3.8% | 5.3% | 7.2% | 14.8% | 7.2% | n/m |
| **Other** | | | | | | | | | |
| Depreciation / Sales | 3.4% | 4.9% | 6.8% | 11.6% | 7.1% | 4.0% | 7.6% | 6.8% | 3.7% |
| Net Cap. Ex. / Sales | 2.6% | 4.8% | 6.9% | 5.9% | 4.0% | 3.5% | 3.6% | 4.0% | 3.0% |

Source: Capital IQ, Inc.



Valuation & Financial Opinions

SRR | STOUT | RISIUS | ROSS

## A. EXHIBITS

**Exhibit G - Interest-Bearing Debt**

*As of December 31, 2014*

|  | Face Value | Interest Rate |
|---|---|---|
| First Lien Notes | $ 328,157 | 5.75% |
| Revolver-Appleton | 6,450 | 4.75% |
| State of Ohio Loan | 4,488 | 6.00% |
| Second Lien Notes | 246,701 | 9.00% |
| Industrial Revenue Bonds - Part 2 | 6,000 | 0.30% |
| Columbia County, Wisconsin Forgivable Note | 300 | 0.00% |
| **Total ($) / Weighted Average (%)** | **$ 592,096** | **7.04%** |





Valuation & Financial Opinions

## A.  EXHIBITS

**Exhibit H - Synthetic Equity Dilution**

*In Thousands of U.S. Dollars, except Per Share Values*

Long-Term Incentive Plan

| Grant Date | Number of Instruments (Thousands) | Fair Market Value Per Share | Exercise Price | Dilution Per Unit | Pre-Tax Dilution | After-Tax Dilution @ 38.5% |
|---|---|---|---|---|---|---|
| 7/1/2005 | 138.000 | $ 11.00 | $ 27.77 | $ 0 | $ 0 | $ 0 |
| 1/1/2006 | 140.200 | 11.00 | 28.56 | 0 | 0 | 0 |
| 1/1/2007 | 163.000 | 11.00 | 33.62 | 0 | 0 | 0 |
| 1/1/2008 | 199.500 | 11.00 | 33.41 | 0 | 0 | 0 |
| 1/1/2009 | 310.000 | 11.00 | 21.43 | 0 | 0 | 0 |
| 7/1/2009 | 14.000 | 11.00 | 18.87 | 0 | 0 | 0 |
| 1/2/2011 | 409.000 | 11.00 | 12.84 | 0 | 0 | 0 |
| 1/1/2012 | 245.500 | 11.00 | 15.01 | 0 | 0 | 0 |
| 8/13/2012 | 2.000 | 11.00 | 16.45 | 0 | 0 | 0 |
| 1/1/2013 | 186.100 | 11.00 | 17.55 | 0 | 0 | 0 |
| 9/24/2013 | 5.000 | 11.00 | 17.85 | 0 | 0 | 0 |
| 1/1/2014 | 210.650 | 11.00 | 16.25 | 0 | 0 | 0 |
| 7/1/2014 | 28.000 | 11.00 | 16.30 | 0 | 0 | 0 |
| Total | 2,050.950 | | | | $ 0 | $ 0 |

Canadian SARs Plan

| Grant Date | Number of Instruments (Thousands) | Fair Market Value Per Share | Exercise Price | Dilution Per Unit | Pre-Tax Dilution | After-Tax Dilution @ 38.5% |
|---|---|---|---|---|---|---|
| 1/1/2005 | 0.200 | $ 11.00 | $ 26.36 | $ 0 | $ 0 | $ 0 |
| 1/1/2006 | 0.300 | 11.00 | 28.56 | 0 | 0 | 0 |
| Total | 0.500 | | | | $ 0 | $ 0 |

|  |  |
|---|---|
| Total (Rounded) | $ 0 |



Valuation & Financial Opinions



## A.  EXHIBITS

### Exhibit I - Analysis of Historical Working Capital

| In Thousands of U.S. Dollars | As of | | | | |
|---|---|---|---|---|---|
| | 12/31/2010 | 12/31/2011 | 12/31/2012 | 12/31/2013 | 10/31/2014 |
| Accounts Receivable | $ 93,374 | $ 90,339 | $ 92,680 | $ 75,928 | $ 58,534 |
| Inventories | 110,032 | 102,527 | 94,349 | 92,313 | 91,975 |
| Other Current Assets | 21,412 | 8,724 | 5,620 | 6,078 | 3,629 |
| **Total Cash-Free Current Assets** | **224,818** | **201,590** | **192,649** | **174,319** | **154,138** |
| Accounts Payable | 48,651 | 51,766 | 68,600 | 61,454 | 66,451 |
| Accrued Expenses [a] | 45,502 | 48,055 | 57,102 | 44,722 | 50,472 |
| **Total Debt-Free Current Liabilities** | **94,153** | **99,821** | **125,702** | **106,176** | **116,923** |
| **Net Working Capital** | **$ 130,665** | **$ 101,769** | **$ 66,947** | **$ 68,143** | **$ 37,215** |
| Net Sales | 849,884 | 857,329 | 849,756 | 807,486 | 802,940 |
| **Net Working Capital / Sales** | **15.4%** | **11.9%** | **7.9%** | **8.4%** | **4.6%** |

[a]  Excludes Environmental Liability



Valuation & Financial Opinions



## A. EXHIBITS

| Select Historical and Projected Metrics | | | | | |
|---|---|---|---|---|---|
| | Paperweight Development Corp. Select Ratios | | | | Guideline Public Company Historical |
| | 5-Year Historical Average | 5-Year Historical Median | 5-Year Projected Average | 5-Year Projected Median | Low | High |
| Return on Assets | 0.2% | 1.3% | n/a | n/a | -5.7% | 5.6% |
| Return on Equity | 3.1% | 15.3% | n/a | n/a | 4.8% | 16.0% |
| EBIT Margin | 7.0% | 7.5% | 12.0% | 12.1% | 1.2% | 9.3% |
| EBITDA Margin | 11.6% | 11.1% | 15.6% | 15.7% | 8.9% | 18.9% |
| Net Capital Expenditures to Sales | 2.5% | 2.1% | 3.9% | 3.9% | 3.0% | 17.7% |
| Unlevered Free Cash Flow to Sales | 6.3% | 7.9% | n/a | n/a | 3.4% | 8.4% |
| | | 5-Year Historical CAGR | 5-Year Projected CAGR | 5-Year Historical Low CAGR | 5-Year Historical High CAGR |
| Revenue Growth Rate | | -1.5% | 4.1% | -20.2% | 9.7% |
| Adjusted EBITDA Growth Rate | | -3.3% | 15.7% | -24.0% | 13.8% |

■ We were not provided with projected balance sheets and cash flow statements. Accordingly, we could not calculate the Company's projected return on assets, return on equity, or unlevered free cash flow to sales ratios. These ratios have historically been within the range of the guideline companies.

■ The Company's historical EBIT and EBITDA margins are within the range of the guideline companies. The Company's profit margins are projected to increase as Encapsys, which generates higher margins relative to the Company as a whole, is projected to contribute a larger proportion of total net sales.

■ The Company's historical ratio of net capital expenditures to sales is below the low end of the range of the guideline companies. However, the Company's level of capital expenditures is projected to increase to support projected Encapsys growth, compliance with new regulations regarding emissions limits for industrial boilers, and maintenance requirements.

■ The Company's historical revenue and adjusted EBITDA growth rates are within the ranges of the guideline companies. The Company's revenue and adjusted EBITDA growth rates are projected to increase due primarily to the projected growth of Encapsys.



Valuation & Financial Opinions



# Appendix B

## Guideline Company Descriptions

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1194 of 1527    Document 1-2

APPVION

Valuation & Financial Opinions



# B.  GUIDELINE COMPANY DESCRIPTIONS

## International Paper Company

International Paper Company ("IP") is a global forest products, paper and packaging company that is complemented by an extensive distribution system. IP operates 26 pulp, paper and packaging mills, 88 converting and packaging plants, 25 wood products facilities, and seven specialty chemical plants.

## MeadWestvaco Corporation

MeadWestvaco Corporation ("MWV") was formed as a result of the merger of the Mead Corporation and Westvaco Corporation in January 2002. As a combined entity, MWV's principal business segments include: (1) packaging products; (2) coated and specialty papers; (3) consumer and office products; and (4) specialty chemicals. MWV has operations in 29 countries and serves customers in approximately 100 nations.

## Neenah Paper, Inc.

Neenah Paper, Inc. ("NP") engages in the manufacture and distribution of premium and specialty paper grades, as well as bleached kraft pulp in North America and Europe. The company has three primary operations: (1) the fine paper business; (2) the technical paper business; and (3) the pulp business. Neenah Paper was incorporated in 2004 and is headquartered in Alpharetta, Georgia.

## Wausau Paper Company

Wausau Paper Company ("WPP") manufacturers, converts, and sells paper and paper products. WPP's principal office is located in Mosinee, Wisconsin, with an additional ten facilities in six states. The company is organized into three operating groups: the specialty paper group; the printing and writing group; and the towel and tissue group.

## Domtar Inc.

Domtar, Inc. ("UFS") manufactures and markets uncoated freesheet paper in North America. It operates through four segments: (1) Paper; (2) Paper Merchants; (3) Wood; and (4) Packaging. The Paper segment manufactures and distributes business commercial printing and publication, and technical and specialty papers, as well as pulp. The Paper Merchants segment engages in the purchase, warehousing, sale, and distribution of various products manufactured by the company and other manufacturers. The Wood segment involves in the manufacture and marketing of lumber and wood-based value-added products, as well as in the management of forest resources. The Packaging segment produces corrugated boxes and containers and specialty products.





Valuation & Financial Opinions

## B.   GUIDELINE COMPANY DESCRIPTIONS

### P.H. Glatfelter Company

P.H. Glatfelter Company ("P.H. Glatfelter"), together with its subsidiaries, manufactures specialty papers and engineered products. P.H. Glatfelter provides papers for trade book publishing, carbonless products, tea bags and coffee filters, specialized envelopes, playing cards, pressure-sensitive postage stamps, metallized papers for labels and packaging, and digital imaging applications. P.H. Glatfelter's products include wet laid non-woven products, such as double-sided adhesive tape substrates and battery grid pasting tissue. P.H. Glatfelter serves customers in various markets, including book publishing, carbonless and forms, envelope and converting, engineered products, food and beverage, composite laminates, and other technical niche markets.

### Verso Paper Corporation

Verso Paper Corp. ("Verso") manufactures and supplies coated papers to catalog and magazine publishers. Verso was founded in 2006 and is based in Memphis, Tennessee.



Appendix C

**Control Premium**



# C.    CONTROL PREMIUM

## Control Premium

The value of a fractional interest in a company may be equal to, more than, or less than a pro rata share of the value of the entire company. That is, certain valuation approaches provide indications of value on a controlling ownership basis, and other approaches provide indications of value on a minority ownership interest basis. The analyst must reconcile these differing value indications to arrive at an indication of value consistent with the purpose and objective of the assignment. The adjustment from a minority ownership interest basis to a controlling ownership interest basis is typically made by applying a premium for control.

In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

With respect to the DCF Method, the indication of value can reflect a minority or a controlling ownership interest, depending on a number of factors. In our analysis, we used a capital structure based on industry averages and Appvion's long-term capital structure in estimating the WACC. In addition, based on our discussions with Appvion's management and our review of Appvion's financial projections, the forecasted results reflect optimal financial performance that a hypothetical financial buyer could not affect materially. Furthermore, the selected exit EBITDA multiple applied in the DCF method incorporates a control premium. Therefore, the indication of value from the DCF Method in our analysis represents a controlling ownership interest value.

Control rights are one of the most important variables affecting the value of a company. The appropriate premium for control depends on the controlling shareholders' ability to exercise any or all of the various rights typically associated with control. As a result, the value of a minority ownership interest investment in a company is not necessarily a pro rata percentage of the value of the entire enterprise, and vice versa. One of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in our selection of the appropriate control premium.

The most objective and established evidence of control premiums is the study of cash tender offers. By looking at premiums offered during a tender for control of a company with publicly held shares, we can approximate the difference between a controlling and minority ownership interest value.



Valuation & Financial Opinions



# C. CONTROL PREMIUM

A control premium can be inferred by observing control premiums paid in acquisitions of publicly traded companies. *Mergerstat Review 2014* tracks publicly announced formal transfers of ownership of at least 10% of a company's equity. According to these annual studies, the premium paid for controlling interests relative to noncontrolling interests in publicly traded companies ranged from 23.1% to 41.1% over the past 20 years, with a median premium of 33.0%. The results of these studies are summarized in the table below.

| Percent Premium Paid Over Market Price | | | | | |
| --- | --- | --- | --- | --- | --- |
| Year | Number of Transactions | Median Premium Paid | Year | Number of Transactions | Median Premium Paid |
| 1994 | 260 | 35.0% | 2004 | 322 | 23.4% |
| 1995 | 324 | 29.2% | 2005 | 392 | 24.1% |
| 1996 | 381 | 27.3% | 2006 | 454 | 23.1% |
| 1997 | 487 | 27.5% | 2007 | 491 | 24.7% |
| 1998 | 512 | 30.1% | 2008 | 294 | 36.5% |
| 1999 | 723 | 34.6% | 2009 | 239 | 39.8% |
| 2000 | 574 | 41.1% | 2010 | 348 | 34.6% |
| 2001 | 439 | 40.5% | 2011 | 321 | 37.8% |
| 2002 | 326 | 34.4% | 2012 | 323 | 37.1% |
| 2003 | 371 | 31.6% | 2013 | 257 | 29.7% |
| | | | **20-Year Median Control Premium** | | **33.0%** |

Source: Factset Mergerstat LLC, *Mergerstat Review 2014*.

In addition, we searched for control premiums paid in transactions within Appvion's industry. According to *Mergerstat Review 2014*, there was one transaction in the paper industry with an average control premium of 341.0% in 2009, one transaction with a control premium of 7.9% in 2010, four transactions with an average control premium of 80.6% in 2011, zero transactions in 2012, and three transactions with an average control premium of 29.4% in 2013.

**Applicability to the Subject Company**

There is one important factor to consider when applying the data above to the Company. The transactions of the interests in the companies discussed above represent both financial and strategic acquisitions. Often, strategic acquisitions include a premium for such items as economies of scale, the reduction in competition, increased purchasing power, etc. Fair Market Value, however, represents a hypothetical buyer, not a specific strategic buyer. Accordingly, the control premium that would apply to an interest in Appvion would be lower than that indicated by the study.

Based on the facts and circumstances related specifically to our valuation of the Appvion equity, we applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of Appvion.



- 101 -



Valuation & Financial Opinions

# Appendix D

## Assumptions and Limiting Conditions

APPVION

Valuation & Financial Opinions



# D. ASSUMPTIONS AND LIMITING CONDITIONS

This valuation report is subject to the following assumptions and limiting conditions:

- In performing our analysis, we used various financial and other information provided to us by management or obtained from other private and public sources, and relied on the accuracy and completeness of this information. We have not been engaged to compile, review, or examine such information in accordance with standards established by the American Institute of Certified Public Accountants. Accordingly, we do not express an opinion or any other form of assurance thereon. Furthermore, we take no responsibility for the achievability of any expected, forecasted, projected, or hypothetical results anticipated or assumed by the management of the Company.

- For the purpose of this engagement and report, we have made no investigation of, and assume no responsibility for, the titles to, or liabilities against, the assets or equity of the Company, including, but not limited to, any contingent or environmental liabilities.

- Our conclusion of value assumes the assets and liabilities presented in the Company's October 31, 2014 balance sheet were intact as of that date and that the projected December 31, 2014 balance sheet will not be materially different than on the Valuation Date. Any change in the level of assets or liabilities could cause a change in the value we estimated. Furthermore, we assume there are no hidden or unexpected conditions that would adversely affect the value we estimated.

- Our conclusion of value is applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.

- Our services, this report, and the opinions expressed herein are provided exclusively for the use of the Trustee for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.

- The opinions expressed herein are not intended to be investment advice and should in no way be construed as such. Furthermore, this report does not constitute a "fairness opinion" regarding any contemplated present or future transaction.

- None of our employees who worked on this engagement have any known financial interest in the assets or equity of the Company or the outcome of this valuation. Further, our compensation is neither based nor contingent on the results of our analysis.

- Stout Risius Ross, Inc. is not required to give testimony in court, or be in attendance during any hearings or depositions, unless previous arrangements have been made. We are committed to supporting the valuation report provided compensation arrangements for such additional services have been made.

- This valuation contemplates facts and conditions that are known or knowable as of the Valuation Date. Events and conditions occurring after the Valuation Date have not been considered, and Stout Risius Ross, Inc. has no obligation to update our report for such events and conditions.

- By accepting this report, the client acknowledges the terms and indemnity provisions provided in the executed engagement letter and the assumptions and limiting conditions contained herein.





Valuation & Financial Opinions

# Appendix E

## Statement of Qualifications



Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 1202 of 1527   Document 172

Valuation & Financial Opinions



# E.  STATEMENT OF QUALIFICATIONS

## Scott D. Levine, CPA / ABV, CFA

Scott D. Levine is a Managing Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. Over the last twenty years, he has had extensive experience in the valuation of business interests in both private and public corporations. Mr. Levine has performed valuation analyses in a broad range of industries and for numerous purposes including fairness and solvency opinions, estate and gift taxation, shareholder disputes, purchase price allocation, mergers and acquisitions, marital dissolutions and liability and damages analysis. He has a particular expertise in the valuation of business ownership interests in employee stock ownership plan (ESOP) related analyses, including ESOP security formation, transaction analysis, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. Levine has served are biotechnology, computer services, construction, engineering, entertainment, financial services, government contracting, healthcare, manufacturing, medical practices, telecommunications and wholesale distribution.

Mr. Levine has presented on many different topics in the field of business valuation to the following organizations: the American Society of Appraisers; the National Center for Employee Ownership; the ESOP Association; and the Association for Corporate Growth. He has also authored many articles related to the valuation of closely held companies. In addition, Mr. Levine has testified as an expert witness in state courts, arbitration and deposition.

Prior to joining SRR, Mr. Levine was a principal with a national valuation firm specializing in the valuation of closely held companies. During his tenure, he was responsible for business development and management of business valuation assignments as well as hiring and supervising staff. Prior to that, Mr. Levine was a CPA with Price Waterhouse in their audit group and was responsible for conducting audits for both privately held and publicly traded companies.

Mr. Levine is a member of the CFA Institute, the American Institute of Certified Public Accountants and the ESOP Association.



Valuation & Financial Opinions



# E.   STATEMENT OF QUALIFICATIONS

## Aziz El-Tahch, CFA

Aziz El-Tahch is a Managing Director in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. He has experience in the valuation of securities, intangible assets, and business interests for numerous purposes, including fairness and solvency opinions, mergers and acquisitions, corporate strategic planning, stock options and warrants, purchase price allocation, goodwill impairment testing, estate and gift taxation, shareholder disputes, and liability and damages analysis. He has extensive experience in the valuation of business ownership interests in Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security formation and transactions, determination of transaction fairness and adequate consideration and annual employer security valuation updates.

Among the many industries that Mr. El-Tahch has served are advertising, aerospace, agriculture, apparel, cable television, commercial printers, construction, engineering, financial services, furniture, government and defense contracting, healthcare, industrial machinery, insurance, internet retailing, metals, paper, packaging, pharmaceuticals, oil and gas services, paint, petroleum refining, restaurant, specialty chemicals, telecommunications and wholesale distribution, trucking, among others. Mr. El-Tahch has presented at numerous conferences and seminars on the subjects of valuation and transaction advisory services. He has also published articles on the use of ESOPs  to facilitate business transitions and the valuation of intangible property in the context of transfer pricing analyses.

Prior to joining SRR, Mr. El-Tahch was a Senior Investment Analyst at a New York-based alternative assets investment fund with approximately $500 million under management. At the fund, Mr. El-Tahch focused on credit card debt securitizations, collateralized debt obligation (CDO) and collateralized loan obligation (CLO) securities, and second-lien and mezzanine loans to middle-market companies. Among the industries that Mr. El-Tahch served are the regional banking and healthcare industries.

Mr. El-Tahch graduated *magna cum laude, Phi Beta Kappa* from Georgetown University's Edmund A. Walsh School of Foreign Service with a concentration in Economics. Mr. El-Tahch is a member of the CFA Institute, the New York Society of Security Analysts, the Association for Corporate Growth, the National Center for Employee Ownership, and the ESOP Association, where he serves as an Officer on the Executive Committee of the New York / New Jersey Chapter.





Valuation & Financial Opinions

# E.   STATEMENT OF QUALIFICATIONS

## Isaiah Aguilar, CFA

Isaiah Aguilar is a Senior Vice President in the Valuation & Financial Opinions Group. His concentration is in ESOP and ERISA Advisory Services. He has had experience in the valuation of business interests in both private and public corporations. Mr. Aguilar has performed valuation analyses in a broad range of industries and for numerous purposes, including fairness and solvency opinions, estate and gift taxation, shareholder disputes, and liability and damages analysis. He has had particularly strong experience in the valuation of business ownership interests in Employee Stock Ownership Plans (ESOPs), and has performed analyses related to ESOP security formation and transactions, determination of transaction fairness and adequate consideration, and annual employer security valuation updates.

Among the many industries that Mr. Aguilar has served are agriculture, commercial printers, construction, engineering, financial services, forest and paper products, government contracting, healthcare, information technology, paint, petroleum refining and specialty chemicals, among others.

Mr. Aguilar earned an MA in Applied Economics and a BA in International Studies from The Johns Hopkins University in Baltimore, Maryland. Mr. Aguilar is a member of the CFA Institute and the ESOP Association. Mr. Aguilar has earned the right to use the Chartered Financial Analyst designation.

 APPVION

Valuation & Financial Opinions

 SRR STOUT | RISIUS | ROSS

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **Oldapco, Inc.** | ) | **Case No. 17-12082 (MFW)** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

## ORDER OF REASSIGNMENT OF JUDGE

**AND NOW, this** 11th day of April, 2019, **it is hereby ORDERED** that the above

Chapter 11 case (and all associated cases) is **TRANSFERRED** to the **Honorable Mary F.**

**Walrath** for all further proceedings and dispositions.[1]

_____
Christopher S. Sontchi
Chief Judge

---

[1] When filing papers, please include the initials of the Judge assigned to the case.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 65, 66, 67, 68, 69, 70, 71** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

<u>NOTICE OF CANCELLATION</u>

Pursuant to the Court's email to Plaintiff's counsel, dated April 2, 2019, the Pretrial Conference scheduled for April 23, 2019 has been removed from the Court's calendar, and will be rescheduled by the Court for a later date to be determined.

Dated: April 15, 2019

1

**GRANT & EISENHOFER P.A.**

By: */s/* Vivek Upadhya
Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com

and

Gordon Z. Novod (*pro hac* admission pending)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene
I. Davis, as Co-Trustees of the Appvion
Liquidating Trust*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br><br>OLDAPCO, INC., *ET AL.,*<br><br>DEBTORS. | CHAPTER 11<br><br>CASE NO. 17-12082 (MFW)<br><br>**(JOINTLY ADMINISTERED)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,<br><br>PLAINTIFF,<br><br>V.<br><br>MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40,<br><br>DEFENDANTS. | ADV. PROC. NO. 18-50955 (MFW)<br><br>**RELATED DOCKET NOS. 65, 66, 67, 68, 69, 70** |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

<div align="right">

**Page**

</div>

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT AND SUMMARY OF FACTUAL ALLEGATIONS ............... 1

I.   OVERVIEW OF ACTION ......................................................................... 1

II.  SUMMARY OF THE FACTUAL ALLEGATIONS CONTAINED IN THE FAC ............. 3

III. SUMMARY OF CLAIMS ALLEGED IN THE FAC ...................................... 6

ARGUMENT ...................................................................................................... 6

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE CLAIMS
ASSERTED IN THE FAC ......................................................................... 6

    A.  LEGAL STANDARD ..................................................................... 7

    B.  RECOVERIES FROM THIS LITIGATION WILL DIRECTLY IMPACT CREDITOR RECOVERIES
UNDER THE PLAN ........................................................................... 9

    C.  THE DEFENSES ASSERTED BY STOUT AND ARGENT WILL REQUIRE THIS COURT TO
INTERPRET THE PLAN ..................................................................... 9

    D.  THIS COURT MAY BE REQUIRED TO RESOLVE DISCOVERY DISPUTES REGARDING THE
SCOPE OF PRIVILEGES TRANSFERRED TO THE LITIGATION TRUST, AND PRIVILEGES
TRANSFERRED TO APPVION HOLDING CORP. UNDER THE ASSET PURCHASE
AGREEMENT ("APA") ................................................................. 10

    E.  THE FAC MAY REQUIRE THIS COURT TO DETERMINE WHETHER PROOFS OF CLAIM
FILED BY CERTAIN DEFENDANTS ARE ALLOWABLE .................... 11

II.  THE FAC'S CAUSES OF ACTION WERE PRESERVED IN THE PLAN ............ 12

    A.  ERISA-SPECIFIC DEFINITIONS DO NOT APPLY TO TEXTUAL ANALYSIS OF A
BANKRUPTCY PLAN OF LIQUIDATION .......................................... 12

    B.  THE CLAIMS ASSERTED IN THE FAC RELATE TO THE ESOP, BUT DO NOT INVOLVE
RIGHTS AND OBLIGATIONS UNDER ERISA ................................. 13

III. ERISA DOES NOT PREEMPT ANY OF THE CLAIMS ASSERTED IN THE FAC ....... 13

    A.  ERISA DOES NOT AND CANNOT PREEMPT THE TRADITIONAL FIDUCIARY DUTIES
OWED BY THE D&OS TO THE DEBTORS AND THEIR STAKEHOLDERS UNDER STATE
LAW .............................................................................................. 13

        1.  Federal Preemption ...................................................... 14

        2.  ERISA Preemption .......................................................... 16

            (a)  ERISA Section 502(a)'s Express/Complete Preemption ................ 18

                (i)  *Shore* Found Preemption Because the Plaintiff Sued to Enforce a
Benefit Due Under the ERISA Plan and Because the ERISA Plan
Created the Legal Duty At Issue ............................................. 19

<div align="center">

i

</div>

(ii)    *Pascack* Did Not Find Preemption Because the Plaintiff Did Not Have ERISA Standing and the Claims Existed Outside of the ERISA Plan ..................................................................................... 20

(b)    ERISA Section 514(a)'s Conflict Preemption ................................. 21

B.    ERISA SECTION 502(A) DOES NOT APPLY TO ANY OF THE CLAIMS IN THE FAC........ 23

1.    The First *Pascack* Prong*:* ERISA Does Not Preempt the FAC's Claims Because The Appvion Liquidating Trust Neither Has Nor Asserts Any Claims Under ERISA ................................................................................................ 24

2.    The Second *Pascack* Prong*:* The FAC's Claims Involve Corporate Fiduciary Duties, Which Are Separate and Distinct from ERISA Fiduciary Duties .............. 26

3.    Overlapping Service of Certain Officer/Employee Defendants between Their Service as Employees of the Debtors and as Members of the ESOP Committee Does Not Mandate Preemption ................................................................ 27

4.    The FAC Does Not Allege Any ERISA Claims Against Stout .............................. 28

C.    THE CLAIMS ASSERTED IN THE FAC DO NOT INTERFERE WITH THE PURPOSE OF ERISA SECTION 514(A) ................................................................................... 29

1.    ERISA Section 514(a) Does Not Preempt the Claims Against the D&Os ............. 30

2.    ERISA Section 514(a) Does Not Preempt the Claims Against Argent and Stout ... 32

IV.    STOUT IS SUBJECT TO PERSONAL JURISDICTION IN THIS COURT .................... 33

A.    IT IS WELL-SETTLED THAT BANKRUPTCY RULE 7004(D) AUTHORIZES NATIONWIDE SERVICE OF PROCESS ....................................................................................... 34

B.    STOUT HAS SUFFICIENT MINIMUM CONTACTS WITH THE UNITED STATES TO BE SUBJECT TO PERSONAL JURISDICTION UNDER THE BANKRUPTCY RULES ..................... 35

C.    STOUT ALSO HAS SUFFICIENT MINIMUM CONTACTS WITH DELAWARE TO BE SUBJECT TO PERSONAL JURISDICTION WITHIN THIS STATE ........................................... 36

V.    THE FAC ADEQUATELY PLEADS THAT ARGENT AND STOUT AIDED AND ABETTED THE D&OS' BREACHES OF FIDUCIARY DUTY ........................................ 37

A.    LEGAL STANDARD .................................................................................................... 37

B.    THE FAC PLEADS SUFFICIENT FACTS TO INFER THAT ARGENT AND STOUT AIDED AND ABETTED THE D&OS' BREACHES OF FIDUCIARY DUTY ............................................. 39

1.    Argent and Stout Were Fully Aware of the Mismanagement ................................. 39

2.    Argent's and Stout's Own Behavior is Evidence of Scienter .................................. 40

VI.    THE D&O DEFENDANTS ERR BY ARGUING THAT PLAINTIFF FAILS TO PLEAD COUNTS IX, XIV-XVIII WITHOUT PARTICULARITY .................................... 42

VIII.    THE FAC SUFFICIENTLY PLEADS THAT APPVION DID NOT RECEIVE REASONABLY EQUIVALENT VALUE IN EXCHANGE FOR THE ARGENT TRANSFERS .......................................................................................................... 43

IX.    STOUT FALSELY STATES THAT COUNT VI IS PARTIALLY TIME BARRED ........ 44

ii

X.  STOUT ERRS BY ARGUING THAT PLAINTIFF FAILS TO STATE CLAIMS FOR RELIEF IN COUNTS X AND XI ................................................................................ 44

   A.  COUNT X (AVOIDANCE PREFERENCE PURSUANT TO 11 U.S.C. §§ 547, 544(B) AND 550, 6 DEL. C. § 1301 ET SEQ., WISCONSIN STATUTES, CH. 242, ET SEQ.) PROPERLY STATES A CLAIM .................................................................................. 44

   B.  COUNT XI (AVOIDANCE OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(B), 548(A)(1)(B), AS WELL AS UNDER 6 DEL. C. §§ 1301-1311, WISCONSIN STATUTES, CH. 242.01-242.11) ....................................................................................... 45

   C.  COUNT XIII (AVOIDANCE OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(B), 548(A)(1)(B), AS WELL AS UNDER 6 DEL. C. §§ 1301-1311, WISCONSIN STATUTES, CH. 242.01-242.11) ....................................................................................... 46

XI.  THE COURT SHOULD DENY THE D&OS' REQUEST TO TRANSFER VENUE ........ 46

   A.  LEGAL STANDARD ................................................................................................ 47

      1.  This Forum is Appropriate Because the Certain Defendants Themselves Chose It Previously ....................................................................................... 48

      2.  The "First-Filed" Rule Is Inapplicable ...................................................... 49

         (a)  The Wisconsin Action Involves Different Claims and Beneficiaries ............. 49

         (b)  The Wisconsin Action Covers a Different Time Period ................................ 49

      3.  The Overlapping Claim May Be Dismissed In Wisconsin .................................... 50

      4.  The Petition to Transfer Venue is Procedurally Improper ....................................... 50

CONCLUSION ...................................................................................................................... 51

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1212 of 1527    Document 14-2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aetna Health, Inc. v. Davila*,
    542 U.S. 200 (2004)..................................................................................................16

*Anheuser–Busch, Inc. v. Paques*,
    277 B.R. 615 (Bankr. E.D. Pa. 2000) ...............................................................35, 36

*Antioch Co. Litig. Trust v. Morgan*,
    456 B.R. 791 (Bankr. S.D. Ohio 2011)..................................................................27

*Arizona v. U.S.*,
    132 S. Ct. 2492 (2012).............................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................... 42

*AT & T v. Empire Blue Cross/Blue Shield*,
    1994 WL 16057794 (D.N.J. July 19, 1994)......................................................32, 33

*Barry v. Trustees of the Int'l Ass'n Full–Time Salaried Officers and Employees of
    Outside Local Unions*,
    404 F. Supp. 2d 145 (D.D.C. 2005) ......................................................................26

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005)................................................................................................15

*Bellemead Dev. Corp. v. New Jersey State Council of Carpenters Ben. Funds*,
    11 F. Supp. 2d 500 (D.N.J. 1998) .........................................................................23

*Breland v. Liberty Life Assur. Co. of Bos.*,
    2014 WL 5795681 (W.D. Pa. Nov. 6, 2014) ........................................................30

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)....................................................................................37

*Buttonwood Tree Value Partners, L.P., et al., v. R.L. Polk & Co., Inc., et al.*,
    2017 WL 3172722 (Del. Ch. Jul. 24, 2017)......................................................36, 37

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*,
    519 U.S. 316 (1997)................................................................................................22

*Carabillo v. Ullico, Inc.*,
    357 F.Supp.2d 249 (D.D.C. 2004) ........................................................................22

iv

*Carter v. San Pasqual Fiduciary Tr. Co.*,
    2016 WL 6803768 (C.D. Cal. Apr. 18, 2016) ...................................................32, 33

*In re Centaur, LLC*,
    No. 10-10 799 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) .......................................37

*Chamber of Commerce of the U.S. v. Whiting*,
    131 S. Ct. 1968 (2011)..........................................................................15

*Cmty. Commc'ns Co. v. City of Boulder, Colo.*,
    455 U.S. 40 (1982)..............................................................................15

*Cont'l Ins. Co. v. Dawson*,
    273 F. Supp. 3d 688 (N.D. Tex. 2017) ...............................................................32

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000).............................................................................15

*Davis v. Screen Actors Guild, Inc.*,
    2008 WL 11336377 (C.D. Cal. Apr. 17, 2008) .....................................................21

*In re DBSI, Inc.*,
    467 B.R. 309 (Bankr. D. Del. 2012) .............................................................. 34, 35

*De Buono v. NYSA-ILA Med. & Clinical Serv. Fund*,
    520 U.S. 806 (1997).............................................................................16

*Delta Star, Inc. v. Patton*,
    76 F.Supp.2d 617 (W.D. Pa. 1999)...............................................................27, 28

*DiFelice v. Aetna U.S. Healthcare*,
    346 F.3d 442 (3d Cir. 2003)......................................................................18

*Eckelkamp v. Beste*,
    315 F.3d 863 (8th Cir. 2002) ..................................................................27, 28

*Ethridge v. Harbor House Restaurant*,
    861 F.2d 1389 (9th Cir. 1988) ...................................................................21

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).............................................................................15

*Gobeille v. Liberty Mutual Ins. Co.*,
    136 S. Ct. 936 (2016)....................................................................12, 21, 22, 23

*Green v. Fund Asset Mgmt., L.P.*,
    245 F.3d 214 (3d Cir. 2001)......................................................................15

v

*In re Hechinger Inv. Co. of Delaware, Inc.*,
  288 B.R. 398 (Bankr. D. Del. 2003) ....................................................47

*Intellectual Ventures I LLC v. Altera Corp.*,
  842 F. Supp. 2d 744 (D. Del. 2012) ....................................................47

*Kollman v. Hewitt Associates, LLC*,
  487 F.3d 139 (3d Cir. 2007) ...............................................................17

*In re LGI, Inc. Michaels v. World Color Press, Inc.*,
  322 B.R. 95 (Bankr. D. N.J. 2005) .........................................................8

*Menkes v. Prudential Ins. Co. of Am.*,
  762 F.3d 285 (3d Cir. 2014) ...............................................................30

*Metropolitan Life Ins. Co. v. DePalo*,
  2014 WL 4681094 .....................................................................13, 31

*In re Millennium Lab Holdings II, LLC*,
  562 B.R. 614 (Bankr. D. Del. 2016) ..................................................7, 11

*In re MPC Computers, LLC*,
  465 B.R. 384 (Bankr. D. Del. 2012) ......................................................8

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Inc. Co.*,
  514 U.S. 645 (1995).................................................................21, 22, 23

*Nagy v. DeWise*,
  705 F. Supp. 2d 456 (E.D. Pa. 2010) ...............................12, 22, 31, 32

*New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*,
  760 F.3d 297 (3d Cir. 2014).......................................................... *passim*

*In re Nickels Midway Pier, LLC*,
  332 B.R. 262 (Bankr. D.N.J. 2005) .....................................................14

*In re Old BPSUSH, Inc.*,
  589 B.R. 524 (Bankr. D. Del. 2018) .....................................................14

*In re Onco Invest. Co.*,
  320 B.R. 577 (Bankr. D. Del. 2005) .....................................................47

*Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse*,
  879 F.2d 1146 (3d Cir. 1989).................................................................17

*Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*,
  388 F.3d 393 (3d Cir. 2004), *as amended* (Dec. 23, 2004) ............. *passim*

vi

*In re PMTS Liquidating Corp.*,
    452 B.R. 498 (Bankr. D. Del. 2011) ...................................................................6

*Pryzbowski v. U.S. Healthcare, Inc.*,
    245 F.3d 266 (3d Cir. 2001)............................................................................22

*In re Qualteq, Inc.*,
    No. 11-12572 KJC, 2012 WL 527669 (Bankr. D. Del. Feb. 16, 2012).................50

*RCS Creditor Tr. v. Schorsch*,
    2018 WL 1640169 (Del. Ch. Apr. 5, 2018) .......................................................38

*Rescap Liquidating Trust v. Primary Capital Advisors*,
    527 B.R. 865 (S.D.N.Y. 2014)........................................................................7, 9

*Resorts Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l., Inc.)*,
    372 F.3d 154 (3d Cir. 2004)...........................................................................7, 8

*In re Seven Fields Dev. Corp.*,
    505 F.3d 237 (3d Cir. 2007)................................................................................7

*Shore v. Indep. Blue Cross & Indep. Health Grp.*,
    2016 WL 6821944 (E.D. Pa. Nov. 18, 2016) ..........................................19, 20, 24

*Swift Elec. Supply Co. v. Twp. of Lakewood*,
    168 F. Supp. 2d 298 (D.N.J. 2001) ..................................................................23

*In re Syntax-Brillian Corp.*,
    573 F. App'x 154 (3d Cir. 2014) ......................................................................38

*In re Tandycrafts, Inc.*,
    317 B.R. 287 (Bankr. D. Del. 2004) .................................................................35

*Trustco Bank v. Automated Transactions LLC*,
    933 F. Supp. 2d 668 (D. Del. 2013)..................................................................47

*In re Uni-Marts, LLC*,
    404 B.R. 767 (Bankr. D. Del. 2009) .................................................................34

*In re Valley Media, Inc.*,
    288 B.R. 189 (Bankr. D. Del. 2003) .................................................................43

*Weisenberger v. BT Americas, Inc.*,
    2010 WL 1133473 (D.N.J. Mar. 22, 2010)...................................................23, 29

**Statutes**

6 DEL. C. §§ 1301-1311.....................................................................42, 44, 45, 46

6 Del. C. § 1305(b) ...................................................................................................42

6 Del. C. § 1301(7)(b) ...............................................................................................42

11 U.S.C. § 502(d) ....................................................................................................11

11 U.S.C. § 541 .........................................................................................................24

11 U.S.C. § 544 ...........................................................................................................6

11 U.S.C. § 544(b) .......................................................................................6, 44, 45, 46

11 U.S.C. § 547 .........................................................................................................44

11 U.S.C. § 547(b) .....................................................................................................44

11 U.S.C. § 547(c)(2) .................................................................................................44

11 U.S.C. §548(a)(1)(B) ..................................................................6, 36, 45, 46

11 U.S.C. § 550 ...............................................................................6, 36, 44

11 U.S.C. §§ 1101-1174 ....................................................................8, 47, 48

28 U.S.C. § 1334(b) ...........................................................................6, 7

28 U.S.C. § 1404 .......................................................................................................50

28 U.S.C. § 1404(a) ...................................................................................................50

28 U.S.C. § 1412 ..............................................................................46, 50

28 U.S.C. §§ 2071-2077 ............................................................................................34

29 U.S.C. § 1132 .............................................................................................. *passim*

29 U.S.C. § 1132(a)(1) ...............................................................................................16

29 U.S.C. § 1132(a)(2)-(11) .......................................................................................16

29 U.S.C. § 1144(a) .......................................................................................... *passim*

Wis. Stat. § 242 ...............................................................................42, 44

Wis. Stat. §§ 242.01-242.11 ..............................................................45, 46

Wis. Stat. § 242.01(7)(b) ...........................................................................................42

Wis. Stat. § 242.05(2) ................................................................................................42

**Other Authorities**

U.S. Const. Art. VI, § 2.................................................................................14

FED. R. BANKR. P. 7004 ...................................................................34, 35, 36

FED. R. BANKR. P. 7004(d)...........................................................33, 34, 35, 36

FED. R. BANKR. P. 7087 ..........................................................................50

FED. R. CIV. P. 12(b)(6)............................................................................41

**Other Documents**

*Buttonwood Tree Value Partners, L.P., et al., v. R.L. Polk & Co., Inc., et al.*,
Main Brief In Support of Defendant Stout Risuis Ross, Inc.'s Motion to Dismiss
Plaintiff's Second Amended Verified Class Action Complaint,
 2017 WL 1213383 (Del. Ch. Mar. 28, 2017)..........................................37

Alan D. Halperin and Eugene I. Davis, as co-trustees of the Appvion Liquidating Trust ("Plaintiff"), hereby files this memorandum of law in opposition to Defendants' motions to dismiss, and their attendant briefs in support thereof. *See* D.I. 65, 66, 67, 68, 69, 70 (collectively, the "Motions"). In support of this opposition, Plaintiff respectfully states as follows:

## PRELIMINARY STATEMENT AND
## SUMMARY OF FACTUAL ALLEGATIONS

### I.    OVERVIEW OF ACTION

The Debtors' Plan[1] vested Plaintiff with the authority to prosecute the Litigation Claims. In furtherance of this authority, Alan D. Halperin and Eugene I. Davis, as the Co-Trustees of the Appvion Liquidating Trust, have filed a single action against the Director Defendants, the Officer/Employee Defendants (with the Director Defendants, the "D&O Defendants" or the "D&Os"), Argent, and Stout.

