18-50955

Dkt. # 100

FILED UNDER SEAL

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

1

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "<u>Co-Trustees</u>") of the Appvion Liquidating Trust (the "<u>Appvion Liquidating Trust</u>") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1. This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "<u>ESOP</u>"), the former ultimate owner of the Debtors.

2. The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("<u>Appvion</u>") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3. Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

2

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.    This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.    These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.    The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7. The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8. In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9. The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

4

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.    During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.     Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.     Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.    In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.    When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

7

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.     Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.     As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.    This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.    A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.    Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.     Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## **PARTIES**

21.     Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.     Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.     The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

---

[1] *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

24.     Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.     Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.     Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee.

11

Ms. Van Straten resides in Appleton, Wisconsin.

27.     Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.     Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.     Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.     Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became

chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.    Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.    Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.    Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and

served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34.    Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35.    David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36.    Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37.    John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in

connection with any FMV Determination connected with any claim asserted herein.

38.    Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "<u>Director Defendants</u>."

39.    Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "<u>Officer/Employee Defendants</u>."

40.    Argent Trust Company ("<u>Argent</u>"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.    Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.    Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## <u>NON-PARTIES</u>

43.    George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

44.    The Principal Financial Group ("<u>The Principal</u>"), acted as a record-keeper to handle the accounting related to the ESOP.

45.     Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.     Maureen Cosgrove is or was formerly an employee of Argent.

47.     Marc Hansberger is or was formerly an employee of Argent.

48.     Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.     Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.     Mark Shorthouse is or was formerly an employee of Argent.

51.     David Williams is or was formerly an employee of Argent.

52.     Phil Buchanan is or was formerly an employee of Argent.

53.     From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.     Cara Davis is or was formerly an employee of Stout.

55.     Robert S. Socol is or was formerly an employee of Stout.

56.     Aziz El Tahch is or was formerly an employee of Stout.

57.     From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

## JURISDICTION AND VENUE

58.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

16

1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.     Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS

### I.    OVERVIEW OF THE DEBTORS' BUSINESS

#### A.    DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY

61.     Prior to their bankruptcy filing on October 1, 2017 (the "Petition Date"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "Debtors"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.     In addition to its headquarters in Appleton, Wisconsin, Appvion had manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.     Appvion's business was organized into two operating divisions: carbonless ("Carbonless" or the "Carbonless Business") and thermal ("Thermal" or the "Thermal Business"), referring to the type of paper produced by each division.

64.     The thermal paper segment developed and produced substrates for the transaction

17

and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.    The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.    On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.    In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.    Prior to the Petition Date, PDC owned 100% of the common stock of Appvion. Prior to the Petition Date, Appvion only had one class of common stock.

18

69.     As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.     As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.     In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_Aug_4_2015.pdf    Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.     Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

B.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.     PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

74.     PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.     Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.     Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.     Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.     Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.     APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.     On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.    EMPLOYEE OWNERSHIP AT APPVION

### A.    THE ESOP STRUCTURE

81.    Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.    Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.    The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.    Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.    When an ESOP participant retired, or otherwise terminated his or her employment with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the

21

ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.    The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.    For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.    Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.    Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.    According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, the appraiser must consider all facts considered relevant.… factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management,

workforce, and facilities, relative to their competitors, may also be considered.

Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.     The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

### B.    ADMINISTRATION OF THE **ESOP** AND THE **ESOP TRUST**

92.     Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.     On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.     Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.     Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.     The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified

benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.      Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.      Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.      Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its duties to the ESOP.

100.      Amongst Argent's duties to the ESOP was determining the FMV of the common

24

stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP Trustee, since before 2013.

101.    The terms and scope of Stout's services were confirmed in writing at various times over the course of Stout's engagement by each ESOP Trustee.

102.    Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout Engagement Letter provided that Stout would provide certain financial advisory services to Reliance, solely in Reliance's capacity as ESOP Trustee.

103.    The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 collectively, the "Valuation Dates."). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the [ESOP Trustee]. We will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset…

104.    The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc. (MLB_01959) The June 2013 Stout Engagement Letter states as follows:

In order for us to maximize the value of our work and to keep the project on schedule, It Is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

...

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945); Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement

26

Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.     Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

### Figure 2: Schedule of Payments by Appvion to Stout

| Payment Date | Payment Amount | Check # |
| --- | --- | --- |
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.     In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.     In addition to engaging Stout to assist with the FMV Determination, Argent hired the Principal to serve as record-keeper to handle the accounting related to the ESOP, and to ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

### C.    THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.     The biannual FMV Determination served several crucial functions, related both to

27

the administration of the ESOP, and to the operation of the Debtors' businesses.  For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

    a.   determine the per-share price at which ESOP participants made contributions to the ESOP;

    b.   determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

    c.   estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

    d.   estimate the upcoming repurchase obligations under the ESOP; and

    e.   determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other

investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation,

because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. See, e.g., Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the

30

recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.    <u>Third</u>, the Debtors adopted a long-term incentive plan ("<u>LTIP</u>") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.    Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.    Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

126.    Prior to the Petition Date, the Debtors' primary sources of liquidity and capital

resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.    OTHER INDEBTEDNESS AND OBLIGATIONS

131.    On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development

32

Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.    PENSION PLAN OBLIGATIONS

132.    Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

#### Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)

|  | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at

3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

  **F.**  **INTERCOMPANY INDEBTEDNESS**

  133. As described more fully herein, all ESOP/PDC common share activities, including issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001, employee withdrawals were significantly larger than employee contributions.

  134. On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany Note"). *See* App000002.

  135. On November 20, 2013, an Intercompany Promissory Note Distribution and Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In connection therewith, Appvion purported to make a non-cash distribution to PDC in the aggregate amount of the Note and PDC acknowledged receipt of the distribution and further acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended January 2, 2016, at 43.

  136. Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board (App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board (App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof. Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

34

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC Security Holders Agreement") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.    The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC

35

common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.    In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.    The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.    On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "Appvion Security Holders Agreement") which sets forth the manner in which the members of the Appvion Board are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as

Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

## B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The PDC Board and/or the Appvion Board's compensation committee(s) also had authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152.    Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153.    Specifically, the per-share grant value of RSU awards granted in the preceding fiscal year was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.     The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.     The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.     Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

C.     EXECUTIVE COMPENSATION BETWEEN 2013 – 2016

1.     *Richards*

157.     Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

39

### Figure 4: Richards' Compensation Between 2013 - 2015

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $ - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

### 2.    Gilligan

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

### Figure 5: Gilligan's Compensation Between 2014 - 2016

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $ - | $465 |
| Non-equity incentive plan compensation | $82,707 | $ - | $ - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

40

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 3. *Ferree*

160.    Ferree's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

### Figure 6: Ferree's Compensation Between 2013 - 2016

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $  - | $  - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 4. *Van Straten*

161.    Van Straten's executive compensation was heavily dependent on Stout's valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

41

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $   - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $   - | $   - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 5.    *Arent*

162.    Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $   - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

163.     The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

### D.     NON-EMPLOYEE DIRECTOR COMPENSATION

164.     Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.     Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.     Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.     On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for

the year ended December 28, 2013, at 110.

     E.      **ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING**

     168.     Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

     169.     The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

     170.     Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

     171.     Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and other matters related to the Debtors.

172.    From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

**Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants**

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|---|---|---|---|---|---|---|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion PDC | Ad Hoc Committee | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |
| Appvion | N/A | 8/12/15 | Appleton, WI | | Steve Martin | App010293 |

45

| | | | | | Marc Hansberger | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15– 11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.    THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.    The financial demise of Appvion and the abject failure of the Debtors' management to create reliable, non-inflated, financial projections was well known to the members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC Board were updated by Management on a regular basis, and actively participated in the vetting

process of these projections through board activities as well as through the activities of the Audit Committee.

174.    Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.    When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.    From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.    In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments…" App006037.  The Audit Committee also cautioned that the highly

47

leveraged capital structure presented covenant compliance risk. App006037.

178.   In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.   In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.   From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance against the annual incentive plan targets, executive incentive plan, liquidity,

48

biannual share prices as calculated by Stout.

## VI.    STOUT'S FMV DETERMINATIONS

### A.    THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181.    Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182.    Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183.    Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated

projections by knowingly manipulating key aspects of its valuations.

184.    Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185.    Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186.    Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

> 1. The PDC's financial statements filed with the SEC;
>
> 2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 3. The PDC's internally-prepared balance sheets;
>
> 4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;
>
> 6. Publicly available information and financial data on publicly traded companies considered similar to the Debtors from an investment risk/return perspective; and

51

7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B. STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70

per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "June 2016 FMV"), at 53.

197.    As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "Dec. 2016 FMV"), at 39.

198.    As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "June 2017 FMV"), at 39.

199.    Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

**Figure 10: FMV Determinations of the PDC Common Stock Price**



Appvion Historical Stock Price: November 2001 - June 2017

June 2017 FMV, at 38.

53

C.    **STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF THE PDC COMMON STOCK SHARES WAS SUSCEPTIBLE TO MANIPULATION, AND WAS WILDLY INFLATED AND FLAWED.**

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other financial and market data are pronounced for the period June 2013 through June 2017. During that period the FMV of PDC's common stock as calculated by Stout is higher than other available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality.  Stout was fully aware that the projections it received from management were unjustifiably inflated and unreliable.  Instead of pressing management for more reliable projections on which to base its FMV Determinations in limited instances, Stout attempted to compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking various aspects of its valuation methodologies. These adjustments were inconsistent between different FMV Determinations, and often lacked any business justification.  Many of the errors in the FMV Determinations detailed below are therefore not the result of mere academic disagreement over the most prudent way to value the Debtors' business, but rather adjustments that Stout knowingly made to compensate for the unreliable financial projections it was provided and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants'

breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

> **1.    The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities**

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of
Second Lien Notes and Debt Obligation Used by Stout
($ in thousands)**

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($ 3,018) | ($2,770) | ($ 2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.    Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.    Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the

56

quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013, at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed the Debtors' underfunded pension liability and whether Stout should include this liability in its FMV Determinations. Upon information and belief, Ferree was tasked with discussion the underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation obligations, workers compensation obligations, accrued insurance obligations, accrued taxes obligations, due on accounts receivable securitization, and other obligations resulted in the

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

214.    Figure 12 below reflects these other omitted liabilities.

### Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations ($ in thousands)

|  | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

###        2.        The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ███████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal

59

Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ████████ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

**Figure 13: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ████ | ████ | ████ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ████████ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately ████████ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

**Figure 14: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ████ | ████ | ████ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ████ | ████ | ████ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

223.    In spite of the actual Thermal EBITDA being approximately ███████

███████ management's projections, management only reduced its Thermal EBITDA

projections by ███████ for the next fiscal year, and by no more than ███████

███████ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.

224.    Management's projections for the June 2016 FMV Determination also failed to

respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of █

███████ for the twelve months ended June 30, 2016, well below the projected

amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise

its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not

change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV,

at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as

follows in Figure 15:

**Figure 15: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | ███ | ███ | ███ | ███ | ███ | | | | | |
| June 2012 FMV | ███ | ███ | ███ | ███ | ███ | | | | | |
| Dec. 2012 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| June 2013 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| Dec. 2013 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| June 2014 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| Dec. 2014 FMV | | | | ███ | ███ | ███ | ███ | ███ | | |
| June 2015 FMV | | | | ███ | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2015 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| June 2016 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2016 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |
| June 2017 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV, at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 16:

### Figure 16: FMV Determinations – Carbonless EBITDA Projections

| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | ███ | ███ | ███ | ███ | ███ | | | | | |
| **June 2012 FMV** | ███ | ███ | ███ | ███ | ███ | | | | | |
| **Dec. 2012 FMV** | | ███ | ███ | ███ | ███ | ███ | | | | |
| **June 2013 FMV** | | ███ | ███ | ███ | ███ | ███ | | | | |
| **Dec. 2013 FMV** | | | ███ | ███ | ███ | ███ | ███ | | | |
| **June 2014 FMV** | | | ███ | ███ | ███ | ███ | ███ | | | |
| **Dec. 2014 FMV** | | | | ███ | ███ | ███ | ███ | ███ | | |
| **June 2015 FMV** | | | | ███ | ███ | ███ | ███ | ███ | ███ | |
| **Dec. 2015 FMV** | | | | | ███ | ███ | ███ | ███ | ███ | |
| **June 2016 FMV** | | | | | ███ | ███ | ███ | ███ | ███ | |
| **Dec. 2016 FMV** | | | | | | ███ | ███ | ███ | ███ | ███ |
| **June 2017 FMV** | | | | | | ███ | ███ | ███ | ███ | ███ |

*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV, at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015 FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 17:

### Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)

| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Actual Total (Excluding Encapsys)** | ███ | ███ | ███ | ███ | ███ | | | | | |
| **June 2012 FMV** | ███ | ███ | ███ | ███ | ███ | | | | | |
| **Dec. 2012 FMV** | | ███ | ███ | ███ | ███ | ███ | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **June 2013 FMV** | ██████████████████████ | | | | | | | | |
| **Dec. 2013** | | ████████████████████ | | | | | | | |
| **June 2014 FMV** | | ██ | ████ | ████████ | | | | | |
| **Dec. 2014 FMV** | | ████ | ████ | ████ | ████ | ████ | | | |
| **June 2015 FMV** | | ████ | ████ | ████ | ████ | ████ | ████ | | |
| **Dec. 2015 FMV** | | | ████ | ████ | ████ | ████ | ████ | | |
| **June 2016 FMV** | | | ████ | ████ | ████ | ████ | ████ | | |
| **Dec. 2016 FMV** | | | | ████ | ████ | ████ | ████ | ████ | |
| **June 2017 FMV** | | | | ████ | ████ | ████ | ████ | ████ | |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3. The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

> is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

> Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management,

63

Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.    In order to select companies for Stout's Guideline Company Method analysis, Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.    Stout admitted that "…there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served…" June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.    Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June

2017 FMV, at 72.

233.    The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.    For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.    Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.    The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.    Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 66 of 632    Document 14-3

Businesses separately.

238.    In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015 FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.    In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.    A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36;

66

Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id.* Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

244.    In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board  again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.    In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App011563.

246.    For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. First, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.    Second, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the

68

December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.   <u>Third</u>, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.   In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.   In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is

69

> appropriate to apply a premium to the guideline company multiples
> to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

70

255.    However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256.    Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257.    Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258.    The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259.    In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year

71

EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

### 4. The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations

260.    The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261.    For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

72

262.    Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.    Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.    Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.    Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were

73

below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.    In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

### 5.    Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method

267.    The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

### a.    The Company-Specific Risk Premium

268.    Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 18: Company-Specific Risk Premium Used By Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 0.0% | 2.0% | 0.0% | 0.0% | 1.0% | 2.0% | 0.0% | 0.0% |
| Thermal | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 4.0% | 4.0% | 4.0% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

75

270.    For example, the Company-Specific Risk Premium used by Stout  for the June

2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to

reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium

for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-

45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless

Business during that period remained virtually unchanged from FMV Determination Date to

FMV Determination Date. *See* Figure 19 below.

**Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)**

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | -- | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at

23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the

Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV

Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's

financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse

and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr.

Aguilar of Stout stated that, with ***emphasis added***:

> Carbonless continue to decline. There has been somewhat of an offset by the sales
> of specialty products that are higher margin. They have made some progress on
> sales of security paper which is use[d] for documents such as birth certificates
> (very small market). The company expects sales to be relatively flat. ***Over the
> long term sales are expected to decline. The projections are the same as the
> projection provided for year end with the exception of 2016***.

76

273.    In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.    For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF Valuation.

275.    At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with *emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.    In spite of Mr. Aguilar's observation that the Thermal Business year ended December 31, 2016 EBITDA projections would be back up from the projections used at the December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.    Even G. Grant Lyon, then the sole member of the ESOP Administrative Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.

> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017

FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout

allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV

Determination to account for the fact that the projections for future years' EBITDA had been

lowered from the levels used in the June 2016 FMV Determination. Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ████ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Thermal:
>
> – Over the last three years, Thermal's adjusted EBITDA declined at an
>   annualized rate of ████. In comparison, the Company is projecting
>   annualized adjusted EBITDA growth of ████ for Thermal between the
>   LTM period and fiscal 2021. There is increased risk associated with the
>   Company's projections given that projected earnings growth is above
>   historical levels.
>
> – Thermal's adjusted EBITDA projection for fiscal 2017 is ████ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ████ lower

78

than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is projecting annualized adjusted EBITDA growth of ███ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ███ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

### b.    The Cost of Debt

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average

Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |
| Thermal | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), …." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December

31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21 below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0X     | 5.0X    | 5.0X     | 5.5X    | 5.5X     | 5.5X    | 6.5X     | 7.0X    |
| Thermal    | 6.0X     | 7.5X    | 7.5X     | 5.5X    | 5.5X     | 5.5X    | 5.5X     | 5.5X    |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect

the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV, at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288.    In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289.    Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### D.    THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON

290.    The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291.    During the time period where valuation methodology decisions were employed by

Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.     In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr. Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.     In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.     Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| **TOTAL** | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

**Figure 24: Ferree 2017 SERP Distributions**

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| **TOTAL** | **$177,874** |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues

84

from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

### E.    COMPENSATION AND BENEFITS

#### 1.    The Officer/Employee Defendants and Director Defendants' Compensation

299.    As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300.    The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301.    In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302.    Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting

85

date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.    The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.    The Debtors' Pension Plan

307.    The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.    Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.    Ownership of PDC Common Stock

309.    Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

**Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013**

| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | Total LTIP Units | Total Canadian SAR Units | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|---|
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| Total | 6,934,029 | 370,000 | 110,918 | 2,248,780 | 300 | 9,664,027 | 100.0% |

June 2015 FMV, at 7.

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |
| [a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money. | | | | | | |

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

89

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| Total | 6,262,701 | 248,650 | 139,570 | 911,034 | 7,561,955 | 100.0% |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| Total | 5,932,120 | 334,797 | 145,505 | 1,223,759 | 7,636,181 | 100.0% |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

F.    APPVION'S CREDIT RATING HISTORY

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

### G.    SUMMARY OF ESOP TRANSACTIONS

318.    At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.    Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.    Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.    The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.    The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**



See June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value ($ in thousands, except share price)**

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ▆ | ▆ | ▆ |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ▆ | ▆ | ▆ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ▆ | ▆ | ▆ |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ▆ | ▆ | ▆ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 | | | | | |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ▆ | ▆ | ▆ |

See Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at 35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36,

39-40.

324.    Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.    From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.    For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.    For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.    For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.    For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.    For the six months leading up to December 2015, contributions to the ESOP

totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

### H.    APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

### Figure 36: Historical Trading Prices



### Figure 37: Historical Trading Prices (% Changes)



I.    THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING
      FINANCIAL POSITION AND INSOLVENCY

335.    The markets took note of the Debtors' declining financial condition. In November

2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "<u>BVAL</u>") at a discount

to par. *See* Figure 38 below.

### Figure 38: BVAL of the Second Lien Notes in November 2013
### ($ in thousands)

|          | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|----------|------------------|---|--------------|---|--------------|-----------|
| 11/29/2013 | $250,000 |  | 98.125% |  | $ 245,313 | $ (4,688) |
| 11/27/2013 | $250,000 |  | 98.0% |  | $ 245,000 | $ (5,000) |
| 11/26/2013 | $250,000 |  | 98.0% |  | $ 245,000 | $ (5,000) |
| 11/25/2013 | $250,000 |  | 97.75% |  | $ 244,375 | $ (5,625) |
| 11/22/2013 | $250,000 |  | 97.75% |  | $ 244,375 | $ (5,625) |
| 11/21/2013 | $250,000 |  | 97.75% |  | $ 244,375 | $ (5,625) |
| 11/20/2013 | $250,000 |  | 97.875% |  | $ 244,688 | $ (5,313) |
| 11/19/2013 | $250,000 |  | 97.75% |  | $ 244,375 | $ (5,625) |
| 11/18/2013 | $250,000 |  | 97.688% |  | $ 244,220 | $ (5,780) |
| 11/15/2013 | $250,000 |  | 97.938% |  | $ 244,845 | $ (5,155) |
| 11/14/2013 | $250,000 |  | 98.125% |  | $ 245,313 | $ (4,688) |

*Source*: Bloomberg.

336.    Then, again, in the second half of 2014, the Second Lien Notes were valued by

BVAL from par (100% of the principal amount) to approximately 68% of par by December 31,

2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014

reflected the market's belief that the value of the debt was materially impaired and that Appvion

was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the

conclusion that Appvion was insolvent through the Petition Date.

337.    The markets fundamentally disagreed with Stout concerning Stout's the value of

PDC common stock.

338.    As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or

at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.   As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 |  | 98.6880% |  | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $    - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $    - |
| Second Lien Notes | $ 250,000 |  | 68.8756% |  | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $    - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $    - | $    - |
| TOTAL | $ 596,835 |  |  |  | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.   As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 |  | 93.688% |  | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $    - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $    - |
| Second Lien Notes | $ 250,000 |  | 64.938% |  | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $    - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $    - | $    - |
| TOTAL | $ 597,748 |  |  |  | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,308 |  | 93.50% |  | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $    - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $    - |
| Second Lien Notes | $ 250,000 |  | 40.125% |  | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $    - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $    - | $    - |
| TOTAL | $ 425,918 |  |  |  | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2016.

**Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 |  | 95.5% |  | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 |  | 100% |  | $ 27,000 | $  - |
| Ohio Loan | $ 2,238 |  | (n/a) |  | $ 2,238 | $  - |
| Second Lien Notes | $ 250,000 |  | 57.56% |  | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  300 |  | (n/a) |  | $  300 | $  - |
| TOTAL | $ 443,838 |  |  |  | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of December 31, 2016.

**Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 |  | 97.69% |  | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 |  | 100% |  | $ 31,920 | $  - |
| Ohio Loan | $ 1,443 |  | (n/a) |  | $ 1,443 | $  - |
| Second Lien Notes | $ 250,000 |  | 57.00% |  | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  100 |  | (n/a) |  | $  100 | $  - |
| TOTAL | $ 447,035 |  |  |  | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2017.

### Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 |  | 97.38% |  | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 |  | 100% |  | $ 19,500 | $  - |
| Ohio Loan | $  626 |  | (n/a) |  | $ 626 | $  - |
| Second Lien Notes | $ 250,000 |  | 52.69% |  | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  - |  | (n/a) |  | $  - | $  - |
| TOTAL | $ 454,426 |  |  |  | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was insolvent. The market, per the trading prices of the debt, did not believe that the value of the company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

### J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE BALANCE-SHEET TEST

346.    The book value of the Debtors' liabilities exceeded the book value of their assets since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

|  | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

## K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST

347.    The Debtors were insolvent on a cash-flow basis at various points in time since 2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business.

*See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII.  THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the

December 2014 FMV, as no such motion was made. *Id.*

351. On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id.* The ESOP Committee members asked questions regarding the June 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352. On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id.* The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id.*

353. On January 15, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the

December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.    On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.    On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

356.    On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout.

*Id.*

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id.*

## VIII.  THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on

105

May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C. The Plan.

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of

106

Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.   The Plan of Liquidation defines "Preserved D&O Claims" as:

any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; provided, however, that the Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.   The Plan of Liquidation defines "Released D&O" to mean:

any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.   The Plan of Liquidation defines "Released D&O Claims" to mean "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.   The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.   The Plan of Liquidation Provides that following the Effective Date, the

Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally

permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "<u>Effective Date</u>") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

IX.    **THE   DIRECTOR   DEFENDANTS   AND   THE   OFFICER/EMPLOYEE DEFENDANTS   ARE   NOT   RELEASED   D&OS   UNDER   THE   PLAN   OF LIQUIDATION.**

377.    Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.    Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.    Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.    Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.    Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.    Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.    Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.    Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.    Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.    Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.    Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.    Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.    Upon information and belief, Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date. Upon information and belief, Mr. Gilligan does not qualify as a "Released D&O" under the Plan of Liquidation.

**X.      NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS**

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors' bankruptcy counsel, DLA Piper LLP (US), with a  letter detailing the existence of the claims and causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims existed against the current and former directors and officers of Appvion under theories of breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee wrote that the Creditors' Committee "intends to hold the current and former directors and officers of the Debtors accountable for their actions."

**XI.     CAUSES OF ACTION**

**COUNT I**

**(Breach of Fiduciary Duties of Care and Loyalty Against The Officer/Employee Defendants and the Director Defendants)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock in order to further their own individual self-interest, the Director Defendants and the Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of

110

PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their individual financial interests. Because each Director Defendant and Officer/Employee Defendant stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the selection of companies for use in Stout's Guideline Companies Method analysis. In these and

in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

### <u>COUNT II</u>
**(Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)**

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed

fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

### COUNT III
**(Breach of Fiduciary Duty of Care Against Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher)**

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions made by ESOP participants. Further, distributions had significantly outstripped contributions in

the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

<u>**COUNT IV**</u>
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these

114

malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT V
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the

Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VI
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these

116

malfeasant acts.

418.     Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VII
**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

419.     The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420.     Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421.     Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422.     During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423.     The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424.     The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425.     Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of

an illegal dividend.

426.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT VIII

### (Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)

427.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.    From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.    From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr.

118

Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT IX
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)

436.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.    The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.    At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.    At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.    In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.    The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified Distributions were made.

