# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | | |
|---|---|---|
| ALAN D. HALPERIN AND EUGENE I. DAVIS AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 19-CV-1561-WCG |
| MARK R. RICHARDS, *et al.,* | ) ) ) | |
| Defendants. | ) ) ) | |

**UNREPORTED CASES CITED IN**
**ARGENT TRUST COMPANY'S MOTION TO DISMISS**

i

# TABLE OF CONTENTS

**Decision**                                                                                                      **Tab**

*Schuppel v. Teamsters "General" Local Union No. 200*, No. 07C0853,
    2008 U.S. Dist. LEXIS 68054 (E.D. Wis. May 2, 2008) ........................................................ A

*Arndt v. AON Hewitt Benefit Payment Servs., LLC*, No. 15-C-750, 2015 WL 7313392,
    2015 U.S. Dist. LEXIS 156553 (E.D. Wis. Nov. 19, 2015) .................................................. B

*Brugos v. Nannenga*, No. 2:03-cv-547,
    2005 U.S. Dist. LEXIS 31148 (N.D. Ind. Dec. 5, 2005) ...................................................... C

*AT&T v. Empire Blue Cross & Blue Shield*, No. 93-cv-1224, 1994 WL 16057794,
    1994 U.S. Dist. LEXIS 21091 (D.N.J. July 19, 1994) .......................................................... D

*Carter v. San Pasqual Fiduciary Tr. Co.*, No. 15-cv-01507,
    2016 U.S. Dist. LEXIS 163017 (C.D. Cal. Apr. 18, 2016) ................................................... E

*McLemore v. Regions Bank*, Nos. 08-cv-0021, 08-cv-1003, 2010 WL 1010092,
    2010 U.S. Dist. LEXIS 25785 (M.D. Tenn. Mar. 18, 2010) ................................................. F

*Matthew v. Laudamiel*, No. 5957, 2015 WL 5723985,
    2015 Del. Ch. LEXIS 247 (Del. Ch. Sept. 28, 2015) ........................................................... G

*In re Dole Food Co., Stockholder Litig.*, No 9079-VCL,
    2015 Del. Ch. LEXIS 223 (Del. Ch. Aug. 27, 2015) ........................................................... H

*In re Xura, Inc. Stockholder Litig.*, No. 12698-VCS, 2018 WL 6498677,
    2018 Del. Ch. LEXIS 563 (Del. Ch. Dec. 10, 2018) ............................................................ I

*Cumming v. Edens*, No. 13007-VCS, 2018 WL 992877,
    2018 Del. Ch. LEXIS 54 (Del. Ch. Feb. 20, 2018) .............................................................. J

*Nymex S'holder Litig. v. N.Y. Mercantile Exch.*, Inc., Nos. 3621-VCN, 3835-VCN,
    2009 Del. Ch. LEXIS 176 (Del. Ch. Sept. 30, 2009) ........................................................... K

*McFall v. Stacy & Witbeck, Inc.*, No. 14-cv-04150-JSC, 2016 WL 6248882,
    2016 U.S. Dist. LEXIS 148399 (N.D. Cal. Oct. 26, 2016) ................................................... L

# Tab A


## *Schuppel v. Teamsters "General" Local Union No. 200*

United States District Court for the Eastern District of Wisconsin

May 2, 2008, Decided

Case No. 07C0853

**Reporter**

2008 U.S. Dist. LEXIS 68054 *; 44 Employee Benefits Cas. (BNA) 2241

RICHARD SCHUPPEL, DONALD IHLENFELD and THOMAS SCHALLS, Plaintiffs, v. TEAMSTERS "GENERAL" LOCAL UNION NO. 200, Defendant.

## Core Terms

fiduciary, good faith, plaintiffs', employee benefit plan, fair dealing, discretionary, appointing power

## Case Summary

### Procedural Posture

Plaintiff former members sued defendant, their former union, alleging breach of fiduciary duty claims under *29 U.S.C.S. §§ 1104*, *1105*, *1132*, *1133*, of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.*, and a common law breach of the duty of good faith and fair dealing claim. The union moved to dismiss the complaint under *Fed. R. Civ. P. 12(b)(6)* and alternatively moved for summary judgment in the suit.

### Overview

The members alleged that the union was the fiduciary of a multi-employer pension plan and that it violated *§ 1104* and *§ 1132(a)(3)* by failing to appropriately discharge its fiduciary duties and violated *§ 1105* by participating, as a fiduciary, in a co-fiduciary's breach of his fiduciary duties. The union contended that it was not a fiduciary as that term was defined in *29 U.S.C.S. § 1102(a)(2)*, *(21)(A)*. The court agreed. The mere fact that the union had a duty to seek favorable benefits for its member and to enter into the agreements necessary to ensure that the plan could function did not make it a fiduciary of the plan; it had no obligation to oversee the employer's contributions to the plan. Neither the collective bargaining agreement nor the plan documents gave the union power to appoint employer trustees, which power might be sufficient to confer fiduciary status. The union could not be held liable under *§ 1133* because that section imposed liability only on benefit plans. The members' common law breach of an implied duty of good faith and fair dealing claim was preempted by ERISA. Even if it were not, the members failed to assert an actionable claim under that theory.

### Outcome

The court granted the union's dismissal motion and directed the clerk to enter a judgment accordingly.

# LexisNexis® Headnotes

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1*[ 🔻 ] **Complaints, Requirements for Complaint**

A complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN2*[ 🔻 ] **Complaints, Requirements for Complaint**

A complaint need only contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed. R. Civ. P. 8(a)*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN3*[ 🔻 ] **Motions to Dismiss, Failure to State Claim**

The essence of a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* is not that the plaintiff has pleaded insufficient facts, it is that even accepting all of the alleged facts, the plaintiff

has no legal claim. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact). In other words, the complaint must contain enough facts to state a claim to relief that is plausible on its face. In considering a R. 12(b)(6) motion, a district court generally may not consider material outside the pleadings. However, when a complaint refers to a document not attached to the complaint, the court may consider that document in ruling on a R. 12(b)(6) motion if the document is unquestioned.

Business & Corporate
Compliance > ... > ERISA > Fiduciaries > Named Fiduciary Appointment & Obligations

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Pensions & Benefits Law > ERISA > Fiduciaries > General Overview

*HN4*[ 🔻 ] **Fiduciaries, Named Fiduciary Appointment & Obligations**

Breach of fiduciary duty claims under *29 U.S.C.S. §§ 1104*, *1105*, *1132(a)(3)*, cannot survive unless the defendant is a fiduciary as defined by the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* ERISA provides that a person is a fiduciary of an employee benefit plan if such person is named in the plan, *29 U.S.C.S. § 1102(a)(2)*, or to the extent that : (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (ii) he renders investment advice for a fee or other compensation, direct or

indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. *29 U.S.C.S. § 1002(21)(A)*. Thus, a fiduciary under *§ 1102* is a person or entity which has obligations to or control of an employee benefit plan, not one who has obligations to individual beneficiaries of a plan. In enacting this section, Congress was primarily concerned with the possible misuse of plan assets.

> Business & Corporate Compliance > ... > Pension Plan Funding Requirements > Pension Plan Funding

> Labor & Employment Law > Collective Bargaining & Labor Relations > General Overview

> Pensions & Benefits Law > ERISA > Fiduciaries > General Overview

## *HN5*[⤓] Funding Requirements, Pension Plan Funding

A union's duty to seek favorable benefits for its members and to enter into the agreements necessary to ensure that an employee benefit plan can function do not make it a fiduciary of the plan. Nor do such duties impose a duty on the union to oversee an employer's contributions to the plan.

> Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

> Pensions & Benefits Law > ... > Fiduciaries > Fiduciary Responsibilities > General Overview

## *HN6*[⤓] Causes of Action, Breach of Fiduciary Duty

The fiduciary liability provisions of the Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1001 et seq.*, are concerned with the misuse of plan assets, not with responsibilities toward individual beneficiaries.

> Pensions & Benefits Law > ERISA > Claim Procedures

## *HN7*[⤓] ERISA, Claim Procedures

See *29 U.S.C.S. § 1133*.

> Pensions & Benefits Law > ERISA > Claim Procedures

> Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > General Overview

> Pensions & Benefits Law > ... > Fiduciaries > Fiduciary Responsibilities > General Overview

## *HN8*[⤓] ERISA, Claim Procedures

By its terms, *29 U.S.C.S. § 1133* only applies to an "employee benefit plan." It is incorrect as a matter of law that a plan fiduciary or a plan administrator may be sued under *§ 1133*. Only an employee benefit plan may be sued under *§ 1133*.

> Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

## *HN9*[⤓] Contract Interpretation, Good Faith & Fair Dealing

Every contract implies good faith and fair

dealing between the parties to it.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Applicability

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Pensions & Benefits Law > ERISA > Civil Litigation > Federal Common Law

Pensions & Benefits Law > ERISA > Federal Preemption > State Laws

**HN10**[⬇] **Federal Common Law, Applicability**

The Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.* preempts state law regarding the duty of good faith and fair dealing as it relates to an employee benefits plan. Where ERISA preempts state law, but is silent on a topic, courts should develop a body of federal common law, where appropriate, based on principles of state law. The federal courts have not established a common law duty of good faith and fair dealing applicable to ERISA plans, and one judge in the United States District Court for the Eastern District of Wisconsin has declined to recognize such a duty.

**Counsel:** **[*1]** For Richard Schuppel, Donald Ihlenfeld, Thomas Schalles, Plaintiffs: Alan C Olson, LEAD ATTORNEY, Alan C Olson & Associates SC, New Berlin, WI.

For Teamsters "General" Local Union No. 200, Defendant: Asmaa S Abdul-Haqq, Scott D

Soldon, Previant Goldberg Uelmen Gratz, Miller & Brueggeman SC, Milwaukee, WI.

**Judges:** LYNN ADELMAN, District Judge.

**Opinion by:** LYNN ADELMAN

# Opinion

## DECISION AND ORDER

Plaintiffs Richard Schuppel, Donald Ihlenfeld and Thomas Schalls bring this action against defendant Teamsters Union Local 200 ("Local 200") under the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001 et seq.* Local 200 now moves to dismiss or alternatively for summary judgment.

## I. PLAINTIFFS' ALLEGATIONS

Plaintiffs are former employees of Werner, Johann & Son, Inc. ("Werner") and former members of defendant Local 200. Plaintiffs allege that in 1966, Local 200 and Werner became parties to an existing labor agreement (the "CBA"), which called for Werner to participate in the Central States Pension Fund ("the Plan"), a multi-employer employee benefit plan. Plaintiffs allege that for a number of years, Werner neglected to contribute to the Plan. Plaintiffs further allege that Local 200 was a fiduciary of **[*2]** the Plan and, as a fiduciary, owed certain duties to them under ERISA, which it failed to perform. Specifically, plaintiffs allege that Local 200 failed to "procure a participation agreement" from Werner, "provide a participation agreement to

the pension fund," "enter trust agreements necessary to create the Plan," "designate the Employer Trustees," "notify the Plan of plaintiffs' participation in the Plan," "make a joint request for retroactive participation in the Plan" or give plaintiffs a copy of the CBA. (Compl. at P 16.) Plaintiffs also allege that as a result of Local 200's failures, they incurred significant damages. They also allege that they did not discover these failures until 2005. Plaintiffs claim that Local 200's actions violated several ERISA provisions, namely *29 U.S.C. §§ 1104*, *1105*, *1132* and *1133*, and violated the common law duty of good faith and fair dealing. [1]

## II. STANDARD OF REVIEW

*HN2*[↑] A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. *HN3*[↑] The essence of a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* is not that the plaintiff has pleaded insufficient facts, it is that even accepting all of the alleged facts, the plaintiff has no legal claim. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)*. Of course, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)* (internal citation omitted). In other words, the complaint must contain "enough facts to state a claim to relief that is plausible

---

[1] Plaintiffs' complaint does not refer to a claim under *§ 1105*, but plaintiff raises this section in its response to the motion to dismiss. *HN1*[↑] A "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992)*. As such, **[*3]** I will not dismiss out of hand any legal theories raised for the first time in plaintiffs' brief. Instead, I ask whether the complaint alleges facts supporting the new legal theory.

on its face." *Id. at 1974*.

In considering a *Rule 12(b)(6)* motion, I generally may not consider material outside the pleadings. However, when a complaint refers to a document **[*4]** not attached to the complaint, a court may consider that document in ruling on a *Rule 12(b)(6)* motion if the document is unquestioned. *Minch v. City of Chicago, 486 F.3d 294, 300 n.3 (7th Cir. 2007)*. In the present case, the complaint refers to the CBA and the Plan and such documents are central to this case. Local 200 has submitted copies of the CBA and the Plan, and plaintiffs do not dispute their authenticity. Therefore, in addressing Local 200's *Rule 12(b)(6)* motion, I will rely on them. However, I will not consider Local 200's motion as one for summary judgment and will not consider the additional material that it filed.

## III. DISCUSSION

## A. Claim that Local 200 Violated *§§ 1104*, *1105* and *1132(a)(3)*

Plaintiffs allege that Local 200 violated *§§ 1104* and *1132(a)(3)* by failing to appropriately discharge its fiduciary duties and violated *§ 1105* by participating, as a fiduciary, in a co-fiduciary's breach of his fiduciary duties. Thus, plaintiffs' *HN4*[↑] claims under these sections cannot survive defendant's motion unless Local 200 is a fiduciary as defined by ERISA. ERISA provides that a person is a fiduciary of an employee benefit plan if such person is named in the plan, *29 U.S.C. § 1102(a)(2)*, **[*5]** or

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of

Andrea Stubblefield

its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

_29 U.S.C. § 1002(21)(A)_. Thus, a fiduciary under this section is a person or entity which has obligations to or control of an employee benefit plan, not one who has obligations to individual beneficiaries of a plan. _Forys v. United Food and Commercial Worker's Int'l Union, 829 F.2d 603, 607 (7th Cir. 1987)_. In enacting this section, Congress was primarily concerned "'with the possible misuse of plan assets.'" _Id._ (quoting _Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-43, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985))_.

Relying on _§ 1002(21)(A)(iii)_, plaintiffs argue that Local 200 has discretionary control over the administration of the Plan by virtue of its power to (1) procure a participation agreement from **[*6]** Werner, (2) provide a participation agreement to the pension fund, (3) enter into appropriate trust agreements necessary for the administration of the pension fund and (4) designate the Employer Trustees under such agreement. (Compl. at P 14.) Plaintiffs do not advance any legal arguments that support their contention that the powers they cite in (1), (2) and (3) above make Local 200 a fiduciary. And case law makes clear that possessing such powers does not make a union a fiduciary. **HN5[↑]** A union's duty to seek favorable benefits for its members and to enter into the agreements necessary to ensure that a benefit plan can function do not make it a fiduciary of the plan. _Forys, 829 F.2d at 607_; _United Indep. Flight Officers, Inc. v. United Air Lines, Inc., 756 F.2d 1274, 1280 (7th Cir. 1985)_; _United Indep. Flight Officers, Inc. v. United Air Lines, Inc., 756 F.2d 1262, 1268_

_(7th Cir. 1985)_. Nor do such duties impose a duty on the union to oversee an employer's contributions to the plan. _Rosen v. Hotel & Rest. Employees & Bartenders Union, 637 F.2d 592, 599 (3d Cir. 1981)_.

As to (4) above, plaintiffs cite several cases indicating that the power to appoint plan trustees can confer fiduciary status **[*7]** on an the appointing party. _See, e.g., Licensed Div. Dist. No. 1 MEBA/NMU v. Defries, 943 F.2d 474 (4th Cir. 1991)_; _Liss v. Smith, 991 F. Supp. 278 (S.D.N.Y. 1998)_; _Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629 (W.D. Wis. 1979)_. However, in the present case, both the CBA and the Plan make clear that Local 200 had no power to appoint Employer Trustees. [2] In the CBA, Werner authorizes "Employers' Associations," not Teamsters Local 200, "to enter into appropriate trust agreements necessary for the administration of [the Plan], and designate the Employer Trustees under such agreement." (Br. in Supp. Ex. A at 26 (1966 version); Br. in Supp. Ex. M at 13 (1999 version).) Further, the Plan specifies that the Employer Trustees shall be appointed by the Motor Carriers Employers Conference - Central States, the Souther Motor Carriers Labor Relations Association, the United Parcel Service of America, the Cartage Employers Management Association, and the trustees themselves. (Br. in Supp. Ex. C at 4.) Thus, though plaintiffs allege that the CBA and the Plan grant Local 200 the power to appoint trustees, the documents belie this allegation.

Further, even were I to ignore the language of the CBA and the Plan, plaintiffs' fiduciary claims would nevertheless have problems. Plaintiffs do not allege or argue that Local 200

---

[2] On April 30, 2008, at a conference on this motion, **[*8]** plaintiffs' attorney clarified that the complaint's reference to Employer Trustees was not a typographical error. In any case, the Plan does not give Local 200 the power to appoint Employee Trustees, either.

exercised appointment power in a manner detrimental to the Plan. Rather, they allege that Local 200 failed to exercise the appointment power in some undisclosed way detrimental to plaintiffs. As stated, *HN6*[⬆] ERISA's fiduciary liability provisions are concerned with "'misuse of plan assets,'" not with responsibilities toward individual beneficiaries. *Forys, 829 F.2d at 607* (quoting *Russell, 473 U.S. at 142-43*); *see also § 1002(21)(A)*.

While plaintiffs correctly assert that it is often inappropriate to dismiss a case on the basis of fiduciary status prior to discovery, in the present case, the contracts that plaintiffs claim confer fiduciary status upon Local 200 in fact do not do so. Further, plaintiffs have not suggested that any other evidence exists that might support their contention that Local 200 has any **[*9]** discretionary control over the Plan. Thus, there is no point in authorizing discovery and no reason to delay dismissing plaintiff's claims under *§§ 1104*, 1005 or *1132*.

## B. Claim that Local 200 Violated *§ 1133(1)* & *(2)*

*Section 1133* states that:

> *HN7*[⬆] In accordance with regulations of the Secretary, every employee benefit plan shall -
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*HN8*[⬆] By its terms, this section only applies to an "employee benefit plan." Plaintiffs' complaint does not allege that Local 200 is an employee benefit plan, and it clearly is not. Plaintiffs argue that Local 200 is a plan fiduciary or a plan administrator, and thus may be sued under *§ 1133*. Putting to the side the fact that neither the CBA nor the Plan makes Local 200 a fiduciary or administrator of the plan, this is incorrect as a **[*10]** matter of law. Only an employee benefit plan may be sued under *§ 1133*. *Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397, 406 (7th Cir. 1996)*; *see also Smith v. Foremost Farms, No. 05-C-686, 2007 U.S. Dist. LEXIS 1815, 2007 WL 101201, at * 4 (E.D. Wis. Jan. 8, 2007)*. Local 200 is not an employee benefit plan, thus I will dismiss plaintiffs' *§ 1133* claims.

## C. Claim that Local 200 Breached a Duty of Good Faith and Fair Dealing

*HN9*[⬆] "'Every contract implies good faith and fair dealing between the parties to it.'" *Bozzacchi v. O'Malley, 211 Wis. 2d 622, 626, 566 N.W.2d 494 (Ct. App. 1997)* (quoting *Chayka v. Santini, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561 (1970))*; *accord Restatement (Second) of Contracts § 205*. Plaintiffs assert that Local 200 breached this duty and thereby violated state law or, to the extent that ERISA preempts a state law claim, violated federal law. *HN10*[⬆] ERISA preempts state law regarding the duty of good faith and fair dealing as it relates to an employee benefits plan. *Smith v. Blue Cross & Blue Shield United, 959 F.2d 655, 657 (7th Cir. Wis. 1992)*. The Seventh Circuit has stated that "where ERISA preempts state law but is silent on a topic, courts should develop a body of federal common law, where appropriate, based on principles **[*11]** of state law." *Metro. Life Ins. Co. v. Johnson, 297 F.3d 558, 567 (7th Cir. 2002)*. However, the federal courts have not established a common law duty of good faith

and fair dealing applicable to ERISA plans and one judge in this district recently declined to recognize such duty. *Smith, 2007 U.S. Dist. LEXIS 1815, 2007 WL 101201, at *4*.

Regardless of the preemption and federal common law issues, plaintiffs have failed to state any good faith claim. Plaintiffs do not specify which contract underlies this claim. Their complaint refers to two contracts: the Plan and the CBA. They concede that their good faith claim has only a "'tenuous, remote or peripheral'" relationship to the Plan, (Br. in Opp'n to Mot. to Dismiss at 14 (quoting *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983))*, thus their claim must be related to the CBA. However, plaintiffs are not parties to the CBA (except as represented by Local 200), thus there is no basis for their assertion that Local 200 had a duty of good faith and fair dealing with respect to them. *See Bozzacchi, 211 Wis. 2d at 626* (referring to a duty "between the parties" to a contract). Further, the relationship between plaintiffs and Local 200 is likely governed by federal **[*12]** labor relations law not by ERISA or any ERISA-related common law. Regardless, it is clear that plaintiffs have failed to state a claim for breach of an implied duty of good faith and fair dealing, whether such duty arises out of state or federal law. Thus, I will dismiss this claim.

## IV. CONCLUSION

**Therefore,**

**IT IS ORDERED** that defendant's motion to dismiss is **GRANTED** and this action is **DISMISSED.**

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2 day of May, 2008.

/s/

LYNN ADELMAN

District Judge

*End of Document*

# Tab B

 Cited
As of: December 16, 2019 3:50 PM Z

## *Arndt v. AON Hewitt Benefit Payment Servs., LLC*

United States District Court for the Eastern District of Wisconsin

November 19, 2015, Decided; November 19, 2015, Filed

Case No. 15-C-750

**Reporter**
2015 U.S. Dist. LEXIS 156553 *; 60 Employee Benefits Cas. (BNA) 2643; 2015 WL 7313392

JEFFREY ARNDT, Plaintiff, v. AON HEWITT BENEFIT PAYMENT SERVICES, LLC, et al., Defendants.

## Core Terms

benefits, preemption, preempted, misrepresentation, cases, beneficiary, retirement, pension, plans, damages, terms

**Counsel:** [*1] For Jeffrey K. Arndt, Plaintiff: Jill J Ray, Thomas Wickham Schmidt, LEAD ATTORNEYS, Law Firm of Conway Olejniczak & Jerry SC, Green Bay, WI.

For Aon Hewitt Benefit Payment Services, LLC, Hewitt Associates LLC, Defendants: Amanda S Amert, Hillary August, April A Otterberg, Jenner & Block LLP, Chicago, IL.

**Judges:** William C. Griesbach, Chief United States District Judge.

**Opinion by:** William C. Griesbach

## Opinion

### DECISION AND ORDER

Plaintiff Jeffrey Arndt brought this action in state court, alleging that the Defendants had misrepresented the pension benefits he would receive upon his retirement. Plaintiff alleges he relied on that misinformation, to his detriment, when he decided to retire from his job. The Defendants removed the case to federal court and now move to dismiss on the grounds of preemption. For the reasons given below, the motion will be granted.

The Defendants ("Hewitt") are in the business of administrating pension plans. Plaintiff's employer contracted with Hewitt to administer its plan, and in 2012 and 2013 Hewitt allegedly informed Arndt what he could expect to receive as a pension benefit when he retired. According to the complaint, Arndt did receive that expected benefit for some sixteen months, until [*2] he received a letter from Hewitt explaining that his benefit had been miscalculated because it had failed to account for payments to be made to Arndt's ex-wife. Arndt asserts that had he known what his actual benefit would have been, he would have kept working. The misinformation resulted in the lost wages he would have earned had he kept working. The complaint does not allege an actual cause of action (nor does it have to),

but in briefing the Plaintiff has suggested the Defendants' conduct amounts to negligent misrepresentation.

## I. Complete Preemption does not Apply

Hewitt first argues that dismissal is warranted because the cause of action is completely preempted by federal law, namely, the Employee Retirement and Income Security Act (ERISA), _29 U.S.C. § 1001, et seq._ Complete preemption—"a doctrine only a judge could love"—_Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1075 (7th Cir. 1992)_, confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim. _Franciscan Skemp Healthcare Inc. v. Central States, 538 F.3d 594, 596 (7th Cir. 2008)_.

Complete preemption is a doctrine of removal jurisdiction rather than a substantive "defense." If the complete preemption doctrine applies, a court recharacterizes a plaintiff's state law claims as federal ones for **[*3]** the purpose of creating federal question jurisdiction. The doctrine is aimed at preventing plaintiffs' lawyers from artfully crafting claims so as to remain in state court, thus depriving defendants of their federal forum for what are actually federal claims. In short, complete preemption is not a basis for dismissal of the claim on its merits, but merely a basis for finding federal jurisdiction. "Even when ERISA completely preempts a state claim, it does not follow that the claim should be dismissed." _Connecticut Gen. Life Ins. Co. v. Grand Ave. Surgical Ctr., Ltd., No. 13 C 4331, 2014 U.S. Dist. LEXIS 4855, 2014 WL 151755, *2 (N.D. Ill. Jan. 14, 2014)_.

Since the only purpose in discussing complete preemption is to establish subject matter jurisdiction, the analysis is relevant only in those cases where jurisdiction would otherwise be lacking. Here, the Plaintiff has conceded that diversity jurisdiction exists. The parties are from different states, and the complaint seeks lost wages and overtime for an unspecified amount of time, but presumably for several years, which would place the amount in controversy at well over the $75,000 threshold. Since there is already a basis for federal jurisdiction, it doesn't matter whether the claims are characterized as "federal" or not, because Hewitt may remove the case either way. _Bartholet, 953 F.2d at 1075_ (the "right **[*4]** to remove cases that 'really' depend on federal law goes by the misnomer 'complete preemption.'"); _Nat'l Prod. Workers Union Ins. Trust v. Life Ins. Co. N. Am., No. 05-CV-5415, 2010 U.S. Dist. LEXIS 29582, 2010 WL 1292429, at *7 (N.D. Ill. Mar. 29, 2010)_ ("Given the existence of [diversity] jurisdiction, there is no need to decide whether the Court also has federal question jurisdiction [under ERISA].") Accordingly, I agree with the Plaintiff that the complete preemption doctrine is neither relevant nor applicable here.

## II. Conflict Preemption

Hewitt also argues that conflict preemption applies. Unlike the ill-named doctrine of complete preemption, conflict preemption is an actual preemption defense that would warrant dismissal. For purposes of conflict preemption, ERISA preempts all state laws that "relate to" an ERISA-covered employee benefit plan. _New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)_; _§ 514(a)_. Here, clearly the claim alleged in the complaint "relates to" an ERISA plan because Hewitt's erroneous statements about the Plaintiff's pension plan were what induced him to retire early. But courts are not to apply an "uncritical literalism" to the preemption question. _Trustees of AFTRA_

*Health Fund v. Biondi, 303 F.3d 765, 780 (7th Cir. 2002)* (citations omitted). Almost any state law claim could be said to "relate to" a plan, and so "a state-law claim is not expressly preempted under *§ 1144(a)* merely because it requires a cursory examination of ERISA plan provisions." **[*5]** *Id.* Instead, preemption will be found only if a court is required to interpret or apply the terms of an ERISA plan, or if the claim interferes with or supplements what ERISA otherwise provides. *Id.*

Here, unlike most claims brought in preemption cases, the Plaintiff is not seeking benefits allegedly due under the plan in question. In fact, he goes to great pains to eschew any desire to collect funds he believes are owing. Instead, he seeks the wages he lost from his employer by relying on Hewitt's incorrect statements about what those benefits would be. The actual terms of the plan, he argues, are largely irrelevant to his claim.

Hewitt points to a number of cases in which plaintiffs' claims were found preempted despite an attenuated relationship with the plans themselves. For example, in *Haasl v. Leach Co.*, this court found preemption of breach of contract and negligent misrepresentation claims:

> The alleged fraud or misrepresentation here is that Yakley falsely said that the terms of the Leach plan were X, when actually they were Y. Just as was the case with the breach of contract claim, determining whether there was actually a misrepresentation will necessarily involve an interpretation **[*6]** of the actual terms of the Leach plan. At their heart, all of these claims must "relate to" an ERISA plan because they are based on misrepresentations about the terms of an ERISA plan.

*Haasl v. Leach Co., No. 02-C-1184, 2004 U.S. Dist. LEXIS 15302, 2004 WL 1584128, at *8 (E.D. Wis. Feb. 17, 2004)*.

In another case the Defendants cite, the plaintiff was suing to receive benefits under a plan he alleged he was promised, and the court found that "[a] suit based on the difference between the pension promised by contract and the pension established by the plan 'relates to' the pension plan." *Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1077 (7th Cir. 1992)*. Here, it is true that Arndt alleges that Hewitt said Arndt's benefits would be X, when in reality they were Y. The genesis of this lawsuit is an error in calculating plan benefits. But unlike *Haasl* and *Bartholet*, this plaintiff is studiously and deliberately *not* suing to receive the difference in benefits promised versus benefits actually received (X minus Y). Because the Plaintiff has conceded he is not entitled to more benefits under the plan, the court is not being asked to compare the alleged promise to the plan at all. Accordingly, Arndt is correct that a court hearing his claim would not be required to interpret the terms of the plan at issue. His claim is thus somewhat farther afield from the other preemption **[*7]** cases Hewitt cites.

Even so, the claim here is that an error in administering an ERISA plan led the Plaintiff to suffer damages. It is true that the Plaintiff has alleged damages *apart from* the benefits owed under the plan itself, but that will not save a claim that, at its core, is premised on an error in administering an ERISA plan. Otherwise, presumably any plaintiff could get around the preemption bar by alleging that the benefits administration error caused consequential damages rather than just the loss of plan benefits. For example, a plaintiff aggrieved by a miscalculation in benefits might allege infliction of emotional distress, which led to medical bills, as well as pain and suffering. Even if she did not seek the benefits themselves as damages, her lawsuit would no doubt be preempted as "relating to" an ERISA

plan. *Estate of Coggins v. Wagner Hopkins, Inc., 174 F. Supp. 2d 883, 888 (W.D. Wis. 2001)*; *Dreczka v. Hartford Life & Acc. Ins. Co., No. 10-C-0002, 2013 U.S. Dist. LEXIS 37774, 2013 WL 1148899, at *3 (E.D. Wis. Mar. 19, 2013)* (claim for emotional distress resulting from insurer's hiring of a private investigator preempted because it "arise[s] from and relate[s] to the administration of policy benefits".) The centerpiece of Plaintiff's argument is the fact that he is not seeking plan benefits but rather consequential damages resulting from an error in administering the plan, but that is not enough **[*8]** to save his claim from preemption.

It could be helpful to step back from the statute's text and examine the purpose of preemption in the first place. By drafting an express preemption clause, Congress intended to say that ERISA provided the *exclusive* means of obtaining redress for matters relating to benefit plans. The goal was "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law." *Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990).* That body of benefits law will not be uniform, however, if benefits administrators are subject to claims *in addition to* ERISA claims merely because the plaintiff seeks damages above and apart from the ERISA plan benefits themselves. Thus, the Supreme Court has held that "any state-law cause of action that . . . . supplements . . . the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted." *Aetna Health Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004).* ERISA creates a federal right of action for a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *29*

*U.S.C. § 1132(a)(1)(B)*. The claim alleged here would **[*9]** supplement what ERISA provides by making a third-party benefits administrator liable to a plan beneficiary not just for what is recoverable under ERISA itself but under state law consequential damage theories as well. Allowing a plaintiff to proceed on a claim not provided by ERISA itself would conflict with ERISA's exclusive domain because it would create an alternative enforcement mechanism to ERISA. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 658, 659-60, 658, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995).* "Generally speaking, ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan." *Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 378 (4th Cir. 2001).* " ERISA preemption is commonly understood to apply to state common law claims that an ERISA fiduciary misrepresented the nature or availability of retirement benefits, or failed to provide enough information to permit the retiring beneficiary to make an intelligent retirement decision." *Id.*

Arndt relies primarily on a Seventh Circuit case finding no preemption. In *Trustees of AFTRA Health Fund v. Biondi*, the Seventh Circuit found no preemption of a fraud claim brought against an employee who had failed to notify the plan that he had divorced his wife. *303 F.3d 765, 780 (7th Cir. 2002)*. In so holding, the **[*10]** court noted that an ERISA plan merely served as the context for the fraud by the employee, and allowing the lawsuit to proceed would not disrupt or supplant any of ERISA's fundamental concerns. *Id. at 779-780*. That result was reasonable because ERISA itself does not provide any kind of scheme for compensating employers for employee fraud. Here, however, the lawsuit is brought by a plan beneficiary who seeks compensation as a

result of an error in administering an ERISA plan—something at the very core of ERISA itself.

In a number of cases finding no preemption in misrepresentation cases, the key factor is that a third party was alleging fraud against an insurer or benefits administrator (or, as in *Biondi* against an employee), and ERISA itself does not provide any mechanism for recompense in such situations. "The crucial factor is less often the content of the misrepresentation, and more often the way the misrepresentation affects the relationship between the plan agents and the third-party providers." *Vencor Hosps.-Ltd. P'ship v. Aetna U.S. Healthcare, Inc., No. IP00-0695CBS, 2001 U.S. Dist. LEXIS 17546, 2001 WL 1029109, at *3 (S.D. Ind. Sept. 6, 2001)* (collecting cases). Those kinds of misrepresentation claims "do not alter the primary relationship between beneficiary and **[*11]** administrator under a plan." *Id.* By contrast, "[c]ourts have preempted state law claims in cases where third parties attempt to enforce or expand the rights of beneficiaries under the terms of ERISA plans, or where third parties assert rights as assignees of plan beneficiaries." *Id.* The point is that when a party is trying to expand the rights an ERISA plan beneficiary would otherwise have under ERISA, the claim is preempted. *Biondi*, on which Arndt relies heavily, is simply another example of a situation (fraud committed by an *employee*) in which ERISA does not have much say or provide any mechanism for recovery. By contrast, ERISA has a strong say about what avenues are available to a plan beneficiary who alleges an error was made in calculating his benefits. That means the claim is preempted.

In sum, Arndt is correct that this is not another in a long line of cases in which a plaintiff is trying to obtain benefits due under an ERISA plan through a mechanism other than ERISA

itself. Even so, allowing the claim to proceed would create a cause of action that supplements what ERISA already provides when a plan beneficiary alleges an error in benefits administration. Accordingly, I find the claim **[*12]** preempted and, because Plaintiff does not suggest that an amendment could cure the defect (i.e., that he would actually have a cause of action under ERISA itself), the case will be subject to dismissal.

## III. Conclusion

The Defendants' motion to dismiss is **GRANTED**. The case is dismissed with prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this 19th day of November, 2015.

/s/ William C. Griesbach

William C. Griesbach, Chief Judge

United States District Court

---

*End of Document*

# Tab C

 Neutral

As of: December 16, 2019 3:51 PM Z

# *Brugos v. Nannenga*

United States District Court for the Northern District of Indiana, Hammond Division

December 5, 2005, Decided

CAUSE NO. 2:03-CV-547 RM

**Reporter**

2005 U.S. Dist. LEXIS 31148 *; 36 Employee Benefits Cas. (BNA) 2041

JOHN D. BRUGOS, et al., Plaintiffs vs. GERRY NANNENGA, et al., Defendants

**Subsequent History:** Motion denied by *Brugos v. Nannenga, 2006 U.S. Dist. LEXIS 42870 (N.D. Ind., June 13, 2006)*

**Prior History:** *Brugos v. Nannenga, 2005 U.S. Dist. LEXIS 31147 (N.D. Ind., Dec. 5, 2005)*

## Core Terms

pension fund, quotations, continuity, employee benefit plan, state law, preempted, state law claim, predicate act, preemption, fiduciaries, pleaded, argues, pattern of racketeering activity, allegations, plaintiffs', regulation, courts, breach of fiduciary duty, remedies, parties, schemes, weighs

## Case Summary

### Procedural Posture

Plaintiffs, members of the board of trustees of a pension fund, sued defendant attorney for legal malpractice, breach of fiduciary duty, unjust enrichment, fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1961 et seq.* The attorney moved for dismissal of certain claims asserted against him for failure to state a claim against which relief could be granted under *Fed. R. Civ. P. 12(b)(6)*.

### Overview

The court had to decide whether the state law claims brought against the attorney were of the sort Congress intended to supplant when it passed the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, and also what effect the law upon which those claims were brought had on ERISA plans. The court found that based on the board members' pleaded facts, the common law breach of fiduciary duty claim against the attorney, which arose from the attorney's breach of fiduciary duties owed to the pension fund, was preempted because it offended Congress' intent to create an exclusive remedy in *29 U.S.C.S. §§ 1104* and *1109*, as asserted under *29 U.S.C.S. § 1132(a)(2)*. ERISA did not preempt the board members' claim under the Indiana Securities Act because ERISA explicitly allowed state law claims founded in the regulation of securities. *29 U.S.C.S. § 1144(b)(2)(A).* The attorney's motion

Amanda Stubblefield

dismiss the claims under _18 U.S.C.S. § 1962(c)_ and _(d)_, and _Ind. Code § 35-45-6-2_ was denied because the vast amount of participants and beneficiaries of the pension plan, and the distinct injuries inflicted by the alleged activities satisfied the continuity prong.

**Outcome**

The attorney's motion to dismiss was granted as to the breach of fiduciary duty claims, both of which were dismissed with prejudice, and denied the motion as to the remaining counts.

# LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

_HN1_[⤓] **Motions to Dismiss, Failure to State Claim**

A _Fed. R. Civ. P. 12(b)(6)_ motion to dismiss challenges the sufficiency of the complaint, not its underlying merits, and the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiffs. Dismissal under _Fed. R. Civ. P. 12(b)(6)_ is proper only if it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief, and the defendant bears the burden of showing the plaintiff has either pleaded facts that show he is not entitled to relief or failed to allege a claim upon which relief can be granted.

Pensions & Benefits Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits Law > ERISA > Federal Preemption > State Laws

_HN2_[⤓] **ERISA, Federal Preemption**

When faced with a conflict preemption assertion under the Employee Retirement Income Security Act (ERISA), _29 U.S.C.S. § 1001 et seq._, the statute provides the starting point for the court's analysis. Section 514(a) (_29 U.S.C.S. § 1144(a)_) of ERISA says that ERISA shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan. The trick is to determine how close a relation the state law must have to the plan. The United States Supreme Court has held that a law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan. It went on to stress that ERISA does not preempt only state laws specifically designed to affect employee benefit plans, or only state laws dealing with the subject matters covered by ERISA. Instead, as the Court reiterated later, ERISA includes expansive preemption provisions, which are intended to ensure that employee benefit plans regulation would be exclusively a federal concern.

Pensions & Benefits Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits Law > ERISA > Civil Litigation > General Overview

Pensions & Benefits Law > ERISA > Federal

Preemption > State Laws

**_HN3_[⬇]** **ERISA, Federal Preemption**

Congress enacted the Employee Retirement Income Security Act (ERISA), _29 U.S.C.S. § 1001 et seq._, to protect the interests of participants in employee benefit plans and their beneficiaries by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the federal courts. ERISA's comprehensive legislative scheme includes an integrated system of procedures for enforcement. That integrated enforcement mechanism, ERISA § 502(a) (29 U.S.C.S. § 1332(a)), is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans. Therefore, any state-law cause of action that duplicates, supplements or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted.

Pensions & Benefits
Law > ERISA > Federal
Preemption > General Overview

Pensions & Benefits
Law > ERISA > Federal
Preemption > State Laws

**_HN4_[⬇]** **ERISA, Federal Preemption**

While the preemption provisions of the the Employee Retirement Income Security Act (ERISA), _29 U.S.C.S. § 1001 et seq._, are expansive, the party asserting the preemption defense bears the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law. That is especially true for areas traditionally left to the states for regulation. For the court to determine whether the normal presumption against preemption has been overcome in a particular case, the court must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of the state law on ERISA plans.

Pensions & Benefits
Law > ERISA > General Overview

**_HN5_[⬇]** **Pensions & Benefits Law, ERISA**

The stated objectives of the Employee Retirement Income Security Act (ERISA), _29 U.S.C.S. § 1001 et seq._, are to protect the interests of participants and their beneficiaries, by requiring the disclosure and reporting of financial and other information by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the federal courts, and by improving the equitable character and soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring termination insurance.

Pensions & Benefits
Law > ERISA > Federal
Preemption > State Laws

**_HN6_[⬇]** **Federal Preemption, State Laws**

The United States Supreme Court has identified at least three instances where a state law can be said to have a connection with or reference to employee benefit plans,

when it (1) mandates employee benefit structures or their administration, (2) binds employers or plan administrators to particular choices or precludes uniform administration practice, thereby functioning as a regulation of an Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, plan itself, and (3) provides an alternate enforcement mechanism to ERISA.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Breach of Fiduciary Duty

Pensions & Benefits Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits Law > ERISA > Federal Preemption > State Laws

**HN7**[⬇] **Causes of Action, Breach of Fiduciary Duty**

When a plan under the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, or any party authorized by *29 U.S.C.S. § 1132* to execute a suit on behalf such plan, alleges that its fiduciaries breached an owed duty, *29 U.S.C.S. §§ 1104* and *1109* delineate the only possible claims and remedies, as shown by ERISA's objective to establish standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and provide for appropriate remedies, sanctions and ready access to the federal courts. *29 U.S.C.S. § 1001(b)*.

Pensions & Benefits Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits

Law > ERISA > Federal Preemption > State Laws

**HN8**[⬇] **ERISA, Federal Preemption**

The limited remedies available under the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, are an inherent part of the careful balancing between ensuring a fair and prompt enforcement of rights. To allow an identical common law claim, premised on identically pleaded facts, and seemingly pleaded only to supplement the ERISA remedies available would undermine Congress' intent to make the ERISA civil enforcement mechanism exclusive.

Pensions & Benefits Law > ERISA > Federal Preemption > Savings Clause

**HN9**[⬇] **Federal Preemption, Savings Clause**

The Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, explicitly allows state law claims founded in the regulation of securities. *29 U.S.C.S. § 1144(b)(2)(A)*.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN10**[⬇] **Complaints, Requirements for Complaint**

*Fed. R. Civ. P. 8* does not require a complaint include the facts or the elements of a claim.

Securities Law > ... > Elements of Proof > Pattern > General Overview

Securities Law > RICO Actions > Elements of Proof > General Overview

Securities Law > RICO Actions > Heightened Pleading Requirements

**HN11**[⬇] **Elements of Proof, Pattern**

Because the Indiana Racketeer Influenced and Corrupt Organizations Act, *Ind. Code § 35-45-6-1 et seq.*, was patterned after the federal Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1961 et seq.*, the courts analyze their alleged deficiencies jointly. A RICO plaintiff alleging a violation of *18 U.S.C.S. § 1962(c)* must show: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity, and the heightened pleading requirements of *Fed. R. Civ. P. 9(b)* apply to the allegations of fraud in a civil RICO complaint. Therefore, to plead adequately a pattern of racketeering activity, a plaintiff must allege with particularity two predicate acts. The complaint must be specific with respect to the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations.

Securities Law > ... > Elements of Proof > Pattern > Conspiracy

**HN12**[⬇] **Pattern, Conspiracy**

To state a claim for conspiracy under *18 U.S.C.S. § 1962(d)*, a plaintiff must allege: (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity; and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. The complaint

need not allege that each defendant agreed personally to commit two predicate acts but rather need only allege that each defendant agreed to participate in an endeavor which, if completed, would constitute a violation of the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1961 et seq.*

Securities Law > ... > Elements of Proof > Pattern > Continuity & Relationship Test

Securities Law > ... > Elements of Proof > Pattern > General Overview

**HN13**[⬇] **Pattern, Continuity & Relationship Test**

A pattern is required whether a claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1961 et seq.*, is pleaded under 18 U.S.C.S. § 1926(c) or (d) The United States Supreme Court long ago made clear that the statutory definition of a pattern, two racketeering acts within 10 years, did not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern. To establish a pattern of racketeering activity, a plaintiff must show continued criminal activity, or the threat thereof, and relationship between the predicate acts, a standard commonly dubbed the continuity plus relationship test.

Securities Law > ... > Elements of Proof > Pattern > Closed & Open Ended Continuity

Securities Law > ... > Elements of Proof > Pattern > Continuity & Relationship Test

**HN14**[⬇] **Pattern, Closed & Open Ended**

## Continuity

As the United States Supreme Court has noted, in the context of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.*, continuity is both a closed-and open-ended concept. As its name suggests, a closed period of racketeering activity involves a course of criminal conduct that has ended. A plaintiff may demonstrate a closed period of continuity by proving a series of related predicates extending over a substantial period of time. On the other hand, an open-ended period of racketeering is a course of criminal conduct that lacks the duration and repetition to establish continuity. A plaintiff may nevertheless satisfy continuity by showing past conduct that by its nature projects into the future with a threat of repetition. To summarize, a RICO plaintiff can satisfy the continuity prong either by: (1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit; or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future.

Securities Law > ... > Elements of Proof > Pattern > Continuity & Relationship Test

### *HN15*[↓] Pattern, Continuity & Relationship Test

Courts analyze allegations of continuity using a multifactor test, in which the court considers: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. No one factor is dispositive of a claim. Rather, analysis of the continuity prong is fact-specific and undertaken with the goal of achieving a natural and commonsense result, consistent with Congress' concern with long-term criminal conduct. While courts have hesitated to find several years long enough to satisfy the continuity requirement, there is no established benchmark time frame that is sufficient.

Securities Law > Blue Sky Laws > Types of Securities

### *HN16*[↓] Blue Sky Laws, Types of Securities

The Indiana Securities Act includes investment contract in its definition of "security." *Ind. Code § 23-2-1-1(k)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

### *HN17*[↓] Heightened Pleading Requirements, Fraud Claims

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. *Fed. R. Civ. P. 9(b)*. To survive a *Fed. R. Civ. P. 12(b)(6)* motion to dismiss, a fraud claim must plead the who, what, when, and where of the alleged fraud.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

### *HN18*[↓] Heightened Pleading Requirements, Fraud Claims

While the particulars of the charge of fraud would be easier to grasp if the acts, the times, the concealment, and a single defendant were

placed in a single paragraph, so long as those data are somewhere in the complaint, *Fed. R. Civ. P. 9(b)* is satisfied.

**Counsel: [*1]** For John D Brugos, Douglas Robinson, solely in their capacities as fiduciaries and members of the Special Litigation Committee and Board of Trustees of the Indiana Regional Council of Carpenters Pension Trust Fund a/k/a Northwest Indiana Regional Council of Carpenters Pension Trust Fund, Plaintiffs: Barry F Irwin, Kirkland and Ellis -- Chi/IL, Chicago, IL; Kevin B Duff, Marion B Adler, Rachlis Durham Duff & Adler, Chicago, IL.

For Indiana Regional Council of Carpenters Pension Trust Fund also known as Northwest Indiana Regional Council of Carpenters Pension Trust Fund, Plaintiff: Drew G A Peel, Scott F Hessell, Barry F Irwin, David E Suchar, Kirkland and Ellis -- Chi/IL, Chicago, IL.

For Builders and Carpenters LLC, Plaintiff: Kevin B Duff, Marion B Adler, Rachlis Durham Duff & Adler, Chicago, IL.

For Carl Paul Ihle Jr, Defendant: Alison L Benjamin, Nick J Thiros, Cohen & Thiros PC, Merrillville, IN.

For Kevin Pastrick, Defendant: George E Horn Jr, Michael V Knight, Barnes & Thornburg LLP -- SB/IN, South Bend, IN.

For Peter Manous, Defendant: Mark L Rotert, Matthew J Guide, Law Office of Mark L Rotert, Chicago, IL; Scott E Yahne, Efron Efron & Yahne PC, Hammond, **[*2]** IN.

For Lake Erie Land Co, Defendant: Ronald S Safer PHV, John C Martin PHV, Matthew D Lahey, Schiff Hardin LLP -- Chi/IL, Chicago, IL.

For Robert Novak, Defendant: Gregory J Sarkisian, Sarkisian and Fleming, Portage, IN; Albert J Lucas, Peter A Rosato, Calfee Halter & Griswold LLP -- Col/OH, Columbus, OH; John Patrick Reed, Abrahamson Reed & Bilse, Hammond, IN.

For James Bohlen, Defendant: Albert J Lucas, Peter A Rosato, Calfee Halter & Griswold LLP -- Col/OH, Columbus, OH; Harold Abrahamson, John Patrick Reed, Kenneth D Reed, Abrahamson Reed & Bilse, Hammond, IN; Abrahamson Reed & Bilse, Hammond, IN.

For Burke Costanza & Cuppy LLP, Movant: Natalie V Shrader, Burke Costanza & Cuppy LLP -- Mun/IN, Munster, IN.

For Robert Beiker, Terry Sherwood, ThirdParty Defendants: Steven J Roeder, Williams Montgomery & John Ltd, Chicago, IL.

For Mark Danielson, ThirdParty Defendant: Blake T Hannafan, Michael T Hannafan, Nicholas A Pavich, Michael T Hannafan & Associates Ltd, Chicago, IL.

For Carl Lakomek, ThirdParty Defendant: Kevin B Duff, Rachlis Durham Duff & Adler, Chicago, IL.

For David Tharp, ThirdParty Defendant: Kevin B Duff, Marion B Adler, Rachlis **[*3]** Durham Duff & Adler, Chicago, IL.

For Carl Paul Ihle Jr, Cross Defendant: Alison L Benjamin, Cohen & Thiros PC, Merrillville, IN.

For Peter Manous, Cross Defendant: Scott E Yahne, Efron Efron & Yahne PC, Hammond, IN.

For John D Brugos, Counter Defendant: Kevin B Duff, Rachlis Durham Duff & Adler, Chicago, IL.

For Douglas Robinson, solely in their capacities as fiduciaries and members of the Special Litigation Committee and Board of Trustees of the Indiana Regional Council of Carpenters Pension Trust Fund a/k/a Northwest Indiana Regional Council of Carpenters Pension Trust Fund,Counter Defendant: Kevin B Duff, Rachlis Durham Duff & Adler, Chicago, IL.

For Robert Beiker, ThirdParty Defendant: Steven J Roeder, Williams Montgomery & John Ltd, Chicago, IL.

For Carl Lakomek, ThirdParty Defendant: Marion B Adler, Rachlis Durham Duff & Adler, Chicago, IL.

For Terry Sherwood, ThirdParty Defendant: Steven J Roeder, Williams Montgomery & John Ltd, Chicago, IL.

For Mark Danielson, ThirdParty Defendant: Nicholas A Pavich, Michael T Hannafan & Associates Ltd, Chicago, IL.

**Judges:** Robert L. Miller, Jr., Chief Judge.

**Opinion by:** Robert L. Miller, Jr.

# Opinion

OPINION AND **[*4]** ORDER

Peter Manous moves for dismissal of certain claims asserted against him for failure to state a claim against which relief can be granted. _FED. R. CIV. P. 12(b)_6. The motion is ripe for ruling. [1] For the following reasons, the court grants the motion in part and denies it in part.

Mr. Manous served either as an attorney or advisor of the Pension Plan and as an undisclosed agent or attorney for Lake Erie Land. Mr. Manous pleaded guilty to eight crimes related to his actions **[*5]** in connection with the Coffee Creek Investment and was sentenced to more than two years' incarceration. Mr. Manous attacks the third amended complaint brought by John Brugos and Douglas Robinson, solely in their capacities as fiduciaries and members of the Board of Trustees of the Indiana Regional Council of Carpenters Pension Trust Fund a/k/a the Northwest Indiana Regional Council of Carpenters Pension Trust Fund ("the Pension Fund"), the Pension Fund, and Builders and Carpenters, LLC. The Board of Trustees and the Pension Fund created Builders and Carpenters, LLC, an Indiana Limited Liability Company, to act as the owner, developer, and operator of the Coffee Creek Investment.

Because the third amended complaint effectively subsumes all previous complaints,

---

[1] The plaintiffs' response appears to be in violation of N.D. IND. L.R. 5.2(a), which requires the response to be double-spaced. When converted to a double-spaced document, the response would violate N.D. IND. L.R. 7.1(d), which requires responses that would exceed 25 pages to be filed only with leave of court. Future violations of these rules will result in the court disregarding any pages exceeding the limit allowed by local rule or leave of court.

the court refers to it simply as the complaint. All claims pleaded in the complaint appear to stem from the Pension Fund's involvement in the Coffee Creek Investment -- land that was originally part of the Coffee Creek Center, a 640-acre residential and commercial development in Chesterton, Indiana owned principally by Lake Erie Land. The specifics surrounding the actual purchase of the Coffee Creek Investment are complex and **[*6]** detailed extensively in the complaint, and for the purposes of the motions before the court, the complaint's recitation of these specifics serve as the underlying facts for the court's analysis of the issues.

> Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later. A complaint suffices if any facts consistent with its allegations, and showing entitlement to prevail, could be established by affidavit or testimony at trial. The consistency proviso is why some complaints may be dismissed pronto: litigants may plead themselves out of court by alleging facts that defeat recovery.

*Doe v. Smith, 429 F.3d 706, 2005 U.S. App. LEXIS 25051, -- F.3d --, 2005 WL 3099687 at *1 (7th Cir. Nov. 21, 2005)* (quotations and citations omitted). *HN1*[↑] A *Rule 12(b)(6)* motion to dismiss challenges the sufficiency of the complaint, not its underlying merits, *see Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990)*, and the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiffs. *Slaney v. Int'l Amateur Ath. Fed'n, 244 F.3d 580, 597 (7th Cir. 2001).* **[*7]** Dismissal under *Rule 12(b)(6)* is proper only if it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief, *Szumny v. American Gen. Fin., 246 F.3d 1065, 1067 (7th Cir. 2001)*, and the defendant bears the burden of showing the plaintiff has either

pleaded facts that show he is not entitled to relief or failed to allege a claim upon which relief can be granted. *Doe v. Smith, 2005 U.S. App. LEXIS 25051, -- F.3d --, 2005 WL 3099687 at *1*; *Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005)*.

Mr. Manous seeks dismissal of counts VIII (legal malpractice), IX (breach of fiduciary duty), XI (unjust enrichment), XII (Indiana Crime Victims' Relief Act, "ICVRA" claims), XVI (Indiana Securities Act), and XVII (common law fraud) on the grounds that they are preempted by the Employee Income Retirement Security Act (ERISA) *29 U.S.C. § 1001, et seq.* He also moves the court to dismiss counts XIII (Racketeer Influenced and Corrupt Organizations Act, "RICO") and (Indiana Racketeer Influenced and Corrupt Organizations Act, "IRICO"), XIV (same), XVI (Indiana Securities Act), and XVII (common law fraud) because of various perceived **[*8]** pleading deficiencies.

First, Mr. Manous asserts the "conflict preemption" defense provided for in ERISA against all the state law claims brought against him. *HN2*[↑] When faced with a such an assertion under ERISA:

> the statute provides the starting point for [the court's] analysis. Section 514(a) [*29 U.S.C. § 1144(a)*] says that ERISA shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. The trick, as the Court explained in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)*, is to determine how close a relation the state law must have to the plan. In *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)*, the Court held that [a] law relates to an employee benefit plan, in the normal sense

of the phrase, if it has a connection with or reference to such a plan. It went on to stress that ERISA does not preempt only state laws specifically designed to affect employee benefit plans, or only state laws dealing with the subject matters covered by ERISA. Instead, as the Court reiterated later in *Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004),* **[*9]** ERISA includes expansive pre-emption provisions, which are intended to ensure that employee benefit plans regulation would be exclusively a federal concern.

*McDonald v. Household Int., Inc., 425 F.3d 424, 428 (7th Cir. 2005)* (quotations, citations, and parallel citations omitted).

**HN3**[↑] Congress enacted ERISA to protect . . . the interests of participants in employee benefit plans and their beneficiaries by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the Federal courts. . . . ERISA's comprehensive legislative scheme includes an integrated system of procedures for enforcement. This integrated enforcement mechanism, ERISA § 502(a), *29 U.S.C. § 1132(a)*, is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans. . . . Therefore, any state-law cause of action that duplicates, supplements or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore **[*10]** pre-empted.

*Aetna Health Inc., et al v. Davila, 542 U.S. 200, 208-209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)* (citations and quotations omitted).

**HN4**[↑] While ERISA's preemption provisions are expansive, the party asserting the preemption defense "bears the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA-ILA Med. and Clinical Servs. Fund, 520 U.S. 806, 814, 117 S. Ct. 1747, 138 L. Ed. 2d 21 (1997)* (quotations and citations omitted). This is especially true for areas traditionally left to the states for regulation. *Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d 765, 775 (7th Cir. 2002).* For the court to determine "whether the normal presumption against pre-emption has been overcome in a particular case, [the court] must go beyond the unhelpful text and the frustrating difficulty of defining its key term," *De Buono v. NYSA-ILA Med. and Clinical Servs. Fund, 520 U.S. 806, 813-14, 117 S. Ct. 1747, 138 L. Ed. 2d 21 (1997)* (quotations and citations omitted), and" look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of **[*11]** the state law on ERISA plans." *Egelhoff v. Egelhoff, 532 U.S. 141, 147, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (1997)* (quotations and citations omitted); *see also Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d at 776, n.8* ("we join the First Circuit in concluding that when the nexus between a state law and ERISA is less than clear, federal courts are required to evaluate the law in light of ERISA's statutory objectives -- regardless of which category of preemption the state law might fall under.").

In short, the court must decide whether the state law claims brought against Mr. Manous are of the sort Congress intended to supplant when it passed ERISA, and also what effect the law upon which these claims are brought has on ERISA plans, all the while keeping in mind ERISA's **HN5**[↑] stated objectives:

to protect . . . the interests of participants .

. . and their beneficiaries, by requiring the disclosure and reporting . . . of financial and other information . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal courts . . . and by **[*12]** improving the equitable character and soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring termination insurance.

*Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d at 774* (quoting *29 U.S.C. § 1001(b)-(c)*)(quotations and citations omitted).

Both parties say <u>Biondi</u> supports their respective positions. In <u>Biondi</u>, the trustees of a health insurance fund brought similar ERISA and state law claims against a participant of the fund alleging he intentionally misrepresented his marital status to secure future benefits for his ex-wife. Before analyzing whether the state law claims were preempted, the court of appeals reiterated that:

*HN6*[⬆] the Supreme Court has identified at least three instances where a state law can be said to have a connection with or reference to employee benefit plans, when it (1) mandates employee benefit structures or their administration, (2) binds employers or plan administrators to particular choices or precludes uniform administration practice, thereby functioning as a regulation **[*13]** of an ERISA plan itself, and (3) provides an alternate enforcement mechanism to ERISA.

*Trustees of the AFTRA Health Fund v. Biondi, 303 F.3d at 775*. After comparing the trustees' claims with the Supreme Court's three instances, the court of appeals concluded the

defendant hadn't carried his burden to prove the trustees' state law claims fell into one of three categories, and thus found ERISA did not preempt the claims. Mr. Manous argues that unlike the claims in <u>Biondi</u>, the plaintiffs' state law claims are impermissible alternative enforcement mechanisms to ERISA. [2]

Mr. Manous argues that the plaintiffs' common law breach of fiduciary duty claim is identical **[*14]** to the ERISA breach of fiduciary duty claim, and is premised on the same facts. As explicitly stated in the complaint, the claim arises from Mr. Manous' breach of his fiduciary duties owed to the Pension Fund as the Pension Fund's lawyer and advisor. *HN7*[⬆] When an ERISA plan (or any party authorized by *29 U.S.C. § 1132* to execute a suit on behalf such plan) alleges that its fiduciaries breached an owed duty, *29 U.S.C. §§ 1104* and *1109* delineate the only possible claims and remedies, as shown by ERISA's objective to "establish[] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and . . . provide for appropriate remedies, sanctions and ready access to the Federal courts." *29 U.S.C. § 1001(b)*. To allow a common law breach of fiduciary duty claim arising from these facts would conflict with this objective.

Moreover, the only difference between count VI, which alleges a breach of fiduciary duty under ERISA, and claim IX, which alleges a breach of common law fiduciary duty, is the requested remedy of punitive damages. This, too, conflicts with Congress' objectives when it enacted **[*15]** ERISA, as *HN8*[⬆] "the limited remedies available under ERISA are an inherent part of the careful balancing between

---

[2] While the parties disagree as to whether the three instances identified in <u>Biondi</u> are exhaustive of the three instances where preemption is proper under *29 U.S.C. § 1144*, the court needn't resolve that issue. Mr. Manous crafts his arguments in terms of this third instance articulated <u>Biondi</u>.

ensuring a fair and prompt enforcement of rights." *Aetna Health Inc., et al v. Davila, 542 U.S. at 215* (quotations and citations omitted). To allow an identical common law claim, premised on identically pleaded facts, and seemingly pleaded only to supplement the ERISA remedies available would undermine "Congress' intent to make the ERISA civil enforcement mechanism exclusive." *Id. at 216*. Based on the plaintiffs' pleaded facts, the common law breach of fiduciary duty claim against Mr. Manous is preempted because it offends Congress' intent to create an exclusive remedy in *29 U.S.C. §§ 1104* and *1109* (as asserted under *29 U.S.C. § 1132(a)(2)*. [3]

 **[*16]** Mr. Manous asks this court to find ERISA preempts the plaintiffs' Indiana Securities Act claim. ERISA **HN9**[⬆] explicitly allows state law claims founded in the regulation of securities. *29 U.S.C. § 1144(b)(2)(A)*. Whether the plaintiffs have pleaded the requisite facts under this claim is addressed below, but the claim is not preempted.

Mr. Manous argues the remaining state law claims: unjust enrichment; professional malpractice; common law fraud; and any claim brought under the Indiana Crimes Victim's Relief Act; all fall within the heart of ERISA regulation because an ERISA plan was the alleged victim and the remedies sought conflict with ERISA's exclusive enforcement scheme. Mr. Manous, though, has not cited any law that *per se* renders these claims preempted by ERISA. Moreover, there exists facts the plaintiffs could prove that would entitle them to relief. Thus, preemption analysis would be

premature and improper at this stage, as would dismissal for this reason under *Rule 12(b)(6)*.

Alternatively, Mr. Manous seeks dismissal of certain claims based on various pleading deficiencies. He says the plaintiffs did not adequately plead their professional malpractice, **[*17]** unjust enrichment, RICO, IRICO, Indiana Securities Act, and common law fraud claims.

Mr. Manous attacks both the professional malpractice and unjust enrichment claims because they lack the requisite facts or elements needed to prevail. *Rule 8* **HN10**[⬆] does not require a complaint include "the facts or the elements of a claim." *Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002)*; see also *FED. R. CIV. P. 8(a)(2)*. Thus, these claims stand.

Mr. Manous also attacks the claims under RICO, *18 U.S.C. § 1962(c)* and *(d)*, and IRICO *IND. CODE § 35-45-6-2*, asserting the plaintiffs failed to allege a pattern of racketeering activity sufficient to support either claim. **HN11**[⬆] Because the IRICO statue was patterned after the federal RICO statute, *Yoder Grain, Inc. v. Antalis, 722 N.E.2d 840, 845 (Ind. App. 2000)*, the court analyzes their alleged deficiencies jointly.

A RICO plaintiff alleging a violation of *§ 1962(c)* must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity . . . [and] the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* **[*18]** apply to the allegations of fraud in a civil RICO complaint. Therefore, to plead adequately a pattern of racketeering activity, a plaintiff must allege with particularity two predicate acts. The complaint must be specific with respect to the time, place, and content of the alleged

---

[3] Because Count X necessarily relies on the existence of Count IX, that too is dismissed. The ERISA counterparts to these claims are already pleaded in Count VI and Count VII, so there seems no need to follow the traditional route of dismissing the claim without prejudice and granting the plaintiff leave to amend the complaint with an appropriate ERISA claim.

false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations.

*Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 784 (7th Cir. 1999)* (quotations and citations omitted).

HN12[⬆] To state a claim for conspiracy under *§ 1962(d)*, a plaintiff must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals. The complaint need not allege that each defendant agreed personally to commit two predicate acts but rather need only allege that each defendant agreed to participate in an endeavor which, if completed, would constitute a violation of RICO.

**[*19]** Id. (quotations and citations omitted).

Mr. Manous argues the complaint lacks the particular facts needed to establish a pattern of racketeering activity. Such HN13[⬆] a pattern is required whether a RICO claim is pleaded under *18 U.S.C. § 1962(c)* or *(d)*.

the Supreme Court long ago made clear that the statutory definition of a pattern -- two racketeering acts within ten years -- did not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern. To establish a pattern of racketeering activity, a plaintiff must show continued criminal activity (or the threat thereof) and relationship between the predicate acts -- a standard commonly dubbed the continuity plus relationship test.

* * *

HN14[⬆] As the Court has noted, continuity is both a closed-and open-ended concept. As its name suggests, a closed period of racketeering activity involves a course of criminal conduct that has ended. A plaintiff may demonstrate a closed period of continuity by proving a series of related predicates extending over a substantial period of time. On the other hand, an open-ended period of racketeering is a course of **[*20]** criminal conduct that lacks the duration and repetition to establish continuity. A plaintiff may nevertheless satisfy continuity by showing past conduct that by its nature projects into the future with a threat of repetition. To summarize, a RICO plaintiff can satisfy the continuity prong either by (1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future.

*Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d 659, 672-73 (7th Cir. 2005)* (citations and quotations omitted).

Mr. Manous doesn't argue that the predicate acts lack the needed relationship. He focuses instead on the continuity prong. HN15[⬆] Courts analyze allegations of continuity using "a multifactor test, in which [the court] considers (1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries." *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d at 673.* **[*21]** "No one factor is dispositive of a claim. Rather, . . . analysis of the continuity prong is fact-specific and undertaken with the goal of achieving a natural and commonsense result, consistent

with Congress' concern with long-term criminal conduct." Id. (quotations and citations omitted).

The plaintiffs identify several predicate acts of varying type, and note they all occurred within in a finite time frame of five years. While courts have hesitated to find several years long enough to satisfy the continuity requirement, there is no established benchmark time frame that is sufficient. *See Roger Whitmore's Auto. Servs.. Inc. v. Lake County, Ill., 424 F.3d at 673*. This factor, then, weighs slightly in the plaintiffs' favor.

The parties identify the Pension Fund (and potentially two other pension funds) as the only victim(s), but the court is not entirely comfortable with assuming the damage is to the Pension Fund alone and not to its beneficiaries and participants. At this stage, the actual amount of damage cannot (and must not) be determined; the alleged amount of loss (more than $ 5 million) is taken as true, so the Pension Fund's participants and beneficiaries **[*22]** might turn out to be the true victims of the purported scheme. Given the vast amount of participants and beneficiaries, at this stage this factor weighs heavily in favor of the plaintiffs.

The parties disagree on the number of schemes involved. Mr. Manous argues that however one reads the complaint, the facts support only one scheme with one intended result-to influence the Pension Fund to purchase the Coffee Creek Investment and to financially benefit from the sale. The plaintiffs argue the complaint identifies at least two schemes-the initial scheme to influence the Pension Fund to purchase the Coffee Creek Investment, and the subsequent scheme to cover it up when the Department of Labor began its investigation.

While arguing the first factor (that the predicate acts of the schemes occurred over a sufficiently long time frame), the plaintiffs

identify the duration of the alleged schemes as lasting five years. Yet, when arguing this third factor, the Pension Fund sees two separate schemes, with first (influencing the Pension Fund to purchase the Coffee Creek Investment) beginning in 1998 and ending in 2000, and the second (the cover-up) beginning in 2000 and lasting, at the most, **[*23]** until 2003. The Pension Fund cannot have it both ways, so the court finds only one scheme pleaded in the complaint. This factor weighs strongly in favor of Mr. Manous.

Finally, the court is to look at the occurrence of distinct injuries inflicted by the alleged activity. Mr. Manous identifies a single alleged injury to the Pension Fund as the sole purchaser of the land. As the plaintiffs identify, though, there were at least two distinct categories of injury even if there is only one scheme: the first occurred when Mr. Manous influenced the Pension Fund to purchase the Coffee Creek Investment, and the second when the Pension Fund incurred substantial losses resulting from the concealment of the scheme. This factor weighs in favor of the Pension Fund.

When all the factors are weighed, the scale tips in favor of the plaintiffs having sufficiently pleaded their RICO and IRICO claims."Analysis of the continuity prong is fact-specific," *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d at 673*, though, and at this procedural stage, the court could look only to the complaint and draw all reasonable inferences in favor of the plaintiff. Facts on which Mr. **[*24]** Manous relies might provide the grounds for success at summary judgment or trial, but they cannot provide the reason to dismiss the claims now. Whether the plaintiffs can succeed on their claims is not today's issue-it is enough that they have comported with the pleading requirements of the law.

Mr. Manous also argues the Indiana Securities

Act claim should be dismissed. However, the complaint identifies the existence of an investment contract that gives rise to the alleged liability referred to in count XVI. The Indiana Securities Act *HN16*[↑] includes "investment contract" in its definition of "security." *IND. CODE § 23-2-1-1(k)*. If the plaintiffs prove the existence of this investment contract, and show it was offered and sold in violation of the Indiana Securities Act, the plaintiffs would be entitled to relief.

Finally, Mr. Manous argues the complaint fails to allege the common law fraud claim against him with the required specificity. He points to the language contained in count XVII itself to highlight the broad language in which the plaintiffs allege the fraud. The Pension Fund responds by highlighting other language contained in the complaint that it contends **[*25]** satisfies the pleading requirements.

*HN17*[↑] "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *FED. R. CIV. P. 9(b)*. To survive a *Rule 12(b)(6)* motion to dismiss, a fraud claim "must plead the who, what, when, and where of the alleged fraud." *Lachmund v. ADM Investor Servs., Inc., 191 F.3d at 782* (quotations and citations omitted).

Mr. Manous says neither the fraud claim itself, nor the identified paragraphs by the Pension Fund satisfy the heightened pleading standard. When the court considers all the specific allegations contained in the complaint, though, the complaint adequately alleges the who, what, when, and where of the alleged fraud asserted against Mr. Manous. *HN18*[↑] While "the particulars of the charge of fraud would be easier to grasp if the acts, the times, the concealment, and a single defendant were placed in a single paragraph . . . [so] long as those data are somewhere in the complaint --

and they are -- *Rule 9(b)* is satisfied." *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co., 412 F.3d 745, 749 (7th Cir. 2005).* **[*26]**

For these reasons, the court GRANTS Peter Manous' motion to dismiss as to count IX and count X, both of which shall be dismissed with prejudice, and DENIES the motion as to the remaining counts [Doc. No. 153].

SO ORDERED.

ENTERED: December 5, 2005

Robert L. Miller, Jr.

Chief Judge

United States District Court

_____

**End of Document**

# Tab D

Q Questioned
As of: December 16, 2019 3:52 PM Z

# *AT&T v. Empire Blue Cross & Blue Shield*

United States District Court for the District of New Jersey

July 18, 1994, Decided ; July 19, 1994, Filed; July 20, 1994, ENTERED on THE DOCKET

Civ. No. 93-1224 (HLS)

**Reporter**

1994 U.S. Dist. LEXIS 21091 *; 1994 WL 16057794

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Plaintiffs, v. EMPIRE BLUE CROSS AND BLUE SHIELD, et al., Defendants.

**Notice:** [*1] NOT FOR PUBLICATION

**Disposition:** Defendants' joint motion to dismiss the complaint against them or for summary judgment on Count 1 denied as to the ERISA and RICO claims (Counts 1, 3, and 4), and granted as to Counts 6, 8, 10, 12, 14, 15, 16, 18, and 19. Defendant Capital Blue Cross' appeal of Magistrate Judge Pisano's Order granting plaintiffs' motion to file a Third Amended Complaint dismissed as moot, and Capital's motion for summary judgment denied. The motion of defendants Associated and Southeastern to dismiss or for summary judgment denied, and plaintiffs' cross-motion as to the audit claim against Associated and Southeastern granted.

## Core Terms

fiduciary, Discounts, enterprise, allegations,

funds, discretionary authority, summary judgment, fiduciary duty, audit, Participating, entities, defendants', plaintiffs', amounts, affiliates, Appeals, centralization, Deposition, plans, fraudulent, preemption, preempted, Benefits, state law, breached, state law claim, negotiated, bills, complaint alleges, accounting

## Case Summary

### Procedural Posture

Defendant medical plan administrators moved to dismiss plaintiff employer's complaint brought in its own right and on behalf of medical benefit plans for its employees, to recover damages allegedly suffered due to Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, and Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1962*, violations by defendant. Plaintiffs cross-moved for summary judgment.

### Overview

Plaintiff employer, the plan sponsor and fiduciary, asserted claims of ERISA violation, breach of contract, and breach of the implied covenant of good faith and fair dealing against

defendant medical plan administrators. Plaintiff also sought an accounting and an audit of the books and records of defendants. The gravamen of plaintiff's suit was that defendants withheld discounts that should have been refunded, and made misrepresentations that made possible the withholding of those amounts. The court concluded that the complaint as a whole alleged sufficient connections between defendants' discretionary authority and their alleged misdeeds to state a claim that defendants breached fiduciary duties under ERISA. Such allegations were sufficient to warrant an accounting. Reading the allegations broadly, the court concluded that plaintiff sufficiently alleged that defendants collectively participated in the operation or management of the alleged enterprises to subject them to RICO liability. Even if the underlying claim were at base a breach of contract claim, sufficient allegations of misrepresentation and fraud related to that breach could support a RICO claim.

**Outcome**

Defendants' joint motion to dismiss the complaint against them or for summary judgment on ERISA and RICO claims was denied. The motion to dismiss was granted as to the remaining counts.

# LexisNexis® Headnotes

Civil
Procedure > ... > Responses > Defenses,

Demurrers & Objections > Motions to Dismiss

**_HN1_[↓] Defenses, Demurrers & Objections, Motions to Dismiss**

The court can only grant a motion to dismiss if, reading all inferences of the complaint in plaintiffs' favor, there is no set of facts on which plaintiffs can prevail.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

**_HN2_[↓] Summary Judgment, Motions for Summary Judgment**

The court will only grant summary judgment if there are no issues of material fact and, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. _Fed. R. Civ. P. 56(c)_. Notwithstanding this presumption in favor of the non-moving party, in opposing a motion for summary judgment, a party must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.

Pensions & Benefits

Law > ... > Fiduciaries > Fiduciary Responsibilities > General Overview

**HN3**[⬇] **Fiduciaries, Fiduciary Responsibilities**

See *29 U.S.C.S. § 1002(21)(A)*.

Business & Corporate Compliance > ... > Fiduciaries > Fiduciary Responsibilities > Duty of Loyalty

Governments > Fiduciaries

Pensions & Benefits Law > ... > Fiduciary Responsibilities > Prohibited Transactions > General Overview

Pensions & Benefits Law > ERISA > General Overview

Business & Corporate Compliance > ... > Fiduciaries > Fiduciary Responsibilities > Prohibited Transactions

**HN4**[⬇] **Fiduciary Responsibilities, Duty of Loyalty**

An Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, fiduciary must discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, *29 U.S.C.S. § 1104(a)*, and in performing services to the plan is limited to reasonable compensation and reimbursement of expenses properly and actually incurred. *29 U.S.C.S. §§ 1106(a)* & *1108(c)(2)*.

Governments > Fiduciaries

Pensions & Benefits Law > ... > Fiduciaries > Fiduciary Responsibilities > General Overview

Pensions & Benefits

Law > ERISA > General Overview

Pensions & Benefits Law > ERISA > Fiduciaries > General Overview

**HN5**[⬇] **Governments, Fiduciaries**

Where an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, attach. Where, however, employers conduct business and make business decisions not regulated by ERISA, no fiduciary duties apply. And, when employers wear "two hats" as employers and administrators they assume fiduciary duties only when and to the extent that they function as plan administrators, not when they conduct business that is not regulated by ERISA.

Governments > Fiduciaries

Pensions & Benefits Law > ... > Fiduciaries > Fiduciary Responsibilities > General Overview

Pensions & Benefits Law > ERISA > General Overview

Pensions & Benefits Law > ERISA > Fiduciaries > General Overview

**HN6**[⬇] **Governments, Fiduciaries**

Where a defendant insurance company is an Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, plan fiduciary with respect to claims handling, it is not a fiduciary with respect to functions owed by the administrator, such as notifying plan beneficiaries of policy lapse.

Business & Corporate
Compliance > ... > ERISA > Funding
Requirements > Pension Plan Funding

Pensions & Benefits Law > ERISA > Claim
Procedures

*HN7*[⬇] **Funding Requirements, Pension Plan Funding**

See *29 C.F.R. § 2580.412-5(b)(2) (1993)*.

Business & Corporate
Compliance > ... > ERISA > Funding
Requirements > Pension Plan Funding

Governments > Fiduciaries

Pensions & Benefits Law > ERISA > Claim
Procedures

*HN8*[⬇] **Funding Requirements, Pension Plan Funding**

To determine whether a particular item constitutes an asset of the plan, it is necessary to determine whether the item question may be used to the benefit, financial or otherwise, of the fiduciary at the expense of plan participants or beneficiaries.

Governments > Fiduciaries

Pensions & Benefits Law > ERISA > Civil
Litigation > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Fiduciaries > General
Overview

Pensions & Benefits

Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

*HN9*[⬇] **Governments, Fiduciaries**

An employer may not bring an action under the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, to recover losses that the employer itself suffered. Fiduciary duties under ERISA are generally owed to plan participants and beneficiaries only. However, an employer that is also a plan fiduciary may bring an ERISA claim on behalf of the plan to recover losses suffered by the plan. *29 U.S.C.S. § 1132*.

Governments > Fiduciaries

Pensions & Benefits
Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Fiduciaries > General
Overview

*HN10*[⬇] **Governments, Fiduciaries**

The Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, definition of fiduciary should be given a broad reading.

Governments > Fiduciaries

Pensions & Benefits
Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

Pensions & Benefits
Law > ERISA > Fiduciaries > General
Overview

**HN11**[⬇] **Governments, Fiduciaries**

See *29 U.S.C.S. § 1105(a)*.

Governments > Fiduciaries

Pensions & Benefits
Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Fiduciaries > General
Overview

**HN12**[⬇] **Governments, Fiduciaries**

An Employee Retirement Income Security Act
(ERISA), *29 U.S.C.S. § 1001 et seq.*, fiduciary
has obligation to provide account on demand
to Plan.

Antitrust & Trade Law > ... > Private
Actions > Racketeer Influenced & Corrupt
Organizations > General Overview

Criminal Law &
Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations
Act > Elements

Criminal Law &
Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations
Act > General Overview

**HN13**[⬇] **Private Actions, Racketeer
Influenced & Corrupt Organizations**

See *18 U.S.C.S. § 1962(c)*.

Antitrust & Trade Law > ... > Private

Actions > Racketeer Influenced & Corrupt
Organizations > General Overview

Criminal Law &
Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations
Act > General Overview

**HN14**[⬇] **Private Actions, Racketeer
Influenced & Corrupt Organizations**

There are four elements necessary to make
out a claim under *18 U.S.C.S. § 1962(c)*: (1)
the existence of an enterprise affecting
interstate commerce; (2) that the defendant
was employed by or associated with the
enterprise; (3) that the defendant participated,
either directly or indirectly, in the conduct or
the affairs of the enterprise; and (4) that he or
she participated through a pattern of
racketeering activity.

Antitrust & Trade Law > ... > Private
Actions > Racketeer Influenced & Corrupt
Organizations > General Overview

Criminal Law &
Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations
Act > Elements

Criminal Law &
Procedure > ... > Racketeering > Racketeer
Influenced & Corrupt Organizations
Act > General Overview

**HN15**[⬇] **Private Actions, Racketeer
Influenced & Corrupt Organizations**

*18 U.S.C.S. § 1961(4)* defines an enterprise
as any individual, partnership, corporation,
association, or any legal entity, and any union
or group of individuals associated in fact
although not a legal entity.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > Elements

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

## *HN16*[⬇] Private Actions, Racketeer Influenced & Corrupt Organizations

A Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1962*, enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation, and an alleged association-in-fact of the defendant corporation, its employees, and its agents does not constitute an enterprise distinct from the defendant corporation.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > Elements

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

## *HN17*[⬇] Private Actions, Racketeer Influenced & Corrupt Organizations

In order to be subject to liability under *18 U.S.C.S. § 1962(c)*, a defendant must have

had some part in directing the affairs of the enterprise. Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1962*, liability is not limited to those with primary responsibility for the enterprise's affairs, but some part in directing the enterprise's affairs is required.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > Elements

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

## *HN18*[⬇] Private Actions, Racketeer Influenced & Corrupt Organizations

Where a defendant accountant provides accounting services to the alleged enterprise, the Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1962*, claim against him should not be dismissed because he is alleged to have participated directly in the alleged fraud, the primary RICO violation.

Business & Corporate Compliance > ... > ERISA > Criminal Charges & Defenses > Theft

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

Criminal Law & Procedure > ... > Theft & Related

Offenses > Embezzlement > General Overview

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

Pensions & Benefits Law > ERISA > Criminal Charges & Defenses > General Overview

*HN19*[🔽] **Criminal Charges & Defenses, Theft**

Predicate acts of fraud alleged under Racketeer Influenced and Corrupt Organizations (RICO), *18 U.S.C.S. § 1962*, must be plead with particularity in accordance with *Fed. R. Civ. P. 9(b)*.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

*HN20*[🔽] **Pleadings, Heightened Pleading Requirements**

*Fed. R. Civ. P. 9(b)* requires a plaintiff to plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

*HN21*[🔽] **Pleadings, Heightened Pleading Requirements**

In applying *Fed. R. Civ. P. 9(b)*, focusing exclusively on its particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules. *Rule 9(b)* requires plaintiffs to plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that the allegations of date, place or time fulfill these functions, but nothing in the rule requires them.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

*HN22*[🔽] **Pleadings, Heightened Pleading Requirements**

*Fed. R. Civ. P. 9(b)* is satisfied when the allegations in the complaint indicate who made the representations to whom, and the general content of the representations.

Criminal Law & Procedure > ... > Theft & Related Offenses > Embezzlement > Elements

Pensions & Benefits Law > ... > Fiduciary Responsibilities > Prohibited Transactions > General Overview

Criminal Law & Procedure > ... > Theft & Related
Offenses > Embezzlement > General Overview

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

Business & Corporate Compliance > ... > Fiduciaries > Fiduciary Responsibilities > Prohibited Transactions

## *HN23*[⤓] **Embezzlement, Elements**

*18 U.S.C.S. § 664* prohibits conversion of funds related to an employee welfare benefit plan.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > General Overview

## *HN24*[⤓] **Private Actions, Racketeer Influenced & Corrupt Organizations**

To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose. Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.

Insurance Law > ... > ERISA > Preemption Clause > Bad Faith & Misrepresentation

Pensions & Benefits

Law > ERISA > Federal Preemption > Definitions

Insurance Law > ... > ERISA > Preemption Clause > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Federal Preemption

Pensions & Benefits
Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits
Law > ERISA > Federal Preemption > State Laws

## *HN25*[⤓] **Preemption Clause, Bad Faith & Misrepresentation**

Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, preempts any and all state laws insofar as they may now or hereafter relate to any employee benefit plan covered by ERISA. *29 U.S.C.S. § 1144(a)*. "State laws" as defined in the statute include all laws, decisions, rules, regulations, or other state action having the effect of law, of any state. *29 U.S.C.S. § 1144(c)(1)*.

Pensions & Benefits
Law > ERISA > Federal Preemption > General Overview

Pensions & Benefits Law > Employee Benefit Plans > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Federal Preemption

**HN26[↧] ERISA, Federal Preemption**

The Employee Retirement Income Security Act's (ERISA), *29 U.S.C.S. § 1001 et seq.*, preemption provisions establish as an area of exclusive federal concern the subject of every state law that relates to an employee benefit plan governed by ERISA.

Pensions & Benefits
Law > ERISA > Federal
Preemption > State Laws

Pensions & Benefits
Law > ERISA > Federal Preemption

Pensions & Benefits
Law > ERISA > Federal
Preemption > General Overview

**HN27[↧] Federal Preemption, State Laws**

Courts have taken it for granted that state laws designed to affect employee benefit plans are preempted. However, a state law is also preempted even though it makes no mention of benefit plans, if it relates to any benefit plan. *29 U.S.C.S § 1144(a)*. The Supreme Court has interpreted the words "relate to" quite broadly in light of the legislative history behind the preemption clause, which was selected over more restrictive formulations of preemption. In light of the broad formulation of "state laws," preemption applies to state common-law claims as well as state statutes related to benefit funds.

Pensions & Benefits
Law > ERISA > Federal
Preemption > General Overview

Pensions & Benefits
Law > ERISA > Federal Preemption

**HN28[↧] ERISA, Federal Preemption**

A law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan. Under this broad common-sense meaning, a state law may relate to a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect.

Pensions & Benefits
Law > ERISA > Federal
Preemption > General Overview

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits
Law > ERISA > Federal Preemption

**HN29[↧] ERISA, Federal Preemption**

A rule of law relates to an Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, plan if it is specifically designed to affect employee benefit plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan. Where the court is dealing with a statute of general applicability which does not single out ERISA plans for special treatment, and which functions without regard to the existence of such plans, the cases which have cordoned off this area of preemption are inapplicable.

Governments > Fiduciaries

Pensions & Benefits
Law > ERISA > Federal
Preemption > State Laws

Pensions & Benefits
Law > ERISA > General Overview

Pensions & Benefits

Law > ERISA > Federal Preemption

Pensions & Benefits
Law > ERISA > Federal
Preemption > General Overview

*HN30*[⬇] **Governments, Fiduciaries**

Courts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.*, entities, such as the employer, the plan, the plan fiduciaries, and the beneficiaries, than if it affects the relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan.

**Counsel:** Robert J. Gilson, Esq., Michael R. Cole, Esq., Riker, Danzig, Scherer, Hyland & Perretti, Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 (Attorneys for plaintiffs).

William J. O'Shaughnessy, Esq., Clapp & Eisenberg, One Newark Center, Newark, NJ 07102 (Attorney for defendant Empire Blue Cross).

Yale I. Lazris, Esq., Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg, 155 Prospect Avenue, West Orange, NJ 07052 (Attorney for defendants Independence Blue Cross and Blue Cross and Blue Shield of the National Capital Area).

Michael **[*2]** R. Perle, Esq., Hayden, Perle & Silber, 1500 Harbor Blvd., Weehawken, NJ 07087 (Attorney for defendant Blue Cross and Blue Shield Mutual of Ohio).

Lauren E. Handler, Esq., Porzio, Bromberg & Newman, 163 Madison Ave., Morristown, NJ 07962-1997 (Attorney for defendant Blue Cross and Blue Shield of Illinois, a/k/a Health Care Services Corporation).

Richard M. Hannon, Esq., Vice President & General Counsel, Blue Cross and Blue Shield of Arizona, Inc., 2444 West Las Palmaritas Dr., Phoenix, AZ 85021-4883 (Attorney for defendant Blue Cross and Blue Shield of Arizona).

Andrew O. Bunn, Esq., David R. Kott, Esq., McCarter & English, Four Gateway Center, 100 Mulberry Street, Newark, NJ 07101-0652 (Attorneys for defendants Blue Cross and Blue Shield of Michigan, Blue Cross and Blue Shield of Virginia, and Central Benefits Mutual Insurance Company).

Hugh Francis, Esq., Francis & Berry, 310 South Street, Morristown, NJ 07960 (Attorney for defendant Blue Cross of California).

Patricia A. Hart, Esq., Blue Cross and Blue Shield of Missouri, 1831 Chestnut Street, St. Louis, MO 63103 (Attorney for defendant Blue Cross and Blue Shield of Missouri).

Lawrence E. Miller, Esq., **[*3]** LeBoeuf, Lamb, Greene & MacRae, One Riverfront Plaza, Newark, NJ 07102 (Attorney for defendants Associated Insurance Companies, Inc., a/k/a Blue Cross and Blue Shield of Indiana, and Blue Cross and Blue Shield of Kentucky, a/k/a Southeastern Group).

Steven J. Fram, Esq., Archer & Greiner, One Centennial Square, P.O. Box 3000, Haddonfield, NJ 08033-0966 (Attorney for defendant Capital Blue Cross).

George E. McDavid, Esq., Reed Smith Shaw & McClay, 116 Village Boulevard, Suite 200, Princeton Forrestal Village, Princeton, NJ 08540 (Attorney for defendant Blue Cross and Blue Shield of Western Pennsylvania).

Michael D. Malloy, Esq., Stern, Dunbrow & Marcus, 111 Dunnell Road, Maplewood, NJ 07040 (Attorney for defendant Blue Cross and Blue Shield of Florida, Inc.).

Herbert J. Stern, Esq., Stern & Greenberg, 75 Livingston Ave., Roseland, NJ 07068 (Attorney for defendant Blue Cross and Blue Shield of Massachusetts).

**Judges:** H. LEE SAROKIN, U.S. District Judge

**Opinion by:** H. LEE SAROKIN

# Opinion

## OPINION

*Sarokin,* **[*4]** *District Judge*

Before the court are six motions: (1) the joint motion of 14 defendants to dismiss the complaint against them and/or for summary judgment dismissal of State Street Bank as plaintiff; (2) the motion of Blue Cross and Blue Shield of Massachusetts and Blue Cross of Western Pennsylvania to dismiss the complaint against them; (3) the motion of Associated Insurance Companies, Inc., a/k/a Blue Cross and Blue Shield of Indiana, and Southeastern Group, Inc., a/k/a Blue Cross

and Blue Shield of Kentucky, to dismiss the complaint against them or, in the alternative, for summary judgment; (4) the cross-motion of plaintiffs for summary judgment as against Associated and Southeastern; (5) Capital Blue Cross' appeal from the March 15, 1994 Order of Magistrate Judge Joel A. Pisano granting plaintiffs leave to file the Third Amended Complaint; and (6) the motion of Capital Blue Cross for summary judgment on all counts against it.

*Background*

The facts alleged are as follows. Plaintiff American Telephone and Telegraph Co. ("AT&T") maintains medical benefit plans for its employees, employees of its affiliates, certain retirees, and their respective dependents (collectively, **[*5]** the "Plan"). AT&T is the sponsor and administrator of the Plan, which is an employee welfare benefit plan under *29 U.S.C. 1002(1)* and *1003(a)* and is covered under the Employee Retirement Income Security Act of 1974, *29 U.S.C. § 1001 et seq.,* as amended ("ERISA"). AT&T is sponsor and administrator of the Plan. Plaintiff State Street Bank and Trust Company ("State Street") is Trustee of the AT&T Health Benefits Trust (the "Trust"), through which the Plan is funded. Plaintiffs bring this action in their own right and on behalf of the Plan to recover damages allegedly suffered in the administration of the Plan. Cmplt. PP 1-7.

Defendants are Empire Blue Cross and Blue Shield ("Empire") and 16 additional Blue Cross and Blue Shield entities alleged to have participated in the administration of the Plan. Plaintiffs assert claims of ERISA violation, federal RICO claims, and various state law claims against Empire and 11 of the additional defendants known as the "Participating Plan

Defendants" ("PPDs"). [1] Plaintiffs assert claims of ERISA violation, breach of contract, and breach of the implied covenant of good faith and fair dealing against five other defendants, known as the "Supplemental [*6] Participating Plan Defendants" ("SPPDs"). [2] These defendants are known collectively as the "Blue Cross affiliates." Plaintiffs also claim they are entitled to an injunction allowing an accounting and an audit of the books and records of Empire, the PPDs, and the SPPDs, and to an award of attorneys' fees. Cmplt, P 70.

[*7] Plaintiffs' claims are based upon the following allegations. AT&T entered into a series of agreements (the "Agreement") with Empire, and through Empire with the other defendants, for the nationwide administration of the Plan in reliance upon representations that Empire and the Blue Cross affiliates received certain discounts, rebates, and periodic adjustments or reimbursements (the "Discounts") from hospitals that were unavailable to others, and upon representations that the Plan would receive the benefit of these Discounts if AT&T contracted with Empire and the Blue Cross affiliates for the administration of the Plan. Cmplt, PP 29-30. Pursuant to the Agreement, Empire would act as "control plan," and would administer the Plan with the Blue Cross affiliates nation-wide on a "cost-plus" basis; that is, Empire or the local Blue Cross affiliate would pay hospitals the actual costs of the provided services after applicable Discounts, and the Plan would then reimburse the Blue Cross affiliates, through Empire, for those actual costs, plus an administrative fee. Cmplt, PP 30-31.

The Agreement allegedly provided that Empire and the other defendants would provide plaintiffs with periodic [*8] reports and invoices, would keep records of all Plan transactions, and would allow AT&T and/or an auditor to audit them to ensure full compliance with the Agreement. Cmplt, P 32. It also provided that defendants would pass on to the Plan any percentage of year-end or other periodic settlements or Discounts attributable to claims paid by the Plan. Cmplt, P 36. In 1988, Empire and the Blue Cross affiliates established the National Account Service Company ("NASCO"), a centralized claims processing system through which Empire would continue to act as control plan. Cmplt, P 37. There is no allegation that the Agreement changed in any respect after the centralization of claims processing through NASCO.

The complaint further alleges that the PPDs and the SPPDs knew or should have known that Plaintiffs were entitled to all available Discounts by virtue of agreements Empire represented it had entered into with these defendants, and by virtue of certain Guidelines issued by the National Blue Cross and Blue Shield Association (BCBSA) which provided that plans participating in a national account such as AT&T's should obtain from the control plan a document outlining the requirements for participation. [*9] Cmplt, PP 38-40.

Allegedly, since at least 1984, the amounts plaintiffs have been billed through Empire have been substantially in excess of the amounts

---

[1] The Participating Plan Defendants are Health Care Services Corporation, a/k/a/ Blue Cross and Blue Shield of Illinois; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of Ohio; Central Benefits Mutual Insurance Co.; Independence Blue Cross; Blue Cross of California; Capital Blue Cross; Blue Cross of Western Pennsylvania; Blue Cross and Blue Shield of Massachusetts; Trigon Mutual, a/k/a Blue Cross and Blue Shield of Virginia; and Blue Cross and Blue Shield of the National Capital Area. Cmplt, PP 11-22.

[2] The Supplemental Participating Plan Defendants are Blue Cross and Blue Shield of Arizona, and Blue Cross and Blue Shield of Florida (against whom additional claims are also made); Associated Insurance Company, a/k/a Blue Cross and Blue Shield of Indiana; Blue Cross and Blue Shield of Missouri; and Southeastern Group, a/k/a Blue Cross and Blue Shield of Kentucky. Cmplt, PP 23-28. Associated and Southeastern have now merged and will be called, collectively, AIC.

Amanda Stubblefield

the local Blue Cross affiliates actually paid for the services rendered to Plan participants. During this time, Empire and certain Blue Cross affiliates including the PPDs allegedly intentionally and wrongfully retained all or a portion of the Discounts due to plaintiffs under the Agreement. Cmplt, P 44. Plaintiffs further allege, upon information and belief, that certain defendants including the PPDs knowingly and wilfully rendered fraudulent reports of claims amounts to Empire, knowing and intending that these reports would be used to bill plaintiffs more that they should have paid under the Agreement, and that these defendants failed to report the actual Discounts they received. Cmplt, P 46-47.

Plaintiffs further allege that the defendants conspired together to retain Discounts and to keep knowledge of this from plaintiffs, and to induce plaintiffs into believing they were receiving the full benefit of the Discounts. Cmplt, PP 47-50, 52. In addition, PPD and SPPD defendants have allegedly refused to allow plaintiffs to conduct [*10] audits to determine whether all Discounts were passed on. Cmplt, P 53.

Since this action was filed in 1993, plaintiffs have amended their complaint several times. The most recent complaint, the Third Amended Complaint, to which all references herein are made, was filed after Magistrate Judge Joel A. Pisano granted plaintiffs' Motion for Leave to File an Amended Complaint on March 15, 1994. Capital Blue Cross ("Capital") appeals from Magistrate Judge Pisano's Order granting this motion. However, since the Third Amended Complaint has already been filed and served, since Capital moves for summary judgment on all claims asserted against it in the Third Amended Complaint, and because of the court's conclusions regarding the sufficiency of the complaint set forth herein, the court considers this appeal moot.

Fourteen defendants now move together to dismiss the complaint against them, and/or for summary judgment dismissal of State Street as plaintiff. Memorandum of Law in Support of the Motion of Certain Participating Plan Defendants to Dismiss the Complaint (hereinafter "Jt. Mem."). [3] Central Benefits Mutual Insurance Company submitted a Supplemental Memorandum in support of this motion [*11] (hereinafter "Central Benefits Mem."). In a separate motion, Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross of Western Pennsylvania have moved jointly to dismiss the complaint against them (hereinafter "Mass. Mem."). In addition, Associated Insurance Companies, Inc. and Southeastern Group, Inc., collectively "AIC," move to dismiss plaintiffs' claim for an independent audit, or in the alternative, for summary judgment on this claim (hereinafter "AIC Brf."). Plaintiffs have cross-moved for summary judgment on the same claim (hereinafter "Plf. AIC Opp.")

[*12] For ease of exposition, the court will address the various motions in the course of its discussion of the main motion to dismiss the complaint. The court has considered all the filed briefs, and finds that many of the defendants' arguments are duplicated in the Joint Memorandum. Therefore, the court will refer primarily to this document, and will refer to other briefs only insofar as they present different arguments.

---

[3] Joining together in this motion are Independence Blue Cross, Blue Cross and Blue Shield of the National Capital Area, Blue Cross and Blue Shield of Arizona, Inc., Health Care Service Corporation, Blue Cross and Blue Shield Mutual of Ohio, Central Benefits Mutual Insurance Company, Blue Cross of California, Associated Insurance Companies, Inc., Capital Blue Cross, Southeastern Group, Inc., Blue Cross and Blue Shield of Western Pennsylvania, Blue Cross and Blue Shield of Florida, Inc., and Blue Cross and Blue Shield of Virginia. Blue Cross and Blue Shield of Michigan also joined, but has since settled with plaintiffs.

## Discussion

HN1[↑] This court can only grant a motion to dismiss if, reading all inferences of the Complaint in plaintiffs' favor, there is no set of facts on which plaintiffs can prevail. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* HN2[↑] The court will only grant summary judgment if there are no issues of material fact and, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Wisniewski v. Johns-Manville, 812 F.2d 81, 84 (3d Cir. 1987)*. Notwithstanding this presumption [*13] in favor of the non-moving party, in opposing a motion for summary judgment, a party

> must do more than simply show that there is some metaphysical doubt as to the material facts . . . . In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.

*Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Applying these standards, the court will address the various motions as they pertain to the claims asserted in the complaint.

### A. The ERISA Claim

Defendants offer two main arguments in support of their motion to dismiss plaintiffs' ERISA claim against them. First, they argue that the complaint fails to allege a required nexus between their alleged fiduciary obligations and their purported misconduct. Second, they argue that AT&T and State Street are not proper ERISA plaintiffs.

## 1. The "Nexus" Argument

Defendants contend that under the law of this circuit, a person owes fiduciary duties to an ERISA plan only with respect to aspects of the plan over which that person exercises discretionary authority or responsibility. [*14] They further contend that the complaint alleges no wrongdoing with respect to their discretionary functions, and moreover that the alleged misconduct concerns an area in which the complaint alleges defendants had *no* discretion -- i.e., their alleged *obligation* to pass on discounts to AT&T. Jt. Mem. at 7-11. In short, defendants argue that there can be no claim that they breached an ERISA fiduciary duty where it is alleged that they had no discretion with respect to the conduct at issue. Jt. Mem. at 11.

ERISA defines a fiduciary as follows:

> HN3[↑] a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*29 U.S.C. § 1002(21)(A)*. [4] Defendants ground

---

[4] HN4[↑] An ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," *29 U.S.C. § 1104(a)*, and in performing services to the plan is limited to "reasonable compensation" and "reimbursement of expenses properly and actually incurred."

their argument in **[\*15]** the functional nature of this definition, reasoning that they are only fiduciaries "to the extent" that they exercise discretionary authority.

Count 1 of the complaint alleges that defendants are fiduciaries of the Plan for the following reasons:

> because they exercise discretionary authority with respect to the disposition of assets of the Plan and discretionary authority and responsibility in the administration of the Plan in that, among other things, (i) they have the power to grant or deny claims under the Plan, (ii) they negotiate Discounts with hospitals with respect to medical expenses covered by the Plan, and were retained because of their expertise in negotiating **[\*16]** and obtaining the Discounts, a critical part of the administration of the Plan, (iii) they have the responsibility for designing, implementing and administering record-keeping systems, and (iv) they respond to questions and concerns of persons covered under the Plan in their respective operating areas.

Cmplt, P 59. As noted, defendants claim the complaint does not allege misconduct with respect to any of these functions. Jt. Mem. at 10. Plaintiffs respond that defendants overlook relevant allegations in the complaint establishing a link between the discretionary functions alleged in P 59 and the alleged misconduct, and case law upholding ERISA claims in analogous situations based on alleged breaches of "overall" fiduciary duties. The court turns first to the legal argument.

*a. The "Nexus" Requirement*

Plaintiffs contend that each of the responsibilities set forth in P 59 is sufficient to bind defendants "to ERISA's overall fiduciary

standards." Plf. Mem. at 14, 16. In support of this proposition, plaintiffs cite *Libbey-Owens-Ford Co. v. Blue Cross and Blue Shield Mutual of Ohio, 982 F.2d 1031* (6th Cir.), *cert. denied, 510 U.S. 819,* **[\*17]** *114 S. Ct. 72, 126 L. Ed. 2d 41 (1993)* ("LOF"), in which the United States Court of Appeals for the Sixth Circuit found that the defendant Blue Cross entity was a fiduciary because it exercised discretionary authority over whether or not to honor claims. *LOF,* 982 F.2d at 1035. Plaintiffs also cite *Sixty-Five Sec. Plan v. Blue Cross and Blue Shield, 583 F. Supp. 380* (S.D.N.Y.), *adhered to on reargument, 588 F. Supp. 119 (S.D.N.Y. 1984),* in which the United States District Court for the Southern District of New York similarly found that the defendant Blue Cross entity was a fiduciary of the plan because it exercised discretion regarding the payment of claims. *Sixty-Five Sec. Plan, 583 F. Supp. at 386.* The *Sixty-Five Sec. Plan* court also noted that the defendant could be deemed a fiduciary because it had been retained largely because of its expertise in obtaining hospital discounts which were a "crucial part of the administration" of the plan, and because of its record-keeping responsibilities. *583 F. Supp. at 387-88.*

The nub of defendants' "nexus" argument is that no such overall ERISA fiduciary status may be imposed upon them under the law of this circuit, **[\*18]** and that they may be found to owe duties only regarding particular aspects of the Plan over which they exercised discretionary authority. Courts in this circuit have clearly distinguished between actions employers take in their capacity as employer, which involve business functions giving rise to no fiduciary duties under ERISA, and actions those employers take in their capacity as administrators of ERISA plans, which do give rise to such duties. *See, e.g., Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3rd Cir. 1990)* (employer's decision to amend ERISA plan was a business decision, not plan

---

*29 U.S.C. §§ 1106(a)* & *1108(c)(2).*

an administration decision which would have subjected the employer, as administrator, to ERISA fiduciary duties); *Payonk v. H.M.W. Indus., Inc., 883 F.2d 221 (3rd Cir. 1989)* (where no misrepresentation was alleged, employer's decision to terminate plan was a business decision giving rise to no fiduciary duties under ERISA); *Canale v. Yegen, 782 F. Supp. 963 (D.N.J. 1992)* (allegation of employer/administrators' mismanagement of entity in which plan held assets only implicated ERISA fiduciary duties inasmuch as it alleged fraudulent misconduct and failure to protect plan assets from [*19] dissipation as consequence of such fraudulent misconduct).

The Third Circuit Court of Appeals has outlined the following guidelines for distinguishing between the functions of employer and plan administrator:

> HN5[↑] Where an administrator of a plan decides matters required in plan administration or involving obligations imposed upon the administrator by the plan, the fiduciary duties imposed by ERISA attach. Where, however, employers conduct business and make business decisions not regulated by ERISA, no fiduciary duties apply. And, when employers wear "two hats" as employers and administrators ". . . they assume fiduciary duties 'only when and to the extent' that they function as plan administrators, not when they conduct business that is not regulated by ERISA.

> *Payonk, 883 F.2d at 225* (citations omitted) (quoted in *Blaw Knox Retirement Plan v. White Consol. Indus., 998 F.2d 1185, 1189 (3rd Cir. 1993)*.

There appears to be no case from this circuit applying a similar functional analysis to the question of whether an insurance carrier may be deemed a fiduciary. However, cases from other circuits involving insurers are instructive. The United States Court of Appeals [*20] for the Eighth Circuit held in *Kerns v. Benefit Trust Life Ins. Co., 992 F.2d 214 (8th Cir. 1993)*, that HN6[↑] while the defendant insurance company was an ERISA plan fiduciary with respect to claims handling, it was not a fiduciary with respect to functions owed by the administrator, such as notifying plan beneficiaries of policy lapse. *Id. at 217*.

The Court of Appeals for the Seventh Circuit has also applied a "nexus" requirement. In *Schulist v. Blue Cross of Iowa, 717 F.2d 1127 (7th Cir. 1983)*, that court noted that its first inquiry was to determine whether the defendant exercised any discretionary authority over the alleged misconduct -- in that case, the setting of premiums. *717 F.2d at 1131*. The *Schulist* court held that since the flat premium amount was a set term of the defendant's contract bid, the defendant did not exercise discretionary control over the premium amount and thus did not owe any fiduciary duty to return any portion of unused premiums. [5]

[*21] Referring to the cases upon which plaintiffs rely, defendants point to a difference among circuits in the analysis of ERISA fiduciary status. Jt. Reply at 8. In *Tregoning v. American Community Mutual Ins. Co., 12 F.3d 79 (6th Cir. 1993)*, cert. denied, 511 U.S. 1082, 114 S. Ct. 1832, 128 L. Ed. 2d 461 (1994), the Sixth Circuit Court of Appeals found that the

_____

[5] The *Schulist* court differentiated this flat rate agreement, in which the defendant exercised no control over the plan trustees' decision to accept the defendant's bid, from a case in which an insurance broker had assumed fiduciary duties to ensure that the amount of compensation he received was reasonable by virtue of his discretionary responsibility for formulating bid specifications, evaluating bids, and advising trustees of the welfare plan in the selection of an insurance plan. *Schulist, 717 F.2d at 1131 n.4* (citing *Brink v. Da Lesio, 496 F. Supp. 1350* (D.Md. 1980, rev'd in part, aff'd in relevant part, *667 F.2d 420 (4th Cir. 1981))*.

defendant was a fiduciary because it had the sole authority to grant or deny claims. *Tregoning, 12 F.3d at 83*. The *Tregoning* court also noted that by virtue of the holding in *Libbey-Owens-Ford,* its analysis of the fiduciary issue differed from that applied by the Fourth Circuit in *Coleman v. Nationwide Life Ins. Co., 969 F.2d 54 (4th Cir. 1992),* cert. denied, 506 U.S. 1081, 113 S. Ct. 1051, 122 L. Ed. 2d 359 (1993). The *Coleman* court, in contrast, noted that "the fiduciary function is not an indivisible one. . . . [A] court must ask whether a person is a fiduciary with respect to the particular activity at issue," and that discretionary authority or responsibility was pivotal to definition of a fiduciary. *Coleman, [*22] 969 F.2d at 61*.

Defendants argue that *Coleman* (along with *Schulist* and *Kerns)* is in accord with the law of this circuit, and that *Tregoning* and *LOF* are not. Jt. Reply at 8. As noted, there appears to be no case from this circuit in which the "nexus" requirement has been applied in the context of an insurance provider. On the basis of related case law from this circuit and others, however, the court agrees that the mere fact that defendants exercised some discretionary authority with respect to some aspect of the Plan would not be sufficient to subject it to "overall" fiduciary duties with respect to all aspects of the Plan. However, there remains the question of whether the allegations of the complaint in this case establish a sufficient nexus between defendants' alleged exercise of discretionary authority and the conduct by which they allegedly breached fiduciary duties.

*b. The Sufficiency of the Allegations*

As noted, defendants argue that the complaint fails to allege any breach of a duty with specific regard to the areas over which they exercised discretionary authority. The foundation of defendants' argument is their view that the alleged retention **[*23]** of

Discounts is solely a breach of contract claim, not an ERISA claim. They argue that the alleged retention of such Discounts is analogous to the retention of surplus premiums in *Schulist,* which was found to present a possible breach of contract claim, but not an ERISA claim. Jt. Mem. at 12-13. In *Schulist,* however, the premium amounts were fixed in the defendant's bid before it had any dealings with the plan trustees, and that fixed amount became a term of the contract. The contract did not provide for the return of any excess premium amounts. *Schulist, 717 F.2d at 1132-33*. In contrast, the Agreement at issue in this case (including the alleged agreements between Empire and the Participating Plan Defendants) does not contain a fixed amount of Discount to which Plaintiffs would be entitled. Rather, it provides that such Discounts will be negotiated by defendants and passed on to the Plan. Though the obligation to pass on Discounts is contractual, the process for obtaining such discounts necessarily involves discretionary authority. Therefore, the alleged retention of the negotiated Discounts also involves some exercise of discretionary authority, thereby implicating fiduciary **[*24]** duties under ERISA.

As noted above, the complaint specifically alleges that defendants exercised discretionary authority with respect to the disposition of Plan assets and in the administration of the Plan through their authority to grant or deny claims, their authority and responsibility to negotiate hospital Discounts, their record-keeping responsibilities, and their responsibility to respond to questions of persons covered under the Plan. Cmplt. P 59. Defendants claim no misconduct is alleged with regard to these functions. However, defendants view the allegations in the complaint too narrowly.

With regard to defendants' alleged authority over the disposition of plan assets, for

example, the complaint alleges that defendants exercised discretionary authority over the disposition of an amount of money called the "prepaid amount." Specifically, the complaint alleges as follows:

P 34. Pursuant to the Agreement, Plaintiffs agreed that a sum of money (the "prepaid amount") would be deposited and made available to Empire, *for Empire and the Blue Cross affiliates, to pay anticipated claims*. Under the Agreement, the prepaid amount was revised, relying in part on Empire's reports [*25] of the amounts previously paid in order to maintain the deposit at a level sufficient to meet anticipated claims based on actual costs incurred.

P 35. Empire represented that the prepaid amount was necessary in order for Empire and Blue Cross affiliates to pay hospitals promptly and, as a result, negotiate and pass on Discounts.

Cmplt, PP 34-35 (emphasis added). Further, the complaint alleges that the referenced reports of amounts previously paid, which Empire submitted to plaintiffs, and according to which the amount to be prepaid was determined, were developed using information supplied by defendants. Cmplt, PP 41, 45. It is further alleged that defendants:

knowingly and fraudulently rendered false reports to Empire overstating the amounts paid . . . with the intent of causing Empire to overcharge Plaintiffs pursuant to the Agreement. As a result, Empire, knowing that the reports it received . . . were false, or with reckless disregard for their truthfulness, fraudulently overstated in its accounting reports to Plaintiffs the amounts paid by Empire and Blue Cross affiliates for which Empire and Blue Cross affiliates claimed reimbursement under the Agreement.

[*26] Cmplt, P 45.

With further regard to defendants' alleged exercise of discretionary authority over record-keeping, the complaint alleges that defendants:

failed to disclose to Plaintiffs information that would have put Plaintiffs on notice of the claims alleged herein, which information was known to Empire, the Participating Plan Defendants and the Supplemental Participating Plan Defendants, and by making the false representations and omissions alleged herein, Empire, the Participating Plan Defendants and the Supplemental Participating Plan Defendants breached their fiduciary duties owed to Plaintiffs and the Plan and have fraudulently concealed the information which would have put Plaintiffs on notice.

Cmplt, P54.

With further regard to defendants' alleged exercise of discretionary authority over the disposition of Plan assets, it is alleged that they engaged in activities prohibited under *29 U.S.C. § 1106*, including:

(i) providing services to the Plan for which they knowingly and fraudulently received excessive and unreasonable compensation; (ii) dealing with the assets of the Plan for their own interest and account; and (iii) acting in transactions [*27] involving the Plan, including claims processing and settlements, on behalf of themselves or other parties whose interests are adverse to the interests of the Plan.

Cmplt, P 63. Defendants' alleged breaches include "failing to pass on to Plaintiffs the full benefit of all Discounts received from hospitals," P 64; and failing to disclose and concealing documents that would have put plaintiffs on notice that full Discounts were not being passed on, P 66.

The gravamen of plaintiffs' suit is that the moving defendants acted with and through Empire to accomplish both the alleged withholding of Discounts that should have been refunded, and the alleged misrepresentations that made possible the withholding of those amounts. A fair reading of the complaint as a whole, and the quoted portions in particular, leads to the conclusion that defendants' alleged misdeeds were directly linked with their alleged exercise of discretionary authority. Indeed, it is particularly difficult to imagine how defendants could be alleged to have accomplished the withholding of Discounts without allegations that they also failed to report accurately the amounts they actually paid for services provided under **[*28]** the Plan.

Defendants demand a level of particularity in the allegation of a "nexus" between alleged breaching acts and alleged discretionary authority that is simply not practical. The argue, for example, that the complaint's allegations do not amount to an ERISA claim because the AT&T-Empire Agreement does not specifically delegate to defendants any discretionary authority in the design of record-keeping systems. Jt. Reply at 13. More relevant to the "nexus" inquiry is whether defendants are alleged to have had and exercised such authority in actuality. Here, plaintiffs have clearly made such allegations. The court concludes that the complaint as a whole alleges sufficient connections between defendants' discretionary authority and their alleged misdeeds to state a claim that defendants breached fiduciary duties under ERISA.

## 2. The "Improper Plaintiffs" Argument

Defendants argue that neither AT&T nor State Street may assert a valid ERISA claim based on the allegations in the complaint. On this basis, they seek dismissal or summary judgment on the ERISA claim.

### a. AT&T

Defendants argue that AT&T is not a proper plaintiff because the alleged losses were suffered by **[*29]** AT&T, not the Plan, and it was only AT&T's assets, not the Plan's, that were ever at risk. Jt. Mem. at 14. Although the complaint alleges that "payments under the Plan have been made with AT&T's and/or the Plan's money or have been reimbursed in full by AT&T," P 42, defendants call this allegation "vague," and claim that discovery has shown that AT&T bore all financial risks associated with the Plan. Jt. Mem. at 17-18.

Defendants further claim that the evidence shows that although since the end of 1987 AT&T has funded its Plan through a Trust, it never funded the Trust in an amount greater than the claims that had already been incurred. Jt. Mem. at 18. Finally, defendants claim that since AT&T has merely paid all the amounts necessary to fund the Plan, it is in essence claiming that it overpaid for those benefits. This, defendants argue, is a contractual claim, but not an ERISA claim.

The evidence defendants have submitted largely supports their factual contentions. For example, the Trust Agreement provides that AT&T "shall contribute such assets to the Trust as it reasonably determines is necessary and appropriate to pay all current expenses under the Plan for each year . . ." Trust **[*30]** Agreement at 6, Exh. 3 to Certification of R. Nicholas Gimbel (hereinafter "Gimbel Cert."). In addition, financial reports confirm that for many months, deposits precisely equaled disbursements, suggesting that the amounts were deposited to cover specific bills. *See* Reports, Exh. 6 to Gimbel Cert. Also, a number of the annual reports concerning the Trust refer to it as a "pass-through" arrangement, wherein investments were held

short term awaiting disbursement. *See* Reports, Exh. 5, 7, 9, 11 and 15 to Gimbel Cert.

Deposition testimony also generally supports defendants' factual contentions. Carol Armstrong, the witness AT&T designated to respond to questions about the funding of the Trust, testified that for at least part of the year, AT&T transferred amounts into the Trust that corresponded directly with the amounts Empire requested. Deposition of Carol Armstrong at 49-50, Exh. 2 to Gimbel Cert. Armstrong also testified that in December of each year, AT&T made a deposit corresponding to its actuaries' estimates of the medical expenses that had been incurred that year, but had not yet been reported to AT&T ("incurred but not reported" or "IBNR" claims). *Id.* at 20-21.

 **[*31]** Donald P. Harrington, Vice-President of Benefits Compensation Systems at AT&T, explained in his deposition that the AT&T medical benefits plan is basically self-insured -- that is, AT&T pays, through the Blue Cross carrier, exactly what the service providers charged, without buying insurance. Deposition of Donald P. Harrington at 55, 75, Exh. 16 to Gimbel Cert. He also testified that from 1983-1988, AT&T would pay claims directly out of its corporate assets. *Id. at 80*.

Robert C. Varecha, Empire Vice-president for sales and account management, formerly employed at AT&T as benefits manager, testified that the money to pay claims came from AT&T either directly, or through an "operating fund." Deposition of Robert C. Varecha at 713, Exh. 18 to Gimbel Cert. Varecha also testified that failure to pass on all discounts would result in diminution of AT&T funds. *Id.* at 716-17.

Apparently, defendants believe this evidence confirms their contention that the Plan had no assets, and that AT&T is therefore the real

party in interest and an improper plaintiff in this action. *See* Jt. Mem. at 21. The court disagrees with the legal conclusions defendants draw from these facts. While the **[*32]** funds used to pay hospital claims under the Plan originated as AT&T corporate assets, those moneys became Plan assets when they were transferred into the Trust. Federal regulations relevant to the question of when employer contributions to an employer-administered plan become assets of the plan provide:

> *HN7*[⬆] Contributions made to a plan by such employer . . . would normally become "funds or other property" of the plan if and when they are taken out of the general assets of the employer . . . and placed in a special bank account or investment account; or identified on a separate set of books and records; or paid over to a corporate trustee or used to purchase benefits from an insurance carrier or service or other organization; or otherwise segregated, paid out or used for plan purposes, whichever shall occur first.

*29 C.F.R. § 2580.412-5(b)(2) (1993)*. *See also Acosta v. Pacific Enterprises, 950 F.2d 611, 620 (9th Cir. 1991) HN8*[⬆] ("To determine whether a particular item constitutes an 'asset of the plan,' it is necessary to determine whether the item question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries.").

 **[*33]** In *Sixty-Five Security Plan v. Blue Cross and Blue Shield, supra,* the United States District Court for the Southern District of New York found that under a similar "self-insurance" type of arrangement, the defendant Blue Cross entity exercised control over plan assets because it made payments out of a

fund set up by the plaintiff. Though the *Sixty-Five Sec. Plan* court did not directly address the question of how that fund was funded, it is clear that the arrangement for payment of claims was similar to that in the present case -- that is, the defendant paid claims out of a fund established by the plaintiff. *Sixty-Five Sec. Plan, 583 F. Supp. at 384-85*.

In addition, the Trust Agreement provides that funds transmitted into the Trust may only be used for the purpose of providing insurance protection to plan beneficiaries, and could only revert to AT&T under particular circumstances. Trust Agreement, P 3.2, Exh. A to Certification of Steven E. Shiffman (hereinafter "Shiffman Cert."). Thus, once funds were deposited into the Trust, they could not be used by AT&T for other purposes.

It is clear that **HN9**[⬆] an employer may not bring an action under ERISA to recover losses that the **[*34]** employer itself suffered. *Carl Colteryahn Dairy, Inc. v. Western Pennsylvania Teamsters and Employers Pension Fund, 847 F.2d 113, 119 (3rd Cir. 1988)*, *cert. denied, 488 U.S. 1041, 102 L. Ed. 2d 989, 109 S. Ct. 865 (1989)*. Fiduciary duties under ERISA are generally owed to plan participants and beneficiaries only. Thus, in *Colteryahn,* the plaintiff did not present an ERISA claim in alleging fraud and misrepresentation that caused the *employer itself* to suffer an injury. *Id.* However, an employer that is also a plan fiduciary may bring an ERISA claim on behalf of the plan to recover losses suffered *by the plan. 29 U.S.C. § 1132. United States Steel Corp. v. Pennsylvania Human Rights Comm'n, 669 F.2d 124, 127-28 (3rd Cir. 1982)*.

Defendants argue that because the Plan is unfunded, it is not subject to ERISA's full fiduciary requirements. Jt. Mem. at 15. Plaintiffs counter that whether the plan is funded or unfunded is irrelevant with respect to

fiduciary duties under ERISA. In support of this contention, plaintiffs point out that although Congress specifically exempted employee welfare benefit plans such as AT&T's from funding and vesting requirements, *29 [*35] U.S.C. §§ 1051(1)* & *1081(c)(a)*, it did not exempt them from ERISA's fiduciary requirements. Plf. Mem. at 28. *See 29 U.S.C. § 1101(a)* (exempting other types of plans from fiduciary requirements); *Deibler v. Local Union 23, 973 F.2d 206, 209 (3rd Cir. 1992)* ("While welfare benefit plans are less strictly regulated under ERISA than are pension plans, they are nevertheless subject to ERISA's fiduciary standards . . . ").

In *Libbey-Owens-Ford (LOF), supra,* the Sixth Circuit Court of Appeals found that the district court had erred in holding that because the plan had no assets, there could be no funds for which the defendant Blue Cross entity would be obligated to account. The *LOF* court found a fiduciary duty because the defendant Blue Cross entity had the power and authority to earmark the funds that Libbey-Owens-Ford allocated to the plan. *LOF,* 982 F.2d at 1036.

Defendants' purport to rely on *Massachusetts v. Morash, 490 U.S. 107, 104 L. Ed. 2d 98, 109 S. Ct. 1668 (1989)*, a case the court finds inapposite. That case concerned the question of whether a vacation benefits policy constituted an employee welfare benefit plan under ERISA. The United States **[*36]** Supreme Court held that such a policy did not constitute an ERISA plan, but was instead a payroll practice. *490 U.S. at 117-18*. The Court stated that it would have reached a different conclusion if a number of employers had created a separate fund to guarantee payment of vacation benefits to workers, *Id. at 120*, but that hardly amounts to a holding that unfunded plans are not subject to ERISA fiduciary requirements. Plf. Mem. at 29-30.

Because the funds which supported the Plan

became Plan assets as soon as they were deposited into the Trust, and because those are in part the funds defendants allegedly misappropriated, the Plan suffered the loss here alleged. As employer-sponsor of the Plan, AT&T is a fiduciary of the Plan under ERISA and a proper plaintiff in this action.

### b. State Street

Defendants argue that State Street is not a true fiduciary because it acted solely at the discretion of AT&T with regard to the Plan Trust. Jt. Mem. at 14-23. Defendants rely on the Trust Agreement, which does not appear to delegate discretionary authority to State Street, and on the deposition testimony of David B. Hill, Assistant Vice President at State Street Bank.

Hill testified **[*37]** that State Street exercised no discretion with regard to payments into or out of the Trust. Asked to summarize State Street's responsibilities with respect to the Trust, Hill said: "State Street's responsibilities are to receive contributions and pay out benefits as directed by AT&T." Deposition of David B. Hill at 36, Exh. 1 to Gimbel Cert. Hill also testified that he did not know of any investment discretion that had been delegated to State Street. *Id.* at 42, 44. Although Hill also testified that State Street was responsible for making sure that contributions to the Trust in excess of the amount of benefits payments were invested in assets, State Street did not have discretion over how those funds were invested. *Id. at 52*.

Plaintiffs do not appear to dispute defendants' factual contentions, borne out by the evidence, that State Street did not in fact exercise discretionary authority over Plan assets. Rather, they argue that State Street is automatically a fiduciary of the Plan by virtue of its status as a named Trustee. *See* Trust, P 2.1 (n); Plf. Mem. at 33.

Defendants cite to several cases in which courts held that banks were not fiduciaries with respect to the funds **[*38]** in question. A bank that is a mere depository for plan funds may not be a plan fiduciary. *O'Toole v. Arlington Trust Co., 681 F.2d 94, 96 (1st Cir. 1982)*. Similarly, a bank that was not vested with discretionary authority and did not exercise discretionary authority over the funds in question was held not to be a fiduciary. *Pension Fund-Local 701 v. Omni Funding Group, 731 F. Supp. 161, 173-65 (D.N.J. 1990)*. Where there was no evidence that a bank exercised discretionary authority over the relevant funds, and where its duties under a "letter agreement" did not include a grant of discretionary authority, the bank in question was not a fiduciary. *Hibernia Bank v. International Brotherhood of Teamsters, 411 F. Supp. 478, 489-90 (N.D.Cal. 1976)*. Plaintiffs attempt to distinguish these cases by pointing out that only *Hibernia Bank* involved a bank's attempt to invoke fiduciary status to bring a claim under ERISA, and that that bank was only the agent of the trust holding funds in a commercial account, not a named trustee as is State Street. Plf. Mem. at 35.

In opposition, plaintiff cites cases where courts have found that banks named as trustees of ERISA funds are by definition **[*39]** fiduciaries. *See, e.g., NARDA, Inc. v. Rhode Island Hospital Trust National Bank, 744 F. Supp. 685, 690 (D. Md. 1990)* (citing *29 C.F.R. 2509.75-8(D-3)* for the proposition that a trustee is by definition a fiduciary, although the bank in question also had discretionary duties under the trust instrument); *Successor Trust Committee v. First State Bank, 735 F. Supp. 708, 715 (W.D.Tex. 1990)* ("Courts have consistently found trustees of an ERISA plan or of plan assets, by the very nature of their positions, to be fiduciaries as that term is defined under ERISA"); *Trustees of Hotel Employees v. Amivest Corp., 733 F. Supp. 1180, 1184 (N.D.Ill. 1990)* ("[A] trustee is the

proper party to litigate issues on behalf of the trust.").

Under ERISA's functional definition of "fiduciary," State Street did not exercise the discretionary authority which would make it a fiduciary of the Plan. However, as plaintiffs' sources show, courts have held that named Trustees are ERISA fiduciaries by virtue of their positions. **HN10[↑]** The ERISA definition of fiduciary should be given a broad reading. *Mutual Life Ins. Co. of New York v. Yampol, 840 F.2d 421, 425 (7th Cir. 1988)*. Thus, even though State Street may not meet the statutory definition in functional terms, it is by virtue of its position a Plan fiduciary and therefore a proper plaintiff. There may be some statutory purpose served in limiting the definition of fiduciaries when claims are made against them, but no like purpose is served when it is the purported fiduciary making the claim. The latter should certainly receive a broader reading under the statute.

### 3. The "Parties in Interest" Claim

Defendants dispute plaintiffs' contention that even if defendants are not fiduciaries, they are liable as "parties in interest" to the Plan within the meaning of *29 U.S.C. § 1002(14)*. Jt. Reply at 14. First, they claim that Count 1 alleges only that defendants breached their duties as fiduciaries, and does not mention liability arising from alleged party-in-interest status. Second, defendants argue that the alleged failure to pass on Discounts and other payments does not amount to a "prohibited transaction" involving parties in interest under 29 *§ 1106(a)(1)(D)*, because it does not involve a transfer or transaction involving the assets of the plan. Jt. Reply at 15. Moreover, defendants contend, the prohibitions in *§ 1106* are intended to address conflict of interest situations, not conflicts with outside arms-length entities. Jt. Reply at 15.

[*40]

As noted *supra*, however, the complaint does allege that defendants engaged in activities specifically prohibited under *§ 1106*. *See, e.g.,* Cmplt, P 63. In addition, the suit is premised on the allegation that defendants were fiduciaries, not arm's length entities. In light of the court's conclusion in this regard, the court need not further address defendants' arguments.

### 4. The Co-Fiduciary Liability Claim

Count 1 also asserts a claim against defendants as co-fiduciaries based on their alleged failure to disclose and/or their concealment from plaintiffs that other defendants were failing to pass on all Discounts. Cmplt, P 61. Defendants argue that plaintiffs have failed to plead the necessary elements of such a claim. AIC Brf. at 26. [6]

### *HN11[↑]*

Section 405 of ERISA provides in relevant part that a plan fiduciary may be liable for the breaches of another fiduciary in the following circumstances:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> . . . **[*41]** .
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*29 U.S.C. § 1105(a)*. Defendants claim that P 61 of the Complaint fails to allege that they knew about alleged breaches of other

_____

[6] The defendants who submitted the Joint Memorandum join in the AIC Briefs for this argument. Jt. Mem. at 22 n.14.

fiduciaries. AIC Brf. at 28. Moreover, defendants argue, plaintiffs have pleaded no causal relationship between defendants' alleged co-fiduciary obligations and the alleged breaches of fiduciary duties. AIC Brf. at 29. Neither argument is availing.

First, although P 61 itself does not specifically allege that defendants knew about one another's alleged breaches, such knowledge is alleged elsewhere in the Complaint. Paragraph 54 alleges that defendants knew of and failed to disclose information that would have put AT&T on notice of the alleged breaches. Cmplt, P 54. It further alleges that by making false representations and omissions in this regard, defendants breached their fiduciary duties. Id. Specific acts alleged in this regard include meetings among various defendants wherein alleged breaches were discussed, P 54a, and "efforts by various Blue Cross affiliates to conceal claims regarding Discounts [*42] made by other national accounts . . ." Cmplt, P 54c. In the context of this complaint, these allegations are sufficiently specific to state a claim for co-fiduciary liability. [7]

Second, the alleged breaches were directly related to the control and discretion that defendants allegedly exercised over the administration of Plan assets. See supra. Defendants' reliance on Pension Fund-Local [*43] 701 v. Omni Funding Group, supra, in this regard is misplaced. In that case, the district court held that a bank which was a

fiduciary for limited purposes could not be held liable as a co-fiduciary for breaches of a co-fiduciary where the alleged wrongdoing was "wholly beyond the control of the co-fiduciary and outside the realm of responsibility defined by the statute," and where the plaintiff had shown no causal relationship between the defendant bank's fiduciary duties and the alleged misdeeds. Id. at 176. Here, in contrast, the alleged breaches of the defendants are not unrelated to one another. Indeed, the defendants are alleged to have engaged in parallel breaching activity, and to have enabled that activity to continue by discussing and concealing it. Thus, the alleged breaches of co-fiduciaries are closely related to the alleged direct breaches.

## 5. The Audit Claims

AIC and Southeastern (collectively "AIC") move for dismissal or summary judgment on plaintiffs' claim that they are entitled to an independent audit of AIC to determine whether AIC wrongfully withheld Discounts. [8] Plaintiffs have cross-moved for summary judgment on the same claim.

[*44] AIC argues that plaintiffs have no right to demand an independent audit in the absence of well-founded allegations of wrongdoing. AIC Brf. at 17. It argues further that even if the common law of trusts as incorporated into ERISA entitles plaintiffs to an audit, such an audit must be reasonable in scope and plaintiffs must bear all attendant costs. Id. at 18. AIC contends that it is not bound by the AT&T-Empire Agreement provision granting AT&T the right to an audit because it was not a party to that Agreement. Finally, AIC contends that it has already provided plaintiffs with an accounting that

---

[7] Defendants rely upon Donovan v. Cunningham, 716 F.2d 1455, 1475 (5th Cir. 1983), cert. denied, 467 U.S. 1251, 82 L. Ed. 2d 839, 104 S. Ct. 3533 (1984). See AIC Reply at 9. That case, however, did not impose more stringent pleading standards than the court here applies. Plaintiffs' allegations are sufficient, at this stage of discovery, to put defendants on notice of what facts are alleged to have linked their liability with one another. See Gruby v. Brady, 838 F. Supp. 820, 831 (S.D.N.Y. 1993) (requiring that plaintiffs inform each defendant of the nature of his or her participation in the alleged fraud).

[8] As of June 30, 1993, Southeastern merged with Associated. AIC Brf. at 15.

fulfills any obligations it has under ERISA.

For the proposition that any entitlement plaintiffs may have to an accounting must arise by virtue of common law, AIC relies on *LOF, supra,* in which the plaintiff claimed it was entitled to an accounting by virtue of generally accepted accounting principles rather than by virtue of ERISA or terms in the Master Group Operating Agreement. *LOF,* 982 F.2d at 1035. However, defendants' cannot rely on *LOF* for the proposition that if plaintiffs have a right to an audit, it must come from commonlaw trust principles. *See* AIC Brf. at 18 **[*45]** n.13. That question was not before the *LOF* court.

AIC also relies on cases holding that there is no general right to an accounting absent allegations of wrongdoing. *See* AIC Brf. at 18-19. *See, e.g., Mutuelle Generale Francaise Vie v. Life Assurance Co., 688 F. Supp. 386, 400 (N.D.Ill. 1988)* (to sustain action for an accounting in equity, breach in fiduciary relationship between parties must be alleged); *Brigham v. McCabe, 27 A.D.2d 100, 276 N.Y.S.2d 328 (App. Div. 1966).*

However, AIC also cites cases in which courts held or stated that allegations of wrongdoing were *not* essential to a claim for a general accounting. AIC Brf. at 20-24. AIC tries to distinguish those cases because in some, allegations of wrongdoing were in fact made, so the court's statement that such allegations would not have been necessary constituted dicta. *See, e.g., Morgulas v. J. Yudell Realty, Inc., 161 A.D.2d 211, 554 N.Y.S.2d 597, 600 (App. Div. 1990).*

Even if allegations of wrongdoing are required to entitle plaintiffs to an accounting, the compliant in this case alleges such wrongdoing in the very allegation that AIC has denied plaintiffs access to its books in violation of it obligations **[*46]** as an ERISA fiduciary. *See* Cmplt, P 69. Such an allegation was

sufficient to warrant an accounting in *Morgulas v. Yudall Realty, Inc, supra, 554 N.Y.S.2d at 600,* even though the *Morgulas* court also found that allegations of wrongdoing were not essential where the complaint alleges a fiduciary relationship. [9] Because the court has already found that the compliant sufficiently alleges that defendants were fiduciaries, plaintiffs are entitled to an accounting from AIC. *See LOF,* 982 F.2d at 1036 (**HN12**[⬆]) ERISA fiduciary has obligation to provide account on demand to Plan).

As noted, AIC contends that it has already provided plaintiffs with any audit to which they may be entitled under ERISA. Specifically, AIC submits evidence that the **[*47]** computerized method it uses for billing would prevent wrongful withholding of Discounts absent elaborate efforts to avoid the automatic inclusion of all discounts. AIC Brf. at 3-7; Affidavit of Richard Huber (hereinafter "Huber Aff."); Affidavit of Curtis R. Ladig (hereinafter "Ladig Aff."). AIC claims that it never had "year-end settlements," "fast-pay discounts," or any other discount arrangement with hospital providers other than those regularly programmed into its billing system and automatically passed on to customers, including AT&T. Huber Aff., P 21; Ladig Aff., P 12.

In response to AT&T's concerns, AIC conducted internal audits using approximately 20 randomly selected claims from Associated and approximately 30 randomly selected claims from Southeastern. *See* Deposition of Max Deal at 49, Exh. 30 to Affidavit of Heidi Martinez (hereinafter "Martinez Aff."). AIC claims these internal audits confirm that all

---

[9] Plaintiffs also argue that in light of the fact that independent audits have determined that other defendants withheld some $ 85 million in Discounts, it would be shirking its fiduciary duties if it did *not* demand an independent audit of AIC. Plf. AIC Reply at 4.

Discounts were passed on to AT&T. AIC Brf. at 8-9.

Moreover, AIC has offered on numerous occasions that AT&T could conduct its own audits on a reasonable scale, as long as AT&T paid all costs, including AIC internal costs, associated with such audits. *See* Letters, **[\*48]** Exh. 7, 8, 11, 13, 15, 23, 27 to Martinez Aff. AIC estimates that the audit AT&T requests would cause it to incur at least $ 150,000 in diverted employee time alone. AIC Brf. at 12 n.9. Finally, AIC has offered to bear the costs of the audit initially, if AT&T will reimburse AIC if the audit shows AIC passed along all Discounts. *See* Letter, Exh. 27 to Martinez Aff.

Plaintiffs point out that only an *independent* audit can reliably determine whether all Discounts have been passed on. Plf. AIC Opp. at 3. *See also* Affidavit of Theodore F. Martens, Partner at Coopers & Lybrand, PP 5, 6 ("The 'self-audit' AIC describes would not allow an independent auditor to draw any meaningful conclusions"). In addition, plaintiffs explain that in audits already performed on the books and records of other defendants, plaintiffs have paid the expenses and fees of the independent accounting firm Coopers & Lybrand ("C&L"), and that they would also bear those expenses in an audit of AIC.

Plaintiffs request an order compelling AIC to submit to an audit according to the terms set forth in the Martens Affidavit. Plf. AIC Opp. at 8. The court finds that plaintiffs are entitled to a reasonable independent **[\*49]** audit, and will grant plaintiffs' request. Since plaintiffs' right to the audit arises from AIC's status as an ERISA fiduciary, the court further finds no basis at this juncture upon which to grant AIC's request that plaintiffs reimburse it for internal costs it may incur as a result of the audit.

Capital argues that it is entitled to summary judgment on the ERISA claims because prior to centralization, it passed on all discounts to AT&T, and after centralization, it no longer exercised any discretion in claims processing and therefore was not an ERISA fiduciary. Capital Brf. at 43-46. It submits voluminous evidence which it claims establishes both these contentions. Plaintiffs, however, vigorously dispute Capital's factual assertions and its legal conclusions. Plaintiffs further argue that because discovery has been limited in this preliminary, albeit extended, phase of litigation, they are unable to submit specific evidence to contradict some of Capital's contentions. *See* Affidavit of Michael D. Schissel Pursuant to *Rule 56(f)*.

Briefly, Capital presents the following version of events. Capital, headquartered in Harrisburg, Pennsylvania, **[\*50]** services 21 counties in central Pennsylvania. Capital Brf. at 10. It was a participating plan in the AT&T national account from January, 1984 to April, 1994. *See* Deposition of Robert J. Markel at 15-16 (hereinafter "Markel Dep."), Exh. 1 to Certification of Mark J. Oberstaedt (hereinafter "Oberstaedt Cert."). Before AT&T claims processing was centralized in early 1988, Capital systematically passed on to AT&T all discounts it negotiated with providers. *See, e.g.,* Affidavit of Thomas E. Black, Director of Select Accounts for Capital Blue Cross, PP 2-3 (hereinafter "Black Aff."); Markel Dep. at 32-34

During the centralization process, Capital claims it entered into an agreement with Empire according to which it no longer had to pass on the full amount of discounts it negotiated, and instead all claims paid through Capital would be discounted by a flat rate of 15%, in accordance with the model used to centralize IBM's national account. Black Aff., PP 6-8, 12; Letters exchanged between Capital and Empire, Exhibits to Black Aff.

## 6. Capital's Motion for Summary Judgment

After centralization, Capital no longer exercised any discretion over whether claims were payable. That adjudication was made by the centralized processing **[*51]** center in Middletown, New York. Black Aff., P 17. Capital submitted the full, non-discounted hospital bills to the central processing center, which then applied the flat 15% discount as Capital and Empire had agreed. Capital then paid the hospitals according to the discounted terms it had negotiated. *Id.* Capital claims it had no part in designing, implementing or administering a recordkeeping system in connection with the centralized NASCO system, and that plaintiffs set forth no facts to suggest that Capital had any such role in NASCO. Capital Reply at 27. On the basis of this evidence, Capital claims that there is no evidence it retained discounts prior to centralization, and that after centralization it no longer exercised the discretionary authority over Plan assets or administrative responsibility that might make it an ERISA fiduciary.

Even if Capital's responsibilities were reduced after centralization, however, it was still responsible for transmitting hospital bills to the central processing center. It admittedly knew that these bills represented the full billed amount, and that these bills would eventually be submitted to the Plan reduced by a flat 15% discount. It further **[*52]** knew that the discounted rate it would pay the hospitals for these bills were, in at least some instances, substantially less than the partially discounted bills that would be presented to the Plan. Capital continued to exercise discretionary authority to the extent that it negotiated discounts with providers and retained any portion of those discounts that exceeded the 15% flat rate. In addition, Capital continued to be responsible for administering the Plan to the extent that it forwarded bills, negotiated discounts, and paid providers based on the discounted rates. Thus, Capital's role was quite different from that of the defendant in *Schulist v. Blue Cross of Iowa, 717 F.2d 1127 (7th Cir. 1983)*, upon which Capital seeks to rely. In *Schulist,* the Blue Cross entity was not a fiduciary with respect to the premium amount because that amount had been fixed at the time the employer accepted the contract terms. Here, in contrast, Capital continued to negotiate discount amounts even after centralization, and it retained any portion of such discounts that exceeded 15%, thereby retaining control over what was, in effect, its own rate of reimbursement. Therefore, in accordance with **[*53]** a broad reading of ERISA's definition of fiduciary, Capital was still a Plan fiduciary after centralization.

Although plaintiffs have submitted no evidence directly contradicting Capital's deposition testimony that it passed on all discounts prior to centralization, information necessary to verify those contentions, such as evidence of the actual discount Capital received, is uniquely in the possession of Capital. The court agrees with plaintiffs that they should be entitled to an independent audit before summary judgment should be entertained on this issue. [10] *See* Schissel *Rule 56(f)* Aff., P 5.

 **[*54]** *B. The RICO claims*

Counts 3 and 4 allege that defendants violated the federal Racketeer Influenced and Corrupt Organizations statute (RICO), *18 U.S.C. §§ 1962(c)* and *1962(d)*. **HN13[⤴]** *Section*

---

[10] Capital claims it has never refused an audit request by AT&T. Capital Reply at 5. Indeed, Capital contends that when Empire contacted it about conducting audits for the AT&T account, Capital responded that it was willing to cooperate with the audit request. *See* Letters, Oberstaedt Cert. Exh. I, J, K, L. Each time Capital communicated its willingness to cooperate, however, it claims it received no response from Empire for a period of months. Capital Reply at 7. Capital admits, however, that it refused to permit an audit on AT&T's terms after this litigation was commenced. *Id.* at 7.

1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for any person to conspire to violate subsections (a), (b), or (c) of § 1962. 18 U.S.C. § 1962(d). Defendants argue that plaintiffs have failed to plead the required elements of their RICO claims, and that their allegations of fraud as the RICO "predicate acts" are not alleged with particularity as required by Fed. R. Civ. P. 9(b). The court will first address defendants' motion to dismiss the § 1962(c) count, and then will address the motion with regard to the conspiracy count.

HN14 There are four elements necessary to make out a claim under § 1962(c):

> (1) the existence of an enterprise [*55] affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity . . . .

Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165 (3rd Cir. 1989); United States v. Console, 13 F.3d 641, 652-53 (3rd Cir. 1993). Defendants argue that plaintiffs have failed adequately to plead these essential elements.

## 1. The "Enterprise" Element

Defendants argue that plaintiffs have failed to

identify adequately a specific enterprise [11] for the purposes of RICO, and that to the extent they have alleged such an enterprise, they have failed to allege an enterprise distinct from its alleged members. Jt. Mem. at 31-34.

[*56] With respect to the "enterprise," the complaint alleges as follows:

> 73. At all relevant times there has been and continues to be an association-in-fact, joined at relevant times by Empire and other similar legal entities, including the Blue Cross and Blue Shield Association and each of the Participating Plan Defendants, entitled to use the servicemark "Blue Cross." The associations-in-fact of Blue Cross affiliates and the Blue Cross and Blue Shield Association are "enterprises" within the meaning of 18 U.S.C. § 1961(4). . . . The enterprises are separate and distinct from Empire and each of the other Blue Cross affiliates that have participated in the enterprise.

> 74. A purpose of the enterprises has been and continues to be to induce companies that have medical benefit plans for their employees, such as Plaintiffs, to utilize the enterprises and their participants to administer such plans on a cost-plus basis. The Blue Cross affiliates that participate in the enterprises aid and assist each other, sometimes acting as the control plan in administering an employer's medical benefit plans, as Empire has done in this case, and sometimes acting as a participating [*57] plan.

Cmplt, PP 73-74.

Paragraph 73 alleges two associations-in-fact:

---

[11] HN15 Section 1961(4) defines an enterprise as any "individual, partnership, corporation, association, or any legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

one is an association-in-fact of Empire, similar entities including defendants, and the Blue Cross and Blue Shield Association (BCBSA); the other is the BCBSA itself. Though the allegation arguably could be clearer, the second sentence of P 73 makes sufficiently clear the allegation of two associations-in-fact.

In *B.F. Hirsch v. Enright Refining Co., Inc, 751 F.2d 628, 633-34 (3rd Cir. 1984),* the United States Court of Appeals for the Third Circuit held that the "person" or "persons" charged with violating *§ 1962(c)* must be distinct from the "enterprise." *See also Brittingham v. Mobil Corp., 943 F.2d 297, 300 (3rd Cir. 1991)*. The *Brittingham* court further clarified that *HN16*[↑] a RICO enterprise "must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation," and held that an alleged association-in-fact of the defendant corporation, its employees, and its agents did not constitute an enterprise distinct from the defendant corporation. *Brittingham, 943 F.2d at 301*.

The *Brittingham* court's ruling was directed at RICO claims in which the **[*58]** defendant itself was a collective entity, and the enterprise was alleged to be an association-in-fact of the various parts of the defendant collective entity. *See Brittingham, 943 F.2d at 302*. Mere, the individual defendants are separate and distinct organizations. Thus, the alleged enterprises of their association-in-fact and of the BCBSA are more than and distinct from the individual defendants themselves. "The enterprise is not them, but is the association-in-fact which they allegedly make up." *American Trade Partners v. A-1 Intern. Importing, 755 F. Supp. 1292 (E.D.Pa. 1990)*.

## 2. The "Conduct" Element

In 1993, the United States Supreme Court adopted the "operation or management" test for whether a defendant's alleged actions were sufficiently related to the "conduct" of the affairs of the enterprise to subject that defendant to RICO liability. *Reves v. Ernst & Young, 507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. In *Reves,* the Court upheld the dismissal of RICO claims against an accounting firm that allegedly provided grossly inadequate accounting services to a farming cooperative, where the cooperative's reliance upon those services caused it to **[*59]** become insolvent. The Court held that *HN17*[↑] in order to be subject to liability under *§ 1962(c),* a defendant must have had "some part in directing" the affairs of the enterprise. *Reves, 113 S. Ct. at 1170*. It also held that "RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . but *some* part in directing the enterprise's affairs is required." *Id.* Because the defendant accounting firm had merely provided professional services to the cooperative, albeit critical services, the Court found that it had not participated in the operation or management of the cooperative and therefore could not be subject to RICO liability. *Reves, 113 S. Ct. at 1173-74*.

The Court of Appeals for the Third Circuit has held that under the *Reves* "operation or management" test, "not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise." *University of Maryland v. Peat, Marwick, Main, 996 F.2d 1534, 1538-39 (3rd Cir. 1993)*. Thus, the *Peat, Marwick* court upheld the dismissal of a RICO claim against the defendant accounting firm which had, like the *Reves* defendant, provided extremely **[*60]** important accounting services to the alleged "enterprise" in question. *Peat, Marwick, 996 F.2d at 1539-40*.

Defendants argue that plaintiffs have failed to allege that they directed or controlled the affairs of the alleged enterprises such that they

could be subject to RICO liability under *Reves* and *Peat, Marwick*. Jt. Mem. at 29-30. The compliant alleges in relevant part that defendants:

> employed manipulative and deceptive devices and contrivances, among other things, to induce Plaintiffs to extend the Agreement, to fraudulently conceal the actual amounts paid to hospitals, and to cause Plaintiffs to pay them through Empire substantial sums of money in excess of the amounts to which they were entitled under the Agreement . . . .

Cmplt, P 84. The complaint also alleges that defendants fraudulently rendered false reports to Empire, knowing that these reports would be used to overcharge the Plan (P 45), and that they knowingly and fraudulently failed to report to Empire the amount of Discounts they had actually obtained through periodic settlements with providers (P 46). Plaintiffs argue that these allegations meet the "operation or management" test because **[*61]** the alleged activities of defendants "constitute the very means by which the enterprise operated." Plf. Mem. at 49.

Reading these allegations broadly, as the court must on a motion to dismiss, the court concludes that they sufficiently allege that defendants collectively participated in the "operation or management" of the alleged enterprises to subject them to RICO liability. The alleged purpose of the alleged enterprises is to induce employers such as AT&T to enter into agreements with the enterprises to administer their national employee health benefit plans. *See* Cmplt, P 74. According to the allegations, defendants associated-in-fact in order to induce employers such as AT&T to hire them to administer their Plans. The defendants allegedly participated in the operation and management of the enterprises through submitting reports to Empire for the purpose of billing the Plan in a collective

manner, in accordance with the alleged purposes of the enterprises. Because the alleged enterprises are collective in nature, the allegations of the individual defendants' actions in conjunction with the allegation of their collective purposes (expressed through the enterprises' purposes) **[*62]** suffice to meet the "operation or management" test.

Certain defendants argue that they only provided services to Empire and plaintiffs, and therefore, like the defendants in *Reves* and *Peat Marwick,* they cannot be liable under RICO. *See* Mass. Mem. at 19; Central Benefits Mem. at 4. These defendants also argue that they had no part in *directing* Empire or the alleged enterprises to do anything. Mass. Mem. at 20. Other defendants add that the submission of reports to Empire in no way constitutes "direction" of the alleged enterprises under *Reves.* Jt. Reply at 23. These arguments are unpersuasive. As noted, the alleged enterprises are collective in nature, allegedly composed of the individual defendants. Therefore, the "operation or management" test must be fulfilled by allegations that defendants participated in the collective operation or management of those enterprises. Because Empire is not an alleged enterprise, but is instead alleged to be part of the collective enterprises *along with* the other defendants, there is no need for plaintiffs to allege that defendants directed Empire. In addition, the submission of reports is one of the activities alleged to have **[*63]** been done in furtherance of the enterprises' purpose to win the national accounts of employers such as AT&T. As such, the allegations, broadly read, suffice under *Reves* and *Peat, Marwick.*

The court's conclusion is supported by a recent case from the Eastern District of Pennsylvania, in which the district court found that **HN18** even though the defendant accountant had provided accounting services to the alleged enterprise as had the *Reves* and

*Peat Marwick* defendants, the RICO claim against him should not be dismissed because he was alleged to have participated directly in the alleged fraud, the primary RICO violation. *Circle Business Credit, Inc. v. Becker, 1994 U.S. Dist. LEXIS 1894*, No. 92-3177, 1994 WL 52848 (E.D.Pa. Feb. 18, 1994), at *3. Similarly, defendants here are alleged to have participated directly in the alleged fraud, and therefore are subject to RICO liability.

### 3. *Rule 9(b)*

The alleged acts of racketeering upon which plaintiffs predicate their RICO claims are acts of mail fraud and wire fraud in violation of *18 U.S.C. §§ 1341* and *1343*, and embezzlement from an employee welfare benefit plan in violation of *18 U.S.C. § 664*. *See* Cmplt, PP 78, 79. **HN19[↑]** Predicate acts of fraud **[*64]** alleged under RICO must be plead with particularity in accordance with *Fed. R. Civ. P. 9(b)*. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3rd Cir. 1984)*, cert. denied, 469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985).

*Rule 9(b)* states as follows: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be alleged generally." *Fed. R. Civ. P. 9(b)*. The Third Circuit Court of Appeals has held that: **HN20[↑]**

> *Rule 9(b)* requires a plaintiff to plead (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.

*Shapiro v. UJB Financial Corp., 964 F.2d 272,* *284 (3rd Cir. 1992)*, *cert. denied, 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992)*. Defendants argue that the complaint fails to comply with the rule because it fails to inform each defendant of the specific false representations allegedly **[*65]** giving rise to the claims against it. Jt. Mem. at 37-38.

The complaint alleges that defendants knowingly sent false reports to Empire overstating the amounts they paid for hospital services for Plan beneficiaries, knowing that these reports would be used to bill the Plan and cause it to pay more that the actual costs of those services. Cmplt, PP 45, 78. While the complaint does not identify each and every such report, Plaintiff explains that there were literally thousands of them. Plf. Mem. at 37. While the complaint does not specify the time and date of each report, the complaint as whole makes sufficiently clear what "reports" are alleged to have been fraudulent.

The Third Circuit Court of Appeals has explained the particularity requirement of *Rule 9(b)* as follows:

> **HN21[↑]** In applying *Rule 9(b)*, "focusing exclusively on its 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." . . . *Rule 9(b)* requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged and to safeguard **[*66]** defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that the allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them.

*Seville Indus. Mach. Corp. v. Southmost*

*Mach. Corp., 742 F.2d 786, 791 (3rd Cir. 1984)* (citations omitted). Thus, *HN22*[↑] *Rule 9(b)* is satisfied when the allegations in the complaint indicate "who made the representations to whom, and the general content of the representations." *Saporito v. Combustion Engineering Inc., 843 F.2d 666, 675 (3rd Cir. 1988)*, vacated, 489 U.S. 1049 (1989). The allegations in this complaint meet this standard.

Defendants protest that further specificity is needed "to distinguish between a difference in opinion as to performance under a contract and a valid claim of fraud." Jt. Mem. at 36. Defendants claim that *Dana Corp. v. Blue Cross & Blue Shield, 900 F.2d 882 (6th Cir. 1990)* supports this contention. In that case, however, the United States Court of Appeals for the Sixth Circuit held, upon allegations strikingly similar to those alleged here, that the plaintiff corporation made sufficient allegations of intentional fraud by the defendant **[*67]** Blue Cross organizations to state a claim under RICO. *Dana, 900 F.2d at 885*. The *Dana* court held specifically that the district court had erred in dismissing the RICO claims in reliance on *Blount Financial Services, Inc. v. Walter E. Heller & Co., 819 F.2d 151 (6th Cir. 1987)*, which the *Dana* court clarified as follows: "*Blount* does not stand for a blanket prohibition of RICO claims related to contract disputes." Rather, the relevant inquiry is whether the plaintiffs made sufficient allegations of misrepresentations or omissions reasonably calculated to deceive. *Dana, 900 F.2d at 885*. In the present case, as in *Dana,* the alleged misrepresentations concern the level of Discounts hospitals provided to the Blue Cross plans, which information was solely in the hands of the defendant Blue Cross organizations. Thus, even if the underlying claim were at base a breach of contract claim, sufficient allegations of misrepresentation and fraud related to that breach could support a RICO claim.

Defendants also argue that plaintiffs have failed to allege violation of *18 U.S.C. § 664* with sufficient particularity under *Rule 9(b)*. *HN23*[↑] *Section 664* prohibits conversion of funds **[*68]** related to an employee welfare benefit plan. Defendants argue that because proof of a *§ 664* claim requires proof of specific criminal intent, *Ris v. Bedell, 699 F. Supp. 429, 436 (S.D.N.Y. 1988)*, plaintiffs' *§ 664* claim should be subject to the same particularity requirements as are plaintiffs' fraud claims. Jt. Mem. at 35-36 n.22; Mass. Brf. at 16-18. *Rule 9(b)* itself provides, however, that intent may be alleged generally. *See supra.* In addition, plaintiffs have adequately alleged that defendants wilfully converted Plan assets. Cmplt, P 85.

Plaintiffs also argue that the particularity requirement is relaxed where relevant information is uniquely in the possession of the defendants. Plf. Mem. at 41; Cmplt, P 50. Defendants protest that plaintiffs have had the reports themselves for some time. Jt. Reply at 21. However, defendants fail to address the point that plaintiffs have not had access to information about what Discounts defendants actually received from hospitals during the relevant periods. This information is, after all, critical to the basis of the suit. Because plaintiffs have not had access to this information, they cannot be penalized for failing to specify **[*69]** which reports in particular failed to accurately reflect Discount levels.

## 4. The Conspiracy Claim

The Third Circuit Court of Appeals has explained pleading requirements for RICO conspiracy claims as follows:

*HN24*[↑] To plead conspiracy adequately, a plaintiff must set forth allegations that

address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose. . . . Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.

*Shearin, supra, 885 F.2d at 1166-67.*

Defendants argue that the complaint fails to allege they knew the alleged predicate acts were part of an overall pattern of racketeering activity. Jt. Mem. at 34. Plaintiffs allege that defendants "did knowingly and intentionally combine, conspire, confederate and agree together and with each other to violate § 1962(c) . . ." Cmplt, P 88. In addition to this conclusory allegation, however, the complaint is replete with allegations that defendants knowingly and wilfully submitted false reports for the purpose of inducing the Plan to pay more for **[*70]** services than defendants were actually charged, and that defendants were aware that other defendants were engaging in the same activities. *See* Cmplt, PP 44-50, 54, 61. Thus, the complaint sufficiently alleges knowledge that the alleged individual acts were part of an overall pattern of racketeering activity.

## 5. Capital's Motion for Summary Judgment

As it did with regard to the ERISA claim, Capital argues that plaintiffs have come forth with no proof that it engaged in any wrongdoing. Specifically, Capital argues there is no evidence it had any fraudulent intent in not passing on full Discounts under the centralized billing system because Capital always believed AT&T had consented to the flat 15% discount. Capital Brf. at 37. Capital also argues that it never submitted misleading reports to Empire because the reports were

intended to list the full amounts hospitals charged, not the discounted amounts. Capital Brf. at 39. Because its actions were not fraudulent, Capital argues, they cannot be the predicate acts for a RICO claim. *Id.* at 40.

Capital relies in this regard upon its alleged agreement with Empire, pursuant to which only the flat 15% discount would be passed **[*71]** on. As noted above, plaintiffs have not been afforded discovery regarding this alleged agreement. *See* Plf. Capital Opp. at 22. With regard to the RICO claims, the court agrees that plaintiff should be afforded an opportunity to take discovery with regard to that agreement and with regard to Capital's relationship with the BCBSA and with other Blue Cross entities which are alleged to have defrauded the plan. Therefore, the court will not grant summary judgment on the RICO claim at this time.

## C. The State Law Claims

Plaintiffs assert state law claims against defendants in Count 6 (for breach of contract); Count 8 (for breach of the implied covenant of good faith and fair dealing); Count 10 (for fraud and fraudulent inducement); Count 12 (for conversion) Count 14 (for breach of fiduciary duty); Count 15 (for conspiracy to commit and aiding and abetting a fraud, conversion, and a breach of fiduciary duty); Count 16 (against Blue Cross of Arizona and Blue Cross of Florida for conspiracy to commit and aiding and abetting a breach of fiduciary duty); and Counts 18 and 19 (for violations of the New Jersey Anti-Racketeering Act, or "Little RICO"). Defendants argue that plaintiffs' **[*72]** state law claims are preempted by ERISA, and should therefore be dismissed. Jt. Mem. at 42-47. They also argue that each claim is in itself infirm. The court turns first to the ERISA preemption argument.

**HN25**[⬆] Section 514(a) of ERISA provides that ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. *29 U.S.C. § 1144(a)*. "State laws" as defined in the statute include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *29 U.S.C. § 1144(c)(1)*. Since the state law claims asserted here are based on alleged agreements regarding the administration of an ERISA benefit plan and conduct related to such agreements, defendants argue, they relate to the plan and must be preempted. Mass. Brf. at 24. Plaintiffs argue in opposition that the preemption issue is premature, and that in any event the state laws allegedly violated are laws of general applicability, and that ERISA does not preempt claims based upon such laws. Plf. Mem. at 59-64.

The United States Supreme Court has discussed in a series of opinions the expansive sweep of ERISA's preemption clause, which it has **[*73]** termed "conspicuous for its breadth." *FMC v. Holliday, 498 U.S. 52, 58, 112 L. Ed. 2d 356, 111 S. Ct. 403 (1990)*; *Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 95 L. Ed. 2d 55, 107 S. Ct. 1542 (1987)*; *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1986)*. **HN26**[⬆] ERISA's preemption provisions "establish[] as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA." *FMC, 498 U.S. at 58*. Interpreting the congressional intent behind the preemption provision, the Court quoted remarks of ERISA's sponsors that preemption would "eliminate the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Pilot Life, 481 U.S. at 46* (quoting 120 Cong. Rec. 29933 (1974) (remarks of Sen. Williams)).

**HN27**[⬆] Courts have taken it for granted that state laws designed to affect employee benefit plans are preempted. *See, e.g., Mackey v. Lanier Collection Agency & Service, 486 U.S. 825, 829, 100 L. Ed. 2d 836, 108 S. Ct. 2182 (1988)*; *Bricklayers and Allied Craftsmen International Union Local 33 Benefit Funds v. America's Marble Source, Inc., [\*74] 950 F.2d 114, 117 (3rd Cir. 1991)*. However, a state law is also preempted even though it makes no mention of benefit plans, if it "relate[s] to" any benefit plan. *29 U.S.C. § 1144(a)*. Taking as the touchstone of any preemption question the congressional intent in enacting the statute, the Supreme Court has interpreted the words "relate to" quite broadly in light of the legislative history behind the preemption clause, which was selected over more restrictive formulations of preemption. *Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138, 112 L. Ed. 2d 474, 111 S. Ct. 478 (1990)*; *Pilot Life, 481 U.S. at 46*. In light of the broad formulation of "state laws," preemption applies to state common-law claims as well as state statutes related to benefit funds. *See, e.g., McClendon, 498 U.S. 133, 112 L. Ed. 2d 474, 111 S. Ct. 478* (state wrongful-discharge claim predicated on theory that employer terminated plaintiff to avoid contributing to his pension fund was preempted).

The Court has explained:

**HN28**[⬆] "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Under this "broad common-sense **[*75]** meaning," a state law may "relate to" a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect.

*McClendon, 498 U.S. at 139* (citations omitted). Nevertheless, the Court has also

recognized that " some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw v. Delta Air Lines, 463 U.S. 85, 100 n.21, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983)*.

Interpreting the ERISA preemption cases, the United States Court of Appeals for the Third Circuit recently summarized the law as follows:

*HN29* A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefit plans, if it singles out such plans for special treatment, or if the rights or restrictions it creates are predicated on the existence of such a plan. Because we are here dealing with a statute of general applicability . . . which does not single out ERISA plans for special treatment, and which functions without regard to the existence of such plans, the cases which have cordoned off this area of preemption are inapplicable.

[*76] *United Wire, Metal and Machine Health and Welfare Fund v. Morristown Mem. Hosp., 995 F.2d 1179, 1192* (3rd Cir.), *cert. denied, 510 U.S. 944, 510 U.S. 944, 114 S. Ct. 382, 126 L. Ed. 2d 332, 114 S. Ct. 383 (1993)* (footnotes omitted) (holding that New Jersey's statutory scheme for setting hospital rates was not preempted by ERISA).

Defendants argue that plaintiffs' state law claims are directly related to the Plan because they seek to recover Plan funds, because they are predicated upon alleged agreements and conduct involving Plan administration, and because they seek to hold defendants to state law standards for the same conduct upon which plaintiffs' ERISA claims are based.

For the argument that the claims are preempted because they seek to recover Plan

assets, defendants rely upon *Pension Fund-Local 701 v. Omni Funding Group, supra*, in which the district court stated: "If a plaintiff seeks recovery of pension fund monies, the claim 'relates to' the benefit plan, no matter how the claim is characterized." *Omni Funding Group, 731 F. Supp. at 170* (citing *Shiffler v. Equitable Life Assurance Soc'y, 838 F.2d 78, 81 (3rd Cir. 1988)*. Plaintiffs argue that [*77] this statement of the *Omni Funding Group* court was overruled by the Third Circuit Court of Appeals in *United Wire,* apparently focusing on that court's conclusion that the mere fact that the New Jersey regulatory scheme at issue increased the operating costs of ERISA plans did not bring it within the scope of ERISA preemption. Plf. Mem. at 63 & n.45. *See United Wire, 995 F.2d at 1193, 1995*. *United Wire,* however, did not address the question defendants pose of whether a particular claim is preempted because it seeks to recover plan assets.

Defendants also rely on *First National Ins. v. Sunshine-Jr. Food Stores, 960 F.2d 1546 (11th Cir. 1992)*, *cert. denied, 506 U.S. 1079, 113 S. Ct. 1045, 122 L. Ed. 2d 354 (1993)*, in which the Court of Appeals for the Eleventh Circuit held that state law claims including breach of contract, misrepresentation, breach of duties of due care and good faith, willful and wanton conduct, and an action under the Alabama Code for failure to disclose material information were preempted by ERISA because the claims "had an obvious connection with the plan," and were based on the plan's alleged failure [*78] to adhere to the terms of the group policy under which the plan was funded. *First National Ins., 960 F.2d at 1550*. The appellate court noted that "state contract and tort laws that impose varying standards upon the administrator of a welfare benefit plan create significant potential for conflict with ERISA and thus are logically preempted." *Id.*

Finally, defendants cite to *Pane v. RCA Corp., 868 F.2d 631 (3rd Cir. 1989)*, in which the Third Circuit Court of Appeals upheld the dismissal of state law claims brought by an ERISA plan beneficiary against his employer. The *Pane* court rejected the contention that the state law claims and ERISA provisions "co-exist" for purposes of enforcement, and held that the state claims were therefore preempted. *Pane, 868 F.2d at 635*.

Plaintiffs argue in opposition that the court should focus on the character of the state laws and causes of action in the abstract to determine whether they "relate to" ERISA plans. In addition to relying on the language of *United Wire* quote above, plaintiffs cite to *Sommers Drug Stores v. Corrigan Enterprises, Inc, 793 F.2d 1456 (5th Cir. 1986)*, *cert. denied, 479 U.S. 1034, 93 L. Ed. 2d 837, [*79] 107 S. Ct. 884 (1987)*, for the proposition that both ERISA claims and state law claims may be brought upon the same set of facts. In *Sommers Drug Stores,* a plan trust brought claims that the defendants had breached their fiduciary duties to the plan under ERISA, and claims that they had breached their fiduciary duties to the plan as shareholder through a scheme to purchase shares owned by the plan to the detriment of the plan. The Fifth Circuit Court of Appeals held that the state law claim was based on the traditional common law of corporate fiduciary duty as it pertained to the relationship of the defendants as directors and the plan as shareholder. *793 F.2d at 1468*. Thus, it found that the ERISA and corporate duties, although parallel, were independent. *Id.*

In the course of its analysis, the *Sommers Drug Stores* court observed that **HN30**⊡ "courts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities -- the employer, the plan, the plan fiduciaries, and the beneficiaries -- than if it affects the relations between one of these entities and an outside party, or between two outside parties with only an incidental **[*80]** effect on the plan." *793 F.2d at 1476* (citation omitted). The court agrees. While there is support in the language of the ERISA cases for plaintiffs' argument that the preemption question turns on the character of the state law or cause of action in the abstract, there is even more support for defendants' argument that whether or not a state law "relates to" an ERISA plan depends upon the particular claim asserted.

It would frustrate the intended effect of the preemption provision to prevent conflicts among state standards of conduct applicable to ERISA entities if plaintiffs could assert state claims against such entities predicated upon the same conduct which is alleged to be governed by ERISA. Here, plaintiffs have asserted ERISA claims against these defendants based on their alleged status as ERISA Plan fiduciaries. The court has found the allegations sufficient to state such a claim. Because the court has found that ERISA at least arguably governs the alleged misconduct at issue, plaintiffs' state law claims predicated upon that same alleged conduct are preempted.

## Conclusion

For the foregoing reasons, defendants' joint motion to dismiss the complaint against them or **[*81]** for summary judgment on Count 1 is denied as to the ERISA and RICO claims (Counts 1, 3, and 4), and is granted as to Counts 6, 8, 10, 12, 14, 15, 16, 18, and 19. Defendant Capital Blue Cross' appeal of Magistrate Judge Pisano's Order granting plaintiffs' motion to file a Third Amended Complaint is dismissed as moot, and Capital's motion for summary judgment is denied. The motion of defendants Associated and Southeastern to dismiss or for summary

judgment is denied, and plaintiffs' cross-motion as to the audit claim against Associated and Southeastern is granted.

H. LEE SAROKIN

U.S. District Judge

Date: July 18, 1994

## ORDER

This matter having come before the court upon (1) the joint motion of 14 defendants to dismiss the complaint against them and/or for summary judgment on Count 1 of the complaint; (2) the motion of defendants Blue Cross and Blue Shield of Massachusetts and Blue Cross of Western Pennsylvania to dismiss the complaint against them; (3) the motion of defendants Associated Insurance Companies, Inc., a/k/a Blue Cross and Blue Shield of Indiana, and Southeastern Group, Inc., a/k/a Blue Cross and Blue Shield of Kentucky (collectively, "AIC") to dismiss the complaint **[*82]** against them or, in the alternative, for summary judgment; (4) the cross-motion of plaintiffs for summary judgment as against AIC; (5) the appeal of Capital Blue Cross from the March 15, 1994 Order of Magistrate Judge Joel A. Pisano granting plaintiffs leave to file the Third Amended Complaint; and (6) the motion of Capital Blue Cross for summary judgment on all counts against it;

And the court having considered the submissions the parties and the arguments of counsel; and for the reasons expressed in the accompanying opinion; and for good cause shown;

IT IS this 18 day of July, 1994, hereby

ORDERED that the joint motion of defendants to dismiss the complaint against them and/or for summary judgment on Count 1 of the

complaint be and the same is hereby denied as to Counts 1, 3, and 4, and granted as to Counts 6, 8, 10, 12, 14, 15, 16, 18, and 19; and it is further

ORDERED that the motion of defendants Blue Cross and Blue Shield of Massachusetts and Blue Cross of Western Pennsylvania to dismiss the complaint against them be and the same is hereby denied as to Counts 1, 3, and 4, and granted as to Counts 6, 8, 10, 12, 14, 15, 16, 18, and 19; and it is further

ORDERED that the **[*83]** motion of defendants AIC to dismiss the complaint against them or, in the alternative, for summary judgment be and the same is hereby denied; and it is further

ORDERED that the cross-motion of plaintiffs for summary judgment as against AIC be and the same is hereby granted; and it is further

ORDERED that the appeal of Capital Blue Cross from the March 15, 1994 Order of Magistrate Judge Joel A. Pisano granting plaintiffs leave to file the Third Amended Complaint be and the same is hereby dismissed as moot; and it is further

ORDERED that the motion of Capital Blue Cross for summary judgment on all counts against it be and the same is hereby denied.

H. LEE SAROKIN

U.S. District Judge

End of Document

# Tab E

 Caution
As of: December 16, 2019 3:53 PM Z

# *Carter v. San Pasqual Fiduciary Trust Co.*

United States District Court for the Central District of California

April 18, 2016, Decided; April 18, 2016, Filed

SACV 15-01507 JVS (JCGx)

**Reporter**

2016 U.S. Dist. LEXIS 163017 *; 61 Employee Benefits Cas. (BNA) 2854

Pamela Carter, et al. v. San Pasqual Fiduciary Trust Co., et al.

**Opinion by:** James V. Selna

**Prior History:** *Carter v. San Pasqual Fiduciary Trust Co., 2016 U.S. Dist. LEXIS 122311 (C.D. Cal., Feb. 22, 2016)*

# Opinion

**CIVIL MINUTES - GENERAL**

## Core Terms

fiduciary, stock, motion to dismiss, disclose, breach of fiduciary duty, monitor, prohibited transaction, plan participant, state law claim, fiduciary duty, transactions, alleged breach, co-fiduciary, allegations, conflict preemption, business decision, cause of action, fraudulently, breaches, benefit plan, per share, state law, self-dealing, settlement, inflated, denies, prices, lease

**Proceedings:** (IN CHAMBERS) **Order GRANTING IN PART and DENYING IN PART Defendants Fleet Card Fuels, William Davies, Richard Davies Fleet Card Fuels' Motion to Dismiss**

**The Court, having been informed by all parties in this action that they submit on the tentative ruling previously issued, hereby GRANTS IN PART and DENIES IN PART Defendants Fleet Card Fuels, William Davies, Richard Davies Fleet Card Fuels' Motion to Dismiss. The Court makes these rulings in accordance with the tentative ruling as follows:**

**Counsel: [*1]** Attorneys for Plaintiffs: Not Present.

Attorneys for Defendants: Not Present.

Defendants Fleet Card Fuels, William Davies, and Richard Davies (collectively, "Defendants") filed a motion to dismiss the second amended complaint filed by Plaintiffs Pamela Carter, Deborah Martin, Christine Morales, Stanley Caraker, Stanley Nicks, Michaela Vecht, Bert Schorling, Jeanette

**Judges:** James V. Selna.

Breiten, Raymond Bachar, Katherine Mitchell, Stephanie Castro, Bruce Hinsley, and Arlene Pounds on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"). Docket No. 44. The Plaintiffs filed an opposition. Defendants filed a reply. Docket No. 51.

**[*2]** For the following reasons, the Court **grants in part** and **denies in part** the motion to dismiss.

## 1. Background

In November 2003, William and Richard Davies (collectively, "the Davies"), as officers and directors of Fleet Card Fuels, established the Fleet Card Fuels Employee Stock Ownership Plan ("Plan"), an employee-owner benefit plan that allowed participating employees to acquire stock in Fleet Card Fuels. Docket No. 41 ¶ 36. The Plan designated Fleet Card Fuels as the plan administrator and the Davies as the plan trustees. Id. ¶¶ 23-25. All three were also designated as named fiduciaries under the Plan. Id. Plaintiffs are former employees of Fleet Card Fuels who were vested participants in the Plan. Id. ¶¶ 9-21. Plaintiffs allege the following.

In September 2004, Defendants entered into a scheme with Strategic Equity Group, an investment advisor firm, to sell Fleet Card Fuels stock held by the Davies and WP Davies Oil, a closely-held company also owned by the Davies, to the Plan at fraudulently inflated prices. Id. ¶ 37. Under the scheme, Defendants would hire Strategic Equity Group to serve as an investment advisor to the Plan. Id. In turn, Strategic Equity Group would misrepresent and fail **[*3]** to disclose to Plan participants information regarding Fleet Card Fuels's financial condition and performance, account receivables, and commingled funds between the Davies, Fleet Card Fuels, and

WP Davies Oil; fraudulently inflate Fleet Card Stock prices on the basis of these misrepresentations and non-disclosures; and then sell the stock to the Plan at fraudulently inflated prices. Id. The scheme was successful: through its various misrepresentations and non-disclosures, Strategic Equity Group fraudulently increased the value of Fleet Card Fuels stock to a peak value of $16.92 per share on October 31, 2009. Id. ¶¶ 38-42. On the advice of Strategic Equity Group, the Plan then purchased Fleet Card Fuels stock at these inflated values: for example, in May 2010, after Strategic Equity Group completed its annual stock valuations for the 2009 fiscal year, the Plan agreed to purchase from Davies and WP Davies Oil 23,651 Fleet Card Fuels shares for approximately $400,000.00 at $16.92 per share. Id. ¶ 42.

In addition to their scheme to sell Fleet Card Fuels stock to the Plan at fraudulently inflated prices, Defendants also engaged in two self-interested transactions to benefit Davies and WP **[*4]** Davies Oil at the expense of Fleet Card Fuels: the Catching settlement and the Flyers Energy, LLC redemption agreement.

*The Catching settlement.* In December 2010, former truck drivers for Nikolaus Tank Lines, Inc. ("Nikolaus"), a subsidiary to WP Davies Oil owned by the Davies, filed a putative class action lawsuit in Los Angeles Superior Court against Nikolaus ("Catching"), alleging violation of California wage and hour law. Id. ¶ 44. In response to the lawsuit, the Davies attempted to sell Nikolaus to a competitor trucking company named H.F. Cox, Inc. Id. ¶ 45. The talks ended after the Davies and WP Davies Oil refused to indemnify H.F. Cox, Inc. for any liability arising out of Catching. Id. ¶ 45.

In May 2011, after attempts to sell Nikolaus to H.F. Cox, Inc. ended, the Davies closed Nikolaus and directed Nikolaus to liquidate its

assets at below-market rates. Id. ¶¶ 46-47. The liquidation of Nikolaus generated over $1.1 million in cash. Id. ¶ 47. The Davies then directed Nikolaus to use its liquidation proceeds to repay outstanding cash loans of approximately $450,000.00 to Fleet Card Fuels and $80,000.00 to WP Davies Oil. Id. ¶ 50. By July 2011, only $3,000.00 remained in Nikolaus's [*5] commercial checking account. Id. ¶ 49.

In October 2011, the putative class in Catching amended its complaint to add a cause of action for fraudulent conveyance against Fleet Card Fuels on the basis of Nikolaus's $450,000.00 loan payment to Fleet Card Fuels. Id. ¶ 50. In May 2012, the Davies entered into a settlement agreement to settle Catching on behalf of both Nikolaus and Fleet Card Fuels. Under the agreement, Nikolaus and Fleet Card Fuels agreed to pay $1.5 million in settlement awards to a putative class consisting solely of truck drivers formerly employed by Nikolaus. Id. ¶ 63. The Davies also directed Fleet Card Fuels to pay legal fees incurred in Catching equal to approximately $500,000.00. Id. ¶ 65. By shifting the defense costs and settlement obligations for Catching from Nikolaus to Fleet Card Fuels, the Davies depleted Fleet Card Fuels's assets and caused the value of Fleet Card Fuels stock held by the Plan to fall 90%. Id. ¶ 66.

*The redemption agreement.* Sometime thereafter, the Davies sold Fleet Card Fuels to Flyers Energy, LLC. Under the sale agreement, Flyers Energy, LLC agreed to pay the Davies $1.6 million for non-compete agreements and WP Davies Oil $1.5 million for [*6] consulting services. Id. ¶ 90. As part of the sale, Flyers Energy, LLC also agreed to enter into a 20-year lease agreement with WP Davies Oil for gas stations previously leased to Fleet Card Fuels. Id. ¶ 62. The leases are worth approximately $40 million. Id. In

September 2012, to facilitate the sale of Fleet Card Fuels to Flyers Energy, LLC, the San Pasqual Fiduciary Trust Company, hired by Defendants to provide trust services to the Plan, entered into a redemption agreement with Fleet Card Fuels on behalf of the Plan, under which Fleet Card Fuels agreed to purchase 216,175 shares held by the Plan for $600,000.00 at a value of $2.78 per share. Id. ¶ 92. This number was significantly lower than the peak $16.92 per share valuations on October 31, 2009. Id.

On the basis of these allegations, Plaintiffs filed a putative class action complaint against Defendants and others[1] on behalf of themselves and other vested Plan participants alleging: (1) breach of fiduciary duty in violation of the federal Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001 et seq.*; (2) engaging in prohibited transactions in violation of ERISA; (3) co-fiduciary liability in violation of ERISA; (4) breach of fiduciary duty [*7] in violation of state law; and (5) aiding and abetting breach of fiduciary duty in violation of state law. Id. ¶¶ 106-207. The Defendants now move to dismiss the complaint in its entirety for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*. See Docket No. 44.

## 2. Legal Standard

Under *Rule 12(b)(6)*, a defendant may move to dismiss for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. To overcome a motion to dismiss under *Rule 12(b)(6)*, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S.*

---

[1] Plaintiffs have also sued the San Pasqual Fiduciary Trust Company and Strategic Equity Group, among others. See generally Docket No. 41. Plaintiffs' claims against these defendants are not subject to this motion to dismiss.

*544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*.

In resolving a 12(b)(6) motion under Iqbal and Twombly, the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true. *Iqbal, 556 U.S. at 678*. Second, and assuming the well-pleaded factual allegations are true, the Court must "determine whether they plausibly **[*8]** give rise to an entitlement to relief." *Id. at 679*. This determination is "context-specific," requiring the Court to draw on its experience and common sense. Id. There is no plausibility, however, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id.

## 3. Analysis

3.1. Plaintiffs' federal law claims under ERISA are dismissed in part.

### 3.1.1. Fiduciary status

Congress enacted ERISA to establish minimum standards for the operation and administration of employee benefit plans. *29 U.S.C. § 1001(a)*. To that end, ERISA requires ERISA plans to vest the "authority to control and manage the operation and administration of the plan" in named fiduciaries. Id. *§ 1102(a)*. ERISA in turn imposes "standards of conduct, responsibility, and obligation" on the named fiduciaries. Id. *§ 1001(b)*. These standards, responsibilities, and obligations include the fiduciary duties of prudence, loyalty, and disinterestedness. Id. *§§ 1104(a), 1106(b)(1)*.

As a threshold matter, to state a claim for breach of fiduciary duty, co-fiduciary liability, or participation in a prohibited transaction in violation of ERISA, the plaintiff must first allege that the defendant was acting as an ERISA fiduciary when committing the alleged ERISA **[*9]** violation. *Pegram v. Herdrich, 530 U.S. 211, 226, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000)*; see also *29 U.S.C. §§ 1109* (breach of fiduciary duty), *1106(a)* (prohibited transactions), *1105(a)* (co-fiduciary liability). An individual can become an ERISA fiduciary in two ways. First, the individual may be named as a fiduciary under the terms of an ERISA plan. *29 U.S.C. § 1102(a)(2)*. If so, the scope of the individual's responsibilities as a named fiduciary may be limited by the plan instrument. *DeFazio v. Hollister, Inc., 854 F. Supp. 2d 770, 801 (E.D. Cal. 2012)*, aff'd sub nom. *DeFazio v. Hollister Employee Share Ownership Trust, 612 F. App'x 439 (9th Cir. 2015)* (citing authorities). Second, the individual can acquire functional fiduciary status by (1) exercising discretionary authority or control over management of an ERISA plan or disposition of its assets; (2) rendering investment advice for a fee or other compensation; or (3) exercising discretionary authority in the administration of the plan. *29 U.S.C. § 1002(21)(A)*. Whether the individual is a functional fiduciary is a factual question, *Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d 904, 913 (9th Cir. 1997)*, that focuses on the individual's action, authority, control, and discretion, *Parker v. Bain, 68 F.3d 1131, 1139 (9th Cir. 1995)*.

Plaintiffs allege three breaches that form the bases of their claims for breach of fiduciary duty, co-fiduciary liability, and participation in a prohibited transaction: (1) Defendants settled Catching with Fleet Card Fuels assets to avoid personal liability to the Davies and WP Davies Oil; (2) Defendants entered **[*10]** into non-compete agreements and consulting agreements to personally benefit the Davies and WP Davies Oil when selling Fleet Card Fuels assets to Flyers Energy, LLC; and (3) Defendants entered into lease agreements to

benefit WP Davies Oil when selling Fleet Card Fuels assets to Flyers Energy, LLC. Docket No. 48 at 15-18.[2] In their motion to dismiss, Defendants argue that they were not acting as ERISA fiduciaries when committing these alleged breaches because these acts were business decisions taken in their capacities as an employer and officers and directors of Fleet Card Fuels. Docket No. 44 at 17-20.

Whether an ERISA fiduciary acts in its fiduciary or business capacity "depends upon the nature of the function performed." *Beck v. Pace Int'l Union, 551 U.S. 96, 101, 127 S. Ct. 2310, 168 L. Ed. 2d 1 (2007)*. Typically, an individual that has both fiduciary and business functions does not act as an ERISA fiduciary just because its business decisions affect **[*11]** the value of an ERISA plan's assets. *Johnson v. Couturier, 572 F.3d 1067, 1077 (9th Cir. 2009)*. This includes employee stock ownership plans whose assets include the employer's stock. *Johnson, 572 F.3d at 1077*.

However, in the Ninth Circuit, an individual that has both fiduciary and business functions is liable for breach of fiduciary duty under ERISA for business decisions affecting the value of plan assets when the individual could directly profit from the business decisions. Id. ("[A]n ESOP fiduciary also serves as a corporate director or officer, imposing ERISA duties on business decisions from which that individual could directly profit does not to us seem an unworkable rule."). As the Ninth Circuit explains, this rule is necessary to protect plan participants from "obvious self-dealing" by ERISA fiduciaries and to preserve ERISA

fiduciary duties as "the highest known to law." Id. (quoting *Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996)* (internal quotation omitted)). However, the rule is also sufficiently narrowly tailored so as not to interfere with "day-to-day corporate decisions shielded by the business judgment rule." Id.

On their face, the alleged breaches described above are business decisions related to the settling of a putative class action and the sale of company stock in the context of a corporate **[*12]** acquisition. However, Plaintiffs have adequately alleged that Defendants were acting as fiduciaries under Johnson: Plaintiffs allege that (1) at all relevant times, Defendants were either named or functional fiduciaries regarding the operation and administration of the Plan and its assets, including Fleet Card Fuels stock, Docket No. 41 ¶¶ 23-25, 75-79; (2) Defendants' alleged breaches decreased the value of Fleet Card Fuels stock, e.g., id. ¶¶ 66, and (3) Defendants' alleged breaches could directly profit Fleet Card Fuels and the Davies (either personally or through WP Davies Oil). These profits included: (1) the Davies and WP Davies Oil (as the parent company to Nikolaus) avoided liability in Catching; (2) the Davies and WP Davies Oil's entered into beneficial consulting, non-compete, and lease agreements with Flyers Energy, LLC valued at over $40 million dollars; and (3) Fleet Card Fuels redeemed stock held by the Plan for below-market prices. In the Ninth Circuit under Johnson v. Couturier, these allegations are sufficient to allege fiduciary status.

3.1.2. Failure to monitor and failure to disclose

In addition to the three breaches discussed above, Plaintiffs also allege that Defendants breached **[*13]** their fiduciary duties under ERISA by (4) failing to disclose to Plan participants information regarding Fleet Card Fuels's financial condition and performance, account receivables, funds commingled

---

[2] Plaintiffs also allege that Defendants breached their fiduciary duties by failing to disclose certain financial information to Plan participants and failing to monitor the San Pasqual Fiduciary Trust Company and other Defendants. See Docket No. 44 at 16-25. The Court discusses these allegations separately in Section 3.1.2 below.

between the Davies and WP Davies Oil, and potential liability in <u>Catching</u>; (5) failing to monitor San Pasqual Fiduciary Trust Company, which resulted in San Pasqual's (a) failure to investigate Fleet Card Fuels's potential liability in <u>Catching</u>, (b) failure to identify the conflict of interest in the non-compete and consulting agreements with Flyers Energy, LLC, (c) failure to hire an independent appraiser to determine the value of Fleet Card Fuels stock held by the Plan, and (d) failure to obtain independent bids for Fleet Card Fuels stock held by the Plan; and (6) failing to monitor other Defendants' performance of their fiduciary duties under the Plan. Docket No. 41 ¶¶ 122-32.[3] Defendants seek to dismiss these claims for failure to allege violation of the duty to disclose and the duty to monitor under ERISA. Docket No. 44 at 20-22. The Court takes each argument in turn.

*Duty to disclose.* ERISA contains explicit disclosure requirements that require ERISA fiduciaries to provide plan participants with certain information regarding plan administration. *29 U.S.C. §§ 1021-31*. In the Ninth Circuit, ERISA fiduciaries also have a general duty to disclose information regarding plan administration to plan participants. *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1045 (9th Cir. 2001)*. Defendants move to dismiss Plaintiffs' claim for failure to disclose on two grounds: (1) Plaintiffs have not alleged that Defendants failed to satisfy "specific disclosure requirements" under ERISA and (2) Plaintiffs have not alleged that they "made a written request" for information from Defendants. Docket No. 44 at 21-22. However, Defendants identify no binding authorities (and the Court

has found none) holding that claims for failure to disclose must be tied to an explicit ERISA reporting requirement or that plan participants must make a written request on plan fiduciaries to trigger the duty to disclose. But see *Cal. Ironworkers, 259 F.3d at 1045* (acknowledging the "general duty to disclose facts material to investment issues" under ERISA); *Nunez v. Monterey Peninsula Eng'g, 867 F. Supp. 895, 910 (N.D. Cal. 1994)* ("The Ninth Circuit has ruled, though, [*15] that these explicit disclosure requirements are not necessarily exhaustive."). The Court therefore denies Defendants' motion to dismiss Plaintiffs' ERISA claims for failure to disclose.

*Duty to monitor.* ERISA fiduciaries have a duty to monitor the performance of their appointees. *29 C.F.R. § 2509.75-8* FR-17. To state a claim for failure to monitor under ERISA, the plaintiff must allege that the defendant "failed to review the performance of its appointees at reasonable intervals in such a manner as may be reasonably expected to ensure compliance with the terms of the plan and statutory standards." *In re Calpine Corp., 2005 U.S. Dist. LEXIS 9719, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005)* (citing *29 C.F.R. § 2509.75-8* FR-17). "No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure." *29 C.F.R. § 2509.75-8* FR-17. Here, Plaintiffs allege no facts regarding whether, when, and to what extent Defendants monitored either the San Pasqual Fiduciary Trust or other Defendants. See Docket No. 41 ¶¶ 120, 123, 126. The Court therefore dismisses Plaintiffs' ERISA claim for failure to monitor. The Court grants Plaintiffs leave to amend these claims, however.

### 3.1.3. Prohibited transactions

Plaintiffs' second cause [*16] of action alleges

---

[3] Unlike the breaches discussed above, none of these breaches is a business decision. Rather, these alleged breaches implicate [*14] Defendants' administrative responsibilities as ERISA fiduciaries in their operation and administration of the Plan.

that Defendants engaged in "prohibited transactions" in violation of 29 U.S.C. § 1106. Docket No. 41 ¶¶ 136-148. Section 1106 broadly prohibits two kinds of transactions: transactions between a plan and a party-in-interest, and transactions between a plan and a plan fiduciary. See 29 U.S.C. § 1106. Specifically, section 1106(a) prohibits plan fiduciaries from causing the plan to enter into any transaction with a party-in-interest if the plan fiduciary knows that the transaction directly or indirectly transfers assets from the plan to the party-in-interest. Id. Section 1106(b) similarly prohibits self-dealing by the plan fiduciary regarding plan assets. 29 U.S.C. § 1106(b). Defendants move to dismiss this claim on two grounds: (1) Plaintiffs do not allege violation of section 1106(a) because Plaintiffs do not identify any party-in-interest, plan fiduciary, or plan assets at issue in the alleged prohibited transactions, and (2) Plaintiffs do not allege violation of section 1106(b) because Plaintiffs do not allege any transactions involving lending or the investment of Plan assets. Docket No. 44 at 22-24.[4] Both arguments fail.

First, as to section 1106(a), Plaintiffs identify the parties-in-interest, the plan fiduciary, and the plan assets at issue in the alleged prohibited transaction: Plaintiffs have alleged that Fleet Card Fuels and the Davies caused the Plan to enter into a transaction with Fleet Card Fuels to redeem Fuel Card Fuels stock held by the Plan at $2.78 per share, and this transaction directly transferred Plan assets to Fuel Card Fuels and indirectly transferred Plan assets to the Davies. Docket No. 41 ¶ 143. These allegations are sufficient to allege a prohibited transaction in violation of section 1106(a).

Second, as to section 1106(b), there are no authorities holding that section 1106(b) is limited to transactions involving lending or the investment of plan assets. Rather, the plain language of section 1106(b) broadly prohibits any self-dealing between the plan and plan fiduciary. See, e.g., 29 U.S.C. § 1106(b)(1) ("A fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."). The redemption agreement between Fleet Card Fuels, the Davies, and the Plan therefore falls under section 1106(b). The authorities cited by Defendants establish [*18] only that self-dealing could include transactions involving lending and the investment of plan assets, and not that only these kinds of transactions constitute prohibited self-dealing under 1106(b). See, e.g., Raff v. Belstock, 933 F. Supp. 909, 915-16 (N.D. Cal. 1996) ("Transactions between a plan and a fiduciary are prohibited by 29 U.S.C. section 1106(b). Prohibited transactions include loans from a plan to a fiduciary.").

### 3.1.4. Co-fiduciary liability

Plaintiffs' third cause of action alleges "co-fiduciary liability" against Defendants in violation of 29 U.S.C. § 1105(a). Docket No. 41 ¶¶ 149-53. Under ERISA, a co-fiduciary is liable for breach by another fiduciary in three circumstances: (1) the fiduciary knowingly participated in a breach by another fiduciary; (2) the fiduciary's breach enabled another fiduciary to breach; or (3) the fiduciary failed to make reasonable efforts to remedy a breach by another fiduciary. 29 U.S.C. § 1105(a). As summarized in Section 1 above, Plaintiffs have alleged extensive facts that Fleet Card Fuels and the Davies knowingly participated in each other's alleged breaches, enabled each other to breach, and/or failed to take reasonable efforts to remedy each other's alleged

---

[4] In their reply, Defendants argue for the first time that Plaintiffs fail to allege that Defendants failed to secure "adequate consideration" for the sale of Plan assets. [*17] Docket No. 51 at 12-14. The Court declines to consider arguments raised for the first time in a reply.

breaches. The Court therefore denies Defendants' motion to dismiss the third cause of action for co-fiduciary **[*19]** liability.

3.2. Plaintiffs' state law claims for breach of fiduciary duty are subject to conflict preemption.

In addition to the three federal claims under ERISA, Plaintiffs allege two state law claims against Defendants: (1) breach of fiduciary duty in violation of California law and (2) aiding and abetting breach of fiduciary duty in violation of California law. Docket No. 41 ¶¶ 154-207. Defendants argue that both state law claims are subject to "conflict preemption" under ERISA. Docket No. 44 at 25-26. The Court agrees.

ERISA provides for the comprehensive federal regulation of employee benefit plans. _Metropolitan Life Ins. Co. v. Parker, 436 F.3d 1109, 1111 (9th Cir. 2006)_. To that end, ERISA includes two preemption provisions that defeat certain state law claims: "complete preemption" under _§ 502(a) of ERISA_ and "conflict preemption" under _ERISA § 514(a)_. ERISA's conflict preemption provisions provide that ERISA "shall supersede any and all State laws insofar as they may . . . relate to any employee benefit plan." _29 U.S.C. § 1144(a)_ (emphasis added). For purposes of ERISA preemption, a state law claim "relate[s] to" an ERISA plan if the claim either makes "reference to" or holds a "connection with" an ERISA plan. _Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 324, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997)_. Plaintiffs' state law claims are subject to conflict preemption under the "connection with" prong. **[*20]**

"[T]he Supreme Court has not provided a succinct definition of, or analytical framework for, evaluating" conflict preemption under the "connection with" prong. _Paulsen v. CNF Inc., 559 F.3d 1061, 1082 (9th Cir. 2009)_. To

determine whether a state law claim holds a "connection with" an ERISA plan, the Ninth Circuit uses a "relationship test." _Id. at 1082-1083_. The "relationship test" asks whether the plaintiff's state law claim intrudes on an ERISA-regulated relationship. Id. When applying the relationship test, "[t]he key to distinguishing between what ERISA preempts and what it does not lies . . . in recognizing that the statute comprehensively regulates certain relationships: for instance, the relationship between plan and plan member, between plan and employer, between employer and employee (to the extent an employee benefit plan is involved), and between plan and trustee." _Gen. Am. Life Ins. Co. v. Castonguay, 984 F.2d 1518, 1521 (9th Cir. 1993)_.

Here, Plaintiffs (in their capacity as Plan participants) are suing Fleet Card Fuels (in its capacity as Plan administrator) and the Davies (in their capacity as Plan trustees) for their alleged breaches of fiduciary duty in violation of California law. Accordingly, the duties giving rise to Plaintiffs' state law claims for breach of fiduciary duty run from plan sponsor and plan trustees to **[*21]** plan participants. These relationships are ERISA-regulated relationships. _Castonguay, 984 F.2d at 1521_. Plaintiffs' state law claims are therefore subject to conflict preemption under the "connection with" prong. The Court dismisses these claims with prejudice.

**4. Conclusion**

For the reasons stated above, the Court **grants** the motion to dismiss as follows:

(1) The Court **dismisses without prejudice** Plaintiffs' first cause of action for breach of fiduciary duty under ERISA based on Defendants' alleged breach of the duty to monitor; and

(2) The Court **dismisses with prejudice**

Plaintiffs' fifth cause of action for breach of fiduciary duty in violation of state law and sixth cause of action for aiding and abetting breach of fiduciary duties in violation of state law against Defendants.

The Court otherwise **denies** the motion to dismiss. Plaintiffs shall file an amended complaint within 30 days.

IT IS SO ORDERED.

---

**End of Document**

# Tab F

⚠️ Caution
As of: December 16, 2019 3:54 PM Z

# *McLemore v. Regions Bank*

United States District Court for the Middle District of Tennessee, Nashville Division

March 18, 2010, Decided; March 18, 2010, Filed

Case No. 3:08-cv-0021; Case No. 3:08-cv-1003

**Reporter**

2010 U.S. Dist. LEXIS 25785 *; 49 Employee Benefits Cas. (BNA) 1279; 2010 WL 1010092

JOHN L. McLEMORE, Trustee, Plaintiff, v. REGIONS BANK, as Successor in Interest by Merger to AMSOUTH BANK, and MID-ATLANTIC CAPITAL CORPORATION, Defendants. EFS, Inc., et al., Plaintiffs, v. REGIONS BANK, as Successor in Interest by Merger to AMSOUTH BANK, Defendant.

**Subsequent History:** Motion granted by *EFS, Inc. v. Regions Bank, 2010 U.S. Dist. LEXIS 39697 (M.D. Tenn., Apr. 22, 2010)*

Affirmed by *McLemore v. Regions Bank, 2012 U.S. App. LEXIS 11600 (6th Cir.) (6th Cir. Tenn., 2012)*

## Core Terms

fiduciary, bad faith, preempted, plans, plaintiffs', affirmative defense, negligence claim, funds, transactions, circumstances, Pleadings, deposit, withdrawals, courts, aiding and abetting, savings institution, unjust enrichment, aiding-and-abetting, banks, allegations, transfers, terms, conduct constituted, motion for judgment, actual knowledge, breach of duty, fiduciary duty, depositor's, breached, amounts

## Case Summary

### Procedural Posture

In consolidated actions, the court considered two motions for judgment on the pleadings filed by defendant bank and a motion to strike the bank's affirmative defenses of comparative negligence filed by plaintiffs, a bankruptcy trustee and former clients of a third-party administrator for various employee benefit plans. The owner of the third party administrator stole client money from fiduciary accounts kept at the bank.

### Overview

The bank argued that plaintiffs' negligence claims had to fail because it did not owe a duty to the administrator's clients and because the Uniform Fiduciaries Act (UFA) immunized its conduct. As an initial matter, the court rejected the bank's apparent argument that *Tenn. Code Ann. § 35-2-111(c)* completely immunized banks from all liability, in any circumstances, arising from a fiduciary's actions. Plaintiffs alleged that the bank knew that the owner was breaching his fiduciary duty by withdrawing money from fiduciary accounts and using it for his own personal benefit. They also alleged facts suggesting that the bank acted in bad

faith. Thus, their claims were valid under the UFA. The court found that the majority of plaintiffs' negligence claims and claims under the Tennessee Consumer Protection Act (TCPA), *Tenn. Code Ann. § 47-18-101 et seq.*, failed. First, to the extent that the claims were based on the bank's negligent conduct, they were foreclosed by the UFA. Second, to the extent that the TCPA claims were based on the bank's bad faith or actual knowledge of the owner's scheme, they were preempted by the Employee Retirement Income Security Act (ERISA).

**Outcome**

The bank's motions for judgment on the pleadings were granted in part and denied in part. The trustee's complaint was dismissed in its entirety. The clients' claims were also dismissed, except for the claims of three clients whose 401(k) and retirement plans were not covered by Title I of ERISA. The court denied the motion to strike.

# LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Judgments > Pretrial Judgments > Judgment on Pleadings

**HN1**[↧] **Motions to Dismiss, Failure to State Claim**

The United States District Court for the Middle District of Tennessee approaches a *Fed. R. Civ. P. 12(c)* motion for judgment on the pleadings the same way it approaches a *Rule 12(b)(6)* motion to dismiss. The Federal Rules of Civil Procedure require a plaintiff to provide a short and plain statement of the claim showing that the pleader is entitled to relief. *Fed R. Civ. P. 8(a)(2)*. In deciding a motion to dismiss under *Rule 12(b)(6)*, the court will construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in favor of the plaintiff. The court must assume that all of the plaintiff's factual allegations are true, even if they are doubtful in fact. In contrast, legal conclusions are not entitled to the assumption of truth. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. The factual allegations must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

Governments > Fiduciaries

**HN2**[↧] **Customer-Bank Relations, Fiduciary Relationships**

Tennessee has adopted the Uniform Fiduciaries Act, which governs a bank's liability for the actions of a fiduciary depositor. Specifically, the act explains the contours of liability to a fiduciary's principals when the fiduciary transfers funds to his or her own personal account: If a fiduciary makes a deposit in a bank or savings institution to the fiduciary's personal credit of checks drawn by

the fiduciary upon an account in the fiduciary's own name as fiduciary, or if the fiduciary otherwise makes a deposit of funds held by the fiduciary as fiduciary, the bank or savings institution receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of the obligation as fiduciary. The bank or savings institution is authorized to pay the amount of the deposit upon the personal check of the fiduciary without being liable to the principal unless the bank or savings institution receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary in making such deposit or in drawing such check or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith. *Tenn. Code Ann. § 35-2-109*.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

Governments > Fiduciaries

### *HN3*[⬇]  Customer-Bank Relations, Fiduciary Relationships

The provisions of the Uniform Fiduciaries Act at *Tenn. Code Ann. § 35-2-109* are bolstered by an amendment, passed by the Tennessee legislature in 1993, clarifying that a bank does not acquire any duty simply because it knows that a depositor is a fiduciary. Furthermore, a bank generally has no duty to limit a fiduciary's transactions: (1) Knowledge on the part of the bank or savings institution of the existence of a fiduciary relationship or the terms of the relationship shall not impose any duty or liability on the bank or savings institution for any action of the fiduciary. (2) A bank or savings institution has no duty to establish an account for a fiduciary or to limit transactions in an account so established unless, in its discretion, it contracts in writing with the fiduciary to establish or limit transactions with respect to such an account. *Tenn. Code Ann. § 35-2-111(c)(1)-(2)*.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

Governments > Fiduciaries

### *HN4*[⬇]  Customer-Bank Relations, Fiduciary Relationships

The Uniform Fiduciaries Act was designed to facilitate banking transactions by relieving depository banks of the responsibility of assuring that an authorized fiduciary used entrusted funds for proper purposes. It is based on the assumption that a fiduciary will properly apply funds entrusted to him or her, and it places the burden on the principal to employ honest fiduciaries. It also specifically rejects the idea that negligence on the part of a third person dealing with a fiduciary is sufficient to shift the risk of fiduciary misconduct from the principal to the third party.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

### *HN5*[⬇]  Customer-Bank Relations, Fiduciary Relationships

Nothing in *Tenn. Code Ann. § 35-2-111(c)(1)* forecloses liability if a bank has actual knowledge that a fiduciary is breaching his or her duty. Instead, it merely states that a bank's knowledge of the existence of a fiduciary relationship or the terms of the relationship, by itself, does not create liability. Because this does not speak to situations where a bank has acted in bad faith or with knowledge of a fiduciary's wrongdoing, *Tenn. Code Ann. § 35-2-111* can be reconciled with *Tenn. Code Ann. §§ 35-2-107* and *35-2-109*.

Governments > Legislation > Expiration, Repeal & Suspension

**HN6**[⬇]  **Legislation, Expiration, Repeal & Suspension**

In Tennessee, repeal by implication is disfavored and occurs only when a later statute cannot be construed harmoniously with an earlier statute.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

Governments > Fiduciaries

**HN7**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

A bank is liable to a principal for a fiduciary's illegal withdrawal or transfer of funds if, and only if, the bank had actual knowledge that the fiduciary was breaching his or her fiduciary duty or had knowledge of such facts that its action amounts to bad faith. *Tenn. Code Ann. §§ 35-2-107*, *35-2-109*. Anything less is insufficient to support liability.

Governments > Fiduciaries

**HN8**[⬇]  **Governments, Fiduciaries**

The Uniform Fiduciaries Act does not define "bad faith," although it does define good faith: A thing is done in good faith, within the meaning of this chapter, when it is in fact done honestly, whether it is done negligently or not. *Tenn. Code Ann. § 35-2-102(b)*. The obvious implication is that a bad-faith act is done dishonestly.

Banking Law > Bank Activities > Customer-

Bank Relations > Fiduciary Relationships

**HN9**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

The Tennessee Court of Appeals has characterized the Uniform Fiduciaries Act as requiring circumstances that put the bank on notice that the fiduciary is misappropriating funds or intends to misappropriate funds.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

**HN10**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

In applying the Uniform Fiduciaries Act, courts have consistently held that a bank acts in bad faith if the facts and circumstances surrounding the fiduciary's breach are so cogent and obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction. In other words, whether a bank has acted in bad faith turns on whether it knew facts that were sufficiently suggestive of the fiduciary depositor's breach of duty.

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

**HN11**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

The touchstone of the bad faith inquiry under the Uniform Fiduciaries Act is whether the facts known to a bank sufficiently suggest a breach by the fiduciary. This requires more than a showing that the bank was negligent.

Banking Law > Bank Activities > Customer-

Bank Relations > Fiduciary Relationships

**HN12**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

Negligence does not negate a bank's good faith: Even a failure to inquire under suspicious circumstances will not negate "good faith," unless the failure to do so is due to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction. Conversely, if a bank has knowledge that a fiduciary intends to appropriate trust funds to his own use, and that to release funds to him will aid a breach of trust, then the bank will be held to have acted in "bad faith."

Banking Law > Bank Activities > Customer-Bank Relations > Fiduciary Relationships

Evidence > Burdens of Proof > Allocation

**HN13**[⬇]  **Customer-Bank Relations, Fiduciary Relationships**

To show that a defendant bank had knowledge of such facts that its action amounts to bad faith, pursuant to *Tenn. Code Ann. §§ 35-2-107* and *35-2-109*, plaintiffs must show that the circumstances surrounding transactions so clearly suggested a breach of fiduciary duty that the bank's failure to investigate was a conscious effort to avoid knowledge of wrongdoing. Plaintiffs cannot merely show that the defendant was negligent in not discovering a third party's fraud or not undertaking reasonable efforts to monitor its depositors.

Evidence > Burdens of Proof > Allocation

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

**HN14**[⬇]  **Burdens of Proof, Allocation**

To establish an aiding and abetting claim under Tennessee law, a plaintiff must demonstrate that a defendant knew that the primary tortfeasor's conduct constituted a breach of duty and that the defendant provided substantial assistance or encouragement of that conduct.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > General Overview

**HN15**[⬇]  **Civil Litigation, Causes of Action**

Employee Retirement Income Security Act (ERISA) provides that non-fiduciaries may be subject to liability for knowingly participating in a fiduciary's violation of ERISA.

Governments > Courts > Common Law

Pensions & Benefits Law > ERISA > Federal Preemption > Federal Law Exemption

Torts > Business Torts > Fraud & Misrepresentation > General Overview

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > General Overview

Torts > Negligence > Types of Negligence Actions > General Overview

**HN16**[⬇]  **Courts, Common Law**

In the context of preemption under the Employee Retirement Income Security Act (ERISA), courts in the Sixth Circuit have permitted claims against nonfiduciaries for negligence, fraud, and other common law causes of action to proceed.

Torts > ... > Statute of
Limitations > Tolling > Discovery Rule

**HN17**[⤓]  **Tolling, Discovery Rule**

Tennessee applies the "discovery rule" to tort actions, which means that the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered.

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

**HN18**[⤓]  **Deceptive & Unfair Trade Practices, State Regulation**

The Tennessee Consumer Protection Act (TCPA), *Tenn. Code Ann. § 47-18-101 et seq.*, provides supplementary state law remedies to consumers. *Tenn. Code Ann. § 47-18-104(a)* states that unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices. Subsection (b) of the statute, without limiting the scope of subsection (a), lists a number of specific activities that are unfair or deceptive.

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

**HN19**[⤓]  **Deceptive & Unfair Trade Practices, State Regulation**

If a particular act or practice is not contained within *Tenn. Code Ann. § 47-18-104 (b)*'s non-exclusive list, the definitions of unfair and deceptive are left to the courts on a case by case basis.

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

**HN20**[⤓]  **Deceptive & Unfair Trade Practices, State Regulation**

Negligent conduct can constitute an unfair or deceptive act pursuant to *Tenn. Code Ann. § 47-18-104* of the Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.* Clearly, knowing or intentional conduct can constitute an unfair act as well.

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

Banking Law > Bank Activities > Customer-
Bank Relations > Fiduciary Relationships

**HN21**[⤓]  **Deceptive & Unfair Trade Practices, State Regulation**

The Tennessee Consumer Protection Act (TCPA), *Tenn. Code Ann. § 47-18-101 et seq.*, contains an exemption for acts or transactions specifically authorized under the laws of Tennessee. *Tenn. Code Ann. § 47-18-111(a)(1)*. The Uniform Fiduciaries Act specifically authorizes a bank to effectuate a fiduciary depositor's transfers, without being liable to the principal, as long as the bank is acting in good faith and without actual knowledge of the fiduciary's breach of duty. *Tenn. Code Ann. §§ 35-2-107*, *35-2-109*. This is true even if the bank has acted negligently.

Antitrust & Trade Law > Consumer
Protection > Deceptive & Unfair Trade
Practices > State Regulation

**HN22**[⤓]  **Deceptive & Unfair Trade**

**Practices, State Regulation**

The Tennessee Consumer Protection Act, *Tenn. Code Ann. § 47-18-101 et seq.*, contains a one-year statute of limitations and five-year statute of repose. *Tenn. Code Ann. § 47-18-110*.

Contracts Law > Remedies > Equitable Relief > General Overview

**HN23[↓] Remedies, Equitable Relief**

In Tennessee, the elements of an unjust enrichment claim are: 1) a benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

Pensions & Benefits Law > ERISA > Civil Litigation > General Overview

Pensions & Benefits Law > ERISA > Federal Preemption > State Laws

**HN24[↓] ERISA, Civil Litigation**

Any state-law cause of action that duplicates, supplements, or supplants the civil enforcement remedy under the Employee Retirement Income Security Act (ERISA) conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted. Accordingly, state law claims against non-fiduciaries may be preempted where they merely reframe an ERISA claim as a state law cause of action.

Civil Procedure > ... > Defenses,

Demurrers & Objections > Affirmative Defenses > Contributory Negligence

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN25[↓] Affirmative Defenses, Contributory Negligence**

*Fed. R. Civ. P. 12(f)* allows a court to strike from a pleading an insufficient defense. *Fed. R. Civ. P. 8* governs the level of detail required in parties' pleadings. *Rule 8(a)(2)* requires a plaintiff's complaint to contain a short and plain statement of the claim showing that the pleader is entitled to relief. Similarly, *Rule 8(b)*, which is titled "Defenses; Admissions and Denials," requires a defendant's answer to state in short and plain terms its defenses to each claim asserted against it. *Fed. R. Civ. P. 8(b)(1)(A)*. *Rule 8(c)*, titled "Affirmative Defenses," states that, in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including contributory negligence. *Fed. R. Civ. P. 8(c)(1)*. Unlike subsections (a) and (b), subsection (c) does not include any language requiring the party to state anything in "short and plain" terms.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

**HN26[↓] Complaints, Requirements for**

**Complaint**

A complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. Thus, mere conclusory statements are not enough to state a cause of action.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > General Overview

**HN27[⬇]** **Defenses, Demurrers & Objections, Affirmative Defenses**

Some district courts have found that the standard enunciated in Iqbal and Twombly applies equally to affirmative defenses, making conclusory statements of comparative negligence insufficient to raise such a defense. Other courts have reached the opposite conclusion. The United States District Court for the Middle District of Tennessee agrees with the latter view--that Twombly and Iqbal did not change the pleading standard for affirmative defenses. On its face, Twombly applies only to complaints and to *Fed. R. Civ. P. 8(a)(2)*, because the court was interpreting that subsection's requirement of a short and plain statement of the claim showing that the pleader is entitled to relief. The opinion does not mention affirmative defenses or any other subsection of *Rule 8*. Iqbal also focused exclusively on the pleading burden that applies to plaintiffs' complaints.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

**HN28[⬇]** **Responses, Defenses, Demurrers & Objections**

Although *Fed. R. Civ. P. 8(b)* does require a defendant to state its defenses in short and plain terms, which is similar to the language in *Rule 8(a)*, the United States Court of Appeals for the Sixth Circuit has explicitly stated that *Rule 8(b)* does not apply when a defendant asserts an affirmative defense. Under Sixth Circuit case law, a defendant asserting an affirmative defense is not required to plead specific supporting facts. Instead, an affirmative defense may be pleaded in general terms and will be held to be sufficient as long as it gives plaintiff fair notice of the nature of the defense.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

**HN29[⬇]** **Defenses, Demurrers & Objections, Affirmative Defenses**

The United States Court of Appeals for the Sixth Circuit has consistently used "fair notice" as the standard for whether a defendant has sufficiently pleaded an affirmative defense. Twombly and Iqbal did not change this.

**Counsel:** **[*1]** For John C. McLemore (3:08-cv-00021), Plaintiff: Edwin M. Walker, Robert

Martin Garfinkle, LEAD ATTORNEYS, Garfinkle, McLemore & Walker, PLLC, Nashville, TN; Phillip G. Young, Jr., Garfinkle, McLemore & Young, PLLC, Nashville, TN.

For EFS, Inc. (3:08-cv-00021), Plaintiff: Harold Naill Falls, Jr., LEAD ATTORNEY, Falls & Veach, Nashville, TN.

For Regions Bank, as Successor in Interest by Merger to AmSouth Bank (3:08-cv-00021), Defendant: John R. Wingo, Jonathan Frederick Teitenberg, LEAD ATTORNEYS, James W. Berry, Jr., Frost, Brown & Todd, LLC, Nashville, TN.

For Mid-Atlantic Capital Corporation (3:08-cv-00021), Defendant: Barbara D. Holmes, LEAD ATTORNEY, Harwell, Howard, Hyne, Gabbert & Manner, Nashville, TN; Craig Vernon Gabbert, Jr., David Alexander Fardon, LEAD ATTORNEYS, Harwell, Howard, Hyne, Gabbert & Manner, P.C., Nashville, TN; David L. McClenahan, Matthew J. Fader, Ryan D. DeMotte, LEAD ATTORNEYS, K&L Gates LLP, Pittsburgh, PA.

For Attorney Naill Falls (3:08-cv-00021), Interested Party: John B. Veach, III, LEAD ATTORNEY, Falls & Veach, Asheville, NC; Harold Naill Falls, Jr., Falls & Veach, Nashville, TN.

For U.S. Secretary of Labor (3:08-cv-00021), Amicus: Nathaniel Spiller, LEAD [*2] ATTORNEY, U. S. Department of Labor, Washington, DC.

For EFS, Inc., Summit Terminaling Services, LLC, as sponsor of the Summit Terminaling Services, LLC 401(k) Retirement Plan, Summit Terminaling Services, LLC Retirement Plan, Julia Price, as trustee of The Bay Institute of San Francisco Retirement Plan, Robert Erickson, as trustee of The Bay Institute of San Francisco Retirement Plan, Grant Davis, as trustee of The Bay Institute of San Francisco Retirement Plan, The Bay Institute of San Francisco Retirement Plan, J. Michaels Clothiers, Inc., as sponsor of the J. Michaels Clothiers, Inc. Retirement Plan, J. Michaels Clothiers, Inc. Retirement Plan, Abcow Services, Inc., as sponsor of the Abcow Staffing 401(k) Retirement Plan, Abcow Staffing 401(k) Retirement Plan, Max Dull, as trustee of the Heritage Equity Group 401(k) Savings Plan, Heritage Equity Group 401(k) Savings Plan, Kurtis J. Winstead, as trustee of the Colbert & Winstead 401(k) Plan, Richard L. Colbert, as trustee of the Colbert & Winstead 401(k) Plan, Colbert & Winstead, PC 401 (k) Plan, James Edward Simpson, Edgar C. Phillips, Robert C. Rossow, RCSim, Inc. 401(k) Savings Plans, RCSIM, Inc., as Sponsor of the RCSim, Inc. [*3] 401(k) Plan, Herbert E. Pounds, Jr., PC, as trustee of the HErbert E. Pounds, Jr., PC 401(k) Plan, Herbert E. Pounds, Jr., PC, as Sponsor of the Herbert E. Pounds, Jr., PC 401(k) Plan, Brian K. Allen, as trustee for the Brian Allen Photo Individual 401(k), Deborah Niedermeyer, as trustee of the Deborah Niedermeyer Individual 401(k), Sloan Morgan, as trustee of the As You Sow 401(k) Plan, Tom Van Dyke, as trustee of the As You Sow 401(k) Plan, As You Sow 401(k), As You Sow, as Sponsor of the As You Sow 401k Retirement Savings Plan, Jo Ann Diehl, as trustee of the Jimbo's Natural Family 401(k) Plan, James Someck, as trustee of the Jimbo's Natural Family 401(k) Plan, Jimbo's Natural Family, Inc. 401 (k) Plan, Jimbo's Natural Family, Inc., Lester L. Turner, Jr., as trustee of the Tuned In Broadcasting, Inc. 401(k) Plan, Tuned in Broadcasting, Inc. 401 (k) Plan, Tuned In Broadcasting, Inc., Bonnie Walsh, as trustee of the Independant Press Association 401(k) Plan, Richard Landry, as trustee of the Independant Press

Association 401(k) Plan, Independent Press Association 401 (k) Plan, Independent Press Association, Crawford Gallimore, as trustee of the The Hamilton-Ryker Group 401(k), Wayne [*4] McCreight, as trustee of the The Hamilton-Ryker Group 401(k) Plan, The Hamilton-Ryker Group, LLC 401 (k) Plan, The Hamilton-Ryker Group, LLC, Barbara Korinacek, as trustee of the Gonzales County Hospital District 401(k) Plan, Lisa Gindler, as trustee of the Gonzales County Hospital District 401(k) Plan, John Fritz, as trustee of the Gonzales County Hospital District 401(k) Plan, Greg Peterek, as trustee of the Gonzales County Hospital District 401(k) Plan, Tim Markman, as trustee of the Gonzales County Hospital District 401(k) Plan, Gonzales County Hospital District 401 (k) Plan, Gonzales County Hospital District, Mauro Mastrapasqua, as trustee of the Mastrapasqua Asset Management, Inc. 401(k) Plan, Frank Mastrapasqua, as trustee of the Mastrapasqua Asset Management, Inc. 401 (k) Plan, Mastrapasqua Asset Management, Inc. 401 (k) Plan, Mastrapasqua Asset Management, Inc., Michael Egan, as trustee of the Grassworx SE, LLC 401(k) Plan, Grassworx SE, LLC 401 (k) Plan, Grassworx SE, LLC, EFS, Inc. 401 (k) Plan (3:08-cv-01003), Plaintiffs: Harold Naill Falls, Jr., LEAD ATTORNEY, Falls & Veach, Nashville, TN; John B. Veach, III, LEAD ATTORNEY, Falls & Veach, Asheville, NC.

For Michael Egan, [*5] as trustee of the EFS, Inc. 401(k) Plan (3:08-cv-01003), Plaintiff: Harold Naill Falls, Jr., LEAD ATTORNEY, Falls & Veach, Nashville, TN.

For Regions Bank, successor AmSouth Bank (3:08-cv-01003), Defendant: John R. Wingo, LEAD ATTORNEY, James W. Berry, Jr., Jonathan Frederick Teitenberg, Frost, Brown & Todd, LLC, Nashville, TN.

For John C. McLemore (3:08-cv-01003), Interested Party: Robert Martin Garfinkle, LEAD ATTORNEY, Garfinkle, McLemore & Walker, PLLC, Nashville, TN.

**Judges:** ALETA A. TRAUGER, United States District Judge.

**Opinion by:** ALETA A. TRAUGER

# Opinion

## MEMORANDUM

Pending before the court are two Motions for Judgment on the Pleadings filed by defendant Regions Bank (Docket Nos. 106 and 108), plaintiff John McLemore's response (Docket No. 116), plaintiff EFS, Inc.'s response (Docket No. 117), the defendant's replies (Docket No. 123 and 124), and the plaintiffs' joint surreply (Docket No. 134). Also pending is the plaintiffs' joint Motion to Strike (Docket No. 112) and the defendant's response (Docket No. 114). For the reasons discussed below, the defendant's motion as to plaintiff McLemore will be granted, the defendant's motion as to plaintiff EFS will be granted in part and denied in part, and the plaintiffs' [*6] motion will be denied.

## BACKGROUND

Barry Stokes owned and operated 1Point Solutions, LLC ("1Point"), which acted as a third-party administrator ("TPA") for various employee benefit plans, including 401(k)

retirement plans. [1] Stokes and 1Point held a number of fiduciary and personal accounts with defendant Regions Bank ("Regions"). [2] Over the course of several years, Stokes stole client money from the fiduciary accounts, and he and 1Point ultimately entered bankruptcy. These two consolidated suits were brought by the bankruptcy trustee, John McLemore (the "Trustee"), and several former clients of 1Point (collectively, "the plaintiffs").

In addition to 401(k) plans, 1Point acted as TPA for other types of savings plans, which the plaintiffs refer to collectively as "cafeteria plans." These included **[*7]** health savings accounts, flexible spending accounts, and dependent care accounts. Generally speaking, these accounts held pre-tax funds that employees could spend on qualifying health- or childcare-related expenses.

TPAs usually provide record-keeping services and assist in transferring money. The plaintiffs allege that most TPAs do not handle money or securities themselves. 1Point, however, opened numerous accounts at Regions to hold funds for its clients, including accounts titled "1Point 401(k)," "1Point FSA," "1Point FSA Depository Acct," "1Point HSA," and "1Point DCA." Stokes allegedly opened at least 58 accounts at Regions.

The plaintiffs allege that 1Point intended to set up separate accounts for each client, using the clients' tax identification numbers. Instead, Regions allegedly insisted that 1Point set up accounts under 1Point's own tax identification number, giving them names that referenced

---

[1] Unless otherwise noted, the allegations are drawn from McLemore's Second Amended Complaint (Docket No. 99) and EFS' Second Amended Complaint (Docket No. 100).

[2] Stokes and 1Point's banking was actually done with AmSouth Bank ("AmSouth"), which merged with Regions. AmSouth continues to operate as a division of Regions. For simplicity, the court will refer to Regions and AmSouth collectively as "Regions."

each individual client, such as "1Point FSA Metro Government Account." 1Point deposited nearly $ 6 million in 401(k) funds and $ 45 million in cafeteria plan funds with the defendant. When it ceased operations, 1Point was the TPA for 52 separate 401(k) plans.

Regions is subject to certain **[*8]** federal banking laws, including the Bank Secrecy Act. Regulations under that act, which impose a range of anti-money-laundering compliance requirements, are promulgated and enforced by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). For example, banks are required to report large currency transactions and to file suspicious-activity reports when transactions appear to be designed to evade cash reporting regulations.

Banks are also required to establish procedures and systems to comply with FinCEN regulations, including automated computer monitoring of accounts. The plaintiffs allege that Regions failed to implement such systems. The Trustee has attached documents to his complaint showing that, in 2004, the Department of the Treasury found that, during the previous four years, Regions' predecessor, AmSouth, failed to: (1) implement policies sufficient to capture suspicious account activity; (2) report suspicious activity in a timely manner because of these systemic deficiencies; and (3) respond to instances of accounts being used for embezzlement and fraud. (Docket No. 99, Exs. 1-4.) AmSouth was fined $ 10 million for these violations, and it agreed **[*9]** to pay an additional $ 40 million under a Deferred Prosecution Agreement with the U.S. Attorney's Office. The plaintiffs allege that Regions failed to remedy these violations in 2005 and 2006.

According to the plaintiffs, Stokes' and 1Point's account activity was unusual and should have "triggered red flags under FinCEN law and guidance," which in turn should have alerted

Regions to its duty to investigate the transactions further. (Docket No. 99 P 45.) For example, Stokes withdrew hundreds of thousands of dollars from the 1Point 401(k) account in cashier's checks made payable to himself. He frequently transferred money among 1Point's and his own accounts, and various accounts were often overdrawn. The plaintiffs allege that Stokes used money in 1Point's accounts to pay for operating and personal expenses and that Regions withdrew its fees from 1Point's trust accounts.

Among other things, the plaintiffs allege that Regions "knew or should have known":

> (1) that 1Point was a TPA holding funds for the benefit of 401(k) plans and cafeteria plans;
>
> (2) "that Stokes was withdrawing large sums of money in transactions which individually do not require a Currency Transaction Report, but taken together, **[*10]** do reach such levels";
> (3) "that Stokes was using cashier's checks and other transfers to withdraw substantial amounts of money from fiduciary accounts for his personal benefit";
> (4) "that Stokes was using wire transactions to send money from fiduciary accounts to accounts which were not related to the fiduciary business of the accounts";
> (5) "that Stokes was conducting a large number of transactions in even dollar amounts," many of which "appear to have been structured to avoid the currency transfer reporting laws";
> (6) "that the transactions in its accounts were not consistent with the TPA business of 1Point";
> (7) "that there was an unreasonably high volume of wire transfers and cashier's checks, in connection with frequently overdrawn accounts"; and
> (8) "that it was allowing fiduciary accounts

to be commingled and overdrawn."

(Docket No. 99 at PP 53-66; *see also* Docket No. 100 PP 61-74.)

The plaintiffs allege that 1Point moved its accounts to Fifth Third Bank in early 2006, but that the bank soon closed most of the accounts for improper activity. 1Point then returned its accounts to Regions. 1Point ceased operations and entered bankruptcy in September 2006.

This suit was initially filed **[*11]** in bankruptcy court by the Trustee against Regions and Mid Atlantic Capital Corporation ("MACC") for their alleged fault in allowing Stokes' wrongdoing. [3] On February 11, 2008, this court withdrew the reference of that case to the bankruptcy court. (Docket No. 7.) Regions filed a Motion to Dismiss, and, in a memorandum dated September 9, 2008, this court found that: (1) the Employee Retirement Income Security Act ("ERISA") gave the Trustee standing to pursue his claims on behalf of the plans; (2) Regions was not a fiduciary under ERISA; (3) the Trustee's non-fiduciary ERISA claim against Regions should be dismissed; (4) ERISA preempted the Trustee's state-law claim that Regions aided and abetted Stokes' and 1Point's breach of fiduciary duty; and (5) the Trustee's state-law negligence claim could go forward. (Docket No. 33.)

On December 9, 2008, the Trustee's case was consolidated with an effectively identical suit filed by EFS, Inc., a former client of 1Point, and other former 1Point clients (collectively, "EFS"). (Case No. 3:08-cv-1003, Docket No. 17.) On November 18, 2009, the Trustee filed a Second Amended **[*12]** Complaint, asserting claims for negligence and recklessness, unjust enrichment, and violation of the Tennessee Consumer Protection Act.

---

[3] MACC has since been voluntarily dismissed from the suit. (Docket No. 62.)

(Docket No. 99.) On November 25, 2009, EFS filed its own Second Amended Complaint, asserting identical claims. [4] (Docket No. 100.)

## ANALYSIS

The defendant has filed two Motions for Judgment on the Pleadings, pursuant to *Federal Rule of Civil Procedure 12(c)*, arguing that all claims should be dismissed. The plaintiffs have filed a joint Motion to Strike Defendant's Affirmative Defenses of Comparative Negligence or, in the Alternative, for More Definite Statement of Defenses, pursuant to *Rule 12(f)*.

### I. Motion for Judgment on the Pleadings Standard

*HN1*[↑] The court approaches a *Rule 12(c)* motion for judgment on the pleadings the same way it approaches a *Rule 12(b)(6)* motion to dismiss. *Jelovsek v. Bredesen, 545 F.3d 431, 435 (6th Cir. 2008)*. The Federal Rules of Civil Procedure require a plaintiff to provide "a short and plain [*13] statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. In deciding a motion to dismiss under *Rule 12(b)(6)*, the court will "construe the complaint in the light most favorable to the plaintiff . . . and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007)*; *Inge v. Rock Fin. Corp., 281 F.3d 613, 619 (6th Cir. 2002)*. The court must assume that all of the plaintiff's factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*

---

[4] EFS' Second Amended Complaint also states three aiding-and-abetting claims. EFS concedes that, in accordance with the court's previous dismissal of the Trustee's aiding-and-abetting claims, these should be dismissed. (Docket No. 117 at 2.)

*(2007)*. In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal, U.S. , 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)*.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal, 129 S. Ct. at 1949* (quoting *Twombly, 550 U.S. at 570*). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. at 1949-50*.

### II. Negligence Claims

#### A. The UFA and the Duty Owed by Regions

The defendant argues that the [*14] plaintiffs' negligence claims must fail because it did not owe a duty to 1Point's clients and because the Uniform Fiduciaries Act immunizes its conduct.

The parties spend many pages of their briefs arguing over the duty that banks owe to non-customers, or to a fiduciary depositor's principals. (*See* Docket No. 116 at 9-14; Docket No. 117 at 6-18.) The plaintiffs' arguments focus on broad principles of negligence law, which generally state that the existence of a duty of care is based on the foreseeability of harm. *See, e.g., Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 365 (Tenn. 2009)* ("In order to determine whether a duty is owed in a particular circumstance, courts must first establish that the risk is foreseeable . . . .").

But these general principles are irrelevant to this case, because *HN2*[↑] Tennessee has adopted the Uniform Fiduciaries Act ("UFA"), which governs a bank's liability for the actions of a fiduciary depositor. Specifically, the act

explains the contours of liability to a fiduciary's principals when the fiduciary transfers funds to his or her own personal account: [5]

> If a fiduciary makes a deposit in a bank or savings institution to the fiduciary's personal credit of checks **[*15]** drawn by the fiduciary upon an account in the fiduciary's own name as fiduciary, . . . or if the fiduciary otherwise makes a deposit of funds held by the fiduciary as fiduciary, the bank or savings institution receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of the obligation as fiduciary. The bank or savings institution is authorized to pay the amount of the deposit . . . upon the personal check of the fiduciary without being liable to the principal unless the bank or savings institution receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary in making such deposit or in drawing such check or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

*Tenn. Code Ann. § 35-2-109*.

A similarly worded section governs withdrawals by the fiduciary from an account containing fiduciary funds:

> If a deposit is made in a bank or savings institution to the credit of a fiduciary as such, the bank or savings institution is

authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank or savings institution pays the check with actual knowledge that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.

*Id.* § 35-2-107.

*HN3*[↑] These provisions are bolstered by an amendment, passed by the Tennessee legislature in 1993, clarifying that a bank does not acquire any duty simply because it knows that a depositor is a fiduciary. Furthermore, a bank generally has no **[*17]** duty to limit a fiduciary's transactions: [6]

> (1) Knowledge on the part of the bank or savings institution of the existence of a fiduciary relationship or the terms of the relationship shall not impose any duty or liability on the bank or savings institution for any action of the fiduciary.
>
> (2) A bank or savings institution has no duty to establish an account for a fiduciary or to limit transactions in an account so established unless, in its discretion, it contracts in writing with the fiduciary to establish or limit transactions with respect to such an account . . . .

*Id.* § 35-2-111(c)(1)-(2).

---

[5] Although the relevant sections of the UFA are phrased in terms of checks written or deposited by the fiduciary, the act applies equally to withdrawals and intra-bank transfers. *See Chambers v. First Trust & Sav. Bank, No. 030A1-9108-CH-00293, 1992 Tenn. App. LEXIS 231, at *8 (Tenn. Ct. App. Mar. 4, 1992)* (applying the UFA and noting **[*16]** that the transactions at issue "were not by check but by non-negotiable in-bank withdrawal slip transactions"); *Rheinberger v. First Nat'l Bank, 276 Minn. 194, 150 N.W.2d 37, 41 (Minn. 1967)* (applying the UFA to intra-bank transfers). The parties do not argue otherwise.

[6] The Trustee argues that this provision does not apply to Regions, because *section 35-2-111(a)* states: "This chapter is applicable to state and federal savings and loan associations and savings banks." (Docket No. 116 at 2-3.) But *section 35-2-111(c)* explicitly applies to "banks," which is defined by *section 35-2-102(a)(1)* to include any association "carrying on the business of banking." This definition clearly includes Regions and its predecessor, AmSouth.

The Tennessee Court of Appeals recently explained the purpose of the UFA:

> HN4[↑] The UFA was designed to facilitate banking transactions by relieving [*18] depositary banks of the responsibility of assuring that an authorized fiduciary used entrusted funds for proper purposes. It is based on the assumption that a fiduciary will properly apply funds entrusted to him or her, and it places the burden on the principal to employ honest fiduciaries. It also specifically rejects the idea that negligence on the part of a third person dealing with a fiduciary is sufficient to shift the risk of fiduciary misconduct from the principal to the third party.

C-Wood Lumber Co. v. Wayne County Bank, 233 S.W.3d 263, 274 (Tenn. Ct. App. 2007) (citations omitted).

As an initial matter, the court rejects the defendant's apparent argument that section 35-2-111(c) completely immunizes banks from all liability, in any circumstances, arising from a fiduciary's actions. (Docket No. 107 at 8-9.) If this were true, that section would implicitly repeal sections 35-2-107 and 35-2-109, which allow liability if a bank has actual knowledge that a fiduciary is breaching his or her duty. HN5[↑] Nothing in section 35-2-111(c)(1) forecloses such liability. Instead, it merely states that a bank's knowledge "of [*19] the existence of a fiduciary relationship or the terms of the relationship," by itself, does not create liability. Because this does not speak to situations where a bank has acted in bad faith or with knowledge of a fiduciary's wrongdoing, these sections of the UFA can be reconciled. HN6[↑] In Tennessee, repeal by implication is disfavored and occurs only when a later statute cannot be construed harmoniously with an earlier statute. C-Wood Lumber, 233 S.W.3d at 278.

Taken together, these provisions make it clear that HN7[↑] a bank is liable to a principal for a fiduciary's illegal withdrawal or transfer of funds if, and only if, the bank had "actual knowledge" that the fiduciary was breaching his or her fiduciary duty or had "knowledge of such facts that its action . . . amounts to bad faith." Tenn. Code Ann. §§ 35-2-107, 35-2-109. Anything less is insufficient to support liability.

## B. Bad Faith

HN8[↑] The UFA does not define "bad faith," although it does define "good faith": "A thing is done 'in good faith,' within the meaning of this chapter, when it is in fact done honestly, whether it is done negligently or not." Id. § 35-2-102(b). The obvious implication is that a bad-faith act is done dishonestly.

Only [*20] a handful of Tennessee courts have addressed the meaning of "bad faith." In McConnico v. Third National Bank, 499 S.W.2d 874 (Tenn. 1973), the court, although primarily discussing "bad faith" under the Uniform Commercial Code, equated bad faith with dishonesty. [7] Id. at 881-82 (discussing Tenn. Code Ann. § 35-2-109, which was then numbered section 35-210, and holding that "there is no showing of such conduct as would evidence dishonesty and consequently such bad faith under the [UCC] statute"); see also C-Wood Lumber, 233 S.W.3d at 284 (noting that, under the UFA, a plaintiff must "prove[] that the bank was acting dishonestly"). HN9[↑] The Tennessee Court of Appeals has characterized the UFA as requiring

---

[7] More recently, the Tennessee Supreme Court has clarified that, under the UCC, bad faith "encompasses a wider range of actions than outright deception or untruthfulness" and can include "a knowing or reckless disregard of a customer's rights." [*21] Glazer v. First Am. Nat'l Bank, 930 S.W.2d 546, 549-50 (Tenn. 1996).

"circumstances [that] put the bank on notice that the fiduciary is misappropriating funds or intends to misappropriate funds." *Chambers v. First Trust & Sav. Bank, No. 030A1-9108-CH-00293, 1992 Tenn. App. LEXIS 231, at *8 (Tenn. Ct. App. Mar. 4, 1992)*.

In *Chambers,* a court-appointed guardian held money in trust for three minors, and the defendant bank's president signed a document acknowledging a court order that forbade non-emergency withdrawals without the court's permission. *Id. at *6-7, 9*. The guardian depleted the accounts by making regular withdrawals over the course of five months. The court found that, by failing to investigate the withdrawals, the bank was acting in bad faith, because it "knew that the court's order specifically forbade withdrawal of funds." *Id. at *9*. Thus, the court premised its determination of bad faith on the bank's knowledge of the circumstances surrounding the guardian's breach of her fiduciary duty.

*HN10*[⬆] In applying the UFA, courts in other jurisdictions have consistently held that a bank acts in bad faith if "the facts and circumstances [surrounding the fiduciary's breach] are so cogent and obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." [8] *Richards v. Platte Valley Bank,*

*866 F.2d 1576, 1583 (10th Cir. 1989)* (applying [*22] Colorado law); *see also UNR-Rohn v. Summit Bank, 687 N.E.2d 235, 239 (Ind. Ct. App. 1997)*; *Master Chemical Corp. v. Inkrott, 55 Ohio St. 3d 23, 563 N.E.2d 26, 31 (Ohio 1990)*; *Edwards v. Nw. Bank, 39 N.C. App. 261, 250 S.E.2d 651, 656-657 (N.C. Ct. App. 1979)*; *Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles, 505 S.W. 2d 454, 458 (Mo. Ct. App. 1974))*. In other words, whether a bank has acted in bad faith turns on whether it knew facts that were sufficiently suggestive of the fiduciary depositor's breach of duty. [9]

This requires more than a showing that the bank was negligent. *C-Wood Lumber, 233 S.W.3d at 274*; *see also O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.), 118 F.3d 1246, 1251 (8th Cir. 1997)* ("'Bad faith' requires something more than mere negligence and can be found where the [bank] disregards circumstances that are suggestive

---

[8] In assessing bad faith, some courts, including the Sixth Circuit, have found it relevant whether the bank's actions are "commercially unjustifiable." *E.g., Jim White Agency Co. v. Nissan Motor Corp., 126 F.3d 832, 834 (6th Cir. 1997)* ("Thus, in determining whether [the defendant] acted in bad faith, the trier of fact would have to determine whether [the defendant's] actions were 'commercially unjustifiable.'") (applying Ohio law and citing to the UFA to explain "good faith" under the UCC); *Crawford Supply Group, Inc. v. LaSalle Bank, N.A., No. 09 C 2513, 2010 U.S. Dist. LEXIS 4691, at *22-23 (N.D. Ill. Jan. 21, 2010)* ("When determining whether bad faith exists, courts consider whether it is 'commercially [*23] unjustifiable for the payee to disregard and refuse to learn facts [that are] readily available.'"). Nevertheless, *HN11*[⬆] the touchstone of the

---

bad faith inquiry is whether the facts known to the bank sufficiently suggest a breach by the fiduciary.

[9] Numerous other courts have used similar formulations. *E.g., Watson Coatings, Inc. v. Am. Express Travel Related Servs., 436 F.3d 1036, 1041 (8th Cir. 2006)* ("Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive.") (citation omitted) (applying Missouri law); *N.J. Title Ins. Co. v. Caputo, 163 N.J. 143, 748 A.2d 507, 514 (N.J. 2000)* ("[B]ad faith denotes a reckless disregard or purposeful obliviousness of the known facts suggesting impropriety by the fiduciary. . . . [W]here facts suggesting fiduciary misconduct are compelling and obvious, it is bad faith to remain passive and not inquire further because such inaction amounts to a deliberate desire to evade knowledge."); *Appley v. West, 832 F.2d 1021, 1031 (7th Cir. 1987)* ("At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive.") (citation omitted) (applying Illinois law); *Minnesota Valley Country Club, Inc. v. Gill, 356 N.W.2d 356, 362 (Minn. Ct. App. 1984)* [*24] (finding bad faith where the bank's representatives knew that a fiduciary's "use of the money was a breach of his duty"); *Guaranty Bank & Trust Co. v. C & R Dev. Co., 260 LA. 1176, 258 So. 2d 543, 547 (La. 1972)* (finding bad faith when "[t]he bank had before it clear evidence of a probable misappropriation"); *Peoples Nat'l Bank v. Guier, 284 Ky. 702, 145 S.W.2d 1042, 1047 (Ky. 1940)* ("The circumstances and conditions may be so cogent and obvious that to remain passive amounts to bad faith.") (citation omitted).

of a breach and are sufficiently obvious such that it is in bad faith to remain passive.") (applying Missouri law). As the Supreme Court of Pennsylvania has explained, *HN12*[↑] negligence does not negate a bank's good faith:

> Even a failure to inquire under suspicious circumstances will not negate "good faith," unless the failure to do so is due to a deliberate desire to evade knowledge [*25] because of a belief or fear that inquiry would disclose a vice or defect in the transaction. Conversely, if a bank has knowledge that a fiduciary intends to appropriate trust funds to his own use, and that to release funds to him will aid a breach of trust, then the bank will be held to have acted in "bad faith."

*Robinson Protective Alarm Co. v. Bolger & Picker, 512 Pa. 116, 516 A.2d 299, 304 (Pa. 1986)* (citations omitted), *quoted in In re Mushroom Transp. Co., 382 F.3d 325, 344 (3d Cir. 2004)*.

Thus, *HN13*[↑] to show that the defendant had "knowledge of such facts that its action . . . amounts to bad faith," *Tenn. Code Ann. §§ 35-2-107*, *35-2-109*, the plaintiffs must show that the circumstances surrounding Stokes' and 1Point's transactions so clearly suggested a breach of fiduciary duty that Regions' failure to investigate was a conscious effort to avoid knowledge of Stokes' wrongdoing. The plaintiffs cannot merely show that the defendant was negligent in not discovering Stokes' fraud or not undertaking reasonable efforts to monitor its depositors.

The plaintiffs have, in fact, alleged that Regions knew that Stokes was breaching his fiduciary duty by withdrawing money from fiduciary accounts and using it for [*26] his own personal benefit. They have also alleged facts suggesting that Regions acted in bad faith. Thus, their claims are valid under the UFA.

## C. Preemption

The defendant further argues that, because the plaintiffs' negligence claims are limited by the UFA to claims of knowing or bad-faith conduct, those claims are preempted by ERISA. [10] (Docket No. 123 at 16-18.)

Previously, the court found that the Trustee's aiding-and-abetting claim against Regions were preempted by ERISA, while his negligence claim was not. It is instructive to refer to the relevant section of the court's September 9, 2008 memorandum. After reviewing the relevant case law, the court wrote:

> *A. Aiding and Abetting Claims . . .*
>
> [T]he Trustee alleges that the defendants were aware of the fraud perpetuated by Stokes and 1Point and failed to act on this knowledge, and that the defendants knowingly participated in this fiduciary breach.
>
> The defendants claim that the Trustee's aiding and abetting claims, though framed [*27] as state law causes of action, essentially seek redress for breach of fiduciary duty under ERISA, in that they are "derivative of, and inseparable from" the plans' ERISA claims against Stokes and 1Point and would require this court to make a determination as to whether Stokes and 1Point breached their duties to the plans. *HN14*[↑] To establish an aiding and abetting claim under Tennessee law, *a plaintiff must demonstrate that a defendant*

---

[10] Because mere negligence cannot support liability under the UFA, it is not technically correct to call the surviving claims "negligence" claims. Regardless, for simplicity, the court will refer to them as such.

*knew that the primary tortfeasor's conduct constituted a breach of duty* and that the defendant provided substantial assistance or encouragement of that conduct. Although the Trustee's aiding and abetting claims involved some wrongdoing on the part of the defendants, they nevertheless are derivative of the plans' ERISA claims to the extent that they are *fundamentally premised on this conduct of Stokes and 1Point and as their adjudication will necessitate the court's consideration of whether this conduct constituted a breach of duty of which the defendants were aware.*

Additionally, as Stokes and 1Point appear to have been fiduciaries under ERISA and, therefore, were traditional ERISA plan entities, adjudication of the Trustee's aiding and abetting claims would **[*28]** necessarily involve a resolution of issues pertaining to Stokes' relationship with the affected ERISA plans and his activities with respect to . . . those plans' assets, all of which is governed by ERISA. . . .

It is also noteworthy that **HN15**[↑] ERISA provides that non-fiduciaries, such as the defendants here, may be subject to liability for knowingly participating in a fiduciary's violation of ERISA. Therefore, to the extent that the Trustee's aiding and abetting claims *essentially constitute an allegation that the defendants participated in the fiduciary breach of Stokes and 1Point,* ERISA provides the sole remedy for such actions, and the Trustee's aiding and abetting claims are additionally preempted for this reason.

As the Trustee's aiding and abetting claims implicate the relationships among traditional ERISA plan entities and as they constitute an alternate means for the Trustee to pursue a remedy for what is, at its core, an ERISA claim, these claims are preempted.

### B. Negligence Claims

With respect to the negligence claims, however, the Trustee has a much stronger argument against preemption. **HN16**[↑] Courts in the Sixth Circuit have permitted claims against nonfiduciaries for negligence, fraud, **[*29]** and other common law causes of action to proceed.

Unlike the aiding and abetting claims asserted by the Trustee, adjudication of the negligence claims *does not require any inquiry into the duties imposed on Stokes and 1Point by ERISA or whether their conduct constituted a breach of those duties.* Instead, the negligence claims arise independently out of the defendants' conduct and involve only the defendants' actions *vis a vis* the plans. As such, these claims are not preempted by ERISA.

(Docket No. 33 at 32-35 (emphasis added and citations and footnotes omitted).)

Thus, the Trustee's negligence claim was not preempted because it "[did] not require any inquiry into the duties imposed on Stokes and 1Point by ERISA or whether their conduct constituted a breach of those duties." (*Id.* at 35.) This stood in contrast to the preempted aiding-and-abetting claim, which was "fundamentally premised on [the] conduct of Stokes and 1Point" and would "necessitate the court's consideration of whether their conduct constituted a breach of duty of which the defendant[] [was] aware." (*Id.* at 33.) The main reason that the Trustee's aiding-and-abetting claim was preempted was because it required him to show **[*30]** "that [the] defendant knew that [Stokes'] conduct constituted a breach of duty." (*Id.*)

The plaintiffs' surviving negligence claims are identical to the preempted aiding-and-abetting

claims in this key respect. As explained above, the plaintiffs must show either (1) that Regions acted with knowledge of Stokes' and 1Point's breach of fiduciary duty, or (2) that Regions acted in bad faith because it knew facts that were obviously suggestive of their breach. Like the aiding-and-abetting claims, these claims are "derivative of the plans' ERISA claims," (*id.* at 33), because they necessarily require an examination of whether, and how, Stokes and 1Point breached their fiduciary duty. As with the preempted claims, the plaintiffs effectively "must demonstrate that [the] defendant knew that [Stokes' and 1Point's] conduct constituted a breach of duty." [11] (*Id.*) The plaintiffs have once again "essentially . . . alleg[ed] that the defendant[] participated in the fiduciary breach of Stokes and 1Point," (*id.* at 34), by consciously remaining passive in the face of Stokes' bad acts. Unlike the negligence claim that the court allowed to go forward, these claims do not "arise independently out of the defendant['s] **[*31]** conduct" and do not "involve only the defendant['s] actions *vis a vis* the plan." (*Id.* at 35.)

Indeed, in support of his contention that the defendant acted in bad faith, the Trustee points to allegations in his complaint that Regions "knew or should have known" that Stokes was conducting transactions that breached his fiduciary duty. (Docket No. 116 at 4-6.) Similarly, EFS argues that "the facts alleged by plaintiffs support an assertion that Regions had actual knowledge of wrongdoing." (Docket No. 117 at 6.) When the court

------------------------------------------------

[11] The plaintiffs argue that, because Stokes is now serving a sentence in a federal prison, it is undisputed that he stole his client's money. Thus, it will not be necessary to determine whether he violated his ERISA duties. (Docket No. 134 at 3-4.) But this argument misses the point. The aiding-and-abetting claim was not preempted because it was difficult to show that Stokes breached his fiduciary duty, or because his breach was contested by the parties. The claim was preempted because it was "fundamentally premised on [the] conduct of Stokes and 1Point." (Docket No. 33 at 33.) It is irrelevant whether that conduct is undisputed.

previously allowed the Trustee's negligence **[*32]** claim to go forward, it did not contemplate that the claim would require proof of the defendant's knowledge of Stokes' fiduciary breach.

The plaintiffs cite *As You Sow v. AIG Financial Advisors, Inc., 584 F. Supp. 2d 1034 (M.D. Tenn. 2008)*, and *Colbert & Winstead, PC v. AIG Fin. Advisors, Inc., No. 3:07-1117, 2008 U.S. Dist. LEXIS 53179 (M.D. Tenn. July 8, 2008)*, as examples of cases in which negligence claims were not preempted. Both cases were brought by Stokes' former clients against the securities firms for which Stokes was a registered securities representative and investment advisor. The plaintiffs alleged that the defendants were negligent in supervising Stokes. *584 F. Supp. 2d at 1037-38, 1049*; *2008 U.S. Dist. LEXIS 53179 at *5*. Both courts found that the negligence claims were not preempted, for largely the same reasons that this court previously allowed the Trustee's negligence claim to go forward.

But as described above, the surviving claims here are not for mere negligence. They are instead premised on Regions' knowing or bad-faith conduct. The claims in *As You Sow* and *Colbert & Winstead* did *not* depend on the defendants having knowledge of Stokes' fiduciary breach. In other **[*33]** words, the claims here are not merely "'based on the defendant['s] common law duty'" to monitor depositors' activity; instead, they are "'based on [the fiduciary's] behavior,'" *Colbert & Winstead, 2008 U.S. Dist. LEXIS 53179 at *13* (quoting *Coldesina v. Estate of Simper, 407 F.3d 1126, 1138 (10th Cir. 2005))*, because they depend on Regions' knowledge of Stokes' breach. Thus, they are preempted by ERISA.

The plaintiffs point out that three of the EFS plaintiffs are suing regarding plans that are not covered by ERISA. (Docket No. 134 at 5-6.) Specifically, they argue that plaintiffs Deborah

Niedermeyer, Brian Allen, and James Simpson hold individual 401(k) and retirement plans that are not "employee benefit plans" for the purposes of Title I of ERISA, [12] which contains the act's civil enforcement and preemption sections. [13] *See* 29 C.F.R. § 2510.3-3(a)-(c) (2010). Because it appears that these plans are not covered by ERISA, [14] the claims by these three plaintiffs are not preempted. [15]

The plaintiffs also argue that the Trustee represents numerous individual, governmental, and church plans that are not covered by ERISA. (Docket No. 134 at 6.) But the court previously held that the Trustee's standing to pursue claims on behalf of the plans depended on his status as an ERISA fiduciary. (Docket No. 33 at 7-13.) Generally, when a bankrupt debtor has misappropriated funds held in trust,

the bankruptcy trustee lacks standing to bring claims against third parties for harm to the beneficiaries of the trust. *Stevenson v. J.C. Bradford & Co. (In re Cannon), 277 F.3d 838, 855 (6th Cir. 2002).* This is because any funds recovered will go to the beneficiaries, and not to the bankruptcy estate. *Id.* But this court held that *Cannon* was not squarely applicable and that the Trustee had standing to pursue his claims because the Trustee is an ERISA fiduciary. (Docket No. 33 at 8-13.) To the extent that the Trustee purports to represent non-ERISA plans, he has no standing to pursue these claims.

In sum, the court finds that the majority of the plaintiffs' negligence [*36] claims are preempted for the same reasons that the Trustee's previous aiding-and-abetting claim was preempted. The claims will be dismissed, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson. [16]

## III. TCPA Claims

The plaintiffs have also asserted claims under the Tennessee [*37] Consumer Protection Act ("TCPA"), *Tenn. Code Ann. § 47-18-101 et seq.*

---

[12] It appears to the court that a fourth plaintiff, Gonzales County Hospital District ("GCHD"), may also fall outside of ERISA's scope. The EFS complaint alleges that GCHD "is a governmental entity" and that [*34] its 401(k) plan was "established for the benefit of the hospital's employees." (Docket No. 100 P 4.) ERISA Title I does not apply to "governmental plans." 29 U.S.C. § 1003(b)(1); *see also id.* § 1002(32) (defining "governmental plan").

The plaintiffs, however, do not specifically mention GCHD in their surreply. If the plaintiffs wish to argue that GCHD's claims are not preempted because ERISA Title I does not apply to its benefit plan, they may file a Motion to Reconsider regarding GCHD.

[13] The court assumes that Stokes and 1Point nevertheless owed these plaintiffs a fiduciary duty.

[14] Although the court accepts the plaintiffs' representation that these are non-ERISA plans, the defendant is free to argue in future proceedings that ERISA actually does apply to these plans.

[15] The plaintiffs argue that it is illogical for these plaintiffs' claims to survive, while other, identical claims are preempted. (Docket No. 134 at 6.) But this is a wholly unremarkable result. For example, the EFS plaintiffs could even bring state-law claims against Stokes for breach of fiduciary duty. These claims would be identical, in that they would be based on the same set of transfers and misappropriations by Stokes. [*35] But, as here, the claims brought by ERISA plaintiffs would be preempted, while the claims by non-ERISA plaintiffs would not.

---

[16] The Trustee filed his initial complaint on August 20, 2007. The defendant argues that the three-year statute of limitations in *Tenn. Code. Ann. § 28-3-105* applies to bar claims that accrued before August 20, 2004. (Docket No. 107 at 17.) While this may be true, HN17[↑] Tennessee applies the "discovery rule" to tort actions, which means that "the cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered. *Potts v. Celotex Corp., 796 S.W.2d 678, 680 (Tenn. 1990).* Nothing at this stage of the litigation suggests that the plaintiffs were aware of Stokes' fraud until 1Point filed bankruptcy in September 2006. Thus, the claims are not time-barred.

The defendant does not argue that EFS' complaint does not relate back to the Trustee's initial complaint. (*See* Docket No. 109 at 6-7.)

HN18[↑] The TCPA "provides additional, supplementary state law remedies to consumers." *Morrison v. Allen, No. M2007-01244-COA-R3-CV, 2009 Tenn. App. LEXIS 298, at \*28 (Tenn. Ct. App. Jan. 30, 2009)* (quotation marks omitted). *Tenn. Code Ann. § 47-18-104(a)* states that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices." *Subsection (b)* of the statute, "[w]ithout limiting the scope of subsection (a)," lists a number of specific activities that are "unfair or deceptive." Most of these activities deal with misrepresenting goods, and none of them applies to this case.

The defendant argues that, because none of the *subsection (b)* examples are at issue here, the TCPA is inapplicable. (Docket No. 107 at 19-20.) This is incorrect. HN19[↑] "If a particular act or practice is not contained within [*subsection (b)*]'s non-exclusive list, 'the definition[s] of [unfair and deceptive] are left to the courts on a case by case basis.'" *Wolfe v. MBNA Am. Bank, 485 F. Supp. 2d 874, 890 (W.D. Tenn. 2007)* (citing *Ganzevoort v. Russell, 949 S.W.2d 293, 300 (Tenn. 1997)*) (last two alterations [*38] in original). Thus, in *Wolfe,* the court found that the defendant bank's failure to make reasonable efforts to verify a credit card applicant's identity "clearly [fell] within the scope of 'unfair' acts or practices under the TCPA." *Id.* This accords with the Tennessee Court of Appeals' recent statement that HN20[↑] "[n]egligent conduct can constitute an unfair or deceptive act." *Morrison, 2009 Tenn. App. LEXIS 298 at \*30.* Clearly, knowing or intentional conduct can constitute an unfair act as well.

But, for the majority of the plaintiffs, the TCPA claims fail for the same reasons that their negligence claims fail. First, to the extent that the claims are based on Regions' negligent conduct, they are foreclosed by the UFA. HN21[↑] The TCPA contains an exemption for

"[a]cts or transactions . . . specifically authorized under the laws [of Tennessee]." *Tenn. Code Ann. § 47-18-111(a)(1)*. The UFA specifically "authorize[s]" a bank to effectuate a fiduciary depositor's transfers, "without being liable to the principal," as long as the bank is acting in good faith and without actual knowledge of the fiduciary's breach of duty. *Id. §§ 35-2-107, 35-2-109.* This is true even if the bank has acted negligently.

Second, [*39] to the extent that the TCPA claims are based on the defendant's bad faith or actual knowledge of Stokes and 1Point's scheme, they are preempted by ERISA for the same reason the negligence claims are preempted: the claims are derivative of the plans' ERISA claims because the requisite "unfair or deceptive" conduct depends on the defendant's knowledge of Stokes' breach.

Thus, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose plans are not covered by Title I of ERISA, the plaintiffs' TCPA claims will be dismissed. [17]

## IV. Unjust Enrichment Claims

Finally, the plaintiffs have asserted unjust enrichment claims. The defendant argues that these are duplicative of the Trustee's equitable ERISA claim, which the court previously

---

[17] HN22[↑] The TCPA contains a one-year statute of limitations and five-year statute of repose. *Tenn. Code Ann. 47-18-110.* The defendant argues that the one-year period bars claims regarding activity that occurred more than one year before the Trustee filed his initial complaint on August 20, 2007. (Docket No. 107 at 21-22.) But, as with the negligence claims, the "discovery rule" applies, *Schmank v. Sonic Auto., Inc., 2008 Tenn. App. LEXIS 291, at \*6 (Tenn. Ct. App. May 16, 2008),* and nothing at this stage suggests that the plaintiffs discovered their TCPA claims before 1Point's bankruptcy filing in September 2006.

The EFS plaintiffs concede that the five-year [*40] statute of repose bars recovery for Regions' conduct before August 2002. (Docket No. 117 at 21.)

dismissed. (Docket No. 107 at 22.)

**HN23**[↑] In Tennessee, the elements of an unjust enrichment claim are: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus. LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005)* (quotation marks omitted) (alteration in original). The plaintiffs allege that Regions was unjustly enriched because it "received a large number of fees as a result of its negligent and improper business relationship with 1Point Solution and Barry Stokes." (Docket No. 99 P 76; Docket No. 100 P 110.)

The court previously dismissed the Trustee's *29 U.S.C. § 1132(a)(3)* claim, which sought equitable relief against Regions. In doing so, the court stated:

> In *Great-West* **[*41]** *Life & Annuity Insurance Co. v. Knudson,* the Supreme Court held that the remedy of restitution is only equitable, and thus recoverable under *§ 1132(a)(3)*, where the plaintiff seeks "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession," and rejected the plaintiffs' claim because it sought funds that were not in the defendants' possession. *534 U.S. 204, 213-14, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002)* . . . .

The Trustee further argues, in his opposition to Regions/AmSouth's motion to dismiss, that he may be entitled to disgorgement of fees and charges that Regions/AmSouth withdrew from the accounts. Although restitution and disgorgement may, at times, constitute equitable remedies recoverable under *§ 1132(a)(3)*, that is not the case here. There is no allegation that the funds the Trustee seeks to recover are specifically identifiable and held in the defendants' possession.

(Docket No. 33 at 26-27.)

The current unjust enrichment claims seek disgorgement of Regions' fees, which is the exact remedy sought by the Trustee's *§ 1132(a)(3)* claim. **HN24**[↑] "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement **[*42]** remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health, Inc. v. Davila, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)*. Accordingly, "state law claims against non-fiduciaries may be preempted where they merely reframe an ERISA claim as a state law cause of action." (Docket No. 33 at 29 (citing *Briscoe v. Fine, 444 F.3d 478, 499 (6th Cir. 2006)*.) The unjust enrichment claims appear to be a reframing of the previously dismissed ERISA claim.

In addition, the inequitable circumstances forming the basis of the claim are the allegations that Regions benefitted by ignoring Stokes' and 1Point's wrongdoing. As with the negligence and TCPA claims, the unjust enrichment claims are preempted to the extent that they depend on Regions' knowledge of Stokes' and 1Point's breach of fiduciary duty.

Accordingly, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose plans are not covered by Title I of ERISA, the plaintiffs' unjust enrichment claims will be dismissed.

## V. Motion to Strike

Because some claims remain, the court will

address the plaintiffs' Motion to Strike. The plaintiffs argue that, in asserting the affirmative defense **[*43]** of comparative negligence, the defendant has failed to meet the pleading requirements of the Federal Rules of Civil Procedure.

The Answer to EFS' Second Amended Complaint contains several statements regarding comparative fault. In its affirmative defenses section, Regions alleges:

1. . . . [The plaintiffs'] damages were caused in whole or in part by the comparative fault of one or more of the following: [A list of the plaintiffs and individuals and entities who acted on behalf of the relevant plans]. . . .

4. Plaintiffs' fault is comparatively greater than any fault of Regions. . . .

6. . . . Regions is entitled to contribution, indemnification or a reduction in the award by the percentage of fault assigned to any other parties, persons or entities whose negligence or other acts proximately contributed to the claimed damages.

7. . . . [The plaintiffs'] damages are the result of their own acts or omissions or those of their respective fiduciaries, including without limitation their failure and the failure of their trustees and other fiduciaries to perform basic due diligence prior to retaining Barry Stokes and 1Point, and their failure to supervise and control Barry Stokes and 1Point, and **[*44]** are not the result of any act or omission by Regions.

(Docket No. 105 at 10-12.)

**HN25**[⬆] *Federal Rule of Civil Procedure 12(f)* allows a court to "strike from a pleading an insufficient defense." *Rule 8* governs the level of detail required in parties' pleadings. *Rule 8(a)(2)* requires a plaintiff's complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to

relief." Similarly, *Rule 8(b)*, which is titled "Defenses; Admissions and Denials," requires a defendant's answer to "state in short and plain terms its defenses to each claim asserted against it." *Id. 8(b)(1)(A)*. *Rule 8(c)*, titled "Affirmative Defenses," states that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense," including "contributory negligence." *Id. 8(c)(1)*. Unlike *subsections (a)* and *(b)*, *subsection (c)* does not include any language requiring the party to state anything in "short and plain" terms.

The recent Supreme Court cases of *Iqbal* and *Twombly* held that **HN26**[⬆] "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal, 129 S. Ct. at 1949* (quoting *Twombly, 550 U.S. at 570*). Thus, **[*45]** "mere conclusory statements" are not enough to state a cause of action. *Id.* The plaintiffs argue that the standard enunciated in *Iqbal* and *Twombly* applies equally to affirmative defenses, making conclusory statements of comparative negligence insufficient to raise such a defense. (Docket No. 113 at 3.)

**HN27**[⬆] Some district courts have agreed with the plaintiffs' view. *E.g., Tracy v. NVR, Inc., No. 04-CV-6541L, 2009 U.S. Dist. LEXIS 90778, at *27-30 (W.D.N.Y. Sept. 30, 2009)* (striking affirmative defenses that were pleaded "in simple conclusory terms"); *United States v. Quadrini, No.: 2:07-CV-13227, 2007 U.S. Dist. LEXIS 89722, at *11-12 (E.D. Mich. Dec. 6, 2007)* ("Like the plaintiff, a defendant also must plead sufficient facts to demonstrate a plausible affirmative defense . . . ."); *Home Mgmt. Solutions, Inc. v. Prescient, Inc., 2007 U.S. Dist. LEXIS 61608, at *4-5, 9-10 (S.D. Fla. Aug. 21, 2007)* (holding that affirmative defenses "are subject to the general pleading requirements of *Rule 8(a)*"). Other courts have reached the opposite conclusion. *E.g., First Nat'l Ins. Co. of Am. v. Camps Servs., No. 08-*

cv-12805, 2009 U.S. Dist. LEXIS 149, at *4-5 (E.D. Mich. Jan. 5, 2009) ("*Twombly's* analysis **[\*46]** of the 'short and plain statement' requirement of *Rule 8(a)* is inapplicable to this motion under *Rule 8(c)*."); *Westbrook v. Paragon Sys., 2007 U.S. Dist. LEXIS 88490, at *2 (S.D. Ala. Nov. 29, 2007)* (holding that *Twombly* did not extend to *Rule 8(b)* or *(c)*).

This court agrees with the latter view -- that *Twombly* and *Iqbal* did not change the pleading standard for affirmative defenses. On its face, *Twombly* applies only to complaints and to *Rule 8(a)(2)*, because the Court was interpreting that subsection's requirement of "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Twombly, 550 U.S. at 555* (quoting *Fed. R. Civ. P. 8(a)(2)*). The opinion does not mention affirmative defenses or any other subsection of *Rule 8*. *Iqbal* also focused exclusively on the pleading burden that applies to plaintiffs' complaints. *See 129 S. Ct. at 1949-54*.

**HN28**[⬆] Although *Rule 8(b)* does require a defendant to state its defenses "in short and plain terms," which is similar to the language in *Rule 8(a)*, the Sixth Circuit has explicitly stated that "*Rule 8(b)* does not apply when a defendant asserts an affirmative defense." *Pollock v. Marshall, 845 F.2d 656, 657 n.1 (6th Cir. 1988)*. **[\*47]** *But see Montgomery v. Wyeth, 580 F.3d 455, 467-68 (6th Cir. 2009)* (implying that the *Rule 8(b)(1)* standard applies to a statute-of-repose defense).

Under Sixth Circuit case law, a defendant asserting an affirmative defense is not required to plead specific supporting facts. Instead, "'[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense.'" *Lawrence v. Chabot, 182 Fed. Appx. 442, 456 (6th Cir. 2006)* (quoting 5 Wright & Miller, Federal Practice and Procedure § 1274). Thus, in *Lawrence,* it

was sufficient for the defendants to plead merely that they were "entitled to qualified immunity for all activities complained of in this complaint." *Id.* The court relied on its earlier decision in *Davis v. Sun Oil Co., 148 F.3d 606 (6th Cir. 1998)*, in which it refused to strike an affirmative defense stating that "Plaintiffs' claims are barred by the doctrine of res judicata." *182 Fed. Appx. at 456* (quoting *Davis, 148 F.3d at 612*).

More recently, in *Montgomery,* the Sixth Circuit held that the defendant properly pleaded a statute-of-repose defense when its answer stated that "'Plaintiff's **[\*48]** causes of action are barred in whole or in part by the applicable statutes of limitations and repose,'" and when its affirmative defenses included "'defenses of the Tennessee Products Liability Act of 1978, as codified in [*Tenn. Code Ann.] §§ 29-28-101 through 108*.'" *580 F.3d at 467* (alteration in original). This was enough to meet *Rule 8*'s requirements. *Id.* Notably, the Sixth Circuit's decision in *Montgomery* post-dated *Twombly* and *Iqbal.*

Thus, **HN29**[⬆] the Sixth Circuit has consistently used "fair notice" as the standard for whether a defendant has sufficiently pleaded an affirmative defense. *Id.; Lawrence, 182 Fed. Appx. at 456*. *Twombly* and *Iqbal* did not change this. This court has little trouble finding that Regions' Answer, which lists the people who were allegedly comparatively negligent and the specific duties of care that they violated, gives plaintiffs sufficient notice of the nature of the affirmative defense. *See Del-Nat Tire Corp. v. A to Z Tire & Battery, Inc., No.09-2457, 2009 U.S. Dist. LEXIS 114337, at *5-6 (W.D. Tenn. Nov. 23, 2009)* (denying motion to strike because the defendant's affirmative defense of credits and offsets listed five discrete sources for the credits, which **[\*49]** gave the plaintiff fair notice), *report and recommendation accepted by 2009 U.S. Dist. LEXIS 114332 (W.D. Tenn. Dec. 8, 2009)*.

Because the defendant has met its burden for pleading the affirmative defense of comparative negligence, the court will deny the plaintiffs' Motion to Strike.

## CONCLUSION

For all of the reasons discussed above, the defendants' Motions for Judgment on the Pleadings will be granted in part and denied in part. The Trustee's complaint will be dismissed in its entirety. The EFS plaintiffs' claims will also be dismissed, except for the claims of plaintiffs Niedermeyer, Allen, and Simpson, whose 401(k) and retirement plans are not covered by Title I of ERISA. Finally, the court will deny the plaintiffs' Motion to Strike.

An appropriate order will enter.

/s/ Aleta A. Trauger

ALETA A. TRAUGER

United States District Judge

## ORDER

For the reasons expressed in the accompanying Memorandum, the Motion for Judgment on the Pleadings filed by defendant Regions Bank in Case No. 3:08-cv-21 (Docket No. 106) is **GRANTED,** and plaintiff John McLemore's complaint is **DISMISSED.** Entry of this Order shall constitute the judgment in that case.

The Motion for Judgment on the Pleadings filed by defendant **[*50]** Regions Bank in Case No. 3:08-cv-1003 (Docket No. 108) is **GRANTED IN PART** and **DENIED IN PART.** All claims except those by plaintiffs Deborah Niedermeyer, Brian K. Allen, and James Simpson are **DISMISSED.**

The joint Motion to Strike filed by the plaintiffs

(Docket No. 112) is **DENIED.**

These two cases were previously consolidated. Because all claims in Case No. 3:08-cv-0021 have been dismissed, that case is now closed, and all future filings pertaining to the *EFS* plaintiffs should be filed under Case No. 3:08-cv-1003.

It is so Ordered.

Entered this 18th day of March 2010.

/s/ Aleta A. Trauger

ALETA A. TRAUGER

United States District Judge

---

End of Document

# Tab G

 Positive

As of: December 16, 2019 3:54 PM Z

## *Matthew v. Laudamiel*

Court of Chancery of Delaware, Kent

June 5, 2015, Submitted; September 28, 2015, Decided; September 28, 2015, EFiled

C.A. No. 5957-VCN

**Reporter**

2015 Del. Ch. LEXIS 247 *; 2015 WL 5723985

STEWART MATTHEW, Plaintiff, v. CHRISTOPHE LAUDAMIEL, FLÄKT WOODS GROUP SA, FLÄKT WOODS LIMITED and DREAMAIR LLC, Defendants.FLÄKT WOODS GROUP SA, Cross-Claim Plaintiff, v. CHRISTOPHE LAUDAMIEL, ROBERTO CAPUA, ACTION 1 SRL, and DREAMAIR LLC, Cross-Claim Defendants.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Subsequent History:** Affirmed by *Matthew v. Laudamiel, 2016 Del. LEXIS 362 (Del., June 22, 2016)*

**Prior History:** *Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 38 (Del. Ch., Feb. 21, 2012)*

## Core Terms

email, Scent, Post-Trial, winding up, projections, technology, negotiations, damages, cash flow, valuation, Collaboration, dissolution, terminate, tortious interference, employment agreement, parties, rights, liquidation, conspiracy, co-CEOs, Reply, breach of fiduciary duty, aiding and abetting, unjust enrichment, confidential, certificate, conversion, breached, notice, emergency meeting

## Case Summary

### Overview

HOLDINGS: [1]-A former co-CEO of a limited liability company (LLC) proved his breach of contract claim, arising from allegations that defendants unlawfully dissolved the parties' LLC and then created a competitor, as he established that they terminated his employment agreement and disposed of the LLC's assets without the unanimous vote of all the parties, as required; [2]-Aiding and abetting claims against a third party failed because there was no direct evidence that he knew he was advocating wrongdoing by pushing the parties to resolve their differences, and his actions were not so suspect that knowing participation in the illicit winding up effort could have been inferred; [3]-Defendants breached a duty of loyalty by failing to act to promote the best interests of the LLC, including improperly winding up and distributing assets of the LLC and sharing confidential information.

**Outcome**

Judgment and award of damages for former co-CEO; judgments entered for different defendants.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1*[⬇] **Appeals, Appellate Briefs**

Waiver generally operates to bar issues not briefed.

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of Evidence

*HN2*[⬇] **Burdens of Proof, Allocation**

For a plaintiff to recover, he must prove his case by a preponderance of the evidence. He bears the burden of proving that certain evidence, when compared to the evidence opposed to it, has the more convincing force.

Civil Procedure > Parties > Pro Se Litigants > General Overview

*HN3*[⬇] **Parties, Pro Se Litigants**

A party's status as a self-represented litigant is afforded some consideration.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

*HN4*[⬇] **Fiduciary Duties, Duty of Loyalty**

The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.

Business & Corporate Law > ... > Causes of Action & Remedies > Breach of Fiduciary Duty > General Overview

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

Evidence > Burdens of Proof > Allocation

Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

Evidence > Inferences & Presumptions > Inferences

*HN5*[⬇] **Causes of Action & Remedies, Breach of Fiduciary Duty**

The elements of an aiding and abetting claim are: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a nonfiduciary defendant knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary. The court does not require a figurative smoking gun, and

knowledge can be inferred under circumstances where conduct is particularly suspect. Knowing participation requires a showing that the nonfiduciary acted with the knowledge that the conduct advocated or assisted constitutes such a breach.

Evidence > Burdens of Proof > Allocation

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN6*[🔽] **Burdens of Proof, Allocation**

The requirement to show knowledge in an aiding and abetting claim is important to facilitate the commercial interaction of corporate entities.

Evidence > Types of Evidence > Circumstantial Evidence

*HN7*[🔽] **Types of Evidence, Circumstantial Evidence**

Circumstantial evidence can prove a fact if the fact follows as a natural or very probable conclusion from the facts actually proven.

Torts > ... > Contracts > Intentional Interference > Elements

*HN8*[🔽] **Intentional Interference, Elements**

A claim for tortious interference requires that: (1) there was a contract; (2) about which the particular defendant knew; (3) an intentional act that was a significant factor in causing the breach of contract; (4) the act was without justification; and (5) it caused injury. Tortious interference involves not only knowledge that a contract exists but also intent to interfere with

that contract.

Torts > ... > Contracts > Intentional Interference > Defenses

*HN9*[🔽] **Intentional Interference, Defenses**

The justification element of a tortious interference with contractual relations claim depends on factors such as: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Torts > ... > Contracts > Intentional Interference > Elements

*HN10*[🔽] **Intentional Interference, Elements**

A court evaluates tortious interference claims, including possible justification, mindful that some types of intentional interference with contractual relations are a legitimate part of doing business.

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Torts > ... > Contracts > Intentional Interference > Elements

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

Evidence > Inferences & Presumptions > Presumptions > Effects

**HN11**[⬇] **Contract Interpretation, Good Faith & Fair Dealing**

The mere existence of an employment agreement does not permit a finding that an employee has a right to a term of continued employment - a number of cases addressing the implied covenant of good faith and fair dealing recognize a presumption under Delaware law that employment contracts are "at-will in nature with duration indefinite." That one can interfere without understanding the legal effect of a contract does not negate the requirement of intending to interfere with something in the first place for purposes of tortious inference with contractual relations.

Evidence > Burdens of Proof > Allocation

Torts > ... > Concerted Action > Civil Conspiracy > Elements

Evidence > Types of Evidence > Circumstantial Evidence

**HN12**[⬇] **Burdens of Proof, Allocation**

A claim for conspiracy requires: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage. Because a plaintiff often cannot produce direct evidence of a conspiracy, circumstantial evidence can be offered as "proof that it occurred."

Business & Corporate Law > ... > Shareholder Actions > Appraisal Actions & Dissent Rights > Fair Market Value

Evidence > Burdens of Proof > Preponderance of Evidence

**HN13**[⬇] **Appraisal Actions & Dissent Rights, Fair Market Value**

In a statutory appraisal proceeding, each side has the burden of proving its respective valuation positions by a preponderance of the evidence. Even if one side fails to satisfy its burden, the court must use its own independent judgment to determine fair value.

**Counsel:** [*1] Thad J. Bracegirdle, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware, Attorney for Plaintiff.

Christopher Laudamiel, of New York, New York, Self-Represented Defendant.

Seth J. Reidenberg, Esquire of Tybout, Redfearn & Pell, Wilmington, Delaware and Mark Thornhill, Esquire, Kersten Holzhueter, Esquire, and Angus Dwyer, Esquire of Spencer Fane Britt & Browne LLP, Kansas City, Missouri, Attorneys for Defendants FlÄkt Woods Group SA and FlÄkt Woods Limited.

**Judges:** NOBLE, Vice Chancellor.

**Opinion by:** NOBLE

# Opinion

### MEMORANDUM OPINION

NOBLE, Vice Chancellor 1

Plaintiff, a businessman, aspired to create an

innovative scenting business. He teamed with a perfumer and a financier in a limited liability company ("LLC"), which collaborated with an established company interested in integrating scenting technology into its commercial air handling systems. Developing a functioning product proved difficult, however, and interpersonal conflict further plagued the LLC. At some point, the perfumer and the financier began to seek support from an employee of the air handling company. The employee, who believed that the perfumer's skills were more valuable to the air handling company, participated in communication and meetings **[*2]** that excluded the businessman. Shortly after the perfumer and the financier voted to dissolve the LLC, they formed a new, similar company and ultimately contemplated working with the employee and the air handling company in a similar capacity. The businessman responded with this action asserting direct and indirect claims relating to the failed business. The Court sets forth its findings of fact and conclusions of law in this post-trial memorandum opinion. For the reasons below, the Court finds that the perfumer is liable for his conduct, the air handling company lacked the requisite scienter to participate in the wrongful conduct or cause independent injury and thus has no liability, and an award of $491,839.79 from the perfumer and the entity he controls, subject to resolution of one remaining issue, fairly compensates the businessman.

# I. BACKGROUND

## A. *The Parties*

Plaintiff and Counterclaim Defendant Stewart Matthew ("Matthew") was a manager of Aeosphere LLC ("Aeosphere" or the "Company") and held 35% of its membership units.[1] He maintains this action against Defendant and Counterclaim Plaintiff Christophe Laudamiel ("Laudamiel"), as well as Defendants DreamAir LLC ("DreamAir"),[2] FläKt **[*3]** Woods Group SA ("FWGSA"), and FläKt Woods Limited ("FWL") to vindicate his rights following Aeosphere's dissolution. The liability of Roberto Capua ("Capua"), Capua's investment vehicle Action 1 SRL ("Action 1"), and SEMCO LLC ("SEMCO"), named in Matthew's original complaint, is no longer at issue.

Matthew, Laudamiel and Action 1 were Aeosphere's members, and Matthew, Laudamiel and Capua were Aeosphere's managers.[3] Laudamiel, like Matthew, held 350 common units of Aeosphere (35% of the fully diluted total), and Capua held 300 preferred units of Aeosphere (30% of the fully diluted total).[4] Laudamiel and Capua formed DreamAir on May 7, 2010, shortly before Matthew filed Aeosphere's certificate of cancellation.[5] FWGSA "provides management services and contracts for management services for the FläKt Woods family of companies,"[6] including **[*4]** FWL, a United Kingdom entity. For convenience, the Court does not distinguish between FWGSA and FWL. A critical part of FWGSA's business is the manufacture and sale of air handling units.[7]

---

[1] Joint Pre-Trial Stipulation and [Proposed] Order ("Stip.") § II ¶¶ 2-3; JX 230 ("LLC Agreement") at A-1 (showing the members' interests).

[2] Default judgment has been entered against DreamAir; only the amount of damages remains, and that question is resolved in this memorandum opinion because the liability of Laudamiel and the liability of DreamAir are the same.

[3] Stip. § II ¶¶ 2-3.

[4] LLC Agreement A-1.

[5] JX 240 (details of DreamAir LLC); JX 405 (Aeosphere's certificate of cancellation); Trial Tr. vol. III, at 737 (Laudamiel).

[6] Stip. § II ¶¶ 5-6.

[7] Trial Tr. vol. II, 388 (Yule).

## B. *The Creation of Aeosphere*

Aeosphere originated as an entertainment company founded by Matthew to develop a project called the Scent Opera.[8] The Scent Opera involved presenting a story through scents and sounds and would eventually yield performances at prominent museums.[9] Although Laudamiel initially was not interested in forming a business with Matthew, he agreed to create the fragrances for the Scent Opera.[10] To obtain funding for his project, Matthew made a number of "cold call[s]," one of which was to FWGSA.[11] As the discussions progressed, Matthew worked primarily with Neil Yule ("Yule"), then responsible for various business development projects at FWGSA.[12] Yule saw an opportunity for FWGSA to use scenting technology with its air handling units to offer an "aroma-control and fragrancing" system.[13] This Scent Project intrigued **[*5]** Yule because it would allow FWGSA to differentiate its business in a "mature industry with a lot of competition."[14]

The discussions culminated in the formation of Aeosphere, with Matthew and Laudamiel as co-CEOs, and the execution of the Operating Agreement of Aeosphere LLC dated June 20, 2008.[15] Aeosphere entered into a Collaboration Agreement with FWGSA on July 2, 2008.[16] The Collaboration Agreement broadly anticipated Aeosphere developing proprietary scent formulas, another company providing the scented oils, and FWGSA marketing and supplying the "integrated package . . . for incorporation into new or existing air handling equipment designed to ensure the controlled diffusion of the selected scent into selected areas of space."[17]

The parties disagree about whether they based their agreement on the use of electric field effect technology ("EFET"), developed by Battelle Memorial Institute ("Battelle"), to transform scent oils into particles that could be dispersed by the air handling units. It is clear, however, that the parties saw EFET as the best option in terms of both function and profitability.[18] While a device developed by Prolitec, Inc. ("Prolitec") existed as a prospective alternative to EFET, the Prolitec device did not perform as well as claimed[19] and use of such device would mean collaborating with an FWGSA competitor.[20]

Yule presented the Scent Project to FWGSA, but FWGSA did not adopt the project because of the costs associated with developing the technology, among other reasons.[21] Aeosphere eventually found a source of funding in Capua, who provided €1.55 million through Action 1.[22] In return, Action 1 received

---

[8] Trial Tr. vol. I, 20-23 (Matthew).

[9] *Id.* at 16-18 (Matthew). Scent Opera performances were given at the Guggenheim Museums in New York and Bilbao, Spain.

[10] *Id.* at 20-21 (Matthew).

[11] *Id.* at 21-22 (Matthew).

[12] *Id.* at 22-23 (Matthew); Trial Tr. vol. II, 390-91 (Yule).

[13] JX 1 at FWGSA_000020 (describing the scope of the Collaboration Agreement).

[14] Trial Tr. vol. II, 388-89 (Yule).

[15] *See* JX 435 (original operating agreement).

[16] JX 1 (Collaboration Agreement). The original collaboration agreement was amended in March and April 2009. Stip. § II ¶ 8; JX 6 (April amendment).

[17] JX 1 at **[*6]** FWGSA_000020-21.

[18] *E.g.*, JX 4 (email from Matthew to Yule discussing scenting technologies); JX 154 (comparing EFET technology to Prolitec technology); Trial Tr. vol. II, 428-29 (Yule).

[19] JX 115 at FWGSA 016470; Trial Tr. vol. II, 395-96 (Yule).

[20] Trial Tr. vol. II, 392 (Yule).

[21] *Id.* at 391 (Yule); Trial Tr. vol. III, 776 (Margrita) (discussing sundry financing issues).

[22] Dep. Trs. of Roberto Capua, vols. I and II ("Capua Dep.") 148; LLC Agreement B-1. Matthew suggested that the actual

a 30% membership interest in Aeosphere [*7] [23] and Capua became a manager.[24] Part of the effort to attract Capua's investment involved Matthew's preparation of pro forma financials projecting that FWGSA would sell 15,100 scenting devices by the end of 2013 (and 2,200 by the end of 2010).[25]

Under Aeosphere's LLC Agreement, certain actions, such as terminating Matthew and winding up Aeosphere, required a unanimous vote of the co-CEOs, though Capua negotiated other meaningful voting rights.[26] Generally speaking, Capua's investment came with a "preferred return" of 7% (compounded annually) on "outstanding and unreturned . . . Capital Contributions" and priority in distributions of available cash and liquidation proceeds.[27] The new arrangement was reflected in the LLC Agreement, dated as of May 11, 2009. Matthew and Laudamiel's employment agreements [*8] appeared as attachments to the LLC Agreement.[28] Each had a term of five years, with a base salary equivalent to $300,000 in the first year and $350,000 per year thereafter.

Around March 2009, with news of Capua's investment, Yule updated projections and pitched the Scent Project once more.[29] At about the same time, FWGSA contracted with Battelle for an option to license the Battelle technology,[30] and the Collaboration Agreement was amended to increase royalties on sales "[i]n return for [Aeosphere's] co-investment with FWG[SA]" in the technology contemplated by the License and Development Agreement with Battelle.[31] The assumption of using EFET was "significan[t]" to Yule's projections that 2010 sales would reach around €2.6 million.[32] Yule claims that his projection would have been at best one-fifth to one-tenth of that had the Prolitec technology been used.[33] Jean Philippe Margrita, who became FWGSA's senior vice president of marketing and product development in late 2008,[34] was somewhat skeptical of Yule's numbers; he believed that it would take over a year to begin selling units using EFET.[35] FWGSA adopted the Scent Project as one of its initiatives but used a more conservative [*9] projection of €500,000 in 2010 sales (later updated to €200,000 in forecasted sales) in seeking shareholder

---

investment was less. Trial Tr. vol. I, 58-59, 74 (Matthew) ("[A]s I recall, it was 1.4 million euros.").

[23] LLC Agreement A-1.

[24] Stip. § II ¶ 3; LLC Agreement A-1.

[25] JX 239 at LCA 002597; Trial Tr. vol. I, 124-25 (Matthew).

[26] See Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012) (interpreting § 5.2.6 of the LLC Agreement).

[27] LLC Agreement §§ 1.1, 4.1, 6.1, 9.4.

[28] Id. at E-1-2.

[29] Trial Tr. vol. II, 393, 397 (Yule); see also JX 115 (updated PowerPoint).

[30] JX 5 (agreement between Battelle and FWGSA).

[31] JX 6 at FWGSA_000014. Matthew, however, protests that "payment of royalties to Aeosphere was never tied specifically to sales of equipment using EFET." Pl.'s Post-Trial Reply Br. 7. The amendment also provided that Aeosphere would "remain exclusive designer and supplier of scented media to all FWG[SA] equipment and systems for a period of 10 years" if FWGSA did not execute the agreement with Battelle. JX 6 at FWGSA_000014.

[32] JX 141; Trial Tr. vol. II, 427-28 (Yule). The parties debate whether Yule's projections were "cautious" (as Yule wrote in a contemporaneous email to Matthew), JX 141, or if they were the product of a salesman trying to pitch a project. See Trial Tr. vol. II, 413-14 (Yule). The Court addresses the reliability of the various projections [*10] in its discussion of damages, infra.

[33] Trial Tr. vol. II, 428 (Yule). The figures would have been even less if FWGSA did not acquire exclusive rights to the Prolitec technology. Id.

[34] Trial Tr. vol. III, 767 (Margrita).

[35] Id. at 792-94 (Margrita) (elaborating, for example, that "it will have been at least three month[s] for the prototype, another

approval of the November 2009 budget.[36] The presentation noted that the FWGSA "device [was] not yet completed" but anticipated using Prolitec technology in the meantime.[37] Unfortunately, even the updated numbers proved too optimistic.

## C. The Conflict and Yule's Involvement

As Aeosphere struggled, conflict arose within the Company's management, including Laudamiel's desire to bring her husband, perfumer Christophe Hornetz ("Hornetz"), into the business as an employee,[38] and certain conduct during the Scent Opera engagements.[39] As to be expected with disagreements and secret negotiations, the record does not paint a clear picture of [*11] who was planning to do what, and when. A few records and acts, however, are particularly noteworthy and illustrate the timeline of the managers' negotiations and the ultimate dissolution.

Around September 2009, Matthew, Laudamiel, and Capua began to discuss restructuring their roles within Aeosphere.[40] Records from

October confirm pre-existing strife and a desire to exclude certain members from communication. In one email chain, Laudamiel expressed concern about Matthew holding up a project, and Yule suggested fabricating a scheduling conflict as a ruse to keep Matthew out of a meeting they felt unnecessary.[41] In a follow-up email, Yule asked Laudamiel about the "possibility that [Matthew] could gain access to [Laudamiel's] mails through the Aeosphere server."[42] Laudamiel and Yule discussed business opportunities [*12] without informing Matthew into November.[43] Matthew, too, solicited Capua's help to prevent Laudamiel from "hav[ing] his own way all the time."[44]

Laudamiel and Capua then held a secret meeting with Yule in Paris. During that January 2010 meeting, the three discussed the conflict within Aeosphere and Capua's desire "to place the business into . . . different business streams [*13] to . . . allow [Matthew] and [Laudamiel] to operate in their preferred areas and . . . avoid some of the conflict."[45] Yule claims that he did not know that Laudamiel and Capua wanted to discuss a potential division; he had believed the meeting was to visit a site for a Scent Opera performance and

---

probably six, seven months to realize the product, then another probably three month[s] to test it").

[36] JX 270 at FWGSA 098985; JX 271 at FWGSA 029973; Trial Tr. vol. IV, 874-75, 885, 887-89 (Margrita). During post-trial oral argument, counsel for the FlÄkt Woods parties stated that the €200,000 number was the only number presented to shareholders. Post-Trial Oral Arg. Tr. ("Oral Arg. Tr.") 95. See Trial Tr. vol. IV, 880 (Margrita) (explaining that most orders result in sales).

[37] JX 271 at FWGSA 029973.

[38] E.g., Trial Tr. vol. I, 80-82, 93 (Matthew).

[39] See Trial Tr. vol. IV, 815-16, 836 (Laudamiel). For example, Laudamiel felt hurt when Matthew yelled at him, publicly, at one venue. Trial Tr. vol. IV, 815-16 (Laudamiel). The Court does not know the full extent of these tensions and only raises them for context. The Court will not speculate on matters for which it does not have a factual basis.

[40] Trial Tr. vol. I, 92-94, 162-63 (Matthew). One option placed Matthew "as the sole CEO," a suggestion that Matthew declined as unacceptable to Laudamiel. Id. at 94 (Matthew).

[41] JX 120 at FWGSA 008502-03 (October 22-23 emails).

[42] Id. at FWGSA 008502 (October 23 email from Yule to Laudamiel). Yule's concern about security is also reflected in a later instruction to another FWGSA employee to email Laudamiel at his personal address. JX 155 at FWGSA 009300 (March 2010 email).

[43] E.g., JX 120 at FWGSA 008503 ("[I]f I show [Matthew] all the details, the project will be stopped every second week."); JX 143 (Yule mediating communication between a client and Laudamiel); Trial Tr. vol. III, 573-74 (Yule) (discussing a proposal sent by Yule "on behalf of Christophe Laudamiel of Aeosphere and of Flakt Woods Group.").

[44] JX 227 at LCA000001 (October 21 email from Matthew to Capua).

[45] Trial Tr. vol. II, 451 (Yule); accord Trial Tr. vol. III, 579 (Yule).

a center for perfumery.[46] He admits, however, that he had known as early as fall 2009 that the managers were considering "some sort of reorganization."[47] Yule agreed to keep the meeting confidential.[48] Laudamiel and Capua likely did not inform Matthew of the meeting,[49] although Capua did inform Matthew that he had discussed the management problems with Yule at some point.[50] The evidence suggests that Matthew did not authorize his co-members to discuss the internal separation discussions with Yule and attempted to keep them confidential himself.[51]

Adding to the tension was a string of disappointing test results. Matthew highlights a failed round of testing, of which Yule notified Laudamiel and Capua on January 21, 2010.[52] In his email, Yule suggested,

> One option is for you guys to use the EF[E]T option as a bargaining chip in your negotiations with [Matthew]. If we agree

that it is not a suitable technology for HVAC applications, then perhaps you should **[*15]** offer the license to [Matthew] as his share of Aeosphere, allowing him to leave without the need for an additional financial pay-off?[53]

The next day, in response to emails from Capua about conflict with Matthew, Yule expressed his "100% commit[ment]" to Laudamiel and Capua.[54] He not only agreed to conceal his knowledge of "how serious matters had become"[55] but also represented that "[a]ny contact [he may] have with [Matthew] during this time will purely be on the basis that it may help [Laudamiel and Capua]."[56] Yule admits that he favored Laudamiel (and Capua), as Laudamiel's skills were more valuable to the business arrangement (at least going forward).[57] At the same time, he intended to "remain[] entirely impartial with regard to Aeosphere's internal structural review."[58] In Yule's words, "the ideal scenario" for FWGSA would have been for Aeosphere to have two divisions, one with Matthew developing new media projects and one with Laudamiel working on ambient scenting.[59]

---

[46] Trial Tr. vol. II, 450-51 (Yule); *see also* JX 144 at FWGSA 008872 (explaining a wish to take Yule to two places in Paris).

[47] Trial Tr. vol. III, 563 (Yule).

[48] *See* JX 145 at LCA 024939 ("If and when you decide to tell [Matthew] that we have met, then please let me know straight away so that I am aware."). **[*14]** In the same email, Yule forwarded a marketing plan that he thought was an effort by Matthew "to establish his position in the relationship and to be seen to be the person driving the agenda forward." *Id.* While Matthew highlights Yule's conduct in this instance, the communication also implies one-sided contact by Matthew. *Id.* at LCA 024939-40 (Jan. 7, 2010 email from Matthew to Yule).

[49] *See* Capua Dep. 120; JX 146; Trial Tr. vol. III, 698-99 (Laudamiel) (stating that he has "no idea" whether Matthew was ever told of the Paris meeting).

[50] *See* JX 7 at SM046307 (email from Matthew to Capua stating that "your . . . disclosure to [Yule] of a rift in Aeosphere destabilised his trust in the Flakt Woods Aeosphere arrangement").

[51] *See, e.g., id.* at SM046307-08; JX 41; JX 42 at SM031527; JX 150 at FWGSA 009058.

[52] JX 147 at LCA 025266.

[53] *Id.* Matthew observes, however, that residential and consumer applications were not part of the license agreement and therefore could not be used as a "bargaining chip." Pl.'s Post-Trial Reply Br. 18 (citing, for example, JX 5). **[*16]**

[54] *See* JX 148 at FWGSA 008960.

[55] *Id.* at FWGSA 008963. In feigning ignorance of Capua's "divorce arrangement," Yule "instead spoke as if the Aeosphere team were simply evaluating [a] different business structure for the future which might involve [Matthew] leaving Aeosphere to form a new venture[], which would still work closely with Aeosphere and FW[GSA]." *Id.*

[56] *Id.* at FWGSA 008960.

[57] Trial Tr. vol. III, 592-93 (Yule).

[58] JX 150 at FWGSA 009057 (Jan. 28 email from Yule to Matthew); *see also* Trial Tr. vol. II, 474-75 (Yule).

[59] Trial Tr. vol. II, 476 (Yule); *see also id.* at 452-53 (Yule) ("I said if [Capua] can find a way to allow [Matthew] and [Laudamiel] to work in their different areas and Flakt Woods to

By February 2010, if not earlier, the managers had retained counsel and were discussing a separation of business activities.[60] On February 3, Capua asked Matthew to "discuss our members['] current situation during our meeting," adding that "[b]asically we are in agreement almost in everything[, though] we must deal with your proposal of split job and exclusivity."[61] In that email chain, Capua refers to "the split of the company [*17] we are evaluating," explaining that he "do[es] not trust [Matthew] anymore," and ends that he will "see if [he] can r[e]cover some money from this terrible investment."[62] Thereafter, the managers had a board meeting, which ended in frustration,"bang[]ing doors" and a hasty exit by Matthew.[63] They were unable to agree on a budget.[64] A follow-up email from Matthew to Capua states, "I cannot agree to a discussion of budget limited to a two to three months time horizon. Our company could face financial ruin in the meantime unless we set a responsible budget."[65]

In contrast, discussions among Laudamiel, Capua, and Yule continued. Matthew focuses on a number of exchanges [*18] over the next few months. For example, Yule, Laudamiel, and Capua held a February 24 conference call to discuss EFET and Prolitec.[66] At that point,

Laudamiel believed that EFET was still a viable option.[67] Emails from March 8 through 9 discuss pursuit of EFET and working without interference from Matthew.[68] Capua explained that they "finally reached a preliminary agreement [to] have [Matthew] out of the company at least for management and decision making" but retaining a "20% share."[69] At the end of March, Yule told a third party (then in negotiations with FWGSA and Aeosphere) about the management dispute and that Laudamiel and Capua "are close to concluding a deal that will result in [Matthew] leaving the firm in the next few weeks."[70] Though his testimony was not completely consistent, Yule stated in his deposition that he understood the negotiations to be confidential.[71] He told the third party contact, "[Matthew] is not aware that you and I have already spoken and I would prefer to maintain that impression during our call."[72]

Regardless whether the conflict was a result of mutual negotiation (as alleged by Defendants) or a conspiracy to oust him (as alleged by Plaintiff), April emails reflect growing pressure on Matthew to resolve the conflict. On one hand, the correspondence appears to show some movement toward an arrangement where the co-CEOs could avoid deadlock, such as by making Capua the new CEO and allowing Matthew and Laudamiel to pursue

---

continue to have . . . a good and hopefully a better working relationship, then I've got no concerns about that.").

[60] Capua Dep. 37-38; Trial Tr. vol. I, 160 (Matthew).

[61] JX 28 at SM046427. Just one day earlier, Yule wrote Laudamiel and Capua about working with a chef—an opportunity that would not exist as long as Matthew remained their business partner. JX 113 at FWGSA 009094 ("As soon as [Matthew's] exit from Aeosphere has been confirmed, we should very quickly re-establish the connection with [the chef]."). Yule knew that Matthew had interpersonal conflicts with the chef. Trial Tr. vol. III, 605-06 (Yule).

[62] JX 28 at SM046427.

[63] JX 236 at LCA 027110.

[64] Id.

[65] Id. at LCA 027111.

[66] See JX 153; JX 154.

[67] Trial Tr. vol. III, 700 (Laudamiel).

[68] JX 156. One email from Yule to Laudamiel suggested a call to discuss test results and options with Capua and Laudamiel, [*19] to be followed by a separate call involving Matthew. Id. at FWGSA 009369-70.

[69] Id. at FWGSA 009371.

[70] JX 157 at FWGSA 009532.

[71] See Trial Tr. vol. III, 613-14 (Yule); Dep. Trs. of Neil Yule, vol. II 455.

[72] JX 157 at FWGSA 009532.

their respective fields.[73] In one chain dated April 13, Capua explained that he was "done on financing [A]eosphere unless thing[s] change[d]" but that he was "trying the impossible to fix th[e] company."[74] Around one week later, Capua told Matthew that "[i]f everything is ok we can meet to finalize and sign [documents]" after discussing a "few little points."[75]

On the other hand, there is ample evidence that Matthew saw only part of the picture. Notably, Laudamiel suggested on April 22 that Yule send an email, during the period of negotiations, to help his ability to work free from Matthew's "manipulations and . . . arrogance."[76] Laudamiel's suggestion resulted in an email (also dated April 22) in which Yule stated, "I am fearful that unless matters are quickly resolved, then I will be told to wind up [FWGSA's] involvement in the scent project."[77] Matthew promptly followed up with a private phone call to Yule[78] and an email request that Yule "consider sending a follow up message" that properly reflects his value to Aeosphere.[79] The next day, Matthew emailed Capua to "terminate discussions of an alternative arrangement, unless it were to buy you and Christophe out of the company."[80] At this [*21] point (or shortly thereafter), Defendants say, the communication broke down.[81]

Capua and Matthew exchanged a few emails after April 23, in which Matthew reminded Capua that they "have responsibility to act according to [their] company's amended operating agreement."[82] Laudamiel forwarded Yule certain April 23 emails sent by Matthew rejecting Capua's suggestion to become [*23] CEO—apparently at Yule's request[83] and against Matthew's instructions about confidentiality.[84] On April 27, Yule sent an email to Matthew making clear that FWGSA considered Laudamiel the critical business partner and that he needed to inform his board

---

[73] See JX 29 at SM035389 (April 7 email from Capua to Matthew stating that "[counsel] informed me about your decision [to] quit any negotiation for our new agreement. Of course I was very disappointed especially considering all that we have [*20] achieved . . . in order to fix our current management situation and start working to make [A]eosphere start in a good way."); JX 31 at SM052299 (April 9 email from Capua to Matthew suggesting that Capua become CEO and that they "continue [their] negotiation, or [Capua will] have to direct [his] legal advisor for another type of strategy and war.").

[74] JX 33 at SM052263-64.

[75] JX 34.

[76] JX 122 at FWGSA 009915.

[77] JX 37 at SM052245. Yule's email incorporates a significant portion of Laudamiel's draft. For example, Yule wrote,

> Without wishing to interfere in internal Aeosphere matters, you will understand I am sure that . . . it is important for me to have some clarity. The clock is ticking and I am fearful that unless matters are quickly resolved, then I will be told to wind up our involvement in the scent project. So if you could provide me with a little information, I would be grateful.
>
> It is also clear that the internal issues are becoming

increasingly apparent to our other partners. The guys at Battelle have made several informal comments to me, such as "the guys at Aeosphere seem to have lost interest" and "Christophe's lost his fire[.]"[] Christophe — they have always placed great store on your reputation and expertise

. . . .

Id. Laudamiel's suggestion was,

> Without of course interfering in internal Aeosphere matters[], you will understand that the special position of [FWGSA] makes me nervous not to hear a new plan when the clock is ticking, so if you could provide me with a little information, [*22] I would be very grateful.
>
> Know also no matter how hard you try to conceal it, people such as Battelle did feel something was not going round in the past phone conferences, for instance that Christophe is losing his usual passion and flame, and that worries people because this is key for Aeosphere.

JX 122 at FWGSA 009916.

[78] Matthew points out that the Collaboration Agreement did not allow FWGSA to terminate for ten years—although winding up Aeosphere presented another way out. Pl.'s Opening Post-Trial Br. 14 n.7.

of the conflict.[85] That email expressed a hope that "peace" would be achieved but also "implore[d] [Matthew] to quickly identify a way in which the business can be divisionalised or if necessary separated, in order for all parties to move forward."[86] Yule hoped the email would be helpful to Laudamiel and Capua,[87] but did not discuss his concerns with Margrita.[88] In an April 29 reply, Matthew explained to Yule that Aeosphere, as a team, was committed to working with FWGSA.[89]

Capua claims that he consulted counsel and decided, around May 3, to hold an emergency meeting on May 4 to wind up the company.[90] Yet on April 28 and 29, Laudamiel wrote emails to Yule discussing a "Commando Operation" and "DDay." [*24] [91] It is equally clear that Laudamiel was anticipating an important event (at a minimum, withdrawing money from Aeosphere's bank accounts[92]) and that Yule had no idea what Laudamiel meant.[93]

On April 29 and 30, Laudamiel took over $145,000 from Aeosphere's account, of which $70,000 was distributed to Action 1.[94] Matthew was only given a day's notice of the emergency meeting.[95] Attached to the email notice was an agenda setting forth dissolution and winding-up as the top item on the list.[96]

Matthew did not attend the May 4 meeting.[97] Regardless, Laudamiel and Capua took a vote "to cease operations, wind up the affairs of the Company and dissolve as soon as is practical in order to preserve important Company rights and avoid further Company liabilities."[98] Votes were taken to terminate Matthew's employment, and Laudamiel was placed in charge of overseeing Aeosphere's winding up and liquidation.[99] Capua understood that he was putting himself at risk of a lawsuit for breach of the LLC Agreement.[100] Laudamiel also understood that Matthew had some rights

---

[78] Trial Tr. vol. II, 488-89 (Yule).

[79] JX 38.

[80] JX 42 at SM031529.

[81] Capua Dep. 154-55 ("[A]fter [Matthew] . . . closed down the negotiations with no reason to me. . . . I decided this was the only solution."); see also Trial Tr. vol. IV, 836-37 (Laudamiel) (describing the period around April 22 and explaining that he and Capua "were running out of solutions, suggestions, to Mr. Matthew"); Oral Arg. Tr. 67-69, 76-77.

[82] JX 42 at SM031528.

[83] JX 123 at FWGSA 009985. Yule did not "recall having any concern about confidentiality at the time." Trial Tr. vol. III, 619-20 (Yule).

[84] JX 123 at FWGSA 009986.

[85] JX 44 at FWGSA 066884.

[86] JX 124 at FWGSA 010053.

[87] Id.

[88] Trial Tr. vol. IV, 932-33 (Margrita).

[89] JX 125.

[90] See Capua Dep. 150-51 (explaining that he spoke with counsel before making his "decision to call th[e] meeting" and that he "probably" did not know about calling the meeting until May 3).

[91] JX 158 at FWGSA 010215.

[92] Laudamiel admitted that he knew of the emergency meeting and dissolution vote by (at least) late April or early May. See Trial Tr. vol. III, 721-24 (Laudamiel). The Court notes that Laudamiel and Capua could, in theory, vote on the matter without violating the LLC Agreement; it was the subsequent action in accordance with the non-unanimous vote that breached the LLC Agreement.

[93] See Trial Tr. vol. II, 505-06 (Yule); Trial Tr. vol. III, 707, 756-57 (Laudamiel).

[94] JX 111; Trial Tr. vol. III, 707, 709-11, 715-20 (Laudamiel). [*25]

[95] JX 109 (email about the emergency meeting); JX 110 (noting that Matthew had "acknowledged receipt of" the information).

[96] JX 109.

under the LLC Agreement.[101] In letters of that same date, Laudamiel assigned himself equipment in the Berlin office and "scents, scent formulas, scent conventions and annotations and test designs" and assigned Matthew equipment in the London office and "rights to the libretto of the ScentOpera 'Green Aria.'"[102]

Laudamiel emailed Yule that same day, informing him that it was "GAME OVER" and **[*26]** that he and Capua would soon "be back up and running, AND FREE."[103] The next day, Yule emailed Battelle to assure it of FWGSA's continued "commitment to the development of scenting solutions for HVAC applications."[104] By that time, FWGSA and other entities with business ties had received notice that Aeosphere was in the process of winding up.[105] Yule explained at trial that he sent this email because he was interested in "a license that [he] may be able to sell to somebody else."[106] However, Matthew observes that there were contractual barriers, including Battelle's consent and potential rights of Aeosphere.[107] Laudamiel formed DreamAir

on May 7, but must have planned for this entity in advance, judging from the documents filed that day.[108] On May 10, Matthew emailed Yule to inform him that "[Matthew's] partners in Aeosphere LLC[] have taken steps to dissolve the company" unlawfully and that he intended "to protect [his] rights and interest."[109] Laudamiel caused the filing of Aeosphere's certificate of cancellation on May 12, 2010[110] and forwarded a copy to Yule.[111] At the time of dissolution and winding up, Aeosphere had $21,000 in its bank account.[112]

### D. Post-Winding Up Events

One day after receiving the certificate, Yule informed Battelle that he invited Laudamiel (who "remain[ed] a passionate supporter of EF[E]T") and Capua to join their conference call regarding EFET.[113] The email expressed a willingness of Capua and Laudamiel to fund further testing efforts, including by sending a Battelle engineer to FWGSA's testing facility in Sweden.[114]

The next set of communication Matthew highlights involves a July 28 email from Capua **[*28]** seeking clarification on the business relationship between DreamAir and FWGSA: "[W]e really need to understand how our relationship is going to start."[115] He continued, "I know that you are very busy in more important issue[s] that involve your

---

[97] JX 110 at LCA 001576.

[98] Id.

[99] Id. at LCA 001576-77.

[100] Capua Dep. 166-68.

[101] See Trial Tr. vol. III, 704-05 (Laudamiel).

[102] JX 110 at LCA 001580-81.

[103] JX 126.

[104] JX 159 at FWGSA 010272 ("Please be aware that this has **[*27]** no impact on FlÄkt Woods' commitment to the development of scenting solutions . . . . I do not expect it will be long before Christophe is once again in a position to lend his technical and creative support to this process.").

[105] See id. at FWGSA 010272-73.

[106] Trial Tr. vol. III, 626 (Yule).

[107] Pl.'s Opening Post-Trial Br. 22 (citing JX 5 at FWGSA_000007, FWGSA_000009; JX 6 § 4).

[108] JX 240; Trial Tr. vol. III, 737-45 (Laudamiel) (questioning Laudamiel about the events surrounding the filing).

[109] JX 48 at FWGSA 096730.

[110] JX 405.

[111] JX 129 (informing Yule that "[t]he Dissolution documents were signed yesterday and filed today with the State of Delaware").

[112] See JX 434 at Schedule 7 (closing balance sheet).

[113] JX 161 at FWGSA 010391.

[114] Id.; Trial Tr. vol. III, 747 (Laudamiel).

[115] JX 162 at FWGSA 010618.

Amanda Stubblefield

company but please do not forget about us."[116] Yule replied that his "assumption has been that DreamAir will simply inherit the terms of the agreement previously in place with Aeosphere" but that "[a]s [they] will initially be primarily working with the Prolitec equipment, [FWGSA's] margins will be far smaller."[117] Yule sent DreamAir a draft Collaboration Agreement in October 2010[118] and encouraged Laudamiel to sign.[119] Changes included provisions allowing them "to revisit all of the substantive clauses at a later date."[120] They never formalized the contract.[121] Ultimately, DreamAir sold Prolitec units and Prolitec scents.[122]

E. *Procedural Posture*

This litigation has a long history. Matthew filed his original claim in November 2010 against Laudamiel, Capua, Action 1, FWGSA, and SEMCO.[123] In February 2012, the Court dismissed claims against SEMCO and FWGSA for lack of personal jurisdiction and certain counterclaims filed by Laudamiel, Capua, and Action 1.[124] The Supreme Court

later reversed that decision in part, finding that the Court had personal jurisdiction over FWGSA based on the conspiracy theory of personal jurisdiction.[125] Matthew added DreamAir and FWL in later amended complaints. He moved for partial summary judgment on claims for breach of the LLC Agreement and conversion, which led to a June 2012 opinion generally denying the motion.[126] However, the Court explained that, "unless the Manager Defendants prevail on one of their affirmative defenses or Matthew is unable to prove that he suffered any damages, [Laudamiel and Capua] will be liable for a breach of § 5.2.6(b)(iii) of the LLC Agreement" by winding up Aeosphere without Matthew's approval.[127]

Capua and Action 1 reached a settlement with Matthew, and all relevant claims against them were dismissed **[*30]** with prejudice in April 2014.[128] One condition of the settlement was Capua's agreement to cease funding Laudamiel and DreamAir's legal representation.[129] Counsel for Laudamiel withdrew as of April 10, 2014,[130] and Laudamiel proceeded as a self-represented litigant. One month later, the Court granted

---

[116] *Id.*

[117] *Id.* at FWGSA 010617.

[118] *See* JX 163 (draft agreement).

[119] JX 168 at FWGSA 007007; Trial Tr. vol. III, 642 (Yule).

[120] Trial Tr. vol. III, 679-81 (Yule); *see also* JX 163 at FWGSA 003692-93.

[121] Trial Tr. vol. II, at 529-31 (Yule).

[122] *See* JX 199 (sales summary); Trial Tr. vol. III, 758 (Laudamiel) ("We were nowhere near, and I want to say one or two years away from actually having **[*29]** a [custom] scent sold in a Prolitec device.").

[123] Verified Compl. ¶¶ 7-11.

[124] *Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 38, 2012 WL 605589 (Del. Ch. Feb. 21, 2012)*; *see also Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 72, 2012 WL 983142 (Del. Ch. Mar. 20, 2012)*, rev'd sub nom. *Matthew v. Fläkt Woods Gp. SA, 56 A.3d 1023 (Del. 2012)*.

---

[125] *Matthew v. Fläkt Woods Gp. SA, 56 A.3d 1023 (Del. 2012)*.

[126] *Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572 (Del. Ch. June 29, 2012)*.

[127] *2012 Del. Ch. LEXIS 145, [WL] at *8*.

[128] Stipulation and [Proposed] Order of Partial Dismissal, Apr. 10, 2014.

[129] *See* Mot. of Defs. Christophe Laudamiel, Roberto Capua, Action 1 SRL, and DreamAir LLC to Withdraw Appearances of Their Att'ys of Record and for Stay of Case Management Schedule ¶ 3, Mar. 21, 2014.

[130] Order Granting Mot. to Withdraw Appearances of Gregory V. Varallo and Kevin M. Gallagher of Richards, Layton & Finger, and Roger E. Barton and Randall L. Rasey of Barton LLP, Apr. 10, 2014.

default judgment against DreamAir.[131] Before trial, the Court granted summary judgment on one of Laudamiel's counterclaims, finding that Matthew had not materially breached the LLC Agreement.[132] The Court granted FWGSA's motion for summary judgment on Matthew's unjust enrichment claims but denied the attempt to dismiss the other claims against FWGSA.[133]

## II. CONTENTIONS

By the time of trial, Matthew maintained breach of contract, breach of fiduciary duty, conversion, **[*31]** and unjust enrichment claims against Laudamiel; aiding and abetting and tortious interference with contract claims against FWGSA; and civil conspiracy claims against Laudamiel, FWGSA, and DreamAir.[134] Laudamiel's counterclaims for non-material breach of contract[135] and for breach of fiduciary duty remained as well. Laudamiel did not participate in post-trial briefing, but he did appear for trial and post-trial argument. **HN1**[↑] ] Waiver generally operates to bar issues not briefed. Nonetheless, the Court is aware of the difficulties of proceeding as a self-represented litigant and will consider FWGSA's arguments

---

[131] *Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 287, 2014 WL 2152353 (Del. Ch. May 22, 2014).*

[132] *Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 218, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014).*

[133] *Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 228, 2014 WL 5904716, at *4 (Del. Ch. Nov. 12, 2014).*

[134] Pl.'s Opening Post-Trial Br. 2.

[135] While the Court in *Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 218, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014)* dismissed Laudamiel's material breach counterclaims, *2014 Del. Ch. LEXIS 218, [WL] at *2*, it "[did] not dismiss claims for non-material breach which, perhaps, could justify minimal or nominal damages." *2014 Del. Ch. LEXIS 218, [WL] at *2 n.11.* Laudamiel only sought to allege claims of material breach, but those claims fell short of material breach, arguably remaining after summary judgment as claims for non-material breach.

---

in determining whether Matthew has met his burdens to establish his claims and right to recovery.

Matthew's claims against Laudamiel, while differing in technical elements, largely seek to hold **[*32]** Laudamiel accountable for winding up Aeosphere and pursuing its business without him. Matthew points to earlier opinions effectively finding Laudamiel liable for breach of contract with respect to winding up and employment termination. Matthew also alleges that Laudamiel contravened the LLC Agreement's confidentiality provision. The conversion claim, too, is based on violation of the LLC Agreement (in winding up), although this contractual violation is argued to have breached Delaware's LLC Act. The fiduciary duty claims point to a self-interested effort to misappropriate the benefits of Aeosphere resulting in violations and injury broader than that addressed by the LLC Agreement. Matthew's unjust enrichment claim is similarly based on a scheme to "usurp[] Aeosphere's assets and opportunities for [Laudamiel's] personal benefit."[136] The conspiracy claims against Laudamiel (and DreamAir and FWGSA) are said to have foundation in the above theories.[137] Matthew attacks Laudamiel's counterclaims by claiming a lack of breach, simple disagreement, and lack of demonstrable, material harm.

FWGSA attempts to frame the dispute such that the LLC Agreement governs all potential recovery. Laudamiel's argument perhaps is best described as an effort to clarify and explain his conduct. He did not analyze the legal elements of Matthew's claims or his own counterclaims. Matthew's arguments in reply emphasize waiver.

---

[136] Pl.'s Opening Post-Trial Br. 35.

[137] Pl.'s Post-Trial Reply Br. 27 (identifying breach of fiduciary duty, conversion, **[*33]** and unjust enrichment in support of the conspiracy claims).

The theories of liability remaining against FWGSA are aiding and abetting, tortious interference, and civil conspiracy. With respect to the aiding and abetting claims, Matthew argues that Laudamiel breached his duty of loyalty by favoring personal interests, failing to deal candidly with Matthew, sharing confidential information with business partners, improperly winding up Aeosphere, terminating Matthew, and generally engaging in a scheme to remove Matthew and take Aeosphere's "most valuable assets" for his own business.[138] According to Matthew, there is enough evidence (direct and circumstantial) to find that FWGSA (through Yule) "knowingly facilitated Mr. Laudamiel's breach of trust,"[139] or engaged in a scheme to push Matthew out of Aeosphere and misappropriate the Company's assets. Matthew further draws on a number [*34] of emails to illustrate the breadth of Defendants' actions and the harm he suffered. FWGSA attacks the aiding and abetting claims by arguing that Laudamiel acted in the best interests of Aeosphere,[140] that contract claims supersede the fiduciary duty claims, that FWGSA did not knowingly act to facilitate a breach by Laudamiel, and that no damages resulted from any breach. While directly attacking the elements of the claims, FWGSA also explains Yule's actions in the overall business context.

Matthew's tortious interference claims similarly draw on direct and circumstantial evidence. The focus here, though, is on Yule's knowledge of Matthew's employment agreement and the LLC Agreement and his actions encouraging violation of those contracts. Matthew alleges that FWGSA is liable in tort because Yule encouraged Capua and Laudamiel's breaches, knowing that Matthew was a co-CEO of Aeosphere and having [*35] notice of the LLC Agreement (the latter, two days before the certificate of cancellation was filed). On the other hand, FWGSA asserts that Matthew's claims must fail because FWGSA did not know of "both the [LLC Agreement and the employment] contract[s] and the specific provision[s] allegedly interfered with,"[141] no act of FWGSA caused a breach, the Collaboration Agreement justified FWGSA's acts, and Matthew suffered no damages.

Finally, on the civil conspiracy claims, Matthew describes a conspiracy "for the ultimate purpose of misappropriating Aeosphere's assets to Mr. Matthew's exclusion, actions which were not limited to (but pre-dated and post-dated) the Company's winding up."[142] He bases the claims on Laudamiel's breach of fiduciary duty, conversion (as a statutory violation), and unjust enrichment and adds that the direct and circumstantial evidence presented at trial is sufficient to establish the conspiracy. FWGSA responds that the claims against it must fail because, similar to the aiding and abetting claims, it did not knowingly participate. It disputes the showing of any tort and explains that the members of Aeosphere made the consequential decisions, including the one [*36] to wind up Aeosphere.

Matthew's claims for damages rest on the value of his interest in Aeosphere and the value of his employment agreement. With respect to Aeosphere, the parties primarily debate whether a discounted cash flow or liquidation[143] approach better accounts for its

---

138 Pl.'s Opening Post-Trial Br. 31-32.

139 *Id.* at 37.

140 At oral argument, FWGSA offered that Laudamiel's conduct before winding up Aeosphere (such as engaging in communications without Matthew) should not be evaluated as interested transactions because there was no associated financial benefit. Oral Arg. Tr. 82-83.

141 Defs.' Post-Trial Answering Br. 39.

142 Pl.'s Opening Post-Trial Br. 43.

143 Counsel for FWGSA suggested some distinction between a

value and, if using the former, whether Aeosphere was a start-up or early development stage company. Matthew highlights factors such as Capua's financing commitment and Aeosphere's low capital requirements, valuable contracts with established companies like FWGSA, and ability to proceed whether or not EFET materialized. In response, FWGSA emphasizes Aeosphere's cash shortage, Capua's refusal to contribute additional funds, the management conflict, and EFET's poor prospects. Related debates include the reliability of the valuation inputs, the effect of Capua's preferred units on the calculations, and the extent to which the Court may consider facts that post-date Aeosphere's dissolution. These issues account for the difference between Matthew's measure ($3,184,000) and FWGSA's measure ($0) of Matthew's ownership interest.

Additionally, Matthew contends that he should recover the expected value of his (five-year) employment agreement ($1.4 million) because of Defendants' tortious conduct. FWGSA counters that Matthew has not shown that the alleged wrongful conduct caused the loss in payment. Rather, Aeosphere had insufficient funds to continue its operations and neither Laudamiel nor Capua was willing to act to fund Matthew's salary. The damages dispute ends with Matthew requesting pre-judgment interest for his opportunity costs, compounded quarterly, and FWGSA advocating for simple interest, if any.

## III. ANALYSIS

traditional **[*37]** liquidation methodology and its expert's approach. Oral Arg. Tr. 101 ("I don't think [the expert] was really performing a liquidation analysis. What he did was to say, 'I don't think this is a going concern.'"). Because the expert's approach assumed Aeosphere was not a going concern and for simplicity and convenience, the Court nonetheless refers to this approach as the liquidation approach.

## A. *Legal Standard*

**HN2**[⬆] For Matthew to recover, he must prove his case by a preponderance of the evidence.[144] He bears the burden of proving that "certain evidence, when compared to the evidence opposed to it, has the **[*38]** more convincing force."[145] **HN3**[⬆] Laudamiel's status as a self-represented litigant is afforded some consideration, but Laudamiel chose not to submit post-trial briefing despite inclusion in the scheduling process.[146] Issues not briefed are "generally" considered waived.[147] Thus, the Court deals with the claims against Laudamiel for completeness and largely to determine FWGSA's liability. Because Matthew needs to support his claims for damages, FWGSA's counter-presentation will be considered broadly.

## B. *The Direct Claims*

## 1. Contract Claims

Earlier opinions largely dictate the result on Matthew's contract claims, and the Court need not belabor the point here. In June 2012, the Court held that section 5.2.6(b)(iii) of the LLC Agreement required a unanimous vote to wind up Aeosphere.[148] Although not specifically the

---

[144] *See Estate of Osborn ex rel. Osborn v. Kemp, 2009 Del. Ch. LEXIS 149, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009)* ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd, 991 A.2d 1153 (Del. 2010)*.

[145] *In re Mobilactive Media, LLC, 2013 Del. Ch. LEXIS 26, 2013 WL 297950, at *9 (Del. Ch. Jan. 25, 2013)* (internal quotation marks omitted).

[146] *See* Oral Arg. Tr. 3-5. 30

[147] *See Del. Transit Corp. v. Amalgamated Transit Union Local 842, 34 A.3d 1064, 1068 n.4 (Del. 2011)*.

[148] *Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012)*.

subject of that opinion, sections 5.2.6(b)(i) and (ii) fall under the same umbrella: a unanimous vote was required to terminate Matthew's employment agreement and dispose Aeosphere's assets.[149] Matthew did not vote to terminate his employment agreement, wind [*39] up Aeosphere, or divide the assets. There is also an allegation that Laudamiel breached Section 10.10 of the LLC Agreement, which prohibited use and disclosure of "financial or business data, . . . contracts or agreements entered into by or on behalf of [Aeosphere,] or other proprietary information."[150] Laudamiel undoubtedly shared information about separation discussions with FWGSA. He sought Yule's help to push along confidential separation negotiations. The question then, foreshadowed in the Court's June 2012 opinion, is whether Laudamiel "prevail[s] on one of [his] affirmative defenses or Matthew is unable to prove that he suffered any damages."[151]

The Court provided a partial answer [*40] in an October 2014 opinion, in which it found that Matthew had not committed any material breach to excuse Laudamiel's.[152] Laudamiel maintained two counterclaims leading into trial: non-material breach of contract and breach of fiduciary duty.[153] These claims generally involve "(1) acting unilaterally without approval; (2) failing to agree on or approve various contracts or courses of action for Aeosphere; and (3) failing to attend important meetings and events."[154] Laudamiel did not participate in post-trial briefing, but at post-trial oral argument he noted Matthew's failure to bring in clients as promised, a neglect of responsibility to prepare a business plan, and a general sentiment that Matthew "killed" projects.[155] The Court acknowledges the difficulty of proceeding as a self-represented litigant (and in a foreign language), but, as Matthew observes, Laudamiel has neither substantiated that the "harm" was more than legitimate disagreement between business partners nor proved losses from Matthew's conduct.[156]

The Court discusses damages below. For present purposes, the Court observes that Matthew has only supported claims for his ownership interest in Aeosphere and compensation under his employment agreement.[157] In his Opening Post-Trial Brief, Matthew does mention that he "should be granted equitable restitution for Mr. Laudamiel's unjust enrichment (or, alternatively, the imposition of a constructive trust over any future income Mr. Laudamiel

---

[149] Id. ("The only reasonable interpretation of § 5.2.6(b) is that it required the approval of all three Managers to approve the enumerated actions.").

[150] LLC Agreement § 10.10. In the Pretrial Stipulation and Order, Matthew raised the question of whether the emergency meeting was properly called. Stip. § III.A ¶ 4. This issue was not developed in the post-trial briefing, and any violation would not materially affect Matthew's recovery.

[151] Matthew v. Laudamiel, 2012 Del. Ch. LEXIS 145, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012). The Court declined to grant Matthew's motion for summary judgment on his conversion claim (based on breach of the LLC Agreement) for the same reasons. 2012 Del. Ch. LEXIS 145, [WL] at *11.

[152] Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 218, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014).

[153] Def. Christophe Laudamiel's Verified Answer to Fourth Am. Verified Compl. and Countercls. ¶¶ 111-18.

[154] Matthew v. Laudamiel, 2014 Del. Ch. LEXIS 218, 2014 WL 5499989, at *2 (Del. Ch. Oct. 30, 2014).

[155] Oral Arg. Tr. 108-09. He also briefly mentioned that Matthew would discuss projects [*41] with Yule alone, but he "had no problem with [that]." Id. at 107.

[156] See Pl.'s Opening Post-Trial Br. 56-57 (incorporating Pl.'s Opening Pre-Trial Br. 28-33, 56-59).

[157] The Joint Pre-Trial Stipulation and Order asks for an injunction against [*42] use of Aeosphere's assets, an order for an accounting, a constructive trust, and attorneys' fees and costs. Matthew does not seriously develop these claims in his post-trial briefing. Furthermore, Matthew has not convinced the Court to award attorneys' fees against Laudamiel, a self-represented litigant.

and DreamAir will receive by reason of their wrongful conduct)."[158] His focus, however, is on the value of his units and his employment agreement, and he has not demonstrated enrichment beyond the value captured by his share of Aeosphere.[159] This point is significant because Matthew cannot recover multiple times on his various theories. The Court is satisfied that Matthew's showing on the breach of contract claims supports any damages that he can prove from the unlawful winding up of Aeosphere and termination of his employment agreement.[160]

## 2. Non-Contract Claims

The Court analyzes Matthew's non-contract claims against Laudamiel (breach of fiduciary duty, conversion, and unjust enrichment[161]) because of their potential impact on FWGSA's liability. Matthew's fiduciary duty claims look to Laudamiel's conduct over the entirety of the Aeosphere-FWGSA relationship, with the winding up just one (though a "critical"[162]) step along the way. In addition, [*43] Matthew alleges a breach of loyalty by the very acts of improperly winding up Aeosphere[163] and failing in his "obligation to deal candidly" with Matthew.[164] FWGSA frames the dispute as

one about discrete acts associated with violations of Sections 5.2.6(b)(i)-(iii), 9.3, and 10.10 of the LLC Agreement—namely firing Matthew, distributing Aeosphere's assets, winding up Aeosphere, and disclosing confidential information.[165]

Laudamiel breached his fiduciary duties if he acted for a purpose other than to promote the best interests of Aeosphere.[166] Except for general arguments that the scent-related intellectual property rights he took were worthless to Matthew[167] and that it was impossible to conduct business with Matthew, Laudamiel has not defended against Matthew's claim of disloyalty in the winding up process, distributing Aeosphere's assets [*44] in a way that would facilitate future scenting work, creating DreamAir, and filing the termination paperwork on May 12. Although the DreamAir-FWGSA partnership did not prove profitable, the Court cannot find that Laudamiel did not act in anticipation that it would. Laudamiel shared confidential information and, though often for the benefit of Aeosphere's business, some of that sharing went toward asking for help in manipulating the negotiation process. Matthew has met the prima facie requirements for fiduciary duty claims. These claims remain to the extent that they might facilitate recovery against FWGSA.[168] Matthew has not shown injury

---

[158] Pl.'s Opening Post-Trial Br. 35.

[159] Cf. Pl.'s Opening Pre-Trial Br. 52 ("To the extent the Court may find after trial that Mr. Matthew cannot adequately be compensated by an award of damages, equitable restitution for unjust enrichment is appropriate." (emphasis added)). An award of damages accounting for the value of the intellectual property taken should adequately compensate Matthew.

[160] The argument for different remedies for tort and contract is discussed in the context of damages, infra.

[161] The conspiracy claims are said to rest on these three underlying claims and are addressed in more detail in connection with the claims against FWGSA.

[162] Pl.'s Post-Trial Reply Br. 1.

[163] Id. at 25 n.6.

[164] Pl.'s Opening Post-Trial Br. 31 (internal quotation marks omitted).

[165] See, e.g., Defs.' Post-Trial Answering Br. 35-36 (arguing that the contract claims bar the fiduciary duty claims); id. at 44 n.7 (noting "the primacy of contract theory").

[166] HN4[↑] ] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." In re Orchard Enters., Inc. S'holder Litig., 88 A.3d 1, 33 (Del. Ch. 2014) (alterations and internal quotation marks omitted). Although Laudamiel was a director of an LLC, [*45] no one disputes that he owed fiduciary duties to Aeosphere.

[167] Oral Arg. Tr. 111-12.

[168] The Court is not deciding that every breach of contract that

independent of that subsumed by the contract or the fiduciary duty claims (and their indirect causes of action discussed below), and the Court need not address the conversion claims and the unjust enrichment claims in detail.[169]

C. *The Indirect Claims*

1. The Aiding and Abetting **[*46]** Claims

As relevant in light of the above, Matthew argues that the evidence shows conduct "so suspect" that the Court can find that FWGSA knowingly participated in Laudamiel's breach of fiduciary duty.[170] *HN5*[⬆] The elements of an aiding and abetting claim are "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a nonfiduciary defendant knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary."[171] The Court does not require a figurative smoking gun, and knowledge can be inferred under circumstances where conduct is particularly suspect.[172] Knowing participation

requires a showing "that the nonfiduciary act[ed] with the knowledge that the conduct advocated or assisted constitutes such a breach."[173]

Matthew characterizes Yule's wrongdoing as "an executive at . . . a contractual partner of Aeosphere[] interject[ing] himself into an internal dispute within the company."[174] Matthew's analysis of Yule's knowledge, accordingly, looks to the "overall course of conduct with the motive and objective of removing Mr. Matthew from Aeosphere."[175] Although parts of the story remain unclear, the Court can find with confidence that Yule did not know until after the May 4 vote that Capua's and Laudamiel's actions would be improper and that early May is a proper focal point for determining FWGSA's liability. Further discussion of the facts is warranted, especially to explain why the Court does not find a broad and longstanding scheme to wind up Aeosphere.

Matthew begins **[*48]** his Opening Post-Trial Brief by discussing the events of October 2009. By then, Aeosphere's members were considering separate divisions of, and roles within, Aeosphere. Over the following months,

---

involves some planning or discussion supports a fiduciary duty claim. The facts here show months of discussions, combined with potential pecuniary interests. These claims might have been dismissed if Laudamiel had retained an attorney, but the Court will not act on such speculation.

[169] The conversion claim involves unlawfully depriving Matthew of his units, covered by damages the Court will award for the violation of LLC Agreement § 5.2.6(b)(iii). The Court notes, without deciding, that it seems circular to find an independent statutory claim for violating a contract, based on the LLC Act's facilitation of private ordering. *See* Pl.'s Opening Post-Trial Br. 34 (invoking 6 Del. C. § 18-801(a)(1)-(2)).

The unjust enrichment claims were based on "the unlawful winding up of Aeosphere, which represented the culmination of . . . [the] scheme . . . to remove Mr. Matthew . . . , for the purpose of usurping Aeosphere's assets and opportunities for [Laudamiel's] benefit," rather than an injury independent of that already discussed. *Id.* at 35. *See also supra* note 159.

[170] Pl.'s Opening Post-Trial Br. 37.

[171] *Triton Constr. Co. v. E. Shore Elec. Servs., Inc., 2009 Del. Ch. LEXIS 88, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009)*, aff'd, **988 A.2d 938 (Del. 2010)** (TABLE).

[172] *Id.*

[173] *Id.* As the Court explains in a footnote in *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, *HN6*[⬆] the requirement to show knowledge in an aiding and abetting claim is important to "facilitate[] the commercial interaction of corporate entities." 965 A.2d 715, 747 n.88 (Del. Ch. 2008). The alternative would produce an undesirable result: "whether a particular act by a board constitutes a breach **[*47]** of fiduciary duty is highly context specific, such third-parties would have to undertake extensive due diligence in order to assure themselves that the board had not breached a duty in authorizing the transaction." *Id.*

[174] Oral Arg. Tr. 16. Matthew also specifies that Yule went too far by "assisting one side in that dispute, . . . facilitating their knowledge, [and] creating an imbalance in the knowledge between Mr. Matthew and the adverse parties." *Id.* at 23.

[175] *Id.* at 20.

Matthew was excluded from meetings and communication. By February, Capua and Matthew were discussing a split of the company and had retained counsel, signifying the seriousness of their attempt to resolve the problems. An email from April 7 suggests that Matthew had decided to walk away from negotiations, but the negotiations continued. Capua has asserted that Matthew's April 23 email was the final straw.[176] Capua claims to have consulted his counsel at that point and to have decided to dissolve Aeosphere.

Yule, of course, played some role in the managers' dispute, as the email record proves. Matthew did not authorize discussions of internal affairs, but both sides asked Yule for help to a certain degree. Yule was not opposed to working with Matthew, although Yule stated that Laudamiel provided more value to the collaboration. Yule also told at least one business partner about Aeosphere's management difficulties. On April 28, Laudamiel informed Yule about the "Commando Operation" through [*49] an email asking for more time to review certain terms with Prolitec and mentioning unexpectedly "find[ing] the jungle in New York."[177] It was not until May 10, however, only two days before the certificate of cancellation was filed, that Yule received from Matthew actual notice that Capua and Laudamiel possibly violated the LLC Agreement.[178]

One could argue that the negotiations for a mutual agreement on splitting Aeosphere were pretextual and part of a bigger secret plan, of which Yule knew early on. Nonetheless, evidence of continued business through months of negotiations and the eventual involvement of counsel makes Defendants' position the more probable.[179] A longstanding scheme to push someone out and steal assets is not consistent with spending months in negotiations with that person and notifying him of a meeting at which he could vote in opposition.[180] The July 28 email from [*50] Capua pleading that Yule "not forget about [DreamAir]" and the Collaboration Agreement markup offer further support. If Capua, Laudamiel, and Yule contrived to take the Scent Project for themselves, Capua should not have had to implore Yule to move forward with the DreamAir-FWGSA relationship. The agreement Yule proposed would likely not have avoided concrete terms.

At most, the Court can find that Laudamiel and Capua formed a plan, by late April, to engage in a "Commando Operation" of withdrawing cash[181] and calling an emergency meeting to pursue, among other items, dissolution.[182] Yule's (literally fitting) response to the "Commando Operation" email, imagining Laudamiel "crawling through the undergrowth in . . . camo-paint,"[183] suggests that he [*51] was clueless about Laudamiel's intentions (but was trying to be socially responsive).[184] That

---

[176] Id. at 76-77; JX 39.

[177] JX 158 at FWGSA 010215. Laudamiel contends that the dissolution decision came in May, Oral Arg. Tr. 106, but a privilege log entry discussed at trial suggests that Laudamiel was aware of a preliminary agenda for the emergency meeting by April 29. Trial Tr. vol. III, 712-14 (Laudamiel).

[178] Oral Arg. Tr. 87-88; JX 48 at FWGSA 096730.

---

[179] Matthew argues that the Court can infer knowledge or rely on circumstantial evidence in support of his various claims. HN7[↑] Circumstantial evidence can prove a fact if the fact "follows as a natural or very probable conclusion from the facts actually proven." In re Purported Last Will & Testament of Langmeier, 466 A.2d 386, 402 (Del. Ch. 1983). The Court reaches its factual conclusions with this authority in mind.

[180] Matthew had notice but chose not to participate in the May 4, 2010, meeting. JX 110 at LCA 001576 (emergency meeting minutes).

[181] JX 158.

[182] JX 109.

[183] JX 158 at FWGSA 010215.

[184] Yule's email said, "Good luck with the raid!" Id. Yet it does not make sense that Yule would send Laudamiel a "rush"

Yule was involved in confidential communications and clearly favored Laudamiel does not lead to a natural or probable conclusion that he knew about the emergency meeting and that Capua and Laudamiel would engage in wrongful conduct.

By May 10, Yule knew that Matthew thought the winding up had been conducted unlawfully. That said, there is no direct evidence that Yule knew he was advocating wrongdoing by pushing the parties to resolve their differences,[185] and his actions between May 4 and 121[186] are not so suspect that the Court can infer knowing participation in the illicit winding up effort.[187] At most, Yule emailed business partners (who had previously received notice of the winding up on May 5), asked for documentation that Aeosphere was no longer in business,[188] and invited **[*52]** Laudamiel to join a conference call (sometime between May 12 and 13).[189] Yule walked the line by expressing his opinions throughout the entire Aeosphere-FWGSA relationship, but the evidence does not show that he knowingly participated in a breach of fiduciary duties relating to the winding up effort.

Admittedly, there is ample evidence that Yule conveyed information about management conflict to a third party and participated in discussions about management issues to an extent unknown by (and actively concealed from) Matthew. However, Aeosphere and its members suffered no harm from these acts. It is likely that Yule had a sense of the disagreement from Matthew and Laudamiel's attempts to communicate with him on an individual basis. Despite Matthew's attempts to keep negotiations confidential, Matthew's yelling at Laudamiel at a Scent Opera venue was no secret. Yule's statement to a potential third-party partner that Matthew was soon to leave did not cause that partner to terminate relations with either FWGSA or Aeosphere.[190] If anything, the negotiations with business partners enhanced Aeosphere's profitability. Yule explained that Laudamiel was the more valuable co-CEO to FWGSA—a scenting project needs a skilled perfumer—and that appears to have been true despite Matthew's **[*54]** contrary personal beliefs. The Court fails to see how Yule's repeating true information is actionable misconduct. The emails do not say that Matthew must quit or be fired. Yule stated that he was willing to work with both co-CEOs. Reminding the managers that their squabbles were hurting business is generally not objectionable. Instructing the managers to end their relationship lawfully, in the right context, is not necessarily wrongful.

Matthew's argument that Capua and

---

[185] Yule testified that he had never received a copy of the LLC Agreement. Trial Tr. vol. II, 479, 501 (Yule). On cross examination, he was questioned about the extent of his knowledge of Laudamiel's employment rights, but not his lack of receipt. See Trial Tr. vol. III, 653-56 (Yule). The Court does not seek to create an insurmountable burden of due diligence in commercial transactions with third parties by requiring in depth knowledge of all governing documents to avoid contributing to a potential breach.

[186] Once the certificate of cancellation was filed on May 12, Capua and Laudamiel no longer owed fiduciary duties to Aeosphere. See *Comerica Bank v. Global Payments Direct, Inc., 2014 Del. Ch. LEXIS 136, 2014 WL 3779025, at *14 n.120 (Del. Ch. Aug. 1, 2014)* (citing cases to distinguish between duties owed before and after termination of a joint venture).

[187] See Pl.'s Opening Post-Trial Br. 16-23 (reciting facts).

[188] Trial Tr. vol. II, 510-11 (Yule); see also JX 129 (May 12 email from Laudamiel attaching minutes from May 4).

[189] See **[*53]** JX 161 at FWGSA 010391. In a May 13 email,

request to read and comment on "Flaktwoods — Prolitec business terms" if he knew that Laudamiel was occupied with a crucial part of their alleged scheme. See id. at FWGSA 010215-16.

---

Yule indicates that he has invited Capua and Laudamiel to join the call. That email followed an email from May 12 in which Yule mentioned looking forward to the call. 41

[190] See JX 157 at FWGSA 009532.

Laudamiel would not have dissolved Aeosphere without assurance of Yule's support, raised in the context of the tortious interference claims, is also relevant on the point of resulting damages.[191] Capua and Laudamiel clearly valued FWGSA's support, but the inferences that can be drawn from Yule's "poor set of words"[192] do not outweigh the testimony and emails showing independent disagreement among Aeosphere's members and the escalation of the negotiations. Yule had expressed support for Laudamiel since at least October and sent his 100% commitment email in January.[193] The managers subsequently engaged in months of negotiations. Yule's belated involvement at most accelerated the already inevitable deterioration **[*55]** in Aeosphere's management relationships—it did not cause independent harm.[194] In sum, the aiding and abetting claims fail for lack of knowing participation and harm.

## 2. The Tortious Interference Claims

FWGSA's opposition to the tortious interference claims centers around whether Yule had the requisite knowledge of the LLC Agreement (and its particular provisions), the causal chain, and justification. **HN8**[⬆] A claim for tortious interference requires that "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was

a **[*56]** significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury."[195] Tortious interference involves not only knowledge that a contract exists but also intent to interfere with that contract.[196] **HN9**[⬆] The justification element depends on factors such as:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.[197]

**HN10**[⬆] The Court evaluates tortious interference claims, including possible justification, mindful that "some types of intentional interference with contractual relations are a legitimate part of doing business."[198]

Again, the Court starts with the premise that the potential violations are disclosure of confidential information and unlawful acts associated with **[*57]** winding-up, not a broad scheme. The tortious interference analysis focuses on Yule's knowledge of the LLC Agreement and attached employment contract,

---

[191] *E.g.*, Pl.'s Post-Trial Reply Br. 27.

[192] Trial Tr. vol. II, 469 (Yule).

[193] *See* Pl.'s Opening Post-Trial Br. 4-5 (citing the October 23 email to create a scheduling conflict).

[194] The Court finds that while Yule was aware that Laudamiel and Capua were taking a hard line with Mathew, there is no indication that Yule knew prior to the dissolution meeting that unanimous approval was required to oust Matthew or that doing so without unanimous approval would violate the LLC agreement. Yule was on notice of the dissolution's impropriety only after Matthew so informed him in a post-meeting email, JX 48 at FWGSA 096730, which Yule may or may not have believed.

---

[195] *WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P. ("WaveDivision II"), 49 A.3d 1168, 1174 (Del. 2012)* (internal quotation marks omitted).

[196] *NAMA Hldgs., LLC v. Related WMC LLC, 2014 Del. Ch. LEXIS 232, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014).*

[197] *WaveDivision II, 49 A.3d at 1174* (citing *Restatement (Second) of Torts § 767* (1979)).

[198] *NAMA Hldgs., LLC, 2014 Del. Ch. LEXIS 232, 2014 WL 6436647, at *26.*

but the relevant facts are similar to those above. Yule had not known about the LLC Agreement (much less that Capua and Laudamiel were violating any provision of it) until May 10. As between the time of notice and the time that Laudamiel filed the certificate of cancellation (two days later), Matthew points to no act that significantly affected the filing of the certificate of cancellation or resulted in loss to Aeosphere, as discussed above.

As previously mentioned, Matthew argues that Capua would not have wound up Aeosphere if he did not have Yule's commitment to work with a new business.[199] For support, Matthew quotes a deposition passage in which Capua addressed the topic of asking Yule whether he would be willing to work with successors to Aeosphere, where Aeosphere would be divided into two companies led by Matthew and Laudamiel separately. Capua also recalled a concern that "without Flakt Woods Aeosphere would collapse."[200] At most, such facts could support an inference that Yule's support was significant in Capua's decision to wind up **[*58]** Aeosphere. However, Capua's conduct is not at issue, and expressing a willingness to work with two different businesses does not show that Yule knew about the LLC Agreement, intended a breach of that agreement, or acted between May 10 and 12 to effectuate such a breach. If Yule's support caused the harm of winding up Aeosphere, it would mean that Capua and Laudamiel wasted months of their time and legal fees in negotiations and in operating Aeosphere—the more likely scenario is that Capua and Laudamiel grew tired of dealing with Matthew.

With respect to the employment agreement (which was part of the LLC Agreement),

Matthew alleges that there is enough evidence to find that Yule knew about it early on and intentionally interfered. He cites Yule's testimony and the Collaboration Agreement (with its amendments) that Matthew signed as co-CEO. On the other hand, Yule testified that he did not "know if [Matthew and Laudamiel] were working for Aeosphere with a salary or if they were simply shareholders and drawing dividends."[201] As FWGSA observes, **_HN11_[⬆]** the mere existence of an employment agreement **[*59]** does not permit a finding that an employee has a right to a term of continued employment—a number of cases addressing the implied covenant of good faith and fair dealing recognize a presumption under Delaware law that employment contracts are "at-will in nature with duration indefinite."[202] That one can interfere without understanding the legal effect of a contract does not negate the requirement of intending to interfere with something in the first place. There is also no reason to doubt Yule's position that FWGSA would have been amenable to working with Aeosphere as two separate companies or that he hoped that "peace" would ensue. Even if there were some knowledge of a contract, Matthew has failed to establish the critical element of intent to interfere with Matthew's employment.

Additionally, FWGSA prevails on the justification element. Yule expressed that Laudamiel's skill was more valuable to FWGSA, a true statement, and did not make overt threats.[203] He did, however, exert pressure (at times prompted by Laudamiel),

---

[199] Pl.'s Opening Post-Trial Br. 42 (citing Capua Dep. 115); Pl.'s Post-Trial Reply Br. 26-27.

[200] Capua Dep. 115.

[201] Trial Tr. vol. II, 502 (Yule).

[202] Defs.' Post-Trial Answering Br. 40-41 (quoting _Bailey v. City of Wilm._, 766 A.2d 477, 480 (Del. 2001)).

[203] _See generally_ Def. Fläkt Woods Group SA's Mem. of Law in Supp. of Its Mot. for Summ. J. 25-32. Matthew also incorporates earlier filings on the justification issue. _See_ Pl.'s Opening Pre-Trial Br. 45-49.

and there was some disingenuousness in his representation that FWGSA's board would get involved. **[*60]** More importantly, though, FWGSA was invested in a Collaboration Agreement that it hoped would differentiate itself from the competition in the air-handling market, and therefore had a proper motive[204] (and interest[205]) in urging its business partner[206] to resolve its management disputes. FWGSA concedes that Yule's conduct interfered with valid contracts, but justification does not require all factors to be met. Finally, as noted above, the weight of the evidence is that Yule was not the deciding factor in the winding up (although Yule did cause some disclosure of confidential information for which the Court has found no independent injury). The Court cannot ignore the progression of the separation negotiations and the value of the Scent Project to FWGSA and Aeosphere. Therefore, for reasons of justification and lack of knowledge, intent, and injury, the tortious interference claims fail.

### 3. The Conspiracy Claims

FWGSA argues that the conspiracy claim must fail for the reasons the aiding and abetting claims do: namely the lack of a wrongful act, knowing participation, and harm.[207] **HN12**[⬆] A

---

[204] *See* WaveDivision II, 49 A.3d at 1174 ("Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding **[*61]** of improper interference.").

[205] *See* WaveDivision Hldgs., LLC v. Highland Capital Mgmt. L.P. ("WaveDivision I"), 2011 Del. Super. LEXIS 479, 2012 WL 3224310, at *12 (Del. Super. Aug. 7, 2012) ("It was not improper for the defendants to interfere with the Wave Agreements in order to protect their own financial interest in Millennium."). However, both FWGSA's interest in protecting its investment in the Scent Project and Matthew's interest in his contract rights without interference by third parties were important. *See* 2011 Del. Super. LEXIS 479, [WL] at *13 (discussing "[t]he societal interests in protecting the freedom of action of the actor and the contractual interests of the other." (emphasis removed)).

[206] The parties' economic relationship weighs in favor of justifying FWGSA's involvement. *Id.*

claim for conspiracy requires "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage."[208] Because "a plaintiff often cannot produce direct evidence of a conspiracy," circumstantial evidence can be offered as "'proof that it occurred.'"[209] Without rehashing **[*62]** the arguments above, the claims of FWGSA's involvement in a "conspiracy" of breaching confidentiality or excluding Matthew fail as against FWGSA because either (1) no act of Yule was in furtherance of winding up Aeosphere or (2) no actual losses resulted. There was no "confederation" involving FWGSA regarding dissolution, winding up, and terminating Matthew's employment agreement—Yule did not know about Capua and Laudamiel's plans until after their acts had occurred (and he did not cause any harm once he had notice of potential wrongdoing). The exchange of confidential information did not produce any quantifiable harm to Aeosphere or Matthew. In contrast, Matthew succeeds on his claim against DreamAir. Laudamiel acted to form DreamAir before Aeosphere's certificate of cancellation was filed, and (anyway) default judgment has been entered against DreamAir. The breaches of fiduciary duty by Laudamiel (at a minimum) support holding DreamAir responsible for the damages, discussed below, on equal footing with Laudamiel. Thus, Matthew's conspiracy claims succeed to the extent that he can recover (once) for his injury.

### D. *Damages*

Based on the above, Matthew **[*63]** maintains claims for damages against Laudamiel and

---

[207] Defs.' Post-Trial Answering Br. 43.

[208] Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987).

[209] Reid v. Siniscalchi, 2014 Del. Ch. LEXIS 237, 2014 WL 6589342, at *6 (Del. Ch. Nov. 20, 2014).

DreamAir but not FWGSA. Matthew seeks compensation for the value of his ownership interest in Aeosphere (the "remedy for conversion of . . . Matthew's Aeosphere membership units"[210]) and his employment agreement (the remedy for "a breach that was tortiously encouraged . . . by FWGSA"[211]). According to Matthew, these damages total $4,584,000 plus interest. Matthew must prove that he is entitled to this amount to attain his full recovery, although the Court views its task as analogous to an appraisal and will exercise discretion in determining the appropriate valuation.[212]

A few preliminary issues should be addressed. First, the Court declines to balance the qualifications of the expert witnesses, Kevin Vannucci ("Vannucci") for Matthew and G. Matt Barberich, Jr. ("Barberich") for FWGSA, other than to note that they were sufficient to present opinions at trial. Second, the parties do not argue that the LLC Agreement offers a standard for determining damages for a breach, although Section 9.3 governs how payments are to be made after dissolution. Third, consistent with an appraisal, the Court does not factor in events or facts unknowable as of the relevant date for valuation purposes, here May 12, 2010.[213] Finally, the Court has

not sought out the details of Matthew's settlement with Capua, but Matthew cannot recover twice for the same harm.

Amidst the debate over whether Aeosphere should be considered a going concern or should be treated [*65] as if it had been liquidated,[214] the Court is convinced that neither side's account presents the entire story. If Aeosphere were worthless, it does not make sense that Laudamiel would specifically assign himself intellectual property and continue to work on a modified version of the Scent Project. On the other hand, the EFET system was not marketable by May 2010, reducing Aeosphere's potential for profitability.

The entirety of the financial and other evidence demonstrates that Aeosphere was in dire financial straits. The Company could not even afford to pay Matthew and Laudamiel, its own co-CEOs, given its inadequate cash flow. The business continued to suffer as the co-CEOs failed to cooperate. Further, Aeosphere had considerable debt and at best a suboptimal product to sell. No evidence existed of any potential investor other than Capua, and by all accounts Capua refused to commit additional

---

[210] Pl.'s Opening Post-Trial Br. 44.

[211] *Id.* at 55. In the reply brief, Matthew frames the issue as a remedy for tortious interference, which the Court has already rejected. The Court will, however, consider the value of the employment contract for thoroughness and to address any lingering concern about Laudamiel's liability.

[212] See *Montgomery Cellular Hldg. Co. v. Dobler, 880 A.2d 206, 221 (Del. 2005)* (*HN13* ↑) "In a statutory appraisal proceeding, each side has the burden of proving its respective valuation positions by a preponderance of the evidence. Even if one side fails to satisfy its burden, the Court . . . must use its own independent judgment to determine fair [*64] value." (footnote omitted)). Again, the Court will consider FWGSA's damages arguments above.

[213] See, e.g., *Gearreald v. Just Care, Inc., 2012 Del. Ch.*

---

LEXIS 91, 2012 WL 1569818, at *5 (Del. Ch. Apr. 30, 2012) ("The Court should consider all factors known or knowable as of the Merger Date that relate to the future prospects of the Companies, but should avoid including speculative costs or revenues." (internal quotation marks omitted)).

[214] FWGSA argues that a discounted cash flow method does not produce a useable result in Aeosphere's case because it is not a going concern, it lacks a history of revenues, and lacks reliable inputs. *See, e.g.,* Defs. Fläkt Woods Group SA and Fläkt Woods Limited's Mem. in Further Supp. of Their Mot. In Limine to Preclude Testimony of Kevin Vannucci 4-6. Another problem is that it is difficult to place a value on specific Aeosphere assets, such as the Scent Opera, but that does not appear to have inflated Vannucci's calculations. Matthew contends that "this Court has not applied a liquidation-based valuation . . . to appraise equity shares." Pl.'s Post-Trial Reply Br. 31. He also raises concerns that using liquidation value "incentivize[s] fiduciaries to simply pursue dissolution of an entity and [*66] transfer its liquidated assets to a new business rather than through a merger that might trigger appraisal rights." Oral Arg. Tr. 44-45.

capital.[215] Finally, if one makes the generous assumption that Aeosphere's cash burn rate was $30,000 per month (based in part on the co-CEOs foregoing salaries),[216] its bank account would have sustained operations for only another five to six months. There was some subjective optimism about EFET, though successful adaption of the technology to the commercial context was far from certain and never in fact materialized. As mentioned, Vannucci's cash flow projections assumed a viable EFET product, and were prepared by individuals motivated to promote Aeosphere. For these reasons, [*67] the Court cannot adopt Vannucci's valuation wholesale.

The liquidation approach is also imperfect because it does not address the Court's concerns about the distribution of Aeosphere's assets—particularly its intangible assets. Barberich's analysis worked off of the closing balance sheet in Vannucci's report,[217] and the value of the Scent Project was not included in the balance sheet.[218]

As noted above, Aeosphere was running on fumes, and hindsight proves that the Scent Project (never able to use EFET) was not profitable. At the time of the winding up, however, Aeosphere, despite its troubles, was a going concern with value [*68] in its intellectual property and potentially lucrative contracts with well-established entities such as

FWGSA. Recognizing that Aeosphere had some value as a going concern, but mindful of the speculative nature of Aeosphere's product and future cash flows, the Court adopts Vannucci's discounted cash flow model with a reduced enterprise value and allocates a 35% interest to Matthew.

Vannucci, in his valuation, utilized venture capital rates of return for purposes of selecting a discount rate.[219] In making this selection, Vannucci's first task was to classify Aeosphere into one of five stages of development, each of which is designated a distinct range of potential discount rates.[220] The first stage, a start-up stage investment, is one in which "[t]he venture funding is to be used substantially for product development, prototype testing, and test marketing."[221] The second stage, an early development stage investment, is one "made in companies that have developed prototypes that appear viable and for which further technical risk is deemed minimal."[222]

In classifying Aeosphere, the Court considers the following facts: First, Aeosphere had been in business for over a year, had contracts of value, and held some expectation that the Prolitec technology would suffice until EFET became marketable. Second, the parties were clearly interested in EFET, and Laudamiel and Capua did not just walk away from Aeosphere. Third, while Vannucci's valuation utilized projected cash flows assuming a viable EFET

---

[215] Aeosphere might have had a breach of contract claim, but that would not be a source of immediate and reliable funding to continue its operations.

[216] The Court adopts this number for hypothetical purposes only. This figure is part of what Vannucci considered when determining that Aeosphere could be valued as a going concern. See Trial Tr. vol. IV, 990-91, 994-96 (Vannucci).

[217] JX 287 at 4 (explaining that Barberich would temper Vannucci's "aggressive" calculations but emphasizing that even Vannucci's balance sheet shows that Aeosphere "had no value").

[218] See JX 434 at Schedule 1 & n.4.

[219] Trial Tr. vol. IV, 1003 (Vannucci) (reasoning that Aeosphere's youth renders the CAPM less reliable than the established "VC rates of return"); JX 434 at [*69] Schedule 4.

[220] Trial Tr. vol. IV, 1005-06 (Vannucci).

[221] JX 287 at 32. Potentially acceptable discount rates for a start-up stage investment range from 50% to 125%. JX 434 at Schedule 4.

[222] JX 287 at 33. Potentially acceptable discount rates for an early development stage investment range from 40% to 70%. JX 434 at Schedule 4.

technology, the Court's calculation considers EFET a mere expectancy and assumes use of the then-viable Prolitec technology.[223] Given these facts, Aeosphere can reasonably be considered an early development stage company. The Court, therefore, adopts Vannucci's discount rates—40% for the FWGSA projections and 50% for the Aeosphere projections—both of which fall within the range of acceptable rates for an early development stage company. [*70] [224]

Vannucci's free cash flow inputs, however, assumed a viable EFET technology, and were therefore inflated.[225] To compensate, the Court, in its independent valuation, reduced the free cash flows to one-fifth of their projected value.[226] This reduction is consistent with Yule's testimony regarding the value of the scenting project absent viable EFET technology.[227] Yule, however, further stated that if the Prolitec relationship was not exclusive (which it was not[228]), the projections

"would drop again by a factor of about ten."[229] In hindsight, therefore, the adjusted projections could reasonably be reduced to as little as two percent of the originals.[230]

The Court's decision to reduce the projected free cash flows to one-fifth, as opposed to some lesser value between one-fifth and one-fiftieth, [*72] is deliberate. At the time of the valuation, the EFET technology lingered as a possibility. Therefore, the projected free cash flow, while assuming the use of Prolitec technology, must also incorporate the expected value of the EFET technology as of the time of the valuation. The Court incorporates such value by reducing the projected free cash flows by the minimum factor suggested by Yule, as opposed to reducing them further given the lack of an exclusive agreement with Prolitec.[231] The possibility that EFET-based products could be ready to sell within a year of a successful test is further counterbalanced by the improbability that the co-managers would have outlasted the testing.

Applying the 40% and 50% discount rates respectively to FWGSA's and Aeosphere's adjusted free cash flow projections results in a weighted[232] value of $1,908,066.56 for the

---

[223] This fact is relevant because Prolitec was an existing technology that "appear[ed] viable"—even though its use would presumably reduce margins relative to the yet unperfected EFET technology—further justifying Aeosphere's "early development" classification.

[224] JX 434 at Schedule 4.

[225] While the Court adopts Vannucci's valuation model and discount rates, the Court finds credible Yule's testimony regarding the appropriate cash flow reduction to compensate for the uncertainty surrounding EFET.

[226] By simply reducing Aeosphere's free cash flows, as opposed to adjusting its revenue [*71] and expenses independently, the Court assumes that Aeosphere's cost of goods sold and operating expenses vary proportionately to sales. Such an assumption is not unreasonable in light of the fact that "Aeosphere, on its own, was not a capital-intensive company," and therefore incurred relatively few fixed costs, resulting in an unlevered cost structure. Trial Tr. vol IV, 995 (Vannucci).

[227] Trial Tr. vol. II, 428 (Yule) (stating that projections assuming Prolitec technology would be one-fifth to one-tenth of those assuming EFET).

[228] Id. at 428, 524 (Yule).

[229] Id. at 428 (Yule).

[230] The Court reaches this figure by reducing the above one-fifth by the additional ninety percent suggested by Yule given the lack of an exclusive agreement with Prolitec. The Court notes, however, that a reasonable interpretation of Yule's testimony could result in a finding of one percent of the original projections. Id. (Yule stating that projections assuming Prolitec could be as low as ten percent of those assuming EFET; reducing that amount by a "factor of . . . ten" results in projections at one percent of the originals).

[231] The Court notes, however, that without additional data, equating the expected value of the EFET technology at the time of the valuation to the value added by reducing cash flows by a mere 80% is somewhat of a rough estimate.

[232] The Court adopts Vannucci's weights of 60% for the FWGSA projections and 40% for the Aeosphere projections.

Scent Project.[233] Accounting for cash and cash equivalents, working capital, and non-operating assets[234] brings Aeosphere's enterprise [*73] value to $1,405,256.56. The total value of Matthew's 35% share, treating all units equally, is therefore $491,839.79. Capua's preferred units had a liquidation preference and a preferred return, but the Court cannot find with confidence that those rights should be afforded any material value: the winding up was wrongful and the prospect of repayment in the face of Aeosphere's many struggles is too speculative. Matthew had a 35% interest in Aeosphere and the right not to have it wound up without his approval. Although it is difficult to discern the value of an idea, and reasonable minds could disagree, the Court reaches this result with some level of comfort.

Matthew appears to base his claim for damages from his employment contract on tortious interference. He has failed to prove that claim against FWGSA, but the question of Laudamiel's and DreamAir's liability lingers. Matthew argues that he should receive the remainder of his pay under his five-year contract because the remedy for a tort is what he expected, not simply what Aeosphere would have paid. The Court rejects this argument because Matthew's compensation was not reduced by any wrongful act; Matthew's employment contract had a five-year term, but Matthew and Laudamiel had

been deferring salaries since at least May 2009.[235] Capua and Laudamiel likely would not have authorized additional payments, and Matthew has not provided a basis for the Court to find that Aeosphere's cash flow would improve. Importantly, the Court's willingness to accept a discounted cash flow valuation in the first place rests in part on the co-CEOs' willingness to forgo compensation so that Aeosphere could remain a going concern.[236] Thus, Matthew has not [*75] demonstrated that he is separately entitled to damages for the termination of his employment contract.

### E. *Other Matters*

If the implementing order establishes that DreamAir owes any amount to Matthew, it shall respond to the motion to compel. Matthew has not provided a basis for shifting attorneys' fees to overcome the American Rule. Pre-judgment interest and post-judgment interest compounded quarterly at the statutory rate fairly compensate Matthew.

## IV. CONCLUSION

For the reasons discussed above, the Court awards Matthew $491,839.79 from Laudamiel and DreamAir for the unlawful winding up of Aeosphere, subject to a determination of the effect of the Capua and Action 1 settlement reached by Matthew.[237] The interested parties shall address this issue. Judgment will be entered in favor of FWGSA and FWL and

---

JX 434 at Schedule 1 n.1 (Valuation Synthesis and Conclusion).

[233] While Vannucci's calculations primarily consider the Scent Project, Dep. Trs. of Kevin Vannucci ("Vannucci Dep.") 66-68, Aeosphere's portfolio of business opportunities contained sundry additional projects. JX 285 at 3. Vannucci, however, stated that any projected cash flows for such additional projects would be "too speculative" to include in the valuation model. [*74] Vannucci Dep. 67. Thus, the value of Aeosphere represented by Vannucci's and the Court's calculations stems primarily from the Scent Project.

[234] JX 434 at Schedule 1.

---

[235] Trial Tr. vol. I, 88 (Matthew).

[236] Matthew supports his expert's valuation by observing Capua's commitment to fund salaries. Pl.'s Opening Post-Trial Br. 48-49. Capua would not have done so. If the Court accepts that Aeosphere was a going concern despite its inability to make payroll, it is fair to assume that Matthew would not have continued to work without compensation.

[237] The Court [*76] has chosen to reach this decision without being aware of the amount for which Capua and Action 1 settled.

against Matthew.[238]

Entry of an implementing order will await, in the absence of a request from any party, a conclusion regarding the effect of the earlier settlement.

---

**End of Document**

---

[238] The pre-trial order does not squarely address FWGSA's cross-claims. Nonetheless, with this conclusion, the cross-claims of FWGSA are moot and, thus, are dismissed.

# Tab H

⚠ Caution
As of: December 16, 2019 3:55 PM Z

## *In re Dole Food Co., Stockholder Litig.*

Court of Chancery of Delaware

July 2, 2015, Submitted; August 27, 2015, Decided

CONSOLIDATED C.A. No. 8703-VCL CONSOLIDATED C.A. No. 9079-VCL

**Reporter**
2015 Del. Ch. LEXIS 223 *

IN RE DOLE FOOD CO., INC. STOCKHOLDER LITIGATION. IN RE APPRAISAL OF DOLE FOOD COMPANY, INC.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Prior History:** *In re Dole Food Co., 110 A.3d 1257, 2015 Del. Ch. LEXIS 47 (Del. Ch., Feb. 27, 2015)*

## Core Terms

Projections, Merger, farms, stockholders, per share, Lender, advisors, cost saving, negotiations, plans, fiduciary, freeze-out, shares, purchases, Packaged, presentation, repurchase, announcement, ships, savings, damages, estimate, stock, fair price, forecasts, bankers, unfair, special committee, confidential information, controlling stockholder

## Case Summary

### Overview

HOLDINGS: [1]-In this breach of fiduciary duty action, the evidence at trial established that the merger was not a product of fair dealing where (1) one defendant constructed a set of projections that contained falsely low numbers, (2) one defendant's fraud tainted the approval of the Merger by the Committee, as well as the stockholder vote, (3) one defendant engaged in fraud, misrepresentation, self-dealing, and gross and palpable overreaching; [2]-One defendant was personally liable for damages resulting from the Merger where defendant acted in two capacities: as the company's controlling stockholder and as a director of the company; [3]-A second defendant was personally liable for damages resulting from the Merger where he acted in two capacities in connection with the Merger: as a director and as the company's President, Chief Operating Officer, and General Counsel.

### Outcome

Several defendants were liable for breaches of their duty of loyalty in the amount of $148,190,590.18.

Amanda Stubblefield

## LexisNexis® Headnotes

burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction.

Evidence > Burdens of
Proof > Preponderance of Evidence

*HN1*[⬇]  **Burdens of Proof, Preponderance of Evidence**

Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard. Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. Under this standard, the party bearing the burden is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, the party must prove only that it is more likely than not that it is entitled to relief.

Evidence > Burdens of Proof > Allocation

Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

Evidence > Burdens of Proof > Initial Burden of Persuasion

*HN2*[⬇]  **Burdens of Proof, Allocation**

For a breach of fiduciary duty claim, the defendants initially bare the burden of proof under the entire fairness standard of review. If defendants believe the allocation should be different, they must seek and obtain a pretrial determination in their favor. Otherwise, the

Evidence > Burdens of Proof > Allocation

Torts > ... > Multiple
Defendants > Concerted Action > Civil Aiding & Abetting

*HN3*[⬇]  **Burdens of Proof, Allocation**

The burden for an aiding and abetting claim differed rests with the plaintiffs.

Business & Corporate
Law > ... > Shareholder Actions > Appraisal Actions & Dissent Rights > General Overview

Evidence > Burdens of Proof > Allocation

Mergers & Acquisitions
Law > Mergers > Rights of Dissenting Shareholders

*HN4*[⬇]  **Shareholder Actions, Appraisal Actions & Dissent Rights**

In an appraisal proceeding, each side bears the burden of proving its contentions.

Mergers & Acquisitions
Law > Mergers > General Overview

*HN5*[⬇]  **Mergers & Acquisitions Law, Mergers**

The Delaware Supreme Court has instructed that when a merger gives rise to both a plenary action for breach of fiduciary duty and a statutory appraisal proceeding, the court should rule on the plenary claims first,

because a finding of liability and the resultant remedy could moot the appraisal proceeding.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Causes of Action

Evidence > Burdens of Proof > Allocation

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

Evidence > Burdens of Proof > Initial Burden of Persuasion

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

**HN6**[⬇] **Controlling Shareholders, Causes of Action**

When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion. Where a merger was an interested transaction, entire fairness provides the baseline standard of review. Where the record does not permit a pretrial determination that the defendants were entitled to a burden shift or a lower standard of review, the burden of persuasion remains with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

**HN7**[⬇] **Controlling Shareholders, Fiduciary Duties**

The concept of fairness has two basic aspects: fair dealing and fair price. Fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. Fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. Although the two aspects may be examined separately, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

Evidence > Burdens of Proof > Initial Burden of Persuasion

**HN8**[⬇] **Controlling Shareholders, Fiduciary Duties**

Fairness does not depend on the parties' subjective beliefs. Once entire fairness applies, the defendants must establish to the court's satisfaction that the transaction was the

product of both fair dealing and fair price. Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

*HN9*[⬇] **Controlling Shareholders, Fiduciary Duties**

The concept of entire fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation. According to the common law nostrum, fraus omnia corrumpit—fraud vitiates everything.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

*HN10*[⬇] **Controlling Shareholders, Fiduciary Duties**

The concept of fair dealing encompasses an evaluation of how the transaction was timed and initiated. The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

*HN11*[⬇] **Controlling Shareholders, Fiduciary Duties**

A calculated effort to depress the market price of a stock until the minority stockholders are eliminated by merger or some other form of acquisition constitutes unfair dealing. It is an example of the prototype instance in which the timing of a merger would itself likely constitute a breach of a controlling shareholder's duty under the entire fairness standard, namely, when it could be shown both (1) that the minority was financially injured by the timing (i.e., from their point of view it was an especially poor time to be required to liquidate their investment) and (2) that the controlling shareholder gained from the timing of the transaction what the minority lost.

Business & Corporate
Law > ... > Corporate Governance > Shareholders > General Overview

*HN12*[⬇] **Corporate Governance, Shareholders**

Diversified public stockholders should be less risk-averse, precisely because of their diversification, than a large stockholder with non-diversified risk. Shareholders can diversify the risks of their corporate investments. Thus, it is in their economic interest for the

corporation to accept in rank order all positive net present value investment projects available to the corporation, starting with the highest risk adjusted rate of return first. Shareholders don't want (or shouldn't rationally want) directors to be risk averse.

Business & Corporate
Law > ... > Shareholder Duties &
Liabilities > Controlling
Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Shareholders

**HN13**[⬇] **Controlling Shareholders, Fiduciary Duties**

Delaware decisions have long worried about a controller's potential ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause them to support a deal that was not in the best interests of the company or its stockholders. The Delaware Supreme Court has confirmed that controlling stockholder status does not, standing alone, give rise to concern. At the same time, Delaware decisions recognize that when controllers actually make retributive threats, that fact is evidence of unfair dealing.

Business & Corporate
Law > ... > Shareholder Duties &
Liabilities > Controlling
Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Shareholders

**HN14**[⬇] **Controlling Shareholders, Fiduciary Duties**

Fair dealing encompasses questions of how the transaction was negotiated.

Business & Corporate
Law > ... > Shareholder Duties &
Liabilities > Controlling
Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Shareholders

**HN15**[⬇] **Controlling Shareholders, Fiduciary Duties**

An important element of an effective special committee is that it be fully informed in making its determination. In order to make a special committee structure work it is necessary that a controlling shareholder disclose fully all the material facts and circumstances surrounding the transaction.

Business & Corporate
Law > ... > Shareholder Duties &
Liabilities > Controlling
Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Shareholders

**HN16**[⬇] **Controlling Shareholders, Fiduciary Duties**

There are certain categories of negotiating information that the controlling stockholder need not share, such as information disclosing the top price that a proposed buyer would be willing or able to pay, or the lowest price that a proposed seller would accept, but the categories of information that the controller must disclose include: 1) all of the material terms of the proposed transaction; 2) all

material facts relating to the use or value of the assets in question to the beneficiary itself. Such facts would include alternative uses for assets or "hidden value" (e.g., there is oil under the land subject to sales negotiation); 3) all material facts which it knows relating to the market value of the subject matter of the proposed transaction. Such facts would include, for example, forthcoming changes in legal regulation or technological changes that would affect the value of the asset in question either to the subsidiary or to others. These categories are intended to encompass all material information known to the fiduciary except that information that relates only to its consideration of the price at which it will buy or sell and how it would finance a purchase or invest the proceeds of a sale.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

[HN17](#)[⬇]     Controlling     Shareholders, Fiduciary Duties

Implicit in the expectation that the controller disclose information is the requirement that the controller disclose it accurately and completely. The controller must believe that the disclosures are true and cannot deliberately withhold material information or otherwise immaterial information that is nevertheless necessary to make the disclosed information complete and non-misleading. The fair dealing element of the entire fairness standard mandates that all fiduciaries, including the controller and its representatives, comply with the duty of candor owed by corporate fiduciaries to disclose all material

information relevant to corporate decisions from which they may derive a personal benefit. The duty of candor, integral to fair dealing, dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

[HN18](#)[⬇]     Controlling     Shareholders, Fiduciary Duties

A controller cannot engage in fraud. Nor can a corporate officer, even if his principal loyalty is to a controller who is his boss and source of post-transaction employment. To be blunt, if a duly empowered committee asks for information, a corporate officer, employee, or agent has a duty to provide truthful and complete information.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions

Law > Mergers > Duties & Liabilities of Shareholders

[HN19](#)[⬇️] **Controlling Shareholders, Fiduciary Duties**

Accurate and up-to-date information about the company's financial performance is particularly important to a committee's work. Withholding the company's latest projections, and knowledge of their existence, from the Special Committee and its advisors is without more enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

[HN20](#)[⬇️] **Controlling Shareholders, Fiduciary Duties**

The second aspect of the entire fairness inquiry is fair price. The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation. For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness. The value of a corporation is not a point on a line, but a range of reasonable values. When evaluating the fair price aspect of the entire fairness standard of review, the court considers whether the transaction was one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept. A court readily could

conclude that a price fell within the range of fairness and would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

[HN21](#)[⬇️] **Controlling Shareholders, Fiduciary Duties**

The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions. The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

[HN22](#)[⬇️] **Controlling Shareholders, Fiduciary Duties**

Fair price can be the predominant

consideration in the unitary entire fairness inquiry. Most often, however, the two aspects of the entire fairness standard interact. A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price. The fact that negotiations occurred is not dispositive. It is not sufficient for directors to achieve the best price that a fiduciary will pay if that price is not a fair price. Nor is it sufficient to obtain a fair price if that price is not the best alternative available for the corporation and its stockholders.

Mergers & Acquisitions
Law > Mergers > General Overview

**HN23[↓]** **Mergers & Acquisitions Law, Mergers**

Methods of valuation are only as good as the inputs to the model.

Mergers & Acquisitions
Law > Mergers > General Overview

**HN24[↓]** **Mergers & Acquisitions Law, Mergers**

Delaware law is clear that elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered. In essence, when the court determines that the company's business plan as of the merger included specific expansion plans or changes in strategy, those are corporate opportunities that must be considered part of the firm's value. Obviously, when a business has opened a couple of facilities and has plans to replicate those facilities as of the merger date, the value of its expansion plans must be considered in

determining fair value. To hold otherwise would be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations.

Business & Corporate
Law > ... > Shareholder Duties & Liabilities > Controlling Shareholders > Fiduciary Duties

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Shareholders

**HN25[↓]** **Controlling Shareholders, Fiduciary Duties**

The concept of fairness is of course not a technical concept. No litmus paper can be found or Geiger-counter invented that will make determinations of fairness. This judgment concerning "fairness" will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

**HN26[↓]** **Management Duties & Liabilities, Fiduciary Duties**

A ruling that a transaction is not entirely fair

does not automatically result in liability for the defendants. The entire fairness test seeks to determine whether directors complied with their fiduciary duties. The test has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction. Directors who have breached their duties may have defenses to liability, such as exculpation under *Del. Code Ann. tit. 8, § 102(b)(7)*, protection due to reliance on advisors under *Del. Code Ann. tit. 8, § 141(e)*, or other doctrines.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > General
Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

*HN27*[⤓] **Management Duties & Liabilities, Fiduciary Duties**

See *Del. Code Ann. tit. 8, § 102(b)(7)*.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > General
Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

*HN28*[⤓] **Management Duties & Liabilities, Fiduciary Duties**

The effect of a provision like an Exculpatory Clause is to protect directors from personal liability for monetary damages for a breach of fiduciary duty, except for the four categories

listed in *Del. Code Ann. tit. 8, § 102(b)(7)*. The totality of these limitations or exceptions is to eliminate director liability only for duty of care violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Causes of Action > General
Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > General
Overview

*HN29*[⤓] **Management Duties & Liabilities, Causes of Action**

When a corporation has an exculpatory provision and a self-dealing transaction has been determined to be unfair, only the self-dealing director is subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind. For other directors, even the ones who might be deemed non-independent by status, the presence of the exculpatory charter provision requires an examination of their state of mind, in order to determine whether they breached their duty of loyalty by approving the transaction in bad faith, rather than in a good faith effort to benefit the corporation. In other words, their status as non-independent directors is only a fact relevant to the ultimate determination whether they complied with their fiduciary duties, it is not a status crime making them a guarantor of the fairness of the transaction. In light of the Exculpatory Clause, the liability of the directors

must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

## HN30[⬇] Management Duties & Liabilities, Fiduciary Duties

The Delaware Supreme Court has held that for purposes of the Delaware common law of fiduciary duties, these concepts elide: The duty of loyalty includes a requirement to act in good faith, which is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty. Likewise for purposes of the Delaware common law of fiduciary duties, the Delaware Supreme Court has held that acting in bad faith and not acting in good faith are two sides of the same coin. At a minimum, good faith requires that the decision-maker act honestly and without pretext. Bad faith involves the opposite. In its most extreme form, it involves the conscious doing of a wrong because of dishonest purpose or moral obliquity or a state of mind affirmatively operating with furtive design or ill will. But it also encompasses other failures to act in good faith, including when a decision-maker intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for the decision-maker's duties, or when the decision-maker intentionally acts with a purpose other than" the purpose that the decision-maker is obligated to pursue. A corporate fiduciary thus acts in bad faith when motivated by a purpose

other than that of advancing the best interests of the corporation and its stockholders.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

## HN31[⬇] Concerted Action, Civil Aiding & Abetting

A claim for aiding and abetting has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages proximately caused by the breach.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

## HN32[⬇] Concerted Action, Civil Aiding & Abetting

In the context of a claim for aiding and abetting, because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of "knowing participation" requires that the secondary actor have provided "substantial assistance" to the primary violator. A secondary actor is liable for harm resulting to a third party from the tortious conduct of another if the secondary actor knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN33*[⬇️] **Concerted Action, Civil Aiding & Abetting**

In the context of a claim for aiding and abetting, a court's analysis of whether a secondary actor "knowingly" provided "substantial assistance" is necessarily fact intensive. Illustrative factors include the following: The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects; the amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct; the nature of the relationship between the secondary and primary actors; and the secondary actor's state of mind.

> Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

> Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN34*[⬇️] **Management Duties & Liabilities, Fiduciary Duties**

In the context of a claim for aiding and abetting, a fiduciary sharing of information with an affiliated stockholder and its advisors, standing alone, is not inherently a breach of duty. It depends on what the provider and recipients do with the information, including whether they use the information to the detriment of the corporation and its

stockholders or to benefit themselves improperly. Of course, just as the law could have a bright-line anti-sharing rule, it could have a bright-line rule against unauthorized bid preparations by insiders. Indeed, such a rule likely follows from a strong-form anti-sharing rule. Under such an approach, the law would require a controller to act like a third-party bidder. Before a third-party bidder can legitimately access confidential information about its target, it has to approach the company and obtain permission. A controller or manager would have to do the same. Under such a regime, an advisor who consciously assisted a fiduciary in preparing an as-yet unauthorized bid would have knowingly participated in the breach. If the company or its stockholders suffered harm, as they did here, then the advisor would be jointly and severally liable. But our law does not appear to me to have adopted a bright-line position. The use and sharing of information is rather another context-dependent inquiry.

> Civil Procedure > Remedies > Damages > General Overview

> Mergers & Acquisitions Law > Mergers > General Overview

*HN35*[⬇️] **Remedies, Damages**

Once a breach of duty has been established, the court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate. At that point, the remedy could be a damages award equal to the fair value of the shares, but the measure of any recoverable loss under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the true value as determined under appraisal proceedings. In determining damages, the powers of the Court of Chancery are very

Amanda Stubblefield

broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages. The award may include elements of rescissory damages if the court considers them susceptible of proof and a remedy appropriate to all the issues of fairness presented by the case. An award exceeding the fair value of the plaintiffs' shares may be appropriate particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Civil
Procedure > Remedies > Damages > General Overview

Mergers & Acquisitions
Law > Mergers > General Overview

### HN36[↓] Management Duties & Liabilities, Fiduciary Duties

Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. Damages must be logically and reasonably related to the harm or injury for which compensation is being awarded. But as long as that connection exists, the law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions
Law > Mergers > General Overview

Civil
Procedure > Remedies > Damages > General Overview

### HN37[↓] Management Duties & Liabilities, Fiduciary Duties

In a plenary breach of fiduciary duty action, the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship. Once disloyalty has been established, the standards require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

Civil Procedure > Remedies > Judgment Interest > Postjudgment Interest

Civil Procedure > Remedies > Judgment Interest > Prejudgment Interest

### HN38[↓] Judgment Interest, Postjudgment Interest

A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues. Pre- and post-judgment

interest will accrue at the legal rate, fluctuating with the underlying Federal Discount Rate and compounded quarterly, until the date of payment. *Del. Code Ann. tit. 6, § 2301(a)*.

**Counsel: [*1]** Stuart M. Grant, Nathan A. Cook, Kimberly A. Evans, Michael Manuel, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Randall J. Baron, A. Rick Atwood, Jr., David T. Wissbroecker, Edward M. Gergosian, Maxwell R. Huffman, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Marc A. Topaz, Lee D. Rudy, Michael C. Wagner, Justin O. Reliford, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Class Counsel for Plaintiffs in In re Dole Food Co., Inc. Stockholder Litigation.

Stuart M. Grant, Geoffrey C. Jarvis, Nathan A. Cook, Kimberly A. Evans, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Counsel for Petitioners Hudson Bay Master Fund Ltd., Hudson Bay Merger Arbitrage Opportunities Master Fund Ltd., and Ripe Holdings LLC in In re Appraisal of Dole Food Company, Inc.

Kevin G. Abrams, J. Peter Shindel, Jr., Daniel R. Ciarrocki, Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Counsel for Petitioners Merion Capital LP, Merion Capital II, LP, Magnetar Capital Master Fund Ltd., Spectrum Opportunities Master Fund Ltd., Magnetar Global Event Driven Master Fund Ltd., and Blackwell Partners LLC in In re Appraisal of Dole Food Company, Inc.

J. Clayton Athey, PRICKETT, JONES **[*2]** & ELLIOTT, P.A., Wilmington, Delaware; Peter M. Stone, Edward Han, PAUL HASTINGS LLP, Palo Alto, California; Counsel for Defendants David H. Murdock and DFC Holdings, LLC.

Bruce Silverstein, Elena C. Norman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Andrea E. Neuman, Colin B. Davis, GIBSON, DUNN & CRUTCHER LLP, New York, New York; William B. Dawson, GIBSON, DUNN & CRUTCHER LLP, Dallas, Texas; Counsel for Defendants C. Michael Carter and David A. DeLorenzo and Respondent Dole Food Company, Inc.

Stephen C. Norman, Matthew F. Davis, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David B. Hennes, Stephen M. Juris, Joshua D. Roth, Jesse Ryan Loffler, Andrew B. Cashmore, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP; Counsel for Defendants Deutsche Bank AG, New York Branch and Deutsche Bank Securities Inc.

**Judges:** LASTER, Vice Chancellor.

**Opinion by:** LASTER

# Opinion

**MEMORANDUM OPINION**

**LASTER, Vice Chancellor**.

In November 2013, defendant David H. Murdock paid $13.50 per share to acquire all of the common stock of Dole Food Company,

Inc. ("Dole" or the "Company") that he did not already own. Before the transaction, Murdock owned approximately 40% of Dole's common stock, served as its Chairman and CEO, **[*3]** and was its *de facto* controller. The transaction was structured as a single-step merger (the "Merger"). The Merger closed on November 1, 2013.

In his initial letter to Dole's board of directors (the "Board"), Murdock offered to pay $12.00 per share. Informed by then-Chancellor Strine's decision in *MFW*,[1] Murdock conditioned his proposal on (i) approval from a committee of the Board made up of disinterested and independent directors (the "Committee") and (ii) the affirmative vote of holders of a majority of the unaffiliated shares. Despite mimicking *MFW*'s form, Murdock did not adhere to its substance. He and his right-hand man, defendant C. Michael Carter, sought to undermine the Committee from the start, and they continued their efforts throughout the process.

Before trial, the allegations and evidence regarding Murdock and Carter's activities, together with the relationships between certain Committee members and Murdock, were sufficient to create triable questions of fact regarding the Committee's independence. The record at trial, however, demonstrated that the Committee **[*4]** carried out its task with integrity. The Committee was assisted in this effort by expert legal counsel and an investment bank—Lazard Frères & Co. LLC ("Lazard")—that likewise acted with integrity. In contrast to a string of decisions that have criticized financial advisors for flawed and outcome-driven analyses,[2] this opinion can

praise and rely on Lazard's thorough and balanced work product.

Because of the diligence of its members and their advisors, the Committee overcame most of Murdock and Carter's **[*5]** machinations. The Committee negotiated an increase in the price from $12.00 to $13.50 per share, which Lazard opined fell within a range of fairness. Several market indicators supported Lazard's opinion. Stockholders approved the Merger, with the unaffiliated stockholders narrowly voting in favor in a 50.9% majority.

But what the Committee could not overcome, what the stockholder vote could not cleanse, and what even an arguably fair price does not immunize, is fraud. Before Murdock made his proposal, Carter made false disclosures about the savings Dole could realize after selling approximately half of its business in 2012. He also cancelled a recently adopted stock repurchase program for pretextual reasons. These actions primed the market for the freeze-out by driving down Dole's stock price and undermining its validity as a measure of value. Then, after Murdock made his proposal, Carter provided the Committee with lowball

---

[1] *In re MFW S'holders Litig., 67 A.3d 496 (Del. Ch. 2013)*, aff'd sub nom., *Kahn v. M&F Worldwide Corp., 88 A.3d 635 (Del. 2014)*. During the pendency of this case, the Delaware Supreme Court adopted then-Chancellor Strine's analysis.

[2] *See, e.g., Koehler v. NetSpend Hldgs., Inc., 2013 Del. Ch. LEXIS 131, 2013 WL 2181518, at *16-17 (Del. Ch. May 21, 2013)* (reviewing details of "weak fairness opinion"); *In re El Paso Corp. S'holder Litig., 41 A.3d 432, 441 (Del. Ch. 2012)* (Strine, C.) (noting "questionable aspects" of banker's valuation); *In re S. Peru Copper Corp. S'holder Deriv. Litig., 52 A.3d 761, 771-73, 803-804 (Del. Ch. 2011)* (Strine, C.) (critiquing misleading analyses prepared by financial advisor); *In re Loral Space & Commc'ns Inc., 2008 Del. Ch. LEXIS 136, 2008 WL 4293781, at *10-11, *14-15 (Del. Ch. Sept. 19, 2008)* (Strine, V.C.) (analyzing erroneous and misleading presentation by financial advisor); *Robert M. Bass Gp., Inc. v. Evans, 552 A.2d 1227, 1245 (Del. Ch. 1988)* (critiquing banker's analyses that included "at least one assumption that is incorrect, and upon others that are highly questionable"); *see also In re Del Monte Foods Co. S'holders Litig., 25 A.3d 813, 817 (Del. Ch. 2011)* (enjoining transaction where banker "secretly and selfishly manipulated the sale process to engineer a transaction that would permit [the bank] to obtain lucrative buy-side financing fees").

management projections. The next day, in a secret meeting that violated the procedures established by the Committee, Carter gave Murdock's advisors and financing banks more positive and accurate data. To their credit, the Committee and Lazard recognized that Carter's [*6] projections were unreliable and engaged in Herculean efforts to overcome the informational deficit, but they could not do so fully. Critically for purposes of the outcome of this litigation, the Committee never obtained accurate information about Dole's ability to improve its income by cutting costs and acquiring farms.

By taking these actions, Murdock and Carter deprived the Committee of the ability to negotiate on a fully informed basis and potentially say no to the Merger. Murdock and Carter likewise deprived the stockholders of their ability to consider the Merger on a fully informed basis and potentially vote it down. Murdock and Carter's conduct throughout the Committee process, as well as their credibility problems at trial, demonstrated that their actions were not innocent or inadvertent, but rather intentional and in bad faith.

Under these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty. This decision holds Murdock and Carter [*7] jointly and severally liable for damages of $148,190,590.18, representing an incremental value of $2.74 per share. Although facially large, the award is conservative relative to what the evidence could support.

The other defendants are not liable. Defendant David A. DeLorenzo erred by siding with Murdock at the outset of the Committee process, but he did not participate in the breaches of duty that led to liability. The plaintiffs also sought to impose secondary liability on Murdock's financial advisor and lead financing source, defendants Deutsche Bank Securities, Inc. and Deutsche Bank AG (jointly "Deutsche Bank"). Deutsche Bank acted improperly by favoring Murdock and treating him as the bank's real client in transactions before the Merger, even when Deutsche Bank was officially representing Dole, but Deutsche Bank did not participate knowingly in the breaches that led to liability, and Deutsche Bank's role as Murdock's advisor did not lead causally to damages.

In addition to the plenary litigation, holders of 17,287,784 shares sought appraisal. This decision likely renders the appraisal proceeding moot. The parties will confer on this issue and inform the court of their views.

## I. [*8] FACTUAL BACKGROUND

Trial took place over nine days. The parties introduced over 1,800 exhibits. Ten fact witnesses and three experts testified live. The parties lodged twenty-nine depositions. The laudably thorough pre-trial order contained 419 paragraphs, and the pre-trial and post-trial briefs collectively totaled 668 pages.

The voluminous evidence conflicted on many issues. To facilitate fact-finding under conditions of uncertainty, courts evaluate evidence against a burden of proof. For this case, the appropriate standard of proof was straightforward: a preponderance of the evidence.[3] The question of who bore it was

---

[3] *See* Estate of Osborn ex rel. Osborn v. Kemp, 2009 Del. Ch. LEXIS 149, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) (HN1[↑]) "Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more

complex.

*HN2*[↑] For the breach of fiduciary duty claim, the defendants initially bore the burden of proof under the entire fairness standard of review. *See Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1239 (Del. 2012)*. The Delaware Supreme Court held in *Americas Mining* that if defendants believe the allocation should be different, they must seek and obtain a pretrial determination in their favor. *Id. at 1243*. Otherwise, "the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Id.* The defendants moved for summary judgment on the standard of review and allocation of burden, arguing that because they emulated *MFW*, the business judgment rule became the operative standard of review. Alternatively, they argued that if entire fairness continued to apply, the burden had shifted to the plaintiffs to prove unfairness. *See Emerald P'rs v. Berlin (Emerald II), 787 A.2d 85, 98-99 (Del. 2001)*. I held that the defendants had not made the showing necessary to change the standard of review or shift the burden, and so "the burden of persuasion will remain with the defendants throughout the trial to demonstrate the **[*10]** entire fairness of the interested transaction." Dkt. 585 at 4, 6.

*HN3*[↑] The burden for the aiding and abetting claim differed: it rested with the plaintiffs. *In re Rural Metro Corp., 88 A.3d 54, 85 (Del. Ch. 2014)* (appeal pending). *HN4*[↑] The burden

for the appraisal proceeding was different still: each side bore the burden of proving its contentions. *Montgomery Cellular Hldg. Co. v. Dobler, 880 A.2d 206, 221 (Del. 2005)*.

Although I have tried to adhere to the different burdens required by the case law, the Delaware Supreme Court has explained that the real-world benefit of burden-shifting is "modest" and only outcome-determinative in the "very few cases" where the "evidence is in equipoise." *Ams. Mining, 51 A.3d at 1242*. This was not one of those cases. Had the burden been allocated to the plaintiffs on all issues, the result would have been the same.[4]

## A. Murdock's Relationship With Dole

Dole is one of the world's largest producers and marketers of fresh fruit and vegetables. Murdock became involved with Dole in 1985 when Flexi-Van Corporation merged with Castle & Cooke, which had owned all of Dole's stock since 1961. Both were public companies. Before the merger, Murdock was the CEO and 33% owner of Flexi-Van. After the merger, Murdock became Chairman and CEO of the combined company, which was named Castle & Cooke. Flexi-Van's stockholders received 45% of the combined company, giving Murdock a 14% stake. In 1991, the combined company changed its name to Dole.

In 2003, Murdock took Dole private in a leveraged buyout. While owned solely by Murdock, Dole felt the effects of the financial crisis of 2008. Dole had taken on significant

---

convincing force and makes you believe that something is more likely true than not." *Agilent Techs, Inc. v. Kirkland, 2010 Del. Ch. LEXIS 34, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)* (Strine, V.C.) (internal quotation marks omitted). "Under this standard, [the party bearing the burden] is not required to prove its claims by clear and convincing **[*9]** evidence or to exacting certainty. Rather, [the party] must prove only that it is more likely than not that it is entitled to relief." *Triton Const. Co. v. E. Shore Elec. Servs., 2009 Del. Ch. LEXIS 88, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009)*, aff'd, 988 A.2d 938 (Del. 2010)* (TABLE).

[4] The allocations did influence my rulings on a number of procedural issues, including the allotment of trial time, the order of witnesses, the schedule for post-trial briefing, and presentation of post-trial argument. Generally speaking, because the defendants bore the burden of proof on the fiduciary duty claim, they were given the advantages that ordinarily inure to the party that bears the burden, such as the opportunity to present their case and arguments first and to present a rebuttal case **[*11]** and reply.

debt, and a large tranche of bonds was scheduled to mature in 2009. Dole typically refinanced its debt a year before maturity, but it delayed in the hope that rates would improve. Instead, the bond markets froze. Dole finally refinanced its debt just sixty days before the bonds matured. It was forced to pay a very high interest rate.

Murdock's real estate ventures also suffered. Murdock had obtained [*12] loans that required unanimous approval from all of the banks in the lending syndicate to waive a covenant or extend a maturity date. During the financial crisis, several loans went into default. Some of the more troubled banks refused to modify the loans. Murdock had provided personal guarantees and faced the threat of collection actions.

Deutsche Bank and Wells Fargo stepped in to help Murdock. They had worked with Murdock for years and took a "long term view [of] the relationship." JX 1680 at 2. They bought out the objecting banks and granted the loan modifications Murdock sought. The plaintiffs accurately observe that this instance reflects the longevity and depth of Murdock's relationship with his favored banks, such as Deutsche Bank. *See* Murdock 74-76 (describing his relationships with banks and noting that "most of my banks have been with me for 40 years").

To pay down the debt on the Company and his real estate ventures, Murdock considered selling Dole. Late in 2009, Dole approached Del Monte Packaged Foods Company. The negotiations stalled with Del Monte offering $700 million and Murdock asking $1 billion.

Instead of selling Dole entirely, Murdock decided to sell a portion of [*13] Dole's equity to the public. In October 2009, Dole conducted an initial public offering of approximately 41% of its shares. The IPO price was $12.50 per share, which valued Dole at approximately

5.9x estimated 2010 EBITDA.[5]

Murdock retained sole ownership of Castle & Cooke, which was spun off before the IPO. Castle & Cooke owned Murdock's other business ventures [*14] and real estate assets, including the Hawaiian island of Lanai. Murdock became CEO of Castle & Cooke. Scott Griswold, who had previously managed the Castle & Cooke businesses as part of Dole, became Castle & Cooke's Executive Vice President of Operations. Griswold was deeply involved in the process leading to the Merger. When considering his involvement, it is important to recall that he was not a Dole officer or employee during the relevant period. Griswold worked for Murdock in his capacities as the owner of Castle & Cooke and as a stockholder of Dole.

The newly public Dole operated three business segments: Fresh Fruit, Fresh Vegetables, and Packaged Foods. Fresh Fruit was Dole's largest division, with revenue of $4.4 billion in 2012. Fresh Vegetables and Packaged Foods were significantly smaller, with revenue of $1.1 billion and $1.3 billion respectively. Fresh Fruit focused primarily on bananas and pineapples with smaller operations for other products, like kiwifruit. Fresh Vegetables distributed a wide variety of fresh produce. It also included Dole's fresh berry business (despite the division's name) and distributed packaged salads and

---

[5] Murdock obtained additional liquidity by entering into a forward sale covering another 27% of Dole's stock. The forward sale was structured through the Murdock Automatic Common Exchange Security Trust, and the resulting securities were called "MACES." The plaintiffs have argued that the MACES influenced the timing of the announcement of the ITOCHU Transaction, discussed below, and that communications surrounding the MACES show that Deutsche Bank's primary loyalty was to Murdock, not Dole. It is undisputed that the ITOCHU Transaction was favorable for Dole and its stockholders, and the timing of that transaction does not have any relevance to the outcome of this litigation. That Deutsche Bank saw Murdock as its primary client is apparent from overwhelming evidence in the record. The communications surrounding the MACES are cumulative.

other packaged vegetables. Packaged Foods **[*15]** produced products such as canned pineapples, fruits cups, and frozen fruit.

## B. Murdock's Goal Of Taking Dole Private

After Dole became public, Murdock regularly considered the possibility of taking it private again. As Murdock testified at trial, he had "never really wanted" to sell equity to the public, but "it was a necessity" because of the financial issues he faced. Murdock 98; *see id.* at 87, 89, 94-95; JX 1680. Others at Dole recognized that Murdock did not like the public company model. Sherry Lansing, an outside director and member of the Committee, testified that Murdock "seemed frustrated all the time. He seemed frustrated with boards . . . . He seemed not to like the push back" or the need to "have [outside directors] there . . . ." Lansing Dep. 15.

Murdock evidenced his distaste for the public company model in how he ran Dole. Murdock was an old-school, my-way-or-the-highway controller, fixated on his authority and the power and privileges that came with it. Murdock testified that he was "the boss" at Dole, and "[t]he boss does what he wants to do."[6] In contemporaneous documents, his

associates did not address him by name. They referred to him deferentially as "the Chairman." Criticizing Murdock was **[*16]** unthinkable. On those rare occasions in the record when Murdock was challenged, he responded aggressively, including by giving tongue-lashings to outside directors Andrew J. Conrad and Dennis Weinberg, then forcing Weinberg off the Board. Murdock's bankers were careful not to offend him, knowing that he would put them in the "penalty box."[7]

---

many of Murdock's assertions were not credible or plainly wrong. To rehabilitate him, the defendants tried to portray him as a confused 91-year-old man, but it was clear that Murdock's intellect remains sharp. Murdock's problem was different. By dint of his prodigious wealth and power, he has grown accustomed to deference and fallen into the habit of characterizing events however he wants. That habit serves a witness poorly when he faces a skilled cross-examiner who has contrary documents and testimony at his disposal.

On the second day of trial, Murdock tried a different approach: He became evasive and attempted to cast himself as an uninvolved CEO who lacked any meaningful knowledge about what was going on at his company. He even denied being involved in major decisions, such as when Dole started giving intra-quarter earnings guidance in the months before the Merger. *See* Murdock 304-05, 311-14. This version of Murdock was not credible either.

In addition to offering the "confused old man" theory, the defendants sought to blunt the cumulative effect of Murdock's testimony, demeanor, and actions by citing his philanthropy, which is commendable. But it does not inoculate his **[*18]** business dealings. Tycoons like Vanderbilt, Carnegie, and Rockefeller built great fortunes as aggressive businessmen, then devoted substantial portions of their wealth to the betterment of all. More recently, Bill Gates led a company that was prosecuted successfully for antitrust violations, yet his foundation appears (at least to me) to be a force for good. The ultimate balancing is for posterity and the divine. My task is far narrower: to evaluate how Murdock and his fellow fiduciaries behaved in connection with a specific transaction.

---

[6] Murdock 49-51 (video testimony); *see* Murdock 40 (admitting that he can be "pushy"); Murdock 47 ("I'm abrupt. I'm always a strong-willed man. That's the reason why I get so many things done." (video testimony)); Murdock 76 ("I have been charged many times with being a strong individual, and I'm not ashamed of it."); Murdock Dep. 175 (referring to his outside directors, "They have their own opinions too, but I'm usually a little stronger than most people.").

Murdock tried out three different personas during his testimony. During his deposition, he showed the true force of his domineering personality. During the first day of trial, Murdock tried to appear more reasonable and conciliatory on direct, but on cross-examination, he could not resist being combative. He denied basic points and made long speeches. Both during his deposition and on the first day **[*17]** of trial,

[7] Grellier Dep. at 47; *see* Grellier 2114 (describing Murdock as "extremely volatile"); *id.* at 2130 (describing Murdock as "very, very headstrong" and "not receptive to being pushed by anybody to do anything"). In one of the more telling moments at trial, plaintiffs' counsel asked Dole's coverage banker about an internal email in which he referred facetiously to Murdock, after the sale of Lanai, as being "bunkered in his office counting his money." Brook 1983. The banker quailed and quickly testified, "I was actually being very flip on that. He

The fact that Murdock preferred to see Dole become a private company did not mean that he was unwilling to consider other transactions that would enhance his personal wealth. He is, after all, a highly successful capitalist. One example was late 2010, when Dole contacted Chiquita Brands International Inc. about a potential merger. Importantly, the Chiquita transaction would have expanded Murdock's empire. In substance, Dole would have acquired Chiquita, with Dole's stockholders owning 63.5% of the combined company, Dole designating a proportionate number of the initial board seats, and the company operating out of Dole's headquarters. The companies came close to finalizing a deal that would have valued Dole at $1.256 billion, but Dole ultimately decided not to go forward because of concerns about payments Chiquita had made in Colombia to a known terrorist organization.

The next year, Wells Fargo pitched Murdock on selling some or all of Dole to Hain Celestial Group ("Hain"). Murdock and DeLorenzo, who had taken the job as Dole's CEO in 2007, met with Hain. The discussions quickly shifted to Hain purchasing either Packaged Foods or a combination of Packaged Foods and Fresh Vegetables. [*20] A deal for those businesses seemed close, but Hain broke off talks in April 2012.

During the discussions with Hain, Murdock asked Dole's CFO, Joseph Tesoriero, to provide his recommendations about the strategic alternatives that Dole should pursue. Tesoriero prepared a two-page memorandum describing "value creation projects currently under consideration at Dole . . . in the ideal sequence in which they should occur." JX 162 at 1 (the "Tesoriero Memo"). As the memo reflected, these were not hypotheticals; they were projects "currently under consideration." *Id.* Tesoriero sent the document to Murdock and copied DeLorenzo and Griswold.

The Tesoriero Memo contemplated a three-phase plan. First, Dole would complete four small transactions then underway. As it happened, two of the deals were completed, and two were not.

Next, Dole would sell Packaged Foods and Fresh Vegetables to Hain, which was the transaction under consideration at the time. After that deal fell through, Dole explored other alternatives for Packaged Foods. As events turned out, Dole sold Packaged Foods and the Asian operations of Fresh Fruit to ITOCHU Corporation of Japan ("ITOCHU").

Finally, Murdock would "take [the remaining [*21] Dole] business private or . . . merge it with another company." *Id.* Tesoriero explained that although the remaining business "contains valuable assets (e.g. the Hawaii land, idle land in Latin America, our fleet of ships . . . ), it may not demand a very high multiple in the stock market due to the nature of the fresh fruit business." *Id.*

The Tesoriero Memo was a candid assessment of Murdock's overall strategy. It shows that Murdock's goal was to take Dole private again, and that Murdock and his team saw some form of break-up as a key step in the process. The basic premise was to separate Dole's higher-margin businesses (predominantly Packaged Foods) from its lower margin businesses (predominantly Fresh Fruit), realize the value of the higher-margin businesses, and then pursue a transaction involving the remainder of the Company. Although Murdock was open to other ideas for the remainder, the primary option was for Murdock to buy it.

## C. Exploring Alternatives For Packaged

---

wasn't in his office counting his money." *Id.* His demeanor reflected serious concern about how Murdock would react to his [*19] remark.

## Foods

When the Tesoriero Memo was written, the near-term alternative for generating value from Packaged Foods was a sale to Hain. After negotiations with Hain broke down, Murdock and Dole management began considering [*22] other options. One obvious way to separate the businesses was by spinning off Packaged Foods.

Murdock focused on a spinoff after reaching an agreement on April 8, 2012, to sell Lanai for $300 million. This transaction was part of Murdock's effort to generate liquidity and reduce his overall debt, thereby strengthening his personal balance sheet for a potential take-private.

Murdock had owned Lanai through Castle & Cooke, and Griswold was heavily involved in the sale process. Deutsche Bank served as Castle & Cooke's advisor on the sale. With the agreement in hand, Murdock told Griswold that he wanted to focus on splitting Dole into two companies.

During the same period, Deutsche Bank began modeling a transaction in which Dole would spin off Packaged Foods and then Murdock would take the remaining company private. Eric Brook, the Deutsche Bank coverage officer for Dole, instructed his team to model "[a] separation of the Packaged Foods business . . . with the idea being that the Fruit/vegetable business would be a private co . . . . The Consumer team will begin the go private analysis." JX 173 at 1. The overall structure resembled the plan in the Tesoriero Memo, but with the separation of [*23] Packaged Foods accomplished via a spinoff rather than a sale to Hain.

Deutsche Bank presented the spinoff-plus-take-private idea to Murdock on April 27, 2012. After the meeting, Brook instructed the Deutsche Bank team to work on two separate projects: a split-off and a refinancing for Dole and a freeze-out for Murdock. JX 179 at 1. Brook stressed that the latter was "not to share with Dole mgmt." *Id.*

At the time, Wells Fargo was already working with the Board on a spinoff of Packaged Foods. There were two main differences between Wells Fargo's plan and Deutsche Bank's. First, Wells Fargo planned a domestic IPO of Packaged Foods, while Deutsche Bank had convinced Murdock of the benefits of an Asian IPO. Second, Deutsche Bank was working on a follow-on take-private.

With Murdock on board, Deutsche Bank quickly asserted itself. On April 30, 2012, Deutsche Bank gave Dole management the presentation on the "Asian split-off and a refinancing" that Brook had contemplated. JX 183. On May 1, the Deutsche Bank team met again with Murdock. On May 2, the Board was scheduled to consider Wells Fargo's plan for the spinoff. So advanced was the transaction that the Wells Fargo presentation contemplated [*24] announcing *the next day*. But after Deutsche Bank's meetings with Murdock and Dole management, the Board decided to conduct a broader strategic business review. Dole retained both Wells Fargo and Deutsche Bank as advisors. Wells Fargo considered primarily U.S.-based transactions. Deutsche Bank explored opportunities in Asia.

On May 3, 2012, Dole announced the strategic business review. The defendants tried to spin this announcement as if Dole was exploring strategic alternatives for the whole Company, but Dole's announcement was narrower: Dole said it was reviewing alternatives and evaluating prospects and options "pertaining to select businesses of the company." JX 197. The announcement highlighted the possibility of a "separation of one or more of our businesses," which was consistent with Wells

Fargo and Deutsche Bank's earlier presentations focusing on divesting Packaged Foods. *Id.* Dole management considered and rejected a broader description. JX 196. Moreover, Murdock owned 40% of Dole's stock, and he was not a seller. Dole was looking primarily to sell Packaged Foods or other specific businesses to pay down debt. If an offer for the whole company had come in, Murdock and the **[*25]** Board would have considered it, but that was not the main focus of the exercise.

Wells Fargo contacted seventeen parties about their interest in potential transactions involving Dole's businesses. Ten executed nondisclosure agreements and received confidential information. None proposed a transaction. Apollo Global Management LLC ("Apollo") did contact Dole and expressed interest in purchasing Fresh Vegetables for $300 million. DeLorenzo told Apollo to offer at least $500 million. After receiving some due diligence, Apollo said it would raise its price, but would not commit to $500 million.

Meanwhile, Dole and Deutsche Bank reached out to ITOCHU, a company that had worked with Dole in Asia for over fifty years. ITOCHU had been Dole's importer of record in Japan, distributed many of Dole's products, and provided back-office services for Dole in the region. Dole and Deutsche Bank thought ITOCHU could serve as a cornerstone investor for an Asian IPO. ITOCHU was interested, and discussions began.

In May 2012, the prospect of an Asian IPO became less attractive after a selloff in the Asian markets. Murdock suggested that Dole and ITOCHU instead form a joint venture that would own the Asian **[*26]** operations of Fresh Fruit and Packaged Foods ("Dole Asia"). Negotiations shifted to that idea.

On June 14, 2012, Deutsche Bank provided Dole management with a presentation that analyzed both Apollo's offer for Fresh Vegetables and the potential ITOCHU joint venture. Deutsche Bank calculated that if Dole continued to trade at 6.1x EBITDA, then selling Fresh Vegetables for $500 million would increase Dole's stock price by 8.5%. JX 233 at 16. In contrast, selling half of the Asian joint venture to ITOCHU would increase Dole's stock price by 35.9%. *Id.* at 17.

After the meeting, Dole broke off discussions with Apollo to focus on the ITOCHU joint venture. The transactions were not mutually exclusive, but DeLorenzo thought continuing discussions with Apollo would be "too much of a distraction." DeLorenzo Dep. 21. The plaintiffs have questioned that decision, claiming weakly that it was intended to help Murdock with his eventual buyout. Having considered the record, I do not see anything problematic about the decision to focus on the joint venture.

### D. Murdock And Deutsche Bank Continue Their Freeze-Out Discussions.

During the strategic business review, Deutsche Bank acted as Dole's financial advisor and **[*27]** reported to the Board. While serving in that role, Deutsche Bank should not have been secretly helping Murdock plan to acquire Dole. But Deutsche Bank characterized itself as having a number of different relationships with Murdock and his companies. Deutsche Bank used these alternative relationships as conduits for conversations with Murdock that it should not have been having as the Board's advisor.

Deutsche Bank's roles included advisor and lender to Castle & Cooke and Murdock personally. Those roles provided the context for Deutsche Bank's meetings with Murdock about a going-private transaction in early 2012. Deutsche Bank had two separate coverage officers: Brook for Dole, and Richard

Grellier for Castle & Cook and Murdock. To maintain a façade of separation, Grellier took the lead during the early 2012 discussions with Murdock. Internally, Brook and Grellier kept each other informed and planned together.

Other Deutsche Bank roles included purchasing agent for Murdock's trades in Dole stock and margin lender to Murdock. In July, Murdock and Deutsche Bank used these roles as cover for further discussions about a going-private transaction. An internal Deutsche Bank presentation described **[*28]** Murdock's plans:

> Murdock has requested that [Deutsche Bank] consider providing debt capital alongside his capital to
>
> - 1) cash settle the remaining 24 [million] shares subject to forward sale [under the terms of the MACES issued at the time of the IPO]
> - 2) acquire some or all of the 15 [million] shares held by the top 15 shareholders in Dole
> - 3) depending on availability, acquire 90% or all of the shares of Dole.

JX 260 at 9. The presentation went on to discuss financing for an acquisition of "100% of the shares of Dole." *Id.* The presentation cited indications that Murdock was serious, including:

> — Murdock was receptive to guaranteeing the debt.
> — Murdock was willing to secure the debt using the $770 million in equity value of his holdings outside Dole.
> — Murdock had told Deutsche Bank that "he will continue to sell real estate assets that were previously considered lifetime hold assets" to fund the purchase of additional Dole stock.
>
> — In June 2012, Murdock had sold Madison Warehouse for $226 million and Castle & Cooke Cold Storage for $225 million, in addition to his earlier sale of the

island of Lanai. Murdock had told Deutsche Bank that he was "committed to contribute another $90 million **[*29]** of proceeds" from those sales "to increase his share position."

*Id.* at 8-9, 14. The internal Deutsche Bank presentation was consistent with the overall picture that emerges from the Tesoriero Memo, Murdock's prior discussions with Deutsche Bank, and Murdock's conduct, including his sales of assets like Lanai. Murdock was pursuing a long-term strategy directed towards taking Dole private.

## E. The ITOCHU Transaction

In late summer 2012, Dole's discussions with ITOCHU shifted to the possibility of ITOCHU acquiring Dole Asia (the "ITOCHU Transaction"). Both sides liked the idea, and discussions unfolded during August. On September 17, 2012, ITOCHU formally agreed to acquire Dole Asia for $1.685 billion in cash. Dole announced the agreement the same day. The price of Dole stock increased to over $14.00 per share.

Shortly after the ITOCHU Transaction was announced, Grellier and Murdock scheduled another meeting to discuss a freeze-out. Before the meeting, Brook spoke with DeLorenzo, who thought it was "best to find a way to get [M]urdock out of the [D]ole stock." JX 330 at 1. He recommended that Deutsche Bank present options that included an "equity market selldown," "sell[ing] [Murdock's] stake to [a] [private equity] or strategic **[*30]** [buyer]," and a cash sale to Chiquita, as well as a "full take private." *Id.; see* JX 325. But when Grellier met with Murdock the next day, Murdock volunteered that he wanted to take Dole private himself. Grellier 2123. Afterwards, Grellier told his team that Murdock was "anxious to do a deal" and "[e]specially interested in whether to aggregate assets and

do transformational deals before or after a potential take private." JX 326 at 1.

On January 11, 2013, Deutsche Bank sent a presentation about a freeze-out to Dole's Treasurer, Beth Potillo. Deutsche Bank asked that she review it and "let us know if you catch anything awry." JX 394 at 1. The presentation evaluated a freeze-out funded in part by rolling over Murdock's existing equity and an additional equity contribution of either $100 million or $250 million. *Id.* at 4-7.

The sending of the freeze-out presentation to Potillo illustrated how difficult it was for Deutsche Bank to maintain the fiction that it could differentiate between its roles. In this instance, while working for Dole and reporting to its Board, Deutsche Bank sent a presentation about Murdock's acquisition bid to a Dole officer and asked the Dole officer for comment. No one passed the information **[*31]** on to the Board.

At trial, Deutsche Bank claimed that it was no longer working for Dole when it began working on a freeze-out, but that was not accurate. Deutsche Bank began discussing a freeze-out with Murdock after the sale of Lanai. The spinoff and freeze-out were part of a two-step plan in which Murdock would take Dole private in the second step, although the second part of the strategy was "not to share with Dole mgmt." JX 179 at 1. Deutsche Bank continued its consideration of a take-private during the strategic business review, as shown by the July presentation about Murdock's stock ownership. *See* JX 260. Moreover, the signing of the agreement for the ITOCHU Transaction did not mean that Deutsche Bank's engagement ended. The firm's retention letter specified that its engagement did not end until that transaction closed, and that event did not occur until April 1, 2013. During this post-signing, pre-closing period, Deutsche Bank continued working on the ITOCHU Transaction, including by fielding calls from third parties and assisting Dole with regulatory approvals. During that period, Deutsche Bank continued helping Murdock plan a freeze-out.

**F. Carter Takes Over.**

As part of the ITOCHU **[*32]** Transaction, DeLorenzo committed to leave Dole, join ITOCHU, and run Dole Asia for at least two years. JX 371 at 9. In anticipation of DeLorenzo's resignation, the Board agreed that Murdock would start functioning as CEO, and Carter would start functioning as President and COO. Both formally assumed their roles in February 2013, after DeLorenzo resigned. The transition effectively took place in December 2012. Carter retained his position as Dole's General Counsel and Corporate Secretary. He also joined the Board. So did a former Dole director, Rolland Dickson. Dickson served on the Committee, and his background is discussed in connection with that role.

As a practical matter, responsibility for day-to-day management of Dole passed from DeLorenzo to Carter in December 2012. Carter was Murdock's only direct report, which meant that the executive team reported to him. *See* JX 699 at 2. His job was to carry out Murdock's plans, and he did so effectively, even ruthlessly. When Carter set a goal for a division, they fell into line. *See* Carter 869. Dole's executives could not envision anyone failing to carry out Carter's instructions. *See* Mitchell Dep. 56.

With the ITOCHU Transaction wrapping **[*33]** up, a freeze-out was the next step in the long-term plan Murdock had been pursuing. Dole had split off its higher-margin businesses, achieved a premium valuation, and used the proceeds to pay down debt. This created an opportunity to take the remaining business private.

The defendants have contended that Murdock did not decide to pursue a freeze-out until June 7, 2013, and did not make any preparations for the transaction before May 2013. That characterization is not accurate. Murdock had been focusing on a freeze-out since 2012, as demonstrated by the Tesoriero Memo, his regular discussions with Deutsche Bank, and his preparatory sales of assets. Once Carter took the reins, he began priming Dole for the final step.

### 1. Carter Guides The Market Downward.

Dole management knew that after the ITOCHU Transaction, Dole could achieve significant cost savings. Dole had sold approximately half of its business and could "right-size" the rest. *See* JX 1147 at 6. In its fairness presentation to the Board, Deutsche Bank advised that Dole could achieve $50 million in annual cost savings. Deutsche Bank viewed the $50 million per year estimate as reasonable, had undertaken "due diligence discussions around **[*34]** it," evaluated "what triggered the cost savings," and "stress-tested" the estimate to "understand what the sources of those cost savings were to confirm that those made sense in the context of the separation of Dole Asia." DiMondi 1464-66. In a presentation to analysts, DeLorenzo provided the same $50 million figure, explaining that $20 million of savings would be implemented immediately at the corporate level and the remaining $30 million would be implemented at the division level, with the full run-rate of $50 million per year achieved by the end of 2013. These estimates were arguably conservative. An April 2012 analysis by Dole management estimated annual total cost savings as high as $125 million. JX 1615 at 3. And in January 2013, Deloitte & Touche had sent Carter an analysis identifying savings of $50-90 million per year. JX 389 at 4.

In November 2012, Dole reiterated that it expected to achieve the full $50 million in annual savings, with $20-25 million achieved in 2013 and the full $50 million per year starting in 2014. JX 350 at 11. A Board presentation in December 2012 projected similar figures, although with a one-year delay before they would be fully achieved. According **[*35]** to that presentation, $35 million in savings would be achieved in 2014 and the full $50 million achieved in 2015. JX 370 at 8.

Then in January 2013, Carter announced something different. In a January 2 press release, he told the markets that Dole's "current expectation" was for adjusted 2013 EBITDA in the $150-$170 million range, "including 2013 planned cost savings in the $20 million range." JX 384. He did not mention any additional cost savings. Dole's stock price dropped 13% after the announcement. JX 987 at 5.

Three weeks later, Dole issued another press release. It quoted Carter as saying, "[W]e expect 2013 Adjusted EBITDA for the new Dole to be at the low end of the guidance range we announced on January 2, 2013, assuming no major market changes." JX 400 at 3. The January 24 release also lowered Dole's valuation of certain assets, including 25,000 acres of land in Hawaii, which was revised down to $175-$200 million from over $500 million just four months prior. *Id.* at 4; JX 1138 17. And, on February 22, 2013, Carter announced that "[f]resh fruit performance is continuing its declining trend, principally due to banana market conditions, and Dole expects that 2013 Adjusted EBITDA for these businesses **[*36]** will be at the low end of the previously announced guidance range of $150 - $170 million . . . ." JX 426 at 3.

The defendants have claimed that Carter made these announcements because he

honestly believed that Dole would not hit its guidance and that $30 million of the $50 million in savings was not achievable. The $50 million in savings that DeLorenzo announced, however, was actually lower than Dole's internal plan, which identified $62 million in specific cost-cutting initiatives. JX 3069 at 2. As support for the supposed impossibility of achieving the cuts, Carter argued that "one of the ideas was to smash together, merge if you wish, our Vegetables business with our North America Fresh Fruit business" and that such a move "just could not work in the market in terms of the people we sold to." Carter 1105. That portion of the cost-saving plan accounted for only $10-$20 million in cost savings, leaving $42-52 million in other initiatives. JX 389 at 13. The defendants never went over the detailed spreadsheet of department-by-department savings that DeLorenzo prepared. They simply relied on Carter's testimony, without offering any quantification or support. *See* Carter 872, 1105, 1137. [*37]

Just as the defendants did not explain where the cost savings went at trial, Carter did not explain the disappearance of the cost savings to the market. The loss of $30 million in savings represented approximately 20% of Dole's forecasted EBITDA, yet he mentioned it virtually without comment. The timing of his announcement on January 2 suggests the real reason. It came just after Deutsche Bank renewed its discussion with Murdock about the freeze-out and just days before Deutsche Bank gave a detailed presentation that it prepared with the assistance of Dole management on January 11. *See* JX 326, 394. In other words, Carter made the announcement just as internal discussions about the freeze-out were heating up.[8]

## 2. The Brouhaha Over The Self-Tender

A week after the January 2, 2013, release that guided the market downward, Murdock, Carter, and Potillo met with Deutsche Bank, ostensibly about a potential share repurchase program for Dole. Deutsche Bank's presentation did discuss Dole repurchasing $25-$200 million of its shares, but also contained a section on a potential purchase of 100% of the Company's outstanding stock—a full take-private. JX 392. On January 25, 2013, Deutsche Bank sent Griswold and Potillo another presentation and discussed in the cover email how the different programs would affect Murdock's ownership and his ability to gain majority control. JX 404 at 1. A presentation prepared by Scotiabank, another Dole lender, explained how the repurchase program would fit into plans for Murdock to take Dole private. JX 447 at 6. Scotiabank [*39] projected that the repurchase price would be significantly lower than what Murdock would pay for the remaining shares, meaning Murdock would benefit more from a larger repurchase.

In February 2013, Deutsche Bank provided Dole management with another presentation, this time analyzing the choice between a self-tender and a program of open market purchases. JX 415 at 6-7. The presentation explained that a self-tender would enable Dole to buy a larger volume of shares quickly, but that Dole would have to pay a 26 premium over market. With the open market program,

---

[8] Equally telling was the fact that promptly after the Merger had been negotiated, Murdock told his lenders that Dole could achieve $200 million in EBITDA. Carter testified that Murdock made that claim without any support, and that he was forced

to fill in the gap with cost savings. Carter 970-71. Fortunately, Carter was able immediately to identify $40 million in cost savings, $35 million of which were unrelated to the elimination of public company costs. Carter 971, 979. In reality, [*38] the cost savings that Carter found were the same savings that were previously available. During his deposition, Renato Acuña, the President of the Fresh Fruit division, testified candidly that the cost savings achieved after the Merger were available previously. *See* Acuña Dep. 14-15. Carter simply delayed them so that post-Merger, Murdock would benefit.

Dole would not a pay a premium, but there was a "risk of price appreciation given the long time frame." *Id.* at 7. Describing the price appreciation as a "risk" showed where Deutsche Bank's loyalties lay. Price appreciation was a risk to Murdock for taking the company private. It was not a risk for Dole or its stockholders, who would benefit from the higher price.

Murdock and management decided that they favored the self-tender. Dole hired Bank of America Merrill Lynch ("BAML"), another bank that Dole had worked with frequently in the past, to advise on the share repurchase. At Deutsche Bank, Grellier and Brook decided they were "comfortable" **[*40]** with this development because they thought it was "[b]etter to hold out for [the] advisory" engagement on the freeze-out transaction. JX 474 at 1. They just needed to "[make] sure [the BAML bankers] don't get too close to go private discussions." *Id.*

On May 2, 2013, the Board discussed the potential share repurchase program. At the time, the Board had nine members. Three were members of management: Murdock, Carter, and DeLorenzo. A fourth was Murdock's son Justin. The other five were outside directors: Conrad, Weinberg, Lansing, Dickson, and Elaine Chao. The four outside directors other than Weinberg would later serve on the Committee, and this decision discusses their backgrounds in connection with that event.

Conrad and Weinberg opposed the self-tender. They believed that open market purchases were better for Dole and its stockholders. Due to their opposition, the Board decided to revisit the issue in three to five days. Weinberg made plans for the outside directors to have an executive session with counsel in the interim.

Meanwhile, the bankers at BAML were becoming concerned. They advised Carter and Potillo to buy shares in the open market or wait for the stock price to decline. JX 510 at **[*41]** 1. Internally, the bankers described the self-tender as "ridiculous and terrible corporate finance" to the point where "[r]eputational risk of such is [a] real issue . . . ." JX 511 at 1.

But Murdock kept pressing for a self-tender, and he called Conrad and Weinberg repeatedly about it. Eventually, Conrad told Murdock bluntly that he thought Murdock was trying to get a majority of the shares and that Conrad would not let him do it through a self-tender. Murdock became furious. Conrad 831. On May 4, 2013, he left Conrad the following voicemail:

> Hello, Dr. Conrad. David [Murdock]. I'd like to talk to you. I'm in New York at [telephone number]. I wanted to talk with you about what's going on [with] you and Denny Weinberg. I can't believe that you are opposed to the most, very good thing for the company, and I cannot imagine why you would be opposing it, but it sure as hell pisses me off to think that you didn't call me and tell me what it is going on with you. I'm not accustomed to having a friend double-cross me but if that has happened . . . .

JX 518. Murdock continued speaking, but Conrad's voicemail stopped recording. At trial, Murdock testified that he ended his threatening message with the suddenly **[*42]** conciliatory conclusion, then "I'll go your way." Murdock 415. That testimony was not credible.

On May 6, 2013, the outside directors met in executive session. They discussed the self-tender and open market repurchases. They also considered possible defensive measures against Murdock, but decided not to implement any.

On May 8, 2013, the full Board met. Murdock did not attend. The directors unanimously

approved open market repurchases.

After the vote, Murdock left a voicemail for Weinberg that was similar to the one he left for Conrad. Weinberg described the message as "not for public consumption." Weinberg Dep. 33. Conrad described it as "stronger than mine." Conrad Dep. 13. Weinberg recalled Murdock saying, "[I]f you think you're trying to take over my company, you won't be successful. Nobody needs you, including me, and we'll talk about that more when you call me." Weinberg Dep. 33; *cf.* Murdock 62-66 (providing not-credible testimony after viewing video clip of Weinberg).

Weinberg did not call Murdock back. A few days later, Carter called Weinberg and asked him to resign, citing a "lack of collegiality at the board level" due to Weinberg's "personality clash" with Murdock. Carter Dep. 20. **[*43]** On May 14, 2013, the Board executed written consents accepting Weinberg's resignation. Justin Murdock also resigned. This left Dole with three management directors (Murdock, Carter, and DeLorenzo) and four non-management directors (Conrad, Chao, Lansing, and Dickson).[9]

### 3. Carter Cancels The Repurchase Plan.

Murdock did not get his way on the self-tender, but he and Carter made sure that the

outside **[*44]** directors did not get their way either. Two weeks later, Carter used the pretext of funding new ships to cancel the repurchase program.

Dole shipped most of the bananas destined for North America on a fleet of three refrigerated vessels. By 2013, the ships were old and needed replacing. In May, Dole management recommended commissioning three new ships for $168 million. Management explained the old ships had to be retired, and Dole would either need to buy new ships or pay expensive third-party shipping costs. Management estimated that new ships would save $37 million per year compared to third-party shipping costs.

The Board approved the new ships, and Carter issued a press release announcing the decision on May 28, 2013. In the same press release, he announced that share repurchases had been "suspended indefinitely." JX 582. The press release quoted Carter as stating:

> [W]e have decided to use our existing funding resources to take advantage of this opportune window in the shipping industry. . . . With the approximate $165 million investment in the ships and the drag on earnings due to significant losses in our strawberry business, the share repurchase program is being suspended indefinitely. **[*45]**

*Id.* at 1. After the announcement, Dole's stock price tumbled 10%.

Carter had not informed the Board about his decision to suspend the repurchase plan, nor had he suggested any connection between the ships and the repurchase plan. Dole's outside directors only learned of the plan's cancellation from public sources. Chao described the press coverage as "pretty devastating" and asked Carter if he had anticipated the response. He had, and he testified at trial that he knew the

---

[9] When asked about the reason for Weinberg's departure during his deposition, Murdock initially testified that Weinberg had bought a house on Lanai, "was thinking about retiring," "was thinking of doing other things," "didn't have time," and "couldn't always be [present at Board meetings]." Murdock Dep. 41. After being confronted with his May 4 voicemail to Conrad and Weinberg's deposition testimony, Murdock conceded the true backstory of Weinberg's ouster. Murdock 42-45. Murdock nevertheless claimed that he and Weinberg "stayed—not quite as close a friends as we used to be, but friendly" and that Weinberg "was at his house and had meals." Murdock 67. Weinberg testified during his deposition in May 2014 that he had not spoken to Murdock since leaving the Board a year earlier. Weinberg Dep. 34.

announcement would drive down the stock price. JX 592; Carter 1101.

At trial, Carter claimed he cancelled the plan because he was worried about covenants in Dole's debt, and he performed a calculation which showed the covenants were at risk if Dole immediately spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships. That calculation was pretextual. Dole was not obligated to spend the full $200 million on shares, and the program was authorized to be carried out over a year. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The Board believed that the ship acquisition and share repurchase programs were [*46] both feasible. So did BAML, which advised the Board on the share repurchase. On cross-examination Carter conceded that the debt covenants would not have been tripped by pursuing both initiatives, even if the ships had been paid in full and all $200 million of share repurchases were completed in May 2013. Carter 1097-1101. In any case, there was no reason Carter needed to take action immediately without consulting the Board.

### G. Murdock Makes His Proposal.

While these events were unfolding, Murdock was making his final preparations for the freeze-out. During a meeting on April 12, 2013, Murdock cautioned Deutsche Bank to provide feedback "in verbal form only" and "to restrict the working group to only senior bankers," which meant the people who had "been at his breakfast table over the last 90 days." JX 476 at 1. After the meeting, Deutsche Bank updated its internal materials. JX 1681 at 1.

On May 15, 2013, Murdock met with senior bankers from Deutsche Bank and told them he wanted a "highly confident" letter on May 29 and would "approach the board on the 31st."

JX 555 at 1. Murdock and Carter spoke with Deutsche Bank again on May 20. JX 564 at 1. They discussed "arranger fees" for Deutsche [*47] Bank to finance the take-private. *Id.*

At trial, despite all of his preparations, Murdock testified that he had not yet decided to propose the Merger. He claimed that in early June 2013, he visited his friend Lee Kun-hee, the chairman of Samsung, in South Korea, and that Lee told him to make up his mind. Murdock supposedly decided on the flight back to pursue the freeze-out.

That is a nice story, but Murdock did too much planning over the preceding months, had been considering a freeze-out for too long, and is too decisive an individual to have dithered until Lee bucked up his courage. He initially delayed because he thought the share price was trending down, in part because of Carter's activities, and a lower price would make his proposal look better. *See* JX 1689. Murdock may well have chosen not to make his proposal formally until after he returned from Korea, but that was a matter of personal convenience. It was not because he was at a loss for what to do.[10]

### H. The Committee

On June 10, 2013, Murdock delivered his initial proposal to the Board. JX 604. The stock had most recently traded at $10.20. Murdock's letter contemplated a transaction at $12.00 per share. Murdock stated that he was "a buyer, not a seller," so the Board would not be able seek a higher price per share from a third party

---

[10] Carter claimed at trial that he was shocked to receive Murdock's proposal. Carter 946. That testimony was not credible. Carter participated in meetings and conference calls concerning Murdock's take-private plans during the preceding [*48] months, and he had helped negotiate the financing fees that Deutsche Bank would earn.

interested in buying the entire Company. *See* JX 610; Murdock 460-61; Conrad Dep. 9.

Murdock set a deadline of July 31, 2013, for the Board to respond to his offer. His letter stated that "time is of the essence" and that he planned to withdraw his offer if it wasn't accepted by July 31. JX 604 at 4. Murdock did not set the deadline because of any particular event that would occur after July 31. Murdock admitted at trial that he set an artificial deadline so the Board would have to act quickly. Murdock 459-60.

On June 11, 2013, the Board formed the Committee, comprising Conrad, Chao, Dickson, and Lansing. Of the four, Conrad had the most entanglements with Murdock:

• Conrad had a long history as a director for Murdock-controlled companies. He served as a director of Castle **[*49]** & Cooke from 2005 to 2009, and as a director of Castle & Cooke Investments from 2008 to 2009. At the time of the Merger, he had served as a director of Dole since 2003 and also served as a director of NovaRx Corporation, another company that Murdock controlled.

• In addition to serving as a director of NovaRx, Conrad served as a clinical design consultant for NovaRx and invested $2 million in Prescient Innovations I, LLC, the affiliate through which Murdock controls NovaRx.

• Conrad and Murdock co-founded the California Health & Longevity Institute, where Conrad served as the Lab Director. Conrad owned 70% of the entity, which was located across the street from Dole's headquarters in space leased from a Murdock affiliate.

• Conrad was the Chief Scientific Officer of the North Carolina Research Campus (the "NCRC"), which Murdock founded in 2005 and to which Murdock gave $700 million. One of the NCRC's programs is the David H. Murdock

Research Institute (the "Murdock Institute"). During the time that he served on the Board, Conrad served as a director of the Murdock Institute. Since 2007, Murdock and his affiliates made contributions and extended loans to the Murdock Institute totaling **[*50]** $243.2 million. On May 8, 2013, shortly before he made his merger proposal, Murdock pledged an additional $50 million to the Murdock Institute.

• Conrad was the Executive Vice President and Chief Scientific Officer of LabCorp. In collaboration with Duke University, LabCorp was commercializing new biomarkers using data from the MURDOCK Study (Measure to Understand Reclassification of Disease of Cabarrus/Kannapolis), funded through a $35 million grant from Murdock.

In addition to these carrots, Murdock had shown Conrad the stick. After Conrad and Weinberg led the opposition to Murdock's self-tender proposal, Murdock left threatening voicemails for both of them, and Carter secured Weinberg's resignation.

Dickson's connections to Murdock were not as extensive as Conrad's, but also deserved a closer look. He was the Emeritus Director of Development at the Mayo Foundation for Medical Education and Research. Murdock had contributed to the Mayo Foundation to fund a professorship called the David H. Murdock-Dole Food Company Professorship, and the Mayo Clinic listed Murdock as a principal benefactor. In 2001 and earlier, Dickson served as Murdock's personal physician. From 1999 to 2003, Dickson **[*51]** served on the Dole Board, and he was a member of the special committee that approved Murdock's going-private transaction in 2003. After that deal closed, Dickson left the Board. Murdock reappointed Dickson to the Board in February 2013—just months before he made his proposal. One might be skeptical

about the coincidence. Dickson received $98,000 for serving on the Committee in 2013, which represented approximately one-fourth of his income.

Lansing was a former actress and successful film studio executive, having served as Chair and CEO of the Motion Picture Group of Paramount Pictures from 1992 to 2005. She was also a philanthropic leader. She co-founded the California Spirit gala, which raises funds for the American Cancer Society. In 2009, the California Spirit event honored Murdock, and Lansing joined the Board later that year. Of a similar order of magnitude, Lansing had served on the Board of Regents of the University of California system since 1999 and was Chair from 2011 to 2013. She also served on the board of the UCLA Foundation, while Murdock has been a Regents' Professor of Creativity in Business at UCLA's Anderson Graduate School of Management and presented at the UCLA Longevity **[*52]** Center Institute Conference. Lansing also served on the American Red Cross Board of Governors, which held its All American Award Dinner in 2013 at the David H. Murdock Core Laboratory at the NCRC.

Chao had the fewest ties to Murdock. She served as a director of Dole from 1993 to 2001, then rejoined the Board in 2009. She served as Secretary of Labor in the cabinet of President George W. Bush from 2001 to 2009. Murdock raised funds for George W. Bush. She is married to Senator Mitch McConnell, and Murdock contributed $4,800 to his campaign in 2008.

Murdock, Carter, and DeLorenzo wanted the Board to pick the Committee's Chair, and they wanted it to be Conrad. The Committee members wanted to pick their own Chair, and because they comprised a majority of the Board, they were able to include this power in the resolutions. Murdock, Carter, and

DeLorenzo voted against that provision. The disagreement over who should pick the Chair turned out not to matter, because the Committee chose Conrad anyway.

Before trial, Conrad's role as Chair was not a reassuring fact. It was reasonable to infer from Conrad's ties to Murdock, the events surrounding Weinberg's resignation, and the insiders' desire to **[*53]** have Conrad as Chair that Conrad would be cooperative, if not malleable, when facing Murdock. But after hearing Conrad testify and interacting with him in person at trial, I am convinced that he was independent in fact.

Dickson, Lansing, and Chao did not testify at trial, but having considered the Committee's performance, I have no concerns about their independence. That is all the more true for Lansing, whose connections to Murdock suggested only that they moved in the same circles and were not themselves compromising, and for Chao, whose connections to Murdock were similar in tenor but less extensive.

## I. Carter Interferes With The Committee.

With the Committee established, it would have been nice if Murdock and Carter had stepped aside and let the Committee do its job. They could have taken the 4-to-3 vote on choosing the Chair as an indication that the Committee would be independent. Instead, Carter asserted himself.

The first fight was over the scope of the Committee's authority. The Committee wanted its mandate to include considering alternatives to Murdock's proposal, with the additional authority to continue considering alternatives even if Murdock withdrew his proposal. Carter **[*54]** objected, telling the Committee:

The Dole Board created the Special Committee . . . specifically to deal with

Murdock's proposal and for no other purpose. That's the only delegated authority from the Board. That's why the resolutions have a termination provision, so that the Special Committee's mandate ends if the proposal is withdrawn. . . . [T]he Board did not replace itself with a charge to sell the company other than in the context of the proposal.

JX 651 at 1. As Conrad recalled, Carter "hammered on" these issues with the "intention to try to limit the scope of what the Committee could do." Conrad Dep. 20. The Committee members decided not to force the issue because they believed that if push came to shove, they comprised a majority of the Board and could have a new vote at the Board level.

The next confrontation was over the Committee's ability to enter into non-disclosure agreements with other potential bidders. Carter insisted on having control over the terms of the agreements. He stated that "Dole will not delegate its authority over its own proprietary confidential information" to the Committee, and he insisted that "Dole will enter in a direct confidentiality agreement with that [*55] party, starting from a standard form and tailoring for the specific attributes of that third party." JX 651 at 1. On this issue, Carter was clearly in the wrong, because it was the Committee that was empowered to exercise Dole's authority, not Carter. But the Committee decided not to force this issue either. As a result, Carter always knew whenever the Committee provided confidential information to an interested party. Carter nominally worked for Dole, but he really worked for Murdock, so Murdock knew as well.

The third dispute was over the Committee's choice of advisors. Conrad took the lead in the selection process, and he started by reading *MFW*. With the help of other Committee members, Conrad compiled a list of law firms and investment banks. To ensure that their advisors would be independent, Conrad and the Committee ruled out firms that had done business with Murdock or Dole, as well as any firms that Murdock or Dole recommended. After interviewing several, they retained Sullivan & Cromwell LLP and Richards Layton & Finger, P.A. as their legal counsel, and Lazard as their financial advisor. The lead attorney from Sullivan & Cromwell was Alison Ressler. The lead partner for Lazard [*56] was Al Garner.

Carter objected to Lazard. He wanted the Committee to hire BAML, a bank with a longstanding relationship with Dole. Carter complained that Conrad had not given him a draft of Lazard's engagement letter before signing it, that a twelve-month engagement was too long, and that the letter contemplated that Lazard would explore alternative transactions. Returning to his stance on the Committee's mandate, Carter argued that "Lazard is incentivized to go well beyond Murdock's Proposal and the Board's intended scope of the Special Committee." JX 660 at 3. Carter complained to Murdock and DeLorenzo as well, explaining that "the scope of Lazard's engagement goes well beyond the Special Committee's mandate." *Id.* at 1.

In response to Carter's concerns, the Committee and Lazard removed the reference to a twelve-month engagement and the detailed description of alternative transactions. *Compare* JX 654 *with* JX 652. At trial, Conrad explained the practical reasoning behind the concession. Carter was refusing to let Lazard start conducting due diligence until he signed off on Lazard's engagement letter, and the clock was ticking on a response to Murdock's offer.

Meanwhile, Murdock was preparing [*57] to launch a hostile tender offer if the Committee did not respond favorably by the July 31

deadline. On June 28, Murdock told Deutsche Bank that he was 75% sure he wanted to move forward with a hostile tender offer if the Committee did not agree to a transaction, and he told Deutsche Bank to be ready to launch in three to four weeks. JX 1729 at 1. Murdock indicated that his reserve price for the tender offer was between $13.00 and $13.50 per share. *Id.* Deutsche Bank prepared an internal "hostile offer memo" describing the offer. JX 1613. A draft press release contemplated that the offer would be launched during the Committee's deliberations. It included a proposed quotation from Murdock which stated that he was making a tender offer despite "recogniz[ing] that the Dole special committee has not concluded its study of my initial proposal." JX 678 at 2. Other documents confirm that Murdock was preparing to launch a hostile offer. *See, e.g.,* JX 679; JX 1607; JX 1730; JX 1757. Carter knew that Murdock was preparing the hostile offer and consulted with Deutsche Bank and Murdock about it. *See* JX 1729 at 1; JX 1730 at 1; *cf.* Carter 966. At trial, Carter argued that he had no obligation to inform the Committee **[*58]** as long as Murdock had not yet made a firm decision to launch. Carter 1013.

### J. Carter Gives False Financial Information To The Committee.

The next step in Carter's interactions with the Committee proved fatal to the process. To be able to negotiate at arm's length with Murdock, the Committee needed reliable financial projections from Dole management. Lazard's work, including any fairness opinion it rendered, likewise depended on "the accuracy and completeness" of "estimates and forecasts provided by the Company." JX 783 at 2. As Garner candidly acknowledged, material misinformation from the Company could undermine the entire exercise. Garner 1311.

Carter used his control over Dole's management to provide false information to the Committee. In the ordinary course of business, on an annual basis, Dole prepared three-year budgets and financial projections using a bottom-up process. That process typically began in late summer and continued through the fall. It started with the operating divisions, which created detailed models and projections for Dole's management. Management then aggregated the projections, met with the divisions, and pushed them to refine their figures. After an iterative **[*59]** process, senior management generated the final numbers.

Using its standard process, under DeLorenzo's direction, Dole had prepared a set of three-year projections in December 2012 (the "December Projections"). In April 2013, Dole provided the December Projections to its lenders for use in refinancing Dole's debt after the ITOCHU Transaction.

Lazard obtained a copy of the December Projections shortly after being retained. On July 8, 2013, Lazard met with Dole management to discuss the December Projections. At the meeting, Lazard asked for updated projections that reflected Dole management's "current best views about the prospects of [the] business." Garner 1248. Lazard also asked Dole management to extend the projections from three to five years.

Carter took charge of revising the December Projections. He called together Dole's senior management, including the division heads from foreign offices, for a two-day meeting on July 9 and 10, 2013. During the meeting, Carter instructed the division heads to create modified projections from the top down. Rather than generating a complete set of projections with supporting profit-loss statements, Carter and his team created only high-case and low-case **[*60]** adjusted EBITDA forecasts. Carter

told the division heads to reverse engineer the supporting budgets after the meeting. That process was not completed until July 22, 2013.

On July 11, 2013, Carter presented the new five-year projections (the "July Projections") to the Board and the Committee. He did not give the Committee or its advisors the opportunity to meet in person with the division heads.

The July Projections were significantly lower than the December Projections. For example, the July Projections reduced the EBITDA in year three of the December Projections from $211.9 million to $169.2 million, a reduction of over 20%. JX 783 at 17. The July Projections were so low that Lazard did not think they would support Murdock's $12.00 offer, much less provide a basis for negotiating a higher price. Garner 1249. Conrad concluded that the projections were not "an accurate representation of the value of the Company." Conrad Dep. 25. Garner thought that "management had taken a meat cleaver to the projections in a way that it would be very difficult, if not inappropriate, for a committee to weigh these projections as the basis for determining the adequacy of a price." Garner Dep. 32.

Two aspects **[*61]** of the July Projections warrant particular focus. First, the projections contained only $20 million out of the $50 million in post-ITOCHU cost savings that Deutsche Bank had validated and DeLorenzo had originally predicted. Carter 881-82. This decision has already discussed the unsupported nature of that reduction.

Second, the July Projections did not forecast that Dole would receive any additional income from purchases of farms. Carter 985. At the time Carter prepared the July Projections, Dole management had identified the need to acquire farms as a strategic imperative. Dole sourced its fruit in Latin America from both Dole-owned farms and independent growers,

and Dole had embarked on a long-term strategy of increasing the amount of fruit sourced from Dole-owned farms. Historically, Dole occupied an advantageous position as a middleman that bought from disorganized and unsophisticated growers and sold to a fragmented distribution market that lacked pricing power. But in the new millennium, both ends of the equation were changing. Consolidation in the grocery industry and the entry of large purchasers like Wal-Mart shifted the balance of pricing power towards distributors. Meanwhile, **[*62]** the internet gave growers access to detailed pricing information, and changes in the transportation market enabled them to bypass Dole by shipping fruit in refrigerated containers on general purpose container ships. The logical strategic response for Dole was to increase the scope of its vertical integration by acquiring farms, thereby capturing the growers' share of the profits.

Before the ITOCHU Transaction, Dole had plans to purchase additional farms in Latin America. In October 2012, the Board approved the acquisition of 2,328 hectares of banana farms in Ecuador for $58.9 million, which Dole estimated would generate $15 million per year in incremental income. JX 344 at 71. Dole expected that investing in other new farms similarly would "improve [Dole's] average fruit cost . . . and margins." JX 900 at 2.

Dole delayed the farm purchases because of "cash flow restrictions" before the ITOCHU Transaction. Id. at 2. The sale to ITOCHU gave Dole the financial resources to resume its purchases. Id. Dole bought approximately half of its targeted farms before the remaining purchases were suspended because of a tax dispute with Ecuadorian authorities. JX 421 at 7; Acuña 1167.

Although Dole had focused **[*63]** initially on Ecuador, the Company's interest in farms was

not limited to that country. Dole was engaged in a "permanent search for the most efficient source mix" in Latin America and beyond. JX 900 at 2. Put simply, Dole was interested in good deals on farms wherever it could find them, and the capital request for the Ecuador farms noted that buying farms in Guatemala and Costa Rica would be advantageous for the same reasons. JX 900 at 2; DeLorenzo 641-43, 680. But the July Projections did not contain any incremental income from farms.

In contrast to what gave the Committee, Carter provided more positive information to Murdock's bankers when he met with them separately the next day. Griswold had asked Carter to set up a meeting between Dole management and the lenders for Murdock's freeze-out so that the lenders could conduct financial due diligence. Having brought Dole's management together to create the July Projections, Carter had them stay for a meeting with Murdock's bankers on July 12, 2013 (the "Lender Meeting"). Multiple representatives from Deutsche Bank, BAML, and Scotiabank attended, as did Griswold and Murdock's attorneys from Paul Hastings. At least fourteen members of Dole's **[*64]** senior management were present. Carter did not tell the Committee or its advisors that the meeting was taking place.

Carter claimed at trial that the purpose of the Lender Meeting was to update Dole's existing lenders about the Company's performance, not to talk about Murdock's take-private proposal. Carter 964. That was false, as he conceded when confronted with contrary evidence on cross-examination. Carter 1024. Griswold had asked for the meeting, and he was not a Dole employee. When instructing Dole management to stay for the meeting, Carter told them explicitly that they needed to "[p]lan to hold over to make presentations/respond to questions in a D/D [due diligence] meeting on Friday July 12 . . . [to] [a]bout 20+ people from

DHM's [Murdock's] four lead banks *re the go-private proposal.*" JX 681 (emphasis added). Deutsche Bank regarded the Lender Meeting as a "Project Fresh Financing Due Diligence Session," using the code name for the freeze-out ("Project Fresh"). JX 3042 at 1.

During the Lender Meeting, Carter told Murdock's bankers that Dole would outperform the July Projections. He said that Dole would "beat or meet forecasts of $155 [million in EBITDA]" and that Dole likely could "upsize **[*65]** the projection by $18-$19 [million]." JX 692 at 1.

During the Lender Meeting, Carter discussed the projected $50 million in post-ITOCHU Transaction cost savings. The meeting agenda included a discussion of the "timing and realization of total cost savings, originally guided at $50 m[illion] at the time of [the] announcement of [the] ITOCHU transaction." JX 3042 at 10. In preparing for the meeting, Carter did not simply stick to the lowered guidance he had given the market in January. He instead instructed Tesoriero to send him the original analysis that supported "well over $50 [million in cost savings]" on July 2. JX 1697 at 1. According to notes by a Deutsche Bank representative, Carter said Dole already had achieved "just $20 [million] of cost savings" in the $154 million EBITDA for 2013. JX 692 at 3.

Carter also told Murdock's bankers during the Lender Meeting that Dole would be able to substantially increase its income by buying more farms. Notes taken by a Deutsche Bank representative reflect that Dole's farm purchases "[e]asily could be $100 [million] ($15 [million] initial return or 20% EBITDA margin)." JX 692 at 3. Dole was "[t]rying to reach a competitive advantage in Guatemala" and hence "buying its **[*66]** own farms for the first time." *Id.* at 2. Ecuador remained at the top of the list, but Dole "could capture a buck

on pricing anywhere by buying farms." *Id.* at 3. Notes taken by a BAML representative confirm Dole's plan to "[a]cquire more land to have more Dole owned bananas and pineapples." JX 699 at 5.

The Committee and its advisors never found out about the full scope of the Lender Meeting. They did learn the next day that Deutsche Bank had met with Dole management without them, and they were informed that Deutsche Bank had access to the Committee's data room. JX 700 at 3. But until this litigation, the Committee and its advisors never knew that BAML, Scotiabank, Wells Fargo, Paul Hastings, and Griswold had also attended the Lender Meeting, or that Murdock's advisors had the opportunity to meet in person with and question Dole's international management. *Id.*; Conrad 816. By the time the Committee learned about the meeting, Dole's international management team had already dispersed throughout the world, so the Committee could not obtain equivalent information for itself. *See* Conrad 813.

The Lender Meeting was an obvious violation of the procedures that the Committee had established. On June 24, 2013, Conrad **[*67]** had sent letters to Murdock and Carter setting forth the procedures to be followed for confidential information about Dole in connection with Murdock's proposal. JX 646 (the "Process Letter"). The Process Letter instructed Murdock and his advisors to go through the Committee when interacting with Dole on matters relating to Murdock's proposal. It stated clearly that "all communications by you or any of your advisors concerning [the proposed take-private] . . . should be strictly limited to myself, as Chairman of the Committee, or our advisors, [Sullivan & Cromwell] and Lazard." *Id.* at 2.

If the Committee had known about the planned Lender Meeting, it would not have permitted the meeting to take place. Garner 1323-24. If the Committee had authorized some form of due diligence meeting for Murdock's lenders, then Lazard and possibly the Committee members themselves would have attended. *Id.* Lazard and the Committee never learned what Carter told Murdock's lenders about the cost savings and the farms. Conrad 815-16, 819-22. As Conrad recognized, "[t]his information would have been helpful and important to us. We should have known this." Conrad 834.

The Lender Meeting was not the only time that Carter flouted **[*68]** the Committee's instructions. After learning that Deutsche Bank had met with Dole management, Sullivan & Cromwell instructed Carter to "immediately shut down Deutsche Bank's access to the data room and cease to provide them with any information." JX 700 at 3. *Carter refused*. When Sullivan & Cromwell responded that providing information to Deutsche Bank violated the Process Letter, Carter responded, without explanation, "I am complying with the process letter." *Id.* at 1. But he wasn't, and he hadn't.[11] Carter also had violated the Process Letter and his duties to Dole by helping Murdock and Deutsche Bank to plan a hostile tender offer, and he would do so again later in the process by advising Murdock and his team about negotiating with the Committee and the terms of the eventual merger agreement.

_____

[11] At trial, after being pinned down on cross-examination and forced to concede the actual subject matter of the Lender Meeting, Carter characterized his decision not to tell Lazard about it as an innocent mistake, suggesting that "if I had to do it again, I would have [invited Lazard]." Carter 965. That testimony was not credible. Carter invented a cover story for the Lender Meeting at the time, and he **[*69]** stuck with it until it was proven false on cross-examination at trial. He never provided the Committee with full disclosure about the participants in the Lender Meeting or its subject matter even after the fact. And he continued to violate the Process Letter in other ways as the Committee's process unfolded.

## K. The Committee Develops Its Own Projections.

Once the Committee and Lazard realized that they could not rely on the July Projections, they decided to prepare their own forecasts. They used the December Projections as a starting point and made their own adjustments. The Committee instructed Lazard to attempt to replicate Dole's normal bottom-up budgeting process and to draw on other sources within Dole, such as materials used to secure financing, public statements about value, and Board presentations.

Using these inputs, Lazard prepared the "Committee Projections." *See* JX 783 at 21-22. Conrad personally spent many hours working with Lazard on the new projections. Conrad 767. The Committee and Lazard concluded that the Committee Projections represented an aggressive but reasonable and achievable forecast. Conrad Dep. 29; Garner 1258.

Notably, because Lazard relied on guidance provided **[*70]** by Dole management, the Committee Projections did not include upward adjustments for achieving the final $30 million of the $50 million in cost savings or from the purchases of additional farms. Conrad 820-22. Lazard did not include any additional cost savings associated with the division-level restructuring plan that was adopted after the ITOCHU Transaction because management did not advise Lazard that the remaining initiatives could still be undertaken. Lazard also did not have access to Tesoriero's analysis that supported the $50 million in cost savings, even though Carter consulted with Tesoriero about it in preparation for the Lender Meeting. Lazard did include a sensitivity case in its analysis that contemplated an additional $30 million in annual cost savings. JX 783 at 31. Lazard calculated that achieving these cost savings would increase Lazard's estimate of Dole's value by $345 million, or $3.80 per share. *Id.*

Lazard did not include a sensitivity case for farms because management had not provided specific guidance on this issue. Garner 1283-84. By contrast, Carter had told Murdock's bankers in the Lender Meeting that Dole would acquire $100 million in farms, generating $15 **[*71]** million in annual EBITDA improvement. *See* JX 692 at 3. DeLorenzo admitted at trial that the Board had never suspended or terminated the farm purchase program. DeLorenzo 688.

## L. The Committee Receives Indications Of Interest From Other Bidders.

After the announcement of Murdock's proposal, the Committee and its advisors received incoming calls from interested parties. The most serious were from two potential financial buyers, Platinum Equity and Apollo, and two potential strategic buyers, ITOCHU and Chiquita. The initial expressions of interest from ITOCHU and Apollo did not develop into offers, and no one focused on them at trial. Platinum Equity floated a figure of $14 per share, but Garner testified credibly that after questioning Platinum Equity, Lazard decided that the offer was not serious.

Chiquita, by contrast, was serious about acquiring all of Dole, including Murdock's stake. Lazard viewed Chiquita as the most promising bidder, in part because Dole and Chiquita had previously come close to finalizing a deal. Because of this view, the Committee and its advisors asked Murdock to entertain an offer from Chiquita. He refused, confirming that he was only a buyer, not a seller.

## M. The **[*72]** Committee Negotiates With Murdock.

In late July 2013, with Murdock's artificial deadline of July 31 approaching, the Committee decided to send Conrad to meet with Murdock. The Committee and Lazard had met with Murdock initially on June 24, shortly after Lazard was retained, so that Murdock could make his pitch. After that meeting, Carter's opposition delayed Lazard's access to confidential information, and then Lazard and the Committee had to invest significant time and effort preparing the Committee Projections.

Conrad met with Murdock at his home on July 27, 2013. The Committee and its advisors agreed beforehand that Conrad would not make a counteroffer or accept a proposal during the meeting, and Conrad told Murdock that. He also told Murdock that the July 31 "deadline was unrealistic unless there was a sensational offer that would wow the committee" and that otherwise the Committee was going to continue its process. Conrad 778-79.

Murdock became upset. He reiterated his demand that the Committee make a decision by July 31 and criticized the pace of the Committee's work. Conrad 778. During what Conrad described as an "arduous" meeting, Murdock pressured Conrad, but Conrad consistently **[*73]** refused to make a counter-offer. Conrad 778-79. Frustrated, Murdock began negotiating against himself, increasing his offer to $12.25, then to $12.50. Conrad 778. Finally, Conrad thanked Murdock and started to leave. While Conrad was walking down the driveway, Murdock called him back and offered $13.05. Conrad 779-80. Conrad reiterated that he was not authorized to accept an offer and left. Conrad 779-80.

## N. The Committee And Murdock Agree On Price.

The Committee scheduled a second meeting with Murdock for five days later, on August 1, 2013. This time, Lansing accompanied Conrad, with the rest of the Committee and its advisors available by phone.

The meeting took place at Murdock's offices. Murdock attended with his advisors. Murdock increased his offer to $13.25 per share, stating "That's it, I'm not going to pay any more." Murdock 782. After teleconferencing separately with their team, Conrad and Lansing countered at $14.00. Conrad cited the expression of interest from Platinum Equity at $14 per share as a justification for that price. Murdock met with his advisors separately and then offered $13.50. Conrad and Lansing teleconferenced again with their team, and the Committee decided **[*74]** to accept Murdock's price.

Conrad felt that Murdock "had reached his limit" and "that there was nothing left for him to pay." Conrad 784. Lazard's DCF analysis using the Committee Projections valued Dole at between $11.40 and $14.08, and the $13.50 price fell closer to the top of the range than the midpoint. *See* JX 783 at 29. The price also exceeded the ranges of values generated by Lazard's public company and precedent transaction analyses. *Id.* The Committee's advisors believed that it was a good outcome. Conrad 784. At the time, the Committee and its advisors did not know that the projections Lazard had used lacked material information about planned cost savings and farm purchases.

## O. The Terms Of The Merger Agreement

After reaching agreement on price, the Committee and its advisors negotiated the terms of the Agreement and Plan of Merger among DFC Holdings, LLC, DFC Merger Corp., Murdock, and Dole (the "Merger Agreement"). Murdock pushed for a two-step transaction with strong deal protections, and

he claimed (inaccurately) that the Committee's agreement on price had encompassed those terms. *See* JX 759. The Committee stood firm and insisted on a one-step transaction, a go-shop period, **[\*75]** a small breakup fee, and an additional equity commitment from Murdock to ensure the transaction would close.

During the negotiations, without receiving permission from the Committee, Carter and other members of Dole's senior management advised Murdock. They took steps to conceal their involvement by minimizing their written communications, but the record contains sufficient examples to suggest that the communications were more extensive. For example, Carter, Potillo, and Jeff Conner, Dole's Associate General Counsel, helped Murdock's counsel revise an agreement with Murdock's lenders. JX 770. Carter also spoke with Murdock's attorneys about the deal by phone. JX 778. Carter even advised Murdock's attorneys about pro-Murdock terms to obtain in the Merger Agreement. *See* JX 759 at 1. He also consulted with Murdock's attorneys about how to deal with the Committee on other matters. *See* JX 635.

### P. The New Budget

While negotiations over the Merger Agreement were ongoing, Carter started Dole's annual budgeting process and instructed Dole's divisions to correct certain unreasonable assumptions made weeks earlier for purposes of the July Projections. On August 8, 2014, acting on Carter's instructions, **[\*76]** Dole's Controller sent a memo to management about creating their forecasts. JX 773. The memorandum noted that all operating divisions except Europe would "easily" exceed 4% EBITDA margins, that the new base case EBITDA projections needed to be "at the **high end** of the EBITDA projections" from the July Projections, and stated that the EBITDA

margins therefore "must meet a **minimum 4% target** for 2014, with improvements each year thereafter." *Id.* at 1 (emphasis in original). The memo told management to ignore the EBITDA forecasts for years four and five in the July Projections because those forecasts "need to be reassessed, as these years' projections were kept flat from 2016." *Id.* The new projections were supposed to be more favorable in other areas as well, with annual capital expenditures to be forecasted "at no more than 1.25% of divisional revenues," compared to the 1.5% of revenue forecast in the July Projections. *Id.*; JX 783 at 15. The memo emphasized that the materials attached to the email for use in preparing the new projections were "**not to be circulated outside of this distribution group**." JX 773 at 2 (emphasis in original).

If the Committee had seen the new budget or knew about the **[\*77]** different assumptions, it might have upended the agreement on price and reset the valuation expectations for Dole. On August 11, 2013, it seemed possible that the Committee might find out. Murdock's and Dole's attorneys were resisting Sullivan & Cromwell on some final points. The Committee had been scheduled to meet to consider the Merger Agreement that day, but on the morning of August 11, Ressler of Sullivan & Cromwell suggested that the Committee would hold off. She cited a Board meeting scheduled for the next day at which Dole's management would present updated information on the budget, and she observed that the Committee could take that information into account. JX 782 at 2.

Ressler sent her email to other lawyers who were working on the Merger for Dole. When they asked Carter about the budget meeting, he lied. Despite having started the budgeting process and given instructions to Dole's controller about the changes to convey to management, Carter claimed to "know nothing

about a management team meeting next week." JX 782 at 1. He also wrote that "[t]here are no changes to the operating budget -- I had conversations with Lazard yesterday about our timing of payments in 2013 to husband **[*78]** cash for the closing in light of bank requirements, that's all." *Id.* He concluded, "I don't believe there is any need to delay the merger agreement consideration." *Id.* Carter also forwarded his response to Murdock's attorneys, who used it to push Sullivan & Cromwell to have the Committee vote on the deal. *See* JX 780; JX 782 at 1.

Later that morning, Murdock called Conrad and left one of his signature voicemails. This time he attacked Ressler and urged Conrad to have the Committee consider the transaction that day.

> Yes, Andrew. David [Murdock], here. It is 20 minutes after 11:00 and I very desperately need to talk to you quickly and if I can possibly get to you. I don't know if this call is going through to you or not. But they are going to postpone the transaction and they will destroy it today if that woman lawyer [referring to Ressler] gets her way. And we're all wondering — Pete [Tennyson] and Michael [Carter] — all of us — are wondering what in the hell do they think they're doing. They've already taken 10 days past the 1st and so they'll destroy it. And I'm urging you not to let them. You have the power to tell them you want a vote today. They are saying they don't want to vote, **[*79]** and they want to get another meeting on Monday.

JX 787. Conrad received the voicemail. Conrad 788.

The Committee meeting went forward that afternoon, and they recommended Murdock's proposal to the Board. Immediately afterwards, the Board met and approved the transaction. The terms of the final transaction included an

additional $50 million equity commitment from Murdock plus a 30-day go-shop period during which Dole would pay Murdock a $15 million breakup fee if Dole terminated Murdock's deal to accept a superior proposal.

After the Merger Agreement was signed, Dole made presentations to the rating agencies in September 2013 and to its lenders in October 2013 that utilized forecasts similar to the Committee Projections and significantly higher than the July Projections that Carter gave Lazard. The presentations noted that (i) Dole planned "to increase owned production in bananas, pineapples and selected berries to improve productivity at the farm level," JX 837 at 17, and (ii) the adjusted EBITDA margins for the Fresh Fruit division were expected to "increase by 50 bps from 2013 to 2015 due to increased operating leverage through further investments" in Company-owned farms. JX 845 at **[*80]** 2. Internal management materials entitled "Latin American 2014 Budget and 5 Y[ear] P[lan]" prepared in October 2013, observed that Dole's "5YP presumes we continue investing in additional banana and pineapple company farms." JX 879 at 39.

## Q. The Transaction Closes.

During the go-shop period, Lazard contacted over sixty parties. Leonard Green & Partners and Platinum Equity executed confidentiality agreements and met with management. Both eventually declined to bid.

Murdock's financing syndicate changed after the Merger Agreement was signed. The final price exceeded what the lending group previously had authorized. Wells Fargo, one of Murdock's long-time bankers, dropped out. Deutsche Bank and the other participating lenders put together the financing.

Dole held a special meeting of stockholders on October 31, 2013. A narrow majority of 50.9%

of the disinterested shares voted in favor, 21.2% voted against, 10.5% abstained, and 17.4% did not vote. The transaction closed on November 1, 2013.

## R. Dole's Performance Shortly After The Transaction

After the Merger closed, Dole bought almost exactly the amount of farms that Carter had predicted at the Lender Meeting. Carter told Murdock's bankers at the Lender **[*81]** Meeting that farm purchases "[e]asily could be $100 [million]" and produce a "$15 [million] initial return." JX 692 at 3. Dole met or exceeded both predictions after the take-private. According to a Wells Fargo analyst report dated December 5, 2014, that year Dole spent "$37 million for the acquisition of a pineapple farm and $7 million for the acquisition of a banana farm . . . . In addition, Dole has purchased several farms throughout the year, which require payments in FQ4 exceeding $80 million." JX 924 at 2. A Deutsche Bank report stated that the farms were expected to increase EBITDA by "around $23 million once the acquisitions are fully integrated." JX 920 at 1. Carter testified that Dole purchased a total of "maybe $80, $100 million worth of farms, roughly" in 2014. Carter 985.

The defendants insist that none of these farm purchases could have been foreseen, but all were consistent with Dole's long-term strategy of buying farms. *See, e.g.*, JX 900 at 2. Moreover, Dole actually was considering plans to purchase some of the specific farms before the Merger. Carter had told Murdock's bankers at the Lender Meeting that Dole was considering buying farms in Ecuador, Guatemala, and Chile. JX **[*82]** 699 at 5; JX 692 at 3. In addition, in October 2013, shortly after negotiations with the Committee ended, a Dole presentation indicated that the Company

was interested in acquiring seven farms for a total of $75.9 million (including required capital investments for improvements) at an average cash flow return on investment of 30.9%. JX 879 at 41. The list identified a pineapple farm in Costa Rica and banana farms in Costa Rica, Ecuador, Guatemala, Honduras, and Peru. *Id.* at 47. Just one month after the Merger closed, Dole acquired a pineapple farm in Costa Rica for approximately $40 million. Acuña 1198. Dole had identified this farm as an acquisition target in July 2013. Acuña Dep. 16-17.

After the Merger closed, Dole achieved more than the $50 million in cost savings predicted after the ITOCHU Transaction. *See* JX 914 at 1. Dole achieved roughly $30 million of cost savings in 2014 and approximately $51 million in 2015. JX 920 at 1. Carter testified that Dole ultimately achieved approximately $70 million in cost reductions, with only $5.5 million attributed to Dole no longer operating as a public company. Carter 984, 979.

## II. LEGAL ANALYSIS

"This case is another progeny of one of our law's hybrid **[*83]** varietals: the combined appraisal and entire fairness action." *Del. Open MRI Radiology Assocs., P.A. v. Kessler, 898 A.2d 290, 299 (Del. Ch. 2006)* (Strine, V.C.). **HN5**[⬆] The Delaware Supreme Court has instructed that when a merger gives rise to both a plenary action for breach of fiduciary duty and a statutory appraisal proceeding, the court should rule on the plenary claims first, because a finding of liability and the resultant remedy could moot the appraisal proceeding. *Cede & Co. v. Technicolor, Inc. (Technicolor Appraisal I), 542 A.2d 1182, 1189 (Del. 1988)*. "[R]egardless of the Court's substantive findings, the plaintiffs are limited to, and statutorily assured of, a single recovery." *Bomarko, Inc. v. Int'l Telecharge, Inc. (Bomarko I), 794 A.2d 1161, 1177 (Del. Ch.*

*1999*), *aff'd*, *766 A.2d 437 (Del. 2000)* (*Bomarko II*).

In the plenary proceeding, the plaintiffs claim that the Merger was not entirely fair. They argue that Murdock, Carter, and DeLorenzo breached their duty of loyalty and are personally liable for damages, and they contend that Deutsche Bank is also liable as an aider and abetter. They also seek to impose liability on DFC Holdings, LLC, one of two entities that Murdock used to effect the Merger.

This decision holds that Murdock and Carter breached their duty of loyalty and are liable to the Class for $148,190,590.18, representing damages of $2.74 per share. The plaintiffs did not prove their case against DeLorenzo or Deutsche Bank.

## A. The Merger Was Not Entirely Fair [*84] .

**HN6**[⬆] "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Ams. Mining, 51 A.3d at 1239*. The Merger was an interested transaction, so entire fairness provided the baseline standard of review. Because the record did not permit a pretrial determination that the defendants were entitled to a burden shift or a lower standard of review, "the burden of persuasion . . . remain[ed] with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Id. at 1243*.

**HN7**[⬆] "The concept of fairness has two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983)*. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the

directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined [*85] separately, "the test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*

**HN8**[⬆] Fairness does not depend on the parties' subjective beliefs. Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing and fair price." *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV), 663 A.2d 1156, 1163 (Del. 1995)* (internal quotation marks omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1145 (Del. Ch. 2006)*.

### 1. Fair Dealing

The evidence at trial established that the Merger was not a product of fair dealing. This is not a case that requires an overly granular analysis of the *Weinberger* factors. Carter engaged in fraud. **HN9**[⬆] The concept of entire fairness "certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation." *Rabkin v. Philip A. Hunt Chem. Corp., 498 A.2d 1099, 1104 (Del. 1985)*. According to the common law nostrum, *fraus omnia corrumpit*—fraud vitiates everything. Here it rendered useless and ineffective the highly commendable efforts of the Committee and [*86] its advisors to

negotiate a fair transaction that they subjectively believed was in the best interests of Dole's stockholders.

### a. Timing and Initiation

Under *Weinberger*, HN10[↑] the concept of fair dealing encompasses an evaluation of how the transaction was timed and initiated.[12] The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal. For approximately eighteen months, Murdock had planned on taking Dole private after first separating and realizing the value of Dole's higher-margin businesses. This strategy was reflected in the Tesoriero Memo and Murdock's discussions with Deutsche Bank about a spinoff-plus-privatization structure. It was corroborated by Murdock's sales of assets, including Lanai, and his discussions with Deutsche Bank about the availability of

the resulting capital for that purpose. The ITOCHU Transaction set the stage for the planned freeze-out to unfold. But rather than making a merger proposal when Dole's stock was trading at high levels following the announcement of the ITOCHU Transaction, which took into account DeLorenzo's explanation of [*87] the $50 million in run-rate cost savings that Dole could achieve, Carter first primed the market by pushing down the stock.[13]

HN11[↑] "[A] calculated effort to depress the [market] price" of a stock "until the minority stockholders [are] eliminated by merger or

---

[12] *See, e.g., Glassman v. Unocal Exploration Corp., 777 A.2d 242, 248 (Del. 2001)* (reaffirming teaching of *Weinberger* that fairness must take into account whether "the merger was timed to take advantage of a depressed market, or a low point in the company's cyclical earnings, or to precede an anticipated positive development"); *Rabkin, 498 A.2d at 1106* (reversing dismissal of complaint challenging fairness of freeze-out merger where plaintiff alleged that controller timed the proposal to occur after a one-year commitment to pay a higher price expired); *In re John Q. Hammons Hotels Inc. S'holder Litig., 2009 Del. Ch. LEXIS 174, 2009 WL 3165613, at *14 (Del. Ch. Oct. 2, 2009)* (explaining that "[p]laintiffs could prevail at trial on the issue of fair dealing if they were able to establish that the price of the minority shares was depressed as a result of Hammons's [pre-merger] improper self-dealing conduct"); *Sealy Mattress Co. of N.J. v. Sealy, Inc., 532 A.2d 1324, 1335 (Del. Ch. 1987)* (explaining that a controlling stockholder is "obliged not to time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price"); *see also Braasch v. Goldschmidt, 41 Del. Ch. 519, 199 A.2d 760, 763 (Del. Ch. 1964)* (finding that complaint stated claim based on actions taken before short-form merger in which "the merger was the final step of a conspiracy [*88] to accomplish an unlawful end by unlawful means").

[13] Academic research has found a correlation between management-led buyouts and lowered guidance, increased reserves, and other measures that reduce the apparent performance of a company during periods before the announcement of the buyout. "The US literature on accounting manipulation states that downward earnings management prior to [management buyouts] is expected." Yaping Mao & Luc Renneboog, *Do Managers Manipulate Earnings Prior to Management Buyouts* 5 (Center Discussion Paper Series No. 2013-055, October 11, 2013); *see* James Ang, Irena Hutton & Mary Anne Majadillas, *Manager Divestment in Leveraged Buyouts*, 20 European Fin. Mgmt. 462 (2013) (finding positive pre-transaction earnings management when managers disinvest in a third-party leverage buyout but negative earnings management when managers retain a significant ownership stake after the transaction); Patricia Dechow, Weili Ge & Catherine Schrand, *Understanding Earnings Quality: A Review Of The Proxies, Their Determinants And Their Consequences*, 50 J. Acc. & Econ. 344 (2010) (finding that managers have options to make different accounting choices that vary depending on their [*89] misrepresentation objective); Y. Woody Wu, *Management Buyouts and Earnings Management*, 12 J. Acc. & Fin. 373 (1997) (finding that earnings manipulation in management buyouts caused an average decrease in price of 18.6%); Susan E. Perry & Thomas H. Williams, *Earnings Management Preceding Management Buyout Offers*, 18 J. Acc. & Econ. 157 (1994) (finding evidence of downward accrual management); *see also* Paul E. Fisher & Henock Louis, *Financial Reporting And Conflicting Managerial Incentives: The Case Of Management Buyouts*, 54 Mgmt. Sci. 1700 (2008) (finding downward earnings manipulation generally decreases when the managers require large amounts of external financing, but that the effect is smaller if the company has significant fixed assets to serve as collateral). The behavior in this case provides a real-world example of this phenomenon.

some other form of acquisition" constitutes unfair dealing. *Sealy Mattress, 532 A.2d at 1336*. It is an example of the "prototype instance in which the timing of a merger would itself likely constitute a breach of a controlling shareholder's duty" under the **[*90]** entire fairness standard, namely, "when it could be shown both (1) that the minority was financially injured by the timing (i.e., from their point of view it was an especially poor time to be required to liquidate their investment) and (2) that the controlling shareholder gained from the timing of the transaction what the minority lost." *Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 599 (Del. Ch. 1986)* (Allen, C.).

As described in the Factual Background, Carter departed from Dole's historic practice by providing earnings guidance, and the guidance he provided changed Dole's estimate of its ability to achieve cost savings after the ITOCHU Transaction. DeLorenzo had told the markets that Dole could achieve $50 million in cost savings, with $20 million implemented immediately in 2012 and the remaining $30 million implemented in 2013. By the end of 2013, Dole would have achieved the full run-rate of $50 million per year. In his January 2013 press release, Carter told the markets that Dole's "current expectation" was that Dole only would achieve "2013 planned cost savings in the $20 million range." JX 384. Dole's stock price dropped 13% after the announcement.

It is certainly possible for cost estimates to change, but in this case the evidence at trial **[*91]** forced me to conclude that Carter's reduced estimate was false. Deutsche Bank had done diligence on Dole's cost-cutting plan and believed it was reasonable. DeLorenzo backed it, and he was a credible witness. Other analyses suggested the total cost savings could be higher. *See* JX 1615; JX 389. Carter was not a credible witness on this issue, and he did not provide a believable explanation for the reduced figure. *See* Factual Background, Part F.1, *supra*.

Not coincidentally, after the Merger closed, Dole told the analysts who covered its publicly traded debt that Dole had completed over $30 million in additional cost cutting. A Deutsche Bank analyst covering Dole drew the obvious conclusion: "We would have expected a rationalization of the business post the [ITOCHU Transaction] but it seems like the company is just getting around to it now." JX 914. Logically, Dole should have achieved these savings as a result of the ITOCHU Transaction, not the Merger. In the ITOCHU Transaction, Dole sold approximately half of its business, significantly reducing the size of the Company. As DeLorenzo and Deutsche Bank recognized, the sale naturally presented the opportunity for major cost cutting. The **[*92]** Merger did not. After Murdock bought it, the Company was essentially the same, with only $5.5 million of savings attributed to public company costs.[14]

For Carter to have intentionally given the market a subterranean estimate of Dole's anticipated cost savings matches up with his

---

[14] According to the defendants, Murdock and Carter could not achieve the cost savings they generated after the Merger as long as Dole was a public company ostensibly because the cuts were too "risky" for public stockholders. Carter 982. That argument turns traditional principles of limited liability and diversification upside down. **HN12[↑]** Diversified public stockholders should be less risk-averse, precisely because of their diversification, than a large stockholder with non-diversified risk. *See, e.g., Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1052 (Del. Ch. 1996)* ("Shareholders can diversify the risks of their corporate investments. Thus, it is in their economic interest for the corporation to accept in rank order all positive net present value investment projects available to the corporation, starting with the *highest risk adjusted rate of return first*. Shareholders don't want (or shouldn't rationally want) directors to be risk averse."). The contention that the post-ITOCHU cuts had to be made after the Merger was a face-saving rationalization of self-interested behavior. The savings from discontinuing Dole's **[*93]** status as a public company stand on a different footing.

unilateral and pretextual cancellation of the stock repurchase program that the Board adopted on May 8, 2013. As discussed in the Factual Background, Murdock had pushed for Dole to engage in a self-tender offer that would have increased his ownership above a mathematical majority and helped him pay a lower overall price in an eventual freeze-out. *See, e.g.*, JX 404; JX 447. Led by Conrad and Weinberg, the Board opted instead for a program of open market purchases that would provide greater benefits to Dole and its unaffiliated stockholders. Later that month, the Board also approved the plan for Dole to purchase three new refrigerated transport ships. On May 28, just under three weeks after the Board approved the repurchase plan, Carter announced that share repurchases had been "suspended indefinitely" so that Dole could use its capital on the ships. JX 582. Dole's stock price tumbled 10% after the announcement.

Carter knew the announcement would drive down the stock price. JX 592; Carter 1101. Carter had **[*94]** not informed the Board of this decision or suggested any connection existed between the ships and the repurchase plan. Dole's outside directors only learned of the decision from public sources. At trial, Carter claimed that he was worried about covenants in Dole's debt, but they would not have been tripped even if Dole spent the entire $200 million to repurchase shares and immediately paid the entire $165 million for the ships. Regardless, Dole did not have to do either. Dole was authorized to repurchase shares in management's discretion over the course of a year; it did not have to spend the full $200 million and not right away. The contract for the ships called for payments spread over four years, with $32.9 million per year due in 2013 and 2014. The evidence establishes that the ship acquisition and share repurchase programs were both feasible. Carter did not cancel the stock repurchase

plan because doing so would benefit Dole. He did it to make Dole's stock price drop in advance of Murdock's planned merger proposal.[15]

## b. Transaction Negotiation

Under *Weinberger*, **HN14**[⬆]] fair dealing encompasses questions of how the transaction was negotiated. The defendants have relied on the indisputably excellent work of the Committee and its advisors. But even the most motivated, skilled, and well-advised special committee cannot achieve a fair result if those in control of the corporation deliberately undermine its efforts.[16]

**HN15**[⬆]] "[A]n important element of an effective special committee is that it be fully informed in making its determination."[17] "[I]n

---

[15] He also did it to spite the outside directors and teach them a lesson about who was really in charge. During pre-trial proceedings, Murdock and Carter's response to **[*95]** the outside directors' opposition to the self-tender was part of what factored into my conclusion that triable issues of fact existed regarding the Committee's independence. **HN13**[⬆]] Delaware decisions have long worried about a controller's potential ability to take retributive action against outside directors if they did not support the controller's chosen transaction and whether it could cause them to support a deal that was not in the best interests of the company or its stockholders. *See, e.g.*, *Kahn v. Tremont Corp. (Tremont II), 694 A.2d 422, 428 (Del. 1997)* (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk . . . that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder"); *In re Cox Commc'ns, Inc. S'holders Litig., 879 A.2d 604, 617-19 (Del. Ch. 2005)* (Strine, V.C.) (describing case law); *In re Pure Res., Inc., S'holders Litig., 808 A.2d 421, 436 (Del. Ch. 2002)* (same). The Delaware Supreme Court has confirmed that controlling stockholder status does not, standing alone, give rise to concern. *In re Cornerstone Therapeutics Inc. S'holders Litig., 115 A.3d 1173, 1183 (Del. 2015)*. At the same time, Delaware decisions recognize that when controllers actually make retributive threats, that fact is retributive of unfair dealing. *See Kahn v. Lynch Commc'n Sys., Inc. (Lynch), 638 A.2d 1110, 1120 (Del. 1994)*; *Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 465 (Del. Ch. 2011)* (citing threats made by

order to make a special committee structure work it is necessary that a controlling shareholder . . . disclose fully all the material facts and circumstances surrounding the transaction."[18] _HN16_[⬆] There are certain categories of negotiating information that the controlling stockholder need not share, such as "information disclosing the top price that a proposed buyer would be willing or able to pay, or the lowest price that a proposed seller would accept,"[19] but the categories of

Murdock and Dole management proposed the self-tender, Conrad and Weinberg opposed it. As detailed in the Factual Background, Murdock was furious and did everything he could to pressure both of them into changing their views. After the directors held an executive session on May 6, 2013, Murdock petulantly absented himself from the next Board meeting on May 8. After Conrad and Weinberg convinced the Board to adopt the program of open market repurchases, Murdock left a threatening message for Weinberg that was "not for public consumption." Weinberg Dep. 33. A few days later, Carter called Weinberg and demanded his resignation, citing a "lack of collegiality at the board level" due to Weinberg's "personality clash" with Murdock. **[*97]** Carter Dep. 20. Weinberg resigned, and the full Board accepted his resignation. Less than three weeks later, Carter cancelled the repurchase program.

Before evaluating the evidence at trial, it seemed to me that these events provided an extreme example of retributive action that would influence the thinking and actions of an outside director. Murdock and Carter had shown the outside directors that if they went in a different direction than Murdock wanted, they risked losing their Board seats, and the decision they staked their positions on would be nullified. As discussed, having reviewed the record at trial and heard Conrad testify, I am convinced that the Committee was in fact independent, notwithstanding Murdock and Carter's shot across the bow.

---

[16] _See Mills Acq. Co. v. Macmillan, Inc., 559 A.2d 1261, 1284 (Del. 1989)_ ("[W]hen a board is deceived by those who will gain from **[*98]** such misconduct, [including officers of the corporation,] the protections girding the decision itself vanish."); cf. _Lynch, 638 A.2d at 1120_ (holding that even if the members of a special committee were "truly independent and . . . performed their tasks in a proper manner," that alone would not be sufficient to show fair dealing) (citing _Am. Gen. Corp. v. Texas Air Corp., 1987 Del. Ch. LEXIS 382, 1987 WL 6337, at *4 (Del. Ch. Feb. 5, 1987))_.

[17] _In re Tele-Commc'ns, Inc. S'holders Litig., 2005 Del. Ch. LEXIS 206, 2005 WL 3642727, at *10 (Del. Ch. Dec. 21, 2005)_; see also _Lynch, 638 A.2d at 1120-21_ ("Particular consideration must be given to evidence of whether the special committee was truly independent, fully informed and had the freedom to negotiate at arm's length.").

---

controlling stockholder as "evidence of unfairness"); _Hammons, 2009 Del. Ch. LEXIS 174, 2009 WL 3165613, at *12 n.38_ ("[N]either special **[*96]** committee approval nor a stockholder vote would be effective if the controlling stockholder engaged in threats, coercion, or fraud."); cf. _Pure Res., 808 A.2d at 445_ (reviewing tender offer by controlling stockholder under lower standard of review as long as "the controlling stockholder has made no retributive threats").

In this case, just weeks before Murdock proposed the Merger, Murdock and Carter gave the outside directors a demonstration of the costs and futility of resistance. When

[18] _Kahn v. Tremont Corp. (Tremont I), 1996 Del. Ch. LEXIS 40, 1996 WL 145452, at *15 (Del. Ch. Mar. 21, 1996)_ (Allen, C.) (internal quotation marks omitted). In _Tremont I_, Chancellor Allen held that the special committee functioned effectively and shifted to the plaintiffs the burden to prove that the transaction price was unfair. _1996 Del. Ch. LEXIS 40, [WL] at *1_. On appeal, the Delaware Supreme Court held that the special committee had not functioned effectively and reversed **[*100]** for a new determination of fairness with the burden properly assigned. _Tremont II, 694 A.2d at 429-30_. The

information that the controller must disclose include:

1) . . . all of the material terms of the proposed transaction;

2) . . . all material facts relating to the use or value of the assets in question to the beneficiary itself. Such facts would include alternative uses for assets or "hidden value" **[*99]** (e.g., there is oil under the land subject to sales negotiation);

3) . . . all material facts which it knows relating to the market value of the subject matter of the proposed transaction. Such facts would include[,] for example[,] forthcoming changes in legal regulation or technological changes that would affect the value of the asset in question either to the subsidiary or to others.

*Tremont I, 1996 Del. Ch. LEXIS 40, 1996 WL 145452, at *16* (footnotes omitted). These categories are intended to encompass "*all material information known to the fiduciary except that information that relates only to its consideration of the price at which it will buy or sell and how it would finance a purchase or invest the proceeds of a sale.*" *Id.*

**HN17**[⬆] Implicit in the expectation that the controller disclose this information is the requirement that the controller disclose it accurately and completely. The controller must believe that the disclosures are true and cannot deliberately withhold material information or otherwise immaterial information that is nevertheless necessary to make the

disclosed information complete and non-misleading. The fair dealing element of the entire fairness standard mandates that all fiduciaries, including the controller and its representatives, comply with

the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit. . . . The **[*101]** duty of candor, integral to fair dealing, dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge *to mislead others in the performance of their own fiduciary obligations.*[20]

To state what should be obvious, **HN18**[⬆] a controller cannot engage in fraud. Nor can a corporate officer, even if his principal loyalty is to a controller who is his boss and source of post-transaction employment. To be blunt, if a duly empowered committee asks for information, a corporate officer, employee, or agent has a duty to provide truthful and complete information.[21]

---

Delaware Supreme Court did not reverse any of the Chancellor's legal rulings, although it did disagree with the use of the term "privileged" to describe information that a controller can withhold during a negotiation. *Id. at 432.* This decision cites aspects of *Tremont I* that were not reversed on appeal. In light of this disclosure, citations to *Tremont I* omit the cumbersome "rev'd on other grounds."

19 *Tremont I, 1996 Del. Ch. LEXIS 40, 1996 WL 145452, at *15*; accord *Pure Res., 808 A.2d at 451.*

20 *Bomarko I, 794 A.2d at 1180* (internal quotation marks omitted; emphasis added); *accord HMG/Courtland Props., Inc. v. Gray, 749 A.2d 94, 119 (Del. Ch. 1999)* (Strine, V.C.) (explaining that directors have an "unremitting obligation to deal candidly with their fellow directors" (internal quotation marks omitted)); *see Odyssey Partners, L.P. v. Fleming Cos., 735 A.2d 386, 413 (Del. Ch. 1999)* ("No doubt Fleming [the controlling stockholder] had a duty of disclosure to the ABCO board of directors in seeking their approval."). Even in a short-form merger, where appraisal is the exclusive remedy, a court of equity has "the ever-present power . . . to deal with illegality or fraud." *Stauffer v. Standard Brands, Inc., 41 Del. Ch. 7, 187 A.2d 78, 80 (Del. 1962)*; *accord Braasch, 199 A.2d at 764*. *See generally In re Unocal Exploration Corp. S'holders Litig., 793 A.2d 329, 347 (Del. Ch. 2000)* ("*Stauffer* and *Braasch* remain authoritative expressions of the law."), *aff'd sub **[*102]** nom. Glassman v. Unocal Exploration Corp., 777 A.2d 242 (Del. 2001).*

21 *In re Cysive, Inc., S'holder Litig., 836 A.2d 531, 544 (Del. Ch. 2003)* (Strine, V.C.) (holding that the duty of an officer-director was to "provide the special committee and its advisors with all the information they asked for, because they were

HN19[↑] Accurate and up-to-date information about the company's financial performance is particularly important to a committee's work. Withholding the company's latest "projections, and knowledge of their existence, from the [Special] Committee and its advisors" is "without more . . . enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders." *In re Emerging Communs., Inc. S'holders Litig., 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *35*.

The Committee asked Carter for updated management forecasts that reflected Dole management's "current best views about the prospects of [the] business." Garner 1248. Carter constructed a set of projections that contained falsely low numbers. In place of Dole's usual bottom-up approach, Carter and the management team created the new projections from the top down. Garner described the process as follows:

> [Dole management] used a different approach **[*103]** than I normally see in which they basically did not start out by saying what's revenues, what's expenses, what's the difference and there's the profit. They basically said, let's look at the profit line, the EBITDA line that have come from the three-year process and let's see what's different from the way we now see the world in terms of pricing and costs of the system and how the bottom line would change given management's new view of the world. And then they worked their way

back up to the top, you know, in other words, in terms of what the revenue was. They had a high and a low case and they looked in the middle and they developed it on the way up. It was — suffice it to say, it was not a particularly rigorous process in our view.

Garner Dep. 25.

The Committee and Lazard had immediate concerns about the July Projections:

• Dole management could not provide a basis for the reduction in revenue forecasts as compared to the December Projections.

• The projections were inconsistent with what Dole gave its lenders in April 2013 for the post-ITOCHU Transaction refinancing.

• The forecasts were inconsistent with what the Board reviewed just weeks earlier when approving the purchase of the new **[*104]** ships.

• The growth forecasted for 2014 and 2015 was "just an extrapolation based on a mathematical formula, not on real information." Conrad Dep. 26.

• Dole management inexplicably kept flat the EBITDA estimates for 2016 and 2017 except for a small adjustment for the new cargo ships.

Conrad concluded that the July Projections were not "an accurate representation of the value of the Company" and that the Committee would "have to find an independent way to evaluate the value of the company." Conrad Dep. 25. Garner believed that "management had taken a meat cleaver to the projections in a way that it would be very difficult, if not inappropriate, for a committee to weigh these projections as the basis for determining the adequacy of a price." Garner Dep. 32; *accord* Garner 1249, 1313.

Conrad and Garner were too polite and

---

entitled to all the information the company had"); *see Kalisman v. Friedman, 2013 Del. Ch. LEXIS 100, 2013 WL 1668205, at *3 (Del. Ch. Apr. 17, 2013)* ("A director's right to information is essentially unfettered in nature.") (internal quotation marks omitted); *accord Schoon v. Troy Corp., 2006 Del. Ch. LEXIS 123, 2006 WL 1851481, at *1 n. 8 (Del. Ch. June 27, 2006)*; *Intrieri v. Avatex, 1998 Del. Ch. LEXIS 96, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998)*; *Belloise v. Health Mgmt., Inc., 1996 Del. Ch. LEXIS 127, at *36 (Del. Ch. June 11, 1996)* (Allen, C.).

professional to come right out and say it, but a court has to call things as they are. The projections Carter provided were knowingly false. Carter intentionally tried to mislead the Committee for Murdock's benefit.

The contrast between what Carter told the Committee and what he told Murdock's lenders and advisors during the Lender Meeting the next day confirms the fraudulent **[*105]** nature of the July Projections. So does the contrast between what Carter told the Committee and the instructions he gave a month later for the preparation of the budgets and projections that would be used to run the Company post-Merger. *See* Factual Background, Part P, *supra*.

Faced with Carter's fraud, the Committee and Lazard created, on an expedited basis, their own set of projections. Their heroic efforts have enabled the defendants to argue that Carter's misconduct was a "no harm, no foul" situation. The Committee and Lazard did succeed in generating a credible and reliable projection regarding Dole's business—the most credible and reliable projection in the case—but they could not do so for areas where they did not receive full or accurate information.

The Committee and Lazard never received full and accurate information about the cost savings that Dole could achieve. Dole management failed to share with the Committee or Lazard the analysis supporting the $50 million in cost savings that Tesoriero prepared, even though Carter considered it and contacted Tesoriero about it before meeting with Murdock's lenders. Dole management also did not provide the Committee and Lazard with accurate information about Dole's farm **[*106]** purchases, and as a result Lazard removed any effect of additional farm purchases from its analysis. *See* Factual Background, Part K,

*supra*. By providing the Committee with false information, Carter ensured that the process could not be fair.

Although the false projections were the most egregious of Carter's activities, he interfered with and obstructed the Committee's efforts to manage the process and negotiate with Murdock in other ways as well:

• At the outset, Carter sought to restrict the Committee's mandate and limit the Committee to a simple "up or down" decision on Murdock's offer, rather than having the ability to consider and explore the viability of potentially superior alternatives.

• Carter resisted the Committee's hiring of Lazard, sought to steer the Committee towards BAML, a banker with a prior relationship with Dole and Murdock, and attempted to limit the scope of Lazard's activities.

• When the Committee asserted its authority to enter into confidentiality agreements on behalf of the Company, Carter refused to go along, insisting that it was his job. Through Carter, Murdock thereby gained a window into the Committee's actions that he should not have had.

• Carter secretly assisted Murdock and his advisors **[*107]** in preparing a hostile tender offer for use if the Committee did not accede quickly enough.

• Carter secretly convened the Lender Meeting, which was a clear violation of the Process Letter established by the Committee.

• After the Committee caught wind that Deutsche Bank had attended a meeting with management and had access to the Company's data room, Carter did not come clean about the full scope of the Lender Meeting, its subject matter, or attendees.

• When the Committee instructed Carter to

cancel Deutsche Bank's access to the data room, Carter refused.

• Carter secretly advised Murdock on how to negotiate against the Committee and provided advice to Murdock and his counsel on deal terms and agreements.

Given Carter's activities, the negotiation of the Merger was the antithesis of a fair process. Through his actions, Carter "render[ed] the Special Committee ineffective as a bargaining agent for the minority stockholders," notwithstanding the Committee's valiant efforts. *In re Emerging Communs., Inc. S'holders Litig., 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *35*.

### c. Transaction Structure And Approval

Carter's fraud tainted the approval of the Merger by the Committee, as well as the stockholder vote. Perhaps, with the benefit of full information, the Committee would have approved the Merger **[*108]** anyway. Whether they would have approved the transaction "is inherently unknowable because there is no way to learn what [the Committee would have done] in the absence of [the fiduciaries'] disloyal conduct." *Bomarko, 794 A.2d at 1184*.

Likewise, perhaps if the stockholders had full information about Murdock and Carter's activities, both before and during the negotiation process, they might nevertheless have voted for the deal. That outcome is also impossible to know. Because both protective procedures were tainted, neither provides evidence of fairness.

There are features of the Merger Agreement which, on different facts, might provide evidence of fairness. The Committee obtained a go-shop provision with a low break-up fee, and Lazard diligently sought out other bidders. If Murdock had committed to support an

alternative transaction, then the failure of a higher bidder to come forward would be a significant indicator.[22]

But Murdock controlled over 40% of Dole's voting power, and he was not a seller. He made that clear in his original proposal. He had affirmed that fact in his meetings with Conrad. He had confirmed it separately when the Committee asked him to entertain a proposal from Chiquita. Conrad had to inform potential bidders that Murdock would not sell his Dole shares or partner with them. On the facts of this case, the go-shop was cosmetic.

### 2. Fair Price

*HN20* [↑] The second aspect of the entire fairness inquiry is fair price. "The fair price analysis is part of the entire fairness standard of review; it is not itself a remedial calculation." *Reis, 28 A.3d at 465*. For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness. "The value of a corporation is not a point on a line, but a range of **[*110]** reasonable values . . . ." *Cede & Co. v. Technicolor, Inc., 2003 Del. Ch. LEXIS 146, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003)*, aff'd in part, rev'd in part on other

---

[22] Compare *Cysive, 836 A.2d at 538* (noting that the controlling stockholders "were enthusiastic supporters of the effort to find a buyer or strategic partner for [the company]," and consequently, the lack of any higher bid provided evidence that the transaction price was a fair price), and *Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd., 847 A.2d 340, 350 (Del. Ch. 2004)* (Strine, V.C.) (finding merger **[*109]** price a reliable indicator of the company's value where the company's largest stockholder was willing to sell its stake and the sales process was not flawed in any material respect), with *In re First Boston, Inc. S'holders Litig., 1990 Del. Ch. LEXIS 74, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990)* (Allen, C.) ("[T]he fiduciaries' position may preclude the emerge[nce] of alternative transactions at a higher price.").

grounds, [884 A.2d 26 (Del. 2005)](). When evaluating the fair price aspect of the entire fairness standard of review, the court considers whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[23] "A court readily could conclude that a price fell within the range of fairness and would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price."[24]

**[HN21](🔗)** "The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions." [Reis, 28 A.3d at 466](). "The range of fairness concept has most salience when the controller has established a process **[*111]** that simulates arm's-length bargaining, supported by appropriate procedural protections."[25]

---

[23] [Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III), 663 A.2d 1134, 1143 (Del. Ch. 1994)]() (Allen, C.), *aff'd*, [Technicolor Plenary IV, 663 A.2d 1156](); *accord* [Tremont I, 1996 Del. Ch. LEXIS 40, 1996 WL 145452, at *1]() ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept.").

[24] [Reis, 28 A.3d at 466](); *compare* [Technicolor Plenary IV, 663 A.2d at 1176-77]() (affirming that merger consideration of $23 per share was entirely fair), *with* [Cede & Co. v. Technicolor, Inc., 884 A.2d 26, 30 (Del. 2005)]() (awarding fair value in appraisal of $28.41 per share).

[25] *Id.*; *see, e.g.,* [M.P.M. Enters., Inc. v. Gilbert, 731 A.2d 790, 797 (Del. 1999)]() ("A merger price resulting from arm's-length negotiations where there are no claims of collusion is a very strong indication of fair value."); [Van de Walle v. Unimation, Inc., 1991 Del. Ch. LEXIS 27, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991)]() ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available. The fact that a transaction price was forged in the crucible of

**[HN22](🔗)** Fair price can be the predominant consideration in the unitary entire fairness inquiry.[26] Most often, however, the two aspects of the entire fairness standard interact. "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[27] The

---

objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair.").

[26] Even a controller that has effected a squeeze-out unilaterally with no process at all conceivably could prove at trial that the transaction was entirely fair. Envision, for example, an altruistic controller who is the sole director of a privately held company and who owns a majority of the shares with the balance held by the company's employees. For idiosyncratic reasons, the controller wishes to eliminate the minority. At the same time, because of the controller's relationship with the employees, the controller wishes to provide an indisputably generous price. The controller implements the deal unilaterally via a one-page merger agreement, approves it at the board level with a unanimous written consent, and approves it at the stockholder level by written consent. The concept of "process" is non-existent, but even under those circumstances, I believe that a controller who proved that the **[*113]** price was indeed fair would not have breached his duties. *Cf.* [In re Trados Inc. S'holder Litig., 73 A.3d 17 (Del. Ch. 2013)]() (holding that fiduciaries did not breach their duties when they failed to follow a fair process yet nevertheless approved a transaction that yielded a fair price).

[27] [Reis, 28 A.3d at 467](); *accord* [Ross Holding & Mgmt. Co. v. Advance Realty Gp., LLC, 2014 Del. Ch. LEXIS 173, 2014 WL 4374261, at *33 (Del. Ch. Sept. 4, 2014)]() ("Robust procedural protections may support a determination that price was fairly within a range of reasonable values, and a failure of process may prevent a Court from reaching such a conclusion."); *see* [William Penn P'ship v. Saliba, 13 A.3d 749, 758 (Del. 2011)]() ("Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process."); [Tremont II, 694 A.2d at 432]() ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); [Gentile v. Rossette, 2010 Del. Ch. LEXIS 123, 2010 WL 2171613, at *9 (Del. Ch. May 28, 2010)]() ("From a tainted process, one should not be surprised if a tainted price emerges."); [Bomarko I, 794 A.2d at 1183]() ("[T]he unfairness of the process also infects the fairness of the price."); [HMG/Courtland, 749 A.2d at 116]() (holding that the defendants did not satisfy their burden by showing that the

fact that negotiations **[*112]** occurred is not dispositive. "It is not sufficient for . . . directors to achieve the best price that a fiduciary will pay if that price is not a fair price." *First Boston, 1990 Del. Ch. LEXIS 74, 1990 WL 78836, at *7*. Nor is it sufficient to obtain a fair price if that price is not the best alternative available for the corporation and its stockholders. *Id.*

The principal evidence on the issue of fair price consists of the expert opinions at trial, the Committee's negotiations, Lazard's fairness opinion, and market indications. Taken together, these sources indicate that without accounting for Carter's fraud, the $13.50 per share price fell within a range of fairness. After accounting for Carter's fraud, the $13.50 per share price represents a closer call, but still may have fallen within the lower end of a range of fairness.

The opposing expert opinions presented at trial adopted widely divergent views of the value of Dole, as is often the case in valuation litigation. *See In re Appraisal of Dole Food Co., Inc., 114 A.3d 541, 556-59 (Del. Ch. 2014)*. Relatively speaking, the plaintiffs' expert was more helpful, because his work demonstrated how different assumptions and inputs affected Dole's value. The defense expert did little more than provide a second fairness opinion using pro-defendant assumptions. Lazard's work was far more credible. As already noted, it was thorough and balanced, and it was prepared for the benefit of the Committee as part of their consideration of the transaction, rather than by an expert retained by the defendants to help **[*115]** them defeat the plaintiffs' claims. In the final analysis, neither of the parties' experts provided compelling evidence about the fairness or unfairness of the price.

---

price was "within the low end of the range of possible prices that might have been paid in negotiated **[*114]** arms-length deals" where "[t]he process was . . . anything but fair").

If the Committee and Lazard had not been misled, then the Committee's negotiations and Lazard's analysis would have provided powerful evidence of fairness. But Carter's actions tainted both the negotiation process and Lazard's work product. **HN23**[↑] Methods of valuation "are only as good as the inputs to the model." *Neal v. Alabama By-Products Corp., 1990 Del. Ch. LEXIS 127, 1990 WL 109243, at *9 (Del. Ch. Aug. 1, 1990)*, aff'd, *588 A.2d 255 (Del. 1991)*.

Modifying Lazard's discounted cash flow ("DCF") analysis to take into account the information that Carter misrepresented or withheld suggests that the $13.50 per share price may have been below the range of fairness. In its DCF analysis, Lazard determined that the range of fair value for Dole's common stock at the time of the Merger was between $11.40 and $14.08. In the areas where Lazard received complete information, the Committee Projections and Lazard's DCF provide the best insight into Dole's business and its value at the time of the Merger. But the Committee Projections require adjustments for the areas where the Committee and Lazard were misled.

The first issue is cost-cutting. The evidence showed that **[*116]** Murdock and Carter delayed Dole's cost-cutting program until after the freeze-out, then achieved more than $30 million in incremental savings. In its sensitivity table, Lazard calculated that an incremental $30 million cost savings would justify an increase in price of $3.80 per share.

The second issue is farm purchases. At the Lender Meeting, Carter predicted that Dole easily could purchase $100 million in new farms. The plaintiffs' expert, Kevin Dages, calculated that purchasing an incremental $28.6 million in farms in Ecuador would have increased Dole's value by $1.22 per share. *Compare* JX 1590 at 108 *with id.* at 106. In

making this calculation, Dages used 3.2% both as his perpetual growth rate and to project cash flows in years four and five. Lazard used 1.5%, which this decision adopts for consistency. Modifying these inputs reduces the value of an incremental $28.6 million in farms to $0.87 per share. Scaling up the benefit proportionately for Carter's $100 million in farm purchases yields incremental value of $3.04 per share.

At the time of the Merger, there was obviously some uncertainty about how much Dole actually could achieve in cost savings, as well as the number of farms that [*117] Dole could buy and the value they would generate. Both undertakings were riskier and less certain than Dole's established business. In my view, it would overvalue the incremental cash flows available from these sources to treat them for valuation purposes as being just as certain as the cash generated by Dole's core operations. As discussed below, this decision finds that for purposes of this case, a more reasonable estimate of the cost savings is $1.87 per share, and a more reasonable estimate of the value of the planned farm purchases is $0.87 per share. *See, infra,* Part D.

Adding the full value of the incremental cost savings and farm purchases ($6.84 per share) increases the range of fair value implied by Lazard's DCF to $18.24 to $20.92. Adding what this decision determines to be a more reasonable assessment of the value of those initiatives ($2.74 per share) increases the range to $14.14 to $16.82. The Merger price falls below both ranges.

The defendants have argued vociferously—nigh desperately—that the court cannot consider anything that happened after the Merger closed and must ignore both the cost savings that Dole actually achieved, as well as its farm purchases. **HN24**[⬆]
"Delaware [*118] law is clear that 'elements of

future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered.'" *Del. Open MRI, 898 A.2d at 315* (quoting *Weinberger, 457 A.2d at 713*). "In essence, when the court determines that the company's business plan as of the merger included specific expansion plans or changes in strategy, those are corporate opportunities that must be considered part of the firm's value." *Id. at 315 n.51.*

> Obviously, when a business has opened a couple of facilities and has plans to replicate those facilities as of the merger date, the value of its expansion plans must be considered in determining fair value. To hold otherwise would be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations—think McDonald's or Starbucks.

*Id. at 315-16.* This is what Dole was doing with the cost savings and farm purchases. The plans to cut costs and buy farms to improve profits were part of [*119] Dole's "operative reality" on the date of the Merger.[28]

---

[28] *See id.; accord Cede & Co. v. Technicolor, Inc., 758 A.2d 485, 499 (Del. 2000)* (holding that post-closing evidence that validated a pre-merger forecast was admissible to show that "plans in effect at the time of the merger have born fruition"); *Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 298-99 (Del. 1996)* (requiring that valuation include value of business plans in existence at the time of the merger); *Huff Fund Inv. P'ship v. CKx, Inc., 2014 Del. Ch. LEXIS 82, 2014 WL 2042797, at \*4 (Del. Ch. May 19, 2014)* ("It is clear from our case law that, where a company begins to implement business plans, revenues from those plans must be accounted for in an income-based valuation method."), *aff'd, 2015 Del. LEXIS 77, 2015 WL 631586 (Del. Feb. 12, 2015)* (ORDER); *ONTI, Inc. v. Integra Bank, 751 A.2d 904, 910 (Del. Ch. 1999)* (discussing

The modified DCF analysis suggests that with the benefit of full information about Dole's value, including its plans for cost savings and farms, the Merger price was not fair. That said, the DCF methodology was not the only method [*121] Lazard used, and the fact that the modified calculations in this decision generate ranges above the deal price does not mean that Lazard would have made the same judgments or done the math the same way. Even if Lazard agreed with the figures in this decision, it does not necessarily mean that the firm would have concluded that the Merger price of $13.50 per share fell below the range of fairness. The firm may have concluded that the price was still fair, albeit at towards the lower end of fairness.

There are also market indicators. The

---

law governing incorporation in valuation of plans in existence at the time of the merger); *Ryan v. Tad's Enters., Inc., 728 A.2d 682, 697 (Del. Ch. 1996)* (considering multiple post-closing events in determining the fairness of the merger price). *See generally* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 146 (2005) ("Remember that the company is worth not only the present value of the free cash flow from its current assets, but also the free cash flows generated by the reinvestment strategy that it pursues. The development of the cornfield is a reinvestment of the company's free cash flow and, although the actual investments are not made until after the squeeze-out, [*120] the plans are in place before the squeeze-out."); John C. Coffee, Jr., *Transfers of Control and the Quest for Efficiency: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones?*, *21 Del. J. Corp. L. 359, 418* ("Although the idea [of excluding elements of value arising from the accomplishment or expectation of the merger] makes some sense in the arm's-length transaction where the dissenting shareholder is truly opting out, it is misapplied in squeeze-outs where the shareholder is being expelled and where those who remain may be exploiting asymmetric information."). Although these cases focus on appraisal, the valuation principles and standards for determining statutory fair value are the same as those used to evaluate the fair price aspect of the entire fairness test. *See Orchard Enters., 88 A.3d at 30 & n.11* (collecting cases). Additionally, "[i]n an entire fairness case, where the influence of control is important, there is a sucker insurance purpose to such evidence." *In re S. Peru Copper Corp. S'holder Deriv. Litig., 52 A.3d 761, 812 n.177 (Del. Ch. 2011)* (Strine, C.), *aff'd* **51 A.3d 1213 (Del. 2012)**.

defendants relied on every transaction that Dole had considered since Murdock's discussion with Del Monte in 2009, as if Dole had been engaged in an ongoing, multi-year market check. That was a decent try for purposes of litigation, but it was not what actually happened. The only time Murdock really considered selling Dole was after the financial crisis, when he and Dole were overburdened by debt. He solved his difficulties by taking Dole public. From that point on, the only third-party transaction involving all of Dole that Murdock seriously considered was the Chiquita deal, which was really an acquisition by Dole of Chiquita and would have expanded [*122] Murdock's empire. Otherwise Murdock was not a seller. If someone had approached him with a blow-out price he likely would have considered it, but he placed a high value on the benefits of control. He was particularly unwilling to sell during the period surrounding the Merger, which is the only relevant timeframe.

The defendants have also used metrics implied by various transactions involving Dole and its peers (Chiquita and Del Monte) to show that the Merger was fair. Taken together, these indicators point in the same direction as the Lazard analysis: Without information about Dole's cost savings and farm purchases, the $13.50 price was within the range of fairness. With information about Dole's cost savings and farm purchases, the deal price fell towards the low end of the range of fairness and may have dropped below it. The defendants also pointed to Wells Fargo's decision to withdraw from the loan syndicate as evidence that the deal price was high. Wells Fargo just as easily could have been uncomfortable with the amount of leverage rather than the price. The number of turns of leverage that banks will fund is heavily affected by prevailing market conditions, and there were meaningful [*123] external dynamics at work in 2013, such as the "Taper Tantrum," when rates jumped in response to

concern that the Federal Reserve was moderating the massive subsidy known euphemistically as Quantitative Easing. *See* Frauen 2042-43. On a company-specific level, the degree of leverage also depends on the size of the equity check, and Murdock was only committing to provide an incremental $100 million in equity. He did not actually write the check to Dole until early 2015. Given the multiple factors involved, Wells Fargo's apparent discomfort with Murdock's preferred financing package does not indicate that the price was fair.

### 3. The Unitary Determination Of Fairness

**HN25**[↑] "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness . . . ." *Tremont I, 1996 Del. Ch. LEXIS 40, 1996 WL 145452, at *8.* "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Technicolor Plenary III, 663 A.2d at 1140.*

In my view, Carter's conduct rendered the Merger unfair. He engaged in "fraud, misrepresentation, self-dealing, [and] gross and palpable overreaching." *Weinberger, 457 A.2d at 714.* Assuming for the sake of argument that the **[*124]** $13.50 price fell within a range of fairness, the plaintiffs are entitled under the circumstances to a "fairer" price. *Reis, 28 A.3d at 466.* This is because by engaging in fraud, Carter deprived the Committee of its ability to obtain a better result on behalf of the stockholders, prevented the Committee from having the knowledge it needed to potentially say "no," and foreclosed the ability of the stockholders to protect

themselves by voting down the deal.[29]

## B. The Liability Of The Fiduciary Defendants

**HN26**[↑] A ruling that a transaction is **[*125]** not entirely fair does not automatically result in liability for the defendants. "The entire fairness test seeks to determine whether directors complied with their fiduciary duties." *Reis, 28 A.3d at 465.* The test "has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction." *Venhill Ltd. P'ship v. Hillman, 2008 Del. Ch. LEXIS 67, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008)* (Strine, V.C.). Directors who have breached their duties may have defenses to liability, such as exculpation under *Section 102(b)(7)* of the DGCL, protection due to reliance on advisors under *Section 141(e)* of the DGCL, or other doctrines.

Section 10.1 of Dole's certificate of incorporation provides that "[t]o the fullest extent permitted by the DGCL as the same exists or as may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." Dkt. 695 Ex. A. (the "Exculpatory Clause"). *Section 102(b)(7)* of the DGCL provides that

---

[29] *See* *HMG/Courtland, 749 A.2d at 116-17* (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko I, 794 A.2d at 1184* (holding that although the "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts).

HN27[⬆] the certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: [*126] (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 Del. C. § 102(b)(7).HN28[⬆] The effect of a provision like the Exculpatory Clause is to protect directors from personal liability for monetary damages for a breach of fiduciary duty, except for the four categories listed in Section 102(b)(7). "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., Delaware Corporation Law and Practice § 6.02[7] at 6"18 (2013).

HN29[⬆] When a corporation has an exculpatory provision and a self-dealing transaction has been determined to be unfair, "only the self-dealing director [is] subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind." Venhill, 2008 Del. Ch. LEXIS 67, 2008 WL 2270488, at *22. For other directors, "even the ones who might be [*127] deemed non-independent by status, the presence of the exculpatory charter provision . . . require[s] an examination of their state of mind, in order to determine whether

they breached their duty of loyalty by approving the transaction in bad faith . . . , rather than in a good faith effort to benefit the corporation." Id. at *23. "In other words, their status [as non-independent directors] is only a fact relevant to the ultimate determination whether they complied with their fiduciary duties, it is not a status crime making them a guarantor of the fairness of the transaction." Id. In light of the Exculpatory Clause, "[t]he liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." In re Emerging Communs., Inc. S'holders Litig., 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *38.

## 1. Murdock

Murdock is personally liable for damages resulting from the Merger. Murdock acted in two capacities in connection with the Merger: as Dole's controlling stockholder and as a Dole director.

As this court held in Emerging Communications, a provision like the Exculpatory Clause "does not apply to [a defendant] in his capacity as [a] controlling stockholder." Id. As Dole's controlling stockholder, Murdock [*128] "breached his duty of loyalty to . . . the plaintiff shareholder class, by eliminating [Dole's unaffiliated] stockholders for an unfair price in an unfair transaction . . . . For that breach of duty [Murdock] is liable." Id.

Murdock is also liable in his capacity as a director. He breached his duty of loyalty by orchestrating an unfair, self-interested transaction. In addition, as the buyer, he "derived an improper personal benefit" from the transaction. Id. The Delaware Supreme Court recently confirmed this outcome in

*Cornerstone*: As the interested party, "a finding of unfairness after trial will subject [him] to liability for breach of the duty of loyalty regardless of [his] subjective bad faith." *115 A.3d at 1181*; *accord Venhill, 2008 Del. Ch. LEXIS 67, 2008 WL 2270488, at \*22*.

Up to this point, this decision has not focused separately on DFC Holdings, LLC, an entity Murdock controlled and used as one of the acquisition vehicles for the Merger. Before the Merger, DFC Holdings, LLC was the sole owner of DFC Merger Corp., which merged with and into Dole. In *Emerging Communications*, this court held that the acquisition vehicles that the controlling stockholder used to effectuate an unfair freeze-out merger were liable as aiders and abetters to the same extent **[\*129]** as the controlling stockholder. *2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at \*38*. The same analysis applies to DFC Holdings, LLC.

### 2. Carter

Carter is personally liable for damages resulting from the Merger. He also acted in two capacities in connection with the Merger: as a director and as Dole's President, Chief Operating Officer, and General Counsel. He is liable both as a director and as an officer.

Carter is not entitled to exculpation in his capacity as a director because he breached his "duty of loyalty to the corporation [and] its stockholders" and his acts and omissions were "not in good faith." *8 Del. C. § 102(b)(7)*. **HN30** The Delaware Supreme Court has held that for purposes of the Delaware common law of fiduciary duties, these concepts elide: The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006)* (internal quotation marks omitted). Likewise for purposes of the Delaware common law of fiduciary duties, the Delaware Supreme Court has held that "acting in bad faith" and "not acting in good faith" are two sides of the same coin.[30] At a minimum, good faith requires that the decision-maker act "honestly and without pretext."[31] Bad faith involves the opposite. **[\*130]** In its most extreme form, it involves "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or "a state of mind affirmatively operating with furtive design or ill will." *McGowan v. Ferro, 859 A.2d 1012, 1036 (Del. Ch. 2004)*. But it also encompasses other failures to act in good faith, including when a decision-maker "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for [the decision-maker's] duties," or when the decision-maker "intentionally acts with a purpose other than" the purpose that the decision-maker is

---

[30] *See ev3, Inc. v. Lesh, 114 A.3d 527, 539 (Del. 2014)*; *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi., 75 A.3d 101, 110-11 (Del. 2013)*; *Allen v. Encore Energy P'rs, L.P., 72 A.3d 93, 104 (Del. 2013)*; *Stone v. Ritter, 911 A.2d 362, 369 (Del. 2006)*; *In re Walt Disney Co. Deriv. Litig. (Disney II), 906 A.2d 27, 67 (Del. 2006)*. *See generally* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, *98 Geo. L.J. 629 (2010)*.

[31] Joseph K. Leahy, *A Decade After* Disney: *A Primer on Good and Bad Faith*, 83 U. Cin. L. J. 859, 864 (2015); *accord* Strine, *supra*, at 655 (explaining that the concept of good faith encompasses a director's "honest, non-pretextual use of power"). For cases illustrating these concepts see, e.g., *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)* (explaining that as part of the business judgment rule, directors are **[\*131]** presumed to act "in good faith and in the honest belief that the action taken was in the best interests of the company"); *In re Walt Disney Co. Deriv. Litig. (Disney I), 907 A.2d 693, 755 (Del. Ch. 2005)* ("To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."), *aff'd, 906 A.2d 27 (Del. 2006)*; *Kaplan v. Goldsamt, 380 A.2d 556, 568 (Del. Ch. 1977)* (stating that directors must act "in good faith, with honest motives, and for honest ends").

obligated to pursue.[32] A corporate fiduciary thus acts in bad faith when motivated by a purpose other than that of advancing the best interests of the corporation and its stockholders.[33]

Carter demonstrated that his primary loyalty was to Murdock, not to Dole or to its unaffiliated stockholders. Through Dole, Murdock was Carter's employer, and Carter would continue to run Dole for Murdock after the Merger. Carter knew of Murdock's buyout plans at least as early as January 2013, and he consistently acted to promote Murdock's interests. In support of Murdock's plan to privatize Dole, Carter (i) pushed down the stock price, (ii) advocated for the self-tender, (iii) participated in calls and meetings concerning Murdock's plans to launch a hostile tender offer, (iv) sought at the outset to restrict

---

[32] *Disney II, 906 A.2d at 67*; *accord Stone, 911 A.2d at 369* ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney II, 906 A.2d at 67*)).

[33] *See Venhill, 2008 Del. Ch. LEXIS 67, 2008 WL 2270488, at *28* ("Howard did not act in the good faith pursuit of Venhill's best interests, as he was bound to do. Instead, he acted in bad faith by impoverishing Venhill in order to keep Auto-Trol afloat for personal reasons unrelated to Venhill's own best interests."); *Guttman v. Huang, 823 A.2d 492, 506 n.34 (Del. Ch. 2003)* (Strine, V.C.) ("A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest. . . . The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's [*132] best interest does not make it faithful, as opposed to faithless."); *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996)* (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig., 1989 Del. Ch. LEXIS 9, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989)* (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

the authority of [*133] the Committee and its advisors, (v) created falsely low forecasts for the Committee to use, (vi) convened the secret Lender Meeting and lied to the Committee about his supposed compliance with the Process Letter, (vii) disregarded the Committee's instructions to terminate Deutsche Bank's access to the data room, (viii) provided advice to Murdock, Deutsche Bank, and Murdock's counsel, and (ix) started a new budgeting process using quite different and more positive assumptions and estimates without telling the Committee. Carter's vote in favor of the Merger as a director was the culmination of a course of conduct permeated by bad faith and disloyalty.

Carter also acted in his capacity as Dole's President, COO, and General Counsel. Indeed, Carter primarily interacted with the Committee as an officer. When he provided false information to the Committee and when he organized and led the Lender Meeting, Carter was acting primarily as President and COO of Dole. When he interfered with the Committee's operations in other ways, such as by trying to cabin its mandate, objecting to Lazard, insisting on having control over Dole's confidential information, and providing legal and strategic advice [*134] to Murdock, Carter was acting primarily as Dole's General Counsel. As an officer, Carter owed the same duties that he owed as a director, but the Exculpatory Clause does not protect him when acting in those capacities. *Gantler v. Stephens, 965 A.2d 695, 709 nn.36-37 (Del. 2009)*.

### 3. DeLorenzo

DeLorenzo presents a close call, but I conclude that he is not liable to the plaintiffs. After the ITOCHU Transaction, DeLorenzo left Dole but remained on the Board. The plaintiffs contend that Murdock kept him there to have a

guaranteed vote in favor of the Merger. As evidence of DeLorenzo's allegiance to Murdock, they observe that he voted against the Committee's resolution to give it authority to appoint its own chairman—something DeLorenzo admitted did not make sense. DeLorenzo 699-701. The plaintiffs then analogize DeLorenzo's situation to Salvatore Muoio in *Emerging Communications. 2004 Del. Ch. LEXIS 70, 2004 WL 1305745 at *39-40*. In that decision, Justice Jacobs (sitting by designation) held that a director who (i) had longstanding affiliations with the controller, (ii) was serving as a paid consultant for the controller and was seeking additional business from the controller, and (iii) continued to have financial relationships with the controller after the transaction failed to prove that he was entitled to exculpation. **[*135]** *Id.* Justice Jacobs observed that Muoio had special expertise that placed him "in a unique position" to know that controller's freeze-out was unfair, yet he remained silent and voted in favor of the deal.

> In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of [the controlled company's] intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

*2004 Del. Ch. LEXIS 70, [WL] at *40*. Justice Jacobs noted that unlike other less knowledgeable and less sophisticated directors, Muoio could not claim to have relied on the fairness opinion obtained by the committee. *Id.*

Given these facts, Justice Jacobs asked the following question: "Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve the deal?" *Id.* He recognized that the possibility existed that Muoio sincerely believed that the $10.25 price was minimally fair, but he observed **[*136]** that under *Section 102(b)(7)*, the burden falls upon the director to show that his failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." *Id.* (citing *Emerald II, 787 A.2d at 98*) (internal quotation marks and alterations omitted). He continued:

> The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to [the controller]. The second was that Muoio, for whatever reason, consciously and intentionally disregarded his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith.

*Id.* (internal quotation marks and footnotes omitted). Justice Jacobs concluded that Muoio had "not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character." *Id.*

The plaintiffs contend that **[*137]** DeLorenzo, even more so than Muoio, possessed specialized knowledge about the value of Dole. He knew in particular about the cost savings available after the ITOCHU Transaction, having led the effort to identify a total of $50 million in recurring savings and given that number to the market, and he also knew about Dole's plans to buy farms. They

contend DeLorenzo should have advocated against a transaction that he knew undervalued Dole and voted against the deal. They say that instead he remained silent and voted in favor of the Merger to further his relationship with Murdock and because he had been well compensated by Murdock and Dole over the years.

DeLorenzo's situation resembles Muoio's in many ways. The principal distinctions are that DeLorenzo had left to work for ITOCHU, was no longer receiving remuneration from Murdock or his companies, and was not soliciting business from Murdock. At most, DeLorenzo may have felt some residual loyalty to Murdock. Importantly, DeLorenzo did not personally participate in or know about the specific misconduct in which Murdock and Carter engaged.

Ultimately what is required is an assessment of DeLorenzo's motives. "[D]ivining the operations of a person's **[*138]** mind is an inherently elusive endeavor." *2004 Del. Ch. LEXIS 70, [WL] at *40*. Although the issue is close and the analogy to *Emerging Communications* is strong, I find that DeLorenzo was entitled to rely on the Committee's recommendation of the Merger. *See 8 Del. C. § 141(e)*. I do not believe that he acted disloyally or in bad faith. He is therefore entitled to exculpation. *See 8 Del. C. § 102(b)(7)*.

## C. The Claim For Aiding And Abetting Against Deutsche Bank

The plaintiffs seek to impose liability on Deutsche Bank for aiding and abetting Murdock and Carter's breaches of fiduciary duty. *HN31*[⬆] This claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages

proximately caused by the breach. *Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)*. The finding of liability against Murdock and Carter satisfies the first, second, and fourth elements, but the third element is lacking.

*HN32*[⬆] Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of "knowing participation" requires that the secondary actor have provided "substantial assistance" to the primary violator. *Kuhns v. Bruce A. Hiler Delaware QPRT, 2014 Del. Ch. LEXIS 47, 2014 WL 1292860, at *21 (Del. Ch. Mar. 31, 2014)*. *Section 876(b) of the Restatement (Second) of Torts* reflects **[*139]** this requirement by making a secondary actor liable "[f]or harm resulting to a third party from the tortious conduct of another" if the secondary actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Restatement (Second) of Torts § 876(b)* (1979); *see Anderson v. Airco, Inc., 2004 Del. Super. LEXIS 393, 2004 WL 2827887, *2-3 (Del. Super. Nov. 30, 2004)*.

*HN33*[⬆] A court's analysis of whether a secondary actor "knowingly" provided "substantial assistance" is necessarily fact intensive. Illustrative factors include the following:

. The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

. The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

. The nature of the relationship between the secondary and primary actors; and

. The secondary actor's state of mind.

The list is drawn from and expands on factors that appear in *Kuhns*, which drew its list from *Patton v. Simone, 1992 Del. Super. LEXIS 495, 1992 WL 398478, \*12 (Del. Super. Dec. 14, 1992)*.

In the current case, the plaintiffs did not prove that Deutsche Bank knowingly participated in the breaches of duty giving rise to fiduciary liability. **[\*140]** The critical breaches of duty involved fraud regarding Dole's cost-cutting and purchases of farms. The tortious conduct was serious, its wrongfulness was clear, and the extent of the consequences was obvious, but Deutsche Bank did not know about or participate in those acts. Deutsche Bank did not make any of the misrepresentations, was not present for them, and did not conceal information from the Committee. Deutsche Bank was not directly involved, nor even secondarily involved, in the critical breaches of duty.

Deutsche Bank did participate directly in the Lender Meeting, but the plaintiffs did not prove that Deutsche Bank knew about the Process Letter or that the meeting violated its terms. A sophisticated firm like Deutsche Bank doubtless would have expected the Committee and its advisors to establish protective procedures such as those set forth in the Process Letter, and if the Deutsche Bank representatives had pondered whether the Committee had authorized the meeting, then they likely would have found it suspicious that Lazard and possibly Conrad and other Committee members were not in attendance. But even then, Carter and his team might have provided the same information to the **[\*141]** Committee and Lazard separately. Deutsche Bank did not have any reason to think that the information it received at the Lender Meeting

was different than the information that the Committee received.

The most that can be said is that the Deutsche Bank professionals who attended the meeting might have had some reason to be concerned that something may have been amiss. For that purpose, it is important to consider that when the Lender Meeting took place, Deutsche Bank was acting as Murdock's advisor and lead financier. Given that role, I do not believe it was Deutsche Bank's job to call the Committee, its counsel, or Lazard to make sure everything was OK.[34] The fault lay with Dole's officers and employees, principally Carter, who owed their duties to Dole and, for purposes of Murdock's offer, reported to and acted under the direction of the Committee. The same analysis applies to Deutsche Bank's access to the Committee's data room and its communications with Carter, Potillo, and other Dole officers.

The plaintiffs take a broader view of Deutsche Bank's culpable **[\*142]** conduct. They argue that Deutsche Bank should be liable for acting as Murdock's *de facto* advisor, advancing his interests, and assisting him with preliminary planning for the freeze-out beginning in 2012. The plaintiffs emphasize the periods when the bank was formally advising Dole on the strategic business review and the ITOCHU Transaction, but they also stress the months from January through May 2013 when Deutsche Bank was communicating regularly with Carter, Potillo, and other Dole officers to help plan the freeze-out.[35] The plaintiffs complain that Deutsche Bank knowingly

---

[34] Of course, had they done so, it would have been commendable and insulated them from any risk of liability relating to the meeting.

[35] *See* Murdock 132-33, 248-60, 262-269, 286-290; Carter 950, 954; Grellier 2149-2165, 2197-2202; JX 173; JX 244; JX 393; JX 394; JX 396; JX 404; JX 476; JX 478; JX 1634; JX 1670; JX 1671.

received confidential Dole information that it used to help Murdock plan the freeze-out and to advance his interests on other matters.

This theory might present problems for Deutsche Bank if it constituted an inherent breach of duty for a director or officer to share Dole's confidential information with a substantial stockholder without Board authorization. In his capacity as a director and Dole's *de facto* controller, and later as its **[*143]** CEO, Murdock had complete access to Dole's confidential information. Because Murdock was also Dole's controlling stockholder, and because he is a human being with only one brain, in practice he was necessarily and constantly sharing that information with himself in his stockholder capacity. He went further by sharing Dole's confidential information with his personal advisors, such as Deutsche Bank, Griswold, and his counsel at Paul Hastings, during periods when they were advancing his personal interests as a stockholder. At Murdock's direction, other Dole fiduciaries, like Carter and Potillo, also shared confidential information and participated in discussions with Deutsche Bank, Griswold, and Paul Hastings. If Murdock had been a third party unaffiliated with Dole, rather than its dominant investor, no one from Dole would have been sharing this information with him and his advisors. At a minimum they would not have received information without Board approval and a confidentiality agreement.

In my view, **HN34** a fiduciary sharing of information with an affiliated stockholder and its advisors, standing alone, is not inherently a breach of duty.[36] It depends on what the

provider and recipients **[*144]** do with the information, including whether they use the information to the detriment of the corporation and its stockholders or to benefit themselves improperly.[37] Under existing law, it does not seem to me that the information sharing and preparatory activities in which Murdock engaged, including Deutsche Bank's consultations with Dole officers and its use of Dole's confidential information for preliminary takeover planning, rose to the level of breach.[38] Of course, just as the law could have

---

[36] *See Kalisman, 2013 Del. Ch. LEXIS 100, 2013 WL 1668205, at \*6; Kortum v. Webasto Sunroofs, Inc., 769 A.2d 113, 121 (Del. Ch. 2000); KLM v. Checchi, 1997 Del. Ch. LEXIS 125, 1997 WL 525861, at \*2-3 (Del. Ch. July 23, 1997); Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp., 1996 Del. Ch. LEXIS 56, 1996 WL 307444, at \*5 (Del. Ch. June 4, 1996);*

[37] *AOC Ltd. P'ship v. Horsham Corp., 1992 Del. Ch. LEXIS 110, 1992 WL 97220, at \*1 (Del. Ch. May 4, 1992); see also Schoon v. Smith, 953 A.2d 196, 208 (Del. 2008)* (holding that director lacked standing to sue derivatively because stockholder he represented could bring suit, which only could happen if director was able to share information with affiliated stockholder). For discussions of the nuanced issues raised by information sharing and the difficulties of a bright-line rule that either permits or prohibits sharing, see J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, *70 Bus. Law. 33, 54-57 (2015);* Cyril Moscow, *Director Confidentiality*, *74 L. & Contemp. Probs. 197 (2011),* and Catherine G. Dearlove & Jennifer J. Barrett, *What To Do About Informational Conflicts Involving Designated Directors*, 57 Prac. Law. 45 (2011).

[37] *See, e.g., Oberly v. Kirby, 592 A.2d 445, 463 (Del. 1991)* ("It is an act of disloyalty for a fiduciary to *profit personally* from the use of information secured in a confidential relationship.") (emphasis added)*; Brophy v. Cities Serv. Co., 31 Del. Ch. 241, 70 A.2d 5, 7-8 (Del. Ch. 1949)* ("A fiduciary is subject to a duty to the beneficiary not *to use on his own account* information confidentially **[*146]** given him by the beneficiary or acquired by him during the course of or on account of the fiduciary relation or in violation of his duties as fiduciary, *in competition with or to the injury of the beneficiary, . . .* unless the information is a matter of general knowledge." (internal quotation marks omitted; emphasis added)); *Holdgreiwe v. Nostalgia Network, Inc., 1993 Del. Ch. LEXIS 71, 1993 WL 144604, at \*6-7 (Del. Ch. Apr. 27, 1993)* (Allen, C.) (limiting director's ability to share information directly or through advisors where he was affiliated with entity engaged in active litigation against corporation); *Henshaw v. Am. Cement Corp., 252 A.2d 125, 130 (Del. Ch. 1969)* (same; noting that a remedy for breach of fiduciary duty would exist if the director seeking inspection were to "abuse his position as director [by making] information available to persons hostile to the corporation or otherwise not entitled to it").

[38] Imagine an alternative history in which Murdock not only mimicked *MFW*'s form but adhered to its substance. Under

a bright-line anti-sharing rule, it could have a bright-line rule against unauthorized bid preparations by insiders. Indeed, such a rule likely follows from a strong-form anti-sharing rule. Under such an approach, the law would require a controller like Murdock (or a manager considering an LBO) to act like a third-party bidder. Before a third-party bidder can legitimately access confidential information about its target, it has to approach the company and obtain permission. A controller or manager would have to do the same. Under such a regime, an advisor who consciously assisted a fiduciary in preparing an as-yet unauthorized bid would have knowingly participated in the breach. If the company or **[*145]** its stockholders suffered harm, as they did here, then the advisor would be jointly and severally liable. But our law does not appear to me to have adopted a bright-line position. The use and sharing of information is rather another context-dependent inquiry.

If I am incorrect and Murdock's sharing and use of Dole's confidential information was prohibited, then Deutsche Bank knowingly participated in the breach. Under the first illustrative factor, Deutsche Bank knew that it was receiving confidential information from Murdock, Carter, Potillo, and other Dole insiders, and it used the information to assist Murdock in planning for the freeze-out and on

other issues that affected his personal interests as a stockholder. Deutsche Bank's assistance was prolonged and extensive. At all stages, its relationship with the primary actors was problematic. Deutsche Bank took pains at trial to **[*148]** stress that at many points when it was receiving and using this information, it was not working for Dole. During those periods, Deutsche Bank knew it should not have access to Dole's confidential information. At other times, Deutsche Bank was serving as a common law agent and owed a duty of loyalty to Dole.[39] During those periods, Deutsche Bank should have been focused on promoting Dole's interests. It should not have been using Dole's confidential information to advance Murdock's interests.

But to reiterate, I do not believe that the preparatory activities amounted to a breach on the facts of this case, nor that any actions by Deutsche Bank while its loyalties were divided resulted in harm. In my view, the scope of Deutsche Bank's exposure to liability depends on their knowing **[*149]** participation in the breaches of duty that gave rise to causally related damages, namely Carter's interference with and fraudulent misrepresentations to the Committee. The aiding and abetting claim against Deutsche Bank therefore fails.

## D. Damages

HN35[↑] Once a breach of duty has been established, this court's "powers are complete

---

those circumstances, the Committee would have had full access to accurate information about the Company, could have bargained with Murdock on an informed and arm's length basis, could have agreed to a deal or, if it concluded that Murdock was not willing to pay a fair price or that there were better alternatives available for **[*147]** Dole and its stockholders, said no. By stepping back from his controller role and disabling himself at the Board and stockholder level when he made his initial proposal, Murdock would no longer have stood on both sides of the transaction, the Committee could have performed its function effectively, and the stockholders could have protected themselves at the ballot box. It does not seem to me that under those circumstances, Murdock would be thought to have breached his fiduciary duties by making preparations for his offer and enlisting Deutsche Bank's assistance.

---

[39] In re Shoe-Town, Inc. S'holders Litig., 1990 Del. Ch. LEXIS 14, 1990 WL 13475, at *7 (Del. Ch. Feb. 12, 1990); see Restatement (Third) of Agency § 1.01 & cmt. b (2006); William W. Bratton & Michael L. Wachter, Bankers and Chancellors, 93 Tex. L. Rev. 1, 31 (2014). As Professors Bratton and Wachter discuss, a common law agency relationship is contractable, subject to certain outer limits. Because Deutsche Bank does not face liability even under a traditional common law relationship, this decision does not parse the potential implications of provisions in Deutsche Bank's engagement letters.

to fashion any form of equitable and monetary relief as may be appropriate . . . ." *Weinberger, 457 A.2d at 714*. At that point, the remedy could be a damages award equal to the fair value of the shares, but "the measure of any recoverable loss . . . under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings." *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 371 (Del. 1993)*. "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Bomarko II, 766 A.2d at 440*. The award may include "elements of rescissory damages" if the court "considers them susceptible of proof and a remedy appropriate to all the issues of fairness" presented by the case. *Weinberger, 457 A.2d at 714*. An award exceeding the fair value of the plaintiffs' shares may be appropriate **[*150]** "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Id.*

**HN36**[⬆] "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc. (Thorpe II), 676 A.2d 436, 445 (Del. 1996)*. Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 766, 773 (Del. 2006)*. But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc., 1992 Del. Ch. LEXIS 224, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)* (Allen, C.). "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." *Thorpe v. CERBCO, Inc., 1993 Del. Ch. LEXIS 257, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993)*.

**HN37**[⬆] In a plenary breach of fiduciary duty action, "the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Gesoff, 902 A.2d at 1154*. "Once disloyalty has been established, the standards evolved in *Oberly v. Kirby* and *Tri-Star* require that a fiduciary not profit personally from his conduct, and that the beneficiary **[*151]** not be harmed by such conduct." *Thorpe II, 676 A.2d at 445* (citing *Oberly, 592 A.2d at 463*, and *In re Tri-Star Pictures, Inc., Litig., 634 A.2d 319, 334 (Del. 1993))*.

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)*.

As discussed, on the facts presented, the stockholders are not limited to an arguably fair price. They are entitled to a fairer price.

The Committee Projections and Lazard's analysis, with adjustments for the areas where Murdock and Carter misled the Committee, provide the best insight into Dole's business and its value at the time of the Merger. Because uncertainties in damages calculations

are resolved against the wrongdoer, these items could support an award of damages as high as $6.84 per share, consisting of $3.80 per share for the delayed cost-cutting and $3.04 for the concealed projections about farm purchases. But while such a finding is possible, it would treat all of the upside from those initiatives as certain and would assume that the Committee [*152] could extract 100% of the incremental benefits from Murdock. If the goal of awarding damages in a case involving a breach of the duty of loyalty is to extinguish "all possibility of profit," then imposing that figure on Murdock and Carter is what the law demands.

To my mind, however, that level of damages seems unrealistic and harsh, except as a form of rescissory damages.[40] The cost-saving

initiatives and the purchases of new farms were riskier and less certain than Dole's established business, so it overvalues the incremental cash flows from these sources to treat them as being just as certain as the cash generated by Dole's core operations. This opinion therefore incorporates more modest cost savings and benefits from farm purchases. Dole's Management High Case assumed $14.8 million in incremental cost savings. Carter 908; see JX 783 at 21 (rounding to $15 million). The number was adopted by Seth Ferguson, one of the defendants' experts. JX 1593 at 72. It provides a reasonable middle-ground estimate of the likely benefits of additional cost-cutting. Lazard's sensitivity table implies that $14.8 million in cost savings would be worth $1.87 per share.

For the farm purchases, this decision adopts the plaintiffs' ask. Rather than seeking the full $100 million in farm purchases that Carter identified at the Lender Meeting or which Dole otherwise appears to have planned, the plaintiffs only sought to incorporate $28.6 million. As discussed above, that investment in farms would be worth an additional $0.87 per share.

These more modest estimates add $2.74 per share to Lazard's DCF valuation range, increasing it to $14.14 to $16.82 per share. The midpoint of the adjusted range, which is $15.48 per share, approximates the result of an arm's length negotiation between parties having equal information. The result is a price $1.98 per share higher than [*155] the $13.50 per share Murdock paid. But because the defendants engaged in fraud, and in light of the Delaware Supreme Court's guidance regarding damages calculations for loyalty breaches, the plaintiffs are entitled to the full

---

[40] Because Carter engaged in fraud, [*153] rescissory damages could be justified on these facts, and there is evidence suggesting that damages of $6.84 per share would not be unwarranted. Carter testified that Dole not only met its budget for 2014, but that it had exceeded that budget by "quite a bit." Carter 994. At trial, the plaintiffs introduced evidence showing that Dole reached $196.5 million in adjusted EBITDA in just the first three quarters of 2014, more than what was forecasted in the Committee Projections for the entire year. JX 923 at 4; Carter 993-95; cf. JX 783 at 22 (showing that the Committee Projections forecasted $189 in EBITDA in 2014). Supposedly to contradict this evidence, the defendants sought to introduce just one of the monthly comprehensive management reporting packages for 2014, called the "Tuesday Package," even though Dole previously moved for a protective order to avoid producing those documents. See Tr. 2072-73. After the plaintiffs objected and I ordered the production of the remaining Tuesday Packages from 2014, the defendants withdrew the lone Tuesday Package from evidence. Despite my ruling, the defendants never produced the other Tuesday Packages, yet they continued to rely on Carter's unsupported [*154] testimony about the withdrawn Tuesday Package. The natural inference is that the Tuesday Packages would have supported an even higher damages award based on rescissory principles. See Lynch, 638 A.2d at 1119 n.7 ("The production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse."); accord Smith v. Van Gorkom, 488 A.2d 858, 879 (Del. 1985); Chesapeake Corp. v. Shore, 771 A.2d 293, 301 & n.7 (Del. Ch. 2000) (Strine, V.C.). Ironically, one of the defendants' main themes

during post-trial argument was that the plaintiffs had "cherry-picked" their evidence.

incremental $2.74 per share in damages.

The resulting damages award implies a fair value for Dole of $16.24, significantly less than the maximum of $20.34 per share the responsible estimate standard could support. The $2.74 per share figure suggests that Murdock and Carter's pre-proposal efforts to drive down the market price and their fraud during the negotiations reduced the ultimate deal price by 16.9%. This result matches the findings of one study in which the data supported an average price decrease of 18.6% caused by earnings manipulation before management-led buyouts. *See* Wu, *supra*. Another way to evaluate the award is to start with the market price after the ITOCHU Transaction, when Dole's stock traded above $14.00 per share. By the time Murdock made his offer, the price had declined to $10.20 per share, in part because of Carter's actions. The award of $16.24 represents a 16.0% premium over the trading price of $14.00 per share, which is relatively modest.[41]

**HN38**[⬆] "[A] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. TransWorld Airlines, Inc., 540 A.2d 403, 409 (Del. 1988)*. Pre-and post-judgment interest will accrue at the legal rate, fluctuating with the underlying Federal Discount Rate and compounded quarterly, until the date of payment.[42]

---

[41] *See,* **[*156]** *e.g.,* FactSet, *US M&A News and Trends* (July 2015), http://www.factset.com/websitefiles/PDFs/flashwire/flashwire_7.15 (reporting an average deal premium between 30% and 40% in the third quarter of 2013, when the freeze-out was negotiated); Jens Kengelbach & Alexander Roos, Boston Consulting Gp., *Riding the Next Wave in M&A* 12 (2011) (finding an average deal premium of 26% between 1990 and 2010 in a sample of approximately 26,000 transactions); Gregg A. Jarrell, James A. Brickley & Jeffry M. Netter, *The Market for Corporate Control*, 2 J. Econ. Persp. 49, 51 (1988) (finding average historical deal premiums ranging from 19% to 35% in different decades).

## E. The Appraisal Proceeding

The appraisal claimants seek the fair value of **[*157]** their shares. They are also members of the Class and are entitled to the remedy provided by this decision. Because they are only entitled to a single recovery, the damages award potentially renders the appraisal claim moot. The appraisal proceeding could regain its relevance, however, if the appraisal claimants did not receive complete relief from Murdock, Carter, and DFC Holdings, at which point they would have reason to proceed against Dole. But because Dole is owned indirectly by Murdock through DFC Holdings, a separate remedy against Dole may not have incremental utility.

The issue may also be moot because this court held in *Emerging Communications* that both acquisition vehicles used by the controller to effect an unfair privatization—both the parent company and the merger subsidiary—were liable to the same degree as the controller. *See* Part B.1, *supra*. Through DFC Holdings, Murdock caused DFC Merger Corp. to merge with and into Dole, which thereby became liable for DFC Merger Corp.'s obligations. *See* 8 Del. C. § 259(a).

It may be that the parties can resolve these issues in the first instance. Rather than burdening an overly long opinion with further analysis of appraisal and its contingent **[*158]** relevance, the parties shall meet and confer about whether further rulings are necessary.

---

[42] *See* 6 Del. C. § 2301(a); *Levey v. Browstone Asset Mgmt., LP, 2014 Del. Ch. LEXIS 158, 2014 WL 4290192 (Del. Ch. Aug. 29, 2014)* (explaining rationale for fluctuating rate); *Taylor v. Am. Specialty Retailing Gp., Inc., 2003 Del. Ch. LEXIS 75, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003)* (using quarterly compounding interval for legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").

## III. CONCLUSION

Murdock, his entity DFC Holdings, LLC, and Carter are liable for breaches of their duty of loyalty in the amount of $148,190,590.18. DeLorenzo and Deutsche Bank are not liable to the plaintiffs. The parties will confer and advise the court as to any issues that remain to be addressed.

**End of Document**

# Tab I

 Neutral
As of: December 16, 2019 3:56 PM Z

# *In re Xura, Inc. Stockholder Litig.*

Court of Chancery of Delaware

September 11, 2018, Submitted; December 10, 2018, Decided

CONSOLIDATED C.A. No. 12698-VCS

**Reporter**
2018 Del. Ch. LEXIS 563 *; 2018 WL 6498677

IN RE XURA, INC. STOCKHOLDER LITIGATION

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Subsequent History:** Objection overruled by *In re Xura, Inc. Stockholder Litig., 2019 Del. Ch. LEXIS 51 (Del. Ch., Feb. 13, 2019)*

Motion granted by, Dismissed by, in part *In re Xura, Inc. Stockholder Litig., 2019 Del. Ch. LEXIS 255 (Del. Ch., July 12, 2019)*

## Core Terms

negotiations, Proxy, stockholders, breach of fiduciary duty, appraisal, allegations, per share, pled, motion to dismiss, communications, aiding and abetting, Go-Shop, adverse inference, fiduciary, parties, Merger, terms, disclosure, Strategic, contacted, documents, well-pled, buyer, team, bid, pleading stage, cleansing, stock, business judgment rule, fiduciary duty

## Case Summary

### Overview
HOLDINGS: [1]-Plaintiff former stockholder had standing to pursue a breach of fiduciary duty claim against defendant, the corporation's former CEO, despite its pending appraisal action, because plaintiff alleged the CEO directed the corporation to consummate an undervalued transaction for reasons other than the best interests of stockholders and sought traditional post-closing remedies, including rescissory damages and disgorgement; [2]-That a majority of the corporation's stockholders approved the transaction did not require application of the business judgment standard under Corwin and dismissal of the claim, as plaintiff pled facts supporting a reasonable inference that the stockholder approval was uninformed; [3]-Plaintiff failed to state a claim that defendant LLC aided and abetted the CEO's breach of fiduciary duty, as it did not well-plead that the LLC knew of the CEO's conflict.

### Outcome
Motion to dismiss denied in part and granted in part.

# LexisNexis® Headnotes

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Business
Judgment Rule

Business & Corporate
Law > ... > Management Duties &
Liabilities > Defenses > Ratification

## *HN1*[⬇] **Fiduciary Duties, Business Judgment Rule**

Under Corwin v. KKR Fin. Hldgs. LLC, when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies.

Civil Procedure > Pleading &
Practice > Pleadings > Complaints

Evidence > Inferences &
Presumptions > Inferences

Civil
Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to
Dismiss

## *HN2*[⬇] **Pleadings, Complaints**

For the purposes of a motion to dismiss, the court accepts as true the complaint's well-pled factual allegations and draws all reasonable inferences in the plaintiff's favor.

Civil Procedure > Pleading &
Practice > Pleadings > Complaints

Evidence > Types of
Evidence > Documentary Evidence

Civil
Procedure > ... > Responses > Defenses,
Demurrers & Objections > Motions to
Dismiss

## *HN3*[⬇] **Pleadings, Complaints**

On a motion to dismiss, the court may consider documents that are incorporated by reference or integral to the complaint.

Evidence > Judicial Notice > Adjudicative
Facts > Public Records

Evidence > Judicial Notice > Adjudicative
Facts > Verifiable Facts

## *HN4*[⬇] **Adjudicative Facts, Public Records**

Trial courts may take judicial notice of facts in SEC filings that are not subject to reasonable dispute.

Civil Procedure > ... > Defenses,
Demurrers & Objections > Motions to
Dismiss > Failure to State Claim

Evidence > Inferences &
Presumptions > Inferences

Civil
Procedure > ... > Pleadings > Complaints >
Requirements for Complaint

Civil Procedure > Pleading &
Practice > Pleadings > Rule Application &
Interpretation

## *HN5*[⬇] **Motions to Dismiss, Failure to**

**State Claim**

Under *Del. Ch. Ct. R. 12(b)(6)*, a complaint must be dismissed if the plaintiff would be unable to recover under any reasonably conceivable set of circumstances susceptible of proof based on the facts pled in the complaint. In considering a motion to dismiss, the court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in the plaintiff's favor. The court need not accept conclusory allegations that lack factual support, however, or accept every strained interpretation of the allegations proposed by the plaintiff.

Civil Procedure > Pleading & Practice > Pleadings > Complaints

Evidence > Types of Evidence > Documentary Evidence

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN6*[⬇] **Pleadings, Complaints**

Where a complaint incorporates several documents by reference, and makes clear that others are integral to the complaint, the court may consider those documents in their entirety for purposes of deciding a motion to dismiss under *Del. Ch. Ct. R. 12(b)(6)*. A document is integral if it is the source of the facts pled.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

*HN7*[⬇] **Management Duties & Liabilities, Fiduciary Duties**

A public policy, existing through the years, demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Self-Dealing

*HN8*[⬇] **Management Duties & Liabilities, Fiduciary Duties**

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.

Business & Corporate Law > Corporations > Shareholder Actions > Appraisal Actions & Dissent Rights

Civil Procedure > Preliminary Considerations > Equity > Relief

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Causes of Action

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

Business & Corporate Law > ... > Shareholder Actions > Appraisal Actions & Dissent Rights > Remedies

*HN9*[⬇] **Shareholder Actions, Appraisal**

## Actions & Dissent Rights

The difference between appraisal and fiduciary duty cases is that the breach of fiduciary duty claim seeks an equitable remedy that requires a finding of wrongdoing. The appraisal proceeding seeks a statutory determination of fair value that does not require a finding of wrongdoing.

> Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

> Business & Corporate Law > ... > Management Duties & Liabilities > Defenses > Ratification

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

*HN10*[⬇] **Fiduciary Duties, Business Judgment Rule**

Under Corwin v. KKR Fin. Hldgs. LLC, when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies. One disclosure violation is sufficient to prevent application of Corwin.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

> Business & Corporate Law > ... > Management Duties & Liabilities > Defenses > Ratification

*HN11*[⬇] **Management Duties & Liabilities, Fiduciary Duties**

With respect to application of the business judgment rule, Delaware law does not require boards to engage in self-flagellation in their public disclosures. Even so, to invoke cleansing under Corwin v. KKR Fin. Hldgs. LLC at the pleading stage, a fiduciary defendant must demonstrate that stockholders possessed all material information before casting the votes that provide the basis for cleansing. Corwin was never intended to serve as a massive eraser, exonerating corporate fiduciaries for any and all of their action or inactions preceding their decision to undertake a transaction for which stockholder approval is obtained.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Causes of Action

> Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

> Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

*HN12*[⬇] **Management Duties & Liabilities, Causes of Action**

A plaintiff need not allege that a majority of the board committed a non-exculpated breach by failing to supervise management in order to state a claim against a disloyal CEO.

> Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

> Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

Evidence > Inferences & Presumptions > Inferences

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

## [HN13](#)[⬇] Complaints, Requirements for Complaint

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege facts that, if true, would demonstrate: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary. A claim of knowing participation need not be pled with particularity. Yet, it is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

## [HN14](#)[⬇] Motions to Dismiss, Failure to State Claim

In the context of determining whether a complaint states a claim, inferences cannot take the place of facts.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Evidence > Inferences & Presumptions > Inferences

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

## [HN15](#)[⬇] Motions to Dismiss, Failure to State Claim

In the context of determining whether a complaint states a claim, where there is no precedent fact, there can be no inference; an inference cannot flow from the nonexistence of a fact, or from a complete absence of evidence as to the particular fact. Nor can an inference be based on surmise, speculation, conjecture, or guess, or on imagination or supposition. Inferences draw their life from facts, and without such a factual foundation, they remain speculation.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

## [HN16](#)[⬇] Concerted Action, Civil Aiding & Abetting

The knowledge standard embedded in Delaware's aiding and abetting law is a stringent one, one that turns on proof of scienter of the alleged abettor.

**Counsel:** [*1] A. Thompson Bayliss, Esquire and David A. Seal, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, Attorneys for Plaintiff Obsidian Management LLC.

Robert S. Saunders, Esquire, Arthur R. Bookout, Esquire, Matthew P. Majarian, Esquire and Haley S. Stern, Esquire of

Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants Frank Baker, Michael Hulslander and Siris Capital Group, LLC.

John L. Reed, Esquire, Ethan H. Townsend, Esquire, Peter H. Kyle, Esquire and Harrison S. Carpenter, Esquire of DLA Piper LLP (US), Wilmington, Delaware and Rudolf Koch, Esquire, Susan M. Hannigan, Esquire and Anthony M. Calvano, Esquire of Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Defendant Philippe Tartavull.

**Judges:** SLIGHTS, Vice Chancellor.

**Opinion by:** SLIGHTS

# Opinion

### SLIGHTS, Vice Chancellor

What began as an appraisal case has become, with the benefit of appraisal discovery, a breach of fiduciary duty case. The plaintiff here, Obsidian Management LLC, is a former stockholder of Xura, Inc. When an affiliate of Siris Capital Group, LLC acquired Xura via merger, Obsidian dissented and sought appraisal. According to Obsidian, in the discovery that followed the filing of its petition **[*2]** for appraisal in this Court, Obsidian uncovered evidence that Xura's former CEO, Philippe Tartavull, breached his fiduciary duties to Xura stockholders in the sale process leading up to the merger. It initiated this breach of fiduciary duty and aiding and abetting action individually, on its own behalf, against Tartavull and Siris,

respectively, soon after.

The appraisal and fiduciary duty actions have been consolidated and the appraisal action stayed pending final adjudication of the breach of fiduciary duty and aiding and abetting claims. Defendants, Tartavull and Siris, have moved to dismiss those claims with prejudice under *Court of Chancery Rule 12(b)(6)*. While Defendants base their principal merits defense on the so-called *Corwin* doctrine,[1] they also challenge Plaintiff's standing to bring this fiduciary duty action given that Plaintiff purportedly seeks identical relief in its pending appraisal action. If the Court determines that Plaintiff has standing, and that *Corwin* does not apply at the pleading stage, then Defendants challenge whether Plaintiff has stated viable claims—Tartavull challenges the sufficiency of Plaintiff's *Revlon*, care and loyalty claims and Siris challenges the sufficiency of the pled aiding **[*3]** and abetting claim.

In this Memorandum Opinion, I conclude (1) Plaintiff has standing to pursue these claims notwithstanding its pending appraisal action; (2) Plaintiff has pled facts that support a reasonable inference that the stockholder vote approving the merger was uninformed; (3) Plaintiff has pled a viable breach of fiduciary duty claim against Tartavull as Xura's CEO; and (4) Plaintiff has failed to plead a viable aiding and abetting claim against Siris. My reasons follow.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the

---

[1] *HN1*[↑] *See* **Corwin v. KKR Fin. Hldgs. LLC, 125 A.3d 304 (Del. 2015)** (holding that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies.").

Complaint,[2] documents incorporated by reference or integral to the Complaint and judicially noticeable facts available in public Securities and Exchange Commission filings.[3] *HN2*[⬆] For the purposes of this Motion to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[4]

## A. Parties and Relevant Non-Parties

Plaintiff, Obsidian Management LLC, is a Delaware Limited Liability Company and former Xura, Inc. stockholder at all times relevant to this litigation.[5] Obsidian owned 933,555 shares of Xura common stock prior to the Merger.[6] As noted, Obsidian is also currently pursuing [*4] an appraisal of its Xura shares in this Court (the "Appraisal Action").[7]

Defendant, Philippe Tartavull, was Xura's CEO from 2012 until December 19, 2016.[8] He served as a director of Xura from 2012 until August 19, 2016—when an affiliate of Defendant, Siris Capital Group, LLC, acquired all outstanding shares of Xura by merger (the "Transaction").[9] Xura terminated Tartavull as CEO on December 19, 2016, four months after the Transaction closed.[10]

Defendant, Siris, is a Delaware Limited Liability Company. Defendant, Frank Baker, is Siris's co-founder and one of its Managing Partners.[11] Defendant, Michael Hulslander, is a principal of Siris, having been promoted after the Transaction's closing.[12] For the sake of clarity, I refer to claims against these defendants collectively as claims against the "Siris Defendants."

Non-party, Xura, Inc. (or "the Company"),[13] was a publicly traded Delaware Corporation. Non-party, Jacky Wu ("Wu"), was Xura's CFO from April 2015 until August 26, 2016.[14] Non-party, Hank Nothhaft, was Xura's Chairman of the Board from October 2012 until August 19, 2016.[15] Non-party, Matthew Drapkin, was a director of Xura from March 2014 [*5] until August 19, 2016.[16] Drapkin was a partner of

---

[2] I cite to the Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "Compl. ¶ _"; Philippe Tartavull's Opening Brief in Support of his Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "TOB"; Philippe Tartavull's Reply Brief in Further Support of his Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "TRB"; the Siris Defendants' Opening Brief in Support of Their Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "SOB"; the Siris Defendants' Reply Brief in Further Support of Their Motion to Dismiss Plaintiff's Verified Complaint for Breach of Fiduciary Duty as "SRB"; and Plaintiff's Combined Opposition to Defendants' Motions to Dismiss as "PAB."

[3] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 860 A.2d 312, 320 (Del. 2004)* (holding that, *HN3*[⬆] on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint); *In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 170 (Del. 2006)* (holding that *HN4*[⬆] trial courts may take judicial notice of facts in SEC filings that are "*not* subject to reasonable dispute") (emphasis in original).

[4] *Gen. Motors (Hughes) S'holder Litig., 897 A.2d at 168*.

[5] Compl. ¶ 20.

[6] *Id.*

[7] *Id.* ¶ 2. *See Obsidian Mgmt. LLC v. Xura, Inc.*, C.A. No. 12698-VCS (Del. Ch.).

[8] Compl. ¶ 21.

[9] *Id.*

[10] *Id.* ¶ 107.

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 23.

[13] For the sake of clarity, I use "Xura" to refer to Xura, Inc. regardless of the date. In doing so, I acknowledge that, prior to August 2015, Xura, Inc. was known as Comverse, Inc.

[14] *Id.* ¶ 25.

[15] *Id.* ¶ 26.

[16] *Id.* ¶ 27.

Northern Right Capital Management, L.P., an activist investor that held a significant amount of Xura stock and routinely sought board seats on small-cap, public companies.[17] Non-party, Goldman Sachs & Co. ("Goldman"), was Xura's longtime financial advisor and served in that capacity in connection with the Transaction.[18]

## B. Tartavull's First Contacts with Siris

Tartavull first met Baker in Barcelona in 2012. Tartavull sought out Siris as a potential financial sponsor for an acquisition involving the Company the following year. In the discussions that ensued, the parties contemplated that Tartavull would remain as the CEO of the post-acquisition Xura and would serve as chair of an operating committee that would also include Siris executive partners and members of Xura's senior management. While nothing came of these discussions in 2013, the two kept in touch.

In late 2014, Siris and Tartavull met again to discuss a potential acquisition of Xura. Tartavull had lunch with Hubert de Pesquidoux, a Siris Executive Partner, and Baker on November 17, 2014. Three days later, Tartavull joined Siris representatives for dinner where discussions [*6] about a possible acquisition continued. Later that month, Siris representatives attended a meeting at Xura's Wakefield, Massachusetts headquarters.

On January 7, 2015, Siris submitted a letter of interest in which it proposed to acquire Xura for $24 per share.[19] The letter underscored

that Siris "continue[d] to be impressed by the senior leadership team and is excited about the prospect of partnering with them."[20] Xura's board of directors (the "Board") discussed Siris's expression of interest at its January 13, 2015 meeting. Before the Board could formally respond, however, Siris decreased its offer to $20-$22 per share citing significant execution risks and deteriorating financials. The Board rejected the offer and, again, the negotiations ended.

## C. Xura Focuses Inward

Following this second failed negotiation, Xura looked inward and endeavored to enhance shareholder value. On April 14, 2015, Xura entered into a Master Service Agreement with Tech Mahindra and began to outsource a significant portion of its workforce in exchange for payments totaling $211 million over six years. Two weeks later, on April 29, 2015, Xura sold its billing systems and support business (at the time this made [*7] up approximately half of Xura's revenues) to Amdocs for $272 million. Then, on August 6, 2015, Xura acquired Acision Global Limited for $136 million in cash and 3.14 million shares of common stock. The transformation ultimately led the Company to its new name—Xura.

## D. Siris Circles Back

On October 19, 2015, Siris contacted Tartavull directly with an offer to acquire the new and improved Xura for $30-$32.50 per share. Once again, Siris made clear that it was "excited about the prospect of working with the management team to help Xura reach its full potential."[21] Tartavull and Baker immediately

---

[17] Id.

[18] Id. ¶ 4.

[19] Id. ¶ 35; Definitive Proxy Statement on Schedule 14A (the

"Proxy") at 27.

[20] Compl. ¶ 35.

[21] Compl. ¶ 39.

Amanda Stubblefield

began discussing Siris's offer amongst themselves.[22] On October 21, 2015, Baker texted Tartavull looking for the Board's feedback on Siris's offer. According to the Proxy, Tartavull advised the Board of Baker's outreach at the time or soon after it occurred.[23]

The Board considered Siris's offer at its October 22, 2015 meeting and directed management to communicate to Siris that the offer was inadequate and the Company was not for sale. Tartavull provided this feedback to Baker in a telephone conversation on October 29, 2015.

Siris was undeterred. On the day it received news of the Board's rejection from [*8] Tartavull, Siris representatives, Tartavull and Wu continued to discuss a possible acquisition, including a discussion of Xura's forecasts and other non-public information. Siris raised its offer to $35 per share the next day. In its offer letter, Siris stated that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."[24] Siris followed its letter with a request directed to Tartavull for an exclusivity period of four to six weeks. Tartavull promptly relayed the request to the Board.

## E. Siris Negotiates Directly with Tartavull and Management

The Board discussed Siris's revised proposal at its November 5, 2015 meeting. This time the Board "authorized management to continue discussing a potential transaction with Siris" and "authoriz[ed] the engagement of Goldman to assist the Company in the process."[25] The Board also authorized Xura's management to agree to a three-week period of exclusivity with Siris if Siris could confirm a deal price and provide assurances regarding financing.[26]

On November 12, 2015, Goldman emailed Siris a contract extending the terms of the non-disclosure [*9] agreement Siris and Xura previously executed back in 2013.[27] That agreement stated:

> You agree that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, *will be submitted or directed only to the Chief Executive Officer of the Company* or any designee thereof (the "Designated Officer"). You further agree that, subject to paragraph 11, under no circumstances will you or your Representatives discuss or otherwise communicate any aspect of the Transaction to any member of the management of the Company without the express written permission of the Designated Officer.[28]

Goldman and Xura management participated in discussions and due diligence sessions with Siris throughout November 2015.

In response to various data requests from Siris directed to Wu, on November 19, 2015, Goldman asked Hulslander to ensure that Siris copied Goldman on all transaction-related communications with Xura moving forward. On

---

[22] As discussed below, Plaintiff contends that many of these discussions took place via text messages that Tartavull and Baker both failed to preserve notwithstanding a duty to do so. PAB 10.

[23] Proxy 28.

[24] Compl. ¶ 43.

[25] Compl. ¶ 44; Joskowicz Aff. Ex. I (Pl.'s Pre-Trial Br. 10; JX163); Proxy 29.

[26] Bookout Aff. Ex. 22 at XURA0000226.

[27] Bookout Aff. Ex. 8 at GS-XURA-000180426.

[28] Bookout Aff. Ex. 8 at GS-XURA-000180433-34. (Emphasis supplied).

November 29, 2015, Hulslander forwarded Baker an email from Goldman offering to coordinate a call with Wu. Although Hulslander indicated he would participate [*10] in the call orchestrated by Goldman, internally he was working with his Siris team to come up with a plan to exclude Goldman and work directly with Xura management to "get the remaining high priority data."[29]

Siris reiterated its $35 per share offer in a December 2, 2015 letter. Consistent with its previous communication, Siris again emphasized that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."[30]

The Board held a meeting on December 3, 2015, with Goldman and its legal advisor, DLA Piper LLP (US), to discuss Siris's December 2 letter. At the meeting, the Board created a committee consisting of Tartavull, Nothhaft and Drapkin (the "Strategic Committee"). According to the Proxy, the mandate of the Strategic Committee was to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."[31] Despite its mandate, the Strategic Committee never met with Siris, never took any formal action and never kept minutes nor any written record of its activities. Instead, the Strategic [*11] Committee functioned essentially as a weekly check-in with Tartavull. Indeed, one of the three Special Committee members, Nothhaft, did not even realize that the Special Committee existed or that he was a member of the committee until he learned about it at his deposition in the appraisal litigation.

Later in December, Xura missed the filing deadline for its 10-Q when it encountered technical difficulties incorporating Acision's UK-based accounting system with Xura's system. Xura eventually filed its 10-Q on December 28, 2015.

Throughout January 2016, Xura's senior management and Goldman engaged in various meetings and due diligence sessions with Siris. Siris received access to the Company's data room on January 15, 2016. Management presentations highlighting Xura's revenue, bookings, expenses and product pipeline occurred during due diligence meetings on January 12 and 20-22, 2016.

All the while, Tartavull communicated directly with Siris on a regular basis without keeping Goldman informed—despite Goldman's stated preference that "communications go through [Goldman]."[32] Tartavull's regular communications with Siris troubled Wu, the Company's CFO. Accordingly, Wu asked Goldman to speak [*12] with Tartavull about channeling communications through Goldman. Goldman agreed, but Tartavull ignored the admonition. Siris likewise ignored Goldman's request that it be included in all communications with Xura. Indeed, at his deposition, Hulslander acknowledged that, even though Goldman "smacked us on the hand," the direct communications with Tartavull continued.[33]

## F. Goldman Shops Xura Unsuccessfully

During the last week of January 2016, Goldman worked with the Board and senior

---

[29] Compl. ¶ 45.

[30] Compl. ¶ 46.

[31] Compl. ¶ 101.

[32] Compl. ¶ 53. Here again, Plaintiff alleges that these communications frequently occurred through text messages that have since been lost or destroyed. PAB 12.

[33] Compl. ¶ 53.

management to identify nine potential parties that might have an interest in acquiring the Xura.[34] The interested parties included five financial sponsors and four strategic buyers.[35] After initial contacts, three financial sponsors (Bain Capital, Carlyle, and Thoma Bravo) and one strategic buyer (Nokia) executed confidentiality agreements and moved to the next stage of the sale process.[36]

The second stage of the process proved to be an effective filter.[37] Bain Capital never attended any presentations and never responded to Goldman's efforts to schedule a call.[38] Xura made management and financial presentations to Nokia, Thoma Bravo and Carlyle.[39] Soon after, Nokia and Thoma Bravo informed Goldman they were no longer interested. [*13] [40]

The last potential bidder standing—Carlyle—soon followed the other suitors out of the process. On March 8, 2016, Goldman had a call with Carlyle to discuss the Company's long-term model and to answer diligence questions.[41] In doing so, Goldman did not hide the fact that Xura was a "complicated story."[42] Prior to obtaining full diligence, on March 13, 2016, Carlyle provided Goldman with a verbal indication of interest in the range of $26-$27 per share.[43] Nevertheless, Carlyle stated that it "[had] a lot of work to do to confirm."[44]

Goldman informed Carlyle that the offering price would at least have to match Siris's offer of $28 per share.[45] Carlyle maintained it could not bid at that price and exited the bidding process thereafter.[46]

While Goldman was courting other bidders, Siris held firm and showed no sign of concern. From Hulslander's vantage point, "the Company [was] not 'for sale' and [Siris] ha[d] a proprietary angle on the deal . . . ."[47]

## G. Tartavull Lends Siris A Helping Hand

Despite Xura's business transformation, its fortunes did not noticeably improve. On December 15, 2015, Xura announced disappointing preliminary third quarter results and disclosed the delay in filing of [*14] its Form 10-Q for the quarter ending October 31, 2015.[48] The Company's stock closed at $22.53 per share that day.[49] The trend of declining share value continued into 2016. On February 17, 2016, Xura's stock closed at $19.12 per share, marking a nearly 15% drop in the span of two months.[50] By February 24, 2016, the Company's common stock was trading at $18.64 per share.[51] At the time of the Transaction, Xura's stock was trading at $18.94 per share.[52]

During the course of due diligence, Siris grew uneasy about Xura's outlook, particularly its

---

[34] Compl. ¶ 54; Proxy 30.

[35] Proxy 30.

[36] Compl. ¶ 54; Proxy 30.

[37] Compl. ¶ 57; Proxy 30.

[38] Id.

[39] Id.

[40] Id.

[41] Compl. ¶ 67.

[42] Id.

[43] Compl. ¶ 68; Proxy 31.

---

[44] Id.

[45] Proxy 31.

[46] Compl. ¶ 70; Proxy 32.

[47] Compl. ¶ 55; Pl.'s Ex. 3.

[48] Compl. ¶ 49; Proxy 30.

[49] Proxy 30.

[50] Id.

[51] Id. 31.

[52] Id. 33.

cash flow projections and the historic and pending liabilities.[53] Siris informed Goldman on February 18, 2016, that it intended to submit a revised indication of interest that incorporated these concerns.[54]

Meanwhile, an industry trade show, Mobile World Congress, convened from February 22 through 25, 2016 in Barcelona, the site of the original Tartavull-Siris encounter.[55] Baker planned to attend and to meet with "Xura personnel" while there.[56] Hulslander was on board, saying it made "sense to get together with [Tartavull] and part of his team in some capacity."[57] By the first day of the trade show, Baker and Tartavull had scheduled a lunch meeting.[58]

During that **[*15]** February 24 lunch, Baker and Tartavull discussed Siris's latest offer, the timing of the Transaction and possible additional M&A transactions.[59] Baker indicated Siris would offer $27 per share.[60] With a gentle nudge, Tartavull told Baker that the offer price should be $28 per share.[61] Baker later acknowledged that the parties "agreed" upon $28 in advance of Siris sending a letter to Tartavull memorializing that price.[62]

Tartavull did not inform anyone at Xura or Goldman about his meeting with Baker, either before or after it occurred.[63] Neither Baker nor Tartavull recalled this meeting at their depositions.[64] Moreover, none of this appeared in the Proxy or any other public filing.[65] The only evidence of the meeting is an internal communication between two lower-level Siris employees.[66]

The next day, Siris submitted a revised offer of $28 per share.[67] The letter echoed Siris's statement that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."[68] Siris also renewed its request for exclusivity.[69]

## H. Exclusivity and Tartavull's Continued Negotiations with Siris [*16]

On February 29, 2016, the Board, along with its legal and financial advisors, met to discuss Siris's revised proposal—oblivious to Tartavull's side conversations with Siris.[70] The Board discussed the terms of Siris's proposal, the downward adjustment of Xura's financial projections and forecasts, the underperformance of the Acision business and the Company's ability to execute its strategic plan.[71] The Board then "authorized management to continue discussing a

---

[53] Proxy 30-31.

[54] Compl. ¶ 59; Proxy 30.

[55] Compl. ¶ 60.

[56] Compl. ¶ 60.

[57] Id.

[58] Id.

[59] Compl. ¶ 61; Pl.'s Ex. 4.

[60] Compl. ¶ 61.

[61] Id.

[62] Id. ¶ 62.

[63] Id. ¶ 63.

[64] Id. ¶ 61. ("At their depositions, Baker and Tartavull denied ever negotiating over price.").

[65] Id. ¶ 60.

[66] Compl. ¶ 61.

[67] Id. ¶ 64.

[68] Id.

[69] Proxy 31.

[70] Compl. ¶ 64; Proxy 31.

[71] Proxy 31.

potential transaction with Siris."[72] The Board also authorized management to negotiate the length of a "go-shop" period and the amount of the termination fee in exchange for a grant of exclusivity.[73] Tartavull participated in a due diligence call on March 5, 2016, and Xura representatives attended meetings with Siris and their respective advisors from March 7 through March 11, 2016.[74]

Siris reiterated its revised indication of interest at $28 per share and again requested exclusivity on March 14, 2016.[75] On the following day, the Board authorized management to enter into an exclusivity agreement until April 8, 2016.[76]

In the meantime, Wu continued to express concern to Goldman regarding Tartavull's contacts with Siris. Indeed, he stated internally **[*17]** that Tartavull "appears to be working directly with Siris on his own."[77] On March 17, 2016, one day after he executed Siris's exclusivity agreement, Tartavull told Siris privately that Wu told "white lies."[78] He even suggested that Siris assign someone to take over Wu's modeling functions during the transaction process.[79] This prompted Baker to instruct his team to "triple check" Xura's numbers and to plan a "mind meld" between Wu and a possible replacement.[80]

## I. Siris Retrades Again

On March 23, 2016, Michael Ronen from Goldman predicted Siris's next move: "[h]ere comes the price renegotiation . . . [w]e are in exclusivity and now [S]iris will create a crisis to take price down[.]"[81] Wu saw the price reduction coming too, noting that Siris was going to "try to retrade."[82]

The day after Goldman predicted Siris's retrade, Siris retraded. Siris advised Goldman it might not be able to offer more than $24 per share. Siris confirmed its position with Tartavull on April 6, 2016, stating it could no longer support its prior offer of $28 per share.

That same day, the Board met to discuss the status of the sale process. At the meeting, management advised the Board that it might not be able to file Xura's **[*18]** Form 10-K for fiscal year ended January 31, 2016 on time. The Board instructed Goldman to disclose the potential delay to Siris. Goldman did so and then, to make matters worse, Goldman had to provide Siris with downward revisions to the Company's financial projections.

On April 7, 2016, Goldman and the Board decided that the right response to Siris's retrade strategy was to go "radio silent."[83] Tartavull, however, apparently thought otherwise. He contacted Baker directly to discuss next steps. When Siris contacted Wu to follow up, Wu lamented to Goldman, "[w]e are bidding against ourselves."[84]

On April 9, 2016, Siris offered $24.75 per share after speaking with Tartavull. Siris justified this price move by emphasizing the material decline in projected cash flow and the overall underperformance of the Company's businesses. The Board discussed the revised

---

[72] JX 258.

[73] Proxy 31.

[74] Compl. ¶¶ 65-66; Proxy 31.

[75] Proxy 32.

[76] Id.

[77] Compl. ¶ 72.

[78] Compl. ¶ 73; Pl.'s Ex. 5.

[79] Compl. ¶ 73.

[80] Id.

[81] Compl. ¶ 76; Pl.'s Ex. 6.

[82] Compl. ¶ 74.

[83] Compl. ¶ 79; Pl.'s Ex. 8.

[84] Id.

offer at its April 12, 2016 meeting and instructed Goldman that Siris must raise its price to $25 per share to extend exclusivity. Siris agreed to the $25 price, and Xura extended the exclusivity period for two weeks.

## J. An Interested Seller Is Diverted to Buy Side

On April 15, 2016, Xura publicly announced that it would not meet its 10-K **[*19]** filing deadline again and that it was in negotiations with a potential buyer for a sale at $25 per share. In that announcement, Xura stated that it missed the 10-K filing deadline due to "complex strategic negotiations for the potential sale of the company."[85] Immediately following the announcement, Keith Geeslin of Francisco Partners contacted Tartavull to let him know that "if Xura is going to be sold, [Francisco Partners] would appreciate the opportunity to bid."[86] For reasons not coincidental by Plaintiff's lights, Francisco Partners never made a bid because, somehow, it learned Siris was the potential buyer.[87] Instead, Francisco Partners contacted Siris about a potential co-investment on the buy-side of the transaction.

## K. The Merger Agreement, the Unfruitful Go-Shop and Stockholder Litigation

On May 19, 2016, Xura's Board held a special meeting to discuss the terms of the proposed transaction with Siris. During the meeting, the Board deliberated Siris's request that Xura do without a go-shop or at least limit it to 30 days. The Board declined and insisted on a 45-day go-shop. Goldman also presented its preliminary financial analysis of the proposed

---

[85] Compl. ¶ 88.

[86] *Id.* ¶ 89; Pl.'s Ex. 9.

[87] Compl. ¶ 90.

transaction. The Board met again **[*20]** on May 22, 2016. DLA Piper LLP (US) discussed the material terms of the proposed Transaction and Goldman presented an oral fairness opinion.

On May 23, 2016, Xura and Siris executed a definitive merger agreement at $25 per share (the "Merger Agreement"). The Merger Agreement provided for a 45-day go-shop (the "Go-Shop"), a 2% termination fee (or $0.50 per share) if a superior proposal was submitted during the Go-Shop and a 3.5% termination fee (or $0.875 per share) if a superior proposal was submitted after the Go-Shop.

On May 25, 2016, Siris executed an NDA with Neuberger Berman ("Neuberger"), which at the time held over 5% of Xura's stock. By the end of June 2016, Neuberger had sold nearly all of its Xura stock. Instead of exiting its investment in Xura, however, Neuberger was co-investing its equity with Siris. Neuberger-controlled entities ultimately co-invested $16,985,345 on the buy-side of the Transaction. Thus, by the time of closing, both Neuberger and Francisco Partners had joined Siris on the buy-side.

During the Go-Shop, Goldman contacted 26 prospective buyers, including Francisco Partners and all of the other parties contacted during the pre-signing market check. While three **[*21]** parties entered into confidentiality agreements during the Go-Shop, none submitted acquisition proposals. By June 15, 2016, Goldman reported that there were no parties participating in the Go-Shop. Regarding Francisco Partners, Tartavull said at his deposition: "since Siris was engaged, I don't think [Francisco Partners] want[ed] to go to battle seriously in a go-shop."[88] Indeed, Plaintiff alleges that Tartavull approved Francisco Partners as a financing source for

---

[88] Compl. ¶ 96.

Siris before the Go-Shop period expired.[89]

On July 11, 2016 and July 22, 2016, Xura stockholders filed lawsuits in the United States District Court for the District of Massachusetts seeking to enjoin the Merger (the "Massachusetts Actions"). On July 26, 2016, Xura, Siris and the Massachusetts plaintiffs reached an agreement whereby Xura would issue a supplemental proxy statement in exchange for a release of all claims related to the Merger against Xura, its directors and Siris.

On August 16, 2016, a majority of Xura's stockholders voted to approve the Merger. The Transaction closed on August 19, 2016. After closing, Tartavull negotiated a long-term incentive plan that could have paid him over $25 million.[90] That plan yielded [*22] no benefits for Tartavull, however, because Xura terminated Tartavull after closing on December 19, 2016, before the plan could be executed.

## L. Tartavull Faces Job Uncertainty

As Tartavull negotiated the Xura/Siris combination, Xura stockholders and the Board contemplated Tartavull's future with the Company in the event a transaction was not consummated. Major stockholders, including Wellington Asset Management and Steinberg Asset Management, openly questioned Tartavull's performance. In early March, before Xura and Siris agreed to exclusivity, Obsidian indicated that it intended to launch a proxy contest and made clear to both Tartavull and

the Board its view that Xura should find a new CEO. In April, Nothhaft privately advised Tartavull that the Board was considering major changes if there was no deal, including changes at the Board level and the highest ranks of management.[91] Thus, as Tartavull engaged in private negotiations with Siris, he was facing a genuine risk that he would lose his job at Xura if the Company was not acquired. And he knew it.

## M. Lost Cell Phones, Lost Data and Claims of Spoliation

Throughout the process that led to the Merger, Tartavull, Baker and Hulslander [*23] exchanged text messages on various personal and business devices. Many if not most of those messages have been either lost or destroyed.[92] As alleged, Tartavull was under a duty to preserve documents no later than May 30, 2016, when Xura received a litigation

---

[89] Id.

[90] Compl. ¶ 95 ("After the execution of the Merger Agreement, Tartavull and Siris began finalizing the terms of a long-term incentive plan for employees Siris intended to retain (the "LTIP"). Siris asked Tartavull to provide the list of participants for the LTIP prior to the close of the Merger. Tartavull and Siris ultimately agreed on LTIP allocations that promised a potential payout to Tartavull of over $25 million.").

[91] Id. ¶ 84. ("Xura's board had begun to consider making changes to the management team absent a sale, and certain directors had concluded that Tartavull should go. Nothhaft told this to Tartavull. . . ."). Unlike the major stockholders' dissatisfaction and the proxy contest rumblings, however, Nothahft's confidential message to Tartavull regarding his dim future with the Company was not disclosed to shareholders or potential buyers, including Siris.

[92] Id. ¶ 109. Plaintiff asks the Court to draw an adverse inference at the pleading stage given its well-pled allegations of spoliation. Delaware courts have yet to decide whether an adverse inference is available to the plaintiff at the pleading stage when responding to a motion to dismiss. Some federal courts have held that an adverse inference may be drawn at the motion to dismiss stage; others have held that adverse inferences must be preceded by thorough factual inquiries and findings. Compare Callahan v. Schultz, 783 F.2d 1543, 1545 (11th Cir. 1986) (holding that "[u]nder the adverse inference rule, we hold the district court was justified in denying the government's motion to dismiss[]" where government failed to produce exhibits it claimed would justify dismissal); Richtek Tech. Corp. v. uPI Semiconductor Corp., 2011 U.S. Dist. LEXIS 48877, 2011 WL 1627986, at *1 (N.D. Cal. Apr. 28, 2011) (describing order requiring defendant to produce documents where "failure to comply fully may result in an adverse inference being drawn against Powerchip in its motion

demand letter relating to the Merger.[93] The Siris Defendants were obliged to preserve documents, as alleged, no later than July 11, 2016, when the first of the Massachusetts complaints named them as parties.[94] It is alleged that those preservation obligations continued after Plaintiff filed the Appraisal Action and after Plaintiff served discovery seeking text messages.[95]

Tartavull used multiple phones during the Merger negotiations. He turned over one of his phones to Xura when he departed in December 2016.[96] Xura then restored the factory settings on the phone and thereby wiped its data. To date, the parties have had no success mining data from that phone.[97] In the Appraisal Action, Tartavull produced some text messages from a different unwiped phone, but that production did not include pre-Closing texts, some of which were mentioned in emails that were produced.[98]

Baker initially indicated [*24] that he damaged his Blackberry in March 2017, at least eight months after he incurred a duty to preserve.[99] He stated that he disposed of the Blackberry after it stopped working, though Siris stated in a verified interrogatory response that the device was lost.[100] In January 2018, after the Court heard argument on Obsidian's Motion for an Adverse Inference in the Appraisal Action, Baker found his Blackberry in a ski bag.[101] Because Baker cannot remember the password, however, no one has been able to recover any data from that device either.[102]

Hulslander inadvertently "cleared" his phone in June 2017, at least eleven months after he incurred a duty to preserve.[103] More specifically, he incorrectly entered the password on his phone too many times thereby triggering a feature that automatically wiped the data from memory.[104]

### N. Procedural Posture

Plaintiff filed its Appraisal petition on August

---

to dismiss (and possibly future motions).") with *ABC Bus. Forms, Inc. v. Pridamor, Inc., 2009 U.S. Dist. LEXIS 113847, 2009 WL 4679477, at \*3 (N.D. Ill. Dec. 1, 2009)* (citation omitted) (striking spoliation allegations from pleadings because "'[s]poliation of evidence' . . . may be the basis for sanctions, but it does not 'give rise in civil cases to substantive claims or defenses.'"); *Jarvis v. FedEx Office & Print Servs., Inc., 2009 U.S. Dist. LEXIS 99868, 2009 WL 3579035, at \*3 (D. Md. Oct. 27, 2009)* (holding that "[p]laintiff's request for sanctions based on spoliation of evidence is improper at this [pleading] stage of the proceedings."); *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd., 2009 U.S. Dist. LEXIS 31555, 2009 WL 998402, at \*1 (E.D. Mich. Apr. 14, 2009)* ("[S]poliation is not a substantive claim or defense but a 'rule of evidence[.]'") (citation omitted); *Rodriguez v. Ocean Motion Watersports, Ltd., 2014 U.S. Dist. LEXIS 192994, 2014 WL 11880984, at \*2 (S.D. Fla. Nov. 5, 2014)* (addressing motion to dismiss and holding that spoliation inference plaintiff sought "would be more appropriately prayed for in a later motion."). The issue is interesting, to be sure, but I need not address it here as I have determined, applying the generous inferences that flow to Plaintiff under *Chancery Rule 12(b)(6)*, that the Complaint as to Tartavull survives dismissal without the need for adverse inferences and cannot survive dismissal as to Siris even with reasonable adverse inferences.

[93] Compl. ¶ 110.

[94] *Id.* ¶ 111.

[95] *See* Pl.'s Exs. 10-12.

[96] *Id.*

[97] *Id.*

[98] *Id.* ¶ 113.

[99] *Id.* ¶ 111.

[100] *Id.*

[101] Compl. ¶ 111. I note that the Court has not issued a final ruling on Obsidian's spoliation motion in the Appraisal Action but expects that the motion will be renewed and resolved in this litigation.

[102] *Id.*

[103] *Id.* ¶ 112.

[104] *Id.*

29, 2016. On January 29, 2018, the Massachusetts plaintiffs abandoned the proposed settlement of the Massachusetts Actions and dismissed their complaints. Plaintiff filed this fiduciary duty action soon after, on March 30, 2018. On April 18, 2018, the Court continued the appraisal trial and informed **[*25]** the parties that it would consolidate the Appraisal Action and this action. Siris moved to dismiss this action on April 30, 2018. Tartavull filed his motion to dismiss on May 14, 2018.

## II. LEGAL ANALYSIS

**HN5**[⬆️] Under *Court of Chancery Rule 12(b)(6)*, a complaint must be dismissed if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[105] In considering a motion to dismiss, the Court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in Plaintiff's favor.[106] The Court need not accept conclusory allegations that lack factual support, however, or "accept every strained interpretation of the allegations proposed by the plaintiff."[107] Because the **HN6**[⬆️] Complaint incorporates several documents by reference, and makes clear that others are integral to the Complaint, the Court may consider those documents in their entirety for purposes of deciding the Motion.[108]

I address Plaintiff's claim against Tartavull first. In doing so, I consider the following issues: (1) does Plaintiff have standing to assert his breach of fiduciary duty claims; (2) if so, does *Corwin* cleansing apply; **[*26]** (3) if not, has Plaintiff stated a claim of breach of fiduciary duty against Tartavull as Xura CEO; and (4) if so, does Board approval of Tartavull's conduct cleanse any breach of fiduciary duty that might be pled. With respect to Plaintiff's claim against Siris, I consider whether Plaintiff has well-pled all of the *prima facie* elements of aiding and abetting a breach of fiduciary duty, with a particular concentration on whether it has adequately pled that Siris knowingly participated in the alleged breach.

## A. Plaintiff Has Adequately Pled a Breach of Fiduciary Duty Against Tartavull as Xura CEO

**HN7**[⬆️] "A public policy, existing through the years . . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation . . . ."[109] In essence, Plaintiff alleges Xura was steered into the Transaction by a fiduciary who had an interest different from shareholders, namely self-

---

[105] *In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d at 168* (citing *Savor, Inc. v. FMR Corp., 812 A.2d 894, 896-97 (Del. 2002))*.

[106] *In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d at 168*.

[107] *Id.*

[108] See *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 613 (Del. 1996)* (stating that the court may consider on motion to dismiss documents beyond the complaint if the documents are

---

"integral to . . . and incorporated [within] the complaint.") (citation omitted); *Winshall v. Viacom Int'l, Inc., 76 A.3d 808, 818 (Del. 2013)* (stating that a "plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms.") (citations omitted); *In re Sirius XM S'holder Litig., 2013 Del. Ch. LEXIS 240, 2013 WL 5411268, at *4 n.17 (Del. Ch. Sept. 27, 2013)* ("A document is integral if it is the 'source' of the facts pled.") (citation omitted).

[109] *Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)*. See also id. (**HN8**[⬆️]) "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.").

preservation.[110] While Plaintiff does not concede that Tartavull stands alone in his breach of fiduciary and, **[*27]** indeed, maintains that Xura's Board (or at least its Strategic Committee) bears some responsibility for the harm done here,[111] it has trained its sights on Tartavull as the most culpable and most accessible (i.e., non-exculpated) actor.[112]

For his part, Tartavull (joined by Siris) argues that, to justify dismissal, the Court need look no further than the fully informed, uncoerced and disinterested stockholder approval of the Transaction and the cleansing effect of that approval on any breach of fiduciary duty claim Plaintiff might otherwise be able to plead against him.[113] He also maintains that Plaintiff

---

has not well-pled a breach of fiduciary duty claim even if *Corwin* cleansing is unavailable. As a threshold matter, however, Tartavull argues that the Court lacks jurisdiction to consider the *bona fides* of Plaintiff's claims because Plaintiff lacks standing to bring them. I take up that issue first.

### 1. Plaintiff Has Standing

Tartavull cites then-Chancellor Strine's decision in *In re Appraisal of Aristotle Corp.* in support of his argument that Plaintiff lacks standing to pursue breach of fiduciary duty claims given that he has already filed, and has pending, a petition for appraisal relating to the Transaction.[114] In *Aristotle*, the court rejected the plaintiffs' attempt to "complicate" a pending appraisal case by asserting a "late-breaking" breach of fiduciary duty claim that would "only yield [them] a right to a 'quasi' version of something they already possess in its actual form."[115] That is not what is happening here.

---

[110] *See In re Zenith Nat'l Ins. Corp. S'holders Litig.*, C.A. No. 5296-VCL, at 5 (Del. Ch. Apr. 22, 2010) (TRANSCRIPT) (describing the risk that a "CEO might steer the deal or the process to a particular buyer or particular result with whom he either has a long-time relationship or some expectation [] of benefits"); *In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 194 (Del. Ch. 2007)* ("If management had an incentive to favor a particular bidder (or type of bidder), it could use the . . . process to its advantage, by using different body language and verbal emphasis with different bidders.").

[111] *See In re Del Monte Foods Co. S'holders Litig., 25 A.3d 813, 835 (Del. Ch. 2011)* (holding that board acted unreasonably by allowing conflicted investment bank to negotiate price with bidder); *In re Lear Corp. S'holder Litig., 926 A.2d 94, 117 (Del. Ch. 2007)* (criticizing special committee because it failed to chaperone conflicted CEO's negotiations with the buyer and failed to provide "more assurance that [the CEO] would take a tough line and avoid inappropriate discussions that would taint the process."); *In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d at 194* (criticizing special committee because they "let this process be driven by management[]" despite the concern that "some bidders might desire to retain existing management or to provide them with future incentives while others might not.").

[112] *See Gantler v. Stephens, 965 A.2d 695, 709 n.37 (Del. 2009)* (holding that *8 Del. C. § 102(b)(7)* does not authorize the exculpation of corporate officers).

[113] **Corwin, 125 A.3d at 309** (holding that the business judgment rule is the standard of review when a transaction is approved by a majority of disinterested, uncoerced fully

---

informed stockholders). In deciding this motion, I have presumed, as the parties do, that the business judgment rule applies to Tartavull as CEO. I acknowledge, however, that this point is not settled in our law and that there is a lively debate among members of the academy regarding whether corporate officers may avail themselves of business judgment rule protection. *See, e.g.*, Michael Follett, *Gantler v. Stephens: Big Epiphany or Big Failure? A Look at the Current State of Officers' Fiduciary Duties and Advice for Potential Protection*, *35 Del. J. Corp. L. 563, 576 (2010)* (suggesting that officers are protected by the business judgment rule); Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, *60 Bus. Law. 439 (2005)* (applying principles of agency and making the case that officer conduct should be evaluated under a negligence paradigm); Lawrence A. Hamermesh & A. Gilchrest Sparks III, *Corporate Officers and the **[*28]** Business Judgment Rule: A Reply to Professor Johnson*, *60 Bus. Law. 865 (2005)* (arguing that Delaware courts should approach officer liability in much the same manner they approach director liability).

[114] *In re Appraisal of Aristotle Corp., 2012 Del. Ch. LEXIS 9, 2012 WL 70654 (Del. Ch. Jan. 10, 2012).*

[115] *In re Appraisal of Aristotle Corp., 2012 Del. Ch. LEXIS 9, 2012 WL 70654, at *3.*

First, unlike *Aristotle*, where the plaintiff's breach of fiduciary duty claim focused on alleged disclosure violations, Plaintiff has raised disclosure failures as much to plead around Tartavull's *Corwin* defense as to state affirmative claims for relief.[116] The gravamen of Plaintiff's breach of fiduciary duty claim is that a conflicted fiduciary directed Xura to consummate an undervalued transaction for reasons other than the best interests of stockholders. The disclosure allegations accent that claim but they are not proffered **[*29]** as the essence of the breach. Second, unlike *Aristotle*, where the plaintiff sought only quasi-appraisal as a remedy for the alleged fiduciary breach, Plaintiff has sought more traditional post-closing remedies as redress for Tartavull's alleged breach, including rescissory damages and disgorgement.[117] Under our law, Plaintiff has standing to maintain both this claim and its appraisal claim.[118]

## 2. *Corwin* Does Not Apply at the Pleading Stage

As noted, Tartavull (and Siris) argue that *Corwin* requires application of the business judgment standard and dismissal of the claim because an informed, uncoerced majority of Company's stockholders approved the Transaction.[119] I disagree. As pled, Xura's stockholders could not have cleansed conduct about which they did not know.

**HN10**[⬆] "[O]ne [disclosure] violation is sufficient to prevent application of *Corwin*."[120] Here, Plaintiff has adequately pled seven. From the public disclosures provided to Xura stockholders, it is reasonably conceivable that stockholders lacked the following material information when they voted to approve the Transaction: (1) Tartavull and Siris regularly communicated regarding the Transaction in private without **[*30]** the knowledge or approval of the Board or Goldman; (2) Tartavull and Baker negotiated price terms directly without Board approval, and Tartavull advised Siris what offer the Board would accept[121]; (3) Siris made clear its intention to work with management (including Tartavull) after consummation of the Transaction in all of its offer letters to the Company; (4) the Strategic Committee did not do the work attributed to it in the Proxy; (5) Francisco Partners initially expressed interest in offering a superior bid but somehow learned that Siris was Xura's counterparty and then moved its financial support to the buy-side of the

---

116 *See In re Solera Hldgs., Inc. S'holder Litig., 2017 Del. Ch. LEXIS 1, 2017 WL 57830, at \*7-8 (Del. Ch. Jan. 5, 2017)* (holding that "a plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote.").

117 *See In re Trados Inc. S'holder Litig., 73 A.3d 17, 35 (Del. Ch. 2013)* (describing **HN9**[⬆] ] difference between appraisal and fiduciary duty cases as "[t]he breach of fiduciary duty claim seeks an equitable remedy that requires a finding of wrongdoing. The appraisal proceeding seeks a statutory determination of fair value that does not require a finding of wrongdoing.").

118 *Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1187-88 (Del. Ch. 1988)* (holding that shareholder had standing to pursue a breach of fiduciary duty claim seeking rescissory damages while also pursuing appraisal remedy).

119 TOB at 29. *See Singh v. Attenborough, 137 A.3d 151 (Del. 2016)* (ORDER) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result").

120 *van der Fluit v. Yates, 2017 Del. Ch. LEXIS 829, 2017 WL 5953514, at \*8 n.115 (Del. Ch. Nov. 30, 2017)*.

121 *Alessi v. Beracha, 849 A.2d 939, 946 (Del. Ch. 2004)* (holding that negotiations between buyers and target's CEO were material when the parties discussed "significant terms" including "valuation").

Transaction[122]; (6) Siris offered Neuberger a "side deal" by inviting it to co-invest its equity with Siris on the buy-side; and (7) Tartavull received word from Nothhaft during negotiations with Siris that his position at Xura was in jeopardy if the Company was not sold.[123]

In deciding that Plaintiff has pled facts supporting a reasonable inference that stockholder approval of the Transaction was uninformed, I am mindful that **HN11**[↑] our law does not require boards to engage in self-flagellation in their public disclosures.[124] Even so, to [*31] invoke *Corwin* cleansing at the pleading stage, a fiduciary defendant must demonstrate that stockholders possessed all material information before casting the votes that provide the basis for cleansing. Plaintiff

alleges that stockholders were entirely ignorant of the extent to which Tartavull influenced the negotiations and ultimate terms of the Transaction, not to mention his possible self-interested motivation for pushing an allegedly undervalued Transaction on the Company and its stockholders. Having found that these allegations are well-pled, this is enough to justify denying Tartavull business judgment deference at the pleading stage by virtue of the stockholder vote.[125]

## 3. Plaintiff Has Pled a Viable Claim Against Tartavull

Tartavull was a CEO leading a sale process. Plaintiff has well-pled that his interests—e.g., a $25 million payout and continued employment post-closing in the face of his looming termination from stand-alone Xura[126] —were different than those of Xura's stockholders. Continued employment in itself is a material interest.[127] In *In re Answers Corp. Shareholders Litigation*, the court refused to dismiss a complaint alleging that a CEO's desire to keep his job caused [*32] him to seek a quick sale of the company.[128] Plaintiff

---

[122] In this regard, I acknowledge Defendants' argument that Plaintiff merely speculates regarding whether Francisco Partners ultimately would have made a bid for Xura and whether that bid would have been superior to the Siris bid. Plaintiff's response—that we will never know where the Francisco Partners' overture might have gone—is, likewise, well taken. Indeed, as a wise "do-dah man" once observed, "Sometimes your cards ain't worth a dime if you don't lay 'em down." Garcia, Lesh, Weir, Hunter, *Truckin* (1970). In any event, what is conceivably material about Francisco Partners is not its initial expression of interest but the fact that it expressed interest, later declined to participate in the Go-Shop and then mysteriously joined forces with Siris on the buy-side of the Transaction.

[123] *See van der Fluit, 2017 Del. Ch. LEXIS 829, 2017 WL 5953514, at *8* (finding that dismissal under *Corwin* was inappropriate because the proxy failed to disclose that "Opower negotiators were Yates and Laskey, who each received post-transaction employment and the conversion of unvested Opower options into unvested Oracle options . . . ."); *cf. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr. v. Comstock, 2016 Del. Ch. LEXIS 133, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016)*, aff'd, **158 A.3d 885 (Del. 2017)** (holding that a board need not "disclos[e] details about offers [for acquisition] that directors conclude are not worth pursuing"—a fact directly opposite of the facts pled here where Plaintiff alleges that Xura did, in fact, pursue Francisco Partners in during the go-shop).

[124] *Stroud v. Grace, 606 A.2d 75, 84 n.1 (Del. 1992)* ("[A] board is not required to engage in 'self-flagellation' . . . .").

[125] *See Sciabacucchi v. Liberty Broadband Corp., 2017 Del. Ch. LEXIS 93, 2017 WL 2352152, at *20 (Del. Ch. May 31, 2017)* (observing that "*Corwin* 'was never intended to serve as a massive eraser, exonerating corporate fiduciaries for any and all of their action or inactions preceding their decision to undertake a transaction for which stockholder approval is obtained.'") (quoting *In re Massey Energy Co. Deriv. Litig., 160 A.3d 484, 2017 WL 1739201, at * 19 (Del. Ch. 2017)*).

[126] Compl. ¶ 95.

[127] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 978 (Del. 2003)*, aff'd, *845 A.2d 1040 (Del. 2004)* (finding that president, chief operating officer and director of corporation had "a material interest in her own continued employment").

[128] *In re Answers Corp. S'holders Litig., 2011 Del. Ch. LEXIS 57, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012)* (refusing to dismiss complaint alleging CEO's desire to keep his job caused him to seek a quick, undervalued sale of the

has alleged that, as Tartavull was engaged in unauthorized discussions with Siris, he knew that both the Board and stockholder activists were displeased with his performance and likely would remove him from office if a sale of the Company did not occur. According to the well-pled allegations in the Complaint, this looming reality prompted Tartavull to favor Siris over other potential bidders, to feed information to Siris that would fortify its bid and then to negotiate quickly for his Transaction-related payout.[129] These allegations are adequate at this stage to state a claim for breach of fiduciary duty.

### 4. Board Approval Does Not Cleanse Tartavull's Conduct

Tartavull argues that, because "no director besides Tartavull is named in the Complaint[,]" and because "Plaintiff does not dispute that a majority of the Board was independent and disinterested[,]" to state a claim against him, Plaintiff must adequately plead that "the Board did not act in good faith in approving the Transaction."[130] Here again, I disagree. **HN12**[⬆] A plaintiff need not allege that a majority of the board committed a non-exculpated breach by failing to supervise management **[*33]** in order to state a claim against a disloyal CEO.[131] While Plaintiff has not pled a

*MacMillan* fraud-on-the-board claim, it has pled facts that support a reasonable inference that the Board was not fully informed of Tartavull's conduct—as contemplated in *MacMillan*.[132] The Board, like shareholders, cannot approve (and ratify) what it did not know. The Complaint alleges the Board was unaware of the February 24, 2016 lunch meeting between Baker and Tartavull.[133] On March 23, 2016, Goldman acknowledged that Tartavull and Siris had dinner without Goldman, and that it did not know (and could not report to the Board) what Tartavull discussed with Siris during that dinner.[134] Defendants have pointed to nothing in the Complaint that would overcome these well-pled allegations that the Board was uninformed. Accordingly, there is no basis to invoke Board ratification as a defense at the pleading stage, even assuming that board ratification would be a defense to a CEO's alleged breach of fiduciary duty.

### B. Plaintiff Has Not Stated a Viable Aiding and Abetting Claim

---

members did not oversee conflicted members sufficiently"); *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999)* ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (citing *In re J.P. Stevens & Co., Inc., 542 A.2d 770, 780-81 (Del. Ch. 1988)*).

[132] *See Mills Acq. Co., 559 A.2d at 1280* ("By placing the entire process in the hands of [the CEO and Chairman], through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye."). *See also In re Toys "R" Us, Inc. S'holder Litig., 877 A.2d 975, 1002 (Del. Ch. 2005)* ("[T]he paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price.").

[133] Compl. ¶ 63.

[134] *Id.* ¶ 77.

---

company).

[129] Compl. ¶¶ 61, 63, 73, 79, 83, 84, 95, 107. It is remarkable to see evidence that a CEO undermined the authority and questioned the competency of his CFO in direct communications with a potential acquirer at the peak of negotiations during a sale process. Yet, that is what the pled evidence reveals here. It is not surprising, therefore, that the CFO (Wu) testified at deposition that he believed Tartavull's direct contacts with Siris "undermined the [C]ompany's negotiating position." Compl. ¶ 79.

[130] TOB at 36.

[131] *See Kahn v. Stern, 2018 Del. LEXIS 114, 2018 WL 1341719, at *1 n.4 (Del. Mar. 15, 2018)* (ORDER) (highlighting that a plaintiff can state a *Revlon* claim "where impartial board

**HN13**[⬆] To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege facts **[*34]** that, if true, would demonstrate: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."[135] "A claim of knowing participation need not be pled with particularity."[136] Yet, "it is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss."[137]

To sustain its burden to plead knowing participation in this case, Plaintiff must well-plead that Siris knew of Tartavull's conflict. In this regard, it is useful to reiterate what the alleged conflict *is* and what it *is not*. Plaintiff's proffered conflict is not simply that Tartavull sought to favor and facilitate a transaction with Siris. Instead, the conflict is that Tartavull sought to favor and facilitate a transaction with Siris *because* he thought he would lose his job and the chance at post-closing benefits if the Transaction did not close.[138] With this in mind, I am satisfied that Plaintiff has failed to plead facts from which I could reasonably **[*35]** infer that Siris knew of Tartavull's alleged conflict and resulting breach of fiduciary duty.

**HN14**[⬆] Inferences "cannot take the place of" facts.[139] Even if the Court were to assume for purposes of this Motion that spoliation occurred, as alleged, and that an adverse inference is, therefore, justified, the only fact that has been pled is that Siris was communicating with Tartavull by text message during the timeframe in which they were negotiating the Transaction. This would perhaps support an adverse inference that the parties were discussing the Transaction in these text messages. One could go so far as to draw an adverse inference that Tartavull engaged in text communications with Siris without Board knowledge or authority, given the pled facts that Tartavull engaged in such unauthorized communications with Siris in other contexts. But Plaintiff conspicuously stops short of alleging any precedent facts, even on information and belief, from which a pleading stage adverse inference could be drawn that Tartavull told or otherwise indicated to Siris that he was in danger of losing his job if the Transaction fell through or that he was motivated to steer Xura into the Transaction for self-interested **[*36]** reasons. Nor does Plaintiff allege that Goldman tipped Siris off regarding the conflict. And the Strategic Committee could not somehow have leaked news of Tartavull's pending fate because that committee never even met with Siris.[140] In short, there are no pled facts from which an adverse inference that Siris knew of Tartavull's conflict, and therefore knowingly participated in

---

[135] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 Del. Ch. LEXIS 169, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007). *See also Goodwin v. Live Entm't, Inc.*, 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999), *aff'd*, **741 A.2d 16 (Del. 1999)** (holding that a defendant will be held liable for aiding and abetting when he "purposely induced the breach of the duty of care . . . .").

[136] *In re Shoe-Town, Inc. S'holders Litig.*, 1990 Del. Ch. LEXIS 14, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990).

[137] *Morgan v. Cash*, 2010 Del. Ch. LEXIS 148, 2010 WL 2803746, at *4 (Del. Ch. July 16, 2010).

[138] Compl. ¶ 84.

[139] *Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. 1980); *see also* **In re Asbestos Litig.**, 155 A.3d 1284, 1284 n.2 (Del. 2017) (TABLE) (**HN15**[⬆]) "Where there is no precedent fact, there can be no inference; an inference cannot flow from the nonexistence of a fact, or from a complete absence of evidence as to the particular fact. Nor can an inference be based on surmise, speculation, conjecture, or guess, or on imagination or supposition."); *Smith v. Haldeman*, 2012 Del. Super. LEXIS 385, 2012 WL 3611895, at *1 (Del. Super. Aug. 21, 2012) ("Inferences draw their life from facts, and without such a factual foundation, they remain speculation.").

[140] Compl. ¶ 48.

Tartavull's breach, could be drawn.[141]

Plaintiff contends the fact that Siris spoke directly with Tartavull after Goldman asked to be "'ke[pt] . . . on any communications with the Company going forward'" is evidence of Siris's knowing participation in Tartavull's breach.[142] Not so. The Board authorized management to negotiate with Siris on November 5, 2015,[143] and reaffirmed that authorization during Board meetings on December 3, 2015[144] and February 29, 2016.[145] Xura's standard non-disclosure agreement required Siris to communicate through Tartavull and to get his permission before communicating directly with others.[146] Goldman's request to be kept in the loop was not a condition imposed by the Board or the Strategic Committee, and it certainly was not binding upon Siris. Siris's alleged disregard of that request, therefore, [*37] cannot form the basis of an aiding and abetting

claim.

Plaintiff's allegations that Siris somehow aided and abetted in the Board's deficient disclosures also fall short.[147] At the outset, I note that an aiding and abetting claim based on a third-party's alleged failure somehow to *prevent* a board from providing misleading disclosures to stockholders rests on thin ice.[148] Yet that is what Plaintiff alleges here. It has pled no facts to support an inference that Siris knowingly *facilitated* alleged disclosure deficiencies or otherwise "knowingly participated" in that aspect of the alleged breach of fiduciary.[149] Instead, at best, Plaintiff alleges (albeit summarily) that Siris knew certain facts and knew that the Board was not disclosing those facts to stockholders.

In any event, with regard to the specific

---

[141] *See In re Zale Corp. S'holders Litig., 2015 Del. Ch. LEXIS 249, 2015 WL 5853693, at \*21 (Del. Ch. Oct. 1, 2015)* (dismissing aiding and abetting claim when plaintiff failed to plead that acquirer knew about the alleged non-disclosure constituting the purported fiduciary breach); *Hospitalists of Delaware, LLC v. Lutz, 2012 Del. Ch. LEXIS 207, 2012 WL 3679219, at \*7* ("[T]he acquirer's mere receipt of preferential terms does not demonstrate participation in the target board's breach of duty . . . ."); *Houseman v. Sagerman, 2014 Del. Ch. LEXIS 55, 2014 WL 1600724, at \*9 (Del. Ch. Apr. 16, 2014)* ("'[I]t is not the fiduciary that must act with scienter, but rather the aider and abettor.'" (citation omitted)); *Rouse Props., 2018 Del. Ch. LEXIS 93, 2018 WL 1226015, at \*25* (holding that buyers are "entitled to negotiate the terms of the Merger with only [their] interests in mind; [they are] under no duty or obligation to negotiate terms that benefit[] [sellers] or otherwise to facilitate a superior transaction for [sellers]."); *Morgan, 2010 Del. Ch. LEXIS 148, 2010 WL 2803746, at \*5* ("[R]etaining management is a routine occurrence" and "[t]o view the retention of management on reasonable terms with suspicion would only undermine business practices that often facilitate the difficult transitions required when two businesses merge."); *In re Telecommc'ns, Inc. S'holders Litig., 2003 Del. Ch. LEXIS 78, 2003 WL 21543427, at \*3 (Del. Ch. July 7, 2003)* (dismissing aiding and abetting claim and finding that "the fact that AT&T [the acquirer] negotiated with Malone [the target's CEO] and the TCI management team" does not "provide a sufficient basis for inferring that AT&T knowingly participated in any breach of fiduciary duty that may have

occurred.").

[142] Compl. ¶ 44.

[143] TOB Ex. 22 at XURA0000226; *see also* Compl. ¶ 44.

[144] Compl. ¶ 47.

[145] JX 258 at XURA0000289.

[146] TOB Ex. 16 at SIRIS0198355-56; *see also* TOB Ex. 8 at GS-XURA000180433-34.

[147] I note Plaintiff alleges Siris Defendants aided and abetted the purported disclosure deficiencies for the first time in its Answering Brief. PAB 75-76. The Complaint simply claims Siris Defendants aided and abetted a breach of fiduciary duty "by engaging in direct and improper communications with Tartavull throughout the negotiations that led to the Merger." Compl. ¶ 127. This alone is enough to disregard the claim. *In re Rouse Props., Inc., 2018 Del. Ch. LEXIS 93, 2018 WL 1226015, at \*23 n.197 (Del. Ch. Mar. 9, 2018)* (citation omitted) ("'Under *Rule 15(aaa)*, a party cannot use its brief as a mechanism to informally amend its complaint.'").

[148] Plaintiff unsurprisingly cites no case law in support of this argument. PAB 75-76.

[149] Courts have found aiding and abetting liability in the *narrow* circumstance where the third-party plays an active role in the "informational vacuum." *In re Rural Metro Corp., 88 A.3d 54, 96 (Del. Ch. 2014)*, *decision clarified on denial of reargument sub nom. In re Rural Metro Corp. S'holders Litig., 88 A.3d 54, 2014 WL 1094173 (Del. Ch. 2014)*. Here, there is no allegation

disclosure violations Siris allegedly aided and abetted Xura in committing, Plaintiff has not alleged anything to support its conclusory allegation that "[t]he Siris Defendants knew that Francisco Partners had expressed interest and [were] diverted to the buy-side of the transaction."[150] Nor has Plaintiff well-pled that Siris **[*38]** aided and abetted a breach of fiduciary duty because it "knew about [its] side deal with Neuberger[,]" but sat by as the Board failed to disclose the deal to stockholders.[151]

*HN16*[⬆] The knowledge standard embedded in our aiding and abetting law is "a stringent one, one that turns on proof of scienter of the alleged abettor."[152] Plaintiff's allegations fall short of this standard.

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss Count I must be DENIED and the motion to dismiss Count II must be GRANTED.

**IT IS SO ORDERED**.

---

End of Document

---

that Siris provided knowingly false information to Xura with the knowledge that the Board would disclose that information to shareholders.

[150] PAB 76.

[151] *Id.*

[152] *Binks v. DSL.net, Inc., 2010 Del. Ch. LEXIS 98, 2010 WL 1713629, at *10 (Del. Ch. Apr. 29, 2010)*. See also *Houseman v. Sagerman, 2014 Del. Ch. LEXIS 55, 2014 WL 1600724, at *9 (Del. Ch. Apr. 16, 2014)* ("'[I]t is not the fiduciary that must act with scienter, but rather the aider and abettor.'" (citation omitted)).

**Tab J**

 Positive

As of: December 16, 2019 3:58 PM Z

# *Cumming v. Edens*

Court of Chancery of Delaware

November 21, 2017, Submitted; February 20, 2018, Decided

C.A. No. 13007-VCS

## Reporter

2018 Del. Ch. LEXIS 54 *; 2018 WL 992877

JOHN CUMMING, derivatively on behalf of NEW SENIOR INVESTMENT GROUP, INC., Plaintiff, v. WESLEY R. EDENS, SUSAN GIVENS, VIRGIS W. COLBERT, MICHAEL D. MALONE, STUART A. MCFARLAND, CASSIA VAN DER HOOF HOLSTEIN, FIG LLC, FORTRESS OPERATING ENTITY I LP, FIG CORPORATION, HOLIDAY ACQUISITION HOLDINGS LLC, and FORTRESS INVESTMENT GROUP LLC, Defendants, and NEW SENIOR INVESTMENT GROUP, INC., Nominal Defendant.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

## Core Terms

Senior, Acquisition, allegations, challenged transaction, Offering, Minutes, Secondary, Van, stockholder, Portfolio, pled, bid, management agreement, disinterested, reasonable doubt, negotiated, loyalty, financing, unfair, safe harbor, Answering, terms, business judgment rule, reasonable inference, board of directors, motion to dismiss, donations, futility, Pricing, aiding and abetting

## Case Summary

### Overview

HOLDINGS: [1]-A derivative complaint adequately pleaded demand futility under *Del. Ch. Ct. R. 23.1* by asserting facts that showed a majority of directors were conflicted because some had financial interests and others had close social ties to those who were financially interested; [2]-Allegations of self-dealing by overpaying for properties, thereby advancing others' interests at the expense of the corporation and its stockholders, stated a claim for breach of the duty of loyalty; [3]-Compliance with *Del. Code Ann. tit. 8, § 144(a)(1)* did not necessarily invoke business judgment review; [4]-Absent an independent and disinterested board majority, the standard of review was entire fairness; [5]-Unfair dealing and unfair price were adequately pleaded; [6]-A *Del. Code Ann. tit. 8, § 102(b)(7)* exculpatory provision extinguished duty of care claims against directors but not loyalty claims.

### Outcome

Motion to dismiss denied.

Amanda Stubblefield

where those in control of the company refused to assert a claim belonging to it.

# LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

## *HN1*[⤓]  Motions to Dismiss, Failure to State Claim

The relevant facts on a motion to dismiss for failure to state a claim are drawn from the complaint's well-pled allegations, the documents the complaint incorporates by reference, and those matters the court is permitted to consider by stipulation of the parties. For purposes of the motion to dismiss, the court accepts as true the well-pled facts in the complaint and draws all reasonable inferences in the plaintiff's favor.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Enforcement of Corporate Rights

## *HN2*[⤓]  Derivative Actions, Enforcement of Corporate Rights

A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation. A board of directors does not stand alone, however, in its authority to initiate litigation on behalf of the corporation. In certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to redress the conduct of a torpid or unfaithful management

Business & Corporate Law > ... > Standing > Demands > Futility

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

## *HN3*[⤓]  Demands, Futility

Because a derivative plaintiff who elects not to make a demand seeks to displace the board's authority, it is appropriate to require that he plead particularized facts that create a reasonable doubt as to whether the board is fit to consider the demand. When the complaint challenges a business decision of the board, the derivative plaintiff meets his burden to plead demand futility by pleading particularized facts that create either (1) a reasonable doubt that the board of directors that would respond to the demand was disinterested and independent or (2) a reasonable doubt that the challenged transaction was otherwise the product of a valid exercise of business judgment. This reasonable doubt standard is not the same as the burden of proof imposed upon the prosecution in a criminal case. It is, instead, a more literal distillation of the phrase meaning simply that there is reason to doubt.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

## *HN4*[⤓]  Derivative Actions, Procedural Matters

*Del. Ch. Ct. R. 23.1* places a heightened pleading burden on a plaintiff to meet stringent requirements of factual particularity that differ substantially from the permissive notice

pleadings embodied in *Del. Ch. Ct. R. 8* and that animate *Del. Ch. Ct. R. 12(b)(6)*. Even so, the court is still bound to draw all reasonable inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought.

Business & Corporate
Law > ... > Standing > Demands > Futility

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN5*[⤓] Demands, Futility

In order to plead futility under the first prong of the Aronson analysis, a complaint must raise a reasonable doubt that a majority of the directors could have evaluated a demand independently and without self-interest. When determining whether the complaint pleads director interest or lack of independence, the court does not consider the pled facts in isolation but instead considers them in totality. The court will deem a director interested for purposes of this analysis when he stood on both sides of the transaction at issue or stood to receive a material benefit that was not to be received by others. A material benefit is one that is significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties. A pleading of materiality, however, is only required in the absence of self-dealing.

Business & Corporate
Law > ... > Standing > Demands > Futility

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN6*[⤓] Demands, Futility

The inquiry for director independence is contextual and asks whether a director's decision was based on the merits of the subject before the board rather than on extraneous considerations or influences. To show lack of independence, a plaintiff pleading futility must allege that a director is so beholden to an interested director that his or her discretion would be sterilized. Specifically, the relationship between the challenged director and the interested director must be so close that one could infer that the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.

Business & Corporate
Law > ... > Standing > Demands > Futility

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN7*[⤓] Demands, Futility

The case law has applied a contextual approach to directors' independence, explaining that Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. Homo sapiens is not merely homo economicus. An array of other motivations exist that influence human behavior; not all are any better than greed or avarice, there is envy, to name just one. But also there are motives like love, friendship, and collegiality; there are those who direct their behavior as best they can on a guiding creed or set of moral values. Nor should the law ignore the social nature of humans. Corporate directors are generally the sort of people deeply enmeshed in social institutions.

Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation.

Business & Corporate Law > ... > Standing > Demands > Futility

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

### *HN8*[🔻] Demands, Futility

Determining whether a plaintiff has pled facts supporting an inference that a director cannot act independently of an interested director for purposes of demand excusal can be difficult. Service on another board alongside the interested director, alone, is insufficient to raise a reasonable doubt as to a director's independence, especially when the interested director does not control either company.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN9*[🔻] Derivative Actions, Procedural Matters

*Del. Ch. Ct. R. 12(b)(6)* imposes a less stringent pleading standard than *Del. Ch. Ct. R. 23.1*. Thus, a complaint that survives a motion to dismiss pursuant to *Rule 23.1* also will survive a *Rule 12(b)(6)* motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

### *HN10*[🔻] Motions to Dismiss, Failure to State Claim

The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Causes of Action

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

### *HN11*[🔻] Management Duties & Liabilities, Causes of Action

When determining whether directors breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct. With this distinction in mind, a logical approach to analyzing a breach of fiduciary duty claims is to work through the standard of conduct, apply a standard of review, and then determine whether the

defendants have properly invoked any immunities or defenses, such as exculpation.

> Business & Corporate
> Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

> Business & Corporate
> Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

*HN12*[⬇] **Fiduciary Duties, Duty of Care**

In performing their duties, the directors of Delaware corporations owe fundamental fiduciary duties of care and loyalty. The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. Thus, Delaware law is clear that the board of directors of a for-profit corporation must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare.

> Business & Corporate
> Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

*HN13*[⬇] **Fiduciary Duties, Business Judgment Rule**

Satisfying the requirements of *Del. Code Ann. tit. 8, § 144* only means that a challenged transaction is not void or voidable solely because of a conflict of interest. While noncompliance with the disclosure requirement of *§ 144(a)(1)*, *(2)* by definition

triggers fairness review rather than business judgment rule review, the satisfaction of *§ 144(a)(1)* or *(2)* alone does not always have the opposite effect of invoking business judgment rule review. Rather, satisfaction of *§ 144(a)(1)* or *(2)* simply protects against invalidation of the transaction solely because it is an interested one. As such, *§ 144* is best seen as establishing a floor for board conduct but not a ceiling. Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

> Business & Corporate
> Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

*HN14*[⬇] **Fiduciary Duties, Business Judgment Rule**

*Del. Code Ann. tit. 8, § 144(a)(1)* provides that a covered transaction will not be void or voidable solely as a result of an offending interest if it is approved by an informed majority of the disinterested directors, even though the disinterested directors be less than a quorum. Under the *§ 144* statutory analysis, so long as there is one informed, disinterested director on the board, and so long as he or she approves the transaction in good faith, the transaction will not be presumptively voidable due to the offending interest. In other words, a board with a single disinterested director may approve a covered transaction and reap the benefits of the *§ 144* safe harbor. Under the common law, however, the factor is somewhat different; approval must be by a disinterested majority of the entire board. That is, a plaintiff may rebut the presumption of the business judgment rule by showing that a majority of the individual directors were interested or beholden. In the common-law analysis, therefore, a transaction approved by a board

with a single disinterested director is subject to the entire-fairness standard. The standards are phrased similarly for the statutory and common-law analyses, but they are in fact quite different.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

*HN15*[⤓] Fiduciary Duties, Business Judgment Rule

Compliance with *Del. Code Ann. tit. 8, § 144(a)(1)* does not necessarily invoke business judgment review of an interested transaction. The court must still adhere to settled common law principles when fixing the appropriate standard of review by which fiduciary conduct should be measured.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN16*[⤓] Fiduciary Duties, Business Judgment Rule

As a general matter, the business judgment rule presumption that a board acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders. To establish that a board was interested or lacked independence, a plaintiff

must allege facts as to the interest and lack of independence of the individual members of that board. To rebut successfully business judgment presumptions in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director. If a director-by-director analysis leaves insufficient independent directors to make up a board majority, then the court will review the board's decision for entire fairness.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Business & Corporate Law > ... > Standing > Demands > Futility

*HN17*[⤓] Fiduciary Duties, Duty of Loyalty

Finding a director is either interested or not independent under the first prong of the Aronson rule will not always translate to a finding of interest or lack of independence in the fiduciary duty analysis. Under the first prong of Aronson, the focus is on whether the director's interest or conflict creates a reasonable doubt that the director could objectively consider a demand. In the fiduciary duty context, the focus is on whether the director's interest or conflict caused the director to do or not do something that has harmed the corporation. The inquiries are different and do not necessarily overlap.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

**HN18[⤓] Management Duties & Liabilities, Fiduciary Duties**

The applicability of the entire fairness standard normally will preclude a dismissal of a complaint on a *Del. Ch. Ct. R. 12(b)(6)* motion to dismiss. Entire fairness review asks whether the transaction (i) was the product of fair dealing, and (ii) reflected a fair price.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Fiduciary Duties

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

**HN19[⤓] Management Duties & Liabilities, Fiduciary Duties**

Allegations revealing unfair dealing should focus on when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Causes of Action

Business & Corporate Law > ... > Directors

& Officers > Management Duties & Liabilities > Fiduciary Duties

**HN20[⤓] Management Duties & Liabilities, Causes of Action**

Abstaining from a vote does not shield a director from liability.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Defenses

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

**HN21[⤓] Management Duties & Liabilities, Defenses**

Only claims that, as a matter of law, cannot be exculpated by a *Del. Code Ann. tit. 8, § 102(b)(7)* exculpatory provision can survive a motion to dismiss.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Defenses

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

**HN22[⤓] Management Duties & Liabilities, Defenses**

Breaches of the duty of loyalty are not exculpated under Delaware law. Breach of loyalty claims cannot be extinguished at the pleading stage under *Del. Code Ann. tit. 8, §*

102(b)(7).

conflict between duty and self-interest.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > Defenses

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

## HN23[🔽] Management Duties & Liabilities, Defenses

When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Self-Dealing

## HN24[🔽] Fiduciary Duties, Duty of Loyalty

Corporate officers and directors are not permitted to use their positions of confidence to further their private interests. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

## HN25[🔽] Concerted Action, Civil Aiding & Abetting

To state a claim of aiding and abetting, a complaint must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach. Where the court finds that the plaintiff has pled breach claims, the focus turns to whether the plaintiff has adequately pled knowing participation by the alleged aiders and abettors. An adequate pleading of knowing participation requires a pleading of scienter. To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper, and that he acted with an illicit state of mind. The requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove.

Business & Corporate Law > ... > Duties & Liabilities > Knowledge & Notice > Agent Knowledge

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

## HN26[🔽] Knowledge & Notice, Agent Knowledge

Under Delaware law, the knowledge of an agent acquired while acting within the scope of his or her authority and the acts of agents in

that scope are imputed to the principal. Applying this fundamental agency principle, entities have been held liable for aiding and abetting a defendant where the entities were under the control of that defendant and were the mechanisms through which that defendant accomplished the challenged transaction.

**Counsel: [*1]** Jeffrey Gorris, Esquire, Christopher Foulds, Esquire and Christopher Quinn, Esquire of Friedlander & Gorris P.A., Wilmington, Delaware; David Wales, Esquire, David MacIsaac, Esquire and John Vielandi, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York; Adam Warden, Esquire of Saxena White P.A., Boca Raton, Florida; Steven B. Singer, Esquire and Joshua H. Saltzman, Esquire of Saxena White P.A., White Plains, New York; J. Elazar Fruchter, Esquire of Wohl & Fruchter LLP, New York, New York, Attorneys for Plaintiff.

Robert S. Saunders, Esquire, Ronald N. Brown, III, Esquire, Sarah R. Martin, Esquire and Elisa M.C. Klein, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants.

**Judges:** SLIGHTS, Vice Chancellor.

**Opinion by:** SLIGHTS

# Opinion

## MEMORANDUM OPINION

**SLIGHTS, Vice Chancellor**

Plaintiff, John Cumming, is a stockholder of nominal defendant, New Senior Investment Group, Inc. ("New Senior"). He initiated this action derivatively on behalf of New Senior against members of the New Senior board of directors alleging they breached their fiduciary duties in connection with their approval of a transaction whereby New Senior acquired assets at an unfair price from **[*2]** an entity controlled by Fortress Investment Group, LLC ("Fortress"). Cumming asserts that a majority of the New Senior board was either interested in the transaction or disabled by conflicts arising from various relationships with a principal of Fortress, Wesley Edens. He further alleges that the transaction, comprised of three related and equally unfair elements, must be subject to the entire fairness standard of review. For both of these reasons, Cumming maintains that he is excused from demanding that the managers of New Senior assert these claims directly under either or both "prongs" of *Aronson*.[1]

Defendants have moved to dismiss Cumming's complaint under *Court of Chancery Rules 23.1* and *12(b)(6)*. They argue he has failed to plead particularized facts to demonstrate demand excusal under *Rule 23.1* and has failed to plead viable, non-exculpated claims that can survive their challenge under *Rule 12(b)(6)*. I disagree. The complaint pleads sufficiently particularized facts to create a reasonable doubt that a majority of the New Senior board was disinterested or independent. It also pleads facts that support a reasonable inference that the defendants

---

[1] *Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984)* overruled on other grounds, *Brehm v. Eisner, 746 A.2d 244 (Del. 2000)* (citing *8 Del. C. § 141(a)*) (holding that demand on a board is excused where a plaintiff alleges particularized facts creating a "reasonable doubt" that either (1) a majority of the directors were disinterested and independent, or (2) the challenged transaction was a valid exercise of business judgment).

breached their duty of loyalty by approving a conflicted, unfair **[*3]** transaction, and thereby pleads a non-exculpated claim under _8 Del. C. § 102(b)(7)_. Finally, the complaint pleads a reasonably conceivable claim of aiding and abetting a breach of fiduciary duty against Fortress (and its affiliates) by alleging that Fortress, as seller, knowingly exploited conflicts of interest among members of the New Senior board in order to facilitate the transaction and thereby advance its own interests (and those of the interested directors) at the expense of New Senior stockholders. Accordingly, the motion to dismiss must be denied as to all counts of the complaint.

# I. BACKGROUND

_HN1_[↑] The relevant facts are drawn from the complaint's well-pled allegations, the documents the complaint incorporates by reference and those matters I am permitted to consider by stipulation of the parties.[2] For

---

[2] _EMSI Acq., Inc. v. Contrarian Funds, LLC, 2017 Del. Ch. LEXIS 73, 2017 WL 1732369, at *1 (Del. Ch. May 3, 2017)_. Plaintiff received certain documents from New Senior in response to a books and records demand. The parties agreed that documents produced in response to that demand would be deemed incorporated within the complaint whether or not referenced therein. Transmittal Aff. of Elisa M.C. Klein in Supp. of Defs.' Opening Br. in Supp. of their Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Klein Aff.") Ex. 34 (Confidentiality Agreement) ¶ 7; Quinn Letter dated Nov. 16, 2017, Ex. 2, at 2. Notwithstanding this agreement, Plaintiff argues that Defendants have referred to materials outside of the produced or incorporated documents in resisting his motion to dismiss. Accordingly, he urges me to convert this motion into a motion for summary judgment, and then allow him to take discovery before addressing the motion. Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 17 n.8; Transcript of Oral Argument on Defs.' Mot. to Dismiss, Nov. 21, 2017, D.I. 33 ("Tr.") 62:12-63:5. Consistent with this Court's practice, beyond the four corners of the Verified Amended Derivative Complaint ("Complaint"), I have considered only those documents produced by New Senior in response to the _Section 220_ demand or incorporated by Cumming in his Complaint. "[I]f a document or the circumstances support more than one possible inference, and

purposes of this motion to dismiss, the Court accepts as true the well-pled facts in the Complaint and draws all reasonable inferences in Plaintiff's favor.[3]

## A. Parties and Relevant Non-Parties

Plaintiff, John Cumming, was a stockholder of New Senior at all relevant times and remains a New Senior stockholder today.[4] He purports to bring this action derivatively on behalf of New Senior.

Nominal Defendant, New **[*4]** Senior, is a Delaware corporation with its principal place of business in New York.[5] It has no employees of its own.[6] Rather, it is an externally-managed, publicly-traded real estate investment trust ("REIT") that owns a portfolio of senior housing facilities totaling 154 properties across the United States.[7] New Senior was originally formed as a subsidiary of Drive Shack, Inc. ("Drive Shack"), which is another publicly-traded REIT managed and dominated by Fortress.[8] New Senior was spun off from Drive Shack in November 2014.[9]

Defendant, Fortress, is a global asset and investment management firm.[10] It was founded by, among others, Defendant, Wesley Edens

---

if the inference that [P]laintiff seeks is reasonable, then [P]laintiff [has] receive[d] the inference." _Amalgamated Bank v. Yahoo! Inc., 132 A.3d 752, 798 (Del. Ch. 2016)_. Thus, I decline Plaintiff's invitation to convert this motion into a motion for summary judgment.

[3] _Wayne Cty. Emples. Ret. Sys. v. Corti, 2009 Del. Ch. LEXIS 126, 2009 WL 2219260, at *8 (Del. Ch. July 24, 2009)_.

[4] Verified Am. Deriv. Compl. ("Compl.") ¶ 21.

[5] Compl. ¶ 22.

[6] Compl. ¶ 29.

[7] Compl. ¶ 22.

[8] Compl. ¶ 23.

[9] Compl. ¶ 23.

[10] Compl. ¶ 24.

("Edens"), in 1998 and went public in 2007.[11]

Defendant, Fig LLC ("FIG"), is New Senior's manager and an indirect subsidiary of Fortress.[12] FIG is wholly owned and managed by Defendant, Fortress Operating Entity I LP ("FOE I").[13] FOE I's sole general partner is FIG Corporation ("FIG Corp."), a wholly-owned Fortress subsidiary.[14] FIG Corp. and Fortress' three "principals" (including Edens) own 100% of FOE I's limited partnership interests.[15] "Fortress, FIG, FOE I, FIG Corp., Drive Shack, and New Senior all operate out of the same offices."[16]

Defendant, Holiday Acquisition Holdings LLC ("Holiday"),[17] "is the second largest private owner and operator of independent living communities for seniors in the United States."[18] In 2007, Holiday was acquired by Fortress Holiday Investment Fund ("FHIF"), a Fortress-managed private equity fund. Since then, it has been "controlled and majority-

owned by Fortress," primarily through FHIF.[19]

At the time of the challenged transactions, New Senior's board of directors (the "Board" or the "New Senior Board") had six members: Edens, Susan Givens, Virgis Colbert, Michael Malone, Stuart McFarland and Cassia van der Hoof Holstein, all of whom joined the Board by Fortress' designation in October 2014.[20] The committee of New Senior's board of directors organized to negotiate and consummate the transaction at issue here (the "Transaction Committee") comprised Malone, Van der Hoof Holstein, Colbert and McFarland.[21] As of the filing of this action, the Board consisted of seven members, the six members serving at the time of the challenged transaction and Robert Savage.[22] Savage is not a defendant in this action.

Defendant, Edens, is Fortress' founder and one of its "Principals."[23] He is also Fortress' largest [*6] stockholder[24] and the co-chairman of its board of directors.[25] At Fortress, "Edens is responsible for Fortress' private equity and publicly traded alternative investment

---

[11] Compl. ¶ 24. "As of April 2, 2015, Fortress, Edens and other New Senior insiders owned approximately 7.2% of New Senior's outstanding stock." Compl. ¶ 27.

[12] Compl. ¶ 31. FIG also manages, *inter alia*, the Fortress funds that own Holiday, Drive Shack and Fortress investment funds that own a majority of Nationstar Mortgage Holdings, Inc. *Id.* [*5]

[13] Compl. ¶ 32.

[14] Compl. ¶ 33. I note that the Complaint collectively refers to Fortress, FIG, FOE I and FIG Corp. as "Fortress." Compl. ¶ 34. I have done my best to differentiate among the entities, when necessary, with help of the parties' briefing and the incorporated documents. Otherwise, I adopt the convention utilized in the Complaint and refer to the Fortress entities collectively as "Fortress." An organizational chart is attached as an appendix to this Memorandum Opinion.

[15] Compl. ¶ 33. Fortress' "principals" are Defendant Edens and non-parties, Peter L. Briger, Jr. and Randal A. Nardone. *Id.*

[16] Compl. ¶ 35.

[17] The portfolio of properties at issue here belonged to and was sold by Holiday Retirement, which is alleged to be an affiliate of Holiday Acquisition Holdings LLC (the only named "Holiday" defendant in this matter). Compl. ¶ 3 n.2. Because of

the interrelationship of the Holiday companies, the Complaint refers to "Holiday Retirement, with its affiliates, including Harvest Facility Holdings LP, Holiday Facility Holdings, LP, Holiday Acquisition Holdings LLC, and Holiday AL Holdings LP" collectively as "Holiday." *Id.* Once again, I will follow the Complaint and refer to the Holiday entities collectively as "Holiday."

[18] Compl. ¶ 36.

[19] Compl. ¶ 36.

[20] Compl. ¶¶ 27, 37, 52, 60, 63, 134.

[21] Compl. ¶¶ 14-17.

[22] Compl. ¶ 134.

[23] Compl. ¶¶ 23, 33. The Complaint alleges that the three-person control group of Fortress together owns approximately 45% of Fortress' voting stock. Compl. ¶ 37.

[24] According to the Complaint, "[a]s of April 6, 2016, [Edens] owned approximately 22.6% of Fortress' Class A shares and about 27.2% of its Class B shares" making him Fortress' largest stockholder. Compl. ¶ 37.

[25] Compl. ¶¶ 24, 33, 37.

businesses, which include both Holiday and New Senior."[26] Edens has been the Chairman of the New Senior Board since October 2014.[27] He also serves as a director of FIG Corp., as officer and general partner of the funds that own Holiday, and as a director of non-party, A&K Global Health LLC ("A&K"), which was founded by Fortress in 2011.[28] Along with Givens, he was designated as one of two members of the New Senior Board's pricing committee that determined the price of the equity offering used, in part, to fund the transaction at issue (the "Pricing Committee").[29]

Defendant, Givens, is New Senior's CEO and a member of its Board.[30] Givens also serves as managing director of Fortress' private equity group[31] and holds interests in Holiday through Fortress' private equity fund.[32] She was New Senior's lead negotiator in the acquisition of the portfolio of properties challenged here and, as noted, served on the two-person Pricing Committee alongside Edens.[33]

Defendant, Malone, served as Chairman of the Transaction Committee.[34] From 2008 to 2012, [*7] Malone served as managing director of Fortress.[35] He also sits on the boards of directors of a Fortress-affiliated company, non-party Nationstar Mortgage Holdings ("Nationstar"), and Walker & Dunlop, which provided financing for the challenged transaction.[36] Malone holds ownership interests in Fortress, New Senior and Walker & Dunlop.[37] At the time of the challenged transaction, Malone had retired from his Senior Executive Banker and Managing Director positions at Bank of America after 24 years of service and, thus, did not have full-time employment.[38] It is alleged he earned $1.7 million in director fees between 2012 and 2015 from Fortress-managed companies.[39]

Defendant, Van der Hoof Holstein, was added to the Transaction Committee by written consent after its inception.[40] In addition to her service on the New Senior Board, she also serves on the board of directors of A&K together with Edens.[41] Van der Hoof Holstein's full-time employment is with Partners in Health ("PIH"), a nonprofit medical organization, where she has served as Chief Partnership Integration Officer since 2010.[42] It is alleged that Edens' wife serves on the board of directors of PIH and that the Edens family is a "trusted partner" [*8] of the organization, donating money and otherwise providing significant support for PIH's worldwide relief efforts.[43]

Van der Hoof Holstein has also served as Associate Director of the Global Health Delivery Partnership ("GHDP") for the Department of Global Health and Social Medicine at Harvard Medical School since

---

[26] Compl. ¶ 38.

[27] Compl. ¶ 37.

[28] Compl. ¶¶ 33, 36, 39.

[29] Compl. ¶ 6.

[30] Compl. ¶ 41.

[31] Compl. ¶ 41.

[32] Compl. ¶¶ 41, 135. Givens did not disclose the amount of her ownership interest in Holiday in her director questionnaire. Transmittal Aff. of Christopher P. Quinn ("Quinn Aff.") Ex. 2, at SNR00000108.

[33] Compl. ¶ 41.

[34] Compl. ¶ 42.

[35] Compl. ¶¶ 43-44.

[36] Compl. ¶¶ 45-49.

[37] Compl. ¶¶ 44, 50.

[38] Klein Aff. Ex. 4 (2015 Proxy Statement), at 7.

[39] Compl. ¶ 51.

[40] Compl. ¶ 52.

[41] Klein Aff. Ex. 4 (2015 Proxy Statement), at 8; Compl. ¶ 39.

[42] Compl. ¶ 53.

[43] Compl. ¶¶ 54-56.

2011.[44] According to the Complaint, GHDP has received continued substantial support from Edens over many years.[45]

Defendant, Colbert, was also a member of the Transaction Committee.[46] In addition to his service on the New Senior Board, Colbert "has served in a variety of key leadership positions with Miller Brewing Company since 1979," and "continues to serve as Senior Advisor to MillerCoors LLC."[47] He previously served on the boards of directors for several other companies.[48] It is alleged that around the time Colbert became a member of the Board, Edens (as controlling owner) invited Colbert to join him as a co-owner of the Milwaukee Bucks (the NBA team), through Partners for Community Impact, LLC, and that Colbert accepted the invitation. Colbert now enjoys the unique opportunity of being a co-owner of an NBA franchise, along with approximately 24 others in the Bucks' ownership group. **[*9]** [49]

Defendant, McFarland, was the final member of the Transaction Committee.[50] McFarland also serves as a Fortress-designated director of Drive Shack, which, as mentioned, is managed by Fortress and was New Senior's parent prior to the spin-off in November 2014.[51] McFarland receives 60% of his publicly declared income from his various board fees.[52] He lists his address with the SEC for investment purposes (for non-Fortress investments) as "C/O Fortress Investment

Group."[53]

## B. New Senior's Spin-Off

New Senior was spun off from Drive Shack in 2014 (the "Spin-Off").[54] Prior to the Spin-Off, "Drive Shack was dominated by Fortress, as most of Drive Shack's board and management were affiliated with Fortress."[55] Edens served as the chairman of Drive Shack's board from 2002 until May 2016 and as its CEO from 2002 until 2007.[56] As part of the Spin-Off, Fortress "appointed all of New Senior's directors, classified the Board with staggered terms, and severely curtailed the filling of director vacancies and the removal of directors."[57] It also "installed Fortress-affiliated personnel as the senior management of New Senior."[58]

## C. The FIG-New Senior Management Agreement

"In conjunction with the Spin-Off, New Senior entered **[*10]** into a management agreement [] with Fortress' subsidiary FIG[], pursuant to which FIG[] manages New Senior's day-to-day operations."[59] Thus, all of New Senior's

---

[44] Compl. ¶¶ 57-58.

[45] Compl. ¶ 15.

[46] Compl. ¶ 60.

[47] Klein Aff. Ex. 4 (2015 Proxy Statement), at 6.

[48] Klein Aff. Ex. 4 (2015 Proxy Statement), at 6.

[49] Compl. ¶¶ 60, 62.

[50] Compl. ¶ 63.

[51] Compl. ¶¶ 23, 63.

[52] Compl. ¶ 63.

[53] Compl. ¶ 63.

[54] Compl. ¶ 3.

[55] Compl. ¶ 26.

[56] Compl. ¶ 26.

[57] Compl. ¶ 27.

[58] Compl. ¶ 28.

[59] Compl. ¶ 28. At the time of the challenged transaction, New Senior's management team consisted of: (i) Givens, New Senior's CEO and Fortress' private equity group's managing director; (ii) Justine Cheng, New Senior's CFO, Treasurer and COO and also a managing director of Fortress' private equity group, employed by Fortress since 2004; (iii) Julien P. Hontang, New Senior's Chief Accounting Officer and managing partner of Fortress' private equity fund; and (iv) Cameron MacDougall, New Senior's secretary and a managing partner and general counsel of Fortress' private equity fund, employed by Fortress since 2007. Compl. ¶ 29.

management is employed by FIG. Under the management agreement, FIG receives compensation in the form of an annual management fee of 1.5% of New Senior's gross equity as well as incentive compensation of 25% on New Senior's returns above a certain threshold.[60] The management agreement further provides that FIG is to receive 10% of the number of shares sold in any stock offering at the offering's exercise price.[61]

According to New Senior's public disclosures, New Senior is "completely reliant on [FIG]."[62] Thus, New Senior is "subject to the risk that [FIG] will terminate the Management Agreement and that [New Senior] will not be able to find a suitable replacement for [its] [m]anager in a timely manner, at a reasonable cost or at all."[63] The public disclosures confirm that the management agreement was "not negotiated at arm's length, and its terms, including fee payable, may not be as favorable to [New Senior] as if it had been negotiated with an unaffiliated party."[64]

## D. The Challenged Transaction

The transaction at issue here is more accurately [*11] described as three separate (but inextricably intertwined) transactions, each of which Plaintiff alleges was detrimental

to New Senior. *First*, the overarching transaction was New Senior's acquisition of a portfolio of properties (the "Holiday Portfolio") from Defendant Holiday (the "Acquisition") at an allegedly unfair price. *Second*, New Senior financed the Acquisition (in part) through an equity offering that allegedly favored Fortress to the detriment of New Senior. And *third*, New Senior entered into a property management agreement with Holiday to manage the Holiday Portfolio at allegedly higher-than-market rates (collectively the "Challenged Transactions").[65]

## 1. The Acquisition

The Board was first made aware of the possibility of acquiring the Holiday Portfolio at a meeting on May 5, 2015.[66] At that meeting, "Givens informed three members of the Board that Holiday had solicited bids for the sale of the Holiday Portfolio" and that she "expected to submit a bid" on New Senior's behalf.[67] She also "indicated the expected price range for the portfolio."[68] In her presentation, Givens advised the Board that the Acquisition would be part of New Senior's "key initiative" to "build pipeline and close [*12] on new acquisitions."[69] In response to Givens' announced intentions, the Board discussed its plan to form a transaction committee "if [New Senior] were invited to proceed to the second

---

[60] Klein Aff. Ex. 1 (FIG Management Agreement), at 9. "Gross Equity" is defined as "for any period [] (A) the sum of (i) the 'Total Equity,' plus (ii) the value of contributions made by partners other than [New Senior], from time to time, to the capital of any subsidiary . . . less (B) any capital dividends or capital distributions . . . ." *Id.*

[61] Klein Aff. Ex. 1 (FIG Management Agreement), at 10.

[62] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

[63] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

[64] Klein Aff. Ex. 25 (Preliminary Prospectus Supplement June 22, 2015), at S-22.

[65] New Senior and Holiday Acquisitions Holdings, LLC were the parties to the management agreement. Klein Aff. Ex. 35 (2016 Proxy Statement), at 26.

[66] This meeting was attended by "Fortress-affiliated members of New Senior's management team." Compl. ¶ 73 n.8. None of the Fortress-affiliated employees recused themselves from the meeting. Compl. ¶ 75. Neither Van der Hoof Holstein nor Edens were present. Compl. ¶ 73 n.8; Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

[67] Compl. ¶ 73.

[68] Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

[69] Klein Aff. Ex. 6 (Board Presentation May 5, 2015), at SNR00000230-231.

round of bidding."[70]

When the Board next met to discuss the possible acquisition, on May 15, 2015, Givens reported that she had already made an opening non-binding bid of $660 million for the Holiday Portfolio.[71] She then outlined the specifics of the bid, including that "Fortress and its affiliates would manage the Holiday Portfolio post-acquisition,"[72] that "management had begun speaking to lenders about potential financing" and that, "in the event the Company won the auction, she would recommend conducting an equity offering in order to fund a portion of the purchase price."[73] Givens explained that Holiday was motivated to sell "because the funds that own a majority of Holiday [were] seeking to monetize their investments in order to return capital to [their] investors in the near future."[74] She closed by emphasizing that she expected the sales process to be "very competitive."[75]

Following Givens' presentation and the Board's discussion of the proposed acquisition, Cameron MacDougall, the Board's Secretary and a managing [*13] director and general counsel of Fortress, outlined the process by which the Board should evaluate the proposed acquisition and answered Board member questions regarding applicable legal standards.[76] The Board did not seek out or

receive independent legal or financial advice at this time.[77] Based on the information provided, the Board agreed to form the Transaction Committee at this meeting but did not actually do so until later.[78] Edens recused himself from this May 15 meeting and declared that he would continue to recuse himself from meetings where the Board intended to discuss a potential acquisition of the Holiday Portfolio due to his affiliation with Fortress.[79]

The Board met again on May 18, 2015, and again Givens requested that MacDougall advise the Board on its actions in evaluating the potential acquisition.[80] The Board decided that the Transaction Committee would comprise Malone, Colbert and McFarland. It was determined that Van der Hoof Holstein could not join the Transaction Committee at that time given her other commitments.[81] While its members were selected, the Board, again, elected not to form the Transaction Committee at this meeting. The Board did, however, interview candidates [*14] to serve as independent counsel for the Transaction Committee, and ultimately decided to retain Davis, Polk & Wardwell ("Davis Polk").[82]

The next day, the Board finally resolved to form the Transaction Committee (comprising Malone, Colbert and McFarland, with Malone as Chairman) and delegated to this committee the full authority to consider and accept or reject the potential acquisition.[83] During this meeting, the Board was informed, for the first

---

[70] Klein Aff. Ex. 5 (May 5, 2015 Board Minutes).

[71] Compl. ¶¶ 73, 77; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes). Plaintiff alleges that "Givens never explained how she calculated the $660 million bid amount." Pl.'s Answering Br. 15. Indeed, the May 15 Board Minutes are silent as to how the bid was calculated. Klein Aff. Ex. 7.

[72] Compl. ¶¶ 78-80, Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[73] Klein Aff. Ex. 7 (May 15, 2015 Board Minutes).

[74] Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[75] Compl. ¶ 77.

[76] Compl. ¶ 79; Klein Aff. Ex. 4 (2015 Proxy Statement), at 16; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[77] Compl. ¶ 79.

[78] Compl. ¶ 79; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes), at 2.

[79] Compl. ¶ 74; Klein Aff. Ex. 7 (May 15, 2015 Board Minutes).

[80] Compl. ¶ 81.

[81] Compl. ¶ 81.

[82] Compl. ¶ 81.

[83] Klein Aff. Ex. 10 (May 19, 2015 Board Minutes), at SNR00000238; Compl. ¶ 82.

time, of Givens' interest in the transaction due to her indirect ownership interest in Holiday.[84] Notwithstanding this revelation, it does not appear that the Board pressed for specifics regarding the extent of Givens' interest in Holiday or the extent to which she would or should remain involved in the negotiations.[85] While Givens recused herself from the meeting, she continued thereafter to function as New Senior's lead negotiator.[86]

On May 29, 2015, Givens learned that the two other bidders for the Holiday Portfolio had dropped out of the bidding process.[87] Without input from (or knowledge of) the Transaction Committee or the Board, Givens reduced New Senior's bid by $20 million (to $640 million).[88] The Transaction Committee was not informed of the revised [*15] bid until its first meeting on June 1, 2015, when Givens (who was in attendance along with three other Fortress-affiliated individuals) advised that the remaining bidders had dropped out, announced that she had unilaterally lowered the bid and declared that final bids were due on June 5, 2015, only four days later.[89] Davis

Polk was not in attendance at this meeting.[90]

Givens explained that her reduced $640 million bid was "derived by applying the capitalization rate implied by the purchase price for the last portfolio marketed by Holiday and sold to Northstar Realty Finance Corporation [], which was 6.1%."[91] In presenting this justification for the revised bid, Givens failed to "disclose whether Northstar was the only bidder for its asset purchase from Holiday" and wrongfully compared the Northstar deal occupancy rate, which was 90%, to the 87.6% rate purportedly implicated by the Holiday Portfolio.[92] These flaws, according to Plaintiff, rendered the Northstar deal inapposite. Moreover, none of the values used by Givens to support her lowered bid were or could be independently verified.[93]

As of this first meeting of the Transaction

---

none of the so-called *Yahoo* documents support the contention that the offer was "non-binding" and, therefore, I must either ignore Defendants' assertion to the contrary or convert this motion into a motion for summary judgment. Pl.'s Answering Br. 17 n.9. At this stage, because the documents incorporated in the Complaint do not speak to the character of the bid provided to Holiday as of June 5, I will accept as true Plaintiff's allegation that the bid was binding upon New Senior.

---

[84] Compl. ¶ 82.

[85] Compl. ¶ 82.

[86] Compl. ¶ 82.

[87] Compl. ¶ 83; Klein Aff. Ex. 11 (May 19, 2015 Committee Minutes). Plaintiff alleges that the documents produced in response to his books and records demand did not disclose any final bids from other potential bidders. Compl. ¶ 76; Pl.'s Answering Br. 17 n.8. Having found nothing in the documents that contradicts this allegation, for purposes of this motion, I accept the allegation as true.

[88] Compl. ¶ 83.

[89] Compl. ¶¶ 85-86. Plaintiff and Defendants disagree whether the bids due on June 5 were still to be non-binding. Defendants assert that the bids were to remain non-binding, that the Transaction Committee was free to walk away from the Acquisition and that there is "no support in the *Yahoo* record that the company was committed to anything. It made a nonbinding proposal." Tr. 11:6-8; Defs.' Opening Br. in Supp. of the Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Defs.' Opening Br.") 12-13. Plaintiff, on the other hand, asserts that

[90] Compl. ¶ 98.

[91] Compl. ¶ 89.

[92] Compl. ¶¶ 90, 92.

[93] Compl. ¶ 91. Plaintiff alleges that "the minutes of the June 1, 2015 Transaction Committee meeting reflect no discussion or debate concerning whether New Senior's enhanced bargaining position warranted a substantially larger reduction than a mere $20 million in New Senior's initial $660 million bid." Compl. ¶ 87. The minutes from that meeting state that "[t]he Transaction Committee engaged in a robust discussion regarding the information conveyed by Ms. Givens. They asked a variety of questions regarding the expected risks and benefits of the acquisition, the proposed capitalization rate, and the terms of the purchase agreement, and each question was answered to the Transaction Committee's satisfaction." Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at 2. At this stage, drawing all reasonable inferences in Plaintiff's favor, I find that the particularized facts pled support Plaintiff's allegation that Givens was not pressed to justify her decision to reduce the bid by only $20 million.

Committee, even though only New Senior remained in the **[*16]** process, Citigroup, the broker for the proposed acquisition, still had not declared New Senior as the winning bidder. Nevertheless, Givens advised the Transaction Committee that she expected that announcement to occur soon.[94] With the end of the process in sight, Givens suggested that the Transaction Committee select a financial advisor to assess the fairness of the proposed price and assured the Committee that, in the meantime, she would negotiate further favorable price adjustments.[95] Givens ultimately negotiated an additional $5 million in capital expenditure adjustments.[96]

At its June 2 meeting, the Transaction Committee retained Greenhill & Co. ("Greenhill") as its financial advisor.[97] The following day, Givens made a presentation to Greenhill in which she outlined the specific terms of the Acquisition and explained that the draft agreement did not contain a financing contingency because "New Senior had determined that agency financing was preferable."[98]

On June 16, 2015, the entire Board met to consider the Acquisition and to hear from Givens and Edens regarding their views in support of the transaction.[99] Immediately

following this Board meeting, the Transaction Committee met and, after **[*17]** a briefing by Givens, management left the meeting.[100] With management out of the room, Malone requested that Greenhill provide an overview of the transactional structure including an analysis of the conflicts of interest.[101] Greenhill complied and then reviewed its preliminary analysis of the "fairness, from a financial point of view, to [New Senior] of the [c]onsideration to be paid."[102] This analysis included comparable transactions (although Greenhill noted that the senior living market made this "analysis relatively less meaningful"), a discounted cash flow analysis and the view of certain Wall Street research analysts.[103] The meeting lasted about two hours.[104]

On June 21, 2015, the meeting of the Transaction Committee once again began with a presentation from lead negotiator Givens, this time focused on the proposed financing plan and other more granular aspects of the Acquisition.[105] After management left the meeting, the Committee received Greenhill's final fairness presentation and unanimously determined to recommend that the Board authorize the Acquisition.[106] Immediately thereafter, the Board convened a meeting and approved the Acquisition with both Edens and

---

[94] Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at 2.

[95] Compl. ¶¶ 98-99.

[96] Compl. ¶ 99.

[97] Compl. ¶ 101; Klein Aff. Ex. 14 (June 2, 2015 Committee Minutes). Notably, Greenhill was not retained until after Givens had already submitted the final bid of $640 million. Compl. ¶ 101.

[98] Compl. ¶ 102. Plaintiff is highly critical of the fact that no reason was given for failing to include a financing contingency in the final bid for New Senior's protection, especially given its leverage as the sole bidder for the assets. *Id.* Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss Pl.'s Verified Am. Deriv. Compl. ("Defs.' Reply Br.") 18-19.

[99] Klein Aff. Ex. 18 (June 16, 2015 Board Minutes).

[100] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes). Van der Hoof Holstein began attending Transaction Committee meetings on June 10, 2015, although she was not designated as a member of the Committee until June 19. Compl. ¶ 103.

[101] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes).

[102] Compl. ¶¶ 102, 104; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 4; Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes), at SNR00000248.

[103] Klein Aff. Ex. 19 (June 16, 2015 Committee Minutes), at SNR00000249.

[104] Compl. ¶¶ 102, 104; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 4.

[105] Klein Aff. Ex. 22 (June 21, 2015 Committee Minutes).

[106] Compl. ¶¶ 106-07; Klein Aff. Ex. 22 (June 21, 2015 Committee Minutes).

Givens recusing.[107] No stockholder vote **[*18]** was requested.[108]

## 2. The Secondary Offering

The Acquisition was financed in part by a secondary public offering of New Senior common stock (the "Secondary Offering").[109] The Board delegated the task of determining the terms of the Secondary Offering to Edens and Givens by resolution dated June 21, 2015, appointing them as the sole members of the Pricing Committee.[110] On June 23, 2015, the Pricing Committee met for the first time and resolved to offer $266,973,360[111] in equity at a price of $13.75 per share.[112] Only a portion of the money raised through the equity offering was used to finance the Acquisition.[113]

Edens and Givens received shares in the Secondary Offering totaling 72,727,[114] and FIG was granted a ten-year option to acquire 2,011,409 New Senior shares for the $13.75

offering price pursuant to its management agreement with New Senior.[115] Greenhill did not assess the Secondary Offering as part of its fairness opinion and the Board was not apprised of either the number of shares to be offered or the offering price prior to approving the Acquisition.[116] New Senior announced the Secondary Offering on June 25, 2015.[117] The market reacted poorly; New Senior stock closed at $14.14 on June 23 and dropped to **[*19]** $13.65 on June 26.[118]

## 3. The Holiday Management Agreement

As part of the Acquisition, Holiday and New Senior entered into a no-bid management agreement (the "Holiday Management Agreement") under which Holiday would continue to manage the Holiday Portfolio.[119] The Holiday Management Agreement provided that Holiday would be compensated with 5% of New Senior's revenues as well as an incentive

---

[107] Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000260-61.

[108] Compl. ¶ 19.

[109] Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000266; Compl. ¶ 109.

[110] Compl. ¶ 109; Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000266.

[111] Compl. ¶ 110.

[112] Compl. ¶ 120. New Senior's stock closed at $15.25 one day prior to the Secondary Offering. *Id.* Neither the Board, the Transaction Committee nor the Pricing Committee ever questioned this discount. Compl. ¶ 113.

[113] Compl. ¶ 110. As discussed below, Plaintiff alleges Edens and Givens caused New Senior to offer more equity than was needed to complete the Acquisition out of selfinterest. Compl. ¶ 111.

[114] Compl. ¶ 122. The Complaint alleges that Edens, through a side agreement, was entitled directly to purchase 72,727 shares at the offering price and that an additional 102,917 shares were allocated to certain employees and officers (also at the offering price) with 14,545 shares allocated to Givens. *Id.*

---

[115] Compl. ¶ 121. The management agreement entitled FIG to 10% of the shares sold in an equity offering. Klein Aff. Ex. 1 (FIG Management Agreement).

[116] Compl. ¶ 112; Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 3. The June 21 Board Minutes state that MacDougall (not Davis Polk) "reviewed the terms of the equity offering" with the Board. Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000261. Aside from that mention, the documents incorporated in the Complaint, contrary to Defendants' assertion, lead to the reasonable inference that the Board was not aware of the pricing of the shares to be sold in the equity offering prior to the creation of the Pricing Committee. *See, e.g.,* Klein Aff. Ex. 24 (June 21, 2015 Board Minutes), at SNR00000267:

> RESOLVED, that the Board hereby approves the Offering and the sale and issuance of the Shares for a maximum aggregate offering price not to exceed $300 million (plus a 15% overallotment option) and on such other terms to be determined by the Pricing Committee . . .

[117] Compl. ¶ 18. New Senior retained Citigroup as one of the underwriters and joint-book-running managers of the Secondary Offering even though Citigroup had represented Holiday and Fortress during the sale process leading up to the Acquisition. Compl. ¶¶ 114-15.

[118] Compl. ¶ 18. Defendants contend that "[o]ver 60 potential

fee of 20% above a designated threshold.[120] These fees were significantly above market.[121]

A Greenhill presentation made to the Transaction Committee indicates that the terms of the Holiday Management Agreement were first disclosed to the Committee during a June 2015 meeting.[122] As with the Secondary Offering, Greenhill did not opine on the fairness of the Holiday Management Agreement.[123] Nor is there any indication that the Transaction Committee looked into or interviewed other managers for the Holiday Portfolio or even attempted to negotiate more **[*20]** favorable terms.[124]

### E. Fortress' Alleged Interest in the Transactions

Plaintiff alleges that Edens and Givens caused New Senior to enter into the Challenged Transactions to advance certain of Fortress'

own interests, including: (1) Fortress' planned shift of assets to publicly-traded companies; (2) the approaching maturity date of FHIF (through which Fortress held its interests in Holiday); (3) the increase in FIG's management fees resulting from the Secondary Offering; and (4) the increase in fees received through the Holiday Management Agreement as outlined previously. I discuss each briefly below.

### 1. The Planned Shift of Assets

At the time of the Acquisition, Fortress was in the midst of a plan to shift its assets under management from private equity funds, like the funds that own Holiday, to its Permanent Capital Vehicles ("PCVs"), like New Senior.[125] This shift would yield a greater return to Fortress because Fortress could "charge higher fees on the gross equity and operating results [of PCVs] . . . over a longer time period."[126] Fortress disclosed this plan in a 2013 presentation where it outlined the "economic benefits of its 'New Model.'"[127] Presentations in 2014 and 2015 evidence Fortress' **[*21]** execution of the plan.[128]

The sale of the Holiday Portfolio to New Senior was executed in furtherance of the New Model, as revealed in a statement made by Givens in an interview with *Seniors Housing Business* published in September 2015:

> New Senior has been, and we expect it will continue to be, Fortress' dedicated vehicle for investing in the seniors housing industry. While the private equity funds have a finite life to them, New Senior is one of the permanent capital vehicles at

---

investors submitted indications of interest in the Secondary Offering. Of those 60, nearly one-third placed a limit at or below $13.75 [per share]. Only 11 placed a limit above $13.75, and they only did so for an indication totaling less than $40 million, a woefully insufficient figure." Defs.' Opening Br. 20 (internal citation omitted).

[119] Compl. ¶ 95.

[120] Compl. ¶ 95; Klein Aff. Ex. 35 (2016 Proxy Statement), at 26.

[121] Compl. ¶ 95 ("[C]ertain other managers charge a fixed amount of only 3% of revenues and certain other managers receive no incentive fee. As Givens conceded in her September 2015 Interview, there are only 'some cases' where property managers are paid an incentive fee based on performance. Indeed, Holiday charges no incentive fee to New Senior for the 'Hawthorn' property portfolio that New Senior purchased from Holiday.") (internal quotation omitted).

[122] Klein Aff. Ex. 12 (Transaction Committee Presentation: Holiday 28 Portfolio), at SNR0000038-39. The Complaint alleges that the Transaction Committee did not consider the Holiday Management Agreement and was not even apprised of its exact terms until after approval of the Acquisition. Compl. ¶¶ 96-97.

[123] Quinn Aff. Ex. 5 (Greenhill Fairness Opinion), at 2.

[124] Compl. ¶ 96.

[125] Compl. ¶ 72.

[126] Compl. ¶¶ 9, 67, 70.

[127] Compl. ¶ 67.

[128] Compl. ¶¶ 70-71; Quinn Aff. Ex. 1 (Fortress Presentation), at 8-9.

Fortress, given it is a public company with no time period upon which the equity has to be returned to investors.[129]

### 2. The Looming Maturity of FHIF

Prior to the close of the Acquisition, Fortress was in need of liquidity because its fund, FHIF, through which it held its majority interest in Holiday, had a maturity date of January 2017, at which time FHIF was to return capital to its investors.[130] By selling the Holiday Portfolio to New Senior at an inflated price, Holiday seized an opportunity to facilitate the delivery of promised returns.[131]

### 3. Increase of New Senior's Gross Equity

Plaintiff alleges that Fortress, Edens and Givens received unfair benefits from the $266 million Secondary Offering (of which only $175.3 million **[*22]** was used for the Acquisition) at the expense of New Senior in two ways: (1) the stock was offered at a "deep discount to the market price" and the offering included an award of options to Fortress, Edens and Givens at that discounted price; and (2) the Secondary Offering increased New Senior's gross equity resulting in higher management fees to FIG (under pre-existing agreements) and a depressed New Senior share price, all compounded by the fact that Edens and Givens saw to it that more equity was issued than was needed to fund the Acquisition.[132] Indeed, the increase of gross equity from the Secondary Offering led to an increase in FIG's management fees from $8.5

million in 2014 to $14.3 million in 2015.[133] Because the acquisition agreement did not contain a financing contingency, New Senior was locked into the Secondary Offering even if the market responded poorly to news of the Acquisition (which it did).[134]

### 4. Holiday Benefits

As noted, Givens arranged for Holiday to earn substantial fees through the Holiday Management Agreement. These fees benefited FHIF and ultimately Fortress.

### F. Procedural Posture

Plaintiff filed his Verified Derivative Complaint on December 27, 2016. Defendants filed their **[*23]** first motion to dismiss on March 16, 2017. Plaintiff responded by filing his Verified Amended Derivative Complaint on June 8, 2017.[135] The Complaint has three counts: Count I asserts a breach of fiduciary duty claim against all of the directors of New Senior (excluding Robert Savage); Count II asserts a breach of fiduciary duty claim against Givens as an officer of New Senior; and Count III asserts an aiding and abetting breaches of fiduciary duty claim against Fortress, Holiday, FIG, FOE I and FIG Corp.

Defendants now move to dismiss the Complaint for failure adequately to plead demand futility under _Court of Chancery Rule 23.1_ and failure to state a viable claim under _Rule 12(b)(6)_. According to Defendants, Plaintiff cannot plead demand futility because a majority of the Board was disinterested and independent and the Challenged Transactions were products of valid exercises of the Board's

---

[129] Compl. ¶¶ 29, 66.

[130] Compl. ¶ 4.

[131] Compl. ¶ 4.

[132] Compl. ¶¶ 6-8, 110-111, 115. The Secondary Offering caused New Senior's market capitalization to drop by $100 million. Compl. ¶ 102.

[133] Compl. ¶ 119.

[134] Compl. ¶ 113.

[135] D.I. 12. _See_ Del. _Ct. Ch. R. 15(aaa)_.

business judgment.[136]

In riposte, Plaintiff argues that demand is excused as futile because there is reason to doubt (1) the disinterestedness and independence of a majority of the Board at the time of the filing of this action and (2) that the Challenged Transactions were otherwise the proper exercise of business judgment.[137] Thus, Plaintiff [*24] argues he has satisfied both prongs of *Aronson*.[138] As for the *Rule 12(b)(6)* motion, Plaintiff argues that he has pled sufficient facts to state claims for both breach of the duty of care and breach of the duty of loyalty. He also argues that entire fairness is the standard of review and that the pled facts support a reasonable inference of an unfair price and unfair process with respect to the Challenged Transactions.[139] These same pled facts, according to Plaintiff, overcome Defendants' *Section 102(b)(7)* defense.

## II. ANALYSIS

There is no question that Cumming's claims challenging the Board's determination to acquire assets are derivative claims that ultimately belong to New Senior. It is appropriate, therefore, first to take up the threshold question of whether Cumming may bring these claims on behalf of New Senior. Because I find that Cumming has pled particularized facts that support a finding of demand futility such that he may bring this action derivatively, I must also consider whether he has stated viable claims to survive

Defendants' motion under *Rule 12(b)(6)*. For the reasons that follow, I conclude that he has.

## A. Plaintiff Has Adequately Pled Demand Futility

**HN2**[⬆] "[A] cardinal precept of the General Corporation Law of the State [*25] of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[140] As noted, Plaintiff's claims here allege harm suffered by New Senior. The claims, therefore, belong to the Company and the decision whether or not to pursue them typically would rest with the Board.[141] A board of directors does not stand alone, however, in its authority to initiate litigation on behalf of the corporation. In certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to "redress the conduct of a torpid or unfaithful management . . . where those in control of the company refused to assert a claim belonging to it."[142]

**HN3**[⬆] Because the derivative plaintiff who elects not to make a demand "seeks to displace the board's authority," it is appropriate to require that he plead particularized facts that "create a reasonable doubt" as to whether the board is fit to consider the demand.[143] When the complaint challenges a business decision of the board, *Aronson* instructs that

---

[136] Defs.' Opening Br. 2-4.

[137] In his first complaint, Plaintiff alleged that Fortress was a controlling stockholder of New Senior. The now-operative Complaint no longer makes that claim.

[138] *Aronson, 473 A.2d 805*; Pl.'s Answering Br. 41.

[139] Pl.'s Answering Br. 62 (arguing that Defendants "cannot establish entire fairness on a motion to dismiss").

---

[140] *Aronson, 473 A.2d at 811*.

[141] *White v. Panic, 783 A.2d 543, 550 (Del. 2001)* (stating that "[i]n most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation").

[142] *Aronson, 473 A.2d at 811*.

[143] *La. Mun. Police Emples. Ret. Sys. v. Pyott, 46 A.3d 313, 351 (Del. Ch. 2012)* (citation omitted), *rev'd on other grounds, Pyott v. La. Mun. Police Emples. Ret. Sys., 74 A.3d 612 (Del. 2013)*.

the derivative plaintiff meets his burden to plead demand futility by pleading particularized facts that create either (1) a reasonable doubt that the **[*26]** board of directors that would respond to the demand was disinterested and independent **or** (2) a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment."[144] The "reasonable doubt" standard articulated in *Aronson* is not the same as the burden of proof imposed upon the prosecution in a criminal case.[145] It is, instead, a more literal distillation of the phrase meaning simply "that there is reason to doubt."[146]

**HN4**[⬆] *Rule 23.1* places a heightened pleading burden on the plaintiff to meet "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" embodied in *Court of Chancery Rule 8* and that animate *Court of Chancery Rule 12(b)(6)*.[147] Even so, the court is still "bound to draw all reasonable inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought."[148]

_____

144 *Aronson, 473 A.2d at 814*.

145 *Grimes v. Donald, 673 A.2d 1207, 1217 (Del. 1996)*.

146 *Id. Grimes* explains that another way to construe *Aronson's* "reasonable doubt" standard is to inquire whether the stockholder has articulated "a 'reasonable belief' (objectively) that the board lacks independence or that the transaction was not protected by the business judgment rule." *Id.* The standard is "sufficiently flexible and workable to provide the stockholder with the 'keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Id.*

147 *Brehm, 746 A.2d at 254*.

148 ***Del. Cty. Empls. Ret. Fund v. Sanchez, 124 A.3d 1017, 1022 (Del. 2015)***; *Pyott, 46 A.3d at 351* (explaining that the "requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations" and that Plaintiff must only plead specific facts and is not required to plead evidence or "facts sufficient to sustain a 'judicial finding.'").

Plaintiff did not make a demand on the Board. Therefore, as he must, he has endeavored to plead demand futility. While he need only do so under either of *Aronson's* prongs, Plaintiff contends that he has pled demand futility under both. Because I find that the Complaint pleads futility **[*27]** under the first prong, I need not and decline to reach Plaintiff's arguments that he has satisfied the second prong as well.

**HN5**[⬆] In order to plead futility under *Aronson's* first prong, the complaint must raise a reasonable doubt that a majority of the directors could have evaluated a demand independently and without self-interest.[149] When determining whether the complaint pleads director interest or lack of independence, the court does not consider the pled facts in isolation but instead considers them in totality.[150]

The court will deem a director "interested" for purposes of this analysis when he stood on both sides of the transaction at issue or stood to receive a material benefit that was not to be received by others.[151] A material benefit is one that is "significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties."[152] A pleading of

_____

149 *Brehm, 746 A.2d at 256-57*.

150 *See **Sanchez, 124 A.3d at 1019*** ("it is important that the trial court consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs").

151 *Chester Cty. Empls. Ret. Fund v. New Residential Inv. Corp., 2016 Del. Ch. LEXIS 153, 2016 WL 5865004, at *9 (Del. Ch. Oct. 7, 2016)*; *Robotti & Co. v. Liddell, 2010 Del. Ch. LEXIS 4, 2010 WL 157474, at *12 (Del. Ch. Jan. 14, 2010)*.

152 *Robotti, 2010 Del. Ch. LEXIS 4, 2010 WL 157474, at *12*; *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1134, 1151 (Del. Ch. 1994)* ("not every financial interest in a transaction that is

materiality, however, is only required "in the absence of self-dealing."[153]

HN6[↑] The inquiry for director independence is contextual and asks whether a director's decision was "based on the merits of the subject before the board rather than on extraneous considerations or influences." [*28] [154] "To show lack of independence, the plaintiff must allege that a director is so beholden to an interested director that his or her discretion would be sterilized."[155] Specifically, the relationship between the challenged director and the interested director must be "so close that one could infer that the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director."[156]

The parties agree that the members of the New Senior Board that would have considered Plaintiff's demand (if he had made one) comprised directors Savage, Edens, Givens, Malone, Van der Hoof Holstein, Colbert and McFarland. The Court's function now is to "count heads."[157] By requesting books and records from New Senior prior to filing his Complaint, Cumming has done what our courts have long counseled plaintiffs to do: he

has utilized the tools provided by our law to gain access to documents that allowed him to plead specific facts that support his allegations of interest and lack of independence.[158]

## 1. Savage

Plaintiff does not challenge the independence or disinterestedness of Savage who joined the Board after the Challenged Transactions. In this regard, [*29] Savage stands alone.

## 2. Edens

Plaintiff contends that Edens is interested in the Challenged Transactions and lacks independence from Fortress. Defendants do not seriously dispute Edens' conflicts, nor could they. Edens is Fortress' founder, one of its principals and the co-chairman of its board of directors.[159] He is Fortress' largest stockholder and is responsible for Fortress' private equity and publicly traded alternative investment businesses (including Holiday and New Senior).[160] Additionally, while it appears that Edens recused himself from voting on the Acquisition, he was one of two members on the Pricing Committee that set the terms and

---

not shared with shareholders [is] sufficient").

153 *Cambridge Ret. Sys. v. Bosnjak, 2014 Del. Ch. LEXIS 107, 2014 WL 2930869, at *5 (Del. Ch. June 26, 2014)* (internal quotation omitted).

154 *Chester Cty., 2016 Del. Ch. LEXIS 153, 2016 WL 5865004, at *9*; *Orman v. Cullman, 794 A.2d 5, 25 n.50 (Del. 2002)*.

155 *Chester Cty., 2016 Del. Ch. LEXIS 153, 2016 WL 5865004, at *9*.

156 *Robotti, 2010 Del. Ch. LEXIS 4, 2010 WL 157474, at *12*.

157 *In re EZCORP, Inc. Consulting Agmt. Deriv. Litig., 2016 Del. Ch. LEXIS 14, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016)*; *id.* ("If the board of directors lacks a majority comprising independent and disinterested directors, then demand is futile.").

158 *See, e.g., Sandys v. Pincus, 152 A.3d 124, 128-29 (Del. 2016)* ("For many years, this Court and the Court of Chancery have advised derivative plaintiffs to take seriously their obligations to plead particularized facts justifying demand excusal. This case presents the unusual situation where a plaintiff who sought books and records to plead his complaint somehow only asked for records relating to the transaction he sought to redress and did not seek any books and records bearing on the independence of the board. . . . As a result of the plaintiff's failure, he made the task of the Court of Chancery more difficult than was necessary and hazarded an adverse result for those he seeks to represent."); *Brehm, 746 A.2d at 266-67* (describing the "tools at hand" available to a stockholder to assist in pleading particular facts to demonstrate demand futility).

159 Compl. ¶ 37.

160 Compl. ¶¶ 37-38; Defs.' Opening Br. 24 n.10.

pricing for the Secondary Offering used to finance the Acquisition and under which both FIG and Edens himself received share options. Thus, Plaintiff has adequately pled facts raising a reasonable doubt that Edens could have independently considered a demand challenging these transactions.

### 3. Givens

Here again, Defendants do not earnestly dispute Givens' lack of independence and disinterest for purposes of the [Rule 23.1](#) analysis.[161] Givens was the second member of the Pricing Committee setting the terms for the Secondary Offering and she also received options under **[*30]** the Secondary Offering. Moreover, she was employed by Fortress and yet was New Senior's lead negotiator for the Acquisition.[162] Because she stood on both sides of the Challenged Transactions, it is reasonable to infer on that basis alone that she was interested in the Challenged Transactions. Accordingly, Plaintiff has satisfied his burden to raise a reasonable doubt regarding Givens' ability objectively to consider a demand.

### 4. Malone

Plaintiff challenges Malone's fitness to consider a demand on both interest and independence grounds. Malone is alleged to be interested in the Challenged Transactions because, as a director of both Walker & Dunlop, which stood to lend $464.7 million to New Senior to help fund the Acquisition, and the borrower, New Senior, Malone also stood on both sides of the transaction.[163] The

Complaint alleges that Walker & Dunlop has provided financing to New Senior in the past and that New Senior's loans "constituted approximately 17.4% of [Walker & Dunlop's] Freddie Mac loan origination volume in 2015."[164] It goes on to allege that, in April 2015, Walker & Dunlop "closed on the largest deal in its 77 year history—originating $670 million in loans to New Senior."[165] Finally, **[*31]** the Complaint alleges that Walker & Dunlop expected to enjoy a continuing relationship with New Senior that would lead to further lucrative investments.[166] Viewing these pled facts together, it is reasonably conceivable that Walker & Dunlop had a material interest in providing the $464.7 million loan to finance the Acquisition.[167] Thus, Plaintiff has raised a reasonable doubt as to whether Malone, as a director of Walker & Dunlop, was disinterested in the Challenged Transactions. Malone was a dual fiduciary here and the interests of the beneficiaries he served (lender vs. borrower) were not aligned.[168] Accordingly, Plaintiff has

---

[164] Compl. ¶ 49.

[165] Compl. ¶ 48.

[166] Compl. ¶¶ 48-49.

[167] Plaintiff also points to other conflicts affecting Malone that relate principally to his prior service on the Fortress board of directors and as a managing director for Fortress, his current ownership of substantial Fortress stock and the substantial, material director fees he earns from Fortress board placements. Compl. ¶¶ 44, 50; Pl.'s Answering Br. 30. Although I need not take up these alleged conflicts given my findings relating to Malone's service on the Walker & Dunlop board, I do note that, in totality, the weight of the pled facts regarding these conflicts is substantial.

[168] See [Chester Cty., 2016 Del. Ch. LEXIS 153, 2016 WL 5865004, at *10](#) ("Plaintiff has alleged particularized facts sufficient to create a reasonable doubt as to Edens, Jacobs, and Nierenberg's disinterestedness in the HLSS transactions because of their dual fiduciary positions at Fortress and New Residential."); [Chen v. Howard-Anderson, 87 A.3d 648, 670 (Del. Ch. 2014)](#) ("If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest."); [In re Nine Sys. Corp. S'holders Litig., 2014 Del. Ch. LEXIS 171, 2014 WL 4383127, at *29-30](#)

---

[161] Tr. 44:9-14.

[162] It is also alleged that Givens was further motivated to favor the Challenged Transactions because she holds stock in the Fortress funds that own Holiday. Compl. ¶ 41.

[163] Compl. ¶ 50; Pl.'s Answering Br. 26.

adequately pled that Malone was "interested" for demand futility purposes.[169]

## 5. Van der Hoof Holstein

Plaintiff challenges Van der Hoof Holstein's fitness to consider a demand based on her especially close ties to Edens. Van der Hoof Holstein is employed in a leadership position at PIH, a non-profit organization where Edens' wife has for many years served on the board of directors and to which the Edens family makes substantial financial and other contributions.[170] To illustrate the close connection, Plaintiff points to the fact that Edens' daughter wore her [*32] self-described "lucky" PIH pin while appearing on national television at the NBA draft as a representative of her father (and the NBA team he owns). He also highlights Edens' hands-on support of PIH's relief efforts in Haiti; support that was praised by Van der Hoof Holstein's immediate supervisor in several publications.[171] These close ties are further revealed in the fact that Van der Hoof Holstein serves alongside Edens on several boards, including A&K (an organization founded by Fortress).[172] The compensation for her board service, as facilitated by Edens, amounts to at least half of her annual income.[173]

This court has considered on several occasions the extent to which charitable donations to a cause associated with a director made by an interested individual or entity might serve as a basis to reasonably doubt whether the director was beholden to the interested donor. Defendants rely primarily on this court's analysis of the issue in *In re Goldman Sachs*[174] and *In re J.P. Morgan Chase*[175] to support their argument that Edens' charitable contributions to PIH do not raise a reasonable doubt regarding Van der Hoof Holstein's independence. In *Goldman Sachs*, a

---

*(Del. Ch. Sept. 4, 2014)* (describing the so-called "dualfiduciary problem"); *Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983)* ("There is no 'safe harbor' for such divided loyalties in Delaware.").

[169] *See Chester Cty., 2016 Del. Ch. LEXIS 153, 2016 WL 5865004, at *9* ("When a director of a corporation owes fiduciary duties as a director or officer of another corporation, the director is conflicted for purposes of the first prong of *Aronson*. . . ."); *Kahn v. Portnoy, 2008 Del. Ch. LEXIS 184, 2008 WL 5197164, at *7 (Del. Ch. Dec. 11, 2008)* ("Portnoy, as a director of HPT and TA, is therefore bound to act in the best interest of both companies. Thus, when Portnoy acted on behalf of TA in approving the transaction, his loyalties as an HPT director raise at least a reasonable doubt as to whether he was acting in the best interest of TA.").

[170] Compl. ¶¶ 53-54. The Complaint alleges that "[t]he Edens family has donated between $100,000 and $1,000,000 to PIH every fiscal year from 2008-2012 and in 2015." Compl. ¶ 54.

[171] Compl. ¶¶ 55-58. Van der Hoof Holstein's direct supervisor is Dr. Paul Farmer, the founder of PIH. Compl. ¶ 56. The recognition in a Van der Hoof Holstein-edited book was with respect to Edens' connection to GHDP. Compl. ¶ 58. "GHDP is a partnership between [the Department of Global Health and Social Medicine] and PIH that trains healthcare professionals

to deliver medical care to destitute populations worldwide." Compl. ¶ 57. Van der Hoof Holstein is not listed as an employee on the GHDP website (Dr. Farmer is) but her connection to and position as Associate Director of GHDP does not appear to be contested. *See* Klein Aff. Ex. 4 (2015 Proxy Statement), at 8. The Complaint further supports the claim of strong ties by reference to a comment that Chelsea Clinton in 2015 acknowledging that the "Edens'[] extraordinary support for PIH's work in Haiti, include[ed] traveling to Haiti with Dr. Paul Farmer (PIH's founder and [Van der] Hoof Holstein's boss) and Clinton." Compl. ¶ 56.

[172] Compl. ¶ 59.

[173] Compl. ¶ 59. "According to PIH's publicly available Form 990 tax returns, Hoof Holstein earned $72,500 from PIH in 2013, $106,002 from PIH in 2014, and $149,855 from PIH in 2015, for working 60 hours a week. Hoof Holstein therefore receives at least half of her income from her New Senior Board service. It is also reasonable to infer that Hoof Holstein receives similar compensation from A&K Global Health, which means that the vast majority of her compensation comes through her service on Fortress-affiliated boards with Edens." *Id.*

[174] *2011 Del. Ch. LEXIS 151, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011).*

[175] *In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808 (Del. Ch. 2005).*

member of the company's board was **[*33]** also the chair of a $100 million renovation campaign for a charitable organization and a trustee of the University of Chicago where part of his responsibilities also included raising money.[176] The plaintiffs alleged that the company made contributions to the renovation campaign as well as to the university.[177] The court determined that the allegations failed to raise a reasonable doubt regarding the director's independence when

> nothing more can be inferred from the complaint than the facts that the Goldman Foundation made donations to a charity that Bryan served as trustee, that part of Bryan's role as a trustee was to raise money, and that Goldman made donations to another charity where Bryan chaired a renovation campaign. The Plaintiffs do not allege that Bryan received a salary for either of his philanthropic roles, that the donations made by the Goldman Foundation or Goldman were the result of active solicitation by Bryan, or that Bryan had other substantial dealings with Goldman or the Goldman Foundation. The Plaintiffs do not provide the ratios of the amounts donated by Goldman, or the Goldman Foundation, to overall donations, or any other information demonstrating that the amount would **[*34]** be material to the charity. Crucially, the Plaintiffs fail to provide any information on how the amounts given influenced Bryan's decision-making process.[178]

In *J.P. Morgan*, the court found the allegations of conflict similarly lacking. The plaintiff there challenged several directors' independence

based on the defendant company's donations to two organizations (the American Natural History Museum and the United Negro College Fund) at which the directors held various positions, including president, trustee and CEO.[179] The court found that the complaint lacked any indication that the contributions to the respective non-profits were of import to the directors or how the donations would affect the directors' decision making.[180]

For his part, Plaintiff cites to *In re Oracle*[181] and *Delaware County Employees Retirement Fund v. Sanchez*.[182] In *Oracle*, then-Vice Chancellor Strine analyzed the independence of a two-person special litigation committee that had moved to dismiss a derivative action.[183] The committee members were both tenured professors at Stanford who were tasked with investigating claims of insider trading against other directors on the company's board. The court found the following ties to exist **[*35]** between the targets of the committee's investigation and Stanford: one director was also a professor at Stanford who had taught one of the committee members; another was a Stanford alumnus who had directed millions of dollars of donations over the years to Stanford; and the third was the company's CEO who donated millions of dollars to Stanford through a personal foundation.[184] The court concluded

---

[176] *2011 Del. Ch. LEXIS 151, 2011 WL 4826104, at \*8*.

[177] *Id.*

[178] *2011 Del. Ch. LEXIS 151, [WL] at \*9*.

---

[179] *906 A.2d at 814-15*.

[180] *Id. at 822-23*.

[181] *824 A.2d 917 (Del. Ch. 2003)*.

[182] **124 A.3d 1017, 1022 (Del. 2015)** (finding a pleading sufficient to raise a reasonable doubt as to director independence when the pled facts alleged that the director had been friends with the interested director for over fifty years and that friendship had resulted in economic advantages (including full-time employment) for the director).

[183] *824 A.2d 917*.

[184] *Id. at 920-21*.

that "the ties among the [committee], the Trading Defendants, and Stanford are so substantial that they cause reasonable doubt about the [committee]'s ability to impartially consider whether the Trading Defendants should face suit."[185] _HN7_[⬆] The court reached this conclusion by applying a "contextual approach," explaining:

> Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. Homo sapiens is not merely homo economicus. We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among [*36] us who direct their behavior as best they can on a guiding creed or set of moral values.
> Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation.[186]

In my view, _Oracle_ is the more fitting and persuasive authority here. Plaintiff has pled that Van der Hoof Holstein is employed by, and has a leadership role in, a relief organization that clearly derives substantial support, both financial and devotional, from the Edens family through considerable donations, aide in relief efforts and service on its board. Plaintiff's failure to quantify precisely the

contributions made by the Edens family, as argued by Defendants, does not undercut the particularized pleading that their support is significant to PIH, Van der Hoof Holstein's main employer, and to Van der Hoof Holstein.[187] The fact that Plaintiff does not allege that Van der Hoof Holstein actually solicited the donations or the other support provided by the Edens family to PIH does not dilute [*37] their relevance to the "independence" analysis.[188] When the Edens family's ties to PIH are coupled with the substantial and clearly material director fees Van der Hoof Holstein receives from service on boards at the behest of Edens, I am satisfied that these allegations raise reasons to doubt Van der Hoof Holstein's independence from Edens.

With that conclusion, I have determined that a majority of the seven directors that would have considered a demand from Plaintiff are in some way conflicted. Thus, I could stop the _Aronson_ analysis here. For the sake of completeness, however, I will address the independence of both Colbert and McFarland as well.

---

[185] _Id. at 942_.

[186] _Id. at 938_.

[187] Defs.' Opening Br. 27-28 ("Plaintiff has failed to allege how donations amounting to less than 1% of PIH's annual revenue would affect the decision-making of Ms. van der Hoof Holstein.").

[188] Defs.' Opening Br. 24, 28 ("Plaintiff has not alleged that Ms. van der Hoof Holstein's role at PIH had anything to do with fundraising, let alone that she personally solicited the Edens family donations."). _See In re Limited, Inc., 2002 Del. Ch. LEXIS 28, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002)_ ("The Court in ascertaining the sufficiency of a complaint challenging a director's loyalty does not apply an objective reasonable director standard; instead, the Court must apply a subjective actual person test to determine whether a particular director lacks independence because he is controlled by another.") (internal quotation omitted); _McMullin v. Beran, 765 A.2d 910, 923 (Del. 2000)_ ("In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances.").

## 6. Colbert

The thrust of Plaintiff's allegations with respect to Colbert is that there is reason to doubt his independence from Edens after Edens invited Colbert to join the Milwaukee Bucks ownership group, a unique, prestigious and lucrative opportunity available, by NBA rule, to no more than 750 people in the world.[189] In return for this invitation, Colbert, through Partners for Community Impact, LLC, assisted Edens and the City of Milwaukee in their efforts to build a new arena in downtown Milwaukee.[190] This connection, according to Plaintiff, **[*38]** creates such "a special and highly unusual financial and social relationship because of the prestige associated with an ownership stake" that Colbert could not be expected to act against Edens' interests, especially given that Colbert joined Edens' Bucks ownership group around the same time he joined the New Senior Board.[191]

Plaintiff likens the Bucks ownership connection between Edens and Colbert to the unique relationship at issue in *Sandys v. Pincus*.[192] In *Pincus*, our Supreme Court found that a derivative plaintiff had raised a reasonable doubt regarding a director's independence by pleading that the interested director's family and the family of the challenged director owned a private plane together.[193] The Court based its finding on the fact that "[c]o-ownership of a private plane involves a partnership in a personal asset that is not only expensive, but also requires close cooperation in use, which is suggestive of detailed planning indicative of a continuing, close personal friendship."[194] Such close relationships, the Court explained, would be expected "to heavily influence a human's ability to exercise impartial judgment."[195]

Defendants argue that the relationship Plaintiff has proffered **[*39]** here is nothing like the one presented in *Pincus*. Colbert is a co-owner of a sports team with Edens, along with several others. According to Defendants, this business relationship does not evidence the kind of close friendship or personal relationship that can reasonably be inferred when individuals own a private plane together.

I agree with Defendants that the relationship dynamics are different. There is likely little or no planning required between Edens and Colbert to ensure that the Bucks continue to operate successfully as an NBA franchise.[196] But that does not mean the dynamics of joining together to own a professional sports team are

---

[189] Compl. ¶¶ 60-61. According to the Complaint, NBA rules limit team ownership groups to 25 individuals, each of whom must own at least 1% of the team. Compl. ¶ 60. Thus, it is alleged that it is unlikely that Colbert would have the opportunity to "become an owner of another team if Edens, as the team's dominant partner, decided to squeeze Colbert out of the [Bucks] ownership group." Pl.'s Answering Br. 38.

[190] Compl. ¶ 62.

[191] Compl. ¶ 61. The Complaint does not say much about the financial rewards Colbert has received or might expect to receive from his ownership interest in the Bucks. It only alleges that the "relationship is . . . lucrative" and that other investors have "reaped a 25-fold gain on [their] investment[s]." *Id.* The real thrust of the Complaint, and Plaintiff's futility argument, is that Edens invited Colbert to join an exclusive and highly rewarding "club" that Colbert likely would not have had access to but for Edens' generosity. Compl. ¶ 62.

[192] *152 A.3d 124 (Del. 2016)*.

[193] *Id. at 130*.

[194] *Id.*

[195] *Id.*

[196] *Id.* (emphasizing the planning and coordination required to own a private plane together). For example, I suspect that Colbert and Edens collectively have absolutely nothing to do with whether the "Greek freak" remains healthy, happy, productive and a major draw for Bucks fans. *See* http://www.espn.com/nba/player/_/id/3032977/giannis-antetokounmpo (a.k.a., the "Greek freak," number 34 in your bucks program).

any less revealing of a unique, close personal relationship. Edens invited Colbert to join him in a relatively small group of investors who would own a highly unique and personally rewarding asset. In return, Colbert assisted Edens in the effort to build a new arena for the team they now co-owned. I am satisfied that this relationship creates a reason to believe that Colbert "may feel . . . beholden to [Edens]."[197]

## 7. McFarland

As for the final director, McFarland, the Complaint alleges that he serves on the board of Drive Shack, where he was placed [*40] as a Fortress designee alongside Edens, and that he receives 60% of his publicly reported income from his service on Fortress-affiliated boards.[198] The Complaint further characterizes as "telling" the fact that McFarland lists his address for purposes of investment activities as "C/O Fortress Investment Group."[199]

Plaintiff's allegations concerning McFarland's lack of independence are more scant than those pled regarding the other directors. As I review these allegations, I am reminded that, in *Sanchez*, our Supreme Court observed that HN8[⬆] "[d]etermining whether a plaintiff has pled facts supporting an inference that a director cannot act independently of an interested director for purposes of demand excusal . . . can be difficult."[200] While a close call, I am satisfied that there is reason to doubt McFarland's independence. In so finding, I acknowledge that our law is settled that

service on another board alongside the interested director, alone, is insufficient to raise a reasonable doubt as to a director's independence,[201] especially when the interested director does not control either company.[202] But there is more pled here.

McFarland is a director of New Senior and Drive Shack, both of [*41] which are managed by Fortress. He was placed on these boards by Fortress and serves on both of them alongside Edens. Based on public filings, McFarland receives 60% of his publicly reported income from Fortress-managed companies.[203] And he lists his address on SEC Form 4s (for investments unrelated to Fortress) as "C/O Fortress." Weighing the totality of these facts, there is reason to doubt whether McFarland's material ties with Fortress and Edens would affect his ability independently to evaluate a demand to bring claims against them.[204]

---

[197] *Pincus, 152 A.3d at 128*.

[198] Compl. ¶ 63. "Fortress and Edens, with and through their affiliates, own approximately 8% of Drive Shack's outstanding stock, and Fortress is the manager of Drive Shack." *Id.*

[199] Compl. ¶ 63.

[200] *Sanchez, 124 A.3d at 1019*.

[201] *See, e.g., Highland Legacy Ltd. v. Singer, 2006 Del. Ch. LEXIS 55, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006)* (finding that allegations of service on the boards of different companies alongside one another only provides a "naked assertion of a previous business relationship [that] is not enough to overcome the presumption of a director's independence").

[202] Compl. ¶ 63.

[203] Compl. ¶ 63.

[204] *See, e.g., Portnoy, 2008 Del. Ch. LEXIS 184, 2008 WL 5197164, at *8* ("The complaint alleges similar facts with respect to Gilmore and Donelan. Gilmore is a director of TA and FVE. For 2007, she was paid $89,480 in fees as a director of TA and $70,940 in fees as a director of FVE, compensation the complaint alleges is material to Gilmore because it exceeds the compensation from her position as a clerk in the United States Bankruptcy Court. Gilmore also worked at Sullivan & Worcester LLP from 1993 to 2000, during part of which time Portnoy was a partner and chairman of the firm. Donelan is a director of TA and a trustee of HRPT and the ILC. In 2007, Donelan was paid $88,980 in fees as a director of TA and $73,600 in fees as a trustee of HRPT."); *In re Ply Gem Indus., Inc. S'holders Litig., 2001 Del. Ch. LEXIS 123, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001)* ("past benefits conferred . . . may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's

* * * *

Plaintiff has pled sufficient facts to raise a reasonable doubt regarding the disinterestedness and independence of the majority of the New Senior Board such that demand would have been futile under the first prong of *Aronson*. I need not and decline to address *Aronson*'s second prong.[205] The motion to dismiss under *Court of Chancery Rule 23.1* is denied.

## B. Plaintiff Has Stated Viable Claims Against the Board and Givens as Officer

**HN9[↑]** *Rule 12(b)(6)* imposes a "less stringent" pleading standard than *Rule 23.1*.[206] "Thus, a complaint that survives a motion to dismiss pursuant to *Rule 23.1* also will survive a *12(b)(6)* motion to dismiss, 'assuming that it otherwise contains sufficient facts to state a [*42] cognizable claim.'"[207] **HN10[↑]** "The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible

of proof."[208]

Plaintiff's claims sound in breach of fiduciary duties. As this court explained in *Frederick Hsu*:

> **HN11[↑]** when determining whether directors breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.[209]

With this distinction in mind, a logical approach to analyzing the breach of fiduciary duty claims is to "work[] through the standard of conduct, apply[] [*43] a standard of review, and then determin[e] whether the defendants have properly invoked any immunities or defenses, such as exculpation."[210] I follow that approach here.

### 1. The Standard of Conduct

**HN12[↑]** "In performing their duties the directors [of Delaware corporations] owe fundamental fiduciary duties of care and loyalty."[211] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or

---

loyalty to a corporation may be premised").

[205] *See Cambridge, 2014 Del. Ch. LEXIS 107, 2014 WL 2930869, at *6* (finding demand futility under the first prong of *Aronson* and, therefore, declining to consider the second prong); *TVI Corp. v. Gallagher, 2013 Del. Ch. LEXIS 260, 2013 WL 5809271, at *10 (Del. Ch. Oct. 28, 2013)* (same); *Limited, 2002 Del. Ch. LEXIS 28, 2002 WL 537692, at *7* (same).

[206] *TVI Corp., 2013 Del. Ch. LEXIS 260, 2013 WL 5809271, at *12*.

[207] *Id.*

---

[208] *Savor, Inc. v. FMR Corp., 812 A.2d 894, 896-97 (Del. 2002)*.

[209] *Frederick Hsu Living Tr. v. ODN Hldg. Corp., 2017 Del. Ch. LEXIS 67, 2017 WL 1437308, at *15 (Del. Ch. Apr. 24, 2017)*.

[210] *Id.*

[211] *Polk v. Good, 507 A.2d 531, 536 (Del. 1986)*.

controlling shareholder and not shared by the stockholders generally."[212] Thus, "Delaware law is clear that the board of directors of a for-profit corporation . . . must, within the limits of its legal discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."[213]

Plaintiff has alleged that the Board defendants caused New Senior to pay more than was reasonable for the Holiday Portfolio to advance the interests of Fortress and Edens at the expense of New Senior and its stockholders.[214] Accepted as true, these allegations **[\*44]** describe the kind of self-dealing transaction that gives rise to a classic breach of the duty of loyalty claim.[215]

## 2. The Standard of Review

---

[212] Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993). Plaintiff alleges that the Board defendants breached both their duty of care and duty of loyalty. I focus on the duty of loyalty allegations, however, because, as discussed below, Defendants have invoked a Section 102(b)(7) defense that would exculpate them from liability for breaches of the duty of care.

[213] Leo E. Strine, Jr., A Job Is Not a Hobby: The Judicial Revival of Corporate Paternalism and Its Problematic Implications, 41 J. Corp. L. 71, 107 (2015).

[214] Compl. ¶¶ 4-10, 109, 111, 128, 150.

[215] See, e.g., Chen, 87 A.3d at 671 ("Delaware cases recognize that liquidity is one benefit that may lead directors to breach their fiduciary duties, and stockholder directors may be found to have breached their duty of loyalty if a desire to gain liquidity caused them to manipulate the sale process and subordinate the best interests of the corporation and the stockholders as a whole.") (internal quotation omitted); Rales v. Blasband, 634 A.2d 927, 935 (Del. 1993) (explaining that allegations that the company's board decided to buy "junk bonds" for the sole benefit of two directors "who were acting in furtherance of their business relationship" with the company issuing the bonds would, if proven true, constitute a breach of the duty of loyalty); Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618, 659 (Del. Ch. 2013) (finding a breach of the duty of loyalty alleged where directors had participated in financing rounds at favorable terms explaining that "each

As is often the case at the pleadings stage, much ink has been spilled by the parties to express their competing views regarding the applicable standard of review.[216] Plaintiff argues that his claims implicate entire fairness review because the Challenged Transactions were interested transactions. Accordingly, given the heightened scrutiny with which the Court must review his claims, he maintains that the Court cannot adjudicate them on a motion to dismiss under Rule 12(b)(6).[217]

Not surprisingly, Defendants argue that the Court should review Plaintiff's claims under the business judgment rule. They maintain that the Complaint, at best, pleads facts that would allow a reasonable inference that only Edens, Givens and perhaps Malone were interested in the Challenged Transactions. Thus, because a majority of the Transaction Committee was disinterested, the Challenged Transactions fit within the safe harbor codified in 8 Del. C. § 144(a)(1) and, therefore, the business judgment rule applies. Moreover, they maintain that, even without the safe harbor, "[t]o invoke entire fairness **[\*45]** [at the pleading stage], in the absence of a controlling shareholder, Plaintiff would need to allege that a majority of the board was interested in the [Challenged Transactions] or beholden to an interested party."[218] Since the Complaint pleads neither factual predicate (majority interest or lack of independence) for entire fairness review, the business judgment presumption must apply. I disagree on both counts.

---

financing challenged in the complaint was a self-interested transaction implicating the duty of loyalty and raising an inference of expropriation").

[216] See Larkin v. Shah, 2016 Del. Ch. LEXIS 134, 2016 WL 4485447, at *7 (Del. Ch. Aug. 25, 2016) (characterizing the determination of the appropriate standard of review as the "gating question").

[217] Pl.'s Answering Br. 62.

[218] Defs.' Opening Br. 43 (citing Orman, 794 A.2d at 23) (emphasis in the original).

## a. *Section 144*

Defendants' *Section 144(a)(1)* argument catenates along the following analytical tree: (i) under Supreme Court precedent, approval by a majority of disinterested directors under *Section 144(a)(1)* triggers review under the business judgment rule; (ii) for purposes of applying the safe harbor of *Section 144(a)(1)*, the Court should consider only whether directors are interested in the transaction, and should not be concerned with whether the majority of the board is also independent; and (iii) since Plaintiff has only challenged three directors on grounds they were interested in the Challenged Transactions, the majority of the Board met the requirements of *Section 144(a)(1)* and their decisions must, therefore, be protected as valid business judgments.[219] In support of this argument, Defendants rely principally upon *Benihana of Tokyo, Inc. v. Benihana, [*46] Inc.*, decided by our Supreme Court in 2006.[220] There, applying *Section 144(a)(1)*, the Court stated "[a]fter approval by disinterested directors, courts review the interested transaction under the business judgment rule . . . ."[221]

Our case law interpreting *Section 144(a)(1)* is murky at best. A search of one's favorite legal research site would yield cases that appear to support the view that *Section 144(a)(1)*'s safe harbor works as Defendants suggest.[222] That same search, however, would yield several cases, even post-*Benihana II*, where our courts have viewed *Section 144(a)(1)* much more narrowly.[223]

---

finally settled, *see, e.g.,* *Benihana II, 906 A.2d at 120* (stating that interested director transactions approved pursuant to the *144(a)(1)* safe harbor are reviewed under the business judgment rule), it was frequently suggested that *Section 144* . . . did no more than to remove a director's disability to participate in a quorum to vote on an interested transaction, but did nothing to sanitize such a transaction if it was inherently unfair."); *Oberly v. Kirby, 592 A.2d 445, 466 (Del. 1991)* ("The enactment of *8 Del. C. § 144* in 1967 limited the stockholders' power in two ways. First, *section 144* allows a committee of disinterested directors to approve a transaction and bring it within the scope of the business judgment rule. Second, where an independent committee is not available, the stockholders may either ratify the transaction or challenge its fairness in a judicial forum, but they lack the power automatically to nullify it. When a challenge to fairness is raised, the directors carry the burden of establishing the transaction's entire fairness, sufficient to pass the test of careful scrutiny by the courts.").

[223] *See* *Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 185 (Del. Ch. 2005)* ("*Benihana I*"), aff'd, *906 A.2d 114 (Del. 2006)* ("While I find that the Benihana Board's approval of the BFC financing meets the requirements of *8 Del. C. § 144(a)(1)*, that section merely protects against invalidation of a transaction "solely" because it is an interested one. . . . Because BOT also contends that the Director Defendants breached their fiduciary duties of loyalty and care, my analysis does not end with the "safe harbor" provisions of *§ 144(a)*."); *Khanna v. McMinn, 2006 Del. Ch. LEXIS 86, 2006 WL 1388744, at *25 n.201 (Del. Ch. May 9, 2006)* (same); *Cinerama, 663 A.2d at 1169* (same); *Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 745 (Del. Ch. 2007)* ("Before the 1967 enactment of *8 Del. C. § 144*, a corporation's stockholders had the right to nullify an interested transaction. To ameliorate this potentially harsh result, *section 144* as presently enacted provides three safe harbors to prevent nullification of potentially beneficial transactions simply because of director self-interest. First, *section 144* allows a committee of disinterested directors to approve a transaction and, at least potentially, bring it within the scope of the business judgment rule."); *Zimmerman v. Crothall, 2012 Del. Ch. LEXIS 64, 2012 WL 707238, at *18 (Del. Ch. Mar. 5, 2012)* ("As the Delaware Supreme Court observed in *Fliegler v. Lawrence*, *§ 144* 'merely removes an interested director cloud when its terms are met and provides against invalidation of an agreement solely because such a director . . . is involved.' That is, the statute only addresses the void or voidable issue presented by the common law before the 1967 amendments to the Delaware General Corporation Law. Thus, it does not appear that either *8 Del. C. § 144* or § 6.13 of the Operating

---

[219] Defs.' Opening Br. 51 ("[R]egardless of whether any of the four directors who approved the Acquisition were not independent, they are disinterested in the Acquisition, and the Amended Complaint should be dismissed.").

[220] *Benihana of Tokyo, Inc. v. Benihana, Inc., 906 A.2d 114 (Del. 2006)* ("*Benihana II*").

[221] *Id. at 120*.

[222] *See, e.g.,* *Sutherland v. Sutherland, 2009 Del. Ch. LEXIS 46, 2009 WL 857468, at *4 n.13 (Del. Ch. Mar. 23, 2009)* ("Notably, before the law related to *Section 144 of the DGCL*

To put *Benihana II* in context, it is useful to review the decision of this court in *Benihana I* that was affirmed. In clarifying the interaction between *Section 144(a)(1)* and the common law business judgment rule, this court explained:

> **HN13**[↑] Satisfying the requirements of *§ 144* only means that the BFC Transaction is not void or voidable solely because of the conflict of interest.
>
> While non-compliance with *§§ 144(a)(1), (2)*'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of *§§ 144(a)(1)* or *(a)(2)* alone does not always have the opposite effect of invoking business judgment rule review. Rather, **[*47]** satisfaction of *§§ 144(a)(1)* or *(a)(2)* simply protects against invalidation of the transaction "solely" because it is an interested one. As such, *§ 144* is best seen as establishing a floor for board conduct but not a ceiling. Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.

After determining that the defendant board members had guided the interested transaction into *Section 144(a)(1)*'s safe harbor, and that the transaction, therefore, would not be voided, Vice Chancellor Parsons proceeded to address the plaintiff's allegations that the directors breached their fiduciary duties by applying common law standards. He ultimately concluded that none of the directors had breached their duty of loyalty because the

majority of the directors that approved the transaction were disinterested *and* independent and the Board did not enter into the transaction for an improper purpose.[224]

Several commentators and judges, post-*Benihana II*, have similarly articulated the difference between the oft-confused *Section 144(a)* safe harbors and the common law our courts apply to determine the appropriate standard of review by which to adjudicate a challenge to an interested **[*48]** transaction. A particularly cogent expression of the distinction (and the confusion) can be found in *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, where the authors explain:

> **HN14**[↑] *section 144(a)(1)* provides that a covered transaction will not be void or voidable solely as a result of the offending interest if it is approved by an informed majority of the disinterested directors, even though the disinterested directors be less than a quorum. Under the *section 144* statutory analysis, so long as there is one informed, disinterested director on the board, and so long as he or she approves the transaction in good faith, the transaction will not be presumptively voidable due to the offending interest. In other words, a nine-member board with a single disinterested director may approve a covered transaction and reap the benefits of the *section 144* safe harbor.
>
> Under the common law, however, the factor is somewhat different; approval must be by a disinterested majority of the entire board. That is, a plaintiff may rebut the presumption of the business judgment rule by showing that a majority of the individual directors were interested or beholden. In the common-law analysis, therefore, a transaction approved by the nine-

---

Agreement, which is based on *§ 144*, was intended to address the common law rules for liability for breach of fiduciary duty. Therefore, even if Defendants have complied with § 6.13, that would not operate as a safe harbor against review of the challenged transactions under the entire fairness standard.") (internal citation omitted).

---

[224] *Benihana I, 891 A.2d at 191*.

member **[*49]** board discussed above (with the single disinterested director) will be subject to the entire-fairness standard. The standards are phrased similarly for the statutory and common-law analyses, but they are in fact quite different.[225]

Based on the plain language of the statute,[226] and my reading of the persuasive authority on the subject, I am satisfied that _HN15_[⬆️] compliance with _Section 144(a)(1)_ does not _necessarily_ invoke business judgment review of an interested transaction. The Court must still adhere to settled common law principles when fixing the appropriate standard of review by which fiduciary conduct should be measured.[227]

**b. The Majority of the Board Was Interested In the Challenged Transactions or Not Independent**

In _Orman v. Cullman_, Chancellor Chandler succinctly laid out the pathway to overcoming the business judgment presumption at the pleading stage by alleging that the Board acted out of self-interest or with allegiance to interests other than the stockholders':

> _HN16_[⬆️] As a general matter, the business judgment rule presumption that a board

---

equitable review if its provisions obviating a statutory fairness burden were met is controversial. . . . To date, the Delaware courts have generally read the statute more narrowly, while drawing on it in crafting rulings in equity.") (citing _In re Cox Commc'ns, Inc. S'holders Litig., 879 A.2d 604, 614-15 (Del. Ch. 2005))_; _Zimmerman, 2012 Del. Ch. LEXIS 64, 2012 WL 70723, at *18_; _Valeant, 921 A.2d at 745_.

[226] _8 Del. C. § 144_:

> (a) **No contract or transaction** between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, **shall be void or voidable solely for this reason**, or solely because the director or officer is **[*50]** present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if. . . .

(emphasis supplied).

[227] _Benihana I, 891 A.2d at 191_ ("No safe-harbor exists for divided loyalties in Delaware."). I acknowledge that some read our case law as holding that compliance with _Section 144_ safe harbors justifies a burden-shift in the entire fairness analysis. While I cannot say that I share that view of our law, I need not weigh in on that issue at this stage of the proceedings. _See_ Edward P. Welch, Robert S. Saunders, Allison L. Land & Jennifer C. Voss, _Folk on the Delaware General Corporation Law_, § 144.02 (6th ed. 2018) (citing _Cooke v. Oolie, 1997 Del. Ch. LEXIS 92, 1997 WL 367034, at *9 (Del. Ch. June 23, 1997)_ ("It is now clear that even if a board's action falls within the safe harbor of _Section 144_, the board is not entitled to receive the protection of the business judgment rule. Compliance with _Section 144_ merely shifts the burden to the plaintiffs to demonstrate that the transaction was unfair.")).

---

[225] Blake Rohrbacher, John Mark Zeberkiewicz & Thomas A. Uebler, _Finding Safe Harbor: Clarifying the Limited Application of Section, 144, 33 Del. J. Corp. L. 719, 737-38 (2008)_. _See also_ R. Franklin Balotti & Jesse A. Finkelstein, _The Delaware Law of Corporations and Business Organizations_, § 4.16 (3d ed. 2018) ("Apart from the statutory safe-harbor analysis, the courts also scrutinize interested-director transactions under a common-law fiduciary review. This fiduciary review involves factors similar—though not quite identical—to those under _Section 144_. That is, approval by a disinterested majority of the board or disinterested stockholders may revive the presumptions of the business judgment rule. Otherwise, the courts will use the entire-fairness standard to scrutinize the transaction."); Leo E. Strine, Jr., Lawrence A. Hamermesh, R. Franklin Balotti & Jeffrey M. Gorris, _Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law_, 98 Geo. J.L. 629, 656-57 & n.85 (2010) ("The question of whether _section 144_ was intended to create a safe harbor from

acted loyally can be rebutted by alleging facts which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders. To establish that a board was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the individual members of that board. To rebut successfully business judgment **[*51]** presumptions in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.[228]

"If a director-by-director analysis leaves insufficient [independent] directors to make up a board majority, then the court will review the board's decision for entire fairness."[229]

As noted, the Complaint alleges that a majority of the New Senior directors approved the self-dealing Acquisition at an excessive price, allowed New Senior to issue stock to finance the Acquisition at an unreasonable discount, declined to exercise their independent judgment when making those decisions and let Givens (and Edens), who stood on both sides of the deal, control the negotiation and sale process.[230] According to Plaintiff, these pled facts make "[t]his [an] entire fairness case."[231] I

agree.

Following Edens' and Givens' abstention from the vote, the Acquisition was approved by the Board members who served on the Transaction Committee—Malone, Van der Hoof Holstein, Colbert and McFarland. Since the test for **[*52]** director interest and independence is generally the same for purposes of this analysis as the test under the first prong of *Aronson*,[232] for the same reasons I determined those directors were interested or not independent under *Aronson*, I find that Plaintiff has well-pled that each of those directors was interested or not independent with respect to the Challenged Transactions.[233]

Additionally, the Complaint alleges that Edens and Givens were the sole members of the Pricing Committee, setting the terms of the Secondary Offering under which they both

---

[228] *Orman, 794 A.2d at 22-23* (later explaining that interest can also be shown by a director standing on both sides of a transaction).

[229] *Frederick Hsu, 2017 Del. Ch. LEXIS 67, 2017 WL 1437308, at *26*.

[230] Compl. ¶ 150.

[231] Pl.'s Answering Br. 1.

---

[232] *TVI Corp., 2013 Del. Ch. LEXIS 260, 2013 WL 5809271, at *14*. I note, for the sake of clarity, that **HN17[↑]** finding a director is either interested or not independent under the first prong of *Aronson* will not always translate to a finding of interest or lack of independence in the fiduciary duty analysis. Under the first prong of *Aronson*, the focus is on whether the director's interest or conflict creates a reasonable doubt that the director could objectively consider a demand. In the fiduciary duty context, the focus is on whether the director's interest or conflict caused the director to do or not do something that has harmed the corporation. While the inquiries are different, and do not necessarily overlap, they lead to the same answer here, at least as alleged in the Complaint. See *2013 Del. Ch. LEXIS 260, [WL] at *12*.

[233] See also *Limited, 2002 Del. Ch. LEXIS 28, 2002 WL 537692, at *7* ("For the reasons set forth [in the *Rule 23.1* analysis], I am satisfied that the Complaint states a claim for breach of the duty of loyalty. The challenged transactions were approved by a unanimous board of twelve; six of those directors were either interested or subject to disqualifying doubts about their independence. As set forth below, the challenged transactions, while perhaps not constituting corporate waste, appear unfair to the stockholders. Thus, because the challenged transactions were not approved by a majority of independent and disinterested directors, the Complaint states a loyalty claim that survives a challenge under *Court of Chancery Rule 12(b)(6)*.").

(along with FIG) received share options. The Complaint also alleges that Givens, who works for Fortress, negotiated the Holiday Management Agreement with her employer's affiliate. Those allegations are sufficient to raise a reasonable inference that Edens and Givens were interested in the Challenged Transactions. Because the Complaint adequately pleads that no independent and disinterested Board majority approved the Transactions, the standard of review, for now, is entire fairness.

I note that *HN18*[⬆] "[t]he applicability of the entire fairness standard 'normally will preclude a dismissal of a complaint on a *Rule 12(b)(6)* motion to dismiss.'" **[*53]** [234] Nevertheless, I review briefly the pled facts and find that the Complaint adequately alleges that the Challenged Transactions were not entirely fair.

Entire fairness review asks whether the transaction (i) was the product of "fair dealing," and (ii) reflected a "fair price."[235] I address both elements, albeit in reverse order. As for unfair price, Plaintiff argues that unfair price is revealed by the following pled facts: (i) the market reacted poorly to the Acquisition ("New Senior's stock price plummeted")[236]; (ii) only New Senior submitted a final bid for the Holiday Portfolio[237]; (iii) Givens failed to leverage the fact that New Senior was the only serious bidder and justified her adjustment to the initial bid by drawing a comparison to a transaction that was very different from the Acquisition involving a company that elected not to bid for the Holiday Portfolio[238]; (iv) Givens and the Transaction Committee allowed New Senior to enter into a no-bid management agreement with Holiday at above-market rates[239]; (v) Edens and Givens caused the Board to approve a Secondary Offering that generated substantial fees for Fortress[240]; and (vi) the Secondary Offering was at a grossly discounted price that benefited **[*54]** Fortress, Givens and Edens but harmed New Senior by causing a sudden loss in market capitalization amounting to approximately $100 million.[241] These facts more than adequately allow for a reasonable inference of unfair price.

*HN19*[⬆] ] Allegations revealing unfair dealing should focus on "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[242] With these elements clearly in mind, Plaintiff alleges the following facts that allow a reasonable inference of an unfair process: (i) Fortress, Edens, and Givens stood on both sides of the deal, and then initiated, structured, and negotiated each element of the Challenged Transactions[243]; (ii) the Transaction Committee was flawed in its composition, led by a Chairman who sat on the board of the primary

---

[234] *In re Riverstone Nat'l, Inc. Stockholder Litig., 2016 Del. Ch. LEXIS 111, 2016 WL 4045411, at *15 (Del. Ch. July 28, 2016)* ("Once a plaintiff rebuts the business judgment rule, the burden shifts to the defendant to establish that the [transaction] was the product of both fair dealing and fair price.").

[235] *Kahn v. Lynch Commun. Sys., Inc., 638 A.2d 1110, 1115 (Del. 1994)* (internal citations omitted).

[236] Pl.'s Answering Br. 53. *See also* Compl. ¶¶ 18, 124, 126.

[237] Compl. ¶ 83.

[238] Compl. ¶¶ 83-85, Klein Aff. Ex. 11 (June 1, 2015 Committee Minutes), at SNR00000241 ("Ms. Givens explained that the reduced purchase price was derived by applying the capitalization rate implied by the purchase price for the last portfolio marketed by Holiday and sold to Northstar, which was 6.1%.").

[239] Compl. ¶¶ 95-96.

[240] Compl. ¶¶ 104, 109-113.

[241] Compl. ¶¶ 102, 110-111, 115, 121-122.

[242] *Lynch, 638 A.2d at 1115*

[243] Compl. ¶¶ 73-74, 151.

lender for the transaction, and ineffective in its execution, *inter alia*, by allowing Givens to negotiate exclusively on behalf of New Senior "against" her employer (Fortress)[244]; (iii) the Transaction Committee allowed Givens to make her bids without direction from, or even consultation with, the Transaction Committee and without **[*55]** the benefit of advice from the Committee's financial advisor (Greenhill)[245]; (iv) Givens provided Greenhill with flawed data to use in its fairness opinion relating to the Acquisition[246]; (v) the Transaction Committee did not seek a fairness opinion with respect to the Secondary Offering or the Holiday Management Agreement[247]; (vi) even though there were no other bidders, the Transaction Committee allowed Givens to commit to an acquisition agreement with no financing contingency, thereby ensuring that the Company would have to go forward with the unfair Secondary Offering[248]; (vii) the Board allowed Givens and Edens alone to serve on the Pricing Committee even though they (and Fortress) stood to benefit personally from the offering (to the exclusion of other stockholders)[249]; and (viii) the Board approved the no-bid management agreement Givens offered to Holiday without even seeing the terms of Holiday's incentive compensation.[250] It can be reasonably inferred from these allegations that New Senior's directors engaged in an unfair process when negotiating and approving the Challenged Transactions.[251]

---

[244] Compl. ¶¶ 42, 82.

[245] Compl. ¶¶ 73, 77, 83, 86-87, 100-101.

[246] Compl. ¶¶ 89-94.

[247] Compl. ¶ 112.

[248] Compl. ¶ 102.

[249] Compl. ¶¶ 109, 111.

[250] Compl. ¶ 97.

[251] Defendants maintain that Edens and Givens cannot be held liable because they both abstained from the Board vote approving the Challenged Transactions. Defs.' Opening Br. 55.

## 3. The Exculpatory Charter Provision

Contrary to Plaintiff's assertion, **[*56]** the application of entire fairness review does not necessarily result in denial of the motion to dismiss with respect to *each* individual defendant.[252] New Senior's certificate of incorporation contains a *Section 102(b)(7)* exculpatory provision at Article Six, which exculpates New Senior's directors from liability to the fullest extent permitted by Delaware law.[253] Thus, *HN21*[⬆] only claims that, as a matter of law, cannot be exculpated by that provision can survive the motion to dismiss.[254]

*HN22*[⬆] Breaches of the duty of loyalty are

---

The argument ignores Givens' nearly exclusive role in negotiating the Challenged Transactions, Givens and Edens' role as sole members of the Pricing Committee and settled Delaware law that rejects the "Geronimo theory," which posits that a director can avoid liability by "extricating himself from decision-making about something he knows is going to be bad [by] pull[ing] the ripcord" and abstaining from the vote. *See Cambridge Ret. Sys. v. Decarlo*, C.A. No. 10879-CB, at 14 (Del. Ch. June 16, 2016) (TRANSCRIPT). *See also Gesoff v. IIC Indus., Inc., 902 A.2d 1130 (Del. Ch. 2006)* (*HN20*[⬆]) rejecting argument that abstaining from the vote shields a director from liability); *Valeant, 921 A.2d at 753* (same); *Frederick Hsu, 2017 Del. Ch. LEXIS 67, 2017 WL 1437308, at *38* (same).

[252] *In re Cornerstone Therapeutics Inc., Stockholder Litig., 115 A.3d 1173, 1179 (Del. 2015)* ("We now resolve the question presented by these cases by determining that plaintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory

not exculpated under Delaware law.[255] I have already addressed the alleged breaches of the duty of loyalty by Edens, Givens, Malone, Van der Hoof Holstein, Colbert and McFarland (and found them to be adequately pled). Accepting the well-pled facts of the Complaint as true, they each were in a conflicted state when they negotiated and approved the Challenged Transactions and, in that state, acted in a manner that advanced either their own interests or the interests of those to whom they were beholden at the expense of the Company.[256] These breach of loyalty claims cannot be extinguished at the pleading stage under _Section 102(b)(7)_.

In Count II, Plaintiff alleges that Givens is separately liable for breaches of her duty [*57] of care and duty of loyalty in her capacity as a New Senior officer.[257] While Plaintiff has alleged similar breaches of the duty of care against all directors (including Givens in her capacity as director) under Count I,[258] those

claims fall directly within the exculpatory charter provision so I will not address them further. The exculpatory provision, however, does not cover Givens in her capacity as officer.[259] Defendants acknowledge Givens' exposure but argue that the due care claim against her must be dismissed because the Complaint does not adequately differentiate between Givens' conduct as officer and her conduct as director. I disagree. Givens, as director, was not a member of the Transaction Committee and recused herself as director from Board level discussions and votes. Nevertheless, as officer, along with the remainder of her Fortress-based management team, she led all aspects of the negotiations and sale process, often without consulting or receiving direction from the Transaction Committee. Accordingly, Givens may be held liable for breaching her duties of care and loyalty to New Senior, to the extent such breaches are proven.[260]

## C. Plaintiff Has Stated a Viable Aiding

---

charter provision, or that director will be entitled to be dismissed from the suit. That rule applies regardless of the underlying standard of review for the transaction.").

[253] Klein Aff. Ex. 36 (Amended and Restated Certificate of Incorporation of New Senior Investment Group Inc.), at 8.

[254] _Cornerstone, 115 A.3d at 1180_ ("[T]he mere fact that a plaintiff is able to plead facts supporting the application of the entire fairness standard to the transaction, and can thus state a duty of loyalty claim against the interested fiduciaries, does not relieve the plaintiff of the responsibility to plead a non-exculpated claim against each director who moves for dismissal.").

[255] _Id. at 1179-80_ (_HN23_[⬆️]) "When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.").

[256] _Guth v. Loft, 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)_ (holding that _HN24_[⬆️]) "[c]orporate officers and directors are not permitted to use their positions of confidence to further

---

their private interests. . . . The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.").

[257] With respect to the duty of care, Plaintiff alleges, for instance, that Givens' projections with respect to the rise of the Holiday Portfolio's occupancy rate were "grossly negligent" and that Givens justified the size of New Senior's bid by reference to a capitalization rate that she knew was not comparable to the acquisitions under consideration. Pl.'s Answering Br. 44-46; Compl. ¶¶ 89-93.

[258] Pl.'s Answering Br. 42. _See, e.g._, Compl. ¶¶ 96-97 ("Therefore, the Board could not have been fully informed when it approved the Holiday Acquisition.").

[259] _Gantler v. Stephens, 965 A.2d 695, 709 (Del. 2009)_.

[260] _McPadden v. Sidhu, 964 A.2d 1262, 1275-76 (Del. Ch. 2008)_ ("Though an officer owes to the corporation identical fiduciary duties of care and loyalty as owed by directors, an officer does not benefit from the protections of a _Section 102(b)(7)_ exculpatory provision, which are only available to directors. Thus, so long as plaintiff has alleged a violation of care or loyalty, the complaint proceeds against [the officer].").

and [*58] Abetting Claim

Finally, at Count III, the Complaint alleges aiding and abetting breaches of fiduciary duty against Fortress, Holiday, FIG, FOE I and FIG Corp. HN25[↑] To state a claim of aiding and abetting, a complaint must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach.[261] The first two elements have been addressed in my findings above. Defendants do not attack the Complaint's causation allegations. Thus, as is often the case in aiding and abetting litigation, given the Court's finding that Plaintiff has pled breach claims, the focus turns to whether Plaintiff has adequately pled "knowing participation" by the alleged aiders and abettors.

An adequate pleading of "knowing participation" requires a pleading of scienter.[262] "To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind."[263] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim [*59] among the most difficult to prove."[264] Difficult, but not impossible.

Based on the well-pled facts in the Complaint, it is reasonably conceivable that all five of the alleged aiders and abettors knowingly participated in the directors' alleged breaches. HN26[↑] Under Delaware law, "the knowledge of an agent acquired while acting within the scope of his or her authority [and the acts of agents in that scope] [are] imputed to the principal."[265] In *In re Emerging Communications*,[266] applying this fundamental agency principle, the court held that two entities were "liable for having aided and abetted" an individual defendant where the entities were under the control of that defendant and "were the mechanisms through which" that defendant "accomplished" the challenged transaction.[267] This same type of scheme is alleged here—Givens and Edens are alleged to have facilitated the Challenged Transactions through the various Fortress subsidiaries named as aiders and abettors.[268] Under basic principles of agency, all of their knowledge is imputed to the Fortress entities they served as agents.[269]

Defendants lament that Plaintiff has failed to plead that any of the alleged aiders and abettors materially benefited [*60] from the Challenged Transactions.[270] Even if allegations of materiality were required to support an aiding and abetting claim, and Defendants cite no authority imposing that requirement, the Complaint goes to significant

---

[261] *Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)*.

[262] See *RBC Capital Mkts., LLC v. Jervis, 129 A.3d 816, 861-62 (Del. 2015)* (quoting *Malpiede, 780 A.2d at 1097*) ("As an example, this Court has said that 'a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.'").

[263] *Id. at 862* (internal quotation omitted).

[264] *Id.*

[265] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc., 2012 Del. Ch. LEXIS 287, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012)*.

[266] *In re Emerging Communs, Inc. Shareholders Litig., 2004 Del. Ch. LEXIS 70, 2004 WL 1305745 (Del. Ch. May 3, 2004)*.

[267] *2004 Del. Ch. LEXIS 70, [WL] at *38*.

[268] Compl. ¶¶ 6-8, 28-33, 62, 73-82.

[269] See *Metro. Life, 2012 Del. Ch. LEXIS 287, 2012 WL 6632681, at *19* (applying agency principals in aiding and abetting analysis); *Quadrant Structured Prods. Co., Ltd. v. Vertin, 102 A.3d 155, 204 (Del. Ch. 2014)* (same).

[270] Defs.' Opening Br. 59-60.

lengths to allege how the aiders and abettors benefitted (materially) from the Challenged Transactions.[271]

In their roles as director members of New Senior's Pricing Committee, Givens and Edens alone set the terms of the Secondary Offering while also being employed by and otherwise affiliated with FIG. FIG, in turn, receives substantial management fees from New Senior based on New Senior's gross equity.[272] The allegedly unfair Secondary Offering approved by Givens and Edens caused New Senior's gross equity to increase substantially with resulting increases in FIG's management fees.[273] Givens and Edens also caused New Senior to issue "approximately $100 million in additional equity that New Senior did not need for the [] Acquisition" and thereby increased FIG's fees even more.[274] And, of course, by pushing New Senior into the Secondary Offering, Givens and Edens saw to it that FIG would receive options to purchase over 2 million shares of New Senior stock (at the discounted [*61] price).[275] Given these well-pled facts, it is reasonably conceivable that FIG knowingly participated in, and benefited from, the individual directors' breaches of their duty of loyalty or care.[276]

The allegations are similarly compelling against Fortress. Plaintiff alleges that Fortress pushed the Acquisition in furtherance of a broader plan to shift its assets under management to publicly-traded companies that were externally managed by Fortress, such as New Senior, so it (through FIG) could charge higher management fees over longer periods of time.[277] He further alleges that FHIF, Fortress' private equity fund that is the majority owner of Holiday, pushed the Holiday sale to facilitate the "return of capital to its investors" in advance of its "maturity date of January 2017."[278] Those allegations, when coupled with the allegations that Givens ran the negotiations for New Senior and made bids for the Holiday Portfolio without any authorization from a Board comprised of members that were either interested in the Challenged Transactions or beholden to others who were, create a reasonably conceivable narrative that Fortress knowingly participated in the Board's and Givens' breaches.[279]

To evaluate [*62] the sufficiency of the aiding and abetting claims pled against FOE I, FIG Corp and Holiday, one first needs to appreciate the close relationships of these entities within the Fortress network.[280] FIG Corp. is the sole general partner of FOE I and, together with Edens and the remaining two Fortress-principals, it owns all of FOE I's

---

[271] See, e.g., Compl. ¶¶ 65-72, 118-121.

[272] Compl. ¶ 7.

[273] Compl. ¶ 118.

[274] Compl. ¶ 7.

[275] Compl. ¶ 8.

[276] Houseman v. Sagerman, 2014 Del. Ch. LEXIS 55, 2014 WL 1478511, at *8 (Del. Ch. Apr. 16, 2014) (holding that Section 102(b)(7) does not apply to aiding and abetting claims, and collecting cases).

---

[277] Compl. ¶ 9. Fortress has publically stated that it can generate between $375 million and $425 million of present market value for its shareholders from the fees it earns from managing $1 billion in a PCV. Compl. ¶ 118. As applied to the $266 million of invested capital generated by the Secondary Offering, Fortress can expect to generate between $99.75 million and $113.05 million in value, which is material to Fortress. Id.

[278] Compl. ¶ 4.

[279] The Complaint also alleges that Fortress stood to gain from Holiday retaining the property management of the Holiday Portfolio. Compl. ¶ 10. Defendants take issue with this allegation because the property management fees would go to Holiday not Fortress. Defs.' Opening Br. 60. While that is true, Plaintiff has sufficiently alleged the connections between Fortress and Holiday which lead to the reasonable inference that Fortress, the indirect owner of a majority of Holiday's equity, would benefit from additional revenues collected by Holiday.

[280] See appendix.

limited partnership interests. FOE I, in turn, is the sole managing partner and sole owner of FIG, which is a subsidiary of Fortress and manages the Fortress private equity funds that own a majority of the Holiday interests. With the allegations outlined above pertaining to FIG and Fortress, just as in *Emerging Communications*, I am satisfied, for now, that Plaintiff has adequately pled that all of these networked entities were vehicles that aided and abetted the directors, and Givens as officer, in their alleged breaches of fiduciary duty.[281]

## III. CONCLUSION

Based on the foregoing, Defendants' motion to dismiss is **DENIED**.

## IT IS SO ORDERED.



End of Document

---

[281] *Emerging, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *38* (finding aiding and abetting pled for two companies based on the allegations with respect to the person that controlled them).

# Tab K

 Positive

As of: December 16, 2019 3:59 PM Z

## *Nymex S'holder Litig. v. New York Mercantile Exch., Inc.*

Court of Chancery of Delaware, Kent

March 17, 2009, Submitted; September 30, 2009, Decided

C.A. No. 3621-VCN, C.A. No. 3835-VCN

### Reporter

2009 Del. Ch. LEXIS 176 *

IN RE NYMEX SHAREHOLDER LITIGATION; SHELBY GREENE, on behalf of herself and all others similarly situated, Plaintiff, v. NEW YORK MERCANTILE EXCHANGE, INC., NYMEX HOLDINGS, INC., RICHARD SCHAEFFER, THOMAS GORDON, JAMES NEWSOME, STEPHEN ARDIZZONE, A. GEORGE GERO, NEIL CITRONE, FRANK SICILIANO, WILLIAM FORD, HARVEY GRALLA, WILLIAM MAXWELL, HOWARD GABLER, DANIEL RAPPAPORT, DENNIS SUSKIND, MELVYN FALIS, ROBERT STEELE, JOHN McNAMARA, CME GROUP, INC. and CMEG NY INC., Defendants.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**Prior History:** *In re NYMEX S'holder Litig., 2008 Del. Ch. LEXIS 227 (Del. Ch., July 29, 2008)*

## Core Terms

merger, fiduciary duty, rights, shareholders, stock, negotiations, allegations, Bylaws, Memberships, breach of fiduciary duty, fiduciary, motion to dismiss, breached, collar, Plaintiffs', aiding and abetting, acquisition, asserts, trading, seats, disclosure, unfair, stockholders, subsidiary, loyalty, parties, shares, bid, per share, membership rights

## Case Summary

### Procedural Posture

Plaintiff shareholders filed two suits against defendants, an acquired company (AC), some of its directors, and an acquirer, challenging an already-consummated acquisition of the AC by an entity controlled by the acquirer. Their claims included numerous breaches of fiduciary duties of loyalty, candor, and care, resulting in the failure of the shareholders to receive fair value for their shares. Defendants filed motions to dismiss both actions.

### Overview

The AC and the acquirer entered into the merger agreement after successful negotiations, which was approved by the board. Shareholders of the AC filed suit, alleging that due to the multiple breaches of

fiduciary duties, they did not receive fair value for their shares. The court found that whether or not the Revlon scrutiny applied, as the AC's certificate of incorporation contained an exculpatory clause authorized by *Del. Code Ann. tit. 8, § 102(b)(7)* and the shareholders failed to successfully plead a failure to act loyally, claims for a breach of fiduciary duty and of disclosure against directors failed. There was an insufficient showing that two specifically named directors violated their fiduciary duties through their failure to negotiate a collar and their alleged self-dealing. Other claims were purely derivative, for which the shareholders no longer had standing. A claim that the acquirer's board aided and abetted the AC directors' breaches of fiduciary duty failed where the allegations were conclusory on the issue of knowing participation. Claims by a particular class of shareholders failed, as they were owed no fiduciary duty solely by virtue of their membership.

**Outcome**
The court granted the motions to dismiss.

# LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN1*[⬇] **Motions to Dismiss, Failure to State Claim**

A motion under Del. Ch. Ct. R. 12(b)(6) to dismiss for failure to state a claim will be granted if it appears with reasonable certainty that a plaintiff could not prevail upon any set of facts that can be inferred from the pleadings. In considering a motion to dismiss, a court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. The court must accept the inferences that can reasonably be drawn in favor of the plaintiff from such facts. However, the court must neither blindly accept all allegations as true, nor draw all inferences from them in plaintiff's favor unless they are reasonable inferences.

Business & Corporate Law > ... > Management Duties & Liabilities > Defenses > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN2*[⬇] **Management Duties & Liabilities, Defenses**

Revlon scrutiny applies only to transactions in which a fundamental change of corporate control occurs or is contemplated. A fundamental change of control does not occur for purposes of Revlon where control of the corporation remains, post-merger, in a large, fluid market. Thus, for example, in a transaction where cash is the exclusive consideration paid to the acquired corporation's shareholders, a fundamental change of corporate control occurs--thereby triggering Revlon--because control of the corporation does not continue in a large, fluid market. In transactions that involve merger consideration that is a mix of cash and stock--the stock portion being stock of an acquirer

whose shares are held in a large, fluid market-
-there is no black line rule explaining what
percentage of the consideration can be cash
without triggering Revlon.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Defenses > General Overview

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

### HN3[⬇] Management Duties & Liabilities, Defenses

The Revlon standard has been defined as
follows: When directors propose to sell a
company for cash or engage in a change of
control transaction, they must take reasonable
measures to insure that the stockholders
receive the highest value reasonably
attainable.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Business
Judgment Rule

### HN4[⬇] Fiduciary Duties, Business Judgment Rule

The business judgment rule is a presumption
that in making a business decision, the
directors of a corporation acted on an informed
basis, in good faith and in the honest belief
that an action taken was in the best interests
of the company.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Duty of
Loyalty

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

### HN5[⬇] Fiduciary Duties, Duty of Loyalty

In order to state a claim for breach of the duty
of loyalty, a plaintiff must plead facts from
which a court can reasonably infer that either a
majority of the director defendants either stood
on both sides of the merger or were dominated
and controlled by someone who did; or failed
to act in good faith, i.e., where a fiduciary
intentionally fails to act in the face of a known
duty to act, demonstrating a conscious
disregard for his duties.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Duty of
Loyalty

### HN6[⬇] Fiduciary Duties, Duty of Loyalty

That directors acquiesce in, or endorse actions
by, a chairman of the board--actions that from
an outsider's perspective might seem
questionable --does not, without more, support
an inference of domination by the chairman or
the absence of directorial will for purposes of
showing a breach of the duty of loyalty.

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > Duty of
Loyalty

### HN7[⬇] Fiduciary Duties, Duty of Care

There is no single blueprint that a corporate
board must follow to fulfill its duties. In any

event, claims of flawed process are properly brought as duty of care, not loyalty, claims.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

*HN8*[⤓] **Fiduciary Duties, Business Judgment Rule**

It is well within the business judgment of a corporate board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and the Chief Executive Officer.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Evidence > Inferences & Presumptions > Presumptions

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

*HN9*[⤓] **Fiduciary Duties, Duty of Care**

The mere failure to secure deal protections in a merger context that, in hindsight, would have been beneficial to shareholders does not amount to a breach of the duty of care. The presumption of deference to the judgment of management is only superseded by a showing of gross negligence, bad faith or conflicting personal interest.

Business & Corporate
Law > ... > Management Duties & Liabilities > Fiduciary Duties > Business Judgment Rule

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of Directors & Officers

*HN10*[⤓] **Fiduciary Duties, Business Judgment Rule**

A decision to include a collar with a merger context is within a corporate board's business judgment.

Business & Corporate Law > ... > Actions Against Corporations > Standing > General Overview

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN11*[⤓] **Actions Against Corporations, Standing**

A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit.

Business & Corporate
Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

*HN12*[⤓] **Actions Against Corporations,**

## Direct Actions

In deciding whether a claim is direct or derivative, a court must look at the "nature of the wrong alleged," instead of a plaintiff's characterization of the claim.

> Business & Corporate Law > ... > Shareholder Actions > Actions Against Corporations > Direct Actions

> Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

> Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

### *HN13*[⤓] Actions Against Corporations, Direct Actions

Tooley abandoned the previously employed "special injury" test--whether the plaintiff suffered an injury different from that suffered by shareholders in general--and replaced it with a two-part test for purposes of determining whether a claim is direct or derivative: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually). In considering the first prong of Tooley, the critical question is looking at the body of a complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?

> Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > General Overview

### *HN14*[⤓] Actions Against Corporations, Derivative Actions

Entrenchment claims are usually viewed as purely derivative in nature.

> Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

> Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

### *HN15*[⤓] Management Duties & Liabilities, Fiduciary Duties

A breach of fiduciary duty that works to preclude or undermine the likelihood of an alternative, value-maximizing transaction is treated as a derivative claim because a company suffers the harm, having been precluded from entering into a transaction that would have maximized the return on its assets. Additionally, the injury falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation. With respect to the second prong of Tooley, any monetary recovery would properly belong to the company, if only because there is no rational way in which to define a class differing from all of the shareholders at the time the judgment is entered.

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

> Business & Corporate Law > ... > Actions Against Corporations > Derivative

Actions > Procedural Matters

*HN16*[⬇]  **Management Duties & Liabilities, Causes of Action**

Where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature.

Business & Corporate
Law > ... > Shareholder Actions > Actions
Against Corporations > Direct Actions

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

Business & Corporate Law > ... > Actions
Against Corporations > Derivative
Actions > Procedural Matters

*HN17*[⬇]  **Actions Against Corporations, Direct Actions**

Tooley acknowledges the continuing viability of an exception to the general rule for certain entrenchment claims arising in the merger context with respect to whether they are direct or derivative. A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated.

Business & Corporate
Law > ... > Shareholder Actions > Actions
Against Corporations > Direct Actions

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

Business & Corporate
Law > ... > Management Duties &
Liabilities > Fiduciary Duties > General
Overview

*HN18*[⬇]  **Actions Against Corporations, Direct Actions**

In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.

Business & Corporate
Law > ... > Shareholder Actions > Actions
Against Corporations > Direct Actions

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

*HN19*[⬇]  **Actions Against Corporations, Direct Actions**

With respect to whether a claim arising out of a merger is direct or derivative, any reduction in the consideration offered to shareholders as a result of inappropriate side payments does not necessarily give rise to a direct claim. Instead, a direct claim is found only if the side transactions are alleged to have reduced the consideration offered to the target stockholders to a level that is unfair, then an attack is labeled as individual because it goes directly to the fairness of the merger.

Business & Corporate
Law > ... > Shareholder Actions > Actions
Against Corporations > Direct Actions

Mergers & Acquisitions
Law > Mergers > Duties & Liabilities of
Directors & Officers

## HN20[⬇] Actions Against Corporations, Direct Actions

Mentioning a merger in a complaint does not talismanically create a direct action. Instead, there must be a causal link between a breach complained of and the ultimate unfairness of the merger.

> Business & Corporate
> Law > ... > Management Duties &
> Liabilities > Fiduciary Duties > Duty of Care

> Business & Corporate
> Law > ... > Management Duties &
> Liabilities > Fiduciary Duties > Duty of
> Loyalty

## HN21[⬇] Fiduciary Duties, Duty of Care

A fiduciary duty of disclosure is a specific application of the duties of care and loyalty; it requires that a corporate board of directors disclose fully and fairly all material information within the board's control when it seeks shareholder action. A mere conclusory allegation that the alleged disclosure violations also constitute a violation of the duty of loyalty is not sufficient to survive a motion to dismiss.

> Business & Corporate Law > ... > Causes
> of Action & Remedies > Breach of
> Fiduciary Duty > Elements

> Civil
> Procedure > ... > Pleadings > Complaints >
> Requirements for Complaint

> Torts > ... > Multiple
> Defendants > Concerted Action > Civil
> Aiding & Abetting

## HN22[⬇] Breach of Fiduciary Duty, Elements

In order to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in the breach by a non-fiduciary defendant; and (4) damages. With regard to the third element--"knowing participation"--conclusory allegations are insufficient as a matter of law.

> Business & Corporate Law > ... > Causes
> of Action & Remedies > Breach of
> Fiduciary Duty > Elements

> Evidence > Weight & Sufficiency

> Torts > ... > Multiple
> Defendants > Concerted Action > Civil
> Aiding & Abetting

## HN23[⬇] Breach of Fiduciary Duty, Elements

Evidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries. Under the knowing participation standard, a bidder's attempts to reduce a sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting.

> Business & Corporate Law > Agency
> Relationships > Fiduciaries > Formation

> Business & Corporate
> Law > ... > Management Duties &
> Liabilities > Fiduciary Duties > General
> Overview

## HN24[⬇] Fiduciaries, Formation

In determining whether or not a particular relationship gives rise to fiduciary duties under

Delaware law, courts have focused their inquiry on the "nature of the interest or entitlement" at issue. Specifically, before a fiduciary duty arises, an existing property right or equitable interest supporting such a duty must exist. In a corporate context, the duties grow out of the relationship between the managers of a corporation and its owners, the shareholders.

Business & Corporate Law > Agency Relationships > Fiduciaries > Formation

*HN25*[↓] **Fiduciaries, Formation**

In determining whether or not a particular relationship gives rise to fiduciary duties, the relevant question is whether there is a separation of legal control from beneficial ownership with respect to a valid property interest necessary for the imposition of a trust relationship with concomitant fiduciary duties.

Business & Corporate Law > Agency Relationships > Fiduciaries > Formation

*HN26*[↓] **Fiduciaries, Formation**

For a fiduciary duty to be created, there must be both: (1) a property or other equitable interest; and (2) the ceding of legal control over the property interest, such that the owner reposes special trust in and reliance on the judgment of those in control.

Business & Corporate Law > ... > Directors & Officers > Scope of Authority > General Overview

*HN27*[↓] **Directors & Officers, Scope of Authority**

In a parent and wholly-owned subsidiary

context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.

Business & Corporate Law > Corporations > Articles of Incorporation & Bylaws > General Overview

*HN28*[↓] **Corporations, Articles of Incorporation & Bylaws**

A corporation's bylaws and charter are contracts among its shareholders.

**Counsel:** [*1] Pamela S. Tikellis, Esquire, A. Zachary Naylor, Esquire, Scott M. Tucker, Esquire, and Tiffany J. Cramer, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware, Attorneys for Plaintiffs Cataldo J. Capozza, Polly Winters, Joan Haedrich, and Shelby Greene; Mark C. Rifkin, Esquire, Rachel S. Poplock, Esquire, Russell S. Miness, Esquire of Wolf Haldenstein Adler Freeman & Herz LLP, New York, New York; Avi Garbow, Esquire and Lynda J. Grant, Esquire of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, New York; and Richard A. Speirs, Esquire and Stephen L. Brodsky, Esquire of Zwerling, Schacter & Zwerling LLP, New York, New York, Attorneys for Plaintiffs Cataldo J. Capozza, Polly Winters and Joan Haedrich; Denis F. Sheils, Esquire, Christina Donato Saler, Esquire, and Jared Solomon, Esquire of Kohn, Swift & Graf, P.C., Philadelphia, Pennsylvania, Attorneys for Plaintiff Shelby Greene.

Raymond J. DiCamillo, Esquire and Jillian M. Grob, Esquire of Richards, Layton & Finger,

P.A., Wilmington, Delaware, and Greg A. Danilow, Esquire, John A. Neuwirth, Esquire, Joshua S. Amsel, Esquire, and Stefania D. Venezia, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Defendants [*2] New York Mercantile Exchange, Inc., NYMEX Holdings, Inc., Richard Schaeffer, Thomas Gordon, James Newsome, Stephen Ardizzone, A. George Gero, Neil Citrone, Frank Siciliano, William Ford, Harvey Gralla, William Maxwell, Howard Gabler, Daniel Rappaport, Dennis Suskind, Melvyn Falis, Robert Steele, and John McNamara.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Stephen D. Dargitz, Esquire, Jenness E. Parker, Esquire, and Rachel J. Barnett, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, and Christina M. Tchen, Esquire and Christal Lint, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, Illinois, Attorneys for Defendants CME Group, Inc. and CMEG NY Inc.

**Judges:** NOBLE, Vice Chancellor.

**Opinion by:** NOBLE

# Opinion

**MEMORANDUM OPINION**

NOBLE, *Vice Chancellor*

These two actions involved challenges to the now-consummated acquisition of Defendant NYMEX Holdings, Inc. ("NYMEX") by an entity controlled by Defendant CME Group, Inc. ("CME"). Some of the claims are brought on behalf of former shareholders of NYMEX. [1] Others are brought on behalf of the Class A Members (i.e., those "seat holders" having contractual trading rights) of the NYMEX Exchange, which was a subsidiary of NYMEX. [*3] [2]

In this memorandum opinion, the Court addresses Defendants' motions to dismiss both actions.

## I. BACKGROUND

### A. *The Parties*

NYMEX (or the "Company"), formerly a publicly traded Delaware corporation, was the largest commodity futures exchange in the world. [3] The Company's principal operations were conducted through its two subsidiaries, the New York Mercantile Exchange, Inc. ("NYMEX Exchange") and Commodity Exchange, Inc. ("COMEX"). [4]

Plaintiffs Cataldo Capozza, Polly Winters, and Joan Haedrich owned NYMEX common stock. [5] Plaintiff Capozza also was a Class A Member of the NYMEX Exchange from 1983 through sometime in 2008. [6] Plaintiff Shelby Greene,

_____

[1] *In re NYMEX S'holder Litig.,* C.A. No. 3621-VCN (the "NYMEX Action").

[2] *Greene v. NYMEX Holdings, Inc.,* C.A. No. 3835-VCN (the "Greene Action"). For convenience, the Third Consolidated and Amended Class Action Complaint in the NYMEX Action will be referred to as the "Complaint," and the Amended Class Action Complaint in the Greene Action will be referred to as the "Greene Complaint."

[3] Compl. P 3.

[4] Compl. P 14.

[5] Compl. PP 11, 12, 13.

[6] Compl. P 11.

also a Class A Member, brought her action on behalf of the Class A Members of the NYMEX Exchange.

Defendant **[*4]** Richard Schaeffer was the chairman of both NYMEX and NYMEX Exchange and was a member of the NYMEX Board of Directors (the "Board"). [7] Schaeffer also had been a Class A Member of the NYMEX Exchange since 1981. [8] Defendant James Newsome was the President, Chief Executive Officer, and a member of the Board of Directors of NYMEX. [9] In addition to Schaeffer and Newsome, all of the other members of the Board are named as individual Defendants (the "Director Defendants"). [10]

Defendant CME formed Defendant CMEG NY, Inc. as its wholly-owned subsidiary for the purpose of acquiring NYMEX. [11]

B. *Pre-Merger Modifications to NYMEX's Structure*

From 1872 until 2000, NYMEX Exchange operated **[*5]** as a New York not-for-profit membership organization. Seemingly anticipating the subsequent trend towards demutualization of exchanges, NYMEX Exchange demutualized in 2000, converting to a Delaware for-profit entity organized as a stock holding company with a subsidiary membership company. In the demutualization,

---

[7] Compl. P 15.

[8] *Id.*

[9] Compl. P 16.

[10] Those Defendants are: Stephen Ardizzone, Neil Citrone, Melvyn Falis, William Ford, Howard Gabler, A. George Gero, Thomas Gordon, Harvey Gralla, William Maxwell, John McNamara, Daniel Rappaport, Frank Siciliano, Robert Steele, and Dennis Suskind. In the various filings, there is a discrepancy as to the number of directors--15 or 16. One director, Defendant Gralla, did not serve on the Board after May 2008, and the Court assumes that the end of service accounts for the disparity.

[11] Compl. P 38.

each NYMEX Exchange membership was converted into two pieces--a Class A membership in the subsidiary exchange, representing trading privileges on NYMEX Exchange, and one share of NYMEX Holdings common stock, representing an equity interest in NYMEX Holdings, the surviving parent. NYMEX Holdings' interest in NYMEX Exchange was converted into the sole outstanding Class B membership in the subsidiary Exchange. NYMEX Holdings retained all equity in the Exchange, as well as a right to all dividends and liquidation proceeds.

C. *The Merger*

In July 2007, the Board established the Strategic Initiatives Committee (the "SIC") in order to consider, negotiate, and recommend any significant transactions involving the Company. [12] In or about June or July 2007, John Thain ("Thain"), then Chairman of the New York Stock Exchange ("NYSE"), met with Schaeffer and expressed NYSE's interest in acquiring **[*6]** NYMEX. [13] As discussions progressed, Thain, on behalf on NYSE, spoke of purchasing NYMEX for $ 142 per share, reflecting a meaningful premium above the trading price. NYSE ultimately did not make a formal offer to purchase NYMEX. The Complaint alleges that Schaeffer did not inform the SIC or the Board of either his communications with Thain or NYSE's interest in purchasing NYMEX for $ 142 per share. [14] It further alleges that "NYSE ultimately declined to make a formal proposal for purchasing NYMEX because Schaeffer personally demanded a senior executive position for himself as a pre-condition to the deal." [15]

---

[12] Compl. P 76.

[13] Compl. P 77.

[14] Compl. PP 81, 83, 85.

[15] Compl. P 82.

Sometime in late spring 2007, Schaeffer and Newsome began negotiating the sale of NYMEX to CME with Terry Duffy, CME's Chairman, and Craig Donahue, CME's Chief Executive Officer, but, it is alleged, they did not provide the Board or the SIC any of the details of these negotiations. [16] The Board, however, was made aware that negotiations between the two companies were in progress for the purpose of a business combination. [17] On January 7, 2008, NYMEX and CME entered into a confidentiality agreement in order to discuss [*7] more fully a potential acquisition. [18] On January 9, 2008, the Board approved the adoption of a change of control severance plan, "which provide[d] for more than $ 97 million in change in control payments to senior management." [19]

On January 28, 2008, NYMEX announced that it was in the process of negotiating a potential combination with CME, and that CME had offered to buy NYMEX for approximately $ 119 per share, which represented a 2.1% premium over the closing price of NYMEX shares on that day and an 11% premium above the closing price of NYMEX shares on the last trading day prior to the announcement. [20] A substantial portion of the merger consideration was to be paid in CME stock. [21] The Company also announced that it had entered into a 30-day exclusive negotiating period with CME. [22]

The Complaint alleges that, prior to any formal agreement between [*8] CME and NYMEX, "Schaeffer and Newsome committed to Duffy and Donahue that NYMEX would not attempt to renegotiate any of the economic terms of the proposed sale," and that this alleged arrangement was not disclosed to the Board. [23]

On January 24, 2008, only four days before NYMEX announced that it was in exclusive merger discussions with CME, CME stock had closed at $ 635.14 per share, an almost $ 90 per share increase over its closing price a week earlier. [24] The Complaint alleges that NYMEX timed the announcement of the exclusivity period in order for CME to capitalize on the recent increase in its stock price. [25] One week after the announcement, however, CME stock fell to $ 485.25 per share. [26] The CME offer did not contain a "collar"--a mechanism that could have offered some protection against market fluctuations in CME stock--on the stock portion of the merger consideration. Accordingly, because a substantial portion of the consideration in CME's offer was CME stock, the loss in value of CME stock had the effect of materially reducing the total merger consideration.

The Complaint alleges that CME offered to "collar" the stock portion of the merger consideration, but such offer was rejected by Schaeffer and Newsome because it would have adversely affected the value of their NYMEX stock options. Accordingly, Schaeffer and Newsome did not inform the board that

---

[16] Compl. PP 87, 91, 92, 114.

[17] Compl. P 117.

[18] Compl. P 88.

[19] Compl. P 117. *See also* Compl. PP 125-28. NYMEX's Compensation Committee first discussed the severance plan on November 19, 2007, and voted to recommend it to the NYMEX Board on December 11, 2007. In July 2008, the Board reduced the overall cost of the severance plan to $ 67 million.

[20] Compl. PP 90, 95.

[21] Compl. P 103.

[22] Compl. P 95.

---

[23] Compl. PP 93-94.

[24] Compl. P 100.

[25] *Id. See also* Compl. P 101 (noting [*9] that Schaeffer was advised by email that CME stock had risen substantially while the transaction was being negotiated).

[26] Compl. P 102.

CME had offered a collar. [27]

Despite the decline in the price of CME stock, the parties extended the 30-day exclusivity period to March 15, 2008. [28] On March 17, 2008, NYMEX announced that it had entered into a merger agreement with CME. Pursuant to the merger agreement, which was unchanged from the terms of CME's original offer, CME was to acquire all of NYMEX's common stock in exchange for $ 36 per share in cash and 0.1323 shares of CME common stock per NYMEX share. [29] However, based upon the value of CME stock before the capital markets' opening on March 17, 2008, the implied value of the merger consideration had declined to $ 100.30 per NYMEX share. [30] The Complaint alleges that the Board approved the transaction "without obtaining, [*10] soliciting, or attempting to solicit other, higher bids for the Company's shares." [31]

On or about March 16, 2008, the Board obtained fairness opinions on the acquisition from J.P. Morgan Securities, Inc. ("J.P. Morgan") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"). [32] Both financial advisors opined that the consideration to be paid to NYMEX shareholders was fair as of the date the fairness opinions were issued. [33] The Complaint alleges that the discounted cash flow analyses performed by both financial advisors were flawed, which resulted in an improperly low implied range of values for NYMEX stock. [34]

In addition to the shareholder vote, the Merger Agreement also [*11] had a closing condition that required 75% of NYMEX Exchange Class A Members to approve amendments to the governing documents of NYMEX Exchange that curtailed most of their rights as Class A Members. As part of the transaction, Class A Members, who collectively owned between 45 and 47 percent of NYMEX common stock, were also offered a $ 750,000 "Membership Rights Payment" as a means to compensate them for the reduction in value of their seats and in exchange for the individual waiver of additional rights. [35] The amended merger proxy statement, filed with the Securities and Exchange Commission ("SEC") on July 21, 2008, informed Exchange Class A Members that they would be required to waive all rights and claims as Class A Members against Defendants, as well as their rights and claims as NYMEX shareholders (other than the right to the merger consideration), in order to receive the $ 750,000 Membership Rights Payment. [36] This included their right to join the class in this case. Specifically, the "Waiver and Release" provision of the Amended Proxy stated in relevant part:

> By executing this Waiver and Release, and effective upon acceptance of the Membership Rights Payment, . . .

---

[27] Compl. PP 105, 107-09.

[28] Compl. P 111.

[29] Compl. P 112.

[30] Compl. P 116.

[31] Compl. P 115.

[32] Compl. P 134.

[33] Compl. P 134.

[34] Compl. P 137. The Greene Complaint similarly asserts that the fairness opinions issued by investment banker Sandler

O'Neill regarding the value of the Class A Memberships were unreliable and unfair. Specifically, the Greene Complaint alleges that Sandler O'Neill "reached its preordained conclusion by employing an unreliable methodology to suppress the true value for a Class A Membership." Greene Compl. P 73.

[35] Compl. P 131. The Merger Agreement initially contemplated requiring Class A Members to sell their memberships in exchange for a Membership Rights Payment of $ 612,750, for a total paid by CME of $ 500 million. After Class A Members voiced opposition to the amount of consideration offered and threatened to block the merger, the revised merger agreement raised the consideration offered to $ 750,000 and allowed Members to retain their seats, though with sharply curtailed rights. Greene Compl. PP 70, 83, 96-97.

[36] Compl. PP 130-31.

("Releasing **[*12]** Parties"), effective as of the Effective Time, hereby absolutely, unconditionally and irrevocably waives any right to and releases and forever discharges . . . (collectively, the "Released Parties") from any and all manner of causes of action, damages, liabilities, obligations, promises, judgments, claims and demands of any nature whatsoever, in law or in equity, of every kind and description, whether known or unknown, suspected or absolute or contingent ("Actions"), which such Releasing Parties (in any capacity whatsoever, including, without limitation, their capacities as stockholders of NYMEX Holdings) ever had, now have or hereafter can, shall or may have against any Released Party . . . . [37]

Subsequently, NYMEX mailed a "Final Waiver & Release" to all Class A Members that deleted any reference to the Effective Time. [38] The Plaintiffs allege that the deletion of reference to the Effective Time gives the Final Waiver & Release a retroactive effect. [39] Among those claims purportedly waived in the Final Waiver & Release are certain rights to a percentage of NYMEX Exchange revenues in perpetuity, subject to certain triggering events, previously stipulated in NYMEX Exchange governing **[*13]** documents ("Section 311(G) rights"). In her complaint, Greene asserts that such rights had already vested and, thus, were not (and could not have been) extinguished by the class vote approving the removal of such provisions.

The Board unanimously approved the merger. In addition, over 95% of the shares voted were voted in favor of the merger. More than 80% of the NYMEX Exchange Class A Members voted in favor of amending the governing documents of the Exchange in order to satisfy the closing condition. The merger was consummated on August 22, 2008.

### D. *Shareholder* **[*14]** *Class Allegations* [40]

In the NYMEX Action, the shareholder class plaintiffs allege numerous breaches by Defendants of the fiduciary duties of loyalty, due care and candor in the sale of NYMEX to CME, and that, as a result of such breaches, NYMEX shareholders did not receive fair value for their shares. Plaintiffs allege that the Board is controlled by Chairman Richard Schaeffer, and that the Board agreed to sell NYMEX through an unfair process at an inadequate price in order for Schaeffer and NYMEX Chief Executive Officer and President James Newsome to obtain nearly $ 60 million in severance payments. [41] Plaintiffs point to Schaeffer's alleged scuttling of a more favorable deal with NYSE, his behavior with respect to certain, unrelated transactions involving the Board, as well as his central role in the CME negotiations as evidence **[*15]** that he "rule[d] the Board with an iron hand." [42] The fiduciary duty breaches committed by the Board, it is alleged, include omitting or misstating necessary information in NYMEX's proxy statements with respect to the

---

[37] CME Group, Inc., Form S-4, at L-1 (July 21, 2008) (Pl.'s Mot. for Decl. J., Ex. C).

[38] Compl. P 132.

[39] *Id.*

---

[40] To some extent, one cannot help but wonder if the Plaintiffs in both actions have sought to present a litany of claims with the hope that in the aggregate they will support a theme that something untoward occurred. In this instance, the Court is not persuaded that it can reasonably infer that the collective whole is greater than the sum of the individual parts.

[41] Of the original $ 96 million in executive severance payments, Schaeffer would receive $ 35 million and **[*16]** Newsome would receive $ 24 million if they were terminated "without cause" or resigned for "good reason" during the eighteen months following the change in control. Compl. PP 127-28.

[42] Compl. P 66.

CME deal, agreeing to CME's first and only offer, failing to inquire into other potential transactions, agreeing to a 30-day exclusive negotiating period with CME, allegedly causing investment bankers to understate the value of NYMEX shares in fairness opinions supporting the transaction, and agreeing to a $ 50 million breakup fee. In addition, Plaintiffs assert that the Board breached its fiduciary duties by agreeing to the $ 97 million change in control plan with an acquisition agreement imminent. The shareholder Plaintiffs further assert specific breaches of fiduciary duties by Defendants Schaeffer and Newsome in the context of their roles in negotiating the CME transaction, as well as by Schaeffer in his dealings with NYSE in the summer of 2007. Finally, Plaintiffs assert that the CME Defendants aided and abetted the NYMEX Defendants in the breach of these duties.

### E. Class A Member Class Allegations

Like the shareholder complaint, the Greene Complaint alleges fiduciary duty breaches by the Board toward the Class A Members of NYMEX in the CME transaction. Specifically, that Defendants inadequately compensated Class A Members for the decline in the value of their memberships and for their loss of certain rights and privileges as a result of the transaction, particularly with respect to future revenue sharing provisions. Greene also asserts that Defendants breached their duties by interpreting the timing of certain of these rights in "self-serving" ways, failing to obtain proper fairness opinions regarding the value of these rights to Class A Members, and actively working to undervalue Class A Member seats. As with the shareholder Plaintiffs, Greene asserts that the process was unfair to Class A Members because of the undue influence of Schaeffer and Newsome in the negotiations. Greene asserts that the CME Defendants aided and abetted in the breach of fiduciary

[*17] duties owed by the Board to Class A Members and breached their own fiduciary duties owed to the Members. [43] Finally, both Greene and the shareholder Plaintiffs contend that requiring Class A Members to sign a waiver and release of any claims against Defendants in order to receive the Membership Rights Payment from the Company was coercive and, therefore, that the release should be declared unlawful, void and unenforceable.

## II. ANALYSIS

### A. Applicable Standard

Before the Court are motions to dismiss both actions. *HN1*[↑] A motion under *Court of Chancery Rule 12(b)(6)* to dismiss for failure to state a claim will be granted if it appears with reasonable certainty that the plaintiff could not prevail upon any set of facts that can be inferred from the pleadings. [44] In considering a motion to dismiss, the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [45] The Court must accept the inferences that can reasonably be drawn in favor of the plaintiff from such facts. However, the court must neither blindly accept all allegations as true, nor draw all inferences from them in plaintiff's favor unless they are reasonable inferences. [*18] [46] With these principles in mind, the Court turns first to the NYMEX Action.

### B. The NYMEX Action

Count I of the Complaint alleges that

---

[43] Greene Compl. PP 128-39.

[44] *Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del. Ch. 2000)*.

[45] *Gantler v. Stephens, 965 A.2d 695, 703 (Del. 2009)*.

[46] *In re Lukens Inc. S'holders Litig., 757 A.2d 720, 727 (Del. Ch. 1999)*.

Schaeffer, Newsome, and the Board breached their fiduciary duties of care and loyalty. Count II of the Complaint alleges that the CME Defendants aided and abetted those alleged breaches.

1. Substantive Claims Against the NYMEX Defendants

The Plaintiffs contend that various fiduciary failures by the Defendant Directors resulted in an unfair price obtained through an unfair process.

The parties dispute whether this case should be evaluated under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* [47] as involving a fundamental change of corporate control or whether it should be evaluated under the business judgment rule, which may be viewed as granting greater deference to board action. [48] The parties agree--as they must--that **HN2**[⬆] *Revlon* scrutiny applies only to transactions "'in which a fundamental change of corporate control occurs or is contemplated.'" [49] They dispute what constitutes **[\*19]** a fundamental change of control sufficient to trigger *Revlon* scrutiny. A fundamental change of control does not occur

for purposes of *Revlon* where control of the corporation remains, post-merger, in a large, fluid market. [50] Thus, for example, in a transaction where cash is the exclusive consideration paid to the acquired corporation's shareholders, a fundamental change of corporate control occurs--thereby triggering *Revlon*--because control of the corporation does not continue in a large, fluid market. In transactions, such as the present one, that involve merger consideration that is a mix of cash and stock--the stock portion being stock of an acquirer whose shares are held in a large, fluid market--"[t]he [Delaware] Supreme Court has not set out a black line rule explaining what percentage of the consideration can be cash without triggering *Revlon*." [51] In *In re Santa Fe Pacific Corp. Shareholder Litigation,* the Supreme Court held that a merger transaction involving consideration of 33% cash and 67% stock did not trigger *Revlon*. [52] In contrast, in *Lukens,* this Court stated that a merger transaction involving consideration of 60% cash and 40% stock likely triggered *Revlon*. [53] Here, **[\*20]** the consideration paid to NYMEX shareholders was 56% CME stock and 44% cash, falling between the standards of *Santa Fe* and *Lukens*. [54] The parties therefore argue over whether *Revlon* has been triggered. [55]

---

[47] *506 A.2d 173 (Del. 1986)*. **HN3**[⬆] ] The *Revlon* Standard has been defined as follows: "When directors propose to sell a company for cash or engage in a change of control transaction, they must take reasonable measures to insure that the stockholders receive the highest value reasonably attainable." *In re Topps Co. S'holders Litig., 926 A.2d 58, 64 (Del. Ch. 2007)*.

[48] *See, e.g., Moran v. Household Int'l, Inc., 500 A.2d 1346, 1356 (Del. 1985)* (**HN4**[⬆]] "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." (internal quotation marks omitted)); 1 Stephen A. Radin, The Business Judgment Rule: Fiduciary Duties for Corporate Directors 11-15 (6th ed. 2009).

[49] *Paramount Commc'ns Inc. v. QVC Network Inc., 637 A.2d 34, 46 (Del. 1994)* (quoting *Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1286 (Del. 1989)*).

---

[50] *See id. at 47.*

[51] *In re Lukens Inc. S'holders Litig., 757 A.2d at 732 n.25*.

[52] *669 A.2d 59, 64, 70-71 (Del. 1995)*.

[53] *In re Lukens, Inc. S'holders Litig., 757 A.2d at 732 n.25*.

[54] At **[\*21]** the time that the Board approved the transaction, the cash component comprised 36% of the total consideration, while CME stock made up 64%.

[55] Plaintiffs also assert that the fact that the severance plan treats the transaction as a change in control additionally mandates that *Revlon*'s scrutiny be applied (citing to *Louisiana Mun. Police Employees' Ret. Sys. v. Crawford, 918 A.2d at 1172, 1179 n.6 (Del. Ch. 2007))*.

The Court, however, need not decide whether *Revlon* scrutiny applies to the present transaction. NYMEX's Certificate of Incorporation contains an exculpatory clause authorized by *8 Del. C. § 102(b)(7)* that protects the NYMEX directors from personal monetary liability for breaches of the duty of care. Thus, even if *Revlon* applied to this case, application of the exculpatory clause would lead to dismissal unless the Plaintiffs have successfully pleaded a failure to act loyally (or in good faith), which would preclude reliance on the *Section 102(b)(7)* provision. [56] For the reasons set forth below, they have not. Accordingly, the motion to dismiss the shareholders' substantive merger claims for failure to state a breach of fiduciary duty claim must be granted.

The Plaintiffs argue that that they have sufficiently alleged that Schaeffer, Newsome, and the Board acted disloyally. At the outset, the Court observes that the Plaintiffs must plead sufficient facts to show that *a majority of the Board of Directors* breached the fiduciary duty of loyalty; whether they otherwise would have stated a claim against Schaeffer and Newsome would not be controlling. That two directors may have been conflicted does not, by itself, impinge upon the independence of the remaining members of the Board--all of whom supported the merger. [57] Accordingly, the Court addresses the Board's alleged breach of the duty of loyalty.

*HN5*[⬆] In order to state a claim for breach of the duty of loyalty, the Plaintiffs must plead facts from which this Court can reasonably infer that either: "a majority of the Director Defendants either stood on both sides of the merger or were dominated and controlled by someone who did"; [58] or failed to act in good faith, i.e., where a "'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" [59] The Plaintiffs do not allege that any member of the Board--apart from Schaeffer and Newsome--stood on both sides of the transaction. Instead, the Plaintiffs allege that the fourteen disinterested members of the Board who unanimously voted to approve the transaction were dominated and controlled by Schaeffer and acted in bad faith. In particular, the Plaintiffs argue that the Court should infer domination and control by Schaeffer and an intentional dereliction of duty by the Board from the following allegations: the Board approved the change of control severance plan; it accepted the CME's first offer; it permitted Schaeffer and Newsome to "bypass [*24] the SIC"; it failed to obtain a "collar" on the stock portion of the merger consideration; and its members were afraid of being terminated because Schaeffer had "forced" a former board member to resign when that member disagreed with Schaeffer regarding a transaction unrelated to the present one.

*HN6*[⬆] That directors acquiesce in, or endorse actions by, a chairman of the board-- actions that from an outsider's perspective might seem questionable [60]--does not, without

---

[56] *See Lyondell Chemical Co. v. Ryan, 970 A.2d 235, 239 (Del. 2009)* [*22] (noting that because "Lyondell's charter include[d] an exculpatory provision, pursuant to *8 Del. C. § 102(b)(7)*, . . . th[e] case turn[ed] on whether any arguable shortcomings on the part of the Lyondell directors also implicate[d] their duty of loyalty, a breach of which is not exculpated.").

[57] *See In re Frederick's of Hollywood, Inc., 2000 Del. Ch. LEXIS 19, 2000 WL 130630, at *7 (Del. Ch. Jan. 31, 2000)* (holding that, where "the pleaded facts show[ed] that only one of [] four directors was interested, and as a result, the merger was approved by a majority of disinterested [*23] directors . . . , the duty of loyalty claim fail[ed] for lack of a valid premise.").

[58] *In re Lukens Inc. S'holders Litig., 757 A.2d at 728.*

[59] *See, e.g., Lyondell, 970 A.2d at 243* (quoting *In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 67 (Del. 2006)*).

[60] Whether some of the various Board decisions questioned by the Plaintiffs were reasonable is, of course, difficult to assess from the face of a complaint challenging separate conduct. Many of the instances cited by the Plaintiffs are best viewed

more, support an inference of domination by the chairman or the absence of directorial will. The NYMEX directors were otherwise unquestionably independent--this is not an instance where certain relationships raised some concern but not sufficient doubt to sustain a challenge to director independence. In short, the Complaint alleges nothing more than a board which relied upon, and sometimes deferred to, its chairman. It does not allege dominance such that the independence or good faith of the board may fairly be questioned. The Court concludes that it would be unreasonable **[*25]** to infer from these allegations that the Board was dominated by Schaeffer or that the Board acted in bad faith.

Because the Plaintiffs' allegations are too conclusory to support an inference of domination, the Plaintiffs, at bottom, must seek to convert into a loyalty claim their aversion to the process the Board employed in negotiating the merger. The most that can be inferred from their allegations is that the Board's process was not perfect. However, the Delaware Courts have repeatedly held that **_HN7_**[↑] "there is no single blueprint that a board must follow to fulfill its duties." [61] In any event, claims of flawed process are properly brought as duty of care, not loyalty, claims and, as discussed, those claims are barred by the exculpatory clause of NYMEX's Certificate of Incorporation. Moreover, to the extent the Complaint alleges that the Board acted in bad **[*26]** faith, such allegations must fail because, based on the facts in the Complaint, it cannot be said that the Board intentionally failed to act

in the face of a known duty to act, demonstrating a conscious disregard for its duties. More precisely, the Complaint has not alleged that the Board "utterly failed to obtain the best sale price." [62] Therefore, the Court must grant the Defendants' motion to dismiss the Complaint as to the breaches of fiduciary duty claims. [63]

2. Claims Against Defendants Schaeffer and Newsome

In addition to the claims brought against them as members of the Board (which are dismissed as failing to state an actionable claim), [64] Defendants Schaeffer and Newsome are alleged to have violated their fiduciary duties through "active participation in wrongdoing" [65] in their joint role as the principal negotiators with CME. Specifically, Plaintiffs allege that Schaeffer and Newsome violated their fiduciary duties by "rejecting and keeping secret CME's secret collar offer, ignoring the SIC, and withholding information regarding strategic opportunities and bids" from fellow directors, [66] as well as in

---

as little more than disagreements over the directors' exercise of their business judgment.

[61] _Barkan, 567 A.2d at 1286. See also Lyondell, 970 A.2d at 242-43; In re CompuCom Sys., Inc. S'holders Litig., 2005 Del. Ch. LEXIS 145, 2005 WL 2481325, at *5 (Del. Ch. Sept. 29, 2005); McMillan v. Intercargo Corp., 768 A.2d 492, 502 (Del. Ch. 2000)._

[62] _Lyondell, 970 A.2d at 244; Wayne County Employees' Ret. Sys. v. Corti, 2009 Del. Ch. LEXIS 126, 2009 WL 2219260, at *14 (Del. Ch. June 24, 2009)_ (same).

[63] This includes Plaintiffs' claims that NYMEX accepted CME's first and only offer without attempting to raise it, that NYMEX timed the acquisition to capitalize on the high price of CME stock and the low price of NYMEX stock, that NYMEX agreed to a 30-day exclusive negotiating period with CME, that NYMEX entered into a change in control plan in the lead up to the acquisition, **[*27]** and that NYMEX agreed to a $ 50 million break-up fee (equaling less than 1% of the total deal consideration; _see, e.g., McMillan, 768 A.2d at 505_). In addition, there are insufficient facts surrounding Plaintiffs' claims regarding allegedly improper fairness opinions by the investment banks to establish facially a link between these opinions and the breach of any fiduciary duties by Defendants. All such claims are, accordingly, dismissed.

[64] _See supra_ Part II.B.1

[65] Compl. P 124.

[66] Compl. P 142.

"committing" to CME that NYMEX would not attempt to renegotiate any of the economic terms of the proposed **[*28]** sale and failing to advise the Board of such a commitment, and in entering into an agreement with CME to vote their shares in favor of the proposed acquisition. Schaeffer is additionally alleged to have breached his fiduciary duties by "rejecting NYSE's interest in the Company due to NYSE's failure to abide by his personal demands." [67]

The claim that Schaeffer and Newsome breached their fiduciary duties by being the sole negotiators with CME and not involving the SIC in the consideration or negotiation of the acquisition is dismissed. [68] **HN8**[⬆] It is well within the business judgment of the Board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and the Chief Executive Officer. Additionally, as the Court has already found that the Board was clearly independent, there was no requirement to involve an independent committee in negotiations, nor does the existence of such a committee mandate its use. The allegation that Schaeffer and Newsome committed to CME that NYMEX would not renegotiate any of the economic terms of the acquisition is similarly not actionable, since Plaintiffs **[*29]** have not put forth any evidence for how Schaeffer and Newsome were capable of binding NYMEX from seeking to modify the terms of the agreement had the Board wanted to. Finally, as the Complaint does not allege why the act of entering into a voting support agreement is a breach of fiduciary duties, particularly where the economic incentives of directors and shareholders are aligned and where the overall percentage of shares locked-up is not material, this claim is additionally dismissed. Because the claim against Schaeffer and Newsome for failing to obtain a collar on the transaction and the claim against Schaeffer with respect to the failed negotiations with NYSE both involve more complex legal issues, the Court discusses each at greater length.

a. *Schaeffer and Newsome's Failure to Obtain a Collar*

Plaintiffs claim that Defendants Schaeffer and Newsome violated their fiduciary duties by rejecting CME's offer to collar the stock portion of the merger **[*30]** consideration and by not communicating CME's offer to their fellow directors, despite the risk--subsequently realized--that shareholders would be harmed by a decline in the value of CME stock. [69] This claim is plead in a speculative and conclusory fashion that fails to satisfy even the "plaintiff friendly" standards of *Court of Chancery Rule 12(b)(6)*.

**HN9**[⬆] The mere failure to secure deal protections that, in hindsight, would have been beneficial to shareholders does not amount to a breach of the duty of care. [70] The presumption of deference to the judgment of management is only superseded by a showing of gross negligence, bad faith or conflicting personal interest. Plaintiffs have failed to plead the facts necessary to overcome this presumption.

Here, Plaintiffs assert that Schaeffer and Newsome rejected the collar because of its potentially adverse effects on their stock options. By pointing to potential

---

[67] *Id.*

[68] The extent of involvement and awareness of the Board with respect to the merger negotiations between NYMEX and CME is disputed by the parties. The Court assumes the truthfulness of Plaintiffs' allegations for purposes of the motion to dismiss.

[69] The parties dispute whether or not CME offered NYMEX a collar for the stock portion of the merger consideration. The Court assumes the truthfulness of this fact for purposes of the motion to dismiss.

[70] *See, e.g., In re The Coleman Company, Inc. S'holders Litig., 750 A.2d 1202 (Del. Ch. 1999)*.

**[\*31]** consequences for Schaeffer and Newsome, not shared with other shareholders, they seek to convert a duty of care claim into a duty of loyalty claim. However, the Plaintiffs provide no substance for this claim other than the broad assertion that "a collar would have greatly diminished the value of Schaeffer's and Newsome's NYMEX stock options by substantially reducing or eliminating any potential increase in the price of NYMEX stock while any protection against a downward price movement would have had little or no cost to Schaeffer or Newsome." [71] Perhaps that is true, but it does not establish a conflict for either Schaeffer or Newsome. Otherwise, any director with options would be deemed conflicted if no collar were sought.

The Plaintiffs bolster the Complaint with assertions that CME "offered" to collar the stock portion of the consideration, and that Schaeffer and Newsome did not inform the Board of this "offer." [72] The Board, considering the transaction objectively, never requested a collar, nor found one worth negotiating for. [73] Moreover, it is not reasonable to infer that the Board was unaware of the potential benefits (or costs) that a collar might have. Plaintiffs **[\*32]** seemingly choose not to acknowledge that, because contractual terms are the result of negotiations, concessions tend to come at a price. [74] It was well within the Board's judgment, regardless of any views that could be ascribed to Schaeffer or Newsome, to omit a collar while negotiating various merger terms. Whether, in retrospect, such a trade-off was worthwhile "is of no legal moment." [75] Consequently, motion to dismiss the claim is granted.

### b. *Schaeffer and the NYSE "Offer"*

Plaintiffs claim that Schaeffer foiled a potential bid by NYSE for considerably greater consideration than the CME transaction by demanding a position for himself and the combined entity. Schaeffer asserts that these allegations are "nonsensical" and should not be credited, since the instant transaction **[\*33]** was consummated at a lower price than the NYSE bid and provided him with no such position, and since there could have been any number of reasons for why a formal bid was never submitted by NYSE to NYMEX. [76]

Plaintiffs' claims with respect to Schaeffer's handling of the potential acquisition by NYSE assert a breach of the duty of loyalty and, thus, are not covered by the exculpatory clause in the NYMEX Certificate. However, because all claims surrounding the proposed acquisition by NYSE are derivative, not direct, in nature, the Plaintiffs lost standing to bring them following NYMEX's merger with CME. [77]

Historically, the question of whether a claim raised by a plaintiff in a merger context was direct or derivative often proved elusive. [78] This debate, of course, is especially important in the context of mergers because its outcome

---

[71] Compl. P 108.

[72] Compl. P 105.

[73] This Court has previously held that *HN10*[⬆] ] the decision to include a collar is within a board's business judgment. *See State of Wisconsin Inv. Bd. v. Bartlett, 2000 Del. Ch. LEXIS 42, 2000 WL 238026, at \*9 (Del. Ch. Feb. 24, 2000).*

[74] *See, e.g., Dittrick v. Chalfant, 948 A.2d 400, 407 (Del. Ch. 2007)* ("In business dealings . . . the old adage still applies: there is no such thing as a free lunch.").

[75] *Cf. In re Coleman, 750 A.2d at 1209.*

[76] Reply Br. in Further Support of NYMEX Holdings, Inc.'s and the Indiv. Defs.' Mot. to Dismiss Compl. at 6.

[77] *See Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984)* (*HN11*[⬆] ] "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit.").

[78] *See, e.g., Agostino v. Hicks, 845 A.2d 1110, 1117 (Del. Ch. 2004)* ("The distinction between direct and derivative claims is frustratingly difficult to describe with precision.").

often determines whether or not a plaintiff's **[\*34]** claim survives. _HN12_[⬆] In deciding whether a claim is direct or derivative, the Court must look at the "nature of the wrong alleged," instead of the plaintiff's characterization of the claim. [79]

The Court's initial analysis is guided by _HN13_[⬆] _Tooley v. Donaldson, Lufkin & Jenrette, Inc.,_ [80] which abandoned the previously employed "special injury" test--whether the plaintiff suffered an injury different from that suffered by shareholders in general--and replaced it with a two-part test: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." [81] In considering the first prong of _Tooley,_ the critical question is: "'Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, **[\*35]** has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?'" [82]

The particular allegations against Schaeffer-- that he rejected a deal with NYSE because he failed to secure a post-merger position for himself and that he withheld this information from his fellow directors, preventing them from making an informed decision about the CME merger--may best be seen as an entrenchment claim. _HN14_[⬆] Entrenchment claims are usually viewed as purely derivative in nature. [83]

_HN15_[⬆] A breach of fiduciary duty that works to preclude or undermine the likelihood of an alternative, value-maximizing transaction is treated as a derivative claim because the company suffers the harm, having been "precluded **[\*36]** from entering into a transaction that would have maximized the return on its assets." [84] Additionally, the injury "falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation." [85] With respect to the second prong of _Tooley,_ any monetary recovery would properly belong to the company, "if only because there is no rational way in which to define a class differing from all of the shareholders at the time the judgment is entered." [86]

However, _HN17_[⬆] _Tooley_ acknowledges the continuing viability of _Parnes v. Bally_

---

[83] _See, e.g., In re First Interstate Bancorp Consol. S'holders Litig., 729 A.2d 851, 861-62 (Del. Ch. 1998)_, aff'd sub nom. **Bradley v. First Interstate Bancorp, 748 A.2d 913 (Del. 2000)** (TABLE) ("[C]laims arising from transactions which operated to deter or defeat offers to purchase the subject company's stock, i.e., entrenchment claims, are generally found to be derivative in nature.").

[84] _Agostino, 845 A.2d at 1123. See also Kramer, 546 A.2d at 353_ (citing _Elster, 100 A.2d at 222_) (_HN16_[⬆] "[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature.").

[85] _In re Berkshire Realty Co., Inc., 2002 Del. Ch. LEXIS 146, 2002 WL 31888345, at \*4 (Del. Ch. Dec. 18, 2002). See also Gentile v. Rossette, 906 A.2d 91, 99 (Del. 2006)_ ("[Dilution] claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable **[\*37]** result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.").

[86] _Dieterich v. Harrer, 857 A.2d 1017, 1028 n.20 (Del. Ch. 2004)_. Because no merger was consummated with the NYSE

---

[79] _Elster v. American Airlines, Inc., 34 Del. Ch. 94, 100 A.2d 219, 223 (Del. Ch. 1953)_; _Kramer v. Western Pacific Indus., Inc., 546 A.2d 348, 352 (Del. 1988)_.

[80] _845 A.2d 1031 (Del. 2004)_.

[81] _Id. at 1033_.

[82] _Id. at 1036_ (quoting _Agostino, 845 A.2d at 1122_).

*Entertainment Corp.* [87] as an exception to this general rule for certain entrenchment claims arising in the merger context. The *Parnes* court held that a "stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." [88] In *Parnes,* the complaint alleged that the Chairman and Chief Executive Officer of Bally Entertainment, Arthur Goldberg, had "informed all potential acquirors that his consent would be required for any business combination with Bally and that, to obtain his consent, the acquirer would be required to pay Goldberg substantial sums of [*38] money and transfer to him valuable Bally assets." [89] Hilton Hotels, the ultimate acquirer of Bally, allegedly assented to these demands, which amounted to a more than $ 70 million windfall to Goldberg.

In reversing this Court, the Delaware Supreme Court held that these allegations constituted a direct claim because the plaintiffs had challenged the validity of the merger itself. The decision in *Parnes* was in tension with that Court's earlier decision in *Kramer v. Western Pacific Industries,* [90] where plaintiffs' allegations that directors had breached fiduciary duties in diverting to themselves tens of millions of dollars of merger sale proceeds by way of stock options, golden parachutes and unnecessary fees and expenses were deemed a derivative claim. [91] *Parnes*

distinguished *Kramer* on the grounds that the plaintiffs in *Kramer* had only alleged that the wrongful actions reduced the amount of consideration paid and had not challenged the underlying fairness of the merger. Specifically, **HN18**[⬆] "in order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors [*39] with breaches of fiduciary duty resulting in unfair dealing and/or unfair price." [92]

Seemingly, the Plaintiffs seek to fit the self-dealing allegations against Schaeffer within the exception recognized by *Parnes.* Accordingly, the complaint attempts to link Schaeffer's alleged scuttling of the NYSE deal both with the Board's later decision to revise the change in control payments and with Plaintiffs' ultimate assertion of "an unfair and inadequate price" paid by CME. [93] However, Delaware Courts have interpreted the *Parnes* exception very narrowly. For example, in *Golaine v. Edwards,* this Court held that *Parnes* did not establish the principle that **HN19**[⬆] any reduction in the consideration offered to shareholders as a result of inappropriate side payments would give rise to a direct claim. Instead, a direct claim would be found only "[i]f the side transactions are alleged to have reduced the consideration offered to the target stockholders to a level that is unfair, then an attack is labeled as individual because it goes directly to the fairness of the merger." [94]

---

(or even a formal offer received), it is additionally unclear that damages could have ever been successfully proven with respect to the alleged breach.

[87] *722 A.2d 1243 (Del. 1999)*.

[88] *Id. at 1245*.

[89] *Id.*

[90] *546 A.2d 348 (Del. 1988)*.

---

[91] *Id. at 354*.

[92] *Parnes, 722 A.2d at 1245*.

[93] Compl. P 143.

[94] *Golaine v. Edwards, 1999 Del. Ch. LEXIS 237, 1999 WL 1271882 at *6 (Del. Ch. Dec. 12, 1999)*. [*40] In *Golaine,* the Court dismissed plaintiffs' challenge to $ 20 million in investment banking fees paid to directors in connection with a merger as failing to state an individual claim.

More importantly, courts have explained that HN20[↑] "mentioning a merger [in the complaint] does not talismanically create a direct action." [95] Instead, there must be a causal link between the breach complained of and the ultimate unfairness of the merger. In *Dieterich,* the Chief Executive Officer of Starbase Corporation, which was actively soliciting acquisition bids, was alleged to have aggressively discouraged suitors so that he could represent to the board that a highly dilutive transaction (in which, unbeknownst to the board, he would personally obtain "substantial amounts of Starbase common stock at below-market prices") [96] was the best offer he had been able to find. Further, the Chief Executive Officer was alleged to have intentionally misrepresented to the board that he had included a "fiduciary out" clause in the transaction that would have allowed the board to accept a better offer, if one arose. He then "continued to sabotage other possible transactions" [97] in favor of his own by confidentially disclosing **[*41]** to certain suitors, including Borland Software Corporation, that Starbase was worth considerably less than it appeared to be. After the self-interested transaction ultimately collapsed, Borland came forward with a bid of $ 24 million, down from its original (rebuffed) offer of $ 40 to $ 45 million.

The Court reluctantly concluded that these alleged breaches gave rise to a direct claim, but noted that:

> This conclusion is not "free from doubt" because the deal ultimately negotiated with Borland in October 2002 can be seen as being causally unrelated to the fiduciary

misconduct alleged in the April -- June 2002 timeframe. ***This would even more clearly be the case if the ultimate merger partner was a third party with no connection with the earlier negotiations.*** [98]

Viewed in light of *Dieterich,* it is clear that Plaintiffs' allegations regarding the NYSE negotiations fall well outside of the *Parnes* exception, because the alleged breaches of fiduciary duties are far too attenuated from the ultimate CME transaction and the price that CME paid to establish a causal link. As the complaint itself asserts, NYMEX was in **[*42]** serious discussions with NYSE regarding a possible combination between June and August of 2007. A confidentiality agreement was signed on June 8, and Thain allegedly committed to a purchase price of $ 142 per share on August 1 and "repeatedly said he wanted to have a deal with NYMEX papered within two to three weeks." [99] The Complaint does not allege the specific date at which discussions between NYMEX and NYSE broke down, but asserts that the November approval of the change in control severance plan by the Board occurred "in the aftermath of the aborted NYSE bid." [100] At oral argument, Plaintiffs' counsel noted that "the change in control agreement sprung into existence between the collapsed NYSE deal and the nascent CME deal." [101] Indeed, while "discussions" with CME had begun in late spring of 2007, they did not turn serious until the parties signed a confidentiality agreement on January 7, 2008. Exclusive negotiations with CME would not begin until January 28, 2008, nearly six months after NYSE's

---

[95] *Dieterich, 857 A.2d at 1027.*

[96] *Id. at 1021.*

[97] *Id.*

[98] *Id. at 1029* (emphasis added).

[99] Compl. P 80.

[100] Compl. P 125.

[101] Tr. of Oral Arg. (Mar. 17, 2009) at 60.

"commitment" to pay $ 142 per share and more than two months after Plaintiffs themselves concede the NYSE bid had been aborted. Thus, it cannot be said that the failed negotiations with **[*43]** NYSE are in any way causally linked with the consideration ultimately offered in the CME transaction. More importantly, there is no suggestion that the alleged breach occurred in order to benefit CME. This is not the limited case seemingly countenanced by *Parnes* and its progeny where Schaeffer favored an unfairly low bid from CME against a higher bid from NYSE because CME offered him some personal pecuniary benefit. [102] Indeed, Schaeffer is not alleged to have received anything of value from CME apart from the consideration received by NYMEX shareholders as a whole. [103] As such, the alleged breach of fiduciary duties with respect to the NYSE negotiations could only be the basis for purely derivative actions. Accordingly, the motion to dismiss these claims is granted.

3. Disclosure Claims in the NYMEX Action

The Plaintiffs contend that the Board members also breached their fiduciary duties by "fail[ing] to inform Class members fully on material information relating to the fairness of the proposed sale to CME and the conditions under which the sale was negotiated." [104] In particular, the Plaintiffs claim that the Board should have disclosed the following: more details concerning the NYSE's then-potential offer of $ 142 per share; Schaeffer's alleged

self-interest in connection with an NYSE/NYMEX business combination; the fact that Schaeffer had been negotiating the terms of the transaction with CME; and additional information regarding the underlying assumptions of the fairness opinions, including an explanation for why J.P. Morgan and Merrill Lynch both used two transactions in their precedent transaction analysis that were never consummated. [105] Plaintiffs also assert that these fairness opinions should have been updated to reflect the fact that the change in CME's share price reduced the total consideration **[*45]** by roughly $ 2 billion from the time opinions were first prepared. For reasons discussed below, the Complaint's disclosure claims must be dismissed.

**HN21**[↑] The fiduciary duty of disclosure is a specific application of the duties of care and loyalty; [106] it "requires that a board of directors 'disclose fully and fairly all material information within the board's control when it seeks shareholder action.'" [107] Because the fiduciary duty of disclosure is an application of the duties of care and loyalty, the previous discussion of the NYMEX Certificate's Section 102(b)(7) exculpatory provision is necessarily implicated. [108] Specifically, to the extent the Plaintiffs' disclosure claims are rooted in the duty of care, they must be dismissed because they are barred by the exculpatory clause. [109]

---

[102] *Cf. In re First Interstate Bancorp, 729 A.2d at 855-60.* Although this opinion was issued before *Parnes,* the Supreme Court later confirmed that the decision that plaintiffs' claims were derivative was consistent with both *Parnes* and *Kramer.* **Bradley v. First Interstate Bankcorp, 2000 WL 383788, 748 A.2d 913 (Del. 2000) (TABLE).**

[103] In fact, the overall **[*44]** value of the severance plan was reduced from the $ 97 million approved by the Board prior to a signed deal with CME to $ 67 million in July 2008.

[104] Compl. P 144(c).

---

[105] Pls.' Opp'n Br. to Defs.' Mot. to Dismiss at 25-31.

[106] *See Wayne County Employees' Ret. Sys. v. Corti, 954 A.2d 319, 330 (Del. Ch. 2008).*

[107] *Id.* (quoting *Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992)).*

[108] *See supra* Part II.B.1. *See also Globis Partners, L.P. v. Plumtree Software, Inc., 2007 Del. Ch. LEXIS 169, 2007 WL 4292024, at \*15 (Del. Ch. Nov. 30, 2007)* ("*Section 102(b)(7)* applies to violations of a director's duty of disclosure." (citing *Arnold v. Soc'y for Sav. Banc., 650 A.2d 1270, 1287 (Del. 1994)); Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 141 n.20 (Del. 1997).*

[109] *See Wayne County Employees' Ret. Sys., 2009 Del. Ch.*

And, to the extent that the Plaintiffs attempt to tie them to the duty of loyalty, they must also be dismissed. "A mere conclusory allegation that the alleged disclosure violations also constitute a violation of the duty of loyalty is not sufficient to survive a motion to dismiss, particularly in light of the holding that the Complaint **[*46]** fails to otherwise state a non-exculpated claim against the Director Defendants for breach of fiduciary duty." [110] As discussed above, the Plaintiffs' conclusory attempts to convert care claims into loyalty claims failed for that very reason: they were conclusory.

Accordingly, the Complaint's claims of breach of the duty of disclosure must be dismissed.

4. Aiding and Abetting Claims Against CME

The Plaintiffs allege that the CME Defendants aided and abetted the NYMEX Defendants' breaches of fiduciary duty. **HN22** In order to state a claim for aiding and abetting a breach of fiduciary duty, the Plaintiffs must show: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in the breach by a non-fiduciary defendant; and (4) damages. [111] With regard to the third element--"knowing participation"--conclusory allegations such as "[aiding and abetting defendant] had knowledge of the

_____

LEXIS 126, 2009 WL 2219260, at *9 (holding that the plaintiffs' disclosure claims rooted in the duty of care were barred by the § 102(b)(7) exculpatory clause in the corporation's charter). *See also* In re Transkaryotic Therapies, Inc., 954 A.2d 346, 362 (Del. Ch. 2008) (denying monetary and injunctive relief for disclosure violations after the consummation of a merger where there was no evidence **[*47]** of a breach of the duty of loyalty or the lack of good faith by the directors who authorized the disclosures).

[110] Wayne County Employees' Ret. Sys., 2009 Del. Ch. LEXIS 126, 2009 WL 2219260, at *9.

[111] In re Santa Fe Pacific Corp. S'holder Litig., 669 A.2d 59, 72 (Del. 1995). *See also* In re Gen. Motors (Hughes) S'holder Litig., 2005 Del. Ch. LEXIS 65, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005), *aff'd*, 897 A.2d 162 (Del. 2006).

[fiduciary d]efendants' fiduciary duties and knowingly and substantially participated and assisted in the [fiduciary d]efendants' breaches of fiduciary duty, and, therefore, aided and abetted such breaches of fiduciary duties" are insufficient as a matter of law. [112] That is the very flaw with the Plaintiffs' allegation that CME knowingly participated in the **[*48]** alleged breaches of fiduciary duty.

The Complaint's only allegation of knowing participation is that:

> CME and CMEG NY have aided an abetted the Director Defendants in their breaches of fiduciary duty. As participants of the Acquisition, CME and CMEG NY are aware of the Director Defendants' breaches of fiduciary duties and in fact actively and knowingly encouraged and participated in said breaches in order to obtain the substantial financial benefits that the Acquisition would provide at the expense of NYMEX's stockholders. [113]

This is precisely the sort of conclusory allegation that failed to state an aiding and abetting a breach of fiduciary duty claim in *In re Sante Fe.* [114]

The Plaintiffs argue that their allegations are not conclusory because the Complaint states that "Schaeffer and Newsome committed to Duffy and Donahue [CME's negotiators] that NYMEX would not attempt to renegotiate the economic **[*49]** terms of the Acquisition." [115] This is insufficient to raise a reasonable inference that Donahue and Duffy (or any CME representative) were knowingly

_____

[112] In re Santa Fe, 669 A.2d at 72.

[113] Compl. P 149.

[114] In re Santa Fe, 669 A.2d at 72.

[115] Compl. P 56(G). *See also* Compl. P 94 (noting that "Schaeffer and Newsome . . . did not advise the Board that they had given their commitment to Duffy and Donahue").

encouraging or participating in breaches by Schaeffer and Newsome. The only reasonable inference from this "commitment" is that Donahue and Duffy were deft negotiators-- seeking to "lock-up" a transaction that, presumably, they viewed as favorable to CME. [116] Absent from the Complaint is any allegation that Donahue and Duffy *induced* Schaeffer and Newsome to commit not to renegotiate the economic terms of the transaction; the Court's role on a motion to dismiss is not to redraft the Complaint for the Plaintiffs. Accordingly, because the Complaint states only in conclusory fashion that the CME Defendants aided and abetted the alleged breaches of fiduciary duty, the motion to dismiss the shareholder Plaintiffs' aiding and abetting claims is granted.

## C. *The Class A Member Claims -- the Greene Action*

In the *Greene* Action, Plaintiff Greene maintains for herself and others similarly situated that Defendants also breached the fiduciary duties owed to Class A Members through certain actions taken during the course of the CME merger beyond those asserted in the shareholders' Complaint-- including failing to maximize the consideration offered for **[*51]** Class A Memberships and

failing to provide a fairness opinion with respect to the purchase price offered for Class A Memberships [117]--and that the CME Defendants aided and abetted the breach of these duties. The Court finds all these claims not actionable. Greene also raises breach of fiduciary claims surrounding Class A Members' Section 311(G) rights, including that Defendants failed to call a special meeting about the Section 311(G) trading rights until after they had sent notices to Class A Members redefining the terms of these rights, that Defendants failed to investigate concerns raised over the propriety of the Board's calculations on the timing of Section 311(G) rights despite promising to do so, that the modified rights payments came with tax disadvantages, and that Defendants required Class A Members to sign a "coercive" [118] Final Waiver & Release that released Defendants from all past and future claims in order to obtain the $ 750,000 Membership Rights Payment. Because the Section 311(G) claims raise distinct legal issues, the Court analyzes them separately. [119]

### 1. Claims for Breach of Fiduciary Duties

**HN24**[⬆] In determining whether or not a particular relationship gives rise to fiduciary duties under Delaware law, courts have focused their inquiry on the "nature of the interest or entitlement" at issue. [120]

---

[116] This Court has consistently held that **HN23**[⬆] "evidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, **[*50]** because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries." *In re Frederick's of Hollywood, Inc. S'holders Litig., 1998 Del. Ch. LEXIS 111, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998)*; *In re Shoe-Town, Inc. S'holders Litig., 1990 Del. Ch. LEXIS 14, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990)* (concluding that the motion to dismiss as to the acquirer, GECC, would be granted because GECC's "involvement in the challenged transaction," was entirely consistent with "GECC as a party engaged in an arms-length negotiation of a business transaction"). "Under [the knowing participation] standard, a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting . . . ." *Malpiede v. Townson, 780 A.2d 1075, 1097 (Del. 2001)*.

[117] In addition, Greene cites the Board's decision to restrict the number of seats each Class A Member was allowed **[*52]** to hold, thereby reducing the seats' market value, as well as certain "misstatements" made by the principals of CME as additional breaches of fiduciary duties owed Class A Members.

[118] Greene Compl. P 1. The Plaintiffs in the NYMEX Action also bring a claim with respect to the enforceability of the waiver and release on behalf of the shareholders who are also Class A Members.

[119] *See infra* Part II.C.2.

[120] *Simons v. Cogan, 549 A.2d 300, 303 (Del. 1988)*.

Specifically, "before a fiduciary duty arises, an existing property right or equitable interest supporting such a duty must exist." [121] In this context, the duties grow out of the relationship between the managers of a corporation and its owners, the shareholders. Before NYMEX's 2000 demutualization, such a fiduciary relationship existed between Class A Members and the NYMEX Defendants. [122] However, the demutualization severed Members' equity stake in the Exchange and transferred it into an equity stake in NYMEX Holdings. With that transfer, those fiduciary [*53] duties owed Members *qua* members were terminated and the resultant fiduciary relationship existed only by way of their status as NYMEX Holdings shareholders. Consequently, any present rights unique to Class A members arise purely through their trading contract with the Exchange and are limited by the terms of that contract, the Exchange Certificate of Incorporation and Bylaws.

In her complaint, Greene asserts that a variety of sources establish the existence of a fiduciary duty between NYMEX Defendants and Class A Members, including the fact that Members have a vested property right in their seats, and that the Exchange's governing documents appear to countenance certain duties owed to Members. She argues that courts in Delaware and New York have recognized fiduciary duties owed to similarly situated plaintiffs, and that the Delaware General Corporation Law [*54] has expanded shareholder rights to members in non-stock corporations.

As a general matter, Greene's assertion that "[m]embers in a non-stock corporation are owed the same fiduciary duties by the corporation's governing body as a shareholder in a stock corporation is owed by the corporation's board of directors," [123] while overbroad, is not unfounded. The inquiry over whether a fiduciary duty exists between Defendants and the Class A Members does not turn on whether the Exchange is a stock or a non-stock corporation. Greene, however, misstates Delaware law in asserting that the "focus is on whether it is governed by a body that is empowered to act on behalf of the 'Corporation [and] its members.'" [124] *HN25*[⬆] The relevant question is, instead, whether there is a "separation of legal control from beneficial ownership" [125] with respect to a valid property interest "necessary for the imposition of a trust relationship with concomitant fiduciary duties." [126] The cases that Greene cites in this regard do not help her cause because they involved non-stock corporations and exchanges whose plaintiff members still retained an equity stake *by way of* their memberships, as had been the case with NYMEX before [*55] the demutualization. [127]

The assertion by Greene that the existence of a leasing market for seats on the Exchange evidences a vested property interest that

---

[121] *Id. at 304*.

[122] *See, e.g., CBOT Holdings, Inc. v. Chicago Bd. Options Exch., Inc., 2007 Del. Ch. LEXIS 114, 2007 WL 2296355 (Del. Ch. Aug. 3, 2007)*; *Higgins v. NYSE, 10 Misc. 3d 257, 806 N.Y.S.2d 339 (N.Y. Sup. Ct. 2005)*; *Wey v. NYSE, 15 Misc. 3d 1127A, 841 N.Y.S.2d 222 (N.Y. Sup. Ct. 2007)*; *Hyman v. NYSE, 18 Misc. 3d 1112A, 856 N.Y.S.2d 24 (N.Y. Sup. Ct. 2007)*.

[123] Pl. Shelby Greene's Br. in Opp'n to Defs.' Jt. Am. Mot. to Dismiss and Stay Disc. ("Greene Br. in Opp'n") at 18 (citing *Nevins v. Bryan, 885 A.2d 233, 248 n.53 (Del. Ch. 2005)*).

[124] Greene Br. in Opp'n at 19 (citing language in the Exchange's Certificate of Incorporation).

[125] *Malone v. Brincat, 722 A.2d 5, 9 (Del. 1998)*.

[126] *Simons v. Cogan, 549 A.2d 300, 303 (Del. 1988)*.

[127] Greene asserts that "a Class A Membership is an equity interest in the Exchange," (Greene Br. in Opp'n at 23 n.7) and ought to be treated in line with this line of cases. However, the fact that CME successfully acquired NYMEX without simultaneously purchasing the Class A seats evidences the untenability of this claim.

carries with it fiduciary duties is also misguided. **HN26[⬆]** For a fiduciary duty to be created, there must be both (1) a property or other equitable interest; and (2) the ceding of legal control over the property interest, such that the owner "reposes special trust in and reliance on the judgment" [128] of those in control. This second prong is not met with respect [*56] to any property interest Class A Members have in their seats. While a given lessee pays rent to the Class A Member-lessor for the "rights, privileges and use" of a Membership, [129] it is the individual Class A Member, not the NYMEX Defendants, who determines whether or not to lease her seat, as well as the scope and terms of any seat leasing arrangement.

Additionally, the Bylaws expressly carve out determinations over the rights of Class A Members, including with respect to seat leasing arrangements, from the Board's power and control. They, instead, place the authority in the self-governance of the Class A Members as a whole. Section 301(A) of the Bylaws states, "Except as set forth in Section[] . . . 311, . . . the Exchange shall be managed by the Board," while Section 301(D) states, "With respect to Section[] . . . 311, . . . the Directors shall (i) not be liable to the Exchange or its Members by reason of the actions or omissions of the Class A Members. . . ." Section 311 includes a list of those matters deemed Special Matters, which require a vote by the owners of Class A Memberships [*57] to be changed. Section 311(C)(6) names the following as Special Matters:

> material changes to the Membership, eligibility or capital requirements to become a Member, Member Firm or clearing member, to lease a membership

or to exercise the associated trading or clearing rights or privileges;

Accordingly, because the terms of individual leasing contracts were determined by the associated lessor Members and any structural changes to the rights of Members to lease were governed by the Class A Members as a group, it cannot be said that Defendants had control over the Membership seats sufficient to establish a distinct fiduciary duty.

Finally, Greene claims that the Exchange Certificate of Incorporation and Bylaws themselves imply the existence of fiduciary duties to Class A Members, and that these governing documents should be "accorded great deference as long as their provisions do not run afoul of Delaware's corporate statute or public policy." [130] Specifically, she points to Article 3 of the Exchange Bylaws, which states that the Board "is vested with all powers necessary and proper for the government of the Exchange," [131] and to Article Fifth of the Certificate, which states that the "the [*58] business and affairs of the Corporation shall be managed by or under the direction of the Board." [132] Although Greene is correct that this relationship creates a fiduciary duty to the equity holder of the Exchange--NYMEX Holdings--she is incorrect in her inference that it is also enjoyed by Class A Members. Because Class A Members hold no equity in the Exchange they cannot benefit from the

---

[128] *McMahon v. New Castle Assoc., 532 A.2d 601, 604 (Del. Ch. 1987)*.

[129] Greene Br. in Opp'n at 23 n.7.

---

[130] Greene Br. in Opp'n, at 27 (citing *Jones Apparel Group, Inc. v. Maxwell Shoe Co., Inc., 883 A.2d 837, 2004 WL 5366716, at *8-9 (Del. Ch. 2004)*. Greene also cites *Scattered Corp. v. Chicago Stock Exchange, Inc., 1996 Del. Ch. LEXIS 79, 1996 WL 417507, at *4 (Del. Ch. July 12, 1996)*, for the doctrine that "a corporate charter will normally be interpreted literally and technically."

[131] NYMEX Exchange Bylaws, Section 300 (Pl.'s Mot. for Decl. J., Ex. B).

[132] NYMEX Exchange Certificate of Incorporation, Article Fifth (Pl.'s Mot. for Decl. J, Ex. A).

existence of this duty. [133]

Additionally, Plaintiff points to Article Ninth in the Exchange Certificate, which states that directors will be not personally liable "to the Corporation or its members" for monetary damages for breach of fiduciary duties except, *inter alia,* "for any breach of the director's duty of loyalty to the Corporation or its members." However, this clause does not function to create or acknowledge the existence of any fiduciary duties, but acts to delineate the rights of directors and the Exchange should a court later find such duties, which this Court declines to do here. Greene's assertions to the contrary, the provision of a means to exculpate the breach of possible fiduciary duties by [*60] a managing agent does not operate to create such duties.

Thus, NYMEX Defendants owe no fiduciary duty to Class A Members solely by virtue of their membership. For this Court to hold otherwise would expand the fiduciary relationship far beyond the boundaries previously established by Delaware courts and would unnecessarily impose upon the NYMEX directors competing fiduciary relationships. Accordingly, the motion to dismiss breach of fiduciary duty claims brought on behalf of the Class A Members against the NYMEX Defendants is granted. Furthermore, as any liability that the CME Defendants would have

---

[133] *See Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1174 (Del. 1998)* (**HN27**⬆) "[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the [*59] parent and its shareholders."). *See also Grace Bros. Ltd v. Unitholding Corp., 2000 Del. Ch. LEXIS 101, 2000 WL 982401, at *12 (Del. Ch. July 12, 2000)* (holding that, where members of a parent company's board of directors also serve on the board of the parent's wholly-owned subsidiary or "have knowledge of proposed action at the subsidiary level that is detrimental to parent company, they have a fiduciary duty, as part of their management responsibilities, to act in the best interests of the parent company and its stockholders.").

toward the Class A Members would necessarily be derivative of those duties owed by the NYMEX Defendants, the motions to dismiss the aiding and abetting claims and breach of fiduciary duty claims against the CME Defendants are likewise granted.

2. Plaintiff's Section 311(G) Claims

Greene argues that Class A Members are entitled to past due, present, and future payments as a result of the provision in Section 311(G) of the Exchange Bylaws--since amended by Class A Members in conjunction with this merger--that grants Members a percentage of gross Exchange revenues for certain NYMEX Division products [*61] once a given percentage threshold of electronic trading in the particular product is met. [134] She further asserts that the Board's recent interpretation of when such Section 311(G) rights would trigger was improper and in violation of their fiduciary duties, and that the Board also breached its duties in failing to investigate and report on shareholder concerns about the propriety of this interpretation, delaying the special meeting with respect to these rights and prohibiting Plaintiff counsel from attending the meeting, as well as in structuring the Membership Rights Payment to be subject to ordinary income tax treatment. [135] Finally, Greene alleges (as do the shareholder Plaintiffs) that both the Class A Member vote and the execution of the Final Waiver & Release waiving the right to these royalties were coerced by Defendants and that the release should be declared unlawful, void and unenforceable by the Court. [136] For their part, Defendants assert that the Section 311(G) rights and Class waivers are

---

[134] Greene Compl., Wherefore Clause, P E.

[135] Greene Compl. PP 79-95. These fiduciary duty claims (i.e., those not based in contract) have been dismissed previously. *See supra* Part II.C.1.

[136] Greene Compl., Wherefore Clause, P B.

contractual disputes subject to the mandatory arbitration provision found in the previous Exchange Bylaws and thus beyond the reach of this Court. [137] Greene counters that the Court **[*62]** should extend its supplemental jurisdiction to hear these claims because the factual issues surrounding the Section 311(G) rights are "directly linked to the unfair process the Defendants' engaged in throughout the course of the merger" and that it would otherwise deny Plaintiff complete justice "as her fiduciary duty claims rest in substantial part on the resolution of the Section 311(G) issue." [138]

The question of whether Class A Members are owed Section 311(G) payments turns on the contractual rights they have by way of the governing documents of the Exchange. As such, they are subject to the arbitration provision delineated in the Exchange Bylaws and outside the purview of this Court. [139] However, the appropriate disposition of Greene's claims as to the fairness of the transaction at issue and the fact that the potential coerciveness of the waiver turns on the availability of any past **[*63]** due, present or future Section 311(G) payments necessitate a more careful analysis of the substance of those claims involving Section 311(G) rights, a task to which the Court now turns.

Prior to its amendment by Class A Members, Section 311(G) of the Exchange Bylaws

provided, in relevant part:

> If the exchange determines . . . to terminate permanently all open outcry floor trading for a particular listed product on the NYMEX Division and instead to list such NYMEX Division product for trading only via electronic trading, or at least 90% of contract volume of such applicable NYMEX Division product is from electronic trading, **[*64]** then in such case the owners of Class A memberships shall, at the time of the termination or shift to electronic trading, thereafter be entitled to receive in perpetuity . . . 10% of the gross Exchange revenues attributable to all revenue . . . from the electronic trading of such applicable NYMEX Division product. [140]

Greene's assertion is that this threshold was met for each of the applicable NYMEX Division products by 2007, and that, as a result, she and each Class A Member is entitled to at least $ 68,000 in past due royalty payments, totaling more than $ 55.5 million. She disputes NYMEX's recent interpretation of when the rights trigger--only upon two consecutive quarters of more than 90% electronic trading-- as "self-serving," contrary to the "clear language of Section 311(G)," [141] and in breach of their fiduciary duties. Greene additionally raises issue with NYMEX's methodology for calculating trading percentages. The Court need not determine the correct trigger for Section 311(G) rights or whether Defendants' interpretation of the Bylaw provision was proper, as any claims for past, current, or future payments were extinguished by the Class A Member vote to amend the Exchange Bylaws **[*65]** and eliminate these rights.

The Bylaws were amended by Class A

[137] Am. Mot. to Dismiss and to Stay Disc. P 2.

[138] Greene Br. in Opp'n at 48.

[139] The arbitration provision is found in Section 311(D)(1) of the Exchange's Bylaws and states, in relevant part: "Any dispute as to whether the rights of the owners of the Class A Memberships concerning a Special Matter [all matters set forth in subsections (C) through (H) of Section 311] have been violated . . . will be submitted to mandatory and binding arbitration. . . ." NYMEX Exchange Bylaws, Section 311(D)(1). In addition to Section 311(G), any "material changes to the Membership" are also included within the scope of Special Matters. Id., Section 311(C)(6).

[140] NYMEX Exchange Bylaws, Section 311(G).

[141] Compl. P 86.

Members pursuant to Section 500(B)(1) of the document, which states that Section 311(G) may be "amended, modified, eliminated, waived or deleted in any way . . . with the consent of the owners of 75% of all of the Class A Memberships." [142] Section 500(B)(2) of the Bylaws further states that, in addition to the Section 500(B)(1) provision calling for a supermajority vote to modify certain sections, including Section 311(G):

> [A]ny amendment, modification, elimination, waiver, deletion or expansion of or supplement to the certificate of incorporation or bylaws of NYMEX Holdings or the certificate of incorporation of the Corporations which could adversely affect any rights of the Class A Members under or in connection with . . . 311(H), shall require . . . the concurrence of the owners of 75% of all of the Class A Memberships. . . . [143]

The Bylaws operate as a contract both among its Class A Members as individuals as well as between the Corporation and Class A Members as a group. [144] Accordingly, actions [*66] taken by the Class A Members in aggregate, pursuant to procedures delineated in the Bylaws, may successfully bind Members with respect to their individual claims. The vote of a supermajority of Class A Members to amend the Bylaws to eliminate Section 311(G) rights makes Plaintiff's claim for Section 311(G) rights not actionable. Any past claims to Section 311(G) rights by Class A Members were equally waived by the vote. [145] The

protection of these individual contractual claims lays in the super-majority vote required by the class to remove them, and in the proper disclosure of the terms of any such amendment proposed. [146] This was certainly met in the instant case. Class A Members understood that a vote in favor of amending the Bylaws would serve to eliminate all claims to Section 311(G) royalties, and the Supplemental Proxy--aided by Plaintiff's complaint--gave class members clear notice of a dispute over the potential value of the rights being foregone. Nevertheless, Class A Members voted overwhelmingly to amend the Exchange's Bylaws to eliminate the rights, with more than 80% voting in favor. As is evidenced by their ability to renegotiate the terms of the Revised Proposal in their [*67] favor, Class A Members were not coerced into voting in favor of the amendments or in waiving their Section 311(G) rights. Thus, there is no fundamental unfairness to Plaintiff in recognizing the consequences of this vote. As such, the motion to dismiss all Plaintiff's claims involving Section 311(G) rights is granted.

### D. *The Final Waiver and Release*

Finally, the plaintiffs in both actions seek to have the Final Waiver & Release [*68] that Class A Members were required to sign in order to receive the Membership Rights Payment declared unlawful, void and unenforceable as coercive and overly broad. [147] Defendants argue that the waiver should be

---

[142] NYMEX Exchange Bylaws, Section 500(B)(2).

[143] *Id.,* Section 500(B)(1).

[144] *See, e.g., Jana Master Fund, Ltd. v. CNET Networks, Inc., 954 A.2d 335, 338 (Del. Ch. 2008)* (**HN28** ↰) "[A] corporation's bylaws and charter are contracts among its shareholders . . . .").

[145] Greene's assertions to the contrary, the Section 311(G) payments are not "vested" rights that would persist despite the

Class A Member amendment. Such rights do not arise where a corporation's bylaws give notice that contractual rights provided for in the bylaws may be eliminated by amendment. *See, e.g., Roven v. Cotter, 547 A.2d 603, 608 (Del. Ch. 1988).*

[146] Such protection should have been adequate in this case, given that Class A Members would be expected to have substantially identical interests and there is no indication that a material number of Members held any adverse interests.

[147] Greene Compl., Wherefore Clause, P B; Compl., Wherefore Clause, P C.

viewed in conjunction with the Class A Member vote to amend the Certificate and Bylaws, and that there was no actionable coercion where the Members had veto power over the transaction and could retain the status quo. [148] Because Class A Members have no actionable claims remaining either as Members or as stockholders, the Court need not determine whether or not the Final Waiver & Release was coercive, and declines to do so here. [149]

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted. Implementing **[\*69]** orders will be entered.

---

---

[148] Reply Br. of Defs. CME Group, Inc. and CMEG NY Inc. in Further Supp. of their Cross-Mot. for Partial Summ. J. at 1-2. Defendants also assert that the shareholder Plaintiffs do not have standing to challenge the waiver. *Id.* at 3.

[149] Similarly, the Court need not consider the related question of whether removal of the reference to the Effective Date improperly made the waiver retroactive.

# Tab L

 Neutral
As of: December 16, 2019 4:00 PM Z

# McFall v. Stacy & Witbeck, Inc.

United States District Court for the Northern District of California

October 26, 2016, Decided; October 26, 2016, Filed

Case No. 14-cv-04150-JSC

**Reporter**
2016 U.S. Dist. LEXIS 148399 *; 2016 WL 6248882

KEVIN MCFALL, Plaintiff, v. STACY AND WITBECK, INC., et al., Defendants.

## Core Terms

valuation, aiding and abetting, stock price, statute of limitations, allegations, manipulation, discovery, breach of fiduciary duty, cause of action, stock, shares, discovery rule, amended complaint, three year, tortfeasors, fraudulent concealment, actual knowledge, quotation, suspected, accrual, accrued, marks, motion to dismiss, share price, projections, suspicion, discover, parties, drive, substantial assistance

**Counsel:** [*1] For Kevin McFall, Plaintiff: Keith Pitt, LEAD ATTORNEY, Philip Nelson, Slinde Nelson Stanford, Portland, OR.

For Stacy and Witbeck, Inc., a California corporation, Defendant: Karl David Belgum, Stacy Morgan Boven, Nixon Peabody LLP, San Francisco, CA.

For John Bollier, Defendant: Karl David Belgum, Nixon Peabody LLP, San Francisco, CA.

For Houlihan Lokey, Inc., a California

corporation, Defendant: Jacqueline Elizabeth Young, LEAD ATTORNEY, Perkins Coie LLP, San Francisco, CA; Thomas Russell Johnson, Jr., PRO HAC VICE, Perkins Coie, Portland, OR.

**Judges:** JACQUELINE SCOTT CORLEY, United States Magistrate Judge.

**Opinion by:** JACQUELINE SCOTT CORLEY

## Opinion

### ORDER RE: HOULIHAN LOKEY'S MOTION TO DISMISS

Re: Dkt. No. 94

Plaintiff Kevin McFall alleges that Stacy and Witbeck, Inc., and John Bollier, the CEO of Stacy and Witbeck, breached their respective duties to him regarding the valuation of the company's stock, and that their efforts to do so were aided and abetted by Houlihan Lokey, Stacy and Witbeck's independent valuation firm. Newly added Defendant Houlihan Lokey's motion to dismiss the aiding and abetting claim is now pending before the Court. (Dkt. No. 94.) Having considered the parties' briefs and

having had the benefit **[*2]** of oral argument on October 6, 2016, the Court GRANTS the motion to dismiss. As the Second Amended Complaint expressly alleges that Plaintiff believed the stock price was being manipulated as early as March 2012, and as the breach of fiduciary duty claim accrued in March 2103, Plaintiff's aiding and abetting a breach of fiduciary duty claim filed against Houlihan Lokey in April 2016 is barred by the statute of limitations. However, Plaintiff will be granted leave to amend to allege, if possible, that the doctrine of fraudulent concealment applies and to adequately plead a claim for aiding and abetting.

## BACKGROUND

### A. Factual Allegations of the Second Amended Complaint

Plaintiff was a long-time senior level employee and member of the board of directors of Stacy and Witbeck. (Second Amended Complaint ("SAC"), Dkt. No. 84 at ¶¶ 7-8.) In March 2012, Plaintiff announced his intent to retire in June 2013 because of concerns he had regarding "stock price manipulations." (*Id.* at ¶ 21.) In particular, Plaintiff had concerns regarding CEO John Bollier's efforts to devalue the company stock commencing in the Spring of 2010. (*Id.* at ¶ 17.) Bollier was assisted in his efforts by Houlihan Lokey ("Houlihan"), **[*3]** the financial valuation firm which Stacy and Witbeck had contracted with for many years to provide an appraisal of the value the Employee Stock Options ("ESOP") shares. (*Id.* at ¶ 15.) In addition to ESOP shares, certain key employees such as Plaintiff also privately held stock pursuant to a Buy-Sell Agreement executed in 2006.[1] (*Id.* at ¶ 13.) Although

Houlihan's appraisal "was explicitly limited to" valuation of the ESOP shares, Houlihan "knew that the valuation was being used for the separate and distinct purpose of valuing the company private shares." (*Id.* at ¶ 15.)

When Bollier became CEO in 2010 he "instructed" Houlihan to "value the company without taking into account excess cash on hand, a major variation from generally accepted accounting and valuation principles which has the effect of depressing stock value." (*Id.* at ¶ 17.) Bollier continued his efforts to "drive down the company stock price" through 2012 "refusing to count Stacy and Witbeck's excess cash—now at record levels—as part of the company's valuation." (*Id.* at ¶ 19.) After members of the Board protested, **[*4]** Bollier allowed Houlihan to include some of the excess cash, "driv[ing] up the valuation slightly." (*Id.* at ¶ 20.) Nonetheless, "Houlihan "knew that the Stacy and Witbeck projections and excess cash calculations were unreasonably conservative and not in keeping with generally accepted accounting and business appraisal principles." (*Id.*)

For the fiscal year 2012 ("FY 2012") evaluation, Bollier and Houlihan "commenced a process of manipulating numbers and assumptions inside the valuation itself to raise up the stock price without disturbing the fundamental pessimism of the Bollier projections that Bollier had already sold to senior company management." (*Id.* at ¶ 23.) Based on Bollier's "overly pessimistic set of future projections" and refusal "to count excess cash towards the evaluation" Houlihan initially valued the stock at $226 per share—a decline of nearly 20%. (*Id.* at ¶ 23.) Because Bollier and Houlihan "knew that th[is] dramatic stock price reduction would wreak havoc inside the Board of Directors and with the company

---

[1] The Buy-Sell Agreement was discussed at length in the Court's Order on a prior motion to dismiss. (Dkt. No. 23.)

stockholders, they "engaged in a number of accounting machinations to drive the stock price up to $246." (*Id.* at ¶¶ 23-24.) "[W]orking in concert, [they] employed a number of valuation gymnastics **[*5]** to arrive at the predetermined valuation number," although Houlihan "knew that the underlying projections were overly conservative" and "out of step with" valuation principles. (*Id.* at ¶ 24.) In March of 2013, Bollier announced a FY 2012 share price of $279.24; "Houlihan Lokey had hit their target." (*Id.* at ¶ 25.)

As a result of this share price manipulation, when Plaintiff sold his shares in March 2013 they were significantly undervalued despite 2012 being a record year for profits at Stacy and Witbeck. (*Id.* at ¶¶ 22-25.) Indeed, while the FY 2012 stock price was valued only 1% above the prior year, the fiscal year 2013 (the year Bollier liquidated holdings) the stock price was set at rate that was 22% higher than the prior year. (*Id.* at ¶¶ 25-26.) Plaintiff alleges that he suffered $3 million in damages as a result of the stock price manipulation.

## B. Procedural Background

Plaintiff filed this action alleging two claims for relief for breach of contract, breach of good faith and fair dealing, and breach of fiduciary duty against Defendant Stacy & Witbeck and John Bollier.[2] (Dkt. No. 1.) The Court granted in part and denied in part Defendants' motion to dismiss. (Dkt. No. 23.) Plaintiff **[*6]** thereafter filed a First Amended Complaint which Defendants answered. (Dkt. Nos. 31 & 32.) The parties delayed much of their discovery to pursue mediation in September 2015; however, mediation was ultimately unsuccessful. (Dkt. No. 41 at 2:14-16.[3])

Following this, the parties engaged in discovery as a result of which Plaintiff sought to add Houlihan as a Defendant. Under the liberal amendment standards of *Federal Rule of Civil Procedure 15*, Plaintiff was granted leave to do so and thereafter filed the now operative Second Amended Complaint. (Dkt. Nos. 83 & 84.) The Second Amended Complaint includes the prior claims against Stacy and Witbeck and Bollier and includes a new claim that Houlihan aided and abetted in Bollier's breach of fiduciary duty. Houlihan thereafter filed the now pending motion to dismiss the SAC.[4] (Dkt. No. 94.)

## DISCUSSION

Houlihan's motion to dismiss the SAC is two-fold. First, Houlihan argues that Plaintiff's aiding and abetting claim is barred by the statute of limitations. Second, Houlihan contends that even if not so barred, Plaintiff's allegations fail to state a claim for aiding and abetting a breach of fiduciary duty. The Court addresses each in turn.

## A. The Statute of Limitations

Although the statute of limitations is an affirmative defense, if the face of the complaint demonstrates that the claim was filed after its expiration the defendant may raise the defense in a motion to dismiss. *Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980)*.

## 1) A Three-Year Statute of Limitations

---

[2] The first claim for relief has three "counts": one for breach of contract, and two for breach of the duty of good faith and fair dealing as to each defendant separately.

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[4] Houlihan has also consented to the jurisdiction of the undersigned magistrate **[*7]** judge pursuant to *28 U.S.C. § 636(c)*. (Dkt. No. 93.)

**Applies**

"The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or nonfraudulent." *Am. Master Lease LLC v. Idanta Partners, Ltd., 225 Cal. App. 4th 1451, 1479, 171 Cal. Rptr. 3d 548 (2014)*, as modified (May 27, 2014). Houlihan contends that the three-year limitations period applies because its conduct alleged here sounds in fraud: Plaintiff alleges that Houlihan's valuations were false and misrepresented the company's actual value. Plaintiff counters that this is nothing more than an attempt to recast Plaintiff's allegations which nowhere use the term fraud. **[*8]** However, "[t]he statute of limitations that applies to an action is governed by the gravamen of the complaint, not the cause of action pled." *City of Vista v. Robert Thomas Sec., Inc., 84 Cal. App. 4th 882, 889, 101 Cal. Rptr. 2d 237 (2000)*. It is thus not dispositive that Plaintiff does not use the terms fraud or misrepresentation in the context of his aiding and abetting claim. *See Thomson v. Canyon, 198 Cal. App. 4th 594, 607, 129 Cal. Rptr. 3d 525 (2011)* ("[w]here the gravamen of the complaint is that defendant's acts constituted actual or constructive fraud, the applicable statute of limitations is the *Code of Civil Procedure section 338, subdivision (d)* three-year limitations period, governing fraud even though the cause of action is designated by the plaintiff as a claim for breach of fiduciary duty.") (internal citation and quotation marks omitted). Instead, the Court looks to the essence of Plaintiff's complaint.

Under California law, the elements of fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damages." *Lazar v. Superior Court, 12 Cal. 4th. 631, 638, 49 Cal. Rptr. 2d 377,*

*909 P.2d 981 (1996)*. In contrast, "[t]he elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damages proximately caused by the breach." *Tribeca Companies, LLC v. First American Title Insurance Company, 239 Cal. App. 4th 1088, 1114, 192 Cal. Rptr. 3d 354 (2015)*.

Here, **[*9]** Plaintiff alleges Houlihan and Bollier "together [] commenced a process of manipulating numbers and assumptions inside the valuation" (SAC at ¶ 23); "engaged in a number of accounting machinations" (*Id.* at ¶ 24); and "working in concert, employed a number of valuation gymnastics" (*Id.*). These allegations regarding Houlihan's misrepresentations of Stacy and Witbeck's actual value through accounting "gymnastics" and "manipulati[ons]" sound in fraud. *Compare City of Vista, 84 Cal.App.4th at 889* (concluding that the three-year fraud statute of limitations for fraud applied to a claim that a securities broker misrepresented the risk-level of a security) *with Thomson v. Canyon, 198 Cal. App. 4th at 607* (concluding that "Plaintiff's claim is not founded upon the concealment of facts but upon defendants' alleged failure to draft documents necessary to the real estate transaction in which they represented plaintiff."). Accordingly, the three year statute of limitations for fraud applies.

**2) Accrual of Plaintiff's Fraud and Aiding and Abetting Claims**

A cause of action accrues at "the time when, under the substantive law, the wrongful act is done, or the wrongful result occurs, and the consequent liability arises," *Norgart v. Upjohn Co., 21 Cal. 4th 383, 397, 87 Cal. Rptr. 2d 453, 981 P.2d 79 (1999)* (internal citation and quotation marks omitted). In other words, the statute **[*10]** of limitations begins to run "when the cause of action is complete with all of its

elements." *Norgart, 21 Cal. 4th at 397* (citation omitted). The aiding and abetting a breach of fiduciary duty claim is predicated on the FY 2012 valuation of Stacy and Witbeck's shares which was set on March 8, 2013 (Plaintiff had already sold his shares three months earlier). This then is the date upon which the claim accrued. Plaintiff's suggestion that the accrual date should instead be the date he actually paid for his shares (sometime in June of 2013) is unavailing; given that Plaintiff had already sold his shares, he was damaged when the share price was set at an allegedly artificially low level.

Although Plaintiff timely pled his breach of fiduciary duty claim against Stacy & Witbeck and John Bollier, he did not seek to add Houlihan as a party until April 22, 2016—more than three years after the breach of fiduciary duty claim, and thus the aiding and abetting the breach claim accrued. Plaintiff argues that his delay in filing is nonetheless excused under the discovery rule.

### 3) The Discovery Rule Does Not Save Plaintiff's Aiding and Abetting Claim

Under California's discovery rule, a fraud claim is "not deemed to have accrued **[*11]** until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Cal. Code. Civ. P. § 338(d)*. "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof — when, simply put, he at least suspects [] that someone has done something wrong to him, wrong being used, not in any technical sense, but rather in accordance with its lay understanding." *Norgart, 21 Cal. 4th at 397-98* (internal citation and quotation marks omitted). "[S]uspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will

generally trigger the statute of limitations period." *Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807, 27 Cal. Rptr. 3d 661, 110 P.3d 914 (2005)*. The discovery rule "allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity" because "the identity of the defendant is not an element of a cause of action." *Id.* Thus, "[t]he discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." *Id.*

Because the discovery rule operates as an exception to the statute of limitations, "if an action is brought more than three years after commission of the fraud, plaintiff has the burden **[*12]** of pleading and proving that he did not make the discovery until within three years prior to the filing of his complaint." *Hobart v. Hobart Estate Co., 26 Cal.2d 412, 437, 159 P.2d 958 (1945)*. "To excuse failure to discover the fraud within three years after its commission, a plaintiff also must plead facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Cansino v. Bank of Am., 224 Cal. App. 4th 1462, 1472, 169 Cal. Rptr. 3d 619 (2014)* (internal quotation marks omitted). To that end, a plaintiff must allege facts showing "the time and surrounding circumstances of the discovery and what the discovery was." *Id.* "The discovery related facts should be pleaded in detail to allow the court to determine whether the fraud should have been discovered sooner." *Id.*

Plaintiff affirmatively alleges that he suspected wrongdoing—that is, the manipulation of the stock price—in March 2012, and that as a result of that suspicion he announced in March 2012 that he would retire in June 2013. (Dkt. No. 84 at ¶ 21.) The discovery rule therefore does not save his claim: he discovered, or at least suspected, wrongdoing before his cause

of action even accrued in March 2013.

Plaintiff contends in his opposition brief (although not pled in **[\*13]** the SAC) that it was not until early 2016 that he had access to documents—produced during discovery—that detailed Houlihan's active role in Bollier's share price manipulation. (Dkt. No. 106 at 7.) Plaintiff argues that he attempted to obtain discovery regarding the FY 2012 valuation, and in particular, Houlihan's involvement in the valuation process since the commencement of this action, but that Houlihan and Stacy & Witbeck resisted his efforts to do so. Plaintiff also emphasizes the parties' stay of discovery while attempting mediation. These facts, however, do not toll the discovery rule. Plaintiff had three years from accrual of the claim to investigate his suspicions regarding the stock price manipulations. That Plaintiff did not know Houlihan was allegedly aiding and abetting the stock manipulation until March of 2016 is immaterial as the discovery rule "allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity." *Fox, Inc., 35 Cal. 4th at 807.* "[T]he rationale for distinguishing between ignorance of the wrongdoer and ignorance of the injury itself appears to be premised on the commonsense assumption that once the plaintiff is aware of the injury, the **[\*14]** applicable limitations period . . . normally affords sufficient opportunity to discover the identity of all the wrongdoers." *Bernson v. Browning-Ferris Indus., 7 Cal. 4th 926, 932, 30 Cal. Rptr. 2d 440, 873 P.2d 613 (1994)*; *see also Pedro v. City of Los Angeles, 229 Cal. App. 4th 87, 102-03, 176 Cal. Rptr. 3d 777 (2014)* (holding that that "ignorance of the identity of the accused officer" did not toll the one-year statute of limitations for a *Government Code Section 3304* claim; the statute began to run upon the discovery of an allegation of misconduct and "the statute does not state or suggest that the defendant's identity must be known or suspected for the

limitations period to commence.").

At oral argument, Plaintiff advanced an alternative argument—that he did not discover the stock manipulation until the FY 2013 share price was set in March of 2014 because the 22% uptick in share price confirmed that the FY 2012 valuation was an outlier. This argument, however, is contradicted by his express allegation that in March of 2012 he announced his plan to retire "due to the stock price manipulation and the impact it might have on his shares." (Dkt. No. 84 at ¶ 21.) If in March 2012 he was so concerned about stock manipulation that he announced he would retire in June 2013, he had "a suspicion of wrongdoing, and therefore an incentive to sue" as soon as his claim accrued in March **[\*15]** 2013. *Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1111, 245 Cal. Rptr. 658, 751 P.2d 923 (1988).* "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; []he cannot wait for the facts to find h[im]." *Id.*; *Fox, 35 Cal. 4th at 808* ("[i]n order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury.").

## 4) Leave to Amend to Allege Fraudulent Concealment

At oral argument, Plaintiff suggested that the equitable estoppel doctrine of fraudulent concealment should apply here based on the difficulty Plaintiff had obtaining discovery from Houlihan. "In order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Baker v. Beech Aircraft*

Amanda Stubblefield

*Corp., 39 Cal.App.3d 315, 321, 114 Cal. Rptr. 171(1974)* (citation omitted). "A plaintiff must affirmatively excuse his failure to discover the fraud within three years by showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to **[*16]** put him on inquiry." *Bedolla v. Logan & Frazer, 52 Cal.App.3d 118, 129, 125 Cal. Rptr. 59 (1975)*. This equitable principle extends to estop a "defendant who intentionally conceals his or her identity...from asserting the statute of limitations to defeat an untimely claim." *Bernson, 7 Cal. 4th at 934*. However, "[w]here the identity of at least one defendant is known[] the plaintiff must avail himself of the opportunity to file a timely complaint naming Doe defendants and take discovery." *Id. at 937*.

Here, Plaintiff served Houlihan with a subpoena in March 2015—a year before the statute of limitations ran—but did not move the Court to compel compliance with the subpoena until a year later. (*Compare* Dkt. No. 54-1 at 8 *with* Dkt. No. 54.) The record is not clear as to what was going on during this one year period, although the parties have acknowledged that discovery was stayed during part of this time while the parties attempted to mediate. In October 2015, Plaintiff sought to compel Defendants to produce valuation documents including documents provided to Houlihan. In doing so, Plaintiff characterized Houlihan as Stacy and Witbeck's "purportedly independent valuation firm" and argued that the initial stock price for 2012 was established by Bollier "[i]n a very tightly controlled process with Houlihan Lokey"—parroting **[*17]** language which was to appear in the Second Amended Complaint. (*Compare* Dkt. No. 45 at 1 *with* SAC at ¶ 20.) The Court granted Plaintiff's request to compel Defendants to produce documents regarding the valuation process including those shared with Houlihan. (Dkt. No. 48.) Then, nearly five months later, Plaintiff returned to Court

seeking to compel Houlihan's compliance with the previously-issued subpoena.

Under the fraudulent concealment doctrine "the statute will toll only until such time that the plaintiff knows, or through the exercise of reasonable diligence should have discovered, the defendant's identity" but "a plaintiff may not disregard reasonably available avenues of inquiry which, if *vigorously* pursued, might yield the desired information." *Bernson, 7 Cal. 4th at 936* (emphasis added). Plaintiff shall be granted leave to amend his complaint to allege that the statute of limitations was tolled due to fraudulent concealment to the extent that Plaintiff has a good faith basis for doing so.

## B. Plaintiff has not Adequately Pled an Aiding and Abetting Claim

Under California law, [l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person ... (1) knows the other's conduct **[*18]** constitutes a breach of duty and (2) gives substantial assistance or encouragement to the other to so act." *Casey v. U.S. Bank Nat'l Ass'n, 127 Cal. App. 4th 1138, 1144 (2005)* (internal citation and quotation marks omitted). With respect to the first factor, only actual knowledge suffices. *In re First Alliance Mortg. Co., 471 F.3d 977, 993 (9th Cir. 2006)* ("the defendant must have actual knowledge of the specific primary wrong the defendant substantially assisted."). Indeed, while "ordinary business transactions ... can satisfy the substantial assistance element of an aiding and abetting claim" this is true only where the defendant "actually knew those transactions were assisting the [fiduciary] in committing a specific tort [breach of fiduciary duty]. Knowledge is the crucial element." *Casey, 127 Cal.App. 4th at 1145*. Pleading that a defendant had "vague suspicion of wrong doing" or knew of "wrongful or illegal conduct"

is inadequate. *In re First Alliance Mortg. Co., 471 F.3d at 993 n.4* (internal citation and quotation marks omitted); *see Casey, 127 Cal.App.4th at 1151-52.*

The starting point for the Court's analysis is to "identify precisely the breach of fiduciary duty for which [plaintiff] seeks to hold [defendant] liable." *Casey, 127 Cal. App. 4th at 1146* (quoting *In re Sharp Intern. Corp. 281 B.R. 506, 513-14 (Bankr. E.D.N.Y. 2002)).* Here, Plaintiff seeks to hold Houlihan liable for Bollier's breach of fiduciary duty to non-ESOP shareholders under the Buy-Sell Agreement through stock price manipulation. Thus, Plaintiff must **[*19]** allege that Houlihan had actual knowledge that Bollier was using Houlihan's valuation to manipulate the stock price under the Buy-Sell Agreement. The closest Plaintiff comes is his allegation that "Houlihan Lokey knew that the valuation was being used for the separate and distinct purpose of valuing the company private shares." (SAC at ¶ 15.) This allegation, combined with the allegations that Bollier and Houlihan "commenced a process of manipulating numbers and assumptions inside the valuation itself to raise up the stock price without disturbing the fundamental pessimism of the Bollier projections" and that Houlihan "knew that the underlying projections were overly conservative" call into question Houlihan's independence. (*Id.* at ¶ 24.) However, the allegations do not support a plausible inference that Houlihan had actual knowledge that Bollier was seeking to manipulate the stock price to ensure that Plaintiff and other shareholders received less money than they deserved under the Buy-Sell Agreement. "The fact that a company is inflating its receivables does not necessarily mean that the company's principals are looting it. Although it is possible that State Street suspected that **[*20]** the [principals] were engaged in this activity in order to cover up the fact that they were siphoning monies from

Sharp, *suspicion and surmise do not constitute actual knowledge.*" *Sharp, 281 B.R. at 515* (emphasis added). Plaintiff's argument in his opposition brief that Houlihan cannot have been unaware of Bollier's "dual status" and "potentially competing fiduciary duties to a disparate classes of shareholders (ESOP and non-ESOP)" is not sufficient. (Dkt. No. 106 at 16 n. 29.) It is not enough to say that Houlihan should have known that "something fishy" was going on especially where, as here, the allegations are that Houlihan's efforts were aimed at driving the stock price *up*—not down. *See Casey, 127 Cal. App. 4th at 1149.*

As the *Casey* court explained, "the banks' alleged knowledge of the [primary alleged tortfeasor's] suspicious account activities— even money laundering—*without more*, does not give rise to tort liability for the banks." *Id. at 1151* (emphasis in original). Merely alleging that the banks "knew that the [tortfeasors] were engaged in wrongful or illegal conduct ... in breach of their fiduciary duties" does not sufficiently plead that the banks had actual knowledge that the tortfeasors were misappropriating plaintiff's funds. *Id. at 1152.* However, **[*21]** "it is equally clear that if the [plaintiff] can allege the banks knew the [tortfeasors] were stealing corporate funds and knowingly assisted the [tortfeasors] in laundering this stolen money, those allegations would suffice to state a claim for aiding and abetting the theft (or breach of fiduciary duty)." *Id. at 1151.* So too here. Plaintiff fails to allege that Houlihan had actual knowledge that Bollier's efforts were aimed at breaching his fiduciary duty to ensure that shareholders received less money than they were entitled under the Buy-Sell agreement. "[A]iding and abetting requires participation in a specific primary wrong *with knowledge of the object to be attained.*" *Id. at 1152* (internal citation and quotation marks omitted) (emphasis added).

As for the second prong of an aiding and

abetting claim—that Houlihan provided substantial assistance to Bollier's alleged misconduct—Plaintiff's allegations are inadequate for the same reasons. While "[o]rdinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort[,] [k]nowledge is the crucial element." *In re First All. Mortgage Co., 471 F.3d 977, 995 (9th Cir. 2006)* ( *[\*22]* *citing* *Casey, 127 Cal. App. 4th 1138, 26 Cal.Rptr.3d at 406*). Indeed, "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting." *Austin B. v. Escondido Union Sch. Dist., 149 Cal.App.4th 860, 879, 57 Cal. Rptr. 3d 454 (2007)* (internal citation omitted). Plaintiff also fails to distinguish the conduct at issue here from the conduct in *Mendelsohn v. Capital Underwriters, Inc., 490 F. Supp. 1069 (N.D. Cal. 1979)*, wherein the court considered an aiding and abetting claim against accountants in a securities fraud action. The court concluded that plaintiff had failed to allege substantial assistance because the accounting firm "had no authority to influence the affairs of [the primary tortfeasor] and, had [the accountant] quit upon learning of [the primary tortfeasor's] irregular financial practices, [the primary tortfeasor] could simply have hired a less astute accountant or bookkeeper." *Id. at 1084*; *see also* *Wright v. Schock, 571 F. Supp. 642, 663 (N.D. Cal. 1983)*, aff'd, *742 F.2d 541 (9th Cir. 1984)* ("The performance of mere ministerial tasks is insufficient to establish aiding and abetting liability").

Here, Houlihan is alleged to have followed "Bollier['s] instruct[ions] [] to value the company without taking into account excess cash on hand" in 2009. (SAC at ¶ 17.) Similarly, for the fiscal year 2011 valuation "in a tightly controlled process [Bollier] instructed

Houlihan Lokey to include some, but not all the excess cash, to drive up the valuation slightly." **[\*23]** (*Id.* at ¶ 20.) For fiscal year 2012, Houlihan worked with Bollier "to raise up the stock price." (*Id.* at ¶ 24.) Critically, to the extent that these allegations show affirmative acts on the part of Houlihan—as opposed to Houlihan following Bollier's instructions—they all relate to Houlihan's efforts to drive the stock price up. In this regard, Plaintiff has also failed to adequately allege causation. Plaintiff's characterization of this as an "it-could-have-been-worse" defense is unavailing. "[C]ausation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a substantial factor in causing the harm suffered." *See* *Neilson, 290 F. Supp. 2d at 1135*. Plaintiff alleges that Houlihan worked with Bollier to drive up the stock price. Such conduct does not support a plausible inference that that Houlihan's actions were a substantial factor in causing Plaintiff's harm, namely, a reduced stock valuation.

## CONCLUSION

For the reasons stated above, Houlihan's motion to dismiss is GRANTED. Plaintiff is granted leave to amend his complaint to the extent that he can allege that he was estopped from amending his complaint to state a claim against Houlihan within **[\*24]** the statute of limitations period based on Houlihan's fraudulent concealment of its wrongdoing. If he can do so, he shall also address the Court's concerns regarding the adequacy of his allegations on the aiding and abetting claim. Plaintiff shall file his amended complaint within 20 days of the date of this Order.

This Order disposes of Docket No. 94.

**IT IS SO ORDERED**.

Dated: October 26, 2016

/s/ Jacqueline Scott Corley

JACQUELINE SCOTT CORLEY

United States Magistrate Judge

---

End of Document