UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

ALAN D. HALPERIN AND EUGENE I. DAVIS
AS CO-TRUSTEES OF THE APPVION
LIQUIDATING TRUST

      Plaintiff,

v.                                                    Case No. 1:19-CV-1561

MARK R. RICHARDS, THOMAS J. FERREE,
TAMI L. VAN STRATEN, JEFFREY J.
FLETCHER, KERRY S. ARENT, STEPHEN P.
CARTER, TERRY M. MURPHY, ANDREW F.
REARDON, KATHI P. SEIFERT, MARK A.
SUWYN, CARL J. LAURINO, DAVID A.
ROBERTS, ARGENT TRUST COMPANY,
STOUT RISIUS ROSS, INC., STOUT RISIUS
ROSS, LLC, JOHN/JANE DOES 1-40,

      Defendants.

**OPENING BRIEF IN SUPPORT OF STOUT RISIUS ROSS, INC. AND STOUT RISIUS ROSS, LLC'S MOTION TO DISMISS THE REVISED SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PROCEDURAL HISTORY .......................................................................................... 1

INTRODUCTION ....................................................................................................... 2

STANDARD OF REVIEW ......................................................................................... 7

ARGUMENT .............................................................................................................. 8

I.   Count VI is Preempted by ERISA .......................................................................... 8

     A.   It is the Law of the Case that Count VI is "Related to" the Appvion ESOP ................... 9

     B.   Stout's Work Related to a "Core" Function of Plan Administration. ........................... 10

     C.   Plaintiff Cannot Use State Law as an Alternate Enforcement Mechanism................... 12

II.   The RSAC Fails to Plead a State Law Aiding and Abetting Claim Under Delaware and Wisconsin Law................................................................................................. 15

     A.   The RSAC Fails to Plead an Aiding and Abetting Claim Under Delaware Law........... 15

         1.   The RSAC Fails to Plead Knowing Participation. ..................................... 15

            a.   The RSAC Pleads No Facts to Support an Inference that Stout "Knowingly Participated" in Unlawful Conduct. ...................................... 16

            b.   It is Implausible that Stout "Knowingly Participated" in Unlawful Conduct....... 21

         2.   The RSAC Fails to Plead Proximate Cause............................................ 24

     B.   The RSAC Fails to Plead an Aiding and Abetting Claim Under Wisconsin Law. ........ 26

III.   Count VI Should be Dismissed With Prejudice. .................................................. 28

CONCLUSION........................................................................................................... 28

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004) ........................................................................................... 8, 9
*ALA, Inc. v. CCAIR, Inc.*,
    29 F.3d 855 (3d Cir. 1994) ....................................................................................... 23
*Arndt v. AON Hewitt Benefit Payment Svs., LLC*,
    No. 15-C-750, 2015 WL 7313392 (E.D. Wis. Nov. 19, 2015) ...................................... 8, 9, 12
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 8, 21, 24
*Ashley v. Jones*,
    No. 17-C-1785, 2018 WL 4354971 (E.D. Wis. Sept. 12, 2018) ............................................ 28
*Beerly v. Dep't of Treasury*,
    768 F.2d 942 (7th Cir. 1985) ....................................................................................... 21
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 7, 15
*Consol. Beef Indus., Inc. v. New York Life Ins. Co.*,
    949 F.2d 960 (8th Cir. 1991) ....................................................................................... 14
*Custer v. Pan Am. Life Ins. Co.*,
    12 F.3d 410 (4th Cir. 1993) ......................................................................................... 14
*DeBruyne v. Equitable Life Assurance Soc. of U.S.*,
    920 F.2d 457 (7th Cir. 1990) ................................................................................ 8, 9, 10
*DIRECTV, Inc. v. Baye*,
    No. 04-C-1104, 2005 WL 3088451 (E.D. Wis. Nov. 17, 2005) ........................................... 24
*Dixon v. Ladish Co.*, No. 10-CV-1,
    076, 2011 WL 719018 (E.D. Wis. Feb. 22, 2011) ........................................................... 26
*Dobbs v. DePuy Orthopedics, Inc.*,
    842 F.3d 1045 (7th Cir. 2016) ..................................................................................... 15
*Duphily v. Del. Elec. Coop., Inc.*,
    662 A.2d 821 (Del. 1995) ...................................................................................... 24, 25
*Egelhoff v. Egelhoff*,
    532 U.S. 141 (2001) .................................................................................................... 9
*Enzo Life Scis., Inc. v. Adipogen Corp.*,
    82 F. Supp. 3d 568 (D. Del. 2015) ............................................................................... 15
*Gerosa v. Savasta & Co.*,
    329 F.3d 317 (2d Cir. 2003) ........................................................................................ 13
*Gibson v. Prudential Ins. Co. of Am.*,
    915 F.2d 414 (9th Cir. 1990) ....................................................................................... 14
*Gobeille v. Liberty Mut. Ins. Co.*,
    136 S. Ct. 936 (2016) ............................................................................................. 8, 9
*Grad v. Associated Bank, N.A.*,
    No. 2010-AP-1461, 2011 WL 2184335 (Wis. Ct. App. June 7, 2011) ............................... 27, 28
*Great-West Life & Annuity Co. v. Knudson*,
    534 U.S. 204 (2002) ................................................................................................. 13

ii

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000) ................................................................................ 12, 13

*In re Broadstripe, LLC*,
    444 B.R. 51 (Bankr. D. Del. 2010) ........................................................ 15

*In re Santa Fe Pac. Corp. S'holder Litig.*,
    669 A.2d 59 (Del. 1995) ........................................................................ 16

*In re Telecomms., Inc. S'holders Litig.*,
    No. A-16470, 2003 WL 21543427 (Del. Ch. July 7, 2003) ................... 16

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990) ............................................................................... 8, 9

*Kool, Mann, Coffee & Co. v. Coffey*,
    300 F.3d 340 (3d Cir. 2002) .................................................................. 21

*Le Bleu Corp. v. Fed. Mfg. LLC*,
    No. 17-CV-549, 2018 WL 4936032 (E.D. Wis. Oct. 10, 2018) ............ 10

*Lee v. Pincus*,
    No. CV 8458-CB, 2014 WL 6066108 (Del. Ch. Nov. 14, 2014) ........... 15, 16, 23, 24

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ................................................................. 7

*McDonald v. Household Int'l, Inc.*,
    425 F.3d 424 (7th Cir. 2005) ................................................................. 9, 10

*McLemore v. Regions Bank*,
    682 F.3d 414 (6th Cir. 2012) ................................................................. 13, 14

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ............................................................................... 13

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ............................................................................... 9

*Morgan v. Cash*,
    No. 5053-VCS, 2010 WL 2803746 (Del. Ch. July 16, 2010) ............... 16, 17

*Ochoa v. State Farm Life Ins. Co.*,
    910 F.3d 992 (7th Cir. 2018) ................................................................. 8

*Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*,
    179 F.3d 523 (7th Cir. 1999) ................................................................. 23

*Perez v. Mueller*,
    No. 13-cv-1302, 2014 WL 2050606 (E.D. Wis. May 19, 2014) ........... 13

*Petri v. Solo Cup Co.*,
    No. 06-C-0994, 2007 WL 30884 (E.D. Wis. Jan. 4, 2007) ................... 9

*Pohl v. Nat'l Benefits Consults.*,
    956 F.2d 125 (7th Cir. 1992) ................................................................. 14

*RBC Capital Mkts., LLC v. Jervis*,
    129 A.3d 816 (Del. 2015) ...................................................................... 16

*Reich v. Cont'l Cas. Co.*,
    33 F.3d 754 (7th Cir. 1994) ................................................................... 12, 13

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) .................................................................. 13

