## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALAN D. HALPERIN and EUGENE I. DAVIS,
as Co-Trustees of the Appvion Liquidating Trust,

    Plaintiff,

  v.            Case No. 19-C-1561

MARK R. RICHARDS, THOMAS J. FERREE,
TAMI L. VAN STRATEN, JEFFREY J. FLETCHER,
KERRY S. ARENT, STEPHEN P. CARTER,
TERRY M. MURPHY, ANDREW F. REARDON,
KATHI P. SEIFERT, MARK A. SUWYN, and
DAVID A. ROBERTS,

    Defendants.

---

## DECISION AND ORDER

---

In late 2001, the employees of Appvion, Inc., contributed nearly $107 million from their 401(k) retirement accounts to an employee stock ownership plan (ESOP), which was used to purchase all of the common stock of Paperweight Development Corporation (PDC). PDC then used the employee contributions, along with other financing, to purchase Appvion from its parent company, Arjo Wiggins Appleton, for a total purchase price in excess of $800 million. The plan was for Appvion to continue operating and generate sufficient profit which, together with ongoing employee retirement contributions, would allow PDC to pay off its debt and repurchase its stock as employees retired or otherwise terminated their employment.

Unfortunately, the plan ultimately failed. On October 1, 2017, some sixteen years after the sale, Appvion filed voluntary petitions for relief under Chapter 11. Under the Chapter 11 Plan of Liquidation, Plaintiffs Alan D. Halperin and Eugene I. Davis, as co-trustees of the Appvion

Liquidating Trust, were given authority to pursue certain causes of action on behalf of the trust. Plaintiffs commenced an adversary proceeding in the U.S. Bankruptcy Court for the District of Delaware on November 30, 2018, for the benefit of certain Appvion creditors, against a number of former Directors and Officers of Appvion, Inc. Plaintiffs assert that the Director and Officer Defendants breached their fiduciary duties of care and loyalty (Counts I and III); that the ESOP Committee Members aided and abetted the Director and Officer Defendants in breaching their fiduciary duties (Count IV); and that certain Director and Officer Defendants received illegal dividends in violation of Delaware state law (Counts VII and VIII). On October 13, 2023, Defendants filed a motion for summary judgment as to Plaintiffs' claims and Plaintiffs filed a motion for summary judgment as to its unlawful dividend claim (Count VII). Defendants subsequently filed a motion to exclude the opinions of Plaintiffs' experts on December 18, 2023.

## BACKGROUND

Appvion, formally known as Appleton Papers Inc. until 2013, was a Delaware corporation headquartered in Appleton, Wisconsin, that produced specialty paper products for specific functions, such as fax machines, point-of-sale receipts, and carbonless forms. Appvion also had multiple business segments, including Thermal, Carbonless, and Encapsys (which it sold in August 2015). Prior to 2001, Appvion offered its employees a traditional Section 401(k) retirement plan. In late 2001, the employees of Appvion contributed nearly $107 million of their retirement accounts to an ERISA-governed employee stock ownership plan (ESOP) to be used to purchase all of the common stock of PDC, a company incorporated to serve as Appvion's parent and holding company. PDC then purchased Appvion from its parent company, Arjo Wiggins Appleton, and Appvion became a wholly-owned subsidiary of PDC. The ESOP owned 100% of PDC common stock through the Appvion Inc. Employee Stock Ownership Trust.

2

Appvion's governance structure included a chief executive officer (CEO) and a board of directors comprised of the CEO and six directors. Defendants Richards, Reardon, Carter, Murphy, Seifert, Suwyn, and Roberts (collectively, the Director Defendants) were members of the Appvion Board of Directors and the PDC Board of Directors at various times from June 30, 2013, to October 1, 2017. Defendants Richards, Ferree, Van Straten, Fletcher, and Arent (collectively, the Officer Defendants) were officers of Appvion at various times between June 30, 2013, and October 1, 2017. The board of directors appointed an ESOP Committee to oversee and administer the ESOP. Richards, Ferree, Van Straten, and Arent were members of the ESOP Committee. The ESOP Committee appointed the ESOP Trustee, which held and managed the Employee Stock Ownership Trust's assets as an ESOP fiduciary and had sole authority to set the value of the PDC common stock. The ESOP Trustee engaged an independent valuation firm, Stout Risius Ross, to value PDC stock twice annually. Appvion provided Stout with financial projections and financial statements to generate valuations. The ESOP Committee conducted semi-annual meetings to review the stock price calculations with the ESOP Trustee and Stout.

After PDC's purchase of Appvion, Appvion employees continued to use their tax-deferred retirement savings to purchase additional stock throughout their employment. Upon an employee participant's retirement, the ESOP would repurchase the participant's PDC common stock at fair market value. As a holding company, PDC did not have its own operating or revenue-generating assets, so Appvion periodically transferred money to PDC from January 1, 2013, to September 30, 2017, in order to fund the ESOP so that it could satisfy the repurchase obligations. As part of this arrangement, on June 11, 2004, PDC gave Appvion an intercompany promissory note in the amount of $167,066,667 with a 6% annual interest rate.

