UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ALAN D. HALPERIN and EUGENE I. DAVIS,
as Co-Trustees of the Appvion Liquidating Trust,

   Plaintiffs,

    v.         Case No. 19-C-1561

MARK R. RICHARDS, et al.,

   Defendants.

---

## DECISION AND ORDER ON PLAINTIFFS' *DAUBERT* MOTIONS

---

Plaintiffs Alan D. Halperin and Eugene I. Davis, as co-trustees of the Appvion Liquidating Trust, brought this action alleging Defendants Mark Richards, Thomas Ferree, Tami Van Straten, Jeffrey Fletcher, Kerry Arent, Stephen Carter, Terry Murphy, Andrew Reardon, Kathi Seifert, Mark Suwyn, and David Roberts breached their fiduciary duties as directors and officers of Appvion Inc. Plaintiffs seek various forms of relief, including compensatory and punitive damages. Plaintiffs filed motions to exclude the opinions of three of Defendants' expert witnesses: Gregory Brown, Dr. Allen Ferrell, and Christopher O. Luettgen. This order resolves those motions.

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. That standard applies "to all experts, not just to 'scientific' ones." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013). *Daubert* requires a district court to "act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Kirk v. Exxon Mobile Corp.*, 870 F.3d 669, 673 (7th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). In performing its gatekeeping role, "the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (citation omitted). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis*, 561 F.3d at 705.

## A. Gregory Brown

Defendants offer Greg Brown, an employee benefits, Employee Retirement Income Security Act (ERISA), and executive compensation attorney, as an expert to assist the jury in understanding the unique structure and operational considerations of employee stock ownership plans (ESOPs). As an initial matter, Plaintiffs argue that Greg Brown is unqualified to offer opinions in this case due to his inadequate knowledge, skill, or experience. Plaintiffs argue that Greg Brown lacks knowledge when it comes to the law supporting Plaintiffs' claims, but they

concede that he "may be knowledgeable about those aspects of the ERISA statutes and regulations that support Defendants' positions." Dkt. No. 208 at 21. Greg Brown has been an attorney for over 46 years and has "dedicated the majority of [his] law practice to working on ESOP transactions [and] day-to-day governance and retirement plan administration issues." Dkt. No. 181-186 at 2. He has also been involved in "several hundred ESOP transactions" and has testified as an expert witness in federal and state courts in matters involving ERISA, ESOP transactions, executive employment agreements, executive deferred compensation plans, and tax-qualified retirement plans. Dkt. No. 211 at 14. Greg Brown's experience renders him qualified to provide expert opinions regarding the structure and operational considerations of ESOPs. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" (quoting Fed. R. Evid. 702)).

Plaintiffs also argue that Greg Brown's opinions are not based on sufficient facts or data because Greg Brown misstated Plaintiffs' allegations against Defendants. They contend that Greg Brown's error calls his diligence and understanding of the case into question. But Plaintiffs' challenges are fodder for cross-examination; they do not demonstrate that Greg Brown's opinions fail the requirements of Federal Rule of Evidence 702. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (noting that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact").

Next, Plaintiffs contend that Greg Brown's anticipated testimony concerning "ERISA repurchase liability" consists of inadmissible legal conclusions. Defendants respond that Greg

Brown's opinions are not outcome-determinative legal conclusions and reflect industry practice and standards of corporate governance.

Plaintiffs are correct that an attorney may not provide opinions on what the law is or how it applies. An expert witness may not testify to legal conclusions or to the applicability or interpretation of a particular statute or regulation, even if, as is true with respect to Greg Brown, that expert is well-versed in the law. "[T]he meaning of statutes, regulations, and contract terms is a subject for the court, not for testimonial experts. The only legal expert in a federal courtroom is the judge." *United States v. Lupton*, 620 F.3d 790, 799–800 (7th Cir. 2010) (citing *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008); *United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory.")); *see also United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009) ("District judges, rather than witnesses, must explain to juries the meaning of statutes and regulations." (citation omitted)).