During the relevant time frame covered by the FAC, Paperweight Development Corp. ("PDC") paid $35.5 million to the ESOP, its owner. This support came at the expense of PDC's wholly owned subsidiary, Appvion, Inc. ("Appvion"), which loaned PDC over $60 million which went without repayment. The ongoing financial strain caused by ESOP ownership caused a ripple effect on the Debtors' business, increasingly straining cash flow, constraining liquidity, and restricting money for capital expenditures. Eventually, the Debtors filed for bankruptcy protection and the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan) each suffered massive losses.

This action arises, in part, in connection with the inflation of the bi-annual valuations of PDC common stock, performed by Stout and adopted by Argent, the Debtors' manipulated

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning as set forth in Plaintiff's First Amended Complaint ("FAC") (D.I. 59).

financial projections, and the Debtors' inability to meet those projections during the period June 2013 through June 2017. Relatedly, the FAC focuses on the relationship between the bi-annual valuation of PDC (determined by Argent and Stout with the assistance of certain D&O Defendants) and the projections. *See* FAC ¶¶ 6-7, 10-13. The FAC alleges that through the coordinated actions of the D&O Defendants, Argent and Stout, the bi-annual valuations were purposefully inflated, causing the Debtors to borrow money from third party lenders, contributing to their need to seek bankruptcy protection. *See* FAC ¶¶ 115-17, 298, 405. The FAC pleads that the D&O Defendants were motivated to inflate the valuations for their personal gain, as they stood to reap substantial financial rewards from both their eventual retirement from the Debtors, and from the manner in which their equity incentive compensation was determined. *See* FAC ¶¶ 3, 6, 14, 120-24, 150-67, 290-306, 393, 395-96. The FAC asserts claims rooted in state law for breaches of fiduciary duties as well as aiding and abetting those breaches. *See* FAC ¶¶ 391-418. The FAC also asserts claims for illegal corporate dividends related to inter-debtor transfers to support payments to the ESOP. *See* FAC ¶¶ 419-35. Lastly, the FAC alleges facts supporting and asserts claims to avoid fraudulent transfers and to recover preferences related to transfers made to Argent, Stout and certain D&Os. *See* FAC ¶¶ 436-551.

Defendants move to dismiss certain counts of the FAC on the purported basis that:

- This Court does not have subject matter jurisdiction for particular claims alleged in the FAC;

- Particular claims alleged in the FAC were not preserved under the Plan;

- Particular claims alleged in the FAC related to breaches of state corporate fiduciary duties are preempted by ERISA;

- The FAC fails to allege facts sufficient to state particular claims;

- Particular claims alleged in the FAC are time-barred; and

- This Court does not have personal jurisdiction over Stout.

2

Additionally, the Defendants assert that this action should be transferred to the U.S. District Court for the Eastern District of Wisconsin, where G. Grant Lyon, on behalf of the ESOP Committee, filed an action against certain of the Defendants.

As set forth herein, the Motions misconstrue the relief that Plaintiff seeks, mischaracterize certain claims asserted therein, and make arguments that are not supported by the facts and/or the law. For the reasons stated herein, the Motions should be denied.

## II.    SUMMARY OF THE FACTUAL ALLEGATIONS CONTAINED IN THE FAC

The D&O Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Appvion to fund withdrawals by retiring and other ESOP participants. *See* FAC ¶¶ 2, 138. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. *See* FAC ¶ 2.

Faced with persistent industry headwinds, the Debtors' businesses had a significant shortfall between the revenue they generated, and the considerable financial demands that their capital structure and ESOP ownership imposed on them. *See* FAC ¶¶ 5, 175. Although the Debtors virtually never came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that stretched beyond the realm of achievability. *See* FAC ¶¶ 5 (Fig. 1), 173-175.

The financial projections that management prepared played a fundamental role in the determining the fair market value of PDC's common equity. *See* FAC ¶¶ 6, 181-82. The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. *See* FAC ¶ 6. Each determination of the fair market value of PDC's common equity had a direct effect on Management's incentive-laden compensation program, because the

3

value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP Trustee. *See* FAC ¶¶ 7, 120-24, 150-56, 393, 395-96. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to the preparation of financial projections that formed the basis of each such valuation. *See* FAC ¶ 7.

In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, the Director Defendants were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. *See* FAC ¶ 8. Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations. *See* FAC ¶¶ 11, 181-82.

Despite the Debtors' history of failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. *See* FAC ¶¶ 12, 280, 286, 288, 396. In addition to knowingly accepting Management's unrealistic projections, Argent and Stout routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. *See* FAC ¶¶ 13, 184-85.

The Director Defendants failed to observe basic tenets of good corporate governance where each of Appvion and PDC were insolvent. *See* FAC ¶¶ 9, 14, 140-72. The Debtors were balance sheet and cash flow insolvent, both of which were reflected in real time by the trading

4

prices of the Debtors' Term Loans and Second Lien Notes, even when Stout opined that the Debtors were solvent by a significant margin. *See* FAC ¶¶ 15, 338, 345-47, 422.

The consequences of the alleged misconduct were plainly evident. As a result of the inflated FMV Determinations, since June 30, 2013, the Debtors paid out a net amount of $35.5 million to the ESOP. *See* FAC ¶ 16. This outflow had a ripple effect on the Debtors' business, influencing the Debtors' decision to sell its Encapsys business, increasing demands on cash flow, constraining liquidity, and restricting money for capital expenditures. *See* FAC ¶¶ 16, 71. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan) each suffered massive losses. *See* FAC ¶¶ 16, 129, 336, 338.

Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt in a failing business. *See* FAC ¶ 20. This action seeks to hold the D&Os accountable, as well as those who aided in the commission of unlawful and improper acts.

This action also seeks redress for breaches of the duties of care and loyalty by the D&O Defendants, who wore dual hats, in connection with the parent / subsidiary relationship of PDC and Appvion with respect to certain intercompany transfers.[2] *See* FAC ¶¶ 391-435. Additionally, the FAC seeks avoidance and recovery from the D&Os, Argent and Stout of voidable transfers and preference payments. *See* FAC ¶¶ 436-551.

---

[2]    These claims arise from the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. After the November 2013 loan forgiveness occurred, the D&O Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment.

5

### III.   SUMMARY OF CLAIMS ALLEGED IN THE FAC

The FAC alleges claims as follows:

Count I:      against the **D&O Defendants** for breaches of fiduciary duties under Delaware law (applicable to claims asserted as assignee of claims of Appvion's estate), and under Wisconsin law (applicable to claims asserted as assignee of claims of PDC's estate) related to the overvaluation of PDC's common stock.

Count IV:    against **certain D&O Defendants** for breaches of the fiduciary duties under Delaware law (applicable to claims asserted as assignee of claims of Appvion's estate), and under Wisconsin law (applicable to claims asserted as assignee of claims of PDC's estate) related to actions taken while serving as members of the ESOP Committee and the alleged breaches of fiduciary duties by the D&O Defendants asserted in Count I.

Counts V & VI:    against **Argent and Stout** for aiding and abetting breaches of fiduciary duties under Delaware law (applicable to claims asserted as assignee of claims of Appvion's estate), and under Wisconsin law (applicable to claims asserted as assignee of claims of PDC's estate) for Argent and Stout's involvement in breaches of fiduciary duties by the D&O Defendants asserted in Count I.

Counts II & III:    against **certain D&O Defendants** for breaches of the fiduciary duties under Delaware law (applicable to claims asserted as assignee of claims of Appvion's estate), and under Wisconsin law (applicable to claims asserted as assignee of claims of PDC's estate) in connection with certain intercompany loans and Intercompany Note Forgiveness.

Counts VII & VIII:    against **certain Director Defendants** for illegal dividends under the Delaware Corporate Code in connection with certain intercompany loans and Intercompany Note Forgiveness.

Counts IX, X, XII, XIV – XVIII:    against **Stout, Argent and certain D&O Defendants** under 11 U.S.C. §§ 544, 547, and 550, and state law, where applicable, in connection with the voidable preferences.

Counts XI & XIII:    against **Stout and Argent** under 11 U.S.C. §§ 544, 548(a)(1)(B), and 550, and state law, where applicable, in connection with the voidable transfers.

## **ARGUMENT**

### I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE CLAIMS ASSERTED IN THE FAC

The D&Os, Stout, and Argent each assert that this court lacks subject matter jurisdiction over the claims against them. All three argue that certain of the claims asserted in the FAC are

neither "core" proceedings under 28 U.S.C. § 1334(b), nor are they covered by the "related to" jurisdiction provision of 28 U.S.C. § 1334(b). *See* D&O Br. at 5-10; Stout Br. at 17-19; Argent Br. at 21 (joining the subject matter jurisdiction argument raised by the D&Os).

A.    LEGAL STANDARD

A bankruptcy court may exercise jurisdiction over a cause of action asserted after the confirmation of a plan of liquidation if such cause of action shares a "close nexus" to the bankruptcy plan. *Resorts Binder v. Price Waterhouse & Co., LLP, (In re Resorts Int'l., Inc.)*, 372 F.3d 154, 168–69 (3d Cir. 2004). In the context of claims asserted following the confirmation of a plan of liquidation, a proceeding is "related to" a bankruptcy case for purposes of Section 1334(b) "if 'there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter.'" *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621–22 (Bankr. D. Del. 2016) (citing *In re Resorts Int'l, Inc.*, 372 F.3d at 166–67). The "close nexus" test governs all causes of action brought post-confirmation, even if the conduct giving rise to the claims occurred pre-confirmation. *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 264–65 (3d Cir. 2007).

"Related to" jurisdiction in this context "includes proceedings to construe and enforce provisions of a plan, and matters affecting the interpretation, implementation, consummation, execution or administration of a confirmed plan." *In re Millennium Lab Holdings II*, 562 B.R. at 621–22. Courts have held that "related to" jurisdiction exists over post-confirmation state law claims where plaintiff's claims are preserved under a plan and transferred to a liquidating trust. *Rescap Liquidating Trust v. Primary Capital Advisors*, 527 B.R. 865, 871 (S.D.N.Y. 2014). In finding a close nexus, the court noted that the creditors would receive a share of any recovery in the litigation. *Id.* The Third Circuit held that "related to" jurisdiction exists if there is a "close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation,

7

implementation, consummation, execution or administration of a confirmed plan or incorporated litigation trust agreement…" *In re Resorts Int'l., Inc.,* 372 F.3d at 168-69. The "close nexus" test has also been applied to find subject matter jurisdiction over post-confirmation claims that were specifically retained under the bankruptcy plan. *In re MPC Computers, LLC,* 465 B.R. 384, 393-94 (Bankr. D. Del. 2012); *see also In re LGI, Inc. Michaels v. World Color Press, Inc.*, 322 B.R. 95, 107-08 (Bankr. D. N.J. 2005) (finding that "litigation, contemplated by the Plan and part of the corpus of the Distribution Trust, serves the 'implementation, consummation [and] execution' of the Plan.").

Here, the causes of action asserted against the D&Os, Stout, and Argent, and the defenses asserted by them, share a sufficiently close nexus with the underlying bankruptcy proceeding to confer subject matter jurisdiction. In adjudicating the claims asserted in the FAC, this Court will likely also have to resolve several issues intimately related to the bankruptcy proceeding.

The D&O Defendants argue that there is no "related to" jurisdiction over claims against them for breaches of fiduciary duties and illegal dividends because there is "no nexus to … the Plan other than the potential to increase the amount the Litigation Trust will ultimately distribute." D&O Br. at 8 (emphasis excluded). The D&O Defendants ask this Court to ignore the bargain struck in the Plan as the linchpin of the consensual resolution of the Debtors' chapter 11 cases. The D&O Defendants cannot seriously dispute the importance of the creation of the Appvion Liquidating Trust to the implementation, consummation, and execution of the Plan. As stated in the Debtors' combined plan and disclosure statement, pursuant to the "2L/Committee Settlement," the terms of which were included in the Plan, all major constituencies in the Debtors' chapter 11 cases agreed that

> … (iv) ***any and all Litigation Claims will be transferred to the Liquidating Trust on the Effective Date***; (v) the Liquidating Trust shall make Distributions of … (b)

8

> ***the Litigation Proceeds***, … on a Pro Rata basis to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5; … (vii) the parties will fully support the Debtors' Plan, provided that the Plan is consistent with the 2L/Committee Settlement … (emphasis added)

Plan Art. III.D.7.b (emphasis added).

The 2L/Committee Settlement required that the Debtors file an acceptable plan of liquidation consistent with the terms of the "2L/Committee Settlement Agreement," which shall

> ***establish one or more liquidating trusts*** … to which all claims related to or arising out of [the ESOP]; ***all claims and causes of action against the Debtors' current and former directors and officers*** … ; all claims and causes of action arising under Chapter 5 of the Bankruptcy Code not purchased by Purchaser pursuant to the terms of the APA; and ***all claims and causes of action against insiders of the Debtors***.

Motion Seeking Approval of the 2L/Committee Settlement, ¶ 12.a [D.I. 374] (emphasis added); *see also* 2L/Committee Settlement Agreement, ¶ 4 [D.I. 734-1].

## B.   RECOVERIES FROM THIS LITIGATION WILL DIRECTLY IMPACT CREDITOR RECOVERIES UNDER THE PLAN

The outcome of this litigation will directly impact creditor recoveries—to holders of Second Lien Notes and General Unsecured Claims (as defined in the Plan). As in *ResCap Liquidating Trust*, funds recovered by Plaintiff in this case will be distributed to unsecured creditors under the distribution structure established by the Plan. *ResCap Liquidating Trust*, 527 B.R. at 871. Therefore, these distributions will necessarily and plainly involve the "implementation, consummation, execution or administration" of the Plan.

## C.   THE DEFENSES ASSERTED BY STOUT AND ARGENT WILL REQUIRE THIS COURT TO INTERPRET THE PLAN

Stout and Argent each argue that certain of the claims brought against them are barred via *res judicata*, because they were not preserved in the Plan. *See* Stout Br. at 15-17; Argent Br. at 11-12. As dismissed more fully below *in Section III*, Plaintiff believes that this argument is

meritless. As Stout and Argent make clear, the text of the Plan itself is a disputed issue in this litigation. This Court will have to interpret the text of the Plan, including its own findings of fact and conclusions of law confirming the Plan. Interpreting the Plan and the implementation thereof is precisely what this Court should be doing.

### D. THIS COURT MAY BE REQUIRED TO RESOLVE DISCOVERY DISPUTES REGARDING THE SCOPE OF PRIVILEGES TRANSFERRED TO THE LITIGATION TRUST, AND PRIVILEGES TRANSFERRED TO APPVION HOLDING CORP. UNDER THE ASSET PURCHASE AGREEMENT

The Plan provides that:

[o]ther than as provided for in the 363 Sale Documents, *the Liquidating Trust is the successor to the Debtors, their Estates*, their books and records, and *their Privileges* and protections (it being understood that to the extent the Liquidating Trustee is a successor with respect to documents subject to a common interest privilege with any third party, nothing herein shall relieve the Liquidating Trustee of any formal or informal obligations with respect to such common interest agreements).

Plan VIII.G.1 (emphasis added). The Plan also provides that:

[e]ffective as of the Effective Date, *all Privileges of the Debtors relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered to the Liquidating Trust*, without waiver or release, *and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and is entitled to assert such Privileges*….

Plan Art. IX.M (emphasis added). The Plan defines "Privilege" as "the attorney client privilege, work product protections or other immunities (including without limitation those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtors or their Estates." Plan Art. I.A.139.

Thus, on the plain text of the Plan, Plaintiff is the Debtors and their estates' successor to the privilege as it relates to the Liquidating Trust Assets. Nonetheless, Appvion Holding Corp. has asserted that it had purchased the Debtors' privilege in the Asset Purchase Agreement ("APA). The APA provides that "*Purchased Assets*" includes "*all* other or additional assets,

properties, ***privileges***, rights (including prepaid expenses) and interests ***of Sellers relating to the Business***, the Assumed Liabilities ***or the Purchased Assets***." APA § 1.1(n) [D.I. 751-1] (emphasis added). The APA does not, however, specify what types of privileges it purported to transfer and the APA only transferred certain claims and causes of action "relating to the Business, the Purchased Assets,…" APA § 1.1(z).

Plaintiff believes that APA section 1.1(n) cannot be read to include legal privileges related to the causes of action being pursued by Plaintiff since those allegations in the FAC do not constitute "Purchased Assets." However, because of the dispute with Appvion Holding Corp. over the scope and extent of privileges under the Plan and the APA, this may become an issue that this Court will be asked to resolve.

### E.    THE FAC MAY REQUIRE THIS COURT TO DETERMINE WHETHER PROOFS OF CLAIM FILED BY CERTAIN DEFENDANTS ARE ALLOWABLE

Certain defendants (including Murphy, Carter, Arent, Ferree, Richards, Fletcher, and Argent) have filed proofs of claim. *See In re OLDAPCO, Inc.*, Case No. 17-12082, D.I. 1127, at 3, 6, 12, 19, 24. These proofs of claim may be disallowable under 11 U.S.C. § 502(d). The causes of action asserted against these defendants will therefore both a) determine whether their proofs of claim are allowable, and b) affect the distributions to creditors under the Plan.

These issues are germane to the resolution of the claims asserted in the FAC and affect "interpretation, implementation, consummation, execution or administration" of the Plan. *In re Millennium Lab Holdings II*, 562 B.R. at 621–22. This action, therefore, shares a sufficiently close nexus with the bankruptcy proceeding, granting this Court "related to" subject matter jurisdiction over each of the causes of action asserted in the FAC.

## II.    THE FAC'S CAUSES OF ACTION WERE PRESERVED IN THE PLAN

Stout and Argent each argue that certain of the claims brought against them are barred via *res judicata*, because they were not appropriately preserved in the Plan of Liquidation. *See* Stout Br. at 15-17; Argent Br. at 11-12. Both Stout and Argent argue that the claims against them could only have been preserved as "claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims." Stout Br. at 16-17; Argent Br. at 11. They further argue that because this provision shares the phrase "related to" with ERISA Section 514(a), Plaintiff may choose from only two options that both lead to dismissal. Stout Br. at 17; Argent Br. at 11-12. This argument rests on an overly simplistic and literal reading of the two phrases.

### A.    ERISA-SPECIFIC DEFINITIONS DO NOT APPLY TO TEXTUAL ANALYSIS OF A BANKRUPTCY PLAN OF LIQUIDATION

The use of the phrase "related to" in the Plan and in ERISA Section 514(a) is little more than a textual coincidence that Argent and Stout treat as a "gotcha" argument. It is not. As explained at length in Sections III.A.2.b and III.C, *supra*, whether a claim is "related to" an ERISA plan for purposes of preemption under ERISA Section 514(a) requires nuanced and sophisticated consideration. The Supreme Court has cautioned that taken literally, if the phrase "relate to" were allowed to "extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." *Gobeille v. Liberty Mutual Ins. Co.*, 136 S. Ct. 936, at 943 (2016). Instead, ERISA Section 514(a) narrowly preempts only those claims which would interfere with the provision's purpose of ensuring a "uniform body of benefits law." *Nagy v. DeWise*, 705 F. Supp. 2d 456, at 462 (E.D. Pa. 2010). Section 514(a) therefore only preempts claims that "direct the Court's inquiry to the Plan, require an analysis of the [ERISA plan's] terms, [or] involve the calculation and payment of benefits due to [an ERISA

plan] participant." *Metropolitan Life Ins. Co. v. DePalo*, 2014 WL 4681094, at \*10, D. New Jersey (Sept. 22, 2014).

### B.    THE CLAIMS ASSERTED IN THE FAC RELATE TO THE ESOP, BUT DO NOT INVOLVE RIGHTS AND OBLIGATIONS UNDER ERISA

Contrary to Stout's and Argent's assertions, there is no necessary tension between ERISA Section 514(a) and the preservation of claims under the Plan. There is no question that the claims asserted in the FAC "relate to" and "arise out of" the ESOP, in that they relate to the manner in which the Defendants manipulated the valuations required by the ESOP. This does not mean, however, that resolution of the FAC's claims will interfere with ERISA's purpose, or require the Court to thoroughly parse the ESOP's terms.

An informed reading of ERISA Section 514(a), and a common-sense reading of both the Plan and the claims asserted in the FAC make clear that dismissal is not warranted on either ground. Counts V and VI were properly preserved in the Plan as claims "related to or arising out of the ESOP." In the event that an issue of fact is presented by what the Plan's text "related to or arising out of the ESOP" means, fact discovery will ultimately bear extrinsic evidence supporting Plaintiff's claims that Counts I and VI were properly preserved in the Plan.

The Court should deny Stout's and Argent's motions to dismiss on this ground.

## III.    ERISA DOES NOT PREEMPT ANY OF THE CLAIMS ASSERTED IN THE FAC

### A.    ERISA DOES NOT AND CANNOT PREEMPT THE TRADITIONAL FIDUCIARY DUTIES OWED BY THE D&OS TO THE DEBTORS AND THEIR STAKEHOLDERS UNDER STATE LAW

Each of D&Os, Argent, and Stout assert that ERISA preempts Counts I through VIII of the FAC. D&O Br. at 10-12; Argent Br. at 5-11; Stout Br. at 6-15. At the outset, it is critically important to note that Plaintiff *does not* assert any claim or cause of action as "***participant, beneficiary, or fiduciary***" of the ESOP under ERISA. Plaintiff *does not* seek to enforce any

provision of the ESOP or seek to claim benefits owed to ESOP participants or beneficiaries related thereto. The FAC makes clear that each breach of fiduciary claim is asserted "under applicable state corporate law." FAC ¶¶ 392, 399, 403. Since aiding and abetting claims are adjunct to the underlying breach of fiduciary duty claims, it is absurd to conclude that these claims are asserted under anything other than state law. The FAC also makes clear that the illegal corporate dividend claims are asserted under the Delaware Corporate Code. FAC ¶¶ 424, 433.

The Motions, however, erroneously assume that the claims for breaches of fiduciary duties under state law and related aiding and abetting claims are alleged under ERISA. The Defendants frame their argument in a way that would lead to an absurd result – ERISA preemption of state law claims asserted by a Plaintiff that is not an ESOP participant, beneficiary, or fiduciary. Furthermore, no claim is asserted against any Defendant related to their actions as an ERISA fiduciary.

### 1.    Federal Preemption

Under the Supremacy Clause, state laws that interfere with or are contrary to federal law are preempted. *See* U.S. Const. Art. VI, § 2. Congress may preempt state law (1) explicitly, or may do so implicitly under (2) "field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law," or (3) "conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *In re Old BPSUSH*, Inc., 589 B.R. 524, 533 (Bankr. D. Del. 2018) (internal citations omitted); *see also  In re Nickels Midway Pier, LLC*, 332 B.R. 262, 273 (Bankr. D.N.J. 2005). Express preemption applies "when there is an explicit statutory command that state law be displaced." *Id*.

14

Under implied preemption, state-law causes of action that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000), or that "would frustrate the purposes of" the federal scheme," *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir. 2001), are preempted. "If the purpose of the [federal] act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (internal quotation marks omitted); *accord Arizona v. U.S.*, 132 S. Ct. 2492, 2501 (2012).

The Supreme Court requires a strong showing to overcome the "high threshold" imposed by the presumption against implied preemption. An "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" because "such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968, 1985 (2011). In recognition of this principle, and "[b]ecause pre-emption treads on the very sensitive area of federal-state relations," *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 455 U.S. 40, 61 (1982), the Supreme Court repeatedly holds that "'a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" *Whiting*, 131 S. Ct. at 1985 (citing *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). Federalism, therefore, is the guiding principle of any implied preemption analysis: "[b]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal punctuation and citation omitted).

To give teeth to this "high threshold," the Supreme Court mandates that Defendants make a strong showing of a "clear and manifest purpose of Congress" in order to "bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA-ILA Med. & Clinical Serv. Fund*, 520 U.S. 806, 813 n.8, 814 (1997) (internal punctuation and citation omitted). The presumption against preemption of state law not only applies here, it applies with greater force because the States have traditionally regulated fiduciary duties owed to the corporate enterprise and its stakeholders. *In re PMTS Liquidating Corp.*, 452 B.R. 498, 507 (Bankr. D. Del. 2011) ("Under the internal affairs doctrine, one state alone has authority to regulate matters peculiar to relationships among or between the corporation and its current officers, directors, and shareholders. The state under which the corporation is chartered has this authority.") (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)).

Thus, by inference, Defendants argue that Plaintiff's claims are preempted by "field preemption," or by "conflict preemption." However, neither applies here because ERISA does not preempt, or even conflict with, the field of fiduciary duties owed by directors and officers of corporations to their stakeholders, so as to bar the FAC's fiduciary duty related claims.

### 2.    ERISA Preemption

ERISA preemption analysis begins with understanding the Congressional intent of preemption.

> Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans. . . . The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. . . . [A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.

*Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208-09 (2004).

16

ERISA contains two distinct statutory provisions which each have preemptory power. First, ERISA Section 502(a) provides for "complete" or "express" preemption by authorizing participants or beneficiaries of ERISA plans to bring suit to challenge the benefits and rights owed to them under the plan. 29 U.S.C. § 1132(a)(1). ERISA Section 502(a) also authorizes the U.S. Secretary of Labor and ERISA plan fiduciaries to bring certain claims. 29 U.S.C. § 1132(a)(2)-(11). Because this section provides the exclusive remedy for ERISA plan participants and beneficiaries to enforce the rights and benefits due to them, it "completely" preempts participants and beneficiaries from bringing such claims under state law.

Second, ERISA Section 514 provides for "conflict" preemption, stating that ERISA preempts any "*state laws insofar as they* may now or hereafter *relate to any employee benefit plan*." 29 U.S.C. § 1144(a) (emphasis added). The Third Circuit analyzes ERISA Section 514(a) preemption by looking at the potential burden to the ERISA plan. *Kollman v. Hewitt Associates, LLC*, 487 F.3d 139, at 148 (3d Cir. 2007). ERISA preempts state law claims relating to essential functions of the ERISA plan brought by ERISA plan beneficiaries because those claims would burden the ERISA plan. *Id.* at 149-150. Conversely, ERISA would not preempt state law claims that would not burden the ERISA plan, such as those brought by non-beneficiaries or non-participants, or those that do not relate to essential functions of ERISA plan administration. *See id.* at 148 (analyzing *Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146 (3d Cir. 1989)).

Express preemption under ERISA Section 502(a) is a "'jurisdictional concept,' whereas express preemption under ERISA Section 514 is a 'substantive concept governing the applicable law.'" *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*,

760 F.3d 297, 302 (3d Cir. 2014) (citing *In re U.S. Healthcare, Inc.*, 193 F.3d 151, 160 (3d Cir. 1999)).

### (a)    ERISA Section 502(a)'s Express/Complete Preemption

ERISA Section 502(a) "allows for civil actions to be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan." *DiFelice v. Aetna U.S. Healthcare*, 346 F.3d 442, 446 (3d Cir. 2003) (internal punctuation and citation omitted). "Standing under the statute is limited to participants and beneficiaries." *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004), *as amended* (Dec. 23, 2004). ERISA Section 502(a)'s primary—if not exclusive—purpose is to allow for participants and beneficiaries of ERISA plans to enforce the benefits due to them under such plans. Consistent with this purpose, claims which challenge "the administration of or eligibility for benefits are . . . completely preempted," while claims that relate to the "quality of medical treatment" received by a participant or beneficiary, for example, are generally not preempted by ERISA Section 502(a). *DiFelice*, 346 F.3d at 447 (citing *Pryzbowski*, 245 F.3d at 273).

In evaluating whether ERISA Section 502(a) preempts a particular claim, the Third Circuit has explained that "[p]aring the issue down to its essence, . . . the relevant question must be whether the claim 'could have been the subject of a civil enforcement action under §502(a).'" *DiFelice*, 346 F.3d at 447 (citing *Pryzbowski*, 245 F.3d at 273). If a claim could have been brought as a civil enforcement action, then it was clearly a "plan benefit claim," which Congress intended to preempt. *DiFelice*, 346 F.3d at 447.

Acknowledging that evaluating whether a claim could have been brought as a civil enforcement action under ERISA is "anything but an exact science," the Third Circuit fashioned a two-factor test to determine if a claim is completely preempted by ERISA Section 502(a). *DiFelice*, 346 F.3d at 446. "A claim is preempted where (1) it could have been brought under

18

ERISA's Section 502(a) (*see* 29 U.S.C. § 1132), and (2) it alleges breach of a legal duty that is not independent of the ERISA plan." *Shore v. Indep. Blue Cross & Indep. Health Grp.*, 2016 WL 6821944, at *2 (E.D. Pa. Nov. 18, 2016) (citing *Pascack*, 388 F.3d at 398.

Regarding the second factor, a legal duty is "independent" of an ERISA plan only if it "would exist whether or not an ERISA plan existed." *New Jersey Carpenters and the Trustees Thereof v. Tishman Construction Corporation of New Jersey*, 760 F.3d 297, at 303–04 (3d Cir. 2014) (internal punctuation and citation omitted). "In other words, if the state law claim is not derived from, or conditioned upon the terms of an ERISA plan, and nobody needs to interpret the plan to determine whether that duty exists, then the duty is independent." *Id.* at 303 (internal citation and punctuation omitted). A claim under state law is "completely preempted only if both of [these] prongs are satisfied." *Id.*

*Shore* and *Pascack,* which came to opposite conclusions applying the two-factor test, provide a roadmap for analyzing ERISA Section 502(a) preemption within the Third Circuit.

> (i)     ***Shore* Found Preemption Because Plaintiff Sued to Enforce a Benefit Due Under the ERISA Plan and Because the ERISA Plan Created the Legal Duty At Issue**

The U.S. District Court for the Eastern District of Pennsylvania applied this two-factor test in *Shore*. In *Shore*, plaintiff was a law firm that had contracted with Independence Blue Cross to provide healthcare benefits to its employees. *Shore*, 2016 WL 6821944, at *1. Plaintiff claimed that Independence had reneged on an earlier commitment to freeze plaintiff's premium rates for a fixed period, and asserted various causes of action under state law, including common law fraud and breach of fiduciary duty. *Id.* Independence Blue Cross, the defendant, claimed that ERISA preempted these claims. *Id.*

19

Applying the two-factor test, the court found that *Shore* plaintiff's claims satisfied both factors. <u>First</u>, the *Shore* court found that the rate freeze agreement was put in place to "clarify updated responsibilities due under the plan arising out of a failure to pay covered benefits," and that the *Shore* plaintiff was "suing to enforce a benefit" due to it under the ERISA plan. *Shore*, 2016 WL 6821944, at *2. <u>Second</u>, *Shore* found that no independent legal duty was at issue, other than that created by the ERISA plan. *Id.*, 2016 WL 6821944, at *3. With both factors satisfied, *Shore* held that ERISA Section 502(a) preempted plaintiff's claims. *Id.* These claims pertained directly to plaintiff's rights and benefits under an ERISA plan, and rested exclusively upon obligations that would not have existed but for the plan. The claims therefore fell squarely within ERISA Section 502(a)'s purview.

<div style="text-align:center">

(ii)  ***Pascack* Did Not Find Preemption Because Plaintiff Did Not Have ERISA Standing and the Claims Existed Outside of the ERISA Plan**

</div>

By contrast, in *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F. 3d 393 (3d Cir. 2004), where the Third Circuit formulated the two-factor test, the Third Circuit affirmed the district court's finding that the claims asserted therein failed to satisfy both factors. *Id.*, 388 F.3d at 401-04. In *Pascack*, plaintiff was a hospital that provided care to beneficiaries of an ERISA plan, which the hospital sued for payment. *Id.*, at 396. <u>First</u>, the Third Circuit found that the hospital could not have brought its claims under ERISA Section 502(a), because the hospital lacked standing because "the hospital was neither a participant or beneficiary under the Plan and there was no proof that the hospital received a valid assignment of rights." *Id.*, 388 F.3d at 400. <u>Second</u>, the Third Circuit affirmed where the district court found that the hospital's claims were "predicated on a legal duty that is independent of ERISA," because the claims were based on a subscriber agreement that existed separately from the ERISA plan. *Id.*, 388 F.3d at 402. The Third Circuit reached this conclusion despite recognizing that

<div style="text-align:center">20</div>

plaintiff's "claims, to be sure, are derived from an ERISA plan, and exist only because of that plan." *Id.* (internal punctuation and citation omitted).

*Pascack* and its progeny demonstrate that complete preemption pursuant to ERISA Section 502(a) applies only to claims brought by ERISA plan participants or beneficiaries, and only where such claims do not rest on independent legal duties that exist regardless of ERISA.

Courts outside the Third Circuit have similarly recognized that when assessing preemption, there is a fundamental difference between "state law claims that replicate a claim for benefits (which are preempted) and state law claims that seek relief unrelated to unpaid benefits." *Davis v. Screen Actors Guild, Inc.*, 2008 WL 11336377, at *6 (C.D. Cal. Apr. 17, 2008). The Ninth Circuit has observed that "ERISA preempts only those state law claims that arise out of the administration of a covered plan." *Ethridge v. Harbor House Restaurant,* 861 F.2d 1389, 1404 (9th Cir. 1988).

### (b)     ERISA Section 514(a)'s Conflict Preemption

ERISA Section 514(a) preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Supreme Court recently observed that "if 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." *Gobeille*, 136 S. Ct. at 943 (internal quotations omitted). For this reason, the Supreme Court has cautioned that although conflict preemption under ERISA Section 514(a) is broad, the literal meaning of the phrase "related to" should not lead courts to stretch preemption "to the furthest stretch of its indeterminacy." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Inc. Co.*, 514 U.S. 645, 655 (1995).

When evaluating whether ERISA preempts a particular claim, the court must always begin "with the starting presumption that Congress does not intend to supplant state law."

*Travelers Inc. Co.*, 514 U.S. at 654. State statutes "of general application that are neither directed to ERISA plans nor interfered with their administration" are generally insufficient to overcome this presumption against preemption. *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 277 (3d Cir. 2001) (internal punctuation and citation omitted). Similarly, "'run-of-the-mill' state law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan" are not subject to ERISA preemption under ERISA Section 514(a). *Carabillo v. Ullico, Inc.*, 357 F.Supp.2d 249, at 257 n. 7 (D.D.C. 2004).

Because the "relates to" statutory language is "often unhelpful in deciding whether a particular state law is preempted," *Nagy v. De Wese*, 705 F. Supp. 2d 456, 462 (E.D. Pa. 2010), courts look for guidance to "'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997) (citing *Travelers*, 514 U.S. at 658–59). Considering Congress's intent behind ERISA Section 514(a) (and, indeed, ERISA as a whole) helps courts conduct an inquiry that would otherwise be susceptible to "limitless application." *Gobeille*, 136 S. Ct. at 943.

> In enacting ERISA Section 514(a),
>
> Congress intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government and to prevent the potential for conflict in substantive law requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.

*Nagy v. De Wese*, 705 F. Supp. 2d 456, 462 (E.D. Pa. 2010) (citing *Travelers*, 514 U.S. at 656–57) (internal punctuation omitted). ERISA Section 514(a) is therefore meant to ensure that

ERISA plan administrators are not forced to contend with the inconsistent legal patchwork that would otherwise result from state laws that impose varying obligations on them.