443.    The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.    As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.    Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.    In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

## COUNT X
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)**

447.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.    Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "July 2017 Stout Payment").

449.    Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "Stout Preference Payments").

450.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose

before the Stout Preference Payments occurred.

451.    The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

452.    At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453.    In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454.    The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455.    The Stout Preference Payments were made while the Debtors were insolvent.

456.    As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457.    Stout had reasonable cause to believe that the Debtors were insolvent.

458.    In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## COUNT XI
### (Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)

459.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

121

460.    Stout received payment in Figure 2 above totaling $522,229.71 (the "<u>Stout Transfers</u>") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

### COUNT XII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.    The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.    At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.    In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

123

474.    The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.    The Argent Preference Payments were made while the Debtors were insolvent.

476.    As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.    Argent had reasonable cause to believe that the Debtors were insolvent.

478.    In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

### <u>COUNT XIII</u>
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.    Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.    At the time of the Argent Transfers, (i) Appvion was engaged in business or a

transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

## COUNT XIV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)**

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

**Figure 46: Siefert Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $          15,625 |
| 3/17/2017 | $          15,625 |
| 7/3/2017 | $          15,625 |
| 9/26/2017 | $          15,625 |
| 9/28/2017 | $          15,625 |
| TOTAL | $          78,125 |

489.    Ms. Siefert received board fee payments as set forth in Figure 46.

490.    The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492.    The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493.    At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495.    The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496.    The Siefert Board Fee Payments were made while the Debtors were insolvent.

126

497.    As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

### COUNT XV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $    13,750 |
| 3/17/2017 | $    17,500 |
| 7/3/2017 | $    17,500 |
| 9/26/2017 | $    17,500 |
| 9/28/2017 | $    17,500 |
| **TOTAL** | **$    83,750** |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director

127

remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn

Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVI
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)**

513.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

514.    In addition to the compensation otherwise addressed herein, Mr. Murphy received board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $       25,000 |
| 3/17/2017 | $       25,000 |
| 7/3/2017 | $       25,000 |
| 9/26/2017 | $       25,000 |
| 9/28/2017 | $       25,000 |
| **TOTAL** | **$      125,000** |

515.    Mr. Murphy received board fee payments as set forth in Figure 48.

516.    The Murphy Board Fee Payments include $55,000 for non-employee director remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Murphy Board Fee Payments occurred.

518.    The Murphy Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

519.    At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)**

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "Laurino Board Fee Payments") within one year

of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        13,750 |
| 3/17/2017 | $        13,750 |
| 7/3/2017 | $        13,750 |
| 9/26/2017 | $        13,750 |
| 9/28/2017 | $        13,750 |
| **TOTAL** | **$        68,750** |

528.    Mr. Laurino received board fee payments as set forth in Figure 49.

529.    The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.    The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.    At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.    The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.    The Laurino Board Fee Payments were made while the Debtors were insolvent.

131

536.    As a result of the Laurino Board Fee Payments, Mr. Laurino received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)**

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $      13,750 |
| 3/17/2017 | $      13,750 |
| 7/3/2017 | $      13,750 |
| 9/26/2017 | $      13,750 |
| 9/28/2017 | $      13,750 |
| **TOTAL** | **$      68,750** |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director

132

remuneration.

543.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.    The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.    At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.    The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.    The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.    As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.    Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.    In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the

Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Gilligan, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Mr. Gilligan, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l) On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n) On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o) On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p) On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q) On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r) On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this

Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(s) awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t) awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u) awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: June 26, 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (Delaware Bar No. 5085)
Vivek Upadhya (Delaware Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

136

**<u>CERTIFICATE OF SERVICE</u>**

I, Vivek Upadhya, hereby certify that on June 26, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.

*/s/ Vivek Upadhya*
Vivek Upadhya

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.*, | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 6, 59, 97, 100, 101** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,
PURSUANT TO 11 U.S.C. § 105(a), BANKRUPTCY RULE
7015(A)(2), AND LOCAL RULE 9004-1 PERMITTING ALAN D.
HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE
APPVION LIQUIDATING TRUST, TO FILE A REVISED SECOND AMENDED
COMPLAINT AND TO AMEND THE ADVERSARY PROCEEDING CAPTION**

Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of

the Appvion Liquidating Trust, by and through their undersigned counsel, hereby move (the

1

"Motion") for leave to amend the Second Amended Complaint (the "SAC") filed in this action, in the form attached hereto as Exhibit A (the "Revised SAC") pursuant to Rule 7015(a)(2) of the Federal Rules of Bankruptcy Procedure[1] and to amend the Adversary Proceeding caption pursuant to Local Rule 9004-1. In support of the Motion, the Co-Trustees state the following:

## RELIEF REQUESTED

1.      By this motion, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, the Co-Trustees request entry of an order, substantially in the form attached hereto as Exhibit E (the "Proposed Order"), granting the Co-Trustees leave to file the Revised SAC to modify certain allegations resulting from the Co-Trustee's agreement to dismiss the above-captioned matter against Mr. Kevin Gilligan without prejudice pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Relatedly, Plaintiff moves pursuant to Local Rule 9004-1 to remove Mr. Gilligan from the caption of the above-captioned matter.

2.      On June 19, 2019, the undersigned provided a draft of the Revised SAC[2] to counsel for the Defendants in connection with the Plaintiff's request for consent to file that Revised SAC. Plaintiff requested Defendants' respond by June 26, 2019. None of the Defendants responded to Plaintiff's request for consent as of the date and time of the filing of this Motion.

---

[1]    Contemporaneously herewith, Plaintiff has or will file a motion to file the Revised Second Amended Complaint under seal. Since the revisions that would constitute the Revised SAC do not relate to text subject to a sealing request, Plaintiff files a redacted version of the Revised SAC as Exhibit B.

[2]    Counsel for the Plaintiff provided a redline version of the Revised SAC reflecting changes from the unredacted version of the SAC. A copy of that document is attached hereto in unredacted and redacted forms as Exhibit C and D, respectively.

2

## JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, as well as under Article XV of the Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation (D.I. 970-1) (the "Plan").

4.      The Co-Trustees consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The relief requested herein is warranted pursuant to Bankruptcy Rule 7015(a)(2) and Local Rule 9004-1.

## BACKGROUND

6.      Mr. Gillian was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in these positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Since the Plan's Effective Date, Mr. Gilligan has served as a consultant for Appvion Holding Corp.

7.      The Second Amended Complaint alleged that:

[U]pon information and belief, Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date. Upon information and belief, Mr. Gilligan does not qualify as a "Released D&O" under the Plan of Liquidation.

SAC (Adv. D.I. 101), ¶ 389.

8.      It is Plaintiff's understanding that Mr. Gilligan:

- Served as Chief Executive Officer of Appvion, Inc. and PDC until June 13, 2018 (the "363 Sale Effective Date");

3

- Was retained by Appvion Holding Corporation ("NewCo") as of June 13, 2018 as a "Senior Advisor" for a period of 180 days commencing on June 13, 2018; and

- Was terminated by NewCo effective December 13, 2018 pursuant to a Confidential Separation and Release Agreement.

9.     The Plan provides that:

"Released D&O" means any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan, Art. I.A.148. "Released D&O Claims" means "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O." Plan, Art. I.A.149.

10.    The Plan defines "Litigation Claims" to exclude the Released D&O Claims. Plan, Art. II.A.114 (emphasis added). Since the 363 Sale Effective Date was June 13, 2018, December 10, 2018 is 180 days following the 363 Sale Effective Date (i.e., following June 13, 2018). The Plan's release contains a carve-out for acts that to constitute actual fraud, willful misconduct, or gross negligence. As set forth in the Plan, claims for actual fraud, willful misconduct, or gross negligence on Mr. Gilligan's part are not released and the joint stipulation of dismissal by and between Plaintiff and Mr. Gilligan (see Adv. D.I. 97) does not change that.

## ADDITIONAL BACKGROUND

11.    On November 30, 2018, the Co-Trustees filed the Complaint [Adv. D.I. 6] (the "Complaint") commencing the above-captioned adversary proceeding.

12.    On January 29, 2019, Argent filed its Motion to Dismiss the Complaint [Adv. D.I. 41]. On that same date, the D&O Defendants[3] and Stout filed motions to dismiss the Complaint. [Adv. D.I. 36, 38].

---

[3]    Capitalized terms not otherwise defined herein shall have the meaning as set forth in the SAC.

4

13.     On February 19, 2019, the Co-Trustees filed the SAC.

14.     On May 29, 2019, the Co-Trustees filed a stipulation and proposed order amongst the parties concerning the filing of the SAC, the filing of the SAC under seal, and the completion of briefing with respect to Defendants' Motions to Dismiss. *See* Adv. D.I. 96.

15.     On June 3, 2019, the Co-Trustees filed a joint stipulation of dismissal by and between Plaintiff and Mr. Gilligan. *See* Adv. D.I. 97.

16.     On June 26, 2019, the Co-Trustees filed the Second Amended Complaint in unredacted and redacted form. *See* Adv. D.I. 100, 101.

### THE REVISED SAC
### (i.e., THE REVISED SECOND AMENDED COMPLAINT)

17.     Since the SAC contains allegations specifically concerning Mr. Gilligan, Plaintiff believes that it is prudent and appropriate to make certain limited revisions to reflect the dismissal of the litigation against him. Additionally, the Revised SAC would correct specific allegations concerning Mr. Gilligan's status as a "Released D&O" under the Plan. It would also make other revisions concerning the persons against whom each count is asserted. The Revised SAC does not, however, impact any of the arguments made in the Motions to Dismiss filed by the Defendants [Adv. D.I. 65-70], or the responses and replies filed related thereto [Adv. D.I. 77, 80-82].

18.     Additionally, the Revised SAC contains a revised caption, removing Mr. Gilligan.

### BASIS FOR RELIEF

19.     It is well settled that leave to amend a pleading pursuant to Rule 15(a) should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that "leave sought should, as the rules require, be 'freely given'"); *see also Dole v. Arco Chem. Co.*, 921 F.2d 484, 486-87 (3d Cir. 1990). "This approach ensures that a

particular claim will be decided on the merits rather than on technicalities." *Dole*, 921 F.2d at 487. Leave to amend a complaint should be granted "[i]n the absence of any apparent or declared reason [not to] — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman*, 371 U.S. at 182; *see also Glob. Link Liquidating Trust v. Avantel, S.A. (In re Glob. Link Telecom Corp.)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (courts typically find an amendment permissible unless "'there is undue delay, bad faith, a dilatory motive, prejudice, or futility.'" (internal citation omitted).

20.     Courts have liberally granted amendments, and have only denied leave to amend where the amendment is motivated by bad faith or where it would be unduly prejudicial to the opposing party. *See Adams v. Gould, Inc.*, 739 F.2d 858, 868-69 (3d Cir. 1984) (finding that in the absence of bad faith and prejudice to defendants, the district court erred in failing to open up a judgment and granting leave to plaintiff in order to amend its amended complaint). To prevent amendment of a complaint, "the non-moving party . . . 'must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the … amendments been timely.'" *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989).

21.     "Third Circuit courts have extrapolated five instances in which a court may deny leave to amend a complaint: (1) if delay in seeking amendment is undue; (2) if delay in seeking amendment is prejudicial to the opposing party; (3) if delay in seeking amendment is motivated by bad faith; (4) if the amendment is futile in that it fails to state a claim for which relief can be granted; or (5) if the movant does not provide a drafted amended complaint." *Mortgage Lenders*

6

*Network USA, Inc. v. Wells Fargo Bank (In re Mortgage Lenders Network, USA, Inc.)*, 395 B.R. 871, 876 (Bankr. D. Del. 2008) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001)).

### A.    The Delay In Seeking Amendment Is Not Undue

22.    There is no undue delay, bad faith, or dilatory motive on the Co-Trustees' part, and no parties in interest will be prejudiced by the filing of the Revised SAC. The Revised SAC is nearly identical to the SAC, except for addressing a limited number of allegations concerning Mr. Gilligan. Only after a dialogue and the receipt of additional documentation concerning Mr. Gilligan did the Co-Trustees determine that the filing of the Revised SAC was appropriate, and, by this Motion, have timely sought leave to amend the SAC.

### B.    The Delay In Seeking Amendment Is Not Prejudicial To Argent

23.    Additionally, the Defendants cannot demonstrate any prejudice whatsoever.

24.    In contrast, the Co-Trustees will be exposed to a risk of significant prejudice if leave to amend is denied. The SAC contains allegations that are now known to be incorrect and it is appropriate to permit the Plaintiff to amend. Denial of leave to amend would unnecessarily complicate this adversary proceeding.

### C.    The Delay In Seeking Amendment Is Not Motivated By Bad Faith

25.    As stated above, only after a dialogue and the receipt of additional documentation concerning Mr. Gilligan did the Co-Trustees determine that the filing of the Revised SAC was desirable, and, by this Motion, have timely sought leave to amend the SAC.

### D.    The Amendment Is Not Futile In That It States A Claim For Which Relief Can Be Granted

26.    The Co-Trustees believe that the Revised SAC contains allegations that are sufficient for which relief can be granted.

7

**E.    Defendants Were Provided with the Draft Revised SAC In Advance of the Filing of This Motion**

27.    The Co-Trustees have provided a draft of the Revised SAC when the Co-Trustees sought Defendants' consent to amend the SAC under Rule 15. Redacted and unredacted copies of the Revised SAC are attached hereto as Exhibits A and B.

## CONCLUSION

WHEREFORE, for the reasons stated above, the Co-Trustees respectfully request the entry of an order: (a) permitting the Co-Trustees to file the Proposed Second Amended Complaint, (b) permitting the caption in the above-captioned Adversary Proceeding to be changed to remove Kevin Gilligan, (c) stating that Plaintiff need not amend the Summons or any of the pleadings previously filed in this adversary proceeding to amend the caption, and (d) granting the Co-Trustees such further relief as is just and proper.

Dated: June 27, 2019

**GRANT & EISENHOFER P.A.**
*/s/ Vivek Upadhya*
Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: cmackintosh@gelaw.com
        vupadhya@gelaw.com

-and-

Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

8

# EX. A
# FILED UNDER SEAL

# Ex. B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## REVISED SECOND AMENDED COMPLAINT

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "Co-Trustees") of the Appvion Liquidating Trust (the "Appvion Liquidating Trust") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.  This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "ESOP"), the former ultimate owner of the Debtors.

2.  The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("Appvion") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3.  Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

2

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.     This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.     These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.     The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7.      The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8.      In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9.      The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

4

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.    During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

5

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.      Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.      Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.    In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.    When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

7

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.    Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.    As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

8

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.     This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.     A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.     Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.     Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## **PARTIES**

21.     Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.     Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.     The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

---

[1]  *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

24.    Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.    Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.    Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee.

11

Ms. Van Straten resides in Appleton, Wisconsin.

27.     Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.     Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.     Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.     Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became

chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.     Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.     Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.     Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and

served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34.    Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35.    David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36.    Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37.    John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in

connection with any FMV Determination connected with any claim asserted herein.

38.    Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "Director Defendants."[2]

39.    Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "Officer/Employee Defendants."[3]

40.    Argent Trust Company ("Argent"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.    Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.    Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## NON-PARTIES

43.    George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

---

[2]  Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended Complaint, he remains defined as a "Director Defendant" as referenced herein.

44.    The Principal Financial Group ("The Principal"), acted as a record-keeper to handle the accounting related to the ESOP.

45.    Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.    Maureen Cosgrove is or was formerly an employee of Argent.

47.    Marc Hansberger is or was formerly an employee of Argent.

48.    Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.    Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.    Mark Shorthouse is or was formerly an employee of Argent.

51.    David Williams is or was formerly an employee of Argent.

52.    Phil Buchanan is or was formerly an employee of Argent.

53.    From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.    Cara Davis is or was formerly an employee of Stout.

55.    Robert S. Socol is or was formerly an employee of Stout.

56.    Aziz El Tahch is or was formerly an employee of Stout.

57.    From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June

---

[3] Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended

2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

## JURISDICTION AND VENUE

58.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.    Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS

### I.    OVERVIEW OF THE DEBTORS' BUSINESS

#### A.    DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY

61.    Prior to their bankruptcy filing on October 1, 2017 (the "Petition Date"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "Debtors"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.    In addition to its headquarters in Appleton, Wisconsin, Appvion had

Complaint, he remains defined as a "Officer/Employee Defendants" as referenced herein.

manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.     Appvion's business was organized into two operating divisions: carbonless ("Carbonless" or the "Carbonless Business") and thermal ("Thermal" or the "Thermal Business"), referring to the type of paper produced by each division.

64.     The thermal paper segment developed and produced substrates for the transaction and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.     The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.     On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.     In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC

18

simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.    Prior to the Petition Date, PDC owned 100% of the common stock of Appvion. Prior to the Petition Date, Appvion only had one class of common stock.

69.    As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.    As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.    In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_Aug_4_2015.pdf    Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.    Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

### B.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.    PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

74.    PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.    Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.    Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.    Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.    Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.    APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.    On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.    EMPLOYEE OWNERSHIP AT APPVION

### A.    THE ESOP STRUCTURE

81.    Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.    Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.    The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.    Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.    When an ESOP participant retired, or otherwise terminated his or her employment with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.    The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.    For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.    Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.    Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.    According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, the appraiser must consider all facts considered relevant.… factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management, workforce, and facilities, relative to their competitors, may also be considered.

Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.    The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

**B.    ADMINISTRATION OF THE ESOP AND THE ESOP TRUST**

92.    Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.    On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.    Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.    Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the

23

Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.     The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.     Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.     Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on

September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.     Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its duties to the ESOP.

100.    Amongst Argent's duties to the ESOP was determining the FMV of the common stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP Trustee, since before 2013.

101.    The terms and scope of Stout's services were confirmed in writing at various times over the course of Stout's engagement by each ESOP Trustee.

102.    Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout Engagement Letter provided that Stout would provide certain financial advisory services to Reliance, solely in Reliance's capacity as ESOP Trustee.

103.    The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 collectively, the "Valuation Dates."). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the [ESOP Trustee]. We will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset…

104.    The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc.

25

(MLB_01959) The June 2013 Stout Engagement Letter states as follows:

> In order for us to maximize the value of our work and to keep the project on schedule, It Is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.
>
> Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

> Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.
>
> ...
>
> We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to

26

FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945); Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.    Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

### Figure 2: Schedule of Payments by Appvion to Stout

| Payment Date | Payment Amount | Check # |
|---|---|---|
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.    In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.    In addition to engaging Stout to assist with the FMV Determination, Argent hired The Principal to serve as record-keeper to handle the accounting related to the ESOP, and to

27

ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

### C.    THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.    The biannual FMV Determination served several crucial functions, related both to the administration of the ESOP, and to the operation of the Debtors' businesses.  For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

a.    determine the per-share price at which ESOP participants made contributions to the ESOP;

b.    determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

c.    estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

d.    estimate the upcoming repurchase obligations under the ESOP; and

e.    determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase

obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation, because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a

30

director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.    <u>Third</u>, the Debtors adopted a long-term incentive plan ("<u>LTIP</u>") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.    Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.    Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same

date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

126.    Prior to the Petition Date, the Debtors' primary sources of liquidity and capital resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization

32

Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.    OTHER INDEBTEDNESS AND OBLIGATIONS

131.    On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.    PENSION PLAN OBLIGATIONS

132.    Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

#### Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)

| | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

33

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

      **F.    INTERCOMPANY INDEBTEDNESS**

133.    As described more fully herein, all ESOP/PDC common share activities, including issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001, employee withdrawals were significantly larger than employee contributions.

134.    On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany Note"). *See* App000002.

135.    On November 20, 2013, an Intercompany Promissory Note Distribution and Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In connection therewith, Appvion purported to make a non-cash distribution to PDC in the aggregate amount of the Note and PDC acknowledged receipt of the distribution and further acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended January 2, 2016, at 43.

136.    Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board

(App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board (App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof. Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC

35

<u>Security Holders Agreement</u>") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.    The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.    In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.    The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.    On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "<u>Appvion Security Holders Agreement</u>") which sets forth the manner in which the members of the Appvion Board

are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

### B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The

37

PDC Board and/or the Appvion Board's compensation committee(s) also had authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152.    Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153.    Specifically, the per-share grant value of RSU awards granted in the preceding

fiscal year was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.    The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.    The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.    Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

C.    **EXECUTIVE COMPENSATION BETWEEN 2013 – 2016**

1.    ***Richards***

157.    Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

39

**Figure 4: Richards' Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $ - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

### 2.    Gilligan

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

**Figure 5: Gilligan's Compensation Between 2014 - 2016**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $ - | $465 |
| Non-equity incentive plan compensation | $82,707 | $ - | $ - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 3. *Ferree*

160.    Ferree's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

**Figure 6: Ferree's Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $  - | $  - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 4. *Van Straten*

161.    Van Straten's executive compensation was heavily dependent on Stout's valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $ - | $ - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 5. *Arent*

162. Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $ - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

42

163.    The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

### D.    NON-EMPLOYEE DIRECTOR COMPENSATION

164.    Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.    Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.    Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.    On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for

43

the year ended December 28, 2013, at 110.

      E.      ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING

168.    Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

169.    The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

170.    Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

171.    Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and other matters related to the Debtors.

172.    From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

**Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants**

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|-------|-----------------|--------------|------------------|----------------------|------------------------|----------|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion PDC | Ad Hoc Committee | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |
| Appvion | N/A | 8/12/15 | Appleton, WI | | Steve Martin | App010293 |

45

| | | | | | Marc Hansberger | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15–11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.    THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.    The financial demise of Appvion and the abject failure of the Debtors'
management to create reliable, non-inflated, financial projections was well known to the
members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC
Board were updated by Management on a regular basis, and actively participated in the vetting

46

process of these projections through board activities as well as through the activities of the Audit Committee.

174.    Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.    When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.    From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.    In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments…" App006037.  The Audit Committee also cautioned that the highly

47

leveraged capital structure presented covenant compliance risk. App006037.

178.    In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.    In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.    From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance against the annual incentive plan targets, executive incentive plan, liquidity,

biannual share prices as calculated by Stout.

## VI.    STOUT'S FMV DETERMINATIONS

### A.    THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181.    Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182.    Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183.    Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated

49

projections by knowingly manipulating key aspects of its valuations.

184.    Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185.    Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186.    Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

   1. The PDC's financial statements filed with the SEC;

   2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;

   3. The PDC's internally-prepared balance sheets;

   4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;

   5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;

   6. Publicly available information and financial data on publicly traded companies considered similar to the Debtors from an investment risk/return perspective; and

7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70

per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "<u>June 2016 FMV</u>"), at 53.

197.    As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "<u>Dec. 2016 FMV</u>"), at 39.

198.    As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "<u>June 2017 FMV</u>"), at 39.

199.    Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

**<u>Figure 10: FMV Determinations of the PDC Common Stock Price</u>**



June 2017 FMV, at 38.

53

C.    **STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF THE PDC COMMON STOCK SHARES WAS SUSCEPTIBLE TO MANIPULATION, AND WAS WILDLY INFLATED AND FLAWED.**

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other financial and market data are pronounced for the period June 2013 through June 2017. During that period the FMV of PDC's common stock as calculated by Stout is higher than other available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality.   Stout was fully aware that the projections it received from management were unjustifiably inflated and unreliable.   Instead of pressing management for more reliable projections on which to base its FMV Determinations in limited instances, Stout attempted to compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking various aspects of its valuation methodologies. These adjustments were inconsistent between different FMV Determinations, and often lacked any business justification.  Many of the errors in the FMV Determinations detailed below are therefore not the result of mere academic disagreement over the most prudent way to value the Debtors' business, but rather adjustments that Stout knowingly made to compensate for the unreliable financial projections it was provided and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants'

54

breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

### 1.    The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of
Second Lien Notes and Debt Obligation Used by Stout
($ in thousands)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($ 3,018) | ($2,770) | ($ 2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.    Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.    Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the

quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013, at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed the Debtors' underfunded pension liability and whether Stout should include this liability in its FMV Determinations. Upon information and belief, Ferree was tasked with discussion the underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation obligations, workers compensation obligations, accrued insurance obligations, accrued taxes obligations, due on accounts receivable securitization, and other obligations resulted in the

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

214.    Figure 12 below reflects these other omitted liabilities.

### Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations (\$ in thousands)

|  | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

**2.    The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections**

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ███████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal

59

Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ▮▮▮▮▮▮▮ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

**Figure 13: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ▮▮▮ | | ▮▮▮ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ▮▮▮▮▮▮▮ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately ▮▮▮▮▮▮▮▮▮ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

**Figure 14: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ▮▮▮ | ▮▮▮ | ▮▮▮ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

223.    In spite of the actual Thermal EBITDA being approximately ██████████ ████████ management's projections, management only reduced its Thermal EBITDA projections by ██████████ for the next fiscal year, and by no more than ████████ ██████████ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.