*Russell v. K-Mart Corp.*,
    761 A.2d 1 (Del. 2000) .......................................................................... 24, 25, 26

iii

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ........................................................................................... 9
*United States v. Thomas*,
    11 F.3d 732 (7th Cir. 1993) ............................................................................ 10
*Van Dusen v. Barrack*,
    376 U.S. 612 (1964) ........................................................................................ 15
*Wilmington Shipping Co. v. New England Life Ins. Co.*,
    496 F.3d 326 (4th Cir. 2007) ..................................................................... 13, 14
*Winslow v. Brown*,
    125 Wis. 2d 327 (Wis. Ct. App. 1985) ...................................................... 27, 28
*Wright v. Associated Ins. Cos. Inc.*,
    29 F.3d 1244 (7th Cir. 1994) .......................................................................... 3, 5
*Zazzali v. Hirschler Fleischer, P.C.*,
    482 B.R. 495 (D. Del. 2012) ................................................................ 16, 18, 19

Statutes

26 U.S.C. § 401(a)(28)(C) ...................................................................................... 3, 11
29 U.S.C. § 1104 ........................................................................................................ 3
29 U.S.C. § 1132(a)(3) ......................................................................................... 12, 13
29 U.S.C. § 1144(a) .................................................................................................... 8

Rules

Fed. R. Civ. P. 8(a) ..................................................................................................... 7

Other Authorities

Restatement (Second) Of Torts § 448 (1965) ............................................................ 26

iv

## PROCEDURAL HISTORY

This action was originally filed as an adversary proceeding in the United States Bankruptcy Court for the District of Delaware by the co-trustees of the Appvion Liquidating Trust ("Plaintiff" or the "Liquidating Trust"). *See* Compl., Adv. D.I. 1, *Halperin, et al. v. Richards, et al.*, Adv. Proc. No. 18-50955 (KJC) (the "Delaware Action").[1] Plaintiff asserted state law claims for breach of fiduciary duty (Counts I-III), state law claims for aiding and abetting those fiduciary breaches (Counts IV-VI), violations of state corporate law (Counts VII-VIII), and violations of federal and state bankruptcy law (Counts IX-XVIII) against former directors and officers of Appvion Inc. ("Appvion" or the "Company"), former members of Appvion's ESOP Administrative Committee (the "ESOP Committee"), the ESOP's trustee, Argent Trust Company, N.A. ("Argent"), and the ESOP trustee's financial advisor, Stout.[2]

On October 23, 2019, the presiding bankruptcy judge transferred the non-bankruptcy-related claims (the "Transfer Order") to this Court.[3] Adv. D.I. 113. As to Stout, the only claim that has been transferred to this Court is a claim for aiding and abetting breach of fiduciary duty (Count VI). *Id.* The bankruptcy court explained that the transfer of these claims was appropriate because most of the public and private interests "favor transfer of venue to Wisconsin and . . . there

---

[1] The Liquidating Trust filed a First Amended Complaint in the United States Bankruptcy Court for the District of Delaware on February 19, 2019, Adv. D.I. 59, which the defendants moved to dismiss on March 19, 2019. Adv. D.I. 65-70. The Liquidating Trust filed a Second Amended Complaint on June 26, 2019, Adv. D.I. 101, which it subsequently revised on July 2, 2019. Revised Second Am. Compl., Dkt. 2 ("RSAC").

[2] "Stout" is a collective reference to defendants Stout Risius Ross, Inc. and Stout Risius Ross, LLC. Argent contracted with Stout Risius Ross, Inc. to prepare valuations from 2012 through 2016. Stout Risius Ross, Inc. reorganized as Stout Risius Ross, LLC in 2017. Accordingly, Argent contracted with Stout Risius Ross, LLC for the June 2017 valuation. *See* Ex. 1, Stout Engagement Agreements; *see also infra* n.5.

[3] At the same time, the Bankruptcy Court denied the motions to dismiss Plaintiff's bankruptcy-related claims (Counts IX-XVIII). Those claims remain pending before the Bankruptcy Court in the Delaware Action.

1

is no compelling factor in favor of retaining jurisdiction over these Counts in Delaware." Adv. D.I. 112 at 21.

On November 25, 2019, this Court entered the parties' joint stipulation to file renewed motions to dismiss briefing regarding the transferred claims, Counts I-VIII. Dkt. 17. Pursuant to the stipulation, Defendants' renewed motions to dismiss and Plaintiff's opposition thereto are to assert only the basic grounds for dismissal that were asserted or preserved in the Bankruptcy Court proceeding, but left open by the Transfer Order. Dkt. 16 at 3-4. As to the single claim against Stout, those grounds are that (i) Count VI is preempted by ERISA and (ii) Count VI fails to state a valid claim for aiding and abetting a breach of fiduciary duty.[4]

## INTRODUCTION

Appvion sponsored for its employees the Appvion Retirement Savings and Employee Stock Ownership Plan (the "Plan" or the "ESOP"), an employee benefit pension plan governed by ERISA. The ESOP Committee was a named fiduciary of the Plan, which was intended to operate as a tax-qualified retirement plan investing primarily in the stock of Appvion's parent company, Paperweight Development Corporation ("PDC"). In 2014, the Company retained Argent[5] and delegated to it certain ERISA fiduciary duties with respect to the Plan. Those duties included ensuring that, for ESOP administration purposes, the share price of the Company stock held in the

---

[4] Several days before Plaintiff filed the instant action, the Appvion ESOP Committee filed a lawsuit in this Court which is based on the substantially same factual predicate. *See Appvion Inc. Ret. Sav. and Emp. Stock Ownership Plan v. Buth, et al.*, No. 1:18-cv-01861-WCG (E.D. Wis. 2018), Dkt. 1 (the "ESOP Committee Action"). Defendants in this action, along with others, have been named as defendants in the ESOP Committee Action. The ESOP Committee Action asserts claims for violation of ERISA, co- and non-fiduciary liability under ERISA, indemnification, state law fraud and negligent misrepresentation, and violations of federal and Wisconsin state securities laws.

[5] State Street was named Trustee of the ESOP when it was created. *See* RSAC ¶ 94. Reliance Trust Company ("Reliance") became Trustee on April 1, 2013, *see id.*, and Argent became Trustee on May 28, 2014. *See id.* ¶ 92.

2

Plan was valued each year by an independent appraiser, as required by statute. *See* 26 U.S.C. § 401(a)(28)(C).

Argent therefore contracted with Stout for a singular and discrete purpose: to provide the statutorily-required independent valuation of the PDC stock held by the ESOP. *See* Ex. 1, Stout Engagement Agreements.[6] In that role, Stout provided services (and owed contractual duties) only to the Trustee—not to the Plan and not to the Company. *See, e.g., id.*, Stout Engagement Agreement (6/20/2013), at 2.[7] Although the Trustee owed fiduciary duties to the Plan as set forth in ERISA, *see generally* 29 U.S.C. § 1104, Stout was not a fiduciary to the Plan (and the RSAC does not suggest that it was) and, thus, owed no duty to the Plan.

Similarly, Stout owed no duty to the Company. Stout prepared the independent valuation for the Trustee, and it ultimately was the Trustee's obligation to determine the fair market value of PDC stock. *See* RSAC ¶ 413. The engagement agreements clearly defined the limited nature of Stout's role. Each agreement provided that Stout would "report ***solely to the Trustee***, notwithstanding that the Company w[ould] pay all fees for [Stout's] work." *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), at 2 (emphasis added). Further, the agreements provided that Stout's valuation analysis would "be used ***for annual reporting and plan administration purposes by the Trustee***." *See, e.g., id.* (emphasis added). By signing the agreements, Appvion acknowledged that Stout could not successfully perform its services if it did not receive "accura[te] and complete[]" information from the Company. *See, e.g., id.* at 5.

---

[6] The RSAC repeatedly quotes from and refers to Stout's engagement letters, *see* RSAC ¶¶ 102-08, and accordingly the Court may consider them when determining the instant motion to dismiss. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

[7] The Trustee did not delegate any fiduciary duties to Stout. *See generally* Ex. 1.

3

Stout received a fixed fee of $50,000 for each semi-annual valuation, or $100,000 annually. *See, e.g., id.* at 3. The amount of this fixed fee remained the same from 2013 through 2017, except for a single valuation for which Stout received an hourly fee. *See* Ex. 1.[8] Stout's compensation did not depend on the value it placed on the Company. *See, e.g., id.*, at 7, Professional Terms, ¶ 12.