3

Until 2013, Appvion made the repurchase transfers to PDC under the Intercompany Note. But between 2013 and 2017, the domestic and global paper industry experienced challenges that impacted Appvion's product lines and financial state. On November 18, 2013, Appvion executed an "Intercompany Promissory Note Distribution and Payoff Letter," by which Appvion made a $244,895,000 "non-cash distribution" to PDC equaling the Intercompany Note's indebtedness. PDC and Appvion then entered into an "intercompany lending arrangement," which Defendants contend was necessary to ensure the ESOP had funding for repurchases on an ongoing basis. Between January 1, 2014, and October 1, 2017, Appvion transferred $30,603,411 to PDC for the purpose of funding the ESOP's repurchases of PDC common shares.

On October 1, 2017, Appvion filed voluntary petitions for relief under Chapter 11. Under the liquidation plan, Plaintiffs were appointed as co-trustees of the Appvion Inc. Liquidating Trust. Plaintiffs filed this action on November 30, 2018, to recover losses from Defendants' alleged wrongs against the corporation. In particular, Plaintiffs contend that Defendants fraudulently inflated the PDC stock valuations or failed to stop the alleged overvaluations because Defendants' pay was tied to those valuations. They also assert that the Officer Defendants improperly allowed Appvion and PDC to engage in an intercompany lending arrangement to fund PDC's ESOP obligations and that, by forgiving and extending the intercompany notes, Defendants provided unlawful dividends to PDC.

Defendants counter that, given the challenges faced by domestic and global paper industries, Appvion implemented measures to help bolster its product line and financial state. Although those measures were ultimately unsuccessful, Defendants contend that they exercised sound business judgment in making those decisions. They also argue that they did not provide unlawful dividends to PDC.

## ANALYSIS

All parties agree that Appvion was incorporated under the laws of Delaware, and therefore Delaware law governs the substantive dispute. The parties also agree that federal procedural law applies.

### A. Summary Judgment Standard

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: a court construes facts and inferences arising from them in favor of the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citation omitted).

### 1. Breach of Fiduciary Duties of Care and Loyalty Claims

Plaintiffs assert that the Director and Officer Defendants breached their fiduciary duties of care and loyalty. In particular, Plaintiffs claim that Defendants breached their duties of care and loyalty by participating in and contributing to PDC stock overvaluations to further their own

5

financial interests and by failing to detect and take actions to stop the alleged overvaluations (Count I). Plaintiffs also allege that the Officer Defendants breached their fiduciary duties of care and loyalty by allowing Appvion and PDC to engage in an intercompany lending arrangement to fund PDC's ESOP obligations.

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (citation omitted)). Under Delaware law, directors "owe duties of care and loyalty to the corporation and its stockholders." *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). "Corporate officers owe fiduciary duties that are identical to those owed by corporate directors." *In re Pattern Energy Grp. Inc. Stockholders Litig.*, No. 2020-0357, 2021 WL 1812674, at *65 (Del. Ch. May 6, 2021) (citation omitted).

"[L]iability for breaching the duty of care is predicated upon concepts of gross negligence." *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) (citations omitted). In the duty of care context, "gross negligence has been defined as reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. 2005) (cleaned up). As to the duty of loyalty, the plaintiff must establish that the defendant acted in bad faith by showing "either (1) an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or (2) that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re MeadWestvaco Stockholders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017) (citations omitted).

Defendants assert that, although their attempts to save Appvion from financial ruin were ultimately unsuccessful, they acted on an informed basis, were not disinterested, and were not grossly negligent in their actions and are thus protected by Delaware's business judgment rule. Under the business judgment rule, "the business decisions of directors will not be disturbed if they can be attributed to any rational business purpose." *Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000). It "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citing *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del. Ch. 1971); *Robinson v. Pittsburgh Oil Refinery Corp.*, 126 A. 46 (Del. Ch. 1924)). To rebut the presumption, the plaintiff must prove by a preponderance of the evidence that the presumption does not apply "either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an unintelligent or unadvised judgment, by failing to inform themselves of all material information reasonably available to them before making a business decision." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 756 (Del. Ch. 2005) (citations omitted). If the plaintiff succeeds, "the burden then shifts to the defendants to prove by a preponderance of the evidence that the challenged transactions were entirely fair to the corporation." *Id.* at 757.