But Greg Brown's report contains more than legal opinions. While Greg Brown construes various provisions of ERISA, the Tax Code, and related regulations in describing the ESOP structure, his report also describes generally the structure and operations of an ESOP. For instance, Greg Brown states, "With the ESOP's adoption, the Code and ERISA imposed obligations on PDC, as issuer of the stock held by the Appvion ESOP Trust, to distribute and then repurchase that stock from employees upon their resignation, dismissal, disability, death or retirement." Dkt. No. 181-186 at 9. He explains:

> Code Section 409(h)(1) requires an ESOP to provide an employee who is entitled to a distribution the option to demand that the benefits be distributed in employer stock shares, rather than cash. U.S. Department of Labor ("DOL") regulations issued under ERISA Section 408(b)(3) impose the requirement – generally called a put option – while ERISA Section 404(a)(1)(D) requires that a fiduciary administer a plan in accordance with the plan document (which will contain put option provisions

4

in order to qualify as an ESOP under Code section 4975(e)(7) and ERISA Section 407(d)(6).

When a distribution is made in stock shares, and the employer's stock is not readily transferable on an established market, Code Section 409(h)(1) requires that the employer (or an affiliate) repurchase the distributed shares at fair market value. Essentially, the law creates an internal market for the terminated employee to receive employer stock shares, even though no nationally recognized market exists to trade those shares.

For Appvion, PDC stock shares were not readily tradeable on an established securities market. As a result, PDC had to give Appvion employees a put option that allowed them to require PDC or its affiliate, subsidiary or parent (not the ESOP) to repurchase distributed employer securities under a fair market valuation formula. Under Code Section 409(h)(1)(B), this put option must permit the employee to require the employer to repurchase employer stock shares under a fair market valuation formula determined by an independent valuation firm. Generally, the fair market value is calculated as of the ESOP's preceding valuation date.

To this end, Appvion and PDC established a process whereby the operating company (Appvion) transferred funds, when needed, up to its holding company parent (PDC) to enable the parent to redeem vested shares of its common stock from terminated ESOP employees. This process was typical of ESOP industry practices to recover ESOP Code- and ERISA-required repurchase obligations. It was accomplished through equity transfers from Appvion to PDC to cover the ESOP's repurchase liability obligations.

When an employee takes a stock distribution held in an ESOP account in one taxable year and exercises his or her put option, the employer (or affiliate, subsidiary or parent) must pay the option price in either a single sum or in substantially equal annual installments over a period which begins no later than 30 days after the employee exercises the option and extends no longer than five years. The employer must also provide adequate security for the unpaid amounts and must pay a reasonable interest rate. If an employee exercises a put option under an installment distribution, the employer must pay the option price within 30 days of the exercise. With installment distributions, the option price will vary in accordance with the ESOP trustee's most recent fair market value determined in conjunction with its valuation consultant for the valuation date preceding each installment payment.

*Id.* at 7–9.

This information will assist the jury in understanding what ESOPs are and how they work. To the extent Appvion's and the Appvion ESOP's processes dealing with these matters were typical of ESOP industry practices, it would appear relevant to the claims Plaintiffs have asserted.

5

The fact that Brown is a lawyer does not disqualify him from testifying. To the extent his opinions are legal arguments, they are not admissible and instead amount to arguments that counsel should present to the court, not through expert opinion testimony to the jury. *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012). The provisions of ERISA, the Tax Code, and related regulations Greg Brown refers to are tangential to the crucial questions the factfinder will be required to answer, namely, whether Defendants breached their fiduciary duties. In general, Greg Brown may testify about the structure and typical industry practices of ESOP-owned companies, but his application of those considerations to Appvion may not be offered because his methodology is too entwined with inadmissible legal argument and conclusions.