With this Congressional purpose in mind, the Supreme Court identified three categories of laws that, as a general matter, are inherently more likely to overcome the presumption against preemption with which courts must begin their analysis. *Travelers*, 514 U.S. at 654. These categories consist of "state laws that (1) 'mandate employee benefit structures or their administration' [sic] (2) provide 'alternative enforcement mechanisms,' or (3) preclude uniform administration of the plan." *Weisenberger v. BT Americas, Inc.*, 2010 WL 1133473, at *3 (D.N.J. Mar. 22, 2010) (citing *Travelers*, 514 U.S. at 658-60). State laws falling under these categories are most likely to interfere with the Congressional intent of providing a "single uniform national scheme for the administration of ERISA plans." *Gobeille*, 136 S. Ct. at 947.

"State laws that do not fit into one of these categories are usually safe from preemption." *Weisenberger*, 2010 WL 1133473, at *3; *see also Swift Elec. Supply Co. v. Twp. of Lakewood*, 168 F. Supp. 2d 298, 304–05 (D.N.J. 2001) ("Aside from those areas, there is a strong presumption against preemption pursuant to [ERISA] section 514(a)")); *Bellemead Dev. Corp. v. New Jersey State Council of Carpenters Ben. Funds*, 11 F. Supp. 2d 500, 509 (D.N.J. 1998) ("Outside these aforementioned areas, the presumption against preemption pursuant to [ERISA] Section 514(a) is considerable.")).

## B.    ERISA SECTION 502(A) DOES NOT APPLY TO THE FAC'S CLAIMS

The D&O Defendants[3] and Stout each argue that ERISA Section 502(a) preempts the claims against them. D&O Br. at 10-12; Stout Br. at 6-15. These arguments lack merit and reveal

---

[3]    The D&O Defendants cite to several cases in support of their argument that ERISA preempts Counts I-IV, VII, and VIII. D&O Br. at 10-12. The D&O Defendants, however, cite interchangeably to cases that address complete preemption and conflict preemption, without explicitly stating which doctrine they believe preempts the claims against them. *Id.* The D&O

a disguised effort to mislead this Court as to the claims plead in the FAC. "A claim is preempted where (1) it could have been brought under ERISA's Section 502(a) (*see* 29 U.S.C. § 1132), and (2) it alleges breach of a legal duty that is not independent of the ERISA plan." *Shore*, 2016 WL 6821944, at *2 (citing *Pascack*, 388 F.3d at 398). These factors are conjunctive. Plaintiff's claims do not satisfy either of the criteria required for complete preemption under *Pascack*.

> **1.      The First *Pascack* Prong*:* ERISA Does Not Preempt the FAC's Claims Because The Appvion Liquidating Trust Neither Has Nor Asserts Any Claims Under ERISA**

ERISA only establishes an enforcement regime for those it serves; it does not establish an enforcement regime to serve non-plan participants and non-plan beneficiaries. Only an ERISA plan participant, beneficiary or fiduciary, as well as the Secretary of Labor, may bring claims for violations of ERISA. Express preemption under ERISA serves to preclude an aggrieved party from pursuing identical claims under ERISA and under applicable state law. This makes sense insofar as the ESOP participants have a right under ERISA to pursue claims arising under ERISA, but not to duplicate such claims.

The Appvion Liquidating Trust, as Plaintiff, is not a participant, beneficiary or fiduciary of the ESOP. Plaintiff's claims brought against the D&Os for breaches of fiduciary duties under state corporate law were part of the Debtors' estates (under 11 U.S.C. § 541) and are brought by Plaintiff as the assignee of those claims under the Plan. While the Plan permits Plaintiff to pursue "Causes of Action related to the ESOP held by the Debtors and their Estates," the Plan also assigns "all Proposed D&O Claims" and "all claims and Causes of Action against insiders of the

---

Defendants first cite to ERISA Section 514(a), but proceed to explain the two-factor test that the Third Circuit applies to preemption under ERISA Section 502(a). *See* D&O Br. at 10. For that reason, out of an abundance of caution, Plaintiff will assume that the D&O Defendants argue that both complete and conflict preemption applies to the claims asserted against them. While Argent also cites to cases addressing preemption under ERISA Section 502(a), it appears to argue only for preemption under ERISA Section 514.

Debtors" to Plaintiff. Plan Art. I.A.114. Thus, the state law breach of fiduciary duty claims against the Debtors' former D&Os alleged in the FAC are not exclusively asserted by reference to the ESOP in the Plan. State law breach of fiduciary duty claims are not ERISA-based claims belonging to ERISA "plan" participants or ERISA "plan" beneficiaries. Because Plaintiff does not have a remedy under ERISA against the D&Os for breach of corporate fiduciary duty, there is no dual remedy available to Plaintiff that ERISA preemption seeks to preclude.

Additionally, Plaintiff's claims in Counts VII and VIII of the FAC based in Delaware Corporate Code, arise in connection with illegal corporate dividends from subsidiary Appvion to the parent PDC. ERISA does govern the relationship between a parent and a subsidiary, even when the parent is owned by an ESOP. Similarly, Plaintiff does not rely on rights or obligations created by the ESOP. Plaintiff's claims seek to redress the damage the D&Os' breaches of fiduciary duties inflicted on Appvion itself (and its creditors, as stakeholders of an insolvent corporate enterprise)—not damage inflicted on the ESOP, or on the ESOP's participants or beneficiaries. Stout itself states that ERISA's enforcement scheme "would be completely undermined if ERISA-plan *participants and beneficiaries* were free" to pursue state law claims; that Section 502(a) permits only a "*participant, beneficiary, or fiduciary*" to bring claims against a non-fiduciary; and that "Plaintiff's cause of action [is] unavailable under ERISA." Stout Br. at 10-11 (emphases added). Similarly, the D&Os state that the "[Plaintiff] do[es] not have standing to pursue ERISA claims." D&O Br. at 11. Therefore, it is undisputed that Plaintiff does not bring its claims under ERISA Section 502(a), and thus, Plaintiff's claims cannot be preempted under the first prong of *Pascack*.

2.     **The Second *Pascack* Prong: The FAC's Claims Involve Corporate Fiduciary Duties, Which Are Separate and Distinct from ERISA Fiduciary Duties**

Plaintiff's claims in Counts I-IV of the FAC revolve around the *corporate* fiduciary duties owed by the D&Os to the Debtors, in their capacities as *corporate* directors and officers, under state corporate law. All directors and officers of Delaware and Wisconsin corporations owe fiduciary duties of care and loyalty, and these duties "would exist whether or not an ERISA plan existed." *Tishman*, 760 F.3d at 303–304. Plaintiff's claims are not ERISA claims, and the mere fact that the Debtors were directly, or indirectly, owned by an ESOP prior to the Petition Date does not render state fiduciary duty law and state corporate law a nullity.

Plaintiff's claims are not founded in the D&Os' failure to satisfy their respective fiduciary obligations as *ERISA* fiduciaries, nor does Plaintiff rely on rights or obligations created by the ESOP. Plaintiff *does not* assert claims concerning the provision or denial of benefits under the ESOP. Plaintiff *does not* assert claims based on harm inflicted by the D&Os on the ESOP itself or its participants. Plaintiff *does not* seek to enforce the rights of ESOP beneficiaries or ESOP participants. Rather, Plaintiff brings claims, under state corporate law, as the assignee of the Liquidating Trust Assets from the Debtors' bankruptcy estates. Further, Plaintiff's claims seek to redress the damage the D&Os' breaches of fiduciary duty inflicted on the Debtors themselves (and their creditors, as stakeholders of an insolvent corporate enterprise)—not damage inflicted on the ESOP, or on the ESOP's participants or beneficiaries. That the D&Os may have owed parallel fiduciary obligations under ERISA to the ESOP itself is irrelevant to this litigation: ERISA "recognizes that individuals may be both ERISA plan fiduciaries and officers or other employees in a corporation." *Barry v. Trustees of the Int'l Ass'n Full–Time Salaried Officers and Employees of Outside Local Unions,* 404 F. Supp. 2d 145, 151 (D.D.C. 2005).

26

3.    **Overlapping Service of Certain Officer/Employee Defendants between Their Service as Employees of the Debtors and as Members of the ESOP Committee Does Not Mandate Preemption**

The ESOP Committee was comprised of members of Appvion's executive team while those same persons were employed by the Debtors. Notwithstanding this fact, courts have frequently concluded that such overlapping service does not cause the application of preemption.

A bankruptcy court in the Sixth Circuit has addressed preemption in a factual setting similar to here. The court in *Antioch Co. Litig. Trust v. Morgan*, analyzed preemption in a case where the directors wore dual hats as both corporate fiduciaries and ERISA fiduciaries. 456 B.R. 791 (Bankr. S.D. Ohio 2011). In *Antioch*, although the directors were sued in both their capacity as ERISA fiduciaries and their capacity as corporate fiduciaries, the court found they wore dual hats and analyzed these claims separately. *Id.* The court declined to preempt the state law claims because they were related to the role the corporate fiduciaries played in the "downward spiral of the company," rather than to harm caused to the plan itself. *Id* at 843. The court also noted that the state law claims had "no discernable relationship" to the ERISA plan except for the fact that the company was organized as an ESOP. *Id.* Here, like the Antioch directors, several of the D&Os also wore dual hats, serving on the ESOP Committee. FAC ¶¶ 24-26, 28, 36.

Several other cases support the conclusion that ERISA does not preempt a state law corporate breach of fiduciary duty claim brought against a director by a non-plan beneficiary. In *Eckelkamp v. Beste*, the Eighth Circuit distinguished the ERISA claims under federal law brought by an employee stock ownership plan (or plan beneficiaries) from state law claims brought by the corporation. 315 F.3d 863, 870-71 (8th Cir. 2002) (citing *Delta Star, Inc. v. Patton*, 76 F.Supp. 2d 617 (W.D. Pa. 1999)). The Eighth Circuit noted that unlike the *Eckelkamp* claims, *Delta Star* involved claims brought against "a former company president, director, and ESOP fiduciary . . . had been brought under state law by the corporation." *Id.* Because of this

27

difference, the Eighth Circuit observed that "[p]reemption was not an issue" in *Delta Star*. *Id.* at 870. *Eckelcamp* ultimately preempted the state law claims, in large part, because they were brought by plan beneficiaries. *Id.* at 870-71. The *Delta Star* court did not consider preempting the state law claims against the director, who wore dual hats as a corporate fiduciary and an ERISA fiduciary, in his non-ERISA fiduciary capacity. Instead, the Eighth Circuit applied ERISA to the claims brought against the director in his capacity as an ERISA fiduciary and state law to the claims brought against the director in his capacity as a director and officer of the company. *Delta Star*, 76 F.Supp.2d at 632-34. Notably, *Delta Star* was in the Third Circuit and applied Delaware corporate law. *Id.*

*Eckelkamp* and *Delta Star* therefore make clear that ERISA preemption does not apply to claims brought by non-beneficiaries against directors not acting in an ERISA fiduciary role.

### 4.    The FAC Does Not Allege Any ERISA Claims Against Stout

Likewise, Plaintiff does not claim that Stout violated the fiduciary duties, if any, it owed to the ESOP. Indeed, Plaintiff does not claim that Stout itself violated any fiduciary duties at all. Instead, the FAC alleges that Stout knowingly aided and abetted the D&Os' breaches of their state *corporate* fiduciary duties to the Debtors. These claims are not "derived from, or conditioned upon" the terms of an ERISA plan, and have nothing to do with any duties imposed by the ESOP. *Tishman*, 760 F.3d at 303.

While Plaintiff alleges that Stout aided and abetted the D&Os breach of their fiduciary duties, the language and content of the ESOP itself is not part of Plaintiff's claims. Although Argent, as the ESOP trustee and an ERISA fiduciary, retained Stout to value PDC's common stock for reporting and administration purposes, Stout's valuation factored significantly into the D&Os' business decisions. Stout's inflated valuations forced the Debtors to borrow money they could not afford to repay, to continue their operations and fund ESOP distributions. Stout's

assistance work with, and assistance to certain former D&Os in respect of the overvaluation of the PDC common stock, forms the basis of Plaintiff's claims against Stout. Therefore, although some of Stout's work related to essential functions of the plan, Plaintiff's specific claims against Stout do not relate to the essential functions of the plan, but rather Stout's role in aiding the D&Os breaches of their fiduciary duty. The FAC is quite clear that the claims against the D&Os are based on state corporate law.

Stout argues at length that Plaintiff cannot bring its claims under ERISA, that Plaintiff seeks relief that is unavailable under ERISA, and that ERISA does not supply any "other appropriate equitable relief" to Plaintiff. Stout Br. at 10-13. These arguments either weigh against ERISA preemption, as explained above, or are wholly irrelevant. The two-factor test employed by the Third Circuit under *Pascack* is clear and discrete, and is not satisfied here.

## C.    THE CLAIMS ASSERTED IN THE FAC DO NOT INTERFERE WITH THE PURPOSE OF ERISA SECTION 514(A)

The D&Os, Argent, and Stout each move to dismiss the FAC on the grounds that ERISA Section 514(a) preempts the claims brought against them. Each of these arguments are incorrect. As set forth above, the Supreme Court has identified three types of laws that are inherently more likely to be preempted by Section 514(a): "state laws that (1) 'mandate employee benefit structures or their administration' [sic] (2) provide 'alternative enforcement mechanisms,' or (3) preclude uniform administration of the plan." *Weisenberger v. BT Americas, Inc.*, Civ. No. 09-4828 2010 WL 1133473, at *3 (D.N.J. Mar. 22, 2010) (citing *Travelers*, 514 U.S. at 658-60). There is no question that the fiduciary duties that Delaware and Wisconsin impose on directors and officers of their corporations do not fit within any of these categories, nor do any of the defendants assert that they do.

29

Defendants' preemption arguments under ERISA Section 514(a) rest, therefore, on various assertions that the claims brought against them "relate to" the ESOP. As explained further below, these assertions lack merit.

### 1.    ERISA Section 514(a) Does Not Preempt the Claims Against the D&Os

The D&Os argue that because the claims against them "relate to" an ERISA plan, ERISA Section 514(a) serves to preempt these claims. D&O Br. at 10-11. Further, the D&Os assert that "[c]ourts regularly hold that ERISA preempts state law fiduciary breach claims relating to employee benefit plans." D&O Br. at 10. The D&Os cite two cases in support of this contention. D&O Br. at 10-11.

Both of these cases involve claims that concern the denial of benefits under ERISA plans. First, the claims at issue in *Menkes* "relate[d] to the improper denial of benefits," and such claims "involving denial of benefits or improper processing of benefits require interpreting what benefits are due under the plan." *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 296 (3d Cir. 2014). Second, in *Breland*, "all of [plaintiff's] state law claims derive from [d]efendant's decision to terminate his benefits" under the ERISA plan. *Breland v. Liberty Life Assur. Co. of Bos.*, No. 14-352 2014 WL 5795681, at *2 (W.D. Pa. Nov. 6, 2014). In each case, plaintiffs claimed that the defendants' termination of their benefits constituted breaches of their state law fiduciary duties.

As these cases suggest, there is no doubt that ERISA Section 514(a) preempts state law claims related to the denial or amount of benefits under an ERISA plan. The FAC does not assert any such claims, however, rendering *Menkes* and *Breland* inapposite here. That both *Menkes* and *Breland* involve the denial of benefits only serves to underscore the narrow and focused scope of preemption under ERISA Section 514(a).

30

In further support of their argument, the D&Os write that the "Trustees' claims against the D&Os are founded on the allegations that Appvion's former directors, officers, and consultants did not administer the ESOP appropriately." D&O Br. at 11. They recite various factual allegations from the FAC and ultimately argue that these "claims necessarily depend on the ESOP's existence and administration, and therefore relate to" the ESOP. D&O Br. at 11.

The D&Os misrepresent the facts. Although the valuations of PDC stock were undoubtedly central to the administration of the ESOP, the ESOP itself is only tangentially relevant to the claims asserted in the FAC. In deciding the causes of action asserted in the FAC the court need refer to only one single provision of the ESOP: that which required the ESOP Trustee to obtain a biannual valuation of PDC's common stock, and the lack of a benefit to the corporate enterprise arising from its continued ownership by an ESOP. That is all. Resolution of Plaintiff's claims will not "direct the Court's inquiry to the Plan, require an analysis of the Plan's terms, [or] involve the calculation and payment of benefits due to a Plan participant." *Metro. Life Ins. Co. v. DePalo*, No. 13-3092 (KM) 2014 WL 4681094, at *10 (D.N.J. Sept. 22, 2014).

As discussed above, the Third Circuit analyzes ERISA Section 514(a) preemption in the context of the burden the state law litigation would present to the ERISA plan. Here, it is clear that there is no burden to the ERISA plan. State law claims that "only require[] a cursory examination of plan provisions" are not preempted by ERISA Section 514(a). *Metro. Life Ins. Co. v. DePalo*, 2014 WL 4681094, at *10 (D.N.J. Sept. 22, 2014). (internal citation and punctuation omitted). Only the most cursory of examinations is required here.

Further, Plaintiff's claims against the D&Os will leave undisturbed ERISA Section 514's goal of ensuring a "uniform body of benefits law." *Nagy v. De Wese*, 705 F. Supp. 2d 456, 462 (E.D. Pa. 2010) (citing *Travelers*, 514 U.S. at 656-57) (internal punctuation omitted). Future

31

ERISA plan administrators will have no occasion to refer to this Court's eventual decision on the merits here, and such decision will have no absolutely no bearing on the actual administration of ERISA plans. Preemption here will therefore not serve to "prevent the potential for conflict in substantive law requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Id.* (internal punctuation omitted).

**2.    ERISA Section 514(a) Does Not Preempt the Claims Against Argent and Stout**

The same considerations prevent ERISA Section 514(a) from preempting the claims asserted against Argent and Stout. Argent argues that Plaintiff's allegations are preempted because "they challenge Argent's conduct in discharge of duties as trustee which are governed by ERISA." Argent Br. at 7. Similarly, Stout argues that Plaintiff's claims against it are preempted because "the FAC is built upon allegations of unlawful conduct related to the valuation of the stock held by the Plan." Stout Br. at 8.

Argent supports its argument by alleging that "courts routinely have held that aiding and abetting claims are preempted under ERISA," and cites three cases for this proposition. Argent Br. at 9. <u>First</u>, in *AT & T v. Empire Blue Cross/Blue Shield*, plaintiffs "asserted ERISA claims against the[] defendants based on their alleged status as ERISA Plan fiduciaries." No. Civ. 93-1224 (HLS) 1994 WL 16057794, at *27 (D.N.J. July 19, 1994). <u>Second</u>, *Cont'l Ins. Co. v. Dawson* addressed preemption only under ERISA Section 502(a), and is therefore inapposite to an analysis of conflict preemption under ERISA Section 514(a). 273 F. Supp. 3d 688, 692 (N.D. Tex. 2017). <u>Third</u>, in *Carter v. San Pasqual Fiduciary Tr. Co.*, plaintiffs brought suit in their capacities as plan participants, against defendants in their capacities as plan administrators and trustees. No. SACV 15-01507 (JVS) 2016 WL 6803768, at *7 (C.D. Cal. Apr. 18, 2016).

32

Because these claims ran "from plan sponsor and plan trustees to plan participants," they involved "ERISA-regulated relationships" and were therefore preempted. *Id.*

Each of these cases is inapposite here. There is no doubt that claims that involve entities' roles as ERISA plan participants or fiduciaries are preempted by ERISA Section 514(a), because such claims would be "predicated upon the same conduct which is alleged to be governed by ERISA." *Empire Blue Cross/Blue Shield*, 1994 WL 16057794, at *27. *ERISA does not, however, govern the fiduciary duties that Delaware and Wisconsin impose on corporate directors and officers*. Plaintiff's claims here rest entirely on these corporate fiduciary duties alone, and the independent fiduciary obligations that governed Argent and Stout are wholly immaterial to these claims. In other words, Plaintiff's claims against Argent and Stout for aiding and abetting breaches of fiduciary duty *under state law* would be unaffected were this court to find that neither party owed any fiduciary duties whatsoever.

Argent further alleges that it owed no independent duty to the Debtors, and instead owed duties solely to the participants and beneficiaries of the ESOP. Argent Br. at 10. For this reason, Argent claims that the Debtors' have no standing to pursue claims under ERISA, and ERISA Section 514(a) therefore preempts Debtors' claims here. Argent has this argument backwards. It is precisely ***because*** Plaintiff is not vested with claims that arise under ERISA that ERISA does not preempt the FAC's claims.

For the foregoing reasons, ERISA does not act to preempt any of the claims asserted in the FAC. The Court should deny the Defendants' motion to dismiss on this ground.

## IV.   STOUT IS SUBJECT TO PERSONAL JURISDICTION IN THIS COURT

The FAC asserts claims for aiding and abetting breach of fiduciary duty (FAC Count VI), to recover preference payments (FAC Count X), and to recover fraudulent transfers (FAC Count XI). Stout argues that these claims should be dismissed because this court lacks personal

jurisdiction over Stout. Stout Br. at 38-40. In support of this argument, Stout argues that Bankruptcy Rule 7004(d) does not confer personal jurisdiction here because these "[bankruptcy] [r]ules are not statutes." Stout Br. at 39. Further, Stout also argues that it lacks the requisite "minimum contacts" necessary for this court to exercise personal jurisdiction over it. Stout errs on both points.

### A.    IT IS WELL-SETTLED THAT BANKRUPTCY RULE 7004(D) AUTHORIZES NATIONWIDE SERVICE OF PROCESS

This Court has recognized that Bankruptcy Rule 7004(d) allows courts to exercise personal jurisdiction over non-resident defendants that may not otherwise be subject to jurisdiction in the forum state:

> Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure generally limits *in personam* jurisdiction of the federal courts over non-resident defendants to that which a court of general jurisdiction in the forum state would have. However, this limitation does not apply where extra-territorial service of process is "authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). Bankruptcy Rule 7004(d), which allows nationwide service of process in bankruptcy cases, is just such a statute.

*In re Uni-Marts, LLC*, 404 B.R. 767, 775 (Bankr. D. Del. 2009).

Stout argues that although "certain courts" have recognized that Bankruptcy Rule 7004(d) authorizes nationwide service of process, these courts were mistaken because they "discount the plain language" of the Rules Enabling Act, 28 U.S.C. §§ 2071-2077. Stout Br. at 39. This Court has already rejected this argument. In *In re DBSI, Inc.*, the defendants argued that the court could not exercise personal jurisdiction over them because Rule 7004 does not qualify as a federal statute. 467 B.R. 309, 313–14 (Bankr. D. Del. 2012). This Court rejected this argument, stating that Bankruptcy Rule 7004, "although not a federal statute, serves to authorize nationwide service of process." *Id.* This Court further stated that it had already "soundly rejected [a] defendant's argument that Bankruptcy Rule 7004(d) cannot authorize extra-territorial service of process because it is not [a] federal statute that was passed by both houses of Congress and

34

signed by the President." *Id.* (citing *Tribune Media Servs. v. Beatty*, 418 B.R. 116, 122 (Bankr. D. Del. 2009)) (internal punctuation omitted). In rejecting this argument, this Court recognized that Bankruptcy Rule 7004 "authorizes nationwide personal jurisdiction … regardless of the fact that the grant is contained in a rule rather than a federal statute." *In re DBSI, Inc.*, 467 B.R. at 313–14.

That Stout felt compelled to rely on a legal theory clearly rejected by this Court evinces the spuriousness of its argument. This Court may properly rely on Bankruptcy Rule 7004(d) to exercise personal jurisdiction over Stout. The Court's inquiry does not conclude here, however. Once the Court determines that Plaintiff properly effectuated service upon Stout pursuant to Bankruptcy Rule 7004(d), it must also consider "whether the exercise of its jurisdiction fits within the constitutional requirements of due process." *In re Tandycrafts, Inc.*, 317 B.R. 287, 289 (Bankr. D. Del. 2004). This inquiry requires the court to consider whether the defendant has "minimum contacts with the United States, rather than with a particular state." *Anheuser–Busch, Inc. v. Paques*, 277 B.R. 615, 628 (Bankr. E.D. Pa. 2000) (citing *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000)) (internal quotations omitted).

### B.   STOUT HAS SUFFICIENT MINIMUM CONTACTS WITH THE UNITED STATES TO BE SUBJECT TO PERSONAL JURISDICTION UNDER THE BANKRUPTCY RULES

Here, there is no question that Stout has minimum contacts with the United States. Stout Risius Ross, Inc. is a Michigan corporation, while Stout Risius Ross, LLC is a Michigan limited liability corporation. Stout Br. at 39. Because there is no doubt that Stout "has minimum contacts with the United States, therefore, due process permits service upon it." *In re Tandycrafts, Inc.*, 317 B.R. 287, 289 (Bankr. D. Del. 2004).

Because Plaintiff properly effectuated service on Stout pursuant to Bankruptcy Rule 7004(d), and because Stout has minimum contacts with the United States that satisfy the

constitutional requirements of due process, Stout is subject to personal jurisdiction before this Court. Stout's motion to dismiss for lack of personal jurisdiction should be denied.

### C.   STOUT ALSO HAS SUFFICIENT MINIMUM CONTACTS WITH DELAWARE TO BE SUBJECT TO PERSONAL JURISDICTION WITHIN THIS STATE

Because Stout argues that Rule 7004(d) does not confer personal jurisdiction here, Stout also argues that it lacks sufficient "minimum contacts" with the state of Delaware that would grant this court personal jurisdiction even without Bankruptcy Rule 7004. Stout Br. at 39-40. In support of this argument, Stout asserts that Plaintiff has failed to plead that Stout has any contacts with Delaware, and that both Stout entities are incorporated outside Delaware. *Id*., at 39.

Stout is incorrect. The FAC alleges that since at least July 16, 2012, Stout acted as a service provider to both Reliance and Argent, as ESOP Trustee. FAC ¶¶ 41-42. The FAC further alleges that Stout entered into engagement letters with Reliance, Argent, and Appvion, each of which were substantially similar to the June 2013 engagement letter. The engagement letters stated: "We understand that [Appvion] will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of [Appvion] and returned to us." FAC ¶ 105.

The FAC also alleges that Appvion is a Delaware corporation. FAC ¶ 76. The FAC alleges that between 2014 and 2017, Stout received $522,229.71 from Appvion in exchange for Stout's services to the ESOP Trustee. FAC ¶¶ 109 (Fig. 2), 110. The FAC asserts that Stout is the recipient of avoidable fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B) and 550.

Lastly, Stout Risius Ross, Inc. ("SRR") has, in at least one other litigation, had sufficient contact with the State of Delaware so as to permit personal jurisdiction of the courts of the State of Delaware. *See Buttonwood Tree Value Partners, L.P., et al., v. R.L. Polk & Co., Inc., et al.*, C.A. No. 9250-VCG (Del. Ch.). In that class action, SRR was a named defendant in connection

with its service as advisor to *R.L. Polk & Co., Inc.*, a Delaware corporation. *Buttonwood*, 2017 WL 3172722, C.A. No. 9250-VCG (Del. Ch. Jul. 24, 2017). SRR moved to dismiss the *Buttonwood* action on a variety of grounds, but did not contend that an absence of personal jurisdiction existed in Delaware. Main Brief In Support of Defendant Stout Risuis Ross, Inc.'s Motion to Dismiss Plaintiff's Second Amended Verified Class Action Complaint filed in *Buttonwood*, 2017 WL 1213383, C.A. No. 9250-VCG (Del. Ch. March 28, 2017).

Should the Court find that Bankruptcy Rule 7004 does not confer personal jurisdiction over Stout here, it may yet properly exercise personal jurisdiction over Stout because Stout has sufficient contacts with the state of Delaware to satisfy the constitutional precepts of due process.

## V.   THE FAC ADEQUATELY PLEADS THAT ARGENT AND STOUT AIDED AND ABETTED THE D&OS' BREACHES OF FIDUCIARY DUTY

Argent and Stout each argue that the FAC fails to state a claim against them for aiding and abetting a breach of fiduciary duty. Argent Br. at 12-16; Stout Br. at 19 *et seq*. Both Argent's and Stout's arguments rest on the assertion that the FAC fails to adequately plead scienter, purportedly required for claim of aiding and abetting a breach of fiduciary duty. In doing so, Argent and Stout overstate both the burden that Plaintiff is required to meet, and the law.

### A.   LEGAL STANDARD

When reviewing a motion to dismiss for failure to state a claim, courts must construe the complaint "in the light most favorable to the plaintiff." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Centaur, LLC*, No. 10-10 799 2013 WL 4479074, at *2 (Bankr. D. Del. Aug. 19, 2013) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

37

The Third Circuit employs a three-step process to determine the sufficiency of a complaint under the Supreme Court's guidance in *Twombly* and *Iqbal*: 1) the court must "take note of the elements a plaintiff must plead to state a claim;" 2) "the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth;" and 3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Burtch*, 662 F.3d at 221.

A claim for aiding and abetting a breach of fiduciary duty under Delaware law must satisfy four elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)) (internal punctuation omitted).[4] The third element of scienter is satisfied if a defendant "act[s] with the knowledge that the conduct advocated or asserted constituted such a breach." *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del.2001)). A plaintiff may satisfy this "knowing participation" standard by demonstrating that "the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RCS Creditor Tr. v. Schorsch*, 2018 WL 1640169, at *5 (Del. Ch. Apr. 5, 2018) (internal punctuation and citation omitted).

---

[4]  Since Defendants do not contend that Plaintiff has not properly plead the aiding and abetting claims under Wisconsin law, Plaintiffs do not address it herein and reserve the right to do so as needed.

38

### B.   THE FAC PLEADS SUFFICIENT FACTS TO INFER THAT ARGENT AND STOUT AIDED AND ABETTED THE D&OS' BREACHES OF FIDUCIARY DUTY

Neither Argent nor Stout allege that the FAC's allegations fail to meet the first three elements of a claim for aiding and abetting a breach of fiduciary duty. *See* Argent Br. at 12-16; Stout Br. at 26-30. Argent and Stout instead each focus on the fourth element of "knowing participation."

Here, Argent argues that Plaintiff "offer[s] no allegation that Argent acted with scienter," and relies merely on conclusory statements to support its claim against Argent. Argent Br. at 14-15. Similarly, Stout argues that "the FAC fails plausibly to plead 'knowing participation' in support of a state law aiding and abetting claim." Stout Br. at 27. Not so. The FAC makes substantial and painstakingly particularized factual allegations that, drawing all reasonable inferences in favor of Plaintiff, support the claims that Argent and Stout aided and abetted the D&Os' breaches of fiduciary duty.

#### 1.   Argent and Stout Were Fully Aware of the Mismanagement

The FAC alleges that Argent and Stout worked closely with Debtors' management to prepare the FMV Determinations, and for other purposes. Argent, in its capacity as ESOP Trustee, and Stout, as the independent appraiser engaged by Argent, "sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended." FAC ¶ 10. In performing their respective roles, Argent and Stout each relied on information provided by the Debtors' management (including financial projections), and routinely met with members of management to discuss the Debtors' financial health and expected performance. FAC ¶¶ 10, 13. Argent and Stout also occasionally participated in what was known as the "Argent Trust ESOP Services Committee," where they each met to review the FMV Determinations, and discussed matters related to the

Debtors' businesses, projections, strategic initiatives, and other matters. FAC ¶ 171. In addition to the foregoing, Argent and Stout also frequently attended meetings of the Appvion and PDC boards. FAC ¶ 172 (Fig. 9).

This intimate working relationship with the Debtors' meant that Argent and Stout were each deeply familiar with the Debtors' businesses, their projected financial performance, and their financial health. In turn, Argent and Stout relied heavily on this information supplied by Debtors' management to calculate the value of PDC's common stock. FAC ¶ 181. The FAC alleges that Debtors' management purposefully manipulated the financial projections and other information that they provided to Argent and Stout, in order to maximize their own financial gain. FAC ¶ 182.

The extent and egregiousness of this manipulation was such that Argent and Stout—being deeply familiar with the Debtors' true financial state—could not have been ignorant of management's misconduct. FAC ¶ 183. The allegations in the FAC make plain that the disconnect between the information Argent and Stout relied on, on the one hand, and Argent and Stout's knowledge of the Debtors' true state, on the other, was such that it was inconceivable that Argent and Stout were anything less than fully aware that Debtors' management was providing them with manipulated financial information.

## 2.    Argent's and Stout's Own Behavior is Evidence of Scienter

Argent and Stout's awareness in this regard is evinced by the numerous adjustments they made to the FMV Determinations that are inexplicable as anything other than an attempt to compensate for management's manipulated projections. FAC ¶ 203. The FAC alleges that in preparing the FMV Determinations, Argent and Stout, *inter alia*, selectively excluded liabilities from their analysis; utilized assumptions that were unjustifiably optimistic in the face of their knowledge of the Debtors' history of falling far short of projections; collaborated with Debtors'

40

management to produce a fundamentally flawed guideline companies analysis; and made objectively unjustifiable exclusions and adjustments to manipulate the outcome of the FMV Determinations. FAC ¶¶ 206-80.

As a specific example of these inexplicable decisions, consider Argent's and Stout's treatment of the company-specific risk premium. Between the December 2014 FMV and the December 2015 FMV, Argent and Stout increased the risk premium in their discounted cash flow analysis of the Debtors from 0% to 2%. FAC ¶¶ 268-71. The FAC alleges that Argent and Stout made this change despite the Debtors' financial projections remaining virtually constant over the same time period. Because the Debtors' financial projections remained constant, and because there were no other fundamental changes to the Debtors' business during this time, the *only* plausible explanation for this change is that Argent and Stout knew that "Appvion's projections available at that time were overly optimistic" and were "attempting to compensate for that risk." FAC ¶ 280.

Argent attempts to dismiss the foregoing allegations as "conclusory," and as therefore being "insufficient to overcome a motion to dismiss." Argent Br. at 12. It is difficult to imagine a complaint that involves a more particularized set of allegations. The FAC relies heavily on, and cites to, dozens of documents that demonstrate in great detail the methodological choices Argent and Stout made in conducting the FMV Determinations. *See* FAC ¶¶ 200-89. The FAC explains, step by step, why these choices bore no relation to the Debtors' true financial condition. The FAC alleges that Argent and Stout were fully aware that the Debtors' true financial condition was far worse than management attempted to convey. FAC ¶¶ 203-04, 217-98. Based on these allegations, the FAC asserts that the *only* explanation for Argent and Stout's conduct is that they

were aware of the D&Os' manipulations, and attempted to adjust for these manipulations in their FMV Determinations.

Argent and Stout therefore had constructive, if not actual, knowledge that the D&Os were breaching their fiduciary duties, and taken as a whole, these allegations—drawing all reasonable inferences to be drawn therefrom—go far beyond the "sheer possibility that a defendant has acted unlawfully" that is required to withstand a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## VI.    THE D&O DEFENDANTS ERR BY ARGUING THAT PLAINTIFF FAILS TO PLEAD COUNTS IX, XIV-XVIII WITHOUT PARTICULARITY

The D&Os request that the Court dismiss Counts IX, XIV-XVIII of the FAC to the extent they assert claims under Wisconsin or Delaware law. D&O Br. at 16-17. The D&Os claim that each of Counts IX, XIV-XVIII of the FAC only cite generically to Wisconsin and Delaware law (6 Del. C. §1301, *et seq* and Wisconsin Statutes Ch. 242). *Id*. The D&Os falsely state that these statutes govern only fraudulent transfer claims. *Id*. This is plainly wrong.

A cause of action under *both* 6 Del. C. § 1305(b) and Wis. Stat. 242.05(2) exists when a transfer is made to an insider for an antecedent debt, when the debtor was insolvent, and the insider had reasonable cause to believe that the debtor was insolvent. *See* 6 Del. C. § 1305(b); Wis. Stat. §242.05(2). These specific subsections of the Delaware Code and the Wisconsin Statutes proscribe the elements of a preference claim, not a fraudulent transfer claim. As applicable here, section 1301(7)(b) of Title 6 of the Delaware Code and Section 242.01(7)(b) of the Wisconsin Statutes define an "insider" to include a director or officer of a corporate debtor.

The FAC alleges that (i) each of Siefert, Suwyn, Murphy, Laurino, and Roberts were directors of Appvion and PDC (each a debtor) and thus insiders of Appvion and PDC, (ii) Ferree's was an insider of Appvion and PDC (each a debtor), (iii) Appvion was insolvent at the

42

time of each payment/transfer, (iv) each insider had to have known that Appvion was insolvent at the time of each payment/transfer. Additionally, the FAC states, with particularity, the dates and amounts of the payments subject to Counts IX, XIV-XVIII of the FAC. *See* FAC ¶¶ 293 (Fig. 22); 294 (Fig. 23); 295 (Fig. 24); 437; 488 (Fig. 46); 501 (Fig. 47); 514 (Fig. 48); 527 (Fig. 49); 540 (Fig. 50). Each of aforementioned payments is referenced to Appvion's Statement of Financial Affairs ("SOFAs") (D.I. 266). While the allegations against Ferree in FAC paragraph 295 do not explicitly refer to Appvion's SOFAs, the date and amount of that payment is found on the same pages (*i.e.*, D.I. 266, Question 30, at 11-12), as the payments found in FAC paragraphs 293 (Fig. 22) and 294 (Fig. 23) of the FAC.

The D&Os' footnote 6 on page 18 of their brief is factually incorrect. Since each debtor filed its own statements of financial affairs, there is no mistaking the reference to Appvion's SOFAs plainly implies that Appvion, Inc. was the debtor/transferor making the payment. There is no other serious interpretation.

Thus, the FAC includes (i) an identification of the nature and amount of each payment, (2) the date of the payment, (3) the name of the debtor/transferor, (4) the name of the transferee and (5) the amount of the transfer. *See In re Valley Media, Inc.*, 288 B.R. 189, 192 (Bankr. D. Del. 2003). Accordingly, the Court should not dismiss Counts IX, XIV-XVIII of the FAC.

## VIII.    THE FAC SUFFICIENTLY PLEADS THAT APPVION DID NOT RECEIVE REASONABLY EQUIVALENT VALUE IN EXCHANGE FOR THE ARGENT TRANSFERS

Argent claims that Count XIII should be dismissed because Plaintiff did not adequately plead facts to demonstrate that Appvion received less than reasonably equivalent value in exchange for the Argent Transfers. Argent Br. at 17. Plaintiff disagrees.

It is undisputed that Argent did not provide any services directly to Appvion. The FAC does not allege to the contrary. Argent says it was trustee for the ESOP and not Appvion, and

that Argent did not owe any duties (fiduciary or otherwise) to Appvion. Plaintiff does not contest

these facts. Thus, Appvion did not receive anything from the Argent Transfers (*i.e.*, did not

receive reasonably equivalent value).

## IX.   STOUT FALSELY STATES THAT COUNT VI IS PARTIALLY TIME BARRED

Stout erroneously claims that Count VI is partially time barred and should be dismissed

to the extent that the FAC asserts claims against Stout that pre-date October 1, 2014. Stout Br. at

30-32. The FAC clearly states that "[t]hrough this conduct, after October 1, 2014, Stout [aided]

and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the

fiduciary duties of care and loyalty, …" FAC ¶ 418. Thus, it should be abundantly clear that

Plaintiff only asserts claims against Stout that are not time barred.