224.    Management's projections for the June 2016 FMV Determination also failed to respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of █ ██████████ for the twelve months ended June 30, 2016, well below the projected amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV, at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as follows in Figure 15:

### Figure 15: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | ██ | ██ | ██ | ██ | ██ | | | | | |
| June 2012 FMV | ██ | ██ | ██ | ██ | ██ | | | | | |
| Dec. 2012 FMV | | ██ | ██ | ██ | ██ | ██ | | | | |
| June 2013 FMV | | ██ | ██ | ██ | ██ | ██ | | | | |
| Dec. 2013 FMV | | | ██ | ██ | ██ | ██ | ██ | | | |
| June 2014 FMV | | | ██ | ██ | ██ | ██ | ██ | | | |
| Dec. 2014 FMV | | | | ██ | ██ | ██ | ██ | ██ | | |
| June 2015 FMV | | | | ██ | ██ | ██ | ██ | ██ | ██ | |
| Dec. 2015 FMV | | | | | ██ | ██ | ██ | ██ | ██ | |
| June 2016 FMV | | | | | ██ | ██ | ██ | ██ | ██ | |
| Dec. 2016 FMV | | | | | | ██ | ██ | ██ | ██ | ██ |
| June 2017 FMV | | | | | | ██ | ██ | ██ | ██ | ██ |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV, at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 16:

### Figure 16: FMV Determinations – Carbonless EBITDA Projections



*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV, at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015 FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 17:

### Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **June 2013 FMV** | | ■ | | ■ | ■ | ■ | | | |
| **Dec. 2013** | | | ■ | ■ | ■ | ■ | ■ | | |
| **June 2014 FMV** | | | ■ | ■ | ■ | ■ | ■ | | |
| **Dec. 2014 FMV** | | | | ■ | ■ | ■ | ■ | ■ | |
| **June 2015 FMV** | | | | ■ | ■ | ■ | ■ | ■ | ■ |
| **Dec. 2015 FMV** | | | | | ■ | ■ | ■ | ■ | ■ |
| **June 2016 FMV** | | | | | ■ | ■ | ■ | ■ | ■ |
| **Dec. 2016 FMV** | | | | | | ■ | ■ | ■ | ■ |
| **June 2017 FMV** | | | | | | ■ | ■ | ■ | ■ |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3.     The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

> is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

> Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management,

Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.   In order to select companies for Stout's Guideline Company Method analysis, Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.   Stout admitted that "...there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served..." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.   Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June

2017 FMV, at 72.

233.    The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.    For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.    Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.    The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.    Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless

Businesses separately.

238.    In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015 FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.    In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.    A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36;

Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id*. Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

244.     In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board  again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.     In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App011563.

246.     For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. First, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.     Second, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the

December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.   Third, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.   In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.   In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is

> appropriate to apply a premium to the guideline company multiples
> to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

255.    However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256.    Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257.    Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258.    The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259.    In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year

71

EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

4. **The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations**

260.    The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261.    For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

262.    Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.    Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.    Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.    Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were

below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.    In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

### 5.    Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method

267.    The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

74

### a.    The Company-Specific Risk Premium

268.    Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 18: Company-Specific Risk Premium Used By Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 0.0%     | 2.0%    | 0.0%     | 0.0%    | 1.0%     | 2.0%    | 0.0%     | 0.0%    |
| Thermal    | 1.0%     | 1.0%    | 2.0%     | 2.0%    | 2.0%     | 4.0%    | 4.0%     | 4.0%    |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

75

270.    For example, the Company-Specific Risk Premium used by Stout for the June 2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless Business during that period remained virtually unchanged from FMV Determination Date to FMV Determination Date. *See* Figure 19 below.

### Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | -- | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr. Aguilar of Stout stated that, with ***emphasis added***:

> Carbonless continue to decline. There has been somewhat of an offset by the sales of specialty products that are higher margin. They have made some progress on sales of security paper which is use[d] for documents such as birth certificates (very small market). The company expects sales to be relatively flat. ***Over the long term sales are expected to decline. The projections are the same as the projection provided for year end with the exception of 2016.***

76

273.    In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.    For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF Valuation.

275.    At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with *emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.    In spite of Mr. Aguilar's observation that the Thermal Business year ended December 31, 2016 EBITDA projections would be back up from the projections used at the December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.    Even G. Grant Lyon, then the sole member of the ESOP Administrative Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.

> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017

FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout

allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV

Determination to account for the fact that the projections for future years' EBITDA had been

lowered from the levels used in the June 2016 FMV Determination. Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ███ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Thermal:
>
> – Over the last three years, Thermal's adjusted EBITDA declined at an
>   annualized rate of ████. In comparison, the Company is projecting
>   annualized adjusted EBITDA growth of ████ for Thermal between the
>   LTM period and fiscal 2021. There is increased risk associated with the
>   Company's projections given that projected earnings growth is above
>   historical levels.
>
> – Thermal's adjusted EBITDA projection for fiscal 2017 is ████ lower
>   than the projections used as of the June 30, 2016 analysis. The increased
>   conservatism of management's forecast reduces the risk associated with
>   the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts
> for risk factors specific to the subject company (i.e., unsystematic risk factors) not
> captured in the long-term market equity risk premium, beta, or the small stock
> risk premium.
>
> We considered the following factors in selecting the Company Specific Risk
> Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ████ lower

78

than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is projecting annualized adjusted EBITDA growth of ████ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ████ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

## b.    The Cost of Debt

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average

79

Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |
| Thermal | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), ...." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December

31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21 below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0X     | 5.0X    | 5.0X     | 5.5X    | 5.5X     | 5.5X    | 6.5X     | 7.0X    |
| Thermal    | 6.0X     | 7.5X    | 7.5X     | 5.5X    | 5.5X     | 5.5X    | 5.5X     | 5.5X    |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect

the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV, at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288.    In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289.    Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### D.    THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON

290.    The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291.    During the time period where valuation methodology decisions were employed by

Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.    In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr. Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.    In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.    Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| **TOTAL** | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

**Figure 24: Ferree 2017 SERP Distributions**

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| **TOTAL** | **$177,874** |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues

from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

    E.    **COMPENSATION AND BENEFITS**

        1.    **The Officer/Employee Defendants and Director Defendants' Compensation**

299.    As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300.    The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301.    In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302.    Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting

date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.     The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.     The Debtors' Pension Plan

307.     The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.     Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.     Ownership of PDC Common Stock

309.     Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

### Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013

| | | | | Total | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | **Paperweight Equity Ownership Schedule** | | | | |
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| Total | 6,934,029 | 370,000 | 110,918 | 2,248,780 | 300 | 9,664,027 | 100.0% |

June 2015 FMV, at 7.

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| **Paperweight Equity Ownership Schedule** | | | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| **Paperweight Equity Ownership Schedule** | | | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |

[a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money.

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| Total | 6,262,701 | 248,650 | 139,570 | 911,034 | 7,561,955 | 100.0% |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| Total | 5,932,120 | 334,797 | 145,505 | 1,223,759 | 7,636,181 | 100.0% |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

**F.    APPVION'S CREDIT RATING HISTORY**

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

### G.    SUMMARY OF ESOP TRANSACTIONS

318.    At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.    Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.    Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.    The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.    The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

91

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**





*See* June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value
($ in thousands, except share price)**

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ■ | ■ | ■ |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ■ | ■ | ■ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ■ | ■ | ■ |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ■ | ■ | ■ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 | | | | | |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ■ | ■ | ■ |

*See* Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at 35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36,

39-40.

324.     Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.     From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.     For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.     For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.     For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.     For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.     For the six months leading up to December 2015, contributions to the ESOP

totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

## H.    APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

**Figure 36: Historical Trading Prices**



**Figure 37: Historical Trading Prices (% Changes)**



I.    THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING
      FINANCIAL POSITION AND INSOLVENCY

335.    The markets took note of the Debtors' declining financial condition. In November

2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "BVAL") at a discount

to par. *See* Figure 38 below.

**Figure 38: BVAL of the Second Lien Notes in November 2013**
**($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value |  | (Deficit) |
|---|---|---|---|---|---|---|---|
| 11/29/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |
| 11/27/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/26/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/25/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/22/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/21/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/20/2013 | $250,000 | | 97.875% | | $ | 244,688 | $ | (5,313) |
| 11/19/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/18/2013 | $250,000 | | 97.688% | | $ | 244,220 | $ | (5,780) |
| 11/15/2013 | $250,000 | | 97.938% | | $ | 244,845 | $ | (5,155) |
| 11/14/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |

*Source*: Bloomberg.

336.    Then, again, in the second half of 2014, the Second Lien Notes were valued by

BVAL from par (100% of the principal amount) to approximately 68% of par by December 31,

2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014

reflected the market's belief that the value of the debt was materially impaired and that Appvion

was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the

conclusion that Appvion was insolvent through the Petition Date.

337.    The markets fundamentally disagreed with Stout concerning Stout's the value of

PDC common stock.

338.    As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or

96

at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.    As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 |  | 98.6880% |  | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $    - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $    - |
| Second Lien Notes | $ 250,000 |  | 68.8756% |  | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $    - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $    - | $    - |
| TOTAL | $ 596,835 |  |  |  | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.    As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

97

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 | | 93.688% | | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 64.938% | | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - | | (n/a) | | $   - | $   - |
| TOTAL | $ 597,748 | | | | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,308 | | 93.50% | | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 40.125% | | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - | | (n/a) | | $   - | $   - |
| TOTAL | $ 425,918 | | | | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of June 30, 2016.

**Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 | | 95.5% | | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 | | 100% | | $ 27,000 | $   - |
| Ohio Loan | $ 2,238 | | (n/a) | | $ 2,238 | $   - |
| Second Lien Notes | $ 250,000 | | 57.56% | | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   300 | | (n/a) | | $ 300 | $   - |
| TOTAL | $ 443,838 | | | | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of December 31, 2016.

**Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 | | 97.69% | | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 | | 100% | | $ 31,920 | $   - |
| Ohio Loan | $ 1,443 | | (n/a) | | $ 1,443 | $   - |
| Second Lien Notes | $ 250,000 | | 57.00% | | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   100 | | (n/a) | | $ 100 | $   - |
| TOTAL | $ 447,035 | | | | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of June 30, 2017.

**Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 | | 97.38% | | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 | | 100% | | $ 19,500 | $   - |
| Ohio Loan | $  626 | | (n/a) | | $ 626 | $   - |
| Second Lien Notes | $ 250,000 | | 52.69% | | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - | | (n/a) | | $   - | $   - |
| TOTAL | $ 454,426 | | | | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was

insolvent. The market, per the trading prices of the debt, did not believe that the value of the

company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents)

is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns

Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

**J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE BALANCE-SHEET TEST**

346.    The book value of the Debtors' liabilities exceeded the book value of their assets

since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book

Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

| | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

## K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST

347.    The Debtors were insolvent on a cash-flow basis at various points in time since 2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business. *See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII.    THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the

December 2014 FMV, as no such motion was made. *Id.*

351.    On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id.* The ESOP Committee members asked questions regarding the June 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352.    On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id.* The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id.*

353.    On January 15, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the

December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.    On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.    On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

356.    On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout.

*Id.*

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id.*

## VIII.    THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on

105

May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of

Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.    The Plan of Liquidation defines "Preserved D&O Claims" as:

any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; provided, however, that the Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.    The Plan of Liquidation defines "Released D&O" to mean:

any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.    The Plan of Liquidation defines "Released D&O Claims" to mean "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.    The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.    The Plan of Liquidation Provides that following the Effective Date, the

Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally

permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "Effective Date") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

IX.    **THE** DIRECTOR DEFENDANTS **AND THE** OFFICER/EMPLOYEE DEFENDANTS **ARE NOT RELEASED D&OS UNDER THE PLAN OF LIQUIDATION.**

377.    Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.    Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.    Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.    Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.    Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.    Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.    Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.    Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.    Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.    Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.    Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.    Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.    Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date.

X.    **NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS**

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors'

bankruptcy counsel, DLA Piper LLP (US), with a letter detailing the existence of the claims and causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims existed against the current and former directors and officers of Appvion under theories of breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee wrote that the Creditors' Committee "intends to hold the current and former directors and officers of the Debtors accountable for their actions."

## XI.  CAUSES OF ACTION

### <u>COUNT I</u>

**(Breach of Fiduciary Duties of Care and Loyalty Against The** Officer/Employee Defendants **and the** Director Defendants**)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock in order to further their own individual self-interest, the Director Defendants and the Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their individual financial interests. Because each Director Defendant and Officer/Employee Defendant

stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the selection of companies for use in Stout's Guideline Companies Method analysis. In these and in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated

inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

## <u>COUNT II</u>
**(Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)**

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013,

112

Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

**<u>COUNT III</u>**
**(Breach of Fiduciary Duty of Care Against Richards, Ferree, Van Straten, Arent, and Fletcher)**

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions made by ESOP participants. Further, distributions had significantly outstripped contributions in the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany

113

Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

<u>**COUNT IV**</u>
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT V

### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VI

### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

418.    Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be

116

determined at trial.

## COUNT VII

### (Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)

419.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422.    During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423.    The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424.    The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

426.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT VIII

117

**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

427.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.    From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.    From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal

dividend.

## COUNT IX

**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)**

436.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.    The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.    At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.    At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C.§ 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.    In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.    The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified Distributions were made.

443.    The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.    As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more

119

than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.    Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.    In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

## <u>COUNT X</u>
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)**

447.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.    Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "<u>July 2017 Stout Payment</u>").

449.    Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "<u>Stout Preference Payments</u>").

450.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Stout Preference Payments occurred.

451.    The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

120

452.    At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453.    In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454.    The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455.    The Stout Preference Payments were made while the Debtors were insolvent.

456.    As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457.    Stout had reasonable cause to believe that the Debtors were insolvent.

458.    In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## <u>COUNT XI</u>
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

459.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

460.    Stout received payment in Figure 2 above totaling $522,229.71 (the "<u>Stout Transfers</u>") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the

121

June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

## COUNT XII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.    The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.    At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.    In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

474.    The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.    The Argent Preference Payments were made while the Debtors were insolvent.

476.    As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.    Argent had reasonable cause to believe that the Debtors were insolvent.

478.    In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

### COUNT XIII
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.    Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.    At the time of the Argent Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be

124

beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

### COUNT XIV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)**

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

**Figure 46: Siefert Board Fee Payments**

| Payment | Payment Amount |
| --- | --- |

| Date | | |
|------|---|---|
| 12/16/2016 | $ | 15,625 |
| 3/17/2017 | $ | 15,625 |
| 7/3/2017 | $ | 15,625 |
| 9/26/2017 | $ | 15,625 |
| 9/28/2017 | $ | 15,625 |
| **TOTAL** | **$** | **78,125** |

489.    Ms. Siefert received board fee payments as set forth in Figure 46.

490.    The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492.    The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493.    At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495.    The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496.    The Siefert Board Fee Payments were made while the Debtors were insolvent.

497.    As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $          13,750 |
| 3/17/2017 | $          17,500 |
| 7/3/2017 | $          17,500 |
| 9/26/2017 | $          17,500 |
| 9/28/2017 | $          17,500 |
| **TOTAL** | **$          83,750** |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

127

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVI
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)

513.     The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

514.     In addition to the compensation otherwise addressed herein, Mr. Murphy received board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        25,000 |
| 3/17/2017 | $        25,000 |
| 7/3/2017 | $        25,000 |
| 9/26/2017 | $        25,000 |
| 9/28/2017 | $        25,000 |
| **TOTAL** | **$       125,000** |

515.     Mr. Murphy received board fee payments as set forth in Figure 48.

516.     The Murphy Board Fee Payments include $55,000 for non-employee director remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Murphy Board Fee Payments occurred.

518.     The Murphy Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

519.     At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVII
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "Laurino Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $    13,750 |
| 3/17/2017 | $    13,750 |
| 7/3/2017 | $    13,750 |
| 9/26/2017 | $    13,750 |
| 9/28/2017 | $    13,750 |
| **TOTAL** | **$    68,750** |

528.    Mr. Laurino received board fee payments as set forth in Figure 49.

529.    The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.    The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.    At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.    The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.    The Laurino Board Fee Payments were made while the Debtors were insolvent.

536.    As a result of the Laurino Board Fee Payments, Mr. Laurino received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

131

Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)**

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 13,750 |
| 3/17/2017 | $ 13,750 |
| 7/3/2017 | $ 13,750 |
| 9/26/2017 | $ 13,750 |
| 9/28/2017 | $ 13,750 |
| **TOTAL** | **$ 68,750** |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director remuneration.

543.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

132

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.    The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.    At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.    The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.    The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.    As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.    Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.    In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court

enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l) On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n) On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o) On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p) On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q) On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r) On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

135

(s)  awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t)  awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u)  awarding Plaintiff such other and further relief as the Court deems just and proper.


Dated: June 26, 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (admitted *pro hac* vice)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com


*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

136

# EX. C
# FILED UNDER SEAL

# Ex. D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ~~KEVIN GILLIGAN,~~ ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**REVISED SECOND AMENDED COMPLAINT**

1

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "<u>Co-Trustees</u>") of the Appvion Liquidating Trust (the "<u>Appvion Liquidating Trust</u>") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "<u>ESOP</u>"), the former ultimate owner of the Debtors.

2.      The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("<u>Appvion</u>") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3.      Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.    This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.    These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.    The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7.      The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8.      In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9.      The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.     During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.     Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.     Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.     In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.     When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.    Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.    As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.     This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.     A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.     Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.     Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## PARTIES

21.     Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.     Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.     The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

24.     Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC

---

[1] *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.     Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.     Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee. Ms. Van Straten resides in Appleton, Wisconsin.

27.     Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.     Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.     Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.     Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to

the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.    Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.    Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.    Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing

assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34.    Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35.    David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36.    Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37.    John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in connection with any FMV Determination connected with any claim asserted herein.

38.    Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "Director Defendants."[2]

39.    Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "Officer/Employee Defendants."[3]

40.    Argent Trust Company ("Argent"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.    Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.    Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## NON-PARTIES

43.    George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board  by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

44.    The Principal Financial Group ("The Principal"), acted as a record-keeper to

---

[2] Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended Complaint, he remains defined as a "Director Defendant" as referenced herein.
[3] Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended Complaint, he remains defined as a "Officer/Employee Defendants" as referenced herein.

handle the accounting related to the ESOP.

45.    Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.    Maureen Cosgrove is or was formerly an employee of Argent.

47.    Marc Hansberger is or was formerly an employee of Argent.

48.    Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.    Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.    Mark Shorthouse is or was formerly an employee of Argent.

51.    David Williams is or was formerly an employee of Argent.

52.    Phil Buchanan is or was formerly an employee of Argent.

53.    From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.    Cara Davis is or was formerly an employee of Stout.

55.    Robert S. Socol is or was formerly an employee of Stout.

56.    Aziz El Tahch is or was formerly an employee of Stout.

57.    From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

**JURISDICTION AND VENUE**

58.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.    Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS**</u>

## I.    OVERVIEW OF THE DEBTORS' BUSINESS

### A.    DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY

61.    Prior to their bankruptcy filing on October 1, 2017 (the "<u>Petition Date</u>"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "<u>Debtors</u>"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.    In addition to its headquarters in Appleton, Wisconsin, Appvion had manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.    Appvion's business was organized into two operating divisions: carbonless ("<u>Carbonless</u>" or the "<u>Carbonless Business</u>") and thermal ("<u>Thermal</u>" or the "<u>Thermal Business</u>"), referring to the type of paper produced by each division.

64.     The thermal paper segment developed and produced substrates for the transaction and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.     The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.     On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.     In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.     Prior to the Petition Date, PDC owned 100% of the common stock of Appvion.

Prior to the Petition Date, Appvion only had one class of common stock.

69.    As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.    As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.    In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_ Aug_4_2015.pdf Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.    Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

### B.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.    PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the

stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

74.     PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.     Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.     Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.     Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.     Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.     APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.     On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.    EMPLOYEE OWNERSHIP AT APPVION

### A.    THE ESOP STRUCTURE

81.     Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.     Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.     The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.     Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.     When an ESOP participant retired, or otherwise terminated his or her employment

with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.    The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.    For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.    Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.    Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.    According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

> In determining a company's fair market value, the appraiser must consider all facts considered relevant.… factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management, workforce, and facilities, relative to their competitors, may also be considered.
>
> Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.
>
> To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.     The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

**B.     ADMINISTRATION OF THE ESOP AND THE ESOP TRUST**

92.     Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.     On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.     Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.     Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.    The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.    Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.    Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its

duties to the ESOP.

100.   Amongst Argent's duties to the ESOP was determining the FMV of the common stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP Trustee, since before 2013.

101.   The terms and scope of Stout's services were confirmed in writing at various times over the course of Stout's engagement by each ESOP Trustee.

102.   Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout Engagement Letter provided that Stout would provide certain financial advisory services to Reliance, solely in Reliance's capacity as ESOP Trustee.

103.   The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 collectively, the "Valuation Dates."). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the [ESOP Trustee]. We will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset…

104.   The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc. (MLB_01959) The June 2013 Stout Engagement Letter states as follows:

In order for us to maximize the value of our work and to keep the project on schedule, It Is important for us to be provided with information we request from

the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

...

We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945);

Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.    Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

### Figure 2: Schedule of Payments by Appvion to Stout

| Payment Date | Payment Amount | Check # |
|---|---|---|
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.    In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.    In addition to engaging Stout to assist with the FMV Determination, Argent hired ~~the~~The Principal to serve as record-keeper to handle the accounting related to the ESOP, and to ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

### C.    THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.    The biannual FMV Determination served several crucial functions, related both to the administration of the ESOP, and to the operation of the Debtors' businesses.  For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

     a.   determine the per-share price at which ESOP participants made contributions to the ESOP;

     b.   determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

     c.   estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

     d.   estimate the upcoming repurchase obligations under the ESOP; and

     e.   determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to

diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation, because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and

because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.    <u>Third</u>, the Debtors adopted a long-term incentive plan ("<u>LTIP</u>") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.    Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.    Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million

of long-term debt obligations.

126.    Prior to the Petition Date, the Debtors' primary sources of liquidity and capital resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.    OTHER INDEBTEDNESS AND OBLIGATIONS

131.    On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.    PENSION PLAN OBLIGATIONS

132.    Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

### Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)

|  | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended

January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K

for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at

3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter

ended July 2, 2017, at 2.

### F.    INTERCOMPANY INDEBTEDNESS

133.    As described more fully herein, all ESOP/PDC common share activities, including

issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP

redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001,

employee withdrawals were significantly larger than employee contributions.

134.    On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a

promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany

Note"). *See* App000002.

135.    On November 20, 2013, an Intercompany Promissory Note Distribution and

Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In

connection therewith, Appvion purported to make a non-cash distribution to PDC in the

aggregate amount of the Note and PDC acknowledged receipt of the distribution and further

acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to

Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date

thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended

January 2, 2016, at 43.

136.    Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board

(App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board

(App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof.

Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC Security Holders Agreement") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.     The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.     In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.     The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.     From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.     On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "Appvion Security Holders Agreement") which sets forth the manner in which the members of the Appvion Board are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to

Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

### B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The PDC Board and/or the Appvion Board's compensation committee(s) also had authority for

administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152.    Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153.    Specifically, the per-share grant value of RSU awards granted in the preceding fiscal year was equivalent to the most recent FMV Determination performed by Stout (and

adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.    The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.    The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.    Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

### C.    EXECUTIVE COMPENSATION BETWEEN 2013 – 2016

#### 1.    *Richards*

157.    Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

**Figure 4: Richards' Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $ - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

### 2.    Gilligan

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

**Figure 5: Gilligan's Compensation Between 2014 - 2016**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $ - | $465 |
| Non-equity incentive plan compensation | $82,707 | $ - | $ - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 3. *Ferree*

160.    Ferree's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

**Figure 6: Ferree's Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $   - | $   - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 4. *Van Straten*

161.    Van Straten's executive compensation was heavily dependent on Stout's valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $   - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $   - | $   - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

   **5.    *Arent***

   162.    Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $   - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

163.    The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

### D.    NON-EMPLOYEE DIRECTOR COMPENSATION

164.    Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.    Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.    Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.    On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee

Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

### E.    ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING

168.    Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

169.    The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

170.    Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

171.    Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and

other matters related to the Debtors.

172.    From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

### Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|---|---|---|---|---|---|---|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion | Ad Hoc | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |

| PDC | Committee | | | | | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 8/12/15 | Appleton, WI | | Steve Martin Marc Hansberger | App010293 |
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15-11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.    THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.    The financial demise of Appvion and the abject failure of the Debtors' management to create reliable, non-inflated, financial projections was well known to the members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC

Board were updated by Management on a regular basis, and actively participated in the vetting process of these projections through board activities as well as through the activities of the Audit Committee.

174.    Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.    When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.    From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.    In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities

and debt repayments…" App006037. The Audit Committee also cautioned that the highly leveraged capital structure presented covenant compliance risk. App006037.

178.   In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.   In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.   From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance

against the annual incentive plan targets, executive incentive plan, liquidity, biannual share prices as calculated by Stout.

## VI.    STOUT'S FMV DETERMINATIONS

### A.    THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181.    Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182.    Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183.    Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it

to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated projections by knowingly manipulating key aspects of its valuations.

184.    Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185.    Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186.    Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

1. The PDC's financial statements filed with the SEC;

2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;

3. The PDC's internally-prepared balance sheets;

4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;

5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;

6. Publicly available information and financial data on publicly traded companies

considered similar to the Debtors from an investment risk/return perspective; and

7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "June 2016 FMV"), at 53.

197.    As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "Dec. 2016 FMV"), at 39.

198.    As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "June 2017 FMV"), at 39.

199.    Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

**Figure 10: FMV Determinations of the PDC Common Stock Price**



June 2017 FMV, at 38.