In short, Stout was a service provider to the Trustee of an ERISA plan sponsored by the Company. It owed no duty to the Company or to the Plan. Its obligation was solely to the Trustee.

Now, despite Stout's limited role, Plaintiff makes Stout's valuation work the centerpiece of its RSAC and seeks to pin the downfall of the Company on a vast purported conspiracy to manipulate those valuations. That conspiracy is implausible for a number of reasons, not the least of which is that it was supposedly carried out by a changing cast of directors and officers of the Company over a period of many years.

Further, the RSAC claims that Stout's valuations were manipulated "primarily" because they were based on financial projections that had been "inflated" by the Company's management. *See, e.g.*, RSAC ¶ 203 ("The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality."). This theory is patently implausible. The financial projections were just ***one*** component of the information that Stout considered when preparing the valuations, as is expressly

---

[8] The May 18, 2015 engagement agreement provided that the June 30, 2015 valuation would be billed at standard hourly rates, plus out-of-pocket expenses, and that the December 31, 2015 valuation would be prepared for $50,000. *See* Ex. 1, Stout Engagement Agreement (5/18/2015) at 16. This is because Stout was already engaged by the Trustee to conduct work related to the sale of the Company and/or the sale of certain of its business units during these time periods. *See infra* n.10.

4

indicated in Stout's reports.[9]  *See, e.g.*, Ex 4, 6/30/2014 FMV at 3 (identifying the principal sources of information used by Stout in performing its analysis, including, *inter alia*, the Company's audited financial statements, PDC's audited financial statements and Form 10-K filings with the U.S. Securities and Exchange Commission ("SEC"), PDC's Form 10-Q filing with the SEC, the Company's internally-prepared financial statements, the Company's internally-prepared balance sheet, the Company's financial projections, discussions with the Company's management, and publicly available information and financial data on similar publicly traded companies).[10]  It is implausible that management's purported "inflation" of this one source of data resulted in the "manipulation" of Stout's opinions, as the RSAC alleges.

Moreover, the RSAC analyzes Stout's valuations in a vacuum.  Among the other sources of data that Stout considered when preparing its valuations was the contemporaneous feedback it received on the Company's value from independent third parties.  Indeed, multiple third parties made offers to buy the Company or its business units at prices that ***exceeded*** Stout's valuations.[11]

---

[9] The RSAC puts at issue and incorporates Stout's valuation reports.  The Court thus may consider the reports when determining the instant motion.  *See Wright*, 29 F.3d at 1248.

[10] For certain reports, Stout also considered information from third parties who provided feedback on the Company's value.  *See, e.g.*, Ex. 3, 6/30/2013 FMV at 3 (Stout considered a June 2013 Confidential Information Memorandum prepared by Jefferies LLC); Ex. 5, 12/31/2014 FMV at 3 (Stout considered June 2013 and July 2014 Confidential Information Memoranda prepared by Jefferies LLC; Jefferies LLC's December 2014 presentation to the Company; Sherman Capital Holdings' letter of intent to purchase the Company; and Croda International's letter of intent to purchase the Encapsys business unit).

[11] In 2012, the Company considered a combination with another entity that would have resulted in the Company going public.  *See* Ex. 3, 6/30/2013 FMV, at 12; *see also* Ex. 2, 2012 10-K, at 23.  Were this case to proceed, the evidence would show that the consideration to be paid for shares of PDC was $21.00 per share—a substantial premium over the $15.01 per share value estimated by Stout as of December 31, 2011.  *See* RSAC Fig. 10.  Later that year, Hicks Equity Partners, LLC submitted a letter of intent to purchase the stock of PDC at $22.00 per share—which also reflected a significant premium over Stout's most recent valuation of the stock at $16.45 per share.  *See* Ex. 3, 6/30/2013 FMV at 13; RSAC Fig. 10.  Further, in 2015, Sherman Capital Holdings, LLC purchased the Encapsys business unit for $208 million—which likewise reflected a significant

5

These offers were real-world indicators of the Company's value, which Stout considered when preparing its valuations. Stout also considered information from the Company's auditors, who consistently issued unqualified audit opinions[12] that treated the Company as a going concern.[13] *See, e.g.*, Ex. 2, 2012 10-K at 44. It is patently implausible that these third parties also were manipulating data concerning the Company's value and joined in the purported scheme to defraud.

Although Plaintiff has specifically described the manner in which it believes Stout's professional services were inadequate (a claim it does not and cannot bring), Plaintiff has utterly failed to articulate any facts supporting the aiding and abetting claim it does bring. Plaintiff does not plead any ***facts*** that could support a reasonable inference that Stout had knowledge of any unlawful conduct by others, or that Stout participated in such conduct.

---

premium over Stout's most recent valuation of that component of the business at $166 million. *See* Ex. 7, 12/31/2015 FMV at 17; Ex. 5, 12/31/2014 FMV at 65-66.

[12] An "unqualified opinion" is an independent auditor's professional determination that a company's "financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles." AICPA, *The Auditor's Standard Report,* AU §5 08.10, available at https://www.aicpa.org/Research/Standards/AuditAttest/DownloadableDocuments/AU-00508.pdf. By contrast, a "qualified opinion" is an auditor's determination that a company's financial statements contain "misstatements, individually or in the aggregate, [that] are material but not pervasive to the financial statements." AICPA*, Determining the Type of Modification to the Auditor's Opinion*, AU-C § 705.08, available at https://www.aicpa.org/Research/Standards/AuditAttest/DownloadableDocuments/AU-C-00705.pdf. An "adverse opinion" is an auditor's determination that a company's financial statements contain "misstatements, individually or in the aggregate [that] are both material and pervasive to the financial statements." *Id*. A qualified or adverse opinion may be appropriate in circumstances where an auditor doubts management's conclusions as to an entity's ability to continue as a going concern, or where the company's financial statements do not adequately disclose its ability to continue as a going concern. AICPA, *Implications for the Auditor's Report,* AU-C § 570.26, § 570.A58, available at https://www.aicpa.org/Research/Standards/AuditAttest/DownloadableDocuments/AU-C-00570.pdf.

[13] A "going concern" is an accounting principle that assumes an entity "will continue its operations for a reasonable period of time," *i.e.*, that the entity's liquidation is not "imminent." *Id*. at §570.02.

The RSAC likewise fails to offer any reason why Stout would be motivated to further unlawful activity by others. Stout is not alleged to have profited from the supposed misconduct. Stout was paid a fixed fee for its work, and the RSAC does not allege its fees were unreasonable. The RSAC's allegations depict, ***at most***, that Plaintiff—with the benefit of hindsight—believes Stout did not perform its job well; the absence of facts or motive supporting claims beyond that confirms that Plaintiff has failed to "nudge[] [its aiding and abetting] claim[] across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

Even if Plaintiff had articulated some plausible theory that Stout, in exchange for a modest flat fee, discarded its professional integrity to benefit the directors and officers of an entity that was not even its client, the aiding and abetting claim still fails. ERISA's broad preemptive effect mandates that claims relating to ERISA plans be brought under ERISA. Because ERISA does not provide Plaintiff with a cause of action or the remedy he seeks, Plaintiff seeks to dodge ERISA preemption by artful pleading. This is not permitted. Regardless, Count VI fails to allege that Stout aided and abetted any unlawful conduct under both Delaware and Wisconsin law. For all of these reasons, Count VI should be dismissed with prejudice.

## STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While a complaint "does not need detailed factual allegations," a plaintiff must plead "more than labels and conclusions." *Twombly*, 550 U.S. at 545 ("[A] formulaic recitation of a cause of action's elements will not do."). "[C]onclusory allegations merely reciting the elements of the claim are not entitled to th[e] presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Rather, a plaintiff must "plead[] factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ochoa v. State Farm Life Ins. Co.*, 910 F.3d 992, 994 (7th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I.    Count VI is Preempted by ERISA.

ERISA preempts Plaintiff's state law aiding and abetting breach of fiduciary duty claim.[14] "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions . . . which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Aetna Health Inc. v. Davila,* 542 U.S. 200, 208 (2004) (internal quotation marks omitted).