Defendants contend that the Director Defendants consistently engaged in a robust governance process; acted pursuant to the company's by-laws and typical ESOP industry practices; and received and reviewed accurate and current information about the company's operations, issues, and financial condition. They assert that the Officer Defendants also acted on an informed basis and in a deliberate manner with respect to the PDC stock valuations, as they routinely relied on external advisors who were experts in their respective fields; appointed an independent trustee

to hold, manage, and control the Employee Stock Ownership Trust's assets; established a robust process to review the valuation reports and PDC stock valuations approved by the ESOP Trustee; and adopted a consistent and robust process to review the financial projections provided to Stout, along with the company's financial performance. In addition, they assert that the Officer Defendants acted on an informed basis and in good faith with respect to the intercompany lending arrangement between Appvion and PDC because they acted in the company's and the ESOP's best interests, relied on the company's external advisors, and acted in compliance with ERISA requirements. Defendants also argue that they did not act in self-interest or in bad faith by virtue of the company's compensation structure.

Plaintiffs assert that, in exercising their fiduciary duties, the Director Defendants were not only required to be mindful of the interests of the corporation and its stockholders, but they were also required to be mindful of the interests of Appvion's creditors because Appvion was "balance sheet insolvent." They contend that, under the balance sheet test, a plaintiff must prove that liabilities exceeded the company's assets at a fair value. Plaintiffs assert that Appvion was balance sheet insolvent from June 2013 through September 2017 and that, once Appvion was balance sheet insolvent, Defendants' duties were to maximize Appvion's value for Appvion and its creditors. They argue that Defendants breached their fiduciary duties because they did not seek advice regarding what their duties were in the event Appvion became insolvent.

Defendants contend that the balance sheet test actually requires showing "a deficiency of assets below liabilities *with no reasonable prospect that the business can successfully be continued in the face thereof*." Defs.' Reply Br. at 21, Dkt. No. 157 (citing *In re Tropicana Ent., LLC*, 520 B.R. 455, 472 (Bankr. D. Del. 2014); *Prod Res. Grp. L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004); *In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 599 (Bankr. D. De. 2008)). They

assert that Plaintiffs have presented no evidence that Appvion had no reasonable prospect of successfully continuing and have therefore failed to establish that Appvion was balance sheet insolvent.

Where state law provides the rule of decision and the highest state court has not addressed the issue, "the federal court must predict how the highest court of the state would decide the case if presented with the case today." *Klunk v. Cnty. of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999) (citation omitted). In the absence of guidance from a state's supreme court, the federal court looks to but is not bound by "the decisions of the lower state courts." *Rodman Indus., Inc. v. G&S Mill, Inc.*, 145 F.3d 940, 943 (7th Cir. 1998) (citation omitted); *see King v. Damiron Corp.*, 113 F.3d 93, 95 (7th. Cir. 1997) (analyzing whether the "Supreme Court of Connecticut or lower Connecticut state courts" had decided the state law issue); *Arnold v. Metropolitan Life Ins. Co.*, 970 F.2d 360, 361 (7th Cir. 1992) ("In this diversity case, in the absence of an Illinois Supreme Court decision in point, we must look to the decisions of the Appellate Court of Illinois.").

The Delaware Supreme Court has not squarely addressed the question of how to analyze balance sheet insolvency for breaches of fiduciary duties. However, the Court of Chancery has,[1] concluding that the assets versus liabilities test is the proper one. *See Quadrant Structured Products Company, Ltd. v. Vertin*, 115 A.3d 535 (Del. Ch. 2015) (*Quadrant II*). In *Quadrant II*, the plaintiff owned debt securities issued by defendant Athilon Capital Corp., a Delaware corporation. *Id.* at 539. The plaintiff claimed that the defendant corporation was insolvent and asserted claims of breach of fiduciary duty against the individual board of director defendants. In

---

[1] There is perhaps no better predictor of how the Delaware Supreme Court would decide an issue of corporate law. The Court of Chancery is "widely recognized as the nation's leading authority on corporate law issues." *Simmonds v. Credit Suisse Secs. (USA) LLC*, 638 F.3d 1072, 1089 (9th Cir. 2011) (citing William H. Rehnquist, THE PROMINENCE OF THE DELAWARE COURT OF CHANCERY IN THE STATE-FEDERAL JOINT VENTURE OF PROVIDING JUSTICE, 48 Bus. Law. 351 (1992)), *reversed on other grounds*, 556 U.S. 221 (2012).

their motion for summary judgment, the defendants argued that "a plaintiff bears a greater burden to establish insolvency than the traditional balance sheet test, under which 'an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held.'" *Id.* (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992)). Like Defendants, here, the defendants in *Quadrant II* asserted that a plaintiff must additionally prove "that the corporation has no reasonable prospect of returning to solvency." *Id.*