Greg Brown also offered rebuttal responses and critiques to the opinions of Plaintiffs' expert, Marc Brown. Plaintiffs assert that Greg Brown is not qualified to critique Marc Brown's conclusions regarding Appvion's balance sheet insolvency. They argue that while Marc Brown has over 25 years of experience in valuing companies, Greg Brown has no valuation expertise. Greg Brown is not offering any valuation opinions. Instead, Greg Brown highlights certain considerations unique to ESOPs that he believes Marc Brown ignored. Greg Brown's critiques of Marc Brown's opinions stem from his experience with ESOPs. The court finds that Greg Brown is a qualified witness to serve as a rebuttal expert to Marc Brown. *See United States v. Madoch*, 935 F. Supp. 965, 972 (N.D. Ill. 1996) ("[O]ne expert need not hold the exact same set of qualifications to rebut another expert's testimony; instead, the expert must only be qualified to testify as an expert on the issues to which he or she testifies at trial.").

Plaintiffs contend that Greg Brown's opinions regarding the Appvion Credit Agreement are inadmissible legal conclusions. Greg Brown asserts in his rebuttal report that Marc Brown "ignores ESOP-specific provisions in the Appvion Credit Agreement." Dkt. No. 181-188 at 10. He recites certain provisions of the Credit Agreement and states what he believes Appvion's

6

obligations were under those provisions. Greg Brown's interpretation of the Credit Agreement is impermissible legal argument. "An expert witness may not testify simply regarding his reading of a contract." *Fox v. Admiral Ins. Co.*, No. 12-CV-8740, 2016 WL 6476461, at *2 (N.D. Ill. Nov. 2, 2016) (citation omitted); *see also RLJCS Enters., Inc. v. Professional Ben. Trust Multiple Employer Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("Arguments about the meaning of . . . contracts . . . belong in briefs, not in 'experts' reports.'"). In short, Greg Brown may not offer testimony regarding these legal conclusions.

**B. Dr. Allen Ferrell**

Dr. Allen Ferrell is an economist and the Greenfield Professor of Securities Law at Harvard Law School. Defendants asked Dr. Ferrell to assess whether the economic evidence supports Plaintiffs' allegations that Defendants had an incentive to inflate the fair market value of PDC's common stock, that Defendants provided inflated projections to Stout, that Appvion and PDC were insolvent prior to the petition date, and that Appvion lacked adequate surplus to pay a corporate dividend to PDC in connection with the forgiveness of the Intercompany Note in 2013 and subsequent intercompany loans. Dr. Ferrell reached the following opinions:

1. Plaintiffs' claim that Defendants had an incentive to inflate the fair market value of PDC's common stock is inconsistent with Defendants' compensation structure and their actions.

2. Plaintiffs' claim that the projections provided to Stout were inflated is inconsistent with the economic evidence.

3. Plaintiffs' claim that the Debtors were insolvent prior to the petition date is unsupported.

4. Plaintiffs' claim that Appvion lacked adequate surplus to pay a dividend to PDC is flawed.

Dkt. No. 181-183 at 5.

Plaintiffs assert that Dr. Ferrell's opinions about Defendants' economic incentives with respect to PDC's stock valuations are speculative and unreliable. Dr. Ferrell concluded that Defendants' actions are inconsistent with an alleged intent to maximize their compensation by inflating the fair market value of PDC's common stock. He explained, "If Defendants were trying to manipulate their compensation as Plaintiffs claim, they would *not* have (i) stayed with the Company as long as they did (termination would have allowed them to cash out their proceeds earlier); (ii) lost money and become creditors in the bankruptcy; and (iii) turned down a portion of incentive compensation that they already earned." *Id.* at 19–20. Plaintiffs argue that Dr. Ferrell's opinion rests on improper speculation about Defendants' motives regarding their incentive compensation.

Plaintiffs are correct that an expert cannot offer a speculative opinion about a party's mental state and underlying motivations. *See DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (finding that engineering expert could testify that reducing the amount of padding could save money or that the company's explanation for using that padding was not sound, but he could not testify that the company's motive was to save money). Accordingly, Dr. Ferrell may not speculate about Defendants' subjective motives or state of mind. But he may testify based on his experience as an economist and his analysis of Appvion's compensation structure, as to the incentives that existed and might have been at play. This is permissible expert opinion and will not be excluded. Plaintiffs are able to challenge Dr. Ferrell's theories on economic incentives through cross-examination.