## X.   STOUT ERRS BY ARGUING THAT PLAINTIFF FAILS TO STATE CLAIMS FOR RELIEF IN COUNTS X AND XI

### A.   COUNT X (AVOIDANCE PREFERENCE PURSUANT TO 11 U.S.C. §§ 547, 544(B) AND 550, 6 DEL. C. § 1301 ET SEQ., WISCONSIN STATUTES, CH. 242, ET SEQ.) PROPERLY STATES A CLAIM

Stout requests that the Court dismiss Count X of the FAC for failure to state a claim in its

entirety. Stout seeks dismiss of this Count on several grounds.

First, Stout claims that Count X should be dismissed because there is no state law

analogue to Bankruptcy Code Section 547(b) and the state law statutes cited by Plaintiff (i.e., 6

Del. C. §1301, *et seq* and Wisconsin Statutes Ch. 242) do not apply to non-insiders. *Id*. Plaintiff

does not contest this assertion and will stipulate to the dismissal of Count X insofar as it relates

to claims under state law. Plaintiff *does not, however,* agree to the dismissal of the remainder of

Count X and believes that it is properly plead under 11 U.S.C. § 547(b).

Second, Stout erroneously seeks the dismissal of Count X, asserting affirmative defenses

under 11 U.S.C. § 547(c)(2). Stout Br. at 33-35. Stout acknowledges that "affirmative defenses,

such as an ordinary court defense, are generally inappropriate for resolution on a motion to dismiss." Stout Br. at 33 (internal citation omitted). This is not the case here. While Stout devotes several pages to arguing facts and circumstances concerning why the Stout Preference Payments falls within the ordinary course defense, Stout is remarkably silent in addressing the timing of such payments. Plaintiff alleged in paragraph 109 (Fig. 2) of the FAC the payment history by Appvion to Stout starting in 2014. The question of whether Stout can establish that the timing of the Stout Preference Payments falls within the ordinary course of business defense is a question of fact and one that Stout has not addressed. Additionally, Plaintiff lacks precise dates for certain prior payments made by Appvion to Stout in order to evaluate whether Stout has a meritorious preference defense. *See* FAC ¶ 109 (Fig. 2). Stout's brief does not shed any light on the availability of this defense.

### B.    COUNT XI (AVOIDANCE OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(B), 548(A)(1)(B), AS WELL AS UNDER 6 DEL. C. §§ 1301-1311, WISCONSIN STATUTES, CH. 242.01-242.11)

Stout seeks dismissal of Count XI of the FAC for failure to state a claim. Stout claims that Count XI should be dismissed because Plaintiff did not adequately plead facts to demonstrate that Appvion received less than reasonably equivalent value in exchange for the Stout Transfers. Stout Br. at 35-37. Plaintiff disagrees.

It is undisputed that Stout did not provide any services directly to Appvion. The FAC does not make any allegation to the contrary. Stout claims that it was contracted by Argent to serve as an independent appraiser, "for a singular and discrete purpose: to provide the statutorily-required independent valuation of the PDC stock held by the ESOP." Stout Br. at 1. Stout also claims that it "provided services (and owed contractual duties) only to [Argent]—not to the [ESOP] and not to [Appvion]" Stout Br. at 2. Lastly, Stout also claimed that it "owed no duty to

45

[Appvion]," as it "prepared the independent valuation for [Argent], and it ultimately was [Argent's] obligation to determine the fair market value of PDC stock. Stout Br. at 2.

Yet, later in its brief, Stout claims that "Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers." Stout Br. at 36 (quoting FAC ¶ 462). Stout argues that Appvion received reasonably equivalent value in exchange for the Stout Transfers because Stout sent Appvion invoices and Appvion paid those invoices. Stout does not, however, allege that Appvion received reasonably equivalent value in exchange for the Stout Transfers. Stout does not argue that the benefit that Appvion received from the amount of money it paid to Stout was reasonably equivalent to the benefit Appvion received from Stout's work, if any.

### C.  COUNT XIII (AVOIDANCE OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(B), 548(A)(1)(B), AS WELL AS UNDER 6 DEL. C. §§ 1301-1311, WISCONSIN STATUTES, CH. 242.01-242.11)

Stout seeks dismissal of Count XIII of the FAC for failure to state a claim *against Stout*. Stout is entirely correct that Count XIII of the FAC does not state a claim against Stout. Rather, and contrary to title header, Count XIII of the FAC asserts claims *against Argent related to the Argent Transfers*. *See* FAC ¶¶ 480-86, prayer for relief (m). Plaintiff believes that the balance of the text of Count XIII make it abundantly clear that Count XIII is asserted against Argent and not against Stout. Accordingly, as needed, Plaintiff requests leave to amend the title header for Count XIII to replace "Against Stout" with "Against Argent."

## XI.    THE COURT SHOULD DENY THE D&OS' REQUEST TO TRANSFER VENUE

In addition to moving to dismiss the claims against them, the D&Os also petition this Court to transfer venue to the Eastern District of Wisconsin. D&O Br. at 12-13. Stout joins this request. Stout Br. at 19 n.22. The D&Os argue that venue transfer is appropriate because of the "first filed" rule followed in the Third Circuit, and make a number of factual allegations that purport to justify a transfer of venue.

## A.    LEGAL STANDARD

Section 1412 of Title 28 of the United States Code provides that a "district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. In the bankruptcy context, for proceedings under or related to a case under title 11, "venue is generally proper in the district court where the bankruptcy case is pending." *In re Onco Invest. Co.*, 320 B.R. 577, 579 (Bankr. D. Del. 2005). Although Section 1412 grants a district court discretion to transfer a case before it, there is a "strong presumption in favor of maintaining venue where the bankruptcy case is pending." *In re Hechinger Inv. Co. of Delaware, Inc.*, 288 B.R. 398, 402 (Bankr. D. Del. 2003). "[A] defendant's state of incorporation has always been a predictable, legitimate venue for bringing suit." *Trustco Bank v. Automated Transactions LLC*, 933 F. Supp. 2d 668, 671 (D. Del. 2013) (internal punctuation and citations omitted).

Courts must afford plaintiff's choice of forum substantial weight. "A plaintiff's choice of venue should only be disturbed when the balance weighs heavily in favor of the defendant's motion for transfer." *In re Onco Invest. Co.*, 320 B.R. at 579. Courts generally defer to plaintiff's selection of forum as long as it is legally proper. *Id.,* at 580. The defendant must prove that venue transfer is appropriate by a preponderance of the evidence. *Id.,* at 579. This burden is a "heavy one: 'unless the balance of convenience of the parties is ***strongly*** in favor of defendant, plaintiff's choice of forum should prevail.'" *Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 750–51 (D. Del. 2012) (emphasis in original).

Here, the D&Os (and Stout) fail to meet this heavy burden, for four reasons. First, many of the Director Defendants themselves authorized the Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in Delaware. Second, the "first-filed" rule is inapplicable here because the instant action is fundamentally distinct from the ESOP's action in

Wisconsin. <u>Third</u>, the interest of justice and convenience of the parties do not overcome the substantial weight given to Plaintiff's choice of forum. <u>Fourth</u>, the D&Os' petition for venue transfer is procedurally improper.

### 1.      This Forum is Appropriate Because the Certain Defendants Themselves Chose It Previously

D&Os argue that "[t]his forum has no connection to the Amended Complaint other than the Trustees chose it." D&O Br. at 12. The D&Os are mistaken. Many of the Director Defendants themselves authorized the Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in Delaware, and thus have no basis to now contest that they are being unfairly sued in Delaware. *See, e.g.*, Case No. 17-12082 (Bankr. D. Del), D.I. 1. The Director Defendants serving on the PDC Board and Appvion Board as of the Debtors' petition date, could have limited their bankruptcy authorization to non-Delaware venues—including, most notably, Wisconsin. Yet, they authorized a Delaware bankruptcy filing.

The D&Os claim that there are a plethora of factors that now compel a transfer to Wisconsin. The D&O Defendants allege that (i) management and operation of the Debtors primarily took place in Wisconsin, (ii) many, but not all, of the D&O Defendants live in Wisconsin, and (iii) the majority of percipient events occurred in Wisconsin. D&O Br. at 14-15. Yet, the D&O Defendants do not claim that these factors were so onerous, at the time of the Bankruptcy filing, so as to prevent the Appvion Board and PDC Board from authorizing chapter 11 filings in Delaware.

Plaintiff's action was filed in Delaware just like the Debtors' bankruptcy cases. As explained in Sections I and II, *supra*, the claims asserted in the FAC share a close nexus with the bankruptcy proceeding. Had the Defendant Directors serving on the Appvion Board and PDC Board authorized a chapter 11 filing in Wisconsin or some other venue, Plaintiff could have

considered following suit. But the Defendant Directors did not. The D&Os' assertion that only two factors—Plaintiff's choice and the applicability of Delaware law—support venue in this forum is therefore disingenuous at best. D&O Br. at 14.

### 2.    The "First-Filed" Rule Is Inapplicable

The "first-filed" rule does not apply here because the Wisconsin Action fundamentally differs from the instant action. The D&Os attempt to cast the Wisconsin FAC and the FAC here as involving the "same subject matter." D&O Br. at 4. Not so. The D&Os ignore several crucial differences between the two actions.

### (a)    The Wisconsin Action Involves Different Claims and Beneficiaries

The Wisconsin Action was filed by G. Grant Lyon, on behalf of the current ESOP Committee, seeking redress for harm suffered by ESOP participants and beneficiaries under ERISA, and other theories of liability. Plaintiff's action seeks redress for the D&Os' breaches of their fiduciary duties under state corporate law, state fraudulent transfer law, and under the Bankruptcy Code, as a means of recovering for the harm such breaches inflicted on the Debtors' corporate enterprises themselves. These actions are plainly distinct.

### (b)    The Wisconsin Action Covers a Different Time Period

The Wisconsin FAC challenges conduct that stretches back to the formation of the ESOP itself, beginning in 2001. Plaintiff's claims relate allege misconduct beginning in 2013. *See* FAC ¶¶ 14 (Fig. 1), 133-39, 157-63, 172 (Fig. 9), 190-98, 200-89. As a result, the Wisconsin FAC and the FAC each assert unique causes of action that rely on distinct factual predicates. For example, the Wisconsin FAC brings claims for breaches of fiduciary duty under ERISA; engaging in prohibited transactions; fraud; negligent misrepresentation; and securities fraud. *See* Wisconsin FAC ¶ 516 *et seq.* These claims rely on factual allegations that are wholly unrelated to those

alleged in the FAC and U.S. District Court's adjudication of the Wisconsin FAC will not further its adjudication of the instant action.

### 3.    The Overlapping Claim May Be Dismissed In Wisconsin

It is the Co-Trustees belief that Mr. Lyon lacks standing to bring claims regarding the D&Os' breaches of their *corporate* fiduciary duties. Such claims were explicitly vested in the Liquidating Trust in the Plan of Liquidation. *See* Plan Art. VIII.D; *see also* Plan Art. I.A.34, 58, 111, 114. If the District Court for the Eastern District of Wisconsin dismisses Lyon's claims, the factual overlap between the two actions will shrink even further, and thereby further reduce what little judicial economy may be gained from litigating these cases before the same court.

### 4.    The Petition to Transfer Venue is Procedurally Improper

Because the instant action is "a case or proceeding under title 11," any transfer of venue for the instant action is governed by 28 U.S.C. § 1412, and not 28 U.S.C. § 1404(a). *See* D&O Br. at 13. The D&Os assert instead that this Court may transfer venue under either 28 U.S.C. §§ 1404 or 1412, and cite for this proposition *In re Qualteq, Inc.*, No. 11-12572 KJC, 2012 WL 527669, at *1 (Bankr. D. Del. Feb. 16, 2012). *Qualteq* makes no mention of 28 U.S.C. § 1404 whatsoever, and addresses venue transfer exclusively under 28 U.S.C. § 1412. *See id.* at *5-7.

In further support of their petition to transfer venue, the D&Os state that courts' analysis under both 28 U.S.C. §§ 1404 and 1412 "turn[s] on the same issues." D&O Br. at 13 n.4 (citing *I.R.S. v. CM Holdings, Inc.*, 1999 WL 459754, at *2 (D. Del. Jun. 10, 1999)). However, this does not mean that a party may, as a procedural matter, freely choose between the two provisions without regard to the nature of the action.

Bankruptcy Rule 7087 relates to 28 U.S.C. § 1412, provides that "[o]n motion and after a hearing, the court may transfer an adversary proceeding or any part thereof to another district pursuant to 28 U.S.C. § 1412."

The D&Os have not satisfied the "heavy burden" required to overcome the dual presumptions that apply here: Plaintiff's forum selection, and prosecuting this action in the same forum as the underlying bankruptcy proceeding. For the foregoing reasons, the Court should deny the D&Os motion to transfer venue to the Eastern District of Wisconsin.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court enter the proposed order, attached hereto as Exhibit A, denying Defendants' Motions to dismiss.

Dated: April 16, 2019

**GRANT & EISENHOFER P.A.**

*/s/ Vivek Upadhya*
Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: cmackintosh@gelaw.com
       vupadhya@gelaw.com
       agartman@gelaw.com


-and-

Gordon Z. Novod (*pro hac vice* pending)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

## <u>CERTIFICATE OF SERVICE</u>

I, Vivek Upadhya, hereby certify that on April 16, 2019, a true and correct copy of the foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing System to all registered ECF users appearing in the case.

_/s/ Vivek Upadhya_
Vivek Upadhya

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | Adv. Proc. No. 18-50955 (MFW) |
| v. | **Related Docket Nos. 65, 66, 67, 68, 69, 70** |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

### [PROPOSED] ORDER DENYING EACH OF THE DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

Upon the Former Directors and Officers' Motion to Dismiss Amended Complaint or in the Alternative Transfer Venue (Adv. Proc. D.I. 65), the Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint (Adv. Proc. D.I. 69), and Defendant Argent Trust Company's Motion to Dismiss (Adv. Proc. D.I. 67) (the "Motions to Dismiss"), and the briefs filed in support thereof; this Court having considered Plaintiff's opposition to the Motions to Dismiss and the omnibus brief filed in support thereof, and Defendants' reply briefs in further support of their motions to dismiss; this Court having heard oral argument on the Motions to

Dismiss; this Court having determined that the Defendants have failed to demonstrate sufficient legal and factual justification for the Motions to Dismiss; and after due deliberations, and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1. The Former Directors and Officers' Motion to Dismiss Amended Complaint or in the Alternative Transfer Venue is DENIED;

2. The Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint is DENIED; and

3.  Defendant Argent Trust Company's Motion to Dismiss is DENIED.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | Adv. Proc. No. 18-50955 (MFW)  **Related Docket Nos. 59, 65, 67, 69, 77** |
| Defendants. | |

## STIPULATION FOR EXTENSION OF TIME FOR DEFENDANTS TO FILE REPLY BRIEFS IN FURTHER SUPPORT OF THE MOTIONS TO DISMISS

Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust (collectively, the "**Plaintiff**"), on the one hand, and Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan (collectively, the "**D&O Defendants**,"), Stout Risius Ross, Inc., and Stout Risius Ross, LLC (collectively, "**Stout**"), and Argent Trust Company ("**Argent Defendant**," and together with the

Plaintiff, the "**Parties**"), on the other hand, through their respective undersigned counsel, hereby

stipulate and agree as follows:

1.    The Parties agree and stipulate that the time within which the D&O Defendants, Stout and Argent Defendant may file Replies in further support of the Motions to Dismiss (Dkt. Nos. 65, 67, 69) is hereby extended to and including *May 7, 2019.*

2.    Except as specifically set forth herein, all rights, claims, and defenses of the Parties are fully preserved**.**

**GRANT & EISENHOFER P.A.**

_/s/ Vivek Upadhya_

Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Telephone: 302-622-7000
Email: cmackintosh@gelaw.com
      vupadhya@gelaw.com

—and—

Gordon Z. Novod (*pro hac vice* pending)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

**SAUL EWING ARNSTEIN & LEHR LLP**

_/s/ Mark Minuti_

Mark Minuti (Delaware Bar No. 2659)
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: 302-421-6840
Email: Mark.Minuti@saul.com

—and—

**JENNER & BLOCK LLP**

Craig Martin (*pro hac vice* pending)
David Jimenez-Ekman (*pro hac vice* pending)
Michael Graham (*pro hac vice* pending)
353 North Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
Email: cmartin@jenner.com
      djimenez-ekman@jenner.com
      mgraham@jenner.com

*Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan*

- 2 -

**CHIPMAN BROWN CICERO & COLE, LLP**

  */s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (Delaware Bar No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: desgross@chipmanbrown.com

—and—

**GROOM LAW GROUP**
Lars Golumbic, Esquire (admitted *pro hac vice*)
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5811
Telephone: (202) 861-6615
Email: lgolumbic@groom.com

*Counsel for Defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC*

**MORRIS JAMES LLP**

  */s/ Carl N. Kunz, III*
Carl N. Kunz, III (Delaware Bar No. 3201)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: cknuz@morrisjames.com

—and—

**KEATING MUETHING & KLEKAMP PLL**
Michael L. Scheier (*pro hac vice* pending)
Brian P. Muething (admitted *pro hac vice*)
Jacob Rhode (admitted *pro hac vice*)
One East 4th Street
Suite 1400
Cincinnati, OH 45202
Telephone: (513) 639-3814
Email:bmuething@KMKLAW.com

*Counsel for Argent Trust Company*

- 3 -

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | Adv. Proc. No. 18-50955 (MFW) |
| Defendants. | |

## AFFIDAVIT OF SERVICE

STATE OF DELAWARE    )
                     )    SS
NEW CASTLE COUNTY     )

Michelle M. Dero, being duly sworn according to law, deposes and says that she is employed by the law firm of Chipman Brown Cicero & Cole, LLP, counsel to *Stout Risius Ross, Inc., and Stout Risius Ross, LLC* in the above referenced action, and on the 23rd day of April 2019, the *Stipulation for Extension of Time for Defendants to File Reply Briefs in Further Support of the Motions to Dismiss* [Adv. Docket 78] (the "**Stipulation**") was filed *via* the Court's CM/ECF electronic filing system ("**CM/ECF**"), which sent notice of the Stipulation to all parties receiving notification through CM/ECF.

In addition, on the 23rd day of April 2019, the Stipulation was also served on the parties listed on the attached service list *via* hand delivery or first-class mail.

/s/ Michelle M. Dero
Michelle M. Dero

S<small>WORN</small> T<small>O</small> A<small>ND</small> S<small>UBSCRIBED</small> before me this 24th day of April 2019.

/s/ *Kristin A. McCloskey*

Kristin A. McCloskey
Notary Public
State of Delaware
My Commission Expires July 7, 2020

***Via*** **First-Class Mail**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
*Grant & Eisenhofer P.A.*
123 Justison Street
Wilmington, Delaware 19801
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-
Trustees of the Appvion Liquidating Trust)

***Via*** **Hand Delivery**

Tara L. Lattomus, Esquire
*Eckert Seamans Cherin & Mellot, LLC*
222 Delaware Avenue, 7th Floor
Wilmington, Delaware 19801
(Counsel for Argent Trust Company)

***Via*** **First-Class Mail**

Brian P. Muething, Esquire
Jacob D. Rhode, Esquire
*Keating Muething & Klekamp PLL*
One East 4th Street, Suite 1400
Cincinnati, Ohio 45202
(Counsel for Argent Trust Company)

***Via*** **Hand Delivery**

Carl N. Kunz, Esquire
*Morris James LLP*
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(Counsel for Argent Trust Company)

***Via*** **First-Class Mail**

Craig Martin, Esquire
David Jimenez-Ekman, Esquire
Michael Graham, Esquire
*Jenner & Block LLP*
353 North Clark Street
Chicago, Illinois 60654-3456
(Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten,
Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy,
Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino,
David A. Roberts, and Kevin Gilligan)

***Via*** **First-Class Mail**

Gordon Z. Novod, Esquire
*Grant & Eisenhofer P.A.*
485 Lexington Avenue, 29th Floor
New York, New York 10017
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-
Trustees of the Appvion Liquidating Trust)

***Via*** **Hand Delivery**

Mark Minuti, Esquire
*Saul Ewing Arnstein & Lehr LLP*
1201 North Market Street, Suite 2300
Wilmington, Delaware 19801
(Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten,
Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy,
Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino,
David A. Roberts, and Kevin Gilligan)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (KJC) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (KJC) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, Defendants. | **REPLY IN SUPPORT OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC'S MOTION TO DISMISS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT........................................................................................................................ 3

    I.    Count VI is Preempted by ERISA................................................................... 3

        A.    Count VI is Preempted by Section 514......................................... 4

        B.    Count VI is Preempted by Section 502(a)(3)............................... 5

    II.    Count VI Was Not Reserved in the Plan of Liquidation. ............................... 6

    III.    The Court Does Not Have Subject Matter Jurisdiction over Count VI. .........7

    IV.    Count VI Fails to Plead a State Law Aiding and Abetting Claim. ..................7

        A.    Knowing Participation. .................................................................... 8

        B.    Proximate Cause. ........................................................................... 12

    V.    Counts X and XI Fail to State Claims for Relief. ......................................... 12

        A.    Count X Fails to State a Claim for Relief Against Stout. ............... 12

        B.    Count XI Fails to State a Claim for Relief Against Stout................ 13

    VI.    The Court Lacks Personal Jurisdiction over Stout......................................... 14

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

Cases

*ALA, Inc. v. CCAIR, Inc.*,
   29 F.3d 855 (3d Cir. 1994)........................................................................5
*Hausknecht v. John Hancock Life Ins. Co. of New York*,
   334 F. Supp. 3d 665 (E.D. Pa. 2018) .................................................3, 4
*In re Syntax-Brillian Corp.*,
   573 F. App'x 154 (3d Cir. 2014) ...........................................................8
*Kollman v. Hewitt Assocs., LLC*,
   487 F.3d 139 (3d Cir. 2007)..............................................................4, 5
*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001) ........................................................8, 9, 11
*Max Daetwyler Corp. v. R. Meyer*,
   762 F.2d 290 (3d Cir. 1985)...............................................................15
*Menkes v. Prudential Ins. Co. of Am.*,
   762 F.3d 285 (3d Cir. 2014)..........................................................4, 5, 6
*Metro. Life Ins. Co. v. Depalo*,
   No. 13-3092, 2014 WL 4681094 (D.N.J. Sept. 22, 2014) .........................6
*Nat'l Sec. Sys., Inc. v. Iola*,
   700 F.3d 65 (3d Cir. 2012)................................................................4, 5
*Pilot Life Ins. Co. v. Dedeaux*,
   481 U.S. 41 (1987)..............................................................................4
*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983)..............................................................................4
*URS Corp. v. Lebanese Co. for Dev. & Reconstruction of Beirut Cent. Dist. SAL*,
   512 F. Supp. 2d 199 (D. Del. 2007)....................................................15
*Wilmington Shipping Co. v. New England Life Ins. Co.*,
   496 F.3d 326 (4th Cir. 2007) ...............................................................6
*Winslow v. Brown*,
   371 N.W.2d 417 (Wis. Ct. App. 1985) ..................................................8

Statutes

11 U.S.C. § 547(b)..................................................................................13
29 U.S.C. § 1132(a)(3) .............................................................................6
29 U.S.C. § 1144(a) .................................................................................4

## INTRODUCTION

Stout was not the mastermind of a scheme to defraud Appvion or anyone else—nor did it participate in such a scheme. Stout was the independent appraiser of the shares of stock held by the Plan. Stout's role was narrow and discrete: it was engaged by the Trustee[1] to perform semi-annual valuations of the Plan that were mandated by statute and the terms of the Plan. *See* Op. Br. at 2, 9. Stout never served as a financial advisor to the Company[2] or otherwise was involved in the business affairs of the Company.

Stout's valuations of the stock held by the Plan tracked its estimation of the Company's equity value. Both figures reflected a significant decline in share value beginning in 2008:[3]



---

[1] Plaintiff's Opposition to Defendants' Motions to Dismiss (D.I. 77) ("Opposition" or "Opp."), does not dispute that the First Amended Complaint ("FAC") puts at issue and incorporates Stout's engagement agreements and valuation reports. *See* Stout's Opening Brief in Support of its Motion to Dismiss the First Amended Complaint (D.I. 70) ("Op. Br.") at 2 n.3 & 3 n.7.

[2] Indeed, during this time period, the Company engaged Jefferies LLC, among others, to serve as its financial advisor as it "explore[d] strategic alternatives to facilitate the achievement of its business objectives," *i.e.*, sale of the Company. *See* Ex. 4, 12/31/2015 FMV at A.302-04.

[3] This data is reflected in Stout's valuation reports, which have been incorporated into the FAC. *See supra* n. 1; *see also* FAC ¶¶ 190-199 & Fig. 10.

1

Just because the value of the Company declined over time does not mean that the Company was insolvent, however. At the same time that Stout was preparing its valuations, the Company, through its financial advisors, was trying to sell the Company in total or by division. *See* Op. Br. at 24 n.26. Through the related due diligence processes, various third parties— including the investment bankers retained by the Company and prospective purchasers— provided feedback on the Company's value. Several of those prospective buyers ultimately made offers to purchase the Company, in whole or in part, ***at prices that exceeded Stout's valuations***. *See id.* at 3 n.8. Moreover, during this same time period, the Company consistently received unqualified audit opinions. *See id.* at 3. This third party data—which Stout referenced in its reports and considered when preparing its valuations—***indicated that there was value in the Company***. The Company's equity value was declining, but the Company was hardly worthless—and this was reflected in Stout's valuations.

Plaintiff contends, nevertheless, that Stout "inflated" its valuations of the Company to further a scheme by the Directors and Officers to enrich themselves. *See* Opp. at 1-5. Specifically, Plaintiff claims that Company's financial projections, were "manipulated" by the Company's management. According to Plaintiff, Stout was "fully aware" of this "manipulation;" and Stout used the "manipulated" data to "inflate" its valuations. *See id.* at 37-42. Plaintiff's theory of liability makes no sense. Stout's valuations reflected that the value of the Company was not increasing, but rather was ***declining***. Further, in preparing its valuations Stout considered more than just the "manipulated" financial projections. Stout considered market feedback from third parties, including prospective purchasers, which, if anything, indicated that the Company was worth more than the (declining) values Stout reported. Indeed, the Company received purchase offers that were consistent with or exceeded Stout's valuations

2

*even as it did not meet the "manipulated" financial projections*.  If the Directors and Officers were manipulating the value the Company, then these sophisticated investors must have also fallen victim to the same scheme (or joined it).  The Opposition does not address any of these points.  The Opposition likewise does not address the lack of bona fide financial motive by Stout to engage in the alleged fraud:  Stout received a reasonable, fixed fee for its services that did not change over time.[4]

In sum, the Opposition cites no well-pleaded factual allegations that support the inference that Stout aided and abetted any illegal conduct.  Even if Plaintiff had alleged facts supporting the inference that Stout did knowingly participate in breaches of fiduciary duty, Count VI would still fail.  As the Opposition acknowledges, the claim "relates to" the ESOP and thus is preempted by ERISA.  Moreover, the FAC fails to articulate the legal basis for any other claims for relief against Stout.  The FAC, therefore, should be dismissed with prejudice as to Stout.

## ARGUMENT

### I.    Count VI is Preempted by ERISA.

Count VI is preempted by ERISA Section 514—because it "relates to" an employee benefit plan—and Section 502(a)(3)—because it seeks relief that is unavailable under ERISA's enforcement mechanism.  Plaintiff's arguments against preemption selectively rely on cases that articulate formulations of the ERISA preemption analysis that appear to support its position.  These arguments are nothing more than a thinly-veiled attempt to bypass ERISA because the cause of action Plaintiff asserts and form of relief it seeks are not available under the statute.

---

[4] These are just some of the arguments raised in Stout's Opening Brief that the Opposition fails to address and thus concedes.  *See Hausknecht v. John Hancock Life Ins. Co. of New York*, 334 F. Supp. 3d 665, 682-83 (E.D. Pa. 2018) ("By failing to respond to a majority of Defendant's arguments, Plaintiffs have conceded them[.]").

3

A.      **Count VI is Preempted by Section 514.**

ERISA Section 514 broadly preempts state laws that "relate to any employee benefit plan." 29 U.S.C. § 1144(a).[5]  Courts have held that preemption under Section 514 is appropriate where the conduct at issue "implicate[s] the funding, benefits, reporting or administration of an ERISA plan[,]" *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 149 (3d Cir. 2007), and where the state law claims are "premised on the existence of the plans." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 84 (3d Cir. 2012).

The Opposition acknowledges that ***"[t]here is no question that the claims asserted in the FAC 'relate to' and 'arise out of' the ESOP, in that they relate to the manner in which the Defendants manipulated the valuations required by the ESOP."*** Opp. at 13 (emphasis added). Indeed, the Opposition does not dispute that Stout's entire involvement in this matter arose out of an ERISA Trustee's obligation—which was mandated by the terms of the Plan and by statute— to have an ERISA Plan's stock holdings valued by an independent appraiser. *See* Op. Br. at 9. Nor does the Opposition dispute that Stout's valuation of the stock held by the Plan was a "core" function of plan administration. *See id.* at 8.  Further, the Opposition concedes Stout performed the valuations for ***"reporting and administration purposes,"*** *see* Opp. at 28—that is, Stout's valuations were used by the ERISA fiduciary used for plan administration purposes, *i.e.*, for making distributions to eligible participants from their Plan accounts. *See* Op. Br. at 2. The

---

[5] Preemption under Section 514 is not "narrow[]," Opp. at 12, nor does the determination of whether a claim is "related to" an employee benefit plan require "nuanced and sophisticated consideration." *Id.* The Supreme Court has described Section 514(a) as "deliberately expansive." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987), and the Third Circuit has held that the phrase "relate to" should be given "a broad, common-sense meaning, such that a state law '"relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 293-94 (3d Cir. 2014) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)).

claim against Stout is thus preempted because it "implicate[s] the funding, benefits, reporting or administration of an ERISA Plan[,]" *Kollman*, 487 F.3d at 149, and is "premised on the existence of [an ERISA plan]." *Iola*, 700 F.3d at 84.

The Opposition also argues that Plaintiff's claims rest "entirely" on the Directors' and Officers' corporate fiduciary duties and that "the independent fiduciary obligations" applicable to Stout[6] and Argent are "wholly immaterial to these claims." Opp. at 33. This argument lacks merit. Stout's conduct cannot be viewed in a vacuum. The purported misconduct occurred while ***Stout*** was carrying out a "core" function of plan administration pursuant to its contractual relationship with the ERISA Trustee. ***Stout*** was not engaged in the corporate management of the Company, nor did it serve as a financial advisor to the Company—and the FAC does not so allege. It follows that ***Stout's*** work—which solely related to the essential functions of the Plan[7]—falls squarely within the purview of ERISA. Accordingly, Count VI "relates to" the Plan and is preempted by ERISA Section 514(a).

### B.    Count VI is Preempted by Section 502(a)(3).

Count VI is also preempted by ERISA Section 502(a)(3). Section 502(a)(3) preempts "any 'state cause of action that provides an alternative remedy to those provided by the ERISA civil enforcement mechanism' because such a cause of action 'conflicts with Congress' clear intent to make the ERISA mechanism exclusive.'" *Menkes*, 762 F.3d at 296.

---

[6] Stout was not a fiduciary to the Plan or the Company and the FAC does not allege that it was one. *See* Op. Br. at 10 n.10.

[7] The Opposition claims that only "***some*** of Stout's work related to essential functions of the Plan." Opp. at 29 (emphasis added). This statement, which is unsupported by any citations to the FAC, is contrary to the terms of Stout's engagement agreements, which expressly provide that Stout was only engaged to perform semi-annual valuations of the Plan for reporting and administration purposes. *See, e.g.*, Ex. 1, 6/20/2013 Engagement Agreement, at A.2. The terms of Stout's engagement agreements, and not Plaintiff's unsupported assertions, control. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994).

Congress deliberately chose to provide a narrow form of relief against non-fiduciaries such as Stout:  Section 502(a)(3) allows a "participant, beneficiary, or fiduciary" to obtain "appropriate equitable relief" from a non-fiduciary where the non-fiduciary is a knowing participant in a prohibited transaction.  29 U.S.C. § 1132(a)(3); *see also* Op. Br. at 10.  The cause of action (aiding and abetting breach of fiduciary duty) and form of relief (money damages) that Plaintiff seeks against Stout are thus unavailable under ERISA.  *See id.* at 11-13.  Tellingly, the Opposition does not dispute this point.  *See* Opp. at 28-29.

Nor does the Opposition dispute that ERISA preemption may leave a plaintiff without a cause of action or remedy.  *See* Op. Br. at 13-15.  As noted in Stout's Opening Brief, "ERISA's preemptive scope is not diminished simply because a finding of preemption will leave a gap in the relief available to a plaintiff."  *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007); *see also Metro. Life Ins. Co. v. Depalo*, No. 13-3092, 2014 WL 4681094, at *11 (D.N.J. Sept. 22, 2014) ("[T]he availability of a federal remedy is not a prerequisite for federal preemption.").  That is precisely the case here:  ERISA provides a cause of action and form of relief against non-fiduciaries, but it does not provide any relief to Plaintiff. *See* Op. Br. at 13.  Count VI is thus preempted by Section 502(a)(3).

II.    **Count VI Was Not Reserved in the Plan of Liquidation.**

Count VI also should be dismissed because it was not reserved in the Plan of Liquidation. Relevant here, the Plan reserved "claims and Causes of Action ***related to or arising out of the ESOP*** that are not Direct ESOP Claims."  *See* FAC ¶ 366 (emphasis added).  The use of the term "related to" in the Plan is not a "textual coincidence."  *Cf.* Opp. at 12.  As previously explained, the term "relate[d] to" for purposes of Section 514(a) preemption is to be given its ***"common-sense meaning."***  *Menkes*, 762 F.3d at 293-94.  Applying that meaning here, the Plan reserved ERISA claims (*i.e.*, claims that are "related to or arising out of the ESOP") that are held by the

6

Debtors and their Estates.  *See* FAC ¶ 370 (Direct ESOP Claims are "direct cause[s] of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, ***excludes any Causes of Action related to the ESOP held by the Debtors and their Estates***.") (emphasis added).  Count VI thus was not reserved in the Plan and should be dismissed.

### III.    The Court Does Not Have Subject Matter Jurisdiction over Count VI.

This Court lacks subject matter jurisdiction over Count VI.  The Opposition does not dispute that Count VI is not a "core" bankruptcy claim.  *See* Opp. at 7-11.  Plaintiff claims that Count VI is "related to" the bankruptcy case because, *inter alia*, the Court must interpret the Plan to decide whether Count VI was reserved.  *See id.* at 9-10.  This is a transparent attempt by Plaintiff to manufacture a basis for the Court's subject matter jurisdiction over this matter where there is none.  The Plan's language is clear and ambiguous and a review of the Court's findings of fact and conclusions of law confirming the Plan is not necessary to determine whether Count VI was reserved.  For this reason, as well as the reasons set forth in Stout's Opening Brief,[8] the Court lacks subject matter jurisdiction over Count VI.[9]

### IV.    Count VI Fails to Plead a State Law Aiding and Abetting Claim.

Count VI fails to state an aiding and abetting breach of fiduciary duty claim against Stout[10] under Delaware or Wisconsin law.[11]  The Opposition fails to cite any well-pleaded

---

[8] Stout further incorporates by reference the portion of the Directors' and Officers' Reply Brief ("the D&O's Reply") that addresses this Court's subject matter jurisdiction.

[9] To the extent this Court finds that there is subject matter jurisdiction over this case, the Court should transfer this case to the United States District Court for the Eastern District of Wisconsin. Stout incorporates by reference the portion of the D&O's Reply that addresses transfer.

[10] The Opposition concedes that Count VI only asserts a claim against Stout with regard to conduct that occurred on or after October 2, 2014. *See* Opp. at 44.

[11] The Opposition claims that Count VI has been asserted under Delaware law as to "claims asserted as assignee of claims of Appvion's estate" and Wisconsin law as to "claims asserted as

7

allegations that support the inference that Stout "knowingly participated" in any illegal conduct and does not address (and thus concedes) Stout's argument that there were multiple superseding causes of Plaintiff's alleged injury. *See* Opp. at 37-42.

### A.    Knowing Participation.

The Opposition fails to cite any well-pleaded factual allegations in the FAC that support the inference that Stout acted with actual or constructive knowledge that the Directors and Officers were engaged in unlawful conduct. *See id.* There are none. The FAC asserts allegations that are either (i) bald and conclusory, *see, e.g.*, FAC ¶ 183 (alleging that Stout was "fully aware" that management's projections were "inflated") or (ii) built on assumptions and inferences. *See*, *e.g., id.* (alleging that "it strains credulity that Stout was unaware of the Debtors' track record of missing projections"). Such allegations are insufficient to plead "knowing participation," as the authority cited in the Opposition confirms.[12]

For example, the Opposition claims that Stout "could not have been ignorant of management's misconduct" because, *inter alia*, it had an "intimate working relationship with the Debtors." *See* Opp. at 40. The FAC alleges no *facts* in support of this assertion. Stout's role was extremely limited: Stout was engaged by the ESOP Trustee to perform semi-annual

---

assignee of claims of PDC's estate." Opp. at 6. The elements of an aiding and abetting breach of fiduciary duty claim under Delaware and Wisconsin law are generally the same. *Compare Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) *with Winslow v. Brown*, 371 N.W.2d 417, 423 (Wis. Ct. App. 1985). Thus, for the reasons stated in Stout's Opening Brief and this Reply, Count VI fails to state a claim for relief under both Delaware and Wisconsin law.