**C.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF THE PDC COMMON STOCK SHARES WAS SUSCEPTIBLE TO MANIPULATION, AND WAS WILDLY INFLATED AND FLAWED.**

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other financial and market data are pronounced for the period June 2013 through June 2017. During

that period the FMV of PDC's common stock as calculated by Stout is higher than other available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality.    Stout was fully aware that the projections it received from management were unjustifiably inflated and unreliable.    Instead of pressing management for more reliable projections on which to base its FMV Determinations in limited instances, Stout attempted to compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking various aspects of its valuation methodologies. These adjustments were inconsistent between different FMV Determinations, and often lacked any business justification.  Many of the errors in the FMV Determinations detailed below are therefore not the result of mere academic disagreement over the most prudent way to value the Debtors' business, but rather adjustments that Stout knowingly made to compensate for the unreliable financial projections it was provided and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants' breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

1.    **The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities**

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of Second Lien Notes and Debt Obligation Used by Stout ($ in thousands)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($3,018) | ($2,770) | ($2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.    Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.    Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5,

2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the

quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12;

PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension

obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities

from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014

FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013,

at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed

the Debtors' underfunded pension liability and whether Stout should include this liability in its

FMV Determinations. Upon information and belief, Ferree was tasked with discussion the

underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation

obligations, workers compensation obligations, accrued insurance obligations, accrued taxes

obligations, due on accounts receivable securitization, and other obligations resulted in the

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July

2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec.

2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5,

2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the

quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47;

PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

214.    Figure 12 below reflects these other omitted liabilities.

**Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations**
**($ in thousands)**

| | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### 2.    The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the

forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ████████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ████████ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

**Figure 13: FMV Determinations - Thermal EBITDA Projections
($ in thousands)**

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ▮▮▮ | ▮▮▮ | ▮▮▮ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ▮▮▮▮▮ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately ▮▮▮▮▮ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

**Figure 14: FMV Determinations - Thermal EBITDA Projections
($ in thousands)**

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ▮▮▮ | ▮▮▮ | ▮▮▮ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

223.    In spite of the actual Thermal EBITDA being approximately ▮▮▮▮▮ ▮▮▮▮▮ management's projections, management only reduced its Thermal EBITDA projections by ▮▮▮▮▮ for the next fiscal year, and by no more than ▮▮▮▮▮ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.



224.    Management's projections for the June 2016 FMV Determination also failed to respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of ████ ████████████████ for the twelve months ended June 30, 2016, well below the projected amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV, at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as follows in Figure 15:

### Figure 15: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | | | | | | | | | | |
| June 2012 FMV | | | | | | | | | | |
| Dec. 2012 FMV | | | | | | | | | | |
| June 2013 FMV | | | | | | | | | | |
| Dec. 2013 FMV | | | | | | | | | | |
| June 2014 FMV | | | | | | | | | | |
| Dec. 2014 FMV | | | | | | | | | | |
| June 2015 FMV | | | | | | | | | | |
| Dec. 2015 FMV | | | | | | | | | | |
| June 2016 FMV | | | | | | | | | | |
| Dec. 2016 FMV | | | | | | | | | | |
| June 2017 FMV | | | | | | | | | | |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV, at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 16:

### Figure 16: FMV Determinations – Carbonless EBITDA Projections



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | ███ | ███ | ███ | ███ | ███ | | | | | |
| June 2012 FMV | ███ | ███ | ███ | ███ | ███ | | | | | |
| Dec. 2012 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| June 2013 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| Dec. 2013 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| June 2014 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| Dec. 2014 FMV | | | | ███ | ███ | ███ | ███ | ███ | | |
| June 2015 FMV | | | | ███ | ███ | ███ | ███ | ███ | | |
| Dec. 2015 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| June 2016 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2016 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |
| June 2017 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |

*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV, at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015 FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 17:

### Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual Total (Excluding Encapsys) | ███ | ███ | ███ | ███ | ███ | | | | | |
| June 2012 FMV | ███ | ███ | ███ | ███ | ███ | | | | | |
| Dec. 2012 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| June 2013 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| Dec. 2013 | | | ███ | ███ | ███ | ███ | ███ | | | |
| June 2014 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| Dec. 2014 FMV | | | | ███ | ███ | ███ | ███ | ███ | | |
| June 2015 FMV | | | | ███ | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2015 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| June 2016 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2016 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |
| June 2017 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3.    The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

> is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

> Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management, Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.    In order to select companies for Stout's Guideline Company Method analysis,

Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.    Stout admitted that "…there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served…" June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.    Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

233.    The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.    For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.    Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.    The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.    Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless Businesses separately.

238.    In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015

FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.    In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.    A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's

LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id*. Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

244.    In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board  again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.    In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See*

App011563.

246.    For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. First, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.    Second, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.    Third, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June

2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.    In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.    In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is appropriate to apply a premium to the guideline company multiples to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December

2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

255.    However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256.    Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257.    Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258.    The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259.    In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of

the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

### 4. The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations

260.     The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261.     For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

262.     Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's

performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.    Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.    Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.    Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the

Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.   In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

### 5.   Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method

267.   The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

#### a.   The Company-Specific Risk Premium

268.   Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

**Figure 18: Company-Specific Risk Premium Used By Stout**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 0.0% | 2.0% | 0.0% | 0.0% | 1.0% | 2.0% | 0.0% | 0.0% |
| Thermal | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 4.0% | 4.0% | 4.0% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

270.    For example, the Company-Specific Risk Premium used by Stout  for the June 2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless Business during that period remained virtually unchanged from FMV Determination Date to

FMV Determination Date. *See* Figure 19 below.

**Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)**

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr. Aguilar of Stout stated that, with ***emphasis added***:

> Carbonless continue to decline. There has been somewhat of an offset by the sales of specialty products that are higher margin. They have made some progress on sales of security paper which is use[d] for documents such as birth certificates (very small market). The company expects sales to be relatively flat. ***Over the long term sales are expected to decline. The projections are the same as the projection provided for year end with the exception of 2016***.

273.    In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.    For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF

Valuation.

275.    At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with

*emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.    In spite of Mr. Aguilar's observation that the Thermal Business year ended

December 31, 2016 EBITDA projections would be back up from the projections used at the

December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.    Even G. Grant Lyon, then the sole member of the ESOP Administrative

Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.
>
> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017

FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout

allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV

Determination to account for the fact that the projections for future years' EBITDA had been

lowered from the levels used in the June 2016 FMV Determination. Stout stated:

Company Specific Risk Premium: The company-specific risk premium accounts

for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.

We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:

– Carbonless' adjusted EBITDA projections for fiscal 2017 are ███ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Over the last three years, Thermal's adjusted EBITDA declined at an annualized rate of ███ In comparison, the Company is projecting annualized adjusted EBITDA growth of ███ for Thermal between the LTM period and fiscal 2021. There is increased risk associated with the Company's projections given that projected earnings growth is above historical levels.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ███ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

Company Specific Risk Premium: The company-specific risk premium accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.

We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:

– Carbonless' adjusted EBITDA projections for fiscal 2017 are ███ lower than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is

projecting annualized adjusted EBITDA growth of ███ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ███ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

**b.    The Cost of Debt**

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0%     | 6.0%    | 6.0%     | 6.0%    | 5.5%     | 4.4%    | 4.8%     | 6.5%    |
| Thermal    | 6.0%     | 6.0%    | 6.0%     | 6.0%    | 5.5%     | 4.4%    | 4.8%     | 6.5%    |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June

2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), …." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December 31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21

below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0X | 5.0X | 5.0X | 5.5X | 5.5X | 5.5X | 6.5X | 7.0X |
| Thermal | 6.0X | 7.5X | 7.5X | 5.5X | 5.5X | 5.5X | 5.5X | 5.5X |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV,

at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288.     In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289.     Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### D.     THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON

290.     The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291.     During the time period where valuation methodology decisions were employed by Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.     In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr.

Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.    In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.    Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| **TOTAL** | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

### Figure 24: Ferree 2017 SERP Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| TOTAL | $177,874 |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

E.    COMPENSATION AND BENEFITS

1.    **The Officer/Employee Defendants and Director Defendants' Compensation**

299.    As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300.    The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301.    In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302.    Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers.

Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.    The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.    The Debtors' Pension Plan

307.    The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.    Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.    Ownership of PDC Common Stock

309.    Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

**Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013**

| | | | | Total | | | |
|---|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| **Total** | **6,934,029** | **370,000** | **110,918** | **2,248,780** | **300** | **9,664,027** | **100.0%** |

June 2015 FMV, at 7.

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| | **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| | **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |
| [a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money. | | | | | | |

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

**Paperweight Equity Ownership Schedule**

| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| **Total** | **6,262,701** | **248,650** | **139,570** | **911,034** | **7,561,955** | **100.0%** |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

**Paperweight Equity Ownership Schedule**

| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| **Total** | **5,932,120** | **334,797** | **145,505** | **1,223,759** | **7,636,181** | **100.0%** |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

### F.    APPVION'S CREDIT RATING HISTORY

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

### G.    SUMMARY OF ESOP TRANSACTIONS

318.    At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.    Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.    Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.    The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.    The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**



*See* June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value ($ in thousands, except share price)**

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ██████ | | |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ██████ | | ████ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ██████ | | |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ██████ | | ████ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 | | | | | |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ██████ | | |

*See* Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at

35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36, 39-40.

324.    Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.    From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.    For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.    For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.    For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.    For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.    For the six months leading up to December 2015, contributions to the ESOP totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

### H.    APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

**Figure 36: Historical Trading Prices**



**Figure 37: Historical Trading Prices (% Changes)**



## I.    THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING FINANCIAL POSITION AND INSOLVENCY

335.    The markets took note of the Debtors' declining financial condition. In November 2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "BVAL") at a discount to par. *See* Figure 38 below.

### Figure 38: BVAL of the Second Lien Notes in November 2013
### ($ in thousands)

|            | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|------------|------------------|---|--------------|---|--------------|-----------|
| 11/29/2013 | $250,000 | | 98.125% | | $ 245,313 | $ (4,688) |
| 11/27/2013 | $250,000 | | 98.0% | | $ 245,000 | $ (5,000) |
| 11/26/2013 | $250,000 | | 98.0% | | $ 245,000 | $ (5,000) |
| 11/25/2013 | $250,000 | | 97.75% | | $ 244,375 | $ (5,625) |
| 11/22/2013 | $250,000 | | 97.75% | | $ 244,375 | $ (5,625) |
| 11/21/2013 | $250,000 | | 97.75% | | $ 244,375 | $ (5,625) |
| 11/20/2013 | $250,000 | | 97.875% | | $ 244,688 | $ (5,313) |
| 11/19/2013 | $250,000 | | 97.75% | | $ 244,375 | $ (5,625) |
| 11/18/2013 | $250,000 | | 97.688% | | $ 244,220 | $ (5,780) |
| 11/15/2013 | $250,000 | | 97.938% | | $ 244,845 | $ (5,155) |

| 11/14/2013 | $250,000 | 98.125% | $ 245,313 | $ (4,688) |

*Source*: Bloomberg.

336.    Then, again, in the second half of 2014, the Second Lien Notes were valued by BVAL from par (100% of the principal amount) to approximately 68% of par by December 31, 2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014 reflected the market's belief that the value of the debt was materially impaired and that Appvion was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the conclusion that Appvion was insolvent through the Petition Date.

337.    The markets fundamentally disagreed with Stout concerning Stout's the value of PDC common stock.

338.    As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.    As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 | | 98.6880% | | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $ - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $ - |
| Second Lien Notes | $ 250,000 | | 68.8756% | | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $ - |
| Columbia County, Wisconsin Forgivable Note | $ - | | (n/a) | | $ - | $ - |
| TOTAL | $ 596,835 | | | | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.    As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 |  | 93.688% |  | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 |  | 64.938% |  | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - |  | (n/a) |  | $   - | $   - |
| TOTAL | $ 597,748 |  |  |  | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|

| Term Loan | $ 157,308 | 93.50% | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 | 100% | $ 9,600 | $  - |
| Ohio Loan | $ 3,010 | (n/a) | $ 3,010 | $  - |
| Second Lien Notes | $ 250,000 | 40.125% | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 | (n/a) | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  - | (n/a) | $  - | $  - |
| TOTAL | $ 425,918 | | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2016.

**Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 | | 95.5% | | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 | | 100% | | $ 27,000 | $  - |
| Ohio Loan | $ 2,238 | | (n/a) | | $ 2,238 | $  - |
| Second Lien Notes | $ 250,000 | | 57.56% | | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  300 | | (n/a) | | $  300 | $  - |
| TOTAL | $ 443,838 | | | | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of December 31, 2016.

**Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 | | 97.69% | | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 | | 100% | | $ 31,920 | $  - |
| Ohio Loan | $ 1,443 | | (n/a) | | $ 1,443 | $  - |
| Second Lien Notes | $ 250,000 | | 57.00% | | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $ 100 | | (n/a) | | $ 100 | $  - |
| TOTAL | $ 447,035 | | | | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2017.

**Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 | | 97.38% | | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 | | 100% | | $ 19,500 | $  - |
| Ohio Loan | $ 626 | | (n/a) | | $ 626 | $  - |
| Second Lien Notes | $ 250,000 | | 52.69% | | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  - | | (n/a) | | $  - | $  - |
| TOTAL | $ 454,426 | | | | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was insolvent. The market, per the trading prices of the debt, did not believe that the value of the

company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

**J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE BALANCE-SHEET TEST**

346.    The book value of the Debtors' liabilities exceeded the book value of their assets since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

|  | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

**K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST**

347.    The Debtors were insolvent on a cash-flow basis at various points in time since

2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business. *See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII.   THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated

20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2014 FMV, as no such motion was made. *Id.*

351.    On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2015 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352.    On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id*. The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id*.

353.    On January 15, 2016, the ESOP Committee met, with ESOP Committee members

Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.    On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.    On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

356.    On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout. *Id*.

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id*.

VIII.  **THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.**

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to

claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims

(as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C. ~~The Plan.~~

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest

in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust

Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

> any and all Causes of Action of any Debtor and/or any of the Estates against any
> Person (excluding the Released D&O Claims), including but not limited to, (a) all
> claims and Causes of Action related to or arising out of the ESOP that are not
> Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of
> Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of
> Action that constitute Acquired Assets), and (d) all claims and Causes of Action
> against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.    The Plan of Liquidation defines "Preserved D&O Claims" as:

> any and all claims and Causes of Action (together with any proceeds thereof,
> including any proceeds of the D&O Insurance) held by the Debtors and their
> Estates against the Debtors' Directors and Officers, solely in their capacities as
> such, including those claims and Causes of Action that are not currently asserted,
> but could be asserted against them, including but not limited to, Claims held by
> the Debtors and their Estates relating to the ESOP; provided, however, that the
> Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.    The Plan of Liquidation defines "Released D&O" to mean:

> any of the Debtors' Directors and Officers who (i) served in such capacity at any
> time in the four months prior to the 363 Sale Effective Date, (ii) are retained or
> employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain
> retained or employed by the Purchaser for a period of not less than 180 days
> following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.    The Plan of Liquidation defines "Released D&O Claims" to mean "any claims

and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.    The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.    The Plan of Liquidation Provides that following the Effective Date, the Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "Effective Date") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr.

Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

## IX.    **THE** DIRECTOR DEFENDANTS **AND THE** OFFICER/EMPLOYEE DEFENDANTS **ARE NOT RELEASED D&OS UNDER THE PLAN OF LIQUIDATION.**

377.    Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.    Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.    Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.    Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.    Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.    Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.    Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.    Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.    Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.    Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.    Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.    Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.    ~~Upon information and belief,~~ Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of

Appvion Holding Corp. after the Effective Date. ~~Upon information and belief, Mr. Gilligan does not qualify as a "Released D&O" under the Plan of Liquidation.~~

## X.    NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors' bankruptcy counsel, DLA Piper LLP (US), with a letter detailing the existence of the claims and causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims existed against the current and former directors and officers of Appvion under theories of breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee wrote that the Creditors' Committee "intends to hold the current and former directors and officers of the Debtors accountable for their actions."

## XI.    CAUSES OF ACTION

### COUNT I
**(Breach of Fiduciary Duties of Care and Loyalty Against The** Officer/Employee Defendants **and the** Director Defendants**)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties of care and loyalty under applicable state corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock in order to further their own individual self-interest, the Director Defendants and the Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their individual financial interests. Because each Director Defendant and Officer/Employee Defendant stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the

selection of companies for use in Stout's Guideline Companies Method analysis. In these and in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

### COUNT II
**(Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)**

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion,

Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

## COUNT III
### (Breach of Fiduciary Duty of Care Against Richards, ~~Gilligan,~~ Ferree, Van Straten, Arent, and Fletcher)

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions

made by ESOP participants. Further, distributions had significantly outstripped contributions in the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

## <u>COUNT IV</u>
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, ~~Gilligan~~, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or

encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

**COUNT V**
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)**

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## <u>COUNT VI</u>
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or

encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

418.    Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

**COUNT VII**
**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

419.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422.    During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423.    The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424.    The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr.

Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

426.     Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## <u>COUNT VIII</u>
**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

427.     The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.     Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.     Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.     From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.     From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.     The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.     The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT IX
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)**

436.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.    The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.    At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.    At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C.§ 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.    In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.    The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified

Distributions were made.

443.    The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.    As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.    Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.    In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

## <u>COUNT X</u>
### *(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)*

447.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.    Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "<u>July 2017 Stout Payment</u>").

449.    Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "<u>Stout Preference Payments</u>").

450.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor

could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Stout Preference Payments occurred.

451.    The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

452.    At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453.    In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454.    The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455.    The Stout Preference Payments were made while the Debtors were insolvent.

456.    As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457.    Stout had reasonable cause to believe that the Debtors were insolvent.

458.    In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## COUNT XI
### (Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)

459.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

460.    Stout received payment in Figure 2 above totaling $522,229.71 (the "Stout Transfers") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C. §§

544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

## COUNT XII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.    The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.    At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.    In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

474.    The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.    The Argent Preference Payments were made while the Debtors were insolvent.

476.    As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.    Argent had reasonable cause to believe that the Debtors were insolvent.

478.    In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

### COUNT XIII
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.    Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.    At the time of the Argent Transfers, (i) Appvion was engaged in business or a

transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

## COUNT XIV
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

**Figure 46: Siefert Board Fee Payments**

| Payment Date | Payment Amount |
|--------------|---------------|
| 12/16/2016 | $ 15,625 |
| 3/17/2017 | $ 15,625 |
| 7/3/2017 | $ 15,625 |
| 9/26/2017 | $ 15,625 |
| 9/28/2017 | $ 15,625 |
| **TOTAL** | **$ 78,125** |

489.    Ms. Siefert received board fee payments as set forth in Figure 46.

490.    The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492.    The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493.    At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495.    The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496.    The Siefert Board Fee Payments were made while the Debtors were insolvent.

497.    As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

### COUNT XV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        13,750 |
| 3/17/2017 | $        17,500 |
| 7/3/2017 | $        17,500 |
| 9/26/2017 | $        17,500 |
| 9/28/2017 | $        17,500 |
| **TOTAL** | **$        83,750** |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director

remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn

Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVI
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)**

513.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

514.    In addition to the compensation otherwise addressed herein, Mr. Murphy received board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        25,000 |
| 3/17/2017 | $        25,000 |
| 7/3/2017 | $        25,000 |
| 9/26/2017 | $        25,000 |
| 9/28/2017 | $        25,000 |
| **TOTAL** | **$      125,000** |

515.    Mr. Murphy received board fee payments as set forth in Figure 48.

516.    The Murphy Board Fee Payments include $55,000 for non-employee director remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Murphy Board Fee Payments occurred.

518.    The Murphy Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

519.    At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11

U.S.C. § 101.

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

### <u>COUNT XVII</u>
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)**

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "<u>Laurino Board Fee Payments</u>") within one year of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 13,750 |
| 3/17/2017 | $ 13,750 |
| 7/3/2017 | $ 13,750 |
| 9/26/2017 | $ 13,750 |
| 9/28/2017 | $ 13,750 |
| TOTAL | $ 68,750 |

528.    Mr. Laurino received board fee payments as set forth in Figure 49.

529.    The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.    The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.    At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.    The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.    The Laurino Board Fee Payments were made while the Debtors were insolvent.

536.    As a result of the Laurino Board Fee Payments, Mr. Laurino received more than

he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $          13,750 |
| 3/17/2017 | $          13,750 |
| 7/3/2017 | $          13,750 |
| 9/26/2017 | $          13,750 |
| 9/28/2017 | $          13,750 |
| **TOTAL** | **$          68,750** |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director remuneration.

543.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.     The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.     At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.     In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.     The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.     The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.     As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.     Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.     In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Gilligan, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Mr. Gilligan, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l)    On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n)    On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o)    On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p)    On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q)    On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r)    On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered

by the Plaintiff pursuant to 11 U.S.C. § 550;

(s) awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t) awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u) awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: ~~May 22,~~June [___], 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (admitted *pro hac* ~~admission pending~~vice)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (~~Delaware~~DE Bar No. 5085)
Vivek Upadhya (~~Delaware~~DE Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

# Ex. E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 6, 59, 97, 100, 101** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND
EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING
TRUST, FOR LEAVE TO FILE A REVISED SECOND AMENDED
COMPLAINT AND TO AMEND THE ADVERSARY PROCEEDING CAPTION**

This matter coming before the Court on the Motion for Leave to Amend the Second
Amended Complaint and to amend the Adversary Proceeding caption (the "Motion") of
Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of the
Appvion Liquidating Trust, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, made
applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure and pursuant to Local

1

Rule 9004-1; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing (if any) on the Motion and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED:

1. The Motion is granted.

2. The Co-Trustees are authorized to file the Revised Second Amended Complaint attached as **Exhibit A** to the Motion.

3. The caption in the above-captioned Adversary Proceeding is hereby changed to remove Kevin Gilligan. Plaintiff need not amend the Summons or any of the pleadings previously filed in this adversary proceeding to amend the caption.

4. The Co-Trustees are authorized to take all steps necessary or appropriate to carry out this Order.

5. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

2

## <u>CERTIFICATE OF SERVICE</u>

I, Vivek Upadhya, hereby certify that on June 27, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.




           */s/ Vivek Upadhya*         
           Vivek Upadhya

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS,
AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST,
PURSUANT TO 11 U.S.C. §§ 105(a) AND 107(b), BANKRUPTCY RULE
9018, AND LOCAL RULE 9018-1 PERMITTING ALAN HALPERIN
AND EUGENE DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED
<u>VERSION OF THE PROPOSED REVISED SECOND AMENDED COMPLAINT</u>**

Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of

the Appvion Liquidating Trust, by and through their undersigned counsel, hereby move (the

1

"Motion to Seal") for the entry of an order pursuant to sections 105(a) and 107(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal (i) the unredacted version of the Revised Second Amended Complaint (the "Revised SAC") in the form as attached to the contemporaneously filed Motion for Leave to Amend the Second Amended Complaint (the "Motion for Leave")  filed in this action as Exhibit A, and (ii) the redline version of the Revised SAC reflecting changes from the unredacted version of the SAC as attached to the Motion for Leave as Exhibit C. In support of the Motion to Seal, the Co-Trustees state the following:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion to Seal pursuant to 28 U.S.C. §§ 157 and 1334, as well as under Article XV of the confirmed plan of liquidation (the "Plan") in the above-captioned cases.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 107(b). Relief is also warranted pursuant to Bankruptcy Rule 9018 and Local Rule 9018-1.

## BACKGROUND

3.      On August 14, 2018, the Court entered an order confirming the Plan for the Debtors' bankruptcy estates. Under the terms of the Plan and corresponding documents, the Trust was given the right, authority, and discretion to pursue Litigation Claims (as defined in the Plan), specifically reserving all rights to investigate and prosecute causes of action against,

among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan), and any persons related to claims and Causes of Action related to or arising out of Debtor Paperweight Development Corporation's employee stock ownership plan (the "ESOP") that are not Direct ESOP Claims (as defined in the Plan). The Plan's effective date was August 24, 2018.

4.      In accordance with the Plan and pursuant to the Liquidating Trust Agreement (as defined in the Plan), the Appvion Liquidating Trust was established with the authority to obtain, investigate and prosecute the Litigation Claims vested in the Liquidating Trust. Alan D. Halperin and Eugene I. Davis were appointed as the Co-Trustees of the Appvion Liquidating Trust.

5.      On November 30, 2018, the Co-Trustees filed the Complaint [Adv. D.I. 6] (the "Complaint") commencing the above-captioned adversary proceeding.

6.      On January 29, 2019, the Defendants filed Motions to Dismiss the Complaint. [Adv. D.I. 36, 38, 41].

7.      On February 19, 2019, the Co-Trustees filed the First Amended Complaint [Adv. D.I. 59] (the "FAC") pursuant to Rule 15 of the Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure. By the FAC, the Co-Trustees assert causes of action for breaches of fiduciary duty against certain former directors and officers/employees of the Debtors, as well as against Argent Trust Company (stemming from its service as trustee of the ESOP) and against Stout Risius Ross affiliated entities for aiding and abetting breaches of fiduciary duties. The FAC also pleads causes of action related to unlawful corporate dividends. The FAC also pleads causes of action under 11 U.S.C. §§ 544, 547, 548 and 550, as well as under applicable state law with respect to certain transfers made by the Debtors.