ERISA Section 514(a) preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Section 514(a) is "conspicuous for its breadth" and employs "deliberatively expansive language." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990) (internal quotations marks omitted). Indeed, Section 514 "contains what may be the most expansive express pre-emption provision in any federal statute." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 947 (2016) (Thomas, J., concurring). Preemption under Section 514(a) is a defense that warrants dismissal of state law claims. *See Arndt v. AON Hewitt Benefit Payment Svs., LLC*, No. 15-C-750, 2015 WL 7313392, at *2 (E.D. Wis. Nov. 19, 2015) (Griesbach, J.).

The Seventh Circuit has held that the phrase "relate to" should be "given its broad common-sense meaning," *DeBruyne v. Equitable Life Assurance Society of U.S.*, 920 F.2d 457, 468 (7th

---

[14] Although the source of law applicable to Count VI is not pleaded in the RSAC, Plaintiff has acknowledged that Count VI has been asserted under state law. *See* Plaintiffs' Mem. of Law in Opp. to Defendants' Mots. to Dismiss (Adv. D.I. 77) ("Pl. Opp."), at 6 & 12.

8

Cir. 1990) (alteration in original) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985)), such that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 428 (7th Cir. 2005) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)). The Supreme Court has held that a "state law that has an impermissible 'connection with' ERISA plans" where the state law "'governs . . . a central matter of plan administration' or 'interferes with nationally uniform plan administration.'" *Gobeille*, 136 S. Ct. at 943 (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)). Further, state laws providing alternative enforcement mechanisms to ERISA are preempted because such laws "conflict[] with the clear congressional intent to make the ERISA remedy exclusive." *Davila*, 542 U.S. at 209.

ERISA does not preempt "only state laws dealing with the subject matters covered by ERISA." *Shaw*, 463 U.S. at 98. "[A] state law may 'relate to' a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Petri v. Solo Cup Co.*, No. 06-C-0994, 2007 WL 30884, at *2 (E.D. Wis. Jan. 4, 2007) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Thus, courts have found that state common law claims of general applicability may be preempted under Section 514(a). *See, e.g.*, *Arndt*, 2015 WL 7313392, at *3 (holding that state law negligent misrepresentation claim was preempted under Section 514(a)).

A. **It is the Law of the Case that Count VI is "Related to" the Appvion ESOP.**

Plaintiff acknowledges that Count VI is "related to" the Appvion ESOP—indeed, in the RSAC, Plaintiff claims that his authority for asserting the claim against Stout is based on the Plan of Liquidation's reservation of claims that are ***related to or arising out of the ESOP*** that are not

9

Direct ESOP Claims." RSAC ¶¶ 23, 364 (emphasis added).[15]   The Bankruptcy Court accepted

Plaintiff's argument when finding that it had subject matter jurisdiction over all of Plaintiff's non-

bankruptcy claims (*i.e.*, the claims that have been transferred to this Court, including Count VI)—

because those claims were, as Plaintiff claimed, ***"related to or arising out of the ESOP"*** and thus

reserved in the Plan of Liquidation. *See* Pl. Opp. at 11-12.

The Bankruptcy Court's holding that Count VI is "related to" the ESOP is the law of the

case and binding on this Court. *See United States v. Thomas*, 11 F.3d 732, 736 (7th Cir. 1993)

("[W]hen a court decides upon a rule of law, that decision should continue to govern the same

issues in subsequent stages of the same case."); *see also Le Bleu Corp. v. Fed. Mfg. LLC*, No. 17-

CV-549, 2018 WL 4936032, at *3-4 (E.D. Wis. Oct. 10, 2018) (holding that transferring judge's

rejection of plaintiff's argument was the law of the case).  The plain import of the Bankruptcy

Court's holding is that Count VI is preempted under Section 514(a).  That is, applying the "normal

sense," *McDonald*, 425 F.3d at 428, and "broad common-sense meaning" of the phrase "relate to,"

*DeBruyne*, 920 F.2d at 468, Count VI has a "connection with or reference to" an ERISA plan—

the Appvion ESOP—and thus is preempted.  *McDonald*, 425 F.3d at 428.

## B.    Stout's Work Related to a "Core" Function of Plan Administration.

Further, Count VI is "related to" the ESOP (and thus preempted) because the ERISA Plan

and the duties surrounding it form the entire basis for the claim.  Specifically, the RSAC is built

upon allegations of unlawful conduct related to the valuation of the stock held by the Plan—what

the RSAC describes as a "core" function of plan administration.  *See* RSAC ¶ 1 ("This litigation

involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain

---

[15] *See also* Pl. Opp. at 13 ("***There is no question that the claims asserted in the FAC 'relate to'
and 'arise out of' the ESOP***, in that they relate to the manner in which the Defendants manipulated
the valuations required by the ESOP.") (emphasis added).

of the Debtors' directors and officers, and the advisers they engaged to ***oversee and administer the core functions of [the Plan]***.") (emphasis added); *see also id.* ¶ 112 ("The biannual FMV Determination served several crucial functions, related both to ***the administration of the ESOP*** and to the operation of the Debtors' businesses.") (emphasis added).  Indeed, Stout's engagement letters expressly provided that the valuations were prepared for the ERISA Trustee's work related to ***"annual reporting and plan administration."***  *See id.* ¶ 103 (emphasis added); *see also* Ex. 1, Stout Engagement Agreement (6/20/2013), at 2.

Stout's entire involvement with this matter arose out of the ERISA Trustee's fiduciary obligation to have the ERISA Plan's stock holdings valued by an independent appraiser.  Here, the ESOP Committee was delegated the fiduciary function of overseeing the Trustee.  *See* RSAC ¶ 97 ("Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee.  The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP.").  The ESOP Committee, in turn, engaged Argent, *id.* ¶ 93, to serve as the Plan's Trustee to carry out plan fiduciary functions, including "determining the fair market value of PDC's common stock."  *Id.* ¶ 413; *see also id.* ¶¶ 99-100.  The Plan (and the Internal Revenue Code, *see* 26 U.S.C. § 401(a)(28)(C)), required the Trustee to retain an independent outside appraiser to assist it with this determination.  *Id.* ¶ 89.  Argent, accordingly, retained Stout to provide an independent valuation of PDC stock ***"[i]n accordance with . . . ERISA."***  *See, e.g.*, Ex. 1, 6/20/2013 Stout Engagement Agreement, at 2.  Argent, as the Trustee, reviewed Stout's valuations and "determin[ed] the fair market value of PDC's common stock."  RSAC ¶ 413.  Thus, the ESOP Committee was responsible for overseeing the Trustee's work in determining the fair market value of the stock held by the Plan, and the Trustee in turn retained Stout to provide

Case 1:19-cv-01561-WCG   Filed 12/16/19   Page 16 of 34   Document 21

independent valuations. The ESOP Committee's oversight responsibility with respect to the valuations related to a "core" plan administrative function. *See id.* ¶ 1.

In sum, Stout, which was hired by the ERISA Trustee to carry out an ERISA plan-required function related to plan administration, is alleged to have aided and abetted breaches by the ERISA plan fiduciaries who were responsible for monitoring the ERISA Trustee's performance. Count VI thus is plainly "related to" an ERISA plan and preempted. *See Arndt*, 2015 WL 7313392, at *3 (holding that state law claim premised on an error in ERISA plan administration— "something at the very core of ERISA itself"—was preempted).

### C. Plaintiff Cannot Use State Law as an Alternate Enforcement Mechanism.

Moreover, Count VI is preempted because Plaintiff is attempting to use a state law aiding and abetting claim as an alternative enforcement mechanism to ERISA. ERISA provides a narrow form of relief and remedy against non-fiduciaries. Specifically, under ERISA Section 502(a)(3), *a participant, beneficiary or fiduciary* may obtain *"appropriate equitable relief"* against a non-fiduciary who knowingly participates in a *prohibited transaction*. *See* 29 U.S.C. § 1132(a)(3) (emphasis added); *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000).