The court noted that an "irretrievable insolvency showing" has been historically required only when a creditor seeks to obtain the appointment of a receiver under Section 291 of the Delaware General Corporation Law (DGCL). In Delaware, the appointing of a receiver requires that "the corporation have 'no reasonable prospect that the business can be continued' in addition to 'a deficiency of assets below liabilities.'" *Id.* at 558 (quoting another source). "This additional showing was necessary," the court explained, "because the appointing of a receiver was a 'drastic' act that displaced the corporation's board of directors." *Id.* (quoting another source). The court observed that the rationale for the rule is that "[a] court should never wrest control of a business from the hands of those who have demonstrated their ability to manage it well, unless it be satisfied that no course, short of the violent one, is open as a corrective to great and imminent harm." *Id.* (internal quotation marks and citation omitted). In other words, "if the corporation's duly elected managers had a reasonable prospect of bringing the corporation to solvency, then the court should not appoint a receiver." *Id.* The court concluded that its examination of precedent "demonstrates that the irretrievable insolvency test only applies in receivership proceedings for reasons unique to that remedy." *Id.*

The court did note that one Court of Chancery decision had incorporated the concept of irretrievable insolvency into the traditional balance sheet test in *North American Catholic*

*Educational Programming Foundation, Inc. v. Gheewalla*, No. 1456-N, 2006 WL 2588971, at *10 (Del. Ch. Sept. 1, 2006). *Id.* at 556–57. But it explained that the *Gheewalla* court quoted the statement of law from a portion of a decision in *Production Resources Group L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004), that addressed the appointment of a receiver and *Gheewalla* did not address the irretrievable insolvency requirement in its analysis in any event.[2] *See Gheewalla*, 2006 WL 2588971, at *10. The *Quadrant II* court found that *Production Resources* actually supported the use of the traditional balance sheet test for assessing breach of fiduciary duty claims. 115 A.3d at 558–59.

In *Production Resources*, the creditor-plaintiffs sought to obtain a receiver and to pursue claims for breach of fiduciary duty against the defendants. The *Production Resources* court found that the plaintiffs had stated a claim for appointing a receiver and met the standard for irretrievable insolvency. 863 A.2d at 782–83. The court then turned to the plaintiffs' breach of fiduciary duty claims. Rather than revisit the question of insolvency, the court treated its earlier ruling as dispositive. The *Quadrant II* court found that this decision made sense—"by showing irretrievable insolvency, the plaintiff met a more onerous standard than the traditional balance sheet test, so the pleading necessarily satisfied the less stringent test." 115 A.3d at 558. The *Quadrant II* court found that nothing in the breach of fiduciary duty section of the *Production Resources* decision "suggested that a creditor had to plead irretrievable insolvency." *Id.* at 558–59. In other words, *Production Resources* supported the "use of the traditional balance sheet test, not the irretrievable

---

[2] Neither did the Supreme Court when it reviewed the *Gheewalla* decision. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 98 (Del. 2007). It "acknowledged that the Court of Chancery had defined insolvency using the 'no reasonable prospect' standard, but . . . did not discuss the standard or acknowledge its difference from the more traditional standard." Robert J. Stearn, Jr. & Cory D. Kandestin, *Delaware's Solvency Test: What It Is And Does It Make Sense? A Comparison of Solvency Tests Under The Bankruptcy Code And Delaware Law*, 36 Del. J. Corp. L. 165, 177 (2011). It had no reason to. The only issue on appeal was whether creditors of an insolvent corporation can bring direct fiduciary duty claims against its directors. *Gheewalla*, 930 A.2d at 94.

11

insolvency test." *Id.* at 559. The *Quadrant II* court determined that neither *Production Resources* nor *Gheewalla* changed the law regarding the traditional balance sheet test. *Id.* The *Quadrant II* court ultimately held that, under the traditional balance sheet test, a plaintiff must only establish that "an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held." *Id.* 539 (internal quotation marks and citation omitted).

Defendants cite numerous cases that add the "irretrievable insolvency showing" to the balance sheet test, but these cases involve requests to appoint a receiver. The court finds persuasive the *Quadrant II* court's explanation as to why such a showing is not required in cases outside of the receivership context. In short, under the balance sheet test, Plaintiffs must show that Appvion had liabilities in excess of a reasonable market value of assets held. *See id.*

Even under the traditional balance sheet test, however, the parties dispute whether Appvion was balance sheet insolvent. Defendants assert that, despite Plaintiffs' assertion that Appvion was balance sheet insolvent, Appvion continued to operate and meet its obligations as they came due for more than four years before its Chapter 11 filing, received formal offers to buy the company, and had unused credit facilities and refinanced its debt. This unresolved factual dispute must be decided by a jury.