Plaintiffs also assert that the court should exclude Dr. Ferrell's opinion that Plaintiffs' claim that the projections provided to Stout were inflated is inconsistent with the economic evidence. They contend that the opinion is unreliable because there are several "analytical gaps" between Dr. Ferrell's review of the evidence and his conclusion. First, Plaintiffs assert that Dr.

8

Ferrell only looked at the performance of Appvion and its competitors relative to their financial projections in the short-term and did not account for the fact that Stout's fair market value determination was based on Defendants' year two through five projections. Second, Plaintiffs take issue with Dr. Ferrell's assertion that Defendants did not give inflated projections to Stout because auditors did not provide a qualified audit opinion or otherwise note any issues with inflated projections during their review of PDC's Form 10-Ks. Plaintiffs contend that Auditing Standard 2415 does not require that auditors look for signs showing the fair market value of a stock was inflated by false projections and that Dr. Ferrell's lack of understanding of the auditing standards makes his opinions unreliable. Third, Plaintiffs argue that Dr. Ferrell improperly relied on a third-party valuation as evidence that the projections provided to Stout were not inflated. The "*Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy," *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012), including the "soundness of the factual underpinnings" of the expert opinion, *Smith*, 215 F.3d at 718. If Plaintiffs take issue with the reasonableness of Dr. Ferrell's consideration of the evidence, they may identify those issues on cross-examination or through their own expert's testimony. *See Daubert*, 509 U.S. at 596.

Plaintiffs further argue that Dr. Ferrell's opinions regarding Appvion's balance sheet insolvency are irrelevant and unreliable. They contend that, even though the issue in this case is whether Appvion was balance sheet insolvent, Dr. Ferrell does not use the phrase "balance sheet insolvency" anywhere in his report. Instead, Dr. Ferrell's opinions on solvency rely on what Plaintiffs assert are differing definitions of "insolvent" and "insolvency." Plaintiffs contend that the economic evidence Dr. Ferrell relies on to reach his conclusions do not actually belie Plaintiffs' claim that Appvion was insolvent. Plaintiffs' challenge to Dr. Ferrell's opinion is merely a disagreement of how the evidence is to be viewed and the weight to be given to Dr. Ferrell's

9

assessment of the evidence. To the extent Plaintiffs take issue with any of the conclusions Dr. Ferrell reaches in his reports or in his eventual testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such opinions. *Id.* Plaintiffs' arguments do not provide a basis for the exclusion of Dr. Ferrell's opinions.

Finally, Plaintiffs contend that Dr. Ferrell's rebuttal report should be excluded to the extent it incorporates the same opinions contained in his affirmative report. Because none of the opinions contained in Dr. Ferrell's affirmative report are improper, the opinions in the rebuttal report are likewise admissible and will not be excluded.

## C. Christopher O. Luettgen

Defendants retained Christopher Luettgen to (1) provide an overview of the paper market during the relevant period from 2010 to 2017, (2) discuss the state of the carbonless and thermal paper markets in which Appvion operated, and (3) opine on how the conditions in these markets may have impacted Appvion during the relevant period. Luettgen offers the following opinions: (1) Appvion faced challenging conditions in the paper market and such conditions negatively impacted the industry; (2) Appvion faced declining demand for its carbonless paper products and pivoted toward other specialty papers to account for this challenge; (3) Appvion faced a volatile market for its thermal paper products, but despite this volatility, net sales for Appvion's thermal segment increased during the relevant period; (4) net sales for Appvion's thermal segment grew during the relevant period, but the growth was not enough to offset the decline in net sales for Appvion's carbonless segment; and (5) overall, the relevant period was a difficult time in the markets in which Appvion operated and the actions undertaken by Appvion were consistent with seeking to remain competitive in a challenging marketplace. Dkt. No. 181-184 at 7–9.