[12] *See In re Syntax-Brillian Corp.*, 573 F. App'x 154, 163 (3d Cir. 2014) ("[T]he Trust attempts to substantiate its assertion of knowledge by insinuating that Preferred Bank must have known of the fraud in the context of the purportedly suspicious circumstances. . . . The existence of such circumstances, coupled with bald assertions of knowledge, was insufficient to survive [a] motion to dismiss."); *Malpiede*, 780 A.2d at 1098 (affirming dismissal of aiding and abetting breach of fiduciary claim where there was "no indication in the amended complaint that [the defendant] participated in the board's decisions, conspired with the board, or otherwise caused the board to make the decisions at issue").

valuations of PDC stock that were to be used for plan administration purposes, *i.e.*, to determine the price at which the stock would be purchased and sold, as statutorily required. *See* Op. Br. at 1-2. Stout was not a member of the Company's management team. Stout did not serve as a financial advisor to the Company. As part of its due diligence process for its work for the Plan Trustee, Stout met with Appvion's management when preparing its valuations (as expressly contemplated in its engagement agreements, *see* Op. Br. at 20-21), but that does not mean that Stout worked hand-in-glove with the Company's management on a day-to-day basis. Moreover, Stout did not "frequently" attend the meetings of Appvion or PDC boards, as the Opposition contends. *Cf.* Opp. at 40. The FAC identifies 45 meetings of the Appvion and PDC boards that took place from May 7, 2014 to June 20, 2017, *see* FAC Fig. 9, but alleges that Stout attended just *two* of those meetings. *See id.* Stout attended those meetings at *the request of the Trustee*—it did not participate in those meetings as an advisor to the Company's management. *See, e.g.*, Ex. 1 6/20/2013 Engagement Agreement at A.2 ("We will report *solely to the Trustee* . . . .") (emphasis added). If anything, these facts support the inference Stout did not have an "intimate working relationship" with Appvion's management and instead performed routine professional services pursuant to the terms of its engagement agreements. This does not amount to "knowing participation." *See* Op. Br. at 27.

Similarly, the Opposition claims that it is "inconceivable" that Stout was not "fully aware" that the Debtors' management was providing it with "manipulated financial information," because Stout had "knowledge of the Debtors' true state." Opp. at 40. The Debtors' "true state," however, was reflected by real world market indicators of the Company's value from independent third parties—including the Company's auditors, the investment bankers engaged by the Company to assist with its multiple attempts to sell the Company in whole or in part, and

9

the prospective purchasers who made offers to buy the Company or its divisions—which Stout considered when preparing its valuations.  *See* Op. Br. at 3 & 24.  This data—which the Opposition fails to acknowledge—indicated that the Company was far from insolvent.  As noted in Stout's valuation reports, the Company received purchase offers for prices that were consistent with or exceeded Stout's valuations, *see id.* at 3 n.8, and consistently received unqualified audit opinions, *see id.* at 3-4—*even as the Company did not meet its financial projections*.  The fact that a company does not meet its financial projections does not indicate that the company is financially insolvent.  Thus, it is not reasonable to infer that Stout was "fully aware" that the financial projections were being "manipulated" by the Company's management, when real world market data indicated that there was value in the Company's equity.[13]

In addition, the Opposition claims that Stout made "adjustments" to its valuations and employed "methodological choices" that are "inexplicable as anything other than an attempt to compensate for management's manipulated projections."  Opp. at 40-41.  The FAC devotes many paragraphs to describing purported "errors" and "flaws" in Stout's valuations, *see* Op. Br. at 21-23,[14] but does not allege any *facts* that could lead to the inference that Stout acted in

---

[13] Stout's valuations were not prepared in a vacuum.  The FAC is premised on the notion that Stout participated in the Directors' and Officers' fraud because it knowingly relied on the "manipulated" financial projections, but the projections were just one of *multiple* data points— including the third party data described above—considered by Stout when preparing its valuations.  *See* Op. Br. at 24.  This is yet another point that the Opposition fails to address.
[14] Indeed, the FAC alleges that the fact the Company's debt was trading below par is "strong evidence" that the Company was insolvent years before it filed the Petition.  *See* FAC ¶¶ 335-45.  This argument is baseless.  Just because a company's debt is trading below par does not mean that the company is insolvent.  Even a cursory search of publicly available financial information demonstrates that during the relevant time period, multiple companies had a positive equity value even though their debt was trading below par.  *See, e.g.,* https://www.ishares.com/us/products/239565/ishares-iboxx-high-yield-corporate-bond-etf *and* https://www.ishares.com/us/products/239566/ishares-iboxx-investment-grade-corporate-bond-etf.

10

furtherance of the Directors' and Officers' purported breaches of fiduciary duty. *See id.* As explained in Stout's Opening Brief, the FAC's allegations amount to nothing more than disagreement with how Stout prepared its valuations, *see id.*, and the Opposition offers nothing that meaningfully disputes this point. Indeed, the Opposition does not contest that the business valuation of privately-held ESOP stock is a task that requires a significant degree of professional judgment. *See id.* at 22. Plaintiff's disagreement with how Stout exercised this judgment does not give rise to an aiding and abetting breach of fiduciary duty claim.

Further, the Opposition fails to address several key points raised in Stout's Opening Brief that undermine Plaintiff's aiding and abetting claim. First, the Opposition does not dispute that the FAC fails to plead any financial motive by Stout to engage in unlawful conduct: the engagement agreements demonstrate the unremarkable fact that Stout was paid a fixed fee for its work and the FAC does not allege that this fee was excessive or unreasonable. *See id.* at 25 & 28. The Opposition repeatedly refers to the Directors' and Officers' motivation to inflate the valuations, *see* Opp. at 2-3 & 40, yet says nothing as to any motivation by Stout—financial or otherwise—to do so. Second, the Opposition does not dispute that the purported fraudulent scheme is implausible. *See* Op. Br. at 23-24. It strains credulity that 13 individual officers and directors, multiple trustees, and an independent valuation firm engaged in a coordinated effort to carry out the fraud over a multiple year period. *See id.* The Opposition offers no response to this argument. Third, the Opposition does not dispute that Stout's valuations reflected a decline in the value of PDC stock. *See id.* at 21 n.24. If anything, Stout's valuations accurately reflected a Company that was in decline. Accordingly, the FAC fails to allege that Stout "knowingly participated" in any illegal conduct.

11

B.    **Proximate Cause.**

The Opposition does not address Stout's argument that the FAC fails to plausibly plead proximate cause, *see* Opp. at 37-42, and thus concedes that the FAC fails to plead this element of its aiding and abetting claim.  Count VI should be dismissed on this basis alone.

If anything, the Opposition supports Stout's argument that its valuations were not the "but for" cause of Plaintiff's purported injury.  The Opposition acknowledges that the Company's business was "*[f]aced with persistent industry headwinds*" that adversely impacted its revenue; *see id.* at 3 (emphasis added); the Debtors were in a financial "*hole*," *id.* at 1 (emphasis added), and that the Company had a "*doomed capital structure*," *id.* at 5 (emphasis added); Appvion loaned PDC over $60 million that was not repaid, *see id.* at 1; the Company's ESOP obligations were one of several factors that "*influenc[ed]*" its decision to sell the Encapsys business unit, *id.* at 5 (emphasis added)[15]; and "the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt in a failing business." *Id.*  Stout's valuations thus did not "in natural and continuous sequence" cause Plaintiff's injury.  *See* Op. Br. at 28-30.  Accordingly, Count VI should be dismissed due to the FAC's failure to plausibly allege proximate cause.

V.    **Counts X and XI Fail to State Claims for Relief.**

A.    **Count X Fails to State a Claim for Relief Against Stout.**

Count X asserts an avoidance preference claim relating to two specific payments made by Appvion to Stout:  (1) a payment in the amount of $25,937.60 on July 7, 2017, *see* FAC ¶ 448,

---

[15] The Opposition fails to address the fact that the Company sold its Encapsys division for more than a $40 million premium over Stout's most recent valuation of that component of the business.  *See* Op. Br. at 3 n.8.  It strains credulity that Plaintiff is alleging that Stout overvalued the Company when this business unit—which was a significant component of the Company's value—sold at a substantial premium over Stout's valuation.

12

and (2) a payment in the amount of $25,536.00 on August 10, 2017 (collectively referred to in the FAC as the "Stout Preference Payments"). *See id.* ¶ 449.

The Opposition concedes that Count X should be dismissed to the extent it purports to assert claims under state law, *see* Opp. at 44, and fails to make any plausible argument as to why Count X also should not be dismissed to the extent it purports to state a claim under the Bankruptcy Code. The Opposition does not dispute, and thus concedes, that the elements of the ordinary course defense appear on the face of the FAC. *See id.* at 44-45. The Trustee routinely engaged Stout to perform semi-annual valuations for multiple years before the petition was filed, FAC ¶ 100; the Trustee engaged Stout to perform the June 30, 2017 valuation, *see id.* ¶ 108 (citing the May 3, 2017 engagement letter for the FMV Determinations as of June 30, 2017 and December 31, 2017), which Stout prepared, *see, e.g., id.* ¶ 198; and Appvion made payments to Stout in July and August 2017 which total just over $50,000, *see id.* ¶ 109 & Fig. 2, which was the flat fee that Stout consistently charged Appvion per the terms of its engagement letters for each valuation, plus expenses, *see generally* Ex. 1, including its May 3, 2017 engagement letter. *See id.* at A.28-29. As a result, the July 7, 2017 and August 10, 2017 may not be avoided under Bankruptcy Code Section 547(b).[16] *See* Op. Br. at 33-35.

## B.    Count XI Fails to State a Claim for Relief Against Stout.

The Opposition's arguments as to Count XI, which purports to assert a fraudulent conveyance claim, are similarly unavailing. As a threshold matter, the Opposition entirely fails

---

[16] The Opposition's argument regarding the timing of the Company's payments to Stout makes no sense. As stated Stout's Opening Brief, the parties entered into a May 3, 2017 engagement agreement for, *inter alia*, Stout's preparation of the June 30, 2017 valuation, *see* FAC ¶ 198, and the Company made payment to Stout for that work in the ordinary course shortly after the work was completed, in July and August 2017. *See* FAC ¶ 109 (Fig. 2). The July and August 2017 payments are the only payments at issue in Count X. *See id.* ¶¶ 448-49.

to address—and thus concedes—Stout's argument that the FAC's conclusory allegation regarding reasonably equivalent value is insufficient to plead a fraudulent conveyance claim. *See* Op. Br. at 36-37.

Further, the Opposition's claim that Appvion did not receive reasonably equivalent value for the transfers because "Stout did not provide any services directly to Appvion," Opp. at 45, is frivolous. Stout contracted with Argent to prepare the valuations, *see id.*, but the Company agreed to pay Stout's fees and expenses and signed the engagement agreements, *see generally* Ex. 1 *(a point the Opposition does not dispute)*, and ultimately received the benefit of Stout's services. Indeed, the Opposition does not dispute that Stout's engagement agreements were negotiated at arm's-length; that Stout prepared the FMV reports pursuant to the terms of those contracts, which Stout carried out in good faith; and that Stout was paid a reasonable, fixed fee for its work. These facts demonstrate that the Company received reasonably equivalent value for the transfers. *See* Op. Br. at 36-37.[17]

## VI.    The Court Lacks Personal Jurisdiction over Stout.

The exercise of personal jurisdiction over Stout in this matter is not consistent with the Constitution and the laws of the United States because there is no federal statute applicable here that provides for nationwide service of process. Stout acknowledges that certain courts disagree with its position, but respectfully submits that these cases discount the language of the Rules Enabling Act. *See* Op. Br. at 38-39. Moreover, the exercise of personal jurisdiction is inappropriate here because the FAC does not allege that Stout had minimum contacts with the State of Delaware. *See id.* at 39-40. Stout performed valuations of PDC stock pursuant to its

---

[17] The Opposition concedes that Count XIII does not state a claim for relief against Stout. *See* Opp. at 46. Accordingly, Count XIII should be dismissed with prejudice as to Stout.

*contract with the Trustee*.  Stout did not have a contractual relationship with the Company.  *See*

*generally* Ex. 1.  Even if it did, that alone would not be enough to establish the minimum

contacts required for the exercise of specific personal jurisdiction.[18]  Moreover, Stout's status as

a defendant in an unrelated case filed in Delaware state court, *see* Opp. at 36-37, has nothing to

do with whether this Court may exercise specific jurisdiction over Stout in this case.[19]

## CONCLUSION

For all of the reasons stated above, the First Amended Complaint should be dismissed

with prejudice as to Stout.

Dated: May 7, 2019
       Wilmington, Delaware

Mark L. Desgrosseilliers (DE Bar No. 4083)
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Email:  desgross@chipmanbrown.com

-and-

Lars C. Golumbic, admitted *pro hac vice*
Groom Law Group, Chartered
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Phone: (202) 861-6615
Email:  lgolumbic@groom.com

*Attorneys for Stout Risius Ross, Inc. and Stout
Risius Ross, LLC*

---

[18] *See URS Corp. v. Lebanese Co. for Dev. & Reconstruction of Beirut Cent. Dist. SAL*, 512 F. Supp. 2d 199, 217 (D. Del. 2007).
[19] *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 298 (3d Cir. 1985) ("It is axiomatic that the issue of minimum contacts turn on the specific facts of each case[.]").  The claims against Stout accordingly should be dismissed for lack of personal jurisdiction.

15

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.,* | Case No.: 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 18-50955-MFW |
| MARK R. RICHARDS et al | |
| Defendants. | |

## REPLY BRIEF IN SUPPORT OF ARGENT TRUST COMPANY'S MOTION TO DISMISS

Carl N. Kunz, III, Esq. (DE Bar No. 3201)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801-1494
Telephone: (302) 888-6800
Facsimile:   (302) 571-175
E-mail:  ckunz@morrisjames.com

Michael L. Scheier (Ohio 0055512)
Brian P. Muething (Ohio 0076315)
Jacob Rhode (Ohio 0089636)
**KEATING MUETHING & KLEKAMP, PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202
Email:  mscheier@kmklaw.com
bmuething@kmklaw.com
     jrhode@kmklaw.com
Tel:  (513) 579-6400
Fax:  (513) 579-6457

*Counsel for Argent Trust Company*

## **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................2

      A.    Plaintiffs' Aiding and Abetting Claim (Count V) Must Be Dismissed ...................2

           1.    The Aiding and Abetting Claim is Preempted by ERISA Section 514(a)...2

           2.    The Aiding and Abetting Claim Should Alternatively be Dismissed Because it was Not Preserved in the Bankruptcy Plan. ..............................6

           3.    In all Events, Plaintiffs Failed to Adequately Plead an Aiding and Abetting Claim against Argent. .............................................................7

      B.    The Avoidance Claims (Count XII and XIII) Should also be Dismissed...............9

           1.    Argent's Motion to Dismiss the Preference Claim (Count XII) is Unopposed. ............................................................................................9

           2.    The Fraudulent Transfer Claim (Count XIII) Should also be Dismissed..10

III.   CONCLUSION....................................................................................................12

## **TABLE OF AUTHORITIES**

**Cases**

*Ankele v. Hambrick*,
  286 F. Supp. 2d 485 (E.D. Pa. 2003) .................................................................. 10

*Antioch Co. Litig. Trust v. Morgan*,
  456 B.R. 791 (Bankr. S.D. Ohio 2011) .............................................................. 4-5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................ 11

*AT&T v. Empire Blue Cross & Blue Shield, No. 93-cv-1224*,
  1994 U.S. Dist. LEXIS 21091 (D.N.J. July 19, 1994) ........................................ 5

*Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*,
  466 B.R. 626 (Bankr. D. Del. 2012)................................................................... 11

*Cumming v. Edens.*,
  2018 Del. Ch. LEXIS 54 (Del. Ch. Feb. 20, 2018) ............................................ 9

*Estate of Millner v. Bayada Nurses, Inc.*,
  No. 05-cv-3164, 2006 U.S. Dist. LEXIS 3709 (D.N.J. Jan. 30, 2006) ............. 9-10

*Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*,
  Nos. 09-11582, 2012 Bankr. LEXIS 5102 (Bankr. D. Del., Oct. 31, 2012) ............. 10-11

*Hollister v. U.S. Postal Serv.*,
  142 F. App'x 576 (3d. Cir. 2005) ....................................................................... 9

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) .......................................................................................... 2, 5

*In re Santa Fe Pacific Corp. Shareholder Lit.*,
  669 A.2d 59 (Del. 1995) .................................................................................... 8

*Kollman v. Hewitt Associates, LLC*,
  487 F.3d 139 (3d. Cir. 2007) ............................................................................. 3

*McFall v. Stacy & Witbeck, Inc.*,
  No. 14-cv-04150, 2016 U.S. Dist. LEXIS 148399 (N.D. Cal., Oct. 26, 2016) ....... 8

*McLemore v. Regions Bank*,
  Nos. 08-cv-0021, 08-cv-1003, 2010 U.S. Dist. LEXIS 25785 (M.D. Tenn. Mar. 18, 2010) ... 5

*Menkes v. Prudential Ins. Co. of Am.*,
  762 F.3d 285 (3d Cir. 2014) ........................................................................... 2, 3, 5

*Metro. Life Ins. Co. v. Depalo*,
  No. 13-3092, 2014 U.S. Dist. LEXIS 132502 (D.N.J. Sep. 22, 2014) ..................................... 7

*Nat'l Sec. Sys. v. Iola*,
  700 F.3d 65 (3d Cir. 2012) ............................................................................................. 2, 3, 5

*O'Neal v. Middletown Twp., No. 3:18-cv-5269*,
  2019 U.S. Dist. LEXIS 59 (D.N.J. Jan. 2, 2019) ...................................................................... 9

*Pardo v. Gonzaba, (In re APF Co.)*,
  308 B.R. 183 (Bankr. D. Del. 2004) ...................................................................................... 11

*Person v. Teamsters Local Union 863*,
  No. 12-2293, 2013 U.S. Dist. LEXIS 149252 (D.N.J. Oct. 17, 2013) ..................................... 9

**Statutes**

29 U.S.C. § 1144(a) (ERISA Section 514) ................................................................................... 2

## I.    <u>INTRODUCTION</u>

The Court should dismiss all three claims against Argent Trust Company in the First Amended Complaint ("FAC"). Plaintiffs' Opposition Brief (D.I. 77) does nothing to change this conclusion.

Argent argued that the sole substantive state law claim against it, aiding and abetting members of the Appvion Board's alleged breach of fiduciary duties, was preempted by the explicit statutory preemption provision in ERISA section 514(a). After devoting approximately eighteen pages discussing preemption generally and the arguments of the other defendants for dismissal under ERISA section 502—a section irrelevant to Argent's Motion—Plaintiffs spent less than two pages trying to refute Argent's specific argument that Plaintiffs' claim is preempted by the broad statutory preemption of ERISA section 514(a). But, as Plaintiffs themselves concede in their Opposition Brief, the aiding and abetting claim is related to and arises out of the ESOP and challenges actions central to the administration of the ESOP. That being the case, their claim is preempted by ERISA section 514(a), which broadly preempts all causes of action that relate to an employee benefit plan like the Appvion ESOP.

As to Argent's alternative argument that Plaintiffs have failed to plead a plausible aiding and abetting claim, the Opposition Brief fails to identify a single allegation that Argent had incentive or reason to knowingly participate in the Appvion Board's allegedly tortious conduct. Nor have Plaintiffs identified any allegations from which the Court may reasonably infer such incentive or reason. In fact, it is unreasonable to infer from the FAC's allegations that a government regulated, independent, institutional ESOP trustee like Argent, with no alleged incentive or reason to do so, would willfully assist others in allegedly looting an ESOP company.

With regard to the fraudulent transfer claim, the FAC fails to state a claim because Plaintiffs do not challenge that the payment of trustee fees to Argent satisfied an antecedent debt of Appvion, thus establishing as a matter of law that the payments were for reasonably equivalent value.

Lastly, the preference claim is particularly easy to dismiss: Plaintiffs failed to respond at all, reason enough to dismiss the claim under prevailing Third Circuit waiver law.

Based on the foregoing, and as more fully laid out below and in Argent's Opening Brief, the Court should dismiss the three claims against Argent with prejudice.

## II.  ARGUMENT

### A.  Plaintiffs' Aiding and Abetting Claim (Count V) Must Be Dismissed

#### 1.  The Aiding and Abetting Claim is Preempted by ERISA Section 514(a).

Argent moved to dismiss Plaintiffs' aiding and abetting claim under ERISA section 514(a), which broadly preempts all state laws and causes of action that "relate to any employee benefit plan." 29 U.S.C. § 1144(a). (Argent Br., D.I. 68 at 5-11.) As explained in Argent's Opening Brief, the Supreme Court and Third Circuit have repeatedly emphasized this "relate to" language is "conspicuous for its breadth" and uses "deliberately expansive language" to preempt all state law claims that have "a connection with or reference to" an employee benefit plan. (*Id.*) *See also, e.g.*, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-140 (1990); *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 83-84 (3d Cir. 2012); *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 293-296 (3d Cir. 2014). There is no question state law claims have an impermissible "connection with" an employee benefit plan, and are therefore preempted under section 514(a), when they are "premised on the existence of" the plan and relate to "administration of" that plan. *Ingersoll-Rand Co.*, 498 U.S. at 138-140 (finding preemption under section 514(a) of a state law claim that, as here, makes "specific reference to, and indeed is premised on, the existence of a pension plan" ); *Iola*, 700 F.3d

2

at 83-84 (affirming preemption under section 514(a) of state law claims "premised on the existence of the plans" and challenging conduct related to "administering the plans"); *Menkes*, 762 F.3d at 293-296 (affirming preemption under section 514(a) of state law claims "premised on the existence of the plan"); (Argent Br., D.I. 68 at 5-9) (citing and discussing additional cases).

Plaintiffs' aiding and abetting claim is preempted under these well-established principles. As Plaintiffs themselves concede, "[t]here is no question that the claims asserted in the FAC 'relate to' and 'arise out of' the ESOP . . ." (Opposition Brief ("Opp."), D.I. 77 at 13.) Likewise, Plaintiffs admit "the biannual [valuations by Argent giving rise to Plaintiffs' claim] served several crucial functions, related [ ] *to the administration of the ESOP*," and were mandated by the Appvion ESOP and Trust Agreements. (FAC ¶ 112) (emphasis added).[1] Just as material, Plaintiffs allege in FAC ¶ 113 that Argent's valuation determinations were required for matters central to plan administration, including "contributions to the ESOP," "distributions to ESOP participants," and "estimate[s] [of] the upcoming repurchase obligations under the ESOP." Those allegations should be the end of the ERISA preemption inquiry, and with the help of Plaintiffs' own concessions, resolve it in Argent's favor.[2]

Plaintiffs spend some eighteen pages of their Opposition Brief on a confusing and meandering discussion about general preemption and a provision under ERISA (section 502) that Argent for good reason – it is irrelevant - did not address in its Motion. Instead, Plaintiffs devote

---

[1] Copies of the ERISA plan documents that mandate and govern all of Argent's challenged conduct—the Appvion ESOP and Trustee Agreements—are attached to Argent's Motion. (*See* D.I. 68-1, 68-2, 68-3.)

[2] Plaintiffs do not and cannot refute these well-established preemption principles under section 514(a). For example, at one point Plaintiffs cite to *Kollman v. Hewitt Associates, LLC*, 487 F.3d 139 (3d. Cir. 2007) (Opp., D.I. 77 at 17), where the Third Circuit relied upon the expansive scope of section 514 to affirm as preempted a state law claim against a plan service provider. There, the challenged actions by the service provider related to conduct necessary for administration of the plan (just like the valuation determinations by Argent were necessary for administration of the Appvion ESOP), and to "subject such companies to the differing state court interpretations of [a] tort . . . would create obstacles to the uniformity of plan administration that was and is one of ERISA's goals." *Id.* at 148.

3

less than two pages to Argent's argument for preemption under ERISA section 514(a). (*See* Opp., D.I. 77 at 32-33.) In that very brief discussion of Argent's argument, Plaintiffs do not even address, much less distinguish, the principal and most analogous case discussed at length in Argent's Opening Brief. (Argent Br., D.I. 68 at 9-10 (*citing Antioch Co. Litig. Trust v. Morgan*, 456 B.R. 791 (Bankr. S.D. Ohio 2011)).

In *Antioch*, as here, a post-confirmation litigation trustee sued directors for breach of state law fiduciary duties. The litigation trustee also sued the institutional ESOP trustee for "aiding and abetting" those breaches of state law fiduciary duty. There, an ESOP fiduciary had also filed a separate lawsuit in a different court on behalf of the ESOP and its participants asserting ERISA claims against the institutional ESOP trustee based upon the same alleged conduct (*Fish, et al. v. GreatBanc Trust Company, et al.*, 09-cv-1668 (N.D. Ill.)), just as the Appvion ESOP Administrative Committee for the Appvion ESOP has done in the Eastern District of Wisconsin before this case was even filed.[3] After summarizing the expansive preemptive effect of section 514(a), the Bankruptcy Court in *Antioch* concluded that the aiding and abetting claim was preempted because it was based solely on the institutional ESOP trustee's conduct in its role as an ERISA fiduciary, and thus "necessarily interfere[d] with the comprehensive ERISA enforcement scheme." *Antioch*, 456 B.R. at 836. Just like the FAC in this case, the complaint in *Antioch* did "not contain a single allegation that suggests [the ESOP trustee] made any decision, good, bad or otherwise, outside of its fiduciary role as the ESOP Trustee." *Id.*

Plaintiffs ironically urge this Court to follow the *Antioch* court's preemption analysis of the claims asserted against the director defendants in that case, stating in their brief that the *Antioch* court correctly "addressed preemption in a factual setting similar to here." (Opp., D.I. 77 at 27.)

---

[3] A copy of the Amended Complaint in that separate ERISA lawsuit—E.D. Wisc. No. 1:18-cv-01861-WCG (the "Wisconsin Action")—has been filed in this case at D.I. 66-1.

4

Yet, to quote the Plaintiffs, the *Antioch* court "addressed preemption in a factual setting similar to here" in dismissing the liquidating trustee's aiding and abetting claims against the ESOP trustee, and the Plaintiffs have provided no reason that this Court should not reach the same conclusion. Plaintiffs do not even dispute that other courts, like the *Antioch* court, have also routinely held state law aiding and abetting claims are preempted by ERISA, as Argent notes in its Opening Brief. (Argent Br., D.I. 68 at 9-10).[4]

There are simply no allegations in the FAC, and Plaintiffs do not argue in the Opposition Brief, that Argent took any action outside of conduct that is (1) premised on the existence of the Appvion ESOP, (2) fundamental to the administration of the Appvion ESOP, and (3) governed by ERISA. Plaintiffs admit that "the valuations of PDC stock were undoubtedly central to the administration of the ESOP," and that there is "no doubt that claims that involve entities' roles as ERISA [ ] fiduciaries are preempted by ERISA section 514(a)[.]" (Opp. at 31, 33.) It is hard to imagine a claim that has a more direct "connection with" an employee benefit plan or that more closely relates to "administration of" an employee benefit plan than Plaintiffs' state law claim against Argent based solely upon actions required by the Appvion ESOP and Argent's ERISA fiduciary role as Trustee. (Argent Br., D.I. 68 at 5-9); *Ingersoll-Rand Co.*, 498 U.S. at 138-140

---

[4] Plaintiffs also ignore *McLemore v. Regions Bank*, Nos. 08-cv-0021, 08-cv-1003, 2010 U.S. Dist. LEXIS 25785, 2010 WL 1010092 (M.D. Tenn. Mar. 18, 2010). *McLemore* is another decision where aiding and abetting claims by a bankruptcy trustee were dismissed as preempted. (*See* Argent Br., D.I. 68 at 9-10.). Plaintiffs attempt to distinguish some of these other cases by noting in passing that the parties had "ERISA-regulated relationships" and were brought by plaintiffs authorized to bring suit under ERISA. (Opp. at 32-33.) Those decisions turned not upon the status of the plaintiffs or relationships between the parties to the case, but upon the same preemption principles that require dismissal of the aiding and abetting claim against Argent. *See, e.g., AT&T v. Empire Blue Cross & Blue Shield*, No. 93-cv-1224, 1994 U.S. Dist. LEXIS 21091, *76, *80 (D.N.J. July 19, 1994) (dismissing aiding and abetting claim that was "predicated upon alleged agreements and conduct involving [employee benefit] Plan administration"—like Argent's valuation determinations mandated by the Appvion ESOP and Trustee Agreements for purposes of ESOP administration—and sought to hold defendant "to state law standards for the same conduct upon which [the] ERISA claims are based," which would squarely "frustrate the intended effect of the preemption provision to prevent conflicts among state standards of conduct applicable to ERISA entities")

5

*Iola*, 700 F.3d at 83-84; *Menkes*, 762 F.3d at 293-296.

That Plaintiffs improperly seek to impose a state law standard for conduct governed by ERISA is perhaps most clearly demonstrated by the allegations in the Wisconsin Action, which Plaintiffs do not mention in their Opposition Brief. Prior to this action, the ESOP Administrative Committee for the Appvion ESOP brought ERISA claims against Argent in the Eastern District of Wisconsin based on the identical allegations that Plaintiffs subsequently asserted under state law here. (*See* D.I. 66-1.) ERISA section 514(a) was designed to prohibit this very thing, namely, subjecting an ERISA fiduciary to a state law for the very same conduct governed by ERISA. Because Plaintiffs' aiding and abetting claim impermissibly seeks to use state common law to challenge Argent's conduct related to its fiduciary role with the Appvion ESOP, it is preempted by section 514(a) and should be dismissed.

### 2. The Aiding and Abetting Claim Should Alternatively be Dismissed Because it was Not Preserved in the Bankruptcy Plan.

The Court should dismiss the aiding and abetting claim for the alternative reason that it was not preserved in the Bankruptcy Plan of Liquidation (the "Bankruptcy Plan"). Recall that the Bankruptcy Plan reserves only specific claims for the Plaintiffs to pursue and everything else is barred. Those reserved claims are:

> (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

(FAC ¶ 366.) As noted in Argent's Opening Brief, three of the four categories of preserved Litigation Claims ((b)-(d)) are facially inapplicable to Argent. (Argent Br., D.I. 68 at 11.) Plaintiffs do not contend otherwise.

The remaining section, (a), does not identify Argent by name or identify the aiding and

abetting breach of state law fiduciary duty claim against Argent. It stretches the plain language of section (a) past its breaking point to conclude that the claim against Argent has a textual basis in the Bankruptcy Plan, and it should be dismissed on that ground alone. Plaintiffs are therefore left to contend that the state law tort claim against Argent is "related to…the ESOP", placing it squarely within ERISA "related to" preemption.

Plaintiffs tepidly resist this conclusion (Opp., D.I. 77 at 12) by claiming that the same words—"related to"—in ERISA preemption and the Bankruptcy Plan is a "textual coincidence" and a "gotcha." (Opp. at 12.) But Plaintiffs never explain why the phrase "related to" should receive different constructions by the Court. It would be a strange outcome indeed for the claim against Argent to be "related to…the ESOP" for Bankruptcy Plan purposes but not "related to" ERISA for preemption purposes, particularly in light of clear Supreme Court and Third Circuit precedent affirming that ERISA preemption under section 514(a) is "deliberately expansive" and "conspicuous for its breadth," as explained in Argent's Opening Brief. (Argent Br., D.I. 68 at 5-7.)[5]

### 3. In all Events, Plaintiffs Failed to Adequately Plead an Aiding and Abetting Claim against Argent.

Even if preserved and not preempted, the Court should dismiss the aiding and abetting claim against Argent for failure to state a claim.

Plaintiffs failed to address Argent's central thematic argument for dismissal—that the aiding and abetting claim against Argent is not plausible under *Twombly* and *Iqbal*. (Argent Br., D.I. 68 at 14-16.) Argent argued in its Opening Brief that it had absolutely no incentive or reason

---

[5] That Plaintiffs may be left without a state law cause of action against Argent is inconsequential to the preemption analysis. As the court in *Metro. Life Ins. Co. v. Depalo* explained in a decision Plaintiffs attempt to rely upon (Opp. 12-13), the "difficult position" of leaving plaintiff without state law claims "does not empower the Court to disregard section 514(a)'s text, Congress's intent, binding precedent interpreting section 514(a), and other persuasive opinions . . . There is no such exception in the preemption provisions of ERISA." No. 13-3092, 2014 U.S. Dist. LEXIS 132502, at *30-31 (D.N.J. Sep. 22, 2014).

7

to assist the directors in allegedly breaching their fiduciary duties, and more importantly for Rule 12 purposes, no such incentive or reason is plead. (*Id.* at 14-15.) Nor can the Court reasonably infer such incentive or reason from any specific allegation, or the FAC generally. In fact, Argent pointed out how *implausible* it was that a professional trustee firm with *nothing* to gain would engage in such conduct. (*Id.*) Taking the argument still further, Argent contended that it was ever more implausible to think this alleged conspiracy would stretch over a decade, a changing group of directors, and multiple independent trustee firms. These were important arguments and Plaintiffs challenged neither the facts nor the legal importance of Argent's lack of incentive or reasons. This pleading deficiency compels dismissal for failure to state a claim.

Having ignored our main point that Plaintiffs failed to plead an improper incentive or reason, Plaintiffs attempt to counter our additional argument in our Opening Brief (*id.* at 14) that they did not satisfy the stringent "knowing participation" element of their claim by asserting in their Opposition Brief that Argent was "fully aware" of the directors' "mismanagement." (Opp., D.I. 77 at 39.) To support this sweeping and conclusory contention, however, Plaintiffs point only to FAC allegations that Argent worked with the Debtors' "management," and thus they now argue, "could not have been ignorant of management's misconduct." (Opp., D.I. 77 at 40.) That conclusory statement fails to plead "knowing participation" or an inference of "knowing participation" in anything, and especially not "knowing participation" in a breach of duty by the *directors*. *McFall v. Stacy & Witbeck, Inc.*, No. 14-cv-04150-JSC, 2016 U.S. Dist. LEXIS 148399, *20 (N.D. Cal., Oct. 26, 2016) (citing *In re Sharp Int'l Corp.*, 281 B.R. 506, 515 (Bankr. E.D.N.Y. 2002)) (dismissing aiding and abetting claims against valuation advisor). In other words, Plaintiffs' conclusory allegations and statements (Argent was "fully aware" and "could not have been ignorant") do not state or provide a reasonable basis to infer the "knowing participation" element

of an aiding and abetting claim, as Argent showed in its Opening Brief. *E.g.*, *In re Santa Fe Pacific Corp. Shareholder Lit.,* 669 A.2d 59, 72 (Del. 1995) (proper to dismiss aiding and abetting claim where plaintiff failed to plead more than conclusory allegations about knowing participation); (Argent Br., D.I. 68 at 12-15).

Plaintiffs fare no better on the further requirement to plead facts showing Argent acted with scienter, which provides another "degree of insulation from liability" for service providers like Argent, as explained in our Opening Brief. (Argent Br., D.I. 68 at 13-14.) In their Opposition Brief, Plaintiffs point only to alleged flaws in Argent's and Stout's valuation work. Yet even assuming (as we must at this point) that such alleged flaws occurred, that a valuation decision might have been flawed hardly pleads that Argent acted with "an illicit state of mind." *Cumming v. Edens.*, 2018 Del. Ch. LEXIS 54, at *58 (Del. Ch. Feb. 20, 2018). This is particularly so where, again, there is no allegation in the FAC from which the Court could reasonably infer that Argent stood to gain from its alleged bad acts and the risking of its professional reputation. This is hardly the case and these are hardly the allegations that make an exception to the rule that an "aiding and abetting claim [is] among the most difficult to prove.'" *Cumming*, 2018 De. Ch. LEXIS 54 at *58-59 (quoting *RBC Capital Mkts. LLC v. Jervis*, 129 A.3d 816, 866 (Del. 2015)).

B.     **The Avoidance Claims (Count XII and XIII) Should also be Dismissed**

1.     **Argent's Motion to Dismiss the Preference Claim (Count XII) is Unopposed.**

Argent moved to dismiss Plaintiffs' preference claim (Count XII). (*See* Argent Mot., D.I. 67; Argent Br., D.I. 68 at 20-21.) Plaintiffs do not contest this aspect of our motion in their Opposition Brief. Because Plaintiffs fail to present any argument in opposition to Argent's motion to dismiss Count XII, they have waived the opportunity to contest it, and the Court can and should enter judgment in Argent's favor. *Hollister v. U.S. Postal Serv.*, 142 F. App'x 576, 577 (3d. Cir.

9

2005) (a party's failure to oppose an argument raised in a motion to dismiss constitutes waiver). *See also O'Neal v. Middletown Twp.*, No. 3:18-cv-5269, 2019 U.S. Dist. LEXIS 59, at *9 (D.N.J. Jan. 2, 2019) ("Plaintiffs fail to present any substantive argument in opposition to Defendants' argument, and therefore, have conceded the point"); *Person v. Teamsters Local Union 863*, No. 12-2293, 2013 U.S. Dist. LEXIS 149252, at*5 (D.N.J. Oct. 17, 2013) ("Failure to raise legal arguments in opposition to a motion to dismiss results in waiver"); *Estate of Millner v. Bayada Nurses, Inc.*, No. 05-cv-3164, 2006 U.S. Dist. LEXIS 3709, at *5-6 (D.N.J. Jan. 30, 2006) (same); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) ("Plaintiff makes no response to this argument, and thus has waived his opportunity to contest it"), *aff'd*, 136 F. App'x 551 (3d Cir. 2005). The Court should therefore dismiss Count XII as to Argent.

### 2. The Fraudulent Transfer Claim (Count XIII) Should also be Dismissed.

Argent moved to dismiss Plaintiffs' fraudulent transfer claim (Count XIII) as a matter of law because it is undisputed that the challenged payments were made to satisfy Appvion's antecedent debt to pay Argent's trustee fees, and also because the FAC fails as a pleading matter to allege facts sufficient to establish a claim. (Argent Br., D.I. 68 at 16-19.) Plaintiffs offer a four-line response. They argue Count XIII should not be dismissed because Argent provided services to the Appvion ESOP, not "directly to Appvion . . . ." (Opp. at 43-44.) This superficial response ignores Argent's principal argument for dismissal—the Argent Transfers indisputably were made for the satisfaction of an *antecedent debt of Appvion*, which as a matter of law constitutes reasonably equivalent value to Appvion for purposes of both Bankruptcy Code section 548(a) and the Uniform Fraudulent Transfer Act. (Argent Br., D.I. 68 at 17-19.)

Under the Trustee Letter Agreements incorporated into the FAC—which Plaintiffs ignore—it is undisputed that Appvion agreed to pay Argent specified fees in exchange for Argent's

services on behalf of Appvion's ESOP and Employee Stock Ownership Trust ("ESOT"). (D.I. 68-4, D.I. 68-5.) Appvion therefore had a preexisting obligation (i.e., antecedent debt) to pay Argent for those services. Because the challenged Argent Transfers were payments towards Appvion's antecedent debt, they constitute reasonably equivalent value to Appvion as a matter of law. That requires dismissal under Rule 12(b)(6), as this Court and numerous others have held in decisions Plaintiffs neither cite nor refute. (*See* Argent Br., D.I. 68 at 17-19) (citing *Gellert v. Coltec Indus. (In re Crucible Materials Corp.)*, Nos. 09-11582, 11-53884, 2012 Bankr. LEXIS 5102, at \*21-22 (Bankr. D. Del., Oct. 31, 2012) (Walrath, J.) (fraudulent transfer claim related to payments debtor made on behalf of defendant lessee failed because the payments were for a contractual obligation debtor assumed and thus constituted reasonably equivalent value); *Pardo v. Gonzaba, (In re APF Co.)*, 308 B.R. 183 (Bankr. D. Del. 2004) (payments of antecedent debt not avoidable as fraudulent transfer); *Burch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626, 660 (Bankr. D. Del. 2012 (same).