8.    On March 19, 2019, the Defendants filed their Motions to Dismiss the FAC and the related memorandum of law in support of that motion to dismiss. *See* Adv. D.I. 65, 66, 67, 68, 69, 70.

9.    On April 16, 2019, the Co-Trustees filed their Memorandum of Law In Opposition to Defendants' Motions to Dismiss. *See* Adv. D.I. 77.

10.    On May 7, 2019, the Defendants filed their reply briefs in support of their motions to dismiss the FAC. *See* Adv. D.I. 80, 81, 82.

11.    On May 29, 2019, the Co-Trustees filed a stipulation and proposed order amongst the parties concerning the filing of the SAC, the filing of the SAC under seal, and the completion of briefing with respect to Defendants' Motions to Dismiss. *See* Adv. D.I. 96.

12.    On June 3, 2019, the Co-Trustees filed a joint stipulation of dismissal by and between Plaintiff and Mr. Gilligan. *See* Adv. D.I. 97.

13.    On June 26, 2019, the Co-Trustees filed unredacted and redacted versions of the Second Amended Complaint [Adv. D.I. 100, 101] (the "SAC").

14.    Contemporaneously with the filing of the Motion to Seal, the Co-Trustees filed a motion, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, requesting entry of an order granting the Co-Trustees leave to file the Revised SAC to modify certain allegations resulting from the Co-Trustee's agreement to dismiss the above-captioned matter against Mr. Kevin Gilligan without prejudice pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. Additionally, the Co-Trustees requested Court authorization to remove Mr. Gilligan from the caption of the above-captioned matter moved pursuant to Local Rule 9004-1.

**RELIEF REQUESTED**

15.    By this Motion to Seal, the Co-Trustees request authority to file the unredacted version of the Revised SAC (as well as the redline thereof) under seal and to file a publicly viewable version of the Revised SAC (as well as the redline thereof) with the sealed portions redacted. Additionally, the Co-Trustees seek permission to provide the unredacted version of the Revised SAC (as well as the redline thereof) to the Court, the Defendants and their counsel, Appvion Holding Corp. and its counsel, and any other party permitted to review "Confidential" information under a protective order later entered by this Court.

**BASIS FOR RELIEF[1]**

16.    While Bankruptcy Code section 107(a) contemplates public access to materials filed in connection with bankruptcy cases, Bankruptcy Code Section 107(b) provides an exception to the general rule. Under that section, "on request of a party in interest, the bankruptcy court shall . . . (1) protect an entity with respect to . . . confidential . . . commercial information." 11 U.S.C. § 107(b). Moreover, Bankruptcy Rule 9018 permits parties in interest to file a motion seeking to file documents under seal. *See* Fed. R. Bankr. P. 9018 ("On motion . . ., with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of . . . confidential commercial information . . . .").

17.    Additionally, Bankruptcy Code section 105(a) gives the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

18.    The unredacted Revised SAC contains, discusses, and references material non-public information relating to financial projections of the Debtors' Thermal and Carbonless

---

[1]    The basis for the relief requested herein is substantially identical to the basis for the relief previously sought and granted by the Court with respect to the Complaint, the FAC and the SAC. *See* Adv. D.I. 94, 95, 99.

businesses. Those financial projections were used by Stout and Argent in preparing a discounted cash flow analysis in connection with Stout and Argent's determination of the fair market value of Paperweight Development Corporation common stock as of June 30 and December 31 of each year. The last fair market value determination by Stout and Argent was as of June 30, 2017 (the "June 2017 FMV Determination"). The discounted cash flow analysis for each of the Carbonless and Thermal businesses contain earnings before interest, tax, depreciation and amortization projections for fiscal years ending 2017 through 2021. Additionally, the June 2017 FMV Determination also contains projected net sales and projected operating income for fiscal years ending 2017 through 2021.

19.      The Revised SAC also cites to and discusses Stout/Argent's opinions of the fair market value of PDC common stock dating back to June 2013, and financial results preceding that time frame.

20.      In preparing its biannual valuations, Stout purportedly relied on the Debtors' internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business; the Debtors' internally-prepared balance sheets; and on discussions with certain members of Debtors' senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

21.      Appvion Holding Corp., the purchaser under the 363 Sale Agreement (as defined in the Plan), has indicated that it believes that certain aspects of each of the Stout/Argent fair market value determinations addressed in the SAC and in the Revised SAC are confidential.

22.      In advance of the filling of what is now the FAC, counsel for the Co-Trustees provided an unredacted version of the FAC to Appvion Holding Corp. Appvion Holding Corp.,

6

through its counsel, had informed the undersigned counsel that it believed that only certain parts of the FAC should be filed under seal. While the Co-Trustees reserved their right to ultimately contest that designation, the Co-Trustees submit this present Motion to Seal so as to preserve the confidentiality of certain information previously designated by Appvion Holding Corp.

23.     The text that the Co-Trustees' request sealing treatment includes redactions consistent with the earlier redacted versions of the Complaint, the FAC and the SAC, filed on the Court's ECF system on December 3, 2018, February 19, 2019 and June 26, 2019, respectively. *See* Adv. D.I., 6, 59, and 101.

24.     Thus, the Co-Trustees request permission to file an unredacted copy of the Revised SAC under seal to preserve the claimed confidentiality of certain information contained in the Revised SAC.

25.     In connection with this Motion to Seal, the Co-Trustees have provided an unredacted copy of the Revised SAC to (i) the Court, and (ii) counsel of record for each Defendant. The Co-Trustees believe that, under the circumstances, such notice is sufficient and that no further notice need be given.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 434 of 632    Document 14-3

**CONCLUSION**

WHEREFORE, for the reasons stated above, the Co-Trustees respectfully request the entry of an order: (a) permitting the Co-Trustees to file certain parts of the Revised SAC (as well as the redline thereof) under seal and to file a publicly viewable version of the Revised SAC (as well as the redline thereof) with the sealed portions redacted; (b) permitting the Co-Trustees to provide the unredacted version of the Revised SAC (as well as the redline thereof) to the Court, the Defendants and their counsel, Appvion Holding Corp. and its counsel, and any other party permitted to review "Confidential" information under a protective order later entered by this Court; and (c) granting the Co-Trustees such further relief as is just and proper.

Dated: June 27, 2019

GRANT & EISENHOFER P.A.

*/s/ Vivek Upadhya*
Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: cmackintosh@gelaw.com
       vupadhya@gelaw.com

-and-

Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene
I. Davis, as Co-Trustees of the Appvion
Liquidating Trust*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955-MFW |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND
EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, PURSUANT TO 11 U.S.C. §§ 105(A) AND 107(B),
BANKRUPTCY RULE 9018, AND LOCAL RULE 9018-1 PERMITTING ALAN D.
HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED
<u>VERSION OF THE REVISED SECOND AMENDED COMPLAINT</u>**

This matter came before the Court upon the motion (the "<u>Motion to Seal</u>") of Plaintiff

Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of the Appvion

1

Liquidating Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the revised second amended complaint (the "Revised SAC"); and the Court having considered the Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that

1.      The Motion to Seal is GRANTED.

2.      The Co-Trustees are permitted to file the unredacted version of the Revised SAC (as well as the redline thereof) under seal and to file a publicly viewable version of the Revised SAC (as well as the redline thereof) with the sealed portions redacted.

3.      The Clerk of the Court shall keep the unredacted version of the Revised SAC segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.      The foregoing notwithstanding, access to the unredacted version of the Revised SAC while under seal shall be provided only to the Court, the Defendants and their counsel, Appvion Holding Corp. and its counsel, and any other party permitted to review "Confidential" information under a protective order later entered by this Court.

5.      Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

2

6.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation of this Order.

### CERTIFICATE OF SERVICE

I, Vivek Upadhya, hereby certify that on June 27, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.


/s/ Vivek Upadhya
Vivek Upadhya

18-50955

Dkt. # 104

FILED UNDER SEAL

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 102 and 103** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## **AFFIDAVIT OF SERVICE**

I, Meghan E. Leyh, being duly sworn deposes and says that she is over the age of eighteen, is an employee of Grant & Eisenhofer P.A., and is not a party to this action.

That on the 27th day of June, 2019, I electronically mailed out:

1.      Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. § 105(a), Bankruptcy Rule 7015(A)(2), and Local Rule

9004-1 Permitting Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, to File a Revised Second Amended Complaint and to Amend the Adversary Proceeding, Ex. A- Second Amended Complaint (filed under seal). Ex. B- Redacted Second Amended Complaint, Ex. C- Redline of the SAC (filed under seal), Ex D- Redline of the SAC Redacted, Ex. E Proposed Order and the Certificate of Service; and

2.    Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. §§ 105(a) and 107(b), Bankruptcy Rule 9018, and Local Rule 9018-1 Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, to File Under Seal the Unredacted Version of the Proposed Revised Second Amended Complaint, with the Proposed Order and the Certificate of Service on the following counsel of record:

| SAUL EWING ARNSTEIN & LEHR LLP | CHIPMAN BROWN CICERO & COLE, LLP |
|---|---|
| Mark Minuti (Delaware Bar No. 2659) | Mark L. Desgrosseilliers (Delaware Bar No. 4083) |
| 1201 North Market Street, Suite 2300 | |
| Wilmington, DE 19801 | Hercules Plaza |
| Telephone: 302-421-6840 | 1313 North Market Street, Suite 5400 |
| Email: Mark.Minuti@saul.com | Wilmington, Delaware 19801 |
| | Telephone: (302) 295-0191 |
| - and - | Email: desgross@chipmanbrown.com |
| | |
| **JENNER & BLOCK LLP** | -and- |
| Craig Martin (*pro hac vice* pending) | |
| David Jimenez-Ekman (*pro hac vice* pending) | **GROOM LAW GROUP** |
| Michael Graham(*pro hac vice* pending) | |
| Telephone: (312) 222-9350 | Kara Petteway Wheatley |
| Email: cmartin@jenner.com | Lars Golumbic, Esquire (admitted *pro hac vice*) |
| djimenez-ekman@jenner.com | GROOM LAW GROUP |
| mgraham@jenner.com | 1701 Pennsylvania Avenue, N.W. |
| | Washington, DC 20006-5811 |
| *Counsel for Mark R. Richards, Thomas J.* | Telephone: (202) 861-6615 |
| *Ferree, Tami L. Van Straten, Jeffrey J.* | Email: KWheatley@groom.com |
| *Fletcher, Kerry S. Arent, Stephen P. Carter,* | lgolumbic@groom.com |
| *Terry M. Murphy, Andrew F. Reardon, Kathi* | |
| *P. Seifert, Mark A. Suwyn, Carl J. Laurino,* | |
| *David A. Roberts, Kevin Gilligan* | |

|  | *Counsel for Defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC* |
|---|---|
| **MORRIS JAMES LLP**<br>Carl N. Kunz, III, Esq.<br>500 Delaware Avenue, Suite 1500<br>P.O. Box 2306<br>Wilmington, DE 19801<br>Telephone: (302) 888-6800<br>Email: ckunz@morrisjames.com<br><br>-and-<br><br>**KEATING MUETHING & KLEKAMP PLL**<br>Michael L. Scheier (*pro hac vice* pending)<br>Brian P. Muething (admitted *pro hac vice*)<br>Jacob Rhode (admitted *pro hac vice*)<br>One East 4th Street<br>Suite 1400<br>Cincinnati, OH 45202<br>Telephone: (513) 639-3814<br>Email: bmuething@KMKLAW.com<br><br>*Counsel for Argent Trust Company* |  |

**GRANT & EISENHOFER P.A.**

By: Meghan E. Leyh
Meghan E. Leyh
Paralegal

STATE OF DELAWARE  )
           S.S.:  )
NEW CASTLE COUNTY  )

Subscribed and sworn to (or affirmed) before me this 27th day of June, 2019

Pam Hererin
Notary Public

**PAMELA MARIE HEVERIN**
Notary Public - State of Delaware
My Commission Expires August 3, 2021

## <u>CERTIFICATE OF SERVICE</u>

  I, Vivek Upadhya, hereby certify that on June 27, 2019, a true and correct copy of the foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing System to all registered ECF users appearing in the case.


            */s/ Vivek Upadhya*
            Vivek Upadhya

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955-MFW |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, KEVIN GILLIGAN, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**ORDER GRANTING MOTION OF ALAN D. HALPERIN AND
EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, PURSUANT TO 11 U.S.C. §§ 105(A) AND 107(B),
BANKRUPTCY RULE 9018, AND LOCAL RULE 9018-1 PERMITTING ALAN D.
HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST, TO FILE UNDER SEAL THE UNREDACTED
<u>VERSION OF THE REVISED SECOND AMENDED COMPLAINT</u>**

This matter came before the Court upon the motion (the "<u>Motion to Seal</u>") of Plaintiff

Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "<u>Co-Trustees</u>") of the Appvion

1

Liquidating Trust, for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 107(b), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9018-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") permitting the Co-Trustees to file under seal the unredacted version of the revised second amended complaint (the "Revised SAC"); and the Court having considered the Motion to Seal; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion to Seal establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that

1.      The Motion to Seal is GRANTED.

2.      The Co-Trustees are permitted to file the unredacted version of the Revised SAC (as well as the redline thereof) under seal and to file a publicly viewable version of the Revised SAC (as well as the redline thereof) with the sealed portions redacted.

3.      The Clerk of the Court shall keep the unredacted version of the Revised SAC segregated and under seal pursuant to Local Rule 9018-1(b) until further order of this Court.

4.      The foregoing notwithstanding, access to the unredacted version of the Revised SAC while under seal shall be provided only to the Court, the Defendants and their counsel, Appvion Holding Corp. and its counsel, and any other party permitted to review "Confidential" information under a protective order later entered by this Court.

5.      Notwithstanding any applicable federal or local rule of procedure, the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

6.    This Court shall retain jurisdiction over any and all matters arising from or related to the implementation of this Order.

**Dated: July 2nd, 2019**
**Wilmington, Delaware**

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

18-50955

Dkt. # 107

FILED UNDER SEAL

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

**REVISED SECOND AMENDED COMPLAINT**

1

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "Co-Trustees") of the Appvion Liquidating Trust (the "Appvion Liquidating Trust") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.    This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "ESOP"), the former ultimate owner of the Debtors.

2.    The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("Appvion") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3.    Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.      This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.      These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.      The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7.      The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8.      In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9.      The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

4

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.    During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.    Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.    Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.    In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.    When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

7

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.     Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.     As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.    This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.    A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.    Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

9

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.     Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## **PARTIES**

21.     Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.     Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.     The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

---

[1]   *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

24.     Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.     Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.     Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee.

11

Ms. Van Straten resides in Appleton, Wisconsin.

27.    Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.    Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.    Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.    Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became

chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.    Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.    Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.    Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and

13

served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34. Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35. David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36. Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37. John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in

14

connection with any FMV Determination connected with any claim asserted herein.

38.    Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "Director Defendants."[2]

39.    Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "Officer/Employee Defendants."[3]

40.    Argent Trust Company ("Argent"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.    Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.    Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## NON-PARTIES

43.    George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

---

[2]    Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended Complaint, he remains defined as a "Director Defendant" as referenced herein.

15

44.    The Principal Financial Group ("The Principal"), acted as a record-keeper to handle the accounting related to the ESOP.

45.    Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.    Maureen Cosgrove is or was formerly an employee of Argent.

47.    Marc Hansberger is or was formerly an employee of Argent.

48.    Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.    Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.    Mark Shorthouse is or was formerly an employee of Argent.

51.    David Williams is or was formerly an employee of Argent.

52.    Phil Buchanan is or was formerly an employee of Argent.

53.    From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.    Cara Davis is or was formerly an employee of Stout.

55.    Robert S. Socol is or was formerly an employee of Stout.

56.    Aziz El Tahch is or was formerly an employee of Stout.

57.    From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June

---

[3] Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended

2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

## JURISDICTION AND VENUE

58.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.     Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS

### I.    OVERVIEW OF THE DEBTORS' BUSINESS

#### A.    DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY

61.     Prior to their bankruptcy filing on October 1, 2017 (the "Petition Date"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "Debtors"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.     In addition to its headquarters in Appleton, Wisconsin, Appvion had

_____

Complaint, he remains defined as a "Officer/Employee Defendants" as referenced herein.

manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.     Appvion's business was organized into two operating divisions: carbonless ("Carbonless" or the "Carbonless Business") and thermal ("Thermal" or the "Thermal Business"), referring to the type of paper produced by each division.

64.     The thermal paper segment developed and produced substrates for the transaction and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.     The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.     On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.     In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC

simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.    Prior to the Petition Date, PDC owned 100% of the common stock of Appvion. Prior to the Petition Date, Appvion only had one class of common stock.

69.    As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.    As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.    In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_Aug_4_2015.pdf    Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.    Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

19

### B.    THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.    PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

74.    PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.    Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.    Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.    Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.    Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.    APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.    On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.    EMPLOYEE OWNERSHIP AT APPVION

### A.    THE ESOP STRUCTURE

81.    Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.    Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.    The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.     Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.     When an ESOP participant retired, or otherwise terminated his or her employment with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.     The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.     For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.     Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.     Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.     According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, the appraiser must consider all facts considered relevant.… factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management, workforce, and facilities, relative to their competitors, may also be considered.

Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.     The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

**B.    ADMINISTRATION OF THE ESOP AND THE ESOP TRUST**

92.     Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.     On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.     Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.     Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the

Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.    The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.    Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on

24

September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.     Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its duties to the ESOP.

100.     Amongst Argent's duties to the ESOP was determining the FMV of the common stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP Trustee, since before 2013.

101.     The terms and scope of Stout's services were confirmed in writing at various times over the course of Stout's engagement by each ESOP Trustee.

102.     Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout Engagement Letter provided that Stout would provide certain financial advisory services to Reliance, solely in Reliance's capacity as ESOP Trustee.

103.     The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 collectively, the "Valuation Dates."). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the [ESOP Trustee]. We will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset…

104.     The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 473 of 632    Document 14-3

(MLB_01959) The June 2013 Stout Engagement Letter states as follows:

> In order for us to maximize the value of our work and to keep the project on schedule, It Is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.
>
> Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

> Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.
>
> ...
>
> We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to

26

FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945); Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.     Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

### Figure 2: Schedule of Payments by Appvion to Stout

| Payment Date | Payment Amount | Check # |
|---|---|---|
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.     In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.     In addition to engaging Stout to assist with the FMV Determination, Argent hired The Principal to serve as record-keeper to handle the accounting related to the ESOP, and to

27

ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

### C.   THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.    The biannual FMV Determination served several crucial functions, related both to the administration of the ESOP, and to the operation of the Debtors' businesses.  For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

    a.   determine the per-share price at which ESOP participants made contributions to the ESOP;

    b.   determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

    c.   estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

    d.   estimate the upcoming repurchase obligations under the ESOP; and

    e.   determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase

28

obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

29

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation, because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a

director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.    <u>Third</u>, the Debtors adopted a long-term incentive plan ("<u>LTIP</u>") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.    Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.    Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same

date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

126.    Prior to the Petition Date, the Debtors' primary sources of liquidity and capital resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization

32

Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.   OTHER INDEBTEDNESS AND OBLIGATIONS

131.   On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.   PENSION PLAN OBLIGATIONS

132.   Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

**Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)**

|  | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

F.    **INTERCOMPANY INDEBTEDNESS**

133.    As described more fully herein, all ESOP/PDC common share activities, including issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001, employee withdrawals were significantly larger than employee contributions.

134.    On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany Note"). *See* App000002.

135.    On November 20, 2013, an Intercompany Promissory Note Distribution and Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In connection therewith, Appvion purported to make a non-cash distribution to PDC in the aggregate amount of the Note and PDC acknowledged receipt of the distribution and further acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended January 2, 2016, at 43.

136.    Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board

34

(App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board (App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof. Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC

<u>Security Holders Agreement</u>") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.    The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.    In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.    The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.    On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "<u>Appvion Security Holders Agreement</u>") which sets forth the manner in which the members of the Appvion Board

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 484 of 632    Document 14-3

are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

## B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The

37

PDC Board and/or the Appvion Board's compensation committee(s) also had authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152.    Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153.    Specifically, the per-share grant value of RSU awards granted in the preceding

fiscal year was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.    The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.    The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.    Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

C.    EXECUTIVE COMPENSATION BETWEEN 2013 – 2016

1.    *Richards*

157.    Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

**Figure 4: Richards' Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $ - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

### 2.    Gilligan

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

**Figure 5: Gilligan's Compensation Between 2014 - 2016**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $ - | $465 |
| Non-equity incentive plan compensation | $82,707 | $ - | $ - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 3. *Ferree*

160.    Ferree's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

#### Figure 6: Ferree's Compensation Between 2013 - 2016

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $ - | $ - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 4. *Van Straten*

161.    Van Straten's executive compensation was heavily dependent on Stout's valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

41

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $    - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $    - | $    - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 5.    *Arent*

162.    Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $    - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

163.    The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

**D.    NON-EMPLOYEE DIRECTOR COMPENSATION**

164.    Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.    Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.    Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.    On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for

43

the year ended December 28, 2013, at 110.

E.    ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING

168.    Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

169.    The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

170.    Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

171.    Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and other matters related to the Debtors.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 492 of 632    Document 14-3

172.    From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

**Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants**

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|---|---|---|---|---|---|---|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion PDC | Ad Hoc Committee | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |
| Appvion | N/A | 8/12/15 | Appleton, WI | | Steve Martin | App010293 |

| | | | | | Marc Hansberger | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15–11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.   THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.    The financial demise of Appvion and the abject failure of the Debtors' management to create reliable, non-inflated, financial projections was well known to the members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC Board were updated by Management on a regular basis, and actively participated in the vetting

process of these projections through board activities as well as through the activities of the Audit Committee.

174.    Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.    When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.    From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.    In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments…" App006037.  The Audit Committee also cautioned that the highly

47

leveraged capital structure presented covenant compliance risk. App006037.

178.    In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.    In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.    From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance against the annual incentive plan targets, executive incentive plan, liquidity,

48

biannual share prices as calculated by Stout.

## VI. STOUT'S FMV DETERMINATIONS

### A. THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181.    Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182.    Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183.    Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated

projections by knowingly manipulating key aspects of its valuations.

184. Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185. Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186. Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

50

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

> 1. The PDC's financial statements filed with the SEC;
>
> 2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 3. The PDC's internally-prepared balance sheets;
>
> 4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;
>
> 5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;
>
> 6. Publicly available information and financial data on publicly traded companies considered similar to the Debtors from an investment risk/return perspective; and

7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70

per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "June 2016 FMV"), at 53.

197.    As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "Dec. 2016 FMV"), at 39.

198.    As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "June 2017 FMV"), at 39.

199.    Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

### Figure 10: FMV Determinations of the PDC Common Stock Price



Appvion Historical Stock Price: November 2001 - June 2017

June 2017 FMV, at 38.

C.    **Stout's Determination of the Fair Market Value of the PDC Common Stock Shares Was Susceptible to Manipulation, and Was Wildly Inflated and Flawed.**

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other financial and market data are pronounced for the period June 2013 through June 2017. During that period the FMV of PDC's common stock as calculated by Stout is higher than other available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality.    Stout was fully aware that the projections it received from management were unjustifiably inflated and unreliable.    Instead of pressing management for more reliable projections on which to base its FMV Determinations in limited instances, Stout attempted to compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking various aspects of its valuation methodologies. These adjustments were inconsistent between different FMV Determinations, and often lacked any business justification.  Many of the errors in the FMV Determinations detailed below are therefore not the result of mere academic disagreement over the most prudent way to value the Debtors' business, but rather adjustments that Stout knowingly made to compensate for the unreliable financial projections it was provided and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants'

54

breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

### 1.    The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of**
**Second Lien Notes and Debt Obligation Used by Stout**
**($ in thousands)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($ 3,018) | ($2,770) | ($ 2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.   Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.   Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the

56

quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013, at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed the Debtors' underfunded pension liability and whether Stout should include this liability in its FMV Determinations. Upon information and belief, Ferree was tasked with discussion the underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation obligations, workers compensation obligations, accrued insurance obligations, accrued taxes obligations, due on accounts receivable securitization, and other obligations resulted in the

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July

2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec.

2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5,

2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the

quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47;

PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

214.    Figure 12 below reflects these other omitted liabilities.

### Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations
### ($ in thousands)

| | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the

quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56;

PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended

January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-

K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2,

2017, at 8.

215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under

applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### 2.    The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ██████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal

59

Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ████████ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

**Figure 13: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ████ | ████ | ████ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ████████ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately ████████████ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

**Figure 14: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ████ | ████ | ████ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ████ | ████ | ████ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

60

223.    In spite of the actual Thermal EBITDA being approximately █████████ ████████ management's projections, management only reduced its Thermal EBITDA projections by ██████████ for the next fiscal year, and by no more than ███████████ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.