In enacting ERISA, Congress chose *not* to provide standing to pursue a cause of action to Plaintiff, the liquidating trustee of the company that sponsored the benefit plan. Further, Congress chose *not* to provide the cause of action—aiding and abetting a breach of fiduciary duty—that Plaintiff has attempted to bring against Stout. *See Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) ("A majority of the Supreme Court has made clear its view that Congress's omission to impose on nonfiduciaries a duty not to participate knowingly in an ERISA fiduciary's breach of

fiduciary obligations was not inadvertent.").[16]   In addition, Congress chose ***not*** to provide the remedy—money damages, *see* RSAC ¶ 418 (demanding relief for "***damage*** to the Debtors and their businesses and prospects") (emphasis added)—that Plaintiff demands against a non-fiduciary.[17]   Accordingly, Plaintiff has no ERISA claim against Stout.

Although the scope of relief available against a non-fiduciary under ERISA is narrow, that does not mean that Plaintiff can bring a state law claim to avoid those limitations.  *See McLemore v. Regions Bank*, 682 F.3d 414, 426 (6th Cir. 2012) (holding that the plaintiff could not recast an ERISA claim as a state law claim to obtain relief against non-fiduciary that is unavailable under ERISA).   The fact that this leaves Plaintiff without a remedy is not troubling.   "ERISA's preemptive scope is not diminished simply because a finding of preemption will leave a gap in the relief available to a plaintiff."  *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007).  The Seventh Circuit has specifically held that this is true with regard to claims against non-fiduciaries.  *See Pohl v. Nat'l Benefits Consults.*, 956 F.2d 125, 128-29 (7th

---

[16] *See also Renfro v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011) ("29 U.S.C. § 1132(a)(3) does not authorize suit against nonfiduciaries charged solely with participating in a fiduciary breach.") (internal quotation marks omitted); *Gerosa v. Savasta & Co.*, 329 F.3d 317, 322 (2d Cir. 2003) (holding that a cause of action against a non-fiduciary for knowing participation in a breach of fiduciary duty did not survive the Supreme Court's decisions in *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) and *Great-West Life & Annuity Co. v. Knudson*, 534 U.S. 204 (2002)).  In *Perez v. Mueller*, No. 13-cv-1302, 2014 WL 2050606, at * 4 (E.D. Wis. May 19, 2014), the district court allowed claims for knowing participation in a breach of fiduciary duty to proceed against a non-fiduciary, but it appears that the defendants did not raise the question of whether ERISA provides such a cause of action.

[17] The type of relief available against non-fiduciaries such as Stout under Section 502(a)(3) is limited to "appropriate equitable relief."  *See Harris Tr.*, 530 U.S. at 250.  The Supreme Court has emphasized that "appropriate equitable relief" is narrow in scope.  *See id.* (holding that "appropriate equitable relief" includes "restitution of the [trust] property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom."); *Great-West Life,* 534 U.S. at 213 (holding that a plaintiff could seek the imposition of constructive trust or an equitable lien under Section 502(a)(3)).

Cir. 1992) (in action against a non-fiduciary, holding that state law claim was preempted even though ERISA did not provide the plaintiff with a remedy).[18]

It is not surprising that Plaintiff does not have a remedy. ERISA's enforcement scheme provides statutory standing to bring a claim to, among other enumerated persons and entities, the fiduciaries of Plan. As previously explained, the Plan's current fiduciary, the ESOP Committee, has initiated a lawsuit that is pending before this Court, which asserts substantially similar allegations against many of the defendants named in this case. Although the allegations are similarly unmeritorious and Stout expects to defeat them, the plaintiff therein, as an ERISA fiduciary, has standing to seek an ERISA remedy (against at least some of the named defendants), in contrast to the contorted manner in which Plaintiff attempted to bring state law breach of fiduciary duty claims in this matter. To the extent the conduct alleged in the breach of fiduciary duty claims was unlawful, ERISA provides a remedy (against at least some of the defendants) for the Plan, not the Liquidating Trust of the Company that sponsored the Plan.

---

[18] Multiple circuit courts of appeal have reached the same conclusion. *See McLemore*, 682 F.3d at 426-27 (holding "the availability of a remedy under ERISA is not relevant to the preemption analysis," even where the plaintiff is left without a remedy against a non-fiduciary); *Wilmington Shipping*, 496 F.3d at 342-43 ("ERISA preempts state-law claims against nonfiduciaries if those claims relate to a plan. The central question is not whether a particular defendant is a fiduciary, or whether the preemption decision would create a gap in the law with respect to suits against nonfiduciaries, but rather whether the action *relates* to any employee benefit plan.") (citation and internal quotation marks omitted); *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 419 (4th Cir. 1993) ("[T]he generalized contention that there should be some form of action available against nonfiduciaries is insufficient to overcome the specific language of the statute which provides for preemption of any claim that relates to an employee benefit plan."); *Consol. Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 964 (8th Cir. 1991) *cert. denied,* 503 U.S. 985 (1992) ("[B]ecause ERISA allows equitable relief against both fiduciaries and non-fiduciaries, Congress intended pre-emption to apply even where no ERISA fiduciary remedy existed."); *Gibson v. Prudential Ins. Co. of Am.*, 915 F.2d 414, 417-18 (9th Cir. 1990) (holding that state law claims that were "directly connected with the Plan" were preempted, even though money damages are not available against a non-fiduciary under ERISA).

For all of these reasons, Count VI is preempted by ERISA Section 514(a) and should be dismissed with prejudice.

## II. The RSAC Fails to Plead a State Law Aiding and Abetting Claim Under Delaware and Wisconsin Law.

Whether preempted or not, Count VI should be dismissed because the RSAC fails to plead any facts that plausibly allege that Stout aided and abetted any breaches of fiduciary duty. *See Twombly,* 550 U.S. at 556. This failure persists under both Delaware and Wisconsin law.[19]

### A. The RSAC Fails to Plead an Aiding and Abetting Claim Under Delaware Law.

Under Delaware law, there are four elements to a claim of aiding and abetting a breach of fiduciary duty: "(i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the defendant; and (iv) damages proximately caused by the breach." *In re Broadstripe, LLC,* 444 B.R. 51, 107 (Bankr. D. Del. 2010). At minimum, the RSAC fails to plausibly allege the third and fourth elements of this cause of action.[20]

#### 1. The RSAC Fails to Plead Knowing Participation.

"Knowing participation has been described as a 'stringent' standard that turn[s] on proof of scienter." *Lee v. Pincus*, No. CV 8458-CB, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014)

---

[19] "[W]hen a case is transferred from a district court with proper venue to another district court, the transferee court will apply the choice-of-law rules of the state in which the transferor court sits." *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1048 (7th Cir. 2016) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964)). Accordingly, Delaware's choice of law rules apply to this case. Delaware subscribes to the internal affairs doctrine, "under which the internal affairs of a corporate entity are governed by the law of the state of incorporation. Claims implicating an entity's internal affairs include breach of fiduciary duty [and] aiding and abetting." *Enzo Life Scis., Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 597 (D. Del. 2015). Plaintiff alleges that Appvion is a Delaware corporation, RSAC ¶ 76, and PDC is a Wisconsin corporation. *Id.* ¶ 73. Thus, Delaware law applies to Count VI as it relates to Appvion, and Wisconsin law applies to Count VI as it relates to PDC. As explained *infra*, the standard for aiding and abetting breach of fiduciary duty is substantially the same under Delaware and Wisconsin law, and Plaintiff fails to state a claim for relief under either state's law.

[20] Stout does not concede that Plaintiff has plausibly alleged that there was a breach of any fiduciary duties by the directors and officers or Argent.

15

(second internal quotation marks omitted) (alteration in original); *see also In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59 (Del. 1995) (holding that conclusory allegations of knowledge and participation in breaches of fiduciary duty to be insufficient under Rule 12(b)(6)). An aider and abettor must act "knowingly, intentionally, or with reckless indifference; that is, with an illicit state of mind." *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (internal quotations omitted). Allegations that a professional engaged in "routine" services without pleading facts "suggesting how and why" it used its position to aid the alleged breaches of fiduciary duty do not support an inference of "knowing participation." *See Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. 2012) (citing *Morgan v. Cash*, No. 5053-VCS, 2010 WL 2803746, at *4-8 (Del. Ch. July 16, 2010)). A plaintiff may plead knowing participation by alleging facts that support the inference that the defendant would profit from the breach or through direct factual allegations that the defendant sought to induce the breach. *See In re Telecomms., Inc. S'holders Litig.*, No. A-16470, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003).