Plaintiffs also contend that, regardless of whether Appvion was insolvent, Defendants breached their fiduciary duties by failing to stop the over-valuations of PDC's common shares and acting in their self-interest by receiving substantial compensation tied to the inflation of PDC's common stock shares. But the parties dispute how often the Board of Directors discussed ongoing projects and initiatives, how often they met with legal counsel, whether they received regular updates and reports from the ESOP Committee, whether the ESOP Committee conducted due diligence before appointing an ESOP trustee, whether the five-year financial projections Appvion

12

provided to Stout were the same projections used for internal planning, what the terms of the intercompany lending arrangement were, and whether Defendants acted in Appvion's best interests in approving the intercompany lending arrangement. The applicability of the business judgment rule is generally a fact-intensive and credibility-laden inquiry that is not suitable for determination upon a motion for summary judgment. In this case, genuine issues of material fact exist regarding whether the business judgment rule shields Defendants' conduct and whether Defendants acted in their self-interest. Accordingly, Defendants are not entitled to summary judgment on this basis.

Defendants argue that Plaintiffs' breach of the duty of care claim against the Director Defendants is barred by the DGCL's exculpatory provision, 8 Del. C. § 102(b)(7). Section 102(b)(7) allows Delaware corporations to include a provision in their articles of incorporation that eliminates or limits "the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." The provision cannot, however, eliminate or limit the liability of a director "(i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit." § 102(b)(7). Although Plaintiffs do not dispute that Appvion's certificate of incorporation contained a clause that triggers the protections of the exculpatory provision, they assert that the Director Defendants' conduct amounted to bad faith and thus falls outside § 102(b)(7)'s exculpatory provision. Because a dispute of fact remains as to whether the Director Defendants acted in bad faith, the Director Defendants are not entitled to summary judgment on this basis.

Defendants further assert that 8 Del. C. § 141(e) provides an additional, independent basis to reject Plaintiffs' duty of care claim against the Director Defendants as to the PDC stock valuations. That provides:

> A member of the board of directors, or member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

§ 141(e). Defendants contend that the Director Defendants are protected by § 141(e) because they "reasonably and justifiably relied on various external advisors as part of the Board's robust governance process." Defs.' Br. at 36, Dkt. No. 135. Plaintiffs contend that the Director Defendants knew that the projections provided to the external advisors were unreliable and unrealistic and acted in bad faith in relying on any external advisors' projections or valuations. Again, because a dispute of fact exists as to whether the Director Defendants acted in bad faith, summary judgment cannot be granted on this basis.

As to the Officer Defendants, Defendants argue that the Officer Defendants did not breach their fiduciary duties with respect to the intercompany lending arrangement because the arrangement was required to satisfy contractual and legal obligations, including PDC's ERISA-mandated repurchasing obligations. Defendants explain that, to satisfy the ERISA-mandated repurchase obligations, PDC and Appvion entered into an intercompany arrangement that allowed for the transfer of funds needed for the ESOP (through PDC) to buy back an ESOP participant's shares after a requested distribution, as required by ERISA and Appvion's Credit Agreement. They contend that, had the officers not effectuated the intercompany transfers, the ESOP could not have made participant distributions, which would have "jeopardized the ESOP's tax-qualified

14

status and triggered a default under the company's credit agreement." Defs.' Reply Br. at 12, Dkt. No. 157. Plaintiffs assert that a genuine dispute of material fact exists as to whether Defendants acted in Appvion's best interests in approving the intercompany lending arrangement, what the terms of the intercompany lending arrangement were, and whether Appvion had a legal obligation to make the payments. As a result of these factual disputes, Defendants' motion for summary judgment as to Plaintiffs' breach of fiduciary duties of care and loyalty claims against the Director and Officer Defendants must be denied.

### 2. Aiding and Abetting Claim

Plaintiffs assert that Richards, Ferree, Van Straten, and Arent, as ESOP Committee members, aided and abetted the breaches of the duty of care and loyalty committed by other defendants. A claim for aiding and abetting requires that a plaintiff show "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002).

In this case, Plaintiffs assert that Richards, Ferree, Van Straten, and Arent had fiduciary duties as officers. "[I]f a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 204 (Del. Ch. 2014) (*Quadrant I*). Because Plaintiffs have asserted breach of fiduciary duty claims against Richards, Ferree, Van Straten, and Arent as officers, these defendants cannot also be liable for aiding and abetting under Delaware law. Therefore, Defendants' motion for summary judgment as to Plaintiffs' aiding and abetting claim is granted.

### 3. Illegal Dividend Claims (Counts VII and VIII)

Counts VII and VIII allege that the director defendants—Richards, Carter, Murphy, Reardon, Seifert, and Suwyn—violated the DGCL by issuing illegal dividends. *See* 8 Del. C. §§ 170, 173, and 174.

For context, the DGCL permits corporate directors to "declare and pay dividends upon the shares of its capital stock" either (1) out of its surplus or (2) out of its net profits in that year. 8 Del. C. § 170(a). Dividends "may be paid in cash, in property, or in shares of the corporation's capital stock." *Id*. § 173. No corporation, however, "shall pay dividends except in accordance with this chapter." *Id*.