Plaintiffs assert that Luettgen is not qualified to render his opinions regarding Appvion's business decisions. Although Luettgen is an engineer and chemist, Plaintiffs argue that he lacks the expertise in making business decisions necessary to offer opinions on Appvion's conduct in the paper industry. To determine whether an expert is qualified to testify on a particular matter, a court should "consider a proposed expert's full range of practical experience as well as academic or technical training." *Smith*, 215 F.3d at 718.

Luettgen has extensive training—he received a bachelor of science in paper engineering, a master of science in pulp and paper, and a doctor of science in pulp and paper. In addition, Luettgen has more than 40 years of experience in the pulp and paper industry. He is an Associate Director at the Renewable Bioproducts Institute at the Georgia Institute of Technology and also serves as a Professor of the Practice in the School of Chemical and Biomolecular Engineering in the College of Engineering at the Georgia Institute of Technology. In these roles, Luettgen is responsible for industry connections between the pulp, paper, packaging, and tissue member companies and the academic research of the Institute as well as teaching a pulp and paper program and related courses to undergraduate and graduate students. In April 2023, Luettgen accepted the position of Executive Director for the Alliance for Pulp & Paper Technology Innovation, where he works with the industry and its member companies to solicit, support, and encourage funding for breakthrough technologies to enhance the manufacturing footprint in the United States. Prior to joining the Georgia Institute of Technology, Luettgen worked at Scott Paper Company and Kimberly-Clark Corporation for over 20 years. He held several leadership roles with these companies, including Senior Research and Engineering Manager for North America Innovation and Manufacturing Support for the commercial business sector. Dkt. No. 181-184 at 4.

Plaintiffs claim that Luettgen is unqualified to offer his opinions because he lacks experience as a manager of a paper company in a challenging market. But "[a]n expert's

11

specialization or lack thereof, typically goes to the weight of the testimony, not its admissibility." *Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023) (internal quotation marks and citation omitted). Plaintiffs' challenges to Luettgen's qualifications can be explored on cross-examination. Considering Luettgen's full range of practical experience as well as his academic training, the court finds that Luettgen is qualified as an expert on the topics about which he is expected to testify.

Next, Plaintiffs argue that Luettgen's testimony is irrelevant to the ultimate issue of whether Defendants breached their fiduciary duties and is therefore not helpful to the trier of fact. But expert testimony need not concern an ultimate issue in the case to be relevant. "When analyzing the relevance of proposed expert testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of *any* of the issues involved in the case. The expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy this requirement." *Smith*, 215 F.3d at 718 (citation omitted). Defendants contend that Luettgen will help the jury understand the changing conditions of the paper industry during the relevant period and analyze the reasonableness of Appvion's conduct. The court concludes that Luettgen's testimony would be both relevant and helpful to the trier of fact, even if he does not offer any opinions on the ultimate issues in this case.

Finally, Plaintiffs assert that Luettgen's opinions regarding Appvion's business decisions are not reliable. They contend that Luettgen's opinions "reflect his mere subjective review of the record, based on overgeneralized assertions of his 'experience,'" and that there is no objective way to test his conclusions. Dkt. No. 217 at 19–20. "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante*, 619 F.3d at 761; *see also* Fed. R. Evid. 702 (noting that a witness can be "qualified as an expert by knowledge, skill, *experience*, training, or education"). Luettgen's knowledge and experience give him the

12

foundation necessary to opine on the market conditions of the paper industry and Appvion's conduct during the relevant period. Any weaknesses in his testimony may be addressed through cross-examination. *See Smith*, 215 F.3d at 719 ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citation omitted)). In sum, Luettgen's opinions are admissible under *Daubert* and the Federal Rules of Evidence.

**IT IS THEREFORE ORDERED** that Plaintiffs' motion to exclude the opinions of Gregory Brown (Dkt. No. 208) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to exclude the opinions of Dr. Allen Ferrell (Dkt. No. 215) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to exclude the opinions of Christopher O. Luettgen (Dkt. No. 217) is **DENIED**.

Dated at Green Bay, Wisconsin this 17th day of April, 2025.

William C. Griesbach
United States District Judge