Count XIII fails for yet another reason—the FAC does not sufficiently allege facts to state a fraudulent conveyance claim. In the FAC, Plaintiffs state only the bare legal conclusion that "Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers" (FAC ¶ 481), which is the very type of threadbare recital that numerous courts have held is insufficient to survive a Rule 12(b)(6) motion to dismiss a fraudulent transfer claim. (*See* Argent Br., D.I. 68 at 16-19.) Plaintiffs' argument that Argent's services were for the Appvion ESOP and therefore Appvion "did not receive anything" is wrong, and does not cure this pleading deficiency. After all, it is undisputed that Appvion established the ESOP to provide benefits for its employees (D.I. 68-1), established the ESOT for the purpose of funding those benefits for its employees (D.I. 68-2, D.I. 68-3), and then contracted to pay Argent to act as ESOP Trustee and provide necessary

services on behalf of Appvion's ESOP, ESOT, and employees. (D.I. 68-4, D.I. 68-5.) Plaintiffs

argument that Appvion "did not receive anything" from Argent's services is simply not a

"plausible" or "reasonable inference" to be drawn from the FAC. *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

The Court should dismiss Plaintiffs' constructive fraudulent transfer claim in Count XIII.

**III.** **CONCLUSION**

For the foregoing reasons, and the reasons stated in Argent's Motion and Opening Brief

(D.I. 67, D.I. 68), the claims against Argent Trust Company should be dismissed.

Dated: May 7, 2019                             **MORRIS JAMES LLP**

/s/ Carl N. Kunz, III
Carl N. Kunz, III (DE Bar No. 3201)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801-1494
Telephone: (302) 888-6800
Facsimile:  (302) 571-175
E-mail:  ckunz@morrisjames.com

and

Michael L. Scheier, Esq. (0055512)
Brian P. Muething, Esq. (0076315)
Jacob Rhode, Esq. (0089636)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202
E-mail:  mscheier@kmklaw.com
E-mail: bmuething@kmklaw.com
E-mail: jrhode@kmklaw.com
Telephone:  (513) 579-6400
Facsimile:  (513) 579-6457

*Counsel for Argent Trust Company*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 18-50955 (MFW) |
| MARK R. RICHARDS, et al., | |
| Defendants. | |

### AFFIDAVIT OF JAMIE L. DAWSON, PARALEGAL

STATE OF DELAWARE      :
                               : SS:

NEW CASTLE COUNTY    :

         I, Jamie L. Dawson, certify that I am, and at all times during the service, have been an employee of Morris James LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on May 7, 2019, I caused to be served:

### REPLY BRIEF IN SUPPORT OF ARGENT TRUST COMPANY'S MOTION TO DISMISS

         Service was upon the parties on the attached list as indicated thereon.

Date:   May 7, 2019

_____
Jamie L. Dawson

**SWORN AND SUBSCRIBED** before me this 7th day of May, 2019.

_____
Notary

*[Notary seal: REBECCA ZERBE, MY COMMISSION EXPIRES JUNE 14, 2020, NOTARY PUBLIC, STATE OF DELAWARE]*

**VIA HAND DELIVERY**
Vivek Upadhya, Esq.
Grant & Eisenhofer PA.
123 Justison Street
Wilmington, DE 19801
[Counsel to Plaintiff]

Mark Minuti, Esq.
Saul Ewing Arnstein & Lehr LLP
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
[Counsel to Mark R. Richards, Thomas J.
Ferree, Tami L. Van Straten, Jeffrey J.
Fletcher, Kerry S. Arent, Stephen P. Carter,
Terry M. Murphy, Andrew F. Reardon, Kathi
P. Seifert, Mark A. Suwyn, Carl J. Laurino,
David A. Roberts and Kevin Gilligan]

Mark L. Desgrosseilliers, Esq.
Chipman Brown Cicero & Cole, LLP
1313 North Market Street, Suite 5400
Wilmington, DE 19801
[Counsel to Stout Risius Ross, Inc. and Stout
Risius Ross, LLC]

**VIA FIRST CLASS MAIL**
Gordon Z. Novod, Esq.
Grant & Eisenhofer PA
485 Lexington Avenue, 29th Floor
New York, NY 10017
[Counsel to Plaintiff]

Michael T. Graham, Esq.
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
[Counsel to Mark R. Richards, Thomas J.
Ferree, Tami L. Van Straten, Jeffrey J.
Fletcher, Kerry S. Arent, Stephen P. Carter,
Terry M. Murphy, Andrew F. Reardon, Kathi
P. Seifert, Mark A. Suwyn, Carl J. Laurino,
David A. Roberts and Kevin Gilligan]

Lars C Golumbic, Esq.
Groom Law Group
1701 Pennsylvania Avenue NW, Suite 1200
Washington, DC 20006
[Counsel to Stout Risius Ross, Inc. and Stout
Risius Ross, LLC]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.*, | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF THE FORMER DIRECTORS' AND
OFFICERS' MOTION TO DISMISS AMENDED COMPLAINT**

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino, Esq. (DE Bar No. 6027)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6806
Facsimile: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

Craig C. Martin (Admitted *Pro Hac Vice*)
David Jimenez-Ekman (Admitted *Pro Hac Vice*)
Melissa M. Root (Admitted *Pro Hac Vice*)
Michael T. Graham (Admitted *Pro Hac Vice*)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2776
Facsimile: (312) 527-0484
cmartin@jenner.com
djimenez-ekman@jenner.com
mroot@jenner.com
mgraham@jenner.com

*Counsel for Former Directors and Officers*

Dated: May 7, 2019

34915910.1 05/07/2019

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.      THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE STATE
        LAW CLAIMS. ...................................................................................................... 2

        A.      The Plan's Purported Transfer Of The State Law Claims To The Liquidation
                Trust Does Not Create A "Close Nexus." .................................................. 3

        B.      The Possibility Of Recoveries On The State Law Claims Does Not Create A
                "Close Nexus." ........................................................................................... 6

        C.      The Possibility Of A Privilege Dispute Does Not Create A "Close Nexus." ......... 7

        D.      Certain D&Os' Proofs Of Claim Do Not Create A "Close Nexus." ................... 7

II.     ERISA PREEMPTS PLAINTIFFS' STATE LAW CLAIMS ........................................... 7

III.    ALTERNATIVELY, THE COURT SHOULD TRANSFER THIS ACTION TO THE
        EASTERN DISTRICT OF WISCONSIN. ..................................................................... 11

IV.     THE PREFERENCE COUNTS FAIL TO STATE A CLAIM. ....................................... 14

CONCLUSION ................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004).............................................................................................9, 11

*Albert v. Avery, Inc.*,
724 F. Supp. 245 (S.D.N.Y. 1989)...........................................................................10

*Allis-Chalmers Corp. v. Lueck,*
471 U.S. 202 (1985).................................................................................................9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...............................................................................................10

*AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower*
*Liquidating Trust)*,
335 B.R. 309 (Bankr. D. Del. 2005) .........................................................................6

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),*
372 F.3d 154 (3d Cir. 2004)............................................................................. passim

*BWI Liquidating Corp. v. City of Rialto (In re BWI Liquidating Corp.),*
437 B.R. 160 (Bankr. D. Del. 2010) .....................................................................3, 6

*DHP Holdings II Corp. v. The Home Depot, Inc. (In re DHP Holdings II Corp.),*
435 B.R. 264 (Bankr. D. Del. 2010) ...................................................................12, 14

*Estate of Jennings v. Delta Air Lines, Inc.,*
126 F. Supp. 3d 461, 463 (D.N.J. 2015) ...................................................................8

*Freedom Mortg. Corp. v. Irwin Fin. Corp.,*
No. C.A. 08-146 GMS, 2009 WL 763899 (D. Del. Mar. 23, 2009).........................13

*Friedland v. Unum Grp.,*
50 F. Supp. 3d 598, 603 (D. Del. 2014)....................................................................8

*Geruchat v. Ernst Young LLP (In re Seven Fields Dev. Corp.),*
505 F.3d 237 (3d Cir. 2007).............................................................................2, 5, 6

*Huss v. Green Spring Health Servs., Inc.,*
18 F. Supp. 2d 400 (D. Del. 1998)............................................................................8

*In re ACandS, Inc.,*
Adv. No. 10-53702, 2011 WL 744913 (Bankr. D. Del. Feb. 22, 2011) ....................6

ii

*In re Lids Corp.*,
    260 B.R. 680 (Bankr. D. Del. 2001) ...........................................................................7

*IPC Int'l Corp. v. Milwaukee Golf Shopping Center LLC (In re IPC Int'l Corp.)*,
    Adv. No. 14-50333, 2014 WL 5544692 (Bankr. D. Del. Nov. 3, 2014) ...............................12

*Iron Workers Mid-South Pension Fund v. Terotechnology Corp.*,
    891 F.2d 548 (5th Cir. 1990) .....................................................................................10

*Kollman v. Hewitt Assocs., LLC*,
    487 F.3d 139 (3d Cir. 2007)..........................................................................................8

*Liquidating Trustee v. Granite Fin. Solutions, Inc. (In re MPC Computers, LLC)*,
    465 B.R. 384 (Bankr. D. Del. 2012) .............................................................................5

*MacDonald v. Summit Orthopedics, Ltd.*,
    681 F. Supp. 2d 1019 (D. Minn. 2010)..........................................................................8

*Menkes v. Prudential Ins. Co. of Am.*,
    762 F.3d 285 (3d Cir. 2014)..........................................................................................8

*Metro. Life Ins. Co. v. DePalo*,
    No. CIV.A. 13-3092 (KM), 2014 WL 4681094 (D.N.J. Sept. 22, 2014) ..............................10

*Michaels v. World Color Press, Inc. (In re LGI, Inc.)*,
    322 B.R. 95 (Bankr. D.N.J. 2005) .................................................................................5

*Nagy v. De Wese*,
    705 F. Supp. 2d 456 (E.D. Pa. 2010) ...........................................................................11

*OCB Restaurant Co., LLC v. Vlahakis (In re Buffets Holdings, Inc.)*,
    397 B.R. 725 (Bankr. D. Del. 2008) ...........................................................................12

*Pacor, Inc. v. Higgins*,
    753 F.2d 984 (3d Cir. 1984)..........................................................................................5

*Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*,
    274 B.R. 634 (Bankr. D. Del. 2001) ......................................................................14, 15

*Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*,
    388 F. 3d 393 (3d Cir. 2004)........................................................................................8

*Rescap Liquidating Trust v. Primary Capital Advisors (In re Residential Capital, LLC)*,
    527 B.R. 865 (S.D.N.Y. 2014)....................................................................................5, 6

*Shandler v. DLJ Merchant Banking, Inc. (In re Insilco Techs., Inc.)*,
    330 B.R. 512 (Bankr. D. Del. 2005) .........................................................................5, 6

iii

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ............................................................................................10

*Solmonese v. Shyamsundar (In re AmCad Holdings, LLC)*,
  Adv. No. 15-51979, 2016 WL 3412289 (Bankr. D. Del. June 14, 2016) ..................4

*Son v. Coal Equity, Inc. (In re Centennial Coal, Inc.)*,
  282 B.R. 140 (Bankr. D. Del. 2002) ....................................................................12

*Tilton v. Radiation Oncologists*,
  409 F. Supp. 2d 560 (D. Del. 2006) ......................................................................8

*Trosio v. Erickson (In re IMMC Corp.)*,
  Adv. No. 10-53063 (KJC), 2011 WL 6832900 (Bankr. D. Del. Dec. 29, 2001) .......5

*Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*,
  288 B.R. 189 (Bankr. D. Del. 2003) ....................................................................15

*Wash. Mut., Inc. v. XL Specialty Ins. Co. (In re Wash Mut., Inc.)*,
  Adv. No. 12-50422 (MFW), 2012 WL 4755209 (Bankr. D. Del. Oct. 4, 2012) .....4, 6

*White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*,
  450 B.R. 504 (Bankr. D. Del. 2011) ....................................................................14

## STATUTES

11 U.S.C. § 502 ................................................................................................2, 3, 7

28 U.S.C. § 1404 .............................................................................................11, 12

28 U.S.C. § 1412 .............................................................................................11, 12

29 U.S.C. § 1144 ................................................................................................10

6 Del. C. § 1301 *et seq.* ........................................................................................14

Wisconsin Statutes, Ch. 242, *et seq.* ....................................................................14

iv

## INTRODUCTION

Plaintiffs' Opposition fails to show that they have pleaded viable, non-preempted claims against the D&Os that can or should proceed in this Court.  (*See generally* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss [Dkt. 77] ("Opp." or "Opposition").)  In the D&Os' opening brief, we demonstrated that the amended complaint should be dismissed because the Court lacks subject matter jurisdiction, ERISA preempts the pleaded state law claims, and the putative preference claims were insufficiently pleaded.  (*See generally* Brief in Support of the Former Directors' and Officers' Motion to Dismiss Amended Complaint or in the Alternative Transfer Venue [Dkt. 37] ("Memo."))  We also showed that, in the alternative, this action should be transferred to the Eastern District of Wisconsin, where a first-filed case alleging substantively identical wrongful conduct is pending.  Plaintiffs' Opposition leaves these conclusions intact.

*First*, Plaintiffs concede (Opp. at 7) the operative legal standard that should be applied to invoke subject matter jurisdiction:  they must show a "close nexus" between their post-confirmation adversary claims and the Plan.  But each of the close nexus theories Plaintiffs offer (Opp. at 8-11) — alternatively, that (i) the Plan's creation of the Trust confers jurisdiction, (ii) the creditor's recovery will be enhanced, (iii) the Plan could be relevant to possible privilege disputes, or (iv) that Plaintiffs' hypothetical objections under Section 502(d) confer jurisdiction over state law claims — is foreclosed by Third Circuit authority and this Court's prior opinions. There is no subject matter jurisdiction here.

*Second*, Plaintiffs' attempt (Opp. at 13-26) to evade ERISA preemption by characterizing the alleged wrongful conduct as causing an injury to the Debtors fails.  (*See also* FAC ¶¶ 1-3.) The alleged conduct about which Plaintiffs complain occurred in the course of the ERISA-governed ESOP's administration and has a substantial connection to the ESOP.  ERISA bars

state law claims based on that conduct through conflict preemption, even if Plaintiffs allege collateral effects on the Debtors.  Moreover, Plaintiffs do not contest that they lack standing to bring ERISA claims themselves under ERISA Section 502(a), as they do not qualify as ESOP fiduciaries, participants or beneficiaries.

*Third*, Plaintiffs' response (Opp. at 46-51) to the D&Os' request for a venue transfer focuses on the trees and ignores the forest.  Plaintiffs do not and cannot dispute that a first-filed action is pending in Wisconsin — a case that alleges almost identical wrongful conduct by overlapping actors and that will turn on the same evidence and witnesses located preponderantly in Wisconsin.  Instead, Plaintiffs interpose meritless procedural objections but offer no practical, economy-driven reasons that two actions over the same conduct should proceed in two disparate forums, risking inconsistent results.

*Fourth*, Plaintiffs' procedurally improper attempt to bolster their supposed preference claims by offering additional facts in their brief fails to cure their inadequately pleaded claims.

## ARGUMENT

## I.    The Court Lacks Subject Matter Jurisdiction Over The State Law Claims.

Plaintiffs do not dispute that the state law claims in Counts I-IV and VII-VIII are non-core claims over which this Court lacks "arising under" or "arising in" jurisdiction.  (*See generally* Opp.)  Plaintiffs concede (Opp. at 7) that because they brought the state law claims post-confirmation, the Third Circuit's "close nexus" test is the appropriate standard to evaluate whether this Court has "related to" jurisdiction.  *See also Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166-67 (3d Cir. 2004); *Geruchat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*, 505 F.3d 237, 258 (3d Cir. 2007).  Under this test, a court lacks jurisdiction unless the claim "affects an integral aspect of the bankruptcy process." *Resorts Int'l*, 372 F.3d at 167.

2

Plaintiffs' contentions that the state law claims against the D&Os nonetheless affect an "integral aspect of the bankruptcy process" lack merit for at least four reasons.  *First*, Plaintiffs' assertion (Opp. at 8-9) that there is jurisdiction because the Plan purports to transfer the state law claims to the Liquidation Trust ignores that such a transfer cannot, under well-settled Third Circuit law, create jurisdiction over claims when it is otherwise lacking.  *Second*, Plaintiffs' argument (Opp. at 9) that jurisdiction is conferred because recoveries on the state law claims will enhance Plan recoveries is doomed by directly contrary Third Circuit law.  *Third*, Plaintiffs' contention (Opp. at 10-11) that jurisdiction is created because of speculation that the Plan ***may*** need to be referenced in undescribed, potential discovery disputes is undone by the law foreclosing "unending jurisdiction."  *Fourth*, Plaintiffs misplace their reliance (Opp. at 11) on the fact that certain D&Os filed proofs of claim, because they cannot assert an objection under Section 502(d) until there is a final judgment against the creditor.

### A.    The Plan's Purported Transfer Of The State Law Claims To The Liquidation Trust Does Not Create A "Close Nexus."

Third Circuit law is clear:  "[w]here a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."  *Resorts Int'l*, 372 F.3d at 167.  In their Opposition, Plaintiffs attempt to do just what this Circuit prohibits — they claim that Plan provisions that purport to transfer "all claims and causes of action against the Debtors' current and former directors and officers" to the post-confirmation Liquidation Trust create subject matter jurisdiction.  (Opp. at 8-9.)  However, as this Court has explained, "[p]lan provisions that purport to preserve the bankruptcy court's jurisdiction are not alone sufficient to establish post-confirmation jurisdiction; instead the court must determine whether a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan."  *BWI Liquidating Corp. v. City of Rialto (In re BWI Liquidating Corp.)*, 437

B.R. 160, 165 (Bankr. D. Del. 2010) (internal quotation marks omitted).  "[E]ven when a plan clearly and unambiguously reserves jurisdiction for a specific cause of action, the Court will not have post-confirmation jurisdiction unless a substantial nexus is established."  *Wash. Mut., Inc. v. XL Specialty Ins. Co. (In re Wash Mut., Inc.)*, Adv. No. 12-50422 (MFW), 2012 WL 4755209 at *5 (Bankr. D. Del. Oct. 4, 2012).

The Plan here defines the "Litigation Claims" transferred to the Liquidation Trust to include "Preserved D&O Claims," which it broadly defines as "any and all claims and Causes of Action [] held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP …"  (Memo. Exhibit B, Liquidation Plan, Art. II.A.136.)  This "wholesale assignment of causes of action" against the D&Os is the type of language that this Court has found insufficient to create a "close nexus."  *Solmonese v. Shyamsundar (In re AmCad Holdings, LLC)*, Adv. No. 15-51979, 2016 WL 3412289 at *2 (Bankr. D. Del. June 14, 2016).  The fact that the Liquidation Trust's creation and the Debtor's transfer of "Litigation Claims" to the Liquidation Trust was a construct that was part of a pre-confirmation settlement does not transform the state law claims into claims that bear a "close nexus" to the Plan.  If that were the case, any plan that included the transfer of claims to a post-confirmation trust would automatically confer jurisdiction over all claims transferred — precisely the type of "unending jurisdiction" that *Resorts International* prohibits. 372 F.3d at 167.

Nor have Plaintiffs here shown that there is a "substantial nexus" between the state law claims' resolution and the confirmed Plan.  The Opposition summarily asserts that "[i]n adjudicating the claims asserted in the FAC, this Court will likely also have to resolve several

4

issues intimately related to the bankruptcy proceeding." (Opp. at 8.) But Plaintiffs provide no explanation as to what these "intimately related" issues are, nor could they, as the state law fiduciary breach and illegal dividend claims are wholly collateral to the bankruptcy case. A court will not need to consult the Plan, the Liquidating Trust, or consider any "unique bankruptcy-related issues" to adjudicate those claims. *Trosio v. Erickson (In re IMMC Corp.)*, Adv. No. 10-53063 (KJC), 2011 WL 6832900, at *4 (Bankr. D. Del. Dec. 29, 2001). Plaintiffs also make no effort to distinguish this case from *Shandler v. DLJ Merchant Banking, Inc. (In re Insilco Techs., Inc.)*, 330 B.R. 512 (Bankr. D. Del. 2005) and *In re IMMC Corp.*, where under similar facts the bankruptcy courts dismissed for lack of subject matter jurisdiction post-confirmation claims against directors and officers that were identified in the plans specifically (*Insilco*) and generally (*IMMC*). 330 B.R. at 524-26; 2011 WL 6832900 at *3-4

Plaintiffs' cited case law is inapposite. In *Liquidating Trustee v. Granite Fin. Solutions, Inc. (In re MPC Computers, LLC)*, 465 B.R. 384 (Bankr. D. Del. 2012), the debtor filed the complaint during the pendency of its bankruptcy case and the plan provided for the trustee's substitution for the debtor post-confirmation. Recognizing this as a "key factual distinction," the court held that the jurisdictional test in *Pacor, Inc. v. Higgins*, 753 F.2d 984 (3d Cir. 1984), not *Resorts International*, was the appropriate test. 465 B.R. at 391-92. In *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95 (Bankr. D.N.J. 2005), the court distinguished *Resorts International* because the *Resorts International* claim arose post-confirmation, whereas the *LGI* facts underlying the case arose pre-confirmation. 322 B.R. at 103. The Third Circuit has since rejected this distinction as irrelevant. *Seven Fields*, 505 F.3d 237 at 263-65. Plaintiffs also rely heavily on *Rescap Liquidating Trust v. Primary Capital Advisors (In re Residential Capital,*

5

*LLC*), 527 B.R. 865, 871 (S.D.N.Y. 2014), an out of Circuit case of no precedential value that

conflicts with Third Circuit law.[1]

    **B.**    **The Possibility Of Recoveries On The State Law Claims Does Not Create A "Close Nexus."**

    Plaintiffs argue that since this litigation's outcome ***could*** impact creditor recoveries, the

claims involve the Plan's "implementation, consummation, execution or administration."  (Opp.

at 9.)   However, the Third Circuit has rejected the theory that creditor recoveries provide a

jurisdictional basis:  "if the mere possibility of a gain or loss of trust assets sufficed to confer

bankruptcy court jurisdiction, any lawsuit involving a continuing trust would fall under the

'related to' grant.'"  *Resorts Int'l*, 372 F.3d at 170; *see also In re ACandS, Inc.*, Adv. No. 10-

53702, 2011 WL 744913, at *2 (Bankr. D. Del. Feb. 22, 2011), *as corrected* (Feb. 23, 2011);

*BWI Liquidating Corp.*, 437 B.R. at 166; *Insilco Techs., Inc.*, 394 B.R. at 750.

---

[1]   While Plaintiffs have not cited *AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309 (Bankr. D. Del. 2005), we are mindful of this Court's opinion and respectfully suggest that it does not compel a finding of jurisdiction in this case.  In *AstroPower*, the plan specified nine causes of action as "Litigation Claims," including: "[c]auses of action arising out of or in connection with the Debtor's sale of stock in Xantrex Technology, Inc."  335 B.R. at 324. Based in part on this language, this Court held that there was a "sufficiently close nexus with the bankruptcy proceeding to support jurisdiction post-confirmation" over the liquidation trust's breach of contract, fiduciary duty, and other non-core claims against Xantrex.  *Id.* at 325.  In its jurisdictional analysis, this Court emphasized that *Resorts International* decided the "narrow issue of 'related to' jurisdiction over a claim that arose post-confirmation." *Id.* at 324.  This Court contrasted the post-confirmation dispute in *Resorts International* with the pre-confirmation dispute before it.  *Id.*  As noted above, after this Court's *AstroPower* opinion, the Third Circuit clarified that the *Resorts International* "close nexus" test was not dependent upon whether a cause of action first arose pre- or post-confirmation.  *Seven Fields*, 505 F.3d at 263-65.  More recently, this Court has instructed that "even where a plan clearly and unambiguously reserves jurisdiction for a specific cause of action, the Court will not have post-confirmation jurisdiction unless a substantial nexus is established."  *In re Wash Mut.*, 2012 WL 4755209 at *5.  Thus, *AstroPower* is distinguishable for at least three reasons: (i) the claims were described more specifically in the *AstroPower* plan; (ii) the Third Circuit has since held that one of the distinguishing factors this Court relied upon in its analysis does not impact the jurisdictional question; and (iii) Plaintiffs here cannot show a close nexus between the state law claims and the Plan.

C.    **The Possibility Of A Privilege Dispute Does Not Create A "Close Nexus."**

Plaintiffs also attempt to use a ***potential*** discovery dispute with Appvion Holding Corp. as a bootstrap to create jurisdiction over their state law claims against the D&Os.  (Opp. at 10-11.)  If Plaintiffs were correct, the mere possibility of a single privilege dispute could create a jurisdictional basis over any and all claims they choose to assert over any and all defendants. *Resorts International* rejected this type of "unending" jurisdiction.  *Resorts Int'l*, 372 F.3d at 167.  Even if the Court were presented with a discovery dispute between Plaintiffs and Appvion Holding Corp., its resolution would have no bearing on whether the Court has subject matter jurisdiction over entirely distinct state law claims.

D.    **Certain D&Os' Proofs Of Claim Do Not Create A "Close Nexus."**

Plaintiffs further argue that their potential objections to certain D&Os' proofs of claim under 11 U.S.C. § 502(d) create jurisdiction over the state law causes of action.  (Opp. at 11.) Not so.  As this Court has held, Section 502(d) is not applicable "[u]ntil the Debtor obtains a judgment against [the creditor] upon which [the creditor] is liable."  *In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001).  The resolution of Plaintiffs' state law claims before a court with proper jurisdiction does not modify Plaintiffs' substantive rights to object under Section 502(d) if they otherwise have a basis to do so.  In sum, this Court lacks subject matter jurisdiction over Counts I-IV, VII and VIII, and those claims should be dismissed with prejudice.

## II.    **ERISA Preempts Plaintiffs' State Law Claims.**

In our opening brief (Memo. at 10-12), the D&Os established that ERISA preempts Plaintiffs' state law counts in Counts I-IV, VII and VIII in their entirety.  Plaintiffs' lengthy but academic discussion of ERISA preemption's contours (Opp. at 14-23) fails to overcome the basic point that the alleged ***conduct*** Plaintiffs complain about occurred in the course of the ESOP's administration and allegedly injured the ESOP.  That means ERISA governs the

7

conduct, and therefore Plaintiffs' state law claims are preempted under **conflict** preemption. (**Complete** preemption does not come into play because Plaintiffs do not have standing to bring their claims under ERISA in the first place.[2])  Plaintiffs' attempt to escape ERISA conflict preemption's broad reach fails for at least two reasons.

   **First**, Plaintiffs cannot avoid preemption by asserting (Opp. at 26) that they are suing "as the assignee of the Liquidating Trust Assets" and seeking to "redress the damage the D&Os' breaches of fiduciary duty inflicted on the Debtors themselves" because the alleged **conduct** that forms the basis for their claims occurred in the ESOP's administration and allegedly injured the ESOP.  Courts have rejected plaintiffs' attempts to evade preemption by claiming that they are suing over the "fiduciary duties . . . owed to . . . creditors," when their claims nonetheless implicate "relations between principal ERISA entities," such as the employer, the plan, plan fiduciaries, and beneficiaries.  *MacDonald v. Summit Orthopedics, Ltd.*, 681 F. Supp. 2d 1019, 1027 (D. Minn. 2010).  Third Circuit courts routinely dismiss state law claims that relate to ERISA.  *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 296 (3d Cir. 2014); *Kollman v. Hewitt Assocs., LLC*, 487 F.3d 139, 149-50 (3d Cir. 2007); *Estate of Jennings v. Delta Air Lines, Inc.*, 126 F. Supp. 3d 461, 463 (D.N.J. 2015); *Friedland v. Unum Grp.*, 50 F. Supp. 3d 598, 603 (D. Del. 2014); *Tilton v. Radiation Oncologists*, 409 F. Supp. 2d 560, 568 (D. Del. 2006); *Huss v. Green Spring Health Servs., Inc.*, 18 F. Supp. 2d 400, 403-06 (D. Del. 1998).

   Here, Plaintiffs allege that the D&Os' and outside advisors' actions or inactions harmed the ESOP.  For example, Plaintiffs state in their opening paragraph that "[t]his litigation involves

---

[2]    Even if Plaintiffs were able to establish ERISA standing to bring their claims, then their claims would also be barred by complete preemption.  *See Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F. 3d 393, 402 (3d Cir. 2004) (if plaintiff has standing to bring claims, the relevant question is whether there is a "legal duty that is independent of ERISA.").  Here, there is not, as discussed further below.

8

the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the 'ESOP'), the former ultimate owner of the Debtors."  (FAC ¶ 1.)  Plaintiffs allege that the D&Os were "at the helm of a sinking ship" because the Company's ESOP ownership "required substantial and unconditional financial support" to fund the ESOP participants' benefit payments.  (FAC ¶ 2.) The amended complaint alleges that the D&Os "materially inflated the value of the stock held by the ESOP" with "an unjustifiably high valuation."  (FAC ¶ 3.)  Simply put, the amended complaint heavily focuses on the ESOP, its valuations and its administration.

While Plaintiffs argue (Opp. at 13-14) that they do not seek to claim ESOP benefits for any participants or beneficiaries or to enforce any ESOP provision, they concede that the Court would need to refer to the ESOP's governing plan document, which requires the ESOP Trustee to obtain a biannual valuation of PDC's common stock, and the lack of a benefit to the corporate enterprise arising from its continued ESOP ownership.  (Opp. at 31.)  The ESOP's plain terms are thus "certainly material," and require a preemption finding.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985) ("The interests in interpretive uniformity and predictability . . . require that the meaning given a contract phrase or term be subject to uniform federal interpretation.").

Similarly, the substance of Plaintiffs' allegations relating to a supposed improper "corporate dividend" is actually conduct relating to the ESOP.  Plaintiffs allege that Appvion forgave an intercompany loan to PDC in November 2013 and extended credit to it from 2014 through the petition date.  (FAC ¶¶ 419-435.)  Plaintiffs allege that ESOP distributions significantly outstripped ESOP contributions in the years leading up to the Petition, forcing PDC to borrow the funds from Appvion necessary to continue to fulfill its ESOP distribution

9

obligations.  (*Id.* ¶ 406.)  Stripped of the corporate dividend label, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), it is clear that these allegations relate to ESOP contributions and distributions — both areas wholly within the ESOP's administration.  *See Albert v. Avery, Inc.*, 724 F. Supp. 245, 253-54 (S.D.N.Y. 1989) (holding that a distribution of a liquidating dividend which would clearly prevent a required ERISA distribution would be an ERISA violation).  Adjudication of these claims would impact matters ERISA regulates, namely, an ESOP's funding requirements.  *Albert*, 724 F. Supp. at 254.  Because Plaintiffs' state law claims would add an additional requirement to an employee benefit plan's administration, ERISA preempts them.  *See Iron Workers Mid-South Pension Fund v. Terotechnology Corp.*, 891 F.2d 548, 554 (5th Cir. 1990).[3]

**Second**, Plaintiffs assert (Opp. at 29-30) that ERISA conflict preemption under Section 514(a), 29 U.S.C. § 1144(a), does not bar their claims.  However, the conflict preemption doctrine provides a complete defense to any state law claim that "relates to" an ERISA plan.  29 U.S.C. § 1144(a); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983).  Plaintiffs cite only two cases to support their theory that conflict preemption does not bar their claims against the D&Os, and both support the D&Os — not Plaintiffs.  The first case, *Metro. Life Ins. Co. v. DePalo* holds that ERISA preempts an insurance company's state law claims against a plan participant who received a double benefit payment.  *Metro. Life Ins. Co. v. DePalo*, No. CIV.A. 13-3092 (KM), 2014 WL 4681094, at *11 (D.N.J. Sept. 22, 2014).  The court explained that the "availability of a federal remedy is not a prerequisite for federal preemption."  *Id.*  *DePalo* directly contradicts Plaintiffs' position that they must have a remedy under state law because

---

[3]    In the Opposition, Plaintiffs cite several cases to support their complete preemption arguments, however, as discussed above, complete preemption is irrelevant here because Plaintiffs lack standing to bring any claims under ERISA.

10

they are not "an ESOP participant, beneficiary, or fiduciary" and there is no "dual remedy" available. (Opp. at 14, 25.) Put another way, ERISA's preemptive scope applies even when such a finding would leave a gap in the Plaintiffs' available relief. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 214-15 (2004).

The second case Plaintiffs cite (Opp. at 31), *Nagy v. De Wese,* held that a defendant's fiduciary status may be relevant to whether ERISA preempts claims against that defendant, depending on the circumstances. *Nagy v. De Wese*, 705 F. Supp. 2d 456, 464, 470 (E.D. Pa. 2010). Here, the Debtors on whose behalf the claims are asserted and the D&Os are alleged to be ERISA sponsors and/or fiduciaries (*see* FAC ¶¶ 8, 132; *accord* Wisconsin FAC, Dkt. 37-1, ¶¶ 2, 30, 57, 541, 562), making the D&Os' preemption argument all the stronger. *Nagy*, 795 F. Supp. 2d at 464. Plaintiffs' claims in Counts I-IV, VII and VIII all relate to or arise out of the ESOP and therefore should be dismissed with prejudice as preempted by ERISA.

## III. Alternatively, The Court Should Transfer This Action To The Eastern District Of Wisconsin.

In our opening brief (Memo. at 12-15), the D&Os demonstrated that, if it is not dismissed, this action should be transferred to the Eastern District of Wisconsin under 28 U.S.C. § 1404 or § 1412 and/or the "first-filed" rule. In their response, Plaintiffs do not and cannot dispute that there is an earlier-filed action with overlapping subject matter that will involve much of the same evidence and many of the same witnesses. They also offer no commonsense reason why the two actions should proceed in two different forums. Instead, Plaintiffs assert (Opp. at 47-50) transfer would be procedurally improper and that the "first-filed" rule does not apply. Plaintiffs' assertions are meritless, and the Court should order transfer, for at least four reasons.

***First***, Plaintiffs' procedural attack on the D&O's request (Opp. at 50) is meritless. Plaintiffs incorrectly assert that the D&Os' request to transfer venue is "procedurally improper"

11

because "the instant action is governed by 28 U.S.C. § 1412, and not 28 U.S.C. § 1404(a)," and a party may not "freely choose between the two provisions without regard to the nature of the action."   (Opp. at 50.)   In fact, the D&Os moved to transfer venue under **both** statutory provisions and addressed both Section 1404 and Section 1412 in their opening brief, explaining that a decision to transfer venue under either section turns on the same issues.   (Memo. at 13 n.4).   Indeed, Third Circuit courts routinely recognize that the analysis remains the same under both sections.   *See, e.g.*, *DHP Holdings II Corp. v. The Home Depot, Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 264, 268-69 (Bankr. D. Del. 2010); *IPC Int'l Corp. v. Milwaukee Golf Shopping Center LLC (In re IPC Int'l Corp.)*, Adv. No. 14-50333, 2014 WL 5544692, at *5 (Bankr. D. Del. Nov. 3, 2014).

*Second*, Plaintiffs' reliance (Opp. at 47, 51) on presumptions they say are created by Plaintiffs' forum selection, and the forum of the bankruptcy proceeding, is misplaced.   As Plaintiffs acknowledge (Opp. at 47), the legal standard requires a preponderance of the evidence to support a venue transfer; there is no "heavy burden" on the D&Os.   Moreover, the weight given to the Plaintiffs' forum choice and the bankruptcy forum is "diminished" where, as here, the plaintiff's venue choice for the bankruptcy proceeding "has no direct relation to the operative, underlying facts of the [adversary] proceeding" or even to plaintiffs' residence or place of business, as neither Plaintiff resides in Delaware.   *Son v. Coal Equity, Inc. (In re Centennial Coal, Inc.)*, 282 B.R. 140, 144-45 (Bankr. D. Del. 2002); *see also OCB Restaurant Co., LLC v. Vlahakis (In re Buffets Holdings, Inc.)*, 397 B.R. 725, 728 (Bankr. D. Del. 2008). There is no reason to afford either of these factors any substantial weight here.

*Third*, Plaintiffs' contention (Opp. at 48-49) that transfer is improper because **certain** D&Os "authorized" chapter 11 filings in Delaware is misplaced for several reasons.   At the outset, while some D&O defendants were involved in the decision about where to commence

12

proceedings on the Debtors' behalf (not in any personal capacity), others were not.  Moreover, Plaintiffs cite no authority for their position that an officer's participation in "authorizing" a forum for a bankruptcy proceeding for an entity means that officer personally consents to separate adversary proceedings in that forum.  That is especially true here, where the adversary proceeding's underlying facts have no direct relation to the bankruptcy plan, and a substantially similar action is already pending in another forum.

*Fourth*, Plaintiffs' attack (Opp. at 49-50) on the "first-filed" rule's application by focusing on the existence of some differences between the two actions misses the point.  The first-filed rule's purpose "is to avoid differing outcomes on the same issue by two sister courts, thereby minimizing duplicative litigation in different fora, and saving judicial resources." *Freedom Mortg. Corp. v. Irwin Fin. Corp.*, No. C.A. 08-146 GMS, 2009 WL 763899, at *4 (D. Del. Mar. 23, 2009).  "Complete identity of the parties and issues . . . is not required for the 'first-filed' rule to apply." *Id.* (collecting cases).  Indeed, a party "cannot avoid the application of the 'first-filed' rule . . . where the claims all pertain to the subject matter of another dispute already before a competent court." *Id.* at *5.  Plaintiffs focus on some differences in claims, beneficiaries, and time periods between this proceeding and the Wisconsin case.  However, this adversary proceeding is, if anything, a subset of the Wisconsin case's claims, as this case focuses on activity from 2012 to 2017, while the Wisconsin case focuses on activity from 2001 to 2017.  Where, as here, the two cases involve nearly identical factual allegations as to a particular time period, transfer is necessary "to avoid differing outcomes on the same issue." *Id.* at *4.

At bottom, this Court has discretion as to whether to transfer this case to Wisconsin, and the Court is bound to consider the twelve factors identified in the D&Os opening brief.  (Memo. at 12.)  "The court should consider all relevant factors and has discretion to determine on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in

13

favor of transfer." *In re DHP Holdings II Corp.*, 435 B.R. at 269 (internal quotation marks omitted). Plaintiffs cannot and do not dispute that the underlying claims arose in Wisconsin, or that most of the relevant witnesses and records are located there. (Opp. at 48.) It makes no sense, as a matter of judicial economy and in preserving the parties' resources, to have two actions alleging the same core factual conduct proceeding in two different courts a half a country away from each other.