224.    Management's projections for the June 2016 FMV Determination also failed to respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of █ ██████████ for the twelve months ended June 30, 2016, well below the projected amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV, at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as follows in Figure 15:

### Figure 15: FMV Determinations - Thermal EBITDA Projections
### ($ in thousands)



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | ███ | | | | | | | | | |
| June 2012 FMV | ███ | ███ | ███ | ███ | ███ | | | | | |
| Dec. 2012 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| June 2013 FMV | | ███ | ███ | ███ | ███ | ███ | | | | |
| Dec. 2013 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| June 2014 FMV | | | ███ | ███ | ███ | ███ | ███ | | | |
| Dec. 2014 FMV | | | | ███ | ███ | ███ | ███ | ███ | | |
| June 2015 FMV | | | | ███ | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2015 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| June 2016 FMV | | | | | ███ | ███ | ███ | ███ | ███ | |
| Dec. 2016 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |
| June 2017 FMV | | | | | | ███ | ███ | ███ | ███ | ███ |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV, at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 16:

**Figure 16: FMV Determinations – Carbonless EBITDA Projections**

| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Actual** | ██ | ██ | ██ | ██ | ██ | | | | | |
| **June 2012 FMV** | ██ | ██ | ██ | ██ | ██ | | | | | |
| **Dec. 2012 FMV** | | ██ | ██ | ██ | ██ | ██ | | | | |
| **June 2013 FMV** | | ██ | ██ | ██ | ██ | ██ | | | | |
| **Dec. 2013 FMV** | | | ██ | ██ | ██ | ██ | ██ | | | |
| **June 2014 FMV** | | | ██ | ██ | ██ | ██ | ██ | | | |
| **Dec. 2014 FMV** | | | | ██ | ██ | ██ | ██ | ██ | | |
| **June 2015 FMV** | | | | ██ | ██ | ██ | ██ | ██ | ██ | |
| **Dec. 2015 FMV** | | | | | ██ | ██ | ██ | ██ | ██ | |
| **June 2016 FMV** | | | | | ██ | ██ | ██ | ██ | ██ | |
| **Dec. 2016 FMV** | | | | | | ██ | ██ | ██ | ██ | ██ |
| **June 2017 FMV** | | | | | | ██ | ██ | ██ | ██ | ██ |

*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV, at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015 FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA Projections at various FMV Dates is as follows in Figure 17:

**Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)**

| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Actual Total (Excluding Encapsys)** | | | | | | | | | | |
| **June 2012 FMV** | ██ | ██ | ██ | ██ | ██ | | | | | |
| **Dec. 2012 FMV** | | ██ | ██ | ██ | ██ | ██ | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **June 2013 FMV** | | █ | █ | █ | █ | | | |
| **Dec. 2013** | | █ | █ | █ | █ | █ | | |
| **June 2014 FMV** | | █ | █ | █ | █ | | | |
| **Dec. 2014 FMV** | | | █ | █ | █ | █ | █ | |
| **June 2015 FMV** | | | █ | █ | █ | █ | █ | █ |
| **Dec. 2015 FMV** | | | | █ | █ | █ | █ | █ |
| **June 2016 FMV** | | | | █ | █ | █ | █ | █ |
| **Dec. 2016 FMV** | | | | | █ | █ | █ | █ |
| **June 2017 FMV** | | | | | █ | █ | █ | █ |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3.    The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

> is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

> Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management,

Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.    In order to select companies for Stout's Guideline Company Method analysis, Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.    Stout admitted that "...there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served..." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.    Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June

2017 FMV, at 72.

233.     The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.     For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.     Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.     The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.     Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless

Businesses separately.

238.    In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015 FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.    In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.    A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36;

Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id.* Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

244.    In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.    In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App011563.

246.    For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. <u>First</u>, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.    <u>Second</u>, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the

December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.    Third, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.    In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.    In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is

69

> appropriate to apply a premium to the guideline company multiples
> to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

255. However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256. Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257. Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258. The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259. In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year

71

EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

4. **The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations**

260. The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261. For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

262.   Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.   Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.   Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.   Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were

below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.    In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

### 5.    Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method

267.    The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

a.        **The Company-Specific Risk Premium**

268.    Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 18: Company-Specific Risk Premium Used By Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 0.0% | 2.0% | 0.0% | 0.0% | 1.0% | 2.0% | 0.0% | 0.0% |
| Thermal | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 4.0% | 4.0% | 4.0% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

270.    For example, the Company-Specific Risk Premium used by Stout for the June 2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless Business during that period remained virtually unchanged from FMV Determination Date to FMV Determination Date. *See* Figure 19 below.

**Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)**

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | -- | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr. Aguilar of Stout stated that, with *emphasis added*:

> Carbonless continue to decline. There has been somewhat of an offset by the sales of specialty products that are higher margin. They have made some progress on sales of security paper which is use[d] for documents such as birth certificates (very small market). The company expects sales to be relatively flat. ***Over the long term sales are expected to decline. The projections are the same as the projection provided for year end with the exception of 2016***.

273.    In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.    For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF Valuation.

275.    At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with *emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.    In spite of Mr. Aguilar's observation that the Thermal Business year ended December 31, 2016 EBITDA projections would be back up from the projections used at the December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.    Even G. Grant Lyon, then the sole member of the ESOP Administrative Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.

> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017 FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV Determination to account for the fact that the projections for future years' EBITDA had been lowered from the levels used in the June 2016 FMV Determination. Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ▮▮▮▮ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Thermal:
> – Over the last three years, Thermal's adjusted EBITDA declined at an annualized rate of ▮▮▮▮. In comparison, the Company is projecting annualized adjusted EBITDA growth of ▮▮▮▮ for Thermal between the LTM period and fiscal 2021. There is increased risk associated with the Company's projections given that projected earnings growth is above historical levels.
> – Thermal's adjusted EBITDA projection for fiscal 2017 is ▮▮▮▮ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ▮▮▮▮ lower

than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is projecting annualized adjusted EBITDA growth of ███████ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ██████ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

### b.    The Cost of Debt

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average

Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

| | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |
| Thermal | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), …." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December

31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21 below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0X | 5.0X | 5.0X | 5.5X | 5.5X | 5.5X | 6.5X | 7.0X |
| Thermal | 6.0X | 7.5X | 7.5X | 5.5X | 5.5X | 5.5X | 5.5X | 5.5X |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect

the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV, at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288.    In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289.    Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

### D.    THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON

290.    The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291.    During the time period where valuation methodology decisions were employed by

Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.    In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr. Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.    In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.    Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| **TOTAL** | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

**Figure 24: Ferree 2017 SERP Distributions**

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| **TOTAL** | **$177,874** |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues

from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

### E.    COMPENSATION AND BENEFITS

#### 1.    The Officer/Employee Defendants and Director Defendants' Compensation

299.    As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300.    The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301.    In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302.    Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting

date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.    The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.    The Debtors' Pension Plan

307.    The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.    Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "<u>PIUMPF</u>"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.    Ownership of PDC Common Stock

309.    Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

**<u>Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013</u>**

| | | | | Total | | | |
|---|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | Total LTIP Units | Total Canadian SAR Units | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|---|
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | Total LTIP Units | Total Canadian SAR Units | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|---|
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | Total LTIP Units | Total Canadian SAR Units | Fully Diluted Ownership | Percentage |
|---|---|---|---|---|---|---|---|
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| Total | 6,934,029 | 370,000 | 110,918 | 2,248,780 | 300 | 9,664,027 | 100.0% |

June 2015 FMV, at 7.

88

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |
| [a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money. | | | | | | |

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

| | Paperweight Equity Ownership Schedule | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| Total | 6,262,701 | 248,650 | 139,570 | 911,034 | 7,561,955 | 100.0% |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

| | Paperweight Equity Ownership Schedule | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| Total | 5,932,120 | 334,797 | 145,505 | 1,223,759 | 7,636,181 | 100.0% |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

F.    **APPVION'S CREDIT RATING HISTORY**

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

G.    SUMMARY OF ESOP TRANSACTIONS

318.    At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.    Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.    Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.    The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.    The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

91

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**



*See* June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value ($ in thousands, except share price)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ███ | ███ | ███ |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ███ | ███ | ███ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ███ | ███ | ███ |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ███ | ███ | ███ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 |  |  |  |  |  |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ███ | ███ | ███ |

*See* Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at 35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36,

39-40.

324.    Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.    From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.    For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.    For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.    For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.    For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.    For the six months leading up to December 2015, contributions to the ESOP

totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

### H.    APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

**Figure 36: Historical Trading Prices**



**Figure 37: Historical Trading Prices (% Changes)**



I.   THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING
     FINANCIAL POSITION AND INSOLVENCY

335.   The markets took note of the Debtors' declining financial condition. In November

2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "BVAL") at a discount

to par. *See* Figure 38 below.

**Figure 38: BVAL of the Second Lien Notes in November 2013**
**($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | | (Deficit) | |
|---|---|---|---|---|---|---|---|---|
| 11/29/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |
| 11/27/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/26/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/25/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/22/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/21/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/20/2013 | $250,000 | | 97.875% | | $ | 244,688 | $ | (5,313) |
| 11/19/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/18/2013 | $250,000 | | 97.688% | | $ | 244,220 | $ | (5,780) |
| 11/15/2013 | $250,000 | | 97.938% | | $ | 244,845 | $ | (5,155) |
| 11/14/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |

*Source*: Bloomberg.

336.   Then, again, in the second half of 2014, the Second Lien Notes were valued by

BVAL from par (100% of the principal amount) to approximately 68% of par by December 31,

2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014

reflected the market's belief that the value of the debt was materially impaired and that Appvion

was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the

conclusion that Appvion was insolvent through the Petition Date.

337.   The markets fundamentally disagreed with Stout concerning Stout's the value of

PDC common stock.

338.   As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or

at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.    As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 |  | 98.6880% |  | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 |  | 68.8756% |  | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - |  | (n/a) |  | $   - | $   - |
| TOTAL | $ 596,835 |  |  |  | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.    As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 | | 93.688% | | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 64.938% | | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - | | (n/a) | | $   - | $   - |
| TOTAL | $ 597,748 | | | | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,308 | | 93.50% | | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 | | 100% | | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 | | (n/a) | | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 | | 40.125% | | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - | | (n/a) | | $   - | $   - |
| TOTAL | $ 425,918 | | | | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2016.

### Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 |  | 95.5% |  | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 |  | 100% |  | $ 27,000 | $   - |
| Ohio Loan | $ 2,238 |  | (n/a) |  | $ 2,238 | $   - |
| Second Lien Notes | $ 250,000 |  | 57.56% |  | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   300 |  | (n/a) |  | $ 300 | $   - |
| TOTAL | $ 443,838 |  |  |  | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of December 31, 2016.

### Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 |  | 97.69% |  | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 |  | 100% |  | $ 31,920 | $   - |
| Ohio Loan | $ 1,443 |  | (n/a) |  | $ 1,443 | $   - |
| Second Lien Notes | $ 250,000 |  | 57.00% |  | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   100 |  | (n/a) |  | $ 100 | $   - |
| TOTAL | $ 447,035 |  |  |  | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of June 30, 2017.

**Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)**

| | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 | | 97.38% | | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 | | 100% | | $ 19,500 | $   - |
| Ohio Loan | $  626 | | (n/a) | | $ 626 | $   - |
| Second Lien Notes | $ 250,000 | | 52.69% | | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $    - | | (n/a) | | $   - | $   - |
| TOTAL | $ 454,426 | | | | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was

insolvent. The market, per the trading prices of the debt, did not believe that the value of the

company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents)

is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns

Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

**J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT
UNDER THE BALANCE-SHEET TEST**

346.    The book value of the Debtors' liabilities exceeded the book value of their assets

since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book

Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

| | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

### K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST

347.    The Debtors were insolvent on a cash-flow basis at various points in time since 2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business.

*See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII.    THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the

December 2014 FMV, as no such motion was made. *Id.*

351.    On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id.* The ESOP Committee members asked questions regarding the June 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352.    On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id.* The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id.*

353.    On January 15, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the

December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.    On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.    On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

356.    On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout.

*Id.*

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id.*

## VIII.    THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on

105

May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of

Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.    The Plan of Liquidation defines "Preserved D&O Claims" as:

any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; provided, however, that the Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.    The Plan of Liquidation defines "Released D&O" to mean:

any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.    The Plan of Liquidation defines "Released D&O Claims" to mean "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.    The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.    The Plan of Liquidation Provides that following the Effective Date, the Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally

permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "Effective Date") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

**IX.    THE** DIRECTOR DEFENDANTS **AND THE** OFFICER/EMPLOYEE DEFENDANTS **ARE NOT RELEASED D&OS UNDER THE PLAN OF LIQUIDATION.**

377.    Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.    Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.    Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.    Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.    Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.    Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.    Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.    Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.    Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.    Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.    Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.    Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.    Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date.

**X.    NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS**

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors'

bankruptcy counsel, DLA Piper LLP (US), with a  letter detailing the existence of the claims and

causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims

existed against the current and former directors and officers of Appvion under theories of

breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee

wrote that the Creditors' Committee "intends to hold the current and former directors and

officers of the Debtors accountable for their actions."

## XI.    CAUSES OF ACTION

### <u>COUNT I</u>
**(Breach of Fiduciary Duties of Care and Loyalty Against The** Officer/Employee Defendants
**and the** Director Defendants**)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs

as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their

respective capacities as directors, executive officers, and/or employees of the Debtors, each

individually owed the Debtors fiduciary duties of care and loyalty under applicable state

corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock

in order to further their own individual self-interest, the Director Defendants and the

Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of

PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached

the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction

with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their

individual financial interests. Because each Director Defendant and Officer/Employee Defendant

110

stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the selection of companies for use in Stout's Guideline Companies Method analysis. In these and in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated

inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

<u>**COUNT II**</u>
**(Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)**

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013,

Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

## <u>COUNT III</u>
### (Breach of Fiduciary Duty of Care Against Richards, Ferree, Van Straten, Arent, and Fletcher)

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions made by ESOP participants. Further, distributions had significantly outstripped contributions in the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany

113

Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

<u>**COUNT IV**</u>
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

114

## COUNT V

**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)**

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VI

**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)**

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 563 of 632    Document 14-3

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

418.    Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be

116

determined at trial.

## COUNT VII

### (Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)

419.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422.    During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423.    The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424.    The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

426.    Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT VIII

117

**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

427.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.    From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.    From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal

dividend.

### COUNT IX
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)**

436.   The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.   Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.   The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.   At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.   At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C.§ 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.   In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.   The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified Distributions were made.

443.   The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.   As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more

119

than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.    Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.    In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

## COUNT X
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)**

447.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.    Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "July 2017 Stout Payment").

449.    Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "Stout Preference Payments").

450.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Stout Preference Payments occurred.

451.    The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

120

452.    At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453.    In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454.    The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455.    The Stout Preference Payments were made while the Debtors were insolvent.

456.    As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457.    Stout had reasonable cause to believe that the Debtors were insolvent.

458.    In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## <u>COUNT XI</u>
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

459.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

460.    Stout received payment in Figure 2 above totaling $522,229.71 (the "<u>Stout Transfers</u>") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the

121

June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

<u>**COUNT XII**</u>
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under
6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "<u>Argent Preference Payments</u>"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "<u>Argent Transfers</u>"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.    The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.    At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.    In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

474.    The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.    The Argent Preference Payments were made while the Debtors were insolvent.

476.    As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.    Argent had reasonable cause to believe that the Debtors were insolvent.

478.    In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

## COUNT XIII
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.    Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.    At the time of the Argent Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be

124

beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

## COUNT XIV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)**

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

**Figure 46: Siefert Board Fee Payments**

| Payment | Payment Amount |
|---------|----------------|

| Date | | |
|---|---|---|
| 12/16/2016 | $ | 15,625 |
| 3/17/2017 | $ | 15,625 |
| 7/3/2017 | $ | 15,625 |
| 9/26/2017 | $ | 15,625 |
| 9/28/2017 | $ | 15,625 |
| TOTAL | $ | 78,125 |

489. Ms. Siefert received board fee payments as set forth in Figure 46.

490. The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492. The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493. At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494. In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495. The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496. The Siefert Board Fee Payments were made while the Debtors were insolvent.

497. As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

126

Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 13,750 |
| 3/17/2017 | $ 17,500 |
| 7/3/2017 | $ 17,500 |
| 9/26/2017 | $ 17,500 |
| 9/28/2017 | $ 17,500 |
| **TOTAL** | **$ 83,750** |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

127

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn Board Fee Payments to the Appvion Liquidating Trust.

Case 1:19-cv-01561-WCG    Filed 11/19/19    Page 576 of 632    Document 14-3

## COUNT XVI
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)**

513.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

514.    In addition to the compensation otherwise addressed herein, Mr. Murphy received board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $          25,000 |
| 3/17/2017 | $          25,000 |
| 7/3/2017 | $          25,000 |
| 9/26/2017 | $          25,000 |
| 9/28/2017 | $          25,000 |
| **TOTAL** | **$         125,000** |

515.    Mr. Murphy received board fee payments as set forth in Figure 48.

516.    The Murphy Board Fee Payments include $55,000 for non-employee director remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Murphy Board Fee Payments occurred.

518.    The Murphy Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

519.    At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

129

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

### COUNT XVII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)**

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "Laurino Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

130

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        13,750 |
| 3/17/2017 | $        13,750 |
| 7/3/2017 | $        13,750 |
| 9/26/2017 | $        13,750 |
| 9/28/2017 | $        13,750 |
| TOTAL | $        68,750 |

528.    Mr. Laurino received board fee payments as set forth in Figure 49.

529.    The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.    The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.    At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.    The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.    The Laurino Board Fee Payments were made while the Debtors were insolvent.

536.    As a result of the Laurino Board Fee Payments, Mr. Laurino received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

131

Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)**

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 13,750 |
| 3/17/2017 | $ 13,750 |
| 7/3/2017 | $ 13,750 |
| 9/26/2017 | $ 13,750 |
| 9/28/2017 | $ 13,750 |
| TOTAL | $ 68,750 |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director remuneration.

543.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

132

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.    The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.    At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.    The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.    The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.    As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.    Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.    In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court

enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l) On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n) On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o) On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p) On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q) On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r) On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

135

(s)  awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t)  awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u)  awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: June 26, 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (admitted *pro hac* vice)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

## <u>CERTIFICATE OF SERVICE</u>

I, Vivek Upadhya, hereby certify that on July 2, 2019, a true and correct copy of the

foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing

System to all registered ECF users appearing in the case.

*/s/ Vivek Upadhya*         
Vivek Upadhya

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.*, | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | |
| | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 6, 59, 97, 100, 101** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## ORDER GRANTING MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, FOR LEAVE TO FILE A REVISED SECOND AMENDED COMPLAINT AND TO AMEND THE ADVERSARY PROCEEDING CAPTION

This matter coming before the Court on the Motion for Leave to Amend the Second

Amended Complaint and to amend the Adversary Proceeding caption (the "Motion") of

Plaintiffs Alan D. Halperin and Eugene I. Davis, as Co-Trustees (the "Co-Trustees") of the

Appvion Liquidating Trust, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, made

applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure and pursuant to Local

- 3 -

Rule 9004-1; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing (if any) on the Motion and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED:

1. The Motion is granted.

2. The Co-Trustees are authorized to file the Revised Second Amended Complaint attached as **Exhibit A** to the Motion.

3. The caption in the above-captioned Adversary Proceeding is hereby changed to remove Kevin Gilligan. Plaintiff need not amend the Summons or any of the pleadings previously filed in this adversary proceeding to amend the caption.

4. The Co-Trustees are authorized to take all steps necessary or appropriate to carry out this Order.

5. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**Dated: July 22nd, 2019**
**Wilmington, Delaware**

**MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | **Related Docket Nos. 65-70, 80-82, 84, 102, 103** |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## STIPULATION AND [PROPOSED] ORDER REGARDING MOTION OF ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, CONCERNING THE COMPLETION OF BRIEFING WITH RESPECT TO DEFENDANTS' MOTIONS TO DISMISS

Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust

("**Plaintiff**"), on the one hand, and Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten,

Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon,

Kathi P. Seifert, Mark A. Suwyn, Carl J. Laurino, David A. Roberts (collectively, the "**D&O**

**Defendants**,"), Stout Risius Ross, Inc., and Stout Risius Ross, LLC (collectively, "**Stout**"), and Argent Trust Company ("**Argent**," and together with Plaintiff, the "**Parties**"), on the other hand, through their respective undersigned counsel, hereby stipulate and agree as follows:

1.      This Stipulation memorializes certain agreements of the Parties following the filing of (i) *Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. §§ 105(a), Bankruptcy Rule 7015(A)(2), and Local Rule 9004-1 Permitting Alan D.  Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, to File A Revised Second Amended Complaint and to Amend the Adversary Proceeding Caption* [Adv. D.I. 102] (the "**Motion to File Revised Second Amended Complaint**") and (ii) *Motion of Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust, Pursuant to 11 U.S.C. §§ 105(a) and 107(b), Bankruptcy Rule 9018, and Local Rule 9018-1 Permitting Alan Halperin and Eugene Davis, as Co-Trustees of the Appvion Liquidating Trust, to File Under Seal the Unredacted Version  of the Proposed  Revised Second Amended Complaint,* ("**Motion for Leave to File the Revised Second Amended Complaint Under Seal**") [Adv. D.I. 103].

2.      The Defendants stipulate that in light of the filing of the Revised Second Amended Complaint, the Defendants prefer to stand on their current motions to dismiss and related pleadings [Adv. D.I. 65-70, 80-82, 84] concerning the First Amended Complaint, and those motions and related filings shall have equal applicability to the Revised Second Amended Complaint.

3.      The Plaintiff agrees that in light of the Defendants' stipulation to stand on their current motions to dismiss and related filings related to the First Amended Complaint as if those motions and related filings have equal applicability to the Revised Second Amended Complaint,

stands on its Opposition to Defendants' motions to dismiss [Adv. D.I. 77] with respect to all Counts except as to Argent's motion to dismiss and reply as to Count XII of the First Amended Complaint. Plaintiff continues to believe that the Second Amended Complaint, formerly filed added new allegations that moot certain aspects of Argent's motion to dismiss Count XII.

4.      Subject to the foregoing, the Parties believe that briefing for the Defendants' motions to dismiss remains complete, and the Parties agree that no further briefing or motion practice is required at this time.

5.      Except as specifically set forth herein, all rights, claims, and defenses of the Parties are fully preserved.

Dated: July 24, 2019

**GRANT & EISENHOFER P.A.**

*/s/  Vivek Upadhya*
Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
123 Justison Street
Wilmington, DE 19801
Telephone: 302-622-7000
Email: cmackintosh@gelaw.com
        vupadhya@gelaw.com

- and-

Gordon Z. Novod (admitted *pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Mark Minuti*
Mark Minuti (DE Bar No. 2659)
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: 302-421-6840
Email: Mark.Minuti@saul.com

- and -

**JENNER & BLOCK LLP**
Craig Martin (admitted *pro hac vice*)
David Jimenez-Ekman (admitted *pro hac vice*)
Michael Graham (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Email: cmartin@jenner.com
        djimenez-ekman@jenner.com
        mgraham@jenner.com

*Counsel for Mark R. Richards, Thomas J. Ferree, Tami L. Van Straten, Jeffrey J. Fletcher, Kerry S. Arent, Stephen P. Carter, Terry M. Murphy, Andrew F. Reardon, Kathi*

3

*P. Seifert, Mark A. Suwyn, Carl J. Laurino,*
*David A. Roberts, Kevin Gilligan*

**CHIPMAN BROWN CICERO & COLE,**
**LLP**

*/s/ Mark L. Desgrosseiliers*
Mark L. Desgrosseilliers (DE Bar No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
Telephone: (302) 295-0191
Email: desgross@chipmanbrown.com

-and-

**GROOM LAW GROUP**

Lars Golumbic, Esquire (admitted *pro hac vice*)
GROOM LAW GROUP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5811
Telephone: (202) 861-6615
Email: lgolumbic@groom.com

*Counsel for Defendants Stout Risius Ross, Inc.*
*and Stout Risius Ross, LLC*

**MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (DE Bar No. 3201)
500 Delaware Street, Suite 1500
Wilmington, DE  19801-1494
Telephone: (302) 888-6800
Facsimile:  (302) 571-1750
Email: ckunz@morrisjames.com

-and-

**KEATING MUETHING & KLEKAMP**
**PLL**
Michael L. Scheier (admitted *pro hac vice*)
Brian P. Muething (admitted *pro hac vice*)
Jacob Rhode (admitted *pro hac vice*)
One East 4th Street
Suite 1400
Cincinnati, OH 45202
Telephone: (513) 639-3814
Email:bmuething@KMKLAW.com
*Counsel for Argent Trust Company*

SO ORDERED:_____

4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OLDAPCO, INC., et al., | ) | |
| | ) | Case No. 17-12082 (MFW) |
| Debtors. | ) | Jointly Administered |
| ———————————————————— | ) | |
| | ) | |
| ALAN D. HALPERIN AND EUGENE I. | ) | |
| DAVIS, AS CO-TRUSTEES OF THE | ) | |
| APPVION LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. No. 18-50955 |
| MARK R. RICHARDS, THOMAS J. FERREE, | ) | |
| TAMI L. VAN STRATEN, JEFFREY J. | ) | |
| FLETCHER, KERRY S. ARENT, STEPHEN | ) | |
| P. CARTER, TERRY M. MURPHY, | ) | |
| ANDREW F. REARDON, KATHI P. | ) | |
| SEIFERT, MARK A. SUWYN, CARL J. | ) | |
| LAURINO, DAVID A. ROBERTS, | ) | |
| ARGENT TRUST COMPANY, STOUT RISIUS | ) | |
| ROSS, INC., STOUT RISIUS ROSS, LLC, | ) | |
| JOHN/JANE DOES 1-40 | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION[1]

Before the Court are the Motions of certain former Directors
and Officers of the Debtors (the "D&O Defendants"), Stout Risius
Ross, Inc., and Stout Risius Ross, LLC (collectively "the Stout
Parties"), and Argent Trust Company ("Argent") (collectively, the
"Defendants") to Dismiss the Revised Second Amended Complaint

---

[1]    The Court is not required to state findings of fact or
conclusions of law pursuant to Rule 7052 of the Federal Rules of
Bankruptcy Procedure.  Instead, the facts recited are those
averred in the Complaint, which must be accepted as true for the
purposes of this Motion.  Ashcroft v. Iqbal, 556 U.S. 662, 678
(2009).