> a.  *The RSAC Pleads No Facts to Support an Inference that Stout "Knowingly Participated" in Unlawful Conduct.*

The RSAC pleads no facts that lead to an inference that Stout did anything other than perform semi-annual valuations for the Trustee pursuant to the terms of its engagement agreements. *Cf. Zazzali*, 482 B.R. at 519; *Morgan*, 2010 WL 2803746, at *4-8. Stout's engagement agreements expressly contemplated that Stout, at the request of the Trustee, would meet with Appvion's management[21] and rely on the "assumptions and information" provided by the Company to prepare the valuations. *See, e.g.,* Ex. 1, Stout Engagement Agreement

---

[21] While the RSAC claims Stout met with the company's management on a regular basis, it is telling that the RSAC alleges that Stout attended two (out of forty-five) meetings of the Appvion and PDC boards of directors over a three-year time-period. *See* RSAC ¶ 172, Fig. 9.

16

(6/20/2013), at 3 ("[T]he Company acknowledges that the successful delivery of our services . . . [is] dependent on . . . the accuracy and completeness of the assumptions and information provided to us . . . ."). Specifically, Stout considered several types of financial data prepared by the Company's management, including, *inter alia*, the Company's internally-prepared financial statements, the Company's internally-prepared balance sheet, and the Company's financial projections. *See, e.g.*, Ex. 4, 6/30/2014 FMV at 3.

The RSAC claims that Company management "inflated" ***one*** of these sources of data—the Company's financial projections—and that the "inflated projections . . . are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality." *See* RSAC ¶¶ 183, 203. While the RSAC faults Stout for not seeking "more reliable projections" from management, *see, e.g.*, *id.* ¶¶ 183, 203, Stout's engagement agreements ***did not*** contemplate that Stout would independently verify whether the financial information that the Company provided to it was accurate. That was not within the scope of its assignment, as its engagement agreements expressly indicate. *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), Professional Terms, ¶ 5 ("The scope of our work will not allow us to verify the accuracy of such information, and it is understood that we will have no duty of independent investigation or verification of such information."). Stout was not engaged to "compile, review or examine" the financial information provided to it by the Company in accordance with accounting standards. *See* Ex. 4, 6/30/2014 FMV at 96. Moreover, Stout's obligation was not to audit the Company's financial projections, such as in the form of a quality of earnings analysis. *See* Ex. 1, Stout Engagement Agreement (6/20/2013), Professional Terms, ¶ 5. Rather, Stout was engaged to conduct diligence sufficient to determine that it was not unreasonable for it to rely on the financial information that the Company provided to it, including the financial projections. *See id.* ("We will in our report to the

17

Trustee state that during the course of our engagement nothing has come to our attention that has caused us to believe that it was unreasonable for us to utilize or rely upon the financial projections or other financial information provided to us by the Company."). Indeed, Stout's reports expressly stated that Stout took "no responsibility for the achievability of any expected, forecasted, projected or hypothetical results anticipated or assumed by the management of the Company." *See, e.g.*, Ex. 4, 6/30/2014 FMV at 96.

Moreover, Stout had no reason to question the accuracy of the projections, given that they were not prepared solely for the purpose of the valuation of PDC stock. As with any other company, Appvion's management prepared the projections to run the business. The projections, in turn, were also used by multiple third parties for other purposes. Investment bankers and prospective buyers—including buyers who ultimately submitted offers to buy the Company and/or its divisions at prices that exceeded Stout's valuations, *see* supra n.11—reviewed the projections as part of their due diligence on the prospective transactions. Thus, Stout has no reason to inquire as to whether the projections—which were not prepared for purposes of the valuations and were simultaneously being reviewed by multiple third parties—were being manipulated by the Company's management.

In sum, while the RSAC implies that Stout's meetings with Appvion's management team and its reliance on the financial information provided to it by the Company support Plaintiff's assertion that Stout was aiding the directors and officers in unlawful conduct, *see, e.g.*, RSAC ¶¶ 10, 13, 181-85, 203, these allegations do not support a reasonable inference that Stout knowingly participated in unlawful conduct. The RSAC does not plausibly plead any facts from which it could reasonably be inferred that Stout knew that this information was "purposefully inflated" or "manifest[ly] implausib[le]." *See* RSAC ¶ 11; *see also Zazzali*, 482 B.R. at 519 (finding allegation

that defendant law firm must have known that corporate insiders were committing fraud and breaching their fiduciary duties based on "numerous and glaring misstatements in the PPMs [(private placement memorandums)] . . . [wa]s unsupported," because the plaintiff "failed to plead any fact giving rise to a reasonable inference that Defendant was aware that the PPMs did not contain factually accurate financial information").

Similarly, the RSAC faults Stout for relying on the financial projections because they were "unrealistic" and "unreliable." *See, e.g.*, *id.* ¶¶ 12-13, 203, 416. Even if the projections were "unrealistic" and "unreliable," that does not necessarily mean that they were purposefully manipulated by Appvion's management to enrich themselves (and, in turn, that Stout knew or should have known about the purported manipulation). Indeed, the RSAC acknowledges that the projections may not have been "purposefully inflated" by Appvion's management. *See, e.g.*, *id.* ¶ 11 ("Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, *or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited*, the EBITDA projections played a crucial role in Stout's FMV Determinations.") (emphasis added). If Company's management did not deliberately manipulate the projections, then there was no scheme to inflate the price of the PDC stock in which Stout could have "knowingly participated."

Likewise, the RSAC points out "errors" in Stout's work, but pleads no *facts* that could reasonably lead to the inference that the "errors" were purposeful or that Stout was colluding with Appvion's management. The RSAC claims that the valuations were "flawed" because they excluded material indebtedness and certain liabilities, RSAC ¶¶ 206, 209; included comparisons to companies that were "not suitable," *id.* ¶ 228; relied on "improper exclusions and adjustments,"

19

*id.* ¶ 260; and contained other purported "errors" and "flaws."[22]  *See id.* ¶¶ 243-49, 259, 267, 269-

80.  The RSAC claims these "errors" were "not the result of mere academic disagreement."  *Id.* ¶

203.  According to Plaintiff, Stout was "fully aware" that the projections were inflated, *id.* ¶¶ 183,

203, and the "errors" in the valuations were "knowingly made to compensate for the unreliable

financial projections."  *Id.* ¶ 203.  The RSAC, however, pleads no **facts** to support these

conclusions.

The RSAC implies that Stout worked in concert with Appvion's management to produce

the "inflated" valuations, but does not actually allege as much.  The RSAC alleges that Stout relied

on the financial projections at management's "behest," *see id.* ¶ 217, but this allegation only

supports the inference that Appvion's management provided Stout with the "assumptions and

information" contemplated in Stout's engagement agreements, *see* Ex. 1, Stout Engagement

Agreement (6/20/2013), at 3, not that Stout colluded with Appvion's management to inflate the

price of PDC stock in its valuations.  Further, the RSAC alleges "[u]pon information and belief"

that one or more of the officers "assisted Stout to selectively exclude" certain EBITDA ratios,

RSAC ¶ 265, and that Stout's decision regarding whether to apply a Company-Specific Risk

---

[22] Despite Plaintiff's identification of these supposed "errors," none of the Company's own financial advisors, consultants, or independent outside auditors—all of whom were aware of Stout's valuation work—ever alerted the Company to these or any other errors in Stout's valuations.  *See* Ex. 4, 6/30/2014 FMV at 17 (Company engaged Jefferies LLC to help explore strategic business options, including sale of the Company); Ex. 5, 12/31/2014 FMV at 18 (same); Ex. 6, 6/30/2015 FMV at 16 (same); Ex. 7, 12/31/2015 FMV at 15 (same); Ex. 8, 6/30/2016 FMV at 11, 13 (Company engaged Jefferies LLC to help explore strategic business options, including sale of the Company and engaged Boston Consulting Group to identify potential cost reduction and revenue opportunities); Ex. 9, 12/31/2016 FMV at 14-16 (same; Company engaged Barclays Capital as its financial advisor and to identify and assist with strategic alternatives); Ex. 10, 6/30/2017 FMV at 13-16 (same); *see, e.g.*, Ex. 2, 2012 10-K at 43 (unqualified audit opinion by PricewaterhouseCoopers LLP).