Along those lines, the Delaware legislature built in a liability provision for directors. In cases of "willful or negligent" violations of the dividend provisions, directors "shall be jointly and severally liable, within 6 years after paying such unlawful dividend . . . , to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid." *Id*. § 174. That said, in determining the value of the corporation and its assets/liabilities, directors are protected by "relying in good faith" upon the corporation's records and upon information provided to them by officers or third parties (such as outside advisors). *Id*. § 172.

Plaintiffs seek to hold the director defendants liable under these provisions. Count VII is based on Appvion's November 2013 forgiveness of the Intercompany Note executed by PDC. Plaintiffs assert that, on November 18, 2013, Appvion executed an "Intercompany Promissory Note Distribution and Payoff Letter," pursuant to which Appvion made a "non-cash distribution" to PDC. The non-cash distribution represented the principal and interest that PDC owed to Appvion pursuant to a June 11, 2004 Intercompany Note executed by PDC in Appvion's favor.

16

Plaintiffs contend that the forgiveness of the Intercompany Note was, "in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent." Revised 2d Am. Compl. ¶ 423, Dkt. No. 2.

Count VIII is based on intercompany loans made from Appvion to PDC beginning in 2014. Plaintiffs likewise assert that these loans were, "in substance, an unlawful dividend made while Appvion was insolvent." *Id.* ¶ 432.

Plaintiffs move for summary judgment on Count VII, arguing that the November 2013 loan forgiveness was an unlawful dividend because Appvion had neither a sufficient surplus nor net profit to make such a distribution. Defendants, on the other hand, move for summary judgment on Counts VII and VIII, arguing (among other things) that an illegal dividend claim requires the formal declaration of a dividend. Because it is undisputed that Appvion did not formally declare any dividends from 2013 to 2017, Defendants assert that Plaintiffs' illegal dividend claims must be dismissed.

Like the other claims, the illegal dividend claim turns on Delaware law. This court must therefore rely on the Delaware Supreme Court or lower courts. *King*, 113 F.3d at 95. The former has not addressed whether directors are liable under the DGCL for undeclared dividends, but the Court of Chancery has. In *Quadrant I*, it held that "Delaware law does not recognize a claim for constructive dividends." 102 A.3d at 201. The claim in that case was that Company A issued unlawful dividends when it paid excessive service and license fees to an affiliate organization (Company B) of Company A's sole equity holder (Company C). *Id.* at 166. The court dismissed the claim. *Id*.

It began by noting that Delaware law takes a "formal and technical approach" to "claimed violations of the DGCL":

As a general matter, those who must shape their conduct to conform to the dictates of statutory law should be able to satisfy such requirements by satisfying the literal demands of the law rather than being required to guess about the nature and extent of some broader or different restriction at the risk of an ex post facto determination of error. The utility of a literal approach to statutory construction is particularly apparent in the interpretation of the requirements of our corporation law—where both the statute itself and most transactions governed by it are carefully planned and result from a thoughtful and highly rational process.

Thus, Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity causes our law, in that setting, to reflect an enhanced respect for the literal statutory language.

*Id.* at 201 (quoting another source). The court explained that "[t]he declaration of a dividend is a specific corporate act governed by specific sections of the DGCL" and "no section of the DGCL extends the restrictions governing the payment of dividends to other transactions." *Id.* at 202. It concluded that, while the plaintiff's claims of improper transfer payments and self-dealing could be challenged as breaches of fiduciary duty, those allegations do not state a claim for a statutory violation of the provisions governing dividends. *Id.*

The *Quadrant I* court was the first Delaware court to address whether a party can bring an illegal dividend claim where the defendant did not formally declare a dividend and concluded it could not. Subsequent cases remain in accord. *See JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1247 (Del. Ch. 2019) ("There is no claim for a constructive dividend in Delaware.").

Plaintiffs offer two responses. First, they take umbrage with *Quadrant I*'s allegedly "flawed" reasoning. They cite to several federal court decisions holding that the substance, not the form, of the transaction is what matters for an illegal dividend claim. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409 (5th Cir. 2014); *In re Musicland Holding Corp.*, 398 B.R. 761 (Bankr. S.D.N.Y. 2008); *In re Buckhead Am. Corp.*, 178 B.R. 956 (D. Del. 1994); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992 (S.D.N.Y. 1991). Whatever their reasoning

18

may be, it makes little difference—these are not decisions of a Delaware state court (nor do they rely on any). This court's duty is to predict how the Delaware Supreme Court would resolve the question. As this court has already noted, the Delaware Court of Chancery is an especially significant predictor not only because it is a lower state court but also because it is the "nation's leading authority on corporate law issues." *Simmonds*, 638 F.3d at 1089. This aside, the cases Plaintiffs cite came out either before or days after *Quadrant I*.