## IV. The Preference Counts Fail To State A Claim.

Instead of defending their existing pleading of their preference claims, Plaintiffs attempt to use their Opposition brief to supplement their insufficiently pled claims. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, 450 B.R. 504, 511 (Bankr. D. Del. 2011) (quoting *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.1988)).

The amended complaint cited only generically to chapters of Wisconsin and Delaware law and therefore failed to put the D&Os on notice of the actual claims and legal theories supporting the state law claims in Counts IX and XIV-XVIII. *Pardo v. Avanti Corp. Health Sys., Inc. (In re APF Co.)*, 274 B.R. 634, 639-40 (Bankr. D. Del. 2001). In the Opposition, Plaintiffs incorrectly state (again) that their state law causes of action under 6 Del. C. § 1301 *et seq.* and Wisconsin Statutes, Ch. 242, *et seq.* are preference claims. Both Del. C. § 1305(b) and Wis. Stat. § 242.05(2) — the specific statutes that Plaintiffs identify for the first time in their Opposition — are their respective states' statutory chapter for Fraudulent Transfers.

Plaintiffs' own confusion as to their claims underscores the necessity of asserting claims by specific statute, rather than by generic reference. "[T]he pleading requirements of the Federal Rules are not intended to reduce a defendant to guesswork and conjecture." *Pardo*, 274 B.R. at

14

639-40.  Similarly, although the Opposition appears to state that the Count IX transfer to Mr.

Ferree was made by Appvion, Inc., the amended complaint itself was ambiguous on this point,

stating that the transfer was made by "PDC *and/or* Appvion" (FAC at ¶ 441) and therefore fails

to adequately plead the preference count.  *Valley Media, Inc. v. Borders, Inc. (In re Valley*

*Media, Inc.)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003).

## CONCLUSION

For the foregoing reasons, the D&Os respectfully request that the Court dismiss the

Adversary Proceeding with prejudice, or in the alternative, transfer the Adversary Proceeding to

the Eastern District of Wisconsin where a first-filed action is pending.

Dated:  May 7, 2019                                          Respectfully submitted,

Craig C. Martin (Admitted *Pro Hac Vice*)           /s/ Mark Minuti
David Jimenez-Ekman (Admitted *Pro Hac Vice*)       Mark Minuti (DE Bar No. 2659)
Melissa M. Root (Admitted *Pro Hac Vice*)           Monique B. DiSabatino (DE Bar No. 6027)
Michael T. Graham (Admitted *Pro Hac Vice*)         **SAUL EWING ARNSTEIN & LEHR LLP**
**JENNER & BLOCK LLP**                              1201 North Market Street, Suite 2300
353 N. Clark Street                                 P.O. Box 1266
Chicago, IL 60654-3456                              Wilmington, DE 19899
Telephone: (312) 923-2776                           Telephone: (302) 421-6840

*Counsel for Former Directors and Officers*

34915910.1 05/07/2019

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Mark Minuti, hereby certify that on May 7, 2019, I caused a copy of the foregoing **Reply Brief of the Former Directors' and Officers' in Support of Motion to Dismiss Amended Complaint** was served via First Class Mail on the party on the attached service list.

/s/ Mark Minuti
Mark Minuti (DE Bar No. 2659)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
(302) 421-6840

**Service List**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Gordon Z. Novod, Esquire
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017

Mark L. Desgrosseilliers, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801

Lars Golumbic, Esquire
Groom Law Group
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5811

Carl N. Kunz, III, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801

Michael L. Scheier, Esquire
Brian P. Muething, Esquire
Jacob Rhode, Esquire
Keating Muething & Klekamp PLL
One East Fourth Street, Suite No. 1400
Cincinnati, Ohio 45202

34915910.1 05/07/2019

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## AFFIDAVIT OF SERVICE

STATE OF DELAWARE )
) SS
NEW CASTLE COUNTY )

Michelle M. Dero, being duly sworn according to law, deposes and says that she is employed by the law firm of Chipman Brown Cicero & Cole, LLP, counsel to *Stout Risius Ross, Inc., and Stout Risius Ross, LLC* in the above referenced action, and on the 7th day of May 2019, the *Reply in Support of Stout Risius Ross, Inc. and Stout Risius Ross, LLC's Motion to Dismiss* [Adv. Docket 80] (the "**Reply**") was filed *via* the Court's CM/ECF electronic filing system ("**CM/ECF**"), which sent notice of the Reply to all parties receiving notification through CM/ECF.

In addition, on the 7th day of May 2019, the Stipulation was also served on the parties listed on the attached service list *via* hand delivery or overnight mail.

*/s/ Michelle M. Dero*
Michelle M. Dero

SWORN TO AND SUBSCRIBED before me this 9th day of May 2019.

_____/s/ Kristin A. McCloskey_____

Kristin A. McCloskey
Notary Public
State of Delaware
My Commission Expires July 7, 2020

- 2 -

*Via* **Hand Delivery**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
*Grant & Eisenhofer P.A.*
123 Justison Street
Wilmington, Delaware 19801
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust)

*Via* **Hand Delivery**

Tara L. Lattomus, Esquire
*Eckert Seamans Cherin & Mellot, LLC*
222 Delaware Avenue, 7th Floor
Wilmington, Delaware 19801
(Counsel for Argent Trust Company)

*Via* **Overnight Mail**

Brian P. Muething, Esquire
Jacob D. Rhode, Esquire
*Keating Muething & Klekamp PLL*
One East 4th Street, Suite 1400
Cincinnati, Ohio 45202
(Counsel for Argent Trust Company)

*Via* **Hand Delivery**

Carl N. Kunz, Esquire
*Morris James LLP*
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(Counsel for Argent Trust Company)

*Via* **Overnight Mail**

Craig Martin, Esquire
David Jimenez-Ekman, Esquire
Michael Graham, Esquire
*Jenner & Block LLP*
353 North Clark Street
Chicago, Illinois 60654-3456
(Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, and Kevin Gilligan)

*Via* **Overnight Mail**

Gordon Z. Novod, Esquire
*Grant & Eisenhofer P.A.*
485 Lexington Avenue, 29th Floor
New York, New York 10017
(Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust)

*Via* **Hand Delivery**

Mark Minuti, Esquire
*Saul Ewing Arnstein & Lehr LLP*
1201 North Market Street, Suite 2300
Wilmington, Delaware 19801
(Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, and Kevin Gilligan)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.*, | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, Defendants. | **Re:  Adv. Docket Nos. 59, 60, 65, 66, 67, 68, 69, 70, 77, 80, 81 and 82** |

**COMBINED REQUEST FOR ORAL ARGUMENT ON (1) FORMER DIRECTORS' AND OFFICERS' MOTION TO DISMISS AMENDED COMPLAINT OR IN THE ALTERNATIVE TRANSFER VENUE; (2) DEFENDANT ARGENT TRUST COMPANY'S MOTION TO DISMISS; AND (3) MOTION OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC TO DISMISS COMPLAINT**

NOW COMES defendants Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan, and Argent Trust Company, and Stout Risius Ross, Inc. and Stout Risius Ross, LLC, by and through their undersigned counsel, pursuant to Del. Bankr. LR 7007-3, and hereby respectfully request oral argument in connection with the following motions (collectively, the "Motions"):

1.    Former Directors and Officers' Motion to Dismiss Amended Complaint or in the

Alternative Transfer Venue [Docket No. 65];

2.    Defendant Argent Trust Company's Motion to Dismiss [Docket No. 67]; and

3.    Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss

Complaint [Docket No. 69].

Briefing on the Motions is now completed.

Dated: May 13, 2019

| | |
|---|---|
| /s/ Mark Minuti | /s/ Carl N. Kunz, III |
| Mark Minuti (DE Bar No. 2659) | Carl N. Kunz, III |
| **SAUL EWING ARNSTEIN & LEHR LLP** | **MORRIS JAMES LLP** |
| 1201 North Market Street, Suite 2300 | 500 Delaware Avenue, Suite 1500 |
| P.O. Box 1266 | P.O. Box 2306 |
| Wilmington, DE 19899 | Wilmington, DE 19801 |
| Telephone: (302) 421-6840 | Telephone: (302) 888-6800 |
| Facsimile: (302) 421-5873 | Facsimile: (302) 571-1750 |
| mark.minuti@saul.com | ckunz@morrisjames.com |
| | |
| -and- | -and- |
| | |
| Craig C. Martin (Admitted *Pro Hac Vice*) | Michael L. Scheier (Admitted *Pro Hac Vice*) |
| David Jimenez-Ekman (Admitted *Pro Hac Vice*) | Brian P. Muething (Admitted *Pro Hac Vice*) |
| Melissa M. Root (Admitted *Pro Hac Vice*) | Jacob Rhode (Admitted *Pro Hac Vice*) |
| Michael T. Graham (Admitted *Pro Hac Vice*) | **KEATING MUETHING & KLEKAMP PLL** |
| **JENNER & BLOCK LLP** | One East Fourth Street, Suite No. 1400 |
| 353 N. Clark Street | Cincinnati, OH 45202 |
| Chicago, IL 60654-3456 | Telephone: (513) 579-6400 |
| Telephone: (312) 923-2776 | Facsimile: (513) 579-6457 |
| Facsimile: (312) 527-0484 | mscheier@kmklaw.com |
| cmartin@jenner.com | bmuething@kmklaw.com |
| djimenez-ekman@jenner.com | jrhode@kmklaw.com |
| mroot@jenner.com | |
| mgraham@jenner.com | *Counsel for Argent Trust Company* |
| | |
| *Counsel for Former Directors and Officers* | |

2

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (DE Bar No. 4083)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
Telephone: (302) 295-0191
Facsimile:  (302) 295-0199
desgross@chipmanbrown.com

      -and-

Lars C. Golumbic (Admitted *Pro Hac Vice*)
**GROOM LAW GROUP**
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5811
Telephone: (202) 861-6615
lgolumbic@groom.com

*Counsel for Stout Risius Ross, Inc. and Stout
Risius Ross, LLC*

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al*., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, Defendants. | |

## CERTIFICATE OF SERVICE

I, Mark Minuti, hereby certify that on May 13, 2019, I caused a true and correct copy of the foregoing **Combined Request for Oral Argument on (1) Former Directors' and Officers' Motion to Dismiss Amended Complaint Or in the Alternative Transfer Venue; (2) Defendant Argent Trust Company's Motion to Dismiss; and (3) Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint** to be served via First Class Mail on the parties on the attached service list.

*/s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
(302) 421-6840

34924338.1 05/13/2019

**Service List**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Gordon Z. Novod, Esquire
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017

34924338.1 05/13/2019

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.*, | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | **Re:  Adv. Docket Nos. 59, 60, 65, 66, 67, 68, 69, 70, 77, 80, 81, 82 and 84** |

**COMBINED NOTICE OF COMPLETION OF BRIEFING ON (1) FORMER DIRECTORS' AND OFFICERS' MOTION TO DISMISS AMENDED COMPLAINT OR IN THE ALTERNATIVE TRANSFER VENUE; (2) DEFENDANT ARGENT TRUST COMPANY'S MOTION TO DISMISS; AND (3) MOTION OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC TO DISMISS COMPLAINT**

PLEASE TAKE NOTICE that defendants Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan, Argent Trust Company, and Stout Risius Ross, Inc. and Stout Risius Ross, LLC hereby notify the Court that briefing on their motions to dismiss the Plaintiff's amended complaint (collectively, the "Motions") is complete.  The following documents relate to the Motions:

34924390.1 05/15/2019

1.      First Amended Complaint [REDACTED] (filed: February 19, 2019) [Docket No. 59];

2.      First Amended Complaint [FILED UNDER SEAL] (filed: February 19, 2019) [Docket No. 60];

3.      Former Directors and Officers' Motion to Dismiss Amended Complaint or in the Alternative Transfer Venue (filed: March 19, 2019) [Docket No. 65];

4.      Brief in Support of the Former Directors and Officers' Motion to Dismiss Amended Complaint or in the Alternative Transfer Venue (filed: March 19, 2019) [Docket No. 66];

5.      Defendant Argent Trust Company's Motion to Dismiss (filed: March 19, 2019) [Docket No. 67];

6.      Opening Brief in Support of Defendant's Motion to Dismiss (filed: March 19, 2019) [Docket No. 68];

7.      Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint (filed: March 19, 2019) [Docket No. 69];

8.      Opening Brief in Support of Stout Risius Ross, Inc. and Stout Risius Ross, LLC's Motion to Dismiss the First Amended Complaint (filed: March 19, 2019) [Docket No. 70];

9.      Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss (filed: April 16, 2019) [Docket No. 77];

10.     Reply in Support of Stout Risius Ross, Inc. and Stout Risius Ross, LLC's Motion to Dismiss (filed: May 7, 2019) [Docket No. 80];

11.     Reply Brief in Support of Argent Trust Company's Motion to Dismiss (filed: May 7, 2019) [Docket No. 81];

12.     Reply Brief in Support of the Former Directors' and Officers' Motion to Dismiss Amended Complaint (filed: May 7, 2019) [Docket No. 82]; and

13.     Combined Request for Oral Argument on (1) Former Directors' and Officers' Motion to Dismiss Amended Complaint Or in the Alternative Transfer Venue; (2) Defendant Argent Trust Company's Motion to Dismiss; and (3) Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint (filed: May 13, 2019) [Docket No. 84].

Dated: May 15, 2019

/s/ Mark Minuti
Mark Minuti (DE Bar No. 2659)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mark.minuti@saul.com

                -and-

Craig C. Martin (Admitted *Pro Hac Vice*)
David Jimenez-Ekman (Admitted *Pro Hac Vice*)
Melissa M. Root (Admitted *Pro Hac Vice*)
Michael T. Graham (Admitted *Pro Hac Vice*)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2776
Facsimile: (312) 527-0484
cmartin@jenner.com
djimenez-ekman@jenner.com
mroot@jenner.com
mgraham@jenner.com

*Counsel for Former Directors and Officers*

/s/ Carl N. Kunz, III
Carl N. Kunz, III (DE Bar No. 3201)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
ckunz@morrisjames.com

                -and-

Michael L. Scheier (Admitted *Pro Hac Vice*)
Brian P. Muething (Admitted *Pro Hac Vice*)
Jacob Rhode (Admitted *Pro Hac Vice*)
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite No. 1400
Cincinnati, OH 45202
Telephone: (513) 579-6400
Facsimile: (513) 579-6457
mscheier@kmklaw.com
bmuething@kmklaw.com
jrhode@kmklaw.com

*Counsel for Argent Trust Company*

34924390.1 05/15/2019

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (DE Bar No. 4083)
**CHIPMAN BROWN CICERO & COLE, LLP**
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
Telephone: (302) 295-0191
Facsimile:  (302) 295-0199
desgross@chipmanbrown.com

        -and-

Lars C. Golumbic (Admitted *Pro Hac Vice*)
**GROOM LAW GROUP**
1701 Pennsylvania Avenue, N.W.
Washington, DC  20006-5811
Telephone: (202) 861-6615
lgolumbic@groom.com

*Counsel for Stout Risius Ross, Inc. and Stout Risius Ross, LLC*

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., *et al.*, | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 18-50955 (MFW) |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, Defendants. | |

## CERTIFICATE OF SERVICE

I, Mark Minuti, hereby certify that on May 15, 2019, I caused a true and correct copy of the foregoing **Combined Notice of Completion of Briefing on (1) Former Directors' and Officers' Motion to Dismiss Amended Complaint Or in the Alternative Transfer Venue; (2) Defendant Argent Trust Company's Motion to Dismiss; and (3) Motion of Stout Risius Ross, Inc. and Stout Risius Ross, LLC to Dismiss Complaint** to be served via First Class Mail on the parties on the attached service list.

/s/ Mark Minuti
Mark Minuti (DE Bar No. 2659)
**SAUL EWING ARNSTEIN & LEHR LLP**
1201 N. Market Street, Suite 2300
P. O. Box 1266
Wilmington, DE 19899
(302) 421-6840

**Service List**

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE  19801

Gordon Z. Novod, Esquire
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017

34924390.1 05/15/2019

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,
PURSUANT TO 11 U.S.C. §§ 105(a) AND 107(b), BANKRUPTCY RULE
9018, AND LOCAL RULE 9018-1 PERMITTING ALAN HALPERIN
AND EUGENE DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED
<u>VERSION OF THE PROPOSED SECOND AMENDED COMPLAINT</u>**

       Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of

the Appvion Liquidating Trust, by and through their undersigned counsel, hereby move (the

1

"Motion to Seal") for the entry of an order pursuant to sections 105(a) and 107(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the Proposed Second Amended Complaint (the "Proposed Second Amended Complaint"). In support of the Motion to Seal, the Co-Trustees state the following:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion to Seal pursuant to 28 U.S.C. §§ 157 and 1334, as well as under Article XV of the confirmed plan of liquidation (the "Plan") in the above-captioned cases.

2.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 107(b). Relief is also warranted pursuant to Bankruptcy Rule 9018 and Local Rule 9018-1.

## BACKGROUND

3.     On August 14, 2018, the Court entered an order confirming the Plan for the Debtors' bankruptcy estates. Under the terms of the Plan and corresponding documents, the Trust was given the right, authority, and discretion to pursue Litigation Claims (as defined in the Plan), specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan), and any persons related to claims and Causes of Action related to or arising out of Debtor Paperweight Development Corporation's

2

employee stock ownership plan (the "ESOP") that are not Direct ESOP Claims (as defined in the Plan). The Plan's effective date was August 24, 2018.

4.       In accordance with the Plan and pursuant to the Liquidating Trust Agreement (as defined in the Plan), the Appvion Liquidating Trust was established with the authority to obtain, investigate and prosecute the Litigation Claims vested in the Liquidating Trust. Alan D. Halperin and Eugene I. Davis were appointed as the Co-Trustees of the Appvion Liquidating Trust.

5.       On November 30, 2018, the Co-Trustees filed the Complaint [Adv. D.I. 6] (the "Complaint") commencing the above-captioned adversary proceeding.

6.       On January 29, 2019, the Defendants filed Motions to Dismiss the Complaint. [Adv. D.I. 36, 38, 41].

7.       On February 19, 2019, the Co-Trustees filed the First Amended Complaint [Adv. D.I. 59] (the "FAC") pursuant to Rule 15 of the Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure. By the FAC, the Co-Trustees assert causes of action for breaches of fiduciary duty against certain former directors and officers/employees of the Debtors, as well as against Argent Trust Company (stemming from its service as trustee of the ESOP) and against Stout Risius Ross affiliated entities for aiding and abetting breaches of fiduciary duties. The claims arise in connection with the inflation of the bi-annual valuations of Debtor Paperweight Development Corp.'s ("PDC") common stock, performed by Stout under its engagement for that purpose by Argent. The FAC focuses on the Debtors' financial projections, and the Debtors' historic inability to meet those projections during the period June 2013 through June 2017. Relatedly, the FAC focuses on the relationship between the fair market value of PDC (determined by SRR with the assistance of certain defendant directors and officers) and the projections. The FAC pleads that through the coordinated actions of the directors and

officers/employees of the Debtors and Argent Trust/Stout, the biannual valuations were purposefully inflated. The FAC focuses on the effect of that inflation as it caused the Debtors to borrow money from third party lenders, increasing their borrowings and contributing to their need to seek bankruptcy protection. Further, the FAC pleads that certain of the Debtors' directors and officers/employees were motivated to inflate the valuations for their personal gain, as they stood to reap substantial financial rewards from both their eventual retirement from the Debtors, and from the manner in which their equity incentive compensation was determined. The FAC also pleads causes of action related to unlawful corporate dividends. The FAC also pleads causes of action under 11 U.S.C. §§ 544, 547, 548 and 550, as well as under applicable state law with respect to certain transfers made by the Debtors.

8.    On March 19, 2019, the Defendants filed their Motions to Dismiss the FAC and the related memorandum of law in support of that motion to dismiss. *See* Adv. D.I. 65, 66, 67, 68, 69, 70.

9.    On April 19, 2019, the Co-Trustees filed their Memorandum of Law In Opposition to Defendants' Motions to Dismiss. *See* Adv. D.I. 77.

10.    On May 7, 2019, the Defendants filed their reply briefs in support of their motions to dismiss the FAC. *See* Adv. D.I. 80, 81, 82. In that reply brief, Argent claimed that the Plaintiff (in the Co-Trustee's opposition brief) did not contest Argent's argument that Count XII was pled with inadequate specificity, and therefore asserted that the Court should enter judgment on Count XII in Argent's favor. *See* Adv. D.I. 81 at 9. For the reasons set forth in Plaintiff's motion to file a Proposed Second Amended Complaint (filed contemporaneously herewith), Plaintiff seeks Court authorization to file a limited amendment to the FAC.

4

## RELIEF REQUESTED

11.     By this Motion to Seal, the Co-Trustees request authority to file the unredacted version of the Proposed Second Amended Complaint under seal.

## BASIS FOR RELIEF

12.     While Bankruptcy Code section 107(a) contemplates public access to materials filed in connection with bankruptcy cases, Bankruptcy Code Section 107(b) provides an exception to the general rule. Under that section, "on request of a party in interest, the bankruptcy court shall . . . (1) protect an entity with respect to . . . confidential . . . commercial information." 11 U.S.C. § 107(b). Moreover, Bankruptcy Rule 9018 permits parties in interest to file a motion seeking to file documents under seal. *See* Fed. R. Bankr. P. 9018 ("On motion . . ., with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of . . . confidential commercial information . . . .").

13.     Additionally, Bankruptcy Code section 105(a) gives the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

14.     The unredacted Proposed Second Amended Complaint contains, discusses, and references material non-public information relating to financial projections of the Debtors' Thermal and Carbonless businesses. Those financial projections were used by Stout and Argent in preparing a discounted cash flow analysis in connection with Stout and Argent's determination of the fair market value of PDC common stock as of June 30 and December 31 of each year. The last fair market value determination by Stout and Argent was as of June 30, 2017 (the "June 2017 FMV Determination"). The discounted cash flow analysis for each of the Carbonless and Thermal businesses contain earnings before interest, tax, depreciation and

5

amortization projections for fiscal years ending 2017 through 2021. Additionally, the June 2017 FMV Determination also contains projected net sales and projected operating income for fiscal years ending 2017 through 2021.

15.     The Proposed Second Amended Complaint also cites to and discusses Stout/Argent's opinions of the fair market value of PDC common stock dating back to June 2013, and financial results preceding that time frame.

16.     In preparing its biannual valuations, Stout purportedly relied on the Debtors' internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business; the Debtors' internally-prepared balance sheets; and on discussions with certain members of Debtors' senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

17.     Appvion Holding Corp., the purchaser under the 363 Sale Agreement (as defined in the Plan), has indicated that it believes that certain aspects of each of the Stout/Argent fair market value determinations addressed in the FAC and in the Proposed Second Amended Complaint are confidential.

18.     In advance of the filling of what is now the FAC, counsel for the Co-Trustees provided an unredacted version of the FAC to Appvion Holding Corp.. Appvion Holding Corp., through its counsel, has informed the undersigned counsel that it believes that only certain parts of the FAC should be filed under seal. While the Co-Trustees reserved their right to ultimately contest that designation, the Co-Trustees submit this Motion to Seal so as to preserve the confidentiality of certain information designated by Appvion Holding Corp.

19.    The text that the Co-Trustees' request sealing treatment includes redactions consistent with the earlier redacted versions of the Complaint and the FAC filed on the Court's ECF system on December 3, 2018 and February 19, 2019, respectively. *See* Adv. D.I., 6. It also contains additional redactions to new text added by virtue of the amendment.

20.    Thus, the Co-Trustees request permission to file an unredacted copy of the Proposed Second Amended Complaint under seal to preserve the claimed confidentiality of certain information contained in the Proposed Second Amended Complaint.

21.    In connection with this Motion to Seal, the Co-Trustees have provided an unredacted copy of the Proposed Second Amended Complaint to (i) the Court, and (ii) counsel of record for each Defendant. The Co-Trustees believe that, under the circumstances, such notice is sufficient and that no further notice need be given.

## CONCLUSION

WHEREFORE, for the reasons stated above, the Co-Trustees respectfully request the entry of an order: (a) permitting the Co-Trustees to file certain parts of the Proposed Second Amended Complaint under seal, and (b) granting the Co-Trustees such further relief as is just and proper.

Dated: May 22, 2019

**GRANT & EISENHOFER P.A.**

*/s/ Vivek Upadhya*

Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: cmackintosh@gelaw.com
           vupadhya@gelaw.com
           agartman@gelaw.com

-and-

Gordon Z. Novod (*pro hac vice* pending)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene
I. Davis, as Co-Trustees of the Appvion
Liquidating Trust*

8

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955-MFW |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND
EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, PURSUANT TO 11 U.S.C. §§ 105(A) AND 107(B),
BANKRUPTCY RULE 9018, AND LOCAL RULE 9018-1 PERMITTING ALAN D.
HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED
<u>VERSION OF THE PROPOSED SECOND AMENDED COMPLAINT</u>**

This matter came before the Court upon the motion (the "<u>Motion to Seal</u>") of Plaintiff

Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of the Appvion

Liquidating Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the proposed second amended complaint (the "Proposed Second Amended Complaint"); and the Court having considered the Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that

1.     The Motion to Seal is GRANTED.

2.     The Co-Trustees are permitted to file the unredacted version of the Proposed Second Amended Complaint under seal and to file a publicly viewable version of the Proposed Second Amended Complaint with the sealed portions redacted.

3.     The Clerk of the Court shall keep the unredacted version of the Proposed Second Amended Complaint segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.     The foregoing notwithstanding, access to the unredacted version of the Proposed Second Amended Complaint while under seal shall be provided only to the Court, and counsel for the Defendants.

5.     Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

6.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation of this Order.

**<u>CERTIFICATE OF SERVICE</u>**

I, Vivek Upadhya, hereby certify that on May 22, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.


*/s/ Vivek Upadhya*
Vivek Upadhya

18-50955

Dkt. # 87

FILED UNDER SEAL

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 6, 59, 67, 68, 77, 81** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,
PURSUANT TO 11 U.S.C. §§ 105(a) AND 107(b), BANKRUPTCY
RULE 9018, AND LOCAL RULE 9018-1 PERMITTING ALAN
HALPERIN AND EUGENE DAVIS, AS CO-TRUSTEES OF THE
APPVION LIQUIDATING TRUST, TO FILE A SECOND AMENDED COMPLAINT**

Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of

the Appvion Liquidating Trust, by and through their undersigned counsel, hereby move (the

"Motion") for leave to amend the First Amended Complaint filed in this action, in the form

1

attached hereto as Exhibit A (the "<u>Proposed Second Amended Complaint</u>" or "<u>Proposed SAC</u>") pursuant to Rule 7015(a)(2) of the Federal Rules of Bankruptcy Procedure.[1] In support of the Motion, the Co-Trustees state the following:

<div align="center">**RELIEF REQUESTED**</div>

1.     By this motion, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, the Co-Trustees request entry of an order, substantially in the form attached hereto as Exhibit C (the "<u>Proposed Order</u>"), granting the Co-Trustees leave to file the Proposed SAC to amend certain paragraphs of the First Amended Complaint [Adv. D.I. 59] (the "<u>FAC</u>") to provide the dates and amounts of each of the payments received by defendant Argent Trust Company ("<u>Argent</u>") during the ninety (90) days prior to the Petition Date.

2.     If the Court grants this relief, the following paragraphs of the FAC will be amended to read as follows (with new text in **<u>bold, double underline</u>**):[2]

98.     Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion**<u>, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017. See D.I. 266, Question 3, at 17.</u>** Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

469.     Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date**<u>, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017</u>** (the "<u>Argent Preference Payments</u>"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "<u>Argent Transfers</u>"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

---

[1]  Contemporaneously herewith, Plaintiff has or will file a motion to file the Proposed Second Amended Complaint under seal. Since the revisions that would constitute the Proposed SAC do not relate to text subject to a sealing request, Plaintiff files a redacted version of the Proposed SAC as Exhibit B.

[2]  While the FAC defines Appvion, Inc. as "Appvion," *see* FAC ¶2, Argent's Memorandum of Law in Support of its Motion to Dismiss incorrectly suggests that the FAC does not identify the payor debtor. *See* ECF 68, at 20.

<div align="center">2</div>

473.    In the ninety (90) days prior to the Petition Date, ~~PDC and/or~~ Appvion**, Inc.** transferred property or an interest in property totaling $35,996 in cash to Argent.

3.    On May 10, 2019, the undersigned counsel spoke with counsel for Argent and presented in writing the proposed amendments as well as the basis for the Co-Trustees' request. Plaintiff requested Argent's consent by May 17, 2019. On May 17, 2019, Argent's counsel indicated that Argent was not able to respond to Plaintiff's request for consent until at least May 24, 2019. In light of the presently submitted motions to dismiss the Plaintiff's complaint, including Court XII applicable to Argent, Plaintiff moves this Court for relief to amend the First Amended Complaint.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, as well as under Article XV of the confirmed plan of liquidation (the "Plan") in the above-captioned cases.

5.    The Co-Trustees consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    The relief requested herein is warranted pursuant to Bankruptcy Rule 7015(a)(2).

## BACKGROUND

7.    On November 30, 2018, the Co-Trustees filed the Complaint [Adv. D.I. 6] (the "Complaint") commencing the above-captioned adversary proceeding.

8.      On January 29, 2019, Argent filed its Motion to Dismiss the Complaint [Adv. D.I. 41]. On that same date, the D&O Defendants[3] and Stout filed motions to dismiss the Complaint. [Adv. D.I. 36, 38].

9.      On February 19, 2019, the Co-Trustees filed the FAC. The FAC added Count XII against Argent alleging that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550. *See* FAC, ¶¶ 468-478, prayer for relief, (l).

10.     On March 19, 2019, Argent filed its Motion to Dismiss the FAC and the related memorandum of law in support of that motion to dismiss (the "Argent MOL"). *See* Adv. D.I. 67, 68. In support of Argent's request to dismiss Count XII, Argent stated that "...a preference claim, like Count XII in the [FAC], 'must identify each transfer by date, amount, name of transferor, and name of transferee.'" Argent MOL, at 20 (internal citation omitted). Argent did not, in the Argent MOL, state specifically that it believed that the FAC did not identify each Argent Preference Payment by date, amount, name of transferor and name of transferee.

11.     On April 19, 2019, the Co-Trustees filed their Memorandum of Law In Opposition to Defendants' Motions to Dismiss, including Argent's Motion to Dismiss. *See* Adv. D.I. 77. Because Argent did not specifically identify which information that it believed was not properly plead with respect to Count XII, the Co-Trustees did not specifically respond to this objection.

12.     On May 7, 2019, Argent filed its reply brief in support of its motion to dismiss the FAC. *See* Adv. D.I. 81. In that reply brief, Argent claimed that the Plaintiff (in the Co-Trustee's

---

[3]    Capitalized terms not otherwise defined herein shall have the meaning as set forth in the FAC.

opposition brief) did not contest Argent's argument that Count XII was pled with inadequate specificity, and therefore asserted that the Court should enter judgment on Count XII in Argent's favor. *See* Adv. D.I. 81 at 9.

<div align="center">

**THE AMENDED COMPLAINT**

</div>

13.     Since the FAC already identifies Argent as the transferee, the Co-Trustees seek to make certain limited clarifying amendments to FAC in order to make clear that Appvion was the transferor, and to identify the date and amount of each of the Argent Preference Payments. If granted, this will be the first amendment to this Count of the FAC. Plainly, the Proposed SAC is based on the same facts as the FAC.

<div align="center">

**BASIS FOR RELIEF**

</div>

14.     It is well settled that leave to amend a pleading pursuant to Rule 15(a) should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that "leave sought should, as the rules require, be 'freely given'"); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990). "This approach ensures that a particular claim will be decided on the merits rather than on technicalities." *Dole*, 921 F.2d at 487. Leave to amend a complaint should be granted "[i]n the absence of any apparent or declared reason [not to] — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman*, 371 U.S. at 182; *see also Glob. Link Liquidating Trust v. Avantel, S.A. (In re Glob. Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (courts typically find an amendment permissible unless "there is undue delay, bad faith, a dilatory motive, prejudice, or futility.").

<div align="center">

5

</div>

15.     Courts have liberally granted amendments, and have only denied leave to amend where the amendment is motivated by bad faith or where it would be unduly prejudicial to the opposing party. *See Adams v. Gould, Inc.*, 739 F.2d 858, 868-69 (3d Cir. 1984) (finding that in the absence of bad faith and prejudice to defendants, the district court erred in failing to open up a judgment and granting leave to plaintiff in order to amend its amended complaint). To prevent amendment of a complaint, "the non-moving party . . . must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments . . . been timely." *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989).

16.     "Third Circuit courts have extrapolated five instances in which a court may deny leave to amend a complaint: (1) if delay in seeking amendment is undue; (2) if delay in seeking amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which relief can be granted; or (5) if the movant does not provide a drafted amended complaint." *Mortgage Lenders Network USA, Inc. v. Wells Fargo Bank (In re Mortgage Lenders Network, USA, Inc.)*, 395 B.R. 871, 876 (Bankr. D. Del. 2008) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001)).

### A.    The Delay In Seeking Amendment Is Not Undue

17.     There is no undue delay, bad faith, or dilatory motive on the Co-Trustees' part, and no parties in interest will be prejudiced by the filing of the Proposed SAC. The Proposed SAC is nearly identical to the FAC, except for the clarification text concerning Count XII and Argent. Only after re-reviewing the FAC after reading Argent's reply brief in support of its motion to dismiss, did the Co-Trustees determine that the filing of the Proposed SAC was desirable, and, by this Motion, have timely sought leave to amend the FAC.

**B.      The Delay In Seeking Amendment Is Not Prejudicial To Argent**

18.      Additionally, Argent cannot demonstrate any prejudice whatsoever; to the extent Argent was harmed by any deficiency in the pleading of Count XII of the FAC, such deficiencies would be cured by the amendments set forth herein and the Proposed SAC.

19.      In contrast, the Co-Trustees will be exposed to a risk of significant prejudice if leave to amend is denied.  Were the Court to deny leave to amend, and then dismiss Count XII without prejudice,  the Co-Trustees would then be required to initiate a separate adversary proceeding against Argent solely to bring the preference claims presently brought under Count XII.  Such a process would be duplicative, time consuming, and a waste of both the Co-Trustees' and this Court's time and resources. Thus, denial of leave to amend would prejudice only the moving party and the resources of this Court, while working no harm upon Argent, the non-moving party.

**C.      The Delay In Seeking Amendment Is Not Motivated By Bad Faith**

20.      As stated above, only after re-reviewing the FAC after reading Argent's reply brief in support of Argent's motion to dismiss, did the Co-Trustees determine that the filing of the Proposed SAC was desirable, and, by this Motion, have timely sought leave to amend the FAC.

**D.      The Amendment Is Not Futile In That It States A Claim For Which Relief Can Be Granted**

21.      The Co-Trustees believe that with the revisions to the FAC stated herein, they have alleged a claim for which relief can be granted.

E.      **Argent Was Provided with the Revisions to the FAC that Would Constitute the Proposed SAC**

22.     The Co-Trustees have provided a draft of the revisions to the FAC that would constitute the Proposed SAC. Redacted and unredacted copies of the Proposed SAC are attached hereto as Exhibits A and B.

## CONCLUSION

WHEREFORE, for the reasons stated above, the Co-Trustees respectfully request the entry of an order: (a) permitting the Co-Trustees to file the Proposed Second Amended Complaint, and (b) granting the Co-Trustees such further relief as is just and proper.

Dated: May 22, 2019

                                        **GRANT & EISENHOFER P.A.**
                                        */s/ Vivek Upadhya*
                                        Christine Mackintosh (Delaware Bar No. 5085)
                                        Vivek Upadhya (Delaware Bar No. 6241)
                                        R. Alexander Gartman (*pro hac vice* to be filed)
                                        123 Justison Street
                                        Wilmington, Delaware 19801
                                        Tel: 302-622-7000
                                        Email: cmackintosh@gelaw.com
                                               vupadhya@gelaw.com
                                               agartman@gelaw.com

                                        -and-

                                        Gordon Z. Novod (*pro hac vice* pending)
                                        485 Lexington Avenue, 29th Floor
                                        New York, New York 10017
                                        Tel: 646-722-8500
                                        Fax: 646-722-8501
                                        Email: gnovod@gelaw.com

                                        *Special Counsel for Alan D. Halperin and
                                        Eugene I. Davis, as Co-Trustees of the Appvion
                                        Liquidating Trust*

8

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.*, | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 6, 59, 67, 68, 77, 81** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND
EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING
TRUST, FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

This matter coming before the Court on the Motion for Leave to Amend Complaint (the

"Motion") of Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-

Trustees") of the Appvion Liquidating Trust, pursuant to Rule 15(a) of the Federal Rules of Civil

Procedure, made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure; and

this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to

1

28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing (if any) on the Motion and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED:

1. The Motion is granted.

2. The Co-Trustees are authorized to file the Proposed Second Amended Complaint attached as **Exhibit A** to the Motion.

3. The Co-Trustees are authorized to take all steps necessary or appropriate to carry out this Order.

4. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# Ex. A
# FILED UNDER SEAL

# SEE ADV. PROC. D.I. # 87

# Ex. B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>OLDAPCO, INC., *et al.,*<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12082 (MFW)<br><br>**(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40,<br><br>Defendants. | Adv. Proc. No. 18-50955 (MFW) |

## SECOND AMENDED COMPLAINT

1

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "Co-Trustees") of the Appvion Liquidating Trust (the "Appvion Liquidating Trust") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "ESOP"), the former ultimate owner of the Debtors.

2.      The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("Appvion") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3.      Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.      This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.      These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.      The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7.        The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8.        In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9.        The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

4

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.    During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

5

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.     Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.     Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.    In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.    When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.     Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.     As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.    This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.    A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.    Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

9

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.    Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## **PARTIES**

21.    Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.    Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.    The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

---

[1]    *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

24.    Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.    Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.    Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee.

11

Ms. Van Straten resides in Appleton, Wisconsin.

27.    Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.    Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.    Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.    Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became

chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.     Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.     Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.     Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and

served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34.    Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35.    David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36.    Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37.    John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in

14

connection with any FMV Determination connected with any claim asserted herein.

38.     Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "Director Defendants."

39.     Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "Officer/Employee Defendants."

40.     Argent Trust Company ("Argent"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.     Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.     Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## NON-PARTIES

43.     George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

44.     The Principal Financial Group ("The Principal"), acted as a record-keeper to handle the accounting related to the ESOP.

45.    Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.    Maureen Cosgrove is or was formerly an employee of Argent.

47.    Marc Hansberger is or was formerly an employee of Argent.

48.    Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.    Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.    Mark Shorthouse is or was formerly an employee of Argent.