(the "Complaint") filed by the Co-Trustees of the Appvion Liquidating Trust (the "Plaintiffs") which seeks, _inter alia_, damages for breach of fiduciary duties and the avoidance and recovery of preferential transfers and constructively fraudulent transfers. (Adv. D.I. 108.) The Defendants seek to dismiss Counts I through VIII for lack of subject matter jurisdiction or, alternatively, to transfer venue of those Counts to Wisconsin. The Defendants also seek dismissal of Counts IX through XVIII for failure to state a plausible claim for relief. For the reasons set forth below, the Court will (i) grant the motion to transfer venue of Counts I through VIII, (ii) grant the Motion to Dismiss Count X only to the extent it relies on state law, and (iii) deny the Motions to Dismiss in all other respects.

I.    BACKGROUND

In late 2001, the employees of Appvion, Inc. ("Appvion"), contributed approximately $107 million to an employee stock ownership plan ("ESOP") which used the funds to purchase all of the common stock of Paperweight Development Corporation ("PDC"). (Adv. D.I. 108 at ¶ 67.)[2] PDC then purchased Appvion from its parent company, Arjo Wiggins Appleton p.l.c. (_Id._) PDC was the ultimate parent company of the Debtors and entirely owned by the ESOP. (_Id._ at ¶¶ 68 & 73.)

---

[2]    Citations to the adversary docket are to "Adv. D.I." while citations to the main docket are to "D.I."

2

Through the tax-qualified ESOP, Appvion employees could defer compensation which was then used to purchase PDC common stock at a price determined by an independent appraiser twice a year.  (<u>Id.</u> at ¶ 81.)  Upon the retirement of a participant, the ESOP would re-purchase the participant's PDC common stock at the fair market value.  (<u>Id.</u> at ¶ 85.)

On May 28, 2014, Argent became the trustee of the ESOP. Argent was supervised by the ESOP administrative committee (the "ESOP Committee").  (<u>Id.</u> at ¶ 92.)  One of Argent's duties was to determine the fair market value ("FMV") of PDC common stock. (<u>Id.</u> at ¶ 100.)  Argent hired the Stout Parties to conduct the FMV determination.  (<u>Id.</u>)  Appvion paid the Stout Parties $522,229.71 for their services between 2014 and 2017.  (<u>Id.</u> at ¶ 109.)

Distributions from the ESOP to participants sometimes exceeded the ESOP's cash on hand, causing the ESOP to turn to PDC for an inter-company loan.  (<u>Id.</u> at ¶ 115.)  PDC borrowed funds from Appvion in order to satisfy the ESOP's repurchase obligations.  (<u>Id.</u> at ¶ 116.)  Appvion often borrowed from third party lenders to fund its loans to PDC.  (<u>Id.</u>)

On June 11, 2004, PDC gave Appvion a promissory note (the "Note") in the amount of $167,006,667.  (<u>Id.</u> at ¶ 134.)  On November 20, 2013, Appvion made a "non-cash distribution" to PDC in the amount of the Note, thereby cancelling the Note.  (<u>Id.</u> at ¶ 135.)  After the Note was cancelled, Appvion continued making

3

loans to PDC to fund ESOP distributions.  (_Id._ at ¶ 138.)

On October 1, 2017, Appvion and its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11.  (D.I. 1.)  On August 14, 2018, the Court confirmed the Debtors' Second Amended Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation.  (D.I. 970.)  Under the Plan, the Plaintiffs were given authority to pursue certain of the estate's causes of action.  (D.I. 836 at Art. VIII. B.)  The Plaintiffs commenced this adversary proceeding on November 30, 2018.  (Adv. D.I. 1.)  Counts I through III of the Complaint assert causes of action against the D&O Defendants for breach of fiduciary duties in: (1) causing the overvaluation of PDC common stock, (2) forgiving the Note for no consideration, and (3) extending loans to PDC with knowledge that they could never be repaid.  (Adv. D.I. 108 at ¶¶ 391-406.) Counts IV through VI assert causes of action against the ESOP Committee members, Argent, and the Stout Parties, respectively, for aiding and abetting the D&O Defendants in breaching their fiduciary duties.  (_Id._ at ¶¶ 407-418.)  Counts VII and VIII assert claims against certain D&O Defendants for payment of illegal dividends in violation of Delaware state law.  (_Id._ at ¶¶ 419-435.)  Counts IX through XVIII assert avoidance actions against certain D&O Defendants, the Stout Parties, and Argent. (_Id._ at ¶¶ 436-551.)

Four days before the adversary proceeding was filed, the

4

ESOP Administrative Committee had commenced an action in the United States District Court for the Eastern District of Wisconsin.  <u>Appvion Inc. Ret. Sav. and Emp. Stock Ownership Plan v. Buth et al.</u>, No. 1:18-cv-01861-WCG (E.D. Wis. filed Nov. 26, 2018).  That suit asserted similar causes of action as the Complaint and asserted a derivative cause of action for breach of fiduciary duty for the overvaluation of PDC common stock against many of the Defendants.  (<u>Id.</u>)

The Plaintiffs filed the First Amended Complaint on February 19, 2019.  (Adv. D.I. 59.)  On March 19, 2019, the D&O Defendants filed a Motion to Dismiss Counts I through IV, VII, and VIII, or alternatively to transfer venue of Counts I through VIII to the District Court for the Eastern District of Wisconsin. (Adv. D.I. 65, 66.)  Argent filed a Motion to Dismiss Counts V, XII, and XIII, and the Stout Parties filed a Motion to Dismiss Counts VI, X, XI, and XIII.  (Adv. D.I. 67, 68, 69, 70.)  Briefing on the motions was completed on May 15, 2019.  (Adv. D.I. 85.)

Subsequently, the Plaintiffs filed a Second Amended Complaint and a Revised Second Amended Complaint.[3]  (Adv. D.I. 108.)  The parties have stipulated that the Defendants' motions to dismiss have equal applicability to the Revised Second Amended Complaint.  (Adv. D.I. 96.)  The matter is now ripe for decision.

---

[3]     The revision simply removed one Defendant, Kevin Gilligan, from the suit.  (Adv. D.I. 108.)

5

## II.    JURISDICTION

The Court has jurisdiction over the Motions to Dismiss and transfer venue.  A bankruptcy court generally has authority to determine whether or not it has subject matter jurisdiction over a proceeding.  Liquidating Trustee v. Granite Fin. Solutions, Inc. (In re MPC Computers, LLC), 465 B.R. 384, 387 (Bankr. D. Del. 2012).  "The Court has the power to enter an order on a motion to dismiss even if the underlying matter is not core." Giuliano v. Genesis Fin. Solutions, Inc. (In re Axiant, LLC), Adv. No. 50526, 2012 WL 5614588, at *1 (Bankr. D. Del. 2012). Further, a motion to transfer venue is a core proceeding over which the Court has jurisdiction.  28 U.S.C. § 157(b).


## III.    DISCUSSION

### A.    Subject Matter Jurisdiction

The Defendants' motions ask the Court to dismiss Counts I through VIII for lack of subject matter jurisdiction.  The Plaintiffs oppose the motions, contending this Court has jurisdiction over those claims.

#### 1.    Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a federal court may dismiss a complaint for lack of subject matter jurisdiction.  The issue in a 12(b)(1) motion is the federal court's power to hear the case.  Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  The

6

issue can be raised in any manner, including on motion of one of the parties or by the court <u>sua</u> <u>sponte</u>.  Even if the parties consent to subject matter jurisdiction, the court may dismiss the action.  <u>In re Seven Fields Dev. Corp.</u>, 505 F.3d 237, 256 (3d Cir. 2007) ("neither the bankruptcy court nor the parties can write their own jurisdictional ticket") (internal citations omitted); <u>In re Wolverine Radio Co.</u>, 930 F.2d 1132, 1137–1138 (6th Cir.1991) (holding that "[p]arties can neither waive nor consent to subject matter jurisdiction," and "no action of the parties can confer subject-matter jurisdiction upon a federal court.").

In a Rule 12(b)(1) motion to dismiss, the party invoking the federal court's jurisdiction bears the burden of establishing that the court has jurisdiction.  <u>See, e.g.</u>, <u>Common Cause of Pa. v. Pa.</u>, 558 F.3d 249, 257 (3d Cir. 2009).

### a.   Core Jurisdiction

The bankruptcy court's jurisdiction is derived from 28 U.S.C. §§ 1334 and 157.  Upon referral from the District Court, the bankruptcy court has jurisdiction over "core" matters which include (1) cases under title 11, (2) proceedings arising under title 11, and (3) proceedings arising in a case under title 11. <u>In re Resorts Int'l, Inc.</u>, 372 F.3d 154, 162 (3d Cir. 2004). Core proceedings are matters that only arise under title 11.  <u>Id.</u> The bankruptcy court can enter a final judgment in core matters. 28 U.S.C. § 157(b)(1).

7

In this case, Counts IX through XVIII are core proceedings because they assert avoidance actions under chapter 5 of the Bankruptcy Code.  28 U.S.C. § 157(b)(2)(F).  Those actions do not arise except in the context of a bankruptcy proceeding. Therefore, the Court has jurisdiction to hear them and enter a final judgment.

b.    <u>Non-core Jurisdiction</u>

The bankruptcy court also has jurisdiction to hear non-core proceedings which are those that are "related to a case under title 11." <u>Resorts</u>, 372 F.3d at 162; 28 U.S.C. §§ 1334(b) & 157(a).  In non-core proceedings, the bankruptcy court may enter a final order only if the parties consent.  <u>See, e.g.</u>, <u>Wellness Int'l Network Ltd. v. Sharif</u>, 135 S. Ct. 1932 (2018).  Otherwise, the bankruptcy court may only hear the matter and "submit proposed findings of fact and conclusions of law to the district court" which will enter a final judgment after de novo review. <u>Id.</u> at 1940.  <u>See also</u> 28 U.S.C. § 157(c)(1).

In this case, the Court concludes that Counts I through VIII are non-core matters because they assert claims arising under state law which could be brought in the absence of a bankruptcy case.  Therefore, the Court could not enter a final judgment on those claims, absent consent of the parties.

In addition, there is a question whether the Court has retained jurisdiction over those claims after confirmation of the Debtors' Plan.

8

c.    Post-Confirmation Related to Jurisdiction

Pre-confirmation "related to" jurisdiction extends to matters that "could conceivably have any effect on the estate being administered in bankruptcy." Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). Once a plan is confirmed, however, the estate ceases to exist and all property of the estate vests in the debtor, unless the plan provides otherwise. 11 U.S.C. § 1141(b). The bankruptcy court retains post-confirmation "related to" jurisdiction only when there is a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." Resorts, 372 F.3d at 166. "Matters that affect the interpretation, implementation, consummation, execution, or administration of a confirmed plan will typically have the requisite close nexus." Id. at 167.

The Defendants argue that the Court does not have post-confirmation jurisdiction over Counts I through VIII. They contend that the state law causes of action for breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and payment of illegal dividends have no nexus to the confirmed plan other than potentially increasing the amount that might be distributed to creditors. The Defendants argue that the broad language of the Debtors' Plan which retained jurisdiction over all causes of action transferred to the Plaintiffs is insufficient to create post-confirmation jurisdiction. Resorts, 372 F.3d at 166 (a plan which retains jurisdiction over "all

9

claims and causes of action" is not effective as it is so broad as to encompass countless causes of action and "raise[s] the specter of unending jurisdiction"). The Defendants contend that a "close nexus may be found [only] where the plan specifically enumerates the cause of action." Astropower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower, 335 B.R. 309, 325 (Bankr. D. Del. 2005).

The Plaintiffs respond that the Debtors' Plan (which incorporated a settlement agreement) gave them standing to pursue the specific claims and causes of action against the D&Os and insiders of the Debtor which are the basis of the Complaint. (D.I. 734, 836.) The Plaintiffs point to the language in the 2L Settlement, which was incorporated in the Plan, providing that any and all Litigation Claims will be transferred to the Liquidating Trust on the Effective Date and stating that "[f]or the avoidance of doubt, the Litigation Claims shall include, but not be limited to, all claims related to or arising out of the Appvion Retirement Savings and Employee Stock Ownership Plan [and] all claims and causes of action against the Debtors' current and former directors and officers." (D.I. 734 at Art. II.4.) These provisions were incorporated into the Plan. (D.I. 836 at Art. II. 111 & 114 & Art. VIII. D.)

The Defendants are correct that a wholesale assignment of causes of action to a post-confirmation trust fails to establish a close nexus to the bankruptcy estate sufficient to support

10

post-confirmation non-core jurisdiction.  Shandler v. DLJ
Merchant Banking, Inc. (In re Insilco Tech., Inc.), 330 B.R. 512,
525 (Bankr. D. Del. 2005).  However, where the chapter 11 plan
retains jurisdiction over a specific cause of action it is
evidence of a sufficient close nexus because "[r]etention of
jurisdiction over a specific cause of action suggests litigation
of that action is critical to the plan's implementation."  Gavin
Solmonese, LLC v. Shyamsundar (In re AmCad Holdings, LLC), No.
14-12168, Adv. No. 15-51979, 2016 WL 3412289, at *2 (Bankr. D.
Del. June 14, 2016); AstroPower, 335 B.R. at 325 (concluding that
where the plan specifically describes an action over which the
Court has related to jurisdiction and expressly provides for
retention of jurisdiction to liquidate that claim for the benefit
of the debtors' estates and creditors, there is a sufficient
close nexus to support post-confirmation jurisdiction).

      In this case, the Court finds that the Debtors' Plan does
provide for retention of jurisdiction over the specific claims
that are at issue in the Complaint.  The Plan defined "Litigation
Claims" to include specifically claims "related to or arising out
of the ESOP that are not Direct ESOP Claims [held by the ESOP
Committee or Trustee]" as well as the "Preserved D&O Claims"
which are defined as "any and all claims and Causes of Action . .
. held by the Debtors and their Estates against the Debtors'
Directors and Officers [who are not released in the Plan],
including but not limited to, Claims held by the Debtors and

their Estates relating to the ESOP." (D.I. 836 at Art. II. 58, 114 & 136.)  Thus, Counts I through VIII, which are related to the ESOP but are not direct ESOP claims, are expressly identified in the Plan as being retained.  The Court finds this language similar to that in AstroPower, where the Court found that it had subject matter jurisdiction over non-core post-confirmation claims expressly identified in the plan.  335 B.R. at 324.[4] Thus, the Plan in this case is distinguishable from the plans in AmCad and Insilco which broadly retained jurisdiction over all claims.  330 B.R. at 525; 2016 WL 3412289, at *2.  Therefore, the Court will deny the Motions to Dismiss Counts I through VIII for lack of subject matter jurisdiction.[5]

B.    Personal Jurisdiction

The Stout Parties have filed a Motion to Dismiss, arguing that this court does not have personal jurisdiction over them. (Adv. D.I. 70 at 39.)

The Stout Parties concede that they have been served

---

[4]    The plan of liquidation in AstroPower provided that the liquidating trustees would have the authority to "prosecute and/or settle any and all . . . causes of action arising out of or in connection with the Debtor's sale of stock in Xantrax Technology, Inc."  335 B.R. at 324.

[5]    The Plaintiffs also argue that there is a close nexus supporting jurisdiction because the litigation could enhance creditor recoveries, may require the court to resolve privilege disputes, and may require the court to determine whether certain proofs of claim are allowable under section 502(d).  It is not necessary to address these arguments as the Court concludes that the Plan retained jurisdiction by specifically identifying the claims at issue in the Complaint.

12

pursuant to Rule 7004(d), which authorizes nationwide service of process.  Fed. R. Bankr. P. 7004.  The Stout Parties assert, nonetheless, that the Court cannot rely on Rule 7004 for personal jurisdiction because the Third Circuit has held that a court may not exercise personal jurisdiction in the absence of a governing federal statute providing for nationwide service of process.  See Max Daetwyler Corp. v. Meyer, 762 F.2d 290, 300 (3d Cir. 1985).  The Stout Parties argue that Rule 7004 is not a federal statute and, thus, it cannot be a basis for exercising personal jurisdiction.  The Stout Parties also contend that they are Michigan corporations with no minimum contact with Delaware, as required by due process.

This argument has been roundly rejected by the courts.  See, e.g., Capmark Fin. Group Inc. v. Lin (In re Capmark Fin. Group Inc.), 479 B.R. 330, 339 (Bankr. D. Del. 2012); Zazzali v. 1031 Exchange Group LLC (In re DBSI, Inc.), 467 B.R. 309, 313-14 (Bankr. D. Del. 2012); Tribune Media Servs., Inc. v. Beatty (In re Tribune Co.), 418 B.R. 116, 122 (Bankr. D. Del. 2009).  As the Court in Capmark noted:

> For more than a decade, this Court has consistently held that, because Bankruptcy Rule 7004(d) provides for nationwide service of process, this Court's personal jurisdiction may be assessed on the basis of a defendant's contacts with the United States as a whole, rather than with any particular state. . . . [The Daetwyler] holding simply applied a requirement of federal statutory authorization found in former Federal Rule 4(e).  Rule 4(e) was, however, abrogated in 1993 when the Federal Rules were amended to add Rule 4(k)(2), which creates federal long-arm jurisdiction in

13

> cases involving claims that arise under federal law.
> Since that amendment, and the enactment in 1996 of
> Bankruptcy Rule 7004(f), a federal long-arm provision
> like Federal Rule 4(k)(2), the question of whether
> Bankruptcy Rule 7004(d) is a statute has "become merely
> academic."

Capmark, 479 B.R. at 339-40 (citations omitted).

The Court agrees with the reasoning of the courts which have found service under Rule 7004 sufficient to confer personal jurisdiction in an adversary proceeding.  Rule 7004(d), like Federal Rule of Civil Procedure 4(k), is sufficient to create federal long-arm jurisdiction.  "Where service is made under Rule 7004(d), the defendant 'need only have minimum contacts with the United States to satisfy Fifth Amendment due process.'"  TAC Holdings, Inc. v. Salci (In re Tandycrafts, Inc.), 317 B.R. 287, 289 (Bankr. D. Del. 2004) (quoting Brown v. C.D. Smith Drug Co., 1999 WL 709992, at *3 (D. Del. 1999)).  "The forum in bankruptcy cases is the United States in general, not the particular forum state."  Tribune, 418 B.R. at 123 (citations omitted).

In this case, the Stout Parties admit that they have been served pursuant to Rule 7004 and as Michigan entities clearly have sufficient contacts with the United States.  Accordingly, the Court will deny the Stout Parties' Motion to Dismiss for lack of personal jurisdiction.

C.   Transfer

Alternatively, the Defendants ask the Court to transfer venue of the non-core claims in Counts I through VIII.  The

14

Plaintiffs oppose this request.

       1.   <u>Standard</u>

The Defendants seek to transfer venue of Counts I through VIII under 28 U.S.C. § 1412, while the Plaintiffs contend that the motion is procedurally defective because transfer of those claims is properly considered under 28 U.S.C. § 1404.[6]  The courts disagree as to whether section 1412 or 1404 applies to the transfer of non-core claims.  <u>Compare</u> <u>Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.</u>, 408 B.R. 90, 97-98 (Bankr. S.D. Tex. 2009) (concluding that section 1412 applies only to core matters and that transfer of non-core matters is properly brought under section 1404) <u>with</u> <u>Campbell v. Williams</u>, No. 1.14-cv-097, 2015 WL 3657627, at *2 (S.D. Tex. June 12, 2015) (concluding that section 1412 applies to non-core claims).

The Court concludes that it is not necessary to decide this issue, as the standard is the same under both sections.  <u>See, e.g.</u>, <u>In re Emerson Radio Corp.</u>, 52 F.3d 50, 55 (3d Cir. 1995) ("section 1412 largely include[s] the same criteria for the transfer of cases as section 1404(a), i.e., 'the interest of justice' or 'the convenience of the parties.'"); <u>ICICI Bank Ltd. v. Essar Glob. Fund Ltd.</u>, 565 B.R. 241, 257 (S.D.N.Y. 2017)

---

     [6]    Section 1412 provides that the Court "may transfer venue of a case or proceeding under title 11 . . . in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Section 1404 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action."  28 U.S.C. § 1404.

(noting that whether the court applies section 1404 or 1412 "is largely inconsequential"); IRS v. CM Holdings, Inc., No. CIV. A. 97-695 MMS, 1999 WL 459754, at *2 (D. Del. June 19, 1999) (noting that the "decision to transfer venue under either section 1404 and 1412 has been determined to turn on the same issues").

In considering whether to transfer venue under either section, the Court should consider both public and private interests. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). The private interests include: (1) the plaintiff's forum preference; (2) the defendant's preference; (3) whether the claim arose in another forum; (4) the convenience of the parties based on their physical locations and financial ability; (5) the convenience of the witnesses; (6) where the books and records are located. Id. at 879. The public interest factors include: (1) the enforceability of the judgment; (2) practical considerations to simplify the trial; (3) the administrative difficulty in the two fora resulting from court congestion; (4) the interest of the local forum in deciding the controversy at home; (5) the familiarity of the trial judge with the applicable law; and (6) the public policies of the fora. Id. at 879-80. The Court should consider all relevant factors and has "broad discretion to determine on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." Id. at 883.

The D&O Defendants argue that Counts I through VIII should

16

be transferred to the Eastern District of Wisconsin because a majority of the <u>Jumara</u> factors weigh in favor of venue transfer.

      a.   <u>Jumara Factors</u>

      i.   <u>Plaintiffs' Forum Preference</u>

The Plaintiffs in this case prefer to litigate in Delaware. Therefore, the first <u>Jumara</u> factor weighs against transfer of venue.

      ii.   <u>Defendants' Forum Preference</u>

The Defendants would like to litigate this matter in Wisconsin.  Therefore, this factor weighs in favor of transfer of venue.

The Plaintiffs contend, however, that the Defendants' preference of a forum for this adversary proceeding should be discounted because the D&O Defendants themselves authorized the Debtors to file bankruptcy in Delaware and the Counts in question share a close nexus to the bankruptcy case.

The Court disagrees with the Plaintiffs on this point: the consideration of where to file a bankruptcy case is different from the consideration of where to file an adversary proceeding. For example, the former may be based on the convenience of the forum to the lenders or to all the creditors in a case while the latter considers the convenience of the forum only to the parties to the action.

Nonetheless, the defendant's forum preference is generally given less weight than the plaintiff's in deciding a motion to

Case 1:19-cv-01561-WCG   Filed 11/19/19   Page 608 of 632   Document 14-3

transfer venue.  DHP Holdings II Corp. v. The Home Depot, Inc.
(In re DHP Holdings II Corp.), 435 B.R. 264, 273 (Bankr. D. Del.
2010).

### iii. Location Where Claim Arose

The Defendants assert that the claims arose from Appvion's
management and operation, which took place in Appleton,
Wisconsin.  The Plaintiffs do not dispute this.  (See D.I. 77 at
48.)  Therefore, this factor weighs in favor of transferring
venue to Wisconsin.

### iv.  Convenience of the Parties

The Defendants argue that this factor also supports transfer
of venue because a substantially similar cause of action is
pending in Wisconsin, naming twelve of the sixteen Defendants.
Further, the Defendants assert that seven Defendants reside in or
near Wisconsin and two other Defendants live closer to Wisconsin
than Delaware.  Four of the Defendants who live closer to
Delaware are named in the Wisconsin action and will need to
travel to Wisconsin anyway.

The Plaintiffs argue that the Defendants authorized the
bankruptcy filing in Delaware.  Because the Defendants did not
think it was an inconvenient forum then, the Plaintiffs argue
they have no basis to assert it is inconvenient to litigate the
adversary proceeding in Delaware.  Further, the Plaintiffs argue
that the Plan provides for them to have standing to pursue these
claims and that these Counts share a close nexus to the

18

bankruptcy case.