Premium may have been made "with possible input from Management." *Id.* ¶ 269. The RSAC does not plead a single fact in support of these allegations. Indeed, the RSAC contains multiple paragraphs concerning the knowledge that the members of the boards of Appvion and PDC allegedly had regarding the reliability of the Company's projections. *See id.* ¶¶ 173-80. Those paragraphs do not include any allegations concerning ***Stout's*** knowledge. *See id.*

At most, Plaintiff—with the benefit of hindsight—alleges that Stout did a poor job in valuing the Company. That does not amount to "knowing participation" in unlawful conduct. Indeed, circuit courts of appeal recognized that the valuation of stock requires the exercise of professional judgment. *See Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 362-63 (3d Cir. 2002) (acknowledging the "extremely difficult task of valuing the stock of a company which is privately owned"); *Beerly v. Dep't of Treasury,* 768 F.2d 942, 947 (7th Cir. 1985) ("People estimate [stock] value differently."). Plaintiff's allegations that Stout's valuations could have been performed differently thus are insufficient to plead "knowing participation."

> b. *It is Implausible that Stout "Knowingly Participated" in Unlawful Conduct.*

The purported scheme to defraud—coordinated among multiple classes of defendants over a period of years—is implausible. *See Iqbal,* 556 U.S. at 678. Such a coordinated effort is particularly implausible given the significant turnover among the alleged wrongdoers. The ESOP was formed in 2001, *see* RSAC ¶ 67, and the composition of Appvion's management changed over time.[23] The turnover in personnel was not limited to the Company. The Trustee of the ESOP also

---

[23] From the time the ESOP was created in 2001 until the Company filed for bankruptcy in 2017, there were multiple changes in the management of Appvion. The Company's CEO changed two times. *See* RSAC ¶¶ 24, 36. The other officers of the Company changed over time, *see id.* ¶¶ 25 (Ferree – served in various management roles from 2006 - 2017), 26 (Van Straten – became Vice President, General Counsel and Secretary of PDC and Appvion in 2012), 27 (Fletcher – became Vice President and Controller of Appvion in 2010 and retired in 2017), 28 (Arent – became Senior

21

changed multiple times.  *See supra* n.5.  It is patently implausible that the 13 individual officers and directors who have been named as defendants in the RSAC (and potentially the officers and directors who preceded these individuals), multiple trustees, and an independent valuation firm all worked in concert to inflate the value of the PDC stock, seamlessly handing the baton of fraud off from one to another over an indefinite time period that at a minimum lasted several years.

The fraud is even more implausible given that Stout relied on multiple sources of data—which included data from the Company *as well as real-world indications of market value from independent third parties*—when preparing its valuations.  The RSAC claims that the "inflated projections" are "primarily responsible" for the "disconnect" between Stout's valuations and the Company's "financial reality."  RSAC ¶ 203.  The projections, however, were just one of multiple data points considered by Stout.  As is reflected in its valuation reports, Stout considered multiple sources of financial data, as well as other information, when preparing its valuations.  *See, e.g.*, Ex. 4, 6/30/2014 FMV at 3.  Indeed, Stout considered data from third parties, including the Company's auditors, the investment bankers engaged by the Company to assist with its multiple attempts to sell its assets, and the prospective purchasers who made offers to buy the Company in whole or in part.[24]  It is implausible that the alleged manipulation of one of the sources of data that

---

Vice President of Human Resources in 2013 and retired in 2015), as did its directors.  *See, id.* ¶¶ 29 (Carter, 2004-2016), 30 (Murphy, 2007-2016), 31 (Reardon, 2007-2015), 32 (Seifert, from 2004), 33 (Suwyn, from 2011), 34 (Laurino, from 2017), 35 (Roberts, from May 2016).

[24] The Company engaged in several attempts to sell its assets.  In the related due diligence processes, the Company's financial data was reviewed by multiple third parties, including investment bankers and prospective purchasers.  *See, e.g.,* Ex. 7, 12/31/2015 FMV at 15-17.  Yet Defendants' purported scheme to "manipulate" the stock price supposedly continued even as the processes necessary for such potential sales took place and the Company received purchase offers that *exceeded* the valuations prepared by Stout.  *See supra* n.11.  This is patently implausible. Further, it underscores why Stout could not have had even constructive knowledge of any allegedly unlawful conduct by the officers and directors: even the third parties reviewing the Company's financial records who submitted offers to purchase the Company did not detect the supposed fraud.

22

Stout considered resulted in the purportedly "inflated" valuations, just as it is implausible that the alleged fraud was joined by the third parties who were providing contemporaneous feedback on the Company's value.

Stout's purported knowledge of and participation in this fraudulent scheme is rendered further implausible by the limited scope of Stout's engagements and the nature of its compensation. Stout was engaged to determine the fair market value of the stock "for annual reporting and plan administration purposes by the Trustee" and reported "solely to the Trustee." *See, e.g.*, Ex. 1, Stout Engagement Agreement (6/20/2013), at 2.[25] It was the ***Trustee's*** responsibility to review and ultimately determine the fair market value of Company stock for ESOP administration purposes. *See, e.g.*, RSAC ¶¶ 100, 412-13. Stout could not plausibly have known nor should it have known that its valuations—which were expressly for use by the Trustee—were being manipulated by Appvion's management for their own financial benefit. The RSAC does not make such an allegation. Moreover, in contrast to the directors and officers, Stout had no incentive to inflate the valuations. Stout's receipt of a fixed fee for its work negates any inference that Stout would have benefitted from the fraud in any way. While Stout's engagements were renewed each year (at the same rate), its continued receipt of a reasonable, fixed fee for services rendered does not amount to a motive to engage in unlawful conduct. *See Lee*, 2014 WL 6066108, at *14 ("[I]t is not reasonable to infer here that, simply by receiving fees (that are not alleged to be

---

[25] The RSAC alleges that, contrary to the terms of Stout's engagement agreements, "Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations." RSAC ¶ 113; *cf. Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.") (quoting *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994)). The RSAC, however, does not allege that ***Stout*** knew or should have known that the Trustee (or anyone else) was using its valuations for purposes other than those set forth in its engagement agreements.

unreasonable) for acting as underwriters in the secondary offering, that Underwriter Defendants 'participated in the [Zynga] board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue.") (second and third alterations in original). Where, as here, the RSAC pleads facts that are "'merely consistent with' a defendant's liability," the allegations fall "short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678.

### 2. The RSAC Fails to Plead Proximate Cause.

Further, the RSAC fails to allege facts that plausibly plead proximate cause.[26] A proximate cause is one "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the results would not have occurred." *Russell v. K-Mart Corp.*, 761 A.2d 1, 5 (Del. 2000). "In order to break the causal chain, the intervening cause must also be a superseding cause, that is, the intervening act or event itself must have been neither anticipated nor reasonably foreseeable by the original tortfeasor." *Duphily v. Del. Elec. Coop., Inc.*, 662 A.2d 821, 829 (Del. 1995). A court may decide proximate causation as a matter of law if there can be "no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinarily negligent . . . ." *Id.* at 831.