Aside from attacking *Quadrant I*'s reasoning, Plaintiffs argue that the case does not apply here. In their eyes, the court's decision relied largely upon the types of transactions at issue— there, service and license fees. They argue that the transactions here—intercompany loan forgiveness and subsequent loans—are starkly different, meaning *Quadrant I* should not apply. The court sees it differently. *Quadrant I* never said that its decision rested on a specific type of payment. To the contrary, it used broad language. *See, e.g.*, *Quadrant I*, 102 A.2d at 202 ("Delaware law evaluates claims about improper transfer payments and self-dealing under the rubric of fiduciary duty."). And it made a point to emphasize Delaware's "formal and technical approach" to DGCL violations. *Id.* at 201. It would make little sense, then, for the court to premise its decision on a specific type of payment. Accordingly, this court will apply *Quadrant I*'s holding that Delaware does not recognize claims for constructive dividends.

In this case, there is no dispute that the Appvion Board did not declare dividends from 2013 through 2017, and Plaintiffs cannot assert illegal dividend claims based on constructive dividends. Therefore, Plaintiffs' illegal dividend claims (Counts VII and VIII) must be dismissed.

## B. Motion to Exclude Plaintiffs' Experts

Defendants filed a motion to exclude the opinions of three of Plaintiffs' expert witnesses: Marc J. Brown, CFA, Hon. Christopher S. Sontchi (ret.), and James S. Feltman, CPA. Motions to

exclude may be brought at any time after the filing of an expert report. "The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Federal trial courts "are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008). The Seventh Circuit has made clear that even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are . . . relevant under the test set forth by the Supreme Court in *Daubert*." *Lewis*, 561 F.3d at 705.

### 1. Marc J. Brown, CFA

Defendants seek to exclude Marc Brown's opinions that "Appvion was balance sheet insolvent on each of the valuation dates; Appvion had negative surplus on each of the valuation dates; and Appvion's net profits were negative on most of the net profits measurement dates, including after controlling for the gain on the sale of the Encapsys assets, whose proceeds were earmarked principally for debt repayment." Dkt. No. 185-25 at 21. As an initial matter,

Defendants assert that Brown used the wrong "balance sheet test" in reaching his decisions because Brown concluded that Appvion had liabilities in excess of assets held without considering whether Appvion had a reasonable prospect of continuing its business. But as the court explained earlier, the traditional balance sheet test only requires that a plaintiff show that the business had liabilities in excess of a reasonable market value of assets held. *Quadrant II*, 115 A.3d at 539. In short, Brown's opinions will not be excluded on this basis.

Defendants also argue that Brown's valuation opinions suffer from a "number of critical flaws." Defs.' Br. at 10, Dkt. No. 162. More specifically, Defendants assert that Brown improperly used "EBITDA Adjustment Factors" to adjust Appvion's reported forecast projections downward by 10 to 30% to account for "overoptimism." They contend that Brown's "EBITDA Adjustment Factors" failed to account for unanticipated events or the volatility in the paper market that may have led Appvion to miss its projections. Defendants also argue that Brown treated guideline companies inconsistently and failed to account for Appvion's continued operation for more than four years after he claimed it was insolvent. Defendants' disagreements with Brown's opinions and the purported inconsistencies contained in his report are fodder for cross-examination and do not warrant pretrial preclusion of the opinions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). For these reasons, the court denies Defendants' motion to exclude Brown's opinions.

### 2. Hon. Christopher S. Sontchi (ret.)

Plaintiffs retained Judge Sontchi as an expert to provide opinions regarding whether Defendants breached their fiduciary duties of care and loyalty and whether Appvion issued unlawful dividends to PDC under Delaware law. Judge Sontchi opined:

(1) Defendants breached their fiduciary duties of care and loyalty owed to Appvion by failing to detect and failing to take any action to stop the overvaluation of PDC's common stock, and for failing to detect and to remedy the systematic and repeated inability of management to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock and to further their self-interest;

(2) Appvion's Officers breached their fiduciary duties of care and loyalty owed to Appvion by participating in and/or permitting the transfer money from Appvion to PDC and to extend credit from Appvion to PDC in the form of the "Interest-Bearing Intercompany Loans" with the knowledge that PDC (a) would never be able to repay the Intercompany Loans; and (b) never intended on repaying Appvion for intercompany indebtedness; and

(3) Appvion issued unlawful dividends under Delaware law to PDC (i) through the execution of the "Intercompany Promissory Note Distribution and Payoff Letter" on November 18, 2013, pursuant to which Appvion made a non-cash distribution of Appvion's property to PDC in the aggregate amount of the Intercompany Note; and (ii) through transfers from Appvion to PDC from 2014 through 2017 in connection with the Interest-Bearing Intercompany Loans from Appvion to PDC when PDC (a) would never be able to repay the Intercompany Loans; and (b) never intended on repaying Appvion for intercompany indebtedness.

Dkt. No. 179-5 at 18, 24, 26. Defendants assert that Judge Sontchi's opinions should be excluded because they are impermissible legal conclusions.