51.    David Williams is or was formerly an employee of Argent.

52.    Phil Buchanan is or was formerly an employee of Argent.

53.    From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.    Cara Davis is or was formerly an employee of Stout.

55.    Robert S. Socol is or was formerly an employee of Stout.

56.    Aziz El Tahch is or was formerly an employee of Stout.

57.    From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

## JURISDICTION AND VENUE

58.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

16

1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.    Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS

I.    **OVERVIEW OF THE DEBTORS' BUSINESS**

    A.    **DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY**

61.    Prior to their bankruptcy filing on October 1, 2017 (the "Petition Date"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "Debtors"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.    In addition to its headquarters in Appleton, Wisconsin, Appvion had manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.    Appvion's business was organized into two operating divisions: carbonless ("Carbonless" or the "Carbonless Business") and thermal ("Thermal" or the "Thermal Business"), referring to the type of paper produced by each division.

64.    The thermal paper segment developed and produced substrates for the transaction

and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.    The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.    On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.    In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.    Prior to the Petition Date, PDC owned 100% of the common stock of Appvion. Prior to the Petition Date, Appvion only had one class of common stock.

69.    As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.    As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.    In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_Aug_4_2015.pdf    Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.    Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

    B.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.    PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

19

74.     PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.     Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.     Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.     Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.     Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.     APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.     On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.    EMPLOYEE OWNERSHIP AT APPVION

### A.    THE ESOP STRUCTURE

81.    Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.    Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.    The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.    Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.    When an ESOP participant retired, or otherwise terminated his or her employment with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the

ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.    The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.    For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.    Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.    Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.    According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, the appraiser must consider all facts considered relevant.… factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management,

workforce, and facilities, relative to their competitors, may also be considered.

Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.    The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

**B.    ADMINISTRATION OF THE ESOP AND THE ESOP TRUST**

92.    Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.    On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.    Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.    Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.    The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified

benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.    Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.    Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its duties to the ESOP.

100.    Amongst Argent's duties to the ESOP was determining the FMV of the common

24

stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained

Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP

Trustee, since before 2013.

101.    The terms and scope of Stout's services were confirmed in writing at various

times over the course of Stout's engagement by each ESOP Trustee.

102.    Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement

Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout

Engagement Letter provided that Stout would provide certain financial advisory services to

Reliance, solely in Reliance's capacity as ESOP Trustee.

103.    The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair
Market Value of the common stock of Appvion, Inc. ("Appvion" or the
"Company") as of June 30, 2013 and December 31, 2013 collectively, the
"Valuation Dates."). We understand that our valuation analysis will be used for
annual reporting and plan administration purposes by the [ESOP Trustee]. We
will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees
for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the
term "Fair Market Value" as the price at which an asset would change hands
between a willing buyer and a willing seller when the former is not under any
compulsion to buy and the latter is not under any compulsion to sell, and both
parties are able, as well as willing, to trade and are well-informed about the asset
and the market for the asset…

104.    The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc.

(MLB_01959) The June 2013 Stout Engagement Letter states as follows:

In order for us to maximize the value of our work and to keep the project on
schedule, It Is important for us to be provided with information we request from
the Company promptly. Additionally, if the Company is or becomes aware of
other relevant information necessary to the proper completion of this engagement,
the Company agrees to provide us with this information.

25

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

...

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945); Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement

26

Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.     Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

**Figure 2: Schedule of Payments by Appvion to Stout**

| Payment Date | Payment Amount | Check # |
|---|---|---|
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.     In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.     In addition to engaging Stout to assist with the FMV Determination, Argent hired the Principal to serve as record-keeper to handle the accounting related to the ESOP, and to ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

C.     THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.     The biannual FMV Determination served several crucial functions, related both to

the administration of the ESOP, and to the operation of the Debtors' businesses. For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

        a.  determine the per-share price at which ESOP participants made contributions to the ESOP;

        b.  determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

        c.  estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

        d.  estimate the upcoming repurchase obligations under the ESOP; and

        e.  determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other

investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation,

because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the

recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.   Third, the Debtors adopted a long-term incentive plan ("LTIP") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.   Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.   THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.   Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

126.   Prior to the Petition Date, the Debtors' primary sources of liquidity and capital

resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.    OTHER INDEBTEDNESS AND OBLIGATIONS

131.    On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development

Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.    PENSION PLAN OBLIGATIONS

132.    Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

#### Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)

|  | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at

3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

      F.      **INTERCOMPANY INDEBTEDNESS**

      133.    As described more fully herein, all ESOP/PDC common share activities, including issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001, employee withdrawals were significantly larger than employee contributions.

      134.    On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany Note"). *See* App000002.

      135.    On November 20, 2013, an Intercompany Promissory Note Distribution and Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In connection therewith, Appvion purported to make a non-cash distribution to PDC in the aggregate amount of the Note and PDC acknowledged receipt of the distribution and further acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended January 2, 2016, at 43.

      136.    Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board (App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board (App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof. Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC Security Holders Agreement") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.    The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC

common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.    In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.    The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.    On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "Appvion Security Holders Agreement") which sets forth the manner in which the members of the Appvion Board are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as

36

Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

### B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The PDC Board and/or the Appvion Board's compensation committee(s) also had authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152.    Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153.    Specifically, the per-share grant value of RSU awards granted in the preceding fiscal year was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.    The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.    The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.    Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

C.    EXECUTIVE COMPENSATION BETWEEN 2013 – 2016

1.    *Richards*

157.    Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

**Figure 4: Richards' Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $  - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

2.    **Gilligan**

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

**Figure 5: Gilligan's Compensation Between 2014 - 2016**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $  - | $  - | $465 |
| Non-equity incentive plan compensation | $82,707 | $  - | $  - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

**3.** *Ferree*

160.    Ferree's executive compensation until his retirement was heavily dependent on

Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

**Figure 6: Ferree's Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $  - | $  - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year

ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form

10-K for the year ended December 31, 2016, at 83.

**4.** *Van Straten*

161.    Van Straten's executive compensation was heavily dependent on Stout's

valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $    - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $    - | $    - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 5.    *Arent*

162.    Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $    - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

163.    The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

### D.    NON-EMPLOYEE DIRECTOR COMPENSATION

164.    Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.    Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.    Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.    On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for

43

the year ended December 28, 2013, at 110.

       E.      **ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING**

      168.    Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

      169.    The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

      170.    Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

      171.    Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and other matters related to the Debtors.

172.    From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

### Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|---|---|---|---|---|---|---|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion PDC | Ad Hoc Committee | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |
| Appvion | N/A | 8/12/15 | Appleton, WI | | Steve Martin | App010293 |

| | | | | | Marc Hansberger | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15–11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.   THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.   The financial demise of Appvion and the abject failure of the Debtors' management to create reliable, non-inflated, financial projections was well known to the members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC Board were updated by Management on a regular basis, and actively participated in the vetting

46

process of these projections through board activities as well as through the activities of the Audit Committee.

174.    Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.    When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.    From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.    In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments…" App006037.   The Audit Committee also cautioned that the highly

leveraged capital structure presented covenant compliance risk. App006037.

178.    In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.    In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.    From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance against the annual incentive plan targets, executive incentive plan, liquidity,

biannual share prices as calculated by Stout.

## VI.    STOUT'S FMV DETERMINATIONS

### A.    THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181.    Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182.    Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183.    Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated

projections by knowingly manipulating key aspects of its valuations.

184.    Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185.    Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186.    Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

> 1. The PDC's financial statements filed with the SEC;
>
> 2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 3. The PDC's internally-prepared balance sheets;
>
> 4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;
>
> 6. Publicly available information and financial data on publicly traded companies considered similar to the Debtors from an investment risk/return perspective; and

       7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B.  STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70

per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "June 2016 FMV"), at 53.

197.   As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "Dec. 2016 FMV"), at 39.

198.   As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "June 2017 FMV"), at 39.

199.   Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

**Figure 10: FMV Determinations of the PDC Common Stock Price**



June 2017 FMV, at 38.

C.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF THE PDC
COMMON STOCK SHARES WAS SUSCEPTIBLE TO MANIPULATION, AND WAS
WILDLY INFLATED AND FLAWED.

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock,
as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per
share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock,
as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial
performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other
financial and market data are pronounced for the period June 2013 through June 2017. During
that period the FMV of PDC's common stock as calculated by Stout is higher than other
available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily
responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial
reality.  Stout was fully aware that the projections it received from management were
unjustifiably inflated and unreliable.  Instead of pressing management for more reliable
projections on which to base its FMV Determinations in limited instances, Stout attempted to
compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking
various aspects of its valuation methodologies. These adjustments were inconsistent between
different FMV Determinations, and often lacked any business justification.  Many of the errors in
the FMV Determinations detailed below are therefore not the result of mere academic
disagreement over the most prudent way to value the Debtors' business, but rather adjustments
that Stout knowingly made to compensate for the unreliable financial projections it was provided
and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants'

54

breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

> **1.    The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities**

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of
Second Lien Notes and Debt Obligation Used by Stout
($ in thousands)**

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($ 3,018) | ($2,770) | ($ 2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.    Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.    Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the

56

quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013, at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed the Debtors' underfunded pension liability and whether Stout should include this liability in its FMV Determinations. Upon information and belief, Ferree was tasked with discussion the underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation obligations, workers compensation obligations, accrued insurance obligations, accrued taxes obligations, due on accounts receivable securitization, and other obligations resulted in the

57

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

     214.    Figure 12 below reflects these other omitted liabilities.

### Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations
### ($ in thousands)

| | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

     215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

> **2.    The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections**

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ███████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal

Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ███████ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

### Figure 13: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ███ | ███ | ███ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ███████ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately █████████ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

### Figure 14: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ███ | ███ | ███ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ███ | ███ | ███ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

223.    In spite of the actual Thermal EBITDA being approximately █████████ ██████████ management's projections, management only reduced its Thermal EBITDA projections by ████████████ for the next fiscal year, and by no more than █████████ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.

224.    Management's projections for the June 2016 FMV Determination also failed to respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of █ ██████████████ for the twelve months ended June 30, 2016, well below the projected amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV, at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as follows in Figure 15:

## Figure 15: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | █ | | | | | | | | | |
| June 2012 FMV | █ | █ | █ | █ | █ | | | | | |
| Dec. 2012 FMV | | █ | █ | █ | █ | █ | | | | |
| June 2013 FMV | | █ | █ | █ | █ | █ | | | | |
| Dec. 2013 FMV | | | █ | █ | █ | █ | █ | | | |
| June 2014 FMV | | | █ | █ | █ | █ | █ | | | |
| Dec. 2014 FMV | | | | █ | █ | █ | █ | █ | | |
| June 2015 FMV | | | | █ | █ | █ | █ | █ | █ | |
| Dec. 2015 FMV | | | | | █ | █ | █ | █ | █ | |
| June 2016 FMV | | | | | █ | █ | █ | █ | █ | |
| Dec. 2016 FMV | | | | | | █ | █ | █ | █ | █ |
| June 2017 FMV | | | | | | █ | █ | █ | █ | █ |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV, at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 16:

### Figure 16: FMV Determinations – Carbonless EBITDA Projections



*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV, at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015 FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 17:

### Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 1437 of 1527    Document 14-2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **June 2013 FMV** | | ███████████████ | | | | | | |
| **Dec. 2013** | | ███████████████ | | | | | | |
| **June 2014 FMV** | | █ | ██ | ██ | ████ | | | |
| **Dec. 2014 FMV** | | | ██ | ██ | ██ | ██ | | |
| **June 2015 FMV** | | | ██ | ██ | ██ | ██ | ██ | ██ |
| **Dec. 2015 FMV** | | | | ██ | ██ | ██ | ██ | ██ |
| **June 2016 FMV** | | | | ██ | ██ | ██ | ██ | ██ |
| **Dec. 2016 FMV** | | | | | ██ | ██ | ██ | | ██ |
| **June 2017 FMV** | | | | | ██ | ██ | ██ | ██ | ██ |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3. The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

> is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

> Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management,

Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.    In order to select companies for Stout's Guideline Company Method analysis, Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.    Stout admitted that "…there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served…" June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.    Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June

2017 FMV, at 72.

233.    The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.    For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.    Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.    The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.    Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless

Businesses separately.

238.   In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015 FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.   In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.   A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36;

Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id.* Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

67

244.    In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board  again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.    In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App011563.

246.    For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. <u>First</u>, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.    <u>Second</u>, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the

December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.   Third, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.   In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.   In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is

appropriate to apply a premium to the guideline company multiples
to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

255.    However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256.    Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257.    Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258.    The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259.    In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year

71

EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

4. **The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations**

260.    The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261.    For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

262.    Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.    Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.    Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.    Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were

below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.    In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

### 5.    Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method

267.    The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

### a.    The Company-Specific Risk Premium

268.    Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 18: Company-Specific Risk Premium Used By Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 0.0% | 2.0% | 0.0% | 0.0% | 1.0% | 2.0% | 0.0% | 0.0% |
| Thermal | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 4.0% | 4.0% | 4.0% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

75

270.    For example, the Company-Specific Risk Premium used by Stout for the June 2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless Business during that period remained virtually unchanged from FMV Determination Date to FMV Determination Date. *See* Figure 19 below.

**Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)**

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | -- | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr. Aguilar of Stout stated that, with ***emphasis added***:

> Carbonless continue to decline. There has been somewhat of an offset by the sales of specialty products that are higher margin. They have made some progress on sales of security paper which is use[d] for documents such as birth certificates (very small market). The company expects sales to be relatively flat. ***Over the long term sales are expected to decline. The projections are the same as the projection provided for year end with the exception of 2016.***

76

273.    In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.    For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF Valuation.

275.    At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with *emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.    In spite of Mr. Aguilar's observation that the Thermal Business year ended December 31, 2016 EBITDA projections would be back up from the projections used at the December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.    Even G. Grant Lyon, then the sole member of the ESOP Administrative Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.
>
> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

77

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017

FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout

allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV

Determination to account for the fact that the projections for future years' EBITDA had been

lowered from the levels used in the June 2016 FMV Determination. Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ████ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Thermal:
>
> – Over the last three years, Thermal's adjusted EBITDA declined at an
>   annualized rate of ████. In comparison, the Company is projecting
>   annualized adjusted EBITDA growth of ████ for Thermal between the
>   LTM period and fiscal 2021. There is increased risk associated with the
>   Company's projections given that projected earnings growth is above
>   historical levels.
>
> – Thermal's adjusted EBITDA projection for fiscal 2017 is ████ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ████ lower

78

than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is projecting annualized adjusted EBITDA growth of ████ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ████ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

### b.    The Cost of Debt

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average

Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0%     | 6.0%    | 6.0%     | 6.0%    | 5.5%     | 4.4%    | 4.8%     | 6.5%    |
| Thermal    | 6.0%     | 6.0%    | 6.0%     | 6.0%    | 5.5%     | 4.4%    | 4.8%     | 6.5%    |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), …." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December

31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21 below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0X     | 5.0X    | 5.0X     | 5.5X    | 5.5X     | 5.5X    | 6.5X     | 7.0X    |
| Thermal    | 6.0X     | 7.5X    | 7.5X     | 5.5X    | 5.5X     | 5.5X    | 5.5X     | 5.5X    |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect

the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV, at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288.    In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289.    Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### D.    THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON

290.    The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291.    During the time period where valuation methodology decisions were employed by

Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.    In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr. Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.    In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.    Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| **TOTAL** | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

**Figure 24: Ferree 2017 SERP Distributions**

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| **TOTAL** | **$177,874** |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues

from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

E.  COMPENSATION AND BENEFITS

1.  The Officer/Employee Defendants and Director Defendants' Compensation

299.    As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300.    The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301.    In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302.    Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting

85

date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.    The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.    The Debtors' Pension Plan

307.    The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.    Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.    Ownership of PDC Common Stock

309.    Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

### Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013

| | | | | Total | | | |
|---|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **Total** | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **Total** | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **Total** | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| **Total** | 6,934,029 | 370,000 | 110,918 | 2,248,780 | 300 | 9,664,027 | 100.0% |

June 2015 FMV, at 7.

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| | | | **Paperweight Equity Ownership Schedule** | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| | | | **Paperweight Equity Ownership Schedule** | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |

[a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money.

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| Total | 6,262,701 | 248,650 | 139,570 | 911,034 | 7,561,955 | 100.0% |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| Total | 5,932,120 | 334,797 | 145,505 | 1,223,759 | 7,636,181 | 100.0% |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

**F.    APPVION'S CREDIT RATING HISTORY**

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

G.   SUMMARY OF ESOP TRANSACTIONS

318.   At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.   Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.   Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.   The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.   The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

91

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**



*See* June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value**
**($ in thousands, except share price)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ███ | ███ | ███ |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ███ | ███ | ███ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ███ | ███ | ███ |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ███ | ███ | ███ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 | | | | | |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ███ | ███ | ███ |

*See* Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at 35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36,

39-40.

324.    Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.    From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.    For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.    For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.    For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.    For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.    For the six months leading up to December 2015, contributions to the ESOP

totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

H.    APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

**Figure 36: Historical Trading Prices**



**Figure 37: Historical Trading Prices (% Changes)**



I.    THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING
      FINANCIAL POSITION AND INSOLVENCY

335.    The markets took note of the Debtors' declining financial condition. In November

2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "BVAL") at a discount

to par. *See* Figure 38 below.

**Figure 38: BVAL of the Second Lien Notes in November 2013**
**($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| 11/29/2013 | $250,000 |  | 98.125% |  | $  245,313 | $  (4,688) |
| 11/27/2013 | $250,000 |  | 98.0% |  | $  245,000 | $  (5,000) |
| 11/26/2013 | $250,000 |  | 98.0% |  | $  245,000 | $  (5,000) |
| 11/25/2013 | $250,000 |  | 97.75% |  | $  244,375 | $  (5,625) |
| 11/22/2013 | $250,000 |  | 97.75% |  | $  244,375 | $  (5,625) |
| 11/21/2013 | $250,000 |  | 97.75% |  | $  244,375 | $  (5,625) |
| 11/20/2013 | $250,000 |  | 97.875% |  | $  244,688 | $  (5,313) |
| 11/19/2013 | $250,000 |  | 97.75% |  | $  244,375 | $  (5,625) |
| 11/18/2013 | $250,000 |  | 97.688% |  | $  244,220 | $  (5,780) |
| 11/15/2013 | $250,000 |  | 97.938% |  | $  244,845 | $  (5,155) |
| 11/14/2013 | $250,000 |  | 98.125% |  | $  245,313 | $  (4,688) |

*Source*: Bloomberg.

336.    Then, again, in the second half of 2014, the Second Lien Notes were valued by

BVAL from par (100% of the principal amount) to approximately 68% of par by December 31,

2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014

reflected the market's belief that the value of the debt was materially impaired and that Appvion

was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the

conclusion that Appvion was insolvent through the Petition Date.

337.    The markets fundamentally disagreed with Stout concerning Stout's the value of

PDC common stock.

338.    As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or

at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.    As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 |  | 98.6880% |  | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $    - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $    - |
| Second Lien Notes | $ 250,000 |  | 68.8756% |  | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $    - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $    - | $    - |
| TOTAL | $ 596,835 |  |  |  | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.    As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 | | 93.688% | | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 64.938% | | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $    - | | (n/a) | | $    - | $   - |
| TOTAL | $ 597,748 | | | | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,308 | | 93.50% | | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 40.125% | | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $    - | | (n/a) | | $    - | $   - |
| TOTAL | $ 425,918 | | | | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and

98

Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2016.

**Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 | | 95.5% | | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 | | 100% | | $ 27,000 | $  - |
| Ohio Loan | $ 2,238 | | (n/a) | | $ 2,238 | $  - |
| Second Lien Notes | $ 250,000 | | 57.56% | | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $   300 | | (n/a) | | $ 300 | $  - |
| TOTAL | $ 443,838 | | | | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of December 31, 2016.

**Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 | | 97.69% | | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 | | 100% | | $ 31,920 | $  - |
| Ohio Loan | $ 1,443 | | (n/a) | | $ 1,443 | $  - |
| Second Lien Notes | $ 250,000 | | 57.00% | | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $   100 | | (n/a) | | $ 100 | $  - |
| TOTAL | $ 447,035 | | | | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2017.

**Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 |  | 97.38% |  | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 |  | 100% |  | $ 19,500 | $   - |
| Ohio Loan | $  626 |  | (n/a) |  | $ 626 | $   - |
| Second Lien Notes | $ 250,000 |  | 52.69% |  | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - |  | (n/a) |  | $   - | $   - |
| TOTAL | $ 454,426 |  |  |  | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was insolvent. The market, per the trading prices of the debt, did not believe that the value of the company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

**J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE BALANCE-SHEET TEST**

346.    The book value of the Debtors' liabilities exceeded the book value of their assets since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

|  | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

## K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST

347.    The Debtors were insolvent on a cash-flow basis at various points in time since 2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business. *See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII.  THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the

December 2014 FMV, as no such motion was made. *Id.*

351.    On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2015 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352.    On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id*. The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id*.

353.    On January 15, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the

December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.    On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.    On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

356.    On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout.

*Id.*

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id.*

## VIII.    THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on

May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C. The Plan.

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of

Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.    The Plan of Liquidation defines "Preserved D&O Claims" as:

any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; provided, however, that the Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.    The Plan of Liquidation defines "Released D&O" to mean:

any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.    The Plan of Liquidation defines "Released D&O Claims" to mean "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.    The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.    The Plan of Liquidation Provides that following the Effective Date, the

Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally

permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "Effective Date") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

IX.   **THE DIRECTOR DEFENDANTS AND THE OFFICER/EMPLOYEE DEFENDANTS ARE NOT RELEASED D&OS UNDER THE PLAN OF LIQUIDATION.**

377.   Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.   Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.   Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.   Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.   Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.   Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.   Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.   Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.   Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.   Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.   Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.   Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.   Upon information and belief, Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date. Upon information and belief, Mr. Gilligan does not qualify as a "Released D&O" under the Plan of Liquidation.

**X.    NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS**

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors' bankruptcy counsel, DLA Piper LLP (US), with a letter detailing the existence of the claims and causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims existed against the current and former directors and officers of Appvion under theories of breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee wrote that the Creditors' Committee "intends to hold the current and former directors and officers of the Debtors accountable for their actions."

**XI.    CAUSES OF ACTION**

<u>**COUNT I**</u>
**(Breach of Fiduciary Duties of Care and Loyalty Against The Officer/Employee Defendants and the Director Defendants)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock in order to further their own individual self-interest, the Director Defendants and the Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of

PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their individual financial interests. Because each Director Defendant and Officer/Employee Defendant stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the selection of companies for use in Stout's Guideline Companies Method analysis. In these and

in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

## <u>COUNT II</u>
### (Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed

fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

## COUNT III
### (Breach of Fiduciary Duty of Care Against Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher)

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions made by ESOP participants. Further, distributions had significantly outstripped contributions in

113

the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

## COUNT IV
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these

114

malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT V
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the

Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

### COUNT VI
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these

116

malfeasant acts.

418.    Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VII
**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

419.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422.    During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423.    The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424.    The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of

117

an illegal dividend.

426.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT VIII

**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

427.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.    From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.    From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr.

Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT IX
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)

436.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.    The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.    At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.    At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C.§ 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.    In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.    The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified Distributions were made.

119

443.    The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.    As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.    Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.    In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

**COUNT X**
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under**
**6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)**

447.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.    Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "July 2017 Stout Payment").

449.    Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "Stout Preference Payments").

450.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose

before the Stout Preference Payments occurred.

451.    The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

452.    At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453.    In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454.    The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455.    The Stout Preference Payments were made while the Debtors were insolvent.

456.    As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457.    Stout had reasonable cause to believe that the Debtors were insolvent.

458.    In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## COUNT XI
### (Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)

459.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

121

460.    Stout received payment in Figure 2 above totaling $522,229.71 (the "Stout Transfers") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

## COUNT XII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.     The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.     Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.     The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.     At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.     In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

123

474.     The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.     The Argent Preference Payments were made while the Debtors were insolvent.

476.     As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.     Argent had reasonable cause to believe that the Debtors were insolvent.

478.     In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

## <u>COUNT XIII</u>
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.     The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.     Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.     At the time of the Argent Transfers, (i) Appvion was engaged in business or a

<div align="center">124</div>

transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

## COUNT XIV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)**

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

125

**Figure 46: Siefert Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 15,625 |
| 3/17/2017 | $ 15,625 |
| 7/3/2017 | $ 15,625 |
| 9/26/2017 | $ 15,625 |
| 9/28/2017 | $ 15,625 |
| TOTAL | $ 78,125 |

489.    Ms. Siefert received board fee payments as set forth in Figure 46.

490.    The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492.    The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493.    At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495.    The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496.    The Siefert Board Fee Payments were made while the Debtors were insolvent.

126

497.    As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

### COUNT XV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $    13,750 |
| 3/17/2017 | $    17,500 |
| 7/3/2017 | $    17,500 |
| 9/26/2017 | $    17,500 |
| 9/28/2017 | $    17,500 |
| **TOTAL** | **$    83,750** |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director

127

remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn

Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVI
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)

513.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

514.    In addition to the compensation otherwise addressed herein, Mr. Murphy received board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 25,000 |
| 3/17/2017 | $ 25,000 |
| 7/3/2017 | $ 25,000 |
| 9/26/2017 | $ 25,000 |
| 9/28/2017 | $ 25,000 |
| **TOTAL** | **$ 125,000** |

515.    Mr. Murphy received board fee payments as set forth in Figure 48.

516.    The Murphy Board Fee Payments include $55,000 for non-employee director remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Murphy Board Fee Payments occurred.

518.    The Murphy Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

519.    At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)**

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "Laurino Board Fee Payments") within one year

of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $      13,750 |
| 3/17/2017 | $      13,750 |
| 7/3/2017 | $      13,750 |
| 9/26/2017 | $      13,750 |
| 9/28/2017 | $      13,750 |
| TOTAL | $      68,750 |

528.    Mr. Laurino received board fee payments as set forth in Figure 49.

529.    The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.    The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.    At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.    The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.    The Laurino Board Fee Payments were made while the Debtors were insolvent.

536.    As a result of the Laurino Board Fee Payments, Mr. Laurino received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)**

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $      13,750 |
| 3/17/2017 | $      13,750 |
| 7/3/2017 | $      13,750 |
| 9/26/2017 | $      13,750 |
| 9/28/2017 | $      13,750 |
| **TOTAL** | **$      68,750** |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director

132

remuneration.

543.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.    The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.    At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.    The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.    The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.    As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.    Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.    In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the

133

Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court

enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Gilligan, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Mr. Gilligan, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l) On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n) On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o) On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p) On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q) On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r) On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this

Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(s) awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t) awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u) awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 22, 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (*pro hac* admission pending)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

**<u>CERTIFICATE OF SERVICE</u>**

I, Vivek Upadhya, hereby certify that on May 22, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.


*/s/ Vivek Upadhya* _____
Vivek Upadhya

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>OLDAPCO, INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 17-12082 (MFW)<br>(Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS,<br>AS CO-TRUSTEES OF THE APPVION<br>LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MARK R. RICHARDS, THOMAS J. FERREE,<br>TAMI L. VAN STRATEN, JEFFREY J.<br>FLETCHER, KERRY S. ARENT, STEPHEN P.<br>CARTER, TERRY M. MURPHY, ANDREW F.<br>REARDON, KATHI P. SEIFERT, MARK A.<br>SUWYN, CARL J. LAURINO, DAVID A.<br>ROBERTS, KEVIN GILLIGAN, ARGENT<br>TRUST COMPANY, STOUT RISIUS ROSS,<br>INC., STOUT RISIUS ROSS, LLC, JOHN/JANE<br>DOES 1-40,<br><br>Defendants. | Adv. Proc. No. 18-50955 (MFW)<br><br>Related Docket No. **7** |

**ORDER GRANTING AMENDED MOTION OF ALAN D. HALPERIN AND EUGENE I.
DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, PURSUANT
TO 11 U.S.C. §§ 105(A) AND 107(B), BANKRUPTCY RULE 9018, AND LOCAL
RULE 9018-1 PERMITTING ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, TO FILE
UNDER SEAL THE UNREDACTED VERSION OF THE COMPLAINT**

This matter came before the Court upon the motion (the "Amended Motion to Seal") of

Plaintiff Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of the

- 1 -

Appvion Liquidating Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the complaint (the "Complaint"); and the Court having considered the Amended Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Amended Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that

1.      The Amended Motion to Seal is GRANTED.

2.      The Co-Trustees are permitted to file the unredacted version of the Complaint under seal and to file a publicly viewable version of the Complaint with the sealed portions redacted.

3.      The Clerk of the Court shall keep the unredacted version of the Complaint segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.      The foregoing notwithstanding, access to the unredacted version of the Complaint while under seal shall be provided only to the Court, and counsel for the Defendants.

5.      Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

6.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation of this Order.

**Dated: May 23rd, 2019**
**Wilmington, Delaware**

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>OLDAPCO, INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 17-12082 (MFW)<br>(Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS,<br>AS CO-TRUSTEES OF THE APPVION<br>LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MARK R. RICHARDS, THOMAS J. FERREE,<br>TAMI L. VAN STRATEN, JEFFREY J.<br>FLETCHER, KERRY S. ARENT, STEPHEN P.<br>CARTER, TERRY M. MURPHY, ANDREW F.<br>REARDON, KATHI P. SEIFERT, MARK A.<br>SUWYN, CARL J. LAURINO, DAVID A.<br>ROBERTS, KEVIN GILLIGAN, ARGENT<br>TRUST COMPANY, STOUT RISIUS ROSS,<br>INC., STOUT RISIUS ROSS, LLC, JOHN/JANE<br>DOES 1-40,<br><br>Defendants. | Adv. Proc. No. 18-50955 (MFW)<br><br>Related Docket No. **61** |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS, AS
CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, PURSUANT
TO 11 U.S.C. §§ 105(A) AND 107(B), BANKRUPTCY RULE 9018, AND LOCAL
RULE 9018-1 PERMITTING ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, TO FILE
UNDER SEAL THE UNREDACTED VERSION OF THE AMENDED COMPLAINT**

This matter came before the Court upon the motion (the "Motion to Seal") of Plaintiff

Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of the Appvion

Liquidating Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule

- 1 -

9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the amended complaint (the "Amended Complaint"); and the Court having considered the Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that

1.      The Motion to Seal is GRANTED.

2.      The Co-Trustees are permitted to file the unredacted version of the Amended Complaint under seal and to file a publicly viewable version of the Amended Complaint with the sealed portions redacted.

3.      The Clerk of the Court shall keep the unredacted version of the Amended Complaint segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.      The foregoing notwithstanding, access to the unredacted version of the Amended Complaint while under seal shall be provided only to the Court, and counsel for the Defendants.

5.      Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

6.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation of this Order.

**Dated: May 23rd, 2019**
**Wilmington, Delaware**

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 86, 88** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**STIPULATION AND [PROPOSED] ORDER REGARDING MOTIONS OF
ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF
THE APPVION LIQUIDATING TRUST, CONCERNING (1) THE FILING
OF THE SECOND AMENDED COMPLAINT, (2) THE FILING OF THE
SECOND AMENDED COMPLAINT UNDER SEAL, AND (3) THE COMPLETION
OF BRIEFING WITH RESPECT TO DEFENDANTS' MOTIONS TO DISMISS**

Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust

("**Plaintiff**"), on the one hand, and Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten,

Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon,

Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan (collectively, the "**D&O Defendants**,"), Stout Risius Ross, Inc., and Stout Risius Ross, LLC (collectively, "**Stout**"), and Argent Trust Company ("**Argent**," and together with Plaintiff, the "**Parties**"), on the other hand, through their respective undersigned counsel, hereby stipulate and agree as follows:

1.      This Stipulation memorializes certain agreements of the Parties following the filing of (i) *Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. §§ 105(a) and 107(b), Bankruptcy Rule 9018, and Local Rule 9018-1 Permitting Alan Halperin and Eugene Davis, as Co-Trustees of the Appvion Liquidating Trust, to File A Second Amended Complaint* [Adv. D.I. 88] (the "**Motion for Leave to Amend**") and (ii) *Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. §§ 105(a) and 107(b), Bankruptcy Rule 9018, and Local Rule 9018-1 Permitting Alan Halperin and Eugene Davis, as Co-Trustees of the Appvion Liquidating Trust, to File Under Seal the Unredacted Version  of the Proposed Second Amended Complaint,* ("**Motion for Leave to File the Second Amended Complaint Under Seal**") [Adv. D.I. 86].

2.      Pursuant to Rule 7015(a)(2) of the Federal Rules of Bankruptcy Procedure, the Defendants consent to Plaintiff filing a Second Amended Complaint ("**SAC**") in the form as attached to the Motion for Leave to Amend. Specifically, as set forth in the Motion for Leave to Amend, the text below in **<u><u>bold, double underline</u></u>** is now part of the SAC.

> 98.      Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion**<u><u>, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017. *See* D.I. 266, Question 3, at 17.</u></u>** Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

469.       Argent received payments totaling \$35,996 in the ninety (90) days prior to the Petition Date**, from Appvion, Inc. as follows: (i) \$17,979 on August 10, 2017, and (ii) \$18,017 on September 5, 2017** (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of \$200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

473.       In the ninety (90) days prior to the Petition Date, ~~PDC and/or~~ Appvion**, Inc.** transferred property or an interest in property totaling \$35,996 in cash to Argent.

3.       The Defendants stipulate that in light of the filing of the Second Amended Complaint, the Defendants prefer to stand on their current motions to dismiss and related pleadings [Adv. D.I. 65-70, 80-82, 84] concerning the First Amended Complaint, and those motions and related filings shall have equal applicability to the Second Amended Complaint.

4.       The Plaintiff agrees that in light of the Defendants' stipulation to stand on their current motions to dismiss and related filings related to the First Amended Complaint as if those motions and related filings have equal applicability to the Second Amended Complaint, stands on its Opposition to Defendants' motions to dismiss [Adv. D.I. 77] with respect to all Counts except as to Argent's motion to dismiss and reply as to Count XII of the First Amended Complaint. Plaintiff believes that the Second Amended Complaint adds new allegations that moots certain aspects of Argent's motion to dismiss Count XII.

5.       Subject to the foregoing, the Parties believe that briefing for the Defendants' motions to dismiss remains complete, and the Parties agree that no further briefing or motion practice is required at this time.

6.       The Defendants further consent to the Motion for Leave to File the Second Amended Complaint Under Seal.

7.      Except as specifically set forth herein, all rights, claims, and defenses of the Parties are fully preserved.

8.      Upon the Court's entry of this stipulation and proposed order, and the Court's granting of the Motion for Leave to File the Second Amended Complaint Under Seal Plaintiff will promptly file the Second Amended Complaint under seal.

Dated: May 29, 2019

**GRANT & EISENHOFER P.A.**

/s/ Vivek Upadhya
Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Telephone: 302-622-7000
Email: cmackintosh@gelaw.com
        vupadhya@gelaw.com

- and -

Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com


*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

**SAUL EWING ARNSTEIN & LEHR LLP**

/s/ Mark Minuti
Mark Minuti (DE Bar No. 2659)
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: 302-421-6840
Email: Mark.Minuti@saul.com

- and -

**JENNER & BLOCK LLP**
Craig Martin (admitted *pro hac vice*)
David Jimenez-Ekman (admitted *pro hac vice*)
Michael Graham (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Email: cmartin@jenner.com
        djimenez-ekman@jenner.com
        mgraham@jenner.com

*Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts, Kevin Gilligan*

4

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (DE Bar No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
Telephone: (302) 295-0191
Email: desgross@chipmanbrown.com

-and-

**GROOM LAW GROUP**

Lars Golumbic, Esquire (admitted *pro hac vice*)
GROOM LAW GROUP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5811
Telephone: (202) 861-6615
Email: lgolumbic@groom.com

*Counsel for Defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC*

**MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (DE Bar No. 3201)
500 Delaware Street, Suite 1500
Wilmington, DE  19801-1494
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
Email: ckunz@morrisjames.com

-and-

**KEATING MUETHING & KLEKAMP PLL**

Michael L. Scheier (admitted *pro hac vice*)
Brian P. Muething (admitted *pro hac vice*)
Jacob Rhode (admitted *pro hac vice*)
One East 4th Street
Suite 1400
Cincinnati, OH 45202
Telephone: (513) 639-3814
Email:bmuething@KMKLAW.com
*Counsel for Argent Trust Company*

SO ORDERED:_____

5

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| OLDAPCO, INC., et al., | Case No. 17-12082 (MFW) |
| Debtors. | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| Plaintiff, | Adv. Proc. No. 18-50955 (MFW) |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## JOINT STIPULATION OF DISMISSAL

PLEASE TAKE NOTICE that, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, the above-captioned matter is dismissed without prejudice only as between Plaintiff and defendant Kevin Gilligan.  Such dismissal is without prejudice to, and does not apply to, the claims of the Plaintiff against any other above-captioned defendant.

Date: June 3, 2019

**GRANT & EISENHOFER P.A.**

*/s/ Vivek Upadhya*
Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Telephone: 302-622-7000
Email: cmackintosh@gelaw.com
       vupadhya@gelaw.com

- and-

Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and
Eugene I. Davis, as Co-Trustees of the
Appvion Liquidating Trust*

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: 302-421-6840
Email: Mark.Minuti@saul.com

- and -

**JENNER & BLOCK LLP**
Craig Martin (admitted *pro hac vice*)
David Jimenez-Ekman (admitted *pro hac vice*)
Michael Graham (admitted *pro hac vice*)
Telephone: (312) 222-9350
Email: cmartin@jenner.com
       djimenez-ekman@jenner.com
       mgraham@jenner.com

*Counsel for Kevin Gilligan*

- 2 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Vivek Upadhya, hereby certify that on June 3, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.


*/s/ Vivek Upadhya*
Vivek Upadhya

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| | Adv. Proc. No. 18-50955-MFW |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, PURSUANT TO 11 U.S.C. §§ 105(A) AND 107(B), BANKRUPTCY RULE 9018, AND LOCAL RULE 9018-1 PERMITTING ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED <u>VERSION OF THE PROPOSED SECOND AMENDED COMPLAINT</u>**

This matter came before the Court upon the motion (the "<u>Motion to Seal</u>") of Plaintiff Alan D.

Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of the Appvion Liquidating

Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the proposed second amended complaint (the "Proposed Second Amended Complaint"); and the Court having considered the Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED that

1.    The Motion to Seal is GRANTED.

2.    The Co-Trustees are permitted to file the unredacted version of the Proposed Second Amended Complaint under seal and to file a publicly viewable version of the Proposed Second Amended Complaint with the sealed portions redacted.

3.    The Clerk of the Court shall keep the unredacted version of the Proposed Second Amended Complaint segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.    The foregoing notwithstanding, access to the unredacted version of the Proposed Second Amended Complaint while under seal shall be provided only to the Court, and counsel for the Defendants.

5.    Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

6.    This Court shall retain jurisdiction over any and all matters arising from or related to the
implementation of this Order.

Dated: June 24, 2019