It is true that the Plan and Confirmation Order provide for the resolution of these disputes in Delaware.  (See D.I. 836 at Art. XV; D.I. 970 at ¶ 33.)  However, "even where there is a contractual forum selection provision, the Court should consider if there is some inconvenience to the parties."  DHP, 435 B.R. at 274.  Although the Plaintiffs are located near Delaware, the vast majority of the other related parties are located in and around Wisconsin.  Further, there is a proceeding involving many of the same parties and issues already pending in the Eastern District of Wisconsin.  Therefore, the Court concludes that the convenience of the parties weighs in favor of transfer of venue to Wisconsin.

### v.   Convenience of Witnesses

The Defendants argue that the witnesses are largely located in Appleton, Wisconsin.  The Plaintiffs do not dispute this assertion but merely contend that this venue could not be inconvenient for witnesses as the Defendants chose it for the bankruptcy case.  Again, the Court finds that selecting this venue for the main case is different from choosing it for the adversary proceeding.  For example, there is no evidence that the witnesses are the same for both.  Thus, the Court concludes that this factor weighs in favor of transferring venue to Wisconsin.

### vi.  Books and Records

The Defendants assert that the books and records are located

19

in Wisconsin.  The Plaintiffs do not dispute this assertion.
Therefore, this factor weighs in favor of transfer to Wisconsin.

### vii. Enforceability of Any Judgment

A judgment in either jurisdiction would be given full faith
and credit.  However, because these Counts are non-core, the
bankruptcy court could not issue a final ruling, but instead,
would be required to make a report and recommendation to the
District Court.  Resorts, 372 F.3d at 162; 28 U.S.C. § 157(c)(1).
This would unnecessarily delay a final resolution of the issues
if the case remained in Delaware.  Therefore, the Court concludes
that this factor weighs in favor of transfer to Wisconsin.

### viii. Practical Considerations

Currently there is a cause of action pending in Wisconsin
with facts and issues that are similar, if not duplicative, to
those raised here.  The Defendants argue that a majority of the
events, documents, witnesses, and Defendants are closer to
Wisconsin than Delaware.  The Plaintiffs do not present an
argument for why it would be more efficient to litigate the non-
core claims in Delaware as opposed to Wisconsin.  Therefore, the
Court finds that this factor weighs in favor of the transfer of
venue to Wisconsin.

### ix. Court Congestion

The Defendants concede that this factor does not favor one
jurisdiction over the other.  Therefore, the Court finds that
this factor is neutral.

x.    Local Interests

The Defendants argue that the Wisconsin courts have a local interest in monitoring and rectifying the harms created by its citizens and businesses.  The Plaintiffs do not argue that Delaware has a stronger local interest than Wisconsin.  Therefore, the Court finds that this factor favors transfer to Wisconsin.

xi.    Familiarity of the Trial Judge

Neither party raises this factor as an issue and the Court finds that this factor is neutral.  This Court has no familiarity with the facts of this case other than that gleaned from consideration of the motions to dismiss.  It is not aware of the extent of the familiarity of the Wisconsin Court with the facts in that action.

After weighing the above factors, the Court finds that most favor transfer of venue to Wisconsin and that there is no compelling factor in favor of retaining jurisdiction over these Counts in Delaware.  Therefore, the Court will grant the Defendants' motion to transfer venue of Counts I through VIII of the Complaint to the United States District Court for the Eastern District of Wisconsin.  Because the Court is transferring these Counts, there is no need to address the Defendants' arguments for dismissal of these Counts of the Complaint.[7]

---

[7]    These arguments include (1) that the Plaintiff's claims are pre-empted by ERISA; (2) that the Complaint fails to state a

21

C.    <u>Rule 12(b)(6) Dismissal</u>

The Defendants also ask that the Court dismiss the remaining Counts of the Complaint under Rule 12(b)(6) for failure to state a plausible claim for relief.  The Plaintiffs oppose this request.

1.    <u>Standard of Review</u>

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "provide the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Fed. R. Civ. P. 8(a)(2).

Rule 12(b)(6) governs a motion to dismiss for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (<u>quoting</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  The question is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>abrogated on other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814–15 (1982).

The plaintiff must provide more than "threadbare recitals of

---

claim for aiding and abetting; and (3) that the breach of fiduciary duties claims are partially time-barred.

22

a cause of action's elements, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1940. A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Twombly, 550 U.S. at 562.

There is a two-part analysis to determine whether to dismiss a complaint for failure to state a claim. First, the court "must accept all the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." Id. at 211.

### a. Counts IX and XIV-XVIII Against D&Os

Counts IX and XIV through XVIII seek to avoid preferential transfers to certain D&O Defendants.[8] (Adv. D.I. 108 at ¶¶ 436-446 & 487-551.) The Counts assert that the transfers are avoidable under the Bankruptcy Code, as well as under Delaware and Wisconsin state law. 11 U.S.C. § 547; Del. Code Ann. tit. 6, § 1301 et seq; Wis. Stat. § 242 et seq.

Those D&O Defendants initially argue that these Counts fail to state a claim pursuant to state law because they generically cite to the Wisconsin and Delaware statutes and not to any

---

[8]    The D&O Defendants named in those Counts are: Ferree, Seifert, Suwyn, Murphy, Laurino, and Roberts.

specific section.  The Court rejects this argument because the Delaware and Wisconsin statutes cited by the Plaintiffs are not lengthy and the elements of those statutes cited by the Plaintiffs in their Complaint are easily identified.

The D&O Defendants also seek to dismiss Counts IX and XIV through XVIII to the extent they assert state law preference avoidance causes of action because, they argue, the statutes are for avoidance of fraudulent transfers, not preferences.  Since the Complaint refers to them as preferences, the D&O Defendants contend that it does not put them on notice of the actual claims and legal theories against them.

The Plaintiffs contend that the Complaint does state the elements of a claim under Delaware and Wisconsin law which provide for recovery of any transfer to an insider on account of an antecedent debt while the debtor was insolvent and the insider had reasonable cause to believe the debtor was insolvent.  Del. Code Ann. tit. 6, § 1305(b) and Wis. Stat. § 242.05(2).  The Plaintiffs assert that this is more akin to a preference claim than a fraudulent conveyance claim.  Further, the Plaintiffs argue that the Complaint states, with particularity, the dates and amounts of the transfers and references Appvion's Statement of Financial Affairs ("SOFA") thereby averring that Appvion was the transferor.  Thus, the Plaintiffs contend that the Complaint contains enough to state a plausible claim for relief under the Bankruptcy Code and state law.

Both statutes identify causes of action that are similar to insider preferences under the Bankruptcy Code.  It is notable that the Wisconsin Court of Appeals, in analyzing section 242.05(2), noted that the "provision addresses what is sometimes called a preferential transfer - a novel category of fraudulent transaction based on bankruptcy principles."  Beck v. BidRX, LLC, 918 N.W.2d 96, 100 (Wis. Ct. App. 2018).  Whether the statutes are indeed "preferences" or "fraudulent transfers," however, is legal semantics rather than a basis to dismiss the Counts.  The issue raised by the Motion to Dismiss is whether the Complaint states a claim for relief under those statutes.

Section 1305(b) of the Delaware statute states that a transfer is avoidable "if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."  Del. Code Ann. tit. 6, § 1305(b).  Similarly, section 242.05(2) of the Wisconsin statute provides that a transfer is avoidable "if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."  Wis. Stat. § 242.05(2).

To survive a motion to dismiss, a complaint seeking to avoid preferential transfers under the Bankruptcy Code must provide: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged

25

preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." In re Valley Media, Inc., 288 B.R. 189, 192 (Bankr. D. Del. 2003).

In the Complaint, the Plaintiffs allege that the D&O Defendants (1) were insiders of the Debtors; (2) received transfers from the Debtors on account of antecedent debt, while the Debtors were insolvent; (3) had reasonable cause to believe the Debtors were insolvent; and (4) the transfers caused them to receive more than under a chapter 7 liquidation. (Adv. D.I. 108 at ¶¶ 292-296, 436-551.) Each Count against the D&O Defendants provides the amounts of the transfers and the approximate dates they were made. (Id.) The Court finds that these allegations are sufficient to state a claim for relief under the Bankruptcy Code and Wisconsin and Delaware Law.

Therefore, the Court concludes that the D&O Defendants' Motion to Dismiss Counts IX and XIV through XVIII for failure to state a plausible claim for relief under the Bankruptcy Code and Wisconsin and Delaware Law should be denied.

b.   Count IX

The D&O Defendants also assert that Count IX should be dismissed as ambiguous because it identifies the transferor as "PDC and/or Appvion." The Plaintiffs respond that each debtor entity filed its own SOFA, and the Complaint specifically references Appvion's SOFA, not PDC's, when discussing the

26

transfers to Ferree in Count IX.  (See Adv. D.I. 108 at ¶¶ 293-295.)  Thus, the Plaintiffs contend that the Complaint sufficiently identifies Appvion as the transferor.

The Court agrees with the Plaintiffs.  The Complaint expressly refers to Appvion's SOFA, which includes the transfers to Ferree identified by the Plaintiffs in the Complaint.  (Id., citing D.I. 266 at 30.12.)  Therefore, the Court finds that the Complaint sufficiently identifies Appvion as the transferor of the funds transferred to Ferree.  Consequently, the Court concludes that the Plaintiffs have raised a plausible claim for relief in Count IX and will deny the Motion to Dismiss that Count.

c.   <u>Counts X Through XIII</u>

Counts X and XII assert causes of action to avoid preferential transfers to the Stout Parties and Argent under the Bankruptcy Code, Delaware and Wisconsin law.  11 U.S.C. §§ 547, 544(b) & 550; Del. Code Ann. tit. 6, § 1301 et seq.; Wis. Stat. § 242 et seq.  Counts XI and XIII assert causes of action to avoid fraudulent transfers to the Stout Parties and Argent under the Bankruptcy Code, Delaware and Wisconsin law.  11 U.S.C. §§ 544(b) & 548(a)(1)(b); Del. Code Ann. tit. 6, § 1301-13011; Wis. Stat. § 242.01-242.11.  The Defendants move to dismiss these Counts for failure to state a claim.

i.   <u>Count X</u>

The Stout Parties argue that Count X should be dismissed to

27

the extent it raises a cause of action under state law because
the Delaware and Wisconsin law cited by the Plaintiffs do not
provide any basis to avoid a transfer to a non-insider.  The
Stout Parties also argue that Count X should be dismissed in its
entirety because the Complaint demonstrates the elements of an
ordinary course defense on its face.

The Plaintiffs concede that the state law causes of action
apply only to insiders and stipulates to the dismissal of Count X
to the extent it relates to claims under state law.  (Adv. D.I.
77 at 44.)  The Plaintiffs argue, however, that they properly
pled a claim for a non-insider preference under section 547(b) of
the Bankruptcy Code.  The Plaintiffs assert further that whether
the Stout Parties can establish an ordinary course of business
defense is a question of fact that is not appropriately decided
at this stage.  They contend that such a defense requires the
analysis of the timing of the preference payments in relation to
the issuance of the invoices in comparison to the timing of
historical payments, which are not apparent from the face of the
Complaint.

The Court agrees with the Plaintiffs.  The ordinary course
of business defense is an affirmative defense, which is usually
not a proper basis for a motion to dismiss.  <u>Adelphia Commc'ns</u>
<u>Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)</u>,
365 B.R. 24, 79 (Bankr. S.D.N.Y. 2007).  It is true that a
complaint may be dismissed under Rule 12(b)(6) "where an

unanswered affirmative defense appears" on the face of the
complaint.  In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir.
2005).  However, that is not the case here.  An analysis of the
ordinary course defense requires an analysis of the timing of
payments made between the transferor and transferee before and
during the preference period.  See Burtch v. Detroit Forming Inc.
(In re Archway Cookies), 435 B.R. 234, 243 (Bankr. D. Del. 2010),
aff'd sub nom. In re Archway Cookies LLC, 511 B.R. 726 (D. Del.
2013).  While the Complaint identifies when the preference
payments were made, it does not state when the historical
payments were made or the timing of the payments in relation to
the issuance of the invoices.  (See Adv. D.I. 108 at ¶¶ 293-295.)
Thus, the information in the Complaint, on its face, does not
provide the Stout Parties with an ordinary course defense under
section 547(c)(2).

Therefore, the Court will grant the Motion to Dismiss Count
X as it relates to the state law claims, but deny the Motion to
Dismiss as it relates to the claim under section 547(b) of the
Bankruptcy Code.

### ii.   Counts XI and Count XIII

Count XI and Count XIII assert constructively fraudulent
conveyance claims against the Stout Parties and Argent,
respectively.  The Stout Parties and Argent argue that those
Counts should be dismissed because the Plaintiffs did not
adequately plead facts to demonstrate that Appvion received less

29

than reasonably equivalent value for the transfers.  They contend that the transfers were for amounts due them for services rendered for the benefit of the Debtors.

The Plaintiffs assert that Appvion did not receive reasonably equivalent value for the transfers to Argent because Argent provided services to the ESOP, not Appvion, and, therefore, its services could not constitute reasonably equivalent value to Appvion.  (See, e.g., Adv. D.I. 108 at ¶¶ 92-94.)  Similarly, the Plaintiffs assert that Appvion did not receive reasonably equivalent value for the transfers to the Stout Parties because the Stout Parties provided services to Argent, who independently contracted with the Stout Parties to provide a valuation of the PDC stock.  (See, e.g., id. at ¶ 102.)  Even if the services performed by the Stout Parties and Argent could have theoretically benefitted the Debtors indirectly, the Plaintiffs contend that they did not because the services were not adequately performed.

The Bankruptcy Code provides that a transfer is constructively fraudulent if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation and was insolvent on the date that such transfer was made."  11 U.S.C. § 548(a)(1).  The Third Circuit has held that the courts should conduct a two-part inquiry to determine whether a debtor received reasonably equivalent value in exchange for a transfer: (i) whether the debtor received any value for the

transfer at all, and (ii) if so, whether that value was "reasonably equivalent" to the value of the transfer.  In re R.M.L., Inc., 92 F.3d 139, 149 (3d Cir. 1996).  See also Kirschner v. JP Morgan Chase Bank N.A. (In re Millennium Lab Holdings II, LLC), No. 15-12284 (LSS), 2019 WL 1005657, at *5 (Bankr. D. Del. Feb. 28, 2019).

"Payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value. . . . [because] [t]he Bankruptcy Code and Delaware statute both define 'value' to include satisfaction of an antecedent debt." Burtch v. Opus, LLC (In re Opus East, LLC), 528 B.R. 30, 83 (Bankr. D. Del. 2015) (citing 11 U.S.C. § 548(d)(2)(A) and Del. Code Ann. tit. 6, § 1304(a)(2)), aff'd, 698 F. App'x 711 (3d Cir. 2017). In this case, it is not clear whether the Debtors owed a debt to the Stout Parties or Argent.  Even if the amounts due to the Stout Parties and Argent were antecedent debts owed by the Debtors, however, the question remains "whether reasonably equivalent value was given in exchange for the transfer." R.M.L., 92 F.3d at 149.  While there is a presumption that it was, evidence may overcome that presumption.  Dismissal at this point, before the Plaintiffs can present evidence on that point is not appropriate.

The Third Circuit utilizes a "totality of the circumstances" approach to determine whether a debtor received reasonably equivalent value, including "(i) the 'fair market value' of the

31

benefit received as a result of the transfer, (ii) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (iii) the transferee's good faith." In re Fruehauf Trailer Corp., 444 F.3d 203, 213 (3d Cir. 2006).

For purposes of a motion to dismiss, claims of constructive fraud are evaluated under the notice pleading requirement of Rule 8(a)(2). Stanziale v. Brown-Minneapolis Tank ULC, LLC (In re BMT-NW Acquisition, LLC), 582 B.R. 846, 856 (Bankr. D. Del. 2018). To state a plausible claim for relief under this standard, the plaintiff must allege that "there was a transfer for less than reasonably equivalent value at a time when the [Debtor was] insolvent" and provide facts "simply identifying the dates, amounts, source, and the transferee of each of the alleged transfers." Id. (citing In re AgFeed USA, LLC, 546 B.R. 318, 336 (Bankr. D. Del. 2016)). The Court is not tasked with making a determination of whether the transfers were for reasonably equivalent value at the motion to dismiss stage. Rather, at this stage of the proceedings, the Court's task is to determine whether the Complaint contains enough to put the Defendants on notice of the Plaintiffs' claim for relief. Millennium Lab, 2019 WL 1005657, at *6.

Here, the Complaint identifies twelve transfers from Appvion to the Stout Parties with the exact dates for seven of those transfers and approximate dates for the remainder. (Adv. D.I. 108 at ¶ 109.) The Complaint alleges that Appvion received less

32

than reasonably equivalent value for those transfers because the Stout Parties did not adequately perform the services they were hired to do.  Specifically, the Complaint alleges that the Stout Parties consistently utilized flawed calculations to increase their FMV determinations.  (Id. at ¶¶ 190-289.)

As for the Argent transfers, the Complaint alleges that Argent received $200,000 per year from 2015 through the petition date for services rendered as the ESOP Trustee.  (Id. at ¶¶ 98 & 469.)  The Complaint asserts that Appvion did not receive reasonably equivalent value for those payments.  (Id. at ¶ 481.)

Because the question of whether the Debtors received reasonably equivalent value in exchange for these transfers is a fact-intensive inquiry, the Court concludes that a decision on that contested fact is not appropriate at this stage.  Millennium Lab, 2019 WL 1005657, at *5.  The Court finds, therefore, that the Plaintiffs have satisfied the pleading standard by stating a plausible claim for avoidance of a constructively fraudulent transfer against Argent and the Stout Parties.  Therefore, the Court will deny the motions to dismiss Counts XI and XIII.

### iii. Count XII

Count XII seeks to avoid preferential transfers to Argent totaling $35,996.  Argent argues that the Court should dismiss Count XII because the Complaint fails to identify the transferor precisely by name.  The Plaintiffs did not respond to Argent's Motion to Dismiss Count XII.  Consequently, Argent asserts that

33

the Plaintiffs waived the opportunity to contest its Motion to Dismiss Count XII.

While courts may, in rare cases, grant an unopposed motion to dismiss without an analysis of the merits, a decision on the merits is preferred. See Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991). In Stackhouse, the Third Circuit "made clear [its] disfavor of dismissals under Rule 12 for purpose of a sanction, and held that a Rule 12(b)(6) motion should not be granted without an analysis of the merits of the underlying complaint." Id.

In this case, although the Plaintiff did not respond to the Motion to Dismiss Count XII, on consideration of the merits of that motion, the Court concludes that it should be denied. A well-pled complaint to avoid a preferential transfer should identify the nature and amount of each antecedent debt, each alleged preferential transfer, the debtor/transferor, the transferee, and the amount of the transfer. Valley Media, 288 B.R. at 192. Here, the Complaint identifies two transfers as allegedly preferential: (1) $17,979 on August 10, 2017, and (2) $18,017 on September 5, 2017. (Adv. D.I. 108 at ¶ 469.) Further, the transferor is specifically identified as Appvion. (Id.)[9]  Therefore, the Court finds that Count XII states a

---

[9]     In addition, as with the transfers to the Stout Parties and Ferree, Appvion's SOFA specifically identifies these two transfers to Argent. (D.I. 266 at 3.44.)

34

plausible claim for an avoidable preference.   Accordingly, the
Court will deny Argent's Motion to Dismiss Count XII.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the
Defendants' motion to transfer venue of Counts I through VIII to
the District Court for the Eastern District of Wisconsin.   The
Court will grant the Motion to Dismiss Count X to the extent it
relies on state law.   The Court will deny, in all other respects,
the Defendants' Motions to Dismiss.

An appropriate Order follows.


Dated: October 23, 2019          BY THE COURT:


                                 Mary F. Walrath
                                 United States Bankruptcy Judge

35

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OLDAPCO, INC., et al., | ) | |
| | ) | Case No. 17-12082 (MFW) |
| Debtors. | ) | Jointly Administered |
| —————————————————— | ) | |
| | ) | |
| ALAN D. HALPERIN AND EUGENE I. | ) | |
| DAVIS, AS CO-TRUSTEES OF THE | ) | |
| APPVION LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. No. 18-50955 |
| MARK R. RICHARDS, THOMAS J. FERREE, | ) | |
| TAMI L. VAN STRATEN, JEFFREY J. | ) | |
| FLETCHER, KERRY S. ARENT, STEPHEN | ) | |
| P. CARTER, TERRY M. MURPHY, | ) | |
| ANDREW F. REARDON, KATHI P. | ) | |
| SEIFERT, MARK A. SUWYN, CARL J. | ) | |
| LAURINO, DAVID A. ROBERTS, KEVIN | ) | |
| GILLIGAN, ARGENT TRUST COMPANY, | ) | |
| STOUT RISIUS ROSS, INC., | ) | |
| STOUT RISIUS ROSS, LLC, | ) | |
| JOHN/JANE DOES 1-40 | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

**AND NOW**, this **23rd day** of **OCTOBER, 2019**, for the reasons stated in the accompanying Opinion, it is hereby

**ORDERED** that the Motions to Dismiss Counts I through VIII of the Complaint for lack of subject matter jurisdiction are **DENIED**; and it is further

**ORDERED** that the Motions to transfer venue of Counts I through VIII to the United States District Court for the Eastern District of Wisconsin are **GRANTED**; and it is further

ORDERED that the Motion to Dismiss Count X is **GRANTED** as it relates to state law claims, but **DENIED** as it relates to claims under 11 U.S.C. § 547(b); and it is further

ORDERED that the Motions to Dismiss Counts IX through XVIII in all other respects are **DENIED**.

DATED: October 23, 2019        BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc:  Christine Mackintosh, Esquire[1]

---

[1]    Counsel shall distribute a copy of this Order and the accompanying Opinion to all interested parties and file a Certificate of Service with the Court.

## SERVICE LIST

Mark L. Desgrosseilliers, Esquire
Chipman Brown Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
Counsel to Stout Risius Ross, Inc. and Stout Risius Ross, LLC

Lars C. Golumbic, Esquire
Groom Law Group, Chartered
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Counsel to Stout Risius Ross, Inc. and Stout Risius Ross, LLC

Mark Minuti, Esquire
Monique B. DiSabatino, Esquire
Saul Ewing Arnstein & Lehr LLP
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Counsel to Former Directors and Officers

Craig C. Martin, Esquire
David Jimenez-Ekman, Esquire
Melissa M. Root, Esquire
Michael T. Graham, Esquire
Jenner & Block, LLP
353 N. Clark Street
Chicago, IL 60654
Counsel to Former Directors and Officer

Carl N. Kunz, III, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801
Counsel to Argent Trust Company

Michael L. Scheier, Esquire
Brian P. Muething, Esquire
Jacob Rhode, Esquire
Keating Muething & Klekamp, PLL
One East Fourth Street, Suite No. 1400
Cincinnati, OH 45202
Counsel to Argent Trust Company

Christine Mackintosh, Esquire
Vivek Upadhya, Esquire
R. Alexander Gartman, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
Special Counsel to Alan Halperin and Eugene Davis, as Co-Trustees
of Appvion Liquidating Trust

Gordon Z. Novod, Esquire
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Special Counsel to Alan Halperin and Eugene Davis, as Co-Trustees
of Appvion Liquidating Trust

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | (Jointly Administered) |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | Related Docket Nos. 112, 113 |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Vivek Upadhya, hereby certify that on October 29, 2019, true and correct copies of Adv. D.I. 112 and Adv. D.I. 113, issued by the Honorable Mary F. Walrath, each in the adversary proceeding captioned *Alan D. Halperin and Eugene I. Davis, as Co-Trustees Of The Appvion Liquidating Trust, v. Mark R. Richards, et al.*, Adv. Pro. No. 18-50955 (Bankr. D. Del.) (MFW), were served via email to the counsel listed below:

**SAUL EWING ARNSTEIN & LEHR LLP**
Mark Minuti
Monique Disabatino
1201 North Market Street, Suite 2300
Wilmington, DE 19801
Telephone: 302-421-6840
Email: Mark.Minuti@saul.com
           Monique.disabatino@saul.com

**JENNER & BLOCK LLP**
Craig Martin
David Jimenez-Ekman
Melissa Root
Michael Graham
353 N. Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Email: cmartin@jenner.com
           djimenez-ekman@jenner.com
           mroot@jenner.com
           mgraham@jenner.com

**MORRIS JAMES LLP**
Carl N. Kunz, III
500 Delaware Street, Suite 1500
Wilmington, DE 19801-1494
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: ckunz@morrisjames.com

**CHIPMAN BROWN CICERO & COLE, LLP**
Mark L. Desgrosseilliers
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801
Telephone: (302) 295-0191
Email: desgross@chipmanbrown.com

**KEATING MUETHING & KLEKAMP PLL**
Michael L. Scheier
Brian P. Muething
Jacob Rhode
One East 4th Street
Suite 1400
Cincinnati, OH 45202
Telephone: (513) 639-3814
Email: MSCHEIER@KMKLAW.com
           bmuething@KMKLAW.com
           JRhode@KMKLAW.com

**GROOM LAW GROUP**
Lars Golumbic, Esquire
GROOM LAW GROUP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006-5811
Telephone: (202) 861-6615
Email: lgolumbic@groom.com

                                        */s/ Vivek Upadhya*
                                        Vivek Upadhya (DE Bar No. 6241)