The RSAC alleges a lengthy chain of events that ultimately led to Plaintiff's purported injury. Stout prepared the valuations using information provided by Appvion's management that

---

[26] Plaintiff's Opposition did not respond to Stout's argument that Plaintiff failed to plead proximate cause. *See* Pl. Opp. at 37-42 (no argument regarding proximate cause). Plaintiff, accordingly, has conceded this argument, *see DIRECTV, Inc. v. Baye,* No. 04-C-1104, 2005 WL 3088451, at *1 (E.D. Wis. Nov. 17, 2005) (Griesbach, J.) (holding that party conceded facts to which it failed to respond), and is barred from raising it here. *See also* Dkt. 16 at 4 (limiting Plaintiff's opposition to "the basic grounds asserted or preserved in the Delaware Bankruptcy Court").

may or may not have been "purposefully inflated," RSAC ¶ 11, even though Appvion's management agreed to provide Stout with "accura[te]" "assumptions and information." *See, e.g.,* Ex. 1, Stout Engagement Agreement (6/20/2013), at 3. The Trustee then reviewed and adopted those valuations (with the ESOP Committee overseeing the Trustee's work), *see* RSAC ¶¶ 89, and the "inflated" valuations were then used to set prices for the purchases and sales of PDC stock. *Id.* ¶ 16. Because the ESOP "frequently" did not have enough cash to fund the cost of ESOP distributions at the "inflated" stock prices, the ESOP borrowed money from PDC. *Id.* ¶ 115. Appvion's management breached their fiduciary duties to the Company by extending credit from Appvion to PDC in the form of intercompany loans, so that PDC could in turn lend money to the ESOP. *Id.*, Count III. In at least one instance, Appvion's management breached their fiduciary duties to the Company by forgiving an intercompany note from Appvion to PDC for no consideration. *Id.* ¶ 18, Count II. Appvion borrowed money from its lenders to fund its loans to PDC. *Id.* ¶ 116. The "outflow" of money from Appvion "had a ripple effect" on the business, "***playing a role*** in the Debtors' decision to sell" the Encapsys business unit. *Id.* ¶ 16 (emphasis added). This, in turn, "saddl[ed] the Debtors" with an "unsustainable capital structure." *Id.* All of this supposedly somehow led to Appvion's bankruptcy and Plaintiff's injury.

This chain of events includes multiple superseding causes, and there could be no "reasonable difference of opinion" as to their foreseeability. *Cf. Russell*, 761 A.2d at 5. It certainly was not foreseeable to Stout that Appvion's management would supply it with information that was not accurate and complete, contrary to the terms of its engagement agreements. It also was not foreseeable that they would do so to enrich themselves. Further, it was not foreseeable to Stout that Appvion's management would commit breaches of fiduciary duty when deciding that Appvion should loan money to PDC to fund ESOP distributions and, in at least one instance, forgive a loan

25

from Appvion to PDC for no consideration.  *Cf.* Restatement (Second) Of Torts § 448 (1965) ("The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, . . . unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created.").  It was not foreseeable to Stout that Appvion's management would decide to sell a key business unit and revenue driver as a result of the Company's debt obligations, which included ***but were not limited to*** its loans to PDC to fund ESOP distributions.  Indeed, the RSAC acknowledges that the ESOP obligations "***play[ed] a role***" in the decision to sell the Encapsys business unit but were not the primary reason for that decision.[27]  *See* RSAC ¶ 16.  This is far from a "natural and continuous sequence."  *Cf. Russell*, 761 A.2d at 5.  No reasonable person could come to the conclusion that Stout's conduct was the "but for" cause of Plaintiff's purported injury, when, on the face of the RSAC, there were multiple acts and events by other actors that were unforeseeable to Stout.  Accordingly, to the extent Plaintiff's claim is brought under Delaware law, it should be dismissed.

### B.    The RSAC Fails to Plead an Aiding and Abetting Claim Under Wisconsin Law.

The legal standard for aiding and abetting a breach of fiduciary duty under Wisconsin law is not materially different than the standard under Delaware law.  *See Dixon v. Ladish Co.*, No. 10-CV-1076, 2011 WL 719018, at *2-3 (E.D. Wis. Feb. 22, 2011) (explaining that "Wisconsin courts often look to Delaware for guidance concerning corporate law," and applying elements of

---

[27] Should this case proceed, the evidence will show that Appvion's management considered the sale of the Company in whole or in part for ***years*** due to ongoing liquidity issues.  *See, e.g.*, Ex. 5, 12/31/2014 FMV at 18.  Multiple factors contributed to the Company's accumulation of debt, including its sale of several investments at significant losses and the recession of 2008-09.  *See id.* at 19.  The strain on the Company's liquidity was reflected in Stout's declining valuations of the Company, *see* RSAC Fig. 10, and was described in Stout's reports.  *See, e.g.*, Ex. 5, 12/31/2014 FMV at 18.

Delaware aiding and abetting breach of fiduciary duty to Wisconsin claim for the same). Under Wisconsin law, a person aids or abets another's tortious conduct when "(1) [t]he person undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) the person consciously desires or intends that his conduct will yield such assistance." *Winslow v. Brown*,125 Wis. 2d 327, 336-37 (Wis. Ct. App. 1985)

"Intent" is an "essential element of an aiding and abetting claim." *Grad v. Associated Bank, N.A.*, No. 2010-AP-1461, 2011 WL 2184335, at *7 (Wis. Ct. App. June 7, 2011). "Mere presence, with no effort to prevent unlawful conduct, is not aiding and abetting unless an intent to assist is communicated." *Winslow*, 125 Wis. 2d at 336-37; *see also Grad,* 2011 WL 20184335, at *7. ("[P]assively accompanying a driver on an unlawful trip does not raise an inference of a willingness to assist."). Thus, Wisconsin courts have granted motions to dismiss aiding and abetting claims where the plaintiff's complaint fails to plead "other circumstances" showing that the defendant "assented to the tortious act, and lent to it his countenance and approval." *Id.* at *8.

The RSAC fails to allege conscious desire or intent for the same reasons it fails to allege "knowing participation" under Delaware law. *See supra* Part II.A.1. The RSAC alleges only that Stout performed valuations for the Trustee pursuant to the terms of its engagement agreements and that it met with Appvion's management to obtain the financial information necessary to carry out its professional obligations. *See supra id.* It pleads no facts to support an inference that Stout even knew the information it was receiving from management was purportedly manipulated—much less that Stout knew that the directors' and officers' were engaged in breaches of fiduciary duty and expressly communicated its intent to assist in those purported breaches. *See supra id.*; *see also Winslow* 125 Wis. 2d at 336. At best, Plaintiff has alleged Stout's proximity to the allegedly

27

unlawful conduct of others, which is insufficient to plead an aiding and abetting claim under Wisconsin law.  *See Winslow* 125 Wis. 2d at 336; *Grad*, 2011 WL 2184335 at *8.[28]

## III.    Count VI Should be Dismissed With Prejudice.

The Court should dismiss Count VI with prejudice and should not afford Plaintiff a *fourth* chance to amend its allegations.  A court can deny a motion for leave to amend where the pleading is futile.  *Ashley v. Jones*, No. 17-C-1785, 2018 WL 4354971, at *1 (E.D. Wis. Sept. 12, 2018) (Griesbach, J.).   "An amendment is futile when it could not withstand a motion to dismiss."  *Id.* Here, Plaintiff has had more than ample time and opportunity to prepare his complaint.   Indeed, Plaintiff already has had *three* bites at the apple, and still has not stated a viable aiding and abetting claim against Stout.  Accordingly, Count VI should be dismissed with prejudice.

## CONCLUSION

For all of the reasons stated above, Count VI of Plaintiff's Revised Second Amended Complaint should be dismissed with prejudice as to Stout.

Dated: December 16, 2019

/s/ Lars C. Golumbic
Lars C. Golumbic
Kara Petteway Wheatley
Meredith Kimelblatt
Groom Law Group, Chartered
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Phone: (202) 861-6615
Email:  lgolumbic@groom.com
          kwheatley@groom.com
          mkimelblatt@groom.com

-and-

---

[28] To the extent the directors and officers prevail on their motion to dismiss the breach of fiduciary duty claims against them (Counts I-IV), then the aiding and abetting claim against Stout must also be dismissed. See, e.g., *In re Mortg. Elec. Registration Sys., Inc.,* 754 F.3d 772, 786 (9th Cir. 2014).

Ross W. Townsend (Wis. Bar No. 1011622)
Law Firm of Conway, Olejniczak & Jerry
231 South Adams Street, P.O. Box 23200
Green Bay, WI 54305-3200
Telephone: (920) 437-0476
Fax: (920) 437-2868
rwt@lcojlaw.com


*Attorneys for Stout Risius Ross, Inc. and Stout Risius Ross, LLC*