Though an expert may provide an opinion as to the ultimate factual issues in the case, he may not testify "as to legal conclusions that will determine the outcome of the case." *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Judge Sontchi's opinions are impermissible legal conclusions. Although Plaintiffs assert that they have retained Judge Sontchi to provide testimony regarding the complex areas of the law to the extent it may be of assistance to the court, but testimony is only relevant "if it helps the *trier of fact* in understanding the evidence or in determining a fact at issue." *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002) (emphasis added). Judge Sontchi's opinions encroach upon the court's authority to instruct the jury on the law to be applied to the facts of the case. *See also United States v. Sinclair*,

74 F.3d 753, 757–58 n.1 (7th Cir. 1996) ("Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case. That is, they cannot testify about legal issues on which the judge will instruct the jury."); 2 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 704.1 (5th ed. 2001) (noting that experts are not permitted "to render an opinion as to questions which are matters of law for the court"). Accordingly, Defendants' motion to exclude the opinions of Judge Sontchi is granted.

### 3. James S. Feltman, CPA

Plaintiffs retained James S. Feltman to rebut the opinion of Defendants' expert, Allen Ferrell, Ph.D., that Appvion, its subsidiaries and affiliates, and PDC were not insolvent prior to October 1, 2017, the date Appvion filed for Chapter 11 bankruptcy. Feltman concluded that Appvion was insolvent four years prior to its Chapter 11 filing.

Defendants assert that Feltman's opinions should be excluded because he did not investigate the evidence and instead relied on three academic articles provided by Plaintiffs' counsel to reach his opinion. Courts require experts to offer their own opinions, rather than "merely parrot[] information provided to him by a party." *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-341, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (citation omitted). But experts may base an opinion on information provided to them so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

Here, Feltman did not parrot information provided by Plaintiffs. To support his opinions, Feltman reviewed the expert reports of Ferrell, Sontchi, and Brown, as well as Defendants' answers to the second amended complaint and PDC's 10-K Forms. He also referenced three articles: (1) Vikramn Desai et al., *Are going-concern issues disclosed in audit reports associated*

*with subsequent bankruptcy?, Evidence from the United States*; (2) Marshall A. Geiger et al., *Research Notes Bankruptcies, Audit Reports, and the Reform Act*; and (3) Dr. Adrienna Huffman et al., *Going-Concern Qualifications: A Reliable Predictor of Insolvency.* Dkt. No. 184-4 at 4.

Defendants do not dispute that an expert in the particular field of accounting would not reasonably rely upon these types of articles in forming an opinion. Instead, they assert that Feltman should have undertaken an independent effort to verify and evaluate the articles' reliability. The thoroughness of Feltman's review of the materials go to weight, rather than admissibility. Defendants are free to challenge whether Feltman's reliance on the articles was reasonable on cross-examination. *See Douglas Dynamics, LLC v. Buyers Prod. Co.*, No. 09-CV-261, 2010 WL 4118098, at *2 (W.D. Wis. Oct. 8, 2010) ("Moreover, plaintiff's concerns about [the defense expert's] thoroughness in reviewing relevant materials do not make [the expert's] opinion unreliable. Instead, they are issues that may be raised to the jury to challenge the weight [the expert's] opinions should carry.").

Defendants also assert that Feltman's opinions are not based on "sufficient facts or data." But Feltman reviewed the expert reports of Ferrell, Sontchi, and Brown, as well as Defendants' answers to the second amended complaint and PDC's 10-K Forms in reaching his opinions. Again, any disagreement Defendants may have with Feltman's opinions or the underlying data he relied on may be addressed on cross-examination. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citation omitted)). Feltman offers proper

24

rebuttal testimony challenging the methodology and conclusions underlying Ferrell's opinions and will not be excluded.

**CONCLUSION**

For these reasons, Defendants' motion for summary judgment (Dkt. No. 134) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted with respect to Plaintiffs' aiding and abetting claim (Count IV) and illegal dividend claims (Counts VII and VIII), and those claims are dismissed. The motion is denied in all other respects. Plaintiffs' motion for summary judgment (Dkt. No. 130) is **DENIED**. Plaintiffs' motion for leave to file a sur-reply (Dkt. No. 173) is **GRANTED**. The Clerk is directed to detach and e-file Plaintiffs' sur-reply (Dkt. No. 173-1) and Defendants' response to Plaintiffs' sur-reply (Dkt. No. 174-1).

Defendants' motion to exclude the opinions of Plaintiffs' expert witnesses (Dkt. No. 161) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted as to the opinions of Judge Sontchi, and his opinions will be excluded. The motion is denied in all other respects. Finally, Defendants' motion to strike the Declaration of Marc J. Brown (Dkt. No. 197) is **GRANTED** as the court did not consider that Declaration in its decision. The Clerk is directed to set the matter on the court's calendar for further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of September, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

Case 1:19-cv-01561-WCG    Filed 09/30/24    Page 25 of 25    Document 201